**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | 07 Civ. _____ |
| **ENRON CREDITORS RECOVERY CORP.**, *et al.*, | Chapter 11 |
| Reorganized Debtors. | Case No. 01-16034 (AJG) |
| | Jointly Administered |
| **ENRON CORP.**, *et al.*, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 03-09266 |
| **CITIGROUP, INC.**, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE**
<u>**CITIGROUP DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**</u>

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF THE CASE .........................................................................................4

I.    The "Mega Complaint" ..........................................................................................4

II.   The Citigroup Defendants' Proofs of Claim ..................................................12

III.  The Bankruptcy Court's Core Order and the Pending Appeal .................13

ARGUMENT ........................................................................................................................15

I.    The Reference Should Be Withdrawn Based On The Citigroup Defendants'
Jury Trial Rights .............................................................................................................17

    A.    The Citigroup Defendants Have Jury Trial Rights ...................................19

        1.    The Common Law Causes of Action Must Be Tried To a Jury.......20

        2.    The Preference and Fraudulent Conveyance Claims Against
CXC, CAFCO and CRC Must Be Tried To A Jury.........................20

        3.    The Proofs Of Claim Filed By Certain Citigroup Defendants
Have No Impact On Their Jury Trial Rights  On The
Common Law Claims ................................................................................23

    B.    Citigroup's Jury Trial Rights On Certain Claims Is Ample  "Cause"
To Withdraw The Reference For The Entire Case.....................................25

II.   The Reference Should Be Withdrawn Because The Common Law  Claims
Are Non-Core......................................................................................................................26

    A.    The Core/Non-Core Distinction.......................................................................27

    B.    Efficiency and Uniformity Support Withdrawal of the Reference Here......31

III.  The Reference Should Be Withdrawn Because Trial In This Action Will Be
Lengthy and Exceedingly Complex ........................................................................32

CONCLUSION.........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*ABF Capital Mgmt.* v. *Kidder Peabody & Co.*
(*In re Granite Partners, L.P.*), 210 B.R. 508 (Bankr. S.D.N.Y. 1997)................................... 10

*Beacon Theatres, Inc.* v. *Westover,*
359 U.S. 500 (1959) ................................................................................................ 21, 26

*Ben Cooper, Inc.* v. *Ins. Co. of Penn.*
(*In re Ben Cooper, Inc.*), 896 F.2d 1394 (2d Cir. 1990), *vacated,* 498 U.S. 964
(1990), *reinstated,* 924 F.2d 36 (2d Cir. 1991) ......................................................... 29

*Braniff Int'l. Airlines, Inc.* v. *Aeron Aviation Resources Holdings II, Inc.*
(*In re Braniff Int'l. Airlines, Inc.*), 159 B.R. 117 (E.D.N.Y. 1993) ......................................... 33

*CBI Holding Co.* v. *Bank. Ser., Inc.*
(*In re CBI Holding Co.*), 311 B.R. 350 (S.D.N.Y. 2004) ....................................................... 32

*Complete Mgmt. Inc.* v. *Arthur Andersen, LLP*
(*In re Complete Mgmt. Inc.*), No. 02 Civ. 1736(NRB), 2002 WL 31163878
(S.D.N.Y. Sept. 17, 2002) ....................................................................................................... 33

*In re Crown Vantage, Inc.,*
No. C 02-03836(WHA), 2002 WL 32872440 (N.D. Cal. Dec. 16, 2002) ............................. 20

*Curriden* v. *Middleton,*
232 U.S. 633 (1914) ................................................................................................................ 20

*Curtis* v. *Loether,*
415 U.S. 189 (1974) ................................................................................................................ 25

*Enron Corp.* v. *Citigroup, Inc.*
(*In re Enron Corp.*), 349 B.R. 108 (Bankr. S.D.N.Y. 2006) .................................................. 14

*Enron North Am. Corp.* v. *Random House, Inc.*
(*In re Enron Corp.*), No. 03 Civ 9312(LTS), 2007 WL 102085 (S.D.N.Y. Jan.
12, 2007) ................................................................................................................................. 17

*Enron Power Mktg., Inc.* v. *Virginia Elec. & Power Co.*
(*In re Enron Corp.*), 318 B.R. 273 (Bankr. S.D.N.Y. 2004) .................................................. 18

*Germain* v. *Conn. Nat'l Bank,*
988 F.2d 1323 (2d Cir. 1993)......................................................................................... passim

*Granfinanciera, S.A.* v. *Nordberg,*
492 U.S. 33 (1989) ........................................................................................................ passim

*Hassett* v. *BancOhio Nat'l Bank*
(*In re CIS Corp.*),172 B.R. 748 (S.D.N.Y. 1994) .................................................. 27

*Horwitz* v. *Sheldon*
(*In re Donald Sheldon & Co.*), No. 92 Civ. 6834(JSM), 1992 WL 396885
(S.D.N.Y. Dec. 17, 1992) ........................................................................................ 15

*Interconnect Tel. Services, Inc.* v. *Farren*,
59 B.R. 397 (S.D.N.Y. 1986) .................................................................................. 30

*Judge* v. *Ridley & Schweigert*
(*In re Leedy Mortgage Co.*), 62 B.R. 303 (E.D. Pa. 1986) ................................... 34

*Katchen* v. *Landy*,
382 U.S. 323 (1966) ................................................................................................ 22

*Kittay* v. *Atl. Bank of N.Y.*
(*In re Global Serv. Group, LLC*), 316 B.R. 451 (Bankr. S.D.N.Y. 2004) ............. 10

*Kittay* v. *Ernst & Young, LLP*
(*In re Kleinert's, Inc.*), No. 04 Civ. 5286(DLC), 2004 WL 1878787 (S.D.N.Y.
Aug. 19, 2004) ........................................................................................................ 30

*Lagenkamp* v. *Culp*,
498 U.S. 42 (1990) ........................................................................................ 21, 22, 23

*Lesser* v. *A-Z Assocs.*
(*In re Lion Capital Group*), 63 B.R. 199 (S.D.N.Y. 1985) ................................... 15

*Luan Inv. S.E.* v. *Franklin 145 Corp.*
(*In re Petrie Retail, Inc.*), 304 F.3d 223 (2d Cir. 2002) ....................................... 28

*McCord* v. *Papantoniou*,
316 B.R. 113 (E.D.N.Y. 2004) .......................................................................... 18, 26

*Napolitano* v. *Hourigan*
(*In re R.J. Patton Co.*), No. 3:06mc183(PCD), 2006 WL 3826705 (D. Conn.
Nov. 30, 2006) ........................................................................................................ 18

*Northern Pipeline Constr. Co.* v. *Marathon Pipeline Co.*,
458 U.S. 50 (1982) ........................................................................... 28, 29, 32, 33

*Official Comm. of Unsecured Creditors of Corson Mfg. Co.* v. *HSBC Bank USA*
(*In re Corson Mfg. Co.*), Ch. 11 Case Nos. 01-MC-5E, 99-16855K, Adv. No.
00-1366K, 2001 WL 877394 (W.D.N.Y. Jun. 27, 2001) ....................................... 30

*Orion Pictures Corp.* v. *Showtime Networks, Inc.*
(*In re Orion Pictures Corp.*), 4 F.3d 1095 (2d Cir. 1993) ............................... passim

*Pereira* v. *Farace*,
    413 F.3d 330 (2d Cir. 2005) ............................................................................ 20

*Rickel & Assocs.* v. *Smith* (*In re Rickel & Assocs.*),
    03 Civ. 7236 PKC, 2003 WL 23021972 (S.D.N.Y. Dec. 24, 2003) ................................. 18, 24

*Redmond* v. *Hassan*
    (*In re Hassan*), 376 B.R. 1 (Bankr. D. Kan. 2007) ................................................ 21

*Resolution Trust Corp.* v. *Best Products Co.*
    (*In re Best Products Co.*), 68 F.3d 26 (2d Cir. 1995) ........................................ 29, 30

*Solutia Inc.* v. *FMC Corp.*,
    No. 04 Civ. 2842(WHP), 2004 WL 1661115 (S.D.N.Y. July 27, 2004) ............................... 32

*U.S. Lines, Inc.* v. *Am. S.S. Owners Mut. Protection & Indem. Ass'n*
    (*In re U.S. Lines, Inc.*), 197 F.3d 631 (2d Cir. 1999) ........................................... 30

*United Orient Bank* v. *Green*
    (*In re Green*), 200 B.R. 296 (S.D.N.Y. 1996) ....................................................... 30

*Wechsler* v. *Squadron, Ellenoff, Plesent & Sheinfeld LLP*,
    201 B.R. 635 (S.D.N.Y. 1996) ........................................................................ 30

## FEDERAL STATUTES

11 U.S.C. § 502(d) ............................................................................................ 10, 22

11 U.S.C. § 510(c) ............................................................................................... 10

28 U.S.C. § 157 ................................................................................................ 2, 28

28 U.S.C. § 157(a) ................................................................................................ 16

28 U.S.C. § 157(b) ............................................................................... 14, 28, 29, 32

28 U.S.C. § 157(c) .......................................................................................... 28, 29

28 U.S.C. § 157(d) ...................................................................................... 1, 16, 36

28 U.S.C. § 157(e) .................................................................................. 2, 16, 18, 19

28 U.S.C. § 1334(a)-(b) ......................................................................................... 33

**STATE STATUTES**

TEX. CIV. PRAC. & REM. CODE § 33.003(a) ................................................................................. 12

TEX. CIV. PRAC. & REM. CODE § 33.013(a) ................................................................................. 12

**RULES**

Federal Rule of Bankruptcy Procedure 9033 ................................................................................. 4

**CONSTITUTIONAL PROVISIONS**

Fifth Amendment of the United States Constitution................................................................. 7, 35

Seventh Amendment of the United States Constitution.........................................................Passim

## PRELIMINARY STATEMENT

Citigroup Inc. and certain of its affiliates and related parties (the "Citigroup defendants" or "Citigroup") move to withdraw the reference under 28 U.S.C. § 157(d), so that this multi-billion dollar litigation commenced by the Enron estate -- alleging common law claims as to which the Citigroup defendants have requested, and are entitled to, a jury trial -- may be tried before a jury and an Article III judge.

Enron's collapse was one of the largest and most precipitous business failures -- and the result of one of the most far-reaching alleged frauds -- in commercial history.  Despite the fact that the alleged fraud at Enron relates to Enron's own audited financial statements, the financial institutions that did business with Enron, including Citigroup, have become the chosen targets for litigation because, in the wake of Enron's bankruptcy and Arthur Andersen's demise, they are the only remaining deep pockets.  The allegations against Citigroup (which Citigroup vehemently denies) and the other financial institution defendants revolve around a central thesis:  that, in executing structured financings for Enron that were not recorded as debt on Enron's balance sheet, the financial institutions knowingly participated in Enron's fraud.  Enron's investors and creditors have already advanced this theory in other litigations seeking to recover their losses.

Here, however, it is *Enron* -- the architect of the fraud -- that is suing Citigroup (and other financial institutions) on this theory, attempting:  (1) to recover damages from Citigroup for *Enron's own fraud,* and (2) to recover payments Enron made to Citigroup over a three year period in *repayment* of the money that Enron concededly received and enjoyed as a result of these structured financings.

Specifically, Enron has brought three common law counts against Citigroup:  for aiding and abetting Enron's own fraud, for aiding and abetting Enron's

management's own breaches of fiduciary duty, and for conspiring with Enron management to manipulate and misstate Enron's financial statements. Enron seeks to recover tens of billions of dollars in damages (as well as punitive damages) from Citigroup under these common law claims. Enron has also brought claims against Citigroup seeking to recover, as preferential or fraudulent transfers, more than 80 payments that Enron made to Citigroup (totaling approximately $2.7 billion) over three years in repayment of the monies that Enron had previously received (and enjoyed) through the structured financings it executed with Citigroup. This action is presently scheduled for trial in the bankruptcy court starting April 28, 2008.

This case (dubbed the "Mega Claim" by Enron) belongs in the district court. Under 28 U.S.C. § 157 and governing case law, the reference in this case should be withdrawn for several independent reasons:

*First*, Enron's claims are actions at common law, entitling Citigroup to a jury trial under the Seventh Amendment. Where, as here, a party to an adversary proceeding has a Seventh Amendment right to a jury trial and does not consent to the conduct of that trial by the bankruptcy court, the reference *must* be withdrawn so that trial can take place before a jury in the district court. *See* 28 U.S.C. § 157(e).

Enron has already indicated its intent to evade this result by suggesting (in previous proceedings) that proofs of claims filed by some of the Citigroup defendants in the Enron bankruptcy (long before Enron commenced this adversary proceeding) somehow strip *all* the Citigroup defendants of their jury trial rights with respect to *all* of the claims alleged in Enron's complaint. Enron's sweeping argument is baseless.

In filing a proof of claim, a party is deemed to have submitted to the equitable jurisdiction of the bankruptcy court (and thus waived its right to a jury trial) only

for claims by the estate that "*bear directly on the allowance*" of that proof of claim (such as a preference or fraudulent transfer claim by the debtor against that party).  Here, however, several Citigroup defendants (against whom Enron is seeking to recover almost $1.7 billion in fraudulent transfers) have filed *no* such proofs of claims in the case and thus retain their jury trial rights not only for the common law claims but for Enron's fraudulent conveyance and preference claims as well.  Moreover, Enron's common law tort claims have no bearing whatsoever on the allowance of the proofs of claim filed by the other Citigroup defendants.  Indeed, Enron's counsel has admitted as much.  Thus *each* of the Citigroup defendants has a Seventh Amendment right to a jury trial with respect to these common law tort claims.

       *Second*, the reference should be withdrawn because Enron's common law tort claims are not within the "core" jurisdiction of the bankruptcy court.[1]  While core proceedings involve substantive rights created by federal bankruptcy law, non-core proceedings (such as Enron's common law tort claims) involve rights that would exist in the absence of a bankruptcy case.  Since Enron's common law claims are not core, even if they could be tried to a bankruptcy court (and they cannot given Citigroup's jury trial rights), the bankruptcy court would not be able to enter final orders with respect to these claims.  Instead, under Bankruptcy Rule 9033, the bankruptcy court could issue only recommended findings of fact and conclusions of law, subject to *de novo* review in the district court in a proceeding in which the district court may hear additional evidence.  As the Second Circuit has recognized, meaningful *de novo* review of an exceedingly complex

---

[1]    The question of whether or not the common law claims are "core," is the subject of a separate motion for leave to appeal pending before this Court (*see infra* pp. 13-14).

and lengthy trial such as this one will be less efficient than withdrawing the reference and trying the case in the district court in the first instance.

*Third*, the length and complexity of this "Mega" trial, in and of itself, constitutes sufficient "cause" to withdraw the reference, *even if* no jury rights existed and if all the claims were core. The bankruptcy courts were created as a forum for the prompt and efficient administration of the bankrupt's estate. They were not created to, nor are they particularly equipped to, conduct "Mega" trials. In this case, Enron alleges classic common law causes of action, seeks billions of dollars and raises difficult questions of state law, including *in pari delicto*, the availability of an "innocent decisionmaker" exception, causation, foreseeability, and "deepening insolvency" damages. This case will require scores of fact and expert witnesses, resolution of numerous difficult evidentiary issues and months of trial time. This case belongs in the district court.

## STATEMENT OF THE CASE

### I.    The "Mega Complaint"

Enron Corporation and various subsidiaries filed for Chapter 11 protection in the Southern District of New York on December 2, 2001. On September 24, 2003, almost a year after the bar date for parties to file claims in Enron's bankruptcy case, Enron commenced this action against various financial institutions including Citigroup.[2]

---

[2]    *See* Order Pursuant to Bankruptcy Rules 2002(a)(7), 2002(1), and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Providing Notice Thereof, *In re Enron Corp.*, Chapter 11 Case No. 01-16034(AJG) (Bankr. S.D.N.Y. Aug. 1, 2002); Debtors' Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Sept. 24, 2003).

The current version of the "Mega Complaint,"[3] filed on January 10, 2005, is brought on behalf of at least eleven separate Enron entities (referred to collectively in the complaint as "Plaintiff" or "Debtors").[4] It names as defendants ten separate financial institutions, together with a number of their respective subsidiaries and allegedly related parties.[5] With respect to Citigroup, Enron's complaint groups together nine separate defendant entities under the defined term "Citigroup,"[6] including the public holding

---

[3]  *See* Reorganized Debtors' Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Jan 10, 2005) (the "Compl."), attached as Ex. A to the accompanying Declaration of Brad S. Karp in Support of the Citigroup Defendants' Motion to Withdraw the Reference dated November 27, 2007 (the "Karp Declaration" or "Karp Decl.").

[4]  Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (Compl. ¶¶ 13-17.)

[5]  The ten financial institutions are Citigroup, J.P. Morgan Chase & Co. ("JPMC"), Barclays plc ("Barclays"), Deutsche Bank AG, Canadian Imperial Bank of Commerce ("CIBC"), Merrill Lynch & Co., Inc. ("Merrill"), Credit Suisse First Boston, Inc. ("CSFB"), The Toronto-Dominion Bank ("Toronto Dominion"), The Royal Bank of Scotland ("RBS"), and The Royal Bank of Canada ("RBC"). (Compl. ¶¶ 18-98.)

[6]  Citigroup Inc., Citibank, N.A., Citigroup Global Markets, Inc. (formerly known as Salomon Smith Barney, Inc. and Salomon Brothers, Inc.), Citicorp North America, Inc., Citigroup Financial Products, Inc. (formerly known as Salomon Brothers Holding Company, Inc.), Citigroup Global Markets Ltd. (formerly known as Salomon Brothers International Ltd.), CXC LLC (formerly known as CXC Incorporated, hereinafter "CXC"), Corporate Asset Funding Company, LLC (formerly known as Corporate Asset Funding Company, Inc., hereinafter "CAFCO") and Corporate Receivables Corporation, LLC (formerly known as Corporate Receivables Corporation, Inc., hereinafter "CRC"). (Compl. ¶¶ 18-28.) Enron also includes defendant Delta Energy Corporation ("Delta") under the defined term "Citigroup;" Delta, however, is neither owned, nor managed by any Citigroup entity, is represented by separate counsel, is not a movant with respect to this motion and is not included as a "Citigroup defendant" as that term is used herein.

company, various direct and indirect subsidiaries, and three independently-owned financial

services companies managed by a Citigroup affiliate under agreements with their

respective owners.[7] The complaint further groups the "Citigroup" defendants together with

each of the other ten financial institution defendants (defined to include numerous of their

respective subsidiaries, affiliates and allegedly related entities) under the defined term

"Bank Defendants." (Compl. ¶¶ 1, 18-98.)

The Mega Complaint alleges that the Bank Defendants "participated with a

small group of senior officers and managers of Enron in a multi-year scheme to manipulate

Enron's financial statements and misstate its financial condition." (*Id.* ¶ 1.) According to

Enron, this "small group" (defined in the Mega Complaint as the "Insiders") consisted of

six senior Enron officers:  Andrew Fastow (Enron's Chief Financial Officer); Ben Glisan

(senior finance executive and Enron's Treasurer from 2000 to 2001); Jeffrey McMahon

(senior finance executive and Enron's Treasurer from 1998 to 2000); Richard Causey

(Enron's Chief Accounting Officer); R. Davis Maxey (head of Enron's Structured Tax

Transaction Group); and Michael Kopper (senior finance executive). (*Id.* ¶¶ 137-49.) The

Mega Complaint acknowledges that "it is likely there were others." (*Id.* ¶ 137.)[8]

---

[7]  While the Mega Complaint alleges, "upon information and belief," that these
independently-owned financial services entities -- CXC, CAFCO and CRC -- are
"wholly-owned subsidiar[ies] of Citigroup" (Compl. ¶¶ 24-26), that is manifestly not
the case.  CRC, CXC and CAFCO are third-party owned, special-purpose, limited-
liability securitization entities that purchase revenue-producing financial assets from
clients of Citigroup and fund their purchases by selling asset-backed commercial paper
and medium-term notes in the market.  Citigroup administers these entities, providing
accounting and other services, but has no ownership interest in them.  (Karp Decl. ¶ 4.)

[8]  The concession is a staggering understatement.  This Court can take judicial notice of
the convictions and guilty pleas of a legion of additional Enron insiders, including:
Jeffrey Skilling, Enron's CEO (convicted of insider trading, securities fraud and
conspiracy) (currently on appeal); Kenneth Lay, Enron's Chairman (convicted of
conspiracy and fraud) (conviction abated after Kenneth Lay's death); David Delaney,

According to Enron, "[t]he Bank Defendants principally assisted the scheme by designing, implementing and often financing structured finance transactions with Enron, knowing that the Insiders were improperly recording the financial effects of these transactions." (*Id.* ¶ 2.) Specifically, the Mega Complaint challenges at least 67 structured finance transactions that Enron executed with the Bank Defendants – fifteen involving Citigroup.[9] Enron alleges that the Insiders used these structured financings to disguise increased debt, artificially increase cash flow from operations and inflate earnings, all in an effort to maintain Enron's all-important credit rating.[10] According to the Mega

---

CEO of Enron Retail (pled guilty to insider trading); Ken Rice, CEO of Enron Broadband (pled guilty to securities fraud); Kevin Hannon, COO of Enron Broadband (pled guilty to conspiracy to commit securities and wire fraud); Timothy Despain, Enron's Assistant Treasurer (plead guilty to conspiracy to commit securities fraud); Dan Boyle, VP of Enron Global Finance (convicted of conspiracy to commit wire fraud, conspiracy to falsify books, records and accounts and lying to a congressional investigator); Mark Koenig, Enron's Director of Investor Relations (pled guilty to aiding and abetting securities fraud); Paula Rieker, VP of Investor Relations (pled guilty to insider trading); Timothy Belden, Managing Director of West Power Trading Division (pled guilty to conspiracy to commit wire fraud); John Forney, West Power Trading Desk Manager (pled guilty to conspiracy to commit wire fraud and making a false statement to a government agency). Moreover, 51 other former Enron employees invoked their Fifth Amendment right against self-incrimination in refusing to answer questions at their depositions in this case, and 6 others invoked the Fifth Amendment to avoid being deposed at all. (Karp Decl. ¶¶ 5-9.)

[9]  *See* Expert Report of B. Douglas Bernheim, Ph.D., April 6, 2007 ("Bernheim Report"), at 56-58, attached as Ex. B to the Karp Decl.

[10]  *See, e.g.,* Compl. ¶ 177 ("The Insiders repeatedly and improperly used accounting techniques, each dependent on the use of SPEs, to prop up Enron's important credit ratios."); *id.* ¶ 163 ("To avoid increased debt, the Insiders used financing structures to obtain cash that could be accounted for on Enron's financial statements as something other than debt or, in some cases, not at all."); *id.* ¶ 2 ("These phony 'prepay' transactions routinely closed at the end of a fiscal quarter and were arranged in amounts specifically chosen to inflate Enron's operating cash flow to levels necessary to maintain Enron's credit ratings."); *id.* ¶ 151 (Fastow and "other members of senior management fraudulently manipulated Enron's financial statements by means including '(1) generating improper earnings and funds flow'") (internal citation omitted); *id.* ¶ 228 (the Insiders "manufactured earnings for Enron through sham

Complaint, "[b]uoyed by artificially strong credit ratings and flourishing stock prices" resulting from the scheme, Enron "incurred billions and billions of dollars of debt which its business operations were not able to repay" and Enron became "deeply insolvent." (*Id.* ¶ 7.)

Based on the alleged "scheme," the Mega Complaint asserts three common law causes of action -- aiding and abetting fraud, aiding and abetting breach of fiduciary duty and civil conspiracy -- against each of the Bank Defendants (and, thus, against each of the Citigroup defendants). (*Id.* ¶¶ 1267-1601 (Counts 74-76).) In connection with each common law count, Enron alleges that:

> [a]s a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) *its debt was wrongfully expanded* out of all proportion to its ability to repay and it became insolvent and thereafter *deeply insolvent*; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

(*Id.* ¶¶ 1273, 1595, 1600 (emphases added).)

In the Mega Complaint, Enron does not quantify the compensatory damages that it seeks on its common law claims. However, Enron has submitted an expert report which, among other things, estimates the harm to Enron as a result of the Bank

---

transactions when Enron was having trouble otherwise meeting its goals for a quarter.").

Enron also alleges that the Bank Defendants aided the scheme by becoming investors in private partnerships the Insiders formed for the purposes of doing transactions with Enron designed to help Enron report favorable financial results. *See, e.g., id.* ¶¶ 178, 229-44.

Defendants' challenged transactions at $18 billion.[11]  Enron's expert refers to this damages figure as the "avoidable deficiency balance" -- that is, the amount of the expected shortfall in Enron creditors' ultimate recoveries in bankruptcy that allegedly would have been avoided "but for" the Bank Defendants' challenged transactions.[12]  In addition, Enron seeks punitive damages in connection with each of the common law counts.  (Compl. ¶¶ 1274, 1596, 1601.)

The Mega Complaint also asserts numerous bankruptcy causes of action aimed at avoiding and recovering allegedly preferential and fraudulent transfers made by Enron entities to the Bank Defendants in connection with the challenged structured finance transactions.  (*Id.,* ¶¶ 704-1180, 1220-1266N (Counts 1–25, 65-73B).)  Virtually without exception, these challenged transfers constitute *repayments* by the Enron entities of monies that they concededly received and enjoyed through these structured financings.  Eliminating duplication, Enron seeks to recover from the Citigroup defendants approximately $2.7 billion in such repayments.  (*Id.* ¶¶ 704-40.)  In addition to these avoidance claims, the Mega Complaint also seeks to disallow the proofs of claims filed by any of the Bank Defendants under Section 502(d) of the Bankruptcy Code based on these defendants' alleged receipt and failure to return preference or fraudulent transfers, and to subordinate their claims under Section 510(c) based on alleged "inequitable conduct, including the conduct described in th[e] Complaint."  (*Id.* ¶¶ 1261, 1266F; *see also* 741-

---

[11]  *See* Bernheim Report, at 7, 156, 201.

[12]  *See id., e.g.,* at 7,155-56; *see also id.* at 5 (defining "Enron's deficiency balance" as "the difference between [Enron's] total obligations and total [creditor] recoveries in bankruptcy.")  The Bernheim Report expressly states that the harm it is measuring is "damages to the estate and [Enron's] creditors."  *Id.*

742, 890-91, 1012-13, 1048-49, 1061-62, 1100-01, 1179-80, 1237-38, 1256-66N (Counts 5, 19, 36, 41, 44, 49, 59, 68 and 72-73B).)[13]

While Enron alleges that the challenged transactions were part of a fraudulent scheme, Enron does not seek to rescind these transactions as fraudulently induced or as the unauthorized acts of corrupt Enron executives. Of course, if Enron were to disavow and seek to rescind these transactions, Enron would be required to return the up-front payments previously received and enjoyed as the price of securing the return of Enron's *repayment* of these sums (and invalidating any proofs of claim seeking further repayments). Enron clearly does not wish to do this. Thus, Enron has made the strategic decision to forego these defenses and remedies in an effort to have its cake and eat it, too -- an effort both *to keep the benefits* of the up-front payments while *nevertheless clawing back any repayments* as alleged fraudulent transfers. Through this stratagem, Enron hopes to enjoy the same money twice.

Citigroup answered Enron's complaint and filed a jury demand.[14] Fact discovery in the Mega Claim was coordinated with the securities class action and other Enron-related litigation pending in the United States District Court for the Southern

---

[13]   11 U.S.C. §§ 502(d), 510(c). A claim for equitable subordination under Section 510(c) against non-insiders like the Bank Defendants requires either domination and control by the outsider or the breach of an underlying duty such as the commission of a tort. *Kittay* v. *Atl. Bank of N.Y.* (*In re Global Serv. Group, LLC*), 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004). The Mega Complaint does not allege that the Bank Defendants dominated and controlled Enron. Where, as here, a claim for equitable subordination is premised on a breach of an underlying duty, the plaintiff "cannot recover damages and obtain equitable subordination for the same wrong." *ABF Capital Mgmt.* v. *Kidder Peabody & Co.* (*In re Granite Partners, L.P.*), 210 B.R. 508, 517 (Bankr. S.D.N.Y. 1997).

[14]   *See* Jury Demand filed by Citigroup defendants, *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Feb. 26, 2004), attached as Ex. C to the Karp Decl.

District of Texas. Fact discovery commenced in July 2004 and concluded (with minor exceptions) in November 2005. More than 453 depositions relevant to the Mega Claim were taken during that period, more than 18,019 exhibits were marked, and countless pages of documents were produced (approximately 15 million pages by the Bank Defendants alone, and approximately 125 million more pages by Enron and Arthur Andersen).[15]

In the course of the Mega Claim litigation, eight of the Bank Defendants have settled with Enron.[16] Of the Bank Defendants, only Citigroup and BT/DeutscheBank remain as defendants in the Mega Claim. The parties are currently conducting expert discovery. In that connection, 28 depositions of the parties' respective experts have been scheduled.[17] Dispositive motions must be filed on or before January 7, 2008 and trial is scheduled to begin on April 28, 2008 in the bankruptcy court.[18]

There can be no dispute that trial of this matter will be lengthy and exceedingly complex. The trial will necessarily explore, among other things, Citigroup's relationship with Enron over a four-year period and the fifteen structured transactions that Enron executed with Citigroup. Moreover, under the Texas loss allocation rules (which should govern here, since Enron suffered its alleged injury in Texas), Citigroup will be

---

[15] *See* Karp Decl. ¶ 11.

[16] RBS settled on August 9, 2005. CIBC settled on December 12, 2005. RBC settled on December 14, 2005. Merrill settled on December 21, 2005. JPMC settled on December 29, 2005. Toronto Dominion settled on June 8, 2006. Barclays settled on December 21, 2006. CSFB settled on December 26, 2006.

[17] *See* Karp Decl. ¶ 12.

[18] *See* Second Amended Scheduling Order, *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Aug. 23, 2007), attached as Ex. D to the Karp Decl.

entitled to present evidence at trial so that the trier of fact can determine the percentage of responsibility of "each claimant," "each defendant," "each settling person" and "each responsible third party who has been designated under Section 33.004," TEX. CIV. PRAC. & REM. CODE § 33.003(a);[19] this provision effectively requires trial of all potentially responsible parties -- including Enron itself.[20] The complexity of the trial is further complicated by the presentation of all issues relevant to the case against the other remaining bank defendant, Deutsche Bank.

## II.  The Citigroup Defendants' Proofs of Claim

On or before the bar date, certain of the Citigroup Defendants filed proofs of claim against the Debtors. These proofs of claim sought payment in connection with five (of the fifteen) Citigroup-related transactions that Enron challenges in the Mega

---

[19] On November 16, 2007, Citigroup filed a motion in the bankruptcy court to confirm that Texas law on loss allocation governs Enron's common law claims. (*See* Citigroup's Motion for a Determination that Texas Law On Loss Allocation Governs Enron's Common Law Claims, *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Nov. 16, 2007), attached as Ex. E to the Karp Decl.) Under Chapter 33 of the Texas Civil Practice and Remedies Code, where a defendant is found by the trier of fact to be 50% or less responsible for the plaintiff's damages, the defendant is liable only for the percentage of damages corresponding to its percentage of fault. TEX. CIV. PRAC. & REM. CODE §§ 33.013(a).

[20] There can be no dispute that Enron's alleged injury (if it has suffered any injury distinct from that of its creditors) is attributable to many responsible parties. Indeed, Enron itself (along with its Committee of Unsecured Creditors) has blamed, among others, Enron insiders, Arthur Andersen, Enron's directors, and the eight financial institutions that have previously settled the Mega Claim. Compl. ¶¶ 1-8; *see, e.g., Official Committee of Unsecured Creditors of Enron Corp.* v. *Andrew S. Fastow, et al.*, Civil Action No. H-04-0091 (S.D. Tex. Oct. 31, 2006); Emergency Motion of Official Committee of Unsecured Creditors for Order Under 11 U.S.C. §§ 105(a), 1103(c) and 1109(b) for Authorization to Commence Litigation Against Vinson & Elkins LLP, Andrews & Kurth LLP, Kirkland & Ellis LLP, Arthur Andersen LLP, Mark A. Frevert, Rebecca P. Mark, James V. Derrick, Jr., Jeffrey McMahon, Carl Fastow, as Administrator of the Fastow Family Foundation, and Certain Insider Employees, *In re Enron Corp.*, Chapter 11 Case No. 01-16034(AJG) (Nov. 21, 2003 Bankr. S.D.N.Y.).

Complaint as well as in connection with other transactions that Enron has never challenged. In addition, Citigroup Inc. filed proofs of claim on behalf of itself and its wholly-owned subsidiaries seeking indemnification for litigation arising out of Enron's fraud.[21]

CRC, CAFCO, and CXC, independently-owned financial services entities managed by a Citigroup affiliate, have no proofs of claim at issue in the Enron bankruptcy.[22]

## III.     The Bankruptcy Court's Core Order and the Pending Appeal

Section 157(b)(3) of title 28 provides that a bankruptcy court must determine, in the first instance, whether the proceeding falls within its core jurisdiction. 28 U.S.C. § 157(b)(3). Thus, in 2005 and 2006 certain Bank Defendants, including Citigroup, moved the bankruptcy court for an initial determination that the common law claims in the Mega Complaint are not core proceedings; this was done expressly as a prelude to making a motion before the district court to withdraw the reference. The question of whether or not a proceeding is within the core jurisdiction of the bankruptcy courts is one of the factors that a district court considers in determining whether to withdraw the reference because the core/non-core question affects where the case can be tried most efficiently: a

---

[21]  *See* Karp Decl. ¶¶ 13-14.

[22]  Citibank, N.A., as agent, filed a proof of claim on behalf of CXC, among others, in connection with a transaction known as "Rawhide," but that proof of claim was withdrawn in connection with a court-approved 2004 settlement of all Rawhide-related claims. *See* Order Pursuant to Section 363 of the Bankruptcy Code and Rules 2002, 6004, and 9010 of the Federal Rules of Bankruptcy Procedure, *In re Enron Corp.*, No., 01-16034(AJG) (Bankr. S.D.N.Y. April 22, 2004), attached as Ex. F to the Karp Decl. Pursuant to the parties' settlement agreement, the current Mega Complaint has eliminated all counts seeking to avoid or recover Rawhide-related transfers or seeking to disallow or subordinate any proofs of claim based on Rawhide-related transfers.

bankruptcy court can issue final orders in a core proceeding, but, in a non-core proceeding, can issue only proposed findings of fact and conclusions of law subject to *de novo* review in the district court.

Enron opposed the Bank Defendants' motion, contending that the common law claims are core. In August 2006, the bankruptcy court ruled that the common law claims were core proceedings. *See Enron Corp.* v. *Citigroup, Inc.* (*In re Enron Corp.*), 349 B.R. 108, 112 (Bankr. S.D.N.Y. 2006) ("Core Order"). According to the bankruptcy court, these traditionally non-core claims were nonetheless rendered core because: the Bank Defendants had filed proofs of claim (and reserved rights of set-off); Enron asserted its common law claims as counterclaims to those proofs of claim; and the proofs of claim and common law claims were factually interrelated because some of the proofs of claims stemmed from some of the structured transactions challenged in the common law counts.[23]

In September 2006, Citigroup (along with certain other Bank Defendants) filed a motion in the district court for leave to appeal the bankruptcy court's Core Order. Citigroup did so, in large part, to ensure that the bankruptcy court's erroneous Core Order would not be binding on the district court in connection with a subsequent motion to withdraw the reference.[24] Enron opposed the motion for leave to appeal the Core Order. That motion is fully briefed and presently pending before this Court.[25]

---

[23]  *See generally* Core Order. The Bankruptcy Court held that its analysis in the Core Order, which only addresses Enron's arguments as they relate to Barclays and Barclays' proofs of claim, applies equally to the other Bank Defendants inasmuch as they have also filed proofs of claim for amounts greater than Barclays. 349 B.R. at 115, n.3.

[24]  Certain district courts have concluded that: "The determination of whether a proceeding is core can only be reviewed by the District Court on a proper, timely appeal from that determination. Thus an order entered by the Bankruptcy Court that the proceeding is core is binding on the District Court in a motion to withdraw the

## ARGUMENT

Enron's "mega" action against its banks and other financial institutions was automatically referred to the bankruptcy court superintending the Enron bankruptcy pursuant to this District's standing order, as authorized by 28 U.S.C. § 157(a).[26] Citigroup now moves this Court to withdraw the reference in this action for "cause" under 28 U.S.C. § 157(d). Section 157(d) provides: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d); *see Orion Pictures Corp.* v. *Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1100-02 (2d Cir. 1993).

---

reference until and unless the order is overturned on appeal." *E.g., Horwitz* v. *Sheldon* (*In re Donald Sheldon & Co.*), No. 92 Civ. 6834(JSM), 1992 WL 396885, at *2 (S.D.N.Y. Dec. 17, 1992); *Lesser* v. *A-Z Assocs.* (*In re Lion Capital Group*), 63 B.R. 199, 209 (S.D.N.Y. 1985).

[25] *See* Bank Defendants Joint Memorandum of Law in Support of Their Motion For Leave to Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3), *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Sept. 25, 2006) ("Bank Defs.' Joint Mem. re Core Determination"); Plaintiffs Memorandum of Law in Opposition to the Bank Defendants' Motion For Leave To Appeal the Decision of the Bankruptcy Court Concerning Determination Under 28 U.S.C. § 157(b)(3), *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Nov. 27, 2006) ("Pls.' Opp. re Core Determination"); and Bank Defendants' Joint Reply Memorandum of Law in Support of Their Motion for Leave to Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3), *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Dec. 5, 2006), 2006 ("Bank Defs.' Joint Reply re Core Determination"), attached as Exs.G-I to the Karp. Decl.

[26] Section 157(a) provides: "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). This District has adopted such an order. *See* Order Referring All Cases Arising Under, In Or Related To Title 11 (S.D.N.Y. July 11, 1984).

Here, "cause" indisputably exists because the Citigroup defendants have Seventh Amendment rights to a jury trial in this action and will not consent to have that jury trial conducted by the bankruptcy court. The governing statute is clear: a bankruptcy court may not conduct a jury trial without the express consent of all parties. 28 U.S.C. § 157(e). ("If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and *with the express consent of all parties*.") (emphasis added). Thus, the Citigroup defendants' jury trial rights must be vindicated in the district court.

Moreover, the fact that the trial of common law tort claims is not within the "core" jurisdiction (much less the core competency) of the bankruptcy court, provides independent "cause" to withdraw the reference in this case. Because these common law tort claims are non-core, even if they could be tried in the bankruptcy court (and they cannot given Citigroup's jury trial rights), the bankruptcy court could issue only recommended findings of fact and conclusions of law, subject to *de novo* review in the district court. As the Second Circuit has recognized, the inefficiency of conducting meaningful *de novo* review provides "cause" to withdraw the reference from the bankruptcy court. *Orion Pictures Corp.*, 4 F.3d at 1101. Here, where the trial will be months-long and exceedingly complex, the "cause" is manifest.

Indeed, even if there were no question of jury trial rights or non-core claims in this case, the length and complexity of the "mega" trial, in and of itself, constitutes "cause" to withdraw the reference here. The bankruptcy courts are specialized tribunals created as a forum for the prompt and efficient administration of the bankrupt's estate. They were not created to -- nor are they particularly equipped to -- conduct lengthy and

16

complex trials of common law claims. While it may now have become fashionable for

debtors accused of fraud to pursue mega-tort actions against alleged "aiders and abettors"

(despite the enormous hurdles of *in pari delicto* and the absence of distinct damages to the

debtor), the recent vogue provides no basis to entrust the bankruptcy courts with functions

for which they were never intended. This case -- alleging classic common law claims,

seeking billions of dollars in alleged tort damages, raising difficult state law and

evidentiary issues, requiring scores of fact and expert witnesses as well as many months to

try -- belongs in the district court and the reference should be withdrawn for cause.[27]

## I.    The Reference Should Be Withdrawn Based On The Citigroup Defendants' Jury Trial Rights

Section 157(e) of Title 28, adopted in 1994, makes clear that the bankruptcy

court cannot conduct jury trials without the "express consent of all parties." 28 U.S.C.

§ 157(e). In light of Section 157(e), where -- as here -- there are jury trial rights and no

express consent to a jury trial in the bankruptcy court, the district court must conduct the

jury trial. *See, e.g.*, *Rickel & Assocs.* v. *Smith* (*In re Rickel & Assocs.*), 03 Civ. 7236 PKC,

2003 WL 23021972, at *3 (S.D.N.Y. Dec. 24, 2003) ("Because there is no express

consent, this proceeding may not be tried with a jury in bankruptcy court"); *McCord* v.

---

[27] Case law in this district, including in adversary proceedings relating to the Enron bankruptcy, indicate that a motion to withdraw the reference may be premature if the case is not trial-ready. *See, e.g.*, *Enron North Am. Corp.* v. *Random House, Inc.* (*In re Enron Corp.*), No. 03 Civ. 9312(LTS), 2007 WL 102085, at *2 (S.D.N.Y. Jan. 12, 2007) (denying motion to withdraw "without prejudice to renewal, including . . . renewal in connection with dispositive motion practice and/or renewal when the case is trial-ready"); *Enron Power Mktg., Inc.* v. *Virginia Elec. & Power Co.* (*In re Enron Corp.*), 318 B.R. 273, 275 (Bankr. S.D.N.Y. 2004) (withdrawal of the reference motion premature where case was not trial-ready). Though the interlocutory appeal from the Core Order is still pending, the Citigroup defendants submit that this motion is now ripe for consideration. Indeed, by the time this motion is fully briefed and decided, the trial will be imminent.

*Papantoniou*, 316 B.R. 113, 126 (E.D.N.Y. 2004) ("defendant's refusal to consent means

that the district court will conduct any eventual jury trial in this adversary proceeding");

*Napolitano* v. *Hourigan* (*In re R.J. Patton Co.*), No. 3:06mc183(PCD), 2006 WL 3826705,

at *1 (D. Conn. Nov. 30, 2006). Thus, we address the question of the Citigroup

defendants' jury trial rights as a threshold issue.[28]

       As demonstrated below, the common law claims against the Citigroup

defendants and the fraudulent transfer and preference claims against CXC, CRC and

CAFCO are legal claims as to which the defendants have asserted (and are asserting) a

Seventh Amendment right to a jury trial.

---

[28] Before the 1994 bankruptcy amendments, and at the time that the Second Circuit issued its seminal ruling in *Orion Pictures Corp.,* 4 F.3d 1095, 1100-02 (discussing factors for a district court to consider in determining whether to withdraw the reference), a bankruptcy court in this Circuit had the power to hold jury trials in core proceedings only. *See id.* (noting that "the Seventh Amendment's Reexamination Clause . . . likely would prohibit jury trials in bankruptcy courts in non-core proceedings due to the district court's *de novo* review of such proceedings"). Thus, *Orion Pictures* directed courts to "first evaluate whether the claim is core or non-core," noting that this evaluation will "determine[] the relevance of parties' jury trial rights to deciding a motion to withdraw the reference." *Id.* Thus, prior to the adoption of Section 157(e), the core/non-core distinction was necessarily a threshold issue in the Circuit on a motion to withdraw the reference. Now, however, the core/non-core issue has little, if any, relevance to the question of whether the reference must be withdrawn to vindicate the Citigroup defendants' jury trial rights. As the Second Circuit explained:

> the designation of an action as "core" does not control whether or not the action may be tried before a jury. The right to a jury trial is of constitutional concern. Neither Congress nor the courts may deprive litigants of their constitutional rights simply by labeling a cause of action "core." Thus the determination that the Trustee's action is "core" is entitled to minimal weight in reaching our ultimate decision on the jury trial issue.

*Germain* v. *Conn. Nat'l Bank*, 988 F.2d 1323, 1326-27 (2d Cir. 1993).

A.    **The Citigroup Defendants Have Jury Trial Rights**

The Seventh Amendment to the United States Constitution guarantees the right to trial by jury "[i]n suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. Am. 7. The term "suits at common law" has long been held to refer to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33, 41 (1989) (emphasis in original) (quoting *Parsons* v. *Bedford*, 28 U.S. 433, 447 (1830)). In determining whether a jury trial right exists, courts perform a two-step analysis: first, the court compares the action to the "18th–century actions brought in the courts of England prior to the merger of law and equity"; second, the court determines whether the remedy sought "is legal or equitable in nature." *Granfinanciera, S.A.*, 492 U.S. at 42; *see also Pereira* v. *Farace*, 413 F.3d 330, 337 (2d Cir. 2005). Courts then "balance" these two inquiries, "giving greater weight to the latter." *Id.* (internal quotation marks omitted).

Where a statutory claim is at issue, such as the preference and fraudulent conveyance claims here, there is a third step in which courts "decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder." *Granfinanciera, S.A.,* 492 U.S. at 42. "Unless a legal cause of action involves 'public rights,' Congress may not deprive parties litigating over such a right of the Seventh Amendment's guarantee to a jury trial." *Id.* at 53. A claim arising in a bankruptcy is a matter of "public right" only when it arises "as part of the process of allowance and disallowance of claims" and is "integral to the restructuring of debtor-creditor relations." *Id.* at 58 (internal citation omitted).

1.    **The Common Law Causes of Action Must Be Tried To a Jury**

Enron's common law causes of action are subject to Seventh Amendment jury trial rights. A claim for aiding and abetting breach of fiduciary duty, seeking money damages, is plainly a suit at law triggering a right to a jury trial. *See Pereira*, 413 F.3d at 339 (noting breach of fiduciary duty claim was equitable in 18th century England, but finding claim conveyed jury trial rights where compensatory damages sought).

A claim for aiding and abetting fraud, seeking money damages also clearly carries a right to a jury trial. *See Curriden* v. *Middleton*, 232 U.S. 633, 636 (1914) (holding that a claim for fraud seeking money damages is an action at law not triable in equity); *In re Crown Vantage, Inc.*, No. C 02-03836(WHA), 2002 WL 32872440, at *3 (N.D. Cal. Dec. 16, 2002) (finding it "beyond dispute" that claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and conspiracy were actions at law under the first two prongs of the *Granfinanciera* test).

It is equally clear that a claim for civil conspiracy seeking money damages is a claim at law conveying jury trial rights. *Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500, 512-13 (1959) (Stewart, J. dissenting) (finding that conspiracy claims seeking money damages "[c]learly . . . stated a cause of action triable as of right by a jury"); *Redmond* v. *Hassan* (*In re Hassan*), 376 B.R. 1, 18-21 (Bankr. D. Kan. 2007) (recommending claims for civil conspiracy, fraud and breach of fiduciary duty be considered legal claims conveying jury trial rights).

2.    **The Preference and Fraudulent Conveyance Claims Against CXC, CAFCO and CRC Must Be Tried To A Jury**

The three-part test applicable to statutory claims applies to whether a claim for preference or fraudulent conveyance carries a jury trial right. While these claims are

legal in nature and seek a legal remedy, the Supreme Court has found that the question of whether jury rights attach "depends upon whether the creditor has submitted a claim against the estate." *Lagenkamp* v. *Culp*, 498 U.S. 42, 45 (1990); *Granfinanciera, S.A.*, 492 U.S. at 35.

In filing a proof of claim against the estate, a creditor voluntarily subjects himself to the bankruptcy court's equitable power to determine the allowance or disallowance of that claim. *Lagenkamp*, 498 U.S. at 43 ("by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power"); *Granfinanciera, S.A.*, 492 U.S. at 59 n.14 (1989) ("by submitting a claim against the estate, creditors subject themselves to the court's equitable power to disallow those claims...."); *Katchen* v. *Landy*, 382 U.S. 323 (1966). Because the Bankruptcy Code mandates that a court must disallow "any claim of any entity" that received and has not returned a preferential or fraudulent transfer, *see* 11 U.S.C. § 502(d), the bankruptcy court cannot determine whether to allow or disallow a creditor's claim without resolving the debtor's preference or fraudulent conveyance action against that creditor. *See Katchen*, 382 U.S. at 330 ("Unavoidably and by the very terms of the Act, when a bankruptcy trustee presents a [preference] objection to a claim, the claim can neither be allowed nor disallowed until the preference matter is adjudicated."); *Lagenkamp*, 498 U.S. at 44 (preference action against creditor with proof of claim is "integral" to and "becomes part of the claims-allowance process which is triable only in equity"); *Germain*, 988 F.2d at 1327 ("before a claim may be allowed, a court *must* resolve any preference issues that the trustee might raise") (emphasis in original).

As the Second Circuit has explained, "the *Katchen*, *Granfinanciera*, and *Langenkamp* line of Supreme Court cases stands for the proposition that by filing a proof of claim a creditor forsakes its right to adjudicate before a jury any issue *that bears directly on the allowance* of that claim – and does so not so much on a theory of waiver as on the theory that the legal issue has been converted to an issue of equity." *Germain*, 988 F.2d at 1329 (emphasis in original); *see Katchen*, 382 U.S. at 336 ("The Bankruptcy Act . . . converts the creditor's legal claim into an equitable claim to a pro rata share of the res, a share which can neither be determined nor allowed until the creditor disgorges the alleged voidable preference") (internal citation omitted). Thus, those Citigroup defendants with proofs of claim pending in the Enron bankruptcy will not be able to assert jury trial rights with respect to the preference and fraudulent conveyance claims asserted against them; those preference and fraudulent conveyance claims are triable in equity because, under the provisions of the Bankruptcy Code, these claims must be decided as an integral part of the "claims-allowance process."

But Citigroup defendants CXC, CRC, and CAFCO do not have any proofs of claim at issue in the Enron bankruptcy. Thus there can be no argument that resolution of the preference or fraudulent transfer claims against these entities are part of the "claims-allowance process." *See Langenkamp*, 498 U.S. at 45 ("If a party does not submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial."); *Granfinanciera, S.A.*, 492 U.S. at 33 (fraudulent conveyance). The preference and fraudulent transfer claims against CXC, CRC, and CAFCO, which in aggregate seek to recover almost $1.7 billion, must be tried to a jury.

22

### 3.    The Proofs Of Claim Filed By Certain Citigroup Defendants Have No Impact On Their Jury Trial Rights On The Common Law Claims

The fact that some Citigroup defendants have proofs of claim pending in the Enron bankruptcy has absolutely no bearing on their right to a jury trial with respect to the common law claims. As the Second Circuit has made clear, by filing a proof of claim a creditor gives up its right to try before a jury *only* those issues "*that bear[] directly on the allowance* of that claim." *Germain* 988 F.2d at 1329 (emphasis in original); *id.* (legal dispute becomes equitable only if claims allowance process "cannot be accomplished without resolution of what would otherwise be a legal dispute"). "[N]either precedent nor logic supports the proposition" that a creditor "automatically waives all right to a jury trial whenever a proof of claim is filed." *Id.* at 1330. "For a waiver to occur, the dispute must be part of the claims-allowance process or affect the hierarchical reordering of creditors claims." *Id.*

As *Germain* held: "It is reasonable that a creditor or debtor who submits to the equity jurisdiction of the bankruptcy court thereby waives any right to a jury trial for the resolution of disputes vital to the bankruptcy process, such as those involving the determination of who is a valid creditor and which creditors are senior in the creditor hierarchy. We will not presume that the same creditor has knowingly and willingly surrendered its constitutional right to a jury trial for the resolution of disputes that are only incidentally related to the bankruptcy process." *Id.* at 1329-30.

Manifestly, the common law claims asserted in the Mega Complaint are, at most, "only incidentally related to the bankruptcy process." As with the lender liability action at issue in *Germain*, Enron's common law claims do not charge any violation of the Bankruptcy Code, would exist independently of the bankruptcy process and seek money

damages to augment the estate. *See id.* at 1327-28, 1331 (lender liability claims seek "compensation for damage done" and have "nothing to do with the essence of the bankruptcy regulatory scheme of allowing or reordering claims." ); *Rickel & Assocs.*, 2003 WL 23021972 at *3 (creditor that filed proof of claim had jury trial right on breach of fiduciary duty claim seeking money damages where no violation of any bankruptcy code provision was alleged).

Here, as in *Germain*, resolution of the common law claims will have no direct effect on the allowance of the proofs of claim. The common law claims do not seek the rescission of the challenged transactions, do not question the validity or amount of the proofs of claim, and otherwise provide no basis to disallow claims related to those transactions.[29] Indeed, the only basis under which the Mega Complaint seeks to disallow the Citigroup proofs of claim is on the basis of those defendants' receipt of preferential or fraudulent transfers.[30]

---

[29] Enron acknowledges as much. In a recent letter to the Court, Enron explained that "[a]lthough . . . the Mega Complaint *refers in passing* to its having been 'brought as an objection and counterclaim'. . . it was brought to address the inequitable conduct issues and disallow or subordinate claims solely on the basis of the defendants' inequitable conduct . . . . [T]he factual bases for the underlying claims . . . were simply *not* put at issue by the Mega Complaint." Ltr. from William J. McSherry, Jr., to Hon Arthur J. Gonzalez, *Enron Corp., et al.* v. *Citigroup, Inc., et al.*, No. 03-09266(AJG) (Bankr. S.D.N.Y. Oct. 2, 2007) (emphasis in original), at 2 n.2, attached as Ex. J to the Karp Decl.

[30] While Enron does seek equitable subordination of the Citigroup defendants' proofs of claim under § 510(c) of the Bankruptcy Code based on these defendants alleged "inequitable conduct, including the conduct described in [the Mega Complaint]," the law is clear that, a party will not be denied its constitutional right to a jury trial of legal claims "just because other claims arising out of the same facts are equitable." *Germain*, 988 F.2d at 1329; *see also Curtis* v. *Loether*, 415 U.S. 189, 196 n.11 (1974) ("if this legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact").

The proofs of claim of certain Citigroup defendants have no effect on these defendants' Seventh Amendment right to a jury trial on Enron's common law claims.

**B.    Citigroup's Jury Trial Rights On Certain Claims Is Ample "Cause" To Withdraw The Reference For The Entire Case**

Because the reference must be withdrawn on substantial claims with clear jury trial rights, this Court should withdraw the reference with respect to the entire case for reasons of efficiency and to conserve judicial resources. While the Mega Complaint contains certain equitable claims that can be tried in the bankruptcy court (*i.e.*, the equitable subordination, preference and fraudulent conveyance claims asserted against Citigroup defendants with proofs of claim against the Enron estate), many of these claims (including the equitable subordination and intentional fraudulent conveyance claims) are predicated, at least in part, on the *same* alleged fraudulent scheme described in the Mega Complaint as forming the basis for the common law claims as to which the Citigroup defendants are clearly entitled to a jury trial.

Where, as here, there is substantial factual overlap between legal and equitable claims, the court must "wherever possible," exercise its discretion to ensure that the "right to a jury trial of legal issues [is not] lost through prior determination of equitable claims." *Beacon Theatres*, 359 U.S. at 510-11. Thus, the jury trial in this action must *precede* any trial in the bankruptcy court. Because the factual issues have substantial overlap, this Court should withdraw the entire action for reasons of efficiency. *See Orion Pictures Corp.*, 4 F.3d at 1101 (instructing district courts to weigh, among other considerations, "questions of efficient use of judicial resources" and "delay and costs to the

parties"); *McCord*, 316 B.R. at 126 (finding that reference would have to be withdrawn for trial where some defendants had a right to a jury trial and others did not).[31]

## II.    The Reference Should Be Withdrawn Because The Common Law Claims Are Non-Core

This Court should withdraw the reference for the independent reason that Enron's common law tort claims are not within the "core" jurisdiction of the bankruptcy court.  Because these claims are non-core, even if they could be tried in the bankruptcy court (and they cannot given the Citigroup defendants' jury trial rights), the bankruptcy court could issue only recommended findings of fact and conclusions of law subject to *de novo* review in the district court in a proceeding in which the district court may hear additional evidence.   As the Second Circuit has recognized, the inefficiency, delay and costs of *de novo* review support withdrawing the reference from the bankruptcy court:

> A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core since it is upon this issue that questions of efficiency and uniformity will turn.  For example, the fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court.

---

[31]   In its opposition to the motion for leave to appeal the Core Order, Enron suggested that the Citigroup defendants contractually waived any right to a jury trial in the Mega Claim based on alleged jury trial waivers in "many" transaction documents relating to the Citigroup challenged transactions. (*See* Pls.' Opp. re Core Determination *supra* note 25 at 7-8).  This is not the case.  First, Enron's common law claims allege that the Citigroup defendants participated in a broad-based conspiracy that is not reducible to the fifteen Citigroup transactions.  Thus even if certain transaction documents contain jury waiver rights in favor of Enron, these cannot waive a jury trial with respect to the common law claims.  In all events, the pertinent transaction documents do not in fact contain waivers from each of the Citigroup defendants for the benefit of Enron (much less waivers of sufficient breadth to cover the claims at issue in the Mega Claim).  Enron cannot sustain its burden of demonstrating that the Citigroup defendants knowingly waived their Seventh Amendment rights to a jury trial with respect to the claims in this action.

*Orion Pictures Corp.*, 4 F.3d at 1101. Here, where the trial will be months-long and exceedingly complex, the arguments in favor of withdrawal are overwhelming.[32]

### A.    The Core/Non-Core Distinction

The United States Supreme Court first articulated the core/non-core distinction in *Northern Pipeline Constr. Co.* v. *Marathon Pipeline Co.*, 458 U.S. 50 (1982). In *Marathon*, the Supreme Court held that "Congress may not vest in a non-Article III court, [such as the bankruptcy court], the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law[.]" *Luan Inv. S.E.* v. *Franklin 145 Corp.* (*In re Petrie Retail, Inc.*), 304 F.3d 223, 228-29 (2d Cir. 2002) (quoting *Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985) (discussing the *Marathon* holding)). In considering the constitutionality of the bankruptcy court's Article I jurisdiction, a plurality of the Court noted that "the restructuring of debtor-creditor relations, *which is at the core of the federal bankruptcy power*, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages[.]" *Marathon*, 458 U.S. at 71 (emphasis added).

---

[32]    In connection with the Bank Defendants' motion for leave to appeal the Core Order, Citigroup and Enron have previously submitted briefs to this Court on the question of whether the common law claims are "core." *See* Bank Defs.' Joint Mem. re Core Determination *supra* note 25; Pls.' Opp. re Core Determination; Bank Defs.' Joint Reply re Core Determination *supra* note 25. For purposes of this motion, Citigroup incorporates in their entirety the arguments made in the Bank Defendants' prior briefing on this issue and merely summarizes those arguments here.

On this motion, the Court should review *de novo* the question of whether the common law claims are "core." *Hassett* v. *BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748, 755 (S.D.N.Y. 1994). Indeed, Enron has previously insisted that the law is unambiguous in requiring *de novo* review of the core/non-core determination on a motion to withdraw the reference. *See* Pls.' Opp. re Core Determination at 21-23. In all events, Citigroup timely moved to appeal the Core Order to ensure that its right to *de novo* review was preserved.

Congress enacted Section 157 of title 28 to codify this core/non-core distinction and implement *Marathon. See Petrie Retail*, 304 F.3d at 229 (citing *S.G. Phillips Constrs., Inc.* v. *City of Burlington* (*In re S.G. Phillips Constrs., Inc.*), 45 F.3d 702, 705 (2d Cir. 1995) (citing *Arnold Print Works, Inc.* v. *Apkin* (*In re Arnold Print Works, Inc.*), 815 F.2d 165, 166-67 (1st Cir. 1987) (Breyer, J.))). Section 157(b)(1) provides that bankruptcy courts have comprehensive power to hear and determine "core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). Section 157(c)(1) provides that in a non-core proceeding (which simply "relates to" a bankruptcy case) "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." *Id.* § 157(c)(1).

Section 157(b)(2) sets forth a non-exhaustive list of proceedings that Congress deems to be "core." *Id.* § 157(b)(2). These include, for example, "matters concerning the administration of the estate" (*id.* § 157(b)(2)(A)), "allowance or disallowance of claims against the estate" (*id.* § 157(b)(2)(B)), "counterclaims by the estate against persons filing claims against the estate" (*id.* § 157(b)(2)(C)), "proceedings to determine, avoid or recover preferences" (*id.* § 157(b)(2)(F)), "proceedings to determine, avoid or recover fraudulent conveyances" (*id.* § 157(b)(2)(H)), and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship" (*id.* § 157(b)(2)(O)).

Although the literal wording of the Section 157(b)(2) examples of "core" proceedings could be read to sweep in virtually any matter relating to a bankruptcy,

Congress was not free to cross the constitutional line drawn by the Court in *Marathon*, and
the statute has been carefully interpreted with an eye to the constitutional issue. *See Orion
Pictures Corp.*, 4 F.3d at 1102 ("While it is clear that Congress intended § 157(b)-(2)(A)'s
designation of matters relating to the administration of the estate as core to encompass a
wide range of matters, there is no evidence of any Congressional intent to contravene the
Supreme Court's holding in *Marathon*."); *see also Resolution Trust Corp.* v. *Best Products
Co.* (*In re Best Products Co.*), 68 F.3d 26, 31 (2d Cir. 1995); *Ben Cooper, Inc.* v. *Ins. Co.
of Penn.* (*In re Ben Cooper, Inc.*), 896 F.2d 1394, 1398 (2d Cir. 1990), *vacated*, 498 U.S.
964 (1990), *reinstated*, 924 F.2d 36 (2d Cir. 1991).

The Second Circuit has repeatedly admonished lower courts that "an open-
ended, limitless construction [of Section 157(b)(2)] would be incorrect. A determination
of whether a matter is 'core' depends on the nature of the proceeding." *Best Products,* 68
F.3d at 31; *U.S. Lines, Inc.* v. *Am. S.S. Owners Mut. Protection & Indem. Ass'n* (*In re U.S.
Lines, Inc.*), 197 F.3d 631, 637 (2d Cir. 1999). As the Second Circuit has explained:
"Proceedings can be core by virtue of their nature if either (1) the type of proceeding is
unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings
directly affect a core bankruptcy function." *U.S. Lines*, 197 F.3d at 637.

Under this analysis, the common law claims are plainly non-core: they are
not unique to or uniquely affected by the Enron bankruptcy case nor do they directly affect
a core bankruptcy function. The common law claims arose pre-petition, seek to vindicate
private rights arising under state law, would exist whether or not Enron had filed for
bankruptcy and seek money damages.[33]

---

[33]   Courts in this Circuit have consistently held that claims such as these are non-core.
     *E.g., Kittay* v. *Ernst & Young, LLP* (*In re Kleinert's, Inc.*), No. 04 Civ. 5286(DLC),

Enron argues (and the bankruptcy court held) that the common law claims, though admittedly non-core if considered in isolation, become core because "they stem from the same transaction and are logically connected" to certain of Citigroup's proofs of claim.[34] A mere *factual* connection to a proof of claim, however, does not change the underlying "nature" of the common law claims and provides no basis for transforming an admittedly *non-core* claim into a core one.

Nor can Enron transform the common law claims into "core" claims simply by labeling the entire Mega Complaint a "counterclaim." In what Enron itself has described as a mere passing reference (*see supra* n.29), the Mega Complaint states (at paragraph 8) that "[a]s to those Defendants who have filed claims or on whose behalf claims have been filed against Plaintiff, this adversary proceeding is brought as an objection and counterclaim to those claims." Of course, the common law claims cannot be "counterclaims" against CXC, CRC or CAFCO because these defendants have no proofs

---

2004 WL 1878787, at *1 n.2 (S.D.N.Y. Aug. 19, 2004) (bankruptcy court held that claims for breach of contract, negligence, professional malpractice, fraud, negligent misrepresentation and aiding and abetting breach of fiduciary duties were non-core); *Official Comm. of Unsecured Creditors of Corson Mfg. Co.* v. *HSBC Bank USA* (*In re Corson Mfg. Co.*), Ch. 11 Case Nos. 01-MC-5E, 99-16855K, Adv. No. 00-1366K, 2001 WL 877394, at *2 (W.D.N.Y. Jun. 27, 2001) (claims premised on malpractice and various breaches of fiduciary duty are non-core); *Wechsler* v. *Squadron, Ellenoff, Plesent & Sheinfeld LLP*, 201 B.R. 635, 638-640 (S.D.N.Y. 1996) (malpractice, breach of contract and breach of fiduciary duty claims are non-core); *United Orient Bank* v. *Green* (*In re Green*), 200 B.R. 296, 298-99 (S.D.N.Y. 1996) (malpractice, breach of fiduciary duty claims are non-core); *Interconnect Tel. Services, Inc.* v. *Farren*, 59 B.R. 397, 398, 400 (S.D.N.Y. 1986) (conspiracy to defraud, wrongful appropriation of confidential information and unfair competition are non-core claims).

[34] In fact, the common law claims against the Citigroup defendants do not "stem from the same transaction" as the proofs of claim. Enron's common law claims allege a broad-based conspiracy between the Citigroup defendants and Enron insiders. As supposed proof, Enron points to fifteen challenged Citigroup transactions as well as a number of other dealings between the parties. The Citigroup defendants' proofs of claim relate to only *five of the fifteen* Citigroup transactions Enron has specifically challenged.

of claim at issue in Enron's bankruptcy case.  And the common law claims are not counterclaims against any other Citigroup defendants' proof of claim because, as previously discussed, the common law claims do not contest the validity or amount of any proofs of claims.  Because resolution of the common law claims will have no direct effect on the allowance of the Citigroup defendants' proofs of claim, they cannot be considered counterclaims within the meaning of section 157(b)(2)(C);[35] to the extent that section 157(b)(2)(C) would permit such an interpretation it would run afoul of *Marathon*.

### B.    Efficiency and Uniformity Support Withdrawal of the Reference Here

*De novo* review of the bankruptcy court's findings with respect to the common law claims would involve significant duplication of judicial effort and "significant additional costs and expenditure of time and effort to both parties." *Solutia Inc.* v. *FMC Corp.*, No. 04 Civ. 2842 (WHP), 2004 WL 1661115 at *3 (S.D.N.Y. July 27, 2004).  The non-core nature of the common law claims thus "strongly weighs in favor of withdrawal of the reference." *Id.; see also Orion Pictures Corp.*, 4 F.3d at 1101 ("the fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court.")

Questions of uniformity and consistency also favor withdrawal of the reference here.  Even if it were permissible to try the core and non-core claims in the bankruptcy court, the district court would then be called on to review different claims

---

[35]  This case is thus distinguishable from cases in this District holding that a common law claim is "core" where it "could provide a defense" against the defendant's proof of claim. *See, e.g., CBI Holding Co.* v. *Bank. Ser., Inc.* (*In re CBI Holding Co.*), 311 B.R. 350, 363 (S.D.N.Y. 2004).

involving the same facts (or even the same claims against different defendants) subject to different standards of review, leading to potentially inconsistent results. Trying the core claims in the bankruptcy court and non-core claims in the district court could lead to similar anomalies on appeal and would clearly result in unnecessary duplication, delay, and waste. Because the common law claims are non-core, this court should withdraw the reference with respect to the entire case in the interest of efficiency and uniformity.[36]

### III.    The Reference Should Be Withdrawn Because Trial In This Action Will Be Lengthy and Exceedingly Complex

The length and complexity of the trial in this matter provides independent "cause" to withdraw the reference in this case. Even where a claim is core, "if the trial in such cases would be a complicated proceeding, the case should be adjudicated in District Court as opposed to the Bankruptcy Court." *Braniff Int'l. Airlines, Inc.* v. *Aeron Aviation Resources Holdings II, Inc. (In re Braniff Int'l. Airlines, Inc.)*, 159 B.R. 117, 126 (E.D.N.Y. 1993). Indeed, even if the common law claims could be viewed "technically" as "core" because they were brought as putative counterclaims to certain Citigroup defendants' proofs of claim (were such a conclusion permissible under *Marathon*), this Court should withdraw the reference for reasons of "efficiency and fairness." *Complete Mgmt. Inc.* v. *Arthur Andersen, LLP (In re Complete Mgmt. Inc.)*, No. 02 Civ. 1736(NRB),

---

[36] The other factors mentioned in *Orion Pictures Corp.* -- uniformity of bankruptcy administration and the prevention of forum shopping -- have little relevance here. 4 F.3d at 1101. Enron has confirmed its reorganization plan which, in essence, provides for the distribution of all of its assets to its creditors, whereupon Enron will cease to operate as an ongoing business. *See,* Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief, *In re Enron Corp.*, No. 01-16034(AJG) (Bankr. S.D.N.Y. July 15, 2004). Moreover, the Mega Claim is before the bankruptcy court based on the automatic reference and this motion seeks to withdraw the reference to the district court with original jurisdiction over this proceeding. *See*, 28 U.S.C. § 1334(a)-(b).

2002 WL 31163878, at *3 (S.D.N.Y. Sept. 17, 2002) ("even assuming that the...adversary proceeding is technically a core proceeding," withdrawing reference where, *inter alia*, the "adversary proceeding raises legal issues more commonly resolved by this court than the bankruptcy courts, and the advancement of this action will involve extensive discovery, expert testimony, and a lengthy and complex trial requiring a jury."). *See also, Judge* v. *Ridley & Schweigert* (*In re Leedy Mortgage Co.*), 62 B.R. 303, 306 (E.D. Pa. 1986) (withdrawing reference on trustee's "core" counterclaim for breach of contract and negligence where "trustee's counterclaim is a matter very different from matters included in the typical administration of a bankrupt estate.... The trial will be lengthy and complex. It will last from two to four weeks, far longer than most proceedings in bankruptcy court...[and] the trustee here seeks more than a mere setoff. He has asserted an affirmative claim for damages.").

Citigroup anticipates that a trial in this matter will take at least four months. It will involve scores of fact witnesses and as many as 28 experts on topics as varied as accounting, auditing, corporate governance, investment banking, credit rating agencies, derivatives, energy trading contracts, limited partnership investments, asset valuation, insolvency, and damages.[37] The trial will, at a minimum, explore Citigroup's relationship with Enron over a four-year period and the fifteen structured transactions involving Citigroup that are specifically challenged in the Mega Complaint. The trial also necessarily will explore Enron's own conduct -- across all of its businesses -- over the relevant period to permit the finder of fact to determine Enron's proportionate share of responsibility for any damages it may have sustained (which amount Enron may not

---

[37]    The trial obviously will require testimony from additional fact and expert witnesses regarding Deutsche Bank and the transactions in which it participated.

33

recover regardless of whether New York or Texas law applies and regardless of the applicability of *in pari delicto*).  Moreover, because the Texas loss allocation rules should apply, the Citigroup defendants will try all potentially responsible third parties, including the other financial institutions named in the Mega Complaint and, thus, the trial necessarily will cover the 52 additional transactions involving these financial institutions specifically challenged in the Mega Complaint.[38]

Besides the difficult trial management and evidentiary issues posed by the scope and substance of the trial, the court will also need to determine a multitude of difficult legal questions including, among many others, questions of imputation (with respect to the convictions, pleas, and Fifth Amendment invocations of Enron's former management), *in pari delicto*, and whether there is an "innocent decisionmaker" exception to *in pari delicto*.  The damages issues involve complex questions of proximate causation, foreseeability and the viability of "deepening insolvency" damages.  A trial such as this lies well outside the intended purpose and core competency of bankruptcy courts.  Indeed, we are unaware that a trial approaching the length, complexity and magnitude of this one that has ever been tried in any bankruptcy court.

For reasons of "efficiency and fairness," this Court should exercise its discretion to withdraw the reference in this case so that the trial in this matter can be conducted in the district court.

---

[38]  The 52 additional transactions include those allegedly involving Deutsche Bank, who is a current defendant in this case.

## CONCLUSION

For the foregoing reasons, the Citigroup defendants respectfully request that this Court grant the Motion to Withdraw the Reference under 28 U.S.C. § 157 (d).

Dated: New York, New York
      November 27, 2007

                Respectfully submitted,

                /s/  Brad S. Karp
                Brad S. Karp (BK-3702)
                Stephen J. Shimshak (SS-8822)
                Douglas R. Davis (DD-0874)
                Michael Gertzman (MG-8096)
                Claudia L. Hammerman (CH-9005)
                PAUL, WEISS, RIFKIND, WHARTON &
                GARRISON LLP
                1285 Avenue of the Americas
                New York, NY 10019-6064
                Telephone:  (212) 373-3000

                *Attorneys for Citigroup Inc., Citibank,*
                *N.A., Citigroup Global Markets, Inc.,*
                *Citicorp North America, Inc., Citigroup*
                *Financial Products, Inc., Citigroup Global*
                *Markets Ltd., CXC LLC, Corporate Asset*
                *Funding Company, LLC, and Corporate*
                *Receivables Corporation, LLC.*