UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**ENRON CREDITORS RECOVERY CORP.**, *et al.*,<br><br>Reorganized Debtors. | 07 Civ. _____<br><br>Chapter 11<br>Case No. 01-16034 (AJG)<br><br>Jointly Administered |
| **ENRON CORP.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**CITIGROUP, INC.**, *et al.*,<br><br>Defendants. | Adv. Pro. No. 03-09266 |

**DECLARATION OF BRAD S. KARP IN SUPPORT OF THE CITIGROUP
DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

Brad S. Karp declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to Citigroup Inc., Citibank, N.A., Citigroup Global Markets, Inc. ("CGMI"), Citicorp North America, Inc., Citigroup Financial Products, Inc., Citigroup Global Markets Ltd. ("CGM Ltd."), CXC LLC ("CXC"), Corporate Asset Funding Company, LLC and Corporate Receivables Corporation, LLC in this action. I submit this declaration in support of the Citigroup Defendants' Motion to Withdraw the Reference and to place before the Court certain documents referred to therein.

2.      Attached hereto, at the tabs indicated below, are true and correct copies of the following documents referred to in the Memorandum of Law in Support of the Citigroup Defendants' Motion to Withdraw the Reference:

Exhibit A:    Reorganized Debtors' Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, dated January 10, 2005

Exhibit B:    Expert Report of B. Douglas Bernheim, Ph.D, submitted by Enron on April 6, 2007

Exhibit C:    Jury Demand filed by Citigroup defendants on February 26, 2004

Exhibit D:    Second Amended Scheduling Order, entered on August 23, 2007

Exhibit E:    Citigroup's Memorandum of Law in Support of its Motion for a Determination that Texas Law On Loss Allocation Governs Enron's Common Law Claims, filed November 16, 2007

Exhibit F:    Order Pursuant to Section 363 of the Bankruptcy Code and Rules 2002, 6004, and 9010 of the Federal Rules of Bankruptcy Procedure, entered April 22, 2004, *In re Enron Corp.*, No., 01-16034 (AJG) (Bankr. S.D.N.Y.)

Exhibit G:    Bank Defendants Joint Memorandum of Law in Support of Their Motion For Leave to Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3), filed September 25, 2006 (without exhibits)

Exhibit H:    Plaintiffs Memorandum of Law in Opposition to the Bank Defendants' Motion For Leave To Appeal the Decision of the Bankruptcy Court Concerning Determination Under 28 U.S.C. § 157(b)(3), filed November 27, 2006 (without exhibits)

Exhibit I:    Bank Defendants' Joint Reply Memorandum of Law in Support of Bank Defendants' Joint Motion For Leave To Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3), filed December 5, 2006

Exhibit J:    Letter From William J. McSherry, Jr., to Hon. Arthur J. Gonzalez, dated Oct. 2, 2007 (without exhibits)

<u>Independently-Owned Financial Services Defendants</u>

3.    On September 24, 2003, Enron and certain of its debtor affiliates ("Enron") commenced this action (the "Mega Claim") against various financial institutions, including Citigroup Inc. (Adv. Pro. No. 03-09266(AJG) (Docket No. 1).

4.    The Reorganized Debtors' Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, dated January 10, 2005 (the "Mega Complaint") alleges, "upon information and belief," that three independently-owned financial services entities -- CXC, CAFCO and CRC -- are "wholly-owned subsidiar[ies] of Citigroup" (Compl. ¶¶ 24-26.) I understand that CRC, CXC, and CAFCO are third-party owned, special-purpose, limited-liability securitization entities that purchase revenue-producing financial assets from clients of Citigroup and fund their purchases by selling asset-backed

commercial paper and medium-term notes in the market.  I further understand that Citigroup had administered these entities, providing accounting and other services, but has no ownership interest in them.

Insiders

      5.     The Mega Complaint identifies a small group of senior officers and managers of Enron who allegedly participated in a scheme to manipulate Enron's financial statements -- Andrew Fastow (Enron's Chief Financial Officer); Ben Glisan (senior finance executive and Enron's Treasurer from 2000 to 2001); Jeffrey McMahon (senior finance executive and Enron's Treasurer from 1998 to 2000); Richard Causey (Enron's Chief Accounting Officer); R. Davis Maxey (head of Enron's Structured Tax Transaction Group); and Michael Kopper (senior finance executive).  (*Id.* ¶¶ 137-49.)

      6.     Numerous other Enron insiders have been convicted or pled guilty to criminal charges:

      (a)     Jeffrey Skilling, Enron's CEO, was convicted of insider trading, securities fraud and conspiracy, *see* Judgment in a Criminal Case, *United States* v. *Skilling*, No. 04cr25 (S.D. Tex. Oct. 25, 2006), appeal docketed, No. 06-20885 (5th Cir. Nov. 16, 2006);

      (b)     Kenneth Lay, Enron's Chairman, was convicted of conspiracy and fraud, *see* Jury Verdict, Memorandum of Decision and Verdict, *United States* v. *Lay*, No. 04cr25 (S.D. Tex. May 25, 2006), abatement of decision, *United States* v. *Lay*, 456 F. Supp. 2d 869 (S.D. Tx 2006);

      (c)     David Delaney, CEO of Enron Retail, pled guilty to insider trading, *see* Cooperation Agreement, *United States* v. *Delainey*, No. 03cr420 (S.D. Tex. Oct. 30, 2003);

      (d)     Kenneth Rice, CEO of Enron Broadband, pled guilty to securities fraud, *see* Cooperation Agreement, *United States* v. *Rice*, No. 03cr93 (S.D. Tex. July 30, 2004);

      (e)     Kevin Hannon, COO of Enron Broadband, pled guilty to conspiracy to commit securities and wire fraud, *see* Cooperation

Agreement, *United States* v. *Hannon*, No. 03cr93 (S.D. Tex. Aug. 31, 2004);

   (f) Timothy Despain, Enron's Assistant Treasurer, pled guilty to conspiracy to commit securities fraud, *see* Cooperation Agreement, *United States* v. *Despain*, No. 04cr449 (S.D. Tex. Oct. 5, 2004);

   (g) Dan Boyle, VP of Enron Global Finance, was convicted of conspiracy to commit wire fraud, conspiracy to falsify books, records and accounts and of lying to a congressional investigator, *see* Judgment in a Criminal Case, *United States* v. *Boyle*, No. 03cr363 (S.D. Tex. May 25, 2005);

   (h) Mark Koenig, Enron's Director of Investor Relations, pled guilty to aiding and abetting securities fraud, *see* Cooperation Agreement, *United States* v. *Koenig*, No. 04cr389 (S.D. Tex. Aug. 25, 2004);

   (i) Paula Rieker, VP of Investor Relations, pled guilty to insider trading, *see* Plea Agreement, *United States* v. *Reiker*, No. 04cr192 (S.D. Tex. May 19, 2004);

   (j) Timothy Belden, Managing Director of West Power Trading Division, pled guilty to conspiracy to commit wire fraud, *see* Plea Agreement, *United States* v. *Belden*, No. 02cr313 (N.D. Ca. Oct. 17, 2002); and

   (k) John Forney, West Power Trading Desk Manager, pled guilty to conspiracy to commit wire fraud and making a false statement to a government agency, *see* Plea Agreement, *United States* v. *Forney*, No. 03cr178 (N.D. Ca. Aug. 5, 2004).

  7. Fifty-one other former Enron employees invoked their Fifth Amendment right against self-incrimination in refusing to answer questions at their depositions in this case:

   (a) Jeremy Martin Blachman;

   (b) Kelly Boots;

   (c) Raymond Bowen;

   (d) James J. Brown;

   (e) William Brown;

   (f) Richard Burton Buy;

(g)     Rebecca Comeau Carter;

(h)     Catherine Clark;

(i)     John Douglas Arnold;

(j)     Wesley Colwell;

(k)     Mary Helen Cook;

(l)     David Cox;

(m)     Janet Dietrich;

(n)     Richard D. DiMichele;

(o)     John Echols;

(p)     Joel Nathan Ephross;

(q)     Rodney Faldyn;

(r)     Clint Freeland;

(s)     Michael Santos Galvan;

(t)     Peyton Stinson Gibner;

(u)     David Gorte;

(v)     Shirley Ann Hudler;

(w)     James Hughes;

(x)     Kevin Duane Jordan;

(y)     Mary K. Joyce;

(z)     Andrew Kanellopoulos;

(aa)     Dan Leff;

(bb)     Kathleen Marie Lynn;

(cc)     Rodney Malcolm;

(dd)     Gordon McKillop;

(ee)     Lisa Mellencamp;

(ff)    Jordan Mintz;

(gg)    Mark. S. Muller;

(hh)    Julia Heintz Murray;

(ii)    Lou Pai;

(jj)    Mark Anderson Palmer;

(kk)    Anne Yaeger Patel;

(ll)    Gary Peng;

(mm)    Timothy Proffitt;

(nn)    Andrea Vail Reed;

(oo)    Rex Richard Rogers;

(pp)    Barry Schnapper;

(qq)    Richard Christian Sherman;

(rr)    Phillip M. Sisneros;

(ss)    Ryan Hugh Siurek;

(tt)    Edward Steven Smida;

(uu)    Carol St. Clair;

(vv)    Gregory Wade Stubblefield;

(ww)    Martin Sunde;

(xx)    John Clinton Walden; and

(yy)    Lawrence Gregory Whalley.

8.    Two insiders, Georgeanne Hodges and Mary Cilia, invoked their

Fifth Amendment rights and refused to be deposed at all.

9.    Four insiders facing criminal indictments invoked their Fifth

Amendment rights to stay their depositions:

(a)    Joseph M. Hirko, *see* Order Granting Motion to Postpone Discovery and Stay Answer During Pendency of Criminal Proceedings, *Newby* v. *Enron Corp.*, No. H-01-CV-3624 (S.D. Tex. March 30, 2004);

(b)    Kevin Howard, *see* Order Granting Emergency Motion To Stay Deposition of Kevin A. Howard, *Newby* v. *Enron Corp.*, No. H-01-CV-3624 (S.D. Tex. Nov. 15, 2005);

(c)    Rex T. Shelby, *see* Order on Emergency Motion to Stay Deposition of Rex T. Shelby, *Newby* v. *Enron Corp.*, No. H-01-CV-3624 (S.D. Tex. Nov. 15, 2005); and

(d)    Scott Yeager, *see* Order Granting Corrected Emergency Motion to Stay Deposition of Scott Yeager, *Newby* v. *Enron Corp.*, No. H-01-CV-3624 (S.D. Tex. Nov. 15, 2005).

10.    Documents demonstrating the Fifth Amendment invocations referred to in paragraphs seven, eight and nine are available upon request by the Court but are not attached hereto because of their volume.

Discovery

11.    Fact discovery in this action was coordinated with the securities class action and other Enron-related litigation pending in the United States District Court for the Southern District of Texas. Fact discovery commenced in July 2004 and concluded (with minor exceptions) in November 2005. More than 453 depositions relevant to the Mega Claim were taken during that period, more than 18,019 exhibits were marked, and countless pages of documents were produced (approximately 15 million pages by the bank defendants alone, and approximately 125 million more pages by Enron and Arthur Andersen).

12.    In the course of the Mega Claim litigation, eight of the bank defendants have settled with Enron. The remaining parties are currently conducting expert discovery. I understand that 28 depositions of the parties' respective experts have been scheduled.

Proofs of Claim

13.     Under my direction, associates at Paul Weiss reviewed the proofs of claim filed by or on behalf of the Citigroup defendants in connection with Enron's bankruptcy case. They determined and informed me that, on or before the bar date, proofs of claim were filed by or on behalf of Citibank N.A., Citicorp North America, Inc., CGM Ltd. (as its predecessor Salomon Brothers International, Ltd.), CGMI (as its predecessor Salomon Smith Barney, Inc.), and Citigroup Financial Products, Inc. (as its predecessor Salomon Brothers Holding Company) against Enron Corp., Enron North America Corp., Enron Metals & Commodities Corp. and/or Enron Power Marketing, Inc. These proofs of claim sought payment in connection with five (of the fifteen) Citigroup-related transactions that Enron challenges in the Mega Complaint as well as other transactions that Enron has never challenged. Citigroup Inc. also filed proofs of claim on behalf of itself and its subsidiaries seeking indemnification for litigation arising out of allegations of fraud by Enron.

14.     Citibank, N.A., as agent, for CXC, among others, Citibank, N.A., as portfolio manager and Citicorp North America, Inc., as agent, each filed a proof of claim in connection with a transaction known as "Rawhide." All Rawhide-related proofs of claim were withdrawn in connection with the court-approved 2004 settlement related to the Rawhide transaction and, pursuant to the parties' settlement agreement, the current Mega Complaint has eliminated all counts seeking to avoid or recover Rawhide-related transfers or seeking to disallow or subordinate any proofs of claim based on Rawhide-related transfers. *See* Order Pursuant to Section 363 of the Bankruptcy Code and Rules

2002, 6004, and 9010 of the Federal Rules of Bankruptcy Procedure, *In re Enron Corp.*,

No. 01-16034(AJG) (Bankr. S.D.N.Y. April 22, 2004), attached hereto as Exhibit F.

      15.    The Citigroup defendants will provide copies of the proofs of

claim referred to herein to the Court upon request but has not attached them hereto due to

their volume.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      November 27, 2007

                      Brad S. Karp

Exhibit A

ENRON CORP., *et al.*
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

| | | |
|---|---|---|
| **UNITED STATES BANKRUPTCY COURT** | | **Chapter 11** |
| **SOUTHERN DISTRICT OF NEW YORK** | | **Case No. 01-16034 (AJG)** |
| | x | |
| | : | **Jointly administered** |
| **In re** | : | |
| | : | |
| **ENRON CORP., *et al.*,** | : | |
| | : | |
| **Reorganized Debtors.** | : | |
| | x | |

**ENRON CORP.; ENRON NORTH** :
**AMERICA CORP.; ENRON NATURAL** :
**GAS MARKETING CORP.; ENRON** :
**BROADBAND SERVICES, INC.; ENRON** :
**ENERGY SERVICES, INC.; EES SERVICE** :
**HOLDINGS, INC.; ENRON** :
**INTERNATIONAL, INC.; ENRON** :
**ENERGY SERVICES OPERATIONS,** :
**INC.; ECT MERCHANT INVESTMENTS** :      **Adversary Proceeding**
**CORP.; ENRON POWER MARKETING,** :      **No. 03-09266 (AJG)**
**INC.; and ATLANTIC COMMERCIAL** :
**FINANCE, INC.,** :
                                       :
        **Plaintiffs,** :
                                       :
    **v.** :
                                       :
**CITIGROUP INC.; CITIBANK, N.A.;** :
**CITIGROUP GLOBAL MARKETS, INC.;** :
**CITICORP NORTH AMERICA, INC.;** :
**DELTA ENERGY CORPORATION;** :
**CITIGROUP FINANCIAL PRODUCTS,** :
**INC.; CXC LLC; CORPORATE ASSET** :
**FUNDING COMPANY, LLC;** :
**CORPORATE RECEIVABLES** :
**CORPORATION, LLC; CITIGROUP** :
**GLOBAL MARKETS LTD.; LONG LANE** :
**MASTER TRUST IV; J.P. MORGAN** :
**CHASE & CO.; J.P. MORGAN CHASE** :
**BANK (FORMERLY CHASE** :
**MANHATTAN BANK); MAHONIA** :
**LIMITED; MAHONIA NATURAL GAS** :
**LIMITED; STONEVILLE AEGEAN** :
**LIMITED; JP MORGAN SECURITIES** :
**INC.; BARCLAYS PLC; BARCLAYS** :
**BANK PLC; COLONNADE LIMITED;** :
**BARCLAYS CAPITAL SECURITIES** :
**LIMITED; BARCLAYS CAPITAL, INC.;** :
**BARCLAYS PHYSICAL TRADING** :
**LIMITED (FORMERLY BARCLAYS** :
**METALS (HOLDINGS) LIMITED);** :
**BARCLAYS METALS LIMITED;** :
**DEUTSCHE BANK AG; DEUTSCHE** :
**BANK TRUST COMPANY AMERICAS;** :
**DEUTSCHE BANK SECURITIES INC.;** :
**DEUTSCHE BANK LUXEMBOURG S.A.;** :

604041v1/007457

DEUTSCHE BANK TRUST COMPANY     :
DELAWARE; DEUTSCHE BANK TRUST     :
CORPORATION; BANKERS TRUST     :
INTERNATIONAL PLC; BT     :
COMMERCIAL CORP.; DB GREEN,     :
INC.; DEUTSCHE LEASING NEW YORK     :
CORP.; SENECA DELAWARE, INC.;     :
DEUTSCHE BANK, S.A.; BT EVER, INC.;     :
SENECA LEASING PARTNERS, L.P.;     :
CANADIAN IMPERIAL BANK OF     :
COMMERCE; CIBC WORLD MARKETS     :
CORP.; CIBC CAPITAL CORPORATION;     :
CIBC WORLD MARKETS PLC; CIBC,     :
INC.; MERRILL LYNCH & CO., INC.;     :
MERRILL LYNCH, PIERCE, FENNER &     :
SMITH INC.; MERRILL LYNCH     :
CAPITAL SERVICES, INC.; CREDIT     :
SUISSE FIRST BOSTON, INC.; CREDIT     :
SUISSE FIRST BOSTON (USA), INC.;     :
CREDIT SUISSE FIRST BOSTON LLC;     :
CREDIT SUISSE FIRST BOSTON     :
INTERNATIONAL; CREDIT SUISSE     :
FIRST BOSTON (USA)     :
INTERNATIONAL, INC.; CREDIT     :
SUISSE FIRST BOSTON; PERSHING     :
LLC; DLJ CAPITAL FUNDING, INC.; DLJ     :
FUND INVESTMENT PARTNERS III,     :
L.P.; ERNB LTD.; MERCHANT CAPITAL,     :
INC.; THE TORONTO-DOMINION     :
BANK; TORONTO DOMINION (TEXAS),     :
INC.; TD SECURITIES (USA) LLC; THE     :
ROYAL BANK OF SCOTLAND PLC; THE     :
ROYAL BANK OF SCOTLAND     :
INTERNATIONAL LIMITED; THE     :
FINANCIAL TRADING COMPANY     :
LIMITED; SIDERIVER INVESTMENTS     :
LIMITED; NATIONAL WESTMINSTER     :
BANK PLC; CAMPSIE LTD.; COUTTS     :
(CAYMAN) LIMITED; ROYAL BANK OF     :
CANADA; ROYAL BANK HOLDING     :
INC.; RBC DOMINION SECURITIES     :
INC.; RBC DOMINION SECURITIES     :
LIMITED; RBC HOLDINGS (USA) INC.;     :
RBC CAPITAL MARKETS     :
CORPORATION; SUNDANCE     :
INDUSTRIAL PARTNERS L.P.; CAYMUS     :

**TRUST; JGB TRUST; SPHINX TRUST;**    :
**PYRAMID I ASSET, L.L.C.;**    :
**NIGHTHAWK INVESTORS L.L.C.;**    :
**WHITEWING ASSOCIATES L.P.;**    :
**NAHANNI INVESTORS L.L.C.;**    :
**MARENGO, L.P.; KLONDIKE RIVER**    :
**ASSETS, L.L.C.; YOSEMITE**    :
**SECURITIES TRUST I; YOSEMITE**    :
**SECURITIES COMPANY, LTD.; YUKON**    :
**RIVER ASSETS L.L.C.; ENRON CREDIT**    :
**LINKED NOTES TRUST; ENRON**    :
**CREDIT LINKED NOTES TRUST II;**    :
**ENRON STERLING CREDIT LINKED**    :
**NOTES TRUST; ENRON EURO CREDIT**    :
**LINKED NOTES TRUST; THE BANK OF**    :
**NEW YORK, INDENTURE TRUSTEE**    :
**AND COLLATERAL AGENT; BESSON**    :
**TRUST; STATE STREET BANK AND**    :
**TRUST CO.; STATE STREET BANK AND**    :
**TRUST CO. OF CONNECTICUT, N.A.;**    :
**RELIANCE TRUST COMPANY,**    :
**TRUSTEE;  FLEETBOSTON FINANCIAL**    :
**CORP.; and FLEET NATIONAL BANK,**    :
   :
       **Defendants.**    :
_____    :
   x


**REORGANIZED DEBTORS' FOURTH AMENDED COMPLAINT
FOR THE AVOIDANCE AND RETURN OF PREFERENTIAL
PAYMENTS AND FRAUDULENT TRANSFERS, EQUITABLE
SUBORDINATION, AND DAMAGES, TOGETHER WITH OBJECTIONS
AND COUNTERCLAIMS TO CREDITOR DEFENDANTS' CLAIMS**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THIS ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.   Enron Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.   Enron North America Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.   Enron Natural Gas Marketing Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        4.   Enron Broadband Services, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        5.   Enron Energy Services, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        6.   EES Service Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        7.   Enron International, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        8.   Enron Energy Services Operations, Inc. . . . . . . . . . . . . . . . . . . . . . . 10

        9.   ECT Merchant Investments Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        10.  Enron Power Marketing, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        11.  Atlantic Commercial Finance, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   The Bank Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.   The Citigroup Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.   The JP Morgan Chase Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        3.   The Barclays Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        4.   The BT/Deutsche Bank Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        5.   The CIBC Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        6.   The Merrill Lynch Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        7.   The CSFB Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8.      The Toronto Dominion Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9.      The RBS Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10.    The RBC Defendants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

11.    The Bank Defendants' Proofs of Claim . . . . . . . . . . . . . . . . . . . . . . . . 24

C.     Additional Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D.     Claim Transferee Defendants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.     JURISDICTION AND VENUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.    FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A.     Enron Insiders And The Bank Defendants Together Caused Enron's Collapse
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.      The Insiders Were Enron Officers With Power And Authority,
Motivated By Greed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

a.      Fastow, Causey, McMahon, and Glisan caused Enron to enter
into the improper SPE transactions, and ensured the
transactions were improperly reported . . . . . . . . . . . . . . . . . . . . 32

b.      Causey and Maxey caused Enron to enter into improper tax
transactions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

c.      Fastow and Kopper orchestrated (and profited from) the
scheme through SPEs they managed  . . . . . . . . . . . . . . . . . . . . . 35

d.      The Insiders benefitted from their improper conduct  . . . . . . . . 35

e.      The Insiders are being held criminally accountable . . . . . . . . . . 36

2.      The Bank Defendants Were Essential To The Scheme And Were
Also Motivated By Greed  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3.      How The Scheme Worked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

a.      Enron embraced mark to market accounting and trading  . . . . . 39

b.      Enron's credit rating became vitally important . . . . . . . . . . . . . 40

c.      The Insiders understood how the rating agencies determined
Enron's credit rating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

d.    The Insiders engaged in a scheme that used SPEs improperly to prop up Enron's credit rating . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(1)    The Insiders applied accounting techniques improperly to four types of transactions . . . . . . . . . . . . 46

(2)    The Enron prepay transactions were loans improperly disguised as commodity trades . . . . . . . . . . . . . . . . . . . 48

(3)    The Insiders used FAS 140 transactions improperly to hide and move debt off Enron's balance sheet and to increase cash flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

(4)    The Insiders used minority interest transactions improperly to hide debt . . . . . . . . . . . . . . . . . . . . . . . . . . 58

(5)    The Insiders used tax transactions improperly to generate paper income . . . . . . . . . . . . . . . . . . . . . . . . . . 61

e.    The scheme gave the Insiders and the Bank Defendants time and opportunity to profit at Enron's expense . . . . . . . . . . . . . . . . 62

(1)    In late 1997, Fastow and Kopper formed Chewco . . . . . . 64

(2)    In 1999, Fastow and Kopper expanded their scheme by creating the LJM partnerships . . . . . . . . . . . . . . . . . . . 64

(3)    In 1999, CSFB and RBS aided Fastow by knowingly participating in and supporting LJM1 . . . . . . . . . . . . . . 65

(4)    In 1999, the Bank Defendants aided Fastow and Kopper by knowingly participating in and supporting LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

f.    Enron's outside directors were unaware of the scheme . . . . . . . . 73

4.    The Bank Defendants Knowingly Participated In Manipulating And Misstating Enron's Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . 76

a.    Citigroup knowingly assisted the Insiders in misstating Enron's financial condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

(1)    Citigroup's relationship with Enron . . . . . . . . . . . . . . . . 80

(2)    The Citigroup prepays . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

(3)    The minority interest transactions . . . . . . . . . . . . . . . . . . 95

(a)    Nighthawk . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

(b)    Nahanni . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

(4)    The Forest Products transactions . . . . . . . . . . . . . . . . . . 101

(5)    Citigroup offloaded its Enron exposure . . . . . . . . . . . . 108

(6)    Citigroup revised its structured finance policies . . . . . . 109

b.    Chase knowingly assisted the Insiders in misstating Enron's
financial condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

(1)    Chase's relationship with Enron  . . . . . . . . . . . . . . . . . . 113

(2)    The Chase prepay transactions . . . . . . . . . . . . . . . . . . . . 114

(a)    Payments or transfers during the ninety-day
period prior to bankruptcy . . . . . . . . . . . . . . . . 123

(3)    FAS 140 transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

(a)    Hawaii  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

(b)    Fishtail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

c.    Barclays knowingly assisted the Insiders in misstating
Enron's financial condition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

(1)    Barclays' relationship with Enron  . . . . . . . . . . . . . . . . . 130

(2)    J.T. Holdings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

(3)    Nikita . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

(3)(a)  Avici  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

(4)    SO$_2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

(a)    The September transaction . . . . . . . . . . . . . . . . 139

(b)    The October transaction . . . . . . . . . . . . . . . . . . 142

(c)    Economic reality and allocation of risk in the
SO$_2$ transactions . . . . . . . . . . . . . . . . . . . . . . . . . 146

(d)    Barclays' improper appropriation of Plaintiff's funds for sums not due . . . . . . . . . . 147

(5)    Chewco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

(6)    Prepays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

     (a)    Nixon Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . 150

     (b)    The September 2001 Prepaid Oil Swap . . . . . . . 151

d.    BT/Deutsche Bank knowingly assisted the Insiders in misstating Enron's financial condition . . . . . . . . . . . . . . . . . . . 152

(1)    BT/Deutsche Bank's  relationship with Enron . . . . . . . 152

(2)    The tax transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

     (a)    Steele . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

     (b)    Cochise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

     (c)    Teresa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

     (d)    Tomas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

     (e)    Renegade and Valhalla . . . . . . . . . . . . . . . . . . . . 162

(3)    BT/Deutsche Bank limited its Enron exposure . . . . . . . 163

e.    CIBC knowingly assisted the Insiders in misstating Enron's financial condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

(1)    CIBC's relationship with Enron . . . . . . . . . . . . . . . . . . . 165

(2)    The FAS 140 transactions . . . . . . . . . . . . . . . . . . . . . . . 166

     (a)    The 1998 FAS 140 transactions . . . . . . . . . . . . 168

     (b)    The 1999 FAS 140 transactions . . . . . . . . . . . . 169

     (c)    The 2000 FAS 140 transactions . . . . . . . . . . . . 170

f.    Merrill Lynch knowingly assisted the Insiders in misstating Enron's financial condition . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

(1)    Merrill Lynch's relationship with Enron . . . . . . . . . . . . 178

    (2)  Nigerian Barge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

    (3)  1999 electricity trade . . . . . . . . . . . . . . . . . . . . . . . . . . 182

    (4)  LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

  g.  CSFB knowingly assisted the Insiders in misstating Enron's
    financial condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

    (1)  CSFB's relationship with Enron . . . . . . . . . . . . . . . . . . 185

    (2)  LJM1 and LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

      (a)  The Rhythms Hedge . . . . . . . . . . . . . . . . . . . . . . 188

      (b)  The CSFB Bridge Loan and the SAILs
        transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

      (c)  The Southampton transaction . . . . . . . . . . . . . . 191

      (d)  LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

    (3)  The Prepaid Oil Swaps . . . . . . . . . . . . . . . . . . . . . . . . . 193

    (4)  FAS 140 transactions . . . . . . . . . . . . . . . . . . . . . . . . . . 195

      (a)  Nile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

      (b)  Nikita . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

    (5)  CSFB abandoned Enron . . . . . . . . . . . . . . . . . . . . . . . . 200

  h.  Toronto Dominion knowingly assisted the Insiders in
    misstating Enron's financial condition . . . . . . . . . . . . . . . . . . 203

    (1)  Toronto Dominion's relationship with Enron . . . . . . . 204

    (2)  The Toronto Dominion Prepays . . . . . . . . . . . . . . . . . . 207

    (3)  Toronto Dominion limited its Enron exposure . . . . . . 213

  i.  Royal Bank of Scotland/NatWest knowingly assisted the
    Insiders in misstating Enron's financial condition . . . . . . . . . . 214

    (1)  RBS's relationship with Enron . . . . . . . . . . . . . . . . . . 216

    (2)  LJM1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

           (a)     LJM1 and the Rhythms Hedging transaction . . . 220

           (b)     RBS's total return swap with AIG . . . . . . . . . . . 221

           (c)     Cuiaba . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

       (3)     The RBS FAS 140 transactions . . . . . . . . . . . . . . . . . . . 225

           (a)     Sutton Bridge . . . . . . . . . . . . . . . . . . . . . . . . . . 226

           (b)     ETOL I, II, and III . . . . . . . . . . . . . . . . . . . . . . 227

       (4)     The Nixon prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

    j.     RBC knowingly assisted the Insiders in misstating Enron's financial condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

       (1)     RBC's relationship with Enron . . . . . . . . . . . . . . . . . . . 232

       (2)     Alberta . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

       (3)     Hawaii . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

       (4)     RBC limited its Enron exposure . . . . . . . . . . . . . . . . . 238

  5.     The Bank Defendants Acted Together To Manipulate And Misstate Enron's Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

  6.     The Bank Defendants' Participation In The Insiders' Scheme Caused Substantial Loss to Enron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

V.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

  A.    COUNTS 1 - 5 (Against Citigroup Defendants) . . . . . . . . . . . . . . . . . . . . . 244

    COUNT 1     (Avoidance of the Citi Preferential Transfers) . . . . . . . . . . . . . 244

    COUNT 2     (Avoidance of the Citi 548 Transfers as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

    COUNT 3     (Avoidance of the Citi 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . 250

    COUNT 4     (Recovery of the Citi Preferential Transfers, Citi 548 Transfers and Citi 544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . 256

COUNT 5          (Disallowance of Claims Under Bankruptcy Code Section
                 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

B.     COUNTS 6 - 19 (Against JP Morgan Chase and Fleet Defendants) . . . . . . . . 257

COUNT 6          (Avoidance of the Mahonia Preferential Commodity
                 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

COUNT 7          (Avoidance of the Mahonia 548 Commodity Transfers as
                 Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

COUNT 8          (Avoidance of the Mahonia 544 Commodity Transfers Under
                 Section 544 of the Bankruptcy Code and Applicable State
                 Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . 265

COUNT 9          (Avoidance of the Chase Preferential Principal and Interest
                 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

COUNT 10         (Avoidance of the Chase 548 Principal and Interest Transfers
                 as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277

COUNT 11         (Avoidance of the Chase 544 Principal and Interest Transfers
                 Under Section 544 of the Bankruptcy Code and Applicable
                 State Fraudulent Conveyance or Fraudulent Transfer Law) . . . 284

COUNT 12         (Avoidance of the Chase Preferential Purported Margin
                 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297

COUNT 13         (Avoidance of the Chase 548 Purported Margin Transfers as
                 Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

COUNT 14         (Avoidance of the Chase 544 Purported Margin Transfers
                 Under Section 544 of the Bankruptcy Code and Applicable
                 State Fraudulent Conveyance or Fraudulent Transfer Law) . . . 313

COUNT 14A        (Violation of Automatic Stay) . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

COUNT 14B        (Turnover of Property of the Estate) . . . . . . . . . . . . . . . . . . . . . . 328

COUNT 14C        (Avoidance of Unauthorized Postpetition Transfers) . . . . . . . . 328

COUNT 15         (Avoidance of the Chase Preferential Transfer) . . . . . . . . . . . . 329

COUNT 16         (Avoidance of the Chase 548 Transfers as Fraudulent
                 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

COUNT 17    (Avoidance of the Chase 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . 331

COUNT 18    (Recovery of the Mahonia Commodity Transfers, the Chase Principal and Interest Transfers, the Chase Purported Margin Transfers, the Mahonia/JPMC Postpetition Transfers, the Chase Preferential Transfers, the Chase 548 Transfers, and the Chase 544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

COUNT 19    (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

C.    COUNTS 20 - 29 (Against Barclays Defendants) . . . . . . . . . . . . . . . . . . . . . . . . 334

COUNT 20    (Avoidance of the Barclays Preferential Transfers) . . . . . . . . . . 334

COUNT 21    (Avoidance of the Barclays 548 Transfers as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

COUNT 22    (Avoidance of the Barclays 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . 340

COUNT 22A    (Unjust Enrichment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

COUNT 23    (Turnover of Property of the Estate) . . . . . . . . . . . . . . . . . . . . . 345

COUNT 24    (Violation of Automatic Stay) . . . . . . . . . . . . . . . . . . . . . . . . . . 346

COUNT 25    (Avoidance of Unauthorized Postpetition Transfers) . . . . . . . . 347

COUNT 25A    (Breach of Contract) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

COUNT 25B    (Conversion) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

COUNT 25C    (Unjust Enrichment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

COUNT 26    (Invalid and Avoidable Setoffs) . . . . . . . . . . . . . . . . . . . . . . . . . 349

COUNT 27    (Avoidable Setoffs Resulting in Improvement in Position) . . . . 350

COUNT 28    (Recovery of the Barclays Avoidable Transfers) . . . . . . . . . . . . 351

COUNT 28A    (Avoidance of Unperfected Security Interest in Emission Credits) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

COUNT 28B   (Recovery of Emission Credits for the Benefit of the Estates) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

COUNT 28C   (Transfer of Lien to the Estate) . . . . . . . . . . . . . . . . . . . . . . . . . 352

COUNT 29    (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

D.    COUNTS 30 - 36 (Against BT/Deutsche Bank Defendants) . . . . . . . . . . . . . . 353

COUNT 30    (Avoidance of Valhalla Setoff as a Postpetition Transaction) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

COUNT 31    (Recovery of Avoided Postpetition Transfers) . . . . . . . . . . . . . 357

COUNT 32    (Avoidance of the BT/Deutsche Bank Preferential Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357

COUNT 33    (Avoidance of the BT/Deutsche Bank 548 Transfers as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

COUNT 34    (Avoidance of the BT/Deutsche Bank 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . 361

COUNT 35    (Recovery of the BT/Deutsche Bank Preferential Transfers, the BT/Deutsche Bank 548 Transfers, and the BT/Deutsche Bank 544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

COUNT 36    (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

E.    COUNTS 37 - 41 (Against CIBC Defendants) . . . . . . . . . . . . . . . . . . . . . . . . 367

COUNT 37    (Avoidance of the CIBC Preferential Transfers) . . . . . . . . . . . 367

COUNT 38    (Avoidance of the CIBC 548 Transfers as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368

COUNT 39    (Avoidance of the CIBC 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . 368

COUNT 40    (Recovery of the CIBC 544 Transfers) . . . . . . . . . . . . . . . . . . . 373

COUNT 41    (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373

F.  COUNTS 42 - 44 (Against Merrill Lynch Defendants) . . . . . . . . . . . . . . . . . . 373

   COUNT 42   (Avoidance of the Merrill Lynch 544 Transfers Under Section
              544 of the Bankruptcy Code and Applicable State Fraudulent
              Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . 373

   COUNT 43   (Recovery of the Merrill Lynch 544 Transfers) . . . . . . . . . . . 375

   COUNT 44   (Disallowance of Claims Under Bankruptcy Code Section
              502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 375

G.  COUNTS 45 - 49 (Against CSFB Defendants) . . . . . . . . . . . . . . . . . . . . . . . . 376

   COUNT 45   (Avoidance of the CSFB Preferential Transfers) . . . . . . . . . . . 376

   COUNT 46   (Avoidance of the CSFB 548 Transfers as Fraudulent
              Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377

   COUNT 47   (Avoidance of the CSFB 544 Transfers Under Section 544 of
              the Bankruptcy Code and Applicable State Fraudulent
              Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . 379

   COUNT 47A  (Unjust Enrichment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

   COUNT 47B  (Turnover of Property of the Estate) . . . . . . . . . . . . . . . . . . . . 383

   COUNT 48   (Recovery of the CSFB Preferential Transfers, the CSFB 548
              Transfers and the CSFB 544 Transfers) . . . . . . . . . . . . . . . . . . 384

   COUNT 49   (Disallowance of Claims Under Bankruptcy Code Section
              502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384

H.  COUNTS 50 - 54 (Against Toronto Dominion Defendants) . . . . . . . . . . . . . . 385

   COUNT 50   (Avoidance of the Toronto Dominion Preferential Transfers . . 385

   COUNT 51   (Avoidance of the Toronto Dominion 548 Transfers as
              Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 386

   COUNT 52   (Avoidance of the Toronto Dominion 544 Transfers Under
              Section 544 of the Bankruptcy Code and Applicable State
              Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . 389

   COUNT 53   (Recovery of Avoided Transfers Related to the Toronto
              Dominion Preferential Transfers, the Toronto Dominion 544
              Transfers and the Toronto Dominion 544 Transfers) . . . . . . . . 393

|  |  | COUNT 54 | (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393 |

I.     COUNTS 55 - 59 (Against RBS Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . 394

COUNT 55 (Avoidance of the RBS Preferential Transfer) . . . . . . . . . . . . 394

COUNT 56 (Avoidance of the RBS 548 Transfers as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 394

COUNT 57 (Avoidance of the RBS 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . . 396

COUNT 58 (Recovery of the RBS 548 Transfers and RBS 544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

COUNT 59 (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

J.     COUNTS 60 - 64 (Against RBC Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . 399

COUNT 60 (Avoidance of the RBC Preferential Transfers) . . . . . . . . . . . . 399

COUNT 61 (Avoidance of the RBC 548 Transfers) . . . . . . . . . . . . . . . . . . . 399

COUNT 62 (Avoidance of the RBC 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . . 400

COUNT 63 (Recovery of the RBC Preferential Transfers, RBC 548 Transfers and the RBC 544 Transfers) . . . . . . . . . . . . . . . . . . . 400

COUNT 64 (Disallowance of Claims Under Bankruptcy Code Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

K.     COUNTS 65 - 68 (Guarantee and Letter of Credit Claims) . . . . . . . . . . . . . . 401

COUNT 65 (Avoidance of the Challenged Transaction Guarantees and Certain Letter of Credit Agreements as Fraudulent Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

COUNT 66 (Avoidance of the Challenged Transaction Obligations Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . . . 403

COUNT 67    (Recovery of the Challenged Transaction Obligations; Unjust
Enrichment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

COUNT 68    (Disallowance of Claims Under Bankruptcy Code
Section 502(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

L.    COUNTS 69 - 73B (Additional Counts Under the Bankruptcy Code) . . . . . . . 407

COUNT 69    (Avoidance of Intentional Fraudulent Transfers Under
Section 548(a)(1)(A) of the Bankruptcy Code; Against All
Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

COUNT 70    (Avoidance of Intentional Fraudulent Transfers and
Conveyances Under Section 544 of the Bankruptcy Code and
Applicable State Law; Against All Defendants) . . . . . . . . . . . . 409

COUNT 71    (Recovery of Avoided Intentional Fraudulent Transfers and
Conveyances Under Section 550 of the Bankruptcy Code;
Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 411

COUNT 72    (Disallowance of Claims Under Bankruptcy Code
Section 502(d); Against All Defendants) . . . . . . . . . . . . . . . . . . 412

COUNT 73    (Equitable Subordination Under Sections 510(c)(1)-(2) and
105(a) of the Bankruptcy Code; Against Subordination
Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

COUNT 73A  (Equitable Subordination Under Sections 510(c)(1)-(2) and
105(a) of the Bankruptcy Code; Against Claim Transferee
Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415

COUNT 73B  (Disallowance of Claims Under Bankruptcy Code
Section 502(d); Against Claim Transferee Defendants) . . . . . . 417

M.    COUNTS 74 - 76 (Common Law Counts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

COUNT 74    (Aiding and Abetting Breach of Fiduciary Duty; Enron
Against All Bank Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

COUNT 75    (Aiding and Abetting Fraud; Enron Against All Bank
Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422

Roosevelt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 423

Truman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Jethro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 425

Yosemite I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 426

Nixon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 427

Yosemite II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 428

Yosemite III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 429

Yosemite IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 430

June 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431

Nighthawk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431

Nahanni . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 432

Bacchus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 433

Sundance Industrial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 433

Chase VI Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

Chase VII Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 435

Chase VIII Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 436

Chase IX Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 437

Chase X Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 437

Chase XI Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 439

Chase XII Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 439

Fishtail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 440

December 2000 Prepaid Oil Swap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 440

Nikita . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 441

Nile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442

JT Holdings Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442

SO$_2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443

Chewco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 444

Steele . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 445

Cochise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

Teresa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 447

Tomas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 448

Renegade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 449

Valhalla . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 450

Riverside III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 451

Riverside IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 451

Pilgrim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 452

Riverside V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 453

Leftover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 454

Nimitz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 455

Ghost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456

Alchemy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456

Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

Specter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458

Hawaii . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458

Nigerian Barge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 459

1999 Electricity Trades . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460

December 1998 Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460

Truman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461

Jethro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461

Nixon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462

The Alberta Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462

The London Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 463

Sutton Bridge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 464

ETOL I, II, and III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 465

Citigroup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 469

JP Morgan Chase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475

Barclays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 480

BT/Deutsche Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

CIBC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 487

Merrill Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 491

CSFB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 494

Toronto Dominion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 496

RBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500

RBC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 504

COUNT 76    (Unlawful  Civil  Conspiracy;  Enron  Against  All Bank
Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 505

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 511

**REORGANIZED DEBTORS' FOURTH AMENDED COMPLAINT
FOR THE AVOIDANCE AND RETURN OF PREFERENTIAL
PAYMENTS AND FRAUDULENT TRANSFERS, EQUITABLE
SUBORDINATION, AND DAMAGES, TOGETHER WITH OBJECTIONS
AND COUNTERCLAIMS TO CREDITOR DEFENDANTS' CLAIMS**

Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron

Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron

International, Inc., Enron Energy Services Operations, Inc., ECT Merchant Investments Corp.,

Enron Power Marketing, Inc., and Atlantic Commercial Finance, Inc., as reorganized debtors,

together with affiliated reorganized debtors for purposes of Counts 73, 73A and 73B as specified

below, allege for their Complaint as follows:

**I.
NATURE OF THIS ACTION**

1.    Reorganized debtors Enron Corp. ("Enron"), Enron North America Corp. ("ENA"),

Enron Natural Gas Marketing Corp. ("ENGM"), Enron Broadband Services, Inc. ("Enron

Broadband"), Enron Energy Services, Inc. ("Enron Energy Services"), EES Service Holdings, Inc.

("EES Service Holdings"), Enron International, Inc. ("Enron International"), Enron Energy Services

Operations, Inc. ("EESO"), ECT Merchant Investments Corp. ("ECTMI"), Enron Power Marketing,

Inc. ("EPMI"), and Atlantic Commercial Finance, Inc. ("ACFI"), together with affiliated

reorganized debtors as specified below, bring this adversary proceeding against the banks and

investment banks that bear substantial responsibility for the stunning downfall of what was once the

seventh largest corporation in the United States.  These banks and investment banks (together with

certain subsidiaries and affiliates, the "**Bank Defendants**") participated with a small group of senior

officers and managers of Enron (the "**Insiders**") in a multi-year scheme to manipulate Enron's

financial statements and misstate its financial condition.  The central purposes of this scheme were

to mask a growing disparity between the company's reported revenues, which were increasingly

based upon speculative mark-to-market accounting valuations, and its real earnings from operations, as well as to conceal the mountain of debt required to keep the company's varied and often unsuccessful business ventures afloat. For the Insiders, the ultimate purpose of the scheme was to provide them with opportunities to obtain profits from self-dealing transactions with Enron – profits that were shared with many of the Bank Defendants.

2.      The Bank Defendants principally assisted the scheme by designing, implementing, and often financing structured finance transactions with Enron, *knowing* that the Insiders were improperly recording the financial effects of these transactions. For example, many of the Bank Defendants made loans to Enron but deliberately disguised these loans as prepay commodity contracts. These phony "prepay" transactions routinely closed at the end of a fiscal quarter and were arranged in amounts specifically chosen to inflate Enron's operating cash flow to levels necessary to maintain Enron's credit ratings. The billions of dollars Enron received from the "prepay" transactions were wrongly recorded as cash flow from Enron's business operations, giving the false appearance that Enron's businesses were healthy and disguising the mismatch between its reported income and the cash generated by ongoing operations. Both the Bank Defendants and the Insiders knew that the "prepay" transactions were loans, and should have been recorded by Enron as cash from financing activities – not from business operations. In addition, Enron's obligation to repay the amounts loaned in the "prepay" deals was debt, but the Bank Defendants knew the Insiders were manipulating Enron's balance sheet by recording them as price risk management liabilities. Internally, the Bank Defendants described the prepays as ***"we were basically making a loan to [Enron]"*** and ***"oil goes in a circle so they all cancel . . . net net economically like a loan."*** One banker saw these transactions as ***"window dressing"*** and warned that ***"[t]he scale of financial period manipulation [at Enron] is exceedingly worrying."***

3.      A second large group of transactions involves the purported sale of Enron assets to special purpose entities ("SPEs") in which Bank Defendants appeared to make the "at risk" equity investment that accounting rules required.  In many cases, however, the Insiders gave the Bank Defendants secret assurances that their equity investment would be repaid.  As one banker candidly wrote, ***"Enron is Not permitted to ASSURE a repurchase of our equity (though this is our undocumented 'understanding' with the CFO)."***  Since the Bank Defendants viewed these transactions as loans and not as true equity investments, *they* insisted upon promises of repayment as a condition of the deal.  Knowing that such assurances invalidated the intended accounting for these transactions, the Insiders and Bank Defendants concealed these oral promises from others at Enron and from Enron's accountants.  With the Bank Defendants' full knowledge, the Insiders then improperly treated the proceeds from the transactions as operating cash flow – not cash flow from financing – and often recorded bogus gains on sales of the assets.  One banker, whose bank completed four of these transactions with Enron, described this as ***"21st Century Alchemy."***  The cumulative effect on Enron's financial statements of the Bank Defendants' knowing participation in the scheme is staggering:  Between 1997 and 2001, the Bank Defendants' structured finance transactions with Enron allowed the Insiders wrongfully to record more than $9 billion as operating cash flow and more than $1 billion as income and improperly to understate Enron's debt by more than $11 billion.

4.      Many of the Bank Defendants aided the scheme by becoming investors in private partnerships the Insiders formed for the purpose of profiting from transactions with Enron.  The most notorious of these partnerships, LJM, was named for former Chief Financial Officer Andrew Fastow's wife and children.  Some Bank Defendants were attracted to these partnerships by the promise of extraordinary returns on their investment; others were induced by Fastow's threat that their participation was the key to a continuing flow of business from his employer, Enron.  All knew

that by investing in these partnerships, whose only business would be with Enron, they were assisting Enron's CFO and other Insiders in profiting at Enron's expense. Importantly, the longer the Insiders and Bank Defendants were able to maintain the appearance of Enron's success through structured finance transactions, the more opportunities the Insiders and their private partnerships had to extract ill-gotten gains from Enron.

5.     For the Bank Defendants, the scheme offered the irresistible temptation of enormous fees plus revenues from equity and debt underwritings, traditional financings, and other unusually lucrative transactions with Enron, such as the phony "prepays" and the SPEs. For some of the Bank Defendants, the sheer frequency of Enron deals – an average of one per month for over four years – was sufficient reward for the risk that the scheme might unravel. For other Bank Defendants, the Insiders' unmistakable threat that lenders who refused transactions would be denied future Enron business did the trick. The Bank Defendants were hugely rewarded for their involvement. Between 1997 and Enron's demise in 2001, they collected hundreds of millions in revenue from Enron deals – if not more. In addition, those who invested in the private partnerships with the Insiders received lucrative returns.

6.     For the Insiders, the scheme provided unparalleled financial and professional rewards. They received generous compensation packages and bonuses based upon Enron's financial performance, as fueled by the scheme. They exercised stock options and reaped millions of dollars in gains from Enron's stock prices, which were seriously inflated by the scheme. And some of them made millions of dollars in profits from their ownership interests in the private partnerships that did business with Enron. Former CFO Fastow and his family members made $60,000,000 from slight investments in these partnerships. Former Enron Treasurer Ben Glisan made $1,000,000 in a few months from an investment of only $6,000. Former senior manager Michael Kopper took home almost $30,000,000. Some of the Insiders such as Kopper and Glisan kept their participation in

these partnerships secret from Enron.  Fastow, whose participation was known, deceived Enron by promising that both the transactions between the partnerships and Enron and his compensation would be carefully reviewed by others to determine their fairness.  But those promises were never kept.

7.      The effect of the Insiders' and Bank Defendants' scheme on Enron was devastating. While the company's financial statements appeared robust, in truth many of Enron's operations were struggling.  Buoyed by artificially strong credit ratings and flourishing stock prices, and willingly assisted by the Bank Defendants, the company incurred billions and billions of dollars of debt which its business operations were not able to repay.  As a result, in a few years Enron deteriorated from a healthy energy company into a deeply insolvent trading company.  Its bankruptcy followed quickly from the first disclosures of the scheme.  By that time, Enron was insolvent by tens of billions of dollars.

8.      By this Complaint, Enron, ENA, ENGM, Enron Broadband, Enron Energy Services, EES Service Holdings, Enron International, EESO, ECTMI, EPMI, and ACFI (collectively, "Plaintiff") bring several types of claims against the Bank Defendants (and in certain counts against all Defendants).  First, under section 550 of Title 11 of the United States Code (the "Bankruptcy Code"), Plaintiff seeks to recover from the Bank Defendants payments that Plaintiff made in connection with the structured finance transactions that were preferential transfers under section 547(b) of the Bankruptcy Code, improper postpetition transfers under section 549 of the Bankruptcy Code, and/or fraudulent transfers under sections 544 and 548 of the Bankruptcy Code and applicable state law.  Second, based upon these preferences, postpetition transfers, and/or fraudulent transfers, Plaintiff seeks to disallow claims the Defendants filed against the Plaintiff's estate, pursuant to section 502(d) of the Bankruptcy Code and pursuant to section 502(a) to the extent that the claims are based upon obligations that Plaintiff fraudulently incurred.  Third, in

Counts 73 and 73A of this Complaint, Subordination Plaintiff seeks to equitably subordinate under

sections 510 and 105 of the Bankruptcy Code the claims against the Subordination Plaintiff's estate

made by Defendants submitting proofs of claim.  Fourth, with respect to certain purported sales,

Enron and ENA seek: (a) declaratory relief pursuant to the Bankruptcy Code and Rules to

recharacterize those purported sales as unsecured or partially secured loan transactions; (b) in certain

instances, the avoidance of unperfected security interests; and (c) the recovery of property of the

estate or its value.  Fifth, Enron seeks to recover the enormous damages it suffered as a result of the

Bank Defendants' knowing participation in the Insiders' scheme to manipulate and misstate Enron's

financial condition.  Claims against the Bank Defendants for aiding and abetting the Insiders'

breaches of fiduciary duties to Enron are brought in Count 74, for aiding and abetting the Insiders'

fraud in Count 75, and for civil conspiracy in Count 76.  As to those Defendants who have filed

claims or on whose behalf claims have been filed against Plaintiff, this adversary proceeding is

brought as an objection and counterclaim to those claims.

## II.
## THE PARTIES

A.    **Plaintiff**

   1.    **Enron Corp.**

   9.    Plaintiff Enron is an Oregon corporation with its principal place of business in

Houston, Texas.  As of this date, Enron is a reorganized debtor in accordance with the Plan, as

defined below.  Enron today is neither represented by, nor representative of, the group of corrupt

officers who contributed to the company's financial collapse.  The wrongdoers have been driven out,

and were replaced by the outside, independent management of Stephen Forbes Cooper, LLC (headed

by restructuring specialist Stephen Cooper).  By Order dated April 4, 2002, the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") authorized and

approved the employment of Stephen Cooper as acting CEO and Chief Restructuring Officer of Enron effective January 28, 2002. The Bankruptcy Court also authorized the assignment of a certain number of Stephen Forbes Cooper, LLC individuals to act as new officers of Enron. Cooper and the new officers were given full authority to manage and operate Enron's business. By Order dated July 15, 2004 (the "Confirmation Order"), the Bankruptcy Court confirmed the Supplemental Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"). The effective date of the Plan occurred on November 17, 2004. Pursuant to the Confirmation Order, Enron is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

10.     Further, the wrongdoing of former Enron officers and managers, as well as that of each Bank Defendant in this case, has been investigated by at least one of two independent examiners appointed by the Bankruptcy Court. By Order dated April 8, 2002, the Bankruptcy Court directed the United States Trustee for the Southern District of New York (the "U.S. Trustee") to appoint an examiner for Enron (the "Enron Examiner"). That Order gave the Enron Examiner broad authority to investigate and report on transactions at Enron involving special purpose entities. On May 22, 2002, the U.S. Trustee appointed Neal Batson as the Enron Examiner. Since his appointment, the Enron Examiner has reviewed millions of pages of documents, has taken sworn testimony from nearly 200 witnesses, and has issued four extensive reports on SPE transactions at Enron. All of the Enron Examiner's third report and part of the fourth report were devoted to examining the role of the following Bank Defendants in causing Enron's collapse: Citigroup, J.P. Morgan Chase, Barclays, BT/Deutsche Bank, CIBC, Merrill Lynch, Credit Suisse First Boston, Royal Bank of Scotland, and Toronto Dominion.

2.     **Enron North America Corp.**

11.     Plaintiff ENA is a Delaware corporation with its principal place of business in Houston, Texas.  ENA is the successor-in-interest to Enron Capital & Trade Resources Corp.  ENA is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, ENA is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

12.     The wrongdoing of certain financial institutions has been investigated by an independent examiner appointed by the Bankruptcy Court (the "ENA Examiner").  The Bankruptcy Court appointed the ENA Examiner, Harrison J. Goldin, to investigate institutions that the Enron Examiner could not examine because of interest conflicts.  As a result, the ENA Examiner reviewed the activities of Royal Bank of Canada and its respective subsidiaries and/or affiliates.   On November 14, 2003, the ENA Examiner issued his report detailing Royal Bank of Canada's part in the scheme that led to Enron's collapse.

3.     **Enron Natural Gas Marketing Corp.**

13.     Plaintiff ENGM is a Delaware corporation with its principal place of business in Houston, Texas.  ENGM is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, ENGM is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

4.     **Enron Broadband Services, Inc.**

14.     Plaintiff Enron Broadband is an Oregon corporation with its principal place of business in Houston, Texas.  Enron Broadband is a wholly-owned subsidiary of Enron.  It is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, Enron Broadband is

managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized

Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan

Administration Agreement.

**5.      Enron Energy Services, Inc.**

15.      Plaintiff Enron Energy Services is a Delaware corporation with its principal place of

business in Houston, Texas.  Enron Energy Services is a wholly-owned subsidiary of Enron.  It is

a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, Enron Energy Services

is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized

Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan

Administration Agreement.

**6.      EES Service Holdings, Inc.**

16.      Plaintiff EES Service Holdings is a Delaware corporation with its principal place of

business in Houston, Texas.  EES Service Holdings is a reorganized debtor under the Plan.  Pursuant

to the Confirmation Order, EES Service Holdings is managed by a new board of directors and, to

the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes

Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

**7.      Enron International, Inc.**

16A.    Plaintiff Enron International is a Delaware corporation with its principal place of

business in Houston, Texas.  Enron International is a reorganized debtor under the Plan.  Pursuant

to the Confirmation Order, Enron International is managed by a new board of directors and, to the

extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper

LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

**8.**     **Enron Energy Services Operations, Inc.**

16B.     Plaintiff EESO is a Delaware corporation with its principal place of business in Houston, Texas.  EESO is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, EESO is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

**9.**     **ECT Merchant Investments Corp.**

16C.     Plaintiff ECTMI is a Delaware corporation with its principal place of business in Houston, Texas.  ECTMI is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, ECTMI is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

**10.**     **Enron Power Marketing, Inc.**

16D.     Plaintiff EPMI is a Delaware corporation with its principal place of business in Houston, Texas.  EPMI is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, EPMI is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

**11.**     **Atlantic Commercial Finance, Inc.**

16E.     Plaintiff ACFI is a Delaware corporation with its principal place of business in Houston, Texas.  ACFI is a reorganized debtor under the Plan.  Pursuant to the Confirmation Order, ACFI is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

17.     Plaintiff and the affiliated entities included on Schedule A (attached) are at times referred to collectively herein as "Subordination Plaintiff," "Debtors," or "Reorganized Debtors."

B.     **The Bank Defendants**

1.     <u>**The Citigroup Defendants**</u>

18.     Defendant Citigroup Inc. is a Delaware corporation.  Its principal place of business is 399 Park Ave., New York, New York 10043.  Citigroup Inc. is a registered bank holding company.  Citigroup Inc. owns and/or controls each of the following entities.

19.     Defendant Citibank, N.A. ("Citibank") is a nationally chartered bank and is Citigroup Inc.'s principal bank subsidiary.  Its principal place of business is 399 Park Avenue, New York, New York 10043.

20.     Defendant Citigroup Global Markets, Inc. (formerly Salomon Smith Barney, Inc. and Salomon Brothers, Inc.) ("SSB") is a New York corporation.  Its principal place of business is 388 Greenwich Street, New York, New York 10013.  It is a Citigroup Inc. subsidiary.

21.     Defendant Citicorp North America, Inc. ("Citicorp N.A.") is an indirect subsidiary of Citigroup Inc. and is a Delaware corporation.  Its principal place of business is 450 Mamaroneck Avenue, Harrison, New York 10528.

22.     Defendant Delta Energy Corporation ("Delta") is a Cayman Islands limited liability company.  Delta is an SPE created solely for the purpose of serving as the pass-through party in Citigroup prepay transactions.

23.     Defendant Citigroup Financial Products, Inc., f/k/a Salomon Brothers Holding Company, Inc. ("Salomon Holding"), is a Delaware corporation and, upon information and belief, is a wholly-owned subsidiary of Citibank.  Its principal place of business is 388 Greenwich Street, New York, New York 10013.

24.     Defendant CXC LLC, f/k/a CXC Incorporated ("CXC"), is a Delaware limited liability company and, upon information and belief, is a wholly-owned subsidiary of Citibank.  Its principal place of business is 399 Park Avenue, New York, New York.

25.     Defendant Corporate Asset Funding Company, LLC, f/k/a Corporate Asset Funding Company, Inc. ("CAFCO"), is a Delaware limited liability company.  Its principal place of business is 85 Broad Street, New York, New York 10004.  Upon information and belief, CAFCO is a wholly-owned subsidiary of Citigroup.

26.     Defendant Corporate Receivables Corporation, LLC, f/k/a Corporate Receivables Corporation, Inc. ("CRC"), is a California corporation.  Its principal place of business is care of Citicorp N.A. at 450 Mamaroneck Avenue, Harrison, New York 10528.  Upon information and belief, CRC is a wholly-owned subsidiary of Citigroup.

27.     Defendant Citigroup Global Markets Ltd. (formerly Salomon Brothers International Ltd.) ("CGML") is a private limited company organized under the laws of the United Kingdom and, upon information and belief, is a wholly-owned subsidiary of Citigroup Inc.  Its principal place of business and registered office is located at Citigroup Centre, 33 Canada Sq., Canary Wharf, London E14 5LB, England, United Kingdom.

28.     Each of Citigroup Inc., Citibank, Citigroup Global Markets (formerly SSB), Citicorp N.A., Delta, Salomon Holding, CXC, CAFCO, CRC, and CGML acted as the control person, successor, agent, co-conspirator, alter ego, and/or co-venture partner of the others as to the matters discussed herein and are collectively referred to in this Complaint as "Citigroup."

### 2.     The JP Morgan Chase Defendants

29.     Defendants J.P. Morgan Chase & Co. and its wholly-owned subsidiary, JP Morgan Chase Bank (formerly The Chase Manhattan Bank) (together, "JPMC"), are banking corporations organized and existing under the laws of Delaware and New York, respectively.  Each has its

headquarters at 270 Park Avenue, 35th Floor, New York, New York 10017.  JPMC includes the successor to Chase Manhattan Bank, as a result of the merger of J.P. Morgan & Co., Inc. with and into Chase Manhattan Corporation on December 31, 2000.  JPMC owns and/or controls each of the following entities.

30.     Defendant Mahonia Limited ("Mahonia") is a Jersey, Channel Islands SPE established at the request of JPMC for the purpose of serving as the pass-through party in the JPMC prepay transactions.

31.     Defendant Mahonia Natural Gas Limited ("Mahonia NGL") is a Jersey, Channel Islands SPE established at the request of JPMC.  It is a subsidiary of Mahonia Limited.

32.     Defendant Stoneville Aegean Limited ("Stoneville") is a Jersey, Channel Islands SPE established at the request of JPMC.

33.     Defendant JP Morgan Securities Inc. ("JPMSI") is a Delaware corporation.  Its principal place of business is 270 Park Avenue, 35th Floor, New York 10017.  It is a subsidiary of JP Morgan Chase & Co.

34.     Each of JPMC, Mahonia, Mahonia NGL, Stoneville, and JPMSI acted as the control person, successor, agent, co-conspirator, alter ego, and/or co-venture partner of the others as to the matters discussed herein and they are collectively referred to herein as "Chase" or "JP Morgan Chase."

**3.     The Barclays Defendants**

35.     Defendant Barclays plc ("Barclays plc") is a public limited company registered under the laws of England.  Its principal place of business is 54 Lombard Street, London EC3P 3AH, England, United Kingdom.  Barclays plc owns and/or controls each of the following entities.

36.    Defendant Barclays Bank plc ("Barclays Bank") is a public limited company registered under the laws of England and Wales.  Barclays Bank plc's principal place of business is 54 Lombard St., London EC3P 3AH, England, United Kingdom.

37.    Defendant Colonnade Limited ("Colonnade") is a limited company registered in Guernsey.  Its registered office is 7 New Street, St. Peter Port, Guernsey, Channel Islands.

38.    Defendant Barclays Capital Securities Limited ("Barclays Capital London") is a private limited company registered in England and Wales under company number 01929333.  Its registered office is 54 Lombard Street, London EC 3P 3AH, England, United Kingdom.

39.    Defendant Barclays Capital, Inc. ("Barclays Capital") is a Connecticut corporation. Its principal place of business is 200 Park Avenue, New York, New York 10166.  It is an indirect subsidiary of Barclays plc.

40.    Defendant Barclays Physical Trading Limited, f/k/a Barclays Metals (Holdings) Limited, is a private limited company registered in England and Wales under company number 2044103. Its registered office is 54 Lombard Street, London EC3P 3AH, England, United Kingdom.

41.    Defendant Barclays Metals Limited ("Barclays Metals"), is a private limited company registered in England and Wales under company number 00330591.  Its registered office is 54 Lombard Street, London, EC3P 3AH, England, United Kingdom.

42.    Each of Barclays plc, Barclays Bank, Colonnade, Barclays Capital London, Barclays Capital, Barclays Physical Trading Limited, and Barclays Metals acted as the control person, successor, agent, co-conspirator, co-venture partner and/or alter ego of the others as to the matters discussed herein, and they are collectively referred to herein as "Barclays."

**4.    The BT/Deutsche Bank Defendants**

43.    Defendant Deutsche Bank AG is a stock corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business in Frankfurt,

Germany.  Deutsche Bank AG does business throughout the world, including in the United States where its principal place of business is 31 West 52nd Street, New York, New York 10019.  Upon information and belief, Deutsche Bank, New York and Deutsche Bank, London are branches of Deutsche Bank AG.  Deutsche Bank AG owns and/or controls each of the following entities.

44.    Defendant Deutsche Bank Trust Company Americas is a New York state-chartered bank with its principal place of business at 60 Wall Street, New York, New York 10005.  On or about June 4, 1999, Taunus Corporation, a subsidiary of Deutsche Bank AG, merged with Bankers Trust Corporation, owner of 100% of the common stock of Bankers Trust Americas, and on or about April 25, 2003, Bankers Trust Corporation changed its name to Deutsche Bank Trust Company Americas.  Upon information and belief, Deutsche Bank Trust Company Americas is an indirect subsidiary of Deutsche Bank AG and a successor in interest to Bankers Trust Company.

45.    Defendant Deutsche Bank Securities Inc. is a Delaware corporation.  Its registered agent for service of process is CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  Deutsche Bank Securities Inc. is an indirect subsidiary of Deutsche Bank AG and the surviving entity of a merger with Deutsche Bank Alex Brown, a Delaware corporation formerly known as BT Alex Brown Incorporated.

46.    Defendant Deutsche Bank Luxembourg S.A. is a stock corporation organized and existing under the laws of the Grand Duchy of Luxembourg, with a registered seat and its principal place of business in Luxembourg.  Deutsche Bank Luxembourg S.A. does business throughout the world, including in the United States.  Upon information and belief, Deutsche Bank Luxembourg S.A. is a wholly-owned subsidiary of Deutsche Bank AG.

47.    Defendant Deutsche Bank Trust Company Delaware is a Delaware state-chartered bank with its principal place of business in Wilmington, Delaware.  Upon information and belief,

Deutsche Bank Trust Company Delaware is an indirect, wholly-owned subsidiary of Deutsche Bank AG and successor-in-interest to Bankers Trust (Delaware).

48.    Defendant Deutsche Bank Trust Corporation (formerly Bankers Trust Corporation, which, in turn, was formerly known as Bankers Trust New York Corp.) is a New York corporation. Its principal place of business is New York, New York.  Upon information and belief, Deutsche Bank Trust Corporation is an indirect, wholly-owned subsidiary of Deutsche Bank AG.

49.    Not Used.

50.    Defendant Bankers Trust International plc is a public limited company organized and existing under the laws of England.  Its principal place of business is in London, England.  Upon information and belief, Bankers Trust International plc is a wholly-owned subsidiary of Deutsche Bank AG.

51.    Defendant BT Commercial Corp. is a Delaware corporation.  Its principal place of business is 14 Wall Street, New York, New York 10005.  Upon information and belief, BT Commercial Corp. is an indirect, wholly-owned subsidiary of Deutsche Bank AG.

52.    Defendant DB Green, Inc., f/k/a BT Green, Inc., is a New York corporation.  Its principal place of business is 31 West 52nd Street, New York, New York 10019.  Upon information and belief, DB Green, Inc. is an indirect, wholly-owned subsidiary of Deutsche Bank AG.

53.    Defendant Deutsche Leasing New York Corp., f/k/a BT Leasing Corp., is a New York corporation.  Its principal place of business is at 31 West 52nd Street, New York, New York 10019.  Upon information and belief, Deutsche Leasing New York Corp. is an indirect, wholly-owned subsidiary of Deutsche Bank AG.

54.    Defendant Seneca Delaware, Inc., f/k/a EN-BT Delaware, Inc. is a Delaware corporation.  Its principal place of business is in Wilmington, Delaware.  Upon information and belief, Seneca Delaware, Inc. is an indirect, wholly-owned subsidiary of Deutsche Bank AG.

55.     Defendant Deutsche Bank, S.A. is an Argentinian corporation.  Its principal place of business is in Buenos Aires, Argentina.  Upon information and belief, Deutsche Bank, S.A. is a direct, wholly-owned subsidiary of Deutsche Bank AG.

56.     Defendant BT Ever, Inc. is a New York corporation.  Its principal place of business is 31 West 52nd Street, New York, New York 10019.  Upon information and belief, BT Ever, Inc., is a subsidiary of Deutsche Bank AG.

57.     Defendant Seneca Leasing Partners, L.P. is a Delaware limited partnership.  Its principal place of business is in Wilmington, Delaware.  Upon information and belief, Seneca Leasing Partners, L.P. is owned at least in part by Deutsche Leasing New York Corp. and Seneca Delaware, Inc., both of which are subsidiaries of Deutsche Bank AG and collectively hold all of the voting rights in Seneca Leasing Partners, L.P.

58.     Each of Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc., Deutsche Leasing New York Corp., Seneca Delaware, Inc., Deutsche Bank S.A., BT Ever, Inc., and Seneca Leasing Partners, L.P. acted as the control person, successor, agent, co-conspirator, co-venture partner and/or alter ego of the others as to the matters discussed herein, and they are collectively referred to herein as "BT/Deutsche Bank."

### 5.     The CIBC Defendants

59.     Defendant Canadian Imperial Bank of Commerce is a Canadian chartered bank.  Its principal place of business is Commerce Court, Toronto, Ontario, Canada M5L 1A2.  Canadian Imperial Bank of Commerce owns and/or controls each of the following entities.

60.     Defendant CIBC World Markets Corp. (formerly known as CIBC Corp.) is a Delaware corporation.  Its principal place of business is 425 Lexington Avenue, New York,

New York 10017.  CIBC World Markets Corp. is an indirect subsidiary of Canadian Imperial Bank of Commerce.

61.     Defendant CIBC Capital Corporation is a Delaware corporation.  Its principal place of business is 425 Lexington Avenue, New York, New York 10017.  CIBC Capital Corporation is a subsidiary of Canadian Imperial Bank of Commerce.

62.     Defendant CIBC World Markets plc is a public limited company authorized to do business in the United Kingdom.  Its principal place of business is Cotton Centre, Cotton Lane, London SE1 2QL, England, United Kingdom.  CIBC World Markets plc is a wholly-owned subsidiary of Canadian Imperial Bank of Commerce.

63.     Defendant CIBC, Inc. is a Delaware corporation.  Its principal place of business is 425 Lexington Avenue, New York, New York 10017.  CIBC, Inc. is an indirect subsidiary of Canadian Imperial Bank of Commerce.

64.     Each of Canadian Imperial Bank of Commerce, CIBC World Markets Corp., CIBC Capital Corporation, CIBC World Markets plc, and CIBC, Inc. acted as the control person, successor, agent, co-conspirator, and/or co-venture partner of the others as to the matters discussed herein, and they are collectively referred to herein as "CIBC."

**6.     The Merrill Lynch Defendants**

65.     Defendant Merrill Lynch & Co., Inc. is a Delaware corporation.  Its principal place of business is 2 Broadway, New York, New York 10080.  Merrill Lynch & Co., Inc. is a holding company that owns and/or controls each of the following entities.

66.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware corporation. Its principal place of business is 4 World Financial Center, 250 Vesey Street, New York, New York 10281.  It is a wholly-owned subsidiary of Merrill Lynch & Co., Inc.

67.     Defendant Merrill Lynch Capital Services, Inc. is a Delaware corporation. Its principal place of business is 250 Vesey Street, New York, New York 10281. It is a subsidiary of Merrill Lynch & Co., Inc.

68.     Each of Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., and Merrill Lynch Capital Services, Inc. acted as the control person, successor, agent, co-conspirator, and/or co-venture partner of the others as to the matters discussed herein, and they are collectively referred to herein as "Merrill Lynch."

### 7.     The CSFB Defendants

69.     Defendant Credit Suisse First Boston, Inc. ("CSFB, Inc.") is a Delaware corporation. Its principal place of business is 11 Madison Avenue, New York, New York 10010. CSFB owns and/or controls each of the following entities.

70.     Defendant Credit Suisse First Boston (USA), Inc. ("CSFB USA") is a Delaware Corporation. Its principal place of business is 11 Madison Avenue, New York, New York 10010-3643. Defendant CSFB USA is a subsidiary of CSFB, Inc.

71.     Defendant Credit Suisse First Boston LLC ("CSFB LLC") (formerly known as Credit Suisse First Boston Corporation) is a Delaware corporation. Its principal place of business is 11 Madison Avenue, New York, New York 10010. CSFB LLC is a wholly-owned subsidiary of CSFB USA.

72.     Defendant Credit Suisse First Boston International ("CSFB Int'l") is incorporated in the United Kingdom. Its principal place of business is One Cabot Square, London El4 4QJ, England, United Kingdom. CSFB Int'l is owned by both Credit Suisse First Boston (80%) and Credit Suisse Group (20%).

73.     Defendant Credit Suisse First Boston (USA) International, Inc. ("CSFB USA Int'l") is a Delaware corporation.  Its principal executive office is Park Plaza Avenue, New York, New York 10055.  CSFB USA Int'l was formerly known as Credit Suisse Financial Products (USA), Inc.

74.     Defendant Credit Suisse First Boston ("CSFB") is a business entity organized under the laws of Switzerland.  Its principal place of business is in Zurich, Switzerland.  Through its branch in the Cayman Islands, CSFB participated in one or more of the transactions with Enron challenged in this Complaint.

75.     Defendant Pershing LLC ("Pershing") (formerly known as Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ")) is a Delaware corporation.  Its principal place of business is 11 Madison Avenue, New York, New York 10010.  Pershing is a wholly-owned subsidiary of CSFB USA.  As a result of a November 3, 2000, merger of DLJ into CSFB USA, CSFB, Inc. and CSFB LLC are successors in interest to and/or affiliated with Pershing/DLJ.

76.     Defendant DLJ Capital Funding, Inc. ("DLJ Capital") is a Delaware corporation.  Its principal place of business is 11 Madison Avenue, New York, New York 10010.  DLJ Capital is a wholly-owned subsidiary of Credit Suisse First Boston, Inc.

77.     Defendant DLJ Fund Investment Partners III, L.P. ("DLJ Fund") is a limited partnership.  Its principal place of business is 11 Madison Avenue, New York, New York 10010.

78.     Defendant ERNB Ltd. ("ERNB") is a Cayman Islands exempt limited partnership.  Its principal place of business is 11 Madison Avenue, New York, New York 10010.

79.     Defendant Merchant Capital, Inc. ("Merchant Capital") is a Delaware corporation.  Its principal place of business is 11 Madison Avenue, New York, New York 10010.  Merchant Capital is a wholly-owned subsidiary of CSFB USA.

80.     Each of CSFB, Inc., CSFB USA, CSFB LLC, CSFB Int'l, CSFB USA Int'l, CSFB, Pershing, DLJ Capital, DLJ Fund, ERNB, and Merchant Capital acted as the control person,

successor, agent, co-conspirator, co-venture partner and/or alter ego of the others as to the matters discussed herein, and are collectively referred to herein as "CSFB" or "DLJ."

### 8.    The Toronto Dominion Defendants

81.    Defendant The Toronto-Dominion Bank ("Toronto Dominion Bank") is a Schedule 1 chartered bank subject to the provisions of the Bank Act of Canada.  Its headquarters is Toronto Dominion Tower, P.O. Box 1, 12th Floor, 55 King Street West, Toronto, Ontario, Canada M5K 1A2. Toronto Dominion Bank owns and/or controls both of the following Toronto Dominion entities.

82.    Defendant Toronto Dominion (Texas), Inc. ("Toronto Dominion Texas") is a Delaware corporation.  Its principal place of business is 909 Fannin Street, Suite 1700, Houston, Texas 77010.

83.    Defendant TD Securities (USA) LLC, f/k/a Toronto Dominion Securities (USA), Inc. ("Toronto Dominion Securities"), is a Delaware corporation.  Its principal office is 31 West 52nd Street, 19th Floor, New York, New York 10019-6118.

84.    Each of Toronto Dominion Bank, Toronto Dominion Texas, and Toronto Dominion Securities acted as the control person, successor, agent, co-conspirator, and/or co-venture partner of the others as to the matters discussed herein and they are collectively referred to herein as "Toronto Dominion."

### 9.    The RBS Defendants

85.    Defendant The Royal Bank of Scotland plc ("Royal Bank of Scotland") is a public limited company.  Its principal place of business is 36 St. Andrew Square, Edinburgh EH2 2YB, United Kingdom.  It is a parent company of the following entities, along with The Royal Bank of Scotland Group plc.

85A.    Defendant The Royal Bank of Scotland International Limited ("RBSI") is a company incorporated in Jersey, Channel Islands.  Its registered office is at Royal Bank House, 71 Bath Street,

St. Helier, Jersey JE 4 8PJ, Channel Islands. Its principal places of business are Jersey, Guernsey and the Isle of Man. RBSI is wholly owned by Royal Bank of Scotland and/or The Royal Bank of Scotland Group plc.

86.     Defendant The Financial Trading Company Limited, f/k/a RBS Financial Trading Company Limited (collectively "RFTCL"), is a company incorporated in England and Wales (registration no. 4074178). Its principal place of business is Waterhouse Square, 138-142 Holborn, London EC1N 2TH, England, United Kingdom. RFTCL is a wholly-owned subsidiary of Royal Bank of Scotland. RFTCL was a special purpose vehicle for the ETOL transaction.

87.     Defendant Sideriver Investments Limited ("Sideriver") is a private limited company incorporated in England and Wales (registration no. 04229502). Its principal place of business is Waterhouse Square, 138-142 Holborn, London EC1N 2TH, England, United Kingdom. Enron Europe Ltd. and Royal Bank of Scotland Group, plc are Sideriver's parent companies.

88.     Defendant National Westminster Bank plc ("NatWest") is a public limited company. Its principal place of business is 135 Bishopsgate, London EC2M 3UR, England, United Kingdom. NatWest is a subsidiary of Royal Bank of Scotland.

89.     Defendant Campsie Ltd. ("Campsie") is a Cayman Islands limited partnership. Its address is P.O. Box 707GT, Grand Cayman, Cayman Islands, BWI, attention Andrew Galloway/Stuart Gibson.

90.     Defendant Coutts (Cayman) Limited ("Coutts") is a Cayman Islands limited partnership or limited liability company. Its address is Coutts House, 1446 West Bay Road, P.O. Box 707GT, Grand Cayman, Cayman Islands, BWI, attention Roger Yeomans/Stuart Gibson.

91.     Each of Royal Bank of Scotland, RBSI, RFTCL, Sideriver, NatWest, Campsie and Coutts acted as the control person, successor, agent, co-conspirator, and/or co-venture partner of the others as to the matters discussed herein and they are collectively referred to herein as "RBS."

10.    **The RBC Defendants**

92.    Defendant Royal Bank of Canada ("RBC") is a bank chartered under the Bank Act of Canada.  Its principal place of business is Royal Bank Plaza, 200 Bay Street, Toronto, Ontario, Canada M5J 2J5.  RBC also has a United States headquarters located at One Liberty Plaza, 165 Broadway, New York, New York 10006.

93.    Defendant Royal Bank Holding Inc. ("RBH") is a Canadian corporation.  Its principal place of business is 200 Bay Street, Toronto, Ontario, Canada M5J 2J5.  RBH is a wholly-owned subsidiary of RBC.

94.    Defendant RBC Dominion Securities Inc. ("RBC DSI") is a Canadian corporation. Its principal place of business is Royal Bank Plaza North Tower, 200 Bay Street, Toronto, Ontario, Canada M5J 2W7.  Upon information and belief, RBC DSI is a wholly-owned subsidiary of RBC. Upon information and belief, RBC DSI also does business as RBC Capital Markets.

95.    Defendant RBC Dominion Securities Limited ("RBC DSL") is a Canadian business corporation.  Its principal place of business is Royal Bank Plaza North Tower, 200 Bay Street Toronto, Ontario, Canada M5J 2W7.  Upon information and belief, RBC DSL also does business as RBC Capital Markets.  Upon information and belief, RBC DSL is a wholly-owned subsidiary of RBC.

96.    Defendant RBC Holdings (USA) Inc. ("RBC USA") is a Delaware corporation.  Its principal place of business is One Liberty Plaza, 165 Broadway, New York, New York 10006. Upon information and belief, RBC USA is a wholly-owned subsidiary of RBC.

97.    Defendant RBC Capital Markets Corporation, f/k/a RBC Dominion Securities Corporation ("RBC CMC"), is a New York corporation.  Its principal place of business is One Liberty Plaza, 165 Broadway, New York, New York 10006.

98.     Each of RBC, RBH, RBC DSI, RBC DSL, RBC USA and RBC CMC acted as the control person, successor, agent, co-conspirator, co-venture partner and/or alter ego of the others as to the matters discussed herein, and they are collectively referred to herein as "RBC."

**11.     The Bank Defendants' Proofs of Claim**

99.     Each of the Bank Defendants except RBC – Citigroup, JP Morgan Chase, Barclays, BT/Deutsche Bank, CIBC, Merrill Lynch, CSFB, Toronto Dominion, and RBS – has filed one or more proofs of claim against the Subordination Plaintiff in the Chapter 11 cases being jointly administered in this Court under consolidated case number 01-16034.

**C.     Additional Defendants**

100.     Defendant Sundance Industrial Partners L.P. ("Sundance Industrial") is a Delaware limited partnership.   Its registered office is care of National Registered Agents Inc., 9 East Loockerman Street, Suite 1B, Dover, Delaware 19901.  Under Bankruptcy Code section 101(2)(B), Sundance Industrial is an affiliate of Plaintiff.  As such, it is an insider of Plaintiff under Bankruptcy Code section 101(31)(E).

101.     Not Used.

102.     Not Used.

103.     Not Used

104.     Defendant Caymus Trust is a Delaware business trust.  Its registered office is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890.

105.     Defendant JGB Trust is a Delaware business trust.  Its registered office is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890.

106.     Not Used.

107.     Not Used.

108.     Defendant Sphinx Trust ("Sphinx Trust") is a Delaware business trust. Its registered office is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890. Wilmington Trust Company is the Trustee for Sphinx Trust. Sphinx Trust acted as a trust in the Nile Transaction (as defined in paragraph 583) and has filed two proofs of claim.

108A.     Defendant Pyramid I Asset, L.L.C. ("Pyramid I") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1221 Lamar, Suite 1600, Houston, Texas 77010. Its registered address is care of National Registered Agents, Inc., 9 East Loockerman Street, Dover, Delaware 19901.

109.     Defendant Nighthawk Investors L.L.C. ("Nighthawk") is a Delaware limited liability company. Its address is care of The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

110.     Defendant Whitewing Associates L.P. ("Whitewing") is the successor in interest to Whitewing Associates L.L.C. and is a Delaware limited partnership. Its principal place of business is care of Enron Corp., 1221 Lamar, Suite 1600, Houston, Texas 77010.

111.     Defendant Nahanni Investors L.L.C. ("Nahanni") is a Delaware limited liability company. Its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

112.     Defendant Marengo, L.P. ("Marengo") is a Delaware limited partnership. Its address is care of Enron Corp., 1221 Lamar, Suite 1600, Houston, Texas 77010.

113.     Defendant Klondike River Assets, L.L.C. ("Klondike") is a Delaware limited liability company. Its address is care of Enron Corp., 1221 Lamar, Suite 1600, Houston, Texas 77010.

114.    Defendant Yosemite Securities Trust I ("Yosemite I Trust") is a Delaware business trust.  Its address is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attn: Corporate Trust Administration.  Its registered office is CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  Citigroup formed or directed the formation of the Yosemite I Trust in connection with the Yosemite I transaction.  Under section 101(31) of the Bankruptcy Code, Yosemite I Trust is an insider with respect to transfers made to it up to one year prior to the Petition Date.

115.    Defendant Yosemite Securities Company, Ltd. ("Yosemite Securities") is a Jersey, Channel Islands limited liability company.  Its principal address is care of Company Secretary, P.O. Box 1075, Elizabeth House, 9 Castle Street, St. Helier, Jersey JE4 2QP, Channel Islands.  Citigroup formed or directed the formation of Yosemite Securities in connection with the Yosemite II transaction.

115A.    Yukon River Assets L.L.C. ("Yukon") is a limited liability company organized under the laws of the State of Delaware.  Its registered agent is care of National Registered Agents, Inc., 9 East Loockerman Street, Dover, Delaware 19901.

116.    Defendant Enron Credit Linked Notes Trust ("ECLN Trust") is a Delaware business trust.  Its address is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attn: Corporate Trust Administration.  Citigroup formed or directed the formation of the ECLN Trust in connection with the Yosemite III transaction.

117.    Defendant Enron Credit Linked Notes Trust II ("ECLN II Trust") is a Delaware business trust.  Its address is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attn: Corporate Trust Administration.  Citigroup formed or directed the formation of the ECLN II Trust in connection with the Yosemite IV transaction.

118.    Defendant Enron Sterling Credit Linked Notes Trust ("ESCLN Trust") is a Delaware business trust. Its address is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attn: Corporate Trust Administration. Citigroup formed or directed the formation of the ESCLN Trust in connection with the Yosemite IV transaction.

119.    Defendant Enron Euro Credit Linked Notes Trust ("EECLN Trust") is a Delaware business trust. Its address is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-001, Attn: Corporate Trust Administration. Citigroup formed or directed the formation of the EECLN Trust in connection with the Yosemite IV transaction.

120.    Defendant The Bank of New York, Indenture Trustee and Collateral Agent ("BoNY"), is a New York corporation. Its principal place of business is 1 Wall Street, New York, New York 10286. Plaintiff is suing BoNY solely in its capacity as Indenture Trustee and Collateral Agent for:

> (i)     Holders of the 8.25% Series 1999-A Linked Enron Obligations Due 2004 of Yosemite I Trust;
>
> (ii)    Holders of the 8.75% Series 2000-A Linked Enron Obligations Due 2007 of Yosemite Securities;
>
> (iii)   Holders of the 8.00% Enron Credit Linked Notes Due 2005 of ECLN Trust;
>
> (iv)    Holders of the 7.375% Enron Credit Linked Notes Due 2006 of ECLN II Trust;
>
> (v)     Holders of the 7.25% Enron Sterling Credit Linked Notes Due 2006 of ESCLN Trust; and
>
> (vi)    Holders of the 6.50% Enron Euro Credit Linked Notes Due 2006 of EECLN Trust.

121.    Defendant Besson Trust is a Delaware business trust. Its registered office is care of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890. Wilmington Trust Company is the trustee of Besson Trust.

122.    Defendant State Street Bank and Trust Co. is a Massachusetts trust company. Its principal place of business is at 225 Franklin Street, Boston, Massachusetts 02110.

123.    Defendant State Street Bank and Trust Co. of Connecticut, N.A. is a Connecticut national banking association. Its principal place of business is 225 Asylum Street, 29th Floor, Hartford, Connecticut 06103.

123A.    Defendant Reliance Trust Company, Trustee ("Reliance") is a Georgia banking corporation. Its principal place of business is 3384 Peachtree Road, N.E., Suite 900, Atlanta, Georgia 30326. Upon information and belief, Reliance is the successor trustee to State Street Bank and Trust Co. and State Street Bank and Trust Co. of Connecticut, N.A. in connection with the guaranty referenced in paragraph 1221A and the JT Holdings transaction.

124.    Defendant FleetBoston Financial Corp. ("FleetBoston Financial") is a Delaware corporation. Its registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

125.    Defendant Fleet National Bank is a national banking corporation. Its principal place of business is 111 Westminster Street, Providence, Rhode Island 02903. Fleet National Bank is a subsidiary of FleetBoston Financial (formerly Fleet Boston Corp.).

126.    Defendant Long Lane Master Trust IV ("Long Lane") is a Delaware business trust which has appeared in this case. Long Lane was formed by Fleet to serve as a commercial paper conduit for Fleet. Fleet is the administrator of Long Lane. Upon information and belief, between January 1, 1998 and December 2, 2001, Long Lane engaged in transactions only at the direction and with the approval of Fleet.

126A.  Each of FleetBoston Financial, Fleet National Bank, and Long Lane acted as the control person, successor, agent, co-conspirator, co-venture partner and/or alter ego of the others as to matters discussed herein, and they are collectively referred to as "Fleet."

127.    A number of the Additional Defendants have filed one or more proofs of claim against the Subordination Plaintiff in the Chapter 11 cases being jointly administered in this Court under consolidated case number 01-16034.

**D.    Claim Transferee Defendants**

127A.  Defendant Deutsche Bank Trust Company Americas is a Claim Transferee Defendant as that term is defined in paragraph 1266E.  Between the Petition Date and on or about May 28, 2002, Deutsche Bank Trust Company Americas received transfers of claims against Enron or its affiliates that were held as of the Petition Date by defendants Citibank, Deutsche Bank AG, and CIBC Inc.

127B.  Defendant Chase is a Claim Transferee Defendant as that term is defined in paragraph 1266E.  Between the Petition Date and on or about January 10, 2002, Chase received transfers of claims against Enron or its affiliates that were held as of the Petition Date by defendants Merrill Lynch, CSFB, and Bank Boston, NA, Fleet's predecessor-in-interest.

### III.
### JURISDICTION AND VENUE

128.    On December 2, 2001 (the "Petition Date"), Enron, ENA, Enron Broadband, Enron Energy Services, EESO, and EPMI filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  ENGM, EES Service Holdings, ECTMI, Enron International, and ACFI filed their voluntary petitions for relief on January 11, 2002, April 18, 2002, May 16, 2003, and June 27, 2003, respectively.

129.    The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 1334(b) and 1334(e), and section 38.1 of the Plan.  The claims alleged herein are core proceedings under 28 U.S.C. §§ 157(b)(2)(B), (C), (E), (F), (H), (K), and (O).  Resolution of the claims alleged herein will critically affect the Debtors' reorganization, the value of the Debtors' estate, and any distribution to the Debtors' creditors.  Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the United States District Court for the Southern District of New York's reference of proceedings to the Bankruptcy Court, this Court may exercise subject matter jurisdiction in this case.

130.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and certain of the defendants may be found in this District, and pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under title 11 or arising in or related to a case under title 11.

131.    This Adversary Proceeding is brought in accordance with Federal Rules of Bankruptcy Procedure 7001, *et seq.*, and seeks relief under sections 105(a), 362, 502(a), (d), 510(c), 542, 544, 547(b), 548, 549, 550, and 553 of the Bankruptcy Code.

## IV.
## FACTUAL ALLEGATIONS

**A.    Enron Insiders And The Bank Defendants Together Caused Enron's Collapse**

132.    During the year and a half that the Enron and ENA Examiners have been investigating Enron's SPEs, they have gathered and reviewed millions of pages of documents from Citigroup, Chase, CIBC, Barclays, Merrill Lynch, BT/Deutsche Bank, CSFB, Toronto Dominion, RBS, and RBC.  As part of their investigation, the Examiners have taken nearly 200 oral sworn statements, including more than 115 statements of the Bank Defendants' employees.

133.    The Enron Examiner has issued four reports which, combined, total 4,235 pages of text, including 34 appendices that are expanded discussions of topics covered in the body of the

reports.  In these reports and their appendices, the Enron Examiner dissects "substantially all of Enron's material SPE transactions identified to date."  Exam. II at 3.[1]  He explains precisely how SPEs were improperly used at Enron in conjunction with specific accounting techniques "to impact dramatically its financial statements" in violation of Generally Accepted Accounting Principles ("GAAP").  Exam. III at 2.  He identifies a number of Enron's senior officers responsible for manipulating Enron's financial statements, discusses specific claims Enron has against those officers, discusses the role Bank Defendants other than RBC played in that manipulation, and discusses specific claims Enron has against these Bank Defendants for their wrongdoing.

134.    For his part, the ENA Examiner has issued one report which totals 917 pages of text and includes 24 annexes.  Among the topics in his report is the role RBC played in the Insiders' manipulation of Enron's financial statements and the specific claims Enron has against RBC as a result.

135.    It is not surprising that the Enron and ENA Examiners required, collectively, over 5,100 pages of text to explain the fraud that caused Enron to collapse into bankruptcy.  The scope and complexity of the transactions in which certain Enron officers entangled Enron, with the help of the Bank Defendants, during the late 1990s and early 2000s is breathtaking.

136.    Basically, Enron was bled to death during the late 1990s and early 2000s by a relative few, key Insiders.  From at least 1997, the Insiders engaged in a sophisticated – and startlingly effective – fraud using SPEs that ultimately destroyed Enron.  Based on his review of "substantially all" of Enron's material SPE transactions, the Enron Examiner concluded in his second report that:

---

[1] The Enron Examiner's four reports are cited as Exam. I, Exam. II, Exam. III, and Exam. IV or Exam. Final Report.  If the cite is to the report as opposed to its appendices, the volume is followed by a page number.  An example is "Exam. II at 6."  If the cite is to one of the appendices, the volume is followed by the appendix title, which is followed by a page number.  An example is "Exam. II, App. B at 3."

through pervasive use of structured finance techniques involving SPEs and aggressive accounting practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition or performance. This financial engineering in many cases violated GAAP and applicable disclosure laws, and resulted in financial statements that did not fairly present Enron's financial condition, results of operations or cash flows.

Exam. II at 15.

## 1. The Insiders Were Enron Officers With Power And Authority, Motivated By Greed

137. The Insiders were at least six Enron officers (although it is likely there were others): Andrew S. Fastow, Ben F. Glisan, Jr., Jeffrey McMahon, Michael Kopper, Richard A. Causey, and R. Davis Maxey. The Insiders held positions of authority and substantial responsibility at Enron – positions they abused by improperly using SPEs, manipulating Enron's financial statements, and profiting from that manipulation at Enron's expense.

### a. Fastow, Causey, McMahon, and Glisan caused Enron to enter into the improper SPE transactions, and ensured the transactions were improperly reported.

138. Fastow led the Insiders. From January 1997 to March 1998, Fastow was Senior Vice President of Finance and a Managing Director of Enron. During that time, Fastow engaged in and encouraged the structured financing deals that eventually felled Enron. In March 1998, he was elevated to Chief Financial Officer. As CFO, Fastow's direct reports included the Treasury and the Special Projects Groups. Fastow was fired for cause in October 2001.

139. McMahon was also intimately involved with Enron's finances from at least 1997 through May 2000. Throughout 1997 and early 1998, McMahon served as Chief Financial Officer of Enron Europe. In July 1998, he became Senior Vice President of Finance and Treasurer of Enron – a position that reported directly to Fastow. He remained Treasurer until mid-2000. When

Fastow was fired in late 2001 and Enron began to unravel, McMahon was first named CFO and then President and COO.  He resigned all positions effective June 1, 2002.

140.    Glisan held various positions at Enron from 1997 until May 2000.  Among other things, he was an accountant for Enron and an officer of two Enron subsidiaries – Enron Capital Corp. and Enron Energy Services Capital Corp.  In May 2000, Glisan replaced McMahon as Treasurer of Enron, and began reporting directly to Fastow.  Glisan was Treasurer until November 2001, when he was fired upon the company's discovery that he had profited from secret transactions with Enron.

141.    Causey was Executive Vice President and Enron's Chief Accounting Officer from 1996 until Enron's collapse.  Enron's Corporate Accounting & Financial Reporting Group reported directly to him.  He was also a member of Enron's Management Committee.  Before he joined Enron, Causey was a senior manager at Arthur Anderson & Co., where he had primary responsibility for the Enron engagement.  Causey was fired on February 14, 2002.

142.    By March 2000, Fastow, Glisan, and Causey (as ex officio member) also comprised the Office of the Chair of Enron Global Finance.  Enron Global Finance was charged with the treasury and capital raising functions, and had its own set of accountants.

143.    As a result of their positions, Fastow, Causey, Glisan and McMahon were able to control the SPE transactions in which Enron engaged, the manner in which Enron reported those transactions, and the flow of information to rating agencies, including to Moody's Investor's Service, Inc. ("Moody's) and Standard & Poor's Credit Information Services ("S&P").

144.    Causey and Fastow oversaw and implemented the financial and accounting operations at Enron.  Causey and R. Davis Maxey were responsible for the tax transactions.  Glisan and McMahon were responsible for the SPE transactions, and both reported to Fastow.  Together Fastow, Glisan, and McMahon determined which transactions to begin and which to complete.  They

determined what structures to form and which lenders to use. In cooperation with the Bank Defendants, they also determined the terms and conditions of the transactions themselves.

145.    Together, Fastow, Causey, Glisan and McMahon were the architects of Enron's disclosure policy, and were responsible for how Enron's financial statements disclosed the SPE transactions. Their strategy – refined and implemented over a period of years – was one of opaqueness, not transparency.

146.    Finally, Fastow, Glisan and McMahon were responsible for communicating with the rating agencies. They knew that from at least 1997 on the rating agencies believed Enron's operations and prospects were robust, and they knew rating agencies had formed those beliefs as a result of the distorted and inaccurate financial information the Insiders had Enron report. John Diaz, a Managing Director at Moody's, testified before Congress that Fastow, Glisan, and McMahon did not deal truthfully with Moody's.

> **b.    Causey and Maxey caused Enron to enter into improper tax transactions.**

147.    The Tax Group reported to Causey, Enron's CAO. Maxey headed the Structured Transactions Group within the Tax Group. Like Causey, Maxey is a certified public accountant. From at least 1997 through bankruptcy, Maxey was also a licensed attorney. Maxey was fired on January 11, 2002, after he refused his superior's request to detail, in writing, all tax transactions that implicated Enron's assets. Immediately before he was fired, Maxey is alleged to have shredded documents from his office.

148.    Causey was responsible for determining which tax transactions to begin and which to complete. Maxey worked closely with BT/Deutsche Bank in designing, structuring and/or implementing the tax transactions, which Causey then approved.

c.   **Fastow and Kopper orchestrated (and profited from) the scheme through SPEs they managed.**

149.   Between 1994 and July 2001, Kopper held various executive positions at Enron, including head of Special Projects. For most of that time, Kopper reported directly to Fastow. Between January 2000 and July 2001, Kopper was also a managing director of LJM2 Capital Management. In July 2001, Kopper resigned to run LJM2 Co-Investments LP, an affiliate of entities Kopper purchased from Fastow for approximately $16.5 million.

d.   **The Insiders benefitted from their improper conduct.**

150.   Manipulating Enron's financial statements brought the Insiders huge personal gains, both in employee benefits (salary, bonus, stock options, etc.), and in earnings from improper transactions with Enron in which they or their family members profited at Enron's expense. For example:

- Between October 1998 and November 2001, Fastow sold Enron stock for $33.675 million. This included sales in each of the years 1998, 1999, and 2000. In addition to his salary, Fastow received $3 million in bonuses from 1997 through 2000. He also received at least $60.6 million from related party transactions, bringing his total take during the period of fraud to nearly $100 million.

- Between October 1998 and November 2001, Causey sold Enron stock for $13.386 million. This included sales in each of the years 1998, 1999, and 2000. In addition to his salary, Causey received another $1.5 million in bonuses from 1997 through 2000, bringing his total take to nearly $15 million.

- At the end of 1999, McMahon sold Enron stock for $2.739 million. In addition to his salary, McMahon received another $3.3 million in bonuses from 1997 through 2000, bringing his total take to over $6 million.

- For the five years 1997 through 2001, Maxey received bonuses totaling $1.7 million in addition to his regular salary. (For comparison, Maxey's bonus for 1996 – before many of the tax structures discussed in this complaint – had been just $15,667.) For 2000, Maxey also received $625,000 worth of restricted Enron stock. For that year, Maxey's compensation exceeded that of his superior, Robert Hermann. Causey approved Maxey's compensation.

- For the year 2001 alone, Glisan received compensation in the form of salary, bonuses, and stock worth a total of $2.05 million. He also made $1 million in a matter of months on an investment in a self-interested partnership Fastow created to engage in related party transactions with Enron. Glisan's total investment had been $6,000.

- From 1997 through bankruptcy, Kopper (and his domestic partner William Dodson) received approximately $30 million solely from Kopper's participation in three self-interested partnerships that engaged in related party transactions: $12.7 million in distributions and $1.6 million in management fees from transactions with Chewco, at least $7.3 million in distributions and $178,000 in management fees from LJM1, and at least $7.2 million in management fees from LJM2 during a short tenure as its *de facto* general partner.

### e.     The Insiders are being held criminally accountable.

151.     Three of the six Insiders – Fastow, Glisan and Causey – have been indicted as a result of Enron's collapse. Fastow pled guilty on January 14, 2004 to two counts of conspiracy to commit wire fraud and conspiracy to commit wire and securities fraud. He also agreed to forfeit assets having an approximate value of $23,800,000, which he admitted constituted proceeds of his criminal acts. He also agreed, in Exhibit A to his Plea Agreement, that he and other members of senior management fraudulently manipulated Enron's financial statements by means including: "(1) generating improper earnings and funds flow; (2) enabling Enron to set inflated 'market' prices for assets; and (3) improperly protecting Enron's balance sheet from poorly performing and volatile assets." Fastow Plea Agreement, Ex. A, par. 4. Fastow further admitted that he breached his fiduciary duties to Enron's shareholders. *Id.* at par. 11.

152.     Glisan was indicted on twenty-four counts of money laundering, wire fraud, and conspiracy. On September 10, 2003, he pled guilty to one count of conspiracy to commit wire and securities fraud. Pursuant to a plea agreement, Glisan forfeited $938,000 in profit earned from an illegal transaction involving one of Enron's off-balance sheet partnerships. He was sentenced to five years in prison, the maximum term for the charge to which he pled, and began serving his sentence

immediately.  As part of his plea agreement, Glisan admitted:  "Beginning in the spring of 2000, I and others at Enron engaged in a conspiracy to manipulate artificially Enron's financial statements."  Glisan September 10, 2003 Statement, Ex. 1 to Plea Agreement.

152A.  Causey was indicted initially on January 21, 2004 and in a Superseding Indictment on February 18, 2004 on multiple counts of securities fraud, conspiracy to commit securities fraud, and wire fraud.  Among the charges made against Causey are that he structured "financial transactions in a misleading manner in order to conceal the amount of Enron's debt and to create the appearance of greater cash flows."  Superseding Indictment, at 11.  Causey invoked his Fifth Amendment right against self-incrimination when called to testify before Congress, and he refused to give testimony to the Enron Examiner.

153.  Neither McMahon nor Maxey has yet been indicted, although the criminal investigations as to their roles in Enron's demise are ongoing.  Both asserted their Fifth Amendment rights in order to avoid being deposed by the Enron Examiner.  Maxey's alleged document shredding has also been investigated by the FBI.

154.  The United States Attorney filed felony charges against Kopper in the form of a criminal information.  On August 21, 2002, Kopper pled guilty to conspiracy to commit wire fraud and money laundering, and agreed to forfeit $4 million in criminal proceeds.  Under the terms of his plea agreement, Kopper must cooperate fully with the government.  Also on August 21, 2003, Kopper settled an action brought against him by the Securities and Exchange Commission.  The settlement required Kopper to disgorge an additional $8 million (beyond the $4 million he forfeited in the criminal case).  Kopper is now permanently barred from acting as an officer or director of any public company.

2.    **The Bank Defendants Were Essential To The Scheme And Were Also Motivated By Greed**

155.    The Enron Examiner concluded that the Insiders did not – and could not have – consummated the SPE transactions that brought down Enron on their own.  The Bank Defendants joined them in the fraud.  In written testimony to Congress, the Chief Investigator for the Permanent Subcommittee on Investigations voiced the same conclusion:  "The evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities."  Testimony of Robert Roach before Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate, 127th Cong. (2d Sess.) (the "PSI Hearings"), July 23, 2002 at 1 [hereinafter "Roach Testimony"].  Like the Insiders, the Bank Defendants were motivated by greed.

156.    In exchange for substantially aiding the Insiders, the Bank Defendants earned huge fees.  Between 1998 and 2001 alone, Enron paid the Bank Defendants more than $600 million.  Citigroup received $99.05 million, Chase received $96 million, Merrill Lynch received $35.94 million, BT/Deutsche Bank received $38 million, Barclays received $27.28 million, CIBC received $24.16 million, and CSFB received $110.75 million.  Toronto Dominion, RBS, and RBC also received millions.  The Bank Defendants also received premium interest rates on their investments:  For example, in the Nigerian Barge deal, Merrill Lynch was promised and received a guaranteed 22.14% return on an investment of $7 million for approximately 6 months.  In addition, the Bank Defendants and many of their executives received lucrative returns on investments made in self-interested partnerships through which the Insiders improperly transacted business with Enron.

3.     **How The Scheme Worked**

    a.     **Enron embraced mark to market accounting and trading.**

157.     The Insiders' financial manipulation worked because of the transformation that occurred within Enron and the energy industry at the close of the last century.  Until the mid-1990s, Enron was a relatively traditional energy company with a concentration in natural gas pipelines.  In the mid- to late-1990s, however, Enron's management, including the Insiders, transformed Enron into a company that depended less on pipelines and transportation and more on energy trading and investing in new technologies and businesses.  In many ways, an accounting concept fueled this change: mark to market accounting ("MTM accounting").

158.     Before MTM accounting, energy companies (including Enron) carried their assets at historical value.  Under MTM accounting, assets are carried at fair value.  Importantly, under MTM accounting, a change in value of an asset from quarter-to-quarter is recorded as a gain or loss on the income statement.

159.     Enron began using MTM accounting in 1992 for its gas trading business.  Enron received the SEC's approval to do so after representing that Enron's gas business (i) was separately operated from Enron's other business, (ii) consisted of contracts and financial instruments, and (iii) was analogous to a securities trading operation.  Over the next few years, as Enron grew its commodity trading operations, it extended MTM accounting to those areas as well: electric power, pulp and paper, and coal.  In 1996, Enron extended MTM accounting to JEDI, an off-the-books investment partnership, by analogizing JEDI's activities to those of an investment company.  In 1997, Enron extended the investment company analogy (and MTM accounting) to its merchant banking business.  In 1998, the Financial Accounting Standards Board promulgated EITF 98-10, which for the first time required energy trading contracts to be marked to market.  Finally, in 1999 and 2000, Enron extended the use of MTM accounting to nonenergy commodities.

160.    There was nothing inherently wrong with MTM accounting as such.  As the Enron Examiner noted, "Setting aside valuation abuses, the problem was not that Enron used MTM accounting, but rather that Enron resorted to financial engineering to address the effects of MTM accounting."  Exam. II at 24 n.63.  In fact, MTM accounting was a potent generator of earnings, earnings Enron could recognize on its financial statements long before the activities it was valuing actually generated cash.  MTM accounting was such a successful earnings generator that by December 31, 2000, $22.8 billion – or 35% – of Enron's total balance sheet assets were accounted for using MTM accounting.

### b.    Enron's credit rating became vitally important.

161.    Enron's use of MTM accounting grew as Enron discovered new ways to realize its benefits.  Over time, Enron made huge investments in new technologies, as well as in businesses potentially capable of using those technologies, neither of which generated immediate earnings.  Not surprisingly, by mid-1999, Enron (in all its parts) had grown into a "voracious consumer of cash" – cash it did not have.  As an analyst at JP Morgan explained at that time:

> Unlike the typical domestic electric utility, ENE is not a cash flow story.  It has not invested in infrastructure during the past 100 years in order to rest on its depreciation laurels.  It is investing vigorously in its future.  As such, operating cash flow is eaten up by the need for working capital and capital expenditures.  Beyond that, ENE's equity investments need to be funded via bank debt, debt and equity capital markets, and asset divestitures.

JP Morgan Securities, Inc. Company Report on Enron Corp., July 9, 1999 at 7 (JP Morgan Securities Report) (quoted in Exam. II at 17 n.47).

162.    Enron's need for cash made Enron's credit rating critically important.  As explained in Enron's 1999 Annual Report:  "Enron's continued investment grade status is critical to the success of its wholesale business as well as its ability to maintain adequate liquidity."  Enron's growing emphasis on trading also implicated Enron's credit rating.  Absent a favorable rating, Enron

could not trade with others in the commodities markets except by posting collateral. Without substantial cash, posting collateral was a significant problem. As the Enron Examiner found, Enron Wholesale Services – the division of Enron that created trading markets in gas, oil, electricity and other energy products – was by far the most significant of Enron's business segments. "Thus, the continued success of Enron's entire business was dependent upon the continued success of its Wholesale Services business segment, which in turn was dependent upon Enron's credit ratings for its senior unsecured long-term debt." Exam. II at 18-19.

163. One other reason why Enron's credit rating was vital: A key component of Enron's credit rating was the amount of its debt. To avoid increased debt, the Insiders used financing structures to obtain cash that could be accounted for on Enron's financial statements as something other than debt or, in some cases, not at all. Ironically, some of those structures themselves had the effect of increasing the importance of Enron's credit ratings because they included defaults or trigger events directly or indirectly based on Enron's credit rating. Three examples:

164. The Marlin share trust structure raised more than $1 billion in December 1998. The structure included a trigger, and a trigger event occurred if Enron's credit rating on its senior debt fell below a certain point at the same time that Enron's stock price fell below a certain point for a certain number of days. Once a trigger event occurred, other provisions went into play, the culmination of which was that Enron could be required to make a deficiency payment to noteholders of $915 million.

165. Enron's other large share trust, the Osprey (or Whitewing) structure, involved a similar arrangement. Through an initial financing in September 1999 and subsequent rounds in July and October 2000, Enron raised more than $2.6 billion. In connection with that structure, a decline in credit rating coupled with a fall in Enron's stock price could, under certain other circumstances, require Enron to pay $2.4 billion to noteholders.

166.    Finally, in the Rawhide minority interest structure – which raised $750 million in December 1998 – a downgrade event was defined as a specified drop in the rating of Enron's long-term, unsecured debt.  Under the transaction documents, that downgrade would put other provisions into play which, at their end, required Enron to repay certain loans.  This was significant since at the date of bankruptcy, the loan amount was still approximately $691 million.

167.    Thus, in just three structures, a drop in Enron's credit rating could have triggered events that could have required Enron to make payments of more than $4 billion dollars – again, money Enron did not have.  And these three were not the only structures in which credit rating triggers created adverse consequences for Enron.  The transaction documents for other structures included triggers that caused defaults, increased margins, increased interest rates, eliminated the ability to invest in Enron notes, and increased pricing for the financing – to the tune of more than $3 billion:   Triple Lutz ($114 million), Valhalla ($50 million), Nahanni ($15 million), SE Acquisition (up to $120 million), Margaux ($125 million), Mahonia ($650 million), Aircraft Financing ($468 million), Monte ($350 million), Brazos VPP ($170 million), Enron Building North Synthetic Lease ($284 million), Tammy ($500 million), Choctaw ($500 million), and JT Holdings ($74 million).

> c.    **The Insiders understood how the rating agencies determined Enron's credit rating.**

168.    The soundness of Enron's credit rating depended on the soundness of certain financial ratios.  Five were key:  (i) funds flow interest coverage, (ii) pre-tax interest coverage, (iii) funds flow from operations to total obligations, (iv) total obligations to total obligations plus shareholders' equity and certain other items, and (v) debt to total capital.  Between them, these five ratios shared six components:

- **Funds flow from operations**, defined as **net cash provided by operating activities** (from the cash flow statement) less cash provided from decreases in working capital (or plus cash used for increases in working capital).

- **Balance sheet debt**, defined as short-term and long-term **debt appearing on the face of the balance sheet**.

- Total obligations, defined as **balance sheet debt**, **plus guarantees of debt of third parties** and guarantees of lease residual values, **plus any excess of price risk management liabilities over price risk management assets**. Guaranteed debt was reduced by the value Enron attributed to the assets supporting the underlying debt. **Debt of unconsolidated equity affiliates was not included because (unless guaranteed) it was nonrecourse to Enron**.

- **Shareholders equity** and certain other items, defined as shareholders' equity, plus "mezzanine" items, minority interests and company-obligated preferred securities of subsidiaries.

- Adjusted earnings for credit analysis, defined as IBIT, less gain on sale of nonmerchant assets and the excess of earnings from equity method investees over distributions from those investees, plus impairment losses.

- **Interest expense**, defined as interest incurred, less interest capitalized, plus estimated lease interest expense.

Enron 2000 Annual Report, "Financial Review – Selected Financial and Credit Information (Unaudited)" at 52 (emphasis added).

169.    Understanding the effect these components had on Enron's credit ratios gave the Insiders the power to manage the ratios by managing Enron's financial statements. Simply stated, and measured by their impact on Enron's credit ratios, the Insiders recognized that:

- raising money by increasing debt (and interest) which showed up on Enron's balance sheet was bad,

- raising money by issuing stock and increasing shareholders' equity was bad, and

- raising money by guaranteeing others' obligations was bad.

170.    Moreover, the Insiders learned early that the rating agencies viewed MTM accounting itself as having a possible negative effect on Enron's credit ratios. The fact that MTM accounting

allowed Enron to recognize earnings before an activity generated cash created a "quality of earnings" problem.  As JP Morgan explained in 1999,

> [ENA] has significant flexibility in structuring contracts and hence booking earnings. It is primarily a financial business and hence uses "mark to market" accounting.  As such, contracts can be structured to recognize the economic value of projects long before they are operational and cash is coming in the door. . . .  This has two effects: front-end-loaded earnings that bias the denominator in the P/E ratio and a timing disconnect between projects' cash and earnings effects.

JP Morgan Securities Report at 4 (quoted at Exam. II at 26).

171.    The Insiders also learned quickly that the rating agencies measured the earnings problem as the gap between net income and funds flow *from operations*.  That is because true funds flow from operations represents high quality earnings that will likely recur and can be counted on to service debt and provide cash for operations in the future.  A gap between book net income and funds flow from operations makes the quality of net income suspect and puts into doubt whether funds will be available, as needed, to run the business.  For example, if cash needed for day-to-day operations is entirely raised through financing (as opposed to operations), the business is likely in trouble.  On the other hand, a small gap between net income and funds flow from operations likely means the business is healthy – at least it does if the size of the gap has not been fraudulently engineered.

172.    The Insiders, however, realized that by "managing" the gap between net income and funds flow from operations, they could hide the extent of any earnings problem MTM accounting created.  For the Insiders, managing the gap came to mean characterizing cash Enron received in transactions involving SPE structures as cash flowing from operating activities instead of from financing activities.  Of course, knowing how a financial statement can be manipulated is not the same thing as manipulating it.  For help – and for financing – the Insiders turned to the Bank Defendants.

**d.     The Insiders engaged in a scheme that used SPEs improperly to prop up Enron's credit rating.**

173.     Enron is *not* complaining simply that the Insiders and the Bank Defendants managed Enron's business with SPE structures.  Just as there is nothing inherently wrong with MTM accounting, there is nothing inherently improper about using structured finance and SPEs to achieve and report legitimate business results.  As the Chief Credit Officer of the Corporate Finance Group of Moody's testified during the PSI Hearings, "It should be stressed that structured financing is a common risk management tool available globally to corporations, financial institutions, and state and local governments.  It is a recognized method, for example, of enhancing liquidity and of transferring credit risk when appropriately implemented."  Testimony of Pamela M. Stumpp, the PSI Hearings, July 23, 2002 at 28 [hereinafter "Stumpp Testimony"].

174.     However, in the case of Enron, the Insiders and the Bank Defendants used structured finance to report results Enron never achieved.  Again, as Moody's testified at the PSI Hearings: "The problem was that the actual Enron risk was different from that portrayed by Enron's incomplete and misleading financial disclosures." *Id.* at 31.  Obviously, reporting results that were never achieved is improper, especially because the whole point of reporting the incorrect results is to fool rating agencies and others – including Enron's creditors and its own Board of Directors – into believing that Enron was living up to its credit rating.

175.     Companies registered with the Securities and Exchange Commission ("SEC") are required to file their financial statements in conformance with GAAP.  If a structure is used, the financial impact of that structure must – at a bare minimum – be captured in the company's financial statements in accordance with the requirements of GAAP.  In addition to technical compliance with GAAP's specific rules, the accounting must also satisfy the principle of "fairly presents." That is, even if a structure is reported in a manner that complies with individual, technical rules of GAAP,

the reporting still violates GAAP if the resulting financial statements do not "fairly present in all material respects" the financial position, results of operations, and cash flows of the company.

176.    The Insiders saw to it the SPE transactions were recorded and reported in a manner that violated GAAP.  In each instance, the transaction was reported in a manner that was inconsistent with one or more key parts of the structures through which the transaction was accomplished.  Some (but not necessarily all) of these specific failings are identified in the discussion of the types of structures the Insiders used, which follows.  Equally important, however, the manner in which the transactions were reported did not fairly present in all material respects Enron's financial position, results of operations, and cash flows for the periods reported.  In part, as the Enron Examiner explained, that is because many of the SPE transactions were designed to be reported in a manner inconsistent with the economic substance of the underlying transaction:

> [I]t is doubtful that a company's financial position can be "fairly presented" . . . if, through pervasive use of structured finance and aggressive accounting practices, a public company has so engineered its reported financial position and results of operation that its financial statements bear little resemblance to the economic substance of its actual financial condition or performance.

Exam. II at 56.  That is exactly what the Insiders – with necessary help from the Bank Defendants – did.

### (1)    The Insiders applied accounting techniques improperly to four types of transactions.

177.    The Insiders repeatedly and improperly used accounting techniques, each dependent on the use of SPEs, to prop up Enron's important credit ratios.  They applied these techniques to four different transaction structures: (i) prepay transactions, (ii) FAS 140 transactions, (iii) minority interest transactions, and (iv) tax transactions.  The basics of these structures are discussed in section (2) below.

178.    Self-interested partnerships – like LJM1 and LJM2 – were also part of the process. Basically, the Insiders used these partnerships to temporarily "warehouse" Enron's underperforming assets – that is, the Insiders ostensibly sold underperforming assets to the self-interested partnerships (counter-intuitively, often at *higher* values than appeared on Enron's financial statements).   The Insiders used the "sale" to justify moving the assets off Enron's balance sheet.   Moving the assets off-balance sheet meant that Enron's financial statements never showed the decrease in value the asset had suffered (as MTM accounting would have required, had they been kept on the balance sheet), or the debt associated with the asset.   It also left Enron's credit ratios undisturbed.   The history of one asset illustrates the process.

179.    In January 1998, Enron acquired an interest in Catalytica, a developer of technology to reduce or eliminate emissions produced by natural gas turbines.   Enron's interest was subsequently hedged through Raptor – an SPE.   It was "warehoused" between December 18, 1998 and December 3, 2000 in Rawhide, and then warehoused again between December 3, 2000 and March 12, 2001 with an affiliate of LJM2.   Enron Insiders controlled Raptor and LJM2, which was an investor in Rawhide.   Several months before the asset was sold to the LJM2 affiliate, an Enron employee wrote:

> Some straight talk on valuation:
>
> Catalytica: Our initial investment was $30 million.   By early 2000 this had been writtenup [sic] to 47 million (the value BR – before raptor) based on a wing and a prayer.   Subsequently we were requested to come up with the highest possible value for the raptor arrangement.   *This value is not the value at which a willing buyer and seller would transact an exchange.*   We conjured up a model which used every assumption provided by the company at face value with no risk adjustment.   These assumptions were "aggressive" to say the least; they constituted the basis for IB hype for the then contemplated IPO.   We could mathematically get to the $116.1 million raptor value, which translates to a $600-$700 million enterprise value.   The IPO was pulled and the company strategy changed to spin-off, i.e. no IB hype, roadshow, romance etc.   The technology has not been commercially tested.  . . .

E-mail from Richard Lydecker, Enron, to Jeff Donahue, Enron, Sept. 15, 2000 at 1 (emphasis added).

180.    For some Insiders, the ultimate purpose of these partnerships was improper. They used them as vehicles for siphoning money from Enron. Not just those Insiders profited, however. Bank Defendants did too. The Insiders permitted and/or encouraged the Bank Defendants to invest in the partnerships and reap significant returns on their investments as reward for facilitating "problematic" SPE transactions and remaining quiet about the impropriety of Enron's financial reporting.

**(2)    The Enron prepay transactions were loans improperly disguised as commodity trades.**

181.    From 1992 through 2001, Enron engaged in structured transactions called "prepay transactions" (the "Enron prepay transactions"). Ostensibly, the Enron prepay transactions were commodity trades – that is, trades in which Enron agreed to deliver a specific amount of a commodity (such as gas or oil) in the future, usually over the course of several years, in exchange for a single, up-front payment (the purchase price) from the purchaser.

182.    Enron did not invent the concept of prepay transactions. As the SEC recently explained in a complaint filed against JP Morgan Chase, in a typical prepay transaction there are two parties and

> the seller bets that the market price of the subject commodity would be lower at the time of delivery than at the time the contract is made. The purchaser bets the opposite way: that the market price of the commodity at the time of delivery will exceed the price it paid at the time of contracting. In a typical prepay transaction, therefore, each side assumes commodity price risk.

*SEC v. J.P. Morgan Chase & Co.*, Complaint at ¶ 12 (S.D. Tex. 2003) [hereinafter "SEC Chase Complaint]. But, beginning in at least 1997, the Enron prepay transactions failed to qualify as typical prepay transactions, because each side did not assume commodity price risk. More

specifically, when the relevant trades involved in a typical Enron prepay are pieced together, it is clear that *neither* party assumed commodity price risk. In fact, the commodity price was irrelevant to the transaction.

183.    As the SEC explained (in the context of JP Morgan Chase), the Enron prepay transactions:

> employed a structure that passed the counter-party commodity price risk back to Enron, thus eliminating all commodity risk from the transaction. As in typical prepays, Enron received cash up front. In contrast to typical prepays, however, with all elements of the structure taken together, if all parties performed as expected, Enron's future obligations were distilled to repayment of that cash with negotiated interest. The interest amount was set at the time of the contract and was independent of any changes in the price of the underlying commodity. This was accomplished through a series of simultaneous trades whereby Enron passed the counter-party commodity price risk to a Chase-sponsored special purpose vehicle, which passed the risk to Chase, which, in turn, passed the risk back to Enron.

*Id.* ¶ 13.

184.    The "trick" to the Enron prepay transactions was a circle of three. That is, each prepay transaction involved three essential parties: an Enron affiliate, a financial institution, and a pass-through entity (usually controlled by the financial institution), each of which, at the end of the transaction, owed obligations to the other. Although their details differed, from 1997 forward, the Enron prepay transactions always included three steps that, viewed together, eliminated commodity price risk for all three parties while producing reams of paper giving the appearance of commodity trades. As the Enron Examiner explained, "Thus, in substance, the prepayments to Enron simply created Enron debt." Exam. II at 64. And the Enron prepay transactions were actually loans.

185.    The Insiders understood and intended that the three steps be viewed together, and that they effectively eliminate commodity risk. In June 2000, a recently completed $650 million prepay transaction with Chase was commemorated with a tombstone that included a triangle, to represent

the three parties to the transaction.  It also included, in quotation marks, the slogan:  "Let the circle be unbroken."

186.    In 2003, the District Attorney of New York County completed an 18-month investigation into Enron's prepay transactions with JP Morgan Chase and Citigroup.  In a July 28, 2003 letter to Alan Greenspan, Chairman of the Board of Governors of the Federal Reserve System, and others, the District Attorney explained the nature of his investigation:

> In the course of our investigation, which began shortly after Enron filed its bankruptcy petition, we have interviewed hundreds of witnesses from throughout the country and abroad and analyzed more than one million documents.  In addition, testimony was taken from 46 witnesses and more than 2,700 exhibits were introduced before a New York Grand Jury, which sat for six months.

R. Morgenthau letter to The Honorable Alan Greenspan, July 28, 2003 [hereinafter "Morgenthau Letter"] at 2.

187.    Based on this extensive, independent investigation, District Attorney Morgenthau reached the same conclusion as the Enron Examiner and the SEC:

> Prepaid commodities transactions, which involve the present sale of a commodity in exchange for future delivery, are routine and serve legitimate economic ends in commodities trading.  As our investigation disclosed, however, the prepaids Chase and Citibank engaged in with Enron were never designed to constitute trading in the commodities markets.  Despite the banks' efforts to make these transactions look like commodities trades, they were trades on paper only.  In substance, they were loans.

*Id.*

188.    The Insiders used the prepay device because accounting rules for commodity trades are different than accounting rules for debt.  Prepay transactions were simply a means of obtaining significant amounts of cash pursuant to a structure that allowed Enron to report favorable financial statement results.  Had the financial institutions simply loaned Enron money, the Insiders would have been required to record the loan amount on Enron's balance sheet as debt.  Instead, by falsely classifying the repayment obligation as generated by a commodity sales contract, the Insiders

reported the repayment obligation as price risk management liabilities.  The difference in treatment was important because balance sheet debt is a component of several of the key financial ratios the rating agencies continuously monitored.

189.    The difference in accounting treatment also was important to Enron's cash flow statements.  Had the cash flow to Enron been properly recognized as loan proceeds, those funds would have been recorded as cash flow from financing activity.  Instead, by misclassifying the funds flow as emanating from a commodity contract, the Insiders ensured that the funds were reported as cash flow from operating activities.  Again, cash categorized as funds flow from operations helped the Insiders "manage" the "quality of earnings" problem that the rating agencies perceived could arise from the use of MTM accounting.

190.    Accounting for the Enron prepay transactions as if they were commodities contracts rather than debt violated GAAP – among other provisions, FAS133 and Emerging Issues Task Force Abstract 98-15 ("EITF 98-15"), titled "Structured Notes Acquired for a Specified Investment Strategy."

191.    Every independent entity to investigate the Enron prepay transactions agrees that they violated GAAP.  The Senate Permanent Committee on Investigations investigated and reported on the Enron prepay transactions.  At the conclusion of the investigation, the Committee's Chief Investigator characterized the prepays as a "sham" and described succinctly the GAAP rules for prepays and how the Enron prepays deviated from those rules:

> In order for [prepay] transactions like the ones used by Enron and the banks to be legitimately booked as a trading liability and not debt, four elements had to be present: One, the three parties had to be independent; two, the trades among the three parties could not be linked; three, the trades had to contain price risk; and, four, there had to be a legitimate business reason for the trades.
>
> The Enron type prepays we examined failed on all accounts:  Two of the three parties in the Enron trades were related – the banks and their offshore special purpose entities which the banks established and controlled; the trades among the

> parties were linked – contracts associated with the trades were designed so that a default in one trade affected the other trades; there was no price risk – except for fees and interest payments, the final impact of the trades was a wash; neither the banks nor the banks' special purpose entities had a legitimate business reason for purchasing the commodities used in the trades.

Roach Testimony at 15-16.

192.    Both the Enron Examiner and District Attorney Morgenthau reached the same conclusion, as a result of their respective investigations.  The Enron Examiner concluded:

> Pursuant to an application of existing GAAP, the commercially interdependent steps in the transactions should have been viewed together, and Enron should have recorded the proceeds of these borrowings as cash flow from financing activities and its repayment obligations as debt.  As a result of its accounting for the Prepay Transactions, Enron materially (i) understated its debt, (ii) overstated its cash flow from operating activities and (iii) overstated its price risk management liability.

Exam. II at 66.  In District Attorney Morgenthau's 's words, "Structuring these transactions as commodities trades . . . enabled Enron unfairly to account for the funds it received as cash flow from operations, rather than as the proceeds of bank or credit financing."  Morgenthau Letter at 2.

193.    The violations were particularly egregious because – as the Bank Defendants knew – the Insiders used the Enron prepay transactions as a tool to satisfy the rating agencies' expectations.  The tool was effective because the ratings agencies understood neither the nature of the prepays nor the fact that they violated GAAP.  On July 23, 2002, Ronald Barone, the Managing Director of S&P's Utilities, Energy & Project Finance Group testified at the PSI Hearings.  With respect to the Enron prepays, he stated:

> It now appears . . . [that] Enron may have incurred approximately $4 billion in debt-like obligations structured as prepaid forward transactions and swap transactions. . . . While Enron did not provide specific details about these particular transactions, the generalized information it did provide, which underpinned our analysis, led us to conclude that the funds from these transactions were more akin to operational cash flow than new debt-like obligations.

> Despite our repeated requests for complete, timely and reliable information, Enron did not disclose any information revealing a link between the prepaid forward transactions and the swap transactions. . . . While our knowledge about the full

nature of these transactions and/or any links between them is still limited, any lack of disclosure by Enron of their material aspects would have been yet another flagrant violation of Enron's duty and responsibility to provide Standard & Poor's with complete, timely and reliable information.

Testimony of Ronald Barone, the PSI Hearings [hereinafter "Barone Testimony"], July 23, 2002 at 32. Pamela Stumpp likewise testified on behalf of Moody's, albeit more bluntly: "Moody's did not have any knowledge, prior to Enron's bankruptcy, of the existence of Enron's prepaid forward and related swap transactions." Stumpp Testimony at 29. When Senator Joseph Lieberman asked why Moody's did not detect the transactions, Ms. Stump stated: "[C]andidly, these transactions were disguised loans, and it was very difficult, and it would be very difficult from a simple examination of a company's financial statements to detect them. . . . [I]n this case it was a clear effort at hiding what was really debt from ourselves as well as other investors." *Id.* at 43.

194.    Enron obtained more than $8 billion in financing from just Citigroup and Chase over the six years before bankruptcy. Other financial institutions – including CSFB, Barclays, Toronto Dominion, and RBC – also participated in prepays.

195.    Enron prepay transactions were also Enron's single largest source of cash during the four years before bankruptcy. Typically, the prepay transactions closed at the end of a financial quarter, and had a striking impact on Enron's financial statements. For example, in 2000 Enron's total operating cash flows were $4.779 billion, of which prepay transactions generated $1.527 billion (or 32%). In 1999, Enron total operating cash flows were $1.228 billion, of which prepay transactions supplied $1.231 billion gross.

196.    Had the Enron prepays been reported as debt, Enron's debt to total capital ratio would have been dramatically different in 1999 and 2000. In 1999, treating the Enron prepay amounts as debt would have increased Enron's debt by 31% and changed Enron's debt to capital ratio from 38.5% to 45%. In 2000, treating the Enron prepay amounts as debt would have increased Enron's

debt by 39% and changed Enron's debt to capital ratio from 40.9% to 49.1%.  As the Enron

Examiner concluded, "Reduced operating cash flow and increased debt levels in these amounts

would almost certainly have resulted in credit ratings lower than those enjoyed by Enron at the

applicable times."  Exam. II at 61.

197.     In their testimony to Congress, representatives from Moody's and S&P's agreed.

Ms. Stumpp from Moody's testified,

> Based on our limited knowledge, these transactions appear to have been a form of
> financing.  If such transactions had been accounted for as a loan, Enron's operating
> cash flow would have been reduced and its debt would have been greater.  The
> disclosure of these transactions as loans would have exerted downward pressure on
> Enron's credit rating.
>
> Of course, knowing all that we do know today about the true nature of Enron's
> corporate enterprise, *it is clear that Enron had not been an investment grade
> company for several years*.  The compounded impact of these [prepay] transactions
> alone on Enron's financial framework may have resulted in the lower rating and
> perhaps an earlier downgrade to below investment grade status.

Stumpp Testimony at 30 (emphasis added).  Mr. Barone from S&P's explained:  "In hindsight, and

without full information, it is difficult to assess the effect full disclosure about these transactions

would have had on our ratings analysis; but the sheer volume of the transactions suggests that it

would likely have been significant."  Barone Testimony at 33.

> **(3)     The Insiders used FAS 140 transactions improperly to hide and
> move debt off Enron's balance sheet and to increase cash flow**.

198.     The Insiders found other ways to raise financing without reporting debt.  In general,

Enron could generate cash immediately from an asset by monetizing the asset through a structured

finance transaction involving an SPE.  By 1998, the Insiders were raising money by monetizing

Enron's assets through "FAS 140 transactions."  FAS 140 is a financial accounting standard that

governs the securitization of financial assets.[2]  As such, it defines the accounting by which transfers of financial assets (and their liabilities) to SPEs are recorded.  By 1998, the Insiders had become vitally interested in structuring FAS 140 transactions because FAS 140 allowed asset transfers to be accounted for as sales.  The beauty of accounting for a transfer as a sale was that the sale removed the asset (and its corresponding liabilities) from Enron's balance sheet and allowed Enron to recognize gain and operating cash flow from the transfer.

199.    These benefits became particularly important over time, as it grew obvious to the Insiders that Enron's merchant portfolio was rapidly declining in value.  By November 2000, over a year before Enron filed bankruptcy, Enron documents show the Insiders knew that

- 59% of originally expended capital was not meeting expectations,

- Enron had $3.8 billion of earnings exposure on assets performing below expectation,

- 81 out of 167 equity transactions were underperforming,

- 43% of originally expended debt capital was not performing or "had issues,"

- Enron had $315 million of earnings exposure on debt that was non-performing or "had issues," and

- 31 out of 55 debt transactions were nonperforming or had issues.

200.    Of course, because of MTM accounting, each underperforming asset had been originally recorded on Enron's financial statements at "fair value" based on a then-rosy assessment of the value of that asset, determined in the afterglow of the transaction.  As assessments changed – and the document quoted above shows that they did, radically – MTM accounting

---

[2] FAS 140 replaced FAS 125 effective April 1, 2001.  Some of Enron's transactions were governed by FAS 125 and some by FAS 140.  All of Enron's FAS 125, FAS 140 and other similar transactions are called FAS 140 transactions throughout this Complaint.

likewise required the Insiders to re-determine each underperforming asset's fair value and change Enron's financial statements to recognize the loss.

201.    But it quickly became clear to the Insiders that the size and number of Enron's asset failures ran the risk of toppling Enron's credit rating.  Therefore, the Insiders created FAS 140 transactions as an alternative:  Instead of re-valuing the asset on Enron's financial statements and recognizing the loss, the Insiders ostensibly transferred the asset into a structure that purportedly qualified for sale reporting pursuant to FAS 140.  The Insiders then moved the asset off the balance sheet, used the cash to operate the company, and – for the time being – resolved the valuation problem.

202.    Between 1998 and the Petition Date, Enron participated in more than forty FAS 140 transactions.  The manner in which the Insiders caused Enron to report a large number of them violated GAAP.  Usually, the SPE structure into which the asset was transferred did not meet the requirements for reporting the transfer pursuant to FAS 140.  Moreover, reporting the transactions as if they involved FAS 140 structures failed to fairly present in all material respects Enron's financial position, results of operations, and cash flows.

203.    FAS 140 is inapplicable unless the asset being transferred is isolated from the transferor such that it cannot be reached by the transferor's creditors in bankruptcy.  An asset is not isolated if it is transferred to an SPE that should itself be consolidated on the transferor's financial statements.  The question of consolidation is therefore crucial to FAS 140 accounting treatment.

204.    FAS 140 incorporates accounting guidelines that address aspects of the question of consolidation.  These guidelines have created a "prevailing practice" with respect to consolidating SPEs.  The prevailing practice – in accounting jargon, "the 3% equity rule" – is the equivalent of a requirement.  As the Enron Examiner explained, the rule means an SPE must be consolidated

-56-

unless *independent* third parties make an *equity investment* in the SPE equal to at least *3% of the fair value* of the entity's assets, and the equity investment is *at risk* during the entire term of the SPE.

205.    In substantially all of the FAS 140 transactions involving the 3% equity requirement, the Insiders promised the equity owner verbally that Enron would repay the equity investment. The Bank Defendants to whom these promises were made often documented the promise in their records. The Insiders who made the promises routinely honored them. Where repayment was promised, equity was not at risk, and accounting for the transaction pursuant to FAS 140 thus violated GAAP.

206.    Some of the Bank Defendants called the Insiders' promises to repay the equity investments "trust me" equity. "Trust me" equity eliminated risk and, therefore, also eliminated the Bank Defendants' incentive for analyzing FAS 140 deals, before investing, as real investments. When the CFO or Treasurer of one of the world's largest corporations assures repayment of an investment, determining whether the economics of the underlying asset will support the investment is superfluous. Likewise, when the CFO or Treasurer knows the investor is not scrutinizing the economics of the underlying asset, he is not constrained when he values that asset. Eliminating equity risk therefore makes it relatively easy to record the "sale" at an inflated value, and thereby avoid reporting any loss in value on Enron's financial statements. That is what the Insiders did. In this way, the Bank Defendants knowingly facilitated the Insiders' abuse of MTM accounting by participating in FAS 140 (and other) transactions in which they received unwritten promises of repayment of their equity investments.

207.    Although the Enron Examiner did not report on every FAS 140 transaction, he concluded that for every FAS 140 transaction he did report on, the transaction should be re-characterized as a loan. By failing to report the transaction as a loan in the first instance, the Insiders (with the support and assistance of the Bank Defendants) were able at least to

- record approximately $350 million of income as gain on sales of assets for assets that were not actually sold,

- record $1.1 billion as cash flow from operating activities which should have been reported as cash flow from financing activities,

- remove approximately $894 million of debt (improperly) from Enron's financial statements, and

- leave $857 million in contingent obligations off Enron's balance sheet.

208.    Had the FAS 140 transactions been properly recorded, they would have had a substantial impact on Enron's credit rating.

**(4)    The Insiders used minority interest transactions improperly to hide debt.**

209.    The Insiders used another device to keep debt off Enron's balance sheet and engineer its financial statements: the minority interest structure.  Citigroup designed the structure and regarded it as a proprietary product.  Enron's five primary minority interest structures were Rawhide, Nighthawk, Choctaw, Nahanni and Zephyrus.  To execute the structure, the Insiders caused the creation of a subsidiary (Entity A), the majority of which Enron owned.  (Therefore, Entity A was consolidated with Enron for financial purposes.)  A new and allegedly independent entity (Entity B) purchased the "minority interest" in Entity A. Entities A and B were both SPEs.

210.    Enron purchased its majority interest in Entity A by contributing various assets.  In the meantime, Entity B took out a bank loan.  Entity B then purchased its minority interest by contributing the proceeds of the loan, plus 3% equity, to Entity A.  Finally, Entity A loaned Enron the total amount of Entity B's contribution.  At the end of the transaction, it appeared that Enron had received funds directly from an affiliate that was already consolidated with Enron for financial accounting purposes (as opposed to from the bank that loaned Entity B the money).  Therefore, Enron did not have to book any debt for the transaction, and Enron's debt ratios were not affected by the loans.  Additionally, Enron booked the funds as operating income.

211.    An actual example:  On December 27, 1997 the Insiders closed Enron's first minority interest structure.  Whitewing Associates LLC ("Whitewing") was formed to be the majority-owned entity (Entity A in the example above).  Nighthawk Investors LLC ("Nighthawk") was the new and allegedly independent entity (Entity B in the example above) formed to own the minority interest. Enron borrowed $578 million from Citibank and contributed that amount to Whitewing in exchange for a 53.6% managing member interest (the Class A interest).  Whitewing was consolidated with Enron for financial accounting purposes.  Nighthawk contributed $500 million for its 46.4% Class B member interest in Whitewing.  Nighthawk obtained its funds by borrowing $485 million (97%) from CXC, a Citigroup commercial paper affiliate.  The other $15 million (3%) was furnished by Golden Eagle L.L.C. ("Golden Eagle"), the managing member and purported 100% equity owner of Nighthawk.  Golden Eagle in turn was owned by Kestrel Investor, L.L.C. ("Kestrel"), which was owned by HCM High Yield Opportunity Fund, LP ("HCM").  Golden Eagle obtained its $15 million from Kestrel, which had obtained $7.9 million from HCM and had borrowed $7.1 million from CXC.  Citibank provided liquidity support for the loan to Kestrel, and Ambac Assurance Corporation ("Ambac") provided a surety bond for repayment of the $7.1 million loan to Kestrel. That loan was expressly non-recourse to Kestrel or HCM.  The Enron convertible preferred stock, and any dividends with regard to it, were the sources of payments to CXC and Golden Eagle/Kestrel.

212.    Whitewing used $1 billion of the $1.078 billion capitalization to buy newly issued shares of Enron convertible preferred stock.  Whitewing loaned the remaining $78 million to Enron. The Enron convertible preferred stock and the note from Enron were Whitewing's sole assets. Enron then repaid the Citibank loan it had used to fund its Class A interest in Whitewing.  The net effect was that Enron obtained $500 million that, except for HCM's $7.9 million investment, was provided by Citibank's affiliate, CXC.  Enron, through a complex series of undertakings, assumed virtually all of the risk of loss and the obligation to repay the Nighthawk note and the Golden Eagle

"equity." Nighthawk was not consolidated with Enron for financial accounting purposes, and Enron did not record any of this money as debt.

213.    Enron's accounting treatment for Whitewing, as well as for other minority interest transactions, did not comply with GAAP.  The accounting treatment suffered from the same infirmities as the FAS 140 transactions.  In nearly every case, "Entity B" should have been consolidated with Enron for financial accounting purposes and, if it had been, the loan proceeds would have been recorded as debt rather than as a minority interest.  Typically consolidation was necessary because there was either a guarantee (in substance) that took the risk out of Entity B's equity contribution or there was insufficient outside equity in the first place.  For example, to avoid consolidating Nighthawk with Enron, Nighthawk needed independent equity equal to 3% of its total capitalization.  However, the 3% capitalization was not there.  Kestrel's entire $15 million was protected by a "costless collar" consisting of put and call options.  In addition, $7.1 million of the so-called equity was not at risk because it was borrowed on a non-recourse basis from CXC.  The $500 million should have been recorded as Enron debt.

214.    The minority interest transactions materially affected Enron's financial statements. For example, Nahanni (another year-end deal) contributed 41% of Enron's total reported cash flow from operations in 1999, and had no business purpose other than to increase Enron's operating cash flows.

215.    Had the minority interest transactions been properly recorded, they would have had a substantial impact on Enron's credit rating.

216.    As part of their scheme to manipulate and misstate Enron's financial statements, the Insiders caused Plaintiff to make transfers of interest in property and incur obligations as set forth more fully throughout the rest of this Complaint.  They also caused Plaintiff to guarantee aspects of most (if not all) of the prepay transactions and certain of the FAS 140 and minority interest

transactions. The Insiders took these actions in breach of their fiduciary duties to Enron and with actual intent to hinder, delay, or defraud one or more entities to which Plaintiff was or later became indebted.

> **(5)    The Insiders used tax transactions improperly to generate paper income.**

217.    Consistent with their misuse of SPEs, the Insiders found a way to generate financial statement income – without any positive cash flow – through complex tax structures that had no genuine tax-saving purpose. The "tax transactions" involved different technical approaches (tax basis step-up, basis shifting, REMIC carryover basis) but had as a common theme the creation of deferred tax assets that could be booked as financial statement income over an artificially short time period. To accomplish this, the Insiders created structures often involving SPE entities and transactions that BT/Deutsche Bank primarily designed. BT/Deutsche Bank served as Enron's exclusive financial advisor on these transactions and also profited by being a counter-party in some of them. In causing Enron to engage in the transactions and record income improperly, the Insiders also caused Enron to pay BT/Deutsche Bank huge fees, ranging from $6 million to more than $11 million per transaction.

218.    Four of the tax transactions were Teresa, Steele, Cochise, and Tomas. During the time the Insiders engaged in these transactions, Enron already had substantial available tax deductions. In the words of Robert Hermann, head of Enron's tax department, "We had debt to choke a horse, plenty of interest deductions and stock option expense deductions. We had losses. We didn't need deductions." Sworn Statement of Robert Hermann at 46:6-14. Enron therefore did not need any tax shelters to reduce current income tax liability. On the contrary, the explicit, predominant purpose of the tax transactions was something entirely different: to increase financial accounting income. Some of the tax transactions actually created financial income at the cost of real

money.  Teresa, for example, resulted in a payment in 1997 through 2001 by an Enron subsidiary of approximately $131 million in federal income taxes which that subsidiary would not have had to pay absent the transaction.

219.    Enron and BT/Deutsche Bank entered into two other tax transactions, known as Valhalla and Renegade, in order for *BT/Deutsche Bank* – not *Enron* – to reduce its tax liability. These were known as "accommodation" transactions – that is, transactions the Insiders agreed to as reward for BT/Deutsche Bank's creativity.  BT/Deutsche Bank compensated Enron for its role in them.

220.    Taken together, the effect of the tax transactions was to inflate Enron's income in its public financial statements by significant amounts.  Investigators for the Senate Finance Committee concluded that by 2001, the BT/Deutsche Bank tax transactions accounted for $446 million of the $651 million attributed to Enron's tax schemes.  Under GAAP, these sums could not be recognized as income unless Enron would receive real, anticipated tax benefits in future years.  That was not the case.  Those transactions were therefore "artificial transactions" with "no bona fide business purpose."  And, as the Enron Examiner concluded, the Insiders' accounting treatment for these transactions was inappropriate.

221.    The Insiders should not have engaged in the tax transactions, nor should they have recorded income on Enron's financial statements from the tax transactions.  The tax transactions had a material effect on Enron's financial statements.  Eliminating the income they represented would have had a material impact on Enron's credit rating.

>    **e.**    **The scheme gave the Insiders and the Bank Defendants time and opportunity to profit at Enron's expense.**

222.    From late 1997 until late 2001 a number of the Insiders facilitated these SPE transactions by establishing and operating three self-interested partnerships: Chewco, LJM1, and

LJM2.  In doing so, the Insiders received active assistance and eager financial support from many

of the Bank Defendants.  The Insiders used these vehicles to help carry out the scheme.  For

example, the Insiders – with the Bank Defendants' knowledge – used them to store under-achieving

or illiquid Enron assets, thus moving them (and the debt associated with them) off Enron's balance

sheet.  The Insiders – with the Bank Defendants' knowledge – used them to "create" funds flow

from operations to report on Enron's balance sheet.  The Insiders – with the Bank Defendants'

knowledge – also used them to obtain off-balance sheet financing.  These uses helped the Insiders

keep Enron's credit profile stable and, thereby, its stock price strong.  Report of Investigation by the

Special Investigative Committee of the Board of Directors of Enron Corp. at 4-5 (Feb. 1, 2002)

[hereinafter "Powers Report"].

223.    But those were not the partnerships' only or even primary uses.  Notoriously, at least

three Insiders – Fastow, Kopper, and Glisan – used the self-interested partnerships illegally to siphon

money from Enron, in the forms of huge investment returns and management fees.  Altogether,

Fastow and his family received over $31 million in distributions, over $12 million in management

fees, and approximately $16.35 million in connection with the sale of Fastow's interest in LJM2.

Kopper and his domestic partner received at least $24.5 million in distributions and at least

$8.9 million in management fees.  Glisan received $1,040,744 on a total investment of $5,800.

224.    All three Insiders have been prosecuted in connection with the investment vehicles.

All three have pled guilty.  As part of his plea, Glisan admitted that he and others "engaged in a

conspiracy to manipulate artificially Enron's financial statements," and that "LJM enabled Enron

to falsify its financial picture to the public; in return, LJM received a prearranged profit."  *Glisan*

*9/10/03 Statement*, Ex. 1 to Plea Agreement.  Kopper similarly admitted that the Chewco and LJM

transactions were part of an illegal scheme to defraud.  Plea Allocution dated August 21, 2002,

*United States v. Kopper*, Cr. No. H-02-0560 (S.D. Tex., Aug. 21, 2002).

**(1)    In late 1997, Fastow and Kopper formed Chewco.**

225.    Chewco was the first of the three independent investment vehicles.  In the early 1990's, Enron entered into a limited partnership with California Public Employees' Retirement System ("CalPERs").  The partnership was Joint Energy Development Incorporated ("JEDI"), and CalPERs was the sole limited partner.  In late 1997, CalPERs decided to divest itself of its interest in JEDI.  Although Enron could have purchased CalPERs' interest directly, doing so would have meant consolidating JEDI on Enron's financial statements.  At the time, consolidation would effectively have wiped out 40% of Enron's reported 1997 profits and added approximately $700 million in debt to Enron's balance sheet.  To avoid that, Fastow and Kopper conceived of, and created, Chewco – and made it the replacement investor.

226.    A problem with Chewco in that role, however, was that Chewco did not satisfy the 3% equity rule.  Barclays structured and financed the equity piece of Chewco.  However, a sufficient percent of equity was not at risk.  As discussed in the Barclays' section below, Barclays' equity investment was secured by reserve accounts the Insiders established with Enron's money.  Virtually all of Chewco's equity therefore was traceable back to Enron.  Nonetheless, by treating Chewco as an unconsolidated entity, Fastow had Enron report JEDI profits and *not* report JEDI debt on Enron's financial statements – which meant Enron, in turn, announced better-than-expected 1997 performance.  Fastow and Kopper paid themselves handsomely from Chewco for this illusion.

**(2)    In 1999, Fastow and Kopper expanded their scheme by creating the LJM partnerships.**

227.    Emboldened by the success of Chewco – as well as by the money he made from it – Fastow conceived and created the second and third "independent" investment vehicles:  LJM1 and LJM2.  LJM1 (technically, LJM Cayman, L.P.) was a Cayman Islands limited partnership.

LJM2 (technically, LJM Co-Investment, L.P.) was a Delaware limited partnership. Through entities he controlled, Fastow served as the general partner of the managing partner of each.

228.    Both LJM partnerships were formed in 1999. From June 1999 through June 2001 – a period of two years – the Insiders had Enron enter into *more than twenty* distinct transactions with the partnerships. Three were with LJM1 and the rest with LJM2. Through those twenty-plus transactions, the Insiders were able to increase dramatically their manipulation of Enron's financial statements. They moved many poorly performing assets off-balance sheet. They manufactured earnings for Enron through sham transactions when Enron was having trouble otherwise meeting its goals for a quarter. They even improperly inflated the value of Enron's investments by backdating transaction documents to dates advantageous to Enron. Powers Report at 4-5, 134; Exam. II., App. L at 1, 6, 28.

> **(3)    In 1999, CSFB and RBS aided Fastow by knowingly participating in and supporting LJM1.**

229.    Subject to conditions imposed by Enron's board, Fastow formed LJM1 at the end of June 1999. The ostensible reason for its formation dates back to 1998.

230.    In March 1998, an Enron subsidiary purchased 37% (5.2 million shares) of the equity in Rhythms NetConnection, Inc. ("Rhythms") common stock for $10 million. Under the purchase terms, Enron was restricted from selling its equity until January 2000 (the "Lock-up"). In April 1999, 9.4 million shares of Rhythms stock were sold in an initial public offering. As a result, the value of Enron's Rhythms investment increased to approximately $260 million.

231.    After the public offering, Enron marked its Rhythms stock to market. However, it recognized that considerable risk was associated with marking to market the highly volatile Rhythms shares. The Lock-up prohibited Enron from selling its shares, making it vulnerable to any market decline in Rhythms' value. Moreover, even if Rhythms retained its value until Enron could sell its

shares, Enron's 5.2 million Rhythms shares represented the float for Rhythms in the market. Enron, therefore, began looking for a way to lock in its $250 million gain.

232.    Fastow contended that a commercial hedge was not viable. Any fund willing to hedge Enron's investment would have demanded an enormous premium for taking on such a large exposure. So Fastow came up with a different idea. On June 28, 1999, during a Special Meeting of the Enron Board of Directors, Fastow proposed that Enron establish a private equity fund specifically to hedge the Rhythms shares. More particularly, Fastow suggested the formation of two entities, both of which he personally would control: LJM1 and its subsidiary, LJM1 Swap Sub, L.P. ("LJM1 Swap Sub").

233.    The Board approved Fastow's plan but, recognizing the conflict position in which the plan placed Fastow, only on conditions made part of LJM1's partnership agreement. First was that Fastow not receive, directly or indirectly, distributions or allocations resulting from LJM1's Enron stock. Second was that Fastow not receive, directly or indirectly, any proceeds from LJM1 Swap Sub's Enron stock. Third was that Fastow's management fee be calculated by reference to assets in LJM1 other than the Enron shares or any proceeds resulting from those shares (the "Enron Conditions").

234.    Through a complicated series of transactions, Fastow caused Enron to transfer over 3 million shares of its common stock – worth approximately $276 million – to LJM1 which, in turn, transferred approximately one-half of the Enron shares to LJM Swap Sub, to purchase the Rhythms Hedge. The stock came with restrictions. A June 30, 1999 letter agreement restricted LJM1 and LJM1 Swap Sub's right to dispose of the shares for four years without Enron's consent, subject to certain exceptions. Exam. II, App. L. at 8. The letter agreement also prohibited both entities from entering into any transaction that hedged their exposure on their respective portions of the Enron shares for one year without Enron's consent. *Id.*

235.    From the beginning, Fastow knew LJM1 was destined to be profitable. Therefore, as a reward for previous loyalty, Fastow invited two Bank Defendants to purchase equity in LJM1: CSFB and RBS. On June 30, 1999, through subsidiaries, CSFB and RBS each contributed $7.5 million. LJM Partners, LLC, the general partner of LJM1 (which Fastow also controlled), contributed $1.0 million.

236.    Although LJM1's whole purpose was to hedge Enron's risk in its Rhythms stock, LJM1 did not accomplish that, through the Rhythms Hedge or otherwise. As described in paragraphs 561 through 566 below, despite a number of complicated transfers, Fastow failed to transfer any of Enron's true economic risk to any third party with assets other than assets Enron provided. As a result, the Rhythms hedging transaction was a non-economic hedge. Exam. IV, App. E at 36.

237.    In contrast, LJM1 proved very profitable for Fastow, CSFB, RBS, and a select group of others with which Fastow found favor. For example, despite the Enron Conditions, Fastow devised a way to personally profit from the Enron stock in LJM1 and LJM1 Swap Sub. In the process, Fastow helped CSFB and RBS hedge their portions of the Enron shares in LJM1 Swap Sub – despite restrictions on the Enron stock that prohibited them from doing so.

238.    In November 1999, Fastow and the LJM1 limited partners determined to recapitalize LJM1 and, in the process, retire debt LJM1 owed to Enron (from Notes Enron received in exchange for the stock transferred to LJM1) and to CSFB (from a bridge loan CSFB made to LJM1 to invest in Cuiaba and Osprey certificates). At the end of November, Fastow had LJM1 distribute into two escrow accounts – one for each limited partner – LJM1's 1.8 million shares of Enron stock. In return, CSFB and RBS agreed to make equal additional capital contributions of $45.1 million to LJM1, an amount that permitted LJM1 to pay off both the Enron Notes and the CSFB bridge loan.

239.    CSFB and RBS willingly agreed to make these additional contributions to lock-in the limited partners' gains on LJM1's Enron shares, despite the no hedging restriction on those shares. For CSFB, the transaction was SAILs, as described in paragraphs 567-71. For RBS, the transaction involved a total return swap with AIG. Both closed in December 1999. Through the recapitalization and escrow agreements, CSFB and RBS each were assured of a minimum return on the Enron shares, and also had the right to participate in any appreciation of those shares.

240.    Under the November 29, 1999 Second Amended and Restated Agreement of Limited Partnership, LJM1 was required to apply the LJM1 limited partners' additional capital contributions first to pay off the Enron Notes and second to pay off the CSFB bridge loan. CSFBCO 000008615. It did, paying both in full.

241.    That meant LJM1's assets were no longer levered, and the LJM1 partners could enjoy the full value of the assets when they were sold. Fastow ultimately received at least $18 million in distributions related to the recapitalization, and $2.6 million in management fees from LJM1. Exam. II, App. L. at 19. LJM1's balance sheet liquidity also allowed LJM1 to fund a loan to the other Fastow vehicle—LJM2—for $20,000,000 on December 20, 1999.

242.    Through SAILs and the AIG total return swap, and the additional capital contributions, CSFB and RBS knowingly assisted Fastow in receiving funds derived from the value of LJM1's Enron stock, in violation of both Fastow's representations to the Enron Board of Directors and the Enron Conditions. *See* Exam. Final Report, App. F, at 55-56.

243.    The last LJM1 transaction was one of the more egregious displays of Fastow's self-dealing. Through the transaction, LJM1 distributed its interests in LJM1 Swap Sub, and its general partner Swap Co., to CSFB and RBS. The limited partners each received 50% of the equity interests in LJM1 Swap Sub and SwapCo. They turned around and sold those interests to Southampton Place, L.P. ("Southampton"), an entity that CSFB knew Kopper controlled.

244.    The Southampton transaction ultimately benefitted Fastow and Kopper, both of whom were principals in the transaction. Each received $4.5 million. Exam. II, App. L at 34; Powers Report at 92. In his plea allocution, Kopper admitted the Southampton transaction was fraudulent in that Enron was told CSFB and RBS were selling their LJM1 Swap Sub interests for $10 million and $20 million, respectively. In reality, RBS sold its interest for $1 million. The remaining $19 million was split between Fastow, Kopper, three other Enron employees, an LJM2 employee, and three RBS bankers. Plea Allocution dated August 21, 2002, *United States v. Kopper*, Cr. No. H-02-0560 (S.D. Tex.); s*ee also* Superseding Indictment dated April 29, 2003, *United States v. Fastow, et al.*, Cr. No. H-02-0665 (S.D. Tex.).

> **(4)    In 1999, the Bank Defendants aided Fastow and Kopper by knowingly participating in and supporting LJM2.**

245.    From its inception, LJM2 was intended to be a large private equity fund – much larger, for example, than LJM1. When Fastow conceived the idea of LJM2, he took it to Enron's Finance Committee and Board. Fastow explained that he intended to raise $200 million or more from institutional investors to create a private investment partnership that could readily purchase assets from Enron. Fastow explained that he would be the owner of LJM2 Capital Management, LP – LJM2's general partner. Fastow explained that Enron would benefit from his involvement because LJM2 could purchase assets Enron wanted to sell more quickly and with lower transaction costs than outsiders. On October 11, 1999, the Enron Finance Committee and Board of Directors approved the formation of LJM2.

246.    With the assistance of one Bank Defendant – Merrill Lynch – Fastow solicited investments in LJM2 from other Bank Defendants. Merrill Lynch authored a private placement memorandum that emphasized Fastow's position as Enron's CFO, and explained that Fastow,

Kopper, and Glisan would manage LJM2's day-to-day activity. The Executive Summary in the

PPM made LJM2's purpose clear:

> Executive Summary: LJM2 Co-Investment, L.P., a Delaware limited partnership ("LJM2" or the "Partnership"), is being organized by Andrew S. Fastow, Executive Vice President and Chief Financial Officer of Enron Corp., an Oregon corporation ("Enron"), to make… investments in energy- and communications-related business assets. The Partnership expects that Enron will be the Partnership's primary source of investment opportunities and that the Partnership will (i) co-invest with Enron or its subsidiaries… and (ii) make investments in, or acquire an investment interest from Enron or its subsidiaries relating to existing assets or businesses owned by Enron or its subsidiaries. It is expected that in connection with the foregoing investments, Enron will retain significant economic or operating interests in the businesses or assets in which the Partnership invests…. The Partnership's objective is to generate an annualized internal rate of return ("IRR") in excess of 30%….

LJM078358.

247.    The basic investment strategy, as well as important conflicts of interest, were also

spelled out in the Executive Summary:

> Investment Strategy: (1) Invest with Enron; (2) invest in assets and businesses where the seller retains an ongoing economic interest; and (3) capitalize on financial expertise of the principals. LJM2 will typically seek to exit transactions either by negotiating co-sale rights or by securitizing and placing investments in the capital markets. The rationale behind Enron providing investment opportunities to LJM2 is to move assets off-balance sheet and reduce its operating and financial risk by selling portions of investments to co-investors. In many cases Enron seeks to maintain an active or controlling role in the underlying investment.

> Conflicts of Interest: The principals are employees of Enron and owe fiduciary duties to Enron, which may from time to time conflict with LJM2 duties. To combat this potential the principals intend to consult regularly with the Advisory Committee regarding transactions with or involving Enron. Also, companies in which the Partnership invests may also engage in transactions with Enron and profits derived by Enron from such transactions will not be shared with the Partnership.

*Id.*

248.    On December 15, 1999, Fastow issued Supplement No. 1 to the Confidential Private

Placement Memoranda. It set out five initial investments totaling $93 million that were

contemplated to close by year-end 1999.

249.    By the end of December 1999, fourteen limited partners (consisting of individuals as well as business entities) had subscribed to LJM2 and committed a total of $107 million.  These limited partners included 6 Bank Defendants – Citigroup, JP Morgan Chase, BT/Deutsche Bank, CIBC, CSFB, and Merrill Lynch (collectively, the "LJM Investor Defendants").  The chart that follows details the amounts and dates of the LJM Investor Defendants' commitments to LJM2, including the vehicles (usually subsidiaries) through which the LJM Investor Defendants made the commitments.  Altogether, in a four month period, Citigroup committed $15 million, CSFB committed $15 million, JP Morgan Chase committed $25 million, BT/Deutsche Bank committed $10 million, CIBC committed $15 million, and Merrill Lynch committed $21.645 million

| LJM Investor Defendant | Investment Thru | Date | Amount |
|---|---|---|---|
| Citigroup | Citicorp N.A. | 12/21/1999 | $10,000,000 |
| | Primerica Life Insurance | 04/05/2000 | $274,500 |
| | The Travelers Indemnity Company | 04/05/2000 | $3,176,500 |
| | Travelers Insurance Company | 04/05/2000 | $1,355,500 |
| | Travelers Life and Annuity Company | 04/05/2000 | $193,500 |
| JP Morgan Chase | J.P. Morgan Partnership Investment Corporation | 12/21/1999 | $12,000,000 |
| | Chemical Investment Inc. | 12/21/1999 | $10,000,000 |
| | Sixty Wall Street Fund, L.P. | 12/21/1999 | $3,000,000 |
| BT/Deutsche Bank | BT Investment Partners, Inc. | 12/21/1999 | $10,000,000 |
| CIBC | CIBC Capital Corporation | 12/21/1999 | $15,000,000 |
| Merrill Lynch | ML IBK Positions, Inc. (investment vehicle for Merrill Lynch & Co.) | 12/21/1999 | $5,000,000 |
| | ML/LJM2 Co-Investment, L.P. (personal investments of nearly 100 Merrill Lynch executives) | 04/05/2000 | $16,645,000 |
| CSFB | DLJ Fund Investment Partners III, L.P. | 12/21/1999 | $5,000,000 |
| CSFB | Merchant Capital, Inc. | 12/21/1999 | $10,000,000 |

250.    As the chart shows, the LJM Investor Defendants' total commitment at the end of

1999 was $65 million, or roughly 60% of the total $107 million.  However, because there was

insufficient time to fund LJM2 fully by year-end 1999 with capital to engage in transactions to

which LJM2 had been committed, financial institutions, including the LJM Investor Defendants,

funded 100% of the monies needed.  Funding resulted immediately in four transactions that

generated millions in phony profits for Enron and moved hundreds of millions of dollars of debt off

Enron's balance sheet right at year end.

251.    Without the LJM Investor Defendants, LJM2 would not have existed.  The Insiders

would have been unable to personally profit at Enron's expense or use LJM2 to further their

financial statement fraud.  With the LJM Investor Defendants, the Insiders were able to do that and

more.

252.    Each LJM Investor Defendant invested in LJM2 for one or both of the same two

reasons: (i) because Fastow predicted that the investment would earn 30%, and (ii) because the LJM

Investor Defendant understood the investment was necessary to keep Fastow happy and ensure that

he continued to send transactions the LJM Investor Defendant's way.  By participating in LJM2, the

LJM Investor Defendants in fact kept the transactions flowing.  For example, Citigroup engaged in

at least 15 transactions (including many lucrative prepay transactions) after committing to LJM2,

and earned more than $46 million in fees on those transactions.

253.    Every LJM Investor Defendant knew that Fastow and other Insiders were using LJM2

to carry out a scheme to manipulate Enron's financial statements.  Every LJM Investor Defendant

knew that whenever an Insider determined that Enron should enter into a transaction with LJM2, the

Insider's personal interest conflicted with Enron's.  Every LJM Investor Defendant knew that LJM2

provided Fastow and other Insiders unlimited opportunities to profit at Enron's expense.  Finally,

every LJM Investor Defendant knew that its own participation in LJM2 had been purchased by

threats of no future business or promises of exorbitant returns. A Citigroup document says best what every LJM Investor Defendant knew: "In committing to LJM2, we understood that the Fund would be relying on Enron directly for transactions. . . . Additionally, LJM2 principals argue that Enron would make the Fund whole should it suffer losses because the vehicles that the Fund invests in are critically important to Enron's ability to manage its earnings." CITI-B 0017103.

254.    In late 2001, the Insiders' scheme began to unravel, exposing their fraud. On October 16, 2001, Enron announced it would take a $544 million after-tax charge against earnings and a reduction of shareholders' equity of $1.2 billion related to the LJM2 transactions. In November 2001, Enron restated its financials for the period 1997 through 2001 because of accounting errors relating to LJM1 and Chewco. The restatement reduced Enron's reported net income by $28 million in 1997; $133 million in 1998; $248 million in 1999; and $99 million in 2000. The restatement also reduced shareholders' equity by $258 million in 1997; $391 million in 1998; $710 million in 1999; and $747 million in 2000. It increased debt over these years by more than *$2.5 billion.* Powers Report at 2-3.

255.    Discovery of the truth about Chewco and the LJM entities led to discovery of the Bank Defendants' role in the Insiders' fraud. It also exposed how the Bank Defendants knowingly helped the Insiders become rich at Enron's expense.

**f.    Enron's outside directors were unaware of the scheme.**

256.    From 1997 through 2001, Enron's Board of Directors consisted largely of independent, outside directors who had no involvement in the Insiders' and Bank Defendants' scheme and were unaware of it. From 1997 through 2001, these independent, non-management directors constituted at least two-thirds of the Board, which ranged in number between fifteen and nineteen. Enron's outside directors were well-qualified, accomplished business people or professionals. Twelve outside directors had served as CEOs of companies; one was a former Dean

of the Stanford University School of Business; another was a former chair of the U.S. Commodity Futures Trading Commission.

257.    The outside directors did not know the Insiders and the Bank Defendants were manipulating and misstating Enron's financial condition, nor did they know the Insiders were secretly reaping enormous personal profits at the expense of the company. The outside directors did not know, for example, that the prepay transactions with Citigroup, Chase, Barclays, CSFB, RBS, Toronto Dominion, and RBC were anything other than legitimate commodity transactions. They did not know that the transactions had been structured to eliminate commodity risk, and they did not know that the transactions were in substance loans to Enron. The outside directors also did not know that Delta Energy Corporation and Mahonia Limited were shell SPEs established and controlled by Citigroup and Chase, respectively, for the purpose of executing these phony prepay transactions

258.    Similarly, the outside directors of Enron did not know that the Insiders were improperly accounting for transactions with Citigroup, Chase, Barclays, CIBC, CSFB, RBS, and RBC as legitimate FAS 140 and minority interest transactions because in each and every transaction the Insiders had given oral assurances of repayment of the required equity investment. The outside directors were unaware that the structure of the Nigerian Barge transaction with Merrill Lynch included an unwritten guaranteed takeout within six months and a promised rate of return; nor did they know that the electricity trades with Merrill Lynch were mirror images that the Insiders used to manipulate Enron's 1999 financial results. Similarly, the outside directors did not know that the tax transactions with BT/Deutsche Bank had no legitimate business purpose or that the Insiders engaged in them solely to generate accounting income.

259.    Enron's outside directors did not know that the Insiders were using self-interested partnerships with Enron to gain enormous personal benefits. While the Enron Board approved

Fastow's participation in the LJM partnerships, it did so only after receiving assurances from Fastow and other Insiders that his participation would not adversely affect Enron's interests and after insisting on limitations and controls on his role. With respect to LJM1, the Board approved Fastow's participation only (and expressly) on the condition that he have no direct pecuniary interest at any time in Enron stock held in LJM1. As to LJM2, the Board approved Fastow's participation based upon false representations from Fastow and others that the purpose of LJM2 was to provide Enron with an optional source of private equity to manage the company's investment portfolio risk, that Fastow's role as managing partner of LJM2 would benefit Enron, and that controls would be put in place to manage the transactions between Enron and LJM2. The Board specifically required that senior officers, including Causey (who, unbeknownst to the Board, was an Insider too), review and approve all transactions between Enron and LJM2 to ensure their fairness to Enron. The Board also required that all Enron transactions with LJM2 be brought to the attention of the Audit Committee on an annual basis. The outside directors did not know that Fastow and other Insiders ignored and/or circumvented these limitations and controls. As a result, the outside directors were ignorant of the fact that Fastow was reaping tens of millions of dollars from the LJM partnerships or that Glisan, Kopper or any other Enron employee had secretly been given interests in entities transacting business with the company. The Board was not informed that the Insiders would from time to time cause Enron to repurchase assets from LJM2 or find another buyer for those assets at a profit to LJM2. Nor did the outside directors know that Bank Defendants and their executives were participants in the LJM partnerships and were receiving substantial returns on their investments.

260.    Had the outside directors become aware of the Insiders' and the Bank Defendants' scheme to manipulate Enron's financial statements and profit at Enron's expense, they certainly would have stopped it. As a super-majority of the Enron Board, the outside directors had the

authority and ability to do at least the following: (1) to suspend or terminate officers and other employees and initiate appropriate legal proceedings against them; (2) to report wrongdoing to the SEC, the Justice Department, or other regulatory or enforcement authorities and request an immediate investigation; and (3) to retain counsel and other experts and commence their own investigation. Indeed, the Enron Board promptly took many of these remedial actions in the fall of 2001, when evidence of the Insiders' scheme first surfaced. Fastow was terminated and, as more information became available, other Insiders were as well; the Board appointed a special committee to investigate the related party transactions and authorized the retention of legal and accounting experts to assist that committee; and when SEC and, later, Justice Department investigations began, the Board offered full and complete cooperation.

4. **The Bank Defendants Knowingly Participated In Manipulating And Misstating Enron's Financial Condition**

a. **Citigroup knowingly assisted the Insiders in misstating Enron's financial condition.**

261. Citigroup's involvement in the Insiders' manipulation of Enron's financial condition was essential to the success of the Insiders' scheme. Citigroup knew the Insiders were using SPE transactions improperly to generate income and inflate cash flow from operations and to disguise debt as price risk management liabilities. During the relevant period, Citigroup assisted the Insiders in achieving these goals by designing, financing and/or implementing eleven prepay transactions, three minority interest transactions, and two transactions involving Enron's forest products business. Together, these transactions provided Enron with $5.9 billion in financing, from which the Insiders improperly recorded more than $5 billion in cash flow from operating activities, improperly recorded approximately $132 million of income, and understated the debt on Enron's balance sheet by billions of dollars.

262.     Citigroup's participation in SPE transactions with Enron has been thoroughly reviewed and criticized by federal and state regulators, a subcommittee of the United States Senate, and the court-appointed Enron Examiner, all of whom concluded that Citigroup knowingly facilitated the Insiders' misstatement of Enron's financial condition.

263.     Following a multi-month investigation, the SEC instituted an administrative proceeding against Citigroup based upon its role in the manipulation of Enron's financial condition in the prepay transactions, the Nahanni minority interest transaction, and the Bacchus transaction involving Enron's forest products business.  With respect to these transactions, the SEC found that Citigroup assisted Enron in "enhancing *artificially* [its] financial presentations through a series of complex structured financings whose purpose and effect, among other things, was to allow [Enron] to report proceeds of financings as cash from operating activities on their statements of cash flows. In these transactions, Enron . . . received cash upfront and repaid that cash on terms that included a negotiated return in the nature of interest."  SEC Order Instituting a Public Administrative Proceeding in *In the Matter of Citigroup, Inc.*, Administrative Proceeding 3-11192, July 28, 2003 ("SEC Citigroup Order") at 2 (emphasis added).  Citigroup settled the SEC proceeding by paying over $101 million.

264.     Manhattan District Attorney Morgenthau's 18-month investigation of the prepay transactions between Enron and Citigroup concluded that the Citigroup prepays

> were never designed to constitute trading in the commodities markets.  Despite the banks' efforts to make these transactions look like commodities trades, they were trades on paper only.  ***In substance, they were loans.***  Structuring these transactions as commodities trades, however, enabled Enron *unfairly* to account for the funds it received as cash flow from operations, rather than as the proceeds of bank or credit financing.

Morgenthau Letter at 2 (emphasis added).  The Morgenthau investigation also concluded that Citigroup knowingly participated in the misstatement of Enron's financial condition: "Citibank

*knowingly* structured the prepaid transactions with Enron in a way that allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent." *Id.* at 8 (emphasis added). Citigroup entered into a Settlement Agreement with the District Attorney's Office in which it agreed to pay $25 million and adhere to internal reforms designed to prevent future abusive prepay transactions. In a letter to District Attorney Morgenthau dated July 28, 2003, Citigroup Chairman and CEO Charles Prince acknowledged Citigroup's wrongdoing: "***I want to assure you, both personally and on behalf of Citigroup, that the Enron transactions do not reflect our current standards and they would not happen now – and will not happen in the future – at Citigroup.***" (emphasis added).

265. The Permanent Subcommittee on Investigations ("PSI") of the United States Senate also investigated Citigroup's role in Enron's collapse. As to the prepay transactions, the Chief Investigator for the PSI found that

> [i]nternal communications show that it was common knowledge among . . . Citigroup employees that the "prepays" were designed to achieve accounting, not business, objectives and that Enron was booking the "prepay" proceeds as trading activity rather than debt. The evidence indicates that . . . Citigroup not only understood Enron's accounting goal – increasing operating cash flow without reporting debt – but designed and implemented the financial structures to help Enron achieve this objective. Moreover, they accepted and followed Enron's desire to keep the nature of these transactions confidential.

Roach Testimony at 3. He further concluded that Citigroup had knowingly assisted Enron in misrepresenting its financial condition:

> The evidence reviewed by the Subcommittee staff indicates that the financial institutions that participated in Enron 'prepays' understood that Enron was seeking to obtain financing from them, but wanted to obtain the financing through orchestrated, multi-party commodity (largely energy) trades rather than straight-out loans, so that the company could characterize the funds as cash flow from operations rather than cash flow from financing. *Internal communications show that the financial institutions not only understood that Enron intended to engage in this deceptive accounting, they actively aided Enron in return for fees and favorable consideration in other business dealings.*

*Id.* at B-1 (emphasis added).

266.    With respect to the transactions involving Enron's forest products business – Bacchus and Sundance Industrial – the PSI Report found that Citigroup

> actively aided Enron in executing [the transactions], despite *knowing* the transactions utilized deceptive accounting or tax strategies, in return for substantial fees or favorable consideration in other business dealings. The evidence also indicates that Enron would not have been able to complete any of these transactions without the direct support and participation of a major financial institution.

U.S. Senate Permanent Subcommittee on Investigations Report on Fishtail, Bacchus, Sundance, and Slapshot, January 2, 2003, at 2 (emphasis added).

267.    The Enron Examiner reviewed in detail the Citigroup prepays, the three Citigroup minority interest transactions (Nighthawk, Rawhide, and Nahanni), and the two Citigroup transactions involving Enron's forest products business (Bacchus and Sundance Industrial). The Citigroup prepay transactions, the Enron Examiner concluded, were loans disguised to look like commodity transactions; that "each transaction was circular" and that "[a]ll commodity price risk was eliminated by having it circle back to Enron"; that "Citigroup understood Enron's accounting for the Citigroup Prepays and the inadequacy of the disclosures in Enron's financial statements"; and that Citigroup materially assisted the Insiders in misstating Enron's financial condition by, among other things, lending its own funds in five of the prepay transactions, developing the credit-linked note structure by which Enron raised funds for other of the prepays, providing its SPE – Delta – to serve as the shell pass-through party in six of the prepays, and serving as the pass-through entity in two prepays where it was not the lender. Exam. III, App. D at 47, 50. As to the Nighthawk and Nahanni minority interest transactions, the Enron Examiner concluded that Enron's accounting treatment did not comply with GAAP; that Citigroup knew Enron's accounting treatment did not comply with GAAP; and that, despite this knowledge, Citigroup facilitated the Insiders'

misstatement of Enron's financial condition by structuring the transactions, funding loans in the structures, and serving as placement agent for equity investments in the transactions.

268.    Likewise, the Enron Examiner found that the forest products business transactions were improperly accounted for at Enron; that Citigroup knew the accounting was suspect; and that Citigroup nonetheless participated in these transactions by providing both the loans and purchasing the equity necessary for their completion.  The Bacchus forest product transaction was so out of line that one Citigroup employee wrote*: "Sounds like we made a lot of exceptions to our standard policies.  I am sure we have gone out of our way to let them know that we are bending over backwards for them . . . let's remember to collect this iou when it really counts . . . ."* CITI-B 0281946 (quoted in Exam. III, App. D at 124) (emphasis added).  Similarly, the Sundance Industrial deal was so egregious that the head of Citigroup's Global Risk Management Group refused to approve the transaction and warned that *"[t]he GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."*  CITI-B 0307593 (quoted in Exam. III, App. D at 131) (emphasis added).  The Enron Examiner concluded that the evidence he examined was "sufficient for a fact-finder to conclude that Citigroup aided and abetted certain Enron officers in breaching their fiduciary duties."  Exam. III, App. D at 148.

**(1)    Citigroup's relationship with Enron**.

269.    Enron considered Citigroup to be one of its most important financial institutions. From 1997 through 2001, Enron classified Citigroup as one of its select Tier 1 banks.[3]  During this

---

[3] The Insiders defined a Tier 1 bank as one that could:

    i.       Underwrite $1 billion in short period of time
    ii.      Ability to lead/structure complex, mission-critical deals
    iii.    Deliver balance sheet for nonagented deals when needed
    iv.     Relationship driven philosophy vs. transactional
    v.      Account officer capable of delivering institution
    vi.    Strong senior management contacts
    vii.   Well-developed distribution capabilities

(continued...)

period, Citigroup completed over 60 lending and finance transactions with Enron, an average of more than one per month. An Enron Relationship Review described Citigroup as the "[p]rimary banking relationship for Enron in 1999. They line up perfectly with us – we should reward this structure." EC 000252172.

270. Likewise, Citigroup considered Enron one of its most valuable and financially rewarding clients. A September 2001 Revenue Memo at Citigroup acknowledged that "[o]ver the last three years, Enron has grown to be one of the highest revenue clients within Citigroup." (quoted in Exam. III, App. D at 20). During the period 1997 through 2001, Citigroup received approximately $188 million in revenues from its financial transactions with Enron. Enron was so important to Citigroup that at various times Citigroup somewhat reluctantly proceeded with transactions it found distasteful simply to maintain its relationship with Enron and be rewarded with future business.

271. For example, the Citigroup Global Loans Approval Memorandum for Project Bacchus stated: "As a part of Citi's broader relationship with Enron, we have been asked to support this transaction. Given the importance of this relationship to [the Global Energy and Mining group], it is difficult if not impossible to deny this request." CITI-B 0290018. In addition to receiving enormous revenue directly from Enron, and hoping to receive more in future transactions, Citigroup had another reason to value and maintain its relationship with Enron: Citigroup developed products in the course of the relationship that it marketed to other corporations. For example, Citigroup shopped its prepay product to fourteen companies apart from Enron. Citigroup thus had enormous

---

[3] (...continued)
        viii.     Limited execution risk
Exam. III at 46 n.120.

incentives to continue prepay and other transactions with Enron, so as to not jeopardize the opportunity to reap large revenue from marketing these products to other companies.

272.    Citigroup and its subsidiaries also provided Enron with a broad array of financial services during the relevant period, including cash management services, participation in syndicated revolving credit facilities, debt and equity underwriting for both Enron and affiliated entities, merger and acquisition advisory services, project-related finance, and structured finance transactions. Certain of the structured finance transactions used products designed by Citigroup.  For example, Citigroup created the credit-linked notes structure Enron and Citigroup used in the prepays known as Yosemite I through IV.  The minority interest transactions Citigroup brought to Enron used a structure that Citigroup designed and considered to be its proprietary product.

273.    The nature of its multifaceted relationship with Enron gave Citigroup access to Enron's internal documents, to Enron's senior management, and substantial nonpublic information. That information included financial information, business plans and strategies, capital structure, and other information about structured finance/SPE transactions in which Enron was involved. Citigroup understood Enron's use of MTM accounting and how that accounting created a persistent need to generate cash flow from operating activities to match reported earnings.  Citigroup also knew that Enron's success was driven by its credit ratings, and was constantly monitoring the various credit ratios the rating agencies used in determining those ratings.  A 1999 Citigroup credit profile of Enron explained that Enron used prepays and deals such as minority interest transactions to "address two issues which have been raised by the rating agencies," one of which was to correct the mismatch between earnings created by MTM accounting and cash flow from operations.  CITI-B 00449879-880 (quoted in Exam. III, App. D at 34-35).

274.    In its dealings with Enron and the Insiders, Citigroup and its subsidiaries functioned as a single business unit.  Employees of the different subsidiaries were able to speak on behalf of

one another and to cause one another to participate in transactions with Enron. As demonstrated in this Complaint, Citigroup employees analyzed and approved all transactions with Enron but often assigned subsidiaries to take part in their financing and/or implementation. For example, Citigroup caused its subsidiary Citibank to participate in eleven prepay transactions with Enron and thus disguise billions of dollars of loans as commodity trades. Citigroup also caused its SPE, Delta Energy Corporation, to serve as the pass-through entity in six of the prepay transactions. Similarly, Citigroup caused its affiliate CXC to make loans of $485 million to capitalize the minority interest structures Nighthawk and Nahanni. Citigroup also caused its subsidiary Salomon Holding to purportedly contribute $28.5 million to the Sundance Industrial transaction.

275.    The Enron Examiner observed, "Citigroup appears to structure its operations around business units rather than legal entities. Units such as Global Capital Structuring and Derivatives design the products, sell them, and use various legal entities within Citigroup to participate in and book the transactions." Exam III, App. D at 9. Indeed, the Enron Examiner noted that "[f]ew of the Citigroup employees who gave testimony . . . were certain of the legal entity that employed them, and some had signing authority for multiple legal entities." *Id.* In addition to those direct and indirect subsidiaries of Citigroup named in this Complaint, there may be other subsidiaries or affiliates which Citigroup caused to participate in one or more of the transactions with Enron that serve as the basis for this Complaint. It is Enron's intention to hold Citigroup and each of these subsidiaries and affiliates responsible for their participation in the challenged transactions, and Enron notifies Citigroup of its intention to include the subsidiaries and affiliates as defendants upon discovery of their identities.

276.    Throughout the relevant period, Citigroup maintained an office in Houston, Texas. Citigroup executives and other personnel in the Houston office were involved in the SPE transactions with Enron. James Reilly, head of Citigroup's Global Energy & Mining Group in

Houston and the Enron relationship manager, and others in the Houston office were involved in structuring and implementing the Citigroup prepays, minority interest transactions, and forest product transactions. For example, Reilly reached an oral agreement with the Insiders that Enron would repay the Roosevelt prepay within months of its closing, although he knew that the "paperwork cannot reflect that agreement . . . as it would unfavorably alter the accounting." Exam. III, App. D. at 58. It also was Reilly, working with Enron Insider McMahon, who developed the concept of financially settling the Citigroup prepays. Exam. III, App. D at 59 n.217. With the exception of the Roosevelt transaction, all of the Citigroup prepays were financially settled. Another Citigroup executive in Houston, Steve Baillie, worked with the Insiders on the Bacchus forest products transaction. Baillie recognized that Enron was using the transaction to create income and expressed a "concern" over the "appropriateness" of the transaction. Exam. III, App. D. at 120. Reilly, however, pushed for Citigroup to complete the Bacchus transaction, despite knowing that its purpose was to improperly generate income and operating cash flow for Enron, because "[f]or Enron, this transaction is 'mission critical' (their label not mine) for [year end] and a *'must'* for [Citigroup]." Exam. III, App. D at 122 (emphasis added).

**(2)     The Citigroup prepays**.

277.     During the relevant period, Citigroup caused Citibank to complete eleven prepay transactions with Enron, each of which employed a structure designed to disguise a loan to look like a commodity transaction (the "Citigroup prepays"). The eleven Citigroup prepays are:

| Name | Closing Date | Amount Financed |
|------|--------------|-----------------|
| Roosevelt | 12/30/98 | $500 million |
| Truman | 6/29/99 | $500 million |
| Jethro | 9/29/99 | $675 million |
| Yosemite I | 11/18/99 | $800 million |
| Nixon | 12/14/99 | $324 million |
| Yosemite II | 2/23/00 | $331.8 million |
| Yosemite III | 8/25/00 | $475 million |

| Yosemite IV USD | 5/24/01 | $775.1 million |
| Yosemite IV GBP | 5/24/01 | £139 million (approx. $197 million) |
| Yosemite IV Euro | 5/24/01 | €222.5 million (approx. $190.6 million) |
| June 2001 | 6/28/01 | $250 million |

**Total   $4.9203 billion**

The Yosemite IV transaction consisted of three separate prepay financing transactions, one denominated in US dollars, another in British pounds and the third in Euros. These transactions, which are collectively referred to as the Yosemite IV transaction, are separately and respectively referred to as "Yosemite IV USD," "Yosemite IV GBP," and "Yosemite IV Euro."

278.    Citibank structured all eleven prepay transactions and provided transaction support, the shell trading partner and/or a portion of the funds. By doing so, Citibank substantially aided the Insiders' scheme of reporting the proceeds of disguised loans as income from commodity trading activities.

279.    Five of the eleven Citigroup prepays were completed as a fiscal quarter or year was coming to a close at Enron. This was not a coincidence. All of the Citigroup prepays were arranged to inflate Enron's operating cash flow so that Enron could meet or exceed targeted financial results important to rating agencies and/or industry analysts. In some cases, the Insiders also used the proceeds of Citigroup prepays to pay off existing indebtedness, thus further manipulating Enron's balance sheet and the rating agency credit ratios based on it.

280.    For each Citigroup prepay, the Insiders set the prepaid amount to enable Enron to falsely maintain or exceed credit ratios or their vital components. The prepaid amount was in no way determined by any amount of oil or gas that either Enron wanted to sell or the Citigroup affiliate wanted to buy. As the SEC found, "the amount of the commodity subject to a prepay was based on the amount Enron wanted to borrow. That amount was determined by taking the principal amount

required by Enron, adding interest for the number of days the transaction was to last, and dividing that sum by the per-unit price of the referenced commodity."  SEC Citigroup Order at 12.

281.    The Chief Investigator for the PSI reached a similar conclusion*: "Enron's decisions on when to engage in a prepay and the size of the prepay were driven by its need to meet certain ratio targets.  Consequently, funds from prepay transactions would appear on Enron's cash flow statement just days before the end of a quarter, just in time to be factored into Enron's financial statements and pump-up key ratios."*  Roach PSI Testimony at A-6 (emphasis added).

282.    Each of the Citigroup prepays was in substance a loan from Citibank to Enron structured to give the appearance of a commodity transaction.  Although the transaction structure varied somewhat over the course of the Citigroup prepays, in each case the commodity price risk moved through the other parties to the transaction and back to Enron in a circle, eliminating the risk that the price of the underlying commodity might change.  At the closing date of each prepay transaction, the parties executed substantively identical commodity swap agreements that eliminated the effect of any change in commodity price.  Enron repaid to Citibank the prepaid amount (the principal) plus a specified rate of interest.

283.    Manhattan District Attorney Morgenthau reported that in each of the Citigroup prepays "three separate derivative transactions between three ostensibly independent parties actually constituted a unified, circular structure which, in substance, eliminated price risk and enabled Citibank to make the economic equivalent of loans to Enron that Enron could account for as trades." Morgenthau Letter at 6.  He concluded that the prepays *"were really disguised loans."*  *Id.* (emphasis added).  All of the Citigroup prepays, other than Roosevelt, were financially settled, meaning that no commodity ever changed hands.  Over half of the Citigroup prepays – Yosemite I through IV – layered on top of an underlying phony commodity transaction the issuance of credit-

linked promissory notes to institutional investors, the proceeds of which were used to fund the prepaid amounts.

284.    Citigroup's stated purposes for the first Yosemite structure were (i) to maintain Enron's accounting and rating agency treatment, (ii) to increase the capacity of top tier banks so that they could take on more Enron debt, (iii) to reduce the top tier banks' credit exposure to Enron, (iv) to give Enron the ability to change the prepay deals without refinancing, (v) to diversify the investor base, and (vi) to raise $1 billion.  PSI Report Exhibit 160.  Citigroup also wanted to accommodate the Insiders' desire to "confuse" the rating agencies and keep the nature and purpose of the prepay transactions secret from investors:  "[Enron] does not wish to have to explain the details of many of the assets to investors or rating agencies . . . .  Ideally, non-tier 1 participant banks in the deals will be unaware of the 'sale' of the existing positions of the tier 1 banks."  PSI Report Exhibit 160.

285.    Citigroup therefore initially created the credit-linked note device, in part,  to off-load certain of its own Enron exposure into the bank market while earning substantial fees.  This device also served the Insiders' purposes, as they became concerned that some banks' capacity limitations for Enron debt were being reached.

286.    In each Yosemite transaction, Citigroup created or directed the creation of a trust that was off Enron's balance sheet.  The trust offered credit-linked notes (notes linked to Enron's credit) to "Qualified Institutional Buyers."  By funding the prepays in this fashion, Citigroup and the Insiders passed to institutional investors (not Citigroup) the risk that Enron would not or could not repay the notes.

286A.  In each of the Yosemite transactions, the trust issued both debt and equity, the debt in the form of the credit-linked notes and equity in the form of certificates, which were in the aggregate amount of 3% of the value of the trust's assets.   In economic substance, the certificates

of each trust were owned half by Citigroup and half by Enron.  However, neither Citigroup nor

Enron wanted to consolidate the trust on their respective balance sheets or to make disclosure of

their ownership of the trusts.  To avoid this result,  Citigroup and Enron entered into contrived deals

with, respectively, Fleet and LJM2, to create the appearance that the certificates were owned by

others.   Citigroup enlisted the aid of Fleet, which caused its SPE Long Lane, to purchase half the

certificates in Yosemite I  and Yosemite II.  For the Yosemite III transaction, Citigroup had RBC

purchase half of the trust's certificates.  In order to induce Fleet (and its SPE Long Lane) and RBC

to purchase equity in the trusts, Citigroup agreed to assure the complete return of their investments.

Citigroup had its affiliate SSB enter into total return swaps with Long Lane and RBC for their

"equity" investments in the trusts, giving Citigroup the full economic risks and rewards of the

certificates.  For Enron's half of the certificates in the trusts, the Insiders caused LJM2 to make the

purchases and caused Enron entered into total return swaps with LJM2.  These contrived "equity"

investments were essential to the Yosemite transactions, and without the involvement of Fleet (and

its SPE Long Lane) and RBC the Yosemite I, II, and III transactions would not have gone forward.

287.    The Yosemite structures also contained a "black box" feature that concealed the

nature of the assets in the trusts that issued the credit-linked notes.  This made Yosemite an ideal

vehicle for funding prepays.  The credit-linked note device that Citigroup designed for Enron

allowed Insiders to feed their bottomless appetite for borrowing, while allowing Citigroup

simultaneously to avoid further committing its own capital to the scheme.

288.    Six of the Citigroup prepays – Roosevelt, Yosemite I through IV, and a June 2001

prepay – used Delta Energy Corporation as the pass-through entity.  Citigroup formed Delta in the

Cayman Islands specifically to serve as the counterparty in these transactions.  As such, Delta was

a Citigroup-controlled shell corporation that had neither independence from Citigroup nor any

economic substance of its own.  Delta engaged only in transactions involving Citigroup (all but one

of which also involved Enron) and only when so instructed by Citigroup. Citigroup paid the administrative costs of Delta, its attorney fees, and its transaction fees. The forms at Citibank establishing a bank account for Delta listed Delta's address as "c/o Citicorp North America, Inc." and described the account as an "internal account" to be "controlled" by Citigroup. These forms also identified three Citigroup employees as authorized signatories for the account. Internal Citigroup documents refer to Delta as a "shell corporation/SPV" and as a "special purpose entity." CITI-B 0259698. According to the SEC, "Delta was a nominally capitalized SPE established by Citigroup, whose sole purpose in these transactions was to facilitate Enron's accounting treatment." SEC Citigroup Order at 11. As such, Delta is an alter ego of Citigroup.

289. The purpose and effect of the Citigroup prepays was to allow the Insiders to improperly record the proceeds from the prepay transactions (the prepaid amount) as cash flow from operating activities instead of cash flow from financing activities, and to improperly record the obligation to repay this amount as price risk management liabilities instead of debt. And that is exactly what the Insiders did. In each Citigroup prepay, the Insiders accounted for the prepaid amount in Enron's financial records as cash flow from operations (not cash flow from financing activities, which it was), and the obligation to repay that amount as price risk management liabilities (instead of debt, which it was).

290. Citigroup knew the prepays were in substance loans to Enron and, as such, should have been recorded on Enron's financial statements as loans, not commodity trades. Citigroup internal documents (1) describe the Roosevelt prepay as "effectively a commodity denominated corporate obligation," CITI-B 0032092; (2) state candidly that in the Truman prepay, "we were basically making a loan to [Enron]," CITI-B 0260172; and (3) generally summarize Citigroup's prepay transactions with Enron as "oil goes in a circle so they all cancel . . . net economically like a loan," CITI-B 235230, and "Enron's total volume of prepays . . . represents essentially another

layer of corporate debt in addition to debt accounted as such," CITI-B 00616908.  After reviewing

a prepay transaction, one Citigroup employee pointedly questioned:  "[G]iven that the flows on the

prepaid oil swap, caps and floor all net down to the $475mm payment at maturity and a coupon of

7.474%, was there a reason not to simply structure it as a loan or note?"  CITI-B 00499574.  When

another Citigroup employee foolishly asked about the price of the commodity involved in the

disguised loans, the comment back was, "since this is all a circle, why does it matter?"  CITI-B

0069416.

> 291.    The SEC found that
>
> [i]f all the contracts [in a given prepay transaction] were performed pursuant to their
> terms, Citigroup was entitled to receive repayment of its prepayment of the contract
> price, together with a negotiated return on that amount, on a specified schedule – *i.e.,*
> the equivalent of an interest payment on the contract price.  The negotiated return
> was unrelated to any price risk associated with owning a commodity contract.

SEC Citigroup Order at 3.  The Chief Investigator for the PSI concurred:  "[W]hen all the bells and

whistles are stripped away, the basic transaction fails as a prepay and what remains is a loan to

Enron using a bank and an obligation on Enron's part to repay the principal plus interest."  Roach

PSI Testimony at 1.

292.    Not only did Citigroup and Citibank know that the prepays were loans, they also

knowingly made misrepresentations to Arthur Andersen that facilitated the improper accounting for

the transactions.  Andersen told the Insiders that to obtain the desired accounting treatment, the pass-

through entity had to have a legitimate business purpose for entering into the transaction *and* had

to be independent of the financial institution participating in the prepay.  After being made aware

of Andersen's advice to Enron, Citigroup twice caused Delta to represent to Andersen that Delta

satisfied the business purpose and independence requirements – even though Delta clearly did not.

The Enron Examiner has indicated that the evidence is unclear as to whether Andersen relied upon

these misrepresentations.  Exam. IV, App. B at 73-76.  According to the Enron Examiner, Citigroup

and Andersen may have worked together with the Insiders to falsely create the appearance that Delta was an independent business entity – not a Citigroup-sponsored SPE. *Id.* To that extent, Citibank and Andersen combined with the Insiders to manipulate and misstate Enron's financial condition.

293.    In November 1999 (in connection with the Yosemite I prepay) and in June 2001 (in connection with the June 2001 prepay), Citigroup caused Delta to represent falsely that Delta had undertaken business with a number of entities, that it had assets other than those acquired through transactions with Enron, and that it had unencumbered assets available to the Yosemite lenders in the event of a default. These representations were untrue. Delta had neither a legitimate business purpose for entering into the prepay transactions nor was it independent of Citigroup.

294.    Arthur Andersen also advised the Insiders that in order for the prepay transactions to receive the desired accounting treatment, the commodity contracts that formed the transactions could not be linked but, instead, had to operate independently. In practice, of course, the transactions composed a circular group of three contracts between Citigroup, Enron and, in the majority of cases, Delta. Citigroup knew the prepays could not contain cross-termination provisions which would sever one party's obligations if another party defaulted. But to protect their own financial interests, Citigroup structured the contracts to contain provisions that were effectively cross-defaults – collapsing the entire prepay in the event of a default – even if not expressly denominated as such.

295.    Citigroup also knew that by participating in the prepays it was assisting the Insiders in manipulating and misrepresenting Enron's financial condition. Citigroup knew how Enron was accounting for funds generated by the prepays. The SEC concluded that "[a]s Citigroup knew, Enron reported the receipt of cash generated from prepay transactions as cash flow from operating activities, rather than cash flow from financing activities, and it reported its repayment obligation as a price risk management liability, rather than debt." SEC Citigroup Order at 3. One example of

evidence of that knowledge: When Citigroup's commodities desk asked for a share of the fees that the phony prepays generated, the Derivatives Group at Citigroup resisted. The Derivatives Group had created the prepays, and argued that the prepays involved no commodities exposure at all. As the head of the Derivatives Group said, "[If] much of what you do does not involve management of commodities exposures at all, but is simply manipulating cash flows, there may be a much greater overlap in our businesses than I have been lead to believe" (quoted in Exam. III, App. D at 77-78).

296.    Citigroup knew the Insiders were manipulating Enron's financial statements in order to maintain the company's much-needed credit ratings. Internal Citigroup documents candidly state that the prepays provided "favorable accounting treatment" for Enron – meaning that "[a]lthough the deal is effectively a loan, the form of the transaction would allow [Enron] to reflect it as 'liabilities from price risk management activity' on their balance sheet and also provide favorable impact on reported cash flow from operations." CITI-B 0260171-172 (quoted in Exam. III, App. D at 70). Indeed, when Enron began its tumble in the fall of 2001, the head of Citigroup's Derivatives Group wrote a colleague stating, "Want to get your confirmation that (apart from the fact we put deals together for Enron which we knew confused the rating agencies) there is no skellington [sic] in the closet." CITI-B 00910235 (quoted in Exam. III, App. D at 78).

297.    Both Citigroup documents and Citigroup employees acknowledge that the Insiders used the prepay structures to keep Enron's credit ratings from falling. One Citigroup document explained:

> Enron has used contract monetizations and prepaids to address two issues which have been raised by the rating agencies. One of the agencies' issues was that earnings which Enron recognized when mark-to-marking its trading book produce a commensurate cash inflow on a timely basis. Another issue was the tenor mismatch between trading assets and trading liabilities. Enron used to deal with these issues through monetizations, that is effectively selling a given cash flow stream arising from a commodity contract. This produced up-front cash equal to the net present value of the profit in the transaction, and removed the asset and liability from the trading book. However due to certain accounting changes, contract

monetizations became less attractive and are no longer used by Enron. Today, Enron enters into prepaids . . . .

CITI-B 00449879-880 (quoted in Exam. III, App. D at 35). Another Citigroup document states that the Yosemite IV prepay allowed "Enron to maintain the advantageous accounting and rating agency treatment of these financings" (quoted in Exam. III, App. D at 71). Citigroup clearly recognized that the rating agencies had focused on the discontinuity between Enron's net income and funds flow and, accordingly, collaborated with the Insiders by providing prepay transactions to close the gap between the two. Citigroup gave the Insiders substantial assistance which furthered the Insiders' scheme to manipulate Enron's financial statements. In doing so, Citigroup had full knowledge:

- that the Citigroup prepays were loans disguised to look like commodity trades,

- that their purpose was to allow the Insiders to improperly account for the prepaid amounts as cash flow from operations and the obligation to repay the prepaid amounts as price risk management liabilities,

- that in fact the Insiders were improperly accounting for the Citigroup prepays, and

- that the Insiders were using the prepays to misstate Enron's financial condition and to mislead the rating agencies and others into believing that Enron's financial condition was better than it was.

298.     Citibank loaned its own funds to Enron in five of the prepay transactions. Citigroup assisted the Insiders in raising the funds for the Yosemite prepays by designing the credit-linked note structure. With respect to the Yosemite I and II prepays, Citigroup also facilitated the purchase of 50% of the equity in the trust that issued the credit-linked notes. Citigroup allowed its SPE Delta to serve as the pass-through party in eight of the prepays, and Citibank itself served as the pass-through in two other prepays. In addition, Citigroup caused Delta to make false representations to Arthur Andersen, without which the accounting for the prepay transactions would not have been possible.

299.     The Citigroup prepays materially inflated Enron's financial statements.  The prepay transactions were arranged so the Insiders could cause Enron to meet key financial targets critical to the maintenance of Enron's credit ratings.  In each case, the prepaid amount was determined not by the Insider's desire to sell oil or natural gas, but by the amount of cash flow needed to achieve the desired ratings and market reviews. In many cases, the transaction was arranged on the eve of the close of a fiscal period for Enron and closed within days or hours of the end of the quarter or year.  Without the Citigroup prepays, in many quarters during the relevant period, Enron would not have met (much less exceeded) the targeted financial results of the analysts or the market, and Enron's credit ratings would have been downgraded.  As the Enron Examiner concluded, "Prepays were the quarter-to-quarter cash flow lifeblood of Enron."  Exam. II at 45.

300.     In 1998, $500 million of Enron's reported $1.6 billion of cash flow from operations came from Citigroup prepay transactions.  Of Enron's reported $1.2 billion net cash flow from operations in 1999, 76 % ($935 million) was generated by the Citigroup prepay transactions.  In 2000, the Citigroup prepays created 11% ($546 million) of Enron's reported cash flow from operations.  Enron's reported debt for these years also was materially understated because of the Citigroup prepay transactions.  In 1999, Enron's debt was under-reported by 14% ($1.1 billion), and in 2000 it was under-reported by 16% ($1.6 billion).  The Enron Examiner found that "[t]he Citigroup Prepays alone . . . had a material effect on Enron's cash flows from operating activities," and that had the Citigroup prepays been properly recorded, "Enron's reported debt levels would have looked markedly different."  Exam. III, App. D at 48-49.

301.     The Insiders improperly recorded the proceeds from the prepaid transactions as cash flow from operating activities instead of cash flow from financing activities.  They would not have been able to do so without Citigroup, who provided the funds, the transaction support, and the trading partner the Insiders needed.

**(3)      The minority interest transactions**.

302.     In December 1997 and December 1999, Citigroup knowingly helped the Insiders manipulate and misstate Enron's financial condition by designing, loaning money to, and arranging the equity investments in two minority interest transactions known as Nighthawk and Nahanni.  The sole purpose of these year-end transactions was to enable the Insiders to maintain Enron's credit ratings and to meet the expectations of the market.  The effect was debt improperly recorded as a minority interest in a consolidated subsidiary and/or cash flow from operations that was falsely enhanced.

303.     As it does with the SPE in a FAS 140 transaction, GAAP requires that a nonconsolidated SPE in a minority interest transaction be capitalized with at least 3% equity of an independent third party, and that the equity remain at risk throughout the pertinent period.  Although both Nighthawk and Nahanni were structured with the required 3% equity contribution, in neither case was that equity really at risk.  For this reason, neither Citigroup nor the "equity" investors based their decision to invest on the merits of the underlying investment.  The $500 million Nighthawk transaction alone improved Enron's debt-to-equity ratio for 1997 by 8%.  The $500 million Nahanni transaction gave Enron 40% of its operating cash flow in 1999 and improved the debt-to-equity ratio by 16%.

**(a)      Nighthawk**

304.     Nighthawk was Enron's first minority interest transaction the Insiders and Citigroup implemented.  It closed four days before Enron's 1997 fiscal year came to an end – on December 27, 1997.  Nighthawk was completed because of Citigroup; indeed Citigroup characterized itself as Enron's "financial advisor" for the transaction.  Nighthawk was the minority shareholder in an Enron majority-owned subsidiary, Whitewing.  Nighthawk contributed $500 million to Whitewing for the minority interest in Whitewing, which the Insiders should have classified as debt.

-95-

305.     Citigroup developed the structure of the minority interest transaction used in Nighthawk and considered that structure to be a proprietary product.  Citigroup also arranged for Nighthawk's capitalization, which consisted of a loan of $485 million from CXC, a commercial paper conduit managed by Citigroup, and the required 3% equity investment ($15 million) by Harch Capital Management ("Harch").

306.     For several reasons, Nighthawk violated GAAP's requirement that the 3% equity investment in Nighthawk be at risk. First, as set forth above, Nighthawk's purported equity from Kestrel was borrowed – *on a nonrecourse basis.*  Thus, even if Nighthawk failed in its entirety, almost half of Kestrel's equity investment was not at risk.  Moreover, to further protect Kestrel's investment in  Nighthawk, Citigroup obtained a surety bond from Ambac for $7.1 million.  In addition, Citigroup issued Kestrel two hedging agreements that covered approximately $15 million of Enron stock in the Nighthawk structure.  The hedging agreement protected Kestrel's full $15 million equity investment from loss.  For these reasons, the Enron Examiner concluded "that the Nighthawk equity was not at risk." Exam. II, App. I, Annex 1 at 14-15.  As a result, the minority investor – Nighthawk – should have been consolidated with the majority-owned Enron subsidiary, Whitewing, and Nighthawk's debt included on Enron's financial statements.

307.     As creator of the minority interest structure, Citigroup knew that Nighthawk, as the minority investor in the Enron subsidiary, had to have a 3% equity investment at risk throughout the life of the transaction.  Citigroup also knew that the 3% equity in Nighthawk was not at risk.  A senior member of Citigroup's Accounting Advisory Office stated:

> Although the equity is substantive, at a 3% capitalization level **the $15MM of equity is not at risk.**  A collar put option purchased by Citibank from an A-rated dealer protects the $15MM of equity (sharing in losses of the JV).  The equity is back-levered on a nonrecourse basis with a $7.1MM CXC loan with counter party risk assumed by AMBAC.

CITI-B00393281 (quoted in Exam. III, App. D at 97) (emphasis added). After reviewing the Nighthawk structure, Citigroup's accountant concluded that "[i]t would therefore seem appropriate . . . for Enron to consolidate the Investor (SPV) as well as the JV." CITI-B 00395282. The Citigroup Managing Director responsible for the Nighthawk transaction reached a similar conclusion, stating that "[t]he Equity Collar effectively protects the Equity Participant from any risk . . . ." CITI-B 00573142 (quoting Exam. III, App. D at 101).

308.    Citigroup also knew that by designing, implementing, and arranging the financing for Nighthawk, it was assisting the Insiders in manipulating Enron's financial condition. Citigroup knew the Insiders intended to report the $500 million Enron received from Nighthawk as investment in minority interests – not as debt. Indeed, one of the bases on which Citigroup marketed the Nighthawk minority interest transaction to the Insiders was that it would not increase balance sheet debt. A pro forma balance sheet Citigroup prepared as a part of its marketing presentation to Enron showed that the $500 million from the Nighthawk transaction would increase investment in minority interests by $500 million and could potentially *decrease* debt by a like amount, if the Insiders used the Nighthawk proceeds to pay down existing company debt. Another purpose of the Nighthawk transaction was to satisfy rating agency concerns about Enron's financial statements. As a Citigroup memorandum described, the "key benefit to Enron from the transaction is that the financing will generate substantial tax deductible, nondilutive *rating agency equity* . . . ." CITI-B 00256319 (emphasis added).

309.    As a result of the Nighthawk transaction, Enron received $500 million at year-end 1997 without increasing its debt. Had this amount been reflected – as it should have – as debt on Enron's balance sheet, Enron's total debt would have increased by 8%.

#### (b)     Nahanni

310.    Nahanni was another $500 million minority interest transaction that closed at year end, this time on December 29, 1999.  Citigroup again created the structure and advised Enron on the transaction.  Like the Nighthawk structure, Citigroup designed Nahanni as a vehicle for Enron to borrow $500 million that would not be reflected as debt on the company's balance sheet.

311.    Citigroup and the Insiders added a special feature to Nahanni – a feature that "allowed" Enron improperly to record the $500 million as cash flow from operations instead of financing activities.  Nahanni, as the minority investor in Marengo, the consolidated subsidiary owned by Enron, contributed $500 million in Treasury bills, instead of cash, to Marengo, which in turn contributed the Treasury bills to its wholly-owned subsidiary, Yukon.  Yukon then immediately sold the Treasury Bills, and Enron treated the proceeds of the sale as cash flow from operations.  Citigroup specifically suggested using Treasury bills for this purpose.

311A.    Citigroup also arranged for Nahanni's capitalization, again providing a $485 million loan from CXC, Citigroup's affiliate, and arranging an equity investment of $15 million.  Nahanni used these funds to purchase the Treasury Bills that ultimately were contributed to Yukon.  Yukon in turn sold the Treasury Bills and loaned the proceeds to Enron in exchange for a demand promissory note in the maximum principal amount of $497,512,437.81 (the "Nahanni Note").  Unlike other minority interest financings (where the Enron demand loans were unsecured) the transaction documents provided that the Nahanni Note would be supported by a direct-pay letter of credit.

311B.    Pursuant to a Master Credit and Reimbursement Agreement dated December 27, 1999 (the "West LB Nahanni Reimbursement Agreement"), Enron agreed to reimburse Westdeutsche Landesbank Girozentrale, New York Branch ("West LB NY") for draws on any letters of credit issued under the Agreement.  Thereafter, on December 29, 1999, West LB NY

issued Irrevocable Letter of Credit No. 22703100654 for the benefit of Yukon in the sum of $500 million (the "Nahanni L/C"). The transaction documents precluded Yukon from seeking payment from Enron on the Nahanni Note, but instead required Yukon to draw on the Nahanni L/C in order to receive payment on Enron's purported obligations evidenced by the Nahanni Note. The Nahanni L/C had the effect of securing repayment not only of the $485 million loan from CXC to Nahanni but also the $15 million equity investment in Nahanni so that the equity was not truly "at risk." The risk was shifted to West LB NY.

311C. Approximately three weeks later, on or about January 13, 2000, Yukon made a draw on the Nahanni L/C in the amount of $497,512,437.81 and Enron paid West LB NY an equivalent sum under the West LB Nahanni Reimbursement Agreement. Yukon transferred the funds to Marengo, which in turn transferred the funds to Nahanni, which used the funds to repay its $485 million loan from CXC with interest. Enron procured the Nahanni L/C with full knowledge that (a) Yukon would draw on the Nahanni L/C, (b) West LB NY would demand reimbursement in advance of distributing funds under the Nahanni L/C, and (c) the bulk of the proceeds of the Nahanni L/C would be transferred to CXC for providing the funding to facilitate the improper transaction.

311D. The Nahanni transaction was nothing more than a way for the Insiders to manipulate Enron's year-end financial statements. This fact was well known to Citigroup, which assisted the Insiders in structuring the transaction to achieve the Insiders' goals. One Citigroup document described Nahanni as **"year end window dressing."** Exam. III, App. D at 113 (quoting CITI-B 00137997-003) (emphasis added).

312. Nahanni was not properly treated as a minority interest transaction for several reasons. First, the required 3% equity in Nahanni was not at risk because it was secured by the Nahanni L/C. Therefore, as the Enron Examiner concluded, "Enron should have consolidated the

minority investor and reported the Nahanni debt on its balance sheet."  Exam. III, App. D at 115.

Second, by its terms the Nahanni transaction was designed to last no more than a few weeks, just

long enough for the Insiders to artificially inflate Enron's financial results for 1999.  The transaction

closed on December 29, 1999 and the debt was repaid on or about January 13, 2000.  The timing

alone exposed Nahanni as, in the Enron Examiner's words, nothing more than a scheme to "improve

artificially [Enron's] year-end reporting."  *Id.* at 113.  Third, the Insiders should never have recorded

the sale of Treasury bills as cash flow from *operating* activities.  Prior to Nahanni, Enron's merchant

investment operations did not include the sale of Treasury bills, and Nahanni provided no reasonable

basis for doing so then.  The Enron Examiner characterized this derogatorily as one of the most

aggressive uses of MTM accounting.

313.    Citigroup knew Nahanni could not properly be accounted for as a minority interest

transaction.  Citigroup knew the 3% equity investment in Nahanni was improperly supported by the

Nahanni L/C because Citigroup had both structured and helped document the transaction.  The

protection that the letter of credit gave to the equity investor was similar to that given to the equity

investor in Nighthawk – the one that Citigroup's internal accountants concluded eliminated all risk

of the investment.  Citigroup also knew the Nahanni transaction was no more than a year-end

manipulation of Enron's financial statements.  The transaction documents required that the

transaction be unwound by no later than January 27, 2000.  The Citigroup officer responsible for the

transaction reported that "Enron will agree to repay [Nahanni] by January 14th."  CITI-B 00289599.

(That is why Citigroup internally referred to Nahanni as "year-end window dressing" and

"essentially an insurance policy for YE balancing.'"  CITI-B 00289597.)  Finally, Citigroup knew

that Enron's operations did not include selling Treasury bills, so the Insiders could have no

legitimate basis for claiming $500 million as cash flow from operations based upon their sale.

Citigroup's own internal description of Enron's merchant investment activities did not include buying and selling Treasury bills.

314.     As with Nighthawk, Citigroup understood that the purposes of Nahanni were to improperly allow the Insiders to borrow $500 million without recording it as debt and, by selling Treasury bills, to artificially maintain Enron's credit ratings by generating $500 million in cash flow from operations.  Citigroup's Execution Memo on the transaction stated:  "The Nahanni transaction allows Enron to reduce the volatility of operating cash flow (at the expense of greater volatility in its cash flows from financing activities), while avoiding an increase in leverage."  CITI-B 00592095 (quoting Exam. III, App. D at 109).  That same Execution Memo explained Enron's focus on the rating agencies:  "In recent years, rating agencies have focused on 'managing to cash' the profits earned under [MTM] accounting: that is ensuring earnings were a reflection of cash received."  *Id.* at 108.

315.     Nahanni materially affected Enron's financial statements at year-end 1999.  Of Enron's reported $1.2 billion net cash flow from operations that year, $500 million, or 40%, was generated by Nahanni.  By improperly recording the $500 million borrowed from Nahanni as minority interests instead of debt, the Insiders improved Enron's debt-to-equity ratio by 16%.

### (4)     The Forest Products transactions.

316.     In two transactions in December 2000 and June 2001, Citigroup (and in one instance Salomon Holding) knowingly aided the Insiders in improperly monetizing Enron's forest products business.  The first of these transactions, Project Bacchus, was structured as a FAS 140 transaction, the purpose of which was to generate improperly $112 million of income at year-end 2000.  To accomplish this, the Insiders caused Enron to sell 80% of its interest in an SPE (Fishtail) that held certain of Enron's pulp and paper assets, to another SPE called Sonoma I L.L.C. ("Sonoma").  Sonoma was capitalized (indirectly through yet another SPE, Caymus Trust) by Citigroup through

a $194 million loan and an additional $6 million "equity" contribution. Selling 80% of Fishtail's

interest to Sonoma for $200 million created a gain of $112 million to Enron, because Enron carried

the pulp and paper assets on its books at $88 million. The Insiders also reported the entire

$200 million as cash flow from operating activities at year-end 2000. According to the Enron

Examiner, Bacchus was a "short-term structure[] designed by Enron to enable it to meet certain

year-end 2000 earnings targets." Exam. II, App. K at 1.

316A.  As it did in the Yosemite I and Yosemite II prepay transactions, Citigroup enlisted

the assistance of Fleet and its SPE Long Lane to give the appearance of making the $6 million

"equity" investment in the Caymus Trust. The Citigroup affiliate SSB again assured the complete

return of Long Lane's investment through a total return swap, giving Citigroup the full economic

risks and rewards of the equity. Through this contrivance, Citigroup did not consolidate the assets

of the Caymus Trust on its financial statements and made no disclosure of its ownership interest in

the trust. The facade of Long Lane's ownership of the "equity" in the Caymus Trust was necessary

for the Bacchus transaction to proceed as it did, and without the involvement of Fleet and its SPE

Long Lane the Bacchus transaction would not have gone forward.

317.  Six months later, on June 1, 2001, the second forest product transaction, Sundance,

closed. Sundance Industrial was a supposed joint venture of Enron, ENA and Enron Industrial

Markets GP Corp. ("EIM"). Sundance Industrial acquired from Sonoma, via the Bacchus

transaction, certain pulp and paper assets. Citigroup caused its subsidiary Salomon Holding to

participate as a limited partner in the Sundance transaction. It also caused Salomon Holding to

contribute $28.5 million to Sundance Industrial. Finally, Salomon Holding made an unfunded

commitment of $160 million, to be paid only in the event the partnership lost more than

$747 million. Based on the Salomon Holding investment and unfunded commitment, the Insiders

characterized Sundance Industrial as a nonconsolidated entity, thus keeping its debt off Enron's

balance sheet.  Through Sundance Industrial, the Insiders likewise improperly kept $375 million of debt off Enron's balance sheet.

318.    Only a few days before the Sundance Industrial transaction closed, the Insiders asked Citigroup to assist them in improperly creating $20 million of income for Enron.  Citigroup agreed, despite knowing that its part of the transaction had no business purpose apart from creating income for Enron's end of second quarter 2000 income.  At the Insiders' request, Citigroup caused Solomon Holding to use $20 million of the $28.5 million cash contribution designated for Sundance Industrial to "purchase" Enron's Class A equity in Sonoma.  Then,  Solomon Holding contributed to Sundance Industrial $8.5 million in cash and a Class A equity interest in Sonoma.  As the Enron Examiner explained, "Enron *somehow* took the position that [its Sonoma interest] was worth $20 million, and by selling it to Citigroup . . . Enron believed it could record $20 million of gain and, therefore, income."  Exam. III, App. D at 131-32 (emphasis added).  At the time Citigroup participated in this charade, it knew there was no basis for valuing Enron's equity interest in Sonoma at $20 million. It also knew the sole purpose of this aspect of the transaction was to generate income for Enron improperly.   As a result of this last-minute addition to Sundance Industrial, Enron's income increased improperly by $20 million.

319.    Citigroup was well aware that Bacchus could not properly be reported as a FAS 140 transaction.  Citigroup knew that its $6 million equity contribution was not at risk.  Because Citigroup's equity investment was not at risk, the Caymus Trust, and accordingly Sonoma, failed the 3% equity rule.  Accordingly, an "independent" third party did not acquire the Fishtail assets (and in any event the Insiders caused Enron to guarantee the entire purchase price on the "sale" of its own asset).

320.    As a condition of proceeding with the Bacchus transaction, Citigroup sought and received Fastow's oral assurances that, regardless of the value of the Bacchus assets, Enron would

repay Citigroup's "equity" contribution.  Citigroup's approval memo for the Bacchus transaction stated that "Enron's CFO, Andrew S. Fastow, has given his verbal commitment to Bill Fox . . . that Enron Corp. will support the 3% equity piece of this transaction" quoted in Exam. III, App. D at 123.  Other Citigroup documents described Fastow's promise as "verbal support" and "verbal guarantees" *Id.*  Accordingly, Citigroup treated the entire amount it committed to the transaction as a loan.

321.    In the course of its independent investigation, the SEC found that "Citigroup obtained oral representations from Enron that Citigroup would not lose money in connection with its three percent equity investment," and, as a result, concluded:  "In economic reality, Bacchus was a $200 million financing structured as a sale for the sole purpose of allowing Enron to characterize the proceeds as cash flow from operating activities and to record a gain of $112 million."  SEC Citigroup Order at 3, 9.  For this reason, Citigroup made its decision to "invest" $6 million in Bacchus without considering the merits of the underlying investment.  Moreover, Citigroup was aware that to at least one of the Insiders, a reason for engaging in the transaction was "writing up" the value of the assets sold.

322.    Citigroup well understood the significance of keeping Fastow's assurance unwritten.  The SEC concluded that "Citigroup understood that reducing this representation to a written contractual term would have negated Enron's accounting treatment."  SEC Citigroup Order at 3.  When receiving analogous oral commitments in conjunction with the Roosevelt prepay transactions, Citigroup noted that while "Enron has agreed, . . . the papers cannot stipulate that as it would require recategorizing the prepays as simple debt."  CITI-B 00032147.  Had Fastow's oral assurances been included in the transaction documents, Andersen would not have been able to approve the accounting for the Bacchus transaction.  The PSI Report on Bacchus (at 19) stated it this way:

> [T]he Bacchus transaction was steeped in deceptive accounting, if not outright accounting fraud. The evidence shows that Enron guaranteed both the debt and equity "investment" in the Caymus Trust, thereby eliminating all risk associated with the "sale" of the Fishtail assets to the Trust. Without risk, the transaction fails to qualify as a sale under SFAS 140. The fact that Enron's guarantee of the $6 million equity "investment" was never placed in writing, but was kept as an oral side agreement with Citigroup, demonstrates that both parties understood its significance and potential for invalidating the entire transaction. Citigroup nevertheless proceeded with the deal, knowing that a key component, Enron's guarantee of the $6 million, rested on an unwritten and undisclosed oral agreement.

323.    Neither Citigroup nor Salomon Holding treated the $28.5 million contribution, plus the $160 million unfunded commitment, to Sundance Industrial as a real equity investment. The Insiders were able to secure Salomon Holding's cash investment only by requiring the Sundance Industrial partnership to hold a $28.5 million cash reserve at all times, and by giving Citigroup/Salomon Holding the ability to unilaterally terminate the partnership and thus ensure that its unfunded commitment could never be drawn. Other indicia that Salomon Holding's contribution was not an equity investment are that (1) it received a preferred return of LIBOR plus 6.62% per year, paid prior to distributions to other partners, and (2) an excess income sweep provision capped Citigroup's return at the preferred return, thus depriving Citigroup of participating in the upside of the business.

324.    Citigroup also purchased a third-party credit default swap for Salomon Holding's $28.5 million investment. Moreover, Salomon Holding/Citigroup's unfunded commitment was protected from being called. By its terms, the commitment could be called only if the partnership lost more than $747 million. But if there were any indication that might occur, Salomon Holding/Citigroup could exercise its unilateral right to terminate the partnership and thus avoid funding the obligation. In the words of Citigroup: "It is 'unimaginable' how our principal is not returned." CITI-B 0301369 (quoted in Exam. III, App. D at 129).

325.    Citigroup documents acknowledge that the "contribution" to Sundance Industrial was a loan: "The transaction is structured to safeguard against the possibility that we need to contribute our contingent equity and to ensure that there is sufficient liquidity at all times to repay our $25 million investment." CITI-SPSI 0044827. "No circumstance under which $160 million can be called – our investment is debt" PSI 00457254 (quoted in Exam. III, App. D at 129). The memorandum to the Citigroup Capital Market Approval Committee states, "The investment has been structured to act like debt in form and substance." CITI-B 00301794 at 796. One senior Citigroup officer referred to Sundance Industrial as "a funky deal (accounting-wise)" and was "amazed that [Enron] can get it off-balance sheet." CITI-B 00299613 (quoted in Exam. III, App. D at 130). This view was shared by the head of Citigroup's Global Relationship Bank: "We share Risk's view *and if anything, feel more strongly that suitability issues and related risks* when coupled with the returns, make it unattractive." CITI-B 00307591 (emphasis added).

326.    Citigroup and, with respect to Sundance Industrial, Salomon Holding understood that their participation in the Bacchus and Sundance Industrial transactions facilitated the Insiders' manipulation and misstatement of Enron's financial statements. With respect to Bacchus, Citigroup documents acknowledge that, "Enron's motivation in the deal now appears to be writing up the asset in question from a basis of about $100 MM to as high as $250 MM, *thereby creating earnings.*" CITI-B 00289702 (emphasis added). This caused the Citigroup relationship manager for Enron to express concern about the "appropriateness" of the Bacchus transaction, "since there is now an earnings dimension to this deal." *Id.* This concern was shuttled aside, however, because of Citigroup's desire to keep the Insiders satisfied and sending deals and financings to Citigroup. As one Citigroup employee pointedly explained, "For Enron, this transaction is 'mission critical' (their label not mine) for YE and a 'must' for us." CITI-B 00270033 (quoted in Exam. III, App. D at 122)

327.    Before the Bacchus transaction closed, Citigroup had analyzed exactly how it would impact Enron's financial statements:

> The $200 million represents 16.3% and 22.4% of operating cash flow and net income, respectively, for the 12 months ended December 31, 1999. Bacchus represents 22.2% and 11.6% of cash EBITDA for nine months ended 9/30/00 and twelve months ended 12/31/00, respectively.

CITI-B 00284053-055 (quoted in Exam. III, App. D at 121).

328.    With respect to the Sundance Industrial transaction, Citigroup/Salomon Holding was aware that the Insiders intended to move the debt associated with the pulp and paper business off Enron's balance sheet. Citigroup documents state that "Enron owns certain pulp and paper assets . . . which have been purchased by Enron in a manner that the assets are off-balance sheet for GAAP accounting purposes." CITI-B 00296661 (quoted in Exam. III, App. D at 130).

329.    Citigroup overcame its concerns over the accounting abuses it knew arose from Bacchus and Sundance Industrial both because of the Insiders' promised future revenue from transactions with Enron and because Citigroup knew its exposure would quickly be eliminated. Citigroup knew the $200 million it loaned to Bacchus would be repaid within a matter of months when Sundance closed. That in fact happened. Citigroup also knew it could exercise rights in the Sundance Industrial partnership agreements to demand that Enron buy out its interest. On November 30, 2001, two days before Enron declared bankruptcy, Citigroup exercised those rights and the Insiders caused Enron, through the wholly-owned subsidiary EIM, to pay off Salomon Holding's $28.5 million contribution.

330.    The Bacchus and Sundance Industrial transactions materially impacted Enron's financial statements for year-end 2000 and the second quarter of 2001. The $112 million in income Bacchus "created" represented 11% of Enron's reported net pre-tax income for 2000. Bacchus' contribution to cash flow from operations of $200 million constituted over 4% of Enron's operating

cash flow for that year.  Through Sundance Industrial, the Insiders improperly kept $375 million of debt off Enron's balance sheet and improperly generated $20 million of income.

**(5)    Citigroup offloaded its Enron exposure.**

331.    By 1999, Citigroup's "obligor exception" for Enron – the amount by which Citigroup's total exposure to Enron exceeded the internal lending limit – had grown to over *one billion dollars.*  In January 1999, Citigroup's primary relationship manager for Enron warned colleagues that the bank likely would not approve a new cash management facility for Enron, noting that "our exposure predicament is legend."  CITI-B 00440585 (quoted in Exam. III, App. D at 24-25).  A Vice-Chairman of Citigroup described Citigroup's exposure to Enron as "huge" and subsequently refused to approve any additional exposure until proceeds received by Enron from the Yosemite-funded prepays were received and used to pay down existing exposure.  CITI-B 0046533 (quoted in Exam. III, App. D at 25).  "[U]ntil the moment that we have received the debt repayment resulting from the Yosemite transaction, I am not willing to approve another incremental exposure on Enron."  *Id.*

332.    Citigroup thus was clearly motivated to help Enron complete new financings that would bring in cash *to reduce Citigroup's exposure to Enron*.  In fact, Citigroup designed the Yosemite credit-linked note structure to assist Enron in generating prepay proceeds to be used to pay some of Enron's existing bank exposure – including exposure to Citigroup.  Testifying before the United States Senate, Richard Caplan, the designer of Citigroup's Yosemite prepay structures, said the purpose of the Yosemite deals "was to shift risk from the bank market," and that the Insiders ultimately laid off $2.4 billion through the Yosemite transactions.  Much of that exposure was Citigroup's, and Citigroup structured Yosemite so it could reduce that exposure in secret:  "Ideally, nontier 1 participant banks in the deals will be unaware of the 'sale' of the existing position of the

tier 1 banks."  CITI-SPSI 0036296.  By the close of 1999, Citigroup's one billion dollar obligor

exception for Enron had been *eliminated*.  The Yosemite prepays continued in 2000 and 2001.

(6)     Citigroup revised its structured finance policies.

333.    In August 2002, after Citigroup had been targeted for investigation by the SEC, the

Manhattan District Attorney, and the Permanent Subcommittee on Investigations of the United

States Senate, Citigroup announced that it would no longer do business the way it did with Enron.

Then CEO of Citigroup, Sanford Weill, issued a memo to all Citigroup employees in which he

renounced the practices and policies through which Citigroup and its subsidiaries had aided and

abetted the Insiders' misstatement of Enron's financial condition:

> At Citigroup, we are committed to greater transparency in the disclosure of structured finance transactions and we are answering the call from Washington and from investors by adopting strong initiatives ourselves.
>
> ***Quite simply, if a company does not agree to record a material financing as debt on its balance sheet, Citigroup will only execute the transaction if the company agrees to publicly disclose its impact to investors.***
>
> Starting immediately, we will only do these transactions for clients that agree to make prompt disclosure of the details of the transactions including management's analysis of the net effect the transaction has on the financial condition of the company, the nature and amount of the obligations, and a description of events that may cause an obligation to arise, increase or become accelerated.  In addition, we will only do these transactions for clients that agree to provide the complete set of transaction documents to their chief financial officer, chief legal officer and independent auditors.

August 7, 2002 Memorandum from Sanford Weill to all employees (quoted in Exam. III, App. D

at 29 n.99) (emphasis added).

334.    More recently, as a result of Citigroup's participation in manipulating Enron's

financial condition, the Federal Reserve Bank of New York forced Citigroup to formally revise its

policies and practices regarding structured finance transactions.  The Federal Reserve Bank of

New York and the Office of the Comptroller of the Currency (collectively the "Federal Reserve")

jointly conducted a review of Citigroup's structured finance and prepay transactions with Enron. That review resulted in a written agreement between the Federal Reserve and Citigroup dated July 28, 2003, in which the Federal Reserve concluded that Citigroup's transactions with Enron "raised concerns that the manner in which Citigroup and its subsidiaries participated in the Structured Transactions exposed them to significant risks."  Agreement between Federal Reserve and Citigroup dated July 28, 2003, at 2.  To avoid future abuses of structured finance transactions by Citigroup, the Federal Reserve required Citigroup to develop and submit "for review and approval" written revisions to its policies for complex structured finance transactions.  Among other things, those revised policies must ensure that Citigroup: (1) "identif[ies] transactions in which the counterparty relationship or the nature of the transaction with the counterparty poses or may pose heightened legal or reputational risks to Citigroup or its subsidiaries"; (2) requires "complete and accurate disclosure of the counterparty's purpose in entering into the particular transaction"; (3) *"assess[es] whether financial, accounting, rating agency disclosure, or other issues associated with a transaction are likely to raise legal or reputational risks for Citigroup and its subsidiaries"*; and (4) conducts "a higher level review of the overall customer relationship . . . where the counterparty's primary purpose, goal or objective in entering into a transaction is to achieve an accounting or tax effect."  *Id.* at 3-5 (emphasis added).

### b.    Chase knowingly assisted the Insiders in misstating Enron's financial condition.

335.    Like Citigroup, Chase's involvement in the Insiders' manipulation of Enron's financial condition was essential to the Insiders' scheme.  Chase knew the Insiders were using SPE transactions improperly to inflate cash flow from operations and disguise debt as price risk management's liabilities on Enron's financial statements.  From at least 1998, Chase helped the Insiders achieve their improper goals by designing, financing, and/or implementing at least seven

-110-

prepays, two FAS 140s, and one tax transaction.  Together, these transactions provided Enron with billions in financing and allowed the Insiders to understate debt on Enron's balance sheet by billions.

336.    Like Citigroup, Chase's participation has been investigated and roundly criticized by at least Manhattan District Attorney Morgenthau, the PSI of the Committee on Governmental Affairs for the United States Senate, and the Enron Examiner.  All concluded that Chase knowingly facilitated the Insiders' scheme to misstate Enron's financial statements.

337.    Morgenthau's 18-month investigation into the Enron prepays actually "focused more closely on the particulars of the Chase transactions" than on Citigroup's.  Morgenthau Letter at 2. According to Morgenthau, that was because unlike Citigroup, Chase neither cooperated fully with his investigation nor, in the beginning, acknowledged that the prepays were anything other than legitimate arm's-length commodity trades.  As he had with Citigroup, Morgenthau concluded that the prepays between Enron and Chase "were trades on paper only.  In substance, they were loans." *Id.* He found that by structuring the loans as commodity trades, Enron "unfairly" accounted for cash flow from financing as cash flow from operations.  He concluded that Chase knew the effect of the prepays on Enron's financial statements – and specifically knew that the prepays were being used both to "fill liquidity gaps" and to hide debt capital as price risk management liabilities.  He also acknowledged that Chase knew the ultimate goal of the prepays was "fraudulent accounting" and "to make [Enron's] financial statements less transparent."  *Id.* at 8.

338.    When the investigation ended, Morgenthau commented that despite its initial hostility, Chase – like Citigroup – had subsequently "renounced the policies and procedures which led to [its] involvement in the Enron debacle and [had] adopted reforms to see that nothing similar happens again."  *Id.*  Or, as J.P. Morgan Chase & Co. wrote to Morgenthau on July 28, 2003, ***"We have made mistakes.  We cannot undo what has been done, but we can express genuine regret and***

*learn from the past.*" Letter from Marc J. Shapiro, Vice Chairman of J.P. Morgan Chase & Co. to

Robert Morgenthau at 1 (July 28, 2003) (emphasis added).

339.    The PSI investigation focused in part on the Enron prepays and, therefore, also on

Chase.  The Chief Investigator concluded "it was common knowledge" among Enron and Chase

employees that "the prepays were designed to achieve accounting, not business, objectives," and that

Enron was "booking the 'prepay' proceeds as trading activity rather than debt." PSI Report at B-2.

He explained that "lucrative business deals" in the form of fees gave financial institutions like Chase

the "[o]bvious incentive" to both go along with, and even expand upon, Enron's prepay activities.

PSI Report at B-10.  He also concluded that Chase, like Citibank, was not only aware that the

transactions were driven by the desire to manipulate Enron's financial statements, but also actively

aided "in designing and implementing financial structures that created and maintained the fiction

that the transactions were trades rather than loans." PSI Report at B-5.

340.    In the Complaint it filed against J.P. Morgan Chase & Co., the SEC likewise alleged

that Chase aided and abetted the manipulation of Enron's reported financial results through the

prepays.  It alleged that the prepays improperly allowed Enron to report loans from Chase as

operating activities, and that the prepays "had no business purpose aside from masking the fact that,

in substance, they were loans from Chase to Enron."  With respect to Chase's knowledge, the SEC

alleged:

> As Chase knew, Enron engaged in prepays to match its reported fair value earnings
> with reported cash flow from operations to convince analysts and credit rating
> agencies that Enron's fair value earnings were real, i.e., that the reported fair value
> earnings represented gains that could and, eventually would, be turned into cash.
>
> As Chase knew, because prepays were disguised loans, Enron not only overstated its
> cash flow from operating activities, but it understated its cash flow from financing
> activities and understated debt on its balance sheet.  *Chase knew that, as a result,
> analysts and credit rating agencies were being misled*.

SEC Chase Complaint ¶ 2 (emphasis added).

### (1)    Chase's relationship with Enron.

341.    Chase had a long history with Enron.  During the 1990s, as Enron's core business evolved from regional natural gas provider to commodity and financial product trader, the relationship between the two grew in size and strength.  Chase achieved Tier 1 status in 1994 and retained it thereafter.  In turn, Chase labeled Enron a "Blue" client – that is, one that could "*prospectively* generate $5 million or more in deal revenues over an 18-month period." JPMBKR-E 0515593 (emphasis in original).  In fact, by 1999 Enron was generating fees of more than $15 million annually for Chase's Global Oil and Gas Group.  As Chase documents written in Houston show, Chase thought of itself as "Enron's major financing firm."  JPMBKR-E 0016226. Enron's value to Chase was substantial.  Even in 1995, Chase documents show that Chase recognized Enron as "a bonanza in terms of deal flow."  JPMBKR 0315455.  Chase both contributed $20 million in equity capital to LJM2 and led a $65 million revolving credit facility for it.

342.    The close relationship between Chase and Enron was also such that Chase had a deeper and more detailed understanding of Enron's capital structure and financial position, including some of Enron's structured transactions and off-balance sheet obligations, than could have been gleaned from an analysis of Enron's financial statements alone.  In May 1999, Chase knew enough to annotate Enron's financial statements for a meeting with Enron Capital Management officials in Houston, accurately describing where a large number of the off-balance sheet structures, including prepays, were hidden.  JPMCBKR 0017571-78; PSI Exhibit 187mm.  Over the years, Chase also worked on a long-term project with Enron to restructure Enron's balance sheet.  Although the project was never completed, Chase gained valuable insight into Enron's financial condition as a result of it.  In October 2001, as the financial world began to become concerned with Enron, Fastow wrote to Richard Walker at Chase:  "I think you know the credit and the businesses as well as (and better) than anyone in the world, so I'm counting on you to lead the way."  JPMBKR-E 0164513.

343.    Between late 1997 and Enron's bankruptcy, Chase and Enron averaged more than one transaction per month.  For these transactions, Chase earned fees of over $96 million.  Included in the transactions were at least 12 prepay transactions with a combined value of more than $4.8 billion.  There were also many FAS 140 transactions and two minority interest transactions (Choctaw and Zephyrus).  The prepays, especially, were extremely lucrative for Chase.  For example, at the end of June 2000 Chase entered into an Enron prepay transaction with the Insiders that was, effectively, a $650 million loan.  For arranging the transaction, Chase received an upfront fee of approximately $1.6 million.  If the loan had resolved as the parties anticipated and intended (that is, if Enron had not filed bankruptcy), Chase would have received from Enron the return of Chase's $650 million in principal plus $150 million in interest and fees.

344.    Throughout the relevant period, Chase maintained an office in Houston, Texas. Chase executives and other personnel in the Houston office were involved in the SPE transactions with Enron.  Rick Walker, the Enron relationship manager for Chase, was located in its Houston office.  Walker, among other Chase personnel, played a key role in the Chase SPE transactions with Enron.  Walker was involved in structuring and implementing the Chase prepays with Enron, and Walker observed early on that a prepay "represents a term loan embedded in a commodity swap." JPMBKR 0001991 (quoted in Exam. III, App. D at 19) Walker was a member of the Chase team which structured the Fishtail transaction involving Enron's forest products business, and Walker was the client executive on Chase's participation in the Hawaii transaction.  *See* JPMBKR-S 0010295-311; JPMBKR 0134664-678.  Walker also successfully pressed for Chase to invest in LJM2, to which it ultimately committed $20 million.

### (2)    The Chase prepay transactions.

345.    Chase has a unique role in the history of Enron's prepay transactions – Chase invented the Enron version.  It therefore considered the Enron prepays to be proprietary transactions,

using a proprietary technology.  It also never turned down an Insider's request that Chase participate in a prepay.

346.    Chase's first Enron prepay transaction closed in 1992.  At that time, Enron owned certain oil exploration tax credits that were due soon to expire.  To prevent their expiration, Enron needed a way to accelerate income into the 1992 year.  Chase provided Enron with what it needed – the prepay structure, which it invented specifically for that purpose.  At the time, Chase inserted an SPE into the structure strictly because regulations prohibited Chase from accepting physical delivery of a commodity.

347.    The structure served its purpose; however, the Insiders quickly discovered that it offered more, and better, benefits as a financing tool.  By the mid-1990's, the Insiders were executing prepays in order to meet funding objectives.

348.    Chase engaged in seven prepay transactions between December 1997 and Enron's bankruptcy:

| Name | Closing Date | Amount Financed |
|------|-------------|-----------------|
| Chase VI Prepay | 12/97 | $300 million |
| Chase VII Prepay | 06/98 | $250 million |
| Chase VIII Prepay | 12/98 | $250 million |
| Chase IX Prepay | 06/99 | $500 million |
| Chase X Prepay | 06/00 | $650 million |
| Chase XI Prepay | 12/00 | $330 million |
| Chase XII Prepay | 09/01 | $350 million |

**Total  $2.630 billion**

349.    The seven – labeled the "Mahonia transactions," after the SPEs Chase used to close the circle – totaled $2.63 billion.  Notably and predictably, each prepay closed at the end of a financial reporting period, when the Insiders determined that Enron needed cash flow from operations to meet analyst and rating agency expectations.  Like other Enron prepay transactions, the Mahonia transactions included three steps that were precisely calibrated so that they collectively

functioned as an unsecured loan. While each step ostensibly included commodity risk, the risk flowed in a circle between Chase, its SPE, and Enron such that the deliveries netted out and "all that remained was the initial advance and the repayment of same, with interest, over time." Exam. III, App. F at 28. At the end of the day, Enron had received cash up-front from the Mahonia entity – cash that Chase funded – and Enron had agreed to pay the cash plus interest back to Chase on a prearranged schedule.

350.    Chase invented and so (obviously) understood the circularity and the lack of price risk due to the linked contracts – those aspects of the prepay that turned an alleged commodity trade into a loan. A telephone conversation between three Chase employees, taped in the normal course of business on September 20, 2001, shows exactly how well they understood the obligation flow and the purpose of the prepays:

- " . . . [W]hy do they want to hedge with gas where it is now?"

- "They're not hedging, they're just, they're just, they do the back-to-back swap."

- "This is a circular deal that goes right back to them."

- "[It's]. . . basically a structured finance-"

- "It's a financing?

- "Yeah, it's totally a financing, which has piece of it, they're always had on [sic] as a piece of their capital structure, so-"

- "So it's amortizing. Yeah, it's amortizing debt. I get it."

- "That's exactly what it is."

PSI Ex. 184a at 665.

351.    Documents created by Chase make the same point. For example:

•    In August 2001, the Insiders were talking with Chase about selling Enron assets. In an internal Chase communication about the subject, one Chase employee wrote another, "Rick, as you will recall, we had some conceptual

discussion on this about 6 weeks ago.  We had begun to focuss [sic] on it from the point of view of trying to free up capacity in the bank market.  Is that the goal here or is this another hide the debt structure?"  JPMBKR-E 0020290 (quoted in Exam. III, App. E at 16-17).

- In litigation in June 2002, Chase asked a court to require surety bond providers to make payment on bonds that related to certain prepays.  In a filing, Chase asserted that the sureties "knew that the [prepays] were part of a structured financing transaction for Enron's general corporate benefit."  The same filing claimed that "the surety bonds were part of financing transactions in which the funds advanced by JP Morgan Chase to Mahonia were ultimately used by Enron for general corporate purposes, not to secure future sources of the oil and gas to be delivered."  Amended Complaint, *JP Morgan Chase Bank v. Liberty Mutual Insurance Co.*, Case No. 01-Civ. 11523 (S.D.N.Y) at ¶¶ 18, 19.

352.    Consistent with their understanding of the true purpose of the prepays, the parties routinely used language of financing when discussing them.  For example, Chase documents show that in conversations about the prepays, Chase and Enron typically discussed fees in terms of the London Interbank Offered Rate (LIBOR) plus a basis point spread, terms generally used to refer to pricing on loans.  *See, e.g.,* JPMC-H-0111470, JPM-6-04204, Senate-MAH 02296.

353.    Chase clearly considered the prepays' central benefit to be the fact that the structure facilitated treating debt as something other than debt on a balance sheet.  In 1998, Chase actually developed a "pitch book" to sell other companies on the Enron prepay structure.  In it, Chase noted the structure was "balance sheet 'friendly'" and offered an "[a]ttractive accounting impact by converting funded debt to 'deferred revenue,' or long-term trade payable."  PSI Ex. 128; Senate MAH-02604-17.  In a written statement to Congress, Chase admitted that it succeeded in selling seven companies besides Enron on the Enron-style prepays.  PSI Ex. 185q.

354.    Chase also knew the rating agencies did not understand the prepay transactions.  Chase acknowledged in internal documents that "[m]ost users of the prepay structure believe the transaction to be 'rating agency friendly,'" and that "[f]unded debt ratios will likely improve as deferred revenue is not included in debt/capital ratios."  JPMC BKR 0015716-746 (quoted in

Exam. III, App. E at 20).  As late as October 2001, Chase employees bragged that the rating

agencies still "haven't figured out prepays."  JPMC BKR-E 0241185 (quoted in Exam. III at 65).

Chase considered this fact in pricing the transactions for Enron:  "I think what we're trying to gauge

is how, how aggressive they are to pay for this stuff now, which is discretely get, you know, several

hundred million dollars and have no market knowledge of what's going on. . . ."  PSI Ex. 184c

at 684.

355.    All together, Chase used three SPEs as pass-through entities for its loans to

Enron – Mahonia, Stoneville, and Mahonia NGL (collectively, the "Mahonia Entities").  Chase

originally inserted the Mahonia Entities into the structure because regulations prohibited Chase from

taking title to physical natural gas or crude oil.  But after Chase merged with Chemical Bank, the

New York State Banking Department gave Chase permission to take title.  Therefore, as District

Attorney Morgenthau recognized, by 1997 Chase no longer had even a theoretical legitimate

business purpose for using Mahonia.  Chase nevertheless continued to include Mahonia because

excluding it would expose the link between Chase and Enron.

356.    As discussed earlier, under GAAP, the prepay transactions were not legitimately

booked as trades unless the three parties to the trades – Enron, Chase, and the Mahonia

Entities – were independent of each other.  The Mahonia Entities were not independent of Chase,

and Chase knew that.  Indeed, the Mahonia Entities were each shell companies, incorporated at

Chase's behest in the Isle of Jersey, one of the British Channel Islands.  At the time of their creation

in 1986, an attorney acting for Chase acknowledged:  "For obvious reasons it is important that the

SPVs are controlled by Chase but, for accounting and other requirements, it is not desirable that they

are wholly owned by Chase."  Letter from Ian James to Commercial Relations Department, Jersey

Island, April 24, 1986.  PSI Ex. 118.

357.    In its complaint against Chase, the SEC emphasized Mahonia's fatal lack of

independence: "Mahonia was controlled by Chase and was directed by Chase to participate in the

transactions ostensibly as a separate, independent, commodities-trading entity.  In fact, however, the

SPV had no independent reason to participate in these transactions; as Chase knew, Mahonia was

included in the structure solely to effectuate Enron's accounting and financial reporting goals."  SEC

Chase Complaint ¶ 14.

358.    District Attorney Morgenthau also investigated whether Mahonia was independent

and concluded it was not.  Among other things, he reported that

> [t]he only outward sign of Mahonia's existence in Jersey is a sign plate hanging in
> the lobby of the offshore law firm that created it.  It has never had employees, office
> space, a commodities trading desk (much less any gas stations or tankers) or any
> facilities whatsoever for engaging in the business of commodities trading.
> Mahonia's total capitalization, which Chase ultimately paid, was only ten British
> pounds, and Chase paid all the shell company's legal fees, administrative fees,
> government filing fees, and photocopying expenses. Mahonia's sole "profit" in each
> deal was a nominal prearranged fee – never more than $12,500 – again, paid by
> Chase.  (In some deals, the participating SPEs received no compensation whatever
> for taking part in the prepaids.)

Morgenthau Letter at 4.

359.    Other signs that the Chase SPEs were not independent:  They were not permitted to

do business with parties other than Chase without Chase's explicit permission.  Chase acted as their

unpaid agent with respect to operational activities.  The SPEs' off-shore directors were not allowed

access to the SPEs' bank accounts at Chase and were not sent bank statements.

360.    The Enron Examiner agreed with the SEC and the Manhattan District Attorney.  He

found that,

> Mahonia was not independent from JP Morgan Chase in any meaningful sense.  JP
> Morgan Chase had caused Mahonia to be created as a Jersey Channel Islands
> corporation for the express purpose of assisting in transactions arranged by JP
> Morgan Chase. . . . Mahonia, as a "special purpose vehicle," was not capable of
> performing for itself its obligations under the prepay contracts, thus prompting JP
> Morgan Chase to perform such activities as its agent.

Exam. III, App. E at 56.

361.    Chase not only knew that the Mahonia Entities were not independent, it also made misrepresentations to Arthur Andersen that they were.  In late 2001, Arthur Andersen required Enron to prove Mahonia's independence from Chase.  The Insiders therefore asked Chase for a letter that would satisfy Arthur Andersen, one that "doesn't have Chase showing up anywhere on the fax letterhead or anything along those lines, a separate fax number, etcetera."  PSI Ex. 184a at 666.  A day later, the Insiders confirmed that the letter from Mahonia should state "(in words not yet crafted, so any you want to propose are welcome) that Mahonia and Chase are unrelated entities which are not consolidated on a legal or accounting basis with each other."  Exam. III, App. E at 55-56 (quoting AB000512189).  Chase provided the letter even though it knew the opposite was true.  The Enron Examiner has indicated that the evidence is unclear as to whether Andersen relied upon this misrepresentation.  Exam. IV, App. B at 73-76.  According to the Enron Examiner, Chase and Andersen may have worked together with the Insiders to falsely create the appearance that Mahonia was an independent business entity – not a Chase-sponsored SPE.  *Id.*  To that extent, Chase and Andersen combined with the Insiders to manipulate and misstate Enron's financial condition.

362.    Chase also caused the Mahonia Entities to make affirmative misrepresentations about their role in the Enron prepays.  In the contractual documents between Enron and the SPEs, Chase made each of its SPEs affirm that they intended to buy natural gas

    . . . for commercial purposes related to its business as a producer, processor, fabricator, or merchandiser of Natural Gas or natural gas liquids.  The Purchaser has the capacity, and intends, to take delivery of the Natural Gas to be delivered hereunder.  The Purchaser is acquiring the Natural Gas in the ordinary course of business.

EC00158431, EC00105844.  Chase also made the Mahonia Entities affirm that they were "entitled to purchase the Natural Gas [involved in the prepay contract with Enron] free of any taxes" because it was "engaged in the business of reselling the Natural Gas delivered" under the contract, and that

it was "purchasing the Natural Gas for resale to third parties." *Id.* at EC001058442.  As both Chase

and the Mahonia Entities knew, none of these representations was true.

363.    Moreover, in September 1998, Chase helped spread the fraud.  As the Chief

Investigator for the PSI explained in his testimony to Congress, the basic structure of the Mahonia

transactions had

> two key credit support mechanisms to guarantee the parties' obligations, thus
> removing the performance risk in favor of Chase.  First, Enron provide[d] an
> unconditional guarantee for the obligations of its subsidiary to Chase (through
> Mahonia).  Second, the Enron guarantee [was] supported by either a Performance
> Letter of Credit ("PLC") with Enron as the account and Mahonia as the beneficiary;
> or by surety bonds issued by insurance companies.  The PLC amortize[d] according
> to the amortization schedule of the Enron subsidiary's delivery of gas to Mahonia.
> That is, if Enron default[ed] on its guarantee, drawings on the PLC [would] match
> the amount outstanding on the prepay amortization schedule.  Enron [paid] the PLC
> fees, which [were] determined according to Enron's senior debt rating.

PSI at 245.

364.    In September 1998, the Insiders asked Chase to agree that the Insiders could replace

existing PLCs in the prepays with surety bonds that guaranteed Enron's delivery performance

obligations.  The bonds guaranteed that if Enron defaulted on its obligations to Chase (or Mahonia),

insurance companies would pay.  Because Enron would no longer be the guarantor, the change

would have the effect of freeing up capacity at Chase to do additional deals with Enron.  Chase

agreed to the change.  Enron, of course, did eventually fail to meet prepay repayment obligations

to Chase – and Chase promptly sued the insurance companies on the bonds.  The insurance

companies defended against those claims on the ground that the prepay transactions were nothing

more than complicated and undisclosed loans from Chase to Enron, using the Mahonia Entities as

pass-through vehicles.

365.    Enron reported cash flow from operating activities in 1999 of $1.228 billion.

Without the Chase prepays, that number would have been $880 million – 28% lower.  In 2000,

Enron reported cash flow from operating activities of $4.779 billion. Without the Chase prepays, that number would have been $3.798 billion – 21% lower. The prepays had an equally striking impact on Enron's reported debt. In 1999, Enron reported debt of $8.152 billion. Had the then-outstanding Chase prepays been included, the number would have risen to $9.481 billion – an increase of 16%. In 2000, Enron reported debt of $10.229 billion. Had the then-outstanding Chase prepays been included, the number would have risen to $12.539 billion – an increase of 23%. As the Enron Examiner found, these "[r]educed operating cash flow and increased debt levels would have resulted in credit ratings lower than those enjoyed by Enron during this period." Exam. III, App. E at 22.

366.    To Chase, the Mahonia prepay transactions were – in the words of Chase employees – "smoke and mirrors." Deposition S. Aultman, JP Morgan Chase at 142-47 (Aug. 6, 2002) (quoted in Exam. III, App. E at 20-21 & n.70). This "trick" (as the Examiner called it) materially inflated Enron's financial statements from at least 1997 until bankruptcy. The transactions were timed to cause Enron to meet key financial targets critical to the maintenance of Enron's credit ratings and the expectations of the market. In each case, the prepaid amount was determined not by the Insider's desire to sell oil or natural gas, but by the amount of cash flow needed to achieve the desired ratings and market reviews. In each case, the transaction was arranged on the eve of the close of a fiscal period for Enron and closed within days or hours of the end of the quarter or year. Without the Chase prepays, in many quarters during the relevant period, Enron would not have met or exceeded the targeted financial results of the analysts or the market, and Enron's credit ratings would have been downgraded.

367.    Recently, Chase – like Citigroup – renounced the practices and policies through which Chase had aided and abetted the Insiders' misstatement of Enron's financial condition. In

his July 28, 2003 letter to Manhattan District Attorney Morgenthau, the Vice Chairman of J.P.

Morgan Chase & Co. wrote:

> We have made mistakes. We cannot undo what has been done, but we can express genuine regret and learn from the past.
>
> The Prepays are a case in point. Our view historically with respect to such structured finance transactions was that our clients and their accountants were responsible for the clients' proper accounting and disclosure of the transactions. Since Enron's bankruptcy, we have been widely criticized for this approach and for our involvement in the Prepays through which it has been alleged Enron improperly obtained financing in a manner not transparent to its shareholders and the market generally. We will in the future hold ourselves to a higher standard. ***Accordingly, J.P. Morgan Chase has adopted new policies and new procedures designed to ensure that transactions in which it participates are disclosed appropriately by our clients. Under our new policies and procedures, J.P. Morgan Chase would not have approved the Enron prepays.***

(emphasis added).

### (a)    Payments or transfers during the ninety-day period prior to bankruptcy

368.    The following facts about the Chase prepays are alleged more specifically for purposes of certain bankruptcy claims. Seven (7) of the Mahonia transactions involved payments or transfers within the preference period prior to the Petition Date. These seven transactions are Chase VI through Chase XII. Chase VI closed in December 1997, Chase VII closed in June 1998, Chase VIII closed in December 1998, Chase IX closed in June 1999, Chase X closed in June 2000, Chase XI closed in December 2000, and Chase XII closed in September 2001.

369.    As described earlier in the Complaint, the Mahonia transactions were a series of commodity transactions typically involving ENA; ENGM, a wholly-owned subsidiary of ENA; JPMC; Mahonia; and Enron as Guarantor. Stoneville and Fleet were involved in one of the Mahonia transactions, Chase XI.

370.    The Mahonia Entities are SPEs that conducted no independent business and were established for the benefit of, and controlled by, JPMC. As such, the Mahonia Entities are alter egos

and/or effectively one with JPMC. JPMC was the ultimate recipient and beneficiary of substantially all sums paid to and benefits received by the Mahonia Entities during the course of the Mahonia transactions.

371.    While ostensibly prepaid forward oil or gas sales contracts and reciprocal margin payment agreements are common in the energy industry, the Mahonia transactions were different: they were essentially loans made by JPMC to ENA or ENGM, and guaranteed by Enron, involving intertwined and atypical companion agreements that resulted in circular delivery obligations and related financial swap agreements designed to eliminate all price risk.

372.    Not Used.

373.    Not Used.

374.    The Mahonia transactions Chase VI through Chase X involved the following basic steps:

    a.    JPMC provided funding for the transaction by entering into a prepaid forward contract with its alter ego SPE, Mahonia, to buy specified quantities of oil or gas at a specified time and place.

    b.    Mahonia then entered into a virtually identical prepaid forward contracts to buy the same quantity of oil or gas from ENGM (for Chase VI through Chase IX) or ENA (for Chase X) for a price equal to the sum Mahonia received from JPMC (less a nominal fee retained by Mahonia) and for delivery at the same time Mahonia was to deliver the oil and gas to JPMC.

    c.    ENA then entered into an agreement with JPMC that required ENA to make periodic, fixed payments, calculated as a fixed per unit price for a set quantity of oil or gas, to JPMC. For its part, JPMC agreed to pay back to ENA, the prevailing market price for the same quantity of oil or gas. These payments were due at the same time ENGM or ENA was to deliver the same quantity of oil or gas to Chase's SPE Mahonia (and Mahonia was, in turn, to deliver the

commodity to JP Morgan Chase) under the prepaid forward contracts. The transaction, when viewed as an integrated whole, was effectively circular with respect to the commodity, thereby eliminating the risk of price fluctuation over time in the commodity.

375. The three steps described above in paragraph 374 were designed to function as an integrated whole to produce what was, in substance, a term loan by JP Morgan Chase to ENGM or ENA.

375A. Upon information and belief, JPMC sold one-half of the gas it received from Mahonia as part of the Chase VII Mahonia transaction back to ENGM, ENA and Enron.

375B. For the Chase VIII-X Mahonia transactions, JPMC sold all of the oil and gas it received back to ENGM, ENA and Enron.

376. Chase XI did not include the agreement between ENA and JPMC described in paragraph 374(c). Rather, JPMC sold the commodities obtained from ENA to JPMC's SPE Stoneville, which in turn sold the commodities back to ENA at a fixed price. Similar to the payments by ENA to JPMC under the agreement described in paragraph 374(c), the funds paid by ENA to Stoneville – funds that were transferred by JPMC's SPE Stoneville to JPMC – were intended to be sufficient to repay the Chase XI loan with interest.

377. Chase was not the only lender for the Chase XI prepay. Fleet was a co-lender, in an amount equal to 50% of the $330 million prepay loan. In its capacity as co-lender, Fleet had detailed and intimate knowledge of the transaction structure and knew both of Mahonia NGL's involvement and of the fact that Chase created Mahonia and Mahonia NGL. As part of the transaction, Fleet and JPMC entered into a gas off-take agreement whereby gas that Mahonia NGL was to deliver to Fleet instead was to be delivered to JPMC. Fleet understood that the substance of the transaction was a loan. Fleet also understood how Enron accounted for the prepay transaction, i.e., as a price risk management liability rather than as debt. On information and belief, Fleet did

not receive any commodity or monetary payments directly from an Enron affiliated entity. Instead, those payments were made directly to Chase and then forwarded to Fleet. Fleet received fees of approximately $1.1 million for its involvement in the Chase XI prepay transaction.

378.    In contrast to Chase VI through XI, the Chase XII prepay substituted purported swaps for the prepaid forward contracts that were part of the prepay structure described in paragraph 374. Despite the substitution, the material price risk was eliminated from Chase XII as from the other transactions. As a result, when viewed as a whole, Chase XII was, in substance, a $350 million term loan by JPMC to ENA, which Enron guaranteed. The parties' contracts provided that Enron would procure letters of credit to support its guaranty of Chase XII.

378A.   On or about October 9, 2001, Enron procured from JPMC an irrevocable transferable standby letter of credit in the amount of $150 million for the benefit of Mahonia (the "JPMC L/C"). The JPMC L/C supported Enron's guaranty of the Chase XII prepay. Enron procured the JPMC L/C pursuant to a Letter of Credit and Reimbursement Agreement dated May 14, 2001 among certain banks, JPMC and Citibank as co-administrative agents, and JPMC as paying and issuing bank (the "JPMC Reimbursement Agreement").

378B.   On or about October 5, 2001, Enron procured from Westdeutsche Landesbank Girozentrale, London Branch ("West LB London") an irrevocable transferable standby letter of credit in the amount of $165 million for the benefit of Mahonia (the "West LB Mahonia L/C"). The West LB Mahonia L/C, together with the JPMC L/C, supported Enron's guaranty of the Chase XII prepay. Enron procured the West LB Mahonia L/C pursuant to a Trade Finance and Reimbursement Agreement dated September 10, 2001 among certain banks and West LB London as issuing bank (the "West LB Mahonia Reimbursement Agreement").

378C.   Mahonia secured certain of its obligations to JPMC in connection with Chase XII by, among other things, granting JPMC a security interest in the JPMC L/C and West LB L/C.

378D.  In late November 2001, JPMC declared a default under the Chase XII prepay and drew down on the JPMC L/C.  The effect of JPMC's draw was to shift potential losses in connection with the Chase XII prepay to other banks that were parties to the JPMC Reimbursement Agreement.

378E.  On information and belief, on December 5, 2001, JPMC or Mahonia made demand on West LB London for the full amount of the West LB Mahonia L/C.  On information and belief, West LB London subsequently paid no less than $165 million to JPMC or Mahonia under the West LB Mahonia L/C.  This payment paid an amount allegedly due from Enron in connection with its guaranty of the Chase XII prepay.  On or about August 17, 2004, West LB London filed an amended proof of claim (the "West LB Claim") based on the West LB Mahonia Reimbursement Agreement for reimbursement of its payment in connection with the West LB Mahonia L/C.

### (3)    FAS 140 transactions.

#### (a)    Hawaii

379.    Although Chase was not a major participant in the FAS 140 transactions, it did take a $20 million participation interest in Hawaii, on which CIBC was the lead lender.  The Hawaii transactions are described in paragraphs 522 through 526 below.

380.    Chase knowingly facilitated the Insiders' manipulation of Enron's financial statements by participating in the Hawaii transactions.  Chase knew Enron was supporting the loan through a total return swap that provided the lenders with assurance of payment similar to an Enron guaranty.  Chase also knew that the Insiders would not account for the guaranty on Enron's financial statements, as GAAP required.  Despite that knowledge, Chase facilitated the transactions by participating in them.  Without Chase's participation, the Hawaii transactions would not have closed.

#### (b)    Fishtail

381.    In December 2000, Chase knowingly facilitated the Insiders' manipulation of Enron's financial statements by participating in the Fishtail transaction.  Fishtail, which began life as Grinch,

was a project to assist Enron in recording income and cash flow from operations from its pulp and paper business.

382.     The project originally called for Enron to create a joint venture structure (eventually, Fishtail) to which Enron would transfer its existing paper business.  However, Enron ended up transferring to Fishtail only the profits from Enron's existing and future trading contracts.  Fishtail had a maximum life of five years.  Therefore, Enron actually transferred to Fishtail only a five-year profit stream of the contracts, at most.  Enron valued that profit stream at $200 million.

383.     Chase had two roles in connection with the Fishtail structure.  Its first role was as equity participant in Annapurna, an SPE established to be the joint venture partner with Enron in Fishtail.  Annapurna was capitalized with $50 million equity.  Of that $50 million, LJM2 provided $8 million and Chase provided an unfunded commitment of the remaining $42 million, by way of a letter of credit.  Chase knew, however, that none of that $42 million was at risk.  It was 100% supported by Enron.  The structure was set up to allocate the first $200 million in losses solely to Enron.

384.     Chase knew the Insiders intended to account for the transaction in which Fishtail was to be used (Bacchus) as a FAS 140 transaction. Chase also knew that Fishtail had to be structured so as not to be consolidated with Enron.  For that to happen, 20% of Fishtail's capitalization had to come from Annapurna.  But Chase's portion of Annapurna was not at risk because the Insiders had agreed that Fishtail's first $200 million in losses would be allocated completely to Enron.

385.     Chase's second role in Fishtail was as valuation expert.  Enron's $200 million valuation of the five-year profit stream from Enron's trading contracts was dependent on, and supported only by, a valuation analysis Chase performed of Enron's Forest Products business on October 26, 2000, and revised on November 20, 2000.  Chase's valuation had three parts: (i) the

Garden State Paper Company, (ii) "soft assets," such as Enron credit support, risk management expertise, and management strength, and (iii) the pulp and paper trading business.

386.    Enron had acquired the Garden State Paper Company in August 2000 for $72 million; Chase therefore used $72 million in its valuation. Chase did not assign any specific number to Enron's soft assets. Chase assigned a value of $225 million to $300 million to the pulp and paper trading business. Only two months before, that business had been given a mark-to-market value of only $80 million. Less than a year later, in preparing an asset inventory in anticipation of bankruptcy, Enron estimated the total market value of the pulp and paper trading business at $50 million.

387.    Chase's $225 million to $300 million valuation of the pulp and paper trading business was without factual basis or support. Chase's October and November 2000 valuation of Enron's trading contracts was inconsistent with the mark-to-market value attributed to it in September 2000, inconsistent with the value given to it prior to bankruptcy, and inconsistent with its actual value. By all appearances, Chase chose the range $225 million to $300 million solely because the Insiders made known that they valued the trading business at $275 million.

388.    Chase's valuation gave the Insiders an ostensible basis for recognizing improperly a gain in the transfer of the trading contracts from Enron to Annapurna. Chase knew that the Insiders intended to so rely on the valuation Chase provided, knew that the valuation was without support, and yet provided it anyway, which allowed the Fishtail transaction to occur.

389.    Chase knowingly and improperly facilitated the Insiders' manipulation of Enron's financial statements through its valuation, as discussed above, and through its participation in Fishtail.

c.    **Barclays knowingly assisted the Insiders in misstating Enron's financial condition.**

390.    Barclays' participation in the Insiders' scheme was essential, in part because it started early.  By October 1998, Enron already owed Barclays over $1.5 billion.  Several high-ranking Barclays employees have admitted Barclays knew from early on that the Insiders were using multiple and varied financing structures to hide the true nature of Enron's financial condition.  *See* Exam. III, App. F at 9 (citing witness statements).  Barclays understood the Insiders' motives and the transactions' effect on Enron's financial statements.  Barclays Director John Meyer has admitted that no *outsider* could evaluate the effect the Insiders' structures had on Enron's financials.  Of course, as a participant in the scheme, Barclays could.  For example, by early 1999, Barclays knew that the Insiders' structured financings added $4.6 billion to Enron's reported debt for 1998 of $7.4 billion.  Barclays well understood that the additional debt, properly recorded, increased Enron's debt to total capitalization ratio from 41.9% to 63%.

391.    Barclays chose to remain deeply involved in the Insiders' scheme despite knowing exactly what the Insiders were doing.  Seven transactions with Barclays were particularly significant: J.T. Holdings, Nikita, Chewco, SO2, and three prepays.  The Enron Examiner found that all seven were reported improperly by the Insiders, that Barclays participated knowing the seven would be reported improperly, and that as a result of the transactions, a total amount of $410 million was improperly reported as "income" and $1 billion improperly reported as "cash flow from operations."  The Enron Examiner also concluded that $1.77 billion of debt was improperly kept off Enron's 1997-2001 financial statements because of these transactions.

(1)    **Barclays' relationship with Enron**.

392.    Barclays is one of the largest financial services groups in the UK.  Its involvement with Enron was extensive and lucrative.  It attained Tier 1 status in 1993, and kept it until Enron's

bankruptcy. By the late 1990s, Barclays was among Enron's top three banks. Enron, in turn, was Barclays' top oil and gas client worldwide from the late 1990s through 2000. From 1996 through 2001, Barclays led 33 financing transactions and participated in 16 more. Barclays also proposed or considered 27 others during that same time. In connection with the transactions Barclays completed, Barclays was paid over $40 million in fees – a figure that does not include interest Barclays earned on the money it loaned.

393.    Because of its close relationship with the Insiders, Barclays had better access to Enron's true financial information than many other banks, not to mention the rating agencies. Barclays examined Enron's creditworthiness every year based on information to which it was privy by virtue of that relationship. Its access was such that by the end of 1998, Barclays' senior management had already concluded that the increasing reliance on structured financings to handle Enron's off-balance sheet liabilities "was having a material impact on Enron's financial statements." Sworn Statement of John Meyer at 154-57 (quoted in Exam. III, App. F at 11).

### (2)    J.T. Holdings.

394.    Since at least the early 1990s, Barclays has known it is improper *not* to consolidate a synthetic lease structure unless the lessee-SPE that owns the assets is capitalized with 3% independent, at-risk equity. As a result, when the Insiders approached Barclays in the fall of 2000 about participating in an unconsolidated structure involving four distinct synthetic lease transactions, Barclays knew the assets to be leased had to be owned by an SPE capitalized with at least 3% independent, at-risk equity. Nevertheless, as a condition to its equity participation in the J.T. Holdings synthetic lease structure, Barclays told Glisan in November 2000 that Barclays would not participate unless Glisan would guarantee Barclays' equity interest would be returned. Barclays required the promise because it questioned the residual value of the assets underlying the transaction.

395.    On November 14, 2000, Barclays Director Richard Williams advised others at Barclays that he had received the necessary assurance:

> We have had a number of conversations with Enron about the transaction risks and have agreed to go forward on the basis of explicit verbal support from the company's Treasurer.  Specifically, Ben Glisan will commit to us that under all circumstances Enron will execute its purchase option at a price sufficient to repay in full the holders of the B Notes and Certificates.

(quoted in Exam. III, App. F at 23).  Glisan's assurance was exactly what Barclays needed.  On December 7, 2000, Barclays made its equity investment by purchasing $1.3 million of C Trust Certificates and contributing them to the SPE.

396.    Barclays participated in the J.T. Holdings transaction knowing that Glisan's verbal assurance of repayment meant that less than 3% of the equity would be at risk.  (Barclays' certificates were one part of the $3.3 million in trust certificates that made up the 3% equity component.)  Barclays knew, as a result, that the transaction would not be entitled to off-balance sheet accounting treatment.  Barclays also knew the Insiders would ignore that fact, and would treat the transactions as properly off-balance sheet.  Of course, Barclays was right.  The Insiders recorded the transactions off-balance sheet and, as a result, $106.2 million in debt was not properly reported on Enron's financial statements.

### (3)    Nikita.

397.    Nikita – a FAS 140 transaction – raised the same issue as J.T. Holdings.  Barclays knew that the trust structure in the transaction had to include at least 3% "at-risk" equity in order for it not to be consolidated on Enron's balance sheet.  Again, however, Barclays demanded and received verbal assurances from the Insiders that took the risk out of the equity investment and thereby invalidated the off-balance sheet accounting treatment.  Nikita represented $71.9 million of debt improperly kept off Enron's financial statements.

398.    The Insiders used Nikita to monetize Enron's ownership interests in EOTT Energy Partners, LP (the ownership interests are "EOTT Partnership Units").  The transaction contemplated a syndicate, led by Barclays, that would agree to make up to $235 million available through Besson Trust, an SPE.  Besson Trust purchased Enron's ownership interests in EOTT, in part by borrowing approximately $71.9 million from Barclays.  That loan was effectively guaranteed by ENA through a total return swap.  In turn, ENA's obligation under the total return swap was guaranteed by Enron.

399.    Until the day before the transaction closed in September 2001, Barclays' role also was to include purchasing an $8.1 million certificate held by CSFB (the other principal financier of the transaction) which was to constitute the 3% equity investment.  Again, however, because Barclays was concerned  about the value of the assets underlying the transaction, Barclays required the Insiders to verbally assure Enron's repayment to Barclays before Barclays would participate.

400.    Ultimately, regulatory reasons stopped Barclays from holding the certificate.  So, instead, CSFB contributed the equity piece.  However, CSFB only agreed to take Barclays' place because Barclays agreed to enter into a total return swap guaranteeing that *CSFB's* investment would be returned.  Barclays thereby became the *de facto* equity holder.  Of course Barclays took on CSFB's risk only because the Insiders had already guaranteed its own risk – Barclays' risk.  The Insiders' verbal assurances survived closing.

401.    Barclays participated in Nikita knowing that the Insiders' verbal assurance of repayment meant that 3% equity would not be at risk.  Barclays knew that as a result, Enron would not be entitled to off-balance sheet accounting treatment.  Barclays also knew that regardless, the Insiders would not include the transactions on Enron's financial statements.

402.    The verbal assurances Barclays demanded and received directly caused Enron's accounting treatment to fail.  Without those assurances, however, Barclays would not have entered into the total return swap with CSFB.  Without the total return swap, CSFB would not have held the

certificate.  And without true risk for the certificate holder, off-balance sheet treatment was inappropriate.

403.    For purposes of certain bankruptcy claims that arise from Nikita, the following facts are more specifically pled:  Nikita, LLC ("Nikita"), a wholly-owned subsidiary of Enron, contributed the EOTT Partnership Units to another Enron wholly-owned subsidiary, Timber I LLC ("Timber"), in exchange for a Class A Interest in Timber.

404.    Besson Trust, a special purpose entity set up by Enron, purchased the Class B Interest in Timber with financing obtained by issuing a certificate of beneficial interest to CSFB for approximately Eight million One Hundred Thousand Dollars ($8,100,000) and by borrowing approximately Seventy-One million Nine Hundred Thousand Dollars ($71,900,000) from Barclays (the "Barclays Loan").

405.    On or about September 28, 2001, Besson Trust entered into a Total Return Swap Agreement with ENA, which Enron guaranteed, and pursuant to which ENA was obligated to pay Besson Trust an amount equal to the amounts payable on the Barclays Loan in exchange for Besson Trust's agreement to pay ENA all amounts received by Besson Trust with respect to the Class B Interest.

406.    On or about November 6, 2001, ENA paid Two Hundred Forty-Eight Thousand Three Hundred Thirty-Three Dollars and Fifty Cents ($248,333.50) to Besson Trust in accordance with the terms of the Total Return Swap Agreement.

407.    Besson Trust paid Barclays Two Hundred Forty-Eight Thousand Three Hundred Thirty-Three Dollars and Fifty Cents ($248,333.50), the same amount that ENA paid to Besson Trust.

408.    Even though the agreement pursuant to which ENA made the payment to Besson Trust was called "Total Return Swap Agreement," in reality the agreement was not a swap

agreement but an instrument that would allow ENA to make payments of principal and interest on the Barclays Loan.

### (3)(a)   Avici.

408A.   Avici was a FAS 140 transaction that closed on or about December 11, 2000.  The Insiders used Avici to monetize shares in Avici Systems Inc. (the "Avici Shares") that Enron owned through various subsidiaries.  Sales of the Avici Shares were restricted until July 28, 2001, but the Insiders wanted to book the appreciated value of the Avici Shares before that time.

408B.   For Avici, the Insiders and Barclays created a complex FAS 140 structure.  The structure included JGB Trust, which purchased economic interests in two Enron entities that held the Avici Shares.  To pay for the economic interests in the two Enron entities, JGB Trust obtained financing through a Thirty-Four million Three Hundred Twenty-Nine Thousand Eight Hundred Eight Dollar ($34,329,808.00) loan from Barclays (the "Barclays Loan").  JGB Trust also obtained an equity contribution of One million Seventy Thousand One Hundred Ninety-Two Dollars ($1,070,192.00) from LJM2-Max, LLC ("LJM2-Max").

408C.   In connection with Avici, ENA entered into a so-called "total return swap" agreement with JGB Trust (the "Total Return Swap Agreement").  The Total Return Swap Agreement provided that ENA would pay JGB Trust the fixed amounts due under the Barclays Loan and JGB Trust would pay ENA any sums it received from the entities that held the Avici Shares.

408D.   Even though the agreement was called a "Total Return Swap Agreement," in reality the agreement was not a swap agreement but rather a means by which ENA made payments of interest and principal on the Barclays Loan.

408E.   Enron signed a guarantee of ENA's obligations under the Total Return Swap Agreement.

408F.   Avici was, in substance and effect, a loan of Thirty-Four million Three Hundred Twenty-Nine Thousand Eight Hundred Eight Dollars ($34,329,808.00) rather than a sale.  Under the Total Return Swap Agreement, ENA retained the benefits and costs of fluctuations in the value of the Avici Shares, and Barclays received fixed payments that were equivalent to principal and interest on the Barclays Loan.

408G.   At the time Avici closed, both the Insiders and Barclays knew that the Insiders' failure to record it as a loan would be misleading to Enron's creditors.  Because Enron retained the costs and benefits of owning the Avici Shares, and because LJM2-Max's equity contribution to the JGB Trust was not truly at risk or independent of Enron, the Avici transaction was not a proper sale of assets under FAS 140.

408H.   Less than a year after Avici closed, and after the market price of the Avici Shares had declined substantially, Enron and LJM2-Max agreed to unwind the transaction.  JGB Trust repaid the Barclays Loan in full on October 4, 2001.

408I.   For purposes of certain bankruptcy claims that arise from Avici, the following facts are pled more specifically:  Enron Broadband Investments Corp. ("EBIC"), a wholly-owned subsidiary of Enron, contributed the Avici Shares to the sponsor company, EBIC-Apache LLC ("EBIC-Apache"), a single member Delaware limited liability company owned by EBIC, which in turn contributed the Avici Shares to two limited liability companies, JJB-I Asset L.L.C. ("JJB-I") and JJB-II Asset L.L.C. ("JJB-II").  In exchange, EBIC-Apache received:  (a) Class A member interests in JJB-I and JJB-II, representing 100% of the voting power and .01% of the economic interests in those entities, and (b) preferred distributions of Nineteen million Four Hundred Thousand Dollars ($19,400,000.00) and Sixteen million Dollars ($16,000,000.00), the funds for which were provided by JGB Trust as set forth below.

408J.   On or about December 7, 2000, JGB Trust, a Delaware business trust, received Class B member interests in JJB-I and JJB-II, representing 99.99% of the economic interest in those entities.  JGB Trust received the Class B member interests from two other entities – MEB-I LLC and MEB-II LLC (together, "MEB") – that were wholly owned by EBIC-Apache.  In exchange, and using funds that it had received from the Barclays Loan and the LJM2-Max equity contribution, JGB Trust contributed Thirty-Five million Four Hundred Thousand Dollars ($35,400,000.00) to MEB, which MEB transferred to JJB-I and JJB-II, and which JJB-I and JJB-II then transferred to EBIC-Apache by way of the preferred distributions.

408K.   On or about December 7, 2000, ENA entered into the Total Return Swap Agreement with JGB Trust.  The Total Return Swap Agreement provided that JGB Trust would pay ENA any amounts it received from JJB-I or JJB-II.  It also provided that ENA would pay JGB Trust the amount of JGB Trust's debt to Barclays.  On or about the same date, Enron signed a guarantee that it would pay JGB Trust all of ENA's obligations under the Total Return Swap Agreement.

408L.   From approximately January 11, 2001 to approximately October 4, 2001, ENA paid JGB Trust sums equal to the interest on the Barclays Loan.  JGB Trust transferred equal amounts to Barclays.

408M.  On or about October 4, 2001, Avici was unwound.  EBIC-Apache, then known as EBS Ventures LLC ("EBS Ventures"), repurchased from JGB Trust the Class B member interests in JJB-I and JJB-II, which represented the economic interest in the Avici Shares, for Two million Ten Thousand Eight Hundred Thirty-Two Dollars ($2,010,832.00).

408N.  On or about October 4, 2001, ENA paid JGB Trust Thirty-Two million Three Hundred Eighty-Three Thousand Eight Hundred Thirty-One Dollars and Sixteen Cents ($32,383,831.16) based on the terms of the Total Return Swap Agreement.

408O.  On or about October 4, 2001, JGB Trust paid Barclays Thirty-Four million Three Hundred Ninety-Four Thousand Six Hundred Fifty-Four Dollars and Fifteen Cents ($34,394,654.15) as full and final payment of the Barclays Loan.  The payment was substantially equal to the amount JGB Trust obtained from the sale of the Class B member interests to EBS Ventures plus the amount ENA paid JGB Trust under the Total Return Swap Agreement.

### (4)     $SO_2$.

409.     With $SO_2$ the Insiders and Barclays intended to create a financing structure that had the economic characteristics of a loan, but nevertheless the proceeds of which could be recorded on Enron's financial statements as cash flow from operations.  The Insiders and Barclays worked on the structure for months – spring through October 2001.  The $SO_2$ transactions dealt with two purported sales of $SO_2$ emission credits ("Emission Credits") to a Barclays SPE, Colonnade.

409A.  Upon information and belief, prior to entering into the $SO_2$ transactions neither Barclays nor Colonnade had ever engaged in financial transactions involving $SO_2$ emission credits.

410.     The $SO_2$ transactions worked in much the same way as the prepays.  Like the prepays, they also required the participation of an independent third party.  In this case, the designated third party was Colonnade and Colonnade was formed specifically for that purpose.  In truth, Barclays controlled Colonnade, which was nothing but a shell entity that lacked both independence from Barclays and economic substance.  As such, Colonnade is an alter ego and/or effectively controlled by Barclays.

411.     When Barclays structured the $SO_2$ transactions, it knew – because the Insiders had told it – about the "smell test" Arthur Andersen would use to evaluate the independence of a third party from Barclays.  Barclays therefore "seasoned" Colonnade by pushing two short-dated commodity trades through it.  As a factual matter, however, Colonnade still failed the "smell test."

For example, Colonnade had not been in existence for a number of years and it did not have a legitimate history of multiple transactions.

412.    Barclays knew the proceeds of the transactions could not properly be accounted for off-balance sheet.  Barclays also knew the Insiders intended to book the cash flow Enron received in the improperly recorded transactions as cash flow from operating activities.  Moreover, Barclays' own accountants told it several times that they could not understand how the Insiders would get Enron's auditors to permit off-balance sheet treatment for the structure.  Finally, as Barclays' documents show, Barclays was concerned that the structure of the transaction was inconsistent with the "values of Barclay [sic] bank."  BRC 000127900 (quoted in Exam. III, App. F at 41).  Barclays facilitated the transactions anyway.

413.    For purposes of certain bankruptcy claims that arise from $SO_2$, the following facts are more specifically pled.

### (a)    The September transaction

414.    Specifically, with respect to the first purported sale of $SO_2$ Emission Credits, on or about September 28, 2001, Barclays and Colonnade entered into a Committed Money Market Facility pursuant to which Barclays loaned Colonnade One Hundred Thirty-Eight million Four Hundred Seventy-Five Thousand Eight Hundred Twenty-Nine Dollars and Fifty Cents ($138,475,829.50).

415.    On or about September 28, 2001, ENA transferred 757,975 Emission Credits of various vintage years to Colonnade for One Hundred Thirty-Eight million Four Hundred Seventy-Five Thousand Eight Hundred Twenty-Nine Dollars and Fifty Cents ($138,475,829.50) (the "September Transaction"), the exact amount that Colonnade obtained from Barclays.  Colonnade pledged its interest in the Emission Credits and its rights under the September Option Agreement

(as defined below) to Barclays as security for the repayment of funds Colonnade had borrowed from Barclays under the Committed Money Market Facility.

416.    During the same time period, Herzeleide LLC ("Herzeleide"), a wholly-owned subsidiary of Enron, was created for the sole purpose of being a party to certain option agreements with Colonnade in the context of the $SO_2$ transactions.  Herzeleide is the alter ego of Enron and its affiliates.

417.    On or about September 24, 2001, Herzeleide entered into an Option Agreement (the "September Option Agreement") governing the various put and call arrangements with Colonnade. These arrangements gave Herzeleide a call option to purchase from Colonnade the exact same amount and vintage years of Emission Credits as those purchased from ENA in the September Transaction.  In addition, these arrangements gave Colonnade a put right to require Herzeleide to purchase the exact same amount and vintage years of the Emission Credits that ENA sold to Colonnade.

417A.  On or about September 24, 2001, Colonnade paid Herzeleide Five Hundred Dollars ($500.00) to purchase the put right under the September Option Agreement.

418.    Herzeleide acquired the call rights in exchange for a payment of Four Hundred Twenty-Six Thousand Six Hundred Fifty-Nine Dollars and Thirty-Seven Cents ($426,659.37) to Colonnade (the "Herzeleide September Payment") – which was in effect a partial prepayment of interest on the money that Colonnade borrowed from Barclays for the September Transaction.

419.    Upon information and belief, the Herzeleide September Payment was in fact made by Enron or ENA to Colonnade.  Enron's records show that Enron or ENA made a payment to Colonnade equal to the amount that Herzeleide supposedly paid Colonnade as a premium for the call option arrangement under the September Option Agreement.

420.     Upon information and belief, the Herzeleide September Payment was subsequently transferred to Barclays.

421.     As part of the September Transaction, ENA and Barclays then entered into what purported to be a swap confirmation under an existing ISDA Master Agreement (the "September Swap").  Enron provided a limited guarantee of ENA's obligation under the September Swap.  In the September Swap, ENA agreed to pay Barclays, at the end of the term, the amount by which the price of the Emission Credits had declined from the price at which Colonnade had purchased the Emission Credits from ENA, and Barclays agreed to pay ENA the amount by which the price of the Emission Credits had increased from the price at which Colonnade had purchased the Emission credits from ENA.  The price and vintage year of the Emission Credits referenced in the September Swap were identical to the price and vintage year of the Emission Credits ENA sold to Colonnade in the September Transaction.

422.     On or about September 28, 2001, Barclays and Colonnade entered into what purported to be a swap agreement whereby Barclays agreed to pay Colonnade the amount by which the price of the Emission Credits had declined below the price at which Colonnade had purchased the Emission Credits from ENA.  Conversely, Colonnade agreed to pay Barclays the amount by which the price of the Emission Credits had increased above the price at which Colonnade had purchased the Emission Credits from ENA.

423.     The agreements referenced above had the net effect of eliminating the price risk of the Emission Credits from the put and call option arrangements under the September Option Agreement.

424.     The agreements and the derivative transactions described above had the economic effect of providing ENA with financing from Barclays equal to the purchase price that Colonnade paid for the Emission Credits.  Thus, while the September Transaction ostensibly involved a sale

of Emission Credits, in economic substance the September Transaction was a loan that Barclays sought to secure, in part, by Emission Credits and Colonnade's rights under the September Option Agreement.

424A.   The September Transaction was structured so that ENA or Enron, pursuant to the call option granted to Herzeleide, could repay the loan from Barclays by causing Herzeleide to "buy" the Emission Credits from Colonnade at market price.  The effect of entering into the September Swap was that, if the market price had increased since the time of the "sale" (and, therefore, ENA paid back more than it initially borrowed), Barclays would return the difference to ENA, and if the market price had decreased since the time of the "sale" (and, therefore, Enron paid back less than it initially borrowed), ENA would pay the shortfall to Barclays under the September Swap.

425.   On or about October 30, 2001, ENA and Barclays entered into a Termination Agreement, terminating the September Swap.  The Termination Agreement provided for a termination fee to be paid to Barclays.

426.   In accordance with the provisions of the Termination Agreement, on or about October 30, 2001, ENA paid Barclays Ten million One Hundred Three Thousand Two Hundred Ninety-Four Dollars ($10,103,294) as a termination fee (the "Termination Fee").

### (b)     The October transaction

427.   On or about October 30, 2001, ENA purportedly "sold" Colonnade 166,607 Emission Credits for approximately Twenty-Nine million One Hundred Eight Thousand Six Hundred Thirty-Eight Dollars and Eighty-Five Cents  ($29,108,638.85) (the "October Transaction").

428.   Upon information and belief, at some time after the Petition Date, Colonnade transferred the Emission Credits to a Barclays subsidiary, Barclays Metals.

429.     On or about October 30, 2001, Barclays entered into a Committed Money Facility with Colonnade for One Hundred Seventy million Dollars ($170,000,000).  Colonnade used part of these funds to pay ENA for 166,607 Emission Credits of various vintage in the October Transaction.

430.     At the same time, Colonnade entered into a Call Option Agreement with Herzeleide and into a put option agreement with Grampian LLC ("Grampian"), another Enron wholly-owned subsidiary (the "Put Option Agreement").

431.     Grampian was created for the sole purpose of being a party to certain option agreements with Colonnade in connection with the $SO_2$ transactions.  Grampian is the alter ego of Enron.

432.     The put and call agreements that Herzeleide and Grampian entered into functioned in substantially the same way as did the put and call arrangements in the September Transaction. Similarly, Enron provided a limited guarantee of Herzeleide's and Grampian's obligations under the put and call agreements governing the October Transaction.

432A.  On or about October 30, 2001, Colonnade paid Grampian Three Hundred Dollars ($300.00) to purchase the put right under the Put Option Agreement between Colonnade and Grampian.

433.     On or about October 30, 2001, Herzeleide acquired call rights from Colonnade, for the same amount and vintage year as the Emission Credits transferred in the September and October Transactions, in exchange for the aggregate amount of Three million Three Hundred Five Thousand Four Hundred Sixteen Dollars and Two Cents ($3,305,416.02) (the "Herzeleide October Payment").

434.     Upon information and belief, the Herzeleide October Payment was in fact made by Enron or ENA to Colonnade.  Enron's records show that Enron or ENA made a payment to Colonnade equal to the amount that Herzeleide supposedly paid Colonnade as a premium for the call rights in the September and October Transactions.

435. Upon information and belief, the Herzeleide October Payment was subsequently transferred to Barclays.

436. The Herzeleide October Payment, which was paid by Enron or ENA, was in effect a prepayment of interest on the loans that Barclays made to Colonnade to obtain the Emission Credits that ENA purportedly "sold" to Colonnade.

437. Barclays and ENA entered in new swap confirmations, under the existing ISDA Master Agreement, similar to those in the September Transaction.

438. In addition, Barclays and Enron entered into a Charge on Cash Agreement (the "Charge on Cash Agreement"), on or about October 30, 2001, which required Enron to deposit Fifty-Nine million Five Hundred Thousand Dollars ($59,500,000) with Barclays (the "Barclays Deposit") as security for all obligations owing by Enron and its subsidiaries to Barclays and any other entity in which Barclays had an interest.

439. Pursuant to the terms of the Charge on Cash Agreement, Enron deposited the Barclays Deposit with Barclays on or about October 30, 2001.

439A. Upon information and belief, the Barclays Deposit accrued interest in the amount of $263,077.05.

440. Barclays applied the Barclays Deposit and the accrued interest as follows:

(a)     Forty-Five million Six Hundred Two Thousand Two Hundred Ninety-Five Dollars ($45,602,295) was applied against the early termination amount allegedly owed by ENA to Barclays as a result of the early termination of the entire Barclays/ENA swap book;

(b)     Ten million One Hundred Sixty-Three Thousand Ninety-Two Dollars and Twenty-Three Cents ($10,163,092.23) was applied to ENA's alleged obligations to the Besson Trust (relating to the Nikita transaction);

-144-

(c)     Three million Four Hundred Fifty-Nine Thousand Eight Hundred Forty-Four Dollars ($3,459,844) was applied to Enron's alleged obligation as guarantor of the Richmond Power Enterprise, L.P., a Delaware limited partnership;

(d)     Two Hundred Twenty-Two Thousand Fifteen Dollars ($222,015) was applied to alleged and unspecified obligations of Enron Credit Limited; and

(e)     Three Hundred Fifteen Thousand Three Hundred Thirty-Seven Dollars ($315,337) was applied to alleged and unspecified obligations of Enron.

441.    As with the September Transaction, the October Transaction provided ENA with financing from Barclays, which the parties attempted to secure by the Emission Credits purportedly sold to Colonnade and the rights under the call and put agreements.

442.    In accordance with the 1994 ISDA Credit Support Annex dated January 13, 1994 between ENA and Barclays, ENA deposited cash on or about September 28, 2001, in an ENA account at Barclays ("Deposited Funds").  The balance of the account as of December 1, 2001 was $27,132,999.00, and the interest accrued thereon by December 31, 2001 was $32,494.

442A.  On or about December 3, 2001 – the day following the Petition Date – Barclays notified ENA that Barclays was: (a) terminating all transactions governed by the ISDA Master Agreement because ENA had filed a chapter 11 petition, and (b) designating December 4, 2001 as the Early Termination Date for the outstanding transactions under the ISDA Master Agreement.

443.    On or about December 31, 2001, Barclays sent a letter entitled "Statement of Payment on Early Termination."  The letter stated that Barclays had calculated the amount ENA owed Barclays, with respect to certain transactions governed by the 1992 ISDA Master Agreement and the 1994 ISDA Credit Support Annex, to be $72,617,084 plus $150,704 in interest for a total of $72,767,788.  The letter also stated that, after Barclays had applied the Deposited Funds plus accumulated interest, ENA owed Barclays $45,602,295.

443A.   In six separate transactions between December 20, 2001 and February 23, 2002, Colonnade transferred all the Emission Credits it held as a result of the September and October Transactions to Barclays Metals.

443B.   In the period between February 25, 2002 and January 16, 2003, Barclays Metals sold all of the Emission Credits it received from Colonnade to third parties with the exception of 59,058 Emission Credits.

443C.   On or about November 13, 2003, Barclays Metals transferred to Barclays the 59,058 Emission Credits associated with the September and October Transactions.

443D.   Barclays sold to third parties 29,958 of the Emission Credits it received from Barclays Metals in two transactions (the first on or about November 13, 2003 and the second on or about June 15, 2004).  Barclays Bank stills holds 30,000 of the Emission Credits it obtained as a result of the September and October Transactions.

### (c)    Economic reality and allocation of risk in the $SO_2$ transactions

444.    One or more of the various individual transactions that comprised the $SO_2$ transactions might appear in isolation to be normal trading activity on market terms.  When the transactions are viewed in the aggregate, however, the totality of the facts and circumstances make clear that in economic substance, the $SO_2$ transactions constituted a $167,600,000 loan from Barclays to Enron and/or ENA.

445.    Each of the various individual transactions was based upon the same amount and vintage years of the Emission Credits ENA purportedly "sold" to Colonnade.

446.    Each of the various individual transactions related to the September Transaction was entered into contemporaneously with the purported "sale" transaction between ENA and Colonnade in September of 2001.

447.    Each of the various individual transactions related to the October Transaction was entered into contemporaneously with the purported "sale" transaction between ENA and Colonnade in October of 2001.

448.    There is no commercially reasonable explanation for one or more of the various individual transactions unless they are viewed as part of the larger transactions in September and October of 2001.

449.    Enron and ENA never relinquished the benefits or burdens of ownership of the Emission Credits.

450.    In economic substance the Emission Credits were treated as collateral for a loan transaction. From their inception, the swaps and options placed the parties in the same position with respect to the Emission Credits as they would have been in a secured loan transaction. That is, Barclays was obligated to pay Enron the surplus value of the collateral and Enron was obligated to satisfy the deficiency balance should the value of the collateral prove to be less than the loan balance.

451.    At all relevant times, the economic risks undertaken by the parties were consistent with those of a loan transaction, not of a sale transaction.

> **(d)    Barclays' improper appropriation of Plaintiff's funds for sums not due**

451A.    By letter dated December 31, 2001, Barclays notified ENA that Barclays was terminating all transactions governed by the ISDA Master Agreement.

451B.    By letter dated December 31, 2001, Barclays informed ENA that, according to Barclays' calculations, ENA owed Barclays a termination payment of $72,617,084 plus $150,704 in interest for a total of $72,767,788. The letter also stated that, after Barclays had applied the Deposited Funds plus accumulated interest, ENA owed Barclays $45,602,295.

451C.  In actuality, even assuming that all of the agreements Barclays relied on for its calculation were valid and enforceable, ENA owed Barclays no more than $24,308,153.

451D.  On or soon after December 31, 2001, Barclays improperly appropriated $72,767,788 in collateral that Plaintiff had posted in connection with the Charge on Cash and ISDA Master Agreements (the "Barclays Improper Appropriation").

451E.  For the foregoing reasons, even assuming that the agreements Barclays relied on for its calculation were valid and enforceable, the amount Barclays appropriated was greater than the sum ENA owed Barclays by at least $48,459,635 (the "Excess Appropriation Amount").

### (5)    Chewco.

452.    Barclays worked closely with Enron to structure the Chewco transaction.  As described in earlier paragraphs, the Insiders formed Chewco in order to acquire CalPERs' interest in JEDI, when CalPERs decided to sell its interest.  Barclays played a role in financing JEDI originally and, in November 1997, joined with JP Morgan Chase to finance Chewco's indirect acquisition of half of CalPERs' interest.  At the time, Barclays clearly understood that JEDI's only purpose was to maintain off-balance sheet treatment for certain assets.  In fact, Barclays itself described off-balance sheet treatment as JEDI's "raison d'etre."   BRC 00001931 (quoted in Exam. III, App. F at 43).

453.    Barclays' role was to structure (and finance) Chewco's equity investment.  The original concept was that Enron would guarantee Barclays' "quasi-equity" investment in Chewco by providing Barclays with an annual advisory fee that would – not coincidentally – equal the amount of the equity Barclays put "at risk."   Of course, such a fee would very visibly have eliminated Barclays' risk altogether.  For "accounting reasons," therefore, the parties deemed the advisory fee concept unworkable.  Barclays and the Insiders replaced it with "reserve accounts."  As structured, these "reserve accounts" were accounts that Enron funded at the transaction's closing

that effectively provided Barclays with cash collateral covering 60% of its investment in Chewco from day one. Barclays' employees confirmed that the accounts secured repayment of its equity investment. *See* Exam. III, App. F at 48.

454.    Because most of the equity investment in Chewco was guaranteed, 3% equity was not at risk and JEDI was not properly treated as an off-balance sheet entity. Eventually, Enron (as opposed to the Insiders) learned that Barclays had insufficient equity at risk in Chewco. As a result, on November 19, 2001, Enron restated its financials back to 1997, when Chewco and JEDI should first have been consolidated with Enron.

### (6)    Prepays.

455.    Barclays understood the economic substance and effect of the Enron prepay transactions. Nevertheless, it participated in at least three: Roosevelt (a $500 million crude oil and natural gas commodity swap), Nixon (a $324 million crude oil advance), and the September 2001 Prepaid Oil Swap (a $150 million crude oil commodity swap with Enron and CSFB). The Insiders used these prepays to keep $760 million of debt off Enron's financial statements.

456.    Barclays had a detailed understanding of these prepays' "essentially circular" nature, which eliminated all price risk in the transactions. Barclays' credit officer in charge of the Enron relationship understood that notwithstanding their name, the essence of the Enron prepay transactions had nothing to do with deferred revenue. In June 1999, he explained that although Enron was "notionally" agreeing to deliver commodities in satisfaction of a current obligation, "in actual fact they are only borrowing money." BRC 000106893-895 (quoted in Exam. III at 72). In other words, Barclays understood that the prepay transactions in which it participated were intended to disguise loans as cash flow.

457.    By 2000, Barclays also knew that the Insiders were improperly booking the "loan" money as cash flow from operating activities, not cash flow from financing. The Enron Examiner

found that Barclays also knew that the impact of the prepays could not be determined from Enron's published financial statements – in fact, their impact could not truly be understood without access to Enron's management.

458.    For purposes of certain bankruptcy claims that arise from Nixon and the September 2001 Prepaid Oil Swap, the following facts are plead more specifically:

**(a)    Nixon Prepay**

459.    The Nixon transaction was a set of three interrelated prepays involving Citigroup, Barclays and Royal Bank of Scotland.  Toronto Dominion served as the swap counterparty for all three lenders.

460.    On or about December 14, 1999, Barclays advanced ENA one hundred and ten million ($110,000,000.00) dollars pursuant to a Stand-Alone Swap Agreement between Barclays and ENA, and ENA agreed to pay Barclays an amount based on the price of crude oil on the settlement date.

461.    The initial settlement date was March 15, 2000 but the prepay was extended to April 14, 2000.

462.    Toronto Dominion had entered into a swap agreement with ENA and in effect Toronto Dominion served as a conduit through which ENA funneled the funds back to Barclays and the other participating banks.

463.    On or about December 14, 1999, Barclays entered into a swap confirmation with Toronto Dominion, according to which Barclays agreed to pay the same price of crude oil to Toronto Dominion in exchange for a fixed payment equal to the prepayment amount plus an amount that functioned as interest.

464.    The Nixon prepay allowed Enron to book three hundred and twenty four million dollars ($324,000,000.00), of which one-third of the amount financed was provided by Barclays, as cash flow from operating activities instead of cash flow from financing activities.

465.    Barclays earned four hundred and sixty-sis thousand dollars ($466,000.00) for its participation in the Nixon prepay.

### (b)    The September 2001 Prepaid Oil Swap

466.    On or about December 19, 2000, CSFB entered into a prepay transaction with ENA and Morgan Stanley.  The transaction involved a swap agreement between CSFB and ENA, a swap agreement between CSFB and Morgan Stanley, and another swap between ENA and Morgan Stanley.

467.    On or about September 27, 2001, the original swaps were amended, restated and refinanced to October 2002.

468.    On or about September 27, 2001, Barclays replaced Morgan Stanley in this transaction and Barclays became the swap counterparty.

469.    On or about September 27, 2001, ENA paid one million three hundred seventy two thousand and five hundred fifty four dollars and twenty six cents ($1,372,554.26) to Barclays pursuant to a swap confirmation between Barclays and ENA.

470.    On or about the same date, Barclays proceeded to pay CSFB pursuant to the swap confirmation between Barclays and CSFB.

471.    Upon information and belief, on or about September 27, 2001, ENA or Enron paid Barclays a fee for its role as a swap counterparty in the amount of three hundred and ninety thousand ($390,000.00) dollars.

472.    As the swaps netted out, and with the help of Barclays, commodity risk was eliminated and the September 2001 Prepaid Oil Swap operated as a loan between CSFB and ENA.

ENA accounted for the funds it received as cash flow from operating activities rather than as cash flow from financing activities.

           **d.**      **BT/Deutsche Bank knowingly assisted the Insiders in misstating Enron's financial condition**.

      473.    BT/Deutsche Bank's involvement in the Insiders' manipulation of Enron's financial condition was also necessary to the Insiders' scheme.  BT/Deutsche Bank knew the Insiders were using SPE transactions improperly to inflate income on Enron's financial statements and to remove debt.  From at least 1997, BT/Deutsche Bank helped the Insiders achieve their improper goals by designing, financing, and/or implementing several important tax transactions.  Together, these transactions allowed the Insiders improperly to record more than $400 million in income on Enron's financial statements.

      474.    The Enron Examiner reviewed the BT/Deutsche Bank tax transactions discussed here:  Steele, Cochise, Teresa, Tomas, Renegade, and Valhalla.  The Enron Examiner concluded that Steele, Cochise, Teresa, and Tomas were "for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron," that BT/Deutsche Bank knew these transactions had no purpose except to enable the Insiders to incorrectly report income for accounting purposes, and that BT/Deutsche Bank substantially assisted the Insiders' fraud because it "developed [Steele, Cochise, Teresa, and Tomas's] basic tax and accounting structures . . . promoted them to Enron, and participated in the transactions, often as the only party other than Enron affiliates."  Exam. III, App. G at 72-73.

           **(1)**      **BT/Deutsche Bank's relationship with Enron**.

      475.    When Deutsche Bank AG acquired Bankers Trust Corporation ("Bankers Trust") in June 1999, Deutsche Bank AG and Bankers Trust each enjoyed a longstanding relationship with Enron.  By that time, both were Tier 1 banks.  The combined institution was a Tier 1 bank, as well.

All three (Deutsche Bank AG, Bankers Trust, and BT/Deutsche Bank) proposed and engaged in a wide variety of transactions with Enron, worldwide.  One was BT/Deutsche Bank's $10 million investment in LJM2 in December 1999, which was made at Fastow's invitation.  BT/Deutsche Bank also placed a designee on the LJM2 Advisory Committee.  The six tax transactions discussed below became one of BT/Deutsche Bank's most important areas of involvement with Enron.  In a November 29, 2000 internal e-mail, BT/Deutsche Bank described part of Enron's importance to the bank:  "By having this unique access to a very innovative client, we have been able to develop products that we are aggressively marketing to other clients."   DBG 079773-774 (quoted in Exam. III, App. G at 11).  From 1997 through 2001, BT/Deutsche Bank received $72 million in fees from transactions with Enron.

**(2)     The tax transactions**.

476.    In 1997, Enron Insider Maxey formed a Corporate Tax Planning Group within Enron's corporate tax department.  Thereafter, the tax transactions became one of BT/Deutsche Bank's most important areas of involvement with Enron.  Periodically, BT/Deutsche Bank met with Maxey's group to consider structures BT/Deutsche Bank developed that would satisfy Enron's goals.  Among these structures were the highly complex Projects Teresa, Steele, Cochise, and Tomas.  These tax transactions were designed, developed and promoted to Enron by BT/Deutsche Bank, which acted as Enron's exclusive advisor and retained and worked in combination with Arthur Andersen to manipulate the potential accounting effects of these deals.

477.    Because Enron had huge amounts of net operating losses available to it prior to entering into any of the tax transactions, they were not designed to save current or near-term future taxes.  Indeed, the tax transactions had nothing to do with "normal tax savings techniques" and went well beyond "typical corporate 'tax shelter' transactions."  Exam II, App. J at 1.  Rather, these were a "new genre" of transactions designed to "generate" accounting income from projected future tax

savings.  *Id.*  Basically, BT/Deutsche Bank structured transactions that generated current financial accounting income for Enron – including large amounts of pre-tax income – by creating questionable future tax deductions.  Enron would quantify the speculative future tax benefit as a deferred tax credit, which Enron would take into accounting income over the lifetime of the credit.  But as structured by BT/Deutsche Bank, the tax transactions created artificially short lives for the deferred tax credits.  This allowed Enron to include large amounts of accounting income on its statements over just a few years even though the deferred tax asset involved might reflect a projected tax deduction often years or even decades in the future.  The Insiders also failed to set up a reserve in case the speculative tax benefit was never realized.

478.    In exchange for designing and assisting the Insiders in implementing these tax transactions, BT/Deutsche Bank received over $43 million in fees from Enron.  William Boyle, a Bankers Trust vice president, justified BT/Deutsche Bank's huge fees in part by reference to the significant amount of accounting income the tax transactions generated.  AB000187757-77.  Robert J. Hermann, who headed Enron's corporate tax department, provided an illuminating metaphor:  to Enron, the tax transactions were "kind of like cocaine – they got kind of hooked on it."  Exam. II at 87 n.169.  BT/Deutsche Bank also was an investor in three of the transactions – Teresa, Steele, and Cochise.

(a)    Steele

479.    Steele was the first of two REMIC carryover basis transactions (the "REMIC transactions") that BT/Deutsche Bank brought Enron.  The two – Steele and Cochise, both of which BT/Deutsche Bank designed – gave the Insiders' a new roadmap for egregious manipulation of Enron's financial statements.  The REMIC transactions' principal effect was to improperly create pre-tax income on Enron's financial statements.  Between 1997 and 2001, Enron's consolidated

financial statements improperly reported $144 million of pre-tax income from the Steele and Cochise transactions.

480.    BT/Deutsche Bank developed Steele and promoted it to Maxey in June 1997.  The transaction was designed to create $121.8 million of pre-tax financial statement income for Enron. As Enron's exclusive financial advisor in the transaction, BT/Deutsche Bank's contract called for a fee of $10 million.  BT/Deutsche Bank engaged Arthur Andersen to assist in manipulating the accounting aspects of the transaction.  BT/Deutsche also invested in the SPE formed to implement the Steele tax transaction (receiving partnership equity), contributed the REMIC assets to the SPE, and brokered the corporate bond portfolio acquired by the SPE and used by the Insiders to improperly shorten the period of time over which the deferred credits were amortized.

481.    The stated (as opposed to designed) purpose of Steele was to acquire and manage a portfolio of financial assets with an enhanced earnings profile.  But the low-yielding nature of the facilitating assets in the transaction (a portfolio of corporate bonds), as well as Enron's representation that it would not have closed Steele but for its accounting benefits, make clear that this purpose was a sham.

482.    Maxey and BT/Deutsche Bank understood exactly how and why Steele was constructed.  They knew – because they developed and promoted it – that the transaction was meant to improperly generate financial accounting benefits by  amortizing a large portion of the deferred tax credit associated with the acquisition of the REMIC Residual Interests into pre-tax accounting income over the life of five-year corporate bonds.  The amortization of the associated tax benefit into pre-tax income, combined with the artificially short period of time over which that amortization was conducted, made the transaction particularly aggressive and misleading.  As Maxey testified, the low-yield corporate bonds were acquired simply to provide an artificially short useful life of five

years over which to amortize the credit. Exam. III, App. G at 30. Amortizing this tax benefit generated $121.8 million of "operating income."

483.     Enron's accounting treatment of the Steele transaction was misleading and did not comply with GAAP. Among other things, the amortization of the deferred credit into pre-tax income and the selection of the five-year period of the corporate bonds over which to amortize the deferred credit did not comply with GAAP. BT/Deutsche Bank understood this accounting treatment was aggressive. In fact, on September 10, 1997, Peggy Capomaggi, a Bankers Trust employee, expressed doubts in an internal e-mail that Enron's acquisition of assets from the bank properly constituted a "business combination" – a necessary requirement of a legitimate tax transaction. Exam. III, App. G at 34.

484.     Both the Insiders and BT/Deutsche Bank knew that the accounting literature required that the amortization period be chosen through a rational, systematic method. They also knew that the deferred tax assets could only be attributed to REMIC Residual Interests with an estimated life of 27 years. Still, the Insiders had Enron amortize the deferred credit over *five* years. As all involved knew, the five-year period related to the life of the corporate bonds, not the REMIC Residual Interests.

### (b)     Cochise

485.     A common approach BT/Deutsche Bank used for tax transactions – vitally clear in Cochise – was to make a series of transactions look like, and claim that they functioned like, transactions discussed in accounting literature, when actually they did not. For example, BT/Deutsche Bank would find in the accounting literature a conclusion that a particular historical transaction had to be reported in a particular manner in order to fairly present the entity's financial position. BT/Deutsche Bank would then concoct a series of transactions mirroring those in the literature, carefully weave them together, and then claim the accounting rules "required" its

customer to report the transaction as the literature dictated. The problem with BT/Deutsche Bank's approach, however, was that the transactions BT/Deutsche Bank concocted would not otherwise have occurred. And that difference turned the accounting rules on their head. Instead of following rules to report a historical transaction in a manner that fairly presented the transaction, BT/Deutsche Bank avoided fairly presenting the transaction by applying "rules" to a structured transaction that had no substance.

486.    On June 15, 1998 and July 27, 1998, BT/Deutsche Bank promoted Cochise (a variation on Steele) to the Insiders as another scheme to generate accelerated pre-tax accounting income. More specifically, the purpose of Cochise was to generate for Enron $75 million in pre-tax accounting income and $79 million in accounting earnings from the future benefit of future tax deductions. At best, however, the benefits were questionable and the tax deductions speculative. BT/Deutsche Bank not only designed and promoted the Cochise tax transaction, it invested in the SPE formed to implement the transaction (receiving REIT equity), brokered the sale of the assets used to improperly shorten the amortization period (in this case, two airplanes), and it financed the transaction. As Enron's exclusive financial advisor in Cochise, BT/Deutsche Bank's fee was to be $15 million (although it wound up being $11.25 million). Once again, Cochise was constructed so as to allow BT/Deutsche Bank to sell or monetize its REMIC Residual Interests while generating pre-tax financial accounting income that the Insiders wanted.

487.    While Steele's Facilitating Assets were corporate bonds, Cochise's were interests in two airplanes purchased from a BT/Deutsche Bank affiliate (the "Cochise Airplanes"). The Cochise Airplanes were not purchased for their investment potential – in fact, after its bankruptcy, Enron sold them for $40 million less than their 1999 purchase price. Instead, Maxey testified that they were purchased in order for the transactions to be treated as a business combination, and to obtain an asset whose financial accounting basis could be reduced to zero. As Maxey explained, the basis

reduction was needed to offset the deferred tax asset that acquisition of the REMIC Residual Interests generated.

488.     BT/Deutsche Bank knew Cochise was intended solely to improperly generate financial accounting benefits for Enron.  BT/Deutsche Bank also understood that Maxey's tax group planned to recognize a gain on the sale equal to the full fair value of the Cochise Airplanes and amortize the remaining deferred credit into pre-tax income over a five-year period.  Amortizing the credit over five years was not appropriate, since the deferred tax assets were attributable solely to REMIC Residual Interests with a much longer life.

489.     Enron's accounting treatment for Cochise was misleading and did not comply with GAAP because, among other things, there is no basis for amortizing the deferred credit into pre-tax income or amortizing the deferred credit over an artificially selected five-year period.

### (c)     Teresa

490.     Teresa was actually the first tax transaction BT/Deutsche Bank presented and sold to Enron.  BT/Deutsche Bank developed the Teresa transaction and, in May 1996, marketed it to Enron as a method of generating financial accounting income.  Like the REMIC Transactions, Teresa was *not* designed to give Enron present value tax savings, and Bankers Trust Managing Director Thomas Finley has so testified and acknowledged in internal memoranda and presentations to Enron.  In fact, to create accounting statement income, Teresa actually generated tax *liability* of $131 million for Enron (in 1997 through 2000) that Enron would not otherwise have had.

491.     Along with the REMIC Transactions, the Enron Examiner characterized the tax basis step-up transactions, including Teresa, as among the "most egregious" in their manipulation of financial accounting rules.  Teresa engineered a $1.3 billion tax basis step-up for the Enron corporate headquarters building, quantified that increase as a future tax benefit, and recorded that quantified benefit as current accounting income over an artificially short period of time.  The

Insiders intended to accomplish the basis step-up by passing Enron's interest in the corporate headquarters building to a partnership, and later distributing the property to an Enron affiliate that had achieved an increased basis in its partnership interest. Maxey expected the increased tax basis in the partnership interest eventually to be reflected as an increase in the basis of the corporate headquarters building, and expected that it would result in increased depreciation deductions over a period of 39.5 years. Enron recorded, at the outset, deferred tax assets to reflect these potential future tax benefits, assuming that the building was actually distributed back to Enron in the future. Maxey also testified that recording the deferred tax assets reduced current tax expense and thereby increased current reported after-tax earnings.

492.    BT/Deutsche designed the Teresa transaction and promoted it to the Insiders. BT/Deutsche also facilitated the transaction by causing its affiliate to acquire preferred stock in the SPE formed to enable the deal. BT/Deutsche also retained and worked with Arthur Andersen in manipulating the accounting benefits from the Teresa transaction. In its internal discussions, BT/Deutsche Bank estimated that Teresa would provide $240 million of after-tax income. As Enron's exclusive financial advisor with respect to Teresa, BT/Deutsche Bank was initially promised a fee of up to $8 million. However, the fee was later reduced to $6.625 million after the Insiders agreed to participate in another tax transaction (Project Renegade) for BT/Deutsche Bank's benefit. Project Renegade is discussed below.

493.    The accounting treatment for which Teresa was created did not accord with GAAP. For one thing, Enron's ability to realize the future tax benefits it recorded was far from assured. Also, recording Teresa's tax benefits when they were recorded was premature, since those benefits would not actually arise until the basis step-up was reflected in the basis of Enron's corporate headquarters. Even had it not been premature to record the benefits, Enron should have established a valuation allowance or tax cushion.

494.    Through its familiarity with the Teresa transaction, BT/Deutsche Bank knew the tax benefit it reflected would not be available until some undetermined date, years in the future, when Enron's corporate headquarters was distributed to Enron and Enron was able to take increased depreciation deductions.  BT/Deutsche Bank also knew that on a present value basis, Teresa would not provide Enron with tax savings.  Instead, as BT/Deutsche Bank knew, the Insiders' goal was to generate financial accounting income by improperly recording deferred tax assets in advance of future tax deductions, even before the resulting increased basis could attach to a depreciable asset.  In the end, the Insiders and BT/Deutsche Bank used Teresa to improperly create $229 million of after-tax, financial statement income for Enron.

### (d)     Tomas

495.    Responding to an Insider's request, BT/Deutsche Bank designed and proposed the concept of the Tomas transaction to Enron in 1998.  Tomas' principal goal was to side-step Enron's need to report a financial statement expense from the disposal of a portfolio of low-tax-basis assets. Ultimately, the Insiders used Tomas to record permanent tax benefits as pre-tax gains on Enron's financial statements – gains of $25.6 million in 1998 and $18 million in 2000.  In addition to designing and promoting the Tomas transaction to Enron, BT/Deutsche facilitated the transaction by investing in the SPE created to implement the transaction and served as leasing agent for the SPE (for a separate fee), although the SPE did not engage in any leasing activity.

496.    The Tomas structure worked as follows:  Enron contributed assets with a low basis for both accounting and tax purposes – assets it wanted to sell – to an SPE called Seneca.  That SPE had specifically been designed to allow Enron to receive back, or swap, low tax basis stock of an affiliate that held cash equal to the sales value of the low basis assets.  The low basis stock could then be liquidated without Enron having to recognize tax gain.

497.    As part of the transaction, BT/Deutsche Bank and the Insiders represented that Oneida, the Enron SPE involved in Tomas, would engage in a leasing business.  However, by June 2000, Oneida had not done any leasing.  In order to create the appearance that it had, BT/Deutsche Bank and Enron transferred the Cochise Airplanes – the assets used to facilitate the Cochise transaction – to Oneida in the summer of 2000.

498.    Another key aspect of the structure was that those involved in the transaction, including BT/Deutsche Bank, knew it would unwind in two years and a day.  Under applicable tax rules, certain favorable presumptions arise when a contributing partner receives a liquidating distribution more than two years after its contribution.  However, these presumptions are overcome by clear evidence of an understanding that liquidation was agreed to at the outset.  As both a lawyer and an accountant, Maxey knew that because the Insiders intended to unwind the transaction in two years and one day, the tax treatment the Insiders gave Tomas was risky and subject to uncertainty.  BT/Deutsche Bank knew the risk as well.  Nevertheless, Enron recorded the full tax benefit from the avoidance of the built-in gain anyway, as BT/Deutsche Bank fully expected it would.

499.    BT/Deutsche Bank also knew that the price paid for the Cochise Airplanes was inflated.  It was supported by Enron's valuation, but was flatly contradicted by a third-party appraisal that BT/Deutsche Bank commissioned and received from BK Associates, Inc. on June 12, 2000.  The Insiders and BT/Deutsche Bank arranged the sale of the Cochise Airplanes in such a way that Enron booked the entire sale proceeds of $36.5 million as net income from the sale.  This gain recognition was facilitated by inappropriate purchase accounting adjustments that had reduced Enron's book basis in the Cochise Airplanes to zero.

500.    Tomas's accounting did not comply with GAAP.  More specifically, the recognition of gain on the sale of the Cochise Airplanes was improper for at least two reasons:

(a)      First, Maxey has admitted under oath that Enron held the Cochise Airplanes for a period of time simply to create the impression that they had not been purchased for resale, even though the Insiders intended from the outset to dispose of the planes.  Exam. III, App. G at 52. BT/Deutsche Bank knew the Insiders' plans.

(b)      Second, applying purchase accounting adjustments to reduce the book basis of the Cochise Airplanes violated GAAP because the purchase of the Cochise Airplanes was unrelated to the acquisition of the REMIC Residual Interests in Cochise.

### (e)      Renegade and Valhalla

501.    The Renegade and Valhalla tax accommodation transactions did not themselves produce tax *or* accounting benefits for Enron.  Instead, they were lucrative rewards by the Insiders for BT/Deutsche Bank's work on other questionable transactions with the Insiders.  As such, they facilitated the Insiders' scheme *and* created substantial tax benefits for BT/Deutsche Bank.  Enron participated only indirectly in BT/Deutsche Bank's tax benefits through, for example, favorable financing terms and fees.

502.    In Renegade, a December 1998 financing, Enron, through a complex series of transactions, effectively borrowed $8 million from BT/Deutsche Bank at a discounted rate. BT/Deutsche Bank then essentially paid Enron a $1.73 million fee for accommodating it.  In Valhalla, a May 2000 financing transaction, the Insiders helped BT/Deutsche Bank create deductible interest *and* nontaxable income by exploiting differences between U.S. and German tax laws. BT/Deutsche Bank ultimately used Valhalla to finance a stream of tax-exempt income through deductible payments.  Essentially, for an "accommodation fee" equal to the spread between the interest it paid and the interest it received, the Insiders had Enron facilitate a tax-avoidance arrangement for BT/Deutsche Bank.

## (3)     BT/Deutsche Bank limited its Enron exposure.

503.     BT/Deutsche Bank's frequent contact with the Insiders gave it the opportunity to learn the "facts behind the numbers" in Enron's financial statements.  Exam. III, App. G at 20 (quoting Paul Cambridge sworn statement).  By as early as 2000, BT/Deutsche Bank knew enough about Enron's financial situation to begin to attempt to reduce its exposure to Enron – exposure that exceeded $600 million by June 1999.  By October 2001, BT/Deutsche Bank became so worried about the extent of Enron's off-balance sheet debt that it refused to authorize any further credit.  This despite the fact that Enron's *external* ratings were still favorable.

504.     BT/Deutsche Bank held periodic meetings with the Insiders to discuss the reality behind Enron's financial statements.  The Insiders laid no "ground rules" in these meetings as to what could not be discussed.  So BT/Deutsche Bank routinely asked to be briefed on Enron's trading activity revenues, its philosophy regarding asset sales, and the level of its off-balance sheet obligations.  At one such meeting, BT/Deutsche Bank learned that in the fourth quarter of 2000, Enron had used SPE sales to inflate reported cash flow from operating activities from $100 million to almost $5 billion.  As a result of those one-on-one discussions, BT/Deutsche Bank was able to make its own estimate of Enron's off-balance sheet obligations, and confirm that number with the Insiders.

505.     BT/Deutsche Bank's private knowledge was clearly at odds with its public statements.  From at least January 13, 1999 until at least September 15, 2000, BT/Deutsche Bank analysts consistently rated Enron a "Buy."  In its January 28, 2000 report, BT/Deutsche Bank not only rated Enron a "Buy," but raised the stock's target price to $90, predicting a 15% three-year EPS growth rate.  BT/Deutsche Bank succinctly summed up its alleged view of Enron:  "All we can say is WOW!"  Two months later, on April 14, 2000, BT/Deutsche Bank reiterated its "Buy" rating and raised the stock's target price to $96 and its three-year EPS growth rate to 16%.  Five months later,

on September 15, 2000, BT/Deutsche Bank not only reiterated its "Buy" rating, but raised the stock's target price to $100.

        **e.**      **CIBC knowingly assisted the Insiders in misstating Enron's financial condition.**

506.    CIBC played an active and important role in the Insiders scheme to manipulate and misstate Enron's financial condition. Between 1998 and bankruptcy, CIBC and the Insiders completed a substantial number of transactions the Insiders improperly reported pursuant to FAS 140. In each instance, CIBC created and/or participated in the transaction knowing the Insiders intended to account improperly for it in Enron's financial statements. CIBC's role in those transactions was to provide the 3% equity investment needed to qualify the transaction under FAS 140. However, CIBC's equity was never really at risk. CIBC would not, and did not, participate without first receiving the Insiders' agreement that CIBC's equity investment would be repaid. That agreement led CIBC to characterize its investments internally as "trust me" equity. CIBC 1139804 (quoted in Exam. III, App. H at 6).

507.    CIBC knew that because its equity was not at risk, the transactions in which it participated did not qualify for FAS 140 treatment. But CIBC also knew the Insiders would report the transactions as if they did. Without CIBC's equity piece, these FAS 140 transactions would not have occurred. Consequently, CIBC aided the Insiders' scheme to improperly generate cash flow from operations and disguise Enron's true debt. In fact, CIBC's improper FAS 140 transactions generated over $1.7 billion of operating cash flow for Enron and hid over $1.0 billion of debt.

508.    The Enron Examiner, who independently reviewed the CIBC FAS 140 transactions, reached the same conclusion. He found that "CIBC knew the accounting results Enron sought to achieve in the FAS 140 transactions"; that CIBC "obtained verbal assurances" of repayment from the Insiders "knowing that the assurances likely would not be disclosed" and, had they been

disclosed, "Enron could not have accounted for the transaction as it did"; and that CIBC "participated in FAS 140 transactions that CIBC knew were designed to manipulate [Enron's] financial statements." Exam. III, App. H at 2-3.

### (1)     CIBC's relationship with Enron.

509.     Defendant CIBC is a full-service financial institution that operates primarily in Canada, Europe, and the United States.  Throughout the relevant period, CIBC maintained an office in Houston, Texas.  CIBC personnel in this office were involved in discussing and implementing the transactions with Enron discussed below, including preparing the internal credit applications necessary for the approval of each transaction at CIBC.  In at least once instance CIBC personnel in Houston specified how the debt and "equity" portions of one transaction were to be allocated between separate CIBC legal entities in order to maintain the appearance of proper accounting. Exam. III, App. H at 11 n.25.  In addition, CIBC officers in other cities regularly traveled to Houston to meet with the Insiders to discuss, among other things, Enron's assurances of repayment of CIBC's "equity" investment in FAS 140 transactions, increasing the flow of deals to CIBC as a result of CIBC's demonstrated willingness to assist the Insiders in manipulating and misstating Enron's financial condition, and an investment by CIBC in LJM2.  In the early 1990s, CIBC's involvement with Enron was relatively limited.  In 1998, the nature of the relationship changed as the number of transactions between CIBC and Enron increased dramatically.  From 1998 to Enron's bankruptcy, CIBC completed an average of two Enron FAS 140 transactions per quarter – more than three dozen in all, including the various asset transfers in the Hawaii "warehouse" vehicle.  As a result, CIBC was elevated to the status of Tier 1 bank.  From 1997 to bankruptcy, CIBC earned approximately $30 million in fees.  More than $14 million of the fees were attributable solely to the FAS 140 transactions.

509A.   On December 22, 2003 the United States District Court for the Southern District of Texas entered a final judgment against Canadian Imperial Bank of Commerce in Case No. H 03-5785, captioned *United States Securities and Exchange Commission, Plaintiff, v. Canadian Imperial Bank of Commerce, Daniel Ferguson, Ian Schottlaender, Mark Wolf, Defendants*, in connection with CIBC's transactions with Enron.  In addition to enjoining CIBC and its employees from violating the securities laws, the final judgment also directed CIBC to pay $80,000,000, $37,500,000 of which represented disgorgement, $5,000,000 of which represented prejudgment interest, and $37,500,000 of which represented a civil penalty.  In addition, the three CIBC officials named as defendants in this lawsuit were also enjoined from violating securities laws and were ordered, in separate final judgments, to pay $563,000 (Ferguson, December 23, 2003), $528,750 (Schottlaender, June 25, 2004), and $60,000 (Wolf, December 23, 2003).

509B.   In a letter agreement dated December 22, 2003 between the United States Department of Justice and Canadian Imperial Bank of Commerce, CIBC agreed that it would not make any public statement contradicting factual statements to the effect that CIBC entered into transactions with Enron based on unwritten understandings and oral promises from Enron senior management in order to allow Enron to obtain desired accounting treatment.  DOJ/CIBC Letter Agreement, pars. 2, 8, and Appendix A.

### (2)     The FAS 140 transactions.

510.     Beginning in 1998, CIBC and the Insiders executed twelve FAS 140 transactions. In 1998, the transactions were named Riverside 3, Riverside 4, Pilgrim/Sarlux, and Pilgrim/Trakya. In 1999, they were Riverside 5, Leftover, Nimitz, Ghost, Alchemy, and Discovery.  In 2000, they were Specter and Hawaii.  The Hawaii transaction was special, in that it alone allowed Enron to monetize ten different assets.

511.    CIBC knew that in every FAS 140 transaction, the Insiders sought to borrow money for Enron's use without adding debt to Enron's balance sheet.  As a result, CIBC also knew that the goal of every FAS 140 transaction was to avoid consolidating the borrower-SPE on Enron's financial statements.  CIBC thwarted that goal every time it required – and received – the Insiders' assurance that CIBC's equity investment would be repaid.  CIBC fully understood the ramifications of what it was doing, and so allowed the Insiders to keep their promises oral, not written.  However, CIBC recorded the fact of them internally.  For example, on June 21, 2001, one CIBC employee wrote to others:

> Unfortunately there can be no <u>documented</u> means of guaranteeing the equity or any shortfall or the sale accounting treatment is affected.  We have a general understanding with Enron that any equity loss is a very bad thing.  They have been told that if we sustain any equity losses, we will no longer do these types of transactions with them.  We have done many "trust me" equity transactions with Enron over the last 3 years and have sustained no losses to date.  If there has been a case where the value of the asset has been in question, Enron has repurchased the asset at par plus our accrued yield.

AB0000470387 (quoted in Exam. III, App. H at 55-56) (emphasis in original).  CIBC documents unequivocally demonstrate that the Insiders assured repayment of CIBC's "equity" investment in the FAS 140 transactions.  The internal credit memorandum for the Nimitz transaction stated that "executive management at Enron has represented that this money . . . *will absolutely be repaid.*" CIBC 1045206 (quoted in Exam. III, App. H at 6-7) (emphasis added).  Similarly, a CIBC credit memorandum for the Hawaii transaction acknowledged that "Enron is Not permitted to ASSURE a repurchase of our equity (*though this is our undocumented 'understanding' with the CFO).*" CIBC 1044979 (quoted in Exam. III, App. H at 7) (emphasis added).  CIBC employees involved in the FAS 140 transactions with Enron got the point.  CIBC's Risk Management Vice President, Collete Delaney, the individual who presented most of Enron's transactions to the CIBC Credit Committee from 1997 until 2000, testified that she understood that if such "verbal assurances" had been put in

writing, the transactions "would not have met the requirements for the accounting treatment Enron was seeking." *Id.* at 39.

512.    Neither CIBC nor the Insiders disclosed the nature or existence of these verbal assurances.

512A.    "CIBC provided the 'equity' stake [in specified Enron FAS transactions] only because Enron's senior management first orally promised CIBC that the 'equity' would be repaid at or before maturity at par plus an agreed-upon yield.  CIBC sought and obtained such promises from Enron's senior management in connection with its three percent equity investment in Projects Leftover, Nimitz, Alchemy, Discovery and Hawaii 125-0."  DOJ/CIBC Letter Agreement, App. A, par. 6.

513.    CIBC also knew it was not the only bank helping the Insiders manipulate Enron's financial statements.  In connection with its role as a provider of "trust me" equity, CIBC observed that NatWest was another financial institution that trusted Enron enough to do such a deal.  CIBC 1139804 (quoted in Exam. III, App. H at 5 & n.5).

### (a)    The 1998 FAS 140 transactions

514.    In its dealing with Enron before mid-1998, CIBC learned several general objectives that guided the Insiders' choice of transactions – to "get the cash out of contracts that have been marked to market" and, more importantly, to achieve "off-balance sheet treatment of the proceeds associated with the contracts."  From those early dealings, CIBC also knew the Insiders wanted to avoid any real disclosure of the substance of these transactions – in other words, "off-balance sheet treatment without even a note in the financial statements."  CIBC 1429742-743 (quoted in Exam. III, App. H at 55-56).

515.    In June and September 1998, CIBC closed its first two FAS 140 transactions with Enron – Riverside 3 and Riverside 4.  These transactions gave CIBC an even more intimate

understanding of the Insiders' goals, and "provided a springboard to the rest of CIBC's FAS 140 Transactions." Exam. III, App. H at 15. Through them, CIBC learned that the Insiders used "monetizations" to "manage" reported earnings. It also learned that the timing of these transactions was not coincidence. Not surprisingly given their purpose, the Insiders had a tendency "to concentrate deal activity around quarter ends." *Id.* at 16, n.49 (citing CIBC 1139002)

516.    CIBC's credit applications reveal that CIBC knew the FAS 140 transactions were financial statement driven-transactions and structured to give the Insiders maximum flexibility in manipulating earnings. For example, CIBC and the Insiders specifically structured the Riverside 3 loan so it could be "drawn in full or in two tranches (to allow Enron to book gains) in either the second or third accounting quarters." The Riverside 4 loan was also designed to be drawn in two tranches for the same reason. *Id.* at 27 (citing CIBC 1044116).

517.    In December 1998, CIBC and Enron closed Pilgrim/Sarlux and Pilgrim/Trakya, in which the Insiders monetized Enron's interests in two foreign power plants. The Pilgrim transactions were CIBC's first FAS 140 transactions in the United States, and its first FAS 140 transactions to include an Enron total return swap. Through the total return swap, Enron guaranteed repayment of the debt the SPE incurred in the FAS 140 transaction. However, as CIBC knew, that repayment obligation never made it to Enron's financial statements. Although the Enron Examiner asked a number of CIBC employees to identify where in Enron's financial statements those transactions might appear, not a single one could. As a result, the Enron Examiner determined that by structuring the transaction to include a total return swap while recording the transaction pursuant to FAS 140, the Insiders and CIBC caused Enron to inadequately disclose almost $1 billion of debt.

### (b)    The 1999 FAS 140 transactions

518.    CIBC and the Insiders started 1999 with Riverside 5, Leftover (which monetized the interests in the Trakya power plant that were not monetized in Pilgrim/Trakya) and Nimitz (which

monetized the interests in the Sarlux power plant that were not monetized in Pilgrim/Sarlux). In Leftover and Nimitz, CIBC provided the 3% equity piece required for FAS 140 treatment. As usual, however, CIBC's equity was not at risk because before committing any funds, CIBC received the Insiders' assurances – assurances of high ranking executives – that CIBC's 3% equity investment would be fully repaid. Once again, CIBC told no one of the fact of these verbal assurances.

519.    Of course, CIBC also realized that the 1999 FAS 140 transactions were financial statement driven, since the Insiders' practice of engaging in the transactions just prior to reporting periods continued. Nimitz closed just two days before the end of the second quarter of 1999. Ghost closed on December 21, Alchemy on December 27, and Discovery on December 29, 1999 – three transactions in a single eight-day period at the end of the year.

520.    In connection with the 1999 FAS 140 transactions, CIBC again recorded the fact of the Insiders' promise in CIBC's own documents. For example, the CIBC credit application for Discovery reads: "As highlighted, this equity reflects 3% of the total transaction size. This equity component is necessary to get the desired accounting treatment. This facility represents true equity risk. ***Note, however, as has been the case in previous transaction [sic] of this nature, Enron executive management will represent that this money will absolutely be repaid.***" CIBC 1048541 (quoted in Exam. III, App. H at 38) (emphasis added).

(c)    **The 2000 FAS 140 transactions**

521.    By 2000, CIBC and the Insiders had done a number of FAS 140 Transactions, all without a hitch.

522.    Hawaii was the most significant FAS 140 transaction between CIBC and Enron. The first iteration of Hawaii closed in March 2000. Hawaii was a unique structure – a warehouse vehicle "designed to allow the monetization of multiple assets, and a total of 22 transactions were completed under this structure between March 2000 and the fourth quarter of 2001." Exam. III, App. H at 15.

523.    Again, however, before CIBC agreed to purchase the 3% equity in Hawaii, it required Fastow or another senior Insider's assurances that the equity would be repaid.  CIBC likewise insisted that the Insiders reaffirm their repayment commitment every time the facility was restructured or amended.  *Id.* at 46-47.  By the end of 2000, even CIBC's most senior executives were conditioning the approval of FAS 140 Transactions on the express agreement – always unwritten – of repayment.

524.    Once again, CIBC's own documents demonstrate the fact of the agreement.  For example, to obtain approval of a Hawaii credit application, one CIBC employee noted that the Insiders had fully repaid CIBC's equity participation in Discovery.  In a later credit memo CIBC noted that in the past, the Insiders had seen to it that an early equity investment in Hawaii (McGarret N) had been fully repaid, even though the value of the underlying assets had declined.  *Id.* at 47 (citing CIBC 1044570).  In that particular case, Causey approved Enron's repurchase of CIBC's equity at inflated prices.  *Id.*  In truth, Enron repaid CIBC's equity in full on several transactions (including Hanover Compressor and Eli Lilly assets) where the value of the assets in the SPE had declined substantially and, therefore, the purported equity value should have been correspondingly reduced.

525.    The FAS 140 transactions conducted through Hawaii continued well into 2001.  In every one of them, CIBC engaged in virtually no due diligence on the values of any of the underlying assets.  This total absence of due diligence, or even any real negotiation over the price to be "paid" for the assets being purchased from Enron, demonstrates more than anything else that CIBC knew its equity was not at risk.  Almost equally telling is how CIBC rated the debt and equity portions of these FAS 140 transactions internally.  Despite their supposedly distinct nature, both debt and equity were treated as *debt obligations* of Enron.  *Id.* at 59.

526.    One of the transactions improperly "monetized" through the Hawaii structure was Project Braveheart, the vehicle used by the Insiders to falsely create earnings and cash flow from operations from Enron's contract with Blockbuster to deliver video-on-demand ("VOD") service through Enron's nascent broadband delivery system.    As the Enron Examiner found, "This agreement reflected nothing more than an aspiration.  Enron did not have the technology to deliver VOD on a commercially viable basis and Blockbuster did not have the rights to movies to be delivered."  Exam. II at 29.  Nonetheless, in two Hawaii FAS 140 transactions, one concluded in the fourth quarter of 2000 and the second in the first quarter of 2001, CIBC contributed the debt and the 3% "equity" necessary to allow the Insiders to falsely generate from the Blockbuster transaction a total of $111 million in income and $115 million in cash flow from operations on Enron's financial statements.  *See* Exam. II at 29-32.  CIBC completed these transactions without conducting any due diligence on the value of the underlying contract with Blockbuster, Enron's broadband delivery capabilities, or Blockbuster's ownership of the movie rights, because the Insiders had assured CIBC of the repayment of its "equity" investment.  The Enron presentation on Braveheart confirms that oral assurances of repayment were made to CIBC, as they were on every other FAS 140 transaction. It states that by the end of 2001 Enron would have to replace CIBC with "'true' outside equity (i.e. without [Enron] support)."  AB 0507 02409 (quoted in Exam. III, App. H at 42).  Internal Enron documents indicate that CIBC was selected for these transactions precisely for its "minimal due diligence."  ECa 188987.  Former Enron employee Kevin Howard has been indicted by the Justice Department for violating accounting requirements in the Braveheart transaction because, among other things, he purportedly "'sold' an interest in the [VOD] joint venture to CIBC even though [he] and others knew that Enron had promised CIBC that it would not lose money on its Hawaii 125-O transactions."  Superseding Indictment in *U.S. v. Rice, et al.,* April 29, 2003, at ¶ 26.  Without CIBC's active and knowing participation in Project Braveheart, the Insiders would not have been

able to manipulate and misstate Enron's financial statements as indicated or to falsely promote Enron's broadband operations as highly successful.

   f.    **Merrill Lynch knowingly assisted the Insiders in misstating Enron's financial condition**.

   527.   Merrill Lynch's participation was crucial to the Insiders' manipulation and misstatement of Enron's financial statements, at least in the year 1999.  Over the course of that year, Merrill Lynch participated in three transactions with Enron which form the basis of this Complaint. Merrill Lynch knew that two of those transactions – Nigerian Barge and the electricity trade transactions – were intended to inflate Enron's earnings in the fourth quarter of 1999 by approximately $60 million (or 30%).  Merrill Lynch also knew that its participation in the third transaction, LJM2, would put Fastow and Kopper in a position to profit at Enron's expense.  For its participation in the 1999 transactions with Enron, Merrill Lynch received revenue of approximately $40 million.

   528.   By virtue of an unprecedented agreement with the United States Department of Justice, Merrill Lynch narrowly escaped indictment for its role in manipulating and misstating Enron's financial statements.  As part of the agreement, Merrill Lynch acknowledged that the Justice Department had developed evidence that Merrill Lynch's employees may have ***"violated federal criminal law"*** in the Nigerian Barge and 1999 electricity trade transactions.  Merrill Lynch also "accept[ed] responsibility for the conduct of its employees giving rise to any violation" of those laws.  Based upon these admissions and Merrill Lynch's agreement to adopt policies and procedures to prevent future manipulations of clients' financial statements through structured finance transactions, the Justice Department agreed not to "prosecute Merrill Lynch for any crimes committed by its employees relating to the [Enron] transactions."  Three Merrill Lynch employees involved in the transactions were not so lucky; a federal grand jury indicted them for "knowingly

and intentionally devis[ing] a scheme and artifice to defraud Enron" and others.  Fastow is the primary alleged co-conspirator in that scheme.

529.    On September 17, 2003, Merrill Lynch & Co., Inc. and the Justice Department entered into the unprecedented agreement concluding the Department's criminal investigation of Merrill Lynch's role in the collapse of Enron.  In that agreement, the Justice Department states that it notified Merrill Lynch that "Merrill Lynch personnel have violated federal criminal law" in connection with the Nigerian Barge and 1999 electricity trade transactions with Enron.  Agreement, ¶ 1.  Moreover, the Justice Department concluded that Merrill Lynch employees **"aided and abetted Enron's violation of federal criminal law in connection with the same transactions."**  *Id.* (emphasis added).  For its part, Merrill Lynch

> acknowledges that the Department has developed evidence during its investigation that one or more Merrill Lynch employees may have violated federal criminal law. ***Merrill Lynch accepts responsibility for the conduct of its employees giving rise to any violation in connection with the [Nigerian Barge and 1999 electricity trade transactions].***

*Id.* at ¶ 2 (emphasis added).  To escape indictment, Merrill Lynch not only agreed to accept responsibility for the criminal conduct of its employees, but it "further agree[d] that it will not, through its attorneys, board of directors, agents, officers or employees make any public statement, in litigation or otherwise, contradicting Merrill Lynch's acceptance of responsibility."  *Id.* at ¶ 7.

530.    In addition, Merrill Lynch agreed to adopt policies and procedures to prevent future manipulation of client financial statements through structured finance transactions.  These policies include the following: (1) Merrill Lynch will not participate in any transaction where it believes an objective is to achieve a misleading financial statement; (2) Merrill Lynch will not participate in any transaction in which there is an agreement to unwind the transaction at an agreed-upon price unless that agreement is reflected on its books and is provided to the client's auditor; and (3) Merrill Lynch will not engage in any year-end transaction in which it believes that the client's motivation is to

achieve accounting objectives, including specifically off-balance sheet treatment, without the specific approval of a new Merrill Lynch committee established to review structured finance transactions. *Id.* at Exhibit A.

531.    The same day that Merrill Lynch dodged indictment, a federal grand jury did indict three of its employees for conspiracy to commit wire fraud in connection with the Nigerian Barge transaction. Count One, Indictment in *United States v. Bayly,* CR No. H-03-363 (S.D. Tex. Sept. 17, 2003). One of the three, James Brown, was also indicted for perjury and obstruction of justice for lying to the grand jury about an oral promise Fastow made to Merrill Lynch to repurchase the Nigerian Barges at an agreed-upon rate of return. *Id.* at Counts Two and Three. According to the indictment, the other two employees, Bayly and Furst, also gave false testimony to the SEC and/or the PSI about the unwritten promise from Enron in the Nigerian Barge transaction. *Id.* at ¶¶ 18, 21, 23. The indictment alleges that (1) Merrill Lynch agreed "to serve as a temporary buyer" of the Nigerian barges from Enron (¶ 10); (2) the purpose of the agreement was to enable Enron to "record earnings and cash flow in 1999 and thus appear more profitable" (*id.*); (3) Merrill Lynch's phony purchase of the barges "allowed Enron to record improperly $12 million in earnings and $28 million in funds flow for the fourth quarter of 1999 " (*id.*); (4) Merrill Lynch "knew that the 'purchase' was not real" because it had made "an oral handshake side-deal" with Fastow that Enron would repurchase the barges "within six months" and that "Merrill Lynch would receive a rate of return of approximately 22%." *Id.* at ¶ 11.

532.    The indictment makes clear why Fastow and Merrill Lynch engaged in the Nigerian Barge transaction:  Fastow breached his fiduciary duties to Enron in order to earn year-end bonuses. The phony earnings the transaction generated "enabled the business unit from which the deal emanated [Fastow's group] to meet its targeted financial goals for the year, which in turn led to increased unwarranted bonuses to executives in that business unit." *Id.* at ¶ 10.  For its part, Merrill

Lynch knowingly participated in Fastow's breach of fiduciary duties in order to earn a guaranteed return of 22%. More importantly, by facilitating this year-end transaction, "Merrill Lynch solidified its status as a 'friend of Enron' and thereby positioned itself to receive an increased slice of the lucrative deals that Enron dispensed to financial institutions." *Id.* at ¶ 9. The indictment also alleges that Fastow caused LJM2 – not Enron – to repurchase the barges from Merrill Lynch "without any negotiation between Merrill Lynch and LJM2 as to the purchase price." *Id.* at ¶ 13.

532A. The Merrill Lynch employees (now former employees) stood trial beginning in September 2004. On November 3, 2004, a Houston jury convicted the former Merrill Lynch employees on all counts.

533. Merrill Lynch's role in Enron's downfall has also been examined and criticized by the SEC, the PSI, and the Enron Examiner. The Enron Examiner found that "Merrill Lynch's conduct and participation in the Nigerian Barge and the 1999 electricity trade transactions allowed Enron to book improper gains of approximately $60 million for the fourth quarter of 1999." Exam. III, App. I at 2. As for the Nigerian Barge transaction, the Enron Examiner concluded that Merrill Lynch "entered into an oral agreement with Enron whereby Enron promised to take Merrill Lynch out of the Nigerian Barge transaction within six months at a specified rate of return, knowing that if such an agreement were disclosed to Enron's auditors, Enron could not have accounted for the transaction as a sale." *Id.* With respect to the 1999 electricity trades, the Enron Examiner concluded that Merrill Lynch "entered into two virtually offsetting electricity derivative transactions with Enron that Merrill Lynch knew Enron was using to achieve earnings targets at year-end 1999 and with respect to which Merrill Lynch believed Enron's accounting to be improper." *Id.*

534. On March 17, 2003, the SEC charged Merrill Lynch with aiding and abetting Enron's accounting fraud. The SEC alleged that Merrill Lynch, along with its senior executives Furst, Schuyler M. Tilney, Bayly, and Thomas W. Davis, helped Enron commit securities fraud.

Complaint in *SEC v. Merrill Lynch*, March 17, 2003, at ¶ 1.  The SEC described the Nigerian Barge

transaction as an "asset parking arrangement" in which Enron purported to "sell" an interest in the

barges to Merrill Lynch; in fact, the "risk of ownership never passed to Merrill Lynch," and the

transaction was nothing but a "short term loan" with a "specified rate of return."  *Id.* at ¶ 2.  The

SEC alleged that Merrill Lynch knew Enron would report $12 million in income from this "sham

'sale.'"  *Id.*  About the 1999 electricity trades – for which Enron agreed to pay Merrill Lynch

$17 million in fees – the SEC said that Merrill Lynch knew Enron would improperly report

$50 million in income from the "sham energy trade."  *Id.*  On the same day the SEC filed suit,

Merrill Lynch settled the charges by agreeing to entry of a permanent anti-fraud injunction *and* by

paying $80 million in disgorgement ($37.5 million), penalties ($37.5 million), and interest

($5 million).

535.     PSI also investigated Merrill Lynch's involvement in Enron's collapse.  Senator Carl

Levin, Chairman of the PSI, concluded that Merrill Lynch "helped Enron artificially and deceptively

create revenue."  Statement of Senator Carl Levin, July 30, 2002, at 2.  Senator Levin found that

Enron could never have engaged in the deceptions it did without Merrill Lynch's help.  *Id.*  In his

words, "Merrill Lynch assisted Enron in cooking its books by pretending to purchase an existing

Enron asset when it was really engaged in a loan."  *Id.*

536.     The Enron Examiner concluded that Merrill Lynch's business units operated across

a variety of Merrill Lynch legal entities.  After a Merrill Lynch business unit decided to proceed

with a transaction, it would use whichever legal entity was appropriate for that transaction.  The

Enron Examiner also found that Merrill Lynch committees that dealt with the various transactions

operated generally on Merrill Lynch's behalf.  Few Merrill Lynch employees who testified before

the Enron Examiner were able to specify which of the Merrill Lynch legal entities employed them.

For that reason, this Complaint uses the term "Merrill Lynch" generally to refer to the institution as a whole.

537.    Merrill Lynch executives in its Houston, Texas, and Dallas, Texas, offices were centrally involved in the fraudulent Nigerian Barge and electricity trade transactions.  Schuyler Tilney was the head of Merrill Lynch's Global Energy & Power division and the Houston office of Merrill Lynch.  Exam. III, App. I at 17.  During the relevant period, Tilney served as the senior Enron relationship manager for Merrill Lynch.  *Id.*  Tilney and his wife, who was a senior vice president at Enron, had close personal relationships with Fastow and his wife.  *Id.*  Robert Furst, a Managing Director of Merrill Lynch, worked in the Dallas office of Merrill Lynch.  Complaint in *S.E.C. v. Merrill Lynch & Co., Inc.,* March 17, 2003, at ¶ 12.  For both the Nigerian Barge and electricity trade transactions, the Insiders approached Tilney and/or Furst to obtain Merrill Lynch's cooperation.  Furst and Tilney captained the process of obtaining approval for these deals at Merrill Lynch.  *See* Complaint in *S.E.C. v. Merrill Lynch & Co., Inc.,* March 17, 2003, at ¶¶ 21-27, 36-44.  Both Tilney and Furst participated in discussions with Fastow in which Fastow gave Merrill Lynch oral promises that the transaction would be unwound within six months of closing.  *Id.* at ¶ 27.  Similarly, Tilney and Furst contacted Causey and obtained his assurances that Enron's accounting for the electricity trade transaction was appropriate.  *Id.* at ¶¶ 43-44; *see also* Exam. III, App. I at 40.

**(1)    Merrill Lynch's relationship with Enron**.

538.    Merrill Lynch considered Enron to be "one of its biggest clients" and "the key to its Houston office."  Levin Statement at 4.  1999 was an important year in the relationship.  In that year, Merrill Lynch earned more fees from Enron than any other bank – even though it never rose above Tier 3 status.  Between 1997 and 2001, Merrill Lynch received approximately $63 million in revenue from its transactions with Enron.  Merrill Lynch earned $40 million of that in 1999 alone.

539.     From 1997 through 2001, Merrill Lynch was involved in approximately 35 transactions with Enron, including "underwritings, private placements of debt and equity, structured finance transactions, derivative transactions, and participation as a syndicate member in several credit facilities." Exam. III, App. I at 12. The volume of transactions increased dramatically after November 1998, when Merrill Lynch raised its rating on Enron stock from "neutral" to "accumulate."

540.     Merrill Lynch equity analysts covered Enron from 1997 through 2001. When Merrill Lynch analyst John Olson lowered his rating on Enron stock in July 1997, Enron, including Fastow, pressured Merrill Lynch to change its equity coverage. Merrill Lynch executives Tilney and Rick Gordon understood that Olson's equity coverage of Enron had been a cause of strain between Enron and the bank for years. In April 1998, Fastow informed Merrill Lynch that because of its equity coverage, Merrill Lynch would not be included as a manager of Enron's upcoming $750 million common stock offering. Fastow was explicit about the fact that this action was to send Merrill Lynch a strong message about how "viscerally" Enron felt about the equity coverage. Gordon and Tilney wrote a memorandum to Herb Allison, Merrill Lynch's CEO, explaining that Enron thought Olson's coverage was flawed. In August 1998, Merrill Lynch fired Olson. After Olson's replacement upgraded Enron's stock rating in November 1998, Merrill Lynch's Enron business increased more than tenfold, measured in fees – from $3 million in 1998 to $40 million in 1999.

541.     Merrill Lynch knew that Enron intended to use the 1999 electricity trades and the Nigerian Barge transaction to record improperly gains of approximately $60 million in the fourth quarter of 1999. The former head of Merrill Lynch's Global Derivatives group, Jeffrey Kronthal, testified that Merrill Lynch knew Enron would book earnings of $50-60 million from the electricity trades. Merrill Lynch also knew Enron would book $12 million in earnings from the Nigerian Barge transaction. Merrill Lynch was well aware that Enron's intended accounting for these transactions

violated accounting rules and that Enron frequently moved its assets off-balance sheet. It also knew, as reflected in a December 9, 1998 presentation to Enron about structured financings, that Enron's transactions were often driven by balance sheet issues.

542.    Because it worked on approximately 23 debt and equity offerings for Enron between 1997 and 2001, Merrill Lynch developed a substantial familiarity with Enron's financial condition. As the private placement agent for LJM2, Merrill Lynch made note of the *$17 billion* difference between Enron's assets ($34 billion) and its "assets under management" ($51 billion). Merrill Lynch clearly understood Enron's improper use of off-balance sheet vehicles.

### (2)    Nigerian Barge.

543.    The Insiders brought the Nigerian Barge transaction to Merrill Lynch in mid-December 1999. Because Enron was facing a shortfall in earnings, the Insiders needed to close the transaction by the end of that year. McMahon explained to Merrill Lynch that Enron had attempted to negotiate a sale of the barges to third party Marubeni, but that sale had fallen through. Enron was in a bind, and it needed Merrill Lynch to purchase an interest in the barges before the end of the month. McMahon informed Merrill Lynch's Furst by memorandum that "(i) the transaction would allow Enron to book $12 million in earnings; (ii) Merrill Lynch's 'hold' would be for six months or less; and (iii) the investment would yield a 22.5% rate of return to Merrill Lynch." MLBE 0305288 (quoted in Exam. III, App. I at 25). Furst reminded Merrill Lynch that Enron was one of its top clients, and that participating in the Nigerian Barge transaction would help Merrill Lynch to stand out "from the pack" of Enron's financial institutions. *Id.*

544.    Merrill Lynch's Project and Lease Finance Group initially objected to the Nigerian Barge transaction. Merrill Lynch's executives, including James Brown, were aware from the start that Enron's accounting for the transaction might be improper. Brown knew Merrill Lynch would never gain control over the barges and knew Enron would quickly take Merrill Lynch out of the

transaction.  He also wondered where Enron's $12 million "gain" was coming from if Merrill Lynch was only investing $7 million in the transaction.  Ultimately, Brown warned Merrill Lynch's Debt Markets Commitment Committee that participation in Nigerian Barge posed "***reputational risk, i.e. aid/abet Enron income statement manipulation***."  Exam. III, App. I at 26 (quoting Sworn Statement of James Brown at 62, 76-77) (emphasis added).

545.    Brown also expressed concern about the fact that the proposed deal did not include a *written* agreement that Enron would buy the barges back from Merrill Lynch.  As a condition of going forward with the transaction, Merrill Lynch's Debt Markets Commitment Committee instructed Bayly to get oral confirmation that Enron would commit to taking Merrill Lynch out of the transaction within six months.  Fastow provided that oral commitment in a telephone conversation on December 22, 1999.  Unsurprisingly, neither the agreement to buy back Merrill Lynch's interest in the barges nor to provide an agreed-upon rate of return on its investment was included in the final *written* agreement – the letter agreement between Merrill Lynch and Enron dated December 29, 1999.  To include either, of course, would have disclosed the intended accounting for the transaction was improper.  Additional evidence of the Insiders' promise to take Merrill Lynch out of the "sale" within six months at a predetermined rate of return includes Merrill Lynch's total failure to conduct any due diligence before "buying" its interest in the barges or negotiate the purchase price with Enron, as well as the extremely short time frame – less than two weeks – during which the transaction was proposed and completed.

546.    Despite knowing that the Insiders' intended accounting for the Nigerian Barge transaction was improper, Merrill Lynch proceeded with the transaction.  In return, Merrill Lynch executive Bayly made sure that Fastow understood that Merrill Lynch expected to be rewarded with substantial future business.

547.    In Nigerian Barge, Merrill Lynch purported to purchase 90.1% of Enron's interest in future cash flows from three power-producing barges off the Nigerian coast for $28 million. However, the transaction was really nothing more than a short-term loan; the ownership risks never passed from Enron to Merrill Lynch.

548.    Nigerian Barge closed less than two weeks after McMahon first proposed it.  Once it closed, the Insiders caused Enron to report $12 million from it in fourth quarter earnings.  Six months later, Fastow caused an SPE established by LJM2 to buy Merrill Lynch's $7 million equity back for $7.525 million.  The $525,000 premium, coupled with a $250,000 "advisory" fee Merrill Lynch received for structuring the transaction, amounted to a return of 22.14% on the initial investment.  Note that Merrill Lynch received the advisory fee despite the fact that the Insiders, not Merrill Lynch, structured it.

### (3)    1999 electricity trade.

549.    Merrill Lynch participated in a second transaction at year-end 1999 designed to manipulate and misstate Enron's financial condition: the 1999 electricity trade.  This transaction involved back-to-back electricity call options whose essential terms – price, quantity, market location, and term – were mirror images of each other.  As a result, the sales and purchases of electricity offset each other.  Moreover, the call options were structured so that the first call option could not be exercised until nine months after the transaction closed.  The transaction closed on December 31, 1999.  Merrill Lynch knew that the purpose of this transaction was to artificially generate between $50 million and $60 million of earnings for Enron and thus enable the company to appear to meet its year-end earnings target.  Merrill Lynch also knew that the Insiders' intended accounting for the 1999 electricity trade transaction was improper.  Nonetheless, Merrill Lynch proceeded with the transaction – for the astronomical fee of $17 million.

550.    Merrill Lynch knew that the 1999 electricity trade was a sham electricity transaction. The call options were virtually offsetting and "delta neutral" to both Enron and Merrill Lynch. MLBE 0370936 (quoted in Exam. III, App. I at 39).  Merrill Lynch knew the trades were structured so that the options "in the money" and "out of the money" were equivalent for the two transactions. Exam. III, App. I at 38 (quoting Sworn Statement of Jeffrey Kronthal at 109-110).  Merrill Lynch also knew the Insiders intended to use the 1999 electricity trade to artificially inflate Enron's year-end earnings by approximately $50 million.  E-mails between Merrill Lynch employees acknowledge that "we were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation)."  MLBE 0370956 (quoted in Exam. III, App. I at 42).

551.    The 1999 electricity trade was a sham transaction.  Not only that, Merrill Lynch knew the Insiders would unwind the deal before the first option was exercised.  The Insiders did unwind the deal in May of 2000 and the transactions were terminated without a single trade having occurred. When the Insiders did that, Merrill Lynch's Tilney conceded that "[t]his is not that great a surprise." *Id.* at 44.  Nevertheless, when first approached about unwinding the 1999 electricity trade, Merrill Lynch insisted on being paid the entire $17 million fee because Merrill Lynch had helped the Insiders create earnings for 1999 that boosted Enron's stock price, as well as compensated Enron executives, including some of the Insiders.  Merrill Lynch eventually relented and instead agreed to accept an $8.5 million fee.  *Id.* at 39.

(4)    LJM2.

552.    In addition to its knowing participation in manipulation of Enron's financial statements, Merrill Lynch also facilitated the Insiders' scheme by playing a critical role in LJM2. At Fastow's urging, Merrill Lynch served as the exclusive financial advisor to and placement agent for LJM2, the private investment partnership Fastow, Glisan and Kopper formed.  Merrill Lynch

prepared and distributed the private placement memorandum for LJM2, helped raise approximately $390 million in commitments from investors for LJM2, committed itself to invest $5 million, and established an investment vehicle through which 97 Merrill Lynch executives committed to invest $16 million in LJM2. Through its roles, Merrill Lynch understood well that the purpose of LJM2 was to permit Fastow and Kopper to profit at Enron's expense. Merrill Lynch knew these Insiders were managing LJM2 and that it was formed to transact business with their employer, Enron. The LJM2 private placement memorandum touted as a central benefit of LJM2 the "dual roles" of Fastow and the other Enron employees who would manage the partnership. LJM078364. So central was Fastow's role in LJM2 that investors were assured that they did not have to make additional capital contributions if he no longer served both Enron and LJM2. The private placement memorandum also offered "superior returns" based upon the Insiders' "access to Enron's information pertaining to potential investments."

553.    Merrill Lynch also knew from experience that the Insiders used LJM2 to effectuate their breaches of fiduciary duties to Enron. LJM2 was the vehicle the Insiders used in 2000 to fulfill their (deliberately unwritten) promise to Merrill Lynch to take it out of the Nigerian Barge transaction within six months. The purchase price for that buy-out was not negotiated; instead, LJM2 paid the rate of return agreed by the Insiders at the outset of the transaction six months earlier.

g.    **CSFB knowingly assisted the Insiders in misstating Enron's financial condition.**

554.    CSFB's role in the Insiders' scheme to manipulate Enron's financial statements was significant – both before and after November 3, 2000, when CSFB became affiliated with DLJ (now Pershing). CSFB designed, financed and/or implemented at least 50 financial transactions involving SPEs. CSFB knew the Insiders were using these transactions improperly to inflate cash flow from operations and disguise debt on Enron's financial statements. CSFB's active participation in the

Insiders' schemes, including its crucial roles as investor in the LJM entities and structurer of LJM transactions, made it possible for the Insiders to conceal hundreds of millions of dollars of Enron's debt and claim hundreds of millions of dollars of operating revenue Enron never had.

555.    The Enron Examiner thoroughly reviewed and criticized CSFB's conduct.  He concluded that CSFB knowingly facilitated the Insiders' misstatements of Enron's financial condition.  Specifically, the Examiner found that CSFB's participation in the LJM1 transactions, including the Rhythms Hedge, enabled Enron improperly to recognize $95 million of income in 1999, representing 10.6% of its originally reported net income for that year.  Exam. Final Report, App. F at 2-3.  CSFB's participation in LJM also enabled Fastow to enrich himself and other Enron officers, including Kopper and Glisan, at Enron's expense and in violation of their fiduciary duties to Enron.  *Id.*

556.    While substantial, the damage from LJM was not the only damage to which CSFB contributed.  The Examiner concluded that CSFB's participation in the December 2000 Prepaid Oil Swap, the September 2001 Prepaid Oil Swap, and the Nile and Nikita transactions also allowed the Insiders  improperly to record approximately $172.2 million as cash flow from operating activities and improperly to understate debt by $150 million in its December 31, 2000 balance sheet. Exam. Final Report, App. F at 3-4.

### (1)    CSFB's relationship with Enron.

557.    CSFB was a Tier 1 bank and regular lender to Enron.  That position was strengthened when, in November 2000, CSFB became affiliated with DLJ.  Fastow himself called CSFB the "go to" firm for structured finance and the model for other financial institutions to follow.  CSFBCO 000203135.  In fact, CSFB may have had the closest relationship with the Insiders – especially Fastow – of any of the Bank Defendants.  *See* Exam. Final Report, App. F at 11-20.

558.    Enron paid CSFB substantial fees for its transaction work.  In 1998, CSFB received over $11 million from Enron; in 1999, it received over $25 million; in 2000, it received over $33 million, bringing its total fees for those three years to more than $68 million.  For the year 2001, CSFB projected fees of between $40 million and $50 million from Enron.

559.    CSFB knew by at least early 1999 that Enron used SPEs to manage its financial statements.  For example, CSFB was aware the Insiders managed cash flow on a quarter to quarter basis by closing SPE transactions at the end of the quarter.  CSFB was also aware that Enron's off-balance sheet transactions were complex and opaque.  In July 1999, one CSFB manager noted, "I now assume that running a pipeline business can't take much time.  Enron seems to spend all its available man hours on various, convoluted financing."  CSFBCO 000019283 (quoted in Exam. Final Report, App. F at 22).  CSFB also knew the Insiders were using off-balance sheet transactions to solve problems the rating agencies identified.

560.    Not surprisingly, CSFB knew a great deal about Enron's true financial condition.  Through its role as underwriter on more than 30 Enron securities transactions, CSFB learned much about Enron's operation.  As Enron's merger and acquisition consultant in connection with various asset sales, CSFB learned first-hand that many Enron assets were over-valued and illiquid, and could not be sold on the open market at anything but a loss to Enron.  See Exam. Final Report, App. F at 20-21, 23-25.  Through its investment and participation in LJM1 and LJM2, CSFB learned about the Insiders' non-economic hedges, including Rhythms and Raptors.  It also learned of the Insiders' penchant for warehousing assets such as Cuiaba, and how the warehousing transactions benefitted Fastow, Kopper, and Glisan.   Finally, through its participation in the Rawhide and Osprey/Whitewing transactions, CSFB learned about the negative consequences that a substantial decline in the price of Enron's common stock would have on Enron's financial statements.  See Exam. Final Report, App. F at 25-26.

### (2)    LJM1 and LJM2.

561.    As discussed earlier in the complaint, in March 1998, Enron purchased $10 million in equity in Rhythms.  *See* Exam, Final Report, App. F at 37 n.133.  Following Rhythms' initial public offering, Enron's equity stake substantially increased in value.  As of June 1, 1999, it was worth $260 million.  Under MTM accounting, Enron immediately recognized the increase in value on its books.  Nevertheless, Enron was concerned about the adverse effect a decline in the price of the stock could have on Enron's income statement.   Also as discussed earlier, Enron was contractually prohibited from selling the stock for a period of six months.  Moreover, Enron believed that finding someone to enter into a hedge on terms acceptable to Enron was unlikely.  At Fastow's request, therefore, the Enron Board considered forming LJM1 and hedging the Rhythms stock through it. On June 28, 1999, Fastow presented the idea to the Board.  During that presentation, Fastow represented that he would not personally profit in any way from the value of Enron stock that Enron might place in LJM1.  After making sure that limitation was included in the LJM1 formation documents, the Board approved LJM1 and the Rhythms Hedge.

562.    Fastow established LJMI in June 1999 by contributing $1 million through LJM Partners, LLC ("LJM Partners").  As principal of LJM Partners, Fastow was sole general partner of LJM1.   Fastow invited CSFB and RBS to participate as equity investors, and each (through affiliates) became a limited partner after contributing $7.5 million.  Within a matter of months, LJMI engaged in three transactions, all with Enron: the Rhythms Hedge, Osprey, and Cuiaba.

563.    CSFB knew that its LJM1 investment was being used to create an off-balance sheet vehicle.   CSFB also knew that LJM1 raised conflict of interest concerns relating to Fastow's personal investment and role as general partner, even while he continued to serve as Enron's CFO.  *See* CSFBCO 005725132 and CSFBCO 005725133 (cited in Exam. Final Report, App. F at 39-40).  CSFB Managing Director Robert Jeffe told the Enron Examiner that:

> It was also troubling from the standpoint of Fastow personally wanting to do the transaction. Because I think we all told him at various times that at some point this transaction would come to light and he would look very, very bad.

Exam. Final Report, App. F at 41. Jeffe also testified that:

> we are all taught there are lines of proper behavior and in terms of the way you comport yourself, and this was something that I never ever would consider doing myself even if I had approval from the President of the United States or the U.S. Supreme Court.

*Id.* at pp. 40-41; *see also* CSFBCO 000005024 (cited in Exam. Final Report, App. F at 41). Notwithstanding CSFB's concerns about Fastow's inherent conflicts of interest, CSFB invested its $7.5 million in LJM1. In deciding to do so, CSFB was clearly guided by the importance of Fastow – and the business he doled out – to CSFB.

### (a)    The Rhythms Hedge

564.    To establish the Rhythms Hedge, Enron transferred to LJM1 shares of Enron common stock having an aggregate stock price of $276 million. LJM1 transferred approximately half of those shares to LJM Swap Sub, another entity Fastow created specifically for the Rhythms Hedge. In exchange, Enron received notes in the aggregate amount of $64 million (the "Enron Notes") from LJM1 and a put (the "Rhythms Put") from LJM Swap Sub. The Rhythms Put gave Enron the right, in the future, to require LJM Swap Sub to purchase Enron's Rhythms stock at $56.125 per share.

565.    CSFB knew that LJM Swap Sub was the only party liable for the Rhythms Put. CSFB also knew that LJM Swap Sub's only asset was the Enron stock that LJM1 transferred to LJM Swap Sub. As a result, CSFB knew that the Rhythms Put did not actually transfer Enron's economic risk in Rhythms away from Enron – the transfer was to an entity whose only assets were Enron's stock, which Enron provided.

566.    CSFB therefore knew the hedge was strictly a non-economic, accounting-driven hedge which, if included in Enron's financial statements, would make them materially misleading. *See* Exam. Final Report, App. F at 39-44.  By investing and participating in the structuring of LJM1, CSFB knowingly and substantially helped Fastow breach his fiduciary duties to, and defraud, Enron.

### (b)    The CSFB Bridge Loan and the SAILs transaction

567.    When Fastow decided that LJM1 needed additional funds to timely complete the Cuiaba transaction, he turned to CSFB.  In order to make LJM1's Cuiaba and Osprey investments prior to quarter end, CSFB gave Enron a $25 million bridge loan, which was to be repaid upon the monetization of LJM1's shares of Enron stock (the "SAILs transaction").

568.    The SAILs transaction allowed CSFB to monetize and hedge its interest (as limited partner) in the Enron shares that LJM1 held.  Through SAILs, CSFB locked in for itself a minimum return on the shares, as well as the right to participate in up to 10% of any appreciation of those shares.  On November 29, 1999, LJM1 distributed into two escrow accounts – one for each limited partner – LJM1's 1.8 million shares of Enron stock.  In return, CSFB and RBS agreed to make equal additional capital contributions in an amount that would allow LJM1 to pay off both the Enron Notes and the CSFB Bridge Loan. CSFBCO 000008615 (cited in Exam. Final Report, App. F at 54-55).

568A.    Fastow obtained a verbal side agreement that Enron would repurchase LJM1's interest in Cuiaba at a profit.  Consequently, when the Cuiaba interest was the only asset remaining with LJM1, Fastow "negotiated" for Enron to buy back this interest at a premium.  Exam. IV, App. E at 59-61.  As a result, CSFB received approximately $2.7 million.  *See* Exam. IV, App. E at 59-62.

569.    The SAILs transaction was problematic.  The Enron shares contributed to LJM1 were restricted.  Specifically, a June 30, 1999 letter agreement restricted  LJM1 and LJM Swap Sub's right to dispose of the Enron shares for four years without Enron's consent, subject to certain

exceptions.  Exam. II, App. L. at 8.  The letter agreement also prohibited the two entities from entering into any transaction that hedged their exposure on their respective portions of the shares for one year without Enron's consent. *Id.* Because the SAILs transaction hedged LJM1's exposure in its Enron shares, the transaction required Enron's consent.  As one of only two limited partners, CSFB certainly knew that.  Concerned that Enron would not give that consent, CSFB asked Fastow to have the restrictions lifted.  As *quid pro quo,* Fastow demanded that CSFB invest in LJM2.  When CSFB agreed, Fastow had Causey sign an acknowledgment that purported to give Enron's consent to SAILs.  The Enron Board neither knew about the agreement nor approved it – as CSFB undoubtedly understood.  After all was done, CSFB's Rick Ivers praised CSFB's LJM1 deal team member for doing "an excellent job in the harrowingly complex execution of this deal."  CSFBCO 000010750 (quoted in Exam. Final Report, App. F at 56).

570.    The SAILs transaction closed in December 1999.  It generated  approximately $57.1 million.  From that amount, CSFB kept $12 million and contributed $45.1 million to LJM1.  LJM1, in turn, used CSFB's $45.1 million capital contribution (together with approximately the same amount contributed by RBS) to repay both the Enron Notes and CSFB Bridge Loan.  The LJM1 partners treated the $90 million plus in funds from CSFB and RBS as "additional capital contributions."

571.    The SAILs transaction is evidence of how deeply CSFB was involved in Fastow's scheme, and how willing it was to make Fastow happy.  CSFB knew that Fastow had represented to the Enron Board that he would not personally benefit from the value of the Enron stock held by LJM1.  CSFB also knew that the LJM1 formation documents forbade Fastow from sharing in LJM1 distributions or allocations that resulted from the Enron stock transferred to LJM1 or constituted proceeds resulting from those shares.  Likewise, CSFB knew that other restrictions prohibited Fastow from receiving management fees in connection with the Enron stock LJM1 held or from any

proceeds resulting from those shares. Nevertheless, through the combination of the Bridge Loan and the SAILs transaction, CSFB enabled Fastow to evade the restrictions the Board had imposed and share in the Cuiaba and Osprey assets as if those assets somehow were not purchased with proceeds derived from the value of LJM1's Enron shares. *See* Exam. Final Report, App. F at 55-56. Internally, CSFB recognized that the Bridge Loan and the SAILs transaction not only provided a significant return to CSFB, but also enhanced CSFB's relationship with Fastow.

### (c)    The Southampton transaction

572.    A scant three months later, in March 2000, CSFB closed the Southampton transaction. Southhampton's purpose was to extract value from the Enron shares held by LJM Swap Sub and "unwind" the Rhythms Hedge. Before the closing of the Southampton negotiations, CSFB knew that Fastow and Kopper were principals in Southampton. CSFB was squeamish about the affiliation – so much so that, in preparing the sale of the Swap Sub interests to Southampton, CSFB raised the fact in a telephone call with CSFB's outside counsel and Insider Causey. During the call, the three discussed that Southampton had "some affiliation with other employees of Enron." However, Causey told CSFB and its counsel that "no consent of Enron [was] necessary for [the Southampton transaction]" and that Enron management "was aware of such transactions and approved of them" without the need for any "actions on Enron's part." CSFBCO 000121346-000121347 (quoted in Exam. Final Report, App. F at 59). Given the clear presence of a conflict of interest, not to mention CSFB's knowledge that Enron had imposed substantial restrictions on Fastow's ability to profit from a similar conflict of interest, CSFB had to know that Causey's statements were not true. Nonetheless, CSFB decided to participate in the transaction anyway and, in reward, earned $10 million dollars. CSFB was not the only one to profit, of course. The Southampton partners, including Fastow, Kopper and Glisan, received a total of approximately

$19 million in connection with the Southampton transaction, with Fastow and Kopper splitting $9 million of that.

573.    In summary, CSFB knew that Fastow engaged in self-dealing in connection with LJM1 and that Fastow and Kopper engaged in self-dealing in the Southampton transaction. CSFB knew that Fastow's and Kopper's self-dealing constituted a breach of their fiduciary duties to Enron. Through its participation in the CSFB Bridge Loan, the SAILs transaction, and the Southampton transaction, CSFB knowingly provided substantial assistance to these Insiders in effecting these breaches.

574.    Eventually, the LJM1 partnership liquidated. Over its two years of existence, CSFB's total take was $38 million – approximately $30.5 million over and above its original $7.5 million investment in LJM1.

### (d)    LJM2

575.    In late-August 1999, Fastow contacted both CSFB and DLJ about investing in LJM2. Fastow told CSFB and DLJ that their early commitments to LJM2 would give LJM2 the visibility it needed in order to attract other financial institutions. In December 1999, Fastow invited CSFB to invest $12 million of its LJM1 distribution in LJM2. In deciding whether to invest, both CSFB and DLJ recognized that doing so was important to preserve their relationship with Fastow. Ultimately, CSFB committed $10 million and DLJ committed $5 million. In 2000, CSFB also approved a $30 million credit facility for LJM2.

576.    Directly and as general partner of LJM2, Fastow received approximately $9.3 million in distributions and $9.9 million in management fees. Exam. II, App. L. at 20. Fastow also received $15.5 million in cash and a house valued at $850,000 from Kopper in connection with Fastow's sale of his LJM1 and LJM2 interests to Kopper. *Id.* Of course, CSFB knew all of this because it was a limited partner in both LJM vehicles.

**(3)      The Prepaid Oil Swaps.**

577.     In December 2000, CSFB participated in an Enron prepay transaction, the December 2000 Prepay Oil Swap (the "December Swap"), with ENA and Morgan Stanley.  The Insiders proposed the swap to CSFB on December 11, 2000, with the requirement that it close and fund by December 15, 2000.  Like other Enron prepay transactions, the December Swap consisted of a circular structure of three swaps: one between CSFB USA Int'l and ENA, one between CSFB USA Int'l and Morgan Stanley, and one between ENA and Morgan Stanley.  Like other Enron prepay transactions, circular obligations built into this one effectively removed all commodity risk from the transaction, making it substantively a loan.  The swaps were financially settled and, at the end of the day,  CSFB USA Int'l paid ENA $150 million and nine months later – in September 2001 – ENA was required to repay CSFB Int'l approximately $158 million.  Morgan Stanley simply served as the pass-through entity.

578.     In September 2001, CSFB and the Insiders entered into a related prepay transaction. First, ENA repaid CSFB Int'l approximately $153 million under the December Swap.  At the same time, it entered into a new prepay, the September Prepay Oil Swap (the "September Swap"), between another CSFB subsidiary – CSFB – and Barclays.  The September Swap was structured identically to the December Swap, except this time CSFB advanced the money, approximately $149 million, to ENA**.**  Like the December Swap, the September Swap was structured to eliminate commodity risk by virtue of offsetting swaps, making it, in substance, a loan.

579.     Consistent with their practice, the Insiders accounted for the approximately $150 million derived from the December Swap and the September Swap as cash flow from operations rather than from financing, and reported the liabilities under the swaps as "price risk management activities" rather than as debt on Enron's financial statements.  By accounting for the

proceeds in this way, the Insiders overstated Enron's cash flow from operating activities, closed the gap between Enron's cash and reported revenues, and effectively disguised $150 million in debt.

580.    CSFB absolutely knew the two prepaid oil swap transactions were actually loans that would not appear as debt on Enron's balance sheet.  For one thing, CSFB repeatedly described both transactions as loans in its internal documents.  For example, one CSFB employee described the CSFB prepays as "obvious loan transactions."  AB050700064 (quoted in Exam. IV, App. L at 68). Another wrote that "the swap is booked in their oil swap book and not treated as debt."  CSFBCO 000200220 (quoted in Exam. IV, App. L at 68 n.286).

581.    Knowing the December Swap and the September Swap were actually loans gave rise to internal concern at CSFB about the risks of participating in the transactions.  In connection with the December Swap, CSFB asked the Insiders to make written, "standard representations for accounting-driven transactions" – such as that Enron's external auditors had confirmed the appropriateness of the accounting treatment, Enron's senior management was aware of and approved the transaction, and Enron did not rely on CSFB in deciding to enter into the transaction. AB30507 00074-75 (quoted in Exam. IV, App. L at 69-70).  In the end, the Insiders agreed to give the representations CSFB requested – but *refused* to put them in writing.  *See* CSFBCO 006092153 (cited in Exam. IV, App. L at 71).  Nevertheless, CSFB went through with the transaction.

582.    CSFB participated in the swaps because of the importance of Enron as a client. Internally, CSFB described Enron as "a Priority 1 client of CSFB."  CSFBCO 000044755-58.  In 1999, CSFB made more fees from Enron than any other Tier 1 bank.  AB000 538544 (cited in Exam. IV, App. L at 11).  In turn, CSFB considered Enron as "one of [its] top accounts, if not the number one relationship."  CSFBCO 0000044034 (cited in Exam. IV, App. L at 11).  Not surprisingly, CSFB booked both the December Swap and the September Swap as what they were – loans.

(4)     **FAS 140 transactions.**

(a)     **Nile**

583.     In the summer of 2001, the Insiders asked CSFB to participate in the Nile FAS 140 transaction (the "Nile Transaction" or "Nile").   Nile was structured to accommodate the monetization of slightly more than 24 million shares of common stock of ServiceCo Holdings, Inc. ("ServiceCo") (collectively, together with any proceeds from the post-petition sale of the shares of ServiceCo, the "Nile Asset").   Although Enron and affiliates recorded the Nile Transaction on their books and records as a sale of the Nile Asset by EES Service Holdings to Pyramid I, the Nile Transaction was, in substance and effect, a loan of $25 million from CSFB to EES Service Holdings for Enron's benefit.   CSFB knew that Enron would account for the Nile Transaction as a sale of assets under FAS 140.

583A.   The Nile Transaction was accomplished through a series of steps that the parties intended to appear as if it were a genuine sale of the Nile Asset.   First, EES Service Holdings contributed the Nile Asset to Pyramid I.   In exchange, EES Service Holdings received a Class A Membership interest in Pyramid I and a simultaneous "special distribution" of $25 million.

583B.   The $25 million special distribution to EES Service Holdings was ultimately transferred to Enron.   The remaining consideration, the Class A Membership interest in Pyramid I, gave EES Service Holdings only a 0.01% economic interest in Pyramid I but 100% voting power.

583C.   Sphinx Trust made a $25 million capital contribution to Pyramid I in exchange for a Class B Membership interest in Pyramid I.   The Membership interest was non-voting, but represented a 99.99% economic interest in Pyramid I.   The $25 million was subsequently transferred to Enron.

583D.   Sphinx Trust obtained the funds for its capital contribution to Pyramid I by (a) issuing a Series Certificate for $1,008,793 (the "Nile Certificate") to a CSFB affiliate, and (b) borrowing

the $23,991,207 remainder (the "Nile Note") from CSFB. All of the $25 million for Sphinx Trust's capital contribution to Pyramid I thus came from CSFB or its affiliates. Those funds were eventually transferred to Enron.

583E.   The amount of the Nile Certificate was approximately 4% of the Sphinx Trust's total capitalization. The Nile Certificate paid a fixed return of 12%.

584.   Nile closed on or about September 28, 2001. As part of the transaction, a total return swap agreement between ENA and Sphinx Trust (the "Nile TRS Agreement") served to guarantee Sphinx Trust's obligation to repay the Nile Note. In addition, a separate Guaranty Agreement (the "Enron Nile Guaranty") provided that ultimately Enron would be responsible to repay the Nile Note.

585.   CSFB knew that Enron intended to classify the Nile Certificate as an equity investment by CSFB in the Sphinx Trust that was at risk and permitted Enron to account for the Nile transaction off balance sheet and record the funds it received as cash from operations.   But CSFB was unwilling to make an equity investment that was at risk and would only make the investment if repayment was supported by Enron. CSFB's goals were to be able to "put" the equity investment to Enron at par – meaning the entire amount of CSFB's equity investment – and to earn an overall rate of return on the transaction.   When Enron told CSFB that its proposed par value put would not permit the desired accounting, CSFB began devising other means of achieving the same result – protection of its equity investment, plus a return on the investment.

585A.   CSFB suggested a number of ways to protect its equity investment other than a bald par value put. These mechanisms included creating a fund to repay the equity tranche, which CSFB proposed could be built up over time or created in a lump sum at the outset.   CSFB also proposed that the return payable on the total return swap could be "grossed up" to cover repayment of the principal and interest on the Nile Note, plus repayment of the equity tranche and a yield on the equity.   CSFB also considered "grossing up" the interest rate payable on the Nile Note to repay all

or some of the equity investment. CSFB also proposed pricing the transaction as a whole – both the debt and equity tranches – for an overall return to CSFB of LIBOR plus 350 basis points, with a "side arrangement" requiring that any income CSFB earned in excess of LIBOR plus 350 bps would be credited towards future transactions between CSFB and Enron. Enron again advised that all or some of these arrangements would be caught by its auditors and would not permit the desired accounting.

585B.   CSFB continued to modify the protections to its equity investment and closed the deal with at least three protections for its equity. First, CSFB arranged that it could put its equity investment to Enron at a "fair market" price, determined in the first instance by CSFB as calculation agent.   Second, as CSFB's James Moran testified, the total return swap was priced to include repayment of the principal and interest on the Nile Note, plus a return on the equity certificate, thus assuring repayment of at least a portion of the equity investment. Third, CSFB further arranged for repayment of another portion of its equity investment through the disguise of an "Administrative Fee," equal to twelve percent of the funded amount of the equity tranche, and set forth in a separate letter agreement. The "Administrative Fee" increased if the funded amount of the equity tranche increased, thus always assuring repayment of the same percentage CSFB's equity investment.

585C.   Within two weeks after the closing of the Nile transaction on September 28, 2001, the tenor of the transaction was extended from two years to three years. CSFB took this opportunity to increase the interest rate on the Nile Note. As a result of these protections, CSFB knew that its equity investment in the Nile transaction was not at risk and the accounting treatment Enron intended for the transaction was improper. Internally, both before and after the closing, CSFB repeatedly described the equity tranche as "debt," rather than equity, described the return on the equity tranche as "interest" rather than yield, and stated that the risk associated with the equity investment was "100% Enron via put" and the equity investment was guaranteed an "all-in return

of 12%." In essence, CSFB's "equity" stake in the Sphinx Trust was guaranteed by promises that CSFB would be repaid, with interest.

585D. Enron and its affiliates retained all or substantially all of the benefits of any appreciation in the Nile Asset just as if it had not purportedly sold the Nile Asset. Notwithstanding EES Service Holdings' purported "sale" of the ServiceCo stock to Pyramid I, (a) Enron continued to enjoy the benefits flowing from that stock ownership, in the form of any value derived from it in excess of amounts necessary to repay the Nile CSFB Note and to repay to CSFB the Nile Certificate, with 12% interest, and (b) Enron assumed the risk that the ServiceCo stock would not generate a sufficient return to repay the Nile Note and to repay the Nile Certificate with interest.

585E. Furthermore, as the Class A member of Pyramid I, Enron and its affiliates had the right to prevent the Nile Asset from being sold to a third party, so long as the Nile Note was being repaid, and CSFB had the right to require Enron to buy back the Nile Asset if the Nile Note was not being repaid.

585F. CSFB made the loan to the Sphinx Trust based on its underwriting of the unsecured Enron credit risk, not the value of the Nile Asset. Neither Enron nor CSFB intended the Nile Transaction to be a genuine sale of the Nile Asset, and neither party intended that CSFB would bear the risks or enjoy the benefits of ownership of the Nile Asset. Both Enron and CSFB expected that Enron would repay CSFB in full with interest, without regard to whether, or for how much, the Nile Asset could be sold.

586.    Nile was in substance a loan from CSFB. Nevertheless, the Insiders caused Enron to report $22.2 million of the loan proceeds as cash flow from operating activities, $2.8 million as cash flow from investing activities, and $18.9 million as a gain. *See e.g.* Exam. IV, App. F at 76. CSFB knew that the Insiders would report the transaction improperly under GAAP because CSFB's

equity investment was not at risk.  By its participation in the Nile Transaction, CSFB knowingly gave the Insiders substantial aid in breaching their fiduciary duties to, and defrauding, Enron.

### (b)     Nikita

587.    Nikita was a FAS 140 transaction the Insiders used to monetize Enron's ownership interest in EOTT Energy Partners, LP.  The transaction contemplated a syndicate led by Barclays, which would agree to make up to $235 million available through an SPE called Besson Trust.  The Nikita transaction closed on September 28, 2001.

588.    The Insiders' original intent was that Barclays would provide the 3% equity investment necessary for Nikita to qualify for FAS 140 accounting treatment.  But for alleged regulatory reasons, Barclays – at the last minute – was unable to provide the 3% equity piece.  At the Insiders' request, CSFB agreed to play Barclays' role in the transaction.  However, CSFB first required Barclays to enter into a total return swap that guaranteed CSFB the return of CSFB's investment in the Besson Trust.  Thus, CSFB swapped back to Barclays the risk CSFB assumed by becoming the equity participant.  Before the transaction was completed, however, Barclays obtained "verbal assurances" from Fastow and Glisan that Enron would take Barclays out of the transaction. Without those assurances, Barclays was unwilling to enter into the total return swap CSFB required. And without the total return swap with Barclays, CSFB would not have agreed to hold the 3% equity in the Besson Trust.

589.    Barclays and CSFB knew that the total return swap between them removed CSFB's equity risk, and that Fastow's and Glisan's verbal assurances removed Barclays'.  As a result, neither had equity at risk, and FAS 140 treatment was improper.  Despite that knowledge, both Barclays and CSFB participated in the Nikita transaction, thus giving the Insiders the means to hide $235 million of Enron debt.

## (5) CSFB abandoned Enron.

590.    Beginning no later than 1999, CSFB knew the Insiders were using SPEs to manipulate Enron's financial statements. As CSFB equity analysts who studied Enron understood, for those not intimately involved in the SPEs, Enron's financial statements were "clear as mud." CSFBCO 005255148 (quoted in Exam. IV, App. L at 22).

591.    On August 27, 2001, CSFB met with Enron officers, including Fastow, to discuss Project Cleaver. Project Cleaver examined the possible split of Enron into two separate companies: one regulated, one not. CSFB prepared a presentation for the meeting that included publicly available data only. Based upon that data, CSFB valued Enron's debt – on and off-balance sheet – at $6.4 billion.

592.    At the meeting, Fastow disclosed to CSFB that Enron's debt was actually either $30 billion or $36 billion. CSFBCO 005725129 (cited in Exam. IV, App. L at 26). After the meeting, CSFB began evaluating Enron's financial statements more closely. CSFB also began monitoring its Enron exposure frequently, and took active steps to decrease it. CSFBCO 000553330-CSFBCO 000553333, CSFBCO 005157362, and CSFBCO 005422943 (cited in Exam. IV, App. L at 28). For example, on September 19, 2001, CSFB reduced Enron's $500-$650 million net credit ceiling to $300 million by canceling unused lines of credit, buying credit protection, and refusing to renew maturing loans. CSFBCO 005157362, CSFBCO 005422943 (cited in Exam. IV, App. L at 28). CSFB's internal efforts to reduce its Enron exposure paid off. By December 5, 2001, CSFB's net credit exposure was down to approximately $156.5 million.

593.    In the months leading to Enron's bankruptcy, CSFB internally recognized Enron's poor financial condition. For instance, in e-mails between two of CSFB's Enron deal team members, one, in light of Enron's "latest travails," recounted the other's "ominous warnings 2 years ago that the 'house of cards' may some day collapse." CSFBCO 005122908 (quoted in Exam. IV,

App. L. at 22-23 n.81).  In his response on October 21, 2001, the second CSFB team member noted "P.S. We are still making $$$ at ENE but look out!"  CSFBCO 005122670 (quoted in Exam. IV, App. L at 22-23 n.81).

594.    At this time, CSFB's equity analysts were also privately expressing negative views about Enron's financial condition.  For example, in e-mails between a CSFB equity analyst and a Chase equity analyst, the CSFB analyst stated that, with respect to Enron, "all things point to the potential for one of the biggest frauds in the history of corporate America [sic], bankruptcy is not out of the question."  Chase's analyst responded, "bankruptcy??? [H]oly Moses….that's HUGE!!!...wow, [CSFB's equity analyst] has actually been right on this one."  JPMBKR-E0817342 (quoted in Exam. IV, App. L at 34 n.123).  And, in e-mails between these analysts on October 25, 2001, the CSFB analyst boasted, "Correct me if I'm wrong, but you have been speaking to a member of the coverage team at CSFB who has specifically told you NOT TO BUY  it but to STAY AWAY from it all the way down from $45."  To which the Chase analyst replied, "hey, how has your rating helped clients??? [Y]ou're telling me one thing but clients a different story??? a little shady if you ask me….strap it on man!!! take a stand!!! afraid to lose banking business??? are you an investment banker or equity research analyst???"  JPMBKR-E0817387 (quoted in Exam. IV, App. L at 34 n.123).

595.    By November 2001, CSFB understood Enron's situation completely.  On the heels of the announcement that Dynegy would acquire Enron, another CSFB equity analyst told his CSFB colleague that "ENE just could never tell the truth…. A year from now we will talk about … Enron greed (of a few) and fair value accounting."  CSFBCO 006090157 (quoted in Exam. IV, App. L at 22-23 n.81).

596.    Despite their clear knowledge of the scope of Enron's problems, CSFB's equity analysts continued to rate the Enron stock a "Strong Buy."  In fact, it was not until November 23,

2001, that CSFB's analysts dropped their rating – by which time Enron's stock price had fallen to $4.71 per share. Around that time, a CSFB analyst wrote Chase's: "Okay Wade, how about now? Now will you give some credit for saying NO to buying ENE at 50, at 40, at 30, at 20?", to which Chase's analyst replied, "no dude, you get squatola." The CSFB analyst's rejoineder? "From $50 to $30, lucky, from $30 (when the first skelton [sic] came out) to now, I was in the know….the funny thing is, Gibbons [another CSFB analyst] was also in the know, yet bought the thing." JPMBKR-E0817430 (quoted in Exam. IV, App. L at 34-35 n.123).

597.    During the investigation following Enron's filing for bankruptcy, the CSFB and Chase analysts continued to exchange e-mails regarding CSFB's early knowledge of Enron's deteriorating financial condition and the Insiders' misuse of the off-balance sheet SPEs to manipulate Enron's financial statements. For example, on December 20, 2001, the Chase analyst wrote, "man, you guys are the ones that helped set up these partnerships…not to mention you guys as analysts knew about it and didn't say a word to clients in your research…who's hiding what??? I'm sure the SEC would be very interested in this…don't you think?" CSFBCO 006172707 (quoted in Exam. IV, App. L at 34-35 n.123).

598.    On February 26, 2002, the day before CSFB's lead equity analyst on Enron, Curt Launer, was scheduled to testify before the Senate Committee on Governmental Affairs about the role Wall Street analysts played in the collapse of Enron, the Chase analyst wrote his CSFB friend: "I'm sure Curt [Launer's] testimony will NOT include the fact that you guys knew about this crap in august [sic] (at the latest) but still didn't write about it or bring it to the attention of investors…shall I forward your e-mails to the justice department??? the ones warning me to stay away from ENE – these date waaaaaay back…now, if you telling me and everyone on your salesforce (as you claim) to stay away, don't you think Congress would like to know about this???" CSFBCO 006173455 (quoted in Exam. IV, App. L at 34-35 n.123). In fact, Launer had written a

CSFB colleague two days before giving testimony that his "testimony" was being "'sanitized'" in order to "curry populist favor." CSFBCO 006057889.001 (quoted in Exam. IV, App. L at 34-35 n.123).

599.    CSFB's incentive for continuing to recommend Enron's stock in the face of CSFB's actual knowledge of the magnitude of Enron's true debt is obvious – CSFB wanted to keep Enron afloat by supporting Enron's stock price, at least until CSFB finished extricating itself. CSFB used its knowledge of Enron's financial condition to its benefit and to the detriment of other Enron creditors. *See* Exam. Final Report, App. L at 29-34. As one CSFB analyst wrote another on November 29, 2001– three days before Enron declared bankruptcy – "easy, we were in love with ene and ene loved us. We were their number 1 supporter so the threat of a damaging research note was zero. They needed us to publicly sell the stock almost as much as we needed them for the fees." CSFBCO 006303837 (quoted in Exam. IV, App. L at 34-35 n.123).

**h.    Toronto Dominion knowingly assisted the Insiders in misstating Enron's financial condition.**

600.    Toronto Dominion's involvement in the Insiders' manipulation of Enron's financial condition was an important aspect of the Insiders' scheme. Toronto Dominion knew the Insiders were using structured financing transactions, and particularly prepay transactions, to improperly inflate cash flow from operations and disguise debt as price risk management liabilities on Enron's financial statements. From 1998 to 2000, Toronto Dominion helped the Insiders achieve their improper goals by financing and/or implementing at least six prepay transactions, which are collectively referred to as the "Toronto Dominion prepays." Toronto Dominion also participated in other transactions, such as JEDI, Hawaii, Firefly, and Bammel Gas, that were designed to reduce Enron's on-balance sheet debt. The Toronto Dominion prepays alone provided Enron with approximately $2 billion of financings, from which the Insiders improperly recorded approximately

$1.5 billion of cash flow from operating activities and understated debt on Enron's balance sheet by approximately $1.34 billion.  Exam. IV, App. G at 2.

601.    The Enron Examiner reviewed and criticized Toronto Dominion's conduct in relation to Enron, and concluded that Toronto Dominion knowingly facilitated the Insiders' misstatement of Enron's financial condition.  The Examiner found that the Toronto Dominion prepays were "structured with the commodity price risk moving through the other parties and back to Enron in a circle, so that it was eliminated," and described the prepays as "simply debt structured as commodity swaps."  Exam. IV, App. G at 23.  The Examiner concluded that Toronto Dominion understood both the accounting for the Toronto Dominion prepays and the prepays' effect on Enron's reported financial condition, and that Toronto Dominion therefore knew that the Toronto Dominion prepays were being used "to manage and manipulate [Enron's] financial statement presentation."  Exam. IV, App. G at 45, 47.  Specifically, the Examiner concluded that Toronto Dominion knew the Toronto Dominion prepays did not appear as debt on Enron's financial statements and found evidence that Toronto Dominion knew the proceeds from the Toronto Dominion prepays appeared on Enron's financial statements as cash flow from operations.  *See* Exam. IV at 79.  The Examiner found that Toronto Dominion substantially assisted this fraud by lending funds in five of the Toronto Dominion prepays and serving as a pass-through entity in three of the Toronto Dominion prepays.  Exam. IV, App. G at 27.  In short, Toronto Dominion aided and abetted the Insiders' breaches of their fiduciary duties.

### (1)    Toronto Dominion's relationship with Enron.

602.    Toronto Dominion considered Enron to be an "extremely important and profitable relationship."  TDB-EX 002319-45 (quoted in Exam. IV, App. G at 14 n.41).  From 1997 through 2001, Toronto Dominion completed approximately 40 Enron transactions and received approximately $30 million in income from Enron.  Exam. IV, App. G at 9, 11-13.  Toronto

Dominion's return on Enron-related structured finance transactions overwhelmingly exceeded its internal profitability goals. From late 1998 through 2000, Toronto Dominion's Enron transactions secured a Risk Adjusted Return on Capital of 39% – a rate almost double the return of 20% that Toronto Dominion targeted for its corporate customers. Exam. IV, App. G at 13.

603.    The Toronto Dominion prepays became, over time, an increasingly important part of Toronto Dominion's Enron portfolio. The Examiner concluded: "The dramatic increase in the profitability of the Enron relationship during the period 1998-2000 appears to have been driven by the Toronto Dominion Prepays." Exam. IV, App. G at 14 n.40. One former Toronto Dominion relationship manager noted that the prepays were "highly profitable for us and well received by [Enron.]" TDB-EX(1) 000054-90 (quoted in Exam. IV, App. G at 14 n.40). From 1998 through 2000, Toronto Dominion received approximately $5.5 million in fees from Enron from the prepays, in addition to the premium returns Toronto Dominion obtained from the capital it lent in the transactions. Exam. IV, App. G at 31, 34, 35, 36, 39, 41, and 44.

604.    Because the prepay transactions were so profitable for Toronto Dominion, it continued to participate in them through 2000 despite a "concern regarding balance sheet manipulation." TDB-EX 002320 (quoted in Exam. IV, App. G at 47). In fact, the prepays were so important to Toronto Dominion's profitability that the bank entered into the Hawaii transaction – a transaction that it otherwise would not have done – as a *quid pro quo* for the lucrative London prepay. *See, e.g.,* TDB-EX 000082, TDB-EX000077 (quoted in Exam. IV, App. G at 14).

605.    Toronto Dominion aspired to become a "Tier 1" bank for Enron, on par with Citibank and JPMC. *See* TDB-EX(1) 020264 (cited in Exam. IV, App. G at 9). It continually sought to enhance its relationship with Enron by entering into transactions it knew were suspect, and it knew were being used to manipulate Enron's balance sheets and deceive rating agencies and others who

relied on those balance sheets.  After participating in one prepay transaction, Toronto Dominion boasted:

> Enron has approached us again to help them manage their balance sheet for the rating agencies and the analysts.  The Company is coming to TD as we have demonstrated the ability to deliver, on a short-time frame, the same prepaid structured transaction.

TDB-EX 000040 (quoted in Exam. IV, App. G at 47).

606.    Toronto Dominion's Enron transactions were not limited to the lucrative prepays. Toronto Dominion also participated in other structured finance transactions, derivatives transactions, underwritings, letters of credit, and credit facilities.  Exam. IV, App. G at 9.  Toronto Dominion's multiple relationships with Enron gave it inside access to detailed information about Enron's true financial condition.  Toronto Dominion knew full well that Enron's financial statements did not depict the company's actual financial situation – Toronto Dominion executives were especially concerned with what they described as Enron's "true leverage."  TDB-EX 001425 (quoted in Exam. IV, App. G at 19).  But because of its insight into Enron's finances, Toronto Dominion was able to compile its own analyses of Enron's financial statements, recharacterizing as debt some Enron obligations that Enron did not report as debt – including the Toronto Dominion prepays – in order to gain a more accurate understanding of Enron's financial condition.  Exam. IV, App. G at 19.

607.    In its dealings with Enron and the Insiders, Toronto Dominion and its subsidiaries functioned as a single business unit.  The Enron Examiner observed, "Toronto Dominion appears to structure its operations around business segments rather than legal entities.  Units such as TD Securities design the products, sell them, and use various legal entities within Toronto Dominion to participate in and book the transactions."  Exam. IV, App. G at 7.  For example, Toronto Dominion used its Texas subsidiary, Toronto Dominion Texas, to enter into many of the Toronto Dominion prepays.  The Toronto Dominion Securities business unit had the ability to use Toronto Dominion Texas to enter into transactions to which Toronto Dominion Securities agreed.  Exam.

IV, App. G at 7 & n.23.  In addition to those direct and indirect subsidiaries of Toronto Dominion named in this Complaint, there may be other subsidiaries or affiliates which Toronto Dominion caused to participate in one or more of the transactions with Enron that serve as the basis for this Complaint.  It is Enron's intention to hold Toronto Dominion and each of these subsidiaries and affiliates responsible for their participation in the challenged transactions, and Enron notifies Toronto Dominion of its intention to include the subsidiaries and affiliates as defendants upon discovery of their identity.

### (2)    The Toronto Dominion Prepays.

608.    During the relevant period, Toronto Dominion entered into the Toronto Dominion prepays, which totaled approximately $2 billion, as follows.  *See* Exam. IV, App. G at 22.

| Name | Closing Date | Amount | Amount Financed |
|------|-------------|--------|-----------------|
| December 1998 Prepay | 12/30/98 12/31/98 | $200 million $50 million | Funded $250 million (JPMC was counterparty) |
| Truman Prepay | 6/29/99 | $500 million | Funded $250 million and acted as pass-through entity for $250 million Citigroup-funded portion of prepay |
| Jethro Prepay | 9/29/99 | $675 million | Funded $337.5 million and acted as pass-through entity for $337.5 million Citigroup-funded portion of prepay |
| Nixon | 12/14/99 | $324 million | Acted as pass-through entity for prepays funded by Citigroup, RBS, and Barclays |
| Alberta Prepay | 9/29/00 | Can $147.4 million (approx. $105 million U.S.) (Note: mirror-image Can $147.4 million prepay funded by RBC, with JPMorgan Chase as swap counterparty, closed on the same day) | Funded approx. Can $147.4 million (JPMC acted as counterparty) |
| London Prepay | 12/15/00 12/22/00 | $135 million $30 million | Funded $165 million (Morgan Stanley acting as swap counterparty) |

**Total:**                                    **$2.0 billion**

609.    The three parties involved in each Toronto Dominion prepay included Toronto Dominion, which served as the lender in five of the six transactions; an Enron affiliate, which borrowed the money; and a financial institution, which served as the pass-through entity.  Like the other Enron prepay transactions, the Toronto Dominion prepays were circular and involved the following three basic steps, all of which were negotiated simultaneously and were interrelated:

(a)    In the first step of the transaction, Toronto Dominion and an Enron affiliate entered into a transaction in which Toronto Dominion agreed to pay the Enron affiliate a fixed payment equal to the amount of money Enron wanted to borrow from Toronto Dominion (the "Principal Payment").  In exchange, the Enron affiliate agreed to pay to Toronto Dominion at date(s) in the future the financial equivalent of specified quantities of either oil or gas at the future spot price (the "Floating Payments").

(b)    In the second step of the transaction, Toronto Dominion entered into a so-called swap transaction with a financial institution in which Toronto Dominion agreed to pay the financial institution the same Floating Payments it received from the Enron affiliate in exchange for a fixed payment or payments from the financial institution, which were calculated to be an amount that would cover the Principal Payment plus interest (the "Principal Plus Interest Payments").

(c)    In the third step of the transaction, the financial institution and the Enron affiliate entered into a so-called swap transaction in which the financial institution agreed to pay to Enron the Floating Payments in exchange for Enron paying to the financial institution the Principal Plus Interest Payments.

610.    When the transactions described in paragraphs 609(a)-(c) above are viewed as a whole, no party in the Toronto Dominion prepays had any commodity price risk.  The Floating

Payments went in a complete circle and canceled themselves out such that, in the end, the only payments actually made were the Principal Payment by Toronto Dominion and the Principal Plus Interest Payments by the Enron affiliate.

611.    No Toronto Dominion prepay actually involved the transfer of a commodity.  That is, all the Toronto Dominion prepays were financially settled.  In addition, the prepayment amount of each of the Toronto Dominion prepays depended not on the quantity of oil or gas desired or on any other business reason, but on the amount of money Enron wanted to borrow and the amount of money Toronto Dominion was willing to lend.  For example, in the London prepay, Enron wanted to borrow $400 million but Toronto Dominion would only lend $165 million.  In the Truman prepay, a letter notes that "[t]he precise value of crude oil will be determined at the trade date in an amount sufficient to cover 100% of principal and interest."  TDB-EX 002057 (quoted in Exam. IV, App. G at 23).

612.    Toronto Dominion knew the Toronto Dominion prepays were simply loans to Enron, and therefore should have been recorded as loans on Enron's financial statements – not as commodity trades.  Toronto Dominion understood that because the prepay transactions transferred the price risk of the underlying commodity in a circle, neither Toronto Dominion, nor the Enron affiliate, nor the financial institution involved had any commodity price risk as part of the transaction.  *See, e.g.,* TDB-EX 000002-03 (cited in Exam. IV, App. G at 5 n.7); TDB-EX 000020 (cited in Exam. IV, App. G at 39 n.140); TDB-EX(1) 019961 (quoted in Exam. IV, App. G at 41); TDB-EX 000252 (cited in Exam. IV, App. G at 5 n.7).  A Toronto Dominion employee prepared the following chart for the Truman prepay, clearly demonstrating that Toronto Dominion understood the circularity of the transaction:



Exam. IV, App. G at 33.  Consistent with this understanding, Toronto Dominion documents

repeatedly referred to the prepays as "loans."  *See, e.g.*, TDB-EX(1) 015115, TDB-EX(1) 015117,

TDB-EX 000558, TDB-EX 000170-98, TDB-EX 002057 (quoted in Exam. IV, App. G at 23).

613.    Toronto Dominion also knew the Insiders' disclosures of the Toronto Dominion

prepays were completely at odds with the transactions' economic substance.  First, Toronto

Dominion knew the prepays were accounted for "as price risk management liabilities, <u>not</u> as debt,"

TDB-EX 002319-45 (emphasis in original) (quoted in Exam. IV, App. G at 45), and that the

prepays, therefore, "do not affect Enron's debt covenants since they are not classified as debt,"

TDB-EX(1) 019962 (quoted in Exam. IV, App. G at 45).  Second, Toronto Dominion knew  the

Insiders accounted for the cash proceeds from the Toronto Dominion prepays as cash flow from

operating activities.  Toronto Dominion knew the Insiders used the prepays to generate cash flow,

and also knew the Insiders reported assets from price risk management – including the Toronto

Dominion prepays – as cash flow from operations.  *See* Exam. IV, App. G at 46-47.  In addition, Toronto Dominion executives knew, from their own examination of Enron's financial statements, that the statements contained no meaningful disclosure of the Toronto Dominion prepays.  *See* Exam. IV. App. G at 51.

614.    Toronto Dominion therefore knew that, by structuring and closing the Toronto Dominion prepays, it was assisting the Insiders in creating misleading financial statements and helping to deceive rating agencies and others who relied on Enron's financial statements.  Toronto Dominion understood that the prepay structure had "significant advantages" over a syndicated loan, "specifically, favorable balance sheet treatment."  TDB-EX 001255 (quoted in Exam. IV, App. G at 45).  Internal credit approval memoranda displayed the Risk Management Group's increasing concerns with the "manipulation" of Enron's balance sheet.  *See, e.g.*, TDB-EX 002319-45, TDB-EX(1) 019965 (quoted in Exam. IV, App. G at 20).  An internal e-mail in November, 2000, acknowledged:  "[W]e've been warned about the balance sheet games at least twice in the last few months."  TDB-EX 001266 (quoted in Exam. IV, App. G at 47).  The head of Toronto Dominion's Risk Management Group wrote in November 2000, in response to the credit approval request for the London prepay:

> I find such transactions inconsistent with our objectives of ensuring transparency in our relationships with customers/counterparties and it leads me to question why we should have any relationship to what is increasingly becoming a large unregulated derivatives trading house.  In my view we should completely hedge our direct Enron exposure and future derivative dealings should be on a M2M collateralized basis.

TDB-EX 001526 (quoted in  Exam. IV, App. G at 20).

615.    All the Toronto Dominion prepays were completed at year-end or at the end of a fiscal quarter.  As usual, this was not a coincidence.  Toronto Dominion knew the Insiders were using the Toronto Dominion prepays to conceal the company's true financial condition by inflating cash flow from operations and hiding debt at critical reporting periods.  One Toronto Dominion

executive bluntly noted: "[y]es, they did an off-balance sheet with us to help their year end reporting. Sort of just the kind of thing we do at quarter and year end." TDB-EX 002430 (quoted in Exam. IV, App. G at 47-48).

616.    Toronto Dominion also knew the Insiders were using the Toronto Dominion prepays to maintain the company's all-important credit ratings. According to the December 1998 Prepay Credit Review, "the <u>sole</u> purpose of this facility is to satisfy promises made to the rating agencies early this year about reducing leverage." TDB-EX(1) 015115 (emphasis in original) (quoted in Exam. IV, App. G at 48). Toronto Dominion also understood that the Truman prepay was designed "to satisfy certain commitments made to the rating agencies and the analysts earlier this year with regard to leverage for the quarter ending June 30, 1999 . . . . ." TDB-EX 000037 (quoted in Exam. IV, App. G at 48 n.184).

617.    Despite this knowledge, Toronto Dominion substantially assisted the Insiders by lending its own funds in five of the Toronto Dominion prepays and serving as a pass-through entity in three prepays, two involving Citigroup (Truman and Jethro) and one (Nixon) in which Citigroup, Barclays, and RBS were lenders to Enron.

618.    The Toronto Dominion prepays had a significant impact on Enron's financial statements. Without them, Enron's financial statements would have shown a much lower cash flow from operations and much higher debt levels. In total, the Toronto Dominion prepays enabled the Insiders to record improperly $1.5 billion in cash flow from operating activities and improperly understate debt by $1.34 billion. *See* Exam. IV, App. G at 2. The Examiner concluded, with regard to the net effect of the Toronto Dominion prepays, "[T]he Toronto Dominion Prepays alone . . . had a material effect on Enron's cash flows from operating activities," and that had the Toronto Dominion Prepays been properly recorded "Enron's reported debt levels would have increased." Exam. IV, App. G at 25.

619.    Toronto Dominion also knew it was not the only financial institution assisting the Insiders in manipulating Enron's financial statements.  A former Toronto Dominion employee who had served as Toronto Dominion's relationship manager for Enron testified that Toronto Dominion knew Enron was entering into prepay transactions with other financial institutions.  Sworn Statement of Katherine Lucey, Former Head of the Advisory Group, Sept. 10, 2003, at 47 (quoted in Exam. IV, App. G at 51-52).

620.    In short, Toronto Dominion gave substantial assistance to the Insiders to further the Insiders' scheme to misrepresent Enron's financial condition with full knowledge that:

- The Toronto Dominion prepays were loans disguised as commodity transactions;

- The Insiders were accounting for the prepays as price risk management liabilities, not as debt, and the proceeds from the prepays as cash flow from operations; and

- The purpose of the Toronto Dominion prepays was to manipulate Enron's financial statements and to mislead the rating agencies and others who relied on Enron's financial statements.

### (3)    Toronto Dominion limited its Enron exposure.

621.    Toronto Dominion, as a participant in the Insiders' manipulation of Enron's financial statements, was well aware that Enron's financial statements did not reflect the company's true financial position. Toronto Dominion therefore took measures to limit its own exposure to Enron.

622.    Toronto Dominion's concerns about Enron's financial condition began as early as December of 1998, when Toronto Dominion entered into its first prepay transaction with Enron. In a comment to the credit approval memorandum for the December 1998 prepay, the Head of Toronto Dominion's Risk Management Group noted: "The number of short term financing requests for the Enron group raises concerns regarding their financial strategy." TDB-EX(1) 015117 (quoted in Exam. IV, App G at 19-20).

623.    For most of 1998 and 1999, Enron's outstanding obligations to Toronto Dominion (and therefore Toronto Dominion's credit exposure) exceeded the target amount, or "Exposure Guideline," that Toronto Dominion had set for Enron.  Starting in mid-1999, Toronto Dominion began enforcing its credit exposure guidelines against Enron.  *See* Exam. IV, App. G at 16.

624.    Toronto Dominion took additional steps to protect itself by purchasing credit protection on a large portion of any new Enron exposure.  Indeed, approval of the Alberta and London prepays by Toronto Dominion's Risk Management Group was conditioned on obtaining credit default protection for the full amount of the transaction.  *See* Exam. IV, App. G at 17.

625.    Toronto Dominion's concern about Enron's financial condition continued to grow during 1999 and 2000, as Toronto Dominion executives expressed concern about the "manipulation" of Enron's balance sheet.  TDB-EX 002319-45, TDB-EX(1) 019965 (quoted in Exam. IV, App. G at 6).  In January 2001, senior Toronto Dominion executives met with senior Enron executives, including Fastow, to address Toronto Dominion's concerns about Enron's business and financial strategies and risk management procedures.  Immediately after the meeting, the head of Toronto Dominion's Risk Management Group directed that Toronto Dominion reduce its Enron exposure by October 31, 2001 – the end of Toronto Dominion's fiscal year.

626.    In sum, Toronto Dominion – as a participant in the Insiders' manipulation of Enron's financial statements – was aware of Enron's true financial condition, and took steps to protect itself.

> **i.     Royal Bank of Scotland/NatWest knowingly assisted the Insiders in misstating Enron's financial condition.**

627.    Royal Bank of Scotland/NatWest's ("RBS") involvement in the Insiders' manipulation of Enron's financial condition was also critical to the Insider's scheme.  RBS understood the Insiders were using various RBS transactions to disguise debt, manipulate cash flows, and inflate income from operations on Enron's financial statements.  RBS also understood

that, as a limited partner in LJM1, it was profiting from Fastow's dual role as CFO of Enron and general partner in LJM1. Beginning in at least 1998, RBS designed, financed, and/or implemented several important transactions – the LJM1 related party transaction, four FAS 140 Transactions (Sutton Bridge, ETOL I, ETOL II, and ETOL III), and the Nixon prepay transaction (collectively, the "RBS Transactions") – which allowed the Insiders to fabricate significant income, artificially inflate Enron's cash flow from operations, and obscure Enron's growing debt. In addition, RBS participated in the Ghost and Hawaii FAS 140 Transactions, two transactions involving other financial institutions in addition to RBS.

628.    The RBS Transactions had a substantial impact on Enron's financial statements. The LJM1/Rhythms Hedging Transaction alone enabled the Insiders to recognize $95 million of income in 1999 – 10.6% of Enron's originally reported net income for that year. The Nixon prepay and the four FAS 140 transactions in which RBS took a leading role enabled the Insiders to improperly record approximately $191 million of income from gain on sales of assets, receive approximately $444 million of proceeds that were erroneously recorded as cash flow from operating or investing activities, and understate debt by $177 million in 1999 and $273 million in 2000. *See* Exam. IV, App. E at 3-4.

629.    The Enron Examiner investigated and sharply criticized RBS's conduct in relation to Enron. With respect to the LJM1 related party transaction, the Examiner concluded RBS "played a significant role in [LJM1's] formation and in the implementation of transactions involving LJM1." Exam. IV, App. E at 33. The Examiner found that "RBS's conduct in the LJM1 Related Party Transaction enabled Enron to complete the LJM1/Rhythms Hedging Transactions" (because of which the Insiders improperly recorded $95 million in income), that RBS "structured and implemented Total Return Swaps . . . through which LJM1 received funding LJM1 used improperly to enrich Fastow" (thereby knowingly "act[ing] to circumvent" the restrictions the Enron Board had

placed on Fastow's participation in LJM1), and that RBS benefited from Fastow's conflict of interest when Enron repurchased the Cuiaba asset at a profit to LJM1. Exam. IV, App. E at 3, 7-8, 59-62. With respect to the FAS 140 transactions, the Examiner concluded RBS obtained "verbal assurances" of repayment from the Insiders, which made the accounting for the RBS FAS 140 transactions improper. The Examiner found that RBS understood the verbal assurances "could neither be documented nor publicly disclosed." Exam. IV, App. E at 9. With respect to the Nixon prepay, the Examiner found that RBS participated in a transaction that the bank "internally recognized was simply a loan," and did so "with the knowledge that the proceeds of loan transactions such as the Nixon prepay were booked by Enron as cash flow from operating activities." Exam. IV, App. E at 10-11. In short, RBS aided and abetted the Insiders in breaching their fiduciary duties.

### (1)     RBS's relationship with Enron.

630.     When Royal Bank of Scotland acquired NatWest in March of 2000, each bank in its own right enjoyed a longstanding relationship with Enron. As early as 1995, NatWest boasted: "We are one of Enron's prime relationship banks worldwide . . . ." RBS 1115546 (quoted in Exam. IV, App. E at 13). Royal Bank of Scotland also had a substantial relationship with Enron, participating in 14 Enron transactions between 1997 and the merger in March 2000. Exam. IV, App. E at 14.

631.     RBS, the post-merger entity, retained the Tier 1 bank status NatWest had established prior to the merger. RBS viewed the Enron relationship as "extremely strong," boasted of its "very coveted position" as one of Enron's Tier 1 banks, and called Enron "one of the bank's most remunerative clients." RBS 3088328 (quoted in Exam. IV, App. E at 15). From 1997 through 2001, RBS completed approximately 53 transactions with Enron – most of which, as RBS noticed, took place near the end of quarterly reporting periods. *See* Exam. IV, App. E at 16. These transactions were extremely lucrative for RBS: The bank received over $60 million from Enron transactions

between 1997 and 2001, and, as of November 2000, had averaged a 110% rate of return on its Enron investments.  *See* Exam. IV, App. E at 15, 18.  RBS was willing to participate in the transactions the Insiders used to manipulate Enron's balance sheets because -- quite simply – those transactions paid more than the bank's ordinary Enron work.  RBS recognized in connection with one such transaction:  "Because this is balance sheet management, it pays better than straight Enron corporate risk."  RBS 3112212 (quoted in Exam. IV, App. E at 82).

632.     Enron was such an important client that RBS occasionally participated in structured finance transactions it knew were suspect so it could secure Enron's future business.  For example, RBS was reluctant to extend the Nixon Prepay Transaction because, as one RBS analyst put it, "[t]he scale of financial period manipulation is exceedingly worrying."  RBS 3118862 (quoted in Exam. IV, App. E at 82).  However, following what one RBS document describes as "intense pressure on relationship grounds," RBS agreed to the extension – but only because it could protect itself by purchasing a credit derivative.  *See* Exam. IV, App. E at 83.

633.     RBS's longstanding and profitable relationship with Enron gave it inside access to Enron's financial information.  RBS had a much more accurate understanding of Enron's financial condition, including an understanding of Enron's off-balance sheet liabilities, than could be gleaned from Enron's financial statements alone.  In November, 1998, the Head of Credit Risk for RBS recognized that Enron "will remain heavily leveraged if one takes into account all their off-balance sheet liabilities . . . ."  RBS 1117824-RBS 1117826 (quoted in Exam. III, App. G. at 21).  Another RBS document noted "*continuing moves by Enron to, not only transfer assets off-balance sheet[,] but also to leave Enron itself as little more than a provider of intellectual, hedging and other operational support.*"  RBS 3088396 (quoted in Exam. IV, App. E at 22) (emphasis in original).  In its 2000 "Rating Profile" of Enron, RBS stated that Enron's "aggressive financial policy . . . results in massive off-balance sheet liabilities."  RBS 3088345 (quoted in Exam. IV, App. E at 27).  Top

RBS executives expressed concern about the "absolute level of manipulation" in Enron's financial statements.  RBS 3118880 (quoted in Exam. IV, App. E at 25).

634.    RBS also knew the Insiders were manipulating Enron's financial statements so they did not reflect Enron's real financial condition.  In March 2000, when an RBS credit manager wrote that "[t]he scale of financial period manipulation" was "exceedingly worrying," he continued:

> I can see from a relationship/business perspective that there is a temptation to write another income generating transaction on the basis of the comfort we are drawing from it being very short term, but the concern must obviously be that if lots of counterparties are doing this then any bad news (or shortage for whatever reason of counterparty capacity) will cut refinance ability dramatically and/or end Enron's ability to manipulate thus leading to a horrendous on-balance sheet position which would further exacerbate the position.  The question is when do we stop [?]

RBS 3118862 (quoted in Exam. IV, App. E at 25-26).  As it considered participation in Ghost, an RBS official informed colleagues of his "concern" about what was being done "to massage [Enron's] Balance Sheet."  RBS 3112212 (quoted in Exam. IV, App. E at 24).

635.    RBS even had access to the Insiders' own views on Enron's true financial condition.  In a series of meetings with Glisan and others, RBS learned:

> *In terms of internal RBS treatment of these structures, while Enron may achieve off-balance sheet treatment, we should consider these direct Enron exposure as their operation and off-take is so closely related to Enron.*  Additionally, whatever the tax and accounting treatment, Enron's senior management are consistent in strongly representing verbally that Enron will do everything in their power to protect the investors and lenders involved.

RBS 3120723 (quoted in Exam. IV, App. E at 27) (emphasis in original).

636.    In its dealings with Enron and the Insiders, RBS and its subsidiaries functioned as a single business unit.  Employees of RBS and its subsidiaries were able to speak on behalf of one another and cause one another to participate in transactions with Enron and LJM1.  For example, RBS's relationship manager for Enron was also a Campsie representative; he signed an amendment to the hedging prohibition in the stock held by LJM1 on Campsie's behalf.  *See* Exam. IV, App. E

at 45.  In addition to the direct and indirect subsidiaries of RBS named in this Complaint, there may

be other subsidiaries or affiliates which RBS caused to participate in one or more of the transactions

with Enron that serve as the basis for this Complaint.  It is Enron's intention to hold RBS and each

of these subsidiaries and affiliates responsible for their participation in the challenged transactions,

and Enron notifies RBS of its intention to include the subsidiaries and affiliates as defendants upon

discovery of their identities.

(2)    <strong>LJM1.</strong>

637.    LJM1 was a purportedly "independent" investment vehicle created by Fastow,

through which Insiders such as Fastow and Kopper profited at Enron's expense.  LJM1 consisted

of a general partner (Fastow), who contributed $1 million, and two limited partners (RBS and CSFB,

through their respective affiliates) who each contributed $7.5 million.

638.    LJM1 was a gold mine for  RBS, who received approximately $22.7 million on its

initial $7.5 million investment.  Exam. IV, App. E at 61-62.  RBS recognized that its opportunity

to participate in the lucrative LJM1 vehicle was a reward for being a Tier 1 bank.  On August 31,

2001, with no assets remaining in LJM1, RBS calculated that its return on its LJM1 investment was

"in excess of 1200% IRR.  This is a most satisfactory result and underlines the way Enron supports

its Tier 1 banks."  RBS 6021378 (quoted in Exam. IV, App. E at 61-62).

639.    From the beginning, RBS was fully aware of the conflict of interest posed by

Fastow's dual role as CFO of Enron and the general partner in an investment vehicle that would do

business with Enron.  One RBS executive wrote another to express doubts about the fairness of the

LJM1 transaction to Enron, which "[c]oupled with Fastow's insistence on total secrecy," led him

to conclude that "we should exercise extreme diligence."  RBS 4014174 (quoted in Exam. IV,

App. E at 37)  Two days later, the same executive wrote that he was unable to "get away from the

fact that value is going out of the Enron group."  He said:

> The fact is that a two bit LLC called Martin [the original name for LJM1], owned by a couple of Enron employees, will all of a sudden be *gifted* $220m of Enron stock. It could never bother about the borrowing base, sell the stock in the market, pack up [its] bag and disappear off to Rio.  If you owned it, wouldn't you?  Now I'm beginning to understand why these guys are so keen to get in on it. . . .
>
> What am I missing???????
>
> There needs to be consideration given to the Enron group.

RBS 4014174 (quoted in Exam. IV, App. E at 38) (emphasis in original).

640.    RBS was so worried about Fastow's obvious conflict of interest that it expressed internal concern about the "reputational risk" the bank was taking by participating in LJM1.  *See, e.g.*, RBS 3030461 (quoted in Exam. IV, App. E at 39),  RBS 4014620 (quoted in Exam. IV, App. E at 40 n.141).  An internal RBS document candidly acknowledged:  "[I]t is not too difficult to construct some form of legal action by Enron shareholders (however spurious) claiming that they have been short-changed, that Andy Fastow has 'cherry picked' assets etc. and, in isolation, the position does not look good."  RBS 3030461 (quoted in Exam. IV, App. E at 40).

641.    Despite RBS' initial assertions that it would not proceed with the transaction without reviewing a fairness opinion being prepared by PricewaterhouseCoopers ("PWC"), RBS instead opted to accept Kopper's  verbal assurances that the opinion would bless the transaction as fair to Enron.  *See* Exam. IV, App. E at 41-42.

### (a)    LJM1 and the Rhythms Hedging transaction

642.    RBS knew LJM1 was initially formed to hedge the risk on extremely volatile Rhythms stock held by Enron.  See RBS 4014615 (quoted in Exam. IV, App. E at 34).  The Rhythms Hedging transaction was structured as follows:  Enron gave LJM1 6,755,394 Enron common shares. At the time of this transaction, the shares ostensibly had an unrestricted fair market value of $276 million.  However, Enron transferred the shares subject to liquidity restrictions:  a four-year restriction on resale and a one-year (later changed to two-year) restriction on hedging.  Because of

these restrictions, a 39% discount rate was applied in valuing the shares. LJM1 then contributed approximately one-half the Enron shares to Swap Sub, a hedging vehicle it had formed to enter into the Rhythms Hedge. In return for the shares it transferred to LJM1, Enron received $50 million (later $64 million) in promissory notes from LJM1 and a put right (valued at $104 million) that Enron could exercise, in the future, to force Swap Sub to purchase the Rhythms shares. However, Swap Sub's only asset was the Enron shares it had received from LJM1. *See* Exam. IV, App. E at 31-32, 42-44. As the Examiner concluded: "Thus, Enron did not transfer any of its true economic risk in the Rhythms investment to any third party with assets other than assets provided by Enron." Exam. IV, App. E at 32. RBS was well aware that the Rhythms Hedging transaction did not actually transfer the risk of the Rhythms stock away from Enron. As the Examiner concluded, "RBS was aware that the LJM1/Rhythms Hedging transaction was a non-economic hedge." Exam. IV, App. E at 36.

643.    Because of the LJM1/Rhythms Hedging transaction, the Insiders inappropriately caused Enron to recognize $95 million of income in 1999 – 10.6% of Enron's originally reported net income for the year. *See* Exam. IV, at 67. RBS participated in the formation and funding of LJM1 with full knowledge that the key transaction – the Rhythms Hedge – was a non-economic hedge, and therefore would not be accounted for accurately on Enron's financial statements. An RBS executive later explained that the purported "hedging" transaction with the Rhythms stock actually "enabled the smoothing of earnings" on Enron's financial statements. Sworn Statement of Kevin Howard, at 256, lines 7-9 (quoted in Exam. IV, App. E at 36 n.129).

### (b)    RBS's total return swap with AIG

644.    After the Rhythms Hedging transaction, RBS began searching for ways to extract the upside value of the Enron shares in LJM1 and protect itself from downside risk. *See* Exam. IV, App. E at 43, 46. On November 29, 1999, RBS and CSFB each made a $45.1 million additional capital

contribution to LJM1. In return, LJM1 distributed approximately 1,775,000 shares of Enron stock (worth approximately $137 million on an unrestricted basis) into separate escrow accounts for the benefit of each limited partner. *See* Exam. IV, App. E at 53-55.

645.    When RBS obtained access to the Enron shares through the escrow, it quickly moved to capture the Enron share value that exceeded RBS's capital contribution to LJM1. RBS executed a total return swap with AIG that enabled RBS to book approximately $67 million in income, allowing RBS to recognize a profit in excess of $22 million. *See* Exam. IV, App. E at 53-55. Fastow, meanwhile, benefited as the LJM1 general partner from the additional capital contributions to LJM1. An RBS document succinctly summarized the transaction's goals: "[RBS] wished to lock in and realize its profit from the [LJM1] deal straight away and [Fastow] wished for more cash in LJM for him to invest and generate profit from." RBS 4003282 (quoted in Exam. IV, App. E at 55). One RBS executive boasted about what RBS had accomplished:

> So what [we] have achieved over the last couple of months is to strip out 94% of the value remaining in the vehicle after Fastow put his grubby little fingers in the till, and convert it to P & L. For emphasis, what we have executed was not Enron's idea, or Fastow's idea, or CSFB's idea, it was OUR idea.

RBS 4015211 (quoted in Exam. IV, App. E at 55 n.209).

646.    In restructuring LJM1 and executing the total return swap, RBS knowingly participated in a fraud on Enron. As RBS knew, Fastow had represented to the Enron Board that he would have no economic interest in Enron stock transferred to LJM1. *See* Exam. IV, App. E at 34-35. (In addition, the Amended Partnership Agreement for LJM1 prohibited Fastow from sharing in distributions of proceeds resulting from the Enron stock transferred to LJM1. *See* Exam. IV, App. E at 45.) However, the restructuring of LJM1 enabled Fastow to do exactly what he had promised the Enron Board he would not do: profit from the value of the Enron stock in LJM1. The escrow accounts for the benefit of the limited partners gave RBS control over Enron stock that had formerly

been held in LJM1, and RBS's total return swap with AIG using that Enron stock enabled RBS to make its additional capital contribution to LJM1 – which Fastow was promptly able to profit from. *See* Exam. IV, App. E at 56.  Neither Fastow nor any other Insider disclosed the RBS escrow or the RBS total return swap to the Enron Board.  *See* Exam. IV, App. E at 55-56.

647.    In addition, RBS's participation in the restructuring of LJM1 circumvented another condition on which the Enron Board had relied in approving the LJM1 related-party transaction. The Enron Board had approved LJM1 based, in part, on Fastow's representation that PWC would provide a fairness opinion in which PWC would conclude that the value of the put option and money (LJM1's contribution) would exceed the value of the Enron shares (Enron's contribution).  To reach that view in its fairness opinion, PWC applied an "illiquidity discount" to the Enron shares based on the restrictions Enron had placed on LJM1's ability to transfer or pledge the shares.  These restrictions prohibited LJM1 from hedging the Enron stock it received for two years, and from selling or otherwise transferring that stock for four years.  However, RBS's total return swaps with AIG effectively circumvented the restrictions, thus vitiating the conditions on which PWC based its fairness opinion.  *See* Exam. IV, App. E at 44-45, 85-86, 95.

648.    The participants in LJM1 profited handsomely from the restructuring.  Fastow ultimately distributed $17.9 million to himself from LJM1.  RBS and CSFB each received additional $5.9 million distributions.  *See* Exam. IV, App. E at 59.  In addition, RBS made over $22 million in profit on its total return swap with AIG.  As the Examiner concluded, RBS's total return swap with AIG "circumvented certain restrictions in the Amended Partnership Agreement, contravened representations made by Fastow to the Enron Board when he sought [its] approval for LJM1, and facilitated increased distributions to Fastow and other Enron insiders."  Exam. IV, App. E at 33.

(c)      Cuiaba

649.     RBS also improperly benefitted when Fastow caused Enron to repurchase LJM1's interest in Cuiaba, a Brazilian power plant.  In September 1999, LJM1 purchased this asset from Enron.  However, Fastow obtained an undisclosed verbal side agreement that Enron would repurchase LJM1's interest in Cuiaba at a profit to LJM1 – regardless of how the investment actually performed.

650.     This promise was kept when LJM1 was winding down, and only the Cuiaba asset remained on its balance sheet.  RBS expressed to Fastow its dissatisfaction with the fact that Cuiaba was worthless.  In response, Fastow "negotiated" for Enron to buy back LJM1's interest for $13.7 million.  As the Examiner concluded:  "Enron repurchased LJM1's Cuiaba interest at a premium, even though the facts indicate that the market value of the interests actually decreased during LJM1's ownership period."  Exam. IV, App. E at 59-61.

651.     From the purchase price, Kopper received $7.3 million as general partner in LJM1, and RBS and CSFB each received approximately $2.7 million as limited partners.  *See* Exam. IV, App. E at 59-62; Exam. II, App. L, Annex 3 at 8.  This transaction profited the LJM1 participants at Enron's expense: Fastow bragged that RBS's distribution from the Cuiaba sale would make him "look like a hero in the bank's eyes."  *See* Exam. IV, App. E at 61.  RBS knew it had benefitted from Fastow's self-dealing: An internal RBS document pointed out that Fastow had "*secured a sale of the Brazilian asset to Enron at a price which will be enough to repay our outstanding capital amount and return a further small LP distribution,*" a transaction which Fastow was only able to execute "*as a result of the close ties between Enron and LJM[1].*"  RBS 1112362 (quoted in  Exam. IV, App. E at 60 n.236) (emphasis in original).

652.     Despite recognizing the inherent conflict of interest LJM1 involved, RBS invested in the structure and reaped its benefits – $22.7 million on a $7.5 million investment.  RBS

substantially assisted the Insiders in manipulating Enron's financial statements, secured enormous profits for itself, and helped Fastow and other Insiders personally profit from LJM1 transactions at Enron's expense.

### (3)     The RBS FAS 140 transactions.

653.     RBS also helped the Insiders structure and execute four FAS 140 transactions, which the Insiders used to manipulate Enron's financial statements. The RBS FAS 140 transactions were Sutton Bridge and ETOL I-III. In addition, RBS participated in two others – Ghost and Hawaii.

654.     RBS knew the accounting requirements that governed FAS 140 transactions, including specifically that FAS 140 accounting was only appropriate if the equity RBS contributed to the SPE in the transaction was at risk. Despite this knowledge, RBS secured verbal assurances of repayment from the Insiders, so its equity was not actually at risk in any of the RBS FAS 140 transactions. RBS relied on these verbal assurances in entering into the transactions. RBS would not – and did not – participate in FAS 140 transactions without first getting the Insiders to agree that its equity investment would be repaid.

655.     RBS knew the transactions in which it participated did not qualify for FAS 140 treatment because its equity was not at risk. But RBS also knew the Insiders would report the transactions as if they did. Without RBS's equity piece, these FAS 140 transactions would not have occurred. Consequently, by participating in these transactions, RBS aided the Insiders' scheme to report cash flow improperly as arising from operations and disguise Enron's true debt. RBS knew exactly what the Insiders were doing with these transactions: It referred to the Insiders' booking of gains and cash flow from the FAS 140 transactions as "21st Century Alchemy." RBS 3121150 (quoted in Exam. IV, at 72 n.122). However, neither RBS nor the Insiders ever disclosed the nature or existence of these verbal assurances.

(a)     **Sutton Bridge**

656.     The Sutton Bridge FAS 140 transaction was designed to allow Enron to monetize its equity interest in Sutton Bridge, a gas turbine power plant located in Lincolnshire, England.  Sutton Bridge's importance to both Enron and RBS was highlighted by the fact that it was the first structured equity participation executed by the RBS Structured Finance Division.

657.     RBS knew the Insiders were using Sutton Bridge to manipulate Enron's financial statements.  RBS took pride in having "[f]acilitated [Enron's] ability to realize [$29 million] capital gain to boost half year earnings," and identified "[c]ashflow [sic] generation of [$68 million]" as among the reasons for the transaction.  RBS 3126610-RBS 3126611 (quoted in Exam. IV, App. E at 63).

658.     RBS knew its equity in the SPE established for the transaction needed to be at risk in order for the Insiders' desired accounting treatment to be valid.  As RBS's Sutton Bridge transaction summary noted, the investor "must have a 'significant' equity risk, currently accepted as 3% equity (97% debt)," and there could be "no contractual commitment of the vendor to repurchase the shares."  RBS 3126617 (quoted in Exam. IV, App. E at 65 n.260).  However, RBS obtained verbal assurances from the Insiders that negated any real risk in the transaction.  An RBS memorandum referred to the "short-term involved" and "the 'understanding' with Enron regarding their repurchasing at an agreed return."  RBS 3038535 (quoted in Exam. IV, App. E at 65).  RBS referred to this agreement as "Trust Us."  RBS 3126621 (quoted in Exam. IV, App. E at 65 n.264).  RBS would not have entered into Sutton Bridge without this "Trust Us" assurance.  *See* Exam. IV, App. E at 65.

659.     RBS was fully aware that these verbal assurances thwarted the FAS 140 requirement that the equity in the SPE be at risk.  But RBS also knew that the Insiders needed to account for Sutton Bridge as a FAS 140 transaction in order for them to falsely inflate Enron's cash flow.  So,

RBS compromised by letting the Insiders keep their assurances unwritten but requiring the assurances nevertheless. *See* Exam. IV, App. E at 65. Neither RBS nor the Insiders disclosed the existence of the Sutton Bridge verbal assurances.

660. The Sutton Bridge transaction ended exactly according to the Insiders' and RBS's scheme. RBS's equity was repaid when the underlying asset in the Sutton Bridge structure was sold. RBS made a substantial profit from Sutton Bridge, receiving revenues in excess of $1.2 million and an equivalent return on equity of 1161% per year. *See* Exam. IV, App. E at 63.

661. Sutton Bridge became a valued precedent for RBS, who realized that similar FAS 140 transactions presented an opportunity to "get paid well" for its participation without facing any risk (because of the Insiders' verbal assurances). When RBS considered the ETOL I transaction, one RBS executive wrote that the new transaction was "exactly aligned to the Sutton Bridge deal we did last year – [in that] the whole thing hinges on an 'understanding' with Enron [that] they will buy it all back . . . . I would be happy to sit on the lot for the short period involved providing we get paid well – this is what we did on Sutton Bridge." RBS 6074362 (quoted in Exam. IV, App. E at 66).

### (b)      ETOL I, II, and III

662. During December 1998, RBS arranged and acted as the agent to fund Enron Europe Limited's ("EEL") acquisition of ICI's Teesside Utilities & Services Business on the Wilton chemical site through a new Enron subsidiary, Enron Teesside Operations Ltd. ("ETOL"). "Watershed" was the name of the company that owned the power generation assets and the infrastructure used to supply certain industrial services to various chemical companies located in the Wilton industrial area, one of Europe's leading petrochemical locations. ETOL I, II and III, which closed in November 2000, March 2001, and June 2001, respectively, were the names of the transactions that monetized the dividends flowing out of, and cost savings from, Watershed.

663.    In each of the ETOL I-III transactions, RBS obtained verbal assurances from the Insiders – who included but were not limited to Fastow and Glisan – that its equity investment in the SPE it established and capitalized would be repaid.  Iain Houston, RBS's Head of Structured Finance, told his colleagues before ETOL I:  "I have no issue doing this type of deal in view of the verbal assurances we have been given consistently by senior Enron staff – most recently by Andy Fastow to [senior RBS executives Iain Robertson ("Robertson"), Johnny Cameron] and other [RBS] leading lights."  RBS 6074373 (quoted in Exam. IV, App. E at 68-69).  Another RBS executive said the verbal assurances in ETOL I "come from a very high level and are unequivocal."  RBS 3121434 (quoted in Exam. III, App. E at 70).  An RBS executive proclaimed himself "comforted" by Fastow's "assurance that the bank's remuneration would be met by Enron."  RBS 1113345 (quoted in Exam. IV, App. E at 77).  In ETOL I, RBS also entered into a total return swap, which effectively guaranteed repayment to RBS of the interest, principal, and other amounts due under RBS's loan to the SPE in the transaction.  *See* Exam. IV, App. E at 67-68.  In ETOL II and III, RBS received "high level assurances" regarding repayment of the equity and yield.  *See, e.g.*, RBS 3124934, RBS 3124935, RBS 3124939 (quoted in Exam. IV, App. E at 75-76).  A later memorandum on ETOL III described a "'promise' to make us whole on the equity at the end of the transaction."  RBS 1087734 (quoted in Exam. IV, App. E at 76 n.304).

664.    As in Sutton Bridge, RBS knew these verbal assurances had to be unwritten, otherwise the Insiders would not be able to account for ETOL I-III as FAS 140 transactions.  The RBS Credit Application for ETOL I acknowledges the existence of an "informal agreement to ensure that we achieve our required return and are made whole on the equity principal at transaction maturity," but also candidly states that "their desired accounting treatment does not permit any formal arrangements to be made."  RBS 3141124 (quoted in Exam. IV, App. E at 68).  Another RBS executive referred to "verbal undertakings" that "cannot be formally documented for accounting

reasons." RBS 3141116 (quoted in Exam. IV, App. E at 71). Neither the Insiders nor RBS ever disclosed the verbal assurances in the ETOL I-III transactions.

665.    RBS relied on these verbal assurances in executing ETOL I-III. The verbal assurances were the only reason the ETOL I-III transactions made any sense for RBS – because it would have taken 22 years for RBS to be repaid from the dividend flow from the asset being monetized. *See* RBS 3124953 (cited in Exam. IV, App. E at 77). In ETOL II and III, RBS did not even bother to conduct due diligence to verify Insider representations of the value of the underlying asset, underscoring the extent to which RBS was relying on the Insiders' verbal assurances of repayment. *See* Exam. IV, App. E at 75. But RBS knew that it was in no danger of losing its "investment": The bank's previous experience with Sutton Bridge had taught it that the Insiders would make good on their verbal assurances. As one RBS executive explained, "[p]revious understandings with Enron have always been delivered upon and there is no reason to believe that this particular transaction will prove to be the exception to the rule." RBS 3141117 (quoted in Exam. IV, App. E at 71).

666.    RBS was well aware that it was helping the Insiders create false and misleading financial statements by participating in the ETOL I-III transactions. RBS knew the Insiders would account for these transactions under FAS 140, despite the fact that the Insiders' verbal assurances of repayment rendered RBS's equity without risk. RBS knew the ETOL transactions facilitated "financial engineering." RBS 3121151 (quoted in Exam. IV, App. E at 78). Most succinctly of all, RBS described the ETOL structure as "21st Century Alchemy." RBS 3121150-51 (quoted in Exam. IV, App. E at 78-79).

### (4)    The Nixon prepay.

667.    RBS participated in the Nixon prepay, a series of transactions at year-end 1999. The Nixon prepay purportedly was a commodity trade but, in substance, was a loan to Enron. In the

Nixon prepay, RBS and Barclays each loaned $110 million to Enron, and Citigroup loaned another $104 million, with Toronto Dominion serving as the pass-through entity for all three lenders. In exchange for its $110 million, RBS received a forward commitment from Enron to pay the market price on a certain quantity of crude oil on a certain date. RBS simultaneously entered into a swap agreement with Toronto Dominion whereby RBS agreed to pay the same market price for the same quantity of oil on the same date in exchange for $110 million plus an additional amount that was effectively an interest payment. Toronto Dominion, at the same time, entered into a swap with Enron. By concurrently entering into these fixed-floating and floating-fixed agreements, neither RBS nor Enron retained any forward price risk associated with the underlying quantity of crude oil.

668.    RBS knew full well that the Nixon prepay was, in substance, a loan. It knew the structure was circular, describing it as "set up to remove the commodity risk for all parties, [so] all payments against commodity price moves are exactly off-set by receipts from the party on the other side." RBS 3118966 (quoted in Exam. IV, App. E at 81). Internal RBS documents candidly described Nixon as a "loan." *See, e.g.,* RBS 53118965 (cited in Exam. IV, App. E at 81 n.326). RBS also knew the Insiders' accounting for the Nixon prepay was misleading because it was inconsistent with the transaction's economic substance. As the Examiner concluded, RBS knew "that Enron booked the repayment obligation in the transaction as price risk management activities rather than debt and that the proceeds of loan transactions such as Nixon were booked by Enron as cash flow from operating activities." Exam. IV, App. E at 81.

669.    RBS also knew, more generally, that the Insiders wanted to execute the Nixon prepay so they could camouflage Enron's true financial condition. RBS knew the Insiders wanted to use Nixon to book cash and reduce debt on Enron's financials at a "critical year-end period." RBS 3118972 (quoted in Exam. IV, App. E at 79 n.319). RBS's senior research analyst described Nixon as "little more than a 'window dressing' request" that "raises issues over the absolute level of

manipulation" in Enron's financial statements.  RBS 3118973 (quoted in Exam. IV, App. E at 81).

Nevertheless, RBS participated in Nixon in hopes of getting future Enron business.  RBS saw Nixon

as an opportunity to "[o]nce again uptier the Enron Corp. relationship by assisting them over their

crucial de-leveraging periods of quarter and year ends."  RBS 3018561 (quoted in Exam IV, App. E

at 16 n.56).  In considering an extension of Nixon, another RBS analyst reported:  "[t]he scale of

financial period manipulation is exceedingly worrying."  RBS 3118862 (quoted in Exam. IV, App.

E at 82).

670.    The Nixon prepay settled on April 14, 2000 (less than half a year after it began), and

RBS netted approximately $2.5 million in interest on its $110 million loan.  Because of its

participation in Nixon, RBS profited for itself and knowingly facilitated the Insider's creation and

dissemination of misleading Enron financial statements.

## j.    RBC knowingly assisted the Insiders in misstating Enron's financial condition.

671.    RBC's participation in the Insiders' manipulation of Enron's financial statements was

integral to the Insiders' scheme.  RBC knew the Insiders were using SPE and other structured

finance transactions to manipulate Enron's financial statements.  RBC helped the Insiders achieve

their improper goals by designing and financing the Alberta prepay transaction ("Alberta").  In

addition, RBC participated in Hawaii with full knowledge that the Insiders had guaranteed

repayment of CIBC's equity in the transaction, causing the transaction's accounting to be

misleading.  RBC assisted the Insiders in overstating Enron's cash flow from operations and

understating Enron's debt, helping to hide Enron's true financial condition.

672.    The ENA Examiner has reviewed and criticized RBC's participation in the Insiders'

scheme.  In connection with his investigation of RBC, the ENA Examiner reviewed many of RBC's

Enron-related transactions, including Alberta and Hawaii.  The ENA Examiner also investigated the

extent of RBC's understanding of Enron's financial condition and off-balance sheet liabilities. The ENA Examiner concluded that RBC "participated actively in structuring transactions with Enron that were designed to disguise Enron's exposure to debt." *See* Report of Harrison J. Goldin, the Court-Appointed Examiner in the Enron North America Corp. Bankruptcy Proceeding, Respecting His Investigation of the Role of Certain Entities in Transactions Pertaining to Special Purpose Entities (Nov. 14, 2003) ("ENA Exam."), at 93. With respect to Alberta, the ENA Examiner concluded that RBC "was aware of the U.S. accounting standards applicable to Enron," and that despite this knowledge, that RBC designed and financed the Alberta structure, which was "effectively a loan from RBC to Enron," but was executed through a commodity swap structure that "served no apparent purpose other than to conceal the true nature of the financing." ENA Exam. at 115, 117. The ENA Examiner concluded this evidence is "sufficient for a fact finder to conclude that RBC knowingly aided and abetted Enron officers in consummating transactions that were designed to provide Enron with off-balance sheet funds and to permit Enron officers to manipulate Enron's publicly disclosed financial information in a materially misleading fashion." ENA Exam. at 20.

### (1)    RBC's relationship with Enron.

673.    RBC had a longstanding relationship with Enron, dating back to at least 1995. In the summer of 2000, RBC hired a team of approximately 25 bankers from NatWest's structured finance group, many of whom had participated in Enron-related structured finance deals while they were at NatWest. (NatWest merged with RBS in 2000.) The arrival of this group marked a significant step forward in RBC's Enron relationship: The former NatWest bankers brought a detailed knowledge of Enron's financial condition, close business relationships with Insiders including but not limited to Fastow, and firsthand experience working on transactions with the Insiders that manipulated Enron's financial statements. *See* ENA Exam. at 97-98. The former NatWest bankers

saw their experiences with Enron-related transactions at NatWest as a precedent for the work they sought to do at RBC.  For example, in considering a FAS 140 transaction that RBC ultimately did not participate in, John Bruen, one of the former NatWest bankers, wrote to his colleagues that RBC could obtain "informal comfort" on its "ability to get full and timely repayment under the equity certificates," and alluded to the success of the verbal assurances at NatWest:  "We have invested in similar transactions while at Greenwich NatWest and have obtained full and timely repayment." RBC NY 0083372 (quoted in ENA Exam. at 165).

674.     The former NatWest bankers promptly began leveraging their relationships with the Insiders in an attempt to elevate RBC to Tier 1 bank status.  In fall 2000, RBC agreed to commit $10 million to an approximate $120 million debt facility for LJM2, even though RBC knew LJM2 would assist in "balance sheet management," RBC NY 0096789 (quoted in ENA Exam. at 105), because RBC saw LJM2 as "an entry ticket for more remunerative transactions which we are already seeing coming to us."  RBC NY 0029257 (quoted in ENA Exam. at 104).  Andrew Hews, an RBC executive who had come over with the NatWest group, wrote:  "[T]his invitation came to us from the CFO of Enron and notwithstanding the lack of any formal link with Enron we regard participation as a 'must' in order to position the bank for other transactions which will undoubtedly be generated by Enron in the near future."  RBC NY 0096793 (quoted in ENA Exam. at 104).  *See also* Sworn Statement of Andrew Hews, Oct. 9, 2003, at 31 (cited in ENA Exam. at 98-99).  Similar considerations motivated RBC's participation in the E-Next transaction, which Andrew Hews described as "an extremely important deal to Enron and our profile with them," RBC NY 0118376 (quoted in ENA Exam. at 162), and which Hews predicted "will assist our endeavours to be awarded the much more profitable lead arranger status on a number of potential deals."  RBC NY 0118374 (quoted in ENA Exam. at 162).

675.    Enron became a profitable and important client for RBC.  In October 2000, as the former NatWest bankers were seeing results from their strategy to enhance RBC's relationship with Enron, one former NatWest banker boasted:  "We are acting (marketing) as if we are a Tier 1 bank and they are starting to treat us like one."  RBC NY 0013003 (quoted in ENA Exam. at 103).  As of late 2001, Enron accounted for approximately 30% of the revenues of RBC's Global Structured Finance Group.  *See* ENA Exam. at 107.  In addition to Alberta, discussed in detail below, RBC participated in several other Enron-related transactions such as a $105 million bridge financing and a $105 million credit wrap to an Enron-related off-balance sheet structure known as Bob West Treasure, a $37 million Enron-related SPE transaction called E-Next, and a $10 million loan to the LJM2 structure.  RBC also participated as a $20 million lender in the Hawaii FAS 140 financing.

676.    RBC's relationship with Enron gave it a more detailed understanding of Enron's financial condition, including an understanding of Enron's off-balance sheet liabilities, than could be gleaned from Enron's financial statements alone.  As of 2000, RBC knew that through a swap agreement Enron was effectively guaranteeing a substantial amount of the off-balance sheet debt of JEDI I, and RBC also knew of an off-balance sheet financing using JEDI I and Chewco.  *See* ENA Exam. at 100.  In early September 2000, RBC estimated Enron's off-balance sheet obligations at up to $16 billion – at a time when RBC knew Moody's and Standard and Poor's calculated Enron's off-balance sheet obligations at a far lower level.  *See* ENA Exam. at 100-01.  RBC surmised that the rating agencies were unaware of Enron's exposure from prepaid oil and gas contracts because of the difference between its own internal estimate of Enron's off-balance sheet liabilities and the rating agencies' calculations.  *See* ENA Exam. at 101.  RBC even had access to the Insiders' own views on Enron's financial condition.  In October 2000, several RBC executives, including many who had longstanding relationships with the Insiders from their time at NatWest, met with Insiders including Fastow and Glisan to better understand Enron's financials.  *See* ENA

Exam. at 102-03.  RBC knew the Insiders' use of structured finance transactions was confusing:  In one e-mail, an RBC executive noted that "being Enron's auditor would be a thankless task."  RBC NY 0099069 (quoted in ENA Exam. at 101).

677.    RBC was aware the Insiders manipulated Enron's financial statements in part because of rating agency pressure to reduce debt and increase cash flow.  One RBC executive informed another that "[t]he rating agencies have been pressing Enron vis a vis a low level of cash flow generation to total debt for the rating class."  RBC NY 0099068 (quoted in ENA Exam. at 102).

678.    RBC also knew it was not the only bank assisting the Insiders in manipulating Enron's financial statements.  One RBC executive received a document that led him to write:  "It's [sic] hard to believe this stuff, because it implies the '10 top tier banks' are aware of what's [sic] going on."  RBC NY 0102526 (quoted in ENA Exam. at 101-02).  In addition, the former NatWest bankers were obviously aware of what NatWest had done to assist the Insiders in concealing Enron's true financial status.  *See, e.g.*, RBC NY 0083372 (quoted in ENA Exam. at 165).

### (2)    Alberta.

679.    In late August 2000, after the arrival of the NatWest team, RBC learned the Insiders were seeking off-balance sheet financing for Enron's purchase of 20-year Power Purchase Arrangements auctioned by the Canadian province of Alberta.  *See* ENA Exam. at 108.  RBC was ecstatic about the opportunity to participate in the transaction, calling it a "significant opportunity for the new Structured Finance Group."  RBC NY 0100134 (quoted in ENA Exam. at 109).

680.    RBC devised the final Alberta structure, which consisted of a complicated series of swaps.  *See* ENA Exam. at 112.  In simplified form, the structure worked as follows: Toronto Dominion and RBC each entered into mirror-image prepay transactions, with each funding Can$147.4 million, closing on the same day.  JPMorgan/Chase acted as the swap counter-party for both the RBC-funded and the Toronto Dominion-funded portions of Alberta.  Like the other Enron

prepay transactions, the circular obligations built into Alberta removed all commodity risk from the transactions, making them effectively loans. As the ENA Examiner concluded: "In essence, RBC paid Can$147 million to Enron Canada up front and ENA was obligated to pay quarterly interest and principal on that amount. The floating cash flow went from Enron Canada to RBC to Chase to ENA. Hence, the Alberta prepay transaction was effectively a loan from RBC to Enron." ENA Exam. at 117.

681.    Of course, RBC knew – because it had created the structure – that Alberta was in economic substance a loan. RBC understood the circular nature of the Alberta prepay, and it also understood that because the prepay transactions transferred the price risk of the underlying commodity in a circle, none of RBC, the Enron affiliate or the other financial institutions involved had any commodity price risk as part of the transaction.

682.    However, RBC designed its final Alberta structure in a way that would hide the transaction's true economic substance. RBC proposed concealing the debt with a circle of commodity swap agreements fully guaranteed by Enron. RBC proposed concealing cross-defaults among the swaps. RBC proposed concealing the nature of the swaps by placing loan-related covenants in the Enron guarantee rather than in the swaps. RBC proposed using gas commodity swaps, which better concealed the swaps from scrutiny. RBC proposed including another bank (Chase) in the circle of swaps, which better concealed the swaps' effect. *See* ENA Exam. at 142. RBC knew its ability to unwind the entire transaction meant that it actually faced no commodity price risk, but it also knew that it had to conceal that fact so the Insiders could obtain their desired accounting treatment. An RBC executive explained in an e-mail: "We will have the right to terminate any of the Swaps at our option. The reason for this is that Enron will have the ability to terminate Swap 1 . . . and as soon as there is one termination we obviously have to unwind the whole

thing.  However, we cannot in the documentation state this linkage or we run afoul of the Auditors."

RBC NY 0100079 (quoted in ENA Exam. at 115).

683.    The Insiders accounted for the total Can$294.8 million from the RBC-funded and Toronto Dominion-funded portions of the prepay as funds flow from operations, rather than from financing, and did not record the amount on Enron's balance sheet as debt.  This was no surprise to RBC, who knew the Insiders' accounting for Alberta would be inconsistent with the transaction's economic substance.  RBC described the Insiders' original request for Alberta as a request for an "off-balance sheet structure."  RBC NY 0083145 (quoted in ENA Exam. at 108).  RBC understood the accounting principles applicable to structures such as Alberta.  *see* RBC NY 0100132 (quoted in ENA Exam. at 115), and yet RBC knew the Insiders would account for Alberta as price risk management, not as debt.  In an early version of the Alberta structure that was not eventually used, RBC noted the structure's desired effect was "to permit Enron Canada to treat the financing as a commercial sales contract and not as debt on its balance sheet." RBCNY0078750-754 (quoted in ENA Exam. at 109).

684.    RBC profited for itself by structuring and financing Alberta, receiving Can$500,000 fees for the transaction.  In addition, RBC's performance in Alberta persuaded the Insiders to give RBC access to other lucrative Enron deals.  In a meeting in October 2000 with Fastow, Glisan, and others, Fastow and Glisan told RBC's structured finance team that RBC would be invited to participate in a future structured finance venture because of Alberta (as well as because of RBC's progress in obtaining credit approval for its loan to LJM2).  RBC NY 0013003 (quoted in ENA Exam. at 118).

### (3)    Hawaii.

685.    RBC participated as a $20 million lender in the Hawaii FAS 140 financing.  CIBC's role as lead lender in Hawaii is described at paragraphs 522 through 526.  RBC was  reluctant to

participate in Hawaii but decided to do so because of the possibility that Hawaii would lead to future Enron-related business: An RBC document admits that the bank would not "do this deal [Hawaii] in isolation but have 5 other deals in the pipeline with Enron where we can earn substantial fees." RBC 0133696 (quoted in ENA Exam. at 126). RBC knew CIBC had obtained verbal assurances from the Insiders that CIBC's equity in the Hawaii transaction would be fully repaid, in violation of the 3% equity test, which caused the accounting for the structure to be misleading. Notwithstanding this knowledge, RBC assisted the Hawaii structure by lending money to it.

### (4)    RBC limited its Enron exposure.

686.    As early as 1999, RBC's credit risk management group conducted extensive internal reviews of Enron's financials, including its off-balance sheet vehicles, in a concentrated effort to understand the extent of Enron's true debt. In September 2000, shortly after RBC internally estimated Enron's off-balance sheet obligations at $16 billion, an RBC executive received a document that caused him to write: "[T]he implications of that document for Enron are absolutely enormous. If Bob [Hall, Senior Vice President of Risk Management Group] read it he'd cut the [credit] limit [of Enron] in half." RBC NY 0102526 (quoted in ENA Exam. at 101-02). Also in September 2000, an RBC executive wrote that another RBC executive might have concerns about the "transparency of [Enron's] financial statements (the integrity of the accounting principals [sic] behind the financial statements)." RBC NY 0099068 (quoted in ENA Exam. at 102). At the time these concerns were being voiced within RBC, the bank's efforts to protect itself were already underway: As of September 1, 2000, RBC had reduced its overall Enron credit exposure by approximately Can$240 million.

687.    RBC's Risk Management Group was still concerned in October 2000 about Enron's financial condition. RBC planned to reduce its exposure to Enron by syndicating or underwriting more transactions, focusing on more lucrative off-balance sheet structured financings so it could

earn higher fees, then selling the debt to other banks, insurance companies and other investors. *See* ENA Exam. at 103.

688.     Notwithstanding RBC's concerns about the "transparency" of Enron's financials and the results of its comprehensive analysis of Enron's off-balance sheet liabilities and other credit risks, RBC entered into Alberta and Hawaii, as well as numerous other Enron financings, from September 2000 through the Petition Date.  Even as RBC was pocketing the fees from these off-balance sheet financings, RBC was protecting its bottom line with syndications, sell-downs, assignments, reduced credit limits and purchased credit derivations on the Enron name.  By the Petition Date, RBC's net exposure was approximately $211 million, down from $750 million in 2000.

### 5.     The Bank Defendants Acted Together To Manipulate And Misstate Enron's Financial Condition.

689.     The Bank Defendants acted in concert with the Insiders and with each other to manipulate and misstate Enron's financial condition.  Many of the Enron SPE transactions were designed, structured, implemented and/or financed by, or otherwise required the active participation of, more than one of the Bank Defendants.  In each instance, each participating Bank Defendant was aware that the Insiders were improperly recording the financial effects of the SPE transaction.

690.     Both Citigroup and Barclays facilitated the Roosevelt prepay transaction.  Citigroup loaned $500 million to ENGM in the transaction, and Barclays served as the pass-through entity.

691.     Both Citigroup and Toronto Dominion facilitated the Truman prepay transaction. In two mirror-image prepays which closed on the same day, each loaned $250 million to Enron and each served as the pass-through entity for the other's loan.

692.    Both Citigroup and Toronto Dominion facilitated the Jethro prepay transaction.  In two mirror-image prepays which closed on the same day, each loaned $337.5 million to Enron and each served as the pass-through entity for the other's loan.

693.    Citigroup, Barclays, RBS and Toronto Dominion facilitated the Nixon Prepay Transaction.  Citigroup loaned Enron $104 million, RBS loaned Enron $110 million, and Barclays loaned Enron $110 million.  Toronto Dominion served as the pass-through entity for each of these loans.

694.    Both Toronto Dominion and Chase facilitated the December 1998 Prepay Transaction. Toronto Dominion loaned Enron $250 million, and Chase served as the pass-through entity.

695.    Toronto Dominion, RBC and Chase facilitated the Alberta Prepay Transaction.  In two mirror-image prepays which closed on the same day, Toronto Dominion and RBC each loaned Enron Can$147.4 million.  Chase served as the pass-through entity for each of these loans.

696.    Citigroup and Chase facilitated the forest products SPE transactions – Fishtail, Bacchus and Sundance Industrial.  In Fishtail, Chase, working with LJM2, supported the so-called "equity" investment, even though that "equity" was not at risk due to support from the Insiders.  Chase also provided the Insiders with an inflated valuation of Enron's pulp and paper trading business, valuing the assets at more than twice the value being carried on Enron's books and thereby giving the Insiders an ostensible basis for improperly recognizing a huge gain on the sale of this business.  In Bacchus, Citigroup – based upon the inflated valuation from Chase -- enabled the Insiders to recognize a gain of $112 million, and to report $200 million as cash flow from operations, from the sale of Enron's pulp and paper trading business.  Citigroup provided the "equity" investment for Bacchus, knowing that it was not at risk due to assurances of full repayment from Fastow.  In Sundance Industrial, Salomon Holding, a Citigroup subsidiary,  made an "equity"

investment that was not at risk and enabled the Insiders to buy back the Fishtail equity interest that had been supported by Chase and LJM2 and also allowing the Insiders to improperly keep $375 million of debt off of Enron's balance sheet.

697.   Both Barclays and CSFB facilitated the September 2001 Prepaid Oil Swap Transaction CSFB loaned ENA $150 million, and Barclays served as the pass-through entity.

698.   Both Barclays and CSFB facilitated the Nikita FAS 140 transaction.  Barclays was to purchase and hold the "equity" certificate in the SPE created for this transaction, but at the eleventh hour was unable to do so, for regulatory reasons.  CSFB agreed to step in and purchase the "equity" in the SPE but, as a condition of doing so, CSFB required Barclays to enter into a total return swap, guaranteeing to CSFB the return of its "equity" investment.  Barclays, in turn, knew that it had no "equity" exposure in the transaction, as the Insiders had promised that the equity investment would be repaid by Enron.

**6.     The Bank Defendants' Participation In The Insiders' Scheme Caused Substantial Loss to Enron**.

699.   By knowingly assisting the Insiders in manipulating and misstating Enron's financial condition, the Bank Defendants caused Enron to suffer enormous injury.  Individually, and certainly collectively, the participation of the Bank Defendants was essential to the Insiders' far-reaching scheme to manipulate Enron's financial condition and artificially maintain Enron's credit ratings, all of which enabled the Insiders to improperly obtain personal benefits from transactions with the company and to conceal their acts of past mismanagement.  Without the prepay, FAS 140, minority interest, tax and other transactions designed, implemented, and in many cases financed by the Bank Defendants, the Insiders would not have been able to conceal from the rating agencies and others Enron's true financial condition, and their scheme would have collapsed.  As the Enron Examiner concluded, ***"At least by 1999, and perhaps earlier, Enron's continued success was dependent upon***

*its ability to deploy [structured finance] accounting techniques to manage these key credit ratios."*
Exam. II at 36 (emphasis added).  Similarly, the Bank Defendants' participation with the Insiders' private investment partnerships was critical to their formation and success.  Without the knowing involvement of the Bank Defendants in these vehicles for self-dealing, the Insiders would not have been able to obtain tens of millions of dollars at the company's expense.

700.    The transactions in which each Bank Defendant participated materially altered Enron's financial condition.  The Citigroup prepay transactions, alone, materially affected Enron's 1999 statement of cash flow from operations, causing it to artificially increase from $293 million to over $1.2 billion, an increase of over 300%.  The group of Citigroup transactions challenged herein allowed the Insiders to improperly record more than $5 billion of cash flows from operating activities, improperly record approximately $132 million in income, and understate Enron's debt by billions of dollars during the relevant period.  Similarly, the Chase prepay transactions, alone, assisted the Insiders in overstating Enron's cash flow from operations by $2.6 billion from December 1997 through September 2001.  Without these transactions, Enron's operating cash flow would have been 28% lower in 1999 and 21% lower in 2000, and Enron's debt would have been 16% higher in 1999 and 23% higher in 2000.  Focusing specifically on the prepay transactions, the Enron Examiner found that for 1999 and 2000 Enron "almost certainly" would have had lower credit ratings had these transactions not occurred.

701.    More than half of Enron's net income reported for 1998 was provided by three FAS 140 transactions with CIBC.  Those same transactions provided 45% of Enron's reported cash flow from operations that year.  During 1999, 13% of Enron's reported net income and 67% of its cash flow from operations were based upon FAS 140 transactions with CIBC.  The improper tax transactions that Deutsche Bank facilitated contributed over $518 million to Enron's net income, most of which occurred during the relevant period.  The Nigerian Barge and 1999 Electricity

transactions in which Merrill Lynch played a key role allowed the Insiders to improperly record $60 million of income at year-end 1999, without which Enron would have missed its quarterly earnings target, and the Insiders' scheme would have been threatened. The transactions in which Barclays participated led to $410 million being improperly recorded as income, $1 billion being improperly recorded as cash flow from operations, and $1.7 billion not being included as debt on Enron's financial statements.

702.    CSFB's participation in the LJM1 transactions, including the Rhythms Hedge, enabled Enron improperly to recognize $95 million of income in 1999 – 10.6% of Enron's originally reported net income for the year. CSFB's participation in the December 2000 Prepaid Oil Swap, the September 2001 Prepaid Oil Swap, and the Nile Transaction allowed the Insiders improperly to record approximately $172.2 million as cash flow from operating activities and improperly to understate debt by $150 million in its December 31, 2000 balance sheet. The Toronto Dominion prepays enabled the Insiders to record improperly $1.5 billion in cash flow from operating activities and improperly understate debt by $1.34 billion. RBS's participation in the LJM1/Rhythms Hedging Transaction enabled the Insiders to recognize $95 million of income in 1999. The Nixon prepay and the four FAS 140 Transactions in which RBS took a leading role enabled the Insiders to improperly record approximately $191 million of income from gain on sales of assets, receive approximately $444 million of proceeds that were erroneously recorded as cash flow from operating or investing activities, and understate debt by $177 million in 1999 and $273 million in 2000. RBC's Alberta prepay enabled the Insiders improperly to record Can$294.8 million – Can$147.4 million from the RBC-funded portion and Can$147.4 million from the Toronto Dominion-funded portion – as funds flow from operations, and the same amount was improperly not recorded as debt.

703.     As a direct and proximate result of the Bank Defendants' participation in the Insiders' scheme, the Insiders were able to obtain tens of millions of dollars in improper personal benefits which came at the company's expense.  More significantly, as a direct and proximate result of the Bank Defendants' participation in the Insiders' scheme, Enron's debt was wrongfully expanded out of all proportion to its ability to repay.  As a result, at least as early as 1999, Enron was insolvent. Thereafter, while its true financial condition was concealed by the acts and omissions of the Insiders and the Bank Defendants, the company's debt load increased substantially and its insolvency was aggravated and deepened.  When the scheme of the Insiders and the Bank Defendants was exposed, Enron was forced to file for bankruptcy and incurred and continues to incur substantial legal and administrative costs and the costs of numerous governmental investigations, its relationships with its customers, suppliers, and employees were undermined, and its assets were dissipated.  By the time of its bankruptcy in December 2001, Enron was insolvent by tens of billions of dollars.

## V.
## CLAIMS FOR RELIEF

### A.     *COUNTS 1 - 5*
*(Against Citigroup Defendants)*

### COUNT 1
### (Avoidance of the Citi Preferential Transfers)

704.     The allegations in paragraphs 1 through 703 of this Complaint are incorporated herein by reference.

705.     Within ninety (90) days prior to the Petition Date, or within one year for insiders, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 10/1/2001 | Nahanni | $763,408.33 |
| Enron | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 11/29/2001 | Sundance Industrial | $434,387.50 |
| Enron | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 11/14/2001 | Sundance Industrial | $28,500,000.00 |
| Enron or ENA | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 10/1/2001 | Sundance Industrial | $764,021.67 |
| Enron or ENA | EIM and Enron | Sundance Industrial; Long Lane* | Citibank | 7/18/2001 | Sundance Industrial | $406,417.50 |
| Enron or ENA | ENA | Sundance Industrial; Caymus Trust* | Long Lane; Citibank | 6/1/2001 | Sundance Industrial | $208,500,000.00 |
| Enron | Enron | Citibank | | 11/15/2001 | Yosemite I | $511,111.00 |
| Enron | Enron | Yosemite I Trust; Citibank* | Citibank | 10/16/2001 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/12/2001 | Yosemite I | $1,745,810.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/12/2001 | Yosemite I | $27,254,190.00 |
| Enron | Enron | Yosemite I Trust; Citibank* | Citibank | 4/20/2001 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Citibank | ECLN II Trust | 10/19/2001 | Yosemite IV | $10,045,203.48 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN II Trust | 10/19/2001 | Yosemite IV | $3,943,546.52 |
| Enron | Enron | ECLN II Trust; Citibank* | Citibank | 10/15/2001 | Yosemite IV | $4,239,375.00 |

706.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Citi Preferential Transfers."

707.    To the extent Klondike, Marengo, Nahanni, Sundance Industrial, Caymus Trust, Long Lane, Yosemite I Trust, Delta, or ECLN II Trust are found to be mere conduits of the transfers for which the entities in the third column of the foregoing table are marked with an asterisk, then Salomon Holding, CXC or Citibank was the initial transferee of those transfers and the other

-245-

defendants identified in the fourth column of the table were either conduits or subsequent transferees of those transfers.

708.    Although some of the Citi Preferential Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

709.    The Citi Preferential Transfers constitute transfers of interests in property of Enron and/or ENA.

710.    Each of the Citi Preferential Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

711.    Each of the Citi Preferential Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron and/or ENA before the transfer was made.

712.    Upon information and belief, at the time each of the Citi Preferential Transfers was made, Enron and/or ENA were insolvent for purposes of section 547(b) of the Bankruptcy Code.

713.    Each of the Citi Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

714.    The Citi Preferential Transfers are avoidable as preferences under section 547(b) of the Bankruptcy Code.

## COUNT 2
### (Avoidance of the Citi 548 Transfers as Fraudulent Transfers)

715.    The allegations in paragraphs 1 through 714 of this Complaint are incorporated herein by reference.

716.    On or within one year before the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Citibank or SSB | | 5/18/2001 | Bacchus (fees) | $500,000.00 |
| Enron or ENA | ENA and Enron | Citibank | | 6/29/2001 | June 2001 Prepay (fees) | $500,000.00 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 10/1/2001 | Nahanni | $763,408.33 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 7/2/2001 | Nahanni | $796,297.40 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 4/2/2001 | Nahanni | $844,734.38 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 1/2/2001 | Nahanni | $879,366.67 |
| Enron | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 11/29/2001 | Sundance Industrial | $434,387.50 |
| Enron | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 11/14/2001 | Sundance Industrial | $28,500,000.00 |
| Enron or ENA | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 10/1/2001 | Sundance Industrial | $764,021.67 |
| Enron or ENA | EIM and Enron | Sundance Industrial; Long Lane* | Citibank | 7/18/2001 | Sundance Industrial | $406,417.50 |
| Enron or ENA | EIM and Enron | Salomon Holding | | 6/27/2001 | Sundance Industrial (fees) | $250,000.00 |
| Enron or ENA | ENA | Sundance Industrial; Caymus Trust* | Long Lane; Citibank | 6/1/2001 | Sundance Industrial | $208,500,000.00 |
| Enron or ENA | Enron | Salomon Holding | | 6/1/2001 | Sundance Industrial (fees) | $475,000.00 |
| Enron | Enron | Citibank | | 11/15/2001 | Yosemite I | $511,111.00 |
| Enron | Enron | Yosemite I Trust; Citibank* | Citibank | 10/16/2001 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/12/2001 | Yosemite I | $1,745,810.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/12/2001 | Yosemite I | $27,254,190.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Yosemite I Trust; Citibank* | Citibank | 4/20/2001 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 4/13/2001 | Yosemite I | $33,073,590.00 |
| Enron | ENA and Enron | Citibank | | 2/27/2001 | Yosemite II (fees) | $373,455.11 |
| Enron | Enron | Yosemite Securities; Citibank* | Citibank; Delta | 1/31/2001 | Yosemite II (interest) | $8,717,109.39 |
| Enron or ENA | ENA and Enron | Citibank | Yosemite Securities; Delta | 1/24/2001 | Yosemite II | $20,918,694.38 |
| Enron or ENA | ENA and Enron | Citibank | ECLN Trust | 7/13/2001 | Yosemite III | $12,246,597.44 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN Trust | 7/13/2001 | Yosemite III | $5,504,152.56 |
| Enron | Enron | Citibank | ECLN Trust | 7/16/2001 | Yosemite III (interest) | $2,999,250.00 |
| Enron or ENA | ENA and Enron | Citibank | ECLN Trust | 1/12/2001 | Yosemite III | $10,890,231.04 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN Trust | 1/12/2001 | Yosemite III | $5,775,750.90 |
| Enron | Enron | Citibank | ECLN Trust | 1/12/2001 | Yosemite III (interest) | $2,448,513.89 |
| Enron or ENA | ENA and Enron | Citibank | ECLN II Trust | 10/19/2001 | Yosemite IV | $10,045,203.48 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN II Trust | 10/19/2001 | Yosemite IV | $3,943,546.52 |
| Enron | Enron | ECLN II Trust; Citibank* | Citibank | 10/15/2001 | Yosemite IV | $4,239,375.00 |
| Enron or ENA | Enron and ENA | CGML | | 5/24/2001 | Yosemite IV (underwriting fee) | $943,250.00 |
| Enron or ENA | Enron and ENA | SSB | | 5/24/2001 | Yosemite IV (underwriting fee) | $976,250.00 |
| Enron or ENA | Enron and ENA | SSB | | 5/24/2001 | Yosemite IV | $2,750,000.00 |

717.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Citi 548 Transfers."

718.    To the extent Klondike, Marengo, Nahanni, Sundance Industrial, Caymus Trust, Long Lane, Yosemite I Trust, Yosemite Securities, Delta or ECLN II Trust are found to be mere conduits of the transfers for which the entities in the third column of the foregoing table are marked with an asterisk, then Salomon Holding, CXC or Citibank was the initial transferee of those transfers and the other defendants identified in the fourth column of the table were either conduits or subsequent transferees of those transfers.

719.    Although some of the Citi 548 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

720.    To the extent that any of the Citi 548 Transfers are also included in Count 1 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

721.    Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the Citi 548 Transfers.

722.    The Citi 548 Transfers constitute transfers of interests in property of Enron and/or ENA.

723.    Each of the Citi 548 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

724.    The Citi 548 Transfers were made on or within one year before the Petition Date.

725.    Upon information and belief, when the Citi 548 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining

property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

726.    The Citi 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 3
### (Avoidance of the Citi 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

727.    The allegations in paragraphs 1 through 726 of this Complaint are incorporated herein by reference.

728.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

729.    Enron, ENA, and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Citibank or SSB | | 5/18/01 | Bacchus (fees) | $500,000.00 |
| Enron or ENA | ENA and Enron | Citibank | | 11/18/99 | Jethro | $362,727,001.14 |
| Enron or ENA | ENA and Enron | Citibank | | 9/29/99 | Jethro | $100,000.00 |
| Enron or ENA | ENA and Enron | Citibank | | 6/29/01 | June 2001 Prepay (fees) | $500,000.00 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 10/1/01 | Nahanni | $763,408.33 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 7/2/01 | Nahanni | $796,297.40 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 4/2/01 | Nahanni | $844,734.38 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 1/2/01 | Nahanni | $879,366.67 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 10/2/00 | Nahanni | $877,977.09 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 7/3/00 | Nahanni | $849,902.08 |
| Enron | Enron | Klondike; CXC* | Marengo; Nahanni; CXC | 4/7/00 | Nahanni | $970,270.28 |
| Enron | Enron | Yukon and Klondike; CXC* | Marengo; Nahanni; CXC | 1/13/00 | Nahanni | $487,184,842.01 |
| Enron | Enron | Citibank | | 12/21/99 | Nahanni (underwriting fee) | $1,152,500.00 |
| Enron | Enron | Citibank | | 12/21/99 | Nahanni (fees) | $5,000,000.00 |
| Enron | Enron | Citibank | | 12/21/99 | Nahanni | $7,126.88 |
| Enron | Enron | Whitewing; CXC* | Nighthawk; CXC | 9/24/99 | Nighthawk | $576,720,349.21 |
| Enron | Enron | Whitewing; CXC* | Nighthawk; CXC | 7/8/99 | Nighthawk | $11,784,942.73 |
| Enron | Enron | Whitewing; CXC* | Nighthawk; CXC | 4/7/99 | Nighthawk | $12,000,572.82 |
| Enron | Enron | Whitewing; CXC* | Nighthawk; CXC | 1/8/99 | Nighthawk | $12,781,991.87 |
| Enron or ENA | ENA and Enron | Citibank | | 4/14/00 | Nixon | $106,376,523.52 |
| Enron or ENA | ENA and Enron | Citibank | | 4/14/00 | Nixon | $17,478,448.00 |
| Enron or ENA | ENA and Enron | Citibank | | 3/21/00 | Nixon | $25,000.00 |
| Enron or ENA | ENA and Enron | Citibank | | 12/16/99 | Nixon (fees) | $200,000.00 |
| Enron | ENGM and Enron | Citibank | | 1/12/00 | Roosevelt (fees) | $7,090.54 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | ENGM and Enron | Citibank | | 11/19/99 | Roosevelt (fees) | $1,857.44 |
| Enron or ENGM | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 11/17/99 | Roosevelt | $169,431,427.20 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 11/17/99 | Roosevelt | $343,966.09 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 11/5/99 | Roosevelt | $656,353.59 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 10/7/99 | Roosevelt | $615,902.15 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 9/7/99 | Roosevelt | $618,560.10 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 8/5/99 | Roosevelt | $607,272.54 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 7/8/99 | Roosevelt | $54,159.37 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 7/6/99 | Roosevelt | $516,501.34 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO; Citibank | 6/7/99 | Roosevelt | $697,506.25 |
| Enron or ENGM | Enron or ENGM | Delta; Citibank* | | 5/10/99 | Roosevelt (fees) | $9,699.88 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO and CRC; Citibank | 5/7/99 | Roosevelt | $2,267,492.14 |
| Enron or ENGM | ENGM and Enron | Delta | | 5/6/99 | Roosevelt | $45,164,051.00 |
| Enron or ENGM | ENGM and Enron | Delta; Citibank* | CAFCO and CRC; Citibank | 5/3/99 | Roosevelt | $374,933,093.56 |
| Enron | Enron or ENGM | Citibank | | 4/30/99 | Roosevelt (fees) | $8,699.73 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO and CRC; Citibank | 4/6/99 | Roosevelt | $2,345,362.41 |
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO and CRC; Citibank | 3/5/99 | Roosevelt | $2,151,431.08 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENGM and Enron | Delta; Citibank* | CAFCO and CRC; Citibank | 2/5/99 | Roosevelt | $2,556,304.42 |
| Enron | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 11/29/01 | Sundance Industrial | $434,387.50 |
| Enron | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 11/14/01 | Sundance Industrial | $28,500,000.00 |
| Enron or ENA | EIM and Enron | Sundance Industrial; Salomon Holding* | Salomon Holding | 10/1/01 | Sundance Industrial | $764,021.67 |
| Enron or ENA | EIM and Enron | Sundance Industrial; Long Lane* | Citibank | 7/18/01 | Sundance Industrial | $406,417.50 |
| Enron or ENA | EIM and Enron | Salomon Holding | | 6/27/01 | Sundance Industrial (fees) | $250,000.00 |
| Enron or ENA | ENA | Sundance Industrial; Caymus Trust* | Long Lane; Citibank | 6/1/01 | Sundance Industrial | $208,500,000.00 |
| Enron or ENA | Enron | Salomon Holding | | 6/1/01 | Sundance Industrial (fees) | $475,000.00 |
| Enron or ENA | ENA and Enron | Citibank | | 9/29/99 | Truman | $312,515,786.09 |
| Enron or ENA | ENA and Enron | Citibank | | 6/29/99 | Truman | $1,200,000.00 |
| Enron | Enron | Citibank | | 11/15/01 | Yosemite I | $511,111.00 |
| Enron | Enron | Yosemite I Trust; Citibank* | Citibank | 10/16/01 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/12/01 | Yosemite I | $1,745,810.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/12/01 | Yosemite I | $27,254,190.00 |
| Enron | Enron | Yosemite I Trust; Citibank* | Citibank | 4/20/01 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 4/13/01 | Yosemite I | $33,073,590.00 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/13/00 | Yosemite I | $29,000,000.00 |
| Enron | Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 10/13/00 | Yosemite I (interest) | $6,062,500.00 |
| Enron or ENA | ENA and Enron | Yosemite I Trust; Citibank* | Citibank | 5/31/00 | Yosemite I (interest) | $242,875.46 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 4/21/00 | Yosemite I | $11,231,413.62 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; Yosemite I Trust | 4/18/00 | Yosemite I | $18,535,597.25 |
| Enron | ENA and Enron | SSB | | 11/18/99 | Yosemite I | $5,437,500.00 |
| Enron | ENA and Enron | Citibank | | 2/27/01 | Yosemite II (fee) | $373,455.11 |
| Enron | Enron | Yosemite Securities; Citibank* | Citibank; Delta | 1/31/01 | Yosemite II (interest) | $8,717,109.39 |
| Enron or ENA | ENA and Enron | Citibank | Yosemite Securities; Delta | 1/24/01 | Yosemite II | $20,918,694.38 |
| Enron | ENA and Enron | Citibank | | 3/22/00 | Yosemite II (structuring fee) | $472,440.00 |
| Enron | ENA or Enron | SSB | | 2/23/00 | Yosemite II (underwriting fee) | £1,000,000.00 |
| Enron or ENA | ENA and Enron | Citibank | ECLN Trust | 7/13/01 | Yosemite III | $12,246,597.44 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN Trust | 7/13/01 | Yosemite III | $5,504,152.56 |
| Enron | Enron | Citibank | ECLN Trust | 7/16/01 | Yosemite III (interest) | $2,999,250.00 |
| Enron or ENA | ENA and Enron | Citibank | ECLN Trust | 1/12/01 | Yosemite III | $10,890,231.04 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN Trust | 1/12/01 | Yosemite III | $5,775,750.90 |
| Enron | Enron | Citibank | ECLN Trust | 1/12/01 | Yosemite III (interest) | $2,448,513.89 |
| Enron or ENA | ENA and Enron | SSB | | 8/25/00 | Yosemite III (fees) | $2,750,000.00 |
| Enron or ENA | ENA and Enron | Citibank | ECLN II Trust | 10/19/01 | Yosemite IV | $10,045,203.48 |
| Enron or ENA | ENA and Enron | Delta; Citibank* | Citibank; ECLN II Trust | 10/19/01 | Yosemite IV | $3,943,546.52 |
| Enron | Enron | ECLN II Trust; Citibank* | Citibank | 10/15/01 | Yosemite IV | $4,239,375.00 |

-254-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | CGML | | 5/24/01 | Yosemite IV (underwriting fee) | $943,250.00 |
| Enron or ENA | ENA and Enron | SSB | | 5/24/01 | Yosemite IV (underwriting fee) | $976,250.00 |
| Enron or ENA | ENA and Enron | SSB | | 5/24/01 | Yosemite IV | $2,750,000.00 |

730.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Citi 544 Transfers."

731.    To the extent Klondike, Yukon, Whitewing, Nighthawk, CAFCO, CRC, Marengo, Nahanni, Sundance Industrial, Caymus Trust, Long Lane, Yosemite I Trust, Yosemite Securities, Delta or ECLN II Trust are found to be mere conduits of the transfers for which the entities in the third column of the foregoing table are marked with an asterisk, then Salomon Holding, CXC or Citibank was the initial transferee of those transfers and the other defendants identified in the fourth column of the table were either conduits or subsequent transferees of those transfers.

732.    Although some of the Citi 544 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

733.    To the extent that any of the Citi 544 Transfers are also included in Counts 1 or 2 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

734.    Enron, ENA, and/or ENGM received less than a reasonably equivalent value from the transferees in exchange for the Citi 544 Transfers.

735.    The Citi 544 Transfers constitute transfers of interests in property of Enron, ENA, and/or ENGM.

736.    Each of the Citi 544 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

737.    Upon information and belief, when the Citi 544 Transfers were made, Enron, ENA, and/or ENGM were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

738.    The Citi 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544 of the Bankruptcy Code and applicable state law.

## COUNT 4
### (Recovery of the Citi Preferential Transfers, Citi 548 Transfers and Citi 544 Transfers)

739.    The allegations in paragraphs 1 through 738 of this Complaint are incorporated herein by reference.

740.    To the extent that the Citi Preferential Transfers, Citi 548 Transfers or Citi 544 Transfers are avoided under Bankruptcy Code sections 547, 548 or 544, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

## COUNT 5
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

741.    The allegations in paragraphs 1 through 740 of this Complaint are incorporated herein by reference.

742.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of Citigroup, the initial transferees or beneficiaries identified in paragraphs 705, 716, and 729, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**B.    COUNTS 6 - 19**
**(Against JP Morgan Chase and Fleet Defendants)**

**COUNT 6**
**(Avoidance of the Mahonia Preferential Commodity Transfers)**

743.    The allegations in paragraphs 1 through 742 of this Complaint are incorporated herein by reference.

744.    Within ninety (90) days prior to the Petition Date, Enron, ENA and/or ENGM, directly or through a conduit, made the transfers of barrels of oil and MMBtu of natural gas identified in the following table, or caused them to be made, to or for the benefit of the transferee on or about the dates identified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VII | 2,790,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 09/2001 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 09/2001 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 10/2001 | Chase X | 992,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 10/2001 | Chase X | 3,534,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 11/2001 | Chase X | 960,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 11/2001 | Chase X | 3,420,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 09/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 10/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 11/2001 | Chase XI | 1,302,000 MMBtu |

745.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Mahonia Preferential Commodity Transfers."

746.    Upon information and belief, with respect to Chase VI-X, Mahonia transferred all of the oil and natural gas it received in the Mahonia Preferential Commodity Transfers to JPMC. Similarly, with respect to Chase XI, Mahonia NGL transferred all of the natural gas it received in the Mahonia Preferential Commodity Transfers to JPMC and/or Fleet.

746A.    In Chase XI, Fleet agreed to sell and deliver to JPMC all of the natural gas it received from Mahonia NGL.

747.    Not Used.

748.    To the extent that Mahonia and/or Mahonia NGL are found to be mere conduits of the transfers in the foregoing table,  JPMC and Fleet were the initial transferees of the transfers.

749.    The Mahonia Preferential Commodity Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

750.    Each of the Mahonia Preferential Commodity Transfers was made to or for the benefit of Mahonia, Mahonia NGL, JPMC, or Fleet as initial transferee or beneficiary.

751.    Each of the Mahonia Preferential Commodity Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron, ENA and/or ENGM before the transfer was made.

752.    Upon information and belief, at the time each of the Mahonia Preferential Commodity Transfers was made, Enron, ENA and/or ENGM were insolvent for purposes of section 547(b) of the Bankruptcy Code.

753.    Each of the Mahonia Preferential Commodity Transfers enabled the transferee to receive more than it would have received if the case were a case under chapter 7 of the Bankruptcy

Code, the transfer had not been made, and the transferee received payment of its debts to the extent provided by the Bankruptcy Code.

754.    The Mahonia Preferential Commodity Transfers are avoidable as preferential transfers under section 547(b) of the Bankruptcy Code.

## COUNT 7
### (Avoidance of the Mahonia 548 Commodity Transfers as Fraudulent Transfers)

755.    The allegations in paragraphs 1 through 754 of this Complaint are incorporated herein by reference.

756.    On or within one year of the Petition Date, Enron, ENA and/or ENGM, directly or through a conduit, made the transfers of barrels of oil and MMBtu of natural gas identified in the following table, or caused them to be made, to or for the benefit of the transferee on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase VI | 3,220,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VI | 3,565,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase VII | 2,520,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VIII | 391,000 barrels |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase IX | 3,920,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 12/2000 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 12/2000 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 01/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 01/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 02/2001 | Chase X | 728,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 02/2001 | Chase X | 2,604,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 03/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 03/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 04/2001 | Chase X | 780,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 04/2001 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 05/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 05/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 06/2001 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 06/2001 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 07/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 07/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 08/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 08/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 09/2001 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 09/2001 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 10/2001 | Chase X | 992,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 10/2001 | Chase X | 3,534,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 11/2001 | Chase X | 960,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 11/2001 | Chase X | 3,420,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 04/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 05/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 06/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 07/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 08/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 09/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 10/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 11/2001 | Chase XI | 1,302,000 MMBtu |

757.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Mahonia 548 Commodity Transfers."

757A.    Upon information and belief, with respect to Chase VI-X, Mahonia transferred all of the oil and natural gas it received in the Mahonia Preferential Commodity Transfers to JPMC. Similarly, with respect to Chase XI, Mahonia NGL transferred all of the natural gas it received in the Mahonia Preferential Commodity Transfers to JPMC and/or Fleet.

757B.    In Chase XI, Fleet agreed to sell and deliver to JPMC all of the natural gas it received from Mahonia NGL.

758.    Not Used.

759.    To the extent that Mahonia and/or Mahonia NGL are found to be mere conduits of the transfers in the foregoing table, JPMC and Fleet were the initial transferees of the transfers.

760.    To the extent that any of the Mahonia 548 Commodity Transfers are also included in Count 6 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

761.    Enron, ENA and/or ENGM received less than a reasonably equivalent value from the transferee in exchange for the Mahonia 548 Commodity Transfers.

762.    The Mahonia 548 Commodity Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

763.    Each of the Mahonia 548 Commodity Transfers was made to or for the benefit of Mahonia, Mahonia NGL, JPMC, or Fleet as initial transferee or beneficiary.

764.    The Mahonia 548 Commodity Transfers were made on or within one year before the Petition Date.

765.    Upon information and belief, when the Mahonia 548 Commodity Transfers were made, Enron, ENA and/or ENGM were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

766.    The Mahonia 548 Commodity Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 8
### (Avoidance of the Mahonia 544 Commodity Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

767.    The allegations in paragraphs 1 through 766 of this Complaint are incorporated herein by reference.

768.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

769.    Enron, ENA and/or ENGM, directly or through a conduit, made the transfers of barrels of oil and MMBtu of natural gas identified in the following table, or caused them to be made, to or for the benefit of the transferee on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/1999 | Chase VI | 3,220,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/1999 | Chase VI | 3,450,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/1999 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/1999 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/1999 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/1999 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2000 | Chase VI | 3,335,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2000 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2000 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2000 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2000 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase VI | 3,220,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase VI | 3,565,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VI | 3,565,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VI | 3,450,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/1999 | Chase VII | 2,520,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/1999 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/1999 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/1999 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/1999 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/1999 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2000 | Chase VII | 2,610,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2000 | Chase VII | 2,790,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2000 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2000 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2000 | Chase VI | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2000 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase VII | 2,520,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VI | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VII | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VII | 2,700,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/1999 | Chase VIII | 391,000 barrels |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/1999 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase VIII | 391,000 barrels |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase VIII | 391,000 barrels |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/1999 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/1999 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/1999 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2000 | Chase IX | 4,060,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2000 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2000 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2000 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2000 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 12/2000 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 01/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 02/2001 | Chase IX | 3,920,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 03/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 04/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 05/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 06/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 07/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 08/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 09/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 10/2001 | Chase IX | 4,340,000 MMBtu |
| Enron or ENA or ENGM | ENGM and Enron | Mahonia | JPMC | 11/2001 | Chase IX | 4,200,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 10/2000 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 10/2000 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 11/2000 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 11/2000 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 12/2000 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 12/2000 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 01/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 01/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 02/2001 | Chase X | 728,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 02/2001 | Chase X | 2,604,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 03/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 03/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 04/2001 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 04/2001 | Chase X | 2,790,000 MMBtu |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 05/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 05/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 06/2001 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 06/2001 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 07/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 07/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 08/2001 | Chase X | 806,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 08/2001 | Chase X | 2,883,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 09/2001 | Chase X | 780,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 09/2001 | Chase X | 2,790,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 10/2001 | Chase X | 992,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 10/2001 | Chase X | 3,534,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | JPMC and/or Mahonia | JPMC | 11/2001 | Chase X | 960,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia | JPMC | 11/2001 | Chase X | 3,420,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 04/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 05/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 06/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 07/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 08/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 09/2001 | Chase XI | 1,302,000 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 10/2001 | Chase XI | 1,345,400 MMBtu |
| Enron or ENA or ENGM | ENA and Enron | Mahonia NGL | JPMC; Fleet | 11/2001 | Chase XI | 1,302,000 MMBtu |

770.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Mahonia 544 Commodity Transfers."

770A.    Upon information and belief, with respect to Chase VI-X, Mahonia transferred all of the oil and natural gas it received in the Mahonia Preferential Commodity Transfers to JPMC. Similarly, with respect to Chase XI, Mahonia NGL transferred all of the natural gas it received in the Mahonia Preferential Commodity Transfers to JPMC and/or Fleet.

770B.    In Chase XI, Fleet agreed to sell and deliver to JPMC all of the natural gas it received from Mahonia NGL.

771.    Not Used.

772.    To the extent that Mahonia and/or Mahonia NGL are found to be mere conduits of the transfers in the foregoing table, JPMC and Fleet were the initial transferees of the transfers.

773.    To the extent that any of the Mahonia 544 Commodity Transfers are also included in Counts 6 or 7 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers under section 544 of the Bankruptcy Code and applicable state law.

774.    Enron, ENA and/or ENGM received less than a reasonably equivalent value from the transferee in exchange for the Mahonia 544 Commodity Transfers.

775.    The Mahonia 544 Commodity Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

776.    Each of the Mahonia 544 Commodity Transfers was made to or for the benefit of Mahonia, Mahonia NGL, JPMC, or Fleet as initial transferee or beneficiary.

777.    Upon information and belief, when the Mahonia 544 Commodity Transfers were made, Enron, ENA and/or ENGM were insolvent, or became insolvent as a result of the transfers;

were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

778.    The Mahonia 544 Commodity Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544 of the Bankruptcy Code and applicable state law.

### COUNT 9
**(Avoidance of the Chase Preferential Principal and Interest Transfers)**

779.    The allegations in paragraphs 1 through 778 of this Complaint are incorporated herein by reference.

780.    Counts 9 through 11 are pled in the alternative to Counts 6 through 8 above.

781.    Within ninety (90) days prior to the Petition Date, Enron, ENA, and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VII | $3,122,145.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VIII | $9,804,325.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VIII | $10,663,234.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VIII | $10,564,155.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase IX | $13,760,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase IX | $9,660,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase IX | $715,860.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase IX | $7,948,400.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase IX | $2,773,322.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 09/2001 | Chase X | $11,553,427.20 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 09/2001 | Chase X | $2,653,228.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 10/2001 | Chase X | $8,151,000.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 10/2001 | Chase X | $5,675,340.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2001 | Chase X | $8,236,080.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2001 | Chase X | $6,051,401.95 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 09/2001 | Chase XI | $7,173,134.64 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 10/2001 | Chase XI | $6,941,743.20 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 11/2001 | Chase XI | $7,173,134.64 |

782.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Chase Preferential Principal and Interest Transfers."

783.    To the extent that Stoneville is found to be a mere conduit of the transfers for which it is marked with an asterisk in the foregoing table, JPMC and/or Fleet were the initial transferees of those transfers.

784.    Although certain of the Chase Preferential Principal and Interest Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

785.    The Chase Preferential Principal and Interest Transfers constitute transfers of interests in property of Enron, ENA, and/or ENGM.

786.    Each of the Chase Preferential Principal and Interest Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

787.    Each of the Chase Preferential Principal and Interest Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron, ENA, and/or ENGM before the transfer was made.

788.    Upon information and belief, at the time each of the Chase Preferential Principal and Interest Transfers was made, Enron, ENA, and/or ENGM were insolvent for purposes of section 547(b) of the Bankruptcy Code.

789.    Each of the Chase Preferential Principal and Interest Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

790.    The Chase Preferential Principal and Interest Transfers are avoidable as preferential transfers under section 547(b) of the Bankruptcy Code.

## COUNT 10
### (Avoidance of the Chase 548 Principal and Interest Transfers as Fraudulent Transfers)

791.    The allegations in paragraphs 1 through 790 of this Complaint are incorporated herein by reference.

792.    Counts 9 through 11 are pled in the alternative to Counts 6 through 8 above.

793.    On or within one year of the Petition Date, Enron, ENA, and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferee on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VI | $7,040,768.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VI | $7,795,136.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VII | $2,914,002.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VII | $2,906,386.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VII | $3,226,216.50 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VIII | $13,057,445.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VIII | $13,839,445.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VIII | $11,469,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VIII | $12,365,375.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VIII | $11,284,924.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VIII | $10,282,635.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VIII | $10,830,035.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VIII | $11,687,654.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VIII | $10,631,954.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VIII | $9,804,325.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VIII | $10,663,234.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VIII | $10,564,155.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase IX | $18,858,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase IX | $26,098,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase IX | $43,155,100.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase IX | $24,458,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase IX | $21,786,800.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase IX | $22,527,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase IX | $21,148,200.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase IX | $15,654,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase IX | $13,760,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase IX | $13,760,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase IX | $9,660,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase IX | $715,860.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase IX | $7,948,400.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase IX | $2,773,322.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 12/2000 | Chase X | $15,971,100.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 01/2001 | Chase X | $22,096,800.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 02/2001 | Chase X | $36,576,590.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 03/2001 | Chase X | $20,675,200.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 04/2001 | Chase X | $18,436,320.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 05/2001 | Chase X | $19,079,100.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 06/2001 | Chase X | $17,909,320.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 07/2001 | Chase X | $13,242,000.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 07/2001 | Chase X | $584,340.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 08/2001 | Chase X | $11,642,050.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 08/2001 | Chase X | $2,645,168.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 09/2001 | Chase X | $11,553,427.20 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 09/2001 | Chase X | $2,653,228.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 10/2001 | Chase X | $8,151,000.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 10/2001 | Chase X | $5,675,340.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2001 | Chase X | $8,236,080.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2001 | Chase X | $6,051,401.95 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 05/2001 | Chase XI | $6,941,743.20 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 06/2001 | Chase XI | $7,173,134.64 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 07/2001 | Chase XI | $6,941,743.20 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 08/2001 | Chase XI | $7,173,134.64 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 09/2001 | Chase XI | $7,173,134.64 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 10/2001 | Chase XI | $6,941,743.20 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 11/2001 | Chase XI | $7,173,134.64 |

794.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Chase 548 Principal and Interest Transfers."

795.    To the extent that Stoneville is found to be a mere conduit of the transfers for which it is marked with an asterisk in the foregoing table, JPMC and/or Fleet were the initial transferees of those transfers.

796.    Although certain of the Chase 548 Principal and Interest Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

797.    To the extent that any of the Chase 548 Principal and Interest Transfers are also included in Count 9 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

798.    Enron, ENA, and/or ENGM received less than reasonably equivalent value from the transferees in exchange for the Chase 548 Principal and Interest Transfers.

799.    The Chase 548 Principal and Interest Transfers constitute transfers of interests in property of Enron, ENA, and/or ENGM.

800.    Each of the Chase 548 Principal and Interest Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

801.    The Chase 548 Principal and Interest Transfers were made on or within one year before the Petition Date.

802.    Upon information and belief, when the Chase 548 Principal and Interest Transfers were made, Enron, ENA, and/or ENGM were insolvent or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

803.    The Chase 548 Principal and Interest Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 11
### (Avoidance of the Chase 544 Principal and Interest Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

804.    The allegations in paragraphs 1 through 803 of this Complaint are incorporated herein by reference.

805.    Counts 9 through 11 are pled in the alternative to Counts 6 through 8 above.

806.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

807.    Enron, ENA, and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferee on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/1999 | Chase VI | $7,040,768.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/1999 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/1999 | Chase VI | $7,543,680.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/1999 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/1999 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/1999 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2000 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2000 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2000 | Chase VI | $7,292,224.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2000 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2000 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2000 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2000 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2000 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2000 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2000 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2000 | Chase VI | $7,795,136.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VI | $7,040,768.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VI | $7,543,680.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VI | $7,795,136.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/1999 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/1999 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/1999 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/1999 | Chase VII | $3,217,784.50 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/1999 | Chase VII | $2,914,002.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/1999 | Chase VII | $2,906,386.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/1999 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/1999 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/1999 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/1999 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/1999 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/1999 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/1999 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/1999 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/1999 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/1999 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/1999 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/1999 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/1999 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/1999 | Chase VII | $3,113,985.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/1999 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/1999 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/1999 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/1999 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2000 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2000 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2000 | Chase VII | $3,226,235.88 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2000 | Chase VII | $3,217,765.12 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2000 | Chase VII | $3,018,200.38 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2000 | Chase VII | $3,010,058.62 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2000 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2000 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2000 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2000 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2000 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2000 | Chase VII | $3,217,784.50 |

-288-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2000 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2000 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2000 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2000 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2000 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2000 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2000 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2000 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2000 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2000 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VII | $3,217,784.49 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VII | $3,226,216.51 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VII | $3,217,784.49 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VII | $2,914,002.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VII | $2,906,386.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VII | $3,113,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VII | $3,122,145.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VII | $3,113,985.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VII | $3,226,216.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VII | $3,217,784.50 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/1999 | Chase VIII | $325,703.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/1999 | Chase VIII | $5,967,324.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/1999 | Chase VIII | $6,901,814.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/1999 | Chase VIII | $6,655,484.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/1999 | Chase VIII | $6,952,644.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/1999 | Chase VIII | $7,881,895.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/1999 | Chase VIII | $8,469,842.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/1999 | Chase VIII | $9,581,455.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/1999 | Chase VIII | $8,731,694.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2000 | Chase VIII | $10,296,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2000 | Chase VIII | $10,446,855.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2000 | Chase VIII | $11,481,715.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2000 | Chase VIII | $11,552,095.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2000 | Chase VIII | $11,520,815.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2000 | Chase VIII | $10,347,815.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2000 | Chase VIII | $11,583,375.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2000 | Chase VIII | $12,658,625.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2000 | Chase VIII | $12,294,995.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2000 | Chase VIII | $12,474,855.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2000 | Chase VIII | $14,418,125.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase VIII | $13,057,445.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase VIII | $13,839,445.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase VIII | $11,469,985.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase VIII | $12,365,375.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase VIII | $11,284,924.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase VIII | $10,282,635.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase VIII | $10,830,035.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase VIII | $11,687,654.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase VIII | $10,631,954.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase VIII | $9,804,325.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase VIII | $10,663,234.70 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase VIII | $10,564,155.30 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/1999 | Chase IX | $10,939,899.92 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2000 | Chase IX | $1,502,322.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2000 | Chase IX | $9,219,400.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2000 | Chase IX | $590,922.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2000 | Chase IX | $10,130,800.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2000 | Chase IX | $10,558,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2000 | Chase IX | $11,231,300.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2000 | Chase IX | $12,042,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2000 | Chase IX | $14,291,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2000 | Chase IX | $18,315,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2000 | Chase IX | $18,851,100.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2000 | Chase IX | $12,927,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2000 | Chase IX | $19,308,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2000 | Chase IX | $22,816,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 12/2000 | Chase IX | $18,858,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 01/2001 | Chase IX | $26,098,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 02/2001 | Chase IX | $43,155,100.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 03/2001 | Chase IX | $24,458,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 04/2001 | Chase IX | $21,786,800.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 05/2001 | Chase IX | $22,527,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 06/2001 | Chase IX | $21,148,200.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 07/2001 | Chase IX | $15,654,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 08/2001 | Chase IX | $13,760,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 09/2001 | Chase IX | $13,760,900.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase IX | $9,660,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 10/2001 | Chase IX | $715,860.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase IX | $7,948,400.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | JPMC | | 11/2001 | Chase IX | $2,773,322.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2000 | Chase X | $19,341,830.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 12/2000 | Chase X | $15,971,100.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 01/2001 | Chase X | $22,096,800.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 02/2001 | Chase X | $36,576,590.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 03/2001 | Chase X | $20,675,200.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 04/2001 | Chase X | $18,436,320.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 05/2001 | Chase X | $19,079,100.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 06/2001 | Chase X | $17,909,320.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 07/2001 | Chase X | $13,242,000.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 07/2001 | Chase X | $584,340.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 08/2001 | Chase X | $11,642,050.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 08/2001 | Chase X | $2,645,168.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 09/2001 | Chase X | $11,553,427.20 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 09/2001 | Chase X | $2,653,228.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 10/2001 | Chase X | $8,151,000.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 10/2001 | Chase X | $5,675,340.36 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2001 | Chase X | $8,236,080.00 |
| Enron or ENA or ENGM | ENA and Enron | JPMC | | 11/2001 | Chase X | $6,051,401.95 |
| Enron or NA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 05/2001 | Chase XI | $6,941,743.20 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 06/2001 | Chase XI | $7,173,134.64 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 07/2001 | Chase XI | $6,941,743.20 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 08/2001 | Chase XI | $7,173,134.64 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 09/2001 | Chase XI | $7,173,134.64 |
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 10/2001 | Chase XI | $6,941,743.20 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | ENA and Enron | Stoneville* | JPMC; Fleet | 11/2001 | Chase XI | $7,173,134.64 |

808.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers are referred to herein as the "Chase 544 Principal and Interest Transfers."

809.    To the extent that Stoneville is found to be a mere conduit of the transfers for which it is marked with an asterisk in the foregoing table, JPMC and/or Fleet were the initial transferees of those transfers.

810.    Although certain of the Chase 544 Principal and Interest Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

811.    To the extent that any of the Chase 544 Principal and Interest Transfers are also included in Counts 9 or 10 as preference payments or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

812.    Enron, ENA, and/or ENGM received less than reasonably equivalent value from the transferees in exchange for the Chase 544 Principal and Interest Transfers.

813.    The Chase 544 Principal and Interest Transfers constitute transfers of interests in property of Enron, ENA, and/or ENGM.

814.    Each of the Chase 544 Principal and Interest Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

815.    Upon information and belief, when the Chase 544 Principal and Interest Transfers were made, Enron, ENA, and/or ENGM were insolvent, or became insolvent as a result of the

transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

816.   The Chase 544 Principal and Interest Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544 of the Bankruptcy Code or applicable state law.

## COUNT 12
### (Avoidance of the Chase Preferential Purported Margin Transfers)

817.   The allegations in paragraphs 1 through 816 of this Complaint are incorporated herein by reference.

818.   ENGM entered into certain agreements designated as "margin agreements" with JPMC's SPE Mahonia relating to the Chase VI-Chase IX Mahonia transactions (the "ENGM Margin Agreements"). The ENGM Margin Agreements included (i) a Margin Agreement between Mahonia and ENGM, dated as of December 18, 1997; (ii) a Margin Agreement between Mahonia and ENGM, dated as of June 26, 1998; (iii) a Margin Agreement between Mahonia and ENGM, dated as of December 1, 1998; and (iv) a Margin Agreement between Mahonia and ENGM, dated as of June 28, 1999. All of the ENGM Margin Agreements were amended on December 19, 2000, to permit, among other things, rehypothecation.

819.   ENA entered into certain agreements designated as "margin agreements" relating to the Chase X and Chase XI Mahonia transactions (the "ENA Margin Agreements"). The ENA Margin Agreements included (i) a Margin Agreement between Mahonia and ENA, dated as of June 28, 2000; (ii) a Margin Agreement between Mahonia NGL and ENA, dated as of December 28, 2000; and (iii) a Margin Agreement between Stoneville and ENA, dated as of December 29, 2000.

The June 28, 2000 Margin Agreement was amended on December 19, 2000 to permit, among other things, rehypothecation.

820.    On September 28, 2001, Mahonia and ENA entered into a purported "swap confirmation" related to the Chase XII Mahonia transaction. The confirmation included, among other things, a credit support annex addressing the posting of collateral (the "Mahonia Credit Support Annex").

820A.    The ENGM Margin Agreements, the ENA Margin Agreements, and the Mahonia Credit Support Annex are collectively referred to as the "Margin Agreements."

821.    Under the Margin Agreements, upon the occurrence of certain "Trigger Events" relating to Enron's creditworthiness, ENA and/or ENGM agreed to deliver security to Mahonia, Mahonia NGL, and/or Stoneville for the obligations related to the oil or natural gas commodities under the contracts ENA and/or ENGM entered into with Mahonia, Mahonia NGL, and/or Stoneville. To the extent that ENA's or ENGM's "margin payment" obligations decreased or were eliminated under the applicable Margin Agreement, the Agreement provided that Mahonia, Mahonia NGL, and/or Stoneville would be obligated to return the corresponding funds in accordance with the terms of the Margin Agreements, with interest.

822.    JPMC had a security interest in all of Mahonia's and Mahonia NGL's rights under the Margin Agreements with ENA and ENGM, and upon information and belief, Mahonia transferred the "margin payments" to JPMC.

822A.    JPMC and Stoneville also entered into an agreement dated December 28, 2000, designated as a "margin agreement," relating to the Chase XI Mahonia transaction (the "JPMC Margin Agreement"). Upon information and belief, Stoneville transferred the "margin payments" it received from ENA to JPMC.

823.    The payments characterized as "margin payments" in the Margin Agreements were not truly margin payments.  Margin payments are designed to protect contracting parties from increases or decreases in price risk.  In Chase VI through Chase XII, there was no price risk to any party involved.

824.    Within ninety (90) days prior to the Petition Date, Enron, ENA and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferee on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/04/2001 | Chase X | $12,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/04/2001 | Chase VI – IX | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/05/2001 | Chase X | $900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/05/2001 | Chase VI – IX | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/07/2001 | Chase VI – IX | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/07/2001 | Chase X | $5,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 09/21/2001 | Chase VI – X | $10,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/24/2001 | Chase X | $8,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/24/2001 | Chase VI – IX | $4,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 09/26/2001 | Chase VI – X | $1,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/27/2001 | Chase X | $14,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/27/2001 | Chase VI – IX | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/01/2001 | Chase VI – IX | $2,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/01/2001 | Chase X | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/03/2001 | Chase X | $19,300,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/03/2001 | Chase VI – IX | $24,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/11/2001 | Chase VI – IX | $29,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/11/2001 | Chase X | $24,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/15/2001 | Chase X | $9,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/15/2001 | Chase VI – IX | $24,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/18/2001 | Chase X | $26,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/18/2001 | Chase VI – IX | $17,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/22/2001 | Chase VI – IX | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/22/2001 | Chase X | $19,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/23/2001 | Chase VI – X | $46,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/23/2001 | Chase VI – X | $46,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/26/2001 | Chase VI – IX | $26,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/26/2001 | Chase X | $29,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/29/2001 | Chase VI – XII | $9,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/30/2001 | Chase X | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/30/2001 | Chase VI – IX; Chase XI - XII | $17,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/31/2001 | Chase VI – X; Chase XII | $1,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/31/2001 | Chase VI – IX; Chase XII | $35,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/31/2001 | Chase X | $25,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/02/2001 | Chase XI | $19,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/09/2001 | Chase X | $6,800,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/09/2001 | Chase VI – IX; Chase XII | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/09/2001 | Chase XI | $13,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/13/2001 | Chase VI – IX | $24,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/13/2001 | Chase X; Chase XII | $400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/14/2001 | Chase XI | $6,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/19/2001 | Chase XI | $13,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/20/2001 | Chase VI – XII | $23,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/26/2001 | Chase VI – IX | $17,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/26/2001 | Chase X; Chase XII | $30,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/26/2001 | Chase XI | $1,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/27/2001 | Chase XI | $9,900,000.00 |

825.    The transfers identified in the foregoing table, together with any interest, fees, and

other payments to or for the benefit of Mahonia, Stoneville, or JPMC related to the foregoing

transfers, are referred to herein as the "Chase Preferential Purported Margin Transfers."

826.    To the extent that Mahonia and Stoneville are found to be mere conduits of the

transfers in the foregoing table,  JPMC was the initial transferee of those transfers.

827.    Upon information and belief, Mahonia and Stoneville used the Chase Preferential

Purported Margin Transfers to reduce their outstanding obligations to JPMC.

828.    The Chase Preferential Purported Margin Transfers constitute transfers of interests

in property of Enron, ENA and/or ENGM.

-301-

829.    Each of the Chase Preferential Purported Margin Transfers was made to or for the benefit of Mahonia or Stoneville as initial transferee or beneficiary.

830.    Each of the Chase Preferential Purported Margin Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron, ENA and/or ENGM before the transfer was made.

831.    Upon information and belief, at the time each of the Chase Preferential Purported Margin Transfers was made, Enron, ENA and/or ENGM were insolvent for purposes of section 547(b) of the Bankruptcy Code.

832.    Each of the Chase Preferential Purported Margin Transfers enabled the transferee to receive more than it would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfer had not been made, and the transferee received payment of its debts to the extent provided by the Bankruptcy Code.

833.    The Chase Preferential Purported Margin Transfers are avoidable as preferential transfers under section 547(b) of the Bankruptcy Code.

## COUNT 13
**(Avoidance of the Chase 548 Purported Margin Transfers as Fraudulent Transfers)**

834.    The allegations in paragraphs 1 through 833 of this Complaint are incorporated herein by reference.

835.    On or within one year of the Petition Date, Enron, ENA and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/05/2000 | Chase VI – IX | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/05/2000 | Chase X | $33,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/06/2000 | Chase X | $20,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/06/2000 | Chase VI – IX | $44,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 12/08/2000 | Chase VI – X | $59,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/12/2000 | Chase X | $2,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/12/2000 | Chase VI – IX | $2,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/13/2000 | Chase VI – IX | $40,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/13/2000 | Chase X | $3,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/18/2000 | Chase VI – IX | $6,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/18/2000 | Chase X | $15,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/19/2000 | Chase VI – IX | $41,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/20/2000 | Chase VI – IX | $3,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/20/2000 | Chase X | $11,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/21/2000 | Chase X | $9,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/21/2000 | Chase VI – IX | $15,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 12/22/2000 | Chase VI – X | $3,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/27/2000 | Chase X | $15,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/27/2000 | Chase VI – IX | $32,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/29/2000 | Chase VI – IX | $13,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/29/2000 | Chase X | $10,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/08/2001 | Chase VI – IX | $25,800,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/08/2001 | Chase X | $10,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/09/2001 | Chase X | $21,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/09/2001 | Chase VI – IX | $37,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/11/2001 | Chase X | $19,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/11/2001 | Chase VI – IX | $31,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/11/2001 | Chase X | $33,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/11/2001 | Chase VI – IX | $41,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/12/2001 | Chase X | $16,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/12/2001 | Chase VI – IX | $1,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 01/16/2001 | Chase VI – X | $8,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/17/2001 | Chase VI – IX | $27,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/17/2001 | Chase X | $29,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 01/26/2001 | Chase VI – X | $17,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/29/2001 | Chase X | $30,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/29/2001 | Chase VI – IX | $35,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/30/2001 | Chase X | $8,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/30/2001 | Chase VI – IX | $8,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/01/2001 | Chase VI – IX | $2,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/01/2001 | Chase X | $15,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/06/2001 | Chase X | $3,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/06/2001 | Chase VI – IX | $7,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/08/2001 | Chase VI – IX | $5,700,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/08/2001 | Chase X | $6,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/09/2001 | Chase VI – IX | $63,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/09/2001 | Chase X | $42,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 02/13/2001 | Chase VI – X | $7,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/15/2001 | Chase X | $9,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/15/2001 | Chase VI – IX | $24,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/20/2001 | Chase X | $12,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/20/2001 | Chase VI – IX | $10,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/21/2001 | Chase X | $4,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/21/2001 | Chase VI – IX | $800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/26/2001 | Chase X | $3,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/26/2001 | Chase VI – IX | $5,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/28/2001 | Chase X | $6,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/28/2001 | Chase VI – IX | $2,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/01/2001 | Chase VI – X | $13,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/05/2001 | Chase X | $15,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/05/2001 | Chase VI – IX | $4,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/06/2001 | Chase VI – X | $13,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/06/2001 | Chase VI – X | $11,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/07/2001 | Chase VI – IX | $16,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/07/2001 | Chase X | $11,000,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/08/2001 | Chase VI – IX | $1,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/08/2001 | Chase X | $2,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/09/2001 | Chase VI – IX | $15,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/09/2001 | Chase X | $11,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/14/2001 | Chase X | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/14/2001 | Chase VI – IX | $9,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/20/2001 | Chase X | $5,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/20/2001 | Chase VI – IX | $12,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/22/2001 | Chase X | $17,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/22/2001 | Chase VI – IX | $33,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/26/2001 | Chase VI – X | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/27/2001 | Chase VI – X | $8,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/28/2001 | Chase VI – IX | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/28/2001 | Chase X | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/29/2001 | Chase X | $23,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/29/2001 | Chase VI – IX | $40,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/05/2001 | Chase X | $3,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/05/2001 | Chase VI – IX | $7,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/06/2001 | Chase X | $14,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/06/2001 | Chase VI – IX | $19,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/09/2001 | Chase VI – IX | $40,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/09/2001 | Chase X | $33,400,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/11/2001 | Chase X | $18,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/11/2001 | Chase VI – IX | $21,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/12/2001 | Chase X | $4,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/12/2001 | Chase VI – IX | $15,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/16/2001 | Chase VI – IX | $2,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/16/2001 | Chase X | $3,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/18/2001 | Chase VI – IX | $17,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/18/2001 | Chase X | $8,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 04/24/2001 | Chase VI – X | $1,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/25/2001 | Chase X | $18,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/25/2001 | Chase VI – IX | $10,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 04/30/2001 | Chase VI – X | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/07/2001 | Chase VI – IX | $10,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/07/2001 | Chase X | $7,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/10/2001 | Chase VI – IX | $3,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/10/2001 | Chase X | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/14/2001 | Chase VI – IX | $9,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/14/2001 | Chase X | $4,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/16/2001 | Chase X | $10,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/16/2001 | Chase VI – IX | $14,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/17/2001 | Chase VI – IX | $37,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/17/2001 | Chase X | $27,100,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 05/21/2001 | Chase VI – X | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/22/2001 | Chase X | $10,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/22/2001 | Chase VI – IX | $14,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/01/2001 | Chase X | $9,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/01/2001 | Chase VI – IX | $15,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/06/2001 | Chase X | $22,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/06/2001 | Chase VI – IX | $24,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/12/2001 | Chase VI – IX | $27,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/12/2001 | Chase X | $24,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/13/2001 | Chase X | $32,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/13/2001 | Chase VI – IX | $4,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/14/2001 | Chase VI – IX | $22,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/14/2001 | Chase X | $19,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/21/2001 | Chase VI – IX | $5,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/21/2001 | Chase X | $5,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/25/2001 | Chase VI – IX | $900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/25/2001 | Chase X | $1,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/26/2001 | Chase VI – IX | $3,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/26/2001 | Chase X | $1,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 07/02/2001 | Chase VI – X | $2,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/06/2001 | Chase X | $28,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/06/2001 | Chase VI – IX | $24,500,000.00 |

-308-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/09/2001 | Chase VI – IX | $4,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/09/2001 | Chase X | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/10/2001 | Chase VI – IX | $22,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/10/2001 | Chase X | $24,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/16/2001 | Chase X | $2,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/16/2001 | Chase VI – IX | $6,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/20/2001 | Chase X | $55,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/20/2001 | Chase VI – IX | $32,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/26/2001 | Chase X | $23,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/26/2001 | Chase VI – IX | $21,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/27/2001 | Chase X | $37,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/27/2001 | Chase VI – IX | $41,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/30/2001 | Chase VI – IX | $30,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/30/2001 | Chase X | $1,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/31/2001 | Chase VI – IX | $10,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/31/2001 | Chase X | $12,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/01/2001 | Chase X | $15,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/01/2001 | Chase VI – IX | $300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/06/2001 | Chase VI – IX | $27,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/06/2001 | Chase X | $4,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/08/2001 | Chase VI – IX | $13,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/08/2001 | Chase X | $15,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 08/09/2001 | Chase VI – X | $19,200,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/10/2001 | Chase X | $11,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/10/2001 | Chase VI – IX | $8,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/15/2001 | Chase VI – IX | $37,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/15/2001 | Chase X | $24,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/17/2001 | Chase X | $40,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/17/2001 | Chase VI – IX | $40,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/04/2001 | Chase X | $12,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/04/2001 | Chase VI – IX | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/05/2001 | Chase X | $900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/05/2001 | Chase VI – IX | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/07/2001 | Chase VI – IX | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/07/2001 | Chase X | $5,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 09/21/2001 | Chase VI – X | $10,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/24/2001 | Chase X | $8,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/24/2001 | Chase VI – IX | $4,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 09/26/2001 | Chase VI – X | $1,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/27/2001 | Chase X | $14,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/27/2001 | Chase VI – IX | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/01/2001 | Chase VI – IX | $2,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/01/2001 | Chase X | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/03/2001 | Chase X | $19,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/03/2001 | Chase VI – IX | $24,500,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/11/2001 | Chase VI – IX | $29,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/11/2001 | Chase X | $24,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/15/2001 | Chase X | $9,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/15/2001 | Chase VI – IX | $24,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/18/2001 | Chase X | $26,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/18/2001 | Chase VI – IX | $17,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/22/2001 | Chase VI – IX | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/22/2001 | Chase X | $19,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/23/2001 | Chase VI – X | $46,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/23/2001 | Chase VI – X | $46,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/26/2001 | Chase VI – IX | $26,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/26/2001 | Chase X | $29,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/29/2001 | Chase VI – XII | $9,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/30/2001 | Chase X | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/30/2001 | Chase VI – IX; Chase XI - XII | $17,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/31/2001 | Chase VI – X; Chase XII | $1,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/31/2001 | Chase VI – IX; Chase XII | $35,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/31/2001 | Chase X | $25,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/02/2001 | Chase XI | $19,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/09/2001 | Chase X | $6,800,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/09/2001 | Chase VI – IX; Chase XII | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/09/2001 | Chase XI | $13,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/13/2001 | Chase VI – IX | $24,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/13/2001 | Chase X; Chase XII | $400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/14/2001 | Chase XI | $6,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/19/2001 | Chase XI | $13,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/20/2001 | Chase VI – XII | $23,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/26/2001 | Chase VI – IX | $17,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/26/2001 | Chase X; Chase XII | $30,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/26/2001 | Chase XI | $1,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/27/2001 | Chase XI | $9,900,000.00 |

836.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Chase 548 Purported Margin Transfers."

837.    To the extent that Mahonia and Stoneville are found to be mere conduits of the transfers in the foregoing table, JPMC was the initial transferee of those transfers.

838.    To the extent that any of the Chase 548 Purported Margin Transfers are also included in Count 12 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

839.    Enron, ENA and/or ENGM received less than a reasonably equivalent value from the transferees in exchange for the Chase 548 Purported Margin Transfers.

840.    The Chase 548 Purported Margin Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

841.    Each of the Chase 548 Purported Margin Transfers was made to or for the benefit of Mahonia or Stoneville as initial transferee or beneficiary.

842.    The Chase 548 Purported Margin Transfers were made on or within one year before the Petition Date.

843.    Upon information and belief, when the Chase 548 Purported Margin Transfers were made, Enron, ENA and/or ENGM were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

844.    The Chase 548 Purported Margin Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 14
### (Avoidance of the Chase 544 Purported Margin Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

845.    The allegations in paragraphs 1 through 844 of this Complaint are incorporated herein by reference.

846.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

847.    Enron, ENA and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/30/2000 | Chase X | $64,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/31/2000 | Chase VI – IX | $467,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/07/2000 | Chase VI – IX | $17,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/07/2000 | Chase X | $22,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/12/2000 | Chase X | $32,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/12/2000 | Chase VI – IX | $31,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/13/2000 | Chase VI – IX | $33,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/13/2000 | Chase X | $18,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/19/2000 | Chase VI – IX | $24,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/19/2000 | Chase X | $9,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/20/2000 | Chase X | $5,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/20/2000 | Chase VI – IX | $21,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/22/2000 | Chase X | $14,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/22/2000 | Chase VI – IX | $11,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/25/2000 | Chase X | $8,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/25/2000 | Chase VI – IX | $5,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/26/2000 | Chase X | $8,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/26/2000 | Chase VI – IX | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/27/2000 | Chase X | $18,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/27/2000 | Chase VI – IX | $19,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/28/2000 | Chase VI – IX | $5,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/28/2000 | Chase X | $2,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/29/2000 | Chase X | $3,500,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/29/2000 | Chase VI – IX | $2,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/04/2000 | Chase X | $17,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/04/2000 | Chase VI – IX | $800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/05/2000 | Chase X | $1,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/05/2000 | Chase VI – IX | $800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/11/2000 | Chase X | $1,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/11/2000 | Chase VI – IX | $3,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/12/2000 | Chase VI – X | $5,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/13/2000 | Chase VI – IX | $44,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/13/2000 | Chase X | $38,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/16/2000 | Chase X | $18,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/16/2000 | Chase VI – IX | $35,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/25/2000 | Chase X | $4,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/25/2000 | Chase VI – IX | $11,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/25/2000 | Chase VI – X | $4,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/03/2000 | Chase VI – IX | $12,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/03/2000 | Chase X | $30,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/07/2000 | Chase VI – IX | $41,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/07/2000 | Chase X | $33,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/09/2000 | Chase VI – IX | $38,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/09/2000 | Chase X | $30,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/10/2000 | Chase VI – IX | $33,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/10/2000 | Chase X | $23,200,000.00 |

-315-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/16/2000 | Chase X | $20,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/16/2000 | Chase VI – IX | $30,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/17/2000 | Chase VI – IX | $9,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/17/2000 | Chase X | $7,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/29/2000 | Chase VI – X | $12,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/05/2000 | Chase VI – IX | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/05/2000 | Chase X | $33,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/06/2000 | Chase X | $20,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/06/2000 | Chase VI – IX | $44,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 12/08/2000 | Chase VI – X | $59,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/12/2000 | Chase X | $2,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/12/2000 | Chase VI – IX | $2,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/13/2000 | Chase VI – IX | $40,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/13/2000 | Chase X | $3,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/18/2000 | Chase VI – IX | $6,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/18/2000 | Chase X | $15,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/19/2000 | Chase VI – IX | $41,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/20/2000 | Chase VI – IX | $3,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/20/2000 | Chase X | $11,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/21/2000 | Chase X | $9,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/21/2000 | Chase VI – IX | $15,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 12/22/2000 | Chase VI – X | $3,900,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/27/2000 | Chase X | $15,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/27/2000 | Chase VI – IX | $32,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 12/29/2000 | Chase VI – IX | $13,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 12/29/2000 | Chase X | $10,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/08/2001 | Chase VI – IX | $25,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/08/2001 | Chase X | $10,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/09/2001 | Chase X | $21,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/09/2001 | Chase VI – IX | $37,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/11/2001 | Chase X | $19,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/11/2001 | Chase VI – IX | $31,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/11/2001 | Chase X | $33,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/11/2001 | Chase VI – IX | $41,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/12/2001 | Chase X | $16,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/12/2001 | Chase VI – IX | $1,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 01/16/2001 | Chase VI – X | $8,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/17/2001 | Chase VI – IX | $27,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/17/2001 | Chase X | $29,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 01/26/2001 | Chase VI – X | $17,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/29/2001 | Chase X | $30,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/29/2001 | Chase VI – IX | $35,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 01/30/2001 | Chase X | $8,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 01/30/2001 | Chase VI – IX | $8,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/01/2001 | Chase VI – IX | $2,400,000.00 |

-317-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/01/2001 | Chase X | $15,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/06/2001 | Chase X | $3,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/06/2001 | Chase VI – IX | $7,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/08/2001 | Chase VI – IX | $5,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/08/2001 | Chase X | $6,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/09/2001 | Chase VI – IX | $63,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/09/2001 | Chase X | $42,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 02/13/2001 | Chase VI – X | $7,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/15/2001 | Chase X | $9,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/15/2001 | Chase VI – IX | $24,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/20/2001 | Chase X | $12,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/20/2001 | Chase VI – IX | $10,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/21/2001 | Chase X | $4,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/21/2001 | Chase VI – IX | $800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/26/2001 | Chase X | $3,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/26/2001 | Chase VI – IX | $5,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 02/28/2001 | Chase X | $6,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 02/28/2001 | Chase VI – IX | $2,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/01/2001 | Chase VI – X | $13,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/05/2001 | Chase X | $15,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/05/2001 | Chase VI – IX | $4,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/06/2001 | Chase VI – X | $13,900,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/06/2001 | Chase VI – X | $11,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/07/2001 | Chase VI – IX | $16,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/07/2001 | Chase X | $11,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/08/2001 | Chase VI – IX | $1,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/08/2001 | Chase X | $2,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/09/2001 | Chase VI – IX | $15,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/09/2001 | Chase X | $11,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/14/2001 | Chase X | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/14/2001 | Chase VI – IX | $9,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/20/2001 | Chase X | $5,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/20/2001 | Chase VI – IX | $12,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/22/2001 | Chase X | $17,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/22/2001 | Chase VI – IX | $33,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/26/2001 | Chase VI – X | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 03/27/2001 | Chase VI – X | $8,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/28/2001 | Chase VI – IX | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/28/2001 | Chase X | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 03/29/2001 | Chase X | $23,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 03/29/2001 | Chase VI – IX | $40,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/05/2001 | Chase X | $3,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/05/2001 | Chase VI – IX | $7,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/06/2001 | Chase X | $14,500,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/06/2001 | Chase VI – IX | $19,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/09/2001 | Chase VI – IX | $40,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/09/2001 | Chase X | $33,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/11/2001 | Chase X | $18,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/11/2001 | Chase VI – IX | $21,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/12/2001 | Chase X | $4,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/12/2001 | Chase VI – IX | $15,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/16/2001 | Chase VI – IX | $2,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/16/2001 | Chase X | $3,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/18/2001 | Chase VI – IX | $17,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/18/2001 | Chase X | $8,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 04/24/2001 | Chase VI – X | $1,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 04/25/2001 | Chase X | $18,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 04/25/2001 | Chase VI – IX | $10,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 04/30/2001 | Chase VI – X | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/07/2001 | Chase VI – IX | $10,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/07/2001 | Chase X | $7,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/10/2001 | Chase VI – IX | $3,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/10/2001 | Chase X | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/14/2001 | Chase VI – IX | $9,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/14/2001 | Chase X | $4,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/16/2001 | Chase X | $10,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/16/2001 | Chase VI – IX | $14,500,000.00 |

-320-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/17/2001 | Chase VI – IX | $37,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/17/2001 | Chase X | $27,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 05/21/2001 | Chase VI – X | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 05/22/2001 | Chase X | $10,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 05/22/2001 | Chase VI – IX | $14,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/01/2001 | Chase X | $9,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/01/2001 | Chase VI – IX | $15,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/06/2001 | Chase X | $22,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/06/2001 | Chase VI – IX | $24,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/12/2001 | Chase VI – IX | $27,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/12/2001 | Chase X | $24,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/13/2001 | Chase X | $32,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/13/2001 | Chase VI – IX | $4,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/14/2001 | Chase VI – IX | $22,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/14/2001 | Chase X | $19,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/21/2001 | Chase VI – IX | $5,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/21/2001 | Chase X | $5,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/25/2001 | Chase VI – IX | $900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/25/2001 | Chase X | $1,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 06/26/2001 | Chase VI – IX | $3,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 06/26/2001 | Chase X | $1,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 07/02/2001 | Chase VI – X | $2,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/06/2001 | Chase X | $28,100,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/06/2001 | Chase VI – IX | $24,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/09/2001 | Chase VI – IX | $4,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/09/2001 | Chase X | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/10/2001 | Chase VI – IX | $22,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/10/2001 | Chase X | $24,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/16/2001 | Chase X | $2,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/16/2001 | Chase VI – IX | $6,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/20/2001 | Chase X | $55,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/20/2001 | Chase VI – IX | $32,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/26/2001 | Chase X | $23,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/26/2001 | Chase VI – IX | $21,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/27/2001 | Chase X | $37,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/27/2001 | Chase VI – IX | $41,400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/30/2001 | Chase VI – IX | $30,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/30/2001 | Chase X | $1,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 07/31/2001 | Chase VI – IX | $10,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 07/31/2001 | Chase X | $12,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/01/2001 | Chase X | $15,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/01/2001 | Chase VI – IX | $300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/06/2001 | Chase VI – IX | $27,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/06/2001 | Chase X | $4,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/08/2001 | Chase VI – IX | $13,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/08/2001 | Chase X | $15,600,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 08/09/2001 | Chase VI – X | $19,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/10/2001 | Chase X | $11,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/10/2001 | Chase VI – IX | $8,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/15/2001 | Chase VI – IX | $37,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/15/2001 | Chase X | $24,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 08/17/2001 | Chase X | $40,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 08/17/2001 | Chase VI – IX | $40,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/04/2001 | Chase X | $12,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/04/2001 | Chase VI – IX | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/05/2001 | Chase X | $900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/05/2001 | Chase VI – IX | $600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/07/2001 | Chase VI – IX | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/07/2001 | Chase X | $5,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 09/21/2001 | Chase VI – X | $10,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/24/2001 | Chase X | $8,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/24/2001 | Chase VI – IX | $4,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 09/26/2001 | Chase VI – X | $1,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 09/27/2001 | Chase X | $14,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 09/27/2001 | Chase VI – IX | $7,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/01/2001 | Chase VI – IX | $2,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/01/2001 | Chase X | $6,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/03/2001 | Chase X | $19,300,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/03/2001 | Chase VI – IX | $24,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/11/2001 | Chase VI – IX | $29,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/11/2001 | Chase X | $24,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/15/2001 | Chase X | $9,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/15/2001 | Chase VI – IX | $24,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/18/2001 | Chase X | $26,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/18/2001 | Chase VI – IX | $17,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/22/2001 | Chase VI – IX | $10,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/22/2001 | Chase X | $19,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/23/2001 | Chase VI – X | $46,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/23/2001 | Chase VI – X | $46,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 10/26/2001 | Chase VI – IX | $26,600,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/26/2001 | Chase X | $29,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/29/2001 | Chase VI – XII | $9,700,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/30/2001 | Chase X | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/30/2001 | Chase VI – IX; Chase XI - XII | $17,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/31/2001 | Chase VI – X; Chase XII | $1,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 10/31/2001 | Chase VI – IX; Chase XII | $35,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 10/31/2001 | Chase X | $25,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/02/2001 | Chase XI | $19,900,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Mahonia | JPMC | 11/09/2001 | Chase X | $6,800,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/09/2001 | Chase VI – IX; Chase XII | $1,300,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/09/2001 | Chase XI | $13,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/13/2001 | Chase VI – IX | $24,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/13/2001 | Chase X; Chase XII | $400,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/14/2001 | Chase XI | $6,200,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/19/2001 | Chase XI | $13,800,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/20/2001 | Chase VI – XII | $23,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENGM | Mahonia | JPMC | 11/26/2001 | Chase VI – IX | $17,500,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA and/or ENGM | Mahonia | JPMC | 11/26/2001 | Chase X; Chase XII | $30,000,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/26/2001 | Chase XI | $1,100,000.00 |
| Enron or ENA or ENGM | Enron and/or ENA | Stoneville | JPMC | 11/27/2001 | Chase XI | $9,900,000.00 |

848.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Chase 544 Purported Margin Transfers."

849.    To the extent that Mahonia and Stoneville are found to be mere conduits of the transfers in the foregoing table,  JPMC was the initial transferee of those transfers.

850.    To the extent that any of the Chase 544 Purported Margin Transfers are also included in Counts 12 or 13 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

851.    Enron, ENA and/or ENGM received less than a reasonably equivalent value from the transferees in exchange for the Chase 544 Purported Margin Transfers.

852.    The Chase 544 Purported Margin Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

853.    Each of the Chase 544 Purported Margin Transfers was made to or for the benefit of Mahonia or Stoneville as initial transferee or beneficiary.

854.    Upon information and belief, when the Chase 544 Purported Margin Transfers were made, Enron, ENA and/or ENGM were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

855.    The Chase 544 Purported Margin Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544 of the Bankruptcy Code and applicable state law.

## COUNT 14A
### (Violation of Automatic Stay)

855A.    The allegations in paragraphs 1 through 855 of this Complaint are incorporated herein by reference.

855B.    For purposes of Counts 14A through 14C, Mahonia, Stoneville and/or JPMC will be referred to individually and collectively as "Mahonia/JPMC."

855C.    Subsequent to the Petition Date, Mahonia/JPMC exercised control over funds that ENGM, ENA or Enron delivered to Mahonia/JPMC, purportedly as "margin" or collateral in connection with the Mahonia transactions, together with interest earned on those funds (collectively, the "Prepay Collateral"), and/or acted to apply the Prepay Collateral as a purported offset to obligations that Mahonia/JPMC asserted ENGM or ENA owed it in connection with the Mahonia

transactions ("Prepay Obligations"). Mahonia/JPMC's actions included the exercise of improper postpetition setoffs against the Prepay Collateral.

855D.  Upon information and belief, subsequent to the Petition Date Mahonia/JPMC applied or purported to set off the following amounts of Prepay Collateral against the Prepay Obligations:

| Transaction | Amount |
| --- | --- |
| Chase VI | $ 2,464,844 |
| Chase VII | $ 3,406,648 |
| Chase VIII | $ 14,459,400 |
| Chase IX | $ 97,829,700 |
| Chase X | $114,423,299 |
| Chase XI | $ 47,745,125 |
| Chase XII | $ 34,537,199 |

855E.  The Prepay Collateral was and is property of Plaintiff's estate.

855F.  Accordingly, Mahonia/JPMC is in violation of the automatic stay provisions of section 362 of the Bankruptcy Code, and the Court should enter an order (a) declaring that Mahonia/JPMC has violated the automatic stay, (b) declaring that all actions taken by Mahonia/JPMC in violation of the automatic stay provisions of section 362 of the Bankruptcy Code are null and void *ab initio*, and (c) directing Mahonia/JPMC immediately to take all actions necessary to restore the parties to their relative positions as they existed on December 2, 2001 including, without limitation, turning over and paying to Plaintiff the amounts alleged in paragraph 855D.

## COUNT 14B
### (Turnover of Property of the Estate)

855G.  The allegations in paragraphs 1 through 855F of this Complaint are incorporated herein by reference.

855H.  The Prepay Collateral was and is property of Plaintiff's estate.

855I.   Mahonia/JPMC is in possession, custody and/or control of the Prepay Collateral, which is of substantial value or benefit to Plaintiff's estate and which is property belonging to Plaintiff that may be used by Plaintiff.  Mahonia/JPMC should be ordered to turn over the Prepay Collateral or the value thereof.

855J.   Pursuant to section 542 of the Bankruptcy Code, Plaintiff is entitled to the entry of an order requiring Mahonia/JPMC to pay and turn over the Prepay Collateral or its value to Plaintiff.

## COUNT 14C
### (Avoidance of Unauthorized Postpetition Transfers)

855K.  The allegations in paragraphs 1 through 855J of this Complaint are incorporated herein by reference.

855L.  Subsequent to the Petition Date, Mahonia/JPMC exercised control over the Prepay Collateral and/or transferred the Prepay Collateral (the "Mahonia/JPMC Postpetition Transfers") and applied it to purported Prepay Obligations.

855M.  The Prepay Collateral was and is property of Plaintiff's estate.

855N.  The Mahonia/JPMC Postpetition Transfers were not authorized under the Bankruptcy Code or by the Bankruptcy Court.

855O.  Accordingly, the Mahonia/JPMC Postpetition Transfers should be avoided pursuant to section 549 of the Bankruptcy Code, and Plaintiff is entitled to recover from Mahonia/JPMC the amount of the Mahonia/JPMC Postpetition Transfers plus interest from the transfer dates.

## COUNT 15
### (Avoidance of the Chase Preferential Transfer)

856.    The allegations in paragraphs 1 through 855O of this Complaint are incorporated herein by reference.

857.    Within ninety (90) days prior to the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfer identified in the following table, or caused it to be made, to or for the benefit of the transferee on or about the date specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Transfer Date | Transaction | Transfer Amount |
|------------|---------|-----------------------------------|---------------|-------------|-----------------|
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | 09/28/2001 | Chase XII (fees) | $1,000,000.00 |

858.    The transfer identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfer, is referred to herein as the "Chase Preferential Transfer."

859.    Not Used.

860.    The Chase Preferential Transfer constitutes a transfer of an interest in property of Enron and/or ENA.

861.    The Chase Preferential Transfer was made to or for the benefit of JPMC and/or JPMSI as initial transferee or beneficiary.

862.    The Chase Preferential Transfer was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron and/or ENA before the transfer was made.

863.    Upon information and belief, at the time the Chase Preferential Transfer was made, Enron and/or ENA were insolvent for the purposes of section 547(b) of the Bankruptcy Code.

864.    The Chase Preferential Transfer enabled the transferees to receive more than they would have received if the case were under chapter 7 of the Bankruptcy Code, the transfer had not

been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

865.    The Chase Preferential Transfers is an avoidable preferential transfer under section 547(b) of the Bankruptcy Code.

## COUNT 16
### (Avoidance of the Chase 548 Transfers as Fraudulent Transfers)

866.    The allegations in paragraphs 1 through 865 of this Complaint are incorporated herein by reference.

867.    On or within one year of the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Fleet | 12/29/2000 | Chase XI (fees) | $1,072,500.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | 12/29/2000 | Chase XI (fees) | $1,072,500.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | 01/03/2001 | Fishtail (fees) | $500,000.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | 01/05/2001 | Chase XI (fees) | $437,500.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | 09/28/2001 | Chase XII (fees) | $1,000,000.00 |

868.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Chase 548 Transfers."

869.    Not Used.

870.    To the extent any of the Chase 548 Transfers are also included in Count 15 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

871.     Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the Chase 548 Transfers.

872.     The Chase 548 Transfers constitute transfers of interests in property of Enron and/or ENA.

873.     Each of the Chase 548 Transfers was made to or for the benefit of JPMC, JPMSI, or Fleet as initial transferee or beneficiary.

874.     The Chase 548 Transfers were made on or within one year before the Petition Date.

875.     Upon information and belief, when the Chase 548 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

876.     The Chase 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 17
### (Avoidance of the Chase 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

877.     The allegations in paragraphs 1 through 876 of this Complaint are incorporated herein by reference.

878.     Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

879.    Enron, ENA, and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferees | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | JPMC/ Toronto Dominion Bank and/or Toronto Dominion Texas* | Toronto Dominion Bank and/or Toronto Dominion Texas | 03/01/1999 | December 1998 Prepay | $2,025,193.82 |
| Enron or ENA or ENGM | ENGM and Enron | JPMC and/or JPMSI | | 06/30/1999 | Chase IX (fees) | $1,250,000.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | | 06/29/2000 | Chase X (fees) | $1,625,000.00 |
| Enron or ENA | ENA and Enron | Fleet | | 12/29/2000 | Chase XI (fees) | $1,072,500.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | | 12/29/2000 | Chase XI (fees) | $1,072,500.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | | 01/03/2001 | Fishtail (fees) | $500,000.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | | 01/05/2001 | Chase XI (fees) | $437,500.00 |
| Enron or ENA | ENA and Enron | JPMC and/or JPMSI | | 09/28/2001 | Chase XII (fees) | $1,000,000.00 |

880.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Chase 544 Transfers."

881.    To the extent that JPMC is found to be a mere conduit of the transfers for which it is marked with an asterisk in the foregoing table, Toronto Dominion Bank and/or Toronto Dominion Texas were the initial transferees of those transfers.

882.    To the extent that any of the Chase 544 Transfers are also included in Counts 15 or 16 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy

Code, those transfers are pled alternatively as fraudulent conveyances or transfers under section 544 of the Bankruptcy Code and applicable state law.

883.    Enron, ENA, and/or ENGM received less than a reasonably equivalent value from the transferee in exchange for the Chase 544 Transfers.

884.    The Chase 544 Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

885.    Each of the Chase 544 Transfers was made to or for the benefit of JPMC, JPMSI, Toronto Dominion Bank, Toronto Dominion Texas, or Fleet as initial transferee or beneficiary.

886.    Upon information and belief, when the Chase 544 Transfers were made, Enron, ENA and/or ENGM were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

887.    The Chase 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544 of the Bankruptcy Code and applicable state law.

**<u>COUNT 18</u>**
**(Recovery of the Mahonia Commodity Transfers, the Chase Principal**
**and Interest Transfers, the Chase Purported Margin Transfers,**
**the Mahonia/JPMC Postpetition Transfers, the Chase Preferential**
**Transfers, the Chase 548 Transfers, and the Chase 544 Transfers)**

888.    The allegations in paragraphs 1 through 887 of this Complaint are incorporated herein by reference.

889.    To the extent that the Mahonia Preferential Commodity Transfers, the Mahonia 548 Commodity Transfers, the Mahonia 544 Commodity Transfers, the Chase Preferential Principal and Interest Transfers, the Chase 548 Principal and Interest Transfers, the Chase 544 Principal and Interest Transfers, the Chase Preferential Purported Margin Transfers, the Chase 548 Purported

Margin Transfers, the Chase 544 Purported Margin Transfers, the Mahonia/JPMC Postpetition Transfers, the Chase Preferential Transfer, the Chase 548 Transfers and/or the Chase 544 Transfers are avoided under Bankruptcy Code sections 547, 548, 549, or 544, then, pursuant to section 550 of the Bankruptcy Code, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

**COUNT 19**
**(Disallowance of Claims Under Bankruptcy Code Section 502(d))**

890.    The allegations in paragraphs 1 through 889 of this Complaint are incorporated herein by reference.

891.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of Chase, the initial transferees or beneficiaries identified in paragraphs 744, 756, 769, 781, 793, 807, 824, 835, 847, 855L, 857, 867, and 879, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**C.    *COUNTS 20 - 29***
***(Against Barclays Defendants)***

**COUNT 20**
**(Avoidance of the Barclays Preferential Transfers)**

892.    The allegations in paragraphs 1 through 891 of this Complaint are incorporated herein by reference.

893.    On or within ninety (90) days before the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

-334-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 9/17/01 | Avici | $133,657.39 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/27/01 | Prepaid Oil Swap (fees) | $390,000.00 |
| Enron or ENA | ENA and Herzeleide | Colonnade; Barclays Bank* | Barclays Bank | 9/28/01 | $SO_2$ | $426,159.37 |
| Enron or ENA | ENA | Colonnade; Barclays Metals* | Barclays Metals; Barclays Bank | 9/28/01 | $SO_2$ | 757,975 $SO_2$ Emission Credits |
| Enron or ENA | ENA | Barclays Bank or Barclays Capital | | 9/28/01 | $SO_2$ (fees) | $692,379.15 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/28/01 | $SO_2$ | $27,132,999.00 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/28/01 - 10/31/01 | $SO_2$ (fees) | $1,635,000.00 |
| Enron | Enron and ENA | Barclays Bank | | 10/1/01 | Nikita (fees) | $765,000.00 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/3/01 | $SO_2$ (fees) | $328,294.24 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 10/4/01 | Avici | $32,383,831.16 |
| Enron or ENA | ENA | Colonnade; Barclays Metals* | Barclays Metals; Barclays Bank | 10/4/01 | $SO_2$ | 166,607 $SO_2$ Emission Credits |
| Enron or ENA | Enron | Barclays Bank | | 10/30/01 | $SO_2$ | $30,000,000.00 |
| Enron or ENA | Enron | Barclays Bank | | 10/30/01 | $SO_2$ | $29,500,000.00 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/31/01 | $SO_2$ (fees) | $157,620.85 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/31/01 | $SO_2$ | $10,103,294.96 |
| Enron or ENA | ENA and Herzeleide | Colonnade; Barclays Bank* | Barclays Bank | 11/01/01 | $SO_2$ | $3,305,416.02 |
| Enron | Enron and ENA | Besson Trust; Barclays Bank* | Barclays Bank | 11/06/01 | Nikita | $248,333.50 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 11/09/01 | $SO_2$ (fees) | $235,225.74 |

894.    The transfers identified in the foregoing table, together with any interest, fees, and
other payments to or for the benefit of the transferees related to the foregoing transfers, and the grant

of the security inerest that is the subject of Count 28A hereof, are referred to herein as the "Barclays Preferential Transfers."

895.    To the extent Colonnade, Besson Trust and/or JGB Trust are found to be mere conduits of the transfers for which the initial transferees or beneficiaries are marked with an asterisk in the foregoing table, Barclays Bank or Barclays Metals was the initial transferee of those transfers and the other defendants identified in the fourth column of the table were subsequent transferees of those transfers.

896.    Although some of the Barclays Preferential Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

897.    The Barclays Preferential Transfers constitute transfers of interests in property of Enron and/or ENA.

898.    Each of the Barclays Preferential Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

899.    Each of the Barclays Preferential Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron and/or ENA before the transfer was made.

900.    Upon information and belief, at the time each of the Barclays Preferential Transfers was made, Enron and/or ENA were insolvent for purposes of section 547(b) of the Bankruptcy Code.

901.    Each of the Barclays Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

902.    The Barclays Preferential Transfers are avoidable as preferences under section 547(b) of the Bankruptcy Code.

## COUNT 21
### (Avoidance of the Barclays 548 Transfers as Fraudulent Transfers)

903.    The allegations in paragraphs 1 through 902 of this Complaint are incorporated herein by reference.

904.    On or within one year before the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron and Enron Ventures Corp. | Barclays Bank | | 12/7/00 | JT Holdings (fees) | $369,520.00 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 1/11/01 | Avici | $220,641.74 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 2/12/01 | Avici | $202,355.15 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 3/12/01 | Avici | $169,384.23 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 4/12/01 | Avici | $176,779.44 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 5/14/01 | Avici | $176,073.78 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 6/14/01 | Avici | $144,281.49 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 7/16/01 | Avici | $144,622.93 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 8/16/01 | Avici | $135,688.57 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 9/17/01 | Avici | $133,657.39 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/27/01 | Prepaid Oil Swap (fees) | $390,000.00 |
| Enron or ENA | ENA and Herzeleide | Colonnade; Barclays Bank* | Barclays Bank | 9/28/01 | $SO_2$ | $426,159.37 |
| Enron or ENA | ENA | Colonnade; Barclays Metals* | Barclays Metals; Barclays Bank | 9/28/01 | $SO_2$ | 757,975 $SO_2$ Emission credits |
| Enron or ENA | ENA | Barclays Bank or Barclays Capital | | 9/28/01 | $SO_2$ (fees) | $692,379.15 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/28/01 | $SO_2$ | $27,132,999.00 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/28/01 - 10/31/01 | $SO_2$ (fees) | $1,635,000.00 |
| Enron | Enron and ENA | Barclays Bank | | 10/1/01 | Nikita (fees) | $765,000.00 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/3/01 | $SO_2$ (fees) | $328,294.24 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 10/4/01 | Avici | $32,383,831.16 |
| Enron or ENA | ENA | Colonnade; Barclays Metals* | Barclays Metals; Barclays Bank | 10/4/01 | $SO_2$ | 166,607 $SO_2$ Emission credits |
| Enron or ENA | Enron | Barclays Bank | | 10/30/01 | $SO_2$ | $30,000,000.00 |
| Enron or ENA | Enron | Barclays Bank | | 10/30/01 | $SO_2$ | $29,500,000.00 |
| Enron or ENA | Enron and  ENA | Barclays Bank or Barclays Capital | | 10/31/01 | $SO_2$ (fees) | $157,620.85 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/31/01 | $SO_2$ | $10,103,294.96 |
| Enron or ENA | ENA and Herzeleide | Colonnade; Barclays Bank* | Barclays Bank | 11/01/01 | $SO_2$ | $3,305,416.02 |
| Enron | Enron and ENA | Besson Trust; Barclays Bank* | Barclays Bank | 11/06/01 | Nikita | $248,333.50 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 11/09/01 | $SO_2$ (fees) | $235,225.74 |

905.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, and the grant

of the security interest that is the subject of Count 28A hereof, are referred to herein as the "Barclays 548 Transfers."

906.   To the extent Colonnade, Besson Trust and/or JGB Trust are found to be mere conduits of the transfers for which the initial transferees or beneficiaries are marked with an asterisk in the foregoing table, Barclays Bank or Barclays Metals was the initial transferee of those transfers and the other defendants identified in the fourth column of the table were subsequent transferees of those transfers.

907.   Although some of the Barclays 548 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments or other transfers on disguised loans and the agreements were not genuine "swaps."

908.   To the extent that any of the Barclays 548 Transfers are also included in Count 20 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

909.   Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the Barclays 548 Transfers.

910.   The Barclays 548 Transfers constitute transfers of interests in property of Enron and/or ENA.

911.   Each of the Barclays 548 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

912.   The Barclays 548 Transfers were made on or within one year before the Petition Date.

913.   Upon information and belief, when the Barclays 548 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their

remaining property was an unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

914.    The Barclays 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

<u>**COUNT 22**</u>
**(Avoidance of the Barclays 544 Transfers Under Section 544
of the Bankruptcy Code and Applicable State Fraudulent
Conveyance or Fraudulent Transfer Law)**

915.    The allegations of paragraphs 1 through 914 of this Complaint are incorporated herein by reference.

916.    Pursuant to section 544(b) of the Bankruptcy Code, Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

917.    Enron, ENA and/or ENGM, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ENGM | Enron and ENA | Barclays Bank | | 5/6/99 | Roosevelt (fees) | $187,500.00 |
| Enron or ENA or ENGM | Enron and ENA | Barclays Bank | | 11/17/99 | Roosevelt (fees) | $62,500.00 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 12/16/99 | Nixon (fees) | $466,000.00 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital London | Barclays Bank | 2/23/00 | Yosemite II (fees) | $200,436.15 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 4/14/00 | Nixon | $112,513,644.34 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 4/14/00 | Nixon | $18,486,822.25 |
| Enron | Enron and Enron Ventures Corp. | Barclays Bank | | 12/7/00 | JT Holdings (fees) | $369,520.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 1/11/01 | Avici | $220,641.74 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 2/12/01 | Avici | $202,355.15 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 3/12/01 | Avici | $169,384.23 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 4/12/01 | Avici | $176,779.44 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 5/14/01 | Avici | $176,073.78 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 6/14/01 | Avici | $144,281.49 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 7/16/01 | Avici | $144,622.93 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 8/16/01 | Avici | $135,688.57 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 9/17/01 | Avici | $133,657.39 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/27/01 | Prepaid Oil Swap (fees) | $390,000.00 |
| Enron or ENA | ENA and Herzeleide | Colonnade; Barclays Bank* | Barclays Bank | 9/28/01 | $SO_2$ | $426,159.37 |
| Enron or ENA | ENA | Colonnade; Barclays Metals* | Barclays Metals; Barclays Bank | 9/28/01 | $SO_2$ | 757,975 $SO_2$ Emission credits |
| Enron or ENA | ENA | Barclays Bank or Barclays Capital | | 9/28/01 | $SO_2$ (fees) | $692,379.15 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/28/01 | $SO_2$ | $27,132,999.00 |
| Enron or ENA | Enron and ENA | Barclays Bank | | 9/28/01 - 10/31/01 | $SO_2$ (fees) | $1,635,000.00 |
| Enron | Enron and ENA | Barclays Bank | | 10/1/01 | Nikita (fees) | $765,000.00 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/3/01 | $SO_2$ (fees) | $328,294.24 |
| Enron or ENA | Enron and ENA | JGB Trust; Barclays Bank* | Barclays Bank | 10/4/01 | Avici | $32,383,831.16 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA | Colonnade; Barclays Metals* | Barclays Metals; Barclays Bank | 10/4/01 | $SO_2$ | 166,607 $SO_2$ Emission credits |
| Enron or ENA | Enron | Barclays Bank | | 10/30/01 | $SO_2$ | $30,000,000.00 |
| Enron or ENA | Enron | Barclays Bank | | 10/30/01 | $SO_2$ | $29,500,000.00 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/31/01 | $SO_2$ (fees) | $157,620.85 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 10/31/01 | $SO_2$ | $10,103,294.96 |
| Enron or ENA | ENA and Herzeleide | Colonnade; Barclays Bank* | Barclays Bank | 11/01/01 | $SO_2$ | $3,305,416.02 |
| Enron | Enron and ENA | Besson Trust; Barclays Bank* | Barclays Bank | 11/06/01 | Nikita | $248,333.50 |
| Enron or ENA | Enron and ENA | Barclays Bank or Barclays Capital | | 11/09/01 | $SO_2$ (fees) | $235,225.74 |

918.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, and the grant of the security interest that is the subject of Count 28A hereof, are referred to herein as the "Barclays 544 Transfers."

919.    To the extent Colonnade, Besson Trust and/or JGB Trust are found to be mere conduits of the transfers for which the initial transferees or beneficiaries are marked with an asterisk in the foregoing table, Barclays Bank or Barclays Metals was the initial transferee of those transfers and the other defendants identified in the fourth column of the table were subsequent transferees of those transfers.

920.    Although some of the Barclays 544 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments or other transfers on disguised loans and the agreements were not genuine "swaps."

921.    To the extent that any of the Barclays 544 Transfers are also included in Counts 20 or 21 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

922.    Enron, ENA and/or ENGM received less than a reasonably equivalent value from the transferees in exchange for the Barclays 544 Transfers.

923.    The Barclays 544 Transfers constitute transfers of interests in property of Enron, ENA and/or ENGM.

924.    Each of the Barclays 544 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

925.    Upon information and belief, when the Barclays 544 Transfers were made, Enron, ENA and/or ENGM were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was an unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

926.    The Barclays 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and applicable state law.

## COUNT 22A
### (Unjust Enrichment)

926A.    The allegations of paragraphs 1 through 926 of this Complaint are incorporated herein by reference.

926B.    The purported "sales" by ENA of the Emission Credits were not true sales, but were in fact and substance part of an unsecured or partially secured term loan of One Hundred Sixty-Seven million Six Hundred Thousand Dollars ($167,600,000) by Barclays to ENA.

926C.  Notwithstanding the purported "sales" of the Emission Credits, ENA maintained control over the Emission Credits through, among other things, the call option held by Enron's subsidiary, Herzeleide.

926D.  Notwithstanding the purported "sales" of the Emission Credits, ENA continued to bear all or substantially all of the economic risks and rewards of ownership of the Emission Credits.

926E.  The economic substance of the $SO_2$ transactions was that Barclays bore only the credit risk of non-performance by ENA and bore no risk of loss due to ownership of the Emission Credits.

926F.  Although some of the transfers identified in the tables appearing in Counts 20, 21 and 22 hereof were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

925G.  On or about July 13, 2001, Barclays was advised by its outside accountants that the off-balance sheet accounting treatment contemplated by Enron would be improper under GAAP. Barclays, therefore, knew or should have known when it subsequently entered into the $SO_2$ transactions that under GAAP the $SO_2$ transactions should have been treated as borrowings rather than sales.

926H.  At the time the parties entered into the October Transaction, ENA agreed to pay certain transaction and legal fees and disbursements incurred by Barclays for arranging the transaction.

926I.  Colonnade transferred all of the Emission Credits it held as a result of the September and October Transactions to Barclays Metals in six postpetition transfers between December 20, 2001 and February 23, 2002.  The Emission Credits were property of Plaintiff's estate.  Between February 25, 2002 and January 16, 2003, Barclays Metals sold all except 59,058 of the Emission Credits to third parties.  Barclays Metals transferred the remaining 59,058 Emissions Credits to

Barclays Bank on or about November 13, 2003.  Barclays Bank then sold 29,958 of the Emission Credits to third parties, some on or about November 13, 2003 and the remainder on or about June 15, 2004.  Barclays Bank still holds 30,000 of the Emission Credits it obtained as a result of the September and October Transactions.

926J.   For the foregoing reasons, the Court should determine, and enter an order declaring, that the Emission Credits, and any proceeds, products and profits of the Emission Credits, are property of the Plaintiff's estate under section 541(a) of the Bankruptcy Code.

926K.   The Emission Credits and all of their proceeds, products and profits are property of Plaintiff's estate.  Consequently, the seizure of the Emission Credits and all of their proceeds, products and profits by Barclays unjustly enriched Barclays at Plaintiff's expense.  In equity and good conscience, and in accord with the provisions of the Bankruptcy Code, the Court should enter an order directing Barclays immediately to pay and turn over the Emission Credits, and all proceeds, products and profits of the Emission Credits, or the value thereof, with interest, to Plaintiff.

<u>**COUNT 23**</u>
**(Turnover of Property of the Estate)**

927.   The allegations in paragraphs 1 through 926K of this Complaint are incorporated herein by reference.

928.   Subsequent to the Petition Date, Barclays failed to account to Plaintiff for the whereabouts, disposition or application of the Barclays Deposit and the interest accrued thereon, the Emission Credits, the Excess Appropriation Amount, and the Deposited Funds posted under the 1994 ISDA Credit Support Annex (collectively, the "Collateral").

929.   The Collateral is property of Plaintiff's estate.

930.    Barclays is in possession, custody and/or control of the Collateral, which is of substantial value or benefit to the estate and which is property belonging to Plaintiff that may be used, sold or leased by Plaintiff.

931.    To the extent that the Court determines that the Collateral, and the proceeds, products and profits of the Collateral or its sale, are property of Plaintiff's estate, then, pursuant to section 542 of the Bankruptcy Code, the Court should enter an order directing Barclays immediately to pay and turn over the Collateral, and all proceeds, products and profits of the Collateral or its sale, or the value thereof, with interest, to Plaintiff.

### COUNT 24
### (Violation of Automatic Stay)

932.    The allegations of paragraphs 1 through 931 of this Complaint are incorporated herein by reference.

933.    Subsequent to the Petition Date, Barclays exercised control over the Collateral and/or acted to dispose of the Collateral and apply the proceeds thereof to offset obligations that Barclays asserted Plaintiff owed to Barclays.  Barclays' actions included, without limitation, the exercise of postpetition setoffs against the Collateral and proceeds of the Collateral.

934.    The Collateral was property of Plaintiff's estate.

935.    Accordingly, Barclays is in violation of the automatic stay provisions of section 362 of the Bankruptcy Code, and the Court should enter an order (a) declaring that Barclays has violated the automatic stay, (b) declaring that any and all actions taken by Barclays in violation of the automatic stay provisions of section 362 of the Bankruptcy Code are null and void *ab initio*, and (c) directing Barclays immediately to take all actions necessary to restore the parties to their relative positions as they existed on December 2, 2001.

## COUNT 25
### (Avoidance of Unauthorized Postpetition Transfers)

936.    The allegations of paragraphs 1 through 935 of this Complaint are incorporated herein by reference.

937.    Subsequent to the Petition Date, Barclays took actions to exercise control over the Collateral and/or transfer the Collateral (the "Postpetition Transfers") and apply the proceeds thereof to offset obligations that Barclays asserted Plaintiff owed to Barclays.  Barclays' actions included, without limitation, the exercise of postpetition setoffs against the Collateral and proceeds of the Collateral.

938.    The Collateral was property of Plaintiff's estate.

939.    The Postpetition Transfers were not authorized under the Bankruptcy Code or by the Bankruptcy Court.

940.    Accordingly, the Postpetition Transfers should be avoided pursuant to section 549 of the Bankruptcy Code, and Plaintiff is entitled to recover from Barclays the amount of the Postpetition Transfers plus interest from the transfer dates.

## COUNT 25A
### (Breach of Contract)

940A.    The allegations of paragraphs 1 through 940 of this Complaint are incorporated herein by reference.

940B.    By the Barclays Improper Appropriation, Barclays seized at least $48,459,635 from Plaintiff that ENA did not owe Barclays.  The calculations on which Barclays purported to base its seizure of Plaintiff's funds were incorrect.

940C.    Under the Charge on Cash Agreement and ISDA Master Agreement, Barclays was required to return any property that Plaintiff had posted in connection with those agreements in excess of sums that Plaintiff owed Barclays.

940D.   The Barclays Improper Appropriation, by which Barclays seized at least $48,459,635 from Plaintiff that Barclays was contractually required to return, breached Barclays' contractual obligations to Plaintiff under the Charge on Cash Agreement and the ISDA Master Agreement.

940E.   To the extent that Plaintiff owed Barclays any contractual duties in connection with the Charge on Cash Agreement or ISDA Master Agreement other than payment of sums for which Barclays held more than sufficient collateral, Plaintiff had performed them at the time of the Barclays Improper Appropriation.

940F.   Accordingly, Plaintiff is entitled to judgment against Barclays in an amount to be proved at trial, but not less than $48,459,635 plus interest and attorneys' fees.

## COUNT 25B
### (Conversion)

940G.   The allegations of paragraphs 1 through 940F of this Complaint are incorporated herein by reference.

940H.   By the Barclays Improper Appropriation, Barclays seized at least $48,459,635 in specially segregated funds that belonged to Plaintiff and not Barclays.

940I.   The Barclays Improper Appropriation intentionally and improperly interfered with Plaintiff's ownership of and/or denied Plaintiff's rights to specific property and wrongfully converted that property to Barclays' use.

940J.   Accordingly, Plaintiff is entitled to judgment against Barclays in an amount to be proved at trial, but not less than $48,459,635 plus interest and attorneys' fees.

## COUNT 25C
### (Unjust Enrichment)

940K.   The allegations of paragraphs 1 through 940J of this Complaint are incorporated herein by reference.

940L.   By the Barclays Improper Appropriation, Barclays seized at least $48,459,635 from Plaintiff that ENA did not owe Barclays and that Barclays was not entitled to retain.

940M.   The Barclays Improper Appropriation unjustly enriched Barclays at Plaintiff's expense.  Barclays was enriched by the receipt of the Barclays Improper Appropriation, which was a benefit to Barclays gained at Plaintiff's expense.  It would be unjust to allow Barclays to retain the Barclays Improper Appropriation.  In equity and good conscience, and to prevent unjust enrichment, Barclays should disgorge the $48,459,635 to Plaintiff.

940N.   Accordingly, Plaintiff is entitled to judgment against Barclays in an amount to be proved at trial, but not less than $48,459,635 plus interest and attorneys' fees.

## COUNT 26
### (Invalid and Avoidable Setoffs)

941.   The allegations of paragraphs 1 through 940N of this Complaint are incorporated herein by reference.

942.   The Charge on Cash Agreement, and any other agreements between Barclays and Plaintiff purporting to authorize non-mutual setoff rights are invalid, unenforceable and avoidable under applicable law, including section 553 of the Bankruptcy Code.

943.   Accordingly, to the extent that the Charge on Cash Agreement or any other agreements between Barclays and Plaintiff contain provisions purporting to authorize Barclays to exercise non-mutual setoff rights, the Court should declare that these provisions are invalid and unenforceable pursuant to section 105 of the Bankruptcy Code, and any non-mutual setoffs made by Barclays should be avoided pursuant to section 553 of the Bankruptcy Code and other applicable law.

943A.   Even assuming that the agreements Barclays relied on in its December 31, 2001 letter were valid and enforceable, the Barclays Improper Appropriation was not accomplished in accord

with the parties' contracts in that it was based on a miscalculation of more than $48 million in Barclays' favor. The appropriation was therefore improper and invalid, and should be declared as such and avoided pursuant to section 553 of the Bankruptcy Code and other applicable law.

## COUNT 27
### (Avoidable Setoffs Resulting in Improvement in Position)

944.    The allegations of paragraphs 1 through 943A of this Complaint are incorporated herein by reference.

945.    In the alternative to Counts 24 and 25, as of ninety (90) days prior to the Petition Date, and at all relevant times prior to and including the Petition Date, Barclays was a creditor of Plaintiff. Barclays has asserted that, at certain times within ninety (90) days of the Petition Date, it held claims against Plaintiff.

946.    Within ninety (90) days prior to the Petition Date, on one or more occasions Barclays set off funds it held that were property of Plaintiff, against claims it asserts it held against Plaintiff (the "Barclays Setoffs").

947.    At all times on and during the ninety (90) days immediately preceding the Petition Date, Plaintiff was insolvent for purposes of section 553(c) of the Bankruptcy Code.

948.    Barclays improved its position by effecting the Barclays Setoffs because the amount of the insufficiency immediately after the Barclays Setoffs was less than the insufficiency on the later of ninety (90) days prior to the Petition Date and the first date during the ninety (90) days immediately preceding the Petition Date on which there was an insufficiency. For purposes of this Count, insufficiency means the amount by which any claims asserted by Barclays exceeded any mutual debt owing to Plaintiff by Barclays.

949.    Pursuant to section 553(b) of the Bankruptcy Code, Barclays is liable for the amount by which the Barclays Setoffs enabled it to improve its credit position with respect to Plaintiff in the ninety (90) day period preceding the Petition Date.

## COUNT 28
### (Recovery of the Barclays Avoidable Transfers)

950.    The allegations of paragraphs 1 through 949 of this Complaint are incorporated herein by reference.

951.    To the extent that the Barclays Preferential Transfers, Barclays 548 Transfers, Barclays 544 Transfers, Barclays Improper Appropriation, non-mutual setoffs, Barclays Setoffs, and/or Postpetition Transfers are avoided under sections 547, 548, 544, 549 or 553(b) of the Bankruptcy Code, then, pursuant to section 550 of the Bankruptcy Code, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

## COUNT 28A
### (Avoidance of Unperfected Security Interest in Emission Credits)

951A.   The allegations of paragraphs 1 through 951 of this Complaint are incorporated herein by reference.

951B.   Colonnade filed a Uniform Commercial Code financing statement on September 28, 2001 with the Secretary of State for the State of Delaware that refers in one place to collateral of 862,504 Emission Credits without specifying any vintage years with respect thereto, and in another place to 757,975 Emission Credits for particular vintage years.

951C.   In fact, the $SO_2$ transactions involved 924,582 Emission Credits owned by ENA for various vintage years.

951D.   Colonnade's alleged security interest in the Emission Credits was unperfected in whole or in part under applicable state law on the date of the filing of ENA's chapter 11 petition.

951E.   Accordingly, Colonnade's wholly or partially unperfected security interest in the Emission Credits is avoidable pursuant to section 544 of the Bankruptcy Code, and Plaintiff is entitled to recover from Colonnade and/or Barclays the Emission Credits or the value of the Emission Credits plus interest.

## COUNT 28B
### (Recovery of Emission Credits for the Benefit of the Estates)

951F.   The allegations of paragraphs 1 through 951E of this Complaint are incorporated herein by reference.

951G.   Colonnade's wholly or partially unperfected security interest in the Emission Credits is avoidable pursuant to section 544 of the Bankruptcy Code, and accordingly, pursuant to section 550 of the Bankruptcy Code, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

## COUNT 28C
### (Transfer of Lien to the Estate)

951H.   The allegations of paragraphs 1 through 951G of this Complaint are incorporated herein by reference.

951I.   For the reasons alleged in Count 73 of this Complaint, to the extent that Barclays is determined to have a lien on property of the Subordination Plaintiff's estate, the Court should enter an order transferring such lien to the Subordination Plaintiff's estate, pursuant to sections 510(c)(2) and 105(a) of the Bankruptcy Code.

## COUNT 29
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

952.   The allegations of paragraphs 1 through 951I of this Complaint are incorporated herein by reference.

953.    By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, the claims of Barclays, the initial transferees or beneficiaries identified in paragraphs 893, 904, 917, 928, 937, 946, 951E, and 951G, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under sections 542, 550 and 553 of the Bankruptcy Code.

**D.      COUNTS 30 - 36**
**(Against BT/Deutsche Bank Defendants)**

**COUNT 30**
**(Avoidance of Valhalla Setoff as a Postpetition Transaction)**

954.    The allegations in paragraphs 1 through 953 of this Complaint are incorporated herein by reference.

955.    In or about May 2000, Enron and Deutsche Bank AG entered into Project Valhalla, a financing involving a "net loan" from Deutsche Bank AG to Enron of $50 million. Deutsche Bank AG intended Valhalla to provide approximately $40 million in tax benefits annually to Deutsche Bank AG because of differences in U.S. and German tax laws.

956.    In connection with the financing, Deutsche Bank AG transferred, or "loaned," $2 billion to Rheingold GmbH ("Rheingold"), an indirect German subsidiary of Enron, in return for participation rights entitling Deutsche Bank AG to distribution payments at a 7.7% rate of return.

957.    Rheingold used the $2 billion loan from Deutsche Bank AG to purchase preferred stock in Risk Management & Trading Corporation ("RMTC"), an Enron affiliate. RMTC then loaned the $2 billion to Enron, which loaned $1.95 billion of that amount to Deutsche Bank AG, New York under a structured note bearing interest at a stated rate of 8.74% (the "Deutsche Bank Note"). Among other things, the Deutsche Bank Note provides that Enron may use the interest

accrued thereon to purchase derivative options from Deutsche Bank AG (the "Valhalla Derivatives").

958.    In or about December 2000, Deutsche Bank AG, London was substituted as the borrower under the Deutsche Bank Note.

959.    Although Enron did not receive substantial tax benefits from Project Valhalla, it did receive an "accommodation fee," which was the difference between the 7.7% interest Enron was obligated to pay on the participation rights and the 8.74% interest Enron received on the Deutsche Bank Note. This accommodation fee amounted to an annual fee to Enron in an amount between approximately $17 million and $20 million.

960.    At the same time that the two countervailing loans were entered into, Deutsche Bank AG and Valhalla GmbH ("Valhalla"), another German subsidiary of Enron and the direct parent of Rheingold, entered into a put option agreement that gave Deutsche Bank AG the right to sell its participation rights in Rheingold to Valhalla upon the occurrence of certain specified events, such as a downgrade in Enron's long-term debt or credit rating (the "Put Option Agreement"). To exercise the "put," Deutsche Bank AG was required to specify a business day on which exercise of the put option "shall become effective." By the terms of the Put Option Agreement, the day so specified was required to be more than five business days after receipt of the put notice by Enron and Valhalla.

961.    In the Put Option Agreement, Enron agreed to guarantee Valhalla's repurchase obligations to Deutsche Bank AG (the "Enron/Valhalla Guaranty").

962.    The Put Option Agreement and the Enron/Valhalla Guaranty created two countervailing positions: Deutsche Bank AG, London's $1.95 billion obligation to Enron under the Deutsche Bank Note and Enron's $2 billion obligation to Deutsche Bank AG under the Enron/Valhalla Guaranty. The Deutsche Bank Note and the Enron/Valhalla Guaranty stated that

the parties could, under certain conditions, satisfy amounts owed under one agreement by "setting off" amounts owed under the other agreement.

963.     On or about November 28, 2001, Moody's Investors Services, Inc. and Standard & Poor's Corporation downgraded Enron's credit rating to below investment grade. Deutsche Bank AG viewed this downgrade as triggering a "put occurrence" under the Put Option Agreement.

964.     By letter dated November 28, 2001, Deutsche Bank AG advised Enron and Valhalla that it was exercising its put right under the Put Option Agreement.  Deutsche Bank AG set the "put date" (*i.e.*, the date on which exercise of the put right "shall become effective") as December 6, 2001.

965.     On or about November 29, 2001, Deutsche Bank AG sent a second letter to Enron and Valhalla.  In the November 29, 2001 letter, Deutsche Bank AG stated that it was providing notice of its intention to set off Deutsche Bank AG, London's obligations under the Deutsche Bank Note by any and all amounts Enron owed or would owe to Deutsche Bank AG, including by virtue of the Enron/Valhalla Guaranty, "whether or not then due and payable and whether or not liquidated" (the "Valhalla Setoff").  Deutsche Bank AG did not specify the amount of the purported setoff in the letter, but again identified December 6, 2001 as the "settlement date" for completion of the transaction.

966.     On information and belief, as of December 2, 2001, Deutsche Bank AG was aware that Enron had commenced its Chapter 11 bankruptcy case.

967.     By letter dated December 5, 2001, Deutsche Bank AG advised Enron of its election to terminate an interest rate swap related to the Deutsche Bank Note that had been set forth in a confirmation dated as of May 2, 2000 (the "May 2, 2000 Swap").

968.     On information and belief, as of December 2, 2001, Deutsche Bank AG had not determined what amounts Deutsche Bank AG, London owed Enron and Enron owed Deutsche Bank

AG and, therefore, had not calculated the amount of the Valhalla Setoff.  Until the May 2, 2000

Swap and Valhalla Derivatives were terminated on December 6, 2001, Deutsche Bank AG lacked

information necessary to determine the proper amount of the Valhalla Setoff.

969.    On or about December 6, 2001, Deutsche Bank AG sent letters to Enron and to

Valhalla.  The letter to Enron included a spreadsheet stating that Deutsche Bank AG, London owed

Enron a "settlement amount" of $3,717,357.11 based on the May 2, 2000 Swap.  The letter to

Valhalla stated that Valhalla owed Deutsche Bank AG $39,764,394.84 under the Put Option "after

giving effect to the setoff" under the Deutsche Bank Note and the Enron/Valhalla Guaranty.

970.    By letter dated December 11, 2001, Deutsche Bank AG advised Enron that Enron

owed it $39,764,394.84 by virtue of the Enron/Valhalla Guaranty.

971.    On or about October 15, 2002, Deutsche Bank AG filed a Proof of Claim with this

Court, asserting a claim for $36,047,037.73.  This claim was for the amount, in the view of Deutsche

Bank AG, that Valhalla owed Deutsche Bank AG under the Put Option Agreement, minus the

amount Deutsche Bank AG, London owed Enron for the May 2, 2000 Swap.

972.    Deutsche Bank AG's purported setoff of Deutsche Bank AG, London's obligations

under the Deutsche Bank Note did not occur prior to the Petition Date.

973.    Deutsche Bank AG sought to complete the Valhalla Setoff with knowledge that

Enron had already commenced its Chapter 11 bankruptcy case, and without seeking relief from the

automatic stay under Bankruptcy Code section 362.

974.    On information and belief, Deutsche Bank AG did not record the purported setoff on

its books until the swaps and currency exchanges could be calculated, on or after December 6, 2001.

975.    By completing the Valhalla Setoff after Enron commenced its chapter 11 bankruptcy

case, and with knowledge of the pendency of that case, Deutsche Bank AG acted in willful violation

of the automatic stay imposed by Bankruptcy Code section 362.

976.     By reason of the foregoing facts, the Valhalla Setoff constitutes an improper transfer of property of Plaintiff's estate.

977.     The Valhalla Setoff was an unauthorized postpetition transaction in violation of the automatic stay and, accordingly, is null, void and subject to avoidance under Bankruptcy Code section 549(a).

978.     To allow Deutsche Bank AG to retain the property of Plaintiff's estate that it took to effectuate the Valhalla Setoff would prejudice other creditors and otherwise be inequitable.

## COUNT 31
### (Recovery of Avoided Postpetition Transfers)

979.     The allegations in paragraphs 1 through 978 of this Complaint are incorporated herein by reference.

980.     To the extent that the Valhalla Setoff is avoided under Bankruptcy Code section 549, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from Deutsche Bank AG, for the benefit of Plaintiff's estate, the property transferred, or the value of such property.

## COUNT 32
### (Avoidance of the BT/Deutsche Bank Preferential Transfers)

981.     The allegations in paragraphs 1 through 980 of this Complaint are incorporated herein by reference.

982.     On or within ninety (90) days before the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron | Enron | Deutsche Bank AG, New York | 9/4/01 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/28/01 | Teresa (fees) | $65,088.00 |

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 10/1/01 | Steele (dividend) | $17,165.05 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 10/1/01 | Steele (dividend) | $25,219.44 |
| Enron | Enron | Deutsche Bank AG, New York | 11/2/01 | Valhalla (interest) | $393,555.56 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 11/6/01 | Steele (fees) | $450,000.00 |

983.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "BT/Deutsche Bank Preferential Transfers."

984.    The BT/Deutsche Bank Preferential Transfers constitute transfers of interests in property of Enron.

985.    Each of the BT/Deutsche Bank Preferential Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

986.    Each of the BT/Deutsche Bank Preferential Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron before the transfer was made.

987.    Upon information and belief, at the time each of the BT/Deutsche Bank Preferential Transfers was made, Enron was insolvent for purposes of section 547(b) of the Bankruptcy Code.

988.    Each of the BT/Deutsche Bank Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfer had not been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

989.    The BT/Deutsche Bank Preferential Transfers are avoidable as preferences under section 547(b) of the Bankruptcy Code.

## COUNT 33
**(Avoidance of the BT/Deutsche Bank 548 Transfers as Fraudulent Transfers)**

990.    The allegations in paragraphs 1 through 989 of this Complaint are incorporated herein by reference.

991.    On or within one year before the Petition Date, Enron and/or ENA, directly or through a conduit made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron | Enron | Deutsche Bank AG, New York | 12/29/00 | Teresa (fees) | $1,418,844.00 |
| Enron | Enron | Deutsche Bank AG, New York | 12/29/00 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 1/2/01 | Steele (dividend) | $40,051.78 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 1/2/01 | Steele (dividend) | $58,845.36 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 1/31/01 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 2/2/01 | Valhalla (interest) | $788,388.89 |
| Enron | Enron | Deutsche Bank AG, New York | 3/1/01 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, London | 3/5/01 | Yosemite II | $9,082.22 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 3/30/01 | Steele (dividend) | $31,017.54 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 3/30/01 | Steele (dividend) | $45,571.97 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 4/30/01 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 5/1/01 | Teresa (fees) | $65,087.00 |
| Enron | Enron | Deutsche Bank AG, New York | 5/2/01 | Valhalla (interest) | $597,196.18 |
| Enron | Enron | Deutsche Bank AG, New York | 6/1/01 | Cochise (fees) | $750,000.00 |

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron | Enron | Deutsche Bank AG, New York | 6/29/01 | Teresa (fees) | $65,087.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 7/3/01 | Steele (dividend) | $24,332.21 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 7/3/01 | Steele (dividend) | $35,749.66 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 7/31/01 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 8/2/01 | Valhalla (interest) | $478,687.50 |
| Enron | Enron | Deutsche Bank AG, New York | 9/4/01 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/28/01 | Teresa (fees) | $65,088.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 10/1/01 | Steele (dividend) | $17,165.05 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 10/1/01 | Steele (dividend) | $25,219.44 |
| Enron | Enron | Deutsche Bank AG, New York | 11/2/01 | Valhalla (interest) | $393,555.56 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 11/6/01 | Steele (fees) | $450,000.00 |

992.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "BT/Deutsche Bank 548 Transfers."

993.    To the extent that any of the BT/Deutsche Bank 548 Transfers are also included in Count 32 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

994.    Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the BT/Deutsche Bank 548 Transfers.

995.    The BT/Deutsche Bank 548 Transfers constitute transfers of interests in property of Enron and/or ENA.

996.    Each of the BT/Deutsche Bank 548 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

997.    The BT/Deutsche Bank 548 Transfers were made on or within one year before the Petition Date.

998.    Upon information and belief, when the BT/Deutsche Bank 548 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur or believed that they would incur debts that would be beyond their ability to pay as such debts matured.

999.    The BT/Deutsche Bank 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

### COUNT 34
### (Avoidance of the BT/Deutsche Bank 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

1000.    The allegations in paragraphs 1 through 999 of this Complaint are incorporated herein by reference.

1001.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1002.    Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron | ECT Investments Holding Corp. | BT Ever, Inc. | 1/28/99 | Cochise | $44,046,885.85 |
| Enron | Enron | BT Green, Inc. | 1/28/99 | Cochise | $24,798,594.21 |
| Enron | Enron or ECT Investing Partners L.P. | Bankers Trust Company | 1/29/99 | Steele (fees) | $450,000.00 |
| Enron | Enron | Bankers Trust Company | 3/31/99 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing, L.P. | BT Green, Inc. | 4/1/99 | Steele (dividend) | $31,619.82 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 4/1/99 | Steele (dividend) | $46,456.86 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 4/30/99 | Steele (fees) | $450,000.00 |
| Enron | Enron | Bankers Trust Company | 6/30/99 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 6/30/99 | Steele (dividend) | $33,592.30 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 6/30/99 | Steele (dividend) | $49,354.89 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 7/30/99 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/1/99 | Cochise (fees) | $5,250,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/30/99 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 9/30/99 | Steele (dividend) | $34,661.35 |
| Enron or ENA | Enron or ECT Investing Partners, L.P | Bankers Trust (Delaware) | 9/30/99 | Steele (dividend) | $50,925.57 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 10/29/99 | Steele (fees) | $450,000.00 |
| Enron | Enron or ECT Investments Holding Corp. | Bankers Trust Company | 10/29/99 | Cochise (fees) | $2,648,813.15 |
| Enron | Enron | Deutsche Bank AG, New York | 12/1/99 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 12/30/99 | Teresa (fees) | $1,025,000.00 |

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron | Enron | Deutsche Bank AG, New York | 12/30/99 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 12/30/99 | Steele (dividend) | $38,726.76 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 12/30/99 | Steele (dividend) | $56,898.60 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 2/2/00 | Steele (fees) | $450,000.00 |
| Enron | Enron | Bankers Trust, London | 2/23/00 | Yosemite II (fees) | $7,000.00 |
| Enron | Enron | Bankers Trust, London | 2/23/00 | Yosemite II (fees) | GBP 11,125,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 3/1/00 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Bankers Trust Company | 3/20/00 | Yosemite II (fees) | $2,500.00 |
| Enron | Enron | Deutsche Bank AG, New York | 3/31/00 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 3/31/00 | Steele (dividend) | $39,329.04 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 3/31/00 | Steele (dividend) | $57,783.49 |
| Enron | Enron | Deutsche Bank Luxembourg S.A. | 4/12/00 | Yosemite II (fees) | $9,168.30 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 4/28/00 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 5/2/00 | Valhalla (loan) | $960,000,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 5/2/00 | Valhalla (loan) | $990,000,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 6/1/00 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 6/30/00 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 6/30/00 | Steele (dividend) | $42,340.45 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 6/30/00 | Steele (dividend) | $62,207.95 |
| Enron | Enron | Deutsche Bank AG, New York | 8/2/00 | Valhalla (interest) | $741,270.83 |

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 8/2/00 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/1/00 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/29/00 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 10/2/00 | Steele (dividend) | $41,617.71 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 10/2/00 | Steele (dividend) | $61,146.08 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 10/31/00 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 11/2/00 | Valhalla (interest) | $783,518.00 |
| Enron | Enron | Deutsche Bank AG, New York | 12/1/00 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 12/29/00 | Teresa (fees) | $1,418,844.00 |
| Enron | Enron | Deutsche Bank AG, New York | 12/29/00 | Tomas (fees) | $625,000.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 1/2/01 | Steele (dividend) | $40,051.78 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 1/2/01 | Steele (dividend) | $58,845.36 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 1/31/01 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 2/2/01 | Valhalla (interest) | $788,388.89 |
| Enron | Enron | Deutsche Bank AG, New York | 3/1/01 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, London | 3/5/01 | Yosemite II | $9,082.22 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 3/30/01 | Steele (dividend) | $31,017.54 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 3/30/01 | Steele (dividend) | $45,571.97 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 4/30/01 | Steele (fees) | $450,000.00 |

| Transferor | Obligor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron | Enron | Deutsche Bank AG, New York | 5/1/01 | Teresa (fees) | $65,087.00 |
| Enron | Enron | Deutsche Bank AG, New York | 5/2/01 | Valhalla (interest) | $597,196.18 |
| Enron | Enron | Deutsche Bank AG, New York | 6/1/01 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 6/29/01 | Teresa (fees) | $65,087.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 7/3/01 | Steele (dividend) | $24,332.21 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 7/3/01 | Steele (dividend) | $35,749.66 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 7/31/01 | Steele (fees) | $450,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 8/2/01 | Valhalla (interest) | $478,687.50 |
| Enron | Enron | Deutsche Bank AG, New York | 9/4/01 | Cochise (fees) | $750,000.00 |
| Enron | Enron | Deutsche Bank AG, New York | 9/28/01 | Teresa (fees) | $65,088.00 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | BT Green, Inc. | 10/1/01 | Steele (dividend) | $17,165.05 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust (Delaware) | 10/1/01 | Steele (dividend) | $25,219.44 |
| Enron | Enron | Deutsche Bank AG, New York | 11/2/01 | Valhalla (interest) | $393,555.56 |
| Enron or ENA | Enron or ECT Investing Partners, L.P. | Bankers Trust Company | 11/6/01 | Steele (fees) | $450,000.00 |

1003.   The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "BT/Deutsche Bank 544 Transfers."

1004.   To the extent that any of the BT/Deutsche Bank 544 Transfers are also included in Counts 32 or 33 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

1005.   Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the BT/Deutsche Bank 544 Transfers.

1006.   The BT/Deutsche Bank 544 Transfers constitute transfers of interest in property of Enron and/or ENA

1007.   Each of the BT/Deutsche Bank 544 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1008.   Upon information and belief, when the BT/Deutsche Bank 544 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1009.   The BT/Deutsche Bank 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and applicable state law.

## COUNT 35
### (Recovery of the BT/Deutsche Bank Preferential Transfers, the BT/Deutsche Bank 548 Transfers, and the BT/Deutsche Bank 544 Transfers)

1010.   The allegations in paragraphs 1 through 1009 of this Complaint are incorporated herein by reference.

1011.   To the extent that the BT/Deutsche Bank Preferential Transfers, BT/Deutsche Bank 548 Transfers or BT/Deutsche Bank 544 Transfers are avoided under Bankruptcy Code sections 547, 548 or 544, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

## COUNT 36
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1012.   The allegations in paragraphs 1 through 1011 of this Complaint are incorporated herein by reference.

1013.   By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of BT/Deutsche Bank, the initial transferees or beneficiaries identified in paragraphs 982, 991, and 1002, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**E.**     ***COUNTS 37 - 41***
       ***(Against CIBC Defendants)***

## COUNT 37
### (Avoidance of the CIBC Preferential Transfers)

1014.   Not Used.

1015.   Not Used.

1016.   Not Used.

1017.   Not Used.

1018.   Not Used.

1019.   Not Used.

1020.   Not Used.

1021.   Not Used.

1022.   Not Used.

1023.   Not Used.

## COUNT 38
### (Avoidance of the CIBC 548 Transfers as Fraudulent Transfers)

1024.   Not Used.

1025.   Not Used.

1026.   Not Used.

1027.   Not Used.

1028.   Not Used.

1029.   Not Used.

1030.   Not Used.

1031.   Not Used.

1032.   Not Used.

1033.   Not Used.

1034.   Not Used.

## COUNT 39
### (Avoidance of the CIBC 544 Transfers Under
### Section 544 of the Bankruptcy Code and Applicable
### State Fraudulent Conveyance or Fraudulent Transfer Law)

1035.   The allegations in paragraphs 1 through 1034 of this Complaint are incorporated herein by reference.

1036.   Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1037.   Enron, ENA, ACFI, Enron International, ECTMI, EESO and/or Enron Broadband, directly or through a conduit, made the transfers identified in the following table or caused them to be made, to or for the benefit of CIBC on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 1/13/99 | Project Pilgrim/Trakya (term loan interest) | $169,440.79 |
| Enron or ENA | Enron | CIBC | | 1/13/99 | Project Pilgrim/Sarlux (term loan interest) | $815,228.61 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 1/22/99 | Project Pilgrim/Trakya (term loan interest) | $159.46 |
| Enron or ENA | Enron | CIBC | | 1/22/99 | Project Pilgrim/Sarlux (term loan interest) | $767.22 |
| Enron or ENA | Enron | CIBC | | 2/3/99 | Project Pilgrim/Sarlux (term loan interest) | $1,452,951.21 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 3/5/99 | Project Pilgrim/Trakya (term loan interest) | $418,646.96 |
| Enron or ENA | Enron | CIBC | | 3/5/99 | Project Pilgrim/Sarlux (term loan interest) | $1,327,694.04 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 4/6/99 | Project Pilgrim/Trakya (term loan interest) | $439,355.56 |
| Enron or ENA | Enron | CIBC | | 4/6/99 | Project Pilgrim/Sarlux (term loan interest) | $1,524,822.22 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 5/6/99 | Project Pilgrim/Trakya (term loan interest) | $409,217.63 |
| Enron or ENA | Enron | CIBC | | 5/6/99 | Project Pilgrim/Sarlux (term loan interest) | $1,420,225.88 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 6/7/99 | Project Pilgrim/Trakya (term loan interest) | $434,727.78 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | Enron | CIBC | | 6/7/99 | Project Pilgrim/Sarlux (term loan interest) | $1,508,761.11 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 6/25/99 | Project Pilgrim/Trakya (term loan interest) | $245,968.74 |
| Enron or ENA | Enron | CIBC | | 6/25/99 | Project Pilgrim/Sarlux (term loan interest) | $853,656.25 |
| Enron or ENA or Enron International | Enron and Enron International | CIBC | | 6/25/99 | Project Leftover (arrangement and upfront fees) | $336,300.00 |
| Enron or ENA or ECTMI | Enron | CIBC | | 6/28/99 | Project Pilgrim/Sarlux (term loan principal) | $295,000,000.00 |
| Enron or ENA | Enron and ENA | CIBC | | 6/29/99 | Project Nimitz (upfront fee) | $1,600,000.00 |
| Enron or ENA or Enron International | Enron and ENA | CIBC | | 7/20/99 | Project Nimitz (fees) | $229,013.16 |
| Enron or ENA or ACFI | Enron and ACFI | CIBC | | 9/30/99 | Project Pilgrim/Trakya (repayment of term loan and interest) | $86,331,865.24 |
| Enron or ENA | Enron and ENA | Whitewing* | CIBC | 9/30/99 | Project Nimitz (term loan principal) | $350,385,854.93 |
| Enron or ENA or Enron International | ENA and Enron International | Whitewing* | CIBC | 10/25/99 | Project Leftover (term loan principal) | $100,499,731.28 |
| Enron or Enron Broadband | Enron and Enron Broadband | CIBC | | 12/23/99 | Project Ghost (structure and commitment fees) | $1,137,500.00 |
| Enron or ENA or EESO or ECTMI | Enron and EESO | CIBC | | 12/29/99 | Project Alchemy (arrangement fee) | $225,000.00 |
| Enron or ENA or ECTMI | ENA and Enron | CIBC | | 12/31/99 | Project Discovery (arrangement fee) | $1,075,972.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA or ECTMI | ENA and Enron | CIBC | | 12/31/99 | Project Discovery (structure fee) | $82,000.00 |
| Enron or ENA or ECTMI | ENA and Enron | CIBC | | 12/31/99 | Project Discovery (underwriting fee) | $189,600.00 |
| Enron or Enron Broadband | Enron and Enron Broadband | CIBC | | 1/24/00 | Project Ghost (term loan interest) | $1,643,333.33 |
| Enron or ENA or ECTMI | ENA and Enron | Santa Maria LLC* | CIBC | 1/31/00 | Project Discovery (yield payment) | $782,592.63 |
| Enron or ENA or ECTMI | ENA and Enron | Santa Maria LLC* | CIBC | 2/29/00 | Project Discovery (equity purchase) | $4,202,500.00 |
| Enron or ENA or ECTMI | ENA and Enron | Santa Maria LLC* | CIBC | 2/29/00 | Project Discovery (repayment of term loan and interest) | $127,064,899.11 |
| Enron or Enron Broadband | Enron and Enron Broadband | CIBC | | 3/21/00 | Project Ghost (term loan principal and interest) | $257,741,462.50 |
| Enron or Enron Broadband | Enron and Enron Broadband | CIBC | | 3/22/00 | Project Ghost (breakage fees and $100 equity) | $11,136.81 |
| Enron or Enron Broadband | Enron and Enron Broadband | CIBC | | 4/10/00 | Project Specter (principal, interest, yield and equity payment) | $125,289,137.50 |
| Enron or ENA or EESO | Enron and EESO | LLC Interest Holdings 1* | CIBC | 6/15/00 | Project Alchemy (term loan interest) | $354,942.60 |

1038.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "CIBC 544 Transfers."

1038A.  To the extent Whitewing, Santa Maria LLC or LLC Interest Holdings 1 are found to be mere conduits of the transfers for which they are marked with an asterisk in the foregoing table, CIBC was the initial transferee of those transfers.

1039.    Although some of the CIBC 544 Transfers were related to agreements designated as "swap" agreements, these Transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1040.    To the extent that any of the CIBC 544 Transfers are also included in Counts 37 or 38 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

1041.    Enron, ENA, ACFI, Enron International, ECTMI, ESSO and/or Enron Broadband received less than a reasonably equivalent value from CIBC in exchange for the CIBC 544 Transfers.

1042.    The CIBC 544 Transfers constitute transfers of interests in property of Enron, ENA, ACFI, Enron International, ECTMI, EESO and/or Enron Broadband.

1043.    Each of the CIBC 544 Transfers was made to or for the benefit of CIBC.

1044.    Upon information and belief, when the CIBC 544 Transfers were made, Enron, ENA, ACFI, Enron International, ECTMI, EESO and/or Enron Broadband were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1045.    The CIBC 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and applicable state law.

## COUNT 40
### (Recovery of the CIBC 544 Transfers)

1046.    The allegations in paragraphs 1 through 1045 of this Complaint are incorporated herein by reference.

1047.    To the extent that the CIBC 544 Transfers are avoided under Bankruptcy Code section 544, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

## COUNT 41
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1048.    The allegations in paragraphs 1 through 1047 of this Complaint are incorporated herein by reference.

1049.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of CIBC, the initial transferees or beneficiaries identified in paragraph 1037, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**F.**    ***COUNTS 42 - 44***
        ***(Against Merrill Lynch Defendants)***

## COUNT 42
### (Avoidance of the Merrill Lynch 544 Transfers
### Under Section 544 of the Bankruptcy Code and Applicable
### State Fraudulent Conveyance or Fraudulent Transfer Law)

1050.    The allegations of paragraphs 1 through 1049 of this Complaint are incorporated herein by reference.

1051.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing

unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action

that such a creditor could assert under applicable state law.

1052.    Enron, EPMI, ACFI and/or ENA, directly or through a conduit, made the transfers

identified in the following table, or caused them to be made, to or for the benefit of the transferees

on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ACFI | Enron | Merrill Lynch, Pierce, Fenner & Smith Inc. | 1/4/2000 | Nigerian Barges (advisory fee) | $250,000.00 |
| ENA or Enron | Enron and EPMI | Merrill Lynch Capital Services | 7/10/2000 | 1999 Electricity Trades (termination payment) | $8,500,000.00 |

1053.    The transfers identified in the foregoing table, together with any interest, fees, and

other payments to the transferees related to the foregoing transfers, are referred to herein as the

"Merrill Lynch 544 Transfers."

1054.    Enron, EPMI, ACFI and/or ENA received less than a reasonably equivalent value

from the transferees in exchange for the Merrill Lynch 544 Transfers.

1055.    The Merrill Lynch 544 Transfers constitute transfers of interests in property of Enron,

EPMI, ACFI and/or ENA.

1056.    Each of the Merrill Lynch 544 Transfers was made to or for the benefit of the entities

listed in the third column of the foregoing table as initial transferees or beneficiaries.

1057.    Upon information and belief, when the Merrill Lynch 544 Transfers were made,

Enron, EPMI, ACFI and/or ENA were insolvent, or became insolvent as a result of the transfers;

were engaged in business or a transaction, or were about to engage in business or a transaction, for

which their remaining property was an unreasonably small capital; and/or intended to incur, or

believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1058.   The Merrill Lynch 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code.

## COUNT 43
### (Recovery of the Merrill Lynch 544 Transfers)

1059.   The allegations of paragraphs 1 through 1058 of this Complaint are incorporated herein by reference.

1060.   To the extent that the Merrill Lynch 544 Transfers are avoided under Bankruptcy Code section 544, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

## COUNT 44
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1061.   The allegations of paragraphs 1 through 1060 of this Complaint are incorporated herein by reference.

1062.   By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of Merrill Lynch, the initial transferees or beneficiaries identified in paragraph 1052, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

G.    **COUNTS 45 - 49**
      **(Against CSFB Defendants)**

### COUNT 45
### (Avoidance of the CSFB Preferential Transfers)

1063.    The allegations in paragraphs 1 through 1062 of this Complaint are incorporated herein by reference.

1064.    On or within ninety (90) days before the Petition Date, Enron, ENA, and/or Enron Energy Services, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | CSFB Int'l | 9/26/01 | Prepaid Oil Swap | $153,945,728.06 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 9/28/01 | Prepaid Oil Swap (structuring fee) | $375,000.00 |
| Enron or ENA | Enron and ENA | CSFB | 9/28/01 | Nile (fee) | $75,000.00 |
| Enron or ENA or Enron Energy Services | Enron or ENA or Enron Energy Services | CSFB | 9/28/01 | Nile (agency and participation fees) | $75,000.00 |
| Enron or ENA | Enron and/or ENA | CSFB | 9/28/01 | Nikita (fee) | $1,000,000.00 |
| Enron | Enron | CSFB | 10/3/01 | Summer (expenses) | $1,350,000.00 |

1065.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "CSFB Preferential Transfers."

1066.    Not Used.

1067.    Although some of the CSFB Preferential Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1068.    The CSFB Preferential Transfers constitute transfers of interests in property of Enron, ENA, and/or Enron Energy Services.

1069.    Each of the CSFB Preferential Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1070.    Each of the CSFB Preferential Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron, ENA and/or Enron Energy Services before the transfer was made.

1071.    Upon information and belief, at the time each of the CSFB Preferential Transfers was made, Enron, ENA and/or Enron Energy Services were insolvent for purposes of section 547(b) of the Bankruptcy Code.

1072.    Each of the CSFB Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

1073.    The CSFB Preferential Transfers are avoidable as preferences under section 547(b) of the Bankruptcy Code.

### COUNT 46
### (Avoidance of the CSFB 548 Transfers as Fraudulent Transfers)

1074.    The allegations in paragraphs 1 through 1073 of this Complaint are incorporated herein by reference.

1075.    On or within one year before the Petition Date, Enron, ENA, and/or Enron Energy Services, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | CSFB | 12/19/00 | Prepaid Oil Swap (loan fee) | $870,000.00 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 12/19/00 | Prepaid Oil Swap (structuring fee) | $150,000.00 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 3/19/01 | Prepaid Oil Swap | $2,827,578.83 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 6/19/01 | Prepaid Oil Swap | $2,737,332.88 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 9/26/01 | Prepaid Oil Swap | $153,945,728.06 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 9/28/01 | Prepaid Oil Swap (structuring fee) | $375,000.00 |
| Enron or ENA | Enron and ENA | CSFB | 9/28/01 | Nile (fee) | $75,000.00 |
| Enron or ENA or Enron Energy Services | Enron or ENA or Enron Energy Services | CSFB | 9/28/01 | Nile (agency and participation fees) | $75,000.00 |
| Enron or ENA | Enron and/or ENA | CSFB | 9/28/01 | Nikita (fee) | $1,000,000.00 |

1076.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "CSFB 548 Transfers."

1077.    Not Used.

1078.    Although some of the CSFB 548 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1079.    To the extent that any of the CSFB 548 Transfers are also included in Count 45 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

1080.    Enron, ENA, and/or Enron Energy Services received less than a reasonably equivalent value from the transferees in exchange for the CSFB 548 Transfers.

1081.    The CSFB 548 Transfers constitute transfers of interests in property of Enron, ENA, and/or Enron Energy Services.

1082. Each of the CSFB 548 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1083. The CSFB 548 Transfers were made on or within one year before the Petition Date.

1084. Upon information and belief, when the CSFB 548 Transfers were made, Enron, ENA, and/or Enron Energy Services were insolvent or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1085. The CSFB 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

### COUNT 47
**(Avoidance of the CSFB 544 Transfers Under
Section 544 of the Bankruptcy Code and Applicable
State Fraudulent Conveyance or Fraudulent Transfer Law)**

1086. The allegations in paragraphs 1 through 1085 of this Complaint are incorporated herein by reference.

1087. Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff. Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1088. Enron, ENA, and/or Enron Energy Services, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | CSFB | 12/19/00 | Prepaid Oil Swap (loan fee) | $870,000.00 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 12/19/00 | Prepaid Oil Swap | $150,000.00 |

-379-

| Transferor | Obligor | Initial Transferee or Beneficiary | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | Enron and ENA | CSFB Int'l | 3/19/01 | Prepaid Oil Swap | $2,827,578.83 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 6/19/01 | Prepaid Oil Swap | $2,737,332.88 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 9/26/01 | Prepaid Oil Swap | $153,945,728.06 |
| Enron or ENA | Enron and ENA | CSFB Int'l | 9/28/01 | Prepaid Oil Swap (structuring fee) | $375,000.00 |
| Enron or ENA | Enron and ENA | CSFB | 9/28/01 | Nile (fee) | $75,000.00 |
| Enron or ENA or Enron Energy Services | Enron or ENA or Enron Energy Services | CSFB | 9/28/01 | Nile (agency and participation fees) | $75,000.00 |
| Enron or ENA | Enron and/or ENA | CSFB | 9/28/01 | Nikita (fee) | $1,000,000.00 |

1089.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "CSFB 544 Transfers."

1090.    Not used.

1091.    Although some of the CSFB 544 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1092.    To the extent that any of the CSFB 544 Transfers are also included in Counts 45 or 46 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

1093.    Enron, ENA, and/or Enron Energy Services received less than a reasonably equivalent value from the transferees in exchange for the CSFB 544 Transfers.

1094.    The CSFB 544 Transfers constitute transfers of interests in property of Enron, ENA, and/or Enron Energy Services.

1095.     Each of the CSFB 544 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1096.     Upon information and belief, when the CSFB 544 Transfers were made, Enron, ENA, and/or Enron Energy Services were insolvent or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1097.     The CSFB 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and applicable state law.

**COUNT 47A**
**(Unjust Enrichment)**

1097A.  The allegations in paragraphs 1 through 1097 of this Complaint are incorporated herein by reference.

1097B.  The purported "sale" of the Nile Asset in the Nile Transaction was not a true sale, but instead was part of a financing transaction that was in fact and substance an unsecured loan.  No security interest in the Nile Asset was ever granted to secure the loan.

1097C.  Notwithstanding the purported "sale" of the Nile Asset in the Nile Transaction, Enron maintained control over the Nile Asset after it was nominally transferred.

1097D.  Notwithstanding the purported "sale" of the Nile Asset in the Nile Transaction, Enron continued to bear substantially all of the economic risks and rewards of ownership of the Nile Asset.

1097E.  In the Nile Transaction, CSFB bore the risk that Enron would fail to perform its contractual obligations.  CSFB bore substantially no risk, however, that it would lose money because of a decrease in the value of the Nile Asset.

1097F.  Although the Nile Transaction was related to an agreement designated as a "swap" agreement, the Nile Transaction actually involved payments on disguised loans and the "swap" agreement was not a genuine swap agreement.

1097G.  CSFB knew or should have known that, under applicable law and/or GAAP, the Nile Transaction should have been treated as a borrowing rather than as a sale.

1097H.  For the foregoing reasons, the Nile Transaction did not constitute a true sale and the Nile Transaction should be recharacterized and treated as an unsecured loan transaction.

1097I.   For the foregoing reasons the Court should determine, and enter an Order declaring, that the Nile Asset was, and any proceeds, products and profits of the Nile Asset are, property of the Plaintiff's estate under section 541(a) of the Bankruptcy Code.

1097J.   The Nile Asset was sold in or about 2003.  The proceeds were placed in a segregated account from which they could be distributed only pursuant to Court order or with CSFB's consent (the "Segregated Account").  Defendants CSFB, Pyramid I and Sphinx Trust have refused to consent to allow Plaintiff to take possession of the proceeds of the sale in reliance on purported contractual rights that, for the reasons alleged in this Complaint, they do not genuinely have.  Further, Defendants CSFB, Pyramid I and Sphinx Trust have attempted to extract compensation from Plaintiff in exchange for any agreement to allow Plaintiff to take possession of the proceeds of the sale of the Nile Asset that rightfully belong to Plaintiff.

1097K.  Because all proceeds, products and profits of the Nile Asset and its sale are property of Plaintiff's estate, the refusal of Defendants CSFB, Pyramid I and Sphinx Trust to permit Plaintiff to take possession of the proceeds, products and profits unjustly enriches those Defendants at Plaintiff's expense.  In equity and good conscience, and in accord with the provisions of the Bankruptcy Code, the Court should enter an order directing (a) that all of the proceeds, products and profits of the Nile Asset or its sale that are currently in the Segregated Account be paid to Plaintiff,

and (b) that CSFB, Pyramid I and/or Sphinx Trust immediately pay and turn over, or consent to the payment and turnover of, all additional proceeds, products and profits of the Nile Asset or its sale, or the value thereof, with interest, to Plaintiff.

### COUNT 47B
**(Turnover of Property of the Estate)**

1097L.  The allegations in paragraphs 1 through 1097K of this Complaint are incorporated herein by reference.

1097M.  For the foregoing reasons, the Nile Transaction is properly characterized as an unsecured loan, and the proceeds, products and profits of the Nile Asset and its sale are property of Plaintiff's estate.

1097N. Section 542 of the Bankruptcy Code provides that "an entity . . . in possession, custody, or control . . . of property that the trustee may use, sell, or lease . . . shall deliver to the trustee and account for, such property or the value of such property."

1097O.  Subsequent to the Petition Dates of Enron, ENA and EES Service Holdings, and despite due demand, defendants CSFB, Pyramid I and Sphinx Trust failed and refused to permit delivery of the Nile Asset, or of the proceeds, products and profits of the Nile Asset or its sale, to Plaintiff's estate.  The proceeds, products and profits of the Nile Asset are of substantial value or benefit to Plaintiff's estate and are property belonging to Plaintiff that may be sued, sold or leased by Plaintiff.

1097P.  To the extent that the Court determines that the Nile Asset, and the proceeds, products and profits of the Nile Asset or its sale, are property of Plaintiff's estate, then, pursuant to section 542 of the Bankruptcy Code, the Court should enter an order directing (a) that all of the proceeds, products and profits of the Nile Asset or its sale that are currently in the Segregated Account be paid to Plaintiff, and (b) that CSFB, Pyramid I and/or Sphinx Trust immediately turn

over, or consent to a turn over of, all additional proceeds, products, and profits of the Nile Asset or

its sale, or the value thereof, with interest, to Plaintiff.

## COUNT 48
### (Recovery of the CSFB Preferential Transfers,
### the CSFB 548 Transfers and the CSFB 544 Transfers)

1098.     The allegations in paragraphs 1 through 1097P of this Complaint are incorporated

herein by reference.

1099.     To the extent that the CSFB Preferential Transfers, CSFB 548 Transfers and/or CSFB

544 Transfers is avoided under Bankruptcy Code sections 547, 548, or 544, then pursuant to

Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or

from any immediate or mediate transferee, the property transferred, or the value of such property,

for the benefit of Plaintiff's estate.

## COUNT 49
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1100.     The allegations in paragraphs 1 through 1099 of this Complaint are incorporated

herein by reference.

1101.     By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d),

the claims of CSFB, the initial transferees or beneficiaries identified in paragraphs 1064, 1075, and

1088, and any immediate or mediate transferees, must be disallowed unless and until they have

turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for

which they are liable under Bankruptcy Code section 550.

### H.    COUNTS 50 - 54
### (Against Toronto Dominion Defendants)

## COUNT 50
### (Avoidance of the Toronto Dominion Preferential Transfers)

1102.    The allegations in paragraphs 1 through 1101 of this Complaint are incorporated herein by reference.

1103.    On or within ninety (90) days before the Petition Date, Enron, and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | 9/19/01 | London Prepay | $2,556,901.25 |
| Enron | Enron | Toronto Dominion Texas | 9/19/01 | London Prepay | $139,810.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | 9/28/01 | London Prepay | $2,268.60 |
| Enron or ENA | Enron or ENA | Toronto Dominion Texas and/or Toronto Dominion Bank | 10/19/01 | Coal Corp. Letter of Credit | $22,750.00 |

1104.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Toronto Dominion Preferential Transfers."

1105.    Not Used.

1106.    Although some of the Toronto Dominion Preferential Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1107.    The Toronto Dominion Preferential Transfers constitute transfers of interests in property of Enron and/or ENA.

1108.    Each of the Toronto Dominion Preferential Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as the initial transferees or beneficiaries.

1109.    Each of the Toronto Dominion Preferential Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron and/or ENA before the transfer was made.

1110.    Upon information and belief, at the time each of the Toronto Dominion Preferential Transfers was made, Enron and/or ENA were insolvent for purposes of section 547(b) of the Bankruptcy Code.

1111.    Each of the Toronto Dominion Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made, and the transferees received payment of their debts to the extent provided by the Bankruptcy Code.

1112.    The Toronto Dominion Preferential Transfers are avoidable as preferential transfers under section 547(b) of the Bankruptcy Code.

## COUNT 51
### (Avoidance of the Toronto Dominion 548 Transfers as Fraudulent Transfers)

1113.    The allegations in paragraphs 1 through 1112 of this Complaint are incorporated herein by reference.

1114.    On or within one year before the Petition Date, Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Toronto Dominion Texas | 12/18/00 | London Prepay (structuring fee) | $877,500.00 |
| Enron | Enron | Toronto Dominion Texas | 12/19/00 | London Prepay (agent fee and upfront fee) | $50,000.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas | 12/22/00 | London Prepay (structuring fee) | $195,000.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | 3/21/01 | London Prepay | $151,959.38 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | 3/23/01 | London Prepay | $2,730,052.15 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas | 6/18/01 | London Prepay | $2,632,899.35 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | 6/22/01 | London Prepay | $1,216,310.61 |
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | 6/22/01 | London Prepay | $59,576.80 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | 9/19/01 | London Prepay | $2,556,901.25 |
| Enron | Enron | Toronto Dominion Texas | 9/19/01 | London Prepay | $139,810.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | 9/28/01 | London Prepay | $2,268.60 |
| Enron or ENA | Enron or ENA | Toronto Dominion Texas and/or Toronto Dominion Bank | 10/19/01 | Coal Corp. Letter of Credit | $22,750.00 |

1115.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Toronto Dominion 548 Transfers."

1116.    Not Used.

1117.    Although some of the Toronto Dominion 548 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1118.    To the extent that any of the Toronto Dominion 548 Transfers are also included in Count 50 as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

1119.    Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the Toronto Dominion 548 Transfers.

1120.    The Toronto Dominion 548 Transfers constitute transfers of interests in property of Enron and/or ENA.

1121.    Each of the Toronto Dominion 548 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1122.    The Toronto Dominion 548 Transfers were made on or within one year before the Petition Date.

1123.    Upon and information and belief, when the Toronto Dominion 548 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was an unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

1124.    The Toronto Dominion 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 52

**(Avoidance of the Toronto Dominion 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

1125.    The allegations in paragraphs 1 through 1124 of this Complaint are incorporated herein by reference.

1126.    Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1127.    Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | | 3/01/99 | December 1998 Prepay | $251,004,904.14 |
| Enron or ENA | ENA and Enron | JPMC/ Toronto Dominion Bank and/or Toronto Dominion Texas* | Toronto Dominion Bank and/or Toronto Dominion Texas | 3/01/99 | December 1998 Prepay | $2,025,193.82 |
| Enron or ENA | ENA and Enron | Toronto Dominion Securities and/or Toronto Dominion Bank and/or Toronto Dominion Texas | | 6/29/99 | Truman Prepay (upfront fees) | $1,100,000.00 |

-389-

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | | 9/29/99 | Truman Prepay | $304,224,684.57 |
| Enron or ENA | ENA and Enron | Toronto Dominion Securities and/or Toronto Dominion Bank and/or Toronto Dominion Texas | | 9/29/99 | Jethro Prepay (upfront fees) | $775,000.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | | 11/18/99 | Jethro Prepay | $362,457,093.92 |
| Enron or ENA | ENA and Enron | Toronto Dominion Securities and/or Toronto Dominion Bank and/or Toronto Dominion Texas | | 12/16/99 | Nixon Prepay (upfront fees) | $250,000.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Securities and/or Toronto Dominion Bank and/or Toronto Dominion Texas | | 4/6/00 | Nixon Prepay (extension fees) | $85,000.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas | | 12/18/00 | London Prepay (structuring fee) | $877,500.00 |
| Enron | Enron | Toronto Dominion Texas | | 12/19/00 | London Prepay (agent fee and upfront fee) | $50,000.00 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Toronto Dominion Texas | | 12/22/00 | London Prepay (structuring fee) | $195,000.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | | 3/21/01 | London Prepay | $151,959.38 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | | 3/23/01 | London Prepay | $2,730,052.15 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas | | 6/18/01 | London Prepay | $2,632,899.35 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | | 6/22/01 | London Prepay | $1,216,310.61 |
| Enron or ENA | ENA and Enron | Toronto Dominion Bank and/or Toronto Dominion Texas | | 6/22/01 | London Prepay | $59,576.80 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | | 9/19/01 | London Prepay | $2,556,901.25 |
| Enron | Enron | Toronto Dominion Texas | | 9/19/01 | London Prepay | $139,810.00 |
| Enron or ENA | ENA and Enron | Toronto Dominion Texas and/or Toronto Dominion Bank | | 9/28/01 | London Prepay | $2,268.60 |

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee(s) | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | Enron or ENA | Toronto Dominion Texas and/or Toronto Dominion Bank | | 10/19/01 | Coal Corp. Letter of Credit | $22,750.00 |

1128.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of the transferees related to the foregoing transfers, are referred to herein as the "Toronto Dominion 544 Transfers."

1129.    To the extent JPMC is found to be mere a conduit of the transfer marked with an asterisk in the foregoing table, Toronto Dominion Texas and/or Toronto Dominion Bank were the initial transferees of the identified transfer.

1130.    Although some of the Toronto Dominion 544 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1131.    To the extent that any of the Toronto Dominion 544 Transfers are also included in Count 50 or 51 as avoidable preferential transfers or fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

1132.    Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the Toronto Dominion 544 Transfers.

1133.    The Toronto Dominion 544 Transfers constitute transfers of interests in property of Enron and/or ENA.

1134.    Each of the Toronto Dominion 544 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1135.    Upon and information and belief, when the Toronto Dominion 544 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was an unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

1136.    The Toronto Dominion 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(a)(1)(B) of the Bankruptcy Code and under applicable state law.

**COUNT 53**
**(Recovery of Avoided Transfers Related to the Toronto Dominion Preferential Transfers, the Toronto Dominion 544 Transfers and the Toronto Dominion 544 Transfers)**

1137.    The allegations in paragraphs 1 through 1136 of this Complaint are incorporated herein by reference.

1138.    To the extent that the Toronto Dominion Preferential Transfers, Toronto Dominion 548 Transfers and/or Toronto Dominion 544 Transfers is avoided under Bankruptcy Code sections 547, 548, or 544, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

**COUNT 54**
**(Disallowance of Claims Under Bankruptcy Code Section 502(d))**

1139.    The allegations in paragraphs 1 through 1138 of this Complaint are incorporated herein by reference.

1140.    By reason of the foregoing facts and pursuant to Bankruptcy Code Section 502(d), the claims of Toronto Dominion, the initial transferees or beneficiaries identified in paragraphs 1103, 1114, and 1127, and any immediate or mediate transferees, must be disallowed

unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**I.    COUNTS 55 - 59**
**(Against RBS Defendants)**

**COUNT 55**
**(Avoidance of the RBS Preferential Transfer)**

1141.    Not Used.

1142.    Not Used.

1143.    Not Used.

1144.    Not Used.

1145.    Not Used.

1146.    Not Used.

1147.    Not Used.

1148.    Not Used.

1149.    Not Used.

1150.    Not Used.

1151.    Not Used.

**COUNT 56**
**(Avoidance of the RBS 548 Transfers as Fraudulent Transfers)**

1152.    The allegations in paragraphs 1 through 1151 of this Complaint are incorporated herein by reference.

1153.    On or within one year before the Petition Date, Enron, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron | Enron | Royal Bank of Scotland | | 1/16/2001 | ETOL I (interest) | $920,922.57 |
| Enron | Enron | RFTCL and Royal Bank of Scotland plc | Royal Bank of Scotland | 2/28/2001 | ETOL I (interest) | $1,587,636.74 |

1154.   The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "RBS 548 Transfers."

1155.   To the extent that RFTCL is found to be a mere conduit of any transfer in the foregoing table, Royal Bank of Scotland was the initial transferee of that transfer.

1156.   Although some of the RBS 548 Transfers were related to agreements designated as "swap" agreements, these Transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1157.   Not Used.

1158.   Enron received less than a reasonably equivalent value from the transferees in exchange for the RBS 548 Transfers.

1159.   The RBS 548 Transfers constitute transfers of interests in property of Enron.

1160.   Each of the RBS 548 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1161.   The RBS 548 Transfers were made on or within one year before the Petition Date.

1162.   Upon information and belief, when the RBS 548 Transfers were made, Enron was insolvent, or became insolvent as a result of the transfers; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was an unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

1163.   The RBS 548 Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 57
**(Avoidance of the RBS 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

1164.   The allegations of paragraphs 1 through 1163 of this Complaint are incorporated herein by reference.

1165.   Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1166.   Enron and/or ENA, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the transferees on or about the dates specified below:

| Transferor | Obligor | Initial Transferee or Beneficiary | Subsequent Transferee | Initial Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|---|---|
| Enron or ENA | ENA and Enron | Royal Bank of Scotland | | 12/16/1999 | Nixon (fees) | $220,000.00 |
| Enron | Enron | Royal Bank of Scotland | | 2/23/2000 | Yosemite II (underwriting fees) | £125,000 |
| Enron | Enron | RBSI and Royal Bank of Scotland* | Royal Bank of Scotland | 2/23/2000 | Yosemite II (fees) | £3,500 |
| Enron or ENA | ENA and Enron | Royal Bank of Scotland | | 3/15/2000 | Nixon (extension fee) | $40,000.00 |
| Enron or ENA | ENA and Enron | Royal Bank of Scotland | | 4/17/2000 | Nixon | $131,000,466.59 |
| Enron | Enron | Royal Bank of Scotland | | 1/16/2001 | ETOL I (interest) | $920,922.57 |
| Enron | Enron | RFTCL and Royal Bank of Scotland | Royal Bank of Scotland | 2/28/2001 | ETOL I (interest) | $1,587,636.74 |

1167.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to the transferees related to the foregoing transfers, are referred to herein as the "RBS 544 Transfers."

1168.    To the extent that RFTCL and/or RBSI are found to be mere conduits of the transfers for which the initial transferees or beneficiaries are marked with an asterisk in the foregoing table, Royal Bank of Scotland was the initial transferee or beneficiary of those transfers.

1169.    Not Used.

1170.    Although some of the RBS 544 Transfers were related to agreements designated as "swap" agreements, these transfers were actually payments on disguised loans and the agreements were not genuine "swaps."

1171.    To the extent that any of the RBS 544 Transfers are also included in Count 56 as avoidable fraudulent transfers under section 548 of the Bankruptcy Code, those transfers are pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

1172.    Enron and/or ENA received less than a reasonably equivalent value from the transferees in exchange for the RBS 544 Transfers.

1173.    The RBS 544 Transfers constitute transfers of interests in property of Enron and/or ENA.

1174.    Each of the RBS 544 Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

1175.    Upon information and belief, when the RBS 544 Transfers were made, Enron and/or ENA were insolvent, or became insolvent as a result of the transfers; were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining

property was an unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1176.    The RBS 544 Transfers are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and applicable state law.

### COUNT 58
### (Recovery of the RBS 548 Transfers and RBS 544 Transfers)

1177.    The allegations of paragraphs 1 through 1176 of this Complaint are incorporated herein by reference.

1178.    To the extent that the RBS 548 Transfers or RBS 544 Transfers are avoided under Bankruptcy Code sections 547, 548 or 544, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferees, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

### COUNT 59
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1179.    The allegations of paragraphs 1 through 1178 of this Complaint are incorporated herein by reference.

1180.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of RBS, the initial transferees or beneficiaries identified in paragraphs 1153 and 1166, and any immediate or mediate transferees, must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**J.    *COUNTS 60 - 64***
    ***(Against RBC Defendants)***

## COUNT 60
### (Avoidance of the RBC Preferential Transfer)

1181.    Not Used.

1182.    Not Used.

1183.    Not Used.

1184.    Not Used.

1185.    Not Used.

1186.    Not Used.

1187.    Not Used.

1188.    Not Used.

1189.    Not Used.

1190.    Not Used.

1191.    Not Used.

## COUNT 61
### (Avoidance of the RBC 548 Transfers)

1192.    Not Used.

1193.    Not Used.

1194.    Not Used.

1195.    Not Used.

1196.    Not Used.

1197.    Not Used.

1198.    Not Used.

1199.    Not Used.

1200.    Not Used.

1201.    Not Used.

1202.    Not Used.

1203.    Not Used.

## COUNT 62

### (Avoidance of the RBC 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

1204.    Not Used.

1205.    Not Used.

1206.    Not Used.

1207.    Not Used.

1208.    Not Used.

1209.    Not Used.

1210.    Not Used.

1211.    Not Used.

1212.    Not Used.

1213.    Not Used.

1214.    Not Used.

1215.    Not Used.

## COUNT 63

### (Recovery of the RBC Preferential Transfers, the RBC 548 Transfers and the RBC 544 Transfers)

1216.    Not Used.

1217.    Not Used.

## COUNT 64
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1218.   Not Used.

1219.   Not Used.

**K.   COUNTS 65 - 68**
**(Guarantee and Letter of Credit Claims)**

## COUNT 65
### (Avoidance of the Challenged Transaction Guarantees and Certain Letter of Credit Agreements as Fraudulent Transfers)

1220.   The allegations in paragraphs 1 through 1219 of this Complaint are incorporated herein by reference.

1221.   On or within one year before the Petition Date, Enron incurred obligations (the "Challenged Transaction Obligations") in the form of guarantees, and obligations to obtain letters of credit and reimburse draws on letters of credit, to or for the benefit of the beneficiaries of the obligations in connection with the following transactions on or about the dates specified below:

| Transaction Name | Principal Defendant | Transaction Date |
| --- | --- | --- |
| Yosemite IV | Citigroup | 05/24/2001 |
| June 2001 | Citigroup | 06/28/2001 |
| Chase XI Prepay | Chase | 12/28/2000 |
| Chase XII Prepay | Chase | 10/09/2001 |
| December 2000 Prepaid Oil Swap | CSFB | 12/15/2000 |
| September 2001 Prepaid Oil Swap | CSFB, Barclays | 09/27/2001 |
| Nile | CSFB | 09/28/2001 |
| Nikita | CSFB, Barclays | 09/28/2001 |
| JT Holdings, Inc. | Barclays | 12/07/2000 |
| $SO_2$ September | Barclays | 09/28/2001 |
| $SO_2$ October | Barclays | 10/30/2001 |
| ETOL III | RBS | 06/20/2001 |
| London Prepay | Toronto Dominion | 12/15/2000; 12/22/2000 |

1221A.    The Challenged Transaction Obligations include, but are not limited to, Enron's agreements to obtain the JPMC L/C and/or the West LB Mahonia L/C, the JPMC Reimbursement Agreement, the West LB Mahonia Reimbursement Agreement, and the following guarantees:

| Guarantor | Named Beneficiaries | Transaction Date | Transaction |
|-----------|---------------------|------------------|-------------|
| Enron | Mahonia | 10/09/01 | Chase XII |
| Enron | Besson Trust | 9/28/01 | Nikita |
| Enron | Sphinx Trust | 9/28/01 | Nile |
| Enron | Sideriver Investments Limited | 6/20/01 | ETOL III |
| Enron | State Street Bank and Trust Co., State Street Bank and Trust Co. of Connecticut, N.A. and Citibank, N.A. | 12/07/00 (2nd Amended and Restated Parent Guarantee) | JT Holdings, Inc. |

1222.    Any modifications or amendments of Challenged Transaction Obligations are also referred to herein as "Challenged Transaction Obligations."

1223.    Enron received less than a reasonably equivalent value from the beneficiaries in exchange for the Challenged Transaction Obligations.

1224.    The Challenged Transaction Obligations constitute obligations incurred by Enron.

1225.    The Challenged Transaction Obligations were incurred on or within one year before the Petition Date.

1226.    Upon information and belief, when the Challenged Transaction Obligations were incurred, Enron was insolvent, or became insolvent as a result of the Challenged Transaction Obligations; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was an unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

1227.   The Challenged Transaction Obligations are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.  Accordingly, any and all proofs of claim asserted by a Defendant based on Challenged Transaction Obligations are subject to disallowance as unenforceable obligations.  With respect to the JPMC L/C and Reimbursement Agreement:  (a) any and all claims asserted by, for or through JPMC in any capacity are unenforceable and should be disallowed; (b) any and all claims of purported subrogees of Mahonia are unenforceable and should be disallowed; and (c) to the extent that any Defendants in this proceeding were syndicate members in privity with Enron that hold direct claims against it under the JPMC L/C or Reimbursement Agreement, those claims are unenforceable and should be disallowed.  With respect to the West LB Mahonia L/C and the Mahonia Reimbursement Agreement, Plaintiff seeks recovery of any amount Plaintiff may pay on account of the West LB Claim.  Any payment by Plaintiff to JPMC or Mahonia in connection with the Chase XII prepay is subject to avoidance as a fraudulent transfer or conveyance, including any payment made indirectly through West LB London.

## COUNT 66
### (Avoidance of the Challenged Transaction Obligations Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

1228.   The allegations in paragraphs 1 through 1227 of this Complaint are incorporated herein by reference.

1229.   Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1230.   To the extent that the Challenged Transaction Obligations are included in Count 65 as avoidable fraudulent transfers under section 548 of the Bankruptcy Code, those obligations are

pled alternatively as fraudulent conveyances or transfers avoidable under section 544 of the Bankruptcy Code and applicable state law.

1230A.  Enron's execution of the West LB Nahanni Reimbursement Agreement and entry into an agreement to procure the Nahanni L/C, both for the benefit of CXC, are avoidable under section 544 of the Bankruptcy Code and applicable state law.

1230B.  In Counts 66 through 68, (a) the Challenged Transaction Obligations identified in Count 65, (b) the West LB Nahanni Reimbursement Agreement, (c) Enron's entry into an agreement to obtain the Nahanni L/C, (d) any obligations Enron incurred in the form of guarantees, or obligations to obtain or reimburse draw on letters of credit, in connection with the transactions identified in the following table, and (e) any modifications or amendments of any of the foregoing, are referred to as "Challenged Transaction Obligations."

| Transaction Name | Principal Defendant | Transaction Date |
|---|---|---|
| Yosemite I | Citigroup | 11/18/1999 |
| Yosemite II | Citigroup, Barclays | 02/23/2000 |
| Yosemite III | Citigroup | 08/25/2000 |
| Roosevelt | Citigroup, Barclays | 12/30/1998 |
| Truman | Citigroup, Toronto Dominion | 06/29/1999 |
| Jethro | Citigroup, Toronto Dominion | 09/29/1999 |
| Nixon | Citigroup, Barclays, Toronto Dominion | 12/14/1999 |
| Chase VI Prepay | Chase | 12/18/1997 |
| Chase VII Prepay | Chase | 06/26/1998 |
| Chase VIII Prepay | Chase | 12/01/1998 |
| Chase IX Prepay | Chase | 06/28/1999 |
| Chase X Prepay | Chase | 06/28/2000 |
| Pilgrim/Sarlux | CIBC | 12/22/1998 |
| Pilgrim/Trakya | CIBC | 12/23/1998 |
| December 1998 Prepay | Toronto Dominion | 12/30/1998 |

1231.    Enron received from the beneficiaries of the Challenged Transaction Obligations less than a reasonably equivalent value in exchange for the Challenged Transaction Obligations.

-404-

1232.    The Challenged Transaction Obligations constitute obligations incurred by Enron.

1233.    Upon information and belief, when the Challenged Transaction Obligations were incurred, Enron was insolvent, or became insolvent as a result of the Challenged Transaction Obligations; was engaged in business or a transaction, or was about to engage in business or a transaction, or for which its remaining property was an unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

1234.    The Challenged Transaction Obligations are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and applicable state law. Accordingly, any and all proofs of claim based on the Challenged Transaction Obligations are subject to disallowance as unenforceable obligations.   With respect to the JPMC L/C and Reimbursement Agreement:  (a) any and all claims asserted by, for or through JPMC in any capacity are unenforceable and should be disallowed; (b) any and all claims of purported subrogees of Mahonia are unenforceable and should be disallowed; and (c) to the extent that any Defendants in this proceeding were syndicate members in privity with Enron that hold direct claims against it under the JPMC L/C or Reimbursement Agreement, those claims are unenforceable and should be disallowed.   With respect to the West LB Mahonia L/C and the Mahonia Reimbursement Agreement, Plaintiff seeks recovery of any amount Plaintiff may pay on account of the West LB Claim.  Any payment by Plaintiff to JPMC or Mahonia in connection with the Chase XII prepay is subject to avoidance as a fraudulent transfer or conveyance, including any payment made indirectly through West LB London.  In addition, any claims based on the West LB Nahanni Reimbursement Agreement or Nahanni L/C are unenforceable and should be disallowed.

## COUNT 67
### (Recovery of the Challenged Transaction Obligations; Unjust Enrichment)

1235.    The allegations in paragraphs 1 through 1234 of this Complaint are incorporated herein by reference.

1236.    To the extent that the Challenged Transaction Obligations are avoided under Bankruptcy Code sections 544 or 548, then, pursuant to Bankruptcy Code section 550, Plaintiff may recover from the beneficiaries of the Challenged Transaction Obligations, or from any immediate or mediate transferee, for the benefit of Plaintiff's estate, any property transferred by reason of the Challenged Transaction Obligations, or the value of such property, including: (a) the $487,184,842.01 identified in paragraph 729, which represents the portion of the draw on the Nahanni L/C that Enron transferred to West LB NY for the benefit of CXC; and (b) any payment by Plaintiff to JPMC or Mahonia in connection with the Chase XII prepay, including any payment made indirectly through West LB London.

1236A.    Because Plaintiff incurred any obligation to obtain, or reimburse payments under, the West LB Mahonia L/C in connection with an improper prepay transaction that was designed and facilitated by JPMC and Mahonia, and because any obligations Plaintiff incurred in connection with the Chase XII prepay were fraudulent transfers or conveyances, any payment from Plaintiff to or for the benefit of JPMC or Mahonia in connection with the Chase XII prepay unjustly enriches those Defendants at Plaintiff's expense. In equity and good conscience, and in accord with the provisions of the Bankruptcy Code, the Court should enter an order directing JPMC and Mahonia to disgorge to Plaintiff the amount of any payment from Plaintiff to or for the benefit of JPMC or Mahonia in connection with the Chase XII prepay, including any payment made indirectly through West LB London.

## COUNT 68
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

1237.    The allegations in paragraphs 1 through 1236A of this Complaint are incorporated herein by reference.

1238.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the Challenged Transaction Obligations should be declared null and void, and the claims of the beneficiaries of those Obligations, and any immediate or mediate transferees of the beneficiaries of those Obligations must be disallowed unless and until they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which they are liable under Bankruptcy Code section 550.

**L.    COUNTS 69 - 75**
     **(Additional Counts Under the Bankruptcy Code)**

## COUNT 69
### (Avoidance of Intentional Fraudulent Transfers Under
### Section 548(a)(1)(A) of the Bankruptcy Code; Against All Defendants)

1239.    The allegations in paragraphs 1 through 1238 of this Complaint are incorporated herein by reference.

1240.    In furtherance of their scheme to manipulate and misstate Enron's financial statements, the Insiders, in breach of their fiduciary duties, caused the Plaintiff to make transfers of interests of the Plaintiff in property, and/or to incur obligations either directly or as a guarantor, on or within one year before the Petition Date (the "Intentional Fraudulent Transfers").

1241.    The Intentional Fraudulent Transfers were caused by the Insiders in connection with the following transactions described in this Complaint:

| Transaction Name | Principal Defendant | Transaction Date |
|---|---|---|
| Yosemite I* | Citigroup | 11/18/1999 |
| Yosemite II* | Citigroup | 02/23/2000 |
| Yosemite III* | Citigroup | 08/25/2000 |

| Transaction Name | Principal Defendant | Transaction Date |
|---|---|---|
| Yosemite IV* | Citigroup | 05/24/2001 |
| June 2001 Prepay* | Citigroup | 06/28/2001 |
| Nahanni* | Citigroup | 12/17/1999 |
| Bacchus | Citigroup | 12/20/2000 |
| Sundance | Citigroup | 06/01/2001 |
| | | |
| Chase VI Prepay* | JP Morgan Chase | 12/18/1997 |
| Chase VII Prepay* | JP Morgan Chase | 06/26/1998 |
| Chase VIII Prepay* | JP Morgan Chase | 12/01/1998 |
| Chase IX Prepay* | JP Morgan Chase | 06/28/1999 |
| Chase X Prepay* | JP Morgan Chase | 06/28/2000 |
| Chase XI Prepay* | JP Morgan Chase | 12/28/2000 |
| Fishtail | JP Morgan Chase | 12/19/2000 |
| Chase XII Prepay* | JP Morgan Chase | 09/28/2001 |
| | | |
| December 2000 Prepaid Oil Swap* | CSFB | 12/15/2000 |
| September 2001 Prepaid Oil Swap* | CSFB | 09/27/2001 |
| Nile* | CSFB | 09/28/2001 |
| Nikita* | CSFB | 09/28/2001 |
| | | |
| JT Holdings, Inc.* | Barclays | 12/07/2000 |
| September 2001 Prepaid Oil Swap* | Barclays | 09/27/2001 |
| Nikita* | Barclays | 09/28/2001 |
| S0$_2$ September* | Barclays | 09/28/2001 |
| S0$_2$ October* | Barclays | 10/30/2001 |
| | | |
| Nigerian Barge | Merrill Lynch | 12/29/1999 |
| 1999 Electricity Trades | Merrill Lynch | 12/31/1999 |
| | | |
| Alberta Prepay* | Toronto Dominion | 09/29/2000 |
| London Prepay* | Toronto Dominion | 12/15/2000; 12/22/2000 |
| | | |
| Steele | BT/Deutsche Bank | 10/31/1997 |
| Cochise | BT/Deutsche Bank | 01/28/1999 |
| Tomas | BT/Deutsche Bank | 09/15/1998 |
| Teresa | BT/Deutsche Bank | 03/21/1997 |
| Valhalla | BT/Deutsche Bank | 05/02/2000 |
| | | |
| ETOL I | RBS | 11/1/2000 |
| ETOL II | RBS | 3/30/2001 |
| ETOL III* | RBS | 6/20/2001 |
| Nixon Prepay | RBS | 12/14/1999 |
| Sutton Bridge | RBS | 06/08/1999 |

1242.    The Intentional Fraudulent Transfers include obligations that Enron incurred in the form of guarantees, and/or obligations to obtain or reimburse draws on letters of credit, in connection with the transactions marked with an asterisk in the foregoing table.

1243.    Each transfer of an interest of the Plaintiff in property and each obligation incurred in connection with the transactions identified in the preceding table, including each fee, principal, interest and other payment or transfer of funds or obligation incurred whether directly or as a guarantor, was an Intentional Fraudulent Transfer.  The Intentional Fraudulent Transfers include without limitation each transfer of an interest of Plaintiff in property or obligation incurred that Plaintiff has sought to avoid and recover in any of the preceding Counts of this Complaint.

1244.    Each Intentional Fraudulent Transfer was caused by the Insiders in breach of their fiduciary duties with actual intent to hinder, delay or defraud one or more entities to which Plaintiff was or became, on or after the date that such transfers were made or such obligations were incurred, indebted.  These transfers and obligations were made to assist the Insiders in presenting misleading or incomplete financial information about Enron and diminished Plaintiff's estate.

1245.    The Intentional Fraudulent Transfers are avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT 70
### (Avoidance of Intentional Fraudulent Transfers and Conveyances Under Section 544 of the Bankruptcy Code and Applicable State Law; Against All Defendants)

1246.    The allegations in paragraphs 1 through 1245 of this Complaint are incorporated herein by reference.

1247.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

1248.    In furtherance of their scheme to manipulate and misstate Enron's financial statements, the Insiders, in breach of their fiduciary duties, caused the Plaintiff to make transfers of interests of the Plaintiff in property, and/or to incur obligations either directly or as a guarantor, before the Petition Date (the "Intentional Fraudulent Conveyances").

1249.    The Intentional Fraudulent Conveyances were caused by the Insiders in connection with the transactions listed in the preceding Count of this Complaint and the following additional transactions:

| Transaction Name | Principal Defendant | Transaction Date |
|---|---|---|
| Roosevelt* | Citigroup | 12/30/1998 |
| Truman* | Citigroup | 06/29/1999 |
| Jethro* | Citigroup | 09/29/1999 |
| Nixon* | Citigroup | 12/14/1999 |
| Nighthawk | Citigroup | 12/29/1997 |
| | | |
| Riverside III | CIBC | 06/30/1998 |
| Riverside IV | CIBC | 09/28/1998 |
| Pilgrim/Sarlux* | CIBC | 12/22/1998 |
| Pilgrim/Trakya* | CIBC | 12/23/1998 |
| Riverside V | CIBC | 01/29/1999 |
| Leftover | CIBC | 05/28/1999 |
| Nimitz | CIBC | 06/25/1999 |
| Ghost | CIBC | 12/21/1999 |
| Alchemy | CIBC | 12/22/1999 |
| Discovery | CIBC | 12/30/1999 |
| Specter | CIBC | 03/28/2000 |
| | | |
| Roosevelt* | Barclays | 12/30/1998 |
| Nixon* | Barclays | 12/14/1999 |
| Yosemite II* | Barclays | 02/23/2000 |
| | | |
| December 1998 Prepay* | Toronto Dominion | 12/30/1998 |
| Truman* | Toronto Dominion | 07/29/1999 |
| Jethro* | Toronto Dominion | 09/29/1999 |
| Nixon* | Toronto Dominion | 12/14/1999 |
| | | |
| Renegade | BT/Deutsche Bank | 12/23/1998 |

1250.    The Intentional Fraudulent Conveyances include obligations that Enron incurred in the form of guarantees, and/or obligations to obtain or reimburse draws on letters of credit, in connection with the transactions marked with an asterisk in the foregoing table and the table in paragraph 1241.

1251.    Each transfer of an interest of the Plaintiff in property and each obligation incurred in connection with the transactions identified in the foregoing table and in the preceding Count of this Complaint, including each fee, principal, interest and other payment or transfer of funds or obligation incurred whether directly or as a guarantor, was an Intentional Fraudulent Conveyance. The Intentional Fraudulent Conveyances include without limitation each transfer of an interest of Plaintiff in property that Plaintiff has sought to avoid and recover in any of the preceding Counts of this Complaint.

1252.    Each Intentional Fraudulent Conveyance was caused by the Insiders in breach of their fiduciary duties with actual intent to hinder, delay or defraud one or more entities to which Plaintiff was or became, on or after the date that such transfers were made or such obligations were incurred, indebted.  These transfers were made to assist the Insiders in presenting misleading or incomplete financial information about Enron and diminished Plaintiff's estate.

1253.    The Intentional Fraudulent Conveyances are avoidable as fraudulent conveyances or fraudulent transfers  under section 544 of the Bankruptcy Code or applicable state law.

## COUNT 71
### (Recovery of Avoided Intentional Fraudulent Transfers and Conveyances Under Section 550 of the Bankruptcy Code; Against All Defendants)

1254.    The allegations in paragraphs 1 through 1253 of this Complaint are incorporated herein by reference.

1255.    To the extent that any Intentional Fraudulent Transfer or Conveyance is avoided under Bankruptcy Code sections 544 or 548(a)(1)(A), then, pursuant to Bankruptcy Code section

550, Plaintiff may recover from the initial transferee or beneficiary, or from any immediate or mediate transferees, the property transferred, or the value of such property, for the benefit of Plaintiff's estate.

### COUNT 72
**(Disallowance of Claims Under Bankruptcy Code Section 502(d);
Against All Defendants)**

1256.   The allegations in paragraphs 1 through 1255 of this Complaint are incorporated herein by reference.

1257.   By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of each Defendant must be disallowed unless and until the Defendant has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which the Defendant is liable under Bankruptcy Code section 550.

### COUNT 73
**(Equitable Subordination Under Sections 510(c)(1)-(2) and 105(a) of the
Bankruptcy Code; Against Subordination Defendants)**

1258.   The allegations in paragraphs 1 through 1257 of this Complaint are incorporated herein by reference.

1259.   This Count is brought on behalf of Enron, ENA, and all of their affiliated debtor entities in the chapter 11 cases jointly administered under case number 01-16034 [AJG] (collectively, the "Subordination Plaintiff"), a list of which is annexed as Schedule A.

1260.   Except as otherwise indicated below, Subordination Plaintiff alleges this claim against all Defendants (except the RBC Defendants and certain other defendants with respect to particular obligations as specified below) that have asserted or may assert claims against Subordination Plaintiff in any capacity (collectively, the "Subordination Defendants").

1261.   The Subordination Defendants engaged in and benefitted from inequitable conduct, including the conduct described in this Complaint, that has resulted in injury to Subordination

Plaintiff's creditors and conferred an unfair advantage on the Subordination Defendants. This inequitable conduct has resulted in harm to Subordination Plaintiff and to its entire creditor body, in that general unsecured creditors (a) have been misled as to Subordination Plaintiff's true financial condition, (b) have been induced to extend credit without knowledge of the actual facts regarding Subordination Plaintiff's financial condition, and (c) are less likely to recover the full amounts due to them.

1262.    Under principles of equitable subordination, in equity and good conscience, all claims that have been or may be asserted against the Subordination Plaintiff by, on behalf of, or for the benefit of the Subordination Defendants in any capacity should be subordinated for purposes of distribution, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code, such that no Subordination Defendant's claim is paid ahead of the claim of any other creditor.

1263.    All claims asserted by any of the Subordination Defendants in any capacity against the Subordination Plaintiff should be subordinated such that no Subordination Defendant's claim is paid ahead of the claim of any other creditor.

1264.    All claims asserted by persons or entities other than Subordination Defendants (including agents, lead lenders, SPEs, or trustees) against the Subordination Plaintiff, to the extent that the claims are asserted in whole or in part, directly or indirectly, on behalf of or for the benefit of the Subordination Defendants in any capacity, should be subordinated to that extent.

1264A.  Chase has asserted claims against Subordination Plaintiff's estate that arise out of certain sureties' participation in challenged transactions, including Chase VI, Chase VII, Chase VIII, Chase IX, Chase X and Chase XI.  These claims ("Surety Claims") were transferred to Chase by the sureties or are based on purported common law rights of subrogation.  The relevant sureties include those identified in Schedule B.

1264B.  Insofar as any Surety Claims are premised on the surety's subrogation to, or assertion of, claims against Subordination Plaintiff that previously had belonged to Chase, those Surety Claims should be subordinated.  Chase acted inequitably with respect to Subordination Plaintiff in connection with each challenged transaction in which Chase participated.  All of Chase's claims arising out of challenged transactions should therefore be subordinated.  A surety's acquisition of Chase's claims arising out of challenged transactions, whether by subrogation or otherwise, did not eliminate Subordination Plaintiff's grounds for subordinating those claims.  Similarly, reassignment of the claims to Chase did not eliminate Subordination Plaintiff's grounds for subordinating them.  Accordingly, all Surety Claims premised on subrogation to, or assertion of, claims that previously had belonged to Chase should be subordinated for purposes of distribution pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

1264C.  Insofar as any Surety Claims are premised on any asserted indemnities, guarantees, or other agreements between Subordination Plaintiff and a surety, or on any other obligations that a surety asserts Subordination Plaintiff owes it in the surety's own right, those Surety Claims should be subordinated.  Each obligation Plaintiff incurred in connection with a challenged transaction is avoidable under sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code for reasons alleged in Counts 69 and 70 and in the detailed descriptions of the challenged transactions in this Complaint: the Insiders, in breach of their fiduciary duties, caused Plaintiff to incur the obligations for less than a reasonably equivalent value and with actual intent to hinder, delay or defraud Plaintiff's creditors. Accordingly, each indemnity agreement identified in Schedule B, and every other claim or obligation a surety has asserted against Subordination Plaintiff arising out of a challenged transaction, is avoidable under section 548 of the Bankruptcy Code, and any Surety Claim arising out of such an avoidable obligation should be subordinated for purposes of distribution pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

1265.     Plaintiff cannot at this time identify each and every one of the voluminous claims that may have been filed by, on behalf of, or for the benefit of any of the Subordination Defendants, because information necessary to make this determination is exclusively in the possession of others. The Court should exercise the full extent of its equitable powers to ensure that all claims, payments and benefits, of whatever kind or nature, which have been or may be asserted against the Subordination Plaintiff by, on behalf of, or for the benefit of the Subordination Defendants, in any capacity, directly or indirectly, are subordinated pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code. No funds which would otherwise be paid to creditors should be paid to any of the Subordination Defendants.

1266.     Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

1266A.  For the reasons alleged in this Count 73, to the extent that any of the Subordination Defendants is determined to have a lien on property of the Subordination Plaintiff's estate, the Court should enter an order transferring such lien to the Subordination Plaintiff's estate, pursuant to sections 510(c)(2) and 105(a) of the Bankruptcy Code.

### COUNT 73A
**(Equitable Subordination Under Sections 510(c)(1)-(2) and 105(a) of the
Bankruptcy Code; Against Claim Transferee Defendants)**

1266B.  The allegations in paragraphs 1 through 1266A of this Complaint are incorporated herein by reference.

1266C.  This Count is brought on behalf of Subordination Plaintiff.

1266D.  As of the Petition Date, some Defendants in this proceeding directly or indirectly held interests in claims against or obligations of Subordination Plaintiff which were subsequently transferred to others on or after the Petition Date. These interests in claims or obligations, which Defendants held as of the Petition Date but subsequently transferred, are referred to herein as

"Transferred Claims." The first defendant that transferred a given Transferred Claim on or after the Petition Date is referred to herein as the "Claim Transferor Defendant" for that Transferred Claim.

1266E. Any Defendant asserting a Transferred Claim in any capacity against Subordination Plaintiff is referred to herein as a "Claim Transferee Defendant." Claim Transferee Defendants that Subordination Plaintiff has been able to identify are alleged in Section II.D of this Complaint.

1266F. Each Claim Transferor Defendant engaged in and benefitted from inequitable conduct, including the conduct described in this Complaint, that has resulted in injury to Subordination Plaintiff's creditors and conferred an unfair advantage on the Claim Transferor Defendant. This inequitable conduct has resulted in harm to Subordination Plaintiff and to its entire creditor body, in that general unsecured creditors: (a) have been misled as to the Subordination Plaintiff's true financial condition, (b) have been induced to extend credit without knowledge of the actual facts regarding Plaintiff's financial condition, and (c) are less likely to recover the full amounts due to them.

1266G. Under the principles of equitable subordination, in equity and good conscience, each Transferred Claim, if it had not been transferred and instead had been asserted against the Subordination Plaintiff by, on behalf of, or for the benefit of the Claim Transferor Defendant in any capacity on or after the Petition Date, would have been subject to subordination for purposes of distribution pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code. In addition, any lien securing the subordinated claim would have been transferred to Subordination Plaintiff's estate pursuant to sections 510(c)(2) and 105(a) of the Bankruptcy Code.

1266H. Any Transferred Claim asserted by a Claim Transferee Defendant against the Subordination Plaintiff, to the extent that the claim was held by a Claim Transferor Defendant in any capacity on or after the Petition Date, should be subordinated to the same extent as if the Claim

Transferor Defendant continued to hold the claim, and any lien securing the subordinated claim should be transferred to Subordination Plaintiff's estate.

1266I.   Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

**COUNT 73B**
**(Disallowance of Claims Under Bankruptcy Code Section 502(d);**
**Against Claim Transferee Defendants)**

1266J.   The allegations in paragraphs 1 through 1266I of this Complaint are incorporated herein by reference.

1266K.   Each Transferred Claim would be subject to disallowance under section 502(d) of the Bankruptcy Code if (a) the Transferred Claim had not been transferred and instead had been asserted against Subordination Plaintiff by, on behalf of, or for the benefit of the Claim Transferor Defendant in any capacity on or after the Petition Date, and (b) the Transferred Claim as asserted by, on behalf of, or for the benefit of the Claim Transferor Defendant would be subject to disallowance under section 502(d) of the Bankruptcy Code.

1266L.   Each Transferred Claim would be subject to disallowance under section 502(d) of the Bankruptcy Code if (a) the Transferred Claim was transferred after the Petition Date to a Defendant in this proceeding (the "Defendant Transferee"), and the Transferred Claim was not subsequently transferred, but instead was asserted against Subordination Plaintiff by, on behalf of, or for the benefit of the Defendant Transferee after the Petition Date, and (b) the Transferee Claim as asserted by, on behalf of, or for the benefit of the Defendant Transferee would be subject to disallowance under section 502(d) of the Bankruptcy Code.

1266M.   Any Transferred Claim, to the extent that a Claim Transferor Defendant or Defendant Transferee held the Claim in any capacity on or after the Petition Date, should be

disallowed to the same extent as if the Claim Transferor Defendant or Defendant Transferee had continued to hold the claim until the present.

1266N.  By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), all Transferred Claims should be disallowed unless and until (a) the Claim Transferor Defendant that held an interest in the Transferred Claim as of the Petition Date has turned over to Subordination Plaintiff all property transferred, or paid Subordination Plaintiff the value of such property, for which the Claim Transferor Defendant is liable under Bankruptcy Code section 550 as alleged in this Complaint, and (b) any Defendant Transferee that held the Transferred Claim on or after the Petition Date has turned over to Subordination Plaintiff all property transferred, or paid Subordination Plaintiff the value of such property, for which the Defendant Transferee is liable under Bankruptcy Code section 550 as alleged in this Complaint.

**M.    COUNTS 74 - 76**
**(Common Law Counts)**

**COUNT 74**
**(Aiding and Abetting Breach of Fiduciary Duty;**
**Enron Against All Bank Defendants)**

1267.    The allegations in paragraphs 1 through 1266N of this Complaint are incorporated herein by reference.

1268.    As officers, senior officers, and/or employees with management responsibility at Enron and/or its subsidiaries, the Insiders owed Enron fiduciary duties.  These duties required the Insiders at all times to act on behalf of Enron in good faith, to exercise the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and to conduct themselves in a manner they reasonably believed to be in the best interest of the company.  As part of their fiduciary duties, the Insiders at all times were required to be honest and candid and to make complete disclosure in their dealings with the company and its Board of Directors.  Further, in their

communications with investors the Insiders were obligated to do so honestly, candidly and completely in all material respects.

1269.    By virtue of the acts and omissions described in this Complaint, the Insiders repeatedly violated their fiduciary duties to Enron. The Insiders violated their duties of good faith, due care, and loyalty by causing Enron to enter into each of the numerous structured finance transactions described in this Complaint, including the prepay, FAS 140, minority interest, tax and other transactions, for the purpose and with the effect of manipulating and misstating Enron's financial condition. The Insiders also breached their fiduciary duties of good faith, due care, and loyalty to Enron by reporting or causing to be reported in Enron's financial statements the financial effects of these transactions as though they were valid and in compliance with applicable accounting and other requirements, when, as described in this Complaint, they were not. With respect to those same structured finance transactions, the Insiders violated their duties to conduct themselves honestly, candidly and with full disclosure in their dealings with the company and its Board of Directors. Further, the Insiders breached their fiduciary duty of honesty, candor and complete disclosure by causing Enron's communications with its investors pertaining to these transactions and their effects on Enron's financial statements to be materially misleading and incomplete.

1270.    By virtue of the acts and omissions described in this Complaint, Insiders Fastow, Kopper, and Glisan also breached their duties of good faith, due care, and loyalty by entering into transactions with Enron, directly and through entities in which they or members of their families owned an interest, in which they or their family members derived an improper personal benefit at the expense of the company. These Insiders also breached their duties of good faith, due care, and loyalty by arranging for and facilitating transactions between Enron and other officers and employees of the company, acting directly and through entities in which they or members of their families owned an interest, in which Enron officers and employees derived an improper personal

benefit at the expense of the company.  In each of these transactions, these Insiders and Causey breached their fiduciary duties by failing to disclose to the company all material facts of each such transaction and/or by deliberately failing to supervise these transactions.

1271.    By virtue of the acts and omissions described in this Complaint, the Bank Defendants knowingly gave substantial assistance to the Insiders in breaching their fiduciary duties to Enron. In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants participated with actual knowledge that the purpose of the transaction was to manipulate and misstate Enron's financial statements and that the transaction would be reported by Enron in a materially misleading manner.  In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants gave substantial assistance to the Insiders by designing, implementing, financing, purporting to invest in, obtaining others to invest in, and/or closing the transaction and/or by causing their subsidiaries or affiliates to do the same.

1272.    By virtue of the acts and omissions described in this Complaint, the Bank Defendants knowingly gave substantial assistance to those Insiders who breached their duties of good faith, due care, and loyalty by entering into transactions with Enron, directly and through entities in which they or members of their families owned an interest, in which they or members of their families derived an improper personal benefit.  In each of the transactions described in this Complaint in which an Insider and/or a member of his family improperly derived a personal benefit from a transaction with Enron, one or more of the Bank Defendants participated with actual knowledge that the transaction was designed to or would benefit the Insider at Enron's expense.  In each of these transactions, one or more of the Bank Defendants and/or their officers gave substantial assistance to the Insiders by investing, or by obtaining others to invest, in the transaction or the entity formed by the Insiders to participate in the transaction.

1273.    As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

1274.    Enron's injuries as described in this Complaint resulted from fraud and/or malice on the part of the Bank Defendants.  When viewed objectively from the Bank Defendants' standpoint, the acts and omissions described in this Complaint involved an extreme degree of risk at the time they occurred, considering the probability and magnitude of the potential harm to Enron.  The Bank Defendants had an actual, subjective awareness of the risk to Enron posed by their acts and omissions, but they nevertheless proceeded with conscious indifference to Enron's rights.  Further, the acts and omissions described in this Complaint demonstrate a malicious, reckless, and/or willful disregard of Enron's rights and welfare on the part of the Bank Defendants.  The same acts and omissions also were aimed at the public generally and were taken by the Bank Defendants in utter disregard of the public interest, including without limitation the interests of the many other entities that were financially involved with Enron, as well as the rights and interests of the investing public. Therefore, in order to punish the Bank Defendants, to deter the Bank Defendants from repeating the acts and omissions described in this Complaint, to protect the public against similar acts and omissions in the future, and to serve as a warning to others, the Bank Defendants should be held liable for exemplary or punitive damages.

## COUNT 75
### (Aiding and Abetting Fraud;
### Enron Against All Bank Defendants)

1275.    The allegations in paragraphs 1 through 1274 of this Complaint are incorporated herein by reference.

1276.    The Insiders, as officers, senior officers, and/or employees with management responsibility at Enron and/or its subsidiaries, owed Enron fiduciary duties.  Specifically, among others, the Insiders owed Enron a fiduciary duty to be honest and candid and to make complete disclosure in their dealings with the company and its Board of Directors.

1277.    From 1997 through 2001, the Insiders knowingly misrepresented and/or omitted to disclose to the company and its Board of Directors (1) the true nature and/or purpose of the structured finance transactions listed below, including that they would be reported in Enron's financial statements in a manner that violated GAAP and/or was otherwise misleading; and (2) the wrongful manipulation and misstatement of Enron's financial statements directly caused by the structured finance transactions listed below.  The structured finance transactions are Roosevelt, Truman, Jethro, Yosemite I, Nixon, Yosemite II, Yosemite III, Yosemite IV, June 2001 prepay, Nighthawk, Nahanni, Bacchus, Sundance Industrial, Chase VI prepay, Chase VII prepay, Chase VIII prepay, Chase IX prepay, Chase X prepay, Chase XI prepay, Chase XII prepay, Fishtail, December 2000 Prepaid Oil Swap, September 2001 Prepaid Oil Swap, Nile, Nikita, JT Holdings Inc., $SO_2$, Chewco, Steele, Cochise, Teresa, Tomas, Renegade, Valhalla, Riverside III, Riverside IV, Pilgrim, Riverside V, Leftover, Nimitz, Ghost, Alchemy, Discovery, Specter, Hawaii, Nigerian Barge, 1999 Electricity Trade, December 1998 Prepay, The Alberta Prepay, The London Prepay, Sutton Bridge, ETOL I, ETOL II, and ETOL III.

1278.    With respect to these structured finance transactions, the Insiders knowingly caused to be included in Enron's internal and publicly disseminated financial statements misleading

information about the company's cash flow from operating and financing activities, income and net income, debt and price risk management liabilities, interest expense, and other information, as well as the financial measures, ratios and other calculations which are derived from or are based upon these figures.

1279.    In addition, with respect to these structured finance transactions, the Insiders knowingly made misrepresentations and/or omitted to disclose material information to the company and/or its Board of Directors at the Board meetings and Board committee meetings listed below, all of which took place prior, or in some cases immediately prior, to the closing of one or more of the structured finance transactions.  Once each of the structured finance transactions listed below closed, and its financial effects were captured initially in Enron's internal and publicly disseminated financial statements, at no time thereafter did any of the Insiders reveal to the company or its Board of Directors (1) the true nature and/or purpose of the structured finance transactions, including that they had been reported in Enron's financial statements in a manner that violated GAAP and/or was otherwise misleading, and/or (2) the wrongful manipulation and misstatement of Enron's financial statements directly caused by these structured finance transactions.

### *Roosevelt*

1280.    The Insiders did not disclose to Enron that the accounting for the Roosevelt transaction, which closed approximately December 30, 1998, was inconsistent with GAAP or was otherwise misleading.

1281.    The Insiders did not disclose to Enron that the accounting for the Roosevelt transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 12-13, 1998, and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on

December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 18, 1998).

1282.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the Roosevelt transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, the Finance Committee meeting on December 7, 1998, and the Executive Committee meeting on December 18, 1998.

1283.    Insider McMahon did not disclose to Enron that the accounting for the Roosevelt transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, and the Finance Committee meeting on December 7, 1998.

### *Truman*

1284.    The Insiders did not disclose to Enron that the accounting for the Truman transaction, which closed approximately June 29, 1999, and was scheduled to continue until September, 1999, was inconsistent with GAAP or otherwise misleading.

1285.    The Insiders did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including a meeting on June 28, 1999, one day before the transaction closed), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on June 7, June 11, and June 22, 1999).

1286.    Insider Fastow did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 28, 1999, one day before the transaction closed, and at the Finance Committee meeting on May 3, 1999.

1287.    Insider Causey did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

1288.    Insider McMahon did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee Meeting on May 3, 1999, and at the Executive Committee meeting on June 22, 1999.

### *Jethro*

1289.    The Insiders did not disclose to Enron that the accounting for the Jethro transaction, which closed approximately September 29, 1999, and was scheduled to continue until November, 1999, was inconsistent with GAAP or otherwise misleading.

1290.    The Insiders did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 10 and September 17, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 9, 1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on September 3, September 14, and September 24, 1999).

1291.    Insider Fastow did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 9, 1999.

1292.    Insider McMahon did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on September 17, 1999.

1293.    Insider Causey did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 9, 1999.

### *Yosemite I*

1294.    The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction, which closed approximately November 18, 1999, and was scheduled to continue until December, 2004, was inconsistent with GAAP or otherwise misleading.

1295.    The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 10, September 17, October 11-12, November 5, and November 18, 1999, the same day the project closed).

1296.    The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at a Finance Committee meeting on May 3, 1999, including in a discussion of the Yosemite I transaction in the materials that were provided to the Finance Committee by Insider McMahon as part of the Treasurer's report.

1297.    The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at a Finance Committee meeting on August 9, 1999, including in a discussion of the Yosemite I transaction in the materials that were provided to the Finance Committee.

1298.    Insider Causey did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on August 10 and October 11-12, 1999 and at the Finance Committee meetings on May 3 and August 9, 1999.

1299.    Insider Fastow did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 11-12, 1999 and at the Finance Committee meetings on May 3 and August 9, 1999.

1300.    Insider McMahon did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 11-12, 1999.

*Nixon*

1301.    The Insiders did not disclose to Enron that the accounting for the Nixon transaction, which closed approximately December 14, 1999, was inconsistent with GAAP or otherwise misleading.

1302.    The Insiders did not disclose to Enron that the accounting for the Nixon transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18 and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999, one day prior to closing), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

1303.    Insider Causey did not disclose to Enron that the accounting for the Nixon transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999, and at the Finance Committee meeting on December 13, 1999.

1304.    Insiders McMahon and Fastow did not disclose to Enron that the accounting for the Nixon transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

*Yosemite II*

1305.    The Insiders did not disclose to Enron that the accounting for the Yosemite II transaction, which closed approximately February 23, 2000, and was scheduled to continue until approximately January 2007, was inconsistent with GAAP or otherwise misleading.

1306.    The Insiders did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 5, November 18 and December 14, 1999, and February 7-8, 2000).

1307.    Insider McMahon did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on December 13, 1999, including in a mention of the Yosemite II transaction in a chart in his Treasurer's report.

1308.    Insider Causey did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Board meeting on December 14, 1999.

1309.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on October 6, 2000, including in a mention of Yosemite II in a list of transactions, during a Finance Committee meeting on December 13, 1999, including in a mention of the Yosemite II transaction in a chart in the Treasurer's report, and during Audit and Compliance and Finance Committee meetings on February 12, 2001, including in a mention of Yosemite II in a list of investment activities for 2000.

1310.    Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on February 7-8, 2000.

**Yosemite III**

1311.    The Insiders did not disclose to Enron that the accounting for the Yosemite III transaction, which closed approximately August 25, 2000, and was scheduled to continue until July, 2005, was inconsistent with GAAP or otherwise misleading

1312.    The Insiders did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 1, 7-8, and 24, 2000), in Finance Committee meetings in and around the time of the transaction (including a meeting on August 7, 2000), and in Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

1313.    Insider Causey did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at the August 1 and August 24, 2000, Board meetings, and at the August 7, 2000 Finance Committee meeting.

1314.    Insider Fastow did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at the June 22, 2000 Executive Committee meeting, at the August 1, 2000 Board meeting, and at the August 7, 2000 Finance Committee meeting.

1315.    Insider Glisan did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at the June 22, 2000 Executive Committee meeting, at the August 1, 2000 Board meeting, and at the August 7, 2000 Finance Committee Meeting.

*Yosemite IV*

1316.    The Insiders did not disclose to Enron that the accounting for the Yosemite IV transaction, which closed approximately May 24, 2001, was inconsistent with GAAP or otherwise misleading.

1317.    The Insiders did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on March 16 and May 1, 2001), Finance Committee meetings in and around the time of the transaction (including a meeting on April 30, 2001), and Executive Committee meetings in and around the time of the transaction (including a meeting on March 12, 2001).

1318.    Insider Causey did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001, and the Finance Committee meeting on April 30, 2001.

1319.    Insider McMahon did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001.

1320.    Insider Fastow did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on April 2001 (including in a mention of "certain prepay transactions that were underway") and April 30, 2001, and at the Executive Committee meeting on March 12, 2001.

1321.    Insider Glisan did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading in a Finance Committee meeting on March 12, 2001.

*June 2001*

1322.    The Insiders did not disclose to Enron that the accounting for the June 2001 transaction, which closed approximately June 28, 2001, was inconsistent with GAAP or otherwise misleading.

1323.    The Insiders did not disclose to Enron that the accounting for the June 2001 transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 1 and June 13, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on April 30, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

1324.    Insiders Fastow and Glisan did not disclose to Enron that the accounting for the June 2001 transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on April 30, 2001, and at the Board meeting on June 13, 2001.

1325.    Insider Causey did not disclose to Enron that the accounting for the June 2001 transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 13, 2001.

*Nighthawk*

1326.    The Insiders did not disclose to Enron that the accounting for the Nighthawk transaction, which closed approximately December 26, 1997, was inconsistent with GAAP or otherwise misleading.

1327.    The Insiders did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at the Board and Finance Committee meetings at which the Nighthawk project was presented, including in a Finance

Committee meeting on December 8, 1997, a Board meeting on December 9, 1997, a Board meeting on February 1, 1999, and a Board meeting on September 17, 1999.

1328.    Insider Causey did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 8, 1997, when Nighthawk was presented, and at the Board meeting on February 1, 1999, when the restructuring of Nighthawk was presented.

1329.    Insider Fastow did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 8, 1997, when Nighthawk was presented.

1330.    Insider McMahon did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at Board meetings on February 1 and September 17, 1999, when the restructuring of Nighthawk was presented.

*Nahanni*

1331.    The Insiders did not disclose to Enron that the accounting for the Nahanni transaction, which closed approximately December 17, 1999, was inconsistent with GAAP or otherwise misleading.

1332.    The Insiders did not disclose to Enron that the accounting for the Nahanni transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18 and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999, at which the transaction was referenced), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

1333.    Insiders McMahon, Causey, and Fastow did not disclose to Enron that the accounting for the Nahanni transaction was inconsistent with GAAP or otherwise misleading at the Finance

Committee meeting on December 13, 1999, at which Nahanni was mentioned in a Treasurer's report.

### *Bacchus*

1334.    The Insiders did not disclose to Enron that the accounting for the Bacchus transaction, which closed approximately December 20, 2000, was inconsistent with GAAP or otherwise misleading.

1335.    The Insiders did not disclose to Enron that the accounting for the Bacchus transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and December 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 7, 2000).

1336.    Insiders Causey, Fastow, Glisan, and McMahon did not disclose to Enron that the accounting for the Bacchus transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

### *Sundance Industrial*

1337.    The Insiders did not disclose to Enron that the accounting for the Sundance transaction, which closed approximately June 1, 2001, was inconsistent with GAAP or otherwise misleading.

1338.    The Insiders did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on March 16 and May 1, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on April 30,

2001), and Executive Committee meetings in and around the time of the transaction (including a meeting on March 12, 2001).

1339.   Insider Causey did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001, and the Finance Committee meeting on April 30, 2001.

1340.   Insider McMahon did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001.

1341.   Insider Fastow did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on April 30, 2001, and the Executive Committee meeting on March 12, 2001.

1342.   Insider Glisan did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on April 30, 2001.

### *Chase VI Prepay*

1343.   The Insiders did not disclose to Enron that the accounting for the Chase VI prepay transaction, which was executed approximately December 18, 1997, was inconsistent with GAAP or otherwise misleading.

1344.   The Insiders did not disclose to Enron that the accounting for the Chase VI prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 5, October 14, and December 9, 1997), at Finance Committee meetings in and around the time of the transaction (including meetings on October 13 and December 8, 1997), and Executive Committee meetings in and around the time of the transaction (including meetings on October 21, November 5, and November 14, 1997).

1345.    Insider Causey did not disclose to Enron that the accounting for the Chase VI prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 14, 1997, and the Finance Committee meetings on October 13 and December 8, 1997.

1346.    Insider Fastow did not disclose to Enron that the accounting for the Chase VI prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 14, 1997, and the Finance Committee meetings on October 13 and December 8, 1997, and at the Executive Committee meeting on November 5, 1997.

### Chase VII Prepay

1347.    The Insiders did not disclose to Enron that the accounting for the Chase VII prepay transaction, which closed approximately June 26, 1998 was inconsistent with GAAP or otherwise misleading.

1348.    The Insiders did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4-5 and June 22, 1998, four days before the deal closed), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 4, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on June 3 and June 12, 1998).

1349.    Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 22, 1998, four days before the deal closed, and at the Finance Committee meeting on May 4, 1998.

1350.    Insider Causey did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 4, 1998.

### Chase VIII Prepay

1351.    The Insiders did not disclose to Enron that the accounting for the Chase VIII prepay transaction, which closed approximately December 1, 1998, was inconsistent with GAAP or otherwise misleading.

1352.    The Insiders did not disclose to Enron that the accounting for the Chase VIII prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 10-11 and October 12-13, 1998), at Finance Committee meetings in and around the time of the transaction (including meetings on October 12 and December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on September 11, November 2, November 17, and November 23, 1998).

1353.    Insider Causey did not disclose to Enron that the accounting for the Chase VIII prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 12-13, 1998, at the Finance Committee meetings on October 12 and December 7, 1998, and at the Executive Committee meeting on November 2, 1998.

1354.    Insider Fastow did not disclose to Enron that the accounting for the Chase VIII prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on October 12 and December 7, 1998, and the Executive Committee meetings on September 11, November 2, and November 23, 1998.

1355.    Insider McMahon did not disclose to Enron that the accounting for the Chase VIII prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on October 12 and December 7, 1998, and at the Executive Committee meeting on November 2, 1998.

### *Chase IX Prepay*

1356.    The Insiders did not disclose to Enron that the accounting for the Chase IX prepay transaction, which closed approximately June 28, 1999, and was scheduled to continue until June 30, 2004, was inconsistent with GAAP or otherwise misleading.

1357.    The Insiders did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 19 and June 28, 1999, the same day the deal closed), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on June 7, June 11, and June 22, 1999).

1358.    Insider Fastow did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 28, 1999, and the Finance Committee meeting on May 3, 1999.

1359.    Insider McMahon did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999, and the Executive Committee meeting on June 22, 1999.

1360.    Insider Causey did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

### *Chase X Prepay*

1361.    The Insiders did not disclose to Enron that the accounting for the Chase X prepay transaction, which closed approximately June 28, 2000, and was scheduled to continue until June 30, 2005, was inconsistent with GAAP or otherwise misleading.

1362.    The Insiders did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18 and December 14, 1999, February 7-8, April 3, and May 2, 2000), at Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, February 7 and May 1, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on January 20, March 2, May 17, June 1, and June 22, 2000).

1363.    Insider Causey did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on December 14, 1999 and May 2, 2000, and at the Finance Committee meetings on December 13, 1999 and May 1, 2000.

1364.    Insider Fastow did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on April 3, 2000, at the Finance Committee meetings on December 13, 1999, February 7, 2000, and May 1, 2000, and the Executive Committee meetings on May 17, June 1, and June 22, 2000.

1365.    Insider McMahon did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on December 13, 1999 and February 7, 2000.

1366.    Insider Glisan did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 1, 2000 and the Executive Committee meeting on June 22, 2000.

### Chase XI Prepay

1367.    The Insiders did not disclose to Enron that the accounting for the Chase XI prepay transaction, which closed approximately December 28, 2000, and was scheduled to continue until November, 2005, was inconsistent with GAAP or otherwise misleading.

1368.    The Insiders did not disclose to Enron that the accounting for the Chase XI prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on December 7 and December 21, 2000).

1369.    Insider Fastow did not disclose to Enron that the accounting for the Chase XI prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000, and the Executive Committee meeting on December 21, 2000.

1370.    Insiders Glisan and McMahon did not disclose to Enron that the accounting for the Chase XI prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

### Chase XII Prepay

1371.    The Insiders did not disclose to Enron that the accounting for the Chase XII prepay transaction, which closed approximately September 28, 2001, and was scheduled to continue until March 25, 2002, was inconsistent with GAAP or otherwise misleading.

1372.    The Insiders did not disclose to Enron that the accounting for the Chase XII prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 13-14 and 27, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 13,

2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

1373.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the Chase XII prepay transaction was inconsistent with GAAP or otherwise misleading at a Board meeting on August 13-14, 2001, and a Finance Committee meeting on August 13, 2001.

### Fishtail

1374.    The Insiders did not disclose to Enron that the accounting for the Fishtail transaction, which was executed approximately December 19, 2000, was inconsistent with GAAP or otherwise misleading.

1375.    The Insiders did not disclose to Enron that the accounting for the Fishtail transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and December 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 7, 2000),

1376.    Insiders Causey, Fastow, Glisan, and McMahon did not disclose to Enron that the accounting for the Fishtail transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

### December 2000 Prepaid Oil Swap

1377.    The Insiders did not disclose to Enron that the accounting for the December 2000 Prepaid Oil Swap transaction, which closed approximately December 15, 2000, was inconsistent with GAAP or otherwise misleading.

1378.    The Insiders did not disclose to Enron that the accounting for the December 2000 Prepaid Oil Swap transaction was inconsistent with GAAP or otherwise misleading at Board

meetings in and around the time of the transaction (including meetings on December 7 and 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 7, 2000).

1379.    Insiders Causey, Fastow, Glisan, and McMahon did not disclose to Enron that the accounting for the December 2000 Prepaid Oil Swap transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

*Nikita*

1380.    The Insiders did not disclose to Enron that the accounting for the Nikita transaction, which closed approximately September 28, 2001, was inconsistent with GAAP or otherwise misleading.

1381.    The Insiders did not disclose to Enron that the accounting for the Nikita transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 13-14 and 27, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 13, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

1382.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the Nikita transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on August 13-14, 2001, and the Finance Committee meeting on August 13, 2001.

1383.    Insider Glisan did not disclose to Enron that the accounting for the Nikita transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 13, 2001.

*Nile*

1384.    The Insiders did not disclose to Enron that the accounting for the Nile Transaction, which closed on or about September 28, 2001, was inconsistent with GAAP or otherwise misleading.

1385.    The Insiders did not disclose to Enron that the accounting for the Nile Transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 13 and 27, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 13, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

1386.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the Nile Transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on August 13,2001, and the Finance Committee meeting on August 13, 200l.

1387.    Insider Glisan did not disclose to Enron that the accounting for the Nile Transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 13, 2001.

*JT Holdings Inc.*

1388.    The Insiders did not disclose to Enron that the accounting for the JT Holdings, Inc. transaction, which closed approximately December 7, 2000, was inconsistent with GAAP or otherwise misleading.

1389.    The Insiders did not disclose to Enron that the accounting for the JT Holdings, Inc. transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 7, October 27, and December 7, 2000, the same day the project closed), at Finance Committee meetings in and around the time of the

transaction (including a meeting on October 6, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

1390.    Insider Causey did not disclose to Enron that the accounting for the JT Holdings, Inc., transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 27, 2000, and at the Finance Committee meeting on October 6, 2000.

1391.    Insider Fastow did not disclose to Enron that the accounting for the JT Holdings, Inc., transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 27, 2000, at the Executive Committee meeting on June 22, 2000, and at the Finance Committee meeting on October 6, 2000.

1392.    Insider Glisan did not disclose to Enron that the accounting for the JT Holdings, Inc. transaction was inconsistent with GAAP or otherwise misleading at the Executive Committee meeting on June 22, 2000, and at the Finance Committee meeting on October 6, 2000.

### $SO_2$

1393.    The Insiders did not disclose to Enron that the accounting for the $SO_2$ transaction, which involved two trades, one on or about September 28, 2001 and the other on or about October 30, 2001, was inconsistent with GAAP or otherwise misleading.

1394.    The Insiders did not disclose to Enron that the accounting for the $SO_2$ transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 1, 2001 and eleven dates in November, 2001), at Finance Committee meetings in and around the time of the transaction (including meetings on August 13 and October 8, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

1395.    Insider McMahon did not disclose to Enron that the accounting for the $SO_2$ transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on December 1, 2001, or in November.

1396.    Insiders Causey, Fastow, and Glisan did not disclose to Enron that the accounting for the $SO_2$ transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on August 13 and October 8, 2001.

*Chewco*

1397.    The Insiders did not disclose to Enron that the accounting for the Chewco transaction, which closed on December 30, 1997, was inconsistent with GAAP or otherwise misleading.

1398.    The Insiders did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at a November 5, 1997 Executive Committee meeting in which the project was presented for approval.

1399.    In presenting the Chewco transaction to the Executive Committee, Insider Fastow described Chewco Investments, L.L.C. as "a special purpose vehicle not affiliated with the Company."

1400.    The Insiders did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 5, 1997, October 14, 1997, and December 9, 1997), at Finance Committee meetings in and around the time of the transaction (including meetings on October 13, 1997 and December 8, 1997), and at other Executive Committee meetings in and around the time of the transaction (including meetings on October 21, 1997, November 14, 1997 and December 29, 1997).

1401.   Insider Causey did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at the October 14, 1997 Board meeting and the October 13, 1997 and December 8, 1997 Finance Committee meetings.

1402.   Insider Fastow did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at the October 14, 1997 Board meeting, the October 13, 1997 and December 8, 1997 Finance Committee meetings, and the November 5, 1997 Executive Committee meeting.

1403.   Insider Kopper did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at the November 5, 1997 Executive Committee meeting.

### *Steele*

1404.   The Insiders did not disclose to Enron that the accounting for the Steele transaction, which closed approximately October 31, 1997, was inconsistent with GAAP or otherwise misleading.

1405.   The Insiders did not disclose to Enron that the accounting for the Steele transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 6, May 28, August 11, October 5, and October 14, 1997), at Finance Committee meetings in and around the time of the transaction (including meetings on May 5, August 10, and October 13, 1997), or at Executive Committee meetings in and around the time of the transaction (including meetings on May 23, June 5, July 10, August 21, and October 21, 1997).

1406.   Insider Causey did not disclose to Enron that the accounting for the Steele transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on August 11 and October 14, 1997, at the Finance Committee meetings on May 5, August 10, and October 13, 1997,

or at the Finance Committee meeting on February 9, 1998, in which Project Steele appeared on a document provided to the Finance Committee.

1407.    Insider Fastow did not disclose to Enron that the accounting for the Steele transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on August 11, October 5, and October 14, 1997, at the Finance Committee meetings on May 5, August 10, and October 13, 1997 and February 9, 1998 (in which Project Steele appeared on a document provided to the Finance Committee), or at the Executive Committee meetings on June 5, July 10, and August 21, 1997.

### *Cochise*

1408.    The Insiders did not disclose to Enron that the accounting for the Cochise transaction, which was executed approximately January 28, 1999, was inconsistent with GAAP or otherwise misleading.

1409.    The Insiders did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading during a Board meeting on February 28, 1999, at which the project was discussed, an Executive Committee meeting on December 18, 1998, at which the project was discussed, or during a Finance Committee meeting on December 13, 1999, in which the project appeared on a list of year-end transactions.

1410.    The Insiders did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on July 21, August 10-11, October 12-13, 1998, and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including meetings on August 10, October 12, and December 7, 1998), or at other Executive Committee meetings in and around the time of the transaction (including meetings on September 11, November 2, November 17, November 23, 1998).

1411.    Insider Causey did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on July 21, August 10-11, October 12-13, December 8, 1998, and February 8, 1999, at the Finance Committee meetings on August 10, October 12, and December 7, 1998, or at the Executive Committee meetings on November 2 and December 18, 1998 (during which Causey discussed the Cochise transaction with the Committee).

1412.    Insider Fastow did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on July 21, August 10-11, December 8, 1998, and February 8, 1999, at the Finance Committee meetings on August 10, October 12, and December 7, 1998, or at the Executive Committee meetings on September 11, November 2, November 23, and December 18, 1998.

1413.    Insider McMahon did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on July 21, August 10-11, and December 8, 1998, at the Finance Committee meetings on August 10, October 12, and December 7, 1998, or at the Executive Committee meeting on November 2, 1998.

### *Teresa*

1414.    The Insiders did not disclose to Enron that the accounting for the Teresa transaction, which was executed approximately March 21, 1997, was inconsistent with GAAP or otherwise misleading.

1415.    The Insiders did not disclose to Enron that the accounting for the Teresa transaction was inconsistent with GAAP or otherwise misleading during an Executive Committee meeting on March 25, 1997, at which the project was discussed, or during a Finance Committee meeting on February 9, 1998, in which the project appeared on a list of 1997 transactions.

1416.   Insider Causey did not disclose to Enron that the accounting for the Teresa transaction was inconsistent with GAAP or otherwise misleading during an Executive Committee meeting on March 25, 1997, at which he made a presentation on Teresa, or during a Finance Committee meeting on February 9, 1998, in which the project appeared on a list of 1997 transactions.

1417.   Insider Fastow did not disclose to Enron that the accounting for the Teresa transaction was inconsistent with GAAP or otherwise misleading during an Executive Committee meeting on March 25, 1997, at which Teresa was discussed, or at a Finance Committee meeting on February 9, 1998, in which the project appeared on a list of 1997 transactions.

*Tomas*

1418.   The Insiders did not disclose to Enron that the accounting for the Tomas transaction, which was executed approximately September 15, 1998, was inconsistent with GAAP or otherwise misleading.

1419.   The Insiders did not disclose to Enron that the accounting for the Tomas transaction was inconsistent with GAAP or otherwise misleading during a meeting of the Executive Committee on March 2, 1998, during which the project was discussed.

1420.   Insiders Causey and Maxey did not disclose to Enron that the accounting for the Tomas transaction was inconsistent with GAAP or otherwise misleading during a meeting of the Executive Committee on March 2, 1998, during which the project was discussed.

1421.   In the March 2, 1998 Executive Committee meeting, Insider Causey misrepresented to Enron that (1) Tomas was a project designed to enhance the financial return of a portfolio of leased assets, despite the fact that the SPE did not engage in any leasing activities until the Insiders arranged a lease of aircraft in the summer of 2000, and (2) Tomas would generate after-tax earnings,

despite the fact that the transaction was designed to generate current "pre-tax" financial accounting income by creating questionable future tax deductions.

### *Renegade*

1422.    The Insiders did not disclose to Enron that the Renegade transaction, which was executed approximately December 23, 1998, was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders.

1423.    The Insiders did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at Board meetings in and around the time of the transaction (including meetings on October 12 and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), or at Executive Committee meetings in and around the time of the transaction (including meetings on November 17, November 23, and December 18, 1998).

1424.    Insider Causey did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at the Board meetings on October 12 and December 8, 1998, at the Finance Committee meeting on December 7, 1998, or at the Executive Committee meeting on December 18, 1998.

1425.    Insider Fastow did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998, or at the Executive Committee meetings on November 23 and December 18, 1998.

1426.    Insider McMahon did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders

at the Board meeting on December 8, 1998 or at the Finance Committee meeting on December 7, 1998.

### *Valhalla*

1427.    The Insiders did not disclose to Enron that the Valhalla transaction, which closed approximately in May 2000, was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders.

1428.    The Insiders did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at a Board meeting on December 14, 1999, at which the meeting agenda stated that Causey gave a report on a Finance Committee recommendation that Project Valhalla be approved, or during a December 13, 1999 Finance Committee meeting, at which the transaction was listed in the December 14, 1999 Board agenda as having been discussed.

1429.    The Insiders did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at Board meetings in and around the time of the transaction (including meetings on February 7, 2000, April 3, 2000, May 2, 2000 and August 1, 7, and 24, 2000), in Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, February 7, 2000, May 1, 2000, and August 7, 2000), or in Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

1430.    Insider Causey did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at the December 14, 1999 Board meeting in which he was scheduled to report on the Project, at subsequent Board meetings on May 2, 2000, August 1, and August 7, 2000 or at the December 13, 1999, May 1, 2000, and August 7, 2000 Finance Committee meetings.

1431.    Insider Fastow did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at the June 22, 2000 Executive Committee meeting, at the April 3, 2000, August 1, 7 and 24, 2000 Board meetings, or at the December 13, 1999, February 7, 2000, May 1, 2000, and August 7, 2000 Finance Committee meetings.

1432.    Insider Glisan did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche Bank for its work on other questionable tax transactions with the Insiders at the May 1, 2000 and August 7, 2000 Finance Committee meetings, the June 22, 2000 Executive Committee meeting, or at the August 1, 2000 Board meeting.

### Riverside III

1433.    The Insiders did not disclose to Enron that the accounting for the Riverside III transaction, which was executed approximately June 30, 1998, was inconsistent with GAAP or otherwise misleading.

1434.    During a Board meeting on June 22, 1998, at which Riverside III was discussed, Insiders McMahon and Fastow did not disclose to Enron that the accounting for the transaction was inconsistent with GAAP or otherwise misleading.

### Riverside IV

1435.    The Insiders did not disclose to Enron that the accounting for the Riverside IV transaction, which was executed approximately September 29, 1998, was inconsistent with GAAP or otherwise misleading.

1436.    The Insiders did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at a Board meeting on October 12-13, 1998, during which the transaction was discussed.

1437.    Insider Fastow did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at meetings of the Finance Committee on August 10, 1998, at which the transaction may have referenced, and October 12, 1998, at which the project was referenced.

1438.    Insider McMahon did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at meetings of the Finance Committee on August 10, 1998, at which the transaction may have referenced, and October 12, 1998, at which the project was referenced.

1439.    Insider Causey did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at meetings of the Finance Committee on August 10, 1998, at which the transaction may have referenced, and October 12, 1998, at which the project was referenced, or at the Board meeting on October 13, 1998, at which the transaction was approved.

### *Pilgrim*

1440.    The Insiders did not disclose to Enron that the accounting for the Pilgrim transaction, which was executed approximately December 23, 1998, was inconsistent with GAAP or otherwise misleading.

1441.    The Insiders did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 12-13 and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on November 17, November 23, and December 18, 1998).

1442.    Insider Causey did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on October 12-13 and December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meeting on December 18, 1998.

1443.    Insider Fastow did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meetings on November 23 and December 18, 1998.

1444.    Insider McMahon did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, and at the Finance Committee meeting on December 7, 1998.

### *Riverside V*

1445.    The Insiders did not disclose to Enron that the accounting for the Riverside V transaction, which closed approximately January 29, 1999, was inconsistent with GAAP or otherwise misleading.

1446.    The Insiders did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 12-13 and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on November 17, November 23, and December 18, 1998).

1447.    Insider Causey did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on

October 12-13 and December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meeting on December 18, 1998.

1448.    Insider Fastow did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meetings on November 23 and December 18, 1998.

1449.    Insider McMahon did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998.

### *Leftover*

1450.    The Insiders did not disclose to Enron that the accounting for the Leftover transaction, which was executed approximately May 28, 1999, was inconsistent with GAAP or otherwise misleading.

1451.    The Insiders did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4 and May 19, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on April 13, 1999).

1452.    Insider Causey did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

1453.    Insider Fastow did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999 and at the Executive Committee meeting on April 13, 1999.

1454.    Insider McMahon did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999 and at the Executive Committee meeting on April 13, 1999.

### *Nimitz*

1455.    The Insiders did not disclose to Enron that the accounting for the Nimitz transaction, which was executed approximately June 25, 1999, was inconsistent with GAAP or otherwise misleading.

1456.    The Insiders did not disclose to Enron that the accounting for the Nimitz transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4 and May 19, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 1999, three days before the deal closed).

1457.    Insider Causey did not disclose to Enron that the accounting for the Nimitz transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

1458.    Insider Fastow did not disclose to Enron that the accounting for the Nimitz transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

1459.   Insider McMahon did not disclose to Enron that the accounting for the Nimitz transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999 and at the Executive Committee meeting on June 22, 1999.

### *Ghost*

1460.   The Insiders did not disclose to Enron that the accounting for the Ghost transaction, which closed approximately December 21, 1999 was inconsistent with GAAP or otherwise misleading.

1461.   The Insiders did not disclose to Enron that the accounting for the Ghost transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 5, November 18, and December 14, 1999, one week before the transaction closed) and at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999).

1462.   Insider Causey did not disclose to Enron that the accounting for the Ghost transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999.

1463.   At the Finance Committee meeting on December 13, 1999, during which Ghost was included in Insider McMahon's Treasurer's report, Insiders McMahon, Causey, and Fastow did not disclose to Enron that the accounting for the Ghost transaction was inconsistent with GAAP or otherwise misleading.

### *Alchemy*

1464.   The Insiders did not disclose to Enron that the accounting for the Alchemy transaction, which closed approximately December 22, 1999 was inconsistent with GAAP or otherwise misleading.

1465.   The Insiders did not disclose to Enron that the accounting for the Alchemy transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around

the time of the transaction (including meetings on November 18, and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

1466.   Insider Causey did not disclose to Enron that the accounting for the Alchemy transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999, and at the Finance Committee meeting on December 13, 1999.

1467.   Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Alchemy transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

### *Discovery*

1468.   The Insiders did not disclose to Enron that the accounting for the Discovery transaction, which closed approximately December 30, 1999 was inconsistent with GAAP or otherwise misleading.

1469.   The Insiders did not disclose to Enron that the accounting for the Discovery transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18, and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

1470.   Insider Causey did not disclose to Enron that the accounting for the Discovery transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999, and at the Finance Committee meeting on December 13, 1999.

1471.     Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Discovery transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

### *Specter*

1472.     The Insiders did not disclose to Enron that the accounting for the Specter transaction, which close approximately March 28, 2000, was inconsistent with GAAP or otherwise misleading.

1473.     The Insiders did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at a Board meeting on February 7, 2000 in which McMahon discussed a related "syndication vehicle" with the Board.

1474.     The Insiders did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at other Board meetings in and around the time of the transaction (including a meeting on December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, and February 7, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on January 20, and March 2, 2000).

1475.     Insider Causey did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

1476.     Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on December 13, 1999, and February 7, 2000.

### *Hawaii*

1477.     The Insiders did not disclose to Enron that the accounting for the Hawaii transaction, which closed approximately March 31, 2000, was inconsistent with GAAP or otherwise misleading.

1478.     The Insiders did not disclose to Enron that the accounting for the Hawaii transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 14, 1999, and February 7-8, 2000), at Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, and February 7, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on January 20 and March 2, 2000).

1479.     Insider Causey did not disclose to Enron that the accounting for the Hawaii transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

1480.     Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Hawaii transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on December 13, 1999, and February 7, 2000.

### *Nigerian Barge*

1481.     The Insiders did not disclose to Enron that the accounting for the Nigerian Barge transaction, which closed approximately December 29, 1999, was inconsistent with GAAP or otherwise misleading.

1482.     The Insiders did not disclose to Enron that the accounting for the Nigerian Barge transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 5, November 18, and December 14, 1999).

1483.     Insider Causey did not disclose to Enron that the accounting for the Nigerian Barge transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999.

### *1999 Electricity Trades*

1484.    The Insiders did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction, which closed approximately December 31, 1999, was inconsistent with GAAP or otherwise misleading.

1485.    The Insiders did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 11-12, November 5, and November 18 and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including meetings on August 9 and October 11 and December 13, 1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on September 3, September 14, September 24, and October 20, 1999).

1486.    Insiders Causey, Fastow and McMahon did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on October 11 and December 13, 1999 or at the Board meetings on October 11-12 and December 14, 1999.

1487.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on August 9 and December 13, 1999.

### *December 1998 Prepay*

1488.    The Insiders did not disclose to Enron that the accounting for the December 1998 Prepay, which closed approximately December 30-31, 1998, was inconsistent with GAAP or otherwise misleading.

1489.    The Insiders did not disclose to Enron that the accounting for the December 1998 Prepay was inconsistent with GAAP or otherwise misleading at Board meetings in and around the

time of the transaction (including meetings on October 12-13, 1998, and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 18, 1998)

1490.    Insiders Causey and Fastow did not disclose to Enron that the accounting for the December 1998 Prepay was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, the Finance Committee meeting on December 7, 1998, and the Executive Committee meeting on December 18, 1998.

1491.    Insider McMahon did not disclose to Enron that the accounting for the December 1998 Prepay was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, and the Finance Committee meeting on December 7, 1998.

### Truman

1492.    Not Used.

1493.    Not Used.

1494.    Not Used.

1495.    Not Used.

1496.    Not Used.

### Jethro

1497.    Not Used.

1498.    Not Used.

1499.    Not Used.

1500.    Not Used.

1501.    Not Used.

*Nixon*

1502.   Not Used.

1503.   Not Used.

1504.   Not Used.

1505.   Not Used.

*The Alberta Prepay*

1506.   The Insiders did not disclose to Enron that the accounting for the Alberta Prepay transaction, which closed approximately September 29, 2000, was inconsistent with GAAP or otherwise misleading

1507.   The Insiders did not disclose to Enron that the accounting for the Alberta Prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 1, 7, and 24, 2000), in Finance Committee meetings in and around the time of the transaction (including a meeting on August 7, 2000), and in Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

1508.   The Insiders did not disclose to Enron that the accounting for the Alberta Prepay transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on December 11, 2000, at which the project (referenced as "TD Prepay") appears to have been included on a list of the ten largest transactions for 2000 and apparently discussed.

1509.   Insider Causey did not disclose to Enron that the accounting for the Alberta Prepay transaction was inconsistent with GAAP or otherwise misleading at the August 1 and August 24, 2000 Board meetings, and at the August 7, 2000 Finance Committee meeting.

1510.   Insider Fastow did not disclose to Enron that the accounting for the Alberta Prepay transaction was inconsistent with GAAP or otherwise misleading at the June 22, 2000 Executive

Committee meeting, at the August 1, 2000 Board meeting, and at the August 7, 2000 Finance Committee meeting.

1511.    Insider Glisan did not disclose to Enron that the accounting for the Alberta Prepay transaction was inconsistent with GAAP or otherwise misleading at the June 22, 2000 Executive Committee meeting, at the August 1, 2000 Board meeting, or at the December 11, 2000 Finance Committee meeting, during which he may have discussed the transaction with the Committee.

**The London Prepay**

1512.    The Insiders did not disclose to Enron that the accounting for the London Prepay transaction, portions of which closed on approximately December 15, 2000 and December 22, 2000, was inconsistent with GAAP or otherwise misleading.

1513.    The Insiders did not disclose to Enron that the accounting for the London Prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on December 7 and December 21, 2000).

1514.    Insider Fastow did not disclose to Enron that the accounting for the London Prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000, and the Executive Committee meeting on December 21, 2000.

1515.    Insiders Glisan and McMahon did not disclose to Enron that the accounting for the London Prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

*Sutton Bridge*

1516.    The Insiders did not disclose to Enron that the accounting for the Sutton Bridge transaction, which closed approximately June 8, 1999, was inconsistent with GAAP or otherwise misleading.

1517.    The Insiders did not disclose to Enron that the accounting for the Sutton Bridge transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4 and May 19, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999 in which the transaction was included on a list of 1999 Enron Corporation financings that was provided to the Committee, and in meetings on August 9, 1999 and October 11, 1999, during which the transaction was listed on a schedule of Top Ten Investments that was provided to the Committee), and at Executive Committee meetings in and around the time of the transaction (including meetings on April 13, 1999, June 7, 1999 and June 11, 1999).

1518.    Insider Fastow did not disclose to Enron that the accounting for the Sutton Bridge transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on May 3, 1999 and August 9, 1999 (during which the transaction was mentioned in a presentation) and at the Executive Committee meeting on April 13, 1999.

1519.    Insider Causey did not disclose to Enron that the accounting for the Sutton Bridge transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on May 3, 1999, August 9, 1999 (during which the transaction was mentioned in a presentation) and October 11, 1999 (during which the transaction was also mentioned in a presentation).

1520.    Insider McMahon did not disclose to Enron that the accounting for the Sutton Bridge transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999, and at the Executive Committee meeting on April 13, 1999.

### *ETOL I, II & III*

1521.    The Insiders did not disclose to Enron that the accounting for the ETOL I, II and III transactions, which closed approximately on November 1, 2000, March 30, 2001, and June 20, 2001, respectively, were inconsistent with GAAP or otherwise misleading.

1522.    The Insiders did not disclose to Enron that the accounting for the ETOL transactions was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transactions (including meetings on October 27, 2000, December 7, 2000, December 12, 2000, January 29, 2001, February 13, 2001, March 16, 2001, May 1, 2001 and June 13, 2001), at Finance Committee meetings in and around the time of the transaction (including meetings on October 6, 2000 (during which a Quarterly Risk Update listed Enron's exposure to ETOL), December 11, 2000, February 12, 2001 and April 30, 2001), and at Executive Committee meetings in and around the time of the transaction (including meetings on December 7, 2000, December 21, 2000 and March 12, 2001).

1523.    Insider Fastow did not disclose to Enron that the accounting for the ETOL transactions was inconsistent with GAAP or otherwise misleading at the Board meetings on October 27, 2000, January 29, 2001, February 13, 2001 and June 13, 2001), at the Finance Committee meeting on October 6, 2000, December 11, 2000 and April 30, 2001, and at the Executive Committee meetings on December 21, 2001 and March 12, 2001.

1524.    Insider Causey did not disclose to Enron that the accounting for the ETOL transactions was inconsistent with GAAP or otherwise misleading at the Board meetings on

October 27, 2000, February 13, 2001, May 1, 2001 and June 13, 2001, and at Finance Committee

meetings on October 6, 2000, December 11, 2000 and April 30, 2001.

1525.    Insider McMahon did not disclose to Enron that the accounting for the ETOL

transactions was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1,

2001, and at the Finance Committee Meeting on December 11, 2000.

1526.    Insider Glisan did not disclose to Enron that the accounting for the ETOL

transactions was inconsistent with GAAP or otherwise misleading at the Board meetings on May

1, 2001 and June 13, 2001, and at the Finance Committee meetings on October 6, 2000, December

11, 2000 and April 30, 2001.

1527.    In addition to the foregoing misrepresentations and/or omissions made by the Insiders

to Enron and its Board of Directors, the Insiders made misrepresentations and/or omitted to disclose

material to Arthur Andersen.  The Insiders made each of these misrepresentations and omissions

knowing that if Andersen relied upon them they would be incorporated into financial statements and

other documents prepared or reviewed by Andersen and delivered to Enron and/or its Board of

Directors.  The Insiders made the following misrepresentations and omissions to Andersen:

(a)    The Insiders did not disclose to Andersen the "verbal assurances" they gave

to the Bank Defendants of repayment of their 3% equity investment in connection with FAS 140

transactions such as Bacchus, Nikita, Leftover, Nimitz, Discovery, Alchemy, and Hawaii, which

closed from approximately 1998 to 2001, and other SPE transactions such as J.T. Holdings, which

closed approximately December 7, 2000, even though these "verbal assurances" caused the

accounting for the transactions to violate GAAP or be otherwise misleading.

(b)    The Insiders did not disclose to Andersen the verbal assurances they gave to

Merrill Lynch that Enron would reacquire or assure the repurchase of the assets that had been

purportedly "sold" in the Nigerian Barge transaction, which closed approximately December 29,

1999, or the verbal insurances they gave to BT/Deutsche Bank in the Cochise transaction, which closed approximately January 28, 1999, even though these assurances caused the accounting for these transactions to violate GAAP or be otherwise misleading.

(c)　　The Insiders did not disclose to Andersen that Delta was a special purpose entity established by Citigroup solely to engage in prepay transactions, which was effectively controlled and funded by Citigroup, even though this fact caused accounting for the transactions in which Delta was involved to violate GAAP or be otherwise misleading. The Enron Examiner has indicated that the evidence is unclear as to whether Andersen relied upon these misrepresentations. Exam. IV, App. B at 73-76. According to the Enron Examiner, Citigroup and Andersen may have worked together with the Insiders to falsely create the appearance that Delta was an independent business entity – not a Citigroup-sponsored SPE. *Id.* To that extent, Citibank and Andersen combined with the Insiders to manipulate and misstate Enron's financial condition.

(d)　　The Insiders did not disclose to Andersen that Mahonia, an entity used in prepay transactions with JP Morgan Chase, was not independent from JP Morgan Chase in any meaningful sense, even though this fact caused the accounting for the transactions in which Mahonia was involved to violate GAAP or be otherwise misleading. The Enron Examiner has indicated that the evidence is unclear as to whether Andersen relied upon this misrepresentation. Exam. IV, App. B at 73-76. According to the Enron Examiner, Chase and Andersen may have worked together with the Insiders to falsely create the appearance that Mahonia was an independent business entity – not a Chase-sponsored SPE. *Id.* To that extent, Chase and Andersen combined with the Insiders to manipulate and misstate Enron's financial condition.

1528.　　From 1997 through 2001, Insiders Fastow, Glisan, and Kopper, and in certain instances Causey, knowingly misrepresented and/or omitted to disclose to Enron and/or its Board of Directors (1) the true nature, ownership and/or purpose of Chewco, LJM1 and LJM2, (2) the

wrongful self-dealing facilitated by these entities, and (3) the wrongful manipulation and misstatement of Enron's financial statements caused by or through transactions with these entities.

1529.    With respect to transactions between Enron and Chewco, LJM1 or LJM2, the Insiders knowingly caused to be included in Enron's internal and publicly disseminated financial statements misleading information about the company's cash flow from operating and financing activities, income and net income, debt and price risk management liabilities, interest expense, and other information, as well as the financial measures, ratios and other calculations which are derived from or are based upon these figures.

1530.    At the time the aforementioned misrepresentations and/or omissions were made, the Insiders either knew that they were false, or they made them recklessly without knowledge of their truth.  The Insiders either knew that the accounting for each structured finance transaction was inconsistent with GAAP or that the description of each of those transactions was otherwise misleading, or recklessly did not determine whether the accounting for those transactions was consistent with GAAP or that the descriptions of those transactions were not otherwise misleading.

1531.    The Insiders made these misrepresentations and omissions with the intent and the expectation that Enron and its Board of Directors would rely and act upon them.  Enron and/or its Board of Directors actually and justifiably relied upon these misrepresentations and omissions. Enron and/or its Board of Directors were entitled to and did believe that the Insiders were acting in the best interest of the company and were not employing structured finance transactions (1) whose accounting did not comply with GAAP or otherwise were described in a misleading manner, or (2) for the purpose of manipulating and misstating Enron's financial statements.  Enron and its Board of Directors were entitled to and did believe that the Insiders were acting in the best interest of the company and were not (1) secretly profiting from transactions with the company, (2) sharing profits from transactions with the company with the company's lenders or their executives, or

(3) employing transactions with the company for the purpose or with the effect of manipulating and misstating Enron's financial statements. The Insiders made each misrepresentation or omitted to disclose each material fact, even those made in the first instance to Andersen, for the purpose and with the intention that Enron and/or its Board of Directors would rely upon it.

1532.    By virtue of the acts and omissions described in this Complaint, the Bank Defendants knowingly gave substantial assistance to the Insiders in committing fraud against Enron. In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants participated with actual knowledge that the purpose of the transaction was to manipulate and misstate Enron's financial statements and that the transaction would be reported by Enron in a materially misleading manner. In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants gave substantial assistance to the Insiders by designing, implementing, financing, purporting to invest in, and/or closing the transaction and/or by causing their subsidiaries or affiliates to do the same. In each of the transactions described in this Complaint in which an Insider and/or a member of his family improperly derived a personal benefit from a transaction with Enron, one or more of the Bank Defendants participated with actual knowledge that the transaction was designed to or would benefit the Insider at Enron's expense. In each of these transactions, one or more of the Bank Defendants and/or their officers gave substantial assistance to the Insiders by investing, or by obtaining others to invest, in the transaction or the entity formed by the Insiders to participate in the transaction.

1533.    Specifically, by way of examples and not an exhaustive list, the Bank Defendants gave substantial assistance to the Insiders as follows:

### *Citigroup*

1534.    In connection with the Roosevelt transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about April 22, 1999, James F. Reilly sent an e-mail to Thomas Stott, Steve Baillie, Chris Lyons, Joseph Mackiewicz, Jean Diaz, and William Fox regarding an unwritten agreement to an early repayment of a portion of the prepay transaction.

(b)    On or about April 27, 1999, James F. Reilly sent an e-mail to Onno Ruding, John Kennedy, Tom Boland, William Fox, Thomas Stott, Steve Baillie, Chris Lyons, and Sumit Mathai regarding an unwritten agreement to an early repayment of the portion of the prepay transaction.

1535.    In connection with the Truman transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about June 22, 1999, James Reilly sent an e-mail to William Fox, Sumit Mathai, Steve Baillie, and Thomas Stott regarding the request for a new $500 million prepay.

(b)    On or about September 17, 1999, James Reilly sent an e-mail to Onno Ruding, John Kennedy, Tom Boland, William Fox, Thomas Stott, and Steve Baillie regarding funding of prepay transactions into capital markets.

1536.    In connection with the Nighthawk transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about October 1, 1997, Elliot Conway sent a letter to an Enron employee regarding the costs and fees for the Nighthawk transaction.

1537.    In connection with the Yosemite I transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about August 31, 1999, James Reilly sent an e-mail to William Fox and Steve Baillie regarding Yosemite and a scheduled committee meeting.

(b)      On or about September 17, 1999, James Reilly sent an e-mail to Onno Ruding, John Kennedy, Tom Boland, William Fox, Thomas Stott, and Steve Baillie regarding funding of prepay transactions into capital markets.

(c)      On or about October 1, 1999, Adam Kulick sent an e-mail to Onno Ruding, Petros Sabatacakis, Thomas Boland, Fernando Ynigo, David Bushnell, William Fox, James Reilly, Lynn Feintech, and Paul Deards regarding Project Yosemite approval and structuring.

(d)      On or about October 14, 1999, Adam Kulick sent an e-mail to Lynn Feintech, Tom Francois, and James Reilly forwarding an outline of the prepay transaction.

1538.    In connection with the Nixon transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)      On or about February 15, 2000, James Reilly sent an e-mail to Onno Ruding, Thomas Stott, William Fox, Steve Baillie, and Sumit Mathai regarding use of the prepays to retire the Nixon transaction.

1539.    In connection with the Yosemite II transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)      On or about November 12, 1999, James Reilly sent an e-mail to William Fox, Steve Baillie, and Niels Kirk regarding Enron's desire to complete a second Yosemite transaction.

(b)      On or about November 18, 1999, Sumit Mathai sent an e-mail to Rick Caplan, Tom Francois, Adam Kulick, Steve Baillie, and James Reilly providing an early draft of a transaction description.

(c)      On or about November 22, 1999, Tom Francois sent an e-mail to Adam Kulick, Rick Caplan, Eleanor Wagner, Ramesh Gupta, David Bushnell, James Reilly, William Fox, Thomas Stott, Lynn Feintech, Doug Warren, and Marcy Engel discussing the Yosemite II structure.

(d)     On or about November 23, 1999, Tom Francois sent an e-mail to Adam Kulick, Rick Caplan, Eleanor Wagner, Ramesh Gupta, David Bushnell, James Reilly, William Fox, Thomas Stott, Lynn Feintech, Doug Warren, and Marcy Engel discussing the Yosemite II structure.

(e)     On or about February 15, 2000, James Reilly sent an e-mail to Onno Ruding, Thomas Stott, William Fox, Steve Baillie, and Sumit Mathai regarding use of the Yosemite II proceeds to retire the Nixon transaction.

(f)     On or about December 12, 2000, James Reilly sent an e-mail to Rick Caplan, Steve Baillie, Amanda Angelini, Tom Francois, and Donald Bendernagel regarding Yosemite II accounting.

1540.   In connection with the June 2001 transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)     On or about June 18, 2001, Michael Nepveux sent an e-mail to Amanda Angelini, James Reilly, Sean Mulhearn, William Fox, and Lydia Junek regarding a new request for non-debt funding.

(b)     On or about June 25, 2001, Timothy Swanson sent an e-mail to James Forese, Steve Wagman, and Paul Deards, forwarded by Steve Wagman to Michael Nepveux on June 27, 2001, summarizing the prepay transaction.

1541.   In connection with the Nahanni transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)     On or about July 24, 2001, James Reilly sent an e-mail to Michael Nepveux and Joseph Mackiewicz, regarding use of the Nahanni facility for year-end balancing.

1542.   In connection with the Bacchus transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about November 24, 2000, Steve Baillie sent an e-mail to William Fox, Lydia Junek, Niels Kirk, John Lyons, and James Reilly summarizing the status of various transactions, including the asset treatment in Bacchus.

(b)    On or about November 28, 2000, James Reilly sent an e-mail to Maureen Hendricks, Dean Keller, Steve Becton, Richard Caplan, Amanda Angelini, William Fox, Lydia Junek, Steve Baillie, and Chris Lyons summarizing Bacchus and advising of the critical nature of the transaction.

(c)    On or about December 13, 2000, Shirley Elliot sent an e-mail to William Fox, Steve Baillie, Lydia Junek, Tom Stott, and Tero Tiilikainen regarding the materiality of the Bacchus transaction.

(d)    On or about December 14, 2000, William Fox sent an e-mail to Shirley Elliot, Steve Baillie, Lydia Junek, Tom Stott, and Tero Tiilikainen regarding the Enron balance sheet.

(e)    On or about December 21, 2000, Lydia Junek sent an e-mail to William Fox, Amanda Angelini, Andrew Lee, Dean Keller, Don Bendernagel, Doug Warren, James Reilly, Chris Lyons, Saul Bernstein, Richard Caplan, Steve Baillie, Suzanne Holmes, and Tom Francois regarding verbal support for the transaction received from Andrew Fastow of Enron.

(f)    On or about December 27, 2000, Amanda Angelini sent an e-mail to Steve Baillie, William Fox, Lydia Junek, James Reilly, Steve Becton, Dean Keller, Chris Lyons, Steve Wagman, Lynn Feintech, Paul Deards, and Richard Caplan regarding structural analysis and the "trust me" feature in the Bacchus transaction.

(g)    On or about April 18, 2001, William Fox sent an e-mail to Thomas Stott who, upon information and belief, was resident in Citigroup's offices in New York, New York, referring to verbal support of the Bacchus transaction.

1543.    In connection with the Sundance Industrial transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about May 14, 2001, Richard Caplan sent an e-mail to James Forese, Richard Stuckey, Eleanor Wagner, Donald Bendernagel, Saul Bernstein, Tom Francois, Mark Purwein, Lynn Feintech, Doug Warren, Timothy Leroux, Amanda Angelini, James Reilly, Dean Keller, and John Chrysikopoulos containing a Sundance transaction summary.

(b)    On or about October 29, 2001, Richard Caplan sent an e-mail to William Fox and James Reilly providing a description of the Sundance transaction.

1544.    Citigroup knowingly gave substantial assistance to the Insiders in connection with Citigroup's investment in LJM2, the purported "independent" investment vehicle created by Insider Andrew Fastow.

(a)    On or about December 14, 1999, William Fox sent an e-mail to MaryLynn Putney and James Reilly recommending investment in LJM2.

1545.    Citigroup knowingly gave substantial assistance to the Insiders in connection with a SPE called "Delta," which was used in six Citigroup-Enron prepay transactions, including Roosevelt and Yosemite I through IV.

(a)    On or about November, 1999, Citigroup caused Delta to represent to Arthur Andersen that Delta had undertaken business with a number of entities, that Delta had assets other than those acquired through transactions with Enron, and that Delta had unencumbered assets available to the Yosemite lenders upon a default.

(b)    On or about June, 2001, Citigroup caused Delta to represent to Arthur Andersen that Delta had undertaken business with a number of entities, that Delta had assets other than those acquired through transactions with Enron, and that Delta had unencumbered assets available to the Yosemite lenders upon a default.

*JP Morgan Chase*

1546.    In connection with the Chase VI prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)    On or about September 9, 1997, Richard Walker forwarded a Call Report relating to a call between Richard Walker and an Enron employee regarding initiating the prepay transaction to Peter Lind, Dinsa Mehta, Jeffrey Dellapina, Sandra Aultman, George Serice, Tod Benton, and Juli Bieser.

(b)    On or about October 5, 1997, Richard Walker e-mailed a Call Report relating to an October 3, 1997 call between Richard Walker and an Enron employee regarding executing the Chase VI prepay to Dinsa Mehta, Jeffrey Dellapina, Peter Lind, George Serice, Tod Benton, and Sandra Aultman.

(c)    On or about October 29, 1997,  George Serice sent an e-mail to Susan Stevens, Richard Walker, Karen Simon, Howard Schramm, Sandra Aultman, Dinsa Mehta, and Jeffrey Dellapina regarding an overview of and the benefits to Enron of the prepay transaction.

(d)    On or about November 14, 1997, George Serice sent an e-mail to Greg Nelson, Peter Gleysteen, Susan Stevens, Tod Benton, Karen Simon, and Christian Gates regarding, among other things, pricing, underwriting, credit approval, and the bank market for the prepay transaction.

(e)    On or about December 1, 1997, George Serice sent a memorandum to Jeffrey Dellapina regarding the distribution among Chase entities of the fee collected from the Chase VI prepay.

1547.    In connection with the Chase VII prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about May 29, 1998, Jeffrey Dellapina sent an e-mail to Heather Lindstrom, Mark Malloy, Dexter Charles, Dinsa Mehta, Richard Walker, and George Serice regarding credit exposure related to Chase VII.

(b)     On or about June 2, 1998, George Serice sent an e-mail to Enron employees, Bob Mertensotto, Carrie Cerda, Richard Walker, and Jeffrey Dellapina regarding pricing of the Chase VII prepay.

(c)     On or about June 8, 1998, Mark Malloy sent an e-mail to Richard Walker, Jeffrey Dellapina, Heather Lindstrom, Dinsa Mehta, Dexter Charles, George Serice, and Phillip Levy regarding surety bond issues.

(d)     On or about June 18, 1998, Phillip Levy sent a facsimile to Jeffrey Dellapina regarding Enron bond issues.

(e)     On or about June 29, 1998, Richard Walker sent an e-mail to Richard Garbarino, Don Fraser, Jeffrey Dellapina, Dexter Charles, George Serice, and Bob Mertensotto regarding anticipated prepay revenues.

1548.     In connection with the Chase VIII prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about November 9, 1998, Bob Mertensotto sent an e-mail to Mike Addy and Sandra Aultman regarding Enron's request for the Chase VIII prepay transaction.

(b)     On or about November 24, 1998, Bruce Ellard sent an e-mail to Peter Coad, Steve Allen, Alexander Mintcheff, Vivian Shelton, Dinsa Mehta, and Dexter Charles regarding approval for physical delivery.

(c)     On or about December 2, 1998, Peter Coad sent an e-mail to Don Layton and Don Wilson regarding the background, pricing, return, booking, credit, and documentation of prepay transactions.

1549.     In connection with the Chase IX prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about March 12, 1999, Bob Mertensotto sent an e-mail to Jeffrey Dellapina regarding establishing the Chase IX prepay.

(b)     On or about June 4, 1999, Patrick O'Brien sent an e-mail to Dermot Drysdale, Joseph Scalfani, David Morris, Dinsa Mehta, Janet Caruso, Maggie Serravalli, Erik Gerken, Bruce Ellard, Ronald Antonelli, George Brash, Vivian Shelton, Nick Quintana, Anthony Carpentieri, Sharon Foilek, Lorry Ripley, and Aditya Mohan regarding the classification of the prepay as a loan or a derivative.

(c)     On or about June 7, 1999, Janet Caruso sent an e-mail to Bruce Ellard, Dinsa Mehta, and Robert Benjamin regarding accounting issues related to the proposed prepay transaction.

(d)     On or about June 11, 1999, an Enron employee and Richard Walker had a telephone conference regarding the timing and amount of the Chase IX prepay, a report of which was sent from Richard Walker to Jeffrey Dellapina, Bob Mertensotto, Robert Traband, Christopher Wardell, Gary Wright, Todd Maclin, and Dod Fraser.

(e)     On or about June 24, 1999, Richard Walker sent an e-mail to Dinsa Mehta, Jeffrey Dellapina, Bob Mertensotto, and Robert Traband regarding the business purpose of the prepay.

(f)     On or about June 29, 1999, Chase Commodity Swap Operations sent a facsimile to an Enron employee regarding commodity swap transactions.

1550.     In connection with the Chase X prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about June 28, 2000, Mahonia Limited sent a letter to Chase Manhattan Bank regarding Enron's request to enter into Chase X.

(b)     On or about June 29, 2000, Mahonia Limited sent a Confirmation Letter to ENA regarding commodity price and delivery logistics.

(c)     On or about June 30, 2000, Rajesh Chawla sent an e-mail to Don Wilson, Lesley Daniels Webster, Fraser Partridge, Steven Allen, Vivian Shelton, Dexter Charles, Jeffrey Dellapina, Mark Babunovic, Robert Benjamin, and Janet Caruso regarding Chase X logistics.

(d)     On or about July 7, 2000, Gareth Essex Cater sent an e-mail to Zandra Sherrington regarding transfer instructions for Mahonia Limited.

1551.     In connection with the Chase XI prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about November 11, 2000, an Enron employee, Jeffrey Dellapina, and Richard Walker had a telephone conference regarding Enron's interest in Chase XI, a Call Report of which was sent by Richard Walker to Robert Traband, George Serice, Christopher Lowe, and Christopher Teague.

(b)     On or about November 17, 2000, Colin Carscadden sent an e-mail to Karen Simon, Richard Walker, Robert McGuire, Todd Maclin, Kamal Murari, Robert Traband, and Jeffrey Dellapina regarding Enron's request for Chase XI.

(c)     On or about December 8, 2000, Phillip Levy sent an e-mail to Julie Carter, Gareth Essex Cater, Ian James, and Jeffrey Dellapina regarding the use of SPEs in Chase XI.

(d)     On or about December 12, 2000, Phillip Levy sent an e-mail to Melissa Vogel regarding the term and structure of Chase XI.

(e)     On or about December 29, 2000, Jeffrey Dellapina sent a Fee Letter to Enron regarding fees for Chase XI.

1552.     In connection with the Chase XII prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about September 13, 2001, a telephone conference was held between Jeffrey Dellapina, Robert Traband, George Serice, and Enron employees regarding Mahonia's independence.

(b)     On or about September 20, 2001, an Enron employee sent an e-mail to Jeffrey Dellapina, Robert Traband, and other Enron employees regarding requested representations about Mahonia's independence.

(c)     On or about September 20, 2001, Jeffrey Dellapina, Robert Traband, and Jim Ballentine conducted a telephone conference regarding prepay exposure and use of sureties for the Chase XII prepay.

(d)     On or about September 24, 2001, Julie Carter sent an e-mail to Phillip Levy regarding the structure and the closing documentation related to the transaction.

(e)     On or about September 26, 2001, Jeffrey Dellapina sent an e-mail to Michael Sabloff regarding a revised transaction structure based on tax considerations.

(f)     On or about September 24, 2001, Robert Traband sent an e-mail to James Ballentine, Richard Walker, and Jeffrey Dellapina regarding the Chase XII structuring summary.

1553.   JPMorgan Chase knowingly gave substantial assistance to the Insiders in connection with the Fishtail transaction:

(a)     On December 20, 2000, Robert Traband sent a letter to an Enron employee regarding Enron's agreement to pay Chase a $500,000 advisory fee as consideration for structuring the financing for Annapurna LLC.

(b)     On or about April 9, 2001, Marilyn Fossey sent an e-mail to Robert Traband with a copy to Peter M. Licalzi addressing an issue concerning Annapurna LLC's ownership interest in Fishtail, LLC.

1554.    JPMorgan Chase knowingly gave substantial assistance to the Insiders in connection with the Hawaii transaction:

(a)     On or about November 2, 2000, George Serice sent two e-mails to Robert Traband, Josh Rogers, Roxanne Blanco, and Richard Walker with a copy to Tod Benton regarding JPMorgan Chase's participation in Hawaii.

(b)     On or about November 1, 2000, George Serice sent an e-mail to Roxanne Blanco and Robert Traband regarding Fleet's desire to verify pricing and upfronts on Hawaii.

(c)     On or about November 22-27, 2000, Peter M. Licalzi, Robert Traband, and Bob Mertensotto sent e-mails concerning the pay off and cancellation of the Hawaii 125-0 trust.

1555.    JP Morgan Chase knowingly gave substantial assistance to the Insiders in connection with the Mahonia transactions.

(a)     In a September 13, 2001, telephone call, Jeffrey Dellapina of JP Morgan Chase and Enron employees discussed misrepresenting to Arthur Andersen that Mahonia was independent of JP Morgan Chase.

(b)     On September 28, 2001, the discussed letter was sent to Arthur Andersen.

### Barclays

1556.    In connection with the JT Holdings Inc. transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)     On or about February 23, 2000, Nicholas Bell sent an e-mail to David Barton regarding a permanent reduction in the exposure related to the MTBE-related assets.

(b)     On or about December 1, 2000, Nicholas Bell sent a facsimile to Enron Global Finance regarding Barclays commitment of funding.

1557.    In connection with the Nikita transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)      On or about September 20, 2001, Nicholas Bell sent an e-mail to an Enron employee, Richard Williams, and John Sullivan regarding administrative details of the transaction.

(b)      On or about September 24, 2001, John Sullivan sent an e-mail to Sarah Abbott, Richard Williams, Tim Ritchie, Eric Chilton, Nicholas Bell, and Dhuane Stephens regarding Barclays Exposure Committee approval of the transaction.

(c)      On or about September 26, 2001, John Sullivan sent an e-mail to an Enron employee, Richard Williams, and Nicholas Bell regarding draft transaction documentation.

1558.   In connection with the Chewco transaction, Barclays knowingly gave substantial assistance to the Insiders:

(a)      On December 18, 1997, John Meyer of Barclays sent an e-mail to Bob Clemmens and Henry Pullman of Barclays recommending approval of the Chewco transaction and forwarding an e-mail from George McKean of Barclays regarding the terms of the financing.

(b)      On December 5, 1997, George McKean of Barclays sent an e-mail to John Meyer, Tom Connor, Sal Esposito, and Richard Williams of Barclays, summarizing the terms of the proposed Chewco refinancing.

1559.   In connection with the $SO_2$ transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)      On or about April 10, 2001, Martin Woodhams sent an e-mail to Brian Smith regarding potential areas of risk relating to a transaction and containing an earlier e-mail from an Enron employee regarding a transaction summary.

(b)      On or about October 9, 2001, an Enron employee sent an e-mail to Martin Woodhams, with copies to Robert Bruce, Joel Ephross, Michael Robison, and Ying Liu regarding the timing of payment settlement and structuring of the $SO_2$-related options.

(c)    On or about November 29, 2001, Martin Woodhams sent an e-mail to John Fiorello confirming the number of 2009 allowances owned by Colonnade.

1560.    In connection with the Roosevelt transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)    On or about December 28, 1998, a telephonic conference call was held between Richard Williams, Enron employees, and others regarding the details of the natural gas and prepay and commodity swap terms.

(b)    On or about April 26, 1999, Richard Williams sent an e-mail to Jonathon Taylor and Brian Smith regarding Enron performance issues.

(c)    On or about November 17, 1999, Richard Williams sent an e-mail to Brian Smith regarding the Roosevelt unwind.

1561.    In connection with an SPV known as "Colonnade," Barclays knowingly gave substantial assistance to the Insiders.

(a)    On April 25, 2001, Martin Woodham of Barclays sent an e-mail to himself summarizing Arthur Andersen's "smell test" for special purpose vehicles to meet if they are to be treated as off-balance sheet.

(b)    In its June 6, 2001, engagement letter for the $SO_2$ transaction, Benoit de Vitry of Barclays wrote to an employee of Enron, regarding Enron's payment of out of pocket expenses incurred by Barclays.

(c)    On June 22, 2001, Martin Woodham of Barclays e-mailed an employee of Enron, assuring Enron regarding Colonnade's intended transactional history, business limitations, business partners, and unencumbered assets, months before Colonnade was created or even named.

(d)    On June 25, 2001, Richard Williams of Barclays e-mailed Martin Woodhams of Barclays, regarding the Andersen "smell test" for Colonnade.

(e)    In order to fraudulently meet Arthur Andersen's "smell test," Barclays planned and ultimately executed two short-dated trades with Colonnade on or about August and September, 2001.

(f)    On September 6, 2001, Martin Woodham of Barclays sent a memorandum to the New Products Committee, in which he detailed the fraudulent transactional history that would be created for the SPV.

### BT/Deutsche Bank

1562.    In connection with the Steele transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)    On or about June 24, 1997, Thomas Finley sent a letter to R. Davis Maxey of Enron regarding potential rates of return on a proposed "REMIC/Subco structure" later developed to be Project Steel, and a list of certain representations needed from Enron.

(b)    On or about August 11, 1997, Thomas Finley sent a letter to R. Davis Maxey of Enron regarding the possible costs of entering into Project Steele.

(c)    On or about September 3, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron confirming the engagement of Bankers Trust Company as Enron's exclusive financial advisor in connection with structuring a transaction involving the utilization of an existing partnership owned by Enron's affiliates to make a joint investment in personal property and financial assets.

(d)    On or about October 28, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron.

(e)    On or about January 28, 1999, Brian McGuire sent an Engagement Letter to Richard A. Causey of Enron.

(f)     On or about September 17, 1997, Thomas Finley, Bill Boyle, and Brian McGuire sent a facsimile to R. Davis Maxey of Enron containing a draft presentation booklet for Project Steele.

(g)     On or about September 25, 1997, Thomas Finley sent a letter to R. Davis Maxey of Enron containing summary schedules of income and cash flow projections for Project Steele.

(h)     On or about May 15, 2001, Brian McGuire sent an e-mail to James Hollman and Stephen Jankovitz requesting financial information regarding Project Steele from Enron.

1563.    In connection with the Cochise transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about January 19, 1999, Brian McGuire sent a letter to R. Davis Maxey of Enron regarding schedules of accounting benefits, taxable income and losses, and other calculations.

(b)     On or about January 28, 1999, Brian McGuire sent an Engagement Letter to Richard A. Causey of Enron regarding engagement of Bankers Trust Company in connection with the direct investment in various lease property and a real estate investment trust.

(c)     On or about March 2, 1999, an Enron employee sent a facsimile to Brian McGuire regarding Bankers Trust's presentation materials regarding Project Cochise.

(d)     On or about May 3, 2000, an Enron employee sent an e-mail to Brian McGuire regarding calculations of Maliseet's Class A preferred stock rate reset and taxable income.

1564.    In connection with the Teresa transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about January 21, 1996, Thomas Finley sent a letter regarding an economic model and cash flow projections to R. Davis Maxey of Enron.

(b)     On or about March 27, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron confirming Bankers Trust Company as Enron's exclusive financial advisor in connection with structuring and establishing a limited partnership for Project Teresa.

(c)     On or about March 27, 1997, Enron's Richard A. Causey sent a letter to EN-BT Delaware, Inc., a Deutsche Bank affiliate, providing a written representation regarding Enron's principal purposes for participating in the recapitalization and operation of OPI and Enron Liquids Holding Corp. and the capitalization, formation, and operation of Enron Leasing and Enron Property Management Corp.

(d)     On or about May 15, 1997, a letter was sent from Thomas Finley at Bankers Trust Company to Enron Leasing Partners, L.P. regarding advisory fees for structuring Enron Leasing Partners, L.P.

(e)     On or about December 17, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron.

(f)     On or about December 28, 1998, Brian McGuire sent an amended Engagement Letter to Richard A. Causey of Enron.

(g)     On or about May 26, 1999, James Hollman sent an e-mail to Brian McGuire regarding calculations and adjustments of Enron Liquids Holding Company earnings and profits.

(h)     On or about October 20, 2000, R. Davis Maxey of Enron sent an e-mail to Brian McGuire and another Enron employee regarding quarterly distributions of Enron Leasing Partners, LP.

1565.     In connection with the Tomas transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about February 23, 1998, Brian McGuire sent an e-mail to R. Davis Maxey of Enron summarizing the cash flows and accounting earnings for Project Tomas.

(b)      On or about September 15, 1998, Brian McGuire sent an Engagement Letter to Richard A. Causey of Enron confirming the use of Bankers Trust Company as Enron's exclusive financial advisor in connection with structuring and establishing a limited partnership to acquire and manage a leasing portfolio owned by Portland General Holdings, Inc.

(c)      On or about December 17, 1999, an Enron employee sent an e-mail to Stephen Jankovitz, Brian McGuire, and Danny Wilson regarding payment of fees for Tomas and Teresa.

(d)      On or about July 10, 2000, Brian McGuire sent an e-mail to an Enron employee regarding a description of Seneca Leasing Partners, L.P. and Huron for a bid package.

(e)      On or about July 11, 2000, an Enron employee sent an e-mail to Brian McGuire regarding the status of BT Deutsche Bank's efforts to contact bidders for assets and appraisal information regarding Project Tomas.

(f)      On or about November 1, 2000, Stephen Jankovitz sent an e-mail to Enron employees regarding the opening balance on an Oneida Leasing, Inc. note receivable from Bankers Trust.

1566.    In connection with the Renegade transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)      On or about December 23, 1998, Bankers Trust sent a letter to ECT Equity Corp. confirming a money market trade made in connection with Project Renegade.

(b)      On or about December 28, 1998, Bankers Trust Company sent an Engagement Letter to Enron Finance Holdings Group, in care of Enron Corp., and BT Alex. Brown Incorporated regarding the engagement of BT Alex. Brown Incorporated as the exclusive placement agent for the sale of up to $72,000,000 aggregate principal amount of Wiltshire Financial Asset Company, LLC Certificates, Class A, in connection with Project Renegade.

(c)     On or about December 29, 1998, R. Davis Maxey of Enron sent a facsimile to Brian McGuire regarding execution of the Enron guarantee in the Project Renegade transaction.

1567.     In connection with the Valhalla transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders:

(a)     On or about December 21, 1999, Brian McGuire sent a facsimile to R. Davis Maxey and an Enron employee enclosing a revised accounting memorandum for Project Valhalla.

(b)     On or about May 2, 2000, Deutsche Bank AG sent a reimbursement of expenses letter agreement to Enron pursuant to which Deutsche Bank AG agreed to reimburse Enron for various expenses incurred in connection with Project Valhalla.

(c)     On or about May 2, 2000, Deutsche Bank AG's in-house counsel sent a letter to Enron expressing counsel's opinion with respect to the legality and validity of Deutsche Bank AG's participation in Project Valhalla under the laws of the Federal Republic of Germany.

*CIBC*

1568.     In connection with the Riverside III transaction, CIBC and CIBC World Markets plc knowingly gave substantial assistance to the Insiders.

(a)     On or about June 1, 1998, Shannon Ernst, David Weekes, and Mark Wolf sent an Application for Corporate Credit to VP, Risk Management and CIBC Credit Committee, with copies to Robert Long, Colette Delaney, Michael Corkum, and Katheryn McGovern.

1569.     In connection with the Riverside IV transaction, CIBC and CIBC World Markets plc, knowingly gave substantial assistance to the Insiders.

(a)     On or about September 14, 1998, Shannon Ernst, Steve McTiernan, and Mark Wolf sent an Application for Corporate Credit to VP Risk Management and CIBC Credit Committee with copies to Colette Delaney and Katheryn McGovern.

1570.     In connection with the Pilgrim transaction, there were two separate but related transactions, Pilgrim/Trakya and Pilgrim/Sarlux.  While the transactions commenced on the same day and closed at approximately the same time, a unique asset supported each transaction.  In connection with these transactions, CIBC and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)     On or about October 27, 1998, Ian Schottlaender, Mark Wolf, and Billy Bauch sent a Memorandum to Richard Hassard, William Phoenix, and Ray Smith regarding structuring and underwriting a transaction to provide Enron with an accounting gain on two power plants in which Enron has an equity interest.

(b)     On or about December 4, 1998, Colette DeLaney sent an e-mail to Bob Abra and Lorne Robbins authorizing Pilgrim and asking questions regarding Pilgrim and Riverside.

(c)     On or about December 4, 1998, Bob Abra sent a Credit Communication to Executive Director, Credit Management Houston with a copy to CEO, Large Corporate Market and Executive Director, ACSC authorizing Pilgrim with the understanding that Enron will be asked questions about earnings on Riverside and Pilgrim.

(d)     On or about October 21, 1998, Billy Bauch sent a Memorandum to John Hunkin, Gerald Beasley, Ron Ormand, Ian Schottlaender, and Mark Wolf regarding a meeting with Enron to discuss Enron's financing needs and the transactions Enron intends to complete by year end.

(e)     On or about December 1, 1998, Mark Wolf and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management, the CIBC Credit Committee, Colette Delaney, and Katheryn McGovern.

1571.     In connection with the Riverside V transaction, CIBC and CIBC World Markets plc. knowingly gave substantial assistance to the Insiders.

(a)     On or about December 15, 1998, Shannon Ernst sent an Application for Corporate Credit to Head of Credit Risk Management, Europe, CIBC Credit Committee, Colette Delaney, and Mark Wolf.

1572.    In connection with the Leftover transaction, CIBC and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)     On or about June 14, 1999, Mark Wolf sent an Application for Corporate Credit to VP Risk Management; CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Market; and Michael Ablialoro.

1573.    In connection with the Nimitz transaction, CIBC and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)     On or about June 15, 1999, Mark Wolf sent an Application for Corporate Credit to VP Risk Management; CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Market; and Michael Ablialoro.

1574.    In connection with the Ghost transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc., knowingly gave substantial assistance to the Insiders.

(a)     On or about December 7, 1999, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; the Executive Director, ACSC; CEO, EVP, Large Corporate Market; Michael Ablialoro; and Gerry Beauclair.

1575.    In connection with the Alchemy transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)     On or about December 7, 1999, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit

Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Market; Michael Ablialoro; and Gerry Beauclair.

1576.   In connection with the Discovery transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)   On or about December 15, 1999, Mark Wolf and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Markets; and Michael Ablialoro.

1577.   In connection with the Hawaii transaction, CIBC, CIBC World Markets Corp. and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)   On or about May 21, 2001, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Markets; Michael Ablialoro; and Gerry Beauclair.

(b)   On or about June 21, 2001, Mercy Arango sent an e-mail to Gerry Beauclair, Lorne Robbins, Ian Schottlaender, and Mark Wolf regarding Andrew Fastow's assurance that risk would not be realized and stating that CIBC had sustained no loss during the last three years it did the "trust me" equity transactions.

(c)   On or about August 25, 2000, Mark Wolf and Mercy Arango sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Markets; and Michael Ablialoro.

(d)   On or about October 5, 2000, CVP Risk Management, USA Investment and Corporate Bank sent a Credit Communication to Executive Director, ACSC; CEO, EVP, Large Corporate Market; and Michael Ablialoro authorizing modification to the Hawaii structure.

1578.    In connection with the Specter transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc. together knowingly gave assistance to the Insiders, including:

(a)    On March 20, 2000, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit related to the Specter transaction to the Vice President of Risk Management and the CIBC Credit Committee.

**Merrill Lynch**

1579.    In connection with the Nigerian Barge transaction, Merrill Lynch knowingly gave substantial assistance to the Insiders.

(a)    On or about December 21, 1999, Robert Furst sent a memorandum to Dan Bayly, Mark McAndrews, Jim Brown, Kevin Cox, Schuyler Tilney, and Mark Devito, regarding Jeffrey McMahon's request that Merrill Lynch participate in the Nigerian Barge transaction, noting that there would be a return of 22.5% and a hold for less than six months, and recommending participation in the transaction.

(b)    On or about December 21, 1999, Robert Furst sent a memorandum to Jim Brown regarding the Nigerian Barge transaction.

(c)    On or about December 22, 1999, Brad Bynum sent an e-mail to Mark Devito, James Brown, and William Fuhs regarding an interoffice memorandum related to the Debts Market Commitment Committee meeting.

(d)    On or about December 23, 1999, an unknown Merrill Lynch representative sent a draft letter agreement to Jeff McMahon containing Merrill Lynch's $250,000 advisory fee for acting as Enron's exclusive advisor in the Nigerian Barge transaction, along with a 15% return.

(e)    On or about December 28, 1999, Dan Boyle sent an e-mail to Pamela Perry, cc'd to William Fuhs and Geoffery Wilson, requesting that the $250,000 fee not be paid until the first business day of 2000.

(f)　　　On or about December 29, 1999, Jim Brown sent a final letter agreement with Merrill Lynch's $250,000 fee for its role as exclusive advisor in the Nigerian Barge transaction to Andrew Fastow.

(g)　　　On or about January 25, 2000, Mark Devito e-mailed Schuyler Tilney, regarding Enron's appreciation for Merrill Lynch's assistance in the Nigerian Barge deal and their indication that it would lead to future business.

(h)　　　On or about May 4, 2000, Kira Toone e-mailed Gary Carlin, cc'd to Joseph Valenti, computing a 15% return on the Nigerian Barge investment.

(i)　　　On or about June 13, 2000, Kira Toone e-mailed Alan Hoffman, cc'd to Joseph Valenti and Gerald Haugh, indicating Merrill Lynch's understanding that it would be taken out of the transaction by June 30, 2000.

(j)　　　On or about June 14, 2000, Robert Furst sent a letter to Dan Boyle with copies to James Brown, J. Tomaselli, William Fuhs, and Geoffery Wilson, providing details of wiring instructions to buy Merrill Lynch out of the Nigerian Barge deal.

(k)　　　On or about June 15, 2000, William Fuhs e-mailed Rob Furst and Geoffery Wilson regarding a phone call about Nigerian Barge.

(l)　　　On or about June 15, 2000, Kira Toone e-mailed Joseph Valenti with queries about LJM2 and buyout timing.

(m)　　　On or about June 15, 2000, Joseph Valenti e-mailed Gary Carlin, cc'd to Kira Toone, Michael DeBettis, and Gerald Haugh, noting that LJM2 was purchasing Merrill Lynch's barge interest, but that Merrill Lynch was still involved in the barges based on its limited partner interest in LJM2.

(n)　　　On or about June 29, 2000, William Fuhs e-mailed James Brown, informing him that $7.25 million had been received by Merrill Lynch.

(o)     On or about March 2, 2001, Robert Lyons e-mailed James Brown, regarding promises of repayment from Andrew Fastow.

(p)     On or about January 17, 2002, Kira Toone e-mailed Joseph Valenti, regarding the 15% return.

(q)     On or about January 18, 2002, Curt Cariddi e-mailed John Devine and John Fosina, cc'd to Gary Carlin and Joseph Valenti, regarding the role of Merrill Lynch's funding and the 15% interest.

1580.     In connection with the 1999 electricity trades transaction, Merrill Lynch knowingly gave substantial assistance to the Insiders.

(a)     On or about December 28, 1999, Merrill Lynch Credit Services sent a letter agreement to Enron Power Marketing, Inc., signed by Cliff Baxter and Roger Baum.

(b)     On or about December 29, 1999, Christine Gonzalez, Ron Rosenberg, Jeff Kronthal, Keith Jacobson, Robert McCann, Luke Farber, Robert Seitz, Paul Morton, David Lund, Katie Curran, Kate Maloney, Kathleen Lynch, Donna Schloss, George Glaraga, and John McDermott, sent an e-mail to Dan Gordon discussing terms of the 1999 electricity trades transaction.

(c)     On or about December 30, 1999, Rob Furst had a phone conversation with Richard Causey regarding Enron's accounting for the transaction.

(d)     On or about May 30, 2000, Schuyler Tilney e-mailed Dan Gordon and Rob Furst, stating that Merrill Lynch knew that Enron used the power trades to meet 1999 earnings and discusses termination of the power trade contracts.

(e)     On or about May 30, 2000, Dan Gordon e-mailed Schuyler Tilney and Rob Furst, regarding Tilney's May 30, 2000, e-mail about the power trades.

(f)    On or about May 31, 2000, Dan Gordon e-mailed Rodney Malcolm regarding the termination of the Midwest Peaking Trade.

1581.    In connection with the LJM2 related party entity, Merrill Lynch knowingly gave substantial assistance to the Insiders.

(a)    On September 16, 1999, David Sullivan sent a letter agreement to Andrew Fastow under which Merrill Lynch would act as the exclusive financial advisor to LJM2.

(b)    On December 20, 1999, Joseph S. Valenti sent a subscription agreement package to an unknown party regarding investment in LJM2.

(c)    On December 20, 1999, Michael Kopper sent a letter agreement to Joseph Valenti regarding investment in LJM2.

(d)    On April 5, 2000, Joseph S. Valenti sent a subscription agreement package to an unknown party regarding Merrill Lynch/LJM2 Co-Investment, L.P. investment of $16,645,000 in LJM2.

### *CSFB*

1582.    In connection with the December 2000 Prepaid Oil Swap and/or the September 2001 Prepaid Oil Swap (collectively, the "Prepaid Oil Swap") transaction, CSFB knowingly gave substantial assistance to the Insiders.

(a)    On or about July l2, 2000, e-mails were sent between James Moran and an Enron employee regarding the loan-like features of the Prepaid Oil Swap.

(b)    On or about December 5, 2000, James Moran sent an e-mail to Osmar Abib regarding Enron's request for a prepay transaction, wherein he conceded that the transaction was really a loan.

(c)     On or about December 8, 2000, James Moran sent an e-mail to Ian Emmett, Osmar Abib, Sarah Payne, Greg McElwee, and Nicholas Tjandramaga regarding the structure of swaps in the prepay transaction.

(d)     On or about December 12, 2000, Ian Emmett sent an e-mail to Steve Wootton asking: "Is it OK for us to be entering into such an 'obvious' loan transaction?"  AB050700064 (quoted in Exam. Final Report, App. F at 68).

(e)     On or about December 14, 2000, James Moran sent an e-mail to Geoff Smailes, copied to Nicolas Tjandramaga, Osmar Abib, and Sarah Payne regarding approval for the prepaid oil swap.

(f)     On or about December 14, 2000, Steven Wootton sent an e-mail to Nicolas Tjandramaga and Ian Emmett explaining that the transaction was "accounting driven" and suggesting that cautionary representations be made to mitigate any reputational risk.  AB050700041-AB050700042 (cited in Exam. Final Report, App. F at 70).

(g)     On or about December 15, 2000, Steven Wootton sent an e-mail to James Moran regarding the accounting treatment of the prepaid swap.

(h)     On or about September 10, 2001, Geoff Smalles sent an e-mail to Adrian Cooper, copied to James Moran and Irv Suri, regarding internal accounting of the prepay.

(i)     On or about September 19, 2001, James Moran, David Koczan, Osmar Abib, Brian McCabe, and John Donovan sent a Memorandum to Robert O'Brien, David Maletta, and Ed Devine, with copies to Bayo Ogunlesi, Bob Jeffe, Dominic Capolongo, Jamie Welch, and Paul Davis, regarding renewal of the prepay.

1583.    In connection with the Nile Transaction, CSFB knowingly gave substantial assistance to the Insiders.

(a)    On or about September 19, 2001, James Moran, David Koczan, Osmar Abib, Brian McCabe, and John Donovan sent a Memorandum to Robert O'Brien, David Maletta, and Ed Devine, with copies to Bayo Ogunlesi, Bob Jeffe, Dominic Capolongo, Jamie Welch, and Paul Davis, regarding Enron's request for the Nile proposal.

(b)    On or about September 24, 2001, James Moran, David Koczan, Osmar Abib, Brian McCabe, and John Donovan sent a Memorandum to Robert O'Brien, David Maletta, and Ed Devine, with copies to Bayo Ogunlesi, Bob Jeffe, Dominic Capolongo, Jamie Welch, and Paul Davis, regarding the Project Nile proposal.

(c)    On or about October 10, 2001, James Moran and David Koczan sent a Memorandum to Robert O'Brien, David Maletta, and Ed Devine regarding an amendment to the Nile Transaction.

1584.    In connection with the Nikita transaction, CSFB knowingly gave substantial assistance to the Insiders.

(a)    On or about September 24, 2001, James Moran, David Koczan, Osmar Abib, Brian McCabe, and John Donovan sent a Memorandum to Robert O'Brien, David Maletta, Ed Devine, Bayo Ogunlesi, Bob Jeffe, Dominic Capolongo, Jamie Welch, and Paul Davis regarding the Nikita transaction proposal.

(b)    On or about October 10, 2001, James Moran and David Koczan sent a Memorandum to Robert O'Brien, David Maletta, and Ed Devine regarding a proposed amendment to Project Nikita.

### *Toronto Dominion*

1585.    In connection with the December 1998 prepay transaction, Toronto Dominion knowingly gave substantial assistance to the Insiders.

(a)     On or about December 12, 1998, Victor Huebner forwarded an e-mail received from Robyn Zeller to Tom Spencer, Barry Dennis, Phillip Chiarmamonte, Shane Akeroyd, David Silverstein, Peter Cody, Betty Chiang, Susan Moore, and Dan Carr specifying the framework for the December 1998 prepay transaction and discussing remaining open issues.

(b)     On or about December 13, 1998, David Silverstein sent an e-mail to Victor Huebner, Barry Dennis, Diana Sajer, Robyn Zeller, Betty Chiang, Julian Bott, and Peter Cody regarding a requested increase in the amount of the facility contemplated in the December 1998 prepay transaction.

(c)     On or about December 23, 1998, Douglas Jones sent an e-mail to Dan Carr, Peter Cody, Betty Chiang, Sinan Akdeniz, Danny Elias and Julian Bott regarding the details of his conversation on that same date with employees of Chase Manhattan Bank, as counter party to the December 1998 prepay transaction.

(d)     On or about December 26, 1998, Robyn Zeller sent an e-mail to Barry Dennis, David Silverstein, Julian Bott, Victor Huebner, Mike MacBain, Shane Akeroyd, Joseph Hegener, Eric Girom, Todd Hargarten, Peter Cody, Betty Chiang, Phillip Chiarmamonte, Anne Marie Favoriti, Warren Finlay and Douglas Jones confirming the terms and conditions of the December 1998 prepay transaction.

1586.    In connection with the Truman Prepay and the refinancing of the prepay, known as the Jethro Prepay, Toronto Dominion knowingly gave substantial assistance to the Insiders.

(a)     On or about June 24, 1999, Douglas Jones sent an e-mail to Dan Carr containing a diagram of the various swap legs for the June 1999 prepay transaction with Enron and Citibank.

(b)     On or about June 28, 1999, Danny Elias sent an e-mail to Ann Scully regarding the imminent execution of the swap contemplated in the June 1999 prepay transaction.

(c)     On or about July 20, 1999, Dan Carr sent an e-mail to Vicki Ferguson, Douglas Jones, Ann Scully, and Danny Elias regarding revisions to be made to a swap confirmation for the June 1999 prepay transaction.

(d)     On or about September 16, 1999, Douglas Jones initiated an e-mail chain to Howard Sangwine, Steve MacDougall, Sinan Akdeniz, Joseph Hegener, Linda Lavin, Peter Cody, Ann Scully, Danny Elias, Tim Logie, and Tim Jennings regarding Citibank's proposals for Toronto Dominion's role in the September refinancing of the June 1999 prepay transaction.

(e)     On or about September 29, 1999, Douglas Jones sent an e-mail to Dan Carr, Rick Donner, Peter Cody and Linda Lavin confirming the execution of the September refinancing of the June 1999 prepay transaction.

(f)     On or about September 29, 1999, Linda Lavin sent an e-mail to Warren Finlay, Peter Cody, Rick Donner, and Carter Kaneen discussing the internal distribution of fees paid to Toronto Dominion from the September refinancing of the June 1999 prepay transaction.

1587.   In connection with the Nixon Prepay transaction, Toronto Dominion knowingly gave substantial assistance to the Insiders.

(a)     On or about September 12, 1999, Mark Cherry forwarded an e-mail received from an Enron employee to Graeme Francis, Stephanie Viens, Cori Novellino, Linda Lavin, and Douglas Jones regarding certain open issues related to the December 1999 prepay transaction.

(b)     On or about December 10, 1999, Douglas Jones sent an e-mail to Mark Cherry, Graeme Francis, Stephanie Viens, Cori Novellino, Linda Lavin, and an Enron employee regarding certain details related to the execution of the swap contemplated in the December 1999 prepay transaction.

(c)    On or about December 13, 1999, Douglas Jones forwarded an e-mail received from an Enron employee to Dan Carr regarding revisions proposed by Citibank to certain transactional documents related to the December 1999 prepay transaction.

1588.    In connection with the Alberta Prepay, Toronto Dominion knowingly gave substantial assistance to the Insiders.

(a)    On or about September 6, 2000, Robyn Zeller sent an e-mail to Bob W. Gibson discussing the general terms and conditions of the September 2000 prepay transaction.

(b)    On or about September 21, 2000, Anthony Hull sent an e-mail to Katherine Lucey, Robyn Zeller, Cori Novellino, Lisa Reikman, Sinan Akdeniz and Jamie Dieth regarding the status of work to be completed in connection with the September 2000 prepay transaction.

(c)    On or about September 26, 2000 Victor Huebner sent an e-mail to Robyn Zeller, Cori Novellino and Bob W. Gibson regarding Enron's outstanding debt on its prepay transactions.

1589.    In connection with the London Prepay, Toronto Dominion knowingly gave substantial assistance to the Insiders.

(a)    On or about September 6, 2000, Graeme Francis sent an e-mail to Katherine Lucey, Bob W. Gibson, Julian Bott, and Douglas Jones recounting preliminary discussions regarding the timing and structure of the December 2000 prepay transaction.

(b)    On or about October 26, 2000, Steve Fuller sent an e-mail to Shane Akeroyd, Graeme Francis, Anthony Hull, Danny Elias, Katherine Lucey, and an Enron employee regarding pricing and fees related to the December 2000 prepay transaction.

(c)    On or about November 7, 2000, Cori Novellino sent an e-mail to Robyn Zeller regarding preliminary structuring information for the December 2000 prepay transaction.

(d)      On or about November 17, 2000, Mark Newman sent a facsimile to the Senior Vice President of TD Bank Financial Group containing an e-mail with Toronto Dominion's Group Risk Management comments regarding the December 2000 prepay transaction.

### *RBS*

1590.    In connection with the LJM1 transaction, RBS knowingly gave substantial assistance to the Insiders as follows:

(a)      On or about May 28, 1999, David Bermingham e-mailed Kevin Howard, and Mike Ellison, RBS, regarding a concern that value was going out of the Enron group and that LJM1 would all of a sudden be "gifted" $220 million of Enron stock.

(b)      On or about August 6, 1999, Bermingham e-mailed Howard regarding RBS's decision to circumvent the LJM1 Partnership Agreement via the CSFB SAILs proposal which had enormous upside attraction for Fastow.

(c)      On or about August 20, 1999, Gary Mulgrew (Managing Director, RBS) sent a Memorandum to the Campsie Directors reflecting RBS's understanding that Fastow would have no economic interest in the Enron stock.

(d)      On or about August 31, 1999, David Bermingham e-mailed Kristi DeMaiolo, and David Clement, regarding the motivation behind LJM1's formation, its intended operational procedures, and the economics of the Rhythms Hedging.

(e)      On or about November 9, 1999, Bermingham e-mailed Ben Glisan with a proposal whereby $14 million of value would be transferred to Fastow over a period of time, and indicating that RBS was aware of a verbal agreement between Fastow and Enron that Enron would repurchase Ciuaba at a profit to LJM1.

(f)     On or about November 12, 1999, David Bermingham e-mailed Ben Glisan, setting forth RBS's latest LJM1 restructuring proposal which entailed RBS realizing the entire value of the Enron shares in exchange for $44.5 million.

(g)     On or about August 15, 2000, Adam Pettifer, RBS, e-mailed Kevin Howard attaching a memorandum that illustrated how RBS locked in its profit from the LJM1 restructuring.

1591.    In connection with the Sutton Bridge transaction, RBS knowingly gave substantial assistance to the Insiders.

(a)     Prior to the closing of the Sutton Bridge transaction, Konrad Kruger and Giles Darby authored a memorandum seeking approval for the Sutton Bridge transaction on which handwritten notes were affixed indicating approval of the investment based, in part, on the "understanding" with Enron regarding Enron's repurchase of the equity at an agreed return on December 1, 1999.

(b)     On or about July 8, 1999, an RBS presentation referred to the "trust us" assurance from Enron, to the "arbitrage [of] 'substance over form'" that enabled P&L recognition for what was really a financing, and to the low risk, high reward "equity" in the transaction.

(c)     On or about August 11, 2000, Peter Commons sent an e-mail to Thomas Hardy, Nicola Goss, and Iain Houston regarding the transaction's hinging on an "understanding" with Enron that Enron would repurchase the equity and the fact that RBS was well paid to undertake the transaction.

(d)     On or about September 6, 2001, Adam Pettifer sent an e-mail to Paul Fairbairn and Michael Crosland stating that Enron had honored its "obligation" under the Sutton Bridge transaction and had repaid the equity upon the sale of the asset.

1592.    In connection with the ETOL I, II and III transactions, RBS knowingly gave substantial assistance to the Insiders as follows:

(a)     On or about August 10, 2000, Iain Houston (Head of Structure Finance) sent an e-mail to Nicola Goss, Tom Hardy and Peter Commons regarding RBS not having any problem participating in ETOL based upon the verbal assurances consistently provided by senior Enron staff, most recently by Fastow to Iain Robertson and Johnny Cameron.

(b)     On or about August 11, 2000, Commons sent an e-mail to Hardy, Goss and Houston regarding the similarity between ETOL and Sutton Bridge in that ETOL hinges on an understanding with Enron that they will buy it all back.

(c)     On or about August 16, 2000, Aldo Ferri sent an e-mail to Goss regarding RBS's knowledge of ETOL's affect on Enron's balance sheet.

(d)     On or about September 18, 2000, Milton, Goss and Hardy prepared a ETOL I Credit Application regarding RBS's knowledge that such transaction was aimed to be a true sale and noting that the applicable accounting rules do not allow any formal arrangements to be made on RBS's required return.

(e)     On or about September 19, 2000, Clarke prepared an ETOL I Credit Recommendation regarding reliance placed on Enron's verbal undertakings to make RBS whole on the equity tranche.

(f)     On or about September 20, 2000, Corporate Banking and Financial Markets (CBFM) Credit Committee Minutes were prepared regarding ETOL I noting both the impact of RBS's participation in this deal on Enron's significant off-balance sheet contingent liabilities and the nature of the assurances provided.

(g)     On or about September 25, 2000, Sue Milton sent a memorandum to Commons and Clarke regarding RBS's reliance on Enron to make it whole.

(h)     On or about September 28, 2000, a conference took place between Fastow and Iain Robertson regarding Fastow's assurance that RBS' renumeration would be met by Enron.

(i)      On or about March 1, 2001, Goss sent an ETOL I funding memorandum to Hardy, Howard, Clarke and Steve Gee regarding both RBS's knowledge of Enron's accounting goals for ETOL II and III and the arrangement to make RBS whole.

(j)      On or about March 16, 2001, Clarke prepared an ETOL II and III Credit Recommendation regarding stated returns on equity and RBS's reliance on Enron's understanding to make its whole.

(k)      On or about March 20, 2001, Group Credit Committee Minutes were prepared regarding the reliance by RBS on Enron's verbal undertakings based upon senior level discussions between RBS and Enron.

(l)      On or about March 20, 2001, CBFM Credit Committee Minutes were prepared regarding the reliance on Enron's informal arrangement to make RBS whole on both its equity and return on equity in all the ETOL deals and discussions between RBS and Enron regarding such arrangement

(m)      On or about May 9, 2001, Clarke sent an e-mail to Gordon Pell, Phillip Carraro and David Finlayson regarding RBS's entire reliance on Enron's verbal assurances to make it whole.

1593.      In connection with the Nixon Prepays transaction, RBS knowingly gave substantial assistance to the Insiders as follows:

(a)      On or about November 6, 1999, Brian McInnes approved a Credit Application regarding RBS's knowledge that the Nixon Prepays created a three month synthetic loan and that RBS's participating would assist in crucial de-leveraging at quarter and year ends.

(b)      On or about December 6, 1999, A.W. McAlister (Senior Analyst) prepared a memorandum regarding how the transaction was effectively a window dressing request that was

being used to reduce Enron's reported year-end net debt position and noted issues relating to the absolute level of manipulation undertaken by Enron in its financial statements.

(c)     On or about February 1, 2000, McAlister sent an e-mail to Derek Weir regarding RBS' knowledge that Enron was going to boost cash flows from operating activities from Nixon.

### *RBC*

1594.    In connection with the Alberta transaction, RBC knowingly gave substantial assistance to the Insiders:

(a)     On August 24, 2000, Ian McArthur e-mailed Bob Hall, Frank Piazza, and Blair Fleming, regarding RBC's participation in the Alberta financing.

(b)     On August 30, 2000, Ian McArthur and Mike Ellison submitted to RBC a first transaction approval request for Alberta that acknowledged that the structure would receive off-balance sheet treatment.

(c)     On September 27, 2000, RBC employees prepared a Final Alberta Transaction request, detailing the structure of the Alberta Transaction.

(d)     On September 26, 2000, Blair Fleming e-mailed Ian McArthur, Graeme Hepworth and others explaining that a linkage in the Alberta structure could not be documented for accounting reasons.

1595.    As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

1596.    Enron's injuries as described in this Complaint resulted from fraud and/or malice on the part of the Bank Defendants.  When viewed objectively from the Bank Defendants' standpoint, the acts and omissions described in this Complaint involved an extreme degree of risk at the time they occurred, considering the probability and magnitude of the potential harm to Enron.  The Bank Defendants had an actual, subjective awareness of the risk to Enron posed by their acts and omissions, but they nevertheless proceeded with conscious indifference to Enron's rights.  Further, the acts and omissions described in this Complaint demonstrate a malicious, reckless, and/or willful disregard of Enron's rights and welfare on the part of the Bank Defendants.  The same acts and omissions also were aimed at the public generally and were taken by the Bank Defendants in utter disregard of the public interest, including without limitation the interests of the many other entities that were financially involved with Enron, as well as the rights and interests of the investing public.  Therefore, in order to punish the Bank Defendants, to deter the Bank Defendants from repeating the acts and omissions described in this Complaint, to protect the public against similar acts and omissions in the future, and to serve as a warning to others, the Bank Defendants should be held liable for exemplary or punitive damages.

### COUNT 76
**(Unlawful Civil Conspiracy;
Enron Against All Bank Defendants)**

1597.    The allegations in paragraphs 1 through 1596 of this Complaint are incorporated herein by reference.

1598.    By virtue of the acts and omissions described in this Complaint, from 1997 through 2001 the Bank Defendants conspired with the Insiders, and at least as to Citigroup, Chase, and BT/Deutsche Bank with the Insiders and Arthur Andersen, to manipulate and misstate Enron's financial condition and to facilitate transactions between the Insiders and Enron in which the Insiders derived improper personal benefits.  The Bank Defendants and the Insiders and, to the

extent of its involvement, Arthur Andersen, agreed on the both the objects of the conspiracy and the courses of action to be taken in furtherance of it. The Bank Defendants knowingly participated in the unlawful objects – to manipulate and misstate Enron's financial statements and to facilitate self-dealing transactions between the Insiders and Enron – and knowingly participated in the courses of action taken in furtherance of it – the Insiders' numerous breaches of fiduciary duties to Enron, and the Insiders' fraud against Enron.

1599.   By virtue of the acts and omissions described in this Complaint, numerous overt acts were taken by the Bank Defendants and the Insiders in furtherance of the conspiracy.

1600.   As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

1601.   Enron's injuries as described in this Complaint resulted from fraud and/or malice on the part of the Bank Defendants. When viewed objectively from the Bank Defendants' standpoint, the acts and omissions described in this Complaint involved an extreme degree of risk at the time they occurred, considering the probability and magnitude of the potential harm to Enron. The Bank Defendants had an actual, subjective awareness of the risk to Enron posed by their acts and omissions, but they nevertheless proceeded with conscious indifference to Enron's rights. Further, the acts and omissions described in this Complaint demonstrate a malicious, reckless, and/or willful disregard of Enron's rights and welfare on the part of the Bank Defendants. The same acts and omissions also were aimed at the public generally and were taken by the Bank Defendants in utter disregard of the public interest, including without limitation the interests of the many other entities

that were financially involved with Enron, as well as the rights and interests of the investing public. Therefore, in order to punish the Bank Defendants, to deter the Bank Defendants from repeating the acts and omissions described in this Complaint, to protect the public against similar acts and omissions in the future, and to serve as a warning to others, the Bank Defendants should be held liable for exemplary or punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor as follows:

A.     For an order avoiding and setting aside the transfers identified in Counts 1 through 72.

B.     For an order directing each respective transferee of the transfers and setoffs identified in Counts 1 through 72 to return to Plaintiff the property transferred or pay the value of such property.

B1.     For an order declaring that Mahonia/JPMC (as defined in paragraph 855B) is in violation of the automatic stay, declaring that all actions taken by Mahonia/JPMC in violation of the automatic stay are null and void *ab initio*, and ordering that Mahonia/JPMC shall immediately take all action necessary to restore the parties to their relative positions as they existed on December 2, 2001 including, without limitation, turning over to Plaintiff forthwith the amounts alleged in paragraph 855D.

B2.     For an order directing Mahonia/JPMC to pay and turn over the Prepay Collateral, as identified in Counts 14A and 14B, with interest, to Plaintiff forthwith.

C.     For an order directing Barclays immediately to pay and turn over the Collateral, and all proceeds, products and profits of the Collateral or its sale, or the value thereof, with interest, to Plaintiff forthwith, as requested in Count 23.

D.    For an order declaring that Barclays and Colonnade are in violation of the automatic stay, declaring that all actions taken by Barclays and Colonnade in violation of the automatic stay are null and void *ab initio*, and ordering that Barclays and Colonnade shall immediately take all action necessary to restore the parties to their relative positions as they existed on December 2, 2001, as requested in Count 24.

E.    For an order avoiding and declaring invalid all provisions in the Charge on Cash Agreement or other documents related to the $SO_2$ Transaction and any and all non-mutual setoffs purportedly made by Barclays or any Barclays affiliate, as identified in Count 26.

E1.    For damages as against Barclays in an amount to be proved at trial, but not less than $48,459,635 plus interest and attorneys' fees, as requested in Counts 25A, 25B and 25C.

F.    For an order directing Barclays and any Barclays affiliate to turn over to Plaintiff the property transferred or set off, or its value, as identified in Counts 26 through 28.

F1.    For an order directing Barclays immediately to pay and turn over the Collateral, and all proceeds, products and profits of the Collateral or its sale, or the value thereof, with interest, to Plaintiff forthwith, as requested in Counts 23 and 25.

F2.    For an order directing Colonnade and/or Barclays to turn over to Plaintiff the Emission Credits, or their value, as requested in Counts 22A, 28A and 28B.

F3.    For an order transferring to the Subordination Plaintiff's estate any lien held by Barclays and/or Colonnade on property of the Subordination Plaintiff's estate, as identified in Count 28C.

G.    For an order setting aside the Valhalla Setoff and the postpetition transfers identified in Counts 30 and 31 as improper postpetition transfers.

G1.    For an order directing (a) that all of the proceeds, products and profits of the Nile Asset or its sale that are currently in the Segregated Account forthwith be paid to Plaintiff, and

(b) that CSFB, Pyramid I and/or Sphinx Trust immediately pay and turn over, or consent to the payment and turnover of, all additional proceeds, products and profits of the Nile Asset or its sale, or the value thereof, with interest, to Plaintiff forthwith, as requested in Counts 47A and 47B.

H.     For an order disallowing any claim of each respective transferee of the transfers identified in Counts 1 through 72 unless and until such transferee has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code section 550, and for an order disallowing all Transferred Claims as set forth in Count 73B.

I.     For subordination of all claims or proofs of claim (except for DIP obligations) which have been filed or brought or which may hereafter be filed or brought by, on behalf of, or for the benefit of any of the Subordination Defendants or any Claim Transferee Defendant or their affiliated entities, against the Subordination Plaintiff or other Debtors, in the related bankruptcy proceedings, as identified in Counts 73 and 73A, and for an order transferring to the Subordination Plaintiff's estate any liens securing such subordinated claims.

J.     For an order (a) avoiding and setting aside each Challenged Transaction Obligation as identified in Counts 65 and 66; (b) avoiding and setting aside each Intentional Fraudulent Transfer and each Intentional Fraudulent Conveyance as identified in Counts 69 through 71; (c) directing each transferee of the transfers identified by reference in Counts 69 or 70, or in connection with the guarantees or obligations alleged in Counts 65 or 66, to return the property transferred, or pay the value of such property, to Plaintiff; (d) directing JPMC and Mahonia to disgorge to Plaintiff the amount of any payment from Plaintiff to or for the benefit of JPMC or Mahonia in connection with the Chase XII prepay, including any payment made indirectly through West LB London; and (e) disallowing any and all claims asserted by any Defendant based on any Challenged Transaction Obligation or by any subrogee of Mahonia based on the JPMC L/C.

K.      For an order directing that each Defendant provide an accounting of all transfers of interests of the Plaintiff in property made in connection with or related to the transactions identified in Counts 1 through 72.

L.      For damages in an amount to be proved at trial.

M.      For punitive damages.

N.      For prejudgment interest.

O.      For attorneys' fees and costs, and costs of suit.

P.      For such other and further relief as this Court deems just and proper.

January 10, 2005

        ENRON CORP., *et al.*
        Reorganized Debtors,
        By their Special Litigation Counsel,
        SUSMAN GODFREY L.L.P.,
        By:

              /s/ H. Lee Godfrey
        _____
        H. LEE GODFREY (*pro hac vice*)
        KENNETH S. MARKS (*pro hac vice*)
        MARY KATHRYN SAMMONS (*pro hac vice*)
        JAMES T. SOUTHWICK (*pro hac vice*)
        Members of the Firm
        1000 Louisiana Street, Suite 5100
        Houston, Texas 77002-5096
        (713) 651-9366

             - and -

ENRON CORP., *et al.*,
Reorganized Debtors,
By their Bankruptcy Co-Counsel,
TOGUT, SEGAL & SEGAL LLP,
By:

_____/s/ Scott E. Ratner_____
ALBERT TOGUT (AT-9759)
SCOTT E. RATNER (SER-0015)
Members of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000


ENRON CORP., *et al.*,
Reorganized Debtors,
By their Special Litigation Counsel,
VENABLE LLP,
By:

_____/s/ Richard L. Wasserman_____
RICHARD L. WASSERMAN (RW-8696)
MICHAEL SCHATZOW (*pro hac vice*)
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400


## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2005, a true and correct copy of the foregoing document was sent to all counsel of record by electronic mail.


_____/s/ Kenneth S. Marks_____

Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENRON CREDITORS RECOVERY CORP., et al., | Chapter 11 |
| | Case No. 01-16034 (AJG) |
| Reorganized Debtors | |
| | Jointly Administered |
| v. | |
| | Adversary Proceeding |
| CITIGROUP INC., et al., | No. 03-09266 (AJG) |
| | |
| Defendants | EXPERT REPORT OF B. DOUGLAS BERNHEIM, Ph.D. |

**Date:**
April 6, 2007

**Prepared by:**
B. Douglas Bernheim, Ph.D.

The information and materials referenced in this report may be subject to court orders restricting their use and distribution. Therefore, any recipient should treat this report as strictly confidential and for litigation purposes only.

# Table of contents

I. Qualifications ............................................................................................................................. 1

II. Summary ................................................................................................................................... 4
    II.1. Scope of engagement............................................................................................................ 5
    II.2. Summary of opinions ............................................................................................................ 6
    II.3. Other preliminary matters ..................................................................................................... 9

III. Factual background ................................................................................................................ 11
    III.1. The scope of Enron's operations ....................................................................................... 12
    III.2. Chronology of events surrounding Enron's bankruptcy ..................................................... 18

IV. Causation .............................................................................................................................. 34
    IV.1. Introduction......................................................................................................................... 35
    IV.2. The interests of managers often conflict with the interests of investors............................ 35
    IV.3. When managers act contrary to investors' interests, the market can impose discipline .............. 39
    IV.4. Effective market discipline depends on the timely release of accurate information concerning the company's financial status and performance ................................................................ 42
    IV.5. Enron's masking transactions deprived the market of timely and accurate financial information, thereby undermining market discipline .................................................................. 55
    IV.6. Subverting market discipline through deception has foreseeable consequences ........................ 92

V. Empirical analysis of causation .............................................................................................. 99
    V.1. Introduction........................................................................................................................ 100
    V.2. Overview ............................................................................................................................ 100
    V.3. Data.................................................................................................................................... 104
    V.4. Did Enron deserve an investment grade credit rating?..................................................... 105
    V.5. When would Enron have lost its investment grade status? ............................................... 112
    V.6. Conclusions ....................................................................................................................... 128

VI. Damage analysis .................................................................................................................. 129
    VI.1. Measurement of damages from masking transactions ..................................................... 130
    VI.2. Sources of the growth in Enron's deficiency balance ...................................................... 158

VII. Apportionment analysis ....................................................................................................... 174
    VII.1. Overview .......................................................................................................................... 175
    VII.2. Method of apportionment ................................................................................................. 175
    VII.3. Damages apportioned by transaction............................................................................... 179
    VII.4. Apportionment of damages to Citigroup and BT Deutsche .............................................. 184

VIII. Damages of the ENE and ENA debtors.............................................................................. 185
    VIII.1. Methodology.................................................................................................................... 186
    VIII.2. Apportionment of ENE and ENA damages...................................................................... 194
    VIII.3. Apportionment of damages to Citigroup and BT Deutsche ............................................. 199

IX. Summary of Citigroup and BT Deutsche Damages .............................................................. 200
    IX.1. Harm measured from the earliest possible date of resolution .......................................... 201
    IX.2. Harm measured from the date by which unmasking would more likely than not have brought about early resolution ................................................................................................. 201
    IX.3. Damages apportioned based on incremental contribution of transactions ...................... 202

Expert Report of B. Douglas Bernheim, Ph.D.

# Table of exhibits

Exhibit 1: Enron's self-reported performance by business unit, 1993–2000 ($ million)....................................18

Exhibit 2: Enron market capitalization, 1996–2001 ($ billion)..........................................................................19

Exhibit 3: Enron stock price and S&P 500 index, 1 Jul 2000–31 Dec 2001 ....................................................20

Exhibit 4: Enron's stock price and key events, 1 Oct 2001 – 31 Dec 2001 .....................................................21

Exhibit 5: Rating agencies' credit rating scales ...............................................................................................46

Exhibit 6: Masking transactions ......................................................................................................................56

Exhibit 7: Diagram of June 2001 Prepay (a/k/a Citibank 1) transaction (simplified).......................................63

Exhibit 8: Contribution of June 2001 Prepay (a/k/a Citibank 1) to Enron's reported financial
statements for Q2 2001 ...................................................................................................................66

Exhibit 9: Reversing the June 2001 Prepay (a/k/a Citibank 1) transaction from Enron's reported
financial statements for Q2 2001 .....................................................................................................67

Exhibit 10: Replacing the June 2001 Prepay (a/k/a Citibank 1) transaction with a transparent
loan, Q2 2001 ($ million) .................................................................................................................68

Exhibit 11: Net adjustment, June 2001 Prepay (a/k/a Citibank 1) transaction ($ million) ...............................69

Exhibit 12: Impact of the June 2001 Prepay (a/k/a Citibank 1) transaction on Enron's credit
ratios in Q2 2001 .............................................................................................................................70

Exhibit 13: Diagram of Nahanni transaction (simplified)..................................................................................74

Exhibit 14: Adjustments for Nahanni minority interest transaction in Q4 1999 ($ million) ..............................76

Exhibit 15: Impact of Nahanni on Enron's credit ratios, Q4 1999 ...................................................................77

Exhibit 16: Growth in Enron's use of masking transactions ............................................................................82

Exhibit 17: Enron's true vs. reported coverage ratio, 1990–2001 ...................................................................83

Exhibit 18: Enron's true vs. reported liquidity ratio, 1990–2001 .....................................................................84

Exhibit 19: Enron's true vs. reported leverage ratio, 1990–2001 ....................................................................85

Exhibit 20: Enron's true vs. reported operating profit margin, 1990–2001 ......................................................86

Exhibit 21: Enron's true vs. reported return on capital, 1990–2001 ................................................................87

Exhibit 22: Enron's true vs. reported quality of earnings, 1990–2001 ............................................................88

Exhibit 23: Enron's true vs. reported coverage ratio, 1990–2001 .................................................................106

Exhibit 24: Enron's true vs. reported leverage ratio, 1990–2001 ..................................................................107

Exhibit 25: Probability that a company with Enron's financial results would not have received
an investment grade rating, 1997–2001 .......................................................................................111

Exhibit 26: Cumulative probability of loss of investment grade status, 1997–2001 ......................................116

Exhibit 27: Cumulative probability of loss of investment grade status, 1997–2001, unmasking
Citigroup transactions....................................................................................................................118

Exhibit 28: Asset segments considered in deficiency balance calculation ....................................................132

Exhibit 29: Claim segments considered in deficiency balance calculation ....................................................132

Exhibit 30: Recoveries on platform entities ($ billion) ..................................................................................133

Exhibit 31: Recoveries and obligations on SPE transactions ($ million) .......................................................135

Exhibit 32: Actual and expected recoveries on nontrading assets ($ billion)................................................136

Exhibit 33: Wholesale trading recoveries and claims at actual bankruptcy ($ million) ..................................137

Exhibit 34: Retail trading recoveries and claims at bankruptcy ($ million).....................................................138

Exhibit 35: Other trading-related recoveries and claims at bankruptcy ($ million).........................................138

Exhibit 36: Comparison of book value to claims value for major on balance sheet obligations ($
billion)..............................................................................................................................................139

Exhibit 37: Litigation claims against the estate at or after the petition date ($ million) ................................ 140

Exhibit 38: Miscellaneous claims at bankruptcy ($ million) .......................................................................... 141

Exhibit 39: Actual bankruptcy deficiency balance ($ billion) ........................................................................ 142

Exhibit 40: Platform entities at early resolution ($ billion) ........................................................................... 144

Exhibit 41: Structures at early resolution ($ billion) .................................................................................... 145

Exhibit 42: Calculated nontrading asset recoveries at early resolution ($ billion) ......................................... 146

Exhibit 43: Wholesale trading recoveries and claims at early resolution ($ million) ...................................... 148

Exhibit 44: Retail trading book estimated recoveries and claims at early resolution ($ million) ................... 149

Exhibit 45: European and broadband recoveries at early resolution ($ billion) ............................................. 149

Exhibit 46: On balance sheet debt and noncommodity payables at early resolution ($ billion) ................... 150

Exhibit 47: Litigation claims potentially assertable against Enron at early resolution ($ million) ................ 151

Exhibit 48: Nondebtor guaranty obligations at early resolution ($ billion) ................................................... 151

Exhibit 49: Miscellaneous claims at early resolution ($ billion) .................................................................... 152

Exhibit 50: Calculated claims at early resolution ($ billion) ......................................................................... 153

Exhibit 51: Asset recoveries and claims at early resolution ($ billion) ......................................................... 154

Exhibit 52: Deficiency balance, December 1997 through November 2001 ($ billion) .................................. 155

Exhibit 53: Deficiency balance, December 31, 1997–November 30, 2001 ($ billion) .................................. 156

Exhibit 54: Damages, for early resolution at December 31, 1997 ($ billion) ................................................ 157

Exhibit 55: Damages, for early resolution at June 30, 1999 ($ billion) ........................................................ 157

Exhibit 56: Damages, for unmasking of Citigroup transactions only ($ billion) ........................................... 158

Exhibit 57: Growth of Enron asset segments, December 1997 to June 2001 ($ billion) ............................ 159

Exhibit 58: Growth of Enron debt and structure-related obligations, December 1997 to June 2001 ($ billion) ................................................................................................................................ 159

Exhibit 59: Summary of asset liquidation recoveries compared to book values ($ billion) .......................... 160

Exhibit 60: Major Enron assets contributed to Prisma Energy ..................................................................... 162

Exhibit 61: Selected postbankruptcy charges taken on international assets ($ million) .............................. 165

Exhibit 62: Selected postbankruptcy charges taken on broadband assets .................................................. 166

Exhibit 63: Reported "fair values" of Enron's price risk management assets and liabilities, including prepays ($ billion) ................................................................................................ 167

Exhibit 64: Composition of Enron's PRM assets in 1997 and 2000, by reported fair value ......................... 168

Exhibit 65: Selected postbankruptcy charges taken on wholesale business physical and merchant assets ($ million) ............................................................................................. 169

Exhibit 66: Enron reported book debt, December 1997 to November 2001 and asserted book debt bankruptcy claims ($ billion) ................................................................................... 171

Exhibit 67: Enron structure-related obligations, December 1997 to November 2001 ($ billion) ................. 172

Exhibit 68: Enron's other claim-generating obligations, December 1997 through November 2001 ($ billion) ................................................................................................................................ 173

Exhibit 69: Calculation of incremental contribution for Yosemite I ............................................................. 178

Exhibit 70: Damages by transaction, based on incremental contribution—Prepays ..................................... 180

Exhibit 71: Damages by transaction, based on incremental contribution—FAS 140 ................................... 181

Exhibit 72: Damages by transaction, based on incremental contribution—Minority interest ...................... 182

Exhibit 73: Damages by transaction, based on incremental contribution—Share trust .............................. 182

Exhibit 74: Damages by transaction, based on incremental contribution—Tax transactions ...................... 182

Exhibit 75: Damages by transaction, based on incremental contribution—Related party ............................ 183

Exhibit 76: Damages by transaction, based on incremental contribution—Forest products ........................ 183

Expert Report of B. Douglas Bernheim, Ph.D.

Exhibit 77: Damages by transaction, based on incremental contribution—Other transactions ................... 183

Exhibit 78: Damages by defendant, based on incremental contribution ...................................................... 184

Exhibit 79: Third-party claims against ENE and ENA ($ billion) ............................................................. 188

Exhibit 80: Third party ENE and ENA asset recoveries ($ billion) ............................................................. 189

Exhibit 81: ENE and ENA deficiency balances at bankruptcy ($ billion) ...................................................... 190

Exhibit 82: ENE and ENA payout rates at early resolution.......................................................................... 192

Exhibit 83: ENE and ENA deficiency balance and total damages, December 31, 1997 to
November 30, 2001 ($ billion) .............................................................................................................. 193

Exhibit 84: ENE and ENA damages by transaction, based on incremental contribution—
Prepays ............................................................................................................................................... 195

Exhibit 85: ENE and ENA damages by transaction, based on incremental contribution—FAS
140 ..................................................................................................................................................... 196

Exhibit 86: ENE and ENA damages by transaction, based on incremental contribution—
Minority Interest ................................................................................................................................... 197

Exhibit 87: ENE and ENA damages by transaction, based on incremental contribution—Share
Trust .................................................................................................................................................... 197

Exhibit 88: ENE and ENA damages by transaction, based on incremental contribution—Tax
Transactions ........................................................................................................................................ 197

Exhibit 89: ENE and ENA damages by transaction, based on incremental contribution—
Related Party........................................................................................................................................ 198

Exhibit 90: ENE and ENA damages by transaction, based on incremental contribution—Forest
products................................................................................................................................................ 198

Exhibit 91: ENE and ENA damages by transaction, based on incremental contribution—Other
Transactions ........................................................................................................................................ 198

Exhibit 92: Damages by defendant, based on incremental contribution ($ million) ....................................... 199

Exhibit 93: Damages avoidable by unmasking all transactions, from 31 December 1997 ($
billion) ................................................................................................................................................. 201

Exhibit 94: Damages avoidable by unmasking all transactions, from 30 June 1999 ($ billion) ................... 202

Exhibit 95: Damages avoidable by unmasking Citigroup transactions only ($ billion)................................. 202

Exhibit 96: Summarized damages by defendant, based on incremental contribution ($ million)................. 203

Expert Report of B. Douglas Bernheim, Ph.D.

# I. Qualifications

(1)    I am the Edward Ames Edmunds Professor of Economics at Stanford University. I am also Co-Director of the Tax and Budget Policy Program at the Stanford Institute for Economic Policy Research (SIEPR), a Senior Fellow of SIEPR, and a Partner with Bates White, LLC.

(2)    I received my Ph.D. in Economics from the Massachusetts Institute of Technology in September 1982 and my A.B. from Harvard University, *summa cum laude*, in June 1979. My previous academic appointments include an endowed chair in Economics and Business Policy at Princeton University, where I was also Co-Director of the Center for Economic Policy Studies, and an endowed chair in Insurance and Risk Management at Northwestern University's J.L. Kellogg Graduate School of Management, Department of Finance. I have also served as the Director of the Stanford Institute for Theoretical Economics.

(3)    I have taught courses in Microeconomic Theory (Ph.D. level and undergraduate level), Game Theory (Ph.D. level), Public Finance and Public Economics (Ph.D. level and undergraduate level), Industrial Organization (Ph.D. level), Behavioral Economics (Ph.D. level), and Insurance (Master's level). My Ph.D.-level teaching covers both theoretical issues and applied econometrics (data analysis).

(4)    I have published extensively in peer-reviewed academic journals and elsewhere on topics in personal, corporate, and public finance, public policy, strategic behavior and competitive strategy, microeconomic theory, industrial organization, and other areas. Many of my academic studies entail detailed analysis of microeconomic data using econometric methods.

(5)    I have served on the editorial boards of several professional journals, including *Econometrica*, the *Quarterly Journal of Economics*, the *Journal of Public Economics*, and the *Journal of Financial Intermediation*. I also recently served as a Co-Editor of the *American Economic Review*, which is the journal of the American Economics Association and the profession's most widely read periodical.

(6)    I have received a number of awards and professional recognitions, including election as a Fellow of the American Academy of Arts and Sciences, election as a Fellow of the Econometric Society, a Guggenheim Fellowship, appointment as a Fellow of the Center for Advanced Studies in the Behavioral Sciences, an Alfred P. Sloan Foundation Research Fellowship, and an NBER-Olin Research Fellowship.

(7)    I have been retained as a consultant or expert witness in numerous matters. I have conducted detailed studies of a variety of industries, including financial markets, telecommunications, health care, pharmaceuticals, railroads, airlines, aerospace, and a number of manufactured products. I have assessed damages in a variety of matters involving goods and services such as insurance,

securities brokerage services, vitamins, pharmaceutical products, and thermal fax paper. I have sponsored testimony concerning these studies before various government agencies and judicial bodies. A copy of my curriculum vita is located in Appendix A.

Expert Report of B. Douglas Bernheim, Ph.D.

# II. Summary

## II.1. Scope of engagement

(8) My engagement in this matter encompasses an analysis of damages to the estate and creditors of Enron Creditors Recovery Corp. ("Enron")[1] that resulted from the transactions identified in the Complaint in these proceedings (the "Complaint transactions"). In performing this analysis, I was instructed to assume that the entities named as Bank Defendants in the Complaint (the "Banks")[2] are, in fact, liable for the transactions with which the Complaint associates them (as indicated in Exhibit 6). I was also instructed to treat December 31, 1997, as the earliest date on which damages could have been incurred.

(9) Within the scope of my engagement, I was asked to perform the following specific tasks:

a. Determine whether the transactions identified by the Enron Examiner or the ENA Examiner as those in which Enron's accounting violated Generally Accepted Accounting Principles (GAAP) (collectively, the "masking transactions") were a cause of harm to the Enron estate and creditors;

b. Calculate the total harm (if any) to the Enron estate and creditors that resulted from the masking transactions;

c. Determine whether the Complaint transactions were a cause of harm to the Enron estate and creditors, and if so, measure that harm;

d. Determine whether the Complaint transactions involving Citigroup were sufficient to independently cause measurable harm to the estate, and if so, measure that harm; and,

e. To the extent the masking transactions in combination caused harm to the Enron estate and creditors, evaluate the feasibility of allocating this harm across them based on economic principles. If such an allocation proves feasible, determine the harm associated with each masking transaction, as well as the total harm attributable to the transactions in which each of the Banks participated.

(10) As a by-product of those tasks, I (a) performed an analysis of Enron's deficiency balance (the difference between total obligations and total recoveries in bankruptcy) at various points in time,

---

[1]  Enron Creditors Recovery Corp. is the company formerly known as Enron Corp. The term "Enron" will be used throughout this report to refer to both the pre- and post-petition entity.

[2]  The Banks include the Citigroup Defendants, the JP Morgan Chase Defendants, the Barclays Defendants, the BT/Deutsche Bank Defendants, the CIBC Defendants, the Merrill Lynch Defendants, the CSFB Defendants, the Toronto Dominion Defendants, the RBS Defendants, and the RBC Defendants. Reorganized Debtors' Fourth Amended Complaint, 11–24.

which allows for a determination of the harm to the estate and creditors that would have been avoided at any point in time from December 31,1997 forward; and (b) developed a method of analysis that would allow me to take into account (or eliminate) any transactions other than those named in the Complaint in judging harm to the estate and creditors and in apportioning damages to particular transactions.

(11)     With respect to tasks (c) through (e) in paragraph (9) (that is, the damages calculations I was asked to perform), I was asked to calculate the avoidable harm imposed by the masking transactions (as well as the subset of Complaint transactions) in two ways: (i) the total harm that could have been avoided, measured from the earliest date on which damages could have been incurred (which I have been instructed to assume is December 31, 1997), and (ii) the total harm that, more likely than not, would have been avoided if the transactions had never been masked. I measure the second form of harm based on the likely consequences of (a) unmasking all transactions, (b) unmasking only the Complaint transactions, and (c) unmasking only those in which Citigroup participated.

(12)     In addition to performing the damages calculations described above with respect to the estate and creditors of the consolidated Enron Corp. ("Enron"), I was also asked to perform these analyses on behalf of the estates and creditors of debtor Enron North America Corp. (the holding company, not consolidated with its subsidiaries, here referred to as "ENA") and debtor Enron Corp. (the holding company, not consolidated with its subsidiaries, here referred to as "ENE").

## II.2. Summary of opinions

(13)     I have reached the following principal conclusions:

(14)     First, the Complaint transactions were a material cause of harm to the Enron, ENA, and ENE estates ("estates") and their creditors because they subverted the normal processes through which poorly performing or irresponsible managers are disciplined and constrained both by internal forces (such as other managers and the company's board of directors) and by external forces (such as credit rating agencies). In particular, the Complaint transactions were a material cause of harm to the company, as well as to the estates and creditors, because they subverted the normal processes by which a company's stakeholders and market monitors influence, and, in some cases, exert control over poorly performing or irresponsible corporate managers. The Complaint transactions enabled certain Enron managers to falsely portray the company as a successful enterprise and, consequently, to pursue activities and investments that ultimately contributed to Enron's accumulating losses. My analysis indicates that, had the economic content of the

masking transactions been unmasked, Enron's financial difficulties would have been resolved at a much earlier date (e.g., through bankruptcy, acquisition, reorganization, and/or replacement of management), and Enron's losses and the harm to creditors would have been much smaller. The result would have been that fewer creditor claims would have been incurred and unpaid, and those creditor claims that would have been incurred nonetheless would have received a greater percentage recovery. My analysis indicates that the results would be qualitatively similar if only the Complaint transactions, or only the Citigroup transactions, were unmasked.

(15)  Second, because the Complaint transactions subverted market monitoring through deception, the resulting harm to the estates and creditors was, at a general level, reasonably foreseeable to any party with even limited knowledge of the deception. Preventing market participants and monitors from taking steps to discipline—and potentially replace—corporate managers in the event they perform poorly or act irresponsibly leads predictably to value destruction. Allowing managers of a financially troubled company to operate without the external imposition of discipline leads predictably to excessive risk taking and value destruction. Allowing managers of a company to hide underperforming assets leads predictably to excessive risk taking and value destruction. Further, permitting a company to operate without the imposition of discipline after deceiving investors leads predictably to excessive risk taking and value destruction. Each of these forms of misconduct and interference with market discipline leads predictably to value destruction and to an increased risk that creditor claims will be unpaid or not paid in full.

(16)  Third, my analysis yields the following calculations of total damages:

   ▪  The total harm that would have been avoided but for the effects of the masking transactions, when measured from the earliest date at which damages could have been incurred (which I assume to be December 31, 1997) is $18.0 billion for the consolidated Enron Corp., or $11.6 billion for ENA and $33.3 billion for ENE.[3]

   ▪  The total harm that would have been avoided but for the effects of the masking transactions, when measured from the latest date by which unmasking all the transactions would more likely than not have forced Enron into early resolution based on the precipitating intervention of just one set of market monitors, the credit rating agencies (which I show to be June 30, 1999), is $17.1 billion for the consolidated Enron Corp., or $9.7 billion for ENA and $29.8 billion for ENE.

--------

[3]  In Section VIII, I explain how it is possible for a single debtor entity to have greater damages than the entire consolidated Enron Corp., and why the sum of the damages of each debtor on a stand-alone basis is greater than the damages of Enron Corp. as a consolidated company.

- ▪ The total harm that would have been avoided but for the effects of only Citigroup's masking transactions, when measured from the latest date by which unmasking Citigroup's transactions would more likely than not have forced Enron into early resolution based on the precipitating intervention of the credit rating agencies (which I show to be December 31, 2000) is $5.4 billion for the consolidated Enron Corp., or $4.1 billion for ENA and $13.3 billion for ENE.

(17)    Fourth, for reasons detailed in Sections V and VI of this report, these damages figures are conservative, meaning that they tend to understate the likelihood of harm and the damages suffered by the company, the estates, and the creditors resulting from the transactions.

(18)    Fifth, economic principles provide an objective, reasoned basis for apportioning damages across transactions. In particular, damages can be divided in proportion to each transaction's causal incremental contribution to the total harm. Applying these principles, I have determined the damages associated with each masking transaction. I have also determined the total damages associated with the masking transactions in which each Defendant participated. My allocation of damages to Enron's estate appears in Section VII, and my allocation of damages to ENA's estate appears in Section VIII.

- ▪ If Citigroup and BT Deutsche are each responsible for only an apportioned share of the avoidable harm based on the incremental contributions of the specific transactions in which each allegedly participated, measured from December 31, 1997, Citigroup's damages are $4.5 billion for the consolidated Enron Corp., or $ 3.0 billion for ENA and $8.8 billion for ENE; BT Deutsche's damages are $388 million for the consolidated Enron Corp., or $236 million for ENA and $680 million for ENE.

- ▪ If Citigroup and BT Deutsche are each responsible for only an apportioned share of the avoidable harm based on the incremental contributions of the specific transactions in which each allegedly participated, measured from June 30, 1999 (the date by which unmasking all transactions would more likely than not have caused the rating agencies to force Enron into early resolution), Citigroup's damages are $4.3 billion for the consolidated Enron Corp., or $2.5 billion for ENA and $7.8 billion for ENE; BT Deutsche's damages are $368 million for the consolidated Enron Corp., or $197 million for ENA and $608 million for ENE.

(19)    Sixth, my analysis of the deficiency balance at various points in time allows a determination of damages to the estate and creditors at any point in time when discipline might have been imposed on the decisions of Enron's managers.

(20)    Seventh, the method I have developed would allow me to compute and apportion damages based on the addition or elimination of transactions.

## II.3. Other preliminary matters

(21)    A complete list of all materials I relied upon in the preparation of this report appears in Appendix B. Naturally, I have also relied on a multitude of materials that I have reviewed over the many years of my training and practice as an economist. The list in Appendix B is necessarily limited to those materials I examined subsequent to and as a result of my retention in this matter.

(22)    I was instructed by counsel to treat as accurate specific categories of data and information provided by the Enron estate, including amounts of bankruptcy recoveries, the values of claims against the estate, and the meaning of specific entries in Enron's Hyperion accounting system. My analysis does not assume that any public disclosures of Enron's financial results prior to bankruptcy were accurate

(23)    In addition, I relied on plaintiffs' accounting experts' reports for an understanding of the masking transactions they analyzed and on the Enron Examiner's report for an understanding of other masking transactions. As described below, I relied on asset values appearing in the expert report prepared by Thomas M. Blake of CRA International, Inc. (the "Blake Report") as well as principal and interest schedules associated with certain masking transactions.[4] I also took into account the opinion of Dr. John Parsons in understanding the consequences to Enron of a downgrade to a credit rating below investment grade. I relied on trained accountants on my staff to adjust Enron's financial statements to reflect the true economic substance of each of the masking transactions.

(24)    I reserve the right to amend this report in the following ways:

   ▪ To replace interim estimates with final calculations

   ▪ To reflect additional research or analyses completed by the other experts after this report was filed

   ▪ To reflect additional transactions that may be identified by the parties or their experts that would affect the calculation of damages or the apportionment of liability

   ▪ To reflect continuing analysis

(25)    My fees for this engagement are based on my normal hourly billing rate, and are not contingent or dependent in any way upon my findings. My billing rate in this matter is $750 per hour. Bates

---

[4]    Expert Report of Thomas M. Blake, submitted April 6, 2007.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Summary

White, LLC, provided research assistance in the preparation of this report. The rates for personnel assigned to this engagement range from $125 to $750 per hour.

Expert Report of B. Douglas Bernheim, Ph.D.

# III. Factual background

## III.1. The scope of Enron's operations

(26)    In this section, I provide context for my analysis of damages by briefly reviewing some salient aspects of Enron's history and operations.

(27)    Enron evolved from the 1985 merger of two natural gas companies: Omaha-based InterNorth and Houston Natural Gas. The business operations of the combined entity were largely based on interstate gas pipelines. In 1989, Enron described itself somewhat more broadly as

> an integrated natural gas company . . . principally engaged in the gathering, transportation and wholesale marketing of natural gas to markets throughout the United States through 38,000 miles of natural gas pipelines, the exploration for and production of natural gas and crude oil in the United States and internationally, the production, purchase, transportation and worldwide marketing of natural gas liquids, crude oil and refined petroleum products, and the production and sale of cogenerated steam and electricity.[5]

(28)    By the end of the 1990s, Enron had undergone a significant transformation with respect to both scale and scope. In principle, one can categorize its operations in a variety of different ways, and indeed the name, number, and composition of its business units changed considerably over time. For the purpose of this discussion, I will divide the company into wholesale and retail operations.

### III.1.1. Enron's wholesale operations

(29)    Enron's wholesale operations primarily involved the production, procurement, transportation, storage, and/or sale (to parties other than end users) of energy commodities, including gas, electrical power, crude oil, coal, and the like, as well as ancillary services related to these commodities. Over the decade prior to its bankruptcy, Enron branched out into many other commodities and related services.

(30)    Roughly speaking, one can divide Enron's wholesale enterprise into physical operations (involving activities such as generation, transportation, and storage), and financial operations (involving aspects of commodity sales and service). However, as discussed below, particular physical and financial services often complemented each other.

---

[5]    Enron Corp., 1989 Form 10-K, at 1 (March 29, 1990).

(31)    The 1990s saw a dramatic expansion of Enron's investment in physical operations. These investments included many large-scale construction projects and the acquisitions of existing utility companies outside the United States. Some notable examples include the construction of a large, gas-fueled power plant in Dabhol, India, starting in 1992; the construction of a 1,875 megawatt gas turbine plant in Teesside, England, which became operational in 1993;[6] and the 1998 acquisition of Wessex Water in the United Kingdom, which became the core holding of Enron's new Azurix water subsidiary.[7] Enron's Annual Report for 1999 noted that the company was developing wholesale energy networks throughout the world and that it was focusing on India, South America, Asia Pacific/Africa/China, and Caribbean/Middle East. The company had numerous such projects underway in every market.[8]

(32)    Following deregulation of the natural gas industry in the 1980s, gas price volatility increased considerably. The challenges this created for producers translated into opportunities for Enron. In 1989, Enron created the "Gas Bank," which was a program "to acquire long-term supplies [of gas] with which to serve firm, long-term markets."[9] Under this program, Enron "contracted for gas in several ways, including not only traditional long-term gas purchase contracts, but also through the acquisition of working interests in producing properties, prepaying for secured long-term supplies and dedications, and other innovative transactions."[10]

(33)    Through these "innovative transactions," Enron created customized arrangements with buyers and sellers to ensure steady supplies of gas, predictable pricing, hedging, and other services. By 1991, Enron's 10-K described "the non-price regulated purchasing and marketing of long-term natural gas commitments," including transactions intended to provide predictable prices and supplies, as one of the company's "principal" activities.[11] That year, Enron created Enron Gas Services (EGS) "to expand the range of Enron's non-price regulated natural gas merchant services."[12] Due to the emergence of markets for natural gas forwards and futures contracts, EGS was able to create "more significant offerings of price risk management services common to other commodities."[13] The various subsidiaries of EGS engaged in a range of trading activities designed to meet different market needs. One of these, Enron Risk Management Services Corp.,

---

[6]    Enron Corp., 1997 Annual Report, at 20.

[7]    Enron Corp., 1998 Annual Report, at 4.

[8]    Enron Corp., 1999 Annual Report, at 7, 10–11.

[9]    Enron Corp., 1989 Form 10-K, at 12–13 (March 29, 1990).

[10]    Ibid., at 13.

[11]    Enron Corp., 1991 Form 10-K, at 1 (March 27, 1992).

[12]    Ibid., at 10.

[13]    Ibid., at 10.

provided "physical and financial price risk management for short and long-term commitments" and "consolidate[d] Enron's role in all phases of price risk management for the natural gas industry."[14] Another EGS subsidiary, Enron Finance Corp., provided gas producers with funding for production in exchange for supply commitments that Enron used to balance out its long-term sales commitments. This funding was secured by an interest in the producer's gas reserves.[15]

(34)    Fueled by the growth of its energy trading activities, by 1997 (if not earlier) Enron emerged as the largest wholesaler of natural gas in North America.[16] Domestically, EGS evolved into Enron Capital and Trade Resources, and then into Enron North America. Other entities, such as Enron Europe, were formed to conduct similar activities internationally. In 2000, Standard & Poor's noted that "Enron has created a powerhouse North American wholesale energy marketing operation, which it is duplicating in Europe and Latin America."[17] S&P attributed the growth and success of Enron's wholesale operations to its "expertise in commodity marketing and derivatives, risk management, and the company's global leadership in energy infrastructure and operation."[18]

(35)    During the 1990s, Enron's wholesale group entered into increasingly diverse and complex contracts and trades that exposed the company to escalating levels of financial risk. The company increasingly played the role of a "market maker." Enron actually took one side of many transactions rather than merely facilitating deals between third parties.[19] Enron expanded its trading activities beyond natural gas, into electrical power, crude oil, coal, steel, liquids, metals, newsprint, and a multitude of other financial instruments—even some related to weather conditions. Enron also increasingly traded "exotic financial instruments such as fixed-price forward purchase and sales contracts, futures, options, and swaps," which S&P said "involve an inherently high level of risk and also leave the company exposed to risk of losses from unauthorized or fraudulent trading activities."[20] In late 1999, Enron introduced a Web-based trading platform called EnronOnline. Enron acted as the buyer or seller (that is, as market maker)

---

[14]   Ibid., at 10.

[15]   Ibid., at 10–11.

[16]   Enron Corp., 1997 Annual Report, at 19 (attributing Enron's success in the wholesale market to its ability to combine "commodity market expertise with a vast physical delivery network and substantial investments in systems and processes that mitigate risk," i.e., its trading systems).

[17]   S&P RatingsDirect, "Research: Enron Corp.," September 11, 2000, 5, ANARPT009605–614.

[18]   Ibid.

[19]   Moody's characterizes market-making as the highest risk trading strategy. Moody's Investors Service, "Refining Our Approach: Rating Energy Trading Companies," May 2001, 4, CSFBLLC006887723–732.

[20]   S&P RatingsDirect, "Research: Enron Corp.," September 11, 2000, 5, ANARPT009605–614.

on every EnronOnline transaction.[21] One year later, Enron touted EnronOnline as the world's largest Web-based e-commerce system, with more than half a million executed transactions involving 1,200 different products.[22]

(36)    In many cases, Enron's physical and financial wholesale operations were closely related. When Enron intended to enter a market as a trader, it frequently made substantial investments in physical assets. Through these investments, Enron expected to acquire the knowledge and relationships necessary for trading specific commodities, particularly those that were far removed from the company's traditional areas of expertise.

(37)    With the creation of Enron Communications in 1998, the company expanded its wholesale operations into broadband services. The objective of this unit, renamed Enron Broadband Services (or EBS) in 1999, was to build "a long-haul fiber-optic network on strategic routes throughout the U.S. to create the nation's first Pure IP(sm) (Internet Protocol) backbone," which was known as the Enron Intelligent Network. By year-end 1999, Enron owned or had contractual access to some 14,000 miles of fiber in the United States that connected "most major U.S. cities." EBS planned to offer "bandwidth on demand . . . for delivering data, applications and streaming rich media to the desktop" including video and other entertainment.[23] A year later, the company described EBS as "a unique, single source for every broadband service" and touted EBS's "instant credibility" in the communications industry.[24]

(38)    Enron characterized EBS as both a telecommunications services company and a trading company—one that treated bandwidth as a tradable commodity like gas or electric power. "Similar to its wholesale energy businesses, Enron acts as principal in its bandwidth transactions and makes markets for bandwidth capacity. Enron aggregates bandwidth supplies from multiple counterparties and, from its portfolio of bandwidth contracts, provides flexible, low cost bandwidth management products to its customers."[25]

---

[21]    EnronOnline "is what is called a 'principal-intermediated' model in which Enron acts as the principal. In other words, rather than striking deals among themselves willy-nilly through an Enron Website, every buyer and seller participating in EnronOnline has to accept Enron as its direct counterparty—i.e., as the seller or the buyer." "A matter of principals," *Economist*, June 28, 2001, http://www.economist.com/opinion/PrinterFriendly.cfm?story_id=674210.

[22]    Enron Corp., 2000 Annual Report, at 3.

[23]    Enron Corp., 1998 Form 10-K (March 31, 1999).

[24]    Enron Corp., 1999 Annual Report, at 14.

[25]    Enron Corp., 1999 Form 10-K (March 30, 2000).

(39)    Enron completed its first bandwidth trade in December 1999 and offered an optimistic near-term forecast: "In 2000 we know that bandwidth trading will gain acceptance in the market, and by 2001 we believe the market will reach critical mass."[26] The tone of the company's 10-K filing was more cautionary, however: "There can be no assurance that such a market [for bandwidth] will develop."[27] The market for bandwidth in fact did not develop as predicted, and Enron was unable to resolve technical barriers to the provision of some advanced services. The company's Q2 2001 Form 10-Q reported a $102 million quarterly loss for broadband (compared with an $8 million loss in Q2 2000), noted "slower market development" and "lower revenue outlook" than anticipated, and foresaw that losses were likely to continue through "at least 2001."[28]

### III.1.2. Enron's retail operations

(40)    Enron's 1997 acquisition of Portland General Electric (PGE), a regulated electric utility, signaled the company's entry into the U.S. retail energy market.[29] Enron claimed that the acquisition of PGE gave it "insight into developing electricity markets" and "credibility to participate in the markets."[30] Enron conducted its retail energy operations through a separate business unit, Enron Energy Services (EES), which was formed in 1997 shortly after the PGE acquisition.[31] The purpose of EES was to market energy directly to end users in deregulated markets and offer unregulated products and services to commercial and industrial customers in regulated markets. EES typically offered highly customized bundles of services tailored to customers' particular needs. For example, Enron's 1997 Annual Report describes a customized four-year energy commodity and services agreement with Pacific Telesis Group.[32] Among other things, EES offered energy efficiency and power quality services, cost reduction projects, remote metering, billing, and customer service.[33] During 1997, Enron sold a 7% stake in EES for $130 million.[34]

---

[26]    Enron Corp., 1999 Annual Report, at 15.

[27]    Enron Corp., 1999 Form 10-K (March 30, 2000).

[28]    Enron Corp., Q2 2000 Form 10-Q (August 14, 2000).

[29]    Enron Corp., 1998 Annual Report, at 10 (describing PGE as a "platform for participation in the deregulating U.S. power industry"). Enron also noted PGE's "valuable expertise in evaluating regional electric distribution assets that complement Enron's strategy." Ibid.

[30]    Enron Corp., 1999 Annual Report, at 4.

[31]    Enron did, however, use the acquisition of PGE to help advance the cause of deregulation, a key component of its retail strategy. Just three months after the June 1, 1997, acquisition, PGE filed a plan with the Oregon Public Utility Commission to allow all of its customers to choose their electricity provider. S&P RatingsDirect, "Research: Portland General Electric Proposes Disaggregation Plan," September 3, 1997, ANARPT009223.

[32]    Enron Corp., 1997 Annual Report, at 26.

[33]    Ibid., at 26, 29.

Expert Report of B. Douglas Bernheim, Ph.D.                    Factual background

### III.1.3. Enron's evolution

(41)    During the 1990s, rapid growth of the "New Enron" (primarily trading, retail services, international investments, and broadband operations), combined with more modest growth of the "Old Enron" (pipeline operations), significantly altered the company's composition. Enron summarized this transition in its Annual Report for 2000—the last one it prepared:

> Enron hardly resembles the company we were in the early days. During our 15-year history, we have stretched ourselves beyond our own expectations. We have metamorphosed from an asset-based pipeline and power generating company to a marketing and logistics company whose biggest assets are its well-established business approach and its innovative people.[35]

(42)    As Exhibit 1 shows, between 1993 and 2000, Enron's domestic pipeline operations—its "core" business—grew at a respectable rate, but these operations were far outpaced by the growth of its other domestic activities (primarily trading, retail, and broadband) and its international ventures.

---

[34]    Ibid., at 29.

[35]    Enron Corp., 2000 Annual Report, at 4–5.

Expert Report of B. Douglas Bernheim, Ph.D.                    Factual background

**Exhibit 1: Enron's self-reported performance by business unit, 1993–2000 ($ million)**

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | CAGR |
|---|---|---|---|---|---|---|---|---|---|
| **Domestic transportation & distribution** | | | | | | | | | |
| Revenues | 1,466 | 976 | 831 | 806 | 1,416 | 1,849 | 2,032 | 2,955 | **11%** |
| Earnings | 382 | 403 | 359 | 570 | 580 | 637 | 685 | 732 | **10%** |
| **Domestic trading and other** | | | | | | | | | |
| Revenues | 6,624 | 6,977 | 7,269 | 10,858 | 16,659 | 23,668 | 28,684 | 77,031 | **42%** |
| Earnings | 316 | 359 | 344 | 332 | 766 | 403 | 592 | 2,014 | **30%** |
| **International** | | | | | | | | | |
| Revenues | 914 | 1,380 | 1,334 | 2,027 | 2,945 | 6,013 | 9,936 | 22,898 | **58%** |
| Earnings | 134 | 189 | 196 | 300 | (36) | 574 | 722 | 351 | **15%** |
| **Stock performance** | | | | | | | | | |
| Enron | 25% | 5% | 25% | 13% | (4%) | 37% | 56% | 87% | **28%** |
| S&P 500 | 7% | (2%) | 34% | 20% | 31% | 27% | 20% | (10%) | **16%** |
| **Major events** | | | | | | | | | |
| | Teesside opens | Begins electric power trading | | Dabhol construc-tion begins | Acquires PGE | Acquires Wessex Water | Creates Enron Online | Trading contracts double; CA Energy crisis | |

Sources: Performance data from Enron 10-K reports; stock price data from Thomson Financial
Note: Compounded annual growth rate (CAGR) is for the seven-year period 1994–2000. All figures presented as originally reported by the company (i.e., not unmasked). Earnings are shown before subtracting out interest and taxes (i.e., on EBIT basis).

## III.2. Chronology of events surrounding Enron's bankruptcy

### III.2.1. Events leading up to the fall of 2001

(43)   Exhibit 2 depicts the rise and fall of Enron's market capitalization between 1996 and 2001. The value of Enron's common stock reached an all-time high of $90.00 in late August 2000 and pushed Enron's market capitalization to over $65 billion.[36] Based on revenues in the year 2000, Enron was ranked seventh on the Fortune 500 list of largest U.S. companies.[37] Yet by year-end 2001, Enron's market capitalization was negligible.

---

[36]   Based on 739 million shares outstanding on July 31, 2000, as reported in Enron Corp.'s Q2 2000 Form 10-Q, daily closing stock price on August 23, 2000, from Thomson Financial.

[37]   "The 500 Largest U.S. Corporations," *Fortune*, April 16, 2001, F-1.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Factual background

**Exhibit 2: Enron market capitalization, 1996–2001 ($ billion)**



Sources: Data from Thomson Financial.

(44)   Exhibit 3 plots Enron's share price and the S&P 500 index between June 2000 and December
       2001. For six months after it reached its peak, Enron's share price tracked the S&P index
       reasonably closely; Enron's shares declined 19.8% compared to 16.8% for the index.[38] However,
       the index began outperforming Enron's stock by a wide margin early in 2001.

---

[38]   Calculated using Thomson Financial data, between August 23, 2000, when Enron reached its all-time high closing
       share price of $90.00 and six months (131 trading days) later, on February 22, 2001.

19

Expert Report of B. Douglas Bernheim, Ph.D.                    Factual background

**Exhibit 3: Enron stock price and S&P 500 index, 1 Jul 2000–31 Dec 2001**



Sources: Data from Thomson Financial.

(45)    Enron's poor performance during the next six months reflected a number of adverse
developments, including the following:

- Early 2001—A broadband deal with Blockbuster collapsed, as did Enron's power generation
  project in Dabhol, India.

- April 2001—Enron disclosed that it was owed $570 million by the bankrupt California
  utility, Pacific Gas & Electric Co.

- August 2001—Jeffrey Skilling resigned as Enron's CEO.

- August 2001—The broadband division reported losses of $137 million for the first six
  months of the year, compared with an $8 million loss in the first half of 2000.[39]

---

[39]    Enron Corp., Q2 2001 Form 10-Q (August 14, 2001).

- Third Quarter 2001—Declines in the share prices of New Power Holdings and Enron compelled Enron to terminate the Raptor structures, recognizing a $1.2 billion reduction in shareholders' equity and notes receivable.[40]

### III.2.2. The fall of 2001

(46)   During the fall of 2001, Enron spiraled into bankruptcy. Exhibit 4 depicts the company's declining share price and identifies some key dates.

**Exhibit 4: Enron's stock price and key events, 1 Oct 2001 – 31 Dec 2001**



Sources: Data from Thomson Financial and news outlets as noted above.

(47)   The following is a brief chronology of Enron's demise:

---

[40]   Enron Corp., Q3 2001 Form 10-Q (November 19, 2001).

**October 16, 2001:**

- Enron announced that it was taking "after-tax non-recurring charges" of $1.01 billion in the third quarter, including the following:

    - A $287 million write-down of its investment in Azurix

    - A $180 million charge associated with the "restructuring" of Enron Broadband Services

    - A $544 million charge "related to losses associated with certain investments, principally Enron's interest in The New Power Company ("New Power Company"), broadband and technology investments, and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity"[41]

- The write-downs resulted in a Q3 2001 loss of $618 million, compared to reported net income of $404 million for Q2 2001 and $292 million for Q3 2000.[42]

- Moody's placed all of Enron's long-term debt on review for downgrade and identified a number of areas that it planned to scrutinize in the coming weeks. These areas included (1) Enron's strategic direction, (2) the earnings and cash flow prospects of Enron's wholesale gas and electricity operations, (3) Enron's responses to problems such as the collapse of the Dabhol project, (4) exposures related to the California energy markets, (5) restructuring efforts, and (6) the potential for further asset write-downs.[43]

- Enron's stock price closed at $33.84, which was 60% below its 52-week high of $84.63.[44]

**October 17, 2001:**

- Enron announced that it was repurchasing 55 million common shares as part of the process of "unwinding" its positions in "a series of complex transactions with an investment vehicle connected" to CFO Andrew S. Fastow (referring to the Raptors). The $1.2 billion shareholder

---

[41] Enron Corp., "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; And Expands Financial Reporting", news release, October 16, 2001.

[42] Ibid.

[43] Moody's Investors Service Rating Action, "Moody's Places All Long Term Debt Obligations of Enron Corp on Review for Downgrade; Senior Unsecured at Baa1," October 16, 2001, ANARPT009109–111; Moody's Investors Service Rating Action, "Correction to Text: Moody's Places All Long Term Debt Obligations of Enron Corp on Review for Downgrade; Senior Unsecured at Baa1 (Commercial Paper P-2 Confirmed, Not On Review)," October 16, 2001, ANARPT009107–108.

[44] Thomson Financial; Enron's stock closed at $84.625 on December 28, 2000.

equity reduction had not been disclosed in the previous day's earnings release but surfaced in a call with analysts. The *Wall Street Journal* quoted an analyst saying that a large reduction of equity and the corresponding negative impact on the company's debt-to-equity ratio could be "a flag for the rating agencies."[45]

**October 22, 2001:**

- Enron announced that the Securities Exchange Commission (SEC) was launching an informal investigation of the partnerships created by Fastow.[46]

- A shareholder filed suit against the company alleging breach of fiduciary duty in connection with the partnerships.[47]

- Enron's stock price fell more than 20% to close at $20.65.[48]

**October 23, 2001:**

- The *Wall Street Journal* reported that some of Enron's transactions had "double trigger provisions;" e.g., the transaction known as Marlin Water Trust II provided that Enron would be in default if (a) its stock price fell below $34.13 for three trading days, and (b) its credit rating fell below investment grade.[49]

- In an interview with the *Wall Street Journal*, Treasurer Ben Glisan acknowledged that in order to meet obligations maturing over the next 20 months, Enron might have to pay hundreds of millions of dollars to various investment vehicles it had created. The company would attempt to meet the obligations by selling assets, but Glisan admitted it might be necessary to issue additional equity, which would dilute the interests of current shareholders.[50]

---

[45] Rebecca Smith and John R. Emshwiller, "Partnership Spurs Enron Equity Cut—Vehicle is Connected to Financial Officer," *Wall Street Journal*, October 18, 2001, quoting Jeff Dietret, an analyst for Simmons & Co. in Houston. The "investment vehicle" referenced was LJM2 Co-Investment LP, a limited partnership created and run by Fastow.

[46] Rebecca Smith and John R. Emshwiller, "SEC Seeks Information on Enron Dealings With Partnerships Recently Run by Fastow," *Wall Street Journal*, October 23, 2001.

[47] Dow Jones News Service, "Enron Faces Holder Suit From Fincl Chief Pacts," October 22, 2001, 3:45 p.m.

[48] Thomson Financial.

[49] Rebecca Smith and John R. Emshwiller, "SEC Seeks Information on Enron Dealings With Partnerships Recently Run by Fastow," *Wall Street Journal*, October 23, 2001.

[50] Rebecca Smith and John R. Emshwiller, "Enron May Issue More Stock to Cover Obligations," *Wall Street*

Expert Report of B. Douglas Bernheim, Ph.D.                     Factual background

- During a conference call, investors asked Enron Chief Executive Officer Kenneth L. Lay and other officers about some of the investment vehicles identified by the *Wall Street Journal* (including the Marlin Water Trust II and Whitewing entities) and expressed frustration with the complexity of the deals.[51]

### October 24, 2001:

- Enron announced that Fastow was taking a "leave of absence" and would be replaced with Jeff McMahon.[52]

- Fitch Ratings put Enron on review for possible downgrade.[53]

- Prudential cut its rating of Enron's common stock to "Sell."[54]

- Dow Jones noted that "[o]ver the past week, a steady flow of negative news about the company has increased doubts about management's credibility. In addition, the sense that more bad news is still lurking amid Enron's web of off-balance sheet financing vehicles is palpable among investors."[55]

- Enron shares fell more than 17% to close at $16.41.[56]

### October 25, 2001:

- S&P changed Enron's long-term outlook to negative, but it maintained the company's rating at BBB+ in anticipation of Enron strengthening its balance sheet with asset sales. S&P warned that Enron's credit quality could erode "as investor confidence in the company's management has waned" and as "concerns have arisen" regarding the long-term effects of

---

*Journal*, October 24, 2001.

[51] Christina Cheddar, "Enron CFO: Company Has Sufficient Liquidity," Dow Jones News Service, October 23, 2001, 9:45 a.m.

Rebecca Smith and John R. Emshwiller, "Enron May Issue More Stock to Cover Obligations," *Wall Street Journal*, October 24, 2001 ("During the conference call, analysts—even some who have been longtime Enron fans—challenged executives about the Fastow partnership arrangement and the company's often opaque financial reports. 'There's the appearance you are hiding something,' said Goldman Sachs analyst David Fleischer.")

[52] Enron Corp., "Enron Names Jeff McMahon Chief Financial Officer," news release, October 24, 2001.

[53] Dow Jones News Service, "Enron Draws Down Credit Facility," October 25, 2001, 7:27 p.m.

[54] Maxwell Murphy, "LATE TRADING: Enron Continues To Be Pounded By Investors," Dow Jones News Service, October 29, 2001, 5:45 p.m.

[55] Christina Cheddar, "In Another About-Face, Enron Taps McMahon As CFO," Dow Jones News Service, October 24, 2001, 5:57 p.m.

[56] Thomson Financial.

recent troubles on Enron's marketing and trading operations. S&P warned that it would issue a downgrade if Enron were unable or unwilling to "restore the balance sheet through sales proceeds and new equity issuances."[57]

- Enron drew down an amount initially thought to be over $1 billion (later revealed as $3 billion) on its committed lines of credit to meet short-term liquidity needs.[58, 59] The company appears to have used nearly $2 billion to pay off its outstanding commercial paper debt. Ronald Barone of S&P said he believed that Enron was having difficulty "rolling over" its commercial paper.[60]

- The "spread" between the prices of Enron's bonds and government bonds was described as "more characteristic of a junk bond with a credit rating of single B or lower."[61]

**October 29, 2001:**

- The *Wall Street Journal* reported that Enron was negotiating with its banks to borrow another $1–2 billion to "head off a potentially devastating loss of investor and business confidence" and that the banks were demanding stricter covenants than in the past.[62]

- Moody's downgraded Enron's senior unsecured long-term debt from Baa1 to Baa2, and kept the company on review for possible further downgrade. Moody's said that the downgrade was "prompted by the deterioration in Enron's financial flexibility" that had occurred since the October 16 announcements and which led to "substantial loss in investor confidence." This, in turn, had caused the company's stock to lose more than half its value and impaired the company's ability to issue additional commercial paper. Moody's described the areas it would review. These included Enron's success in arranging for more "liquidity support" and maintaining good credit with counterparties, which were described by Moody's as "critical"

---

[57]  S&P RatingsDirect, "Research: Ratings on Enron Corp. Affirmed; Outlook to Negative," October 25, 2001, ANARPT009837–838.

[58]  Dow Jones News Service, "Enron Draws Down Credit Facility," October 25, 2001, 19:27.

[59]  John R. Emshwiller, Rebecca Smith, and Jathon Sapsford, "Enron Taps $3 Billion From Bank Lines In Pre-Emptive Move to Ensure Liquidity—Firm Will Pay Debt, Keep Cash Cushion," *Wall Street Journal*, October 26, 2001.

[60]  Jathon Sapsford and John Emshwiller, "Enron Discusses Credit Line of $1 Billion to $2 Billion With Banks," *Wall Street Journal*, October 29, 2001.

[61]  "Enron Draws Down Credit Facility," Dow Jones News Service, October 25, 2001, 19:27, quoting the *Wall Street Journal*.

[62]  Jathon Sapsford and John Emshwiller, "Enron Discusses Credit Line of $1 Billion to $2 Billion With Banks," *Wall Street Journal*, October 29, 2001.

to Enron's wholesale business. Moody's also expressed its intention to review Enron's off balance sheet transactions "to ascertain the extent to which the company will be able to meet any shortfalls with equity or with additional debt."[63]

- Enron shares closed at $13.81, down more than 10%.[64]

## October 31, 2001:

- Enron announced that its Board of Directors had formed a Special Investigative Committee to examine Enron's transactions with related entities.[65]

- Enron President Gregory Whalley and Chief Financial Officer Jeffrey McMahon visited S&P "to present a plan to resuscitate Enron's financial fortunes and stabilize its credit rating," but S&P was "unconvinced."[66]

- Enron disclosed that the SEC changed the status of its inquiry to that of a formal investigation.[67]

## November 1, 2001:

- S&P downgraded Enron from BBB+ to BBB based on its conclusion that the company was unlikely to be able to restore its long-term credit quality to BBB+ levels. The downgrade was said to reflect a "crisis of investor confidence" that could be traced to Enron's "inability to calm investors that are unsure about the strength of Enron's core energy marketing business and the viability of the company's plan to restore its credit profile." S&P also placed Enron on "CreditWatch Negative." This action reflected uncertainty regarding "further unanticipated events in the capital markets." S&P noted that its long-term outlook for Enron would be based on its review of, among other things, the willingness of counterparties to

---

[63]   Moody's Investors Service Rating Action, "Moody's Downgrades Enron Corp Long Term Debt Ratings (Senior Unsecured To Baa2) And Keeps Them Under Review For Downgrade; Places Enron's P-2 Commercial Paper Rating On Review For Downgrade," October 29, 2001.

[64]   Thomson Financial.

[65]   Dow Jones News Service, "Enron Names Special Committee To Examine Transactions," October 31, 2001, 5:23 p.m.

[66]   Senate Committee on Governmental Affairs, *Rating The Raters: Enron and the Credit Rating Agencies: Hearing Before the Senate Committee on Governmental Affairs*, 107th Congress, 2d session, March 20, 2002, (testimony of Ronald Barone, Managing Director, Standard & Poor's), 13.

[67]   Enron Corp., "Enron Elects William Powers, Jr. to Board of Directors and Establishes Special Committee to Examine Related Party Transactions; SEC Changes Inquiry to Formal Investigation," news release, October 31, 2001.

trade with Enron; Enron's ability to secure additional bank financing and other short-term liquidity support; Enron's success in restoring investor confidence, which would have to include "full, frank disclosure and discussion of [its] business and financial issues;" the effectiveness of asset sales and equity infusions in strengthening Enron's balance sheet; and Enron's ability to maintain a strong "core energy marketing business."[68]

▪ Enron closed at $11.99 per share.[69]

### November 5, 2001:

▪ The *Wall Street Journal* reported that Enron's Chewco transaction raised "new questions" about Enron's dealings with its management. The newspaper reported that Enron paid $35 million to Chewco in March for consideration its reporters could not identify and that Michael Kopper, an associate of Fastow, was the officer involved in the transaction. The *Wall Street Journal* suggested that Chewco was created to avoid consolidating Enron's interest in the JEDI partnership and wrote, "available information on the chain of transactions raises questions about how separate JEDI and Chewco really were from Enron and whether JEDI's assets and liabilities should have been folded into the company's financial statements."[70]

▪ Fitch Ratings downgraded Enron to BBB- and put the company on review for further downgrade.[71]

### November 7, 2001:

▪ The *Wall Street Journal* reported that Dynegy was in advanced discussions to invest $2 billion in Enron and might possibly acquire the company.[72]

▪ The news failed to halt the decline in Enron's share price, which closed at $9.05.[73]

---

[68] S&P RatingsDirect, "Research: Enron Corp.'s Ratings Lowered, Placed in CreditWatch Negative," November 1, 2001, ANARPT009839–841.

[69] Thomson Financial.

[70] John R. Emshwiller, "Enron Transaction Raises New Questions—A Company Executive Ran Entity That Received $35 Million in March," *Wall Street Journal*, November 5, 2001.

[71] Christina Cheddar, "Enron Credit Web Site Lists No Rating For Enron Corp.," Dow Jones News Service, November 5, 2001, 5:54 p.m.

[72] Robin Sidel, "WSJ: Dynegy In Talks To Put About $2B Into Enron Now," Dow Jones News Service, November 7, 2001, 1:57 p.m.

[73] Thomson Financial.

**November 8, 2001:**

▪  The *Wall Street Journal* reported that Dynegy was negotiating to acquire Enron for $7-8 billion in stock and that the deal was to include an immediate $1.5 billion cash infusion.[74]

▪  Enron announced its intention to restate its financial results for 1997 through 2000 and for the first two quarters of 2001. This reduced previously reported net income by $586 million. Enron attributed the restatements to a limited set of transactions involving the Chewco, JEDI and LJM1 entities.[75]

▪  Moody's informed Enron of its intention to downgrade Enron from Baa2 to Ba2, but it agreed to reconsider the impact of the potential Dynegy merger on Enron's creditworthiness.[76]

▪  Enron closed at $8.41 per share.[77]

**November 9, 2001:**

▪  Moody's lowered Enron's long-term debt rating from Baa2 to Baa3, kept it under review for possible further downgrade, and lowered Enron's short-term debt rating to "Not Prime." Moody's again cited Enron's "reduced financial flexibility as a result of a substantial loss of investor confidence." Moody's warned of significant debt maturities in the near term and potentially higher margin requirements for its wholesale trading operations. Moody's praised Enron's "well-established wholesale trading franchise" and regulated pipeline businesses, but it warned that the company might not retain investment grade status without a "substantial near-term injection of equity capital." This was an apparent reference to the company's negotiations with Dynegy.[78]

▪  S&P downgraded Enron from BBB to BBB- in light of the previous day's restatement of earnings and kept the company on CreditWatch for further downgrade. According to S&P,

---

[74]  Robin Sidel and Rebecca Smith, "Dynegy Is in Talks on Purchasing Enron—Deal Would Include Infusion Of Cash to Aid Company In Shoring Up Finances," *Wall Street Journal*, November 8, 2001.

[75]  Enron Corp., Form 8-K (November 8, 2001). John R. Emshwiller, Rebecca Smith, Robin Sidel and Jonathan Weil, "Enron Slashes Profits Since 1997 by 20%—Partnership Dealings Cited As Dynegy Talks Go On; Debt Ratings an Issue," *Wall Street Journal*, November 9, 2001.

[76]  Senate Permanent Subcommittee on Investigations, *The Role of Financial Institutions in Enron's Collapse: Hearing Before the U.S. Senate Permanent Subcommittee on Investigations*, 107th Congress, 2d session, July 23, 2002, (testimony of John Diaz, Managing Director, Moody's Investors Service), 10.

[77]  Thomson Financial.

[78]  Moody's Investors Service Rating Action, "Moody's Downgrades Enron Corp. Long Term Debt Ratings and Keeps Them Under Review for Downgrade; Senior Unsecured to Baa3. Lowers Rating for Commercial Paper to NotPrime," November 9, 2001, MDY-BANK071481.

Enron's retention of an investment grade rating was dependent on the Dynegy merger improving Enron's credit quality through the provision of additional $1.5 billion in equity capital. S&P expressed the view that, postmerger, the combined entity would need to sell Enron's noncore assets in an "effective and orderly manner" and efficiently combine the trading operations of the two companies in order to maintain credit quality. S&P warned that it would subject Enron to "heightened monitoring" while the merger was pending and that it would downgrade the company further if it perceived "any decrease in liquidity or in the soundness of the marketing and trading operations, as measured by regular reports of trading activity, profitability, and cash positions."[79]

- Enron closed at $8.63 per share.[80]

**November 13, 2001:**

- Enron received the previously announced $1.5 billion cash infusion from Dynegy in exchange for interests in Enron's Northern Natural Gas pipeline.[81]

**November 14, 2001:**

- In a conference call with investors, Lay admitted to having made "some very bad investments in non-core businesses." He cited Azurix and Dabhol, which were exacerbated by heavy on- and off balance sheet borrowing. Chief Financial Officer McMahon announced that the company's 10-Q filing would be five days late. Officials on the call would not comment on the company's cash position.[82]

**November 19, 2001:**

- Enron filed its 10-Q quarterly report for the third quarter of 2001.

    - The filing disclosed for the first time that "[t]he November 12 [sic] 2001 downgrade in Enron's senior unsecured debt rating to BBB− by Standard & Poor's has caused a ratings

---

[79] S&P RatingsDirect, "Research: Dynegy Ratings Placed on CreditWatch Negative, Enron Rating Lowered to 'BBB-,'" November 9, 2001, ANARPT009857–859.

[80] Thomson Financial.

[81] Christina Cheddar, "Enron Receives Dynegy $1.5B Cash Infusion Tues.," Dow Jones News Service, November 14, 2001, 3:19 p.m.

[82] Christina Cheddar, "Enron: Events Have Had A Temporary, Negative Effect On Ops," Dow Jones News Service, November 14, 2001, 9:47 a.m.

Expert Report of B. Douglas Bernheim, Ph.D.                                        Factual background

event related to a $690 million note payable that, absent Enron posting collateral, will become a demand obligation on November 27, 2001."[83] The transaction with which the obligation was associated (Rawhide) was not identified.

- The 10-Q also disclosed that Enron had a "contingent obligation" to Whitewing Associates in an amount totaling approximately $1 billion as of September 30, 2001. The obligation had risen some $600 million since that date because Enron's stock price had fallen. The "shortfall in the recovery of Enron's book investment" in Whitewing required a $700 million pretax charge to earnings.[84]

- The 10-Q reported Enron's third quarter loss as $664 million.[85] This was higher than the amount first disclosed on October 16 ($618 million) or the amount discussed on the November 14 conference call ($635 million).

- Enron's executives met with the company's bankers to discuss Enron's desire to restore creditor confidence and relieve its liquidity crisis, as well as its plan to merge with Dynegy.

  - Enron advised the bankers that, while its 10-Q reported $13 billion in debt, it had an additional $25 billion in "off balance sheet" debt, more than $12 billion of which was due to mature in 2003–2005.[86]

  - Enron explained that the recent downgrade triggered a requirement to repay intercompany loans issued as part of the Rawhide minority interest structure and that Enron's failure to pay was a "termination event" that started a nine-business-day "Purchase Option Period." This period would expire on November 26, 2001, and liquidation of assets would then begin unless an extension was granted. Enron requested such an extension, to December 14, 2001.[87]

- Enron closed at $9.06 per share.[88]

---

[83]  Enron Corp., Q3 2001 Form 10-Q (November 19, 2001)
[84]  Ibid.
[85]  Ibid.
[86]  "Enron Corp Bank Presentation," EC05019A0170127–198.
[87]  Ibid.
[88]  Thomson Financial.

**November 21, 2001:**

- Enron's lenders agreed to extend repayment of the $690 million Rawhide note until mid-December.[89]

- Enron's stock closed at $5.01 per share, down over 28% since the previous day's close (and down 45% for the two-day period since the 10-Q was filed on November 19).[90]

**November 27, 2001:**

- Dynegy confirmed that merger discussions were ongoing, but some industry observers were increasingly concerned that the negotiations would fail and that Enron would be driven into bankruptcy.[91] There was speculation that, given the numerous shareholder and employee suits pending against Enron, Dynegy might invoke a clause allowing it to walk away from the deal "if the liabilities from 'pending' or 'threatened' litigation may exceed $3.5 billion."[92]

**November 28, 2001:**

- S&P downgraded Enron from BBB- to B-, which was six notches below investment grade status. S&P expected Dynegy to call off the pending merger due to "the continued drop in confidence in the capital markets that the transaction would hold." S&P felt that Enron's trading business had "sustained significant damage" that made the merger less likely. Collapse of the deal "would create enormous pressure on Enron's credit profile," and a Chapter 11 bankruptcy filing was "a distinct possibility."[93]

- Moody's downgraded Enron's long-term debt from Baa3 to B2, five levels below investment grade status, and kept it on review for further downgrade. Moody's noted that Enron's need for cash, due in part to counterparty demands for cash margin, rendered it less likely that the Dynegy merger would be consummated. It also cited concern over disclosures in Enron's 10-

---

[89]  Dow Jones News Service, "WRAP: Enron Gets Extension To Mid-Dec On $690M Note," November 21, 2001, 3:45 p.m.

[90]  Thomson Financial.

[91]  Christina Cheddar, "Merger Traders Wary Even If Enron, Dynegy Cut New Terms," Dow Jones News Service, November 27, 2001, 1:39 p.m.

[92]  Christina Cheddar, "Dynegy Confirms Talks On Enron Deal Structure—Source," Dow Jones News Service, November 27, 2001, 10:16 a.m.

[93]  S&P RatingsDirect Research: "Enron's Rating Cut to 'B-'; Doubt Cast on Dynegy Merger," November 28, 2001, ANARPT009879–880.

Q and deterioration in Enron's core trading operations. Moody's questioned whether the combination of Enron and Dynegy would be investment grade.[94]

- As disclosed in Enron's 10-Q, the loss of investment grade status, coupled with the company's low stock price, triggered obligations totaling $3.9 billion associated with the Marlin Water and Whitewing share trusts. The 10-Q noted that if Enron were unable to pay this amount when due, "a series of events would begin which could impact Enron's compliance with the terms of its Revolving Credit Agreements and certain other obligations, including bank debt facilities."[95]

- Dynegy terminated the merger agreement and cited "Enron's breaches of representations, warranties, covenants and agreements, including the material adverse change provision."[96]

- In response to Dynegy's cancellation of the merger, Enron announced that it had "temporarily suspended all payments other than those necessary to maintain core operations."[97]

- Enron closed at $0.61 per share, down 85%, in what was called "a historic trading session." More shares of a single stock changed hands that day than ever before in NYSE history. The plunge in Enron's stock price "wreak[ed] havoc on the share prices of companies affected by the energy giant's collapse . . . sending an already vulnerable equities market skidding lower."[98]

**November 29, 2001:**

- Enron announced that it was "evaluating" whether to pay previously announced stock dividends.[99]

- Enron was widely expected to file for bankruptcy protection. Although most observers expected a Chapter 11 filing, some believed Enron would have no real choice but to pursue Chapter 7 liquidation. Either way, the proceedings were expected to be "complex and time-

---

[94] *Rating The Raters* (testimony of John Diaz, Managing Director, Moody's Investors Service), 11; Moody's Rating Review, Enron Corp., November 28, 2001, MDY-BANK 022159–161.

[95] Enron Corp., Q3 2001 Form 10-Q (November 19, 2001).

[96] Dow Jones News Service, "Dynegy Terminates Merger With Enron," November 28, 2001, 12:58 p.m.

[97] Dow Jones News Service, "Enron To Temporarily Suspend Noncore Payments," November 28, 2001, 1:58 p.m.

[98] Robert O'Brien, "US Stocks Stung By Enron Plunge; Dow Utilities At Yr Low," Dow Jones News Service, November 28, 2001, 4:39 p.m.

[99] Dow Jones News Service, "Enron 'Evaluating' Payment Of Previously Declared Divs," November 29, 2001, 8:19 a.m.

consuming" in light of Enron's enormous asset profile "and perhaps many off balance sheet items that will have to be sorted out in court." The loss of Enron's investment grade rating "guaranteed" the collapse of its trading business, "because the company won't have access to the reams of cash it needs to run that business." Enron was perceived to have $13 billion of on balance sheet debt and another $7 billion of off balance sheet debt. The *Wall Street Journal* noted the possibility of "other obligations lurking in connection with its investment partnerships."[100]

**December 2, 2001:**

- Enron filed for Chapter 11 bankruptcy protection with the U.S. Bankruptcy Court for the Southern District of New York.

- The bankruptcy filing came only five days since Enron was still rated "investment grade" and less than a year after it was ranked as the seventh largest company in the United States.[101]

---

[100]   Christina Cheddar, "A Bankrupt Enron Would Likely Become Small Pipeline Co.," Dow Jones News Service, November 29, 2001, 2:54 p.m; Henny Sender and Richard B. Schmitt, "Enron's Woes May Ripple Out to Others—If Energy Company Files For Bankruptcy, Results Are Likely to Be Messy," *Wall Street Journal*, November 29, 2001.

[101]   Based on the Year 2000 Fortune 500 list.

Expert Report of B. Douglas Bernheim, Ph.D.

# IV. Causation

## IV.1. Introduction

(48)    In this section, I show that the masking transactions deprived participants in financial markets of the information required to monitor and police the activities of Enron's management. Had these transactions never been masked (or had the transactions been masked when undertaken, but been unmasked sooner), Enron's financial distress would have been recognized—and, in all likelihood, resolved—at a significantly earlier point in time when the gap between the company's liabilities and assets was considerably smaller.

(49)    My analysis begins with a brief review of several standard and general principles from the field of Corporate Finance: (1) the interests of managers often conflict with the interests of investors; (2) stakeholders and other market monitors can discipline managers when the managers act contrary to investors' interests; and (3) effective market discipline depends on the timely disclosure of accurate financial information. Next, I show that the masking transactions deprived stakeholders and market monitors of accurate financial information, thereby undermining market discipline. Finally, I point out that this subversion of market discipline had consequences that were foreseeable, and should have been at least qualitatively foreseeable to any party familiar with the true economic nature of the transactions.

(50)    This section sets the stage for Sections V and VI. In Section V, I report on a quantitative empirical study that I undertook to determine when, if the transactions had not been masked, stakeholders and market monitors would have likely intervened and forced an earlier resolution. In Section VI, I report on a second empirical study that I undertook to determine the size of Enron's "deficiency balance"—that is, the likely gap between its liabilities and assets at resolution—in each quarter prior to its actual resolution. Combining this information, I calculate the extent to which the masking transactions, by subverting market discipline, damaged the Enron estate and creditors.

## IV.2. The interests of managers often conflict with the interests of investors

(51)    Investors own claims on a corporation's earnings and, consequently, have financial stakes in its success or failure in two main capacities: as equity holders and as debt holders. However, neither the equity holders nor the debt holders ordinarily control the company's business operations directly. This direct control is usually delegated to professional managers. A fundamental tenet of modern Corporate Finance is that the interests of managers often conflict with the interests of

both equity holders and debt holders. In this section, I briefly review the sources of these conflicts.

## IV.2.1. The interests of managers often conflict with the interests of equity investors

(52)    The modern corporation is characterized by what is sometimes termed a "separation of ownership and control." The people who own the corporation and the people who control its operations are not the same. In principle, senior managers and executives (henceforth, simply "managers") are hired as agents of equity holders and are directed to maximize the value of equity by seeking and exploiting profitable business opportunities. In practice, the interests of managers and equity holders often conflict. When managers exercise their discretionary authority, they have incentives to place personal objectives before value maximization.

(53)    The delegation of control to managers inevitably creates what economists term "an agency problem." The standard agency problem involves a principal (here, the equity holders viewed collectively) who relies on an agent (here, managers) to perform some task that affects the principal's well-being (here, through profits). For practical reasons (for example, the principal's inability to perfectly monitor the agent's actions or information), the agent must be given some discretionary authority. The principal's problem is to structure the agent's compensation so as to provide him with the best possible incentives—that is, those that align the manager's interests most closely with the principal's—and, thereby, obtain the highest possible net payoff. For example, a company's board of directors may provide managers with stock options in an attempt to bring management's interests in line with those of equity holders. However, an enormous body of economic research concludes that conflicts between principals and agents, including those between equity holders and managers, remain even when the agent's compensation is structured optimally.[102]

(54)    The conflict of interest between equity holders and managers can manifest itself in a variety of ways. It is most obvious when, as in the case of Andrew Fastow, a manager is caught with his "hand in the till," transferring corporate resources into his own pocket. But there are other manifestations. For example:

---

[102]    See for example, S. Ross, "The Economic Theory of Agency: The Principal's Problem," *American Economic Review* 63 (1973): 134–39, and D.E. Sappington, "Incentives in Principal-Agent Relationships," *Journal of Economic Perspectives* 5, no. 2 (Spring 1991), and references therein.

Expert Report of B. Douglas Bernheim, Ph.D.                                                    Causation

- ▪ Managers benefit when the cash components of their salaries and bonuses are as high as possible, while shareholders benefit when the company's earnings are retained, are paid out as dividends, or are reinvested in profitable business activities.

- ▪ Managers may be tempted to use corporate resources in ways that inure primarily to their own benefit rather than to the benefit of equity holders. This can, for example, result in excessive spending on executive perquisites.

- ▪ Managers who are motivated by the desire for status and power may engage in "empire building," which leads to expansion of scale and scope even when the resulting growth compromises profitability.[103]

- ▪ When managers are compensated with stock options or bonuses keyed to the company's share price, they may have incentives to focus excessively on activities that contribute to quantifiable short-term results instead of activities that contribute to long-term value.

- ▪ When equity holders believe that a manager is not doing a good job running the company, they have an incentive to replace him. But the manager may not wish to relinquish his position, along with its compensation, authority, and status. Accordingly, a manager may resist his demotion, release, or replacement.

(55) Significantly, the interests of managers and equity holders can conflict with respect to the dissemination of information. Investors desire timely and accurate disclosure of financial data. However, when a company conditions a manager's compensation, retention, and/or promotion on financial performance (possibly in an attempt to bring his interests in line with those of equity holders), it provides him with incentives to suppress negative results and to exaggerate positive results.

---

[103] "Managers have incentives to cause their firms to grow beyond the optimal size. Growth increases managers' power by increasing the resources under their control. It is also associated with increases in managers' compensation, because changes in compensation are positively related to the growth in sales." Michael Jensen, "Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers," *AEA Papers and Proceedings*, May 1986, 323. "The tendency of firms to reward middle managers through promotion rather than year-to-year bonuses also creates a strong organizational bias toward growth to supply the new positions that such promotion-based reward systems require." V. Kanniainen, "Empire Building by Corporate Managers: The Corporation as a Savings Instrument," *Journal of Economic Dynamics and Control* 24 (2000): 127–42.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

### IV.2.2. The interests of managers often conflict with the interests of creditors

(56)    Even when managers' interests align with those of equity holders, they usually differ from those of creditors. Equity holders would like to see the firm maximize the value of equity; creditors would like to see it maximize the value of debt. These two objectives are typically inconsistent.

(57)    The interests of creditors and equity holders (or their agents, the managers) come into conflict most directly when corporate activities involve risk. In an influential treatise on ownership structure, Professors Michael Jensen and William Meckling explain this conflict of interest as follows:

> Potential creditors will not loan $100,000,000 to a firm in which the entrepreneur has an investment of $10,000. With that financial structure the owner-manager will have a strong incentive to engage in activities (investments) which promise very high payoffs if successful even if they have a very low probability of success. If they turn out well, he captures most of the gains, if they turn out badly, the creditors bear most of the costs.[104]

(58)    The conflict between creditors and equity holders (or their agents, the managers) arises from the very different nature of their financial claims. Creditors have priority (that is, the firm's assets must be used to pay creditors before they can be distributed to shareholders), but their claims are fixed. They suffer if the firm does very poorly, but they receive nothing extra when the firm does very well. Accordingly, creditors prefer the firm to pursue investments that involve relatively low risk. In contrast, equity holders are the residual claimants on the firm's returns. If the firm does very poorly, they can walk away and let creditors absorb the losses. But if the firm does very well, they enjoy all of the benefits. Accordingly, relative to creditors, equity holders (and their agents) prefer the firm to pursue more risky investments.[105]

---

[104]    Michael C. Jensen and William H. Meckling, "Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure," *Journal of Financial Economics* 3 (1976): 305–60.

[105]    Financial economists sometimes point to a close analogy between equity claims and call options. The owner of a call option has the right, but not the obligation, to buy an asset at a fixed price (the "exercise price"). Equity holders essentially have a call option on the total value of the firm, with an exercise price equal to the value of the company's debt. They can choose to pay off the debt when it matures, in essence "buying" the firm from the creditors, or they can walk away and receive nothing.

The analogy between equity claims and call options is useful because it underscores the conflict of interest between debt and equity holders with respect to risky investments. As Professor Robert Merton demonstrated in the early 1970s, an increase in risk increases the value of a call option. Accordingly, when a firm is faced with a choice between two investments that differ only with respect to risk (and not, for example, with respect to average

(59)    The conflict between the interests of creditors and equity holders (or their agents, the managers) intensifies as the firm encounters financial distress. If the value of the firm slips below the face value of debt, equity holders (or their agents, the managers) may choose to allow the firm to default on its debts. Accordingly, as the firm approaches insolvency, those acting on behalf of equity holders increasingly focus on the "upside potential" of each available project and disregard the "downside" risk. The company may elect a highly risky project over a safer one even when the risky project yields much lower returns on average. Significantly, if the company is permitted to continue operating without restriction after becoming insolvent, the temptation to "bet the farm" can become overwhelming. In that case, equity holders have nothing to lose and everything to gain by taking on bad projects that (on average) are expected to destroy value, provided these projects also involve at least a slim chance of putting the firm back in the black.

## IV.3. When managers act contrary to investors' interests, the market can impose discipline

### IV.3.1. The board of directors can impose discipline

(60)    The board of directors of a solvent company has a responsibility to protect the interests of shareholders. The board oversees senior management and has two major objectives: to maximize shareholder value and to ensure that the company remains a going concern.

(61)    If the board determines that managers are acting contrary to investors' interests, it has many avenues of recourse, including the following:

- Terminating officers

- Withholding discretionary portions of compensation (such as bonuses)

- Requiring changes to the firm's capital structure (for instance, requiring the firm to "deleverage" itself by selling off assets to retire debt)

---

returns), equity holders will prefer the risky investment, while debt holders will prefer the safe investment. Robert Merton, "The Theory of Rational Option Pricing," *Bell Journal of Economics and Management Science* 4, no. 1 (1973): 145–70, and "On the Pricing of Corporate Debt: The Risk Structure of Interest Rates," *Journal of Finance* 29, no. 2 (1974): 449–70.

   ▪ Requiring a shift in strategy (such as scaling back lines of business, product or service offerings, or instituting cost-cutting or efficiency measures)

(62)    Typically, the board's objective is to make changes preemptively rather than to wait for external market monitors to impose discipline. Where the company's reported results are favorable, the board typically has less incentive to either heavily scrutinize those results or to impose discipline.


### IV.3.2. Equity investors can impose discipline

(63)    When equity investors are dissatisfied with the decisions of a company's management, they can impose discipline through three distinct channels.

(64)    The first channel involves trading. A company's share price reflects investors' collective beliefs as to the company's value. These beliefs take into account all publicly available information about the company, including not only its present condition, but also its future prospects.[106] Rising confidence in a company's future prospects tends to cause its stock price to rise as investors bid against one another. Loss of confidence has the opposite effect—the share price drops because investors are inclined to "unload" their shares.

(65)    When managers' compensation packages are tied to share price, managers benefit directly from the approbation of happy investors and feel the displeasure of unhappy ones. Falling share prices can also trigger other forms of market discipline, including actions by creditors or the board of directors.

(66)    The second channel involves voting. Shareholder meetings provide investors with opportunities to express displeasure and, in some instances, oust officers and directors. Large institutional investors can play particularly influential roles in this process. Though shareholder revolts are relatively uncommon, the potential for direct action provides an additional check on management.

---

[106]   A stock's price is regarded by most economists as the best indicator of a company's true value, given the information available to the public. "In an efficient capital market, prices fully and instantaneously reflect all available relevant information. This means that when assets are traded, prices are accurate signals for capital allocation." Thomas E. Copeland, J. Fred Weston, and Kuldeep Shastri, *Financial Theory and Corporate Policy,* 4th ed., 355 (Reading, MA: Addison-Wesley, 2005). "[U]nless one has significant inside information . . . the current price may well be the most reliable estimate of the value of the company *as it is currently being run."* Keith C. Brown, W.V. Harlow, and Seha M. Tinic, "How Rational Investors Deal With Uncertainty," in *The New Corporate Finance: Where Theory Meets Practice,* ed. Donald H. Chew Jr., 22 (New York: McGraw-Hill, 1993) (emphasis in original).

(67)     The third and final channel involves litigation. When all else fails, shareholders can sue the companies they own for failure to live up to their fiduciary responsibilities. Managers are acutely aware of the potential for shareholder suits and have strong incentives to avoid them.

### IV.3.3. Creditors can impose discipline

(68)     When creditors are dissatisfied with the performance of a company's management, they can impose discipline through two main channels.

(69)     First, creditors can decide not to lend the company additional money at attractive rates. Usually, as a company's management loses the confidence and trust of creditors, the company's costs of borrowing rise. Some forms of lending, such as commercial paper, are so sensitive to creditor confidence that they can become unavailable to a company even before its overall creditworthiness has deteriorated to the point of a rating downgrade.[107] When the company experiences a loss of access to credit or higher costs of borrowing, its investment activities become increasingly constrained by the availability of funds. Deteriorating creditworthiness can force a firm to "deleverage" (pay off existing debt) or focus on a more conservative investment strategy.

(70)     Second, anticipating the conflicts of interest that arise once loans are extended, creditors usually insist on the inclusion of protective covenants in loan agreements. A covenant specifies conditions that the borrower is expected to maintain during the life of the loan. Typically, violation of a covenant will impose penalties and/or additional obligations on the borrower.

(71)     There are many types of debt covenants. A common covenant will equate the covenant violation to a default, resulting in acceleration of part or all of the debt. As another example, many of Enron's loan agreements included a covenant requiring the company to keep its ratio of senior debt to total capitalization below 65%. Another common provision provides for cross-default, which puts the borrower in default if the borrower defaults on *another* obligation.[108]

(72)     Creditors can generally choose to waive covenants when default is expected (or after its occurrence) and allow troubled companies a chance to "get back on their feet." For example,

---

[107]   As noted earlier, Enron lost access to the commercial paper market even before its credit rating was actually lowered, and it had to use some $2 billion of the $3 billion it borrowed under its lines of bank credit to redeem outstanding commercial paper on or about October 25, 2001. See Footnote 60.

[108]   U.S. $1,250,000,000 Long-Term Revolving Credit Agreement Dated as of May 18, 2000, ECSHP000101066 – 1152.

Enron's creditors gave it an additional month to comply with the $690 million demand obligation that was triggered by the November 9, 2001, downgrade. In exchange for their forbearance, the lenders may be granted some control over the borrower's restructuring. Or, the lenders can enforce the covenants, which may drive the company into bankruptcy. In either case, covenants are powerful disciplinary mechanisms.

## IV.4. Effective market discipline depends on the timely release of accurate information concerning the company's financial status and performance

(73)    The mere *ability* to impose discipline on a company's management is of little value by itself. Effective discipline is possible only if the board of directors, equity holders, and creditors can distinguish situations in which management is performing well and acting responsibly from situations in which it is not. This requires detailed and accurate information concerning the company's financial status and performance. Moreover, disciplinary responses to management's transgressions are most effective when they occur with minimal delay; this requires the timely release of such information.

### IV.4.1. A company's financial statements are a crucial source of information concerning its financial status and performance

(74)    The SEC requires publicly traded companies to file annual and quarterly financial statements, as well as detailed disclosures when the companies undertake specific activities, such as raising capital. Annual financial statements must be audited and must comply with a standard set of reporting rules intended to promote both *accuracy*—to enable investors to understand the finances of that company standing alone—and *consistency*—to allow investors to compare the finances of that company with the finances stated by other companies.

(75)    Pertinent financial disclosures include a firm's *balance sheet*, *income statement*, *statement of cash flows,* and *statement of stockholders' equity*.[109]

---

[109]    The SEC and the Securities Exchange Act of 1934 require that the following financial statements be prepared in accordance with generally accepted accounting principles and included in the Form 10-K: Balance Sheet, Consolidated Statements of Income, Statements of Cash Flows, and Statements of Stockholders' Equity. See the SEC's "General Instructions" for Form 10-K, http://www.sec.gov/about/forms/form10-k.pdf.

(76)    A firm's *balance sheet* presents a "snapshot" of its resources and capital structure at a particular moment in time. It lists the firm's assets, such as cash, property, equipment, raw materials, and products in inventory. It also lists the firm's liabilities, which consist of various claims on the firm's assets (such as salaries owed to employees) and long- and short-term debt owed to banks and other lenders. The difference between the value of the firm's assets and its liabilities represents its owners' residual claims and is also known as shareholders' equity.

(77)    The balance sheet, if prepared properly, is a vital source of information concerning a company's degree of indebtedness, also known as leverage. This is a critical consideration in assessing the likelihood of insolvency. A more highly leveraged company runs a greater than average risk that its total value will dip below the face value of its debt, and/or that it will be forced to default on interest payments.[110]

(78)    A firm's *income statement* presents the results of its operating activities over some time period, such as a month, quarter (three months), or year. It aggregates the firm's sales, or revenues, for the period on the "top line," and then it subtracts various expenses to arrive at net income on the "bottom line." Net income, also referred to as profits or earnings, is a fundamental measure of a firm's operating success.

(79)    The *statement of cash flows* summarizes the company's inflows and outflows of cash and provides the "best information about a highly leveraged firm's financial health."[111] The cash flow statement is broken down into three major categories: operating, investing, and financing activities; and it shows the extent to which, over the course of the accounting period, the cash flowing into the firm exceeded (or fell short of) the cash flowing out of it.[112] While a firm may be able to survive one or more periods of "negative cash flow" (for instance, during a start-up phase), "if a firm is to continue operating successfully, it must generate more funds than it spends."[113] Cash flow is sometimes described as the "end measure of profitability" because cash

---

[110]    "Traditionally, high debt ratios have been considered acceptable only for firms with low operating leverage or with stable operations (such as public utilities), where the risk of combining operating and financial leverage was low. In recent years, however, financial leverage has been applied to companies with high operating leverage as well (airlines, for example), resulting in financial distress or even bankruptcy during periods of economic adversity." Gerald I. White, Ashwinpaul C. Sondhi, and Dov Fried, *The Analysis and Use of Financial Statements*, 2nd ed. (New York: Wiley, 1998), 172.

[111]    Martin Fridson and Fernando Alvarez, *Financial Statement Analysis, A Practitioners Guide*, 3rd ed. (New York: Wiley, 2002), 98.

[112]    Clyde P. Stickney and Roman L. Weil, *Financial Accounting: An Introduction to Concepts, Methods, and Uses*, 8th ed. (Fort Worth, TX: Dryden Press, 1997), 219.

[113]    Ibid., 14.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

"ultimately repays loans, replaces equipment, expands facilities, and pays dividends."[114] The statement of cash flows is, therefore, critical to investors and market monitors. "The information provided in a statement of cash flows, if used with related disclosures and information in the other financial statements, should help creditors, investors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; and, (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing."[115]

### IV.4.2. Interested parties rely on information contained in a company's financial statements when evaluating its financial status and performance

(80)     Each class of parties discussed in Section IV.2 relies either directly or indirectly on the information contained in a company's financial statements.[116] For any decision pertaining to the imposition of discipline on managers, this information is indispensable. Though board members have access to additional information, they look to financial statements for broad barometers of the company's health and prospects. Equity investors depend on this information when evaluating whether the company's stock is over- or undervalued at its prevailing price. Prior to advancing credit, creditors look to financial statements for information concerning a company's creditworthiness. This information can affect whether credit is advanced, whether third-party insurance or security is required, the level of required collateral, the applicable rate of interest, the nature of covenants imposed, and potentially other terms and conditions. After extending credit, a creditor may continue to use the data contained in the company's financial statements to assess compliance with certain debt covenants.

(81)     Creditors and equity investors often supplement their own evaluations of a company with the conclusions and advice of independent market monitors. Because these monitors are influential, even board members pay close attention to their assessments. These monitors fall into two main categories: securities analysts and credit rating agencies.

---

[114]   Leopold A. Bernstein and John J. Wild, *Financial Statement Analysis: Theory, Application, and Interpretation*, 6th ed. (Boston: Irwin McGraw-Hill, 1998), 344.

[115]   FASB General Standards for Cash Flows Statement, Section C25.103.

[116]   Financial reports "should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions." Financial Standards Accounting Board (FASB), Statement of Financial Accounting Concepts (SFAC) 1, Objectives of Financial Reporting by Business Enterprises.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

(82)    Securities analysts evaluate publicly available information (including SEC filings and press
        releases) and speak directly with a company's executives about business strategy and other
        matters in order to form opinions concerning the company's financial health and prospects.
        Applying their expertise and judgment, they formulate recommendations as to whether investors
        should buy, sell, or hold specific stocks and bonds. They also review and comment on companies'
        performance targets, and they suggest their own targets. Failure to meet analysts' expectations
        can be a sign that a company is experiencing problems. Since analysts are opinion leaders whose
        views are taken seriously by many market participants, their reports play an important role in
        disciplining poorly performing companies. Because of the crucial role they play in monitoring
        corporations, they have been characterized as the "watchdogs" of financial markets.[117]

(83)    In the following section, I comment at greater length on the second class of market monitors—
        credit rating agencies.

### IV.4.3. The special role of credit rating agencies

(84)    Credit rating agencies are firms that evaluate the creditworthiness of a company. These agencies
        use a combination of publicly available information (particularly the financial statements of the
        firm being rated) and information provided privately by the company itself. The two major credit
        rating agencies are Moody's Investors Service, Inc. (Moody's) and Standard & Poor's (S&P).[118]
        Each uses its own standardized scale to summarize its opinion of the creditworthiness of a
        company (an "issuer rating") or of a particular debt issue (or debt-like financial instrument) of the
        company. Above a certain level on each firm's scale, a company or debt instrument is considered
        "investment grade." Below that level, the company or instrument is considered noninvestment
        grade.[119] The rating designations used by S&P and Moody's are depicted in Exhibit 5.

---

[117]   Senate Committee on Governmental Affairs, *The Watchdogs Didn't Bark: Enron and the Wall Street Analysts:
        Hearing before the Senate Committee on Governmental Affairs*, 107th Congress, 2d session, February 27, 2002.

[118]   Moody's and S&P are two of the five agencies (along with Fitch Ratings, A.M. Best Company, and Dominion
        Bond Rating Service, Ltd.) that have achieved the designation, "Nationally Recognized Statistical Rating
        Organization" issued by the SEC.

[119]   "The term 'investment grade' was originally used by various regulatory bodies to connote obligations eligible for
        investment by institutions such as banks, insurance companies, and savings and loan associations. Over time, this
        term gained widespread usage throughout the investment community." Standard & Poor's Corporate Ratings
        Criteria 2002, at 9. The term "junk," as in "junk bond," is also employed as a euphemism for noninvestment grade.
        Ibid.

**Exhibit 5: Rating agencies' credit rating scales**

| Investment grade | S&P | Moody's |
|---|---|---|
| Extremely strong payment capacity | AAA | Aaa |
| Very strong payment capacity | AA+<br>AA<br>AA- | Aa1<br>Aa2<br>Aa3 |
| Strong payment capacity | A+<br>A<br>A- | A1<br>A2<br>A3 |
| Adequate payment capacity | BBB+<br>BBB<br>BBB- | Baa1<br>Baa2<br>Baa3 |
| Noninvestment grade | S&P | Moody's |
| Uncertain payment capacity | BB+<br>BB<br>BB- | Ba1<br>Ba2<br>Ba3 |
| High risk that payment capacity will not exist when obligations come due | B+<br>B<br>B- | B1<br>B2<br>B3 |
| Company is either in default or is very likely to default | CCC+<br>CCC<br>CCC- | Caa1<br>Caa2<br>Caa3 |
| Company is typically in bankruptcy or default | CC<br>C<br>D | Ca<br>C |

Sources: Moody's Rating Symbols & Definitions, August 2004 and S&P Long-term Issue Credit Ratings Definitions, May 2002.

### IV.4.3.1. Accurate credit ratings facilitate market discipline.

(85)    Participants in and monitors of credit markets use credit ratings in a variety of ways. Ratings are "informational tools used by (1) institutional investors to analyze the credit risks associated with fixed-income securities and other debt obligations; (2) issuers seeking access to the capital markets; (3) regulators, for such purposes as measuring the capital adequacy of banks, broker/dealers, and insurance companies; and (4) governments, economists, the media, academics, and other market observers."[120] Moreover, a firm's creditors, lenders, and trading

---

[120]    *Rating The Raters* (Diaz testimony), 4.
         "Credit ratings produced by rating agencies are widely circulated; many investors rely on these ratings to make investment decisions." United States General Accounting Office, Report to the Chairman, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, "Financial Statement Restatements: Trends, Market Impacts, Regulatory Responses, and Remaining Challenges," October 2002 at 13.

counterparties may have contractual arrangements under which different provisions apply, depending on the firm's credit rating.

(86)    Significantly, credit ratings are not intended to reflect conditions that fluctuate over short time horizons. The rating agencies view a company's ability to service its debt over the relevant time horizon as largely independent of these short-term fluctuations. Thus, in contrast to stock prices, which often change significantly from day to day (indeed, from minute to minute), credit ratings tend to be stable.

- "Moody's rating management practices seek to limit rating changes if there is a high likelihood that they might be reversed over a short period of time and to dampen rating change volatility by moving ratings in a gradual, even predictable, fashion in response to changes in fundamental credit quality."[121]

- Similarly, S&P observes that "[t]he stock market emphasizes growth prospects and has a short-time horizon; it is influenced by changes in alternative investment opportunities and can be very volatile. A company's ability to service its debt is not affected directly by such factors."[122]

(87)    A change in a company's long-term credit rating is, therefore, a significant event. A reduction in a company's credit rating, or "downgrade," can send a strong negative message to management, to the board, and to the market as a whole.[123] A downgrade is particularly significant if it causes a company to cross the line between investment grade and noninvestment grade because this can have immediate negative consequences for the rated firm; I describe these consequences in greater detail in Section V.5.4.

(88)    Not surprisingly, ratings have an impact on how some companies are managed. "Many companies . . . incorporate specific rating objectives as corporate goals. Indeed, possessing an 'A' rating, or at least an investment grade rating, affords companies a measure of flexibility and may be worthwhile as part of an overall financial strategy."[124] Enron was one such company. It closely

---

[121]    Moody's, "Rating Transitions and Defaults Conditional on Watchlist, Outlook and Rating History," February 2004, 3.

[122]    Standard & Poor's, "Corporate Ratings Criteria," 2005, 28.

[123]    The rating agency can also announce that it is considering a change in rating, e.g., when S&P places a company on "CreditWatch," it intends to "signal the strong possibility of a rating change." *Rating the Rater* (Barone testimony), 5–6. A downgrade is not always a negative event; it may, for example, reflect a desirable change in the company's strategy, albeit one that reduces the likelihood that it will pay its debts when due.

[124]    Standard & Poor's Corporate Ratings Criteria, 2005, 11.

monitored its rating, as well as the financial statistics that it perceived as critical to that rating, and it aggressively lobbied the rating agencies for upgrades.

(89)    Enron was acutely aware that a downgrade below investment grade status would have a devastating impact on its operations. Its Annual Reports for 1998 through 2000 each state that "Enron's continued investment grade status is critical to the success of its wholesale businesses as well as its ability to maintain adequate liquidity."[125] Enron's focus on maintaining or improving its credit rating, as well as the importance of an investment grade rating to its survival, emerge as central themes in many investigations of its collapse:

- "Two factors drove Enron's management of its financial statements: (i) its need for cash, and (ii) its need to maintain an investment grade rating. Enron was reluctant to issue equity to address these needs for fear of an adverse effect on its stock price and was reluctant to incur debt because of a possible adverse effect on its credit ratings."[126]

- "It is no surprise that the [New York] Times article suggested that one of the prime motivations for Enron's practices was to hide its true debt obligations from the ratings agencies for the purpose of inflating its credit rating."[127]

- "Retaining this investment grade rating, and even improving it, was vital to Enron because it ability to operate and grow its trading business as well as to access the capital markets for its liquidity needs were absolutely dependent upon the stability that the rating provided. In fact, the company consistently lobbied for a higher rating."[128]

- " [Former Treasury Secretary Robert] Rubin [then Chairman of Citigroup's Executive Committee] recalled being told [by Michael Carpenter, VEO of Citigroup Corporate and Investment Banking] that the concern was that a downgrade effectively would end the possibility of the planned merger with Dynegy, which was supposed to stave off an Enron bankruptcy. Indeed, Rubin understood that the downgrade itself probably would precipitate a

---

[125]    Enron Corp., 1998 Annual Report, at 41; see also Enron Corp., 1999 Annual Report, at 37, and Enron Corp., 2000 Annual Report, at 27.

[126]    Batson, Second Interim Report at 15.

[127]    *Rating the Raters* (Barone testimony), 16, referencing "Enron's Many Strands: Finances; Enron Had More Than One Way to Disguise Rapid Rise in Debt," *New York Times*, February 17, 2002.

[128]    Senate Committee on Governmental Affairs Report, "Financial Oversight of Enron," 107th Congress, 2d session, October 7, 2002, at 85.

Expert Report of B. Douglas Bernheim, Ph.D.                                         Causation

bankruptcy, since Enron was a trading company and counterparties would not trade with a below-investment grade entity."[129]

(90)    Enron and other market monitors fully understood that any downgrade (particularly, although not exclusively, one that caused Enron to lose its investment grade status) would jeopardize the company:

- "Any credit rating downgrade would have had serious consequences for Enron, including raising its borrowing costs, limiting the investors who could buy the company's bonds, weakening its trading status, and possibly triggering certain demand debt repayments at off-balance sheet entities affiliated with the company."[130]

- "[T]he continued success of Enron's entire business was dependent upon the continued success of its Wholesale Services business segment, which in turn was dependent on Enron's credit ratings for its senior unsecured long-term debt."[131]

(91)    In Section V.5.4, I explain in greater detail why a drop in Enron's credit rating would have driven the company towards some form of early resolution.

### IV.4.3.2. Credit rating agencies evaluate a company's performance based in large part on its financial statements.

(92)    Credit rating agencies examine a company's financial statements to understand the nature and magnitude of its existing debts, the value of assets available to generate the cash necessary to pay those debts, the firm's likely ability to survive unexpected problems with its cash flow, and its overall profitability.

(93)    In Congressional testimony, representatives of the rating agencies have emphasized their heavy reliance on Enron's reported financial statements. In particular:

- "Standard & Poor's rating of Enron in the BBB category was calculated and monitored on an ongoing basis through a thorough analysis of, among other materials, Enron's reported and

---

[129]   Senate Committee on Governmental Affairs Report, "Enron's Bankers Contacts with Moody's," 107th Congress, 2d session, January 3, 2003, at 9.

[130]   Senate Permanent Subcommittee On Investigations, *The Role of Financial Institutions* (testimony of Robert L. Roach, Counsel and Chief Investigator), at 2.

[131]   Batson, Second Interim Report at 19.

audited financial statements including, in particular, its cash flow, debt burden, and other key financial ratios relevant to our opinion concerning Enron's creditworthiness."[132]

▪ "In making our rating decisions, Moody's analysts largely rely on publicly available information, including SEC filings and audited financial statements."[133]

Therefore, the masking transactions had a significant impact on the rating agencies' ratings of Enron.

(94)    Rating agencies use financial statements to compute a number of specific measures of creditworthiness. I will refer to these henceforth as "credit ratios." While ultimately the credit ratings they assign to companies also reflect other information, including subjective judgments, credit ratios play an important role in the credit-rating process. For example:

▪ S&P states that it examines
   ▪ EBIT interest coverage
   ▪ EBITDA interest coverage
   ▪ Funds from operations/total debt
   ▪ Free operating cash flow/total debt
   ▪ Return on capital
   ▪ Operating income/sales
   ▪ Long-term debt/capital
   ▪ Total debt/capital[134]

▪ Likewise, Moody's states that it considers
   ▪ Operating margin
   ▪ Return on average capitalization
   ▪ Pretax interest coverage
   ▪ Funds from operations interest coverage
   ▪ EBITDA less capital expenditures interest coverage
   ▪ Total debt/EBITDA
   ▪ Retained cash flow/total debt
   ▪ Retained cash flow/capital expenditures (cap ex)
   ▪ Total debt/capitalization[135]

---

[132]  *Rating The Raters* (Barone testimony), 12.
[133]  Ibid., (Diaz testimony), 6.
[134]  See, Standard & Poor's Corporate Ratings Criteria, 2002; also, Standard & Poor's RatingsDirect Analysis of Enron Corp., September 11, 2000, BNPP009632-BNPP009641.

(95)    In conducting the empirical study of causation presented in Section V, I confirmed that, taken together, measures of coverage, leverage, profitability, liquidity, return on capital, and quality of earnings provide a reliable basis for predicting the credit rating assigned to a particular company. The following is a brief summary of the computation and significance of these ratios.

**Funds flow interest coverage (coverage ratio)**

(96)    This ratio measures the ability of the firm to meet its interest payments with its cash flow from operations, excluding changes to working capital. It is calculated as follows:

> Coverage ratio = (net cash flow from operating activities – changes in working capital + interest expense) ÷ interest expense

(97)    All other things being equal, the higher a company's coverage ratio, the greater its ability to meet its obligations and the less likely it is to default on its obligations if it experiences unexpected business problems. This ratio has been described as "a test of staying power under adversity."[136]

(98)    Enron's coverage ratio, based on the figures in its Form 10-K for 1997, was 2.4:[137]

> ($501 million net cash flow from operating activities – ($65 million) changes in working capital + $401 million interest expense) ÷ $401 million interest expense = 2.4

**Leverage ratio**

(99)    This ratio measures the extent to which the firm is financed by debt (borrowed money) as opposed to equity (stock sold to shareholders). It is calculated as follows:

> Leverage ratio = total debt ÷ (total debt + shareholders' equity + minority interest + COPS[138])

(100)   Enron's leverage ratio, based on the figures in its Form 10-K for 1997, was 44.6%:

---

[135]   See, Moody's Investors Service, Financial Ratio Medians for Global Investment Grade Corporates, January 2001; also, Moody's Rating, Enron Corp., March 2000, AASDTEX002241222-AASDTEX002241233.

[136]   Ibid., 8.

[137]   These illustrative calculations are based on Enron's filings with the SEC. In my actual calculations I made certain technical line-item adjustments, which are further discussed in Appendix D.

[138]   Company Obligated Preferred Securities of Subsidiaries.

$6.254 billion total debt ÷ ($6.254 billion total debt + $ 5.618 billion total shareholders' equity + $1.147 billion minority interest + $0.993 billion COPS) = 0.446

(101)    Simply put, "too much debt can lead to a higher probability of insolvency and financial distress."[139] All other things being equal, the higher a company's leverage, the greater its risk of being unable to pay its debts as they come due. This could lead the company to violate requirements of its loan agreements.[140] For example, many of Enron's loan agreements required it to maintain a leverage ratio below 65%, and at year-end 1997 Enron appeared to be satisfying this requirement.[141]

**Profitability ratio**

(102)    The profitability ratio compares the amount of income a company has earned over some time period with the level of business activity necessary to generate that income. This usually involves a comparison of operating earnings and revenues:

Operating profitability ratio = operating income before depreciation and amortization ÷ revenues

(103)    Measuring profitability at the operating level (which also might be described as the operating profit margin percentage) "shows how well management has run the business–buying and selling wisely, and controlling selling and administrative expenses–before taking into account financial policies (which largely determine interest expense) and the tax rate (which is outside management's control)."[142] It is particularly useful because it measures "management's operating prowess separately from its financial acumen."[143] Enron's operating profitability ratio at the end of 1997, as reported, was 3%:[144]

---

[139]    Stephen A. Ross, Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 4th ed. (Chicago: Irwin McGraw-Hill, 1996), 35.

[140]    Stickney, *Financial Accounting*, 292.

[141]    Strictly speaking, the 65% requirement in Enron's loans applies only to the ratio of "senior debt" to "total capitalization." Because my leverage ratio includes all debt, not only senior debt, my numerator is higher than the one I would use if I were determining Enron's compliance with the 65% requirement. My definition of "total debt + shareholders' equity + minority interest + COPS" also differs slightly from the definition of "total capitalization" appearing in Enron's loan agreements.

[142]    Fridson and Alvarez, *Financial Statement Analysis*, 282.

[143]    Ibid., 375.

[144]    This calculation is again presented for illustrative purposes; see footnote 137.

Operating profitability ratio = ($15 million operating income + $600 million
depreciation and amortization) ÷ $20,273 million revenues = 0.03

### Return on capital

(104)   A company's return on capital (ROC) compares its profits with its total investment (both debt and
equity). This is a rough measure of the rate of return generated by the company's investments.
The pretax return on capital is typically calculated as follows:

Return on capital = operating income ÷ average of (total debt + total
shareholders' equity, most recent period) and (total debt + total shareholders'
equity, one year ago period)

(105)   Enron's ROC for 1997 was $15 million operating income ÷ average of ($6.254 billion total debt
and $5.618 billion total shareholders' equity at year end 1997) and ($3.349 billion total debt and
$3.723 billion total shareholders' equity at year end 1996) = 0.002 [145]

### Liquidity ratio

(106)   This ratio measures the ability of a company to generate cash from operations after setting aside
cash outlays (called capital expenditures) needed to maintain and grow its production capacity.
The remaining cash flow is called free cash flow. The ratio of the company's free cash flow to its
total debt is a measure of liquidity in that it compares cash generated by operations (exclusive of
the cash needed to acquire or upgrade the firm's physical assets) with the debt that the company
must ultimately repay.

Liquidity ratio = (net cash flow from operating activities − capital expenditures) ÷
total debt

(107)   In principle, all other things being equal, the higher a company's liquidity ratio, the greater its
ability to meet its obligations, particularly the repayment of its debt principal, and the less likely it
is to default on its obligations.

(108)   Enron's liquidity ratio, based on the figures in its Form 10-K for 1997, was -0.15 (indicating that
the company's cash flow from operations, "CFO,"[146] was insufficient to cover its capital
expenditures):[147]

---

[145]   Ibid.

[146]   All mentions of "CFO" in my report refer to Cash Flow from Operations. To avoid confusion, I always spell out

> Liquidity ratio = ($501 million net cash flow from operating activities − $1.413 billion capital expenditures) ÷ $6.254 billion total debt = (0.15)

**Quality of earnings**

(109)   The term "quality of earnings" (or QOE) usually refers to the degree of conservatism in a firm's reported earnings. Indicators of high earnings quality include:

- Conservative revenue recognition methods

- Bad-debt reserves that are high relative to receivables and past credit losses

- Use of accelerated depreciation methods and short lives

- Rapid write-off of acquisition goodwill and other intangibles

- Minimal capitalization of interest and overhead

- Minimal capitalization of computer software costs

- Expensing of start-up costs of new operations

- Use of the completed contract method of accounting

- Conservative assumptions used for employee benefit plans

- Adequate provisions for lawsuits and other loss contingencies

- Minimal use of off balance sheet financing techniques

- Absence of nonrecurring gains

- Absence of noncash earnings

- Clear and adequate disclosures[148]

(110)   QOE is important because companies with high earnings quality are considered less risky, as these firms have "banked" earnings using conservative accounting policies. Such firms frequently

---

the phrase "Chief Financial Officer," for which CFO is also a commonly used acronym. However, headlines of certain newspaper articles that appear in footnotes throughout this report may contain references to CFO in this latter sense.

[147]   Ibid.

[148]   White, Sondhi, and Fried, *Analysis and Use of Financial Statements*, 956.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

are risk averse in other ways—for example, with respect to financial structures and business plans.[149]

(111)    To measure Enron's QOE, I used the operating cash flow to operating profit ratio. This ratio compares and contrasts Enron's cash profit to its accounting profit. In other words, this ratio measures how much of the operating income before depreciation and amortization (accounting profit) is covered by cash flow provided by Enron's operations (economic or cash profit). It is calculated as follows:

> Quality of earnings ratio = net cash flow from operating activities ÷ operating income before depreciation and amortization

(112)    All other things being equal, the higher a company's QOE ratio is, the more conservative and sound its earnings are, and consequently, the less risky the company is considered.

(113)    Enron's QOE ratio, based on the figures in its Form 10-K for 1997, was 0.81:[150]

> Quality of earnings ratio = $501 million net cash flow from operating activities ÷ ($15 million operating income + $600 million depreciation and amortization) = 0.81

## IV.5. Enron's masking transactions deprived the market of timely and accurate financial information, thereby undermining market discipline

(114)    The Complaint transactions and other masking transactions that I examine in this report subverted the mechanisms of market discipline by helping certain Enron managers mislead stakeholders and market monitors about Enron's financial health and prospects. The masking transactions allowed these managers to develop financial statements that were materially misleading and that supported the myth that Enron was distinguished by an extraordinary level of savvy, creativity, and acumen in formulating and executing innovative business strategies.

---

[149]    Ibid., 957.

[150]    These calculations are presented for illustrative purposes; see footnote 137 for more detail.

## IV.5.1. Masking transactions

(115)   The transactions that I examine are those identified as GAAP noncompliant in the reports of
        Enron's bankruptcy examiner, Neal Batson, or ENA's bankruptcy examiner, Harrison Goldin
        (collectively the "Examiner"), both objective third parties who studied the company's financial
        transactions and accounting in painstaking detail. Exhibit 6 lists all such transactions and
        identifies those that were identified as giving rise to liability on the part of the identified financial
        institutions. The responsible financial institutions are identified in the last column. As described
        below, if not for these transactions, Enron would have been constrained in its operations,
        including its incurrence of debt, and could not have incurred the debt it did, in fact, incur; as a
        consequence, Enron would have ceased to increase its deficiency balance.

**Exhibit 6: Masking transactions**

| Transaction name | Closing quarter | Complaint | Banks |
|---|---|---|---|
| 1999 Electricity Trade | Q4 1999 | Yes | Merrill Lynch |
| Alberta | Q3 2000 | Yes | JPMorgan Chase, RBC, Toronto Dominion Bank |
| Alchemy | Q4 1999 | Yes | CIBC |
| Apache | Q2 1999 | No | — |
| Avici | Q4 2000 | Yes | Barclays |
| Bammel Gas Trust | Q4 1997 | No | — |
| Cerberus | Q4 2000 | No | — |
| Chase VI | Q4 1997 | Yes | JPMorgan Chase |
| Chase VII | Q2 1998 | Yes | JPMorgan Chase |
| Chase VIII | Q4 1998 | Yes | JPMorgan Chase |
| Chase IX | Q2 1999 | Yes | JPMorgan Chase |
| Chase X | Q2 2000 | Yes | JPMorgan Chase |
| Chase XI | Q4 2000 | Yes | JPMorgan Chase |
| Chase XII | Q3 2001 | Yes | JPMorgan Chase |
| Chewco | Q4 1997 | Yes | Barclays |
| Cochise | Q1 1999 | Yes | BT/Deutsche |
| Condor | Q4 1999 | No | — |
| December 1998 Prepay | Q4 1998 | Yes | JPMorgan Chase, Toronto Dominion Bank |
| December 2000 Prepaid Oil Swap | Q4 2000 | Yes | CSFB |
| Discovery | Q4 1999 | Yes | CIBC |
| ETOL I-III | Q4 2000 | Yes | RBS |
| Firefly | Q4 1998 | No | — |
| Fishtail – Bacchus | Q4 2000 | Yes | Citigroup, JPMorgan Chase |
| Ghost | Q4 1999 | Yes | CIBC, RBS |
| Hawaii - Danno B | Q2 2000 | Yes | CIBC |
| Hawaii - McGarret A | Q1 2000 | Yes | CIBC |
| Hawaii - McGarret B | Q2 2000 | Yes | CIBC |

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

| Transaction name | Closing quarter | Complaint | Banks |
|---|---|---|---|
| Hawaii - McGarret C | Q3 2000 | Yes | CIBC |
| Hawaii - McGarret D | Q3 2000 | Yes | CIBC |
| Hawaii - McGarret F | Q4 2000 | Yes | CIBC |
| Hawaii - McGarret G | Q4 2000 | Yes | CIBC |
| Hawaii - McGarret H | Q4 2000 | Yes | CIBC |
| Hawaii - McGarret I | Q1 2001 | Yes | CIBC |
| Hawaii - McGarret J | Q2 2001 | Yes | CIBC |
| Hawaii - McGarret K | Q1 2001 | Yes | CIBC |
| Hawaii - McGarret L | Q1 2001 | Yes | CIBC |
| Hawaii - McGarret M | Q2 2001 | Yes | CIBC |
| Hawaii - McGarret N | Q2 2001 | Yes | CIBC |
| Hawaii - McGarret O | Q3 2001 | Yes | CIBC |
| Hawaii - McGarret P | Q3 2001 | Yes | CIBC |
| Jethro | Q3 1999 | Yes | Citigroup, Toronto Dominion Bank |
| JT Holdings | Q4 2000 | Yes | Barclays |
| June 2001 Prepay (a/k/a Citibank 1) | Q2 2001 | Yes | Citigroup |
| Leftover | Q2 1999 | Yes | CIBC |
| LJM1 - Cuiaba | Q3 1999 | No | — |
| LJM1 - Rhythms | Q2 1999 | No | — |
| LJM2 - Backbone I | Q2 2000 | No | — |
| LJM2 - Backbone II | Q4 2000 | No | — |
| LJM2 - Bob West | Q4 1999 | No | — |
| LJM2 - ENA CLO | Q4 1999 | No | — |
| LJM2 - MEGS | Q4 1999 | No | — |
| LJM2 - Nowa Sarzyna | Q4 1999 | No | — |
| LJM2 - Raptors | Q2 2000 | No | — |
| London | Q4 2000 | Yes | Toronto Dominion Bank |
| Nahanni | Q4 1999 | Yes | Citigroup |
| Nigerian Barge | Q4 1999 | Yes | Merrill Lynch |
| Nighthawk | Q4 1997 | Yes | Citigroup |
| Nikita | Q3 2001 | Yes | Barclays, CSFB |
| Nile | Q3 2001 | Yes | CSFB |
| Nimitz | Q2 1999 | Yes | CIBC |
| Nixon | Q4 1999 | Yes | Barclays, Citigroup, RBS, Toronto Dominion Bank |
| Pilgrim - Sarlux | Q4 1998 | Yes | CIBC |
| Pilgrim - Trakya | Q4 1998 | Yes | CIBC |
| Rawhide | Q4 1998 | No | — |
| Riverside 3 | Q2 1998 | Yes | CIBC |
| Riverside 4 | Q3 1998 | Yes | CIBC |
| Riverside 5 | Q1 1999 | Yes | CIBC |
| Roosevelt | Q4 1998 | Yes | Barclays, Citigroup |
| September 2001 Prepaid Oil Swap | Q3 2001 | Yes | Barclays, CSFB |

| Transaction name | Closing quarter | Complaint | Banks |
|---|---|---|---|
| SO2 | Q3 2001 | Yes | Barclays |
| Specter | Q1 2000 | Yes | CIBC |
| Steele | Q4 1997 | Yes | BT/Deutsche |
| Sundance - Slapshot | Q2 2001 | Yes | Citigroup, JPMorgan Chase |
| Sutton Bridge | Q2 1999 | Yes | RBS |
| Tammy | Q1 2001 | No | — |
| Teresa | Q1 1997 | Yes | BT/Deutsche |
| Tomas | Q3 1998 | No | — |
| Truman | Q2 1999 | Yes | Citigroup, Toronto Dominion Bank |
| Whitewing | Q3 1999 | No | — |
| Yosemite 1 | Q4 1999 | Yes | Citigroup |
| Yosemite 2 | Q1 2000 | Yes | Citigroup |
| Yosemite 3 (a/k/a ECLN 1) | Q3 2000 | Yes | Citigroup |
| Yosemite 4 – EUR (a/k/a ECLN 2) | Q2 2001 | Yes | Citigroup |
| Yosemite 4 – GBP (a/k/a ECLN 2) | Q2 2001 | Yes | Citigroup |
| Yosemite 4 – USD (a/k/a ECLN 2) | Q2 2001 | Yes | Citigroup |

Sources: Transaction name and closing quarter from reports of Examiner Neal Batson; Complaint status from Fourth Amended Complaint in *Enron Corp. v. Citigroup et al.*, Case No. 01-16034; assumption on banks' liability as directed by counsel.

## IV.5.2. The masking transactions distorted Enron's financial results

(116)   The transactions involving the banks noted above and at issue in this litigation took a variety of forms. Yet, the vast majority of them shared certain essential characteristics: they were effectively loans, arrangements under which Enron borrowed funds from the defendant in exchange for an obligation to repay the borrowed amounts with interest (not necessarily referred to as such). As the Special Investigative Committee of Enron's Board concluded after studying the transactions implicated in the October 16, 2001, press release and subsequent restatements, "Many of the most significant transactions apparently were designed to accomplish favorable financial statement results, not to achieve *bona fide* economic objectives or to transfer risk. Some transactions were designed so that, had they followed applicable accounting rules, Enron could have kept assets and liabilities (especially debt) off of its balance sheet; but the transactions did not follow those rules."[151]

---

[151]   William Powers, et al., "Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp.," ("Powers Report") at 4.

Expert Report of B. Douglas Bernheim, Ph.D.                                          Causation

(117)    Despite the fact that in economic terms these transactions were effectively loans, they involved
         structures, forms, and exchanges of extraordinary complexity. The complexity itself aided in
         "masking" the economic substance of the transactions. For example, the true nature of a
         transaction—and thus the true financial condition of the company as a result of the transaction—
         is concealed when transactions that create debt are *not* reported as creating debt, but rather are
         reported as generating operating income. This concealment is enhanced where the debt-creating
         transactions are not only misreported as generating operating income, but are structured in
         elaborate and complex disguises. They require extraordinary time and effort to dissect. The sheer
         complexity of the transactions helps to hide the true economic nature of the transactions from all
         except the principal participants in the transactions; the managers and the banks that received the
         benefits (in effect, loan proceeds and fees) from the transactions.

(118)    The typical transaction fell into one of the following categories:

         ▪  FAS 140 transactions

         ▪  Forest products transactions

         ▪  Minority interest transactions

         ▪  Prepay transactions

         ▪  Related party transactions

         ▪  Share trust transactions

         ▪  Tax transactions

         ▪  Other transactions

         Some transactions are not easily categorized, but all incorporated features from the preceding list.

(119)    Many transactions involved the purported sale of an asset by Enron to a special purpose entity
         (SPE) in exchange for cash or other consideration. The Examiner explained:

                  That cash was most often obtained through a loan to the SPE or an affiliated SPE.
                  However, unlike most transactions in which a person sells an asset, in most of the
                  Selected Transactions Enron or its affiliate agreed to repay the amount of debt
                  the SPE incurred to finance the purchase price. Furthermore, Enron or its affiliate

would continue to control the 'sold' asset and would received the upside benefit if the asset ultimately generated proceeds in excess of the costs of financing.[152]

Enron's repayment obligations were usually set out in a "Total Return Swap" arrangement that required Enron "to make payments to its counterparty (usually an SPE created for the transaction or lenders to the SPE) equal to the scheduled payments (and interest thereon) on the amounts borrowed by the SPE under its credit facility (which was roughly equal to the purchase price of the transferred asset)."[153]

Generally, 3% of the purchase price of the asset was financed by outside "equity" investors (to satisfy what certain Enron managers regarded as the requirement for keeping the transaction "off-balance sheet"), but the maximum return to these investors was generally capped in a manner not typical of true equity, and in some cases Enron offered unwritten assurances that the "equity" investors would receive the specified maximum return, which also made the "equity" more similar to debt. Enron typically reported the transfer of the asset as a sale and treated the cash inflow as CFO. Often, the asset did not generate enough cash flow to support the financing of the transaction or did not appear to be valuable enough to warrant the "equity" invested by outsiders in the SPE. Enron, therefore, used its own credit to back up the credit of the SPE, which exposed the company to a level of risk not ordinarily present in a true asset sale.[154]

(120)   Other types of transactions (such as the "prepay" transactions, examples of which I will discuss below in some detail) had similar effects. The Examiner found that the typical transaction had the economic characteristics of a loan in that it provided Enron with cash inflow while creating future obligations, but it was, nevertheless, not reported as balance sheet debt. Enron typically recorded the inflow as cash flow from operations, even though it was more properly characterized as cash flow from financing activities.

(121)   The manner in which each masking transaction was reported disguised its true economic substance. As a consequence, these transactions distorted many of the figures reported in Enron's financial statements, as well as all measures of creditworthiness derived from the tainted figures.

---

[152]   Batson, First Interim Report, 14–15.

[153]   Ibid. Although the Examiner is referring to a limited set of transactions he reviewed in connection with the first report, his description applies more broadly to Enron's FAS 140 transactions.

[154]   Ibid., 16.

(122)    To measure this distortion, I asked members of my staff who are Certified Public Accountants (CPAs) to adjust Enron's financial statements in accordance with a recharacterization of each transaction that reflects its true economic substance. The details of these adjustments are explained in Appendix C. Generally, the adjustments performed by my staff involved a three-step process:

- ▪ Step 1: Identify the income statement, balance sheet, and cash flow statement line-items that were affected by each transaction, using historical Hyperion accounting system data provided by the Enron estate.

    - ▪ "Reported" income statement and balance sheet items are based on the Tab E data from the transaction master binders prepared by the Enron Accounting Department after the Petition Date.

    - ▪ "Reported" cash flow items are based on the cash flow detail as prepared by the Enron Accounting Department contemporaneously with the production of Enron's reported financial statements.

- ▪ Step 2: "Zero out" the impact of the transaction from each financial statement line-item using Enron's own data.

- ▪ Step 3: Place the transaction back on the books in a way that transparently reflects its economic substance. This usually involves treating the transaction as a loan with the same repayment schedule as the original transaction. For this step, I generally relied on the debt schedules included in the Blake Report.

(123)    In the next two subsections, I illustrate these adjustments, as well as their effects on credit ratios, for two specific transactions. One, known as "June 2001 Prepay" (also known as "Citibank 1"), was a prepay transaction. The other, known as "Nahanni," was a minority interest transaction.

### IV.5.2.1. Prepay transactions: June 2001 Prepay

(124)    The Examiner described Enron's prepay transactions with the Banks as follows:

> Through this technique . . . Enron typically received payment in advance from SPEs established and maintained by banks in exchange for Enron's promise to make future delivery of oil or gas to the SPE (a prepaid forward contract). The SPE received the funds from the bank on account of its own prepaid forward contract with the bank. Enron and the bank would simultaneously enter into derivative contracts pursuant to which Enron would agree to pay a fixed price for the amount of the commodity it had agreed to deliver to the SPE, plus an interest

factor, in exchange for the bank's agreement to pay the market price for the commodity at the times of scheduled deliveries under Enron's prepaid forward contract with the SPE.

Neither Enron, the bank nor the SPE had the risk of price fluctuation on the commodity. Enron was exposed to a floating price risk, having agreed to deliver the commodity to the SPE at specified times in the future, but had eliminated that risk by agreeing to receive the floating price from the bank in exchange for a fixed price. The bank had no commodity risk because, while it was to receive the floating commodity price from the SPE, it had eliminated that risk by agreeing to receive a fixed price (plus an interest element) from Enron in exchange for giving Enron the floating price. The SPE had no commodity price risk because it simply passed what it received from Enron to the bank.

The accounting treatment Enron desired depended on viewing the three steps of the transaction as separate and distinct from each other, rather than recognizing the economic substance and viewing the transaction as a whole. Perhaps more than any of the six techniques, prepays were the quarter-to-quarter cash flow lifeblood of Enron. Through their use, Enron recorded a total of $4.016 billion in borrowings at December 31, 2000 as liabilities from price risk management activities rather than debt. But perhaps more importantly, the prepays accounted for $1.527 billion, or over 50%, of Enron's reported 2000 funds flow from operations. While the prepays were shown as liabilities on Enron's balance sheet, because they were not shown as debt and because the increase in the outstanding prepay balance from one period to the next served to increase funds flow from operations, Enron's key credit ratios were enhanced significantly.[155]

(125)    To illustrate how the prepay transactions affected Enron's credit ratios, I will review one in detail—the June 2001 Prepay transaction, which closed in Q2 2001. Through this transaction, Enron received $250 million from Citigroup.[156] Exhibit 7 shows the transaction's structure.

---

[155]    Batson, Second Interim Report at 44–45, January 21, 2003.
[156]    Batson, Third Interim Report, Appendix D, at 68, June 30, 2003.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 7: Diagram of June 2001 Prepay (a/k/a Citibank 1) transaction (simplified)**



Sources: Batson, Third Interim Report, Appendix D, at 68, June 30, 2003.

(126)    According to the Examiner:

The June 2001 Citigroup Prepay…followed the familiar circular structure, with
Citigroup paying a fixed amount of $250 million to Delta pursuant to a swap on
the closing date. Delta agreed in return to pay Citigroup a floating payment on
the settlement date based on the price of natural gas. Delta then paid the $250
million to Enron on the closing date, in exchange for Enron's agreement to pay
Delta the floating payment on the settlement date based on the same gas price.
Finally, Enron and Citigroup executed a swap, pursuant to which Enron agreed to
pay approximately $256 million to Citigroup on the settlement date, thus
repaying to Citigroup the principal plus interest. Citigroup agreed to pay Enron a

Expert Report of B. Douglas Bernheim, Ph.D.                         Causation

floating payment based on the same price of gas, thus returning the commodity price risk to Enron and thereby eliminating it.[157]

(127)   As with the other prepays, this transaction, "resulted in Enron receiving large upfront payments in return for its obligation to repay the amounts over time, together with additional amounts comparable to interest."[158] Although "Enron appeared to have assumed the market risk of the commodities…these delivery requirements went from party to party around a circle with the result that the apparent assumption of price risk was illusory. *Thus, the transactions were in substance debt.*"[159]

(128)   To better understand how this works, first consider a simplified (hypothetical) arrangement wherein two parties, A and B, enter into two contracts. The first contract requires A to pay B $250 million up front in exchange for a payment from B equal to the market value of some fixed quantity of crude oil at some future settlement date. The second contract requires B to provide A with $256 million in exchange for the market value of the same fixed quantity of crude oil, with both transfers occurring at the same settlement date. When the settlement date arrives, the oil-related legs of the two transactions cancel out; each party both gives up and receives the market value of the same quantity of crude oil. So, in fact, A gives B $250 million up front, and B gives A $256 million at the settlement date. This is equivalent to a standard loan.

(129)   With only two parties, the second contract transparently offsets the risks associated with the first contract. To make the content of its prepay deals less transparent, Enron generally included a third party (the SPE). Still, the same logic applies. To illustrate, suppose that A (a bank) and B (a company) enter into a contract requiring A to pay B $250 million up front in exchange for a payment from B equal to the market value of some fixed quantity of crude oil at some future settlement date. B also enters into a contract with C (an SPE) that requires B to provide C with $256 million in exchange for the market value of the same fixed quantity of crude oil, with both transfers occurring at the same settlement date. Likewise, C enters into a contract with A requiring C to provide A with $256 million in exchange for the market value of the same fixed quantity of crude oil, again with both transfers occurring at the same settlement date. Initially, $250 million flows from A to B. At the settlement date, $256 million flows from B to A, through C. In addition, each party both receives and gives up the market value of the same fixed quantity of crude oil (for example, B receives this value from C, and gives it to A). Consequently, all of

---

[157]   Ibid,, at 68-69.

[158]   Batson, Second Interim Report at 58, January 21, 2003.

[159]   Ibid. (emphasis added).

the oil-related legs of these transactions cancel out. Once again, the net effect involves A giving B $250 million up front, and B giving A $256 million at the settlement date. This is still equivalent to a standard loan.

(130)    Exhibit 7 illustrates the contractual cash flows for the June 2001 Prepay transaction. The triangle operated essentially as described in the previous paragraph. Citigroup was the lead bank ("A" in my example), Enron was the company/borrower ("B" in my example), and Delta was the SPE ("C" in my example).

(131)    With respect to proper accounting treatment, "The Examiner has concluded that Enron should have accounted for the Prepay Transactions as debt rather than as price risk management activities, and that Enron should have reported the cash received as cash flows from financing activities instead of from operating activities."[160] The June 2001 Prepay understated Enron's conventional debt and overstated the success of its operating activities and, thereby, created a misleading impression of Enron's financial health.

(132)    Exhibit 8 lists the amounts that the June 2001 Prepay transaction contributed to specific line-items in Enron's financial statements for the period ending June 30, 2001:

---

[160]    Ibid., 59.

**Exhibit 8: Contribution of June 2001 Prepay (a/k/a Citibank 1) to Enron's reported financial statements for Q2 2001**

| | Reported ($ million) |
|---|---|
| **Income statement** | |
|     Revenues | (1.1) |
|     Interest expense | |
|     Income taxes | |
| **Balance sheet** | |
|    *Assets* | |
|     Cash | 249.5 |
|    *Liabilities* | |
|     PRMA liabilities | 250.6 |
|     Accrued interest | |
|     Total debt | |
|     Deferred income taxes | |
|    *Shareholders' equity* | |
|     Retained earnings | (1.1) |
| **Cash flow statement** | |
|     Net income | (1.1) |
|     Deferred income taxes | |
|     Net PRMA assets | 250.6 |
|     Changes in working capital | |
|     ***Net CFO*** | 249.5 |
|     Issuance of long-term debt | |
|     ***Net CFF*** | |

Sources: June 2001 Prepay Master Binder, Tab E.

(133)    As the exhibit shows, Enron's reporting of the June 2001 Prepay transaction added nearly $250 million to the company's apparent cash flow from operations. Enron's balance sheet reflected the associated obligations not as debt, but as a PRMA (price risk management activity) liability.

(134)    To remove the impact of the June 2001 Prepay structure on each financial statement line-item for the period ending June 30, 2001, my staff made the adjustments shown in Exhibit 9. In most cases, the adjustment simply equals the transaction's contribution to the line-item (shown in Exhibit 8), times negative one. Because the Tab E does not reflect tax consequences (i.e., it was created on a pretax basis), I have applied a 35% marginal tax effect to the income statement adjustments. The remaining entries account for the implications of this assumption.

**Exhibit 9: Reversing the June 2001 Prepay (a/k/a Citibank 1) transaction from Enron's reported financial statements for Q2 2001**

|  | Reported ($ million) | Adjustment I ($ million) |
|---|---|---|
| **Income statement** |  |  |
|     Revenues | (1.1) | 1.1 |
|     Interest expense |  |  |
|     Income taxes |  | 0.4 |
| **Balance sheet** |  |  |
|    *Assets* |  |  |
|     Cash | 249.5 | (249.5) |
|    *Liabilities* |  |  |
|     PRMA liabilities | 250.6 | (250.6) |
|     Accrued interest |  |  |
|     Total debt |  |  |
|     Deferred income taxes |  | 0.4 |
|    *Shareholders' equity* |  |  |
|     Retained earnings | (1.1) | 0.7 |
| **Cash flow statement** |  |  |
|     Net income | (1.1) | 0.7 |
|     Deferred income taxes |  | 0.4 |
|     Net PRMA assets | 250.6 | (250.6) |
|     Changes in working capital |  |  |
|     ***Net CFO*** | 249.5 | (249.5) |
|     Issuance of long-term debt |  |  |
|     ***Net CFF*** |  |  |

Sources: June 2001 Prepay Master Binder, Tab E.

(135)    The next step involves adjusting Enron's financial statements in accordance with a recharacterization of the transaction that reflects its true economic substance. Here, I use a loan that has the same cash flow characteristics (amounts and timing of inflows and outflows) as the actual June 2001 Prepay transaction. Exhibit 10 lists the required adjustments in the column labeled "Adjustment II."

**Exhibit 10: Replacing the June 2001 Prepay (a/k/a Citibank 1) transaction with a transparent loan, Q2 2001 ($ million)**

|  | Reported | Adjustment I | Adjustment II |
|---|---|---|---|
| **Income statement** |  |  |  |
|     Revenues | (1.1) | 1.1 |  |
|     Interest expense |  |  | 0.1 |
|     Income taxes |  | 0.4 | (<0.1) |
| **Balance sheet** |  |  |  |
|    *Assets* |  |  |  |
|     Cash | 249.5 | (249.5) | 249.5 |
|    *Liabilities* |  |  |  |
|     PRMA liabilities | 250.6 | (250.6) |  |
|     Accrued interest |  |  | 0.1 |
|     Total debt |  |  | 249.5 |
|     Deferred income taxes |  | 0.4 | (<0.1) |
|    *Shareholders' equity* |  |  |  |
|     Retained earnings | (1.1) | 0.7 | (0.1) |
| **Cash flow statement** |  |  |  |
|     Net income | (1.1) | 0.7 | (0.1) |
|     Deferred income taxes |  | 0.4 | (<0.1) |
|     Net PRMA assets | 250.6 | (250.6) |  |
|     Changes in WORKING CAPITAL |  |  | 0.1 |
|     ***Net CFO*** | 249.5 | (249.5) |  |
|     Issuance of long-term debt |  |  | 249.5 |
|     ***Net CFF*** |  |  | 249.5 |

Sources: June 2001 Prepay Master Binder, Tab E; the Blake Report Debt Schedules.

(136)    These adjustments treat the June 2001 Prepay transaction as increasing debt on the Balance Sheet and as increasing cash flow from financing activities (CFF) on the Cash Flow Statement. Other line-items are also affected, but the amounts involved are less than $0.5 million (and hence round to zero). I have marked the other affected items using the notation <0.1 and (<0.1).

(137)    Taken together, these two sets of adjustments yield line-item amounts that more faithfully reflect Enron's activities and financial condition. Exhibit 11 shows their combined impact.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 11: Net adjustment, June 2001 Prepay (a/k/a Citibank 1) transaction ($ million)**

| | Reported | Adjustment I | Adjustment II | Net adjustment |
|---|---|---|---|---|
| **Income statement** | | | | |
|    Revenues | (1.1) | 1.1 | | 1.1 |
|    Interest expense | | | 0.1 | 0.1 |
|    Income taxes | | 0.4 | (<0.1) | 0.3 |
| **Balance sheet** | | | | |
| *Assets* | | | | |
|    Cash | 249.5 | (249.5) | 249.5 | - |
| *Liabilities* | | | | |
|    PRMA liabilities | 250.6 | (250.6) | | (250.6) |
|    Accrued interest | | | 0.1 | 0.1 |
|    Total debt | | | 249.5 | 249.5 |
|    Deferred income taxes | | 0.4 | (<0.1) | 0.3 |
| *Shareholders' equity* | | | | |
|    Retained earnings | (1.1) | 0.7 | (0.1) | 0.6 |
| **Cash flow statement** | | | | |
|    Net income | (1.1) | 0.7 | (0.1) | 0.6 |
|    Deferred income taxes | | 0.4 | (<0.1) | 0.3 |
|    Net PRMA assets | 250.6 | (250.6) | | (250.6) |
|    Changes in WORKING CAPITAL | | | 0.1 | 0.1 |
|    ***Net CFO*** | 249.5 | (249.5) | | (249.5) |
|    Issuance of long-term debt | | | 249.5 | 249.5 |
|    ***Net CFF*** | | | 249.5 | 249.5 |

Sources: June 2001 Prepay Master Binder, Tab E; the Blake Report Debt Schedules.

(138)  Using similar procedures, I arrive at net adjustments for all other quarters in which the June 2001 Prepay transaction was open. Adding these net adjustments, quarter-by-quarter, to the figures reported in Enron's 10-Qs effectively replaces the June 2001 Prepay with a transparent loan, thereby removing the transaction's masking effect.

(139)  With the June 2001 Prepay transaction unmasked through the adjustments shown in Exhibit 11, credit ratios computed on the basis of Enron's financial results for Q2 2001 would have been considerably different. Exhibit 12 reports the values of six credit ratios described in Section IV.4.3.2, using Enron's Q2 2001 financial results both as reported, and after making the adjustments described above (thereby replacing June 2001 Prepay with a transparent loan).

Expert Report of B. Douglas Bernheim, Ph.D.                                      Causation

**Exhibit 12: Impact of the June 2001 Prepay (a/k/a Citibank 1) transaction on Enron's credit ratios in Q2 2001**

| Credit ratio | As reported | Replacing June 2001 Prepay with a transparent loan | Difference | Percent difference |
|---|---|---|---|---|
| Coverage (TTM)[161] | 6.19 | 5.92 | (0.27) | (4.3%) |
| Leverage (Debt/Capital) | 0.46 | 0.46 | <0.01 | 1.0% |
| Liquidity (TTM) | 0.11 | 0.09 | (0.02) | (19.2%) |
| Operating profitability (TTM) | 0.02 | 0.02 | <0.01 | <0.1% |
| Quality of earnings (TTM) | 1.17 | 1.09 | (0.07) | (6.3%) |
| Return on capital (TTM) | 0.11 | 0.10 | (<0.01) | (0.5%) |

Sources: June 2001 Prepay Master Binder, Tab E; the Blake Report Debt Schedules.

(140)   The exhibit shows that, in its booking quarter, the June 2001 Prepay primarily allowed Enron to exaggerate its liquidity (which compares a company's free cash flow with its debt level), quality of earnings (which measures the cash component of operating income), and coverage (which measures it ability to service its debt). Replacing the June 2001 Prepay with a transparent loan reduces the company's liquidity ratio by more than 19%, its quality of earnings by more than 6%, and its coverage by more than 4%. The impact of masking on Enron's other credit ratios was less pronounced.

(141)   I made similar adjustments for September 2001, the only other complete quarter impacted by this transaction.

### IV.5.2.2. Minority interest transactions: Nahanni

(142)   My second illustration involves Nahanni, a minority interest transaction. The Examiner explained this class of transactions as follows:

> In simplest terms, a minority interest financing is one in which the amount financed is reflected on the sponsor's balance sheet as a minority interest in a consolidated subsidiary, rather than as debt. Through its minority interest financings, Enron was able to replace on-balance sheet debt with minority interests, thereby improving key financial ratios on which the Rating Agencies relied in establishing Enron's credit ratings.

---

[161]   TTM = Trailing Twelve Months. For TTM ratios, I add the figures reported in Enron's Q2 1999 Form 10-Q with figures for the prior three quarters.

Enron utilized these minority interest financings to raise a substantial amount of cash ($2.75 billion in the aggregate from 1997 to 2000) . . . . Although the financial statement presentation of these financings was important to Enron, these financings were, in large measure, motivated by Enron's desire to maintain its credit ratings and structured to address particular concerns of the Rating Agencies.

In these financings, Enron or an affiliate formed a majority owned subsidiary (a "Majority Owned Subsidiary") that Enron consolidated for financial accounting purposes. Another entity owned the minority interest in the Majority Owned Subsidiary (the "Minority Shareholder"). Enron did not consolidate the Minority Shareholder for financial accounting purposes. This unconsolidated Minority Shareholder generally held no assets other than the minority interest in the Majority Owned Subsidiary. Of the amount contributed by the Minority Shareholder to the Majority Owned Subsidiary, the Minority Shareholder obtained 3% from funding that was characterized as equity in the Minority Shareholder and it borrowed the remaining 97% from third-party lenders. The Majority Owned Subsidiary, in turn, typically loaned the funds received from the Minority Shareholder to Enron or to other Enron-controlled entities that were also consolidated with Enron for financial accounting purposes (with the intercompany loans then eliminated in consolidation).

The Majority Owned Subsidiary distributed to the Minority Shareholder funds in the amounts and at the times necessary to enable the Minority Shareholder to satisfy its obligations to its lenders and make distributions to its equity investors.

The assets that Enron and its subsidiaries contributed to minority interest financing structures varied significantly from project to project. In the financings at issue, the contributed assets ranged from merchant investments in various global energy related products, to short-term gas-related receivables, to preferred stock of a subsidiary, to convertible preferred stock of Enron and, in every structure, demand notes issued by Enron. Regardless of the assets contributed, however, Enron or Enron-controlled entities maintained substantial control over the assets and their proceeds.[162]

---

[162]    Batson, Second Interim Report, Appendix I, at 1–4 (citations omitted).

(143)    In the Nahanni minority interest transaction, Marengo was the Majority Owned Subsidiary. Yellowknife, a wholly owned subsidiary of Enron, was the 50% general partner of Marengo; Nahanni, the nonconsolidated minority shareholder, was the 50% limited partner of Marengo. Nahanni was formed on December 17, 1999, exactly two weeks before the end of Enron's fiscal year. In exchange for interests in Nahanni, MacKenzie Investors and Ambac Private Holdings provided the necessary 3% ($15 million) "outside equity" investment. The remaining 97% ($485 million) of Nahanni's funding came from Citigroup's commercial-paper affiliate, CXC, in the form of a revolving credit advance secured by Nahanni's interest in Marengo.[163]

(144)    Yellowknife financed its 50% stake in Marengo by contributing shares of Houston Pipeline Company preferred stock valued by Enron at $100 million and $400 million in unsecured Enron demand notes, both initially provided by Enron; Marengo placed these assets in a wholly owned subsidiary, Klondike. Marengo placed the $500 million Nahanni investment, in the form of Treasury securities, in another subsidiary called Yukon. On December 29, 1999, Yukon sold the Treasury securities. Enron reported this transaction as proceeds from the sale of merchant investments and thus as cash flow from operating activities. Marengo then loaned the $500 million previously held by Yukon to Enron (Enron demand loans). Enron treated this loan as an intercompany loan, and it was not reflected as debt on Enron's consolidated balance sheet. The entire $500 million in Enron demand loans, including both the $485 million originating with the Citigroup investment and the $15 million traceable back to the "equity" investment, was backed by a letter of credit issued by West LB, which largely eliminated any risk that Citigroup would not be repaid.[164] Enron, through the Master Letter of Credit and Reimbursement Agreement between Enron Corp. and West LB, agreed to reimburse West LB for any amounts West LB was required to fund under its letter of credit.[165]

(145)    On January 13, 2000 (two weeks after it borrowed the $500 million from Nahanni), Enron caused the repayment of the $485 million revolving credit facility of Nahanni in full. However, some $16 million in cash was kept in Yukon so that the equity investment would remain outstanding. This allowed Enron to reuse the Nahanni structure for additional transactions if it were so inclined (although it did not do so).[166]

---

[163]  Ibid., Appendix I, Annex 3 at 4–5.

[164]  Ibid., 5–12.

[165]  Master LOC Agreement, Examiner's footnote 54 of Second Interim Report, Appendix I, Annex 3.

[166]  Second Interim Report, Appendix I, Annex 3, pages 12–13.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

(146)   Requiring that a nonconsolidated structure be capitalized by at least 3% of equity at risk ensures
        that an arms-length party has a financial interest in the performance of the assets or interests
        purchased by that structure. If 100% repayment of the funds available to a structure is guaranteed,
        the risks associated with the assets and interests held by that structure always remain with the
        transferor—in this case, Enron—and outside "equity" participation in the nonconsolidated
        structure is a fiction.

(147)   In Nahanni, the funds obtained from all independent parties (Citigroup, and to a lesser extent,
        MacKenzie and Ambac) were recorded as part of Enron's consolidated operations and were
        supported by a guaranty of repayment arranged by Enron. Because "the West LB Letter of Credit
        effectively assured repayment of both the equity and debt portions of Nahanni's investment,"[167]
        the $500 million inflow obtained through the Nahanni transaction was economically equivalent to
        a loan to Enron from independent entities (Citigroup and, to a lesser extent, MacKenzie, and
        Ambac).

(148)   Exhibit 13 shows a simplified sketch of the relationships among the various entities involved in
        this transaction. The entities in red were consolidated with Enron for the purpose of financial
        reporting; the entities in blue were not.

---

[167]   Ibid., 15.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 13: Diagram of Nahanni transaction (simplified)**



Sources: Batson, Second Interim Report, Appendix I, Annex 3 at 3.

(149)   Concerning the Nahanni transaction's purpose and effect, the Examiner commented:

> The Nahanni Transaction was a $500 million Citibank-led financing created in
> December 1999 to increase Enron's cash flow from operating activities in 1999
> by $500 million (representing 40% of Enron's net operating cash flow for that
> year). The Nahanni Transaction raises accounting issues of non-consolidation of
> the Minority Shareholder and the propriety of characterizing the cash flow as
> cash flow from operating activities.[168]

(150)   The Examiner characterized Project Nahanni as having been engineered "to achieve Enron's
desired accounting results. It appears that Project Nahanni served no business purpose other than
facilitating such accounting results or, as described by Citigroup, 'for year-end window

---

[168]   Ibid., Appendix I, at 6.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

dressing.'"[169] Timothy Despain, who served as Enron's Assistant Treasurer between January 1999 and May 2002, issued a statement in conjunction with his plea of guilty to conspiracy to commit securities fraud. In the statement, he admitted that the sole purpose of Nahanni was to allow Enron to achieve a completely artificial cash flow target it had set for itself (and had told the rating agencies it intended to achieve), but which was at least $500 million higher than the company's true cash flow. He noted that Nahanni was "actually to Enron's financial detriment, apart from its usefulness in misleadingly portraying Enron to the credit rating agencies, because the bank that structured the transaction charged Enron several million dollars to facilitate the transaction."[170]

(151)    With respect to proper accounting treatment, "[t]he Examiner has concluded that Nahanni should have been consolidated with Enron and its borrowings reflected as debt on Enron's consolidated balance sheet, and that Enron's failure to do so did not comply with GAAP…the Examiner has concluded that Enron's presentation of the proceeds from Yukon's sale of Treasury securities as cash flows from operating activities did not comply with GAAP."[171]

(152)    Exhibit 14 shows the financial statement line-item adjustments required to unmask the Nahanni transaction in its booking quarter (Q4 1999). As with June 2001 Prepay, the first step is to reverse the reported impact of Nahanni on each line-item. This is shown in the column labeled "Adjustment I." The next step is to adjust Enron's financial statements in accordance with a recharacterization of the transaction that reflects its true economic substance. Here, I use a loan that has the same cash flow characteristics (amounts and timing of inflows and outflows) as the actual Nahanni transaction. This is shown in the column labeled "Adjustment II." Taken together, these two sets of adjustments yield line-item amounts that more faithfully reflect Enron's activities and financial condition. The final column shows their combined impact.

---

[169]    Ibid., Annex 3 to Appendix I, at 1–2, quoting Citigroup Presentation regarding Citigroup Exposure, Undated, at 28, CITI-B0137997-CITI-B0138003.

[170]    Timothy Despain Cooperation Agreement, October 5, 2004.

[171]    Ibid., 14.

**Exhibit 14: Adjustments for Nahanni minority interest transaction in Q4 1999 ($ million)**

|  | Reported | Adjustment I | Adjustment II | Net adjustment |
|---|---|---|---|---|
| **Income statement** | | | | |
| Interest income | 1 | (1) | | (1) |
| Interest expense | | | 1 | 1 |
| Income taxes | | (0) | (0) | (1) |
| **Balance sheet** | | | | |
| *Assets* | | | | |
| Cash | 501 | (501) | 500 | (1) |
| *Liabilities* | | | | |
| Accrued interest | | | 1 | 1 |
| Long-term debt | | | 500 | 500 |
| Deferred income taxes | | (0) | (0) | (1) |
| *Minority interest* | 500 | (500) | | (500) |
| *Shareholders' equity* | | | | |
| Retained earnings | 1 | (0) | (1) | (1) |
| **Cash flow statement** | | | | |
| Net income | | (0) | (1) | (1) |
| Deferred income taxes | | (0) | (0) | (1) |
| Changes in WORKING CAPITAL | | 0 | 1 | 1 |
| Proceeds from sales of merchant assets | 500 | (500) | | (500) |
| *Net CFO* | 501 | (501) | | (501) |
| Issuance of long-term debt | | | 500 | 500 |
| *Net CFF* | | | 500 | 500 |

Sources: Enron Form 10-K for 1999; Hyperion data; Adjustment II data provided by CRA.

(153)    With the Nahanni transaction unmasked through the adjustments shown in Exhibit 14, credit ratios computed on the basis of Enron's financial results for Q4 1999 would have been considerably different. Exhibit 15 reports the values of the same six credit ratios as Exhibit 12. Exhibit 15 makes use of Enron's Q4 1999 financial results both as reported, and after making the adjustments described above (thereby replacing Nahanni with a transparent loan).

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 15: Impact of Nahanni on Enron's credit ratios, Q4 1999**

| Credit ratio | As reported | Replacing Nahanni with transparent loan | Difference | Percentage difference |
|---|---|---|---|---|
| Coverage (TTM) | 4.14 | 3.43 | (0.71) | (17.1%) |
| Leverage (Debt/Capital) | 0.39 | 0.41 | 0.02 | 6.1% |
| Liquidity (TTM) | (0.14) | (0.19) | (0.05) | N/A |
| Operating profitability (TTM) | 0.05 | 0.05 | 0.00 | 0.0% |
| Quality of earnings (TTM) | 0.58 | 0.34 | (0.24) | (40.8%) |
| Return on capital (TTM) | 0.08 | 0.08 | (<0.01) | (1.5%) |

Sources: Enron Form 10-K for Q4 1999; Nahanni Master Binder, Tab E; Blake Report.

(154)    The exhibit shows that Nahanni, like June 2001 Prepay, primarily allowed Enron to exaggerate its coverage and quality of earnings in the transaction's booking quarter. Enron's reported financials improperly inflated the company's true ratios. Replacing Nahanni with a transparent loan increases the company's leverage ratio by 6%, and reduces its coverage ratio by 17% and its quality of earnings by nearly 41%. The masking of Nahanni noticeably reduced Enron's leverage from 41% to 39%. It had relatively little impact on other credit ratios.

### IV.5.3. The masking transactions significantly distorted Enron's reported financial results for 1997

#### IV.5.3.1. The first three quarters of 1997

(155)    At the start of 1997, Enron appeared to be doing quite well. The first quarter saw substantial growth in the company's wholesale operations. Electricity trading had grown, in volume terms, nearly 350% since Q1 1996.[172] The company's 10-Q announced that Enron had sold "non-strategic" assets totaling some $295 million "consistent with Enron's previously announced strategy of focusing on core businesses." First quarter earnings per share were $0.88 (up slightly from $0.86 in Q1 1996), net income was $222 million (versus $213 million for Q1 1996), and revenues were $5.3 billion (up substantially from $3.1 billion in Q1 1996).

(156)    It appeared that Enron's financial performance began to deteriorate in Q2 1997. The company's overall results were adversely affected by two significant nonrecurring charges:

---

[172]    Enron Corp., Q1 1997 Form 10-Q (May 14, 1997).

Expert Report of B. Douglas Bernheim, Ph.D.                                        Causation

- In Q2 1997, Enron settled claims arising from its contract to buy gas from the North Sea field known as "J-Block" and booked a nonrecurring charge of some $675 million (pretax) that reflected cash payments to the counterparties and the present value of the amended contract conditions.[173]

- In June of 1997, Enron took a $100 million (pretax) charge against earnings in connection with an unsuccessful investment in a plant that produced the chemical additive MTBE.[174]

(157)    Enron's second quarter reported earnings per share and net income from continuing operations were positive ($0.40 and $104 million, respectively), although slightly lower than in Q2 1996. But after accounting for J-Block, MTBE, and other nonrecurring charges, the company suffered a net loss of $420 million, or $1.71 per share.[175]

(158)    The third quarter of 1997 was the first in which Enron reported financial results inclusive of the recently acquired PGE. The combined entities reported net income of $134 million for the quarter, up from Enron's stand-alone total of $123 million a year earlier. To complete the stock-for-stock deal, Enron issued 50.5 million shares of its own stock to PGE shareholders. Enron's earnings per share were down slightly from 1996, $0.44 (compared with $0.48), but they were six cents higher than the First Call consensus estimate. Earnings growth came from Enron's trading arm, Enron Capital & Trade Resources, and from Enron International, while earnings for the Gas Pipeline Group and the Ventures Group were lower than in Q3 1996. Enron's retail energy operations lost money, though not unexpectedly, as the group had incurred considerable expenses preparing to enter deregulated electricity markets. Enron's debt level was higher in Q3 1997 than at the start of the year ($6.9 billion versus $3.3 billion). The company attributed this to two factors: the issuance of new debt to pay the J-Block settlement and the fact that Enron had assumed $1.1 billion in PGE debt. There were no significant write-offs or charges against earnings during this quarter.[176] Arguably, Enron was poised to end the year on a high note.

### IV.5.3.2. Q4 1997: Enron appears to recover

(159)    Enron's financial statements for the year ending December 31, 1997, appeared to support the company's contention that it had adequately addressed the various problems that had arisen

---

[173]   Enron Corp., 1997 Form 10-K (March 31, 1998).

[174]   Ibid.

[175]   Enron Corp., Q2 1997 Form 10-Q (August 14, 1997).

[176]   Enron Corp., Q3 1997 Form 10-Q (November 14, 1997); "Business Brief—ENRON CORP.: Earnings Increased 8.9% On 80% Rise in Revenue," *Wall Street Journal*, October 15, 1997.

during the year. Annual net income was a disappointing $105 million (down considerably from $584 million the year before), but this was largely attributable to the costly settlement of the J-Block claims and the nonrecurring MTBE charges. In its Annual Report to shareholders, Enron conceded that its net income and stock price performance were "unacceptable," but it emphasized that its problems were in the past and that its core businesses were "exceptionally strong." Enron characterized each of its business units as an industry leader that was "uniquely positioned to consistently generate strong earnings growth."[177]

(160)    While net income in 1997 may have been "unacceptable," reported cash flows were strong. After three consecutive quarters of negative cash flow from operations (totaling negative $588 million), Enron appeared to have turned things around in the fourth quarter, during which it booked $1.09 *billion* in CFO, nearly double the amount for Q4 1996. The fourth quarter boost allowed Enron to report CFO of $501 million for the year.[178]

(161)    Even before the Annual Report was issued, market monitors were expressing confidence in the company. On November 20, 1997, Prudential Securities upgraded its rating on Enron's stock from "Hold" to "Buy" based on its "confidence that it will meet our 1998 recurring earnings expectations." Prudential viewed Enron stock as "undervalued." The analysts reported on a recent discussion with COO Jeffrey Skilling, who claimed that Enron's management had "refocused its growth objectives on recurring fully-diluted earnings. We view this as a long-awaited and encouraging change."[179] They described in detail their perception that Enron was successfully pursuing a strategy that involved "minimal" investment risk and a renewed focus on "clean" (i.e., higher "quality") earnings.[180]

(162)    As 1997 ended, Enron held an investment grade credit rating from each of the major rating agencies, just as it had for many previous years. Its Moody's rating was Baa2, which meant that its debts were "neither highly protected nor poorly secured."[181] Moody's saw Enron's rating outlook as "stable," based on its belief that, even after accounting for the off balance sheet debt of

---

[177]    Enron Corp., 1997 Annual Report, at 2–4.

[178]    Enron Corp., 1997 Form 10-K (March 31, 1998).

[179]    Carol M. Coale and Jay H. Rushin, Prudential Securities, Enron Corp. Company Update, November 20, 1997.

[180]    Ibid.

[181]    "Bonds and preferred stock which are rated Baa are considered as medium-grade obligations (i.e., they are neither highly protected nor poorly secured). Interest payments and principal security appear adequate for the present but certain protective elements may be lacking or may be characteristically unreliable over any great length of time. Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well." *Rating the Rater* (Diaz testimony), 6–7.

Expert Report of B. Douglas Bernheim, Ph.D.                                  Causation

which it was aware, Enron's cash flow was sufficient to meet its obligations.[182] Enron ended the
year with an even stronger BBB+ rating from S&P, which praised the company's "strong
competitive position and diversity in worldwide energy marketing, gas transmission, gas and oil
production, and global development, construction and operation of power plants and gas
pipelines." S&P also praised Enron's "powerhouse marketing operation" in North America,
which Enron was said to be "duplicating in Western Europe and Scandinavia." S&P's major
concern was Enron's cash flow (and funds flow interest coverage ratio), which it expected to
improve as gas and oil production grew.[183]

(163)    In early 1998, Enron was named one of "America's Most Admired Companies" by *Fortune*
magazine.[184] When Enron announced its year-end results on January 20, 1998, Dow Jones
reported that analysts were pleased with Enron's "strong fourth quarter earnings." But, in what
might seem a foreshadowing of problems to come, it also reported that analysts were not entirely
sure how to interpret Enron's reported income figures, or whether Enron was recognizing revenue
and classifying charges as "non-recurring" appropriately.[185]

### IV.5.3.3. Q4 97: the reality

(164)    Despite appearances, Enron's actual financial condition at the end of 1997 was problematic. Its
cash flow from operations, which had surpassed $1 billion the previous year, and which exceeded
$0.5 billion in its reported results for 1997, was in fact only $98 million (after recharacterizing the
masking transactions).[186] Market monitors were, therefore, misled into thinking that Enron was
performing well in terms of "clean" or "quality" earnings (that is, net income in the form of actual
cash flows, rather than accruals for expected future cash flows). Likewise, its funds flow
coverage ratio was only 2.51, not 3.40, as reported.[187] Recall that the coverage ratio is a measure

---

[182]    "Moody's stable rating outlook incorporates our expectation that earnings and cash flows for the intermediate term
will enable consistent debt protection measurements, and that fixed income ratios, including off balance sheet
obligations, will not exceed the current levels." Moody's Rating Analysis of Enron Corp., October 1997,
CI000816710–CI000816720.

[183]    S&P RatingsDirect, "Research: Enron Corp.'s $1B Shelf Rated Prelim BBB+/BBB by S&P," Dec. 31, 1997,
ANARPT009243.

[184]    *Fortune,* March 2, 1998, 86.

[185]    Loren Fox, "Analysts Like Enron's 4Q Net, But Differ On Numbers," Dow Jones News Service, January 20,
1998, 2:42 p.m.

[186]    Enron's unmasked CFO and coverage ratios were determined by subtracting the "Adjustment I" values for the
transactions that closed in Q4 1997 from the values appearing in Enron's Form 10-K.

[187]    These figures exclude one-time charges for J-Block and MTBE in 2Q-97.

of liquidity; it reflects a company's ability to generate cash to meet its short-term obligations (see Section IV.4.3.2).

(165)   Had Enron's stakeholders or other market monitors been aware of its true financial condition, they might have compelled its management to confront and resolve its cash flow and quality of earnings issues. But, as a result of the masking transactions, none of these parties learned the truth until years later.

(166)   A number of major masking transactions closed at the end of 1997. Altogether, the Q4 1997 transactions more than offset three consecutive quarters of negative cash flow from operations (totaling negative $588 million ),[188] and they allowed Enron to report fourth quarter CFO of positive $1.09 billion, or $501 million for the year—five times the true number.

### IV.5.4. The masking transactions increasingly distorted Enron's financial results over time

(167)   As shown in Exhibit 16, which counts the number of masking transactions closed in each quarter, Enron's use of masking transactions increased over time.

---

[188]   There were five masking transactions that closed at the end of 1997: Chase VI (prepay), Nighthawk (minority interest), Chewco (related party), Steele (a tax transaction), and the Bammel Gas Trust.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 16: Growth in Enron's use of masking transactions**



Sources: Examiner's reports.

(168)    As shown in the next series of exhibits, the cumulative impact of the transactions grew over time, and Enron's reported financial results bore less and less resemblance to the truth. Enron maintained and even strengthened the illusion that it was legitimately an investment grade firm, even though its true performance placed it increasingly in the company of noninvestment grade firms.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 17: Enron's true vs. reported coverage ratio, 1990–2001[189]**



Sources: Data from Compustat, Enron financial statements, and adjustments for all masking transactions.

(169)    Exhibit 17 depicts Enron's coverage ratio. On an as-reported basis, this ratio ranged between 2 and 4 from 1997 to 2000 and rose even higher in 2001. The general trend over this entire period indicated continuing improvement. The reality—represented by the yellow (lower) line—was radically different. After 1997, Enron's actual coverage ratio was well below its historical average. After the first quarter of 1998, Enron's actual coverage ratio never rose above 2 and often fell significantly below 1. This was an indication of potentially severe liquidity issues.

---

[189]    Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

Expert Report of B. Douglas Bernheim, Ph.D.                              Causation

Exhibit 18: Enron's true vs. reported liquidity ratio, 1990–2001[190]



Sources: Data from Compustat, Enron financial statements, and adjustments for all masking transactions.

(170)  Exhibit 18 compares Enron's true liquidity ratio with its as-reported liquidity ratio. During most of this period, Enron's CFO (minus its capital expenditures) was negative, and this caused Enron to have a negative liquidity ratio. After the masking transactions began, Enron appeared to show signs of improvement (note the spike in reported liquidity in 1998 and the dramatic improvement in the final quarters before bankruptcy). The reality during this period, however, was that Enron's liquidity was generally deteriorating and that it remained negative throughout the entire masking period.

---

[190]  Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

Expert Report of B. Douglas Bernheim, Ph.D.                                     Causation

**Exhibit 19: Enron's true vs. reported leverage ratio, 1990–2001[191]**



Sources: Data from Compustat, Enron financial statements, and adjustments for all masking transactions.

(171)    Exhibit 19 depicts Enron's leverage ratio. On an as-reported basis, this ratio generally varied between 40% and 50% after 1997. But the company's true leverage ratio was much higher and grew fairly steadily after 1997. It actually broke 55% in 1998, hovered near 60% in early 1999, and even surpassed this threshold later that year. In early 2000, it broke 65%—an event which, had these obligations all been classified as senior debt, would have triggered default under many of its debt covenants.[192]

---

[191]    Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

[192]    See Footnote 141 for a more detailed explanation of Enron's compliance with the 65% threshold.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

**Exhibit 20: Enron's true vs. reported operating profit margin, 1990–2001[193]**



Sources: Data from Compustat, Enron financial statements, and adjustments for all masking transactions.

(172)   Exhibit 20 depicts Enron's operating profit margin. According to this ratio, Enron's financial condition worsened fairly steadily from the start of 1996 through 2001. However, in this instance, the masking transactions disguised the truth only to a small extent.

---

[193]   Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

Expert Report of B. Douglas Bernheim, Ph.D.                                        Causation

**Exhibit 21: Enron's true vs. reported return on capital, 1990–2001[194]**



Sources: Data from Compustat, Enron financial statements, and adjustments for all masking transactions.

(173)   Exhibit 21 shows Enron's return on capital. According to this ratio, Enron's performance
        deteriorated around the start of 1996. As shown in the exhibit, the masking transactions disguised
        the fact that Enron's true return on capital continued to deteriorate through the start of 2000.

---

[194]   Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

**Exhibit 22: Enron's true vs. reported quality of earnings, 1990–2001[195]**



Sources: Data from Compustat, Enron financial statements, and adjustments for all masking transactions.

(174)    Exhibit 22 shows Enron's quality of earnings. QOE is an important measure of the conservatism of a company's accounting policies because it reflects the portion of a company's "book" earnings for which the company actually received cash from operations. The greater the extent to which a company's reported earnings actually correspond to CFO, the less risky the company is typically perceived to be. Enron's reported QOE ratio was volatile during this period, but it generally remained above 50% after the masking transactions began. But the reality was quite different: Enron's true QOE ratio hit historic lows in late 1998 and early 1999, and again in early 2000. The company's earnings were increasingly based on accounting-driven transactions and not on actual cash flows from operations.

(175)    The preceding series of exhibits corroborates the Examiner's conclusion that, "through the pervasive use of structured finance techniques involving SPEs and aggressive accounting

---

[195]   Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

Expert Report of B. Douglas Bernheim, Ph.D.                                Causation

practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial position or performance."[196]

### IV.5.5. The masking transactions deceived market monitors and subverted market discipline

(176)    The Complaint transactions and other masking transactions were specifically engineered to subvert market discipline by distorting reported financial results. In the statement that accompanied Timothy Despain's guilty plea, he declared:

> I was directed by my superiors to engage in, and I did engage in, conduct that I recognized was intended to manipulate fraudulently Enron's credit rating, which rating I knew was relied on by the holders and prospective purchasers of Enron's publicly traded stocks and bonds.

> Enron's credit rating was important to Enron in a number of respects. As I and others knew, Enron's credit rating was directly related to the cost of capital Enron borrowed in the marketplace. . . . An investment grade rating was essential to Enron's ability to enter into favorable or unsecured trading contracts with its counterparties. A decline in Enron's credit rating to below investment grade would also have triggered calls for significant amounts of cash to be posted under Enron's existing trading contracts and accelerated payments due under some of Enron's financing structures. Such a drop would also have severely impacted Enron's ability to continue accessing bank credit facilities and borrowing money in the public marketplace.

> . . . The annual cash flow targets that Enron set for itself and reported to the rating agencies were arbitrarily based on what I and others believed was necessary to maintain Enron's investment grade credit rating, rather than on the amount of cash flow Enron's non-regulated businesses were expected to achieve. . . . Enron only achieved its cash flow target numbers by engaging in complex transactions designed primarily and at time exclusively to achieve specific cash flow results.[197]

---

[196]   Batson, Third Interim Report at 11.
[197]   Timothy Despain Cooperation Agreement, October 5, 2004, Statement 1–2.

(177)    Another Enron manager, Chief Financial Officer Andrew Fastow, similarly testified that the
masking transactions were engineered to deceive the credit rating agencies:

> Well, Enron had a problem in that its -- the results it would otherwise have
> published from just its business operations were usually insufficient in order for
> Enron to maintain its investment grade credit rating or to meet its earnings
> targets.
>
> And we were looking with banks who could help us solve this problem, meaning
> doing transactions that would, as we described internally, fill the gap between
> what was really happening inside Enron and what -- the way we wanted Enron to
> appear to the outside world.[198]
>
> Enron desired to have what otherwise was economically, in substance, a loan
> look like something other than a loan so it could achieve a higher credit rating.[199]

(178)    Manipulation of the coverage ratio was particularly critical. One Enron manager, who declared in
a self-evaluation that he was intimately involved with "the generation and measurement of
Enron's funds flow objectives," called the coverage ratio "probably the single most critical metric
and difficult metric for Enron to achieve to maintain its BBB+ rating."[200] Fastow similarly
testified that "Enron generally did not have enough funds flow from operations -- did not have the
funds flow from operations necessary to maintain its investment grade rating, in my opinion."[201]

(179)    For many years, the deception was successful. Executives of both Moody's and S&P testified
before Congress that had they known the truth about Enron's transactions, they would have
reached different conclusions concerning the company's creditworthiness and would have likely
lowered Enron's credit rating—potentially to below investment grade:[202] According to a Moody's
executive:

> Moody's did not have any knowledge, prior to Enron's bankruptcy, of the
> existence of Enron's prepaid forward and related swap transactions. ... If such
> transactions had been accounted for as a loan, Enron's operating cash flow would
> have been reduced and its debt would have been greater. The disclosure of these

---

[198]    Fastow Deposition, October 23, 2006, at 23–24.
[199]    Ibid., at 59.
[200]    Batson, Second Interim Report at 21–22, citing an interoffice memorandum from Joe Deffner to David Delainey.
[201]    Fastow Deposition, October 23, 2006, at 55.
[202]    *Rating the Raters*, 29.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

transactions as loans would have exerted downward pressure on Enron's credit rating.

Of course, knowing all that we know today about the true nature of Enron's corporate enterprise, it is clear that Enron had not been an investment grade company for several years. The compounded impact of these transactions alone on Enron's financial framework may have resulted in a lower rating and perhaps an earlier downgrade to below investment grade status. More fundamentally, however, Moody's would have questioned management's motivations to implement such a structure.[203]

(180)    Similarly, according to an S&P executive:

Had they been revealed, the clandestine dealings and obfuscatory disclosure practices conducted by Enron's management would necessarily have cast long shadows on the validity of Enron's credibility in general and its financial reporting in particular. While it is difficult to say with certainty all the steps Standard & Poor's would have taken had it known these material facts, Standard & Poor's does have a policy of not issuing ratings at all when it concludes that it does not have enough information to form a clear and accurate opinion of the issuer's creditworthiness.[204]

Had Enron told Standard & Poor's the truth about its financial condition during the ratings process—as it was required to do—the impact on Enron's rating would necessarily have been significant.[205]

(181)    Timothy Despain's plea agreement tells a similar story:

Although the prepay transactions were accounted for as commodity transactions and reflected on Enron's books as a trading liability, the transactions in substance created debt-like obligations . . . I and others told the rating agencies that the cash generated from Enron's trading operations was from the sale or 'monetization' of trading contracts . . . Fundamentally, the agencies were led to believe that Enron was generating cash by selling an asset, when in fact Enron was generating cash by incurring a future obligation that operated as debt. . . . I and the Treasurers

---

[203]  *The Role of Financial Institutions,* (testimony of John Diaz, Managing Director, Moody's Investors Service), 1.
[204]  *Rating the Raters* (Barone testimony), 23.
[205]  Ibid., 20.

recognized that if the rating agencies knew about the nature and extent of Enron's prepay transactions, such information would have had a materially negative effect on Enron's credit rating.[206]

## IV.6. Subverting market discipline through deception has foreseeable consequences

(182)   By pumping cash into Enron and creating the illusion of financial health, the Complaint transactions and other masking transactions subverted the usual mechanisms by which stakeholders and market monitors impose discipline on poorly performing or irresponsible corporate managers. In this section, I explain that the subversion of these mechanisms through deception has consequences that are, at a general level, foreseeable to any party with knowledge of the deception.

### IV.6.1. Propping up a company's credit rating will expose more creditors to more risk than they would accept if they knew the truth

(183)   The masking transactions achieved what they were designed to accomplish: they allowed Enron's underperforming management to portray the company as successful. This, in turn, had the effect (in the hands of that management) of allowing the company to incur greater debt and to make investments that ultimately led to additional losses. In particular, the masking transactions allowed an underperforming company with below-investment grade characteristics to retain an investment grade rating it did not deserve. Arguably the single most direct and foreseeable consequence of this is that creditors who did business with Enron or loaned money to the company believed that they were assuming a certain level of credit risk (one commensurate with an investment grade company), when in fact they were assuming a much higher risk.

- Creditors thought that Enron had a relatively healthy leverage ratio and was, therefore, in a position to take on more debt. In fact, Enron was overleveraged and should have been paying down or otherwise reducing its existing debt.

- Creditors thought that Enron deserved its strong credit rating and had a healthy funds flow interest coverage ratio, both of which implied a low probability of default on its loans. In fact,

---

[206]   Timothy Despain Cooperation Agreement, October 05, 2004, Statement 2–3.

Enron's cash flow from operations was generally negative, which made it unlikely that the company could repay its debts.

(184)   Creditors, therefore, continued to extend large amounts of credit to Enron, and they did so at lower interest rates than they would have offered had they known the truth about Enron. Trade creditors similarly did business with Enron on credit when they would otherwise have required cash, collateral, third-party guaranties, or other forms of security against losses. Creditors were not compensated for the true risks they were taking on—instead they were only compensated for the much lower level of risk implied by Enron's misleading financial statements and inflated credit rating. These risks were not merely hypothetical. Enron's deficiency balance in bankruptcy reflects actual losses incurred by deceived creditors. These are predictable consequences of manipulating financial results to create the illusion of greater creditworthiness, and they would have been foreseeable to the parties with knowledge of Enron's deception.

### IV.6.2. Preventing market participants from taking steps to discipline— and potentially replace—managers in the event they perform poorly or act irresponsibly leads predictably to value destruction

(185)   Sometimes firms are managed well, and sometimes they are managed poorly. Good managers can experience bad luck, but they tend, on average, to create value. Similarly, bad managers can experience good luck, but they tend, on average, to destroy value. The potential for timely action by the creditors, equity holders and/or the board of directors leads, on average, to more value creation and less value destruction because (a) the imposition of discipline tends to occur when management is performing poorly or acting irresponsibly, and (b) the threat of discipline (including the possibility of removal) provides managers with incentives to act prudently and responsibly, even when they are inclined to behave otherwise. It follows that the subversion of the mechanisms of market discipline leads, on average, to more value destruction and less value creation.

(186)   For another perspective on this issue, imagine changing the rules of governance for a corporation so that neither creditors nor equity holders or the board has any power to intervene in management's decisions or to alter management's compensation. Removing major controls on management's ability to line its own pockets at investors' expense would inevitably cause the value of the company—both its share price and the market value of its debt—to plummet, reflecting diminished expectations concerning future performance. Depriving these same parties of the information required to impose discipline has a similar effect. The difference between the value of the corporation when the market's disciplinary mechanisms operate properly and the

value when they are impaired corresponds to the market's assessment of the value that these mechanisms create (in terms of expected future performance) by virtue of ameliorating the "agency" problems associated with corporate ownership and governance. When these mechanisms are subverted, this value is destroyed.

### IV.6.3. Allowing a company to operate without the imposition of discipline leads predictably to excessive risk taking, value destruction, and harm to creditors, particularly if the company is financially troubled

(187)   As I discussed previously, when a company does well, its managers usually share in equity holders' upside gains. But once it does poorly enough to enter bankruptcy, the managers do not generally share in the extent of creditors' downside losses. Even before a company enters bankruptcy, as conditions deteriorate this asymmetry can potentially create a preference for risky projects over safe ones, even when the risky alternatives generate negative expected net present value (NPV). This problem becomes more severe as a company's leverage rises. In extreme cases, where the face value of debt exceeds the value of the firm, management—if left unconstrained—has an incentive to "bet the farm" on long-shot gambles. Risky projects become attractive to management if they have sufficient upside potential, *irrespective of their average or downside returns*. Managers who make investment decisions primarily on the basis of upside potential may find themselves with both winners and losers, but, on average, such managers will tend to lose money and can be expected to undertake projects that expose the company to potentially catastrophic losses.

(188)   Ordinarily, managers are not free to act on these incentives. As leverage increases, the cost of borrowing rises and access to credit may evaporate completely. This leaves the company with little capacity to initiate new risky projects. In addition, high leverage and/or insolvency may trigger default under the company's debt covenants, leading to radical changes in management, strategy, and/or capital structure.

(189)   Favorable misrepresentation of financial results deprives uninformed creditors of the information required to detect high leverage or insolvency and, thereby, subverts their ability to constrain managers, either through the restriction of credit or through the exercise of debt covenants, when those conditions prevail. Consequently, by permitting a company—particularly one that is financially troubled—to operate without the imposition of discipline, financial deception leads predictably to excessive risk taking and, on average, value destruction, and harm to creditors. By harm to creditors, I mean that creditors are less likely to be paid on time and in full.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Causation

### IV.6.4. Allowing a company to hide underperforming assets leads predictably to excessive risk taking, value destruction, and harm to creditors

(190)    Ordinarily, managers of healthy companies are deterred from taking on highly risky projects because the costs of downside exposure exceed the benefits of upside potential. I have already observed that high leverage provides management with incentives for excessive risk taking because it insulates them from much of the downside risk. Enron's SPE transactions provided managers with additional insulation and, thereby, reinforced these incentives.

(191)    Enron "began a major program of selling and hedging assets" in the fall of 1999. This program involved "selling" assets to SPEs in transactions where Enron actually retained the risks of ownership and was obligated to repay the "sales proceeds," which it nonetheless booked as revenue and as CFO.[207] It similarly "hedged" some assets in transactions with entities that were in fact related to Enron, with the hedge backed only by Enron stock.[208] As the investments continued to lose value and to require more cash, Enron

> masked the problem by borrowing money against those investments and using various combinations of its SPE transactions to (i) disguise its obligation to repay the amounts borrowed, (ii) report the proceeds as cash flow from operating activities and, in some cases, as revenue, and (iii) hide the decline in value in its MTM merchant investment portfolio.[209]

(192)    Activities that mask business losses and failures, such as Enron's SPE transactions,[210] insulate management from downside exposures, thereby raising management's incentives to take on projects with high upside potential, even in cases where expected NPV is negative. This leads predictably to excessive risk taking and, on average, value destruction, and harm to creditors.

---

[207]    Batson, Third Interim Report, 18–19.

[208]    Ibid., 19.

[209]    Ibid.

[210]    The Examiner found that Enron used SPE transactions to "mask business failures." Batson, Third Interim Report at 14. He observed that unprofitable merchant investments "often found their way into Enron's SPE transactions. There is considerable evidence that Enron's senior management had a difficult task in controlling the size and management of its merchant portfolio, which contained a relatively high percentage of poorly performing and illiquid assets." Ibid., 15. He quotes Enron executive Mark Frevert, who apparently stated, "[w]e may have been 'smoking our own dope' as we continued to build the asset portfolio domestically and we pushed a lot into off-balance sheet vehicles." Ibid.

### IV.6.5. Permitting a company to operate without the imposition of discipline after deceiving investors leads predictably to excessive risk taking, value destruction, and harm to creditors

(193)   Having engaged in deception, Enron managers would have had obvious incentives to conceal the deception (beyond the concealment inherent to the transaction structures themselves) to avoid the inevitably negative consequences of its discovery, some of which I highlight at Section IV.6.6. It was, therefore, foreseeable that the misstatement of Enron's financial results would be followed by concealment, and the concealment would be continued for as long as possible.

(194)   The steps that firms take to avoid discovery of deceptive conduct, including the investments they make after engaging in such conduct, tend to destroy value even if those investments themselves involve no deception. Once managers commit to deception, they run the risk that subsequent results will raise suspicions, lead to investigations, and end with discovery. Managers therefore have incentives to structure the company's investment profile to minimize the likelihood that "red flags" will emerge in the future. This is best accomplished by investing in risky projects, and studies have found that "during periods of suspicious accounting, firms hire and invest excessively."[211] Firms that have engaged in deception will, therefore, tend to "take actions and make pricing decisions that are not optimal," and correspondingly this investment distortion "can have a significant adverse effect on social welfare."[212] This in turn results in harm to creditors.

### IV.6.6. The discovery of deception leads predictably to value destruction and harm to creditors

(195)   When deception occurs, there is always a risk of discovery. When the truth comes out, the consequences for the firm are typically much worse than if the truth had been known from the outset. Accordingly, countenancing deception leads predictably to value destruction and an increased risk that creditors will not be paid on time or in full.

(196)   The various consequences of disclosing deception—restatements; lawsuits; SEC investigations; stock price declines; rating downgrades; loss of confidence among business partners, vendors, and so forth—are front-page news in the business world and well understood throughout Wall

---

[211]   Simi Kedia and Thomas Philippon, "The Economics of Fraudulent Accounting," *Review of Financial Studies* (forthcoming).

[212]   Gil Sadka, "The Economic Consequences of Accounting Fraud in Product Markets: Theory and a Case from the U.S. Telecommunications Industry (WorldCom)," *American Law and Economics Review* 8 (2006), 439–475.

Street. The disclosure of deception leads to a statistically significant destruction of value, as measured by systematic studies.[213] The "[r]evelation of an accounting irregularity or fraud, with its inevitable impact on a company's stock price and reputation—as well as the 'follow-on' shareholder lawsuits and SEC problems—can be disastrous for a company."[214]

(197)     Enron's experience illustrates this principle. Had Dynegy completed its planned acquisition of Enron in November 2001, Enron might have been rescued as a going concern. However, a series of revelations concerning irregularities in Enron's financial statements raised red flags, shattering Dynegy's confidence in Enron's accounting and contributing to the deal's demise.

### IV.6.7. These consequences were foreseeable even with partial knowledge of Enron's deception

(198)     Even parties with partial knowledge of Enron's deception—encompassing, for example, the true economic nature of a subset of the masking transactions—would necessarily recognize the harm to creditors resulting from the masking transactions. The very purpose of the transactions is to achieve a balance sheet result—an appearance—inconsistent with reality. In other words, each masking transaction is intended to (and does) mislead all those who rely on those results to make financial decisions, most especially lenders or those who extend credit. Participants in a masking transaction necessarily foresee that the transaction will have the intended effect. More broadly, to parties with even partial knowledge of the full scope of the deception in which the managers are engaged—and particularly a party who participates in a single deception—it was foreseeable that the scope of deception was not limited to the specific incident in which the party participated. This conclusion follows from several considerations.

---

[213]   Patricia M. Dechow, Richard G. Sloan, and Amy P. Sweeney, "Causes and Consequences of Earnings Manipulation: An Analysis of Firms Subject to Enforcement Actions by the SEC," Contemporary Accounting Research 13 (1996): 1–36; Ehsan H. Feroz, Kyungjoo Park, and Victor S. Pastena, "The Financial and Market Effects of the SEC's Accounting and Auditing Enforcement Releases," Journal of Accounting Research 29 (1991): 107–42; Mason Gerety and Kenneth Lehn, "The Causes and Consequences of Accounting Fraud," Managerial and Decision Economics 18 (1997): 587–99; Jennifer Francis, Donna Philbrick, and Katherine Schipper, "Shareholder Litigation and Corporate Disclosures," Journal of Accounting Research 32 (1994): 137–64; Robert L. Kellogg, "Accounting Activities, Security Prices, and Class Action Lawsuits," Journal of Accounting and Economics 6 (1984): 185–204; Sanjai Bhagat, John Bizjak, and Jeffrey L. Coles, "The Shareholder Wealth Implications of Corporate Lawsuits," Financial Management 27 (1998): 5–27; Melissa S. Baucus and David A. Baucus, "Paying the Piper: An Empirical Examination of Longer-Term Financial Consequences of Illegal Corporate Behavior," The Academy of Management Journal 40 (1997): 129–51; Roger J. Best and Kurt Fanning, "Management Fraud And Stock Price Performance," Proceedings of the Academy of Accounting and Financial Studies 9 (2004): 11–16.

[214]   Kelly M. Hnatt, "Forge the Right Relationship," *Journal of Accountancy* (May 2001).

Expert Report of B. Douglas Bernheim, Ph.D.                              Causation

(199)   First, the fact that certain Enron managers felt compelled to engage in deception, disguise losses, inflate operating income, and keep debt off the books was a good indication that the company's appearance of financial health was misleading.

(200)   Second, the fact that certain Enron managers were willing to engage in one masking transaction indicates a level of dishonesty that would make it foreseeable that they would engage in other forms of deception, including additional masking transactions. Though a party with partial knowledge of Enron's deception—such as a participant in one or a few masking transactions—would have had limited basis for understanding the full or precise scope of deception, it would have been unreasonable for that party to assume that deception was limited to the one or few incidents in which it participated. Indeed, parties who assisted these managers in deceiving creditors and others (by engaging in transactions to mislead rating agencies) would hardly be in a position to suggest that they were surprised that those same Enron managers deceived them as well.

(201)   Third, it was foreseeable that each masking transaction motivated participating Enron managers to undertake additional masking transactions. This conclusion follows from at least the following considerations.

   ▪   Many masking transactions improved Enron's stated financial results during "booking quarter" but then unwound themselves in subsequent quarters, depressing credit ratios and other measures of financial health. It was foreseeable that the participating Enron managers would have strong incentives to engage in additional transactions not merely to pump up baseline results, but also to offset the delayed effects of the earlier transaction. The effect is analogous to that of an addictive drug: once hooked, an addict uses a drug in large part to avoid the "low" associated with abstinence and not simply to obtain a "high." Once started on the path of deception, these Enron managers were effectively "hooked" on masking transactions.

   ▪   A pattern of positive results creates market expectations, and failure to meet these expectations can lead to serious consequences. For a party with partial knowledge of Enron's managers' deception, it was foreseeable that, after using deception to establish high expectations, the participating managers would be strongly motivated to meet these expectations in the future, if necessary, by continued deception.

Expert Report of B. Douglas Bernheim, Ph.D.

# V. Empirical analysis of causation

Expert Report of B. Douglas Bernheim, Ph.D.                    Empirical analysis of causation

## V.1. Introduction

(202)    In Section IV I explained that by helping Enron conceal its true financial condition, the masking transactions foreseeably harmed the company and creditors in a number of ways. They increased the company's leverage and, consequently, its risk of default. They permitted some of Enron's managers to make new investments that were ultimately unsuccessful. They permitted those managers to retain their jobs, and to pursue their ill-fated business plans, despite the fact that they were not producing positive results. They helped create and sustain an environment in which certain Enron managers had strong incentives to make imprudent, risky investments. They generated incentives to engage in further wrongdoing, as well as tolerance for deceitful practices. And they exposed Enron to the harms that predictably follow from the discovery of widespread deception. They also defeated the normal channels of internal and external discipline by depriving creditors, board members, regulators, analysts, equity investors, and credit rating agencies of the information they needed to properly monitor Enron's business activities and prevent the aforementioned harms by intervening in a timely fashion.

(203)    The above are observations, conclusions, and opinions that follow from general principles of Economics and Corporate Finance. Treating the above observations, conclusions, and opinions as a hypothesis, in this section I conduct empirical analyses with respect to a particular form of market discipline to determine whether the masking transactions did, in fact, prevent the market from properly monitoring and policing Enron's activities. My analyses show that, had the economic content of the transactions been unmasked, it is highly likely that market monitoring would have led to a much earlier resolution of Enron's financial difficulties (e.g., through bankruptcy, acquisition, reorganization, and/or replacement of management). In that case, as detailed in Section VI, Enron's losses would have been much smaller. Accordingly, by permitting Enron to engage in activities that prolonged its unfettered operations, the masking transactions causally contributed to damages.

## V.2. Overview

### V.2.1. The nature of the inquiry into the harm that was caused by the masking transactions

(204)    Typically, an analysis of economic damages entails an examination of a counterfactual or "but-for" scenario. The objective of such analysis is the determination of what would have occurred—

100

and, in particular, how much better off certain parties would have been—had other parties not done certain things.

(205)  The "but-for" scenario I employed in this case pertains to what would likely have occurred if the masking transactions (separately and together) had been recorded and reported in a manner that reflected their true economic substance. In other words, for the but-for scenario, I simply "unmask" the masked transactions. This approach is appropriate for two reasons:

- First, according to the plaintiffs' allegations, the transactions at issue in this case were improper because their design masked their economic substance. For example, Enron's prepays were improper because they were designed to misrepresent borrowed funds as cash flow from operations, in violation of GAAP. Accordingly, to determine what would have occurred but for the improper behavior, it is appropriate to remove the masking, not the transactions. This allows me to form an opinion as to whether it would have been feasible, in the absence of deception, for Enron to follow the path (e.g., borrowing and investments) that ultimately led to Enron's catastrophic losses.

- Second, because the but-for scenario leaves the transactions in place—it unmasks them, but it does not eliminate them—it does not require me to speculate about the possible decisions Enron would have been forced to make concerning investment and/or capital structure had its cash flows been different from what they actually were. For example, if Enron had not closed a prepay, it would either have had to borrow more through some other channel, cut expenses, or reduce particular investments. These changes would, in turn, have necessitated other changes going forward; for instance, forgoing some profitable investment project might have eliminated some future profit stream that was used in practice to pay off debt or finance other expenditures. My approach does not require me to speculate about such decisions; on the contrary, it hews closely to the reality of the actual historical record.

(206)  I unmask each transaction by appropriately adjusting Enron's financial statement line-items to reflect the transaction's true economic substance. For each masking transaction, I make adjustments in every quarter during which the transaction affects Enron's financial statement line-items. My discussions of certain specific transactions in Section IV illustrate the nature of these adjustments. As explained in Section IV.5.1, I rely on the Examiner's qualitative recharacterizations of these transactions, which I take as my starting point, as well as quantitative recharacterizations provided by the Blake Report. Members of my staff who are CPAs performed the mechanical tasks of adjusting Enron's financial statements in light of these recharacterizations. The details of these adjustments are explained in Appendix C.

(207)    My objective here is *not* to project the specific manner in which these transactions would have been booked had the participating Enron managers avoided deceptive accounting. Rather, my objective is to unmask each transaction through a straightforward financial recharacterization that is consistent both with its true economic substance and with its properly understood meaning. Since any transparent accounting method would, by definition, provide the market with the same information concerning economic substance as the approach used here, it is reasonable to assume that the market's reaction would have been approximately the same.

(208)    In this section, I examine the extent to which the masking transactions *collectively* delayed the resolution of Enron's financial difficulties, the extent to which the Complaint transactions *collectively* delayed the resolution of Enron's financial difficulties, and the extent to which the transactions of Citigroup *collectively* delayed the resolution of Enron's financial difficulties. In Section VI, I calculate the total damages associated with the delay in resolution. In Section VII, I address the question of apportionment. In Section IX, I summarize the calculations pertaining to the remaining bank defendants, Citigroup and BT Deutsche.

### V.2.2. Credit ratings

(209)    In my analysis, I focus on the reactions of one particular type of market monitor: credit rating agencies. There are several reasons for this.

- First, data on credit ratings are readily available. This makes it possible to build a reliable statistical model of rating agency behavior.

- Second, maintaining an investment grade credit rating was a leading objective of Enron's management, and there is substantial evidence that, to a large extent, this motivated the masking transactions. In undertaking these transactions, certain Enron managers targeted the financial ratios that feature prominently in credit rating agency evaluations.

- Third, the loss of investment grade status for Enron's senior unsecured debt (that is, an S&P downgrade to below BBB- or a Moody's downgrade to below Baa3) would have been disastrous for the firm. For support, see the sources cited in Section IV.4.3.1 and the discussion of "snowballing" in Sections V.5.4 and V.5.5.1.[215]

---

[215]   Enron itself recognized the necessity of maintaining its investment grade rating. See, e.g., Enron Corp. 2000 Annual Report, at 52.

(210)    The adjustments of the balance sheet needed to transparently reflect the masking transactions radically change Enron's apparent financial status. Billions of dollars in debt move from "off balance sheet" (or on the balance sheet as "price risk management liabilities") to "on balance sheet." Billions of dollars actually reported as cash flow from operations become cash flow from financing. With transparent financial reporting, the rating agencies (and the rest of the market) would have understood that Enron's leverage ratio was growing, that its coverage ratio was shrinking, and that other measures of financial health were deteriorating over time. It stands to reason that the rating agencies would have evaluated the transparently reported Enron much differently than the historical Enron. My statistical analysis provides an objective and reliable procedure for projecting Enron's credit rating if Enron's balance sheet had transparently reported these transactions.

(211)    My determinations of Enron's likely credit ratings are based on an extensive examination of the statistical relationships between observable financial characteristics and the credit ratings actually assigned by the rating agencies to thousands of companies for the period Q1 1989 through Q3 2001.

(212)    To identify the best set of financial variables for making these determinations, I began by reviewing a considerable body of academic literature,[216] as well as materials distributed by the rating agencies themselves.[217] Ultimately, based on my economic judgment and measures of predictive accuracy, I settled on a particular statistical model that included particular financial variables. The variables used in my analysis are: the funds flow interest coverage (coverage ratio), the leverage ratio, the operating profitability ratio, the return on capital ratio, the liquidity ratio, and the quality of earnings ratio.

---

[216]    Studies using financial variables to predict bond ratings include the following: E.I. Altman and H.A. Rijken, "How Rating Agencies Achieve Stability," Journal of Banking and Finance 28 (2004): 2679-2714; M.E. Blume, F. Lim, and A.C. MacKinlay, "The Declining Credit Quality of U.S. Corporate Debt: Myth Or Reality?" Journal of Finance 53, no. 4, (1998): 1389–1413; R. Cantor and F. Packer, "Differences in Opinion and Selection Bias in the Credit Rating Industry," Journal of Banking and Finance 21 (1997): 1395–1417; L.H. Ederington, "Classification Models and Bond Ratings," Financial Review 20 (1985): 237–61; Y.H. Gan, "Why Do Firms Pay For Bond Ratings When They Can Get Them For Free?" Working paper, Wharton School, University of Pennsylvania, (2004); M. Kamstra, P. Kennedy, and T.K. Suan, "Combining Bond Rating Forecasts Using Logit," Financial Review 37, no. 2 (2001): 75–96; R.S. Kaplan and G. Urwitz, "Statistical Models Of Bond Ratings: A Methodological Inquiry," Journal of Business 52, no. 2 (1979): 231–61; G.E. Pinches and K.A. Mingo, "A Multivariate Analysis of Industrial Bond Ratings," Journal of Finance 28, no. 1 (1973): 1–18; T.F. Pogue and R.M. Soldofsky, "What is in a Bond Rating?" Journal of Financial and Quantitative Analysis 4, no. 2 (1969): 201–28; and R.R. West, "An Alternative Approach to Predicting Corporate Bond Ratings," Journal of Accounting Research 7 (1970): 118–27.

[217]    E.g., Standard & Poor's, Corporate Ratings Criteria, 2000 at 54; Moody's Investor Service, Financial Ratio Medians For Global Investment Grade Industrials, January 2001.

(213)    By focusing on these variables, I do not mean to suggest that the credit rating agencies considered nothing else. The rating agencies do consider other financial characteristics, and, as they themselves emphasize, their analysis involves subjective judgment. Factors that might appear to be omitted from my analysis—whether objective or subjective—are subsumed in the "disturbance term" of my statistical model.

(214)    It is important to emphasize that it is impossible to determine *with certainty* what a credit rating agency would have done when faced with a different set of facts concerning Enron's financial status. Nor is this my objective. Rather, my objective is to draw conclusions about *probabilities*. Though we cannot say with certainty what specific action a credit rating agency would have taken at a particular point in time, we can confidently assess the probabilities of different actions based on the actions taken in thousands of other similar and dissimilar circumstances.

(215)    It is also important to emphasize that my analysis is based on the way the credit rating agencies *actually behaved*, rather than the way they (or anyone else) said they behaved. However, as it turns out, there is no inconsistency between these two alternatives.[218]

## V.3. Data

(216)    I obtained data on credit ratings from S&P and Moody's. I used two types of ratings for S&P: senior unsecured debt ratings and issuer credit ratings ("ICRs"). For Moody's, I used senior unsecured debt ratings, as well as Moody's estimated senior unsecured debt ratings. I explain the particular uses for each type of ratings data below. I obtained financial statistics on publicly traded companies from Compustat. I combined this information into a single dataset containing measures of quarterly financial performance and credit ratings, covering the period Q1 1989 through Q3 2001. Appendix D describes the construction of this dataset in detail.

(217)    Both S&P and Moody's divide rated companies into a relatively small number of broad categories. S&P categorized Enron as a "corporation," and Moody's categorized it as an "industrial." There is a high degree of overlap between these categories, but they are not identical.

---

[218]    The agencies have acknowledged using very similar ratios in evaluating Enron. See, e.g., Standard & Poor's RatingsDirect Analysis of Enron Corp., September 11 2000, BNPP009632–BNPP009641 ("Financial Profile" focuses on profitability, "cash flow protection" including coverage ratio, and "capital structure," including leverage ratio); Moody's Rating, Enron Corp., March 2000, AASDTEX002241222–AASDTEX002241233 (presenting "Operating Statistics" divided into three groups of figures that correspond to profitability, coverage and leverage statistics).

Expert Report of B. Douglas Bernheim, Ph.D.                    Empirical analysis of causation

My statistical analysis is based on companies in the union of these two categories.[219] I excluded from my analysis all companies for which Compustat does not contain adequate financial information.

(218)     My credit ratings for Enron also make use of but-for financial variables. I obtained these following the three-step process described in Section IV. The details of this procedure are explained in Appendix C.

## V.4. Did Enron deserve an investment grade credit rating?

(219)     An examination of Enron's but-for financial variables reveals that in a number of important respects it looked more like a company with a noninvestment grade rating than one with an investment grade rating.

(220)     Exhibit 23 shows quarterly values of Enron's coverage ratio as reported and unmasked for the period Q1 1990 through Q2 2001. The Exhibit also shows the median value of this variable for firms rated BBB+ and BB+ by S&P. Throughout most of this period, Enron's reported coverage ratio tracked the BB+ ratio. With the transactions unmasked, we see that Enron's coverage ratio declined in late 1997 and never recovered. Indeed, the coverage ratio continued to fall and was actually below 1.0 during a number of quarters after mid-1998. This was an indication of cash flow insufficient to cover interest payments. In contrast, the coverage ratio of the typical firm rated BB+ was close to 4 during the same period. For the typical firm rated BBB+, this ratio was between 5 and 6.

---

[219]    I have also analyzed S&P's ratings based only on companies in S&P's "corporation" category, and Moody's ratings based on only on companies in Moody's "industrial" category. The results are similar.

Expert Report of B. Douglas Bernheim, Ph.D.                Empirical analysis of causation

**Exhibit 23: Enron's true vs. reported coverage ratio, 1990–2001[220]**



Sources: Data from Compustat, Enron financial statements, S&P ICR data, and adjustments for all masking transactions.

(221)    Exhibit 24 shows quarterly values of Enron's leverage ratio as reported and unmasked for the period Q1 1990 through Q2 2001, as well as the median leverage ratios for firms rated BBB+ and BB+ by S&P. From the end of 1992 forward, Enron's as-reported leverage ratios were in line with—indeed, often better than—the median leverage ratios for firms rated BBB+. In contrast, Enron's unmasked leverage ratio increased rapidly starting in 1997, reaching and then surpassing the median for firms rated BB+. By Q2 2000, Enron's unmasked leverage ratio exceeded 65%.

---

[220]    Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D for details.

Expert Report of B. Douglas Bernheim, Ph.D.                Empirical analysis of causation

**Exhibit 24: Enron's true vs. reported leverage ratio, 1990–2001[221]**



Sources: Data from Compustat, Enron financial statements, S&P ICR data, and adjustments for all masking transactions.

(222)    There are, of course, other factors that affected Enron's credit rating. In this section I use statistical methods to address the following question: What is the likelihood that a company with Enron's actual unmasked financial characteristics would have held an investment grade credit rating during the time period starting in Q1 1997 and ending Q3 2001? In other words, based on objective considerations, had the truth been known, would Enron have deserved its investment grade rating?

## V.4.1. The statistical model

(223)    To determine the credit rating most appropriate for a company with Enron's unmasked characteristics, one must use a statistical model that distinguishes between many potential ratings. An important feature of credit ratings is that they are *ordered*. That is, there is a lowest possible

---

[221]    Enron's as-reported financials have been adjusted for nonrecurring charges. See Appendix D.

rating, a second-lowest rating, a next-lowest rating, and so forth, all the way up to the highest possible rating. Econometricians have a collection of standard tools that are specifically designed for the analysis of ordered variables. Two of the most commonly used tools are called the *ordered logit* model and the *ordered probit* model. Each of these models allows the econometrician to study the relationships between ordered categorical assignments and a collection of predictor variables.

(224)    The analysis reported in this section is based on two ordered logit models—one for S&P and one for Moody's. Both models relate a company's credit rating over a period of rating stability (defined as a period of at least four quarters without a change in rating) to the median values (over the same period) of the financial variables listed in Section IV.4.3.2.[222] See Appendix E for a more detailed description of the model.

(225)    I chose the ordered logit model rather than the ordered probit model because in this instance the ordered logit model outperforms the ordered probit model in terms of predictive accuracy. However, it is worth emphasizing that the choice between ordered logit and ordered probit makes relatively little difference in terms of results.

(226)    Ordered logit and ordered probit models are completely standard and are covered in standard textbooks on econometrics.[223] Moreover, these ordered probability models are in common use among applied econometricians and have appeared in numerous published scientific studies in economics and in other fields. Notably, in motivating the use of ordered probability models, one of the leading econometrics textbooks specifically mentions the analysis of companies' credit ratings—in fact, it is the first example listed.[224] In addition, ordered probability models of the sort used here have featured prominently in the published academic literature on credit ratings.[225]

---

[222]    Thus, if one company had 12 consecutive quarters with the same rating, I would use this as one observation. I would derive, for example, a coverage ratio for this observation by taking the median value of the 12 quarterly coverage ratios. A different company may have had two different credit ratings during the same calendar period, each of at least four quarters, which I would use as two observations. For each, I would obtain a coverage ratio by taking the median value of the coverage ratios during the corresponding period of stability.

[223]    See, e.g., W.H. Greene, *Econometric Analysis*, 4th ed. (Upper Saddle River, NJ: Prentice Hall, 2000), 875–79.

[224]    Ibid.

[225]    For example, see R. S Kaplan and G. Urwitz, "Statistical Models of Bond Ratings: A Methodological Inquiry," *Journal of Business* 52, no. 2 (1979): 231–61; L.H. Ederington, "Classification Models and Bond Ratings," *Financial Review* 20 (1985): 237–61; J.A. Gentry, D.T. Whitford, and P. Newbold, "Predicting Industrial Bond Ratings with a Probit Model and Funds Flow Components," *Financial Review* 23, no. 3 (1988): 269–86; M.E. Blume, F. Lim, and A.C. MacKinlay, "The Declining Credit Quality of U.S. Corporate Debt: Myth or reality?" *Journal of Finance* 53, no. 4 (1998): 1389–1413; M. Kamstra, P. Kennedy, and T.K. Suan, "Combining Bond Rating Forecasts Using Logit," *Financial Review* 37, no. 2 (2001): 75–96; and E.I. Altman and H.A. Rijken, "How Rating Agencies Achieve Stability," *Journal of Banking and Finance* 28 (2004).

### V.4.2. Additional data considerations

(227)   Senior unsecured debt tends to be issued disproportionately by companies with higher credit ratings. This stands to reason. Investors have limited appetite for the unsecured debt of noninvestment grade companies. As a result, datasets for senior unsecured debt ratings tend to overrepresent investment grade companies. This is evident from a comparison of the S&P datasets for senior unsecured debt ratings and ICRs. Of the observations with a stable investment grade issuer rating, around 57% had senior unsecured debt ratings. In contrast, of the observations with stable noninvestment grade issuer ratings, less than 10% had senior unsecured debt ratings. The overrepresentation of investment grade companies is also evident from a comparison of the Moody's datasets for actual and estimated senior unsecured debt ratings. Among observations of investment grade status in the larger set, approximately 74% had senior unsecured debt. In contrast, among noninvestment grade observations in the larger set, approximately 32% had senior unsecured debt ratings.

(228)   For this reason, were I to calculate the statistical model described in the preceding section using data on actual senior unsecured debt ratings, my calculations would suffer from what is known as a "sample selection bias." Since there are relatively few noninvestment grade firms with unsecured senior debt, I would necessarily calculate low probabilities of noninvestment grade ratings, conditional on financial performance. It would be inappropriate to project an agency's but-for evaluation of Enron based on its unmasked financial results, using these probabilities. In effect, this would amount to projecting Enron's but-for creditworthiness based on the assumption that Enron would likely have remained creditworthy.

(229)   I solve this problem by using more representative samples. For S&P, I use ICRs instead of senior unsecured debt ratings. This is conservative. Historically, S&P's ICRs are the same or higher than senior unsecured debt ratings more than 99% of the time, when both are available. (The two ratings are the same approximately 85% of the time, the ICR is higher approximately 15% of the time, and the senior unsecured debt rating is higher less than 1% of the time.)

(230)   For Moody's, I use Moody's estimated senior unsecured debt ratings. Documentation obtained from Moody's indicates that these estimates are based on each company's existing ratings. When a company has a senior unsecured debt rating, the estimate is simply the actual rating. When a company has no such rating, Moody's looks for another type of rating for the same company, following a fixed order of priority among types. When an alternative rating is found, it is then adjusted by a fixed number of notches. This number varies according to the type of rating. Moody's cautions that these ratings are estimates and that investors should not rely on them as substitutes for actual ratings based on full evaluations of an issue's creditworthiness.

Expert Report of B. Douglas Bernheim, Ph.D.                    Empirical analysis of causation

Nevertheless, these estimates have a solid foundation, and they are Moody's best measures of credit ratings for senior unsecured debt—both actual and potential—at each point in time.

(231)    As explained previously, rated companies are included in my analysis only if adequate information on financial results is available through Compustat. For S&P, my final sample includes a total of 3,490 observations on 1,929 different companies. For Moody's, my final sample includes a total of 3,599 observations on 2,004 different companies.

### V.4.3. Results

(232)    Equipped with estimates of the ordered logit probability model, one can "plug in" Enron's financial characteristics and, thereby, obtain the probability that a company with these characteristics would have held any given rating—in particular, a noninvestment grade rating—at any given point in time. Here we have one additional complication: we are interested in the probability that *either* S&P *or* Moody's would have rated such a company below investment grade. Thus, our task requires some additional calculations.

(233)    To illustrate how one makes such calculations, consider the following simple example, which involves a standard probability calculation. Suppose someone rolls a single six-sided die. What is the probability that it will show a number less than three? The answer is one-third. Now suppose someone rolls two six-sided dice. What is the probability that *either* will show a number less than three? The probability of rolling a 3, 4, 5, or 6 on a single die is two-thirds. The probability of rolling a 3, 4, 5, or 6 on each of *two* dice is two-thirds squared, or four-ninths. The only other possibility involves rolling a 1 or a 2 on at least one die; the probability of this event is one minus four-ninths, which equals five-ninths. Our answer is five-ninths (roughly 56%). Notice that this probability (five-ninths) is *greater* than the probability that any particular die would show a 1 or a 2 (one-third).

(234)    The calculation described in the previous paragraph is relatively simple because the dice rolls are uncorrelated. In contrast, the credit ratings of S&P and Moody's are strongly correlated, even conditioning on observed financial information. If the ratings moved in lockstep, that is, if they were *perfectly* correlated, we could analyze one and ignore the other. But in practice these ratings also exhibit a considerable degree of independence. It is still possible to calculate the probability that either agency would rate a company below investment grade (indeed, the calculation is completely standard), but one needs an estimate of the *correlation* between their ratings. I obtain this estimate through a standard statistical technique known as "maximum likelihood estimation." In the rest of this section, I summarize the results of my calculations. For further details, see Appendix E.

Expert Report of B. Douglas Bernheim, Ph.D.          Empirical analysis of causation

(235)   Exhibit 25 shows (by quarter) the probability that a company with Enron's financial
characteristics would have received a noninvestment grade rating from at least one agency. These
probabilities are based on Enron's financial performance, both as reported and with all masking
transactions or all Complaint transactions unmasked, during the previous twelve months. The as-
reported curve indicates that based on the standards applied by S&P and Moody's, Enron
deserved its investment grade ratings. During early- to mid-1997, there was only a 26%
probability that a firm with these characteristics would have been rated below investment grade
by at least one agency. Due to poor midyear performance, the probability rose to 31% by the end
of 1997. Based on as-reported credit ratios, over all quarters from Q1 1998 to Q3 2001, the
average probability of a noninvestment grade rating from at least one agency was only 34%.

**Exhibit 25: Probability that a company with Enron's financial results would not have received an investment grade rating, 1997–2001**



(236)   The probabilities with all transactions unmasked were almost identical to the as-reported
probabilities throughout 1997, but these started diverging in 1998. However, the probability that a
firm with Enron's unmasked credit ratios would have been rated below investment grade by at
least one agency jumped to 78% in Q1 1999. The discrepancy between this figure (78%) and the

corresponding figure for Enron's as-reported results (32%) reflects the impact of the deception perpetrated through transactions that masked Enron's poor results for 1997 and 1998. The unmasked probability of a noninvestment grade rating rose somewhat in 1999 (diverging still more from the as-reported probability, which appeared to be stable) and leveled off in the neighborhood of 92% midway through 2000.

(237)   The result is similar if only the Complaint transactions are unmasked. The probability that at least one agency would have rated Enron below investment grade was 75% in Q1 1999 and approximately 80% for each of the following eight quarters.

(238)   In short, given the standards that S&P and Moody's actually apply in practice and Enron's reported financial results, it is understandable that S&P and Moody's provided Enron with investment grade ratings until Q3 2001. However, it is unlikely that both S&P and Moody's would have viewed a firm with Enron's unmasked financial results as deserving an investment grade rating at any point in time between Q4 1998 and Q3 2001.

(239)   I have examined the sensitivity of my findings to alternative specifications and assumptions. For reasonable alternatives, my conclusions are highly robust.

## V.5. When would Enron have lost its investment grade status?

(240)   As discussed in Section IV.4.3.1, credit ratings tend to be stable. During the typical quarter, only about 8% of companies experienced changes in their S&P ratings, and about 12% experienced changes in their Moody's ratings. For S&P, about 3% were upgraded, and about 5% were downgraded. For Moody's, about 5% were upgraded, and about 7% were downgraded. This reflects the philosophy and intent of the rating agencies, which usually act slowly and deliberately and emphasize a firm's long-run prospects over short-term fluctuations. Accordingly, a company that has historically maintained a particular credit rating may continue to hold this rating for some period of time, even when the designation is no longer deserved.

(241)   It follows that, even if it had been reasonably apparent that Enron did not deserve its investment grade rating in, say, Q1 1998, credit rating agencies may not have re-rated the company until some later date. The purpose of this section is to determine *when* either S&P or Moody's would have downgraded Enron.

### V.5.1. The statistical framework

(242)   Despite the stability of credit ratings, there are circumstances in which a change in rating becomes more likely. For example, among companies whose coverage ratios ranked in the lowest decile within their ratings categories, about 7% were downgraded by S&P during the following quarter, and less than 2% were upgraded. Similarly, about 7% were downgraded by Moody's during the following quarter, and about 2% were upgraded. The purpose of my statistical analysis is to identify the observable circumstances under which downgrades tend to occur.

(243)   The severity of a downgrade differs from case to case. For example, in downgrading a company rated BBB+, S&P could assign a new rating BBB (a one-level downgrade), BBB- (a two-level downgrade), BB+ (a three-level downgrade), or possibly something even lower. Like the ratings themselves, data on downgrades are therefore *ordered*: the possible cases include no downgrade, followed by one-level downgrade, followed by two-level downgrade, and so forth. Accordingly, as discussed in Section V.4., my statistical analysis is based on ordered logit models.[226]

(244)   In this case, the model for each rating agency describes the probability of experiencing downgrades of one, two, and three or more levels as a function of (1) the company's initial rating, (2) recent changes in its rating, (3) credit ratios relative to the norm within the company's initial ratings category, and (4) recent changes in these credit ratios. As in Section V.4, the credit ratios include the funds flow interest coverage, the leverage ratio, the operating profitability ratio, the return on capital ratio, the liquidity ratio, and the quality of earnings ratio. See Appendix E for a more detailed description of the model.

(245)   Equipped with estimates of these new ordered logit probability models, one can "plug in" Enron's financial characteristics and, thereby, obtain the probability that a rating agency would have downgraded a company with these characteristics one, two, or three or more levels from any given initial rating, with any given history of recent credit rating changes, at any given point in time.

(246)   Using these "transition probabilities," one can compute the probability that an agency would have downgraded a company with Enron's financial characteristics to noninvestment grade status by any given point in time. The first step in this process is to identify all of the paths through which the company might have reached noninvestment grade status by a particular date. For example, over the course of two quarters, a company with an initial S&P rating of BBB+ can reach a

---

[226]   I settled on the ordered logit model, rather than the ordered probit model, because in this instance the ordered logit model outperforms the ordered probit model in terms of predictive accuracy. However, once again, the choice between the ordered logit and ordered probit models makes relatively little difference in terms of results.

noninvestment grade rating in four different ways: a one-level downgrade followed by a two- or more level downgrade, a two-level downgrade followed by a one- or more level downgrade, a three- or more downgrade followed by anything, and no downgrade followed by a three- or more level downgrade. The next step is to compute the probability that the company would have followed each path. As an example, the probability of one-level downgrade followed by a two-level downgrade is calculated as follows: (1) compute the probability of a one-level downgrade in the first quarter, conditional on an initial rating of BBB+ for that quarter; (2) compute the probability of a two- or more level downgrade in the second quarter, conditional on an initial rating of BBB- for that quarter and the fact that a downgrade occurred in the previous quarter; and (3) multiply these two probabilities together. The third step is to add the resulting probabilities over all downgrade paths that lead to noninvestment grade status by a particular date (in other words, those identified in the first step).[227]

(247)    Likewise, accounting for the correlation between downgrades by S&P and Moody's, one can compute the probability of any path involving a downgrade to noninvestment grade status by *at least one* rating agency prior to any given date. Adding these probabilities over all such paths yields the probability that at least one agency would have rated the company noninvestment grade by that date. Appendix E describes these probability calculations in full detail.

(248)    In considering potential ratings adjustment paths, I rule out the possibility that Enron might have been downgraded to BBB or BBB- by S&P and then subsequently upgraded.[228] In examining the data, I have determined that such occurrences are rare. For example, the S&P sample contains 280 downgrades. Of these, there are only six observations in which S&P upgraded the company in question within four quarters during the 1990 to 2001 period.[229] In almost all of these cases, I identified special circumstances that were not present for Enron.

(249)    I also assume that Moody's would not have upgraded Enron along any but-for path.[230] For the 405 downgrades that are included in my sample, there are only 10 instances in which a Moody's

---

[227]   An equivalent procedure (which I actually follow, as it proves somewhat simpler) is to compute the probabilities for all paths for which the company's rating remains investment grade, sum these up, and then subtract the result from one. I have also corroborated my probability calculations through Monte Carlo simulations.

[228]   I also assume that Enron would not have been upgraded from its initial rating (BBB+ for S&P). This is reasonable, given that S&P did not upgrade Enron and given that Enron's unmasked financial results are worse than its as-reported results.

[229]   Another company appears to have been upgraded in our sample because I choose to examine the modal rating at each point in time. None of this company's individual senior unsecured issues were upgraded, however.

[230]   In reality, Moody's upgraded Enron in early 2000 (toward the end of the but-for period). It is reasonable to assume that Moody's would not have upgraded the but-for Enron given that Enron's unmasked financials are worse than its reported financials.

downgrade was followed by an upgrade within four quarters during the 1990 to 2001 period.[231] Again, in almost all of these cases, I identified special circumstances that were not present for Enron.

### V.5.2. Additional data considerations

(250)    For the analysis in Section V.4, it was important to use a broad, representative sample of companies and not to restrict attention to the sample of firms with rated senior unsecured debt (which would, in effect, have amounted to projecting Enron's but-for creditworthiness based on the assumption that Enron would have remained creditworthy). For the analysis in this section, the opposite is true. Here, we are examining likely changes in Enron's perceived creditworthiness, and we are starting from its historical position at the outset of 1997. Historically, Enron did have rated senior unsecured debt, not only at the outset of 1997, but throughout the time period examined in the but-for scenario. Enron was perceived as sufficiently creditworthy to issue senior unsecured debt at attractive terms. Since the objective of this section is to determine the likelihood of a *change* in perceptions from a given starting point, it is appropriate to compute transition probabilities conditional on the existence of rated senior unsecured debt.

(251)    For this reason, the analysis of this section makes use of S&P and Moody's data on *actual* senior unsecured debt ratings. It is worth mentioning that the results are substantially the same when I use S&P's ICR data and Moody's estimated senior unsecured debt ratings (in other words, the data used in Section V.4). It is not surprising that the choice of datasets makes little difference in this context. The sample selection problem noted in Section V.4 arises because the existence of rated senior unsecured debt is strongly correlated with a firm's creditworthiness. In this section, all probabilities are calculated conditional on a firm's credit rating at the outset of each quarter. Controlling for this initial rating, there is very little *residual* correlation between the existence of rated senior unsecured debt and creditworthiness.

(252)    As explained previously, rated companies are included in my analysis only if adequate information on financial results is available through Compustat. For S&P, my final sample includes a total of 7,413 observations on 606 different companies. For Moody's, my final sample includes a total of 10,792 observations on 888 different companies.

---

[231]    As with S&P, one other company appears to be upgraded in my sample because I choose to examine the modal rating at each point in time. None of this company's individual senior unsecured issues were upgraded, however.

### V.5.3. Results

(253)    Exhibit 26 shows the cumulative probability that a company with Enron's financial characteristics and initial credit ratings of BBB+ (S&P) and Baa2 (Moody's) as of Q1 1997 would have lost investment grade status according to at least one rating agency by the end of each quarter from Q1 1997 through Q3 2001. The blue line is based on Enron's financial results as reported. The yellow and red lines reflect unmasked financial results based on recharacterizations of all the masking transactions, and the Complaint transactions, respectively.

**Exhibit 26: Cumulative probability of loss of investment grade status, 1997–2001**



(254)    As indicated in the exhibit, the odds that at least one credit ratings agency would have downgraded a company with Enron's reported results and initial credit ratings of BBB+ (S&P) and Baa2 (Moody's) in Q1 1997 to noninvestment grade status were roughly 7% by the end of 1997, 15% by the end of 1998, 22% by the end of 1999, 40% by the end of 2000, and 45% by Q3 2001.

(255)    According to my statistical model, it is more likely than not that a company with Enron's reported financial results and initial credit ratings of BBB+ (S&P) and Baa2 (Moody's) in Q1 1997 would have retained its investment grade ratings throughout this period, just as Enron did in practice.

(256)    However, as shown in the figure, starting in early 1998 the probabilities that at least one rating agency would have downgraded a company with Enron's *unmasked* financial results to noninvestment grade status are much higher than for Enron's reported financials. This probability is roughly 7% by the end of 1997, 30% by the end of 1998, 67% by the end of 1999, 92% by the end of 2000, and 97% by Q3 2001. With only the Complaint transactions unmasked, the probabilities are roughly 7% by the end of 1997, 29% by the end of 1998, 58% by the end of 1999, 81% by the end of 2000, and 85% by Q3 2001.

(257)    I also examined the impact of unmasking only the transactions in which Citigroup participated. As reflected in Exhibit 27, it is more likely than not that a company with financial results like those based solely on recharacterizations of Citigroup's transactions would have lost its investment grade rating from at least one agency by Q4 2000. Thus, the Citigroup masking transactions by themselves significantly delayed Enron's loss of investment grade status.

Expert Report of B. Douglas Bernheim, Ph.D.                    Empirical analysis of causation

**Exhibit 27: Cumulative probability of loss of investment grade status, 1997–2001, unmasking Citigroup transactions**



(258)    Thus, it is considerably more likely than not that a company with Enron's unmasked financial results and initial credit ratings of BBB+ (S&P) and Baa2 (Moody's) in Q1 1997 would have lost its investment grade rating from at least one agency well before Q3 2001. In fact, it is more likely than not that such a company would have lost its investment grade status by Q2 1999 (with all transactions unmasked), by Q3 1999 (with only the Complaint transactions unmasked), or by Q4 2000 (with only Citigroup transactions unmasked).

(259)    I have examined the sensitivity of my findings to alternative specifications and assumptions. For reasonable alternatives, my conclusions are highly robust.

## V.5.4. Loss of investment grade rating would have pressed Enron toward early resolution

(260)    My damage analysis treats the loss of investment grade status as an event that would have compelled Enron to take steps to limit its losses, thus preventing significant growth to the

deficiency balance. In this section, I will review some of the facts indicating that a downgrade would have given rise to an early resolution.

(261)   The activities of various market monitors and corporate stakeholders are interdependent. As a result, one major adverse development can create a snowballing sequence of reactions that subjects a company to progressively greater financial distress. In Enron's case, there are indications that the loss of investment grade status would have set in motion a potentially disastrous chain of events.

(262)   Loss of investment grade status would have had an immediate and substantial effect on Enron's wholesale trading operations. Enron would have been required to post additional cash margin and collateral on its trading accounts that may well have totaled billions of dollars. Enron's master trading agreements generally provided that when a party's out of the money (OTM) positions exceeded a given threshold, it could be compelled to post collateral equal to the excess. These thresholds were tied to credit ratings and depended on how deeply Enron was OTM. For example, a downgrade might require $5 million or more of additional collateral for one of hundreds of counterparties with whom Enron traded.

(263)   A downgrade would also have created additional obligations under some of Enron's structured finance transactions—specifically, obligations to immediately repay large amounts that would not otherwise have come due for months or years. The "downgrade trigger" in the Project Rawhide minority interest transaction was one of the events that precipitated Enron's actual bankruptcy. In this transaction, Enron effectively borrowed $750 million from Citigroup in December 1998. As the assets contributed to the structure were sold or monetized, the proceeds could be invested in "Enron Demand Loans," which Enron was required to repay immediately in the event of downgrade.[232] Rawhide is striking not only because of the extraordinary amount of cash that Enron would have had to produce in the event of downgrade (the balance on the Enron Demand Loans was over $1.5 billion in July 2001 and $690.7 million at the time of actual downgrade in November 2001), but because the "trigger" was tripped by a downgrade to BBB-, the lowest rung of the investment grade scale.[233] Enron did not actually have to lose its investment grade rating to suffer substantial financial stress from the Rawhide trigger.

(264)   Two share trust transactions also had downgrade triggers. The Osprey and Marlin transactions each defined a "Note Trigger Event" as a downgrade to below investment grade, when coupled

---

[232]   Strictly speaking, Enron also had the option of posting an unsecured letter of credit (LOC) to secure the loans, or repurchasing the minority shareholders' interest in the structure.

[233]   Batson, Second Interim Report, Appendix I, pp. 7–10, 21–22.

with a drop in Enron's share price to below $59.67 (in the case of Osprey), or $34.13 (in the case of Marlin). In either case, a Note Trigger Event would have required Enron to pay the Notes outstanding under each structure. Both triggers were tripped by Enron's actual downgrade in November 2001, requiring Enron to repay a total of over $3 billion.[234] In addition, both structures invested in debt issued by Enron, which would become due immediately if Enron's credit rating fell below the investment grade level for 30 days or more, regardless of Enron's share price at the time. For instance, Enron issued two notes to the Bristol Water Trust (part of the Marlin structure) totaling $249 million in December 1998. As long as Enron remained investment grade, it would have three years to repay the notes; but if it were below investment grade for 30 days, the outstanding principal amount of the notes would have to be repaid in full immediately.[235]

(265)    The downgrade would have placed Enron under intense pressure to pay off its outstanding commercial paper, while eliminating its ability to issue more. Commercial paper, or short-term corporate "IOUs," trade in a very credit-sensitive market; companies with poor credit have great difficulty issuing commercial paper to meet their short-term needs.[236] As of year-end 1999, Enron and its subsidiaries had some $1.2 billion in commercial paper outstanding.[237] Shortly before its actual bankruptcy, Enron's outstanding commercial paper totaled some $1.85 billion. Even before the company was downgraded, it drew down most of its available bank credit, in large part to pay off its commercial paper. Enron had apparently anticipated that its deteriorating credit would prohibit it from "rolling over" that commercial paper.[238] It is reasonable to conclude that a liquidity crisis at any earlier date would have required a similar response.

(266)    The available evidence indicates "cash calls" under Enron's trading contracts and structured transactions would have created severe liquidity problems at the firm, driving the company toward early resolution. Enron might have sought bankruptcy protection as a result,[239] which

---

[234]   Ibid., Appendices G & H.

[235]   Enron Debt Obligation in favor of Bristol Water Trust dated December 17, 1998, in the amount of $217,782,917; Enron Debt Obligation in favor of Bristol Water Trust dated December 17, 1998, in the amount of $31,217,083.

[236]   Jathon Sapsford, "Bond Boom Isn't Likely to Lift Economy As Corporations Swap Old Debt for New," *Wall Street Journal*, November 19, 2001 ("Under normal conditions, corporations pay off maturing commercial paper by "rolling over" that debt, or issuing new commercial paper to replace the old. But rolling over commercial paper became much harder for AT&T after Moody's cut the company's short-term and long-term credit ratings. . . . Other companies facing downgrades also are scrambling to find alternatives to the commercial-paper market through bonds, loans or revolving credit lines.")

[237]   S&P RatingsDirect, "Research: Enron Corp.," September 11, 2000, ANARPT009605–614.

[238]   Jathon Sapsford and John Emshwiller, "Enron Discusses Credit Line of $1 Billion to $2 Billion With Banks," *Wall Street Journal,* October 29, 2001 (Quoting Standard & Poor's Ronald Barone as observing "that Enron was 'getting a bit more resistance' recently in rolling over its commercial paper as it came due.").

[239]   "We [Moody's] thought that [bankruptcy] was a possibility [if Enron were downgraded] . . . [b]ecause we

would obviously have involved an early resolution, or it might have attempted to survive as a going concern. With respect to the latter possibility, several observations are in order.

a. Enron would have had to draw upon its available cash and sources of short-term credit, such as revolving loans and letters of credit. Having drawn down its major sources of short-term credit, Enron would have had to take steps that would ultimately permit it to repay those debts; defaulting on them would likely have precipitated bankruptcy. Moreover, until those debts were repaid, Enron would have been much less capable of responding to short-term credit needs arising from its other business activities. The company's financial flexibility would have been greatly reduced.

b. Meeting immediate and near-term cash needs would have required Enron to liquidate assets, perhaps under unfavorable conditions. Much as Enron had to sell (or try to sell) certain "non-core" assets just before its actual bankruptcy,[240] it would likely have had to take similar steps at an earlier resolution date.

c. Enron's access to the public debt and equity markets would have been sharply constrained. Many institutional investors are prohibited from owning securities of noninvestment grade companies. Lenders exact higher interest rates from below-investment grade borrowers, when they choose to extend credit at all.[241]

d. To the extent Enron had encountered severe liquidity problems combined with a sharply restricted access to capital markets, it would have been forced to focus on core businesses and sharply curtail its investment activities. Realistically, much of the borrowing and investment

---

expected, we thought there may be a large cash call, collateral cash call on the trading business, for one. And they didn't have the liquidity to deal with that. . ." Deposition of John Diaz (Managing Director, Moody's Investor Service), February 14, 2005, 259.

[240] "Enron has said many of its foreign assets are noncore and are for sale. That likely includes U.K. water company Wessex Water since a major portion of Enron's interest is held by a partnership it set up, Marlin Water Trust. The downgrade to junk status of Enron's debt last week triggered accelerated payments to Marlin investors, implying that Enron must come with a lot of cash quickly. Enron's metals business is also up for sale…" Anita Raghavan and Geoffrey T. Smith, "Fall of a Power Giant: European Affiliate Cuts 1,100 Positions In United Kingdom," *Wall Street Journal*, Dec. 3, 2001.

[241] U.S. $1,250,000,000 Long-Term Revolving Credit Agreement Dated as of May 18, 2000, ECSHP000101066 – 1152 (Schedule I shows the various facility fees and interest rates payable by Enron under the revolving credit agreement, by credit rating).

Enron's own internal Credit Risk Rating system ("E-Ratings") notes that a BB+ or Ba1 rating is characterized by "less access to public markets, reliant on bank financing." Enron Corp. Risk Management Policy, AASDTEX002607168 – 7233, page B-1.

that was responsible for the growth in Enron's deficiency balance could not have occurred if the company had lost its investment grade status.[242]

e.  Commodity trading is highly credit sensitive. There are strong indications that a credit rating below investment grade would have reduced the willingness of counterparties to initiate new trades with the company.[243] Enron's actual loss of investment grade status on November 28, 2001, caused an immediate decrease in trading activity: Dynegy (which, until that day, was in negotiations to acquire Enron) stopped trading with Enron entirely, while some other traders "would deal with Enron on a cash-only basis, a virtual death sentence for a trading outfit that has $16.86 billion in debt and other obligations and less than $2 billion in cash on hand."[244] Many traders started unwinding their positions with Enron weeks before the actual downgrade, recognizing that such an event was increasingly likely.[245]

(267)  The foregoing description captures only the most obvious "first order" effects of a downgrade, but the consequences to Enron would have included other effects as well. A downgrade would have spurred other market monitors to examine Enron's financial condition more closely and critically, both to understand why the downgrade occurred and to evaluate its likely effects.

a.  Enron's own Board members would likely have sought explanations for the downgrade and would have reassessed the company's leadership, strategy, investments, financing arrangements, and other factors. The Board's own scrutiny may well have led to significant

---

[242]  After Enron's collapse, energy trader Mirant Corp. was placed on "credit watch," indicating that the credit rating agencies felt that a downgrade was possible in the near future. "The company's reaction was to promulgate a liquidity plan that called for slashing non-core assets and canceling questionable projects. . . 'Instead of deferring decisions on new plants, we canceled them. As long as our debt is not investment grade, we will have a hard time with longer dated contracts, and we need a way to fix that.'" Peter Buxbaum, "Energy Trading: Electronic Trading Platforms Flourish Despite Enron's Collapse," *Futures Industry Magazine*, March–April 2002 (quoting Ray Hill, Mirant Corp. Chief Financial Officer), http://www.futuresindustry.org/fimagazi-1929.asp?v=p&iss=123&a=763, last accessed March 8, 2007.

[243]  Batson, Second Interim Report at 18–19 ("In order to continue the growth of this [trading] business, Enron needed to trade with other participants without being required to post collateral. Thus, the continued success of Enron's entire business was dependent upon the continued success of its Wholesale Services business segment, which in turn was dependent on Enron's credit ratings for its senior unsecured long-term debt."); Report, "Enron's Bankers Contacts with Moody's," *supra* note 129 at 9 ("Enron was a trading company and counterparties would not trade with a below-investment grade entity.");Diaz Deposition of February 14, 2005 at 259 ("The trading business is confidence sensitive and . . . we had come to know at that point a lot of the contracts had rating triggers in them.").

[244]  Richard Stavros, "Energy Trading & Marketing: The Evolution of the Deal," *Public Utilities Reports*, January 1, 2002 (citing Reuters press reports), http://www.pur.com/pubs/3867.cfm, last accessed March 8, 2007.

[245]  "Because Enron's downward spiral has evolved over several weeks, many companies have had time to unwind hedges with Enron" (citing as examples Anadarko Petroleum Corp., Apache Corp., XTO Energy Inc. and EOG Resources Inc.) Alexei Barrionuevo and Elliott Spagat, "Fall of a Power Giant: Energy Firms Tally Costs of Enron's Woes," *Wall Street Journal*, November 30, 2001.

changes being instituted even before the public market monitors imposed their own discipline.

b.  Wall Street stock and bond market analysts would have reevaluated the company, lowering their revenue and earnings expectations, predicting lower share prices, and demanding more satisfying explanations for the company's then current circumstances and future plans.

c.  Enron's lenders and creditors would have reassessed Enron's likelihood of repaying its debts, in light of a liquidity crisis. For instance, its lenders would likely have reexamined Enron's debt covenants to see whether any had been, or were in danger of, being violated.

    i.  Many of Enron's loan agreements contained "cross-default" provisions such that a significant default under one loan would not only require immediate repayment of that loan, it would also accelerate the repayment obligation under the loan with the cross-default clause.[246]

    ii.  Insolvency is another event of default under Enron's loan agreements.[247] Lenders and others would have reassessed whether Enron was, in fact, likely to be able to pay its debts as they came due, and whether its assets were sufficient to satisfy its obligations.

d.  The rating agencies themselves, having set off these events through a downgrade, would have continued to monitor the aftermath of downgrade closely to see whether further downgrade was warranted.

(268)  Enron's shareholders, of course, did more than monitor the market; they participated in it. Just as Enron's actual downgrade caused a massive drop in investor confidence,[248] so too a hypothetical downgrade at an earlier date would inevitably have caused some degree of decline in Enron's stock price. Depending on the timing and degree of decline, this might have caused the Marlin or Osprey triggers to be tripped. And if the drop were significant, it would potentially have led to the filing of shareholder suits against the company, subjecting Enron to even more pressure and market scrutiny.

---

[246] See, e.g., U.S. $1,250,000,000 Long-Term Revolving Credit Agreement Dated as of May 18, 2000, ECSHP000101066 – 1152, Sec. 6.01(d) (failure to pay interest or principal on any outstanding debt whose principal is at least $100 million is an event of default under this agreement).

[247] Ibid., Sec. 6.01(e).

[248] "Prior to the announcement of Enron's acquisition by Dynegy, Enron shares had declined about 80% as investor confidence was eroded by revelations about the company's financial dealings." Christina Cheddar, "Enron: Events Have Had A Temporary, Negative Effect On Ops," *Wall Street Journal,* November 14, 2001.

(269)    Collectively, these considerations provide strong indications that the loss of investment grade status would have resulted in some form of early resolution

### V.5.5. Reasons why this analysis is conservative

(270)    For the following reasons, my analysis understates the likelihood that a company with Enron's actual characteristics, initial credit ratings of BBB+ (S&P) and Baa2 (Moody's) in Q1 1997, and a policy of transparent financial reporting would have been driven by market or internal forces to an early resolution of its financial problems by any particular quarter. For the same reasons, it understates the likelihood that the masking transactions, if they had been unmasked, would have resulted in action to halt Enron's mounting losses, thus avoiding the damages to the company, the estates, and the creditors that I discuss in following sections.

### V.5.5.1. Reason #1: My analysis does not account for likely interventions by Enron's stakeholders prior to any credit rating downgrade.

(271)    The snowballing, self-reinforcing actions of market monitors would not necessarily have been delayed until after a credit-rating downgrade, as my discussion in Section V.5.4 assumes. Rating agencies are deliberately slow in responding to changes in a company's financial circumstances. Other stakeholders and market monitors usually respond more rapidly. If the masking transactions had been unmasked, Enron's financial condition would have been evident to the entire market, and Enron's Board of Directors, shareholders, and/or creditors would likely have intervened before the credit rating agencies took action. Enron's actual collapse was an illustration of this point. Recall that by the time S&P and Moody's downgraded the company to, respectively, BBB and Baa2, Chief Financial Officer Andrew Fastow had already been replaced, and Enron's creditors, the financial press, investment analysts, and the SEC were all actively investigating Enron's financial status and practices. Had unmasking occurred at an earlier date, it is likely that market monitors would have intervened before the rating agencies moved to downgrade the company. My analysis assumes—conservatively—that the decisive intervention would not have taken place until Enron lost investment grade status.

(272)    For instance, market monitors would likely have become concerned as they witnessed Enron approaching its covenant senior debt ratio threshold of 65%, contained in Enron's $3 billion revolving credit facilities[249] and certain of Enron's other credit, lease, and guarantee agreements.

---

[249]    U.S. $1,250,000,000 Long-Term Revolving Credit Agreement dated as of May 18, 2000 ECSHP000101066 to ECSHP000101151 and U.S. $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 14, 2001

The clauses stipulated that Enron would be in default if its ratio of "Senior Debt" to "Total Capitalization" exceeded 65%. Enron determined its ratio to be 42% at the end of 1999 and 52% at the end of third quarter 2000.[250] This calculation is based only on Enron's reported book debt. If the debt associated with the masking transactions were deemed a component on this calculation once unmasked (i.e. the debt was classified as Senior Debt), the ratio would be higher than originally reported to the market. The results of the masking adjustments to the financial statements suggest that Enron's ratio would have been approximately 60% by the end of 1998 and the ratio would have reached the 65% threshold by the end of third quarter 2000.

### V.5.5.2. Reason #2: My analysis does not account fully for the hypothesized absence of corrective action.

(273)    My analysis is designed to answer, among other things, the following questions: Would properly informed stakeholders have permitted Enron to operate as it actually did between Q1 1997 and Q3 2001 with respect to matters of economic substance (e.g., investments and borrowing)? If not, how long would Enron have been able to stay this course? To answer these questions, I consider a but-for scenario in which Enron stays the course, voluntarily taking no corrective actions, until this becomes infeasible, i.e., until a particular market factor clearly constrains such an action, with the loss of investment grade status. But Enron's course could have become infeasible even sooner. For example, stakeholders might have forced corrective action after an S&P downgrade to BBB, or BBB-. By hypothesizing the absence of corrective action prior to the loss of investment grade status, my but-for scenario overstates the amount of time required for decisive intervention. In this respect, my but-for scenario is, by nature, conservative.

(274)    My statistical analysis compounds this conservatism. For the typical company experiencing a rating downgrade, the likelihood of further downgrades depends on how management and the board of directors respond. A downgrade sometimes leads a company to take corrective action (e.g., replacing management, restructuring debt, or changing strategic plans). Such action can reduce the frequency of further downgrades, even when there is little or no immediate impact on financial results. Consequently, the observed frequency of downgrades for recently downgraded firms (upon which my statistical analysis is based) understates the likelihood of further downgrades for a firm that is assumed to take no corrective action.

---

EC003713643 to EC003713732.

[250]    Calculated by Enron in file "Compliance calculations (use me).xls".

### V.5.5.3. Reason #3: My analysis treats an Enron downgrade as a typical downgrade.

(275)    Sometimes changes in credit ratings reflect adverse or favorable changes in market conditions. In these circumstances, information concerning the magnitude and permanence of market developments can emerge gradually over time. Accordingly, credit rating agencies, wishing to avoid reversals, tend to respond by adjusting ratings slowly, sometimes through a series of small steps.

(276)    In other instances, changes in credit ratings reflect more fundamental reevaluations of financial health and/or business strategy. In these circumstances, rating changes can occur much more rapidly, either in a quick succession of small steps (as occurred in the case of Enron between the end of October and early November 2001), or in large steps (as occurred in the case of Enron at the end of November 2001).

(277)    Beginning in late 1997, Enron's actual financial condition was increasingly inconsistent with the myth of the healthy, innovative, brilliantly managed company it had so carefully cultivated. Disclosure of this condition likely would have shattered this myth and forced a fundamental reevaluation of Enron's financial health and business strategy. A downgrade would have represented a dramatic shift in perspective for the rating agencies, which, along with the rest of the financial market, had treated Enron with considerable deference. It follows that, once the agencies began the process of re-rating Enron, they would likely have moved either in a couple of large steps or in a quick succession of small steps, rather than, as is more typical, in a gradual succession of small steps.

### V.5.5.4. Reason #4: My analysis does not interpret the disappearance of any company's credit rating or financial data as indicating the resolution of financial distress.

(278)    Sometimes poorly performing companies disappear from the S&P, Moody's, or Compustat datasets. This occurs when, for example, a company shuts down or is acquired by another firm, or when S&P or Moody's refuses to issue a rating. In the case of Enron, any of these events would have either constituted or precipitated an early resolution. However, in estimating my statistical model, I make no use of transitions involving a firm's "disappearance." I do this in an abundance of caution, as I am not always able to identify the reason for a company's disappearance. As a result, I understate the probability that Enron's financial difficulties would have been resolved in any given quarter.

Expert Report of B. Douglas Bernheim, Ph.D.                    Empirical analysis of causation

### V.5.5.5. Reason #5: My analysis uses a broad peer group

(279)    As described in Section V.3, my statistical analysis projects Enron's credit rating based on the historical financial results and ratings of firms falling into one of two broad categories: "corporations" for S&P, and "industrial" for Moody's. It is, of course, possible to classify Enron more narrowly based on its specific lines of business. In principle, a credit rating agency might rate members of a narrow category either higher or lower than the average company with similar financial characteristics.

(280)    To explore these possibilities, I identified narrow peer groups for Enron based on contemporaneous documents produced by S&P and Moody's. I then conducted further statistical analysis to measure the "peer group effect," that is, the extent to which the ratings agencies treated these companies either more or less favorably than others with similar financial characteristics.

(281)    To properly measure the peer group effect, one cannot rely on peer ratings prior to Enron's collapse. Enron was the leader among its peer corporations. Its illusory success misled the ratings agencies (as well as the rest of the market) not only about its own profitability and prospects, but also about the attractiveness of Enron's lines of business and overall business model. Companies that emulated Enron were rated highly partly as a consequence of Enron's success. Thus, prior to November 2001, the peer group effect was contaminated by Enron's deception. The credit rating agencies treated Enron's peers much more favorably than they would have if they had known the truth about Enron.

(282)    After Enron's collapse, credit rating agencies were in a position to assess the creditworthiness of Enron's peers based on more accurate information concerning Enron's lines of business and overall business model. An analysis of the financial results and ratings for a large sample of companies, including Enron's narrow peer group, reveals that, after 2001, both Moody's and S&P treated Enron's peers *less* favorably than other companies with similar financial characteristics. To some extent, these companies may have received lower ratings because they were adversely affected by Enron's bankruptcy. It is therefore important to emphasize that my statistical analysis controls for financial results. The negative peer group effect means that these companies were rated lower than others, even adjusting for any financial impairment resulting from Enron's collapse.

(283)    This analysis implies that, if one properly adjusts for the treatment of Enron's narrow peer group by the rating agencies, one finds that Enron would have lost its investment grade status from at least one credit rating agency even sooner than my analysis based on broad comparisons would suggest. Consequently, my analysis based on broad comparisons is conservative.

### V.5.5.6. Reason #6: My analysis does not take into account the possibility that the transparent reporting of masking transactions would have led to revelations of dishonesty, incompetence, or mistaken accounting

(284)    As I have explained, my analysis allows me to determine the likely date of early resolution assuming that any collection of masking transactions had been recorded and reported in a manner that reflected their true economic substance. I can use this framework to determine the likely date of early resolution based on unmasking all transactions (as seen in Exhibit 26), unmasking a single transaction, or unmasking any set of transactions (for instance, unmasking all of Citigroup's transactions, as seen in Exhibit 27).

(285)    For scenarios involving the unmasking of some but not all transactions, my analysis is conservative, because it does not account for possible revelations of earlier dishonesty, deception, fraud, or significant mistakes. As I explained above, poor performance (as revealed by the unmasked, properly reported transactions) would have invited closer scrutiny by the Board, as well as by external market monitors. Such scrutiny might have turned up evidence of deception associated with other transactions that, for the purpose of the scenario under consideration, would have remained masked. Had increased scrutiny led to such revelations, a downgrade or other form of early resolution could have occurred earlier than predicted by my statistical model, particularly in light of the self-reinforcing, or "snowballing" manner in which market mechanisms operate.

## V.6. Conclusions

(286)    In light of both my statistical analysis of downgrades and the qualitative factors reviewed in the Section IV, it is my opinion that the masking transactions deceived stakeholders and market monitors, thereby undermining market (and other) discipline. By helping Enron to conceal poor financial conditions from the market, these transactions prevented market mechanisms from functioning properly, and they deprived market monitors of the information that would have led them to intervene. As a direct consequence of these transactions, Enron's losses were, predictably, allowed to mount. With these transactions unmasked, the market would have compelled steps to limit those losses. In my opinion, by Q2 1999 at the very latest, it is more likely than not that, absent masking, Enron would have faced radical market discipline. Were it possible to account statistically for all of the likely sources and forms of intervention by market monitors, this date would likely be even earlier.

Expert Report of B. Douglas Bernheim, Ph.D.

# VI. Damage analysis

# VI.1. Measurement of damages from masking transactions

## VI.1.1. Overview of damages

### VI.1.1.1. Damages correspond to the avoidable growth in Enron's deficiency balance.

(287)   The masking transactions, many of which involved participation by the Banks, enabled certain Enron managers to conceal the company's true financial condition and to continue to conduct operations in a manner that would not have been possible had Enron's true financial condition been known. Among other activities, Enron continued to expand existing lines of business, invest in new ventures, and incur additional obligations, while the actions of the managers and Banks created a false financial picture. Various parties extended credit to Enron, unaware of the true risks they were exposing themselves to.

(288)   Ultimately, when the deception was revealed and information concerning Enron's true financial status began to emerge, the rating agencies quickly downgraded the company's debt to below investment grade. Shortly thereafter, Enron declared bankruptcy and began a process of liquidation to satisfy its obligations. The value of its assets in bankruptcy fell well short of the outstanding claims against the company. I refer to the gap between the value of outstanding claims and the liquidation value of assets in bankruptcy as Enron's "deficiency balance."

(289)   As discussed in Sections IV and V, had the masking transactions not disguised Enron's true financial condition, stakeholders and market monitors would likely have imposed market discipline and compelled an earlier resolution. This might have taken the form of bankruptcy and liquidation, but it might also have involved Board intervention to remove the participating managers, changes to the company's investment strategy or capital structure, divestiture or dissolution of businesses, revising accounting or disclosure policies, and/or acquisition by another company. With timely action, the company might have been preserved as a going concern and may have been able to retain its ability to discharge its financial obligations in full. My analysis demonstrates, however, that even in the absence of earlier preventive action, the company would have lost investment grade status and would have been compelled to take action to limit further losses. In a worst-case scenario, Enron would have been compelled to pursue bankruptcy protection earlier and relinquish control of its assets to creditors through liquidation. I refer to the gap between the value of outstanding obligations of the company and the liquidation value of assets in bankruptcy at any point in time prior to actual resolution as Enron's avoidable deficiency balance.

(290)  As demonstrated below, the counterfactual deficiency balance at certain points in time prior to
       Enron's actual resolution, when estimated for the company as a whole on a consolidated basis, is
       generally smaller than the actual deficiency balance. The growth in the deficiency balance
       between the but-for dates of resolution and the actual date of resolution shows how the masking
       transactions harmed the Enron estate and creditors by (1) increasing the gap between the value of
       obligations and assets and (2) delaying the company's resolution.

(291)  This measure of damages is conservative for at least two reasons. First, it reflects a worst-case
       scenario in which there is no meaningful external or internal discipline prior to the loss of
       investment grade status. Second, it reflects the consequences of a single method of resolution
       (bankruptcy and liquidation). In response to internal and external pressure, Enron's Board and
       senior management would have chosen an alternative to bankruptcy and liquidation only if they
       felt that such an alternative would have yielded greater value. In such a case, the gap between
       obligations and total asset value would have been smaller. This would have made damages (the
       differences between the actual and but-for gaps) larger. Focusing on a single method of resolution
       is therefore conservative.

(292)  Accordingly, I calculate damages using two inputs: Enron's actual deficiency balance and a
       counterfactual deficiency balance at an earlier point when the participating Enron managers
       would effectively have been forced to put an end to their practices. Enron's actual (postpetition)
       deficiency balance can be measured directly. Claims have been filed, and the assets available to
       satisfy these claims have (in most cases) been liquidated so that cash recoveries are known with
       near certainty.[251] By definition, Enron's counterfactual deficiency balance is not directly
       observable. However, it is possible to estimate this deficiency balance with reasonable accuracy,
       based in large part on Enron's actual experience in bankruptcy. In Section VI.1.2. I explain in
       greater detail how I measured the components of Enron's actual deficiency balance. In Section
       VI.1.3. I describe the methodology used to determine counterfactual deficiency balances.[252]
       Throughout this section, I view Enron as a single consolidated entity; in Section I, I provide
       estimates of the deficiency balances for the specific Enron and Enron North America debtor
       entities on a nonconsolidated basis.

---

[251]  At the date this report was published, a small number of assets remained unsold by the Enron estate. These consist
       primarily of recoveries from foreign assets and subsidiaries such as Enron Europe. As of the report date, the total
       estimated value of these other assets was approximately $757 million.

[252]  Details on the data sources I used and the calculations performed are provided in Appendix F.

### VI.1.2. Measuring Enron's actual deficiency balance

(293)   Enron's actual deficiency balance is the difference between Enron's actual asset recoveries and the actual claims allowed against the estate. Exhibit 28 and Exhibit 29 divide these assets and liabilities into a number of major segments.

**Exhibit 28: Asset segments considered in deficiency balance calculation**

| Asset segments | |
|---|---|
| PGE equity (net of debt) | Other international assets |
| Gas pipelines equity (net of debt) | EOG |
| Prisma (int'l assets) equity (net of debt) | Azurix |
| Broadband assets | Renewable energy assets |
| In-the-money trading contracts (wholesale, retail, other) | Corporate/other assets |
| Other wholesale assets | Interest income |
| Other retail energy assets | Nondebtor recoveries |

**Exhibit 29: Claim segments considered in deficiency balance calculation**

| Claim segments | |
|---|---|
| Book debt | Employee claims |
| Payables | Administrative claims |
| Structures debt | Other claims |
| Litigation claims | Out-of-the-money trading contracts (wholesale, retail, other) |
| Breach of contract/leases | Nondebtor guaranties |
| Tax claims | |

(294)   In the following sections, I will describe how I obtained values for each of the asset and claim segments. For additional details concerning the calculations described in this section, see Appendix F.

### VI.1.2.1. Recoveries on the platform entities

(295)   Following bankruptcy, the estate sold three groups of assets (known collectively as the platform entities) as going concerns. The platform entities are Portland General Electric (PGE), gas pipelines sold under the name CrossCountry Energy, and a group of international assets sold under the name Prisma Energy. Prisma was sold in 2006 for $2.9 billion cash (including the value of previously distributed cash dividends). CrossCountry was sold in 2004 for a combination of cash and assumption of debt totaling $2.1 billion. PGE was spun off into a publicly traded

Expert Report of B. Douglas Bernheim, Ph.D.                                      Damage analysis

company early in 2006. Approximately 27 million shares of PGE's common stock worth $568 million ($21.008 per share) were distributed to creditors of the estate in April 2006; another 2.6 million shares (at that time worth $24.53 per share) were distributed in October 2006.[253] I valued the remaining 32.9 million shares held for future distribution to creditors at their closing price on the New York Stock Exchange at the time this report was being prepared. The book value of the assets (net of debt) and the value of recoveries by the estate (cash and/or debt assumption, or cash value in the case of PGE stock) are shown in Exhibit 30.

**Exhibit 30: Recoveries on platform entities ($ billion)**

| Segment | Book value | Recoveries |
|---|---|---|
| PGE | 1.8 | 1.8 |
| CrossCountry (pipelines) | 0.8 | 2.2 |
| Prisma (international assets) | 2.5 | 2.9 |
| **Total** | **5.1** | **6.9** |

Sources: Prisma recovery from press release, "Enron Announces Proposed Sale of Prisma Energy International, Inc." May 25, 2006; PGE distribution from "Debtors' Sixth Post-Confirmation Status Report.pdf;" Enron Press Release, "Enron Distributes Approximately $3.4 Billion to Creditors." CrossCountry recoveries from "Cross Country Purchase Agreement Amendment 1.pdf."

### VI.1.2.2. Recoveries and claims on financing structures

(296)    Many of Enron's recoveries and obligations at the time of bankruptcy related to "structured finance" activities. Generally speaking, structured finance transactions involve the creation of Special Purpose Entities (SPEs, or structures) whose financial statements are not consolidated with those of their "sponsor." Typically, SPEs borrow funds for very limited purposes (such as buying a specific asset or undertaking a specific project), and they repay their lenders from the proceeds of their activities. Including the masking prepay transactions, Enron entered into over 100 structured finance transactions.

(297)    I measure each structure's contribution to Enron's deficiency balance as the difference between Enron's obligations in connection with that structure and the assets (if any) available to meet those obligations.

(298)    The prepay transactions had no physical assets of their own that resided within the SPE, so they generated no recoveries in bankruptcy. Nonprepay structures generally did have assets and collectively did generate recoveries. There was no single approach to valuing these assets at

---

[253]    Sixth Post-Confirmation Status Report Of The Reorganized Debtors, 3–4 (April 17, 2006).

actual bankruptcy because they were disposed of in different ways. At the time of bankruptcy, some were still held by the SPEs (and in some cases continue to be the subject of litigation). Some were sold in the postpetition period, either as a single item in an arm's length transaction (in which case it is easy to determine the asset's current value) or as part of a bundle of assets (in which case it is difficult to determine stand-alone value). Some were distributed as part of the settlement of structure-related claims, obscuring their true value in an arm's-length transaction. Generally, where an asset's recovery value was not observed in an arm's-length transaction, I determined its value at bankruptcy through a three-step process. First, I found the value at which it appeared on Enron's books prior to being transferred to the SPE.[254] Next, I added to that the value of the total return swap (TRS) that generally remained on Enron's books following the transfer. The TRS was a component of most nonprepay transactions. It required Enron to make (or receive) payments whenever the market value of the asset transferred to the structure fell below (or exceeded) its book value. The book value of the TRS at a given date, therefore, captures changes in the value of the asset after the date at which it was transferred to the SPE. Finally, to estimate the asset's recovery value, I applied the recovery rate at bankruptcy for the business segment that held the asset prior to its transfer. In some cases, it was necessary to account for the fact that claims or disputes involving the structure were settled after bankruptcy. In order to ensure that my measurement of the estate's obligations is independent of Enron's ability to meet those obligations (that is, unaffected by creditors' expectations of payment), I must "unwind" structure-related settlements.

(299)   Enron's SPE transactions generated substantial claims in bankruptcy. Because the prepays were effectively loans,[255] the principal amounts reflected in the Blake Report fairly represent the estate's prepay-related obligations. I use the debt schedules in the Blake Report to identify the outstanding principal amount of each prepay at the time of bankruptcy.[256] Because the prepays had no assets that resided with the SPE, the unpaid principal of each prepay at a particular date is the prepay's entire contribution to the deficiency balance.

(300)   For many of the larger nonprepay structures, the Blake Report includes principal and interest schedules, just as it does for prepays. I employed those where available. In the remaining cases, I

---

[254]   Typically, these assets originally appeared on Enron's balance sheet; then they were sold or transferred to the structure, taking them "off balance sheet." While the asset remained with the structure, its book value was not directly observable.

[255]   Batson, Second Interim Report at 46 (characterizing the prepays as "financing transactions - in essence borrowings by Enron structured to result in favorable accounting treatment").

[256]   The Blake Report.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

generally identified the structure-related claims against the estate and used the allowed or
approved amounts of such claims as the measure of the estate's obligations.

(301)    Many of the nonprepay structures included a small amount of what purported to be equity,
typically representing 3% of total financing. I assume that only the nonequity financing of the
structure would generate obligations in actual or but-for bankruptcy.[257]

(302)    The recoveries and obligations associated with Enron's structured finance activities are shown in
Exhibit 31.

**Exhibit 31: Recoveries and obligations on SPE transactions ($ million)**

| Structure type | Obligation at resolution | Recovery at resolution | Net obligation |
|---|---|---|---|
| FAS 140 | 2,179 | 746 | 1,433 |
| Lease | 97 | 76 | 21 |
| Minority Interest | 1,706 | 150 | 1,556 |
| Other | 705 | 283 | 421 |
| Prepay | 5,100 | 471 | 4,628 |
| Related Party | 46 | 0 | 46 |
| Share Trust | 3,467 | 125 | 3,342 |
| Swap | 243 | 0 | 243 |
| **Total** | **13,541** | **1,851** | **11,689** |

Sources: Obligations and recoveries as set forth in Appendix G.

## VI.1.2.3. Recoveries on other nontrading assets

(303)    I obtained information about recoveries on the estate's other nontrading assets directly from the
Enron estate. To account for assets that had not been fully liquidated when I submitted this report,
I included the estate's total expected recoveries on unsold assets. The estate's actual and expected
recoveries, along with book values, are shown in Exhibit 32.

---

[257]    Note that for purposes of determining Enron's unmasked financial ratios, I treated the 3% equity as debt in those
cases where the Examiner concluded that the SPE should have been consolidated with Enron.

Expert Report of B. Douglas Bernheim, Ph.D.                          Damage analysis

**Exhibit 32: Actual and expected recoveries on nontrading assets ($ billion)**

| Segment | Book value | Recoveries |
|---|---|---|
| Broadband | 0.8 | 0.2 |
| Other wholesale assets | 3.1 | 1.6 |
| Other retail energy assets | 1.3 | 1.1 |
| Other international assets | 1.9 | 0.4 |
| Renewable energy assets | 0.8 | 0.4 |
| Azurix | 0.3 | 0.0 |
| Corporate/other assets | 1.7 | 1.0 |
| Off balance sheet structure assets | 0.0 | 1.9 |
| Interest income | 0.0 | 0.8 |
| Nondebtor recoveries | 1.7 | 1.3 |
| **Total** | **11.6** | **8.7** |

Sources: "closed assets Report 032607.xls," "Global Estate Assets Report 120706_by entity.xls," "Open Assets by Group 022807.xls," Hyperion data.

### VI.1.2.4. Wholesale trading recoveries and claims

(304)   At the time of bankruptcy, Enron's portfolio of commodity trades included thousands of in-the-money (ITM) positions (many of which resulted in recoveries to the estate) and thousands of out-of-the-money (OTM) positions (many of which resulted in claims against the estate). For wholesale trading, I obtained the dollar amounts of actual recoveries from the estate's Settlement Activity Reporting System (SARS), to which I added the estate's estimates of expected future recoveries on ITM positions not yet settled. I obtained data on trading claims from the estate's Claims Management System (CMS).

(305)   I made an additional set of adjustments to reflect the impact of trading claims that were withdrawn as part of a settlement between the estate and a trading counterparty. These settlements have value to the estate in that they allow the estate to avoid making a payment in the future on a claim otherwise potentially entitled to a cash distribution. For instance, if a counterparty had a claim with a $10 million face value filed against a debtor entity whose recovery rate was 20 cents on the dollar, the withdrawal of this claim would have a $2 million value to Enron, albeit not in the form of cash. The creditor is left with an $8 million loss. Ignoring this withdrawn claim would cause me to underestimate both the value the estate recovered for its trading positions and the losses borne by its creditors. In this hypothetical, I would therefore add $2 million to the estate's trading recoveries and $10 million to its trading claims. This would fully capture the true deficiency balance with this creditor: an $8 million shortfall between its claim

and the associated payout. Using recovery rates from the estate's most current Notice of Distribution, I perform an adjustment of this kind for all withdrawn trading claims.[258]

(306)    Adjusting for withdrawn claims, the estate's recoveries on wholesale trading assets and its obligations related to trading claims contribute negative $3 million (net) to the bankruptcy deficiency balance, as seen in Exhibit 33.

**Exhibit 33: Wholesale trading recoveries and claims at actual bankruptcy ($ million)**

| Commodity group | Recoveries | Claims |
|---|---|---|
| ENA - Gas | 1,927 | 2,008 |
| Power | 1,439 | 1,515 |
| Crude | 367 | 236 |
| EIM | 284 | 63 |
| EGM | 58 | 249 |
| **Total** | **4,074** | **4,071** |
| **Contribution to deficiency balance** | **(3)** | |

Sources: Data from SARS, CMS, and sources identified in Appendix F.

### VI.1.2.5. Retail trading recoveries and claims

(307)    Enron's retail contracts with large commercial and industrial clients typically involved a combination of energy commodity sales and energy-related services. These bundled arrangements generated little cash recovery in bankruptcy for various reasons, such as the frequent inclusion of "one-way" termination clauses, which, if enforceable, would deny Enron as the defaulting party the right to recover on ITM positions,[259] and highly idiosyncratic features that rendered some contracts illiquid. The estate recovered a total of $1.3 billion on its retail trading contracts: $868 million was obtained through the settlement of terminated contracts, $457 million was received through servicing live contracts, and $3 million is estimated as the value of claims withdrawn in settlement (using the approach described above under wholesale trading). These recoveries were well below the book value of the estate's total retail exposure (meaning the net value of its receivables, payables, and PRMA balance), which was over $4.1 billion at bankruptcy, as seen in Exhibit 34.

---

[258]    See http://www.enron.com/corp/pdfs/OctoberNoticeofDistribution.pdf.

[259]    See, e.g., DASH dated November 19, 2004, settling a contract for multiple commodities and energy management services, on which Enron recovered only 75% of its positive AR balance, and none of its positive MTM balance, which was subject to a one-way termination clause. ECM000331016–021.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

**Exhibit 34: Retail trading recoveries and claims at bankruptcy ($ million)**

| Commodity group | Recoveries | Claims |
|---|---|---|
| Retail | 1,328 | 186 |
| **Total** | **1,328** | **186** |

Sources: Recoveries on settled contracts from "Retail Settlements 113006 Summary2.xls;" CMS data, and information provided by Enron estate.

### VI.1.2.6. Broadband and Europe trading-related recoveries and claims

(308)    The entities that comprise the Enron estate today also traded fiber-optic bandwidth and commodities in Europe (primarily through Enron Capital and Trade Resources International Corp.). I obtained recovery amounts for Europe and broadband from the most recent available quarterly presentation on trading recoveries to the estate's Board of Directors, and I obtained book values at bankruptcy from Enron's Hyperion accounting system.[260] I applied the same approach to adjusting for withdrawn claims that I applied to wholesale and retail trading. Other trading-related recoveries and claims are presented in Exhibit 35.

**Exhibit 35: Other trading-related recoveries and claims at bankruptcy ($ million)**

| Commodity group | Recoveries | Claims |
|---|---|---|
| Europe | 190 | 136 |
| Broadband | 15 | 27 |
| Other | 0 | 119 |
| **Total** | **205** | **282** |

Sources: "12_31_2005 summary slide for trading.xls," CMS data.

### VI.1.2.7. Claims arising from on balance sheet debt and accounts payable

(309)    Exhibit 36 shows the total claims against the estate arising from on balance sheet debt and accounts payable. For each of these liability categories, I also compare the aggregate amount of allowed claims filed against the estate with the book values of the corresponding liabilities on November 30, 2001.[261] Book debt tends to generate claims nearly equal to book value.

---

[260]    Spreadsheet file, "12_31_2005 summary slide for trading.xls." This report includes both actual recoveries through the date of the report and estimated future recoveries; I include both in calculating my ratio.

[261]    I excluded obligations associated with the three "platform entities" that were operated postbankruptcy and ultimately sold as going concerns: Enron's Gas Pipelines group (which was marketed and sold as CrossCountry Energy), Portland General Electric, and the entities that Enron contributed to form Prisma Energy.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

**Exhibit 36: Comparison of book value to claims value for major on balance sheet obligations ($ billion)**

| Segment | Book value at 30 Nov 2001 | Claims |
|---|---|---|
| Book debt | 11,104 | 11,054 |
| Company-obligated preferred securities | 1,107 | 819 |
| Noncommodity accounts payable | 246 | 222 |
| **Total** | **12,456** | **12,095** |

Sources: Hyperion data; CMS data.

## VI.1.2.8. Litigation claims

(310)   Enron is or was a defendant in a number of litigation matters. Some of these were brought prior to bankruptcy and were still pending at the Petition Date, and others were brought after the Petition Date. Many have since settled; I treat the settlement amount approved by the bankruptcy court as an allowed claim against the estate. With respect to some litigation still pending, the bankruptcy court is not requiring Enron to reserve against a possible adverse verdict. I treat these as nonobligations. With respect to the remaining litigation still pending, the estate has reserved a total of $28 million, which I treat as Enron's total obligation.

(311)   I recognize that the estate may stand to recover damages or settlement proceeds in litigation where it is a plaintiff. However, the value to the estate, if any, of its claims and interests in this litigation (or other proceedings in which it may be a plaintiff) is at this time unknown. I have no reasonable basis for estimating the value of such claims or interests, and I do not include them in my calculations. In addition, Enron is or has been a party to litigation arising out of and made possible by its bankruptcy, including this lawsuit, various avoidance causes of actions, litigation against the company's lawyers and accountants, and other matters. I have been instructed that whether, how, and to what extent settlement and recovery proceeds received in these matters should be factored into the final assessment of damages (for instance, by way of setoff to the amounts I calculate) is a matter of law to be resolved by the Court.[262] Finally, I have no basis for estimating the value of Enron's outstanding litigation claims against other parties at an earlier resolution date. These omissions will impact my damage calculations, either positively or negatively, only to the extent Enron's litigation claims against others changed between the date of early resolution and the date of actual bankruptcy.

---

[262]   I would note, however, that my analysis excludes both the cash proceeds from the avoidance causes of action and the resulting claims, if any, that the defendants filed, or could have filed, against the estate. I also do not include the settlements or other results arising from these proceedings or related adversary proceedings in my deficiency balance calculation. As a result, claims subordinated in settlements in these proceedings are included in the deficiency balance calculation.

Expert Report of B. Douglas Bernheim, Ph.D.                              Damage analysis

(312)    Exhibit 37 summarizes the litigation claims against the estate and their reserved or settled
         amounts.

**Exhibit 37: Litigation claims against the estate at or after the petition date ($ million)**

| Claimant | Amount |
|---|---|
| **Settled claims** | |
| Bear Stearns Investment Products, Inc. | 359 |
| Pacific Gas and Electric | 346 |
| Southern California Edison | 241 |
| U.S. Bank National Association | 168 |
| King Street Acquisition Company, LLC | 95 |
| San Diego Gas and Electric | 70 |
| Misc. Settled claims | 56 |
| **Pending claims** | 28 |
| **Total** | **1,364** |

Sources: CMS data.

### VI.1.2.9. Nondebtor guaranty claims

(313)    There are also claims against Enron Corp. in its role as guarantor of obligations of nondebtors
         (entities within the Enron family which are not debtors in the U.S. bankruptcy proceedings,
         chiefly Enron Capital and Trade Resources, Ltd., Enron Canada Corp., and Enron Europe, Ltd.).
         Although I exclude the underlying claims from the deficiency balance calculation because they
         are not obligations of the estate, I do include guaranties of those obligations. Nondebtor
         guaranties are included at their full ordered or allowed amounts, reduced by the payout rate of the
         underlying nondebtor. The estate's nondebtor guaranties total $1.4 billion.

### VI.1.2.10. Miscellaneous claims

(314)    A portion of creditors' claims fall outside the categories discussed thus far. These include breach
         of contract and lease claims, employee claims, tax claims, and administrative claims (i.e., claims
         related to the cost of overseeing the bankruptcy and liquidation resolution process). These are
         claims for which there is no corresponding book liability. The observed claims in these categories
         are presented in Exhibit 38.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

**Exhibit 38: Miscellaneous claims at bankruptcy ($ million)**

| Segment | Claims/obligations |
|---|---|
| Breach of contract/leases | 815 |
| Tax | 47 |
| Employee | 220 |
| Administrative | 3,149 |
| Other | 947 |
| **Total** | **5,177** |

Sources: CMS data.

(315)   Various defendants have filed indemnity claims against Enron arising from their settlement of shareholders' claims relating to the masking transactions. In light of the allegations of this case, it appeared inconsistent to include such claims in computing damages here. Therefore, those claims were not included in the deficiency or resulting damages calculation.

### VI.1.2.11. Calculation of deficiency balance at November 30, 2001

(316)   Combining all of the recovery and claim elements discussed above, Enron's actual deficiency balance—the difference between actual or estimated cash recoveries on assets and allowed third-party claims against the estate—is $18.0 billion ($21.1 billion in recoveries minus $39.1 billion in claims), as shown in Exhibit 39.

**Exhibit 39: Actual bankruptcy deficiency balance ($ billion)**

| Assets by segment | Book value | Recoveries |
|---|---|---|
| PGE (net of debt) | 1.8 | 1.8 |
| Gas pipelines (net of debt) | 0.8 | 2.2 |
| Prisma (int'l assets) (net of debt) | 2.5 | 2.9 |
| Broadband trading assets | 0.3 | 0.0 |
| Other broadband assets | 0.8 | 0.2 |
| Wholesale trading assets | 12.2 | 4.1 |
| Other wholesale assets | 3.1 | 1.6 |
| Retail trading assets | 3.5 | 1.3 |
| Other retail energy assets | 1.3 | 1.1 |
| International trading assets | 0.9 | 0.2 |
| Other international assets | 1.9 | 0.4 |
| Renewable energy | 0.8 | 0.4 |
| Azurix | 0.3 | 0.0 |
| Corporate/other assets | 1.7 | 1.0 |
| Off balance sheet structure assets | 0.0 | 1.9 |
| Interest income | 0.0 | 0.8 |
| Nondebtor recoveries | 1.7 | 1.3 |
| **Total** | **33.5** | **21.1** |
| Claims by segment | Book value | Claims |
| Book ("on balance sheet") debt | 11.1 | 11.1 |
| Noncommodity payables | 0.2 | 0.2 |
| Structures ("off balance sheet") obligations, including prepays | 0.0 | 13.5 |
| Litigation | 0.0 | 1.4 |
| Breach of contract/leases | 0.0 | 0.8 |
| Trading-related obligations | 17.3 | 4.5 |
| Tax | 0.0 | 0.0 |
| Employee | 0.0 | 0.2 |
| Administrative | 0.0 | 3.1 |
| Other | 0.0 | 0.9 |
| Obligations to nondebtors | 1.0 | 1.0 |
| Nondebtor guaranties | 4.4 | 1.4 |
| Company-obligated preferred securities | 1.1 | 0.8 |
| **Total** | **35.2** | **39.1** |
| **Actual bankruptcy deficiency balance** | | **18.0** |

Sources: All book values from Hyperion data; wholesale trading recoveries from SARS; retail trading recoveries from "Retail Settlements 113006 Summary2.xls;" broadband and Europe trading recoveries from "12_31_2005 summary slide for trading.xls;" Prisma recovery from press release, "Enron Announces Proposed Sale of Prisma Energy International, Inc." May 25, 2006; PGE distribution from "Debtors' Sixth Post-Confirmation Status Report.pdf"; Enron Press Release, "Enron Distributes Approximately $3.4 Billion to Creditors;" gas pipelines from "Cross Country Purchase Agreement Amendment 1.pdf"; other nontrading recoveries from Enron "Global Estate Assets Report 120706_by entity.xls" and "closed assets Report 032607.xls;" and "Open Physical Assets by Group 022807.xls."

### VI.1.3. Measuring the counterfactual deficiency balance at the date of early resolution

(317)    This section summarizes the methods used to compute recovery values (for assets) and claim values (for obligations). These values are calculated as if Enron's financial troubles had been resolved through bankruptcy at an earlier date. I envision a bankruptcy involving the orderly sale of certain businesses as going concerns at fair market value. This would have been in the interest of Enron's creditors and, indeed, is how a number of important Enron assets were liquidated. Where appropriate, I make adjustments based on Enron's actual experience in bankruptcy. The methods I use to compute recovery ratios for Enron's assets and liabilities are appropriate for an evaluation of the company's counterfactual deficiency balance in bankruptcy. I have not considered their appropriateness for other purposes, such as in an evaluation of insolvency, and I recognize that different methodologies may apply in different contexts.

(318)    For additional details of the calculations described in this section, see Appendix F.

### VI.1.3.1. The date at which damages commence

(319)    I compute total damages for the consolidated Enron Corp. using the following two approaches:

- Damages commence after December 31, 1997. I have been instructed to treat this as the earliest possible date on which damages might have been incurred. Under this first approach, the masking transactions are responsible for any increase in deficiency balance starting from the earliest date at which they eliminated the possibility of resolution.

- Damages commence after June 30, 1999. This is the date by which it is more likely than not that at least one set of market monitors, the credit rating agencies, would have intervened and precipitated events forcing Enron to early resolution, but for the deception associated with the masking transactions, according to the model described in Section V.

(320)    I make a separate calculation in which damages commence after December 31, 2000. This is the date by which it is more likely than not that unmasking Citigroup's transactions alone would have caused the rating agencies to intervene and precipitate early resolution, according to the model described in Section V.

### VI.1.3.2. Recoveries on the platform entities

(321)   At early resolution dates, I employed the valuations in the Blake Report and interpolated between his valuation dates.[263] My estimates of the platform entities at the early resolution dates are shown in Exhibit 40:

**Exhibit 40: Platform entities at early resolution ($ billion)**

| Segment | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
| | Book value | Calculated recovery | Book value | Calculated recovery |
| PGE (net of debt) | 2.1 | 2.0 | 2.3 | 2.1 |
| Gas pipelines (net of debt) | 2.1 | 4.0 | 2.3 | 4.3 |
| Prisma (int'l assets) (net of debt) | 0.5 | 0.5 | 1.5 | 1.4 |
| **Total** | **4.7** | **6.4** | **6.1** | **7.7** |

Sources: Book values from Hyperion data; recoveries from the Blake Report.

### VI.1.3.3. Recoveries and claims on financing structures

(322)   The prepay transactions, as previously discussed, held no assets and would have generated no recoveries at early resolution. For the obligations associated with prepays at early resolution, I employed the principal and interest schedules included in the Blake Report.

(323)   To estimate recoveries for assets held by nonprepay structures, I first identified the asset's book value while it was still on Enron's books, just prior to its transfer to the structure. To this amount I added the book value of the TRS held by Enron after the asset's transfer. The sum of the asset's value prior to transfer and the TRS value at the early resolution date equals the asset's book value at early resolution, because the TRS captures any change in the asset's value after its transfer. To estimate recoveries on the asset, I multiply this book value by the recovery ratio of the business segment that held the asset prior to transfer.

(324)   For the obligations associated with nonprepay structures, I used principal and interest schedules from the Blake Report where available; in other cases (smaller structures for which the Blake Report does not include such schedules) I inferred obligations from the size of claims against Enron related to the structure. As discussed in Section VI.1.2, I do not treat the purported equity

---

[263]   More specifically, I determine the ratio of market value (as estimated by the Blake Report) to book equity (book assets net of book liabilities) at each of his estimation dates, interpolate the ratio at other dates, and multiply by book equity at those other dates to arrive at market value.

claim associated with the structure, which typically represented 3% of total financing, as an Enron obligation.

(325)   My estimates of the recoveries and claims on the structured finance transactions at early resolution are shown in Exhibit 41.

**Exhibit 41: Structures at early resolution ($ billion)**

|  | Early resolution at 31 Dec 1997 | Early resolution at 30 Jun 1999 |
|---|---|---|
| Calculated recoveries | 1.6 | 3.3 |
| Claims/obligations | 2.5 | 7.7 |
| **Net recoveries** | **(0.9)** | **(4.4)** |

Sources: Data sources as set forth in Appendix G.

## VI.1.3.4. Recoveries on other nontrading assets

(326)   For estimates of recoveries on Enron's nontrading assets, I relied in part on valuations provided by the Blake Report. The Blake Report assigns a fair market value to these assets based on available financial data and prevailing market conditions for major Enron assets (largely those with book values exceeding $100 million) at five different dates.[264] I extend these valuations to other dates using the ratios of market values to book values at nearby valuation dates; see Appendix F for details.

(327)   For nontrading assets with book values below $100 million and assets for which adequate financial information was not available, I relied on Enron's experience in bankruptcy. Specifically, I grouped Enron's remaining marketable assets into the asset segments identified above.[265] I compared the book value of each segment's assets immediately prior to bankruptcy (based on Enron accounting data from November 30, 2001) to the sum of the gross cash recoveries in bankruptcy for sold assets plus the estimated recovery or remaining book value of any unsold assets in that segment. This yields a recovery percentage for the asset group, which I then applied to the book value of each segment's assets at the early resolution date. This procedure generates the asset recovery figure used in my calculation of the counterfactual deficiency balance.

---

[264]   See the Blake Report; valuation dates are December 31, 1998; December 31, 1999; December 31, 2000; June 30, 2001; and September 30, 2001.

[265]   Excluding goodwill and other nonmarketable assets.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

(328)  Exhibit 42 lists estimated recoveries for each nontrading segment as of December 31, 1997, and
       June 30, 1999. As the table indicates, I estimate that Enron would have recovered $3.9 billion
       from the liquidation of assets with total book value of $6.1 billion at December 31, 1997, and
       would have recovered $7.8 billion on assets with a book value of $9.9 billion at June 30, 1999.

**Exhibit 42: Calculated nontrading asset recoveries at early resolution ($ billion)**

| Segment | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
| | Book value | Calculated recovery | Book value | Calculated recovery |
| Broadband | 0.0 | 0.0 | 0.6 | 0.9 |
| Other wholesale assets | 2.8 | 1.1 | 4.1 | 3.1 |
| Other retail energy assets | 0.1 | 0.0 | 0.1 | 0.1 |
| Other international assets | 1.2 | 0.8 | 2.0 | 1.2 |
| Renewable energy assets | 0.2 | 0.0 | 0.5 | 0.2 |
| EOG | 1.3 | 1.7 | 1.2 | 1.7 |
| Corporate/other assets | 0.3 | 0.2 | 1.1 | 0.5 |
| Interest income | 0.0 | 0.0 | 0.0 | 0.0 |
| Nondebtor cash recoveries | 0.2 | 0.1 | 0.2 | 0.2 |
| **Total** | **6.1** | **3.9** | **9.9** | **7.8** |

Sources: asset valuations from the Blake Report; Hyperion data; Enron spreadsheets, "Closed Asset Sales-Comprehensive.xls" and "Open Physical Assets by Group.xls;" PGE distribution from "Debtors' Sixth Post-Confirmation Status Report.pdf;" gas pipelines from "Cross Country Purchase Agreement Amendment 1.pdf;" Prisma recovery from press release, "Enron Announces Proposed Sale of Prisma Energy International, Inc." May 25, 2006.

### VI.1.3.5. Wholesale trading recoveries and claims

(329)  For wholesale trading I estimate early resolution recoveries and claims by measuring the ratio of
       actual claims to the book value of trading liabilities at the time of bankruptcy, and the ratio of
       actual recoveries to the book value of trading assets at the time of bankruptcy. I assume that these
       ratios are constant over time, and I obtain early resolution book values of trading assets and
       liabilities from Enron's Hyperion accounting system. It is then a matter of simple arithmetic to
       solve for the cash recoveries and claims at early resolution.

(330)  The process for claims is straightforward. Claims observed in CMS and withdrawn claims are
       broken up or allocated by commodity group.[266] Withdrawn claims are mapped to commodity

---

[266]  I calculate the actual bankruptcy claim and recovery ratios separately for four commodity groups: gas, power, the
       commodities traded by the Enron Global Markets ("EGM") companies (consisting mainly of coal and liquids,
       including crude oil), and commodities traded by the Enron Industrial Markets ("EIM") companies, consisting
       mainly of lumber, paper products, and metals.

groups based on the debtor entity. The sum of the observed and withdrawn claims is the numerator of the claim ratio. The denominator of each claim ratio then comes from the value of Enron's wholesale trading liabilities as recorded in its Hyperion accounting system at November 30, 2001. I adjust trading liabilities to account for counterparty replacement costs and to remove the prepays, which are analyzed separately. I also add collateral and margin posted by counterparties with Enron; these amounts are additional Enron trading liabilities. Claims at early resolution are determined by multiplying the claim ratio by the book value plus replacement costs of trading liabilities, obtained from Hyperion data just as at actual bankruptcy.

(331)    To estimate recoveries at early resolution, I first determine the recovery ratio at actual bankruptcy for each commodity group. The numerator of each recovery ratio at bankruptcy equals actual cash recoveries (with both dollar amounts and commodity groups obtained from SARS) plus the value to Enron of any claims withdrawn due to settlement (assigned to commodity groups based on the debtor entity). The denominator of each recovery ratio begins with Hyperion Price Risk Management Assets (PRMA) at November 30, 2001, to which I make certain adjustments. As described more fully in Appendix F, I make an adjustment to account for counterparty replacement costs. Then, I add deposits posted by Enron with counterparties, as these are also a component of Enron's trading assets. Finally, I add Enron's trading accounts receivable. I then estimate and subtract the portion of trading liabilities that are subject to netting against trading assets; this reflects the estate's experience settling its trading positions. These settlements have generally reflected the net value of all positions between the parties, including both ITM and OTM positions. I then multiply the recovery ratio for each commodity group by the adjusted book value of trading assets at each early resolution date, calculated using the same approach and the same data sources as I use for actual bankruptcy.

(332)    My calculation of the actual bankruptcy recovery ratios (and, hence, my application of these ratios to estimations of recoveries at the early resolution date) incorporates one additional refinement. I also account for the fact that during 1997–2001 some of Enron's trading contracts included "one-way" termination clauses that would be expected to impair their value in bankruptcy.[267] I used SARS to distinguish one-way from two-way positions at actual bankruptcy. This allowed me to calculate separate one-way and two-way recovery rates for each relevant commodity. I was advised by the estate that during this time period one-way contracts were used significantly only in physically settled gas, power, and coal contracts. Based on information

---

[267]    As noted in the discussion of retail trading, a "one-way" or "asymmetrical" termination clause is a contractual provision that purports to deny recovery of a termination payment that would otherwise be owed to a party if that party's conduct caused default on the contract.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

provided by the estate, I assumed that all coal contracts during this period were one-way, and I used commodity information in TAGG to estimate the portion of the EGM commodity group that was comprised of coal. The estate also identified the dates at which one-way contracts were phased out in gas and power trading. I assumed that 100% of these commodities were one-way before those dates, and I estimated the drop-off rate between those dates and the date of actual bankruptcy by using the observed proportion of PRMA dollars in one-way contracts at the time of bankruptcy.

(333)    Thus, my approach to estimating trading recoveries accounts for (1) the change in the overall size of Enron's trading book over time, (2) changes in Enron's commodity composition (relevant insofar as certain commodities tended to preserve more of their value in bankruptcy than others), (3) changes in replacement costs, and (4) changes in the use of one-way termination provisions.

(334)    My estimates of the recoveries and obligations related to wholesale trading at two possible early resolution dates are shown in Exhibit 43.

**Exhibit 43: Wholesale trading recoveries and claims at early resolution ($ million)**

| Commodity group | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
| | Recoveries | Claims | Recoveries | Claims |
| ENA - Gas | 503.5 | 222.9 | 547.9 | 497.9 |
| ENA - Power | 26.6 | 515.4 | 226.5 | 363.2 |
| Crude | 225.6 | 173.0 | 80.5 | 489.9 |
| EIM | 23.6 | 12.5 | 54.5 | 30.3 |
| EGM | 19.2 | 13.1 | 20.9 | 28.5 |
| **Total** | **798.5** | **936.8** | **930.3** | **1,409.8** |
| **Contribution to deficiency balance** | **138.3** | | **479.6** | |

Sources: Data sources as set forth in Appendix F.

### VI.1.3.6. Retail trading recoveries and claims

(335)    The retail trading line of business included five debtor entities. For each debtor, the ratio of recoveries to book value of trading assets and the ratio of claims to book value of trading liabilities were calculated at bankruptcy and assumed to be the same at each early resolution date.

(336)    The weighted average recovery and claim ratios at two possible early resolution dates are as shown in Exhibit 44.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

**Exhibit 44: Retail trading book estimated recoveries and claims at early resolution ($ million)**

|  | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
|  | Recoveries | Claims | Recoveries | Claims |
| Book value, retail trading | 1 | 1 | 309 | 96 |
| Weighted average ratios | 24% | 97% | 37% | 20% |
| Estimated bankruptcy value | 0 | 1 | 114 | 19 |

Sources: Book values from Hyperion data; other sources as identified in Exhibit 34.

### VI.1.3.7. Broadband and Europe trading-related recoveries and claims

(337)   I measured the ratio of recoveries plus withdrawn claims to book values at bankruptcy to be 20% for European trading and 5% for broadband, and I applied these ratios to the European and broadband book values at the early resolution dates, as shown in Exhibit 45.

**Exhibit 45: European and broadband recoveries at early resolution ($ million)**

|  | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
|  | Recoveries | Claims | Recoveries | Claims |
| Book value, European trading | 207 | 205 | 250 | 260 |
| Bankruptcy ratio | 20% | 19% | 20% | 19% |
| Estimated bankruptcy value | 42 | 39 | 50 | 50 |
| Book value, broadband trading | 0 | 0 | 20 | 11 |
| Bankruptcy ratio | 5% | 0% | 5% | 32% |
| Estimated bankruptcy value | 0 | 0 | 1 | 3 |
| **Total estimated bankruptcy value** | **42** | **39** | **51** | **53** |

Sources: Hyperion data; "12_31_2005 summary slide for trading.xls," CMS data.

### VI.1.3.8. Claims arising from on balance sheet debt and accounts payable

(338)   Claims related to Enron's on balance sheet debt and noncommodity accounts payable at actual bankruptcy were very close to their book values. I assume that this equivalence would have also prevailed at earlier dates, as shown here in Exhibit 46.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

**Exhibit 46: On balance sheet debt and noncommodity payables at early resolution ($ billion)**

| Segment | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
| | Book value | Claims/ obligations | Book value | Claims/ obligations |
| Book debt | 3.8 | 3.8 | 5.3 | 5.3 |
| Company-obligated preferred securities | 1.0 | 1.0 | 1.0 | 1.0 |
| Payables | 0.2 | 0.2 | 0.1 | 0.1 |
| **Total** | **5.0** | **5.0** | **6.4** | **6.4** |

Sources: Hyperion data.

### VI.1.3.9. Litigation claims

(339)     Some of the litigation that was pending against the estate at the date of bankruptcy could, given the date of the underlying conduct, have been brought against the estate in the event of early resolution in December 1997 or June 1999. For possible early resolution dates coinciding with or following the first quarter in which the claimants could have asserted an action against Enron, I assume that the same litigation would have been brought and would have generated the same claim amount.[268] For earlier resolution dates, I assume that litigation would have generated no claims.

(340)     For litigation claims that were filed against Enron and subsequently withdrawn, dismissed, or disallowed, I assume that there would have been no obligation in the event of an earlier resolution. For litigation claims that are still pending, I use the amount reserved against the claim as recorded in the estate's Claims Management System. To determine whether this claim would be applicable for particular resolution date, I use the same procedure as for resolved claims.[269]

(341)     My analysis of litigation claims is based only on claims filed in the actual Enron bankruptcy. I do not add any litigation claims for actions that could have been asserted against the estate in a counterfactual resolution prior to December 2001 but which were not asserted in the actual bankruptcy. I do not have sufficient information to identify and estimate the value of any such claims.

---

[268]     I determined the earliest date by which the claim might have been asserted by reviewing the allegations of the complaints and working with the Enron estate. For example, a review of the California Energy market litigation claims revealed that an action could have been asserted against the estate as early as the first quarter of 2001 and not likely before this date. See "First Amended Complaint for Declaratory Relief," filed on behalf of the People of the State of California, October 15, 2001.

[269]     Where information needed to assess the earliest feasible complaint date is unavailable, I assume that the claim could be asserted against Enron in all quarters. This is a conservative assumption in that it tends to overstate the deficiency balances in quarters for which a claim could not in fact be asserted, thereby reducing the growth in the deficiency balance between the dates of but-for and actual resolution.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

(342)    Exhibit 47 summarizes the litigation claims potentially assertable against Enron as of December
         31, 1997, and June 30, 1999, the early resolution date implied by my analysis of causation.

**Exhibit 47: Litigation claims potentially assertable against Enron at early resolution ($ million)**

| Claimant | Could be asserted at 31 Dec 1997 | Could be asserted at 30 Jun 1999 |
|---|---|---|
| Bear Stearns Investment Products, Inc. | X | X |
| Pacific Gas and Electric | | |
| Southern California Edison | | |
| U.S. Bank National Association | | |
| King Street Acquisition Company, LLC | | X |
| San Diego Gas and Electric | | |
| Pension Benefit Guaranty Corp. | X | X |
| Other | | |

Sources: CMS; proofs of claim from BSI website.

## VI.1.3.10. Nondebtor guaranty claims

(343)    As noted above, I account for Enron's obligations on its guaranties of nondebtors in the U.S.
         proceedings. The estate provided me with estimates of the total payments that Enron is expected
         to make in its role as guarantor of nondebtor obligations.[270] I computed the ratio of these
         payments to the book value of the nondebtors' liabilities at bankruptcy, and I assumed that the
         same ratio would hold at early resolution. Using this approach, I obtain the estimates of
         nondebtor guaranty obligations shown in Exhibit 48.

**Exhibit 48: Nondebtor guaranty obligations at early resolution ($ billion)**

| Segment | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
| | Book value | Claims/obligations | Book value | Claims/obligations |
| Nondebtor guaranty claims | 0.7 | 0.3 | 0.6 | 0.1 |

Sources: Hyperion data; CMS data; "Non-debtor guaranty claims – mar2007.xls;" "Non-debtor guaranty claims
032907.xls."

---

[270]  Underlying Nondebtors on Guaranties, "Non-debtor guaranty claims4.xls." Because the resolution of Enron
       Corp.'s nondebtor subsidiaries is ongoing, total actual guaranty payments are not yet known. The figures provided
       by the estate account for actual payments to date and expected future payments.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

### VI.1.3.11. Miscellaneous claims

(344)    A small portion of creditors' claims fall outside the categories discussed thus far. These include breach of contract/lease claims, employee claims, tax claims, and administrative claims. To my knowledge, none of the available data directly pertain to the likely magnitude of these claims in an early resolution. There are no book liabilities that map directly to these claims in a way that would permit them to be used in a claim ratio. However, in my opinion, it is reasonable to assume that Enron's employee claims would have been approximately proportional to the size of Enron's workforce and that its other miscellaneous claims would have been proportional to its overall size, as measured by the company's assets. Using these assumptions, I obtain the following estimates for miscellaneous claims at early resolution.

**Exhibit 49: Miscellaneous claims at early resolution ($ billion)**

| Segment | Early resolution at 31 Dec 1997 Claims/obligations | Early resolution at 30 Jun 1999 Claims/obligations |
|---|---|---|
| Breach of contract/leases | 0.2 | 0.4 |
| Tax | 0.0 | 0.0 |
| Employee | 0.1 | 0.2 |
| Administrative | 1.3 | 2.0 |
| Other | 0.4 | 0.6 |
| **Total** | **2.1** | **3.2** |

Sources: Hyperion data; CMS data.

### VI.1.3.12. Total claims

(345)    Exhibit 50 contains a tabulation of claims against Enron in a counterfactual bankruptcy occurring at year-end 1997 or June 30, 1999. On December 31, 1997, the book value of Enron's obligations totaled $7.5 billion, while the counterfactual claims against the estate would have totaled $12.6 billion. On June 30, 1999, these amounts would have been $10.7 billion and $20.9 billion, respectively.

**Exhibit 50: Calculated claims at early resolution ($ billion)[271]**

| Segment | Early resolution at 31 Dec 1997 | | Early resolution at 30 Jun 1999 | |
|---|---|---|---|---|
| | Book value | Claims/obligations | Book value | Claims/obligations |
| Book debt | 3.8 | 3.8 | 5.3 | 5.3 |
| Payables | 0.2 | 0.2 | 0.1 | 0.1 |
| Structures debt | 0.0 | 2.5 | 0.0 | 7.7 |
| Litigation | N/A | 0.4 | N/A | 0.5 |
| Breach of contract/leases | N/A | 0.2 | N/A | 0.4 |
| Trading-related claims | 1.8 | 1.0 | 3.5 | 1.5 |
| Tax | N/A | 0.0 | N/A | 0.0 |
| Employee | N/A | 0.1 | N/A | 0.2 |
| Administrative | N/A | 1.3 | N/A | 2.0 |
| Other | N/A | 0.4 | N/A | 0.6 |
| Obligations to nondebtors | 0.0 | 0.0 | 0.1 | 0.1 |
| Nondebtor guaranty claims | 0.7 | 0.3 | 0.6 | 0.1 |
| Company-obligated preferred securities | 1.0 | 1.0 | 1.0 | 1.0 |
| Sithe long-term contract | 0.0 | 1.4 | 0.0 | 1.3 |
| **Total** | **7.5** | **12.6** | **10.7** | **20.9** |

Sources: Book values from Hyperion data; CMS data.

## VI.1.3.13. The counterfactual deficiency balance

(346)    To compute the total counterfactual deficiency balance, I combine the aforementioned measures of asset recoveries, trading recoveries, and claims. For year-end 1997, I find that Enron would have had $12.8 billion in total asset recoveries and $12.6 billion in claims. For June 30, 1999, the date by which it is more likely than not that Enron would have lost its investment grade rating but for the deception created by the masking transactions, I find that Enron would have had $20.0 billion in total asset recoveries and $20.9 billion in claims. On this date, estimated recoveries would not have been enough to cover claims against the estate; there would thus have been a deficiency balance of $0.9 billion. Exhibit 51 details these calculations.

---

[271]    In this table, true zero values are represented with "N/A"; 0.0 denotes a very small but nonzero value.

**Exhibit 51: Asset recoveries and claims at early resolution ($ billion)**

| | Early resolution at 31 Dec 1997 | Early resolution at 30 Jun 1999 |
|---|---|---|
| **Asset recoveries by segment** | | |
| PGE equity (net of debt) | 2.0 | 2.1 |
| Gas pipelines equity (net of debt) | 4.0 | 4.3 |
| Prisma (Int'l assets) equity (net of debt) | 0.5 | 1.4 |
| Broadband trading assets | 0.0 | 0.0 |
| Other broadband assets | 0.0 | 0.9 |
| Wholesale trading assets | 0.8 | 0.9 |
| Other wholesale assets | 1.1 | 3.1 |
| Retail trading assets | 0.0 | 0.1 |
| Other retail energy assets | 0.0 | 0.1 |
| International trading assets | 0.0 | 0.1 |
| Other international assets | 0.8 | 1.2 |
| Renewable energy | 0.0 | 0.2 |
| EOG | 1.7 | 1.7 |
| Corporate/other | 0.2 | 0.5 |
| Off balance sheet structure assets | 1.6 | 3.3 |
| Interest income | 0.0 | 0.0 |
| Nondebtor recoveries | 0.1 | 0.2 |
| **Total** | **12.8** | **20.0** |
| **Claims by segment** | | |
| Book ("on balance sheet") debt | 3.8 | 5.3 |
| Payables | 0.2 | 0.1 |
| Off balance sheet structures | 2.5 | 7.7 |
| Litigation | 0.4 | 0.5 |
| Breach of contract/leases | 0.2 | 0.4 |
| Trading-related claims | 1.0 | 1.5 |
| Tax | 0.0 | 0.0 |
| Employee | 0.1 | 0.2 |
| Administrative | 1.3 | 2.0 |
| Other | 0.4 | 0.6 |
| Payables to nondebtors | 0.0 | 0.1 |
| Nondebtor guaranties | 0.3 | 0.1 |
| Company-obligated preferred securities | 1.0 | 1.0 |
| Sithe long-term contract | 1.4 | 1.3 |
| **Total** | **12.6** | **20.9** |
| **Deficiency balance (excess recovery)** | **0.0** | **0.9** |

(347)    My analysis seeks to measure harm or damages to the estates and creditors by determining the avoidable portion of the actual deficiency balance. Thus, I compare the deficiency at that time of

early resolution to the actual deficiency caused by the masking transactions. Wherever possible, I use the actual experience of Enron in bankruptcy as my principal starting point for projecting likely outcomes in an early bankruptcy. I note that the values of various assets and obligations may differ according to whether or not a firm is in bankruptcy. Accordingly, my analysis is not intended to reflect either the value of Enron as a going concern or the value that would be realized through dispositions outside of bankruptcy; see the Blake report.

(348)    I have calculated the deficiency balance in an early bankruptcy for every quarter from Q4 1997 through Q3 2001. As shown in Exhibit 52, there would have been no deficiency balance until Q3 1998. These calculations allow a determination of the avoidable deficiency balance—a computation of harm to the company and to creditors—at any point in time under any scenario that would have caused the company to cease incurring the losses that ultimately contributed to the deficiency balance. In the previous section, I focused on just one of the external constraining factors—loss of an investment grade rating—that would have caused the mounting losses to cease. But this calculation can be used to compute damages if the constraint on incurring additional losses came from another source—for example, if any of the involved financial institutions had "blown the whistle" on such transactions at an earlier point in time.

**Exhibit 52: Deficiency balance, December 1997 through November 2001 ($ billion)**

| Date | Deficiency balance |
|------|--------------------|
| Q4 1997 | 0.0 |
| Q1 1998 | 0.0 |
| Q2 1998 | 0.0 |
| Q3 1998 | 0.8 |
| Q4 1998 | 1.2 |
| Q1 1999 | 0.2 |
| Q2 1999 | 0.9 |
| Q3 1999 | 4.3 |
| Q4 1999 | 6.9 |
| Q1 2000 | 7.3 |
| Q2 2000 | 10.5 |
| Q3 2000 | 13.6 |
| Q4 2000 | 12.6 |
| Q1 2001 | 18.4 |
| Q2 2001 | 19.9 |
| Q3 2001 | 20.7 |
| 30 Nov 2001 | 18.0 |

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

Exhibit 53: Deficiency balance, December 31, 1997–November 30, 2001 ($ billion)



## VI.1.4. Damages

(349)   As discussed in Section VI.1.3, I compute damages under two different approaches.

(350)   For the first approach, I assume that damages commence on December 31, 1997. Damages correspond to the increase in deficiency balance that occurred between this date and the date of Enron's eventual resolution. As shown in Exhibit 54, the associated damage figure is $18.0 billion (which is the amount of Enron's deficiency balance today, calculated on a consolidated basis) because at December 31, 1997 the estate's estimated recoveries would have exceeded its estimated claims.

**Exhibit 54: Damages, for early resolution at December 31, 1997 ($ billion)**

|  | Amount |
|---|---|
| Deficiency balance at 31 Dec 1997 | 0.0 |
| Deficiency balance today | 18.0 |
| **Harm to the estate avoidable through early resolution** | **18.0** |

(351)   For the second approach, I assume that damages commence at June 30, 1999, the date by which it is more likely than not that resolution would have occurred but for the deception associated with the masking transactions. My analysis indicates that, more likely than not, Enron would have lost its investment grade status by June 30, 1999. Taking this as the date of early resolution, I calculate that Enron's recoveries would have been sufficient to meet its obligations to creditors (see Exhibit 52). Since the actual deficiency balance today is $18.0 billion, the postponement of Enron's resolution from Q2 1999 to year-end 2001 increased the deficiency balance by $17.1 billion (as shown in Exhibit 55). This figure represents damages for the second approach.

**Exhibit 55: Damages, for early resolution at June 30, 1999 ($ billion)**

|  | Amount |
|---|---|
| Deficiency balance at 30 Jun 1999 | 0.9 |
| Deficiency balance today | 18.0 |
| **Harm to the estate avoidable through early resolution** | **17.1** |

(352)   Separately, I also calculated the growth in Enron's deficiency balance based on December 31, 2000, the date at which unmasking Citigroup's transactions would more likely than not have forced the company into early resolution. As shown in Exhibit 56, $5.4 billion of the actual deficiency balance could have been avoided had Enron been forced into early resolution at Q4 2000.

**Exhibit 56: Damages, for unmasking of Citigroup transactions only ($ billion)**

|  | Amount |
|---|---|
| Deficiency balance at 31 Dec 2000 | 12.6 |
| Deficiency balance today | 18.0 |
| **Harm to the estate avoidable through early resolution** | **5.4** |

## VI.2. Sources of the growth in Enron's deficiency balance

(353)　By hiding the company's true financial position from creditors, rating agencies, and other market monitors, the masking transactions enabled Enron to operate in a manner that contributed to a growing deficiency balance. As discussed previously, damages correspond to the portion of this growth that would have been avoided had the deception not occurred. In the previous section, I measured the growth in Enron's deficiency balance between various possible dates of early resolution and Enron's ultimate bankruptcy. Here, I identify the activities that contributed to this growth.

(354)　In misleading the market, the masking transactions permitted a management team that was performing poorly to lead the company on an aggressive and risky strategy of expansion. As of December 31, 1997, Enron reported gross book value of assets of approximately $22.3 billion.[272] By the second quarter of 2001, this figure had increased to approximately $62.2 billion.[273] As shown in Exhibit 57, most of the increase was concentrated in three areas: trading (both wholesale and retail energy), wholesale investments, and international investments. Together, these areas accounted for more than 90% of Enron's total asset growth.

---

[272]　Enron Corp., 1997 Form 10-K (March 31, 1998).

[273]　Enron Corp., Q2 2001 Form 10-Q (August 14, 2001).

**Exhibit 57: Growth of Enron asset segments, December 1997 to June 2001 ($ billion)**

| Segment | Book value, 31 Dec 1997 | Book value, 30 Jun 2001 | Net increase | Percentage increase |
|---|---|---|---|---|
| Trading (wholesale and retail) | 3.5 | 19.2 | 15.6 | 442% |
| Other wholesale assets | 3.0 | 6.8 | 3.8 | 130% |
| International assets (incl. Prisma) | 2.0 | 6.0 | 4.0 | 203% |
| PGE | 2.1 | 2.4 | 0.2 | 11% |
| Pipelines | 2.1 | 2.3 | 0.2 | 10% |
| Broadband | 0.0 | 1.1 | 1.1 | N/A |
| Other assets | 1.9 | 2.2 | 0.4 | 21% |
| **Total** | **14.5** | **40.0** | **25.5** | **175%** |

Sources: Hyperion data.

(355) For the most part, Enron financed its rapid expansion by taking on additional obligations. This primarily took the form of book debt (which was disclosed in its financial statements) and structure-related obligations. As shown in Exhibit 58, the total growth in these two types of obligations exceeded $19 billion.

**Exhibit 58: Growth of Enron debt and structure-related obligations, December 1997 to June 2001 ($ billion)**

| Segment | Value at 31 Dec 1997 | Value at 30 Jun 2001 | Net increase | Percentage increase |
|---|---|---|---|---|
| Book debt | 3.8 | 12.7 | 8.9 | 233% |
| Company-obligated preferred securities | 1.0 | 0.9 | (0.1) | (9%) |
| Structure-related obligations | 2.5 | 13.4 | 10.9 | 439% |
| **Total** | **7.3** | **27.0** | **19.7** | **270%** |

Sources: Hyperion data; debt schedules provided by the Blake Report.

(356) Once in bankruptcy, Enron found that it was unable to recover the full book value of many of its assets and investments. While the major components of "old Enron" (particularly the pipelines) held or increased their value, the "new Enron" investments largely did not. In fact, early in the bankruptcy proceedings, the Enron estate booked asset impairments of nearly $14 billion, mainly to trading activities (expected loss of cash deposits, write-downs of doubtful accounts receivable, and impairment of the MTM component of ITM positions), equity in Enron Europe, and intangible assets such as goodwill.[274] It also recognized the possibility that asset impairments

---

[274] "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting material to Enron Corp., Form 8-K (April 22, 2002).

might be $9 billion greater, primarily due to the company's anticipated difficulty liquidating trading positions.[275] Recoveries for liquidated assets indeed proved in many cases to be much lower than prebankruptcy book values. Exhibit 59 provides a summary of Enron's actual recoveries through liquidation, as well as the corresponding book values immediately prior to bankruptcy.

**Exhibit 59: Summary of asset liquidation recoveries compared to book values ($ billion)**

| Segment | Book value | Bankruptcy recoveries | Difference | Recovery percentage |
|---|---|---|---|---|
| PGE* | 1.8 | 1.8 | 0.0 | 101% |
| Gas pipelines* | 0.8 | 2.2 | 1.4 | 265% |
| Prisma (Int'l assets)* | 2.5 | 2.9 | 0.4 | 117% |
| Broadband Trading | 0.3 | 0.0 | (0.3) | 5% |
| Other Broadband | 0.8 | 0.2 | (0.6) | 21% |
| Wholesale Trading | 12.2 | 4.1 | (8.1) | 34% |
| Other Wholesale | 3.1 | 1.6 | (1.5) | 53% |
| Retail Trading | 3.5 | 1.3 | (2.1) | 38% |
| Other Retail Energy | 1.3 | 1.1 | (0.2) | 83% |
| International Trading | 0.9 | 0.2 | (0.8) | 20% |
| Other International | 1.9 | 0.4 | (1.5) | 23% |
| Renewable Energy | 0.8 | 0.4 | (0.4) | 49% |
| Azurix | 0.3 | 0.0 | (0.3) | 0% |
| Corporate/Other | 1.7 | 1.0 | (0.7) | 60% |
| Off balance sheet structures | | 1.9 | | |
| Interest income | | 0.8 | | |
| Nondebtor recoveries* | 1.7 | 1.3 | (0.4) | 77% |
| **Total** | **33.5** | **21.1** | **(12.4)** | **63%** |

Sources: As identified in Exhibit 30 through Exhibit 35.
*Book values of segments marked with an asterisk are displayed net of associated liabilities.

(357)    The masking transactions contributed to the growth in deficiency balance in three ways. First, as is clear from Exhibit 58, they provided a substantial fraction of the funds used to finance Enron's investments. Second, by disguising Enron's true financial state, they permitted Enron to obtain additional funds from other investors, including innocent creditors. Third, they successfully misled Enron's stakeholders (existing creditors, equity holders, and the Board), who might otherwise have compelled the company to change its investment strategy, capital structure, and/or

---

[275]    Ibid.

management. In short, the masking transactions provided Enron with both the capital and the appearance of health required to execute the business plan that ultimately left it with a deficiency balance of $17.1 billion.

(358)    Below, I describe in greater detail the factors that contributed to the growth in Enron's deficiency balance.


## VI.2.1. Asset acquisitions and recoveries

### VI.2.1.1. International investments

(359)    Although Enron claimed to be pursuing an "asset light" growth strategy during the 1990s,[276] its investments in traditional asset-intensive energy operations grew dramatically in this time period, particularly outside the United States. Enron's international investments exposed it to the challenges of doing business in unfamiliar markets and cultures and of dealing with political and regulatory regimes it did not fully understand. Moreover, these investments often required large up-front outlays of cash, for which the payoff would come, if at all, years after physical facilities were completed and operational. Ultimately, foreign investments were major contributors to the growth of Enron's deficiency balance; the company borrowed huge sums to invest in projects that never paid off.

(360)    Enron opened its first overseas offices in England in 1988, and it had established a broad international presence by the mid-1990s.[277] Subsequently, it set up energy-trading and marketing operations in Canada, England, Germany, South America, India, and a number of other regions.[278] In addition to its investments in trading infrastructure, during the late 1990s the firm made investments in power plants, natural gas pipelines, power distribution, and utilities across the globe. Some of these investments were made in developing markets in Central and South America, Asia, Africa, and the Middle East—all places where the political and economic risks were substantial.[279]

---

[276]   See, e.g., "A Matter of Principles," *Economist,* June 28, 2001 ("For one thing, Enron is quite unlike such asset-heavy energy giants as ExxonMobil or Electricité de France. . . . [Skilling] has been shedding some of the asset-intensive (and underperforming) bits of the company in recent years.").

[277]   See Enron Corp., 1997 Annual Report, at 42–47.

[278]   Ibid., at 26–31.

[279]   "Project Summer Overview Presentation" (RCUCC02700–2731); "Project Summer Board of Directors Meeting August 8, 2000" presentation (EC004391519), "Project Summer Business Update" (EC004391537).

Expert Report of B. Douglas Bernheim, Ph.D.                              Damage analysis

(361)  Many of these investments performed poorly and produced what were termed "inadequate returns."[280] I understand that prior to bankruptcy the firm attempted to find buyers for many of its international assets. By the summer of 2000, it was considering selling virtually all of its nontrading-related international assets to a group of Middle Eastern investors.[281] However, the deal was not consummated, and Enron still held most of these assets when it declared bankruptcy in 2001.

### Prisma

(362)  Following its declaration of bankruptcy, Enron reorganized some of its most marketable international assets into a newly created structure known as Prisma Energy.[282] Exhibit 60 lists Prisma assets.

**Exhibit 60: Major Enron assets contributed to Prisma Energy**

| Natural gas transmission | Power generation | Power distribution |
|---|---|---|
| TBS (Brazil/Bolivia) | Trakya (Turkey) | Elecktro (Brazil) |
| Vengas (Venezuela) | Puerto Quetzal (Guatemala) | |
| Accroven (Venezuela) | Bahia Las Minas (Panama) | |
| GasBol (Bolivia) | Subic Power Corp (Phil.) | |
| GasMat (Brazil) | Nowa Sarzyna (Poland) | |
| Transredes (Argentina) | Smith/Enron Cogen (Dom. Rep.) | |
| BBPL-GTB (Bolivia) | Corinto (Nicaragua) | |
| BBPL-TBG (Brazil) | GMSA (Argentina) | |
| Centragas (Colombia) | Marianas Energy Company (Guam) | |
| SK-Enron (Korea)[283] | Cuiaba-EPE | |

Sources: Enron Disclosure Statement for the Fifth Amended Joint Plan of Affiliated Debtors, pp 489–518; Prisma Energy website (http://www.prismaenergy.com/).

(363)  On May 26, 2006, Enron announced that Ashmore Energy International Limited had agreed to acquire Prisma in a two-stage transaction expected to close later in 2006. Ashmore agreed to pay

---

[280]  Ibid.

[281]  Ibid.

[282]  Prisma has been wholly owned by, but run separately from, the Enron estate since its formation in 2004. In my counterfactual deficiency balance calculations, I assume that the same set of international assets and businesses would have been grouped into Prisma and marketed as a going concern separately from the rest of the Enron estate. See Appendix D for additional details.

[283]  Prisma Energy Intl., "Prisma Energy Completes Sale of 50% Stake in SK-Enron," news release, October 7, 2005 (http://www.prismaenergy.com/news/ pdfs/release20051007.pdf, accessed May 17, 2006).

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

a total of $2.9 billion, which was $840 million more than the September 30, 2001, book value of Prisma's components.[284]

### Other international assets

(364)    Even though the Prisma assets may have sold for more than their book value, many of Enron's largest international assets have been liquidated by the estate (or are in the process of being liquidated) for substantially less than their book values. Three examples follow.

### Dabhol power plant

(365)    In 1992, Enron entered into an agreement to construct a large electrical generation facility in the Indian state of Maharashtra. The plant was initially projected to cost $2.9 billion, and Enron invested over $1 billion in its construction.[285] The project was beset with problems, including cost overruns, problematic negotiations with local authorities, and allegations of misconduct by some of the parties involved. In May 2001, the strained relationship between Enron and its Indian partner, the Maharashtra State Electricity Board, broke down entirely. Each party accused the other of breaking the agreement. The MSEB stopped taking power from the plant, and at the end of May the plant stopped generating altogether.[286] In August 2001, Enron announced its willingness to sell its stake in Dabhol at cost.[287] Following Enron's bankruptcy filing, the estate was in fact forced to take an $892 million write-down on the Dabhol facility.[288] In 2004, it sold its stake in the project to partners for $24 million.[289]

### Azurix

(366)    In 1998, Enron purchased a British water and wastewater services company, Wessex Water, for approximately $2.24 billion and renamed the company Azurix.[290] This acquisition was part of

---

[284]   Enron Corp., "Enron Announces Proposed Sale of Prisma Energy International, Inc.," news release, May 26, 2006.

[285]   "Fact Sheet: Background on Enron's Dabhol Power Project," Minority Staff, Committee on Government Reform, United States House of Representatives, February 22, 2002, pp 1, http://democrats.reform.house.gov/Documents/20040830150742–77212.pdf on May 17, 2006; Enron Corp. Q3 2001 Form 10-Q, identifying $1.2 billion "investment in and advances to Dabhol and related activities."

[286]   "Dabhol idle as state stops buying from Enron," CNN.com, May 30, 2001.

[287]   Dow Jones News Service, "India BSES:Dabhol Pwr Proj Due Diligence Done Jan –Report," November 19, 2001.

[288]   "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting material to Enron Corp., Form 8-K (April 22, 2002).

[289]   "Closed Estate Assets" report on liquidated assets, January 10, 2006.

[290]   Enron Corp., 1998 Form 10-K (March 31, 1999).

Enron's plan to take advantage of roughly contemporaneous measures that deregulated the marketing and sale of water in many countries and opened the door to trading in water-related financial instruments. Azurix struggled to grow its business and paid substantial premiums to land certain contracts.[291] After an initial public offering of Azurix stock in mid-1999, the value of the company fell significantly in late 1999 and 2000.[292] At the end of 2000, Enron took a $325 million impairment on its $1.1 billion stake. Enron purchased the remaining publicly traded shares of Azurix and then took an additional $287 million impairment in the third quarter of 2001.[293] The Enron estate sold Azurix in 2002 to a Malaysian firm for approximately $780 million, and all of the proceeds were used to retire Azurix debt.[294]

**Gaza Power Plant**

(367)    In June 1999, Enron, with support from the U.S. government, signed an agreement with the Palestinian Energy Authority to build a power plant in the Gaza Strip and provide electricity to the Palestinian Authority.[295] The plant's budgeted cost was approximately $140 million, and Enron obtained a small amount of political risk insurance from the Overseas Private Investment Corporation. After construction had commenced, violence between Israel and the Palestinians erupted in 2000, and work on the plant was halted. Enron found no buyers for the plant following its bankruptcy in 2001, and the company wrote off the entire carrying value of the Gaza plant ($23 million) in April 2002.[296]

(368)    Exhibit 61 summarizes the losses associated with specific international assets, including the three mentioned above.

---

[291]    In one case, Azurix reportedly bid over three times more than the nearest bidder for a services contract in Buenos Aires, Argentina. See http://specials.ft.com/enron/FT3AB0FQKXC.html, accessed May 17, 2006.

[292]    The Blake Report.

[293]    Enron Corp., 2000 Form 10-K (April 2, 2001) and Enron Corp., Q3 2001 Form 10-Q (November 19, 2001).

[294]    "Closed Estate Assets" report on liquidated assets, January 10, 2006; "Malaysian group swoops in to buy Wessex Water", http://waternet.com/news.asp?mode=4&N_ID=30501, accessed January 25, 2006

[295]    "Stalled Venture In Gaza Shows Enron's Daring," *Washington Post*, March 2, 2002, http://www.washingtonpost.com/ac2/wp-dyn/A26217-2002Mar1?language=printer, accessed January 25, 2006.

[296]    "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting material to Enron Corp., Form 8-K (April 22, 2002).

Expert Report of B. Douglas Bernheim, Ph.D.                                   Damage analysis

**Exhibit 61: Selected postbankruptcy charges taken on international assets ($ million)**

| Unit | Assets | Amount of charge ($MM) |
|------|--------|------------------------|
| EGAS | Loss associated with investment in Dabhol facility | 922 |
| EGAS | Foreign currency-related loss for Enron TGS affiliate in Argentina | 233 |
| ENE | Impairment of Azurix Argentinean assets | 136 |
| EGEP | Loss associated with Enron Oil & Gas India sale | 120 |
| ENE | Loss of Azurix deferred tax assets | 107 |
| EGAS | Impairment of SECLP partnership in Dominican Republic | 103 |
| EGAS | Write-down of value of CEG/CEG-Rio assets | 65 |
| EGAS | Expensing of deferred costs associated with development projects | 45 |
| EGAS | Impairment of San Juan Gas fiber optics project | 28 |
| EGAS | Loss due to abandonment of Gaza power plant | 23 |

Sources: "Preliminary Fourth Quarter Charges to be Booked or Disclosed", supporting materials for Enron 8-K filing, April 22, 2002.

## VI.2.1.2. Broadband business

(369)    With its purchase of Portland General Electric in 1997, Enron acquired ownership of FirstPoint Communications, a provider of broadband and multimedia services.[297] Following this acquisition, Enron worked to build a nationwide fiber-optic network. It planned to use this network to deliver media content to consumers. Enron also planned to use its network and expertise in trading to create a market for broadband-based financial instruments.[298] In late 1999, Enron announced its first bandwidth trade and expressed its hope and expectation that the market for broadband-based financial instruments would grow rapidly.[299] By December 2000, Enron reported $1.337 billion in broadband-related assets and nearly $700 million of book equity associated with this business segment. However, the markets for broadband-based financial instruments and streaming media content did not develop as Enron anticipated. Many of the technologies that Enron advertised were never completed, and there were very few broadband trades. Following bankruptcy, the Enron estate estimated an impairment of approximately $698 million to its inventory of "dark fiber," which was Enron's single largest broadband-related asset.[300] This asset was sold, in early 2003, for $141 million. As shown in Exhibit 62, Enron wrote off over $1.0 billion in book value

---

[297]   http://www.chron.com/disp/story.mpl/special/enron/1718323.html, accessed May 17, 2006; http://www.cedmagazine.com/article/CA6265456.html accessed May 17, 2006

[298]   Enron Corp., 1999 Annual Report, at 15.

[299]   Ibid., 16.

[300]   "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting material to Enron Corp., Form 8-K (April 22, 2002).

for a business segment whose total book value at September 30, 2001, was only $1.3 billion; total broadband recoveries in bankruptcy were only $172 million.[301]

**Exhibit 62: Selected postbankruptcy charges taken on broadband assets**

| Unit | Total Assets | Amount of charge ($MM) |
|------|-------------|------------------------|
| EBS | Write-down to market value of Enron fiber and other broadband PP&E | 698 |
| EBS | Potential loss associated with AR in long-term fiber sales agreements | 195 |
| EBS | Impairment of doubtful accounts receivable reserve | 60 |
| EBS | Estimated loss associated with broadband-based contracts | 66 |
| EBS | Loss of goodwill in broadband software development companies | 50 |

Sources: "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting materials for Enron 8-K filing, April 22, 2002.

### VI.2.1.3. Wholesale trading and related assets

(370)    Between 1997 and 2001, at least three kinds of changes to Enron's wholesale activities affected the value of the company's trading-related assets; these were as follows:

- The trading book grew larger.

- The composition of the trading book changed.

- Enron lost value on the physical assets it bought to support its trading activities.

I will review each of these changes in turn.

### VI.2.1.3.1. The trading book grew larger

(371)    The sheer size of Enron's trading book increased markedly between 1997 and the date of the filing of the bankruptcy petition. Each year Enron was engaging in more deals, with more counterparties, covering more commodities and types of transactions. Although the book value of Enron's trading activities was distorted by the masking transactions,[302] Exhibit 63 provides some idea of how trading came to dominate Enron's wholesale business. The "fair values" Enron reported for its trading assets and liabilities grew roughly sevenfold during 1997–2000.[303]

---

[301]    Consisting of $157 million in noncommodity recoveries, per "Closed Asset Sales-Comprehensive.xls," dated January 10, 2006, plus $15 million in broadband trading recoveries, per "12_31_2005 summary slide for trading.xls."

[302]    It was particularly distorted by the prepays discussed above.

[303]    Wholesale assets include net positive futures contract positions, accounts receivable, and deposits.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

**Exhibit 63: Reported "fair values" of Enron's price risk management assets and liabilities, including prepays ($ billion)**



Sources: Data from Enron Corp. Forms 10-K for 1997–2000.

(372)   In bankruptcy, trading liabilities generally produced claims commensurate with the book values of Enron's out-of-the money positions. However, trading assets were generally liquidated for substantially less than the book values of Enron's in-the-money positions. Accordingly, the growth of the trading book over time contributed to the growth of the deficiency balance in bankruptcy.

### VI.2.1.3.2. The composition of the trading book changed

(373)   As Enron's trading portfolio grew in size, it also changed in composition. In 1997, natural gas accounted for two-thirds of Enron's reported "fair value" of price risk management (PRM) assets, but by 2000 it accounted for only 48%. "Other commodities" did not exist as a separate category in 1997, but by 2000 these made up about 7% of the $21 billion in PRM assets.

**Exhibit 64: Composition of Enron's PRM assets in 1997 and 2000, by reported fair value**

| Asset group | Q4 1997 | Q4 2000 |
|-------------|---------|---------|
| Natural gas | 68% | 48% |
| Electricity | 20% | 34% |
| Crude oil and liquids | 10% | 7% |
| Other commodities | 0% | 7% |
| Equity investments | 2% | 4% |

Sources: Enron Corp. Forms 10-K for 1997–2000.

(374)    The new commodities were in some cases riskier (or traded in less liquid markets), and they were less likely than natural gas to preserve their value in bankruptcy. This is because it takes time for a liquid market to develop around any newly traded commodity. When a commodity first starts trading, contracts tend to be illiquid because there are relatively few buyers and sellers and less frequent trades. Illiquid assets, such as contracts for the sale or purchase of thinly traded commodities, cannot readily be converted to cash. Enron pioneered markets for new commodities (such as weather-based derivatives and fiber-optic bandwidth), and it packaged traditional commodities in ways that made them similarly illiquid (for example, trading extremely long-term positions in gas and power).

### VI.2.1.3.3. Enron lost value on the physical assets it bought to support its trading activities

(375)    Enron purchased a wide variety of physical assets and merchant positions to support its trading operations. Acquisitions of utilities, power generation facilities, steel mills, paper mills, and a number of other physical assets complemented Enron's trading activities. These acquisitions provided access to information about industry participants and enhanced Enron's ability to forecast supply and demand. As a result, these assets had (or were expected to have) value to Enron in excess of their value to others. By the time of Enron's bankruptcy, the company had purchased many assets to support transactions involving markets in which it had no presence just a few years earlier, including forest products and retail energy services. When Enron was forced to liquidate these assets in bankruptcy, it was unable to sell them for their book values. These investments therefore played a role in the growth of Enron's deficiency balance. Exhibit 65 lists the accounting impairments taken in 2002 on these physical assets and investments. These impairments were in many instances similar to the actual losses realized when the assets were liquidated.[304]

---

[304]    For example, Enron disclosed a write-down of $99 million to its investment in Stadacona, a Canadian paper mill

Expert Report of B. Douglas Bernheim, Ph.D.                    Damage analysis

**Exhibit 65: Selected postbankruptcy charges taken on wholesale business physical and merchant assets ($ million)**

| Enron unit | Detail on charge | Amount of charge |
|---|---|---|
| EWS/ENA | Loss of PGE goodwill due to cessation of trading | 699 |
| EIM | Loss of Forest Products business goodwill associated with cessation of trading | 135 |
| EIM | Loss on investment in Stadacona paper mill | 99 |
| EIM | Loss on investment in Garden State Paper mill | 57 |
| EWS/ENA | Losses pertaining to investment in coal production entities | 22 |
| EGM | Write-off of goodwill and deferred costs associated with Webmodal investment | 11 |
| EIM | Loss on investment in Papier Masson | 7 |
| EIM | Loss on investment in Satco timberlands investment | 6 |
| EIM | Loss on investment in Clickpaper associated with cessation of forest products trading | 6 |
| EIM | Write-off of deferred costs associated with ENW WIP logistics system | 5 |

Sources: "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting materials for Enron 8-K filing, April 22, 2002.

## VI.2.1.4. Retail trading and related assets

(376)    On December 31, 1997, Enron's retail energy business was barely one year old. It had purchased PGE as part of its retail market entry strategy only seven months earlier and had subsequently formed Enron Energy Services. By the date of bankruptcy, Enron's retail business was much larger. The expansion of this retail operation contributed to the growth of Enron's deficiency balance.

(377)    Bankruptcy severely impaired the value of Enron's retail trading contracts. As EES attempted to liquidate its trading contracts, it found that buyers were "significantly discounting the value of these contracts due to future service obligations, modeling risk due to the complexity" of valuing the contracts, "the capital intensive nature of the contracts" whereby "significant negative cash flows in the front years . . . were offset by positive cash flows in the later years" and one-way termination clauses "whereby the defaulting party is not entitled to market based liquidating damages upon early termination of the contract."[305]

---

that Enron purchased in April 2001 for approximately $365 million and was carrying at $350 million at the time of bankruptcy. In February 2004, Enron sold its interest in Stadacona for approximately $205 million, a value less than the disclosed impaired value. Sources: "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting material to Enron Corp., Form 8-K (April 22, 2002).

[305] "Preliminary Fourth Quarter Charges to be Booked or Disclosed," supporting material to Enron Corp., Form 8-K (April 22, 2002) at 4.

(378)    Although the Enron estate has pursued the sale and settlement of over 600 retail contracts, recoveries have been modest. Just prior to bankruptcy, retail trading contributed over $4 billion (over $1.5 billion in AR and over $2.5 billion in PRM Assets) to the book value of Enron's assets. The estate has recovered only $837 million in settlements thus far. Another $31 million in recoveries is expected on positions still awaiting settlement. It has also recovered $457 million in net proceeds from servicing live retail contracts, for a total of $1.3 billion in actual and expected recoveries.[306] Bankruptcy was devastating to Enron's retail trading activities.

(379)    Enron's retail energy unit also included nontrading assets, which were severely impaired by bankruptcy. Among the larger items listed in the supporting materials for the estate's April 22, 2002, Form 8-K are the following:

- Impairment of property, plant, and equipment, including the capitalized costs of developing information systems too highly customized or too incomplete to have value to third parties ($125 million write-down).

- Payments owed by vendors to EES which are now impaired because EES's liquidation requires it to terminate its contracts with those vendors ($69 million write-down).

- Losses of $28 million in goodwill relating to some EES subsidiaries.

- Losses associated with California customers who disputed amounts owed ($7 million write-down).[307]

In all, the nontrading retail impairments listed in the 8-K supporting materials total some $247 million, or two-thirds of their $374 million book value.[308]

## VI.2.2. Obligations

### VI.2.2.1. Book debt

(380)    Apart from the asset impairments just described, the other major component of the growth of Enron's deficiency balance was the expansion of its obligations. On December 31, 1997, Enron's

---

[306]    Spreadsheets prepared by Enron estate, Retail Settlements (04.30.06) (05.09.06).xls; Retail Settlements 113006 Summary.xls.

[307]    "Preliminary Fourth Quarter Charges To Be Booked or Disclosed," support for Enron Corp., Form 8-K (April 22, 2002), at 4–6.

[308]    Ibid.

Hyperion accounting system reflected $3.8 billion worth of "book" or "on balance sheet" debt.[309] In subsequent quarters, the outstanding amount of Enron's book debt steadily increased, rising to $12.7 billion by June 2001, before declining to $11.1 billion at November 30, 2001. The growth of Enron's book debt and the $11.1 billion in claims the debt ultimately generated are shown in Exhibit 66.

**Exhibit 66: Enron reported book debt, December 1997 to November 2001 and asserted book debt bankruptcy claims ($ billion)**



Sources: Data from Hyperion data; Enron claims data.

## VI.2.2.2. Structure-related obligations

(381)    On December 31, 1997, Enron had some $2.5 billion worth of outstanding obligations associated with off balance sheet structured transactions. As shown in Exhibit 67, the number and value of these structure-related obligations increased dramatically over time. By November 2001, Enron's

---

[309]    Hyperion data.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

obligations had risen to over $13.5 billion. The growth of structure-related obligations was therefore a major contributor to the growth of the deficiency balance.

**Exhibit 67: Enron structure-related obligations,[310] December 1997 to November 2001 ($ billion)**



Sources: Data from debt schedules provided by the Blake Report.

### VI.2.2.3. Other claim-generating obligations

(382)   Several other classes of claims have been asserted against the entire Enron estate including ENA and its subsidiaries. These include litigation claims, breach of contract claims, lease claims, employee-related claims, tax claims, administrative claims, and a collection of other comparatively small claims. There are no direct measures of these obligations prior to bankruptcy. Instead, I have computed these claims indirectly using the procedures described in Section VI.1.3.13.

---

[310]   Adjusted to include prepay obligations and minority interests.

Expert Report of B. Douglas Bernheim, Ph.D.                                    Damage analysis

(383)    I calculate that a bankruptcy occurring at year-end 1997 would have generated an additional $2.5 billion in claims from these sources. As shown below in Exhibit 68, the estimated value of these potential claims grew steadily over time as the result of Enron's continued operations and dwarfed the book values of the corresponding liabilities.

**Exhibit 68: Enron's other claim-generating obligations, December 1997 through November 2001 ($ billion)**



Sources: CMS data.

Expert Report of B. Douglas Bernheim, Ph.D.

# VII. Apportionment analysis

## VII.1. Overview

(384)    Where a number of instances of wrongful conduct, particularly intentionally wrongful conduct by multiple parties, all contribute to a single harm—here, the avoidable deficiency balance—it may be sufficient simply to say that each of the participants should be liable for all of the damages. I have no opinion as to whether this is the appropriate principle in this instance as a matter of law.

(385)    If some sort of apportionment is required, however, my analysis provides a reasoned basis for meeting this requirement. In Section V.5.3, I observed that the masking of the Citigroup transactions was itself sufficient to allow Enron to retain an investment grade credit rating longer than Enron would have retained that rating had the Citigroup transactions been unmasked. Because of the significance of the Citigroup masking transaction, I found that the harm to Enron and creditors resulting directly from the Citigroup masking transactions, and only those transactions, was equal to $5.4 billion.[311]

(386)    Because Citigroup's transactions were so significant, the harm produced by those transactions alone is readily apparent. It is somewhat less apparent for other transactions or banks whose roles were smaller. I was asked, however, whether I could formulate and implement an objective method for apportioning damages among all of the masking transactions. I have developed an apportionment method governed by the economic principle that damages should be divided among transactions in proportion to each transaction's incremental causal contribution to total harm. Applying this principle, I have assigned a damage figure to each masking transaction and to the collection of masking transactions associated with each defendant.

## VII.2. Method of apportionment

(387)    In apportioning damages, it is important to acknowledge that the effects of different transactions interact with each other. This necessarily creates some ambiguity concerning the magnitude of the harm caused by each transaction. For example, transactions closing in the same quarter may have had synergistic effects on the likelihood of a ratings downgrade. Likewise, the existence of an early transaction may have altered the consequences of a later transaction, if for no other reason than it reduced the likelihood of an early resolution prior to the date of the later transaction.

---

[311]    See Section 0 for details.

(388)   Similar issues arise in other contexts. There is, in particular, a close analogy between the
        apportionment of damages among transactions and the standard problem of cost allocation. In the
        typical cost allocation problem, a single production process yields two or more types of products.
        To keep this discussion relatively simple, I will assume that there are exactly two products. The
        objective is to find an appropriate measure of each product's cost.

(389)   The literature on cost allocation features two common measures of a product's cost: incremental
        cost, and stand-alone cost. The incremental cost of a product refers to the difference between the
        cost of producing both products and the cost of producing only the other product. It is the extra
        expenses incurred to produce the product in question. Stand-alone cost refers to the cost of
        producing *only* the product in question. It is the difference between the cost of producing the
        product by itself and the cost of producing nothing.

(390)   These concepts are obviously closely related. They differ only with respect to the assumption one
        makes about the level of production for the other good. When the costs of production are
        interdependent, these measures typically differ. This reflects an inherent ambiguity concerning
        each product's cost.

(391)   Setting this ambiguity aside for the moment, one encounters a second problem: adding up either
        incremental costs or stand-alone costs across products does not necessarily yield total costs.
        Typically, total costs are then allocated in proportion to each product's share of either aggregate
        incremental costs, or aggregate stand-alone costs. Generally, apportionment by incremental costs
        is justified by considerations of economic efficiency.[312]

(392)   With respect to the allocation of damages across the Enron transactions, these concepts have
        obvious counterparts. A transaction's incremental contribution to damages is the difference
        between actual damages and likely damages had the transaction alone been unmasked. A
        transaction's stand-alone contribution to damages is the difference between the likely damages if
        it had been the only masked transaction and the likely damages if none of the transactions had
        been masked. One can allocate total damages across transactions in proportion to either their
        incremental or stand-alone contributions.

---

[312]   For example, it is efficient to set the price of each product equal to its incremental cost, times a factor that depends
        on demand elasticities. This is a consequence of a principle known as Ramsey pricing. See F. Ramsey, "A
        contribution to the theory of taxation," *Economic Journal* 37 (1927): 47–61; or more recently, H. P. Young, "Cost
        Allocation," in *Handbook of Game Theory with Economic Applications,* vol. 2, chap. 34, 1193, ed. Robert J.
        Auman and Sergiu Hart (New York: Elsevier Science, 1994).

(393)    In this context, the principles of efficient deterrence imply that it is better to penalize each responsible party in proportion to the harm caused by its actions at the margin. This consideration favors incremental contribution (which describes an action's impact at the margin) over stand-alone contribution (which describes an action's inframarginal impact). I therefore adopt the incremental measure of contribution to damages.

(394)    Exhibit 69 illustrates the calculation of incremental contribution for the Yosemite I prepay transaction, which closed in Q4 1999. The first two columns are taken directly from Exhibit 52, and the third column is derived from Exhibit 52 by comparing each quarter's deficiency balance with the ending deficiency balance. Column (4) shows, for each quarter, the probability of early resolution with Yosemite I (and all other masked transactions) masked. These probabilities are derived from the cumulative probability of a downgrade to noninvestment grade status with as-reported financial information, shown in Exhibit 26. I obtain the probability of a downgrade to noninvestment grade status in each quarter by taking the difference between the cumulative probability for the quarter of interest and the cumulative probability in the previous quarter. I then multiply the avoidable loss from column (3) by the probability of early resolution in column (4). The product is listed in column (5). Summing the numbers in column (5) yields the statistical expectation of avoidable losses with as-reported financial information. Column (6) shows, for each quarter, the probability of early resolution had Yosemite I (and no other masked transaction) been unmasked. I compute these probabilities using the statistical model from Section V.5, and I followed essentially the same procedure used to determine the probabilities of early resolution when all transactions are unmasked. Notice that the unmasking of Yosemite I raises the probability of early resolution throughout 2000. For each quarter, I then multiply the avoidable loss from column (3) by the probability of early resolution in column (6). The product is listed in column (7). Summing the numbers in column (7) yields the statistical expectation of avoidable losses with Yosemite I unmasked. The difference between the statistical expectation of avoidable losses with Yosemite I masked and unmasked represents this transaction's incremental contribution to expected damages.

**Exhibit 69: Calculation of incremental contribution for Yosemite I**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|
| Quarter | Deficiency balance | Avoidable loss | As-reported probability | As-reported weighted loss (3 x 4) | Adjusted probability | Adjusted weighted loss (3 x 6) |
| Q4 1997 | – | 18.0 | 3.26% | 0.586 | 3.26% | 0.586 |
| Q1 1998 | – | 18.0 | 2.26% | 0.406 | 2.26% | 0.406 |
| Q2 1998 | – | 18.0 | 1.72% | 0.310 | 1.72% | 0.310 |
| Q3 1998 | 0.8 | 17.2 | 1.92% | 0.329 | 1.92% | 0.329 |
| Q4 1998 | 1.2 | 16.8 | 2.85% | 0.480 | 2.85% | 0.480 |
| Q1 1999 | 0.2 | 17.8 | 0.95% | 0.169 | 0.95% | 0.169 |
| Q2 1999 | 0.9 | 17.1 | 2.10% | 0.358 | 2.10% | 0.358 |
| Q3 1999 | 4.3 | 13.7 | 1.60% | 0.219 | 1.60% | 0.219 |
| Q4 1999 | 6.9 | 11.1 | 2.15% | 0.238 | 2.15% | 0.238 |
| Q1 2000 | 7.3 | 10.7 | 2.71% | 0.290 | 3.56% | 0.381 |
| Q2 2000 | 10.5 | 7.5 | 4.57% | 0.343 | 5.95% | 0.446 |
| Q3 2000 | 13.6 | 4.4 | 5.51% | 0.243 | 9.70% | 0.428 |
| Q4 2000 | 12.6 | 5.4 | 4.52% | 0.245 | 8.24% | 0.447 |
| Q1 2001 | 18.4 | – | 1.64% | – | 1.64% | – |
| Q2 2001 | 19.9 | – | 1.82% | – | 1.82% | – |
| Q3 2001 | 20.7 | – | 1.95% | – | 1.95% | – |
| Nov-01 | 18.0 | – | – | – | – | – |
| | | | **Total** | **4.217** | | **4.798** |
| **Incremental contribution: 0.581** | | | | | | |

(395)     Allocating total damages across transactions in proportion to their incremental contributions has a number of attractive features, including the following:

- It is justified based on principles of efficient deterrence.

- It tends to assign larger damages to transactions that created greater distortions in Enron's financial statements.

- It tends to assign larger damages to earlier transactions (which subverted market discipline at a time when avoidable losses were large) relative to later transactions (which subverted market discipline at times when avoidable losses were small).

- It tends to assign larger damages to transactions occurring at critical points in time when the company would have been most susceptible to market discipline had the truth been known.

- It is objective and does not rely on subjective judgment.

## VII.3. Damages apportioned by transaction

(396)    Exhibit 70 through Exhibit 77 tabulate damages by transaction according to transaction type. The first column in each table identifies the transaction. The second column lists its incremental contribution computed as described above. The third column expresses the transaction's incremental contribution as a fraction of the total incremental contribution summed over all transactions. This represents the percentage of total damages for which the transaction is deemed responsible using the incremental contribution method. By construction, adding up the numbers in the third column for all eight exhibits yields 100%.

(397)    The last two columns of the tables indicate the damages assigned to each transaction for the two measures of damages discussed in Section VI.1.4. (The third approach described in Section VI.1.4 measured total damages for the transactions in which Citigroup participated, and therefore does not require apportionment.) Specifically, these columns show the following:

- In my first approach (December 31, 1997), damages equal the total increase in deficiency balance from the earliest date at which the masking transactions eliminated the possibility of resolution, December 31, 1997.

- In my second approach (June 30, 1999), damages equal the increase in deficiency balance from the latest date by which it became more likely than not that the credit rating agencies, even without the involvement of other market monitors, would have taken action leading to an early resolution but for the deception associated with all masking.

**Exhibit 70: Damages by transaction, based on incremental contribution—Prepays[313]**

| Prepay transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Alberta | 17 | 0.29% | 52 | 49 |
| Chase VI | 215 | 3.63% | 653 | 619 |
| Chase VII | 138 | 2.32% | 419 | 397 |
| Chase VIII | 93 | 1.57% | 282 | 267 |
| Chase IX | 236 | 3.97% | 715 | 677 |
| Chase X | 227 | 3.83% | 689 | 653 |
| Chase XI | – | 0.00% | – | – |
| Chase XII | – | 0.00% | – | – |
| December 1998 Prepay | 19 | 0.32% | 57 | 54 |
| December 2000 Prepaid Oil Swap | – | 0.00% | – | – |
| Jethro | 52 | 0.87% | 157 | 149 |
| June 2001 Prepay (a/k/a Citibank 1) | – | 0.00% | – | – |
| London | – | 0.00% | – | – |
| Nixon | 80 | 1.34% | 242 | 229 |
| Roosevelt | 102 | 1.71% | 309 | 292 |
| September 2001 Prepaid Oil Swap | – | 0.00% | – | – |
| Truman | 58 | 0.98% | 176 | 167 |
| Yosemite 1 | 581 | 9.78% | 1,760 | 1,668 |
| Yosemite 2 | 92 | 1.55% | 279 | 265 |
| Yosemite 3 (a/k/a ECLN 1) | 35 | 0.59% | 106 | 101 |
| Yosemite 4 - EUR (a/k/a ECLN 2) | – | 0.00% | – | – |
| Yosemite 4 - GBP (a/k/a ECLN 2) | – | 0.00% | – | – |
| Yosemite 4 - USD (a/k/a ECLN 2) | – | 0.00% | – | – |
| **Total** | **N/A** | **32.75%** | **5,896** | **5,588** |

[313] In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

**Exhibit 71: Damages by transaction, based on incremental contribution—FAS 140[314]**

| FAS 140 Transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Alchemy | 10 | 0.17% | 31 | 29 |
| Avici | – | 0.00% | – | – |
| Bammel Gas Trust | 239 | 4.02% | 725 | 687 |
| Cerberus | – | 0.00% | – | – |
| Discovery | 97 | 1.64% | 295 | 279 |
| ETOL I-III | – | 0.00% | – | – |
| Ghost | 32 | 0.54% | 97 | 92 |
| Hawaii - Danno B | 10 | 0.16% | 29 | 28 |
| Hawaii - McGarret A | 2 | 0.03% | 6 | 6 |
| Hawaii - McGarret B | 1 | 0.02% | 4 | 4 |
| Hawaii - McGarret C | 1 | 0.01% | 2 | 1 |
| Hawaii - McGarret D | 4 | 0.07% | 13 | 13 |
| Hawaii - McGarret F | – | 0.00% | – | – |
| Hawaii - McGarret G | – | 0.00% | – | – |
| Hawaii - McGarret H | – | 0.00% | – | – |
| Hawaii - McGarret I | – | 0.00% | – | – |
| Hawaii - McGarret J | – | 0.00% | – | – |
| Hawaii - McGarret K | – | 0.00% | – | – |
| Hawaii - McGarret L | – | 0.00% | – | – |
| Hawaii - McGarret M | – | 0.00% | – | – |
| Hawaii - McGarret N | – | 0.00% | – | – |
| Hawaii - McGarret O | – | 0.00% | – | – |
| Hawaii - McGarret P | – | 0.00% | – | – |
| Leftover | 82 | 1.38% | 249 | 236 |
| Nikita | – | 0.00% | – | – |
| Nile | – | 0.00% | – | – |
| Nimitz | 79 | 1.33% | 240 | 228 |
| Pilgrim - Sarlux | 306 | 5.16% | 929 | 880 |
| Pilgrim - Trakya | 75 | 1.26% | 227 | 215 |
| Riverside 3 | 230 | 3.87% | 697 | 660 |
| Riverside 4 | 87 | 1.46% | 264 | 250 |
| Riverside 5 | 4 | 0.07% | 13 | 12 |
| Specter | 16 | 0.27% | 48 | 45 |
| Sutton Bridge | 50 | 0.85% | 152 | 144 |
| **Total** | **N/A** | **22.33%** | **4,020** | **3,809** |

---

[314]   In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

Expert Report of B. Douglas Bernheim, Ph.D.                    Apportionment analysis

**Exhibit 72: Damages by transaction, based on incremental contribution—Minority interest**

| Minority interest transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Nahanni | 165 | 2.79% | 502 | 475 |
| Nighthawk | 321 | 5.41% | 974 | 923 |
| Rawhide | 330 | 5.56% | 1,001 | 949 |
| Total | N/A | 13.76% | 2,477 | 2,347 |

**Exhibit 73: Damages by transaction, based on incremental contribution—Share trust**

| Share trust transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Firefly | 170 | 2.87% | 516 | 489 |
| Whitewing | 573 | 9.64% | 1,737 | 1,646 |
| Total | N/A | 12.51% | 2,252 | 2,134 |

**Exhibit 74: Damages by transaction, based on incremental contribution—Tax transactions[315]**

| Tax transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Apache | 8 | 0.13% | 24 | 22 |
| Cochise | 10 | 0.17% | 31 | 29 |
| Condor | 1 | 0.02% | 3 | 3 |
| Steele | 70 | 1.18% | 212 | 201 |
| Tammy | – | 0.00% | – | – |
| Teresa | 48 | 0.80% | 145 | 137 |
| Tomas | 6 | 0.09% | 17 | 16 |
| Total | N/A | 2.40% | 431 | 409 |

---

[315] In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

**Exhibit 75: Damages by transaction, based on incremental contribution—Related party**

| Related party transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Chewco | 682 | 11.49% | 2,069 | 1,961 |
| LJM1 - Cuiaba | 89 | 1.50% | 269 | 255 |
| LJM1 - Rhythms | 6 | 0.10% | 18 | 17 |
| LJM2 - Backbone I | 29 | 0.48% | 87 | 82 |
| LJM2 - Backbone II | – | 0.00% | – | – |
| LJM2 - Bob West | 20 | 0.33% | 60 | 57 |
| LJM2 - ENA CLO | 71 | 1.20% | 217 | 205 |
| LJM2 - MEGS | 3 | 0.06% | 10 | 10 |
| LJM2 - Nowa Sarzyna | 30 | 0.50% | 91 | 86 |
| LJM2 - Raptors | 11 | 0.19% | 34 | 32 |
| **Total** | **N/A** | **15.86%** | **2,855** | **2,706** |

**Exhibit 76: Damages by transaction, based on incremental contribution—Forest products**

| Forest products transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| Fishtail - Bacchus | 0 | 0.00% | – | – |
| Sundance - Slapshot | 0 | 0.00% | – | – |
| **Total** | **N/A** | **0.00%** | **0** | **0** |

**Exhibit 77: Damages by transaction, based on incremental contribution—Other transactions[316]**

| Other transaction | Incremental contribution | % Share of damages | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|---|---|
| | | | Damages ($ million) | |
| 1999 Electricity Trade | 24 | 0.40% | 72 | 68 |
| JT Holdings | 0 | 0.00% | – | – |
| Nigerian Barge | 0 | 0.01% | 1 | 1 |
| SO2 | 0 | 0.00% | – | – |
| **Total** | **N/A** | **0.41%** | **73** | **69** |

---

[316]  In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

## VII.4. Apportionment of damages to Citigroup and BT Deutsche

(398)   To apportion damages among the remaining bank defendants, Citigroup and BT Deutsche, I added the damages allocated to each of the transactions in which each bank participated. Results appear in Exhibit 78.

**Exhibit 78: Damages by defendant, based on incremental contribution**

| Defendant | 31 Dec 1997 | 30 Jun 1999 |
|---|---|---|
| | Total damages of defendant's transactions ($ million) | |
| Citigroup | 4,506 | 4,270 |
| BT Deutsche | 388 | 368 |

Expert Report of B. Douglas Bernheim, Ph.D.

# VIII. Damages of the ENE and ENA debtors

## VIII.1.  Methodology

### VIII.1.1. Adapting the methodology to calculate debtor-specific damages

(399)    In Section VI, I estimated damages to the estate and its creditors by viewing Enron and all its subsidiaries (excluding those who are not debtors in the U.S. bankruptcy proceeding) as a single consolidated entity. Here, I adapt my methodology to estimate damages for Enron Corp. (ENE)[317] as a distinct debtor entity, not consolidated with any subsidiaries that are debtors in their own right. I do the same for ENA (and indeed, for each of the 180 separate entities in the U.S. proceedings, though I do not present the results of those calculations in this report).

(400)    In keeping with the principle that the effects of an early bankruptcy should be inferred to the greatest extent possible from Enron's actual experience in bankruptcy, I estimate debtor-specific damages by incorporating an important component of the Enron estate's Plan of Reorganization, which provides for debtor-specific payout rates: the "global compromise."[318] Prior to the settlement embodied in this compromise, it was unclear how a court might rule on several issues impacting creditor payouts, including whether distributions to creditors should be based on substantive consolidation of the various Enron debtor entities or on nonconsolidation of the various debtor entities. This uncertainty arose largely from the "extensive intercompany claims and varying degrees of entanglement" between the Enron entities. The global compromise was intended to settle the disagreement between creditors who favored distributions calculated on a substantive consolidation basis and those who favored nonconsolidation.[319] It provides for payout rates obtained by estimating distributions to creditors under both scenarios. Distributions are equal to 70% of what the creditor would receive pursuant to nonconsolidation, plus 30% of what the creditor would receive under substantive consolidation.[320]

---

[317]    Unless the context clearly indicates otherwise, in sections VIII and IX the abbreviation ENE is intended to refer to the Enron Corp. debtor entity. Likewise, the abbreviation ENA refers to the Enron North America Corp. debtor entity.

[318]    Order Confirming Supplemental Modified Fifth Amended Joint Plan Of Affiliated Debtors Pursuant To Chapter 11 Of The United States Bankruptcy Code, And Related Relief, July 15, 2004, 37 (approving "the settlements and compromises embodied in the . . . Global Compromise Motion").

[319]    Findings Of Fact And Conclusions Of Law Confirmng [sic] Supplemental Modified Fifth Amended Joint Plan Of Affiliated Debtors, July 15, 2004, 37–40.

[320]    Ibid., 47–48.

(401)    To approximate the global compromise, I calculate the payouts that each debtor would make on its obligations as the weighted average of the payouts it would make on a nonconsolidated (or "stand-alone") basis and the payouts it would make on a consolidated basis (that is, based on the analysis presented above in Section VI). As in the global compromise, the stand-alone payout receives a weight of 70%, and the consolidated payout receives a weight of 30%. The deficiency balance for the debtor is then the difference between its total obligations and payouts measured with this weighted average payout.

(402)    To determine the stand-alone deficiency balance of each debtor, I first identify the actual recoveries of and claims against each one, employing the same data sources described in Section VI. For this purpose, however, I track the recoveries and claims for each debtor separately.[321]

(403)    I must then account for a factor that played no role in my estimate of consolidated damages in Section VI: intercompany claims. When the estate in bankruptcy is viewed as a single consolidated entity, amounts owed by one legal entity within the estate to another are irrelevant to the calculation of the deficiency balance. Such amounts are not part of the estate's obligations to outside creditors, nor do they contribute to the assets available to pay those creditors.

(404)    However, if each debtor is viewed as a distinct entity with its own set of assets and obligations, intercompany claims must be taken into account. Intercompany claims impact each debtor's obligations to third-party creditors, as well as the total assets available to satisfy those obligations. For example, ENA's intercompany claim against EPMI may contribute value to ENA that increases the recoveries of its creditors, while intercompany claims against ENA increase its obligations. Accounting for intercompany balances is the first major difference between my methodology here and in Section VI.

(405)    Additionally, I must also make various new adjustments for guaranty claims. Prior to bankruptcy, Enron guarantied many of the debts and obligations of its various subsidiaries. Some of those subsidiaries, such as ENA, are also debtors in the U.S. proceedings; others, such as ECTRL, are not. In Section VI, I ignore Enron's guaranties of obligations of debtor subsidiaries, because the claims against those debtors relating to the underlying obligation are already included in the database from which I obtain claim values. Including both the underlying claim and the guaranty would be double-counting. On the other hand, claims against nondebtors are not part of the claims database, so I included the value of Enron's guaranties of those claims ("nondebtor guaranties").

---

[321]    Employees of the Enron estate assisted me in identifying the debtor entities for some data.

(406)    I recognize the full allowed amount of each guaranty claim as an obligation of ENE. I estimate payouts on the guaranty claims based on the terms of the global compromise, which limits ENE's payouts on guaranty claims to a payout rate calculated as 70% of the ENE stand-alone payout rate, plus 15% of ENE's consolidated payout rate.

(407)    The following paragraphs describe my analyses in somewhat greater detail; for a more complete description, see Appendix F.

## VIII.1.2. Debtor-specific deficiency balance at bankruptcy

### VIII.1.2.1. Estimating each debtor's deficiency balance on a nonconsolidated basis

(408)    I treat every debtor in the U.S. bankruptcy proceedings as a distinct entity with its own set of assets and obligations. The actual third-party obligations of ENE and ENA at bankruptcy are as shown in Exhibit 79.

**Exhibit 79: Third-party claims against ENE and ENA ($ billion)**

| Segment | Claims/obligations, ENE | Claims/obligations, ENA |
|---|---|---|
| Book ("on balance sheet") debt | 10.5 | 0.2 |
| Payables | 0.0 | 0.0 |
| Structure-related obligations | 6.6 | 5.5 |
| Litigation | 0.4 | 0.0 |
| Breach of contract/leases | 0.1 | 0.0 |
| Trading-related claims | 0.1 | 2.4 |
| Tax | 0.0 | 0.0 |
| Employee | 0.2 | 0.0 |
| Administrative | 1.3 | 0.6 |
| Other | 0.9 | 0.0 |
| Obligations to nondebtors | 0.1 | 0.7 |
| Nondebtor guaranties | 1.4 | 0.0 |
| Debtor guaranties | 8.8 | 0.0 |
| Company-obligated preferred securities | 0.8 | 0.0 |
| **Total** | **31.2** | **9.5** |

Sources: CMS data.

(409)    The asset recoveries of the ENE and ENA debtor entities are derived from a smaller group of asset segments than Enron as a consolidated whole. Several of the Enron asset segments (such as renewable energy and all nonwholesale trading) fall outside of both ENE and ENA. The relevant asset segments and related recoveries for the ENE and ENA debtors are as shown in Exhibit 80.

Expert Report of B. Douglas Bernheim, Ph.D.                Damages of the ENE and ENA debtors

**Exhibit 80: Third party ENE and ENA asset recoveries ($ billion)**

| Segment | Recoveries, ENE | Recoveries, ENA |
|---|---|---|
| Platform entity asset recoveries | 3.3 | 0.0 |
| Nonplatform entity asset recoveries | 1.3 | 0.9 |
| Trading contracts | 0.0 | 2.6 |
| Off balance sheet structures | 0.8 | 0.5 |
| Interest income | 0.8 | 0.0 |
| Nondebtor recoveries | 0.4 | 0.9 |
| **Total** | **6.6** | **4.9** |

Sources: As identified in Exhibit 30 through Exhibit 33.

(410)    After identifying each debtor's third-party assets and obligations, I next add in each debtor's intercompany payables to other debtors. In keeping with my practice of measuring a debtor's obligations without regard to its ability to pay them, these intercompany payables are added to each debtor's obligations at full value.

(411)    By contrast, each debtor's intercompany receivables are assets, the values of which are or may be impaired in bankruptcy. This complicates the calculation. The value of a debtor's intercompany receivables depends on the ultimate payout rates for all debtors (the "stand-alone payout rates"), but the stand-alone payout rates will depend on the value of the each debtor's receivables. To deal with this interdependence, I developed an approach explained in Appendix F, which identifies mutually consistent values of stand-alone payout rates and impairment rates for intercompany receivables. This allows me to use values for each debtor's intercompany receivables that are consistent with the payout rates used for other debtors, and payout rates for each debtor that are consistent with the impairments to its receivables from other debtors.[322]

(412)    It is then a relatively simple matter to calculate the deficiency balance. I first calculate a weighted average payout rate based on the terms of the global compromise. I take 70% of the stand-alone payout rate (which differs for each debtor), and add 30% of the consolidated payout rate (which is 55% for all debtors, based on the analysis presented in Section VI). The weighted average payout rate times the debtor's obligations is the total expected recovery for the creditors of that entity; the portion of the debtor's obligations *not* recovered is the deficiency balance.[323]

(413)    The total ENE and ENA deficiency balances at the time of bankruptcy are shown in Exhibit 81.

---

[322]    This is a slight oversimplification. As explained in Appendix F, the calculations also account for each debtor's equity investments in nonconsolidated affiliates. As with intercompany receivables, the value of these equity investments may be impaired in bankruptcy; the calculation accounts for this as well.

[323]    Mathematically, the deficiency balance = claims − (weighted average payout rate x claims).

Expert Report of B. Douglas Bernheim, Ph.D.    Damages of the ENE and ENA debtors

**Exhibit 81: ENE and ENA deficiency balances at bankruptcy ($ billion)**

| Asset recoveries by segment | ENE | ENA |
|---|---|---|
| Intercompany accounts receivable (stand-alone basis) | 11.0 | 5.6 |
| Platform entity asset recoveries | 3.3 | 0.0 |
| Nonplatform entity asset recoveries | 1.3 | 0.9 |
| Trading contracts | 0.0 | 2.6 |
| Off balance sheet structures | 0.8 | 0.5 |
| Interest income | 0.8 | 0.0 |
| Nondebtor recoveries | 0.4 | 0.9 |
| **(A) Total recoveries** | **17.6** | **10.4** |
| **Claims by segment** | | |
| Intercompany accounts payable | 28.7 | 14.5 |
| Book ("on balance sheet") debt | 10.5 | 0.2 |
| Payables | 0.0 | 0.0 |
| Structure-related obligations | 6.6 | 5.5 |
| Litigation | 0.4 | 0.0 |
| Breach of contract/leases | 0.1 | 0.0 |
| Trading-related claims | 0.1 | 2.4 |
| Tax | 0.0 | 0.0 |
| Employee | 0.2 | 0.0 |
| Administrative | 1.3 | 0.6 |
| Other | 0.9 | 0.0 |
| Obligations to nondebtors | 0.1 | 0.7 |
| Nondebtor guaranties | 1.4 | 0.0 |
| (B) Debtor guaranties | 8.8 | 0.0 |
| Company-obligated preferred securities | 0.8 | 0.0 |
| **(C) Total claims** | **60.0** | **24.0** |
| **(D) Stand-alone payout rate (D = A / C)** | **29%** | **43%** |
| **(E) Consolidated payout rate** | **54%** | **54%** |
| **(F) Weighted average payout rate (F = 0.7 x D + 0.3 x E)** | **37%** | **47%** |
| **(G) Guaranty payout rate (G = 0.7 x D + 0.15 x E)** | **29%** | **38%** |
| **(H) Guaranty offset** | **4.1** | **0.0** |
| **Deficiency balance (C – (F x (C - B)) - (G x B) - H)** | **34.6** | **12.8** |

Sources: As identified in Exhibit 39.

(414)    Intercompany balances, guaranty claims, and the more limited set of assets and obligations at any debtor entity have a significant impact on the stand-alone payout rates. For example, ENE is the entity at which substantial on balance sheet debt, guaranties, and intercompany payables reside, but its assets are largely limited to its intercompany receivables; Enron's major "hard assets" are owned by other debtors. ENE's intercompany payables, moreover, are obligations that I include at full value (treating the affiliates to whom they are owed just like third-party creditors), while its

intercompany receivables are impaired. Thus, ENE's deficiency balance is significantly larger than the deficiency for Enron as a consolidated entity.

### VIII.1.3.  Counterfactual deficiency balances at early resolution and avoidable losses

(415)    Just as I did for consolidated Enron, I calculated ENE and ENA's deficiency balances in bankruptcy for every quarter from Q4 1997 through Q3 2001. In each case I assumed that, like the actual bankruptcy, the early bankruptcy would have included a 70/30 global compromise arrangement, and I calculated a weighted average of the stand-alone and consolidated payout rates at each quarter to arrive at the deficiency balance. The values of assets and claims were determined as described in Section VI. I obtained the intercompany balances used to determine the stand-alone payout rate directly from the Hyperion accounting system data, just as I did to compute the deficiency balances for the actual bankruptcy.

(416)    The payout rates for ENE and ENA between Q4 1997 and Q3 2001 are as shown in Exhibit 82. Each debtor's weighted average rate is calculated as 70% of the stand-alone rate plus 30% of the consolidated rate.

Expert Report of B. Douglas Bernheim, Ph.D.                    Damages of the ENE and ENA debtors

**Exhibit 82: ENE and ENA payout rates at early resolution**

| Date | Consolidated payout rate | ENE | | ENA | |
|---|---|---|---|---|---|
| | | Stand-alone | Weighted average | Stand-alone | Weighted average |
| Q4 1997 | 100% | 86% | 90% | 54% | 67% |
| Q1 1998 | 100% | 85% | 89% | 50% | 65% |
| Q2 1998 | 100% | 80% | 86% | 53% | 67% |
| Q3 1998 | 95% | 75% | 81% | 53% | 65% |
| Q4 1998 | 94% | 73% | 79% | 50% | 63% |
| Q1 1999 | 99% | 73% | 81% | 62% | 73% |
| Q2 1999 | 95% | 69% | 77% | 48% | 62% |
| Q3 1999 | 82% | 57% | 64% | 52% | 61% |
| Q4 1999 | 71% | 40% | 49% | 40% | 49% |
| Q1 2000 | 73% | 43% | 52% | 42% | 51% |
| Q2 2000 | 67% | 38% | 47% | 40% | 48% |
| Q3 2000 | 61% | 35% | 43% | 37% | 44% |
| Q4 2000 | 69% | 35% | 45% | 45% | 52% |
| Q1 2001 | 60% | 32% | 40% | 40% | 46% |
| Q2 2001 | 55% | 27% | 36% | 38% | 43% |
| Q3 2001 | 51% | 26% | 34% | 33% | 38% |
| 30 Nov 2001 | 54% | 29% | 37% | 43% | 47% |

(417)    Using each debtor's weighted average payout rate and the debtor's total claims and obligations at each date, the debtor's deficiency balance is calculated as claims – (payout rate × claims). The deficiency balance as of each quarter is set forth in Exhibit 83.

**Exhibit 83: ENE and ENA deficiency balance and total damages, December 31, 1997 to November 30, 2001 ($ billion)**

| Date | ENE | | ENA | |
|------|-----|-----|-----|-----|
| | Deficiency balance | Avoidable Losses | Deficiency balance | Avoidable Losses |
| Q4 1997 | 1.3 | 33.3 | 1.2 | 11.6 |
| Q1 1998 | 1.4 | 33.2 | 1.4 | 11.4 |
| Q2 1998 | 2.1 | 32.5 | 1.5 | 11.3 |
| Q3 1998 | 3.2 | 31.4 | 1.7 | 11.1 |
| Q4 1998 | 3.8 | 30.8 | 2.3 | 10.5 |
| Q1 1999 | 3.6 | 31.0 | 1.7 | 11.1 |
| Q2 1999 | 4.8 | 29.8 | 3.1 | 9.7 |
| Q3 1999 | 8.3 | 26.3 | 3.5 | 9.3 |
| Q4 1999 | 13.7 | 20.9 | 5.1 | 7.7 |
| Q1 2000 | 14.1 | 20.5 | 5.6 | 7.2 |
| Q2 2000 | 19.1 | 15.5 | 6.5 | 6.3 |
| Q3 2000 | 21.4 | 13.2 | 7.7 | 5.1 |
| Q4 2000 | 21.3 | 13.3 | 8.7 | 4.1 |
| Q1 2001 | 28.2 | 6.3 | 12.0 | 0.8 |
| Q2 2001 | 34.5 | 0.1 | 14.4 | (1.6) |
| Q3 2001 | 37.5 | (3.0) | 17.1 | (4.4) |
| 30 Nov 2001 | 34.6 | 0.0 | 12.8 | 0.0 |

(418)    Once again, Exhibit 83 shows the impact that intercompany balances, debtor guaranty claims, and the particular allocation of assets and obligations between entities has on the deficiency balance. These factors make it possible for a single entity, ENE, to have a deficiency balance that is larger than the balance for Enron on a consolidated basis.

## VIII.1.4. Damages

(419)    The total damages suffered by any single debtor entity and its creditors are the avoidable losses at the date of an early resolution if all transactions had been unmasked. As in Section VI, I consider three approaches to damages. The first is based on the earliest date at which the masking transactions precluded early resolution (December 31, 1997). As shown in Exhibit 83, ENE and ENA damages total $33.3 billion and $11.6 billion, respectively, for this approach. The second approach is based on June 30, 1999, the date at which it became more likely than not that Enron would have lost its investment grade status had the transactions not been masked. As shown in Exhibit 83, ENE and ENA damages total $29.8 and $9.7 billion respectively for this approach. The third approach measures harm from December 31, 2000, the date by which unmasking

Citigroup's transactions alone would more likely than not have brought about early resolution. Under this approach, Citigroup's damages would be $13.3 billion with respect to ENE and $4.1 billion with respect to ENA.

## VIII.2. Apportionment of ENE and ENA damages

(420)    As I did for consolidated Enron, I apportioned the damages attributable to the ENE and ENA debtor entities and their creditors among transactions in proportion to each transaction's incremental contribution to total damages. I then computed the total damages assigned to all masking transactions associated with each defendant. The rationale for this approach and details of my methodology appear in Section VII (as well as Appendix G); I will not repeat them here.

### VIII.2.1. Damages apportioned by transaction

(421)    The following tables summarize my apportionment of damages by transaction grouped according to transaction type. In each case, I list apportioned damages based on two of the damage approaches described above. The first approach uses the earliest possible date of early resolution (December 31, 1997). The second approach uses the date at which resolution became more likely than not (June 30, 1999). As I noted in Section VII, the third approach described in Section VI.1.4 measured total damages for the transactions in which Citigroup participated, and therefore does not require apportionment.

Expert Report of B. Douglas Bernheim, Ph.D.          Damages of the ENE and ENA debtors

**Exhibit 84: ENE and ENA damages by transaction, based on incremental contribution—Prepays[324]**

| Prepay transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Alberta | 122 | 109 | 35 | 29 |
| Chase VI | 1,055 | 945 | 360 | 300 |
| Chase VII | 681 | 610 | 232 | 194 |
| Chase VIII | 467 | 418 | 159 | 133 |
| Chase IX | 1,260 | 1,128 | 461 | 384 |
| Chase X | 1,796 | 1,608 | 657 | 548 |
| Chase XI | 17 | 16 | 2 | 2 |
| Chase XII | – | – | – | – |
| December 1998 Prepay | 93 | 83 | 33 | 28 |
| December 2000 Prepaid Oil Swap | 8 | 7 | 1 | 1 |
| Jethro | 263 | 235 | 96 | 80 |
| June 2001 Prepay (a/k/a Citibank 1) | – | – | – | – |
| London | 10 | 9 | 1 | 1 |
| Nixon | 434 | 389 | 162 | 135 |
| Roosevelt | 480 | 429 | 162 | 135 |
| September 2001 Prepaid Oil Swap | – | – | – | – |
| Truman | 299 | 267 | 104 | 87 |
| Yosemite 1 | 3,859 | 3,455 | 1,356 | 1,130 |
| Yosemite 2 | 607 | 544 | 215 | 179 |
| Yosemite 3 (a/k/a ECLN 1) | 252 | 226 | 73 | 60 |
| Yosemite 4 - EUR (a/k/a ECLN 2) | – | – | – | – |
| Yosemite 4 - GBP (a/k/a ECLN 2) | – | – | – | – |
| Yosemite 4 - USD (a/k/a ECLN 2) | – | – | – | – |
| **Total** | **11,704** | **10,477** | **4,109** | **3,424** |

---

[324] In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

**Exhibit 85: ENE and ENA damages by transaction, based on incremental contribution—FAS 140[325]**

| FAS 140 transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Alchemy | 54 | 48 | 20 | 16 |
| Avici | 1 | 1 | 0 | 0 |
| Bammel Gas Trust | 1,172 | 1,049 | 400 | 334 |
| Cerberus | 30 | 27 | 3 | 3 |
| Discovery | 559 | 501 | 198 | 165 |
| ETOL I-III | 31 | 28 | 4 | 3 |
| Ghost | 173 | 155 | 59 | 49 |
| Hawaii - Danno B | 71 | 64 | 24 | 20 |
| Hawaii - McGarret A | 14 | 12 | 5 | 4 |
| Hawaii - McGarret B | 11 | 10 | 4 | 3 |
| Hawaii - McGarret C | 4 | 4 | 1 | 1 |
| Hawaii - McGarret D | 31 | 28 | 9 | 7 |
| Hawaii - McGarret F | 9 | 8 | 1 | 1 |
| Hawaii - McGarret G | 1 | 1 | 0 | 0 |
| Hawaii - McGarret H | 12 | 11 | 1 | 1 |
| Hawaii - McGarret I | 0 | 0 | – | – |
| Hawaii - McGarret J | – | – | – | – |
| Hawaii - McGarret K | 0 | 0 | – | – |
| Hawaii - McGarret L | 0 | 0 | – | – |
| Hawaii - McGarret M | – | – | – | – |
| Hawaii - McGarret N | – | – | – | – |
| Hawaii - McGarret O | – | – | – | – |
| Hawaii - McGarret P | – | – | – | – |
| Leftover | 422 | 378 | 151 | 126 |
| Nikita | – | – | – | – |
| Nile | – | – | – | – |
| Nimitz | 409 | 366 | 145 | 121 |
| Pilgrim - Sarlux | 1,470 | 1,316 | 500 | 417 |
| Pilgrim - Trakya | 360 | 322 | 122 | 102 |
| Riverside 3 | 1,115 | 998 | 384 | 320 |
| Riverside 4 | 421 | 377 | 142 | 118 |
| Riverside 5 | 22 | 20 | 8 | 6 |
| Specter | 88 | 79 | 35 | 29 |
| Sutton Bridge | 259 | 232 | 92 | 77 |
| **Total** | **6,740** | **6,033** | **2,308** | **1,923** |

[325] In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

**Exhibit 86: ENE and ENA damages by transaction, based on incremental contribution—Minority Interest**

| Minority interest transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Nahanni | 965 | 864 | 343 | 286 |
| Nighthawk | 1,565 | 1,401 | 533 | 444 |
| Rawhide | 1,795 | 1,607 | 626 | 522 |
| Total | 4,325 | 3,871 | 1,502 | 1,252 |

**Exhibit 87: ENE and ENA damages by transaction, based on incremental contribution—Share Trust**

| Share trust transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Firefly | 888 | 795 | 314 | 262 |
| Whitewing | 3,713 | 3,324 | 1,348 | 1,124 |
| Total | 4,601 | 4,119 | 1,662 | 1,386 |

**Exhibit 88: ENE and ENA damages by transaction, based on incremental contribution—Tax Transactions[326]**

| Tax transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Apache | 51 | 46 | 19 | 15 |
| Cochise | 63 | 57 | 22 | 19 |
| Condor | 6 | 5 | 2 | 2 |
| Steele | 362 | 324 | 125 | 104 |
| Tammy | 0 | 0 | - | - |
| Teresa | 254 | 228 | 89 | 74 |
| Tomas | 29 | 26 | 10 | 8 |
| Total | 765 | 685 | 266 | 222 |

---

[326] In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

Expert Report of B. Douglas Bernheim, Ph.D.                    Damages of the ENE and ENA debtors

**Exhibit 89: ENE and ENA damages by transaction, based on incremental contribution—Related Party**

| Related party transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Chewco | 3,338 | 2,988 | 1,146 | 955 |
| LJM1 - Cuiaba | 506 | 453 | 183 | 153 |
| LJM1 - Rhythms | 33 | 30 | 13 | 11 |
| LJM2 - Backbone I | 216 | 194 | 71 | 59 |
| LJM2 - Backbone II | 7 | 7 | 1 | 1 |
| LJM2 - Bob West | 122 | 110 | 44 | 36 |
| LJM2 - ENA CLO | 419 | 375 | 149 | 124 |
| LJM2 - MEGS | 21 | 19 | 7 | 6 |
| LJM2 - Nowa Sarzyna | 178 | 160 | 64 | 53 |
| LJM2 - Raptors | 177 | 158 | 34 | 29 |
| **Total** | **5,019** | **4,493** | **1,711** | **1,426** |

**Exhibit 90: ENE and ENA damages by transaction, based on incremental contribution—Forest products[327]**

| Forest products transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| Fishtail - Bacchus | 37 | 33 | 4 | 4 |
| Sundance - Slapshot | – | – | – | – |
| **Total** | **37** | **33** | **4** | **4** |

**Exhibit 91: ENE and ENA damages by transaction, based on incremental contribution—Other Transactions[328]**

| Other transaction | ENE damages ($ million) | | ENA damages ($ million) | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 Jun 1999 | 31 Dec 1997 | 30 Jun 1999 |
| 1999 Electricity Trade | 123 | 111 | 44 | 37 |
| JT Holdings | 3 | 3 | 0 | 0 |
| Nigerian Barge | 2 | 2 | 1 | 1 |
| SO2 | – | – | – | – |
| **Total** | **129** | **116** | **46** | **38** |

[327]   In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

[328]   In this table true zero value is represented with a "–"; on the other hand, "0" represents a small value that rounds down to 0 (i.e., value smaller than 0.5).

Expert Report of B. Douglas Bernheim, Ph.D.                    Damages of the ENE and ENA debtors

# VIII.3. Apportionment of damages to Citigroup and BT Deutsche

(422)     To apportion damages among the remaining bank defendants, Citigroup and BT Deutsche, I added the damages allocated to each of the transactions in which each bank participated. Results appear in Exhibit 92.

**Exhibit 92: Damages by defendant, based on incremental contribution ($ million)**

| Defendant | ENE damages | | ENA damages | |
|---|---|---|---|---|
| | 31 Dec 1997 | 30 June 1999 | 31 Dec 1997 | 30 June 1999 |
| Citigroup | 8,761 | 7,843 | 3,047 | 2,540 |
| BT Deutsche | 680 | 608 | 236 | 197 |

Expert Report of B. Douglas Bernheim, Ph.D.

# IX. Summary of Citigroup and BT Deutsche Damages

Expert Report of B. Douglas Bernheim, Ph.D.    Summary of Citigroup and BT Deutsche Damages

## IX.1. Harm measured from the earliest possible date of resolution

(423)    If Citigroup and BT Deutsche (the remaining Bank Defendants) are each fully responsible for all harm to the estates and creditors of Enron on a consolidated basis, starting from the earliest possible date of resolution, December 31, 1997, the damages attributable to each are $18.0 billion. This is the total growth in the deficiency balance of Enron between December 31, 1997, and the present.

(424)    If Citigroup and BT Deutsche are each fully responsible for all harm to the estates and creditors of the ENE and ENA debtors starting from the earliest possible date of resolution, December 31, 1997, the damages attributable to each are $33.3 billion (with respect to ENE) and $11.6 billion (with respect to ENA). This is the total growth in the deficiency balance of each debtor between December 31, 1997 and the present.

**Exhibit 93: Damages avoidable by unmasking all transactions, from 31 December 1997 ($ billion)**

|  | Enron | ENE | ENA |
|---|---|---|---|
| Deficiency balance at 31 December 1997 | 0.0 | 1.3 | 1.2 |
| Deficiency balance today | 18.0 | 34.6 | 12.8 |
| **Harm avoidable through early resolution** | **18.0** | **33.3** | **11.6** |

## IX.2. Harm measured from the date by which unmasking would more likely than not have brought about early resolution

(425)    If Citigroup and BT Deutsche are each fully responsible for harm measured from the date by which it is more likely than not that unmasking *all* transactions would have brought about early resolution through loss of Enron's investment grade rating (June 30, 1999), then the total damages for which each defendant would be responsible on a nonapportioned basis are $17.1 billion (for Enron on a consolidated basis) or $29.8 billion (for ENE) and $9.7 billion (for ENA).

Expert Report of B. Douglas Bernheim, Ph.D.   Summary of Citigroup and BT Deutsche Damages

**Exhibit 94: Damages avoidable by unmasking all transactions, from 30 June 1999 ($ billion)**

|  | Enron | ENE | ENA |
|---|---|---|---|
| Deficiency balance at 30 June 1999 | 0.9 | 4.8 | 3.1 |
| Deficiency balance today | 18.0 | 34.6 | 12.8 |
| **Harm avoidable through early resolution** | **17.1** | **29.8** | **9.7** |

(426)    If Citigroup is responsible only for the harm occurring after the date at which, more likely than not, unmasking its transactions (and no others) would have brought about early resolution through loss of Enron's investment grade rating, then damages are measured from December 31, 2000 onward and total $5.4 billion (for Enron on a consolidating basis) or $13.3 billion (for ENE) and $4.1 billion (for ENA). This is the total growth in the deficiency balance between December 31, 2000 and the present, as can be seen in Exhibit 95.

**Exhibit 95: Damages avoidable by unmasking Citigroup transactions only ($ billion)**

|  | Enron | ENE | ENA |
|---|---|---|---|
| Deficiency balance at 31 Dec 2000 | 12.6 | 21.3 | 8.7 |
| Deficiency balance today | 18.0 | 34.6 | 12.8 |
| **Harm avoidable through early resolution** | **5.4** | **13.3** | **4.1** |

# IX.3. Damages apportioned based on incremental contribution of transactions

(427)    If each of the remaining Bank Defendants is responsible only for an apportioned share of the growth of each debtor's deficiency balance, based on the incremental contributions of the specific transactions in which each allegedly participated, each defendant's damages are as shown in Exhibit 96. Each defendant's damages are computed by summing the damages for that defendant's transactions, as presented in Exhibit 70 through Exhibit 77 (for Enron on a consolidated basis), and from Exhibit 84 through Exhibit 91 (for the ENE and ENA debtors). Exhibit 96 shows damages for each defendant and debtor, measured from the earliest possible date of early resolution (December 31, 1997) and from the date at which unmasking all transactions would more likely than not have resulted in Enron losing its investment grade status and being driven to early resolution (June 30, 1999).

Expert Report of B. Douglas Bernheim, Ph.D.    Summary of Citigroup and BT Deutsche Damages

**Exhibit 96: Summarized damages by defendant, based on incremental contribution ($ million)**

| Defendant | Enron | | ENE | | ENA | |
|---|---|---|---|---|---|---|
| | 31 Dec 1997 | 30 June 1999 | 31 Dec 1997 | 30 June 1999 | 31 Dec 1997 | 30 June 1999 |
| Citigroup | 4,506 | 4,270 | 8,761 | 7,843 | 3,047 | 2,540 |
| BT Deutsche | 388 | 368 | 680 | 608 | 236 | 197 |

Expert Report of B. Douglas Bernheim, Ph.D.

_B. Douglas Bernheim_                                    April 6, 2007

B. Douglas Bernheim, Ph.D.                              Date

Exhibit C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
...............................................................................x

|  |  |
|---|---|
| In re: | : **Chapter 11 Case No.** : **01-16034 (AJG)** |
| **ENRON CORP.,** *et al.,* | : **Jointly Administered** |
| Debtors. |  |

_____x

|  |  |
|---|---|
| **ENRON CORP.,** *et al.,* | : |
| Plaintiffs, | : **Adversary Proceeding** : **No. 03-09266 (AJG)** |
| v. | : |
| **CITIGROUP INC.,** *et al.,* | : |
|  | **JURY DEMAND** |
| Defendants. | : |

...............................................................................x

PLEASE TAKE NOTICE that, pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure

9105, defendants CITIGROUP INC., CITIBANK, N.A., CITIGROUP GLOBAL

MARKETS, INC., CITICORP NORTH AMERICA, INC., SALOMON BROTHERS

HOLDING COMPANY, INC., CXC INCORPORATED, CORPORATE ASSET

FUNDING COMPANY, INC. AND CORPORATE RECEIVABLES CORPORATION,

INC. (collectively, "Citigroup") hereby demand trial by jury of all issues in the above-

entitled action that may be so tried.

Citigroup expressly reserves the right to withdraw this Jury Demand.

Dated:  New York, New York
        February 26, 2004

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  _____/s/ Stephen J. Shimshak_____

        Brad S. Karp (BK-3702)
        Mark F. Pomerantz (MP-9156)
        Stephen J. Shimshak (SS-8822)
        Douglas R. Davis (DD-0874)
        Michael E. Gertzman (MG-8096)
        Claudia L. Hammerman (CH-9005)
        PAUL, WEISS, RIFKIND, WHARTON &
        GARRISON LLP
        1285 Avenue of the Americas
        New York, New York 10019-6064
        Telephone:    (212) 373-3000
        Telecopier:   (212) 757-3990

        *Attorneys for Citigroup Inc.; Citibank,
        N.A.; Citigroup Global Markets, Inc.;
        Citicorp North America, Inc.; Salomon
        Brothers Holding Company, Inc.; CXC
        Incorporated; Corporate Asset Funding
        Company, Inc., and Corporate Receivables
        Corporation, Inc.*

Exhibit D

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————————  x    **Chapter 11**
                                                                 :    **Case No. 01-16034 (AJG)**
**In re**                                                        :
                                                                 :
**ENRON CREDITORS RECOVERY CORP.,** *et*                         :    **Jointly administered**
*al.,*                                                           :
                                                                 :
                                  **Reorganized Debtors**        :
————————————————————————————  x
                                                                 :
**ENRON CREDITORS RECOVERY CORP.;**                              :
**ENRON NORTH AMERICA CORP.; ENRON**                             :
**NATURAL GAS MARKETING CORP.;**                                 :
**ENRON BROADBAND SERVICES, INC.;**                              :
**ENRON ENERGY SERVICES, INC.; EES**                             :
**SERVICE HOLDINGS, INC.; ENRON**                                :
**INTERNATIONAL, INC.; ENRON ENERGY**                            :
**SERVICES OPERATIONS, INC.; ECT**                               :
**MERCHANT INVESTMENTS CORP.;**                                  :
**ENRON POWER MARKETING, INC.; and**                             :
**ATLANTIC COMMERCIAL FINANCE, INC.,**                           :
                                                                 :
                                         **Plaintiffs,**         :
                                                                 :
                             **v.**                              :
                                                                 :

**CITIGROUP INC.; CITIBANK, N.A.;** :
**CITIGROUP GLOBAL MARKETS, INC.;** :
**CITICORP NORTH AMERICA, INC.;** :
**DELTA ENERGY CORPORATION;** :
**CITIGROUP FINANCIAL PRODUCTS, INC.;** :
**CXC LLC; CORPORATE ASSET FUNDING** :
**COMPANY, LLC; CORPORATE** :
**RECEIVABLES CORPORATION, LLC;** :
**CITIGROUP GLOBAL MARKETS LTD.;** :
**LONG LANE MASTER TRUST IV; J.P.** :
**MORGAN CHASE & CO.; J.P. MORGAN** :
**CHASE BANK (FORMERLY CHASE** :
**MANHATTAN BANK); MAHONIA** :
**LIMITED; MAHONIA NATURAL GAS** :
**LIMITED; STONEVILLE AEGEAN** :
**LIMITED; JP MORGAN SECURITIES INC ;** :
**BARCLAYS PLC; BARCLAYS INC.;** :
**BARCLAYS BANK PLC; COLONNADE** :
**LIMITED; BARCLAYS CAPITAL** :
**SECURITIES LIMITED; BARCLAYS** :
**CAPITAL, INC.; BARCLAYS PHYSICAL** :
**TRADING LIMITED (FORMERLY** :
**BARCLAYS METALS (HOLDINGS)** :
**LIMITED); BARCLAYS METALS LIMITED;** :
**DEUTSCHE BANK AG; DEUTSCHE BANK** :
**TRUST COMPANY AMERICAS;** :
**DEUTSCHE BANK SECURITIES INC.;** :
**DEUTSCHE BANK LUXEMBOURG S.A.;** :
**DEUTSCHE BANK TRUST COMPANY** :
**DELAWARE; DEUTSCHE BANK TRUST** :
**CORPORATION; BANKERS TRUST** :
**INTERNATIONAL PLC; BT COMMERCIAL** :
**CORP.; DB GREEN, INC.; DEUTSCHE** :
**LEASING NEW YORK CORP.; SENECA** :
**DELAWARE, INC.; DEUTSCHE BANK, S.A.;** :
**BT EVER, INC.; SENECA LEASING** :
**PARTNERS, L.P.; CANADIAN IMPERIAL** :
**BANK OF COMMERCE; CIBC WORLD** :
**MARKETS CORP.; CIBC CAPITAL** :
**CORPORATION; CIBC WORLD MARKETS** :
**PLC; CIBC, INC.; MERRILL LYNCH & CO.,** :
**INC.; MERRILL LYNCH, PIERCE, FENNER** :
**& SMITH INC.; MERRILL LYNCH** :
**CAPITAL SERVICES, INC.; CREDIT SUISSE** :
**FIRST BOSTON, INC.; CREDIT SUISSE** :
**FIRST BOSTON (USA), INC.; CREDIT** :
**SUISSE FIRST BOSTON LLC; CREDIT** :
**SUISSE FIRST BOSTON INTERNATIONAL;** :
**CREDIT SUISSE FIRST BOSTON (USA)** :
**INTERNATIONAL, INC.; CREDIT SUISSE** :
**FIRST BOSTON; PERSHING LLC; DLJ** :
**CAPITAL FUNDING, INC.; DLJ FUND** :

**Adversary Proceeding**
**No. 03-09266 (AJG)**

**Defendants.   :**
_____ **x**

## <u>SECOND AMENDED SCHEDULING ORDER</u>

To accommodate needed modifications to the schedule in the consolidated

insolvency proceeding, which includes this adversary proceeding to the extent of its insolvency

issues, Plaintiffs and defendants Citigroup Inc. and its affiliates and Deutsche Bank AG and its

affiliates consented to a modification of the deadlines in the Amended Scheduling Order entered

on December 21, 2006 (the "Amended Scheduling Order"), which modified the deadlines

originally set by the Scheduling Order entered on April 20, 2004.  Defendants Yosemite/Credit

Linked Trusts and The Bank of New York, as Indenture Trustee for the Yosemite/Credit Linked

Trusts have opposed the proposed modifications.  A hearing (the "Hearing") was held on August

23, 2007.  Having reviewed the pleadings and having heard the arguments made at the hearing,

the Court overrules the objection of the Trust and finds that the requested modifications of the

Amended Scheduling Order are meritorious and are, therefore, GRANTED.

Accordingly, it is ORDERED that the Amended Scheduling Order is further

amended as follows:

1.    Expert discovery must be completed as follows:

Parties asserting affirmative claims must
identify rebuttal expert reports and submit
expert reports on all issues other than damages
and insolvency, with the expert reports to be
in accordance with Rule 26(a)(2) of the
Federal Rules of Civil Procedure, as adopted
by Bankruptcy Rule 7026, by                                         August 31, 2007

Depositions of expert witnesses on all issues
other than damages and insolvency may
commence on                                                         September 19, 2007

Parties defending affirmative claims (defendants, third-party defendants, and counterclaim defendants) must identify their expert witnesses and submit expert reports on damages, with the expert reports to be in accordance with Rule 26(a)(2) of the Federal Rules of Civil Procedure, as adopted by Bankruptcy Rule 7026, by                 August 31, 2007

Parties asserting affirmative claims (plaintiffs, third-party plaintiffs, and defendants with counterclaims) must identify their rebuttal expert witnesses and submit expert reports on damages, with the expert reports to be in accordance with Rule 26(a)(2) of the Federal Rules of Civil Procedure, as adopted by Bankruptcy Rule 7026, by                 October 29, 2007

Depositions of expert witnesses on damages may commence on                 November 12, 2007

All expert discovery must be complete by                 December 17, 2007

2.      Dispositive motions must be filed by                 January 7, 2008

Oppositions to dispositive motions must be filed within 45 days of service of the motion.  Replies must be filed within 30 days of service of the opposition papers.

3.      Joint pretrial order must be filed by                 April 2, 2008

4.      Trial is set for                 April 28, 2008

SIGNED this 23rd day of August, 2007

**s/Arthur J. Gonzalez**
Honorable Arthur J. Gonzalez
United States Bankruptcy Judge

Exhibit E

Hearing Date: December 20, 2007 at 10 a.m.
Response Deadline: December 10, 2007 at 4 p.m.

Brad S. Karp (BK-3702)
Douglas R. Davis (DD-0874)
Stephen J. Shimshak (SS-8822)
Michael E. Gertzman (MG-8076)
Claudia Hammerman (CH-9005)
Julia Tarver Mason (JM-7307)
Robyn F. Tarnofsky (RT-4546)
Jonathan Hurwitz (JH-8037)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3010
Telecopier: 212-757-3990

Attorneys for Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., Citicorp
North America, Inc., Citigroup Financial Products, Inc., CXC LLC, Corporate Asset
Funding Company, LLC, Corporate Receivables Corporation, LLC, and Citigroup Global
Markets Ltd.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In Re**<br><br>**ENRON CORP.,** *et al.,*<br>            **Reorganized Debtors,**<br><br>v.<br><br>**ENRON CORP.,** *et al.,*<br>            **Plaintiffs,**<br><br>- against –<br><br>**CITIGROUP, INC.,** *et al.,*<br><br>            **Defendants.** | **Chapter 11**<br>**Case No. 01-16034 (AJG)**<br><br>**Jointly Administered**<br><br><br>**Adversary Proceeding**<br>**No. 03 - 09266 (AJG)** |

**CITIGROUP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**
**FOR A DETERMINATION THAT TEXAS LAW ON LOSS ALLOCATION**
**GOVERNS ENRON'S COMMON LAW CLAIMS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 2

BACKGROUND .............................................................................................. 3

ARGUMENT .................................................................................................... 6

I.  A CONFLICT EXISTS BETWEEN THE LOSS ALLOCATION LAW
    OF TEXAS AND NEW YORK .............................................................. 9

  A.  Texas Law on Loss Allocation ...........................................................9
  B.  New York Law on Loss Allocation ...................................................10

II.  UNDER THE *NEUMEIER* TEST, TEXAS LAW ON LOSS
     ALLOCATION APPLIES TO ENRON'S COMMON LAW CLAIMS ............. 12

III. FURTHER DELAY IN DETERMINING THE LAW OF LOSS
     ALLOCATION WILL PREJUDICE CITIGROUP ............................................ 15

CONCLUSION................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Aboud* v. *Budget Rent-A-Car Corp.*,
   29 F. Supp. 2d 178 (S.D.N.Y. 1998) ..................................................................6

*Alami* v. *Volkswagen of Am., Inc.*,
   97 N.Y.2d 281 (2002) ..........................................................................................9

*Allstate Ins. Co.* v. *Stolarz*,
   81 N.Y.2d 219 (1993) ..........................................................................................7

*Armstead* v. *Nat'l R.R. Passenger Corp.*,
   954 F. Supp. 111 (S.D.N.Y. 1997) ....................................................................14

*Bedford* v. *Moore*,
   166 S.W.3d 454 (Tex. App. 2005) .......................................................................9

*Bergeron* v. *Philip Morris, Inc.*,
   100 F. Supp. 2d 164 (E.D.N.Y. 2000) .................................................................7

*Bianco* v. *Erkins*
   (*In re Gaston & Snow*), 243 F.3d 599 (2d Cir. 2001) ........................................6

*Brewster* v. *Baltimore & Ohio R.R. Co.*,
   585 N.Y.S.2d 647 (4th Dep't 1992) ...................................................................14

*Chance* v. *E.I. DuPont de Neumours & Co.*,
   57 F.R.D. 165 (E.D.N.Y. 1972) ..........................................................................6

*Comer* v. *Titan Tool, Inc.*,
   888 F. Supp. 605 (S.D.N.Y. 1995) ......................................................................8

*Cooney* v. *OsgoodMach., Inc.*,
   81 N.Y.2d 66 (1993) .............................................................................7, 8, 12, 13

*Cromer Fin. Ltd.* v. *Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) ...............................................................13

*Curley* v. *AMR Corp.*,
   153 F.3d 5 (2d Cir. 1998) ....................................................................................7

*Dep't of Econ. Dev.* v. *Arthur Andersen & Co.*,
   747 F. Supp. 922 (S.D.N.Y. 1990) ....................................................................11

*Emjayco* v. *Morgan Stanley & Co., Inc.*,
No. 95 Civ. 8546 (DLC), 1996 WL 452266 (S.D.N.Y. Aug. 8, 1996), *aff'd*,
125 F.3d 843 (2d Cir. 1997) ................................................................................................13

*In re Unitec Elevator Servs. Co.*,
178 S.W.3d 53 (Tex. App. 2005).........................................................................10, 15, 16

*JCW Elecs., Inc.* v. *Garza*,
176 S.W.3d 618 (Tex. App. 2005) (noting that the Texas legislature removed
an exception for intentional torts in 1995)........................................................................9

*Klaxon Co.* v. *Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941)............................................................................................................6

*Kelly* v. *Long Island Lighting* Co., 31 N.Y.2d 25 (1972) ......................................................11

*Neumeier* v. *Kuehner*,
31 N.Y.2d 121 (1972) ................................................................................................passim

*O'Brien* v. *Marriott Int'l, Inc.*, No CV 04-3369 (VVP), 2006 U.S. Dist. LEXIS
44446 (E.D.N.Y. Jun. 29, 2006) ......................................................................................6, 7

*Official Comm. of Unsecured Creditors, ex rel. Smartalk Teleservices, Inc.* v.
*Donaldson, Lufkin & Jenrette Sec. Corp.*,
No. 00 Civ. 8688(WHP), 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002)........................6

*Playwell Toy, Inc.* v. *Bureau Ceritas Consumer Prods. Servs., Inc.*,
03-CV-0704C(SC), 2007 WL 2892031 (W.D.N.Y. Sept. 28, 2007) .......................13

*PPI Enters. (U.S.), Inc.* v. *Del Monte Foods Co.*,
No. 99 Civ. 3794 (BSJ), 2003 WL 22118977 (S.D.N.Y. Sept. 11, 2003)...............13

*Richards* v. *AXA Equitable Life Insur. Co.*,
No. 06 Civ. 3744(PAC), 2007 WL 3084968 (S.D.N.Y. Oct. 22, 2007)...............7, 11

*Schultz* v. *Boy Scouts of Am., Inc.*,
65 N.Y.2d 189 (1985) ....................................................................................7, 8, 13, 14

*Simons* v. *Marriott Corp.*,
No. 92 Civ. 3762 (SWK), 1993 WL 410457 (S.D.N.Y. Oct. 13, 1993)....................6

*Sommer* v. *Fed. Signal Corp.*,
79 N.Y.2d 540 (1992)........................................................................................................11

*Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het
Kapitaal Van Saybolt Int'l B.V.* v. *Schreiber*,
407 F.3d 34 (2d Cir. 2005) ..........................................................................................7, 12

*Ward* v. *Emmett*,
  37 S.W.3d 500 (Tex. App. 2001)..................................................................9

*Weiss* v. *La Suisse, Societe D'Assurances Sur La Vie*,
  293 F. Supp. 2d 397 (S.D.N.Y. 2003) ..........................................................6


STATUTES

28 U.S.C. § 157 (2000) ....................................................................................4

C.P.L.R. 1411 (2007).......................................................................................11

C.P.L.R. 1601 ..................................................................................................11

C.P.L.R. 1602 ..................................................................................................11

C.P.L.R. Art. 14 ...............................................................................................11

N.Y. GEN. OBLIG. LAW § 15-108 (2007) .........................................................11

TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 ...............................................9

TEX. CIV. PRAC. & REM. CODE ANN. § 33.002 ...............................................9

TEX. CIV. PRAC. & REM. CODE  ANN. § 33.003 ..........................................5, 10

TEX. CIV. PRAC. & REM. CODE ANN. § 33.004 ..................................10, 15, 16

TEX. CIV. PRAC. & REM. CODE ANN. § 33.011 ...............................................10

TEX. CIV. PRAC. & REM. CODE ANN. § 33.013 ...............................................10

TEX. CIV. PRAC. & REM. CODE § 33.015 .....................................................9, 10

TEX. CIV. PRAC. & REM. CODE § 33.016 .........................................................10


OTHER AUTHORITIES

HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. S.B. 28, 74th Leg., R.S., at 5
  (1995) ........................................................................................................14

Citigroup Inc. and certain of its affiliates and related entities (collectively, "Citigroup")[1] respectfully submit this memorandum of law in support of their motion (the "Motion") for a determination that Texas law governs loss allocation for the common law claims in this action.

## PRELIMINARY STATEMENT

Enron[2] -- the architect of perhaps the greatest fraud in corporate history -- has sued ten Bank Defendants that provided it with financial services and billions of dollars in financing.[3] Despite the fact that these financial institutions were principal victims of Enron's fraud, and together suffered enormous losses when Enron collapsed, Enron seeks to recover more than $18 billion in damages on the theory that the Bank Defendants aided and abetted both *Enron's* fraud and the breaches of fiduciary duty that *Enron's* officers and directors owed the company and its stakeholders.

---

[1]  Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc. (formerly known as Salomon Smith Barney Inc. and Salomon Brothers, Inc.), Citicorp North America, Inc., Citigroup Financial Products, Inc. (formerly known as Salomon Brothers Holding Company, Inc.), CXC LLC (formerly known as CXC Incorporated), Corporate Asset Funding Company, LLC (formerly known as Corporate Asset Funding Company, Inc.), Corporate Receivables Corporation, LLC (formerly known as Corporate Receivables Corporation, Inc.), and Citigroup Global Markets Ltd. (formerly known as Salomon Brothers International Ltd.).

[2]  Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc., and Atlantic Commercial Finance, Inc.

[3]  Citigroup, JP Morgan Chase, Barclays, BT/Deutsche Bank, CIBC, Merrill Lynch, CSFB, Toronto Dominion, RBS, and RBC. *See* Reorganized Debtors' Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, dated January 10, 2005 (the "Fourth Am. Compl.") ¶¶ 18-98.

2

After two years of fact discovery and a year of expert discovery, trial will begin in this case in less than six months. As major trial preparations begin, a threshold issue requires this Court's determination as soon as possible: the law governing loss allocation. Substantial differences exist between Texas and New York law on loss allocation, differences that will shape dramatically Citigroup's and Enron's preparation for, and evidentiary presentation at trial, depending on which law applies. For the reasons set forth below, an analysis under New York choice of law rules indicates that Texas law applies, and accordingly, Citigroup respectfully requests that this Court rule that Texas law governs loss allocation for Enron's common law claims.

## BACKGROUND

Enron filed this action on September 24, 2003, and has amended its complaint four times. In its fourth amended complaint, Enron has asserted common law claims against ten Bank Defendants for: (i) aiding and abetting breach of fiduciary duty by Enron's executives; (ii) aiding and abetting fraud by Enron's executives; and (iii) civil conspiracy with Enron's executives. (Fourth Am. Compl. ¶¶ 1267-1601.) Fact discovery began in July 2004 and ended in November 2005, with some minor exceptions not relevant to the Motion. Trial has been set for April 28, 2008.

On May 23, 2005, eight of the Bank Defendants, including Citigroup, filed a Motion for Leave to Designate Responsible Third Parties Pursuant to Texas Law. Enron objected to that motion as premature because the parties had not completed fact discovery.[4] The parties agreed to defer further briefing, oral argument, and a ruling on

---

[4]    Enron also argued that this Court should decide all choice of law issues together. Citigroup disagrees. Determining the law of loss allocation involves a root question central to Citigroup's and Enron's trial preparation. While other choice of law

loss allocation until the Court deemed it appropriate to address choice of law matters, but in any case no later than 90 days before the start of trial. (Docket Entry #390: Stipulation and Order dated October 3, 2005.) The parties also agreed that if Texas law applies to loss allocation, then the Bank Defendants could designate Responsible Third Parties pursuant to TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001-33.013 (2007), whether or not such designated Responsible Third Parties are parties to this action, up to 60 days before the start of trial (or later, if the Court finds good cause). *Id.*

Eight of the Bank Defendants have now settled with Enron. Only Citigroup and BT/Deutsche Bank remain.[5] Though Citigroup vigorously denies Enron's allegations of misconduct, it must deal with Enron's damages theory and potential loss allocation at trial. New York choice of law principles dictate that Texas law governs loss allocation for Enron's common law claims against Citigroup because the parties do not share a domicile (Texas for Enron and New York for Citigroup), the laws of those states do not favor their respective domiciliaries in this action, and Texas (Enron's primary place of business) is the place of injury.[6]

---

questions exist, none has the same effect on trial preparation as does this critical issue.

[5]  Royal Bank of Scotland settled on August 9, 2005. CIBC settled on December 12, 2005. Royal Bank of Canada settled on December 14, 2005. Merrill settled on December 21, 2005. JPMC/Mahonia settled on December 29, 2005. Toronto Dominion settled on June 8, 2006. Barclays settled on December 21, 2006. Credit Suisse First Boston settled on December 26, 2006.

[6]  While Texas law governs loss allocation, other issues (including, for example, standing, elements of claims, and affirmative defenses) may be subject to different conflict of law analyses and governed by the laws of other jurisdictions. In filing the Motion, Citigroup expressly reserves its right to seek a separate determination as to the appropriate law for all other issues. Citigroup also expressly reserves its right to a jury trial and other rights under 28 U.S.C. § 157 (2000).

4

Consequently, Citigroup can invoke Chapter 33 of the Texas Civil Practice and Remedies Code to designate responsible third parties at any time up to sixty (60) days before trial, and to present evidence at trial so that the trier of fact can determine the percentage responsibility for Enron's alleged harm attributable to "each claimant" (or plaintiff), "each defendant," "each settling person" and "each responsible third party who has been designated under Section 33.004." TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).

Indisputably, many parties share responsibility for the implosion of Enron's business. Enron itself has blamed, among many others, Enron's insiders (many convicted of crimes for their work at Enron), Enron's accountants, Enron's directors, and the financial institutions that did business with Enron. Under Texas's law of loss allocation, the factfinder must apportion any damages award at trial among all responsible parties.[7]

To identify all responsible third parties and to prepare and present evidence on each responsible third party at trial will involve a substantial effort. The magnitude of that effort makes it essential that Citigroup obtain certainty on the choice of law for loss allocation as soon as possible.

---

[7] Indeed, in connection with this Court's approval of the settlement of actions asserted by the Official Committee of Unsecured Creditors against James Derrick, Richard Buy, Ken Harrison and certain outside directors of Enron, on April 11, 2005, the Enron Plaintiffs agreed that, to the extent Chapter 33 applies to this adversary proceeding, the settling Enron officers and directors constitute "settling persons" for whom a factfinder should determine the percentage of responsibility for each.

## ARGUMENT

Consideration of the choice of law question presented here should start with some basic principles. Numerous courts in this district and elsewhere endorse the practice of deciding choice of law issues before trial. *See Weiss* v. *La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 402 (S.D.N.Y. 2003) ("It is the Court's role to decide what [the law is] in advance of trial."); *Chance* v. *E.I. DuPont de Neumours & Co.*, 57 F.R.D. 165, 168 (E.D.N.Y. 1972) ("The question of what the substantive law is must normally be resolved by the judge . . ."); *see also O'Brien* v. *Marriott Int'l, Inc.*, No CV 04-3369 (VVP), 2006 U.S. Dist. LEXIS 44446, at *5-6 (E.D.N.Y. Jun. 29, 2006) (deciding choice of law issue on motion before trial); *Aboud* v. *Budget Rent-A-Car Corp.*, 29 F. Supp. 2d 178, 179 (S.D.N.Y. 1998) (same); *Simons* v. *Marriott Corp.*, No. 92 Civ. 3762 (SWK), 1993 WL 410457, at *1 (S.D.N.Y. Oct. 13, 1993) (same).

To begin the decision-making process, a court determines which state's choice of law rules apply. Here, New York's choice of law rules apply because New York serves as the forum state. *See Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Bianco* v. *Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 601-02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."); *Official Comm. of Unsecured Creditors, ex rel. Smartalk Teleservices, Inc.* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688(WHP), 2002 WL 362794, at *5 (S.D.N.Y. Mar. 6, 2002) ("[C]ourts hearing bankruptcy cases . . . employ the forum state's choice of law doctrines where the underlying rights and obligations are defined by state law.").

Under New York law, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Allstate Ins. Co.* v. *Stolarz*, 81 N.Y.2d 219, 223 (1993); *see Curley* v. *AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998); *Richards* v. *AZA Equitable Life Insur. Co.*, No. 06 Civ. 3744(PAC), 2007 WL 3084968, at *2 (S.D.N.Y. Oct. 22, 2007). If a conflict of laws exists, New York uses an "interest analysis" to resolve the conflict. New York courts "assess[] which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue" and apply the law of that state. *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V.* v. *Schreiber*, 407 F.3d 34, 50 (2d Cir. 2005) (citing *Padula* v. *Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994)). Where the conflict concerns a loss-allocation rule, the interest analysis rests on the principles set forth in *Neumeier* v. *Kuehner*, 31 N.Y.2d 121 (1972).[8] *See Stichting*, 407 F.3d at 50; *Cooney*, 81 N.Y.2d at 73-74.

*Neumeier* expounds three rules for a choice of law analysis of loss allocation. *First*, when the parties share a domicile, the law of that domicile controls. *Second*, when the domiciles of parties differ, and the law of each state favors its domiciliary, the place of injury provides the governing law. *Third*, in all other split-

---

[8]   New York distinguishes between conduct-regulating laws (which regulate primary conduct, such as standards of care) and loss-allocating laws (which prohibit, assign, or limit liability after a tort occurs). *See Bergeron* v. *Philip Morris, Inc.*, 100 F. Supp. 2d 164, 169 (E.D.N.Y. 2000); *Cooney* v. *OsgoodMach., Inc.*, 81 N.Y.2d 66, 72 (1993); *Schultz* v. *Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 198 (1985). Laws that concern contribution and comparative fault unquestionably concern loss-allocation. *See Cooney*, 81 N.Y.2d at 74; *O'Brien*, 2006 U.S. Dist. LEXIS 44446, at *5-6 ("The weight of authority in New York state courts as well as the court in the Second Circuit hold comparative negligence laws to be loss-allocating.").

domicile cases, "the governing law will be that of the place where the [tort] occurred, unless displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants." *Neumeier*, 31 N.Y.2d at 128; *Cooney*, 81 N.Y.2d at 73-74.

A corporation's principal place of business serves as its domicile for choice of law purposes. *Schultz*, 65 N.Y.2d at 194; *Comer* v. *Titan Tool, Inc.*, 888 F. Supp. 605, 609 (S.D.N.Y. 1995). There is no dispute that Enron's principal place of business is Texas (Fourth Am. Compl. ¶¶ 9-16E) and that Citigroup's principal place of business is New York (*id.* ¶¶ 18-28).[9] Both Texas and New York are "interested" states in Enron's common law claims, due primarily to the fact that residents of each are parties to this action, and Texas law and New York law regarding loss allocation conflict with one another.

---

[9]  The Fourth Amended Complaint alleges that one Citigroup entity, Citigroup Global Markets Ltd., is a domiciliary of London, England, but is a wholly owned subsidiary of Citigroup Inc. This does not alter the conflict of laws analysis.

I.

## A CONFLICT EXISTS BETWEEN THE LOSS
## ALLOCATION LAW OF TEXAS AND NEW YORK

A.    <u>Texas Law on Loss Allocation</u>

Chapter 33 of the Texas Civil Practice and Remedies Code codifies the

loss-allocation law of Texas in tort cases.  That Chapter applies to "any cause of action

based on tort in which a defendant, settling person, or responsible third party is found

responsible for a percentage of the harm for which relief is sought." TEX. CIV. PRAC. &

REM. CODE ANN. §§ 33.002(a)(l), 33.015; *JCW Elecs., Inc.* v. *Garza*, 176 S.W.3d 618,

626 & n.3 (Tex. App. 2005) (noting that the Texas legislature removed an exception for

intentional torts in 1995).

Texas has adopted a system of modified comparative fault, barring any

recovery by the plaintiff if the factfinder finds the plaintiffs more than 50% at fault.[10]

TEX. CIV. PRAC. & REM. CODE ANN. § 33.001; *see JCW Elecs., Inc.*, 176 S.W.3d at 626

(finding recovery by plaintiff precluded under § 33.001 because jury allotted 60% of fault

to plaintiff); *Bedford* v. *Moore*, 166 S.W.3d 454, 459 (Tex. App. 2005) (same).

Furthermore, if a defendant's percentage of responsibility is 50% or less, that ***defendant***

***is liable to the claimant "only for the percentage of the damages found by the trier of***

---

[10]    Of course, if some portion of Enron's damages is the result of its own criminal
conduct, then it is barred from recovery altogether. *See Ward* v. *Emmett*, 37 S.W.3d
500, 502 (Tex. App. 2001) ("[I]n those cases where it is shown that, at the time of the
injury, the plaintiff was engaged in the denounced or illegal act, the rule is, if the
illegal act contributed to the injury he can not recover ....") (citations omitted).  New
York law would require the same result. *See Alami* v. *Volkswagen of Am., Inc.*, 97
N.Y.2d 281, 286 (2002) ("[W]here a plaintiff has engaged in unlawful conduct, the
courts will not entertain suit if the plaintiff's conduct constitutes a *serious* violation of
the law and the injuries for which the plaintiff seeks recovery are the *direct* result of
that violation.") (citations omitted).

*fact equal to that defendant's percentage of responsibility* with respect to the . . . harm for which the damages are allowed." TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(a) (emphasis added). A defendant is not jointly and severally liable for damages unless that defendant's percentage exceeds 50%.[11] TEX. CIV. PRAC. & REM. CODE ANN. § 33.013.

Texas law thus requires the trier of fact to determine the percentage responsibility for "(1) each claimant; (2) each defendant; (3) each settling person; and (4) each responsible third party who has been designated under Section 33.004." TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). A "responsible third party" is "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6). Responsible third parties are not required to have any affirmative claims for relief asserted against them, or to be joined as parties to the action.[12]

B.     New York Law on Loss Allocation

New York law on loss allocation in tort actions differs materially from that of Texas. With respect to comparative fault, New York reduces the potential recovery in

---

[11] For a defendant with fault greater than 50%, Texas preserves contribution claims against other parties or nonparties paying less than their equitable share. TEX. CIV. PRAC. & REM. CODE §§ 33.015, 33.016. Though not applicable here, joint and several liability attaches to defendants that have engaged in certain criminal activities with specific intent to do harm. TEX. CIV. PRAC. & REM. CODE § 33.015.

[12] Designation of a person as a responsible third party or a finding of fault against that person does not, in itself, impose liability, and the designation does not provide a basis for liability in any other proceeding. TEX. CIV. PRAC. & REM. CODE § 33.004(i); *see also In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 58 n.5 (Tex. App. 2005) ("[A] responsible third party may include persons who are not subject to the court's jurisdiction or who are immune from liability to the claimant."); *id.* at 64 n.13 ("Under the amended version of section 33.004 . . . a party may be merely designated rather than joined.").

an action in proportion to a plaintiff's percentage of fault, but it does not bar recovery where the plaintiff's fault exceeds 50%. N.Y. C.P.L.R. 1411 (2007).

As for damages not attributable to the plaintiff, New York treats all defendants as jointly and severally liable.[13] Thus, New York *does not limit recovery from each defendant to that defendant's apportioned responsibility or equitable share*; a plaintiff may recover full damages from a single defendant, regardless of culpability. *See Sommer* v. *Fed. Signal Corp.*, 79 N.Y.2d 540, 555-56, 593 (1992) ("[T]ortfeasors generally are jointly and severally liable for a judgment, meaning that each is responsible for the full amount regardless of culpability."); *Kelly* v. *Long Island Lighting* Co., 31 N.Y.2d 25, 30 (1972) (determination of fault attributable to each defendant "does not apply to or change the plaintiffs right to recover against any joint tort-feasor . . . the total amount of his damages suffered").[14] New York's rules for apportionment of fault and contribution apply equally to all claims sounding in tort, including intentional torts. *See Dep't of Econ. Dev.* v. *Arthur Andersen & Co.*, 747 F. Supp. 922, 935 (S.D.N.Y. 1990).

---

[13]  The sole exception to joint and several liability involves non-economic damages in personal injury actions (unless the action involves a car accident, reckless conduct or an international tort). *See* N.Y. C.P.L.R. 1601, 1602.

[14]  A defendant paying more than that defendant's equitable share may bring a separate action for contribution from those parties or non-parties to which some fault was apportioned. *Id.*; N.Y. C.P.L.R. Art. 14; *but see* N.Y. GEN. OBLIG. LAW § 15-108 (2007) (providing that parties who settle with the claimant are "relieve[d] . . . from liability to any other person for contribution").

II.

UNDER THE *NEUMEIER* TEST, TEXAS LAW ON LOSS
ALLOCATION APPLIES TO ENRON'S COMMON LAW CLAIMS

Because the conflict of laws question the Court confronts concerns a loss-

allocating rule, the three-prong *Neumeier* test applies.  *See Stichting*, 407 F.3d at 50;

*Cooney*, 81 N.Y.2d at 73-74.  The first prong of *Neumeier* does not resolve the conflict

because Enron and Citigroup do not share a domicile.  Nor does *Neumeier's* second

prong dispose of the issue; the law of each state does not favor the litigant domiciled in

that state -- Texas law favors Citigroup, the New York domiciliary, and New York law

favors Enron, the Texas domiciliary.  *Neumeier*'s third prong thus applies to this conflict

of laws question because the parties do not share a domicile and because each of Texas

and New York law does not favor its domiciliary.[15]

Under the third prong of *Neumeier*, "the governing law will be that of the

place where the [tort] occurred, unless displacing that normally applicable rule will

advance the relevant substantive law purposes without impairing the smooth working of

the multistate system or producing great uncertainty for litigants."  *Neumeier*, 31 N.Y.2d

at 128; *Cooney*, 81 N.Y.2d at 73-74.  The torts alleged in the Fourth Amended Complaint

consist of claims that the Bank Defendants aided and abetted Enron's fraud and the

various breaches of fiduciary duty by Enron's officers and directors.  These alleged torts

---

[15]    In their May 23, 2005 Motion for Leave to Designate Responsible Third Parties
Pursuant to Texas Law, the Bank Defendants took the position that the second prong
of *Neumeier* applies to the conflict of laws on loss allocation, and that under that
prong, Texas law governs loss allocation on the common law claims in this action.  In
its response, Enron argued that the third prong of *Neumeier* applied.  Both
*Neumeier's* second prong and its third prong indicate that Texas law governs loss
allocation on the common law claims in this action.  Upon further reflection,
Citigroup concurs with Enron that *Neumeier's* third prong resolves the conflict of
laws issue on loss allocation.

took place in Texas because Enron sustained its injury there, in its principal place of business. *Cooney*, 81 N.Y.2d at 73-74 (holding that the place where the tort occurred is the place where the injury was sustained); *see Schultz*, 65 N.Y.2d at 195 (same); *PPI Enters. (U.S.), Inc.* v. *Del Monte Foods Co.*, No. 99 Civ. 3794 (BSJ), 2003 WL 22118977, at *17 (S.D.N.Y. Sept. 11, 2003) (holding that where the plaintiff is a corporation, the place of injury is the jurisdiction in which the plaintiff has its principal place of business); *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (holding that a fraud occurs where "the injury was inflicted, as opposed to the place where the fraudulent act originated"); *see also Emjayco* v. *Morgan Stanley & Co., Inc.*, No. 95 Civ. 8546 (DLC), 1996 WL 452266, at *4 (S.D.N.Y. Aug. 8, 1996) (holding that a civil conspiracy to commit fraud takes place where the injury is sustained), *aff'd*, 125 F.3d 843 (2d Cir. 1997).

Applying New York rather than Texas law would not "advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants." *Neumeier*, 31 N.Y.2d. at 128; *see Playwell Toy, Inc.* v. *Bureau Ceritas Consumer Prods. Servs., Inc.*, 03-CV-0704C(SC), 2007 WL 2892031, at *4 (W.D.N.Y. Sept. 28, 2007) (finding locus of the tort to be a neutral tiebreaker that will neither impair the workings of the multistate system nor produce great uncertainty for litigants). Though New York has long held a strong interest in ensuring that its *own* domiciliaries obtain a full damages recovery, it does not have an interest in assisting non-domiciliaries in recovering against New York resident

13

defendants beyond those defendants' proportionate share of fault.[16] *See Neumeier*, 31 N.Y.2d at 129 (applying Ontario law to bar recovery by an Ontario plaintiff when the defendant was a New York domiciliary); *Brewster* v. *Baltimore & Ohio R.R. Co.*, 585 N.Y.S.2d 647, 648 (4th Dep't 1992) ("New York has no interest in applying its [loss-allocation] laws for the benefit of nonresidents and to the detriment of residents.").

Texas, on the other hand, has modified the common law concept of joint and several liability to protect "deep pockets" from the unfairness of paying more than their equitable share. HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. S.B. 28, 74th Leg., R.S., at 5 (1995) ("SB 28 would eliminate the unfair concept that as long as the defendant who pays had something to do with the harm, that defendant should have to pay all of the damages merely because the defendant has 'deep pockets' and a greater ability to pay.") Texas's loss allocation rules encourage business activity in Texas and protect Texas domiciliaries from excessive damage awards where they are less than 50% at fault. Having conducted its business in Texas, Enron enjoyed the benefits of Texas loss allocation laws; fairness requires that Enron now accept the burdens of those same laws. *Schultz*, 65 N.Y.2d at 201 (holding that "domiciliaries . . . [must] accept the burdens as well as the benefits of that State's loss-distribution tort rules . . . .")

Finally, all of the parties should have reasonably expected that Texas law would apply. Citigroup (through Citigroup employees in Texas) performed financial services for Enron, a Texas resident, and both Citigroup and Enron had every reasonable expectation that the law of Texas and its loss allocation rules would apply to potential tort

---

[16] *See Armstead* v. *Nat'l R.R. Passenger Corp.*, 954 F. Supp. 111, 113 (S.D.N.Y. 1997) ("[T]he strong New York policy favoring partial compensation of its domiciliaries . . .

claims arising out of their relationship.[17]  After all, as a Texas resident with its primary

place of business in Texas, Enron must have reasonably expected that Texas law would

apply to tort claims arising out of its business relationships in Texas and for injuries

sustained in Texas.  Enron alleges that Citigroup aided and abetted a *Texas* fraud --

committed by and against a *Texas* domiciliary -- that caused injury in *Texas*.  On the facts

of this multibillion-dollar case, to allow New York law to trump Texas law would lead to

uncertainty for litigants in multistate tort actions and encourage forum shopping.

III.

### FURTHER DELAY IN DETERMINING THE LAW
### OF LOSS ALLOCATION WILL PREJUDICE CITIGROUP

Under the Texas Civil Practice and Remedies Code, a party seeking to

designate responsible third parties must plead sufficient facts against each such third

party.  TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(g); *In re Unitec Elevator Servs. Co.*,

178 S.W.3d 53, 59 (Tex. App. 2005).  The designating party must then present sufficient

evidence at trial to raise a genuine issue of fact regarding the responsibility of any third

---

has led the New York Court of Appeals to decline to apply a Massachusetts statutory
limit on damages for a wrongful death action.").

[17]  Enron's complaint specifically highlights the activities of Citigroup personnel located
in Houston.  Enron alleges, for example, that:  "[t]hroughout the relevant period,
Citigroup maintained an office in Houston, Texas.  Citigroup executives and other
personnel in the Houston office were involved in the SPE transactions with Enron.
James Reilly, head of Citigroup's Global Energy & Mining Group in Houston and the
Enron relationship manager, and others in the Houston office were involved in
structuring and implementing the Citigroup prepays, minority interest transactions,
and forest product transactions. . . .  It was also Reilly, working with Enron Insider
McMahon, who developed the concept of financially settling the Citigroup prepays. .
. . Another Citigroup executive in Houston, Steve Baillie, worked with the Insiders
on the Bacchus forest products transaction." (Fourth Am. Compl. ¶ 276.)  The
complaint contains no comparable allegations highlighting the activities of Citigroup
personnel in New York.

party designated for the injury at issue. TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(l); *In re Unitec Elevator Servs. Co.*, 178 S.W.3d at 59 n.9. Thus, separate and apart from preparing its defense to Enron's common law and other claims, Citigroup must present a case against each Enron plaintiff, each settling party, and each responsible third party as if it had filed a separate suit for contribution.

That preparation is no small matter. The facts surrounding the Enron debacle have emerged in over six years of government investigations, civil actions, and criminal cases brought across the country. This action alone involved the production of over 18.5 million documents (totaling 129 million pages) and the depositions of over 900 fact witnesses. Citigroup must sift through and distill this voluminous record to prepare and present trial evidence for each settling party and each responsible third party. That necessary process will require a substantial commitment of time, money and people. As a matter of basic fairness and due process, Citigroup needs to know the direction that its trial preparation on loss allocation must take. Here, given the direct conflict between the laws of the interested jurisdictions, the determination that Texas law applies to loss allocation on Enron's common law claims is dispositive of how the parties will proceed with trial preparation.

## CONCLUSION

For all of the foregoing reasons, Citigroup respectfully requests that the Court issue a determination that Texas law on loss allocation governs Enron's common law tort claims.

New York, New York
November 16, 2007

Respectfully submitted,

CITIGROUP, INC.; CITIBANK, N.A.;
CITIGROUP GLOBAL MARKETS INC.,
CITICORP NORTH AMERICA, INC;
CITIGROUP FINANCIAL PRODUCTS, INC.;
CXC LLC; CORPORATE ASSET FUNDING
COMPANY, LLC; CORPORATE RECEIVABLES
CORPORATION, LLC; and CITIGROUP
GLOBAL MARKETS LTD.

By:


/s/ Brad S. Karp
Brad S. Karp
Douglas R. Davis
Stephen J. Shimshak
Michael E. Gertzman
Claudia Hammerman
Julia Tarver Mason
Robyn F. Tarnofsky
Jonathan Hurwitz

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
212-373-3010
212-757-3990 (fax)

Exhibit F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | : |
| In re: | : |
| | : |
| ENRON CORP., et al. | : |
| | : |
| Debtors. | : |
| | : |

Chapter 11

Case No. 01-16034 (AJG)
Jointly Administered

**ORDER PURSUANT TO SECTION 363 OF THE**
**BANKRUPTCY CODE AND RULES 2002, 6004 AND 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**APPROVING (I) A SETTLEMENT AGREEMENT AND MUTUAL**
**RELEASE RELATING TO THE RAWHIDE TRANSACTIONS, AND (II) (A) THE**
**TRANSFER OF CERTAIN PROJECT INTERESTS, AND (B) THE SETTLEMENT**
**OF CERTAIN INTER-STRUCTURE CLAIMS IN CONNECTION THEREWITH**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

Upon the motion dated March 12, 2004 (the "Motion") [1], of Enron Corp.

("Enron"), Enron North America Corp. ("ENA"), Enron Development Funding Ltd., Enron

Global Power & Pipelines L.L.C. ("EGPP"), Atlantic Commercial Finance Inc., Enron Reserve

Acquisition Corp., Enron Ventures Corp., Enron Transportation Services L.L.C., Enron South

America LLC, Enron Commercial Finance Ltd., Enron Caribbean Basin LLC and Enron Expat

Services, Inc. (collectively, the "Movants") and certain of their affiliated debtor entities

(collectively, the "Debtors") that have filed voluntary petitions for relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), as debtors and

debtors in possession, for an order pursuant to Section 363 of the Bankruptcy Code and Rules

---

[1]  Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Settlement Agreement, the Debt Forgiveness Arrangements or the Motion, as applicable.  Each of the Enron Parties, Ponderosa, Sundance, the Rawhide Parties, the Ponderosa Collateral Agent and the Committee are collectively referred to herein as the "Parties," and each is individually referred to as "Party."

2002, 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i)

approving a Settlement Agreement and Mutual Release (the "Settlement Agreement") by and

among the Enron, ENA, Enron Ponderosa Management Holdings, Inc. ("EPMH"), the Ponderosa

Limited Partners (each of the foregoing, collectively the "Enron Parties"), Ponderosa Assets,

L.P. ("Ponderosa"), Sundance Assets, L.P. ("Sundance"), Rawhide Investors L.L.C.

("Rawhide"), Citibank, N.A., solely in its capacity as Ponderosa Portfolio Manger and Sundance

Portfolio Manager (in such capacities, collectively, the "Portfolio Manager"), Citicorp North

America, Inc. ("CNAI"), CXC, LLC ("CXC"), the APA Purchasers, Wilmington Trust

Company, as collateral agent for the lender under the Ponderosa Loan Agreement (as defined

below)(in such capacity, the "Ponderosa Collateral Agent") and the Official Committee of

Unsecured Creditors (the "Committee"), (ii) approving the transfer of certain assets as

contemplated therein, and (iii) approving the release, acquittal, discharge and amendment of the

claims, demands and causes or action as provided in the Settlement Agreement and the Debt

Forgiveness Arrangements; and the Court having reviewed the Motion and having determined

that granting the relief requested is in the best interest of, as applicable, the Movants, their

estates, and creditors, and is a proper exercise of the Movants' business judgment and the

settlement falls within the range of reasonableness; and it appearing that proper and adequate

notice of the Motion has been given under the circumstances and that no other or further notice is

necessary; and upon the record herein; and upon the representations of counsel present at the

hearing; and after due deliberation; and good and sufficient cause approving therefor;

## IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The Court has jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334.

2

B.    As evidenced by the certificate of service filed with the Court, and based on the representations of counsel at the hearing, proper, timely, adequate, and sufficient notice of the Motion and the terms of the Settlement Agreement has been provided in accordance with (A) the Court's Second Amended Case Order, dated December 17, 2002, Bankruptcy Rule 9019 and Rule 9013-1(c) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), to, among others, (i) the Office of the United States Trustee, (ii) the Parties, and  (iii) all entities who had filed a notice of appearance and request for service of papers in these cases in accordance with the Court's Second Amended Case Order; (B) such notice was good and sufficient and appropriate under the particular circumstances; and (C) no other or further notice of the Motion is required.

C.    The requirements of Rule 9013-1(b) of the Local Rules have been waived.

D.    A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein and this Order has been afforded to all those parties listed in paragraph B above.

E.    The Settlement Agreement and the Debt Forgiveness Arrangements were negotiated at arm's-length and proposed and entered into by and among the Parties and the Debt Forgiveness Entities, as applicable, without collusion and in good faith.

F.    The relief sought in the Motion is in the best interests of the Movants, their estates, creditors, and all parties in interest.

**ACCORDINGLY, THE COURT HEREBY ORDERS THAT:**

1.    The findings of fact set forth above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent

3

any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

2.      All parties in interest have had an opportunity to object to the relief requested in the Motion and to the extent that objections to the Motion or the relief requested therein, have not been withdrawn, waived, or settled, such objections and all reservations of rights included therein, are overruled on the merits.

3.      The Motion is granted in its entirety.

4.      The Settlement Agreement and the Debt Forgiveness Arrangements are approved in all respects pursuant to Bankruptcy Rule 9019.

5.      The Movants are authorized, pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, to perform all of their obligations pursuant to the Settlement Agreement and to execute such other documents and take such other actions as are necessary to effectuate the transactions contemplated by the Settlement Agreement and the Debt Forgiveness Arrangements, including to transfer, effective as of the Closing Date, the Transferred Assets held by the Movants.

6.      The mutual waiver and release provisions of the Settlement Agreement and the Debt Forgiveness Arrangements are approved in all respects, and the applicable Movants are authorized to enter into such waivers and releases.

7.      On the Closing Date, each of the proofs of claim filed by Ponderosa, including the Proofs of Claim No. 14207, 14197, 14206 and 14195, shall be deemed irrevocably withdrawn, with prejudice, and to the extent applicable, expunged and all claims set forth therein disallowed in their entirety.

4

8.      On the Closing Date, each of the proofs of claim filed by Sundance, including the Proof of Claim No. 14212, shall be deemed irrevocably withdrawn, with prejudice, and to the extent applicable, expunged and all claims set forth therein disallowed in their entirety.

9.      On the Closing Date, each of the proofs of claim filed by CNAI relating to the Rawhide Transaction (as defined in the Settlement Agreement), including the Proof of Claim No. 14198, shall be deemed irrevocably withdrawn, with prejudice, and to the extent applicable, expunged and all claims set forth therein disallowed in their entirety.

10.      On the Closing Date, each of the proofs of claim filed by Citibank, N.A. relating to the Rawhide Transaction, including the Proofs of Claim No. 14208 and 14209, shall be deemed irrevocably withdrawn, with prejudice, and to the extent applicable, expunged and all claims set forth therein disallowed in their entirety.

11.      On the Closing Date, proofs of claim nos. 10816 and 10819 (as amended by proof of claim no. 21553) filed by Credit Lyonnais, S.A., together with each other proof of claim, if any, that may have been filed by Credit Lyonnais, S.A. asserting claims relating to the Rawhide Transaction (collectively, the "Credit Lyonnais Proofs of Claim") shall be deemed amended to delete and irrevocably withdraw, with prejudice, any reference to the Rawhide Transaction, it being expressly understood (i) by the Enron Parties that the Credit Lyonnais Proofs of Claim are otherwise preserved and not withdrawn, and (ii) that the Debtors reserve the right to object to any claims asserted by Credit Lyonnais as evidenced by the Credit Lyonnais Proofs of Claim as amended as a result of this Order.

12.      On the Closing Date, each of the "RBS Proofs of Claim" (as defined in the Settlement Agreement) filed by National Westminster Bank Plc and The Royal Bank of Scotland

5

plc, together with each other proof of claim, if any, that may have been filed by National

Westminster Bank Plc or The Royal Bank of Scotland plc asserting claims relating to the

Rawhide Transaction (collectively, the "RBS Proofs of Claim"), shall be deemed amended to

delete and irrevocably withdraw, with prejudice, any reference to the Rawhide Transaction, it

being expressly understood (i) by the Enron Parties that the RBS Proofs of Claim are otherwise

preserved and not withdrawn, and (ii) that the Debtors reserve the right to object to any claims

evidenced by the RBS Proofs of Claim as amended as a result of this Order.

13.    On the Closing Date, those claims and causes of action based upon the

Rawhide Transaction brought against the Citigroup Defendants (as defined below) in Counts 1

through 5 of the Debtors' Amended Complaint for the Avoidance and Return of Preferential

Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together With

Objections and Counterclaims to Creditor Defendants' Claims in Adversary Proceeding No. 03-

09266, Enron Corp. v. Citigroup Inc., et al. (the "Amended Complaint"), are dismissed with

prejudice to refiling same.  The "Citigroup Defendants" are those defendants identified on pages

9 and 10 of the Amended Complaint.

14.    On the Closing Date, all claims and causes of action brought against

Ponderosa, Sundance and Rawhide in the Amended Complaint are dismissed with prejudice to

refiling same.

15.    On the Closing Date and thereafter, any and all amounts escrowed, if any,

on or prior to the Closing Date pursuant to agreements of Ponderosa or Sundance and Enron,

Wilmington Trust Company, Citibank and CNAI in respect of the Master Cover Settlement

Order, the Swiss Re PRI Settlement Order and the sale of CEG and CEG Rio may be released

therefrom and paid to the Ponderosa Collateral Agent on behalf of Ponderosa.

6

16.     Except as otherwise provided in this Order, none of the proceeds received by any Enron Party in connection with the transactions contemplated by the Settlement Agreement (except, to the extent required to repay the DIP Obligations[2] pursuant to and in accordance with the Final Order and the Documents, if any) shall be either disbursed or used until further order of this Court, upon notice and a hearing in accordance with applicable Bankruptcy Rules, Local Rules, and the Case Management Order, including without limitation, notice to the Pension Benefit Guaranty Corporation ("PBGC").  Any existing liens, claims (as that term is defined in section 101(5) of the Bankruptcy Code), interests, and encumbrances, which have, or could have been asserted by any of the Debtors or any of their creditors arising in connection with the Debtors' chapter 11 cases (the "Chapter 11 Interests"), (including any Chapter 11 Interests of the PBGC), if any), shall be transferred and attached to the proceeds obtained by the Debtors pursuant to the Settlement Agreement and the Debt Forgiveness Agreement, if any, with the same validity, enforceability, priority, force and effect that they now have as against the Interests, subject to the rights, claims, defenses and objections of the Debtors, and all other interested parties with respect to such Chapter 11 Interests.  Solely for purposes of this decretal paragraph 16, any proceeds received by the Debtors in connection with this Order and the transactions authorized hereby shall be treated in all respects for purposes of Title IV of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461 (2000), as if such proceeds were a separate non-debtor member of Debtor's controlled group, as defined under 29 U.S.C. § 1301(a)(14), until any claim of the PBGC, if any, are satisfied or otherwise resolved upon the completion of a "standard termination" of the Enron Corp. Cash Balance Plan in accordance with the requirements under 29 U.S.C. §

---

[2]   As defined in the Final Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1), dated July 2, 2002 (the "Final Order").

7

1341(b) and 29 C.F.R. Part 4041, Subparts A and B, or upon an order of the Court that PBGC's claims are fully satisfied (each, a "Trigger Event").

17.    The Parties and other persons (including, without limitation, the Movants), to the extent applicable, shall transfer those assets required to be transferred pursuant to the Settlement Agreement to the Parties or their designees entitled thereto and comply with all covenants and related transactions described in the Settlement Agreement.

18.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

19.    The Settlement Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the mutual agreement of the parties thereto in accordance with the terms thereof and in accordance with the governance provisions applicable thereto without further order of the Court; provided, however, that, in connection therewith, the Movants shall obtain the prior written consent of the Committee regarding such modifications, amendments or supplements, which consent shall not be unreasonably withheld; and, provided, further, that any such modification, amendment or supplement shall not be material in nature or not change, in a material way, the economic substance of the transactions approved hereby.

20.    This Order shall be effective and enforceable immediately upon entry of this Order, pursuant to Bankruptcy Rule 6004(g).

Dated:  New York, New York
        April 22, 2004

                              s/Arthur J. Gonzalez
                              HONORABLE ARTHUR J. GONZALEZ
                              UNITED STATES BANKRUPTCY JUDGE

8

Exhibit G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ENRON CORP., *et al.*,<br><br>                    Reorganized Debtors. | Chapter 11<br>Case No. 01-16034 (AJG)<br><br>Jointly Administered |
| ENRON CORP., *et al.*,<br><br>                    Plaintiff,<br><br>                    v.<br><br>CITIGROUP, INC., *et al.*,<br><br>                    Defendants. | Adv. Pro. No. 03-09266 |

**BANK DEFENDANTS' JOINT MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR LEAVE TO**
**APPEAL THE DECISION OF THE BANKRUPTCY COURT**
**CONCERNING DETERMINATION PURSUANT TO 28 U.S.C. § 157(b)(3)**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 5

LEGAL ISSUES ON APPEAL .................................................................................. 11

RELIEF SOUGHT ..................................................................................................... 11

RELEVANT STATUTES .......................................................................................... 11

THE MOTION FOR LEAVE MEETS THE STANDARD FOR INTERLOCUTORY
    APPEAL UNDER 28 U.S.C. § 158(a)(3) ........................................................ 12

I.     THE CORE ORDER'S LEGAL ERRORS WILL FATALLY INFECT THE
     LITIGATION OF THIS UNDERLYING MULTI-BILLION DOLLAR CASE
     AND SHOULD BE REVERSED. ..................................................................... 12

A.    The Scope of "Core" Jurisdiction. .................................................................. 13

B.    The Bank Defendants' Withdrawal Motion Under Section 157(d). ................... 16

C.    The Statutory Conundrum of the Initial Core Determination Under Section
     157(b)(3). ...................................................................................................... 18

D.    Granting Immediate Leave to Appeal Promotes Judicial Efficiency Because
     it Will Determine, Before Trial, the Proper Role of the Bankruptcy Court
     and Appropriate Procedures to be Followed. ................................................... 20

II.    THE BANKRUPTCY COURT'S EXPANSIVE JURISDICTIONAL
     DETERMINATION VIOLATES ARTICLE III OF THE CONSTITUTION AND
     SHOULD BE OVERTURNED. ...................................................................... 21

A.    The Common Law Counts are Inherently Non-Core. ....................................... 24

B.    The Bankruptcy Court's "Logical Connection" Test Is Premised on a
     Constitutionally Infirm "Predominantly Core" or "Intertwinement" Theory
     that Provides No Basis on which To Find the Common Law Counts Core. ........ 25

C.    The Mere Filing of a Proof of Claim Cannot Render the Common Law
     Counts Core .................................................................................................... 30

D.    Under *Marathon,* "Counterclaims" Within the Bankruptcy Court's Core
     Jurisdiction Cannot Include All Claims that the Debtor Can Assert Against
     the Bank Defendants and Do Not Include the Common Law Counts. ................ 33

E.    The Bank Defendants' Assertion of Setoff Rights and Recoupment, Like Their Proofs of Claim, Also Cannot Transform the Underlying Non-Core Nature of the Common Law Counts Into Core Claims. ..................................... 35

CONCLUSION............................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

### CASES

*131 Liquidating Corp.* v. *LaSalle Capital Group, Inc. (In re 131 Liquidating Corp.)*, 222 B.R. 209 (S.D.N.Y. 1998)................................................................. 17

*In re Adelphia Comm'ns Corp.*, 333 B.R. 649 (S.D.N.Y. 2005) ...................................... 22

*Adelphia Communications Corp.* v. *Rigas (In re Adelphia Communications Corp.)*, 02 Civ. 8495, 2003 WL 21297258 (S.D.N.Y. Jun. 4, 2003) ............. 28, 29

*Arnold Print Works, Inc.* v. *Apkin (In re Arnold Print Works, Inc.)*, 815 F.2d 165 (1st Cir. 1987) ........................................................................................................ 14

*Back* v. *LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633 (S.D.N.Y. 1997) ............... 23

*BancBoston Real Estate Capital Corp.* v. *JBI Assocs. Ltd. P'Ship (In re Jackson Brook Inst., Inc.)*, 227 B.R. 569 (D. Me. 1998) .............................................. 22, 23

*Ben Cooper, Inc.* v. *Ins. Co. of Pennsylvania (In re Ben Cooper, Inc.)*, 896 F.2d 1394 (2d Cir. 1990) ............................................................................................... 15

*Communications Workers* v. *Beck*, 487 U.S. 735 (1988)................................................. 34

*Cooper* v. *Howitt (In re 1733 Ridge Road East, Inc.)*, 125 B.R. 722 (S.D.N.Y. 1991)...................................................................................................................... 18

*Enron Corp.* v. *Citigroup, Inc. (In re Enron Corp.)*, Adv. No. 03-9266, Ch.11 No. 01-16034, 2006 WL 2338020 (Bankr. S.D.N.Y. Aug. 14, 2006).................*passim*

*Enron Corp.* v. *Springfield Assocs., L.L.C. (In re Enron Corp.)*, Ch. 11 No. 01-16034, Adv. Nos. 05-01025, 05-01029, 05-01074, 05-01105, 05-010, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006)...................................................... 12

*Enron Power Marketing, Inc.* v. *City of Santa Clara (In re Enron Power Marketing, Inc.)*, 2003 WL 68036 (S.D.N.Y. 2003) ........................................... 36

*Enron Power Marketing, Inc.* v. *Virginia Electric and Power Co. (In re Enron Corp.)*, 318 B.R. 273 (S.D.N.Y. 2004)........................................................ 17, 18

*Ernst & Young, LLP* v. *Bankruptcy Servs. Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. 350 (S.D.N.Y. 2004)........................................................................... 24, 26

*Germain* v. *Connecticut Nat'l Bank*, 988 F.2d 1323 (2d Cir. 1993)............................... 31

*Glinka* v. *Abraham and Rose Co., Ltd.*, No. 2:93-CV-291, 2:93-CV-329, 2:93-CV-361, 1994 WL 905714 (D.Vt. Jun. 6, 1994)........................................... 25, 37

*Halper* v. *Halper*, 164 F.3d 830 (3d Cir. 1999)......................................................... 25, 27

*Hasett* v. *BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748 (S.D.N.Y. 1994) ......... 35

*Horwitz* v. *Sheldon (In re Donald Sheldon & Co., Inc.)*, No. 92 Civ. 6834 (JSM), 1992 WL 396885 (S.D.N.Y. Dec. 17, 1992) ..................................................... 19

*Houbigant, Inc.* v. *ACB Mercantile, Inc. (In re Houbigant)*, 185 B.R. 680 (S.D.N.Y. 1995) .................................................................................................. 19

*Hunnicutt Co., Inc.* v. *TJX Cos., Inc. (In re Ames Department Stores, Inc.)*, 190 B.R. 157 (S.D.N.Y. 1995)................................................................................. 17

*Interconnect Telephone Svcs., Inc.* v. *Farren*, 59 B.R. 397 (S.D.N.Y. 1986)........... 15, 24

*Katchen* v. *Landy*, 382 U.S. 323 (1966)......................................................................... 37

*Kittay* v. *Ernst & Young, LLP (In re Kleinert's, Inc.)*, 2004 WL 1878787 (S.D.N.Y. Aug. 19, 2004) ................................................................................. 24

*Laborers Local 17 Health & Benefit Fund* v. *Phillip Morris, Inc.*, 7 F. Supp. 2d 294 (S.D.N.Y. 1998).......................................................................................... 23

*Lesser* v. *A-Z Assocs. (In re Lion Capital Group)*, 63 B.R. 199 (S.D.N.Y. 1985)........... 19

*In re Lloyd's American Trust Funds Litig.*, No. 96 CIV-1262, 1997 WL 458739 (S.D.N.Y. Aug. 12, 1997) ................................................................................. 23

*Luan Investment S.E.* v. *Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223 (2d Cir. 2002) ...................................................................................... 13, 14

*Mirant Corp.* v. *The Southern Co.*, 337 B.R. 107 (N.D. Tex. 2006) ......................... 26, 30

*Nationwide Roofing & Sheet Metal, Inc.* v. *Cincinnati Ins. Co. (In re Nationwide Roofing & Sheet Metal, Inc.)*, 130 B.R. 768 (Bankr. S.D.Ohio 1991)................. 35

*Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982).......*passim*

*Official Committee of FMI Forwarding Co., Inc.* v. *Union Transport Corp. (In re FMI Forwarding Co., Inc.)*, 2004 WL 1348956 (S.D.N.Y. Jun. 16, 2004).... 26, 27

*Official Committee of Unsecured Creditors of Corson Mfg. Co.* v. *HSBC Bank*
    *USA (In re Corson Mfg. Co.)*, Ch. 11 Nos. 01-MC-5E, 99-16855K, AP
    00-1366K, 2001 WL 877394 (W.D.N.Y. Jun. 27, 2001) .................................... 24

*Orion Pictures Corp.* v. *Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993).........................................................................14, 16,
                                                                                                          17, 18

*Prudential Secs. Credit Corp., LLC* v. *Pacific Pointe Escrow, Inc. (In re*
    *AppOnline.com, Inc.)*, 303 B.R. 723 (S.D.N.Y. 2004)........................................ 17

*Ralls* v. *Doktor Pet Centers, Inc.*, 177 B.R. 420 (D. Mass. 1995)............................. 26, 27

*Ranch 1 Metro, Inc.* v. *State Nat'l Ins. Co. (In re Ranch 1 Metro, Inc.)*, No. C2
    Civ. 4417 (WK), 2002 WL 31175184 (S.D.N.Y. Sept. 27, 2002)....................... 18

*Resolution Trust Corp.* v. *Best Products Co., Inc. (In re Best Products Co., Inc.)*,
    68 F.3d 26 (2d Cir. 1995) .................................................................................. 15

*In re S.G. Phillips Constrs., Inc.* v. *City of Burlington (In re S.G. Phillips*
    *Constrs., Inc.)*, 45 F.3d 702 (2d Cir. 1995)....................................................... 14

*Schneider* v. *Riddick III (In re Formica, Corp.)*, 305 B.R. 147 (S.D.N.Y. 2004) ........... 18

*South Street Seaport Limited P'Ship* v. *Burger Boys, Inc. (In re Burger Boys,*
    *Inc.)*, 94 F.3d 755 (2d Cir. 1996) ....................................................................... 17

*Statutory Committee of Unsecured Creditors of Iridium Operating LLC* v.
    *Motorola, Inc. (In re Iridium Operating, LLC)*, 285 B.R. 822 (S.D.N.Y.
    2002)................................................................................................................... 26

*Stoe* v. *Flaherty*, 436 F.3d 209 (3d Cir. 2006)................................................................ 25

*Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985)................................ 13

*United Illuminating Co.* v. *Enron Power Marketing, Inc. (In re Enron Corp.)*,
    No. 03 Civ. 5078, 2003 WL 22171695 (S.D.N.Y. Sept. 22, 2003) ..................... 18

*United Orient Bank* v. *Green (In re Green)*, 200 B.R. 296 (S.D.N.Y. 1996) ................. 24

*United States Lines, Inc.* v. *American S.S. Owners Mut. Protection & Indem.*
    *Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999)..... 15, 35

*Wechsler* v. *Squadron, Ellenoff, Plesent, & Sheinfeld LLP*, 201 B.R. 635
    (S.D.N.Y. 1996) .....................................................................................................15, 19,
                                                                                                          24

*Weiner's, Inc.* v. *T.G. & Y. Stores Co.*, 191 B.R. 30 (S.D.N.Y. 1996).......................21, 22, 23

## STATUTES AND RULES

28 U.S.C. § 157(b) .........................................................................................*passim*

28 U.S.C. § 157(c) ................................................................................... 13, 20

28 U.S.C. § 157(d) ......................................................................................... 16

28 U.S.C. § 158(a) ........................................................................................... 1

28 U.S.C. § 1292(b) ....................................................................................... 22

Federal Rule of Bankruptcy Procedure 5011 ................................................. 18

Federal Rule of Bankruptcy Procedure 8001 ................................................... 1

Federal Rule of Bankruptcy Procedure 8002 ................................................... 1

Federal Rule of Bankruptcy Procedure 8003 ................................................... 1

Federal Rule of Bankruptcy Procedure 9033 .............................................. 4, 21

## MISCELLANEOUS

3 Collier on Bankruptcy ¶ 3.01 ..................................................................... 37

1 Norton Bankr. L. & Prac. 2d § 4:69............................................................ 16

6 Norton Bankr. L. & Prac. 2d, § 148:15 ...................................................... 21

To the United States District Court for the Southern District of New York:

Pursuant to 28 U.S.C. § 158(a)(3) and Rules 8001, 8002, and 8003 of the Federal Rules of Bankruptcy Procedure, defendants Citigroup Inc. ("Citigroup"), Barclays PLC ("Barclays") and Deutsche Bank AG ("Deutsche Bank") and their respective co-defendant affiliates[1] (together, the "Bank Defendants"), respectfully submit this joint memorandum of law in support of their motion (the "Motion for Leave") for leave to appeal the order (the "Core Order") of the Bankruptcy Court for the Southern District of New York (Gonzalez, J.) (the "Bankruptcy Court") determining that three common law claims in the above-captioned adversary proceeding are core claims pursuant to 28 U.S.C. § 157(b)(2)(B) and (C) ("Section 157(b)(2)(B) and (C)").[2]

## PRELIMINARY STATEMENT

While this motion requires consideration of a compelling constitutional issue concerning the limits of bankruptcy court jurisdiction under Articles I and III of the United States Constitution, the urgent need for appellate review rests on principles of fundamental fairness and judicial economy. In the MegaClaim litigation (defined below), Enron has sued the Bank Defendants in the United States Bankruptcy Court for billions

---

[1]    The Citigroup co-defendant affiliates are:  Citibank, N.A.; Citigroup Global Markets Inc.; Citicorp North America, Inc.; Citigroup Financial Products Inc.; CXC LLC; Corporate Asset Funding Company, LLC; and Corporate Receivables Corporation, LLC.  The Barclays' co-defendant affiliates are:  Barclays Bank PLC; Barclays Capital Inc.; Barclays Capital Securities Limited; Barclays Physical Trading Limited; and Barclays Metals Limited.  The Deutsche Bank co-defendant affiliates are: Deutsche Bank Trust Company Americas; Deutsche Bank Securities Inc.; Deutsche Bank Luxembourg, S.A.; Deutsche Bank Trust Company Delaware; Deutsche Bank Trust Corporation; Bankers Trust International plc; BT Commercial Corp.; DB Green, Inc.; Deutsche Leasing New York Corp.; Seneca Delaware, Inc.; Deutsche Bank S.A.; BT Ever, Inc.; and Seneca Leasing Partners, L.P.

[2]    *Enron Corp.* v. *Citigroup, Inc. (In re Enron Corp.)*, Ch.11 Case No. 01-16034, Adv. No. 03-9266, 2006 WL 2338020 (Bankr. S.D.N.Y. Aug. 14, 2006).

of dollars of avoidable transfers; it has combined those avoidance claims with three

common law counts that seek to hold the Bank Defendants responsible for virtually all of

Enron's tens of billions of dollars of indebtedness.

      The Bank Defendants have demanded a jury trial in the MegaClaim

litigation.  In furtherance of that right, the Bank Defendants will move in the United

States District Court to withdraw the reference of the MegaClaim to that forum under 28

U.S.C. §§ 157(d) and (e).  An element in the district court's consideration of the

withdrawal of the reference motion will concern the core/non-core nature of the common

law claims in the MegaClaim.

      The statutory and case law directives conflict as to how the Bank

Defendants should obtain a determination that the common law claims are (or are not)

within the Bankruptcy Court's core jurisdiction.  Specifically, section 157(d) of title 28

requires parties to file a motion to withdraw the reference in the district court.  28 U.S.C.

§ 157(d).  Yet, section 157(b)(3) of title 28 (and many cases interpreting it)

unambiguously states that the *bankruptcy court judge,* not the district court judge,

initially determines whether a proceeding is core or non-core.  28 U.S.C. § 157(b)(3).

      The statute thus creates an anomalous two-step process:  to withdraw the

reference of a case, the Bank Defendants must file a motion with the district court, but

must first have the bankruptcy court determine one of the factors that the district court

analyzes when deciding whether to grant the withdrawal motion.  Significantly, this

statutory scheme leaves unanswered what effect the bankruptcy court's initial core/non-

core determination has on the district court's analysis of the withdrawal motion.  More

problematically (and of immediate concern here), decisions suggest that absent separate

appellate review, the bankruptcy court's determination of the core/non-core question binds the district court in its consideration of a motion to withdraw the reference.

In his August 14, 2006 decision ("Core Opinion") and the Core Order, Judge Gonzalez erroneously ruled that all of the claims in the MegaClaim are core. Notably, the Bankruptcy Court concluded that the legal nature of a non-core claim may be transformed if it shares operative *facts* -- rather than legal rights -- with core claims. The Bankruptcy Court also failed to consider the nature of each claim standing alone. Instead, it found that the traditionally non-core claims were core based on a "logical connection" between the non-core claims and the creditor's proofs of claim, a fact-driven "predominantly core" or "intertwinement"-based approach that violates the Supreme Court's constitutional holding in *Marathon*.[3]  Finally, the Core Opinion effectively propounds a rule under which all claims against a creditor become core whenever the creditor files a proof of claim against the debtor's estate.  This *per se*, bright-line approach creates an open-ended, limitless construction of the Bankruptcy Court's core jurisdiction that violates the constitutional limits of Article I, invades the exclusive province of the Article III courts, and would result in a great disincentive to all creditors to participate in the chapter 11 process.

The risk that the Core Order may become binding on the Bank Defendants' motion to withdraw the reference leaves the Bank Defendants with no option but to seek leave from this Court for an immediate appeal to reverse and correct the actions of the Bankruptcy Court.  It also justifies granting the Motion for Leave.

---

[3]    *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

The procedural quandary that the statutory scheme and case law create has profound ramifications.  *First*, to preserve their Seventh Amendment jury trial rights over the non-core claims, the Bank Defendants must file a motion to withdraw the reference. Neither the Bank Defendants -- nor the district court -- should be bound by the Bankruptcy Court's error treating these claims as core.  If the district court -- forced to accept as final a lower court determination of the core/non-core nature of the underlying claims -- denies the motion to withdraw the reference and the Bank Defendants' asserted jury trial right on the basis of that flawed determination, a real risk exists that the parties will have to proceed to trial of the MegaClaim before the Bankruptcy Court, and thereafter appeal the denial of the motion to withdraw the reference.  Should the Bank Defendants prevail in such an appeal, the parties would need to "do over" the entire trial, this time before a jury, thus creating excessive delay and duplicative costs for all parties and the judiciary.

*Second*, the core/non-core determination goes to the heart of the bankruptcy court's ability to adjudicate these claims and its judicial method in doing so. While a bankruptcy court may preside over a non-core matter, it can only enter final orders and findings of fact on *core* matters.  *See* 28 U.S.C. § 157(b)(2).  On non-core matters, it must submit written proposed findings of fact and conclusions of law to the district court for its *de novo* review.  *See* 28 U.S.C. § 157(c).  Bankruptcy Rule 9033 sets out in detail the procedures that the Bankruptcy Court must follow in the disposition of non-core proceedings -- procedures unavailable if the Bankruptcy Court deals with all proceedings as core matters.  Stated differently, determining the scope of the Bankruptcy Court's core jurisdiction effectively decides whether the bankruptcy judge acts with all

the powers of a judge, on the one hand, or functions more narrowly, as a judicial officer akin to a magistrate, adjunct to the district court, on the other.

The Core Order thus determines the procedural foundation of the underlying trial.  Knowing the correct process to follow at the outset of this case presents a substantive matter of basic fairness, particularly given the stakes.  Moreover, if the Core Order stands and is not overturned until *after* the trial concludes, the parties will have to redo the entire trial.  This Court can avoid such gross inefficiencies if it grants the Bank Defendants' motion for immediate review of the Core Order.

For all these reasons, the Bank Defendants respectfully request that this Court grant the Motion for Leave and agree to review the Bankruptcy Court's interlocutory Core Order.

## STATEMENT OF FACTS

Enron Corporation and certain affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing on December 2, 2001 (the "Petition Date").  On July 15, 2004, the Court entered an Order confirming Enron's Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan").  The Plan became effective on November 17, 2004.  (Docket No. 19,759).  Enron has begun making distributions under the Plan.

On August 1, 2002, the Bankruptcy Court entered an order establishing October 15, 2002 as the last date by which creditors must file proofs of claim.  (Docket No. 5518).  The Bank Defendants each filed claims against Enron's estates (collectively, the "Bank Defendants' Proofs of Claim").  For example, Barclays filed proofs of claim (the "Barclays' Proofs of Claim") seeking in excess of $85 million, plus unliquidated amounts.  One of the Barclays' Proofs of Claim concerns a transaction (the "JT Holdings

5

Transaction") which Enron asserts was part of an alleged scheme between Enron and the
Bank Defendants by which the Bank Defendants assisted Enron's senior officers and
managers in manipulating and misstating Enron's financial condition.  The Barclays'
Proof of Claim relating to the JT Holdings Transaction also asserts a claim for
contribution, indemnification and reimbursement.  *Enron Corp.* v. *Citigroup Inc. (In re
Enron Corp.)*, Ch. 11 Case No. 01-16034, Adv. No. 03-09266, 2006 WL 2338020, at *1
(Bankr. S.D.N.Y. Aug. 14, 2006) (describing Barclays' Proofs of Claim).

        Citigroup and Deutsche Bank also filed proofs of claim.  Like Barclays'
Proofs of Claims, Citigroup and Deutsche Bank's proofs of claim seek in excess of
$85 million.  Some of the proofs of claim filed by Citigroup and Deutsche Bank also seek
amounts due in connection with transactions which Enron claims were part of the
"scheme" between Enron and the Bank Defendants described above.  Again, like
Barclays' Proofs of Claim, proofs of claim by Citigroup and Deutsche Bank assert claims
for contribution, indemnification and reimbursement.

        On September 24, 2003, Enron and certain of its affiliates (collectively
"Enron") filed this adversary proceeding (the "MegaClaim") against Citigroup and
various other financial institutions.[4]  While the alleged fraud at Enron relates to *Enron's*
financial statements, and *Enron's* senior officers (and many others) perpetrated that fraud
(which was pervasive and reached the highest levels throughout *Enron*), (*see, e.g.,* Cplt.
¶¶ 1, 138-49, 155-56, 173-80, 188, 198-221), Enron seeks to shift responsibility to the
Bank Defendants for its downfall.  Specifically, Enron alleges in the MegaClaim that the
Bank Defendants participated in a multi-year scheme to manipulate Enron's financial

---

[4]    A copy of the Complaint, as amended, is attached hereto as Exhibit <u>A</u>.

statements and misstate its financial condition. (*See, e.g.,* Cplt. ¶ 1). It alleges that the Bank Defendants did so principally by designing and implementing structured finance transactions, knowing that Enron was improperly recording the financial effects of these transactions. (*E.g.,* Cplt. ¶ 2).

Based on these allegations, Enron asserts three self-titled "common law" counts in the MegaClaim complaint against Barclays, Citigroup and Deutsche Bank (among others): (i) aiding and abetting breach of fiduciary duty (Cplt. Count 74), (ii) aiding and abetting fraud (Cplt. Count 75), and (iii) committing unlawful civil conspiracy (Cplt. Count 76) (collectively, the "Common Law Counts"). While Enron did not quantify its damages on these counts, it appears to seek billions of dollars in damages from the Bank Defendants in connection with these claims.[5]

Separately (and independent of the Common Law Counts), the MegaClaim[6] asserts additional bankruptcy causes of action against the Bank Defendants, including counts to avoid and recover allegedly preferential and fraudulent transfers, and

---

[5]    In the MegaClaim complaint, Enron alleges the following damages in connection with its common law aiding and abetting claims against each of the Bank Defendants:

> As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

(Cplt. ¶¶ 1273, 1595, 1600.)

[6]    Enron amended the Complaint on December 1, 2003, April 30, 2004, June 14, 2004 and January 10, 2005.

counts to disallow and equitably subordinate the Bank Defendants' claims against Enron. (Cplt. Counts 1-5, 20-29, 30-36, 65-73B). For all intents and purposes, these counts seek to disallow, equitably subordinate, or avoid and recover as fraudulent or preferential transfers each transfer that Enron or its affiliates made in connection with any of the structured finance transactions that Enron claims helped perpetrate its massive fraud.

Barclays and Citigroup have answered the MegaClaim complaint. Deutsche Bank filed a partial motion to dismiss on February 17, 2004, which remains pending.[7] The Bank Defendants (among other things) have each disputed the Bankruptcy Court's jurisdiction over the non-core claims, and have also demanded a jury trial on these claims. In addition, each of the Bank Defendants -- either in their respective answers or in a proof of claim -- has asserted set-off and recoupment rights against the Debtors.

According to the August 29, 2006, scheduling order in this case, the completion of discovery in the MegaClaim will not occur until May 2007. (Amended Scheduling Order at 6). (Docket No. 553). The parties must file dispositive motions by June 2007, with trial scheduled for October 2007. (*Id.*).

On July 26, 2005, Barclays filed its motion in the Bankruptcy Court for an initial determination finding the Common Law Counts are non-core. (Motion For Initial Determination Under 28 U.S.C. § 157(b)(3) That Certain Claims Are Non-Core Claims

---

[7]    The Bankruptcy Court heard oral argument on Deutsche Bank's motion to dismiss on January 27, 2005. It has not yet rendered a decision on the motion.

("Barclays Non-Core Motion") and supporting memorandum of law).  (Docket Nos. 363, 364).  Barclays argued that the Common Law Counts are non-core claims because, among other things, the claims involve state law rights, exist independently of Enron's bankruptcy case, and do not fall within one of the examples of "core" matters specified in Section 157(b)(2).

On September 12, 2005, Enron filed an objection to Barclays' motion ("Enron's Objection") on the grounds that (a) Barclays' Proofs of Claim and assertion of set-off rights rendered Enron's otherwise non-core claims core and (b) since Enron's core claims were so factually intertwined with its non-core claims, and the adversary proceeding itself as a whole raised predominantly core claims, the entire adversary proceeding was a core proceeding.  (Enron Objection at 27-29).  (Docket No. 386).

On March 17, 2006, Barclays filed its Response to Enron's Objection to Motion for Initial Determination Under 28 U.S.C. § 157(b)(3) That Certain Claims Are Non-Core Claims ("Barclays' Response") (Docket No. 485).  It argued that the filing of proofs of claim and assertion of set-off rights did not provide a basis for converting unrelated non-core claims into core claims.  (Barclays' Response at 2-9).  It further argued that the "intertwinement" or "predominantly core" approaches were constitutionally infirm and effectively eviscerated the Supreme Court's holding in *Marathon*.  (*Id.* at 10-12).  On April 7, 2006, Enron filed a sur-reply.  (Plaintiffs' Sur-Reply In Support Of Their Objection To The Barclays Defendants' Motion For Initial Determination Under 28 U.S.C. § 157(b)(3) That Certain Claims Are Non-Core Claims). (Docket No. 494).

On April 28, 2006, Citigroup filed its Joinder by Citigroup Defendants In Barclays' Motion And Memorandum Of Law In Support of Motion For Initial Determination Under 28 U.S.C. § 157(b)(3) That Certain Claims Are Non-Core ("Citigroup Joinder"). (Docket No. 503). In its joinder, Citigroup adopted Barclays' arguments and further elaborated on the constitutional principles underlying *Marathon*, and the resulting limitations on the Bankruptcy Court's core jurisdiction. Deutsche Bank also joined Barclays' Motion. (*See* The Deutsche Bank Entities' Joinder In The Barclays Defendants' Motion For Initial Determination Under 28 U.S.C. § 157(b)(3) That Certain Claims Are Non-Core Claims). (Docket No. 518).

On June 19, 2006, Enron filed a single objection to all the joinders. It made essentially the same arguments against Citigroup, Deutsche Bank and the other defendants that had filed joinders as it had made against Barclays. (Plaintiffs' Objection To The Joinder Of The Citigroup Defendants, The Deutsche Bank Defendants, And The Merrill Lynch Defendants In The Barclays Defendants' Motion For Initial Determination Under 28 U.S.C. § 157(b)(3) That Certain Claims Are Non-Core Claims). (Docket No. 534).

The Bankruptcy Court heard oral argument on the matter on June 22, 2006. On August 14, 2006, it issued its Opinion Concerning Determination Pursuant To 28 U.S.C. § 157(b)(3) in which it held that the Common Law Counts against Barclays and similarly situated co-defendants, including Citigroup and Deutsche Bank, were core claims pursuant to Sections 157(b)(2)(B) and (C) and that it thus had jurisdiction over the Common Law Counts. (Core Opinion at 13). (Docket No. 547). On August 24, 2006, the Bankruptcy Court entered an order implementing its opinion. (Docket No. 549).

Enron and the Bank Defendants subsequently entered into a consensual stipulation extending the date by which the Bank Defendants may file a notice of appeal and motion for leave to appeal the Core Order to September 25, 2006. The Bankruptcy Court so-ordered the stipulation on September 5, 2006. (Docket No. 555). Accordingly, on September 25, 2006, the Bank Defendants filed a notice of appeal and a joint motion for leave to file interlocutory appeal, along with this Joint Memorandum of Law in Support of Their Motions for Leave to Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3).

## LEGAL ISSUES ON APPEAL

This appeal raises the following legal issues:

1. When confronted with an adversary proceeding that presents both core and non-core claims, did the Bankruptcy Court err in concluding that, as a matter of law, the non-core claims could be transformed into core claims?

2. Did the Bankruptcy Court err in holding, as a matter of law, that non-core claims become core whenever a creditor files a proof of claim or when counterclaims are asserted?

## RELIEF SOUGHT

The Bank Defendants respectfully request that this Court grant leave to appeal the Core Order and reverse the Bankruptcy Court ruling on the core nature of the Common Law Counts.

## RELEVANT STATUTES

The Motion for Leave raises the issue of the constitutional limits of Sections 157(b)(1) and (b)(2)(B) and (C) of the Bankruptcy Code and the outer limits of the Bankruptcy Code's core jurisdiction. These sections provide:

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred

under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to--

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C) counterclaims by the estate against persons filing claims against the estate;
….

28 U.S.C. § 157(b)(1), (2)(B), (2)(C).[8]

## THE MOTION FOR LEAVE MEETS THE STANDARD FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 158(a)(3)

This case presents one of those rare combinations of legal error and procedural quandary that warrants immediate review of the Bankruptcy Court's interlocutory order.  *See, e.g., Enron Corp.* v. *Springfield Assocs., L.L.C. (In re Enron Corp.)*, Ch. 11 Case No. 01-16034, Adv. Nos. 05-01025, 05-01029, 05-01074, 05-01105, 05-010, 2006 WL 2548592, at *8 (S.D.N.Y. Sept. 5, 2006) (granting leave to appeal interlocutory order where exceptional circumstances were present).

## I.    THE CORE ORDER'S LEGAL ERRORS WILL FATALLY INFECT THE LITIGATION OF THIS UNDERLYING MULTI-BILLION DOLLAR CASE AND SHOULD BE REVERSED.

The Bank Defendants sought an initial determination from the Bankruptcy Court that the Common Law Counts are non-core claims as a condition precedent to seeking to withdraw the reference of those counts from the Bankruptcy Court.  The Core

---

[8]    For ease of reference, the Bank Defendants attach a copy of Section 157(b) in its entirety as Exhibit <u>B</u> to this brief.

Order, which erroneously defines the scope of the Bankruptcy Court's jurisdiction over the multi-billion dollar claims at issue here, and which informs consideration of the withdrawal of the reference motion and procedural context in which the trial will take place, fatally infects the entire proceedings and should be reversed.

      A.      **The Scope of "Core" Jurisdiction.**

      Section 157 of title 28 establishes a bankruptcy court's jurisdiction. 28 U.S.C. § 157. The statute divides bankruptcy proceedings into two principal categories: "core" and "non-core." *See* 28 U.S.C. § 157(b); *Luan Investment S.E.* v. *Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228 (2d Cir. 2002). In core proceedings, the bankruptcy court has comprehensive power and may enter appropriate orders and judgments. *See* 28 U.S.C. § 157(b)(1); *Petrie Retail*, 304 F.3d at 228. In non-core proceedings, which otherwise relate to a bankruptcy case under title 11, the bankruptcy court may only submit proposed findings of fact and conclusions of law to the district court for *de novo* review. *See* 28 U.S.C. § 157(c)(1); *Petrie Retail*, 304 F.3d at 228.

      The United States Supreme Court first articulated the core/non-core distinction in *Northern Pipeline Constr. Co.* v. *Marathon Pipeline Co.*, 458 U.S. 50 (1982). In *Marathon*, the Supreme Court held that "Congress may not vest in a non-Article III court, [such as the bankruptcy court], the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law[.]" *Petrie Retail*, 304 F.3d at 229 (quoting *Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985) (discussing the *Marathon* holding)). In considering the constitutionality of the bankruptcy court's Article I jurisdiction, the Supreme Court noted that "the restructuring of debtor-creditor relations, ***which is at the core of the federal bankruptcy power***, must be distinguished from the adjudication of state-created private

rights, such as the right to recover contract damages[.]"  *Marathon*, 458 U.S. at 71

(emphasis added).

Congress enacted Section 157 to codify this core/non-core distinction and

implement *Marathon*.  *Petrie Retail*, 304 F.3d at 229 (citing *In re S.G. Phillips Constrs.,*

*Inc.* v. *City of Burlington (In re S.G. Phillips Constrs., Inc.)*, 45 F.3d 702, 705 (2d Cir.

1995) (citing *Arnold Print Works, Inc.* v. *Apkin (In re Arnold Print Works, Inc.),* 815 F.2d

165, 166-67 (1st Cir. 1987) (Breyer, J.))).  Section 157(b)(2) accordingly provides a non-

exclusive list of proceedings that Congress deemed core.  28 U.S.C. § 157(b)(2).  These

include, for example, matters concerning the administration of the estate (28 U.S.C.

§ 157(b)(2)(A)), allowance or disallowance of claims against the estate (28 U.S.C.

§ 157(b)(2)(B)), counterclaims by the estate against persons filing claims against the

estate (28 U.S.C. § 157(b)(2)(C)), proceedings to determine, avoid or recover preferences

(28 U.S.C. § 157(b)(2)(F)), proceedings to determine, avoid or recover fraudulent

conveyances (28 U.S.C. § 157(b)(2)(K)), and other proceedings affecting debtor-creditor

relationships (28 U.S.C. § 157(b)(2)(O)).

Although the Section 157(b)(2) categories at first glance appear so broad

as to include almost any matter relating to bankruptcy, *Marathon* does not permit such an

expansive interpretation.  *Orion Pictures Corp.* v. *Showtime Networks, Inc. (In re Orion*

*Pictures Corp.)*,  4 F.3d 1095, 1102 (2d Cir. 1993) ("While it is clear that Congress

intended § 157(b)(2)(A)'s designation of matters relating to the administration of the

estate as core to encompass a wide range of matters, there is no evidence of any

Congressional intent to contravene the Supreme Court's holding in *Marathon*."); *see also*

*Resolution Trust Corp.* v. *Best Products Co., Inc. (In re Best Products Co., Inc.)*, 68 F.3d

26, 31 (2d Cir. 1995); *Ben Cooper, Inc.* v. *Ins. Co. of Pennsylvania (In re Ben Cooper, Inc.)*, 896 F.2d 1394, 1398 (2d Cir.), *vacated*, 498 U.S. 964 (1990), *reinstated*, 924 F.2d 36 (2d Cir. 1991).

        The Second Circuit has repeatedly admonished lower courts to resist as erroneous "an open-ended, limitless construction [of Section 157(b)(2)]. A determination of whether a matter is 'core' depends on the nature of the proceeding." *Best Products,* 68 F.3d at 31; *United States Lines, Inc.* v. *American S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999). A matter is core if it directly affects debtor-creditor relations. Conversely, a matter is non-core if it has little or no relation to the Bankruptcy Code, does not arise under the federal bankruptcy law, and would exist in the absence of a bankruptcy case. *See Wechsler* v. *Squadron, Ellenoff, Plesent, & Sheinfeld LLP*, 201 B.R. 635, 639 (S.D.N.Y. 1996); *Interconnect Tel. Svcs., Inc.* v. *Farren*, 59 B.R. 397, 400 (S.D.N.Y. 1986) ("non-core proceedings consist of those claims arising under traditional state law which must be determined by state law. They are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or state court.") (internal quotations and citations omitted).

        As the Bankruptcy Court acknowledged, *Enron Corp.*, 2006 WL 2338020, at *2, under these principles, the Common Law Counts in isolation are non-core claims because they arise under state law, vindicate private rights, exist independently from Enron's bankruptcy case and are pre-petition claims. As detailed below, the Bankruptcy Court then abandoned its initial, correct determination and instead adopted an erroneous one.

**B.    The Bank Defendants' Withdrawal Motion Under Section 157(d).**

Like the core/non-core distinction of Section 157(b)(2), Congress designed the provision for withdrawing the reference in section 157(d) of title 28 ("Section 157(d)") to satisfy the Article III constitutional requirements *Marathon* articulated.  1 Norton Bankr. L. & Prac. 2d § 4:69 (Sept. 2006).  Section 157(d) intends to provide life-tenured district judges with control over referred bankruptcy cases and proceedings.  *Id.*  Thus, "while all bankruptcy cases and proceedings are referred in omnibus fashion by the district courts to the bankruptcy judges of that district pursuant to 28 U.S.C.A. § 157(a), [Section 157(d)] provides a mechanism for the withdrawal, in whole or in part, of any referred case or proceeding." *Id.*; *see also* Order of Acting Chief Judge Robert J. Ward dated July 10, 1984 (standing order of district court in this district referring cases to the bankruptcy court).

Section 157(d) provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

District courts in this circuit consider a number of factors when evaluating whether "cause" exists to withdraw the reference.  *Orion,* 4 F.3d at 1101 (citing cases). These factors include: (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will

prevent forum shopping, and (6) other related factors. *South Street Seaport Ltd. P'Ship* v. *Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 762 (2d Cir. 1996) (citations omitted); *Prudential Secs. Credit Corp., LLC* v. *Pacific Pointe Escrow, Inc. (In re AppOnline.com, Inc.)*, 303 B.R. 723, 726 (E.D.N.Y. 2004) (including the presence of a jury demand as a notable factor).

   In *Orion,* the Second Circuit directed district courts to "first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn," when considering withdrawal of the reference. *Orion*, 4 F.3d at 1101. The core/non-core determination relates to efficiency because "a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court [which] could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court."[9] *Id.*

---

[9] Moreover, case law in this district suggests that a motion to withdraw the reference may be premature if filed during the early stages of a case. *E.g., Enron Power Marketing, Inc.* v. *Virginia Elec. and Power Co. (In re Enron Corp.),* 318 B.R. 273, 275 (S.D.N.Y. 2004) (withdrawal of the reference premature where case was not trial ready); *Hunnicutt Co., Inc.* v. *TJX Cos., Inc. (In re Ames Department Stores, Inc.),* 190 B.R. 157, 163 (S.D.N.Y. 1995) (same). Here, the Bank Defendants have taken the first step necessary to preserve their Seventh Amendment jury trial right. *Orion*, 4 F.3d at 1101-02 ("[i]f a case is non-core and a jury demand has been filed, a district court might find that the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference." ); *131 Liquidating Corp.* v. *LaSalle Capital Group, Inc. (In re 131 Liquidating Corp.)*, 222 B.R. 209, 213 (S.D.N.Y. 1998) (granting motion to withdraw the reference where "[a]t least one of the claims at issue is non-core and must be tried before a jury in this Court.").

C.    **The Statutory Conundrum of the Initial Core Determination Under Section 157(b)(3).**

Section 157(d) and Bankruptcy Rule 5011(a) provide that a district court must hear a motion to withdraw the reference.  *See* 28 U.S.C. § 157(d); F.R.B.P. 5011(a); *Cooper* v. *Howitt (In re 1733 Ridge Road East, Inc.)*, 125 B.R. 722, 724 (W.D.N.Y. 1991).  Section 157(b)(3), on the other hand, expressly states that the bankruptcy judge "shall" determine whether a proceeding is core or non-core.  *See* 28 U.S.C. § 157(b)(3); *1733 Ridge Road East*, 125 B.R. at 724.  These conflicting statutory provisions, coupled with *Orion's* language that "[a] *district court* considering whether to withdraw the reference should *first* evaluate whether the claim is core or non-core," have generated confusion about which court makes the core/non-core determination in the context of a withdrawal motion.  *Orion,* 4 F.3d at 1101 (emphasis added).

In an abundance of caution, the Bank Defendants followed the developing trend in this district that requires a party seeking to withdraw the reference to obtain an initial core/non-core determination from the bankruptcy court.  *See, e.g., Enron Power Marketing, Inc.* v. *Virginia Elec. and Power Co. (In re Enron Corp.),* 318 B.R. 273, 275 (S.D.N.Y. 2004); *Schneider* v. *Riddick III (In re Formica, Corp.)*, 305 B.R. 147, 149 (S.D.N.Y. 2004); *United Illuminating Co.* v. *Enron Power Marketing, Inc. (In re Enron Corp.)*, No. 03 Civ. 5078, 2003 WL 22171695, at \*2 (S.D.N.Y. Sept. 22, 2003) ("UIL's motion is premature.  [The bankruptcy judge] has not yet made a determination whether this action is core or non-core, and there is no need for this court to preempt such a determination….UIL has provided no good reason to depart from the practice of allowing the bankruptcy judge in the first instance to determine if a proceeding is core or non-core."); *Ranch 1 Metro, Inc.* v. *State Nat'l Ins. Co. (In re Ranch 1 Metro, Inc.)*, No. C2

Civ. 4417 (WK), 2002 WL 31175184, at *3 (S.D.N.Y. Sept. 27, 2002) (denying motion

to withdraw the reference as premature because bankruptcy court had not made core/non-

core finding, notwithstanding absence of objection to the motion).

        The Bank Defendants now find themselves in a classic Catch-22:  having

complied with Section 157(b)(3), the Bank Defendants confront a Core Order that, absent

appeal, may bind a district court's consideration of their motion to withdraw the

reference.  *See Horwitz* v. *Sheldon (In re Donald Sheldon & Co., Inc.*), No. 92 Civ. 6834

(JSM), 1992 WL 396885, at *2 (S.D.N.Y. Dec. 17, 1992) ("The determination of whether

a proceeding is core can only by reviewed by the District Court on a proper, timely

appeal from that determination.  Thus, an order entered by the Bankruptcy Court that the

proceeding is core is binding on the District Court in a motion to withdraw the reference

until and unless the order is overturned on appeal."); *Lesser* v. *A-Z Assocs. (In re Lion

Capital Group)*, 63 B.R. 199, 209 (S.D.N.Y. 1985) (same).

        While the core/non-core determination is just one factor that the district

court will consider when granting the motion to withdraw the reference, *Wechsler*, 201

B.R. at 640 (citing *Houbigant, Inc.* v. *ACB Mercantile, Inc. (In re Houbigant)*, 185 B.R.

680, 686-87 (S.D.N.Y. 1995)), it nonetheless remains a factor.  As a result, absent

judicial review of the Core Order now, the Bank Defendants may be forced to proceed on

the withdrawal motion with one factor already decided erroneously against them.  No

litigant should bear the added burden of such an inherently unjust result, and the Bank

Defendants (and the district court deciding the withdrawal motion) should not be bound

by the Bankruptcy Court's erroneous decision.

**D.    Granting Immediate Leave to Appeal Promotes Judicial Efficiency Because it Will Determine, Before Trial, the Proper Role of the Bankruptcy Court and Appropriate Procedures to be Followed.**

The Core Order goes to the heart of the Bankruptcy Court's ability to adjudicate the Common Law Counts.  The core/non-core distinction not only affects the availability of the Bank Defendants' jury trial right, but also shapes the conduct of a trial in the absence of a jury trial right.  In the latter circumstance, it determines whether the Bankruptcy Judge acts as a judge with comprehensive power to enter final orders and judgments, or functions more narrowly as a magistrate adjunct to the district court.  28 U.S.C. §§ 157(b)(2), (c)(1).  The role of the Bankruptcy Judge, in turn, defines the manner in which the case will be tried:  Bankruptcy Rule 7052 defines the Bankruptcy Judge's duties and appropriate procedures in connection with core claims, and Bankruptcy Rule 9033 defines those duties and the appropriate procedures for rendering findings of fact and conclusions of law in connection with non-core claims.  *See, e.g., Halper* v. *Halper*, 164 F.3d 830, 836 (3d Cir. 1999) ("a proceeding's core or non-core nature is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings.")

Here, the Core Order wrongly concludes that the Common Law Counts are core and that the Bankruptcy Court, accordingly, has comprehensive power to enter final orders and binding judgments.  28 U.S.C. § 157(b)(1).  If not challenged now (and if the Bank Defendants do not succeed in withdrawing the reference), the Bankruptcy Court will conduct the trial on these multi-billion dollar claims under Bankruptcy Rule 7052 rather than under Bankruptcy Rule 9033.  Adjudicating the Common Law Counts within the wrong procedural framework would inflict a substantive injustice on the Bank

Defendants.  To illustrate:  in non-core matters the Bankruptcy Judge files proposed findings of fact and conclusions of law for *de novo* review which the clerk then serves on the parties.  F.R.B.P. 9033(a).  Parties then have an opportunity to object and challenge those findings and conclusions.  F.R.B.P. 9033(b).  Upon its *de novo* review, the District Court may accept, reject or modify the proposed findings of fact or conclusions of law, receive further evidence or recommit the matter to the Bankruptcy Court with instructions.  F.R.B.P. 9033(d).  These procedural and substantive safeguards are entirely absent under Bankruptcy Rule 7052.

   Moreover, if the Core Order remains standing and is not overturned until *after* trial concludes, the parties may have to relitigate the entire case.  By granting the Motion for Leave, this Court can avoid such potentially staggering inefficiency.  It can also greatly benefit the adjudication of this case by defining the procedurally and substantively proper role of the Bankruptcy Court -- magistrate or fully empowered judge -- before the submission of dispositive motions and the trial.   All these considerations warrant immediate review of the Core Order.

## II. THE BANKRUPTCY COURT'S EXPANSIVE JURISDICTIONAL DETERMINATION VIOLATES ARTICLE III OF THE CONSTITUTION AND SHOULD BE OVERTURNED.

   The Motion for Leave, which seeks review of the Bankruptcy Court's jurisdictional determination regarding multi-billion dollar state law claims, fully satisfies the standards for interlocutory appeal.  *See, e.g., Weiner's, Inc.* v. *T.G. & Y. Stores Co.*, 191 B.R. 30, 31 (S.D.N.Y. 1996) (bankruptcy court determination that claims were core was an appealable interlocutory order); 6 Norton Bankr. L. & Prac. 2d, § 148:15 (citing cases in which leave to appeal was granted to permit review of bankruptcy court orders determining whether proceeding is core or non-core).

District courts may exercise jurisdiction over an interlocutory bankruptcy court order when that order concerns a controlling question of law for which there is a substantial ground for a difference of opinion, the immediate resolution of which may materially advance the ultimate resolution of the litigation. *See* 28 U.S.C. § 1292(b); *Weiner's*, 191 B.R. at 31; *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 658 (S.D.N.Y. 2005) ("In deciding whether to grant leave to appeal under section 158(a)(3), reviewing courts have applied the standards set forth in 28 U.S.C. § 1292(b)."). Leave to appeal is discretionary, and district courts may adopt a more pragmatic and liberal approach to determining the appealability of bankruptcy court orders. *BancBoston Real Estate Capital Corp.* v. *JBI Assocs. Ltd. P'Ship (In re Jackson Brook Inst., Inc.)*, 227 B.R. 569, 582 (D. Me. 1998) ("This Court will thus analyze the appealability of the Bankruptcy Order in this case using the factors set out in section 1292(b) to guide its analysis while adopting the pragmatic and liberal approach required in determining the appealability of an interlocutory order in a bankruptcy proceeding.")

Here, the Core Order defines the power of the Bankruptcy Court to adjudicate the Common Law Counts. As such, it is immediately appealable. *Jackson Brook Inst.,* 227 B.R. at 582 (noting that courts have granted leave to appeal questions regarding a court's jurisdiction and that treatises regard orders "that go to the power of a court immediately appealable."). In addition, defining the proper procedural and substantive role of the Bankruptcy Court now manifestly advances resolution of the underlying case since it potentially prevents a costly and time-consuming re-trial. *See Weiner's,* 131 B.R. at 31 (accepting interlocutory appeal in part because jurisdictional determination that bankruptcy court cannot hear tort action "will advance the ultimate

termination of the litigation").  The Motion for Leave also presents a pure question of law.  *Back* v. *LTV Corp. (In re Chateaugay Corp.),* 213 B.R. 633, 636 (S.D.N.Y. 1997) (bankruptcy court's jurisdictional determination "involves a controlling issue of law"); *Weiner's,* 191 B.R. at 31 (accepting appeal of core/non-core determination); *Jackson Brook Inst.,* 227 B.R. at 583.

　　　　In addition, the Motion for Leave raises issues on which a substantial ground for difference of opinion exists.  *In re Lloyd's American Trust Funds Litig.,* No. 96 CIV-1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (under § 1292(b), a substantial ground for difference of opinion on the controlling question of law exists if: "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit.") (citations omitted); *see also Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.,* 7 F. Supp.2d 294, 296-97 (S.D.N.Y. 1998) (finding substantial ground for difference of opinion on an issue on which courts had "come to widely varying conclusions.")

　　　　Specifically, the law in this Circuit remains unsettled as to how a bankruptcy court, when confronted with an adversary proceeding that raises both core and non-core claims, should analyze the scope of its core jurisdiction over such claims. Notably, no Second Circuit case has endorsed the Bankruptcy Court's "logical connection" test, which itself assumes a "predominantly core" or "intertwinement" approach to determining core jurisdiction, and lower courts in this District do not agree that such a test passes constitutional muster.  Similarly, no Second Circuit case has concluded that the mere filing of a proof of claim, or the assertion of a set-off or right of

recoupment, renders all claims a debtor might assert against the creditor core. For all these reasons, a substantial ground for difference of opinion exists.[10]

**A.    The Common Law Counts are Inherently Non-Core.**

Courts in this Circuit have consistently held that claims such as the Common Law Counts are non-core. *E.g., Kittay* v. *Ernst & Young, LLP (In re Kleinert's, Inc.)*, 2004 WL 1878787, at *1 n.2 (S.D.N.Y. Aug. 19, 2004) (bankruptcy court held that claims for breach of contract, negligence, professional malpractice, fraud, negligent misrepresentation and aiding and abetting breach of fiduciary duties were non-core); *Official Committee of Unsecured Creditors of Corson Mfg. Co.* v. *HSBC Bank USA (In re Corson Mfg. Co.)*, Civ. Case No. 01-MC-5E, Ch. 11 Case No. 99-16855K, Adv. No. 00-1366K, 2001 WL 877394, at *2 (W.D.N.Y. Jun. 27, 2001) (claims premised on malpractice and various breaches of fiduciary duty are non-core); *Wechsler,* 201 B.R. at 638, 640  (malpractice, breach of contract and breach of fiduciary duty claims are non-core); *United Orient Bank* v. *Green (In re Green)*, 200 B.R. 296, 298-99 (S.D.N.Y. 1996) (malpractice, breach of fiduciary duty claims are non-core); *Interconnect Tel.*, 59 B.R. at 398, 400 (conspiracy to defraud, wrongful appropriation of confidential information and unfair competition are non-core claims).

---

[10]    That the very question of whether a traditionally non-core claim can become core if it is factually intertwined with the creditor's claims against the debtor's estate and the debtor's unrelated counterclaims is presently on appeal to the Second Circuit provides further evidence that this issue is one on which substantial grounds for difference of opinion exists.  (Case No. 04-5972-BK9L; cross appeal 04-6300-BK (XAP) appeal of *Ernst & Young* v. *Bankr. Servs. (In re CBI Holding Co.)*, 311 B.R. 350 (S.D.N.Y. 2004)).  Oral argument on the appeal took place on September 12, 2005.  The Second Circuit has not yet rendered a decision on the matter.

Here, the Bankruptcy Court recognized that the Common Law Counts are inherently non-core.  *Enron,* 2006 WL 2338020, at *2 ("Enron acknowledges that the Common Law Counts would be considered non-core matters when analyzed in isolation.").  That should have ended its inquiry.  Instead, the Bankruptcy Court strayed down a constitutionally infirm analytical path in which it evaluated the nature of the Common Law Counts based on their factual relationship to Barclays' Proofs of Claim.  But the Common Law Counts are non-core because of their legal nature, *not* because Enron happened to assert them along with core claims that share common facts.  *Stoe* v. *Flaherty*, 436 F.3d 209, 218 (3d Cir. 2006) ("claims that 'arise in' a bankruptcy case are claims that by their nature, *not their particular factual circumstance,* could only arise in the context of a bankruptcy case.") (citing *Halper,* 164 F.3d at 836 (proceeding is "core" "if it is a proceeding that, *by its nature*, could arise only in the context of a bankruptcy case")) (emphasis added).

B.    **The Bankruptcy Court's "Logical Connection" Test Is Premised on a Constitutionally Infirm "Predominantly Core" or "Intertwinement" Theory that Provides No Basis on which To Find the Common Law Counts Core.**

Citing no legal authority for its holding, the Bankruptcy Court summarily concluded that the Common Law Counts are core proceedings because they "stem from the same transaction and are logically connected" to Barclays' Proofs of Claim.  (Core Opinion at 10).  With good reason, courts that have considered a "predominantly core" or "intertwinement" approach to determining a bankruptcy court's core jurisdiction -- such as the one the Bankruptcy Court employed here -- seriously question its constitutionality.  *See, e.g., Glinka* v. *Abraham and Rose Co., Ltd.*, No. 2:93-CV-291, 2:93-CV-329, 2:93-CV-361, 1994 WL 905714, at *10 n.14 (D. Vt. Jun. 6, 1994) (questioning whether it

would be appropriate to determine that an entire proceeding is core if the core aspects

predominate and noting that a predominantly core test would not be workable where a

jury demand exists); *Statutory Committee of Unsecured Creditors of Iridium Operating*

*LLC* v. *Motorola, Inc. (In re Iridium Operating LLC),* 285 B.R. 822, 832 (S.D.N.Y.

2002) (not deciding whether court must employ a claim by claim analysis or treat a

proceeding of mixed core and non-core claims as core if the claims are predominantly

core); *Official Committee of FMI Forwarding Co., Inc.* v. *Union Transport Corp. (In re*

*FMI Forwarding Co., Inc.),* 01 Civ. 9462, 2004 WL 1348956, at *6 (S.D.N.Y. Jun. 16,

2004) (noting the lack of binding authority to support a "predominance of core claims"

argument and the fact that the "predominance" approach itself has been called into

question by "a great many federal courts."); *but see Ernst & Young* v. *Bankruptcy Servs.*

*Inc. (In re CBI Holding Co., Inc.),* 311 B.R. 350, 362 (S.D.N.Y. 2004) (apparently

adopting factual intertwinement approach).

       Under the principles of *Marathon*, a claim is either core or it is not. 458

U.S. at 71 and n.26. The Supreme Court's decision requires that the Bankruptcy Court

make an independent jurisdictional determination as to each cause of action that Enron

asserts based on its underlying legal nature, not on shared facts. Section 157(b)'s

reference to "core proceeding" refers to each cause of action or right of recovery pled.

*Mirant Corp.* v. *The Southern Co.,* 337 B.R. 107, 116 (N.D. Tex. 2006) ("the word

'proceedings' as used in section 157 refers to specific claims, causes of action, or grounds

for relief, and not to the entire action."); *Ralls* v. *Doktor Pet Centers, Inc.* 177 B.R. 420,

425 n.6 (D. Mass. 1995). As the district court in *Doktor Pet Centers* explained:

> This is the only interpretation which would adequately heed
> the constitutional concerns in *Marathon*. If the word

"proceeding" referred to the entire action before the court, a party could bring a state law claim within the purview of the bankruptcy judge merely by adding another count to, say, a motion to set aside a preference. This cannot be the case. Each claim must, *on its own*, satisfy the requirements of § 157(b). A district court must scrutinize each count and each asserted right for relief to determine which ones were properly before the bankruptcy judge for final resolution and which ones must receive *de novo* review.

177 B.R. at 425 n.6 (emphasis added).

Bankruptcy courts should therefore employ a claim-by-claim analysis when faced with a case that has a mixture of core and non-core claims. The Court of Appeals for the Third Circuit, for example, has explicitly rejected a "predominantly core" analysis even where "the core aspect heavily predominates and the non-core aspect is insignificant." *Halper*, 164 F.3d at 839 (reversing the district court and bankruptcy court conclusions that a predominantly core adversary proceeding was rendered core in its entirety and adopting "the claim-by-claim approach as the only one consistent with the teachings of *Marathon*.").

Courts in this district have also rejected the "predominantly core" approach, as well as an analysis that would convert non-core claims into core claims on the basis of "factual intertwinement." As the District Court in *FMI Forwarding* noted:

[I]n the Court's view, none of the cases Plaintiff cites stand for the proposition that a cause of action arising before and completely independent of the filing of a bankruptcy petition is inextricably intertwined with core bankruptcy proceedings, and thus none of these cases support classifying the malpractice claim against Marcus as core. Similarly, Plaintiff cites no binding authority to support its 'predominance of core claims' argument; and, in fact, the 'predominance' approach itself has been called into question by a great many federal courts."

2004 WL 1348956, at *5-6 (citing cases) (internal citations and quotations omitted).

Here, the Bankruptcy Court acknowledged that, when considered in isolation, the Common Law Counts are non-core. *Enron Corp.*, 2006 WL 2338020, at *2. It nonetheless concluded that the nature of the Common Law Counts was somehow rendered core because they shared operative facts with some of Barclays' Proofs of Claim. *Id.* at *4. For example, the Bankruptcy Court noted that, among other things:

> [t]he same transaction …forms the basis of [Barclays'] JT
> Transaction Proof of Claim and the Common Law Claims.
> … The alleged damages stem from the entirety of the
> transaction in facilitating the continuance of a company that
> had lost its value. Thus, the same transaction gives rise to
> both the JT Transaction Proof of Claim and the Common
> Law Claims. Therefore, the Common Law Claims are core
> proceedings in that they stem from the same transaction
> and are logically connected to the JT Transaction Proof of
> Claim.

*Enron Corp.*, 2006 WL 2338020, at *4.[11]

Shared operative facts, however, cannot transform the legal nature of non-core claims into core claims any more than they can render core claims non-core. *Adelphia Commc'ns Corp.* v. *Rigas (In re Adelphia Commc'ns Corp.)*, 02 Civ. 8495, 2003 WL 21297258 (S.D.N.Y. Jun. 4, 2003) illustrates the principle. In that case, the

---

[11]   The Bankruptcy Court held that its analysis in the Core Opinion, which only
addresses Enron's arguments as they relate to Barclays and Barclays' proofs of claim,
applies equally to all the Bank Defendants inasmuch as their respective proofs of
claim filed against Enron were for greater amounts than those filed by Barclays.
(Core Opinion at 12 n.3). For ease of reference, the Bank Defendants adopt the
Bankruptcy Court's approach in this regard and present their argument solely in terms
of Barclays and the Barclays Proofs of Claims. By doing so, none of the Bank
Defendants concede that, other than for the purposes of presenting arguments in this
Motion for Leave, they are situated similarly to Barclays in connection with the Bank
Defendants' Proofs of Claim or any other matter in MegaClaim, and hereby expressly
reserve all of their rights in this regard.

debtor had sued a number of insiders alleging violations of RICO and the Securities

Exchange Act, as well as a variety of state law claims. *Id.* at *2. The District Court

found that the claims for fraudulent conveyance, constructive trust and demand for an

accounting were core claims since they directly impacted the bankruptcy estate. *Id.* The

District Court, however, refused to find the remaining claims core, even though they

shared extensive facts:

> Although the remaining claims in this proceeding arise
> from the same set of facts, they are non-core. They are not
> unique to a bankruptcy proceeding, they do not directly
> affect a core bankruptcy function, nor are they matters
> which the bankruptcy court would ordinarily be expected to
> have greater familiarity or expertise.

*Id.* (noting further that "the core claims relate to whether the … defendants hold property

that is actually property of the bankruptcy estate. The non-core claims relate to whether

the … defendants obtained that property in a fraudulent manner. The same discovery,

therefore, applies to both groups of claims. The non-core and core claims are

interrelated…")

The Bankruptcy Court should have followed *Adelphia*. It should have

found that the Common Law Counts remained non-core claims since they are not unique

to bankruptcy, do not effect a core bankruptcy function,[12] and are not the type of claims

over which the Bankruptcy Court presumably has more expertise. Instead, the

Bankruptcy Court made a jurisdictional finding based on a poorly defined "connection"

between non-core claims and their shared facts with a creditor's proof of claim, rather

---

[12]    Notably, Enron has long since confirmed its chapter 11 plan and begun making
       distributions to its creditors.

than on an analysis of whether the underlying legal rights "arise in or under" federal bankruptcy law as Section 157(b) requires.

This "factual intertwinement" or factual inter-relatedness approach fails to pass constitutional muster. *Mirant*, 337 B.R. at 119 ("The court disagrees with [the] conclusion that whatever non-core claims there are … are so intertwined with the other claims in the complaint that the interests of justice would be served if the claims were to be tried together. The principles announced in *Marathon* would be violated if such an intertwinement theory were to be given effect…").

**C.    The Mere Filing of a Proof of Claim Cannot Render the Common Law Counts Core.**

The Bankruptcy Court found that by filing proofs of claim, some of which were based on transactions common to the Common Law Counts, the Bank Defendants effectively rendered the Common Law Counts core under Section 157(b)(2)(B) (concerning the allowance and disallowance of claims against the estate). It reasoned that by filing proofs of claim, the Bank Defendants made the Common Law Counts core because the "bankruptcy court's equitable jurisdiction encompasses interrelated claims that a debtor asserts against a creditor who filed a proof of claim." (Core Opinion at 10). Both the conclusion and its reasoning are incorrect.

Section 157(b)(2)(B) includes the "allowance or disallowance of claims *against the estate*" as a core proceeding. 28 U.S.C. § 157(b)(2)(B). The process of allowing or disallowing claims *against* the estate, however, does not necessarily or automatically implicate the bankruptcy court's adjudication of the *debtor's* wholly separate claims against a *creditor*.

Nor has the Second Circuit condoned the notion that the mere filing of a proof of claim expands a bankruptcy court's equitable jurisdiction to matters only incidentally related to the bankruptcy function.

> As discussed … above, the *Katchen, Granfinanciera,* and *Langenkamp* line of Supreme Court cases stands for the proposition that by filing a proof of claim a creditor forsakes its right to adjudicate before a jury any issue *that bears directly on the allowance* of that claim -- and does so not so much on a theory of waiver as on the theory that the legal issue has been converted to an issue of equity. It is reasonable that a creditor or debtor who submits to the equity jurisdiction of the bankruptcy court thereby waives any right to a jury trial for the resolution of disputes vital to the bankruptcy process, such as those involving the determination of who is a valid creditor and which creditors are senior in the creditor hierarchy. **We will not presume that the same creditor or debtor has knowingly and willingly surrendered its constitutional right to a jury trial for the resolution of disputes that are only incidentally related to the bankruptcy process.**

*Germain* v. *Connecticut Nat'l Bank,* 988 F.2d 1323, 1329-30 (2d Cir. 1993) (italics in original; bold added).

If the mere filing of a proof of claim cannot convert all legal disputes into equitable issues, as the Second Circuit held, then it follows that the mere filing of a proof of claim also does not invoke the Bankruptcy Court's equitable jurisdiction over *all* disputes that the case may present.  Under *Germain*, for a dispute to fall into the Bankruptcy Court's equitable jurisdiction, it "must be part of the claims-allowance process or affect the hierarchical reordering of creditors' claims."  *Germain,* 988 F.2d at 1330.

Here, the Common Law Counts are *not* part of the claims allowance process.  To the contrary, the Common Law Counts are state law causes of action that are assets of the *Debtors*, not claims against their estates.

Resolution of the Common Law Counts also does not effect a reordering of claims. As noted, Enron has already confirmed its chapter 11 plan, which has long since gone effective, and Enron has begun making distributions to its creditors. The only effect that resolution of the Common Law Counts may have on Enron's bankruptcy -- in the unlikely event that Enron prevails at trial -- is the amount of the distributions to which creditors are entitled. As the Bankruptcy Court stated, the potential for increased value inuring to the estate does not make the Common Law Counts core. *Enron,* 2006 WL 2338020, at *3 ("Simply, such an interpretation would eliminate entirely the core/non-core distinction and would thus run afoul of *Marathon*.") (internal citations omitted).

In contrast to the Common Law Counts (which do not affect the "claims-allowance process or affect the hierarchical reordering of the creditors' claims"), Enron has asserted in the MegaClaim numerous causes of action against the Bank Defendants which do just that: they seek to disallow, equitably subordinate, or avoid and recover as preferential or fraudulent transfers, practically every payment that Enron made to the Bank Defendants on transactions that Enron claims perpetrated Enron's fraud. Each of these counts goes to the "allowance or disallowance" of the Bank Defendants' Proofs of Claims against Enron's estate based on the same underlying transactions, and thereby involves the claims-allowance process or affects the hierarchical reordering of the Bank Defendants' rights. They also are causes of action which arise in and under title 11, namely, sections 502, 510(c), 544, 547, 548, and 550 of the Bankruptcy Code. In short, they are all core claims.

The problem with the Bankruptcy Court's reasoning is that it provides no limiting principle. *Marathon*, however, clearly imposes limits on a bankruptcy court's

core jurisdiction and distinguishes "the restructuring of debtor-creditor relations, which is at the *core* of the federal bankruptcy power," from the "adjudication of state-created private rights. . ." *Id.* at 71 (emphasis added).  Thus, the Supreme Court held that while a party may adjudicate a state law claim in federal court on the basis of its relationship to the reorganization petition, "this relationship does *not* transform the state-created right into a matter between the Government and the petitioner for reorganization [*i.e.*, a public right].  Even in the absence of the federal scheme, the plaintiff would be able to proceed against the defendant on the state-law contractual claims."  *Id.* at 71 n.26 (emphasis added).

That is precisely the case here:  the Common Law Counts require the adjudication of state-created private rights.  They do not implicate the restructuring of debtor-creditor relations (*e.g.*, the allowance of Barclays' Proofs of Claim on their own legal merits) which lies at the core of the Bankruptcy Court's power.  The Bankruptcy Court's conclusion to the contrary is wrong and should be reversed.

**D.**    **Under *Marathon*, "Counterclaims" Within the Bankruptcy Court's Core Jurisdiction Cannot Include All Claims that the Debtor Can Assert Against the Bank Defendants and Do Not Include the Common Law Counts.**

Section 157(b)(2)(C) identifies "counterclaims by the estate against persons filing claims against the estate" as core.  Here, the Bankruptcy Court found that the Common Law Counts became core under Section 157(b)(2)(C) because Enron styled them as counterclaims against the Bank Defendants' Proofs of Claim.  *Enron,* 2006 WL 2338020, at *5 ("Further, the Common Law Claims have been asserted in the [MegaClaim] as counterclaims to Barclays' Proofs of Claim.").

As with its analysis of the effect of the Bank Defendants' Proofs of Claim on the legal nature of the Common Law Counts, the Bankruptcy Court reasoned that asserting a counterclaim affects the allowance and disallowance of claims against the Debtors' estates (although the Bankruptcy Court never explained exactly *how* it did so) and invokes the equitable jurisdiction of the bankruptcy court, thereby rendering the Common Law Counts core. *Id.* at *3 - 5. Under *Marathon,* though, not all counterclaims can be core -- the counterclaim must pertain directly to core bankruptcy functions (*i.e.,* it must "aris[e] under title 11 or aris[e] in a case … under title 11"). Any other result, even if the counterclaim arises from the same transaction as the proof of claim, runs afoul of Article III of the Constitution. *Marathon, supra.*

*First*, courts, when construing statutes, have a duty "to interpret a statute in a manner that renders it constitutionally valid." *Communications Workers of America v. Beck,* 487 U.S. 735, 762 (1988). Here, if Section 157(b)(2)(C) is read as giving the Bankruptcy Court core jurisdiction to fully adjudicate *all* estate claims against the Bank Defendants, as the Bankruptcy Court held, then both the "core function" test of *Marathon* and Section 157(b)(2)(C) become meaningless. A constitutionally sound interpretation of Section 157(B)(2)(C), on the other hand, provides that a counterclaim only falls within the Bankruptcy Court's "core" jurisdiction if it falls within the Bankruptcy Court's "core functions," such as the restructuring of debtor-creditor relations. *See Marathon,* 458 U.S. at 71. Here, as previously discussed, the Common Law Counts simply do not meet this standard.

*Second,* the core/non-core dichotomy addresses the question whether Article III allows Congress to assign adjudication of a cause of action to a non-Article III

tribunal.  If a cause of action is not a "public right" for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking "the essential attributes of the judicial power."  *Id.* at 71, 84.  If no act of Congress can assign such a claim to the Bankruptcy Court's core jurisdiction, then surely, no act of the *parties to the litigation,* or the Bankruptcy Court itself, can do so.  But that is precisely what the Bankruptcy Court found:  that the Bank Defendants, by asserting counterclaims against Enron, conferred Article III jurisdiction on the Bankruptcy Court and rendered the Common Law Counts core.  Such an absurd result cannot stand.

In the end, the Bankruptcy Court's attempt to force the Common Law Counts into the "counterclaim" taxonomy of Section 157(b)(2)(C) must fail.  The *nature* of the proceeding -- not its label -- determines whether a matter is core or non-core.  *U.S. Lines,* 197 F.3d at 637; *see Hasett* v. *BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748, 757 (S.D.N.Y. 1994) ("attempt to pigeonhole the claims into the neat categories of core matters … cannot obfuscate the reality that these are claims which at most only incidentally implicate provisions of the bankruptcy code."); *accord Nationwide Roofing & Sheet Metal, Inc.* v. *Cincinnati Ins. Co. (In re Nationwide Roofing & Sheet Metal, Inc.)*, 130 B.R. 768, 775 (Bankr. S.D.Ohio 1991) (holding claims were non-core even though they arguably fit within the literal wording of section 157(b)(2)).

### E.  The Bank Defendants' Assertion of Setoff Rights and Recoupment, Like Their Proofs of Claim, Also Cannot Transform the Underlying Non-Core Nature of the Common Law Counts Into Core Claims.

As a further basis for transforming the Common Law Counts into core claims, the Bankruptcy Court found that Barclays had asserted set-off and recoupment rights, and "has thus invoked [the Bankruptcy Court's] core jurisdiction to determine the validity of its affirmative defense of set-off rights against the Common Law Counts."

*Enron,* 2006 WL 2338020, at *5. Assuming for the sake of argument that a set-off claim or right of recoupment *is* a core claim, it does not follow that the underlying action on which those rights are based is *also* a core claim.[13]

Just this argument has been rejected in an Enron-related case. In *Enron Power Marketing, Inc.* v. *City of Santa Clara (In re Enron Power Marketing, Inc.)*, No. 01 Civ. 7964, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003), Enron Power Marketing, Inc. ("EPMI") filed an adversary proceeding against the City of Santa Clara ("City") seeking to recover post-petition debts that the City owed under a pre-petition agreement and subsequent individual agreements entered into for the purchase and sale of electrical power. *Id.* at *1. The City moved to withdraw the reference of the action to the bankruptcy court, arguing among other things, that the matter was not a core proceeding. *Id.* EPMI argued that the contract dispute was core because the City sought a setoff against EPMI's estate as one of its affirmative defenses, and that resolution of the dispute would impact the administration of its estates. *Id.* at *7. Notwithstanding the presence of an alleged setoff, District Judge Baer found that the contract claims were non-core. *Id.* at *9 ("I disagree with plaintiff that defendant's alleged breaches raise core issues under § 157.")

The same applies here.

---

[13]   In any event, the Bank Defendants' asserted set-off right does not amount to a new "claim." The set-off occurs merely as a consequence of resolving the underlying causes of action between the parties. In other words, the Bank Defendants' distributions on account of their separately allowed claims might be reduced by the amount of the Bank Defendants' (as of yet, purely speculative and unproven) liability to Enron, but the set-off itself does not give rise to a new "claim," and certainly does not state a claim of the kind that could render the wholly separate Common Law Counts core.

Moreover, as with its analysis of what effect filing a proof of claim or asserting a counterclaim has on its core jurisdiction, the Bankruptcy Court incorrectly concluded that asserting a set-off and recoupment right also invoked the Bankruptcy Court's equitable jurisdiction and thereby rendered the Common Law Counts core.

In *Marathon*, Justice Brennan, writing for the plurality, expressly rejected the notion that the bankruptcy court's core jurisdiction expanded to *all* controversies that may fall within the bankruptcy court's *equitable* jurisdiction. *Marathon*, 458 U.S. at 79 n.31. In so holding, the Court specifically noted that *Katchen* v. *Landy,* 382 U.S. 323 (1966), which announced a sweeping principle regarding the effect of filing a proof of claim on a creditor's submission to the bankruptcy court's summary jurisdiction in the context of a preference action under the Bankruptcy Act, did *not* discuss or determine the Article III issue. *Id.* The proposition that the Bank Defendants' mere assertion of claims against the Debtors' estates -- whether by way of a set-off, recoupment right, indemnity or otherwise -- renders all claims in a resulting adversary proceeding core because it invokes the Bankruptcy Court's equitable jurisdiction is plainly inconsistent with *Marathon*. *See Glinka*, 1994 WL 905714, at *9 (noting that *Marathon* raises constitutional doubts as to whether filing a proof of claim renders all counterclaims core, citing to 3 COLLIER ON BANKRUPTCY ¶ 3.01 (L. King, Ed., 1994)). The Bankruptcy Court's equitable jurisdiction simply has no bearing on the inherent legal nature of the Common Law Counts.

For all the reasons discussed above in connection with filing a proof of claim and counterclaims, the Bank Defendants' assertion of a set-off or recoupment right

cannot transform the underlying nature of a non-core claim.  The Common Law Counts

remain non-core.

## <u>CONCLUSION</u>

For the foregoing reasons, the Bank Defendants respectfully request that

this Court grant the Motion for Leave and agree to immediate review of the Bankruptcy

Court's interlocutory Core Order.

Dated:  New York, New York
        September 25, 2006

Respectfully submitted,

/s/ Stephen J. Shimshak                        /s/ Hugh M. McDonald
Stephen J. Shimshak (SS-8822)                  Hugh M. McDonald (HM-2667)
Douglas R. Davis (DD-0874)                     Marc E. Bennett (MB-9164)
Brad S. Karp (BK-3702)                         Andrew Matheson (AM-6471)
Claudia L. Hammerman (CH-9005)                 Lisa J.P Kraidin (LK-3569)
PAUL, WEISS, RIFKIND, WHARTON &                Anna Taruschio (AT-6483)
GARRISON LLP                                   ALLEN & OVERY LLP
1285 Avenue of the Americas                    1221 Avenue of the Americas
New York, NY 10019-6064                        New York, NY 10020
Telephone: (212) 373-3000                      Telephone: (212) 610-6300

*Attorneys for Citigroup, Inc., Citibank, N.A.,*    --and--
*Citigroup Global Markets Inc., Citicorp North*
*America, Inc., Citigroup Financial Products Inc.,*    David H. Braff (DB-0761)
*CXC LLC, Corporate Asset Funding Company,*           Michael T. Tomaino, Jr. (MT-6200)
*LLC, and Corporate Receivables Corporation,*         Jeffrey T. Scott (JS-5014)
*LLC*                                                 SULLIVAN & CROMWELL LLP
                                                      125 Broad Street
                                                      New York, NY 10004
                                                      Telephone: (212) 558-4000

                                                      *Attorneys  for Barclays PLC, Barclays Bank PLC,*
                                                      *Barclays Capital Inc., Barclays Capital Securities*
                                                      *Limited, Barclays Physical Trading Limited*
                                                      *and Barclays Metals Limited*

/s/ Owen C. Pell
Owen C. Pell (OP-0118)
Timothy S. Pfeifer (TP-6331)
Titia A. Holtz (TH-4379)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 819-8200

*Attorneys for Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc., Deutsche Leasing New York Corp., Seneca Delaware, Inc., Deutsche Bank S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P.*

Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP., *et al.*,<br><br>       Reorganized Debtors. | Chapter 11<br>Case No. 01-16034 (AJG)<br><br>Jointly Administerd |
| ENRON CORP., *et al.*,<br><br>       Plaintiff,<br><br>       v.<br><br>CITIGROUP, INC., *et al.*,<br><br>       Defendants. | Adv. Pro No. 03-09266 (AJG) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
THE BANK DEFENDANTS' MOTION FOR LEAVE TO
APPEAL THE DECISION OF THE BANKRUPTCY COURT
<u>CONCERNING DETERMINATION UNDER 28 U.S.C. § 157(b)(3)</u>**

**TABLE OF CONENTS**

SUMMARY OF THE OPPOSITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

AN IMPORTANT NOTE ABOUT JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Citigroup's Claims Against Plaintiffs' Estates . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    Deutsche Bank's Claims Against Plaintiffs' Estates . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Plaintiffs' Counterclaims Against Citigroup and Deutsche Bank . . . . . . . . . . . 11

        1.    Plaintiffs' counterclaim allegations against Citigroup . . . . . . . . . . . . . 12

        2.    Plaintiffs' counterclaim allegations against Deutsche Bank . . . . . . . . . 15

        3.    Plaintiffs' bankruptcy counterclaims based on the scheme between Citigroup, Deutsche Bank and the Enron Insiders . . . . . . . . . 16

        4.    Plaintiffs' common law counterclaims based on the scheme between Citigroup, Deutsche Bank, and the Enron Insiders . . . . . . . . . 18

    D.    Citigroup's Set-Off Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.    Leave to Appeal Interlocutory Orders of Bankruptcy Courts is Limited to Extraordinary Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.    The Motion for Leave Fails to Satisfy Any of the Four Standards for Interlocutory Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    The Core Order does not involve a controlling question of law. . . . . . . 21

        2.    There is no substantial ground for difference of opinion over the Core Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3.    Granting leave to appeal the Bankruptcy Court's Core Order will not materially advance the ultimate determination of this adversary proceeding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        4.    The Motion for Leave does not demonstrate exceptional circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## CASES

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*,
179 B.R. 24 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Adelphia Comm. Corp.*,
333 B.R. 649 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Adelphia Comm. Corp. v. Rigas (In re Adelphia Comm. Corp.)*,
02 Civ. 8495, 2003 WL. 21297258 (S.D.N.Y. June 4, 2003) . . . . . . . . . . . . . . . . . 27

*Bianco v. Hoehn (In re Gaston & Snow)*,
173 B.R. 302 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29, 30

*In re Caldor, Inc.*,
217 B.R. 121 (Bankr. S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Com. Finance Services, Inc. v. Jones (In re Com. Finance Services, Inc.)*,
251 B.R. 397 (Bankr. N.D. Okla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Dynegy Marketing and Trade v. Enron Corp. (In re Enron Corp.)*,
316 B.R. 767 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

*Enron Corp. v. Credit Suisse First Boston International (In re Enron Corp.)*,
No. 01-16034, 2006 U.S. Dist. LEXIS 57422
(S.D.N.Y. May 3, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21,22, 23

*Ernst & Young v. Bankruptcy Services, Inc. (In re CBI Holding Co.,*
*Inc.)*, 311 B.R. 350 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 33

*German v. Federal Home Loan Mortgage Corp.*,
896 F. Supp. 1385 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Glinka v. Abraham and Rose Co., Ltd.*,
No. 2:93-CV-291, 1994 WL. 905714 (D. Vt. June 6, 1994) . . . . . . . . . . . . . . . . . . 27

*Hedstrom Corp. v. Wal-Mart Stores, Inc. (In re Hedstrom Corp.)*,
Nos. 04-38543, 05 C 6888, 2006 WL. 1120572 (N.D. Ill. April 24, 2006) . . . . . . . 26

*Horowitz v. Sheldon (In re Donald Sheldon & Co.)*,
No. 92 Civ. 6834, 1992 U.S. Dist. LEXIS 19232 (S.D.N.Y. Dec. 17, 1992) . . . . . 30

*Klinghoffer v. S.N.C. Achille Lauro,*
  921 F.2d 21 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Liebert v. Levine (In re Solomon Levine),*
  No. 03 Civ. 7146, 2004 U.S. Dist. LEXIS 6025 (S.D.N.Y. April 9, 2004) . . . . . . . 20

*In re Lion Capital Group,*
  63 B.R. 199 *(S.D.N.Y. 1985)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Lombard-Wall Incorporated,*
  48 B.R. 986 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25, 32

*In re Manville Forest Products Corp.,*
  896 F.2d 1384 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Marlin v. U.S. Trustee,*
  333 B.R. 14 (W.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Mercury Masonry Corp.,*
  114 B.R. 35 (Bankr. S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*N. America Energy Conservation, Inc. v. Interstate Energy Resources, Inc.,*
  No. 00 Civ. 4302, 2000 WL. 1514614 (S.D.N.Y. Oct. 12, 2000) . . . . . . . . . . 5, 26, 32

*North Fork Bank v. Abelson,*
  207 B.R. 382 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29, 31

*Official Committee of FMI Forwarding Co., Inc. v. Union Transport Corp.*
  *(In re FMI Forwarding Co., Inc.),*
  01 Civ. 9462, 2004 WL. 1348956 (S.D.N.Y. June 16, 2004) . . . . . . . . . . . . . . . . . 27

*Pan America World Airways, Inc. v. Evergreen International Airlines, Inc.,*
  132 B.R. 4 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Resolution Trust Corp. v. Best Products Co., Inc. (In re Best Products Co.),*
  68 F.3d 26 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re S. G. Phillips Constructors, Inc.,*
  45 F.3d 702 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Statutory Committee of Unsecured Creditors v. Motorola Inc. (In re*
  *Iridium Operating LLC),*
  285 B.R. 822 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7, 24, 25, 26, 32, 33

*Statutory Committee of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC), No. M 47,*
2003 U.S. Dist. LEXIS 11119 (S.D.N.Y. June 30, 2003) . . . . . . . . . . . . . . . . . 21, 29

*In re The Leslie Fay Companies, Inc.,*
No. 97 Civ. 2244, 1997 WL. 555607 (S.D.N.Y. Sept. 4, 1997) . . . . . . . . . . . 4, 25, 32

*United States Lines, Inc. v. America Steamship Owners Mutual Protection and Indemnity Society (In re United States Lines, Inc.),*
199 B.R. 465 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 28

*United States Lines, Inc. v. American Steamship Owners Mutual Protection and Indemnity Society (In re United States Lines, Inc.),*
197 F.3d 631 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Weiner's Inc. v. T.G.&Y. Stores Co.,*
191 B.R. 30 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Winimo Realty Corp.,*
270 B.R. 108 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 32

## STATUTES

28 U.S.C. § 157(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 7, 16, 21, 32

Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Services Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing Inc., and Atlantic Commercial Finance, Inc., plaintiffs in the above-captioned adversary proceeding ("**Plaintiffs**") pending before the United States Bankruptcy Court for the Southern District of New York, the Honorable Arthur J. Gonzalez (the "**Bankruptcy Court**"), submit this Memorandum in Opposition to the Bank Defendants' Motion for Leave to Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3) (the "**Motion for Leave**").[1]

## SUMMARY OF THE OPPOSITION

The Bank Defendants seek leave to appeal an interlocutory order of the Bankruptcy Court determining that certain claims in this adversary proceeding are "core" claims under 28

---

[1] At the time the Motion for Leave was filed, the Bank Defendants were Barclays PLC and its affiliates ("**Barclays**"), Citigroup Inc. and its affiliates ("**Citigroup**"), and Deutsche Bank AG and its affiliates ("**Deutsche Bank**"). Since the Motion for Leave was filed, Plaintiffs reached a settlement with Barclays, pursuant to which Barclays agreed to suspend its participation in the Motion for Leave, subject only to its right to reinstate its participation in the event that either the settling parties do not execute a definitive settlement agreement or such settlement agreement is not approved by the Bankruptcy Court. *Thus, in light of the settlement with Barclays, the Motion for Leave is now brought on behalf of Citigroup and Deutsche Bank.* The adversary proceeding from which this appeal emanates was commenced in September 2003 against eleven bank defendants: JP MorganChase, Credit Suisse First Boston, Merrill Lynch, Canadian Imperial Bank of Commerce, Royal Bank of Canada, Royal Bank of Scotland, Toronto Dominion Bank, FleetBoston, and Barclays, in addition to Citigroup and Deutsche Bank. The Bankruptcy Court has presided over and approved settlements with seven of these bank defendants and will shortly hold hearings on Plaintiffs' settlements with Merrill Lynch and Barclays.

U.S.C. § 157(b)(3) (the "**Core Order**").[2]  The standards by which such motions are judged are

well established.[3]    Interlocutory, piecemeal appeals from bankruptcy court rulings are

appropriate only where (1) the bankruptcy court's order involves a controlling question of law,

(2) over which there is substantial ground for difference of opinion, and (3) an immediate appeal

would materially advance the ultimate determination of the litigation.  *In re Adelphia Comm.*

*Corp.,* 333 B.R. 649, 658 (S.D.N.Y. 2005); *Dynegy Marketing and Trade v. Enron Corp. (In re*

*Enron Corp.),* 316 B.R. 767, 771-72 (S.D.N.Y. 2004).   In addition, leave to appeal should be

granted only where the movant demonstrates that there are "exceptional circumstances"

justifying "a departure from the basic policy of postponing appellate review until after the entry

of a final judgment."  *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir. 1990);

*Marlin v. U.S. Trustee,* 333 B.R. 14, 20 (W.D.N.Y. 2005).

   The Motion for Leave satisfies none of these four standards.

   *First,* whether some of the claims in this adversary proceeding are core or non-core

claims is not a controlling question of law.  "[A] question of law is 'controlling' if reversal of the

[lower] court's order *would terminate the action*."  *In re Enron Corp.,* 316 B.R. at 772 (emphasis

added) (citing *Klinghoffer,* 921 F.2d at 24).  The Bank Defendants do not suggest that reversing

the Bankruptcy Court's Core Order will terminate this adversary proceeding, and it clearly will

not.  Instead, the Bank Defendants argue that the Bankruptcy Court's Core Order defines the

---

[2]  A copy of the Bankruptcy Court's Order Concerning Determination Pursuant to 28
U.S.C. § 157(b)(3) dated August 24, 2006 ("Core Order") is attached as Exhibit "A."

[3]  These standards are acknowledged by the Bank Defendants at page 22 of their Joint
Memorandum of Law in Support of Their Motion for Leave to Appeal the Decision of the
Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3)
("Memorandum").

power of the Bankruptcy Court to adjudicate the core claims, because core claims can be finally determined by bankruptcy courts, whereas non-core claims cannot. *See* Bank Defendants' Joint Memorandum of Law in Support of Their Motion for Leave ("**Memorandum**") at 22. Yet, by itself, the Bankruptcy Court's Core Order has no such effect. In the Motion for Leave, the Bank Defendants repeatedly state their intention to move to withdraw the reference of this adversary proceeding to the Bankruptcy Court. *See id.* at 2, 4, 12, 13, 18-19. That motion has not yet been filed because the Bank Defendants acknowledge that it is premature. *Id.* at 17 n. 9. If a motion to withdraw the reference is filed and if it is granted, no issue regarding the Bankruptcy Court's power over the disputed claims exists. In that event, the claims will no longer be before the Bankruptcy Court.

     ***Second,*** there is no substantial ground for difference of opinion over whether the Bankruptcy Court correctly determined that the claims in the Core Order are core claims. In making its determination, the Bankruptcy Court followed clear precedent in this Court. The Bankruptcy Court held that Plaintiffs' claims (actually counterclaims) against the Bank Defendants for aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy are core claims because they are based upon the same transactions from which the Bank Defendants filed proofs of claim against Plaintiffs' bankruptcy estates seeking hundreds of millions of dollars. Opinion Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3) ("**Core Opinion**") at 10.[4] The Bankruptcy Court further held that Plaintiffs' claims against the

---

     [4] A copy of the Bankruptcy Court's Opinion Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3) dated August 14, 2006 ("Core Opinion") is attached as Exhibit "B." The Opinion is written substantially about the claims brought by Plaintiffs against Barclays and the proofs of claim and other claims asserted by Barclays against Plaintiffs' bankruptcy estates. That is because Barclays filed the motion before the Bankruptcy Court requesting a determination that certain of Plaintiffs' claims were non-core, and Citigroup and Deutsche Bank

Bank Defendants were core claims because the Bank Defendants asserted their proofs of claim as set-offs in their answers to Plaintiffs' complaint. *Id.* at 11.

Both of these holdings squarely follow decisions of this Court. Most recently, in *Ernst & Young v. Bankruptcy Services, Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 363 (S.D.N.Y. 2004), and in *Statutory Comm. of Unsecured Creditors v. Motorola (In re Iridium Operating LLC)*, 285 B.R. 822, 832 (S.D.N.Y. 2002), courts in this District held that common law claims asserted by a debtor against a creditor are core claims where they are based upon the same operative facts or arise out of the same transaction as the creditor's proof of claim. In *CBI Holding*, Judge Wood held the debtor's claims of negligence and fraud against Ernst & Young (a creditor) were core claims because they "are based upon the same operative facts" as Ernst & Young's proof of claim. 311 B.R. at 363. In *Iridium Operating*, Judge Pauley reached a similar result and described the governing legal test as follows:

> Traditionally non-core claims against a creditor in an adversary proceeding will be considered core if: (1) the claim arises out of the same transaction as the creditor's proofs of claim or setoff claim, or (2) the adjudication of the adversary proceeding claim would require consideration of issues raised by the proofs of claim or setoff claim such that the two claims are logically connected.

285 B.R. at 832 (citing *In re Winimo Realty Corp.*, 270 B.R. 108, 122-23 (S.D.N.Y. 2001); *In re*

---

only joined in that motion many months after it was filed. The Bankruptcy Court's determinations in the Core Opinion and the Core Order apply with equal force to Citigroup and Deutsche Bank, and the Bankruptcy Court so held in the Core Opinion. Core Opinion at 12 n.3. The record before the Bankruptcy Court amply demonstrates that, like Barclays, Citigroup and Deutsche Bank filed proofs of claim against Plaintiffs' bankruptcy estates that are based upon the identical transactions which form the basis of Plaintiffs' claims against Citigroup and Deutsche Bank for aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy. In the Memorandum in Support of the Motion for Leave, Citigroup and Deutsche Bank "adopt the Bankruptcy Court's approach . . . and present their arguments solely in terms of Barclays and the Barclays' Proofs of Claims." Memorandum at 28 n. 11.

*The Leslie Fay Companies, Inc.,* No. 97 Civ. 2244, 1997 WL 555607, at *2 (S.D.N.Y. Sept. 4, 1997);  *In re Lombard-Wall Incorporated,* 48 B.R. 986, 990-91 (S.D.N.Y. 1985)).    The Bankruptcy Court's first basis for finding the claims in this case to be core claims – that they arise from the same transactions as the Bank Defendants' proofs of claim – is not subject to substantial difference of opinion.

The same is true of the second basis on which the Bankruptcy Court found the claims in this case to be core claims – that the Bank Defendants asserted claims of set-off based upon their proofs of claim against Plaintiffs' bankruptcy estates.  Courts in this District have held that when a creditor asserts set-offs against a debtor's claim the creditor is making a claim against the debtor's estate.  *In re Iridium Operating,* 285 B.R. at 833 ("[A] setoff is a claim against the bankruptcy estate."); *North Am. Energy Conservation, Inc. v. Interstate Energy Resources, Inc. (In re North Am. Energy Conservation, Inc.),* No. 00-40563, 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 12, 2000) ("[R]egardless of whether a setoff is labeled an 'affirmative defense' or a 'counterclaim,' a setoff is a claim against the bankruptcy estate.").  Moreover, this Court has attributed greater significance to set-off claims against debtors because they "'elevate an unsecured claim to secured status to the extent that the debtor has a mutual, pre-petition claim' against the party asserting setoff."  *North Am. Energy Conservation,* 2000 WL 1514614 at *2 (quoting *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir. 1984)).  Following the clear holdings of these cases, the Bankruptcy Court correctly ruled that Plaintiffs' claims against the Bank Defendants were core claims because the Bank Defendants asserted their proofs of claim in the form of set-offs against Plaintiffs' bankruptcy estates.

*Third,* granting leave to appeal the Bankruptcy Court's Core Order will not materially advance the ultimate determination of this adversary proceeding.  As this Court held in *United*

5

*States Lines, Inc. v. Am. Steamship Owners Mutual Protection and Indemnity Society (In re United States Lines, Inc.)*, 199 B.R. 465, 471-72 (S.D.N.Y. 1996):

> [A] resolution by this Court of the core/non-core issue will not necessarily 'materially advance the ultimate termination of the litigation.' If this Court were to hold that the proceedings are non-core, such a holding would disable the bankruptcy court only from 'enter[ing] appropriate orders and judgments,' and would subject its findings of fact and conclusions of law to de novo review in this Court. The bankruptcy court would not be divested of jurisdiction and the proceedings would continue in that court. Thus, this issue is not a proper subject for interlocutory appeal.

*Fourth,* the Motion for Leave does not demonstrate "exceptional circumstances." The Bank Defendants' two arguments here are unavailing. First, it is not correct that this Court's refusal to accept this appeal will bind a subsequent court's consideration of the "core/non-core" element if and when the Bank Defendants move to withdraw the reference of this adversary proceeding. This is the Bank Defendants' so-called "Catch 22" argument. Memorandum at 2-3, 19. This Court has point blank rejected this argument, and the Bank Defendants' failure to cite this authority in their Motion for Leave is surprising. In *Bianco v. Hoehn (In re Gaston & Snow)*, 173 B.R. 302, 306 (S.D.N.Y. 1994), this Court rejected the argument that failure to appeal a bankruptcy court's determination that a proceeding was core binds a district court's consideration of that element in a later motion to withdraw the reference. Even if this were a legitimate concern, it does not constitute exceptional circumstances warranting acceptance of the Bank Defendants' appeal. If this Court finds it appropriate, it can note in its order refusing leave to appeal that the Bankruptcy Court's Core Order is to be considered by the district court if and when the Bank Defendants seek to withdraw the reference.

The second argument the Bank Defendants make in support of "exceptional circumstances" – that the basis of the Bankruptcy Court's Core Order unconstitutionally

expands the jurisdiction of the bankruptcy courts – also is incorrect.  Courts in this District that have applied the "same transaction" test in determining that common law claims brought by debtors against creditors who file proofs of claim are core claims have considered and rejected this argument.  *See In re Iridium Operating,* 285 B.R. at 834 ("Nor does this Court find that allowing the bankruptcy court to hear these claims as core creates an exception to *Marathon* that would swallow the rule.").

## AN IMPORTANT NOTE ABOUT JURY TRIAL

The Bank Defendants pepper their papers with references to their alleged right to have Plaintiffs' common law claims tried to a jury and the alleged prejudice to that right if the Bankruptcy Court's Core Order is not reversed.  Memorandum at 2, 4, 17 n. 9, 20.  The Bank Defendants' right to jury trial, if any, is not before this Court.  The Bank Defendants made an unmistakable point of telling the Bankruptcy Court that the issue of their right to jury trial, if any, is not germane to the core/non-core question:

> Notably, Citigroup does not ask this Court to determine Citigroup's right to a jury trial or the propriety of withdrawing the reference.  The core/non-core distinction is 'entitled to minimal weight' when reaching a decision on whether Citigroup has a right to a jury trial and also does not end the withdrawal of the reference inquiry.  Rather, Citigroup joins Barclays in asking this Court for an initial determination that the Common Law Counts are non-core to preserve its right to withdraw the reference when appropriate.

Joinder by Citigroup Defendants in Barclays' Motion and Memorandum of Law in Support of Motion for Initial Determination Under 28 U.S.C. § 157(b)(3) that Certain Claims are Non-Core, April 28, 2005, at 5 n. 4 (citations omitted).

However, should there be any issue of the Bank Defendants' right to jury trial, Plaintiffs are prepared to demonstrate that the Bank Defendants contractually waived their right to jury

trial. Many of the transaction documents between Plaintiffs and the Bank Defendants contain broad waivers of the right to trial by jury. For example, looking only at one of the many transactions between Plaintiffs and Citigroup, the Yosemite I transaction, there are several agreements containing jury trial waivers.[5]    The Closing Agreement for the Yosemite I transaction dated November 4, 1999, at Section 4.5(b), provides:    Each of the parties "irrevocably waives to the fullest extent permitted by law all right to trial by jury in any proceeding arising out of or relating directly or indirectly to any of this agreement or any other transaction documents or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory)."    Similarly, the Fiscal Agency Agreement for the Yosemite I transaction dated November 18, 1999, at Section 7.07, provides that "[e]ach of the parties hereto hereby irrevocably waives to the fullest extent permitted by law all right to trial by jury in any proceeding arising out of or relating directly or indirectly to any of this agreement or any other fiscal agency documents or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory)."    Citigroup executed similar waivers of the right to jury trial in other agreements in the Yosemite I transaction and in other transactions with Plaintiffs, as did Deutsche Bank.

The extent to which the Bank Defendants are entitled to a jury trial, if at all, was not placed before the Bankruptcy Court, and thus should not be a factor in this Court's decision on

---

[5] The Yosemite I transaction is one of the transactions on which Citigroup filed proofs of claim against Plaintiffs' bankruptcy estates, *see* Citibank Proof of Claim no. 12108 for $13,310,541.57 and Citibank Proof of Claim no. 12109 for $38,310,541.57, and it is one of the transactions that Plaintiffs allege was part of the scheme in which Citigroup aided and abetted and conspired with former Enron officers. *See* Reorganized Debtors' Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims ("Fourth Amended Complaint") at ¶¶ 277-301.

the Motion to Leave. However, even as a backdrop to consideration of the Motion for Leave, the Court should not assume that the Bank Defendants have a right to trial by jury.

**STATEMENT OF FACTS**

On December 2, 2001, Plaintiffs filed petitions for relief under Chapter 11 of the Bankruptcy Code.

**A.    Citigroup's Claims Against Plaintiffs' Estates**

After Plaintiffs filed their petitions for Chapter 11 relief, Citigroup filed eight (8) proofs of claim against Plaintiffs based upon four phony commodity "prepay transactions," each of which involved the creation by Citigroup of trusts for the issuance of Enron credit-linked notes. These bogus prepay transactions are known as Yosemite I, Yosemite II, Yosemite III, and Yosemite IV. As of this date, Citigroup has at least the following proofs of claim pending against Plaintiffs' estates:

* Citibank, N.A. claim against Enron North America Corp. ("ENA") for $13,310,541.57 under purported swap agreements dated December 22, 1999 between (i) ENA and Delta Energy Corporation and (ii) Citibank and ENA (the "**Yosemite I-ENA Proof of Claim**") (Enron claim no. 12108) (attached as Exhibit "C").

* Citibank, N.A. claim against Enron Corp. for $38,310,541.57 under (i) a Promissory Note dated November 18, 1999 in the original amount of $25,000,000 (the "Yosemite I Magic Note"), and (ii) a Guaranty dated November 18, 1999 of the amounts due under the Yosemite I purported swap agreements (the "**Yosemite I-Enron Proof of Claim**") (Enron claim no. 12109) (attached as "Exhibit "D").

* Citibank, N.A. claim against ENA for $6,200,979.40 under purported swap agreements dated February 23, 2000 between (i) ENA and Delta Energy Corporation and (ii) Citibank and ENA (the "**Yosemite II-ENA Proof of Claim**") (Enron claim no. 12107) (attached as Exhibit "E").

* Citibank, N.A. claim against Enron Corp. for $30,642,060.86 under (i) a Promissory Note dated February 23, 2000 in the original amount of $24,441,081.46 (the "Yosemite II Magic Note"), and (ii) a Guaranty dated

February 23, 2000 of the amounts due under the Yosemite II purported swap agreements (the "**Yosemite II-Enron Proof of Claim**") (attached as Exhibit "F").

\*     Citibank, N.A. claim against ENA for setoff rights under purported swap agreements dated August 25, 2000 (the "**Yosemite III-ENA Proof of Claim**") (Enron claim no. 12104) (attached as Exhibit "G").

\*     Citibank, N.A. claim against Enron Corp. for $27,869,384.72 under a Promissory Note dated August 25, 2000 in the original amount of $25,000,000, plus interest, fees and expenses (the "Yosemite III Magic Note") (the "**Yosemite III-Enron Proof of Claim**") (Enron claim no. 12105) (attached as Exhibit "H").

\*     Citibank, N.A. claim against ENA for $1,054,735.48 under purported swap agreements dated May 24, 2001 between (i) ENA and Delta Energy Corporation and (ii) Citibank and ENA (the "**Yosemite IV-ENA Proof of Claim**") (Enron claim no. 12102) (attached as Exhibit "I").

\*     Citibank, N.A. claim against Enron Corp. for $51,360,616.43 under (i) a Promissory Note dated May 24, 2001 in the original amount of $25,000,000, plus interest, fees and expenses, (ii) a Promissory Note dated May 24, 2001 in the original amount of $24,091,089.28 (collectively, the "Yosemite IV Magic Notes"), and (iii) a Guaranty of the amounts due under the Yosemite IV purported swap agreements (the "**Yosemite IV-Enron Proof of Claim**") (Enron claim no. 12103) (attached as Exhibit "J").

On their face, these claims seek in excess of $168 million from Plaintiffs' estates.

**B.     Deutsche Bank's Claims Against Plaintiffs' Estates**

After Plaintiffs filed their petitions for Chapter 11 relief, Deutsche Bank filed four proofs of claim against Enron Corp. based on three improper tax transactions: Steele, Cochise, and Valhalla. As of this date, Deutsche Bank maintains at least the following proofs of claim against Plaintiffs' estates:

\*     BT Green, Inc. ("BT Green")[6] claim against Enron Corp. for $7,724,726.20 based on the Steele Tax Transaction. Specifically, BT Green claims $7,393,330 under a Guaranty and Indemnification Agreement regarding any adverse tax consequences, and $331,396.19 under the same agreement regarding a failure to

_____

[6] BT Green is a successor in interest to Bankers Trust Company, which was acquired by Deutsche Bank after the Steele Tax Transaction.

make distributions under a partnership agreement (Enron claim no. 12799) (attached as Exhibit "K").

\*    Deutsche Bank Trust Company Delaware ("DB Delaware") claim against Enron Corp. for $11,349,513.37 based on the Steele Tax Transaction. Specifically, DB Delaware claims $10,862,520 under a Guaranty of Obligations regarding payment of a promissory note made out by ECT Investing Partners, L.P. to Bankers Trust Delaware (n/k/a DB Delaware), and $486,993.37 under a Guaranty and Indemnification Agreement regarding a failure to make distributions under a partnership agreement (Enron claim no. 12798) (attached as Exhibit "L").

\*    Deutsche Bank Trust Company Americas ("DB Americas") claim against Enron Corp. for $4,536,000 based on the Teresa and Cochise Tax Transactions. Specifically, DB Americas claims a fee for consulting services that it alleges it provided pursuant to engagement letters dated March 27, 1997 ($786,000) and January 28, 1999 ($3,750,000). DB Americas also lists several claims against Enron Corporation relating to a shareholders agreement and certain put agreements which it claims are contingent, unliquidated, and incapable of calculation (Enron claim no. 12800) (attached as Exhibit "M").

\*    Deutsche Bank claim against Enron Corp. for $102,304,668.35 based on the Valhalla Accommodation Tax Transaction. Specifically, Deutsche Bank claims $102,304,668.35 for adverse tax consequences of the transaction under a Tax Indemnification Agreement between Enron and Deutsche Bank (Enron claim no. 12797) (attached as Exhibit "N").

Deutsche Bank's claims seek to recover more than $125 million from Plaintiffs' estates.

## C.    Plaintiffs' Counterclaims Against Citigroup and Deutsche Bank

In September 2003, Plaintiffs initiated this adversary proceeding asserting counterclaims against Citigroup, Deutsche Bank and other banks and investment banks for the responsibility they bear in the downfall of what was once the seventh largest corporation in the United States. Plaintiffs allege that Citigroup, Deutsche Bank and the other bank defendants participated with a small group of Enron's senior officers and managers (the **"Insiders"**) in a multi-year scheme to manipulate Enron's financial statements and misstate its financial condition. Fourth Amended

Complaint at ¶ 1.[7]  Citigroup, Deutsche Bank and the other bank defendants principally assisted

the scheme by designing, implementing, and often financing structured finance transactions with

Enron, knowing that the Insiders were improperly recording the financial effects of these

transactions. *Id.* at ¶ 2.

Among other improper transactions, Citigroup "made loans to Enron but deliberately

disguised these loans as prepay commodity contracts.  These phony 'prepay' transactions

routinely closed at the end of a fiscal quarter and were arranged in amounts specifically chosen

to inflate Enron's operating cash flow to levels necessary to maintain Enron's credit ratings." *Id.*

"Citigroup knew the prepays were in substance loans to Enron and, as such, should have been

recorded on Enron's financial statements as loans, not commodity trades." *Id.* at ¶ 290.  For its

part, Deutsche Bank facilitated the manipulation of Enron's financial condition by "designing,

financing, and/or implementing several important tax transactions," which "allowed the Insiders

improperly to record more than $400 million in income on Enron's financial statements." *Id.* at

¶ 473.

### 1.    *Plaintiffs' counterclaim allegations against Citigroup*

"Citigroup's involvement in the Insiders' manipulation of Enron's financial condition

was essential to the success of the Insiders' scheme." *Id.* at ¶ 261.

> Citigroup knew the Insiders were using SPE transactions improperly to
> generate income and inflate cash flow from operations and to disguise
> debt as price risk management liabilities.  During the relevant period,
> Citigroup assisted the Insiders in achieving these goals by designing,
> financing and/or implementing eleven prepay transactions, three minority
> interest transactions, and two transactions involving Enron's forest
> products business.  Together, these transactions provided Enron with $5.9
> billion in financing, from which the Insiders improperly recorded more

---

[7] A copy of Plaintiffs' Fourth Amended Complaint is attached as Exhibit "O."

than $5 billion in cash flow from operating activities, improperly recorded approximately $132 million of income, and understated the debt on Enron's balance sheet by billions of dollars.

*Id.*

Citigroup and the Insiders deliberately structured the phony prepays, including the four Yosemite prepays, "in a way that allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent." *Id.* at ¶ 264 (quoting report of Manhattan District Attorney Robert Morgenthau). Each of the Citigroup prepays was a disguised loan to Enron. *Id.* at ¶ 283. The S.E.C. concluded that

> [i]f all the contracts [in a given prepay transaction] were performed pursuant to their terms, Citigroup was entitled to receive repayment of its prepayment of the contract price, together with a negotiated return on that amount, on a specified schedule – *i.e.,* the equivalent of an interest payment on the contract price. The negotiated return was unrelated to any price risk associated with owning a commodity contract.

*Id.* at ¶ 290 (quoting SEC Order Instituting a Public Administrative Proceeding *In the Matter of Citigroup, Inc.,* Adm. Proc. 3-11192, July 28, 2003, at 3).

The four Yosemite prepays closed on the following dates and in the following amounts:

| Yosemite I | 11/18/1999 | $800 million |
| Yosemite II | 2/23/2000 | $331.8 million |
| Yosemite III | 8/25/2000 | $475 million |
| Yosemite IV USD | 5/24/2001 | $775.1 million |
| Yosemite IV GBP | 5/24/2001 | £ 139 million (approx. $197 million) |
| Yosemite IV Euro | 5/24/2001 | € 222.5 million (approx. $190.6 mill.) |

In each of the Yosemite prepays, Citigroup created or directed the creation of a trust – the Yosemite trusts – that issued "credit-linked notes" to investors. *Id.* at ¶ 286. The proceeds from those credit-linked notes were used to fund the phony prepay transactions between Citigroup, its

offshore special purpose entity ("SPE") Delta Energy Corporation ("Delta"), and Enron. Each of the prepay transactions funded by the Yosemite credit-linked notes involved a triangular structure in which purported commodity swap agreements among Citigroup, Delta, and Enron were used to eliminate the risk of a change in commodity price. *Id.* at ¶ 282. Not only did the Yosemite trusts generate funds for the phony prepay transactions, they allowed the Insiders to tap a source of prepay funding other than the Bank Defendants: "The credit-linked note device that Citigroup designed for Enron allowed Insiders to feed their bottomless appetite for borrowing, while allowing Citigroup simultaneously to avoid further committing its own capital to the scheme." *Id.* at ¶ 287.

Each of the four Yosemite transactions also included a promissory note from Enron Corp. to Citigroup. These promissory notes had unspecified rates of interest, the purpose of which was to make certain that Enron would pay to Citigroup sufficient money to enable Citigroup to fund its obligations to the Yosemite Trusts. These promissory notes were appropriately called the "Magic Notes."

The Citigroup prepays, including the four Yosemite prepays, materially altered Enron's financial condition and appearance:

> In 1998, $500 million of Enron's reported $1.6 billion of cash flow from operations came from Citigroup prepay transactions. Of Enron's reported $1.2 billion net cash flow from operations in 1999, 76% ($935 million) was generated by the Citigroup prepay transactions. In 2000, the Citigroup prepays created 11% ($546 million) of Enron's reported cash flow from operations. Enron's reported debt for these years also was materially understated because of the Citigroup prepay transactions. In 1999, Enron's debt was under-reported by 14% ($1.1 billion), and in 2000 it was under-reported by 16% ($1.6 billion). The Enron Examiner found that "[t]he Citigroup prepays alone . . . had a material effect on Enron's cash flows from operating activities," and that had the Citigroup prepays been properly recorded, "Enron's reported debt levels would have looked markedly different." Examiner's report, Vol. III, Appendix D, at 48-49.

*Id.* at ¶ 300.

## 2.     *Plaintiffs' counterclaim allegations against Deutsche Bank*

"Deutsche Bank's involvement in the Insiders' manipulation of Enron's financial condition was also necessary to the Insiders' scheme.  Deutsche Bank knew the Insiders were using SPE transactions improperly to inflate income on Enron's financial statements and to remove debt."  *Id.* at ¶ 473.  Deutsche Bank helped the Insiders achieve these improper goals by designing, financing, and implementing a series of tax transactions which allowed the Insiders to improperly record more than $400 million in income on Enron's financial statements.  *Id.*  Common to these tax transactions was their sole goal: the creation of pre-tax accounting income, rather than any legitimate business purpose.  *Id.* at ¶¶ 481, 488, 494.

Three tax transactions designed by Deutsche Bank for the Insiders' use were Steele, Cochise, and Teresa.  *Id.* at ¶ 474.  Steele and Cochise were REMIC carryover basis transactions designed to create deferred tax credits derived from speculative future tax deductions that Enron could manipulate to create pre-tax current financial statement income.  *Id.* at ¶¶ 479-480.  These transactions alone allowed the Insiders to improperly report $144 million of pre-tax income.  *Id.* at ¶ 479.

As with Steele and Cochise, Teresa was designed to create current accounting income.  In fact, Teresa actually created a tax liability of $131 million that Enron would not otherwise have, in order that the Insiders' could inflate Enron's pre-tax earnings.  *Id.* at ¶ 490.  Deutsche Bank engineered a $1.3 billion tax basis step-up for the Enron corporate headquarters building, quantified that increase as a future tax benefit, and then advised Enron to record that benefit as current accounting income over an artificially short period of time.  *Id.* at ¶ 491.  Deutsche Bank estimated that Teresa would provide Enron with $240 million of after-tax income.  *Id.* at ¶ 492.

In addition to these tax transactions, Enron also entered into accommodation transactions with Deutsche Bank as lucrative rewards from the Insiders to Deutsche Bank for the benefits the Insiders realized from the tax transactions described above. *Id.* at ¶ 501. One of these accommodation transactions, Valhalla, allowed Deutsche Bank to exploit the difference between the U.S. and German tax laws and create deductible interest and nontaxable income on its financial statements. *Id.* at ¶ 502.

### 3. *Plaintiffs' bankruptcy counterclaims based on the scheme between Citigroup, Deutsche Bank and the Enron Insiders*

Based upon the scheme between Citigroup, Deutsche Bank and the Insiders, Plaintiffs asserted several causes of action against Citigroup and Deutsche Bank as counterclaims to the proofs of claim filed by these defendants. *Id.* at ¶ 8 ("As to those Defendants who have filed claims or on whose behalf claims have been filed against Plaintiff, this adversary proceeding is brought as an objection and counterclaim to those claims."). Many of these causes of action, the so-called "bankruptcy counterclaims," clearly are core proceedings.[8]

In Counts 1-5 of the Fourth Amended Complaint, Plaintiffs allege counterclaims against Citigroup seeking avoidance and recovery of specified transfers and disallowance of Citigroup's claims against Plaintiffs' estates under the Bankruptcy Code. *Id.* at ¶¶ 704-742. Importantly, in Count 1, Plaintiffs seek the avoidance of, among others, eight (8) preferential transfers to Citigroup made in connection with the phony Yosemite prepay transactions; in Count 2, Plaintiffs seek the avoidance under Bankruptcy Code § 548 of, among others, twenty-one (21)

---

[8] Barclays acknowledged that the bankruptcy counterclaims are core proceedings in its Memorandum of Law in Support of Motion for Initial Determination Under 28 U.S.C. § 157(b)(3) that Certain Claims are Non-Core Claims. Barclays Memorandum at 3. Citigroup and Deutsche Bank adopted Barclays' briefing before the Bankruptcy Court and, in so doing, acknowledged the same.

transfers to Citigroup made in connection with the phony Yosemite prepays, the total of which is over $165 million; and, in Count 3, Plaintiffs seek the avoidance under Bankruptcy Code § 544 and applicable state fraudulent transfer law of, among others, thirty (30) transfers to Citigroup made in connection with the phony Yosemite prepays totaling over $231 million. *Id.* at ¶¶ 705 (transfer table), 716 (transfer table), 729 (transfer table).

In Counts 30-36 of the Fourth Amended Complaint, Plaintiffs allege counterclaims against Deutsche Bank seeking avoidance and recovery of specified transfers and disallowance of Deutsche Bank's claims against Plaintiffs' estates under the Bankruptcy Code. *Id.* at ¶¶ 954-1013. As the tables in paragraphs 982, 991, and 1002 set forth, forty-eight (48) of the specified transfers relate to the Steele and Cochise tax transactions. Specifically, in Count 32 Plaintiffs seek to avoid four (4) preferential transfers made in connection with the Steele or Cochise tax transactions; in Count 33 Plaintiffs seek to avoid fifteen (15) additional fraudulent transfers under § 548 of the Bankruptcy Code made in connection with the Steele or Cochise tax transactions; and, in Count 34, Plaintiffs seek to avoid forty-eight (48) transfers under § 544 of the Bankruptcy Code and applicable state fraudulent transfer law made in connection with the Steele or Cochise tax transactions. *Id.* at ¶¶ 982, 991, 1002.

In Count 69, Plaintiffs bring an avoidance counterclaim under Bankruptcy Code §§ 544 and 548(a)(1)(A) and applicable state law against Citigroup and Deutsche Bank for their conduct in connection with, respectively, the four phony Yosemite prepays (Citigroup) and the Steele and Cochise tax transactions (Deutsche Bank). *Id.* at ¶¶ 1239-1245. In Counts 73 and 73A, Plaintiffs further allege counterclaims under Sections 510(c) and 105(a) of the Bankruptcy Code for equitable subordination of Citigroup's and Deutsche Bank's claims against Plaintiffs' bankruptcy estates, as well as the claims asserted by their transferees against Plaintiffs' estates.

*Id.* at ¶¶ 1258-1266I.  In total, through these counterclaims, Plaintiffs seek to subordinate claims asserted by Citigroup (and its transferees) in excess of $5.2 billion and to avoid transfers to Citigroup totaling in excess of $231 million, and Plaintiffs seek to subordinate claims asserted by Deutsche Bank (and its transferees) in excess of $161 million (not including unliquidated amounts) and to avoid transfers to Deutsche Bank totaling approximately $103 million.

### 4.    *Plaintiffs' common law counterclaims based on the scheme between Citigroup, Deutsche Bank, and the Enron Insiders*

In addition to "bankruptcy counterclaims," Plaintiffs assert three principal common law counterclaims against Citigroup and Deutsche Bank (and the other bank defendants): (1) aiding and abetting breach of fiduciary duty (Count 74); (2) aiding and abetting fraud (Count 75); and (3) unlawful civil conspiracy (Count 76).  *Id.* at ¶¶ 1267-1601.  These counterclaims are based upon Citigroup's and Deutsche Bank's knowing participation in the scheme to manipulate and misstate Enron's financial condition.  *E.g., id.* at ¶ 1271 ("In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants participated with actual knowledge that the purpose of the transaction was to manipulate and misstate Enron's financial statements and that the transaction would be reported by Enron in a materially misleading manner.  In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants gave substantial assistance to the Insiders by designing, implementing, financing, purporting to invest in, obtaining others to invest in, and/or closing the transaction and/or by causing their subsidiaries or affiliates to do the same.").

The effect on Enron of Citigroup's and Deutsche Bank's scheme with the Insiders was devastating.  As a direct result of manipulating and misstating Enron's financial condition, "Enron's debt was wrongfully expanded out of all proportion to its ability to repay," the

company became insolvent, and "its insolvency was aggravated and deepened." *Id.* at ¶ 703. In addition, Enron was forced to file for bankruptcy and suffered substantial legal and administrative costs, as well as other injuries." *Id.*

### D.    Citigroup's Set-Off Defense

In response to Plaintiffs' counterclaims in this adversary proceeding, Citigroup asserted the defense of set-off.[9]  In its Amended Answer, Citigroup specifically pleaded as one of its "Defenses" that "the claims asserted in the Complaint are barred, in whole or in part, by the doctrines of setoff and/or recoupment."  Amended Answer of Citigroup Defendants to Fourth Amended Complaint, October 28, 2005, at 245 (Thirty-Fourth Defense).[10]  In addition, in its answer to Plaintiffs' counterclaims, Citigroup expressly "adopt[s] and incorporate[s]" as defenses "any and all other defenses asserted . . . by any of the other defendants."  Amended Answer of Citigroup, at 245 (Thirty-Ninth Defense).    Thus, Citigroup has incorporated into its answer the set-off defense asserted by Barclays' specifically based upon its proofs of claim filed against Plaintiffs' estates.

. . . . . .

The proofs of claims against Plaintiffs' estates by Citigroup and Deutsche Bank, both the bankruptcy and common law counterclaims alleged by Plaintiffs against Citigroup and Deutsche

---

[9]  While Deutsche Bank's motion to dismiss is still before the Bankruptcy Court and, for that reason, Deutsche Bank has not yet answered the Fourth Amended Complaint, Deutsche Bank has indicated that it will assert claims of set-off, if and when an answer is filed. *See* letter from Titia Holtz, counsel to Deutsche Bank, to Lawrence Cooke II, Lisa Tancredi, and Richard Milin, counsel to Plaintiffs, dated November 21, 2006 at 2-3.

[10]  Citigroup's Amended Answer filed on October 28, 2005 totals 246 pages.  Rather than burden the Court by attaching the entire Amended Answer, Plaintiffs submit relevant excerpts, which are attached as Exhibit "P."

Bank, and the set-off claim alleged by Citigroup against Plaintiffs' counterclaims derive from an identical factual and transactional basis: the structured finance transactions between Plaintiffs and Citigroup and Deutsche Bank. These claims, counterclaims, and set-off claims are more than logically connected; they arise from the same facts and transactions.

## ARGUMENT

### A.    Leave to Appeal Interlocutory Orders of Bankruptcy Courts is Limited to Extraordinary Cases.

"Interlocutory appeals from decisions of the bankruptcy court are disfavored in the Second Circuit." *Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.),* No. 01-16034, 2006 U.S. Dist. LEXIS 57422, at *2 (S.D.N.Y. May 3, 2006). The "well-established judicial policy" in this District is to discourage interlocutory appeals and avoid "the delay and disruption which results from such piecemeal litigation." *Id.*; *see Abel v. Shugrue (In re Ionosphere Clubs, Inc.),* 179 B.R. 24, 28 (S.D.N.Y. 1995). Thus, interlocutory appeal "is limited to *extraordinary cases* where appellate review might avoid protracted and expensive litigation." *Liebert v. Levine (In re Solomon Levine),* No. 03 Civ. 7146, 2004 U.S. Dist. LEXIS 6025, at *6 (S.D.N.Y. April 9, 2004) (emphasis added) (quoting *German v. Federal Home Loan Mortgage Corp.,* 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995)).

To warrant an interlocutory appeal, the movant must establish that *all* of the following standards are met:

1.    The bankruptcy court's order from which appeal is sought involves a "controlling question of law"

2.    over which there is "substantial ground for difference of opinion."

3.  "An immediate appeal would materially advance the ultimate termination of the litigation."

4.  The appeal involves "exceptional circumstances to overcome the general aversion to piecemeal litigation and to justify a departure from the basic policy of postponing appellate review until after entry of a final judgment."

*Enron Corp. v. Springfield Assoc., LLC (In re Enron Corp.)*, M-47, 2006 U.S. Dist. LEXIS 63223, at *17 (S.D.N.Y. Sept. 5, 2006),. These standards are "strictly applied," *id.* at *16, and failure to meet any of them warrants denial of the motion for leave. *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, No. M 47, 2003 U.S. Dist. LEXIS 11119, at *2 (S.D.N.Y. June 30, 2003).

**B.   The Motion for Leave Fails to Satisfy Any of the Four Standards for Interlocutory Appeal.**

1.  *The Core Order does not involve a controlling question of law.*

The Bankruptcy Court's Core Order determined that three of Plaintiffs' counterclaims against the Bank Defendants are "core" claims under 28 U.S.C. § 157(b)(3).   The Bank Defendants attempt to characterize this ruling as a controlling question of law by claiming that it "defines the scope of the Bankruptcy Court's jurisdiction" and "informs the consideration of the withdrawal of the reference motion," which they have yet to file.  Memorandum at 13.  Even if true, neither of these grounds constitutes a controlling question of law.  Moreover, the Core Order, by itself, does not define the scope of the Bankruptcy Court's jurisdiction.  That will be determined by the court which considers the Bank Defendants' motion to withdraw the reference, if and when it is pursued.

A "controlling question of law" is one that "would terminate the action, or at a minimum that . . . would materially affect the litigation's outcome." *Enron Corp. v. Springfield Associates LLC,* 2006 U.S. Dist. LEXIS 63223 at *18; *see also In re Enron Corp.,* 316 B.R. at 772 ("[A] question of law is 'controlling' if reversal of the [lower] court's order would terminate the action.").

The Bank Defendants make no suggestion that reversing the Bankruptcy Court's Core Order will terminate this adversary proceeding, and it clearly will not. Whether Plaintiffs' claims are determined to be core or non-core, they will continue to be litigated exactly as they are today. Nor do the Bank Defendants argue that reversal of the Core Order will materially affect this litigation's *"outcome."* It clearly will not. The most the Bank Defendants allege is that the core/non-core decision will impact which court tries this case – the Bankruptcy Court or this Court – and whether the case will be tried to a jury or the bench. While Plaintiffs disagree with this allegation, even if true it does not affect the "outcome" of this adversary proceeding. The same claims will be presented in either forum to the finder of fact, who will determine their outcome. *But cf. Enron Corp. v. Springfield Assoc. LLC,* 2006 U.S. Dist. LEXIS 63223, at *24 (finding a controlling question of law because "[i]f the Bankruptcy Court's rulings denying the dismissal of Enron's two causes of action in the Adversary Proceeding are reversed, this may result in the dismissal of these actions in their entirety.").[11]

The Bank Defendants nonetheless are incorrect when they argue that the Core Order "defines the scope of the Bankruptcy Court's jurisdiction" over this adversary proceeding.

---

[11] The Bank Defendants' argument that the Bankruptcy Court's Core Order might "inform" a later consideration of a yet-to-be-filed motion to withdraw the reference is not remotely a controlling question of law.

Memorandum at 13.   Standing alone, the Core Order does not determine the jurisdiction of the Bankruptcy Court.  Throughout the Motion for Leave, the Bank Defendants state they will file a motion to have this Court withdraw the reference of this adversary proceeding to the Bankruptcy Court.  *Id.* at 2, 4, 12, 13, 18-19.  That motion would be premature if filed now, as the Bank Defendants acknowledge.  *Id.* at 17 n. 9 (citing cases where withdrawal of the reference is premature when the case is not "trial ready").  However, if and when the motion to withdraw the reference is filed, and if it is granted,  the scope of the Bankruptcy Court's jurisdiction over this adversary proceeding will be resolved.

### 2.     *There is no substantial ground for difference of opinion over the Core Order.*

To demonstrate a "substantial ground for difference of opinion," the Bank Defendants must  show there is "more than strong disagreement between the adversary parties," *North Fork Bank v. Abelson,* 207 B.R. 382, 390 (E.D.N.Y. 1997); rather, there must be "genuine doubt as to whether the Bankruptcy Court applied the correct legal standard."  *Enron Corp. v. Springfield Assoc., LLC,* 2006 U.S. Dist. LEXIS 63223 at *19.  "[I]t is not sufficient that the relevant case law is 'less than clear' or allegedly 'not in accord' or that there is a strong disagreement among the parties."  *Id.* (quoting *North Fork Bank v. Abelson,* 207 B.R. at 390).

The Bankruptcy Court held that Plaintiffs' claims for aiding and abetting and for civil conspiracy were core claims because "they stem from the same transaction[s] and are logically connected to the [Bank Defendants' proofs of claim]."  Core Opinion at 10.  The Bankruptcy Court specifically analyzed one of the structured finance transactions between Plaintiffs and Barclays – the J.T. Holdings transaction – and stated that:

> Enron argues that the JT Holdings Transaction was part of the alleged scheme between Barclays and the Enron Insiders to manipulate and

misstate Enron's financial condition, and it is the alleged scheme between Barclays and the Enron Insiders that forms the basis of the Common Law Claims. The same transaction thus forms the basis of the JT Holdings Transaction Proof of Claim and the Common Law Claims . . . . The alleged damages stem from the entirety of the transaction in facilitating the continuance of a company that had lost its value. ***Thus, the same transaction gives rise to both the JT Holdings Transaction Proof of Claim and the Common Law Claims.***

*Id.* (emphasis added).[12] The Bankruptcy Court also held that Plaintiffs' claims against the Bank Defendants are core claims because the Bank Defendants asserted their proofs of claim as set-offs in their answers to Plaintiffs' complaint. *Id.* at 11. Thus, through the separate means of a set-off claim, the only basis for which is the Bank Defendants' proofs of claim, the Bank Defendants brought claims against Plaintiffs' estates based upon the same transactions as alleged in Plaintiffs' claims for aiding and abetting and for civil conspiracy.

Rather than reflect substantial ground for difference of opinion, the Bankruptcy Court's determinations demonstrate adherence to established precedent of this Court. In holding that claims alleged by a debtor that are based upon the same transactions as the creditor's proofs of claim are core claims, the Bankruptcy Court squarely followed a line of cases in this Court stretching back over twenty years. *See In re CBI Holding,* 311 B.R. at 363 (finding debtor's

---

[12] This is one of the instances in which the Bankruptcy Court's Core Opinion focused on Barclays. The same analysis applies to the structured finance transactions between Plaintiffs and Citigroup and Deutsche Bank. Those transactions, as demonstrated in this Opposition, give rise to both the proofs of claim filed by Citigroup and Deutsche Bank against Plaintiffs' estates and the counterclaims brought by Plaintiffs against Citigroup and Deutsche Bank for aiding and abetting and for civil conspiracy. Plaintiffs expect that Citigroup and Deutsche Bank share the view that the Bankruptcy Court's analysis of the claims by and against Barclays apply to them. If for some reason they take issue with this view and argue that the claims filed by and against them are different than Barclays, the Motion for Leave should be denied. It is well established that in order for there to be a "controlling question of law," "there must be "a 'pure' question of law that the reviewing court 'could decide quickly and cleanly without having to study the record.'" *In re WorldCom, Inc.,* No. M-47, 2003 U.S. Dist. LEXIS 11160 (S.D.N.Y. June 30, 2003), at *29 (quoting *Ahrenholz v. Board of Trustees,* 219 F.3d 674, 676-77 (7th Cir. 2000)).

claims of negligence, breach of contract, and fraud to be core claims because they "are based upon the same operative facts" as the creditor's proof of claim); *In re Iridium Operating LLC,* 285 B.R. at 830 (finding debtor's claims of aiding and abetting breach of fiduciary duty and breach of contract to be core claims because they "arise from the same operative facts" as the creditor's proof of claim); *Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.),* 270 B.R. 108, 121 (S.D.N.Y. 2001) (finding debtor's claims for declaratory judgment and an accounting to be core claims because they "arise out of the same transaction as the [creditor's] proofs of claim"); *The Leslie Fay Companies v. Falbaum (In re The Leslie Fay Companies, Inc.),* No. 97 Civ. 2244, 1997 WL 555607, at *2 (S.D.N.Y. Sept. 4, 1997) (finding debtor's claim of breach of contract to be a core claim because "it arises out of the same transaction as the [creditor's] proofs of claim"); *Lombard-Wall Inc. v. New York City Housing Development Corp. (In re Lombard-Wall Inc.),* 48 B.R. 986, 991 (S.D.N.Y. 1985) (finding debtor's claims to be core claims because they "arose out of the same transaction" as the creditor's proof of claim).

This line of cases is so established that this Court in *In re Iridium* articulated a clear rule for determining when common law claims by a debtor against a creditor which filed proofs of claim are core claims:

> Traditionally non-core claims against a creditor in an adversary proceeding will be considered core if: (1) the claim arises out of the same transaction as the creditor's proofs of claim or setoff claim, or (2) the adjudication of the adversary proceeding claim would require consideration of issues raised by the proofs of claim or setoff claim such that the two claims are logically connected.

285 B.R. at 832. The Bankruptcy Court's first basis for finding Plaintiffs' claims in this case to be core claims – that they arise from the same transactions as the Bank Defendants' proofs of

claim – is not subject to substantial difference of opinion.  To the contrary, the Bankruptcy Court directly followed the test set forth in *In re Iridium* and other cases in this District.

The same is true of the second basis on which the Bankruptcy Court found the claims in this case to be core claims – that the Bank Defendants' asserted claims of set-off based upon their proofs of claim against Plaintiffs' bankruptcy estates.  Courts in this District have held that when a creditor asserts set-offs against a debtor's claim that the creditor is making a claim against the debtor's estate.  *In re Iridium Operating,* 285 B.R. at 833 ("[A] setoff is a claim against the bankruptcy estate."); *North Am. Energy Conservation, Inc. v. Interstate Energy Resources, Inc. (In re North Am. Energy Conservation, Inc.),* No. 00-40563, 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 12, 2000),  ("[R]egardless of whether a setoff is labeled an 'affirmative defense' or a 'counterclaim,' a setoff is a claim against the bankruptcy estate."); *see also Hedstrom Corp. v. Wal-Mart Stores, Inc. (In re Hedstrom Corp.),* Nos. 04-38543, 05 C 6888, 2006 WL 1120572, at *3 (N.D. Ill. April 24, 2006) ("Whether Hedstrom writes Wal-Mart a check or cancels Wal-Mart's receivable, the end result is the same: the bankruptcy estate will be significantly diminished.  Because Wal-Mart's claimed setoff directly impacts the distribution of the bankrupt's assets, the Court holds that it falls within the bankruptcy court's core jurisdiction."); *Com. Fin. Services, Inc. v. Jones (In re Com. Fin. Services, Inc.),* 251 B.R. 397, 405 (Bankr. N.D. Okla. 2000) ("By pleading setoff as an affirmative defense, Jones is in fact asserting a claim against *the estate's right to recover from Jones,* which itself is property of the estate.") (emphasis in original).

Moreover, this Court has attributed greater significance to set-off claims against debtors because they "'elevate an unsecured claim to secured status to the extent that the debtor has a mutual, pre-petition claim' against the party asserting setoff." *North Am. Energy Conservation,*

at *2 (quoting *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir. 1984)). Following the clear holdings of these cases, the Bankruptcy Court correctly ruled that Plaintiffs' claims against the Bank Defendants were core claims because the Bank Defendants had asserted their proofs of claim against the Plaintiffs' bankruptcy estates in the form of set-offs.[13]

In the Motion for Leave, the Bank Defendants do not dispute that this Court has long held that common law claims brought by debtors against creditors based upon the same transactions as the creditor's proofs of claim are core claims, as in *In re CBI Holding, In re Iridium Operating LLC, In re Winimo Realty, In re The Leslie Fay Companies,* and *In re Lombard-Wall Inc.*[14]    Instead, the Bank Defendants misdirect the discussion by arguing that some courts have rejected a "predominately core" or "intertwinement" analysis for determining core/non-core status, *see* Memorandum at 25-30, and that "the mere filing of a proof of claim cannot render the common law counts core." *Id.* at 30.  These arguments completely miss the

---

[13]  At page 36 of their Memorandum, the Bank Defendants cite *Enron Power Marketing, Inc. v. City of Santa Clara (In re Enron Power Marketing, Inc.),* No. 01 Civ. 7964, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003), as a case which refused to find a debtor's claims against a creditor to be core claims when that creditor asserted set-off claims against the debtor.  While the court in *Enron Power Marketing* did hold that Enron Power Marketing's claims were non-core claims, its decision did not turn on the set-off issue.  Instead, the court ruled that "plaintiff's causes of action are essentially contract claims dressed up as bankruptcy claims." *Id.* at *9.  One explanation for this can be found in the court's statement that the defendant in that case contended that it "has not asserted any setoff or counterclaim against plaintiff." *Id.* at *4.

[14]  The most the Bank Defendants can say on this subject is that Judge Wood's decision in *In re CBI Holding* is on appeal to the Second Circuit.  Memorandum at 24 n. 10.  This they argue "provides further evidence that this issue is one on which substantial ground for difference of opinion exits." *Id.*  It cannot be the case that the mere pendency of an appeal by a party demonstrates a substantial ground for difference of opinion, and the Bank Defendants cite no authority to suggest that.  Otherwise, there almost always will be substantial ground for difference of opinion, and the jurisprudence of this Court stating that the standard is not met when the case law is "less than clear" or "not in accord" or even when there is strong disagreement among the parties would be meaningless.

point.  The cases from this District cited above have found common law claims to be core when those claims are based upon the same transaction as the creditor's proof of claim – not because there is intertwinement between the *debtor's* traditional bankruptcy claims and the *debtor's* common law claims against the creditor.

The cases relied upon by the Bank Defendants illustrate these differences.  For their "intertwinement" argument, the Bank Defendants cite *Glinka v. Abraham and Rose Co., Ltd.,* No. 2:93-CV-291, 1994 WL 905714 (D. Vt. June 6, 1994), *Official Committee of FMI Forwarding Co., Inc. v. Union Transport Corp. (In re FMI Forwarding Co., Inc.),* 01 Civ. 9462, 2004 WL 1348956 (S.D.N.Y. June 16, 2004), and *Adelphia Comm. Corp. v. Rigas (In re Adelphia Comm. Corp.),* 02 Civ. 8495, 2003 WL 21297258 (S.D.N.Y. June 4, 2003). Memorandum at 26, 28.  In *Glinka,* the court held the debtor's conversion and misappropriation of contract rights claims against the creditor were non-core claims because they were *not related to the creditor's proof of claim*:

> Although the decision is close, given that the pre-petition state law counterclaims *are not directly related to the proof of claim*, *Marathon* requires that the conversion and misappropriation of contract rights claims against Federal Plastics must be treated as non-core notwithstanding the filing of an *unrelated* proof of claim.

1994 WL 905714 at \*28-29 (emphasis added).  In *In re FMI Forwarding Co.* and *In re Adelphia Comm. Corp.,* the defendants in the debtors' adversary proceedings did *not* file proofs of claim. Thus, the debtors in those cases did not rely upon, and the courts did not have reason to discuss, the established doctrine in this Court that a debtor's common law claims against a creditor are core claims when they arise out of the same transactions as the creditor's proofs of claim.

3.    *Granting leave to appeal the Bankruptcy Court's Core Order will not materially advance the ultimate determination of this adversary proceeding.*

This Court recognizes that determining whether claims in an adversary proceeding are core or non-core claims does not meet the third standard for granting an interlocutory appeal:

> [A] resolution by this Court of the core/non-core issue will not necessarily 'materially advance the ultimate termination of the litigation.' If this Court were to hold that the proceedings are non-core, such a holding would disable the bankruptcy court only from 'enter[ing] appropriate orders and judgments," and would subject its findings of fact and conclusions of law to de novo review in this Court. The bankruptcy court would not be divested of jurisdiction and the proceedings would continue in that court. ***Thus, this issue is not a proper subject for interlocutory appeal.***

*In re United States Lines, Inc.,* 199 B.R. at 471-72 (emphasis added).

The Bank Defendants rely upon *Weiner's Inc. v. T.G.&Y. Stores Co.,* 191 B.R. 30 (S.D.N.Y. 1996). That case, however, not only involved a post-petition claim of negligence by a debtor against a non-creditor defendant, it was expressly based upon the defendant's right to jury trial, *id.* at 31, an issue not before this Court.

4.    *The Motion for Leave does not demonstrate exceptional circumstances.*

Interlocutory, piecemeal appeals of bankruptcy court orders are granted only in exceptional circumstances, in accordance with "the basic policy of postponing appellate review until after the entry of a final judgment." *North Fork Bank v. Abelson,* 207 B.R. at 391. "Appeals of interlocutory bankruptcy orders are not 'intended as a vehicle to provide early review of difficult rulings in hard cases.'" *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),* No. M 47, 2003 U.S. Dist. LEXIS 11119, at *3 (S.D.N.Y. June 30, 2003) (quoting *German v. Fed. Home Loan Mortgage Corp.,* 896 F.Supp. 1385, 1398 (S.D.N.Y. 1995)).

The Bank Defendants make two arguments to demonstrate "exceptional circumstances" in this case: (1) the "Catch-22" argument, that if this Court refuses this appeal a subsequent court hearing their motion to withdraw the reference will be bound by the Bankruptcy Court's finding that Plaintiffs' common law claims are core, and (2) that the Bankruptcy Court's Core Order unconstitutionally expands the jurisdiction of the bankruptcy courts.  Neither of these arguments has merit.

In *Bianco v. Hoehn (In re Gaston & Snow),* 173 B.R. 302, 306 (S.D.N.Y. 1994), this Court rejected the very "Catch 22" argument made by the Bank Defendants here.  In that case, defendants in an adversary proceeding moved to withdraw the reference.  Those same defendants had moved the bankruptcy court to dismiss the adversary proceeding on the ground that it was a non-core claim, but the bankruptcy court denied the motion and held that the adversary proceeding was a core claim.    *Id.* at 303-04.  In opposing defendants' motion to withdraw the reference, plaintiffs in *In re Gaston & Snow* made the identical argument the Bank Defendants use as their Catch 22 in the Motion for Leave – that the defendants had not directly appealed the bankruptcy court's core determination and, therefore, could not contest this finding in seeking to withdraw the reference.  This Court flatly rejected that argument:

> Plaintiff also notes that Defendants have neither appealed nor sought leave to appeal from the bankruptcy court's determination that the Proceeding was core.  ***Plaintiff argues that the failure to appeal renders the bankruptcy court's determination binding on this Court, subject only to conventional appellate review.  Plaintiff's reliance on In re Lion Capital Group, 63 B.R. 199 (S.D.N.Y. 1985), for this proposition is misplaced.  Lion Capital only held that a district court should not withdraw the reference while the bankruptcy court was itself reviewing the core/non-core determination.  Furthermore, the Second Circuit has made it clear that withdrawal pursuant to § 157, particularly permissive withdrawal, requires a reexamination of the core/non-core determination.  See Orion,*** 4 F.3d at 1102 (a core/non-core reevaluation is the threshold question for withdrawal).

*Id.* at 306 (emphasis added).

The Bank Defendants do not mention this Court's decision in *In re Gaston & Snow*, even though it plainly rejects the lead argument made in their Motion for Leave. *See* Memorandum at 2-3 (arguing that "decisions suggest that absent separate appellate review, the bankruptcy court's determination of the core/non-core question binds the district court in its consideration of a motion to withdraw the reference."). Moreover, the decision in *In re Gaston & Snow* specifically distinguishes one of the two cases on which the Bank Defendants rely – *Lesser v. A-Z Associates (In re Lion Capital Group)*, 63 B.R. 199 (S.D.N.Y. 1985). *See* Memorandum at 19. As this Court explained in *In re Gaston & Snow*, the holding in *In re Lion Capital* is limited to cases where – unlike this one -- a motion to withdraw is filed while the bankruptcy court is reviewing the core/non-core determination. 173 B.R. at 306.

The other case cited by the Bank Defendants in support of their "Catch 22" argument, *Horowitz v. Sheldon (In re Donald Sheldon & Co.)*, No. 92 Civ. 6834, 1992 U.S. Dist. LEXIS 19232 (S.D.N.Y. Dec. 17, 1992), at *4-5, relies entirely upon *In re Lion Capital*. Moreover, Judge Martin's decision in *In re Donald Sheldon* can be explained by the peculiar and outrageous circumstances of that case, in which the defendants moved to withdraw the reference of an adversary proceeding ***after*** an adverse verdict in a two-week jury trial "that they demanded and received." *Id.* at *3.

Notwithstanding the decision in *In re Gaston & Snow*, the Bank Defendants' "Catch 22" argument is not an exceptional circumstance warranting interlocutory appeal of the Core Order, for two reasons. First, if the court accepts the "Catch 22" argument as an exceptional circumstance warranting leave to appeal, appeals of all core/non-core determinations by bankruptcy courts will necessarily have to be granted in this District. Were that to happen,

"interlocutory appeals would become commonplace in the federal courts." *North Fork Bank v. Abelson,* 207 B.R. at 390. Second, if needed, the alleged "Catch 22" can be mitigated by this Court. If this Court finds it appropriate, it can address the Bank Defendants' concern by noting in its order refusing leave to appeal that the Bankruptcy Court's Core Order is to be considered by the district court if and when the Bank Defendants seek to withdraw the reference of this adversary proceeding.

The Bank Defendants also argue that the Motion for Leave presents "exceptional circumstances" because the Bankruptcy Court's Core Order allegedly expands the jurisdiction of the bankruptcy courts beyond their constitutional limits. This argument also lacks merit. The Second Circuit has "held that 'core proceedings' should be given a broad interpretation that is 'close to or congruent with constitutional limits'" and that the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.* should be narrowly interpreted. *U. S. Lines, Inc. v. Am. Steamship Owners Mutual Protection (In re U. S. Lines, Inc.),* 197 F.3d 631, 636-37 (2d Cir. 1999) (citing *Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Prods. Co.),* 68 F.3d 26, 31 (2d Cir. 1995)). Based on this expansive interpretation of what constitutes core proceedings under the Bankruptcy Code, "***the Second Circuit and courts in this district have consistently held adversary proceedings against a creditor that have traditionally been non-core to be core pursuant to §§ 157(b)(2)(B) and (C) due to the filing of a proof of claim or counterclaim or set-off/recoupment by that creditor.***" *In re Iridium Operating LLC.,* 285 B.R. at 831 (emphasis added).[15]

---

[15] In support of this statement, the court cited the following cases as examples: *In re Manville Forest Products Corp.,* 896 F.2d 1384, 1389-90 (2d Cir. 1990) ("The adversary proceeding at issue here involves a simple objection to a proof of claim and clearly falls within the literal language of § 157(b)(2)(B) . . . ."); *In re S. G. Phillips Constructors, Inc.,* 45 F.3d 702,

The Bankruptcy Court held in the Core Order that Plaintiffs' counterclaims against the Bank Defendants for aiding and abetting and civil conspiracy were core claims under 28 U.S.C. §§ 157(b)(2)(B) and (C):

> (2)     Core proceedings include, but are not limited to —
>
> (B)     allowance or disallowance of claims against the estate . . . .;
>
> (C)     counterclaims by the estate against persons filing claims against the estate.

Core Order at 5.  On their face, Plaintiffs' counterclaims against the Bank Defendants fall squarely  within these sections defining core proceedings.  Plaintiffs' counterclaims allege a multi-year scheme between the Bank Defendants and Enron Insiders to manipulate and misstate Enron's financial condition.  That scheme forms the basis for Plaintiffs' counterclaims for aiding and abetting and civil conspiracy and is the basis on which Plaintiffs seek to disallow the Bank Defendants' proofs of claim against Plaintiffs' estates.  Plaintiffs' counterclaims thus directly affect the allowance or disallowance of the Bank Defendants' claims against Plaintiffs' estates.  In addition, Plaintiffs' claims for aiding and abetting and civil conspiracy expressly are filed as objections to the allowance of, and counterclaims to, the Bank Defendants' proofs of claims.

---

705 (2d Cir. 1995) ("[W]e believe that the determinative factor as to the bankruptcy court's jurisdiction in this case is that the [creditor] filed a proof of claim resulting in an adversary proceeding that involved the 'allowance or disallowance of claims against the estate.'"); *In re Winimo Realty Corp.,* 270 B.R. 108, 121-22 (S.D.N.Y. 2001); *N. Am. Energy Conservation, Inc. v. Interstate Energy Res., Inc.,* No. 00 Civ. 4302, 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 12, 2000); *In re The Leslie Fay Cos., Inc.,* No. 97 Civ. 2244, 1997 WL 555607, at *2 (S.D.N.Y. Sept. 4, 1997); *Pan Am. World Airways, Inc. v. Evergreen Int'l Airlines, Inc.,* 132 B.R. 4, 7-8 (S.D.N.Y. 1991); *In re Lombard-Wall Inc.,* 48 B.R. 986, 990-91 (S.D.N.Y. 1985); *In re Caldor, Inc.,* 217 B.R. 121, 128 (Bankr. S.D.N.Y. 1998); *In re Mercury Masonry Corp.,* 114 B.R. 35, 38 (Bankr. S.D.N.Y. 1990).

*See* Fourth Amended Complaint at ¶ 8 ("As to those Defendants who have filed claims or on whose behalf claims have been filed against Plaintiff, this adversary proceeding is brought as an objection and counterclaim to those claims.").

The Bank Defendants argue that, contrary to the established case law in this District, it is not sufficient that Plaintiffs' claims and the Bank Defendants' proofs of claim are based upon the same transactions and the same operative facts. They contend that the legal relief sought by Plaintiffs in their common law counterclaims must be a basis for disallowing the proofs of claim filed by the Bank Defendants. *See* Memorandum at 32-35. The Bank Defendants' position is erroneous, as the cases in this District recognize. If Plaintiffs establish that the Bank Defendants and Enron Insiders designed and implemented a scheme to manipulate and misstate Enron's financial condition, the proof of that scheme will provide a defense to the Bank Defendant's proofs of claim, regardless of whether the legal claim asserted by Plaintiffs is a traditional bankruptcy claim, such as disallowance or expungement, or a common law claim, such as aiding and abetting fraud. *See In re CBI Holding,* 311 B.R. at 363 (finding that debtor's claims against creditor Ernst & Young for fraud and for negligence, "if proven, could provide a defense to Ernst & Young's proof of claim."). *See also In re Iridium Operating LLC,* 285 B.R. at 831 ("An adversary proceeding against a creditor who has filed a proof of claim against the estate is core because under § 157(b)(2)(B) the adversary proceeding would affect the allowance or disallowance of the creditor's claim. In addition, claims in an adversary proceeding are tantamount to counterclaims against a creditor who filed a claim against the estate under § 157(b)(2)(C).") (citations omitted).

Indeed, the court in *In re Iridium Operating LLC* expressly considered and rejected the argument that determining the core/non-core status of a debtor's claims against a creditor based

34

upon a same transaction or operative facts test infringes on the boundary drawn in *Marathon*: "Nor does this Court find that allowing the bankruptcy court to hear these claims as core creates an exception to *Marathon* that would swallow the rule." *Id.* at 834.

Rather than presenting exceptional circumstances, the Bankruptcy Court's Core Order followed established precedent in this District.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Bank Defendants' Motion for Leave to file an interlocutory appeal from the Bankruptcy Court's Core Order.

ENRON CORP., *et al.*
Reorganized Debtors,
By their Special Litigation Counsel,
SUSMAN GODFREY L.L.P.,
By:

_____/s/ H. Lee Godfrey_____

H. LEE GODFREY (*pro hac vice*)
KENNETH S. MARKS (*pro hac vice*)
MARY KATHRYN SAMMONS (*pro hac vice*)
JAMES T. SOUTHWICK (JS-4264)
Members of the Firm
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366

- and -

ENRON CORP., *et al.*,
Reorganized Debtors,
By their Bankruptcy Co-Counsel,
TOGUT, SEGAL & SEGAL LLP,
By:

_____/s/ Scott E. Ratner_____

ALBERT TOGUT (AT-9759)
SCOTT E. RATNER (SER-0015)
RICHARD MILIN  (RM-7755)
Members of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000


ENRON CORP., *et al.*,
Reorganized Debtors,
By their Special Litigation Counsel,
VENABLE LLP,
By:

_____/s/ Richard L. Wasserman_____

RICHARD L. WASSERMAN (RW-8696)
MICHAEL SCHATZOW (*pro hac vice*)
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served on counsel of record, this 27th day of November, 2006, by electronic mail and overnight delivery..


_____/s/ Kenneth S. Marks_____

Exhibit I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 01-16034 (AJG) |
| ENRON CORP., *et al.*, | |
| | Jointly Administered |
| Reorganized Debtors. | |
| ENRON CORP., *et al.*, | |
| Plaintiff, | Adv. Pro. No. 03-09266 |
| v. | |
| CITIGROUP INC., *et al.*, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**BANK DEFENDANTS' JOINT REPLY MEMORANDUM OF
LAW IN SUPPORT OF BANK DEFENDANTS' JOINT MOTION FOR
LEAVE TO APPEAL THE DECISION OF THE BANKRTUPCY COURT
CONCERNING DETERMINATION PURSUANT TO 28 U.S.C. § 157(b)(3)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ..................................................................................................... 3

I.     The Potentially Binding Effect of the Core Order Presents Exceptional
Circumstances Warranting Immediate Review ........................................ 3

II.    The Motion for Leave Otherwise Meets the Standard for Interlocutory Appeal .... 5

A.    Determining the Proper Scope of the Bankruptcy Court's Jurisdiction
Presents a Controlling Question of Law .................................................. 6

B.    The Bankruptcy Court's Use of an Incorrect Standard for Determining the
Core Nature of the Common Law Counts Presents a Substantial Ground for
Difference of Opinion ............................................................................ 7

       1.    *The "Nature of the Proceeding" Determines Whether a Matter is
Core* ............................................................................................ 7

       2.    *The Bank Defendants' Claims Against the Estate Do Not Render  the
Common Law Counts Core* ...................................................... 9

C.    Granting this Appeal Will Materially Advance the Ultimate  Determination
of this Litigation ................................................................................. 17

CONCLUSION ............................................................................................... 18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adelphia Communications Corp.* v. *Rigas (In re Adelphia Communications Corp.)*, 02 Civ. 8495 GBD, 02-41729 REG, 2003 WL 21297258 (S.D.N.Y. Jun. 4, 2003) ..................................................17

*Air Line Pilots Association International* v. *P.B.G.C. (In re United Air Lines, Inc.)*, 337 B.R. 904 (N.D. Ill. 2006) ..............................................10

*BancBoston Real Estate Capital Corp.* v. *JBI Associates Ltd. P'Ship (In re Jackson Brook Inst., Inc.)*, 227 B.R. 569 (D. Me. 1998) ...........................................6

*Bianco* v. *Hoehn (In re Gaston & Snow)*, 173 B.R. 302 (S.D.N.Y. 1994)....................4, 5

*Cibro Petroleum Products, Inc.* v. *City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108 (S.D.N.Y. 2001) ....................................................14

*Enron Corp.* v. *Citigroup, Inc. (In re Enron Corp.)*, 349 B.R. 108 (Bankr. S.D.N.Y. 2006)....................................................................1, 9, 12

*Enron Corp.* v. *Springfield Assocs., L.L.C. (In re Enron Corp.)*, Ch. 11 No. 01-16034, Adv. Pro. Nos. 05-01025, 05-01029, 05-01074, 05-01150, 05-010, M-47, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006) ................7, 9, 17

*Ernst & Young* v. *Bankruptcy Services, Inc. (In re CBI Holding Co.)*, 311 B.R. 350 (S.D.N.Y. 2004)........................................................14

*Germain* v. *Connecticut National Bank*, 988 F.2d 1323 (2d Cir. 1993) ......................6, 13

*Glinka v. Abraham & Rose Co. Ltd.*, No. 2:93-CV-291, 293-CV-329, 2:93-CV-361, 1994 WL 905714 (D. Vt. Jun. 6, 1994)..................................12, 15, 16

*Goya Foods, Inc.* v. *Unanue-Casal (In re Unanue-Casal)*, 164 B.R. 216 (D. P.R. 1993)........................................................................11

*Horwitz v. Sheldon (In re Donald Sheldon & Co., Inc.)*, No. 92 Civ 6834 (JSM), 1992 WL 396885 (S.D.N.Y. Dec. 17, 1992) ....................................4

*Interconnect Telegraph Services, Inc.* v. *Farren*, 59 B.R. 397 (S.D.N.Y. 1986) ........................................................................8

*Jamaica Shipping Co. Ltd.* v. *Orient Shipping Rotterdam, B.V. (In re Millenium Seacarriers, Inc.)*, 458 F.3d 92 (2d Cir. 2006)...........................................3

*Katchen* v. *Landy*, 382 U.S. 323 (1966) ....................................................................... 12

*Kontrick* v. *Ryan*, 540 U.S. 443 (2004) ......................................................................... 3

*Langenkamp* v. *Culp*, 498 U.S. 42 (1990) ................................................................... 12

*LeRoy* v. *Sabena Belgian World Airlines*, 344 F.2d 266 (2d Cir. 1965) ........................... 2

*Lesser* v. *A-Z Associates* (*In re Lion Capital Group*), 63 B.R. 199
    (S.D.N.Y. 1985) ................................................................................................ 4, 5

*Lombard-Wall Inc.* v. *New York City Housing Development Corp.* (*In re*
    *Lombard-Wall Inc.*), 48 B.R. 986 (S.D.N.Y. 1985) ..................................................... 15

*Luan Investment S.E.* v. *Franklin 145 Corp.* (*In re Petrie Retail, Inc.*), 304
    F.3d 223 (2d Cir. 2002) .................................................................................................. 6

*Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U.S.
    50 (1982) .................................................................................................. 7, 8, 11, 12

*Official Committee of FMI Forwarding Co., Inc.* v. *Union Transport
    Corp.* (*In re FMI Forwarding Co., Inc.*), 00 B 41815 (CB), 01 Civ.
    9462, 01-02992 (CB), 2004 WL 1348956 (S.D.N.Y. Jun. 16, 2004) ........................ 16

*Orion Pictures Corp.* v. *Showtime Networks, Inc.* (*In re Orion Pictures
    Corp.*), 4 F.3d 1095 (2d Cir. 1993) ................................................................................ 5

*Statutory Committee of Unsecured Creditors of Iridium Operating LLC* v.
    *Motorola, Inc.* (*In re Iridium Operating, LLC*), 285 B.R. 822
    (S.D.N.Y. 2002) ............................................................................................................ 14

*The Leslie Fay Cos., Inc.* v. *Falbaum* (*In re The Leslie Fay Cos., Inc.*),
    1997 WL 555607 (S.D.N.Y. 1997) .............................................................................. 14

*Treadway* v. *United Bank & Trust Co.* (*In re Treadway*), 117 B.R. 76 (D.
    Vt. 1990) ....................................................................................................................... 10

*U.S. Lines, Inc.* v. *America Steamship Owners Mutual Protection &
    Indemnity Association, Inc.* (*In re U.S. Lines, Inc.*), 197 F.3d 631 (2d
    Cir. 1999) .............................................................................................. 8, 11, 17

*Wechsler* v. *Squadron, Ellenoff, Plesent & Sheinfeld LLP*, 201 B.R. 635
    (S.D.N.Y. 1996) .............................................................................................................. 8

**FEDERAL STATUTES**

28 U.S.C. § 157(b)...................................................................................................1, 6

28 U.S.C. § 157(c)......................................................................................................6

28 U.S.C. § 1292(b)..................................................................................................7, 9

To the United States District Court for the Southern District of New York:

Defendants Citigroup Inc. ("Citigroup"), and Deutsche Bank AG ("Deutsche Bank") and their respective co-defendant affiliates[1] (together, the "Bank Defendants"), respectfully submit this joint reply memorandum of law in support of the Bank Defendants' motion for leave (the motion and supporting memorandum of law, the "Motion for Leave") to appeal from the opinion[2] and order (the "Core Opinion" and "Core Order" respectively) of the Bankruptcy Court for the Southern District of New York (Gonzalez, J.) (the "Bankruptcy Court") determining that certain common law counts in the complaint (the "Complaint") filed by Enron Corp. and certain of its affiliates (collectively, "Enron") in the above-captioned adversary proceeding ("MegaClaim") are core matters within the meaning of 28 U.S.C. § 157(b)(2).

## PRELIMINARY STATEMENT[3]

Enron insists that no exceptional circumstances exist warranting leave to appeal the Core Order because the Bankruptcy Court's determination that the Common Law Counts comprise core matters will not bind a district court in a subsequent motion to

---

[1]   The Citigroup co-defendant affiliates are:  Citibank, N.A.; Citigroup Global Markets Inc.; Citicorp North America, Inc.; Citigroup Financial Products Inc.; CXC LLC; Corporate Asset Funding Company, LLC; Corporate Receivables Corporation, LLC; and Citigroup Global Markets Ltd.  The Deutsche Bank co-defendant affiliates are: Deutsche Bank Trust Company Americas; Deutsche Bank Securities Inc.; Deutsche Bank Luxembourg S.A.; Deutsche Bank Trust Company Delaware; Deutsche Bank Trust Corporation; Bankers Trust International plc; BT Commercial Corporation; DB Green, Inc.; Deutsche Leasing New York Corp.; Seneca Delaware, Inc.; Deutsche Bank, S.A.; DB Ever, Inc. (f/k/a BT Ever, Inc.); and Seneca Leasing Partners, L.P.

[2]   *Enron Corp.* v. *Citigroup, Inc. (In re Enron Corp.)*, 349 B.R. 108 (Bankr. S.D.N.Y. 2006).

[3]   Capitalized terms used herein but not otherwise defined in this reply have the meaning ascribed to them in the Bank Defendants' Motion for Leave.

withdraw the reference.  Courts in this Circuit, however, have squarely held to the contrary.  Moreover, while the Bank Defendants agree that an opinion from this Court dismissing the appeal but affirming that the Core Opinion has no binding effect on a subsequent withdrawal motion may adequately resolve this appeal, the Bank Defendants remain concerned that they have no assurances that *this* Court's order will bind a subsequent district court.[4]  Finally, despite its arguments to the contrary, Enron never commits not to argue, in the context of a withdrawal motion, that the Core Order is binding.  As a result, the Bank Defendants face the very real risk that the Core Order may bind a district court, and that the Bank Defendants will have to proceed on a withdrawal motion with the core factor decided erroneously against them.  This risk compels bringing the present Motion for Leave and warrants this Court's granting immediate review.

            Even if this Court concludes that the Core Order has no binding effect, the Bank Defendants urge this Court to exercise its discretion and consider the merits of the Motion for Leave now.  Doing so promotes judicial economy because this Court's ruling on the scope of the Bankruptcy Court's jurisdiction establishes the proper framework for the parties to litigate this multibillion dollar case.  Notably, if the Bank Defendants do not prevail on their withdrawal motion and the Core Order is not overturned until *after* trial, the parties may have to relitigate the entire case.  By granting the Motion for Leave now this Court can avoid such potentially staggering inefficiency.

---

[4]    *See, e.g., LeRoy* v. *Sabena Belgian World Airlines,* 344 F.2d 266, 274 (2d Cir. 1965) ("It is … customary for a district judge to follow an earlier ruling by one of his brothers in the same litigation, though he is not bound to do so.")

Contrary to Enron's protestations, the Motion for Leave meets the standard for interlocutory appeal. It raises a controlling question of law regarding the constitutional limits of the Bankruptcy Court's core jurisdiction. The Bankruptcy Court's erroneous reliance on a poorly reasoned "same transaction" test, rather than the Second Circuit's controlling "nature of the proceeding" standard, constitutes reversible error and raises a substantial ground for difference of opinion. Finally, for the reasons that the Bank Defendants recite in their Motion for Leave, an immediate appeal will materially advance the ultimate termination of this litigation.

## ARGUMENT

### I.      The Potentially Binding Effect of the Core Order Presents Exceptional Circumstances Warranting Immediate Review.

The Bank Defendants agree with Enron that the Core Order should not bind a district court's review of any subsequent motions. *See Kontrick* v. *Ryan,* 540 U.S. 443, 455 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance.") (citation omitted); *Jamaica Shipping Co. Ltd.* v. *Orient Shipping Rotterdam, B.V. (In re Millenium Seacarriers, Inc.)*, 458 F.3d 92, 96 (2d Cir. 2006) ("objections to the exercise of subject matter jurisdiction may be raised at any time in the course of a litigation").

District courts in this Circuit, however, have unequivocally ruled otherwise.

> Section 157(b)(3) provides that the Bankruptcy Court is to "determine" the issue of whether a proceeding is core or non-core. . . . *The determination of whether a proceeding is core can only be reviewed by the District Court on a proper, timely appeal from that determination.* Thus, an order entered by the Bankruptcy Court that the proceeding

3

> is core is binding on the District Court in a motion to
> withdraw the reference until and unless the order is
> overturned on appeal.

*Horwitz* v. *Sheldon (In re Donald Sheldon & Co., Inc.)*, No. 92 Civ. 6834 (JSM),

1992 WL 396885, at *2 (S.D.N.Y. Dec. 17, 1992) (internal and external citations

omitted) (emphasis added).  Judge Goettel, in *Lesser* v. *A-Z Assocs. (In re Lion Capital

Group)*, 63 B.R. 199 (S.D.N.Y. 1985) reached the same conclusion:

> Section 157(b)(3) empowers the bankruptcy judge to
> determine whether a proceeding is a core or non-core
> proceeding.  Such a determination is binding, subject only
> to conventional appellate review.  Here, [the Bankruptcy
> Judge] has determined that the *A-Z Associates* and *931
> Investors* adversary proceedings are core.  We cannot agree
> with the movants that this ruling is not binding on us now.

63 B.R. at 209 (internal citation omitted).

> *Bianco* v. *Hoehn (In re Gaston & Snow)*, 173 B.R. 302 (S.D.N.Y. 1994) --

the case that Enron cites to the contrary -- while offering some encouragement on this

point, does not convincingly dispose of the matter.  At the outset, *Gaston & Snow*

reached the unfounded conclusion that "*Lion Capital* only held that a district court should

not withdraw the reference while the bankruptcy court was itself reviewing the

core/noncore determination."  *Gaston & Snow*, 173 B.R. at 306.  In *Lion Capital,* the

bankruptcy court issued its core determination *before* the district court ruled on the

defendants' motion to withdraw the reference, which was then *sub judice* before the

district court.  *Lion Capital,* 63 B.R. at 208.  The district court, accordingly, felt bound by

the bankruptcy court's determination.

> Although the movants contend that they have filed an
> appeal . . . we have received neither the notice nor the
> parties' briefs.  Until such time as the Court receives the
> appeal and is fully briefed on the various issues underlying
> [the bankruptcy court's] decision, we decline to take a

position on whether the adversary proceedings are core or non-core proceedings *and we now abide by [the bankruptcy court's] determination.*

63 B.R. at 209 (emphasis added). *Lion Capital* never found withdrawal of the reference inappropriate when the bankruptcy court itself was reviewing the core/noncore issue, as *Gaston & Snow* suggests.

*Gaston & Snow* also mistakenly cites *Orion Pictures Corp.* v. *Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993) for the proposition that permissive withdrawal requires the district court to re-examine a bankruptcy court's core/noncore determination. *Gaston & Snow*, 173 B.R. at 306. The bankruptcy court in that case never made a core determination. Rather, the *district court*, when considering the defendant's motion to withdraw the reference, found the proceeding core. *Orion Pictures*, 4 F.3d at 1102. The need for the district court to re-examine the bankruptcy court's core/noncore determination thus never arose.

In sum, courts in this Circuit have held that a bankruptcy court's determination under section 157(b)(3) may bind a district court's analysis of a withdrawal motion. This risk presents exceptional circumstances warranting immediate review.

## II.    The Motion for Leave Otherwise Meets the Standard for Interlocutory Appeal.

Rather than deal with the standard for interlocutory appeal, Enron spends no less than a third of its Opposition gratuitously reciting its wholly unproven allegations about the Bank Defendants' alleged participation in a "multi-year scheme" to misstate Enron's financial condition. (Opposition at 9 – 20). Enron's recitation of these alleged

"facts" ironically underscores the noncore nature of the Common Law Counts and the need to grant the Motion for Leave.[5]

### A. Determining the Proper Scope of the Bankruptcy Court's Jurisdiction Presents a Controlling Question of Law.

Enron maintains the puzzling position that the Core Order does not define the scope of the Bankruptcy Court's jurisdiction. (Opposition at 21, 22, 23). But "[t]he jurisdiction of the bankruptcy court is set forth in 28 U.S.C. § 157." *Luan Inv. S.E.* v. *Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228 (2d. Cir. 2002). That statute creates two principle jurisdictional categories: core and noncore. *Id.* In core proceedings, the bankruptcy court has plenary power to enter final orders and judgments. 28 U.S.C. § 157(b)(1). In noncore proceedings, the bankruptcy court may only submit proposed findings of fact and conclusions of law to the district court for *de novo* review. 28 U.S.C. § 157(c)(1). On its face, the Core Order indisputably determines the scope of the Bankruptcy Court's jurisdiction.

Because the Core Order's nature remains inherently jurisdictional (regardless of a district court's determination of a withdrawal motion), it presents a controlling question of law. *BancBoston Real Estate Capital Corp.* v. *JBI Assocs. Ltd. P'Ship (In re Jackson Brook Inst., Inc.)*, 227 B.R. 569, 582 (D. Me. 1998).

---

[5]   Enron also devotes several pages to the merits of the Bank Defendants' Seventh Amendment right to a jury trial. The Bank Defendants did not ask the Bankruptcy Court, and do not ask this Court, to determine their jury trial right. That right bears minimally on the core/noncore determination. *See Germain* v. *Connecticut Nat'l Bank,* 988 F.2d 1323, 1327 (2d Cir. 1993). The Bank Defendants will pursue their jury trial right at the proper time and in the proper procedural context.

Reversal of the Core Order also "materially affects the litigation's outcome" because, absent reversal and prevailing on the withdrawal motion, the Bankruptcy Court will try this multibillion dollar lawsuit in the wrong procedural framework (Bankruptcy Rule 7052 rather than Bankruptcy Rule 9033). Doing so inflicts a substantive injustice on the Bank Defendants.

### B. The Bankruptcy Court's Use of an Incorrect Standard for Determining the Core Nature of the Common Law Counts Presents a Substantial Ground for Difference of Opinion.

A "genuine doubt as to whether the Bankruptcy Court applied the correct legal standard" qualifies as a substantial ground for difference of opinion within the meaning of 28 U.S.C. § 1292(b) ("Section 1292(b)"). *Enron Corp.* v. *Springfield Assocs., L.L.C. (In re Enron Corp.)*, Ch. 11 No. 01-16034, Adv. Pro. Nos. 05-01025, 05-01029, 05-01074, 05-01150, 05-010, M-47, 2006 WL 2548592, at *4 (S.D.N.Y. Sept. 5, 2006). In finding the Common Law Counts were somehow transformed into core matters, the Bankruptcy Court erroneously employed a fact-driven "same transaction" test. It should have applied the Second Circuit's "nature of the claim" test. This legal error constitutes grounds for reversal and warrants granting the Motion for Leave.

### 1. The "Nature of the Proceeding" Determines Whether a Matter is Core.

[U]nder *Marathon*,[6] whether a . . . proceeding is core depends on (1) whether [it] is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization. The latter inquiry hinges on the "nature of the proceeding." Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function.

---

[6]    *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

*U.S. Lines, Inc.* v. *Am. Steamship Owners Mut. Protection & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999) (internal citations omitted).

The *U.S. Lines* standard embodies *Marathon's* constitutional principles: non-Article III courts lack authority to adjudicate state-created private rights that do not fall within the core of federal bankruptcy power. *Id.* The standard requires examining the *nature* of the claims at issue: are they unique to, or uniquely affected by, the bankruptcy? Do they affect a core bankruptcy function? If no, then the claims are noncore.

Under this standard, the Common Law Counts are noncore. *E.g.,* *Wechsler* v. *Squadron, Ellenoff, Plesent & Sheinfeld LLP,* 201 B.R. 635, 639 (S.D.N.Y. 1996) ("Noncore proceedings consist of those 'claims arising under traditional state law which must be determined by state law.' . . . They are 'those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or state court.'") (quotations and citations omitted); *Interconnect Tel. Servs., Inc.* v. *Farren*, 59 B.R. 397, 400 (S.D.N.Y. 1986) (rights created by state law that are "independent of and antecedent to the reorganization petition" are noncore) (citations omitted).

The Common Law Counts do not depend on the bankruptcy laws or the Bankruptcy Code. Through these Counts (again, elaborated at Opposition 9 – 20), Enron seeks to vindicate private, non-bankruptcy rights -- it does not, and cannot, cite a single Bankruptcy Code section for any of them, nor does it identify any bankruptcy right that such claims promote. Like the claims vindicating state-law private rights in *Marathon,* the Common Law Counts are noncore. *Northern Pipeline Constr.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 71-72 (1982) ("Appellant Northern's right to recover contract damages

to augment its estate is one of private right, that is, of the liability of one individual to another under the law as defined.") (citation and quotations omitted).

Instead of analyzing the nature of the Common Law Counts under the *U.S. Lines* standard, the Bankruptcy Court treated the Common Law Counts as core proceedings because "they stem from the same transaction and are logically connected to the JT Transaction Proof of Claim." *Enron Corp.*, 349 B.R. at 113. Yet, the Bankruptcy Court provides no legal authority for its "same transaction/logical connection" test. Though it cites to *U.S. Lines* in passing, the Bankruptcy Court did not apply the test of that decision. Its failure to do so raises a "genuine doubt as to whether the Bankruptcy Court applied the correct legal standard" and therefore presents a substantial ground for difference of opinion within the meaning of Section 1292(b). *Springfield Assocs.*, 2006 WL 2548592, at *4.

2. ***The Bank Defendants' Claims Against the Estate Do Not Render the Common Law Counts Core.***[7]

Notwithstanding the Second Circuit's unequivocal instruction in *U.S. Lines*, Enron argues for the "same transaction/logical connection" test, contending that such test properly applies when a creditor's assertion of claims against the debtor's estate renders traditionally noncore claims, core. (Opposition at 25 - 27). The Bankruptcy

---

[7]    Enron also justifies the Bankruptcy Court's finding the Common Law Counts core by pointing to the Bank Defendants' asserted claims of set-off against Enron's estate based on their proofs of claim. (Opposition at 26). While the Core Opinion does not clearly articulate the basis of its holding, this justification fails for the same reasons discussed above regarding the effect of the Bank Defendants' proofs of claim on the Common Law Counts. The Bank Defendants' assertion of set-off rights against Enron's estate (or their assertion of any affirmative claim against Enron's estate, including recoupment and indemnity rights) does not automatically transform the Common Law Counts into core claims.

Court's holding that *any* affirmative claim by a creditor against the debtor's estate renders *all* counterclaims core because of shared facts between the claims -- or worse, some poorly defined "logical" connection -- means that *any* claim by a debtor against a creditor will become core merely because the creditor files a proof of claim, even if the nature of the debtor's claim is inherently noncore. Such a *per se* rule violates *Marathon* and cannot stand.[8]

      (a)     *Merely styling a claim as a "counterclaim" cannot transform its underlying noncore nature.*

      A noncore proceeding cannot be reclassified as a core proceeding simply because the matter constitutes a counterclaim by the estate or concerns the allowance or disallowance of claims. *Air Line Pilots Ass'n Int'l* v. *P.B.G.C. (In re United Air Lines, Inc.)*, 337 B.R. 904, 909 (N.D. Ill. 2006) (citing *In re CIS Corp.,* 172 B.R. 748, 757 (S.D.N.Y. 1994)) (citation omitted); *Treadway* v. *United Bank & Trust Co. (In re Treadway)*, 117 B.R. 76, 81 (D. Vt. 1990) ("The mere characterization of an adversary proceeding within the core terms of 28 U.S.C. §§ 157(b)(2)(A) – (O) will not be dispositive whether the proceeding is core.").

> To merit classification as a core proceeding within the meaning of the statute, the nexus of the counterclaim itself must be a core proceeding as that term is used in section 157(b)(1); that is to say, it must arise under or arise in a case under Title 11. *In other words, a debtor's counterclaim does not become core simply because it is technically or arguably within a given (b)(2) description.*

---

[8]    Since a creditor files its proofs of claim under compulsion of a court-ordered claims bar date and often long before the debtor commences any adversary proceeding against the creditor (as was the case here), this *per se* rule places the creditor in the untenable position of having to decide whether to abandon its claims against the debtor by not filing a proof of claim, or risk losing its right to try noncore claims before an Article III judge by filing a proof of claim to protect its rights, all without full knowledge of the debtor's intent to file noncore counterclaims.

…

> The mere fact that the Amended Counterclaim is raised in the form of a counterclaim against two parties that have filed contingent claims against the bankruptcy estate does not make it a core proceeding. This view would so enlarge bankruptcy jurisdiction as to convert every state action involving a bankruptcy debtor into a federal matter.

*Goya Foods, Inc.* v. *Unanue-Casal (In re Unanue-Casal)*, 164 B.R. 216, 221 (D. P.R. 1993) (citations and quotations omitted) (emphasis added).

Here, the Bankruptcy Court failed to evaluate whether the Common Law Counts "arise under or arise in" a case under title 11, as Section 157(b) requires. The Bankruptcy Court also did not examine the *nature* of the Common Law Counts under the *U.S. Lines* standard. It did not decide whether the Common Law Counts are "unique to or uniquely affected by the bankruptcy proceedings" or "directly affect a core bankruptcy function." *U.S. Lines,* 197 F.3d at 637. Instead, the Bankruptcy Court held that the Common Law Counts became core merely because "they stem from the same transaction and are logically connected" to the Bank Defendants' proofs of claim. A mere *factual* connection, though, between two competing claims provides no basis for determining whether the claims fall within the Bankruptcy Court's core bankruptcy jurisdiction, much less a basis for transforming an admittedly *noncore* claim into a core one. *See Marathon*, 458 U.S. at 71 n.26 (holding that while a party may adjudicate a state law claim in federal court based on its relationship to the reorganization petition, "this relationship does *not* transform the state-created right into a matter between the Government and the petitioner for reorganization [*i.e.,* a public right].") (emphasis added).

11

(b)     *The Effect of Asserting Claims Against Enron's Estates on the Bankruptcy Court's Equitable Jurisdiction Does Not Determine the Nature of Enron's Resulting Counterclaims.*

The Bankruptcy Court adverted to the scope of its equitable jurisdiction as a further justification for transforming the Common Law Counts into core claims. *Enron Corp.*, 349 B.R. at 112. Thus, it cited to a Seventh Amendment jury trial case, *Langenkamp* v. *Culp*, 498 U.S. 42 (1990), for the principle that "the filing of a claim triggers the process concerning 'allowance and disallowance of claim,'" a process "integral to the debtor's restructuring accomplished through the equity jurisdiction of the bankruptcy court." *Id.* The Bankruptcy Court concluded that the Bank Defendants' proofs of claim rendered the Common Law Counts core because the Bank Defendants, in filing proofs of claim, invoked the Court's equitable jurisdiction, which "encompasses interrelated claims that a debtor asserts against a creditor who filed a proof of claim." *Id.* at 113.

The Bankruptcy Court incorrectly relied on its equitable jurisdiction as a basis for transforming the Common Law Counts into core claims. In *Marathon,* the Supreme Court rejected the notion that the bankruptcy court's core jurisdiction expands to *all* controversies that may fall within the bankruptcy court's equitable jurisdiction. *Marathon*, 458 U.S. at 79 n.31. The Court specifically noted that *Katchen* v. *Landy*, 382 U.S. 323 (1966), which announced a sweeping principle regarding the effect of filing a proof of claim on a creditor's submission to the bankruptcy court's summary jurisdiction in the context of a preference action under the Bankruptcy Act -- a case on which *Langenkamp* relies -- did *not* discuss or determine the Article III issue. *Id.; accord Glinka* v. *Abraham & Rose Co. Ltd.*, No. 2:93-CV-291, 293-CV-329, 2:93-CV-361, 1994

WL 905714, at *9 (D. Vt. Jun. 6, 1994) (noting that *Marathon* raises constitutional

doubts as to whether filing a proof of claim renders all counterclaims core).

Even if *Langenkamp*'s reasoning applies by analogy to the core/noncore

determination, the Second Circuit has refused to endorse the Bankruptcy Court's limitless

vision of the effects of filing a proof of claim on its equitable jurisdiction.  In *Germain*, a

creditor trying to avoid jury trial argued that under *Langenkamp* and *Katchen*, filing a

proof of claim triggers the process of allowing and disallowing claims thereby bringing

*all* claims within the bankruptcy court's equitable jurisdiction.  *Germain* v. *Connecticut*

*Nat'l Bank,* 988 F.2d 1323, 1327 (2d Cir. 1993).  The Second Circuit disagreed:

> We agree that the filing of a proof of claim is a *necessary*
> condition – the claims-allowance process can hardly begin
> before a claim is made – however, it is not a *sufficient*
> condition. … The very phrase "claims-allowance process"
> suggests that the resolution of the dispute in which a jury
> trial is sought must affect the allowance of the creditor's
> claim in order to be part of that process.  A preference
> action does so; lender liability actions generally do not.
> Therefore suits like the Trustee's action in this case which
> would augment the estate but which have no effect on the
> allowance of a creditor's claim simply cannot be part of the
> claims-allowance process.

*Id.* at 1327 (emphasis in original).  Just filing of a proof of claim, therefore, does not

trigger the Bankruptcy Court's equitable jurisdiction as to *any* counterclaim the debtor

might file in response.

      (c)     *Precedent Establishes that Counterclaims are Core Only if*
                 *they Relate Directly to the Process of Allowance and*
                 *Disallowance of Claims.*

Examining the precedents upon which the Bankruptcy Court and Enron

rely for the proposition that filing a proof of claim renders all counterclaims core reveals

the limited nature of these rulings.  In each, the counterclaims fell within the bankruptcy

court's core function of allowing and disallowing claims against the estate.  In other words, the counterclaims were core by nature.

*Iridium*, for example, involved claims and counterclaims arising from two related prepetition contracts between the debtor and its former parent, Motorola, Inc. ("Motorola").  *Statutory Committee of Unsecured Creditors of Iridium Operating LLC* v. *Motorola, Inc. (In re Iridium Operating, LLC)*, 285 B.R. 822, 824-26 (S.D.N.Y. 2002). Because the estate's traditionally noncore claims and Motorola's proof of claim arose from the same contracts, the court held that Motorola's proof of claim invoked the bankruptcy court's core jurisdiction to allow and disallow claims, thereby rendering the estate's counterclaims core.  *Id.* at 830 ("The filing of the proof invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution.  *Understood in this sense, a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy"*) (citations omitted) (emphasis in original).

The other cases that Enron cites reach the same result.  *See Ernst & Young* v. *Bankr. Servs., Inc. (In re CBI Holding Co.)*, 311 B.R. 350, 357-58 (S.D.N.Y. 2004) (creditor's proof of claim for unpaid auditing and consulting services to the debtor concerned the same professional services that debtor's counterclaims alleged were negligently performed and constituted professional malpractice); *Cibro Petroleum Prods., Inc.* v. *City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108, 121 (S.D.N.Y. 2001) (creditor's proof of claim was based on same contract the validity of which the debtor challenged in its adversary proceeding); *The Leslie Fay Cos., Inc.* v. *Falbaum (In re The Leslie Fay Cos., Inc.)*, 1997 WL 555607, at *2 (S.D.N.Y. 1997) (debtor's

adversary proceeding and counterclaims against its former employees were based on same issues raised by creditors' proofs of claim seeking damages for age discrimination and the creditors themselves argued that the "adversary proceeding is both 'inextricably intertwined' with the proofs of claim and an 'outgrowth' of the proofs of claim."); *Lombard-Wall Inc.* v. *New York City Hous. Dev. Corp. (In re Lombard-Wall Inc.)*, 48 B.R. 986, 988-89 (S.D.N.Y. 1985) (debtor's counterclaims against creditor were based on letters of credit that secured repo obligations creditor entered into with the debtor, which repo obligations formed the basis of the creditor's proof of claim).

These cases do not support a sweeping rule that shared facts and a "logical connection" suffice to transform traditionally noncore claims into core claims whenever a creditor files a proof of claim.  Rather, these courts found the debtor's counterclaims core only where their *nature* falls within the bankruptcy court's core jurisdiction, *i.e.,* the counterclaims invoke the process of allowance and disallowance of claims and adjudication of debtor-creditor rights.[9]  *E.g., Glinka,* 1994 WL 905714, at *9 ("given that the pre-petition state law counterclaims are not *directly related* to the proof of claim, *Marathon* requires that the conversion and misappropriation of contract rights claims . . . must be treated as non-core notwithstanding the filing of an *unrelated* proof of claim.") (emphasis added).

Finally, none of the claims that these courts considered compare to Enron's Common Law Counts.  They all arose out of one or two contracts or a discrete

---

[9]     Again, to the extent these cases cite *Langenkamp* for the principle that filing a proof of claim invokes the bankruptcy court's equitable jurisdiction, and that this fact suffices to render a noncore claim core, they are wrongly decided and inconsistent with *Marathon*.

event.  The Common Law Counts allege that the Bank Defendants engaged in a "multi-year scheme to manipulate Enron's financial statements and misstate its financial condition" by "designing, implementing, and often financing" hundreds of structured finance transactions with dozens of different Enron-related entities.  (Opposition at 9-21). Viewed against these allegations, the Bankruptcy Court's holding that the Common Law Claims invoke the process of "allowance and disallowance of claims" stretches the boundaries of plausibility and converts a purely state law action into a federal matter just because it involves a bankrupt debtor.

> (d) *The Bankruptcy Court's "Same Transaction/Logical Connection" Test is Like Rejected "Intertwinement" and "Predominantly Core" Approaches to Core Jurisdiction.*

The Bankruptcy Court found the Common Law Counts core because they shared facts common to the Bank Defendants' proofs of claim.  Courts have rejected this "factual intertwinement" approach to core jurisdiction. *E.g., Official Committee of FMI Forwarding Co., Inc.* v. *Union Transport Corp. (In re FMI Forwarding Co., Inc.)*, 00 B 41815 (CB), 01 Civ. 9462, 01-02992 (CB), 2004 WL 1348956, at *6 (S.D.N.Y. Jun. 16, 2004); *Glinka*, 1994 WL 905714, at *10 n.14.

Enron argues that these cases do not apply because they only address the intertwinement between a debtor's traditional bankruptcy claims and the debtor's common law claims against the creditor.[10]  These cases, however, stand for the

---

[10]    The Bank Defendants note that Enron made precisely this argument before the Bankruptcy Court.  Enron argued that the Common Law Counts must be treated as core because they are intertwined with Enron's "indisputably core counterclaims alleging equitable subordination, preferential transfer, and fraudulent conveyance." (Plaintiffs' Objection to the Barclays Defendants' Motion for Initial Determination Under 28 U.S.C. § 157(b)(3) that Certain Claims are Non-core Claims at 27 – 31). Enron's abandonment of this argument speaks volumes about its merits.

16

broader principle that the mere *factual* relatedness between claims -- whether involving a debtor's bankruptcy causes of action and its state law counterclaims, or a debtor's counterclaims and a creditor's proof of claim -- provides no basis for finding the claims core. Thus, the district court in *Adelphia* held that noncore claims remained noncore even though they arose from the same set of facts as the debtor's core claims. *Adelphia Commc'ns Corp.* v. *Rigas (In re Adelphia Commc'ns Corp.)*, 02 Civ. 8495 GBD, 02-41729 REG, 2003 WL 2129758, at *2 (S.D.N.Y. Jun. 4, 2003)

In sum, the *nature* of the claim, not its factual relationship to other claims in the case, determines whether the claim is core. *U.S. Lines*, 197 F.3d at 637. The Bankruptcy Court held to the contrary and should be reversed.

### C.    Granting this Appeal Will Materially Advance the Ultimate Determination of this Litigation.

For the reasons that the Bank Defendants recite in the Motion for Leave, an immediate appeal will materially advance the ultimate termination of this litigation. *See Springfield Assocs.*, 2006 WL 2548592, at *4 ("[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial") (citations omitted) (alteration in original).

[The remainder of this page intentionally left blank.]

## CONCLUSION

For the foregoing reasons, the Bank Defendants respectfully request that this Court grant the Motion for Leave and grant immediate review of the Bankruptcy Court's interlocutory Core Order.

Dated:  New York, New York
       December 5, 2006

Respectfully submitted,

/s/   Stephen J. Shimshak
Stephen J. Shimshak (SS-8822)
Douglas R. Davis (DD-0874)
Brad S. Karp (BK-3702)
Claudia L. Hammerman (CH-9005)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Attorneys for Citigroup, Inc., Citibank, N.A.,
Citigroup Global Markets Inc., Citicorp North
America, Inc., Citigroup Financial Products Inc.,
CXC LLC, Corporate Asset Funding Company,
LLC, Corporate Receivables Corporation, LLC,
and Citigroup Global Markets Ltd.*

/s/   Lawrence Byrne
Lawrence Byrne (LB-4671)
Lance Croffoot-Suede (LC-3725)
Titia A. Holtz (TH-4379)
LINKLATERS
1345 Avenue of the Americas
New York, New York 10105
Telephone: (212) 903-9000

*Attorneys for Deutsche Bank AG, Deutsche Bank
Trust Company Americas, Deutsche Bank
Securities Inc., Deutsche Bank Luxembourg S.A.,
Deutsche Bank Trust Company Delaware,
Deutsche Bank Trust Corporation, Bankers Trust
International plc, BT Commercial Corporation,
DB Green, Inc., Deutsche Leasing New York
Corp., Seneca Delaware, Inc., Deutsche Bank,
S.A., DB Ever, Inc. (f/k/a BT Ever, Inc.), and
Seneca Leasing Partners, L.P.*

Exhibit J



153 East 53rd Street, 31st Floor, New York, NY 10022-4611 ▪ p212 223-4000 ▪ f212 223-4134

William J. McSherry Jr.
212-895-4207
wmcsherry@crowell.com

October 2, 2007

**Via Electronic Mail**

The Honorable Arthur J. Gonzalez
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green, Room 528
New York, NY 10004-1408

*In re Enron Creditors Recovery Corp.*, Case No. 01-16034 (AJG)

Dear Judge Gonzalez:

Another discovery issue arose yesterday between Enron Creditors Recovery Corp. ("Enron") and various Deutsche Bank entities (collectively, "Deutsche Bank"). In the interests of economy we propose to address this issue concurrently with the other Deutsche Bank discovery issue already before your Honor.

Approximately 60 proofs of claim have been filed by Deutsche Bank. Four of those seek unspecified (or only partially specified) amounts for tax indemnity from Enron. Enron believes, based on informal discussions, that Deutsche Bank may be seeking as much as $500 million by these four claims. These claims are asserted to be "contingent [and] unliquidated," and no information – much less evidence – has been provided to explain or substantiate the underlying liabilities for which Enron must purportedly indemnify Deutsche Bank.

On August 30th, Enron served written discovery asking Deutsche Bank to provide substantiation for these claims. Yesterday, October 1 – one day before Deutsche Bank's responses were due – Enron received the attached letter (Exhibit 1) from Deutsche Bank's counsel. Although Enron's discovery was propounded in connection with the Deutsche Bank proofs of claim (referencing the bankruptcy case number), Deutsche Bank invokes discovery deadlines in the Mega Complaint Litigation adversary proceeding as the basis for declining to provide information about its claims.[1] Deutsche Bank's effort to invoke the issues and deadlines

---

[1]     As Deutsche Bank has raised no other objection to the discovery, we have not attached the specific requests for admissions, interrogatories and document requests. If the Court wishes to see the discovery, we are happy to provide it. (There are four sets, one for each entity asserting a proof of claim, seeking the substantiation for each of Deutsche Bank's claims.) The discovery is *not* about the misconduct issues raised in the Mega adversary.

The Honorable Arthur J. Gonzalez
October 2, 2007
Page 2

imposed in the Mega adversary in order to limit discovery concerning its contingent claims is
improper. The Mega adversary addresses the misconduct issues described in the Mega
Complaint itself, not the issues addressed in the proposed discovery.

As background, the specific claims at issue, attached as exhibits 2 through 5, are asserted
by Proofs of Claim Nos. 12797 through 12800.

Proof of Claim No. 12797 (Exhibit 2), filed by Deutsche Bank, AG ("DBAG"), includes
a claim for tax indemnification based on an agreement in which Enron purportedly agreed to
indemnify it for "certain adverse tax consequences of the [Valhalla] Transaction." Exhibit 1, ¶ 2.
Although DBAG contends this claim is fixed and liquidated at $102,304,668.35, it provides no
rationale for how this amount was reached, and further claims that DBAG "holds a contingent,
unliquidated claim against Enron for [additional unspecified] indemnity obligations[.]" *Id.*, ¶ 3.

Proof of Claim No. 12798 (Exhibit 3), filed by Deutsche Bank Trust Company Delaware,
includes several "contingent, unliquidated" claims against Enron, including for "increased tax
liability, in an amount as yet incapable of calculation." Exhibit 2, ¶¶ 2, 4 and 7.

Proof of Claim No. 12799 (Exhibit 4), filed by BT Green, Inc., asserts that "BT Green
has a contingent, unliquidated claim against Enron" for contractual indemnification of "adverse
tax consequence[s]" because "BT Green may suffer an increased tax liability, in an amount as
yet incapable of calculation." Exhibit 3, ¶ 2 (emphasis added). Proof of Claim No. 12800
(Exhibit 5), filed by Deutsche Bank Trust Company Americas, asserts a similar claim.

On January 9, 2004, Enron filed, in the main bankruptcy case, Debtors' Omnibus
Objection to Proofs of Claim etc. (copy attached as Exhibit 6, with exhibits not included) to all
claims filed by the defendants in the Mega adversary.[2] Thereafter, this Court, by order dated
February 25, 2005 ("the February 25 Order"), copy attached as exhibit 7, deemed the Omnibus
Objection an "Initial Objection," and extended the time for objecting to "Claims that are subject
to a pending Omnibus Objection." Specifically, it extended the objection deadline for claims
asserted by Mega defendants to the latter of sixty days after the entry of an order denying such
Initial Objection or sixty days after the entry by an appellate court of a final order from the
appeal of the final order of the bankruptcy court granting such Initial Objection. Exhibit 5, p. 1.
That same February 25 Order also extended the objection deadline for claims filed by Mega

---

[2]    Although, as Deutsche Bank says, the Mega Complaint refers in passing to its having
been "brought as an objection and counterclaim" to the various banks' claims, a fair reading of
the Mega Complaint shows that it was brought to address the inequitable conduct issues and
disallow or subordinate claims solely on the basis of the defendants' inequitable conduct
described in the Complaint. The topics on which discovery is presently sought (*i.e.*, discovery
on the factual bases for the underlying claims for which Deutsche Bank seeks indemnity) were
simply *not* put at issue by the Mega Complaint.

The Honorable Arthur J. Gonzalez
October 2, 2007
Page 3

defendants to the latter of sixty days after the final order of the bankruptcy court resolving the
Mega adversary, including by order approving a settlement resolving that litigation, or sixty days
from the date on which any appellate court enters a final order from an appeal of any final order
resolving the Mega adversary. *Id.,* p. 2.

It is self-evident that the February 25 Order contemplated that not all objections to claims
asserted by Deutsche Bank would be resolved in the Mega Complaint Litigation adversary.
Indeed, as noted in footnote 2, a fair reading of the Mega Complaint shows that resolution of the
basis for or amount of any such claim was never contemplated to be part of the Mega adversary.
Consequently, the discovery regarding the underlying bases for the Deutsche Bank tax indemnity
claims that Enron now seeks is *not* subject to any deadlines imposed in the Mega adversary.

Therefore, Enron asks that this matter be taken up at an informal conference at the
Court's earliest convenience. Enron seeks either an agreement from Deutsche Bank to respond
promptly to the requested discovery or an order requiring it to do so. If the Court has any
questions on substance or scheduling, they may be directed to me, to my partner Cliff Elgarten
(202-624-2523) or to our co-counsel David Stern (310-407-4025).

Respectfully submitted,

William J. McSherry, Jr.

Attachments

cc: Deutsche Bank Counsel of record (via electronic filing)

NYIWDMS: 10042743_1