**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ENRON CREDITORS RECOVERY<br>CORP., et al.,<br><br>Reorganized Debtors.<br><br>ENRON CORP., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITIGROUP INC., et al.,<br><br>Defendants. | CIVIL CASE NO.:  07 Civ. 10612<br><br>Chapter 11<br><br>Case No. 01-16034 (AJG)<br><br>Jointly Administered<br><br>Adversary No. 03-09266 (AJG) |

**DECLARATION OF EDWARD T. ATTANASIO IN OPPOSITION**
**TO THE DEUTSCHE BANK ENTITIES' JOINDER IN THE**
**CITIGROUP DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

I, Edward T. Attanasio, declare:

1.     I am a member of Klee, Tuchin, Bogdanoff & Stern LLP, Special Bankruptcy Litigation Counsel for Plaintiff Enron Creditors Recovery Corp. and its co-plaintiff subsidiaries (collectively, "Enron" or "Plaintiffs") in the adversary proceeding pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") captioned *Enron Corp. et al. v. Citigroup Inc. et al.*, Adv. No. 03-9266 (AJG) (the "Mega Claim Litigation").  I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify to these facts.

2.     Attached hereto are true and correct copies of the following documents that are cited as exhibits in Plaintiffs' Memorandum of Law in Opposition to the Deutsche Bank Entities' Joinder in the Citigroup Defendants' Motion to Withdraw the Reference.   These documents either (1) are pleadings and papers filed in the Mega Claim Litigation, in the jointly administered bankruptcy cases of Enron Corp, pending in the Bankruptcy Court as Case No. 01-16034 (AJG), or in other related proceedings (identified below), or (2) have been produced in discovery in the Mega Claims litigation and/or certain related proceedings.  Pursuant to the Bankruptcy Court's *Order Regarding Presumptive Document Authenticity and Presumptive Business Records Per Rule 803(6) F.R.E.*, attached hereto as Exhibit 1, the documents within category (2) are presumed to be a faithful and authentic reproduction of the original.   Enron requests that, pursuant to Fed. R. Evid. 201 the Court take judicial notice of these documents.  *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003); *In re Global Crossing, Ltd. Secs. Litig.*, 471 F. Supp. 2d 338, 343 (S.D.N.Y. 2006).

| Description | Exhibit |
|---|---|
| Stipulation and Order Regarding the Deutsche Bank Entities' Motion for More Definite Statement dated November 17, 2004 [docket no. 244] | 1 |
| Appendix G (Role of BT/Deutsche and its Affiliates) to the Third Interim Report of Neal Batson, Court Appointed Examiner | 2 |
| Stipulation to Adjourn Hearing dated June 29, 2004 [docket no. 194] | 3 |
| Notice of Adjournment of Hearing on Motion of Defendants the Deutsche Bank Entities' Partial Motion to Dismiss and Motion for More Definite Statement dated October 13, 2004 [docket no. 227] | 4 |
| Notice of Adjournment of Hearing on Motion of Defendants the Deutsche Bank Entities' Partial Motion to Dismiss dated November 12, 2004 [docket no. 240] | 5 |
| Stipulation and Order dated January 25, 2007 [docket no. 592] | 6 |
| Affidavit of Service dated May 6, 2005 [docket no. 318] | 7 |
| Affidavit of Service dated July 6, 2005 [docket no. 346] | 8 |
| Affidavit of Service dated November 2, 2005 [docket no. 419] | 9 |
| Affidavit of Service dated November 4, 2005 [docket no. 240] | 10 |
| Stipulation and Order dated December 1, 2005 [docket no. 443] | 11 |
| Second Stipulation and Order dated February 21, 2006 [docket no. 474] | 12 |
| Third Stipulation and Order dated March 31, 2006 [docket no. 491] | 13 |
| Fourth Stipulation and Order dated May 2, 2006 [docket no. 506] | 14 |
| Fifth Stipulation and Order dated June 7, 2006 [docket no. 531] | 15 |
| Sixth Stipulation and Order dated July 31, 2006 [docket no. 540] | 16 |
| Seventh Stipulation and Order dated September 15, 2006 [docket no. 556] | 17 |
| Deutsche Bank Entities' Joinder in Barclays Defendants' Motion for Initial Determination Under 28 U.S.C. § 157(b)(3) that Certain Claims are Non-Core Claims [docket no. 518] | 18 |
| Letter Agreement dated October 28, 1997 from Thomas F. Finley to Richard A. Causey | 19 |
| Letter Agreement dated January 28, 1999 from Brian J. McGuire to Richard A. Causey | 20 |
| Proof of Claim no. 12800 filed against Enron Corp. by Deutsche Bank Trust Company Americas | 21 |
| Proof of Claim no. 12799 filed against Enron Corp. by BT Green, Inc. | 22 |

| Description | Exhibit |
|---|---|
| Proof of Claim no. 12797 filed against Enron Corp. by Deutsche Bank AG | 23 |
| Proof of Claim no. 12798 filed against Enron Corp. by Deutsche Bank Trust Company Delaware, formerly known as Bankers Trust (Delaware) | 24 |
| Proof of Claim no. 12801 filed against Enron Corp. by EN-BT Delaware, Inc. | 25 |
| Proof of Claim no. 14165 filed against Enron Corp. by Deutsche Bank Luxembourg S.A. | 26 |
| Proof of Claim no. 22501 filed against Enron Corp. by Deutsche Bank S.A. | 27 |
| Proof of Claim no. 14166 filed against Enron Corp. by BT Commercial Corporation | 28 |
| Proof of Claim no. 14182 filed against Enron Corp. by Bankers Trust International plc | 29 |
| Proof of Claim no. 14183 filed against Enron Corp. by BT Leasing Corp. | 30 |
| Proof of Claim no. 14185 filed against Enron Corp. by Seneca Leasing Partners L.P. | 31 |
| Proof of Claim no. 14256 filed against Enron Corp. by Deutsche Bank Trust Corporation (f/k/a Bankers Trust Corporation) | 32 |
| Proof of Claim no. 22515 filed against Enron Corp. by Deutsche Bank Securities Inc. | 33 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of December 2007 at Los Angeles, California.

Edward T. Attanasio

WHITE & CASE LLP
*Attorneys for*
The Deutsche Bank Entities
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
Lawrence Byrne (LB-4671)
Owen C. Pell (OP-0118)
Lance Croffoot-Suede(LC-3725)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **ENRON CORP.,** *et al.,* | : | **Case No. 01-16034 (AJG)** |
| | : | **Jointly Administered** |
| Debtors. | : | |

-------------------------------------------------------x

| | | |
|---|---|---|
| **ENRON CORP.; ENRON NORTH** | : | |
| **AMERICA CORP.; ENRON NATURAL** | : | |
| **GAS MARKETING CORP.; ENRON** | : | |
| **BROADBAND SERVICES, INC.;** | : | |
| **ENRON ENERGY SERVICES, INC.;** | : | |
| **ENRON DEVELOPMENT FUNDING,** | : | |
| **LTD.,** | : | **Adversary Proceeding** |
| | : | **No. 03-09266 (AJG)** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **CITIGROUP INC.,** *et al.,* | : | |
| | : | |
| Defendants. | : | |
| | : | |

_____ x

**STIPULATION AND ORDER REGARDING THE DEUTSCHE**
**BANK ENTITIES' MOTION FOR MORE DEFINITE STATEMENT**

Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities

Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche

Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., BT Green, Inc.,

BT Leasing Corp., EN-BT Delaware, Inc., Deutsche Bank S.A., BT Ever, Inc., and Seneca Leasing Partners, L.P. (collectively, the "Deutsche Bank Entities"), and Enron Corp. and its above-captioned affiliated debtors, as debtors in possession and plaintiffs in this adversary proceeding ("Plaintiffs"), by and through their undersigned counsel, do hereby stipulate as follows:

## RECITALS

A.    Enron and certain of its affiliates (collectively, "Enron") filed voluntary petitions for relief under title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court") on December 2, 2001. Each of these Chapter 11 cases has been consolidated for administrative purposes.

B.    On September 24, 2003, Enron filed, in this Court, a complaint in the above-captioned matter, naming the Deutsche Bank Entities as defendants, among others.

C.    Enron filed an Amended Complaint under seal on December 1, 2003. The Amended Complaint was served on defendants on or about December 4, 2003.

D.    On February 17, 2004, the Deutsche Bank Entities filed a Partial Motion to Dismiss the Amended Complaint and a Motion for More Definite Statement.

E.    On February 17, 2004, Credit Suisse First Boston and certain of its affiliates (collectively, the "CSFB Entities"), also named as defendants in this adversary proceeding, filed a Partial Motion to Dismiss Debtors' Amended Complaint and a Motion for More Definite Statement.

F.    The Deutsche Bank Entities' Motion for More Definite Statement and that of the CSFB Entities are similar.

G.    On September 23, 2004, this Court rendered its decision with respect to the CSFB

Entities' Partial Motion to Dismiss and Motion for More Definite Statement.  In its decision, the

Court denied the CSFB Entities' Motion for More Definite Statement.

H.    The Deutsche Bank Entities' Partial Motion to Dismiss and Motion for More

Definite Statement has not yet been decided.

NOW THEREFORE, it is hereby agreed and consented to by the parties hereto by

their respective counsel as follows:

1.    The Recitals are fully incorporated herein by reference.

2.    Based on this Court's conclusions of law as to the CSFB Entities' Motion for

More Definite Statement, included in its decision of September 23, 2004, the Deutsche Bank

Entities' Motion for More Definite Statement is hereby denied.

Dated: New York, New York
       November 12, 2004

**WHITE & CASE LLP**

By:  __/s/ Owen C. Pell_____
Lawrence Byrne (LB-4671)
Owen C. Pell (OP-0118)
Lance Croffoot-Suede(LC-3725)
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for*
The Deutsche Bank Entities

**SUSMAN GODFREY L.L.P.**

By:  ___/s/ Mary Katherine Sammons_____
Mary Katherine Sammons (*Pro Hac Vice*)
Kenneth S. Marks (*Pro Hac Vice*)
1000 Louisiana Street, Suite 5100

Houston, Texas 77002-5096
(713) 651-9366

*Special Litigation Counsel for*
Enron Corp., et al.,
Debtors-in-Possession

SO ORDERED this 17th day of November, 2004
New York, New York

**s/Arthur J. Gonzalez**
HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:                              :     Chapter 11
                                    :
ENRON CORP., et *al.*,              :     Case No. 01-16034 (AJG)
                                    :
                  Debtors.          :     Jointly Administered
                                    :
-------------------------------------- x

APPENDIX G

(Role of **BT/Deutsche** and its Affiliates)

to

THIRD INTERIM REPORT OF NEAL **BATSON**,
COURT-APPOINTED EXAMINER

Reference is made to the preceding Third Interim Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION ................................................................. | 1 |
| | A. | Introduction and Overview ........................................... | 1 |
| | B. | BT/Deutsche's Role in Em-on's SPE Transactions.............. | 6 |
| | C. | Background Information.. .............................................. | 8 |
| II. | | HISTORY AND DEVELOPMENT OF BT/DEUTSCHE'S INVOLVEMENT WITH ENRON ................................................. | 10 |
| | A. | Relationship Between BT/Deutsche and Enron ................. | 10 |
| | B. | BT/Deutsche's Knowledge of Enron's Financial Condition.. ... | 20 |
| III. | | BT/DEUTSCHE'S ROLE IN ENRON'S SPE TRANSACTIONS.. ........ | 27 |
| | A. | The REMIC Carryover Basis Transactions ..................... | 27 |
| | B. | The Teresa Transaction.. ............................................ | 42 |
| | C. | The Tomas Transaction.............................................. | 48 |
| | D. | Sale of the Cochise Planes ........................................ | 51 |
| | E. | The Share Trust Transactions .................................... | 57 |
| IV. | | POTENTIAL LIABILITY OF BT/DEUTSCHE ........................... | 71 |
| | A. | Arguments Supporting the Imposition of Aiding and Abetting Liability and Equitable Subordination.............................. | 71 |
| | B. | Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination .................................... | 82 |
| | C. | Conclusions.. ........................................................... | 92 |
| V. | | BANKRUPTCY ANALYSIS OF THE VALHALLA SETOFF ........ | 93 |
| | A. | Summary Description of the Valhalla Transaction................ | 93 |
| | B. | The Valhalla Setoff.................................................... | 97 |
| | C. | Bankruptcy Issues Relating to the Valhalla Setoff ............ | 99 |
| | D. | Analysis of Evidence ................................................ | 103 |
| | E. | Recoupment ............................................................ | 112 |
| | F. | BT/Deutsche's Security Interest in the Deutsche/Enron Note.. ... | 117 |
| | G. | Summary.. ................................................................ | 118 |
| VII. | | CONCLUSION ...,............................................ "............ | 121 |

## I.    INTRODUCTION

### A.    Introduction and Overview

In Appendix C (Role of Enron's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading. These wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

This Appendix considers the role of BT/Deutsche in the Debtors' SPE transactions. BT/Deutsche was a Tier 1 Em-on bank and acted in several different capacities in the SPE transactions. A principal area of BT/Deutsche's involvement in Em-on's SPE transactions was the Tax Transactions.' BT/Deutsche designed, promoted and participated in the Teresa, Steele, Tomas and Cochise Transactions (the "BT/Deutsche Tax Transactions").[2] In Appendix C (Role of Em-on's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that the Tax/Accounting Officer Group breached their fiduciary duties by causing Enron to enter into the BT/Deutsche Tax Transactions.

---

[1] The "Tax Transactions" include eleven SPE transactions that originated in Enron's corporate tax department during the 19952000 time period. See Second Interim Report, Appendix J (Tax Transactions).

[2] In addition, Enron participated in the Renegade and Valhalla Transactions as an accommodation party to BT/Deutsche. See Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions.*

In this Appendix, the Examiner discusses evidence indicating that: (i) BT/Deutsche had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by the Tax/Accounting Officer Group; (ii) BT/Deutsche gave substantial assistance to the Tax/Accounting Officer Group by participating in the structuring and closing of the BT/Deutsche Tax Transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of this conduct. The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude[3] that BT/Deutsche aided and abetted those officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct by BT/Deutsche in connection with the BT/Deutsche Tax Transactions for a court to conclude that BT/Deutsche's claims should be equitably subordinated to the claims of other creditors.

BT/Deutsche's conduct in the BT/Deutsche Tax Transactions enabled Enron to: (i) erroneously record approximately $158 million[4] of income from the two REMIC Carryover Basis Transactions,' $143.7 million[6] of which Enron erroneously recorded as

---

[3] See Report, *Standard Adopted by the Examiner.*

[4] From 1997 through September 2001, Enron reported cumulative net income of $61.2 million from the Steele Transaction. Enron Consolidated Financial Statement Reporting, Limited Financial Accounting Summary of Certain Projects, as requested by the Examiner, Oct. 2002, at 9 (the "Enron Consolidated Accounting Summary") [AB000427661-AB000427684]. Through the Cochise Transaction, Enron increased its reported net income by $96.5 million during the period from 1999 to 2001. *Id.* at 14.

[5] The "REMIC Carryover Basis Transactions" include the Steele and Cochise Transactions. Second Interim Report, Appendix J (Tax Transactions), at 2-4.

[6] Enron reported $94.2 million of pre-tax income from the Steele Transaction during the period from March 1997 through September 2001. Enron Consolidated Accounting Summary, at 9. Enron reported $49.5 million in pre-tax income from the Cochise Transaction in the period from 1999 to 2001. *Id.* at 14.

pre-tax income; and (ii) erroneously record a $229 million[7] increase in after-tax net income by reporting the Teresa Transaction in a manner that did not comply with GAAP.

The evidence would allow a fact-finder to conclude that BT/Deutsche:

- acted as a conduit for the sale of the Cochise Planes[8] from Enron to Oneida Leasing, Inc. ("Oneida") in the second quarter of 2000 for the purpose of enabling Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter;[9]

- designed, promoted and participated in the Teresa Transaction while knowing that the transaction was not expected to reduce Enron's tax liability on a present value basis and served no substantial business purpose for Enron other than enabling Enron to "generate income for financial accounting purposes";[10]

- designed, promoted and participated in the Steele Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income;[11] and

---

[7] From 1997 through September 2001, Enron increased reported after-tax income by approximately $229 million as a result of the Teresa Transaction. Enron Consolidated Accounting Summary, at Attachment I.

[8] The "Cochise Planes" are the beneficial interests in two commercial aircraft that were: leased to Continental Airlines, Inc. and United Air Lines, Inc.; transferred from a BT/Deutsche affiliate to the Cochise structure in January 1999; transferred from the Cochise structure to a BT/Deutsche affiliate in June 2000; and transferred from that BT/Deutsche affiliate to the Tomas structure in July 2000. See Second Interim Report, Appendix J (Tax Transactions), at 33-35 and 84-85; Second Interim Report, Annex 2 to Appendix J (Tax Transactions), at 1 1 - 12.

[9] Maliseet Properties Inc. (Project Cochise) Tax Overview, undated (the "Cochise Tax Overview"), at 5 [AB000187586-AB000187591]; Enron Form 10-Q filed with the SEC for the Quarter ended June 30, 2000; see *also* Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[10] Tax Opinion from King & Spalding to R. Davis Maxey, Senior Director, Corporate Tax, Enron, July 29, 1997 (the "July 29 Teresa Tax Opinion"), at 4 [AB000151584-AB000151628]; see *also* Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Bruce Classon, Bankers Trust, and Calli Hayes, Bankers Trust, Mar. 10, 1997, at 6-7 [DBC 012891-DBC 0128971; Facsimile from Thomas Finley, Bankers Trust, to Robert Hermarm, Enron, May 28, 1996, at 10 (PowerPoint presentation materials) [DBC 013815-DBC 0138271; Discussion Material for Enron, Bankers Trust, Oct. 1996, at 10 (PowerPoint presentation materials) [AA-EX00004168-AA-EX00004179]; Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[11] See Letter from Thomas Finley, Managing Director, Bankers Trust, to R. Davis Maxey, Senior Director, Enron, Nov. 7, 1997, attaching Letter from Bill Boyle, Vice President, Bankers Trust, to William McKee, King & Spalding, June 2, 1997 (enclosing memorandum regarding financial accounting for the Steele Transaction) (the "Boyle Accounting Memorandum") [AB000187757-AB000187776]; see *also* Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

- designed, promoted and participated in the Cochise Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as gain on the sale of the Cochise Planes and other pre-tax income.[12]

As a result, BT/Deutsche's claims in the Bankruptcy Case, totaling more than $227 million, are susceptible of being equitably subordinated to the claims of other creditors. This would be in addition to any affirmative recovery that may be available to the Debtors against BT/Deutsche for aiding and abetting the officers' breaches of fiduciary duty, assuming that the Debtors have standing to pursue such a claim.

Another area of BT/Deutsche's involvement in Enron's SPE transactions was the Marlin and Whitewing Share Trust Transactions. In the Second Interim Report, the Examiner concluded that Enron should have consolidated Whitewing Associates L.P. ("Whitewing Associates") and its subsidiaries in Enron's financial statements, and that Enron's financial statements did not fully describe the amount or nature of Enron's contingent liabilities in the Whitewing structure.[13] In this Appendix, the Examiner concludes that there is insufficient evidence available to date that BT/Deutsche's activities in connection with the Share Trust Transactions, standing alone, comprise actionable aiding and abetting of Enron's officers in breaching their fiduciary duties or that BT/Deutsche's claims should be equitably subordinated to the claims of other creditors. The Examiner concludes that there is insufficient evidence available to date that BT/Deutsche had actual knowledge of the extent to which entities in the Share Trust

---

[12] See Discussion Material for Project Cochise, June 15, 1998 (PowerPoint presentation materials) [AB000490808-AB000490818]; Discussion Material for Project Cochise, July 27, 1998 (PowerPoint presentation materials) [K&S027706-K&S027717]; see *also* Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[13] Second Interim Report, Appendix G (Whitewing Transaction).

Transactions should have been consolidated or of Enron's failure to disclose properly the effect of those transactions in its financial statements.

In addition, on November 29, 2001, BT/Deutsche purported to set off its obligations to Enron under a $1.95 billion note and under the settlement of an interest rate swap against Enron's obligation to BT/Deutsche under a guaranty agreement.[14] As discussed below in *"Bankruptcy Analysis of the Valhalla Setoff,"* the Examiner concludes that there is sufficient evidence for a fact-finder to determine that BT/Deutsche failed to effect the setoff prior to the Petition Date (December 2, 2001). Accordingly, the Examiner concludes that Enron's estate has a reasonable basis to assert a claim that BT/Deutsche violated the automatic stay.

If BT/Deutsche's purported setoff violated the automatic stay, there is some support for the proposition that setoff, an equitable remedy, should be denied. Although BT/Deutsche would retain its status as a secured creditor by virtue of a pledge of the $1.95 billion note even if setoff were denied, Section 5 1 O(c)(2) of the Bankruptcy Code could authorize the entry of an order to transfer BT/Deutsche's lien on the note to Enron's estate. A court could conclude, however, that the remedy of denial of setoff, which may allow Em-on to collect on the note, would be unnecessarily punitive and thus inequitable.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Moreover, there are certain defenses to aiding and abetting liability

---

[14] Letter from Brian J. McGuire, Deutsche Bank, and Spring S. Hollis, Deutsche Bank, to Enron and Valhalla GmbH, Nov. 29, 2001 [AB0785 03472-AB0785 034731.

and equitable subordination available to BT/Deutsche. Whether BT/Deutsche will succeed on one or more of these defenses will depend upon the fact-finder's resolution of the facts,

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of BT/Deutsche's *knowledge* of the acts giving rise to the breaches of fiduciary duty. In particular, whether BT/Deutsche knew that Enron's reporting of the BT/Deutsche Tax Transactions would result in the materially misleading presentation of Enron's financial condition because: (i) the transactions were disclosed in a manner that disguised the economic substance of the transactions so as to mislead rating agencies, creditors and investors; and/or (ii) the accounting for the transactions was incorrect. As part of this determination, the fact-finder may consider, among other things: (i) BT/Deutsche's knowledge that the economic substance of the transactions was inconsistent with the disclosure; (ii) its knowledge that Enron's accounting for the BT/Deutsche Tax Transactions was likely incorrect; (iii) the impact of its understanding with Em-on concerning the Cochise Planes; (iv) its knowledge as to the lack of business purpose for these transactions; and (v) whether there was any reliance on accounting representations from Enron or from Andersen and, if so, whether such reliance was reasonable.

- The degree of *assistance* provided by BT/Deutsche to Enron's Tax/Accounting Officer Group. As part of this determination, the fact-finder may consider whether BT/Deutsche designed the transactions, structured the transactions, consummated the transactions or took any action that would invalidate the desired accounting treatment.

- Whether it would have been *reasonably foreseeable* to BT/Deutsche that the BT/Deutsche Tax Transactions would cause injury to Enron and/or its creditors. As part of this analysis, a fact-finder may consider whether the BT/Deutsche Tax Transactions had a material impact on Enron's financial statements.

**B.    BT/Deutsche's Role in Enron's SPE Transactions**

BT/Deutsche was one of Enron's Tier 1 banks and engaged in a variety of transactions with Enron, ranging from traditional commercial lending to participation in

debt and equity offerings. In addition, BT/Deutsche played a major role in Enron's Tax Transactions.

During the period from 1997 until 2001, BT/Deutsche engaged in six Tax Transactions with Enron. In addition to participating in those Tax Transactions, often as the only party other than Em-on affiliates, BT/Deutsche was responsible for designing, promoting and assisting in implementing the transactions.

BT/Deutsche arranged some of Em-on's most aggressive Tax Transactions, including the two REMIC Carryover Basis Transactions that enabled Em-on to report $143.7 million of potential tax benefits as pre-tax income on its financial statements. BT/Deutsche also promoted the Teresa Transaction, the first of Enron's Tax Basis Step-Up Transactions," and Enron's tax-free disposition of leased assets in the Tomas Transaction. BT/Deutsche also induced Enron to participate in the Tax Accommodation Transactions,[16] which produced significant tax benefits for BT/Deutsche but not for Em-on.

From 1997 until the Petition Date, BT/Deutsche was paid approximately $11 million in fees associated with lending and structured finance transactions (other than the BT/Deutsche Tax Transactions),[17] $18 million in fees associated with public and private

---

[15] The "Tax Basis Step-Up Transactions" include the Teresa, Condor and Tammy I Transactions. Second Interim Report, Appendix J (Tax Transactions), at 5-6.

[16] The "Tax Accommodation Transactions" include the Renegade and Valhalla Transactions, Second Interim Report, Appendix J (Tax Transactions), at 6-7.

[17] Amended Response to Request No. 6, Deutsche Bank AG's Objections and Responses to the Feb. 3, 2003, Rule 30(b)(6) Letter Requests (the "Deutsche Bank Response"), paragraphs (c), (e), (f) and (o); Email from Marcus Tarkington, Deutsche Bank, to Paul Cambridge, Deutsche Bank, Apr. 24, 2001 [DBB 008020]. This amount does not include upfront fees from participation in Hawaii 125-0, Rawhide, Cornhusker, MacArthur, Leftovers, Riverside 3, Ponderosa Pine or the Brazos Synthetic Lease.

securities offerings,[18] and $43 million in fees associated with the BT/Deutsche Tax Transactions.'"

C.   **Background   Information**

Deutsche Bank AG ("Deutsche Bank") is a leading international financial service provider. With roughly 77,400 employees, Deutsche Bank serves more than 12 million customers in 75 countries.[20]   Although Deutsche Bank's home market is Europe, Deutsche Bank operates its investment banking and asset management businesses worldwide through numerous offices in Asia and the Pacific Rim, Europe and the Americas.[21]  In 2002, Deutsche Bank had total assets of €758 billion, total net revenues of €24.5 billion and net income of €397 million.[22]

Deutsche Bank traces its history to 1870 when it was founded in Berlin, Germany.[23]  Although it splintered into ten separate institutions following World War II, Deutsche Bank was reconstituted as a single institution in 1957.[24] During the 1970s and 1980s, Deutsche Bank opened a series of branch offices in major capitals around the world.[25] Deutsche Bank also made a number of acquisitions in the 1980s and 1990s to

---

[18] Deutsche Bank Response, paragraphs (i) and (m). This amount does not include fees from serving as the initial purchaser in Yosemite I, Yosemite III or Enron Capital Trust III or the placement of the Azurix IPO.

[19] Second Interim Report, Appendix J (Tax Transactions), at 11; Engagement Letter from Thomas F. Finley, Managing Director, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Mar. 27, 1997 (Teresa Transaction) (the "Teresa OPI Engagement Letter") [AB000188370-AB000188375].

[20] Deutsche Bank Press Service: Group Information: At a Glance, *available at* http://presse.deutsche-bank.de/wms/presse/index.php3?ci=8&language=2.

[21] Deutsche     Bank     AG     Profile     –     Hoover's     Online,     *available     at* http://www.hoovers.com/premium/profile/3/0,2147,40833,00.html.

[22] Deutsche Bank AG Form 20-F filed with the SEC on Mar. 27, 2003, at 3-4.

[23] Deutsche Bank - History, *available at* http://www.deutsche-bank.de/geschichte/en/html/index_c.htm.

[24] Id.

[25] *Id.*

expand its geographical reach, including the acquisition of Bankers Trust Corporation in 1999.[26] When Deutsche Bank acquired Bankers Trust Corporation in June 1999, Bankers Trust Company ("Bankers Trust") was the eighth largest U.S. bank, and the combination of Deutsche Bank and Bankers Trust Corporation ranked as the world's largest financial services firm, as measured by assets.[27]

BT/Deutsche's offices at 130 Liberty Street in New York City suffered severe damage as a result of the September 11, 2001, attacks on the World Trade Towers.[28] All physical documents stored at 130 Liberty Street at the time of the attacks, including active and archived BT/Deutsche tiles relating to Enron transactions, have been unavailable to BT/Deutsche and the Examiner.[29]

---

[26] *Id.*

[27] Paul Beckett and Christopher Roads, *Deutsche Bank, Bankers Trust Formalize Deal,* Wall St. J., Nov. *30,* 1998, at A4.

[28] Affidavit of Patrick G. O'Connor, Data Center, Operations Manager (U.S. and U.K.), Deutsche Bank, June 18, 2003 [AB0971 02260-AB0971 022631.

[29] Letter from Robert S. Khuzami, Managing Director, Deutsche Bank, to Members of Congress, Apr. 3, 2002 [DB 002678-DB 0026881; Sworn Statement of Paul F. Cambridge, former Managing Director, Deutsche Bank, to Daniel J. O'Neill, A&B, May 29 and 30, 2003 (the "Cambridge Sworn Statement"), at 217-19; Sworn Statement of Michael F. Jakubik, Managing Director, Deutsche Bank, to Daniel J. O'Neill, A&B, May 1 and 19, 2003 (the "Jakubik Sworn Statement"), at 33-35.

**II.    HISTORY AND DEVELOPMENT OF BT/DEUTSCHE'S INVOLVEMENT WITH ENRON**

**A.    Relationship Between BT/Deutsche and Enron**

Deutsche Bank and Bankers Trust each had an established relationship with Enron before Deutsche Bank acquired Bankers Trust in June 1999.[30] Deutsche Bank, as a very large commercial bank, was more regularly involved in lending transactions with Enron such as the purchase of Enron notes or participation in a revolving credit facility,[31] while Bankers Trust's relationship with Enron had evolved from a "fairly significant" lending relationship in the 1980s to a focus in the 1990s on energy trading and project structured finance.[32]

Both Deutsche Bank and Bankers Trust were Tier 1 Enron banks.[33] After the combination, Enron consistently ranked BT/Deutsche as a Tier 1 bank.[34] Correspondingly, BT/Deutsche ranked Enron as a top tier client.[35]

An internal BT/Deutsche memorandum in November 2000 summarized BT/Deutsche's relationship with Enron by stating:

---

[30] See Memorandum from Kelly Boots, Enron, to Jeff Skilling, Enron, and Andy Fastow, Enron, regarding Bankers Trust, Oct. 21, 1998 [AB0786 010831; Memorandum from Kelly Boots, Enron, and Sarah Heineman, Enron, to Andy Fastow, Enron, and Paul Chivers, Enron, regarding Deutsche Bank, Nov. 5, 1999 [AB0323 00880].

[31] Memorandum from Kelly Boots, Enron, and Sarah Heineman, Enron, to Andy Fastow, Enron, and Paul Chivers, Enron, regarding Deutsche Bank, Nov. 5, 1999 [AB0323 008801; Deutsche Bank Response.

[32] Cambridge Sworn Statement, at 20-23. Both banks also engaged in other activities such as trading commodities, debt instruments, equities, options, futures, forwards and other derivatives. Bankers Trust also would occasionally be called upon to make regular commercial loans or to buy syndicated loans and Deutsche Bank would occasionally help a client in structuring transactions. Deutsche Bank Response; see also Letter from Marcus M. Tarkington, Bankers Trust, to Kelly Boots, Enron, Feb. 5, 1999 (attaching Enron-Bankers Trust Relationship Review) [DBB 004 129-DBB 004 13 6].

[33] Cambridge Sworn Statement, at 43.

[34] See Memorandum from Kelly Boots, Enron, and Sarah Heineman, Enron, to Andy Fastow, Enron, and Paul Chivers, Enron, regarding Deutsche Bank, Nov. 5, 1999 [AB0323 00880].

[35] Sworn Statement of Calli S. Hayes, Credit Officer, Deutsche Bank, to Mary C. Gill, A&B, Apr. 28 and May 14, 2003 (the "Hayes Sworn Statement"), at 98.

Deutsche Bank is one of Em-on's eight Tier 1 banks. As a Tier 1 bank, we are frequently brought into unique and lucrative transactions for Enron, such as the highly successful Marlin and Osprey Trust transactions that we developed with DLJ. By having this unique access to a very innovative client, we have been able to develop products that we are aggressively marketing to other clients. To maintain this position with Enron, we need to demonstrate that we execute transactions quickly when necessary.

Our relationship philosophy with respect to Enron is that we will manage an exposure level of $350-$450 million with expectation that we will flex that level to $700-$800 million, but always with a view toward bringing the exposure back to the normal range. . . . It is important to note that no other Tier 1 bank has an exposure level less than $1 billion.

During the past four years, we have earned gross advisory, underwriting and structuring fees as follows: $10 million in 1997, $20 million in 1998, $7 million in 1999, and $2 million plus annual tax benefits resulting from a structured tax transaction of $50 million in 2000.[36]

Deutsche Bank, Bankers Trust and the combined entity all engaged in a wide range of transactions and proposed ventures with Em-on and Enron-related entities domestically and abroad.[37] Both Bankers Trust and Deutsche Bank, for example, had lending relationships with domestic and foreign Enron entities. In 1997 and 1998, Bankers Trust International, London, arranged and syndicated the bank financing for four transactions in which Enron assets were financed pending sale.[38] In 1998, Bankers Trust was one of three arrangers of the bank financing for the transaction in which Enron acquired an interest in the Brazilian electric utility, Elektro.[39]     BT/Deutsche also

---

[36] Email from George Tyson, Deutsche Bank, to Marcus Tarkington, Deutsche Bank, Nov. 29, 2000 [DBG 079773-DBG 0797741.

[37] See Deutsche Bank Response.

[38] Deutsche Bank Response, paragraph (e).

[39] Deutsche Bank Response, paragraph (f).

participated in a number of other lending transactions in which it did not have a lead position.[40]

BT/Deutsche also participated in a number of offerings made by Enron and its affiliates. In 1997, Bankers Trust International, London, acted as placement agent in a monetization of a 50% interest in the Sutton Bridge Power Project.[41]     In 1999, BT/Deutsche was a co-manager for the issuance of $750,000,000 Senior Secured Notes (the "Yosemite I Notes").[42]     BT/Deutsche was the sole arranger of a $200 million put option facility with Em-on related to Enron Capital Trust III, and lead manager of the Enron Capital Trust III senior note issuance in June 2000.[43]

BT/Deutsche acted as a joint bookrunning manager for the issuance of $1,024,000,000 Senior Secured Notes in December 1998 (the "Marlin I Notes"),[44] $1,400,000,000 Senior Secured Notes in September 1999 (the "Osprey I Notes"),[45]

---

[40] See Deutsche Bank Response and Exhibit A, Deutsche Bank AG's Objections and Responses to the Feb. 3, 2003, Rule 30(b)(6) Letter Requests.

[41] Deutsche Bank Response, paragraph (c).

[42] Sworn Statement of Craig J. Orchant, Deutsche Bank, to Mary C. Gill, A&B, Apr. 17 and May 13, 2003 (the "Orchant Sworn Statement"), at 93-94. BT/Deutsche was the initial purchaser of Yosemite I Notes in the amount of $84,000,000.   Section 2(a) and Schedule A, Yosemite Securities Trust I Note Purchase Agreement for U.S. $750,000,000 8.25% Series 1999-A Linked Enron Obligations due 2004, Nov. 4, 1999 [AB000079596-AB000079628].

[43] Deutsche Bank Response, paragraph (o).

[44] Deutsche Bank Response, paragraph (i).  BT/Deutsche was the initial purchaser of Marlin I Notes in the amount of $512,000,000.  Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $1,024,000,000 7.09% Senior Secured Notes Due 2001, Dec. 8, 1998 [AB000262820-AB000262850].

[45] Deutsche Bank Response, paragraph (m). BT/Deutsche was the initial purchaser of Osprey I Notes in the amount of $455,000,000.   Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $1,400,000,000 8.3 1% Senior Secured Notes due 2003, Sept. 16, 1999 [SS000023298-SS000023330].

$1,027,000,000 Senior Secured Notes in October 2000 (the "Osprey II Notes"),[46] and $915,000,000 Senior Secured Notes in July 2001 (the "Marlin II Notes").[47]

BT/Deutsche was active in trading these notes on the secondary market.[48] BT/Deutsche used its own capital to facilitate the trading on the secondary market, and considered its ability to facilitate the secondary trading of securities it had initially issued as one of its competitive strengths.[49]

In December 1999, at the invitation of Fastow, a BT/Deutsche affiliate committed to invest $10 million in LJM2.[50] The BT/Deutsche affiliate also placed a designee on the LJM2 Advisory Committee.[51]

---

[46] Deutsche Bank Response, paragraph (m). The Osprey II Notes included $750,000,000 Notes and €315,000,000 Notes, and BT/Deutsche was the initial purchaser of Osprey II Notes in the amounts of $300,000,000 and €126,000,000. Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $750,000,000 7.797% Senior Secured Notes due 2003, and €315,000,000 6.375% Senior Secured Notes due 2003, Sept. 28, 2000 [SS000025440-SS000025481].

[47] Deutsche Bank Response, paragraph (i). The Marlin II Notes included $475,000,000 Notes and €5 15,000,000 Notes, and BT/Deutsche was the initial purchaser of Marlin II Notes in the amounts of $166,250,000 and €180,250,000. Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $475,000,000 6.3 1% Senior Secured Notes due 2003 and €5 15,000,000 6.19% Senior Secured Notes due 2003, July 12,200 1 [AB000045466-AB000045513].

[48] Orchant Sworn Statement, at 97, 3 13, 378 and 449; Deutsche Bank Presentation to Em-on, Osprey Trust Structure, Marketing New Senior Notes, June 30, 2000, at 3-4 (PowerPoint presentation materials) [DBG-00571 1-DBG-005758].

[49] Orchant Sworn Statement, at 3 1 l-1 3.

[50] Cambridge Sworn Statement, at 220 and 230; Letter from Andrew S. Fastow, Enron, to Paul F. Cambridge, Deutsche Bank, Sept. 27, 1999 [AB 000550122]; Letter from Michael J. Kopper, Managing Director, Enron, to Paul Cambridge, Deutsche Bank, Oct. 5, 1999 [DBG 021675]. The BT/Deutsche affiliate has satisfied capital calls for approximately $7.3 million and has received distributions of approximately $6.5 million from LJM2. Response to Request No. 11, Deutsche Bank AG's Objections and Responses to the Feb. 3, 2003, Rule 30(b)(6) Letter Requests.

[51] Facsimile from Emmet, Marvin & Martin, LLP, Counselors-at-Law, to William Walsh, *et al.*, Dec. 9, 1999 [AB0971 02164-AB0971 021671; Letter from LJM Capital Management, L.P. to BT Investment Partners, Inc. and Deutsche Securities, Inc., July 6, 2000 [LJM05651 1-LJM056516]; Cambridge Sworn Statement, at 246 and 248.

The following timeline illustrates when each of the BT/Deutsche Tax Transactions discussed in this Appendix was closed. It also includes other major transactions that Enron completed with BT/Deutsche's assistance during this time period:



January 1997
February 1997
March 1997 — **Teresa Transaction closed**
April 1997
May 1997
June 1997
July 1997 — Sutton Bridge Financing closed
August 1997
Sentember 1997
October 1997 — SBI2 Financing closed
        **Steele Transaction closed**
November 1997
December 1997
January 1998
February 1998
March 1998 — Northern Borders Financing closed
April 1998
May 1998
June 1998 — LNG Power II & Enron Europe Power II Ltd Financing closed
July 1998
August 1998 — Elektro Acquisition closed
September 1998 — **Tomas Transaction Closed**
October 1998
November 1998
December 1998 — Renegade Transaction closed
        **Issuance of Marlin Notes**
January 1999 — **Cochise Transaction closed**
February 1999
March 1999
April 1999
May 1999
June 1999
July 1999
August 1999
September 1999 — **Issuance of Osprey I Notes**
October 1999
November 1999 — Initial Purchase of a portion of Yosemite I Notes
December 1999 — Commitment to invest $10 million in LJM2
January 2000
February 2000
March 2000
April 2000
May 2000 — **Valhalla Transaction closed**
June 2000 — Issuance of Enron Capital Trust III Notes

- 14 -



| | |
|---|---|
| | Sale of Cochise Planes to BT/Deutsche |
| July 2000 | Sale of Cochise Planes to Oneida |
| August 2000 | |
| September 2000 | Issuance of Osprey II Notes |
| October 2000 | |
| November 2000 | |
| December 2000 | |
| January 2001 | |
| February 2001 | |
| March 2001 | |
| April 2001 | E-Next Generation Syndication Facility closed |
| May 2001 | |
| June 2001 | |
| July 2001 | Issuance of Marlin II Notes |
| August 2001 | |
| September 2001 | |
| October 2001 | |
| November 2001 | |
| December 2001 | PETITION DATE (12/02/01) |

A bold line indicates the end of a quarterly or yearly reporting period.

*Role of BT/Deutsche in Enron's Tax Transactions*

The BT/Deutsche Tax Transactions were developed within BT/Deutsche's structured transactions group (the "Structured Transactions Group"). In developing transactions, BT/Deutsche worked with internal and external accounting and tax advisors.[52] BT/Deutsche typically engaged the "on call" advisory group in Andersen's New York office on an hourly rate basis to review a hypothetical transaction and issue a "SAS 50 letter"[53] setting forth the accounting treatment of the transaction.[54] In addition,

---

[52] Sworn Statement of Thomas Finley, former Managing Director, Bankers Trust, to Philip C. Cook, A&B, Apr. 30, 2003 (the "Finley Sworn Statement"), at 15 and 17-19; Sworn Statement of Brian J. McGuire, Managing Director, Deutsche Bank, by Philip C. Cook, A&B, May 2 and 7, 2003 (the "McGuire Sworn Statement"), at 98-100 and 110-11.

[53] See Report on the Application of Accounting Principles, Statement on Auditing Standards No. 50 (American Institute of Certified Public Accountants 1986) ("SAS 50").

[54] Finley Sworn Statement, at 18-19 and 22; McGuire Sworn Statement, at 92-95. In connection with the issuance of the SAS 50 letters, BT/Deutsche typically worked with Mike Baldasaro, an Andersen tax partner, and Ron Weissman, an Andersen accounting partner. Finley Sworn Statement, at 18-19. See *also* Sworn Statement of H. Ronald Weissman, former Partner, Andersen, to Philip C. Cook, A&B, May 14, 2003 (the "Weissman Sworn Statement"), at 18-21 and 24; Sworn Statement of Michael P. Baldasaro,

BT/Deutsche engaged outside tax advisors, such as King & Spalding or Akin Gump, on an hourly rate basis to provide advice on the tax consequences of the hypothetical transaction, which also was reviewed by BT/Deutsche's internal corporate tax department.[55]

The Structured Transactions Group was first introduced to Em-on by a banker from BT/Deutsche's derivatives group.[56] Thereafter, the Structured Transactions Group met periodically with representatives of Enron's tax department to discuss Em-on's goals and objectives and to consider structures that BT/Deutsche had developed that satisfied those goals and objectives.[57]

BT/Deutsche successfully promoted the Teresa, Steele and Cochise Transactions to Enron.[58] BT/Deutsche brought the Tomas Transaction to Enron in response to Enron's request for assistance in disposing of leased assets without recognizing taxable income on the disposition.[59] In all four transactions, Enron engaged BT/Deutsche as its exclusive

---

former Partner, Andersen, to Philip C. Cook, A&B, May 15, 2003 (the "Baldasaro Sworn Statement"), at 95-96 and 101.

[55] Finley Sworn Statement, at 19-21 and 65-66; McGuire Sworn Statement, at 95-102; Sworn Statement of Leon G. Kozak, former Tax Counsel, Deutsche Bank, to Philip C. Cook, A&B, Apr. 29, 2003 (the "Kozak Sworn Statement"), at 62 and 74-75; see, e.g., Memorandum from John P. Buser, Akin Gump, to Thomas F. Finley, Bankers Trust, and William Boyle, Bankers Trust, regarding REMIC/Subco, Aug. 5, 1997 (Steele Transaction) [AGS39958-AGS39979]; Memorandum from John P. Buser, Akin Gump, to Thomas F. Finley, Bankers Trust, and William Boyle, Bankers Trust, regarding Leasing Partnership, Feb. 27, 1998 (Tomas Transaction) [DBF 04373 1-DBF 0437661; Boyle Accounting Memorandum.

[56] Finley Sworn Statement, at 24 and 68, lines l-7; Email from Sanjai Bijawat, Bankers Trust, to Peter E. Lengyel, Bankers Trust, Apr. 1, 1997 [DBG 027037-DBG 027039).

[57] McGuire Sworn Statement, at 48-50.

[58] Letter from Thomas Finley, Managing Director, Bankers Trust, to Robert Hermann, Vice President of Taxes, Enron, May 16, 1996 (Teresa Transaction) [AB000188356-AB000188357]; Letter from Thomas Finley, Managing Director, Bankers Trust, to R. Davis Maxey, Enron, June 17, 1997 (Steele Transaction) [AB0003 18 164-AB0003 181651; Discussion Material for Project Cochise, July 27, 1998 (PowerPoint presentation materials) [K&S027706-K&S027717]; see also Second Interim Report, Appendix J (Tax Transactions).

[59] Finley Sworn Statement, at 144; McGuire Sworn Statement, at 297.

financial advisor in exchange for substantial fees totaling over $43 million for the four

transactions.[60] BT/Deutsche justified the size of its fees in part by the magnitude of the

accounting income that would be generated from such transactions.[61]

At BT/Deutsche's recommendation, Enron frequently used the same tax advisor

that had assisted BT/Deutsche in the development of the transaction.[62] In the Teresa

Transaction, for example, BT/Deutsche engaged King & Spalding to assist in developing

the structure.[63]  BT/Deutsche introduced King & Spalding to Enron who, at

BT/Deutsche's suggestion, hired King & Spalding as its tax counsel in the transaction.[64]

---

[60] Engagement Letter from Thomas F. Finley, Managing Director, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Mar. 27, 1997 ($8 million fee in Teresa Transaction) (the "Original Teresa Engagement Letter") [DBC 060177-DBC 060182]; Amended Engagement Letter from Thomas F. Finley, Managing Director, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Dec. 17, 1997 ($8 million fee in Teresa Transaction) (the "First Amended Teresa Engagement Letter") [AB000188376-AB000188381]; Amended Engagement Letter from Thomas F. Finley, Managing Director, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Dec. 28, 1998 ($8 million fee in Teresa Transaction reduced to $6.625 million) (the "Second Amended Teresa Engagement Letter") [AB000188382-AB000188387]; Engagement Letter from Thomas Finley, Managing Director, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Oct. 28, 1997 ($10 million fee in Steele Transaction) (the "Steele Engagement Letter") [AB0001878 15-AB000187820]; Letter from Brian J. McGuire, Vice President, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Sept. 15, 1998 ($10 million fee in Tomas Transaction) (the "Tomas Engagement Letter") [AB000187226-AB000 1872301; Engagement Letter from Brian J. McGuire, Vice President, Bankers Trust, to Richard A. Causey, Senior Vice President and Chief Accounting and Information Officer, Enron, Jan. 28, 1999 ($15 million fee in Cochise Transaction) (the "Cochise Engagement Letter") [AB000187672-AB000187677]. Enron also engaged BT/Deutsche as its exclusive placement agent with respect to the preferred stock of Organizational Partners, Inc. ("OPI") in exchange for a $2 million fee. Teresa OPI Engagement Letter.

[61] See Boyle Accounting Memorandum, at AB000187760 ("a business entity would be willing to pay . . . little, if any, fee" for potential tax benefits absent accounting benefits, "a moderate fee" if the transaction generated financial accounting benefits in the form of pre-tax income, and "a substantial fee" if the transaction generated accelerated pre-tax income); see also McGuire Sworn Statement, at 173; Steele Engagement Letter, at 2 ($10 million fee reduced if change of law occurs and materially reduces Enron's expected GAAP treatment).

[62] See Finley Sworn Statement, at 21-22 and 65; McGuire Sworn Statement, at 267-68.

[63] Finley Sworn Statement, at 19-2 1.

[64] Email from Sanjai Bijawat, Bankers Trust, to Ted Virtue, Bankers Trust, et al., Apr. 1, 1997 [DBG 027035-DBG 0270361; see also Finley Sworn Statement, at 21-22 and 65-66; Sworn Statement of Robert J. Hermann, former Managing Director and General Tax Counsel, Enron, to Philip C. Cook, A&B, Apr. 7, 2003 (the "Hermann Sworn Statement"), at 36; Letter from William S. McKee, King & Spalding, to James A. Armogida, Senior Counsel, Enron, Mar. 10, 1997 [AB0075 0044].

- 17 -

As another example, BT/Deutsche engaged both King & Spalding and Akin Gump to assist in the development of the transaction that ultimately became known as the Steele Transaction.[65] Akin Gump was then engaged by Em-on to represent it in connection with the transaction by issuing the tax opinion, while King & Spalding represented BT/Deutsche.[66] In addition, as Enron's auditors, Andersen approved the accounting treatment for the actual transaction and, in doing so, relied in part on the third party tax opinions.[67] In one instance (the Teresa Transaction), Andersen also was engaged by King & Spalding to review and comment on the tax opinion, which meant that Andersen worked for three separate parties on the same transaction."

In the Teresa, Steele and Cochise Transactions, BT/Deutsche also served as an investor.[69] Before it could invest in an Enron transaction, BT/Deutsche obtained approvals from its accounting policy and corporate tax departments with respect to the

---

[65] McGuire Sworn Statement, at 95.

[66] Letter from Michael S. Mandel, Akin Gump, to Richard A. Causey, Senior Vice President and Chief Information Officer, Enron, Oct. 22, 1997, regarding Terms of Engagement [AB0075 0018-AB0075 0022]; Tax Opinion from Akin Gump to R. Davis Maxey, Enron, Dec. 16, 1997 (the "Steele Tax Opinion") [AB00151677-AB000151714]; Letter from William S. McKee, King & Spalding, to Robert J. Hermann, Vice President, Tax, Enron, Sept. 8, 1997 [AB0785 04148-AB0785 041493.

[67] See Memorandum from David B. Duncan, Andersen, Robert P. Palmquist, Andersen, and Roger D. Willard, Andersen, to Enron, regarding Formation of Enron Leasing Partners, L.P. (Partnership) and Treatment of Taxable Dividends, Mar. 14, 1997 (Teresa Transaction) [AA 000007073-AA 000007080]; Memorandum from David B. Duncan, Andersen, Robert P. Palmquist, Andersen, and Roger D. Willard, Andersen, to the Files, regarding Tax Accounting for Project Teresa, Mar. 14, 1997 [AB0971 01680-AB0971 016841; Memorandum from Robert P. Palmquist, Andersen, et al., to the Files, regarding Project Teresa dividends and redemptions, Dec. 3 1, 2000 [AB0971 01677-AB0971 016791; Memorandum from Dave Duncan, Andersen, Patty Grutzmacher, Andersen, and Jennifer Stevenson, Andersen, to Files, regarding Whitewing Associates L.P. Contribution-Leaseback Transaction, Nov. 18, 1999 [AB0785 03 104-AB0785 031071; Memorandum from Robert P. Palmquist, Andersen, to the Files, regarding Project Steele, Mar. 26, 1998 [AA 000006607]; Memorandum from Robert P. Palmquist, Andersen, to the Houston Files, regarding Project Tomas, Aug. 28, 1998 [AB0971 016761; Hermann Sworn Statement, at 48-50; Sworn Statement of Robert P. Palmquist, former Partner, Andersen, to Philip C. Cook, A&B, May 13, 2003 (the "Palmquist Sworn Statement"), at 15-17 and 113; Sworn Statement of Roger D. Willard, former Partner, Andersen, to Philip C. Cook, A&B, May 12, 2003 (the "Willard Sworn Statement"), at 29.

[68] Engagement Letter from William S. McKee, King & Spalding, to Robert P. Palmquist, Andersen, Feb. 20, 1997 [K&S 2 05713-K&S 2 057141; Palmquist Sworn Statement, at 90-91.

[69] See Second Interim Report, Annexes 1, 2 and 4 to Appendix J (Tax Transactions).

- 18 -

accounting and tax consequences for both BT/Deutsche and the potential client.[70] BT/Deutsche also obtained approvals from credit, legal and regulatory, and risk management personnel.[71] As a final step, the transaction, including a description of the intended accounting results, was presented to BT/Deutsche's network committee for approval.[72]

The Renegade Transaction was a Tax Accommodation Transaction that Enron entered into with BT/Deutsche in January 1999.[73] The Renegade Transaction produced favorable tax benefits for BT/Deutsche, but did not produce significant tax or accounting benefits to Enron.[74] Instead, Em-on benefited indirectly from BT/Deutsche's tax benefits through favorable financing terms and through a fee of $1.3 million that BT/Deutsche paid Enron for participating in the Renegade Transaction.[75] In addition, BT/Deutsche

---

[70] Finley Sworn Statement, at 42-45; Kozak Sworn Statement, at 16-18 and 39-40; see, e.g., Email from Jody Blumenfeld, Bankers Trust, to Brian J. McGuire, Bankers Trust, Jan. 1, 1999 (regarding Transaction with Enron) [DBF 00 162 1].

[71] Finley Sworn Statement, at 42-44. In addition to internal regulatory reviews and reviews by outside law firms, BT/Deutsche also presented transaction structures to the Federal Reserve Bank of New York in determining whether the bank was permitted to hold an interest in the structures. See, e.g., Letter from Thomas Finley, Bankers Trust, to John S. Cassidy, Federal Reserve Bank of New York, July 24, 1995 [DBE 000024]; Letter from Richard J. Coll, Bankers Trust, to John S. Cassidy, Federal Reserve Bank of New York, Nov. 21, 1996 [DBE 000041].

[72] Finley Sworn Statement, at 45-48; McGuire Sworn Statement, at 133-35.

[73] See Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions*.

[74] See Sworn Statement of R. Davis Maxey, former Vice President Tax, Enron, to Philip C. Cook, A&B, Dec. 11, 2002 (the "Maxey Sworn Statement"), at 210; Wiltshire Financial Asset Company, LLC (Project Renegade), Tax Overview, undated, at 3 [AB000206753-AB000206757]; see *also* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions*.

[75] Wiltshire Financial Asset Company, LLC (Project Renegade), Tax Overview, undated, at 3 [AB000206753-AB000206757]; Project Renegade Business Review, undated, at 2 [AB000206779-AB000206783]; see *also* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions*.

reduced its fees for the Teresa Transaction by $1.75 million in exchange for Enron's agreement to participate as an accommodation party in the Renegade Transaction.[76]

The Valhalla Transaction was a Tax Accommodation Transaction that Enron entered into with BT/Deutsche in May 2000.[77] The Valhalla Transaction is discussed below in the 'Bankruptcy Analysis *of the* Valhalla *Setoff*' Section of this Appendix.

B.    **BT/Deutsche's** Knowledge of **Enron's** Financial Condition

BT/Deutsche had frequent and direct contact with Enron transaction teams and management representatives.[78] BT/Deutsche, through its Senior Relationship Manager, had access to members of Em-on's senior management, including Fastow, Glisan and McMahon.[79] In addition, BT/Deutsche representatives enjoyed informal and direct access to at least two members of the Em-on Board.[80] These contacts with Em-on's senior management and members of its Board afforded BT/Deutsche the opportunity to discuss "the facts behind the numbers" in Em-on's financial statements.[*'] At times, these personal relationships also permitted BT/Deutsche to learn what had occurred at meetings of the Em-on Board and what discussions had taken place.[82] For example, BT/Deutsche

---

[76] McGuire Sworn Statement, at 68 and 363; In-Person Interview with Jim Hollman, former Corporate Tax Employee, Enron, by Philip C. Cook, A&B, Oct. 15, 2002 (the "Hollman Interview"); Second Amended Teresa Engagement Letter; see also Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions.*

[77] See Second Interim Report, Appendix J (Tax Transactions),    *Enron 's Tax Accommodation Transactions.*

[78] Cambridge Sworn Statement, at 115- 16 and 172.

[79] *Id.* at 174-75; Email from Paul F. Cambridge, Deutsche Bank, to Alexander T. Mason, Deutsche Bank, Apr. 25, 2000 [DBA 03942-DBA 039431.

[80] BT/Deutsche's former Senior Relationship Manager for Enron, Paul F. Cambridge, had professional dealings with Herbert "Pug" Winokur, a member of Enron's Board and Chairman of its Finance Committee, beginning in the late 1980's, and the two became personal friends. Cambridge Sworn Statement, at 171 and 176. Yves DeBalman, a member of BT/Deutsche's senior management, was an acquaintance of Jeffrey Skilling. *Id.* at 174.

[81] Cambridge Sworn Statement, at 124 and 126.

[82] *Id.* at 173.

was able to inquire about the manner in which the Enron Board had considered LJM2 governance issues given the potential for conflicts of interest arising out of the role of Andrew Fastow at both LJM2 and Enron.[83]

After Deutsche Bank acquired Bankers Trust in June 1999, BT/Deutsche's combined Enron exposure exceeded $600 million, and BT/Deutsche strove to reduce its overall exposure to Enron throughout 2000 and 2001 .[84] Enron cooperated in the effort to reduce BT/Deutsche's credit exposure to Enron, often by finding or identifying other banks to take out or buy up parts of BT/Deutsche's participation in existing Em-on deals.[85] In April 2000, BT/Deutsche's underwriting committee set a targeted Enron exposure limit of $350 million.[86] Despite the target, however, BT/Deutsche's credit exposure to Enron continued to increase during the rest of 2000 and into 2001.[87] BT/Deutsche purchased Enron credit default protection of $25 million in the derivatives market, and intended to purchase additional credit protection but found the cost prohibitive."

[83] See Email from Paul F. Cambridge, Deutsche Bank, to Sekhae Bahadur, Deutsche Bank, et al., Apr. 18, 2001 [DBB 008673-DBB 0086741; Cambridge Sworn Statement, at 226 and 257-58.

[84] Hayes Sworn Statement, at 112 and 114; see also Email from Paul F. Cambridge, Deutsche Bank, to Alexander T. Mason, Deutsche Bank, Apr. 25, 2000 [DBA 03942-DBA 039431; Email from Paul F. Cambridge, Deutsche Bank, to Calli S. Hayes, Deutsche Bank, Nov. 29, 2000 [DBB 003526-DBB 0035271; En-rail from Calli S. Hayes, Deutsche Bank, to Andre Niewiadowski, Deutsche Bank, Jan. 1, 2001 [DBG 0238241; Email from Marcus Tarkington, Deutsche Bank, to Paul F. Cambridge, Deutsche Bank, Feb. 15, 2001 [DBD 005281]; Email from Calli S. Hayes, Deutsche Bank, to Paul F. Cambridge, Deutsche Bank, Mar. 28, 2001 [DBG 023909].

[85] Cambridge Sworn Statement, at 269 and 273-75; see Email from Paul F. Cambridge, Deutsche Bank, to Richard Khawam, Deutsche Bank, May 3, 2001 ("delays in getting the exposure down have been market based and not through any lack of cooperation from Enron") [DBG 077753-DBG 0777551.

[86] Minutes of Underwriting Committee, Deutsche Bank, Apr. 25, 2000 [DBG 0255401.

[87] Minutes of Underwriting Committee, Deutsche Bank, Dec. 1, 2000 [DBG 025541-DBG 0255421; Email from Paul F. Cambridge, Deutsche Bank, to Richard Khawam, Deutsche Bank, May 3, 2001 [DBG 077753-DBG 0777551; Email from Paul F. Cambridge, Deutsche Bank, to Calli S. Hayes, Deutsche Bank, Nov. 29, 2000 [DBB 003526-DBB 0035271.

[88] Minutes of Underwriting Committee, Deutsche Bank, May 7, 2001 [DBG 0255441.

By October 2001, BT/Deutsche's underwriting committee refused to authorize any additional Enron credit exposure.[89]    Although Enron was "externally rated BBB+/Baa1 . . . Em-on has considerable off-balance sheet liabilities [and] lacks transparency with respect to its hedging activities (despite a number of Company visits).""

According to its former Senior Relationship Manager, BT/Deutsche did as much as it could to keep current with respect to Enron's financial condition."' From time to time, BT/Deutsche would arrange meetings with Em-on to discuss elements of their balance sheet, earnings and performance, and "the facts behind the numbers, to the extent that they were able to share that with us."[92]    At meetings such as this, there were no "ground rules" or restrictions as to what Enron could be asked, but Enron "either chose to answer or not."[93]    For example, BT/Deutsche was unable to examine the details of Enron's hedging activities because "Enron viewed it as proprietary and wasn't willing to share the detail with a company such as Deutsche Bank."[94]

In early 2000, BT/Deutsche became cognizant of a change in Enron's balance sheet and income statement.    BT/Deutsche noted increased revenues from trading operations and increased cash flow from asset sales.[95]    BT/Deutsche focused specifically

---

[89] Amended Minutes of Underwriting Committee, Deutsche Bank, Oct. 9, 2001 [DBG 0436951.

[90] *Id.*

[91] Cambridge Sworn Statement, at 121.

[92] Id. at 124-25.

[93] Id. at 130.

[94] *Id.* at 386-87.

[95] Hayes Sworn Statement, at 77-78, 119 and 122-23.

on Em-on's financial statement footnotes that related to minority interests and special purpose vehicles.[96]

Recognizing that the extent of Enron's off-balance sheet obligations could not be discerned from its financial statements, BT/Deutsche held several meetings with Enron to probe the increasing dependency of Em-on on its trading activities and asset sales.[97] During those meetings, BT/Deutsche requested and received information about the significance of the increase in Enron's revenues from trading activity, Enron's philosophy regarding asset sales and the level of off-balance sheet obligations."[98]

BT/Deutsche wanted to know the approximate amount of Enron's total debt in one form or another in order to assess Enron's creditworthiness and to ensure that Enron's accounting ratios "reflected reality."["][99]  From time to time, BT/Deutsche would calculate its own estimate of Enron's off-balance sheet obligations, and try to confirm that number with Enron.[100] Enron consistently informed BT/Deutsche that its off-balance sheet obligations were in the range of $9–$10 billion."[101]

BT/Deutsche arranged two meetings with Enron in May and June 2001 to allow members of BT/Deutsche's credit group to pose questions about Enron's 2000 annual

---

[96] *Id.* at 74 and 85.

[97] IL!. at 77, SO-81 and 126; Email from Marcus Tarkington, Deutsche Bank, to Jana Mills, Enron, May 23, 2001 [DBG 0233763; Email from Marcus Tarkington, Deutsche Bank, to Greg Caudell, Enron, June 1, 2001 [DBG 023381-DBG 0233951.

[98] Hayes Sworn Statement, at 181; Cambridge Sworn Statement, at 150-55; Email from Marcus Tarkington, Deutsche Bank, to Tim Despain, Enron, *et al.,* June 7, 2001 [DBG 029101].

[99] Cambridge Sworn Statement, at 162-63.

[100] *Id.* at 161-63.

[101] Hayes Sworn Statement, at 13 1.

report.[102] One focus of those meetings was the extent to which sales of merchant assets to special purpose vehicles contributed to the increase in Enron's reported cash flow from operating activities from $100 million through the third quarter to $4.779 billion at year end.[103]

BT/Deutsche generally accepted the information provided by Em-on in response to its requests for additional information about revenues and off-balance sheet transactions[104] and continued to rate the Enron credit internally at B+ until November 9, 2001, when it was downgraded to B-.[105] However, not everyone at BT/Deutsche was placated by Enron's responses. Some credit officers "chose to take the view that they weren't going to believe those responses without any substance to work off."[106]

BT/Deutsche was obviously aware of its own work for Em-on in structuring transactions for "balance sheet management" purposes[107] that involved monetizing or

---

[102] *Id.* at 125-28, 159-61 and 164-66; Email from Marcus Tarkington, Deutsche Bank, to Paul F. Cambridge, Deutsche Bank, June 4, 2001 (attaching memorandum from Marcus Tarkington, Deutsche Bank, to Greg Caudell, Enron, June 1, 2001) [DBG 087164-DBG 0871661.

[103] Hayes Sworn Statement, at 166-73, 177-81 and 186-89; Cambridge Sworn Statement, at 150-5 1 and 153-54; Email from Marcus Tarkington, Deutsche Bank, to Paul F. Cambridge, Deutsche Bank, June 4, 2001 (attaching memorandum from Marcus Tarkington, Deutsche Bank, to Greg Caudell, Enron, June 1, 2001) [DBG 087164-DBG 0871661; Enron Form 10-K tiled with the SEC for the Year ended Dec. 31, 2000.

[104] Hayes Sworn Statement, at 77, 126, 131 and 180-81; Email from Marcus Tarkington, Deutsche Bank, to Kelly Boots, Enron, May 23, 2001 [DBG 0233761; Email from Marcus Tarkington, Deutsche Bank, to Greg Caudell, Enron, June 1, 2001 [DBG 023381-DBG 0233951; Email from Marcus Tarkington, Deutsche Bank, to Tim Despain, Enron, *et al.,* June 7, 2001[DBG 029101].

[105] Hayes Sworn Statement, at 330; Email from Calli S. Hayes, Deutsche Bank, to Pamela Stange, Deutsche Bank, Nov. 9, 2001 [DBD 005203]. BT/Deutsche downgraded the Enron credit rating to D on November 30, 2001. Hayes Sworn Statement, at 332; Deutsche Bank Credit Report for Enron, Nov. 30, 2001 [DBM 03001 l-DBM 0300251.

[106] Cambridge Sworn Statement, at 190-91; see *also* Email from Paul F. Cambridge, Deutsche Bank, to William W. Archer, Deutsche Bank, Sept. 10, 2001 (noting the "general inclination" of BT/Deutsche's Chief Credit Officer for North America "to disbelieve [Enron] no matter what the source") [DB 0022891. The same credit officer was concerned that the resignation of Jeffrey Skilling was "the tip of an iceberg of a lot of potential bad news coming up." Cambridge Sworn Statement, at 188-89.

[107] Cambridge Sworn Statement, at 74.

liquidating assets that Em-on no longer wished to carry on its balance sheet,[108] moving debt off the balance sheet,[109] and improving Enron's accounting ratios.[110] Despite the number of BT/Deutsche Tax Transactions, Share Trust Transactions and other structured transactions with Enron in which BT/Deutsche participated, BT/Deutsche apparently did not consider the combined impact of those transactions on Em-on's reported financial results to be material.[111] Although BT/Deutsche's Structured Transactions Group was well aware of the financial accounting consequences to Enron of the BT/Deutsche Tax Transactions, other personnel did not share the same level of understanding of the magnitude of the financial accounting consequences to Enron.[112]

BT/Deutsche also knew that Enron engaged in other structured transactions, but did not have a good understanding of the magnitude of Enron's prepay transactions.[113] In the latter half of 2001, Em-on approached BT/Deutsche about structuring two prepay transactions in the aggregate amount of approximately $1.5 billion.[114] BT/Deutsche was aware that Enron wanted the transactions to close by year end in order to record the

---

[108] *Id.* at 70.

[109] *Id.* at 70 and 167.

[110] *Id.* at 71.

[111] Hayes Sworn Statement, at 131-32 and 248-50. The senior Enron credit officer at BT/Deutsche was informed that the BT/Deutsche Tax Transactions created "significant amounts of future accounting income" for Enron, but did not consider the impact of any single transaction to be material to Enron and never attempted to determine the aggregate effect of the BT/Deutsche Tax Transactions on Enron's financial statements. Memorandum from Thomas Finley, Bankers Trust, et *al.,* to Bruce Classon, Bankers Trust, and Calli Hayes, Bankers Trust, Mar. 10, 1997, at 6-7 [DBC 012891-DBC 0128971; Hayes Sworn Statement, at 248-50.

[112] Hayes Sworn Statement, at 248-50.

[113] Cambridge Sworn Statement, at 162.

[114] Memorandum from Paul F. Cambridge, Deutsche Bank, and Michael Jakubik, Deutsche Bank, to the Underwriting Committee, Deutsche Bank, Oct. 4, 2001 [DBB 008733-DBB 0087361; Deutsche Bank Memorandum, "Enron Portfolio Monetization Structure Transaction Summary," (describing the proposed structure of Project X) [DBG 065640-DBG 0656411; see also Cambridge Sworn Statement, at 380-81 and 384.

proceeds as cash flow from operating activities on its year-end financial statements.[115] BT/Deutsche's underwriting committee refused to authorize the underwriting of the projects, which would have added $1.5 billion to Enron's off-balance sheet obligations, due, in part, to the size of Em-on's other off-balance sheet obligations."[116]

BT/Deutsche was aware that the extent of Em-on's off-balance sheet activity had increased, and that "the later structures done in 2000 and 2001 were more aggressively structured."[117] However, BT/Deutsche apparently was not aware of the cumulative effect of all of Enron's structured transactions until November 19, 2001, when senior Em-on executives met with certain of Enron's bankers at the Waldorf Astoria hotel in New York City.[118] In light of Em-on's prior assurances that its off-balance sheet obligations were in the range of $9-10 billion, BT/Deutsche was surprised to learn that additional obligations of $25.116 billion were not shown on Enron's balance sheet."[119]

---

[115] Cambridge Sworn Statement, at 369.

[116] Amended Minutes of Underwriting Committee, Deutsche Bank, Oct. 9, 2001 [DBG 0436951; see *also* Deutsche Bank Credit Report on Enron, Oct. 5, 2001 [DBG 04157%DBG 0415911; Cambridge Sworn Statement, at 384 and 386.

[117] Email from Calli Hayes, Deutsche Bank, to Eckhard Osenberg, Deutsche Bank, Nov. 21, 2001 (attaching write-up on Enron for Group Credit Policy Committee Meeting, Nov. 29, 2001) [DBG 066925-DBG 0669471.

[118] Hayes Sworn Statement, at 181-84.

[119] Cambridge Sworn Statement, at 163-64; Enron Corp. Presentation, Waldorf Astoria, New York, NY, Nov. 19, 2001, at 42 [AB000321534-AB000321605]; see *also* Hayes Sworn Statement, at 13 1, 179 and 18 l-84; Jakubik Sworn Statement, at 480.

### III.    BT/DEUTSCHE'S ROLE IN ENRON'S SPE TRANSACTIONS

### A.    The REMIC Carryover Basis Transactions

*Summary Description of the Steele and Cochise Transactions*

Both the Steele Transaction and the Cochise Transaction involved the use of an SPE to acquire REMIC Residual Interests[120] from affiliates of BT/Deutsche.[121] The tax goal of the Steele and Cochise Transactions was to avoid federal income tax to the Em-on SPE on the Phantom Income[122] from the REMIC Residual Interests, but enable hundreds of millions of dollars of Phantom Losses[123] from the REMIC Residual Interests to be deducted on Enron's consolidated return in the future.[124]

---

[120] A "REMIC" refers to a real estate mortgage investment conduit, which in general terms is any entity owning a collateralized pool of real estate mortgages and related securities that, based on their functional characteristics, satisfy technical requirements of the Internal Revenue Code. See I.R.C. §§ 860A-860G. Because of these tax rules, a REMIC is taxed on a flow-through basis somewhat like a partnership. Each interest in a REMIC is classified as either a "REMIC Regular Interest" or a "REMIC Residual Interest." As more fully discussed in Appendix J (Tax Transactions) to the Second Interim Report, a REMIC Regular Interest is a security interest in a pool of mortgages that entitles its holder to receive a specified principal amount. James M. **Peaslee** & David Z. Nirenberg, The Federal Taxation of Mortgage Backed-Securities, 105-106 (rev. ed. 1994) (the "**Peaslee** Nirenberg Treatise"). The REMIC Residual Interest is the remaining single class of interests that is akin to the "equity" ownership of the mortgage pool and that is allocated all of the residual items of taxable income and loss relating to the pool. *Id.* at 106. Holders of REMIC Residual Interests are required to report taxable income calculated as the difference between the gross income from the REMIC's assets and the deductions allowed with respect to its liabilities (including REMIC Regular Interests which are treated for tax purposes as if they were liabilities of the REMIC). I.R.C. § 860C; see *also* Peaslee Nirenberg Treatise, at 398.

[121] See Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions).

[122] In the early years of the life of the mortgage pool, the REMIC usually generates interest income that exceeds the REMIC's deductions for interest paid to the holders of the REMIC Regular Interests. This excess income is commonly referred to as "Phantom Income," and it is allocated to the holder of the REMIC Residual Interest. **Peaslee** Nirenberg Treatise, at 398.

[123] Later in the life of the mortgage pool, the REMIC's deductions for interest paid to the holders of the REMIC Regular Interests typically exceeds its interest income from the mortgages. The excess deductions are referred to as "Phantom Losses" and are allocated to the holder of the REMIC Residual Interest. **Peaslee** Nirenberg Treatise, at 287; see also Preamble to Prop. Treas. Reg. §§ 1.475(a)-1, 1.475(a)-2 and 1.475(b)-3, 58 Fed. Reg. 68,747 (Dec. 29, 1993).

[124] See Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions;* Second Interim Report, Annexes 1, 2 and 3 to Appendix J (Tax Transactions).

Although the REMIC Carryover Basis Transactions appear complex, each transaction basically involved the acquisition of REMIC Residual Interests and a limited amount of additional assets (the "Facilitating Assets").[125] The Facilitating Assets had low economic returns and were acquired for the purpose of enabling Enron to portray the potential benefit of speculative future tax deductions for Phantom Losses as pre-tax income for financial accounting purposes.[126]

In the aggregate, the two REMIC Carryover Basis Transactions resulted in $144 million of pre-tax income being reported from 1997 through September 2001 on Enron's consolidated financial statements.[127] In the Second Interim Report, the Examiner concluded that Enron's recording of the potential benefit of speculative future tax deductions as current pre-tax income was misleading and that Enron's accounting for the REMIC Carryover Basis Transactions did not comply with GAAP.[128]

---

[125] *Id.*

[126] *Id.* Under the principles set forth in Accounting for Income Taxes, Statement of Financial Accounting Standards No. 109 (Financial Accounting Standards Bd. 1992) ("FAS 109"), "Deferred Tax Assets" and "Deferred Tax Liabilities" are recognized for the estimated future tax effects attributable to "Temporary Differences" between (i) the amount of taxable income or expense reported on a company's income tax returns and the amount reported in its financial income statements and (ii) the tax basis in assets or liabilities and the reported amounts of such assets or liabilities in a company's financial statements. See Second Interim Report, Appendix J (Tax Transactions), at 13-21. After recording a Deferred Tax Asset with respect to the basis difference in the acquired REMIC Residual Interests, Enron, purporting to apply accounting principles set forth in Business Combinations, Accounting Principles Bd. Opinion No. 16 (Financial Accounting Principles Bd. 1970) ("APB 16") to the purchase of a single asset, recorded a "Deferred Credit" to offset the Deferred Tax Asset, and amortized the Deferred Credit into pre-tax income. See Second Interim Report, Appendix J (Tax Transactions), at 2 1-22.

[127] Enron Consolidated Financial Accounting Summary, Attachment I.

[128] Second Interim Report, Appendix J (Tax Transactions), at 2-4 and 35-36; see *also* Second Interim Report, Annexes 1, 2 and 3, Appendix J (Tax Transactions).

- 28 -

*Engineering/Structuring of the Steele Transaction*

The first REMIC Carryover Basis Transaction was the Steele Transaction, which closed in October 1997.[129] The purpose of the Steele Transaction was to enable Enron to record $121.8 million of pre-tax financial statement income for the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.[130]

The SPE formed to acquire the REMIC Residual Interests from BT/Deutsche in the Steele Transaction was ECT Investing Partners, L.P. ("ECT Partners").[131] Various Em-on subsidiaries owned approximately 95% of ECT Partners, while two BT/Deutsche affiliates contributed REMIC Residual Interests and cash for the remaining interest in ECT Partners.[132] Recapitalization provisions in the partnership agreement ensured that the Enron affiliates would be able to remove the BT/Deutsche affiliates and limit the interest of the BT/Deutsche affiliates to a stable return on their investments.[133]

The Facilitating Assets in the Steele Transaction were a portfolio of corporate bonds that ECT Partners purchased from a BT/Deutsche affiliate for $51.21 million (the "Corporate Bonds").[134]  The Corporate Bonds had an after-tax yield to maturity of

---

[129] The Steele Transaction is described in depth in Annex 1 to Appendix J (Tax Transactions) to the Second Interim Report.

[130] See Steele Tax Opinion, at 6; Memorandum from Roger D. Willard, Andersen, to Enron Houston Files, regarding Acquisition of Interests in Real Estate Mortgage Investment Conduits (REMICs), Oct. 30, 1997 (the "Steele Accounting Memorandum"), at 1 [AA 000006581-AA 000006587]; Maxey Sworn Statement, at 114; Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

[131] See Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

[132] Section 2, First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P., Oct. 31, 1997 [AB000143218-AB000143439]; Steele Tax Opinion, at 5.

[133] See Sections 3.3 and 3.5, First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P., Oct. 31, 1997 [AB000143218-AB000143439].

[134] Second Interim Report, Annex 1 to Appendix J (Tax Transactions); see *also* Steele Tax Opinion, at 3; Section 2.2, Purchase and Sale Agreement between Bankers Trust New York Corporation and ECT Investing Partners, L.P., Oct. 30, 1997 [AB000143440-AB000143450].

approximately 3.8%.[135] Enron's purpose in acquiring the Corporate Bonds was to obtain an asset with a short useful life of five years over which to amortize the Deferred Credit resulting from Enron's purchase accounting treatment of the transaction.[136]

*Participation in/Knowledge of Enron's Accounting for the Steele Transaction*

BT/Deutsche developed the Steele Transaction because it was looking for an efficient way to sell or monetize REMIC Residual Interests that it had acquired in the course of its business.[137] The transaction that it developed could be used to generate significant accounting benefits for its counterparty.[138] BT/Deutsche used both internal and external advisors in developing the transaction.[139] BT/Deutsche engaged both King & Spalding and Akin Gump to review the tax consequences of the transaction.[140] BT/Deutsche engaged Andersen (New York) to issue a SAS 50 letter on the accounting treatment of the transaction.[141]

BT/Deutsche first promoted the Steele Transaction to Enron in June 1997.[142] BT/Deutsche marketed the transaction as a means of generating pre-tax financial

---

[135] See Project Steele, Detail Computations - Investment in Bonds, undated, at 1 [AB000187846-ABOOO 1878491.

[136] Maxey Sworn Statement, at 125; see *also* Willard Sworn Statement, at 91-93; Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

[137] McGuire Sworn Statement, at 82-83 and 90-91; Finley Sworn Statement, at 90-92.

[138] McGuire Sworn Statement, at 83.

[139] *Id.* at 91 and 95.

[140] *Id.* at 95; Finley Sworn Statement, at 96; see, e.g., Memorandum from John P. Buser, Akin Gump, to Thomas F. Finley, Bankers Trust, and William Boyle, Bankers Trust, regarding REMIC/Subco, Aug. 5, 1997 [AGS39958-AGS39979]; Boyle Accounting Memorandum.

[141] Letter from Andersen to Bankers Trust, Aug. 11, 1997 [DBC 017408-DBC 0174201; McGuire Sworn Statement, at 91-93; Baldasaro Sworn Statement, at 101-02; see *also* Draft Letter from Andersen to Bankers Trust, July 2 1, 1997 [DBF 043780-DBF 0437941.

[142] Letter from Thomas Finley, Managing Director, Bankers Trust, to R. Davis Maxey, Enron, June 17, 1997 (confidentiality letter relating to the provision of evaluation materials for joint venture structure involving real estate related assets) [AB0003 18 164-AB0003 18 165]; Discussion Material for Enron, June 20, 1997 (PowerPoint presentation materials) [AB0053 00096-AB0053 00105].

accounting income.[143]    Although the Steele Transaction was structured to generate speculative future tax deductions for Phantom Losses from the acquired REMIC Residual Interests, the potential accounting benefit of those tax deductions was not recorded as after-tax income by reducing tax expense in the tax provision of Enron's income statement. Instead, the Steele Transaction was structured to allow a major portion of the potential benefit to be amortized into pre-tax income over the life of the Corporate Bonds.[144] The tax opinion for the Steele Transaction explicitly stated that Em-on "undertook the Transaction for the principal purpose of generating financial accounting benefits" and that Enron "would not have entered into the Transaction in the absence of the anticipated *accelerated* accounting benefit of reducing a deferred tax liability and recording a deferred tax asset."[145]

Enron engaged BT/Deutsche to act as its exclusive financial advisor in the Steele Transaction for a fee of $10 million.[146]    In addition to representing BT/Deutsche in developing the transaction, Akin Gump obtained a waiver and represented Enron in implementing the transaction.[147] In light of its prior representation of Enron in the Teresa

---

[143] Discussion Material for Enron, June 20, 1997 (PowerPoint presentation materials) [AB0053 00096-AB0053 00105]; see also Second Interim Report, Annex 1 to Appendix J (Tax Transactions); Finley Sworn Statement, at 107-08 and 126.

[144] McGuire Sworn Statement, at 152 and 154-55; see *also* Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

[145] Steele Tax Opinion, at 7 (emphasis in original).

[146] Steele Engagement Letter, at 2. BT/Deutsche agreed to forfeit any unpaid fee if there was a change in law or accounting rule prior to October 31, 2002, that resulted in a reduction of Enron's expected GAAP accounting treatment. Steele Engagement Letter, at 2.

[147] Letter from Michael S. Mandel, Akin Gump, to Richard A. Causey, Senior Vice President and Chief Information Officer, Enron, Oct. 22, 1997 (regarding Terms of Engagement) [AB0075 0018-AB0075 0022]; see *abo* Letter from Thomas Finley, Bankers Trust, to R. Davis Maxey, Enron, June 24, 1997 (enclosing representations required by Akin Gump to provide a "should" level opinion) [DBC 009410-DBC 0094181.

Transaction, King & Spalding obtained a waiver from Em-on to represent BT/Deutsche in the Steele Transaction.[148]

Andersen prepared tax calculations relating to the REMIC Residual Interests.[149] Andersen's Houston, Chicago and New York offices discussed Enron's accounting treatment of the Steele Transaction and the SAS 50 letter that had been prepared for BT/Deutsche.[150]   Ultimately, Andersen, as Enron's auditors, approved the tax and accounting treatment of the Steele Transaction. [151]

Akin Gump's tax opinion in the Steele Transaction includes representations that Em-on "undertook the Transaction for the principal purpose of generating financial accounting benefits" and that Enron "would not have entered into the Transaction in the absence of the anticipated accelerated accounting benefit . . . ."[152]     In contrast, Andersen's audit team noted that Enron needed "to demonstrate a business purpose for the purchase of REMICs (a business purpose that does not involve the impact the transaction has on financial reporting)."[153]  Despite the fact that Em-on's representations

---

[148] Letter from William S. McKee, King & Spalding, to Robert J. Hermann, Vice President, Tax, Enron, Sept. 8, 1997 [AB0785 04148-AB0785 041491.

[149] Bankers Trust REMIC Residuals, Tax Calculations from June 1997 Together with Independent Public Accountant's Report, Sept. 1997 (PowerPoint presentation materials prepared by Andersen) [AB0522 01461-AB0522 014761; see *also* Letter from Andersen to Dave Maxey, Enron, Oct. 23, 1997 (regarding Basis Calculations of Bankers Trust REMIC Investments) [AB0785 02528-AB0785 025291.

[150] Finley Sworn Statement, at 118-21; McGuire Sworn Statement, at 138-41; Palmquist Sworn Statement, at 123; Willard Sworn Statement, at 31 and 42; see          Email from Roger D. Willard, Andersen, to Richard R. Peterson, Andersen, Oct. 29, 1997 [AB0785 025301; Memorandum from Robert P. Palmquist, Andersen, to the Files, regarding Project Steele, Mar. 26, 1998 [AA000006607].

[151] Memorandum from Robert P. Palmquist, Andersen, to the Files, regarding Project Steele, Oct. 29, 1997 [AA000006606]; Steele Accounting Memorandum; Memorandum from Robert P. Palmquist, Andersen, to the Files, regarding Project Steele, Mar. 26, 1998 [AA 000006607]; see *also* Willard Sworn Statement, at 30-31; Palmquist Sworn Statement, at 129.

[152] Steele Tax Opinion, at 7.

[153] Email from Richard R. Petersen, Andersen, to Roger D. Willard, Andersen, Oct. 25, 1997 [PSI00021682]; see *also* Email from Richard R. Petersen, Andersen, to Roger D. Willard, Andersen, Oct.

in connection with the tax opinion were inconsistent with demonstrating a business purpose apart from financial reporting consequences, Andersen accepted a representation from Em-on that "recognition of the deferred credit, arising from the transaction, in the advance of the recognition of tax benefits is not the sole reason for entering into this transaction."[154]

Because of BT/Deutsche's role in developing and promoting the transaction, BT/Deutsche was intimately familiar with the tax and accounting treatment of the Steele Transaction. BT/Deutsche was aware that the purpose of the Steele Transaction was to generate financial accounting benefits.[155] Specifically, BT/Deutsche knew that Enron would recognize Deferred Tax Assets and a Deferred Credit, and amortize a large portion of the Deferred Credit into pre-tax accounting income over the life of the Corporate Bonds.[156]

---

30, 1997 (regarding Enron-Remic Transaction) [AB0785 025301; Willard Sworn Statement, at 101 ("Entering a transaction solely for the accounting impact is not a valid business purpose.").

[154] Letter from Richard A. Causey, Senior Vice President, Chief Accounting and Information Officer, Enron, to Andersen, Feb. 5, 1998 [AA-EX00000490-AA-EX00000491]; see also Palmquist Sworn Statement, at 126.

[155] See McGuire Sworn Statement, at 82-83, 89 and 156; Memorandum from Thomas Finley, Bankers Trust, et al., to Richard Coll, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Aug. 1, 1997 [DBE 000042-DBE 000046]; Memorandum from Thomas Finley, Bankers Trust, et al., to Mark Leiman, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Aug. 4, 1997 [DBC 009562-DBC 009566); Memorandum from Thomas Finley, Bankers Trust, et al., to John Wadsworth, Bankers Trust, and Mary Harmon, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Aug. 4, 1997 [DBC 009550-DBC 009554]; Memorandum from Thomas Finley, Bankers Trust, et al., to Michael A. Mangravite, Bankers Trust, et al., regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Aug. 4, 1997 [DBC 060255-DBC 0602641; Memorandum from Thomas Finley, Bankers Trust, et al., to Ann Griffith, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Sept. 8, 1997 [DBC 009630-DBC 0096341; Memorandum from Thomas Finley, Bankers Trust, et al., to Ken Abbott, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Sept. 9, 1997 [DBC 009533-DBC 0095371; Memorandum from Thomas Finley, Bankers Trust, et al., to Sean E. Cullinan, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Sept. 10, 1997 [DBC 009619-DBC 0096231.

[156] McGuire Sworn Statement, at 85-89, 116 and 15 l-55; Memorandum from Thomas Finley, Bankers Trust, et al., to Richard Coll, Bankers Trust, regarding Structured Transaction Group ▪ New Product Initiative for REMIC SubCo, Aug. 1, 1997 [DBE 000042-DBE 000046]; Memorandum from Thomas

BT/Deutsche provided a memorandum summarizing the accounting benefits of the Steele Transaction to King & Spalding in connection with the tax planning for the transaction.[157] The memorandum emphasized that the accounting benefits of the Steele Transaction were derived from treating the transaction as a bargain purchase of assets under the accounting rules even though there was no bargain purchase from an economic perspective.[158] This summary of the accounting benefits was provided to Enron in November 1997.[159]

BT/Deutsche also understood that the accounting treatment of the Steele Transaction was aggressive. At least one person at BT/Deutsche initially had an unfavorable reaction to the accounting treatment of the Steele Transaction, but disavowed responsibility for the accounting treatment because Andersen was Enron's auditor:

> Our initial reaction is that we do not think the client's acquisition of assets from BT would constitute a business combination and we are considering the alternative accounting discussed in the memo. . . . However, our continuing review of the client issues do not affect the potential upcoming transaction since AA is directly advising this client in its capacity as its auditing firm.[160]

---

Finley, Bankers Trust, et *al.*, to Mark Leiman, Bankers Trust, regarding Structured Transaction Group • New Product Initiative for REMIC SubCo, Aug. 4, 1997 [DBC 009562-DBC 0095661; Memorandum from Thomas Finley, Bankers Trust, et *al.*, to John Wadsworth, Bankers Trust, and Mary Harmon, Bankers Trust, regarding Structured Transaction Group • New Product Initiative for REMIC SubCo, Aug. 4, 1997 [DBC 009550-DBC 0095541; Memorandum from Thomas Finley, Bankers Trust, et al., to Michael A. Mangravite, Bankers Trust, et *al.*, regarding Structured Transaction Group • New Product Initiative for REMIC SubCo, Aug. 4, 1997 [DBC 060255-DBC 0602641; Memorandum from Thomas Finley, Bankers Trust, *et* al., to Ann Griffith, Bankers Trust, regarding Structured Transaction Group • New Product Initiative for REMIC SubCo, Sept. 8, 1997 [DBC 009630-DBC 0096341; Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Ken Abbott, Bankers Trust, regarding Structured Transaction Group • New Product Initiative for REMIC SubCo, Sept. 9, 1997 [DBC 009533-DBC 0095371; Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Sean E. Cullinan, Bankers Trust, regarding Structured Transaction Group • New Product Initiative for REMIC SubCo, Sept. 10, 1997 [DBC 009619-DBC 0096231.

[157] Boyle Accounting Memorandum; McGuire Sworn Statement, at 103-06.

[158] Boyle Accounting Memorandum; McGuire Sworn Statement, at 103-06.

[159] Boyle Accounting Memorandum.

[160] Email from Peggy H. Capomaggi, Bankers Trust, to Thomas Finley, Bankers Trust, *et al.*, Sept. 10, 1997 [DBC 009589-DBC 0095901; see *also* Finley Sworn Statement, at 124-25.

- 34 -

The two most aggressive and misleading aspects of Enron's accounting for the Steele Transaction were the amortization of the Deferred Credit into pre-tax income and the selection of the period over which to amortize the Deferred Credit. Despite the fact that the treatment of the Steele Transaction as a bargain purchase was determined only by analogy to the rules for business combinations that admittedly did not apply,[161] and despite the absence of accounting authority or any accounting literature contemplating the amortization of the Deferred Credit (a byproduct of accounting for deferred taxes) into pre-tax income, BT/Deutsche claimed that "it was very obvious that [the pre-tax income effect] was the intended result."[162]  With respect to the amortization period, BT/Deutsche and Andersen argued that the accounting literature required only a rational and systematic method.[163]  In the Steele Transaction, however, Enron amortized most of the Deferred Credit over the five year life of unrelated Corporate Bonds, even though the Deferred Tax Assets were attributable solely to REMIC Residual Interests with an estimated 27-year average life.[164]

The Examiner concluded in the Second Interim Report that Enron's accounting treatment of the Steele Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests. [165]

---

[161] See Steele Accounting Memorandum, at 4-5.

[162] McGuire Sworn Statement, at 133.

[163] Boyle Accounting Memorandum, at AB0001 87773; Steele Accounting Memorandum, at 5.

[164] Enron Consolidated Accounting Summary, at 8-9; see *also* Second Interim Report, Appendix J (Tax Transactions); Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

[165] Second Interim Report, Annexes 1 and 3 to Appendix J (Tax Transactions).

*Engineering/Structuring of the Cochise Transaction*

The second REMIC Carryover Basis Transaction was the Cochise Transaction, which closed in January 1999.[166] The purpose of the Cochise Transaction was to enable Enron to record $75 million in pre-tax accounting income and $79 million in earnings through the tax provision of Em-on's income statement for the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.[167]

The SPE formed to acquire the REMIC Residual Interests from BT/Deutsche in the Cochise Transaction was Maliseet Properties, Inc. ("Maliseet").[168] Initially, all of the preferred stock of Maliseet was owned by Enron.[169] The London Branch of Bankers Trust ("BT London") purchased all of Maliseet's common stock from Enron for $100.[170] Because Maliseet needed at least 100 shareholders to qualify as a real estate investment trust ("REIT"), Enron sold six shares of preferred stock to six officers of Enron who became the members of Maliseet's Board of Directors, and sold an additional 98 shares

---

[166] The Cochise Transaction is described in depth in Annex 2 to Appendix J (Tax Transactions) of the Second Interim Report.

[167] See Second Interim Report, Appendix J (Tax Transactions), at 25; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[168] See Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[169] Enron purchased a portfolio of mortgage-backed securities from BT Green, Inc. for a purchase price of $24,798,594 and contributed the mortgage-backed securities to Maliseet in exchange for shares of Series A Preferred Stock and Series B Preferred Stock. Purchase and Sale Agreement between BT Green, Inc. and Enron, Jan. 28, 1999 [AB000144989-AB000145001]; Subscription and Contribution Agreement between Enron and Maliseet Properties, Inc., Jan. 28, 1999 [AB000145015-AB000145034].

[170] Stock Purchase Agreement between Enron and Bankers Trust (London), Jan. 28, 1999 [AB000145041-AB000145053]; see also Stock Power of Enron in favor of Bankers Trust (London), Jan. 28, 1999 [AB000145059].

of preferred stock to 98 individuals not associated with Enron, Maliseet, BT/Deutsche or their affiliates. [171]

BT London contributed REMIC Residual Interests, which had a value of $165,000 and a tax basis of $120 million, to Maliseet, along with approximately $2.7 million of mortgage-backed securities, in exchange for additional shares of Maliseet's common stock and a promissory note from Maliseet. [172]

The Facilitating Assets in the Cochise Transaction were the Cochise Planes.[173] The Cochise Planes were purchased by ECT Investments Holding Corp. ("ECT Holding"), a subsidiary of Em-on, from a BT/Deutsche affiliate for $46.7 million, including brokerage fees.[174]

Because the REMIC Residual Interests were expected to generate Phantom Income over the next five years before they began to generate Phantom Losses, BT London agreed to treat Maliseet's Phantom Income as "consent dividends."[175] BT London, Em-on and Maliseet entered into a shareholders agreement containing

---

[171] Memorandum from Alicia Goodrow, Enron, to R. Davis Maxey, Enron, regarding Project Cochise-Transaction Summary, June 7, 1999, at 2 [AB0074 0734-AB0074 0737]; Untitled Maliseet Shareholder List, July 25, 2002 [AB0074 0652-AB0074 0664]. The Enron officer-shareholders who apparently served as the directors of Maliseet included Robert J. Hermann, Andrew S. Fastow, Robert H. Butts, Richard A. Causey, Jeffrey McMahon and James B. Derrick Jr. Untitled Maliseet Shareholder List, July 25, 2002 [AB0074 0652-AB0074 0664].

[172] Section 2.1, Subscription and Contribution Agreement between Bankers Trust (London) and Maliseet Properties, Inc., Jan. 28, 1999 [AB000144394-AB000144435]; Tax Opinion from McKee Nelson Ernst & Young LLP to R. Davis Maxey, Enron, Mar. 21, 2001 (the "Cochise Tax Opinion"), at 5 and 15 [AB000151794-AB000151878].

[173] Second Interim Report, Appendix J (Tax Transactions), at 33-35; see also Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[174] Aircraft Interest Purchase Agreement (N165UA) between BT Ever, Inc. and ECT Investments Holding Corp., Jan. 28, 1999, at 5 [AB000144520-AB000144546]; Aircraft Interest Purchase Agreement (N83870) between BT Ever, Inc. and ECT Investments Holding Corp., Jan. 28, 1999, at 3 [AB000144592-AB000144619].

[175] Section 4, Shareholders Agreement among Enron, Bankers Trust (London) and Maliseet Properties, Inc., Jan. 28, 1999 [AB000144474-AB000144498].

recapitalization provisions ensuring that Em-on would be able to remove BT London as a shareholder, and to limit the interest of BT London to a stable return on its investment.[176] In five years, once the REMIC Residual Interests had ceased to generate Phantom Income, Enron planned to purchase BT London's interest in Maliseet and begin to deduct the Phantom Losses from the REMIC Residual Interests on Enron's consolidated return.[177]

Enron acquired the Cochise Planes in order to accelerate the recognition of pre-tax income from the Cochise Transaction.[178] The Deferred Credit arising in the Cochise Transaction was offset against the book basis of the Cochise Planes and immediately reduced the book basis of the Cochise Planes from $46.7 million to zero.[179] Accordingly, upon a subsequent sale of the Cochise Planes, Enron planned to recognize the full amount of the sale proceeds of the Cochise Planes as pre-tax income.[180]

*Participation in/Knowledge of Enron's Accounting for the Cochise Transaction*

BT/Deutsche developed the Cochise Transaction because it was looking for an efficient way to sell or monetize its REMIC Residual Interests.[181] The transaction that it

---

[176] See Section 2(a), Shareholders Agreement among Enron, Bankers Trust (London) and Maliseet Properties, Inc., Jan. 28, 1999 [AB000144474-AB000144498].

[177] See Memorandum from Herman Manis, Andersen, and Christopher Herbold, Andersen, to Enron Files, regarding Project Cochise — Acquisition of REMICs, Mar. 3 1, 1999 (the "Cochise Accounting Memorandum"), at 1 and 3 [AA000006082-AA000006088].

[178] See Second Interim Report, Appendix J (Tax Transactions), at 4; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[179] Enron Consolidated Accounting Summary, at 12-13; see *also* McGuire Sworn Statement, at 163-65; Memorandum from Brian McGuire, Deutsche Bank, to Calli Hayes, Deutsche Bank, regarding Structured Transaction Group — Enron — REIT Transaction, Jan. 10, 1999 [DBC 016354-DBC 0163591; Maxey Sworn Statement, at 152-153.

[180] See In-Person Interview with Robert J. Hermann, former Managing Director and General Tax Counsel, Enron, by Philip C. Cook, A&B, Aug. 8, 2002 (the "Hermann Interview"); Maxey Sworn Statement, at 153-56 and 166-67; see *also* McGuire Sworn Statement, at 166-68 and 239-40.

[181] McGuire Sworn Statement, at 161-62 and 237.

developed could be used to generate significant accounting benefits for its counterparty.[182] BT/Deutsche used both internal and external advisors in developing the transaction.[183] BT/Deutsche engaged both King & Spalding and Akin Gump to review the tax consequences of the transaction.[184] BT/Deutsche engaged Andersen (New York) to issue a SAS 50 letter on the accounting treatment of the transaction.[185]

BT/Deutsche promoted the Cochise Transaction to Enron as a means of generating accelerated pre-tax financial accounting income.[186] Although the Cochise Transaction was structured to generate speculative future tax deductions for Phantom Losses from the acquired REMIC Residual Interests, the potential accounting benefit of those tax deductions was not recorded as after-tax income by reducing tax expense in the tax provision of Enron's income statement. Instead, the Cochise Transaction was structured to allow a major portion of the potential benefit to be recognized as pre-tax income upon the sale of the Cochise Planes, and to allow the remainder to be amortized into pre-tax income over a period of five years.[187] The tax opinion for the Cochise

---

[182] *Id.* at 166.

[183] Id. at 169 and 267-68.

[184] Id. at 267-68; Letter from William S. McKee, King & Spalding, to R. Davis Maxey, Senior Director, Corporate Tax, Enron, July 20, 1998 [MN006721-MN006722]; Letter from William S. McKee, King & Spalding, to Leon G. Kozak, Vice President, Bankers Trust, July 20, 1998 [MN006719-MN006720]; In-Person Interview with William S. McKee, Partner, McKee Nelson, by Philip C. Cook, A&B, Dec. 5, 2002 (the "McKee Interview").

[185] Letter from Andersen to Bankers Trust, Aug. 6, 1998 (SAS 50 letter did not include leased asset component to transaction) [AB0074 0577-AB0074 0592]; Letter from Andersen to Bankers Trust, Nov. 13, 1998 (SAS 50 letter issued to address modified structure that included leased assets) [AB0074 0558-AB0074 0576]; Letter from Andersen to Bankers Trust, May 26, 1999 (additional SAS 50 letter issued after the close of the Cochise Transaction to reflect issuance of EITF 98-11) [AB0074 0539-AB0074 0557]; McGuire Sworn Statement, at 169, 235 and 259; Weissman Sworn Statement, at 32, 34 and 38.

[186] Discussion Material for Project Cochise, June 15, 1998 (PowerPoint presentation materials) [AB000490808-AB000490818]; Discussion Material for Project Cochise, July 27, 1998 (PowerPoint presentation materials) [K&S027706-K&S027717].

[187] See McGuire Sworn Statement, at 236-41; Discussion Material for Project Cochise, June 15, 1998, at 8-11 (PowerPoint presentation materials) [AB000490808-AB0004908 18]; see also Discussion Material for

Transaction explicitly stated that one of Em-on's most important purposes for the transaction was to "increase [Enron's] pre-tax financial accounting income and [other] net earnings . . . ."[188]

Enron engaged BT/Deutsche to act as its exclusive financial advisor in the Cochise Transaction for a fee of $15 million.[189] King & Spalding (and subsequently McKee Nelson Ernst & Young LLP) represented Enron, while Akin Gump represented BT/Deutsche.[190] Andersen's Houston, Chicago and New York offices discussed Em-on's accounting treatment of the Cochise Transaction.[191] Ultimately, Andersen, as Enron's auditors, approved the tax and accounting treatment promoted by BT/Deutsche.[192]

Because of BT/Deutsche's role in developing and promoting the transaction, BT/Deutsche was intimately familiar with the tax and accounting treatment of the Cochise Transaction. BT/Deutsche was aware that the purpose of the Cochise Transaction was to generate financial accounting benefits.[193] Specifically, BT/Deutsche

---

Project Cochise, July 27, 1998 (PowerPoint presentation materials) [K&S027706-K&S027717]; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[188] Cochise Tax Opinion, at 12.

[189] Cochise Engagement Letter.

[190] McGuire Sworn Statement, at 272; Letter from William S. McKee, King & Spalding, to R. Davis Maxey, Senior Director Corporate Tax, Enron, July 20, 1998 [MN006721-MN006722]; Letter from William S. McKee, King & Spalding, to Leon G. Kozak, Vice President, Bankers Trust, July 20, 1998 [MN006719-MN006720].

[191] See Cochise Accounting Memorandum; Hermann Sworn Statement, at 48-49.

[192] See Cochise Accounting Memorandum; see     Hermann Sworn Statement, at 48-49; Memorandum from Herman Manis, Andersen, and Christopher J. Herbold, Andersen, to the Files, regarding Project Cochise, Aug. 9, 1999 [AB0785 02552-AB0785 025651.

[193] See McGuire Sworn Statement, at 166-68 and 239-40; Memorandum from Thomas Finley, Bankers Trust, et al., to Michael A. Mangravite, Bankers Trust, et al., regarding Structured Transaction Group - New Product Initiative for REMIC REIT, May 17, 1998 [DBC 048549-DBC 0485543; Memorandum from Brian McGuire, Bankers Trust, to Michael A. Mangravite, Bankers Trust, et al., regarding Structured Transaction Group - Enron/REIT Transaction, Dec. 7, 1998 [DBC 048555-DBC 0485601; Memorandum from Brian McGuire, Bankers Trust, to Michael A. Mangravite, Bankers Trust, et al., regarding Structured Transaction Group - Enron/REIT Transaction, Jan. 7, 1999 [DBC 016105-DBC 0161 10]; Memorandum from Brian McGuire, Bankers Trust, to Paul Nelson, Bankers Trust, regarding Structured Transaction

knew that Em-on would recognize Deferred Tax Assets and a Deferred Credit, and utilize a portion of the Deferred Credit to reduce Enron's basis in the Cochise Planes.[194] BT/Deutsche knew that Em-on would recognize a gain on the sale equal to the full fair value of the Cochise Planes, and amortize the remaining Deferred Credit into pre-tax income over a five year period.[195]

Despite BT/Deutsche's claim that the accounting literature was "straightforward" in requiring the recognition of a Deferred Credit and the reduction of Enron's basis in the Cochise Planes, BT/Deutsche was aware that the Deferred Credit arose exclusively because of the disparity between the book and tax basis of the acquired REMIC Residual Interests.[196] There was no GAAP authority or accounting literature contemplating the amortization of the Deferred Credit (a byproduct of accounting for deferred taxes) into pre-tax income. Moreover, although the accounting literature required at least a rational and systematic method of amortization,[197] Enron amortized the remainder of the Deferred

---

Group • Enron/REIT Transaction, Jan. 10, 1999 [DBC 016098-DBC 016103]; Memorandum from Brian McGuire, Bankers Trust, to John Wadsworth, Bankers Trust, et al., regarding Structured Transaction Group • Enron/REIT Transaction, Jan. 10, 1999 [DBC 060387-DBC 0603921; Memorandum from Brian McGuire, Bankers Trust, to Peggy Capomaggi, Bankers Trust, et al., regarding Structured Transaction Group • Enron/REIT Transaction, Jan. 10, 1999 [DBC 016372-DBC 0163771; Memorandum from Brian McGuire, Bankers Trust, to Calli Hayes, Bankers Trust, regarding Structured Transaction Group • Enron/REIT Transaction, Jan. 10, 1999 [DBC 048020-DBC 0480251; Memorandum from Brian McGuire, Bankers Trust, to Peter Burke, Bankers Trust, regarding Structured Transaction Group • Enron/REIT Transaction, Jan. 10, 1999 [DBC 016378-DBC 0163831; Memorandum from Brian McGuire, Bankers Trust, to Paul Cambridge, Bankers Trust, regarding Structured Transaction Group • Enron/REIT Transaction, Jan. 10, 1999 [DBC 048003-DBC 0480081; Memorandum from Brian McGuire, Bankers Trust, to Jim O'Brien, Bankers Trust, regarding Structured Transaction Group • Enron/REIT Transaction, Jan. 15, 1999 [DBC 016122-DBC 0161261.

[194] McGuire Sworn Statement, at 163-68 and 239-40.

[195] Id. at 166-68 and 239-40; see also Memorandum from Brian McGuire, Bankers Trust, to Calli Hayes, Bankers Trust, regarding Structured Transaction Group Enron/REIT Transaction, Jan. 10, 1999 [DBC 016354-DBC 0163591.

[196] McGuire Sworn Statement, at 241-43.

[197] See id. at 88-89.

Credit over the five year period that Maliseet expected to remain a REIT.[198] The Examiner has concluded that the selection of a five year period was not a rational method because the Deferred Tax Assets were attributable solely to REMIC Residual Interests with a much longer average life, and because Enron could not deduct losses from the REMIC Residual Interests during the period that Maliseet remained a REIT.[199]

The Examiner has concluded that Em-on's accounting treatment of the Cochise Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.[200]

### B.    The Teresa Transaction

*Summary Description of the Teresa Transaction*

The Teresa Transaction was a Tax Basis Step-Up Transaction that closed in March 1 997.[201] The tax goal of the Teresa Transaction was to use an SPE in combination with a series of asset transfers among Enron affiliates to achieve a future increase in the tax basis of Em-on's corporate headquarters building (the "Enron North Building").[202]

The Teresa Transaction did not generate any current federal income tax benefit to Enron because the tax basis step-up event was not expected to occur for many years.[203]

---

[198] Enron Consolidated Accounting Summary, at 15.

[199] See Second Interim Report, Appendix J (Tax Transactions), at 42-43; Second Interim Report, Annex 1 to Appendix J (Tax Transactions).

[200] See Second Interim Report, Appendix J (Tax Transactions), at 42-43; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[201] The Teresa Transaction is described in depth in Annex 4 to Appendix J (Tax Transactions) of the Second Interim Report.

[202] See Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[203] *Id.*

On the contrary, the Teresa Transaction resulted in the payment of approximately $13 1 million of federal income tax by an Enron subsidiary that would not have been paid but for the Teresa Transaction.[204]

For financial accounting purposes, however, Enron reported approximately $229 million of after-tax financial statement income from recording Deferred Tax Assets for the tax benefit created by an anticipated future step-up in the tax basis of the Enron North Building.[205] In the Second Interim Report, the Examiner concluded that Enron's accounting for the Teresa Transaction did not comply with GAAP.[206]

*Engineering/Structuring of the Teresa Transaction*

The SPE formed to participate in the Teresa Transaction was Enron Leasing Partners, L.P. ("ELP").[207] The 98% limited partner in ELP was Organizational Partner, Inc. ("OPI").[208]

Prior to the Teresa Transaction, OPI was a wholly owned subsidiary of Enron.[209] BT/Deutsche assisted Enron in issuing a sufficient amount of newly authorized shares of OPI preferred stock to third parties to prevent OPI from qualifying as a member of

---

[204] *Id.* After Enron's bankruptcy, the subsidiary filed a refund claim with the IRS for a refund of the taxes paid. See Enron Consolidated Accounting Summary, at 6, n. 6.

[205] Enron Consolidated Accounting Summary, at 5-7 and Attachment I.

[206] Second Interim Report, Appendix J (Tax Transactions), at 5-6, 63 and 68; see *also* Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[207] Second Interim Report, Appendix J (Tax Transactions), at 48-50; see *also* Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[208] Section 2.1, Limited Partnership Agreement of Enron Leasing Partners, L.P. among Enron Property Management Corp., Organizational Partner, Inc., and EN-BT Delaware, Inc., Mar. 27, 1997 [AB000141941-AB000142099]; see *also* Second Interim Report, Appendix J (Tax Transactions), at 48.

[209] Second Interim Report, Annex 4 to Appendix J (Tax Transactions). OPI was incorporated on January 25, 1994. See Certified Copy of Certificate of Incorporation of Organizational Partners, Inc., filed with the Secretary of State of Delaware, Mar. 24, 1997 [AB000142315-AB000142323].

Em-on's consolidated group for federal income tax purposes.[210] The preferred stock was issued to EN-BT Delaware, Inc., an affiliate of BT/Deutsche, and to Potomac Capital Investment Corporation ("Potomac"), an investor located by BT/Deutsche.[211]

Because OPI no longer qualified as a member of Em-on's consolidated group for federal income tax purposes, OPI was taxable on its share of deemed dividends arising from intercompany sales and redemptions of preferred stock in an Enron affiliate held by ELP.[212] However, OPI was taxed on only 20% of its share of the dividends, while its tax basis in its partnership interest in ELP was increased by 100% of its share of the dividends.[213] Enron anticipated that its increased tax basis in its partnership interest would eventually be reflected as an increase in the tax basis of the Enron North Building, and thereafter result in increased depreciation deductions over a 39.5-year period.[214]

---

[210] See Memorandum from Gary Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Tom Finley, Structured Finance, Bankers Trust, regarding Enron proposal, Feb. 14, 1997 [DBC 0135921; Letter from Thomas F. Finley, President, EN-BT Delaware, Inc., and Gary R. Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Enron, Mar. 21, 1997 [AB000141857-AB000141861].

[211] Second Interim Report, Annex 4 to Appendix J (Tax Transactions); see *also* Letter from Thomas F. Finley, President, EN-BT Delaware, Inc., and Gary R. Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Enron, Mar. 21, 1997 [AB000141857-AB000141861]. Potomac received a placement fee of $1 million from BT/Deutsche for investing in OPI's stock. Letter from Gary R. Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Tom Finley, Managing Director, Bankers Trust, Mar. 14, 1997, at 2 [DBC 012886-DBC 0128871; Memorandum from Gary Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Tom Finley, Structured Finance, Bankers Trust, regarding Enron proposal, Feb. 14, 1997, at 1 [DBC 0135921; Draft Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction – Enron, Mar. 10, 1997, at 2 [DBC 012906-DBC 0129081.

[212] See Enron Leasing Partners, LP (Project Teresa), Tax Overview, undated, at 4 and 7 (PowerPoint presentation materials) [AB000188264-AB000188270]; Maxey Sworn Statement, at 47 and 58; see *also* Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[213] Maxey Sworn Statement, at 47 and 58; see *also* McGuire Sworn Statement, at 65-66; Finley Sworn Statement, at 80-8 1; McKee Interview; Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[214] See Maxey Sworn Statement, at 58-59; Minutes of the Enron Executive Committee of the Board of Directors Meeting, Mar. 25, 1997, at Agenda Item No. 1 [AB000188326-AB000188336]; McKee Interview.

*Participation in/Knowledge of Enron's Accounting for the Teresa Transaction*

BT/Deutsche used both internal and external advisors in developing the Teresa Transaction.[215]    BT/Deutsche engaged King & Spalding to assist with the tax consequences of the transaction.[216] BT/Deutsche engaged Andersen (New York) to issue a SAS 50 letter on the accounting treatment of the transaction.[217]

BT/Deutsche promoted the Teresa Transaction to Em-on in May 1996.[218] It was marketed as a means of generating financial accounting income.[219]    The Teresa Transaction was not expected to result in any net present value tax savings to Enron.[220] Instead, even the tax opinion for the Teresa Transaction recognized that the predominant purpose of the transaction "was to generate income for financial accounting purposes."[221]

BT/Deutsche was aware that the purpose of the Teresa Transaction was to generate financial accounting benefits.[222] In seeking internal approval for the transaction,

---

[215] Finley Sworn Statement, at 17-2 1.

[216] *Id.* at 19-21; see *also* Baldasaro Sworn Statement, at 136.

[217] Finley Sworn Statement, at 22; Letter from Andersen to BT Securities Corporation, May 12, 1995 [AB0074 1228-AB0074 1233]; Letter from Andersen to Bankers Trust, July 26, 1995 [AB0074 1235-AB0074 1246]; Baldasaro Sworn Statement, at 130-35.

[218] Letter from Thomas Finley, Managing Director, Bankers Trust, to Robert Hermann, Vice President of Tax, Enron, May 16, 1996 (confidentiality letter relating to the provision of evaluation materials for joint venture leasing partnership structure) [AB000188356-AB000188357]; Email from Sanjai Bijawat, Bankers Trust, to Peter E. Lengyel, Bankers Trust, Apr. 1, 1997 [DBC 027037-DBC 027039).

[219] Finley Sworn Statement, at 8 I-82; see *also* Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Enron, attaching Discussion Material for Enron, Bankers Trust, May 28, 1996, at 10 (PowerPoint presentation materials) [DBC 013815-DBC 0138271; Letter from Thomas Finley, Managing Director, Bankers Trust, to Robert Hermann, Vice President of Tax, Enron, May 16, 1996 (confidentiality letter relating to the provision of evaluation materials for joint venture leasing partnership structure) [AB000188356-AB000188357]; Discussion Material for Enron, Oct. 1996, at 10 (PowerPoint presentation materials) [AB000188388-AB000188400]; Discussion Material for Enron, Mar. 27, 1997 (PowerPoint presentation materials) [AB000188401-AB000188405]; Second Interim Report, Annex 4 to Appendix J (Tax Transactions).

[220] Finley Sworn Statement, at 82; July 29 Teresa Tax Opinion, at 38.

[221] July 29 Teresa Tax Opinion, at 4.

[222] See Memorandum from Thomas Finley, Bankers Trust, et *al.,* to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction • Enron Corp., Mar. 10, 1997, at 1

BT/Deutsche noted that it would, among other things, allow Enron to "create significant amounts of future accounting income," with an estimated $240 million of after-tax income over the next six years.[223]

BT/Deutsche requested that Andersen (New York), who prepared the SAS 50 letter, contact Enron to discuss the proposed transaction.[224] After Enron decided to proceed with the transaction, the SAS 50 letter prepared for BT/Deutsche was discussed by Andersen (Houston) and Andersen (Chicago) in determining Enron's accounting treatment.[225] Andersen was also engaged by King & Spalding in connection with the preparation of the tax opinion.[226] Andersen (Houston) ultimately approved the tax and accounting treatment of the Teresa Transaction promoted by BT/Deutsche.[227]

---

and 3 [DBC 012906-DBC 0129091; see *also* Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Enron, May 28, 1996, at 10 (PowerPoint presentation materials) [DBC 013815DBC 0138271; Discussion Material for Enron, Oct. 1996, at 10 (PowerPoint presentation materials) [AB000188388-AB000188400].

[223] Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction - Enron Corp., Mar. 10, 1997, at 1 and 3 [DBC 012906-DBC 0129091; see also Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Bruce Classon, Bankers Trust, and Calli Hayes, Bankers Trust, Mar. 10, 1997, at 6-7 [DBC 012891-DBC 0 128971; Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Paul Nelson, Bankers Trust, Mar. 10, 1997, at 1 and 3 [DBC 060375-DBC 0603781.

[224] Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Em-on, May 28, 1996 (attaching Discussion Material for Enron, May 1996) (PowerPoint presentation materials) [DBC 013815DBC 0138271. William S. McKee, King & Spalding, also participated in presenting the idea for the Teresa Transaction to Enron. In-Person Interview with Greek Rice, Vice President Tax, Enron, by Philip C. Cook, A&B, Aug. 11, 2002.

[225] Email from Roger D. Willard, Andersen, to P. Michael Baldasaro, Andersen, Jan. 23, 1997 (forwarding email from Roger D. Willard, Andersen, to Richard R. Petersen, Andersen, Jan. 20, 1997) [AA 000006916-AA 000006917]; see *also* Facsimile from Roger Willard, Andersen, to Bob Palmquist, Andersen, Jan. 20, 1997 (attaching facsimile from Richard R. Petersen, Andersen, to Michael P. Baldasaro, Andersen, and Roger D. Willard, Andersen, Jan. 17, 1996, attaching letter from Andersen to Bankers Trust, July 26, 1995) [AA-EX00015016-AA-EX00015030]; Palmquist Sworn Statement, at 86.

[226] Engagement Letter from William S. McKee, King & Spalding, to Robert P. Palmquist, Andersen, Feb. 20, 1997 [K&S2057 13-K&S2057 14]; Palmquist Sworn Statement, at 90-9 1.

[227] See Memorandum from David B. Duncan, Andersen, Robert P. Palmquist, Andersen, and Roger D. Willard, Andersen, to the Files, regarding Tax Accounting for Project Teresa, Mar. 14, 1997 [AA-EXOOO 16709-AA-EX000 167 15]; Memorandum from David B. Duncan, Andersen, Robert P. Palmquist, Andersen, and Roger D. Willard, Andersen, to Enron, regarding Formation of Enron Leasing Partners, L.P. (Partnership) and Treatment of Taxable Dividends, Mar. 14, 1997 [AA-EX00004 159-AA-EX00004 167].

Em-on engaged BT/Deutsche to act as Em-on's exclusive financial advisor in connection with the Teresa Transaction for a fee of $8 million, or less if Enron could not recognize the full amount of the intended accounting benefits.[228] Enron also engaged BT/Deutsche to place the OPI preferred stock for a fee of $2 million.[229] Potomac, an investor recruited by BT/Deutsche, purchased $10 million of the OPI preferred stock, and BT/Deutsche purchased the remaining $12.4 million.[230] BT/Deutsche split its $2 million placement fee with Potomac by paying Potomac $1 million for agreeing to invest in OPI preferred stock.[231]

Because of BT/Deutsche's role in developing and promoting the transaction, BT/Deutsche was intimately familiar with the tax and accounting treatment of the Teresa Transaction. BT/Deutsche knew that the tax benefit of the transaction would not be available for years, until the undetermined future date when the Em-on North Building was eventually distributed to Em-on and Enron began to take increased depreciation deductions.[232] BT/Deutsche knew that, on a present value basis, the Teresa Transaction was not expected to result in any tax savings to Enron.[233] BT/Deutsche knew that the purpose of the Teresa Transaction was to generate financial accounting income by

---

[228] Original Teresa Engagement Letter; First Amended Teresa Engagement Letter; Second Amended Teresa Engagement Letter; see *also* Second Interim Report, Appendix J (Tax Transactions).

[229] Teresa OPI Engagement Letter.

[230] Second Interim Report, Annex 4 to Appendix J (Tax Transactions), at 7-8; see *also* Finley Sworn Statement, at 41; Letter from Thomas F. Finley, President, Bankers Trust, and Gary R. Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Enron, Mar. 21, 1997 (confirming that both parties intend to invest in OPI) [AB000141857-AB000142861].

[231] See Memorandum from Gary Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Tom Finley, Structured Finance, Bankers Trust, regarding Enron Proposal, Feb. 14, 1997 [DBC 0135921; Letter from Gary R. Correll, Assistant Vice President, Potomac Capital Investment Corporation, to Tom Finley, Managing Director, Bankers Trust, regarding Enron Equipment Corp. Preferred Offering, Mar. 14, 1997 [DBC 012886-DBC 0128871.

[232] Finley Sworn Statement, at 83-84.

[233] Id. at 82.

recording Deferred Tax Assets well in advance of future tax deductions, and even before the increased basis resulting from the transaction could attach to a depreciable asset.[234] The Examiner has concluded that the financial accounting for the Teresa Transaction was erroneous and misleading because Deferred Tax Assets were recorded prematurely, in violation of GAAP, long before the increased basis could attach to a depreciable asset.[235]

C.    **The Tomas Transaction**

*Summary Description of the Tomas Transaction*

The Tomas Transaction involved an SPE structure that was formed with BT/Deutsche in 1998 and unwound in 2000.[236] As part of its acquisition of Portland General Holdings Inc. ("PGH"), Em-on had acquired a portfolio of assets leased to third parties that had a low tax basis.[237] The goal of the Tomas Transaction was to dispose of those assets without incurring federal income tax, while reporting significant gain for financial accounting purposes.[238] Enron recognized permanent current tax benefits as book pre-tax gains of $25.6 million in 1998 and $18 million in 2000.[239] In the Second

---

[234] See Memorandum from Thomas Finley, Bankers Trust, *et* al., to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction - Enron, Mar. 10, 1997, at 1 and 3 [DBC 012906DBC 0129091; see also Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Bruce Classon, Bankers Trust, and **Calli** Hayes, Bankers Trust, Mar. 10, 1997, at 6-7 [DBC **012891-DBC** 0128961; Memorandum from Thomas Finley, Bankers Trust, *et al.*, to Paul Nelson, Bankers Trust, Mar. 10, 1997, at 1 and 3 [DBC 060375DBC **060377].**

[235] Second Interim Report, Appendix J (Tax Transactions), at 63-68; Second Interim Report, Annex 4 to Appendix J (Tax Transactions), at 25-26.

[236] See Second Interim Report, Appendix J (Tax Transactions), *Enron 's Other Tax Trunsuctions.*

[237] Finley Sworn Statement, at 144; see *also* Project **Tomas,** Business Review, undated, at 2 (PowerPoint presentation materials) [AB000187167-AB000187171].

[238] Project **Tomas,** Business Review, undated, at 2 ("This structure generated tax basis in a portfolio of 'burnt out' leveraged lease assets, which Portland General originally acquired and provided a mechanism for liquidating the portfolio at a substantial gain.") (PowerPoint presentation materials) [AB000187167-ABOOOl87 171]; see also Finley Sworn Statement, at 144.

[239] **Enron** Consolidated Accounting Summary, at 11.

Interim Report, the Examiner concluded that Enron's accounting for the Tomas Transaction probably did not comply with GAAP.[240]

### Engineering/Structuring of the Tomas Transaction

The SPE formed to effect the Tomas Transaction was Seneca Leasing Partners, L.P. ("Seneca"), a partnership owned 95% by PGH and 5% by two affiliates of BT/Deutsche.[241] The Seneca partnership agreement gave PGH the right to compel Seneca to liquidate its partnership interest at any time after two years in exchange for assets designated by PGH.[242] As anticipated from the outset, PGH received the stock of Oneida in redemption of its interest in Seneca on October 2, 2000, immediately upon expiration of the two year period.[243]

### Participation in/Knowledge of Enron's Accounting for the Tomas Transaction

BT/Deutsche brought the concept for the Tomas Transaction to Enron's tax department in 1998 in response to a request from Enron.[244] In developing the transaction, both Akin Gump and Shear-man & Sterling represented BT/Deutsche.[245] BT/Deutsche also engaged Andersen (New York) to prepare a SAS 50 letter on the accounting

---

[240] Second Interim Report, Appendix J (Tax Transactions), at 87-88.

[241] See First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 15, 1998 [AB000147653-AB000147798]; Second Interim Report, Appendix J (Tax Transactions), at 80.

[242] Section 10.8, First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 15, 1998 [AB000147653-AB000147798].

[243] See Enron Risk Assessment and Control Deal Approval Sheet for Project Tomas Windup, Sept. 26, 2000, at 1 [AB000187194-AB000187197]; Section 10.8, First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 15, 1998 [AB000147653-AB000147798]; see also Hermann Sworn Statement, at 182.

[244] Finley Sworn Statement, at 144; McGuire Sworn Statement, at 297; see Tomas Engagement Letter.

[245] McGuire Sworn Statement, at 305-06.

treatment of the transaction but the letter was never issued in final form.[246] After

BT/Deutsche informed Andersen (New York) that the transaction was being presented to

Enron, Andersen (New York) contacted Andersen (Houston) to assist in the preparation

of an accounting memorandum for Enron.[247] Andersen (Houston) also signed off on the

tax consequences of the transaction.[248] Akin Gump represented Em-on in the transaction

while Shear-man & Sterling represented BT/Deutsche.[249]

The tax planning for the Tomas Transaction relied on representations by Em-on

and BT/Deutsche that Oneida would engage in a leasing business.[250] The BT Affiliates

were engaged to act as Oneida's leasing agent for a fee of $300,000 per year.[251] Prior to

---

[246] Facsimile from Brian McGuire, Bankers Trust, to John Buser, Akin Gump, May 27, 1998, attaching draft letter from Andersen to Bankers Trust, May 26, 1998 [AGS34208-AGS34219]; Weissmann Sworn Statement, at 48, 50-51 and 54; McGuire Sworn Statement, at 298.

[247] Weissmann Sworn Statement, at 54-56; McGuire Sworn Statement, at 298-99; Memorandum from H. Ronald Weissmann, Andersen, David B. Duncan, Andersen, and Roger D. Willard, Andersen, to the Files, regarding Enron/Tax Efficient Lease Monetization, May 27, 1998 [PSI00020546-PSI00020556]; Memorandum from H. Ronald Weissmann, Andersen, and David B. Duncan, Andersen, to the Files, regarding Enron/Tax Efficient Lease Monetization, May 27, 1998 [AA-EX00016791-AA-EX00016801].

[248] See Memorandum from Robert P. Palmquist, Andersen, to the Files, regarding Project Tomas, Aug. 28, 1998 [AA-EX00016353].

[249] McGuire Sworn Statement, at 305-06; see also Memorandum from John P. Buser, Akin Gump, to Thomas F. Finley, Bankers Trust, and R. Davis Maxey, Enron, regarding Leasing Partnership, Feb. 27, 1998 [DBF 043731-DBF 0437661; Letter from Michael S. Mandel, Akin Gump, to Thomas F. Finley, Managing Director, Bankers Trust, and R. Davis Maxey, Enron, Jan. 15, 1998 [AGS48808]; Memorandum from Michael S. Mandel, Akin Gump, to R. Davis Maxey, Enron, and James A. Armogida, Enron, regarding Project Tomas, June 15, 1998 [AB0074 2261].

[250] Tax Opinion from Akin Gump to Enron, Nov. 23, 1998 (the "Tomas Tax Opinion"), at 9-10 [AB000151727-AB00015 1789]; see also Email from Howard Jacobson, Akin Gump, to Jeffrey Feinglas, Akin Gump, et al., May 18, 2000 [AGS35922]; Email from Debra Benning, Bankers Trust, to Brian McGuire, Bankers Trust, Mar. 1, 1999 (regarding New Collector Account ᆨ Oneida Leasing) [DBF 006747-DBF 0067501; McGuire Sworn Statement, at 313-18.

[251] Section 5.4, First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 1.5, 1998 [AB000147653-AB000147798]; Service Agreement between BT Leasing Corp. and Oneida Leasing, Inc., Sept. 15, 1998 [AB000148135-AB000148138].

June 2000, however, when PGH gave notice of its intent to withdraw from Seneca, Oneida had not engaged in any leasing business.[252]

In order to give Oneida some semblance of having engaged in leasing activity, Em-on and BT/Deutsche arranged to transfer the Cochise Planes to Oneida.[253] Oneida also purchased a Hawker 800XP aircraft on August 15, 2000, from the SPE formed to participate in the Teresa Transaction.[254]

### D.    Sale of the Cochise Planes

On June 28, 2000, ECT Holding sold the Cochise Planes to BT Leasing Corp. ("BT Leasing") for an aggregate purchase price of $36.5 million.[255] Because the

---

[252] See Project Tomas, Business Review, undated, at 4 (PowerPoint presentation materials) [AB000187167-AB000187171]; McGuire Sworn Statement, at 335-36; Email from Michael Mandel, Akin Gump, to Jeffrey Feinglas, Akin Gump, May 15, 2000 [AGS35908]; Email from Sarah Kight, Akin Gump, to Michael Mandel, Akin Gump, et al., May 18, 2000 [AGS35922].

[253] Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636-DBF 002637]; see also Email from Brian J. McGuire, Deutsche Bank, to Calli S. Hayes, Deutsche Bank, Aug. 14, 2000 [DBC 016678]. The "original plan was to have Oneida filled with leasable assets upon distribution." Email from Jeffrey Feinglas, Akin Gump, to Michael Mandel, Akin Gump, May 15, 2000 [AGS35908].

[254] Aircraft Interest Purchase Agreement (N5732) between Enron Leasing Partners, L.P., and Oneida Leasing, Inc., Aug. 15, 2000 [AB0971 00626-AB0971 006441. The Hawker 800XP aircraft was purchased by ELP from Raytheon Aircraft Company in December 1999, with a scheduled delivery date of June 2000, and was leased to Enron under an operating lease dated June 27, 2000. Hawker 800XP Aircraft Purchase Agreement between Raytheon Aircraft Company and Enron Leasing Partners, L.P., Dec. 23, 1999 [DBC 016710-DBC 016711; Addendum to Aircraft Purchase Agreement by and between Raytheon Aircraft Company and Enron Leasing Partners, L.P., Dec. 23, 1999 [DBC 016753-DBC 016763]; Email from Trey Cash, Enron, to Brian J. McGuire, Deutsche Bank, July 5, 2000 (regarding Enron Hawker • transfer to Oneida) [DBC 016697-DBC 0166981; Article 1, Aircraft Interest Purchase Agreement (N5732) between Enron Leasing Partners, L.P., and Oneida Leasing, Inc., Aug. 15, 2000 [AB0971 00626-AB0971 00644].

[255] Aircraft Interest Purchase Agreement (N83870) between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 017007-DBC 0170231; N83870 Assignment and Assumption Agreement between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 016991-DBC 017000]; Consent, Waiver and Agreement N83870 among Continental Airlines, Inc., BT Leasing Corp, ECT Investments Holding Corp., and First Security Bank, National Association, June 28, 2000 [DBC 016972-DBC 0169781; Amendment No. 2 to Trust Agreement 930 (N83870), between First Security Bank, National Association, and ECT Investments Holding Corp., June 28, 2000 [DBC 017002-DBC 017006-J; Aircraft Interest Purchase Agreement (N165UA) between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 016934-DBC 0169481; N165UA Assignment and Assumption Agreement between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 016919-DBC 0169271; Consent, Waiver and Agreement N165UA among United Airlines, Inc., BT Leasing Corp., ECT

purchase accounting adjustments described above had reduced its book basis in the Cochise Planes to zero, Em-on reported the entire sale proceeds of $36.5 million as net income on the sale.[256] Approximately one month later, on July 27, 2000, BT Leasing sold the Cochise Planes to Oneida for $36.0 million (the same purchase price, but adjusted for lease payments made in the interim).[257]

The Examiner has concluded that Enron's recognition of gain on the sale of the Cochise Planes did not comply with GAAP for several reasons. First, to the extent that Enron acquired the Cochise Planes for resale, it was inappropriate to use purchase accounting adjustments to reduce the basis of the Cochise Planes.[258] In order to create an indication that the Cochise Planes were not acquired for resale, Enron intended to hold the Cochise Planes for a period of one year.[259] From the outset, however, Enron intended to dispose of the Cochise Planes in order to recognize the gain on the sale as soon as the one year period had expired.*[260] Accordingly, despite the fact that Em-on held the Cochise

---

Investments Holding Corp., and First Security Bank, National Association, June 28, 2000 [DBC 016902-DBC 0169061; Cochise Tax Overview, at 5.

[256] See Cochise Tax Overview, at 13; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[257] Aircraft Interest Purchase Agreement (N165UA) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016860-DBC 0168751; N165UA Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 01681 1-DBC 0168191; Consent, Waiver and Agreement N165UA between United Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016805-DBC 016810]; Aircraft Interest Purchase Agreement (N83870) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016832-DBC 0168471; N83870 Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016821-DBC 0168301; Consent, Waiver and Agreement N83870 between Continental Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016797-DBC 0168041; Project Tomas, Business Review, undated, at 4 (PowerPoint presentation materials) [AB0001 87167-AB000187 171].

[258] See Basic Concepts and Accounting Principles Underlying Financial Standards of Business Enterprises, Accounting Principles Bd. Opinion No. 4 (Financial Accounting Standards Bd. 1970).

[259] Hermann Interview; Maxey Sworn Statement, at 166-67.

[260] Hermann Interview; Maxey Sworn Statement, at 154-56 and 166-67; see *also* McGuire Sworn Statement, at 170-71 and 328-29; Memorandum from Dave Maxey, Enron, to Rick Causey, Enron, and Bob Hermann, Enron, regarding Executive Committee Meeting of December 18, 1998, Discussion Points

Planes for slightly more than one year, the evidence supports a finding that Enron acquired the Cochise Planes for resale.

Second, Enron's recognition of gain on the sale of the Cochise Planes was inappropriate because the application of purchase accounting adjustments to reduce the book basis of the Cochise Planes is unsupported by GAAP. Andersen acknowledged that there was no controlling GAAP authority, but argued that basis reduction was supported by analogy to the purchase accounting rules of APB 16 even though APB 16 did not apply.[261] Andersen contended that it was possible for accounting entries relating to the REMIC Residual Interests to have an effect on the basis of the Cochise Planes because both were acquired from the same seller (BT/Deutsche).[262] The Examiner concludes that the purchase accounting rules are inapposite because the purchase of the Cochise Planes was unrelated to the acquisition of the REMIC Residual Interests.

Third, the transfer of the Cochise Planes to BT/Deutsche should not have been recorded as a sale under GAAP if Enron and BT/Deutsche had reached an understanding to return the Cochise Planes to Enron by means of a transfer to Oneida.[263] By February 2000, Enron was already investigating the value of the Cochise Planes for transfer to

---

for Project Cochise, Dec. 17, 1998 ("[T]here is a liquid market for used commercial aircraft.") [AB000490747-AB000490748]; Hermann Sworn Statement, at 158 (a potential advantage of the Cochise Planes was to sell them at a gain).

[261] Cochise Accounting Memorandum, at 5; Willard Sworn Statement, at 57-58.

[262] See Letter from Andersen to Bankers Trust Company, Nov. 13, 1998, at 8 [AB0074 0558-AB0074 0576]; Letter from Andersen to Bankers Trust Company, May 26, 1999, at 8 [AB0074 0539-AB0074 0557]. This rationale would have been precluded if Enron had acquired the Cochise Planes in the market rather than from BT/Deutsche.

[263] See, e.g., Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises, Accounting Principles Bd. Opinion No. 4 (Financial Accounting Standards Bd. 1970) ("[F]inancial accounting emphasizes the economic substance of events even though the legal form may differ.").

Oneida.[264] However, Enron learned that a transfer of the aircraft directly to Oneida would not "achieve Enron's goals from an accounting perspective" of recording a book gain on the sale.[265] Enron already owned 95% of Oneida, through its limited partnership interest in Seneca, and would acquire 100% ownership and control of Oneida upon the distribution of Oneida to Enron in redemption of its partnership interest in Seneca.[266]

After Enron concluded that it could not recognize gain on a direct sale to Oneida, Enron and BT/Deutsche devised a plan to transfer the Cochise Planes first to a BT/Deutsche entity, and then to Oneida.[267] Enron's recognition of gain on the two-step transfer, however, was plainly a violation of GAAP because a transaction cannot be considered a bona fide sale if there is an understanding that the asset will be returned or repurchased.[268]

---

[264] Email from James Hollman, Corporate Tax, Enron, to Brian J. McGuire, Deutsche Bank, Feb. 17, 2000 (regarding Cochise Plane Values) [DBC 0162581; see also McGuire Sworn Statement, at 322-23; Letter from Michael S. Mandel, Akin Gump, to R. Davis Maxey, Vice President, Tax Planning, Enron, and Brian J. McGuire, Director, Deutsche Bank, May 10, 2000 [DBC 060755DBC 0607571.

[265] Email from Sarah Kight, Akin Gump, to Howard Jacobson, Akin Gump, May 23, 2000 (regarding Cochise planes to Tomas) [AGS35929]; see also Email from Sarah Kight, Akin Gump, to Michael Mandel, Akin Gump, et al., May 18, 2000 [AGS35922]; Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636DBF 0026371; McGuire Sworn Statement, at 333-34 and 341.

[266] See Section 10.8, First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 15, 1998 [AB000147653-AB000147798]; Enron Risk Assessment and Control Deal Approval Sheet for Project Tomas Windup, Sept. 26, 2000, at 1 [AB000187194-AB000187197]; see also Hermann Sworn Statement, at 182.

[267] Email from Sarah Kight, Akin Gump, to Howard Jacobson, Akin Gump, et al., May 23, 2000 (regarding Cochise Planes to Tomas) [AGS35929]; Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636-DBF 0026371.

[268] See, e.g., Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises, Accounting Principles Bd. Opinion No. 4 (Financial Accounting Standards Bd. 1970); see also SEC Staff Accounting Bulletin No. 101, 71 S.E.C. Docket 590 (Dec. 3, 1999); Revenue Recognition When Right of Return Exists, Statement of Financial Accounting Standards No. 48 (Financial Accounting Standards Bd. 1981); Accounting for Product Financing Arrangements, Statement of Financial Accounting Standards No. 49 (Financial Accounting Standards Bd. 1981).

BT Leasing was selected to purchase the Cochise Planes because it was one of the general partners of Seneca.[269] At one stage of the planning, BT/Deutsche expected to hold the Cochise Planes for approximately ten days before selling the Cochise Planes to Oneida.[270] An Akin Gump email refers to the planned transaction as "an internal (Enron and BT) distribution," and another recommended that Enron obtain the consent of the lessees to the "double transfer" at one time.[271]

Em-on provided BT/Deutsche with its valuation of the Cochise Planes as of June 16, 2000.[272] Enron determined that the value of the Cochise Planes was $36.4 million.[273] BT/Deutsche obtained a third party appraisal of the Cochise Planes indicating significantly lower values for the Cochise Planes.[274] BT/Deutsche acquired the Cochise Planes on June 28, 2000, paying the higher prices indicated by Enron's valuation.[275]

---

[269] See Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636-DBF 0026371; Email from Brian J. McGuire, Deutsche Bank, to Calli S. Hayes, Deutsche Bank, June 16, 2000 (regarding Leased Assets - United/Continental) [DBF 002632-DBF 0026331.

[270] Email from Brian J. McGuire, Deutsche Bank, to Calli S. Hayes, Deutsche Bank, June 2, 2000 (regarding Leased Assets - United/Continental) [DBF 002632-DBF 0026331; Email from Gregg A. Grauer, Deutsche Bank, to Michael Mandel, Akin Gump, June 20, 2000 (regarding Oneida Leasing - State & Local Tax Analysis) [AGS36084].

[271] Email from Sarah Kight, Akin Gump, to Trey Cash, Corporate Tax, Enron, May 11, 2000 (regarding Cochise Asset Sale) [AGS36053]; Email from Sarah Kight, Akin Gump, to Trey Cash, Corporate Tax, Enron, May 23, 2000 (regarding Cochise Asset Sale) [AGS36058].

[272] Email from Trey Cash, Corporate Tax, Enron, to Brian J. McGuire, Deutsche Bank, May 31, 2000 (regarding Cochise - Valuation of Aircraft) [DBC 016671-DBC 0166761.

[273] Email from Trey Cash, Corporate Tax, Enron, to Brian J. McGuire, Deutsche Bank, May 3 1, 2000 (indicating a value of $19.5 million for the aircraft leased to United Air Lines and $16.9 million for the aircraft leased to Continental Airlines) [DBC 01667 1-DBC 0166761.

[274] See Opinion from R. L. Britton, Vice President, BK Associates, Inc., to Brian McGuire, Deutsche Bank, June 12, 2000 [DBC 016623-DBC 0166261.

[275] Aircraft Interest Purchase Agreement (N83870) between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 017007-DBC 0170231; N83870 Assignment and Assumption Agreement between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 016991-DBC 017000]; Consent, Waiver and Agreement N83870 among Continental Airlines, Inc., BT Leasing Corp, ECT Investments Holding Corp., and First Security Bank, National Association, June 28, 2000 [DBC 016972-DBC 0169781; Amendment No. 2 to Trust Agreement 930 (N83870), between First Security Bank, National Association, and ECT Investments Holding Corp., June 28, 2000 [DBC 017002-DBC 017006];

BT Leasing held the Cochise Planes for approximately one month before selling them to Oneida.[276] A period of one month was ultimately selected because the pricing models could not be adjusted for any shorter period.[277] On July 27, 2000, BT Leasing sold the Cochise Planes to Oneida for $36.0 million (the same purchase price paid by BT Leasing the previous month, but adjusted for lease payments made in the interim).[278]

At the time BT/Deutsche acquired the Cochise Planes, Enron had already given notice of its intent to withdraw from Seneca, and had already identified a need for Oneida to acquire some leased assets in order to be able to demonstrate some business activity on the part of Oneida.[279] Moreover, BT/Deutsche had the sole legal authority to cause the

---

Aircraft Interest Purchase Agreement (N165UA) between ECT Investments Holding Corp. to BT Leasing Corp., June 28, 2000 [DBC 016934-DBC 0169481; N165UA Assignment and Assumption Agreement between ECT Investments Holding Corp. to BT Leasing Corp., June 28, 2000 [DBC 016919-DBC 0169271; Consent, Waiver and Agreement N165UA among United Airlines, Inc., BT Leasing Corp., ECT Investments Holding Corp., and First Security Bank, National Association, June 28, 2000 [DBC 016902-DBC 0169061; Cochise Tax Overview, at 5.

[276] Aircraft Interest Purchase Agreement (N165UA) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016860-DBC 0168751; N165UA Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 01681 l-DBC 0168191; Consent, Waiver and Agreement N165UA between United Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016805-DBC 0168103; Aircraft Interest Purchase Agreement (N83870) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016832-DBC 0168471; N83870 Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016821-DBC 016830]; Consent, Waiver and Agreement N83870 between Continental Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016797-DBC 0168041.

[277] McGuire Sworn Statement, at 342-43.

[278] Aircraft Interest Purchase Agreement (N165UA) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016860-DBC 016875]; N165UA Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 01681 l-DBC 0168191; Consent, Waiver and Agreement N165UA between United Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016805-DBC 016810]; Aircraft Interest Purchase Agreement (N83870) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016832-DBC 0168471; N83870 Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016821-DBC 016830l; Consent, Waiver and Agreement N83870 between Continental Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank and National Association, July 27, 2000 [DBC 016797-DBC 0168041; Project Tomas, Business Review, undated, at 4 (PowerPoint presentation materials) [AB000187167-AB000187 171].

[279] Project Tomas, Business Review, undated, at 4 (PowerPoint presentation materials) [AB000187167-AB000187171]; see also McGuire Sworn Statement, at 350-51; Email from Michael Mandel, Akin Gump,

transfer of the Cochise Planes from BT Leasing to Oneida, and no further negotiations between Enron and BT/Deutsche were necessary to accomplish the transfer, because BT/Deutsche controlled both BT Leasing and Oneida.[280] The sale of the Cochise Planes from BT Leasing to Oneida was signed only by BT/Deutsche personnel acting on behalf of BT Leasing and Oneida and not by any personnel employed by Enron.[281]

In short, there is sufficient evidence to support a finding that the transfer of the Cochise Planes to BT/Deutsche should not have been recorded as a sale under GAAP because Enron and BT/Deutsche had reached an understanding to return the Cochise Planes to Enron by means of a transfer to Oneida.

E.    **The Share Trust Transactions**

Em-on's Share Trust Transactions were unusually complex SPE transactions that enabled Enron to raise funds in the capital markets without reflecting debt on its balance sheet. BT/Deutsche was involved in two of Enron's Share Trust Transactions–the

---

to Jeffrey Feinglas, Akin Gump, May 15, 2000 [AGS35908]; Email from Sarah Kight, Akin Gump, to Jeffrey Feinglas, Akin Gump, *et al.,* May 18, 2000 [AGS35922].

[280] At the time of the sale of the Cochise Planes, BT/Deutsche controlled Oneida because BT Leasing and EN-BT Delaware, Inc. were the general partners of Seneca, which owned all of the stock of Oneida. See First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 15, 1998 [AB000147653-AB000147798]; Email from Debra Benning, Bankers Trust, to Brian McGuire, Bankers Trust, Mar. 1, 1999 (regarding new collection account - Oneida Leasing) [DBF 006747-DBF 0067501.

[281] See Aircraft Interest Purchase Agreement (N165UA) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016860-DBC 0168751; N165UA Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 01681 l-DBC 0168191; Consent, Waiver and Agreement N165UA between United Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016805-DBC 016810]; Aircraft Interest Purchase Agreement (N83870) between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016832-DBC 016847]; N83870 Assignment and Assumption Agreement between BT Leasing Corp. and Oneida Leasing, Inc., July 27, 2000 [DBC 016821-DBC 0168301; Consent, Waiver and Agreement N83870 between Continental Airlines, Inc., BT Leasing Corp., Oneida Leasing, Inc., First Security Bank, National Association, July 27, 2000 [DBC 016797-DBC 0168041.

Marlin Transaction[282] and the Whitewing Transaction.[283]    Together, these two transactions raised approximately $3.8 billion in financing for Em-on from December 1998 through October 2000.[284]

As described in detail in the Second Interim Report, in each Share Trust Transaction, Enron created a trust (the "Issuer") that sold notes and certificates of beneficial interest to the institutional private placement market.[285] The Issuer then contributed the proceeds from the sale of its securities to another entity (the "Holding Entity") and Enron (directly or through subsidiaries) contributed other assets to the Holding Entity. The Holding Entity (i) used a portion of the cash received from the Issuer and the assets contributed by Enron to establish a reserve fund to support the payment of the Issuer's securities and (ii) used the remaining cash received to repay existing financing in Marlin[286] or to purchase assets from Enron or from entities holding Enron-related assets in Whitewing.[287]

The linchpin of Em-on's Share Trust Transactions was Em-on's obligations with respect to its stock. In the Share Trust Transactions:

---

[282] The Marlin Transaction is discussed in depth in Appendix H (Marlin Transaction) of the Second Interim Report.

[283] The Whitewing Transaction is discussed in depth in Appendix G (Whitewing Transaction) of the Second Interim Report.

[284] The December 1998 Marlin Transaction raised $1.15 billion. See Second Interim Report, Appendix H (Marlin Transaction). The Whitewing Transaction raised a total of $2.647 billion in three offerings in September 1999, July 2000 and October 2000. See Second Interim Report, Appendix G (Whitewing Transaction).

[285] See Second Interim Report, Appendix G (Whitewing Transaction); Second Interim Report, Appendix H (Marlin Transaction).

[286] See Second Interim Report, Appendix H (Marlin Transaction).

[287] See Second Interim Report, Appendix G (Whitewing Transaction).

- Enron issued preferred stock to a trust (the "Share Trust");

- Enron agreed to cause the Enron preferred stock (or common stock into which the preferred stock was convertible) to be sold in amounts sufficient to repay the Issuer's notes when due;

- in the event that the Enron stock in the Share Trust was not sufficient to generate the amounts necessary to repay the Issuer's notes, Enron agreed to issue additional shares that, when sold, would make up the shortfall; and

- if sufficient Em-on shares could not be sold to raise the necessary funds, or Enron breached its obligations to issue and sell the Enron shares, Enron was obligated to provide the funds needed to repay the notes.[288]

Em-on retained practical control of the assets owned by the Holding Entities and their subsidiaries and retained substantially all of the anticipated economic risks and rewards of those assets and the Em-on stock held in the Share Trusts. The Issuers and the Holding Entities, however, were not consolidated in Enron's financial statements. As a result, these off-balance sheet structures enabled Enron to obtain financing based on Enron's stock and credit without reflecting the financing on Em-on's consolidated balance sheet.

*Marlin*

In the Marlin Transaction, Em-on raised (and later refinanced a portion of) $1.15 billion in off-balance sheet financing using Em-on's stock (and related Em-on contractual obligations) and other assets to support the financing. The initial Marlin Transaction, which closed in December 1998 ("Marlin I"), was used to refinance a portion of the cost of the November 1998 acquisition of a public company, Wessex Water

---

[288] The Issuer's certificates were to be paid with any assets remaining in the reserve fund, other assets held by the related Holding Entity and, in the Whitewing Transaction, any Enron shares remaining in the Share Trust.

plc. ("Wessex").[289]    The initial Marlin Transaction deconsolidated Azurix Corp. ("Azurix"), Wessex's holding company, and removed a portion of the remaining acquisition financing from Enron's consolidated balance sheet. The second Marlin Transaction, which closed in August 2001 ("Marlin II"), was used to refinance the outstanding notes issued in Marlin I.[290]

In the Second Interim Report, the Examiner stated that it was unable to conclude that Enron was required to consolidate the Holding Entity, and concluded that the Issuer was properly not consolidated into the Holding Entity or Enron.[291]   In addition, the Examiner concluded that Enron's financial statements did not fully describe the amount or nature of Em-on's contingent liabilities created by the Marlin structure.[292]

### BT/Deutsche's Involvement in the Marlin Transactions

BT/Deutsche acted as joint bookrunning manager with Donaldson, Lufkin & Jenrette ("DLJ/CSFB") for both the Marlin I and Marlin II Transactions.[293]   In this

---

[289] See Second Interim Report, Appendix H (Marlin Transaction).

[290] *Id.*

[291] *Id.*

[292] *Id.*

[293] See Offering Memorandum relating to notes issued by Marlin Water Trust and Marlin Water Capital Corp., Dec. 8, 1998 [AB000502307-AB000502515]; Offering Memorandum relating to notes issued by Marlin Water Trust II and Marlin Water Trust Capital Corp. II, July 12, 2001 [AB000045790-AB000045970]; Deutsche Bank Response, paragraph (i). BT/Deutsche also acted as joint placement agent, indenture trustee and Luxembourg paying agent and transfer agent in connection with Marlin I. *Id.* BT/Deutsche also acted as indenture trustee, Luxembourg paying agent and listing agent and as a remarketing agent in connection with Marlin II. *Id.* DLJ was acquired by the Credit Suisse Group in November of 2000. Credit Suisse Group Press Release, "Credit Suisse Group Completes Acquisition of Donaldson, Lufkin & Jenrette," Nov. 3, 2000, at 1.

capacity, BT/Deutsche underwrote the initial purchase of $512,000,000 of the Marlin I Notes[294] and $166,250,000 and €180,250,000 of the Marlin II Notes.[295]

BT/Deutsche became involved in the Enron Share Trust Transactions after being approached by Enron with the request to devise a structure that would address Enron's financing needs related to its acquisition of Wessex Water plc., which was purchased primarily with debt in November of 1998.[296] BT/Deutsche was told that Enron needed additional capital from a third party because the rating agencies had put a limit on the amount of Enron debt that could be used without risking a potential credit rating downgrade.[297] BT/Deutsche understood that Enron's objectives in developing the Marlin structure were to avoid having the rating agencies treat the structure as debt, avoid an adverse impact on its credit rating, have the debt treated as off-balance sheet financing and avoid having to currently issue Enron stock.[298]

BT/Deutsche presented several ideas to Enron that were not accepted by the company, after which Enron presented the share trust structure to BT/Deutsche in a raw form.[299] BT/Deutsche then engaged in a significant effort in order to make the structure

---

[294] Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $1,024,000,000 7.09% Senior Secured Notes due 2001, Dec. 8, 1998 [AB000262820-AB000262750].

[295] Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $475,000,000 6.31% Senior Secured Notes due 2003 and €515,000,000 6.19% Senior Secured Notes due 2003, July 12, 200 1 [AB00045466-AB00045513].

[296] Jakubik Sworn Statement, at 74, 79-80 and 82.

[297] *Id.* at 79-80.

[298] *Id.* at 82-84, 88 and 146.

[299] *Id.* at 80 and 82-83. In fact, DLJ/CSFB has claimed the credit for taking the primary role in developing the share trust concept, See Letter from Paul Davis, Managing Director, CSFB, to C. Cook, Senior Director of Structured Finance, Dynegy Inc., June 1, 2001 (noting that DLJ/CSFB "originally conceived and developed the share trust structure in 1998") [CSFBCO 0053902451; see also Email from Michael Davis, CSFB, to M. Miller, et al., Mar. 20, 2001 [CSFBCO 005000810-CSFBCO 005000811].

work in the capital markets.[300]  BT/Deutsche understood that the Marlin I Notes and certificates were to be repaid either through an Azurix IPO, the sale of the Atlantic assets or the issuance of the Em-on mandatorily convertible preferred stock held in the Share Trust.[301]

The Marlin I Notes were to mature in December 2001, and in the first part of that year, BT/Deutsche began discussions with Enron concerning the manner in which the Marlin I Notes would be repaid, including whether there were alternatives to an asset sale or issuance of Em-on stock.[302]  BT/Deutsche understood that Enron did not want to sell Wessex or issue its stock at that time because of unfavorable market conditions and the desire to not dilute Enron equity.[303]  In addition, BT/Deutsche was aware that Enron's primary objective was "keeping all of the Azurix and Marlin debt off-balance sheet."[304] BT/Deutsche was also aware that Em-on was very sensitive to the ratings impact of refinancing Marlin.[305]  BT/Deutsche was integrally involved in the issuance of the Marlin II Notes, which were used to repay the outstanding Marlin I Notes.[306]  BT/Deutsche negotiated a separate structuring fee with Enron, which was split evenly between

---

[300] Jakubik Sworn Statement, at 83.

[301] *Id.* at 77 and 81; Cambridge Sworn Statement, at 404-05.

[302] Orchant Sworn Statement, at 389-9 1.

[303] *Id.* at 406 and 416-17.

[304] Email from George Tyson, Deutsche Bank, to Paul Cambridge, Deutsche Bank, May 2, 2001 (attaching presentation to Enron, "Discussion of Refinancing Alternatives for Marlin Water Trust," Feb. 15, 2001) [DBM 015871-DBM 015910]; see *also* Orchant Sworn Statement, at 398 and 415-16; Jakubik Sworn Statement, at 9 1.

[305] Orchant Sworn Statement, at 399, 405 and 418-20; Cambridge Sworn Statement, at 402 (Enron "wanted to push the maturity out for as long as they could in the confines of what the market would accept and also what the rating agencies would permit them to do"); Email from George Tyson, Deutsche Bank, to Paul Cambridge, Deutsche Bank, May 2, 2001 (attaching presentation to Enron, "Discussion of Refinancing Alternatives for Marlin Water Trust," Feb. 15, 2001) [DBM 015871-DBM 015910].

[306] See Cambridge Sworn Statement, at 108- 12; Orchant Sworn Statement, at 389-9 1.

BT/Deutsche and DLJ/CSFB.[307]  BT/Deutsche and DLJ/CSFB "collectively provided structuring assistance" to Em-on and "equally contributed to the final solution."[308]

An internal memorandum prepared in connection with the Marlin II offering explained that the "refinancing of the Marlin I Notes permits Enron to maintain the deconsolidation of Azurix until the Azurix assets can be disposed of in an orderly fashion."[309]  "Key sales points" included the fact that Enron was "committed to balance sheet management and an improving credit profile" and that structured financings such as Marlin are used by Enron "as a key part of its capital raising and balance sheet management."[310]  Enron's commitment to balance sheet management was a key selling point because Em-on had avoided increased leverage on the balance sheet, which is typically associated with rapidly growing companies but leads to a weakening credit profile.[311]  BT/Deutsche was aware that Enron intended to disclose the nature of the off-balance sheet financing in the Marlin transaction in the equity footnotes of its financials.[312]

### Whitewing

The Whitewing Transaction raised $2.65 billion in off-balance sheet financing using primarily Enron's stock (and related Em-on contractual obligations), together with

---

[307] Cambridge Sworn Statement, at 109-10.

[308] *Id.* at 111.

[309] Marlin Water Trust II, July 2001, at Section 1 (Presentation materials to Enron including Sales Force Briefing Memo) [DB 000046-DB 000066].

[310] *Id.* Section 3.

[311] Orchant Sworn Statement, at 444; see *also* Orchant Sworn Statement, at 445 ("What was intended by this [balance sheet management] was that they had maintained, you know, reasonable discipline in their debt financing and equity financing to maintain strong investment grade ratings, as opposed to really what the assets and liabilities were, that they had effectively continued to rebalance the capital structure of the company in a way that the rating agencies viewed as providing stability in the credit ratings.").

[312] Jakubik Sworn Statement, at 89.

-63 -

Em-on notes and other assets, to support the financing. Osprey Trust ("Osprey") was the Issuer in the Whitewing structure, and Whitewing Associates was the Holding Entity.[313]

Although Whitewing Associates began as a "blind pool," it eventually paid (through subsidiaries): (i) an aggregate of approximately $1.6 billion to Enron and its consolidated subsidiaries to acquire assets; (ii) at least $614.9 million to refinance debt obligations for which Enron or an Enron subsidiary was directly or indirectly liable; and (iii) at least $354.6 million to acquire additional investments that benefited Enron or LJM2.[314]

The Whitewing Transaction allowed Enron to remove assets from its balance sheet, increase its liquidity and cash flow, reduce the debt shown on its balance sheet and improve its financial ratios.[315] Through the Whitewing Transaction, Enron created a structure that would purchase assets from Em-on where "[a] true third party sale or sale to one of Enron's other equity investment vehicles would be a challenge."[316]

In the Second Interim Report, the Examiner concluded that Em-on should have consolidated Whitewing Associates and its subsidiaries in Enron's financial statements, while the Examiner did not have sufficient evidence to conclude that Em-on should have consolidated Osprey.[317] The consolidation of Whitewing Associates would have resulted in the inclusion on Em-on's consolidated balance sheet all of the assets and liabilities of the Whitewing investment entities and the presentation of Osprey's interest in Whitewing

---

[313] See Second Interim Report, Appendix G (Whitewing Transaction).

[314] Id.

[315] Id.

[316] Enron Caribbean Funds Flow Exercise Presentation, Sept. 13, 1999, at 6 [AB000468953-AB000468965].

[317] See Second Interim Report, Appendix G (Whitewing Transaction).

Associates in the mezzanine portion of Enron's balance sheet. In addition, any cash flow that Enron recorded as a result of Em-on's (or its consolidated subsidiaries') transferring assets to the Whitewing structure would have been eliminated in consolidation. The Examiner also concluded that Enron's financial statements did not fully describe the amount or nature of Enron's contingent liabilities in the Whitewing structure.[318]

*BT/Deutsche's Involvement in the Whitewing Transaction*

BT/Deutsche acted as joint bookrunning manager with DLJ/CSFB with respect to the issuance of both the Osprey I Notes and the Osprey II Notes. BT/Deutsche underwrote $455 million of Osprey I Notes[319] and $300 million and €126 million of Osprey II Notes.[320] BT/Deutsche also assisted in placing $100 million of certificates in September 1999 and $70 million of certificates in July 2000.[321]

Unlike its participation in Marlin, BT/Deutsche was not involved in structuring the Whitewing Transaction.[322] By the time Enron approached BT/Deutsche with the Whitewing Transaction, Enron had already spent a considerable amount of time working with accounting, tax and legal advisors to develop the Whitewing structure.[323] BT/Deutsche worked with Em-on and DLJ/CSFB on refining the structure in order to

---

[318] *Id.*

[319] Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $1,400,000,000 8.3 1% Senior Secured Notes due 2003, Sept. 16, 1999 [SS000023298-SS000023330].

[320] Section 2(a) and Schedule A, Note Purchase Agreement for U.S. $750,000,000 7.797% Senior Secured Notes due 2003, and €315,000,000 6.375% Senior Secured Notes due 2003, Sept. 28, 2000 [SS000025440-SS000025481].

[321] Orchant Sworn Statement, at 148 and 286-88.

[322] Cambridge Sworn Statement, at 139; Orchant Sworn Statement, at 132-33; see Email from Michael Davis, CSFB, to M. Miller, et *al.*, Mar. 20, 2001 (stating that "[w]hile CSFB/DLJ has jointly led all the Enron structured offerings with Deutsche Bank Alex Brown, we have been the company's primary advisor on structuring. Deutche [sic] Bank was given the primary responsibility for marketing and selling the Osprey Euro tranche last year.") [CSFBCO 005000810-CSFBCO 005000811].

[323] Cambridge Sworn Statement, at 139.

make it more marketable and provided input with respect to market receptiveness and distribution.[324]

BT/Deutsche understood that Enron's objective in creating the Whitewing structure was to "deconsolidate or move off balance sheet certain assets and investments of Enron . . . so that they could more efficiently be disposed of" in a manner that created capital mobility and funds flow.[325] It was also clear that Enron wanted the Osprey debt to be off-balance sheet as well.[326]

In the internal memo prepared to educate the BT/Deutsche sales force about the Osprey I Note issuance, BT/Deutsche stated that "[t]he managed disposition of debt and equity investments in its portfolio is a key part of Em-on's strategy to generate liquidity for future investments whilst maintaining a stable, investment grade rating. The Osprey financing will provide off-balance sheet liquidity for Em-on by, among other things, funding the purchase of various investments in Em-on's investment portfolio by Whitewing, a partnership between Enron and Osprey."[327] One of the "key selling points" as set forth in the memo was the fact that Enron has a proven "[t]rack record of protecting its balance sheet and maintaining stable ratings."[328] Further, one of the stated reasons for undertaking the Whitewing Transaction was that it "will demonstrate to the market and to

---

[324] *Id.* at 139-40; Orchant Sworn Statement, at 133-35.

[325] Orchant Sworn Statement, at 136-37; Jakubik Sworn Statement, at 172; Cambridge Sworn Statement, at 69-71. "It took assets and really financed, prefinanced the disposal of those assets off Enron's balance sheet so that money could come back and be redeployed in their company to acquire other assets." Orchant Sworn Statement, at 138. This had the associated benefit of moving the liabilities of the assets off the balance sheet as well. *Id.*

[326] Orchant Sworn Statement, at 156. In addition, Enron requested that the rating agencies treat the Osprey debt as "off-credit" so that it would not be included in Enron's debt calculation. Jakubik Sworn Statement, at 305.

[327] Enron, Osprey Trust, "$1.400mm Senior Secured Notes, Sales Force Briefing Memo," Sept. 8, 1999, Section 2 [DBG 022420-DBG 0224611.

[328] *Id.* Section 3.

the rating agencies Em-on's ability to effectively manage its investment asset portfolio."[329]

When Enron decided to have a follow-on offering of Osprey Notes because of the increased value of the collateral in the structure, BT/Deutsche played the same role as advisor with respect to analysis of market conditions for the issuance of the Osprey II Notes.[330]    To this end, BT/Deutsche made a presentation to Enron regarding the marketing of the new senior notes in order to position itself as a lead on the transaction.[331]  The presentation stated that one "marketing positive" for Osprey II was that the "Whitewing investment management vehicle demonstrated successful track record and is integral to Enron balance sheet management."[332]

BT/Deutsche once again was aware that Enron wanted to maintain the deconsolidated accounting treatment for the Whitewing structure with respect to the Osprey II Note issuance and that this required the maintenance of the equity balance in

---

[329] *Id.* Section 5. BT/Deutsche was aware that this concept of balance sheet management was a driving force behind Enron's structured finance transactions, particularly as it related to maintaining high credit ratings. See Cambridge Sworn Statement, at 75-76 ("In any given transaction – Enron's goal – stated goal – which every financial institution knew, was to get a single A rating from the rating agencies. It was important to them given their growth in their business and the nature of their business. . . .  So the fabric of the discussions with Enron was always one which revolved around their rating and how they were going to get to that rating and monetizing and/or creating liquidity for them to continue to grow their business."). BT/Deutsche considered Enron's desire to manage the leverage on its balance sheet and maintain stable credit ratings an attribute of the company. Orchant Sworn Statement, at 188 and 190-9 1. BT/Deutsche had discussions with Enron about this goal and assisted Enron in achieving this objective. Cambridge Sworn Statement, at 70-72 and 77.

[330] Orchant Sworn Statement, at 258 and 266-67.

[331] BT/Deutsche, "Osprey Trust Structure: marketing new Senior Notes," June 30, 2000 (Presentation materials for Enron) [DBG-00571 l-DBG-0057581; Orchant Sworn Statement, at 309.

[332] BT/Deutsche, "Osprey Trust Structure: marketing new Senior Notes," June 30, 2000, at 22 (Presentation materials for Enron) [DBG-00571 1-DBG-005758].

the structure.[333]  The internal sales force presentation once again referenced capital

raising and balance sheet management as the key elements of the transaction. [334]

BT/Deutsche understood that in order to deconsolidate the Whitewing structure at

both the Osprey and Whitewing Associates levels, there needed to be 3% equity at risk, a

total amount of equity in relation to the overall capital in the structure, as well as other

control elements vested in the equity holders.[335]

BT/Deutsche was aware that the Osprey certificates were indirectly supported by

Em-on credit.[336]  However, the testimony of the BT/Deutsche current and former

employees suggests that BT/Deutsche considered the certificate holders to be fully at

risk.[337]  A BT/Deutsche memo to the European sales force for the Osprey II Note

issuance emphasized that the Whitewing structure was "controlled and strongly supported

---

[333] Orchant Sworn Statement, at 26 l-62.

[334] Email from Craig Orchant, Deutsche Bank, to Francois Bleines, Deutsche Bank, Sept. 13, 2000, (attaching a presentation for use in discussions with the sales force) [DBG 033901-DBG 0339191.

[335] Orchant Sworn Statement, at 139-40.

[336] Facsimile from Ross Newman, Deutsche Bank, and Maia Babbs, Deutsche Bank, to Ken Hovey, Principal Capital Management, Sept. 13, 2000 (stating "[y]ou will recall that primary support for the certificates is provided by Enron owned by Whitewing, supplemented by the Whitewing assets and, to the extent not used to redeem the Senior Notes, the Mandatorily Convertible Preferred Stock. Enron intends to contribute a separate $42 million Enron note to Whitewing in connection with the increase, in addition to the $85 million note contributed in September 1999 and the approximately $60 million note contributed in July 2000.") [PRIN 02806-PRIN 02809]. Thus, the Enron note would amount to $187 million in the aggregate, or 85% of the value of the certificates. See Second Interim Report, Appendix G (Whitewing Transaction). See also Draft "Presentation to Investors $50,000,000 Certificates of Beneficial Ownership in Osprey Trust," Aug. 2000 (stating that the principal of the Osprey certificates is supported by the Enron note, which will have a principal value of $187 million and that "[u]nder all circumstances, no less than 85% of investors' capital is supported by Enron.") [AB0522 11927-AB0522 119581. According to Craig Orchant, this presentation was prepared by DLJ/CSFB, and he did not recall seeing this document previously. Orchant Sworn Statement, at 347.

[337] Jakubik Sworn Statement, at 186-89; Cambridge Sworn Statement, at 360-61; Orchant Sworn Statement, at 361. "[W]hereas the Osprey notes do look to a direct Enron obligation for repayment, and that obligation was this whole share settlement and remarketing process, the certificates do not. They don't benefit from those obligations directly from Enron. They actually look to the assets in Whitewing as their source of repayment, so without recourse, if you will, to Enron." Orchant Sworn Statement, at 1.59.

by Enron Corp."[338]  However, BT/Deutsche did not believe this adversely impacted the deconsolidation accounting analysis because of certain control features vested in the certificate holders.[339]

In marketing the Osprey Notes, BT/Deutsche represented that assets would be transferred from Enron to Whitewing Associates "on an arms length basis" at "fair market value."[340]  BT/Deutsche understood that the value and purchase price of the assets would be monitored by the certificate holders who had certain approval rights that were meant to ensure the assets were transferred at fair market value.[341]  Although it is clear that at one point BT/Deutsche was aware of the assets owned by Whitewing Associates and the purported values,[342] BT/Deutsche was not involved in monitoring the assets in the structure and did not receive updated information related to these assets.[343]  BT/Deutsche also understood that the debt investors were not concerned about the value of the Whitewing assets because the note holders were not looking to those assets as the source of repayment but rather to the Enron securities held by the Share Trust.[344]  From the

---

[338] Email from Craig Orchant, Deutsche Bank, to Francois Bleines, Deutsche Bank, Sept. 13, 2000 (attaching a presentation for use in discussions with the sales force) (emphasis in original) [DBG 033910-DBG 0339191.

[339] Orchant Sworn Statement, at 370.

[340] Id. at 183-84; Enron, Osprey Trust, "$1.400mm Senior Secured Notes, Sales Force Briefing Memo," Sept. 8, 1999, Section 5 [DBG 022420-DBG 0224611.

[341] Orchant Sworn Statement, at 185-86.

[342] Email from Nicole Alvino, Enron, to Ken Hovey, Principal Life, et al., Apr. 11, 2000 (attaching a "list of the current permitted investments in Osprey," which had an aggregate value of $913 million) [DBG 024903-DBG 0249051.

[343] Orchant Sworn Statement, at 191; Enron Conference Call, Nov., 29, 2001, at 4 (statement read by Mike Jakubik to European investors in Marlin and Whitewing, "Enron has not publicly disclosed full details of the assets held by Whitewing or provided any estimate of the valuation of those assets.") [DBG 022539-DBG 0225441.

[344] Orchant Sworn Statement, at 159 ("[Investors] were willing to be comfortable with the uncertainty of which assets were going in and what the value was of those assets because they were not looking to those assets as a source of repayment.").

perspective of placing the debt, therefore, BT/Deutsche did not believe it was necessary to keep track of the Whitewing assets.[345] The Examiner has not found any evidence to indicate that BT/Deutsche was aware that certain assets were transferred to Whitewing Associates in excess of fair market value or that the structure was used by Em-on as a "parking lot" for unwanted assets that could not otherwise be sold.

---

[345] *Id.* at 324-25 ("[W]e did not have significant information on what the assets were, and again, my role from the debt side was primarily related to the notes issuance, and we really positioned the credit as not relying on those underlying assets, fixed assets.").

IV.     **POTENTIAL LIABILITY OF BT/DEUTSCHE**

A.     <u>**Arguments Supporting the Imposition of Aiding and Abetting: Liability and Equitable Subordination**</u>

*Aiding and Abetting Liability*

As described in Appendix C (Role of Enron's Officers), certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading. As set forth more fully in Appendix B (Legal Standards), assuming the Debtors have standing, an affirmative claim against BT/Deutsche for aiding and abetting these breaches of fiduciary duty will exist if: (i) BT/Deutsche had actual knowledge of the wrongful conduct giving rise to the breaches of fiduciary duty; (ii) BT/Deutsche gave substantial assistance to the primary wrongdoers; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of BT/Deutsche's conduct.

BT/Deutsche was responsible for designing, promoting and participating in the BT/Deutsche Tax Transactions. The BT/Deutsche Tax Transactions were intended to have, and in fact did have, the effect of increasing Enron's reported net income by approximately $423 million over the period from 1997 to 2001.[346] However, Enron had little business purpose for the BT/Deutsche Tax Transactions other than creating accounting income.

---

[346] See Second Interim Report, Appendix J (Tax Transactions), at 8-9; Enron Consolidated Accounting Summary, at 6, 9, 11 and 14.

- 71 -

*Absence of Substantial Business Purpose*

The BT/Deutsche Tax Transactions were, for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron. The tax opinions obtained by Em-on in the Teresa, Steele and Cochise Transactions explicitly recited the generation of financial accounting income as a "business purpose" for the transaction that was intended to support tax recognition of the form of the transaction.[347]

As discussed above, the Teresa Transaction involved the transfer of Enron's interest in its corporate headquarters building and stock and debt of Enron entities among Enron affiliates and SPEs. The Teresa Transaction, however, was not intended to save Enron taxes on a present value basis.[348] Instead, the purpose of the Teresa Transaction was to create accounting income, taking advantage of the fact that the rules of FAS 109 ignore the time value of money.[349]

Although the Steele Transaction and the Cochise Transaction each involved the acquisition of REMIC Residual Interests and a limited amount of Facilitating Assets from BT/Deutsche, Enron did not have a separate business purpose of investing in REMIC Residual Interests or low-yielding Facilitating Assets. Instead, even the tax opinions

---

[347] See Steele Tax Opinion, at 7 ("The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's financial accounting group. . . ."); Cochise Tax Opinion, at 12 (purposes for participating in the Cochise Transaction included "to increase the pre-tax financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions"); July 29 Teresa Tax Opinion, at 4 ("The predominant purpose of Enron and its Affiliates for participating in the Purchase was to generate income for financial accounting purposes.").

[348] See Second Interim Report, Annex 4 to Appendix J (Tax Transactions); Finley Sworn Statement, at 82.

[349] See July 29 Teresa Tax Opinion, at 4 ("The predominant purpose of Enron and its Affiliates for participating in the Purchase was to generate income for financial accounting purposes."); Memorandum from Thomas Finley, Bankers Trust, et al., to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction - Enron Corp., Mar. 10, 1997, at 1 ("create significant amounts of future accounting income") [DBC 012906-DBC 0129091.

obtained by Enron in the Steele and Cochise Transactions, like the tax opinion in the Teresa Transaction, explicitly recognize the generation of financial accounting income as a "business purpose" for the transactions that was intended to support tax recognition of the form of the transaction.[350]

The Steele and Cochise Transactions, moreover, were designed to allow Enron to record the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests as pre-tax income on its financial statements, rather than as after-tax income resulting from reduced tax expense in the tax provision of Em-on's income statement.[351] The characterization of those items as pre-tax income was misleading because readers of Em-on's financial statements were unaware that those amounts arose from a tax-related transaction.

The Tomas Transaction involved Enron's disposition of leased assets by contributing the leased assets to a partnership with BT/Deutsche and later receiving the stock of a subsidiary in exchange for its interest in the partnership. Enron intended to dispose of the leased assets, but the absence of leasing activity by the subsidiary is an indication that Enron did not have a bona fide intent to enter into a partnership with BT/Deutsche to engage in leasing activity.

---

[350] See Steele Tax Opinion, at 7 ("The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's financial accounting group . . . ."); Cochise Tax Opinion, at 12 (purposes for participating in the Cochise Transaction included "to increase the pre-tax financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions.").

[351] See Boyle Accounting Memorandum, at AB000187758-AB000187759 ("[T]he accounting benefits of the transaction are derived from treating the transaction as a 'bargain purchase' of assets for accounting purposes, even though there is no bargain purchase from an economic perspective . . . . the transaction is a deal driven by the accounting benefits.").

*Sale of the Cochise Planes*

As discussed above, the Examiner concludes that there is sufficient evidence to support a finding that the transfer of the Cochise Planes to BT/Deutsche should not have been recorded as a sale under GAAP.

Enron initially discussed with BT/Deutsche a sale of the Cochise Planes to Oneida, a subsidiary that would be returned to Em-on upon the redemption of Em-on's partnership interest in Seneca.[352] Enron subsequently advised BT/Deutsche that a transfer of the Cochise Planes directly to Oneida would not achieve Enron's accounting objective of recognizing gain on the transfer.[353] Although Enron could have recognized the gain by selling the Cochise Planes into the market, and causing Oneida to acquire other leased property, it did not do so. Instead, Em-on and BT/Deutsche developed a plan to transfer the Cochise Planes first to a BT/Deutsche entity, and then on to Oneida.[354]

---

[352] See Email from Sarah Kight, Akin Gump, to Howard Jacobson, Akin Gump, May 23, 2000 (regarding Cochise planes to Tomas) [AGS35929]; Email from Sarah Kight, Akin Gump, to Michael Mandel, Akin Gump, et al., May 18, 2000 [AGS35922]; Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636-DBF 0026371; In-Person Interview with Brian J. McGuire, Managing Director, BT/Deutsche, by Philip C. Cook, A&B, Dec. 16, 2002.

[353] Email from Sarah Kight, Akin Gump, to Howard Jacobson, Akin Gump, May 23, 2000 (regarding Cochise planes to Tomas) [AGS35929]; see *also* Email from Sarah Kight, Akin Gump, to Michael Mandel, Akin Gump, et *al.,* May 18, 2000 [AGS35922]; Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636-DBF 0026371. McGuire stated:

> Mr. Maxey relayed to me that his accountants would not be comfortable with a recognition of gain on the sale of the leased aircraft, if they were transferred directly to Oneida, but that it would be acceptable if the assets were transferred to Deutsche Bank, with the understanding that Deutsche Bank could subsequently transfer such assets, again, at the appropriate value in the arm's length value to Oneida.

McGuire Sworn Statement, at 333-34; see also Email from Brian J. McGuire, Deutsche Bank, to Calli S. Hayes, Deutsche Bank, June 16, 2000 (regarding Leased Assets - United/Continental) [DBF 002632-DBF 0026331.

[354] See Email from Brian J. McGuire, Deutsche Bank, to John T. Wadsworth, Deutsche Bank, June 6, 2000 (regarding Oneida Leasing (Project Tomas JV w/ Enron)) [DBF 002636-DBF 0026371; Email from James Hollman, Corporate Tax, Enron, to Brian J. McGuire, Deutsche Bank, Feb. 17, 2000 (regarding Cochise Plane Values) [DBC 0162581; Email from Sarah Kight, Akin Gump, to Howard Jacobson, Akin Gump, May 23, 2000 (regarding Cochise Planes to Tomas) [AGS35929]; Email from Brian McGuire, Deutsche

Although BT Leasing actually owned the Cochise Planes for approximately one month, BT/Deutsche had both the ability and the intent to sell the Cochise Planes to Oneida.[355] BT/Deutsche had the sole legal authority to cause the transfer of the Cochise Planes to Oneida because BT/Deutsche controlled both BT Leasing and Oneida.[356]

The Examiner has not uncovered any evidence that Enron or BT/Deutsche ever informed Andersen of Enron's arrangements with BT/Deutsche concerning the Cochise Planes.[357] The Andersen tax partner on the Cochise Transaction specifically denied receiving any information concerning Em-on's arrangements with BT/Deutsche concerning the Cochise Planes.[358]

The Examiner concludes there is evidence to support a finding that Enron and BT/Deutsche had reached an understanding to return the Cochise Planes to Enron by means of a transfer to Oneida and, therefore, that Enron's recognition of gain on the transfer of the Cochise Planes to BT/Deutsche was erroneous and did not comply with GAAP.

---

Bank, to Calli Hayes, Deutsche Bank, June 2, 2000 (regarding leased assets - United/Continental) [DBF 002632-DBF 0026331; McGuire Sworn Statement, at 338-39.

[355] See McGuire Sworn Statement, at 338-40 and 349-50.

[356] At the time of the sale of the Cochise Planes, BT/Deutsche controlled Oneida because BT Leasing and EN-BT Delaware, Inc. were the general partners of Seneca, which owned all of the stock of Oneida. See First Amended and Restated Limited Partnership Agreement of Seneca Leasing Partners, L.P., among Portland General Holdings, Inc., BT Leasing Corp. and EN-BT Delaware, Inc., Sept. 1.5, 1998 [AB000147653-AB000147798]; see also Email from Brian McGuire, Deutsche Bank, to Calli Hayes, Deutsche Bank, June 2, 2000 (regarding leased assets - United/Continental) [DBF 002632-DBF 0026331.

[357] See Hermann Sworn Statement, at 182 ("I don't know that anybody knew [the Cochise Planes were] going to come back [to Enron]."); Palmquist Sworn Statement, at 157-59. The ten Andersen witnesses interviewed by the Examiner either had no knowledge of the Cochise Transaction or had no knowledge of any arrangements concerning the return of the Cochise Planes.

[358] Palmquist Sworn Statement, at 157-59.

*BT/Deutsche's Role in Enron's Accounting for the BT/Deutsche Tax Transactions*

BT/Deutsche developed the basic tax and accounting structures of each of the BT/Deutsche Tax Transactions.[359] BT/Deutsche prepared presentations to promote the structures to Enron as a means of generating accounting income and in effect sold the products to Enron.[360] In the Second Interim Report, the Examiner concluded that Enron's accounting for the Cochise, Steele and Teresa Transactions was erroneous and misleading and did not comply with GAAP.[361]

In each of the BT/Deutsche Tax Transactions, BT/Deutsche paid fees to the "on call" advisory group in Andersen's New York office to develop an accounting position on the product before BT/Deutsche offered the product to Enron.[362] BT/Deutsche furnished copies of the SAS 50 letters prepared by Andersen to Enron as part of the process of promoting those structures to Enron.[363] BT/Deutsche also engaged law firms

---

[359] Finley Sworn Statement, at 15-17, 90-91 and 144-45; McGuire Sworn Statement, at 90-92.

[360] See Bankers Trust Discussion Materials for Enron, May 1996 (PowerPoint presentation materials) [DBC 013816-DBC 0138271; Bankers Trust Discussion Materials for Enron, June 20, 1997 (PowerPoint presentation materials) [AB0053 00096-AB0053 00105]; Final Discussion Material for Project Cochise, Mar. 10, 1999 (PowerPoint presentation materials) [AB000187642-AB000187651]; see *also* Second Interim Report, Appendix J (Tax Transactions). The one exception was the Tomas Transaction, which BT/Deutsche brought to Enron in response to Enron's request for assistance in disposing of the leased assets without recognizing taxable income on the disposition. Finley Sworn Statement, at 144; McGuire Sworn Statement, at 297.

[361] Second Interim Report, Appendix J (Tax Transactions), at 2-6, 37-44 and 63-68; Second Interim Report, Annexes 1, 2 and 4 to Appendix J (Tax Transactions).

[362] Finley Sworn Statement, at 18-19 and 22; McGuire Sworn Statement, at 92-95; Weissman Sworn Statement, at 18-21 and 24; Baldasaro Sworn Statement, at 95-96 and 101.

[363] See Hermann Sworn Statement, at 46-47; see *also* Letter from Andersen to Bankers Trust, July 26, 1995 (produced to the Examiner by Enron) [AB0074 1235-AB0074 1246]; Letter from Andersen to Bankers Trust, Aug. 6, 1998 (produced to the Examiner by Enron) [AB0074 0577-AB0074 0592]; Letter from Andersen to Bankers Trust, Nov. 13, 1998 (produced to the Examiner by Enron) [AB0074 0558-AB0074 0576]; Letter from Andersen to Bankers Trust, May 26, 1999 (produced to the Examiner by Enron) [AB0074 0539-AB0074 0557].

to render assistance in developing the products, and subsequently encouraged Enron to employ the same lawyers that BT/Deutsche had employed to develop the products.[364]

The reported accounting treatment of the Steele Transaction and the Cochise Transaction did not reflect the economic realities of the transactions. In the Steele and Cochise Transactions, Enron reported pre-tax income from amortizing a Deferred Credit even though the Deferred Credit arose exclusively from recording the anticipated tax benefit of future deductions. The characterization of those items as pre-tax income was misleading because readers of Enron's financial statements were unaware that those amounts arose from a tax-related transaction, as they might have been if the items had been amortized through the tax provision on the income statement and served to increase Enron's after-tax income through a reduction in Enron's effective tax rate.

Andersen's sign-off on the pre-tax income feature of the Steele and Cochise Transactions was extremely aggressive and unsupported by any FASB pronouncements, EITF discussions or other sources of accounting authority. Andersen's memoranda cite no authority or analysis other than its own reasoning "by analogy" to APB 16, which it acknowledged did not apply.[365] The Examiner can find no reasonable basis for characterizing the income resulting from amortization of the accounting adjustments to balance the Deferred Tax Assets arising from speculative future tax deductions as pre-tax income.[366]

---

[364] See Finley Sworn Statement, at 21-22 and 65; Email from Sanjai Bijawat, Bankers Trust, to Ted Virtue, Bankers Trust, *et al.*, Apr. 1, 1997 [DBG 027035-DBG 0270361.

[365] See Letter from Andersen to Bankers Trust, Aug. 6, 1998 [AB0074 0577-AB0074 0592]; Letter from Andersen to Bankers Trust, Nov. 13, 1998 [AB0074 0558-AB0074 0576]; Cochise Accounting Memorandum, at 5; Willard Sworn Statement, at 57-58.

[366] The Examiner has searched both the authoritative accounting literature and the professional practice literature and can find no situation in which expenses or benefits associated with income taxes are ever appropriately reported on the income statement other than as part of the provision for income taxes.

The distortion of Em-on's income in the Steele and Cochise Transactions was exacerbated by the selection of very short periods over which to amortize the Deferred Credits arising from the purchase accounting adjustments. In the Steele Transaction, the bulk of the Deferred Credit was to be amortized over the five year life of the Corporate Bonds, even though the Deferred Credit was attributable exclusively to adjustments relating to the acquisition of the REMIC Residual Interests and not the Corporate Bonds, Similarly, in the Cochise Transaction, the bulk of the Deferred Credit was to be amortized over the five year period in which Maliseet expected to be a REIT, the very period over which Maliseet could not get any tax benefit from the REMIC Residual Interests.    The Examiner concludes that the periods selected for amortization of the

---

Accounting standards have long followed the practice of reflecting the effects of income taxes on net income within the income tax expense component of the income statement.    See, e.g., FAS 109; Accounting for Income Taxes, Statement of Financial Accounting Standards No. 96 (Financial Accounting Standards Bd. 1987) ("FAS 96") (superseded by FAS 109); Accounting for Income Taxes, Accounting Principles Bd. Opinion No. 11 (Financial Accounting Standards Bd. 1967) (superseded by FAS 96 and FAS 109). As a result, those effects are reflected in net (after-tax) income but not pre-tax income. See, e.g., Accounting for the Investment Credit: Accounting Interpretations of APB Opinion No. 4, AICPA Accounting Interpretation No. AIN-APB 4 (Financial Accounting Standards Bd. Feb. 1972-Mar. 1972) (investment credits reflected as reduction of tax expense); Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects, 1 EITF Abstracts (FASB) 94-l (May 18-19, 1995) (housing credits reflected as a component of income taxes); Accounting for Acquired Temporary Differences in Certain Purchase Transactions That Are Not Accounted for as Business Combinations, 2 EITF Abstracts (FASB) 98-11 (Nov. 14-15, 2001) ("EITF 98-11") (Deferred Credit resulting from so-called bargain purchase amortized into income as part of the provision for income taxes). The only comment received by the EITF in connection with its deliberations on EITF 98-1 1 that discussed the possibility of amortizing the Deferred Credit into any part of the income statement other than the provision for income taxes was submitted by John Stewart of Andersen on Mar. 15, 1999. See Comment Letter No. 3, EITF 98-11, Minutes/Issue Summaries (FASB) (Mar. 15, 1999). In that letter, Andersen noted that amortization of the Deferred Credit into the provision for income taxes would technically violate the definition of deferred income tax expense in FAS 109 as "the change during the year in an enterprise's deferred tax liabilities and assets."    Comment Letter No. 3, EITF 98-1 1, Minutes/Issue Summaries (FASB) (1998); see also FAS 109, at ¶ 16.    Because the amortization of the Deferred Credit does not affect the balance in the Deferred Tax Asset or Liability accounts, including amortization of the Deferred Credit in the provision for income taxes indeed is inconsistent with the definition of deferred income tax expense in FAS 109, as the Deputy Chief Accountant of the SEC pointed out in her comment letter on May 18, 1999. See Comment Letter No. 6, EITF 98-11, Minutes/Issue Summaries (FASB) (1998). However, the SEC's comment letter did not support a substantive change to longstanding practice of reporting tax-related gains on the income statement as part of the provision for income taxes because of this technical inconsistency, and amortization through the tax provision was explicitly made mandatory in EITF 98-1 1.

Deferred Credits in the Steele and Cochise Transactions were not rational and did not comply with GAAP.

As discussed above, BT/Deutsche also developed the Teresa Transaction and promoted it to Enron as a means of generating accounting income. The Teresa Transaction was structured not to save taxes, but to create accounting income by taking advantage of the fact that the rules of FAS 109 ignore the time value of money. Thus, the Teresa Transaction was structured so that the reported accounting treatment would not reflect the economic realities of the transaction.

The Examiner has concluded that Enron's recognition of Deferred Tax Assets in the Teresa Transaction was premature and did not comply with GAAP. In the SAS 50 letter prepared for the Teresa Transaction, Andersen took the position that paragraph 34 of FAS 109 does not apply to partnerships.[367] Generally speaking, paragraph 34 of FAS 109 prohibits taking a basis difference in a subsidiary into account as a "Temporary Difference" for purposes of FAS 109 because investments in subsidiaries are essentially permanent in nature.[368] Andersen witnesses questioned by the Examiner did not defend the rationale that paragraph 34 of FAS 109 does not apply to partnerships.[369] In subsequent Tax Transactions, Andersen adopted a different rationale and appears to have abandoned the position that paragraph 34 of FAS 109 does not apply to partnerships.[370]

---

[367] Letter from Andersen to Bankers Trust, July 26, 1995, at 8-11 [AB0074 1235-AB0074 1246].

[368] FAS 109, ¶ 34.

[369] See, e.g., Willard Sworn Statement, at 139-44.

[370] See Letter from Andersen to Chase Securities Inc., Sept. 29, 1999, at 5-6 [AB000187050-AB000187055]; Memorandum from H. Ronald Weissman, Andersen, and P. Michael Baldasaro, Andersen, to the Files, regarding Project Aries, July 7, 2000, at 5-10 [AB000187879-AB000187888].

The Examiner concludes that BT/Deutsche's role in designing, promoting, implementing and participating in the BT/Deutsche Tax Transactions is evidence from which a fact-finder could conclude that BT/Deutsche had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by Enron's Tax/Accounting Officer Group and gave substantial assistance to those officers. Under the applicable law of aiding and abetting, courts often include, as part of the element of substantial assistance, that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. In the case of the BT/Deutsche Tax Transactions, there is evidence of this element. Injury to the Debtors was the direct or reasonably foreseeable result of BT/Deutsche's conduct because the transactions lacked business purpose and were structured to enable Enron to produce materially misleading financial statements, which were disseminated to the public. Enron suffered damages by virtue of the preparation and dissemination of these materially misleading financial statements, including incurring the costs of governmental investigations, the administrative costs of Enron's bankruptcy proceeding and losses caused by the "deepening insolvency" of Enron that occurred while its true financial condition was disguised. A fact-finder could determine that damages such as these were a reasonably foreseeable result of the above-described conduct of BT/Deutsche in connection with the BT/Deutsche Tax Transactions.

*BT/Deutsche's Role in the Share Trust Transactions*

BT/Deutsche participated in the Marlin and Whitewing Share Trust Transactions, which were complicated SPE structures designed with the goal of moving assets off Enron's balance sheet. Although BT/Deutsche was aware of and responsive to Enron's balance sheet management objectives and desire to maintain solid credit ratings, the

Examiner has found insufficient evidence to date for a fact-finder to determine that BT/Deutsche knew that certain entities within the structures should have been consolidated or understood that the accounting analysis of whether other entities should be deconsolidated was questionable. There is also a lack of evidence indicating that BT/Deutsche knew that Enron had not properly disclosed the off-balance sheet financings in its financial statements or that Enron was participating in multiple additional financings with the similar effect of moving assets and liabilities off balance sheet. Accordingly, the Examiner concludes that there is insufficient evidence available to date that BT/Deutsche's activities in connection with the Share Trust Transactions, standing alone, support a claim for aiding and abetting breaches of fiduciary duty by Enron's officers.

*Equitable   Subordination*

Proofs of Claim tiled by BT/Deutsche include the following:

| Claim No. | Amount | Nature of claim |
|---|---|---|
| 2030 | $6,874 | Stock exchange expenses |
| 2031 | $7,306 | Stock exchange expenses |
| 12797 | $13835 1,706 | Enron guaranty in Valhalla Transaction |
| 12798 | $11,349,5 13 | Enron guaranty in Steele Transaction |
| 12800 | $4,536,000 | Consulting services in Cochise Transaction |
| 14259 | $35,193,613 | Swap with respect to Ponderosa Loan |
| 14261 | $36,401,157 | Enron guaranty of ENA and ECL swaps |
| 14290 | $57,370 | Long form swap terminated 12/18/01 |
| 14291 | $1,435,685 | Long form swap terminated 12/18/01 |
| Total | $227,339,224 | |

The principal Proofs of Claim tiled by BT/Deutsche relate to (i) the Valhalla guaranty ($36 million after various setoffs or recoupments) and a tax indemnification agreement ($102.3 million) entered into in connection with the Valhalla Transaction, (ii) Em-on's guaranty of swap obligations of ENA ($22.9 million) and Enron Credit

Limited ($13.4 million), (iii) a swap agreement with respect to the Ponderosa loan ($35.2 million), (iv) an Enron guaranty in connection with the Steele Transaction ($11.3 million) and (v) consulting fees in connection with the Cochise Transaction ($4.5 million).[371]

As set forth more fully in Appendix B (Legal Standards), BT/Deutsche's claims against the Debtors may be equitably subordinated if BT/Deutsche engaged in inequitable conduct and such conduct resulted in an injury to creditors or an unfair advantage to BT/Deutsche. The evidence discussed above supports a finding that BT/Deutsche engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements. Enron's other creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, sufficient evidence exists for a court to equitably subordinate the claims of BT/Deutsche to those of other creditors.

### B. Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination

The Examiner has considered a number of arguments that can be made to support the proposition that BT/Deutsche bears no legal responsibility for the actions of Enron's management in implementing the accounting structures that BT/Deutsche offered to Enron. Many firms have promoted tax-advantaged transactions to sophisticated corporations. Every taxpayer is permitted to structure its affairs in a way that minimizes its tax obligations, and "there is not even a patriotic duty to increase one's taxes."[372] The

---

[371] Proof of Claim of Deutsche Bank AG, filed against Enron in the amount of $138,351,706, Exhibit A [Claim No. 0000012797]; Proof of Claim of Deutsche Bank Trust Company Delaware, filed against Enron in the amount of $11,349,513, Exhibit A [Claim No. 0000012798]; Proof of Claim of Deutsche Bank Trust Company Americas, filed against Enron in the amount of $4,536,000, Exhibit A [Claim No. 0000012800]; Proof of Claim of Deutsche Bank AG filed against Enron, in the amount of $22,989,444.70 and $13,411,712.35, Annex A, at 2-3 [Claim No. 0000014261].

[372] *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd sub nom. Gregory v. Helvering*, 293 U.S. 465 (1935).

marketing of tax-advantaged transactions is a lawful activity, and it is commonly understood in the marketplace that the buyers of such structures bear the responsibility for the proper tax reporting, and financial reporting, of the results of those transactions.

BT/Deutsche's engagement letters, moreover, disclaim virtually all duties to Enron, and generally provide that BT/Deutsche makes no representation or warranty as to any of the tax or accounting consequences of the transaction.[373] BT/Deutsche's engagement letters also generally provide that neither BT/Deutsche nor its representatives "shall have any liability to the Company or its Representatives resulting from their use" of the transaction.[374] Consequently, it can be argued that, as between the parties, it was clear that Enron was on its own to determine the proper tax and accounting treatment of the BT/Deutsche Tax Transactions.

Notwithstanding the disclaimer of any representation or warranty as to the tax and accounting consequences of the BT/Deutsche Tax Transactions, the fact remains that BT/Deutsche developed the basic tax and accounting structures and promoted them to Enron as a means of generating accounting income. In each of the BT/Deutsche Tax Transactions, the amount of BT/Deutsche's fee was explicitly linked to the magnitude of the accounting benefits recognized by Enron.[375] In the case of the REMIC Carryover Basis Transactions, BT/Deutsche recognized that a purchaser would pay little if any fee

---

[373] See Original Teresa Engagement Letter, at 5; Teresa OPI Engagement Letter, at 5; First Amended Teresa Engagement Letter, at 5; Second Amended Teresa Engagement Letter, at 5; Steele Engagement Letter, at 5; Cochise Engagement Letter, at 5; Tomas Engagement Letter, at 5.

[374] Original Teresa Engagement Letter, at 5; Teresa OPI Engagement Letter, at 5; First Amended Teresa Engagement Letter, at 5; Second Amended Teresa Engagement Letter, at 5; Steele Engagement Letter, at 5; Cochise Engagement Letter, at 5; Tomas Engagement Letter, at 5.

[375] See Original Teresa Engagement Letter, at 2; First Amended Teresa Engagement Letter, at 2; Second Amended Teresa Engagement Letter, at 2; Steele Engagement Letter, at 2; Tomas Engagement Letter, at 2; Cochise Engagement Letter, at 2.

for the potential tax benefits absent the accounting benefits, but would pay a substantial fee if the transaction generated accounting benefits in the form of accelerated pre-tax income.[376]

In any event, the potential liability of BT/Deutsche for aiding and abetting breaches of fiduciary duty by Enron's Tax/Accounting Officer Group does not arise out of any representation or warranty relating to the BT/Deutsche Tax Transactions, and strictly speaking is not a liability resulting from Enron's use of the structures. Rather, the potential liability results from the conduct of Enron's Tax/Accounting Officer Group in breaching their fiduciary duties. If the language of BT/Deutsche's engagement letters were broad enough to cover aiding and abetting breaches of fiduciary duty, a court would likely find that the exculpation clauses violated public policy and were void.[377]

In the course of obtaining legal and regulatory approvals for investing in the BT/Deutsche Tax Transactions, BT/Deutsche presented transaction structures to the Federal Reserve Bank of New York.[378] However, a determination that the investments of BT/Deutsche and its subsidiaries in certain transaction structures complied with certain legal constraints imposed on bank holding companies gives no indication that bank regulators ever reviewed or approved the proposed tax or accounting consequences of the structures. The Examiner also received testimony indicating that certain transactions similar to some of the BT/Deutsche Tax Transactions were originally developed and

---

[376] See Boyle Accounting Memorandum.

[377] See Report, *Limitations of Liability Under Engagement Letters.*

[378] See, e.g., Letter from Thomas Finley, Bankers Trust, to John S. Cassidy, Federal Reserve Bank of New York, July 24, 1995 [DBE 000024]; Letter from Richard J. Coll, Bankers Trust, to John S. Cassidy, Federal Reserve Bank of New York, Nov. 21, 1996 [DBE 000041].

implemented by BT/Deutsche for its own account.[379] However, the Examiner has not reviewed any information pertaining to those transactions.

It can be argued that BT/Deutsche did not itself give accounting advice to Enron, but instead relied on Andersen to determine the proper accounting treatment of the BT/Deutsche Tax Transactions and on Enron to determine the proper accounting for the BT/Deutsche Tax Transactions in reliance on its own auditors and on the exact facts of the transactions as finally consummated. Unlike Andersen and Enron, BT/Deutsche was not in a position to know all of the facts that would have been relevant in determining the proper accounting in each case. For example, the issue of whether to establish a reserve would depend on questions such as the amount and timing of other items of income and on the adequacy of the total Enron reserve, facts that would not be known to BT/Deutsche.[380]

However, the role of BT/Deutsche goes far beyond mere reliance on Andersen and Enron to determine the proper accounting for the BT/Deutsche Tax Transactions. BT/Deutsche developed the transactions and employed Andersen to consider the structures and to approve the aggressive accounting techniques before promoting the structures to Enron.[381] The SAS 50 letters approving the accounting techniques were furnished to Enron[382] and, at least in some instances, the individual Andersen accountants

---

[379] Finley Sworn Statement, at 36 and 39; McGuire Sworn Statement, at 79, lines 2-7, and at 82, 151 and 184; see also Finley Sworn Statement, at 12-13; McGuire Sworn Statement, at 78.

[380] See McGuire Sworn Statement, at 145-46 and 244-48.

[381] Finley Sworn Statement, at 18-19 and 22; McGuire Sworn Statement, at 92-95. In connection with the issuance of the SAS 50 letters, BT/Deutsche typically worked with Mike Baldasaro, an Andersen tax partner, and Ron Weissman, an Andersen accounting partner. Finley Sworn Statement, at 18.

[382] See Letter from Andersen to Bankers Trust, July 26, 1995 (produced to the Examiner by Enron) [AB0074 1235-AB0074 1246]; Letter from Andersen to Bankers Trust, Aug. 6, 1998 (produced to the

employed by BT/Deutsche appear to have assisted in marketing the structures to Enron.[383]

As discussed above, the accounting treatment promoted by BT/Deutsche and approved by the SAS 50 letters was highly aggressive. Frequently, the accounting for the structures was controversial within Andersen.[384] In several instances, the Andersen accountants employed by BT/Deutsche to develop the structures were influential in causing the structures to be approved by other Andersen accountants in connection with their implementation by Enron.[385] From this evidence, a fact-finder could determine that any claimed defense that BT/Deutsche bears no legal responsibility because it relied on Andersen's accounting expertise is unjustified.

It can also be argued that BT/Deutsche did not itself give tax advice to Enron. Enron engaged law firms to render tax advice on the BT/Deutsche Tax Transactions.[386] BT/Deutsche generally was not responsible for reviewing the tax opinions and did not play any formal role in helping Enron assess the likelihood of success in sustaining the tax positions.[387] To the extent that the law firms selected by Enron had previously been

---

Examiner by Enron) [AB0074 0577-AB0074 0592]; Letter from Andersen to Bankers Trust, Nov. 13, 1998 (produced to the Examiner by Enron) [AB0074 0558-AB0074 0576]; Letter from Andersen to Bankers Trust, May 26, 1999 (produced to the Examiner by Enron) [AB0074 0539-AB0074 0557].

[383] See, e.g., Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Enron, May 28, 1996 (notifying Hermann that Mike Baldasaro would be calling to discuss the structure of the transaction that later became the Teresa Transaction) (PowerPoint presentation materials) [DBC 013815-DBC 0138271.

[384] Hermann Sworn Statement, at 48-50; Hermann Interview.

[385] Hermann Sworn Statement, at 48-50.

[386] See July 29 Teresa Tax Opinion; Steele Tax Opinion; Cochise Tax Opinion; Tomas Tax Opinion.

[387] See McGuire Sworn Statement, at 115-16 and 265-66; Finley Sworn Statement, at 7 1-72; Original Teresa Engagement Letter; Teresa OPI Engagement Letter; First Amended Teresa Engagement Letter; Second Amended Teresa Engagement Letter; Steele Engagement Letter; Cochise Engagement Letter; Tomas Engagement Letter.

engaged by BT/Deutsche to work on the structures, those conflicts were disclosed to Enron and were waived by Enron.[388]

BT/Deutsche, however, played a significant role in Em-on's selection of law firms to render tax advice on the BT/Deutsche Tax Transactions. Enron could not record the financial accounting benefits of the BT/Deutsche Tax Transactions unless it was "probable" that the underlying tax position would be sustained.[389] In practice, Andersen determined that the "probable" standard under GAAP would be satisfied by obtaining a "should" level opinion from outside legal counsel.[390] Enron would not have entered into the transactions unless it could record the financial accounting benefits.[391] BT/Deutsche employed the same group of outside law firms to develop the structures,[392] and recommended those law firms to Enron.[393] Enron engaged those law firms to render "should" level opinions on the tax benefits of the structures.[394]

In the case of the Teresa Transaction, for instance, BT/Deutsche engaged King & Spalding to assist in developing the structure,[395] and engaged Andersen to consider and

---

[388] See, e.g., Letter from William S. McKee, King & Spalding, to Robert J. Hermann, Vice President Tax, Enron, Sept. 8, 1997 [AB0785 04148-AB0785 041491; Letter from William S. McKee, King & Spalding, to R. Davis Maxey, Senior Director, Corporate Tax, Enron, July 20, 1998 [MN006721-MN006722]; see also Finley Sworn Statement, at 66.

[389] See Second Interim Report, Appendix J (Tax Transactions), *Accounting for Deferred Taxes Under FAS 109.*

[390] See Steele Accounting Memorandum, at 7; Willard Sworn Statement, at 170-71; Palmquist Sworn Statement, at 124-25; Hermann Sworn Statement, at 72.

[391] Hermann Sworn Statement, at 156.

[392] Finley Sworn Statement, at 65-66, 96 and 131; McGuire Sworn Statement, at 95-96 and 305,

[393] Finley Sworn Statement, at 21-22 and 65; Email from Sanjai Bijawat, Bankers Trust, to Ted Virtue, Bankers Trust, *et al.,* Apr. 1, 1997 [DBG 027035-DBG 0270361.

[394] Steele Tax Opinion; Cochise Tax Opinion; July 29 Teresa Tax Opinion; Tomas Tax Opinion.

[395] Finley Sworn Statement, at 19-2 1.

- 87 -

approve the structure before it was offered to Enron.[396] The Andersen accountants employed by BT/Deutsche assisted in promoting the structure to Enron.[397] BT/Deutsche introduced King & Spalding to Enron and Enron hired King & Spalding as its tax counsel in the transaction.[398] King & Spalding, in turn, engaged Andersen to help King & Spalding evaluate the tax consequences of the Teresa Transaction.[399] As Enron's auditors, Andersen ultimately relied in part on the King & Spalding tax opinion in permitting Enron to record the financial accounting benefits of the transaction.[400]

In the Steele Transaction, which closed in the same year as the Teresa Transaction, there is evidence that King & Spalding would not give a "should" level tax opinion to Enron.[401] There is evidence that BT/Deutsche furnished King & Spalding with an extensive accounting memo in order to help King & Spalding understand the asserted business purpose for the transaction, the generation of financial accounting benefits, because business purpose was relevant to the tax analysis under Section 269 of the Internal Revenue Code.[402] There is also evidence that, shortly thereafter, BT/Deutsche communicated to Enron that Akin Gump would give a "should" level opinion if certain

---

[396] *Id.* at 19 and 22; see, e.g., Letter from Andersen to Bankers Trust, July 26, 1995 [AB0074 1235-AB0074 1246].

[397] See Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Enron, May 28, 1996 (notifying Hermann that Mike Baldasaro of Andersen would call to discuss the structure for the transaction that became the Teresa Transaction) (PowerPoint presentation materials) [DBC 013815-DBC 013827].

[398] Finley Sworn Statement, at 21-22 and 65-66; Hermann Sworn Statement, at 36; Letter from William S. McKee, King & Spalding, to James A. Armogida, Senior Counsel, Enron, Mar. 10, 1997 [AB0075 0044].

[399] Letter from William S. McKee, King & Spalding, to Robert P. Palmquist, Andersen, Feb. 20, 1997 [K&S 2 05713-K&S 2 057141].

[400] Memorandum from David B. Duncan, Andersen, Robert P. Palmquist, Andersen, and Roger D. Willard, Andersen, to Enron, regarding Formation of Enron Leasing Partners, L.P., (Partnership) and Treatment of Taxable Dividends, Mar. 14, 1997 [AA-EX00004 159-AA-EX00004 167]; Palmquist Sworn Statement, at 91-93.

[401] Hermann Sworn Statement, at 86-88.

[402] See McGuire Sworn Statement, at 104-06; Boyle Accounting Memorandum; Finley Sworn Statement, at 100-02.

factual representations could be made.[403] The transaction closed with Akin Gump giving the "should" level tax opinion to Enron.[404] Subsequently, in the Cochise Transaction, King & Spalding (and a successor firm to which Mr. McKee transferred) once again provided a "should" level tax opinion to Em-on, and Akin Gump represented BT/Deutsche.[405] In the Tomas Transaction, Akin Gump assisted BT/Deutsche in developing the structure[406] and represented Enron in closing the Tomas Transaction and providing a "should" level tax opinion.[407] Akin Gump represented BT/Deutsche in connection with the transfer of the Cochise Planes from BT/Deutsche to the Cochise structure and, at Enron's request, represented Oneida in connection with the transfer of the Cochise Planes to the Tomas structure.[408]

In summary, in each of the BT/Deutsche Tax Transactions, the financial accounting benefits of the structure depended on a tax opinion from the same group of law firms that BT/Deutsche engaged in developing the structures, and those financial accounting benefits were the reason that Enron implemented the transactions and agreed to pay BT/Deutsche its substantial fees. From this evidence, a fact-finder could

---

[403] See Letter from Thomas Finley, Bankers Trust, to R. Davis Maxey, Enron, June 24, 1997 [DBC 009410-DBC 0094181; McGuire Sworn Statement, at 108-09; see also Steele Tax Opinion.

[404] Steele Tax Opinion. King & Spalding represented BT/Deutsche in closing the Steele Transaction. Letter from William S. McKee, King & Spalding, to Robert J. Hermann, Vice President Tax, Enron, Sept. 8, 1997 [AB0785 0414%AB0785 041491.

[405] See Cochise Tax Opinion; McGuire Sworn Statement, at 272; see abo Letter from William S. McKee, King & Spalding, to R. Davis Maxey, Senior Director Corporate Tax, Enron, July 20, 1998 [MN006721-MN006722]; Letter from William S. McKee, King & Spalding, to Leon G. Kozak, Vice President, Bankers Trust, July 20, 1998 [MN006719-MN006720].

[406] See Memorandum from John P. Buser, Akin Gump, to Thomas F. Finley, Bankers Trust, and R. Davis Maxey, Enron, Feb. 27, 1998 [DBF 043731-DBF 0437661; Memorandum from Michael S. Mandel, Akin Gump, to R. Davis Maxey, Enron, and James A. Armogida, Enron, June 15, 1998 [AB0074 2261].

[407] See Tomas Tax Opinion.

[408] McGuire Sworn Statement, at 322-23; see also Letter from Michael S. Mandel, Akin Gump, to R. Davis Maxey, Vice President Tax Planning, Enron, and Brian J. McGuire, Director, Deutsche Bank, May 10, 2000 [DBC 060755-DBC 0607671.

determine that any claimed defense that BT/Deutsche bears no legal responsibility because the BT/Deutsche Tax Transactions were approved by Em-on's counsel is unjustified.

It can also be argued that the BT/Deutsche Tax Transactions did not have as significant an impact on the misreporting of Enron's financial condition as some of Em-on's other Tax Transactions and non-tax SPE transactions. The Teresa, Steele and Cochise Transactions, for example, closed earlier in time and did not have projected net income benefits as large as the Apache, Condor and Tammy I Transactions in which Enron later engaged.[409]  Moreover, Enron's Tax Transactions did not have a very significant impact on Enron's funds flow from operating activities and key credit ratios.[410]  Nevertheless, the BT/Deutsche Tax Transactions had a material effect on Em-on's reported net income.  For example, the BT/Deutsche Tax Transactions enabled Em-on to erroneously record approximately $158 million of income from the Steele and Cochise Transactions (including $143.7 million erroneously recorded as pre-tax income) through 2001, and $229 million of after-tax net income from the Teresa Transaction through 2001 .[411]

It can be argued that the sale of the Cochise Planes to BT/Deutsche should be respected because BT/Deutsche did in fact pay $36.5 million for the Cochise Planes on

---

[409] See Second Interim Report, Appendix J (Tax Transactions), at 8-9.

[410] See Second Interim Report, *Enron's Use of SPEs*, at 46-49.

[411] Enron Consolidated Accounting Summary, at 6.  Although the Teresa Transaction and the Steele Transaction closed in 1997 and the Cochise Transaction closed in 1999, all three transactions contributed to Enron's reported net income for subsequent periods through 200 1. See Second Interim Report, Appendix J (Tax Transactions).

June 28, 2000, and hold the planes until July 27, 2000.[412] There was no written agreement limiting the benefit to BT/Deutsche if the Cochise Planes increased in value in the interim, or limiting the detriment to BT/Deutsche if the Cochise Planes decreased in value.

Notwithstanding the legal form of the transfers of the Cochise Planes, however, there is evidence to support a finding that the transfer of the Cochise Planes should not have been recorded as a sale for financial accounting purposes.[413]    Although BT/Deutsche in fact held the Cochise Planes for approximately thirty days, there is evidence to support a finding that a bona fide sale did not occur because Enron and BT/Deutsche had reached an understanding to return the Cochise Planes to Enron. Moreover, despite BT/Deutsche's longstanding relationship with Andersen, and Enron's longstanding relationship with Andersen, there is no evidence that either BT/Deutsche or Em-on ever requested Andersen's opinion or informed Andersen of Enron's arrangements with BT/Deutsche concerning the Cochise Planes. The circumstances leading up to the transfer of the Cochise Planes to BT/Deutsche, coupled with Enron's goal, planned since the implementation of the Cochise Transaction, of recognizing gain on the sale, and the transfer of the Cochise Planes to Oneida within thirty days, and at the same price, adjusted only for lease payments in the interim, are sufficient evidence to support a

---

[412] See Aircraft Interest Purchase Agreement (N83870) between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 017007-DBC 0170231; Aircraft Interest Purchase Agreement (N165UA) between ECT Investments Holding Corp. and BT Leasing Corp., June 28, 2000 [DBC 016934-DBC 0169481; Cochise Tax Overview, at 5.

[413] See, e.g., Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises, Accounting Principles Bd. Opinion No. 4 (Financial Accounting Standards Bd. 1970) ("financial accounting emphasizes the economic substance of events even though the legal form may differ").

finding that BT/Deutsche had an understanding with Enron that the Cochise Planes would be returned to Enron.

### C.    Conclusions

There is sufficient evidence for a fact-finder to conclude that: (i) BT/Deutsche had actual knowledge of the wrongful conduct giving rise to the breaches of fiduciary duty by the Tax/Accounting Officer Group; (ii) BT/Deutsche gave substantial assistance to the Tax/Accounting Officer Group by participating in the structuring and closing of the BT/Deutsche Tax Transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that BT/Deutesche aided and abetted the Tax/Accounting Officer Group in breaching their fiduciary dutues. There is also sufficient evidence of inequitable conduct by BT/Deutsche in connection with the BT/Deutsche Tax Transactions for a court to conclude that BT/Deutsche's claims should be equitably subordinated to the claims of other creditors.

## V.    BANKRUPTCY ANALYSIS OF THE VALHALLA SETOFF

### A.    Summary Description of the Valhalla Transaction

The Valhalla Transaction was a Tax Accommodation Transaction that Enron entered into with BT/Deutsche in May 2000. The Valhalla Transaction produced favorable tax benefits for BT/Deutsche, but did not produce significant tax or accounting benefits to Enron.[414] Instead, Enron in effect shared in a portion of BT/Deutsche's tax benefits through an interest rate differential between the interest rate on the "Deutsche/Enron Note" and the interest rate on the "Participation Rights," as defined below.[415]

From Enron's perspective, the Valhalla Transaction was structured to create a five year net borrowing of $50 million by Enron while generating approximately $17-20 million of annual pre-tax earnings and cash flow for Enron.[416] From BT/Deutsche's perspective, the Valhalla Transaction was structured to create approximately $40 million of annual tax benefits for BT/Deutsche.[417]

The net $50 million borrowing in the Valhalla Transaction represented the difference between (i) a $2 billion "loan"* from the Frankfurt office of BT/Deutsche to an indirect German subsidiary of Enron ("Rheingold") structured as a purchase of

---

[414] Maxey Sworn Statement, at 209; McGuire Sworn Statement, at 368; see *also* Second Interim Report, Appendix J (Tax Transactions).

[415] Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions; see also* Maxey Sworn Statement, at 209-10.

[416] Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Accommodation Transactions; see also* McGuire Sworn Statement, at 380.

[417] McGuire Sworn Statement, at 372-73.

[418] Enron and Deutsche Bank agreed to treat Deutsche Bank's purchase of the Participation Rights as a loan and to treat the minimum payments made to Deutsche Bank as interest for U.S. tax purposes. Letter Agreement between Enron and Deutsche Bank AG, May 2, 2000 (regarding U.S. Federal Income Tax Treatment of Transactions) [AB000140278-AB000140279].

"Participation Rights" in Rheingold (the "Participation Rights")[419] and (ii) a $1.95 billion loan (the "Deutsche/Enron Note") from Enron to the New York office of BT/Deutsche.[420] In addition, the Deutsche/Enron Note provided that Enron could use the fixed rate of interest it would otherwise receive from the Deutsche/Enron Note to purchase derivative options from BT/Deutsche (the "Valhalla Derivatives").[421]

In the Valhalla Transaction, BT/Deutsche entered into a Put Option Agreement with Valhalla GmbH ("Valhalla"), an indirect German subsidiary of Enron and the direct parent of Rheingold, that gave BT/Deutsche the right, under certain circumstances, to sell the Participation Rights to Valhalla.[422] The circumstances giving rise to BT/Deutsche's right to sell the Participation Rights to Valhalla under the Put Option Agreement included the downgrading of Enron's credit rating below investment grade.[423]

Enron executed a guaranty of payment in favor of BT/Deutsche (the "Valhalla Guaranty"), which, among other things, guaranteed Valhalla's repurchase obligations to BT/Deutsche under the Put Option Agreement.[424] Under the terms of the Valhalla Guaranty and the Deutsche/Enron Note, BT/Deutsche and Enron were entitled to set off

---

[419] Agreement on Participation Rights *(Genussrechtsvertrag)* between Rheingold GmbH, Valhalla GmbH and Deutsche Bank AG as of May 2, 2000 [AB000140135-AB000140153].

[420] Promissory Note by Deutsche Bank AG (New York) in favor of Enron for $1.95 billion, May 2, 2000 [AB000140263-AB000140271]. The Deutsche/Enron Note was amended on December 12, 2000, to substitute the London office of Deutsche Bank AG for Deutsche Bank AG (New York) as the maker of the note. See Section 1, First Amendment to Promissory Note among Deutsche Bank AG (New York branch), Deutsche Bank AG (London branch), and Enron, Dec. 12, 2000 [AB000140819-AB000140828]. Enron requested the substitution so that interest paid to Enron would be foreign source interest for purposes of determining Enron's foreign tax credit limitation. McGuire Sworn Statement, at 420-21; Sworn Statement of Tina Kyle Livingston, former Tax Director, Enron, to Craig H. Kuglar, A&B, Apr. 30, 2003 (the "Livingston Sworn Statement"), at 94-95.

[421] McGuire Sworn Statement, at 378-81 and 426.

[422] Put Option Agreement between Deutsche Bank AG and Valhalla GmbH, May 2, 2000 [AB000140196-AB000140229].

[423] See *id.* Section 4.2.6.

[424] Enron Guaranty in favor of Deutsche Bank AG, May 2, 2000 [AB000140230-AB000140237].

their respective obligations under the Valhalla Guaranty and the Deutsche/Enron Note.[425] In addition, the Valhalla Guaranty provided that BT/Deutsche "shall have the absolute and unconditional right to satisfy all or any portion of its obligations on the Note by setoff of any unpaid obligations of Guarantor to Counter-party in connection with the obligations (whether or not any of the foregoing are then due and payable and whether or not liquidated)."[426]    Moreover, Enron agreed to treat Rheingold, Valhalla and Em-on as one entity for setoff purposes.[427]

The Deutsche/Enron Note was held by Bankers Trust to secure Em-on's obligations under the Valhalla Guaranty pursuant to a Pledge Agreement between Enron and BT/Deutsche (the "Pledge Agreement")[428] and a Collateral Account Agreement between Enron, BT/Deutsche and Bankers Trust (the "Collateral Account Agreement").[429]

---

[425] See Promissory Note by Deutsche Bank AG (New York) in favor of Enron for $1.95 billion, May 2, 2000, at 4 [AB000140263-AB000140271]; Section 4, Enron Guaranty by Enron in favor of Deutsche Bank AG, May 2, 2000 [AB000140230-AB000140237].

[426] Section 4, Enron Guaranty by Enron in favor of Deutsche Bank AG, May 2, 2000 [AB000140230-AB000140237].

[427] See Promissory Note by Deutsche Bank AG (New York) in favor of Enron for $1.95 billion, May 2, 2000, at 4 [AB000140263-AB000140271]; Section 4, Enron Guaranty by Enron in favor of Deutsche Bank AG, May 2, 2000 [AB000140230-AB000140237].

[428] Pledge Agreement between Enron and Deutsche Bank AG, May 2, 2000 [AB000140244-AB000140251].

[429] Collateral Account Agreement among Deutsche Bank AG, Bankers Trust, and Enron, May 2, 2000 [AB000140252-AB000140262]. The Deutsche/Enron Note was delivered to Deutsche Bank to be held in a securities account.   Receipt from Bankers Trust to Enron, May 2, 2000 (acknowledging receipt of Deutsche/Enron Note from Enron) [AB000140297]. The Collateral Account Agreement contains a New York choice of law provision.   Section 8.03, Collateral Account Agreement among Deutsche Bank AG, Bankers Trust, and Enron, May 2, 2000 [AB000140252-AB000140262].

The structure of the Valhalla Transaction, as of December 12, 2000,[430] is shown in the following diagram:



Note: A bold outline indicates GAAP consolidated entities.

* The remaining 5% interest in Enron Valkyrie, LLC is owned by Enron Diversified Investments Corp. and has not been shown for the purposes of this diagram.

---

[430] The Deutsche/Enron Note was amended on December 12, 2000, to substitute the London office of Deutsche Bank AG for Deutsche Bank (New York) as the maker of the note. See Section 1, First Amendment to Promissory Note among Deutsche Bank AG (New York), Deutsche Bank AG (London), and Enron, Dec. 12, 2000 [AB000140819-AB000140828].

### B.    The Valhalla Setoff

On November 28, 2001, Standard & Poor's Corporation and Moody's Investors Services, Inc. downgraded Em-on's credit rating to below investment grade.[431] On November 28, 2001, BT/Deutsche sent a letter to Enron and Valhalla (the "November 28th Notice") notifying the parties of BT/Deutsche's purported exercise of its put right under the Put Option Agreement (the "Put Right") and specifying that the date of the put would be December 6, 2001.[432]

On November 29, 2001, BT/Deutsche sent a letter to Enron and Valhalla (the "November 29th Notice") notifying the parties that BT/Deutsche was "satisfying any and all amounts it owes or may in the future owe" under the Deutsche/Enron Note by setting off amounts owed to BT/Deutsche by Em-on "whether or not then due and payable and whether or not liquidated."[433] The November 29th Notice did not specify the amount of BT/Deutsche's purported setoff. Em-on filed a voluntary petition for relief pursuant to the Bankruptcy Code on December 2, 2001.

On December 5, 2001, BT/Deutsche sent Em-on notice of its election to terminate an interest rate swap evidenced by a confirmation dated May 2, 2000 (the "May 2000 Swap").[434] On December 6, 2001, BT/Deutsche sent a letter to Enron (the "December 6th

---

[431] *Enron Debt Cut to Junk Bond Status,* Agence France Presse, Nov. 28, 2001, *available at* LEXIS, News Library, Wires File; *Enron Ratings Downgraded to B2 from Baa3 – Moody's,* AFX News Limited, Nov. 28, 2001, *available at* LEXIS, News Library, Wires File.

[432] Letter from Calli Hayes, Deutsche Bank, and Brian J. McGuire, Deutsche Bank, to Valhalla GmbH and Enron, Nov. 28, 2001 (regarding Rheingold GmbH Participation Rights) [AB0785 03470-AB0785 034711.

[433] The November 29th Notice also stated that "[p]ursuant to the terms of the Structured Note, the set-off is effective simultaneously with the giving of this notice." Letter from Brian J. McGuire, Deutsche Bank, and Spring S. Hollis, Deutsche Bank, to Enron and Valhalla GmbH, Nov. 29, 2001 (regarding Set-Off Notice) [AB0785 03472-AB0785 034731.

[434] Facsimile from George Tyson, Deutsche Bank, to Steve Kessler, Deutsche Bank, Dec. 5, 2001, attaching Memorandum from David A. Sigler, Director, Deutsche Bank, and George E. Tyson, III, Vice

Notice") asserting that BT/Deutsche owed Enron $3,7 17,357.11 in respect of a settlement amount due on the May 2000 Swap.[435]

Also on December 6, 2001, BT/Deutsche sent a letter to Valhalla asserting that Valhalla owed BT/Deutsche $39,764,394.84 under the Valhalla Put Option after application of setoffs under the Valhalla Guaranty and the Deutsche/Enron Note.[436] On December 11, 2001, BT/Deutsche sent a letter to Em-on (the "December 1 1[th] Notice") notifying Enron that Enron owed BT/Deutsche $39,764,394.84 under the Valhalla Guaranty after application of setoffs by virtue of Valhalla's obligation under the Put Option Agreement.[437]

On October 15, 2002, BT/Deutsche filed a Proof of Claim with the Court, asserting several claims related to the Valhalla Transaction and Em-on's obligations under the Valhalla Guaranty (the "Valhalla Proof of Claim").[438] Pursuant to the Valhalla Proof of Claim, BT/Deutsche asserted a claim against Enron for $36,047,037.73 after application of various setoffs or recoupments.[439] The calculation reflected the reduction of the amount due and owing BT/Deutsche by virtue of calculation of the swap liability of BT/Deutsche to Enron as of December 6, 2001. According to Exhibit A to the

---

President, Deutsche Bank, Dec. 5, 2001 [DBG 090904-DBG 0909061; see *also* Memorandum from George E. Tyson, Deutsche Bank, and David E. Sisler, Deutsche Bank, to Enron, Dec. 6, 2001 [AB0785 034741.

[435] Memorandum from George E. Tyson, Deutsche Bank, and David E. Sisler, Deutsche Bank, to Enron, Dec. 6, 2001 [AB0785 034741.

[436] Letter from Spring S. Hollis, Deutsche Bank,, and Brian J. McGuire, Deutsche Bank, to Valhalla GmbH, Dec. 6, 2001 (regarding Set-Off) [AB0785 03476].

[437] Letter from Spring S. Hollis, Deutsche Bank, and Brian J. McGuire, Deutsche Bank, to Enron, Dec. 11, 2001 (regarding Enron Guaranty) [AB0785 03475].

[438] Proof of Claim of Deutsche Bank AG, filed against Enron in the amount of $138,351,706, Exhibit A [Claim No. 0000012797].

[439] Id.

Valhalla Proof of Claim, BT/Deutsche asserts that it had the right and exercised its right of setoff or recoupment on November 29, 2001.[440]

BT/Deutsche claims that Valhalla's failure to honor BT/Deutsche's rights under the Put Option Agreement caused Enron to become liable to BT/Deutsche under the Valhalla Guaranty for a debt of $2,158,277,777.78 (the "Valhalla Claim").[441] BT/Deutsche claims that, on or about November 29, 2001, it setoff or recouped $2,118,513,382.94 against the Valhalla Claim, the amount of BT/Deutsche's obligation to Enron under the Deutsche/Enron Note.[442] BT/Deutsche also claims that it setoff or recouped $3,717,357.11 against the Valhalla Claim, the amount due and owing by BT/Deutsche to Enron under the May 2000 Swap.[443]

### C.    Bankruptcy Issues **Relating to the Valhalla Setoff**

*Introduction  and  Overview*

The timing and effectiveness of BT/Deutsche's purported setoff of its obligations under the Deutsche/Enron Note and the May 2000 Swap against the Valhalla Claim may be a significant issue in Enron's Bankruptcy Case. Unless the setoff was effective before the Petition Date, BT/Deutsche's purported setoff violated the automatic stay and is void. In that event, as discussed below, there is some support for the proposition that setoff, which is an equitable remedy, should be denied, Although the remedy of recoupment, unlike setoff, is not subject to the automatic stay, the Examiner concludes that the doctrine of recoupment probably does not apply.

---

[440] *Id.*

[441] *Id.*

[442] *Id.*

[443] *Id.*

If setoff is denied, BT/Deutsche would retain its position as a secured creditor by virtue of the pledge of the Deutsche/Enron Note. If BT/Deutsche's secured claims were equitably subordinated, Section 510(c)(2) of the Bankruptcy Code would authorize the entry of an order to transfer the lien on the Deutsche/Enron Note to Em-on's estate.[444]

The Examiner concludes that Enron's estate has a reasonable basis to assert a claim that BT/Deutsche's purported setoff violated the automatic stay.

*Application of the Automatic Stay to Setoff Rights*

Notwithstanding the general rule that setoff rights are preserved in bankruptcy, the automatic stay prohibits a creditor from setting off obligations in bankruptcy without first obtaining relief from the stay.[445] Most courts, including the Second Circuit Court of Appeals, have held that actions taken in violation of the automatic stay are void and without effect.[446] Moreover, creditors that "willfully" violate the automatic stay may be subjected to actual damages, including attorney's fees and, in appropriate circumstances, punitive damages.[447]

---

[444] 11 U.S.C. § 510(c)(2).

[445] Section 362 of the Bankruptcy Code provides in relevant part that a bankruptcy petition "operates as a stay, applicable to all entities, of. . . (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." 11 U.S.C. § 362(a)(7).

[446] *See 48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.),* 835 F.2d 427 (2d Cir. 1987).

[447] See 11 U.S.C. § 362(h). There is a split of authority as to whether a corporate debtor may recover punitive damages pursuant to 11 U.S.C. § 362(h). *See Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.),* 920 F.2d 183, 186-87 (2d Cir. 1990) ("We now hold that a bankruptcy court may impose sanctions pursuant to § 362(h), under the standard set out in *Crysen/Montenay,* only for violating a stay as to debtors who are natural persons. For other debtors, contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay."); Jove *Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.),* 92 F.3d 1539, 1551 (11th Cir. *1996*) (same); *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.),* 108 F.3d *881,* 884 (8th Cir. 1997) (same); *Johnston Envtl. Corp. v. Knight (In re Goodman),* 991 F.2d 613, 619 (9th Cir. 1993) (same). *Contra Cuffee v. Atl. Bus. & Cmty Dev. Corp. (in re Atl. Bus. & Cmty. Corp.),* 901 F.2d 325, 329 (3d Cir. 1990) (holding without explanation that § 362(h) applies to corporate debtors as well as individual debtors); *Budget Serv. Co. v. Better Homes of Va., Inc.,* 804 F.2d 289, 292 (4th Cir. 1986) (same).

BT/Deutsche has not sought relief from the automatic stay to authorize its setoff. Consequently, if BT/Deutsche's purported setoff of its obligations under the Deutsche/Enron Note and the May 2000 Swap were not effective as of December 2, 2001 (the Petition Date), actions taken by BT/Deutsche to setoff those obligations are void and may give rise to a cause of action in favor of Enron against BT/Deutsche for violating the automatic stay.  In addition, BT/Deutsche would need to seek approval to effect a postpetition setoff under Sections 362(d) and 553 of the Bankruptcy Code by seeking relief from the automatic stay.[448]

A creditor's right of setoff is a permissive right, and the exercise of a right of setoff is within the discretion of the court.[449]  There is a split of authority among the courts as to whether a bankruptcy court may permanently deny an otherwise valid right of setoff where a creditor has violated the automatic stay.

Some courts have held that it is inappropriate for a bankruptcy court to deny a right of setoff under any circumstances.[450]  Other courts, however, have applied a

---

[448] 11 U.S.C. §§ 362(d) and 553.

[449] *Cumberland Glass Mfg. Co. v. Dewitt, 237* U.S. 447, 454-55 (1915) (noting that Section 68a of the Bankruptcy Act, the Bankruptcy Act's provision controlling offsets, was "permissive rather than mandatory, and does not enlarge the doctrine of set-off, and *cannot be invoked in cases where the general principles of set-off would not justify it*.  The matter is placed within the control of the bankruptcy court, which exercises its discretion in these cases upon the general principles of equity.") (citation omitted) (emphasis added); *Newberry Corp. v. Fireman's Fund Ins. Co., 95* F.3d 1392, 1399 (9th Cir. 1996) ("The right of setoff is permissive, not mandatory; its application 'rests in the discretion of [the] court, which exercises such discretion under general principles of [equity].'"); *DuVoisin v. Foster (In re S. Indus. Banking Corp.),* 809 F.2d 329, 332 (6th Cir. 1987) ("The application of setoff, however, is permissive and lies within the equitable discretion of the trial court.").

[450] *United States v. Ruff (In re Rush-Hampton Indus., Inc.),* 98 F.3d 614, 616 (1 Ith Cir. 1996) (holding that harmless violation of the automatic stay did not justify denying Government's right to setoff of accruing postpetition interest against postpetition tax refund, the court reasoned  "[n]owhere does this statute give the Bankruptcy Court the authority to deny all or part of a setoff in lieu of damages simply because the creditor initially violated the automatic stay"); *United States v. Jones (In re Jones),* 230 B.R. 875, 882-83 (M.D. Ala. 1999) (holding that the IRS' failure to move for stay relief to offset non-dischargeable tax debt against refund obligation was a harmless violation of the stay and did not justify permanent denial of the IRS' right of setoff even if such violation was willful); *Weems v. United States (In re Custom Ctr., Inc.),* 163 B.R. 309, 318 (Bankr. E.D. Term. 1994) (holding that creditor's technical violation of the automatic stay by

balancing test to determine whether a creditor's right of setoff should be denied, taking

into account the effect of the stay violation and whether the stay violation was

inadvertent.[451]

Other bankruptcy courts, including a number of decisions out of the Bankruptcy

Court for the Southern District of New York, have held that a "bankruptcy court should

deny a setoff to those creditors who have violated the automatic stay."[452] Under this line

---

failing to put freeze codes in its computers did not justify denying the creditor's right of offset, and holding in dicta that "[t]he court doubts that violating the automatic stay is enough by itself to bar setoff on equitable grounds"); *Teamsters Credit Union v. Lee (In re Lee),* 40 B.R. 123, 127 (Bankr. E.D. Mich. 1984) ("The court may invalidate any action taken in violation of the stay . . . [V]iolation of the section 362(a)(7) stay, however, does not deprive a creditor of any substantive rights in a fund held subject to setoff.") (citations omitted); *see also Gribben v. United States (In re Cribben),* 158 B.R. 920, 924-25 (S.D.N.Y. 1993) (vacating and remanding bankruptcy court's decision denying creditor's right of offset on the basis that the creditor's claim was dischargeable, holding in dicta that there would be no reason to deny the offset where the creditor subsequently moved for stay relief to permit the offset); *In re Shortt,* 277 B.R. 683, 693-94 (Bankr. N.D. Tex. 2002) (refusing to deny creditor's right of setoff due to stay violation where neither the debtor nor any other party in interest was prejudiced by the subject setoff, and granting creditor's motion for relief from the automatic stay *nunc pro tunc* to validate setoff); *cf. First Union v. Abbey Fin. Corp. (In re Abbey Fin. Corp.),* 193 B.R. 89, 93 (Bankr. D. Mass. 1996) (reversing postpetition setoff and refusing to retroactively validate setoff notwithstanding creditor's lack of knowledge of debtor's bankruptcy, but setting a hearing to determine the scope of the creditor's setoff rights).

[451] *See In re Bourne,* 262 B.R. 745, 759-60 (Bankr. E.D. Tenn. 2001) (recognizing split of authority as to whether the right of setoff should be denied when a creditor has violated the automatic stay, and upholding creditor's right of setoff where no third party creditor's would be prejudiced, creditor's stay violation was inadvertent, and creditor's violation was attributable to the debtor's failure to properly schedule the creditor); *United States v. Morgan (In re Morgan),* 196 B.R. 758, 762 (E.D. Ky. 1996) ("Although the Court cannot condone the failure of the United States to timely seek an exemption from the automatic stay before setting off, the Court is unconvinced that equity commands that the I.R.S. forfeit the setoff that it would otherwise be entitled to under 11 U.S.C. § 553. Where a tax refund is the sole asset in the estate, the primary prejudice which would be caused by any such delay, separate from the need of the Trustee to hire counsel, would be to the I.R.S."); *Kroh Operating Ltd. P'ship v. Burnett Bank (In re Kroh Bros. Dev. Co.),* 101 B.R. 114, 118-19 (Bankr. W.D. Mo. 1989) (holding that innocent and technical violation of the automatic stay did not invalidate creditor's otherwise valid right of setoff, "[i]n such circumstances, it makes little difference whether the Court declares the initial exercise invalid and then allows the creditor to re-exercise his right of setoff or the Court simply allows the initial setoff to stand notwithstanding the technical violation of the stay."); *Harbaugh v. United States (In re Harbaugh),* No. CIV. 89-1540, 1989 WL 139254, at *3-*5 (W.D. Pa. Oct. 13, 1989) (reversing the bankruptcy court's order compelling the IRS to return a tax refund to the debtor, which was subject to valid right of setoff; the court reasoned that the equities did not favor denying the IRS' right of setoff because the IRS had not received notice of the debtor's petition, that in a Chapter 7 case a stay violation by a secured creditor is less egregious than a violation by an unsecured creditor, and that the IRS would have been entitled to stay relief in the first right), *aff'd,* 902 F.2d 1560 (3d Cir. 1990).

[452] *Official Comm. of Unsecured Creditors v. N.Y. Dep't of State (In re Operation Open City, Inc.),* 148 B.R. 184, 194 (Bankr. S.D.N.Y. 1992) (holding that the New York Department of State was required to turnover funds owed to a Chapter 11 debtor, which the New York Department of State had setoff

of authority, if BT/Deutsche's purported setoff of its obligations under the Deutsche/Enron Note and the May 2000 Swap violated the automatic stay, Enron would have grounds to argue that BT/Deutsche's right of setoff should be denied altogether.

### D.     Analysis of Evidence

The question of whether a setoff has occurred for purposes of determining whether a creditor has violated the automatic stay by exercising its setoff rights is a matter of federal law.[453] The Supreme Court has held that a setoff occurs for bankruptcy purposes when the following three steps are taken "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff."[454]

---

postpetition against amounts that the debtor owed under unrelated contracts; the court reasoned "[a]s one of my colleagues in this District has held, in the exercise of its discretion a 'bankruptcy court should deny a setoff to those creditors who violate the automatic stay.' In view of the State's violation of the automatic stay, the State must now turnover the Disputed Funds to the Debtor pursuant to § 542(a) of the Code. To do otherwise would have the practical effect of holding that there is an automatic right of setoff.") (quoting *Blava In-Line, Inc. v. Midlantic Nat'l Bank/North (In re Blava In-Line, Inc.),* 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991)), *aff'd,* 170 B.R. 818, 825 (S.D.N.Y. 1994); *Blava In-Line, Inc. v. Midlantic Nat'l Bank/North (In re Blava In-Line, Inc.),* 133 B.R. 33, 36-38 (Bankr. S.D.N.Y. 1991) (citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.),* 882 F.2d 615, 618 (2d Cir. 1989) (holding that a Chapter 11 debtor was entitled to recover the proceeds of a sale of debtor's property, which a creditor had offset post-petition against a loan to the debtor's principal, notwithstanding the fact that the parties had contractually agreed to the offset; the court reasoned that the creditor's actions were in blatant violation of the automatic stay and a standing cash collateral order which prohibited the offset); *Shugrue v. Fischer (In re Ionosphere Clubs, Inc.),* 164 B.R. 839, 844 (Bankr. S.D.N.Y. 1994) (administrative freeze case noting in dicta that "a bankruptcy court should deny a setoff to those creditors who violate the automatic stay" and ordering the government to turnover funds held in an airline fund previously withheld as a setoff); *Charter Crude Oil Co. v. Exxon Co., U.S.A. (In re Charter* Co.), 103 B.R. 302, 305 (M.D. Fla. 1989) ("The bankruptcy court is justified in denying a setoff to those creditors who violate the automatic stay . . . [f]urthermore . . . [a] creditor's setoff privilege is waived if the creditor fails to obtain bankruptcy court approval prior to confirmation of the debtor's plan of reorganization."); *cf. Shugrue v. Chem. Bank, Inc. (In re Ionosphere Clubs, Inc.),* 177 B.R. 198, 208-09 (Bankr. S.D.N.Y. 1995) (administrative freeze case allowing right of setoff notwithstanding stay violation, but reducing right of setoff by trustee's expenses in turnover action).

[453] *Citizens Bank v. Stumpf,* 516 U.S. 16, 19 (1995) ("But even if state law were different, the question whether a setoff *under* § 362(a)(7) has occurred is a matter of federal law, and other provisions of the Bankruptcy Code would lead us to embrace the same requirement of an intent permanently to settle accounts.").

[454] *Citizens Bank v. Stumpf,* 516 U.S. 16, 19 (1995).

Although the evidence shows that BT/Deutsche made a decision prior to the Petition Date to effectuate a setoff, there is evidence from which a fact-finder could conclude that the other steps necessary for the setoff to occur-the taking of some action to accomplish the setoff and a recording of the setoff-did not occur until after the Petition Date. On December 2, 2001, the Petition Date, a representative of BT/Deutsche was aware that Enron had filed under Chapter 11 that morning.[455]

BT/Deutsche purported to exercise its Put Right on November 28, 2001 .[456] The November 28th Notice specified that the date of the put would be December 6, 2001, four days after the Petition Date.[457] The next day, November 29, 2001, BT/Deutsche notified Em-on and Valhalla that it was satisfying any and all amounts owed by BT/Deutsche to Em-on under the Deutsche/Enron Note by setting off amounts owed by Em-on to BT/Deutsche under the Valhalla Guaranty "whether or not then due and payable and whether or not liquidated."[458]

The fact that the exact amount of the setoff was not known prior to the Petition Date is evidence that BT/Deutsche did not complete the actions necessary to accomplish the setoff and to record the setoff prior to the Petition Date. Neither the November 28th Notice nor the November 29th Notice specifies the liquidated amount due and owing from

---

[455] McGuire Sworn Statement, at 452-53.

[456] Letter from Calli Hayes, Deutsche Bank, and Brian J. McGuire, Deutsche Bank, to Valhalla GmbH and Enron, Nov. 28, 2001 (regarding Rheingold GmbH Participation Rights) [AB0785 03470-AB0785 034711; McGuire Sworn Statement, at 429-30.

[457] Letter from Calli Hayes, Deutsche Bank, and Brian J. McGuire, Deutsche Bank, to Valhalla GmbH and Enron, Nov. 28, 2001 (regarding Rheingold GmbH Participation Rights) [AB0785 03470-AB0785 034711.

[458] Letter from Brian J. McGuire, Deutsche Bank, and Spring S. Hollis, Deutsche Bank, to Enron and Valhalla GmbH, Nov. 29, 2001 (regarding Set-Off Notice) [AB0785 03472-AB0785 034731; McGuire Sworn Statement, at 435-36.

BT/Deutsche to Enron or from Enron to BT/Deutsche under the Deutsche/Enron Note, the Put Option Agreement, the Valhalla Guaranty, or the Valhalla Derivatives.

Accordingly, while BT/Deutsche purported to effect the setoff on November 29, 2001, the documentary evidence reviewed by the Examiner does not establish that BT/Deutsche completed calculating the amount of the offset prior to the Petition Date. BT/Deutsche's accounting records indicate that the amounts due from Enron under the Valhalla Derivatives entered into in connection with the Valhalla Transaction were not calculated prior to December 2, 2001.[459] An internal BT/Deutsche email sent on the afternoon of December 1, 2001, contained an incorrect calculation of the amount of the setoff, and establishes that the amount of the setoff was not finally determined until some later time.[460]

At various times during the week of November 26, 2001, and continuing after the Petition Date (December 2, 2001), BT/Deutsche made repeated attempts to calculate the amounts due and owing under the contractual agreements.[461]  In an email dated December 1, 2001, a BT/Deutsche representative described the "Valhalla Unwind" as being calculated as of December 6, 2001, and calculated interest due to Enron through and including December 6, 2001.[462] Further, this email noted that BT/Deutsche notified

---

[459] See McGuire Sworn Statement, at 471-77 and 487-90; Structure Capital Markets, Schedule of "Total Position in DB," (attaching schedules for Project Valhalla Cashflows, Unwind T-Accounts and Interest Expense Accrual) [DBF 026689-DBF 0266931; Valhalla Unwind, Balance Sheet and Income Statement, undated [DBF 0267121; Structure Capital Markets, Schedule of "Total Position in DB," (with attached schedule of current MTM Option) [DBH 000530-DBH 0005341; Email from Nicholas Hides, Deutsche Bank, to Brian McGuire, Deutsche Bank, *et al.*, Dec. 1, 2001 (regarding Draft – Valhalla unwind (Enron)) [DBF 0437 15-DBF 0437261.

[460] Email from Nicholas Hides, Deutsche Bank, to Brian McGuire, Deutsche Bank, *et al.*, Dec. 1, 2001 (regarding Draft – Valhalla unwind (Enron)) [DBF 043715-DBF 0437261.

[461] McGuire Sworn Statement, at 450-5 1 and 487-90.

[462] Email from Nicholas Hides, Deutsche Bank, to Brian McGuire, Deutsche Bank, *et al.*, Dec. 1, 2001 (regarding Draft – Valhalla unwind (Enron)) [DBF 043715-DBF 0437261.

Enron of the setoff on November 29, 2001, and that the amounts due from Enron (or Valhalla) would be calculated through December 6, 2001, with additional accruals running from November 30, 2001, in the amount of $2,556,665.67, at a minimum.[463] Other internal documents of BT/Deutsche indicate that the purported setoff was effected in a series of intercompany/interbank entries that reflect the fact that BT/Deutsche was required to translate the "payment" in dollars to Deutsche Marks and/or Euros as of December 6, 2001.[464]

Because the "net exposure" of Enron depended, in part, on the Valhalla Derivatives and on the May 2000 Swap, it was not possible to determine, with precision, the amounts due and owing to Enron and the amounts due and owing from Enron until the May 2000 Swap and Valhalla Derivatives were terminated.[465]    BT/Deutsche terminated the May 2000 Swap on December 6, 2001, by sending Enron notice of its election to terminate on December 5, 2001.[466]    The amounts finally determined were "settled" as of noon on December 6, 2001, four days after the Petition Date, and were set forth in the December 6th Notice and the December 1 1th Notice.[467] The computation of the net amount owed by Enron was not "finalized" until December 6, 2001.[468]

---

[463] *Id.*

[464] McGuire Sworn Statement, at 470-71; *see also* Valhalla Unwind, Balance Sheet and Income Statement, undated [DBF 026712].

[465] McGuire Sworn Statement, at 474-75 and 477.

[466] Facsimile from George Tyson, Deutsche Bank, to Steve Kessler, Deutsche Bank, Dec. 5, 2001, attaching Memorandum from David A. Sigler, Director, Deutsche Bank, and George E. Tyson, III, Vice President, Deutsche Bank, Dec. 5, 2001 [DBG 090904-DBG 0909061; see also Memorandum from George E. Tyson, Deutsche Bank, and David E. Sisler, Deutsche Bank, to Enron, Dec. 6, 2000 [AB0785 034741.

[467] Letter from Spring S. Hollis, Deutsche Bank, and Brian J. McGuire, Deutsche Bank, to Valhalla GmbH, Dec. 6, 2001 (regarding Set-Off) [AB0785 03476]; Letter from Spring S. Hollis, Deutsche Bank, and Brian J. McGuire, Deutsche Bank, to Enron, Dec. 11, 2001 (regarding Enron Guaranty) [AB0785 034751; McGuire Sworn Statement, at 47 1-72.

[468] McGuire Sworn Statement, at 47 1-72.

As noted previously, the Supreme Court has held that to effectuate a right of setoff, a party must (1) make a decision to effectuate a setoff, (2) take some action accomplishing the setoff and (3) record the setoff.[469] These steps are necessary to evidence the intent to permanently settle accounts for the purposes of Section 362(a)(7) of the Bankruptcy Code. Although few cases discuss in detail the precise elements of each of these requirements, there is support for the proposition where the creditor/offsetting party could not determine the amount of the claim of the debtor against the creditor/offsetting party as of the petition date, the offset could not have been effected.[470]

In this case, amounts continued to accrue after the purported setoff under both the Participation Rights Agreement and the Deutsche/Enron Note. Two days after the purported setoff, an internal BT/Deutsche email noted that Deutsche Bank (Frankfurt) "are [sic] due to receive U.S.D. $36,668,436.00 from Valhalla (Enron entities)."[471] That amount, which was incorrectly calculated as of the time, was subsequently changed to reflect the amounts that could not be calculated precisely until December 6, 2001.[472] Accordingly, the evidence contradicts the position that BT/Deutsche's purported setoff

---

[469] Citizens Bank v. Strumpf, 516 U.S. 16, 19 (1995).

[470] See McCarty v. Nat'l Bank of Alaska, N.A. (In re United Marine Shipbuilding, Inc.), 158 F.3d 997 (9th Cir. 1998) (creditor, an agency of the United States, could not yet exercise its setoff against a tax refund because the IRS had not yet determined the amount of the tax refund owing to the debtor); see also United States v. NBD Bank, N.A., 922 F.Supp. 1235 (E.D. Mich. 1996) (setoff occurred because creditor accepted funds and reduced the debt by the amount of the payment and the reduction in debt was recorded by the creditor and appears in its account statements).

[471] Email from Nicholas Hides, Deutsche Bank, to Brian McGuire, Deutsche Bank, et al., Dec. 1, 2001, at DBF 043716 (regarding Draft    Valhalla unwind (Enron)) [DBF 043715-DBF 0437261. As noted previously, the December 1, 2001 iteration of the calculation of the debt owing to Enron and debt owing from Enron was a draft and did not reflect the actual amounts owing between the parties. McGuire Sworn Statement, at 490-91.

[472] McGuire Sworn Statement, at 474-75 and 477.

was effected and finally recorded as of November 29, 2001 (or indeed, prior to the Petition Date).

BT/Deutsche knew of Enron's bankruptcy filing on Sunday, December 2, 2001.[473] Nevertheless, BT/Deutsche's internal accounting memoranda and other records show continuing recalculation and discussion after the Petition Date over the amount due and owing to Enron and the amount due and owing from Enron in connection with the Valhalla Transaction.[474] Accordingly, the Examiner concludes that there is sufficient evidence for a fact-finder to conclude that BT/Deutsche did not accomplish and record the setoff prior to the Petition Date because it had not established, as of the Petition Date, precisely how much was owed by Enron to BT/Deutsche, nor how much was owed by BT/Deutsche to Enron.

As noted above, some bankruptcy courts, including a number of decisions out of the Bankruptcy Court for the Southern District of New York, have held that a bankruptcy court should deny a setoff to creditors who have violated the automatic stay.[475] Under this line of authority, if BT/Deutsche's purported setoff violated the automatic stay, Enron would have grounds to argue that BT/Deutsche's right of setoff could be denied.

---

[473] *Id.* at 452-53.

[474] See Proof of Claim of Deutsche Bank AG, filed against Enron in the amount of $138,35 1,706, Exhibit A [Claim No. 0000012797]; Structure Capital Markets, Schedule of "Total Position in DB," Dec. 6, 2001 (attaching schedules for Project Valhalla Cashflows, Unwind T-Accounts and Interest Expense Accrual) [DBF 026689-DBF 0266931; Valhalla Unwind, Balance Sheet and Income Statement, undated [DBF 0267121; Structure Capital Markets, Schedule of "Total Position in DB," Dec. 6, 2001 (with attached schedule of current MTM Option) [DBH 000530-DBH 000534]; Email from Nicholas Hides, Deutsche Bank, to Stuart McFarlane, Deutsche Bank, Nov. 29, 2001 (regarding Valhalla trades) [DBF 043637-DBF 04365 1]; Email from Nicholas Hides, Deutsche Bank, to Brian McGuire, Deutsche Bank, et al., Dec. 1, 2001 (regarding Draft-Valhalla unwind (Enron)) [DBF 043715-DBF 0437261.

[475] *Official Comm. of Unsecured Creditors v. N.Y. Dep't of State (In re Operation Open City, Inc.), 148* B.R. 184, 193-94 (Bankr. S.D.N.Y. 1992), *aff'd,* 170 B.R. 818, 825 (S.D.N.Y. 1994), *citing Blava In-Line, Inc. v. Midlantic Nat'l Bank/North (In re Blava In-Line, Inc.),* 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991), *citing MNC Commercial Corp. v. Joseph T. Ryerson & Son, 882* F.2d 615, 618 (2d Cir. 1989).

Exercise of a right of setoff is within the discretion of the court.[476] At the same time, however, the doctrine of setoff "has long occupied a favored position in our history of jurisprudence" and the Second Circuit "has repeatedly favored the allowance of setoffs."[477] The Second Circuit has held that:

> The rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be 'unjust.' It is a rule that has been embodied in every bankruptcy act the nation has had, and creditors, particularly banks, have long acted in reliance upon it.[478]

The Second Circuit has also stated that it is:

> reluctant to disturb this policy unless compelling circumstances require it. A decision disallowing a setoff must not be made cavalierly. The statutory remedy of setoff should be enforced unless the court finds after due reflection that allowance would not be consistent with the provisions and purposes of the Bankruptcy Act as a whole.[479]

---

[476] *Cumberland Glass Mfg. Co. v. DeWitt*, 237 U.S. 447, 454-55 (1915) (holding that, Section 68a of the Bankruptcy Act, the Bankruptcy Act's provision controlling offsets, was "permissive rather than mandatory, and does not enlarge the doctrine of set-off, and *cannot be invoked in cases where the general principles of set-off would not justify it.* The matter is placed within the control of the bankruptcy court, which exercises its discretion in these cases upon the general principles of equity.") (citations omitted) (emphasis added); *Newberry Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1399 (9th Cir. 1996) ("The right of setoff is permissive, not mandatory; its application 'rests in the discretion of [the] court, which exercises such discretion under the general principles of [equity].'"); *DuVoisin v. Foster (In re S. Indus. Banking Corp.)*, 809 F.2d 329, 332 (6th Cir. 1987) ("The application of setoff, however, is permissive and lies within the equitable discretion of the trial court.").

[477] *Bohack Corp. v. Borden, Inc. (In re Bohack Corp.)*, 599 F.2d 1160, 1164-65 (2d Cir. 1979).

[478] *N.J. Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952, 957-58, 961-63 (2d Cir. 1978) (citation omitted) (holding that the trustee had failed to satisfy his burden of proof that the bank was estopped from asserting a right of setoff against the debtor's deposit account; the trustee failed to establish that the subject account was a special account (thereby defeating mutuality between the parties) or that the proceeds in the account could not be withdrawn by the debtor (indicating that the subject funds were transferred to the bank and thereby subject to attack as a preference)); *In re Williams*, 422 F. Supp. 342, 345 n. 4 (N.D. Ga. 1976) ("In exceptional circumstances the court may deny altogether the right of setoff. Such action would be rare, however, and subject to review by the district court for abuse of discretion.") (citation omitted).

[479] *In re Bohack Corp.*, 599 F.2d at 1165 (lower court's order, in an antitrust suit against the creditor, dismissing and deferring (pursuant to Rule 11-44 of the Bankruptcy Act) creditor's counterclaim of setoff based on goods sold and delivered to debtor was an abuse of discretion.); *Burton v. United States (In re Selma Apparel Corp.)*, 155 B.R. 241, 244 (Bankr. S.D. Ala. 1992) (rejecting trustee's argument that the United States was not entitled to setoff unreasonably filed proof of claim, reasoning "[u]nless inconsistent with the bankruptcy laws as a whole, setoff should be permitted.").

Most cases in which courts have exercised discretion to deny setoff outright have involved creditors who engaged in illegal or fraudulent conduct.[480] For example, bankruptcy courts have held that a creditor may not maintain a valid right of setoff when the creditor has misappropriated or converted the debtor's property,[481] or where a creditor, such as a bank, seeks to exercise a setoff right against funds held by the debtor for the benefit of third parties, such as funds in an employee payroll account[482] or in an account designated for certain other creditor claims.[483] Bankruptcy courts also have held that a creditor may not offset a prepetition claim against a debt that is punitive in nature and arises out of a federal or state statute.[484] Moreover, bankruptcy courts have denied a

---

[480] *In re Blanton*, 105 B.R. at 337; *S. Cent. Livestock Dealers, Inc. v. Sec. State Bank of Hedley*, 551 F.2d 1346 (5th Cir. 1977) (when depositor was likely solvent but nonetheless bank, fearing impending insolvency, setoff deposits of depositor, including some deposits the bank knew were segregated for the benefit of depositor's customers, banks setoff rights were denied due to its conduct).

[481] *See Ark. Fuel Oil Co. v. Leisk*, 133 F.2d 79, 80-81 (5th Cir. 1943) (creditor was not entitled to offset balance due under an open account against trustee's claim against the creditor for wrongful conversion of 8,000 barrels of oil); *Windsor Communications Group, Inc. v. Havertown Printing Co.* (*In re Windsor Communications Group, Inc.*) 79 B.R. 210, 216 (E.D. Pa. 1987) (creditor was not entitled to offset value of wrongfully converted paper stock against prepetition claim against the debtor, the court held that "it is well established that, when the creditor's claim for setoff is premised upon willful conversion of the Debtor's property, setoff must be denied. This is because there is no *valid* right to setoff where conversion has occurred.") (citations omitted).

[482] *Sisk v. Saugus Bank & Trust Co.* (*In re Saugus Gen. Hosp., Inc.*), 698 F.2d 42, 47 (1st Cir. 1983) (citing cases).

[483] *Bridgeport Co. v. United States Postal Serv.*, 39 B.R. 118, 128-30 (Bankr. E.D. Ark. 1984).

[484] *See McCollum v. Hamilton Nat'l Bank of Chattanooga*, 303 U.S. 245, 248-49 (1938) (bank was not entitled to setoff prepetition claim against trustee's penalty claim against the bank for its receipt of usurious interest); *Riggs v. Gov't Employees Fin. Corp.*, 623 F.2d 68, 74-75 (9th Cir. 1980) (denying creditor's right of setoff against trustee's claim against the creditor for violating the Truth-in-Lending Act, reasoning that allowing lenders to setoff Truth-in-Lending awards would eliminate the incentive for bankruptcy trustees to bring such claims and would "eliminate the punitive effect of the Act"); *Newton v. Beneficial Fin. Co.*, 558 F.2d 731, 732 (5th Cir. 1977) (same); *Palmer v. Doull Miller Co.*, 233 F. 309, 312-313 (S.D.N.Y. 1916) (debtor's prepetition factor was not entitled to offset unpaid account balance against trustee's claim that factor had received unlawful commissions from the debtor in violation of New York penal law). The court held:

> In the first place, I am of the opinion that the set-off alleged by defendant is not in the same right and does not fall within the provisions of section 68 of the bankruptcy statute. *But I need not stop to discuss this point in detail, because I can put my conclusion upon much broader grounds.* In my opinion, a court of equity should not permit a set-off of this kind, where the party urging the set-off has been guilty of the violation of a penal law

creditor's right of setoff when the creditor has engaged in fraudulent[485] or inequitable conduct.[486]

The Examiner has concluded that there is evidence from which a fact-finder could conclude that BT/Deutsche violated the automatic stay. In addition, the Examiner has concluded that there is sufficient evidence for a fact-finder to conclude that BT/Deutsche engaged in inequitable conduct in connection with acting as a conduit for the sale of the

---

and of the kind of conduct which is morally unsound and tends to undermine the integrity of modern business. To permit such a set-off would amount to an encouragement of practices of this character. If this defendant can in effect escape its wrongdoing by setting off the debt due it, when other creditors must take their chances by proving their claims in bankruptcy, the honest merchant may well inquire how it is that courts postpone him until the dishonest merchant escapes the consequences of his wrongdoing.

233 F. 309, at 312-13 (citation omitted) (emphasis added).

[485] *See Geremia v. N. Atl. Fishing, Inc. (In re Reposa),* 186 B.R. 775, 780 (Bankr. D.R.I. 1995) (creditor was not entitled to offset proof of claim against compensatory and punitive damages awarded to the debtors arising out of fraudulent boat sale. The court held "[b]ased upon 11 U.S.C. § 553, and in light of [the creditor's] fraudulent and willful misconduct, we conclude, as a matter of law, that setoff is not available to him in this case." The court reasoned that "'[e]quity may override a creditor's satisfaction of technical statutory requirements [of § 553].'"); *Brower v. Rosen,* 56 B.R. 214, 217-18 (D. Mass. 1985) (former president of the debtor was not entitled to setoff various sums owed arising out of his employment with the debtor against debtor's claims alleging "tortious, fraudulent or similar unlawful conduct on the part of [the president]," including claims of conversion, misrepresentation, deceit, breach of fiduciary duty, and Chapter 156B liability); *Palmer v. Stokely (In re Blue Bonnet Disc. Stamp Co.),* 259 F. Supp. 776, 780 (W.D. Okla. 1966) (creditors were not entitled to setoff claim vis-A-vis alter ego corporation against obligations owing from the creditors based on a breach of the creditors' fiduciary duties to the debtor, reasoning "[i]n equity a creditor guilty of a fraudulent transaction toward the Bankrupt should not by set-off receive full payment on a claim when other creditors who have not acted fraudulently toward the Bankrupt must receive less by sharing pro-rata in what is left.").

[486] *See United States v. Arkison (In re Cascade Roads, Inc.),* 34 F.3d 756, 762-66 (9th Cir. 1994) (holding that the Government was not entitled to setoff a Chapter 7 debtor's tax liability against a judgment entered against the Government in Claims Court, reasoning that the Government's bad-faith and inequitable conduct, including stonewalling discovery and withholding documents that corroborated the debtor's claim, precluded the Government's right of setoff); *In re Am. Sunlake Ltd. P'ship,* 109 B.R. 727, 731-33 (Bankr. W.D. Mich. 1989) (denying a creditor's right of setoff with respect overpayments made on behalf of the debtor in connection with a multi-party real estate transaction against the debtor's breach of contract claim against the creditor for refusing to accept a reconveyance of the subject property. The court noted in dicta that, even if the conditions precedent to a valid offset were present, the creditor was not entitled to an offset since the creditor was oversecured and the creditor's "breach of contract and inequitable conduct prohibit[ed] [the creditor] from seeking equity to obtain a setoff considering the facts of this case."); *Omaha Nat'l Bank v. T&T Parts Warehouse, Inc. (In re T&T Parts Warehouse, Inc.),* 39 B.R. 399 (Bankr. W.D. Mich. 1984) (bank learned of debtor's check kiting scheme, and then waited for debtor's deposits with bank to build up before setting deposits off against other claims held by bank against debtor; bank's delay in exercising setoff rights to improve its position was sufficient grounds to deny it a right of setoff).

Cochise Planes and in connection with its promotion and participation in the BT/Deutsche Tax Transactions. Such inequitable conduct, however, is unrelated to the Valhalla Transaction. Nevertheless, because there is evidence that BT/Deutsche engaged in inequitable conduct in connection with other transactions with Enron, and because setoff is permissive, the Debtors may be able to argue, and it would be within the discretion of a court to decide, whether those circumstances should be considered or should be sufficient to deny BT/Deutsche's setoff as a matter of equity, notwithstanding the technical validity of BT/Deutsche's setoff right.

### E.     Recoupment

The notices sent by BT/Deutsche to Enron in November and December of 2001 did not assert a right to "recoup" amounts owed to Em-on against amounts owed by Enron. BT/Deutsche apparently first raised the issue of recoupment (as distinct from setoff) in October 2002 in the Valhalla Proof of Claim. According to the Valhalla Proof of Claim, on or about November 29, 2001, Deutsche setoff or recouped $2,118,513,382.94 of its obligations to Enron under the Deutsche/Enron Note against the Valhalla Guaranty, and further setoff or recouped $3,717,357.11 of its obligations under the May 2000 Swap against the Valhalla Guaranty.[487]

An examination of state law is required in order to determine the ability of BT/Deutsche to recoup its obligations.[488]     Because the Deutsche/Enron Note, the May

---

[487] Proof of Claim of Deutsche Bank AG, filed against Enron in the amount of $138,351,706, Exhibit A [Claim No. 0000012797].

[488] *N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997) ("'Recoupment and setoff rights are determined by nonbankruptcy law, which ordinarily is state law.'") (quoting *In re Village Craftsman*, 160 B.R. 740,746 (Bankr. D.N.J. 1993).

2000 Swap and the Valhalla Guaranty all contain a New York choice of law provision,[489]

New York law should govern BT/Deutsche's recoupment rights.["]

The New York Court of Appeals has held:

> Recoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered. *Of course, such a process does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects,* and judgment to be rendered that does justice in view of the one transaction as a whole.[491]

Thus, unlike setoff, a recoupment must arise out of the same contract or transaction.[492] Recoupment implies that the plaintiff has a cause of action and that the defendant also has a cause of action growing out of a breach of some other part of the

---

[489] See Section 10, Enron Guaranty in favor of Deutsche Bank AG, May 2, 2000 [AB000140230-AB000140237]; Promissory Note by Deutsche Bank AG (New York) in favor of Enron for $1.95 billion, May 2, 2000, at 6 [AB000140263-AB000140271]; Section 13, Pledge Agreement between Enron and Deutsche Bank AG, May 2, 2000 [AB000140244-AB000140251]; Section 8.03, Collateral Account Agreement among Deutsche Bank AG, Bankers Trust, and Enron, May 2, 2000 [AB000140252-AB000140262].

[490] *Westinghouse Credit Corp.* v. *D'Urso,* 278 F.3d 138, 146 n. 3 (2d Cir. 2002) (applying New York law to determine parties' recoupment rights where subject agreement contained a New York choice of law provision). However, the Put Option Agreement, the source of the underlying obligation giving rise to Enron's obligation under the Valhalla Guaranty, contains a German choice of law provision. See Section 6.5, Put Option Agreement between Deutsche Bank AG and Valhalla GmbH, May 2, 2000 [AB000140196-AB000140229]. As a result, German law might also impact the effectiveness of BT/Deutsche's election to recoup its claim under the Valhalla Guaranty against its obligation under the Deutsche/Enron Note.

[491] *Nat'l Cash Register Co. v. Joseph,* 86 N.E.2d 561, 562 (N.Y. 1949) (reversing lower court's order denying taxpayer's right of recoupment of an overpayment against City's claim of a deficiency for taxes of the same type, and remanding to Special Term to determine whether taxpayer was entitled to recoupment based on overpayment) (citations omitted) (emphasis added).

[492] *James Talcott, Inc. v. Winco Sales Corp.,* 14 N.Y.2d 227, 231-32, 233, 199 N.E.2d 499, 501-2 (N.Y. 1964) (holding that statutory limitation requiring that contract setoffs against an assignee be matured at the time of the assignment was inapplicable to recoupment; and holding that counterclaim for commissions and freight charges due under distribution agreement arose out of same contract or transaction which resulted in assigned receivable); *compare Rochester-Genesee Reg'l Transp. Dist., Inc. v. Trans World Airlines, Inc.,* 383 N.Y.S.2d 856, 857 (N.Y. Sup. Ct. 1976) (in setoff, both claims must arise in contract, but need not arise out of the same transaction).

same contract, or some other cause connected with the contract, and is in the nature of a cross action.[493]

Assuming that BT/Deutsche had the right under New York law to recoup its claim under the Valhalla Guaranty against its obligation under the Deutsche/Enron Note, a separate question is whether Enron's status as a debtor under the Bankruptcy Code modifies that right. Recoupment is a powerful doctrine in bankruptcy, because it is not subject to the automatic stay or the substantive limitations of Section 553 of the Bankruptcy Code.[494]    Accordingly, bankruptcy courts have narrowly construed its application.[495]    The justification for the recoupment doctrine is that "when the creditor's claim 'arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.'"[496]    Thus, if the recoupment doctrine is applicable, BT/Deutsche may simply retain its payment

---

[493] *Richards Deeves & Son v. Manhattan Life Ins. Co., 88* N.E. 395 (N.Y. 1909) (holding that defendants answer failed to properly allege counter-claim or defense of recoupment).

[494] *Malinowski v. N. Y. State Dep't of Labor (In re Malinowski), 156* F.3d 131, 133 (2d Cir. 1998) ("The distinction between set-off and recoupment is crucial because set-off claims are subject to the automatic stay of 11 U.S.C. § 362 and are substantively limited by the Bankruptcy Code, 11 U.S.C. § 553 (1994). Recoupment, in contrast, comes into bankruptcy law through common law, rather than by statute, and is not subject to the limitations of section 553 or the automatic stay. The automatic stay is inapplicable, because funds subject to recoupment are not the debtor's property.") (citations omitted).

[495] *In re Malinowski,* 156 F.3d at 133 ("[I]n bankruptcy, the term 'transaction' is given a more restricted definition. . 'a mere logical relationship is not enough to warrant recoupment in the bankruptcy context . . . recoupment is an equitable, non-statutory exception to the automatic stay, it should be limited in bankruptcy to cases in which 'both debts. . . arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations.'") (emphasis in original); *In re McMahon,* 129 F.3d at 97 ("In light of the Bankruptcy Code's strong policy favoring equal treatment of creditors and bankruptcy court supervision over even secured creditors, the recoupment doctrine is a limited one and should be narrowly construed.") (citation omitted).

[496] *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.), 782* F.2d 155, 157 (10th Cir. 1986); *In re Malinowski,* 156 F.3d at 135 (considering debtor's lack of inequitable conduct in denying application of recoupment doctrine); *In re McMahon,* 129 F.3d at 97 (applying recoupment doctrine in favor of a public utility which was required to provide service to the debtor).

obligations under the Deutsche/Enron Note and the May 2000 Swap in light of its claim under the Valhalla Guaranty.[497]

For the recoupment doctrine to apply in bankruptcy, "the claim and counterclaim must arise out of the same transaction or set of transactions."[498] However, there is no general standard governing whether claims are part of the same or different transactions. In light of the equitable nature of the recoupment doctrine, courts have not provided a precise definition of the same transaction standard, but instead focus on the facts and the equities of each case.[499]

The Second Circuit has narrowly construed the same transaction requirement.[500] For example, the Second Circuit has held that "[w]here the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment."[501]   In the recent case of Westinghouse Credit *Corp.* v. *D'Urso*, the Second Circuit narrowed the requirement even further and held that "the same reasoning militates against permitting recoupment even

---

[497] See *United Structures of Am., Inc. v. G.R. G. Eng'g (In re Malinowski)*, 9 F.3d 996, 999 (1st Cir. 1993) ("[A] debtor has, in a sense, no right to funds subject to recoupment.").

[498] *In re Malinowski*, 156 F.3d at 133.

[499] *Kosadnar v. Metro. Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1015 (5th Cir. 1998) (citation omitted); *Sims v. United States Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*, 225 B.R. 709, 713-14 (N.D. Cal. 1998), *aff'd*, 224 F.3d 1008 (9th Cir. 2000) (holding that "logical relationship" test is proper test for determining whether claims arise out of the same transaction).

[500] *In re Malinowski*, 156 F.3d at 133-34 (rejecting logical relationship test).

[501] *In re Malinowski*, 156 F.3d at 135 (holding that New York Department of Labor was not entitled to recoup prepetition unemployment overpayments against postpetition benefits owing to the debtor for a separate period of unemployment.); *cf. In re McMahon*, 129 F.3d at 97 (holding that utility company was entitled to recoup prepetition security deposit against prepetition debt notwithstanding the automatic stay; the court reasoned that the deposit "plainly arose out of a single electricity contract between the debtor and [the utility].").

- 115 -

when an integrated transaction is at issue, if the underlying contract has established separate remedies for discrete portions of that transaction."[502]

The Valhalla Proof of Claim states that Em-on, Valkyrie, Valhalla, Rheingold and BT/Deutsche entered into an "integrated series of agreements for the purposes of, *inter alia*, Deutsche Bank's acquisition of certain participation rights in Rheingold."[503] Although there appears to be a "logical relationship" between the Valhalla Guaranty, on one hand, and the Deutsche/Enron Note and the May 2000 Swap, on the other hand, the respective obligations arise under separate contracts.[504] In addition, although the separate contracts cross-reference one another and specifically reference the parties' respective setoff rights, each of the contracts contains its own default and remedy provisions. Moreover, the parties intended from the outset for the Participation Rights and the Deutsche/Enron Note to be discrete and independent contracts so that each might be respected by the parties and by the United States and German taxing authorities, one as a $2 billion equity interest in a German company, and the other as a $1.95 billion loan.[505]

---

[502] 278 F.3d 138, 147 (2d Cir. 2002) (holding that seller was not entitled to recoup purchase price adjustment awarded to buyer/debtor against seller's judgment for damages under lease and note arising under single integrated transaction; the court reasoned that the transaction assigned distinct remedies for each component of the transaction that were not contingent on one another).

[503] Proof of Claim of Deutsche Bank AG, filed against Enron in the amount of $138,35 1,706, Exhibit A [Claim No. 0000012797].

[504] *Paris v. Transamerica Ins. Group (In re Buckley & Assocs. Ins., Inc.),* 67 B.R. 331, 334 (Bankr. E.D. Tenn. 1986), *order vacated on other grounds,* 78 B.R. 155 (E.D. Tenn. 1986) ("If recoupment were allowed in this case, it would be under two contracts, and that is a contradiction in terms.").

[505] For example, in planning a potential termination of the Valhalla Transaction, counsel to Enron recognized that setoff was not the only method of unwinding the transaction, and was concerned that "potentially we would have moved cash around as we had done before, but that was quite troublesome." Livingston Sworn Statement, at 108. Moreover, the theory underlying recoupment is that funds subject to recoupment are not property of the debtor. *See In re Malinowski,* 156 F.3d at 133. Enron, however, was the "legal and sole beneficial owner" of the Deutsche/Enron Note. Pledge Agreement between Enron and Deutsche Bank AG, May 2, 2000, at 3 [AB000140244-AB000140251]; Collateral Account Agreement among Deutsche Bank AG, Bankers Trust, and Enron, May 2, 2000, at 5 [AB000140252-AB000140262]. Although the Deutsche/Enron Note was pledged, under certain circumstances BT/Deutsche was required to return the pledged collateral to Enron. Pledge Agreement between Enron and Deutsche Bank AG, May 2,

In light of the facts and circumstances, the Examiner concludes that a court could determine that the doctrine of recoupment does not apply.

F.     **BT/Deutsche's Security Interest in the Deutsche/Enron Note**

If a court were to determine that recoupment does not apply and that BT/Deutsche violated the automatic stay, BT/Deutsche would need to seek court approval to effect a postpetition setoff. If setoff were denied, BT/Deutsche would retain its position as a secured creditor by virtue of the pledge of the Deutsche/Enron Note pursuant to the Pledge Agreement and the Collateral Account Agreement.

The Examiner recognizes that there are a number of factual and legal defenses to the potential subordination of BT/Deutsche's secured claim and the transfer of the lien on the Deutsche/Enron Note to Enron's estate. In the first instance, a court could determine that BT/Deutsche effectively set off the amounts due under the Deutsche/Enron Note prior to the Petition Date. Even if a court were to determine that the purported setoff violated the automatic stay, the court could order alternative relief to the estate, including, but not limited to, remedies that would not preclude assertion of the offset right with respect to the Deutsche/Enron Note.[506] Moreover, the Examiner recognizes that, absent

---

2000, at 5 [AB000140244-AB000140251]. In addition, BT/Deutsche's remedies under the Collateral Account Agreement (after exercising any right of setoff by or against Enron) included, among other things, the right to sell the Deutsche/Enron Note. Collateral Account Agreement among Deutsche Bank AG, Bankers Trust, and Enron, May 2, 2000, at 6-7 [AB000140252-AB000140262]. Enron's ownership of the Deutsche/Enron Note, as well as the remedies provided in the contractual agreements, are inconsistent with an assertion that recoupment should apply because the Deutsche/Enron Note is not property of Enron's bankruptcy estate.

[506] The Examiner also notes that the May 2000 Swap was terminated after the Petition Date and certain of the amounts due and owing to Enron under the May 2000 Swap were offset against Enron's liability under the Valhalla Guaranty. Under Section 362(b)(17) of the Bankruptcy Code, the termination of the May 2000 Swap and closeout of the amounts due and owing under the May 2000 Swap may be exempt from the automatic stay. BT/Deutsche may argue that its offset of the Deutsche/Enron Note occurred "in connection with" the termination and offset of the swap obligation and should similarly be exempt from the automatic stay. The Examiner has concluded that this argument is not likely to succeed because the Valhalla Guaranty and the Deutsche/Enron Note make no mention of the May 2000 Swap, which had nominal economic value compared to the $2 billion magnitude of the Deutsche/Enron Note.

- 117 -

equitable subordination of BT/Deutsche's claim, BT/Deutsche would (as asserted in its Proof of Claim) continue to have a security interest in the Deutsche/Enron Note and, as a result, would be entitled to the position of a secured creditor with respect to that note.[507]

If BT/Deutsche's secured claims were equitably subordinated under Section 5 1 O(c) of the Bankruptcy Code,[508] this section would authorize the entry of an order to transfer the lien on the Deutsche/Enron Note to Enron's estate. In that event, Enron would be entitled to collect approximately the amount of the Deutsche/Enron Note ($1.95 billion, plus accrued interest) from BT/Deutsche.

### G.    Summary

The Examiner recognizes that, given the entire circumstances surrounding the Valhalla Transaction, and BT/Deutsche's role in other transactions involving Enron, a court could conclude that the remedy of denial of setoff is excessive.   Although, as set forth in this Report, the Examiner concludes that sufficient evidence exists for a court to equitably subordinate the claims of BT/Deutsche to those of other creditors, a court could conclude that the additional remedy of denial of setoff, which may allow Enron to collect

---

[507] See 11 U.S.C. § 506(a) and (b).

[508] See, e.g., Monzack v. ADB Investors (In re Max Sugarman Funeral Home, Inc.), 149 B.R. 274 (Bankr. D.R.I. 1992) (ordering the transfer of the liens securing a creditor's claim to the debtor's estate pursuant to 11 U.S.C. § 510(c)(2)); Slefco v. First Nat'l Bank of Stuttgart (In re Slefco), 107 B.R. 628 (Bankr. E.D. Ark. 1989) (ordering transfer of secured creditor's lien acquired by virtue of its inequitable conduct to the estate). Section 510(c) would allow the court to transfer the lien and/or subordinate the remaining unsecured claim. Moreover, Section 5 10(b) may also have application. The underlying transaction involves the sale of the Participation Rights (an equity interest) in Rheingold, an affiliate of Enron, to Valhalla pursuant to the Put Option Agreement. As a result, Valhalla's obligation to pay the put price (and Enron's guaranty of that payment) would appear to fall within the subordination provisions of Section 510(b). See In re Einstein/Noah Bagel Corp., 257 B.R. 499 (Bankr. D. Ariz. 2000) (applying Section 5 1 O(b) to a put obligation with respect to the purchase of the equity securities of an affiliated debtor from a third party). See also Queen v. Official Comm. of Unsecured Creditors (In re Response U.S.A., Inc.), 288 B.R. 88 (D.N.J. 2003) (applying Section 5 10(b) to subordinate "damages" rising by virtue of the breach of a stock purchase agreement). Thus, the secured claim of BT/Deutsche may be subordinated to the level of common equity.

- 118 -

$1.95 billion on the Deutsche/Enron Note, would be unnecessarily punitive and thus inequitable.

In order for Em-on to collect on the Deutsche/Enron Note, a court would have to conclude that: (i) BT/Deutsche did not complete all the steps necessary for its setoff to occur pre-petition; (ii) BT/Deutsche's post-petition steps to complete the setoff violated the automatic stay, and such stay violation (or BT/Deutsche's inequitable conduct) warrants a complete denial of its setoff rights; (iii) the doctrine of recoupment does not apply; (iv) BT/Deutsche engaged in inequitable conduct sufficient to warrant equitable subordination of its secured claims against Em-on; and as a result (v) the transfer of the lien on the Deutsche/Enron Note to Enron under Section 510(c) of the Bankruptcy Code is the appropriate remedy.  Only if Enron succeeds in all of these arguments would it be allowed to recover on the Deutsche/Enron Note.  In addition, as noted above, while the Bankruptcy Court for the Southern District of New York has denied setoff rights altogether when a setoff was attempted in violation of the automatic stay, it has also granted a more limited remedy in another case, after balancing a creditor's "legitimate expectation that setoff rights will ordinarily be recognized with the need to protect the integrity of the bankruptcy process against unilateral, covert creditor intrusion upon the bankruptcy estate."[509]

While recognizing that the remedies discussed herein are within the discretion of a court, the Examiner concludes that there is sufficient evidence for a fact-finder to determine that BT/Deutsche failed to complete a setoff prior to the Petition Date.

---

[509] *Shugrue v. Chemical Bank, Inc. (In re Ionosphere Clubs, Inc.),* 177 B.R. 198, 208-09 (Bankr. S.D.N.Y. 1995) (creditor exercised setoff rights in willful and knowing violation of automatic stay; setoff denied only to the extent that the estate had to expend funds to attempt to recover estate property).

Accordingly, the Examiner concludes that Em-on's estate has a reasonable basis to assert a claim that BT/Deutsche's purported setoff violated the automatic stay.

## VII.    CONCLUSIONS

The Examiner concludes that there is sufficient evidence for a fact-finder to determine that BT/Deutsche aided and abetted the Tax/Accounting Officer Group in breaching their fiduciary duties because: (i) BT/Deutsche had actual knowledge of wrongful conduct giving rise to the breaches of fiduciary duty by Enron's Tax/Accounting Officer Group; (ii) BT/Deutsche gave substantial assistance to the Tax/Accounting Officer Group by participating in the structuring and closing of the BT/Deutsche Tax Transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct.

The Examiner also concludes that there is sufficient evidence of inequitable conduct by BT/Deutsche in connection with the BT/Deutsche Tax Transactions for a court to determine that BT/Deutsche's claims should be equitably subordinated to the claims of other creditors. This would be in addition to any affirmative recovery that would be available to the Debtors, assuming they have standing, against BT/Deutsche for aiding and abetting the breaches of fiduciary duty.

In addition, the Examiner concludes that there is sufficient evidence for a fact-finder to determine that BT/Deutsche failed to effect the Valhalla Setoff prior to the Petition Date of December 2, 2001. Accordingly, the Examiner concludes that Em-on's estate has a reasonable basis to assert a claim that BT/Deutsche violated the automatic stay.

WHITE & CASE LLP
*Attorneys for*
The Deutsche Bank Entities
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
Lawrence Byrne (LB-4671)
Owen C. Pell (OP-0118)
Lance Croffoot-Suede(LC-3725)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **ENRON CORP.,** *et al.,* | : | **Case No. 01-16034 (AJG)** |
| | : | **Jointly Administered** |
| Debtors. | : | |

------------------------------------------------------x

| | | |
|---|---|---|
| **ENRON CORP.; ENRON NORTH** | : | |
| **AMERICA CORP.; ENRON NATURAL** | : | |
| **GAS MARKETING CORP.; ENRON** | : | |
| **BROADBAND SERVICES, INC.;** | : | |
| **ENRON ENERGY SERVICES, INC.;** | : | |
| **ENRON DEVELOPMENT FUNDING,** | : | |
| **LTD.,** | : | **Adversary Proceeding** |
| | : | **No. 03-09266 (AJG)** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **CITIGROUP INC.,** *et al.,* | : | |
| | : | |
| Defendants. | : | |
| | : | |

_____x

## <u>STIPULATION TO ADJOURN HEARING</u>

IT IS HEREBY STIPULATED AND AGREED, by and among Deutsche Bank AG,

Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank

Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation,

Bankers Trust International plc, BT Commercial Corp., BT Green, Inc., BT Leasing Corp., EN-

BT Delaware, Inc., Deutsche Bank S.A., BT Ever, Inc., and Seneca Leasing Partners, L.P.

(collectively, the "Deutsche Bank Entities"), and Enron Corp. and its above-captioned affiliated

debtors, as debtors in possession and plaintiffs in this adversary proceeding ("Plaintiffs"), by and

through their undersigned counsel, that the hearing to consider the Deutsche Bank Entities'

Partial Motion To Dismiss and Motion For More Definite Statement, scheduled for July 1, 2004,

shall be adjourned to October 14, 2004 at a time to be determined by the Court.

Dated: June 29, 2004

**WHITE & CASE LLP**

By:   /s/ Lance Croffoot-Suede
Lawrence Byrne (LB-4671)
Owen C. Pell (OP-0118)
Lance Croffoot-Suede(LC-3725)
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for*
The Deutsche Bank Entities

**SUSMAN GODFREY L.L.P.**

By:   /s/ Kenneth S. Marks
Kenneth S. Marks (*Pro Hac Vice*)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366

*Special Litigation Counsel for*
Enron Corp., et al.,
Debtors-in-Possession

WHITE & CASE LLP
*Attorneys for*
The Deutsche Bank Entities
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
Owen C. Pell (OP-0118)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------x

| | |
|---|---|
| **In re:** : | **Chapter 11** |
| : | |
| **ENRON CORP.,** *et al.,* : | **Case No. 01-16034 (AJG)** |
| : | **Jointly Administered** |
| **Debtors.** : | |

----------------------------------------x

| | |
|---|---|
| **ENRON CORP.; ENRON NORTH** : | |
| **AMERICA CORP.; ENRON NATURAL** : | |
| **GAS MARKETING CORP.; ENRON** : | |
| **BROADBAND SERVICES, INC.;** : | |
| **ENRON ENERGY SERVICES, INC.;** : | |
| **ENRON DEVELOPMENT FUNDING,** : | |
| **LTD.,** : | **Adversary Proceeding** |
| : | **No. 03-09266 (AJG)** |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | |
| **CITIGROUP INC.,** *et al.,* : | |
| : | |
| **Defendants.** : | |
| : | |

----------------------------------------x

## <u>NOTICE OF ADJOURNMENT OF HEARING ON MOTION OF DEFENDANTS THE DEUTSCHE BANK ENTITIES' PARTIAL MOTION TO DISMISS AND MOTION FOR MORE DEFINITE STATEMENT</u>

PLEASE TAKE NOTICE THAT, a hearing to consider the Partial Motion to Dismiss and

Motion for More Definite Statement, dated February 17, 2004 of Deutsche Bank AG, Deutsche

Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg,

S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers

Trust International plc, BT Commercial Corp., BT Green, Inc., BT Leasing Corp., EN-BT

Delaware, Inc., Deutsche Bank S.A., BT Ever, Inc., and Seneca Leasing Partners, L.P.

(collectively, the "Deutsche Bank Entities")[1] has been adjourned to an undetermined date.


Dated: New York, New York
       October 13, 2004

                                    **WHITE & CASE LLP**

                                    By:   /s/ Owen C. Pell
                                    Owen C. Pell (OP-0118)
                                    1155 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 819-8200

                                    *Attorneys for*
                                    The Deutsche Bank Entities

---

[1] Deutsche Trustee Company Ltd. ("DTCL"), originally included in the Deutsche Bank Entities' Motion, is no longer a party to this action. On June 2, 2004, this Court signed the Stipulation and Order Allowing Certain Claims Filed By Deutsche Trustee Company Limited, As Trustee (Case No. 01-16034, Docket ID No. 18843), where Enron agreed to dismiss all claims and objections as against DTCL with prejudice.

WHITE & CASE LLP
*Attorneys for*
The Deutsche Bank Entities
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
Owen C. Pell (OP-0118)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **ENRON CORP.,** *et al.,* | : | **Case No. 01-16034 (AJG)** |
| | : | **Jointly Administered** |
| **Debtors.** | : | |

--------------------------------------x

| | | |
|---|---|---|
| **ENRON CORP.; ENRON NORTH** | : | |
| **AMERICA CORP.; ENRON NATURAL** | : | |
| **GAS MARKETING CORP.; ENRON** | : | |
| **BROADBAND SERVICES, INC.;** | : | |
| **ENRON ENERGY SERVICES, INC.;** | : | |
| **ENRON DEVELOPMENT FUNDING,** | : | |
| **LTD.,** | : | **Adversary Proceeding** |
| | : | **No. 03-09266 (AJG)** |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | |
| | : | |
| **CITIGROUP INC.,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

--------------------------------------x

**NOTICE OF ADJOURNMENT OF**
**HEARING ON MOTION OF DEFENDANTS THE**
**DEUTSCHE BANK ENTITIES' PARTIAL MOTION TO DISMISS**

PLEASE TAKE NOTICE THAT, a hearing to consider the Partial Motion to Dismiss,

dated February 17, 2004, of Deutsche Bank AG, Deutsche Bank Trust Company Americas,

Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust

Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT

Commercial Corp., BT Green, Inc., BT Leasing Corp., EN-BT Delaware, Inc., Deutsche Bank

S.A., BT Ever, Inc., and Seneca Leasing Partners, L.P. (collectively, the "Deutsche Bank

Entities")[1] has been adjourned to January 27, 2005 at 10 a.m.


Dated: New York, New York
      November 12, 2004

           **WHITE & CASE LLP**

           By:   /s/ Owen C. Pell   
           Owen C. Pell (OP-0118)
           1155 Avenue of the Americas
           New York, New York 10036
           (212) 819-8200

           *Attorneys for*
           The Deutsche Bank Entities

---

[1] Deutsche Trustee Company Ltd. ("DTCL"), originally included in the Deutsche Bank Entities' Motion, is no longer a party to this action. On June 2, 2004, this Court signed the Stipulation and Order Allowing Certain Claims Filed By Deutsche Trustee Company Limited, As Trustee (Case No. 01-16034, Docket ID No. 18843), where Enron agreed to dismiss all claims and objections as against DTCL with prejudice.

Lawrence Byrne (LB-4671)
Lance Croffoot-Suede (LC-3725)
Justin Williamson (JW-6602)
Titia A. Holtz (TH-4379)
LINKLATERS
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000 (Tel)
(212) 903-9100 (Fax)

*Attorneys for the Deutsche Bank Entities*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

In re:
ENRON CORP., et al.,

                    Debtors.

Chapter 11
Case No. 01-16034 (AJG)

Jointly Administered

-------------------------------------------------

ENRON CORP., et al.,

                    Plaintiffs

              v.

CITIGROUP INC., et al.,

                    Defendants.

Adversary Proceeding
No.: 03-09266 (AJG)

-------------------------------------------------x

## STIPULATION AND ORDER

      **A.**      **WHEREAS**, on or about September 24, 2003, Plaintiffs Enron Corp. and certain

affiliates (collectively, "Plaintiffs") filed and served a complaint commencing the above-

captioned adversary proceeding.

      **B.**      **WHEREAS**, on or about December 1, 2003, Plaintiffs filed and served an

amended complaint (the "Amended Complaint").

**C.**    **WHEREAS**, pursuant to the So Ordered Stipulation ordered on January 30, 2004 and entered February 3, 2004, on or about February 17, 2004, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., DB Ever, Inc. (f/k/a BT Ever, Inc.), and Seneca Leasing Partners, L.P. (collectively the "Deutsche Bank Entities," and, together with Plaintiffs, the "Parties") filed and served a partial motion to dismiss the Amended Complaint (the "Partial Motion to Dismiss") and a motion for more definite statement (the "Motion for More Definite Statement").

**D.**    **WHEREAS**, on November 17, 2004, the Motion for More Definite Statement was denied by stipulation.

**E.**    **WHEREAS**, Plaintiffs have amended the Amended Complaint, culminating in the operative complaint in this adversary proceeding filed and served on or about January 10, 2005 (the "Fourth Amended Complaint").

**F.**    **WHEREAS**, the Partial Motion to Dismiss remained pending until December 29, 2006, when, by letter to this Court, the Deutsche Bank Entities withdrew the Partial Motion to Dismiss.

**G.**    **WHEREAS**, the Deutsche Bank Entities' answer to the Fourth Amended Complaint was to be filed and served on or before January 29, 2007.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by
and among the Parties, through their respective counsel, as follows:

     1.    The Deutsche Bank Entities will file and serve their answer to the Fourth
Amended Complaint on or before March 9, 2007.

Dated:     New York, New York
            January 25, 2007

                                 Respectfully submitted,

                                 LINKLATERS

                               By:   /s/ Lance Croffoot-Suede
                                    Lawrence Byrne (LB-4671)
                                    Lance Croffoot-Suede (LC-3725)
                                    Justin Williamson (JW-6602)
                                    Titia A. Holtz (TH-4379)
                                    LINKLATERS
                                    1345 Avenue of the Americas
                                    New York, New York 10105
                                    (212) 903-9000 (Tel)
                                    (212) 903-9100 (Fax)

                               VENABLE LLP

                               By:   /s/ Lawrence H. Cooke II
                                    Richard L. Wasserman (RW-8696)
                                    Michael Schatzow (*Pro Hac Vice*)
                                    Lawrence H. Cooke II (LC-8884)
                                    1800 Mercantile Bank & Trust Building
                                    2 Hopkins Plaza
                                    Baltimore, Maryland 21201
                                    Telephone: (410) 244-7400
                                    *-and-*
                                    405 Lexington Ave.
                                    56th Floor
                                    New York, NY 10174
                                    Telephone: (212) 307-5500

TOGUT, SEGAL & SEGAL LLP

Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone (212) 594-5000

SUSMAN GODFREY L.L.P.

H. Lee Godfrey (*Pro Hac Vice*)
Kenneth S. Marks (*Pro Hac Vice*)
Mary Kathryn Sammons (*Pro Hac Vice*)
1000 Louisiana St., Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366

**SO ORDERED this 26ᵗʰ day of January,
2007:**

  **s/Arthur J. Gonzalez**
HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

ENRON CORP., *et al.*
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
Eric J. Mayer (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP
Special Litigation Counsel to
ENRON CORP. and ENRON NORTH AMERICA CORP.
Reorganized Debtors and Plaintiffs,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RLW-8696)
Michael Schatzow (*pro hac vice*)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                    :

    ENRON CORP., *et al.*,            :
            Reorganized Debtors.    :

                                  :

Chapter 11
Case No. 01-16034 [AJG]

Post-Confirmation

------------------------------------------------------------x
                                  :

ENRON CORP. *et al.*,            :

               Plaintiffs,    :

                                  :

       v.                               :

Adv. Pro. No. 03-09266 [AJG]

CITIGROUP, INC., *et al.*,       :

              Defendants.    :

------------------------------------------------------------x

**AFFIDAVIT OF SERVICE OF**
**PLAINTIFFS' FIRST REQUEST TO BT/DEUTSCHE BANK**
<u>**DEFENDANTS FOR PRODUCTION OF DOCUMENTS AND THINGS**</u>

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF NEW YORK )

        DENISE CAHIR, being duly sworn, deposes and says:  deponent is not a party to the action, is over 18 years of age and resides at New York, New York.

        On April 27, 2005, deponent served a copy of the Plaintiffs' First Request to BT/Deutsche Bank Defendants for the Production of Documents and Things, upon the parties on the annexed service list by depositing a true copy of same enclosed in a pre-paid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

                                          /s/Denise Cahir
                                          DENISE CAHIR

Sworn to before me this
6th day of May 2005

/s/Joanne Minischetti
NOTARY PUBLIC

ENRON CORP., *et al.*
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
Eric J. Mayer (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP
Special Litigation Counsel to
ENRON CORP. and ENRON NORTH AMERICA CORP.
Reorganized Debtors and Plaintiffs,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RLW-8696)
Michael Schatzow (*pro hac vice*)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re                                          :
                                               :      Chapter 11
    ENRON CORP., *et al.*,              :      Case No. 01-16034 [AJG]
        Reorganized Debtors.  :
                                               :      <u>Post-Confirmation</u>
---------------------------------------------------------x
                                               :
ENRON CORP. *et al.*,                          :
        Plaintiffs,          :
                                               :
                                               :      Adv. Pro. No. 03-09266 [AJG]
      v.                        :
                                               :
CITIGROUP, INC., *et al.*,                     :
        Defendants.          :
---------------------------------------------------------x

**AFFIDAVIT OF SERVICE OF**
**PLAINTIFFS' FIRST REQUESTS FOR ADMISSION AND FIRST**
**SET OF INTERROGATORIES TO THE BT/DEUTSCHE BANK DEFENDANTS**

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK )

       DENISE CAHIR, being duly sworn, deposes and says:  deponent is not a party to the action, is over 18 years of age and resides at New York, New York.

       On July 5, 2005, deponent served a copy of Plaintiffs' First Request for Admission and First Set of Interrogatories to the BT/Deutsche Bank Defendants, upon:

       White & Case LLP
       1155 Avenue Of Americas
       New York, NY 10036-2787
       Attn:  Lance Croffoot-Suede, Esq.
              Lawrence Byrne, Esq.
              Owen Pell, Esq.

by hand delivery.

              /s/Denise Cahir
              DENISE CAHIR

Sworn to before me this
6th day of July, 2005

/s/Joanne Minischetti
NOTARY PUBLIC

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                            :

     ENRON CORP., *et al.*,                    :       Chapter 11
            Reorganized Debtors.        :       Case No. 01-16034 [AJG]

                                 :       <u>Post-Confirmation</u>

-------------------------------------------------------------x
                                 :

ENRON CORP. *et al.*,                            :
               Plaintiffs,              :

                                 :

           v.                                       :       Adv. Pro. No. 03-09266 [AJG]

CITIGROUP, INC., *et al.*,                       :
              Defendants.                :

-------------------------------------------------------------x

## AFFIDAVIT OF SERVICE OF
## PLAINTIFFS' SECOND REQUEST TO BT/DEUTSCHE BANK
## <u>DEFENDANTS FOR PRODUCTION OF DOCUMENTS AND THINGS</u>

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK )

        DENISE CAHIR, being duly sworn, deposes and says:  deponent is not a party to the action, is over 18 years of age and resides at New York, New York.

        On October 31, 2005, deponent served a copy of Plaintiffs' Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things upon:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, NY  10036-2787
> Attn:  Owen C. Pell, Esq.
>        Timothy S. Pfeifer, Esq.
>        Titia A. Holtz, Esq.

by Federal Express Priority Overnight delivery.

                                    /s/Denise Cahir
                                    DENISE CAHIR

Sworn to before me this
2nd day of November 2005

/s/Cynthia Juliano
NOTARY PUBLIC

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

In re                                          :
                                               :        Chapter 11
    ENRON CORP., *et al.*,                 :        Case No. 01-16034 [AJG]
        Reorganized Debtors.      :
                                               :        <u>Post-Confirmation</u>

------------------------------------------------------x
                                               :
ENRON CORP. *et al.*,                          :
        Plaintiffs,               :
                                               :
                                               :        Adv. Pro. No. 03-09266 [AJG]
    v.                                      :
                                               :
CITIGROUP, INC., *et al.*,                     :
        Defendants.               :

------------------------------------------------------x

## AFFIDAVIT OF SERVICE OF
## PLAINTIFFS' NOTICE OF DEPOSITION
## OF THE BT/DEUTSCHE BANK DEFENDANTS
## <u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)</u>

STATE OF NEW YORK    )
                                ) ss.:
COUNTY OF NEW YORK )

        DENISE CAHIR, being duly sworn, deposes and says:  deponent is not a party to the action, is over 18 years of age and resides at New York, New York.

        On November 4, 2005, deponent served a copy of Plaintiffs' Notice of Deposition of the BT/Deutsche Bank Defendants Pursuant to Federal Rule of Civil Procedure 30(b)(6) upon:

                White & Case LLP
                1155 Avenue of the Americas
                New York, NY  10036-2787
                Attn:  Owen C. Pell, Esq.
                          Timothy S. Pfeifer, Esq.
                          Titia A. Holtz, Esq.

by hand delivery.

                                      /s/Denise B. Cahir
                                    DENISE CAHIR

Sworn to before me this
4th day of November 2005

/s/Joanne Minischetti
NOTARY PUBLIC

ENRON CORP., et al.,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (pro hac vice)
Kenneth S. Marks (pro hac vice)
Mary Kathryn Sammons (pro hac vice)
James T. Southwick (pro hac vice)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., et al.,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., et al.,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (pro hac vice)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
In re:                                                 :    Chapter 11
                                                       :    Case No. 01-16034 (AJG)
ENRON CORP., et al.,                                   :
                                                       :    (Jointly Administered)
                        Reorganized Debtors.           :
                                                       :
-------------------------------------------------------x
                                                       :
ENRON CORP., et al.,                                   :    Adversary Proceeding No.
                                                       :    03-09266 (AJG)
                        Plaintiffs,                    :
                                                       :
        v.                                             :
                                                       :
CITIGROUP INC., et al.,                                :
                                                       :
                        Defendants.                    :
                                                       :
-------------------------------------------------------x

## STIPULATION AND ORDER

A.    **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.    **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.    **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.    **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

2

E.    **WHEREAS**, the Parties hereto have consented to amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED,** by and among the Parties, through their respective counsel, as follows:

1.    The BT/Deutsche Bank Defendants will serve their objections and responses to Plaintiffs' Second Request on or before December 1, 2005, and will produce their responsive, non-privileged documents in response to that Request on or before January 31, 2006.

2.    Plaintiffs will serve their objections and responses to the requests for admission in the BT/Deutsche Requests on or before December 15, 2005, except that objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a later date to be agreed by the parties in response to a subsequent demand. Similarly, in response to Plaintiffs' subsequent demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a later date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a subsequent demand, and the demand may be made at any time prior to March 1, 2006 or the completion of the deposition(s) described in Paragraph 4 below, whichever is later.

3.    Plaintiffs will serve their objections and responses to the interrogatories in the BT/Deutsche Requests on or before December 30, 2005, and will

3

produce responsive, non-privileged documents in response to those interrogatories, to the extent such documents exist and have not yet been produced, on or before January 6, 2005.

        4.       The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place in February 2006 on date(s) to be agreed by the Parties.  The subject matter of the depositions will not violate the Deposition Protocol Order entered by this Court on March 11, 2004.

        5.       Although the Parties may continue to confer and to seek supplemental responses to discovery requests and deposition notices that have been served within the time permitted by the Scheduling Order, no new discovery requests or deposition notices may be served after the time permitted by the Scheduling Order absent a Court order or the Parties' consent.

        6.       The fact that an extension for providing discovery responses has been granted beyond the November 30, 2005 discovery cut-off date shall not be used as evidence against any party in any other motion or context, shall not constitute a waiver of any other rights that otherwise exist, and shall not in any way expand or reduce the rights of a party that did not exist as of the time of the close of discovery on November 30, 2005.

        7.       This stipulation may be executed in counterparts and the counterparts may be exchanged by facsimile.

Dated      New York, New York
             November 29, 2005

TOGUT, SEGAL & SEGAL LLP

By:   /s/ Richard K. Milin
      Albert Togut (AT-9759)
      Scott E. Ratner (SER-0015)
      Richard K. Milin (RM-7755)
      One Penn Plaza, Suite 3335
      New York, New York 10119
      Telephone:  (212) 594-5000
      Bankruptcy Co-Counsel for Enron
      Corp., *et al.*, Reorganized Debtors

WHITE & CASE LLP

By:   /s/ Owen C. Pell
      Owen C. Pell (OP-0118)
      Timothy S. Pfeifer (TP-6331)
      Titia A. Holtz (TH-4379)
      1155 Avenue of the Americas
      New York, New York 10036
      Telephone:  (212) 819-8200
      Counsel for the BT/Deutsche
      Bank Defendants

**(Signatures concluded on following page)**

SUSMAN GODFREY L.L.P.

By:  /s/ Kenneth S. Marks
      H. Lee Godfrey (*Pro Hac Vice*)
      Kenneth S. Marks (*Pro Hac Vice*)
      Mary Kathryn Sammons (*Pro Hac Vice*)
      1000 Louisiana St., Suite 5100
      Houston, Texas  77002
      Telephone:  (713) 651-9366
      Special Litigation Counsel to Enron Corp.,
      *et al.,* Reorganized Debtors


VENABLE LLP

By:  /s/ Lawrence H. Cooke
      Richard L. Wasserman (RW-8696)
      Michael Schatzow (*Pro Hac Vice*)
      Lawrence H. Cooke II (LC-8884)
      1800 Mercantile Bank & Trust Building
      2 Hopkins Plaza
      Baltimore, Maryland  21201
      Telephone:  (410) 244-7400
      Special Litigation Counsel to Enron Corp.,
      *et al.,* Reorganized Debtors


**SO ORDERED:**

s/Arthur J. Gonzalez
HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

December 1, 2005
Date

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x
                                              :
In re:                                        :   Chapter 11
                                              :   Case No. 01-16034 (AJG)
ENRON CORP., *et al.*,                        :
                                              :   (Jointly Administered)
              Reorganized Debtors.            :
                                              :
———————————————————————————x
                                              :
ENRON CORP., *et al.*,                        :   Adversary Proceeding No.
                                              :   03-09266 (AJG)
              Plaintiffs,                     :
                                              :
     v.                                       :
                                              :
CITIGROUP INC., *et al.*,                     :
                                              :
              Defendants.                     :
                                              :
———————————————————————————x

## SECOND STIPULATION AND ORDER

A.  **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.  **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.  **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.  **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

2

E.      **WHEREAS**, on December 1, 2005, the Court entered a Stipulation and Order amending certain deadlines in the Scheduling Order.

F.      **WHEREAS**, the Parties hereto have consented to a further amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED,** by and among the Parties, through their respective counsel, as follows:

1.      Plaintiffs' objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a date to be agreed by the parties in response to a demand. Similarly, in response to Plaintiffs' demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a demand, and the demand may be made at any time prior to April 3, 2006 or the completion of the deposition(s) described in Paragraph 4 below, whichever is later.

2.      The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place in March 2006 on date(s) to be agreed by the Parties. The subject matter of the depositions will not violate the Deposition Protocol Order entered by this Court on March 11, 2004.

3.      Although the Parties may continue to confer and to seek supplemental responses to discovery requests and deposition notices that have been

served within the time permitted by the Scheduling Order, no new discovery requests or deposition notices may be served after the time permitted by the Scheduling Order absent a Court order or the Parties' consent.

4.    The fact that an extension for providing discovery responses has been granted beyond the November 30, 2005 discovery cut-off date shall not be used as evidence against any party in any other motion or context, shall not constitute a waiver of any other rights that otherwise exist, and shall not in any way expand or reduce the rights of a party that did not exist as of the time of the close of discovery on November 30, 2005.

5.    This stipulation may be executed in counterparts and the counterparts may be exchanged by facsimile.

Dated:    New York, New York
          February 21, 2006


TOGUT, SEGAL & SEGAL LLP

By:  /s/ Richard K. Milin
       Albert Togut (AT-9759)
       Scott E. Ratner (SER-0015)
       Richard K. Milin (RM-7755)
       One Penn Plaza, Suite 3335
       New York, New York 10119
       Telephone: (212) 594-5000
       Bankruptcy Co-Counsel for Enron
       Corp., et al., Reorganized Debtors

WHITE & CASE LLP

By:  /s/  Owen C. Pell
       Owen C. Pell (OP-0118)
       Timothy S. Pfeifer (TP-6331)
       Titia A. Holtz (TH-4379)
       1155 Avenue of the Americas
       New York, New York 10036
       Telephone: (212) 819-8200
       Counsel for the BT/Deutsche
       Bank Defendants


**(Signatures concluded on following page)**

SUSMAN GODFREY L.L.P.

By: /s/ Kenneth S. Marks
      H. Lee Godfrey (*Pro Hac Vice*)
      Kenneth S. Marks (*Pro Hac Vice*)
      Mary Kathryn Sammons (*Pro Hac Vice*)
      1000 Louisiana St., Suite 5100
      Houston, Texas  77002
      Telephone:  (713) 651-9366
      Special Litigation Counsel to Enron Corp.,
      *et al.*, Reorganized Debtors


VENABLE LLP

By: /s/ Lawrence H. Cooke II
      Richard L. Wasserman (RW-8696)
      Michael Schatzow (*Pro Hac Vice*)
      Lawrence H. Cooke II (LC-8884)
      1800 Mercantile Bank & Trust Building
      2 Hopkins Plaza
      Baltimore, Maryland  21201
      Telephone:  (410) 244-7400
      Special Litigation Counsel to Enron Corp.,
      *et al.*, Reorganized Debtors


**SO ORDERED:**

s/Arthur J. Gonzalez
HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

February 21, 2006
Date

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
: 
In re:                                                       :    Chapter 11
                                                             :    Case No. 01-16034 (AJG)
ENRON CORP., *et al.*,                                       :
                                                             :    (Jointly Administered)
           Reorganized Debtors.                              :
                                                             :
-------------------------------------------------------------x
                                                             :
ENRON CORP., *et al.*,                                       :    Adversary Proceeding No.
                                                             :    03-09266 (AJG)
           Plaintiffs,                                       :
                                                             :
      v.                                                     :
                                                             :
CITIGROUP INC., *et al.*,                                    :
                                                             :
           Defendants.                                       :
                                                             :
-------------------------------------------------------------x

## THIRD STIPULATION AND ORDER

A.      **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.      **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.      **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.      **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

E.    **WHEREAS**, on December 1, 2005, the Court entered a Stipulation and Order amending certain deadlines in the Scheduling Order, which were subsequently amended.

F.    **WHEREAS**, the Parties hereto have consented to a further amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and among the Parties, through their respective counsel, as follows:

1.    Plaintiffs' objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a date to be agreed by the parties in response to a demand. Similarly, in response to Plaintiffs' demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a demand, and the demand may be made at any time prior to May 12, 2006 or the completion of the deposition(s) described in Paragraph 4 below, whichever is later.

2.    The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place on or before April 28, 2006 on date(s) to be agreed by the Parties. The subject matter of the depositions will not violate the Deposition Protocol Order entered by this Court on March 11, 2004.

3.      Although the Parties may continue to confer and to seek supplemental responses to discovery requests and deposition notices that have been served within the time permitted by the Scheduling Order, no new discovery requests or deposition notices may be served after the time permitted by the Scheduling Order absent a Court order or the Parties' consent.

4.      The fact that an extension for providing discovery responses has been granted beyond the November 30, 2005 discovery cut-off date shall not be used as evidence against any party in any other motion or context, shall not constitute a waiver of any other rights that otherwise exist, and shall not in any way expand or reduce the rights of a party that did not exist as of the time of the close of discovery on November 30, 2005.

5.      This stipulation may be executed in counterparts and the counterparts may be exchanged by facsimile.

Dated:      New York, New York
            March 30, 2006


TOGUT, SEGAL & SEGAL LLP                    WHITE & CASE LLP

By:  /s/ Richard K. Milin                   By:  /s/ Owen C. Pell
        Albert Togut (AT-9759)                       Owen C. Pell (OP-0118)
        Scott E. Ratner (SER-0015)                   Timothy S. Pfeifer (TP-6331)
        Richard K. Milin (RM-7755)                   Titia A. Holtz (TH-4379)
        One Penn Plaza, Suite 3335                   1155 Avenue of the Americas
        New York, New York 10119                     New York, New York 10036
        Telephone:  (212) 594-5000                   Telephone:  (212) 819-8200
        Bankruptcy Co-Counsel for Enron              Counsel for the BT/Deutsche
        Corp., et al., Reorganized Debtors           Bank Defendants

4

**(Signatures concluded on following page)**

SUSMAN GODFREY L.L.P.

By: _/s/Kenneth S. Marks_____
        H. Lee Godfrey (*Pro Hac Vice*)
        Kenneth S. Marks (*Pro Hac Vice*)
        Mary Kathryn Sammons (*Pro Hac Vice*)
        1000 Louisiana St., Suite 5100
        Houston, Texas  77002
        Telephone:  (713) 651-9366
        Special Litigation Counsel to Enron Corp.,
        *et al.*, Reorganized Debtors


VENABLE LLP

By: _/s/Lawrence H. Cooke II_____
        Richard L. Wasserman (RW-8696)
        Michael Schatzow (*Pro Hac Vice*)
        Lawrence H. Cooke II (LC-8884)
        1800 Mercantile Bank & Trust Building
        2 Hopkins Plaza
        Baltimore, Maryland  21201
        Telephone:  (410) 244-7400
        Special Litigation Counsel to Enron Corp.,
        *et al.*, Reorganized Debtors


**SO ORDERED:**

<u>s/Arthur J. Gonzalez</u>_____         <u>March 31, 2006</u>
HONORABLE ARTHUR J. GONZALEZ         Date
UNITED STATES BANKRUPTCY JUDGE

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                      :

In re:                   :    Chapter 11
                      :    Case No. 01-16034 (AJG)

ENRON CORP., *et al.*,      :
                      :    (Jointly Administered)

      Reorganized Debtors.  :

-------------------------------------------------------------x
                      :

ENRON CORP., *et al.*,      :    Adversary Proceeding No.
                      :    03-09266 (AJG)

      Plaintiffs,        :

      v.                  :

CITIGROUP INC., *et al.*,     :

      Defendants.      :

-------------------------------------------------------------x

## FOURTH STIPULATION AND ORDER

A.     **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.     **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.     **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.     **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

2

E.     **WHEREAS**, on December 1, 2005, the Court entered a Stipulation and Order amending certain deadlines in the Scheduling Order, which were subsequently amended.

F.     **WHEREAS**, the Parties hereto have consented to a further amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and among the Parties, through their respective counsel, as follows:

1.     Plaintiffs' objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a date to be agreed by the parties in response to a demand. Similarly, in response to Plaintiffs' demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a demand, and the demand may be made at any time prior to (a) ninety days following the Court's ruling on the Deutsche Bank Defendants' motion to dismiss, or (b) ninety days before the completion of solvency discovery, whichever is earlier. The parties agree that fact discovery concerning the Valhalla Transaction will be completed prior to the conclusion of expert discovery relating to that Transaction.

2.     The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place on or before June 9, 2006 on date(s) to be

agreed by the Parties.  The subject matter of the depositions will not violate the

Deposition Protocol Order entered by this Court on March 11, 2004.

       3.      Although the Parties may continue to confer and to seek

supplemental responses to discovery requests and deposition notices that have been

served within the time permitted by the Scheduling Order, no new discovery requests

or deposition notices may be served after the time permitted by the Scheduling Order

absent a Court order or the Parties' consent.

       4.      The fact that an extension for providing discovery responses has

been granted beyond the November 30, 2005 discovery cut-off date shall not be used as

evidence against any party in any other motion or context, shall not constitute a waiver

of any other rights that otherwise exist, and shall not in any way expand or reduce the

rights of a party that did not exist as of the time of the close of discovery on November

30, 2005.

       5.      This stipulation may be executed in counterparts and the

counterparts may be exchanged by facsimile.

Dated:     New York, New York
           April 28, 2006

TOGUT, SEGAL & SEGAL LLP       WHITE & CASE LLP

By:  /s/Richard K. Milin         By:  /s/Owen C. Pell
      Albert Togut (AT-9759)           Owen C. Pell (OP-
0118)
      Scott E. Ratner (SER-0015)       Timothy S. Pfeifer (TP-6331)
      Richard K. Milin (RM-7755)      Titia A. Holtz (TH-4379)
      One Penn Plaza, Suite 3335      1155 Avenue of the Americas

Telephone:  (212) 594-5000
Bankruptcy Co-Counsel for Enron
Corp., *et al.,* Reorganized Debtors

Telephone:  (212) 819-8200
Counsel for the BT/Deutsche
Bank Defendants

**(Signatures concluded on following page)**

SUSMAN GODFREY L.L.P.

By:  /s/Kenneth S. Marks_____
      H. Lee Godfrey (*Pro Hac Vice*)
      Kenneth S. Marks (*Pro Hac Vice*)
      Mary Kathryn Sammons (*Pro Hac Vice*)
      1000 Louisiana St., Suite 5100
      Houston, Texas  77002
      Telephone:  (713) 651-9366
      Special Litigation Counsel to Enron Corp.,
      *et al.*, Reorganized Debtors


VENABLE LLP

By:  /s/Lawrence H. Cooke_____
      Richard L. Wasserman (RW-8696)
      Michael Schatzow (*Pro Hac Vice*)
      Lawrence H. Cooke II (LC-8884)
      1800 Mercantile Bank & Trust Building
      2 Hopkins Plaza
      Baltimore, Maryland  21201
      Telephone:  (410) 244-7400
      Special Litigation Counsel to Enron Corp.,
      *et al.*, Reorganized Debtors


**SO ORDERED:**

<u>s/Arthur J. Gonzalez</u>              <u>5/2/2006</u>
HONORABLE ARTHUR J. GONZALEZ      Date
UNITED STATES BANKRUPTCY JUDGE

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                          :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 01-16034 (AJG) |
| ENRON CORP., *et al.*, | : | |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |
| | : | |

------------------------------------------------------------x
                                          :

| | | |
|---|---|---|
| ENRON CORP., *et al.*, | : | Adversary Proceeding No. |
| | : | 03-09266 (AJG) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITIGROUP INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

------------------------------------------------------------x

## FIFTH STIPULATION AND ORDER

A.    **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.    **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.    **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.    **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

2

E.     **WHEREAS**, on December 1, 2005, the Court entered a Stipulation and Order amending certain deadlines in the Scheduling Order, which were subsequently amended.

F.     **WHEREAS**, the Parties hereto have consented to a further amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and among the Parties, through their respective counsel, as follows:

1.     Plaintiffs' objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a date to be agreed by the parties in response to a demand. Similarly, in response to Plaintiffs' demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a demand, and the demand may be made at any time prior to (a) ninety days following the Court's ruling on the Deutsche Bank Defendants' motion to dismiss, or (b) ninety days before the completion of solvency discovery, whichever is earlier. The parties agree that fact discovery concerning the Valhalla Transaction will be completed prior to the conclusion of expert discovery relating to that Transaction.

2.     The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place on or before July 28, 2006 on date(s) to be

3

agreed by the Parties.  The subject matter of the depositions will not violate the

Deposition Protocol Order entered by this Court on March 11, 2004.

      3.     Although the Parties may continue to confer and to seek

supplemental responses to discovery requests and deposition notices that have been

served within the time permitted by the Scheduling Order, no new discovery requests

or deposition notices may be served after the time permitted by the Scheduling Order

absent a Court order or the Parties' consent.

      4.     The fact that an extension for providing discovery responses has

been granted beyond the November 30, 2005 discovery cut-off date shall not be used as

evidence against any party in any other motion or context, shall not constitute a waiver

of any other rights that otherwise exist, and shall not in any way expand or reduce the

rights of a party that did not exist as of the time of the close of discovery on November

30, 2005.

      5.     This stipulation may be executed in counterparts and the

counterparts may be exchanged by facsimile.

Dated:      New York, New York
             June 7, 2006


TOGUT, SEGAL & SEGAL LLP      WHITE & CASE LLP

By:  /s/Richard K. Milin         By:  /s/Owen C. Pell
     Albert Togut (AT-9759)        Owen C. Pell (OP-0118)
     Scott E. Ratner (SER-0015)     Timothy S. Pfeifer (TP-6331)
     Richard K. Milin (RM-7755)    Titia A. Holtz (TH-4379)
     One Penn Plaza, Suite 3335     1155 Avenue of the Americas
     New York, New York 10119     New York, New York 10036

Telephone:  (212) 594-5000                    Telephone:  (212) 819-8200
Bankruptcy Co-Counsel for Enron               Counsel for the BT/Deutsche
Corp., *et al.*, Reorganized Debtors          Bank Defendants

**(Signatures concluded on following page)**

SUSMAN GODFREY L.L.P.

By:  /s/Kenneth S. Marks
　　　　H. Lee Godfrey (*Pro Hac Vice*)
　　　　Kenneth S. Marks (*Pro Hac Vice*)
　　　　Mary Kathryn Sammons (*Pro Hac Vice*)
　　　　1000 Louisiana St., Suite 5100
　　　　Houston, Texas  77002
　　　　Telephone:  (713) 651-9366
　　　　Special Litigation Counsel to Enron Corp.,
　　　　 *et al.*, Reorganized Debtors


VENABLE LLP

By:   /s/Lawrence H. Cooke
　　　　Richard L. Wasserman (RW-8696)
　　　　Michael Schatzow (*Pro Hac Vice*)
　　　　Lawrence H. Cooke II (LC-8884)
　　　　1800 Mercantile Bank & Trust Building
　　　　2 Hopkins Plaza
　　　　Baltimore, Maryland  21201
　　　　Telephone:  (410) 244-7400
　　　　Special Litigation Counsel to Enron Corp.,
　　　　 *et al.*, Reorganized Debtors


**SO ORDERED:**

s/Arthur J. Gonzalez
HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

June 7, 2006
Date

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                     :

In re:                                 :       Chapter 11

ENRON CORP., *et al.*,        :       Case No. 01-16034 (AJG)

                                 :       (Jointly Administered)

        Reorganized Debtors.   :

                                 :

---------------------------------------------------------------x

ENRON CORP., *et al.*,        :       Adversary Proceeding No.
                                 :       03-09266 (AJG)

        Plaintiffs,           :

                                 :

        v.                      :

CITIGROUP INC., *et al.*,    :

        Defendants.       :

                                 :

---------------------------------------------------------------x

## SIXTH STIPULATION AND ORDER

A.    **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.    **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.    **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.    **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

2

E.    **WHEREAS,** on December 1, 2005, the Court entered a Stipulation and Order amending certain deadlines in the Scheduling Order, which were subsequently amended.

F.    **WHEREAS,** the Parties hereto have consented to a further amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED,** by and among the Parties, through their respective counsel, as follows:

1.    Plaintiffs' objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a date to be agreed by the parties in response to a demand. Similarly, in response to Plaintiffs' demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a demand, and the demand may be made at any time prior to (a) ninety days following the Court's ruling on the Deutsche Bank Defendants' motion to dismiss, or (b) February 1, 2007, whichever is earlier. The parties agree that fact discovery concerning the Valhalla Transaction will be completed prior to the conclusion of expert discovery relating to that Transaction.

2.    The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place on or before September 15, 2006 on date(s) to

3

be agreed by the Parties.  The subject matter of the depositions will not violate the

Deposition Protocol Order entered by this Court on March 11, 2004.

      3.     Although the Parties may continue to confer and to seek

supplemental responses to discovery requests and deposition notices that have been

served within the time permitted by the Scheduling Order, no new discovery requests

or deposition notices may be served after the time permitted by the Scheduling Order

absent a Court order or the Parties' consent.

      4.     The fact that an extension for providing discovery responses has

been granted beyond the November 30, 2005 discovery cut-off date shall not be used as

evidence against any party in any other motion or context, shall not constitute a waiver

of any other rights that otherwise exist, and shall not in any way expand or reduce the

rights of a party that did not exist as of the time of the close of discovery on November

30, 2005.

      5.     This stipulation may be executed in counterparts and the

counterparts may be exchanged by facsimile.

Dated:     New York, New York
           July 28, 2006

TOGUT, SEGAL & SEGAL LLP       WHITE & CASE LLP

By:  /s/ Richard K. Milin         By:  /s/ Owen C. Pell
      Albert Togut (AT-9759)           Owen C. Pell (OP-0118)
      Scott E. Ratner (SER-0015)       Timothy S. Pfeifer (TP-6331)
      Richard K. Milin (RM-7755)      Titia A. Holtz (TH-4379)
      One Penn Plaza, Suite 3335      1155 Avenue of the Americas
      New York, New York 10119     New York, New York 10036

Telephone:  (212) 594-5000
Bankruptcy Co-Counsel for Enron
Corp., *et al.,* Reorganized Debtors

Telephone:  (212) 819-8200
Counsel for the BT/Deutsche
Bank Defendants

**(Signatures concluded on following page)**

5

SUSMAN GODFREY L.L.P.

By:  /s/Kenneth S. Marks
      H. Lee Godfrey (*Pro Hac Vice*)
      Kenneth S. Marks (*Pro Hac Vice*)
      Mary Kathryn Sammons (*Pro Hac Vice*)
      1000 Louisiana St., Suite 5100
      Houston, Texas  77002
      Telephone:  (713) 651-9366
      Special Litigation Counsel to Enron Corp.,
      *et al.,* Reorganized Debtors


VENABLE LLP

By:   /s/Lawrence H. Cooke
      Richard L. Wasserman (RW-8696)
      Michael Schatzow (*Pro Hac Vice*)
      Lawrence H. Cooke II (LC-8884)
      1800 Mercantile Bank & Trust Building
      2 Hopkins Plaza
      Baltimore, Maryland  21201
      Telephone:  (410) 244-7400
      Special Litigation Counsel to Enron Corp.,
      *et al.,* Reorganized Debtors


**SO ORDERED:**

<u>s/Arthur J. Gonzalez</u>                    <u>July 31, 2006</u>
HONORABLE ARTHUR J. GONZALEZ          Date
UNITED STATES BANKRUPTCY JUDGE

ENRON CORP., *et al.*,
Reorganized Debtors,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Mary Kathryn Sammons (*pro hac vice*)
James T. Southwick (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

VENABLE LLP,
Special Litigation Counsel to
ENRON CORP., *et al.*,
Reorganized Debtors,
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
:
In re:                                                     :     Chapter 11
                                                           :     Case No. 01-16034 (AJG)
ENRON CORP., *et al.*,                                     :
                                                           :     (Jointly Administered)
          Reorganized Debtors.                             :
                                                           :
-----------------------------------------------------------x
                                                           :
ENRON CORP., *et al.*,                                     :     Adversary Proceeding No.
                                                           :     03-09266 (AJG)
          Plaintiffs,                                      :
                                                           :
          v.                                               :
                                                           :
CITIGROUP INC., *et al.*,                                  :
                                                           :
          Defendants.                                      :
                                                           :
-----------------------------------------------------------x

## SEVENTH STIPULATION AND ORDER

A.     **WHEREAS**, on April 20, 2004, the Court entered a Scheduling Order in this adversary proceeding (the "Scheduling Order").

B.     **WHEREAS**, pursuant to the Scheduling Order, as amended, the date by which fact discovery must be completed in this proceeding is November 30, 2005.

C.     **WHEREAS**, on October 31, 2005, Plaintiffs Enron Corp., Enron North America Corp., Enron Natural Gas Marketing Corp., Enron Broadband Services, Inc., Enron Energy Services, Inc., EES Service Holdings, Inc., Enron International, Inc., Enron Energy Service Operations, Inc., ECT Merchant Investments Corp., Enron Power Marketing, Inc. and Atlantic Commercial Finance, Inc. (collectively, "Plaintiffs") served their Second Request to BT/Deutsche Bank Defendants for Production of Documents and Things ("Plaintiffs' Second Request").

D.     **WHEREAS**, on October 28, 2005, Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT Commercial Corp., DB Green, Inc. (f/k/a BT Green, Inc.), Deutsche Leasing New York Corp. (f/k/a BT Leasing Corp.), Seneca Delaware, Inc. (f/k/a EN-BT Delaware, Inc.), Deutsche Bank, S.A., BT Ever, Inc. and Seneca Leasing Partners, L.P. (collectively "BT/Deutsche Bank Defendants," and, together with Plaintiffs, the "Parties") served their First Set of Requests for Admission and Second Set of Interrogatories to Plaintiffs (the "BT/Deutsche Requests").

2

E.    **WHEREAS**, on December 1, 2005, the Court entered a Stipulation and Order amending certain deadlines in the Scheduling Order, which were subsequently amended.

F.    **WHEREAS**, the Parties hereto have consented to a further amendment of the Scheduling Order as set out below;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and among the Parties, through their respective counsel, as follows:

1.    Plaintiffs' objections and responses to all outstanding written discovery requests concerning the Valhalla Transaction (as defined in those Requests) are to be served at a date to be agreed by the parties in response to a demand. Similarly, in response to Plaintiffs' demand for responses to all of Plaintiffs' outstanding written discovery requests relating to the Valhalla Transaction, the BT/Deutsche Bank Defendants will provide responses at a date to be agreed by the parties. Objections and responses to the Valhalla Transaction written discovery shall be timely if provided within a reasonable time after a demand, and the demand may be made at any time prior to (a) ninety days following the Court's ruling on the Deutsche Bank Defendants' motion to dismiss, or (b) February 1, 2007, whichever is earlier. The parties agree that fact discovery concerning the Valhalla Transaction will be completed prior to the conclusion of expert discovery relating to that Transaction.

2.    The deposition(s) Plaintiffs have noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) will take place on or before October 20, 2006 on date(s) to be

agreed by the Parties. The subject matter of the depositions will not violate the Deposition Protocol Order entered by this Court on March 11, 2004.

3.     Although the Parties may continue to confer and to seek supplemental responses to discovery requests and deposition notices that have been served within the time permitted by the Scheduling Order, no new discovery requests or deposition notices may be served after the time permitted by the Scheduling Order absent a Court order or the Parties' consent.

4.     The fact that an extension for providing discovery responses has been granted beyond the November 30, 2005 discovery cut-off date shall not be used as evidence against any party in any other motion or context, shall not constitute a waiver of any other rights that otherwise exist, and shall not in any way expand or reduce the rights of a party that did not exist as of the time of the close of discovery on November 30, 2005.

5.     This stipulation may be executed in counterparts and the counterparts may be exchanged by facsimile.

Dated:     New York, New York
           September 15, 2006


TOGUT, SEGAL & SEGAL LLP                    WHITE & CASE LLP


By:  /s/ Richard K. Milin                  By:  /s/ Owen C. Pell
         Albert Togut (AT-9759)                     Owen C. Pell (OP-0118)
         Scott E. Ratner (SER-0015)                 Timothy S. Pfeifer (TP-6331)
         Richard K. Milin (RM-7755)                 Titia A. Holtz (TH-4379)
         One Penn Plaza, Suite 3335                  1155 Avenue of the Americas

New York, New York 10119                New York, New York 10036
Telephone:  (212) 594-5000              Telephone:  (212) 819-8200
Bankruptcy Co-Counsel for Enron         Counsel for the BT/Deutsche
Corp., *et al.*, Reorganized Debtors    Bank Defendants

**(Signatures concluded on following page)**

SUSMAN GODFREY L.L.P.

By:  /s/Kenneth S. Marks
       H. Lee Godfrey (*Pro Hac Vice*)
       Kenneth S. Marks (*Pro Hac Vice*)
       Mary Kathryn Sammons (*Pro Hac Vice*)
       1000 Louisiana St., Suite 5100
       Houston, Texas  77002
       Telephone:  (713) 651-9366
       Special Litigation Counsel to Enron Corp.,
       *et al.*, Reorganized Debtors


VENABLE LLP

By:  /s/Lawrence H. Cooke
       Richard L. Wasserman (RW-8696)
       Michael Schatzow (*Pro Hac Vice*)
       Lawrence H. Cooke II (LC-8884)
       1800 Mercantile Bank & Trust Building
       2 Hopkins Plaza
       Baltimore, Maryland  21201
       Telephone:  (410) 244-7400
       Special Litigation Counsel to Enron Corp.,
       *et al.*, Reorganized Debtors


**SO ORDERED:**

s/Arthur J. Gonzalez                       September 15, 2006
HONORABLE ARTHUR J. GONZALEZ             Date
UNITED STATES BANKRUPTCY JUDGE

WHITE & CASE LLP
*Attorneys for*
The Deutsche Bank Entities
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
Owen C. Pell (OP-0118)
Timothy S. Pfeifer (TP-6331)
Titia A. Holtz (TH-4379)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ----------------------------- x | | |
| | : | |
| In re: | : | Chapter 11 |
| | : | Case No. 01-16034 (AJG) |
| ENRON CORP., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| ----------------------------- x | : | |
| | : | |
| ENRON CORP., *et al.*, | : | Adversary Proceeding |
| | : | No. 03-09266 (AJG) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITIGROUP INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |
| ----------------------------- x | | |

### THE DEUTSCHE BANK ENTITIES' JOINDER IN THE BARCLAYS DEFENDANTS' MOTION FOR INITIAL DETERMINATION UNDER 28 U.S.C. § 157(b)(3)  THAT CERTAIN CLAIMS ARE NON-CORE CLAIMS

Defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas,

Deutsche Bank Securities Inc., Deutsche Bank Luxembourg, S.A., Deutsche Bank Trust

Company Delaware, Deutsche Bank Trust Corporation, Bankers Trust International plc, BT

Commercial Corp., DB Green, Inc., Deutsche Leasing New York Corp., Seneca Delaware, Inc., Deutsche Bank S.A., BT Ever, Inc., and Seneca Leasing Partners, L.P. (collectively, the "Deutsche Bank Entities"), respectfully submit this Joinder in the Barclays Defendants' Motion for Initial Determination Under 28 U.S.C. § 157(b)(3) that Certain Claims Are Non-Core Claims (Docket No. 363).

On December 1, 2003, Enron filed an Amended Complaint in the above-captioned adversary proceeding, alleging for the first time claims against the Deutsche Bank Entities. On February 17, 2004, the Deutsche Bank Entities filed a Partial Motion to Dismiss Debtors' Amended Complaint and Motion for a More Definite Statement. While that motion was pending, Enron filed its Second and Third Amended Complaints on April 30, 2004 and June 14, 2004, respectively. On November 17, 2004, a stipulation and order between the Deutsche Bank Entities and Enron was entered, which provided that the Deutsche Bank Entities' Motion for More Definite Statement was denied as per the Court's September 23, 2004 decision as to the CSFB Defendants. On January 10, 2005, Enron filed its Fourth Amended Complaint. Thereafter, on January 27, 2005 the Deutsche Bank Entities partial motion to dismiss was argued. That motion is pending.

Accordingly, the Deutsche Bank Entities have not yet answered Debtors' Fourth Amended Complaint and have not yet formally requested a jury trial. However, because the Deutsche Bank Entities intend to request a jury trial when they do file their answer, the Deutsche Bank Entities now join in the Motion of the Barclays Defendants for Initial Determination Under 28 U.S.C. § 157(b)(3) that Certain Claims Are Non-Core Claims, filed in the above-captioned adversary proceeding on July 26, 2005 (Docket No. 363).

As presented in the Barclays memorandum of law in support of its motion, Enron's common law claims of aiding and abetting breach of fiduciary duty (Count 74), aiding and abetting fraud (Count 75), and unlawful civil conspiracy (Count 76)--all of which have also been alleged against the Deutsche Bank Entities--are non-core claims on which the Deutsche Bank Entities are entitled to a jury trial pursuant to 28 U.S.C. §§ 157(d)-(e).  Further, the Deutsche Bank Entities do not consent to the adjudication of the non-core claims by this Court, and seek a determination that the aforementioned claims are non-core under 28 U.S.C. § 157 in order to preserve their right to a jury trial by the United States District Court.  In the interest of avoiding the submission of duplicative briefing, the Deutsche Bank Entities adopt the briefing submitted by the Barclays Defendants on their motion (Docket Nos. 364 and 485) and the Citigroup Defendants (Docket No. 503).

Accordingly, the Deutsche Bank Entities respectfully request that this Court make an initial determination under 28 U.S.C. § 157(b)(3) that the common law claims identified above are non-core claims.

Dated:  May 12, 2006
       New York, New York

Respectfully submitted,

**WHITE & CASE LLP**

By:

   /s/ Owen C. Pell

Owen C. Pell (OP-0118)
Timothy S. Pfeifer (TP-6331)
Titia A. Holtz (TH-4379)
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for*
The Deutsche Bank Entities



**Bankers Trust**
Bankers Trust New York Corporation
and its affiliated Companies

**Thomas Finley**
Managing Director
Bankers Trust Company

Mailing Address:
Mail Stop 2344
P.O. Box 318, Church Street Station
New York, New York 10008

Address:
One Bankers Trust Plaza
New York, New York 10006
Tel: 212-250-3094
Fax: 212-669-1793

October 28, 1997

Mr. Richard A. Causey
Senior Vice President and
   Chief Accounting and Information Officer
Enron Corp.
P.O. Box 1188
Houston, Texas 77251

Dear Mr. Causey:

This letter is to confirm that Enron Corp. (the **"Company"**) has engaged Bankers Trust Company (**"Bankers Trust"**) as its exclusive financial advisor in connection with structuring a transaction (the **"Transaction"**) which involves the utilization of an existing partnership (**"Enron Partnership"**) owned by affiliates of the Company to make a joint investment in personal property and financial assets including residual interests (the **"REMIC Residuals"**) in real estate mortgage investment conduits.

The Transaction will be structured substantially as described during recent conversations between representatives of the Company and representatives of Bankers Trust, and otherwise as agreed to between the Company and Bankers Trust. Bankers Trust New York Corporation and affiliates (the **"BT Affiliates"**) will contribute various REMIC Residuals, cash and other financial assets to Enron Partnership, and will in return receive Class B limited partnership interests and debt securities of Enron Partnership. Affiliates of the Company will contribute cash, personal property and financial assets to Enron Partnership, and in return will receive Class A and Class B general and limited partnership interests in Enron Partnership.

Upon the terms and subject to the conditions set forth below (the **"Agreement"**), Bankers Trust is retained as exclusive financial advisor to the Company and any of its applicable affiliates with respect to structuring the Transaction.

Mr. Richard A. Causey
October 28, 1997
Page 2

1.    **Services**. At the request of the Company and, as appropriate, Enron Partnership, Bankers Trust will use its best efforts to perform the following services in connection with the Transaction:

    a)    advise and assist in designing an appropriate structure for the proposed Transaction;

    b)    assist in the preparation of financial analysis and computer modeling with respect to the Transaction to the extent requested by the Company being understood that all results of the use of such model shall be the responsibility of the Company;

    c)    work with legal counsel, accountants and other relevant parties to document and close the Transaction; and

    d)    assist in the selection and acquisition of the portfolio of securities (the "**Securities**") to be purchased by Enron Partnership, including advising on the appropriate term to maturity, credit quality and coupon interest rate of the Securities;

    e)    assist, from time to time when requested by the Company, in the evaluation, selection and/or acquisition of additional securities;

    f)    perform such other investment banking and financial advisory services related to or arising out of the services described in this paragraph 1, as Bankers Trust and the Company may from time to time agree.

2.    **Compensation.** In consideration of the services rendered by Bankers Trust, the Company agrees to pay, or cause to be paid, to Bankers Trust a non-refundable cash fee, in the aggregate amount of $10,000,000, subject to any reduction pursuant to the terms hereof. The foregoing notwithstanding, (a) Bankers Trust will be paid $1,000,000 upon the "Closing" of the Transaction and an additional $450,000 on each January 31, April 30, July 31 and October 31 of the years 1998 through 2002, beginning January 31, 1998 and ending October 31, 2002 and (b) if a change in law or accounting rule (or the enacted effective date thereof) prior to October 31, 2002 materially reduces the Company's expected accounting reporting treatment of the Transaction under GAAP (as hereinafter defined), the portion of such fee which has not been paid to Bankers Trust at such time will be forfeited by Bankers Trust.

For the purposes of this Agreement, (a) "**GAAP**" means generally accepted accounting principles in effect in the United States as in effect from time to time as applied to the Transaction, and (b) the "**Closing**" is deemed to have occurred upon the contribution of the REMIC Residuals by the BT Affiliates to Enron Partnership.

It is understood that the foregoing fee does not include fees for additional services including services provided to the Company or its affiliates under other engagement letters, and other services such as

Mr. Richard A. Causey
October 28, 1997
Page 3

swaps, bridge financing, valuation services, commitment fees, and fees and expenses for other parties involved in the transaction (e.g., trustee fees and expenses).

We further agree that the General Partner of Enron Partnership is authorized to cause Enron Partnership to pay the fees under this Agreement and the fees of Akin, Gump, Strauss, Hauer & Feld, L.L.P. incurred by the Company in connection with the Transaction.

3.        **Indemnification.**  The Company hereby agrees to indemnify and hold harmless Bankers Trust and its affiliates and their respective directors, officers, employees, agents and representatives (collectively, "**Indemnified Persons**") from and against all losses, claims, damages, liabilities, costs and expenses incurred by any of them (including fees and disbursements of legal counsel) which (I) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any information provided by the Company in connection herewith or arise out of or are based upon any omission or alleged omission to state therein any material fact necessary to make the statements therein not misleading, or (ii) are otherwise related to or arise out of or in connection with the services contemplated hereby, and the Company will reimburse Bankers Trust and each other Indemnified Person for all expenses (including fees and disbursements of legal counsel) as they are incurred in connection with investigating, preparing or defending any such action or claim, whether or not in connection with pending or threatened litigation in which Bankers Trust or such other Indemnified Person is a party.  The Company will not be responsible, however, for any losses, claims, damages, liabilities, costs or expenses of any Indemnified Person pursuant to clause (ii) in the preceding sentence to the extent they result primarily from the bad faith or recklessness of such Indemnified Person.  The Company also agrees that neither Bankers Trust, nor any other Indemnified Person, shall have any liability to the Company for or in connection with the services contemplated hereby except for such liability for losses, claims, damages, liabilities, costs or expenses incurred by the Company to the extent they result primarily from Bankers Trust's bad faith or recklessness or from any material inaccuracy in any express representation or warranty made by Bankers Trust or any of its affiliates in the documentation governing the Transaction.  If for any reason the foregoing indemnification is unavailable to an Indemnified Person or insufficient to hold any Indemnified Person harmless, then the Company shall contribute to the amount paid or payable by it and Bankers Trust as a result of such losses, claims, damages, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company on one hand and Bankers Trust on the other hand, as well as any relevant equitable considerations.  The amount paid or payable by a party as a result of losses, claims, damages, liabilities, costs or expenses shall be deemed to include any reasonable legal or other fees or expenses incurred in defending any action or claim.  In no event shall the Company be liable to any Indemnified Person for any lost or prospective profits or any other special, punitive, exemplary, consequential, incidental or indirect losses or damages (in tort, contract or otherwise) under or in respect of this Agreement for any failure of performance related hereto howsoever caused, whether or not arising from the Company's sole, joint or concurrent negligence. The Indemnified Persons shall not be required to contribute in the aggregate any amount in excess of the amount of fees actually received by Bankers Trust hereunder.

Mr. Richard A. Causey
October 28, 1997
Page 4

4.    **Additional Services**.  If the Company or Enron Partnership requests Bankers Trust to perform services not contemplated by this Agreement, or if the terms and conditions of Bankers Trust's engagement change, Bankers Trust's compensation therefor will be determined through negotiations conducted in good faith, and the terms of such engagement will be set forth in a separate written agreement between the Company and Bankers Trust.  Nothing in this Agreement is intended to obligate or commit Bankers Trust or any of its affiliates to provide any services other than as set out herein.

5.    **Affiliate Services**.  In connection with the services to be provided hereunder, Bankers Trust may employ the services of its affiliates, including BT Alex. Brown Incorporated.  Bankers Trust may share with any of its affiliates any non-public information related to the Company or the contemplated Transaction.  The term "**affiliate**" as used herein shall have the meaning ascribed to such term in the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended.

6.    **Survival**.  Bankers Trust's engagement hereunder may be terminated at any time by either Bankers Trust or the Company by prior written notice thereof to the other party, provided, that the indemnification provisions set out in Paragraph 3, the compensation provisions outlined in Paragraph 2, and the representations and warranties of the Company contained herein, shall remain operative and in full force and effect and shall survive such termination.  The indemnity obligations of the Company hereunder and referred to herein shall be in addition to any liability the Company may otherwise have.

7.    **Information**.  The Company agrees to furnish to Bankers Trust, and Bankers Trust to the Company, such information as the other party reasonably requests in connection with the Transaction.

8.    **Counterparts, Etc**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and cannot be amended or otherwise modified except in writing executed by the parties hereto.  Bankers Trust may transfer or assign, in whole or from time to time in part, to one or more of its affiliates its rights and obligations hereunder, but no such transfer or assignment will relieve Bankers Trust of its obligations hereunder without the prior written consent of the Company.  The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company and Bankers Trust and their respective affiliates.

9.    **Governing Law**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF.  The Company hereby submits to the non-exclusive jurisdiction of the Federal and New York State courts located in the City of New York in connection with any dispute related to this Agreement, the contemplated Transaction or any of the other matters contemplated hereby.

Mr. Richard A. Causey
October 28, 1997
Page 5

10.    **Notices**.  Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (a) to the Company, at its office at the address set forth above and (b) to Bankers Trust, at its offices at One Bankers Trust Plaza, 130 Liberty Street, New York, New York 10006, Attention: Mr. Thomas Finley.

11.    **Bankers Trust Advice, Role, Etc**.  No opinion or advice rendered by Bankers Trust, whether formal or informal, may be publicly disclosed nor may the Company refer to Bankers Trust's role in the contemplated Transaction without Bankers Trust's prior written consent.  The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar expert advice.  Moreover, the Company understands and agrees that Bankers Trust makes no representation or warranty as to the tax or accounting consequences of the Transaction.  The Company further agrees that neither Bankers Trust nor any of its directors, officers, employees, agents or representatives shall have any liability to the Company or its representatives resulting from the Company's use of the form of structure to be used in the Transaction.

12.    **No Rights in Shareholders, Etc**.  The Company recognizes that Bankers Trust has been retained only by the Company, and that the Company's engagement of Bankers Trust is not deemed to be on behalf of and is not intended to confer rights upon any shareholder, owner or partner of the Company or any other person not a party hereto as against Bankers Trust or any of Bankers Trust's affiliates or the respective directors, officers, agents, employees or representatives of Bankers Trust or Bankers Trust's affiliates.  Unless otherwise expressly agreed, no one other than the Company is authorized to rely upon the Company's engagement of Bankers Trust or any statements, advice, opinions or conduct by Bankers Trust.

If the Company is in agreement with the foregoing, please sign and return one copy of this letter which will thereupon constitute the agreement of the parties hereto with respect to the subject matter of this letter.

BANKERS TRUST COMPANY

By:_____

Thomas F. Finley
Managing Director

Agreed and Accepted:

ENRON CORP.

By:_____

Richard A. Causey
Senior Vice President

Mr. Richard A. Causey
October 28, 1997
Page 5

10.  **Notices.** Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (a) to the Company, at its office at the address set forth above and (b) to Bankers Trust, at its offices at One Bankers Trust Plaza, 130 Liberty Street, New York, New York 10006, Attention: Mr. Thomas Finley.

11.  **Bankers Trust Advice, Role, Etc.**  No opinion or advice rendered by Bankers Trust, whether formal or informal, may be publicly disclosed nor may the Company refer to Bankers Trust's role in the contemplated Transaction without Bankers Trust's prior written consent.  The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar expert advice.  Moreover, the Company understands and agrees that Bankers Trust makes no representation or warranty as to the tax or accounting consequences of the Transaction.  The Company further agrees that neither Bankers Trust nor any of its directors, officers, employees, agents or representatives shall have any liability to the Company or its representatives resulting from the Company's use of the form of structure to be used in the Transaction.

12.  **No Rights in Shareholders, Etc.**  The Company recognizes that Bankers Trust has been retained only by the Company, and that the Company's engagement of Bankers Trust is not deemed to be on behalf of and is not intended to confer rights upon any shareholder, owner or partner of the Company or any other person not a party hereto as against Bankers Trust or any of Bankers Trust's affiliates or the respective directors, officers, agents, employees or representatives of Bankers Trust or Bankers Trust's affiliates.  Unless otherwise expressly agreed, no one other than the Company is authorized to rely upon the Company's engagement of Bankers Trust or any statements, advice, opinions or conduct by Bankers Trust.

If the Company is in agreement with the foregoing, please sign and return one copy of this letter which will thereupon constitute the agreement of the parties hereto with respect to the subject matter of this letter.

BANKERS TRUST COMPANY

By: _____
Thomas F. Finley
Managing Director

Agreed and Accepted:

ENRON CORP.

By: _____
Richard A. Causey
Senior Vice President

Brian J. McGuire
*Vice President*
Bankers Trust Company

January 28, 1999

**♠ Bankers Trust**
*Architects of Value*

Mr. Richard A. Causey
Senior Vice President and
   Chief Accounting and Information Officer
Enron Corp.
P.O. Box 1188
Houston, Texas 77251

Dear Mr. Causey:

    This letter is to confirm that Enron Corp. (the *"Company"*) has engaged Bankers Trust Company (*"Bankers Trust"*) as its exclusive financial advisor in connection with (a) the direct investment in various leased property (the "**Leased Assets**") and (b) a real estate investment trust (the "**REIT**") which will acquire and manage financial assets including real estate mortgage backed securities (the "**Mortgage Securities**") and residual interests (the "**REMIC Residuals**") in real estate mortgage investment conduits (the "**Transaction**").

    The Transaction will be structured substantially as described during recent conversations between representatives of the Company and representatives of Bankers Trust, and otherwise as agreed to between the Company and Bankers Trust. An affiliate of Bankers Trust will transfer leased property to an Enron affiliate in exchange for cash of equal value. Bankers Trust will contribute various REMIC Residuals and Mortgage Securities to the REIT and will in return receive common stock and debt securities of the REIT. Affiliates of the Company will contribute Mortgage Securities to the REIT and will in return receive preferred stock of the REIT.

    Upon the terms and subject to the conditions set forth below (the *"Agreement"*), Bankers Trust is retained as exclusive financial advisor to the Company and any of its applicable affiliates with respect to structuring the Transaction.

1.    **Services.** At the request of the Company, Bankers Trust will use its best efforts to perform the following services in connection with the Transaction:

    a)     advise and assist in designing an appropriate structure for the proposed Transaction;

    b)     assist in the preparation of financial analysis and computer modeling with respect to the Transaction to the extent requested by the Company, it being understood that all results of the use of such model shall be the sole responsibility of the Company;

Mailing Address:
P.O. Box 318
Church Street Station
New York, NY 10008

Telephone: 212 250-1011
Facsimile: 212 669-1793

Mr. Richard A. Causey
January 28, 1999
Page 2

c)     work with legal counsel, accountants and other relevant parties to document and close the Transaction;

d)     provide future investment advisory services with respect to investments of the REIT, including acquisitions and dispositions of the REIT's assets, as requested by the Company or as deemed necessary by Bankers Trust (in its sole discretion);

e)     provide assistance, as necessary, to have the record ownership of the REMIC Residuals transferred on the records of the respective trustees from that of Bankers Trust to that of the REIT; and

f)     perform such other investment banking and financial advisory services related to or arising out of the services described in this paragraph 1, as Bankers Trust and the Company may from time to time agree.

2.     **Compensation.** In consideration of the services rendered by Bankers Trust, the Company agrees to pay, or cause to be paid, to Bankers Trust a cash fee, in the aggregate amount of $15,000,000, subject to any reduction pursuant to the terms hereof. The preceding sentence notwithstanding, (a) Bankers Trust will be paid $5,250,000 on September 1, 1999 and an additional $750,000 on each March 1, June 1, September 1 and December 1 of the years 1999 through and including 2002, beginning December 1, 1999 and ending December 1, 2002; and (b) if a change in law or accounting rule (or the enacted effective date thereof) prior to December 1, 2002 materially reduces the Company's expected accounting reporting treatment of the Transaction under GAAP (as hereinafter defined), the portion of such fee which has not been paid to Bankers Trust at such time will be forfeited by Bankers Trust. Because the predominant purpose of the Transaction is to generate financial accounting benefits, if a Change in Law Event (as such term is used in the operative documents) or a change in accounting rule (or the enacted effective date thereof) occurs prior to December 31, 2003, that materially reduces the Company's expected financial accounting benefit (the "**Expected Benefit**") from the Transaction under GAAP, the fee payable to Bankers Trust will be reduced on a proportionate basis (comparing the actual recorded benefit to the Expected Benefit), provided that in no circumstances will Bankers Trust fee be less than $2 million.

For the purposes of this Agreement, (a) "**GAAP**" means generally accepted accounting principles in effect in the United States as in effect from time to time as applied to the REIT Transaction, and (b) the "**Closing**" is deemed to have occurred upon the transfer of the REMIC Residuals and the Mortgage Securities by Bankers Trust to the REIT and the acquisition by an Enron affiliate of the Leased Assets.

It is understood that the foregoing fee does not include fees for additional services including services provided to the Company or its affiliates under other engagement letters, and other services such as swaps, bridge financing, valuation services, commitment fees, and fees and expenses for other parties involved in the transaction (e.g., trustee fees and expenses).

Mr. Richard A. Causey
January 28, 1999
Page 3

3.     **Indemnification.** The Company hereby agrees to indemnify and hold harmless Bankers Trust and its affiliates and their respective directors, officers, employees, agents and representatives (collectively, *"Indemnified Persons"*) from and against all losses, claims, damages, liabilities, costs and expenses incurred by any of them (including fees and disbursements of legal counsel) which (i) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any information provided by the Company in connection herewith or arise out of or are based upon any omission or alleged omission to state therein any material fact necessary to make the statements therein not misleading, or (ii) are otherwise related to or arise out of or in connection with the services contemplated hereby, and the Company will reimburse Bankers Trust and each other Indemnified Person for all expenses (including fees and disbursements of legal counsel) as they are incurred in connection with investigating, preparing or defending any such action or claim, whether or not in connection with pending or threatened litigation in which Bankers Trust or such other Indemnified Person is a party. The Company will not be responsible, however, for any losses, claims, damages, liabilities, costs or expenses of any Indemnified Person pursuant to clause (ii) in the preceding sentence to the extent they result primarily from the bad faith or recklessness of such Indemnified Person. The Company also agrees that neither Bankers Trust, nor any other Indemnified Person, shall have any liability to the Company for or in connection with the services contemplated hereby except for such liability for losses, claims, damages, liabilities, costs or expenses incurred by the Company to the extent they result primarily from Bankers Trust's bad faith or recklessness. If for any reason the foregoing indemnification is unavailable to an Indemnified Person or insufficient to hold any Indemnified Person harmless, then the Company shall contribute to the amount paid or payable by it and Bankers Trust as a result of such losses, claims, damages, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company on one hand and Bankers Trust on the other hand, as well as any relevant equitable considerations. The amount paid or payable by a party as a result of losses, claims, damages, liabilities, costs or expenses shall be deemed to include any reasonable legal or other fees or expenses incurred in defending any action or claim. In no event shall the Company be liable to any Indemnified Person for any lost or prospective profits or any other special, punitive, exemplary, consequential, incidental or indirect losses or damages (in tort, contract or otherwise) under or in respect of this Agreement for any failure of performance related hereto howsoever caused, whether or not arising from the Company's sole, joint or concurrent negligence. The Indemnified Persons shall not be required to contribute in the aggregate any amount in excess of the amount of fees actually received by Bankers Trust hereunder.

4.     **Company Approval.** The Company acknowledges that the Transaction has been approved by senior management personnel of the Company and by the Executive Committee of its Board of Directors.

5.     **Additional Services.** If the Company requests Bankers Trust to perform services not contemplated by this Agreement, or if the terms and conditions of Bankers Trust's engagement

C:\My Documents\REMICENG6.doc
01/05/80 08.38 PM

Mr. Richard A. Causey
January 28, 1999
Page 4

change, Bankers Trust's compensation therefor will be determined through negotiations conducted in good faith, and the terms of such engagement will be set forth in a separate written agreement between the Company and Bankers Trust. Nothing in this Agreement is intended to obligate or commit Bankers Trust or any of its affiliates to provide any services other than as set out herein.

6.   **Affiliate Services.** In connection with the services to be provided hereunder, Bankers Trust may employ the services of its affiliates, including BT Alex. Brown Incorporated. Bankers Trust may share with any of its affiliates any non-public information related to the Company or the contemplated Transaction. The term *"affiliate"* as used herein shall have the meaning ascribed to such term in the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended.

7.   **Survival.** Bankers Trust's engagement hereunder may be terminated at any time by either Bankers Trust or the Company by prior written notice thereof to the other party, <u>provided</u>, that the indemnification provisions set out in Paragraph 3, the compensation provisions outlined in Paragraph 2, and the representations and warranties of the Company contained herein, shall remain operative and in full force and effect and shall survive such termination. The indemnity obligations of the Company hereunder and referred to herein shall be in addition to any liability the Company may otherwise have.

8.   **Information.** The Company agrees to furnish Bankers Trust with such information as Bankers Trust reasonably requests in connection with its engagement hereunder. The Company recognizes and confirms that Bankers Trust (i) will be relying solely on such information and other information available from generally recognized public sources in performing the services contemplated hereunder, (ii) will not independently verify the accuracy or completeness of such information, (iii) does not assume responsibility for the accuracy or completeness thereof, and (iv) will make appropriate disclaimers consistent with the foregoing.

9.   **Counterparts, Etc.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and cannot be amended or otherwise modified except in writing executed by the parties hereto. Bankers Trust may transfer or assign, in whole or from time to time in part, to one or more of its affiliates its rights and obligations hereunder, but no such transfer or assignment will relieve Bankers Trust of its obligations hereunder without the prior written consent of the Company. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company and Bankers Trust and their respective affiliates.

C:\My Documents\REMICENG6.doc
01/05/80 08:38 PM

Mr. Richard A. Causey
January 28, 1999
Page 5

10.    **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF.

11.    **Notices.** Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (a) to the Company, at its office at the address set forth above and (b) to Bankers Trust, at its offices at One Bankers Trust Plaza, 130 Liberty Street, New York, New York 10006, Attention: Mr. Brian McGuire.

12.    **Bankers Trust Advice, Role, Etc.** No opinion or advice rendered by Bankers Trust, whether formal or informal, may be publicly disclosed nor may the Company refer to Bankers Trust's role in the contemplated Transaction without Bankers Trust's prior written consent. The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar expert advice. Moreover, the Company understands and agrees that Bankers Trust makes no representation or warranty as to the tax or accounting consequences of the Transaction. The Company further agrees that neither Bankers Trust nor any of its directors, officers, employees, agents or representatives shall have any liability to the Company or its representatives resulting from their use of the form of structure to be used in the Transaction.

13.    **No Rights in Shareholders, Etc.** The Company recognizes that Bankers Trust has been retained only by the Company, and that the Company's engagement of Bankers Trust is not deemed to be on behalf of and is not intended to confer rights upon any shareholder, owner or partner of the Company or any other person not a party hereto as against Bankers Trust or any of Bankers Trust's affiliates or the respective directors, officers, agents, employees or representatives of Bankers Trust or Bankers Trust's affiliates. Unless otherwise expressly agreed, no one other than the Company is authorized to rely upon the Company's engagement of Bankers Trust or any statements, advice, opinions or conduct by Bankers Trust.

If the Company is in agreement with the foregoing, please sign and return one copy of this letter which will thereupon constitute the agreement of the parties hereto with respect to the subject matter of this letter.

Mr. Richard A. Causey
January 28, 1999
Page 6

BANKERS TRUST COMPANY

By: _____

Brian J. McGuire
Vice-President

Agreed and Accepted:

Enron Corp.

By: _____

Richard A. Causey
Senior Vice President

FORM B10 (Official Form 10) (4/01)

| United States Bankruptcy Court | Southern District of New York | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case Number |
|---|---|
| **ENRON CORP.** | **01-16034 (AJG)** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):
**Deutsche Bank Trust Company Americas, formerly known as Bankers Trust Company**

☐  Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)        0000012800

Name and address where notices should be sent:
**Jeffrey Welch, Esq.**           **Robert M. Dombroff, Esq.**
**Deutsche Bank AG**              **Bingham McCutchen LLP**
**1301 6th Avenue**              **399 Park Avenue**
**New York, NY 10019**           **New York, NY  10022**
**(212) 469-7890**               **(212) 705-7000**

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

**See attached Exhibit A**

Check here ☐ replaces
if this claim ☐ amends    a previously filed claim, dated:

**1.  Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other_____**See attached Exhibit A**_____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Your SS # _____ ___ ___
Unpaid compensation for services performed
from _____ to _____
(date)            (date)

**2.  Date debt was incurred:**

**3.  If court judgment, date obtained:**

**4.  Total Amount of Claim at Time Case Filed:**   $_____**See attached Exhibit A**
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.  Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other
Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:

**6.  Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**7.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8.  Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. **See attached Exhibit B.**

**9.  Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

NYDOCS2:803293.1

-2-

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|------|---|
| 10/___/0 2 | **DEUTSCHE BANK TRUST COMPANY AMERICAS, formerly known as Bankers Trust Company** <br><br> **By** *Calli S. Hayes* |

Penalty for presenting fraudulent claim. Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Calli S. Hayes, Managing Director

*/   Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

# EXHIBIT A – CALCULATION OF CLAIMS

**Claimant:    Deutsche Bank Trust Company Americas**

1.    On or about January 28, 1999, certain parties, including Bankers Trust Company ("BTCo.") and Enron Corp. ("Enron"), entered into an integrated series of agreements for the purposes of, *inter alia*, the direct investment in various leased property and the establishment of a real estate investment trust (the "Transaction"). On or about April 15, 2002, BTCo. changed its name to Deutsche Bank Trust Company Americas ("DBTCA"). In connection with the Transaction, DBTCA holds certain claims and rights, including the following:

(a.)    DBTCA has a contingent, unliquidated claim against Enron, pursuant to Section 9(a) of that certain Shareholders Agreement, dated as of January 28, 1999, by and among Enron, BTCo., and Maliseet Properties, Inc. ("Maliseet"), in which Enron indemnifies BTCo. from and against any and all losses, costs and expenses (including but not limited to attorneys fees) that arise or result from any activity, action or inaction of Maliseet. As a result of the activity, action or inaction of Maliseet, DBTCA may have suffered damages in amounts as yet incapable of calculation.*/

(b.)    DBTCA has a contingent, unliquidated claim against Enron, pursuant to Section 1.1 of that certain Two Year Put Agreement, dated as of January 28, 1999, between BTCo. and Enron (the "Two Year Put"). In the event that Enron fails to perform its duties under the Two Year Put, DBTCA will suffer damages in an amount as yet incapable of calculation.*/

(c.)    DBTCA has a contingent, unliquidated claim against Enron, pursuant to Section 1.1 of that certain 78 Month Put Agreement, dated as of January 28, 1999, between BTCo. and Enron (the "78 Month Put"). In the event that Enron fails to perform its duties under the 78 Month Put, DBTCA will suffer damages in an amount as yet incapable of calculation.*/

(d.)    DBTCA has a contingent, unliquidated claim against Enron, in addition to any claims set forth above, for any and all other damages resulting from: (i) any failure by Enron to perform any of its obligations under or in respect of any of the documents concerning the Transaction, including without limitation any guaranty or indemnity obligations, or (ii) any improper or inequitable conduct with respect to the Transaction or the parties thereto, including without limitation any fraud, misrepresentation, interference with contractual relations, or undue influence over Maliseet, in an amount as yet incapable of calculation.*/

---

*/ Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

NYDOCS2:803293.1

-2-

2.    From March 1997 through January 1999, several consulting agreements were entered into by and between Enron and BTCo., each memorialized by a duly executed engagement letter, pursuant to which BTCo. provided certain consulting services in return for certain compensation. As a result of the foregoing:

(a.)    DBTCA has a fixed, liquidated claim against Enron, pursuant to Section 2 of a certain engagement letter, dated March 27, 1997, as amended thereafter, in which Enron agreed to pay BTCo. a fee for BTCo.'s consulting services. BTCo. fully performed its obligations. As of December 2, 2001, $ 786,000.00 of that fee remains outstanding and due.*/

(b.)    DBTCA has a fixed, liquidated claim against Enron, pursuant to Section 2 of a certain engagement letter, dated January 28, 1999, in which Enron agreed to pay BTCo. a fee for BTCo.'s consulting services. BTCo. fully performed its obligations. As of December 2, 2001, $ 3,750,000.00 of that fee remains outstanding and due.*/

(c.)    DBTCA has a contingent, unliquidated claim against Enron, pursuant to Section 3 of each of the foregoing engagement letters, in which Enron agreed to indemnify and hold harmless BTCo., *inter alia*, "from and against all losses, claims, damages, liabilities, costs and expenses incurred" by BTCo. that are "related to or arise out of or in connection with the services contemplated hereby." In the event that such losses, etc., are incurred, BTCo. will suffer damages in an amount as yet incapable of calculation.*/

The foregoing may be summarized as follows:

| | |
|---|---|
| 1(a.) Indemnity | _____ |
| 1(b.) Damages under Two Year Put | _____ |
| 1(c.) Damages under 78 Month Put | _____ |
| 1(d.) Other Damages | _____ |
| 2(a.) Consulting Fee | $ 786,000.00 |
| 2(b.) Consulting Fee | $ 3,750,000.00 |
| 2(c.) Consulting Indemnity | _____ |

---

*/  Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

Collection Costs                                    _____

**TOTAL CLAIM OF DEUTSCHE BANK
TRUST COMPANY AMERICAS**
                                                    _____
                                                    **[as yet unknown]**

Claimant reserves the right to amend its Proof of Claim from time to time to restate the amount of this claim as it becomes further liquidated or for other lawful purposes. Claimant also reserves the right to claim all amounts due in respect of any additional legal fees or expenses, default interest, make-whole premium and postpetition interest to the extent allowed by law.

This Proof of Claim is filed under the compulsion of the bar date established in these Chapter 11 cases and is filed to protect the Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

**EXHIBIT B – SUMMARY OF DOCUMENTS RELEVANT TO CLAIMS**

Shareholders Agreement, dated as of January 28, 1999, by and among Enron, BTCo., and Maliseet Properties, Inc. ("Maliseet").

Two Year Put Agreement, dated as of January 28, 1999, between BTCo. and Enron (the "Two Year Put").

78 Month Put Agreement, dated as of January 28, 1999, between BTCo. and Enron (the "78 Month Put").

Engagement Letter, dated March 27, 1997, executed by Enron and BTCo.

Engagement Letter, dated January 28, 1999, executed by Enron and BTCo.

FORM B10 (Official Form 10)(4/01)

| United States Bankruptcy Court    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**ENRON CORP.** | Case Number<br>**01-16034 (AJG)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**BT Green, Inc.** | ☐ | Filed: USBC - Southern District of New York<br>ENRON, Et Al.<br>01-16034 (CA)    0000012799 |
|---|---|---|

Name and address where notices should be sent:

| Jeffrey Welch, Esq. | Robert M. Dombroff, Esq. |
|---|---|
| Deutsche Bank AG | Bingham McCutchen LLP |
| 1301 6th Avenue | 399 Park Avenue |
| New York, NY 10019 | New York, NY 10022 |
| (212) 469-7890 | (212) 705-7000 |

☐ received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor:<br><br>**See attached Exhibit A** | Check here ☐ replaces<br>if this claim ☐ amends    a previously filed claim, dated: |
|---|---|

**1.    Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other **See attached Exhibit A**

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)

Your SS # _____

Unpaid compensation for services performed

from _____ to _____
      (date)          (date)

**2.    Date debt was incurred:**

**3.    If court judgment, date obtained:**

**4.    Total Amount of Claim at Time Case Filed:    $ _____ See attached Exhibit A**

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.    Secured Claim**
- ☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate  ☐ Motor Vehicle
- ☐ Other

Value of Collateral: $ _____

Amount of arrearage and other charges <u>at time case filed</u> included in secured claim, if any:

**6.    Unsecured Priority Claim.**
- ☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $ _____

Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**7.    Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8.    Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. **See attached Exhibit B.**

**9.    Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>10/<u>10</u> /02 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>**BT GREEN, INC.**<br><br>By _____<br>Brian J. McGuire, President |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# EXHIBIT A – CALCULATION OF CLAIMS

**Claimant:    BT Green, Inc.**

On or about October 31, 1997, certain parties, including Bankers Trust Company ("BTCo."), Bankers Trust (Delaware) ("BT-D"), and Enron Corp. ("Enron") entered into an integrated series of agreements for the purposes of, *inter alia*, establishing a limited partnership, ECT Investing Partners, L.P. ("ECTIP"), and acquiring and leasing real and personal property to Enron (the "Transaction"). BT Green, Inc. ("BT Green") became successor in interest to BTCo. with respect to the Transaction, pursuant to that certain Contribution Agreement, dated as of October 31, 1997, between BTCo., as Contributor, and BT Green, Inc., as Contributee. In connection with the Transaction, BT Green holds certain claims and rights, including the following:

1.    BT Green has a fixed, liquidated claim against Enron in the amount of $ 7,393,330.00, pursuant to Section 1 of that certain Guaranty of Obligations, dated as of October 31, 1997, by Enron in favor of BT-D and BTCo (the "Payment Guaranty"), in which Enron guaranteed the punctual payment of, *inter alia*, a certain Promissory Note in the sum of $ 7,393,330.00, dated as of October 31, 1997, made by ECTIP to BT Green (as successor in interest to BTCo.) (the "Note"). As of December 2, 2001, the Note remains outstanding and due.*/

2.    BT Green has a contingent, unliquidated claim against Enron, pursuant to Section 1 of that certain Guaranty and Indemnification Agreement, dated as of October 31, 1997, by Enron in favor of BTCo. and BT-D (the "Performance Guaranty"), in which Enron agreed to indemnify BTCo. and BT-D against any adverse tax consequence resulting from certain acts or omissions of ECT Investing Corp. ("ECTIC") under that certain First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P. by and between Enron, BTCo., BT-D, Enron Pipeline Company, ECT Investments Holding Corp., and ECT Investing Corp. (the "Partnership Agreement"). As a result of the acts or omissions of ECTIC, BT Green may suffer an increased tax liability, in an amount as yet incapable of calculation.*/

3.    BT Green has a fixed, liquidated claim against Enron, pursuant to Section 1 of the Performance Guaranty, in which Enron guaranteed the performance by ECTIC of all of its material obligations and covenants under the Partnership Agreement. As of December 2, 2001, ECTIC had failed to make distributions as required by Section 3 of the Partnership Agreement in the sum of at least $ 331,396.19.*/

4.    BT Green has a contingent, unliquidated claim against Enron, pursuant to Section 1 of the Performance Guaranty. In the event that ECTIC further has failed or does fail to perform its duties as General Partner under the Partnership Agreement, in

---

*/ Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

NYDOCS2:803290.1

-2-

addition to that failure to make distributions set forth in the preceding paragraph, then BT Green, Inc. will suffer damages in an amount as yet incapable of calculation.*/

5.    BT Green has a contingent, unliquidated claim against Enron, pursuant to Section 1.1 of that certain BTCN Put Agreement, dated as of October 31, 1997, between BTCo. and Enron (the "Two Year Put"). In the event that Enron fails to perform its duties under the Two Year Put, BT Green will suffer damages in an amount as yet incapable of calculation.*/

6.    BT Green has a contingent, unliquidated claim against Enron, pursuant to Section 1.1 of that certain BTCT Put Agreement, dated as of October 31, 1997, between BTCo. and Enron (the "78 Month Put"). In the event that Enron fails to perform its duties under the 78 Month Put, BT Green will suffer damages in an amount as yet incapable of calculation.*/

7.    BT Green has a contingent, unliquidated claim against Enron, in addition to any claims set forth above, for any and all other damages resulting from: (i) any failure by Enron to perform any of its obligations under or in respect of any of the documents concerning the Transaction, including without limitation any guaranty or indemnity obligations, or (ii) any improper or inequitable conduct with respect to the Transaction or the parties thereto, including without limitation any fraud, misrepresentation, interference with contractual relations, or undue influence over ECTIP or ECTIC, in an amount as yet incapable of calculation.*/

The foregoing may be summarized as follows:

| | | |
|---|---|---|
| 1. | Guaranty of Note | $ 7,393,330.00 |
| 2. | Tax Indemnity | |
| 3. | Guaranty of Distributions Due | $ 331,396.19 |
| 4. | Guaranty of ECTIC's Performance | |
| 5. | Damages under Two Year Put | |
| 6. | Damages under 78 Month Put | |
| 7. | Other Damages | |
| | Collection Costs | |

---

*/ Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

NYDOCS2:803290.1

-3-

**TOTAL CLAIM OF BT GREEN, INC.** _____

**[as yet unknown]**

Claimant reserves the right to amend its Proof of Claim from time to time to restate the amount of this claim as it becomes further liquidated or for other lawful purposes. Claimant also reserves the right to claim all amounts due in respect of any additional legal fees or expenses, default interest, make-whole premium and postpetition interest to the extent allowed by law.

This Proof of Claim is filed under the compulsion of the bar date established in these Chapter 11 cases and is filed to protect the Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after _de novo_ review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

**EXHIBIT B – SUMMARY OF DOCUMENTS RELEVANT TO CLAIMS**

Contribution Agreement, dated as of October 31, 1997, between BTCo., as Contributor, and BT Green, Inc., as Contributee.

Guaranty of Obligations, dated as of October 31, 1997, by Enron in favor of BT-D and BTCo. (the "Payment Guaranty").

Promissory Note, dated as of October 31, 1997, made by ECT Investing Partners, L.P. to BT Green (as successor in interest to BTCo.) (the "Note").

Guaranty and Indemnification Agreement, dated as of October 31, 1997, by Enron in favor of BTCo. and BT-D (the "Performance Guaranty").

First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P. by and between Enron, BTCo., BT-D, Enron Pipeline Company, ECT Investments Holding Corp., and ECT Investing Corp. (the "Partnership Agreement").

BTCN Put Agreement, dated as of October 31, 1997, between BTCo. and Enron (the "Two Year Put").

BTCT Put Agreement, dated as of October 31, 1997, between BTCo. and Enron (the "78 Month Put").

FORM B10 (Official Form 10)(4/01)

| United States Bankruptcy Court    Southern District of New York | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor<br>ENRON CORP. | Case Number<br>01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>Deutsche Bank AG | ☐ | Filed: USBC - Southern District of New York<br>ENRON, Et Al.<br>01-16034 (CA )    0000012797<br><br>‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ |
|---|---|---|

| Name and address where notices should be sent:<br><br>Jeffrey Welch, Esq.        Robert M. Dombroff, Esq.<br>Deutsche Bank AG        Bingham McCutchen LLP<br>1301 6th Avenue        399 Park Avenue<br>New York, NY 10019        New York, NY 10022<br>(212) 469-7890        (212) 705-7000 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☒ Check box if the address differs from the address on the envelope sent to you by the court | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Account or other number by which creditor identifies debtor:<br><br>See attached Exhibit A | Check here<br>if this claim        ☐ replaces<br>        ☐ amends    a previously filed claim, dated: |
|---|---|

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other  See attached Exhibit A | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Your SS # _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)        (date) |
|---|---|

| 2. Date debt was incurred: | 3. If court judgment, date obtained: |
|---|---|

4. Total Amount of Claim at Time Case Filed:    $_____See attached Exhibit A_____
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. Secured Claim<br>☒ Check this box if your claim is secured by collateral (including a right of setoff).<br>Brief Description of Collateral:<br>☐ Real Estate  ☐ Motor Vehicle<br>☒ Other  right of setoff; pledged Note<br><br>Value of Collateral: $ 1,950,000,000.00<br>(plus interest)<br><br><br>Amount of arrearage and other charges at time case filed included in secured claim, if any: | 6. Unsecured Priority Claim.<br>☐ Check this box if you have an unsecured priority claim<br>Amount entitled to priority $_____<br>Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).<br>☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).<br>☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)<br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).<br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br>☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).<br>*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |
|---|---|

| 7. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>8. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien.<br>DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. See attached Exhibit B.<br>9. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Date<br><br>10/__/02 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>DEUTSCHE BANK AG<br><br>By _____  _____ |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Jeffrey Welch, Counsel        Calli S. Hayes

NYDOCS2:803294.1

# EXHIBIT A – CALCULATION OF CLAIMS

**Claimant:    Deutsche Bank AG**

On or about May 2, 2000, Enron Corp. ("Enron"), Enron Valkyrie, LLC ("Valkyrie"), Valhalla GmbH ("Valhalla") and Rheingold GmbH ("Rheingold") (collectively, the "Enron Parties") and Deutsche Bank AG ("Deutsche Bank") entered into an integrated series of agreements for the purposes of, *inter alia*, Deutsche Bank's acquisition of certain participation rights in Rheingold (the "Transaction"). By that certain Enron Guaranty, dated effective as of May 2, 2000, by Enron in favor of Deutsche Bank, Enron guaranteed the obligations of Valkyrie and Valhalla with respect to the Transaction. In connection with the Transaction, Deutsche Bank holds certain claims and rights, including the following:

1.      After the application of various setoffs or recoupments, Deutsche Bank holds a fixed, liquidated claim against Enron in the amount of $ 36,047,037.73 as a result of the following. On or about November 28, 2001, Deutsche Bank had the right to exercise, and did exercise, by notice to Valhalla and Enron, its rights under that certain Put Option Agreement, dated as of May 2, 2000, between Deutsche Bank and Valhalla (the "Put"). Valhalla did not honor the Put, and Enron, as Guarantor, became liable to Deutsche Bank for a debt of $ 2,158,277,777.78 (the "Debt"). As provided for by various documents governing the Transaction, on or about November 29, 2001, Deutsche Bank offset or recouped against the Debt $ 2,118,513,382.94 then payable to Enron from Deutsche Bank pursuant to that certain Promissory Note, dated May 2, 2000, made by Deutsche Bank to Enron (the "Note") and pledged by Enron to Deutsche Bank as security for Enron's performance as Guarantor pursuant to that certain Pledge Agreement, dated as of May 2, 2000, between Enron and Deutsche Bank (the "Pledge Agreement"). Deutsche Bank further offset or recouped against the Debt $ 3,717,357.11 owed to Enron in settlement of that certain Confirmation of an interest rate swap, dated May 2, 2000.*/

2.      Deutsche Bank holds a fixed, liquidated claim against Enron in the amount of $ 102,304,668.35, pursuant to Section 3 of that certain Tax Indemnification Agreement, dated as of May 2, 2000, between Enron and Deutsche Bank, in which Enron agreed to indemnify Deutsche Bank for certain adverse tax consequences of the Transaction.*/

3.      Deutsche Bank holds a contingent, unliquidated claim against Enron, in addition to any claims set forth above, for any and all other damages resulting from: (i) any failure by Enron to perform any of its obligations under or in respect of any of the documents concerning the Transaction, including without limitation any guaranty or indemnity obligations, or (ii) any improper or inequitable conduct with respect to the Transaction or the parties thereto, including without limitation any fraud,

---

*/ Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

-2-

misrepresentation, interference with contractual relations, or undue influence over Valkyrie, Valhalla, or Rheingold, in an amount as yet incapable of calculation.*/

The foregoing may be summarized as follows:

| | |
|---|---|
| Guaranty of Put Agreement | $ 2,158,277,777.78 |
| Setoff/Recoupment of Note | ($ 2,118,513,382.94) |
| Setoff/Recoupment of Swap Settlement | ($ 3,717,357.11) |
| *subtotal* | *$ 36,047,037.73* |
| Tax Indemnity | $ 102,304,668.35 |
| Other Damages | |
| Collection Costs | |
| **TOTAL CLAIM OF DEUTSCHE BANK AG** | |
| | **[as yet unknown]** |

     Deutsche Bank's claim is a secured claim to the extent of: (i) any right of setoff or recoupment that Deutsche Bank may possess; and (ii) the value of the Note held as security by Deutsche Bank pursuant to the Pledge Agreement. Deutsche Bank asserts that it has validly exercised certain rights of setoff or recoupment as described herein. To the extent that any such exercise is avoided, disallowed, or otherwise set aside, Deutsche Bank asserts that it nevertheless possesses such right of setoff or recoupment, and that its claim is secured by such right of setoff or recoupment and also by the Note. Deutsche Bank may have other rights of setoff or recoupment and reserves the right to amend its proof of claim at any time to assert such rights.

---

*/   Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

Claimant reserves the right to amend its Proof of Claim from time to time to restate the amount of this claim as it becomes further liquidated or for other lawful purposes, including without limitation the right to assert the full amount of its claim against Enron as Guarantor of the Put, in the event that any right of setoff or recoupment claimed or described herein is avoided, disallowed, or otherwise set aside. Claimant also reserves the right to claim all amounts due in respect of any additional legal fees or expenses, default interest, make-whole premium and postpetition interest to the extent allowed by law.

This Proof of Claim is filed under the compulsion of the bar date established in these Chapter 11 cases and is filed to protect the Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

NYDOCS2:803294.1

**EXHIBIT B – SUMMARY OF DOCUMENTS RELEVANT TO CLAIMS**

Enron Guaranty, dated effective May 2, 2000, by Enron in favor of Deutsche Bank.

Agreement on Participation Rights (*Genussrechtsvertrag*), dated as of May 2, 2000, between Rheingold, Valhalla, and Deutsche Bank.

Put Option Agreement, dated as of May 2, 2000, between Deutsche Bank and Valhalla (the "Put").

Promissory Note, dated May 2, 2000, made by Deutsche Bank to Enron Corp. (the "Note").

Pledge Agreement, dated as of May 2, 2000, between Enron and Deutsche Bank.

Interest Rate Swap Confirmation, dated May 2, 2000.

Tax Indemnification Agreement, dated as of May 2, 2000, between Enron and Deutsche Bank.

Letter from Deutsche Bank to Valhalla and Enron, dated November 28, 2001, exercising the Put.

Letter from Deutsche Bank to Valhalla and Enron, dated November 29, 2001, providing notice of exercise of setoff/recoupment rights.

Letter from Deutsche Bank to Enron, dated December 6, 2001, providing notice of net debt to Deutsche Bank after setoff/recoupment of Note.

Letter from Deutsche Bank to Enron, dated December 6, 2001, providing notice of sum due Enron under settlement of swap.

FORM B10 (Official Form 10)(4/01)

| United States Bankruptcy Court | Southern District of New York | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case Number |
|---|---|
| **ENRON CORP.** | **01-16034 (AJG)** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Deutsche Bank Trust Company Delaware, formerly known as Bankers Trust (Delaware)**

☐

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)          0000012798

THIS SPACE IS FOR COURT USE ONLY

Name and address where notices should be sent:

**Jeffrey Welch, Esq.          Robert M. Dombroff, Esq.**
**Deutsche Bank AG          Bingham McCutchen LLP**
**1301 6th Avenue          399 Park Avenue**
**New York, NY 10019      New York, NY 10022**
**(212) 469-7890          (212) 705-7000**

☐  Check box if you have never received any notices from the bankruptcy court in this case.

☒  Check box if the address differs from the address on the envelope sent to you by the court

Account or other number by which creditor identifies debtor:

**See attached Exhibit A**

Check here ☐ replaces
if this claim ☐ amends  a previously filed claim, dated:

1. Basis for Claim
   ☐ Goods sold
   ☐ Services performed
   ☐ Money loaned
   ☐ Personal injury/wrongful death
   ☐ Taxes
   ☒ Other_____**See attached Exhibit A**_____

   ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
   ☐ Wages, salaries, and compensation (fill out below)
   Your SS # _____ ___ _____
   Unpaid compensation for services performed
   from _____ to _____
   (date)          (date)

2. Date debt was incurred:

3. If court judgment, date obtained:

4. Total Amount of Claim at Time Case Filed:   $_____ **See attached Exhibit A**
   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
   Check this box if claim includes interest or other charges in addition to the principal amount of the claim.  Attach itemized statement of all interest or additional charges.

5. Secured Claim
   ☐ Check this box if your claim is secured by collateral (including a right of setoff).
   Brief Description of Collateral:
   ☐ Real Estate   ☐ Motor Vehicle
        ☐ Other

   Value of Collateral:  $_____

   Amount of arrearage and other charges at time case filed included in secured claim, if any:

6. Unsecured Priority Claim.
   ☐ Check this box if you have an unsecured priority claim
   Amount entitled to priority $_____
   Specify the priority of the claim:
   ☐  Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
   ☐  Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
   ☐  Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
   ☐  Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
   ☐  Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
   ☐  Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
   *Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

7. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien.
   DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain.
   If the documents are voluminous, attach a summary. **See attached Exhibit B.**

9. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

NYDOCS2:803291.1

-2-

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|------|------------------------------------------------------------------------------------|
| 10/___/0 2 | **DEUTSCHE BANK TRUST COMPANY DELAWARE,** **formerly known as Bankers Trust (Delaware)** By_____ |

Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Jeffrey Welch, Counsel

*/  Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law.  The Collection Costs are incapable of calculation at this time.

NYDOCS2:803291.1

## EXHIBIT A – CALCULATION OF CLAIMS

**Claimant:**    **Deutsche Bank Trust Company Delaware**

On or about October 31, 1997, certain parties, including Bankers Trust Company ("BTCo."), Bankers Trust (Delaware) ("BT-D"), and Enron Corp. ("Enron") entered into an integrated series of agreements for the purposes of, *inter alia*, establishing a limited partnership, ECT Investing Partners, L.P. ("ECTIP"), and acquiring and leasing real and personal property to Enron (the "Transaction"). On or about April 15, 2002, BT-D changed its name to Deutsche Bank Trust Company Delaware ("DBTC Delaware"). In connection with the Transaction, DBTC Delaware holds certain claims and rights, including the following:

1.    DBTC Delaware has a fixed, liquidated claim against Enron in the amount of $ 10,862,520.00, pursuant to Section 1 of that certain Guaranty of Obligations, dated as of October 31, 1997, by Enron in favor of BT-D and BTCo. (the "Payment Guaranty"), in which Enron guaranteed the punctual payment of, *inter alia*, a certain Promissory Note in the sum of $ 10,862,520.00, dated as of October 31, 1997, made by ECTIP to BT-D (the "Note"). As of December 2, 2001, the Note remains outstanding and due.*/

2.    DBTC Delaware has a contingent, unliquidated claim against Enron, pursuant to Section 1 of that certain Guaranty and Indemnification Agreement, dated as of October 31, 1997, by Enron in favor of BTCo. and BT-D (the "Performance Guaranty"), in which Enron agreed to indemnify BTCo. and BT-D against any adverse tax consequence resulting from certain acts or omissions of ECT Investing Corp. ("ECTIC") under that certain First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P. by and between Enron, BTCo., BT-D, Enron Pipeline Company, ECT Investments Holding Corp., and ECT Investing Corp. (the "Partnership Agreement"). As a result of the acts or omissions of ECTIC, DBTC Delaware may suffer an increased tax liability, in an amount as yet incapable of calculation.*/

3.    DBTC Delaware has a fixed, liquidated claim against Enron, pursuant to Section 1 of the Performance Guaranty, in which Enron guaranteed the performance by ECTIC of all of its material obligations and covenants under the Partnership Agreement. As of December 2, 2001, ECTIC had failed to make distributions as required by Section 3 of the Partnership Agreement in the sum of at least $ 486,993.37.*/

4.    DBTC Delaware has a contingent, unliquidated claim against Enron, pursuant to Section 1 of the Performance Guaranty. In the event that ECTIC further has failed or does fail to perform its duties as General Partner under the Partnership

---

*/ Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

-2-

Agreement, in addition to that failure to make distributions set forth in the preceding paragraph, then DBTC Delaware will suffer damages in an amount as yet incapable of calculation.*/

5.    DBTC Delaware has a contingent, unliquidated claim against Enron, pursuant to Section 1.1 of that certain BTDN Put Agreement, dated as of October 31, 1997, between BT-D and Enron (the "Two Year Put"). In the event that Enron fails to perform its duties under the Two Year Put, DBTC Delaware will suffer damages in an amount as yet incapable of calculation.*/

6.    DBTC Delaware has a contingent, unliquidated claim against Enron, pursuant to Section 1.1 of that certain BTDT Put Agreement, dated as of October 31, 1997, between BT-D and Enron (the "78 Month Put"). In the event that Enron fails to perform its duties under the 78 Month Put, DBTC Delaware will suffer damages in an amount as yet incapable of calculation.*/

7.    DBTC Delaware has a contingent, unliquidated claim against Enron, in addition to any claims set forth above, for any and all other damages resulting from: (i) any failure by Enron to perform any of its obligations under or in respect of any of the documents concerning the Transaction, including without limitation any guaranty or indemnity obligations, or (ii) any improper or inequitable conduct with respect to the Transaction or the parties thereto, including without limitation fraud, misrepresentation, interference with contractual relations, or undue influence over ECTIP or ECTIC, in an amount as yet incapable of calculation.*/

The foregoing may be summarized as follows:

| | | |
|---|---|---|
| 1. | Guaranty of Note | $ 10,862,520.00 |
| 2. | Tax Indemnity | |
| 3. | Guaranty of Distributions Due | $ 486,993.37 |
| 4. | Guaranty of ECTIC's Performance | |
| 5. | Damages under Two Year Put | |
| 6. | Damages under 78 Month Put | |
| 7. | Other Damages | |
| | Collection Costs | |

*/ Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

NYDOCS2:803291.1

-3-

**TOTAL CLAIM OF DEUTSCHE BANK
TRUST COMPANY DELAWARE**
_____
**[as yet unknown]**

Claimant reserves the right to amend its Proof of Claim from time to time to restate the amount of this claim as it becomes further liquidated or for other lawful purposes. Claimant also reserves the right to claim all amounts due in respect of any additional legal fees or expenses, default interest, make-whole premium and postpetition interest to the extent allowed by law.

This Proof of Claim is filed under the compulsion of the bar date established in these Chapter 11 cases and is filed to protect the Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after _de novo_ review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

NYDOCS2:803291.1

**EXHIBIT B – SUMMARY OF DOCUMENTS RELEVANT TO CLAIM**

Guaranty of Obligations, dated as of October 31, 1997, by Enron in favor of BT-D and BTCo. (the "Payment Guaranty").

Promissory Note, dated as of October 31, 1997, made by ECT Investing Partners, L.P. to BT-D (the "Note").

Guaranty and Indemnification Agreement, dated as of October 31, 1997, by Enron in favor of BTCo. and BT-D (the "Performance Guaranty").

First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P. by and between Enron, BTCo., BT-D, Enron Pipeline Company, ECT Investments Holding Corp., and ECT Investing Corp. (the "Partnership Agreement").

BTDN Put Agreement, dated as of October 31, 1997, between BT-D and Enron (the "Two Year Put").

BTDT Put Agreement, dated as of October 31, 1997, between BT-D and Enron (the "78 Month Put").

FORM B10 (Official Form 10) (4/01)

| United States Bankruptcy Court    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**ENRON CORP.** | Case Number<br>**01-16034 (AJG)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after ~~the commencement of the case. A request for~~ payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**EN-BT Delaware, Inc.**

☐

Filed: USBC - Southern District of New York
ENRON, Et AL.
01-16034 (CA)    0000012801

Name and address where notices should be sent:

**Jeffrey Welch, Esq.**          **Robert M. Dombroff, Esq.**
**Deutsche Bank AG**            **Bingham McCutchen LLP**
**1301 6th Avenue**             **399 Park Avenue**
**New York, NY 10019**        **New York, NY 10022**
**(212) 469-7890**               **(212) 705-7000**

☐   Check box if you have never received any notices from the bankruptcy court in this case.

☒   Check box if the address differs from the address on the envelope sent to you by the court

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

**See attached Exhibit A**

Check here
if this claim   ☐ replaces
               ☐ amends   a previously filed claim, dated:

| 1. | Basis for Claim | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
|---|---|---|

☐ Goods sold                                    ☐ Wages, salaries, and compensation (fill out below)
☐ Services performed                          Your SS # _____
☐ Money loaned                              Unpaid compensation for services performed
☐ Personal injury/wrongful death             from _____ to _____
☐ Taxes                                              (date)          (date)
☒ Other **See attached Exhibit A** _____

| 2. | Date debt was incurred: | 3. | If court judgment, date obtained: |
|---|---|---|---|

| 4. | Total Amount of Claim at Time Case Filed: | $ __**See attached Exhibit A**__ |
|---|---|---|

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. | Secured Claim. | 6. | Unsecured Priority Claim. |
|---|---|---|---|

☐   Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
        ☐ Other

Value of Collateral: $_____

☐   Check this box if you have an unsecured priority claim
    Amount entitled to priority $_____
    Specify the priority of the claim:

☐   Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐   Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
☐   Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐   Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐   Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐   Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

Amount of arrearage and other charges <u>at time case filed</u> included in secured claim, if any:

*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| 7. | Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

8.   Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. **See attached Exhibit B.**

9.   Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a self-addressed envelope and copy of this proof of claim.

| Date<br><br>10/ _10_ /02 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>**EN-BT DELAWARE, INC.**<br><br>By _____<br><br>Brian J. McGuire, President |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A – CALCULATION OF CLAIMS

**Claimant:    EN-BT Delaware, Inc.**

On or about March 27, 1997, certain parties, including EN-BT Delaware, Inc. ("EN-BT") and Enron Corp. ("Enron") entered into an integrated series of agreements for the purposes of, *inter alia*, establishing a limited partnership, Enron Leasing Partners, L.P. ("ELP"), and acquiring and leasing real and personal property to Enron (the "Transaction"). In connection with the Transaction, EN-BT holds certain claims and rights, including the following:

EN-BT has contingent, unliquidated claims against Enron, pursuant to that certain Guaranty and Indemnification Agreement, effective as of March 27, 1997, by Enron in favor of EN-BT and Potomac Capital Investment Corp., in which Enron guaranteed: (i) the performance by Enron Property & Services Corp. ("EPSCo.") of its obligations under that certain Management Agreement, dated as of April 14, 1997, by and between ELP and EPSCo. (the "Management Agreement"); and (ii) the performance of Enron Property Management Corp. ("EPM") under that certain Limited Partnership Agreement of Enron Leasing Partners, L.P., dated March 27, 1997, by and among EPM, Organizational Partner, Inc., and EN-BT (the "Partnership Agreement").

1.    In the event that EPSCo. has failed or does fail to perform its obligations under the Management Agreement, EN-BT will suffer damages in an amount as yet incapable of calculation.*/

2.    In the event that EPM has failed or does fail to perform its obligations under the Partnership Agreement, EN-BT will suffer damages in an amount as yet incapable of calculation.*/

3.    EN-BT has a contingent, unliquidated claim against Enron, in addition to any claims set forth above, for any and all other damages resulting from: (i) any failure by Enron to perform any of its obligations under or in respect of any of the documents concerning the Transaction, including without limitation any guaranty or indemnity obligations, or (ii) any improper or inequitable conduct with respect to the Transaction or the parties thereto, including without limitation any fraud, misrepresentation, interference with contractual relations, or undue influence over ELP, EPSCo., or EPM, in an amount as yet incapable of calculation.*/

---

*/  Deutsche Bank also holds a claim for those collection costs related to the claim set forth above, including, without limitation, attorneys fees (the "Collection Costs"), that Deutsche Bank has incurred or will incur and is entitled to recover from the Debtor under the terms and provisions of the Transaction and/or pursuant to applicable law. The Collection Costs are incapable of calculation at this time.

-2-

The foregoing may be summarized as follows:

1.    Guaranty of EPSCo.'s Performance        _____

2.    Guaranty of EPM's Performance           _____

3.    Other Damages                           _____

Collection Costs                              _____

**TOTAL CLAIM OF EN-BT DELAWARE, INC.**       _____
                                              **[as yet unknown]**


Claimant reserves the right to amend its Proof of Claim from time to time to restate the amount of this claim as it becomes further liquidated or for other lawful purposes. Claimant also reserves the right to claim all amounts due in respect of any additional legal fees or expenses, default interest, make-whole premium and postpetition interest to the extent allowed by law.

This Proof of Claim is filed under the compulsion of the bar date established in these Chapter 11 cases and is filed to protect the Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

-3-

## EXHIBIT B – SUMMARY OF DOCUMENTS RELEVANT TO CLAIMS

Guaranty and Indemnification Agreement, effective as of March 27, 1997, by Enron in favor of EN-BT and Potomac Capital Investment Corp.

Management Agreement, dated as of April 14, 1997, by and between ELP and EPSCo. (the "Management Agreement").

Limited Partnership Agreement of Enron Leasing Partners, L.P., dated March 27, 1997, by and among EPM, Organizational Partner, Inc., and EN-BT (the "Partnership Agreement").

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or entity to whom the debtor owes money or property):

Deutsche Bank Luxembourg S.A.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

Deutsche Bank Luxembourg S.A.
Legal Department
31 West 52nd Street
New York, New York 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

Filed: USBC - Southern District of New York
ENRON, ET AL.
01-16034 (CA)
0000014165

THIS                                    JSE

Account or other number by which creditor identifies debtor:

Check here
if this claim   ☐ replaces        a previously filed claim, dated: _____
                ☐ amends

**1. Basis For Claim:**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)

Your S S # _____

Unpaid compensation for services performed

from _____ to _____
        (date)                          (date)

| 2. Date debt was incurred: (See Annex A) | 3. If court judgment, date obtained: |
|---|---|

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)
   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
   ■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate      ☐ Motor Vehicle
   ■ Other: setoff and related rights
Value of Collateral:  $

Amount of arrearage and other charges at the time case filed included in secured claim, if any  $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
   Amount entitled to priority $
   Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever
   is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a)____.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date: October __, 2002

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):

By: _____
Name:
Title: Counsel

By: _____
Name:
Title: Counsel

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
In re:                                                   :    Chapter 11
                                                         :
                                                         :    Case No. 01-16034 (AJG)
Enron Corp.,                                             :
                                                         :    (Jointly Administered)
                                  Debtor.                :
------------------------------------------------------ x

## ANNEX A TO PROOF OF CLAIM OF DEUTSCHE BANK LUXEMBOURG S.A.

Deutsche Bank Luxembourg S.A. ("Claimant") is filing this proof of claim ("Proof of Claim") against Enron Corp. (the "Debtor") for contribution, indemnification, reimbursement and/or any other obligations otherwise arising in favor of the Claimant or any of its affiliates in connection with any litigation or other action, investigation or proceeding, including, without limitation, any investigation by the Official Committee of Unsecured Creditors in these jointly-administered proceedings or any governmental investigation or proceeding, in any way relating to any transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or or any affiliate of the Debtor.   The Claimant on behalf of itself and its affiliates additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

A.    Reservation of Rights/Amendments.

1.    To the extent the Claims asserted herein may also be asserted against any other debtor in these jointly-administered proceedings under law or equity, including but not limited to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its affiliates against each of such other debtors.  Additionally, any common law indemnity claims

against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not: (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.    The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv) against third parties, including, without limitation, any affiliates of the Debtor. Claimant also

reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtor and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3.      In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

B.    Interest, Costs and Attorneys' Fees.

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

C.    Other Claims.

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

D.    <u>Right to Determination in Other Forums.</u>

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

E.    <u>Administrative Claim Status.</u>

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

F.    <u>Open Account.</u>  The Claims are not based on an open account.

G.    <u>Judgments.</u>   No judgment has been rendered on the Claims.

H.    <u>Notices.</u>  All notices concerning this Proof of Claim should be sent to:

> Deutsche Bank Luxembourg S.A.
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn:  Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed

authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
        October __, 2002

Deutsche Bank Luxembourg S.A.

By: _____
    Name: _counsel_
    Title: _____

By: _____
    Name: _____
    Title: _counsel_

<u>Penalty for Presenting a Fraudulent Claim</u>.  Fine of not more than $500,000.00 or imprisonment

of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or entity to whom the debtor owes money or property):

Deutsche Bank S.A.

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (AJG)          0000022501

☐ Check this box to indicate that this claim replaces or amends a previously filed claim.

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

Deutsche Bank S.A.
Legal Department
31 West 52nd Street
New York, New York 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

FILED
U.S. BANKRUPTCY COURT
2003 JAN 24 P 3
S.D.N.Y.

| Account or other number by which creditor identifies debtor: | Check here if this claim ☐ replaces  ☐ amends  a previously filed claim, dated: 10/15/02 |
|---|---|

**1. Basis For Claim:**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)
Your S S # _____ - _____ - _____
Unpaid compensation for services performed
from _____ to _____
   (date)        (date)

| **2. Date debt was incurred: (See Annex A)** | **3. If court judgment, date obtained:** |
|---|---|

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
■ Other: setoff and related rights
Value of Collateral:  $

Amount of arrearage and other charges at the time case filed included in secured claim, if any  $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)___.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JAN 2 4 2003
U.S. BANKRUPTCY COURT
S.D. OF NEW YORK

| Date: January 23, 2003 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>By: _____  By: _____<br>Name: Jeffrey Welch, Esq.  Name: David Mellgard, Esq.<br>Title: Counsel  Title: Counsel |
|---|---|

*Penalty for presenting fraudulent claim:* Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x
In re:                                            :
                                                  :
Enron Corp.,                                      :
                                                  :
                        Debtor.                   :
------------------------------------------------- x

Chapter 11

Case No. 01-16034 (AJG)

(Jointly Administered)

### ANNEX A TO PROOF OF CLAIM OF DEUTSCHE BANK S.A.

Deutsche Bank S.A. ("Claimant") is filing this proof of claim ("Proof of Claim") against Enron Corp. (the "Debtor") for contribution, indemnification, reimbursement and/or any other obligations otherwise arising in favor of the Claimant or any of its affiliates in connection with any litigation or other action, investigation or proceeding, including, without limitation, any investigation by the Official Committee of Unsecured Creditors in these jointly-administered proceedings or any governmental investigation or proceeding, in any way relating to any transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or any affiliate of the Debtor. The Claimant on behalf of itself and its affiliates additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

A.    Reservation of Rights/Amendments.

1.    To the extent the Claims asserted herein may also be asserted against any other debtor in these jointly-administered proceedings under law or equity, including but not limited to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its

affiliates against each of such other debtors.  Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not:  (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.      The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv)

against third parties, including, without limitation, any affiliates of the Debtor. Claimant also reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtor and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3.    In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

B.    Interest, Costs and Attorneys' Fees.

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

C.    Other Claims.

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

D.    <u>Right to Determination in Other Forums.</u>

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

E.    <u>Administrative Claim Status.</u>

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

F.    <u>Open Account.</u>  The Claims are not based on an open account.

G.    <u>Judgments.</u>   No judgment has been rendered on the Claims.

H.    <u>Notices.</u>  All notices concerning this Proof of Claim should be sent to:

> Deutsche Bank S.A.
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.
>
> With a copy to:
>
> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn: Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
        January 23, 2003

                                        Deutsche Bank S.A.

                                        By: _____
                                        Name: Jeffrey Welch, Esq.
                                        Tile: Counsel

                                        By: _____
                                        Name: David Mellgard, Esq.
                                        Title: Counsel

<u>Penalty for Presenting a Fraudulent Claim</u>.  Fine of not more than $500,000.00 or imprisonment of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or entity to whom the debtor owes money or property):

BT Commercial Corporation

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

BT Commercial Corporation
Legal Department
31 West 52nd Street
New York, NY 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

0000014166

Filed USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)

T                                    RT USE

Account or other number by which creditor identifies debtor:

Check here
if this claim    ☐ replaces
☐ amends    a previously filed claim, dated: _____

**1. Basis For Claim:**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)
Your S S # _____ - _____ - _____
Unpaid compensation for services performed
from _____ to _____
(date)       (date)

**2. Date debt was incurred: (See Annex A)**

**3. If court judgment, date obtained:**

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
■ Other: setoff and related rights
Value of Collateral: $

Amount of arrearage and other charges at the time case filed included in secured claim, if any $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever
is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)____.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date: October __, 2002

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
By:
Name:
Title:

Penalty for presenting fraudulent claim: Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x    Chapter 11
In re:                                             :
                                                   :    Case No. 01-16034 (AJG)
Enron Corp.,                                        :
                                                   :    (Jointly Administered)
                    Debtor.                         :
-------------------------------------------------- x
```

## ANNEX A TO PROOF OF CLAIM OF BT COMMERCIAL CORPORATION

A.    <u>Description of Claim</u>.

BT Commercial Corporation ("<u>Claimant</u>") is filing this proof of claim ("<u>Proof of Claim</u>")

against Enron Corp. (the "<u>Debtor</u>") for contribution, indemnification, reimbursement and/or any

other obligations otherwise arising in favor of the Claimant or any of its affiliates in connection

with any litigation or other action, investigation or proceeding, including, without limitation, any

investigation by the Official Committee of Unsecured Creditors in these jointly-administered

proceedings or any governmental investigation or proceeding, in any way relating to any

transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or or

any affiliate of the Debtor. The Claimant on behalf of itself and its affiliates additionally asserts

any and all other rights and remedies arising as a matter of law or equity against the Debtor, or

pursuant to any contract or other arrangement between the Claimant and the Debtor whether or

not such contract or other arrangement is specifically identified herein.

B.    <u>Reservation of Rights/Amendments</u>.

1.    To the extent the Claims asserted herein may also be asserted against any other

debtor in these jointly-administered proceedings under law or equity, including but not limited

to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-

administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its

affiliates against each of such other debtors. Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not: (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.    The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | "PROOF OF CLAIM" |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or entity to whom the debtor owes money or property):<br><br>Bankers Trust International PLC | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | Filed: USBC - Southern District of New York<br>ENRON, Et Al.<br>01-16034 (CA)   0000014182 |
|---|---|---|

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

Bankers Trust International PLC
Legal Department
31 West 52nd Street
New York, NY 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor: | Check here<br>if this claim  ☐ replaces<br>☐ amends   a previously filed claim, dated: _____ |
|---|---|

**1. Basis For Claim:**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)
Your S S # _____-_____-_____

Unpaid compensation for services performed

from _____ to _____
(date)            (date)

| 2. Date debt was incurred: (See Annex A) | 3. If court judgment, date obtained: |
|---|---|

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
■ Other: setoff and related rights
Value of Collateral: $

Amount of arrearage and other charges at the time case filed included in secured claim, if any $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever
is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)____.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date: October __, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>By:<br>Name:<br>Title: |
|---|---|

*Penalty for presenting fraudulent claim:* Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
In re:                                               :     Chapter 11
                                                     :
                                                     :     Case No. 01-16034 (AJG)
Enron Corp.,                                         :
                                                     :     (Jointly Administered)
                       Debtor.                       :
---------------------------------------------------- x

### ANNEX A TO PROOF OF CLAIM OF BANKERS TRUST INTERNATIONAL PLC

A.     <u>Description of Claim.</u>

Bankers Trust International PLC ("Claimant") is filing this proof of claim ("Proof of Claim") against Enron Corp. (the "Debtor") for contribution, indemnification, reimbursement and/or any other obligations otherwise arising in favor of the Claimant or any of its affiliates in connection with any litigation or other action, investigation or proceeding, including, without limitation, any investigation by the Official Committee of Unsecured Creditors in these jointly-administered proceedings or any governmental investigation or proceeding, in any way relating to any transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or or any affiliate of the Debtor.  The Claimant on behalf of itself and its affiliates additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

B.     <u>Reservation of Rights/Amendments.</u>

1.     To the extent the Claims asserted herein may also be asserted against any other debtor in these jointly-administered proceedings under law or equity, including but not limited to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its

affiliates against each of such other debtors. Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not: (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

      2.     The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv)

against third parties, including, without limitation, any affiliates of the Debtor. Claimant also reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtor and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3. In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

C. <u>Interest, Costs and Attorneys' Fees.</u>

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

D. <u>Other Claims.</u>

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

E.    Right to Determination in Other Forums.

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

F.    Administrative Claim Status.

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

G.    Open Account.  The Claims are not based on an open account.

H.    Judgments.   No judgment has been rendered on the Claims.

I.    Notices.  All notices concerning this Proof of Claim should be sent to:

> Bankers Trust International PLC
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn: Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed

authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
        October ___, 2002

                                    Bankers Trust International PLC

                                    By: _____
                                    Name: _____
                                    Title: _____

Penalty for Presenting a Fraudulent Claim.  Fine of not more than $500,000.00 or imprisonment

of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)     0000014183

Name of Creditor (The person or entity to whom the debtor owes money or property):

BT Leasing Corp.

☐ Check box if you are aware anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

BT Leasing Corp.
Legal Department
31 West 52nd Street
New York, NY 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☐ amends a previously filed claim, dated: _____ |
|---|---|

**1. Basis For Claim:**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)

Your S S # _____-_____-_____

Unpaid compensation for services performed

from _____ to _____
      (date)          (date)

| **2. Date debt was incurred: (See Annex A)** | **3. If court judgment, date obtained:** |
|---|---|

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
   ■ Other: setoff and related rights
Value of Collateral: $

Amount of arrearage and other charges at the time case filed included in secured claim, if any $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever
  is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)_____.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date: October __, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>By: _____<br>Name: _____<br>Title: _____ |
|---|---|

*Penalty for presenting fraudulent claim:* Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------ x    Chapter 11
In re:                                           :
                                                 :    Case No. 01-16034 (AJG)
Enron Corp.,                                      :
                                                 :    (Jointly Administered)
                    Debtor.                       :
------------------------------------------------ x
```

## ANNEX A TO PROOF OF CLAIM OF BT LEASING CORP.

A.      Description of Claim.

        BT Leasing Corp. ("Claimant") is filing this proof of claim ("Proof of Claim") against

Enron Corp. (the "Debtor") for contribution, indemnification, reimbursement and/or any other

obligations otherwise arising in favor of the Claimant or any of its affiliates in connection with

any litigation or other action, investigation or proceeding, including, without limitation, any

investigation by the Official Committee of Unsecured Creditors in these jointly-administered

proceedings or any governmental investigation or proceeding, in any way relating to any

transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or or

any affiliate of the Debtor. The Claimant on behalf of itself and its affiliates additionally asserts

any and all other rights and remedies arising as a matter of law or equity against the Debtor, or

pursuant to any contract or other arrangement between the Claimant and the Debtor whether or

not such contract or other arrangement is specifically identified herein.

B.      Reservation of Rights/Amendments.

        1.      To the extent the Claims asserted herein may also be asserted against any other

debtor in these jointly-administered proceedings under law or equity, including but not limited

to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-

administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its

affiliates against each of such other debtors.  Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not:  (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.      The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv)

against third parties, including, without limitation, any affiliates of the Debtor.  Claimant also reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtor and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation.  The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3.    In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

C.    Interest, Costs and Attorneys' Fees.

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

D.    Other Claims.

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

E.    <u>Right to Determination in Other Forums</u>.

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

F.    <u>Administrative Claim Status</u>.

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

G.    <u>Open Account</u>.  The Claims are not based on an open account.

H.    <u>Judgments</u>.  No judgment has been rendered on the Claims.

I.    <u>Notices</u>.  All notices concerning this Proof of Claim should be sent to:

> BT Leasing Corp.
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn:  Howard Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed

authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
        October __, 2002

<div style="margin-left: 40%;">

BT Leasing Corp.

By: _____
Name: _____
Title: _____

</div>

<u>Penalty for Presenting a Fraudulent Claim</u>.  Fine of not more than $500,000.00 or imprisonment

of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

| FORM B10 (Official Form 10) (4/01) | | PROOF OF CLAIM |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | | |

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)     0000014185

**Name of Creditor** (The person or entity to whom the debtor owes money or property):

Seneca Leasing Partners L.P.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

**Name and addresses where notices should be sent:**

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

Seneca Leasing Partners L.P.
Legal Department
31 West 52nd Street
New York, NY 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor: | Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated: _____ |
|---|---|

**1. Basis For Claim:**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)

Your S S # _____-_____-_____

Unpaid compensation for services performed

from _____ to _____
(date)          (date)

| **2. Date debt was incurred:** (See Annex A) | **3. If court judgment, date obtained:** |
|---|---|

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
■ Other: setoff and related rights
Value of Collateral: $

Amount of arrearage and other charges at the time case filed included in secured claim, if any $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)____.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date: October __, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>By:<br>Name:<br>Title: _counsel_ |
|---|---|

Penalty for presenting fraudulent claim: Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
In re:                                             :
                                                   :
Enron Corp.,                                       :
                                                   :
                          Debtor.                  :
-------------------------------------------------- x
```

Chapter 11

Case No. 01-16034 (AJG)

(Jointly Administered)

## ANNEX A TO PROOF OF CLAIM OF SENECA LEASING PARTNERS L.P.

A.    <u>Description of Claim.</u>

Seneca Leasing Partners L.P. ("<u>Claimant</u>") is filing this proof of claim ("<u>Proof of Claim</u>") against Enron Corp. (the "<u>Debtor</u>") for contribution, indemnification, reimbursement and/or any other obligations otherwise arising in favor of the Claimant or any of its affiliates in connection with any litigation or other action, investigation or proceeding, including, without limitation, any investigation by the Official Committee of Unsecured Creditors in these jointly-administered proceedings or any governmental investigation or proceeding, in any way relating to any transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or or any affiliate of the Debtor. The Claimant on behalf of itself and its affiliates additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

B.    <u>Reservation of Rights/Amendments.</u>

1.    To the extent the Claims asserted herein may also be asserted against any other debtor in these jointly-administered proceedings under law or equity, including but not limited to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its

affiliates against each of such other debtors.  Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not:  (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.    The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv)

against third parties, including, without limitation, any affiliates of the Debtor. Claimant also reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtors and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3.      In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

C.      Interest, Costs and Attorneys' Fees.

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

D.      Other Claims.

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

E.    <u>Right to Determination in Other Forums.</u>

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

F.    <u>Administrative Claim Status.</u>

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

G.    <u>Open Account.</u>  The Claims are not based on an open account.

H.    <u>Judgments.</u>   No judgment has been rendered on the Claims.

I.    <u>Notices.</u>  All notices concerning this Proof of Claim should be sent to:

> Seneca Leasing Partners L.P.
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn:  Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed

authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
        October __, 2002

                                        Seneca Leasing Partners L.P.

                                        By: _____
                                        Name: _____
                                        Title: _____

Penalty for Presenting a Fraudulent Claim.  Fine of not more than $500,000.00 or imprisonment

of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

FORM B10 (Official Form 10) (4/01)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (CA)        0000014256

Name of Creditor (The person or entity to whom the debtor owes money or property):

Deutsche Bank Trust Corporation
(f/k/a Bankers Trust Corporation)

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

Deutsche Bank Trust Corporation
Legal Department
31 West 52nd Street
New York, New York 10019
Attn.: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

| Account or other number by which creditor identifies debtor: | Check here<br>if this claim  ☐ replaces<br>                 ☐ amends    a previously filed claim, dated: _____ |
|---|---|

**1. Basis For Claim:**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)

Your S S # _____-_____-_____

Unpaid compensation for services performed

from _____ to _____
      (date)              (date)

**2. Date debt was incurred: (See Annex A)**    |    **3. If court judgment, date obtained:**

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** contingent and unliquidated claims (See Annex A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
☑ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate      ☐ Motor Vehicle
☑ Other: setoff and related rights
Value of Collateral: $

Amount of arrearage and other charges at the time case filed included in secured claim, if any $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever
  is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date: October __, 2002 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>By:<br>Name:<br>Title: |
|---|---|

Penalty for presenting fraudulent claim: Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------  x
                                                :    Chapter 11
In re:                                          :
                                                :    Case No. 01-16034 (AJG)
Enron Corp.,                                    :
                                                :    (Jointly Administered)
                 Debtor.                        :
----------------------------------------------  x
```

## ANNEX A TO PROOF OF CLAIM OF DEUTSCHE BANK TRUST CORPORATION (F/K/A BANKERS TRUST CORPORATION)

A.    Description of Claim.

Deutsche Bank Trust Corporation (f/k/a Bankers Trust Corporation) ("Claimant")  is filing this proof of claim ("Proof of Claim") against Enron North America Corp. (the "Debtor") for contribution, indemnification, reimbursement and/or any other obligations arising in favor of the Claimant or any of its affiliates in connection with that certain litigation captioned Brazos Electric Power Cooperative, Inc. v. Ponderosa Pine Energy, L.L.C., Civil Action No. 3:02-CV-01579-N, pending in the United States District Court for the Northern District of Texas, Dallas Division, or any other litigation or other action, investigation or proceeding, including, without limitation, any investigation by the Official Committee of Unsecured Creditors in these jointly-administered proceedings or any governmental investigation or proceeding, in any way relating to any transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or any affiliate of the Debtor.  The Claimant on behalf of itself and its affiliates additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

B.    Reservation of Rights/Amendments.

1.    To the extent the Claims asserted herein may also be asserted against any other debtor in these jointly-administered proceedings under law or equity, including but not limited to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its affiliates against each of such other debtors. Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not: (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.    The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including,

without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv) against third parties, including, without limitation, any affiliates of the Debtor. Claimant also reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtor and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation. The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3.      In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

C.    Interest, Costs and Attorneys' Fees.

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

D.    Other Claims.

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

E.    Right to Determination in Other Forums.

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

F.    Administrative Claim Status.

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

G.    Open Account.  The Claims are not based on an open account.

H.    Judgments.   No judgment has been rendered on the Claims.

I.    <u>Notices</u>.  All notices concerning this Proof of Claim should be sent to:

> Deutsche Bank Trust Corporation
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn:  Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
       October __, 2002

<div align="right">

Deutsche Bank Trust Corporation


By:_____
   Name:_____
   Title:_____

</div>

<u>Penalty for Presenting a Fraudulent Claim</u>.  Fine of not more than $500,000.00 or imprisonment of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

I.    Notices.  All notices concerning this Proof of Claim should be sent to:

> Deutsche Bank Trust Corporation
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn:  Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
      October ___, 2002

> Deutsche Bank Trust Corporation
>
> By: _____
> Name: _____
> Title: _____

Penalty for Presenting a Fraudulent Claim.  Fine of not more than $500,000.00 or imprisonment of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

FORM B10 (Official Form 10) (4/01)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Enron Corp. | Case Number 01-16034 (AJG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or entity to whom the debtor owes money or property):

Deutsche Bank Securities Inc.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your Attach copy of statem particulars.

☐ Check box if you hav received any notices bankruptcy court in t

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - Southern District of New York
ENRON, Et Al.
01-16034 (AJG)        0000022515

THIS SPACE IS FOR COURT USE ONLY

Name and addresses where notices should be sent:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn.: Howard S. Beltzer, Esq.
Telephone number: (212) 819-8200

Deutsche Bank Securities Inc.
Legal Department
31 West 52nd Street
New York, New York 10019
Attn: Jeffrey Welch, Esq.
Telephone number: (212) 469-7980

| Account or other number by which creditor identifies debtor: | Check here<br>if this claim ☐ replaces<br>■ amends    a previously filed claim, dated: 10/15/02 |
|---|---|

**1. Basis For Claim:**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
■ Other (See Annex A)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)
Your S S # _____
Unpaid compensation for services performed
from _____ to _____
(date)                    (date)

| 2. Date debt was incurred: (See Annex A) | 3. If court judgment, date obtained: |
|---|---|

**4. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:**  contingent and unliquidated claims (See Annex A)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
■ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges. (See Annex A)

**5. SECURED CLAIM.**
■ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐Real Estate        ☐  Motor Vehicle
■ Other: setoff and related rights
Value of Collateral: $

Amount of arrearage and other charges at the time case filed included in
secured claim, if any $ _____

**6. UNSECURED PRIORITY CLAIM.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever
is earlier – 11 U.S.C. § 507 (a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(4).
☐ Up to $2,100* of deposits toward purchase, lease or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(6).
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units – 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)_____.
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JAN 2 4 2003

Date: January 23, 2003

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)
By: _____        By: _____
Name: Jeffrey Welch, Esq.        Name: David Mellgard, Esq.
Title:  Counsel        Title:  Counsel

*Penalty for presenting fraudulent claim:* Fine up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

1/15/2003 2:26 PM (2K)
NEWYORK 955495 v1 [kh9j011.DOC]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
In re:                                             :    Chapter 11
                                                   :    Case No. 01-16034 (AJG)
Enron Corp.,                                       :
                                                   :    (Jointly Administered)
                          Debtor.                  :
-------------------------------------------------- x

## ANNEX A TO PROOF OF CLAIM OF DEUTSCHE BANK SECURITIES INC.

A.    <u>Description of Claim.</u>

Deutsche Bank Securities Inc.[1] ("Claimant") files this proof of claim (the "Proof of Claim") against Enron Corp. (the "Debtor") with respect to any contribution, indemnification, reimbursement and/or other obligations arising in favor of the Claimant or any of its affiliates in connection with the following litigations captioned: (i) The Variable Annuity Life Insurance Company v. Credit Suisse First Boston, et al., Civil Action No. H-02-3680, pending in the United States District Court for the Southern District of Texas, Houston Division, (ii) that certain litigation captioned Washington State Investment Board and Employer-Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Kenneth Lay et al., Civil Action No. H-02-3401, pending in the United States District Court for the Southern District of Texas, Houston Division, and (iii) that certain litigation captioned Abbey National Treasury Services plc v. Credit Suisse First Boston Corporation et al., pending in the United States District Court for the Southern District of

---

[1] Certain of the Schedules to the Statement of Financial Affairs filed by the Debtor on June 17, 2002 and the Amended Statement of Financial Affairs filed on August 15, 2002 list predecessors in interest to the Claimant which are no longer separate entities. As such, Claimant is filing this Proof of Claim on behalf of all such entities and reserves its rights to file additional or supplemental proofs of claim on their behalf.

New York, or any other litigation or other action, investigation or proceeding, including, without limitation, any investigation by the Official Committee of Unsecured Creditors in these jointly-administered proceedings or any governmental investigation or proceeding, in any way relating to any transaction involving the Claimant and/or any affiliate of the Claimant with the Debtor and/or any affiliate of the Debtor. The Claimant on behalf of itself and its affiliates additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

B.      Reservation of Rights/Amendments.

1.      To the extent the Claims asserted herein may also be asserted against any other debtor in these jointly-administered proceedings under law or equity, including but not limited to, in the event of a substantive consolidation of the Debtor with some or all of these jointly-administered debtors, this Proof of Claim also constitutes a claim by the Claimant and/or its affiliates against each of such other debtors. Additionally, any common law indemnity claims against all such debtor(s) are expressly preserved. The execution and filing of this Proof of Claim is not: (i) a waiver or release of any of the Claimant's or any of its affiliates' rights against any other entity or person liable for all or part of the Claims; (ii) a consent by the Claimant or any of its affiliates to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant or any of its affiliates; (iii) a waiver of the right by the Claimant or any of its affiliates to withdraw the reference with respect to the subject matter of the Claims, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving the Claimant or any of its affiliates; or (iv) an election of remedy by the Claimant or any of its affiliates which waives

or otherwise affects any other remedy of the Claimant or any of its affiliates. This Proof of Claim is made without prejudice to the rights of the Claimant or any of its affiliates under the Bankruptcy Code or otherwise, including, without limitation, any and all rights of setoff and recoupment, and to the extent of any such rights of setoff or recoupment this Proof of Claim is filed as a secured claim.

2.    The Claimant and its affiliates do not waive any right to amounts due for any Claim asserted herein by not stating a specific amount due for any such Claim at this time. The Claimant on behalf of itself and its affiliates expressly reserves all of its rights, including, without limitation, its rights: (i) to file a separate proof of claim with respect to any Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supercede this Proof of Claim unless expressly so stated therein); (ii) to amend, modify or supplement in any respect this Proof of Claim, including for the purpose of fixing and liquidating the amount of any contingent or unliquidated claim set forth herein; (iii) to file additional proofs of claim; and (iv) against third parties, including, without limitation, any affiliates of the Debtor.  Claimant also reserves on its own behalf and on behalf of its affiliates the right to assert additional claims against the Debtor and/or any affiliate(s) of the Debtor, including, without limitation, claims for misrepresentation, actual or constructive fraud, fraud in the inducement, false pretenses and/or false representation.  The filing of this Proof of Claim shall not constitute or be construed to effect a waiver by the Claimant or any of its affiliates of any rights, claims, causes of action, setoffs, netting or defenses (or remedies with respect thereto) which Claimant or any of its affiliates may have against or with respect to any person or entity, including, without limitation, the Debtor and its affiliates.

3.      In the event that any order of the Court is entered into which effects: (i) a recharacterization or subordination of claims, including without limitation, the Claims; (ii) substantive consolidation of some or all of the Debtors with any of their affiliates; or (iii) any other similar remedy, the rights of the Claimant to file additional proofs of claim or amended proofs of claim against the Debtor and/or any of its affiliates is specifically reserved.

C.    Interest, Costs and Attorneys' Fees.

The Claimant reserves the right to claim prepetition and postpetition interest, costs and attorneys' fees with respect to all of the Claims to the maximum extent permitted by law.

D.    Other Claims.

The Claimant additionally asserts any and all other rights and remedies arising as a matter of law or equity against the Debtor, or pursuant to any contract or other arrangement between the Claimant and the Debtor whether or not such contract or other arrangement is specifically identified herein.

E.    Right to Determination in Other Forums.

The Claimant reserves all rights to have the Claims and any defenses, counterclaims, or objections thereto determined before any other judicial or administrative body having jurisdiction, and, to the extent necessary to preserve such rights, makes demand therefor.

F.    Administrative Claim Status.

This Proof of Claim is without prejudice to the Claimant's right to assert (a) that some or all of the amounts set forth herein are entitled to be treated as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code, or (b) that the Claimant holds other claims, rights and remedies against the Debtor that are entitled to be treated

as administrative claims against the Debtor pursuant to Sections 503(b) and 507(a)(l) of the Bankruptcy Code.

G.     <u>Open Account.</u>  The Claims are not based on an open account.

H.     <u>Judgments</u>.   No judgment has been rendered on the Claims.

I.    <u>Notices</u>.  All notices concerning this Proof of Claim should be sent to:

> Deutsche Bank Securities Inc.
> Legal Department
> 31 West 52nd Street
> New York, New York 10019
> Attn.: Jeffrey Welch, Esq.

With a copy to:

> White & Case LLP
> 1155 Avenue of the Americas
> New York, New York
> Attn: Howard S. Beltzer, Esq.

The request for copies of notices to be sent to White & Case LLP shall not be deemed authorization of White & Case LLP to accept service of process on behalf of the Claimant.

Dated: New York, New York
       January 23, 2003

Deutsche Bank Securities Inc.

By: _____
    Name: Jeffrey Welch, Esq.
    Title:  Counsel

By: _____
    Name:  David Mellgard, Esq.
    Title:   Counsel

<u>Penalty for Presenting a Fraudulent Claim</u>.  Fine of not more than $500,000.00 or imprisonment of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.