**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

ENRON CREDITORS RECOVERY
CORP., *et al.*,

               Reorganized Debtors.

ENRON CORP., *et al.*,

               Plaintiffs,

     v.

CITIGROUP INC., *et al.*,

               Defendants.

CIVIL CASE NO.:  07 Civ. 10612

Chapter 11

Case No. 01-16034 (AJG)

Jointly Administered

Adversary No. 03-09266 (AJG)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**CITIGROUP DEFENDANTS' MOTION TO WITHDRAW REFERENCE**

# TABLE OF CONTENTS

I.    OVERVIEW OF OPPOSITION ............................................................................. 1

II.   STATEMENT OF THE CASE ................................................................................ 6

    A.   Enron filed bankruptcy in 2001; Judge Gonzalez has administered the
         Case and numerous related adversary proceedings ever since. ............................ 6

    B.   The Enron Examiner was appointed and made detailed findings of
         Citigroup's bad acts, which were supported by several other independent
         bodies. ................................................................................................................. 8

    C.   Citigroup has participated in the Enron bankruptcy case, including by
         filing Proofs of Claims seeking, *inter alia*, repayment of amounts provided
         to Enron in disguised loans and indemnification. ................................................. 11

    D.   Enron initiated the Mega Claim Litigation to disallow Citigroup's Proofs
         of Claim and to recover amounts for the benefit of its creditors. ......................... 17

    E.   Citigroup and Enron have actively litigated the Mega Claim Litigation
         before the Bankruptcy Court. ................................................................................ 19

III.  CITIGROUP FAILS TO MEET THE STATUTORY REQUIREMENTS AND
     LEGAL STANDARDS FOR WITHDRAWAL OF THE REFERENCE ............................... 20

    A.   The Motion to Withdraw the Reference is not timely because Citigroup
         waited over 49 months after this adversary proceeding was filed, and more
         than 44 months after demanding a jury trial. ....................................................... 21

    B.   The Citigroup Defendants have not demonstrated "cause" to withdraw the
         reference. ............................................................................................................. 27

IV.   THE CITIGROUP DEFENDANTS ARE NOT ENTITLED TO A JURY TRIAL ............... 28

    A.   The proofs of claim filed by the Citigroup defendants and their assertion
         of indemnity and setoff in the Answer have converted the estate's actions
         into counterclaims, which are core proceedings with no jury trial rights. ............ 30

    B.   The Citigroup defendants, including CXC, CRC and CAFCO,
         contractually waived their jury trial rights in connection with most of the
         transactions that are the subject of the Complaint. .............................................. 38

    C.   The Citigroup defendants have no jury trial rights on the avoidance
         actions, which are legally and factually distinct in any event. ............................. 41

D.      Enron's equitable subordination claims are indisputably core matters as to which no party has a jury right; these claims and the factually related common law claims should be tried in the Bankruptcy Court commencing in April, whatever the disposition of the other causes of action. ......................... 43

V.      THE BANKRUPTCY COURT HAS ADEQUATE EXPERTISE TO HANDLE THE TRIAL ................................................................................................................................. 46

VI.     CONCLUSION ........................................................................................................................ 48

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re 9281 Shore Road Owners Corp.,
  187 B.R. 837 (E.D.N.Y. 1995) ..........................................................................43

ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.),
  210 B.R. 508 (Bankr. S.D.N.Y. 1997)...............................................................43

Abondolo v. GGR Holbrook Medford, Inc.,
  285 B.R. 101 (E.D.N.Y. 2002) ..........................................................................28

Agudas Chasidei Chabad v. Gourary,
  833 F.2d 431 (2d Cir. 1987)..........................................................................45, 46

Alexander v. Hillman,
  296 U.S. 222 (1935)................................................................................4, 31, 32

Beacon Theatres, Inc. v. Westover,
  359 U.S. 500 (1959)..................................................................................... 44-45

Bear, Stearns Sec. Corp. v. Gredd,
  2001 U.S. Dist. LEXIS 10324 (S.D.N.Y. Jul. 23, 2001) ....................................42

Blurton v. Fesmire (In re Southern Indus. Mech. Corp.),
  266 B.R. 827 (W.D. Tenn. 2001)........................................................................29

Braniff Int'l Airlines v. Aeron Aviation Resources Holdings II
  (In re Braniff Int'l Airlines),
  159 B.R. 117 (S.D.N.Y. 1993).............................................................................47

Brown v. Cushman & Wakefield, Inc.,
  235 F. Supp. 2d 291 (S.D.N.Y. 2002)..................................................................41

In re Commercial Financial Servs., Inc.,
  251 B.R. 397 (Bankr. N.D. Okla. 2000) .........................................................37, 38

Complete Mgmt. v. Arthur Andersen, LLP (In re Complete Mgmt., Inc.),
  2002 U.S. Dist. LEXIS 18344 (S.D.N.Y. Sept. 27, 2002).....................................47

Consol. Indus. Corp. v. Welbilt Holding Co.,
  254 B.R. 237 (N.D. Ind. 2000) ...........................................................................25

Credit Suisse Securities (USA) LLC v. Official Comm. of Unsecured Creditors
   (In re Refco, Inc.),
   2006 U.S. Dist. LEXIS 30662 (S.D.N.Y. May 16, 2006)[†] ................................................20, 21

Dairy Queen, Inc. v. Wood,
   369 U.S. 469 (1962)........................................................................................................44, 45

Delta Air Lines, Inc. v. City of Los Angeles,
   2007 U.S. Dist LEXIS 81216 (S.D.N.Y. Oct. 30, 2007) ....................................................34, 35

Drew v. WorldCom, Inc. (In re WorldCom, Inc.),
   2006 U.S. Dist. LEXIS 52318 (S.D.N.Y. July 26, 2006) ....................................................22, 26

Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.),
   333 B.R. 205 (Bankr. S.D.N.Y. 2005)........................................................................................43

Enron Corp. v. Citigroup Inc. (In re Enron Corp.),
   349 B.R. 108 (Bankr. S.D.N.Y. 2006)..............................................................5, 7, 20, 23, 36

Enron Corp. v. Citigroup Inc. (In re Enron),
   353 B.R. 51 (2006)....................................................................................................................19

Enron Corp. v. Citigroup Inc. (In re Enron),
   2004 Bankr. LEXIS 2124 (Sept. 23, 2004)................................................................................19

Ernst & Young v. Bankruptcy Servs. (In re CBI Holding Co.),
   311 B.R. 350, 363 (S.D.N.Y. 2004)......................................................................34, 35, 47

First Fidelity Bank v. Hooker Investments, Inc. (In re Hooker Investments, Inc.),
   937 F.2d 833 (2d Cir. 1991)......................................................................................................45

Franklin Ridgewood Assocs. v. Catwil Corp.,
   1990 Bankr. LEXIS 2728 (Bankr. E.D. Pa. Oct. 11, 1990)......................................................47

Germain v. Conn. Nat'l Bank,
   988 F.2d 1323 (2d Cir. 1993)................................................................................................5, 33

Granfinanciera, S.A. v. Nordberg,
   492 U.S. 33 (1989)....................................................................................................4, 29, 32, 34

Gredd v. Bear, Sterns Sec. Corp. (In re Manhattan Inv. Fund Ltd.),
   343 B.R. 63 (S.D.N.Y. 2006).....................................................................................................22

---

[†]  For the convenience of the Court, Plaintiffs have filed concurrently herewith an appendix
    containing the unreported decisions that are cited herein.

HA2003 Liquidating Trust v. J.P. Morgan Partners (In re Ha-Lo Indus., Inc.),
   326 B.R. 116 (N.D. Ill. 2005) .................................................................................25

Hassett v. Citicorp N. Am. (In re CIS Corp.),
   188 B.R. 873 (S.D.N.Y. 1995)...............................................................................28

Hedstrom Corp. v. Wal-Mart Stores, Inc. (In re Hedstrom Corp.),
   2006 U.S. Dist. LEXIS 29656 (N.D. Ill. April 24, 2006) .....................................37

Interconnect Tel. Services, Inc. v. Farren,
   59 B.R. 397 (S.D.N.Y. 1986)................................................................................38

Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC),
   373 B.R. 283 (Bankr. S.D.N.Y. 2007)..............................................................6, 47

Judge v. Ridley & Schweigert (In re Leedy Mortg. Co.),
   62 B.R. 303 (E.D. Pa. 1986) .................................................................................47

Katchen v. Landy,
   382 U.S. 323 (1966)...............................................................4, 32, 33, 44, 45

Keating v. United States Lines, Inc. (In re United States Lines, Inc.),
   2006 U.S. Dist. LEXIS 37114 (S.D.N.Y. June 7, 2006) ......................................29

Langenkamp v. Culp,
   498 U.S. 42 (1990)...........................................................................................33, 41

Lender's Decision, Inc. v. Comerica Bank (In re Lender's Decision, Inc.),
   1997 U.S. Dist. LEXIS 16654 (N.D. Ill. Oct. 14, 1997).........................................1

Lone Star Indus. v. Rankin Cty. Econ. Dev. Dist.,
   158 B.R. 574 (S.D.N.Y. 1993)..............................................................................26

In re Mantelman,
   2002 U.S. Dist. LEXIS 8071 (N.D. Ill. May 6, 2002) ..........................................37

Mellon v. Del. & Hudson R.R. (In re Del. & Hudson R.R.),
   122 B.R. 887 (D. Del. 1991)................................................................................42

Mitev v. INS,
   67 F.3d 1325 (7th Cir. 1995) ...............................................................................33

Molloy v. Primus Auto. Fin. Servs.,
   247 B.R. 804 (C.D. Cal. 2000) ............................................................................46

National Westminster Bank v. Ross,
    130 B.R. 656 (S.D.N.Y. 1991)................................................................41

Noonan v. Cunard Steamship Co.,
    375 F.2d 69 (2d Cir. 1967)..................................................................25

In re North Am. Energy Conservation, Inc.,
    2000 U.S. Dist. LEXIS 15084 (S.D.N.Y. Oct. 12, 2000) .......................37

Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,
    458 U.S. 50 (1982)............................................................................32

Official Comm. of Unsecured Creditors v. Lay (In re Enron Corp.),
    295 B.R. 21 (S.D.N.Y. 2003)..........................................................6, 21

Official Comm. of Unsecured Creditors v. Union Transp. Corp.
    (In re FMI Forwarding Co.),
    2005 U.S. Dist. LEXIS 941 (S.D.N.Y. Jan. 21, 2005) ................1, 22, 24

In re Orion Pictures Corp.,
    4 F.3d 1095 (2d Cir. 1993).................................................................27

Parklane Hosiery v. Shore,
    439 U.S. 322 (1979)..........................................................................45

Porges v. Gruntal & Co. (In re Porges),
    44 F.3d 159 (2d Cir. 1995)...................................................................4

In re Pruitt,
    910 F.2d 1160 (3d Cir. 1990)..............................................................21

Reding v. Gallagher (In re Childs),
    342 B.R. 823 (N.D. Ala. 2006) ..................................................25, 26, 28

Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),
    68 F.3d 26 (2d Cir. 1995) ..............................................................43, 44

Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.),
    2003 U.S. Dist. LEXIS 23136 (S.D.N.Y. Dec. 24, 2003) .............21, 22, 25

Schneiderman & Friedman v. Dalnoky,
    2001 U.S. Dist. LEXIS 12700 (S.D.N.Y. Aug. 23, 2001)........................28

Sea Carriers Corp. v. Empire Programs, Inc.,
    2007 U.S. Dist. LEXIS 7812 (S.D.N.Y. Jan. 26, 2007) ..........................25

Shugrue v. Chemical Bank (In re Ionosphere Clubs, Inc.),
    1995 U.S. Dist. LEXIS 11416 (S.D.N.Y. Aug. 11, 1995)............................................1, 21, 22

Singer Co. B.V. v. Groz-Beckert KG (In re Singer Co.),
    2002 U.S. Dist. LEXIS 2629 (S.D.N.Y. Feb. 20, 2002)......................................................21, 26

South St. Seaport Ltd. P'ship v. Burger Boys (In re Burger Boys),
    94 F.3d 755 (2d Cir. 1996)......................................................................................21, 27, 46

Springfield Assocs. L.L.C. v. Enron Corp. (In re Enron Corp.),
    2007 U.S. Dist. LEXIS 63129 (S.D.N.Y. Aug. 27, 2007).........................................................43

Springfield Assocs. L.L.C. v. Enron Corp. (In re Enron Corp.),
    2007 U.S. Dist LEXIS 70731 (S.D.N.Y. Sept. 24, 2007)......................................................2, 43

Stainer v. Latimer (In re Latimer),
    918 F.2d 136 (10th Cir. 1990) ...............................................................................................25

Statutory Comm. of Unsecured Creditors v. Motorola (In re Iridium Operating LLC),
    285 B.R. 822 (S.D.N.Y. 2002)..................................................................................6, 35, 37

United States ex rel. Rahman v. Oncology Assocs.,
    2000 U.S. Dist. LEXIS 22185 (D. Md. Jul. 24, 2000)...........................................................42

Waslow v. MNC Commercial Corp. (In re Paolella),
    161 B.R. 107 (E.D. Pa. 1993) ................................................................................................44

Wechsler v. Hunt Health Sys.,
    2003 U.S. Dist. LEXIS 13775 (S.D.N.Y. Aug. 7, 2003)........................................................40

Yakus v. United States,
    321 U.S. 414 (1944)...............................................................................................................25

## FEDERAL STATUTES & RULES

11 U.S.C. § 101...............................................................................................................16

11 U.S.C. § 1107...............................................................................................................7

28 U.S.C. § 1292..............................................................................................................2

28 U.S.C. § 157.................................................................1, 20, 21, 22, 23, 26, 28, 37

Fed. R. Civ. P. 38..............................................................................................................25

Fed. R. Bankr. P. 9033......................................................................................................29

Enron Creditors Recovery Corp., formerly known as Enron Corp., and its co-plaintiff subsidiaries (collectively, "Plaintiffs" or "Enron"), hereby submit their opposition to the Motion of the Citigroup Defendants to Withdraw the Reference (the "Motion").[1]

## I.

## <u>OVERVIEW OF OPPOSITION</u>

Citigroup has moved to withdraw the reference of an adversary proceeding brought against it, more than four years after the lawsuit was filed, nearly three years after Citigroup filed its answer, and on the eve of trial. As the movant, Citigroup bears the burden of demonstrating that (1) the Motion is "timely" and (2) "cause" exists for withdrawal of the reference under 28 U.S.C. § 157(d). *Lender's Decision, Inc. v. Comerica Bank (In re Lender's Decision, Inc.)*, 1997 U.S. Dist. LEXIS 16654, at *3 (N.D. Ill. Oct. 14, 1997); *Shugrue v. Chemical Bank (In re Ionosphere Clubs, Inc.)*, 1995 U.S. Dist. LEXIS 11416, at *10 (S.D.N.Y. Aug. 11, 1995). Citigroup cannot satisfy its burden as to either requirement.

The Motion is not timely, as expressly required by the statute, and should be denied on that basis alone. The Motion fails to identify a single ground allegedly supporting the requested withdrawal that could not have been timely raised many months or even years ago. Citigroup cannot demonstrate that it filed its Motion "as soon as possible" after having notice of grounds to move to withdraw the reference. *Official Comm. of Unsecured Creditors v. Union Transp. Corp. (In re FMI Forwarding Co.)*, 2005 U.S. Dist. LEXIS 941, at *17 (S.D.N.Y. Jan. 21, 2005). Citigroup has actively participated in this adversary proceeding before the Bankruptcy Court, including in extensive fact and expert discovery and multiple hearings. This belated gambit is a

---

[1]     For the most part, we try to use the same defined terms as Citigroup did in its *Memorandum of Law in Support of the Citigroup Defendants' Motion to Withdraw the Reference* (the "Citi Memo").

transparent attempt both to judge shop and to delay the impending (April 2008) trial. It is also contrary to Citigroup's recent representations to this Court and to the Bankruptcy Court. Just this past summer, for example, Citigroup assured this Court – at oral argument of an appeal arising out of another adversary proceeding in the Enron chapter 11 case – that "the mega complaint against Citibank … is going to be tried before Judge Gonzalez in April of next year."[2] Tr., 8/7/2007, at 28-29.[3]

Aside from the untimeliness of Citigroup's Motion, any contention that this Court *must* withdraw the reference is wrong, and any argument that this Court *should* withdraw the reference is unsupported and demonstrably at variance with precedent in this Court, the Second Circuit, and beyond. *See* Part III.

The lynchpin of the Motion is the contention that some or all of the Citigroup defendants are entitled to a jury trial in this Court despite having filed numerous and extensive claims against the Enron estate in the Bankruptcy Court in the form of (i) proofs of claim (below detailed) and (ii) broad assertions of rights of setoff, recoupment and contractual indemnity in pleadings filed with the bankruptcy court in the Mega Claim Litigation. By semantically reconstructing the proofs of claim it filed on behalf of "affiliates" (a term previously used regularly to describe all the Citigroup defendants), Citigroup now fallaciously contends that three

---

[2]      That assurance was a basis for the Court's refusal to certify the matter for further appeal under 28 U.S.C. § 1292(b). *Springfield Assocs. L.L.C. v. Enron Corp. (In re Enron Corp.)*, 2007 U.S. Dist LEXIS 70731, at *11-*12 (S.D.N.Y. Sept. 24, 2007) ("The Mega Claim Action is scheduled to go to trial in April of 2008. An interlocutory appeal could delay that trial for over a year, at the expense of all of the parties involved in this already protracted bankruptcy case.").

[3]      Transcripts, pleadings and documents referenced in this Memorandum are authenticated (where necessary), excerpted (where lengthy and where excerpts are not misleading) and attached to the Declaration of Matthew C. Heyn (the "Heyn Decl."), filed under separate cover. The August 7, 2007 transcript is Exh. 2.

defendants (CXC, CRC and CAFCO), who are being sued for receiving avoidable transfers, never filed proofs of claim and thus still have a right to a jury trial. The Motion also fails to disclose or address, among numerous other claims, the following claim asserted on behalf of *all* of the Citigroup defendants (CXC, CRC and CAFCO included) in their answer to Reorganized Debtors Fourth Amended Complaint (the "Complaint"):

> Pursuant to the transaction documents relating to certain of the transfers alleged in the Complaint, Plaintiffs and/or their affiliates agreed to hold harmless and indemnify the Citigroup Defendants to the full extent of any losses, expenses, claims or proceedings related to or arising out of, among other things, any transaction or conduct in connection with such transfers. *The Citigroup Defendants hereby invoke all of their contractual and common law indemnity rights, and hereby provide notice to Plaintiffs hereof.*

Answer, at 240 (Eleventh Affirmative Defense) (Heyn Decl., Exh. 3) (emphasis added).[4]

The unqualified and explicit assertion of this affirmative defense on behalf of all the Citigroup defendants, coupled with the filing of parallel proofs of claim seeking similarly broad relief, destroys any contention that there is little or no nexus between the proofs of claim – which, as we discuss below, are asserted on behalf of Citigroup, its subsidiaries and its affiliates – and the causes of action in the Mega Claim Litigation. Indeed, not only does Citigroup's Motion fail to fully disclose or address the massive indemnity proofs of claim filed by Citigroup's affiliates, the Motion does not even mention an order entered in the bankruptcy case expressly requiring a ***$4 billion*** claim reserve for Citigroup's various indemnity and other unliquidated claims filed on behalf of Citigroup, its subsidiaries and affiliates.[5] The magnitude

---

[4]    *See* Part IV.A, explaining why, as a matter of law, the assertion of this and other affirmative defenses is equivalent to filing a proof of claim.

[5]    *See Combined Order, Pursuant to 11 U.S.C. §§ 105(a), 502(c), and 1142, Estimating Certain Contingent or Unliquidated Claims for Purposes of Establishing Reserves*, at 4 (Heyn Decl., Exh. 4). These claims, Proof of Claim Nos. 11264, 13104, 12843, 14503, 14504, and 14505, which are described in section II.C, seek indemnity for Citigroup and its

FOOTNOTE CONTINUED ON NEXT PAGE

of this claim reserve alone is a testament to the breadth of the Citigroup defendants' indemnity claims and the impact of those claims on the claims administration process, the bankruptcy administration and the distributions to other creditors.

Citigroup nevertheless argues that, for purposes of evaluating whether the actions asserted by Enron are "core" matters and whether the Citigroup defendants are entitled to a jury trial on those claims, the Court should simply ignore Citigroup's claims against the estates.[6] This contention is inconsistent with several centuries of equity jurisprudence, as well as controlling Supreme Court and other precedent.  Simply put, when creditors such as Citigroup assert claims against a bankruptcy estate, they "invok[e] the court's jurisdiction to establish their right to participate in the distribution [and] may [not] deny its power to require them to account for what they misappropriated" a requirement that "is in harmony with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief."  *Alexander v. Hillman*, 296 U.S. 222, 241-42 (1935).  The holding in *Alexander v. Hillman* underlies and was expressly relied upon by the Supreme Court in two landmark and directly relevant bankruptcy cases, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59 n.14 (1989), and *Katchen v. Landy*, 382 U.S. 323, 335 (1966).

As aptly encapsulated by *Porges v. Gruntal & Co. (In re Porges)*, 44 F.3d 159, 164 (2d Cir. 1995), *Alexander* and its progeny stand for the proposition – of singular significance here –

---

affiliates from suits against them for their role in aiding and abetting fraud – the exact issue raised by the common law and equitable subordination claims in the Complaint.

[6]  Citigroup also sprinkles its arguments with various protestations of innocence and victimization coupled with snide attempts to portray Plaintiffs as if they were still controlled by such infamous figures as Ken Lay, Jeff Skilling and others.  Although these diversions are irrelevant to the present motion, we deal briefly with these arguments as well.  Silence might otherwise be seen as agreement, and we most assuredly do not agree.

that "once a court sitting in equity has jurisdiction over the parties to a controversy brought before it, the court can decide all disputed matters and decree complete relief."  As we discuss below, there may be a narrow exception "for the resolution of disputes that are only incidentally related to the bankruptcy process." *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993) (emphasis added).  However, any such exception is inapplicable here because (i) the claims filed by Citigroup seeking to recover money relate to the very lending activities that underlie the Complaint; and (ii) all of the Citigroup defendants have asserted numerous claims, including for indemnity (coupled with setoff defenses) premised on all the Citigroup defendants having no culpability arising from, and being able to shift to Enron all losses for, the financial frauds for which they are being sued in dozens of cases, including this one.  *See* Part IV.A.- IV.C.

Moreover, the indemnity/setoff defenses asserted on behalf of all of the Citigroup defendants and the parallel proofs of claim place squarely at issue the propriety of the very conduct that underlies the Complaint; those claims must fail as to each Citigroup defendant that engaged in fraudulent conduct or aided and abetted fraud or breach of fiduciary duties.  Those claims form a crucial nexus with the counterclaims and objections asserted by Enron in the Mega Claim Litigation, as Judge Gonzalez's opinion in *Enron Corp. v. Citigroup Inc. (In re Enron Corp.)*, 349 B.R. 108 (Bankr. S.D.N.Y. 2006), quoted and discussed below in Part IV.A., makes clear.  The relevant agreements, not surprisingly, provide no indemnity for "any bad faith, gross negligence or willful misconduct," which is precisely what the Mega Claim Litigation alleges.

Citigroup lastly contends that the Bankruptcy Court is otherwise incapable of handling a trial of the length and complexity that this adversary proceeding promises to produce.  But bankruptcy courts – especially this Bankruptcy Court – regularly deal with lengthy and complex

disputes.  Indeed, a recent reported decision, *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 290 (Bankr. S.D.N.Y. 2007), involved a 50-day trial conducted by Bankruptcy Judge Peck that was only the first phase of litigation of which this Court previously had refused to withdraw the reference.  *See Statutory Comm. of Unsecured Creditors v. Motorola (In re Iridium Operating LLC)*, 285 B.R. 822 (S.D.N.Y. 2002) (discussed below); *accord Official Comm. of Unsecured Creditors v. Lay (In re Enron Corp.)*, 295 B.R. 21, 26 (S.D.N.Y. 2003) ("Judge Gonzalez holds hearings on Enron bankruptcy matters frequently; has maintained an efficient case management system for Enron-related matters; is familiar with the procedural history and facts surrounding the financial collapse of Enron; and is well-versed in the legal principles concerning fraudulent transfer and avoidance actions.").  *See* Part V.

Finally, even if, despite the arguments that follow, this Court determines that there are some claims which the Bankruptcy Court cannot try, those claims can and should be severed and stayed while the Bankruptcy Court performs the job Congress delegated to it on those issues plainly core to the restructuring of debtor-creditor relations: the allowability of claims advanced by Citigroup and others, and the estate's ability to equitably subordinate those claims to the extent they are allowed.  *See* Part IV.D.

## II.

## STATEMENT OF THE CASE

**A.    Enron filed bankruptcy in 2001; Judge Gonzalez has administered the Case and numerous related adversary proceedings ever since.**

Until the autumn of 2001, Enron was one of the largest companies in the world, with reported revenues for the fiscal year ended December 31, 2000 topping $100 billion.  Exam. III

at 1, (Heyn Decl., Exh. 5).[7]   Once the truth about Enron's financial condition came to light, however, it went from a market capitalization of $65 billion to zero in very short order, filing for relief under chapter 11 of the Bankruptcy Code on December 2, 2001.   *Id.* at 8-10; Bernheim Report at 18-19, (Karp Decl., Exh. B).   Enron's bankruptcy case was assigned to Bankruptcy Judge Arthur Gonzalez, who has handled it and the numerous adversary proceedings it has spawned (including this one) for more than six years.   Notable among these activities was presiding over the hearing that resulted, on July 15, 2004, in the entry of an order confirming the *Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors* (the "Plan"). *Enron Corp. v. Citigroup, Inc. (In re Enron Corp.)*, 349 B.R. 108, 110 (Bankr. S.D.N.Y. 2006).

Although Citigroup devotes a fair amount of time and paper casting aspersions on Enron and its motives in bringing this proceeding, seeking to create the impression that the plaintiff in the pending litigation is dominated by the same people who participated in "one of the most far-reaching" frauds in commercial history, Citi Memo, at 1, that is simply wrong.   Once Enron filed its chapter 11 case, it became a "debtor in possession," with all of the rights and duties of a chapter 11 trustee.   *See* 11 U.S.C. § 1107.   As part of its emergence from bankruptcy, and indeed even prior to filing bankruptcy, Complaint, at 32-34, ¶¶ 138-41 & 147 (Karp Decl., Exh. A), Enron replaced prior management and now has a board of directors and management exclusively charged with collecting and administering Enron's remaining assets, including the Mega Claim Litigation, for the benefit of Enron's creditors.   Plan, at 10, 27-28, & 90, §§ 1.64, 1.173 & 32.1 (Heyn Decl., Exh. 6).

---

[7]   The four reports of the Enron Examiner, whose appointment is discussed below, are cited herein as "Exam. I" through "Exam. IV".   If the cite is to one of the appendices, the volume is followed by the appendix title, which is followed by a page number, *e.g.*, "Exam. II, App. B at 3."   The portions of the report referred to herein have been attached to the Heyn Decl.

### B.    The Enron Examiner was appointed and made detailed findings of Citigroup's bad acts, which were supported by several other independent bodies.

The Complaint was filed only after an independent examiner investigated and filed a detailed report (in multiple volumes) that chronicled the central role of Citigroup and other financial institutions in the manipulation of Enron's financial statements and credit ratings to enable Enron to incur debt that it could never repay. By Order dated April 8, 2002, the Bankruptcy Court directed the United States Trustee ("U.S. Trustee") to appoint an examiner for Enron (the "Enron Examiner") with broad authority to investigate and report on transactions at Enron involving special purpose entities.  On May 22, 2002, the U.S. Trustee appointed Neal Batson.  Following his appointment, Mr. Batson reviewed millions of pages of documents, took sworn testimony from nearly 200 witnesses, and issued four extensive reports to the Bankruptcy Court about what happened at Enron with a particular focus on the involvement of otherwise respected financial institutions.  Complaint, at 7, ¶ 10 (Karp Decl., Exh. A).

The Enron Examiner's reports, which total 4,235 pages of text (including 34 appendices that are expanded discussions of topics covered in the body of the reports), dissect "substantially all of Enron's material SPE transactions identified to date." Exam. II at 3 (Heyn Decl., Exh. 8). The reports explain precisely how special purpose entities ("SPEs") were used improperly at Enron in conjunction with specific accounting techniques "to impact dramatically its financial statements."  Exam. III at 2 (Heyn Decl., Exh. 5).  Most of the Enron Examiner's third report and part of the fourth report are devoted to examining the role of Enron's "tier one banks" (including, most prominently, Citigroup) in causing Enron's collapse.  The Enron Examiner concluded that Enron's officers did not consummate – and could not have consummated – the SPE transactions

that brought down Enron on their own. Exam. III at 34 (Heyn Decl., Exh. 5).[8]   Mr. Batson

presented a mountain of evidence which he declared could lead a fact-finder to conclude that the

Citigroup defendants provided knowing and substantial assistance to the fraud at Enron, and that

injury to Enron was the direct or reasonably foreseeable result of such conduct. *Id.* at 54; Exam.

III, App. D at 2-5, 148 (Heyn Decl., Exh. 10).

Findings similar to those of the Enron Examiner have been made by other independent

fact finders.  The Securities and Exchange Commission also investigated Enron and its banks

and found that:

> Citigroup assisted two Houston-based energy companies, Enron Corp.
> ("Enron") and Dynegy Inc. ("Dynegy"), in enhancing artificially their financial
> presentation through a series of complex structured transactions whose purpose
> and effect, among other things, was to allow those companies to report proceeds
> of financings as cash from operating activities on their statements of cash flows.

*SEC Order Instituting a Public Administrative Proceeding In the Matter of Citigroup, Inc.*,

("SEC Order") Release No. 34, 48230, Fed. Sec. L. Rep. ¶ 75,482 (July 28, 2003) at 1 (Heyn

Decl., Exh. 11); *see generally* Roach Testimony, Appendix D (Heyn Decl., Exh. 9).

One transaction that the SEC found particularly egregious was "Project Nahanni":

> As Citigroup knew, because it helped structure the transaction, the purpose
> of Project Nahanni was to generate cash from operating activities by selling

---

[8]   The Chief Investigator for the Permanent Subcommittee on Investigations voiced the same
opinion:

> The evidence indicates that Enron would not have been able to engage in
> the extent of the accounting deceptions it did, involving billions of dollars, were it
> not for the active participation of major financial institutions willing to go along
> with and even expand upon Enron's activities. … [¶]  The evidence indicates that
> Chase and Citigroup not only understood Enron's accounting goal – increasing
> operating cash flow without reporting debt – but designed and implemented the
> financial structures to help Enron achieve its objective.

Testimony of Robert Roach before Permanent Subcommittee on Investigations of the
Committee on Governmental Affairs of the United States Senate, 127th Cong. (2d Sess.),
July 23, 2002 at 1-2 ("Roach Testimony") (Heyn Decl., Exh. 9).

> Treasury bills ("T-bills") bought with the proceeds of a loan. The transaction took place over approximately five weeks spanning Enron's 1999 fiscal year end. The project was structured as a business partnership between Enron and an "investor" entity arranged by Citigroup to engage in this transaction. The investor entity was capitalized with a $485 million loan from a Citigroup affiliate [defendant CXC] and $15 million in equity contributed by a third party. The idea was that the "investor" entity would turn its capitalization into T-bills and contribute those T-bills into a partnership with Enron. The partnership would sell the T-bills (classified by Enron as "merchant investments"), thus generating cash flow from operating activities. . . . On December 29, 1999, Enron used this structure to increase its reported cash from operating activities by $500 million. Enron informed Citigroup that it would use this $500 million to decrease its reported debt by that amount. Three weeks later, in January 2000, Enron arranged to repay the $485 million loan in full with interest.

*Id.* at 2.

The SEC also gave special attention to a particular improper financing structures created and implemented by Citigroup known as a "prepay transaction," SEC Order, at 2, finding that:

> Citigroup knew [that] Enron reported the receipt of cash generated from prepay transactions as cash flow from operating activities, rather than cash flow from financing activities, and it reported its repayment obligation as a price risk management liability, rather than debt. In net economic effect, Enron used these [prepay] transactions to borrow, over a two and one-half year period, an aggregate amount of $3.8 billion (although at any particular point in time the amount of Enron's outstanding obligations was lower).

*Id.* at 3.[9]

Other fact-finders, notably including New York County District Attorney Robert Morgenthau, were harsher. In a July 2003 letter to the Chairman of the Federal Reserve, District Attorney Morgenthau wrote:

> Chase and Citibank knowingly structured the prepaid transactions with Enron in a way that allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent. The prepaids, ostensibly derivative transactions involving prepayment for volumes of crude oil or natural gas, created

---

[9]   The SEC ultimately concluded that Citigroup caused violations of SEC reporting obligations because it knew or should have known that its acts would contribute to those violations. *Id.*

the appearance that three seemingly independent entities were engaged in legitimate arms-length commodities trading. In fact, the circular structure of the deals eliminated all conceivable market risk, and the transactions, even though they were handled by the derivatives departments, were really disguised loans. Enron should have recorded the prepaids as bank or credit financings and the cash received as cash flows from financings. It did neither. Instead, it recorded the debt as liabilities from price risk management activities and the cash as cash flows from operating activities. As a consequence, Enron continued to function, even as billions of dollars worth of debt-like obligations from the prepaids accumulated on its books, hidden from the view of investors, creditors and regulators alike.

Letter dated July 28, 2003 from New York District Attorney Robert Morgenthau to Hon. Alan

Greenspan *et al.* at 8 (Heyn Decl., Exh. 12).

On the same day that District Attorney Morgenthau determined in his discretion not to

prosecute Citigroup for its role in the Enron collapse, Citigroup's then Chairman and CEO

Charles Prince wrote a letter thanking Mr. Morgenthau and stating:

> I want to assure you, both personally and on behalf of Citigroup, that the Enron transactions do not reflect our current standards and they would not happen now – and will not happen in the future – at Citigroup. During the past year we have worked hard to reinforce the high standards for integrity and transparency that Citigroup, as a leading financial institution, should meet.

Letter dated July 28, 2003 from Charles Prince to Robert Morgenthau at 1 (Heyn Decl., Exh. 13).

The extensive discovery conducted to date only reinforces the egregious nature of

Citigroup's conduct and the depth of its culpability. The guilt of Enron's insiders is old news of

dubious relevance (especially to this Motion). That guilt, however, cannot obscure Citigroup's

culpability.

**C.** **Citigroup has participated in the Enron bankruptcy case, including by filing Proofs of Claims seeking, *inter alia*, repayment of amounts provided to Enron in disguised loans and indemnification.**

The Citigroup defendants have been active participants in the bankruptcy cases, including

as a member of the Enron creditors' committee (the "Committee").[10]  They filed motions and

oppositions (not including those filed by the Committee) in the Bankruptcy Court, including an

opposition to a motion by Enron's creditors to change the venue of the bankruptcy proceeding to

the Southern District of Texas.[11]

However, the most notable of the Bankruptcy Court filings made on behalf of the

Citigroup defendants were the proofs of claim, which Citigroup filed on behalf of itself and its

affiliates, seeking payment of hundreds of millions of dollars.  Among the proofs of claim were

eight based on what the Examiner referred to as questionable commodity "prepay transactions,"

each of which involved the creation by Citigroup of trusts (the "Yosemite Trusts") for the

issuance of Enron credit-linked notes.  These bogus prepay transactions are known as Yosemite

I, Yosemite II, Yosemite III, and Yosemite IV.  In connection with these Yosemite transactions,

Citigroup assigned over $4.8 billion in claims to the Yosemite Trusts[12] but retained the following

claims:

---

[10]  *Appointment of Committee of Unsecured Creditors*  (Heyn Decl., Exh. 14).

[11]  *Omnibus Objection of Citibank, N.A. and Citicorp USA, Inc. to the Motions of (i) Petro-Hunt LLC et al., (ii) Pamela M. Title et al., (iii) Dynergy Inc. et al., (iv) Southern Ute Indian Tribe, (v) Reliant Energy Services, Inc., (vi) El Paso Merchant Energy L.P. and (vii) Anning-Johnson Co. et al. to Change the Venue of the Debtors' Chapter 11 Cases to the Southern District of Texas, Houston Division* (Heyn Decl., Exh. 15).

[12]  *See* Proof of Claim No. 11731 (asserting claim of $753,809,110.00); Proof of Claim No. 11732 (asserting claim of £213,805,555.56); Proof of Claim No. 11733 (asserting claim of £213,805,555.56); Proof of Claim No. 11734 (asserting claim of $512,444,444.44); Proof of Claim No. 11735 (asserting claim of $512,444,444.44); Proof of Claim No. 11736 (asserting claim of $502,253,472.22); Proof of Claim No. 11737 (asserting claim of $502,253,472.22); Proof of Claim No. 11738 (asserting claim of $753,781,250.00); Proof of Claim No. 11739 (asserting claim of £129,858506.94); Proof of Claim No. 11740 (asserting proof of claim of €206,969,444.44); Proof of Claim No. 11741 (asserting proof of claim of €174,772,161.94); Proof of Claim No. 11742 (asserting proof of claim of £129,858506.94). These proofs of claim are attached to the Heyn Decl. as Exhibits 16-27.

- Citibank, N.A. claim against ENA for setoff rights under purported swap agreements dated August 25, 2000. This claim also reserves the right to claim "*undetermined amounts against Debtor for contractual, statutory or common law rights of indemnity and contribution*, if any, for and against any losses, claims, damages or liabilities, joint or several, an legal or other expenses reasonably incurred with the claims [relating to the August 25, 2000 swap agreement]" (Proof of Claim No. 12104) (emphasis added).

- Citibank, N.A. claim against Enron North America Corp. ("ENA") for $13,310,541.57 under purported 1999 swap agreements (Proof of Claim No. 12108).

- Citibank, N.A. claim against Enron Corp. for $38,310,541.57 based on a note and guaranty relating to Yosemite I purported swap agreements (Proof of Claim No. 12109).

- Citibank, N.A. claim against ENA for $6,200,979.40 under 2000 purported swap agreements (Proof of Claim No. 12107).

- Citibank, N.A. claim against Enron Corp. for $30,642,060.86 based on a note and guaranty relating to Yosemite II purported swap agreements (Proof of Claim No. 12106).

- Citibank, N.A. claim against Enron Corp. for $27,869,384.72 under 2000 note plus interest, fees and expenses (Proof of Claim No. 12105).

- Citibank, N.A. claim against ENA for $1,054,735.48 under 2001 purported swap agreements (Proof of Claim No. 12102).

- Citibank, N.A. claim against Enron Corp. for $51,360,616.43 based on two notes and a guaranty relating to Yosemite IV purported swap agreements (Proof of Claim No. 12103).

On their face, these claims seek in excess of $168 million from Plaintiffs' estates.[13]

      As noted by the Citigroup defendants in their Memorandum of Law, the Citigroup

---

[13] These proofs of claim (attached to the Heyn Decl. as Exhibits 28 - 35) are not the only ones that Citigroup filed. Reflective of just how intimate and diverse a role Citigroup played in Enron's prepetition affairs, and Citigroup's determination to claim its share of the Enron estates, Citigroup filed numerous other claims in various capacities (on its own behalf, as agent, etc.) asserting billions of dollars in liabilities. *See* Proof of Claim Nos. 11264, 12098, 12099, 12100, 12101, 12110, 12111, 14179, 14196, 14198, 14208, 14209, 14503 and 14504. Due to their volume, we do not submit them herewith. However, they are available on the website of the claim register, www.bsillc.com, and will be submitted to the Court on request.

defendants' "proofs of claim sought payment in connection with five (of the fifteen) Citigroup-related transactions that Enron challenges in the Complaint as well as in connection with other transactions that Enron has never challenged." Citi Memo, at 12-13. In fact, the other Citigroup-related transactions that are the subject of the Mega Claim Litigation were earlier disguised loans that were repaid at the time the new disguised loans were funded. Exam. III, App. D, at 45.

In addition to the above-referenced hundreds of millions of dollars in claims, Citigroup and its subsidiaries, on October 15, 2002, filed four (4) virtually identical Proofs of Claim against Enron Corp. (Proofs of Claim Nos. 14503 & 14505) and Enron North America Corp. (Proofs of Claims Nos. 12843 & 14504) (collectively, the "Indemnity/Setoff Proofs of Claim").[14] Notably, two of the claims (Nos. 12843 & 14505) purport to be on behalf of Citigroup "and certain of its *affiliates*," and two (Nos. 14503 & 14504) purport to be on behalf of Citigroup "and its *subsidiaries*." Indemnity/Setoff Proofs of Claim, ¶ 2 (emphasis added).

The Indemnity/Setoff Proofs of Claim all expressly assert that the "Claimants' claims are for contractual, statutory and common law rights of indemnity, contribution, set-off and liability against the Debtor arising from, among other things, *Claimants' commercial relations with the Debtor and its affiliates* (the 'Litigation Claims')." Indemnity/Setoff Proofs of Claim, ¶ 4 (emphasis supplied). The affiliates are identified on a non-exclusive basis. The proofs of claim further state that: "Claimants are named parties to various cases identified in Exhibit B attached hereto (the 'Pending Lawsuits'), which have or which may give rise to Litigation Claims." *Id.*, ¶ 5. Exhibit B, in turn, lists 40 lawsuits. Finally, all the Indemnity/Setoff Proofs of Claim "reserve the right to amend and or supplement this Proof of Claim at any time, including after any bar date, in any manner…." *Id.,* ¶ 10. The Motion not only fails to disclose the affiliate indemnity

---

[14]    The Indemnity/Setoff Proofs of Claim are attached to the Heyn Decl as Exhibits 36-39.

claims (Nos. 12843 & 14505), but also that Enron has been required to establish a **$4 billion** reserve for the indemnity claims as well as two other Citigroup unliquidated claims. *See* note 5, *supra.* Citigroup's failure even to mention this $4 billion reserve (hardly a minor or trivial amount) is a glaring omission.

Ignoring the scope, reach and even existence of all of the Indemnity/Setoff Proofs of Claim, Citigroup alleges that three entities (CXC, CRC and CAFCO), defendants in connection with various avoidance actions, have not filed proofs of claim against the estate. Indeed, in what can only be described as "the tail should wag the dog theory" of withdrawal of the reference, the Citigroup defendants seek to use the alleged failure of these avoidance defendants to file proofs of claim as the basis for withdrawal of the reference of the *entirety* of this adversary proceeding as to all Citigroup defendants. Citigroup's legal theory ultimately is irrelevant, however, because its underlying contention that these entities did not assert claims is wrong, for two independently sufficient reasons.

First, as highlighted above, in their answer all of the Citigroup defendants (including, without limitation, CXC, CRC and CAFCO) have asserted offset, recoupment and broad contractual and common law indemnification against Enron. Answer, at 240 (indemnity defense) and 245 (setoff defense) (Heyn Decl., Exh. 3). These assertions foreclose any contention that these three entities have not asserted claims.

Second, as to the proofs of claim filed by Citigroup on behalf of affiliates and subsidiaries in these cases (as well as on its own behalf), Citigroup flatly mischaracterizes those claims – which, as noted above, clearly state that they are asserted on behalf of Citigroup and "its affiliates" – and not just "on behalf of itself and its wholly-owned subsidiaries." Citi Memo, at 13; Karp Decl., ¶ 13. In fact, as noted, Citigroup filed separate proofs of claim for subsidiaries

and affiliates. CXC, CRC and CAFCO are Citigroup affiliates and therefore encompassed within these broad proofs of claim. In pleadings heretofore filed by Citigroup before this Court, and the Bankruptcy Court, Citigroup expressly identified CXC, CRC and CAFCO as "affiliates" or "defendant affiliates."[15] These entities were and are represented by the same law firm, which answered and asserted affirmative defenses on behalf of all Citigroup defendants. Yet, now Citigroup purports to be acting on behalf of "its affiliates and related parties," Citi Memo, at 1, in a not too subtle effort to now disavow its prior admissions, reverse field and label CXC, CRC and CAFCO as something other than "affiliates." As evidence for this eleventh-hour re-characterization, the same counsel for the Citigroup defendants who previously referred to these entities unqualifiedly as "affiliates" now purports to "understand" that these entities are special purpose entities that perhaps are not so closely affiliated with his other clients after all. Karp Decl., ¶ 4. But counsel does not – because he cannot – disprove their affiliate status, s*ee, e.g., id.* ("Citigroup had administered these entities"),[16] nor can he run from prior pleadings he signed. Finally, if any more proof is needed, the conclusion that the Indemnity/Setoff Proofs of Claim filed by the Citigroup "affiliates" included CXC, CRC and CAFCO is further reinforced by the

---

[15] *See, e.g.*, *Bank Defendants' Joint Memorandum of Law in Support of Their Motion for Leave to Appeal*, at 1, n.1 (Heyn Decl., Exh. 40) ("[t]he Citigroup co-defendant affiliates are: Citibank, N.A., Citigroup Global Markets Inc., Citicorp North America, Inc., Citigroup Financial Products Inc., CXC LLC, Corporate Asset Funding Company, LLC, and Corporate Receivables Corporation, LLC"); *Notice of, and Joint Motion of Bank Defendants for Leave to Appeal*, at 2, n.1 (Heyn Decl., Exh. 41) (same); *Notice of Appeal* (Heyn Decl., Exh. 42)(same); and *Joinder by Citigroup Defendants in Barclay's Motion for Determination that Certain Matters are Core*, at 1-2 and 4 (Heyn Decl., Exh. 43) (defining *all* Citigroup defendants, including CXC, CRC and CAFCO, as "Citigroup," and admitting that "[o]n or about October 11, 2002, Citigroup filed proofs of claims against Enron seeking recovery of amounts due under various financial transactions, as well as other grounds for liability").

[16] The term "affiliate" has a very broad definition in the Bankruptcy Code. 11 U.S.C. § 101(2). Putting aside prior statements, the quoted admission in the declaration suffices to make CXC, CRC and CAFCO affiliates of Citigroup for bankruptcy purposes.

above-referenced answer to the Complaint, which reasserted these very same claims as affirmative defenses on behalf of all defendants.

### D.    Enron initiated the Mega Claim Litigation to disallow Citigroup's Proofs of Claim and to recover amounts for the benefit of its creditors.

On September 24, 2003, Plaintiffs initiated this adversary proceeding by filing a counterclaim against Citigroup, the other Citigroup defendants, Deutsche Bank and other banks[17] and their affiliates and related entities for their role in the Enron collapse.  Enron alleged that Citigroup, Deutsche Bank and the other bank defendants participated with a group of Enron's insiders in a multi-year scheme to manipulate Enron's financial statements and misstate its financial condition.  Complaint, at 1, ¶ 1 (Karp Decl., Exh. A).

The Complaint seeks (i) equitable subordination of the priority of certain claims, including the above-referenced $4.8 billion in claims assigned by Citigroup to the Yosemite Trusts; (ii) damages based on theories of aiding and abetting fraud and breach of fiduciary duty, and civil conspiracy; and (iii) avoidance of preferential and/or fraudulent transfers.  Because the same SPE transactions that serve as a basis for many of the Citigroup defendants' proofs of claim also form the basis for Enron's claims for common law damages, equitable subordination, and preference/fraudulent transfer avoidance that are asserted in the Complaint, it is styled as an objection to the claims of the bank defendants and a counterclaim to their proofs of claim.[18]

---

[17]  Those banks are JP Morgan Chase, Credit Suisse First Boston, Merrill Lynch, Canadian Imperial Bank of Commerce, Royal Bank of Canada, Royal Bank of Scotland, Toronto Dominion Bank, FleetBoston and Barclays.  The Bankruptcy Court has presided over and approved the settlements with each of these defendants except for Citibank and Deutsche Bank.

[18]  Complaint at 6, ¶ 8 (Karp Decl., Exh. A).  Citigroup excerpts from a letter submission in connection with a discovery dispute involving another defendant to argue that the Mega Claim Litigation has nothing to do with the claims submitted by Deutsche Bank, and inferentially Citigroup.  *See* Citi Memo, at 24 n.29.  As detailed in the accompanying
FOOTNOTE CONTINUED ON NEXT PAGE

On February 17, 2004, the Citigroup defendants answered the initial complaint and, on February 26, 2004, filed their demand for a jury trial, "expressly reserv[ing] the right to withdraw this Jury Demand." Karp Decl., Exh. C. Consistent with the way it handled the Proofs of Claim, the same counsel filed both pleadings on behalf of all the Citigroup defendants, including "CXC LLC (formerly known as CXC Incorporated); Corporate Asset Funding Company, LLC (formerly known as Corporate Asset Funding Company, Inc.), and Corporate Receivables Corporation, LLC (formerly known as Corporate Receivables Corporation, Inc.)[.]" Answer, at 1.  (Heyn Decl., Exh. 3).

As previously noted, the Answer includes broad indemnity (Eleventh Affirmative Defense) and setoff (Thirty-Fourth Affirmative Defense) affirmative defenses, which are based on contracts that expressly exclude indemnification for any claim "to the extent resulting from … the bad faith, gross negligence or willful misconduct of any" indemnified party. [19]  As described

---

declaration of the letter's author, William McSherry, this argument is semantic game playing. To be sure, the Mega Claim Litigation has nothing to do with computing how much is owed on various unliquidated claims, although it has everything to do with the genesis, purpose and effect of the transactions that produced those claims.  The specific letter in question sought (successfully) to enlist the Bankruptcy Court's aid in ordering Deutsche Bank to answer interrogatories that dealt with their basis for asserting and their computation of tax indemnity claims that, except with respect to their enforceability and amount, are front and center in the litigation against Deutsche Bank in the Mega Claim Litigation.   Similar discovery has not been undertaken with respect to Citigroup monetary claims, as Enron has been able to reconcile them.

[19]   See e.g., Agreement between Enron Corp. and Citibank, N.A., dated as of February 23, 2000, § 6.1(d); Agreement between Enron Corp. and Citibank, N.A., dated as of August 25, 2000, § 6.1(d); Agreement (USD) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 6.1(d); Agreement (Euro) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 6.1(d); and Agreement (Sterling) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 6.1(d).  These agreements are attached to the Heyn Decl. as Exhibits 44 through 48.

See also, Enron Agreement dated as of December 29, 1997 ("Nighthawk Enron Agreement"), § 3.3(b) (Heyn Decl., Exh. 49) (excluding fraud, willful misconduct, bad faith and gross negligence from indemnification); Enron Agreement dated as of December 17,

FOOTNOTE CONTINUED ON NEXT PAGE

in detail below, generally in these same transaction documents, the participating Citigroup and

Enron entities also broadly waived their rights to a jury trial.

E.    **Citigroup and Enron have actively litigated the Mega Claim Litigation before the Bankruptcy Court.**

As befits a case in which so much is at stake, the parties have actively litigated their legal

positions.  That process has been supervised by Judge Gonzalez for the more than four years

since the Complaint was filed.  The docket for the Mega Claim adversary proceeding bears

witness to this fact.[20]  Judge Gonzalez has issued several rulings and held scores of hearings in

this adversary proceeding, and many more in related adversary proceedings and bankruptcy case

itself, often involving both Citigroup and Enron.  In particular, Judge Gonzalez has decided

several motions to dismiss, motions to intervene, discovery disputes, and heard argument on a

motion for partial summary judgment.[21]  Additionally, Judge Gonzalez has issued several orders

coordinating discovery in the Mega Claim Litigation with lawsuits filed against the Citigroup

---

1999 ("Nahanni Enron Agreement"), § 3.4(b) (Heyn Decl., Exh. 50) (same); and Independent Auctioneer Letter Agreement dated December 20, 2000 from Citibank, N.A. to Enron ("Bacchus Letter Agreement"), pp. 1-2 (Heyn Decl., Exh. 51) ("this indemnity shall not apply to the extent that any claims are determined . . . to have resulted from Citibank's . . . willful misconduct, bad faith or gross negligence.").

[20]    A printout of the docket entries for the Mega Claim Litigation is attached to the Heyn Decl. as Exhibit 52.

[21]    *See, e.g.*, *Opinion Concerning Third-Party Defendant Arthur Andersen LLP's Motion to Dismiss Third-Party Complaint*, reported at *Enron Corp. v. Citigroup Inc. (In re Enron)*, 353 B.R. 51 (2006); *Decision and Order Concerning CSFB's Partial Motion to Dismiss Debtors' Amended Complaint and Motion for More Definite Statement*, reported at *Enron Corp. v. Citigroup Inc. (In re Enron)*, 2004 Bankr. LEXIS 2124 (Bankr. S.D.N.Y. Sept. 23, 2004); *Order Denying Motion by the Ad Hoc Committee of Yosemite/CLN Holders for an Order Permitting its Intervention* (Heyn Decl., Exh. 53); *Minute Order on Plaintiffs' Informal Request for Entry of Protective Order* with attached opinion (Heyn Decl., Exh. 54);  Tr. 8/9/2005 at 7-22 (Heyn Decl., Exh. 55).

defendants in the Southern District of Texas and has consolidated discovery in the Mega Claim Litigation with avoidance actions filed by Enron against other creditors.[22]

On July 26, 2005, Barclays filed a motion for a determination that the Mega Claim Litigation was a non-core proceeding. Nine months later, Citigroup, its affiliates, and several other bank defendants joined in the motion. Enron opposed both the motion and the joinders. In August 2006, the Bankruptcy Court concluded that the entire Mega Claim Litigation, including the common law claims, is a core proceeding. *Enron Corp.,* 349 B.R. at 112.

Barclays and the Citigroup defendants filed a motion for interlocutory appeal of that decision in September 2006 and, at long last, 14 months later, filed the instant Motion. As we discuss below, that Motion should now be denied.

### III.

### CITIGROUP FAILS TO MEET THE STATUTORY REQUIREMENTS AND LEGAL STANDARDS FOR WITHDRAWAL OF THE REFERENCE

Section 157 of Title 28 of the United States Code ("Section 157") provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d). The first sentence of this section provides for permissive withdrawal of the reference while the second provides for mandatory withdrawal. *Credit Suisse Securities (USA)*

---

[22] *See, e.g.*, *Deposition Protocol Order* (Heyn Decl., Exh. 56) (ordering a schedule for fact discovery in, *inter alia*, *Newby*, *Tittle*, and Mega Claim Litigation); *Order Regarding Expert Discovery* (Heyn Decl., Exh. 57) (requiring certain procedures to be used in expert discovery in, *inter alia*, *Newby*, *Tittle*, and Mega Claim Litigation); *Stipulation* and *Order* dated as of September 22, 2006 (Heyn Decl., Exh. 58) (ordering consolidated scheduling of various Enron avoidance actions).

*LLC v. Official Comm. of Unsecured Creditors (In re Refco, Inc.)*, 2006 U.S. Dist. LEXIS 30662, at *2 (S.D.N.Y. May 16, 2006); *Enron Corp.*, 295 B.R. at 25.

Contrary to the impression conveyed by Citigroup, *see* Citi Memo, at 2, the Motion involves permissive, not mandatory, withdrawal of the reference under Section 157. There is no contention that the Mega Claim Litigation involves a significant interpretation of non-bankruptcy federal law; hence, there is no *requirement* that this Court withdraw the reference. To obtain the relief they seek, the Citigroup defendants bear the burden (*Ionosphere Clubs,* 1995 U.S. Dist. LEXIS 11416, at *10) of establishing (i) that the Motion is "timely", *Singer Co. B.V. v. Groz-Beckert KG (In re Singer Co.)*, 2002 U.S. Dist. LEXIS 2629, at *11 (S.D.N.Y. Feb. 20, 2002); and (ii) that there is "cause" to withdraw the reference. *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990); *cf. South St. Seaport Ltd. P'ship v. Burger Boys (In re Burger Boys)*, 94 F.3d 755, 762 (2d Cir. 1996). The Motion should be denied because the Citigroup defendants can establish neither predicate for permissive withdrawal – let alone both.

A.    **The Motion to Withdraw the Reference is not timely because Citigroup waited over 49 months after this adversary proceeding was filed, and more than 44 months after demanding a jury trial.**

Under Section 157, a motion to withdraw the reference must be "timely." This Court has held:

> While there is no bright line test for timeliness, the motion should be made at the earliest opportunity after it is apparent that there is a basis for such a motion. *See* 9 *Collier on Bankruptcy* at 5011.01[2]. *See also Davis v. Mahlman*, 149 B.R. 866 (N.D. Ill 1993) (one month after the complaint held untimely); *United States Brizendine v. Montgomery Ward & Co., Inc.*, 143 B.R. 877 (N.D. Ill. 1992) (seven month delay held untimely). [¶] While one district court held that an application filed ten months after the filing of a claim was within "but at the outer limit" of timeliness, *Burger King Corp. v. B-K of Kansas, Inc.*, 64 B.R. 728[, 730] (D. Kan. 1986), I note that it does not appear to have been a case in which the bankruptcy court had devoted substantial resources to the claim.

*Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 2003 U.S. Dist. LEXIS 23136, at

*5-*6 (S.D.N.Y. Dec. 24, 2003) (footnote omitted) (cited in Citi Memo, at 17 & 24); *Ionosphere Clubs*, 1995 U.S. Dist. LEXIS 11416, at *7 ("Abundant case law holds, however, that the moving party should move under Section 157(d) as soon as possible after receiving notice of the grounds for withdrawing the reference.").

In *Rickel*, this Court held that a motion to withdraw the reference made 31 months after the filing of the complaint was untimely, given the amount of time and energy that the bankruptcy court had put into preparing the case for trial.  2003 U.S. Dist. LEXIS 23136, at *9. To similar effect are *Drew v. WorldCom, Inc. (In re WorldCom, Inc.),* 2006 U.S. Dist. LEXIS 52318, at *8-*9 (S.D.N.Y. July 26, 2006) (18 months); *Gredd v. Bear, Sterns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 68 (S.D.N.Y. 2006) (five years); *FMI Forwarding*, 2005 U.S. Dist. LEXIS 941, at *18-*20 (S.D.N.Y. Jan. 24, 2005) (two and a half years); and *Ionosphere Clubs*, 1995 U.S. Dist. LEXIS 11416, at *7 ("Although the discussion of the time limit for a motion for withdrawal of reference is infrequent, courts have generally agreed that eighteen months is grounds for denial.").

As noted above, the complaint initiating the Mega Claim Litigation was filed in September 2003 and now is on the eve of trial.  To the extent the complexity of this case furnished any possible ground to withdraw the reference (as shown below, it does not), the 280-page initial complaint (Heyn Decl., Exh. 59) put the Citigroup defendants on notice of this putative ground to request the withdrawal of the reference.

In February 2004, the Citigroup defendants filed a demand for jury trial that, notably, expressly reserved the right to withdraw the demand.  Karp Decl., Exh. C.  To the extent any of the Citigroup defendants had any jury trial rights (as shown below, they do not), they would have certainly known at that point that there was "cause" to seek withdrawal of the reference.

Plaintiffs filed the operative Fourth Amended Complaint (Karp Decl., Exh A) on January 10, 2005. However, that complaint raises the same types of claims and presents the same complex issues that were originally disclosed in Enron's original complaint, so it is hardly a benchmark date, and even it is almost three years past.

During the 49 months since the Mega Claim Litigation was filed, the 44 months since Citigroup demanded a jury trial, and the 35 months since Plaintiffs filed the operative complaint, the Citigroup defendants have actively participated in an array of discovery and motion practice. As recently as November 16, 2007, the Citigroup defendants filed with the Bankruptcy Court a motion for a determination that Texas law on loss allocation governs Enron's common law claims, and set that motion for hearing on December 20, 2007. Citi Memo, at 12 n.19.

By contrast to the massive amount of work done on the case in the Bankruptcy Court, only partially evidenced by the 638 pleadings listed on the docket (Heyn Decl., Exh. 52), there has been at best lackadaisical activity related to withdrawal of the reference. As discussed above, in July 2005 (over two years ago) Barclays (not Citigroup), filed a motion with the Bankruptcy Court to determine that certain claims asserted by Enron were core. *Enron Corp.*, 349 B.R. at 110. Citigroup joined that motion nine months later and the Bankruptcy Court denied it in August 2006. *Id.* at 115. When in September 2006, Barclays (which shortly thereafter settled) and Citigroup moved for leave to appeal that ruling, they promised "[i]n furtherance of that right [to trial by jury] … [to] move in the United States District Court to withdraw the reference of the Mega Claim…." *Notice of, and Joint Motion by Bank Defendants for Leave to Appeal the Decision of Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. § 157(b)(3)*, at 2 (Heyn Decl., Exh. 41). However, until filing the present Motion, Citigroup had done nothing to honor that 14-month-old representation or to otherwise give any

indication that it intended to object to the trial occurring in the Bankruptcy Court.

Meanwhile, Citigroup has taken actions that are completely inconsistent with seeking to withdraw the reference. Without a hint of any intent to protest having the trial in the Bankruptcy Court, Citigroup participated in calendaring pretrial and trial dates. *Second Amended Scheduling Order* (Karp. Decl., Exh. D); *Amended Scheduling Order* (Heyn Decl., Exh. 61); *Scheduling Order* (Heyn Decl., Exh. 62). As noted above, in August 2007, Citigroup represented to this Court that "the mega complaint against Citibank … is going to be tried before ***Judge Gonzalez*** in April of next year." Tr., 8/7/2007, at 28-29 (Heyn Decl., Exh. 2) (emphasis added). Then just a month before filing the Motion, Citigroup told Judge Gonzalez that "[w]e are now five and a half months from the trial of these matters going forward and every indication is that we are going to trial in April." Tr., 10/15/2007, at 11 (Heyn Decl., Exh. 63). The Motion, unsurprisingly, makes no mention of or explanation for these actions. The April 2008 trial now is just four months away, and Enron has been actively preparing for and relying on that date to begin vindicating the rights of creditors injured by Citigroup's nefarious actions.

Without question, the Citigroup defendants did not act "as soon as possible" after having notice of grounds to withdraw the reference. *See FMI Forwarding*, 2005 U.S. Dist. LEXIS 941, at *17. On the contrary, they not only tested the waters in the Bankruptcy Court, but swam many laps, thus at least creating an inference that this Motion is motivated either by forum shopping or a desire simply to delay trial. As noted above, reported cases have consistently found to be inexcusable delay by defendants who took a fraction of the time that Citigroup took here to file a motion to withdraw the reference.

In many courts – and the question has not been faced squarely in this district – simple delay (as noted, in this case the delay has been coupled with voluminous activity in the

Bankruptcy Court), even absent a finding of improper motives, can serve as an adequate basis for denial of a motion to withdraw the reference and the waiver of any claimed right to a jury trial.[23] *Stainer v. Latimer (In re Latimer)*, 918 F.2d 136, 137 (10th Cir. 1990) ("We hold that to avoid waiver, parties seeking a jury trial must combine their request for a jury trial with a request for transfer to the district court."); *Reding v. Gallagher (In re Childs)*, 342 B.R. 823, 829-30 (N.D. Ala. 2006); *HA2003 Liquidating Trust v. J.P. Morgan Partners (In re Ha-Lo Indus., Inc.)*, 326 B.R. 116, 123-24 (N.D. Ill. 2005); *Consol. Indus. Corp. v. Welbilt Holding Co.*, 254 B.R. 237, 238 (N.D. Ind. 2000). The rationale for these rulings is partly founded on the well-grounded suspicion that a party that truly wants to get a case before an Article III judge and a jury will move expeditiously (and thus a party that behaves differently is engaging in gamesmanship), but also rests on the fundamental respect that all parties must show to courts. As succinctly stated in *Childs*:

> In support of its argument Gallagher relies heavily on the case of *City Fire Equipment Co., Inc. v. Ansul Fire Protection Wormald U.S., Inc.*, 125 B.R. 645 (N.D. Ala. 1999), which found that it was appropriate for the bankruptcy court to handle pre-trial matters, such as supervision of discovery and dispositive motions, even though the case was due to be tried in the district court. Gallagher's ripeness argument simply assumes that, if the motion for withdrawal had been made earlier, this court would have allowed the case to proceed in the bankruptcy court up until it was set for trial. This assumption is misplaced. Such a course of action may or may not have been appropriate in this case, but it is imperative to note that that decision belongs exclusively to the district court, and not to the defendant

---

[23] Although Judge Castel in *Rickel* decided not to imply a waiver from an untimely motion to withdraw without more, 2003 U.S. Dist. LEXIS 23136, at *11, his liberality was not mandatory. *Sea Carriers Corp. v. Empire Programs, Inc.*, 2007 U.S. Dist. LEXIS 7812, at *4-*7 (S.D.N.Y. Jan. 26, 2007) (citing to *Noonan v. Cunard Steamship Co.*, 375 F.2d 69 (2d Cir. 1967)), and numerous cases following it for the proposition that the Second Circuit very strictly applies the time limits of Fed. R. Civ. P. 38(b) and implies waiver from an untimely jury demand); *cf. Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

asking for withdrawal.

342 B.R. at 829.

The argument rejected in *Childs* is virtually identical to the one that Citigroup has offered in the Motion.  Citi Memo, at 17 n.27.  The *Childs* court found the excuse deficient even without evidence of ulterior motives.  This Court should reject it as well, and can and should deny the Motion as untimely, among other reasons.

As damaging as delay standing alone is to a motion to withdraw, delay coupled with forum shopping, foot dragging or other tactical maneuvering is even worse.  *Drew*, 2006 U.S. Dist. LEXIS 52318, at *7; *Singer*, 2002 U.S. Dist. LEXIS 2629, at *12; *Lone Star Indus. v. Rankin Cty. Econ. Dev. Dist. (In re New York Trap Rock Corp.)*, 158 B.R. 574, 577 (S.D.N.Y. 1993) ("Delay for tactical reasons, prejudicial to the adversary or to the administration of justice, can be grounds for denying such an application.").  Given Citigroup's timing, conduct and inconsistent statements over just the past year, there is no good explanation for Citigroup having waited until now to file the instant Motion other than a desire to start afresh with a new judge or simply to delay trial.

Under these circumstances, we respectfully submit that two results follow.  First, the Motion should be denied as being both untimely and premised upon a right to jury trial that has been waived.  Second, if there is some principle that gives any Citigroup defendant a right to jury trial despite its failure timely to move for withdrawal and its further waivers of any such right as set forth below, the case should still remain before the Bankruptcy Court so it can resolve as many of the proceedings as possible, with only the bare minimum dealt with by this Court at the conclusion of that process.

**B.**     <u>The Citigroup defendants have not demonstrated "cause" to withdraw the reference.</u>

Even if the Motion were timely, Section 157 requires that the Citigroup defendants demonstrate that there is "cause" to withdraw the reference.  On the question of "cause," the Second Circuit has held:

> In deciding whether to withdraw an issue from the bankruptcy court, the district court should weigh several factors, of which the first is the most important: (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors.

*In re Burger Boys*, 94 F.3d at 762; *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993).

Notably, Citigroup has rested its Motion exclusively on the allegedly non-core nature of certain of the claims, its consequent alleged right to a jury trial in the District Court and the unsuitability of the Bankruptcy Court's conducting a trial of so complex a case as this.  Citi Memo, at 16-17.  Citigroup has made *no* effort to demonstrate that any of the remaining factors weigh in favor of withdrawal.  *Id.* at 18 n.28; 32 n.36.  This silence is not surprising as those remaining factors – efficient use of judicial resources, avoiding delay, uniformity of bankruptcy administration and prevention of forum shopping – warrant denial of the Motion.

In terms of efficiency, it is undeniable that Judge Gonzalez has spent enormous time on the Enron case and has, as a result, an almost encyclopedic knowledge of it.  The volume of published opinions, dwarfed by the number of unpublished decisions he has made, is already prodigious.[24]  Judge Gonzalez has presided over this adversary proceeding for over four years.  It will require considerable time and effort for a new judge to achieve the same level of familiarity with this adversary proceeding, if that is even possible.  Whatever Citigroup's motivation, Judge

---

[24]   The Westlaw and Lexis databases contain over 100 opinions and orders in Enron authored by Judge Gonzalez.

Gonzalez's familiarity with this case will be entirely wasted if the reference is withdrawn. Indeed, it is precisely to avoid such waste, among other reasons, that the statute requires that the reference withdrawal motion be "timely."[25]

In terms of delay, as the Motion notes, trial is now set for April. It is dubious in the extreme that any judge in this district could become acquainted with this case and start a trial that soon. In fact, given the priority given to criminal cases, the learning curve, and this district's caseload, we think it would be optimistic to assume trial could start in 2008 in any court other than Judge Gonzalez's.

Uniformity of bankruptcy administration (notably, a constitutional consideration) is generally advanced by having bankruptcy judges decide questions of bankruptcy law. *Abondolo v. GGR Holbrook Medford, Inc.*, 285 B.R. 101, 112 (E.D.N.Y. 2002); *Schneiderman & Friedman v. Dalnoky*, 2001 U.S. Dist. LEXIS 12700, at *3-4 (S.D.N.Y. Aug. 23, 2001).

Finally, forum shopping will be discouraged by denying the Motion, which is the reason "that § 157(d) should be construed narrowly, so that it does not provide an 'escape hatch' out of bankruptcy court." *Hassett v. Citicorp N. Am. (In re CIS Corp.)*, 188 B.R. 873, 877 (S.D.N.Y. 1995). Denial of this Motion is, in short, wholly consistent with long-standing precedent in this Circuit and this Court.

## IV.

## THE CITIGROUP DEFENDANTS ARE NOT ENTITLED TO A JURY TRIAL

The Court should reject the Citigroup defendants' interrelated contentions that they are entitled to a jury trial and that Enron's actions against these defendants are non-core matters, for

---

[25] Notably, this problem could have been confronted and mitigated, as Judge Albritton observed in *Childs,* had this Motion been filed timely.

two reasons.[26]

First, the massive claims asserted on behalf of all of the Citigroup defendants as well as their nexus to Enron's causes of action against them in the Complaint renders both sets of claims "core," amenable to be tried before and resolved by a bankruptcy judge, as set forth in Part IV.A. *See also* Part IV.C. (discussing contractual jury waiver as an additional basis for denial of the Motion).

Second, even if, contrary to the overwhelming authority discussed below, some of the Citigroup defendants are entitled to a jury on some of the claims asserted in the Complaint, it is beyond question that the equitable subordination actions asserted by Enron are a core matter as to which no jury trial right exists. The Bankruptcy Court is vested with core jurisdiction to hear and decide equitable subordination irrespective of the nature of the remaining actions. As a result, even if a small subset of the Citigroup defendants has a jury trial right as to the remaining causes of action asserted in the Complaint (they do not), there would be no basis to withdraw the reference as to the equitable subordination actions, which should be tried before the Bankruptcy Court in the first instance. The same is almost certainly true as to the common law causes of action as well, meaning that, as discussed in Part IV.D, the only remotely possible jury trial right might relate to the avoidance causes of action (on which the allegedly unrelated affiliates are

---

[26] The question of whether causes of action in an adversary proceeding filed in a bankruptcy are core or non-core is closely related but not identical to the question of whether a party to that adversary proceeding is entitled to a jury. *Keating v. United States Lines, Inc. (In re United States Lines, Inc.)*, 2006 U.S. Dist. LEXIS 37114, at *18 (S.D.N.Y. June 7, 2006). The core/non-core determination controls whether the bankruptcy court can enter a judgment or can simply make a report and recommendation to the district court. *Id.*, at *18-*19; Fed. R. Bankr. P. 9033. Although as to most core matters, there is no jury trial right, the rule is not universal. *Granfinanciera*, 492 U.S. at 60 (fraudulent transfer triable by jury where defendant did not file claim). Conversely, a jury right does not exist as to all non-core matters. *Blurton v. Fesmire (In re Southern Indus. Mech. Corp.)*, 266 B.R. 827, 833-34 (W.D. Tenn. 2001) (enforcing contractual jury waiver and denying withdrawal of reference).

sued)[27] and those issues can easily be held in abeyance and resolved by this court after the Bankruptcy Court is otherwise concluded this case.

      A.     **The proofs of claim filed by the Citigroup defendants and their assertion of indemnity and setoff in the Answer have converted the estate's actions into counterclaims, which are core proceedings with no jury trial rights.**

As highlighted above, and as briefed at length in connection with the core/non-core motion for leave to appeal filed by Barclays and Citigroup in September 2006, it is and has been Enron's consistent position that whether or not certain of its causes of action against the Citigroup defendants might *in isolation* be non-core and triable by jury, the rule changes where, as here, the defendant has filed proofs of claim seeking to share in the bankruptcy estate. Simply put, the assertion of claims (including via setoff and indemnity affirmative defenses) by the Citigroup defendants triggered the allowance and disallowance process and not only renders otherwise non-core matters core, but also waives any right to a jury trial.

Although Citigroup concedes, as it must, that the filing of a proof of claim by a creditor makes an action against it for the recovery of a preference or fraudulent transfer a core matter which can be tried by a bankruptcy judge, it argues that a state law based claim is constitutionally distinct, such that the filing of a proof of claim does not result in the loss of a jury trial right. Citi Memo, at 19-20. To the extent Citigroup admits of an exception to this general proposition, that exception is confined to only those causes of action "that bear directly on the allowance of [a specific] claim." *Id.* at 23. But an examination of the controlling case law (including cases Citigroup cites and those it does not) and the facts (including those it trumpets and those it ignores) demonstrates that Citigroup's construct is just wrong.

---

[27]   As discussed in Part II.C., those allegedly unrelated affiliates filed claims (either by being party to proofs of claim or through their unambiguous assertion of a setoff and indemnity affirmative defenses), so the avoidance claims can also be resolved by the Bankruptcy Court.

The bedrock principle that the assertion of a claim in a federal equity proceeding involving the adjustment of claims subjects the claimant to affirmative relief in that proceeding is hardly new.  In *Alexander v. Hillman*, 296 U.S. at 230, a 1935 Supreme Court case, Alexander was the equity receiver of a corporation being wound up in federal court in West Virginia.  In response to claims advanced by Hillman and others, Alexander sought court orders denying those claims and asserted counterclaims for affirmative relief.  *Id.* at 235.  The claimants requested dismissal of the counterclaims as beyond the jurisdiction of the receivership court.  The district court agreed and dismissed the counterclaims.  The court of appeals affirmed and the receiver appealed to the Supreme Court.  In reversing, the Supreme Court first noted the important legal consequences of filing those claims:

> Respondents appropriately presented their claims and became entitled to adjudication without petition for intervention, any formal pleading or commencement of suit.  Unquestionably, they submitted themselves to the court's jurisdiction in respect of all defenses that might be made by the receivers and of all objections that other claimants might interpose to the validity, amounts or priorities of their claims.  And they put themselves in position, should their interest warrant, to challenge the receivers, acts and the demands of others claiming as creditors.

296 U.S. at 238-39.

The Court explained why, as a result of filing claims, the claimants not only could pursue remedies in their favor, but were amenable to remedies against them in the receivership court, stating:

> Respondents' contention means that, while invoking the court's jurisdiction to establish their right to participate in the distribution, they may deny its power to require them to account for what they misappropriated.  In behalf of creditors and stockholders, the receivers reasonably may insist that, before taking aught, respondents may by the receivership court be required to make restitution.  That requirement is in harmony with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief.  [Citations omitted]  Distribution may not be made without decision upon the counterclaims.

31

> Nothing is more clearly a part of the subject matter of the main suit than recovery of all that to the *res* belongs.

*Id.* at 241-42.

*Alexander* was followed in 1966 by *Katchen v. Landy*, which determined whether a trustee could recover in a non-jury trial in the bankruptcy court a preference from a creditor that had filed a proof of claim.  382 U.S. at 325.  The Supreme Court answered in the affirmative, relying on the holding of *Alexander's* that is quoted above.  *Id.* at 335.

Next in sequence is *Granfinanciera*, which presented the question of whether creditors that had not filed claims could be sued in the bankruptcy court to recover fraudulent transfers. Notwithstanding various intervening Congressional enactments (including the 1978 Bankruptcy Reform Act and curative legislation in 1984 that codified the core/non-core nomenclature), the Supreme Court had little trouble in determining that an avoidance action against a non-claimant had to be adjudicated before an Article III judge and, if demand were made, in a jury trial.  492 U.S. at 58.  Significantly, in *Granfinanciera*, after discussing its earlier decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), the Court rejected the very distinction that Citigroup seeks to make here (Citi Memo, at 21-25), that a constitutional difference as to the right to a jury trial exists between, on the one hand, preference and fraudulent transfer counterclaims and, on the other hand, common law counterclaims, holding:

> There can be little doubt that fraudulent conveyance actions by bankruptcy trustees … are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.
>
> * * *
>
> Congress simply reclassified a preexisting, common-law cause of action that was not integrally related to the reformation of debtor-creditor relations and that apparently did not suffer from any grave deficiencies. This purely taxonomic change cannot alter our Seventh Amendment analysis. Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause

of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity.

492 U.S. at 56 & 60-61.

Finally, in *Langenkamp v. Culp*, 498 U.S. 42 (1990), the Supreme Court reaffirmed that its decision in *Katchen*, decided under the Bankruptcy Act of 1938, applied to the Bankruptcy Reform Act of 1978, and that "by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power…. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction…. As such, there is no Seventh Amendment right to a jury trial." 498 U.S. at 44-45.

The preceding authorities dictate that Citigroup's assertion of claims eliminates any conceivable right to a jury trial and renders all of Enron's actions core. Citigroup's almost exclusive reliance on *Germain,* 988 F.2d at 1327-30, to support its contention that the Court should essentially disregard all of the claims asserted by Citigroup (Citi Memo, at 2-3 & 23-24), does nothing to undercut the dispositive force of the preceding Supreme Court rulings. *Germain* involved a jury trial demand by a trustee who sued a creditor for money damages and who waived any right to seek equitable subordination. *Id.* at 1332. In holding that the *trustee* there had not lost the right to trial by jury as the result of the *creditor's* having filed a proof of claim – obviously a very different factual setting from this case[28] – the Second Circuit relied upon the fact that the trustee sought only money, and that his suit was "not part of the claims-allowance process and [was] not integral to the reordering of relations among the parties." *Id.* at 1329.

---

[28] "[A]s in much of life, 'context is everything.'" *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995).

Contrary to the implication raised in the Motion, see Citi Memo, at 23, the court in *Germain* did not hold that only an action against a creditor "that bears directly on the allowance of a claim" is within core jurisdiction. Although it used the quoted phrase, its *holding* required only that the estate action be "part of the claims-allowance process… [rather than] only incidentally related to the bankruptcy process." 988 F.2d at 1329-30.

Whether or not the claims asserted by a creditor must bear some relationship to the actions asserted by the estate, *see, e.g., Delta Air Lines, Inc. v. City of Los Angeles*, 2007 U.S. Dist LEXIS 81216, at *10 (S.D.N.Y. Oct. 30, 2007) (denying withdrawal of reference where estate's counterclaims and defendant's claims involved "interpretation of the same contract"); *Ernst & Young v. Bankruptcy Servs. (In re CBI Holding Co.)*, 311 B.R. 350, 363 (S.D.N.Y. 2004) (same result where tort action "based upon the same operative facts" as the contract proofs of claim), makes no difference to the outcome of the Motion. Stated succinctly, the claims asserted by Citigroup satisfy any *conceivable* requirement that those claims relate to Enron's actions in order to render all of Enron's causes of action (including the common law claims) core and to waive any claimed right of jury trial.

First, Citigroup filed no fewer than eight (8) massive proofs of claim (Heyn Decl., Exh. 28-35) directly related to the so-called Yosemite prepay transactions that are at the heart of the Mega Claim Litigation.[29] As noted in Part II.C., those monetary proofs of claim derive from the transactions that remained open after years of complicity by Citigroup in providing the structuring for transactions that were an integral part of the fraudulent manipulation of Enron's

---

[29] *See supra* Part II.C. The Yosemite prepay transactions are described at length in the Complaint, at 84-94, ¶¶ 277-301 & 331-332 (Karp. Decl., Exh. A), as well as in the Examiner's Report. See Exam II, App. E; Exam II, App. E, Annex 2; Exam II, App. E, Annex 3; Exam II, App. E, Annex 4; Exam II, App. E, Annex 5 (Heyn Decl., Exh. 64).

financial statements by managers at Enron, as alleged in the Complaint.  Complaint, at 80-107,

¶¶ 269-330 (Karp Decl., Exh. A).  The other Citigroup-related transactions that are the subject of

the Mega Claim Litigation were earlier disguised loans that were repaid at the time the new

disguised loans were funded.  Complaint, at 108, ¶¶ 331-32 (Karp Decl., Exh. A); Exam. III,

App. D, at 45 (Heyn Decl. Exh. 10).  As the Bankruptcy Court properly found (excerpted below),

any suggestion, therefore, that the monetary proofs of claim do not directly relate to actions

asserted by Enron in the Complaint is wrong.

Second, by the Indemnity/Setoff Proofs of Claim, Citigroup and its subsidiaries and

affiliates separately filed at least four proofs of claim for indemnity, which claims were also

reasserted as affirmative defenses in the Answer filed on behalf of all of the Citigroup

defendants. Answer at 240 & 245 (Eleventh and Thirty-Fourth Affirmative Defenses) (Heyn

Decl., Exh. 3).  Notably, the relevant agreements on which these claims are based expressly

exclude indemnity for any loss "to the extent resulting from . . .  the bad faith, gross negligence

or willful misconduct of any" indemnified party.[30]  Therefore, resolving the indemnity claims

necessarily requires the bankruptcy court to determine whether the Citigroup defendants had

suffered losses which were contractually excluded from indemnity, because, as alleged in the

Complaint, the Citigroup defendants engaged in intentional misconduct.  *See e.g.*, Complaint at

76-77, ¶¶ 261-262 (Karp Decl., Exh. A).  Whether the Citigroup defendants are entitled to

indemnification will necessarily turn on the same operative facts as will the Complaint, and thus

adjudication of the Complaint will, of necessity, directly affect the claims allowance process as

in *Delta*, 2007 U.S. Dist LEXIS 81216, at *10, *CBI*, 311 B.R. at 363, and *Iridium*, 285 B.R. at

832-33.

---

[30]    See contracts cited in footnote 19.

As correctly summarized in the opinion of the Bankruptcy Court on the core/non-core issue (the subject of the related case seeking leave to appeal, but reargued by Citigroup in its Motion):[31]

> Moreover, the JT Transaction Proof of Claim is based upon the JT Transaction, which is one of the transactions referenced in the Complaint. The bankruptcy court's equitable jurisdiction encompasses interrelated claims that a debtor asserts against a creditor who filed a proof of claim. Enron argues that the JT Transaction was part of the alleged scheme between Barclays and the Enron Insiders to manipulate and misstate Enron's financial condition, and it is the alleged scheme between Barclays and the Enron Insiders that forms the basis of the Common Law Claims. The same transaction thus forms the basis of the JT Transaction Proof of Claim and the Common Law Claims, as Enron asserts that absent the letter of credit – which is the subject of and basis for the JT Transaction Proof of Claim – the transaction itself would not have come to fruition. The alleged damages stem from the entirety of the transaction in facilitating the continuance of a company that had lost its value. Thus, the same transaction gives rise to both the JT Transaction Proof of Claim and the Common Law Claims. Therefore, the Common Law Claims are core proceedings in that they stem from the same transaction and are logically connected to the JT Transaction Proof of Claim.

> In addition, Barclays has asserted in the JT Transaction Proof of Claim a broad claim for contribution and indemnification arising out of any of the numerous lawsuits, including securities fraud lawsuits, that have been brought against Barclays. Many of those lawsuits accuse Barclays of participating in the same scheme, *inter alia*, upon which the Complaint rests. The alleged scheme Enron identifies in the Complaint stems from the banking relationship between the Banks and Enron, and the securities fraud litigation arises from that same relationship. Thus, Barclays' claim for contribution and indemnification put that relationship before this Court, and Barclays has therefore not been "involuntarily subjected" to this Court's jurisdiction.

*Enron Corp*, 349 B.R. at 113.

Judge Gonzalez's further determination that the assertion of affirmative defenses has the same effect upon the core/non-core and jury waiver questions as does the filing of proofs of

---

[31]  The references in Judge Gonzalez's opinion are to Barclays, but as Citigroup's *Notice of, and Joint Motion by Bank Defendants for Leave to Appeal the Decision of the Bankruptcy Court Concerning Determination Pursuant to 28 U.S.C. 157(b)(3)*, at 5-6 (Heyn Decl., Exh. 41), makes clear, the same analysis and conclusions apply to Citigroup.

claim, *Enron Corp.*, 349 B.R. at 113-14 ("Barclays has thus invoked this Court's core jurisdiction to determine the validity of its affirmative defense of set-off rights against the Common Law Claims") is well-supported in this district and elsewhere.  A case on point is *In re North Am. Energy Conservation, Inc.*,  2000 U.S. Dist. LEXIS 15084 (S.D.N.Y. Oct. 12, 2000), in which the defendant moved to withdraw the reference of a suit that had been instituted by a debtor-in-possession to collect pre-petition debts (*i.e.*, money and money alone) that were incurred pursuant to contract.  *Id.* at *2.  Defendant raised as an affirmative defense several setoffs – but no counterclaims – for damages resulting from the debtor's rejection of the executory portions of the same contract.  *Id.* at *2-*3.  In denying defendant's motion to withdraw the reference, District Judge Stein held that, although the debtor's claims against the defendant were non-core, "by pleading setoffs in the form of 'affirmative defenses,' Interstate has in fact asserted a claim against North American's bankruptcy estate.  Thus, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B)…."  *Id.* at *6-*7.

District Judge Guzman reached an identical conclusion in *Hedstrom Corp. v. Wal-Mart Stores, Inc. (In re Hedstrom Corp.)*, 2006 U.S. Dist. LEXIS 29656, at *2-*3 & *9 (N.D. Ill. April 24, 2006). (Wal-Mart's assertion of an affirmative defense that it is entitled to set offs for liabilities and expenses arising out of products liability and patent infringement cases involving products sold by Hedstrom to Wal-Mart "falls within the bankruptcy court's core jurisdiction"… because "[w]hether Hedstrom writes Wal-Mart a check or cancels Wal-Mart's receivable, the end result is the same: the bankruptcy estate will be significantly diminished.").  To similar effect are *Iridium,* 285 B.R. at 833 ("The fact that Motorola asserted its setoff claim as an affirmative defense and not a counterclaim is irrelevant."); *In re Mantelman*, 2002 U.S. Dist. LEXIS 8071, at *2 (N.D. Ill. May 6, 2002) ("A setoff is but another way of making a claim

against the estate, and it invokes the equitable jurisdiction of the bankruptcy court."); *In re Commercial Financial Servs., Inc.*, 251 B.R. 397, 405 (Bankr. N.D. Okla. 2000); and *Interconnect Tel. Services, Inc. v. Farren*, 59 B.R. 397, 400-01 (S.D.N.Y. 1986).

The offsets that the Citigroup defendants assert are by no means trivial. The Citigroup defendants paid $2 billion in settlement of the *Newby* class action alone,[32] and Enron's claim reserve is $4 billion. *See* note 5, *supra*. In their proofs of claim, the Citigroup defendants list dozens of other suits they are facing with allegations similar to those asserted in the Mega Claim Litigation. By seeking to set off losses they have incurred or will incur in connection with such actions against any common law, fraudulent transfer and other claims asserted by Enron in the Complaint, the Citigroup defendants have transformed the dispute to one in equity, to which no jury trial rights attach.

In sum, by invoking broad contractual rights to indemnity in both its proofs of claim and answer, Citigroup has squarely asserted claims based on the very actions asserted by Enron in the Complaint, and destroyed any contention that they preserved any right to a jury trial here or that the causes of action asserted by Enron are non-core.

B.    **The Citigroup defendants, including CXC, CRC and CAFCO, contractually waived their jury trial rights in connection with most of the transactions that are the subject of the Complaint.**

The Citigroup defendants and Enron also waived their jury trial rights by contract in many of the transactions that are the subject of the Complaint. While such waivers are not found in every instance, broad waivers were given by both sides in 10 of the 14 transactions at issue in

---

[32]    *See Stipulation of Settlement*, at 14 & 17, ¶¶ 1.38 & 2.1 (Heyn Decl., Exh. 65).

the Mega Claim Litigation.[33]

Most significantly, CXC, CRC and CAFCO – the only Citibank defendants that have not

expressly admitted to filing a proof of claim – specifically waived their jury trial rights in the

only transactions for which the Complaint seeks recovery from them:

- CAFCO and CRC were parties to the Security Agreement dated as of December 30, 1998 ("Roosevelt Transaction Security Agreement") with, among others, Citicorp North America, Inc. ("CNAI"), Enron Capital and Trade Resources

---

[33] A typical contract provision provided, in caps, that all the signatories "irrevocably waive[] all right to trial by jury in any action … (whether based in contract, tort or otherwise) arising out of or relating to this agreement or any of the transactions contemplated hereby." Nighthawk Enron Agreement, § 6.4 (Heyn Decl., Exh. 66). Similarly worded waivers by various Citigroup Defendants are found in at least the following transaction documents to which Enron is a party: Agreement between Enron Corp. and Citibank, N.A., dated as of February 23, 2000, § 7.8(c) (Heyn Decl., Exh. 44); Agreement between Enron Corp. and Citibank, N.A., dated as of August 25, 2000, § 7.8(c) (Heyn Decl., Exh. 45); Agreement (USD) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 7.8(c) (Heyn Decl., Exh. 46); Agreement (Euro) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 7.8(c) (Heyn Decl., Exh. 47); and Agreement (Sterling) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 7.8(c) (Heyn Decl., Exh. 48); Closing Agreement for Yosemite Securities Trust I, $750,000,000 8.25% Series 1999-A Linked Enron Obligations, $75,000,000 Enron Credit-Linked Trust Certificates ("Yosemite I Trust Closing Agreement"), § 4.5(b) (Heyn Decl., Exh. 67) (jury waived by Enron and Salomon Smith Barney, Inc.); Closing Agreement for Yosemite Securities Company, Ltd £200,000,000 8.75% Series 2000-A Linked Enron Obligations, £22,250,000 Equity Certificates ("Yosemite II Trust Closing Agreement"), § 4.5(b) (Heyn Decl., Exh. 68) (jury waived by Enron, Citibank and Salomon Brothers International Limited); Closing Agreement for Enron Credit Linked Notes Trust, $500,000,000 8.00% Enron Credit Linked Notes due 2005, $50,000,000 Certificates ("Yosemite III Trust Closing Agreement"), § 4.5(b) (Heyn Decl., Exh. 69) (jury waived by Enron, Citibank and Salomon Smith Barney, Inc.); Closing Agreement for Enron Euro Credit Linked Notes Trust, €200,000,000 6.5% Enron Euro Credit Linked Notes due 2006, €22,500,000 Certificates ("Yosemite IV Trust (Euro) Closing Agreement"), § 4.5(b) (Heyn Decl., Exh. 70) (jury waived by Enron, Citibank and Salomon Brothers International Limited); Agreement (Sterling) between Enron Corp. and Citibank, N.A. dated as of May 24, 2001 ("Yosemite IV Trust (UK) Closing Agreement"), § 7.8(c) (Heyn Decl., Exh. 48) (jury waived by Enron and Citibank); Closing Agreement for Enron Credit Linked Notes Trust II, $500,000,000 7.375% Enron Credit Linked Notes due 2006 $50,000,000 Certificates ("Yosemite IV Trust (US) Closing Agreement"), § 4.5(b) (Heyn Decl., Exh. 71) (jury waived by Enron, Citibank and Salomon Smith Barney, Inc.); Upfront Fee Letter dated June 29, 1999 from CNAI to Enron ("Truman Fee Letter") (Heyn Decl., Exh. 72); Bacchus Letter Agreement (Heyn Decl., Exh. 51).

Corp. (now named "Enron North America, Inc."), that contained a jury waiver similar to that set forth above.  Roosevelt Transaction Security Agreement, § 7.03. (Heyn Decl., Exh. 74).

- CXC and CNAI were parties to the Credit and Security Agreement dated as of December 29, 1997 (the "Nighthawk Credit Agreement") (Heyn Decl., Exh. 66) pursuant to which CXC loaned funds to Nighthawk Investors, LLC ("Nighthawk").  In the separate agreement pursuant to which Enron agreed to indemnify numerous parties (the "Nighthawk Enron Agreement"), including Nighthawk and its creditors, each indemnified party waived jury trial.  *See* Nighthawk Enron Agreement, Exhibit A (definition of beneficiary), §§ 3.1 and 6.4 (Heyn Decl., Exh. 49).   The same analysis applies to the Nahanni transaction.[34]

Under New York law,[35] "[t]he language of enforceable waiver provisions must be construed literally," *Wechsler v. Hunt Health Sys.*, 2003 U.S. Dist. LEXIS 13775, at *16 (S.D.N.Y. Aug. 7, 2003), consistent with their plain language.  *See National Westminster*

---

[34]  CXC also waived jury trial as the lender to Nahanni Investors, LLC.  *See* Credit and Security Agreement dated as of December 17, 1999 (the "Nahanni Credit Agreement") (Heyn Decl. Exh. 75) at recitals and p. 13 (definition of Lender); Nahanni Enron Agreement, §§ 1.1 (incorporation of definitions from Amended and Restated Limited Partnership of Marengo LP (the "Marengo Partnership Agreement") and 6.4 (jury waiver); and Marengo Partnership Agreement at pp. A-4 and A-17 (stating that "Lender" is included as an "Indemnified Person" for purposes of the Nahanni Enron Agreement).  The Nahanni Enron Agreement, the Nahanni Credit Agreement and the Marengo Partnership Agreement are Exhibits 50, 75 & 76 of the Heyn Decl.

[35]  Virtually all of the relevant transaction documents cited to herein are by their terms to be construed according to the laws of New York.  *See*, *e.g.,* Agreement between Enron Corp. and Citibank, N.A., dated as of February 23, 2000, § 7.7 (Heyn Decl., Exh. 44); Agreement between Enron Corp. and Citibank, N.A., dated as of August 25, 2000, § 7.7 (Heyn Decl., Exh. 45); Agreement (USD) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 7.7 (Heyn Decl., Exh. 46); Agreement (Euro) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 7.7 (Heyn Decl., Exh. 47); and Agreement (Sterling) between Enron Corp. and Citibank, N.A., dated as of May 24, 2001, § 7.7 (Heyn Decl., Exh. 48); Yosemite I Trust Closing Agreement, § 4.5(a) (Heyn Decl., Exh. 67); Yosemite II Trust Closing Agreement, § 4.5(a) (Heyn Decl., Exh. 68); Yosemite III Trust Closing Agreement, § 4.5(a) (Heyn Decl., Exh. 69); Yosemite IV Trust (Euro) Closing Agreement, § 4.5(a) (Heyn Decl., Exh. 70); Yosemite IV Trust (US) Closing Agreement,§ 4.5(a) (Heyn Decl., Exh. 71); Truman Fee Letter (Heyn Decl., Exh. 72); Bacchus Letter Agreement (Heyn Decl., Exh. 73); Nighthawk Enron Agreement, § 6.6 (Heyn Decl., Exh. 49); and Nighthawk Credit Agreement, § 12.07 (Heyn Decl., Exh. 66).

*Bank v. Ross,* 130 B.R. 656, 667-68 (S.D.N.Y. 1991) (and cases cited therein).  A waiver that extends to "any matters whatsoever arising out of this [a]greement," as here, is "extremely broad," *Brown v. Cushman & Wakefield, Inc.*, 235 F. Supp. 2d 291, 294 (S.D.N.Y. 2002), and one that extends to any actions "arising out of <u>or</u> relating to" the agreement is broader still.  For this reason, independent of their post-petition assertion of claims, CXC, CRC and CAFCO waived their jury trial rights before these cases were ever filed.

The Citigroup defendants' agreements to broad waivers of their jury trial rights thus provide an additional reason why they have no right to a jury trial of the Mega Claim Litigation.

 **C.** <u>**The Citigroup defendants have no jury trial rights on the avoidance actions,**</u>
<u>**which are legally and factually distinct in any event.**</u>

As noted, the Motion makes much of the fact that three special purpose entities, CXC, CRC and CAFCO, defendants on some of the preference and fraudulent transfer claims, which Citigroup in repeated pleadings has identified as affiliates, are in fact separate legal entities which never filed claims.  Citi Memo, at 3; 6 n.7; 13 & n.22; 18.  As a result, Citigroup alleges that these entities are entitled to a jury trial on the avoidance actions and, Citigroup thus contends, that as long as there is a jury trial on those causes of action, a jury might as well be empanelled to hear everything.  *Id.* at 20-22.  Notably, Citigroup does not argue, nor could it, that because the avoidance actions are not factually related to the Citigroup proofs of claims, the claimants have a jury trial right on the avoidance actions.  *Langenkamp*, 498 U.S. at 45, put that argument to rest in 1990.  Even excluding the preceding contention, the argument that the affiliates have a jury trial right makes unwarranted factual and logical leaps.

First, as discussed extensively above, proofs of claim asserting rights of indemnity have been filed on behalf of CXC, CRC and CAFCO; they have asserted affirmative defenses of setoff and indemnity; and they contractually waived their right to trial by jury so, for multiple reasons,

the factual predicate that they have and preserved a jury trial right is absent. Accordingly, Citigroup's entire argument is based upon the demonstrably erroneous contention that CXC, CRC and CAFCO still retain some right to a jury trial.

Second, although Archimedes may have been correct when he said "Give me a place to stand and with a lever I will move the whole world," that same principle need not be applied here. The factually distinct avoidance actions against these three entities need not, should not, be the lever that moves anything other than (possibly) those avoidance actions out of the bankruptcy court.

In the circumstances of this case, even if this Court concluded, contrary to the arguments above, that CXC, CRC and CAFCO have not asserted claims against the Enron estate or contractually waived their right to trial by jury, the appropriate consequence would be nothing more than moving the avoidance actions against those three defendants to this Court and, as discussed in Part II.C., trying them after the Bankruptcy Court is done with the equitable subordination claims it is plainly jurisdictionally empowered to decide and the common law claims and the avoidance claims against the other Citigroup defendants, which also are properly before it. This common sense approach has found favor in this and other courts. *See Bear, Stearns Sec. Corp. v. Gredd*, 2001 U.S. Dist. LEXIS 10324, at *11 & n.2 (S.D.N.Y. Jul. 23, 2001); *United States ex rel. Rahman v. Oncology Assocs.*, 2000 U.S. Dist. LEXIS 22185, at *29 (D. Md. Jul. 24, 2000); *Mellon v. Del. & Hudson R.R. (In re Del. & Hudson R.R.)*, 122 B.R. 887, 896-97 (D. Del. 1991); *cf. FMI Forwarding*, 2004 U.S. Dist. LEXIS 10941, at *22-*23. Such an approach would avoid the tremendous inefficiency that would result from withdrawing the multitude of claims asserted in this adversary proceeding from the bankruptcy court and requiring a new judge to acquire the level of familiarity with this complex lawsuit that the

Bankruptcy Judge has acquired through four years of presiding over it.

As such, were this Court to conclude that the avoidance actions cannot proceed in the Bankruptcy Court, it is empowered to – and we submit should – withdraw the reference only as to those avoidance causes of actions, while permitting the Bankruptcy Court to resolve all other aspects of the Mega Claim Litigation.

> **D.    Enron's equitable subordination claims are indisputably core matters as to which no party has a jury right; these claims and the factually related common law claims should be tried in the Bankruptcy Court commencing in April, whatever the disposition of the other causes of action.**

Although Citigroup barely mentions equitable subordination in its Motion, Citi Memo, at 9-10, the issue has been front and center in this case for a long time.  Specifically, the availability of equitable subordination has already been the subject of published decisions of this Court and the Bankruptcy Court.  *Springfield Assocs. L.L.C. v. Enron Corp. (In re Enron Corp.)*, 2007 U.S. Dist. LEXIS 63129 (S.D.N.Y. Aug. 27, 2007), and 2007 U.S. Dist LEXIS 70731 (S.D.N.Y. Sept. 24, 2007); *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205 (Bankr. S.D.N.Y. 2005).

The equitable subordination causes of action are important not only because they have enormous economic significance – as noted above, Citigroup assigned $4.8 billion in claims to the Yosemite Trusts and asserts its own substantial claims, all of which are the subject of equitable subordination causes of action – but also because they are core claims which the Bankruptcy Court has both the right and obligation to try.  *ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 518 (Bankr. S.D.N.Y. 1997) ("equitable subordination is a remedy unique to bankruptcy," citing *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 854 (E.D.N.Y. 1995)); *see also Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26, 32 (2d Cir. 1995) ("[I]t is hard to imagine an

43

issue that is more at the heart of the bankruptcy process than is this.   Enforcement of a

contractual subordination agreement clearly involves the adjustment of the debtor-creditor

relationship, determinations of the priority of liens, and administration of the estate…."); 

*Waslow v. MNC Commercial Corp. (In re Paolella)*, 161 B.R. 107, 116 (E.D. Pa. 1993) (holding

that "[e]quitable subordination is unquestionably a 'core' proceeding," and citing numerous

authorities in support).

Based upon the premise that the Citigroup defendants are entitled to a jury as to the

common law and avoidance actions (which of course is wrong), the Citigroup defendants argue

that the existence of a jury right mandates that this Court withdraw the reference as to the

equitable subordination actions.   Thus, the Citigroup defendants argue that even though equitable

subordination is a core matter carrying no jury right whatsoever, "the jury trial in this action

must precede any trial in the bankruptcy court," Citi Memo, at 25, so that "the right to trial by

jury of legal issues is not lost through prior determination of equitable claims."   *Id.* (citing

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959), and *Dairy Queen, Inc. v. Wood*,

369 U.S. 469 (1962)).

Citigroup's contention, however, ignores subsequent Supreme Court and lower court

authority addressing the precise question in this case, holding that the equitable claims may and

indeed should be tried first before the bankruptcy court notwithstanding a jury right as to any

remaining claims.   In *Katchen v. Landy*, the Supreme Court held that:

> At the outset, we note that the *Dairy Queen* doctrine, if applicable at all, is
> applicable whether or not the trustee seeks affirmative relief.   For, as we have
> said, determination of the preference issues in the equitable proceeding would in
> any case render unnecessary a trial in the plenary action because of the *res
> judicata* effect to which that determination would be entitled….   [T]o say that
> because the trustee could bring an independent suit against the creditor to recover
> his voidable preference, he is not entitled to have his statutory objection to the
> claim tried in the bankruptcy court in the normal manner is to dismember a

scheme which Congress has prescribed. See *Alexander v. Hillman*, 296 U.S. 222, 243. Both *Beacon Theatres* and *Dairy Queen* recognize that there might be situations in which the Court could proceed to resolve the equitable claim first even though the results might be dispositive of the issues involved in the legal claim. To implement congressional intent, we think it essential to hold that the bankruptcy court may summarily adjudicate the § 57g objection; and, as we have held above, the power to adjudicate the objection carries with it the power to order surrender of the preference.

382 U.S. at 339-40.

The Supreme Court amplified on *Katchen* in *Parklane Hosiery v. Shore*, 439 U.S. 322 (1979). In *Parklane*, the Court addressed the question of whether a prior determination in an equitable proceeding had a collateral estoppel effect on a subsequent legal proceeding. The Court answered that question in the affirmative, holding:

Both the premise of *Beacon Theatres*, and the fact that it enunciated no more than a general prudential rule were confirmed by this Court's decision in *Katchen v. Landy*, 382 U.S. 323. In that case the Court held that a bankruptcy court, sitting as a statutory court of equity, is empowered to adjudicate equitable claims prior to legal claims, even though the factual issues decided in the equity action would have been triable by a jury under the Seventh Amendment if the legal claims had been adjudicated first. The Court stated:

Both *Beacon Theatres* and *Dairy Queen* recognize that there might be situations in which the Court could proceed to resolve the equitable claim first even though the results might be dispositive of the issues involved in the legal claim. *Id.*, at 339.

Thus the Court in *Katchen v. Landy* recognized that an equitable determination can have collateral-estoppel effect in a subsequent legal action and that this estoppel does not violate the Seventh Amendment.

439 U.S. at 334-35 (footnote and internal quotation marks omitted).

The *Katchen-Parklane* rule has been applied in this circuit in both bankruptcy and non-bankruptcy cases. *See First Fidelity Bank v. Hooker Investments, Inc. (In re Hooker Investments, Inc.)*, 937 F.2d 833, 839-40 (2d Cir. 1991) (creditor has no right to extension of bar date to avoid having to elect between filing a claim and submitting to bankruptcy court jurisdiction on actions against it); *Agudas Chasidei Chabad v. Gourary*, 833 F.2d 431, 433 &

45

437 (2d Cir. 1987) (replevin action permitted to proceed prior to legal action); *accord Molloy v. Primus Auto. Fin. Servs.*, 247 B.R. 804, 813 (C.D. Cal. 2000) ("Underlying the decision in *Katchen* was the Supreme Court's concern that the right to a jury trial not frustrate the statutory bankruptcy scheme crafted by Congress[.]").

In sum, even were this Court to conclude that other issues in the Mega Claim Litigation are non-core and that the Citigroup defendants have a right to trial by jury on them, this Court clearly can permit the core equitable subordination actions to be tried in April before Judge Gonzalez. Moreover, much as was done in *Molloy*, 247 B.R. at 823, and consistent with Second Circuit policy expressed in *In re Burger Boys*, 94 F.3d at 762, and *In re Orion*, 4 F.3d at 1101, this Court should allow the Bankruptcy Court to decide this unique bankruptcy issue first, and withdraw the reference, if at all, only after the equitable subordination proceedings have concluded.

## V.

### THE BANKRUPTCY COURT HAS ADEQUATE EXPERTISE TO HANDLE THE TRIAL

Although bankruptcy judges in this district – including Judge Gonzalez who simultaneously handled the WorldCom and Enron cases – regularly preside over the largest bankruptcy cases in the country, and incident thereto regularly resolve multi-billion disputes, Citigroup contends that "the fact that the trial of the common law tort claims is not within the 'core' jurisdiction *(much less the core competency)* of the bankruptcy court, provides independent 'cause' to withdraw the reference in this case." Citi Memo, at 16 (emphasis added). This is a tendentious argument supported by three cases, all of which are old, distinguishable or both.

The first, *Braniff Int'l Airlines v. Aeron Aviation Resources Holdings II (In re Braniff Int'l Airlines)*, 159 B.R. 117 (S.D.N.Y. 1993), Citi Memo, at 32, is accurately quoted, but the reason that case was not referred to the bankruptcy court was that the Braniff "trustee in bankruptcy … elected to pursue litigation in a forum other than bankruptcy court [i.e., he filed the action in district court, such that] he is estopped from requesting a later referral to the bankruptcy court." *Id.* at 126.

The second, *Complete Mgmt. v. Arthur Andersen, LLP (In re Complete Mgmt., Inc.)*, 2002 U.S. Dist. LEXIS 18344 (S.D.N.Y. Sept. 27, 2002), Citi Memo, at 32-33, is a bit closer factually, but should be read along with an accompanying footnote that "[a]lthough Andersen recently settled with plaintiffs in the pending securities litigation, this Court's familiarity with the issues raised by that case also supports withdrawal of the reference." *Id.* at *13 n.5; *see CBI*, 311 B.R. at 364 n.7 ("*In re Complete Management, Inc.* is factually similar to this case to the extent that it concerned a malpractice claim by a debtor against an accounting firm that had filed a proof of claim in the debtor's bankruptcy proceeding.  It is factually distinct to the extent that Judge Buchwald had a related securities action pending before her at the time she considered the accountant's withdrawal motion.").

The third, *Judge v. Ridley & Schweigert (In re Leedy Mortg. Co.)*, 62 B.R. 303 (E.D. Pa. 1986), Citi Memo, at 33, involves a district judge who felt (perhaps accurately in 1986 in that district) that a two to four week trial was more than a bankruptcy judge could handle.  Notably, that is not the case in this district, *see, e.g., In re Iridium*, 373 B.R. at 290 (50 day trial).  Indeed, even in its home district, *Leedy* no longer seems to be good law.  *See Franklin Ridgewood Assocs. v. Catwil Corp.*, 1990 Bankr. LEXIS 2728, at *14 n.3 (Bankr. E.D. Pa. Oct. 11, 1990) ("With all due respect, we believe that the *Leedy* decision, like *F/S Airlease*, overlooks the

critical nature of 'centering' a proceeding in the court where the main case is being heard.").

Judge Gonzalez has shown himself to be an exceptionally capable and efficient jurist, who has learned the intricacies of this case over the many years he has managed it. It would be absurd to take this case from him because it is big and complicated. Indeed, that is one of the reasons it should remain where it is.

## VI.

## CONCLUSION

This Motion is tardy, a transparent attempt at forum shopping and delay, and unmeritorious to boot. It should be denied. To the extent the Court determines that any of the Citigroup defendants preserved a right to jury trial on any actions asserted in the Complaint (they did not), any withdrawal of the reference as to those defendants and those actions should be strictly limited to the avoidance actions to which those specific entities are parties. The balance of the case should remain in the Bankruptcy Court for trial in April 2008.

Respectfully submitted,

Dated:   New York, New York          ENRON CREDITORS RECOVERY CORP., *et al.*,
         December 11, 2007           Plaintiffs and Reorganized Debtors
                                     By their Special Bankruptcy Litigation Counsel:

                                     KLEE, TUCHIN, BOGDANOFF & STERN LLP

                                     By: */s/ David M. Stern*
                                     DAVID M. STERN (*pro hac vice* pending)
                                     1999 Avenue of the Stars, 39th Floor
                                     Los Angeles, California 90067
                                     Telephone: (310) 407-4000

                                        —    and    —

CROWELL & MORING LLP

By: */s/ William J. McSherry, Jr.*
WILLIAM J. McSHERRY, JR. (WM-1194)
153 E. 53rd Street
New York, NY 10022
405 Lexington Avenue
Telephone: (212) 223-4000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ENRON CREDITORS RECOVERY<br>CORP., et al.,<br><br>            Reorganized Debtors.<br><br>―――――――――――――――<br><br>ENRON CORP., et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>CITIGROUP INC., et al.,<br><br>            Defendants. | **CIVIL CASE NO.:  07 Civ. 10612**<br><br>Chapter 11<br><br>Case No. 01-16034 (AJG)<br><br>Jointly Administered<br><br>Adversary No. 03-09266 (AJG) |

**APPENDIX OF UNREPORTED DECISIONS CITED IN**
**PLAINTIFFS' OPPOSITION TO CITIGROUP DEFENDANTS' MOTION TO**
**WITHDRAW THE REFERENCE AND DEUTSCHE BANKS' JOINDER**

| <u>Case Name</u> | <u>Tab Number</u> |
|---|---|
| <u>Bear, Stearns Sec. Corp. v. Gredd</u>,<br>2001 U.S. Dist. LEXIS 10324 (S.D.N.Y. Jul. 23, 2001) | 1 |
| <u>Complete Mgmt. v. Arthur Andersen, LLP (In re<br>Complete Mgmt., Inc.</u>),<br>2002 U.S. Dist. LEXIS 18344 (S.D.N.Y. Sept. 27, 2002) | 2 |
| <u>Credit Suisse Securities (USA) LLC v. Official Comm.<br>of Unsecured Creditors (In re Refco, Inc.</u>),<br>2006 U.S. Dist. LEXIS 30662 (S.D.N.Y. May 16, 2006) | 3 |
| <u>Delta Air Lines, Inc. v. City of Los Angeles</u>,<br>2007 U.S. Dist LEXIS 81216 (S.D.N.Y. Oct. 30, 2007) | 4 |
| <u>Drew v. WorldCom, Inc. (In re WorldCom, Inc.</u>),<br>2006 U.S. Dist. LEXIS 52318 (S.D.N.Y. July 26, 2006) | 5 |
| <u>Enron Corp. v. Citigroup Inc. (In re Enron</u>),<br>2004 Bankr. LEXIS 2124 (Sept. 23, 2004) | 6 |
| <u>Franklin Ridgewood Assocs. v. Catwil Corp.</u>,<br>1990 Bankr. LEXIS 2728 (Bankr. E.D. Pa. Oct. 11, 1990) | 7 |
| <u>Hedstrom Corp. v. Wal-Mart Stores, Inc. (In re<br>Hedstrom Corp.</u>),<br>2006 U.S. Dist. LEXIS 29656 (N.D. Ill. April 24, 2006) | 8 |
| <u>Keating v. United States Lines, Inc. (In re United States<br>Lines, Inc.</u>),<br>2006 U.S. Dist. LEXIS 37114 (S.D.N.Y. June 7, 2006) | 9 |
| <u>Lender's Decision, Inc. v. Comerica Bank (In re<br>Lender's Decision, Inc.</u>),<br>1997 U.S. Dist. LEXIS 16654 (N.D. Ill. Oct. 14, 1997) | 10 |
| <u>In re Mantelman</u>,<br>2002 U.S. Dist. LEXIS 8071 (N.D. Ill. May 6, 2002) | 11 |
| <u>In re North Am. Energy Conservation, Inc.</u>,<br>2000 U.S. Dist. LEXIS 15084 (S.D.N.Y. Oct. 12, 2000) | 12 |

Official Comm. of Unsecured Creditors v. Union
  Transp. Corp. (In re FMI Forwarding Co.),                        13
2005 U.S. Dist. LEXIS 941 (S.D.N.Y. Jan. 21, 2005)

Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs.,          14
  Inc.),
2003 U.S. Dist. LEXIS 23136 (S.D.N.Y. Dec. 24, 2003)

Schneiderman & Friedman v. Dalnoky,                               15
2001 U.S. Dist. LEXIS 12700 (S.D.N.Y. Aug. 23, 2001)

Sea Carriers Corp. v. Empire Programs, Inc.,                      16
2007 U.S. Dist. LEXIS 7812 (S.D.N.Y. Jan. 26, 2007)

Shugrue v. Chemical Bank (In re Ionosphere Clubs,                 17
  Inc.),
1995 U.S. Dist. LEXIS 11416 (S.D.N.Y. Aug. 11, 1995)

Singer Co. B.V. v. Groz-Beckert KG (In re Singer Co.),            18
2002 U.S. Dist. LEXIS 2629 (S.D.N.Y. Feb. 20, 2002)

Springfield Assocs. L.L.C. v. Enron Corp. (In re Enron            19
  Corp.),
2007 U.S. Dist. LEXIS 63129 (S.D.N.Y. Aug. 27, 2007)

Springfield Assocs. L.L.C. v. Enron Corp. (In re Enron            20
  Corp.),
2007 U.S. Dist LEXIS 70731 (S.D.N.Y. Sept. 24, 2007)

United States ex rel. Rahman v. Oncology Assocs.,                 21
2000 U.S. Dist. LEXIS 22185 (D. Md. Jul. 24, 2000)

Wechsler v. Hunt Health Sys.,                                     22
2003 U.S. Dist. LEXIS 13775 (S.D.N.Y. Aug. 7, 2003)

LEXSEE 2001 U.S. DIST. LEXIS 10324



Caution
As of: Dec 06, 2007

**BEAR, STEARNS SECURITIES CORP., Plaintiff, - against - HELEN GREDD, Chapter 11 Trustee for MANHATTAN INVESTMENT FUND LTD., Defendant.**

**01 Civ. 4379(NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 10324*

**July 23, 2001, Decided
July 25, 2001, Filed**

**SUBSEQUENT HISTORY:** Remanded by, Count dismissed at *Bear, Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 2002 U.S. Dist. LEXIS 4832 (S.D.N.Y., 2002)*

**PRIOR HISTORY:** *Cromer Fin., Ltd. v. Berger, 2001 U.S. Dist. LEXIS 6282 (S.D.N.Y., May 15, 2001)*

**DISPOSITION:**    [*1] Defendant's motion to withdraw matter granted.

**COUNSEL:** For BEAR, STEARNS SECURITIES CORP.: Daniel J. Kramer, Harry S. Davis, Schulte, Roth & Zabel, L.L.P., New York, NY.

For HELEN GREDD, Chapter II Trustee, MANHATTAN INVESTMENT FUND LTD.: Helen Gredd, Esq., Daniel Reynolds, Esq., Lankler, Siffert & Wohl, L.L.P., New York, NY.

For MANHATTAN INVESTMENT FUND LTD., debtor: Helen Gredd, Esq., Daniel Reynolds, Esq., Lankler, Siffert & Wohl, L.L.P., New York, NY.

For CAROLYN SCHWARTZ, Esq., trustee: Brian Masumoto, Esq., The Office of United States Trustee, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM & ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

    Defendant Bear, Stearns Securities Corp. ("Bear, Stearns" or "defendant") moves for an order pursuant to *28 U.S.C. § 157(d)* withdrawing the above-captioned adversary proceeding from the United States Bankruptcy Court for the Southern District of New York. Plaintiff Helen Gredd ("Gredd" or "Trustee"), the Chapter 11 Trustee for a hedge fund known as the Manhattan Investment Fund, Ltd. ("the Fund"), opposes the motion. [*2] For the reasons that follow, defendant's motion is granted.

**BACKGROUND**

    In this adversary proceeding, the Trustee seeks to

avoid more than $ 3.7 billion in allegedly fraudulent transfers made on behalf of the Fund to Bear, Stearns. The Trustee alleges that the Fund's manager, Michael Berger, engaged in a Ponzi scheme in which new investor deposits were used to mask the massive losses the Fund incurred as a result of Berger's trading activities. Specifically, Berger engaged in a series of dramatically unsuccessful short sales.

A short sale is a speculative transaction where a security not owned by the seller is sold in the hope that the price of the security will decline, permitting the seller to later repurchase the security ("cover") and make a profit. Typically, the seller borrows the security to be sold short from his broker and covers by later buying the identical stock and transferring it to his broker. While transactions of this type may be profitable if the price of the security declines, when the price of the security increases, the resulting losses may be substantial. In this case, the Fund sold short well-known, Internet-related stocks in 1999 and early 2000 and suffered **[*3]** losses in excess of $ 394 million when the price of those securities increased during that period.

While Bear, Stearns is not accused of participating in the Ponzi scheme which attempted to mask these losses, it acted as the Fund's prime broker, providing margin and stock lending services in connection with the Fund's short selling activities. The Trustee now seeks to recover margin payments, short sale proceeds and the repayment of securities loaned to the Fund by Bear, Stearns. The Trustee alleges that Berger made these payments to Bear, Stearns with the specific intent to defraud the Fund's investors, entitling her to avoid those transfers pursuant to *section 548(a)(1)(A) of the Bankruptcy Code*, which provides:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation **[*4]** was incurred, indebted....

*11 U.S.C. § 548(a)(1)(A)*. The margin payments at issue total approximately $ 141 million, while the short sale proceeds and securities transferred to Bear, Stearns total approximately $ 1.7 billion and $ 1.9 billion, respectively. We now turn to the defendant's motion.

## DISCUSSION

Bear, Stearns moves to withdraw this matter from the Bankruptcy Court pursuant to *28 U.S.C. § 157(d)*, which provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

*28 U.S.C. § 157(d)*. The first sentence of *§ 157(d)* provides for "permissive" withdrawal while the second sentence provides for "mandatory" withdrawal. Here, the defendant moves only for mandatory withdrawal.

### [*5] A. Standard for Mandatory Withdrawal Under *§ 157(d)*

Despite the broad language of *§ 157(d)*, which if read literally "could result in a broad escape hatch through which most bankruptcy matters [could] be removed to a district court," *In re Combustion Equip. Assocs., 67 B.R. 709, 711 (S.D.N.Y. 1986)* (internal quotation and citation omitted), courts have narrowly construed the mandatory withdrawal provision to apply only in cases "where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *In re Ionosphere Clubs, Inc., 922 F.2d 984, 995 (2d Cir. 1990)*(citing *In re White Motor Corp., 42 B.R. 693, 700 (N.D. Ohio 1984)*). Consideration is "substantial and material" when the case requires the bankruptcy judge to make a "significant interpretation, as opposed to simple application, of federal non-bankruptcy statutes." *In re CIS Corp., 172 B.R. 748, 753 (S.D.N.Y. 1994)*; *see also City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d*

Cir. 1991)(citations omitted)(dicta); *In re Revere Copper & Brass Inc.,* 172 B.R. 192, 196 (S.D.N.Y. 1994); **[*6]** *In re Adelphi Inst., Inc.,* 112 B.R. 534, 536 (S.D.N.Y. 1990). Moreover, "where matters of first impression are concerned, the burden of establishing a right to mandatory withdrawal is more easily met." *Mishkin v. Ageloff,* 220 B.R. 784, 796 (S.D.N.Y. 1998) (citing *In re Keene Corp.,* 182 B.R. 379, 382 (S.D.N.Y. 1995) and *In re Ionosphere Clubs,* 103 B.R. 416, 419-20 (S.D.N.Y. 1989)).

Accordingly, the question before us is whether resolution of the adversary proceeding requires "substantial and material consideration" of non-Bankruptcy Code federal law. As set forth more fully below, we conclude that it does.

**B. Threshold Question in the Adversary Proceeding is Whether Debtor Has an Interest in the Property at Issue**

As noted previously, the Trustee seeks to avoid certain transfers from the Fund to Bear, Stearns in the adversary proceeding pursuant to *§ 548(a)(1)(A) of the Bankruptcy Code.* The parties are in agreement that the threshold question for the bankruptcy court is whether there was "an interest of the debtor in property" that was transferred in order to determine if the transfers may be avoided under **[*7]** that section. *See 11 U.S.C. § 548(a)(1). See also, e.g., In re Churchill Mortgage Inv. Group,* 256 B.R. 664, 675 (S.D.N.Y. 2000) (*Section 548* authorizes a trustee to avoid transactions "which have the purpose or effect of removing property from a debtor's estate which should properly be used to repay creditors"); 5 *Collier on Bankruptcy P 548.01 [1]* (Lawrence P. King et al., eds., 15th ed. rev. 1996) ("[*Section 548*] allows the trustee to avoid a transaction ... that depletes the debtor's assets to the detriment of the bankruptcy estate.").

Not surprisingly, Bear, Stearns takes the position that the $ 3.6 billion in short sale proceeds and securities transferred to it to cover the Fund's short sales are not property in which the debtor has an interest as a matter of federal securities law, [1] while the Trustee takes the position that the Fund has such an interest in the property. We need not resolve the merits of these conflicting positions for purposes of this motion. Instead, the question presently before us is whether resolution of this matter will require substantial and material consideration of federal law outside the Bankruptcy **[*8]** Code.

1 Bear, Stearns does not dispute that the $ 141 million in margin payments were transfers of property in which the Fund had an interest within the meaning of *§ 548(a)* of the Code.

**C. Substantial and Material Consideration of the Federal Securities Laws is Necessary to Resolve This Proceeding**

Resolution of whether the short sale proceeds and securities at issue are property of the Fund will require substantial and material consideration of the federal securities laws and the regulations issued thereunder. As Bear, Stearns notes, Def.'s Mem. at 13-17, federal regulation of the securities industry in general and of margin and short sale transactions in particular, is pervasive. *See generally, Levitin v. Painewebber, Inc.,* 159 F.3d 698, 705-707 (2d Cir. 1998) (describing federal regulation of margin and short sale transactions). Specifically, defendant points to Regulation T, 12 C.F.R. § 220, and SEC Rule 431(c), which govern margin requirements, and SEC Rule 3b-3, which provides **[*9]** that a person "shall be deemed to own securities only to the extent that he has a net long position in such securities." *17 C.F.R. § 240.3b-3.*

Accordingly, defendant argues that because the Fund was at all times "net short" in the securities it traded through Bear, Stearns, the Fund did not "own" those securities under the securities laws, and therefore, that their transfer to the defendant may not be avoided under *§ 548(a)* of the Code. Likewise, with respect to the proceeds from the short sale of securities, defendant argues that those proceeds would not have been available to satisfy the claims of other creditors because, under Regulation T and SEC rules, those proceeds are frozen until a customer's account balance exceeds federal margin requirements. *See* Federal Reserve Staff Opinion, Aug. 28, 1981, 5 Federal Reserve Regulatory Service 693.2; *See also United States v. Russo,* 74 F.3d 1383, 1388 (2d. Cir. 1996) (noting that all proceeds from short sales "are frozen under the rules until the seller covers the short sale").

In contrast, the Trustee argues that SEC Rule 3b-3 applies only for purposes of calculating margin requirements **[*10]** and does not determine the Fund's ownership interest in the securities transferred to the defendant, that the margin rules contained in Regulation T and SEC rules do not create or define property rights, and that such property rights are defined exclusively by

state law and/or contract. Mem. in Opp'n. at 17-20. Instead, the Trustee argues that a portion of the Bankruptcy Code, *11 U.S.C. § 546(e)*, which provides that margin payments and settlement payments may not be avoided "except under *section 548(a)(1)(A)*", indicates that such payments are property in which the debtor has an interest and are thus recoverable under *§ 548(a)(1)(A)*.

As noted previously, we need not evaluate the merits of the parties' positions concerning the status of this property. It is sufficient to note that answering this question will require us to interpret the various provisions of the federal securities laws relied upon by Bear, Stearns, and the pervasive federal regulatory scheme in this area, *Levitin, 159 F.3d at 701-707*, regardless of whether we ultimately find federal securities law to be dispositive. Moreover, to the extent that *§ 546(e) of the Bankruptcy Code* **[*11]** assumes that margin and settlement payments are property of the debtor, the provision arguably conflicts with other federal regulations in this area. In addition, as the parties have been unable to identify any case brought under *§ 548(a)(1)(A)* or its predecessors to recover proceeds or securities of the type at issue, the issue of whether the Fund has an interest in such property is arguably novel, further weighing in favor of withdrawal.

**CONCLUSION**

Accordingly, we conclude that resolution of this case will require "substantial and material consideration" of non-Bankruptcy Code federal law. For the reasons stated, defendant's motion to withdraw the matter is granted. [2]

> 2   Upon deciding the identified issue requiring "substantial and material consideration" of non-Bankruptcy Code federal law, the Court will refer this matter back to the bankruptcy court for the resolution of the remaining bankruptcy law issues.

**CONFERENCE**

The parties are directed to appear for a conference with the Court on August 13, 2001 at **[*12]** 4:00 p.m. in Courtroom 21A, 500 Pearl Street, New York, New York, for further proceedings in the above-captioned adversary proceeding.

**IT IS SO ORDERED.**

DATED: New York, New York

July 23, 2001

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

LEXSEE 2002 U.S. DIST. LEXIS 18344



Caution
As of: Dec 06, 2007

**In re COMPLETE MANAGEMENT, INC., Debtor, COMPLETE MANAGEMENT, INC., Plaintiff, - against - ARTHUR ANDERSEN, LLP, Defendant.**

**02 Civ. 1736 (NRB), Adv. P. No. 01-03459**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 18344*

**September 26, 2002, Decided
September 27, 2002, Filed**

**SUBSEQUENT HISTORY:** Complaint dismissed at *Complete Mgmt. v. Arthur Andersen, LLP (In re Complete Mgmt.), 2003 U.S. Dist. LEXIS 12977 (S.D.N.Y., July 22, 2003)*

**DISPOSITION:** [*1] Defendant's motion to withdraw reference of adversary proceeding was granted.

**COUNSEL:** For Arthur Andersen, LLP, APPELLANT: James J Sabella, Sidely, Austin, Brown & Wood, LLP, New York, NY USA.

For Complete Management, APPELLEE: David Weicholz, Brooklyn, NY USA.

For Complete Management, DEBTOR: David Weicholz, Brooklyn, NY USA.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD

**UNITED STATES DISTRICT JUDGE**

Presently before this Court is defendant Arthur Andersen's motion to withdraw the reference of this adversary proceeding from the United States Bankruptcy Court for the Southern District of New York pursuant to *28 U.S.C. § 157(d)*. For the following reasons, defendant's motion is granted.

**BACKGROUND**

The brief history of the litigation stemming from the demise of Complete Management, Inc. ("CMI") is as follows. On February 25, 1999, a class action complaint on behalf of the shareholders of CMI was filed with this Court. See *In re Complete Management, Inc. Securities Litigation, 153 F. Supp. 2d 314*, No. 99 Civ. 1454 (NRB) (2001) (denying [*2] defendants' motions to dismiss). On October 12, 1999, CMI filed a petition in Bankruptcy Court for relief under Chapter 11 of the United States Code. In re Complete Management Inc., No. 99-B-10857 (RLB). The motion here at issue stems from an adversary proceeding that was subsequently filed in the Bankruptcy Court by the Official Committee of Unsecured Creditors of CMI (hereinafter referred to simply as "CMI").

CMI filed Adversary Proceeding No. 01-03459 in the Bankruptcy Court against Arthur Andersen ("Andersen"), asserting as the basis for Bankruptcy Court jurisdiction that this case is a related core proceeding pursuant to *28 U.S.C. § 157(b)(2)(O)*. See Compl. P 3. In the complaint, CMI asserts that Andersen's audits of CMI's financial statements were deficient for failing to detect alleged reporting errors. CMI's claims are grounded in state law claims of negligence, relying on theories of malpractice and breach of fiduciary duty. [1] See Sabella Aff. Ex. A. Andersen filed its motion to withdraw the reference from the bankruptcy court on March 5, 2002. I accepted this case as related to the pending securities litigation, In re Complete Management, **[*3]** *Inc. Securities Litigation, 153 F. Supp. 2d 314.*

> 1    We refer to this case as "the Andersen adversary proceeding."

## DISCUSSION

### A. Applicable Law

Defendant Andersen moves to withdraw the Andersen adversary proceeding from the Bankruptcy Court pursuant to *28 U.S.C. § 157(d)*, which states in relevant part, "the district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The crux of CMI's argument for opposing the withdrawal of the reference is that because Andersen filed a proof of claim in the Bankruptcy Court seeking payment for rendered audit services, the Andersen adversary proceeding is a core proceeding. As a threshold matter, we must therefore determine whether the claims asserted by CMI in the adversary proceeding constitute a "core proceeding." [2] *In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993)* ("A district court considering **[*4]** whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn.").

> 2    As explained by the Second Circuit' in *United States Lines, Inc. v. American Steamship Owners Mutual Protection and Indemnity Association, Inc., (In re United States Lines, Inc.), 197 F.3d 631, 636 (2d Cir. 1999)*, the "origin of the core/non-core distinction" derives from *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*

*458 U.S. 50, 73 L. Ed. 2d 598, 102 S. Ct. 2858 (1982)*, in which the Supreme Court held the Bankruptcy Act of 1978 unconstitutional because it vested authority in Article I courts to hear "so-called 'non-core proceedings'" that, without consent, could only be heard by Article III courts. See also Luan Investment S.E. v. Franklin *145 Corp. (In re: Petrie Retail), 304 F.3d 223, 2002 WL 31059184*, at *5 (2d Cir. 2002).

As recently described by the Second **[*5]** Circuit, proceedings can be core "by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, . . . or (2) the proceedings directly affect a core bankruptcy function." See also Luan Investment S.E. v. Franklin *145 Corp. (In re: Petrie Retail), 304 F.3d 223, 2002 WL 31059184*, at *5 (2d Cir. 2002). By contrast, non-core proceedings "involve disputes over rights that...have little or no relation to the Bankruptcy Code, do not arise under the federal bankruptcy law and would exist in the absence of a bankruptcy case." *Wechsler v. Squadron, Ellenoff, Plesent, & Sheinfeld LLP, 201 B.R. 635, 639 (S.D.N.Y. 1996)* (citing *J. Baranello & Sons, Inc. v. Baharestani, 149 B.R. 19, 24 (Bankr. E.D.N.Y. 1992)*). While core proceedings arising under Title 11 may be heard and determined in the bankruptcy court, decisions made by bankruptcy courts in non-core proceedings are subject to *de novo* review by the district court. *28 U.S.C. §§ 157(b)(1)* and *(c)(1)*; *Orion Pictures, 4 F.3d 1095 at 1101*. Further, although jury trials may be held by bankruptcy **[*6]** courts in core proceedings, to allow bankruptcy courts to hold jury trials in non-core, related proceedings would violate the Reexamination Clause of the *Seventh Amendment of the United States Constitution*. *Orion, 4 F.3d 1095 at 1101*; *Weiner's, Inc. v. T. G. & Y. Stores, Co., 191 B.R. 30, 34 (S.D.N.Y. 1996)*.

*Section 157(b)(2) of Title 28 of the United States Code* provides a non-exhaustive list of core proceedings. *Tultex Corp. v. Freeze Kids, L.L.C., 252 B.R. 32, 35-36 (S.D.N.Y. 2000)*. Core matters enumerated in *§ 157* and potentially relevant to the instant proceeding include: proceedings affecting the "allowance or disallowance of claims against the estate", *28 U.S.C. § 157(b)(2)(B)*; "counterclaims by the estate against persons filing claims against the estate," id. *§ 157(b)(2)(C)*; and the catchall provision incorporating "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder

relationship, except personal injury tort or wrongful death claims," id. 157(b)(2)(O). [3] However, since some of the provisions of § 157 "'are [*7] so broad that they could be construed to include almost any matter relating to bankruptcy,'...the Second Circuit has insisted that a determination of whether a matter is core requires a further examination into 'the nature of the proceedings.'" *Cibro Petroleum Products, Inc. v. City of Albany (In re Winimo Realty), 270 B.R. 108 (S.D.N.Y. 2001)*(internal citations omitted). Such analysis considers whether the claim arose before or after the reorganization petition and the degree to which the claim arose independent of the bankruptcy reorganization. See id. (citing *U.S. Lines, 197 F.3d 631 at 637*, and describing these requirements in the context of a contract claim).

> 3   Although plaintiff expressly relies only on *§ 157(b)(2)(O)*, in like situations where the defendant has filed a proof of claim against the estate in the Bankruptcy Court, the provisions of *§§ 157(b)(2)(B)* and *(C)* have also been found applicable. See *Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.), 270 B.R. 108, 120 n. 7 (S.D.N.Y. 2001)* (citing cases to this effect).

[*8] In addition to determining whether a claim is a core proceeding, courts consider a number of other factors, including: whether the claim is legal or equitable, considerations of efficiency, prevention of forum shopping, uniformity in the administration of bankruptcy law, and whether a jury trial has been requested. *In re Orion, 4 F.3d 1095 at 1101*. Thus, even where a claim has been determined to be core to the bankruptcy proceedings, consideration of these factors may make withdrawal of the reference appropriate in certain circumstances. See, e.g., *Judge v. Ridley & Schweigert (In re Leedy Mortgage Co., Inc.), 62 B.R. 303, 306 (E.D. Pa. 1986)* (withdrawing reference in reliance on these additional factors although claim was core); cf. *Keystone Oncology, LLC v. Merrill Cohen (In re Equimed, Inc.), 259 B.R. 269, 272 (D. Md. 2001)* (considering these factors as basis for withdrawal where it was uncontested that the claim was a core proceeding).

**B.  Application of Law to Andersen Adversary Proceeding**

In the present case, Andersen makes, several arguments in support of its position for discretionary withdrawal. First, Andersen argues [*9] that all asserted causes of action are non-core claims that (a) as a matter of law must be finally decided by the district court; (b) the bankruptcy court is constitutionally prohibited from holding jury trials to adjudicate; and (c) raise issues outside of the special expertise of the Bankruptcy Court. Second, Andersen argues that whether the adversary proceeding is core or non-core, the existence of a related securities litigation before this Court, in addition to the traditional handling of malpractice-type cases by district courts rather than bankruptcy courts, favors withdrawing the reference for efficiency's sake.

Arguing in opposition to Andersen's motion for withdrawal, CMI asserts that its pending claim against Andersen in the Bankruptcy Court is a core proceeding. Specifically, CMI supports its invocation of *§ 157(b)(2)(O)*, which incorporates as core those proceedings affecting the liquidation of the estate or adjustment of the debtor-creditor relationship, with two principal arguments. First, CMI posits that, since the instant lawsuit is an asset of the bankruptcy estate, its determination affects the value of the debtor's assets, and therefore "affect[s] the liquidation [*10] of the assets of the estate." Second, CMI argues that, because Andersen has filed a proof of claim in the Bankruptcy Court, the result of the instant action will have a direct impact on the amount due Andersen on its claim. Specifically, CMI argues that the existence of Andersen's proof of claim intertwines the Andersen adversary proceeding with the proceedings in the Bankruptcy Court because the outcome of the Andersen adversary proceeding will determine whether Andersen is properly a creditor of CMI in the Bankruptcy Court.

We categorically reject the first of these arguments. Every claim of a debtor in bankruptcy is an asset of the estate which, if successful, will enure to the benefit of the estate. To interpret the language of *§ 157(b)(2)(O)* so broadly would render the distinction between core and non-core claims meaningless. *Orion Pictures, 4 F.3d 1095 at 1102*; see also *Durso Supermarkets v. D'Urso (In re Durso Supermarkets, Inc.), 170 B.R. 211, 214 (S.D.N.Y. 1994)*(holding *§ 157(b)(2)(O)* inapplicable and stating that "[plaintiff]'s claim of fraud may, if successful, enlarge the estate; however, that fact without more does not 'affect the liquidation [*11] of the assets...or the adjustment of the debtor-creditor or the equity security holder relationship'").

The second of CMI's arguments raises more

complicated questions. There is some case law support for CMI's position that, since Andersen filed a proof of claim against the estate of CMI in the Bankruptcy Court, the adversary proceeding by CMI against Andersen for negligence in performing its audit work for CMI is a counterclaim, and therefore a core proceeding. [4] However, while the cases speak of the filing of a proof of claim subjecting the claimant to the equitable jurisdiction of the Bankruptcy Court, no case has suggested that the equitable jurisdiction extends to a counterclaim that is, as here, seventy times greater than the proof of claim. The claim filed by Andersen is for $ 1 million, the claim advanced by CMI goes beyond a "mere setoff," demanding damages in excess of $ 70 million for the damages allegedly caused to CMI as a result of Andersen's malpractice. *In re Leedy Mortgage Co., 62 B.R. 303 at 306* (stating "the trustee here seeks more than a mere setoff" because "he has asserted an affirmative claim for damages."). Moreover, even assuming that the Andersen **[*12]** adversary proceeding is technically a core proceeding, we find that the other factors to be considered favor the discretionary withdrawal of the adversary proceeding. As discussed above, claims that "involve disputes over rights that...have little or no relation to the Bankruptcy Code, do not arise under the federal bankruptcy law and would exist in the absence of a bankruptcy case" are generally deemed non-core. *Wechsler, 201 B.R. 635 at 639*. CMI's claims against Andersen are based in tort, have no relation to bankruptcy law, and would certainly still exist in the absence of CMI's bankruptcy filing. Further, the claims against Andersen arose entirely pre-petition. Finally, as argued by Andersen, the Andersen adversary proceeding raises legal issues more commonly resolved in this court than the bankruptcy courts, and the advancement of this action will involve extensive discovery, expert testimony, and a lengthy and complex trial requiring a jury. [5] For all these

reasons, we find that the considerations of efficiency and fairness favor withdrawal of the reference of the Andersen adversary proceeding.

4    As explained by Judge Scheindlin in *In re Winimo, 270 B.R. 108 at 121-22*, the filing of a proof of claim can trigger the jurisdiction of the Bankruptcy Court in several ways. For one, by filing the proof of claim, it can be said that defendant brings itself within the equitable jurisdiction of the Bankruptcy Court. Additionally, it may be the case that factual issues necessarily reached in the determination of the adversary proceeding are also necessarily reached in determining the amount due under the defendant's proof of claim.

**[*13]**

5    Although Andersen recently settled with the plaintiffs in the pending securities litigation, this Court's familiarity with the issues raised by that case also supports withdrawal of the reference.

## CONCLUSION

For the foregoing reasons, Andersen's motion to withdraw the reference of the adversary proceeding is granted. A conference is scheduled for October 15, 2002 at 12:15 p.m.

## SO ORDERED.

DATED: New York, New York

September 26, 2002

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

LEXSEE 2006 U.S. DIST. LEXIS 30662



Analysis
As of: Dec 06, 2007

**In re REFCO, INC. CREDIT SUISSE SECURITIES (USA) LLC et al., Plaintiffs,
-against- OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Defendants.**

**06 Civ. 1888 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2006 U.S. Dist. LEXIS 30662*

**May 16, 2006, Decided
May 16, 2006, Filed**

**PRIOR HISTORY:** *In re Refco Inc., 336 B.R. 187, 2006
Bankr. LEXIS 289 (Bankr. S.D.N.Y., 2006)*

**COUNSEL:** **[\*1]** Robert B. McCaw, Philip D. Anker,
Lori A. Martin, John V.H. Pierce, and James H. Millar,
Wilmer Cutler Pickering Hale and Dorr LLP, New York,
New York, for Plaintiffs.

David S. Rosner and Christopher P. Johnson, Kasowitz,
Benson, Torres & Friedman LLP, New York, New York,
for Defendants.

**JUDGES:** GERARD E. LYNCH, United States District
Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiffs in this action are a handful of the numerous
defendants in In re Refco, Inc. Securities Litigation, 05
Civ. 8626, (the "Underwriter Defendants") a securities

action under the Private Securities Litigation Reform Act
("PSLRA") which is currently pending before this Court.
The Underwriter Defendants are also involved in In re
Refco, Inc. et al., 05 BK 60006, a bankruptcy proceeding
in the United States Bankruptcy Court for the Southern
District of New York.

On March 2, 2006, the defendants in this action, the
Official Committee of Unsecured Creditors (the
"Committee") moved in the bankruptcy proceeding for an
order pursuant to *Fed. R. Bankr. P. 2004* permitting them
to serve document requests on the Underwriter **[\*2]**
Defendants. The Underwriter Defendants now move this
Court to withdraw the reference to the Bankruptcy Court
with respect to the Committee's motion under *Rule 2004*,
and to deny the motion. For the reasons stated below, the
Underwriter Defendants' motion to withdraw the
reference will be denied.

*Section 157 of Title 28 of the United States Code*
provides that this Court "may withdraw, in whole or in
part, any case or proceeding referred under this section . .
. for cause shown." Additionally, *§ 157* states that this
Court "shall . . . withdraw a proceeding if the court
determines that resolution of the proceeding requires
consideration of both title 11 and other laws of the United
States . . . ." These two clauses create two different bases
for withdrawal of a reference -- permissive withdrawal

when cause is shown, and mandatory withdrawal when the bankruptcy proceeding requires consideration of a non-bankruptcy federal law. The Underwriter Defendants argue only for permissive withdrawal in support of the instant motion. [1]

    1   In the section of their brief discussing the efficient use of judicial resources (one of the factors to be considered in connection with permissive withdrawal) the Underwriter Defendants note that mandatory withdrawal could provide an alternative ground in support of their motion. They argue that because the PSLRA mandates a stay in the securities action currently before this Court, the bankruptcy court will have to "consider" the PSLRA in deciding whether to permit discovery go forward under *Rule 2004*. The Underwriter Defendants do not explain how or why the bankruptcy court would be required to consider the PSLRA in connection with applying *Rule 2004*. In support of their argument they cite to *In re Adelphia Communications Corp. Sec. Deriv. & Litig., 2006 U.S. LEXIS 8700, 05 Civ. 9050, 2006 WL 337667, at *3 (S.D.N.Y. Feb. 10, 2006)*. In re Adelphia is completely inapposite, however, because while the Adelphia Court granted the movant's motion for withdrawal, the proceedings at issue were claims based on RICO and the Bank Holding Company Act, not bankruptcy-specific discovery procedures.

[*3] *Section 157* does not define "cause" for purposes of determining when a motion for permissive withdrawal should be granted. However, in making that determination courts must consider the following factors:

    (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors.

*In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir. 1996)*. The first factor -- whether the matter to be withdrawn is a "core" bankruptcy matter -- is of primary importance. Id. *Section 157(b)(2)* provides a list of sixteen proceedings

that are considered core, but the list is explicitly non-exhaustive, and our Court of Appeals has instructed that "'core proceedings' should be given a broad interpretation." *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Assoc., Inc., 197 F.3d 631, 637 (2d Cir. 1999)*. To that end, any proceeding that "has as its foundation . . . rights which would not exist independent of a bankruptcy environment" is [*4] properly considered core. *In re Recoton Corp., 2004 U.S. Dist. LEXIS 12452, 04 Civ. 2466, 2004 WL 1497570, at *4 (S.D.N.Y. July 1, 2004)*.

The proceeding here at issue here is the Committee's motion pursuant to *Fed. R. Bankr. P. 2004*. *Rule 2004* permits the examination of "any entity," *Fed. R. Bankr. P. 2004*, so long as that examination relates "only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the bankruptcy estate." *In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)*. The purpose of *Rule 2004* discovery is to enquire into the bankruptcy estate to "discover[] assets, examin[e] transactions, and determin[e] whether wrongdoing has occurred." Id.

The Committee's *Rule 2004* motion is a core proceeding. *Rule 2004* is a rule of *bankruptcy* procedure, and therefore the right to discovery under *Rule 2004* does not exist "independent of a bankruptcy environment." *In re Recoton Corp., 2004 U.S. Dist. LEXIS 12452, 2004 WL 1497570, at *4*. As Chief Bankruptcy Judge Drain explained, the Committee's *Rule 2004* discovery [*5] "is of central importance to the bankruptcy case" (Hr'g Tr. 55, Mar. 23, 2006), and is "truly core in that it is essential . . . to the proper administration of [the bankruptcy case] to pursue the investigation that the [Committee] is pursuing" (id. 61). "This is a very large bankruptcy case" (id. 55), and the Committee has an obligation to "get to the bottom of the events that precipitated [it]," (id. 57). If, as a result of that investigation, the committee decides to bring certain claims against certain parties, then, indeed, *those claims* may be non-core. See, e.g., *In re Adelphia Commc'ns Sec. Deriv. & Litig., 2006 U.S. LEXIS 8700, 2006 WL 337667, at *3* (withdrawing reference with respect to claims brought under RICO and the Bank Holding Company Act). However, the investigation into the possible existence of those yet-to-be-determined claims is purely a bankruptcy matter, and is therefore properly categorized as core. See *In re Recoton Corp., 2004 U.S. Dist. LEXIS 12452, 2004*

*WL 1497570, at *4* ("The discovery sought by the Committee pursuant to *Rule 2004* is properly characterized as a core proceeding.").

The Underwriter Defendants do not seriously dispute that the Committee's **[*6]** *Rule 2004* motion is a core proceeding. [2] Instead, they argue that, notwithstanding the central importance of the core/non-core distinction, other Burger Boys factors favor withdrawal. Specifically, the Underwriter Defendants claim that withdrawal and denial of the Committee's motion would promote the efficient use of judicial resources and avoid unnecessary cost to the parties. To the extent the Underwriter Defendants argue that a denial of the Committee's motion promotes efficiency and minimizes costs, that argument is both correct and irrelevant. Denying the Committee's *Rule 2004* motion would be, in some sense, more efficient than granting the motion - engaging in some discovery is more costly than engaging in no discovery. That is not, however, the sort of efficiency that is contemplated by the *Burger Boys* factors. Weighing the efficiency costs of various potential outcomes does not shed any light on the question of *which court* should decide what that outcome is.

> 2    The Underwriter Defendants admit that the motion "might technically be considered" core. (Pl. Mem. 9.)

**[*7]** With respect to question of who should decide, the Underwriter Defendants argue that having two judges making discovery determinations is inefficient and could lead to inconsistent results. Any inconsistencies, however, are due to the fact that the two judges would be applying different rules of discovery in different proceedings that serve different purposes. Accordingly, because two different sets of rules would need to be applied, little is gained by having one judge decide all discovery issues for both proceedings under both sets of rules. Rather, the more efficient outcome would be to allow the bankruptcy judge to apply the rules of bankruptcy discovery in the bankruptcy proceeding and to allow this Court to apply the rules of civil discovery in the civil proceeding. See *In re Recoton Corp., 2004 U.S. Dist. LEXIS 12452, 2004 WL 1497570, at *4* (stating that it would be inefficient to withdraw a bankruptcy motion from a bankruptcy judge so that it can be heard by a district judge who happens to be presiding over a related securities action).

During a conference in the PSLRA action and related actions pending before this Court, the Court expressed a desire for the coordination of discovery **[*8]** across all Refco-related actions. The Underwriter Defendants seize upon this comment, and argue that this Court's resolution of the Committee's *Rule 2004* motion would facilitate that coordination. This argument stretches the Court's language too far. Discovery across all cases and all courts would indeed be "coordinated" (in some sense of the word) if this Court simply stayed all of it. That, however, is not the sort of coordination the Court was recommending. To the extent that the parties in the bankruptcy proceeding are also involved in the PSLRA action, and to the extent that the information provided in the bankruptcy proceeding will eventually be provided in connection with discovery in the PSLRA action, the Court recommends that the parties, amongst themselves, reach agreements to help minimize unnecessary costs and redundancy. Chief Judge Drain has noted that the Committee is willing to enter into confidentiality agreements so that information obtained in *Rule 2004* discovery is not used prematurely (in the PSLRA action. (Hr'g Tr. 63-63, Mar. 23, 2006.) It seems reasonable that any such agreement could provide for the sharing of information once the time becomes appropriate.

**[*9]** The Committee's *Rule 2004* motion is a core bankruptcy proceeding, and neither efficiency nor cost concerns support a usurpation of the bankruptcy court's jurisdiction over the matter. The Underwriter Defendants do not argue that any other Burger Boys factors favor withdrawal [3] (Pl. Mem. 8-9), and therefore the motion for withdrawal will be denied. Discovery in the bankruptcy proceeding will go forward to the extent allowed under the bankruptcy rules. The discovery process will impose costs on the parties involved, and the overseeing of that process will result in the expending of judicial resources. That is not inefficiency; that is the design of our system. A withdrawal of the Committee's motion and a stay of bankruptcy discovery with respect to the Underwriter Defendants would frustrate that design. The PSLRA's stay provision prevents plaintiffs in securities class actions from imposing discovery burdens on defendants prior to a judicial determination that the plaintiffs' claims have a basis in the law. The PSLRA does not, however, build a wall around defendants' documents and officials for all purposes in all other proceedings. The oversight of discovery in the bankruptcy **[*10]** proceeding is a core bankruptcy matter, and the existence of an independent PSLRA action does not require this Court to interfere with the Chief Judge Drain's management of the

2006 U.S. Dist. LEXIS 30662, *10

discovery process in the bankruptcy case before him.

    3  While the Underwriter Defendants claim in a heading that "The Remaining *Burger Boys* Factors Support Withdrawal of the Reference," the actual text of the section argues that the other factors are neutral. (Pl. Mem. 8-9.)

    The Underwriter Defendants' motion to withdraw the reference with respect to the Committee's motion under *Rule 2004* is denied.

SO ORDERED.

Dated: New York, New York

May 16, 2006

GERARD E. LYNCH

United States District Judge

LEXSEE 2007 U.S. DIST LEXIS 81216



Analysis
As of: Dec 06, 2007

**In re DELTA AIR LINES, INC. et al., Debtors. DELTA AIR LINES, INC., Plaintiff, - against - THE CITY OF LOS ANGELES and LOS ANGELES WORLD AIRPORTS, Defendants.**

**07 Civ. 2649 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 81216*

**October 30, 2007, Decided
October 30, 2007, Filed**

**PRIOR HISTORY: [*1]**
    Adversary Pro. No. 07-1561 (ASH).

**COUNSEL:** For Plaintiff: DAVIS POLK & WARDWELL, By: Sharon Katz, Esq., James I. McClammy, Esq., Hayward Smith, Esq., New York, New York; PAUL, HASTINGS, JANOFSKY & WALKER LLP, By: Robert S. Span, Esq. Los Angeles, California.

For Defendant: KAYE SCHOLER LLP, By: Marc S. Cohen, Esq., Ashleigh A. Danker, Esq., Los Angeles, California.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

    **CHIN, D.J.**

    Defendants the City of Los Angeles and Los Angeles World Airports (together the "City") move to withdraw the reference of this adversary proceeding to the United

States Bankruptcy Court for the Southern District of New York and to transfer venue to the United States District Court for the Central District of California (the "CDCA"). For the reasons that follow, the motion is denied.

**BACKGROUND**

    **A. *The Facts***

    On November 7, 1985, Western Air Lines, Inc. ("Western") signed a Terminal Facilities Lease (the "Lease") with the City to use and occupy Terminal 5 at Los Angeles International Airport ("LAX"). (Pan Decl. Ex. 1 at 10). The Lease covered a period of 40 years. (Id. at 11; Pl. Mem. 3). Section 5 of the Lease specified the circumstances that would trigger its **[*2]** early termination. (Pan Decl. Ex. 1 at 11-12).

    Western simultaneously assigned partial interest in the Lease to the Regional Airport Improvement Corporation ("RAIC"), a non-profit public benefit corporation established to facilitate the tax-exempt financing of airport improvements. (Pl. Mem. 3-4; Req. for Jud. Notice Ex. 8 PP 17-18). In exchange, RAIC issued revenue bonds (the "Bonds") to finance improvements to the Terminal 5 facilities and subleased

the improved facilities back to Western. (Pl. Mem. 3-4; Req. for Jud. Notice Ex. 8 PP 17-18). By virtue of its merger with Western in 1987, plaintiff Delta Air Lines, Inc. ("Delta") succeeded Western as a party to the Lease and the related agreements governing the Terminal 5 improvements (the "Transaction Documents"). (Katz Decl. Ex. 12 at 4).

In 1994, the City commenced development of a master plan to modernize LAX. (Katz Decl. Ex. 6 at 3). As part of that plan, the City devised a new standard lease agreement ("New Lease Form") applicable to all terminals at LAX. (Id. at 6). To implement the New Lease Form, which incorporated additional costs and a fixed five-year term, the City began reviewing ways to terminate its existing long-term **[*3]** terminal leases. (Def. Mem. 8).

**B. *Prior Proceedings***

On September 14, 2005 Delta filed a voluntary petition for relief under Chapter 11 in the Bankruptcy Court. (Pl. Mem. 5). In April 2006, the City objected to Delta's motion for a second extension of time to assume or reject executory contracts, including the Lease. (Pl. Mem. 6; Katz Decl. Ex. 6). Before Judge Hardin, the City declared its right and intent to terminate the Lease irrespective of the Bankruptcy Court's ruling by defeasing the Bonds pursuant to Section 5 of the Lease. (Katz Decl. Ex. 6 at 1). The City suggested that Delta either sign the New Lease Form or opt to discontinue use of Terminal 5. (Katz Decl. Ex. 8 at 25:21-26:1, 45:7-45:15). The Bankruptcy Court granted the extension but made no determination of the City's right to terminate the Lease. (Pl. Mem. 7; Katz Decl. Ex. 8 at 67:1-68:9).

On August 16, 2006, the City filed a proof of claim in the Bankruptcy Court for pre-petition debts owed by Delta, in which the City stated that "the nature and extent of the City's rights and claims against Delta . . . arising under and relating to Transaction Documents may be determined in the Adversary Proceeding." (Pl. Mem. 8; Req. **[*4]** for Jud. Notice Ex. 16 at 297). That December, the City passed a resolution to increase its maintenance and operation ("M&O") charges for tenants of all nine terminals. (Def. Mem. 9). The new rates were imposed on February 2007 and made retroactive to January 2006. (Id.). Following the resolution, American Airlines, Inc., Continental Airlines, Inc., and United Air Lines, Inc. commenced an action in the CDCA challenging the new M&O rates. (Id.; Req. for Jud. Notice Ex. 2).

In January 2007, the City also passed a resolution authorizing its officers to terminate the Lease by defeasing the Bonds pursuant to Section 5 of the Lease. (Pl. Mem. 9). One month later, the City moved before Judge Hardin for an order declaring that the automatic stay provisions under *11 U.S.C. § 362* did not apply to its termination of the Lease, or alternatively, lifting the automatic stay (the "Lift-Stay Motion"). (Katz Decl. Ex. 10). In that motion, the City reasserted its right to terminate the Lease. (*Id.* at 18, 20).

On March 2, 2007, Delta opposed the Lift-Stay Motion and simultaneously commenced this adversary proceeding in the Bankruptcy Court seeking injunctive relief and a declaratory judgment that (1) the **[*5]** City did not have right to unilaterally terminate the Lease under Section 5 and (2) the New M&O Rates violated both the Lease and the automatic stay. (Pl. Mem. 10; Katz Decl. Ex. 12; Req. for Jud. Notice Ex. 8). [1]

> 1   Northwest Airlines, Inc., which had also filed a voluntary petition for bankruptcy in September 2005, commenced an adversary proceeding before Bankruptcy Judge Gropper in the Southern District of New York challenging the New M&O rates and the termination of its Terminal 2 lease. (Req. for Jud. Notice Ex. 9). The City's motion to withdraw the reference of that adversary proceeding is before Judge Sweet in this Court.

On March 8, 2007, the City withdrew the Lift-Stay Motion. (Pl. Mem. 11). Three weeks later, it filed the instant motion to withdraw the reference of the adversary proceeding and transfer the case to the CDCA.

***DISCUSSION***

**A. *Applicable Law***

Defendants seek permissive withdrawal of the reference to the Bankruptcy Court under *28 U.S.C. § 157(d)*, which provides that "the district court may withdraw . . . any case or proceeding referred [to the bankruptcy court] under this section, on its own motion or on timely motion of any party, for cause shown." While *§ 157(d)* does **[*6]** not define "cause," the Second Circuit has established a two-part test for determining whether there is cause to withdraw a reference under the permissive withdrawal standard. *In re Orion Corp., 4 F.3d 1095, 1101 (2d Cir. 1993)* (citations omitted).

First, the court should evaluate whether the claim is core or non-core. Whether a proceeding is core or non-core is fundamental to issues of efficiency and uniformity: non-core matters are reviewed *de novo*, and therefore a district court may conclude that in certain cases a single proceeding in district court is more efficient. *Id.* In contrast, judicial resources may best be conserved by not hearing core matters in district court, as the bankruptcy court generally is more familiar with the issues. *Id.*

*Section 157(b)(2)* sets forth a non-exhaustive list of categories of core proceedings, which includes "matters concerning the administration of the estate," and "counterclaims by the estate against persons filing claims against the estate." *28 U.S.C. § 157(b)(2)(A), (C).* Whether a proceeding is core should be given a broad interpretation. *In re U.S. Lines, Inc., 197 F.3d 631, 636-37 (2d Cir. 1999); see also In re Best Prods. Co., 68 F.3d 26, 31 (2d Cir. 1995)*(noting [*7] that congressional sponsors of the 1984 Bankruptcy Code Amendments "said that 95 percent of the proceedings brought before bankruptcy judges would be core proceedings").

To trigger core status, the proceeding must affect the administration of the estate beyond merely augmenting the assets of the estate for general distribution. See *Orion, 4 F.3d at 1102.* When a claim pertaining to a pre-petition contract impacts other core bankruptcy functions as well, it will more likely render the proceeding core. *See In re Petrie Retail, Inc., 304 F.3d 223, 230-31 (2d Cir. 2002).* While the status of a claim as core or non-core informs issues of efficiency and uniformity, it is not dispositive. *In re Keene Corp., 182 B.R. 379, 383 (S.D.N.Y. 1995)* (citing from *Orion, 4 F.3d at 1101*).

Second, the court must weigh "questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion, 4 F.3d at 1101.*

B. *Application*

I consider first whether the claims are core and second whether withdrawing the reference to the Bankruptcy Court would promote judicial efficiency and be in the best interests [*8] of the parties. The City raises a third issue, the effect of Delta's emergence from bankruptcy, which I also consider.

**1. *Core/Non-core***

The first issue is whether the claims raised in this adversary proceeding -- (a) that the City cannot unilaterally terminate the Lease and (b) that the increased M&O rates violate both the Lease and automatic stay -- are core. I address each claim separately.

**a. *Termination Claim***

I conclude that the City's termination claim is core. First, "matters concerning the administration of the estate" are core, *28 U.S.C. § 157(b)(2)(A)*, and here the resolution of the City's termination claim will surely affect the administration of Delta's estate.

Delta has said that the Terminal 5 facility is a "critical asset of its bankruptcy estate" that will play an "important and expanding role" in its global network. (Pl. Mem. 1). In proceedings in the Bankruptcy Court, Judge Hardin observed that "Delta has made clear how important Los Angeles is to Delta. There can be no doubt, taking its statements then and now, . . . that Los Angeles is very important to debtor." (Katz Decl. Ex. 8 at 47).

Second, "counterclaims by the estate against persons filing claims against the estate" [*9] are core, *28 U.S.C. § 157(b)(2)(C)*, and here the City filed claims against the estate - - the City filed a proof of claim - - and although it is not denominated as a counterclaim, this adversary proceeding is tantamount to a counterclaim as the estate seeks a declaration - that the City could not unilaterally terminate the Lease. *See In re Iridium Operating LLC, 285 B.R. 822, 832 (S.D.N.Y. 2002); In re Millenium Seacarriers, Inc., 419 F.3d 83, 98 (2d Cir. 2005)* (by filing proof of claim, creditor subjects itself "to the bankruptcy court's broad equitable jurisdiction") (citations omitted). Courts in this Circuit have found that debtors' claims in adversary proceedings constitute counterclaims when they arise from the same contract as the proof of claim. *See Iridium, 285 B.R. at 832; In re Lombard-Wall, Inc., 48 B.R. 986, 991 (S.D.N.Y. 1985).*

Defendants argue that plaintiff's termination claim falls short of core status because it pertains to a contract signed prior to Delta's petition for bankruptcy. (Def. Mem. 19). I disagree. The City fixates on the pre-petition timing of the Lease without adequately accounting for the effect the determination of its termination rights would have [*10] on the administration of Delta's reorganized estate.

To determine the core status of contract claims, this Circuit considers whether the contract preceded the debtor's petition and the independence of the adversary proceeding from the debtor's reorganization. *Millenium, 419 F.3d at 97*. The latter still turns on how the proceeding affects a core bankruptcy function. *Id.* (citing from *In re S.G. Phillips Constructors, Inc., 45 F.3d 702, 705 (2d Cir. 1995))*. Defendants concede that whether the disputed contract was formed prior to the debtor's petition for bankruptcy is not dispositive. Here, the effect of Delta's claim on core bankruptcy functions outweighs the importance of the contract's pre-petition origin.

Defendants protest that the proof of claim and the current proceeding are wholly disconnected because the former refers to pre-petition debts whereas the latter concerns post-petition claims. (Def. Mem. 20). This distinction is of little consequence. Debtors' claims need not pertain to the exact provision or dispute referenced by the proof of claim; it will suffice that they require the Bankruptcy Court's interpretation of the same contract. *See Iridium, 285 B.R. at 832-33* (counterclaims **[\*11]** raised in the adversary proceeding found core when they arose from the same contract, but from distinct disputes within that contract).

Because the proof of claim requires the interpretation of the contract at the heart of Delta's counterclaim, and because the City has puts its interpretation before Judge Hardin, I hold the determination of its termination rights core.

### b. *The M&O Rates Claim*

I likewise conclude that Delta's claim to enforce the automatic stay against the new M&O rates is also core. Debtors' petition for bankruptcy operates as an automatic stay, applicable to all entities, of "any act to obtain possession of property of the estate or to exercise control over property of the estate." *11 U.S.C. 362(a)(3)*. Here, Delta asserts that the City's post-petition resolution to increase the M&O relates violates that stay. Proceedings to enforce an automatic stay are core. *In re Chateaugay Corp., 78 B.R. 713, 716-17 (Bankr. S.D.N.Y. 1987)*. It is as simple as that.

The City asserts that Delta's claim to "enforce the automatic stay" cloaks a non-core contract dispute in the garb of a core proceeding. (Def. Reply 9). It does not dispute that valid actions to enforce an automatic stay are **[\*12]** core. Instead the City contends that "no basis"

exists for Delta's claim that the new M&O rates violate the automatic stay because Delta is required to "timely perform" its post-petition lease obligations under *§ 365(d)(3) of the Bankruptcy Code*. (*Id.*). [2]

> 2    The provision reads, in relevant part, "Trustee shall timely perform all obligations of the debtor, except those specified in *section 365(b)(2)*, arising from and after the order for relief under any expired lease of nonresidential real property, until such lease is assumed or rejected." *11 U.S.C. § 365(d)(3)*.

This argument is unavailing. As Delta points out, "the automatic stay has not been lifted and remains in full force and effect." (Req. for Jud. Notice Ex. 8 at P 56). Whether Delta must pay the new M&O rates has not yet been determined. That matter is, in fact, one of the very disputes before Judge Hardin in the adversary proceeding. Delta asserts that the Lease does not permit the City to raise the M&O rates without its consent and that "Defendants have breached the Lease by overcharging Delta for M&O at Terminal 5 through an improper calculation and without mutual agreement of the parties." (*Id.* at P 58). Because the legitimacy **[\*13]** of the new rates remains in question, it would be premature to now define their payment as a "post-petition obligation" unabated by the automatic stay.

The City seemed to recognize this quandary when it filed its Lift-Stay Motion seeking declaratory authority to impose the new M&O charges on Delta. While the City withdrew its motion, there has been no judicial determination that the automatic stay should not apply. As the applicability of the automatic stay remains as yet unaltered, I hold that the adversary proceeding concerns its enforcement and is core.

### 2. *Judicial Efficiency*

The second issue is whether withdrawing the reference would promote judicial efficiency and be in the best interests of the parties. I conclude that judicial efficiency is best served by leaving the proceeding in the Bankruptcy Court. Judge Hardin has already heard matters concerning the Lease. Resolution of the issues raised will have an impact on other matters before him. His familiarity with facts and issues will not only allow for more efficient proceedings, but will also further uniformity of administration of the Delta estate.

The City contends that withdrawing the reference will not hinder judicial efficiency **[\*14]** because "Judge Hardin has never been asked to analyze or interpret the provisions of the Terminal 5 Lease, nor has he done so." (Def. Reply 8). In fact, it argues, it filed the Lift-Stay Motion "so that a *different* court could be asked to interpret the lease." (*Id.*) (emphasis in original). The City states that similarities between the Lease and the contracts before the CDCA counsel withdrawal of the reference and transfer of venue. (*Id.* at 12, 14).

In fact, the City debated the Lease's terms more actively than it now suggests. It did not specifically ask Judge Hardin to interpret the Terminal 5 Lease; instead, it repeatedly declared its right to terminate the Lease and stated that "early termination of the Terminal 5 Lease is inevitable." (Katz Decl. Ex. 6 at 1, 17). Seen in this light, the City's contention that it never asked Judge Hardin to interpret the Lease or decide its termination rights fall short. Its own assertions have placed the issues before Judge Hardin. Withdrawing the reference to the Bankruptcy Court and transferring the matter to the CDCA would undermine judicial efficiency.

### 3. *Delta's Emergence from Bankruptcy*

The City finally contends that Delta's emergence from bankruptcy **[\*15]** counsels withdrawal of the reference to the Bankruptcy Court. I disagree.

Confirmation of chapter 11 plans does not divest bankruptcy courts of all jurisdiction. *In re Ionosphere Clubs, Inc., 1999 Bankr. LEXIS 1875, at \*15 (Bankr. S.D.N.Y. May 12, 1999)* (citations omitted). Bankruptcy courts have narrower jurisdiction over claims raised subsequent to confirmation. See *In re General Media, Inc., 335 B.R. 66, 73-75 (Bankr. S.D.N.Y. 2005)* (claims brought by debtor after its reorganization plan had been confirmed found to lie outside the bankruptcy court's jurisdiction).

Courts in this Circuit have found, however, that the bankruptcy court may retain jurisdiction over claims pending before it at the time of confirmation to implement the debtor's reorganization plan. *See In re Ames Dep't Stores, Inc., 190 B.R. 157, 161 (S.D.N.Y 1995)* (finding pre-confirmation claim "inextricably intertwined" with the implementation of the reorganization plan). Further, bankruptcy courts retain jurisdiction when the debtor's reorganization plan specifically provides for such retention of jurisdiction. *Ionosphere, 1999 Bankr. LEXIS 1875, at \*21-23.*

Here, Delta filed its claims prior to the confirmation of its **[\*16]** reorganization plan. Its plan, confirmed by Judge Hardin, specifies that the Bankruptcy Court will retain jurisdiction over adversary proceedings pending at the time of confirmation. (P1. Supp. Mem. 2). Judge Hardin continues to hear other disputes relating to Delta's bankruptcy. Accordingly, I conclude that Delta's emergence from bankruptcy does not provide cause to withdraw the reference to the Bankruptcy Court.

### *CONCLUSION*

For the reasons set forth above, defendants' motion to withdraw the reference of the adversary proceeding to the Bankruptcy Court and to transfer venue of the proceeding to the United States District Court for the Central District of California is denied.

SO ORDERED.

Dated: New York, New York

October 30, 2007

DENNY CHIN

United States District Judge

LEXSEE 2006 U.S. DIST. LEXIS 52318



Analysis
As of: Dec 06, 2007

**RICHARD H. DREW, Plaintiff, - against - WORLDCOM, INC., Defendant. In re WORLDCOM, INC. et al., Debtors.**

**06 Civ. 3407 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 52318*

**July 24, 2006, Decided**
**July 26, 2006, Filed**

**PRIOR HISTORY:** *In re Worldcom, Inc., 343 B.R. 486, 2006 Bankr. LEXIS 1091 (Bankr. S.D.N.Y., 2006)*
*Drew v. MCI Worldcom Mgmt. Co., 1999 U.S. Dist. LEXIS 18677 (N.D. Tex., Dec. 1, 1999)*

**COUNSEL:** **[*1]** For Worldcom, Inc., In Re: Brian K. O'Bleness, Stinson Morrison Hecker LLP, Kansas City, MO.

For Worldcom, Inc., Debtor: Brian K. O'Bleness, Stinson Morrison Hecker LLP, Kansas City, MO.

For Richard H. Drew, Plaintiff:John E. Wall , Law Office of John E. Wall, Jr., Dallas, TX US.

For WorldCom, Inc., Defendant: Michael J. Leahy, Stinson Morrison Hecker LLP, Omaha, NE US; Brian K. O'Bleness, Stinson Morrison Hecker LLP, Kansas City, MO.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINION BY:** John G. Koeltl

**OPINION**

***OPINION AND ORDER***

**JOHN G. KOELTL, District Judge:**

The claimant, Richard H. Drew ("Drew"), moves to withdraw a reference to the United States Bankruptcy Court for the Southern District of New York in *In re WorldCom, Inc. et al.*, Chapter 11 Case No. 02-13533. [1] For the following reasons, the motion is **denied.**

> 1  In the Southern District of New York, all cases or proceedings arising under Title 11 of the Bankruptcy Code or relating to cases under Title 11 of the Bankruptcy Code, are automatically referred to the Bankruptcy Court in this district under a General Reference Order issued July 10, 1984 pursuant to *28 U.S.C. § 157(a)*. *See Federal Ins. Co. v. Sheldon, 167 B.R. 15, 18-19 (S.D.N.Y. 1994).*

**[*2] I.**

Drew initially filed a suit against MCI WorldCom Management Company, Inc., an affiliate of the defendant, WorldCom, Inc. (collectively "MCI") in state court in Texas in May 1999. That action was removed to the United States District Court for the Northern District of Texas, Dallas Division (Barbara M.G. Lynn, J.), which dismissed the case without prejudice on February 21, 2001 after determining that the case required resolution

of a tariff issue within the exclusive jurisdiction of the Federal Communications Commission (the "FCC"). Shortly thereafter, Drew filed a complaint with the FCC.

In July 2002, MCI commenced proceedings under Chapter 11 of the Bankruptcy Code, *11 U.S.C. § 1101 et seq.,* in the United States Bankruptcy Court for the Southern District of New York. In January 2003, Drew filed a proof of claim in the bankruptcy action, based on allegations that MCI improperly overcharged Drew and others for Federal Universal Services Fees ("FUSF"). MCI objected in the Bankruptcy Court to Drew's claim in October 2004, and Drew filed a response to MCI's claim objection. In that response, Drew conceded that the bankruptcy court had jurisdiction [*3] over the claim and that the claim objection was a "core proceeding" within the meaning of *28 U.S.C. § 157(b).* [2]

> 2   *28 U.S.C. § 157(b)(1)* provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under *section 158* of this title." *28 U.S.C. § 157(b)(2)* defines the term "core proceeding."

Discovery was conducted on Drew's bankruptcy claim between September 2005 and March 2006. On April 5, 2006, MCI filed a motion for summary judgment on that claim and a motion to deny class certification.

On April 26, 2006, Drew filed with the Bankruptcy Court his motion to withdraw this Court's automatic reference to that Court. [3] Local Bankruptcy *Rule 5011-1* of the Southern District of New York requires that, after filing a motion to [*4] withdraw reference in the Bankruptcy Court, the moving party file the motion in the District Court and notify the Bankruptcy Court of the district judge and index number assigned to the action. Thereafter, all papers on the motion are filed in the district court, which must decide the motion.

> 3   *See supra* note 1.

## II.

A motion to withdraw a reference in a bankruptcy case is governed by *28 U.S.C. § 157(d).* That subsection both empowers the district court to withdraw the

reference, in its discretion, "for cause shown," and requires the district court to do so where it finds that resolution of the proceeding before the Bankruptcy Court requires consideration of federal laws other than Title 11 of the Bankruptcy Code that regulate organizations or activities affecting interstate commerce. [4] Drew asserts that this Court is required to withdraw the reference to the Bankruptcy Court because resolution of the proceeding requires consideration of, the Federal False [*5] Claims Act, *31 U.S.C. § 3729,* in addition to Title 11 of the Bankruptcy Code. Drew further argues that, in the alternative, the Court should exercise its discretion under *Section 157(d)* to withdraw the reference for good cause. (Mot. to Withdraw Reference, PP 9-12.) MCI argues that, under the express language of *28 U.S.C. § 157(d),* a motion for withdrawal of reference must be timely regardless of whether the withdrawal in question is discretionary or mandatory, and that Drew's motion is not timely. MCI further argues that neither mandatory nor discretionary withdrawal of the reference is appropriate in this case. It is unnecessary to reach the questions of whether mandatory or discretionary withdrawal of the bankruptcy reference is warranted because the Court agrees that Drew's motion is not timely.

> 4   *28 U.S.C. § 157(d)* provides in full: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."

## [*6] III.

"There is no specific time limit for applications under *28 U.S.C. § 157(d)* to withdraw a reference to the bankruptcy court . . . ." *Lone Star Indus. v. Rankin County Economic Dev. Dist. (In re New York Trap Rock Corp.), 158 B.R. 574, 577 (S.D.N.Y. 1993); see also Singer Co. B.V. v. Groz-Beckert KG (In re Singer Co.), 2002 U.S. Dist. LEXIS 2629, No. 01 Civ. 0165, 2002 WL 243779, at *4 (S.D.N.Y. Feb. 20, 2002)* (citations omitted) (same). In situations such as a motion to withdraw a bankruptcy reference, where "timeliness is not governed by a specific timetable," the Court must

assess timeliness in the context of the parties' interactions throughout the course of the litigation in the Bankruptcy Court. *Lone Star Indus., 158 B.R. at 577*. Therefore, "courts in this Circuit have defined 'timely' to mean 'as soon as possible after the moving party has notice of the grounds for withdrawing the reference.'" *Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Transp. Corp. (In re FMI Forwarding Co.), 2005 U.S. Dist. LEXIS 941, No. 04 Civ. 630, 2005 WL 147298, at *6 (S.D.N.Y. Jan. 24, 2005)* (quoting [**7**] *Kentile Floors v. Congoleum Corp. (In re Kentile Floors), 1995 U.S. Dist. LEXIS 11421, No. 95 Civ. 2470, 1995 WL 479512, at *2 (S.D.N.Y. Aug. 10, 1995)*).

Based on the particular circumstances at issue, a delay that is acceptable in one case may not be acceptable in another case. *Id.; compare Connolly v. Bidermann Indus. U.S.A., 1996 U.S. Dist. LEXIS 8059, No. 95 Civ. 1791, 1996 WL 325575, at *3 (S.D.N.Y. June 13, 1996)* (finding untimely a motion to withdraw reference filed after a delay of eight months), *with Kentile Floors, Inc. v. Congoleum Corp. (In re Kentile Floors, Inc.), 1995 U.S. Dist. LEXIS 11421, No. 95 Civ. 2470, 1995 WL 479512, at *2 (Aug. 10, 1995)* (finding timely a motion to withdraw reference filed after a delay of nine months where the parties had been in mediation for several months and the motion was filed promptly after mediation was abandoned). It is clear, however, that "[d]elay for tactical reasons, prejudicial to the opposing party or the administration of justice, can be grounds for denying" a withdrawal motion. *Lone Star Indus., 158 B.R. at 577*; *see also FMI Forwarding Co., 2005 U.S. Dist. LEXIS 941, 2005 WL 147298 at *6-7; The Singer Co., 2002 U.S. Dist. LEXIS 2629, 2002 WL 243779 at *4* [**8**] .

In this case, over eighteen months elapsed between October 14, 2004, when MCI filed its objection to Drew's claim, and April 26, 2006, when Drew filed the motion to withdraw the reference in the Bankruptcy Court. On numerous occasions, courts in this district have held motions to withdraw untimely when made after delays of similar, or even shorter, duration. *See, e.g., FMI Forwarding Co., 2005 U.S. Dist. LEXIS 941, 2005 WL 147298 at *7* (finding untimely a motion to withdraw reference made eighteen months, exclusive of time spent in mediation, after the moving party became aware of the grounds for the motion); *Connolly, 1996 U.S. Dist. LEXIS 8059, 1996 WL 325575 at *3* (finding untimely a motion to withdraw reference filed after a delay of eight

months); *Lone Star Indus., 158 B.R. at 577* (finding untimely a motion to withdraw reference filed after a "short" period of three months where the circumstances strongly indicated forum shopping).

There is no legitimate justification for the length of the delay in this case. The Bankruptcy Court entered a scheduling order and the parties engaged in discovery in the Bankruptcy Court. There is no indication that the parties in this case spent [**9**] several months seeking to resolve their dispute through mediation, as did the parties in *Kentile Floors*, such that a significant portion of the eighteen month period should be excluded from the delay attributable to Drew. Moreover, the timing of Drew's motion to withdraw the reference gives rise to a strong inference that he is attempting to forum shop. The motion was filed in the Bankruptcy Court, and then in this Court, only three weeks after MCI moved in the Bankruptcy Court for summary judgment and for an order denying class certification.

Drew's assertions on this motion also directly conflict with his representations in 2004, in his response to MCI's objection to his claim, that the Bankruptcy Court had jurisdiction over the objection and that the claim objection was a "core proceeding" under *28 U.S.C. § 157(b)*. This contradiction provides further support for the inference that the motion to withdraw the reference is motivated by a desire to obtain what Drew hopes will be a more favorable forum for litigation of the substantive motions currently pending in the Bankruptcy Court.

In the context of this litigation, therefore, Drew's motion to withdraw [**10**] reference to the Bankruptcy Court, filed eighteen months after he became aware of MCI's objection to his claim, "does not meet the threshold requirement set forth in *28 U.S.C. § 157(d)*" that such a motion be timely. *Connolly, 1996 U.S. Dist. LEXIS 8059, 1996 WL 325575 at *3*.

**CONCLUSION**

For the reasons explained above, Drew's motion to withdraw the reference to the Bankruptcy Court is **denied.**

**SO ORDERED.**

**Dated: New York, New York**

**July 24, 2006**

2006 U.S. Dist. LEXIS 52318, *10

**John G. Koeltl**                                        **United States District Judge**

LEXSEE 2004 BANKR. LEXIS 2124



Analysis
As of: Dec 09, 2007

**In re: ENRON CORP., et al., Reorganized Debtors. ENRON CORP., et al., Plaintiffs, v. CITIGROUP INC., et al., Defendants.**

**Chapter 11, Case No. 01 B 16034 (AJG), Adv. Pro. No. 03-9266 A**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 Bankr. LEXIS 2124*

**September 23, 2004, Decided**

**NOTICE:**    [*1] NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Claim allowed by *Enron Corp. v. Citigroup, Inc. (In re Enron Corp.), 349 B.R. 108, 2006 Bankr. LEXIS 2990 (Bankr. S.D.N.Y., 2006)*

**DISPOSITION:**    Part of motion to dismiss counts 69 to 76 of Complaint as related to Nile transaction, granted, with leave to amend. Portion of motion seeking more definite statement, denied.

**COUNSEL:** For Enron Corp. and Enron North America Corp., Plaintiff: Susman Godfrey L.L.P., Houston, TX; Togut, Segal & Segal LLP, New York, NY; Frank A. Oswald, Togut, Segal & Segal LLP, New York, NY; H. Lee Godfrey, Sussman Godfrey, L.L.P., Houston, TX; Harold D. Jones, Jaspan Schlesinger Hoffman, LLP, Garden City, NY.

For Enron Development Funding, Ltd., Enron Energy Services, Inc., Enron Broadband Services, Inc., Enron Natural Gas Marketing Corp., Enron North America Corp., Plaintiffs: H. Lee Godfrey, Sussman Godfrey, L.L.P., Houston, TX.

For Enron Corp., Plaintiff: H. Lee Godfrey, Sussman Godfrey, L.L.P., Houston, TX; Scott Eric Ratner, Togut, Segal & Segal LLP, New York, NY.

For Citigroup Inc. et al., Defendant: Douglas R. Davis, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY; Stephen J. Shimshak, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY.

For Royal Bank of Scotland plc, Defendant: Lee A. Armstrong, Jones Day, New York, NY; Sevan Ogulluk, Jones Day, New York, NY.

For Long Lane Master Trust IV, Fleet National Bank, FleetBoston Financial Corp., Defendants: John C. Ertman, Ropes & Gray, LLP, New York, NY; Matthew M. [*2] Burke, Ropes & Gray LLP, Boston, MA.

For Canadian Imperial Bank of Commerce, Defendant: Andrew D. Shaffer, Mayer, Brown, Rowe & Maw LLP, New York, NY.

For Barclays Capital Inc., Barclays Bank PLC, Barclays PLC, Defendants: Hugh M. McDonald, Allen & Overy, New York, NY.

For Delta Energy Corporation, Defendant: Jeffrey S. Saltz, Philadelphia, PA.

For Credit Suisse First Boston International (USA), Inc., Credit Suisse First Boston, Inc., Pershing LLC, ERNB Ltd., Credit Suisse First Boston International, DLJ Capital Funding, Inc., Credit Suisse First Boston LLC,

Merchant Capital, Inc., Credit Suisse First Boston (USA), Inc., Defendants: Richard W. Clary, Cravath, Swaine & Moore, LLP, New York, NY.

For Merrill Lynch Capital Services, Inc., Merrill Lynch & Co., Inc., Defendants: Michael J. Riela, Gibson, Dunn & Crutcher LLP, New York, NY; Michelle Craven, Gibson, Dunn & Crutcher, LLP, New York, NY.

For RBC Dominion Securities Corporation, RBC Holdings (USA) Inc., RBC Dominion Securities Limited, RBC Dominion Securities Inc., Royal Bank Holding Inc., Royal Bank of Canada, Defendants: John R. Ashmead, Seward & Kissel, LLP, New York, NY.

For Hawaii II 125-0 Trust, **[*3]** Hawaii I 125-0 Trust, Defendants: Yann Geron, Geron & Associates, P.C., New York, NY.

For Credit Suisse First Boston, Cayman Island Branch, DLJ Fund Investment Partners III, L.P., Defendant: Richard W. Clary, Cravath, Swaine & Moore, LLP, New York, NY.

For Enron Euro Credit Linked Notes Trust, Enron Sterling Credit Linked Notes Trust, Enron Credit Linked Notes Trust II, Enron Credit Linked Notes Trust, Yosemite Securities Company, Ltd., Yosemite Securities Trust I, The Bank of New York, as Indenture Trustee and Collateral Agent, Counter-Claimants: Ronald L. Cohen, Seward & Kissel, New York, NY.

**JUDGES:** Arthur J. Gonzalez, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** Arthur J. Gonzalez

**OPINION**

DECISION AND ORDER CONCERNING CSFB'S PARTIAL MOTION TO DISMISS DEBTORS' AMENDED COMPLAINT AND MOTION FOR MORE DEFINITE STATEMENT

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron Corp. (the "Debtor") and certain of its affiliated entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On April 8, 2002, the Court directed the appointment of an examiner in these cases

**[*4]** pursuant to *11 U.S.C. § 1104(c)* to inquire into, *inter alia*, all transactions involving special purpose vehicles or entities created or structured by or for the Debtors, and transactions not reflected on the Debtors' balance sheets or not reflected in the respective debtor's financial statements in accordance with generally accepted accounting principles. On May 24, 2002, an order was entered approving the appointment of Neal Batson, Esq., as the examiner (the "Examiner"). At various intervals, the Examiner filed reports concerning these cases. On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases.

Prior to confirmation of the Debtors' Plan, in December 2003, the Debtors commenced an adversary proceeding against various banks and investment banks (collectively, the "Defendant Banks") which the Debtors allege were substantially responsible for the Debtors downfall. In the Complaint, the Debtors allege that the Defendant Banks participated with various senior officers of managers (the "Insiders") of the Debtors to manipulate the Debtors' financial **[*5]** statements and misstate the Debtors' financial condition. Allegedly, the purpose of the scheme was to disguise the disparity between the company's reported revenues and its real earnings and to conceal the amount of the companies' debt. The various counts of the Complaint seek (i) under *section 550 of the Bankruptcy Code* to recover transfers made in connection with improper structured finance transactions, including preferential transfers under *section 547(b)* and fraudulent transfers under *sections 544* and *548* of the Bankruptcy Code and applicable state law; (ii) based on the avoidable transfers, to disallow claims the defendants filed against the Debtors' estates, pursuant to *section 502(d) of the Bankruptcy Code*; (iii) the equitable subordination under *sections 510* and *105* of the Bankruptcy Code of the claims against the Debtors' estates made by the defendants submitting proofs of claim; (iv) to recover damages suffered as a result of the Bank Defendants alleged participation in the scheme to manipulate and misstate the Debtors' financial condition; and (v) to recover for the Bank Defendants alleged aiding and abetting the Insiders' fraud and for civil conspiracy. In addition, with **[*6]** respect to defendants that have filed or on whose behalf claims have been filed, the adversary proceeding was brought as a counterclaim to such claims.

Included among the Bank Defendants are various related entities: Credit Suisse First Boston, Inc., Credit

Suisse First Boston (USA), Inc., Credit Suisse First Boston LLC (formerly known as Credit Suisse First Boston Corporation), Credit Suisse First Boston International, Credit Suisse First Boston International (USA), Inc., Pershing LLC (formerly known as Donaldson, Lufkin & Jenrette Securities Corporation), DLJ Capital Funding, Inc., DLJ Fund Investments Partners III, L.P., ERNB Ltd., and Merchang Capital, Inc. (collectively, "CSFB"). In the Complaint, the Debtors allege that each of the CSFB entities acted as the control person, successor, agent, co-conspirator, co-venture partner and/or alter-ego of the others as to matters discussed in the Complaint. The Debtors assert that CSFB knowingly assisted the Insiders in manipulating and misstating the Debtors' financial condition. In the Complaint, the Debtors detail CSFB's role in several allegedly improper transactions including a transaction referred to as the "Nile" transaction.

[*7] In the Complaint, the Debtors allege that CSFB played an essential role in the structuring of the Nile transaction. The Debtors describe how the Nile transaction was accounted for as a Financial Accounting Standard 140 ("FAS 140") transaction. The Debtors allege that accounting for the Nile transaction in this manner was improper because the transaction did not comply with the requirements for a FAS 140 transaction and that the transaction was not reported as GAAP required.

The financial accounting standard referred to as FAS 140 concerns the accounting treatment of transfers of financial assets and their liabilities to special purpose entities ("SPEs"). The use of such FAS 140 transactions enabled the Debtors to remove assets and liabilities from their balance sheet and to recognize gains and cash flow from the transfers. To qualify as the type of FAS 140 transaction that would permit the Debtors to exclude the assets and liabilities from their balance sheet required that certain conditions be met. Specifically, there is a requirement that an independent third party have at least a 3% equity investment of the fair value of the SPE, and that the equity investment be at risk during [*8] the entire term of the SPE. The Debtors assert that between 1998 and the date the Debtors filed for bankruptcy protection, the Debtors participated in more than forty FAS 140 transactions. The Debtors allege, however, that in most of the transactions that purported to comply with the 3% equity rule, the Insiders promised such equity owners that the Debtors would repay the equity

investments. As a consequence, the Debtors allege that the equity was not at risk and the accounting for such transactions under FAS 140 was improper under GAAP. The Debtors allege that this conclusion is supported by the reports filed by the Examiner. In his reports, the Examiner concluded that each FAS transaction on which he reported, including the Nile transaction, should be recharacterized as a loan, and that the Insiders, with the support of the Bank Defendants filed misleading and inaccurate financial statements.

CFSB filed a motion, pursuant to *Fed. R. Bankr. P. 7012* and *Fed. R. Civ. P. 12(b)(6)* and *12(e)*, for partial dismissal of the Debtors' Amended Complaint and for a more definite statement. The portion of the motion seeking partial dismissal of the complaint was filed with respect to the counts [*9] of the Complaint that relate to the Nile transaction. CSFB contends that the Debtors' allegations concerning the Nile transaction revolve around a "single allegation that there was a par value put" which would enable CSFB to obtain the return of all of its equity investment and, therefore, CSFB's equity investment was not actually at risk. CSFB argues that the Debtors' allegation in this regard is contradicted by the Nile closing documents -- specifically, the Limited Liability Company Agreement of Pyramid I Asset LLC (the "Asset Agreement"). According to CSFB, the Asset Agreement specifies that CSFB only had the right to "put" the equity investment back at "fair market value" and not at par value. Further, CSFB contends that because the Asset Agreement had a merger clause, its terms governed the treatment of the return of the equity investment and the "put" to the Debtors and that, therefore, the Debtors cannot look to other CSFB internal documents to contradict the Asset Agreement's terms. CSFB argues that because the Asset Agreement placed the risk of the equity investment on it, the accounting for the Nile transaction was proper and the Debtors claims fail as a matter of law. As [*10] the Debtors did not attach the Asset Agreement to the Complaint, CSFB attached it as an exhibit to its motion.

The Debtors argue that, on a motion to dismiss, the Court is constrained to accepting the facts as pleaded by the plaintiff in a complaint and that the Debtors' Complaint does not rely on the Nile transaction closing documents, which includes the Asset Agreement, to support its allegation that CSFB's equity investment was not at risk. Rather, the Debtors contend that they rely on CSFB's own contemporaneous internal documents that

reflect that it viewed the Nile equity investment as not at risk, as well as post-closing documents. In addition, the Debtors urge that the Examiner reached the same conclusion in his reports where the Examiner determined that the CSFB internal documents could form the basis of a reasonable fact-finder's conclusion that CSFB's "equity" investment was not at risk in the Nile transaction and that CSFB aided and abetted the Insiders' breach of fiduciary duty in connection with that transaction.

With respect to the portion of the motion seeking a more definite statement, the Debtors argue that the Complaint is only required to provide defendants with [*11] fair notice of the claims. CSFB argues that it is entitled to a more specific statement of which CSFB defendant each allegation pertains. CSFB maintains that each CSFB entity is entitled to know the particular wrongdoing alleged against it and should not be required to guess which allegations refer to which defendants. The Debtors counter that CSFB is aware of the CSFB entity against which each allegation pertains because the avoidance actions are directed to the transferees of the transfers specified in the particular counts of the Complaint concerning avoidance actions against CSFB entities and the equitable subordination and common law claims are directed to the CSFB entities that participated in the improper transactions identified in the Complaint. The Debtors contend that CSFB knows at least as much about which entities received initial and subsequent transfers as the Debtors know and that CSFB knows more than the Debtors about the decisions made by the various CSFB entities. Therefore, the Debtors argue that the motion seeking to require the Debtors to plead more detail about facts that CSFB should know at least as well as the Debtors lacks merit and should be denied.

### DISCUSSION

[*12] *Fed. R. Civ. P. 12(b)(6)* is incorporated into bankruptcy procedure by *Fed. R. Bankr. P. 7012(b)*. In considering a *12(b)(6)* motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York, 53 F.3d 465 (2d Cir. 1995)*. The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992)*.

In considering such a motion, although the Court accepts all the factual allegations in the complaint as true,

the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286 106 S. Ct. 2932, 2944 92 L. Ed. 2d 209 (1986)*. Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir. 2000)*.

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless [*13] a liberal one." *Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)*. Pursuant to *Fed. R. Civ. P. 8(a)*, which is made applicable to adversary proceedings by *Fed. R. Bankr. P. 7008*, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99,103, 2 L. Ed. 2d 80 (1957)*. The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Conley, 355 U.S. at 47-48, 78 S. Ct. at 103*. Based upon the liberal pleading standard established by *Rule 8(a)*, even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir. 1997)*. In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations [*14] that matter. *Id., citing, Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 600 (2d Cir. 1991)* (other citations omitted).

In reviewing a *12(b)(6)* motion, the court may consider the allegations in the complaint, exhibits attached to the complaint or incorporated therein by reference, matters of which judicial notice may be taken, *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)*, and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Industrs. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir. 1991)*. However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)*. Rather, a necessary prerequisite for the court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the

pleading. *Id. at 153 n.3.* (citation omitted).

In contrast, when assessing the sufficiency of the complaint, **[*15]** the court does not consider extraneous material because considering such material would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id. at 154.* Moreover, the plaintiff would be prejudiced as it lacked notice that such material would be considered. *Id. at 153.* Therefore, a court must either exclude such material from its consideration of the *12(b)(6)* motion or convert the motion to one for summary judgment providing the parties the opportunity to conduct discovery and supplement the record with additional material to support a *Fed. R. Civ. P. 56* motion. *Id. at 154.*

Nevertheless, in determining a *12(b)(6)* motion, a court may consider a document even where a plaintiff has chosen not to attach that document to the complaint or incorporate it by reference where the plaintiff relies heavily on such document and it is integral to the complaint. *Chambers v. Time Warner, Inc., 282 F.3d at 153, citing, Int'l Audiotext Network, Inc. v. American Telephone and Telegraph Co., 62 F.3d 69, 72 (2d. Cir. 1995).*

Finally, to **[*16]** survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).* A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. *Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).*

Thus, for the purposes of this motion to dismiss, the Court accepts as true all of the material allegations in the Committee's complaint. However, the Court has also determined that it is appropriate to consider the Asset Agreement when considering CSFB's motion to dismiss. Although the Debtors did not attach the contract to the complaint, they rely heavily on its terms and effect and the contract is integral to the complaint, therefore the Court can consider its terms in deciding this *12(b)(6)* motion. *See Int'l Audiotext Network, Inc., 62 F.3d at 72.* Indeed, the basis for CSFB's participation in the Nile transaction is the Asset Agreement. The "put" of the equity investment to the Debtors that the Complaint references derives from the Asset Agreement. In their argument, **[*17]** the Debtors appear to reference an oral

"side deal" where CSFB obtained assurances of return of the equity investment apart from the terms of the Asset Agreement. The Debtors, however, have not pleaded such facts in the Complaint. An additional argument raised by the Debtors is that the transaction was not "fairly presented" by the Debtors in their financial statements as the Debtors allege that the equity investment had some sort of protection that would not coincide with a fair market value return. However, the Debtors have not pleaded this in their Complaint. While the Complaint does not allege these arguments, the Debtors should be afforded an opportunity to amend the Complaint to more specifically set forth their arguments concerning the Nile transaction especially in light of the Examiner's conclusion that there were improprieties infusing the transaction. Therefore, the Court grants the portion of the motion that seeks partial dismissal of the Complaint and dismisses counts 69 to 76 of the Complaint solely as those counts relate to the Nile transaction, however, the Court affords the Debtors leave to amend the Complaint as it relates to the Nile transaction within 120 days from **[*18]** the entry of this Order.

With respect to the portion of the motion seeking a more definite statement, the Court denies this request. *Fed. R. Civ. P. 8(a)* only requires a short and plain statement of claim showing that the pleader is entitled to relief. The Complaint provides a summary of the allegations against CSFB and identifies the particular transactions at issue. CSFB has fair notice of the claims. As noted by the Debtors, the avoidance actions are directed to the transferees of the transfers specified in the particular counts of the Complaint concerning avoidance actions against CSFB entities and the equitable subordination and common law claims are directed to the CSFB entities that participated in the improper transactions identified in the Complaint. CSFB knows which entities received initial and subsequent transfers and CSFB knows more than the Debtors about the decisions made by the various CSFB entities. CSFB can respond to the Complaint as the facts at issue are entirely within CSFB's knowledge. They are aware how the CSFB entities are organized and which particular CSFB entity participated in the described transactions. Moreover, CSFB is afforded an opportunity for discovery **[*19]** and there are other pre-trial procedures which permit CSFB to obtain more detail as to the basis of the claim and as to the disputed facts and issues.

Based upon the foregoing, it is hereby

2004 Bankr. LEXIS 2124, *19

Ordered, that the portion of the motion seeking to dismiss counts 69 to 76 of the Complaint as related to the Nile transaction is granted with leave to amend within 120 days of entry of this Order; and it is further

Ordered, that the portion of CSFB's motion seeking a more definite statement is denied.

Dated: New York, New York

September 23, 2004

**Arthur J. Gonzalez**

UNITED STATES BANKRUPTCY JUDGE

LEXSEE 1990 BANKR. LEXIS 2728



Analysis
As of: Dec 06, 2007

In re: FRANKLIN RIDGEWOOD ASSOCIATES, Debtor; FRANKLIN
RIDGEWOOD ASSOCIATES, Plaintiff v. CATWIL CORPORATION, BARTON
R. ROBERTSON, DAVID W. FISHER, Defendants

Bankruptcy No. 89-12992S, Adversary No. 90-0591S Chapter 11

UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*1990 Bankr. LEXIS 2728*

October 11, 1990

COUNSEL: [*1] Brian Flaherty, Esq., Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pennsylvania, (Attorney for Plaintiff).

J. Gregg Miller, Esq., Pepper, Hamilton & Scheetz, Philadelphia, Pennsylvania, (Attorney for Defendants).

Raymond H. Lemisch, Esq., Adelman Lavine Gold & Levin, Philadelphia, Pennsylvania, (Attorney for Debtor.

Nicholas LePore, Esq., Schnader, Harrison, Segal & Lewis, Philadelphia, Pennsylvania, (Attorney for Creditors' Committee).

Elit Felix, Esq., Norristown, Philadelphia, Pennsylvania, (Attorney for Defendants in state-court).

James J. O'Connell, Esq., Ass't. U. S. Trustee, Philadelphia, Pennsylvania, (U. S. Trustee).

JUDGES: David A. Scholl, United States Bankruptcy Judge.

OPINION BY: SCHOLL

OPINION

REPORT AND RECOMMENDATIONS OF

BANKRUPTCY JUDGE SUR DEFENDANTS' MOTION TO DISMISS, TRANSFER AND/OR ABSTAIN, AND THEIR DEMAND FOR A JURY TRIAL

The Defendants in this adversary proceeding, Catwil Corporation ("Catwil"), Barton R. Robertson ("Robertson"), and David W. Fisher ("Fisher"), filed, on September 17, 1990, a Motion requesting that this court, alternatively, dismiss, transfer and/or abstain from hearing this proceeding and a Demand for a Jury Trial. In their Motion, the Defendants argue that this [*2] proceeding should be transferred to the Eastern District of Missouri ("the EDMO") pursuant to *28 U.S.C. § 1412*; that Robertson and Fisher should be dismissed from this proceeding because the court lacks personal jurisdiction over them; and that this bankruptcy court should abstain from hearing this proceeding. Because of the dictates of Bankruptcy Rule ("B.Rule") 5011(b), it is necessary that, as to the aspect of the motion requesting abstention, we file a Report and Recommendations to the district court, which then must finally determine it. Because not only the other aspects of the Defendants' Motion, but also the issues of whether this matter is core in nature and whether the Defendants are entitled to a jury trial, are matters which this bankruptcy court must determine and which are intertwined with not only each other, but with a

separate motion of the Defendants to the district court to withdraw the reference of this proceeding, these issues are all also addressed herein.

We conclude that the proceeding in issue is core; that the Defendants are not entitled to a jury trial; and that dismissal as to Robertson and Fisher or transfer of venue would be inappropriate. We recommend [*3] that abstention be denied. Because we are prepared to try this proceeding non-jury forthwith, we refuse to stay the proceeding pursuant to B.Rule 5011(c) pending the district court's disposition of the motion for withdrawal of reference or the request for abstention.

The instant underlying bankruptcy case is related to the cases of FRG, Inc. ("FRG"); FRP Limited Partnership ("FRP"); and FMI Limited Partnership ("FMI"). The cases of FRG, FRP, FMI, and four (4) other partnerships structured similarly to the Debtor arrived in this court as the result of a successful motion by a creditor of FRG, FRP, and FMI to transfer the venue of those cases from the Southern District of New York to this court, reflected in a decision of July 28, 1989, by the Honorable Howard C. Buschman III and reported at *107 B.R. 461*. This particular Debtor filed its bankruptcy case in this court shortly after that decision, on August 15, 1989.

The sole business of the Debtor, a Pennsylvania limited partnership, is ownership and operation of an apartment building consisting of 252 residential units located at 100 Ridgegate Lane, St. Peters, Missouri ("the Premises"). The Debtor took over operation of the Premises [*4] in February, 1989. Prior to that date, the Premises was operated by Catwil, the developer of the project. In January, 1989, the Debtor commenced a lawsuit, with various other FRG-related partnerships, against Catwil, Robertson, and Fisher, guarantors of Catwil's obligations, in the Court of Common Pleas of Montgomery County, Pennsylvania, at No. 89-00374 ("the CCP Action"). The Debtor has alleged, in the CCP Action, that the Defendants breached their obligations to the Debtor under a Management Agreement by failing to make mortgage payments totalling $ 66,419.32; under a Development Agreement by failure to construct the Premises in a good and workmanlike manner; and under the Management Agreement by failing to maintain the Premises properly. Damages of "at least $ 250,000" were sought.

The Plan of Reorganization proposed by the Debtor, confirmed on May 30, 1990, provided that the Debtor would continue its operation of the Premises. Although the Debtor contemplated obtaining revenues from its operations, it recognized that raising additional capital from its limited partners was also necessary to maintain ownership of the Premises. Therefore, the Plan provides that, if an effort of [*5] the Debtor to raise capital fails, it will result in relief from the automatic stay for the mortgagees and taxing authority creditors of the Debtor and the dismissal of the case.

The instant adversary proceeding was commenced on July 9, 1990, by the Debtor's filing a counterclaim against Catwil, which had previously filed a proof of claim in the amount of $ 126,840 against the Debtor. The Complaint included counterclaims against not only Catwil, but also claims against Robertson and Fisher, the principals of Catwil, on their personal guarantees of Catwil's performance. The Debtor's allegations are apparently congruent with those asserted in the CCP Action.

On August 16, 1990, prior to the original trial date of August 29, 1990, we listed this proceeding for a settlement conference before the Honorable Judith H. Wizmur of the District of New Jersey. The outcome of that conference was a stipulated scheduling Order of August 17, 1990, requiring the Defendants to respond to the Complaint by August 21, 1990; setting a schedule for discovery culminating in a trial on October 24, 1990; and indicating that Judge Wizmur would preside over a further conference, ultimately scheduled on October [*6] 3, 1990. In lieu of an answer, the Defendants filed a brief precursor to the motion presently before us, on August 24, 1990. Believing this submission to be interposed mostly for delay and finding it not in compliance with Local B.Rule 9014.1, we dismissed this motion in an Order of September 6, 1990, summarily denying it without prejudice and directing the Defendants to answer the Complaint's counterclaims against them by September 10, 1990. An Answer was filed, but the instant motion and the motion to withdraw the reference were also filed, again, we suspect, primarily for delay.

Judge Wizmur was unsuccessful in resolving this matter on October 3, 1990, mostly because the parties interposed an intention to resolve all of the disputes between all of the FRG-related entities and Catwil, which was beyond Judge Wizmur's undertaking. The parties jointly requested that the trial be continued until November 14, 1990, to which our accompanying Orders

accedes with the caveat that this will be the last continuance granted.

By reference to the Defendants' motion to withdraw the reference to the district court, we have ascertained that the Defendants concede that this matter is a core proceeding [*7] as to Catwil, because Catwil has filed a proof of claim in this case subjecting it to a counterclaim thereto, *see 28 U.S.C. § 157(b)(2)(C)*, but that the matter is not core as to Robertson and Fisher, because they have made no similar claims against the estate. We will not accede to this attempt to dichotomize this proceeding. The claims of the Debtor against Robertson and Fisher arise solely from their actions on behalf of their own entity, Catwil. The claims of the Debtor against Robertson and Fisher are thus purely derivative from their claims against Catwil.

In *In re Direct Satellite Communications, Inc., 91 B.R. 7, 8 (Bankr. E.D. Pa. 1988)*, we held that a proceeding in which the claimant-defendant joined non-claimant-third-party defendants was a core proceeding in its entirety under *28 U.S.C. § 157(b)(2)(C)*. Here, the nexus between the claimant and the non-claimant parties is much closer than in *Direct Satellite.* Therefore, as in *Direct Satellite,* we conclude that this entire proceeding is core in nature.

In *Direct Satellite,* we also concluded that the fact that a *§ 157(b)(2)(C)* proceeding is part and parcel of the bankruptcy claims process rendered the entire [*8] proceeding equitable in nature and therefore precluded a jury trial as to any of the claims therein. *91 B.R. at 8-9.* In light of the controlling enlightenment provided in *Granfinanciera v. Nordberg, 109 S.Ct. 2782, 2798-99 (1989)*, we would now reason that the filing of a claim by the counterclaim defendant gave rise to a "public right" as opposed to a "private right," precluding a jury trial. *See In re Light Foundry Associates, 112 B.R. 134, 136-38 (Bankr. E.D. Pa. 1990).* However, the result would be the same. Since the proceeding concerns litigation arising directly out of the bankruptcy claims process and all of the causes of action stated against the non-claimants are interwoven with those against the claimant, as in *In re 222 Liberty Associates, 99 B.R. 639, 344-45 (Bankr. E.D. Pa. 1989)*, no jury trial right attaches.

A matter factually analogous to the instant proceeding is *In re Covey, 892 F.2d 829, 836-37 (9th Cir. 1989)*, in which a non-claimant controlled by a claimant was held to be not entitled to a jury trial. Here, Robertson

and Fisher were officers of Catwil who apparently controlled it, making the elements of privity identical and the equities in their [*9] favor less than those present in the case of the non-claimant party in Cove. Therefore, we conclude that no jury trial right attaches to any portion of this proceeding, and we will proceed to determine it non-jury at the forthcoming trial.

Robertson and Fisher, in another of their unconvincing efforts to separate themselves from their corporation, Catwil, challenge this court's personal jurisdiction over them. They apparently concede valid service upon them under B.Rule 7004(b)(1) and (d). However, they contend that, since they are residents of California, where they serve as officers and directors of Catwil, a California corporation, and have rarely set foot in Pennsylvania, this court's exercise of personal jurisdiction over them would contravene the *Fifth Amendment due process clause*, as interpreted in *International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)*; *In re Real Estate & Settlement Services Antitrust Litigation, 869 F.2d 760, 766 n. 6 (3d Cir. 1989)*; and *Oxford First Corp. v. PNC Liquidating Corp., 372 F.Supp. 191, 198-205 (E.D. Pa. 1974)* (BECKER, J.). Thus, the Defendants' position posits the very ambitious proposition that the nationwide service of process [*10] set forth in the Bankruptcy Rules is unconstitutional.

The Defendants are unable to cite any case supporting this proposition, nor any court applying the *Oxford First* or any other test to determine whether service is constitutional under the Bankruptcy Code. The cases to the contrary are legion. *See, e.g., In re Continental Airlines, Inc., 61 B.R. 758, 767-69 (S.D. Tex. 1986)*; *Windsor Communications Group, Inc. v. Grant, 75 B.R. 715, 733-38 (E.D. Pa. 1985)*; *In re Geauga Trenching Corp., 110 B.R. 638, 647-49 (Bankr. E.D. N.Y. 1990)*; *In re Rusco Industries, Inc., 104 B.R. 548, 550-52 (Bankr. S.D. Ga. 1989)*; *In re GEX Kentucky, Inc., 85 B.R. 431, 434-35 (Bankr. N.D. Ohio 1987)*; *In re Prospect Hill Resources, Inc., 69 B.R. 79, 80 (Bankr. N.D. Ga. 1986)*; *In re Allegheny, Inc., 68 B.R. 183, 187-91 (Bankr. W.D. Pa. 1986)*; In *re F/S Airlease II, Inc., 67 B.R. 428, 430-31 (Bankr. W.D. Pa. 1986)*; [1] *In re Whippany Paper Board Co., 15 B.R. 312 (Bankr. D. N.J. 1981)*; and *In re Nixon Machinery Co., 15 B.R. 131 (Bankr. E.D. Tenn. 1981)*.

1    This decision is cited by the Defendants in support of their motion to change venue. *See*

pages 11-12 *infra.*

[*11] We agree with the conclusion of this legion of cases that Congress has specifically authorized nationwide service of process in bankruptcy matters due to the unique proclivity of bankruptcy cases to involve a large number of parties residing in a wide variety of American jurisdictions. We further recognize that the "purpose of giving bankruptcy courts broad *in personam* jurisdiction in bankruptcy matters is to avoid the fragmentation of litigation that is often a factor in administering a bankruptcy case." *GEX Kentucky,* supra, 85 B.R. at 34, citing, *In re Bell & Beckwith, 41 B.R. 697, 699 (Bankr. N.D. Ohio 1984).* The federal Securities Acts at issue in *Oxford First* contained no language comparable to B.Rule 7004(d), expressly authorizing nationwide service of process. *See,* e.g., *Rusco Industries, supra, 104 B.R. at 551-51*; *Prospect Hill, supra, 69 B.R. at 80*; and *Allegheny, supra, 68 B.R. at 187.* We therefore do not believe that Judge Becker or any other member of the Court of Appeals would be inclined to apply the *Oxford First* test to the Bankruptcy Code and Rules. [2]

> 2   However, if the *Oxford First* test were applied to the instant facts, we believe that the result would be identical with that reached in *Oxford First, 372 F.Supp. at 203-05,* i.e., that the due process claims of the particular defendants in issue lack merit. Assuming *arguendo* that the first prong of the five-prong *Oxford First* test, to which Robertson and Fisher devote most of their attention, i.e., their purported lack of contacts with this jurisdiction, is met, the other prongs are not met. The preferred jurisdiction of the Defendants and the alleged situs of discovery is the EDMO, which is a long plane-ride (albeit a shorter long plane-ride than Philadelphia) from the Defendants' residence and place of business in California. Judicial economy would be served by having all of the litigation involving this debtor and the FRG-related entities and Catwil conducted in the same jurisdiction, i.e., here. The activities of Catwil as to the FRG-related entities throughout the country suggest that the Defendants' activities took place and impacted events far beyond California's boundaries.

[*12] Consequently, we conclude that the motion of Robertson and Fisher to dismiss this proceeding for lack of personal jurisdiction has no merit.

The Defendants alternatively seek to transfer the venue of this proceeding to the EDMO. The EDMO is of course not their own place of residence or business, which is in California. Rather, they seek to transfer it to the situs of the Premises, the EDMO, perhaps taking a cue from Judge Buschman's decision in *FRG,* or that in which we transferred the venue of another FRG-related entity to the situs of the realty owned by it, *In re Boca Raton Sanctuary Associates, 105 B.R. 273 (Bankr. E.D. Pa. 1989).*

However, it must be recalled that the instant motion does not, like the motions under *28 U.S.C. § 1412* in issue in *FRG* or *Boca Raton,* seek to transfer an entire case to another jurisdiction, but only one proceeding arising out of the case. We said, of a similar motion, in *In re American International Airways, Inc., 66 B.R. 642, 645 (Bankr. E.D. Pa. 1986),* that

given "the desirability of centering all litigation involving a debtor in the bankruptcy court where the bankruptcy case is pending," *[In re Windsor Communications Group.* [*13] *Inc., 53 B.R. 293, 295 (Bankr. E.D. Pa. 1985)]*, and the fact that "the plaintiff's choice of forum should rarely be disturbed," *id. at 296,* it is clear that the Defendant's assertion that it will be inconvenienced by being forced to litigate in a bankruptcy court in approximately equal measure to that which the Debtor would be compelled to experience if it were forced to litigate in the district court where the Defendant is located cannot come close to carrying the day for it.

Clearly, the policy of "centering" the Debtor's litigation in this Court would be totally frustrated if we granted the Defendant's Motion.

Therefore, a bankruptcy court is far more inclined towards the transferring of an entire case to another jurisdiction, where the entire case can still be "centered," than lopping off a piece of it for another jurisdiction to consider.

We do not believe that applying the eight-part test set forth in *F/S Airlease, supra,* the Defendants' primary authority, accurately portrays the considerations which militate against transfer of this proceeding to the EDMO. Rather, we believe that the last prong of the test, which relates to "centering," is of extreme importance and [*14] is not given sufficient prominence in the *F/S Airlease* test. [3]

3  The Defendants also submitted an unsolicited Reply Brief which arrived after this Report was drafted. The practice of submitting any unsolicited supplemental brief is always disfavored, for the reasons set forth in *In re Jungkurth, 74 B.R. 323, 325-26 (Bankr. E.D. Pa. 1987)*, aff'd, 87 B.R. 333 (E.D. Pa. 1988). The only new authority cited therein on this point is *In re Leedy Mortgage Co., 62 B.R. 303 (E.D. Pa. 1986)*. With all due respect, we believe that the *Leedy* decision, like *F/S Airlease,* overlooks the critical nature of "centering" a proceeding in the court where the main case is being heard. *Leedy* also involves the distinct situation of defendants seeking to transfer a proceeding to their *own* residence and principal place of business.

Furthermore, as the progress of Judge Wizmur's efforts at settlement bore out, there is a need to center all of the litigation between FRG-related entities and Catwil and its privities in **[\*15]** a single jurisdiction, because the parties apparently deem only a global resolution appropriate.

Finally, we are unable to perceive how Missouri is much more convenient to California-based parties than Pennsylvania. A venue contest, as in *AIA, supra,* typically pits the home of the plaintiff to that of the defendant as a situs. To choose a third forum, which is the home of neither, simply because it is the situs of property which is the subject of dispute and the residence of purely hypothetical witnesses who might find it more convenient is certainly not consistent with the reasoning of *F/S Airlease* nor with good sense.

We also question whether the motion is timely, coming, as it does, more than 60 days after the commencement of the proceeding and after not only this court, but Judge Wizmur on our behalf, has expended considerable resources on it. *See,* e.g., *In re First Summit Development Corp.,* Bankr. No. 89-12209S (Bankr. E.D. Pa. Oct. 5, 1989); and *Boca Raton, supra,* 105 B.R. at 275 n. 2.

We therefore decline the Defendants' invitation to transfer the venue of this proceeding to the EDMO.

We finally reach the issue which made preparation of this Report necessary: **[\*16]** the Defendants' motion to abstain under *28 U.S.C. §§ 1334(c)(1), (c)(2)*. We begin by noting that the Defendants have not articulated to what

alternative proceeding they propose that we are to abstain. Presumably, it is to allow the pending CCP Action to go forward. We observe that such a request would be diametrically inconsistent with the motion to transfer venue to the "convenient" EDMO, since abstention of the CCP Action would result in the litigation of this matter less than thirty miles from our door in Norristown, Pennsylvania. In this respect, as in others that can be noted as we proceed, it becomes apparent that many of our previous conclusions have significantly weakened the Defendants' position regarding abstention.

It is well-established, in this jurisdiction, that "mandatory abstention," pursuant to *§ 1334(c)(2)*, is appropriate only when the following six requirements are all satisfied:

(1) a timely motion is made; (2) the proceeding is based upon a state law claim or state law cause of action; (3) the proceeding is related to a case under Title 11; (4) the proceeding does not arise under Title 11; (5) the action could not have been commenced in a federal court absent **[\*17]** jurisdiction under *28 U.S.C. § 1334*; and *(6)* an action is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction.

*See,* e.g., *In re Micro Design, Inc., Computerware, Inc. v. Micro Design, Inc.,* Misc. No. 90-0425 (E.D. Pa. August 3, 1990), *adopting* Report, slip op. at 7; *In re Taylor, 115 B.R. 498, 500 (E.D. Pa. 1990)*; *In re Container Transport, Inc., 86 B.R. 804, 806 (E.D. Pa. 1988)*; *In re Pacor, Inc., 72 B.R. 927, 932 (Bankr. E.D. Pa. 1987)*, *adopted, 86 B.R. 808 (E.D. Pa. 1988)*; and *In re Futura Industries, Inc., 69 B.R. 831, 834 (Bankr. E.D. Pa. 1987)*.

It appears that only the second and fifth requirements of the six above stated are met here. Satisfaction at the first requirement is doubtful, as the motion was not made until after an Order setting discovery deadlines and a trial date was entered. The third and fourth are not met, as this is a core proceeding, arising under *11 U.S.C. § 502(a)*. The "prior action" portion of the Sixth requirement is met only if the Defendants mean to have us abstain to the CCP Action. How timely the proceeding could be adjudicated in the CCP Action is open **[\*18]** to debate; it is doubtful that it would be tried before October 24, 1990, when we were prepared to hear it, or prior to November 14, 1990, to which date the parties have chosen to continue it. We will not only accommodate them, but will

hold them to this date.

The fact that the requirements for mandatory abstention under *§ 1334(c)(2)* are nearly met is a factor which often merits discretional abstention under *§ 1334(c)(1)*. *See Micro Design,* slip op. at 10; and *In re Joshua Slocum, Ltd., 109 B.R. 101, 107 (E.D. Pa. 1989).* Other factors may also come into play, including the predominance of an issue of particular state importance, *see In re Stephen Smith Home for the Aged, 80 B.R. 678, 682-85 (E.D. Pa. 1987);* a concern for allowing a state court to review its own judgments or agency determinations, *see In re Perry, 86 B.R. 388, 390 (E.D. Pa. 1988);* and *In re Sciortino, 114 B.R. 423, 427 (Bankr. E.D. Pa. 1990);* or a desire to avoid the sticky issue of whether a bankruptcy court may conduct a jury trial. *See Micro Design,* slip op. at 10-11.

However, the Defendants' satisfaction of the requirements for mandatory abstention are quite far off the mark on several scores. **[\*19]** No factor such as those referenced above, nor any other factors which suggest the propriety of abstentions present themselves here. In the absence of such factors, it must be recalled, that

abstention, . . . is the exception to the rule that federal courts should hear and decide matters properly before them. *See In re Earle Industries, Inc., 72 B.R. 131, 134 (Bankr. E.D.Pa. 1987); In re DeLorean Motor Co., 49 B.R. 900, 910* (Bankr. E.D. Mich. 185). "Overuse of the abstention power would defeat the clear intent of Congress to expand jurisdiction so as to facilitate the administration of bankruptcy cases." *In re Krupke, 57 B.R. 523, 528 (Bankr. W.D. Wis. 1986).*

*Ronix Corp. v. City of Philadelphia, 82 B.R. 19, 20 (E.D. Pa. 1988).*

Here, there will be no jury trial. There is a conclave of FRG-related entities having similar disputes with the parties who are defendants in this proceeding already before us. The issues of comity and judicial economy -- which might justify abstention -- all point in favor of the retention of this proceeding by this court.

We will therefore recommend that that aspect of the Defendants' motion requesting abstention be denied, as well as ordering **[\*20]** that all other aspects of the motion are denied and setting the stage for a non-jury trial before

us.

*ORDER*

AND NOW, this 11th bay of October, 1990, upon consideration of the Defendants' Motion to Dismiss, Transfer and/or Abstain and the Defendants' Demand for a Jury Trial, and the submissions of the parties relevant thereto, it is hereby ORDERED AND DECREED as follows:

1. The Deputy in Charge of Bankruptcy Operations for the United States Bankruptcy Court shall forthwith transfer the file in the above-captioned proceeding and the Report and Recommendations of Bankruptcy Judge Sur Defendants' Motion to Dismiss, Transfer, and/or Abstain, and their Demand for a Jury Trial and the proposed Order appended hereto to the Clerk of the United States District Court for the Eastern District of Pennsylvania.

2. The Defendants' Motion to Dismiss this proceeding as to Defendants ROBERTSON and FISHER for lack of personal jurisdiction is DENIED.

3. The Defendants' Motion to transfer the venue of this proceeding to the Eastern District of Missouri is DENIED.

4. It is DETERMINED that this is a core proceeding.

5. The Defendants' Demand for a Jury Trial is STRICKEN.

6. The Defendants' Motion to **[\*21]** stay this proceeding pending disposition of the abstention motion or their motion to withdraw the reference of this proceeding in the district court is DENIED.

7. The trial of this matter is continued, by agreement of the parties, to

WEDNESDAY, NOVEMBER 14, 1990, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

8. No further continuances in the trial of this proceeding shall be permitted and counsel is attached for trial from November 14, 1990, until the trial is concluded.

LEXSEE 2006 U.S. DIST. LEXIS 29656

**In re: HEDSTROM CORPORATION, et al., Debtors, HEDSTROM
CORPORATION, ERO, INC., ERO INDUSTRIES, INC., PRISS PRINTS, INC.,
ERO CANADA, INC., Plaintiffs, v. WAL-MART STORES, INC. and WAL-MART
CANADA, INC., Defendants.**

**05 C 6888**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 29656*

**April 24, 2006, Decided**

**PRIOR HISTORY:** [*1] Chapter 11, 04-38543 (Jointly Administered).

**COUNSEL:** For Hedstrom Corporation, Plaintiff: Patrick A Clisham, Shaw Guissis Fishman Glantz Wolfson, Chicago, IL; Patrick A. Clishman, Shaw Guissis Fishman Glantz Wolfson & Towbin LLC, Chicago, IL.

For Wal-Mart Stores, Inc., Defendant: Timothy R. Casey, Steven Scott Shonder, Gardner Carton & Douglas LLP, Chicago, IL.

For Wal-Mart Canada, Inc., Service List, Defendant: United States Trustee, Office of the United States Trustee, Chicago, IL; Judge Schmetterer, United States Bankruptcy Court, Chicago, IL; Kenneth S Gardner, Chicago, IL.

For Hedstrom Corporation, Debtor: Daley-Hodkin Corporation, Allen J Guon, Shaw Gussis Fishman Glantz Wolfson & Tow, Chicago, Il; Brian Ira Tanenbaum, The Law Offices Of Brian Tanenbaum, Elgin, IL; David M Neff, DLA Piper Rudnick Gary Cary US LLP, Chicago, IL; James J Teich, Shaw Gussis Fishman Glantz, etal, Chicago, IL; Janice A Alwin, Shaw Gussis Fishman Glantz Wolfson & Tow, Chicago, IL; Matthew A Swanson, Shaw Gussis Fishman Glantz, Chicago, IL; Morgan R Brazil; Patrick A Clisham, Robert M Fishman, Shaw Gussis Fishman Glantz Wolfson, Chicago, IL; Steven B Towbin, Shaw Gussis Fishman Glantz Wolfson

[*2] & Towbin LLC, Chicago, IL.

For AT&T Corp., Petitioning Creditor: Michael C. Moody, O'Rourke, Katten & Moody, Chicago, IL.

For Feralloy Corporation, Defendant, Pro se.

**JUDGES:** Judge Ronald A. Guzman. Bankruptcy Judge Jack B. Schmetterer.

**OPINION BY:** RONALD A. GUZMAN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Hedstrom Corp., Ero, Inc., Ero Industries, Inc., Priss Prints, Inc. and Ero Canada, Inc. (collectively, "Hedstrom"), which are in Chapter 11 bankruptcy proceedings, have sued defendants Wal-Mart Stores, Inc. ("Wal-Mart") and Wal-Mart Canada, Inc. ("Wal-Mart Canada") for unpaid receivables. The matter is before the Court on Wal-Mart's motion to withdraw the reference of the adversary proceeding from the bankruptcy court. For the following reasons, the motion is denied.

**Background**

October 18, 2004, Hedstrom, formerly a manufacturer, importer and distributor of sports leisure products, filed for relief under Chapter 11 of the Bankruptcy Code. (Pls.' Compl. P1.) On November 4,

2005, Hedstrom filed an adversary action against Wal-Mart and Wal-Mart Canada for unpaid receivables. (*Id.* P6.) In its answer, Wal-Mart denied owing Hedstrom for the receivables and [**3**] asserted as an affirmative defense that it is entitled to set offs for liabilities and expenses arising out of products liability and patent infringement cases involving products sold by Hedstrom to Wal-Mart. (Wal-Mart's Answer at 6.) Wal-Mart now contends that the adversary action is a non-core proceeding that should be withdrawn from the bankruptcy court and litigated here.

**Discussion**

District courts have original jurisdiction over all cases arising under Title 11 of the Bankruptcy Code. *28 U.S.C. § 1334(b).* In this district, however, bankruptcy cases are automatically referred to the bankruptcy court. *See 28 U.S.C. § 157(a)* (giving district courts power to refer cases arising under Title 11 to bankruptcy court); *LR 40.3.1 (a)* ("Pursuant to *28 U.S.C. § 157(a)*, all cases under Title 11 U.S.C. and all proceedings arising under Title 11 U.S.C. or arising in or related to any cases under Title 11 U.S.C. are referred to the bankruptcy judges of this District."). A district court may withdraw a case referred to the bankruptcy court "on its own motion or on timely motion of any party, [**4**] for cause shown." *28 U.S.C. § 157(d).* "Because withdrawal of a reference is not intended to be an 'escape hatch' from bankruptcy court into district court, courts prefer to grant such relief only in a limited class of proceedings." *In re Coe-Truman Techs., Inc. 214 B.R. 183, 185 (N.D. Ill. 1997)* (citing *In re E&S Facilities, Inc., 181 B.R. 369 (S.D. Ind. 1995), aff'd, 96 F.3d 949 (7th Cir. 1996)).* The moving party has the burden of proving that the reference should be withdrawn. *Id.* (citations omitted).

*Section 157(d)* does not define "cause," but courts generally consider the following factors in determining whether a reference should be withdrawn: "judicial economy, promotion of uniformity and efficiency in bankruptcy administration, reduction of forum shopping, delay and costs to the parties, the particular court's familiarity with the case, and whether the adversary proceeding is core or non-core." *Id. at 187.*

The most important factor is whether the adversary proceeding is core or non-core. *Id.* "'[A] proceeding is core . . . if it invokes a substantive right provided by title 11 or if it is [**5**] a proceeding that, by its nature, could arise only in the context of a bankruptcy case.'" *Barnett v.*

*Stern, Bankr. L. Rep. (CCH) 73584, 909 F.2d 973, 981 (7th Cir. 1990)* (quoting *In re Wood, 825 F.2d 90,97 (5th Cir. 1987)).* "Core proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by some other body of law, normally state." *In re U.S. Brass Corp., 110 F.3d 1261, 1268 (7th Cir. 1997).* Core proceedings include, among others, "matters concerning the administration of the estate," "allowance or disallowance of claims against the estate," and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor. . . relationship." *28 U.S.C. § 157(b)(2)(A), (B), (O).*

Hedstrom is suing Wal-Mart for breach of contract, a claim that the parties agree is non-core. (Wal-Mart's Mot. Withdraw Reference at 3; Pls.' Resp. at 5-6); *see In re Coe-Truman, 214 B.R. at 187* (noting that "breach of [**6**] contract claims have consistently and traditionally been found to be non-core") (citations omitted). What they dispute, however, is whether Wal-Mart's affirmative defense of set off transforms this otherwise non-core proceeding into a core suit.

Wal-Mart relies primarily on *In re Concept Clubs, Inc., 154 B.R. 581 (D. Utah 1993)* to support its position that the setoff defense does not alter the non-core nature of the case. In that case, the Concept Clubs bankruptcy trustee sued Jean Bob, Inc. in bankruptcy court for breach of contract and turnover of funds. *Id. at 583.* Jean Bob asserted a setoff defense, filed a jury demand and asked the court to withdraw the reference from the bankruptcy court. *Id.* Thus, the *Concept Clubs* court had to decide whether the setoff defense constituted a claim against the bankruptcy estate that waived Jean Bob's right to a jury trial and subjected it to the jurisdiction of the bankruptcy court. *Id.*

The court said no, reasoning that a claim of setoff, which seeks a monetary recovery from the bankruptcy estate, is qualitatively different from a defense of setoff, which seeks only to reduce a claim held by the [**7**] estate:

> [T]his court finds that . . . when a creditor seeks an affirmative recovery from the estate through setoff, a proof of claim must be filed. Such a requirement

follows because an affirmative recovery raised through setoff implicates the allowance and disallowance of claims against the estate. . . . [T]he process of claims allowance invokes the equitable powers of the bankruptcy court's jurisdiction. By contrast, setoff raised as an affirmative defense only reduces, or extinguishes, the amount sought by the trustee for the estate. When raised as an affirmative defense, the bankruptcy court's equitable jurisdiction is not required because setoff as a *defense* does not involve the claims allowance process.

*Id. at 589* (emphasis in original) (citation omitted). Because Jean Bob sought only to reduce the amount claimed by the estate, the court concluded that its setoff defense did not invoke the bankruptcy court's jurisdiction or waive its right to a jury trial. *Id.*

The court in *In re Commercial Financial Services, Inc. 251 B.R. 397 (Bankr. N.D. Okla. 2000)*, a case on which Hedstrom relies, reached the opposite conclusion. **[*8]** In that case, Commercial Financial Services, Inc. ("CFS"), operating as a debtor-in-possession, sued defendant Jones for breach of contract. *Id. at 400*. Like Jean Bob, Jones filed a motion to withdraw the reference and an affirmative defense of setoff and made a jury demand. *Id.*

Unlike the *Concept Clubs* court, however, the *Commercial Financial* court saw little difference between a claim of setoff and a defense of setoff:

This Court fails to see a distinction between obtaining something of value from the estate by filing a claim and obtaining something of value from the estate, *i.e.,* discharge of all or a portion of a debt to CTS, by asserting setoff as a defense. In both cases, the estate may be diminished and Jones may be enriched. Nor can the Court comprehend how asserting the defense of setoff does not seek the restructuring of debtor-creditor relations between CFS and Jones in the most classic sense. Setoff, by its very definition, requires mutual *debts and claims. 11 U.S.C. § 553(a).* Jones has

"trigger[ed] the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's **[*9]** equitable power." *Langenkamp, 498 U.S. at 44, 111 S.Ct. at 331, 112 L. Ed. 2d 343*. By alleging a right of setoff, Jones has chosen to participate (albeit in a limited manner) in the allocation of the bankruptcy estate.

*Id. at 407* (emphasis in original). Thus, the court concluded that it had core jurisdiction over CFS's breach of contract claim and Jones' setoff defense and recommended that the district court deny the motion to withdraw. *Id. at 408,412-13*.

This Court finds the reasoning of *Commercial Financial* more persuasive than that of *Concept Clubs.* Whether Hedstrom writes Wal-Mart a check or cancels Wal-Mart's receivable, the end result is the same: the bankruptcy estate will be significantly diminished. Because Wal-Mart's claimed setoff directly impacts the distribution of the bankrupt's assets, the Court holds that it falls within the bankruptcy court's core jurisdiction. *See In re Mantelman,* No. 01 C 9915, 2002 U.S. Dist. LEXIS 8071, 2002 WL 922087, at *1 (N.D. Ill. May 6, 2002) (holding defendant waived right to jury trial, and thus basis for withdrawal of reference, by asserting defense of setoff because "[a] setoff is but another way of making a claim against **[*10]** the estate, and it invokes the equitable jurisdiction of the bankruptcy court"); *In re N. Am. Energy Conservation. Inc., 2000 U.S. Dist. LEXIS 15084, Nos. 00-40563(PCB), 00-276, OOCIV4302(SHS), 2000 WL 1514614, at *2-3 (S.D.N.Y. Oct. 12, 2000)* (denying motion to withdraw reference and stating that "regardless of whether a setoff is labeled an 'affirmative defense' or a 'counterclaim,' a setoff is a claim against the bankruptcy estate").

The other factors relevant to this motion also militate against withdrawal. Judicial economy is better served by leaving the case with the bankruptcy court which, having presided over the bankruptcy case for more than a year, is already familiar with the facts and the parties. Moreover, allowing the bankruptcy court to preside over all matters related to Hedstrom, rather than splitting claims by and against Hedstrom between two courts, will conserve the parties' resources and promote the efficient administration of bankruptcy.

In short, all of the permissive withdrawal factors favor leaving this case in the bankruptcy court. Wal-Mart's motion to withdraw the reference is, therefore, denied.

**Conclusion**

For the foregoing reasons, the Court denies Wal-Mart's **[*11]** motion to withdraw the reference [doc. no. 1]. This case is hereby terminated.

**SO ORDERED.**

APR 24 2006

**HON. RONALD A. GUZMAN**

**United States District Judge**

LEXSEE 2006 U.S. DIST. LEXIS 37114



Analysis
As of: Dec 09, 2007

In the Matter of UNITED STATES LINES, INC.; NORMAN M. KEATING, et al.,
Appellants, -against- UNITED STATES LINES, INC., et al, Appellees.

No. 04 Civ. 6614 (LTS)(FM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2006 U.S. Dist. LEXIS 37114*

June 7, 2006, Decided
June 7, 2006, Filed

COUNSEL: [*1] WATERS & KRAUS, LLP, By:
Charles Siegel, Dallas, TX, Attorneys for Appellant
George Murphy.

NAGEL RICE & MAZIE, LLP, By: Herbert Waldman,
Livingston, NJ, Attorneys for Appellee.

THE MARITIME ASBESTOSIS LEGAL CLINIC, By:
Alan Kellman, Detroit, MI, Attorneys for Appellants
John White and Norman Keating.

JUDGES: LAURA TAYLOR SWAIN, United States
District Judge.

OPINION BY: LAURA TAYLOR SWAIN

OPINION

OPINION AND ORDER

LAURA TAYLOR SWAIN, United States District
Judge

Appellants George Murphy ("Murphy"), John White
("White"), and Norman Keating ("Keating") appeal an
Order of the United States Bankruptcy Court for the
Southern District of New York (Gonzalez, B.J.), dated
June 21, 2004, expunging Appellants' proofs of claim
filed in In re United States Lines, Chapter 11 case No.
86B 12238 (Bankr. S.D.N.Y.). The Court has jurisdiction
of the instant appeal pursuant to *28 U.S.C. § 158(a)(1)*.
For the following reasons, the Order of the Bankruptcy
Court is affirmed.

BACKGROUND

In November 1986, United States Lines, Inc., and
United States Lines, (S.A.) Inc. (collectively "U.S. Lines"
or "Debtor"), filed voluntary petitions for reorganization
under Chapter 11 of [*2] the Bankruptcy Code.
(Memorandum Decision Granting Trust's Motions to
Expunge Proofs of Claim, annexed to Siegel Decl., Ex. B
at 3, ("Expungement Opinion").) Pursuant to court orders
of May 16, 1989, and February 6, 1990, approving the
Debtor's plan of reorganization, U.S. Lines was
reorganized and a Trust was established that became the
successor-in-interest of the companies. The purpose of
the Trust was to administer claims of asbestos-related
injuries and other bodily injuries brought against U.S.
Lines. Faced with the prospect of ongoing claims for
late-manifesting injuries, the Trust made an application to
the Bankruptcy Court for the Southern District of New
York ("Bankruptcy Court") in April 2000 for an order
establishing, among other things, a rolling bar date,

which set the time frame within which potential future claimants could file proofs of claim.

On May 23, 2000, pursuant to *Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure*, the Bankruptcy Court granted the Trust's application and issued an order that imposed a 180-day rolling bar date for all late-manifesting claims (the "Rolling Bar Date"). (Order Establishing Rolling Bar [*3] Date, Appellant White's and Keating's Brief, Ex. 1, ("Rolling Bar Date Order").) The Rolling Bar Date Order provides that, any individual who has "come to hold a Claim against the Debtors that shall have manifested after the date of this Order . . . shall file a proof of such Claim together with any supporting documents with the Clerk of the Bankruptcy Court . . . before the 181st day following manifestation of the underlying bodily injury which is the basis for such Claim." (Id. at 3.) In other words, an individual had 180 days to file a claim against the Trust after the underlying bodily injury manifested itself.

Appellants, who were all merchant mariners who served on voyages aboard vessels owned and operated by U.S. Lines, filed proofs of claim, asserting asbestos-related injuries as follows: Keating filed his claim on November 27, 2002, White filed his claim on March 25, 2003, and Murphy filed his claim on April 8, 2003. The Trust moved to expunge these claims, arguing that Appellants' underlying physical injuries had manifested themselves more than 180 days prior to the interposition of the claims, and that the claims were thus untimely under the Rolling Bar Date Order. [*4] After full briefing and a hearing, Bankruptcy Judge Gonzalez granted the Trust's motion to expunge all three Appellants' claims. Judge Gonzalez concluded that each of the claims had been filed more than 180 days after the relevant bodily injury manifestation date. He also concluded that it was appropriate to use New York law for guidance in interpreting the injury manifestation language used in the Rolling Bar Date Order, that a jury determination as to when the relevant manifestation occurred was not required, that the Rolling Bar Date Order was adequate and did not violate due process rights, and that an excusable neglect argument interposed by Appellant Murphy had been untimely raised.

Appellant Murphy argues that the Bankruptcy Court erred in using New York law as guidance for interpreting the injury manifestation date provision of the Rolling Bar Date Order; Murphy asserts that the Bankruptcy Court should instead have looked to claim accrual principles under federal maritime law or Florida state law. Murphy also contends that the Bankruptcy Court erred in concluding that the interpretation and application of the manifestation date language of the order was a core issue not requiring [*5] a jury determination and that the Rolling Bar Date Order was constitutional. Finally, Murphy argues that the Bankruptcy Court erred in refusing to consider his excusable neglect argument. [1] Keating and White argue that the Bankruptcy Court erred in applying New York law and should instead have applied federal maritime law and, in the alterative, that their claims were timely filed even under New York law. Additionally, the Trust moves to strike portions of Keating's and White's Reply brief on the instant appeal.

> 1    In his initial appellate submission, dated October 20, 2004, Murphy argued the merits of the excusable neglect argument. By Order dated November 12, 2004, the Court declined to exercise its discretion to consider factors outside the record presented and considered by the Bankruptcy Court and stated that the Court's review of the excusable neglect argument would be limited to the Bankruptcy Court's decision not to entertain the argument. (Order, dated November 12, 2004, at 1.) Murphy thereafter filed an amended brief on appeal.

[*6] DISCUSSION

On appeal, the legal determinations of the bankruptcy court are reviewed de novo and its findings of fact are reviewed under a clearly erroneous standard. See *In re Financial News Network Inc., 980 F.2d 165, 169 (2d Cir. 1992); In re Ionosphere Clubs, Inc., 184 B.R. 648, 653 (S.D.N.Y. 1995)* and authorities cited therein. The district court reviews a bankruptcy judge's interpretation of its own orders for abuse of discretion. *Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.), 352 F.3d 671, 678 (2d Cir. 2003).*

*Use of New York Law to Interpret the Rolling Bar Date Order*

Appellants argue that the Bankruptcy Court improperly relied on New York law to interpret its May 23, 2000, Order. The gravamen of their argument is that the Bankruptcy Court should have applied claim accrual principles, based on appellants' knowledge of the cause of their injuries in addition to awareness of their physical

injuries, in determining when their injuries became manifest within the meaning of the May 23, 2000, Rolling Bar Date Order. Appellants contend that, under federal maritime law (specifically, the Jones Act) and Florida state tort law [*7] [2], asbestos-related claims such as those asserted here accrue for statute of limitations purposes only when the claimant is both aware that he has suffered a physical injury and is aware that asbestos was the cause of the injury.

> 2  Appellant Murphy argues for the application of Florida law based on his residence in Florida at the time of his diagnosis.

The fundamental flaw in Appellants' argument is that Judge Gonzalez was not construing or applying a statute of limitations in making his determination as to whether their claims were barred under the May 23, 2000, Order. Rather, he was construing the terms of that prior court order, which was entered pursuant to the claims administration powers granted to the Bankruptcy Court by federal bankruptcy law. Indeed, the Bankruptcy Code's definition of "claim" is much broader than non-bankruptcy concepts of accrued claims ripe for suit and encompasses, inter alia, rights to payment "whether or not such right is reduced to judgment, liquidated, unliquidated, [*8] fixed, contingent, matured [or] . . . unmatured." *11 U.S.C.A. § 101(5)(A) (West 2005)*. Under the Bankruptcy Code, the definition of a claim is to be given the broadest possible application. See *In re Manville Forest Prods. Corp., 209 F.3d 125, 128 (2d Cir. 2000)* ("Congress gave the term claim a broad definition and 'contemplate[d] that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'") (quoting *In re Chateaugay Corp., 944 F.2d 997, 1003 (2d Cir. 1991)*). Claims, no matter how remote or contingent, must be asserted within the context of the bankruptcy proceeding lest the debtor be discharged from liability in connection with them. See, e.g., *In re Johns-Manville Corp., 57 B.R. 680, 687 (Bankr. S.D.N.Y. 1986)*.

Judge Gonzalez's Rolling Bar Date Order recognizes that a certain class of claimants would not even show symptoms of asbestos-related injuries until after the date of the Order. In that Order, he exercised his power to "fix . . . the time within which proofs of claim . . . may be filed" [3] so that such future claimants could [*9] assert their claims in a manner consistent with the just and efficient administration of the estate.

> 3  *Fed. R. Bankr. P. 3003(c)*.

A bar date can be likened to a statute of limitations in that both should be strictly observed. See *In re Enron Corp., 298 B.R. 513, 520 (Bankr. S.D.N.Y. 2003)*. However, as Judge Gonzalez recognized in his decision expunging Appellants' claims, "[s]ince Bankruptcy *Rule 3003(c)* provides the bankruptcy court with discretion to extend the bar date for filing late Chapter 11 proofs of claim, the rule is clearly not a true statute of limitations." (Expungement Opinion at 22-23.)

Thus, it is proper interpretation of Judge Gonzalez' Rolling Bar Date Order, rather than concepts of claim accrual, upon which this Court focuses in determining whether Judge Gonzalez erred in applying the manifestation date language of that Order. The Rolling Bar Date Order gave asbestos-related or other late-manifesting bodily injury claimants claims against [*10] U.S. Lines 180 days to file a proof of claim "following manifestation of the underlying bodily injury which is the basis for such claim." (Rolling Bar Date Order at 3.) When faced with a question as to the interpretation of the "manifestation of underlying bodily injury" language in the order Judge Gonzalez turned, as he had in an earlier contested matter in the U.S. Lines bankruptcy proceeding involving a similar issue under the Rolling Bar Date Order, [4] to authorities interpreting a New York statute of limitations provision that employs a similar focus on the physical manifestation of an injury (as opposed to its underlying cause) in triggering a limitations period for claims for latent injury. (See *N.Y. CPLR § 214-c* (McKinney 2006); Expungement Opinion at 23.) Noting that a "central purpose" of the Rolling Bar Date Order was "to provide a uniform time limit for filing proofs of claim . . . in order to offer a predictable mechanism in assisting the Trust to eventually terminate its operations," [5] Judge Gonzalez found that New York law was a reasonable choice as an interpretive aid because U.S. Lines was situated in New York, most of the places of shipment and discharge were [*11] in New York and most merchant mariners thus executed contracts with U.S. Lines in New York, and New York was the forum state. (Expungement Opinion at 23.) This choice was also consistent with the plain language of the Rolling Bar Date Order, which specifies "underlying bodily injury" as the triggering factor.

> 4  See Memorandum Decision Granting Trust's Motions to Expunge Proofs of Claim, annexed to

Siegel Decl., Ex. R, ("Bence Opinion").
5   Expungement Opinion at 23.

The only relevant issue here is whether Judge Gonzalez' abused his discretion in using New York law to interpret "manifestation" in his Rolling Bar Date Order. The Court finds that he did not. It made sense to use New York law because of the numerous contacts the state had with this case. Moreover, the plain language of the Order contemplated a bar date period beginning at the occurrence of the underlying injury. It thus was reasonable to use New York law as a guide because New York's statute of limitations contemplates a similar **[*12]** notion of manifestation. See *N.Y. CPLR § 214-c* (McKinney 2003); *Wetherill v. Eli Lilly & Co.(In re N.Y. County DES Litig.), 89 N.Y.2d 506, 513, 678 N.E.2d 474, 655 N.Y.S.2d 862 (N.Y. 1997)*. Because claim accrual for non-bankruptcy statute of limitations purposes is not at issue, Appellants' choice of law arguments are inapposite.

*Timeliness of White's and Keating's Claims under the Rolling Bar Date Order*

White and Keating argue that their claims were timely filed even if the manifestation clause of the Rolling Bar Date Order is interpreted using New York law.

The Bankruptcy Court expunged Keating's and White's claims, finding that each individual was aware of a primary symptom of his asbestos-related injury more than 180 days prior to his filing of a claim. (Expungement Opinion at 25-26.) Specifically, Judge Gonzalez found that White was aware of a major symptom of his mesothelioma by reason of the presence of a "large pleural effusion coupled with a possible lung mass, as well as experiencing shortness of breath over three weeks prior to his admission to the hospital." (Id. at 27.) Similarly, Judge Gonzalez found that Keating was aware of a lung mass, which was a "manifestation of a consequential symptom **[*13]** or physical condition" of his asbestos-related lung cancer. (Id. at 25-26.)

The Rolling Bar Date Order provides that all future claimants must file a claim "before the 181st day following manifestation of the underlying bodily injury which is the basis for such Claim." (Rolling Bar Date Order at 3.) Similarly, under New York law, "the time for bringing the action begins to run . . . when the injured party discovers the primary condition on which the claim is based." *Wetherill v. Eli Lilly & Co., 89 N.Y. 2d 506,*

*509, 678 N.E.2d 474, 655 N.Y.S.2d 862 (N.Y. 1997)*; see *N.Y. CPLR § 214-c* (McKinney 2003). New York's concept of primary condition discovery requires a showing of a manifestation of a significant classic symptom of the specific occupational related disease. *Cochrane v. A C & S, Inc., 1998 U.S. Dist. LEXIS 14633, No. 92-8841, 1998 WL 642719 at *8 n.1 (Sept. 18, 1998 S.D.N.Y.)*. An unqualified diagnosis of the cause of the symptoms or plaintiff's understanding of the cause of the symptoms is not, however, necessary. Id. at 3. "Once recognizable symptoms of a condition are sufficiently present, the limitations period begins to run." Id.

White and Keating argue that the symptoms cited **[*14]** by Judge Gonzalez are indicative of a number of illnesses or even no illness and that Judge Gonzalez erred in concluding "that these symptoms are symptoms of the 'primary condition' or are 'classic symptoms' of [an asbestos-related disease.]" (Keating Br., 17.) Appellants' arguments are focused chiefly on a medical report that was presented to the Bankruptcy Court but has not been made part of the record on appeal. The Court has, however, reviewed the extensive quotations from that report in Appellant's brief on appeal, as well as the decision below and the medical reports that have been included in the record on appeal, and finds that the Bankruptcy Court's conclusion that White and Keating's relevant physical injuries were symptoms of asbestos-related disease and first manifested more than 180 days before they filed their respective proofs of claim is not clearly erroneous as a factual determination and that the court's determination that the claims were untimely is not incorrect insofar as it constitutes an interpretation of the terms of the Rolling Bar Date Order.

*The Burden of Proof on the Issue of Timeliness*

Keating and White contest the Bankruptcy Court's analysis **[*15]** of the parties' respective burdens of proof in connection with their filings of proofs of claim. Bankruptcy *Rule 3001(f)* provides the starting point for determining who carries the burden when a proof of claim is filed. *Fed. R. Bankr. P. 3001(f)* (West 2005). Judge Gonzalez noted that, under this rule, a properly filed proof of claim "constitutes prima facie evidence of the validity and amount of the claim." (Expungement Opinion at 24.) He also recognized that, under *section 502(a) of the Bankruptcy Code*, unless a party objects to a proof of claim, it is deemed allowed. (Id.) Citing *In re St. Johnsbury Trucking Co., Inc., 206 B.R. 318, 323 (Bankr.*

Case 1:07-cv-10612-GEL    Document 16-11    Filed 12/11/2007    Page 5 of 7

Page 5
2006 U.S. Dist. LEXIS 37114, *15

*S.D.N.Y. 1997)*, Judge Gonzalez reasoned that, once a party negates the prima facie validity of a proof of claim, the burden shifts back to the claimant, who then bears the ultimate burden of persuasion. (Expungement Opinion at 24.) Judge Gonzalez determined that, while Appellants Keating and White presented prima facie claims, the Trust sufficiently negated the claims and Appellants did not carry their ultimate burden of showing the claims were timely filed. **[*16]** (Id. at 25-27.)

Keating and White argue that Judge Gonzalez improperly relied on In re St. Johnsbury Trucking Co., Inc., and should have relied, instead, on *Cummings Props., LLC v. Dwyer (In re Admetric Biochem, Inc.), 284 B.R. 1 (Bankr. D. Mass. 2002)*. Appellants argue that the former case involves a tax claim and is therefore not comparable to this case. Appellants also suggest that In re Admetric Biochem, Inc. stands for the proposition that, when dealing with statute of limitations or other affirmative defenses, the burden does not shift back to claimants after the party has rebutted a prima facie claim; rather, the opposing party has the ultimate burden of disproving the timeliness of the claim.

It is important to recognize that burdens of proof apply in the bankruptcy context as they would in a non-bankruptcy context. See *Raleigh v. Illinois Department of Revenue, 530 U.S. 15, 20, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000)*. In this case, the issue is not the merits of the personal injury claims but their timeliness under the Rolling Bar Date Order. While a rolling bar date pursuant to *Rule 3003(c)* is obviously unique to bankruptcy, an analysis of the burdens of proof in the statute of limitations **[*17]** context provides the most relevant non-bankruptcy equivalent. Under New York law, the party invoking a statute of limitations bears the burden of proof for establishing such an affirmative defense. See *Bano v. Union Carbide Corp., 361 F.3d 696, 710 (2d Cir. 2004)*. However, if the defendant demonstrates that the claim is untimely, the burden shifts to the plaintiff to show that its comes within an exception to the time bar. See *Pompa v. Burroughs Wellcome Co., 259 A.D.2d 18, 22, 696 N.Y.S.2d 587 (3d Dep't 1999)*; see also *Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d 221, 224 n.5 (2d Cir. 1998)* (In federal statute of limitations case, "[a]lthough reliance on a statute limitations is generally an affirmative defense, we believe that petitioner's prima facie showing that the three-year limit had run properly shifted the burden to the respondent to invoke one of the exceptions."). Contrary to Appellants' suggestion, this burden-shifting analysis is consistent with In re Admetric Biochem, Inc., where the court held that, "if the trustee succeeds in establishing [its affirmative defense] . . . the ultimate burden of **[*18]** proving the validity of its claim by a preponderance of rests on the claimant." *In re Admetric Biochem, Inc., 284 B.R. at 7*. Judge Gonzalez' determination that claimants bore the ultimate burden of proving the validity of their claim was, accordingly, correct, as was his determination that Appellants had failed to carry their burden.

*Manifestation as a Core Issue*

Murphy argues that manifestation was not a core issue, as Judge Gonzalez concluded, but rather an issue that should have been decided by a jury at the district court level. There are two related but separate issues here: first, whether the issue of manifestation was a core issue upon which Judge Gonzalez had authority pursuant to *28 U.S.C. section 157(b)(1)* to enter a judgment expunging Murphy's personal injury claim as untimely and, second, whether Murphy is entitled as a matter of law to a jury trial on the issue of when his claim manifested. See generally *In re Ben Cooper, 896 F.2d 1394 (2d Cir. 1990)* (finding that core proceeding determination is separate from jury trial determination).

The Court finds that Judge Gonzalez had the authority to enter a judgment **[*19]** based on his determination of this issue. Bankruptcy courts may hear and enter judgments on all "core proceedings," a category of proceedings that is specifically defined to include determinations on the "allowance or disallowance of claims against the estate." *28 U.S.C. § 157(b)(2)(B) (West 2005)*. This District "has recognized the authority of the Bankruptcy Court to apply statute of limitations and related dispositive legal defenses in the disallowance of claims, including personal injury claims." *U.S. Lines, Inc. v. U.S. Lines Reorganization Trust (In re U.S. Lines, Inc.), 262 B.R. 223, 234 (S.D.N.Y. 2001)*, relying on *In re Chateaugay Corp., 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1997)*, aff'd in part and rev'd on other grounds, *961 F.2d 378 (2d Cir. 1992)*. Judge Gonzalez had the authority to determine when the claim manifested because the question of timeliness was a threshold question pertaining to the allowance of the claim. Murphy's invocation of the *28 U.S.C. section 157(b)(2)(B)* core jurisdiction exception for estimation of contingent or unliquidated personal injury tort claims is unavailing, because the issue here is not the estimation of **[*20]** damages but,

rather, whether the claim was timely filed. The statutory exception does not "deprive bankruptcy courts of any jurisdiction to disallow personal injury [claims.]" *In re Chateaugay Corp., 111 B.R. at 75*. "A bankruptcy court has the right and duty to disallow claims as a threshold matter, if no legal basis for the claim exists against the debtor." *Id. at 77* (emphasis in original).

The Court also finds that Murphy is not entitled to a jury trial on the issue of when his claim manifested. Murphy notes correctly that *section 1411* of the Federal Judiciary Code preserves the right to a jury trial in the bankruptcy context with regard to personal injury and wrongful death cases. See *28 U.S.C.A. § 1411 (West 2005)*. However, the manifestation date determination at issue goes not to the merits of his personal injury claim but, rather, to whether the claim can be pursued in the context of the U.S. Lines bankruptcy proceeding. A claimant waives a right to a jury trial when filing a proof of claim against a debtor in bankruptcy court on those issues that directly bear on the allowance of a claim or are integral to [*21] the bankruptcy process. See *Langenkamp v. C.A. Culp, 498 U.S. 42, 44-45, 111 S. Ct. 330, 112 L. Ed. 2d 343 (1990)*; *Germain v. Connecticut National Bank, 988 F.2d 1323, 1329 (2d Cir. 1993)* ("It is reasonable that a creditor or debtor who submits to the equity jurisdiction of the bankruptcy court thereby waives any right to a jury trial for the resolution of disputes vital to the bankruptcy process.").

Murphy was not entitled to a jury trial on the issue of manifestation because the timing of the claim was integral to determining whether it could be allowed. *In re Hooker Investments, Inc., L.J., 937 F.2d 833, 840 (2d Cir. 1991)* (finding that "[a] bar order does not function merely as a procedural gauntlet, . . . but as an integral part of the reorganization process) (internal quotations and citation omitted); See also *In re Standard Insulations, Inc., 138 B.R. 947, 951 (Bankr. W.D. Mo. 1992)* (Though *28 U.S.C. § 1411* provides for jury trials for personal injury claims, "the court concludes from the statutory language that jury trials are not required for personal injury claims at the claims allowance stage."), abrogation on [*22] other grounds recognized by *In re Broadmoor Country Club & Apt., 158 B.R. 146 (Bankr. W.D. Mo.1993)*.

*Due Process Argument*

Murphy argues that the application of the Rolling Bar Date to defeat his claim violated his due process rights under the Constitution because the Rolling Bar Date Order was interpreted to measure the 180-day limitation period from the physical manifestation of the asbestos-related injury rather than from the diagnosis of asbestos-related injury or other identification of the link between the physical injury and exposure to asbestos. [6]

> 6  Murphy also argues that future claimants like himself were not adequately represented in connection with the formulation of the Rolling Bar Date Order. Because this issue was not raised before the Bankruptcy Court (see Siegel Decl., Ex. P; Murphy's Reply Br. at 7 n.3), the Court considers it waived and declines to review it. See *Diesel v. Town of Lewisboro, 232 F.3d 92, 107-8 (2d Cir. 2000)* (declining to review an argument because it was raised for first time on appeal and therefore waived).

[*23] Murphy's due process argument fails because the language of the Rolling Bar Date Order itself was plainly sufficient to put future claimants on notice that the initial physical manifestation of disease, as opposed to an asbestos-related diagnosis, is the operative event for Rolling Bar Date purposes. The Order specifically provided that claims had to be filed "before the 181st day following manifestation of the underlying bodily injury." (Rolling Bar Date Order at 3.) Furthermore, Murphy was represented by counsel in a Texas state court action against one of the debtors and others, seeking damages for an asbestos-related injury, by February 2003 at the latest [7] and thus clearly had both knowledge that he had an asbestos-related claim and opportunities to seek any necessary clarification well before the Rolling Bar Date expired as to his claim.

> 7  See Siegel Decl., Ex. U.

*Excusable Neglect Argument*

Murphy argues that the Bankruptcy Court erred in not considering his excusable neglect argument. [*24] Murphy filed a supplemental memorandum arguing excusable neglect one day before the adjourned Bankruptcy Court hearing in the case. Judge Gonzalez declined to consider the argument because it was untimely filed.

Local Bankruptcy *Rule 9006-1(b)* requires that all "answering papers shall be served so as to ensure actual

receipt not later than three days before the return date." *S.D.N.Y. L.B.R. 9006-1(b)* (2005). Judges have discretion to decide when "a departure from [a court's] Local Rules should be excused or overlooked." Cf. *Somlyo v. J. Lu-Rob Enterprises, Inc., 932 F.2d 1043, 1048 (2d Cir. 1991)* (discussing the inherent power of district court judges to depart from the requirements of the local rules). The applicable standard is whether following the local rules would "cause an unjust result." Id. In making this determination, courts should consider a number of factors including "the facts of the case, the content and goal of the Local Rules, the legal precedent on analogous issues, and the letter and legislative intent of any relevant statute." Id. Local Bankruptcy *Rule 9006-1(b)* is an adaptation of Southern District *Local Civil Rule 6.1* (see Comment **[*25]** to Southern District Bankruptcy *Rule 9006-1(b)* (2005)), the purpose of which is to "protect defendants and plaintiffs alike from being ambushed." *Chieco v. International Brotherhood of Teamsters, 175 F.R.D. 467, 469 (S.D.N.Y. 1997)*. A district court reviews decisions within the discretion of a bankruptcy court for abuse of discretion. See e.g. *In re Integrated Resources, Inc., 157 B.R. 66, 72 (S.D.N.Y. 1993)*.

Given the factual circumstances of the instant matter and the purpose of *Rule 9006-1(b)*, the Court finds that Judge Gonzalez did not abuse his discretion in declining to consider the merits of Murphy's excusable neglect argument. Murphy filed his supplemental brief nearly a week after the original January 28, 2004, return hearing

date and one business day before the actual hearing on February 4, 2004. (See Expungement Opinion at 10.) Murphy proffered no reason for his belated attention to this issue, which had been the subject of earlier Trust claim-related litigation. (See Bence Opinion at 18-23.) Neither did he seek additional time from the court to file his supplemental memorandum (See Expungement Opinion at 29). Accordingly, the **[*26]** Court finds no basis to overturn the Bankruptcy Court's decision not to consider the excusable neglect argument.

CONCLUSION

For the foregoing reasons, the June 21, 2004, Order of the United States Bankruptcy Court for the Southern District of New York in Chapter 11 Case Nos. 86B 12238, 86B 12240, 86B 12241 (AJG), expunging Appellants' claims, is affirmed. The Trust's request to strike portions of Keating's and White's reply brief is denied as moot.

SO ORDERED.

Dated: New York, New York

June 7, 2006

LAURA TAYLOR SWAIN

United States District Judge

LEXSEE 1997 U.S. DIST. LEXIS 16654



Analysis
As of: Dec 06, 2007

**IN RE: THE LENDER'S DECISION, INC., Debtor, THE LENDER'S DECISION,
INC., an Illinois corporation, Plaintiff-counterdefendant vs. COMERICA
BANK-ILLINOIS, an Illinois Banking corporation, Defendant-counterplaintiff,
third party plaintiff vs. DAVID ARMISTEAD, Third party defendant.**

**No. 96 C 5470**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1997 U.S. Dist. LEXIS 16654*

**October 14, 1997, Decided**

**DISPOSITION:** [*1] Comerica Bank-Illinois'
renewed motion to withdraw reference [16-1] denied.
Case remanded.

**COUNSEL:** For THE LENDER'S DECISION, INC.,
plaintiff: George Edward Bullwinkel, Bullwinkel
Partners, Ltd., Chicago, IL.

For COMERICA BANK-ILLINOIS, defendant: William
J. Raleigh, Margaret Mary Cahill, Raleigh & Cahill, P.C.,
Chicago, IL.

**JUDGES:** Suzanne B. Conlon, United States District
Judge.

**OPINION BY:** Suzanne B. Conlon

**OPINION**

**MEMORANDUM OPINION AND ORDER**

The Lender's Decision, Inc. ("TLD") is a chapter 11
debtor. TLD filed an adversary proceeding against
Comerica Bank-Illinois ("Comerica") in bankruptcy
court, seeking to recover income allegedly due under a

service contract with Comerica. Before the court is
Comerica's renewed motion to withdraw reference of the
adversary proceeding from bankruptcy court to federal
district court, pursuant to *28 U.S.C. § 157(d)*.

**BACKGROUND**

On July 29, 1996, TLD filed a voluntary petition for
relief under chapter 11 of the bankruptcy code. The next
day, TLD filed an adversary proceeding against Comerica
in bankruptcy court, asserting pre-bankruptcy petition
breach of contract claims and seeking a declaratory
judgment. This court denied Comerica's [*2] previous
motion to withdraw the reference from the bankruptcy
court pursuant to *28 U.S.C. § 157(d)*. See Minute Order,
No. 96 C 5470 (N.D. Ill. Sept. 27, 1996). The court
stated, "If this case goes to trial and a jury is
constitutionally required, Comerica might (but will not
automatically) have cause to withdraw the reference." Id.
Because it was unclear at that early stage of the
proceedings whether a jury trial would be constitutionally
required, or whether any trial at all would be necessary,
Comerica's motion to withdraw reference was denied
without prejudice. Id. The matter was remanded to the
bankruptcy court for further proceedings.

Back in bankruptcy court, Comerica responded with

ten affirmative defenses and a three-count counterclaim. The counterclaim alleges several varieties of fraud by TLD and its principal, David Armistead. Comerica filed a proof of claim against the TLD estate, based on its counterclaim in the pending adversary proceeding. At the close of discovery, Comerica submitted a motion for summary judgment, which the bankruptcy judge denied. With trial now approaching, Comerica renews its motion to withdraw reference of the adversarial proceeding **[*3]** from bankruptcy court to federal district court.

## DISCUSSION

Federal districts courts may refer cases and proceedings involving or relating to bankruptcy matters to bankruptcy judges. *28 U.S.C. § 157(a)*. Withdrawal of a reference to the bankruptcy court is discretionary when cause is shown and mandatory when nonbankruptcy federal laws are at issue. *28 U.S.C. § 157(d)*. Courts apply mandatory withdrawal narrowly, requiring a "significant and material application of a nonbankruptcy federal statute." *In re Mahlmann, 149 B.R. 866, 870 (N.D. Ill. 1993)* (citations omitted). The parties do not suggest that mandatory withdrawal is applicable here. Thus, the issue is whether cause exists for permissive withdrawal.

The burden to establish cause is on Comerica as the movant. To determine whether cause exists, courts consider such factors as "judicial economy, convenience, and the particular court's knowledge of the facts." *In re Sevko, Inc., 143 B.R. 114, 117 (N.D. Ill. 1992)* (citing *In re Ramex Intern., Inc., 91 B.R. 313, 315 (E.D. Pa. 1988)*). Other factors include promoting the uniformity and efficiency of bankruptcy administration, reduction of forum shopping and confusion, **[*4]** conservation of debtor and creditor resources, whether the parties are entitled to a jury trial, and whether the claims involved are core bankruptcy proceedings. Id. (citing *Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp., 106 B.R. 367, 371 (D. Del. 1989)*; *In re McCrory Corp., 160 B.R. 502 (S.D.N.H. 1993)*; see also *In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993)*.

### I. Core Claims v. Non-Core Claims

Some courts have stressed that in addressing a motion to withdraw reference, the initial consideration should be whether the claim is a core bankruptcy proceeding or whether it is non-core. See *In re Orion Pictures Corp., 4 F.3d at 1101*. The Bankruptcy Code divides claims in bankruptcy proceedings into the categories "core" and "non-core." Bankruptcy judges have the authority to "hear and determine all ... core proceedings arising under title 11 ... and may enter appropriate orders and judgments, subject to review under [*28 U.S.C. § 158*]." *28 U.S.C. § 157(b)(1)*. With respect to non-core claims, unless the parties consent, the bankruptcy court can only make recommended findings of fact and conclusions of law which are subject to **[*5]** *de novo* review in the district court. *28 U.S.C. §§ 157(c)(1) and (2)*. Core proceedings are those arising in or under Title 11 cases. Proceedings arising under Title 11 "involve a cause of action created or determined by a statutory provision of title 11." *In re Wood, 825 F.2d 90, 96 (5th Cir. 1987)*. Proceedings arising in a Title 11 case involve "'administrative' matters that arise only in bankruptcy cases" and "would have no existence outside of bankruptcy." *Id. at 97* (e.g., filing a proof of claim). Non-core proceedings have a potential effect on the estate, but "do not invoke a substantial right created by the bankruptcy law." Id.

Comerica argues withdrawal of the reference should be favored because TLD's pre-petition contract claims do not qualify as core bankruptcy proceedings. In the complaint, TLD asserted its claims were core. TLD emphasizes that despite Comerica's active participation in litigating these claims, Comerica never asked the bankruptcy judge to consider whether TLD's claims were truly core, and the bankruptcy judge never ruled on the issue. TLD argues this issue may not properly be raised for the first time before this court. To support its **[*6]** TLD points to the language of the Bankruptcy Code. "The bankruptcy judge *shall* determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." *28 U.S.C. § 157(b)(3)* (emphasis added). To be sure, bankruptcy judges should always determine whether a proceeding is core; *§ 157(b)(3)* could not be more clear on that point. The critical question is what district courts should do when bankruptcy judges fail to make that determination.

TLD states *§ 157(b)(3)* is silent on whether a district court can (or should) take up the issue in the first instance. Comerica asserts bankruptcy judges *usually* determine whether a claim is core in the first instance, but they need not do so. For this proposition, Comerica cites to *§ 157(b)(3)* and *Peachtree Lane Associates, Ltd. v.*

*Granader, 175 B.R. 232 (N.D. Ill. 1994)*. These citations fail to support Comerica's assertion. First, *§ 157(b)(3)* provides bankruptcy judges shall determine whether a proceeding is core; Comerica fails to explain why "shall" should be interpreted as "usually." Second, Peachtree **[*7]** is inapposite. In Peachtree, the bankruptcy court already ruled the proceeding at issue was core. *175 B.R. at 238* ("Our reasoning on this issue parallels the reasoning of the bankruptcy judge and therefore ... extensive discussion of the issue ... would be wholly duplicative."). The parties cite no relevant case authority. Whether a district court should determine the core/non-core issue in the first instance is a question that has arisen most infrequently, and courts are split as to its proper resolution. See, e.g., *Mellon v. Delaware & Hudson Ry. Co., 122 B.R. 887 (D. Del 1991)* (bankruptcy judges required to determine whether the proceedings are core before a withdrawal of reference motion is presented to the district court); *Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp., 106 B.R. 367, 369 - 70 (D. Del. 1989)* (determination whether proceeding is core should be made in the first instance by the bankruptcy court; motion to withdraw reference was premature, or else *§ 157(b)(3)* would be circumvented); but see *In re Keene Corp., 182 B.R. 379, 383 (S.D.N.Y. 1995)* (this determination not clearly and exclusively in the bankruptcy court; no reason to cause further **[*8]** delay by requiring bankruptcy judge to make the initial determination).

*Section 157(b)(3)* is silent on whether a district court can determine whether a proceeding is core in the first instance. Other courts provide no clear guidance; nor do the parties adequately brief the issue. Typically, the determination whether a proceeding is core is an important consideration in deciding a motion to withdraw reference. It is not, however, a dispositive factor; it is but one element of a multi-factor balancing test. For reasons developed more fully below, on this record the court would deny Comerica's motion to withdraw reference whether or not TLD's claims are core bankruptcy proceedings. Because a bankruptcy judge's initial determination of the core/non-core issue would not alter the result of this motion to withdraw reference, there is no reason to cause further delay by denying the motion as premature. Therefore, to the extent other decisions have required as a matter of necessity that a bankruptcy judge rule on the core/non-core issue before a district court hears a motion to withdraw reference, the court respectfully declines to follow those cases.

The court also declines to rule on the **[*9]** underlying core/non-core issue, as its determination would not change the balance of factors pointing to denial of Comerica's motion to withdraw reference. Putting aside whether district courts have the power to determine the core/non-core issue in the first instance, prudential considerations weigh heavily in favor of allowing bankruptcy judges to make the initial determination where doing so is a practical course of action. Defining "core bankruptcy proceeding" -- even in the context of pre-petition contract claims -- can be one of the most challenging theoretical issues in bankruptcy law. It is an issue bankruptcy judges confront on a routine basis. Congress clearly expressed a preference that bankruptcy judges make the initial determination. There is no other plausible interpretation of its command that the bankruptcy judge "shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." *28 U.S.C. § 157(b)(3)*. The court hesitates to override that preference in this case, where the parties have not adequately briefed the core/non-core **[*10]** issue, and its determination is unnecessary to decide the motion.

## II. Other Factors

Comerica argues withdrawal should be favored because it is entitled to a jury trial. In a separate motion, Comerica petitions this court for leave to appeal the bankruptcy judge's order striking Comerica's jury demand. The bankruptcy judge ruled as follows:

> The law is well established that when a creditor files a proof of claim in a bankruptcy case, or files a counterclaim in an adversary proceeding, it consents to jurisdiction by the bankruptcy court and loses its *Seventh Amendment* right to a jury trial. *Peachtree Lane Associates, Ltd. v. Granader, 175 B.R. 232, 236 (N.D. Ill. 1994)*, citing *Langenkamp v. Culp, 498 U.S. 42, 112 L. Ed. 2d 343, 111 S. Ct. 330 (1990)*.... At the time [Comerica's first motion to withdraw reference was denied], it was unclear whether a jury trial would be required. However, Comerica, by its own actions, answered that question by filing a proof of claim in the bankruptcy

case and counterclaims in this adversary proceeding.

Order, No. 96 A 1054 (Bankr. N.D. Ill. July 15, 1997). Comerica argues the bankruptcy judge erred. Comerica further **[*11]** argues the Seventh Circuit does not allow jury trials in the bankruptcy courts, and that this factor alone establishes cause to withdraw the reference. For this proposition, Comerica cites Peachtree and *In re Grabill, 967 F.2d 1152, 1158 (7th Cir. 1992)*; Comerica's reliance is misplaced. After the cases cited by Comerica were decided, Congress added *§ 157(e)* to the Bankruptcy Code. *Section 157(e)* specifically empowers bankruptcy judges to conduct jury trials if specially designated to do so, and with the consent of the parties. Under Local Rule 426, all bankruptcy judges in the district are specially designated to conduct jury trials.

Regardless, the court finds Comerica lost its *Seventh Amendment* right to a jury trial when it voluntarily filed its proof of claim and its counterclaims in the adversary proceeding. In *Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989)*, the Supreme Court recognized that by filing a claim against an estate, a creditor triggers the process of allowance and disallowance of claims, thereby subjecting itself to the bankruptcy court's equitable power. *Id. at 58 - 59* and n. 14. Comerica responds that this **[*12]** logic places it in a "classic 'Catch-22' situation": it was forced to choose between giving up its right to a jury trial or waiving its causes of action against TLD and Armistead. However, Comerica's proof of claim plainly indicates the debt it seeks to recover was incurred before TLD filed its bankruptcy petition. See Opposition Ex. A. Even assuming Comerica's counterclaims were part of the same transaction or occurrence as TLD's contract claim, *Bankruptcy Rule 7013* converts pre-petition counterclaims that would otherwise be compulsory (under FRCP 13) into permissive counterclaims. Thus, as a technical matter, Comerica would not have waived its claims by failing to file them as counterclaims in the adversary proceeding.

Comerica might respond by arguing that as a practical matter, it had to file its proof of claim and the counterclaims in the adversary proceeding in order to have any chance at collecting from the TLD estate. The Second Circuit, responding to that very argument, has stated:

The Bank's argument ignores the fundamental principle underlying the Supreme Courts decisions in Langenkamp and Granfinanciera, which is that filing a proof of claim is not **[*13]** merely a means of providing information to the bankruptcy court, but is a means of invoking the bankruptcy courts equitable jurisdiction over the bankruptcy estate to establish the creditors right to participate in the distribution of the estate. (citations omitted) By seeking to preserve both its ability to file a proof of claim and its right to a jury trial, the Bank wants to invoke the bankruptcy courts equitable jurisdiction so that it may share in the distribution of Debtor's bankruptcy estate, but avoid the bankruptcy courts equitable jurisdiction so that the Bank can obtain a jury trial in the adversary proceeding. The Bank offers no basis, however, for disregarding the general rule of Langenkamp and Granfinanciera....

*In re Hooker Investments, Inc., 937 F.2d 833, 839 (2nd Cir. 1991)*. This argument applies with full force to the facts of the present case. Even if filing a proof of claim were not enough to transform the legal disputes into equitable issues, Comerica's dispute with TLD became part of the claims-allowance process once Comerica filed its three-count counterclaim in the adversary proceeding. See *Peachtree, 175 B.R. at 236* (citing cases); In **[*14]** re *Schwinn Bicycle Co., 184 B.R. 945 (Bankr. N.D. Ill. 1995)*. TLD correctly argues Comerica places undue emphasis on the fact that this court denied Comerica's previous motion to withdraw reference without prejudice. After that ruling, Comerica actively sought out the equitable jurisdiction of the bankruptcy court by voluntarily filing a proof of claim and a three-count counterclaim. In light of the clear precedent in this district on the significance of those actions, Comerica cannot claim surprise that it has lost its right to a jury trial.

Other factors sometimes used to demonstrate cause for permissive withdrawal include judicial convenience, the particular court's knowledge of the facts, promoting the uniformity and efficiency of bankruptcy administration, reduction of forum shopping and confusion, and the conservation of debtor and creditor

resources. Comerica asserts judicial economy will be served and resources for both parties will be conserved by this court hearing the matter in the first instance, instead of conducting a *de novo* review of the bankruptcy court's findings. Comerica fails to explain why, in this particular case, withdrawal of the reference on the eve **[*15]** of trial will save resources or serve the interest of judicial economy. Even assuming the adversarial proceeding is non-core and *de novo* review will be required, Comerica's conclusory assertions are insufficient to justify withdrawal of the reference. Simply because a claim is non-core, it does not follow that resources will automatically be saved by withdrawal of the reference. Indeed, if resources were always wasted by the trial of non-core claims in bankruptcy court, the code would mandate that all references of non-core claims be withdrawn. Rather, bankruptcy courts often hear non-core claims because of the convenience of consolidating related proceedings, the familiarity of the court with the litigation, the uniformity of bankruptcy administration, and the reduction of forum shopping. Even assuming TLD's claims are non-core, these factors point strongly against withdrawal of the reference. Comerica has not met its burden of demonstrating cause.

**CONCLUSION**

Comerica Bank-Illinois' renewed motion to withdraw reference is denied.

ENTER:

Suzanne B. Conlon

United States District Judge

October 14, 1997

LEXSEE 2002 U.S. DIST. LEXIS 8071



Analysis
As of: Dec 06, 2007

In re: JEFFREY A. MANTELMAN, Debtor. FRANCES F. GECKER, not individually but as Chapter 7 Trustee, Plaintiff, vs. CATHERINE CLARE MANTELMAN, Defendant.

Case Number: 01 C 9915

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2002 U.S. Dist. LEXIS 8071*

May 3, 2002, Decided
May 6, 2002, Docketed

**PRIOR HISTORY:** *In re Mantelman v. Clare, 2002 U.S. Dist. LEXIS 1707 (N.D. Ill. Feb. 1, 2002).*

**DISPOSITION:** [*1] Motions to strike jury demand and for reconsideration of withdrawal of reference granted, and withdrawal of reference vacated.

**COUNSEL:** For CATHERINE CLARE MANTELMAN: Richard A. Del Giudice, Earl Edward Farkas, Gozdecki and DelGiudice, Chicago, IL.

For FRANCES F GECKER: Joseph Daniel Frank, Freeborn & Peters, Chicago, IL.

**JUDGES:** JAMES B. MORAN, Senior Judge, U. S. District Court.

**OPINION BY:** JAMES B. MORAN

**OPINION**

*MEMORANDUM OPINION AND ORDER*

The trustee has sued Catherine Clare Mantelman, the wife of the debtor, to recover allegedly fraudulent transfers. Mantelman moved to withdraw the reference, having demanded a jury. Even though the trustee's claim is a core proceeding, any jury trial would have to take place in district court. *Matter of Grabill Corp., 967 F.2d 1152 (7th Cir. 1992)*. We withdrew the reference, not aware that Mantelman had, three days before, filed an answer in which she asserted a setoff as an affirmative defense. The trustee now moves to strike the jury demand and for reconsideration of the withdrawal of reference. The motions are granted, and the withdrawal of reference is vacated.

Mantelman relies upon *In re Concept Clubs, Inc., 154 B.R. 581 (D. Utah 1993)*, [*2] and it does support her position. We agree, however, with *In re North American Energy Conservation, Inc., 2000 U.S. Dist. Lexis 15084* (S.D.N.Y. Oct. 12, 2000), and *In re Commercial Financial Services, Inc., 255 B.R. 68 (Bankr. N.D. Okla. 2000)*. A setoff is but another way of making a claim against the estate, and it invokes the equitable jurisdiction of the bankruptcy court. Once having submitted to that jurisdiction, can and should Mantelman be permitted to, in effect, rewrite history by dropping her setoff claims? We think the answer is probably no, but that issue, as well as the trustee's motion to strike Mantelman's first affirmative defense, we leave

2002 U.S. Dist. LEXIS 8071, *2

to the bankruptcy court.

**JAMES B. MORAN**

    **Senior Judge, U.S. District Court**

    *May 3,* **2002.**

**JUDGMENT IN A CIVIL CASE**

    Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

    IT IS HEREBY ORDERED AND ADJUDGED that Mantelman moved to withdraw the reference, having demanded a jury. The trustee now moves to strike the jury demand and for reconsideration of the withdrawal of reference. The motions are **[*3]** granted, and the withdrawal of reference is vacated.

    Date: 5/3/2002

LEXSEE 2000 U.S. DIST. LEXIS 15084



Caution
As of: Dec 06, 2007

In re NORTH AMERICAN ENERGY CONSERVATION, INC., Debtor. NORTH
AMERICAN ENERGY CONSERVATION, INC., Plaintiff. -against- INTERSTATE
ENERGY RESOURCES, INC., Defendant.

00 Civ. 4302 (SHS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2000 U.S. Dist. LEXIS 15084*; *44 Collier Bankr. Cas. 2d (MB) 1860*

October 10, 2000, Decided
October 12, 2000, Filed

**PRIOR HISTORY:**    **[*1]**  Case No. 00-40563 (PCB),
Adv. Pro. No. 00-2276.

**DISPOSITION:**    Interstate's motion to withdraw the
reference denied.

**COUNSEL:**    For    INTERSTATE    ENERGY
RESOURCES, INC.: Michael S. Schreiber, Robinson,
Brog, Leinwand, Greene, Genovese & Gluck P.C., New
York, NY.

For    NORTH    AMERICAN    ENERGY
CONSERVATION, INC.: Nicholas P. Kajon, Salomon,
Green & Ostrow, P.C., New York, NY.

For    NORTH    AMERICAN    ENERGY
CONSERVATION, INC., debtor: Nicholas P. Kajon,
Salomon, Green & Ostrow, P.C., New York, NY.

**JUDGES:** SIDNEY H. STEIN, U.S. District Judge.

**OPINION BY:** SIDNEY H. STEIN

**OPINION**

*OPINION AND ORDER*

SIDNEY H. STEIN, U.S. District Judge.

Interstate Energy Resources, Inc. ("Interstate"),
defendant in an adversary proceeding commenced in
bankruptcy court by debtor-in-possession North
American Energy Conservation, Inc. ("North American"),
has moved pursuant to *28 U.S.C. § 157(d)* for an order
withdrawing the reference of this adversary proceeding
from the bankruptcy court. For the following reasons,
Interstate's motion is denied.

**I. BACKGROUND**

North American filed a voluntary petition pursuant to
Chapter 11 of the Bankruptcy Code, *11 U.S.C. § 1101 et
seq.*, in the **[*2]** United States Bankruptcy Court for the
Southern District of New York on March 2, 2000. Prior
to that filing, North American marketed natural gas and
electricity on both the wholesale and retail level. The
wholesale business, however, was discontinued just prior
to the filing of the bankruptcy petition.

In the conduct of its wholesale business, North
American entered into a contract in September 1997 with
Interstate under which North American agreed to sell

Case 1:07-cv-10612-GEL    Document 16-14    Filed 12/11/2007    Page 2 of 3

Page 2

2000 U.S. Dist. LEXIS 15084, *2; 44 Collier Bankr. Cas. 2d (MB) 1860

natural gas to Interstate. Pursuant to that contract, North American delivered certain agreed-to quantities of natural gas to Interstate in January and February 2000. North American claims that Interstate owes it approximately $ 1.2 million for those gas deliveries.

On April 13, 2000, North American filed a complaint with the bankruptcy court seeking recovery of the money owed for the January and February 2000 deliveries. In an answer dated May 23, 2000, Interstate admitted that it had accepted delivery, but denied that it was indebted to North American in the amount claimed. In addition, Interstate claimed, in a portion of the answer entitled "Affirmative Defenses", several setoffs against North American for damages resulting [*3] from North American's rejection of the executory portions of the September 1997 contract. The setoffs claimed exceed $ 1.8 million.

Interstate subsequently filed this motion to withdraw the reference.

## II. DISCUSSION

United States district courts have original jurisdiction of all civil proceedings "arising under Title 11 [of the United States Code] or arising in or related to cases under Title 11." *28 U.S.C. § 1334(b)*. District courts may refer those proceedings to the bankruptcy court. *See 28 U.S.C. § 157*; *In re 131 Liquidating Corp., 222 B.R. 209, 211 (S.D.N.Y. 1998)*. In this district, all such cases are automatically referred to the bankruptcy court pursuant to a standing order dated July 10, 1984. *See In re Times Circle East, Inc., 1995 U.S. Dist. LEXIS 11642, *2, No. 95 CIV. 2838, 1995 WL 489551, at *1 (S.D.N.Y. Aug. 15, 1995)*. That reference may be withdrawn, however, in whole or in part, "for cause shown." *See 28 U.S.C. § 157(d)*; *Securities and Exchange Comm'n v. Churchill Securities, Inc., 223 B.R. 415, 419 (S.D.N.Y. 1998)*. "There is no statutory definition of what constitutes 'cause' [*4] to withdraw the bankruptcy reference." *Times Circle*, 1995 WL 489551, at *1.

In *In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993)*, the United States Court of Appeals for the Second Circuit set forth the analytical framework for determining whether there is "cause" to withdraw a reference from the bankruptcy court. First, the court must determine whether the dispute is core or non-core. Second, the court should consider additional factors, such as: (1) whether the claim is legal or equitable, (2) judicial efficiency, (3) prevention

of forum shopping, and (4) uniformity in the administration of bankruptcy law. *See Orion Pictures, 4 F.3d at 1101*. Whether the dispute is core or non core should be determined first, because "it is upon this issue that questions of efficiency and uniformity will turn." *Id.* For example, hearing a core matter in a district court "could be an inefficient allocation of judicial resources given that the bankruptcy court generally will be more familiar with the facts and issues." *Id.*

### A. *Core or Non-Core*

Whether a matter is "core" depends on the nature of the proceeding. *See In re Best Products Co., Inc., 68 F.3d 26, 31 (2d Cir. 1995)*. [*5] "A proceeding that involves rights created by bankruptcy law, or that could arise only in a bankruptcy case, is a core proceeding." *In re Green, 200 B.R. 296, 298 (S.D.N.Y. 1996); see also 28 U.S.C. § 157(b)(2)*. A "non-core" proceeding is one that does not depend on bankruptcy laws for its existence and that could proceed in a court that lacks federal bankruptcy jurisdiction. *See Green, 200 B.R. at 298*.

The parties agree that North American's claims against Interstate are non-core. According to North American, however, Interstate's assertion of setoffs are actually counterclaims against North American's bankruptcy estate and, as such, subject Interstate to the core jurisdiction of the bankruptcy court to "allow[] or disallow[] claims against the estate." *See 28 U.S.C. § 157(b)(2)(B)*.

When a party files a claim against a bankruptcy estate, that party "triggers the process of 'allowance and disallowance of claims,' thereby subjecting [itself] to the bankruptcy court's equitable power." *Langenkamp v. Culp, 498 U.S. 42, 44, 112 L. Ed. 2d 343, 111 S. Ct. 330 (1990) (per curiam)* [*6] (quoting *Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 58-59, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989))*. Thus, if the setoffs pled by Interstate as "affirmative defenses" are actually claims against the estate, this dispute is a core proceeding pursuant to *28 U.S.C. § 157(b)(2)(B)*.

Courts in similar circumstances have held that regardless of whether a setoff is labeled an "affirmative defense" or a "counterclaim", a setoff is a claim against the bankruptcy estate. *See In re Commercial Financial Servs., Inc., 251 B.R. 397, 405 (Bankr. N.D. Okla. 2000); In re Americana Expressways, Inc., 161 B.R. 707, 712-13 (D. Utah 1993)*. Indeed, a setoff claim takes on particular

Case 1:07-cv-10612-GEL    Document 16-14    Filed 12/11/2007    Page 3 of 3

Page 3

2000 U.S. Dist. LEXIS 15084, *6; 44 Collier Bankr. Cas. 2d (MB) 1860

importance in the context of bankruptcy, as it, in effect, "elevates an unsecured claim to secured status to the extent that the debtor has a mutual, pre-petition claim" against the party asserting setoff, as is the case here. *Lee v. Schweiker, 739 F.2d 870, 875 (3d Cir. 1984)*; *see also Commercial Financial Servs., 251 B.R. at 405-06.*

Accordingly, this Court finds that by pleading setoffs in the form of "affirmative **[*7]** defenses", Interstate has in fact asserted a claim against North American's bankruptcy estate. Thus, this is a core proceeding pursuant to *28 U.S.C. § 157(b)(2)(B)*, which squints in the direction of leaving this matter in the bankruptcy court. *See In re Seatrain Lines, Inc., 198 B.R. 45, 53 (S.D.N.Y. 1996).*

B. *Other Factors*

Other *Orion Pictures* factors support that conclusion.

1. *The Nature of the Action*

A claim for breach of contract that seeks only money damages is a legal, rather than an equitable, claim. *See, e.g., Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962)*; *Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 825 (2nd Cir. 1994).* When, however, as here, a party asserts a claim against a bankruptcy estate, it "subjects itself to the bankruptcy court's equitable power," *Langenkamp, 498 U.S. at 44*, and "the legal issue [is] converted to an issue of equity." *Germain v. Connecticut Nat'l Bank, 988 F.2d 1323, 1329 (2d Cir. 1993).* Thus, the nature of the action favors keeping this matter in the bankruptcy court.

2. **[*8]** *Judicial Efficiency*

Pertinent factors to consider in determining the most efficient deployment of judicial resources are whether the matter is likely to reach trial, whether protracted discovery will be required, and whether the bankruptcy court has familiarity with the issues presented. *See Times Circle*, 1995 WL 489551, at *3. North American had numerous pre-petition contracts with gas wholesalers

other than Interstate, and at least some of those contracts have led to other claims against the estate. Issues surrounding those claims are likely to be similar to issues in this adversary proceeding. In addition, this proceeding is only at its preliminary stages, and North American maintains that Interstate's setoff claims will require "intensive" discovery -- an issue on which Interstate is silent. Accordingly, judicial efficiency favors adjudication by the bankruptcy court. *See id.*

3. *Risk of Inconsistent Administration of the Bankruptcy Law*

Leaving this proceeding in the bankruptcy court would also reduce the risk of inconsistent administration of the bankruptcy law. A setoff is a particular type of claim specifically addressed in the bankruptcy code. **[*9]** *See 11 U.S.C. §§ 506(a), 511*; *see also Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1441 (7th Cir. 1993).* Accordingly, the bankruptcy court is best equipped to adjudicate this matter in the first instance.

4. *Forum Shopping*

There has been no claim and no showing that Interstate is engaging in forum shopping. Accordingly, this factor weighs neither in favor nor against withdrawal of the reference in this case.

### III. CONCLUSION

After consideration of each of the factors articulated in *Orion Pictures*, this Court concludes that withdrawal of the reference to the bankruptcy court is not warranted. Accordingly, Interstate's motion to withdraw the reference is denied.

Dated: New York, New York

October 10, 2000

SO ORDERED:

Sidney H. Stein, U.S.D.J.

LEXSEE 2005 U.S. DIST. LEXIS 941



Positive
As of: Dec 09, 2007

**In Re: FMI FORWARDING CO., INC., Debtor. OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF FMI FORWARDING CO., INC., Plaintiff, -against- UNION TRANSPORT CORP., ICLEARIT.COM, LLC, EAST END TRANSPORT CONSULTANTS, LLC, ROBERT MANN, HOWARD MANN, MARCUS & COMPANY, LLC, and FREIDMAN, KAPLAN & SEILER, LLP, Defendants.**

**00 B. 41815 (CB), 04 Civ. 630 (DAB), Adv. Proc. 01-A-2992 (CB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 941*

**January 21, 2005, Decided**
**January 24, 2005, Filed**

**PRIOR HISTORY:** *Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Trans. Corp. (In re FMI Forwarding Co.), 2004 U.S. Dist. LEXIS 10941 (S.D.N.Y., June 10, 2004)*

**DISPOSITION:** [*1] Defendant's motion to withdraw reference denied.

**COUNSEL:** For Union Transport Corp., now known as UTi United States, Inc., Appellant: August C. Venturini, Venturini & Associates, New York, NY.

**JUDGES:** Deborah A. Batts, United States District Judge.

**OPINION BY:** Deborah A. Batts

**OPINION**

*MEMORANDUM AND ORDER*

    DEBORAH A. BATTS, United States District Judge.

    Plaintiff commenced an adversary proceeding in the United States Bankruptcy Court for the Southern District of New York, Adversary Proceeding No. 01-2992 (Blackshear, B.J.), alleging various fraudulent conveyance, breach of fiduciary duty, successor and alter-ego liability, and professional malpractice claims against the above-named Defendants. In addition, Defendant Union Transport Corporation ("UTi") brought a series of cross-claims against Defendants Robert & Howard Mann, East End Transport Consultants, LLC, and Marcus & Company, LLC ("Marcus"). Presently before this Court is UTi's motion to withdraw the reference of the entire Adversary Proceeding from the Bankruptcy Court pursuant to *28 U.S.C. § 157(d)*. For the reasons stated below, UTi's motion is DENIED.

I. BACKGROUND

    A. [*2] The FMI Asset Sale

    On January 3, 2000, the assets of FMI Forwarding Co., Inc. ("FMI"), a corporation engaged in the custom brokerage and freight forwarding business, were sold to Defendant UTi for $ 2 million. (Complaint in Adv. Proc.

01-A-2992 ["Compl."] PP17, 23). Pursuant to the Asset Sale, UTi assumed full control of FMI's business operations, utilizing FMI's premises and employing substantially all of FMI's existing employees. (*Id.* P17).

The sale was consummated pursuant to an Asset Purchase Agreement ("APA") executed by UTi, FMI, and Defendants Robert and Howard Mann, both of whom were officers, directors and shareholders of FMI, on December 23, 1999. (Compl. PP11-12, 21). The Agreement specified that the sale price of FMI's assets could not exceed $ 2 million. (*Id.*) However, Plaintiff alleges that UTi's parent company, UTI Worldwide, Inc., stated in a prospectus for a public offering of its stock that the cost of the FMI Asset Sale was estimated at $ 4.6 million. (*Id.* P26.). Plaintiff also alleges that, at the time of the Asset Sale, FMI was in fact insolvent, that no funds from the proceeds of the sale were set aside to make payments to any of FMI's general [*3] unsecured creditors, nor were these creditors even notified of the sale prior to its closing. (*Id.* P22, 28-29).

On December 21, 1999, FMI retained Defendant Marcus to perform a valuation to establish an estimate of the fair market value of the assets to be sold to UTi pursuant to the APA. (Compl. P121). This valuation was in turn relied upon by FMI in determining whether to close on the Asset Sale to UTi. (*Id.* P125). Marcus allegedly performed the valuation in six days, issuing a valuation for FMI that stated that the aggregate value of the assets to be acquired by UTi was $ 1,554,555. (*Id.* PP123-124).

B. The UTi-East End Consulting Agreement

In conjunction with the Asset Sale, UTi also entered into a consulting agreement on December 29, 1999 ("Consulting Agreement") with Defendant East End Transport Consultants, LLC ("East End"), whose only two members were Robert and Howard Mann. (Compl. PP10, 30; APA § 7.6 (requiring UTi to enter into a "consulting agreement with East End")). Pursuant to the Consulting Agreement, East End, through the Manns, was to provide three-years worth of consulting services, including executive services, to UTi to assist it in the operation [*4] of the business it was acquiring from FMI, in exchange for which UTi would pay East End a total of $ 1,161,000 in consulting fees, which would be subject to adjustment if either or both of the Manns ceased providing services to UTi prior to the expiration of the three-year term. (Compl. P31; UTi's Amended

Answer and Cross Claims ["UTI Answer"] P31; Consulting Agreement §§ 2.1, 8.1). East End was also entitled under the Agreement to a "contingent consulting fee" for each of the three years of the contract term equal to 100% of the Pretax earnings above $ 2,000,000 from UTi's operation of the business acquired from FMI, which thus prevented such earnings from going to FMI's unsecured creditors, who also did not receive any proceeds from the FMI Asset Sale. (Compl. P33; Consulting Agreement § 8.1, Exhibit A).

C. iClearit

By agreement dated September 29, 1999 (the "iClearit Agreement"), FMI transferred ownership of its iClearit Internet customs-clearing software to Defendant iClearit.com, L.L.C ("iClearit.com"), a New-York limited liability company whose sole member is Howard Mann and whose starting capital was supplied entirely by FMI. (Compl. PP36-39, 47). In exchange for the [*5] iClearit software, which FMI had itself been developing over several years, FMI allegedly received no consideration from iClearit.com other than iClearit.com's commitment to pay certain "ongoing expenses for the completion and design and development of the software." (*Id.* P49). Moreover, FMI was allegedly insolvent at the time it made this transfer. (*Id.* P48). Meanwhile, iClearit.com not only received all of its start-up money from FMI, but allegedly continued until at least January 2001 to use FMI's premises, employees, and equipment free of charge to operate its business, which consisted solely of using the iClearit software to provide importers access to customs-clearing services over the Internet. (*Id.* P36, 40-44; UTi Answer P82). Plaintiff characterizes this use of FMI's space, employees and equipment as "administrative transfers" from FMI to iClearit.com. (Compl. P200).

Additionally, pursuant to § 7.12 of the APA, FMI and the Manns were required to cause iClearit.com to deliver a Memorandum of Understanding ("MOU") to UTi pertaining to the iClearit software, pursuant to which UTi would acquire a three-year license to use the iClearit software starting in January [*6] 2000 with an option to renew for an additional three-year term and a right of first refusal if iClearit.com decided to sell the software. (Compl. P35; UTi Answer PP81, 83). However, to date, iClearit.com has not entered into the MOU with UTi. (UTi Answer P84).

D. The FMI Bankruptcy and the Present Adversary

Proceeding

On July 24, 2000, facing $ 4,640,000 in outstanding liabilities owed to over 600 creditors while possessing only $ 1,175,000 in assets, FMI filed a voluntary Chapter 11 petition for bankruptcy in the United States Bankruptcy Court for the Southern District of New York, 00-B-41815 (CB). (Compl. PP15, 19). On February 8, 2001, United States Bankruptcy Judge Cornelius Blackshear issued an order authorizing Plaintiff, the duly appointed official committee of FMI's unsecured creditors, to bring certain causes of action belonging to FMI's estate and creditors against Union Transport and insiders and affiliates of FMI. (*Id.* PP4-5; *see also* Exhibit Book in Support of Plaintiff's Objection and Incorporated Memorandum of Law to Marcus & Company, LLC's Motion to Withdraw the Reference ["Pl. Ex. Book"], Ex. A [Stipulation and Order in Bankruptcy Case No. 00-B-41815 [*7] (CB), dated February 8, 2001] at 3). Plaintiff's authority to bring such claims was subsequently extended in June 2001 to include claims against Defendants Friedman, Kaplan & Seiler, LLP and Marcus. (Pl. Ex. Book, Ex. B [Stipulation and Order in Bankruptcy Case No. 00-B-41815 (CB), dated June 6, 2001] at 2).

Thereafter, on July 27, 2001, Plaintiff commenced the present adversary proceeding before Judge Blackshear, asserting twenty-five causes of action, including: (1) three fraudulent conveyance claims against UTi based on the FMI Asset Sale (Counts I through III of the Complaint); (2) a successor liability claim against UTi seeking to hold it liable for all FMI's obligations on the ground that the Asset sale was a defacto merger of FMI and UTi (Count IV); (3) an alter-ego liability claim against East End seeking to hold it liable for all of the Manns' obligations to FMI's estate (Count V); (4) two fraudulent conveyance claims against UTi, East End and the Manns based on the consulting fees paid to East End (Counts VI and VII); (5) a breach of fiduciary duty claim against the Manns for approving, as directors of FMI, the Asset Sale to UTi and concomitantly arranging for the consulting [*8] fee payments to East End (Count VIII); (6) a professional malpractice claim against Marcus for its allegedly inaccurate valuation of FMI's assets (Count IX); (7) an avoidance claim against UTi alleging that UTi's failure to notify FMI's creditors of the FMI Asset Sale rendered the sale a void bulk sale under Article 6 of the New York Uniform Commerical Code (Count X); (8) two additional fraudulent conveyance claims against UTi

based on its payment of below-market rent to occupy and use FMI's business premises during the year 2000 (Counts XI and XII); (9) five fraudulent conveyance claims against iClearit.com based on FMI's transfer of its iClearit project assets to iClearit.com in September 1999 (Counts XIII-XVII); (10) an alter-ego liability claim against iClearit.com seeking to hold it liable for the Manns' obligations to the FMI estate (Count XVIII); (11) two breach of fiduciary duty claims against the Manns for approving, as FMI directors, the asset transfer and so-called "administrative transfers" to iClearit.com (Counts XIX and XXIII); (12) three additional fraudulent conveyance claims against iClearit.com for the so-called "administrative transfers" it received from FMI (Counts [*9] XX-XXII); and (13) breach of fiduciary duty and negligence claims against Friedman Kaplan stemming from its legal representation of FMI, East End and iClearit.com in connection with the FMI asset sale to UTi and the iClearit project asset transfer (Counts XXIV-XXV). (Compl. PP3, 51-225).

On October 2, 2001, Marcus filed in the Bankruptcy Court both a motion to dismiss Plaintiff's malpractice claim against it and a motion to withdraw the reference of such claim from the Bankruptcy Court so that the claim could be adjudicated in District Court. Similarly, on October 16, 2001, Freidman & Kaplan filed both a motion to dismiss and a motion withdraw the reference of Plaintiff's claims against it. The two withdrawal motions were then combined into one civil action filed with this Court on October 29, 2001. *See* Civil Action No. 01 Civ. 9462 (DAB). However, Plaintiff subsequently settled its claims against Freidman & Kaplan. (*See* Order Approving Compromise and Settlement, in Adv Proc. 01-02992 (CB) (Bankr.S.D.N.Y. Jan. 30, 2002)).

On October 19, 2001, after Marcus had already filed its withdrawal motion, UTi filed an Amended Answer and Cross-Claims, [1] asserting nine of its own causes [*10] of action, including: (1) a claim against the Manns for indemnification for any liability incurred by UTi in the present Adversary Proceeding stemming from FMI's failure to pay its debts and/or from UTi's use of FMI's business premises (Cross-claim One); (2) two breach of contract claims, an unjust enrichment claim, a breach of fiduciary duty claim, and a fraudulent inducement to contract claim against East End and the Manns based on the Mann's alleged failure to provide executive and consulting services promised under the Consulting Agreement (Cross-claims Two through Six); (3) an

additional fraudulent inducement to contract claim against the Manns, as officers and directors of FMI, for failing to disclose in the warranties section of the APA or its attached financial statements that FMI was insolvent at the time of the Asset Sale (Cross-claim Seven); (4) a negligence/indemnification cross-claim against Marcus & Company for its allegedly inaccurate FMI asset valuation which seeks indemnification for any damages exceeding $ 2 million that UTi would be ordered to pay to Plaintiff if it is adjudicated that the FMI assets were sold to UTi for too little money (Cross-claim Eight); and **[*11]** (5) a breach of contract claim against iClearit.com and the Manns for iClearit.com's failure to enter into the MOU with UTi pertaining to the licensing of the iClearit software, as required by § 7.12 of the APA (Cross-claim Nine). (UTi Answer at 19-31).

> 1  UTi filed its original Answer and Cross-claims on October 1, 2001, but that pleading did not include any cross-claims against Marcus.

On October 22, 2001, the Manns, East End and iClearit.com filed their Reply to UTi's Cross-claims, which includes a cross-claim by the Manns against UTi for a declaratory judgment that: (1) UTi breached § 7.16 of the APA by unilaterally making detrimental material changes to the clients, personnel and services of the business acquired from FMI, and (2) such breach excuses the Manns' contractual obligations to UTi under the APA. (Mann Defendants' Reply to Cross-Claims of Union Transport Corp. and Cross-Claims of the Manns Against Union Transport Corp. ["Mann Def. Reply"] PP109-113).

On January 2, 2002, Judge Blackshear denied **[*12]** Marcus' motion to dismiss Plaintiff's malpractice claim, after which Marcus filed an Answer and Demand for Jury Trial on January 10, 2002. Thereafter, on June 26, 2002, Marcus filed its Reply to UTi's cross-claim against it, denying the allegations therein and demanding a jury trial. (Marcus & Company's Reply to Union Transport's Amended Answer & Cross-Claims at 16).

Subsequently, while Marcus' withdrawal motion was still *sub judice* with this Court, all of the parties to the Adversary Proceeding in the Bankruptcy Court, including Marcus, engaged in extensive discovery which, by February 2004, had neared completion. (*See* Transcript of February 11, 2004 Hearing in Adv. Proc. No. 01-02992 (CB) at 8 (Pl.'s Oral Argument) ("there is very little discovery left, and this case is on the eve of trial.")). In addition, on March 27, 2003, Judge Blackshear

dismissed, with Plaintiff's consent, Plaintiff's bulk sale avoidance claim and the two fraudulent conveyance claims against Uti which were based on the latter's renting of FMI's premises for below fair-market rent (Counts X through XII of the Complaint). (*See* Stipulation and Order of Voluntary Dismissal in Adv. Proc. 01-2992 (CB), **[*13]** dated March 27, 2003). The next day, Judge Blackshear ordered Plaintiff and UTi to participate in mediation, (*see* Order in Adv Proc. 01-2992(CB), dated March 28, 2003), which the parties then engaged in for over eight months but which ultimately proved unsuccessful.

On December 5, 2003, Plaintiff moved the Bankruptcy Court to sever its three fraudulent conveyance claims against UTi based on the FMI Asset Sale (Counts I through III of the Complaint) and its two fraudulent conveyance claims against UTi, East End, and the Manns based on the consulting fee payments made by UTi to East End (Counts VI and VII of the Complaint) from the rest of the Adversary proceeding. Subsequently, on January 23, 2004, UTi moved the Bankruptcy Court to stay the severance motion and simultaneously moved to withdraw the entire Adversary Proceeding from the Bankruptcy Court on the ground that all of the claims and cross-claims at issue derived from the same nucleus of operative facts, and thus had to be tried in the same court as, Plaintiff's professional malpractice claim against Marcus. (*See* Declaration of August C. Venturini in Support of UTi's Motion for Withdrawal of the Reference of the Adversary **[*14]** Proceeding "For Cause" ("Venturini Decl.") PP14-15). Of course, at the time UTi made its motion, this Court had yet to rule on Marcus' withdrawal motion.

Thereafter, on February 18, 2004, Marcus wrote to this court requesting permission to amend its withdrawal motion to include UTi's cross-claim against it. (See Letter from Marcus & Company LLC to the Court, dated February 18, 2004). On February 27, 2004, the Court granted Marcus' request and directed Marcus to amend its withdrawal motion within ten days (see Memo-Endorsed Order, dated February 27, 2004), which it did on March 10, 2004. On June 10, 2004, the Court granted Marcus' amended motion, thereby withdrawing the reference of both Plaintiff's malpractice claim and Uti's cross-claim against Marcus from the Bankruptcy Court. (*See* Order in *2004 U.S. Dist. LEXIS 10941, 01 Civ. 9462 (DAB), dated June 10, 2004,* at 19-20). The Court must now decide whether the remaining claims and cross-claims in the

Adversary Proceeding should also be withdrawn from the Bankruptcy Court.

II. DISCUSSION

Under *28 U.S.C. § 157(d)*, a "district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] under this **[*15]** section, on its own motion or on timely motion of any party, for cause shown." While *section 157(d)* itself does not define "for cause," the Second Circuit, in *Orion Pictures Corp. v. Showtime Networks. Inc., 4 F.3d 1095 (2d Cir. 1993)*, set forth several factors to consider in evaluating whether there is cause to withdraw a reference to the bankruptcy court: (1) whether the claim or proceeding is core or non-core; (2) whether it is legal or equitable; and (3) considerations of efficiency, forum shopping, and uniformity of the administration of bankruptcy law. *4 F.3d at 1101*; *see also South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 762 (2d Cir. 1996)* (citing the *Orion* factors).

While the core/ non-core determination is often central to the analysis of whether there is cause to withdraw a reference to the bankruptcy court, *see Orion, 4 F.3d at 1101* ("A district considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn."), it is not determinative **[*16]** of the issue. *See, e.g., Mishkin v. Ageloff, 220 B.R. 784, 800 (S.D.N.Y. 1998)* (noting that while the core nature of a claim "cuts against permissive withdrawal, it is not dispositive" because "in the final analysis, the critical question is efficiency and uniformity"); *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.), 185 B.R. 680, 686 (S.D.N.Y. 1995)* (noting that the core/non-core determination "is not wholly determinative" of the withdrawal issue); *see also Orion,* (specifying that, even after making the core/non-core determination, a district court "should weigh questions of efficient use of judicial resources, delay and costs to the parties. . . and other related factors" before deciding whether there is cause to withdraw the reference).

In addition to establishing cause for withdrawal, a withdrawal motion must be "timely." *28 U.S.C. § 157(d)*. Accordingly, because Plaintiff has raised the timeliness issue here (*see* Objection of the Official Committee of Unsecured Creditors to Motion of Union Transport Corp.

for Permissive Withdrawal of the Reference ["Pl. Obj."] at 7-10), the Court must first determine **[*17]** whether UTi's withdrawal motion is even timely.

A. Timeliness

"There is no specific time limit for applications under *28 U.S.C. § 157(d)* to withdraw a reference to the bankruptcy court." *Lone Star Indus. v. Rankin County Economic Dev. Dist. (In re New York Trap Rock Corp.), 158 B.R. 574, 577 (S.D.N.Y. 1993)*; *Singer Co. B.V. v. Groz-Beckert KG (In re Singer Co.), 2002 U.S. Dist. LEXIS 2629, No. 01 Civ. 0165, 2002 WL 243779, at *4 (S.D.N.Y. Feb. 20, 2002)* (citations omitted) (same). However, courts in this Circuit have defined "timely" to mean "as soon as possible after the moving party has notice of the grounds for withdrawing the reference." *Kentile Floors v. Congoleum Corp. (In re Kentile Floors), 1995 U.S. Dist. LEXIS 11421, No. 95 Civ. 2470, 1995 WL 479512, at *2 (S.D.N.Y. Aug. 10, 1995)* (citations and internal quotations omitted); *Connolly v. Bidermann Indus. U.S.A., 1996 U.S. Dist. LEXIS 8059, No. 95 Civ. 1791, 1996 WL 325575, at *3 (S.D.N.Y. June 13, 1996)* (same). Needless to say, a time lapse that constitutes an unreasonably long delay in one case will not necessarily render a withdrawal motion untimely in another. **[*18]** *Compare Lone Star Indus., 158 B.R. at 577* (finding that the three months between the commencement of the adversary proceeding and the motion to transfer, although short, rendered motion untimely), *with Kentile Floors, 1995 U.S. Dist. LEXIS 11421, 1995 WL 479512, at *2* ("Although nine months elapsed between the filing of the complaint and the motion to withdraw the reference, the motion is timely."). Delay for tactical reasons, such as forum shopping, or which prejudices the opposing party or the administration of justice, can be grounds for denying a withdrawal motion as untimely. *Lone Star Indus., 158 B.R. at 577*; *In re the Singer Co., 2002 U.S. Dist. LEXIS 2629, 2002 WL 243779, at *4* (citing *Lone Star*).

Plaintiff contends that UTi's motion is untimely for two reasons. First, Plaintiff points out that because UTi filed its withdrawal motion more than two-and-a-half years after the commencement of the Adversary Proceeding and over two years after the filing of Marcus' withdrawal motion and its own cross-claim against Marcus, it has been aware of the issues concerning reference withdrawal and has therefore had an opportunity to make a withdrawal motion for a very long

[*19] time. (Pl. Obj. at 7-9). Plaintiff also argues that UTi's motion is untimely because it was filed purely for "dilatory" and "forum-shopping" purposes. (*Id.* at 10). Specifically, Plaintiff contends that by (1) waiting to make its withdrawal motion until after Plaintiff filed its Motion to Sever the claims against UTi from the rest of the Adversary Proceeding in December 2003, and (2) at the same time moving to stay the Bankruptcy Court's ruling on the motion to sever pending this Court's decision on its withdrawal motion, UTi was clearly "attempting to preempt the Bankruptcy Court from deciding the pending the Motion to Sever and making a determination whether [Plaintiff's] core fraudulent conveyance claims should be tried first." (*Id.*). Thus, Plaintiff concludes, "there is no legitimate reason why [UTi] waited two years to file" its withdrawal motion. (*Id.* at 10-11).

The Court agrees with Plaintiff. As Plaintiff correctly points out, over two years passed between the filing of Marcus' withdrawal motion in October 2001, which UTi contends is the primary basis for its own withdrawal motion (*see* UTi Mem. at 1-2, 6), and UTi's filing of its withdrawal motion on January 23, 2004. Moreover, [*20] even discounting the nine months in 2003 during which the parties were in mediation, *see In re Kentile Floors, 1995 U.S. Dist. LEXIS 11421, 1995 WL 479512, at *2* ("The several months during which the parties worked with a court-appointed mediator in an effort to settle the dispute do not count against [the party moving for withdrawal] because filing a motion to withdraw the reference while mediation was underway would have defeated the purpose of mediation."), UTi still delayed filing its motion for eighteen months. Meanwhile, UTi cannot in good faith argue that its opportunity for moving to withdraw did not arise until Marcus' withdrawal motion was granted because UTi filed its motion over four months *before* Marcus' motion was granted. (*See* Order, dated June 10, 2004). [2]

> 2    Similarly, UTi cannot argue that its opportunity to move for withdrawal did not arise until Marcus amended its withdrawal motion to include UTi's cross-claim against it because, like

the granting of Marcus' motion, Marcus did not amend its motion until more than a month after UTi had filed its withdrawal motion.

[*21] Thus, the only reason the Court can surmise for UTi's filing its withdrawal motion when it did was to stay the Bankruptcy Court's ruling on Plaintiff's severance motion and instead require this Court to rule on essentially the same question. After all, in the present motion, UTi is arguing that Plaintiff's claims against it and all other non-Marcus defendants should be adjudicated in the same proceeding before this Court as the malpractice claim and cross-claim against Marcus, while Plaintiff, in its severance motion, argues that its fraudulent conveyance claims against UTi should be separated from its claims against the other Defendants including Marcus. (*See* Plaintiff's Motion and Incorporated Memorandum of Law For An Order Severing the Union Transport Fraudulent Conveyance Claims, filed in Adv. Proc. No. 01-2992 (CB) (Bankr.S.D.N.Y. Dec. 2, 2003), PP47-55 (arguing that the fraudulent conveyance claims against UTi and the malpractice claim against Marcus involve different legal issues and will involve different witness testimony)). The timing of UTi's withdrawal motion therefore screams forum-shopping of the claim severance question, and, as such, the motion is denied as untimely.

[*22] III. CONCLUSION

For the reasons stated above, UTi's motion to withdraw the reference to the Bankruptcy Court of Adversary Proceeding 01-A-2992 is DENIED. The Clerk of Court is directed to close the docket in the above-captioned civil action.

SO ORDERED

DATED: New York, New York

January 21, 2005

Deborah A. Batts

United States District Judge

LEXSEE 2003 U.S. DIST. LEXIS 23136



Caution
As of: Dec 06, 2007

**In re: RICKEL & ASSOCIATES, INC., Debtor. RICKEL & ASSOCIATES, INC., ROBERT RICKEL, and MARVIN NUMEROFF, Plaintiffs, -against- GREGG SMITH, ELLIOTT SMITH, and WIRELESS ACQUISITION PARTNERS, LLC, Defendants. GREGG SMITH, ELLIOTT SMITH, and WIRELESS ACQUISITION PARTNERS, LLC, Third-Party Plaintiffs, -against- KENNETH RICKEL, Third-Party Defendants.**

**03 Civ. 7236 (PKC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 23136*

**December 23, 2003, Decided
December 24, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion to strike denied by *Rickel & Assocs. v. Smith (In re Rickel & Assocs.), 2005 Bankr. LEXIS 237 (Bankr. S.D.N.Y., Feb. 22, 2005)*

**PRIOR HISTORY:**     **[*1]** Chapter 11, Case No. 98-B-47203 (SMB), Adv. Pro. No. 01-2441.
*Rickel & Associates Inc. v. Smith (In re Rickel & Assocs.), 272 B.R. 74, 2002 Bankr. LEXIS 46 (Bankr. S.D.N.Y., 2002)*

**DISPOSITION:**     Defendants' motion to withdraw reference denied without prejudice. Defendants' renewed motion for summary judgment denied without prejudice.

**COUNSEL:** For Gregg Smith, Wireless Acquisition Partners, LLC: Kenneth J Rubenstein, Olsham, Grundman, Frome, Rosenzweig & Wolosky, LLP, Thomas Fleming, Olsan Grundman Frome Rosenzweig & Wolosky, New York, NY USA.

**JUDGES:** P. Kevin Castel, United States District Judge.

**OPINION BY:** P. Kevin Castel

**OPINION**

MEMORANDUM AND ORDER

P. KEVIN CASTEL, U.S.D.J.

Defendants-third party plaintiffs Elliot Smith, Gregg Smith, and Wireless Acquisition Partners, LLC ("WAP") (collectively "defendants") move, pursuant to *Rule 5011 of the Federal Rules of Bankruptcy Procedure* and *28 U.S.C. § 157 (d)*, to withdraw the automatic reference of this adversary proceeding. The proceeding as to which withdrawal is sought was commenced on or about February 26, 2001. Defendants also move for summary judgment.

Nature **[*2]** of the Adversary Proceeding

An understanding of the nature of this proceeding may be gleaned from the complaint. Prior to the October 7, 1998 filing of the Chapter 11 petition, Debtor, Rickel

& Associates, Inc. ("Rickel"), was a licensed broker-dealer. (Compl. P 12). As compensation for underwriting services, Rickel often received warrants to purchase an issuer's common stock. (Compl. P 19). One such issuer was SmartServOnline, Inc. ("SSOL").

Defendant Gregg Smith, a former Managing Director of Rickel, was appointed as a member of the three-person Committee of Unsecured Creditors ("Creditors' Committee"). (Compl. PP 14, 16). The Creditors' Committee set out to liquidate the Debtor's securities portfolio, including the SSOL warrants (Compl. PP 34, 35). Gregg Smith had the primary responsibility, it is alleged, to provide the Creditors' Committee and its counsel with information relating to the SSOL warrants. (Compl. P 35).

Gregg Smith and Elliott Smith, who was president of Debtor's equity division (Compl. P 18), jointly offered to purchase the SSOL warrants from the Debtor. It is alleged that Gregg Smith was the primary negotiator for the Creditors' Committee on the sell side, [*3] while he was purchaser on the buy side. (Compl. PP 38-39). In late January 2000, Gregg Smith, acting for himself and Elliott, was the successful bidder at a telephonic auction (Compl. PP 51-52). Thereafter, the two formed WAP as their acquisition vehicle for the SSOL warrants (Compl. P 53). By order of March 7, 2000, the liquidating plan of reorganization was confirmed by the Court and the sale of the SSOL warrants closed on April 3, 2000. (Compl. PP 63, 65).

It is alleged, among other things, that the two Smiths concealed or inadequately disclosed the anti-dilution features of the SSOL warrants and otherwise provided false information to the Creditors' Committee (Compl. PP 37, 41, 63). It is further alleged that the two Smiths and WAP acquired the warrants at a price of $ 3.525 million at a point in time when they were worth in excess of $ 20 million (Compl. PP 61-62).

The complaint alleges that by reason of the foregoing Gregg Smith breached his fiduciary duties as a member of the Creditors' Committee (Compl. PP 95-99). It also alleges claims for securities fraud, fraud and unjust enrichment against all defendants; the claim for negligent misrepresentation, like the fiduciary duty [*4] claim, is against Gregg Smith alone. (Compl. PP 69-86, 100-103).

In the bankruptcy court, the defendants moved to dismiss the complaint and for summary judgment. In a thorough 61-page opinion, Judge Stuart M. Bernstein denied defendants' motion in substantial part, but granted it some respects. (Memorandum Decision of January 28, 2002 ("Mem. Dec.")). He declined to grant summary judgment to defendants on the basis of release language in a stipulation that was entered as an order of the Court on June 8, 2000. He also ruled that all claims, other than the breach of fiduciary duty claim, were dismissed to the extent that they sought relief on behalf of the Subordinated Creditor Plaintiffs. He dismissed certain other claims which are not before me on this motion--the turnover claim, the request for declaratory relief and the claim for equitable subordination. Judge Bernstein ruled that plaintiffs' motion to vacate the sale of the warrants (which is not the subject of defendants' motion to withdraw) would be tried with the adversary proceeding.

Timeliness of the Motion to Withdraw the Reference

Under the authority of *28 U.S.C. § 157(a)*, all Chapter 11 cases [*5] in this District are automatically referred to the District's bankruptcy judges. An application to withdraw the reference *may* be granted "for cause shown". *28 U.S.C. § 157(d)*. The reference *shall* be withdrawn "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Id.

The statute expressly requires that for the court to withdraw the reference at the behest of a party (as distinguished from doing so on its own motion), the motion to withdraw must be "timely" made. Id. [1] While there is no bright line test for timeliness, the motion should be made at the earliest opportunity after it is apparent that there is a basis for such a motion. See 9 *Collier on Bankruptcy at P5011.01[2]*. See also *Davis v. Mahlmann, 149 B.R. 866 (N.D. Ill 1993)* (one month after the complaint held untimely); *United States Brizendine v. Montgomery Ward & Co., Inc., 143 B.R. 877 (N.D. Ill. 1992)* (seven month delay held untimely).

1   "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting

interstate commerce" *28 U.S.C. § 157* (emphasis added).

[*6] While one district court held that an application filed ten months after the filing of a claim was within, but "at the outer limit" of, timeliness, *Burger King Corp. v. B-K of Kansas, Inc., 64 B.R. 728 (D. Kan. 1986)*, I note that it does not appear to have been a case in which the bankruptcy court had devoted substantial resources to the claim. In *Interconnect Telephone Services, Inc. v. Farren, 59 B.R. 397 (S.D.N.Y. 1986)*, withdrawal was granted after a year had elapsed and there was an intervening ruling on a motion to dismiss by the bankruptcy judge. However, the district court noted that "defendants have represented at a conference before the Court that they will not renew their motion to dismiss in the district court if this action is with-drawn." *Id. at 402*. Here, the motion to withdraw the reference is joined with a renewed summary judgment motion.

This adversary proceeding was pending in the bankruptcy court for 31 months prior to the making of the motion to withdraw. [2] The bankruptcy judge expended substantial resources in producing his 61-page opinion. Despite some protestations to the contrary, defendants do seek to retrace [*7] the district court substantially the same journey previously taken in the bankruptcy court. [3] In the summary judgment motion made along with their motion to withdraw the reference, defendants seek to have this Court dismiss the proceedings based upon the very stipulation, dated April 24, 2000, that was approved and entered as an order of the bankruptcy court on June 8, 2000. This same stipulation formed an integral part of defendants' earlier motion for summary judgment made to the bankruptcy court, which motion was denied and never appealed. See Mem. Dec. at 10-17.

    2    As noted, the complaint is dated February 26, 2001. According to plaintiffs, defendants' motion to withdraw was served on October 1, 2003 (Plaintiffs' Memorandum at 2).

    3    Defendants note that the initial summary judgment opposition was based upon the Rickel affidavit and that the new summary judgment motion relies upon Rickel's deposition testimony. While that may be true, the motion does in substantial part endeavor to revisit the heart of the prior rulings: "... it is respectfully submitted that Judge Bernstein erred by failing to enforce the unequivocal scope of the 'mutual general release'

embodied in the Stipulation." (Defendants' Reply Memorandum at 15)

[*8] While the presence or absence of prejudice is a factor in assessing timeliness, [4] no support is cited for the proposition that it is a sine qua non. I reject defendants' argument that actual prejudice must always be shown and that there can be no prejudice because withdrawal of the reference simply substitutes one court for another. This reasoning would read the timeliness requirement out of the statute. Further, it overlooks the potential prejudice to a plaintiff of having a case dislodged from its steady progression on the bankruptcy court's calendar to be placed on that of the district court. [5] To allow defendants in this case to first have the bankruptcy judge rule on the effect of the stipulation, neither appeal nor reargue that ruling and then, nearly a year later, ask the district judge to revisit the bankruptcy judge's original rulings, would prejudice the plaintiffs and result in unacceptable judicial inefficiency.

    4    Cf. *Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 181-83 (2d Cir. 2001)* (prejudice is a factor in assessing the timeliness of a motion to intervene).

[*9]

    5    According to plaintiffs, Judge Bernstein set the final pretrial conference for November 18, 2003 (Plaintiffs' Memorandum at 9).

I conclude that the motion to withdraw the reference is untimely. That, however, does not end all issues relating to withdrawal of the reference. This is a case in which a jury trial has been demanded. Defendants also seek withdrawal of the reference on the ground that the bankruptcy court may not conduct a jury trial absent the consent of the parties which they have elected to withhold.

Prior to the 1994 bankruptcy amendments, there was authority for the proposition that a bankruptcy court could conduct a jury trial in a core proceeding. *Ben Cooper, Inc. v. Ins. Co. (In re Ben Cooper, Inc.), 896 F.2d 1394 (2d Cir. 1990)*, cert. granted, *497 U.S. 1023, 111 L. Ed. 2d 779, 110 S. Ct. 3269*, vacated and remanded, *498 U.S. 964, 112 L. Ed. 2d 408, 111 S. Ct. 425*, opinion reinstated on remand, *924 F.2d 36, (2d Cir.)* cert. denied. *500 U.S. 928, 114 L. Ed. 2d 126, 111 S. Ct. 2041*. In part to resolve an inter-circuit conflict on the issue, *section 157(e)* of title 28 was adopted, which [*10] provides as follows:

"If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." (emphasis added). [6]

6    The core/non-core distinction is of critical importance to the standard of review (compare *28 U.S.C. § 157(b)(1)* with *§ 157(c)(1)* but the absence of consent dooms a jury trial in this case even if the case were viewed as a core proceeding. Thus, I need not decide the question at this juncture. See *In re Enron Power Marketing, 2003 U.S. Dist. LEXIS 189, 2003 WL 680 36 (S.D.N.Y. Jan. 8, 2003)*; *Good v. Kvaerner US, Inc., 2003 U.S. Dist. LEXIS 13066, 2003 WL 21755782 at n.6 (S.D. Ind., July 25, 2003)* . Prior to the adoption of *section 157(e)*, the core/non-core distinction was necessarily a threshold issue. See *In re Orion Pictures, 4 F.3d 1095, 1101 (2d Cir. 1993)*, cert. denied, *511 U.S. 1026, 128 L. Ed. 2d 88, 114 S. Ct. 1418 (1994)*.

**[*11]**  Because there is no express consent, this proceeding may not be tried with a jury in bankruptcy court. I will conduct a jury trial of this adversary proceeding if a jury trial is required after all pretrial proceedings before the bankruptcy court are concluded. Defendants claim that it is inefficient for anyone other than the trial judge to hear their summary judgment motion (and also complain that their motion is simultaneously accused of being both untimely and premature). I do not have much sympathy for these arguments. Defendants' plea for judicial economy should be evaluated in the context that defendants alone have created. If a judge other than the one deciding the first summary judgment motion were to hear their new motion, it would cause even greater judicial inefficiency than the circumstance defendants posit.

Defendants' motion to withdraw the reference is DENIED without prejudice to its renewal when the bankruptcy court certifies that the adversary proceeding is ready for trial. Defendants' renewed motion for summary judgment is DENIED without prejudice to its being made before the bankruptcy court.

SO ORDERED.

Dated: December 23, 2003

P. Kevin Castel

United **[*12]**  States District Judge

1 of 1 DOCUMENT


**SCHNEIDERMAN & FRIEDMAN, Appellant, - against - PAUL DALNOKY, et al., Appellees.**


**01 Civ. 6247 (VM)**


**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**


*2001 U.S. Dist. LEXIS 12700*


**August 22, 2001, Decided**
**August 23, 2001, Filed**


**SUBSEQUENT HISTORY:** **[*1]** As Amended August 22, 2001.

**DISPOSITION:** Schneiderman & Friedman's Motion to withdraw reference denied.


**COUNSEL:** For SCHNEIDERMAN & FRIEDMAN, appellant: Michael J. Cannon, Clausen, Miller, P.C., New York, NY.

For ANGELA TESE-MILNER, trustee: Norman Landres, Esq., New York, NY.

**JUDGES:** Victor Marrero, U.S.D.J.

**OPINION BY:** Victor Marrero

**OPINION**


***DECISION AND AMENDED ORDER***

**VICTOR MARRERO, United States District Judge.**

Before the Court is the motion of Schneiderman & Friedman ("S&F") for an Order, pursuant to *28 U.S.C. § 157(d)*, withdrawing the reference from the United States Bankruptcy Court for the Southern District of New York to the United States District Court for the Southern District of New York. For the reasons set forth below, the motion is denied.

The Second Circuit has noted that the preliminary inquiry as to whether "cause" exists for withdrawal of a reference under *section 157(d)* is whether the adversary proceeding is core or non-core. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993), cert. denied, 511 U.S. 1026, 128 L. Ed. 2d 88, 114 S. Ct. 1418 (1994).* **[*2]** The Court should further consider (1) whether the claim is a legal or equitable one; (2) the prevention of forum shopping; (3) overall judicial efficiency; and (4) the need for uniformity in the administration of the bankruptcy law. *See Orion, 4 F.3d at 1101; McMahon v. Providence Capitol Enters., Inc. (In re McMahon), 222 B.R. 205 (S.D.N.Y. 1998).*

A. *Core vs. Non-Core*

The Chapter 7 Trustee in this adversary proceeding seeks "to recover assets or the value of assets that were transferred by the Debtor's principal and others for insufficient or no consideration and/or transfers of assets which constitute a fraud on creditors or which constitute a preferential payment and/or conversion of the Debtor's assets. *See* Affirmation of Michael J. Cannon, sworn to June 20, 2001, Ex. D, P 1. The complaint claims defendants S&F and Paul Dalnoky "received payments after the filing of the bankruptcy petition from Debtor funds without application to the Court or authorization" (Compl., P 26) and "did not reveal to the Court that they had received post-petition repayment of fees which were unauthorized." Compl., P 30. The first claim for relief alleges **[*3]** that such transfers were unauthorized, post-petition transfers of estate funds under the

Bankruptcy Code (the "Code") which are voidable by the Trustee. *See* Compl., P 34. The next two claims allege that the transfers also are voidable under the Code because they were made (1) to insiders within one year of the bankruptcy filing date; (2) without fair consideration; and (3) with actual intent to defraud creditors. *See* Compl., PP 37, 40, 44, 45, 48.

Based on the foregoing, the Court concluded that the dispute at the heart of this adversary proceeding has everything to do with the bankruptcy of Rizzo Research International, the Debtor herein; the bankrupt estate; and issues relating to the application of relevant provisions of the Code. S&F concedes that a proceeding - involving rights that are either created by bankruptcy law or could arise only in a bankruptcy - is a core proceeding. *See* Memorandum of Law in Support of Motion, dated June 20, 2001, at 5. Accordingly, the Court concludes that this adversary proceeding is a core proceeding as described in *section 157(b)(2)* of the Code.

B. *Other Factors*

The Court concludes that permitting this matter to proceed before **[*4]** the bankruptcy court would reduce the risk of inconsistent administration of the bankruptcy law. *See Conservation, Inc. v. Interstate Energy Res., Inc. (In re North Am. Energy Conservation, Inc.), 2000 U.S. Dist. LEXIS 15084*, No. 00 Civ. 4302, 2000 WL 1514614 (S.D.N.Y. Oct. 12, 2000); *Cape Cod Mortgage Trust, Inc. v. Gee (In re Gee), 2000 U.S. Dist. LEXIS 173*, No.

98 Civ. 4174, 2000 WL 23251 (S.D.N.Y. Jan. 12, 2000). The Court further concludes that the nature of the action and judicial economy favor allowing Judge Blackshear to continue to preside over this matter. Finally, regarding forum shopping, because there has been no claim of forum shopping, this factor is neutral.

*CONCLUSION AND AMENDED ORDER*

Based on the foregoing, the Court concludes that S&F has not demonstrated sufficient cause for withdrawal of the reference to the bankruptcy court. Accordingly, it is hereby

**ORDERED** that the motion to withdraw the reference is denied; and it is further

**ORDERED** that this Decision and Order amend the Court's July 31, 2001 Order.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: **[*5]** New York, New York

August 22, 2001

Victor Marrero

U.S.D.J.

LEXSEE 2007 U.S. DIST. LEXIS 7812



Caution
As of: Dec 09, 2007

**SEA CARRIERS CORPORATION, Plaintiff, -against- EMPIRE PROGRAMS INC. and ROBERT A. MARTIN, Defendants.**

**04 Civ. 7395 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 7812*

**January 26, 2007, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by *Sea Carriers Corp. v. Empire Programs, Inc., 2007 U.S. Dist. LEXIS 36670 (S.D.N.Y., May 17, 2007)*

**PRIOR HISTORY:** *Sea Carriers Corp. v. Empire Programs, Inc., 2006 U.S. Dist. LEXIS 83843 (S.D.N.Y., Nov. 20, 2006)*

**COUNSEL:** [*1] For Plaintiff: BECKER MEISEL LLC, Eisenhower Plaza II, Livingston, NJ.

For Defendants: LAW OFFICES OF ALLAN H. CARLIN, New York, NY, Attorneys for Plaintiffs, By: ALLAN H. CARLIN, ESQ.

**JUDGES:** Sweet, D.J.

**OPINION BY:** Sweet

**OPINION**

*Sweet, D.J.,*

Defendants Empire Programs, Inc. ("Empire") and Robert A. Martin ("Martin") (collectively, the "Defendants") have moved under *Rule 38, Fed. R. Civ. P.*, to strike the jury demand of plaintiff Sea Carriers Corporation ("Sea Carriers"). For the reasons set forth

below, the motion is granted.

*Prior Proceedings*

Sea Carriers filed its complaint on September 16, 2004, alleging six claims: (1) breach of contract with respect to an alleged oral joint venture agreement between Sea Carriers and Empire (the "Joint Venture Agreement"); (2) breach of an implied covenant of good faith and fair dealing arising from Empire's denial of the Joint Venture Agreement; (3) breach of fiduciary duty based upon Empire's denial of the Joint Venture Agreement; (4) declaratory relief entitling Sea Carriers to participate in any recoveries by Empire relating to the alleged joint venture; (5) the imposition of a [*2] constructive trust with respect to any recoveries by Empire relating to the alleged joint venture; and (6) an accounting. *See* Complaint, PP 30-48.

In April 2006, Sea Carriers agreed to add Martin as a defendant in this action, and by stipulation which was so or on April 14, 2006, leave was granted to the plaintiff to serve an amended complaint which was served on or about May 1, 2006.

Except for dropping the sixth cause of action for an accounting as alleged in the complaint, the claims asserted in the amended complaint with Martin as an additional defendant are virtually identical to those of the

original complaint.

On May 11, 2006, the Defendants served an answer to the amended complaint by mail, denying its essential allegations. No demand for a jury trial was made by either party on any of the issues until May 22, 2006, when Sea Carriers served its jury demand.

The instant motion to strike that demand was marked fully submitted on August 30, 2006.

### Discussion

### 1. *The Right to Demand a Jury Trial Was Waived*

Where, as here, an amended pleading covers the same "general area of dispute" as was covered in the original pleading, the filing of an amended [*3] complaint does not revive the right to demand a jury. *Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Publ'g, Inc.*, 75 F. Supp. 2d 242, 245 (S.D.N.Y. 1999); *see also Swan Brewery Co. Ltd. v. U.S. Trust Co. of New York*, 143 F.R.D. 40, 44 (S.D.N.Y. 1992) (citing *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973); *Rosen v. Dick*, 639 F.2d 82, 94-96 (2d Cir. 1980); *Royal Am. Mgrs., Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1018 (2d Cir. 1989); *White v. McGinnis*, 903 F.2d 699, 703 n.8 (9th Cir.), *cert. denied* 498 U.S. 903, 111 S. Ct. 266, 112 L. Ed. 2d 223 (1990)) ("An amended or supplemental complaint does not, however, revive the right to demand a jury trial either as to factual issues already fully discussed in the original pleadings, or as to new legal theories based on facts previously pleaded." (internal citations omitted)).

The claims asserted in the amended complaint are identical to those of the original complaint, except that they refer to an additional party, Martin. Therefore, the Plaintiff waived its rights to a jury trial with respect to all issues in this action by failing to demand a jury trial [*4] within ten days of service of the answer to the original complaint. *See Rule 38(b), Fed. R. Civ. P.* The addition of parties does not change the underlying claims or the nature of the relief desired and, therefore, does not revive plaintiff's right to a jury trial. *See, e.g., Tuff-N-Rumble Mgmt., Inc., 75 F. Supp. 2d at 246* (quoting *Sunenblick v. Harrell*, 145 F.R.D. 314, 317 (S.D.N.Y. 1993)).

In *Virgin Air, Inc. v. Virgin Atlantic Airways, Ltd.*, 144 F.R.D. 56 (S.D.N.Y. 1992), the court likewise rejected a jury demand that was made after an additional

defendant, Virgin Enterprises, was added to the action by amendment, stating, with respect to the allegations of the amended complaint, that:

> The essence, if not the exact language, of the allegations is the same. The only material difference, as discussed below, is that they are made against Virgin Enterprises in the Amended Complaint. . . .

The Court of Appeals has strongly indicated that the addition of a new party does not revive a jury trial demand.

> We have held that even an amendment to the complaint revives the right [*5] to demand a jury "only if the amendment changes the issue," and we are doubtful that the mere addition of codefendants one year after expiration of [the party's] time to demand a jury trial revived its previously waived jury trial rights.

*State Mutual Life Assurance Company of America v. Arthur Andersen & Co.*, 581 F.2d 1045, 49 (2d Cir. 1978) (citation omitted). In a more recent decision the Court of Appeals for the Fifth Circuit held that the addition of a party to a counterclaim did not create new issues of fact. *Daniel International Corporation v. Fischbach & Moore, Inc.*, 916 F.2d 1061, 63-64 (5th Cir. 1990). In light of these decisions, Virgin Air's contention that it is entitled to a jury trial of the fraud claim because of the addition of a new party is rejected.

*Virgin Air, Inc.*, 144 F.R.D. at 59; *accord Gamboa v. Med. Coll. of Hampton Roads*, 160 F.R.D. 540, 543 (E.D. Va. 1995) (citing *Sunenblick*, 145 F.R.D. 314); *Freire v. Koehring Co.*, 87 Civ. 0221 (CSH), 1994 U.S. Dist. LEXIS 7345, 1994 WL 256743, at *3 (S.D.N.Y. June 3,

*1994).*

## 2. *The Rule 39(b) Application is Denied*

In **[*6]** its opposition to the Defendants' motion, Sea Carriers has sought to rely on *Rule 39(b), Fed. R. Civ. P.*, to grant a jury trial. Sea Carriers has cited the Fifth Circuit's rulings in *Swofford v. B&W, Inc., 336 F.2d 406, 409 (5th Cir. 1964)* and *United States v. Unum, 658 F.2d 300, 303 (5th Cir. 1981)* in support.

As noted by this Court in *Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd., 92 Civ. 9417, 1995 U.S. Dist. LEXIS 7323, 1995 WL 322156 (RWS) (S.D.N.Y. May 26, 1995)*, however, the Second Circuit applies the strict, rigorous test of *Noonan v. Cunard Steamship Co., 375 F.2d 69 (2d Cir. 1967)*, with respect to *Rule 39(b)*:

> The liberality with which 39(b) discretion is to be exercised has varied from circuit to circuit. This Circuit has set forth a restrictive view. *See Printers II, Inc. v. Professionals Publishing, Inc., 596 F. Supp. 1051, 1052 (1984).* In *Noonan v. Cunard, 375 F.2d 69 (2d Cir. 1967)*, the court held that precedent interpreting judicial discretion in exercising 39(b) authority limited a judge's authority 'to determining whether the moving party's showing **[*7]** beyond mere inadvertence is sufficient to justify relief . . .' *Id. at 70* . . . .

> * * *

> District courts . . . have continued to apply the strict holding of *Noonan* to cases that originated in federal court, as this one did.

*See Sait Electronics, S.A. v. Schiebel, 846 F. Supp. 17, 18 (S.D.N.Y. 1994)* (denying motion to grant untimely demand for jury trial when movant failed to make a showing beyond mere inadvertence); *Alvarado v. Santana-Lopez, 101 F.R.D. 367, 368 (S.D.N.Y. 1984)* (A[T]he rigid rule discussed in *Noonan* remains the rule in this circuit for non-removed cases . . . A); *Printers II, Inc. v. Professionals Publishing, Inc., 596 F. Supp. 1051, 1052 (1984)* (declining to exercise discretion and permit untimely jury demand in a case originating in federal court, thus not falling within the *Higgins'* exception).

*Evvtex Co., Inc., 1995 U.S. Dist. LEXIS 7323, 1995 WL 322156, at *1-2.*

The analysis in *Evvtex* applies here, where there is little question of Sea Carriers= inadvertence in failing to file a demand for a jury trial with regard to the issues covered in Sea Carriers' original complaint. **[*8]** Accordingly, Sea Carriers' reliance on *Federal Rule of Civil Procedure 39(b)* is unavailing.

## *Conclusion*

As in *Noonan*, "[t]here is, of course, not the slightest reason to doubt that a judge is quite as able as a jury to make a fair determination" of the issues in this case. *375 F.2d at 72.* Accordingly, for the reasons set forth above, the Court declines to exercise its discretion to permit the untimely jury demand pursuant to *Federal Rule of Civil Procedure 39(b)* and Defendants' motion to strike the jury demand as untimely pursuant to *Federal Rule of Civil Procedure 38* is granted.

LEXSEE 1995 U.S. DIST. LEXIS 11416



Analysis
As of: Dec 06, 2007

In re: IONOSPHERE CLUBS, INC., EASTERN AIRLINES, INC, and BAR
HARBOR AIRWAYS, INC., d/b/a EASTERN EXPRESS, Debtors. MARTIN R.
SHUGRUE, JR. AS TRUSTEE OF THE ESTATE OF EASTERN AIRLINES, INC.,
Plaintiff, -against- CHEMICAL BANK, INC., Defendant.

Chapter 11, Case Nos. 89 B 10448 (BRL), 89 B 10449 (BRL), 91 B 10289 (BRL),
Adversary Proceeding No. 92-1092A, 94 Civ. 4614 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*1995 U.S. Dist. LEXIS 11416*

August 10, 1995, Decided
August 11, 1995, FILED

**COUNSEL:** **[*1]** For Plaintiff: HILL & BARLOW,
Boston, Massachusetts, Of counsel: Bruce E. Falby, Esq.,
Joshua M. Davis, Esq.

For Defendant: CHEMICAL BANK, Legal Department,
New York, New York, Of counsel: James P. Laughlin,
Esq., HAHN & HESSEN, New York, New York, Of
counsel: Jeffrey L. Schwartz, Esq.

**JUDGES:** JOHN F. KEENAN, United States District
Judge

**OPINION BY:** JOHN F. KEENAN

**OPINION**

*OPINION and ORDER*

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant's motion to withdraw
the reference of an adversary proceeding from the
bankruptcy court pursuant to *28 U.S.C. § 157(d)*. For the
reasons stated below, the Court denies Defendant's
motion.

*Background*

Plaintiff Martin Shugrue was appointed Chapter 11
Trustee of Eastern Airlines, Inc. ("Eastern"). Defendant is
Chemical Bank ("Chemical"). On May 1, 1987, Eastern
and Chemical signed a "Merchant Agreement" whereby
Chemical agreed to process all Visa and Mastercard
charges from Eastern's customers as payment for airline
tickets. *See* Pl.'s Mem. at 3. Chemical credited Eastern's
checking account for payment of the tickets and, in turn,
received funds from the banks that issued the credit cards
and a fee **[*2]** for processing the charges. *See* Laughlin
Aff., Ex. B ("Merchant Agreement").

A rider to the Agreement stipulated that Eastern
retain a $ 2.2 million deposit ("Deposit") with Chemical.
*See* Agreement, Bankcard Rider. The Deposit covered
"chargebacks" [1] and other expenses related to the
Agreement. Either party had the authority to terminate
the Agreement on sixty days notice. *See id.,* P 14. The
Agreement permitted Chemical to retain the Deposit for
nine months after termination in order to deduct

chargebacks. *See id.,* Bankcard Rider. On August 29, 1988, Chemical notified Eastern that it intended to terminate the Agreement in sixty days. *See* Laughlin Aff., Ex. C (Answer) P 6. Accordingly, on October 28, 1988, Chemical stopped processing Eastern's credit card sales. Chemical debited $ 888,197.48 from the Deposit for alleged chargebacks from October 28, 1988 to March 9, 1989.

> 1 A "chargeback" is the "paying bank's refusal to honor a check or draft, causing the check to be returned to the presenting bank." Barron's Dictionary of banking Terms 116 (1990). A "chargeback" occurred in the instant case when a customer disputed a charge. Chemical, as the processing bank for Eastern, then debited Eastern's Deposit for the amount of the disputed item. *See* Pl.'s Mem. at 4. The Truth in Lending Act, *15 U.S.C. § 1601 et seq.,* regulates the bank's and the customer's rights concerning "chargebacks."

**[*3]** On March 9, 1989, Eastern filed for bankruptcy under Chapter 11 in this Court. Chemical did not turn over the remaining $ 1,311,802.52 on Deposit, $ 2.2 million minus the $ 888,197.48 chargeback debits.

On November 6, 1992, Plaintiff filed Adversary Proceeding, No. 92-1092A, with the Bankruptcy Court. Plaintiff's Complaint alleges that: (1) Defendant must turn over the Deposit pursuant to *Section 542(b) of the Bankruptcy Code*; (2) Defendant has willfully violated the automatic stay under Section 362, and; (3) Defendant breached the Merchant Agreement by not providing Plaintiff with documentation supporting the chargebacks Defendant deducted from Eastern's Deposit.

On December 23, 1992, Defendant submitted its answer and counterclaims averring that it was authorized to keep the Deposit pursuant to the Merchant Agreement. Defendant acknowledges that it still retains the Deposit and "has not yet requested Permission from the [Bankruptcy] Court to offset accrued chargebacks against the Deposit." Answer P 12.

On March 14, 1994 a status conference was held, and Plaintiff notified the Bankruptcy Court of its intention to move for summary judgment. The time allotted for discovery was **[*4]** extended. Discovery in this action ended on May 19, 1994. Plaintiff filed a motion for summary judgment that day. Three weeks later, on June 13, 1994, Defendant filed the instant motion for withdrawal of the reference. Defendant asserts that Plaintiff's allegations require an interpretation of the Truth in Lending Act ("TILA"), *15 U.S.C. § 1601 et seq.,* which is implemented by Regulation Z, 12 C.F.R. § 226 *et seq.* Thus, Defendant contends that the district court, rather than the bankruptcy court, should determine this proceeding pursuant to *28 U.S.C. § 157(d).*

*Discussion*

**I. Withdrawal of the Reference Under *§ 157(d)***

When issues of law that require the interpretation of non-bankruptcy laws arise in bankruptcy proceedings,

> the district court may withdraw . . . any case or proceeding referred under this section. . . on timely motion of any Party, for cause shown. The district court shall, on the timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

**[*5]** *28 U.S.C. § 157(d).* This Court established in *Lone Star Ind. v. Rankin County Economic Dev. District (In re New York Trap Rock Corp.), 158 Bankr. 574, 576-77 (S.D.N.Y. 1993)*, that the purpose of *Section 157* is to quickly resolve withdrawal issues and minimize the amount of wasted judicial resources. The statute also aims at limiting forum shopping. *See id.*

The district court has the discretion to remove a case or proceeding only in limited circumstances. *See In re White Motor Corp., 42 Bankr. 693, 704 (N.D. Ohio 1984)*; *In re One-Eighty Investments Corp., 72 Bankr. 35 (N.D. Ill. 1987)* (supporting presumption that bankruptcy court should adjudicate bankruptcy proceedings); *In re Combustion Equip. Assocs., 67 Bankr. 709, 711 (S.D.N.Y. 1986)*. Additionally, a motion for mandatory or permissive withdrawal must pass the threshold requirement of timeliness. *See id.; accord In re Securities Group 1980, 89 Bankr. 192, 194 (M.D. Fla. 1988)*; *In re Stavriotis, 111 Bankr. 154, 157-58 (N.D. Ill. 1990)*.

### A. Mandatory Withdrawal

This circuit requires mandatory withdrawal of "cases or issues that would otherwise require a bankruptcy court to engage in significant **[\*6]** interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of N.Y. v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991)*. Two criteria qualify for mandatory withdrawal: (1) Proceedings involving a "substantial and material consideration of non-Bankruptcy code federal statutes" or (2) claims where such consideration is needed to resolve the case. *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 995 (2d Cir. 1990), cert. denied, 502 U.S. 808, 116 L. Ed. 2d 28, 112 S. Ct. 50 (1991)*.

### B. Permissive Withdrawal

The court must continue its analysis of the merits of the motion even if it finds that withdrawal is not mandatory. In its evaluation of permissive withdrawal, the court should consider "whether the claim or proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law." *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993), cert. dismissed, U.S. , 114 S. Ct. 1418 (1994)*. **[\*7]** A primary and determinative factor is whether the proceeding is core or non-core. *See In re Kenai Corp., 136 Bankr. 59, 61 (Bankr. S.D.N.Y. 1992)*.

### II. Analysis

Plaintiff raises the issue of timeliness as its first defense to Defendant's motion. The Court finds Plaintiff's argument has merit. *Section 157(d)* does not offer any concrete guidance as to whether a withdrawal motion is timely. Abundant case law holds, however, that the moving party should move under *Section 157(d)* as soon as possible after receiving notice of the grounds for withdrawing the reference. *See In re Sevko, Inc., 143 Bankr. 114, 116 (N.D. Ill. 1992)*; *In re Baldwin-United Corp., 57 Bankr. 751, 753 (S.D. Ohio 1985)* (a timely § *157(d)* motion is made at "the first reasonable opportunity" and without "undue delay"); *accord Stavriotis, 111 Bankr. at 157-58*. The determination of timeliness must be made on a case-by-case, fact-specific

basis. *See In re Chateaugay, 104 Bankr. 622, 623-24 (S.D.N.Y. 1989)*.

Although the discussion of the time limit for a motion for withdrawal of reference is infrequent, courts have generally agreed that eighteen months is grounds for denial. The district court decided **[\*8]** in *Burger King Corp. v. B-K of Kansas, Inc., 64 Bankr. 728, 730 (D. Kan. 1986)*, that ten months would be "the outer limit of time that [the] court [would] permit for filing such a motion. . . ." *See also Brizendine, Trustee v. Montgomery Ward & Co., Inc., 143 Bankr. 877, 878 (N.D. Ill. 1992)* (finding seven months constitutes untimeliness for motion of withdrawal); *In re Giorgio, 50 Bankr. 327, 329 (D.R.I. 1985)* (denying motion for withdrawal of the reference filed one year after complaint for untimeliness, despite resolution of proceeding required consideration of non-bankruptcy laws regulating interstate commerce). *Cf. Interconnect Telephone Serv., Inc. v. Farren, 59 Bankr. 397, 402 (S.D.N.Y. 1986)* (agreeing that moving to withdraw the reference after one year has elapsed since the filing of the action was untimely, yet not enough to preclude granting of the motion); *Matter of Lissner Corp., 115 Bankr. 604, 610 (N.D. Ill. 1990)* (evaluating delay of seven weeks, yet finding motion timely); *In re IQ Telecommunications, 70 Bankr. 742, 746-47 (N.D. Ill. 1987)* (stating that motion filed eleven weeks after complaint is timely).

Plaintiff charges that the Court should dismiss **[\*9]** Defendant's motion because Defendant filed it eighteen months after filing its answer, more than three months after Plaintiff put Defendant on notice of its intention to move for summary judgment, and more than three weeks after Plaintiff filed its motion for summary judgment. Moreover, Defendant itself concedes that the *pleadings* should show whether "substantial and material consideration" of non-bankruptcy laws are required to resolve the issues presented. Def.'s Mem. at 9 (citing *In re McCrory Corp., 160 Bankr. 502, 505 (S.D.N.Y. 1993)* (quoting *Ionosphere, 922 F.2d at 995*)). Defendant has offered no justification for an eighteen month hiatus before filing the instant motion.

Instead, Defendant dubiously filed this motion after receiving Plaintiff's motion for summary judgment. In light of Defendant's undue delay in moving for withdrawal, the Court cannot seriously consider Defendant's statement about the pleadings being dispositive. As the district court noted in *Stavriotis*, "that

the motion was filed as soon as [Claimant] realized withdrawal might be to his advantage is not sufficient to make the motion for withdrawal of the reference "timely." *Stavriotis,* **[\*10]** *111 Bankr. at 158* (finding six months untimely). The Court finds Defendant's motion untimely. The motion is denied.

### III. Merits of Withdrawal of the Reference

Even if Defendant had filed its motion in a timely manner, the motion to withdraw on mandatory or permissive grounds is without merit. Defendant did not sufficiently show cause why the resolution of this proceeding necessitates substantial and material interpretation of TILA, a statute governing cardholder's rights with banks. *See Ionosphere, 922 F.2d at 995*; *see also In re Continental Airlines, 138 Bankr. 442, 445 (D. Del. 1992)* (holding that the moving party must show "that a substantial and material consideration of nonbankruptcy law is necessary to resolve the case").

Hence, mandatory or permissive withdrawal is not appropriate.

### *Conclusion*

For the reasons stated above, Defendant's motion for withdrawal of the reference of the adversary proceeding from the Bankruptcy Court is denied. The Court directs the Clerk to close this action and remove it from the Court's active docket.

### SO ORDERED.

Dated: New York, New York

August 10, 1995

JOHN F. KEENAN

 **[\*11]**  United States District Judge

LEXSEE 2002 U.S. DIST. LEXIS 2629



Analysis
As of: Dec 06, 2007

**IN RE: THE SINGER COMPANY, N.V. et al., Debtors. THE SINGER COMPANY B.V. and SINGER BRASIL INDUSTRIA E COMERCIO LTDA., Plaintiffs, -against- GROZ-BECKERT KG and DYNO CORPORATION, Defendants. GROZ-BECKERT KG, Counterclaim and cross-claim plaintiff, -against- SINGER DO BRASIL INDUSTRIA E COMERCIO LTDA., Counterclaim defendant, and DYNO CORPORATION, Cross-claim defendant.**

**01 Civ. 0165 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 2629*

**February 15, 2002, Decided
February 20, 2002, Filed**

**DISPOSITION:** **[\*1]** Groz's motion to withdraw reference for adversarial proceeding number 00-2685 from United States Bankruptcy Court for Southern District of New York granted.

**COUNSEL:** For Groz-Beckert KG: Robert T. Schmidt, Esq., Kramer Levin Naftalis & Frankel LLP, New York, NY.

For The Singer Company B.V. and Singer do Brasil Industria e Comercio Ltda.: Shmuel Vasser, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY.

For Dyno Corporation: Barry G. Magidoff, Esq., Greenberg Traurig, LLP, New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge:

Defendant Groz-Beckert KG moves this Court to withdraw the reference for adversarial proceeding number 00-02685, filed September 11, 2000 in the U.S. Bankruptcy Court for the Southern District of New York. The central controversy in the adversarial proceeding is whether plaintiff Singer do Brasil Industria e Comercio Limitada ("Singer Brasil") owns an implied license in *U.S. Patent No. 4,519,330 ("the 330 patent")*, a sewing needle patent, and if so, whether that implied license is subject to a bankruptcy reorganization plan. (*See* The Singer Company **[\*2]** B.V. ("Singer BV") and Singer Brasil's Complaint, Adv. P. No. 00-02685 ("Singer Compl." P 1 et seq.)) Groz-Beckert KG ("Groz"), the current owner of the *330 patent*, counters that Singer Brasil does not own an implied license in the patent. For the reasons set forth below, Groz's motion is granted and adversarial proceeding number 00-02685 is hereby withdrawn from bankruptcy court for adjudication in this Court. [1]

1.  The complaint in the adversarial proceeding also requested a stay of a patent infringement action that Groz filed in the Southern District of Florida against Dyno Corporation ("Dyno"), the exclusive U.S. importer of certain Singer Brasil needles. (Singer Compl. P P 1, 17, 18, 44-46.) The bankruptcy court granted the stay, and Groz has appealed that decision to this Court. That appeal will be addressed in a separately-issued order.

*Background*

On September 12 and 13, 1999, The Singer Company N.V. and certain of its affiliates ("Debtors") filed voluntary petitions for relief under chapter 11 **[*3]** of the Bankruptcy Code. On August 24, 2000, the bankruptcy court confirmed the Debtor's joint plan of reorganization ("the Plan") providing that the automatic stay pursuant to *11 U.S.C. § 362* would remain in force until the effective date of the plan on September 14, 2000 (the "Effective Date"). Singer B.V. and Singer Brasil are reorganized debtors under the Plan.

Singer Brasil manufactured sewing needles covered by the *330 patent*. [2] (*See* Groz's Mem. at 5; Singer Opp. at 7.) In December 1994, Singer B.V. entered into a trademark license agreement with Dyno Corporation ("Dyno"), a Delaware company with its principal office in Florida. (Singer Compl. Ex. B: Trademark License Agreement ("Dyno License") at 1.) Pursuant to that agreement, Dyno became Singer B.V.'s exclusive U.S. distributor for needles covered by the *330 patent*. (Singer Compl. P 14.)

2   The parties dispute whether Singer Brasil continues to manufacture needles covered by the *330 patent*. Defendant alleges that at least as early as March 2000, Singer Brasil changed the needle mold in the machine that manufactured the needles covered by the *330 patent*. (Groz. Mem. at 13-14.) By changing the mold, Groz asserts, the needles no longer infringed the *330 patent*, thus terminating any implied license. (Groz. Mem. at 14.) Singer contends, however, that the machine continues to manufacture needles covered by the *330 patent*. (Singer Opp. at 7.)

**[*4]** On August 10, 2000, Groz filed a patent infringement action against Dyno in the Southern District of Florida. (the "Florida Action")(Affidavit of Jeffrey S.

Trachtman ("Trachtman Aff.") Ex. A: Groz-Beckert KG's Complaint ("Florida Compl.") at 1.) In that action, Groz alleges that Dyno "infringed the *330 patent* by selling and/or importing within the State of New York and elsewhere within the United States, without a license or the consent of [Groz], sewing needles that infringe the *330 patent*." (Florida Compl. P 7.) On September 11, 2000, Singer B.V. and Singer Brasil filed an adversarial proceeding in the U.S. Bankruptcy Court for the Southern District of New York seeking, *inter alia*, (1) a declaration that the Florida Action violates the automatic stay provisions of the Plan; (2) a declaration of ownership of an implied license in the *330 patent*; and (3) a stay of the Florida Action. (Singer Compl. P 1.) The complaint also alleges trademark infringement. (Singer Compl. P 50.)

In November 2000, the bankruptcy court issued a preliminary injunction pursuant to *Bankruptcy Code 105(a)§§* and *362(a)(1)* staying the Florida Action and enjoining Groz and Dyno from taking any action **[*5]** "in connection with or with respect to the Florida Action." (Order dated Nov. 8, 2000.) The court stated that "Singer Brasil has an interest in the *330 Patent* which constitutes property of the estate," (Opinion dated Nov. 3, 2000 at 10), and granted the preliminary injunction on the basis of that ownership. (Order dated Nov. 8, 2000.) The Order, however, did not directly address the more specific issue of whether Singer Brasil owns an implied license in the *330 patent*. Lastly, the Order denied Groz's cross-motion to dismiss the complaint.

Groz moves for withdrawal of the reference under *28 U.S.C. § 157(d)*, which states in pertinent part:

The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

Groz contends that withdrawal in the instant action is **[*6]** mandatory on the ground that resolution of the adversary proceeding requires significant interpretation

and application of federal patent and possibly trademark laws as well. (Groz Mem. at 3.) Groz contends in the alternative that discretionary withdrawal is appropriate because the implied patent license dispute is an issue that falls outside the core jurisdiction of bankruptcy court. (Groz Mem. at 4.) Moreover, Groz asserts that discretionary withdrawal is appropriate because (1) a jury trial in the forum selected by Groz is the most efficient use of resources; (2) it will not prejudice the essentially unrelated bankruptcy case or the already confirmed and effective bankruptcy plan; and (3) it will prevent forum shopping by the Singer plaintiffs who seek to avoid litigation in federal court in Florida in favor of the Southern District of New York Bankruptcy Court. (Groz Mem. at 4, 16-22.)

Singer B.V. and Singer Brasil (together "the Singer plaintiffs") oppose withdrawal on the ground that Groz is forum shopping by filing suit against Dyno in Florida to avoid litigation in bankruptcy court in the Southern District of New York. (Singer Opp. at 3.) The Singer plaintiffs further contend [*7] that Groz's motion is not timely under *28 U.S.C. § 157(d)*, and argue that Groz's delay in moving to withdraw is evidence of forum shopping. (Singer Opp. at 3, 14.) The Singer plaintiffs also assert that withdrawal is not mandatory because resolution of the adversarial proceeding involves the "routine application" of non-complex federal case law. (Singer Opp. at 5, 16, 17.) Moreover, the Singer plaintiffs contend that discretionary withdrawal is inappropriate on the grounds that (1) the primary issue in this action, whether Groz violated the automatic stay in an attempt to control property of the bankruptcy estate, is a core proceeding, (Singer Opp. at 5); and (2) withdrawal based on a jury demand, if at all, should not occur until after the bankruptcy court has supervised discovery and ruled on dispositive pretrial motions. (Singer Opp. at 6, 24, 25.)

Withdrawal of a reference is mandatory when "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." *28 U.S.C. § 157(d)*. Withdrawal is mandatory if the issue requires "significant [*8] interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *See City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991); accord Shugrue v. Pension Benefit Guaranty Corp. (In re Ionosphere Clubs, Inc.), 142 B.R. 645, 647, 649 (Bankr. S.D.N.Y. 1992)*. To determine

whether withdrawal is mandatory, a court must consider whether the case calls for "'substantial and material consideration of non-Bankruptcy code federal statutes'" and whether such consideration is "'necessary for the resolution of the proceeding.'" *McCrory Corp. v. 99 Cents Only Stores (In re McCrory Corp.), 160 B.R. 502, 505 (S.D.N.Y 1993)* (quoting *Shugrue v. AirLine Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 995 (2d Cir. 1990).)*

Here, withdrawal is mandatory because resolution of the adversary proceeding requires substantial and material consideration of domestic patent law, a statutory creation. In their complaint, the Singer plaintiffs seek a declaration that they own an implied license in Groz's *330 patent*. All of the complaint's related bankruptcy law issues that follow depend [*9] upon whether a court finds that the Singer plaintiffs indeed have a property interest in the *330 patent*. Thus, the patent law issues are central to the complaint.

The Singer plaintiffs' claim to an implied patent raises the difficult patent law question of determining under what circumstances an implied patent license can arise. The primary issue is whether Singer Germany's transfer of a needle manufacturing machine to Singer Brasil led to an implied patent license. Relatedly, a court would also need to consider whether Singer Brasil could gain an implied license in a United States patent if the needles, although covered by the *330 patent*, were not imported or sold in the United States during the time that Singer Germany owned the patent. The implied license issue will require patent law interpretation, as little statutory and decisional law addresses the circumstances as set forth in the complaint.

Moreover, Groz believes that Singer Brasil has altered the machine's needle mold, an assertion that calls into question the effective time period of the disputed implied patent license. (Groz. Mem. at 13-14). Resolving that dispute will ultimately require an inquiry into whether the [*10] needles produced in the new mold infringe the *330 patent*. Unquestionably, determining whether an accused product infringes a patent requires significant and material consideration of patent law. This determination requires a two-step analysis in which the court must construe the disputed patent claims and then apply the construed claims to the accused device. *See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995)* (en banc), *aff'd., 517 U.S. 370, 134 L.*

*Ed. 2d 577, 116 S. Ct. 1384 (1996).* The claim construction itself requires a hearing, followed by the court's examination of the intrinsic evidence (the words of the patent itself), the prosecution history, if in evidence, and in some instances extrinsic evidence. *See Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999)* (en banc). At the very least, then, the Singer plaintiff's complaint involves the patent law issues of implied licenses, claim construction, and infringement analysis. Thus, mandatory withdrawal is proper here because resolving the complaint will require the substantial and material consideration of patent law. *See,* **[*11]** *e.g., McRory Corp., 160 B.R. at 505-506* (finding mandatory withdrawal on the grounds that resolution of claims required substantial and material consideration of issues under the Lanham Act).

The Singer plaintiffs contend that Groz's motion should be denied on the ground that it is untimely. (Singer Opp. at 11-15.) No specific time limit exists for applications to withdraw a reference from bankruptcy court. *Lone Star Indus. Inc. v. Rankin County Econ. Dev. Dist. (In re New York Trap Rock Corp.), 158 B.R. 574, 577 (S.D.N.Y. 1993).* However, courts have stated that "a motion is timely if it is made as soon as possible in light of the status of the bankruptcy proceedings." *In re Texaco Inc., 84 B.R. 911, 919 (S.D.N.Y. 1988)* (citations omitted). But "where there did not appear to be unreasonable delay and the debtors are not prejudiced by such a delay then a motion is not considered untimely." *In re Texaco Inc., 84 B.R. at 919* (citations omitted).

Groz bears the burden to show that its motion was timely. *See United States v. Kaplan, 146 B.R. 500, 503 (D. Mass. 1992)* (citation omitted). Determining whether **[*12]** a motion to withdraw is timely involves a fact-specific inquiry into the context of the specific situation. *In re Texaco Inc., 84 B.R. at 919* (citations omitted); *Kaplan, 146 B.R. 503.* Grounds for denying an application include delay for tactical reasons, prejudice to the adversary, prejudice to the administration of justice, or forum shopping. *Lone Star Indus., Inc., 158 B.R. at 577* (citations omitted); *see also Interconnect Telephone Services, Inc. v. Farren (In re Interconnect Telephone Services), 59 B.R. 397, 402 (S.D.N.Y. 1986)* (granting motion to withdraw in the interest of judicial economy, despite one year lapse since filing of complaint and completion of some discovery).

The Singer plaintiffs filed their adversarial

proceeding on September 11, 2000. Groz filed its answer, counterclaim and cross-claim on December 5, 2000, and filed its motion to withdraw the reference on December 7, 2000. Thus, Groz moved for withdrawal two days after issue was joined and three months after the complaint was filed. Groz asserts that it "sought to conserve resources by addressing only threshold procedural issues" such as **[*13]** whether the Bankruptcy Court had jurisdiction over the Florida Action, before addressing the substantive allegations of the adversary proceeding. (Groz Reply at 3-4.) This strategy did not impose an unreasonable delay. *See e.g. Interconnect Telephone Services, Inc., 59 B.R. 397* (motion to withdraw filed one year after the complaint was filed was timely); *Burger King Corp. v. B-K of Kansas, Inc., 64 B.R. 728 (D.Kan. 1986)* (debtor's motion to withdraw ten months after filing adversarial proceeding was timely); *In re Sevko, Inc., 143 B.R. 114 (N.D. Ill. 1992)* (filing motion to withdraw five months after notice and one month after motion to dismiss denied was not untimely). While both parties advance dueling contentions of forum shopping, (*see* Singer Compl. at 1-4, 11-15; Groz Mem. at 21, 22), this Court finds neither argument persuasive. Moreover, the Singer plaintiffs will not suffer undue prejudice from litigating in this Court. In fact, the resulting efficiencies will accrue to their benefit. Claim construction is a question of law for the court to decide. *Markman, 52 F.3d at 970-71.* Yet a district court jury will **[*14]** determine whether the needles in question infringe the asserted claims, as Groz refuses to consent to a jury trial in bankruptcy court. (Groz Opp. at 19.) Thus, it makes little sense for the bankruptcy court to interpret the patent claims, and then have the district court preside over a jury trial centered on those claims. Withdrawing the reference assures that the parties will avoid explaining and arguing the intricacies of the *330 patent* claims twice. Moreover, by conducting the claim construction, this Court will be better prepared to adjudicate the remainder of the action.

*Conclusion*

For the reasons set forth above, Groz's motion to withdraw the reference for adversarial proceeding number 00-2685 from United States Bankruptcy Court for the Southern District of New York is hereby granted.

Dated: February 15, 2002

New York, New York

SO ORDERED:

2002 U.S. Dist. LEXIS 2629, *14

WILLIAM H. PAULEY III                                    U.S.D.J.

LEXSEE 2007 U.S. DIST. LEXIS 63129



Analysis
As of: Dec 09, 2007

**In re ENRON CORP., et al., Reorganized Debtors. ENRON CORP., Plaintiff,
-against- SPRINGFIELD ASSOCIATES, L.L.C. and WESTPAC BANKING
CORPORATION, Defendants. SPRINGFIELD ASSOCIATES, L.L.C., Appellant,
-against- ENRON CORP., Appellee.**

**Chapter 11, No. 01-16034, Jointly Administered, Adversary Proceeding No.
05-01025, 06 Civ. 7828 (SAS), 07 Civ. 1957 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 63129*; *48 Bankr. Ct. Dec. 213*

**August 27, 2007, Decided
August 27, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.), 2007 U.S. Dist. LEXIS 70731 (S.D.N.Y., Sept. 24, 2007)*

**PRIOR HISTORY:** [*1] Chapter 11. No. 01-16034. Jointly Administered. Adversary Proceeding No. 05-01025.
*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.), 340 B.R. 180, 2006 Bankr. LEXIS 541 (Bankr. S.D.N.Y., 2006)*

**COUNSEL:** For Appellant Springfield Associates, L.L.C.: David Parker, Esq., Edward Grosz, Esq., KLEINBERG, KAPLAN, WOLFF & COHEN, P.C., New York, NY; John J. Galban, Esq., SEWARD & KISSEL LLP, New York, NY.

For Intervenor-Appellant Citibank, N.A.: Brad S. Karp, Esq., Stephen J. Shimshak, Esq., Douglas R. Davis, Esq., Claudia L. Hammerman, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, NY.

For Appellee Enron Creditors Recovery Corp., Reorganized Debtor: Kenneth N. Klee, Esq., David M.

Stern, Esq., Lee R. Bogdanoff, Esq., Stacia A. Neeley, Esq., KLEE TUCHIN, BOGDANOFF & STERN LLP, Los Angeles, CA; Edward A. Smith, Esq., VENABLE LLP, New York, NY; Richard L. Wasserman, Esq., Michael Schatzow, Esq., VENABLE LLP, Baltimore, MD.

For Amici Curiae The Securities Industry and Financial Markets Association, the International Swaps and Derivatives Association, and the Loan Syndications and Trading Association: James H. Millar, Esq., WILMER CUTLER PICKERING HALE and DORR LLP, New York, NY; Seth P. Waxman, Esq., Louis R. Cohen, Esq., Craig Goldblatt, Esq., Joel Millar, Esq., Amy Oberdorfer Nyberg, Esq., WILMER CUTLER PICKERING HALE and DORR LLP, Washington, D.C.

For Amici Curiae Abrams Capital, [*2] LLC, Blavin & Company, Inc., and Citadel Investment Group, L.L.C.: Isaac M. Pachulski, Esq., Whitman L. Holt, Esq., STUTMAN, TREISTER & GLATT, P.C., Los Angeles, CA.

For Amicus Curiae Commercial Law League of America: Daniel L. Wallach, Esq., Kathy E. Brewer, Esq., Ivan J.

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 2 of 19

Page 2
2007 U.S. Dist. LEXIS 63129, *2; 48 Bankr. Ct. Dec. 213

Reich, Esq., BECKER & POLIAKOFF, P.A., Fort Lauderdale, FL; Louis S. Robin, Esq., FITZGERALD, O'BRIEN & ROBIN, Longmeadow, MA.

For Amicus Curiae Jeffrey W. Morris: Jeffrey W. Morris, Esq., Samuel A. McCray, Chair in Law, University of Dayton School of Law, Dayton, OH.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Defendant Springfield Associates, L.L.C. ("Springfield") and intervenor Citibank, N.A. ("Citibank") (collectively, "Appellants") in the above-captioned coordinated adversary proceeding bring this interlocutory appeal from the orders of the Bankruptcy Court of the Southern District of New York denying defendant's motion to dismiss an equitable subordination claim under *section 510(c) of the Bankruptcy Code* (the "Subordination Order") [1] and a disallowance claim pursuant to *section 502(d) of the Bankruptcy Code* (the "Disallowance Order") [2] filed by [*3] Enron Corp. [3] and certain of its affiliates (collectively, "Enron" or "Appellee"). The question presented, as the Court stated in its January 30, 2007 Opinion granting leave to file this interlocutory appeal, is "whether equitable subordination under *510(c)* and disallowance under *502(d)* can be applied, as a matter of law, to claims held by a transferee to the same extent they would be applied to the claims if they were still held by the transferor based on alleged acts or omissions on the part of the transferor." [4]

1  *See Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)* ("Subordination Order"), Nos. 01-16034, 05-01025, slip op. (Bankr. S.D.N.Y. Nov. 28, 2005).
2  *See Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)* ("Disallowance Order"), *340 B.R. 180 (Bankr. S.D.N.Y. 2006).*
3  Effective March 1, 2007, Enron Corp. changed

its name to Enron Creditors Recovery Corp.
4  *See Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.), No. M47, 2007 U.S. Dist. LEXIS 9151, 2007 WL 313470, at *1 (S.D.N.Y. Feb. 1, 2007) ("Enron II").*

This question, although fairly simply stated, is complex and of first impression in this Circuit, and will have serious ramifications well beyond the parties [*4] involved in this particular appeal. Hundreds of pages of material have been submitted by the parties and hundreds more by the various *amici curiae,* and all parties were heard at a lengthy oral argument. In resolving the difficult issues presented by this appeal, the Court has undertaken a careful review of the voluminous record, including a close reading of the Bankruptcy Court's two opinions, and the statutes, case law and ultimately, the policy considerations raised by the parties.

That review has revealed that the two opinions below unnecessarily reached beyond the facts of the cases before the court. [5] That overreaching resulted in the outcry from commentators and *amici curiae,* who have expressed great concern that the effect of these opinions will wreak havoc in the markets for distressed debt. While I cannot claim to avoid the use of *dicta* altogether, the conclusions of law here cleave tightly to the facts presented. For the reasons discussed below, the Subordination Order and Disallowance Order are vacated and the matter is remanded to the Bankruptcy Court for proceedings consistent with this Opinion.

5  The Bankruptcy Court applied its holding in each opinion to market purchasers [*5] of distressed debt, even though no such purchasers were transferees before the court. *See, e.g.,* Subordination Order, slip op. at 39 n.15 ("The purchase of bonds and notes are not at issue before the Court in the instant proceeding. However, the Court notes that the post-petition purchaser of such debt instruments either knows or should know that the issuer of these securities is a debtor, so the prices of these transfers would reflect the attendant risks that the claims might be subordinated. Under those circumstances, the purchaser may well not have any available indemnity remedy against the seller, as is the case with the claims trading. But it is the market place that should address such risks in its pricing. . . . [B]ased on the Court's previous policy analysis,

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 3 of 19

Page 3

2007 U.S. Dist. LEXIS 63129, *5; 48 Bankr. Ct. Dec. 213

no legal and policy basis supports the premise that transferees of bonds or notes should be treated differently than those holding the transferred loan claims. *All the post-petition transferees assume the risk that their claims may be subject to subordination.*" (emphasis added)); Disallowance Opinion, *340 B.R. at 201* n.23 (stating the same, but substituting "disallowed" for "subordinated" and "*section 502(d)* **[*6]** disallowance" for "subordination").

## II. BACKGROUND

### A. Facts

Enron was a borrower under a short-term credit agreement extended by a syndicate of banks, including Citibank. The aggregate liability under the short-term credit agreement was $ 1,754,024,000 plus unliquidated amounts. On December 2, 2001, Enron filed for protection under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Accordingly, on the Petition Date, Citibank and the other syndicate banks held claims against Enron under those loan agreements. At various times after the Petition Date, Citibank and certain other syndicate banks transferred, directly or indirectly, some portion of their claims to other entities. Many of the agreements evidencing the transfers contained warranties and indemnities against any acts or conduct of the transferor that may result in the claim receiving less favorable treatment. One of the transferees is Springfield, which acquired a claim of approximately $ 5,000,000 of the indebtedness arising under the Short-Term Credit Agreement that Citibank held as of the Petition Date. Specifically, on February 22, 2002, Citibank transferred its interest in the subject claim to Deutsche Bank (previously **[*7]** Bankers Trust Company) pursuant to a Purchase and Sale Agreement (the "Citi-BT PSA"), as well as an Assignment and Acceptance (the "Citi-BT Assignment"). On May 15, 2002, Deutsche Bank transferred its interest in the claim to Springfield again pursuant to a Purchase and Sale Agreement (the "DB-Springfield PSA") and an Assignment and Acceptance (the "DB-Springfield Assignment"). [6] The Citi-BT PSA and the DT-Springfield PSA both provide for a warranty and indemnity for equitable subordination and disallowance. [7]

6 The Citi-BT PSA is part of the record on appeal. The Citi-BT Assignment, the DB-Springfield PSA and the DB-Springfield

Assignment are not part of the record on appeal. *See* August 8, 2007 Letter from Brad S. Karp, counsel for Citibank, to the Court ("8/8/07 Citibank Letter") at 2 n.1. At the request of the Court, Citibank submitted all four documents. *See* Appendix of Supplemental Documents attached to 8/8/07 Citibank Letter ("8/8/07 Citibank Letter App."). Enron did not object to their submission. *See* August 9, 2007 Letter from David M. Stern, counsel for Enron, to the Court ("8/9/07 Enron Letter") **[*8]** at 1. Accordingly, all four documents are properly before the Court on this appeal.

7 *See* Citi-BT PSA, attached as Document F to the 8/8/07 Citibank Letter App., §§ 4.1(h), 6.1; DB-Springfield PSA, attached as Document 3 to the 8/8/07 Citibank Letter App., §§ 4.1(h), 6.1.

On September 24, 2003, Enron filed an action in the Bankruptcy Court against Citibank and the other transferors seeking, *inter alia:* (1) equitable subordination of the transferors' claims pursuant to *section 510(c) of the Bankruptcy Code* based on allegations that the transferors engaged in inequitable conduct; (2) disallowance of the transferors' claims under *section 502(d) of the Bankruptcy Code* based on allegations that the transferors received and failed to repay certain avoidable transfers; and (3) compensatory and punitive damages from the transferors based on allegations that the transferors aided and abetted fraud and breach of fiduciary duty, and engaged in an unlawful civil conspiracy with Enron insiders (the "MegaClaim Action"). [8] The allegations in the MegaClaim Action are contested, and have not yet been adjudicated.

8 *See In re Enron Corp.,* Nos. 01-16034, 03-09266.

On January 10, 2005, Enron filed a series **[*9]** of adversary proceedings against each of the transferees, including Springfield, in which Enron asserted two causes of action: (1) equitable subordination of the transferee's claims under *section 510(c)* based solely on the alleged misconduct of the transferor of the claims; and (2) disallowance of the transferee's claims under *section 502(d)* based solely on the allegation that a transferor received and failed to repay an avoidable transfer. The complaints against the transferees contain no allegations of misconduct or receipt of and failure to return an avoidable transfer on the part of the transferees.

2007 U.S. Dist. LEXIS 63129, *9; 48 Bankr. Ct. Dec. 213

Following Enron's commencement of the transferee actions, some of the transferees, including Springfield, sued their transferors to enforce their indemnities.

On April 1, 2005, Springfield and certain of the other transferees moved to dismiss the transferee actions on the grounds that neither *section 510(c)* nor *section 502(d)* may be applied as a matter of law to the claims held by the transferees based solely on the alleged conduct of the transferors of those claims. The transferors intervened to submit briefs and argue the issues on behalf of the transferees. On November 28, 2005, the **[*10]** Bankruptcy Court issued the Subordination Order denying the motion to dismiss the equitable subordination count. Certain transferees moved for leave to file an interlocutory appeal of the Subordination Order, which Enron opposed. On March 31, 2006, the Bankruptcy Court issued the Disallowance Order, denying the motion to dismiss the disallowance count, but the order was not issued in the Springfield action until November 6, 2006. Springfield then moved for leave to file an interlocutory appeal of the Disallowance Order, which again was opposed by Enron.

**B. The Interlocutory Appeal**

This Court, in an Opinion and Order dated September 5, 2006, granted certain defendants and intervenors, including Appellants, leave to file an interlocutory appeal from the Bankruptcy Court's Subordination Order (the "September 5 Opinion"). [9] Subsequently, all of the transferee litigations, with the exception of Springfield, settled. In an Opinion and Order dated January 30, 2007, this Court granted in part and denied in part leave to file an interlocutory appeal in the remaining transferee litigation from the Bankruptcy Court's Disallowance Order, and modified the September 5 Opinion to deny in part the interlocutory **[*11]** appeal of the Subordination Order (the "January 30 Opinion"). [10] Familiarity with the September 5 Opinion and the January 30 Opinion, and terms defined therein, is presumed.

> 9   *See Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.), 2006 U.S. Dist. LEXIS 63223, No. M47, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006).*
> 10   *See Enron II,* 2007 WL 313470.

The Court directed the parties to brief the issues raised by the Subordination Order and Disallowance

Order together. Citibank filed its brief in support of Appellants on March 12, 2007. [11] Enron submitted its Appellee's brief on April 16, 2007. [12] Citibank submitted Appellants' reply brief on May 14, 2007. [13]

> 11   *See* Opening Brief of Permitted Intervenor Bank Citibank, N.A. on the Issue of Equitable Subordination and Disallowance of Transferred Claims ("Appellants Mem.").
> 12   *See* Appellee's Brief in Support of Affirmance of the Bankruptcy Court's Rulings Denying Defendants' Motion to Dismiss ("Enron Mem.").
> 13   *See* Reply Brief of Permitted Intervenor Bank Citibank, N.A. on the Issue of Equitable Subordination and Disallowance of Transferred Claims ("Appellants Reply Mem.").

Various *amici curiae* requested leave to file *amicus* briefs on the issues raised in this appeal. **[*12]** The Securities Industry and Financial Markets Association, the International Swaps and Derivatives Association, and the Loan Syndications and Trading Association, submitted an *amicus* brief in Support of Appellants on March 12, 2007 (collectively, "Industry Amici"). [14] Certain of Enron's Creditors, namely Abrams Capital, LLC, Blavin & Company, Inc., and Citadel Investment Group, L.L.C., submitted an *amicus* brief in support of Appellee on April 13, 2007. [15] The Commercial Law League of America submitted an *amicus* brief in support of Appellee on April 16, 2007. [16] Jeffrey Morris, Professor of Law at the University of Dayton School of Law, of counsel at an Ohio law firm, and Reporter to the Advisory Committee on Bankruptcy Rules, also submitted an *amicus* brief in support of Appellee on April 13, 2007. [17] All of the requests for leave to file *amicus* briefs are granted. [18]

> 14   *See* Brief of *Amici Curiae* the Securities Industry and Financial Markets Association, the International Swaps and Derivatives Association, and the Loan Syndications and Trading Association in Support of Appellants ("Industry Amici Mem.").
> 15   *See* Brief of *Amici Curiae* Abrams Capital, LLC, Blavin & Company, Inc. and Citadel **[*13]** Investment Group, L.L.C. in Support of Appellee and Affirmance of the Bankruptcy Court's Orders.
> 16   *See Amicus Curiae,* Commercial Law League of America's, Brief Supporting the Bankruptcy

Case 1:07-cv-10612-GEL     Document 16-21     Filed 12/11/2007     Page 5 of 19

Page 5

2007 U.S. Dist. LEXIS 63129, *13; 48 Bankr. Ct. Dec. 213

Court's Decisions Denying Defendants' Motion to Dismiss.

17   *See* Brief of *Amicus Curiae,* Professor Jeffrey W. Morris, in Support of Equitable Subordination and Disallowance of Transferred Claims.

18   Enron Creditors Amici rely on several public filings in this and other bankruptcies and request judicial notice of those documents. Judicial notice of public records such as court filings, is clearly appropriate. *See Fed. R. Evid. 201(b)(2). Accord Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)* (noting that "courts routinely take judicial notice of documents filed in other courts").

## III. STANDARD OF REVIEW

A district court acts as an appellate court in reviewing judgments rendered by bankruptcy courts. 19 Findings of fact are reviewed for clear error. 20 A finding of fact is clearly erroneous if the court is "'left with the definite and firm conviction that a mistake has been committed.'" 21 A bankruptcy court's conclusions of law, by contrast, are reviewed de novo. 22 The Subordination Order and Disallowance **[*14]** Order at issue on this appeal were based on the Bankruptcy Court's conclusions of law, at the motion to dismiss stage, that equitable subordination and disallowance could be applied to a claim in the hands of a transferee based solely on conduct of the transferor. Accordingly, I review those decisions de novo. 23

19   *See In re Sanshoe Worldwide Corp., 993 F.2d 300, 305 (2d Cir. 1993)* ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

20   *See Fed. R. Bankr. P. 8013* ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Applied Theory Corp., -- F.3d --, No. 06-3390, 2007 U.S. App. LEXIS 16180, 2007 WL 1965012, at *2 (2d Cir. July 9, 2007); In re Cody, Inc., 338 F.3d 89, 94 (2d Cir. 2003).*

21   *In re Manville Forest Prods. Corp., 896 F.2d 1384, 1388 (2d Cir. 1990)* (quoting *United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)).*

22   *See In re Applied Theory, 2007 WL 1965012, at *2; In re Cody, 338 F.3d at 94; In re 139-141 Owners Corp., 313 B.R. 364;* **[*15]** *367 (S.D.N.Y. 2004).*

23   The parties do not dispute that this appeal is subject to de novo review. *See* Appellants Mem. at 2; Enron Mem. at 2 (stating that the "appeal presents a question of law").

## IV. APPLICABLE LAW

### A. Statutory Construction

When interpreting a statute, the well-established rules of statutory construction instruct that "the inquiry begins with the plain language of the statute and 'where the statutory language provides a clear answer, it ends there as well.'" 24 The Court must determine "'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" 25 "A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong." 26

24   *Peralta-Taveras v. Gonzales, 488 F.3d 580, 584 (2d Cir. 2007)* (quoting *Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)). Accord United States v. Razmilovic, 419 F.3d 134, 136 (2d Cir. 2005)* ("'Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.'" (quoting *United States v. Gayle, 342 F.3d 89, 92 (2d Cir. 2003))); In re Caldor Corp., 303 F.3d 161, 167 (2d Cir. 2002)* **[*16]** ("The task of resolving a dispute over the meaning of a provision of the Bankruptcy Code 'begins where all such inquires must begin: with the language of the statute itself.'" (quoting *United States v. Ron Pair Enters., 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989))).*

25   *In re Caldor, 303 F.3d at 168* (quoting *Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).*

26   *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship, 526 U.S. 434, 461, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1999).*

In determining whether the plain meaning of the statute is ambiguous, the Court should look to "the existing statutory text, and not the predecessor statutes." 27 The Court must read the Bankruptcy Code as a whole,

2007 U.S. Dist. LEXIS 63129, *16; 48 Bankr. Ct. Dec. 213

taking care that it does not construe any provision "in a manner that would place it in conflict with other provisions." [28] "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." [29]

27  *Lamie v. United States Trustee, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004)* (citation omitted) (analyzing the meaning of *section 330 of the Bankruptcy Code* and finding that the Circuit Court's reliance on the predecessor statute's construction as a basis for ambiguity in the current  [*17] statute was erroneous).

28  *In re Smart World Techs., LLC, 423 F.3d 166, 183 (2d Cir. 2005)* (citing *Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002)* ("Statutory construction is a holistic endeavor . . . . [T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (internal quotations omitted))). However, "where a conflict between a Rule and a statutory provision exists . . . the Rules Enabling Act requires that [the Court] apply the statutory provision." *Id. at 181*.

29  *Ron Pair Enters., 489 U.S. at 240-41*.

Nonetheless, a court may depart from the plain language "if literal application of the statute will produce a result demonstrably at odds with the intentions of [the statute's] drafters." [30] Accordingly, if the statutory language is ambiguous and resort to canons of construction does not clarify the meaning, the Court may look to the legislative history of the statute to discern Congress's intent. [31] Finally, "'[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.'" [32] To that end, it is proper to consider the effect that the court's interpretation would have on the markets.  [*18] [33]

30  *Id. at 242*.

31  *See United States v. Boccagna, 450 F.3d 107, 114 (2d Cir. 2006)* (citing *Daniel v. American Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir. 2005)*).

32  *Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 371 (2d Cir. 1999)* (quoting *American Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S. Ct. 1534, 71 L. Ed. 2d 748 (1982)*).

33  *See id. at 380* (interpreting New York's

champerty statute in a way to avoid unreasonable results, namely that "[a] well-developed market of secondary purchasers of defaulted sovereign debt would [] be disrupted and perhaps destroyed").

## B. Equitable Subordination

"'Under the doctrine of equitable subordination . . . a bankruptcy court may subordinate a particular claim if it finds that the creditor's claim[], while not lacking a lawful basis nonetheless results from inequitable behavior on the part of that creditor.'" [34] Equitable subordination is specifically authorized by *section 510(c)*, which provides, in pertinent part,

[A]fter notice and a hearing, the court may . . . (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all [*19] or part of another allowed interest . . . . [35]

"Although Congress included no explicit criteria for equitable subordination when it enacted *[section] 510(c)(1)*, the reference in *[section] 510(c)* to 'principles of equitable subordination' clearly indicates congressional intent at least to start with existing doctrine." [36] At the time of enactment, courts had uniformly adopted the three-pronged test set forth by the Fifth Circuit in *In re Mobile Steel Co.* for evaluating whether to equitably subordinate a claim: (1) the subordinated creditor must have engaged in "some type of inequitable conduct"; (2) the misconduct must have "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant"; and (3) equitable subordination of the claim must "not be inconsistent with the provisions of the Bankruptcy Act." [37] Even after the enactment of *section 510(c)*, the vast majority of courts have continued to apply the *Mobile Steel* test, as recognized by the Supreme Court. [38]

34  *Musso v. Ostashko, 468 F.3d 99, 109 (2d Cir. 2006)* (quoting *Kelleran v. Andrijevic, 825 F.2d 692, 697 (2d Cir. 1987)* (Blumenfeld, J., dissenting)). *See also id.* ("By exercising its equitable  [*20] powers, the bankruptcy court may thus 'sift the circumstances surrounding any claim to see that injustice or unfairness is not done in

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 7 of 19

Page 7

2007 U.S. Dist. LEXIS 63129, *20; 48 Bankr. Ct. Dec. 213

administration of the bankruptcy estate.'" (quoting *Kelleran, 825 F.2d at 697-98* (Blumenfeld, J., dissenting) (citing *Pepper v. Litton, 308 U.S. 295, 307-08, 60 S. Ct. 238, 84 L. Ed. 281 (1939)))).

35   *11 U.S.C. § 510(c)*.

36   *United States v. Noland, 517 U.S. 535, 539, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996)* (relying on "principles of statutory construction . . . [and] statements in the legislative history that Congress 'intended that the term 'principles of equitable subordination' follow existing case law and leave to the courts development of this principle'" (citing 124 Cong. Rec. 32398 (1978) (Rep. Edwards); *id.* at 33998 (Sen. DeConcini)) (additional citations omitted)).

37   *563 F.2d 692, 700 (5th Cir. 1977)*.

38   *See, e.g., Noland, 517 U.S. at 538; Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 876 (2d Cir. 1991)* (quoting *In re Universal Farming Indus., 873 F.2d 1334, 1337 (9th Cir. 1989)* ("[E]quitable subordination [is] appropriate when '(1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants . . . and (3) subordination **[*21]** is not inconsistent with bankruptcy law.'")); *In re Marketxt Holdings Corp., 361 B.R. 369, 385 (Bankr. S.D.N.Y. 2007)* (collecting cases).

Inequitable conduct under the first prong of the *Mobile Steel* test is generally defined as either (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality or alter ego. 39 The second requirement is met where the general creditors are less likely to collect their debts as a result of the alleged inequitable conduct. 40 "'If the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner.'" 41 The third requirement "has been read as a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." 42

39   *See, e.g., New Jersey Steel Corp. v. Bank of New York, No. 95 Civ. 3071, 1997 U.S. Dist. LEXIS 18137, 1997 WL 716911, at *4 (S.D.N.Y.*

*Nov 17, 1997)* (citing *In re Fabricators, Inc., 926 F.2d 1458, 1467 (5th Cir. 1981)*); **[*22]** *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.) 340 B.R. 1, 45 (Bankr. E.D.N.Y. 2006)* (citing *In re KDI Holdings, Inc., 277 B.R. 493, 513 (Bankr. S.D.N.Y. 1999); In re 80 Nassau Assocs., 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)*. *See also Adelphia Communs. Corp. v. Bank of Am., N.A. (In re Adelphia Communs. Corp.), Nos. 02-41729, 03-04942,, 365 B.R. 24, 2007 Bankr. LEXIS 1942, 2007 WL 1673928, at *28 (Bankr. S.D.N.Y. June 11, 2007)* ("'Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, *inter alia,* a secret or open fraud lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.'" (quoting *In re 80 Nassau Assocs., 169 B.R. at 837*)).

40   *See In re 80 Nassau Assocs., 169 B.R. at 840. See also In re KDI Holdings, 277 B.R. at 514*.

41   *In re 80 Nassau Assocs., 169 B.R. at 840*.

42   *Noland, 517 U.S. at 539* (quotation omitted). Some courts have concluded that the enactment of *section 510(c)* has rendered the third prong of the *Mobile Steel* test moot. *See, e.g., In re 80 Nassau Assocs., 169 B.R. at 841* ("[S]ince the Bankruptcy Code, unlike its **[*23]** predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot." (citation omitted)). I need not decide that issue here, but note that the Supreme Court's analysis of the *Mobile Steel* test in *Noland* explicitly referred to the third prong and made no mention of its mootness or irrelevance.

"The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors." 43 Nevertheless, many courts view equitable subordination as a "drastic and unusual remedy." 44 Moreover, "the doctrine is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." 45 As the Bankruptcy Court below itself acknowledged, "the power to subordinate an allowed claim is not boundless and courts cannot use equitable principles to disregard

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 8 of 19

Page 8

2007 U.S. Dist. LEXIS 63129, *23; 48 Bankr. Ct. Dec. 213

unambiguous statutory language of the Bankruptcy Code." [46]

43    *Official Comm. of Unsecured Creditors v. Halifax Fund, L.P. (In re AppliedTheory Corp.), 345 B.R. 56, 59 (S.D.N.Y. 2006)* (citing *In re Lockwood, 14 B.R. 374, 380-81 (Bankr. E.D.N.Y. 1981)* ("The fundamental aim of equitable subordination is to undo or offset **[*24]** any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results."), *aff'd, 2007 WL 1965012.*

44    *In re Radnor Holdings Corp., 353 B.R. 820, 840-42 (Bankr. D. Del. 2006)* (quotations omitted). *Accord In re SubMicron Sys. Corp., 291 B.R. 314, 327-29 (D. Del. 2003)* ("Courts have recognized that equitable subordination is an unusual remedy which should be applied only in limited circumstances." (citing *Holt v. FDIC (In re CTS Truss, Inc.), 868 F.2d 146, 148-49 (5th Cir. 1989)))*; *In re M. Paolella & Sons, Inc., 161 B.R. 107, 117 (E.D. Pa. 1993)* (stating that equitable subordination is an "extraordinary" departure from the "usual principles of equality of distribution and preference for secured creditors" (citation omitted)); *In re Kenny, 75 B.R. 515, 527 (Bankr. E.D. Mich. 1987)* ("Equitable subordination is a harsh remedy. It is a remedy that is not to be lightly invoked." (quotation and citation omitted)); *In re Tinsley & Groom, 49 B.R. 85, 90 (Bankr. W.D. Ky. 1984)* ("[E]quitable subordination is a harsh remedy that is not to be lightly invoked."); *In re Allied Tech., Inc., 25 B.R. 484, 499 (Bankr. S.D. Ohio 1982)* **[*25]** (Equitable subordination "should only be used sparingly to rectify obvious inequities.").

45    *In re SubMicron, 291 B.R. at 327* (citing *Trone v. Smith (In re Westgate-California Corp.), 642 F.2d 1174, 1178 (9th Cir. 1981)).*

46    Disallowance Order, 2005 WL 3832053, at *9 (citing *Noland, 517 U.S. at 543* ("[T]he circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code.")).

**C. Disallowance**

    "*Section 502(d)* requires a court to disallow an

entity's claim against the bankruptcy estate if the estate is entitled to recover property from that entity, such as because of a voidable preference, but that entity has failed to first transfer this property back to the bankruptcy estate." [47] *Section 502(d)* provides, in pertinent part,

    [T]he court shall disallow any claim of any entity from which property is recoverable under *section 542, 543, 550,* or *553* of this title or that is a transferee of a transfer avoidable under *section 522(f), 522(h), 544, 545, 547, 548, 549,* or *724(a)* of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under *section 522(i),* **[*26]** *542, 543, 550,* or *553* of this title. [48]

The twin aims of *section 502(d)* are "to assure an equality of distribution of the assets of the bankruptcy estate" [49] and "to have the coercive effect of insuring compliance with judicial orders." [50] Moreover, *section 502(d)* was "not [intended] to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors." [51]

47    *In re McLean Indus., Inc., 30 F.3d 385, 388 (2d Cir. 1994). Accord Germain v. Connecticut Nat'l Bank, 988 F.2d 1323, 1327 (2d Cir. 1993)* ("Under the Bankruptcy Code a court must disallow 'any claim of any entity from which property is recoverable' because of a preferential transfer or fraudulent conveyance." (quoting *11 U.S.C. § 502(d))).*

48    *11 U.S.C. § 502(d).*

49    *In re Davis, 889 F.2d 658, 662 (5th Cir. 1989).*

50    *Id. at 661. Accord In re Shared Techs. Cellular, Inc., 293 B.R. 89, 97 (D. Conn. 2003)* (same).

51    *Petitioning Creditors of Melon Produce, Inc. v. Braunstein, 112 F.3d 1232, 1239 (1st Cir. 1997)* (quotation omitted). *Accord Smith v. American Founders Fin., Corp., No. Civ. A. H-05-1779, 365 B.R. 647, 2007 U.S. Dist. LEXIS 17645, 2007 WL 781949, at *20 (S.D. Tex. Mar. 10, 2007)* **[*27]** (same).

**D. Transfers**

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 9 of 19

Page 9

2007 U.S. Dist. LEXIS 63129, *27; 48 Bankr. Ct. Dec. 213

### 1. Assignments and Sales

An assignment is a contractual transfer of a right, interest, or claim from one person to another. The word "assignment" is not synonymous with "sale," although each is a type of transfer. [52] "Whether or not a particular transfer is an assignment or a sale or some other transaction depends on the terms of the transfer." [53] It "depends, not on the name by which it calls itself, but on the legal effect of its provisions." [54]

> [52] *See, e.g., Feder v. Goetz, 264 F. 619, 624-25 (2d Cir. 1920)* (distinguishing between a transfer "by way of an assignment" and a transfer "by means of a sale").
> [53] 6A C.J.S. *Assignments* § 5.
> [54] *Id. Cf. International Trade Admin. v. Rensselaer Polytechnic Inst., 936 F.2d 744, 748 (2d Cir. 1991)* ("The use of terms such as 'lease' or 'landlord' and 'tenant' does not automatically transform an agreement into a bona fide lease . . .; rather, a court must look to the economic substance of the transaction and not its form." (quotation omitted)).

Sales and assignments can have very different consequences for the transferee. With respect to assignments, "[a]n assignee stands in the shoes of the assignor and subject to all equities against [*28] the assignor." [55] In other words, "an assignee of a claim takes with it whatever limitations it had in the hands of the assignor." [56] These principles are a corollary to the well-established doctrine of *nemo dat qui non habet:* an assignor cannot give more than he has. [57] By contrast, these assignment law principles do not apply to sales. A purchaser does not stand in the shoes of the seller and, as a result, can obtain more than the transferor had in certain circumstances. [58]

> [55] *Goldie v. Cox, 130 F.2d 695, 720 (8th Cir. 1942). Accord Citibank, N.A. v. Tele/Resources, Inc., 724 F.2d 266, 269 (2d Cir. 1983)* ("Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor."). *See also Ward v. Sun Valley Foods Co., Inc., 212 Fed. Appx. 386, 391 (6th Cir. 2006)* (unpublished) ("[I]t is a fundamental rule of the law of contract that the assignee stands in the shoes of the assignor, possessing the same rights and remaining subject to the same defenses as the

assignor.").
> [56] *Caribbean S.S. Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S., 598 F.2d 1264, 1266-67 (2d Cir. 1979). Accord* 29 Williston on Contracts [*29] § 74:47 (4th ed. 2003) (stating that an assignee is "subject to all defenses that the obligor may have against the assignor, including . . . defenses . . . that relate to the assigned obligation itself, but also rights . . . [that] aris[e] out of separate matters that the obligor might have asserted against its original creditor, the assignor").
> [57] *See Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A., No. 01 Civ. 1047, 2002 U.S. Dist. LEXIS 18115, 2002 WL 31174470, at *32 n.39 (S.D.N.Y. Sept. 26, 2002)* (citing Black's Law Dictionary (6th ed. 1990)).
> [58] *See, e.g.,* N.Y. *U.C.C. § 8-202(d)* (stating that all defenses of the issuer of a security with enumerated exceptions, are "ineffective against a *purchaser* for value who has taken the security without notice of the particular defense" (emphasis added)).

These distinctions apply with the same force to transfers of debt and claims. An assignee of a claim takes no more than the assignor had to give. A purchaser of a claim may take more. [59] Although characteristics that inhere in a claim may travel with the claim regardless of the mode of transfer, the same cannot be said for personal disabilities of claimants. A personal disability that has attached to a creditor who transfers [*30] its claim will travel to the transferee if the claim is *assigned,* but will not travel to the transferee if the claim is *sold.* [60]

> [59] *See id.* Section 8-202 of the N.Y. U.C.C. has been held to apply to certain debts. *See, e.g., Highland Capital Mgmt. LP v. Schneider, 8 N.Y.3d 406, 412, 866 N.E.2d 1020, 834 N.Y.S.2d 692 (2007)* (after the Second Circuit certified the question of whether the eight promissory notes issued in that case fell within the definition of a security under Article 8 of the New York Uniform Commercial Code, the New York Court of Appeals held that the promissory notes did meet the *U.C.C. section 8-102(a)(15)* definition of security); *Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, Tex., 87 N.Y.2d 36, 43, 660 N.E.2d 1121, 637 N.Y.S.2d 342 (1995)* (stating that article 8 "governs stocks, bonds and other evidences of indebtedness").

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 10 of 19

Page 10

2007 U.S. Dist. LEXIS 63129, *30; 48 Bankr. Ct. Dec. 213

60  *See In re Latham Lithographic Corp., 107 F.2d 749, 750 (2d Cir. 1939)* (after holding that section 44 of the Bankruptcy Act "creates a personal disability only," stating that "[i]f a creditor who would be disqualified to vote the claim in the debtor's bankruptcy assigns it in good faith *to a purchaser* who is not disqualified, we can see no reason to bar the latter from voting it" (emphasis added)).

## 2. [*31] Exceptions to Assignment Law

### a. Holder in Due Course

An exception to assignment law's rule that an assignor cannot give more than he has exists for holders in due course of a negotiable instrument. [61] A holder of a negotiable instrument qualifies as a holder in due course if it takes the instrument: "(a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." [62] If the holder qualifies as a holder in due course, "he takes the instrument free from (1) all claims to it on the part of any person; and (2) all defenses of any party to the instrument with whom the holder has not dealt [with certain exceptions]." [63]

61  Under N.Y. *U.C.C. § 3-104*, in order for a writing to qualify as a negotiable instrument, the writing must:

(a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer.

62  *Id. § 3-302*.

63  *Id. § 3-305*. Post-petition [*32] purchasers of claims, even if the claims qualify as negotiable instruments, cannot qualify as holders in due course because they cannot take the instrument "without notice that it is overdue" as required by the N.Y. U.C.C.

### b. Third Party Latent Equities Doctrine

Under the third party latent equities doctrine, an assignee without notice takes the property free from the latent equities of third parties other than the debtor. However, many states do not recognize the doctrine of latent equities in the context of transfers of choses in action, including New York. [64] Most bankruptcy claims are choses in action. [65]

64  *See, e.g., Central Trust Co. v. West India Imp. Co., 169 N.Y. 323, 323-24 (1901)* ("It is further the settled law of this state, though a different rule prevails not only in England, but in the federal courts and in some of the states, that a bona fide purchaser for value of a chose in action takes it subject not only to the equities between the parties, but also to latent equities in favor of third persons . . . ."). *See also* 29 Williston on Contracts § 74:46 ("[I]n a majority of jurisdictions the assignee takes subject to an equitable claim against the assignor existing at the time [*33] of the assignment in favor of a third person.").

65  *See Elliott Assocs., 194 F.3d at 363* (analyzing New York's champerty statute, *New York Judiciary Law § 489*, which characterizes bonds, promissory notes and other debts as choses (things) in action).

## V. DISCUSSION

It is undisputed that Springfield is not alleged to have itself acted inequitably or received any preference that would subject its claims to equitable subordination or disallowance. Nevertheless, the Bankruptcy Court held that claims in the hands of Springfield, the transferee, could be both subordinated and/or disallowed based solely on the conduct of Citibank, the transferor.

Enron argues that the Bankruptcy Court's rulings should be affirmed essentially on two grounds. *First,* Enron argues that the general principle of bankruptcy law that all rights among competing claims to a bankruptcy estate are fixed and determined as of the date of petition, as set forth by the Supreme Court in *Sexton v. Dreyfus* and *United States v. Marxen,* [66] applies to equitable subordination and disallowance. Thus, Enron argues that because Citibank held the claims on the Petition Date and that Citibank is subject to equitable subordination and/or disallowance, [*34] Citibank's claims were forever tainted on the Petition Date. *Second,* Enron argues that

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 11 of 19

Page 11

2007 U.S. Dist. LEXIS 63129, *34; 48 Bankr. Ct. Dec. 213

principles of assignment law dictate that a transferee of a claim can have no greater rights than the transferor would have if it still held the claim, and that because the claims in the hands of Citibank were tainted, the transfer of the claim to Springfield cannot cure that taint. Each of Enron's contentions are addressed in turn.

66    *See* Enron Mem. at 14 (citing *Sexton v. Dreyfus, 219 U.S. 339, 31 S. Ct. 256, 55 L. Ed. 244 (1911),* and *United States v. Marxen, 307 U.S. 200, 59 S. Ct. 811, 83 L. Ed. 1222 (1939)).*

## A. Equitable Subordination and Disallowance Are Not Fixed as of the Petition Date

The issue of whether *Sexton* and *Marxen* apply to equitable subordination and disallowance of claims begins and ends with the plain language of the statutes. With respect to equitable subordination, the language of *section 510(c)* reveals that equitable subordination cannot be fixed on the petition date. *First,* court action is a prerequisite to application of *section 510(c).* The statute states that "after notice and a hearing, the court may" equitably subordinate a claim. Equitable subordination must be court-ordered, and can be so ordered only *after* notice and a hearing. *Second,* **[*35]** equitable subordination is permissive -- not mandatory. The statute makes clear that it is within the discretion of the bankruptcy court, which "may" 67 or may not equitably subordinate a claim under the facts and circumstances of each case. *Third,* equitable subordination can be based on post-petition inequitable conduct, 68 which obviously cannot be ascertained or fixed on the petition date. *Fourth,* because *Mobile Steel* dictates that equitable subordination is not available to creditors who suffered no injury, creditors who acquired their claims post-petition and after the alleged misconduct that forms the basis for the equitable subordination may not be entitled to that remedy. 69 Thus, the circumstances of other creditors can become relevant post-petition and may alter the availability of equitable subordination.

67    *11 U.S.C. § 510(c).*
68    *See, e.g., Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982, 991 (3d Cir. 1998);* In re Lemco Gypsum, Inc., 911 F.2d 1553, 1558 (11th Cir. 1990).
69    *See In re W.T. Grant Co., 4 B.R. 53, 78 (Bankr. S.D.N.Y. 1980), aff'd on other grounds, 20 B.R. 186 (S.D.N.Y. 1982), aff'd, 699 F.2d 599 (2d*

*Cir. 1983).*

Likewise, **[*36]** with respect to disallowance, the plain language of *section 502(d)* reveals that disallowance cannot be fixed on the petition date. *First,* like equitable subordination, court action is necessary in order to disallow a claim. *Section 502(d)* states that "the court shall disallow" a claim if it meets the requirements of the statute. Thus, it is the court that must determine whether the claim is of the type to which disallowance is properly applied. 70 *Second,* disallowance of a claim under the terms of *section 502(d)* is completely contingent on the refusal or failure to return the avoidable transfer by the recipient of that avoidable transfer. *Third,* disallowance can be applied based solely on the post-petition receipt of (and failure to return) an avoidable transfer, 71 which again clearly cannot be determined on the petition date.

70    *See, e.g., In re Red Dot Scenic, Inc., 313 B.R. 181, 186 (Bankr. S.D.N.Y. 2004)* ("'[T]o prevent abuse of *[section 502(d)]* this initial disallowance should be made by judicial determination, whether it be obtained in a claim objection or by some form of declaratory judgment action.'" (quoting 4 Collier on Bankruptcy Procedure § 502.05[2][a] (15th ed. 2004))). **[*37]** *See also In re Atlantic Computer Sys., 173 B.R. 858, 862 (S.D.N.Y. 1994)* (*section 502(d)* "clearly envisions some sort of determination of the claimant's liability before its claims are disallowed, and in the event of an adverse determination, the provision of some opportunity to turn over the property."). Of course, the court's action is not discretionary as it is with *section 510(c). Compare 11 U.S.C. § 502(d)* ("[T]he court *shall* disallow any claim . . . ." (emphasis added)), *with id. § 510(c)* ("[T]he court *may* . . . subordinate . . . an allowed claim . . . ." (emphasis added)).
71    *See 11 U.S.C. § 502(d)* (disallowing claims of an entity that is a transferee of a transfer avoidable under enumerated sections, including *section 549,* which specifically addresses post-petition avoidable transfers).

Accordingly, under the plain language of the statutes, equitable subordination and disallowance cannot be fixed as of the petition date, and thus, the principles of *Sexton* and *Marxen* have no application here. Enron's citation to cases holding that statutory priorities become fixed on the

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 12 of 19

Page 12

2007 U.S. Dist. LEXIS 63129, *37; 48 Bankr. Ct. Dec. 213

petition date and travel with the claim are readily distinguishable. Statutory priorities, such as the wage [*38] priority [72] and the United States government priority [73] are capable of being ascertained on the petition date. They are non-discretionary, do not require court action, and are not contingent in any way on the petition date. Thus, while certain priorities become fixed and immutable at the petition date, this is not true for claims of equitable subordination or disallowance.

> [72] *See Shropshire, Woodliff, & Co. v. Bush, 204 U.S. 186, 27 S. Ct. 178, 51 L. Ed. 436 (1907)* (applying *section 507(a)(4)*).
> [73] *Marxen, 307 U.S. at 202-03* (applying section 64(b)(7) of the Bankruptcy Act, which conferred priority upon debts owing to any person, including the United States, who is entitled to priority under the laws of the United States, and section 3466 of the Revised Statutes, which provided that "[w]henever any person indebted to the United States is insolvent . . . the debts due to the United States shall be first satisfied; and the priority hereby established shall extend . . . to cases in which an act of bankruptcy is committed.").

**B. Equitable Subordination and Disallowance Are Personal Disabilities of the Claimant and Travel with the Claim Only When the Claim Is Assigned, Not When It Is Sold**

The parties do not, and cannot, dispute [*39] that the outcome of this case depends on whether the principle that an assignee has no greater rights than its assignor applies to equitable subordination and disallowance. [74] That issue raises a threshold question of law that the Court must decide: are equitable subordination under *section 510(c)* and disallowance under *section 502(d)* attributes of a claim or are they personal disabilities of particular claimants. If they are attributes of the claim, they will travel with the claim regardless of the method of transfer, whereas if they are personal disabilities, their application to transferees depends on whether the transfer was by way of a sale or assignment. [75] As discussed below, I find that equitable subordination and disallowance are both personal disabilities that do not inhere in the claim. Thus, unless there was a pure assignment (or other basis for the transferee to step in the shoes of the transferor), as opposed to a sale of the claim, the claim in the hands of the transferee is not subject to

equitable subordination or disallowance based solely on the conduct of the transferor. [76]

> [74] *See* August 7, 2007 Transcript of Oral Argument ("Tr.") at 50.
> [75] *See supra* Part IV.D.1.
> [76] Accordingly, [*40] the concerns raised by Industry Amici with respect to the effects of the Bankruptcy Court's rulings on the markets for distressed debt are no longer present. *See* Industry Amici Mem. at 10-20. Equitable subordination and disallowance arising out of the conduct of the transferee will not be applied to good faith open market purchasers of claims.

**1. Equitable Subordination Is a Personal Disability**

The issue of whether equitable subordination under *section 510(c)* travels with the claim and can be applied to a transferee based solely on the conduct of a transferor is a matter of statutory interpretation. Both parties concede that there is no case directly on point. The Bankruptcy Court below was the first court to address the question, and this Court conducts a de novo review of that decision.

Enron stresses a plain language approach to *section 510(c)*, arguing that the statute's reference to subordination of "an allowed claim" demonstrates that equitable subordination becomes an attribute of that claim. The phrase cited by Enron, however, cannot be read in a vacuum. The statute expressly invokes "principles of equitable subordination," [77] which indisputably was intended to incorporate the [*41] doctrine as developed by the courts. [78] Thus, I turn to the legislative history and case law to determine whether the legislative intent was to create a characteristic of a claim or rather a personal disability of claimants.

> [77] *11 U.S.C. § 510(c).*
> [78] *See Noland, 517 U.S. at 539.*

The legislative history and case law both demonstrate that Congress intended to create a personal disability. The legislative history's various references to the requirement of misconduct on the part of the "holder" of the claim demonstrate that Congress intended equitable subordination under *section 510(c)* to be specific to the individual who acted inequitably. For example, the legislative history states that "[t]o date, under existing law, a claim is generally subordinated only

2007 U.S. Dist. LEXIS 63129, *41; 48 Bankr. Ct. Dec. 213

if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor." [79] In fact, Congress specifically rejected a broader wording of the statute that was proposed by the House of Representatives, which provided for subordination "on equitable grounds." [80] The enacted version [*42] actually *limits* the scope of equitable subordination.

> 79  124 Cong. Rec. 32398 (Rep. Edwards); *id.* at 33998 (Sen. DeConcini). The juxtaposition between the two clauses of this statement also highlights the focus on the holder in this context. According to the legislative history, the two circumstances where equitable subordination would be present are: (1) if the *holder* has acted inequitably, or (2) the *claim itself* is historically subject to subordination, such as penalties (*i.e.,* punitive claims, which are generally disfavored as against claims for actual losses) or shareholder claims alleging fraud by the debtor. *See, e.g., In re Stirling Homex Corp., 579 F.2d 206, 213 (2d Cir. 1978)* (holding that the claims of defrauded shareholders could be subordinated to the claims of general creditors, even though both were presumably innocent). The present appeal does not involve any penalty or shareholder claims. Accordingly, Congress intended that the holder must be guilty of inequitable conduct before equitable subordination can be imposed.
>
> 80  H.R. 8200, 95th Cong. *§ 510* (1977).

Moreover, at the time of the enactment of *section 510(c)*, courts routinely required misconduct on the part of the creditor [*43] asserting the claim before the court would equitably subordinate a claim. Indeed, as already mentioned above, Enron can point to no case, let alone a case pre-enactment, that applied equitable subordination to a transferee of a claim based on the conduct of the transferor. In light of the legislative history's references to inequitable conduct on the part of the holder of the claim, and the lack of any case law existing at the time of enactment that applied equitable subordination absent misconduct on the part of the holder, I find that Congress did not intend *section 510(c)* to be applied to a transferee of a claim -- who has not acted inequitably -- merely because that claim was transferred, directly or indirectly, by a bad actor.

This result is further supported by the case law following the enactment of *section 510(c)*. Courts consistently have focused on the claimant, rather than the claim, for purposes of applying equitable subordination. [81] For example, the Second Circuit has stated that "equitable subordination is appropriate, *inter alia,* when the *subordinated claimant* has engaged in inequitable conduct that injures competing claimants." [82] The Second Circuit thus recognized that [*44] the appropriate focus is on the claimant, not the claim. Indeed, one of the Bankruptcy Court's other holdings in the Subordination Order, which is not being appealed, is that a creditor's inequitable conduct can result in equitable subordination of any or all of that creditor's claims, as opposed to only those claims related to the misconduct. [83] Application of equitable subordination to unrelated claims based solely on the fact that they are held by a bad actor demonstrates that the proper focus is on the claimant personally, not the claim.

> 81  *See, e.g., In re Monahan Ford, 340 B.R. at 44* ("Pursuant to equitable subordination, a claim may be subordinated if *that claimholder* is guilty of misconduct." (emphasis added) (citing 4 Collier on Bankruptcy Procedure § 510.05[1])); *In re Kreisler, 352 B.R. 671, 676-77 (N.D. Ill. 2006)* ("Having correctly determined [the claimant's] insider status, the bankruptcy court then focused, again correctly, on whether [his] conduct was inequitable.").
>
> 82  *Musso, 468 F.3d at 109* (emphasis added) (citing *Sure-Snap, 948 F.2d at 876*). *Accord Sure-Snap, 948 F.2d at 876* ("[E]quitable subordination [is] appropriate when '(1) the *claimant who is to be subordinated* [*45] has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants . . . and (3) subordination is not inconsistent with bankruptcy law.'" (quoting *In re Universal Farming, 873 F.2d at 1337*)); *In re Hohenberg, 191 B.R. 694, 704 (Bankr. W.D. Tenn. 1996)* (reciting the first prong of the *Mobile Steel* test as "the *subordinated claimant* must have engaged in some type of inequitable conduct" and the second as the "misconduct must have resulted in injury to the [other] creditors or conferred an unfair advantage on the *[subordinated] claimant*" (alterations in original and emphasis added)).
>
> 83  *See* Subordination Order, slip op. at 26.

Case 1:07-cv-10612-GEL     Document 16-21     Filed 12/11/2007     Page 14 of 19

Page 14

2007 U.S. Dist. LEXIS 63129, *45; 48 Bankr. Ct. Dec. 213

In fact, one of the cases Enron relies upon as the champion of its cause, *In re Multiponics, Inc.,* [84] actually supports the conclusion that equitable subordination focuses on the holder of the claim rather than the transferor. In *Multiponics,* the claimant had acquired its claim from two innocent banks. An insider of the claimant had acted inequitably. The district court had found that the claimant was the alter ego of the insider and thus the court imputed the bad acts of the insider to the claimant and equitably subordinated the claim. **[*46]** The circuit court reversed the district court's finding that the claimant was the alter ego of the insider, and thus held that the claim in the hands of the claimant should not have been subordinated. [85] Thus, the holding of the Fifth Circuit comports with this Court's reading of the statute, namely that the focus of *section 510(c)* is on the claimant, not the claim.

84  *622 F.2d 709 (5th Cir. 1980).*
85  *See id. at 725.*

The Bankruptcy Court placed heavy reliance on *Goldie v. Cox* [86] and general principles of assignment law to support its holding. Reliance on *Goldie,* however, is misplaced for two reasons. *First, Goldie* stands for the general proposition that an assignee takes a claim subject to all defenses that the *obligor* has against the assignor. Equitable subordination is a remedy that belongs to the *creditors* -- not the debtor. [87] *Second,* the Bankruptcy Court assumed assignment law's application without deciding whether equitable subordination was an attribute of the claim or a personal disability.

86  *See 130 F.2d at 695.*
87  *In re Applied Theory, 345 B.R. at 59* ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors." (citing **[*47]** *In re Lockwood, 14 B.R. at 380-81*)). Indeed, a debtor acting on its own behalf lacks standing to bring an action for equitable subordination. *See id. at 59 n.1* (citing *In re Riccitelli, 14 Fed. Appx. 57, 58 (2d Cir. 2001)* (unpublished)).

Several other cases cited by Enron support this Court's holding. The cases relied upon by Enron in which courts have applied equitable subordination to a party based on the conduct of a third party are cases where the claim holder has stepped into the shoes of the third party bad actor. For example, in *In re 604 Columbus Avenue Realty Trust,* the court held that the Federal Deposit Insurance Corporation (the "FDIC"), acting as receiver, steps in the shoes of the failed bank for purposes of equitable subordination. [88] But the court expressly acknowledged that the receivership is unique, and that the FDIC in its corporate capacity purchasing the claim does not step in the shoes of the seller and is protected from application of equitable subordination. [89]

88  *See 968 F.2d 1332, 1353 (1st Cir. 1992).*
89  *See id.*

The Bankruptcy Court expressly extended its holding to all transfers of bankruptcy claims. By doing so, it ignored the distinction between assignments **[*48]** and sales and never addressed whether equitable subordination travels with the claim or is a personal disability. Where a claimant has purchased its claim, as opposed to receiving it by assignment, operation of law, or subrogation, assignment law principles have no application with respect to personal disabilities of claimants. [90] Thus, purchasers are protected from being subject to the personal disabilities of their sellers.

90  *See supra* Part IV.D.1.

The distinction is particularly imperative in the distressed debt market context, where sellers are often anonymous and purchasers have no way of ascertaining whether the seller (or a transferee up the line) has acted inequitably or received a preference. No amount of due diligence on their part will reveal that information, and it is unclear how the market would price such unknowable risk. Parties to true assignments, by contrast, can easily contract around the risk of equitable subordination or disallowance by entering into indemnity agreements to protect the assignee.

This is not to say that every purchaser of a claim will be automatically exempt from equitable subordination. This Court's analysis would not apply to bad faith purchasers. **[*49]** Indeed, purchasers of claims with actual notice of the inequitable conduct of the seller may be subject to equitable subordination based on their own misconduct.

Nor does this Court mean to imply that every assignee will automatically be subject to equitable subordination if the assignor has acted inequitably. For example, the assignee may qualify as a holder in due course and thus take the claim free from all defenses of any party to the instrument with whom the holder has not

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 15 of 19

Page 15

2007 U.S. Dist. LEXIS 63129, *49; 48 Bankr. Ct. Dec. 213

dealt. [91] In addition, the doctrine of third party latent equities may apply as an exception the assignment law's application in certain cases, depending on which state law governs the assignment contract. [92]

> 91    If the assignee took the claim post-petition, it could not qualify as a holder in due course. *See supra* Part IV.D.2.a. Nevertheless, according to Citibank, the majority of the transferred claims that were before the Bankruptcy Court below were transferred as a result of pre-petition credit-default swap contracts. *See* Appellants Reply Mem. at 25. The holder in due course doctrine may apply in those circumstances. The application of the holder in due course doctrine to the specific transfer at issue on this **[*50]** appeal is discussed below. *See infra* Part V.C.
> 92    *See supra* Part IV.D.2.b.

At bottom, equitable subordination is a drastic and unusual remedy. As a result, it is important to apply *section 510(c)* narrowly.

## 2. Disallowance Is a Personal Disability

Much like equitable subordination, the issue of whether disallowance under *section 502(d)* is personal to the claimant or inheres in the claim is a matter of statutory interpretation. Unlike equitable subordination, however, this issue has been addressed twice before -- but only once at the district court appellate level. Apart from the Bankruptcy Court below, the parties have come up with one decision on each side, but neither is binding on this Court, and neither was appealed.

Once again, the Court begins with an analysis of the plain language. *Section 502(d)* requires disallowance of "any claim of any entity from which property is recoverable . . . or that is a transferee of a transfer avoidable . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable." [93] The language and structure of the statute is plain, and requires the entity that is asserting the claim be the **[*51]** same entity (*i.e.,* "such entity") that is liable for the receipt of and failure to return property. Enron stresses that the language of the statute cuts the other way, arguing that the phrase "claim of any entity . . . or transferee . . ." means the same thing it means in other parts of *section 502,* namely "claim of a lessor" in *section 502(b)(6)* and "claim of an employee" in *section 502(b)(7)*. However, those terms are

distinguishable because whether a claim is a claim of a lessor or an employee is fixed as of the petition date, as expressly stated in *section 502(b)*. [94] The plain language of *section 502(d)* focuses on the claimant as opposed to the claim and leads to the inexorable conclusion that disallowance is a personal disability of a claimant, not an attribute of the claim.

> 93    *11 U.S.C. § 502(d).*
> 94    *See 11 U.S.C. § 502(b)* (stating that if an objection to a claim is made, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition,* and shall allow such claim in such amount," except to the extent that the claim falls into one of the nine enumerated categories).

This result comports **[*52]** with one of the main purposes of *section 502(d)*, namely to coerce the return of assets obtained by preferential transfer. That purpose would not be served if a claim in the hands of a claimant could be disallowed even where that claimant never received the preference to begin with, and as a result, could not be coerced to return it. It seems implausible that Congress would have intended such a result. This is especially so given that *section 502(d)* was not intended to punish, but rather "to give *creditors* an option to keep *their* transfers (and hope for no action by the trustee) or to surrender *their* transfers and *their* advantages and share equally with other creditors." [95] Applying *section 502(d)* to purchasers of claims would be punitive because they have no option to surrender something they do not have, which means they have not personally obtained any advantage that they could surrender.

> 95    *Melon Produce, 112 F.3d at 1239* (emphasis added) (quotation omitted).

Enron argues that the existence of indemnity agreements, such as the one that exists between Citibank and Springfield, would suffice to fulfill this coercive purpose, albeit one step removed. In other words, the transferee, whose **[*53]** claim will be disallowed unless and until the preference is returned, can in turn coerce the transferor to return it through enforcement of the indemnity agreement. There are two problems associated with relying on indemnity agreements to carry the day. *First,* it is undisputed that standardized indemnity agreements, such as the Loan Syndications and Trading Association ("LSTA") boilerplate indemnity forms, [96]

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 16 of 19

Page 16

2007 U.S. Dist. LEXIS 63129, *53; 48 Bankr. Ct. Dec. 213

were not in use until years *after section 502(d)*'s enactment. [97] Thus, it is doubtful at best that Congress intended to rely on the creation of such indemnity agreements to protect claims purchasers from having their claims disallowed based on the receipt of and failure to return an avoidable transfer on the part of a prior holder of those claims. *Second,* such indemnity agreements simply do not exist in a large area of claims trading, such as the anonymous trading of claims in the distressed debt markets. The Bankruptcy Court's holding applies broadly to all transferees of claims, including all purchasers on the open market. The inability of those purchasers to enter into such agreements with often anonymous sellers cripples any reliance on those agreements as sufficient protection. **[*54]** Indeed, it punctuates the need to distinguish between pure assignments and sales. Classic assignments very well may be accompanied by such indemnity agreements or other protections.

> 96      The model LSTA contains standard warranties and indemnities that include the risk that a transferred claim may be equitably subordinated or disallowed based on the conduct of the transferor.
>
> 97      *See* Appellants Reply Mem. at 17 (stating that the LSTA standard terms "were not developed until 1996, at the earliest").

As mentioned above, the parties have each cited one case in support of their position. Appellants cite a 1988 memorandum opinion and order in a Texas federal district court, *In re Wood & Locker, Inc.* [98] in support of their position. Enron cites a 2003 bankruptcy court decision in the Southern District of New York, *In re Metiom, Inc.* [99] in support of affirmance of the Bankruptcy Court's Disallowance Order. Interestingly, neither case is persuasive.

> 98      *See* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501 (W.D. Tex. June 17, 1988) (refusing to disallow a claim in the hands of a transferee based on the conduct of the transferor because the transferee did not have any liability for a receipt of a preference **[*55]** under any of the sections enumerated in *section 502(d)*).
>
> 99      *See 301 B.R. 634 (Bankr. S.D.N.Y. 2003)* (disallowing a claim in the hands of the transferee based on the transferor's receipt of a preference).

In *Wood & Locker,* the court focused on the claimant

rather than the claim to determine whether the transferee had received a preference. Thus, the decision can be read to support the view that *section 502(d)* is personal to claimants rather than an attribute of the claim. But the *Wood & Locker* court failed to analyze whether there was a basis to impute the conduct of the transferor to the transferee based on the nature of the transfer. The court never addressed whether the claim was assigned or sold and thus, never decided whether assignment law principles should apply to require the transferee to step in the shoes of the transferor.

The same flaws are found in *Metiom* (and the Bankruptcy Court's decision below that followed *Metiom*). Neither decision made any distinction between a claim purchaser and a claim assignee. Rather, both conclusorily invoked assignment law principles to hold that disallowance applies to transferees. Once application of assignment law is assumed, however, the result **[*56]** is a foregone conclusion, regardless of whether the disability at issue is personal to the claimant or a characteristic of a claim. [100] That analysis is incomplete at best, careless at worst. Nevertheless, as it turns out, *Metiom* may have reached the correct result because the facts of that case indicate that the claim was transferred by an assignment. [101] In such circumstances, reliance on assignment law principles is proper. [102] But blind reliance on *Metiom's* analysis will lead to incorrect results in many cases where the transfer is not a pure assignment. The better (and correct) approach is to do what both *Metiom* and the Bankruptcy Court below should have done, which is to take a step back and decide first whether disallowance is a claim characteristic or personal disability, and if the latter, whether assignment law has any application to the transfer at issue.

> 100      *See* Appellants Mem. at 22 ("Resorting to case law concerning claims assignments, the Bankruptcy Court reasoned that the transfer of a claim does not change the nature of the claim. But in invoking that principle, the Bankruptcy Court has assumed its own conclusion." (quotation omitted)).
>
> 101      In *Metiom,* the transferor itself **[*57]** was having financial difficulty and as a result, the court approved a sale of all of the transferor's assets to the transferee, which included an assignment of the claim against Metiom. *See id. at 636-37.*
>
> 102      Likewise, reliance on cases like *Swarts v.*

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 17 of 19

Page 17

2007 U.S. Dist. LEXIS 63129, *57; 48 Bankr. Ct. Dec. 213

*Siegel, 117 F. 13 (8th Cir. 1902)*, where the court disallowed a claim in the hands of a surety who was subrogated to, *i.e.*, stepped into the shoes of, the bad actor would also be proper.

Once again, it bears noting that this Court's analysis does not apply to bad faith purchasers. And a claim purchaser with actual notice of the seller's receipt of an avoidable transfer may be subject to equitable subordination for its own misconduct. Moreover, as the Court discussed with respect to equitable subordination, it should not follow from this analysis that every assignee will automatically be subject to disallowance if the assignor has received (and failed to return) a preference. An exception to the general assignment rule of *nemo dat,* such as holder in due course or third party latent equities, may apply under the facts of some cases.

### C. The Case Is Remanded for a Finding of Whether the Transfer at Issue Was an Assignment or a Sale, and Thus, [*58] Whether Citibank's Conduct May Be Imputed to Springfield

Because the Court holds that equitable subordination under *section 510(c)* and disallowance under *section 502(d)* are not attributes of the claim but rather are personal disabilities of individual claimants, whether equitable subordination and disallowance can be applied to a transferee depends on the nature of the transfer. As discussed above, the Bankruptcy Court did not address this issue. Although the parties do not object to this Court's consideration of the four documents evidencing the transfer (only one of which was in the record below), it is appropriate for the Bankruptcy Court to address this issue in the first instance. [103] Accordingly, the proceeding is remanded to the Bankruptcy Court with instructions to determine whether the claims transferred to Springfield were transferred by way of a sale or whether they were transferred by way of a pure assignment. Of course, this is an interlocutory appeal of the Bankruptcy Court's decision to deny Springfield's motion to dismiss. If the Bankruptcy Court concludes that the nature of the transfer cannot be determined solely from the documents submitted, the issue may have to [*59] be decided at a later stage of the adversary proceeding. [104] But the nature of the transfer will determine whether Springfield's claims can be subject to equitable subordination and/or disallowance based on Citibank's conduct.

103    *See, e.g., Bouboulis v. Transp. Workers*

Union of Am., 442 F.3d 55, 66 (2d Cir. 2006) (vacating the district court's dismissal of a breach of fiduciary duty claim, and remanding "to allow the district court to consider the remaining issues on this claim in the first instance").

104    It should be noted that while here the Bankruptcy Court must review the actual agreements between the parties in order to determine whether there was an assignment or a sale, this will not always be necessary. For instance, sales of claims on the open markets are indisputably sales and subrogation of a surety to the rights under a claim is indisputably an assignment.

Should the Bankruptcy Court find that the transfer to Springfield was by assignment, Springfield may argue that it is not subject to either equitable subordination or disallowance based on certain exceptions to the general rule that an assignee has no more rights than the assignor. I review that argument here for the guidance [*60] of the Bankruptcy Court on remand. [105] Springfield cannot be a holder in due course because this was a post-petition transfer. [106] Similarly, the transfer agreements between the parties are governed by New York law, [107] which as discussed above, does not recognize the doctrine of third party latent equities for choses in action such as these transfers of bank debt. [108] Nonetheless, Springfield will not be without recourse given that it had an indemnity agreement that provides protection against this risk. Indeed, Springfield has already availed itself of this alternative remedy.

105    *See, e.g., McKithen v. Brown, 481 F.3d 89, 106 (2d Cir. 2007)* (remand an issue to the district court "for its examination in the first instance" but also "providing the district court some guidance as to how its inquiry might proceed").

106    *See* Tr. at 65; Citi-BT PSA (dated February 22, 2002); DB-Springfield PSA (dated May 15, 2002). *See also supra* Part IV.D.2.a.

107    *See* Citi-BT PSA P 20 ("This agreement, the rights and obligations of the parties under this agreement, and any claim or controversy directly or indirectly based upon or arising out of this agreement or the transactions contemplated by this agreement [*61] . . . shall in all respects be governed by and interpreted, construed and determined in accordance with, the internal laws of the State of New York . . . ."); DB-Springfield

Case 1:07-cv-10612-GEL    Document 16-21    Filed 12/11/2007    Page 18 of 19

Page 18

2007 U.S. Dist. LEXIS 63129, *61; 48 Bankr. Ct. Dec. 213

PSA P 20 (same). *See also* Citi-BT Assignment, attached as Document 2 to the 8/8/07 Citibank Letter App., P 7 ("This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York."); DB-Springfield Assignment, attached as Document 4 to the 8/8/07 Citibank Letter App., P 7 (same).

108   *See supra* Part IV.D.2.b.

## D. Policy Concerns

It bears repeating that it is not for this Court, or any other court, to make the policy choices assigned to the legislative branch. [109] I have found, based on the plain language of the statutes, their legislative histories, and the case law, that Congress's intent in enacting the equitable subordination and disallowance statutes was to create personal disabilities, and that Congress did not intend that those disabilities would travel to all transferees. The analysis ends there; the Court will not adjust its legal analysis to fit the policy concerns raised by the parties. Nevertheless, the policy concerns they raise with respect to the issues **[*62]** on appeal merit some discussion.

109   *See Noland, 517 U.S. at 543.*

Enron argues that preventing enforcement of equitable subordination and disallowance to claims transferees would encourage "claims washing" on the part of bad faith transferors. Appellants counter that the claim would not be "washed" because the transferor remains subject to direct actions on both the equitable subordination allegations and the receipt of preference allegations. [110] Indeed, Citibank is a defendant in the MegaClaim Action alleging both equitable subordination and receipt of preference. This issue cuts both ways. [111]

110   Citibank asserts that the majority of the transfers that were before the Bankruptcy Court were made pursuant to credit-default swap contracts that were executed *pre-petition. See* Appellants Reply Mem. at 25. Accordingly, the claims washing concern simply would not apply to those types of transfers.

111   Enron also alludes to the potential for collusion among transferors and transferees as another claims washing scenario. This is of little to no concern to the Court because such conduct could subject the colluding transferees to equitable subordination *based on their own*

*misconduct. See supra* Part **[*63]** V.B.1.

Although Appellants are correct that the transferor will be subject to a direct action for its misconduct or receipt of a preference, that remedy is not a perfect substitute. There are burden of proof and time value of money issues associated with pursuing the transferor in a direct action. However, those issues are not as great as Enron would suggest. With respect to the burden of proof differences, Enron argues that equitable subordination under *section 510(c)* requires a lesser showing than for fraud or other common law claims. Whatever the differences may be, it is unlikely that they will result in such a large gap that transferors will routinely be able to immunize themselves through sales.

With respect to the time value of money issue, namely that it may take years to pursue the transferor in a common law action for fraud as opposed to obtaining equitable subordination, this concern is somewhat exaggerated. In order to obtain equitable subordination or disallowance, the debtor in possession must file a complaint and litigate those issues. Contrary to Enron's suggestion, there can be no immediate determination of either issue (which again highlights that these remedies cannot **[*64]** be fixed on the petition date). [112] In fact, the adversary proceeding for equitable subordination and disallowance of Springfield's claims based on Citibank's misconduct may be adjudicated contemporaneously with the MegaClaim Action against Citibank. [113] Thus, the creditors are no worse off, and the time value of money concern is greatly diminished.

112   *See supra* Part V.A.
113   *See* Tr. at 36.

Enron also cites the risk of insolvency of the transferor as cause for concern. Specifically, Enron raises the potential for overall loss to the estate in the absence of disallowance of the transferee's claim if the transferor becomes insolvent before the estate can recover the avoidable transfer. In Enron's example, the transferor holds a $ 1,000 claim. Pre-petition, it receives a $ 200 preferential payment on that claim, and sells the remainder of the claim, $ 800, to the transferee. If the claim were permitted to be disallowed, it would be disallowed unless and until the preference is returned. If it is not returned, the claim is disallowed, and the total cost to the estate is $ 200, the amount of the preference that was paid. If it is returned, the full $ 1,000 claim can be pressed, and assuming **[*65]** the estate is paying 25

2007 U.S. Dist. LEXIS 63129, *65; 48 Bankr. Ct. Dec. 213

cents on the dollar, the estate pays out $ 250, for a total cost to the estate of $ 50 (it gets back $ 200 from the preference and pays out $ 250).

If the claim is *not* permitted to be disallowed in the hands of the transferee, however, the transferee is permitted to press its claim for $ 800. The transferee will then recover 25 cents on the dollar, which amounts to $ 200. In this scenario, the estate has spent a total of $ 400: $ 200 as the avoidable transfer, and $ 200 on the allowed claim of the transferee. The estate must then pursue the transferor for return of the $ 200 preference. This is not a problem if the transferor is solvent (although it does not take into account any time value of money issues as discussed above), but Enron argues that the estate as a whole will suffer if the transferor is insolvent.

Insolvency of the transferor is not of grave concern in the big picture. The possibility that a transferor who is able to sell its claim, as opposed to assign it, will be insolvent is not very great. The more likely scenario is that a lender who is in financial trouble and is therefore anxious to sell its claims would likely be forced to do so by an assignment **[*66]** that includes representations, warranties, and indemnities. In those circumstances, there is no concern of loss to the estate because the transferee's claim *would* be disallowed. Similarly, that same lender might well have been unable to satisfy a judgment in an action brought by the estate, because its liability to the estate could eclipse the potential recovery on its bankruptcy claim. Here, it should be noted, no one disputes that Citibank is a very solvent entity.

At the end of the day, however, there can be no dispute that in limited circumstances, a bad faith transferor may be able to sell its claim to a bona fide purchaser for value, effectively "wash" its claim in the hands of the purchaser, take the proceeds and run, to the detriment of other creditors. However, the risk of that scenario is outweighed by the countervailing policy at issue, namely the law's consistent protection of bona fide purchasers for value. Enron focuses on the harm that will come to the creditors as a result, but the law protects bona fide purchasers for value, and this context is no different. This is a question of allocating the burden and risk of pursuing the bad actor transferor between two groups

**[*67]** of innocents: the creditors as a whole or the transferee. The Court finds that the balance struck by the foregoing legal analysis is fair: the burden and risk is better carried by creditors as a whole in favor of the bona fide purchaser in the context of a sale, but better carried by the assignee in favor of the creditors in the context of an assignment, particularly given the ability of parties to an assignment to obtain indemnities and warranties.

Moreover, in order to ensure that untenable distinctions and unreasonable results are avoided, it is proper to consider the effect that the Court's interpretation would have on the markets. [114] The unnecessary breadth of the Bankruptcy Court's decisions threatened to wreak havoc on the markets for distressed debt. [115] That result has now been avoided.

   114   *See Elliott Assocs.,* 194 F.3d at 380.
   115   *See generally* Appellants Mem. at 38-42; Industry Amici Mem. at 10-20.

## VI. CONCLUSION

For the reasons stated above, I conclude that equitable subordination under *section 510(c)* and disallowance under *section 502(d)* are personal disabilities that are not fixed as of the petition date and do not inhere in the claim. Nevertheless, Springfield may be subject **[*68]** to equitable subordination and disallowance based solely on the conduct of the transferor if the claims were transferred to Springfield by way of an assignment. Accordingly, the Bankruptcy Court's Subordination Order and Disallowance Order are VACATED, and the matter is REMANDED to the Bankruptcy Court to decide the motion to dismiss consistent with this Opinion. The Clerk of the Court is directed to close this appeal.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

August 27, 2007

1 of 4 DOCUMENTS



Analysis
As of: Dec 08, 2007

### In re ENRON CORP., et al., Reorganized Debtors. ENRON CORP., Plaintiff, -against- SPRINGFIELD ASSOCIATES, L.L.C. and WESTPAC BANKING CORPORATION, Defendants. SPRINGFIELD ASSOCIATES, L.L.C., Appellant, -against- ENRON CORP., Appellee.

### Chapter 11, No. 01-16034, Jointly Administered, Adversary Proceeding, No. 05-01025, 06 Civ. 7828 (SAS), 07 Civ. 1957 (SAS)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### *2007 U.S. Dist. LEXIS 70731; Bankr. L. Rep. (CCH) P81,029*

### September 24, 2007, Decided
### September 24, 2007, Filed

**PRIOR HISTORY:** *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.), 2007 U.S. Dist. LEXIS 63129 (S.D.N.Y., Aug. 27, 2007)*

**COUNSEL:** **[*1]** For Enron Corp., In Re (1:06-cv-0728-SAS): David A. Strauss, LEAD ATTORNEY, Attorney at Law, Chicago, IL; Edward Ambrose Smith, III, Venable LLP (NYC), New York, NY.

For Enron Corp., Debtor (1:06-cv-0728-SAS): David A. Strauss, LEAD ATTORNEY, Attorney at Law, Chicago, IL; Edward Ambrose Smith, III, Venable LLP (NYC), New York, NY.

For Springfield Associates, LLC, Appellant (1:06-cv-0728-SAS): Edward Peter Grosz, Marc R. Rosen, LEAD ATTORNEYS, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, NY.

DK Acquisition Partners, LP, RCG, Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C. and Rushmore Capital-II L.L.C. L.L.C., DK Acquisition Partners, LP, RCG Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C. and Rushmore Capital-II L.L.C., Appellant, Pro se.

DK Acquisition Partners, L.P., Appellant, Pro se.

For Enron Corp., Appellee (1:06-cv-0728-SAS): Richard K. Mitin, LEAD ATTORNEY, Togut, Segal & Segal LLP, New York, NY; David A. Strauss, LEAD ATTORNEY, Attorney at Law, Chicago, IL; Edward Ambrose Smith, III, Venable LLP (NYC), New York, NY.

For Commercial Law League of America, Movant (1:06-cv-0728-SAS): Daniel Lawrence Wallach, Becker & Poliakoff, P.A, Fort Lauderdale, FL.

For Amici Curiae **[*2]** The Bond Market Association, the International Swaps and Derivatives Association, Inc., the Securities Industry Association, and the Loan Syndications and Trading Association, Amici Curiae The Securities Industry and Financial Markets Association, the International Swaps and Derivatives Association, Inc., and the Loan Syndications and Trading Association, Amici: Craig Coldblatt, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, DC; James Millar, Wilmer, Cutler, Hale & Dorr, L.L.P. (NYC), New York, NY.

2007 U.S. Dist. LEXIS 70731, *2; Bankr. L. Rep. (CCH) P81,029

For Abrams Capital, LLC, Blavin & Company, Inc., Citadel Investment Group, L.L.C., Amici (1:06-cv-0728-SAS, 1:07-cv-01957-SAS): Whitman Lee Holt, Stutman, Treister & Glatt, P.C., Los Angeles, CA.

For Citibank, NA., Intervenor (1:06-cv-0728-SAS, 1:07-cv-01957-SAS): Stephen J. Shimshak, LEAD ATTORNEY, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

For Enron Corp., In Re (1:07-cv-01957-SAS): Stacey A. Neeley, LEAD ATTORNEY, David M. Stern, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, CA.

For Springfield Associates, LLC, Appellant (1:07-cv-01957-SAS): Marc R. Rosen, Matthew J. Gold, LEAD ATTORNEYS, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, NY.

For Enron Corp., Appellee **[*3]** (1:07-cv-01957-SAS): Stacey A. Neeley, LEAD ATTORNEY, David M. Stern, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, CA.

For Commercial Law League of America, Amicus (1:07-cv-01957-SAS): Daniel Lawrence Wallach, Becker & Poliakoff, P.A, Fort Lauderdale, FL.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**MEMORANDUM OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Appellant Springfield Associates, L.L.C. ("Springfield") seeks certification for interlocutory appeal of this Court's August 27, 2007 Opinion and Order (the "August 27 Opinion") and Judgment dated August 28, 2007. Familiarity with the August 27 Opinion is presumed. Springfield seeks certification of the following two questions:

> (i) whether equitable subordination under *section 510(c) of the Bankruptcy Code* and disallowance under *section 502(d) of the Bankruptcy Code* can be applied, as a matter of law, to claims held by a transferee to the same extent as they

would be applied to such claims if they were still held by the transferor based solely on alleged acts or omissions on the part of the transferor, where no such acts or omissions on the part of the transferee have been alleged, and (ii) if so, whether potential equitable **[*4]** subordination and/or disallowance turn on the distinction between a claim transferred by sale and a claim transferred by assignment. [1]

For the reasons discussed below, the motion to certify for interlocutory appeal is denied.

> 1   Notice of Motion by Springfield Associates, LLC to Modify Order and Judgment for Certification of Interlocutory Appeal at 2.

**I. LEGAL STANDARD**

Appeals of interlocutory district court orders are governed by *28 U.S.C. § 1292(b)*. Under *section 1292(b)*, the order being appealed must "(1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion," and the movant must also show that "(3) an immediate appeal would materially advance the ultimate termination of the litigation." [2] In addition, leave to appeal is warranted only when the movant demonstrates the existence of "exceptional circumstances" [3] sufficient to overcome the "general aversion to piecemeal litigation" [4] and to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." [5] Interlocutory appeal "is limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation,' **[*5]** . . . and is not intended as a vehicle to provide early review of difficult rulings in hard cases." [6] The decision whether to grant an interlocutory appeal from a district court order lies within the district court's discretion. [7]

> 2   *28 U.S.C. § 1292(b)*.
> 3   *Williston v. Eggleston, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006)*.
> 4   *In re AroChem Corp., 176 F.3d 610, 619 (2d Cir. 1999). Accord Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 95 (2d Cir. 1997)*.
> 5   *In re Flor, 79 F.3d 281, 284 (2d Cir. 1996)* (quotation omitted).
> 6   *In re Levine, No. 94-44257, 2004 U.S. Dist. LEXIS 6025, 2004 WL 764709, at \*2 (S.D.N.Y.*

2007 U.S. Dist. LEXIS 70731, *5; Bankr. L. Rep. (CCH) P81,029

*Apr. 9, 2004) (quoting German v. Federal Home Loan Mortgage Corp., 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995)).*

7   *See, e.g., Swint v. Chambers County Comm'n, 514 U.S. 35, 47, 115 S. Ct. 1203, 131 L. Ed. 2d 60 (1995)* ("district courts [have] first line discretion to allow interlocutory appeals"); *In re Kassover, 343 F.3d 91, 94 (2d Cir. 2003); D.M. Rothman Co., Inc. v. Cohen Mktg. Int'l, Inc., No. 98 Civ. 7905, 2006 U.S. Dist. LEXIS 52073, 2006 WL 2128064, at *1 (S.D.N.Y. July 27, 2006).*

"In regard to the first prong, the 'question of law' must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly, without having to study the record." [8] The question must also be **[*6]** "controlling" in the sense that reversal of the district court's order would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome. [9]

8   *In re WorldCom, Inc., No. M47, 2003 U.S. Dist. LEXIS 11160, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).*

9   *See In re XO Commc'ns, Inc., No. 03 Civ. 1898, 2004 U.S. Dist. LEXIS 2879, 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004); North Fork Bank v. Abelson, 207 B.R. 382, 389-90 (E.D.N.Y. 1997).*

As to the second prong, the "substantial ground for a difference of opinion" must arise out of a genuine doubt as to whether the district court applied the correct legal standard in its order. [10] The requirement that such a substantial ground exist may be met when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." [11] However, it is not sufficient that the relevant case law is "less than clear" or allegedly "not in accord," [12] or that there is a "strong disagreement among the parties." [13] "A mere claim that a district court's decision was incorrect does not suffice to establish substantial ground for a difference of opinion." [14] Rather, the district **[*7]** court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is *substantial* ground for dispute." [15]

10   *In re Worldcom, 2003 U.S. Dist. LEXIS 11160, 2003 WL 21498904, at *10 (citation omitted).*

11   *In re Lloyd's Am. Trust Funds Litig., No. 96 Civ. 1262, 1997 U.S. Dist. LEXIS 11937, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (citing Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990)).*

12   *North Fork Bank, 207 B.R. at 390.*

13   *In re Iridium Operating LLC, Nos. 99-45005, 01-02952, M47, 2003 U.S. Dist. LEXIS 11119, 2003 WL 21507196, at *1 (S.D.N.Y. June 30, 2003)* (stating that to demonstrate that there is a substantial ground for difference of opinion a party "must show that the issue is difficult and of first impression and involves more than just a strong disagreement among the parties" (quotation omitted)).

14   *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 426 F. Supp. 2d 125, 2005 WL 3440701, at *2 (S.D.N.Y. 2005)* (citations omitted).

15   *In re Flor, 79 F.3d at 284* (quotation omitted). *Accord Marlin v. United States Trustee, 333 B.R. 14, 20 (W.D.N.Y. 2005).*

Finally, as to the third prong, "'[a]n immediate appeal is considered to advance the ultimate **[*8]** termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial.'" [16] Courts place particular emphasis on the importance of this last factor. [17]

16   *Transportation Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth., 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005) (quoting In re Oxford Health Plans, Inc., 182 F.R.D. 51, 53 (S.D.N.Y. 1998)).*

17   *See Koehler v. Bank of Bermuda, Ltd., 101 F.3d 863, 865-66 (2d Cir. 1996)* ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."); *Lerner v. Millenco, L.P., 23 F. Supp. 2d 345, 347 (S.D.N.. 1998)* ("The Court of Appeals has emphasized the importance of the third consideration in determining the propriety of an interlocutory appeal.").

## II. DISCUSSION

There are no exceptional circumstances present in this case sufficient to overcome the general aversion to piecemeal litigation and to justify a departure from the basic policy of postponing appellate review until after the

Case 1:07-cv-10612-GEL    Document 16-22    Filed 12/11/2007    Page 4 of 5

Page 4
2007 U.S. Dist. LEXIS 70731, *8; Bankr. L. Rep. (CCH) P81,029

entry of a final judgment. Springfield relies heavily on the fact that this Court granted interlocutory appeal of the Bankruptcy Court's Orders and argues **[*9]** that the same reasoning should apply to certify the August 27 Opinion for appeal. [18] The Court's reasoning in granting that interlocutory appeal, however, relied in large part on the breadth of the Bankruptcy Court's rulings and the threat to the markets that those rulings posed. [19] In the Court's August 27 Opinion, the Court significantly scaled back the Bankruptcy Court's rulings, and this Court's narrow holdings took care to ensure that the markets would not be disturbed. [20] Thus, this case no longer satisfies the criteria for interlocutory review.

> 18   Leave to file the interlocutory appeal from the Bankruptcy Court orders was sought by various defendants and permitted intervenors, including defendant Springfield and permitted intervenor Citibank. *See In re Enron Corp., No. M-47, 2006 U.S. Dist. LEXIS 63223, 2006 WL 2548592, at *1 (S.D.N.Y. Sept. 5, 2006).*
>
> 19   *See Id.* (granting leave to appeal in part because of the appellants' concerns regarding the "uncertainty that these rulings -- if left undisturbed -- would inject into the market for the sale of postpetition claims").
>
> 20   Industry Amici's brief in support of Springfield's motion for certification asserts that without immediate appeal to the Second Circuit and **[*10]** perhaps the Supreme Court, uncertainty in the markets will persist. That concern is not significant given this Court's pointed statements in the August 27 Opinion that "the concerns raised by Industry Amici with respect to the effects of the Bankruptcy Courts rulings on the markets for distressed debt are no longer present. *Equitable subordination and disallowance arising out of the conduct of the transferee will not be applied to good faith open market purchasers of claims." In re Enron Corp. No. 06 Civ. 7828, 2007 U.S. Dist. LEXIS 63129, 2007 WL 2446498, at *13 n.76 (S.D.N.Y. Aug. 27, 2007)* (emphasis added) (citation omitted)). *See also id. 2007 U.S. Dist. LEXIS 63129, [WL] at *13 n.104* ("sales of claims an the open markets are indisputably sales").

It bears repeating that interlocutory appeal is "not intended as a vehicle to provide early review of difficult rulings in hard cases." [21] Although there were undoubtedly several issues of first impression raised by this appeal, this is not true of one of the two issues of which Springfield seeks certification. Specifically, there is no substantial ground for a difference of opinion that transfers by sale aid transfers by assignment are distinct. Nor can there be any dispute as to the general principle **[*11]** of assignment law -- that an assignee stands in the shoes of the assignor and subject to all equities against the assignor -- applies to assignments of bankruptcy claims.

> 21   *In re Levine, 2004 U.S. Dist. LEXIS 6025, 2004 WL 764709, at *2.*

Moreover, the issues decided by this Court and remanded to the Bankruptcy Court are not "pure" questions of law that the reviewing court could, decide quickly and cleanly without having to study the record. [22] Rather, this Court remanded the case to the Bankruptcy Court to determine, *inter alia,* whether Springfield obtained the claims by way of an assignment or a sale. That determination may well require a factual inquiry at trial.

> 22   *In re Worldcom, Inc., 2003 U.S. Dist. LEXIS 11160, 2003 WL 21498904, at *10.*

Finally, an interlocutory appeal to the Second Circuit would not advance the ultimate termination of the litigation. To the contrary, it may significantly delay the proceedings in Bankruptcy Court. [23] The Mega Claim Action is scheduled to go to trial in April of 2008. An interlocutory appeal could delay that trial for over a year, at the expense of all of the parties involved in this already protracted bankruptcy case. Indeed, the fact that the proceedings below may moot Springfield's appeal altogether **[*12]** (*e.g.,* if Springfield is found to be a bona fide purchaser for value of Citibank's claims, that would require dismissal of the claims for equitable subordination and disallowance predicated on the conduct of Citibank) also weighs against certification.

> 23   Indeed, it is interesting that neither Citibank nor Enron have joined with Springfield in this request for certification.

## III. CONCLUSION

For the reasons set forth above, Springfield's motion for leave to seek an interlocutory appeal of the August 27 Opinion is denied. The Clerk of the Court is directed to

2007 U.S. Dist. LEXIS 70731, *12; Bankr. L. Rep. (CCH) P81,029

close this motion [No. 66 on the Docket Sheet].

    SO ORDERED:

    Shira A. Scheindlin

Dated: New York, New York

September 24, 2007

LEXSEE 2000 U.S. DIST. LEXIS 22185



Positive
As of: Dec 09, 2007

**UNITED STATES OF AMERICA ex rel. Syed Rahman, Plaintiff vs. ONCOLOGY ASSOCIATES, P.C., et al., Defendants; In Re: EQUIMED, INC., Debtor; In Re: EQUIMED, INC.**

**CIVIL NO. H-95-2241, CIVIL NO. H-00-1216, CIVIL NO. H-00-1569**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

*2000 U.S. Dist. LEXIS 22185*

**July 24, 2000, Decided**

**PRIOR HISTORY:** [*1] Bankruptcy No. 00-1-1147-PM, Adversary No. 00-1180-PM, Bankruptcy No. 00-1-1147-PM, Adversary No. 00-1180-PM.

**DISPOSITION:** Motion of the petitioning creditors to vacate Order withdrawing from the Bankruptcy Court certain matters and proceedings was denied; Motion of Provident Bank to vacate in part and modify Order withdrawing reference was denied; Motion of the Trustee to vacate or modify Order withdrawing reference was denied; Motion of defendant Colkitt and various other entities for withdrawal of reference of the entire bankruptcy case was denied.

**COUNSEL:** For USA, plaintiff (95-CV-2241): S. Hollis Fleischer, Office of the United States Attorney, Baltimore, MD USA.

For USA, plaintiff (95-CV-2241): Michael F Hertz, Polly A. Dammann, Rebecca Rohr, Department of Justice, Daniel A. Spiro, U.S. Dept. of Justice, Washington, DC USA.

For SYED RAHMAN, plaintiff (95-CV-2241): Mark Scott London, Christopher B Mead, London and Mead, Washington, DC USA.

For MOBILE DIAGNOSTECH, INC., A. JEROME

DIGIACOBBE, JR., CALVIN ZONTINE, plaintiffs (00-CV-1216): Irving E Walker, Saul Ewing LLP, Baltimore, MD USA.

For ONCOLOGY ASSOCIATES, P.C., DOUGLAS COLKITT, EQUIMED, INC., defendants (95-CV-2241): Paul M. Sandler, [*2] Shapiro Sher Guinot and Sandler, Baltimore, MD USA.

For ONCOLOGY ASSOCIATES, P.C., defendant (95-CV-2241): John T. Brennan, Jr., Michaels, Wishner & Bonner, Washington, DC USA.

For DOUGLAS COLKITT, KEYS CANCER CENTER LIMITED PARTNERSHIP, defendants (95-CV-2241): Jonathan P Phillips, Williamson Friedberg and Jones, Pottsville, PA USA.

For DOUGLAS COLKITT, defendant (95-CV-2241): Phillip H. Lebowitz, Scott D. Godshall, David Richman, Pepper Hamilton LLP, Philadelphia, PA USA.

For DOUGLAS COLKITT, defendant (95-CV-2241): Iles Cooper, Williamson, Friedberg & Jones, Pottsville, PA USA.

For JERRY DERDUL, defendant (95-CV-2241): Eva Petko Esber, Williams and Connolly LLP, Washington, DC USA.

Case 1:07-cv-10612-GEL   Document 16-23   Filed 12/11/2007   Page 2 of 10

Page 2
2000 U.S. Dist. LEXIS 22185, *2

For JOANNE RUSSELL, defendant (95-CV-2241): Lawrence G McMichael, Peter C Hughes, Dilworth Paxson LLP, Philadelphia, PA USA.

For ATLANTIC RADIATION ONCOLOGY, L.L.C., defendant (95-CV-2241): Gertrude C Bartel, Andrew Jay Graham, Kramon and Graham, Baltimore, MD USA.

For KEYS CANCER CENTER LIMITED PARTNERSHIP, defendant (95-CV-2241): Marcy L. Colkitt, Law Office, Indiana, PA USA.

For KEY WEST HMA, INC., defendant (95-CV-2241): Charles Kevin Kobbe, Jodie Elizabeth [*3] Buchman, Piper Rudnick LLP, Baltimore, MD USA.

For NORTHWEST RADIATION TREATMENT SERVICES, INC., defendant (95-CV-2241): Kimberly Nichelson Tarver, Ober Kaler Grimes and Shriver, Baltimore, MD USA.

For NATIONAL MEDICAL FINANCIAL SERVICES CORPORATION, defendant (95-CV-2241): Peter Konoliqe, Law Office, Wayne, PA USA.

For MALONE ONCOLOGY ASSOCIATES, P.C., NIXON EQUIPMENT CORP., THOMAS JEFFERSON REAL ESTATE CORP., GEORGE WASHINGTON REAL ESTATE CORP., defendants (95-CV-2241): Shawn J Sefret, Rosenberg Proutt Funk and Greenberg LLP, Baltimore, MD USA.

For NIXON EQUIPMENT CORP., defendant (95-CV-2241): Paul Mark Nussbaum, Kenneth Oestreicher, Whiteford Taylor and Preston, Baltimore, MD USA.

For OAKTREE CANCER CARE, INC., PITTSBURGH, PA, KEYSTONE ONCOLOGY, LLC, JMR MEDICAL ASSOCIATES, P.C., CAROLINA CANCER CARE, LLC, SOUTHERN ONCOLOGY, P.A., EASTERN PENNSYLVANIA ONCOLOGY, LLC, MASSACHUSETTS RADIATION ONCOLOGY SERVICES, P.C., CHESTER COUNTY ONCOLOGY, LLC, ROSEWOOD CANCER CARE, INC., FLORIDA ONCOLOGY, P.A., COASTAL ONCOLOGY, LLC., defendants (95-CV-2241): Benjamin Rosenberg, Shawn J Sefret, Rosenberg Proutt Funk and Greenberg LLP, Baltimore, MD USA.

For DOUGLAS [*4] R. COLKITT, GEORGE KEISTER, PAUL CASTRO, EDWARD RUSSELL, JR.,

DONALD GALLO, JUDE SPAK, OAKTREE CANCER CARE, INC., KEYSTONE ONCOLOGY, LLC, ROSEWOOD CANCER CARE, INC., JOANNE RUSSELL, MARCY L. COLKITT, ONCOLOGY SERVICES CORPORATION, HARRISBURG ONCOLOGY ASSOCIATES, P.C., INDIANA ONCOLOGY ASSOCIATES, P.C., LEBANON ONCOLOGY ASSOCIATES, P.C., PLEASANT HILLS ONCOLOGY ASSOCIATES, PC, GREATER PITTSBURGH ONCOLOGY ASSOCIATES, PC, STONEBORO ONCOLOGY ASSOCIATES, P.C., PHOENIXVILLE ONCOLOGY ASSOCIATES, P.C., LITTLESTOWN ONCOLOGY ASSOCIATES, P.C., LEHIGHTON ONCOLOGY ASSOCIATES, P.C., EXTON ONCOLOGY ASSOCIATES, P.C., BUCKS COUNTY ONCOLOGY ASSOCIATES, P.C., DERDEL MGH ONCOLOGY ASSOCIATES, PC, GREENWAY ONCOLOGY ASSOCIATES, PC, DERDEL RANDALLSTOWN ONCOLOGY ASSOCIATES, P.C., DERDEL UNION MEMORIAL ONCOLOGY ASSOCIATES, P.C., DERDEL RIVERSIDE ONCOLOGY ASSOCIATES, P.C., DERDEL CHESAPEAKE ONCOLOGY ASSOCIATES, P.C., FT. PIERCE ONCOLOGY ASSOCIATES, P.C., OKEECHOBEE ONCOLOGY ASSOCIATES, P.A., KEY WEST ONCOLOGY ASSOCIATES, P.A., TAMPA ONCOLOGY ASSOCIATES, P.A., TREASURE COAST ONCOLOGY ASSOCIATES, P.A., LIBERTY ONCOLOGY ASSOCIATES, P.C., ONEONTA RADIATION ONCOLOGY, PC, COMMUNITY RADIATION THERAPY ASSOCIATE, P. [*5] C., SKYLINE ONCOLOGY ASSOCIATES, P.C., MALONE ONCOLOGY ASSOCIATES, P.C., SALISBURY ONCOLOGY ASSOCIATES, P.C., ALBEMARLE ONCOLOGY ASSOCIATES, P.C., MARLTON ONCOLOGY, P.C., SOUTHERN NEW JERSEY CANCER TREATMENT, WILLIAMS COUNTY ONCOLOGY ASSOCIATES, INC., TRI-STATE ONCOLOGY ASSOCIATES, INC., FLAGSTAFF ONCOLOGY ASSOCIATES, PC, KANKAKEE ONCOLOGY ASSOCIATES, PC, HOLYOKE ONCOLOGY ASSOCIATES, P.C., OAKLANE CANCER AND HEMATOLOGY CLINIC, P.C., JMR MEDICAL ASSOCIATES, P.C., CAROLINA CANCER CARE, LLC, SOUTHERN ONCOLOGY, P.A., EASTERN PENNSYLVANIA ONCOLOGY, LLC, MASSACHUSETTS RADIATION ONCOLOGY SERVICES, P.C., CHESTER COUNTY ONCOLOGY, LLC, FLORIDA ONCOLOGY, P.A., COASTAL ONCOLOGY, LLC., COMPREHENSIVE PHYSICS

AND REGULATORY SERVICES, LTD, JOHN DOES 1-25, defendants (00-CV-1216): Jeffrey L. Tarkenton, John David Folds, Womble Carlyle Sandridge and Rice, Erik David Bolog, Womble Carlyle Sandridge and Rice PLLC, Washington, DC USA.

For DOUGLAS R. COLKITT, defendant (00-CV-1216): Phillip H. Lebowitz, David Richman, Pepper Hamilton LLP, Philadelphia, PA USA.

For GEORGE KEISTER, PAUL CASTRO, EDWARD RUSSELL, JR., DONALD GALLO, JUDE SPAK, JEFFERSON RADIATION ONCOLOGY CENTER, LP, OAKTREE CANCER CARE, [*6] INC., KEYSTONE ONCOLOGY, LLC, ROSEWOOD CANCER CARE, INC., COMPREHENSIVE PHYSICS AND REGULATORY SERVICES, LTD, defendants (00-CV-1216): Steven K. White, Michael E Tucci, Stinson Morrison Hecker LLP, Washington, DC USA.

For JOANNE RUSSELL, defendant (00-CV-1216): Paul Mark Nussbaum, Whiteford Taylor and Preston, Baltimore, MD USA.

For MARCY L. COLKITT, defendant (00-CV-1216): Aaron L. Handleman, Eccleston and Wolf PC, Washington, DC USA.

For LAWNWOOD REGIONAL CANCER CENTER, LP, ST. LUCIE COUNTY RADIATION ONCOLOGY, LTD., defendants (00-CV-1216): John G McJunkin, Piper Rudnick LLP, Washington, DC USA.

For LAWNWOOD REGIONAL CANCER CENTER, LP, defendant (00-CV-1216): Lowell Horace Patterson, III, Seyfarth Shaw, Washington, DC USA.

For ST. LUCIE COUNTY RADIATION ONCOLOGY, LTD., defendant (00-CV-1216): Matthew Ralph Goldman, Law Office, Cleveland, OH USA.

For ST. LUCIE COUNTY RADIATION ONCOLOGY, LTD., defendant (00-CV-1216): Shelby F. Mitchell, Ronald F Wick, Baker and Hostetler, Washington, DC USA.

For MERRILL COHEN, intervenor-defendant (95-CV-2241): Matthew Ralph Goldman, Law Office, Cleveland, OH USA.

For MERRILL COHEN, intervenor-defendant (95-CV-2241): [*7] Shelby F. Mitchell, Ronald F Wick, Baker and Hostetler, Washington, DC USA.

For SOVEREIGN BANK, movant (95-CV-2241): Myles R Wren, Scranton, PA USA.

For SOVEREIGN BANK, movant (95-CV-2241, 00-CV-1216): John R Sullivan, Salisbury, MD USA.

For GLORIA FRELIX, movant (95-CV-2241): Reuben B Collins, II, Law Offices of Turner and Collins PLLC, Washington, DC USA.

For MERRILL COHEN, movant (95-CV-2241): Matthew Ralph Goldman, Law Office, Cleveland, OH USA.

For MERRILL COHEN, movant (95-CV-2241): Shelby F. Mitchell, Ronald F Wick, Baker and Hostetler, Washington, DC USA.

For ONCOLOGY SERVICES CORPORATION, movant (00-CV-1216): Jeffrey L. Tarkenton, John David Folds, Womble Carlyle Sandridge and Rice, Erik David Bolog, Womble Carlyle Sandridge and Rice PLLC, Washington, DC USA.

For NIXON EQUIPMENT CORP., movant (00-CV-1216): Paul Mark Nussbaum, Kenneth Oestreicher, Whiteford Taylor and Preston, Baltimore, MD USA.

For DVI FINANCIAL SERVICES, INC., movant (00-CV-1216): Andrew C. Kassner, Drinker Biddle and Reath LLP, Philadelphia, PA USA.

For STEADFAST INSURANCE COMPANY, interested party (95-CV-2241, 00-CV-1216): David M Gische, Ross Dixon and Bell [*8] LLP, Washington, DC USA.

For RELIANCE INSURANCE COMPANY, interested party (95-CV-2241, 00-CV-1216): Daniel James Standish, Wiley Rein and Fielding LLP, Washington, DC USA.

For HERBARD, LTD., interested party (95-CV-2241, 00-CV-1216): Edwin J Mills, Stull Stull and Brody, New York, NY USA.

For JOHNSON & JOHNSON FINANCE CORPORATION, interested party (95-CV-2241, 00-CV-1216): Christopher L. Hamlin, McNamee Hosea Jernigan Kim Greenan and Walker PA, Greenbelt, MD

2000 U.S. Dist. LEXIS 22185, *8

USA.

For JOHNSON & JOHNSON FINANCE CORPORATION, interested party (95-CV-2241, 00-CV-1216): Kimberly Luff Wakim, Thorp Reed and Armstrong LLP, Pittsburgh, PA USA.

For DVI FINANCIAL SERVICES, INC., interested party (95-CV-2241): Andrew C. Kassner, David B. Aaronson, Drinker Biddle and Reath LLP, Philadelphia, PA USA.

For MOBILE DIAGNOSTECH, INC., A. JEROME DIGIACOBBE, JR., CALVIN ZONTINE, interested parties (95-CV-2241): Matthew S. Sturtz, Joel Larkin Perrell, Jr., Miles and Stockbridge PC, Baltimore, MD USA.

For TREATMENT CENTERS LIMITED PARTNERSHIP, PFG CAPITAL CORPORATION, interested parties (95-CV-2241, 00-CV-1216): Joyce A. Kuhns, Karl Joseph Nelson, Saul Ewing LLP, Baltimore, MD USA.

For [*9] REGIONAL MEDICAL SERVICES, INC., interested party (95-CV-2241, 00-CV-1216): James C Olson, Law Office of James C Olson, Owings Mills, MD USA.

For PEPPER HAMILTON LLP, MARCY L. COLKITT & ASSOCIATES, interested parties (95-CV-2241): Phillip H. Lebowitz, David Richman, Pepper Hamilton LLP, Philadelphia, PA USA.

For THE PROVIDENT BANK, interested party (00-CV-1216): Paul-Michael Justin Sweeney, Linowes and Blocher LLP, Bradford F. Englander, Law Office, Silver Spring, MD USA.

For UNITED STATES OF AMERICA, interested party (00-CV-1216): Tamera Lynn Fine, Office of the United States Attorney, Baltimore, MD USA.

For UNITED STATES OF AMERICA, interested party (00-CV-1216): Lynne A Battaglia, Court of Appeals of Maryland, Annapolis, MD USA.

For RESPONSE ONCOLOGY, INC., interested party (00-CV-1216): Stanley J. Samorajczyk, Sam J Alberts, Akin Gump Strauss Hauer and Feld LLP, Washington, DC USA.

For STEADFAST INSURANCE COMPANY, interested

party (00-CV-1216): Jodi L Cleesattle, Ross Dixon and Bell LLP, Washington, DC USA.

For INDIANA HOSPITAL, INDIANA HEALTHCARE, INC., INDIANA HEALTHCARE PROPERTIES, INC., interested parties (00-CV-1216): Diane Festino Schmitt, [*10] Ober Kaler Grimes and Shriver, Samantha Bishop, Law Office, Baltimore, MD USA.

For INDIANA HOSPITAL, INDIANA HEALTHCARE, INC., INDIANA HEALTHCARE PROPERTIES, INC., interested parties (00-CV-1216): Nicholas J Calabrese, Daniel M Mulholland, III, Horty Springer and Mattern PC, Pittsburgh, PA USA.

For GLORIA FRELIX, interested party (00-CV-1216): Reuben B Collins, II, Law Offices of Turner and Collins PLLC, Washington, DC USA.

For JOSEPH C. WON, interested party (00-CV-1216): David B Goldstein, Brooke Schumm, III, Daneker McIntire Schumm Prince Goldstein Manning and Widmann, Baltimore, MD USA.

For MAYUR PATEL, interested party (00-CV-1216): James A Johnson, Semmes Bowen and Semmes PC, Baltimore, MD USA.

For ONCOLOGY ASSOCIATES OF VIRGINIA, P.C., interested party (00-CV-1216): Francine Elizabeth Friedman, Hunton and Williams, Washington, DC USA.

For KEY WEST HMA, INC., interested party (00-CV-1216): Charles Kevin Kobbe, Jodie Elizabeth Buchman, Piper Rudnick LLP, Baltimore, MD USA.

For KEY WEST HMA, INC., interested party (00-CV-1216): Raymond L Fink, Harter Secrest and Emery LLP, Buffalo, NY USA.

For ONCOLOGY ASSOCIATES, P.C., third-party plaintiff [*11] (95-CV-2241): Paul M. Sandler, Shapiro Sher Guinot and Sandler, Baltimore, MD USA.

For ONCOLOGY ASSOCIATES, P.C., third-party plaintiff (95-CV-2241): John T. Brennan, Jr., Michaels, Wishner & Bonner, Washington, DC USA.

For ONCOLOGY SERVICES CORPORATION, third-party plaintiff (95-CV-2241): Jeffrey L. Tarkenton, John David Folds, Womble Carlyle Sandridge and Rice, Erik David Bolog, Womble Carlyle Sandridge and Rice

PLLC, Washington, DC USA.

For NATIONWIDE MUTUAL INSURANCE CO., third-party defendant (95-CV-2241): Peter Konolige, Wayne, PA USA.

For EQUIMED INC., debtor (00-CV-1216): Stephanie Wickouski, Arent Fox Kintner Plotkin and Kahn PLLC, Washington, DC USA.

MERILL COHEN, trustee (00-CV-1216): Matthew Ralph Goldman, Law Office, Cleveland, OH USA.

MERILL COHEN, trustee (00-CV-1216): Richard A Robinson, Baker and Hostetler LLP, Orlando, FL USA.

MERILL COHEN, trustee (00-CV-1216): Shelby F. Mitchell, Ronald F Wick, Baker and Hostetler, Washington, DC USA.

**JUDGES:** Alexander Harvey, II, Senior United States District Judge.

**OPINION BY:** Alexander Harvey, II

**OPINION**

*MEMORANDUM AND ORDER*

Following extended pretrial proceedings in *United States ex rel. Rahman v.* **[*12]** *Oncology Associates, P.C., et al., 229 F. Supp. 2d 458 ("Rahman"),* including, *inter alia,* numerous rulings by the Court on many different matters, [1] a Second Revised Scheduling Order was entered in the case on October 21, 1999. Pursuant to that Order, dates were set for the completion of discovery, for a final pretrial conference and for a jury trial. Those dates were set pursuant to the parties' Stipulation stating that, commencing in October of 1999, they wished to devote their energies during the next six to eight weeks toward the goal of reaching an expeditious settlement of the case. The parties were at the time preparing to enter into mediation before Judge Curtis E. von Kann, a former judge of the District of Columbia Superior Court.

> 1    Interlocutory appeals unsuccessfully challenging rulings of this Court resulted in two separate opinions of the Fourth Circuit. *See U.S. ex rel. Rahman v. Oncology Associates, P.C., 198 F.3d 489 (4th Cir. 1999)* and *U.S. ex rel. Rahman*

*v. Oncology Associates, P.C., 198 F.3d 502 (4th Cir. 1999).*

**[*13]** On December 16, 1999, the parties submitted a further Stipulation, requesting the stay of all formal discovery until February 4, 2000. The parties stated that they had made "tremendous progress" toward a settlement of the case, and they accordingly requested a further extension of relevant deadlines in the proceeding. On December 20, 1999, the Court entered an Order staying formal discovery until February 4, 2000 and requesting that the parties file a status report no later than February 2, 2000.

In the Joint Status Report filed by the parties on February 2, 2000, they stated that substantial progress had been made in the mediation sessions but requested the Court to further stay discovery until February 18, 2000. That request was granted, as was a later one which was submitted with the parties' Joint Status Report of March 2, 2000 and which requested a further extension until March 31, 2000.

Equimed, Inc. ("Equimed") is one of the defendants in the *Rahman* case, as are many of its subsidiaries. On February 4, 2000, certain creditors filed an involuntary petition in bankruptcy with respect to *Equimed* in the United States Bankruptcy Court for the District of Maryland. *In* **[*14]** *re Equimed, Inc.,* Bankruptcy No. 00-1-1147-PM (the "*Equimed* bankruptcy case"). Thereafter, Equimed was adjudicated by the Bankruptcy Court to be a debtor under Chapter 7 of the United States Bankruptcy Code. [2] Merrill Cohen has been appointed Trustee for the bankruptcy estate of the debtor Equimed. On April 27, 2000, the Trustee filed in the Bankruptcy Court an Adversary Proceeding naming as defendants some 89 persons and entities. Adversary No. 00-1180-PM (the "Adversary Proceeding"). Many of the defendants named in the Adversary Proceeding are also defendants in the *Rahman* case.

> 2    Equimed has filed two appeals in this Court challenging Bankruptcy Court Orders refusing to dismiss the *Equimed* bankruptcy case. *See* Civil Nos. H-00-1279 and H-00-1555.

When this Court was advised of the *Equimed* bankruptcy case, it scheduled several conferences to discuss the status of the parties' settlement efforts, the effect which the Equimed bankruptcy might have on the settlement discussions and the applicability **[*15]** of the

automatic stay provisions of *11 U.S.C. § 362(a)* to the *Rahman* case. The first conference was held on April 12, 2000. Because of the continuing settlement negotiations, the parties were informed at that conference that the dates set forth in the Second Revised Scheduling Order of October 21, 1999 would no longer be controlling. The Court indicated that, depending on the outcome of the settlement discussions, another Scheduling Order would be entered at a later date.

Another status conference was held on the record on April 28, 2000. [3] On April 27, 2000, Douglas R. Colkitt, a defendant in both the *Rahman* case and the Adversary Proceeding, had filed a motion for withdrawal of the order of reference to the Bankruptcy Court of certain matters in the *Equimed* bankruptcy case. That motion was discussed with counsel at the status conference held on April 28. The Court indicated that because of the ongoing settlement discussions and because of the overlap between the Adversary Proceeding and certain matters in the *Rahman* case, the Court would consider the entry of an Order withdrawing the reference of certain portions of the *Equimed* bankruptcy [*16] case. In particular, the Court indicated that the Adversary Proceeding and matters relating to the proposed settlement of the *Rahman* case might be withdrawn.

> 3    A transcript of that conference has been prepared and is a part of the record in the *Rahman* case.

Counsel for defendant Colkitt then submitted a proposed Order for withdrawal of reference of portions of the *Equimed* bankruptcy case. On May 2, 2000, this Court entered an Order withdrawing reference of the *Equimed* bankruptcy case with respect to all matters which the proposed settlement in the *Rahman* action had designated for Bankruptcy Court review and with respect to the Adversary Proceeding. As withdrawn, that case has been docketed herein as *In re Equimed, Inc.*, Civil No. H-00-1216 (the "*Equimed* case"). It was further provided, that any party to the *Equimed* bankruptcy case, to the *Rahman* action or to the Adversary Proceeding would be entitled to move to vacate or modify the Order not later than May 18, 2000.

There [*17] are presently pending in the *Equimed* case the following motions: [4]

> (1) Motion of petitioning creditors to vacate Order withdrawing from the

Bankruptcy Court certain matters and proceedings;

> (2) Motion of Provident Bank to vacate in part and modify Order withdrawing reference;

> (3) Motion of Trustee to vacate or modify Order withdrawing reference.

> 4    There is also pending in the *Equimed* case the motion of Dr. Colkitt for an Order to Show Cause to be served upon the Trustee for violating this Court's Order withdrawing reference. This motion will be addressed at a later date, since it must first be determined whether this Court or the Bankruptcy Court should rule on it.

On May 19, 2000, defendant Colkitt and various other entities filed in the Bankruptcy Court a motion for withdrawal of reference of the entire bankruptcy case. That matter has now been docketed in this Court as *In re Equimed, Inc.*, Civil No. H-00-1569.

Voluminous memoranda and numerous exhibits have been filed [*18] by the parties in support of and in opposition to these four pending motions. Following its review of the memoranda and other matters of record in these cases, this Court has determined that no hearing is necessary for a decision on these four pending motions. *See* Local Rule 105.6. For the reasons stated herein, the three pending motions to vacate or modify this Court's Order of May 2, 2000 will be denied, and the motion of defendant Colkitt and other entities for withdrawal of reference of the entire *Equimed* bankruptcy case will also be denied.

I

*The Motions to Vacate the Order of May 2, 2000*

For this Court to exercise its discretionary power to withdraw reference of all or any part of a case filed in the Bankruptcy Court, it must comply with *28 U.S.C. § 157(d)*. Pursuant to *Bankruptcy Rule 5011(a)*, a motion for withdrawal of a case or proceeding shall be heard by the District Court.

*Section 157(d)* provides in pertinent part as follows:

The district court *may* withdraw, *in whole or in part,* any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. (Emphasis added).

[*19] The Court's Order of May 2, 2000 withdrew reference with respect to two discreet matters, first all matters which the proposed settlement in the *Rahman* action designated for Bankruptcy Court review and approval, and second all matters relating to the Adversary Proceeding in the *Equimed* bankruptcy case. The question presented by the three pending motions to vacate or modify the Order of May 2, 2000 is whether cause has been shown for the discretionary action taken by the Court.

On the record here, this Court concludes that ample cause has been shown for the partial withdrawal of reference of portions of the *Equimed* bankruptcy case pursuant this Court's Order of May 2, 2000. Moreover, there is no need to modify that Order. Settlements have now been negotiated between the government and the defendants in the *Rahman* action, and the government has now filed a motion seeking Court approval of the settlement agreements. It has been agreed that these settlements must be approved both by this Court and by the Bankruptcy Court. Were the Court's Order of May 2 to be vacated, two different judicial officers would be required to address and rule on the government's motion for [*20] approval of the settlements. Not only would there be a duplication of effort by the two courts and by the parties and their counsel, but the possibility would also exist that two different courts might render inconsistent decisions.

The record in both the *Rahman* case and the *Equimed* bankruptcy case indicate that there is an overlap in these two actions between the parties, the issues raised, and the assets of the various defendants. There can be little doubt that as a result of the numerous prior rulings made by the undersigned in the *Rahman* case during the past several years, this Court is much more familiar with the parties, with their claims and with the proposed settlements than is Bankruptcy Judge Mannes. Accordingly, this Court is satisfied that the interests of judicial economy will best be served by the withdrawal of reference of settlement matters pursuant to the Court's Order of May 2, 2000. Promoting judicial economy has been recognized as a significant factor to be considered by a court in deciding

whether or not to withdraw the reference of all or any part of a bankruptcy case. *Big Rivers Electric Corp. v. Green River Coal, Inc., 182 B.R. 751, 755 (W.D. Ky. 1995).* [*21]

The Court also concludes that there should be a withdrawal of reference insofar as the Adversary Proceeding is concerned. Many of the defendants in both the *Rahman* action and the Adversary Proceeding are the same. Similar claims are asserted against the same defendants by the government in the *Rahman* action and by the Trustee in the Adversary Proceeding. As the Court noted in *Big Rivers Electric Corp., 182 B.R. at 755,* the overlapping of facts, transactions and issues in two separate cases is good cause for withdrawal of the reference where a proceeding in bankruptcy involves common issues of law and fact with the case pending in the district court.

Moreover, there could not be a trial of the Adversary Proceeding in the Bankruptcy Court. Several defendants in that matter have gone on record as indicating that they will demand a jury trial. A jury trial requested by a party may not be held before a bankruptcy judge absent express consent of the parties. *See 28 U.S.C. § 157(e).* Withdrawal of the reference is therefore required in instances where a defendant who is entitled to a jury trial does not consent to the holding of such trial [*22] in the Bankruptcy Court. *See In re Stansbury Poplar Place, Inc., 13 F.3d 122, 128-29 (4th Cir. 1993).*

In seeking to vacate or modify the Court's Order of May 2, 2000, the movants advance a host of different arguments. In so doing, they have failed to focus on the precise issue before the Court, namely, whether cause exists for this Court to exercise its discretionary authority to withdraw the reference of certain aspects of the bankruptcy case. As noted, ample cause exists for the action previously taken by this Court.

Counsel for the Trustee has spent a considerable amount of time and effort arguing that this Court and the Bankruptcy Court should not approve the settlements which have been reached. In so doing, the Trustee miscomprehends the issue presented and puts the cart before the horse. At this stage of these proceedings, the question presented relates solely to a determination of the judicial officer who will decide whether the proposed settlements should be approved. The Trustee and other interested parties will be given ample opportunity to argue to this Court that the settlements should not be

approved in either the *Rahman* case or in the *Equimed* [*23*] bankruptcy case. [5] Were the pending motions to vacate be granted, the Trustee would be required to have two different judges hear and rule on his objections to the proposed settlements. Duplicative proceedings would result, and judicial economy would not thereby be promoted.

> 5    The Trustee has now been permitted to intervene in the *Rahman* case.

It is argued that the Bankruptcy Court should supervise discovery and hear motions in the Adversary Proceeding, even if trial of the issues in that matter cannot be held before a jury in the Bankruptcy Court. This Court would disagree. Much discovery already undertaken in the *Rahman* case relates to the question whether there have been fraudulent transfers by Equimed. Discovery has not been concluded in the *Rahman* case, and more discovery must occur if that case later proceeds to trial. Similar discovery will be necessary in the Adversary Proceeding. If the settlements are not approved and if both matters proceed to trial, the interests of judicial economy [*24*] would not be served if two different courts monitored the same discovery proceedings and were required to rule on the same discovery disputes.

It is also argued that the automatic stay provisions of *11 U.S.C. § 362* prohibit the government from going forward with the *Rahman* action. However, *§ 362(b)* sets forth exceptions to the automatic stay provisions of the Bankruptcy Code. Under *§ 362(b)(4)*, the filing of a bankruptcy petition does not operate as a stay "of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power ..." The *Rahman* case is just such a proceeding. It involves alleged violations of the False Claims Act and the Federal Debt Collection Procedures Act. Allegations of fraudulent transfers and successor liability are contained in the amended complaint. The government filed the *Rahman* case long before the Equimed bankruptcy proceedings commenced. That civil action is therefore not a case in which the government, as a creditor in the bankruptcy proceeding, has attempted "to artfully plead [its] way out of bankruptcy court ..." *See National Am. Ins. Co. v. Ruppert Landscaping Co., Inc., 187 F.3d 439, 442 (4th Cir. 1999).* [*25*]

After due consideration of the cases cited by the

parties which construe *§ 362(b)(4)*, this Court will follow the Eighth Circuit decision in *In re Commonwealth Companies, Inc., 913 F.2d 518 (8th Cir. 1990).* The Court there held that a False Claims Act suit is a substantial and legitimate exercise of the government's police power which is exempt from the automatic stay. *Id. at 526.* As noted in that case, other courts have held that "*§ 362(b)(4)* does not exclude a governmental action to obtain the entry of a money judgment for a past violation of the law simply because money damages are the only relief sought in the action." *Id. at 522-523,* citing *United States v. Nicolet, Inc., 857 F.2d 202, 207-09 (3d Cir. 1988); EEOC v. McLean Trucking Co., 834 F.2d 398, 400-02 (4th Cir. 1987). See also United States ex rel. Jane Doe v. X, Inc., 246 B.R. 817, 820 (E.D.Va., 2000)* (holding that a False Claims Act *qui tam* action is excepted from the automatic stay provisions of *§ 362* and that a *qui tam* plaintiff acting on behalf of the government may proceed to judgment in the suit brought [*26*] under the False Claims Act in spite of an intervening bankruptcy on the part of one or more defendants).

In his memorandum, the Trustee agrees that cases cited by the government make clear that the police power exception in the statute may allow entry of a money judgment against a bankrupt defendant (Memorandum in Support of Motion to Vacate, p. 12). The Trustee argues, however, that *X, Inc.* and other cases cited by the government do not extend to the enforcement of a judgment obtained by the government and that these cases emphasize that the government is not permitted by way of any such judgment to obtain a pecuniary advantage over creditors. *X, Inc.,* 246 B.R. at 820. However, both the *Rahman* case and the Adversary Proceeding are now before this Court. If any enforcement of a judgment recovered by the government in the *Rahman* case were to improperly and adversely affect a recovery by the Trustee in the Adversary Proceeding on behalf of the bankrupt estate, this Court, pursuant to its Order of May 2, 2000, now has jurisdiction to address that problem and insure that the interests of all parties are protected. Questions relating to the enforcement of a [*27*] judgment obtained by the government in the *Rahman* case will therefore be addressed later. There is no need to decide those questions at this time. If the proposed settlement of the *Rahman* case is approved and the *Rahman* case dismissed, there can be no conflict between that case and the Trustee's control over the property of the bankruptcy estate. If the proposed settlement is not approved and the *Rahman* case and the

Adversary Proceeding go forward, the relationship between the claims of the Trustee in the Adversary Proceeding and the claims of the government in the *Rahman* case can be explored in greater depth later.

According to the Trustee, the Adversary Proceeding is a core bankruptcy proceeding which is best resolved in a bankruptcy court. However, the circumstances here are certainly unique and exceptional. As Judge Smalkin of this Court noted in *In re Furniture Rentors of America, Inc., 162 B.R. 728, 729 (D. Md. 1994)*, withdrawal of the reference at an early stage of an exceptional case is justified even as to core matters.

For these reasons, the pending motions to vacate or modify the Court's Order of May 2, 2000 will be denied.

II

**[*28]** *The Motion for Withdrawal of Reference of the Entire Bankruptcy Case*

Dr. Colkitt and various other entities have filed a motion asking this Court to withdraw reference of the entire bankruptcy case. The same principles discussed hereinabove are applicable to this motion. What the Court must determine is whether, on the record here, cause exists for withdrawal by this Court of the *Equimed* bankruptcy case "in whole." *See § 157(d).*

Following its review of the parties' memoranda, this Court concludes that the movants have not shown cause for withdrawal of reference of the entire *Equimed* bankruptcy case. The movants have not convinced the Court that withdrawal of the entire case would promote judicial economy and the economic use of the parties' resources. Moreover, it appears from the pleadings and other matters of record that Dr. Colkitt is by this motion engaging in forum shopping. Dissatisfied with actions taken by the Bankruptcy Court which appear to be completely justified, Dr. Colkitt is attempting by this motion to have this Court address all matters that would arise during the administration of the bankruptcy estate of the debtor Equimed. In his Opinion of March 3, 2000, Judge **[*29]** Mannes found Dr. Colkitt to be in direct contempt under *Bankruptcy Rule 9020(a)* because he refused to submit during a hearing to further cross-examination after a luncheon recess. The record in the *Equimed* bankruptcy case discloses other examples of attempts by Dr. Colkitt to frustrate and delay the administration of the bankruptcy estate of Equimed. It is

the Bankruptcy Court and not this Court which should deal with these matters.

The principal argument advanced by the movants is that since this Court has partially withdrawn reference of certain portions of the *Equimed* bankruptcy case, it should, in order to promote judicial economy, withdraw the entire case. There is no merit to this contention. The Court's Order of May 2, 2000 effected the withdrawal of only two discreet matters. The vast majority of other aspects of the *Equimed* bankruptcy case have only a tangential relationship to what has been withdrawn and involve matters traditionally handled by a bankruptcy judge.

Dr. Colkitt complains that the Bankruptcy Court has erroneously entered an Order authorizing the Trustee to operate businesses controlled by the debtor or its affiliates. A motion to vacate this Order **[*30]** has been filed in the *Equimed* bankruptcy case, has been briefed by the parties, and is awaiting a hearing before Judge Mannes. The Bankruptcy Court and not this Court should address this and all other motions dealing with the administration of the bankruptcy estate of the debtor Equimed. The *Equimed* bankruptcy case will in the future undoubtedly give rise to numerous, non-exceptional core proceedings which are best resolved in the Bankruptcy Court rather than in this Court. *See United States Life Ins. Co. v. Selman, 1998 U.S. Dist. LEXIS 7933, 1998 WL 278259 (W.D. Va. 1998).*

For these reasons, the pending motion for withdrawal of reference of the entire bankruptcy case will be denied.

III

*Conclusion*

For all the reasons stated, the four pending motions addressed herein will all be denied. Accordingly, it is this *24Th* day of July, 2000 by the United States District Court for the District of Maryland,

ORDERED:

1. That the motion of the petitioning creditors to vacate Order withdrawing from the Bankruptcy Court certain matters and proceedings is hereby denied;

2. That the motion of Provident Bank

2000 U.S. Dist. LEXIS 22185, *30

to vacate in part and modify Order withdrawing reference is hereby **[*31]** denied;

3. That the motion of the Trustee to vacate or modify Order withdrawing reference is hereby denied;

4. That the motion of defendant Colkitt and various other entities for

withdrawal of reference of the entire bankruptcy case is hereby denied; and

5. That the Clerk is directed to close Civil No. H-00-1569.

Alexander Harvey, II

Senior United States District Judge

LEXSEE 2003 U.S. DIST. LEXIS 13775



Caution
As of: Dec 06, 2007

**RAYMOND H. WECHSLER, ADMINISTRATIVE TRUSTEE OF THE TOWERS FINANCIAL CORPORATION ADMINISTRATIVE TRUST, Plaintiff, - against - HUNT HEALTH SYSTEMS, LTD., P&G ENTERPRISES, INC., MHTJ INVESTMENTS, INC., ESPERANZA HEALTH SYSTEMS, LTD. AND FRIENDSHIP, INC., Defendants.**

**94 Civ. 8294 (PKL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 13775*

**August 7, 2003, Decided**
**August 8, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Wechsler v. Hunt Health Sys., 2003 U.S. Dist. LEXIS 14592 (S.D.N.Y., Aug. 21, 2003)*
Reconsideration denied by *Wechsler v. Hunt Health Sys., 285 F. Supp. 2d 343, 2003 U.S. Dist. LEXIS 17364 (S.D.N.Y., Sept. 29, 2003)*

**PRIOR HISTORY:** *Wechsler v. Hunt Health Sys., 2003 U.S. Dist. LEXIS 2589 (S.D.N.Y., Feb. 24, 2003)*

**DISPOSITION:**    [*1]  Plaintiff's motion to bifurcate trial granted.

**COUNSEL:** Joseph G. Colao, Esq., LEADER & BERKON LLP, New York, NY, for Plaintiff.

Daniel J. Kelly, Esq., GADSBY HANNAH LLP, Boston, MA, for Plaintiff.

Brooks Banker, Jr., Esq., ABBERLEY KOOIMAN LLP, New York, New York, for Defendants.

**JUDGES:** Peter K. Leisure, U.S.D.J.

**OPINION BY:** Peter K. Leisure

**OPINION**

*OPINION AND ORDER*

**LEISURE,** *District Judge:*

Plaintiff Raymond H. Wechsler, the administrative trustee overseeing the assets of Towers Financial Corporation ("Towers"), [1] brings this action against Hunt Health Systems, Ltd. ("Hunt Health") and affiliated entities for alleged breach of contract and fraudulent conveyance in connection with the parties' factoring agreements. Plaintiff now requests that this Court enforce the jury waiver clauses in the contracts signed by defendants and, pursuant to *Rule 42(b) of the Federal Rules of Civil Procedure*, bifurcate the trial of this action. Defendants oppose this request, arguing that plaintiff has not established that defendants signed a valid jury waiver in this case; and even if such a waiver existed, defendants argue that bifurcation would be inappropriate.  [*2]  For the following reasons, the Court finds that defendants did sign valid jury waivers in this action, waiving their right

to a jury on all claims that arose from those contracts, specifically, plaintiff's breach of contract, conversion, and breach of guaranty claims, as well as defendants' counterclaim for breach of contract (hereinafter "the contract claims"). Furthermore, the Court grants plaintiff's motion to bifurcate the two sets of claims in this case, and therefore, will conduct a bench trial on the contract claims first, and then, if necessary, a jury trial on plaintiff's fraudulent conveyance claim.

> 1   As this Court has previously noted, by Order of United States Bankruptcy Judge Prudence Carter Beatty dated August 5, 1999, the Towers Financial Administrative Trust was terminated and the Trust's claim against Hunt Health was assigned to Raymond H. Wechsler in his personal capacity.

## BACKGROUND

Familiarity with the prior decisions in this case is assumed. Except as indicated, the parties have **[*3]** stipulated to or do not contest the following facts.

Before it filed for bankruptcy, Towers engaged in the business of factoring accounts receivable, including the accounts receivable of health care providers. Hunt Health is a Texas limited partnership that was formed in 1991 to operate a drug and alcohol dependency rehabilitation center located in Hunt, Texas, doing business as "La Hacienda Treatment Center," or "La Hacienda." In 1991 and during its relationship with Towers, Hunt Health was owned by two corporate partners -- defendants P&G Enterprises, Inc. ("P&G") and MHTJ Investments, Inc. ("MHTJ"). P&G and MHTJ are Texas corporations that are both limited and general partners of Hunt Health, and each one owns 50% of Hunt Health. *See Wechsler v. Hunt Health Systems, Ltd., 198 F. Supp. 2d 508, 511 (S.D.N.Y. 2002).* On July 10, 1991, Towers executed an accounts receivable purchase contract (the "HCP Agreement") with Hunt Health. Prior to its execution, the form HCP Agreement offered by Towers was reviewed by an attorney retained by Hunt Health, and the form was amended at Hunt Health's request prior to its execution. *See id. at 511-12.* On the same **[*4]** date that the defendants signed the HCP Agreement, July 10, 1991, Towers entered into letter agreements (hereinafter "the Guarantees") with P&G and MHTJ. These Guarantees "set forth absolute and unconditional guaranties by P&G and MHTJ of Hunt Health's obligations and liabilities to Towers, if any." *Id. at 511.*

Plaintiff brings this action alleging breach of contract, conversion, and breach of guaranty against Hunt Health, as the obligor of the HCP Agreement, and defendants P&G and MHTJ as guarantors of Hunt Health's obligations. Defendants have brought a counterclaim against plaintiff for breach of contract. Additionally, plaintiff brings claims of constructive and actual fraudulent conveyance against Esperanza Health Systems, Ltd. ("Esperanza"), [2] as the transferee of assets from Hunt Health, and P&G and Friendship, Inc. ("Friendship") as general partners of Esperanza. Therefore, the claims in this case can be separated into two categories: (1) the contract claims (i.e. breach of contract, conversion, breach of guaranty, and defendants' counterclaim for breach of contract) regarding which, the plaintiff alleges that the defendants have waived their right to a jury, **[*5]** and (2) the fraudulent conveyance claims, to which both parties agree, defendants are entitled to a jury trial.

> 2   Esperanza is a Texas limited partnership that was formed on April 2, 1993 by P&G and Friendship. By written agreement executed that same day, Hunt Health agreed to sell Esperanza some of Hunt Health's assets in exchange for Esperanza's assumption of some of Hunt Health's liabilities. *See Wechsler, 198 F. Supp. 2d at 513.*

## DISCUSSION

### I. Defendants Waived Their Right to a Jury Trial on The Contract Claims.

Defendants waived their right to a jury trial on all of plaintiff's contract claims by signing three contracts prior to this litigation, all of which contained jury trial waivers. "Parties to a contract may, by prior written agreement entered into knowingly and voluntarily, waive the [*Seventh Amendment*] right to a jury trial." *Morgan Guaranty Trust Co. of New York v. Crane, 36 F. Supp. 2d 602, 603 (S.D.N.Y. 1999).* Although there is a presumption **[*6]** against waiver, *Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 81 L. Ed. 1177, 57 S. Ct. 809 (1937)* (citations omitted); *Nat'l Equip. Rental, Ltd. v. Hendrix, 565 F.2d 255, 258 (2d Cir. 1977),* and contract provisions containing jury trial waivers are narrowly construed, *Morgan Guaranty Trust Co., 36 F. Supp. 2d at 603,* such a waiver may be upheld if the party attempting to enforce it is able to prove that the waiver was entered into knowingly, intentionally, and voluntarily. *See Hendrix, 565 F.2d at 258* (refusing to

enforce a jury waiver provision against the defendant because the plaintiff failed to provide sufficient evidence that the waiver was either knowing or intentional); *Sullivan v. Ajax Navigation Corp., 881 F. Supp. 906, 910-11 (S.D.N.Y. 1995)* ("The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver.") (citations omitted); *N. Feldman & Son, Ltd. v. Checker Motors Corp., 572 F. Supp. 310, 313 (S.D.N.Y. 1983)* ("When the purported waiver exists in a contract signed prior to the contemplation of litigation, **[*7]** the party seeking to enforce it must demonstrate that the consent was both voluntary and informed."). Moreover, despite the close scrutiny which the Court will apply to the enforcement of any jury waiver, most notably in the determination of whether a waiver was entered knowingly, intentionally, and voluntarily, jury trial waivers are commonly upheld, *see, e.g., Morgan Guaranty Trust Co., 36 F. Supp. 2d at 603* (citing *Hendrix, 565 F.2d at 258*), and it is proper to do so in this case.

Plaintiff adequately proves that the defendants knowingly, intentionally, and voluntarily waived their right to a jury trial when they signed the three agreements containing jury waiver provisions. When determining whether a waiver was entered knowingly, intentionally, and voluntarily, courts must consider the following factors: "negotiability of the contract terms, disparity in bargaining power between the parties, the business acumen of the party opposing the waiver, and the conspicuousness of the jury waiver provision." *Sullivan, 881 F. Supp. at 911; see also Morgan Guaranty Trust Co., 36 F. Supp. 2d at 604.*

The first element, negotiability, **[*8]** is evidenced in this case by the defendants' opportunity to review and revise the documents and provisions at issue prior to signing them. The fact that a contract term was negotiable at the time the contract was being contemplated, even if the term itself was never specifically negotiated, suggests that subsequent consent to such term was knowing and voluntary. *See Morgan Guaranty Trust Co., 36 F. Supp. 2d at 604* (upholding a jury waiver in part because "there [was] no indication that the terms of the note were not negotiable," and "simply because the [defendants] did not attempt to negotiate its provisions does not mean that" they were precluded from negotiating about the waiver); *Oei v. Citibank, 957 F. Supp. 492, 523 (S.D.N.Y. 1997)* (upholding a jury waiver based on similar reasons). Proof of the negotiability of a contract term may include the

fact that other provisions of the contract were successfully negotiated and changed. *See Morgan Guaranty Trust Co., 36 F. Supp. 2d at 604* (noting that, the fact that other parts of the contract were successfully changed by the party challenging the term in question, serves as an indication **[*9]** that this term was also negotiable). On the other hand, non-negotiability of a contract term may be demonstrated when the party consenting to the term was in a position where the party had no choice but to accept the provision, *see Hendrix, 565 F.2d at 258* (refusing to uphold a jury waiver in a situation where the defendant "did not have any choice but to accept the ... contract as written if [the defendant] was to get badly needed funds"); *Sullivan, 881 F. Supp. at 911* (finding a waiver provision non-negotiable because "plaintiff had no choice other than to accept the contract as written"). Similarly, courts have deemed the terms of certain contracts to be non-negotiable where the party consenting to the terms had no opportunity to have an attorney review the contract prior to signing it. *See Hendrix, 565 F.2d at 256-57* (court did not enforce a jury waiver provision partly because at the time the defendant signed the contract, he was "dissuaded" by the plaintiff from consulting an attorney about the contract). In the present case, counsel represented defendants, reviewed the contracts, and made some revisions to the documents prior **[*10]** to defendants signing them. *See Wechsler, 198 F. Supp. 2d at 511-12*; Deposition of Gail Gaines, sworn to on Oct. 29, 1999 ("Gaines Dep."), attached as Ex. 4 to the Affidavit of Daniel J. Kelly, Esq. in Support of Plaintiff's Motion to Bifurcate Trial ("Kelly Aff."), at 82-84. This fact, combined with the lack of evidence suggesting that defendants were in a position where they had no choice but to sign the documents, demonstrates that the jury waiver provisions in this case were negotiable terms.

The fact that both sides to the contracts in this case were of relatively equal bargaining power also demonstrates that the defendants' consent to the jury waivers was knowing, intentional, and voluntary. "Gross inequality in bargaining power suggests ... that [an] asserted waiver was neither knowing nor intentional." *Hendrix, 565 F.2d at 258; Sullivan, 881 F. Supp. at 911* ("Inequality in relative bargaining positions suggests that the asserted waiver was neither knowing nor intentional."). *But see Morgan Guaranty Trust Co., 36 F. Supp. 2d at 604* (upholding a jury waiver provision even though there was a difference in bargaining **[*11]** power between the parties because the party opposing the

waiver was not completely unfamiliar with either the process involved, or the party with whom they were contracting, and therefore maintained the ability to negotiate effectively. By contrast, little or no disparity in bargaining power reflects voluntary action and intent. *Oei, 957 F. Supp. at 523.* Here, the parties to the agreements were all experienced corporate entities, of relatively equal bargaining power, thus further establishing the validity of the waivers.

The fact that the parties opposing the jury trial waiver--the defendants--are experienced business people also suggests that the waiver should be enforced. Extensive past business experience on behalf of the party contesting a jury waiver is an indication that this party knowingly and intentionally consented to the waiver. *Hendrix, 565 F.2d at 258* (noting that it would be unfair to uphold jury waivers in situations where the parties who signed the contract are laymen, who cannot be expected to understand what exactly they were agreeing to); *Morgan Guaranty Trust Co., 36 F. Supp. 2d at 604* (listing he various qualifications **[*12]** of the parties who were denying the validity of the jury waiver, including their work tasks and previous business transactions, as evidence that they knowingly agreed to the provisions); *Oei, 957 F. Supp. at 523* (denying plaintiff's jury demand because plaintiff "was an experienced businessman" who had worked as a product manager for IBM for several years, and therefore he knowingly and intentionally waived his right to a jury when he signed the contract at issue); *Nat'l Westminster Bank v. Ross, 130 B.R. 656, 667 (S.D.N.Y. 1991)* (listing defendant's education credentials, occupation, and past negotiating experience as evidence that he voluntarily and intentionally waived his right to a jury trial); *N. Feldman & Son, 572 F. Supp. at 313* (enforcing a jury waiver in part because the plaintiff had previously entered similar agreements with the defendant that included the same jury waiver provision). The defendants who consented to waivers in this case are Hunt Health Systems, Ltd., a limited partnership, and its corporate partners, P&G Enterprises, Inc. and MHTJ Investments, Inc. Presumably, as corporate entities engaged in various business **[*13]** transactions, these parties are familiar with a multitude of different types of business transactions, perhaps not unlike the one at issue in this case. Therefore, the Court finds that each defendant possessed sufficient business acumen to understand what they were agreeing to, and thus, are deemed to have given their consent knowingly, intentionally, and voluntarily.

Finally, the conspicuous placement of the waivers within the documents is yet another factor indicating that defendants consented to these waivers knowingly and voluntarily. Courts may refuse to uphold jury waivers if they are "set deeply and inconspicuously in the contract." *Hendrix, 565 F.2d at 258.* Although there is no articulated standard for the appropriate placement of waiver provisions, prior case law offers helpful guidelines for determining whether a jury waiver was so embedded and hidden in a text that it should not be enforced. Factors to consider when making this determination include: the placement of the waiver, *i.e.* whether the provision was "buried in a multitude of words," *see id.;* the size and style of the print, *see Morgan Guaranty Trust Co., 36 F. Supp. at 604* **[*14]** (upholding a jury waiver that was written in all capital letters, in contrast to *Hendrix, 565 F.2d at 258,* where the unenforced waiver was in "fine print"); *Ross, 130 B.R. at 667* (finding a jury trial waiver knowing and intentional based on the fact that the provision was "printed in small but entirely legible text," similar to the rest of the agreement); and the location of the provision within the entire document. *See Morgan Guaranty Trust Co., 36 F. Supp. 2d at 604* (finding a waiver provision "quite conspicuous" because it was "in the sole paragraph on the signature page itself, ... it was the last sentence in that paragraph, [and] it immediately preceded the [defendants'] signatures"); *Oei, 957 F. Supp. at 522-23* (describing a jury waiver located in its own paragraph, immediately above the signatures, as "highly conspicuous," even though the provision was part of a form); *N. Feldman & Son, 572 F. Supp. at 313* (noting that evidence that the waiver was voluntary and informed included the fact that it was "clearly visible and located directly above the signatures of the contracting parties"). **[*15]** The jury waiver provisions in this case are sufficiently conspicuous to warrant enforcement because they are set off in separate paragraphs containing other provisions related to litigation procedures, [3] and are clearly stated in the first sentence of these paragraphs. *See* Ex. 1 at p. 4, P 10; P&G Enterprises, Inc.'s "Guaranty" of Hunt Health's obligations and liabilities to Towers under the HCP Agreement, attached as Ex. 2 to Kelly Aff. ("Ex. 2"), at p. 2; MHTJ Investments, Inc.'s "Guaranty" of Hunt Health's obligations and liabilities to Towers under the HCP Agreement, attached as Ex. 3 to Kelly Aff. ("Ex. 3"), at 2. The waiver in the HCP Agreement is in the paragraph immediately preceding the signature lines. *See* Ex. 1 at p. 4, P 10. Moreover, the provisions in all three agreements are legible and set out

in the same typeface as the rest of the document in which they appear. *See* Ex. 1; Ex. 2; Ex. 3. Given this evidence of conspicuousness, coupled with the negotiability of the waivers, the relative equality in bargaining power between the parties, and the business acumen of the defendants, the Court finds that the jury trial waivers were entered knowingly, intentionally, **[*16]** and voluntarily, and therefore, must be upheld.

> 3  The Court notes that the jury waiver provision in the HCP Agreement is located in a paragraph labeled "Miscellaneous," which contains both litigation and non-litigation related provisions. However, the Court finds that the jury waiver in the HCP agreement is conspicuous nonetheless, because it is set out in the same typeface as the rest of the document, and it is in the first sentence of the only complete paragraph on the signature page. *See* Health Care Purchase Contract ("HPC Agreement") between Towers and Hunt Health, attached as Ex. 1 to Kelly Aff. ("Ex. 1"), at p. 4, P 10.

Defendants unconvincingly argue that even if the jury trial waivers are valid, they are of limited scope and not applicable to the claims raised in this case. The language of enforceable waiver provisions must be construed literally. *See Ross, 130 B.R. at 668-69* (interpreting a jury waiver clause that "waived the right in any litigation with the Bank ... to trial **[*17]** by jury" as applicable to "any litigation," including counterclaims that did not directly arise from the agreement containing the clause). In the present case, the jury waiver provision in the HCP states, "You hereby waive any and all right to trial by jury *in any action or proceeding arising from any action* brought under this Agreement." Ex. 1 at 4, P 10 (emphasis added). The waiver provisions in the Guarantees state, "The undersigned hereby expressly waives the right to trial by jury ... in connection with this guaranty." Ex. 2 at 2, P 6; Ex. 3 at 2, P 6. The contract claims raised by the plaintiff and the counterclaim raised by defendants do indeed fall within the rubric of this broad language. Specifically, the Security Agreement, an inducement for agreement to the HCP Agreement, *see* Security Agreement, attached as Ex. D to Affirmation of Brooks Banker, Jr., Esq. in Opposition to Plaintiff's Motion to Bifurcate Trial ("Banker Affirm.") at 1, is a proceeding arising out of the HCP Agreement, and therefore, is subject to the waiver provision in the HCP Agreement. Furthermore, the Security Agreement is linked to the HCP Agreement through a merger provision, which states that **[*18]** the Security Agreement, together with "the other written agreements between [Hunt Health and Towers] represent the entire agreement between [Hunt Health and Towers] concerning the subject matter hereof." *See* Ex. D P 55. Moreover, contrary to what defendants suggest, since the conversion claim was brought only against Hunt Health, one of the parties who consented to the jury waiver, it is appropriate to apply the waiver to this claim as well. *See* First Amended Complaint ("Am. Comp.") P 40, P 63(b). Therefore, because the contract claims in this case arise from the HCP Agreement and the Guarantees, consistent with the broad language of the jury trial waivers therein, the waivers are applicable and therefore will be enforced.

## II. Bifurcation Is Appropriate

*Federal Rule of Civil Procedure 42(b)* provides that the Court may order separate trials of any claims or counterclaims "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." *Fed. R. Civ. P. 42(b)*. "The decision to separate claims and bifurcate a trial rests firmly within the discretion of the trial court." *Hal Leonard Publishing Corp. v. Future Generations, No. 93 Civ. 5290, 1994 U.S. Dist. LEXIS 5195, at *4 (S.D.N.Y. Apr. 21, 1994)* **[*19]** (citing *Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 283 (2d Cir. 1990)); see also Katsaros v. Cody, 744 F.2d 270, 278 (2d Cir. 1984)*. While bifurcation is considered "the exception rather than the rule," *Bowers v. Navistar Int'l Transp. Corp., 1993 U.S. Dist. LEXIS 6129, No. 88 Civ. 8857, 1993 WL 159965 (S.D.N.Y. May 10, 1993)* (Sotomayor, J.), in some instances, separate trials are necessary to serve the ends of justice. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2388 (1995) ("The piecemeal trial of separate issues in a single lawsuit or the repetitive trial of the same issue in severed claims is not to be the usual course. Thus, *Rule 42(b)* should be resorted to only in the exercise of informed discretion when the court believes that separation will achieve the purposes of the rule."). Furthermore, in assessing the usefulness of bifurcation, the Second Circuit has noted that "bifurcated trials have frequently been employed with great success." *In Re Master Key Antitrust Litig., 528 F.2d 5, 15 (2d Cir. 1975)*. Therefore, "*Rule 42(b)* does not call for a bright-line test; rather, a factual **[*20]** and legal analysis of each case informs the court as to the propriety of separate trials." *Bowers, 1993 U.S. Dist. LEXIS 6129,*

2003 U.S. Dist. LEXIS 13775, *20

*1993 WL 159965*; *see also Monaghan v. SZS 33 Assocs., L.P., 827 F. Supp. 233, 245 (S.D.N.Y. 1993)* (finding that, while informative, cases in which *Rule 42(b)* bifurcation has been granted are not decisive in the court's determination of whether to bifurcate in the present case because "*Rule 42(b)* simply does not give rise to a bright-line test"). Moreover, in this determination, the moving party bears the burden of establishing that separate trials are necessary to prevent prejudice or confusion and serve the ends of justice. *See, e.g., Bowers, 1993 U.S. Dist. LEXIS 6129, 1993 WL 159965*; *Buscemi v. Pepsico, Inc., 736 F. Supp. 1267, 1271 (S.D.N.Y. 1990)*.

Plaintiff argues that while bifurcation is most commonly used to separate trials into liability and damage phases, it is appropriate in this case to separate the claims which are to be tried before this Court in a bench trial, and those claims which are to be tried by a jury. *See* Memorandum of Law in Support of Plaintiff's Motion to Bifurcate Trial ("Pl. Mem.") at 6. Furthermore, plaintiff argues **[*21]** that it is in the interest of judicial economy to conduct a bench trial of the claims to which defendants have waived their right to a jury, *see supra*, before a jury trial on the fraudulent conveyance claim, since, if the Court finds for the defendant on the contract claims, such a finding will obviate the need for a subsequent jury trial. *See id.; Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland, 763 F. Supp. 28, 35 (S.D.N.Y.), modified in part on other grounds, 768 F. Supp. 115 (S.D.N.Y. 1991)* (Leisure, J.) ("Generally speaking, bifurcation is most frequently ordered when the resolution of one claim or issue may obviate the need for trial of other, more complicated issues." (citing *Sogmose Realties, Inc. v. Twentieth Century- Fox Film Corp., 15 F.R.D. 496, 497 (S.D.N.Y. 1954)*)).

In deciding whether a separate trial will further convenience, avoid prejudice and ultimately serve the ends of justice, courts have considered factors such as, among other things: "the nature and relation of the claims and the evidence necessary to establish each claim," *Bowers, 1993 U.S. Dist. LEXIS 6129, 1993 WL 159965*; the likelihood that bifurcation, **[*22]** or the failure to bifurcate would result in risk of substantive prejudice; and the likelihood that bifurcation would enhance juror comprehension of the issues presented in the case. *See Union Carbide Corp. v. Montell N.V., 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998)*; *see also Hal Leonard Publishing Corp., 1994 U.S. Dist. LEXIS 5195, at *5*.

The fraudulent conveyance claims, to which defendants are entitled to determination by a jury, are distinct from the contract claims to which defendants have waived their right to a jury. The bench trial regarding the contract claims will address issues including: whether defendants' breaches of the HCP Agreement were material; the amount of damages, if any, that were suffered by Towers as a result of these breaches; and whether a prior breach by Towers excused further performance of defendants' obligations under the HCP Agreement. [4] *See* Pl. Mem. at 9. On the other hand, in a jury trial on plaintiff's fraudulent conveyance claims, the jury will be asked to determine whether Hunt Health's assets were fraudulently transferred to Esperanza, and if Esperanza is therefore liable for Hunt Health's indebtedness to Towers. **[*23]** *See id.*

> 4   In its April 18, 2002 ruling on the parties' renewed summary judgment motions in this action, this Court held that Hunt Health was indebted to Towers for the accounts receivable as well as factoring fees associated with those advances, and that Hunt Health has a "present and future obligation to remit to Towers the proceeds on accounts purchased by Towers." *See Wechsler, 198 F. Supp. 2d at 522*. However, the Court also found that there remained a genuine issue of material fact as to the exact amount of Hunt Health's indebtedness. *See id. at 522-23*.

Plaintiff alleges that there will be no overlap of evidence in the two trials, and that "no facts found by the Court in the trial on the breach of contract claims would deprive defendants of their right to a jury on the fraudulent conveyance claim," Pl. Mem. at 9, while defendants argue that, in fact, there are common issues of fact and law to be determined in the contract claims and the fraudulent conveyance claim, **[*24]** and therefore conducting a bench trial on the contract claims before a jury trial on the fraudulent conveyance claim would deprive defendants of "their *Seventh Amendment* right to a complete trial by jury on the fraudulent conveyance issue." Memorandum of Law in Opposition to Plaintiff's Motion to Bifurcate Trial ("Def. Mem.") at 9. Defendants cite to *Dollar Sys. Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 170 (9th Cir. 1989)*, which held that, "where there are issues common to both the equitable and legal claims, 'the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims.'" *Id.* (quoting *Dairy Queen Inc. v.*

*Wood,* 369 U.S. 469, 479, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962)). The *Dollar* court explained that if the legal claims were not determined prior to the equitable claims, the "'prior non-jury trial of the equitable claims may infringe the right to jury trial on the legal claims because of the collateral estoppel or *res judicata* effect of a prior judicial determination of issues common to the two sets of claims.'" *Id.* (quoting *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 690 (9th Cir. 1976)). **[*25]** However, where there are no common issues of law and fact between the two distinct set of claims to be tried, as was the case in *Dollar,* "'the order of trial is immaterial and may be left in the discretion of the court.'" *890 F.2d at 171* (quoting 9 C Wright & A. Miller, Federal Practice and Procedure § 2305, at 35 (1971)).

Defendants attempt to distinguish the finding in *Dollar,* permitting non-jury claims to be tried prior to the jury claims, by arguing that, in the present case, the two sets of claims do involve common questions of fact and law, and therefore bifurcation is inappropriate. *See* Def. Mem. at 9, n.8. In support of this argument, defendants point to common issues of fact between determinations which will be made by the Court in the non-jury claims, and certain elements which the plaintiff must establish to a jury in order to prevail on the fraudulent conveyance claims under New York law. To prevail on a fraudulent conveyance claim under New York law, a plaintiff must show (1) "the status of plaintiff as creditor of transferors;" (2) "the existence of a debt antecedent to the transfer;" (3) "a conveyance;" (4) "that the conveyance was made at **[*26]** a time of insolvency on the part of the transferors;" (5) "the absence of fair consideration for the transfer;" and (6) "the intent to defraud." *Network Enters., Inc. v. APBA Offshore Prods., Inc., 2002 U.S. Dist. LEXIS 17256, No. 01 Civ. 11765, 2002 WL 31050846, *6 (S.D.N.Y. Sept. 12, 2002)* (quoting *Loblaw Inc. v. Wylie, 50 A.D.2d 4, 8, 375 N.Y.S.2d 706 (N.Y. App. Div. 1975)).* Defendants argue that the Court's bench determination regarding plaintiff's status as a creditor and the existence of a debt antecedent to the transfer, prior to a jury trial on plaintiff's fraudulent conveyance claim, would infringe upon defendants' *Seventh Amendment* right to have every element of the fraudulent conveyance claim determined by a jury. *See* Def. Mem. at 9.

Plaintiff argues that cases such as *Dollar,* which prohibit resolution of the non-jury claims before resolution of the jury claims when there are common elements between the two, are inapplicable to the case at bar since those cases all pertain to situations where legal and equitable claims are joined. *See Dollar, 890 F.2d at 170; Beacon Theatres Inc. v. Westover, 359 U.S. 500, 3 L. Ed. 2d 988, 79 S. Ct. 948 (1959)* **[*27]** (holding that where legal and equitable issues are presented in a single case, "only under the most imperative circumstances ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims"). In the present case, there are no equitable claims, rather only legal claims, the majority of which the defendants have waived their right to a jury trial. Furthermore, while defendants have not waived their right to a jury trial on the fraudulent conveyance claim, plaintiff argues that defendants have explicitly waived their right to a jury trial on the question of whether defendants owe a debt to plaintiff under the HCP Agreement; therefore, plaintiff argues, defendants do not have a *Seventh Amendment* right to a jury trial on these issues. Furthermore, plaintiff argues, requiring a jury trial prior to a bench trial on issues to which defendants have explicitly waived their right to a jury determination would "deprive plaintiff of the benefit of their bargain." *Okura & Co. (America), Inc. v. The Careau Group, 783 F. Supp. 482, 491 n.3 (C.D. Cal. 1991)* (stating that, in a case involving a contractual jury waiver applicable to most but **[*28]** not all causes of action, "to the extent there are overlapping factual issues, to require a jury trial to proceed first on the basis of *Beacon Theatres* would deprive plaintiff of its benefit of the bargain.")

The Court finds that while there may indeed be common issues of fact between the contract claims and the fraudulent conveyance claim, in particular in the determination of plaintiff's status as a creditor and the existence of a debt antecedent to the transfer, these are questions to which defendants have waived their right to a jury determination, and therefore allowing a bench determination of these claims to precede the jury trial on the fraudulent conveyance claim would not infringe upon defendants' *Seventh Amendment* right to a jury trial on the fraudulent conveyance claim. [5] Moreover, bifurcation of the two sets of claims in this case, and conducting a bench trial on the contract claims prior to a jury trial on the fraudulent conveyance claim, would serve the interests of judicial economy and efficiency without prejudicing either party, since a finding for defendants in the bench trial would obviate the need for a jury trial on the fraudulent conveyance claim.

5    The Court notes that, in its April 18, 2002

ruling on the parties' renewed summary judgment motions in this action, this Court found that Hunt Health was indebted to Towers, and that Hunt Health has a "present and future obligation to remit to Towers the proceeds on accounts purchased by Towers." *Wechsler, 198 F. Supp. 2d at 522*; *see also supra* note 4.

## [*29] CONCLUSION

For the foregoing reasons, the Court finds that the jury waiver provisions in the contracts signed by the defendants are valid, and the Court grants plaintiff's

motion to bifurcate this trial. Therefore, this Court will first conduct a bench trial on the contract claims, and then, if necessary, the parties will try the fraudulent conveyance claims before a jury, upon completion of the bench trial.

**SO ORDERED.**

August *7*, 2003.

Peter K. Leisure

U.S.D.J.