```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In re:  ENRON CORP.                     07 Civ. 1957 (SAS)
                                             06 Civ. 7828 (SAS)
 4
     ------------------------------x         Argument
 5
                                             New York, N.Y.
 6                                           August 7, 2007
                                             5:00 p.m.
 7
     Before:
 8
              HON. SHIRA A. SCHEINDLIN
 9
                                             District Judge
10

11

12           APPEARANCES

13

14   PAUL, WEISS, RIFKIND, WHARTON & GARRISON
          Attorneys for Appellant-Intervenor Citibank
15        1285 Avenue of the Americas
          New York, New York  10019-6064
16        (212) 373-3000
     BY: BRAD S. KARP, ESQ.
17        CLAUDIA L. HAMMERMAN, ESQ.
          STEPHEN J. SHIMSHAK, ESQ.
18        DOUGLAS R. DAVIS, ESQ.

19

20   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
     Attorneys for Appellant Springfield Associates LLC
21        551 Fifth Avenue
          New York, New York  10176
22        (212) 986-6000
     BY:  DAVID PARKER, ESQ.

23

24

25
```

1           APPEARANCES

2

WILMER CUTLER PICKERING HALE and DORR LLP
3    Attorneys for Amici Curiae Securities Industry and Financial
Markets Association, International Swaps and Derivatives
4    Association, Loan Syndications and Trading Association
          399 Park Avenue, 31st Flr.
5         New York, New York  10022
          (212) 230-8800
6    BY:  CRAIG GOLDBLATT, ESQ.

7

KLEE, TUCHIN, BOGDANOFF & STERN LLP
8    Attorneys for Appellee Enron Creditors Recovery Corp.
          1999 Avenue of the Stars, 39th Floor
9         Los Angeles, California  90067
          (310) 407-4025
10   BY:  LEE R. BOGDANOFF, ESQ.
          DAVID M. STERN, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

787renrm

1              (Case called)

2              THE COURT:  How many of you intend to be heard?

3              MR. KARP:  I intend to argue for intervenor, and I

4    believe Mr. Goldblatt intends to argue for the industry amici.

5              THE COURT:  Only the two of you intend to be heard?

6              MR. KARP:  Yes, your Honor.

7              MR. GOLDBLATT:  I guess so, your Honor.

8              THE COURT:  Mr. Stern, are you going to be heard

9    alone?

10             MR. STERN:  Yes, your Honor.

11             THE COURT:  I know you folks desperately wanted oral

12   argument, and I was dragged kicking and screaming into

13   accommodating you, because to prepare for oral argument was a

14   whole lot of work.  Then you both separately wanted September,

15   and I was not going to do that.  Having geared up and being

16   ready to go, I wasn't going to lose a month.  So I know it is

17   inconvenient to do this in early August, but that was really my

18   only option.  I was not going to put this off a month.

19             It is 5 o'clock.  The way that came about is one time

20   long ago there was a trial scheduled for today, and then we

21   thought there were too many of you to try to shift the time.  I

22   had planned to give you a generous amount of time.  Had you

23   thought about how much time you hoped to have, Mr. Karp, for

24   your side, for appellant?

25             MR. KARP:  I thought we were given an indication by

1   your law clerk that we would have an hour, 30 minutes a side.

2   We're hoping to keep within that schedule, if that's OK with

3   your Honor.  If you would like to hear more, I'm sure Mr. Stern

4   and I will be able to go on at great length.

5           THE COURT:  I'm sure you could talk forever.  You

6   wrote forever.  You wrote collectively 125 pages, not including

7   the amici or however you pronounce that word.  So you certainly

8   could talk forever.  I'm happy if we can wrap it up with a half

9   hour per side.  I was prepared to go even longer if necessary,

10  because once we are all here, we may as well hash the thing

11  out.

12          With that, Mr. Karp, I guess you want to begin.

13          MR. KARP:  Thank you very much, your Honor.  I'm Brad

14  Karp for intervenor Citibank.  I want to thank your Honor for

15  accommodating the parties' various scheduling issues.  I'd like

16  to reserve five minutes for rebuttal, if I may, and I'd like to

17  allocate five minutes of my time to Mr. Goldblatt on behalf of

18  the industry amici.

19          The issue before this Court is one of statutory

20  interpretation involving to provisions of the bankruptcy code.

21          THE COURT:  I want to remind you early on in the

22  argument that I did read all 125 direct briefing pages and all,

23  I don't know how many, 75 amici pages and endless cases and

24  statutes and the bankruptcy court's opinions.  You have to

25  assume a lot of familiarity.

787renrm

```
1              MR. KARP:  I will assume a lot of familiarity.  Let me

2     begin right away with equitable subordination under 510(c).

3     Your Honor presumably is very well aware of the ruling you

4     issued last September when you granted intervenor's petition

5     for interlocutory review and you touched on the issues to be

6     discussed today and to be addressed ultimately.

7              You wrote in that decision regarding equitable

8     subordination under 510(c) that the intervenors had provided

9     substantial and facially persuasive agreement that the language

10    of 510(c) and the legislative history, as well as the case law,

11    indicate that principles of equitable subordination do not

12    allow the doctrine to be applied to innocent claim holders.

13    Your Honor's observation admittedly was preliminary, but we

14    submit, as you might anticipate, that it was absolutely

15    correct.

16             I'd like to begin with the words of the statute.

17    Section 510(c) provides that after notice and a hearing the

18    court may, under principles of equitable subordination, and it

19    goes on to provide some technical aspects of how claims are

20    subordinated.

21             Section 510(c) by its express terms is limited to

22    those circumstances where principals of equitable subordination

23    apply.  The question thus becomes, What are those principles of

24    equitable subordination?  Fortunately, we have a fair amount of

25    guidance here.
```

```
 1            In 1996, as this Court is aware, the Supreme Court in
 2   United States v. Noland explained how 510(c) is to be
 3   construed.  The court in Noland held that because section
 4   510(c) does not define principles of equitable subordination,
 5   it is necessary to draw inferences of congressional intent from
 6   the legislative history of the act.  So the key becomes, What
 7   did Congress intend in 1978 when it referred to principles of
 8   equitable subordination?  Your Honor, Congress had a clear
 9   understanding of that concept, which it expressed at some
10   length.
11            The legislative history of 510(c) both in the Senate
12   report and in the House report expressly provided that
13   principles of equitable subordination are intended to codify
14   existing law.  There existed as of 1978 well-developed case law
15   setting forth the contours of the equitable subordination
16   doctrine.  With two limited exceptions that both sides agree
17   are not equitable here, involving tax penalty claims and equity
18   security claims, that body of case law required misconduct by
19   the holder of the claim --
20            THE COURT:  Do you have any case that you really think
21   is directly on point, on all fours, or do you really concede
22   that there is no such case?
23            MR. KARP:  To answer that directly, there is no case
24   in history besides Judge Gonzalez's opinion --
25            THE COURT:  That's a lawyer's answer.  Do you have a
```

787renrrm

1  case for your side that squarely holds what you want this Court

2  to hold?

3          MR. KARP:  Not involving transferees.

4          THE COURT:  Good.  That's fine.  That's what I want to

5  know.  Not involving transferees?

6          MR. KARP:  Not involving transferees.  As your Honor

7  is undoubtedly aware from the papers, there has never been a

8  situation before that we are aware of where a debtor estate

9  ever attempted to apply section 510(c) equitable subordination

10  to a transferee.  Never before attempted.  The reason is

11  because section 510(c), when you look at the legislative

12  history --

13          THE COURT:  I don't think I can check that statement

14  out.  I don't know how I would do the research to see if any

15  debtor has ever tried to apply 510(c).

16          MR. KARP:  We tried as hard as we could.

17          THE COURT:  I'm not sure that that is something that I

18  can do by a Westlaw search.  What we search there is cases,

19  decisions.  I don't know what debtors have tried or not drive.

20  So I don't think your statement is evidence.

21          MR. KARP:  I didn't intend it to be evidence.

22          THE COURT:  Good.

23          MR. KARP:  Your Honor, based on the Supreme Court's

24  discussion in Noland, we are instructed to look at what did

25  Congress intend in 1978 when it invoked principles of equitable

1   subordination.  Congress there was quite clear that it applies

2   to holders of claims and that holders of claims must have

3   engaged in either inequitable conduct or misconduct.  Floor

4   statements by Senator DeConcini --

5            THE COURT:  I have all that right out of your brief,

6   the Senate report states, quote, a claim may normally be

7   subordinated only if holder is guilty of misconduct, closed

8   quote.  If it was in your brief, I have those quotes.

9            But I don't think that answers the questions that the

10  adversary has briefed and is forcing you to answer.  They say,

11  for example, wouldn't this gut the concept of equitable

12  subordination?  If a bank that was subject to a possible claim

13  of equitable subordination because it might be the wrongdoer

14  realizes this is coming, then just transfer all the claims to a

15  willing buyer, who supposedly doesn't know about the problem,

16  and there's not going to be any equitable subordination

17  anymore.

18           They are saying it guts 510(c) if you allow this to

19  proceed as you would like, namely, that it can't be broad

20  against the transferee, that the whole concept of equitable

21  subordination can't be brought against the transferee.  There

22  wouldn't be a 510(c).  Everybody would be smart enough to

23  unload the problem.

24           MR. KARP:  Your Honor, that is the claim-washing

25  argument.  It doesn't work for a fundamental reason.  The

```
 1   reason it doesn't work is because the debtor estate has direct

 2   actions against, as you put it, the bad guy.

 3             THE COURT:  Yes.  So what?  It might take ten years

 4   for somebody to win that case.  In the meantime, you've sold

 5   your claim, you have money in the bank.  And we all know about

 6   the time value of money.  So I'm not sure that is an entire

 7   answer.

 8             You could sell off your problem.  Yes, you will be

 9   pursued in litigation.  Good lawyers can make litigation last

10   five or ten years, because they do all the time in my court,

11   and who knows who is going to win and what it is going to

12   settle for and this and that.  Still, you have unloaded the

13   problem on an immediate basis.

14             All I'm saying is their argument is you have wiped out

15   510(c) unless they're right that it can apply to the

16   transferee.

17             MR. KARP:  That is the fundamental question.  Our view

18   of the statutory language, the legislative history and the case

19   law that we have cited, obviously we have cited the Noland

20   case, the Mobile Steel case --

21             THE COURT:  The Noland case said, we're not going to

22   decide the question of transferee, that's an open question.

23   That's a direct quote from Noland:  We are not deciding, it's

24   open.  All they are doing is inviting me to have this problem.

25             MR. KARP:  Equitable subordination based on the case
```

1   law is directed to looking for misconduct on the part of --

2            THE COURT:  I know.  But they specifically said in

3   Noland, we're not going to reach the question of transferees.

4   So Noland is not a big help to me, because it ducked the

5   question.

6            MR. KARP:  Your Honor, let me try to approach it this

7   way.  The purpose of equitable subordination is remedial.  Both

8   sides agree on that.  The actual purpose of equitable

9   subordination is when there is a creditor of the estate that

10  has a claim against the estate and is engaged in misconduct.

11  The estate is able to go after that creditor.  If it can prove

12  misconduct against the creditor --

13           THE COURT:  I understand that.  If the creditor can

14  get rid of the problem at least on an immediate basis by

15  selling off the problem, I understand it can be pursued in a

16  separate action.  In fact, I understand here it is being

17  pursued in a separate action in the so-called mega case or mega

18  action.

19           MR. KARP:  Mega complaint.

20           THE COURT:  Yes, mega complaint.  So I understand it

21  is being pursued.  I do.  But on an immediate basis you are

22  selling it, you have the use of the money, and it's years out

23  and the results are unknown.  I still say their argument

24  doesn't gut 510(c).

25           MR. KARP:  Your Honor, section 510(c) refers to,

1    again, principles of equitable subordination.  When Congress

2    wanted to extend provisions of the bankruptcy code to

3    transferees, to subsequent transferees, it knew how to do so.

4    It did so in section 550(b) of the bankruptcy code.  It

5    specifically referred to recipients of avoidable transfers and

6    subsequent transferees, immediate transferees, subject to a

7    good-faith defense.  It did not do so either in section 510(c)

8    or in section 502(d) with respect to --

9         THE COURT:  Why didn't the Supreme Court just say so?

10    Why did they duck it and say we'll leave that for another day.

11    They could have said what you just said in one footnote.

12         MR. KARP:  Because the question precisely put before

13    the court in Noland is whether the tax penalty exception --

14    remember I mentioned at the outset there were two exceptions.

15         THE COURT:  I know.  Tax penalties.

16         MR. KARP:  That was the issue before the court.  In

17    Noland, Justice Souter stated that equitable subordination, we

18    are not going to accept categorical demarcations where you

19    don't have to prove misconduct.

20         We think the better ruling, certainly the ruling that

21    Livschultz in the Second Circuit applied in the wake of Noland,

22    is that the Supreme Court was indicating that misconduct on the

23    part of the creditor holding the claim to be subordinated is

24    always going to be required, and that the two extensions that

25    were adverted to --

1          THE COURT:  The Supreme Court's holding, is that the

2     holding of Livschultz?

3          MR. KARP:  No, that is not the holding of Livschultz.

4     What Livschultz said is that Mobile Steel is the touchstone,

5     and Mobile Steel said that the claimant must be engaged in

6     misconduct.

7          THE COURT:  Then let's move on to the assignor/

8     assignee problem.  Your adversary says, no matter what, an

9     assignee has no more rights than an assignor.  You dispute

10    that.  You say there are plenty of examples where an assignee

11    has more rights than an assignor.

12          The first set of examples you give are three sections

13    of the New York U.C.C..  You cite section 3-305, 7-502, and

14    8-510.  My question is, is this an assignment or sale?  Is

15    there a difference between assignment and a sale such that

16    these U.C.C. sections really don't apply there anyway?  Some of

17    them are limited to negotiable instruments, for example.  Some

18    of them are limited to holders in due course, that sort of

19    thing.  Is this different?  Are these sales that fall under the

20    U.C.C. or are they assignments?

21          MR. KARP:  We believe that these are sales of bank

22    debt in this particular circumstance.  But the broader response

23    to your Honor's question about assignment law is that it does

24    not apply, it should not apply in connection with either 510(c)

25    or 502(d).  None of the cases that are on point have ever

```
 1    referred to the application of assignment law other than Judge

 2    Gonzalez's decision.

 3            THE COURT:  And a bunch of law review people.

 4            MR. KARP:  Law review people, not surprisingly, go

 5    both ways.

 6            THE COURT:  You're saying it's a sale of bank debt.

 7    That's what you think it is?

 8            MR. KARP:  It was a sale of bank debt.

 9            THE COURT:  Do you think that is different from an

10    assignment?  There is this famous old legal principle that an

11    assignee cannot take more rights than the assignor has.  Maybe

12    another reason that is not applicable is because this is not a

13    classic assignment, this is a sale.

14            MR. KARP:  That's one response.  Also, we have found a

15    case which is cited in our brief, the W.T. Grant case.

16            THE COURT:  I saw that.

17            MR. KARP:  If you look at WT. grant, which was decided

18    by a Southern District bankruptcy judge, affirmed by Judge

19    Duffy in the Southern District, and ultimately affirmed by the

20    Second Circuit in a Judge Friendly opinion, there the court

21    found that the benefit of equitable subordination was not a

22    right that transferred with a claim.

23            THE COURT:  The way I wrote it in my notes is:

24    Similarly, creditors cannot benefit from equitable

25    subordination when they purchase their claims after the alleged
```

```
 1  misconduct of the other creditors and intervention of
 2  bankruptcy and at distressed prices.
 3         MR. KARP:  That's exactly what it stands for, which
 4  makes sense, because the view of equitable subordination and
 5  disallowance, the prevailing view, is that they are personal
 6  disabilities of a creditor, they are not attributes of a claim.
 7         THE COURT:  I don't see how the W.T. Grant holding
 8  gets into that.
 9         MR. KARP:  It doesn't get into that.  I'm trying to
10  respond to your Honor's initial question about the
11  applicability of assignment law.  When you think about what is
12  going on here, this isn't a case of a wage claim in Shropshire
13  or a claim by the United States in Markson.
14         What is going on here is that these are equitable
15  remedies that the bankruptcy estate is trying to take advantage
16  of.  There are personal disabilities that require the court to
17  look at the conduct of the party being charged with equitable
18  subordination or the part against whom disallowance is sought
19  under 502(d).
20         THE COURT:  Your adversary is trying to say the
21  assignee stands in the shoes of the assignor, so they are the
22  same, the alleged wrongdoing of the assignor is attributed to
23  the assignee.  In terms of Mobile Steel, there is still
24  wrongdoing, because you impute that wrongdoing to the assignee.
25  That's why I asked you if another distinction is that this
```

```
 1    isn't really a classic assignment, it's a sale.

 2             MR. KARP:  That's right, that is our position.  Again,

 3    because this particular fact pattern has never before appeared

 4    in the case law, we're trying to look at fundamental

 5    principles.

 6             THE COURT:  They took on section 7-502 of the U.C.C.

 7    and Section 8-510 of the U.C.C., and they said this is not a

 8    security, it's a bank debt.  Is your answer to that the Court

 9    of Appeals opinion of April 3, 2007?

10             MR. KARP:  Yes, it is.  It is cited in our reply

11    brief.

12             THE COURT:  I've got it.  So that's your answer to

13    7-502 and 8-510?

14             MR. KARP:  It is.

15             THE COURT:  They also attack 3-305.  I can't remember

16    why they did.  Your answer to that is?  I guess negotiable

17    instrument was their point.  They said it's not a negotiable

18    instrument, and you say?

19             MR. KARP:  It is a negotiable instrument.

20             THE COURT:  It's that simple.  You tell me it is.  Can

21    you tell me why it is?  They say it is not negotiable because

22    there are other documents you have to look at, it's not plain

23    on it's face.

24             MR. KARP:  We can put the paperwork before your Honor

25    about the various sale of the bank debt from Citibank to
```

```
 1    Deutsche Bank in February of '02, the subsequent sale by

 2    Deutsche Bank to Springfield, the transferee in this case, and

 3    we can provide you with explanations of why it is a negotiable

 4    instrument, if your Honor would be interested that.

 5         THE COURT:  You say you think it would fall under

 6    3-305, is that right, be covered by it?

 7         MR. KARP:  I believe that is correct.  But, your

 8    Honor, if I could brief this issue --

 9         THE COURT:  It's just that you cited those three

10    sections as exceptions to the proposition that an assignee

11    could have no more rights than the assignor?

12         MR. KARP:  That is correct.  The fundamental point,

13    though, your Honor, is that assignment law in our view just

14    does not apply.

15         THE COURT:  Perchance if I don't agree with you, I

16    have to reach this, so I have to understand why it might be

17    something I could distinguish from a classic assignment.

18         MR. KARP:  It is a sale.

19         THE COURT:  That's what I wanted to know, your

20    thoughts on that.  You also cite an old 1939 Second Circuit

21    case that talked about section 44 of the Bankruptcy Act that

22    you said creates a personal disability only about the voting

23    rights.  You said that wouldn't go with the claim, it goes with

24    the person.

25         MR. KARP:  Again, it is a personal disability, which
```

787renin

 1   requires courts to look at the conduct of the party.

 2          THE COURT:  Your point was that an assignee in that

 3   situation could have more rights than the assignor because they

 4   don't carry the personal rights that the assignor had?

 5          MR. KARP:  That's correct.

 6          THE COURT:  Is that an assignment case, do you know?

 7          MR. KARP:  I don't believe it is.

 8          THE COURT:  Oh, yes, it is.  Both the claim and the

 9   debt in bankruptcy is assigned in good faith to the purchaser.

10   That's how I wrote it.  OK.

11          MR. KARP:  Your Honor, if I could continue, unless you

12   have any other questions about equitable subordination.

13          THE COURT:  Because you want to turn to the

14   disallowance?

15          MR. KARP:  I'd like to turn to disallowance.

16          THE COURT:  The only other one on the equitable

17   subordination that your adversary made a big point of is this

18   notion of fixing the priorities at the time of the petition,

19   the whole Sexton-Markson thing.

20          MR. KARP:  The issue there, your Honor, is that that

21   is not the law in any circumstance.  There are certain cases,

22   Sexton and Markson, where you're looking at claim priorities.

23   This is not a case of claim priorities.

24          THE COURT:  Oh, dear.  My clerk said he never put the

25   listeners on.  Hello to the listeners.  I forgot to put you on

1    the speaker about 15 minutes ago.  You just missed the best 15

2    minutes.  What can I tell you?  I think you're going to have to

3    read the transcript.  We can't repeat the 15 minutes for you.

4    I apologize for bringing you in late.  Oh, dear, I'm sorry.

5              Go ahead, Mr. Karp.

6              MR. KARP:  Your Honor, the proposition that Enron

7    argues that the claims are fixed as of the petition date and do

8    not change is not an accurate position.  It wasn't argued

9    before the bankruptcy court.  It doesn't appear in the

10   bankruptcy court ruling.  The reason is because the relative

11   rights among competing claims routinely change based on post-

12   petition events.  They are not fixed and determined as of the

13   petition date.

14             Two of the best examples of that, ironically, your

15   Honor, happen to be equitable subordination under 510(c) and

16   disallowance under 502(d).  The application of both of those

17   statutes, your Honor, by their express terms could not possibly

18   be fixed and determined as of the petition date, because both

19   statutes require notice and a hearing, and both can be applied

20   based on post-petition events that are absolutely unknowable as

21   of the petition date.

22             THE COURT:  You can maybe rearrange priorities after

23   that point, but everybody's position is fixed subject to

24   rearrangement, subject to the application of equitable

25   subordination, subject to the application of 510(c) to have

 1   rearrangement.  But they are saying the character of the claim,

 2   so to speak, is fixed.

 3         MR. KARP:  Again.  For the reasons set forth in our

 4   papers, we disagree with that, because you don't know whether a

 5   claim can be equitably subordinated unless you understand the

 6   conduct that is at issue.  And you don't know whether a claim

 7   can be disallowed unless you know whether or not the party

 8   against whom disallowance is sought has --

 9         THE COURT:  You think that argument has to boil back

10   to the first one:  They can only be right if the conduct of the

11   assignor is imputed to the assignee or the purchaser?

12         MR. KARP:  Absolutely.

13         THE COURT:  Unless that conduct is imputed, it's just

14   not going to work?

15         MR. KARP:  That's correct.  Their argument depends

16   entirely on imputation.

17         THE COURT:  Do think the Multiponics circuit decision

18   is a little contrary to what you are saying, that they were

19   really hinting that it is fixed at the time?

20         MR. KARP:  No.  In fact, quite the contrary.  The

21   Multiponics case, which Enron spending a lot of time featuring

22   in its papers, makes it clear that equitable subordination is

23   an exception to the principle in Markson and the other cases in

24   that line.  In fact, they say it doesn't apply and that

25   equitable subordination is not fixed and determined.  There is

1   a quote directly from that case which makes that point.

2          THE COURT:  From the circuit case or district court

3   case?

4          MR. KARP:  I believe it is in the district court case.

5          THE COURT:  I think so, too.  That's why my question

6   was very specific and had to do with the circuit case.

7          MR. KARP:  Your Honor, in the circuit case it still

8   continues to hold that the principle that Enron latches on to

9   is not an immutable principle.  Enron's entire argument is that

10  it in fact is an immutable principle and that nothing post-

11  petition matters.  Quite to the contrary.  There are many

12  things that matter post-petition, and two of the things that

13  happen to matter here are that 510(c) and 502(d) apply only

14  based on an analysis and an evaluation of a creditor's or

15  holder's or claimant's conduct post-petition.  Under their

16  theory, that would be irrelevant.

17         THE COURT:  I wasn't concentrating on what you just

18  said.  You may have to repeat it.  In the circuit opinion of

19  Multiponics, the circuit did say the status of claims are

20  generally determined at the time of the filing of the

21  bankruptcy petition.  They knew they were in the context of

22  this kind of case we are in.  They were in this context and

23  still said the general rule is that the status of claims is

24  determined at the time of the filing of the bankruptcy

25  petition.

1          MR. KARP:  Yes.

2          THE COURT:  They said there may be situations

3    justifying equitable subordination despite Markson; since we

4    don't agree with the district court's view of the facts

5    regarding alter ego, we need not speculate on that possibility.

6    So whatever it is, it is not a holding.

7          MR. KARP:  It's not a holding.  Again, Mobile Steel,

8    which deals more fully with the issue, predates the circuit's

9    decision in Multiponics.  But the other circuit courts and

10   district courts nationwide continue to cite the Mobile Steel

11   rule.

12         THE COURT:  I think one circuit rejected it.  But

13   that's OK.

14         MR. KARP:  The Supreme Court in the Noland case said

15   the most influential guidance on principles of equitable

16   subordination derives from Mobile Steel's 1977 ruling.  Again,

17   Mobile Steel was decided in November 1977, shortly before

18   section 510(c) of the code was enacted, in 1978.

19         THE COURT:  Right.  If you want to turn to

20   disallowance, be my guest.

21         MR. KARP:  Our argument, as your Honor is undoubtedly

22   familiar with from our briefs, on disallowance is that the

23   statutory language here is clearcut.  "The court shall disallow

24   any claim of any entity that is a transferee of a transfer

25   avoidable unless such transferee has paid the amount for which

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7874ehm

```
1    such entity or transferee is liable."  So section 502(d) on its
2    face from our perspective applies only to parties that have
3    received avoidable transfers.  It does not apply to any party
4    that has not received avoidable transfer.  The Melon case --
5         THE COURT:  Unless, again, the assignee becomes the
6    assignor for this purpose.  Everything goes back to that
7    concept.  If they essentially become one and the same, then you
8    lose that argument.
9         MR. KARP:  Although, again, when you look at the case
10   law under 502(d), here the decisions we think are lined up.
11        THE COURT:  Actually, I think there is only one
12   decision on each side directly on point.  You have In re Wooden
13   Locker, Western District Texas 1988, and they have Metiom,
14   Bankruptcy, Southern District of New York 2003.  That's it.  I
15   found two -- not I found, but you folks seem to have found two
16   lower court decisions, one each, that's all.
17        MR. KARP:  There are two lower court decisions that
18   deal with the issue of transferee, that's correct.
19        THE COURT:  And the box score is 1-1.
20        MR. KARP:  The box score there is 1-1.  On the broader
21   issue, which we think is absolutely applicable here, of whether
22   502(d) applies only to holders of avoidable transfers received
23   from the debtor, the case law going back to the Supreme Court's
24   decision in Katchen v. Landy in 1966 dealing with the
25   predecessor statute to 502(d) makes clear that what is being
```

7871ehrm

 1   looked at, evaluated, is whether the creditor or holder or

 2   claimant has received, is holding on to, an avoidable transfer

 3   from the debtor.

 4        The Melon Produce case against Brownstein in the First

 5   Circuit in 1997 says 502(d) is not complex.  The statute is

 6   expressly directed at recipients of avoidable transfers.  Here,

 7   again, your Honor, there is absolutely no dispute but that the

 8   transferees in this proceeding and the other actions are not

 9   recipients of avoidable transfers.

10        THE COURT:  They are not recipients.  They will get a

11   chance, the other side, but the only theory can be that they by

12   operation of law become that person.  That has to be the

13   theory, that they become that person for purposes of the law,

14   because they stand in their shoes.

15        MR. KARP:  That's exactly right.  They cite two cases

16   that deal with that issue.  One is and Eighth Circuit 105-year-

17   old case Swartz v. Siegel, which involves a surety

18   relationship.  Based on principles of equitable subordination,

19   the surety did stand in the shoes.

20        THE COURT:  And then the FDIC in receivership stands

21   in the shoes.

22        MR. KARP:  That's exactly right.  That's what their

23   argument depends on.  In the other cases we cite in our brief

24   where the FDIC --

25        THE COURT:  In its corporate capacity purchased as

78/rehrm

1    opposed to receiver.  I saw that.

2         MR. KARP:  You know the briefs better than I know the

3    briefs.

4         THE COURT:  That's because I've done nothing else for

5    three days.

6         MR. KARP:  That's all I've done as well, your Honor.

7         THE COURT:  I have 700 cases.  I think you have a

8    smaller number.

9         MR. KARP:  I'm not going to take your Honor on there.

10        One other point we have dealt with.  I can deal with

11   Metiom if you would like.

12        THE COURT:  I think you say basically Metiom was

13   wrongly decided.

14        MR. KARP:  Our view is that the wrongly decided.  It

15   is wrongly decided in large part for a couple of reasons.  One,

16   it does rely on the Swartz case, which involved surety

17   principles and subrogation, so it is inapplicable.  Secondly,

18   the situation in Metiom involved a transferor, Intera, that was

19   insolvent.  There was a transferee that arguably received by

20   imputation an avoidable transfer.

21        Bankruptcy Judge Drain held expressly that it would

22   be, quote-unquote, a pernicious result here if the debtor

23   estate could not reach the avoidable transfer, could not reach

24   it through the transferor, which was insolvent.  The only

25   recourse was through the transferee.  It was an equitable based

1   decision, much like Judge Gonzalez's decisions here.  The

2   Supreme Court in Noland and the legislative history went out of

3   its way to say that courts cannot impose their own views of

4   equity.

5        THE COURT:  You don't have a Roland commission to do

6   equity.

7        MR. KARP:  That's exactly right.  Your Honor, it went

8   further.  In the context of 510(c) there was an earlier version

9   of that statute which went through the House of Representatives

10  which provided that equitable subordination could be granted on

11  any equitable grounds.  The House report indicated that the

12  intent there was to give courts wide berth in determining

13  whether or not to equitably subordinate a claim, and the House

14  rejected.

15       THE COURT:  Speaking of equities, leaving this point

16  for the other folks who may be arguing, you folks have raised

17  the disruption of the markets, and I should be worried about

18  that, I should take that into account.  Do you think I should

19  be worrying about that?  Is that in the scope of what I have to

20  do, worry about the markets?  If so, why?  Why would I have to

21  get into all that balancing of who is more at risk here?

22       MR. KARP:  Your Honor, you certainly don't need to

23  reach that issue under our various theories.  The answer is

24  gleaned from the language of the statute and the legislative

25  history and the case law, in our view.  However, the Second

```
 1    Circuit in Elliott Associates indicated, looking at section

 2    489 --

 3              THE COURT:  I saw that.  Foreign whatever.

 4              MR. KARP:  Exactly.  They're called the foreign debt

 5    markets involving chapter 3 of the statute under the judiciary

 6    law.

 7              -- said that where an interpretation of a statute

 8    would lead to the impairment or disruption of important

 9    markets, that is very much a factor to be taken into account.

10    The Second Circuit actually went a little further.  Just bear

11    with me one moment.

12              THE COURT:  I have the quote in front of me.  Do you

13    want me to read it to you?  "While the district court's ruling

14    might benefit the debtors in the short run, the long term

15    effect would be" -- we don't need to finish.  I have the quote

16    in front of me.

17              MR. KARP:  But it is a legitimate concern.  To try to

18    punctuate the point that is at issue here, while Judge

19    Gonzalez's narrow decision focuses on bank debt, he went out of

20    his way to indicate that in his view it applies not just to

21    bank debt but it applies to all instruments that could be

22    transferred in the course of a bankruptcy proceeding.  He

23    explicitly stated that it can be applied to such instruments as

24    par loans and bonds.  And in the situation of bonds,

25    indemnities of are of no use, as your Honor is well aware.
```

1           THE COURT:  Are those negotiable instruments, bonds?

2   I took that course more than 30 years ago.  I don't remember

3   anything about negotiable instruments.  Surely there is a

4   negotiable instrument lawyer sitting out there who understands

5   negotiable instruments.  Nobody?  Raise your hand if you

6   remember negotiable instruments.

7           MR. KARP:  Mr. Davis.

8           MR. DAVIS:  Yes, your Honor.  Certainly some of the

9   bonds could be in the form of negotiable instruments.

10          THE COURT:  And some might not be?

11          MR. DAVIS:  Correct.  Bonds are more likely to be

12  negotiable instruments than bank debt.

13          THE COURT:  I guess the last question I have for you,

14  and I didn't watch your time but it feels like just about 30

15  minutes --

16          MR. KARP:  It feels longer, your Honor.

17          THE COURT:  That depends where you're sitting or

18  standing.  The last question I have for you is this transferee

19  might have been an innocent, so to speak, may not have engaged

20  in wrongful conduct, may not have been on notice of any

21  wrongful conduct, so it is kind of a classic bona fide

22  purchaser for value or holder in due course.

23          MR. KARP:  Yes.

24          THE COURT:  Should I worry more about that person or

25  should I worry about all the other creditors who collectively

```
 1   might have been able to assert a claim for equitable
 2   subordination against Citibank had it not sold it off?  Are you
 3   balancing the protection of this individual purchaser, maybe
 4   good faith purchaser, or should I worry more about all the
 5   other creditors who might benefit from equitable subordination?
 6        MR. KARP:  Your Honor, again, Judge Gonzalez actually
 7   tried to attempt that balancing test at the conclusion of his
 8   opinion, which is exactly what the Supreme Court says you
 9   cannot do, in which he claimed that the other creditors are
10   entitled to greater deference than this transferee.
11        Besides the fact that the courts say you cannot do
12   that, the more fundamental issue is, to return to the
13   proposition that Enron has already brought a lawsuit against --
14        THE COURT:  I understand that.  I understand how long
15   it can take.  The point is you don't think I should worry about
16   that balance?
17        MR. KARP:  Your Honor, the other creditors are
18   protected by existing bankruptcy law.
19        THE COURT:  The concept of equitable subordination,
20   and we will get to disallowance -- I guess we did -- is that
21   they benefit if the other claim is equitably subordinated to
22   their claim; they would lose that benefit if these claims are
23   not equitably subordinated.
24        MR. KARP:  Again, if there is a finding in the direct
25   adversarial proceeding of the mega complaint against Citibank,
```

```
1   which is going to be tried before Judge Gonzalez in April of

2   next year, that finding is going to prevent -- they are seeking

3   the same damages against Citibank --

4            THE COURT:  That finding is going to prevent what?

5            MR. KARP:  Is going to prevent the creditors from

6   being hurt.  Citibank, a very solvent entity, is going to be on

7   the hook under principles of equitable subordination, of

8   disallowance, of aiding and abetting the violation and breach

9   of fiduciary duties.  The creditors are protected there because

10  the wrongdoer that Congress isolated, the alleged wrongdoer,

11  the transferor --

12           THE COURT:  Not for the claims of the transfer.

13           MR. KARP:  Absolutely.  Citibank is going to be on the

14  hook.

15           THE COURT:  On the hook, yes, but not for equitably

16  subordinated claims or disallowed claims.  On hook a different

17  way:  A direct judgment, so to speak, which will benefit the

18  estate and thereby benefit the creditors in the end.  Just a

19  different route of getting there.

20           MR. KARP:  Claims for disallowance, claims for

21  equitable subordination against Citibank, against the party as

22  to which the adversary proceeding was brought.

23           THE COURT:  They don't have to claim they sold.

24  Citibank doesn't have to claim it sold.

25           MR. KARP:  Again, the damages --
```

1          THE COURT:  I understand.  That's what I said, another

2   route.  The damages would inure to the benefit of the estate,

3   which eventually benefits the other creditors.

4          MR. KARP:  That's exactly right.

5          THE COURT:  I'm supposed to be behind you, not ahead

6   of you.  I just wanted to make sure.

7          Five minutes.  Who was that, you?

8          MR. GOLDBLATT:  Yes, your Honor.

9          MR. STERN:  Your name again?

10         MR. GOLDBLATT:  Craig Goldblatt.

11         THE COURT:  All right, let's go.

12         MR. GOLDBLATT:  Thank you, your Honor.  Craig

13  Goldblatt on behalf of the amici curiae the Securities Industry

14  and Financial Markets Association, the International Swaps and

15  Derivatives Association, and the Loan --

16         (Pause)

17         THE COURT:  (To the telephone participants)  We have

18  been on the line for a long time and you have been listening

19  for a long time.  That's the last we intend to say to you.

20         Go ahead.

21         MR. GOLDBLATT:  -- and the Loan Syndication and

22  Trading Association.  Your Honor, collectively the amici

23  associations represent essentially every sector of the

24  financial markets and very much appreciate the opportunity the

25  Court has given to address this issue of enormous concern to

1   the financial markets.

2         Your Honor, the amici submitted their briefs to bring

3   to the Court's attention, very much for the reason that arose

4   in the colloquy with Mr. Karp, the actual experience in the

5   marketplace as it bears on the analysis that the Elliott

6   Associates suggests is relevant in that, as your Honor said,

7   the statute by its terms, we think that it is the better

8   argument on the statutory terms itself, but you can't just read

9   the statute and you don't have a case on all fours.

10        THE COURT:  Not on equitable subordination issue,

11   right.

12        MR. GOLDBLATT:  That's correct.  As a result, one of

13   the things to consider in deciding which of these rules is

14   appropriate are the consequences in the real world of which

15   rule is adopted.  To that end, your Honor, the experience of

16   the amici in the actual markets very much underscores the point

17   that Mr. Karp made about the disruptive effect of the

18   bankruptcy court's decision here on those markets.

19        Your Honor, before the bankruptcy court's decision,

20   there existed a very vibrant and robust secondary market in

21   bankruptcy claims.  That market included bank debt, bond debt,

22   trade debt, and credit derivatives.  The Second Circuit did

23   explain in Elliott Associates, as you just described, that the

24   existence of these markets facilitates the extension of credit

25   to troubled businesses.

Document Excerpted to Reduce Bulk

7871enhm

1    equitable subordination in that case was not a right that

2    transferred with the claim.  There was a fair amount of back

3    and forth between your Honor and Mr. Stern about this issue.

4           While a claim in the hand of a creditor, an injured

5    creditor, on the petition date might potentially benefit the

6    equitable subordination in that case, a subsequent distressed

7    purchaser of that claim did not acquire that benefit when it

8    bought the claim.  So the benefits and the burdens of equitable

9    subordination are not rights, as Enron contends here, that

10   become affixed to claims and travel with those claims upon

11   transfer, which is the fundamental point that we have been

12   discussing this afternoon.

13          With that, I have nothing further.

14          THE COURT:  Thank you all for a very excellent

15   argument.  Obviously, the Court reserves decision.  And of

16   course you're going to order the transcript in the most

17   expedited manner.  Thank you.

18          (Adjourned)

19

20

21

22

23

24

25



I (We) hereby certify that the foregoing is a true and accurate transcript, to the best of my (our) skill and ability, from my (our) stenographic notes of this proceeding.

Official Court Reporter