**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x
                                        :
**In re:**                              :        **Chapter 11**
                                        :
**ENRON CORP., et al.,**                :        **Case No. 01-16034 (AJG)**
                                        :
              **Debtors.**              :        **Jointly Administered**
                                        :
-------------------------------------------------- x

**THIRD INTERIM REPORT OF NEAL BATSON,**
**COURT-APPOINTED EXAMINER**

**June 30, 2003**

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1
        A.      Background ........................................................................................... 1
        B.      Prior Reports ......................................................................................... 2
        C.      Summary of Conclusions ..................................................................... 3
        D.      Standard Adopted by the Examiner.. ................................................... 6
        E.      How to Read This Report ..................................................................... 7

II.     BACKGROUND ............................................................................................. 8
        A.      Events of Fall 2001 .............................................................................. 8
        B.      The Bankruptcy Filings and Subsequent Events ................................ 10

III.    ROLE OF OFFICERS IN SPE TRANSACTIONS AND POTENTIAL
        LIABILITY ..................................................................................................... 11
        A.      Overview ............................................................................................... 11
        B.      Why Did Enron Officers Engage in the SPE Transactions?. ............... 14
        C.      Officers Involved in SPE Transactions ................................................ 19
        D.      Potential Breaches of Fiduciary Duties ............................................... 24
        E.      Potential Defenses Available to Officers ............................................. 30

IV.     ROLE OF FINANCIAL INSTITUTIONS IN ENRON'S SPE TRANSACTIONS
        AND THEORIES OF LIABILITY ................................................................. 34
        A.      Theories of Potential Liability ............................................................. 34
        B.      Potential Defenses to Aiding and Abetting Claims and Equitable
                Subordination ....................................................................................... 36
        C.      Potential Additional Defenses to Aiding and Abetting Claims ........... 48

V.      SPECIFIC ROLES OF FINANCIAL INSTITUTIONS AND POTENTIAL
        LIABILITY ..................................................................................................... 51
        A.      Citigroup .............................................................................................. 51
        B.      JPMorgan Chase ................................................................................... 61
        C.      Barclays ................................................................................................ 65
        D.      BT/Deutsche ......................................................................................... 72
        E.      CIBC ..................................................................................................... 76
        F.      Merrill Lynch ....................................................................................... 81

VI.     AVOIDANCE ACTIONS ............................................................................... 86
        A.      Overview of Avoidance Actions .......................................................... 86
        B.      Preference Actions in SPE Transactions ............................................. 86
        C.      Selected Professional Avoidance Actions ........................................... 87
        D.      Selected Insider Avoidance Actions .................................................... 88

VII.    INTERIM NATURE OF REPORT ................................................................. 89

VIII.   FINAL REPORT .............................................................................................. 89

Appendix A — Certain Defined Terms

Appendix B — Legal Standards

Appendix C — Role of Em-on's Officers

Appendix D — Role of Citigroup and its Affiliates

Appendix E — Role of JPMorgan Chase and its Affiliates

Appendix F — Role of Barclays and its Affiliates

Appendix G — Role of BT/Deutsche and its Affiliates

Appendix H — Role of CIBC and its Affiliates

Appendix I — Role of Merrill Lynch and its Affiliates

Appendix J — Avoidance Actions

# I.    INTRODUCTION

## A.    Background

On December 2, 2001 (the "Petition Date") and on certain dates thereafter, Enron Corp. ("Emon"), an Oregon corporation, and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court") (collectively, the "Bankruptcy Case").

This Court entered an Order on April 8, 2002 (the "April 8th Order") authorizing and directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).'   On May 22, 2002, the United States Trustee appointed Neal Batson (the "Examiner") as the examiner. The Court, by Order dated May 24, 2002, approved the appointment.

On September 21, 2002, the Examiner tiled the First Interim Report of Neal Batson, Court-Appointed Examiner (the "First Interim Report"). On January 21, 2003, the Examiner submitted to the Court the Second Interim Report of Neal Batson, Court-Appointed Examiner (the "Second Interim Report"; together with the First Interim Report, the "Prior Reports").[2] This Third Interim Report of Neal Batson, Court-Appointed Examiner, constitutes the Examiner's

---

[1] Among other things, the April 8th Order authorized the examiner to:

> inquire into, inter *alia,* all transactions (as well as all entities as defined in the Bankruptcy Code and prepetition professionals involved therein): (i) involving special purpose vehicles or entities created or structured by the Debtors or at the behest of the Debtors (the "SPEs"), that are (ii) not reflected on the Enron Corp. balance sheets, or that (iii) involve hedging using the Enron Corp. stock, or (iv) as to which the Enron examiner has the reasonable belief are reflected, reported or omitted in the relevant entity's financial statements not in accordance with generally accepted accounting principles, or that (v) involve potential avoidance actions against any prepetition insider or professional of the Debtors.

[2] Any references in the Prior Reports and in this Report to meetings, communications, contacts and actions between the Examiner and third parties are intended to refer to the office of the Examiner, which shall include the Examiner and his professionals. Therefore, references to any meetings, communications, contacts and actions taking place between the Examiner and a third party should not be construed as indicating that Neal Batson was present personally for such meetings, communications, contacts or actions,

third report (the "Report").

The Examiner has been authorized to investigate all transactions involving special purpose vehicles created or structured by the Debtors or at the behest of the Debtors (the "SPEs") and those individuals, institutions and professionals involved therein.

### B. Prior Reports

Six SPE transactions were examined in the First Interim Report, and the Examiner concluded that the transactions were, in varying degrees, susceptible of being recharacterized under a "true sale" challenge. If this recharacterization were to occur, the remaining assets in these structures, having a value of approximately $500 million, would be restored to the Debtors' estates.[3]

The Second Interim Report focused on substantially all of Enron's material SPE transactions identified to date. The Examiner provided his preliminary views of the role of the SPEs in the collapse of Enron, including a discussion of how Enron used the SPEs in conjunction with six accounting techniques to impact dramatically its financial statements. The Examiner concluded that Enron manipulated its financial statements in violation of GAAP and failed to make appropriate disclosures to the public of its SPE transactions under applicable disclosure standards. Furthermore, the Second Interim Report also set forth the Examiner's conclusions that many of these transactions were, in varying degrees, susceptible of "true sale" or substantive consolidation challenges which, if successful, would result in assets having an estimated

---

[3] Statements in this Report and in the Prior Reports about estimated values of various assets or portfolios of assets are derived primarily from information provided to the Examiner by employees of the Debtors.   In addition, the estimates typically are not based upon any independent valuation analysis and may not reflect the Debtors' current beliefs about the value of the assets. The Examiner has reflected estimated asset values in this Report primarily for the purpose of providing an indication of the general magnitude of the value of the assets remaining in various structures. Therefore, many of these values may not reflect the actual current fair market value of the assets.

aggregate value between $1.7 billion and $2.1 billion being restored to the Debtors' estates.[4]

Finally, the Examiner identified potential avoidable transfers in the face amount of

approximately $2.9 billion that, to varying degrees, may be recovered by the Debtors' estates.'

C.    **Summary of Conclusions**

The primary focus of this Report is on certain persons and entities that may have

responsibility under applicable legal standards for the Debtors' misuse of its SPE structures.[6]

---

[4] Some, but not all, of the Enron entities that transferred the assets are Debtors in the Bankruptcy Case. Where a non-Debtor transferor is involved in a transaction that is recharacterized as a loan, the most expeditious method to permit the transferor to recover such assets may be for Enron to cause the transferor to file a voluntary petition as part of the Bankruptcy Case. The Examiner has not analyzed the avenues for similar relief in litigation pursued in either state or other federal courts. For purposes of this Report (as well as the Prior Reports), any references to assets being added to or otherwise available to the Debtors' estates shall be deemed to include any transferor of an asset, regardless of whether such transferor is actually a current debtor in the Bankruptcy Case. Furthermore, certain of the subject assets that are potentially recoverable as part of the Debtors' estates have been sold after the Petition Date, with the proceeds being held in escrow subject to further order from the Court. For purposes of this Report (as well as the Prior Reports), references to assets being added to, restored to or otherwise available to the Debtors' estates shall be deemed to include the proceeds of any asset sale.    In addition, as noted in the First Interim Report, in a "true sale" analysis, when credit support is provided by an *affiliate* of the asset transferor, rather than the asset transferor itself, an issue may be raised as to whether the presence of such credit support is a factor that can be relied upon to support a recharacterization of the purported sale as a loan.    The Examiner believes that, even where the Enron party providing the credit support is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the credit support is a relevant factor in determining whether there was a "true sale." A discussion of this issue is contained in Appendix C (Legal Standards) to the Second Interim Report.

[5] As noted in the Second Interim Report, the ability of the Debtors to realize on certain of these avoidance actions is subject to: (i) affirmative defenses of any transferee; (ii) valuation evidence (particularly in the case of constructively fraudulent transfers); and (iii) collectability.    As to valuation, both the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") have engaged investment bankers or other valuation experts.    In order to avoid duplication of efforts, and because the Examiner does not have authority to prosecute actions on behalf of the Debtors' estates, the Examiner has not sought to retain such an expert. To the extent an action is pursued by the Debtors or the Creditors' Committee, investment bankers retained by such party may provide valuation advice.

Finally, the Examiner expresses no views as to collectability. The Examiner notes that many of the transferees of potentially voidable transfers are affiliates of Enron. As a result, affirmative relief against these affiliates may be of limited value, and in the event of substantive consolidation, all or part of such claims may not be recoverable. However, to the extent that these SPEs (or entities claiming through them) hold claims against Enron (or other Debtors), the Debtors may be able to utilize Section 502(d) of the Bankruptcy Code to disallow those claims. The result of such disallowance would be to limit or preclude recovery by investors in the SPE.

[6] The scope of the Examiner's investigation is limited by the terms of the April 8th Order.  Generally this Report does not address any potential causes of action that may arise as a result of any transactions or arrangements that do not involve the Debtors' use of SPEs or other matters specifically identified in the April 8'' Order. For example, many of the financial institutions discussed in this Report were involved in transactions and arrangements with Enron that are not related to subjects listed in the April 8th Order and, as a consequence, the Examiner expresses no

Specifically, the Examiner in this Report concludes that:

- There is sufficient evidence from which a fact-finder could conclude[7] that: (i) certain senior officers' of Enron breached their fiduciary duties under applicable law by causing the Debtors to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known by these officers to be materially misleading; and (ii) these wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including creditors in the Bankruptcy Case.

- There is sufficient evidence from which a fact-finder could conclude that: (i) certain financial institutions that were involved in Enron's SPE transactions'' had *actual knowledge* of the wrongful conduct of these officers; (ii) these financial institutions gave *substantial assistance* to the officers by participating in the structuring and closing of the SPE transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. As a result, a fact-finder could conclude that certain of these Financial Institutions aided and abetted these officers in breaching their

opinion as to whether there are potential causes of action that may arise as a result of such other transactions or arrangements.

[7] See Section I.D. below for a discussion of the standard adopted by the Examiner in this Report.

[8] The Examiner has not concluded his investigation of other senior Enron executives, including Lay, Skilling and Enron's in-house lawyers and will report on these persons in his next report.

[9] The financial institutions discussed in this Report (collectively, the "Financial Institutions") are: (i) Citigroup, Inc. and its affiliates and predecessors (collectively, "Citigroup"); (ii) JPMorgan Chase & Co. (formerly Chase Manhattan Bank) and its affiliates and predecessors (collectively, "JPMorgan Chase"); (iii) Barclays Bank, PLC and its affiliates and predecessors (collectively, "Barclays"); (iv) Deutsche Bank AG and its affiliates and predecessors (collectively, "BT/Deutsche"); (v) Canadian Imperial Bank of Commerce and its affiliates and predecessors (collectively, "CIBC"); and (vi) Merrill Lynch and Co., Inc. and its affiliates and predecessors (collectively, "Merrill Lynch"). The order of presentation of each Financial Institution is based upon the apparent size of the Financial Institution's claims in the Bankruptcy Case (as measured by the proofs of claim filed by the Financial Institution or on its behalf), from the largest to the smallest claims.

In the Prior Reports, the Examiner analyzed and reported on certain legal, structural and accounting issues that arose from Enron's SPE transactions. In the course of that analysis, the Examiner identified a number of financial institutions whose relationships with Enron appeared to warrant further investigation given the scope of the April 8" Order. Generally, these institutions were the ones that had the most significant involvement in Enron's SPE transactions and the most substantial claims against the Debtors' estates. In this Report, the Examiner reports on the relationship between Enron and six of those financial institutions. The Examiner expects to report on additional financial institutions in his Fourth Interim Report in October. Due to conflicts disclosed at the outset of the Examination, the decision as to whether to investigate three other financial institutions and two accounting firms, and if so, the investigation of those institutions and firms, will be made by Harrison J. Goldin (the "ENA Examiner"), the court-appointed examiner in the bankruptcy case of Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) ("ENA"). Order Expanding the Duties of Harrison J. Goldin, the Court-Appointed Examiner in the Enron North America Corp. Bankruptcy Proceeding, to Include the Investigation of Certain Entities Involved in Transactions Pertaining to Special Purpose Entities, June 2, 2003, Docket No. 10993.

fiduciary duties. [10] However, because Em-on's officers participated in the wrongful conduct, the Financial Institutions may assert either that Em-on lacks standing to assert any such claim or that the doctrine of *in pari delicto* is a defense to defeat a claim by Enron.

- There is sufficient evidence of inequitable conduct by certain Financial Institutions in connection with the SPE transactions for a court to determine that the claims of such Financial Institutions, totaling in excess of $5 billion," may be equitably subordinated to the claims of other creditors.

The Examiner also considers whether Section 548(a)(l)(A) of the Bankruptcy Code, which allows the avoidance of obligations *and* transfers made with the intent to hinder, delay or defraud creditors, can be applied to the SPE transactions. If it does, and if a fact-finder determined that Enron entered into an SPE transaction with actual intent to hinder, delay or defraud its creditors, *obligations* incurred in that SPE transaction would be unenforceable. Either as a result of such a finding or if the fact-finder also determined that the *transfers* made in connection with such SPE transactions were made with intent to hinder, delay or defraud, such transfers could be recovered by the Debtors' estates. Any transferee that entered into that

---

[10] As set forth more fully in this Report (including its Appendices), the weight of evidence, availability of defenses and other mitigating factors differ among the Financial Institutions.

[11] This amount could be significantly greater. As discussed in Appendix B (Legal Standards), published case law is unclear as to what happens if the "tainted" claim of a financial institution is purchased by another entity.  That is, if a financial institution engaged in inequitable conduct such that equitable subordination was warranted, and if that financial institution then sold all or a portion of its claim (or syndicated a portion of the loan to other financial institutions after the closing of the transaction), would the claims of these purchasing financial institutions be subject to equitable subordination on the basis of the transferor's conduct.? If the answer to that question is yes, then an analysis of what claims, if any, were sold (or syndicated post-closing) by the financial institution that engaged in misconduct should be undertaken. The Examiner did not undertake this analysis given the expense involved and the uncertainty of the case law.

This amount does, however, include the claims of certain entities (primarily trusts) that filed proofs of claim in certain transactions under which a Financial Institution is the beneficial holder of the debt.

obligation or received such payments in good faith, however, would have a defense to this claim to the extent value was given the Debtors.[12]

In addition, this Report addresses the investigation of certain specific avoidance actions, and concludes that: (i) certain transfers (made in connection with the SPE transactions not previously reviewed for avoidance actions) totaling approximately $368 million could be recovered by the Debtors' estates as constructively fraudulent or preferential transfers; (ii) certain transfers made to insiders (not previously discussed by the Examiner) could be recovered by the Debtors' estates as constructively fraudulent transfers; and (iii) certain transfers made to professionals totaling approximately $70 million could be recovered by the Debtors' estates as preferential transfers.

### D.    Standard Adopted by the Examiner

The Examiner is not the ultimate decision maker on these matters. The Examiner has analyzed the evidence he has gathered to date against the legal standards applicable to the issues identified in this Report. The Examiner has considered both direct evidence and the reasonable inferences that can be drawn therefrom. If there are sufficient facts to support a claim, even though there is evidence to the contrary, then a court would submit that claim to a fact-finder. Where the Examiner reaches the conclusion that there is *sufficient* evidence *for* a *fact-finder* to conclude that a claim (or an element of a claim) is satisfied, the Examiner has determined that in a legal proceeding regarding such matter, the proposition would be submitted to the fact-finder

---

[12] While the Examiner has not made a case-by-case analysis pursuant to this theory of the facts available to him, there is sufficient evidence for a fact-finder to conclude that, with respect to Enron's overall use of SPEs, Enron entered into these transactions with the intent to hinder, delay or defraud its creditors. The Examiner also notes that the facts applicable to the potential claims of aiding and abetting a breach of fiduciary duty, or the potential equitable subordination of certain financial institutions' claims, are facts that would be relevant to the good faith defense.

for decision. In most cases, the fact-finder would be a jury, although in equitable subordination actions the bankruptcy court serves as the fact-finder. The decision of the fact-finder would be made after evaluating the documentary evidence, the testimony and credibility of witnesses, and the reasonable inferences that may be drawn from this evidence.

E.    How to Read This Report

The remaining Sections of this Report provide an overview of the Examiner's conclusions with respect to the matters identified above. More detailed analyses and supporting evidence are set forth in the Appendices to this Report,  Therefore, the reader should review the applicable Appendices (and any Annex attached thereto) for a more complete understanding of the issues addressed in the summaries below.

The first two Appendices to this Report — Appendix A (Certain Defined Terms) and Appendix B (Legal Standards)[13] — are designed to provide the reader with background helpful to understanding the other Appendices.

---

[13] Legal issues addressed in Appendix B (Legal Standards) include, among other things, fiduciary duties of officers, aiding and abetting liability, equitable subordination and transfers made with actual intent to hinder, delay or defraud creditors.

## II.    BACKGROUND

### A.    Events of Fall 2001

Until the fall of 2001, Enron was one of the largest companies in the world and was considered to be one of the most innovative and successful.[14] In the fall of 2001, however, Enron made a series of financial disclosures and restatements of its financial statements that triggered a chain of events culminating in its bankruptcy filing.

In an earnings release issued on October 16, 2001,[15] Kenneth Lay ("Lay"), Em-on's Chairman and CEO, announced that Enron was taking "after-tax non-recurring charges" of $1 .01 billion in the third quarter.'" Enron also disclosed that it would record a $1.2 billion reduction in shareholders' equity as of the end of the third quarter.[17]    On November 8, 2001, Enron announced its intention to restate its financial statements for 1997 through 2000, and the first and

---

[14] According to the 2001 Fortune 500 Rankings, Fortune magazine ranked Enron as the seventh largest corporation in the world, based upon revenues.  *The 500 Largest U.S. Corporations,* Fortune, Apr. 16, 2001, at F-l. On February 19, 2001, Fortune magazine named Enron as the *"Most Innovative Company in America"* for the fifth consecutive year.  *America 's Most Admired Companies,* Fortune, Feb. 19, 2001, at 104.

[15] Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1 .01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; And Expands Financial Reporting," Oct. 16, 2001 [ELIB00001783]. Enron's third quarter ended September 30th.

[16] Although there were several components to the charge, one component related to Enron's "early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity." The "previously disclosed entity" was LJM2 Co-Investment, L.P. ("LJM2"), a private investment limited partnership founded in December 1999. LJM2 was run by Andrew S. Fastow ("Fastow"), Enron's CFO, and Michael J. Kopper ("Kopper"), an Enron employee, and had as its limited partners a significant number of institutional and individual investors. Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "10-Q for 3Q/2001"), at 18-19, Note 4 to Consolidated Financial Statements in connection with related party transactions. The charge related to Enron's termination of four SPEs known as Raptor I, II, III and IV (the "Raptor SPEs") pursuant to which Enron had entered into certain hedging transactions.  As a result of this termination, Enron recognized the $544 million after-tax charge to net income for the third quarter 2001. The pre-tax charge was $710 million. *Id.*

[17] October 16, 2001, 9:00 a.m. C.T., Enron Corp. Conference Call regarding Third Quarter 2001 Earnings Release, Moderator: Mark Koenig (the "Earnings Release") [AB0252 04603–AB0252 046291.

second quarters of 2001, to reduce previously reported net income by an aggregate of $586 million.'*

On November 19, 2001, Enron filed its third quarter Form 10-Q, including interim financial statements, that gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements." In addition, in its third quarter 2001 balance sheet, Em-on reported total debt under generally accepted accounting principles ("GAAP") of $12.978 billion.[20]  On the same day, senior Enron executives informed certain of its bankers that, while the debt reflected on its third quarter 2001 balance sheet under GAAP was $12.978 billion, Em-on's "debt" (as described in the presentation) was $38.094 billion.[21]  Thus, as Enron noted, $25.116 billion of debt was "off balance sheet," or in some cases, reflected on the balance sheet, but classified as something other than debt. Approximately $14 billion of this $25.116 billion of additional "debt" was incurred through structured finance transactions involving the use of SPEs. Enron's presentation to the banks divided the additional debt into the eight categories shown in the following table:

---

[18] Enron Form 8-K tiled with the SEC on Nov. 8, 2001. This filing also contained additional information surrounding the related party transactions. At the time of the announced restatement, the third quarter 2001 financial statements had not been filed, but a loss of $618 million had been announced in the Earnings Release.    On October 3 1, 2001, Enron announced that its Board of Directors (the "Enron Board" or "Enron's Board of Directors") had formed a Special Investigative Committee, headed by William Powers, Jr., Dean of the University of Texas Law School (the "Powers Committee"), to examine and recommend actions with respect to transactions between Enron and entities connected with related parties.  Id. LJM2 and another partnership, LJM Cayman, L.P. ("LJM1"), as well as other investment partnerships, were the principal focus of the Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp., released February 1, 2002 (the "Powers Report").

[19] 10-Q for 3Q/2001. These financial statements gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.  Due to the pending investigation by the Powers Committee and the previously announced restatement, Enron's accounting firm, Arthur Andersen LLP ("Andersen"), was unable to finalize its review of these quarterly statements as required by SEC Rule 10-01(d) of Regulation S-X.

[20] Id.  The debt consisted of $6.434 billion of short-term debt and $6.544 billion of long-term debt.

[21] Enron Corp. PowerPoint Bank Presentation, Waldorf Astoria, New York, N.Y., Nov. 19, 2001 (the "Bank Presentation"), at 48-62 [AB0000321534-AB000321605].

| Category of Additional "Debt" | Amount at 9/30/01 in billions |
|---|---|
| FAS 140 Transactions | $2.087 |
| Minority Interest Financings | $1.690 |
| Commodity Transactions with Financial Institutions | $4.822 |
| Share Trusts | $3.352 |
| Equity Forward Contracts" | $.304 |
| Structured Assets | $1.532 |
| Unconsolidated Affiliates | $10.733 |
| Leases | $.596 |
| **Total** | **$25.116** |

## B.    The Bankruptcy Filings and Subsequent Events

Less than one month after its meeting with its bankers, Enron and certain of its affiliates tiled for bankruptcy.    In the months immediately following Enron's disclosures, allegations surfaced of securities fraud, accounting irregularities, energy market price manipulation, money laundering, breach of fiduciary duties, misleading financial information, ERISA violations, insider trading, excessive compensation and wrongdoing by certain of Enron's bankers.[23]

---

[22] In footnote 28 of the First Interim Report and footnote 33 of the Second Interim Report, the Examiner described a typical equity forward contract as a sale by an issuer of equity securities to a counterparty coupled with the issuer's obligation to repurchase the equity securities from the counterparty in the future for the original purchase price plus a premium. In its simplest terms, an equity forward contract is a contract to exchange an equity or equity basket at a set price at a future date. See Board of Governors of the Federal Reserve System, Instructions for Semiannual Report of Derivatives Activity, June 2003, at 13, *available at* http://www.federalreserve.gov/boarddocs/reportforms/forms/FR _243620030624 i.pdf. Thus, only the second portion of the transaction described in the referenced footnotes is an equity forward. The Examiner is continuing his investigation of equity forward transactions entered into by Enron and has made no determination as to the facts surrounding these transactions.

[23] Numerous Congressional Committees have investigated aspects of Enron's business activities or practices. In addition, there have been several class action lawsuits filed on behalf of shareholders and employees, which are still pending, naming the Debtors, certain of their directors, Andersen, certain other professionals, and others as defendants. These include *Newby* v. *Enron Corp., No.* Ol-CV-3624 (SD. Tex. filed Oct. 22, 2001), a lawsuit alleging, among other things, violations of securities laws (the "Newby Class Action"). Other class actions include *Severed Enron Employees Coalition v. The Northern Trust Co., No.* 02-CV-267 (SD. Tex. filed Jan, 24, 2002), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA, and *Tittle v. Enron Corp., No.* 01-CV-3913 (SD. Tex. filed Nov. 13, 2001), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA. Another lawsuit, *Chao v. Enron Corp.,* No. 03-CV-2257 (SD. Tex. filed June 26, 2003), alleges that Enron, its directors and certain employees did not manage the assets of Enron's pension plans consistent with the standards set forth in ERISA. The Examiner expresses no opinion as to the merits of any of these lawsuits.

**III.    ROLE OF OFFICERS IN SPE TRANSACTIONS AND POTENTIAL LIABILITY**

**A.    Overview**

In his Second Interim Report, the Examiner concluded that through the pervasive use of structured finance techniques involving SPEs and aggressive accounting practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition or performance. Although evidence suggests that Enron's financial engineering began years earlier, the Examiner focused on 2000, the last year for which Enron issued audited financial statements.[24] That year, Em-on's use of six accounting techniques produced 96% of its reported net income and 105% of its reported funds flow from operating activities, and enabled it to report $10.2 billion of debt rather than $22.1 billion of debt. The six accounting techniques are summarized as follows:

- *FAS 140 Transactions.*[25]   Em-on's FAS 140 Transactions were essentially bridge financings of illiquid assets. Although Em-on treated these transactions as sales to SPEs for accounting purposes, Enron assumed liability for repayment of the debt incurred and retained substantially all of the economic benefits and risks of ownership of the asset.[26]

- *Tax Transactions.*[27]   Em-on's Tax Transactions were, for the most part, artificial transactions lacking a bona tide business purpose other than the

---

[24] The financial impact of Enron's use of its six accounting techniques to produce and disseminate materially misleading financial information is not limited to its 2000 annual financial statements. The effect of these techniques on the 2000 annual financial statements is presented only as an illustration. The Examiner has concluded that use of these techniques caused the 1999 annual financial statements and earlier financial statements to be misleading as well.

[25] See Second Interim Report, at 107- 12; Second Interim Report, Appendix M (FAS 140 Transactions).

[26] With one exception, these transactions are structure finance transactions that were intended to comply with either Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 (Financial Accounting Standards Bd. 1996) ("FAS 125"), or its successor, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000) ("FAS 140"). FAS 125 was the accounting standard that governed securitizations of financial assets from January 1, 1997 until it was replaced by FAS 140, which became effective with respect to transactions closing on or after April 1, 2001. Although this Report discusses some transactions that were governed by FAS 125 and others that were governed by FAS 140, this Report refers to this type of transaction and other similar transactions generally as a "FAS 140 Transaction."

[27] See Second Interim Report, at 87-94; Second Interim Report, Appendix J (Tax Transactions).

creation of accounting income for Em-on.  The Tax Transactions were designed to allow Enron to record the potential benefit of speculative future tax deductions as current income on its financial statements and, in some cases, as pre-tax income rather than as after-tax income resulting from reduced tax expense in the tax provision of Em-on's income statement.

- *Non-Economic Hedges.*[28]  Through these transactions, which include the Raptor SPEs and the LJM1 Rhythms hedges, Enron "hedged" the decrease in value of certain of its investments that it had marked to market by entering into derivative contracts with counterparties that were related to Enron. These transactions were accounting hedges and did not provide economic protection to Em-on.

- *Share Trust Transactions.*[29]  Enron's Share Trust Transactions were off-balance sheet financing structures through which an issuing entity would issue notes and equity certificates in the institutional private placement market.  The proceeds would be used, in part, to fund the purchase or refinancing of assets owned by Em-on or its affiliates.  Repayment of the notes and certificates was supported by Enron stock and ultimately by Enron's promise to pay.

- *Minority Interest Transactions.*[30]  Em-on's Minority Interest Transactions allowed Enron to obtain funds while showing the proceeds as a "minority interest" on the balance sheet between liabilities and equity, rather than as debt.

- *Prepay Transactions.*[31]  In the Prepay Transactions, Enron obtained financing through a combination of offsetting commodity trades and swaps. Although the transactions were loans in economic substance, Em-on reported its obligations as price risk management liabilities rather than debt. Moreover, the increase in the outstanding prepay balance from one period to the next served to increase cash flow from operating activities. As a consequence, Em-on's reported financial condition and results of operations were materially misleading and its key credit ratios were improperly enhanced.

---

[28] See Second Interim Report, at 104-06; Second Interim Report, Appendix L (Related Party Transactions).

[29] See Second Interim Report, at 67-68; Second Interim Report, Appendix G (Whitewing Transaction); Second Interim Report, Appendix H (Marlin Transaction).  This Report refers to these transactions as "Share Trust Transactions," or individually as "Whitewing" or "Marlin."

[30] See Second Interim Report, at 79-86; Second Interim Report, Appendix I (Minority Interest Transactions). This Report refers to these transactions as "Minority Interest Transactions."

[31] See Second Interim Report, at 58-66; Second Interim Report, Appendix E (Prepay Transactions). This Report refers to these transactions as a "Prepay" or a "Prepay Transaction."   As discussed in the Second Interim Report, Enron engaged in billions of dollars of Prepay Transactions.  While Enron had a common goal in all its Prepays – reporting price risk management liabilities rather than debt, and cash flow from operating activities rather than from financing activities – there are structural differences in the various Prepay Transactions. Enron's Prepay Transactions can be divided into two general categories – the "SPE Prepays" and the "Third Party Bank Prepays."

The last two weeks of 1999 illustrate the extent to which Em-on relied on the SPE transactions to reach certain financial statement results. During this two week period, Em-on closed at least eleven transactions. In the aggregate, these eleven transactions generated reported net income of $114 million and contributed more than $1.2 billion of cash flow from operating activities while keeping the repayment obligations off balance sheet or recorded on the balance sheet as something other than debt.[32]   The following timeline indicates the date that each transaction closed, as well as the financial institution, or related party, primarily involved in the transaction:



| 12-14 | 12-21 | 12-22 | 12-27 | 12-28 | 12-29 | 12-31 |
|---|---|---|---|---|---|---|
| Nixon Prepay Citigroup | Ghost FAS 140 Transaction CIBC | CLO Trust Bear Steams | Alchemy FAS 140 Transaction CIBC | Bob West Treasure Royal Bank of Canada | Discovery FAS 140 Transaction CIBC | 1999 Electricity Trades Merrill Lynch |
| | Nowa Sarzyna Sale to Whitewing West LB | | | | Nigerian Barge Merrill Lynch | |
| | | | | | Nahanni Minority Interest Citigroup | |
| | | | | | Pluto LJM2 | |

---

Enron's officers knew that in order to approve Enron's desired prepay accounting treatment, Andersen required, among other things, that a substantive third party be involved as one of the counterparties in the transaction in addition to Enron and the lender.  In-Person Interview with John E. Stewart, former Partner, Andersen, by H. Bryan Ives, III, and John E. Stephenson, Jr., A&B, June 12, 2003 (the "Stewart Interview"). In the SPE Prepay Transactions, this third party was an entity that a Financial Institution caused to be created for the purpose of participating in transactions such as the Prepay Transactions.  JPMorgan Chase caused Mahonia to be formed to participate in the SPE Prepays that are referred to as the Mahonia Prepay Transactions. Citigroup caused Delta to be formed to participate in SPE Prepays such as those referred to in this Report as the Yosemite Prepay Transactions and the June 2001 Citigroup Prepay. The evidence suggests that Mahonia and Delta were SPEs for a number of reasons, including that they were owned by charitable trusts, had no employees or operations and had only minimal assets.  In a Third Party Bank Prepay, on the other hand, the third party was not formed to facilitate Prepay Transactions, but was a substantive entity, usually another financial institution.

[32] See Appendix C (Role of Enron's Officers).

## B.    Why Did Enron Officers Engage in the SPE Transactions?

In the Second Interim Report, the Examiner discussed two key factors that drove Enron's management of its financial statements: (i) its need for cash; and (ii) its need to maintain an investment grade credit rating. Enron was reluctant to issue equity to address these needs for fear of an adverse effect on its stock price and was reluctant to incur debt because of a possible adverse effect on its credit ratings.[33]  Moreover, Em-on's use of mark-to-market ("MT,") accounting created a timing gap between recognition of net income and the receipt of associated cash. This "quality of earnings" problem made it particularly challenging for Em-on to raise cash without issuing equity while maintaining its credit rating. Another factor that appears to have motivated Em-on officers' manipulation of Em-on's financial statements was the need to mask Em-on's business failures.

At the Bank Presentation on November 19, 2001, Jeff McMahon ("McMahon"), who was then Em-on's Chief Financial Officer, identified a "series of bad investments" as the first cause of Em-on's problems.[34]  The investments he listed were Azurix,[35] Broadband,[36] Elektro,[37] Dabhol[38]

---

[33] In mid-1998, a DLJ analyst commenting on the recently announced acquisition of Wessex Water, the largest asset in Enron's Azurix structure, noted as follows:

> Combining this acquisition with the recently announced acquisition of a Brazilian electric utility for $1.5 billion shows that Enron Corp. has "spent" about $3.5 billion in recent weeks. To date, Enron Corp.'s debt ratings have been reaffirmed based upon the operating fundamentals of the acquisitions and unspecified plans to sell assets or take other actions to reduce debt. No additional equity is required by Enron Corp. to maintain its balance sheet ratios and credit ratings.

Donaldson, Lufkin & Jenrette, Comment: "Acquisition of U.K. Water Company Adds to EPS and Opportunities for Growth," July 24, 1998, at 3 [ELIB00000544-00001-ELIB00000544-00006].

[34] Bank Presentation, at 5. Similarly, in contemporaneous meetings with employees, Enron Vice Chairman Mark Frevert ("Frevert") informed employees that the problems started in the early 1990s with international assets including India, South America and Asia, which were intended to build a merchant portfolio in these areas. "It didn't pan out that way."  Although Enron had been trying to sell them, most of the international asset sales were small and the major assets had not been sold.  Eric Thode, Enron Net Works, Typed Notes entitled "Enron Net Works Employee Meetings," Oct. 31, 2001 (the "October 2001 Net Works Meeting Notes"), at AB0786 02863 (notes record statements of Frevert, who led the meeting) [AB0786 02859-AB0786 028681.

[35] In November 1998, Azurix was an Enron subsidiary that acquired Wessex, a publicly-held water utility, for approximately $2.4 billion. Enron used SPEs in the Marlin transaction to deconsolidate Azurix and repay part of the

and merchant investments.[39]   Elektro and Dabhol in particular were major consumers of capital.[40]

Although Enron's merchant investments were fifth on McMahon's list of bad investments, these investments often found their way into Enron's SPE transactions. There is considerable evidence that Enron's senior management had a difficult task in controlling the size and management of its merchant portfolio, which contained a relatively high percentage of poorly performing and illiquid assets.[41]   A July 7, 1999 presentation by Fastow and McMahon to a meeting of Em-on's Management Executive Committee indicates that Enron's year-to-date merchant investments were $3.6 billion, or $2.5 billion more than previously planned.[42]   At the same time, Enron was beginning to recognize and track the poor performance of its investment

---

debt it incurred in acquiring Wessex.   In the ensuing period prior to the Petition Date, Azurix became a publicly-held company only to be taken private at Enron's expense approximately eighteen months after the public offering as a result of its poor performance.   In its 2000 fiscal year, Enron took a charge of $326 million to reflect impairment by Azurix in the carrying value of its Argentine assets.   Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000, at 39. That same year, it also recognized a $428 million loss from its equity in Azurix under the equity investee method of accounting.   *Id.* at 76.

[36] The Braveheart transaction, which dealt with one failed investment of Enron's Broadband operations, was described in the Second Interim Report. See Second Interim Report, at 29-32. Another failed investment, certain dark fiber that was the subject of the Backbone transaction, was described in the First Interim Report. See First Interim Report, at 118.

[37] Elektro is a large Brazilian electric utility, the financing for which is largely beyond the scope of the examination. For further information, see Second Interim Report, Annex 2 to Appendix G (Whitewing Transaction).

[38] Dabhol is a large electric generating plant located in India.

[39] Enron's merchant investments were composed of the capital that it provided, generally, to energy and technology businesses seeking debt or equity. These merchant investments were carried at fair value (sometimes referred to as mark-to-market accounting). They included both public and private enterprises.

[40] Enron's Risk Assessment and Control Group ("RAC") analyzed Enron's value in its international assets after Project Summer (an effort to sell all the international assets) failed. Its analysis determined that Enron's June 30, 2001 carry value was $10.119 billion, while RAC's valuation range for these assets was only $4.480 billion to $6.927 billion.

[41] Frevert told Enron employees that "[w]e may have been 'smoking our own dope' as we continued to build the asset portfolio domestically and we pushed a lot into off-balance sheet vehicles." October 2001 Net Works Meeting Notes, at AB0786 02863; see *also* Deposition of Mark A. Frevert, former Vice Chairman, Enron, by William C. Humphreys, Jr., A&B, May 7, 2003, at 220.

[42] Enron Capital Management Executive Committee Presentation, July 7, 1999 (the "Executive Committee Presentation"), at 7 [AB0786 02835-AB0786 028581.

portfolio. In January of 1999, it commenced a bi-weekly Watch List Report to monitor troubled assets.[43] The minutes of the May 3, 1999 meeting of the Finance Committee of Enron's Board of Directors reflect the first mention of a review of the top ten and bottom ten performing assets.[44]

In the first quarter of 2000, Enron's merchant investments problem was of sufficient concern to shift management responsibility for such investments from the business units that originated the investments to a newly created Special Assets Group led by Richard Lydecker ("Lydecker").[45] Simultaneously, planning for the Raptor SPE hedging vehicles began in earnest.[46] By the fall of 2000, many of the assets in Lydecker's Special Assets Group were hedged by the Raptor SPEs, and later were transferred into the Whitewing structure.[47]

In November 2000, members of Enron's Risk Assessment and Control Group ("RAC") made a presentation to other RAC team members[48] entitled "Investment Portfolio Lessons Learned November 2000," reporting that:

- 59% of originally expended capital is not meeting expectations;

- Enron has $3.8 [billion] of earnings exposure on assets performing below expectations; and

- 81 out of 167 equity transactions are underperforming.[49]

---

[43] Enron PowerPoint Presentation, "Investment Portfolio, Lessons Learned," Nov. 2000 (the "Lessons Learned Presentation"), at AB0971 00205 [AB0971 00195-AB0971 002261.

[44] Minutes of the Enron Finance Committee Meeting, May 3, 1999, at 3 [AB000196881-AB000196883].

[45] Sworn Statement of Richard Lydecker, Chief Accounting Officer, Enron, to William C. Humphreys, Jr., A&B, Mar. 18, 2003 (the "Lydecker Statement"), at 26-28.

[46] Email from Ronald T. Astin, Vinson & Elkins, to Scott Sefton, et al., Enron, Feb. 3, 2000 [AB000536958-AB000536964].

[47] Lydecker Statement, at 154-80.

[48] David Gorte ("Gorte"), an Enron Managing Director in the RAC, testified that he did not recall whether the presentation was ever delivered to Enron employees outside the RAC Group. Sworn Statement of David B. Gorte, Managing Director, Enron, to William C. Humphreys, Jr., A&B, Apr. 9, 2003, at 131-33.

[49] Lessons Learned Presentation, at AB0971 00 198.

The presentation also reported on the performance of loans included in Em-on's merchant investment portfolio:

- 43% of originally expended debt capital is not performing or has [credit] issues;

- Enron has $3 15 MM of earnings exposure on debt that is non-performing or has [credit] issues;

- 31 out of 55 debt transactions are non-performing or have [credit] issues.[50]

Another report apparently prepared in 2000[51] begins with a series of questions for a hypothetical investment survey:

How about recommending that your mother invest her IRA into a fund of ninety investments where 84 of the investments average less than a 5% rate of return?

Would [you] feel comfortable investing in a portfolio where 5 1% of the transactions are "troubled" or considered not meeting expectations?

The report then identifies the investment portfolio as Enron's.

The reports list a number of reasons for the poor performance of Enron's investment portfolio, including the lack of investment banking experience of Enron's deal originators,[52] investments in industries in which Enron had little experience,[53] failure to partner with other investors as a way to obtain corroboration of investment potential,[54] and improper incentives and

---

[50] *Id.* at AB0971 00199.

[51] Enron Executive & Dealmakers Survey, undated (the "Investment Survey") [AB09 11 1279-AB09 11 1295]. The version of this report reviewed by the Examiner's attorneys appears to be a draft as there are blank spaces in some of the materials. Although the report is undated, the statistics relate to the 1999 fiscal year, indicating that the report was prepared during 2000.

[52] Investment Survey, at AB09 11 1284; Lessons Learned Presentation, at AB097 1 00209.

[53] Investment Survey, at AB09 11 1284.

[54] Lessons Learned Presentation, at AB0971 00208.

accountability.[55]   When  addressing  the  issues  of  incentives  and  accountability,  one  report indicates that "[c]ommercial personnel are rewarded for deals closed now not how deals perform in the long term."[56]

Whatever the reason, in addition to a quality of earnings problem, Enron appeared to be experiencing a "quality of investments" problem that resulted in the need for cash to fund the investments  and  the  need  to  avoid  losses  if  the  investments  did  not  work  out.    Both  of  these needs  could  be  addressed  by  following  an  aggressive  strategy  of  selling  the  investments.    In  the July 7, 1999 Executive Committee presentation discussed above, an action plan was proposed that  called  for  a  review  of  all  "non-strategic  assets"  and  a  liquidation  of  $750  million  of additional merchant assets.[57]

Beginning  in  the  fall  of  1999,  Em-on  began  a  major  program  of  selling  and  hedging assets.[58]  Many of these sales, however, were not to unrelated parties but to SPEs in transactions in which Em-on retained the risk of ownership of the asset and the recourse obligation to repay

---

[55] Investment Survey, at AB09 11 1284; Lessons Learned Presentation, at AB0971 00204-AB097 1 00205.

[56] Investment Survey, at AB0911 1284 (emphasis in original). The report elaborates by pointing to MTM as one of these  reasons:

> Immediate recognition of MTM earnings, assuming flawless execution, has not incentivized commercial personnel to aggressively manage deal execution through exit for value. Incentives to assure that actual performance meets projections have been inadequate. . . .

> The fact that as much as $304 million in MTM income was credited to [thirty-one troubled investments] causes concerns that proper incentives for long term execution are absent from our current structure and that execution risk has been inadequately modeled and priced by RAC.

*Id.*; see *also* Lessons Learned Presentation, at AB0971 00204-AB0971 00205.

[57] Executive Committee Presentation, at AB0786 02853. The plan noted that merchant asset sales resulted in funds flow, improved financial returns, liquidation and increased return on equity.

[58] For instance, by the end of 1998, an effort was underway at ENA to resolve numerous issues within the merchant portfolio. It had been assembled in a sporadic fashion over many years, tied up a significant amount of capital and contained volatile investments. The portfolio manager determined that one of the best ways to reduce the volatility and risk of the portfolio was to begin to sell it. Enron Syndication of Merchant Portfolio Presentation, Dec. 13, 1998 [AB0786 02869-AB0786 028721; Sworn Statement of Raymond M. Bowen, Jr., Executive Vice President, Chief Financial Officer and Treasurer, Enron, to William C. Humphreys, Jr., A&B, Mar. 23, 2003, at 202-03.

the "sales proceeds." In the same transactions, sales proceeds were recorded as cash flow from operating activities. In the case of hedges, the providers of the hedges were related parties of Em-on, and the hedges were backed primarily by Enron stock contributed by Enron in the first instance. Accordingly, these were mere accounting hedges, not true economic hedges.

In the simplest terms, as Enron's poor investments began to decline in value and to require additional cash, Em-on masked the problem by borrowing money against those investments and using various combinations of its SPE transactions to (i) disguise its obligation to repay the amounts borrowed, (ii) report the proceeds as cash flow from operating activities and, in some cases, as revenue, and (iii) hide the decline in value in its MTM merchant investment portfolio.

C. **Officers Involved in SPE Transactions**

Much of Enron's financial statement manipulation was through the use of its SPE transactions. Enron's SPE transactions were designed and administered under the leadership of Enron's Global Finance and Transaction Support groups in consultation with Andersen's Houston engagement team of accountants and Andersen's Chicago Professional Standards Group ("PSG") of GAAP experts. The SPE transactions themselves were then negotiated and implemented by large, sophisticated teams of senior Em-on accounting, financial and legal personnel.

*Overall Organization*

In general, the Enron officers responsible for its SPE transactions were at two levels within the organization:

- at Enron "corporate" (or headquarters) operations centered in the Accounting and Global Finance areas; or

- within one of Em-on's business units.[59]

The nerve center for SPE transaction activity was Enron's corporate operations. However, the business units quickly learned that the aggressive use of SPEs was a potent tool for them to achieve quarterly profit and operating cash flow goals." For much of the period under investigation by the Examiner, the Enron corporate officers responsible for the SPE transactions reported through two lines of authority: (i) the treasury and finance groups reporting to Fastow; and (ii) the accounting and tax groups reporting to Rick Causey ("Causey"), Executive Vice President and Chief Accounting Officer.

*The Fastow Group.* The groups of officers ultimately reporting to Fastow (the "Fastow Group") included: (i) the treasury function headed by McMahon (an Andersen alumnus), and beginning in early 2000, by Ben Glisan ("Glisan") (another Andersen alumnus); (ii) the Corporate Finance Group headed by Bill Brown and later by Barry Schnapper; (iii) the Special Projects Group headed by Kopper; and (iv) the head finance officers of each of the business units who reported to both the Treasurer and the head of their business unit.[61]

*The Causey Group.* This group of officers, which ultimately reported to Causey (the "Causey Group") and had a role in Enron's SPE transactions, included the following groups: (i)

---

[59] At December 3 1, 2000, the Enron business segments for GAAP accounting purposes, which roughly corresponded with how Enron viewed its business units operationally, were Wholesale Services, Transportation and Distribution, Enron Energy Services, Enron Broadband Services and "Corporate and Other," which housed the Azurix water system business, Enron's wind-generated power projects and methanol and MTBE plants.

[60] See, e.g., Second Interim Report, at 29-32 (discussing the Blockbuster Transaction).

[61] See Enron Global Finance Organization Chart, May 23, 2000 (the "Enron Global Finance Chart of May 23, 2000") [AB0786 028331; Enron Global Finance Organization Chart, June 1, 2001 (the "Enron Global Finance Chart of June 1, 2001") [AB0971 02 175]; Enron Global Functions Organization Chart, July 26, 1999 [AB0971 02 177].

the Transaction Support Group; (ii) the Tax Group; and (iii) the Corporate Accounting &
Financial Reporting Group (the "Financial Reporting Group").

- *Transaction Support.* As the name implies, these licensed certified public
  accountants, many of whom came from management positions at Andersen,
  were at the very heart of Enron's SPE transactions.  This group, headed by
  Rodney Faldyn, not only designed many of the SPE transaction templates and
  constantly refined them for newer, larger and more aggressive applications,
  but also worked side-by-side with officers in the Fastow Group and within the
  business units to ensure that SPE transactions complied with the accounting
  templates they had designed.  Moreover, because of the lack of adequate
  understanding of the transactions by the Financial Reporting Group, the
  Transaction Support Group in fact determined the disclosures in the financial
  statements and in the notes thereto.[62]  These determinations dictated the
  disclosure (or lack thereof) in Management's Discussion and Analysis of
  Financial Condition and Results of Operations ("MD&A") section of Enron's
  annual report.[63]  These accountants were the only people (in addition to
  Causey) who, under Enron's "Rules of Engagement,"[64] were authorized to
  discuss the sensitive SPE transactions with Andersen.[65]  Under these rules, it
  was the job of the Transaction Support experts to spot accounting issues;
  Andersen was to be used only to help resolve those issues. Thus, the
  Transaction Support experts served a critical fact-filtering role between Enron
  and Andersen. These accounting executives, many of whom came from
  Andersen, were themselves the primary designers and refiners of the
  accounting techniques.

- *Tax Group.*  In the years prior to Enron's bankruptcy, Enron's senior
  management encouraged and pressured Managing Director Robert Hermann
  ("Hermann"), the head of Enron's tax department, to help increase the
  reported net income of Enron for financial accounting purposes.'" Over time,

---

[62] Sworn Statement of Kevin Jordan, Director, Enron Net Works, to William C. Humphreys, Jr., A&B, Apr. 25,
2003 (the "Jordan Sworn Statement"), at 31; Email from Ryan Siurek, Senior Director in Transaction Support,
Enron, to Davis Maxey, Vice President of Finance, Enron, *et al.*, Feb. 6, 2001, at 1 (discussing the appropriateness
of the disclosure for the Nahanni transaction) [AB0500 00712-AB0500 007141; Memorandum from Ryan Siurek,
Senior Director in Transaction Support, Enron, to the Files, and copies to Richard Causey, Executive Vice President
and Chief Accounting Officer, Enron, Rodney Faldyn, Vice President of Financial Accounting, Enron, *et al.,* Apr. 3,
2001, at 5 [AB0971 00319-AB0971 003241.

[63] These determinations were passed along to another Causey subgroup, Corporate Accounting & Financial
Reporting, for presentation in Enron's financial statements and related financial disclosure.

[64] Enron Accounting Transaction Group Presentation, "Rules of Engagement," undated
[AB0633 2526-AB0633 2527].

[65] Sworn Statement of John Clinton Walden, Senior Director, Enron, to William T. Plybon, A&B, Mar. 28, 2003, at
95; Jordan Sworn Statement, at 16-17.

[66] See Second Interim Report, Appendix J (Tax Transactions); see *also* Appendix C (Role of Enron's Officers).

Em-on's management came to rely on the tax department and, more specifically, its structured transactions group under the direction of Vice President (Planning) R. Davis Maxey ("Maxey"), to fill the annual "stretch" to produce additions to net income that could not be accomplished by other business units through ordinary operations.[67]    Enron's tax department managed to create $886.5 million of net income from 1995 through September 2001 through the use of the Tax Transactions.[68]

- *Financial Reporting Group.*    The name of this group implies that it had the leadership role in financial statement reporting and disclosure. However, with the possible exception of its leader, Managing Director Bob Butts ("Butts"),[69] this group's role seems to have been largely that of compiling financial statements and reports based on information and instructions from Transaction Support.[70]

The Fastow Group, previously known as Enron Capital Markets, became Enron Global Finance in August 1999. While mainly charged with the treasury and capital raising function, it nonetheless had its own set of lawyers and accountants. By March 2000, the Office of the Chair of Em-on Global Finance was composed of three people – Fastow, Glisan and Causey (as an ex officio or of counsel member).[71]    Glisan replaced McMahon as Treasurer in February 2000, when McMahon moved to Enron Industrial Markets.

---

[67] See Appendix C (Role of Enron's Officers).

[68] Second Interim Report, Appendix J (Tax Transactions), at 8-9.

[69] Butts invoked his Fifth Amendment rights and did not give testimony to the Examiner.

[70] Sworn Statement of Gary Peng, Senior Director, Enron, to John L. Latham, A&B, Apr. 17, 2003, at 27; Sworn Statement of Jan Johnson, former Director in Corporate Financial Reporting, Enron, to Oni A. Holley, A&B, May 20, 2003, at 142.

[71] Enron Global Finance Chart of May 23, 2000; Enron Global Finance Chart of June 1, 2001.

Set forth below is an organizational chart of the primary officer groups involved in the Enron SPE transactions as of June 30, 2000.[72]

* Officers who have exercised their Fifth Amendment rights against self-incrimination; Quaintance's invocation was limited to the Nigerian Barge transaction.

The individuals listed under the various business units do not compose the total population of that unit.

[72] The information on this chart was compiled from various sources available to the Examiner.

The Examiner believes that there is sufficient evidence from which a fact-finder could conclude that Fastow, Causey, Glisan and McMahon, among others, breached their fiduciary duties to Enron by causing Enron to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.[73] That is, they engaged in a course of conduct through the use of SPE transactions that resulted in the false and misleading presentation of the financial condition of Enron by overstating its cash flow from operating activities, overstating its earnings and understating its obligations from these transactions.[74]

### D.    Potential Breaches of Fiduciary Duties

In this Report, the Examiner evaluates the conduct of Enron's officers against their fiduciary duties owed to Enron. An officer of a corporation has fiduciary duties of

---

[73] Because Fastow, Causey, Glisan and McMahon exercised their Fifth Amendment rights, the Examiner's conclusions are based on a review of documentary evidence and the testimony of others. See Appendix C (Role of Enron's Officers) for a full review of this evidence. The Examiner subpoenaed or otherwise requested the opportunity to take the testimony of a number of witnesses who responded by asserting the privilege against self incrimination contained in the Fifth Amendment to the United States Constitution (the "Self-Incrimination Clause") (U.S. Const. amend. V, cl. 2). Where a witness asserted the Self-Incrimination Clause in writing, the Examiner took no further steps to compel any examination of that witness. At least one of those witnesses had either testified in other proceedings, or had produced documents in this bankruptcy proceeding. The Examiner concluded that either of those actions created, at best, only a small chance that the Self-Incrimination Clause had been waived with respect to testimony compelled by the Examiner and as a result, the Examiner did not pursue this waiver argument. See *United States v. Balsys, 524* U.S. *666, 672* (1998); *United States v. Miranti, 253* F.2d 135 (2d Cir. 1958); *United States v. Housand, 550* F.2d 818, 821 n.3 (2d Cir. *1977); Poretto v. United States,* 196 F.2d 392 (5th Cir. 1952); *United States v. Wilcox, 450* F.2d 1131, 1141-42 (5th Cir. 1971); *Marcello v. United States,* 196 F.2d 437 (5th Cir. 1952).

[74] It is also a breach of fiduciary duty for officers to derive improper personal benefits at the expense of the corporation through self-dealing. See Appendix B (Legal Standards). As set forth in Appendix C (Role of Enron's Officers), the Examiner believes there is sufficient evidence from which a fact-finder can conclude that breaches of the fiduciary duty of loyalty occurred in connection with certain of the Related Party Transactions, most notably in the case of Fastow and other officers in the LJM2 transactions. In addition, if it can be demonstrated that certain officers entered into other SPE transactions for their own personal benefit at the expense of Enron, then additional breaches of loyalty may be present outside of the Related Party Transaction context.

good faith, due care and loyalty. Whenever corporate fiduciaries communicate publicly or directly with stockholders, they must do so honestly, candidly and completely in all material respects.[75]   Knowing dissemination of false information about the financial condition of the company is a breach of these fiduciary duties.

Although its SPE structures were complex, Em-on's primary objective was simple: (i) borrow money on what the Financial Institutions required to be essentially a recourse basis without recording debt and (ii) record the loan proceeds as cash flow from operating activities. Thus, Em-on used its SPE structures to disseminate financial information that was fundamentally misleading.

---

[75] In *Malone* v. *Brincat, 722* A.2d 5 (Del. 1998), the plaintiffs alleged that the defendant directors "knowingly and intentionally breached their fiduciary duty of disclosure because the SEC filings made by the directors and every communication from the company to the shareholders since 1994 [were] materially false" and that "as a direct result of the false disclosures . . .  the Company has lost all or virtually all of its value (about $2 billion)."   The Court of Chancery granted the defendant directors' motion to dismiss the claims on the grounds that the directors did not have a fiduciary duty of disclosure in the absence of a request for shareholder action. In essence, the Court of Chancery construed the shareholders' complaint in state court as an attempt to characterize what is properly a federal securities law claim as a state corporate law claim. The Delaware Supreme Court disagreed. The Delaware Supreme Court found, in essence, an implied duty of accurate and honest disclosure whenever directors communicate publicly on behalf of the corporation, stating:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows a *fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.

*Id.* at 13. Recharacterizing the complaint to address the issue as the court thought it should have been raised, the court stated "[t]he issue in this case is not whether [the corporation's] directors breached their duty of disclosure. It is whether they breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company." *Id.* at 14.

Enron is an Oregon corporation. Oregon courts, as well as federal courts applying Oregon law, have in the past relied upon Delaware law for guidance regarding corporation law issues. See, e.g.,  *Stringer v. Car Data Sys., Inc.,* 841 P.2d 1183 (Or. *1992); Chiles v. Robertson,* 767 P.2d 903 (Or. Ct. App. 1989), *modified,* 744 P.2d 500 (Or. Ct. App. 1989); *Kuhn* v. *Sprouse,* 842 F. Supp. 423 (D. Or. 1993). In addition, Oregon courts have referred to the fiduciary duties of officers and directors interchangeably. See, e.g., *Klinicki v. Lundgren, 695* P.2d *906* (Or, 1985); *Haines Mercantile Co. v. Highland Gold Mines Co., 88* P. 865, 866 (Or. 1907) ("It is common learning that the directors and officers of a corporation act in a representative and fiduciary capacity. . . ."); *Chiles v. Robertson, 767* P.2d at 912.

Enron's financial reporting of the transactions discussed in this Report resulted in the materially misleading presentation of Enron's financial condition by failing to disclose the substance of such transactions, regardless of whether the accounting was technically correct. Examples include:

- In the Prepay Transactions and transactions such as $SO_2$, Enron obtained financing and accounted for its obligations as price risk management liabilities rather than debt. Moreover, the increase in the outstanding prepay balance from one reporting period to the next served to increase Enron's reported cash flow from operating activities. In substance, however, these transactions were loans because Enron transferred no commodity price risk, and the proceeds it received had to be repaid with interest at fixed maturity dates. The amounts due, interest rates accrued on the unpaid balances, schedule of maturities and portion of operating cash flow attributable to the transactions could not be discerned from Em-on's financial statements or MD&A. As a result, Em-on's disclosure was materially misleading. Enron used the Prepay Transactions to record a total of $4 billion in borrowings as liabilities from price risk management activities rather than debt and increase cash flow from operating activities by $1.5 billion in its 2000 financial statements.

- In the FAS 140 Transactions, Em-on often recorded a gain from the "sale" of financial assets to SPEs and typically reported the proceeds as cash flow from operating activities. However, Total Return Swaps[76] or similar agreements obligated Enron to repay the proceeds with interest. Neither this repayment obligation nor the related interest rates and maturities were apparent in the financial statements or MD&A. As a result, Enron's disclosure was materially misleading. In 2000, through the use of FAS 140 Transactions, Enron reported over $350 million of net income, over $1 .15 billion of reported cash flow

---

[76] As used in this Report, the term "Total Return Swap" refers to a swap transaction, documented by standard agreements published by ISDA, where one party agrees to pay the other the "total return" (e.g., dividends, interest and any appreciation in value) of a defined underlying asset (which may be an equity interest, a debt obligation or another asset), usually in return for a fixed payment stream, typically tied to an interest rate index. In the case of certain of Enron's SPE transactions, notably the FAS 140 Transactions, the term refers to a swap transaction pursuant to which Enron was entitled to receive the total return of an asset transferred by Enron to an SPE (whether by sale of the asset or otherwise) and agreed to make payments to its counter-party (usually the SPE holding the referenced asset or the lenders to the SPE) equal to the scheduled principal and interest payments on the amounts borrowed by the SPE under a credit facility to acquire the asset. In these instances, the Total Return Swap was the functional equivalent of a guaranty of the loan to the SPE.

from operations and masked over $1.3 billion of repayment obligations.

- The Tax Transactions were designed to allow Enron to record the potential benefit of speculative future tax deductions as current income on its financial statements, and in some cases as pre-tax rather than after-tax income. Through the Tax Transactions, Enron reported $886.5 million of additional income from 1995 through September 200 1 in a manner that was materially misleading.

In many of these transactions, the terms required by certain of the Financial Institutions violated GAAP rules and precluded the desired accounting treatment. The evidence suggests that Enron officers nonetheless achieved the desired accounting treatment by entering into undisclosed side agreements, arrangements with no business purpose and "hardwired"[77] transactions in an attempt to circumvent GAAP. Examples include:

*Undisclosed Side Agreements and Understandings:*

- In substantially all of the FAS 140 Transactions,[78] and in other SPE transactions such as the J.T. Holdings Transaction, there were verbal assurances (memorialized in the Financial Institutions' records) made by Fastow and Glisan that Enron would repay the Financial Institutions the face amount and yield on the required 3% equity investment in SPEs regardless of the value of the assets held by the SPEs. These agreements violated the 3% Equity Test under GAAP. Evidence suggests these agreements were not disclosed to Andersen.[79]

---

[77] As used in this Report, a "hardwired transaction" is one in which the transaction documents are drafted to achieve indirectly an economic result that would have violated applicable GAAP had it been provided for directly.

[78] There is evidence of these assurances in substantially all of the FAS 140 Transactions with CIBC, in the Bacchus Transaction with Citigroup and the Nikita Transaction with Barclays. See Appendix H (Role of CIBC and its Affiliates); Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

[79] In this Report, the Examiner draws certain inferences that Enron did not disclose information to Andersen. In such instances, the primary affirmative support for the inference is testimony provided by current or former Andersen employees and the Examiner's review of Andersen's work papers. The Examiner's investigation of Andersen, including the fact or extent of its knowledge of or involvement in any potential wrongdoing by Enron officers, is ongoing, Accordingly, the Examiner has reached no final conclusions regarding the credibility of this evidence. Nevertheless, the testimony of these witnesses and

The failure to satisfy this test would have resulted in the consolidation of the SPE. In 2000 alone, this would have reduced cash flow from operating activities, and increased debt, by more than $1 billion.

- In the Nigerian Barge transaction and in connection with a sale of airplanes obtained in a Tax Transaction known as Cochise, there were verbal understandings between certain Financial Institutions and Fastow and McMahon (Nigerian Barge) and Maxey (Cochise Planes) that Enron would reacquire or assure the repurchase of the assets that had been purportedly "sold" in the transaction.*" This would have prevented the transactions from qualifying as bona fide sales of the assets under GAAP. Evidence suggests these understandings were not disclosed to Andersen. Em-on improperly reported $48.5 million of income as a result of these transactions.

*Other Undisclosed Arrangements:*

- In connection with the Prepay Transactions with Citigroup known as Yosemite I and II, which were funded by the issuance of Enron credit linked notes, Em-on officers knew that equity certificate holders in the SPEs that issued the notes had entered into Total Return Swaps with respect to their equity interests. As a result of these Total Return Swaps, the SPEs did not have independent 3% equity at risk as required under GAAP and should have been consolidated with Enron. Evidence suggests that these agreements were not disclosed to Andersen. By not making such consolidation, Enron failed to report an additional $1 .1 billion of debt on its balance sheet.

- In a Related Party Transaction known as Chewco, Enron officers knew, but may not have disclosed to Andersen, that reserve accounts created for the benefit of Barclays violated the 3% Equity Test. These reserve accounts, revealed to Andersen in 2001, caused a restatement of Em-on's financial statements for the period 1997 through September 2001, resulting in a $400 million reduction of income, an $800 million reduction of equity and a $600 million increase in debt in that period.*'

---

the evidence identified through the Examiner's review of the work papers create a genuine issue of fact regarding whether Enron officers withheld material information from Andersen.

[80] These examples relate to the promise made to Merrill Lynch to take out its year-end 1999 investment in certain offshore power barges within six months and the understanding with BT/Deutsche that the Cochise planes would be returned to an Enron affiliate within thirty days after Enron had "sold" them to a BT/Deutsche affiliate.

[81] Second Interim Report, Annex 1 to Appendix L (Related Party Transactions); see also Memorandum from Thomas H. Bauer, Andersen, to the Files, regarding Chewco Investigation, Nov. 2, 2001 (the "Andersen Chewco Memorandum") [AB000535339-AB000535344].

*Hardwired Transactions:*

- In a Minority Interest Transaction known as Nahanni that closed in December 1999, an SPE acquired a minority interest in an Em-on subsidiary, contributing $500 million of U.S. Treasury securities. Enron changed its reported definition of "merchant investments" to include Treasury securities, immediately sold the securities, and reported $500 million of cash flow from operating activities. A letter of credit (that was a condition to the financing) expired within thirty days after closing, ensuring that $485 million of the SPE's investment would be repaid shortly after the year-end 1999 financial reporting date.[82]  As a result, Em-on improperly reported $500 million of cash flow from operating activities.

- In the Forest Products Transaction known as Sundance, Citigroup agreed to provide the 3% independent equity that was necessary for Enron to avoid consolidating its forest products joint venture.[83] For Enron to achieve the desired accounting under GAAP, Citigroup's equity had to be at risk. The documents reveal, however, a number of debt-like protections for Citigroup's equity, including Citigroup's unilateral right to dissolve the joint venture and receive repayment from a cash reserve that the joint venture was required to maintain. Accordingly, Citigroup's equity was not at risk. Enron should have consolidated the joint venture and reported the associated debt on its balance sheet (including $375 million borrowed in the Slapshot transaction).[84]

*Transactions Lacking Any Business Purpose:*

- In two Related Party Transactions known as the Rhythms and Raptor Transactions, Enron entered into hedges for many of its merchant investments, enabling Enron to conceal more than $1 billion of losses incurred during a one-year period. The hedges were provided by SPEs, controlled by Fastow through LJM1 or LJM2, and provided no economic benefit to Enron because the only assets available to the SPEs had been provided by Enron, and Enron's investment in the SPEs would absorb substantially all of the losses suffered by the

---

[82] See Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[83] See Second Interim Report, Appendix K (Forest Products Transactions).

[84] In addition, Enron structured Citigroup's investment so that Citigroup "purchased" a 0.01% interest in an Enron SPE that Citigroup immediately contributed to the joint venture. Based on this "sale," which had no business purpose, Enron reported $20 million of income. *Id.*

SPEs.[85]    Thus, the economic risk of the merchant investments remained with Em-on. The only benefit of the hedges to Em-on was favorable accounting treatment.

- In the 1999 Electricity trades, Enron and Merrill Lynch simultaneously entered into two electricity trading contracts that were mirror images of each other and, as a result, there was no commodity risk to either Enron or Merrill Lynch.[86]   The transaction was a sham that had no purpose other than to allow Em-on to report $50 million of income at year-end 1999.

- The Tax Transactions, which created reported income of $885 million, were effectively artificial transactions lacking a significant business purpose other than the creation of accounting income for Enron.[87]

## E.    Potential Defenses Available to Officers

A fact-finder charged with analyzing the evidence to determine whether an officer breached his or her fiduciary duty would also consider the defenses available to the officers. These defenses are summarized here and considered in more detail in Appendix C (Role of Enron's Officers).

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted the reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence.  Moreover, there are defenses to a breach of fiduciary duty claim available to the officers. Whether an officer will succeed on one or more of these defenses will depend upon the fact-finder's resolution of these facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are the degree of an officer's knowledge of whether the reporting of these

---

[85] See Second Interim Report, Appendix L (Related Party Transactions).

[86] See Appendix I (Role of Merrill Lynch and its Affiliates).

[87] See Second Interim Report, Appendix J (Tax Transactions).

transactions would result in a materially misleading presentation of Enron's financial condition.    As part of this determination, the fact-finder may consider, among other things, an officer's knowledge that the economic substance of these transactions was inconsistent with the disclosure, knowledge that Enron's accounting for a transaction was likely incorrect, and the officer's claimed reliance on Andersen and the reasonableness of that reliance.

When many of the officers were asked whether Enron's disclosure of the results of the SPE transactions was misleading, reliance on Andersen's approval of Em-on's accounting for those transactions was a common response.**

It is clear that in addition to (i) consulting with the officers on accounting issues during transaction negotiations and (ii) auditing Em-on's financial statements, Andersen also reviewed Enron's MD&A.[89]   Thus, Andersen was thoroughly involved in Enron's financial    disclosures.

The applicable law, as noted in Appendix B (Legal Standards),"' gives an officer the right to rely on public accountants with respect to matters the officer reasonably believes to be within the accountants' professional competence. Thus, reliance on Andersen for accounting and disclosure of the financial results of the SPE transactions

---

[88] See, e.g., Deposition of Charles Delacey, Vice President of Finance, Enron, by William T. Plybon, A&B, Apr. 3, 2003, at 94-96, 98, 99; Sworn Statement of Ron E. Baker, Manager, Enron, to William T. Plybon, A&B, Mar. 20, 2003, at 71, lines 3-11, 79, lines 6-11, 88, lines 16-22. Fastow, Causey, McMahon and Glisan invoked their privilege against self-incrimination under the Fifth Amendment, and did not give testimony to the Examiner.

[89] Sworn Statement of Rex R. Rogers, Vice President and Associate General Counsel, Enron, to Rebecca M. Lamberth, A&B, May 28, 2003, at 73.

[90] See Appendix B (Legal Standards), *An Officer's Fiduciary Duties.*

provides the officers with a potential defense to a breach of fiduciary duty claim for knowing dissemination of misleading financial information."[91]

In order to avail themselves of this defense, however, such reliance must not be unwarranted.[92] The defense fails if the officers (i) possess actual knowledge of facts that would render reliance unwarranted or (ii) have a measure of knowledge that would cause another person in a similar position and under similar circumstances to make reasonable inquiry that would lead to information rendering reliance unwarranted.[93] The degree of knowledge required to prevent reliance is not necessarily actual knowledge of facts that would render reliance unwarranted (although actual knowledge of such facts would certainly be sufficient). That knowledge would include an awareness that the disclosure approved by Andersen nevertheless resulted in the presentation of false and materially misleading financial statements. An intentional presentation of a materially misleading picture of the financial condition of a company is not absolved because accountants have opined that the financial statements are GAAP compliant.

Claimed reliance would also be unreasonable if material facts were concealed from Andersen that would have precluded the accounting treatment sought by Em-on in those transactions. As is described in Appendix C (Role of Enron's Officers), evidence suggests that certain officers entered into side agreements with Financial Institutions that they knew would have precluded the desired accounting and concealed the existence of these agreements from Andersen.[94]

---

[91] Oregon Business Corporation Act, Or. Rev. Stat. § 60.377(2)(b); Appendix B (Legal Standards).

[92] Or. Rev. Stat. § 60.377(3).

[93] Appendix B (Legal Standards), *An Officer's Fiduciary Duties.*

[94] See Appendix *C* (Role of Em-on's Officers), *Potential Breach of Fiduciary Duty by Officers,* at n. 173.

The evidence also suggests that certain officers concealed from Andersen particular aspects of transactions that the officers knew would have an adverse effect on the desired accounting treatment. In other instances, evidence suggests that certain Enron officers had actual knowledge that Andersen's advice regarding the accounting for SPE transactions was based on a mischaracterization of material facts or that the transactions lacked any business purpose.[95] In these circumstances, a fact-finder could conclude that any alleged reliance on Andersen would be unreasonable.

The evidence also reflects numerous instances in which Em-on officers carefully controlled the flow of information to Andersen in order to achieve a specific accounting result.[96] In an email to Kopper regarding Chewco, Shirley Hudler of ENA states, "I don't know how we are going to 'manage' the Arthur Andersen questions re[garding] Chewco's ability to repay -- will work with Clint Walden ([accounting] support) to craft a story."[97]

---

[95] See Appendix C (Role of Enron's Officers), *"Hardwired" Transactions* and *Transactions Lacking Any Business Purpose.*

[96] See, e.g., Email from Shirley A. Hudler, ENA, to Michael Kopper, ENA, Mar. 14, 2001 (the "Hudler-Kopper Mar. 14, 2001 Email"), at 1 [AB0971 002291; Email from Clint Walden, Enron, to Shirley A. Hudler, ENA, *et al.,* Mar. 26, 2001 [AB0971 002281; Sherman-Vargas Aug. 1, 2001 Email; Email from Debra A. Cash, Andersen, to Rodney Faldyn, Enron, Mar. 19, 2001, at 1 [PSI00290987-PSI00290988]; Email from Joseph Deffner, Enron, to Julia Chin, Enron, *et al.,* July 3 1, 2000, at 1 ("[D]isclosure [regarding this transaction] as blatant as this would not likely sit well with Arthur Anderson (sic)") [AB0888 00105-AB0888 00106]; Email from Ryan Siurek, Senior Director in Transaction Support, Enron, to Rodney Faldyn, Enron, Oct. 22, 2001, at 1 ("I have already requested that Vince [Kaminski] not have further discussions with AA. How do you want to move forward regarding these issues?") [AB0971 01879-AB0971 018811; see *also* Email from James Richardson, Enron, to Luitgard Fischer, Enron, *et al.,* Oct. 16, 2001 ("I understand your concern over the valuations and NOTHING about valuations will be shown to anyone outside of Enron") (emphasis in original) [AB0971 021581. It is important to note that evidence suggests that in some instances Andersen was, in fact, aware of key transaction details and issues. Email from Kent Castleman, Enron, to Gustavo Junqueira, Enron Development, *et al.,* Jan. 13, 1999, at 1 [AB0971 00141-AB0971 001441; Email from Vince J. Kaminski, Enron, to Rakesh Bharati, Enron, Oct. 22, 2001, at 1 [AB0971 01882-AB0971 018841.

[97] Hudler-Kopper Mar. 14, 2001 Email.

## IV.   ROLE OF FINANCIAL INSTITUTIONS IN ENRON'S SPE TRANSACTIONS AND THEORIES OF LIABILITY

### A.   Theories of Potential Liability

Em-on's officers did not, and could not, consummate these SPE transactions on their own.   In this Report, the Examiner reports on the participation of six Financial Institutions in Em-on's SPE transactions and measures each Financial Institution's conduct against two legal theories:

- *Aiding and abetting a breach of fiduciary duty* − whether there is sufficient evidence for a fact-finder to conclude that a Financial Institution aided and abetted wrongful conduct of Em-on's officers that constituted a breach of fiduciary duty such that, assuming Enron has standing, the Financial Institution may be liable for damages to Enron; and

- *Equitable subordination* − whether there is sufficient evidence for a court to conclude that the claims of that Financial Institution against the Debtors should be equitably subordinated to the claims of other creditors.

### *Aiding and Abetting*

For a Financial Institution to be liable for aiding and abetting, a fact-finder must first determine that there has been a breach of fiduciary duty by one or more Enron officers.   If the fact-finder concludes there has been such a breach, the fact-finder may then conclude that a Financial Institution is liable to Enron for aiding and abetting such a breach if the evidence shows that (i) the Financial Institution had *actual knowledge* of the wrongful conduct giving rise to the breach, (ii) the Financial Institution gave *substantial assistance* to the wrongdoer, and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. While there is some authority to the contrary, the actual knowledge standard is strict-"should have known" or "suspicion" will not suffice. Also, "routine" services provided by a Financial Institution will not constitute

substantial assistance. With regard to injury to the Debtors, a fact-finder could conclude that Enron suffered damages as a result of the officers' improper use of the SPE transactions, consisting of, among other things, the cost of governmental investigations, the administrative costs of a bankruptcy proceeding and other losses caused by Enron's "deepening insolvency."[98]

*Equitable Subordination*

A Financial Institution's claims filed in the Bankruptcy Case may be equitably subordinated to the payment of other claims tiled in the case if (i) the Financial Institution engaged in inequitable conduct and (ii) that conduct resulted in harm to other creditors. In the case of creditors that are not insiders or fiduciaries of the debtor, the standard of inequitable conduct is high and has been said to require a breach of a recognized duty. Several cases stand for the proposition that a creditor's participation in the debtor's misrepresentation of its financial condition to other creditors may constitute inequitable conduct that will justify the equitable subordination of the creditor's claim.[99]

If a Financial Institution engaged in inequitable conduct by participating in Enron's misrepresentation of its financial condition, a fact-finder could conclude that other creditors were injured by this conduct because they relied on this information in extending (or continuing to extend) credit to Em-on.

*Application of Traditional Legal Principles to Unusual Facts*

The legal principles of aiding and abetting and equitable subordination are not new or novel and have been applied in many different contexts, as described in more

---

[98] See Appendix B (Legal Standards).

[99] *Id.*

detail in Appendix B (Legal Standards). Although Em-on's use of SPE transactions to manipulate its financial statements is unprecedented in scale and complexity, the legal principles of aiding and abetting and equitable subordination have been applied by courts in analogous circumstances. Thus, a fact-finder's determination as to whether a particular Financial Institution is liable to Enron need not be based on novel theories of law, but rather on application of established legal principles to Enron's facts.

### B. Potential Defenses to Aiding and Abetting Claims and Equitable Subordination

In assessing whether a fact-finder could determine that a Financial Institution has any liability under an aiding and abetting theory or should have its claims equitably subordinated, the Examiner has considered defenses available to the Financial Institutions. In this section, the Examiner has considered potential defenses by reference to the elements of aiding and abetting. The Examiner believes it is useful to consider the same issues when analyzing equitable subordination. The facts and circumstances surrounding each Financial Institution must be considered independently, and Appendices D through I analyze these issues in more detail. The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted the reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Whether a Financial Institution will succeed on one or more defenses to any of these causes of action will depend upon the fact-finder's resolution of the facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of a Financial Institution's *knowledge* of the acts giving rise to the breaches of fiduciary duty.

- The degree of assistance provided by a Financial Institution to Enron's officers.

- Whether it was *reasonably foreseeable* to a Financial Institution that its transactions would cause injury to Enron and/or its creditors.

*No Duty*

The Financial Institutions may contend that they owed no duty to Enron with respect to Enron's accounting decisions, financial statements and related disclosure. In their view, the preparation of Em-on's financial statements and the accompanying notes, as well as the MD&A and related securities law disclosures, were the responsibility of Em-on's senior management.    Em-on employed a large and sophisticated corps of accountants in its Transaction Support Group, which was composed primarily of Andersen alumni.    Andersen audited Enron each year and provided an unqualified opinion certifying that Enron's annual financial statements, including the accompanying notes, fairly presented in all material respects Enron's financial position, results of operations and cash flows.    Andersen also reviewed Em-on's proposed MD&A for its annual reports. Moreover, Enron's officers actively consulted with Andersen regarding the individual SPE transactions and typically received Andersen's approval of the proposed accounting for the transactions as a part of the deal structuring process. Under the circumstances, the Financial Institutions would likely defend any claim for aiding and abetting the breach of fiduciary duty by Enron officers by asserting: (i) the absence of any affirmative duty to prepare or verify the accuracy of Enron's financial statements and

related disclosures; and (ii) their belief that Enron received appropriate advice from competent professionals regarding the GAAP treatment of its SPE transactions and presentation of the results of those transactions in its financial statements and related disclosures.

An aiding and abetting claim does not impose liability on a Financial Institution simply because Enron's accounting or disclosure was incorrect or misleading, however. Furthermore, this theory of liability does not impose liability because a Financial Institution "should have known" that Enron's accounting or financial statement presentation was inappropriate. Rather, it imposes liability on a Financial Institution if the Financial Institution: (i) knew that Enron's officers were engaging in the SPE transactions with the Financial Institution in order to mislead the public about Enron's financial condition; (ii) substantially assisted the officers' conduct; and (iii) injury to Enron was reasonably foreseeable.

As discussed more fully below and in Appendices D through I, there is evidence from which a fact-finder could conclude that certain Financial Institutions, assisting Enron officers: (i) participated in or were aware of side agreements or undisclosed understandings that they knew would invalidate Enron's desired accounting treatment if known by Andersen; (ii) participated in or were aware of misrepresentation of facts to Andersen that they knew would have invalidated Enron's desired accounting treatment if known by Andersen; (iii) participated in or were aware of specific aspects of the SPE transaction that they knew would invalidate Enron's desired accounting treatment if known by Andersen; (iv) knew, based upon their own independent analysis, that Enron's desired accounting treatment was improper; or (v) knew that Enron's disclosure of the

SPE transaction in which they participated was materially misleading to third party creditors, investors and other users of Enron's financial statements, regardless of technical compliance with GAAP.

*Knowledge of Wrongful Conduct*

An aiding and abetting claim requires knowledge of officer misconduct by the Financial Institution. If a fact-finder determines that Enron officers breached their fiduciary duty in a manner that will support aiding and abetting liability, it is likely that in most cases the breach would relate to the misleading financial information that resulted from the SPE transactions in question."'  Thus, in many cases, a Financial Institution's liability will depend on whether a Financial Institution knew that Enron's reporting of these transactions would result in a materially misleading presentation of Enron's financial condition. A fact-finder could conclude that a Financial Institution did not know of the wrongful conduct by certain of Enron's officers in presenting its financial statements. A Financial Institution could also claim that, at most, it should have known of the conduct constituting a breach of fiduciary duty, and therefore it did not have actual knowledge of the necessary wrongful conduct.

To resolve this issue, the fact-finder may consider, among other things:

- Whether a Financial Institution had knowledge that the economic substance of a transaction was inconsistent with Em-on's disclosure.

- Whether a Financial Institution had knowledge that Em-on's accounting for a transaction was likely incorrect.

---

[100] In some cases, it is possible that a Financial Institution may have aided and abetted a breach of the fiduciary duty of loyalty that relates to the receipt by an officer of improper personal benefit at the expense of the Debtors, which conduct may not be associated with misleading financial statements.

- The impact, if any, of an agreement or assurance received by a Financial Institution on its equity investment in a transaction, or an agreement or assurance that Enron would reacquire assets that had been purportedly sold.

- Whether there was any reliance by the Financial Institution on accounting representations by Enron or from Andersen, and if so, whether this reliance was reasonable.

In addition, many of the Financial Institutions are among the largest creditors in the Bankruptcy Case, some of which continued to lend to Enron until the Petition Date. A fact-finder may consider their continued extension of credit to Enron as evidence of a lack of knowledge that Enron's financial statements were materially misleading. A fact-finder could conclude that a Financial Institution acting prudently would not continue to extend hundreds of millions of dollars of credit to a business it knew was engaging in wrongful conduct. On the other hand, it is also possible that a fact-finder would determine that this evidence supports different conclusions. For example, a fact-finder could determine that those Financial Institutions that continued to lend were less concerned about the published financial statements and disclosures because they had a unique understanding of the financial statements (especially the impact of the deals in which they participated) by virtue of their special relationship with Enron. A fact-finder may also conclude that, by syndicating, purchasing credit derivatives, securing letters of credit, obtaining surety bonds or otherwise arranging third party coverage with respect to newly extended Enron credit, the Financial Institutions were focused on third-party credit support and not on Enron's financial condition. Finally, a fact-finder may conclude that so long as the evidence shows that the Financial Institution was aware of the materially misleading financial statements as a result of its transaction with Enron, the fact that the financial statements may have been more misleading than the Financial Institution

believed (as a result of other misleading transactions in which the Financial Institution was not involved) would not preclude liability.

*Impact of Agreements or Assurances on Equity at Risk*

As discussed in Appendix B (Accounting Standards) of the Second Interim Report, under the SPE Accounting Consolidation Analysis, an SPE must be consolidated with its sponsor for accounting purposes unless independent third parties make an equity investment in the SPE equal to at least 3% of the fair value of the entity's assets, which investment is "at risk" during the entire term of the SPE. Applicable GAAP provides that the equity is not "at risk" if the owners "obtained a residual guarantee in an amount that would ensure recovery of their equity investment.""

In several of Enron's SPE transactions, including the Yosemite I and Yosemite II Prepays, and the Bacchus and Nikita FAS 140 Transactions, it appears that holders of the equity interests in SPEs eliminated their economic risks with respect to those interests by entering into Total Return Swaps with other parties with respect to their SPE equity interests.[102] It also appears that in many other SPE transactions, including substantially all of the FAS 140 Transactions when the 3% Equity Test applied, Enron officers promised the holders of the SPE's equity that Enron would repay their equity investment

---

[101] Implementation Issues in Accounting for Leasing Transactions Involving Special Purpose Entities, 2 EITF Abstracts (FASB) 96-21 (Sept. 18-19, 1996) ("EITF 96-21"), at 896. EITF 96-21 also suggests that whether the equity is "at risk" requires consideration of both the form and the substance of the risk. In this regard, it provides that funds obtained to make an at-risk equity investment can be borrowed, but only if both (a) the borrowings are fully recourse to the borrower (a consideration going to both the form and substance of the risk) and (b) the borrower has sufficient assets (in addition to the equity interest in the SPE) to repay the borrowing (a consideration going to the substance of the risk). *Id.*

[102] In these cases, as discussed below, the equity is not at risk under GAAP. See Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

regardless of the value of the underlying asset in the SPE.[103] These promises between Em-on officers and Financial Institutions are often described in the evidence with phrases such as "minuted verbal assurances,"[104] "strongest assurance,"[105] "senior Em-on officers' . . .affirmation that Enron will ensure repayment,"[106] and the like.

As to the latter circumstances, the Financial Institutions often memorialized these promises in their contemporaneous records about the transactions.[107] There is evidence to suggest that Enron did not disclose these arrangements to Andersen,[108] and an inference can be drawn that both Em-on and the Financial Institutions knew that the agreements would not, and could not, be disclosed to Andersen without invalidating Em-on's desired accounting result.[109] If Enron had disclosed these agreements or assurances to Andersen, current and former Andersen accountants have stated that they would have found the equity not to be "at risk,"[110] requiring the SPEs to be consolidated with Em-on, in which case the transactions would have been disclosed as loans.

---

[103] See, e.g., Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[104] See Appendix H (Role of CIBC and its Affiliates).

[105] Id.

[106] See Appendix F (Role of Barclays and its Affiliates).

[107] See, e.g., Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[108] In-Person Interview with Kimberly Scardino, former Partner, Andersen, by H. Bryan Ives, III, and William T. Plybon, A&B, May 29, 2003 (the "Scardino Interview"); Sworn Statement of Carl E. Bass, former Partner, Andersen, to H. Bryan Ives, III, and William T. Plybon, A&B, June 4, 2003 (the "Bass Sworn Statement"), at 31-32; Sworn Statement of Debra A. Cash, former Partner, Andersen, to H. Bryan Ives, III, and William T. Plybon, A&B, June 5, 2003, at 139-42; Stewart Interview; In-Person Interview with Benjamin Neuhausen, former Partner, Andersen, by H. Bryan Ives, III, and John E. Stephenson, Jr., A&B, June 13, 2003 (the "Neuhausen Interview").

[109] See Appendix C (Role of Enron's Officers); Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[110] Scardino Interview; Bass Sworn Statement, at 44-46; Stewart Interview; Neuhausen Interview.

Certain of the Financial Institutions maintain that their 3% equity investments in these FAS 140 Transactions were at risk, notwithstanding any "verbal assurances" or "understandings," because the promises by Enron senior management did not constitute "guarantees" or "enforceable agreements" as a matter of both fact and law.[111] Rather, they suggest that the discussions between the Financial Institutions and Enron senior officers were ordinary course discussions between a commercial bank and its customer that were designed to provide a certain level of comfort regarding the senior officers' awareness of and commitment to the transactions, but were clearly understood by the parties not to constitute enforceable obligations.[112]

The Examiner has considered whether these verbal assurances or understandings are enforceable as a matter of law and a matter of fact. Under applicable New York and Texas law, agreements that are "oral" or "unwritten"[113] are legally enforceable contracts.[114] Sufficient evidence exists for a fact-finder to conclude either that (a) Enron

---

[111] See Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates). This testimony is inconsistent with much of the documentary evidence.

[112] See Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates). This testimony is also inconsistent with much of the documentary evidence.

[113] In several instances these purportedly "oral" assurances were "minuted" and "recorded." See, e.g., Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[114] In addition, even if enforceability of these agreements were an issue, a fact-finder could conclude that such side agreements satisfy the three requirements for an enforceable contract - offer, acceptance and consideration. Had one or more of the Financial Institutions brought an action against Enron to enforce such an agreement, Enron might have defended such a claim by asserting that there was no meeting of the minds (no contract) or that the oral agreement, if a contract, fell within the scope of the Statute of Frauds (which requires certain categories of contracts to be in writing in order to be enforceable). To do so, however, Enron would have had to take the position that the 3% equity was debt, and that its oral agreement was a promise to pay the debt of another. If a court had held that the oral agreement did fall within the Statute of Frauds, a Financial Institution bringing such a claim could have asserted that either the doctrine of partial performance or the doctrine of promissory estoppel applied, both of which are exceptions to the Statute of Frauds. As a general rule, in order to satisfy these exceptions, the action of purchasing the 3% equity would have to be explainable only with reference to the oral agreement, and it would be insufficient to show that the oral agreement merely provided "some motivation" for such action.

and the Financial Institutions entered into an enforceable agreement for the Financial Institutions to purchase the 3% equity certificates in exchange for Em-on's promise to repay the certificate plus yield at maturity in the event the underlying asset value was insufficient to pay out the equity or (b) the Financial Institutions relied to their detriment by purchasing the equity certificates based upon Enron's promise that the equity investment would be repaid. Thus, a fact-finder could determine that the equity was not "at risk" as required by GAAP pursuant to traditional contract law or under theories of promissory estoppel or detrimental reliance.' [15]

In addition, regardless of the enforceability of the verbal assurances provided by Enron, a fair reading of the applicable GAAP suggests that the "at risk" rule of the 3% Equity Test requires that the equity be at risk not just as a matter of strict legal form, but as a matter of substance as well.[116] Thus, the intentions of the parties must be considered in determining whether the equity is truly at risk. Witnesses from the Financial Institutions and from Enron have testified that the discussions described as "verbal assurances," or "minuted assurances" or "representations" of "absolute repayment" were not intended to and, in fact, did not constitute an agreement or enforceable obligation regarding the repayment of the equity.[117]

Nevertheless, evidence suggests that the Financial Institutions sought and obtained these verbal assurances, and relied upon them in purchasing the equity interests,

---

[115] EITF 96-21, at 896.

[116] *Id.*

[117] See Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates); Appendix C (Role of Enron's Officers).

fully expecting Enron to honor them.' [18]  Indeed, the promises often were obtained by the Financial Institutions as a necessary precondition to their approval of the credit.'" Moreover, the evidence suggests that Enron honored its commitment by repurchasing the equity certificates at face value plus stated yield in circumstances where the value of the underlying asset was insufficient to repay the certificate holder.[120] Thus, although there is some conflict in the evidence, a fact-finder could determine that the Financial Institutions were in fact looking to Enron for the repayment of their equity, and in substance the equity was not at risk.

The Financial Institutions that sought and benefited from these verbal assurances may have had other bases for concluding that their equity would be repaid in full at maturity and may therefore assert that they were not relying on the verbal assurances. For example, the Financial Institutions apparently believed that Enron's Total Return Swap obligation on the 97% debt portion of the transaction increased the likelihood that Enron would also pay the 3% equity even if the asset value was insufficient to cover the equity. They expected that Em-on, already liable for 97%, would pay off the 3% in order to maintain good working relationships with the Financial Institutions that bought the equity certificates and to prevent a competitor from purchasing the asset at auction. These expectations, considered in isolation, were based on economic realities and were entirely consistent with the accounting rules.

---

[18] Contrary evidence exists, including denials from certain fact witnesses associated with the Financial Institutions. See Appendix H (Role of CIBC and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

[119] See Appendix D (Role of Citigroup and its Affiliates); Appendix H (Role of CIBC and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

[120] See Appendix H (Role of CIBC and its Affiliates).

These normal commercial expectations, however, did not arise, and should not be considered, in isolation. They arose in the context of Em-on's specific assurances regarding the repayment of the 3% equity. Thus, a fact-finder could determine that the verbal assurances provided, and the circumstances of their delivery, evidence expectations by the Financial Institutions of recovery from Em-on of their 3% equity investment due to Enron's promise of repayment rather than the economic imperatives of the transaction or the probability that Enron's commercial interests would be served by such repayment. Accordingly, there is sufficient evidence for the fact-finder to conclude that Enron's verbal assurances were in fact and substance "residual guarantees" under the applicable GAAP. If so, the equity investments are not "at risk" as required by the 3% Equity Test.

*Degree of Assistance*

There were significant differences in the level of participation by the Financial Institutions in Enron's SPE transactions. Even among those Financial Institutions considered by Enron to be "Tier 1" banks,[121] the evidence reviewed by the Examiner

---

[121] Enron reviewed and ranked its Financial Institutions on an annual or bi-annual basis and placed each of its major banks in various tiers. The highest ranking a Financial Institution could receive was to achieve "Tier 1" status. During the relationship reviews, Enron addressed all aspects of its relationships with each of its Tier 1 and Tier 2 banks, including the relative success or failure of transactions and syndications, appetite for and participation in deals, willingness to extend credit, total credit exposure to Enron, creativity, responsiveness, and the continuation of Tier 1 or Tier 2 status in the upcoming year. In July 1999, Enron's stated criteria for Tier 1 status were:

- Underwrite $1 billion in short period of time
- Ability to lead/structure complex, mission-critical deals
- Deliver balance sheet for non-agented deals when needed
- Relationship-driven philosophy vs. transactional
- Account officer capable of delivering institution
- Strong senior management contacts
- Well-developed distribution capabilities
- Limited execution risk

indicates that there was a wide divergence in their involvement in the SPE transactions as well as the breadth of participation in the number of SPE transactions. For example, during a five-year period ending in 2001, Citigroup, playing a wide array of roles in assisting Em-on, completed over sixty transactions with Em-on, an average of more than one per month.    Other Financial Institutions, such as JPMorgan Chase, CIBC and BT/Deutsche, although participating in many transactions with Enron over a number of years, were most prolific in one type of SPE transaction - the Prepay Transactions in the case of JPMorgan Chase, the FAS 140 Transactions in the case of CIBC and the Tax Transactions in the case of BT/Deutsche.  Barclays participated in several different types of SPE transactions in various roles, and Merrill Lynch, despite having a significant relationship with Enron, did not participate in as many SPE transactions.

*Materiality*

Materiality of individual SPE transactions and series of SPE transactions is a relevant factor in the Examiner's analysis. The SPE transactions vary in amount and in their impact on financial results, such as earnings per share. Some were completed shortly before the Petition Date and after Em-on's last public financial statements were prepared and may, therefore, have caused comparatively less harm to Enron and its creditors. Financial Institutions may assert that where an SPE transaction is found to be immaterial for one or more of these reasons, the transaction should not form a basis for aiding and abetting liability.

---

Enron Relationship Review Mid-Year 1999, July 1999 (the "Enron Relationship Review, July 1999"), at AB0252 01559 (emphasis omitted) [AB0252 01557-AB0252 01601].

**C.**    **Potential Additional Defenses to Aiding and Abetting Claims**

There are other defenses possibly available to a Financial Institution that are unrelated to its knowledge or conduct.    These are potential defenses to aiding and abetting liability, but they should not apply to equitable subordination. They include: (i) standing and *in pari delicto* issues and (ii) the impact of any exculpatory language in its engagement letter with the Debtors.

*Standing and In Pari Delicto*

A threshold question is whether the wrongful conduct of Em-on's officers should bar any claim by Enron against a Financial Institution for aiding and abetting that wrongful conduct. Depending on choice of law determinations one of two legal theories will apply -- either that Em-on has no standing to assert such a claim or that the Financial Institution has a defense to such claim under the doctrine known as *in pari delicto*.

*Standing*. In cases where a corporation's officers have breached their fiduciary duties to the corporation (and a third party is alleged to have aided and abetted that breach), some courts have found that the creditors of the corporation, rather than the corporation, suffered virtually all of the damages. A corporation lacks standing to bring a claim for damages suffered by the creditors.  Even where damage to the corporation has been alleged, courts have imputed the officers' conduct to the corporation and have concluded that only creditors, not the corporation, have standing to assert such claims. Under this line of cases, Enron would not have standing to bring such claims unless (i) the officer that breached his or her fiduciary duty acted solely for his or her own interest and without regard for the interests of Enron, or (ii) there was a relevant, innocent decision maker at Em-on that, had he or she known of the wrongful conduct, could have

or would have prevented it from occurring. If neither is true, the wrongful conduct may form the basis for claims in favor of creditors of Em-on, rather than Em-on.

*In Pari Delicto.* Corporations act through their officers, and the conduct of the officers is ordinarily imputed to the corporation. In certain cases, wrongful conduct by an officer is also attributed to the corporation, and in such cases the corporation may be found to be *in pari delicto* (which is Latin for "in equal fault") with the party that aided and abetted the corporate officer in bringing about the harm. Wrongful conduct of an officer, however, will not be imputed to the corporation when the officer acts with sufficient adverse interest to the corporation. Under this line of cases, when the wrongful conduct of the officer is imputed to the corporation, the defendant can assert this defense to defeat the claim.

Under either approach courts require that the wrongful act cause damage to the corporation for it to assert a claim. Courts have found that a corporation has suffered damages as a result of a breach of fiduciary duty, even though the same conduct also resulted in damages to the creditors. Damages recognized as being suffered by the corporation have included costs of governmental investigations, administrative costs of a bankruptcy proceeding, and losses caused by the "deepening insolvency" of the corporation that occurred while its true financial condition was disguised. The Examiner believes that a fact-finder could conclude that Em-on suffered and continues to suffer damages as a result of the breaches of fiduciary duty by its officers.

*Limitations of Liability Under Engagement Letters*

Another possible defense to a claim of aiding and abetting breach of fiduciary duty is a contractual limitation on a Financial Institution's liability through an

exculpation provision in an engagement letter, fee letter or the like. These contractual provisions are unlikely to provide an effective defense against an aiding and abetting claim, however, because the terms of such provisions typically carve out an exception for claims arising from the Financial Institution's own gross negligence, recklessness or willful misconduct. Because actual knowledge of wrongdoing and substantial assistance are elements of an aiding and abetting claim, the exculpation provisions are inapplicable by their own terms. In addition, under applicable law, regardless of the language in the contract, the courts will impose exceptions to enforcement in the case of bad faith, breach of trust, dishonesty, self-dealing and willful, reckless or grossly negligent misconduct.[122] Therefore, if it is shown that the Financial Institution aided and abetted the breach of fiduciary duty, the exculpation provisions of agreements between Enron and the Financial Institutions are unlikely to block such a claim.

---

[122] *See Gold Connection Disc. Jewelers, Inc. v. Am. Dist. Tel. Co., 622* N.Y.S.2d 740, 741 (N.Y. 1995) (holding that limitation of liability clauses cannot preclude recovery where the losses are the result of gross negligence); *cf. Johnson* v. *Fargo, 90 N.Y.S. 725, 730 (N.Y.* 1904) (holding that exculpatory clauses are generally disfavored and must be strictly construed). Thus, even if the contractual terms did not expressly except grossly negligent, reckless, and willful conduct, New York law would not enforce such a clause to prevent an aiding and abetting breach of fiduciary duty claim. To the extent Texas law applies (which would not be expected, given the overwhelming preference for New York law in the choice of law provisions of the agreements at issue), and to the extent the contractual language does not include specific exceptions, the exculpation provisions would not be enforced to prevent an aiding and abetting claim as a matter of public policy. See *Solis v. Evins,* 951 S.W.2d 44, 50 (Tex. Ct. App. 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy."); *cf. Stine v. Marathon Oil Co., 976* F.2d 254, 260 (5th Cir. 1993) ("In Texas, exculpatory clauses are not favored and are strictly construed.").

## V.    SPECIFIC ROLES OF FINANCIAL INSTITUTIONS AND POTENTIAL LIABILITY

### A.    Citigroup

Citigroup had as close a relationship with Enron as any Financial Institution discussed in this Report.  Citigroup's relationship with Em-on began over twenty years ago, and for at least the five years immediately preceding the Petition Date, Enron considered Citigroup to be a Tier 1 bank.   During that five-year period, Citigroup completed over sixty transactions with Enron, an average of more than one per month.   In connection with these transactions, Citigroup played a wide variety of roles in assisting Em-on. These roles included lender, arranger, syndicator, underwriter, financial adviser and investor, among others.  The transactions included term loans and revolving lines of credit, syndications, debt and equity offerings, mergers and acquisitions, and many types of structured financings.   Citigroup received approximately $188 million in revenue related to Enron transactions during the period 1997 through 2001.

Citigroup helped Em-on implement-and in some cases Citigroup also designed— a number of the SPE transactions reviewed by the Examiner.   These SPE transactions include:

- Four Prepay Transactions referred to as Yosemite I through Yosemite IV in the Second Interim Report;[123]

---

[123] In these Prepay Transactions, Citigroup's SPE, Delta, served as the conduit entity. The funds ultimately loaned to Enron, which totaled approximately $2.4 billion, were raised in private placements of credit linked notes. In Yosemite I and II, a trust or similar entity issued the notes and loaned the proceeds to Delta, and Delta transferred the cash to Enron (or one of its affiliates) as a prepayment under a commodity swap agreement. In Yosemite III and Yosemite IV, the applicable trust transferred the note proceeds to Citigroup in exchange for certificates of deposit, Citigroup transferred the funds to Delta via a commodity swap agreement, and Delta transferred the funds to Enron via another commodity swap agreement.

- Five additional Prepay Transactions between 1997 and 2001 ;[124]

- Two Minority Interest Transactions called Nighthawk and Nahanni;[125] and

- Two Forest Products Transactions called Bacchus (a FAS 140 Transaction) and Sundance Industrial.

*Citigroup's Appropriateness Test*

Not only was Citigroup sophisticated in structured finance, it understood that structured finance could be misused. At the time many of these transactions were being completed, Citigroup's Global Capital Structuring group applied an "appropriateness test" to help determine whether the bank should engage in a particular transaction. Transaction Execution Approval packages were required to include a written questionnaire that set out ten areas of review.[126] These questions went beyond the objective financial criteria such as the client's credit risk and focused on the more subjective features of the transaction.

For example, the questionnaire focused on such matters as whether the client had a legitimate business purpose for entering into the transaction, and whether the true

---

[124] These Prepay Transactions included: (i) Roosevelt for $500 million, in which Citigroup provided all of the funding and Delta and Barclays served as the two counterparties to Enron; (ii) Truman for $500 million, in which Citigroup funded $250 million and Toronto Dominion Bank ("TD Bank") funded $250 million, with each of Citigroup and TD Bank serving as the other's conduit entity; (iii) Jethro for $675 million, which refinanced and extended Truman and had the same parties and structure, with each of Citigroup and TD Bank funding $337.5 million; (iv) Nixon for $324 million, in which Barclays funded $110 million, Royal Bank of Scotland funded $110 million, and Citigroup funded $104 million, with TD Bank serving as the conduit entity; and (v) a Prepay Transaction completed in June 2001 for $250 million, in which Citigroup provided all of the funding and Delta served as the conduit entity.

[125] Citigroup also assisted Enron in a Minority Interest Transaction called Rawhide, which is discussed in Appendix D (Role of Citigroup and its Affiliates). Although the Examiner concluded in the Second Interim Report that Enron's accounting for and disclosures of Rawhide were flawed, the evidence does not appear sufficient at this time to support a conclusion that Citigroup acted wrongfully with respect to Rawhide.

[126] It is not clear whether any group within Citigroup other than Global Capital Structuring used this formal appropriateness test questionnaire. However, Citigroup employees testified that other groups considered similar matters when deciding whether to engage in transactions.

economic substance of the transaction was apparent. These were circumstances that could create reputational risk for Citigroup.

The ten areas, which had to be addressed and approved by the "Designated Responsible Senior" for each transaction, were as follows:

1. **Lack of transparency (Business Objective)** – The true economic substance of the transaction cannot be determined from the structure without significant analysis.
2. **Secrecy of identity of true party** – The true identity of a party to the transaction cannot be determined because of the use of SPVs or charitable trusts in offshore tax havens or bank secrecy jurisdictions.
3. **Circularity** – The transaction is essentially circular with the customer being both the ultimate lender and borrower and/or ultimate buyer and seller.
4. **Fragmentation** – The transaction is constructed so that no one document describes the whole transaction, making it possible for a reader to review documents for a segment of the transaction and not understand that it is part of a larger transaction.
5. **Unusual terms** – The transaction is off-market or contains terms which are significantly different from what one would expect.
6. **Absence of rules/guidance** – The applicable regulatory/ legal/accounting/tax systems lack developed rules or guidance for complex products.
7. **Event risk in regulatory/legal/accounting systems** – The rules governing the transaction are not predictable and could be subject to sudden application of tighter standards, or heightened prosecution because of political or social developments.
8. **Multiple jurisdictions** – Multiple jurisdictions are involved with internal approvals sought individually in each making the process harder to manage and the risk of oversight of the entire transaction greater.
9. **Lack of confirmation of customer assurances** – The absence of third party confirmations (e.g., regulators, auditors, appraisers) of customer assurances on sensitive issues.

10. Disproportionate impact — The transaction will have a significant impact on the customer's financial condition or results, and will not be required to be disclosed.[127]

*Examiner's Conclusions*

As set forth in Appendix C (Role of Em-on's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into certain SPE transactions with Citigroup that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix D (Role of Citigroup and its Affiliates), the Examiner discusses Citigroup's involvement in these SPE transactions. In participating in many of Enron's SPE transactions, Citigroup appears to have violated or ignored its own guidelines for appropriateness. In addition, there is evidence that: (i) Citigroup had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) Citigroup gave substantial assistance to certain of the Debtors' officers by participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that Citigroup aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that Citigroup's claims, totaling approximately \$2.4 billion, may be equitably subordinated to the claims of other creditors.

---

[127] Project Nighthawk Transaction Approval Package, Dec. 1997, at CITI-B 003759 13-CITI-B 003759 14 (containing the Nighthawk Appropriateness Test Questionnaire) [CITI-B 00375890-CITI-B 003759141.

The Examiner's conclusions are based upon a review of testimony and documentary evidence that is set forth in Appendix D (Role of Citigroup and its Affiliates), which the reader should review for a more complete understanding. Transactions considered by the Examiner in which Citigroup participated include the following:

*Prepay Transactions.* The nine Prepay Transactions that Citigroup completed with Enron between 1997 and 2001 (the "Citigroup Prepays") totaled over $4.6 billion.[128] Citigroup knew that, pursuant to these transactions, Enron did not transfer any commodities or any associated price risk, and that the transactions were effectively debt. Citigroup also knew that Enron reported the transactions as cash flows from operating activities, responding to Rating Agency pressure to better match cash flows with net income. Citigroup also knew that Enron's accounting for the Citigroup Prepays, with no disclosure in the financial statement footnotes or MD&A, did not provide an investor with any understanding of the amount of Em-on's repayment obligations or the terms of such obligations. The Citigroup Prepays had a material effect on Enron's financial statements, representing, for example, 76% of Enron's net reported cash flows from operating activities in 1999.

In July 2001, Paul Deards, the head of Citigroup's Derivatives group, which handled the Citigroup Prepays, compared his group's involvement with that of Citigroup's Commodities group:

---

[128] The proceeds of certain of the Citigroup Prepays were used to repay outstanding Citigroup Prepays that were maturing. For example, the $675 million Jethro Prepay Transaction refinanced and extended the $500 million Truman Prepay Transaction. See Global Loans Approval Memorandum, regarding Truman, Sept. 19, 1999 [CITI-B 0035882-CITI-B 0035888]. The $4.6 billion total represents the gross amount of the nine Citigroup Prepays.

> if as you say, much of what you do does not involve management of commodity exposures at all, but is simply manipulating cash flows, there may be a much greater overlap in our businesses than i had been led to believe.[129]

On October 25, 2001, after Skilling's resignation in August and Em-on's devastating earnings release on October 16, 2001, Mr. Deards asked a colleague:

> also want to get your confirmation that (apart from the fact we put deals together for enron which we knew confused the ratings agencies) there is no skellington in the closet.[130]

In addition to loaning its own funds in many of the Citigroup Prepays, Citigroup facilitated Enron's desired accounting treatment of six of the Citigroup Prepays by providing its SPE, Delta, to serve as the conduit entity or other swap counter-party. Andersen had told Enron that each prepay needed to involve three parties, each with a substantive business purpose for entering into the commodity purchase and sale transactions. Nevertheless, Delta was an SPE owned by a Cayman Islands charitable trust and established at the direction of Citigroup for the purpose of entering into that type of transaction.[131]

With respect to the credit linked notes portions of Yosemite I and II, which Citigroup had designed, there is evidence that Citigroup knew Em-on's accounting was

---

[129] Email from Paul B. Deards, Citigroup, to Christopher Fehon, Citigroup, July 5, 2001, at CITI-B 00694155 (capitalization omitted from original email) [CITI-B 00694153-CITI-B 006941551.

[130] Email from Paul Deards, Citigroup, to Rick Caplan, Citigroup, Oct. 25, 2001 (capitalization omitted from original email) [CITI-B 00910235]. Deards testified that "skellington" may have been a pun referring to Jeff Skilling. He also testified that the entire email was a joke. Sworn Statement of Paul Deards, Citigroup, to Steven M. Collins, A&B, June 9, 2003, at 38-39.

[131] In connnection with two of the Citigroup Prepays, Citigroup caused Delta to make representations to Andersen that did not disclose the reality of Delta's formation and use. For example, Delta represented that it had unencumbered assets that would be available to the Yosemite lenders upon a default. However, a Citigroup employee testified that Delta had only about $1,000 in net assets, representing the prefunding of directors fees, and its initial capital.   Sworn Statement of Richard J. Caplan, Citigroup, to Steven M. Collins, A&B, Apr. 22, 2003 (the "Caplan Sworn Statement"), at 261.

not in compliance with GAAP. A senior accountant at Citigroup concluded that Enron should consolidate the entity that issued the notes,[132] which would have resulted in Enron having to report as debt on its balance sheet the $1.1 billion of note proceeds in Yosemite I and II. Despite knowing this conclusion was inconsistent with Enron's desired accounting and thus at odds with the purpose of the entire structure, Citigroup elected to proceed anyway, stating that the issue was "the customer's risk to accept or reject."[133]

Another Citigroup accountant expressed concern about this course of action:

> [I]f we have structured a transaction to help a client avoid consolidation, how can we turn around and take the position that they should be consolidating?  I'm not suggesting that we are responsible for their accounting, but I am afraid that if we ever had to defend this we would either (a) embarrass the client or (b) lose the accounting argument. [134]

*Bacchus (FAS 140 Transaction).*  In Bacchus, Enron effectively borrowed $200 million over the 2000 year-end from Citigroup, recognized $112 million of gain and reported $200 million of cash flow from operating activities. Citigroup received a Total

---

[132] Email from Saul Bernstein, Citigroup, to Frederick Battline, Citigroup, regarding Project Yosemite, Nov. 3, 1999 (the "Bernstein 11/03/99 Email") [CITI-B 0129860–CITI-B 01298611; Memorandum from Saul Bernstein, Citigroup, to Rick Caplan and Adam Kulick, Citigroup, regarding Project Yosemite – Yosemite Co. Structured Credit Derivative Transactions, Oct. 29, 1999 (the "Bernstein 10/29/99 Memo") [CITI-B 0003517-CITI-B 00035221. Bernstein concluded that the Yosemite I trust was an SPE that did not satisfy the 3% Equity Test because the independent equity holder had entered into a Total Return Swap with a Citigroup entity with respect to its equity contribution, and therefore the equity was not at risk. Bernstein 10/29/99 Memo, at 4.  Because of the lack of a "real" independent equity holder, and because Enron was the primary beneficiary of the funds raised by the trust through the trust's issuance of the credit linked notes, Bernstein concluded that Enron should consolidate the trust. *Id.;* Bernstein 1 1/03/99 Email. The Yosemite II Prepay Transaction used the same structure and, thus, had the same issue with respect to the note issuer's equity. In the Yosemite III and Yosemite IV Prepay Transactions, Citigroup consolidated the trust entities that issued the notes, and so those transactions did not present the same concerns for Enron.

[133] Bernstein 1 1/03/99 Email, at CITI-B 0129861. There is evidence that Citigroup discussed some aspect of this conclusion with Enron. *Id.* at CITI-B 0129860; Caplan Sworn Statement, at 154-55. The Examiner has not found any evidence to date that this issue was discussed within Enron, and there is evidence that Andersen was not informed of the facts relating to this issue.

[134] Email from Frederick Battline, Citigroup, to Saul Bernstein, Citigroup, regarding Project Yosemite, Nov. 3, 1999, at CITI-B 0129860 [CITI-B 0129860-CITI-B 01298621.

Return Swap from Em-on for $194 million of the debt and obtained verbal support from Fastow that Em-on would repay the remaining $6 million, which was designed to represent the requisite 3% independent equity. Andersen has testified that it was not aware of any such verbal support and that such support would have invalidated Enron's accounting. In completing Bacchus, Citigroup's officers apparently overcame "key concerns" about the "appropriateness" of the "earnings dimensions to this deal."[135] Referring to transaction terms that Citigroup likely would not have accepted absent the verbal support, Citigroup Director Steve Wagman wrote:

> Sounds like we made a lot of exceptions to our standard policies. I am sure we have gone out of our way to let them know that we are bending over backwards for them . . . let's remember to collect this iou when it really counts.[136]

*Sundance Industrial.* Enron completed Sundance Industrial in order to move all its forest products assets into a nonconsolidated partnership, thus keeping those assets and their associated debt off its balance sheet. The evidence indicates that Citigroup knew its $28.5 million, 3% equity investment in Sundance needed to be at risk in order for Enron to accomplish this objective, but that the investment was structured with so many protections that it was actually debt. There is also evidence that Citigroup believed its obligation to fund up to an additional $160 million, which Enron also needed in order to satisfy Andersen's nonconsolidation accounting requirements, was not at risk. The transaction documents were "hardwired" to require that the partnership lose almost $750 million-the full value of the assets in the partnership-before it could draw on

---

[135] Email from Steve Baillie, Citigroup, to William Fox, Citigroup, *et al.*, Nov. 24, 2000 [CITI-B 0289702-CITI-B 02897031.

[136] Email from Steve Wagman, Citigroup, to Rick Caplan and Amanda Angelini, Citigroup, Dec. 27, 2000 [CITI-B 02819461.

Citigroup's funding commitment. Citigroup believed that, from Enron's perspective, Sundance was "a funky deal (accounting-wise)"[137] and wrote "[t]he GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."[138]

Citigroup also facilitated Enron's objective of recording $20 million of income via the Sundance transaction, by using $20 million of its $28.5 million investment to purchase a .01% interest in an Enron SPE called Sonoma, despite having no business purpose for owning that equity, and then immediately contributing the equity to the partnership. Enron needed to have the right to put the Sonoma equity back to Citigroup in order to get a "true sale" legal opinion, but Citigroup refused to have any risk of owning the asset. Thus, the parties "hardwired" the transaction agreements so that Citigroup could dissolve the partnership prior to having to honor the put.

*Nahanni (Minority Interest Transaction).* In Nahanni, Enron completed a Minority Interest Transaction in which the minority investor contributed $500 million of Treasury securities to an Enron subsidiary, Enron classified these securities as "merchant investments," and Enron promptly sold them and reported the proceeds as cash flow from operating activities. Enron completed the transaction in December 1999 and repaid the debt in mid-January 2000.

The Nahanni transaction had no rational business purpose, including no business purpose related to any temporary need for cash. The Debtors' officers caused Enron to engage in this transaction solely to inflate Enron's reported cash flow from operating

---

[137] Email from Lynn Feintech, Citigroup, to Rick Caplan and copy to Timothy Leroux, Citigroup, regarding cmac memo, May 15, 2001 [CITI-B 02996131].

[138] Memorandum from Dave Bushnell, Citigroup, to Mike Carpenter, Citigroup, regarding Enron-Project Sundance Transaction, May 30, 2001 [CITI-B 0302091-CITI-B 0302092].

activities. Citigroup knew that it was critical for Em-on to report healthy operating cash flow in order to maintain its credit ratings, and Citigroup knew Em-on's desire to include this transaction in its year-end 1999 financial statements. Citigroup designed the Nahanni Minority Interest Structure and recommended that Em-on use Treasury securities in the transaction. Nahanni represented 41% of Enron's total reported cash flow from operating activities for 1999.[139]

In a review of its exposure to Em-on, Citigroup acknowledged that "Enron has used Nahanni only for year-end window dressing . . . . "[140] Jim Reilly, one of Citigroup's key relationship managers for Enron, described Nahanni as: "essentially, an insurance policy for YE 'balancing. '"[141]

*Nighthawk (Minority Interest Transaction).* Nighthawk was a year-end 1997 Minority Interest Transaction that raised $500 million for Enron. A senior Citigroup accountant evaluated Nighthawk before it closed in late 1997 and concluded that, because the equity of the minority interest investor was not at risk, Enron would be required to

---

[139] In Citigroup's Execution Approval Memorandum for Nahanni, it states that Citigroup "has relied on advice from Ben Neuhausen from the Standards Practices Group at Arthur Andersen's Chicago Headquarters as to important accounting matters relating to the transaction." Execution Approval Memorandum from Otto Jager, et *al.,* Citigroup, to the GCS Execution Approval Committee, regarding Project Nahanni Execution Approval, Dec. 14, 1999, at 9 [CITI-B 00313808-CITI-B 00313817]. Mr. Neuhausen was the member of Andersen's Professional Standards Group in Chicago who reviewed and approved certain aspects of the Nahanni structure for Enron. Memorandum from Debra A. Cash, et *al.,* Andersen, to the Files, regarding Non-Cash Activity, Dec. 7, 1999 [AAWP 0100424-AAWP 0100425]. Mr. Nauhausen has told the Examiner that he was not aware that the Nahanni transaction documents were "hardwired" to ensure that, for all practical purposes, the proceeds resulting from the year-end sale of the Treasury securities contributed to the minority interest vehicle would be distributed to the Nahanni lenders within thirty days. Although Mr. Neuhausen did consult with Citigroup on its minority interest structures, he told the Examiner that it was his arrangement with Citigroup that Citigroup would inform him if they were seeking his advice on transactions involving a client of Andersen. He does not recall discussing the Nahanni transaction with Citigroup, nor any minority interest transaction involving a similar use of Treasury securities. Neuhausen Interview.

[140] Citigroup Exposure Spreadsheet, undated, at 28 [CITI-B 0137997-CITI-B 0138003].

[141] Email from James F. Reilly, Citigroup, to Michael Nepveux and copy to Joseph J. Mackiewicz, regarding Enron deals, July 24, 2001, at 1 [CITI-B 0289597-CITI-B 02895981.

consolidate the investor entity, thus requiring that Enron present the $500 million of financing as debt rather than as a minority interest investment.[142] Citigroup knew that minority interest treatment was critical because it had designed the Minority Interest Transaction structure in consultation with the Rating Agencies in order to achieve "equity credit" for the $500 million of proceeds raised through the transaction.

## B.    JPMorgan Chase

Until its bankruptcy, Enron was one of JPMorgan Chase's most important clients. Enron consistently achieved highest-priority "Blue" client status under JPMorgan Chase's internal client classification system – a select status reserved for accounts that could "prospectively generate $5 million or more in deal revenues over an 18-month period."[143]    As early as 1995, JPMorgan Chase considered Enron to be a "bonanza in terms of deal flow." By 1999, Enron had become "the most significant corporate finance relationship of the Global Oil and Gas Group [of JPMorgan Chase], generating annual fees in excess of $15 million and total revenues of $17 million."[144] In 2000, the "relationship revenues" to JPMorgan Chase totaled $29.8 million.[145]

Just as Enron was one of JPMorgan Chase's most important clients, JPMorgan Chase was one of Em-on's most important banks, gaining a detailed understanding of Enron's finances as a result. JPMorgan Chase considered itself to be "Enron's major

---

[142] Memorandum to File, regarding Project Nighthawk, Enron Monetization and Accounting Treatment, Dec. 15, 1997, at CITI-B 00395282 [CITI-B  00395280-CITI-B 003952831.

[143] JPMorgan Chase Memorandum regarding "Blue" and "Green" Account Classifications, undated [JPMBKR-E  05155931.

[144] Memorandum from Josh Rogers, JPMorgan Chase, to Balance Sheet Committee, and copy to Robert Traband, JPMorgan Chase, Nov. 22, 1999 (date marked as "Approved") [SEC0033691 1-SEC00336914].

[145] Memorandum from Rick Walker, JPMorgan Chase, to Don Layton and Marc Shapiro, JPMorgan Chase, regarding Enron, Jan. 18, 2001, at 2  [JPMCBKR0017784-JPMCBKR0017789].

financing firm."[146] JPMorgan Chase consistently achieved and maintained Tier 1 status among Em-on's banks. [147] As Fastow expressed to a JPMorgan Chase officer in October 2001, when Enron's financial difficulties were beginning to be publicly known: "I think you know the credit and the businesses as well as (and better) than anyone in the world, so I'm counting on you to lead the way."[148]

Although JPMorgan Chase participated in many of Enron's transactions over the years, the most significant SPE transactions are a series of Prepay Transactions known as the Mahonia Transactions which took place from 1992 through 2001. Through the Mahonia Transactions, JPMorgan Chase provided Enron with an aggregate of $3.717 billion in financing.[149]  Approximately $1.5 billion of the $1.8 billion in claims that JPMorgan Chase has asserted against the Debtors relates to the Mahonia Transactions.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Em-on's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into

---

[146] Email from Richard S. Walker, JPMorgan Chase, to Joanna Gibb, JPMorgan Chase, Jan. 5, 1999 [JPMBKR-E 0016225-JPMBKR-E 00162261.

[147] See, e.g., Enron Debt Investor Relationship Review, Aug. 2001, at 20 [AB0252 01291-AB0252 013481; Enron Debt Investor Relationship Review, Jan. 2001, at 10 [AB0452 01721-AB0452 018131; Enron Mid-Year Debt Investor Relationship Review, July 2000, at 6 [AB0252 01443-AB0252 015381; Enron Relationship Review, Jan. 2000, at 14 [AB000538536-AB000538624]; Enron Relationship Review, 1999, at 7 [AB000538675-AB000538736]; Enron Relationship Review Mid-Year 1999, July 1999, at 5 [AB0252 01557-AB0252 01601].

[148] Email from Richard S. Walker, JPMorgan Chase, to Eric Fomell, JPMorgan Chase, Oct. 23, 2001 (forwarding a message from Andy Fastow, Enron, to Richard S. Walker, JPMorgan Chase) [JPMBKR-E 01645131.

[149] The proceeds of certain of the Mahonia Transactions were used to repay other Prepay Transactions that were maturing. The $3.7 billion total represents the gross amount of the Prepay Transactions facilitated by JPMorgan Chase.

certain SPE transactions with JPMorgan Chase that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix E (Role of JPMorgan Chase and its Affiliates), the Examiner discusses JPMorgan Chase's involvement in these SPE transactions. The Examiner concludes that there is evidence that: (i) JPMorgan Chase had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) JPMorgan Chase gave substantial assistance to certain of the Debtors' officers by participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-tinder to conclude that JPMorgan Chase aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that JPMorgan Chase's claims, totaling $1.8 billion, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix E (Role of JPMorgan Chase and its Affiliates), which the reader should review for a more complete understanding. The transactions considered by the Examiner in which JPMorgan Chase participated include the following:

*Mahonia Prepay Transactions.* JPMorgan Chase created the Mahonia Transaction structure and sold $3.717 billion of Prepay Transactions to Enron from December 1992 through September 2001. The evidence indicates JPMorgan Chase knew that:

- In economic substance, the Mahonia Transactions were loans to Enron;

- Enron would report its obligations under the Mahonia Transactions as price risk management liabilities rather than as debt, and would report the proceeds it received as cash provided by operating activities rather than as cash provided by financing activities;

- Enron's accounting treatment was not in accordance with the economic substance of the transaction;

- Enron would not provide disclosures in its financial statements or related securities law disclosures that would enable the reader of its financial statements to determine the economic substance of the Mahonia Transactions; and

- Enron's failure to provide adequate disclosure of the Mahonia Transactions was material and was critical to the maintenance of its credit rating.

There is also evidence from which a fact-finder could determine that JPMorgan Chase actively assisted Enron in making misleading representations to Andersen about the independence of Mahonia.[150]

Internal emails from JPMorgan Chase evidence a detailed understanding of Enron's accounting and disclosure objectives:

- "These transactions are balance-sheet advantaged and are used as a year-end management tool. Enron is thus enticed to pay a premium for these transactions."[151]

- "The transaction provides a mechanism for Em-on to replace long term debt with a trade payable."[152]

---

[150] See Appendix C (Role of Enron's Officers).

[151] Email from George Serice, JPMorgan Chase, to Susan F. Stevens, et *al.,* JPMorgan Chase, Oct. 29, 1997 [JPMBKR-E 00633991.

[152] Memorandum from Mitchell Taylor, JPMorgan Chase, to Steve Thorington, JPMorgan Chase, Dec. 22, 1992 [JPMBKR 0002200].

- "Em-on loves these deals as they are able to **hide funded debt from their equity analysts** because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities."[153]

- "[U]nlike Em-on, [redacted entity's] use of a prepay would be more identifiable and likely cannabize [sic] debt capacity on a $ for $ basis. I suggested that there is still a pickup with the agencies given the accounting treatment and my belief that the agencies haven't figured out prepays."[154]

- "I think what we're trying to gauge is how, how aggressive they are to pay for this stuff now, which is discreetly get, you know, several hundred million dollars and have no market knowledge of what's going on . . . ."[155]

## C.    Barclays

Barclays became one of Enron's Tier 1 banks around 1993, and maintained that position up to Enron's bankruptcy. During that time, Barclays was involved in a wide variety of Enron transactions in a wide range of capacities. Among others, Barclays participated in the following SPE transactions:

- The $SO_2$ Transaction,

- The Chewco Transaction.

- The J.T. Holdings Transaction.

- The Nikita FAS 140 Transaction.

- Three Prepay Transactions.

---

[153] Email from George Serice, JPMorgan Chase, to Karen Simon, and copy to Jeffrey Dellapina, JPMorgan Chase, Nov. 25, 1998 (emphasis in original) [JPMCBKR0017536-JPMCBKR0017551].

[154] Email from Rick Walker, JPMorgan Chase, to Jeffrey Dellapina, JPMorgan Chase, Oct. 18, 2001 [JPMBKR-E 02411851.

[155] Transcript of Taped Telephone Call among JPMorgan Chase personnel, Sept. 13, 2001, at 2-3 (transcript prepared by the PSI) [AB000523499-AB000523525].

While Barclays did not usually take the lead in structuring these SPE transactions, it often played vital roles in them, including, on at least two occasions, taking the equity risk required by the SPE structures. Before doing so, however, Barclays required and received from Em-on's officers' verbal assurances covering that equity risk. In other transactions, Barclays worked with Em-on to structure an SPE so that the requisite 3% equity was not actually at risk, and structured and closed a transaction despite being put on notice that Em-on's accounting for the transaction was incorrect.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into these SPE transactions with Barclays that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially   misleading.

In Appendix F (Role of Barclays and its Affiliates), the Examiner discusses Barclays' involvement in certain SPE transactions. The Examiner concludes that there is evidence that:  (i) Barclays had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) Barclays gave substantial assistance to certain of the Debtors' officers by participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct.  This evidence is sufficient for a fact-finder to conclude that Barclays aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that

Barclays's claims, totaling $371 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix F (Role of Barclays and its Affiliates), which the reader should review for a more complete understanding. The transactions considered by the Examiner in which Barclays participated include the following:

*SO₂ Transaction.*   This transaction, which closed on September 28, 2001 (for approximately $138.5 million) and was refinanced on October 30, 2001 (adding approximately $29.1 million), provided Enron with proceeds of approximately $167.6 million. The $SO_2$ Transaction ostensibly dealt with the sale by an Em-on subsidiary of $SO_2$ emission credits to a Barclays' sponsored SPE, Colonnade Limited, a Guernsey company ("Colonnade"). However, both Enron and Colonnade entered into derivative transactions with Barclays, and the resulting circular transaction became in economic effect (if not in appearance) a secured loan.[156]

Barclays helped to structure Colonnade, the SPE used in $SO_2$, to meet the requirements of what Barclays referred to as an Andersen "smell test,"[157] including manufacturing a trading history for Colonnade.   For example, an internal Barclays memorandum reveals:

---

[156] Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions).

[157] Email from Martin Woodhams, Director, Barclays, to Martin Woodhams, Director, Barclays, Apr. 25, 2001 (regarding Enron Structure, SPV's and USGAAP) [BRC 000096518].

Recent tightening of US GAAP regulations with regard to SVP's, [sic] has led to the need of incorporating an SVP [sic] that closely resembles an operating company. To this end, the SVP [sic] will before it transacts with Em-on, undertake a small number of short dated FX, mutual funding and murabaha transactions. This diverse transactional trading history is crucial to the success of achieving off-balance sheet treatment for our client.[158]

Barclays then closed the $SO_2$ Transaction, despite being told by its own outside accountants that Enron likely could not account for the transaction as Enron intended to. As PricewaterhouseCoopers LLP ("PWC") informed Barclays:

- I am still worried about whether this works for your client. It looks risky for them from an accounting perspective.[159]

- We had a meeting yesterday with PWC (Richard Oldfield) to discuss the accounting treatment for Project Noosa. , . . One issue raised at the meeting was that although [Barclays] would not need to consolidate the SPV, it is highly likely that client would need to consolidate the SPV under both UK and US GAAP. This is because the potential upside and downside of the SPV assets continue to remain with the client and hence they have a beneficial interest in the SPV.[160]

*J.T. Holdings and Nikita Transactions.*  Barclays requested and relied on verbal assurances from Enron covering the requisite 3% equity risk in at least two SPE transactions.

Barclays provided one-half of the requisite 3% equity in the J.T. Holdings Transaction, which was a synthetic lease transaction that closed in December 2000. However, in order to address its concerns about the residual value of the assets

---

[158] Memorandum from Martin Woodhams, Director, Barclays, to New Products Committee, regarding Commodities — Structuring Group Product Extension for Colonnade Limited, Sept. 6, 2001, at 2-3 [BRC 000082621-BRC 000082629].

[159] Email from Richard Oldfield, PWC, to Pritesh Pankhania, Barclays, Sept. 10, 2001 [BSX 01212-BSX 012151.

[160] Email from Pritesh Pankhania, Barclays, to Frank McGarahan, Barclays, July 13, 2001, at 1 (regarding FW: Project Noosa — Accounting Note) [BSX 01216-BSX 012171.

underlying the transaction, Barclays sought and received verbal assurances from Glisan,

Em-on's Treasurer, covering the equity risk in the structure:

> We have had a number of conversations with Enron about the [J.T.
> Holdings] transaction risks and have agreed to go forward on the basis of
> explicit verbal support from the company's Treasurer. Specifically, Ben
> Glisan will commit to us that under all circumstances Enron will execute
> its purchase option at a price sufficient to repay in full the holders of the B
> Notes and Certificates."

In a FAS 140 Transaction known as Nikita, Barclays intended to provide the 3%

equity to the SPE.[162]  However, shortly before closing, Barclays and/or Enron realized

that Barclays, for regulatory reasons, could not hold the certificate of beneficial interest.

As a result, another financial institution, CSFB, provided the SPE's equity funding,

subject to one critical condition.  CSFB required Barclays to enter into a Total Return

Swap, essentially guaranteeing to CSFB return of its equity investment in the SPE. Thus,

the certificate risk CSFB nominally assumed was swapped back to Barclays.[163] Barclays

was willing to assume the equity risk via the Total Return Swap only because it

demanded and received from Em-on officer Glisan verbal assurances covering that 3%

equity. Barclays' internal records reveal:

> Barclays ultimately conditioned sanction for the transaction on "written
> recording of senior Enron officers' (at least Treasurer and/or CFO)
> affirmation that Enron will ensure repayment of [the] certificate
> investment."[164]

---

[161] Richard Williams, Director, Barclays, Transaction Comment regarding $1 10MM Synthetic Lease of MTBE Assets, Nov. 14, 2000 [BRC 000046269].

[162] Email from Dave Mradula, Barclays, to Richard Pattinson, Barclays, *et* al., Sept. 27, 2001 [BRC 000036045].

[163] Appendix F (Role of Barclays and its Affiliates).

[164] Email from John Meyer, Director, Barclays, to John Sullivan, Director, Barclays, Richard Williams, Director, Barclays, Eric Chilton, Managing Director, Barclays, *et al.,* Sept. 26, 2001 [BRC 000035918].

Although unable to be the nominal holder of the equity certificate in Nikita, Barclays did provide debt funding to the SPE. Em-on entered into a Total Return Swap with the SPE, obligating itself to provide the SPE with sufficient funds to repay the principal and interest due on the Barclays loan.[165] Barclays understood that this Total Return Swap represented a direct payment obligation of Enron, but knew that this obligation could not be determined by reference to Em-on's financial statements.[166]

The Examiner has concluded that the verbal assurances from Em-on that Barclays demanded and relied on led directly to the failure of the 3% Equity Test in the J.T. Holdings and Nikita Transactions. Apart from the verbal assurance, the Total Return Swap in Nikita resulted in the misrepresentation of that transaction in Enron's financial statements.

Chewco Transaction. At the end of 1997, Enron formed Chewco to invest in JEDI, with the intention of keeping both structures off Enron's financial statements. JEDI's requisite equity was to come from Chewco. Chewco's requisite equity was to come from entities controlled by Em-on officer Kopper (and his friend Dodson). Nearly all of the money contributed by these entities to Chewco — approximately $11.4 million — came from Barclays under so-called "funding agreements." While Enron took the lead in structuring the Chewco Transaction, Barclays required that the repayment of its loans, which were used to fund the Chewco equity, be protected by reserve accounts in the

---

[165] See First Interim Report, Section III--The *Nikita Transaction;* Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions).

[166] Sworn Statement of John Meyer, Director, Barclays, to David Givelber, A&B, Apr. 22, 2003, at 166, *207-08.*

amount of $6.6 million.[167] Accordingly, the equity contribution to Chewco that was "at risk" totaled only a "net $5 million which would be significantly below the 3% required."[168] Revelation of the reserve account credit support played an important part in forcing Enron to restate its income, equity and debt to reflect that Chewco and JEDI should have been consolidated with Em-on from Chewco's inception.

Prepay Transactions. Barclays participated in three Enron Prepay Transactions in several different roles, including acting as a commodity swap counterparty for Enron (ECT) and Delta in a December 1998, $500 million, three year crude oil and natural gas prepay;[169] advancing $110 million in a December 1999, $324 million crude oil prepay;[170] and acting as a commodity swap counterparty for Em-on and CSFB in a September 2001, $150 million, one year crude oil prepay.[171]

Barclays understood that Em-on booked its obligations in the Prepay Transactions in price risk management liabilities and, at least since 2000, that it recorded the cash received as cash flow from operating activities. There is also evidence from which a fact-tinder could conclude that Barclays understood that Enron's disclosure of such transactions would result in misleading financial presentation.

In June 1999, the credit officer in charge of the Enron relationship explained the purpose of the prepays and Enron's accounting for them as follows:

---

[167] See Appendix F (Role of Barclays Bank and its Affiliates).

[168] Andersen Chewco Memorandum, at 2.

[169] See Appendix D (Role of Citigroup and its Affiliates).

[170] *Id.*

[171] See Appendix F (Role of Barclays and its Affiliates).

Prepaid Crude Oil and Natural Gas -- *Don 't for a second think that Enron is satisfying an operating need by selling these commodities forward.* Although notionally they are agreeing to deliver the commodities in satisfaction of an obligation established at the time the banks pay for the commodities, *in actual fact they are only borrowing money.* Their accountant will credit the Revenue account, debit cash, debit Revenue and credit Deferred Revenue. In other words he sees a sale but sets up a liability that is satisfied only as the commodities are delivered. *When calculating the amount of debt Enron has incurred, [Barclays' credit function] (and any analyst who wasn't born yesterday) will take any balance in the deferred revenue account and add it one-for-one to debt.* The only problem, and it's a practical one, is that Enron's Deferred Revenue (of late) has not been substantial enough to be disclosed separately. It has been lumped in with Other Liabilities for the last two or three years.

. . .

[The fact that the Prepay volumes are too large for physical delivery] should make it painfully obvious that the transaction's essence is not about deferred revenue but rather about *plain 01' debt*."[172]

## D.    **BT/Deutsche**

Over time, Enron's management came to rely on the tax department and, more specifically, its structured transactions group to fill the annual "stretch" to produce additions to net income that could not be accomplished by other business units through ordinary operations. [173]   BT/Deutsche played a major role in six of the eleven Tax Transactions that originated in Em-on's tax department during the period from 1995 to 2000.[174] BT/Deutsche designed, promoted and participated in the Teresa, Steele, Tomas and Cochise Transactions (the "BT/Deutsche Tax Transactions").   BT/Deutsche

---

[172] Email from John Meyer, Director, Barclays, to Jonathan Taylor, Barclays, and copies to Robert Clemmens, Chief Credit Officer, Barclays, Henry Pullman, Director, Barclays, Richard Williams, Director, Barclays, and George McKean, Barclays, et *al.*, June 24, 1999, at l-2 (emphases in original) [BRC 000106893-BRC 000106895].

[173] See Appendix C (Role of Enron's Officers).

[174] See Second Interim Report, Appendix J (Tax Transactions).

developed the basic tax and accounting structures of the BT/Deutsche Tax Transactions, promoted them to Enron, and participated in the transactions, often as the only party other than Em-on affiliates. BT/Deutsche received approximately $43 million in fees associated with the BT/Deutsche Tax Transactions from 1997 until the Petition Date.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty by causing the Debtors to enter into BT/Deutsche Tax Transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially   misleading.

In Appendix G (Role of BT/Deutsche and its Affiliates), the Examiner discusses BT/Deutsche's involvement in the BT/Deutsche Tax Transactions.[175] The Examiner concludes that there is evidence that:   (i) BT/Deutsche had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) BT/Deutsche gave substantial assistance to certain of the Debtors' officers by

---

[175] In addition to these issues, on November 29, 2001, BT/Deutsche purported to setoff its obligations to Enron under a $1.95 billion note and under the settlement of an interest rate swap against Enron's obligation to BT/Deutsche under a guaranty agreement. Both the note and the guaranty were entered into in connection with the Valhalla Transaction, one of the two Tax Accommodation Transactions in which Enron participated as an accommodation party to BT/Deutsche.   Although BT/Deutsche made a decision prior to the Petition Date to effectuate the setoff, the steps necessary to effect the setoff may not have been accomplished prior to the Petition Date.   In the event the purported setoff was not effected prior to the Petition Date, any later effecting of the setoff could be a violation of the automatic stay. The Court could decide not to permit the setoff, and if the doctrine of recoupment did not apply and BT/Deutsche's claims against the Debtors were equitably subordinated, Em-on could be entitled to collect the approximate amount of the Deutsche/Enron Note ($1.95 billion, plus accrued interest) from BT/Deutsche and BT/Deutsche would be left with a claim for the amount owed by Enron under the guaranty, which may itself be subject to subordination. These setoff issues are discussed at length in Appendix G (Role of BT/Deutsche and its Affiliates).

participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that BT/Deutsche aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that BT/Deutsche's claims, totaling more than $227 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix G (Role of BT/Deutsche and its Affiliates), which the reader should review for a more complete understanding.

The BT/Deutsche Tax Transactions were, for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Em-on. The Teresa Transaction, for example, was not intended to save Enron taxes on a present value basis.[176] Instead, the purpose of the Teresa Transaction was to create accounting income, taking advantage of the fact that the rules of FAS 109 ignore the time value of money.[177]

The lack of a bona fide business purpose is also evident in the Steele and Cochise Transactions, which each involved Enron's acquisition of REMIC Residual Interests and

---

[176] Tax Opinion from King & Spalding to R. Davis Maxey, Senior Director, Tax Research, Corporate Tax, Enron, July 29, 1997 (the "July 29 Teresa Tax Opinion"), at 40 ("Neither Enron nor any affiliate of Enron will take any action that results in a net tax benefit. . . .") [AB000151584-AB000151628]; Sworn Statement of Thomas Finley, former Managing Director, Deutsche Bank, to Philip C. Cook, A&B, Apr. 30, 2003, at 82.

[177] July 29 Teresa Tax Opinion, at 4 ("The predominant purpose of Enron and its Affiliates for participating in the Purchase was to generate income for financial accounting purposes."); Memorandum from Thomas Finley, Bankers Trust, et al., to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction - Enron Corp., Mar. 10, 1997, at 1 ("create significant amounts of future accounting income") [DBC 012906-DBC 0129091.

a limited amount of Facilitating Assets from BT/Deutsche.[178] Enron did not have a separate business purpose of investing in REMIC Residual Interests or low-yielding Facilitating Assets. Instead, even the tax opinions obtained by Enron in the Steele and Cochise Transactions, like the tax opinion in the Teresa Transaction, explicitly recognize the generation of financial accounting income as a "business purpose" for the transactions that was intended to support tax recognition of the form of the transaction.[179]

The Steele and Cochise Transactions, moreover, were designed to allow Enron to record the potential benefit of speculative future tax deductions as pre-tax income on its financial statements rather than as after-tax income resulting from reduced tax expense in the tax provision of Em-on's income statement.[180] The characterization of those items as pre-tax income was misleading because readers of Enron's financial statements were unaware that those amounts arose from a tax-related transaction.

---

[178] See Second Interim Report, Appendix J (Tax Transactions), *Enron's* **REMIC Carryover Basis Transactions;** see also Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions).

[179] Tax Opinion from Akin Gump to R. Davis Maxey, Enron, Dec. 16, 1997, at 7 ("The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's financial accounting group . . . ") [AB000151677-AB000151714]; Tax Opinion from McKee Nelson Ernst & Young LLP to R. Davis Maxey, Enron, Mar. 21, 2001, at 12 (purposes for participating in the Cochise Transaction included "to increase the pre-tax financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions.") [AB000151794-AB000151878].

[180] Letter from Bill Boyle, Vice President, Bankers Trust, to William McKee, King & Spalding, June 2, 1997, at AB000187758-AB000187759 ("[T]he accounting benefits of the transaction are derived from treating the transaction as a 'bargain purchase' of assets for accounting purposes, even though there is no bargain purchase from an economic perspective . . . the transaction is a deal driven by the accounting benefits.") [AB000187758-AB000187776].

In addition, a portion of Enron's pre-tax gain from the Cochise Transaction was triggered in the second quarter of 2000 by a "sale" of the Cochise Planes.[181] The purported sale, however, was not a bona fide sale to a third party but "an internal (Enron and BT) distribution"[182] to BT/Deutsche, who transferred the Cochise Planes to another Enron SPE structure within thirty days. By acting as a conduit for the sale of the Cochise Planes, BT/Deutsche enabled Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter.

## E.    CIBC

Although it engaged in a variety of transactions with Enron, ranging from traditional commercial loans to swap transactions to securities offerings, CIBC distinguished itself among Enron's financial institutions, and likely earned Tier 1 status, through its role in Enron's FAS 140 Transactions. During the period from June 1998 until October 2001, CIBC engaged in at least eleven of these deals, earning over $14 million in fees. In all of these deals that involved 3% equity, CIBC served as the equity holder in the SPE.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-tinder to determine that certain of

---

[181] The "Cochise Planes" are the beneficial interests in two commercial aircraft that were leased to Continental Airlines, Inc. and United Air Lines, Inc., transferred from a BT/Deutsche affiliate to the Cochise structure in January 1999, transferred from the Cochise structure to a BT/Deutsche affiliate in June 2000, and transferred from that BT/Deutsche affiliate to the Tomas structure in July 2000. See Second Interim Report, Appendix J (Tax Transactions), at 33-34, 84-85; Second Interim Report, Annex 2 to Appendix J (Tax Transactions), at 11-l 2.

[182] Email from Sarah Kight, Akin Gump, to Trey Cash, Corporate Tax, Enron, May 11, 2000 (regarding Cochise Asset Sale) [AGS36053]; Email from Sarah Kight, Akin Gump, to Trey Cash, Corporate Tax, Enron, May 23, 2000 (recommending that Enron obtain consent to the "double transfer" at one time) [AGS36058-AGS36059].

Em-on's officers breached their fiduciary duty by causing the Debtors to enter into certain SPE transactions with CIBC that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix H (Role of CIBC and its Affiliates), the Examiner discusses CIBC's involvement in these SPE transactions. The Examiner concludes that there is evidence that: (i) CIBC had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) CIBC gave substantial assistance to certain of the Debtors' officers by participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that CIBC aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that CIBC's claims, totaling $205 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix H (Role of CIBC and its Affiliates), which the reader should review for a more complete understanding. Transactions considered by the Examiner in which CIBC participated include the following:

*F'S 140 Transactions.* CIBC knew that some of Enron's net income after tax was "financial engineering sourced."[183] There is evidence that CIBC knew the accounting results Enron sought to achieve in the FAS 140 Transactions; namely, that

---

[183] CIBC Credit Committee Agenda, Dec. 4, 1998 (the "CIBC Credit Committee Agenda, Dec. 4, 1998"), at 2 [CIBC S 00199-CIBC S 002051.

Enron was seeking to meet the requirements for sale treatment under FAS 140 and that it was seeking to avoid consolidating the borrower-SPEs so that it could recognize gain from the transaction, reflect the proceeds as cash flow from operating activities and remove the debt from its balance sheet. The FAS 140 Transactions that Enron and CIBC closed between 1998 and 2001 accounted for over $1.7 billion of operating cash flow, hid over $1 billion of debt from Enron's balance sheet and generated $585 million of income based upon "gain on sale" of the assets purportedly transferred.

As early as May 1998, it appears that CIBC understood Enron's reliance on SPE structures to generate earnings. In a May 1998 Credit Application, a CIBC official stated:

> Monetizations that [Enron] has undertaken in recent years, Cash I, II, III, etc., will have no impact on future years' earnings or cash flows. The concept [Enron] employs is that the profit stream of a particular contract is recognized in current period earnings, regardless of tenor. By monetizing their expected future cash flow under a contract they are matching up the recognition of income with cash. Consequently, there is no future income or cash impact of the monetizations, other than the fact that [Enron] must generate new transactions every year for earnings purposes (i.e., there is 'nothing in the cupboard').' [84]

The minutes of a 1998 credit committee meeting at CIBC regarding Pilgrim (one of the FAS 140 Transactions), provide:

> [w]e understand that approximately 15% of [Enron's] current year's [net income after tax] is attributable to similar investment monetization transactions, and we supported [Pilgrim] on the understanding that we would validate our understanding with the Company to ensure that the current and next year's profitability is primarily operations driven as distinct from financial engineering sourced. [185]

---

[184] Credit Application, submitted by Paul A. Jordan, Executive Director, Credit Management, CIBC, *et* al., to Vice President – Risk Management Operations Office, May 12, 1998, at CIBC 1044266 [CIBC 1044249-CIBC 10442681.

[185] CIBC Credit Committee Agenda, Dec. 4, 1998, at 2.

Another CIBC internal memo discussing approval of Pilgrim indicated that approval was subject to the conditions:

> (i) that we will ask the Company how much of fiscal 1998 earnings are being generated by transactions such as Riverside and Pilgrim, and they will confirm to us that the majority of the Company's fiscal 1998 profit is "real" profit i.e. generated by the ongoing Enron businesses, and that earnings are not entirely reliant on [FAS 140] transactions such as Pilgrim and the Riverside deals; and (ii) that we will be comfortable with the analysis around the gain which is being realized on both projects involved in the Pilgrim transaction.[186]

CIBC asserts that its equity was at risk as required by the 3% Equity Test,[187] but the evidence suggests a contrary conclusion.    For example, a June 1999 Credit Application expresses this risk, but then describes the assurances from Enron as to its repayment:

> Like in the Project Leftover transaction . . . this represents true equity risk. Note, however, executive management at Em-on has represented that this money (as with the Project Leftover equity money) will absolutely be repaid."'

---

[186] Memorandum from R.M. Abra, General Manager, CIBC, to Executive Director, Credit Management – Houston, regarding Enron credit application, Dec. 4, 1998 [CIBC 10438601.

[187] See Appendix H (Role of CIBC and its Affiliates), *Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination.*

[188] Credit Application, submitted by Mark H. Wolf, Executive Director, Credit Management, CIBC, to Vice President – Risk Management Operations Office, June 14, 1999, at CIBC 1045206 [CIBC 1045193- CIBC 10452081.

A similar statement was included in the Credit Applications for Alchemy'*'' and Discovery, [190] each of which was a FAS 140 Transaction in which CIBC held the outside equity.

Likewise, the June 1999 agenda from the meeting at which Nimitz was approved includes the following statement:

> [i]n order to comply with accounting opinions, 3% of [Leftover] had to be structured without the guarantee of Enron Corp. and is formally supported only by the project interest itself though we have also been provided with the minuted verbal assurances of Enron's senior staff that the Company will ensure that this section is fully retired . . , at its . . . maturity.[191]

In an October 23, 2000 email written in connection with the November 2000 restructuring of Hawaii, Ian Schottlaender wrote:

> I met with Andy Fastow . . . to discuss . . . his assurance of support for our structured equity commitments. He is very aware of our commitments, acknowledges their importance to Enron and fully accepts our expectation of full repayment. While he cannot, for obvious reasons, guarantee repayment – he fully anticipates our repayment as scheduled.[192]

Similarly, in a statement in a Credit Application regarding amendments to Hawaii, a CIBC employee stated:

> Enron is Not permitted to ASSURE a repurchase of our equity (though this is our undocumented 'understanding' with the CFO).[193]

---

[189] Credit Application, submitted by Mark H. Wolf, Executive Director, Credit Capital Markets, CIBC, et al., to Vice President – Risk Management Operations Office, Dec. 7, 1999, at CIBC 1045068 [CIBC 1045057-CIBC 10450741.

[190] Credit Application, submitted by Mark H. Wolf, Executive Director, Credit Capital Markets, CIBC, to Vice President – Risk Management Operations Office, Dec. 15, 1999, at CIBC 1048541 [CIBC 1048529-CIBC 10485491.

[191] CIBC Credit Committee Agenda, June 15, 1999, at 3 [CIBC S 00228-CIBC S 002341.

[192] Email from Ian Schottlaender, CIBC, to Lorne Robbins, CIBC, et al., Oct. 23, 2000 [CIBC 14698931.

[193] Credit Application, submitted by Mark Wolf, Executive Director, Leveraged Finance Group, CIBC, et al., to Vice President – Risk Management Operations Office, May 2 1, 2001, at CIBC 1044979 (emphasis in original) [CIBC 1044967-CIBC 10449801.

Finally, in an email responding to questions from another CIBC employee about the Hawaii structure, Mercedes Arango wrote:

> Unfortunately there can be no <u>documented</u> means of guaranteeing the equity or any shortfall or the sale accounting treatment is affected. We have a general understanding with Enron that any equity loss is a very bad thing. They have been told that if we sustain any equity losses, we will no longer do these types of transaction with them. . . . We have done many "trust me" equity transactions with Enron over the last 3 years and have sustained no losses to date. If there has been a case where the value of the asset has been in question, Em-on has repurchased the asset at par plus our accrued yield. [194]

## F.    Merrill Lynch

Merrill Lynch entered into approximately thirty-five transactions with Em-on, including under-writings, structured finance, derivative and lending transactions, although many of these transactions were not SPE related.[195] Perhaps no period of time in the Em-on/Merrill Lynch relationship was more critical, however, than the last days of December 1999. During that period, Merrill Lynch entered into two transactions with Enron that Em-on used to substantially inflate and misstate its reported financial performance for the year, allowing Enron to meet its 1999 earnings targets.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into transactions with Merrill Lynch that were designed to manipulate the Debtors' financial

---

[194] Email from Mercedes Arango, CIBC, to Gerry Beauclair, CIBC, *et* al., June 21, 2001, at AB000470387 (emphasis in original) [AB000470387-AB000470389].

[195] See Appendix I (Role of Merrill Lynch and its Affiliates).

statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix I (Role of Merrill Lynch and its Affiliates), the Examiner discusses Merrill Lynch's involvement in the Nigerian Barge and 1999 Electricity Trade Transactions. The Examiner concludes that there is evidence that: (i) Merrill Lynch had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) Merrill Lynch gave substantial assistance to certain of the Debtors' officers by participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that Merrill Lynch aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that Merrill Lynch's claims, totaling $53 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix I (Role of Merrill Lynch and its Affiliates), which the reader should review for a more complete understanding. The transactions considered by the Examiner in which Merrill Lynch participated include the following:

*The Nigerian Barge Transaction.* In this transaction, which closed on December 29, 1999, Merrill Lynch purported to purchase a portion of Em-on's interest in future cash flows to be generated from three power-producing barges anchored off the coast of Nigeria. Although Enron structured the transaction to look like a sale, in reality the transaction was a short-term loan from Merrill Lynch to Enron. The risks of ownership of the barges never passed to Merrill Lynch: Fastow committed in an undisclosed, side

deal to take Merrill Lynch out of the transaction within six months at an agreed rate of return. In accordance with this verbal agreement, Em-on arranged for LJM2 to take Merrill Lynch out of the transaction six months later. Enron reported, as Merrill Lynch knew it would, $12 million in earnings from this transaction at the end of 1999.[196]

*1999 Electricity Trades.* At the same time as the Nigerian Barge Transaction, Merrill Lynch entered into two electricity derivative transactions with Enron. These transactions were back-to-back call options in which the material terms of the transactions were mirror images. Thus, the transactions were structured to be virtually off-setting. Em-on used the 1999 Electricity Trade Transactions solely to achieve financial statement results, much like the Nigerian Barge Transaction.[197] Despite concerns over Enron's intended accounting for these transactions, Merrill Lynch entered into these transactions knowing that Em-on intended to book $50-60 million in earnings from these virtually off-setting transactions and that those earnings would assist Enron in achieving its earnings targets for 1999.[198] Enron terminated the 1999 Electricity Trade Transactions just six months later, before the first call options could be exercised.

Merrill Lynch was aware of the importance of its deals to Em-on. An internal Merrill Lynch email regarding the 1999 Electricity Trade Transactions states:

> We were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation).[199]

---

[196] *Id.*

[197] This intent is underscored by the fact that Enron terminated the electricity trade transactions shortly after year-end and before the first trades under the transactions were scheduled to begin.

[198] See Appendix I (Role of Merrill Lynch and its Affiliates).

[199] Email from Schuyler Tilney, Merrill Lynch, to Dan Gordon, Merrill Lynch, and copy to Rick Gordon, Merrill Lynch, May 30, 2000, at MLBE 0370956 [MLBE 0370956-MLBE 03709571.

Merrill Lynch was also aware that its participation in the Nigerian Barge Transaction posed a "reputational risk, i.e. aid/abet Enron income stmt. manipulation"[200] because of Em-on's intended accounting for the transactions. In testimony provided to the Examiner, James Brown ("Brown"), the Merrill Lynch executive that raised this concern at the Merrill Lynch committee meeting convened to consider the Nigerian Barge Transaction, recalled the following discussion on this point:

> Well, I raised the matter, you know, if Em-on ever in the future fell apart from a credit -just like a credit meltdown or something, and we had been involved in this transaction, in light of the fact that I had these accounting concerns about the transaction, would that somehow create reputational risk for us? Would we have our name in the press?[201]

Brown's concerns with the propriety of Enron's accounting for the transaction stemmed from the side agreement that Enron had made to take Merrill Lynch out of the transaction within six months at an agreed rate of return. Such an agreement, if disclosed to Enron's auditors, would have precluded Enron from accounting for the transaction as a sale.

A Merrill Lynch Credit Flash Report for the week ending December 23, 1999, regarding the Nigerian Barge Transaction references this agreement: "[m]ost unusual transaction of the week was IBK [investment banking] request to approve Em-on

---

[200] See Facsimile from Robert Furst, Merrill Lynch, to Jim Brown, Merrill Lynch, Dec. 2 1, 1999, at MLBE 0111739 (containing a description of the proposed Nigerian Barge transaction) [MLBE 0111739-MLBE 01117631.

[201] Sworn Statement of James A. Brown, Merrill Lynch, to Robb E. Hellwig, A&B, Apr. 28, 2003, at 77-78.

Corporation 'relationship' loan – ML asked to invest $7mm equity in Nigerian power project."[202] The document goes on to describe the Nigerian Barge transaction, stating:

> The transaction will allow Em-on to move assets off-balance sheet and book future cash flows currently as 1999 earnings (approximately $12mm) . . . IBK was supportive based on Enron relationship (approx. $40mm in annual revenues) and assurances from Enron management that we will be taken out of our $7mm investment within next 3-6 months.[203]

Furthermore, an email Brown authored following the Nigerian Barge Transaction described the transaction and verbal assurances received from Fastow as follows:

> We had a similar precedent with Enron last year, and we had Fastow get on the phone with Bayly and the lawyers and promise to pay us back no matter what. Deal was approved and all went well.[204]

---

[202] Email from Vincent J. DiMassimo, Merrill Lynch, to Kevin Cox, Merrill Lynch, Jan. 22, 2002, at MLBE 0016558 (email attachment ▪ Americas Credit Flash Report: Week ending 12/23/99) [MLBE 0016557-MLBE 00165591.

[203] *Id.*

[204] Email from James Brown, Merrill Lynch, to Robert Lyons, Merrill Lynch, Mar. 2, 2001 [MLBE 02429361.

## VI.    AVOIDANCE  ACTIONS

### A.    Overview  of  Avoidance  Actions

The "avoidance actions" covered by this Report are potential claims of the Debtors' estates to avoid certain transfers of money or property as preferences or constructively fraudulent conveyances. These potentially avoidable transfers, set forth in Appendix J (Avoidance Actions), either arose in connection with Em-on's SPE transactions, were made to certain insiders or were paid to certain of the Debtors' professionals.

The law applicable to these avoidance actions, as well as affirmative defenses to those actions, is set forth in Annex 4 (Legal Standards Applicable to Avoidance Actions) to Appendix J. In analyzing such claims, where insolvency is an element of the claim, the Examiner has assumed the insolvency of Enron and its affiliated Debtors under 11 U.S.C. § 101(32) at the time of any subject transfer.[205]

### B.    Preference  Actions  in  SPE  Transactions

As of the filing of the Second Interim Report, the Examiner had not yet completed his preference analysis of(i) the Prepay Transactions and (ii) the FAS 140 Transactions. Annex 1 to Appendix J to this Report contains the Examiner's preference analysis with respect to those transactions.  As set forth therein, the Examiner has identified $368.43 million in voidable preferences resulting from the Prepay Transactions and the FAS 140 Transactions. This amount takes into account defenses that the defendants to such

---

[205] The Examiner has received assurances from the professionals for the Debtors and the Creditors' Committee to the effect that the Debtors, in coordination with the Creditors' Committee, will undertake to complete a solvency analysis with respect to the Debtors.

actions may raise, although certain of the preference claims discussed in Annex 1 to Appendix J will be more difficult to sustain than others.

Moreover, to the extent the recipients of transfers avoidable as preferences have filed claims against the Debtors (and, as set forth in Appendix J, those claims exceed $4.766 billion), the Debtors' estates may be able to utilize Section 502(d) of the Bankruptcy Code to disallow those claims. The result of such disallowance would be to limit or preclude recovery by investors in many of Enron's SPEs.

C.    **Selected Professional Avoidance Actions**

The Examiner has completed his investigation of potential preference claims against certain professionals of the Debtors.   The Second Interim Report identified certain of those claims.[206]   With respect to professionals that are currently providing services to the Debtors' estates as special counsel, the Examiner has identified an additional $6.1 million in preference claims after taking into account their affirmative defenses. With respect to professionals that are not providing services to the Debtors' estates (or that are providing only "ordinary course" services), the Examiner has identified approximately $63.7 million in transfers which are potentially avoidable as preferences. However, as more fully described in the Second Interim Report, based on subsequent orders of this Court and after consultation with the Debtors and the United States Trustee, the Examiner has not analyzed the affirmative defenses that may exist with respect to these potential preference claims.

---

[206] One of the parties subject to examination in the Second Interim Report, Milbank, has returned $215,716 to the Debtors, which was the amount of the preference claim identified by the Examiner against that entity, net of any defenses.

D.    **Selected Insider Avoidance Actions**

The Second Interim Report described the following avoidance actions with respect to insiders: (i) a claim to recover approximately $81.5 million arising out of a series of loans made by Enron to Lay, which Lay repaid with Enron stock at a time when Enron was presumed insolvent; and (ii) preference claims totaling approximately $53 million against certain employees of Em-on arising out of accelerated payments under two deferred compensation plans.[207]    Annex 2 to Appendix J to this Report describes two additional potential avoidance actions against certain insiders of the Debtors.

---

[207] The Creditors' Committee has filed suit on account of the Lay transfers. See *Official Comm. of Unsecured Creditors of Enron Corp.* v. *Lay,* filed Jan. 31, 2003, Adv. Pro. No. 03-02075-AJG (Bankr. S.D.N.Y. filed Jan. 3 1, 2003) (asserting $84 million in fraudulent transfer claims against Lay and his wife, Linda Lay). In addition, on May 16, 2003, the Official Employment-Related Issues Committee filed a motion to assert preference claims on behalf of the accelerated deferred compensation payments.    See Motion of the Official Employment-Related Issues Committee for an Order, Pursuant to Sections 105(a), 1103(c) and 1109(b) of the Bankruptcy Code, Expanding Scope and Mandate and Granting Standing and Authority to Commence Certain Avoidance Actions on Behalf of Debtors' Estates, May 16, 2003, Docket No. 10759.

## VII.    INTERIM NATURE OF REPORT

This Report is an interim report. The Examiner's conclusions with respect to the matters in this Report (and in Appendices hereto) are preliminary.

## VIII.   FINAL  REPORT

In the next report, which the Examiner believes will be his final report, the Examiner intends to report on other matters identified in the April 8th Order, including: (i) the role of other financial institutions in connection with the SPE transactions and whether there are potential affirmative claims of the Debtors' estates against such financial institutions or grounds for equitable subordination of their claims; (ii) the role of Lay, Skilling and Enron's Board of Directors in connection with the SPE transactions and potential liability resulting therefrom; and (iii) the role of certain professionals in connection with the SPE transactions and any potential liability resulting therefrom.

Dated:  June 30, 2003

Respectfully   submitted,

/s/ Neal Batson
Neal Batson
Examiner

ALSTON & BIRD LLP
One  Atlantic  Center
1201 West Peachtree Street
Atlanta, Georgia  30309
404881-7000