# TESTIMONY OF ROBERT ROACH
## CHIEF INVESTIGATOR
### PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
### THE ROLE OF THE FINANCIAL INSTITUTIONS IN ENRON'S COLLAPSE

July 23, 2002

Mr. Chairman, Ranking Member, Members of the Subcommittee, good morning.

Earlier this year Chairman Levin directed the Subcommittee staff to investigate the role of financial institutions in Enron's collapse. The Subcommittee staff – both Democratic and Republican – have worked for the past 7 months on a bipartisan basis to conduct this investigation. We have worked together to review over a million pages of documents and interview dozens of witnesses from Enron, Andersen, other accounting firms, credit rating agencies, and a host of financial institutions including Barclays, Citigroup, Credit Suisse First Boston, FleetBoston, JPMorgan Chase, and Merrill Lynch.

Numerous major financial institutions, both here and abroad, engaged in extensive and complex financial transactions with Enron. The evidence we reviewed showed that, in some cases, the financial institutions were aware that Enron was using questionable accounting. Some financial institutions not only knew, they actively aided Enron in return for fees and favorable consideration in other business dealings. The evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities. The evidence also indicates that some of these financial institutions knowingly allowed investors to rely on Enron financial statements that they knew or should have known were misleading.

Our investigation, among other things, focused on one financing vehicle known as a "prepay." A prepay is commonly thought of as an arrangement in which one party pays in advance for a service or product to be delivered at a later date. Companies use prepays to receive money up front for services to be rendered in the future.

Enron constructed elaborate, multiparty commodity trades that they called prepays in order to book the proceeds from the prepays as cash flow from operations. But when all the bells and whistles are stripped away, the basic transaction fails as a prepay and what remains is a loan to Enron using a bank and an obligation on Enron's part to repay the principal plus interest. With that being true, the proceeds of the so-called prepay transaction should have been booked as debt and cash flow from financing, not as a trading liability and cash flow from operations.

In order for transactions like the ones used by Enron and the banks to be legitimately booked as a trading liability and not debt, four elements had to be present:

– The three parties had to be independent.
– The trades among the three parties could not be linked.
– The trades had to contain price risk.
– There had to be a legitimate business reason for the trades.

The Enron type prepays we examined failed on all accounts:

– Two of the three parties in the Enron trades were related, that is the banks and their offshore special purpose entities which the banks established and controlled.
– The trades among the parties were linked, that is contracts associated with the trades were designed so that a default in one trade affected the other trades.
– There was no price risk. Except for fees and interest payments, the final impact of the trades was a wash.
– Neither the banks nor the banks' special purpose entities had a legitimate business reason for purchasing the commodities used in the trades.

2

Let me describe the structure and operation of these sham prepays. [Appendix C and Appendix D that discuss the details of the prepays have been submitted for the record.]

Enron used these so-called "prepay" transactions to obtain more than $8 billion in financing over approximately 6 years, including $3.7 billion from 12 transactions with Chase and $4.8 billion from 14 transactions with Citgroup. This $8 billion figure is a conservative estimate for the 6 year period, based on the documents we were able to review; the full amount since Enron began using prepays in 1992 may be much larger. Barclays, Credit Suisse First Boston, FleetBoston, Royal Bank of Scotland, and Toronto Dominion participated in over $1 billion of the prepay transactions.

Accounting for "prepay" proceeds as cash flow from operations, rather than cash from financing gave the impression that the money from the prepays was part of Enron's ordinary business activities and not debt. Moreover, the Subcommittee has learned that Enron was simultaneously treating the prepay transactions as loans on its tax returns in order to claim the interest expense as a business deduction.

Enron's practice of using prepay transactions to understate debt and overstate cash flow from operations made its financial statement look much stronger. That, in turn, helped Enron maintain its investment grade credit rating and support, even boost, its share price.

The Subcommittee has done an analysis of what Enron's financial statements would have looked like had it accurately recorded the "prepay" transactions as debt. Please look at this chart, which is marked as Exhibit 104. The chart shows key figures from Enron's year 2000 financial statements, the last audited financial statements that the company filed with the Securities and Exchange Commission. The financial statements showed that Enron had total debt in 2000 of about $10 billion, and funds flow from operations in the range of $3.2 billion. We know from an Enron Board presentation that, at the end of 2000, Enron had about $4 billion in outstanding financing from its so-called "prepays." If Enron had properly accounted for these transactions, its total debt would have increased by about 40% to about $14 billion, and its funds flow from operations would have dropped by almost 50% to about $1.7 billion. Those are dramatic changes.

The impact on Enron's key credit ratios would also have been significant. These credit ratios are the ratios that financial analysts typically use to evaluate a company's financial health. With the inclusion of the prepays as debt, Enron's debt to equity ratio would have risen from about 69% to about 96%. Its debt to total capital ratio would have risen from 40% to 49%. And its funds flow interest coverage, a key measure of a company's ability to meet its financing obligations, would have dropped by almost half, from 4.07 to 2.37. The credit rating agencies testifying in the next panel will discuss the significant effect these numbers would have had on Enron's credit rating.

Any credit rating downgrade would have had serious consequences for Enron, including raising its borrowing costs, limiting the investors who could buy the company's bonds, weakening its trading status, and possibly triggering certain demand debt repayments at off balance sheet entities affiliated with the company. Enron was acutely aware of the importance of its credit rating and its financial ratios.

The Subcommittee staff has additional analysis regarding the financial impact that would have resulted if Enron had accurately reflected its "prepay" proceeds as debt, including drops in the company's enterprise value and a significant drop in its implied share price. In the interests of time, however, I will submit that analysis for the record and answer any questions you may have about it. I also ask that the other appendices to my statement be included in the Subcommittee's hearing record.

Enron was able to book "prepay" proceeds as cash flow from energy trades rather than cash flow from loans only with the assistance of the financial institutions. The banks provided the funding for the prepays, participated in the required complex commodity trades, and allowed Enron to use their offshore entities that they controlled as sham trading partners, for the explicit purpose of allowing Enron to disguise multi-million-dollar loans as trading activity.

Internal communications show that it was common knowledge among Enron, Chase and Citigroup employees that the "prepays" were designed to achieve accounting, not business, objectives and that Enron was booking the "prepay" proceeds as trading activity rather than debt. The evidence indicates that Chase and Citigroup not only understood Enron's accounting goal - increasing operating cash flow without reporting debt - but designed and implemented the financial structures to help Enron achieve its objective. Moreover, they accepted and followed Enron's desire to keep the nature of these transactions confidential.

By design and intent, the prepays as structured by Enron and the financial institutions made it impossible for investors, analysts and other financial institutions to uncover the true level of Enron's indebtedness.

Despite its desire to keep the information confidential, Enron dealt with so many financial institutions that word of its "prepay" structures began to circulate. Chase developed a "pitch book" to sell other companies on Enron-style prepays. The presentation describes the transactions as "Balance sheet 'friendly'. " It also sets out in general terms Chase's use of its special purpose entity, Mahonia, in structuring the trades and clearly explains that the trades are orchestrated to work together. This explanation of the deliberate packaging of the trades flatly contradicts claims that the trades are independent and unrelated. Chase apparently entered into Enron-style prepays with seven companies apart from Enron.

Citigroup also developed a presentation to sell companies on Enron-style prepays, promoting, in particular, the Yosemite structure it had developed to raise the money for the prepays from third party investors without explicitly informing them of the transactions. The presentation boasts that the structure "[e]xpands capability to raise non-debt financing and ... improve cash flows from operations" and "[e]liminates the need for Capital Market disclosure, keeping structure mechanics private." Citigroup shopped this Enron-style prepay to 14 companies, successfully selling it to at least three.

Enron is not the only company obtaining loans disguised as commodity trades, and recording cash flows from operations instead of from financing. Major financial institutions are knowingly assisting and even promoting such transactions, which would not be possible without their willingness to provide the funds, the paperwork, and a sham offshore trading partner.

Thank you. Mr. Brown and I would be happy to answer any questions.

h h h

# A P P E N D I X   A

## ACCOUNTING TREATMENT OF PREPAYS;
## EFFECT OF ENRON'S FINANCIAL STATEMENT

### I.  Prepays -- A General Description

A prepay, in its most simple form, is paying in advance for a service or product to be delivered at a later date. Companies use prepays to receive money up-front for services to be rendered in the future.  Enron used a complex form of prepays as a source of financing that, in the end, misled investors as to the financial health of the company.

To understand Enron's use of prepays, it is important to have knowledge of basic accounting and financial reporting.  Publicly traded companies such as Enron are required to file audited financial reports with the Securities Exchange Commission ("SEC") on an annual basis.  These filings consist of three key financial statements, which combined with the accompanying disclosures, should provide a realistic view of a company's financial health.  They are the income statement, the balance sheet, and the cash flow statement.

The **income statement**, or statement of earnings, provides details on a company's profitability.  It includes both the company's revenues and the costs incurred to generate those revenues.  Other costs, such as interest and taxes are also included, arriving at a company's net income number.  This net income number, divided by the number of a company's shares outstanding, represents the critical earnings-per-share or "EPS" number, used by equity analysts and investors to determine a company's share price.

The **balance sheet** serves as a snapshot of a company's financial condition at a point in time.  Among the critical information it conveys is detail on the amount of debt (money owed by the company) and equity that comprise the company's total value.  Companies with high levels of debt relative to their equity are generally considered risky companies.  They typically are charged higher rates of interest and are sometimes considered less attractive business partners than companies with lower debt levels.  In the case of Enron, the company was under constant pressure to lower the amount of debt on its balance sheet.

The **cash flow statement** represents a company's sources and uses of cash over the quarter or fiscal year. Sources and uses of cash are divided among 1) operating activities; 2) financing activities; and 3) investing activities. These three sections are critical to understanding how a company finances its operations and, in particular, if a company's operations are sufficient to cover its costs and plans for investment.  If a company is not able to meet its cash needs through operating activities, it will probably need to borrow money.[1]  Cash from borrowing will appear on a company's cash flow statement as cash flow from financing activities and will also be reflected in higher debt levels on a company's balance sheet.

Companies registered with the Securities and Exchange Commission are required to file their financial statements in conformance with Generally Accepted Accounting Principles ("GAAP").  GAAP provides the conceptual framework for financial reporting.  The primary purpose of financial reporting is to provide financial statement users, such as investors and creditors, with relevant and reliable financial information on which to base decisions. GAAP is also intended to enhance the consistency, comparability, and transparency of financial statements.  Financial statements prepared under GAAP should, when taken as a whole, present fairly the financial condition, results of operations and cash flows of the company.

In the United States, the SEC has responsibility for the establishment of GAAP.  The SEC administers GAAP through Regulation S-X, Financial Reporting Releases and Staff Accounting Bulletins.  However, the SEC has looked primarily to the private sector standard setter, the Financial Accounting Standards Board ("FASB") to provide authoritative guidance for GAAP through its Statements and Interpretations, Technical Bulletins and Implementation

---

[1]A company may choose to issue additional equity to meet its cash needs.  This has the effect of increasing the company's equity but will also dilute the earnings of the company's current shareholders.

Guides, as well as through consensus published by its Emerging Issues Task Force. The accounting industry, represented by the American Institute of Certified Public Accountants ("AICPA") contributes to GAAP by issuing Accounting Research Bulletins, Statements of Position, Audit and Accounting Guides, ACSEC Practice Bulletins and Accounting Interpretations.

## II. Motivation behind Enron's Prepay Transactions

Enron had two major reasons to reduce its balance sheet debt and increase cash flow from operations: 1) to improve Enron's credit rating and 2) to support and even boost Enron's share price.

### Improve Enron's Credit Rating

Until the recent wave of accounting scandals, cash flow was seen as the most reliable measure of a company's operating performance, because it was believed that the cash flow from operations number could not be manipulated as easily as earnings and was the best representation of the company's ability to meet its obligations. As a result, financial analysts placed heavy emphasis on cash flow numbers in determining a company's credit rating. These ratings, in turn, determined a company's cost of borrowing, attractiveness as a trading partner, and ultimately had an impact on its share price.

Enron, therefore, placed a heavy emphasis on generating operating cash flow, and business units at Enron were given cash flow targets by Enron management that they were expected to meet. In order to generate cash flow, Enron had the following options:

a) It could sell its hard assets, such as power plants and pipelines.
b) It could sell the value (and risks) of specific trades in its trading book to someone else and collect cash proceeds from the sale. (Early in its corporate history, Enron actually did sell off a number of its trades in order to generate cash flow.)
c) It could go to a bank and borrow money, using the trades and their promise of delivering cash a few years down the road as collateral.

Enron used all three options, but it is Enron's use of the third option that is the subject of my testimony today. When using the third option, if Enron borrowed money against the value of its trades, it would have to record the amount borrowed as debt on its balance sheet and proceeds from the loan as cash flow from financing. Already under pressure from rating agencies to reduce its debt load, Enron was unwilling or unable to do this and instead turned to an unusual and complex alternative (some would say an accounting gimmick) -- highly structured prepays that Enron used to report loans in a way that hid its borrowing while painting a more favorable picture of Enron's financial condition. It booked the advance of cash as a trading activity rather than as a loan and proceeds from the loan as cash from operations rather than cash from financing. In this way, Enron raised funds of $8 billion or more beginning in 1995[2] and buried the loans as trading liabilities. The result was that Enron secured the operating cash flow that analysts needed to see in order to view Enron favorably and avoided the appearance of additional debt that analysts would have viewed as troubling.

Several internal Enron documents confirm Enron's view of this use of prepays. An internal memorandum dated August 1997 defines the purpose of prepay transactions as "provid(ing) cash flow to Enron Corp in order to meet its cash flow objectives. They are not intended to be income generating transactions."[3] A later Enron presentation anticipated the need for prepay financings to generate $1 billion in "FFO" (funds flow from operations) annually.[4] A document obtained from an employee in the Enron Accounting Department describes the prepays as "off balance sheet financing (i.e., generate cash without increasing debt load)."[5]

---

[2] Enron presentation to the Finance Committee of the Enron Board, August 2001. "ASF - Detail on Prepays." Bates EC 000058019.

[3] Enron Interoffice Memorandum, "Subject: Prepaid Hydrocarbon Companies," August 22, 1997. Bates EC 001537017.

[4] Enron Yosemite presentation. Bates ECa 000196339-51.

[5] Bates EC 001594743.

In 2000, Enron initiated $1.935 billion[6] or more in prepay transactions, the proceeds of which were included in Enron's financial statements as "Cash Flows from Operating Activities." In addition, the Subcommittee staff estimates that Enron had $4 billion of outstanding prepay debt on its balance sheet as of December 31, 2000.[7] As the following chart demonstrates, if Enron's 2000 year-end financial statements were adjusted to reflect $4 billion in outstanding prepay transactions as debt and deducted the $1.527 billion[8] from "Funds Flow from Operations,"[9] Enron's credit profile would have changed dramatically.

|  | 2000 Reported Financials | Adjustment[10] | 2000 Adjusted Financials |
|---|---|---|---|
| Total Debt | $10.2 billion | $4.0 billion | $14.2 billion |
| Total Equity[11] | $14.8 billion |  | $14.8 billion |
| Total Capital | $25.0 billion |  | $29.0 billion |
| Debt / Equity | 69.2% |  | 96.2% |
| Debt / Total Capital | 40.9% |  | 49.0% |
| Funds Flow from Operations[12] | $3.2 billion | $1.5 billion | $1.7 billion |
| Interest and Other[13] | $1.1 billion | $200 million | $1.3 billion |
| Funds Flow Interest Coverage[14] | 4.07 |  | 2.37 |

These adjustments have a significant impact on Enron's credit ratios. Enron's reported "Funds Flow Interest Coverage" (footnote 14) of 4.07 was typical of a company with an A-/A3 rating, which is a rating that is assigned to a

---

[6] Subcommittee staff estimate based on the following prepay transactions: Chase X (9) / Mahonia - $650 million - June 2000; Chase XI (10) / Mahonia - $330 million - December 2000; Citibank / Delta / Yosemite II - $305 million - February 2000; Citibank / Delta / Yosemite III (CLN I) - $500 million - August 2000; Credit Suisse First Boston, Morgan Stanley - $150 million - December 2000.

[7] 2001 Enron Board presentation. Bates RCO 21428.

[8] Subcommittee staff estimate of Fiscal Year 2000 prepay proceeds of $1.935 billion less $408 million in prepay amortizations, leaving net prepay proceeds of $1.527 billion. Bates EC000058019.

[9] Enron's calculation of "Funds Flow from Operations" is equal to "Cash Flow from Operations" adjusted for Merchant Activities, Equity Earnings, Equity Partnership Distributions and Other. Bates EC 000469193.

[10] Adjustment to "Funds Flow from Operations" deducts the value of Year Fiscal 2000 prepay transactions net of prepay amortizations. Bates EC 000058019. Adjustments to "Interest and Other" reflect a 5% rate of interest on $4.0 billion in prepay debt.

[11] Total Equity is equal to Shareholders' Equity, Company-Obligated Preferred Securities of Subsidiaries and Minority Interests, consistent with Enron's presentation of Total Capital in company presentations to rating agencies. Bates EC 000469368.

[12] Subcommittee staff estimate based on March 2001 Enron Global Markets presentation citing "Actual Funds Flow Interest Coverage" of 4.07. Calculation assumes interest expense of $838 million, dividends on preferred shares of $77 million and rent expense of $143 million as reported in Enron 2000 10-K, yielding "Funds Flow from Operations" of $3.248 billion. Bates EC 000007671.

[13] Interest and Other includes dividends on preferred shares and rent expense.

[14] "Funds Flow Interest Coverage" is calculated as "Funds Flow from Operations" + interest incurred + dividends on preferred shares + rent expense, divided by interest incurred + dividends on preferred shares + rent expense. The Subcommittee staff has included dividends on preferred shares based on the appearance of their inclusion in previous years' calculations.

very stable and financially healthy company. The adjusted number of 2.37 is in line with a company with a BBB-/Baa3 rating, a decline of three rating "notches," reflecting a considerably considerably weaker credit. Likewise, the revised Debt as a Percentage of Total Capital figure of 49.0% is approximately three rating notches below Enron's reported figure of 40.9%.[15]

These declines in financial ratios are significant, because the lower financial ratios would have affected Enron's credit rating, and a lower credit rating would have had serious consequences for Enron's operations:

- Below BBB-/Baa3, Enron would no longer be considered an "investment grade" company. As a result, certain investors' internal investment requirements would have prohibited them from buying the company's bonds, thereby shrinking the pool of money that Enron could tap for its growing cash needs. More importantly, Enron would have been shut out of the commercial paper market which accounted for a significant portion of Enron's borrowing.

- At a lower credit rating, Enron would have been considered a less attractive trading partner. This means that Enron would have lost trading business, the largest source of income to the company. Parties still willing to trade with Enron probably would have reduced the trades they would have been willing to enter into with Enron and/or require Enron to post additional collateral.[16]

- Even more threatening, if Enron had fallen below investment grade (to "junk" status), a number of its trading partners would have had the contractual right to close out existing trades and demand payment from Enron, further straining Enron's cash position.

- A fall below investment grade also would have had a significant impact on Enron's financing. As a higher credit risk, Enron's cost of borrowing would have increased considerably, increasing its interest expense and lowering earnings.

- Equally as significant is the fact that Enron sponsored a number of off-balance sheet vehicles that were supported with Enron credit. Once Enron fell below investment grade, debt holders in these vehicles could demand repayment and Enron would have to make sure they received it. This would have represented a huge liquidity crisis to Enron, and in fact, that liquidity crisis eventually occurred.[17]

Enron was acutely aware of the importance of its credit rating and reported on "progress" with the credit rating agencies at internal meetings and to the Board of Directors. It was also aware that the financial ratios just discussed determined the company's ratings. Enron's decisions on when to engage in a prepay and the size of the prepay were driven by its need to meet certain ratio targets. Consequently, funds from prepay transactions would appear on Enron's cash flow statement just days before the end of a quarter, just in time to be factored into Enron's financial statements and pump-up key ratios.

***Support Enron's Share Price***

---

[15]Average Funds Flow Interest Coverage and Debt / Total Capital per rating category based on March 2001 Enron Global Markets presentation. Bates EC2 000007671.

[16]From Enron's Form 10-Q filing, September 30, 2001: "Maintaining an investment grade credit rating is a critical element in maintaining liquidity for Enron's wholesale business which, together with the natural gas pipeline operations and the retail business, comprise Enron's core business . . . A downgrade to below investment grade could lead to a substantial increase in the level of cash required for collateral and margin deposits with Enron's wholesale trading partners . . . The recent deterioration in Enron's credit rating and decline in its stock price has caused a negative impact on Enron's projected 2001 fourth quarter profitability. This is primarily the result of a reduced level of transaction activity by Enron's trading counter-parties, particularly for longer-term transactions."

[17]From Enron's Form 10-Q filing, September 30, 2001: "Enron has various financial arrangements which require Enron to maintain specified credit ratings. The November 12, 2001 downgrade in Enron's senior unsecured debt rating to BBB- by Standard & Poor's has caused a ratings event related to a $690 million note payable that, absent Enron posting collateral, will become a demand obligations on November 27, 2001. . . In the event Enron were to lose its investment grade credit rating and Enron's stock price was below a specified price, a note trigger event would occur. This could require Enron to repay, refinance or cash collateralize additional facilities totaling $3.9 billion, which primarily consist of $2.4 billion of debt in Osprey Trust and $915 million of debt in Marlin Water Trust."

In addition to a credit ratings impact, Enron's use of prepay transactions and the accounting treatment of these transactions had a profound impact on Enron's valuation, which in turn drove Enron's stock price. Dozens of equity analysts followed Enron and relied on the company's audited financial statements, as well as guidance from Enron management, to set a future target for the company's share price. The manipulation of prepay transactions had a direct impact on the value equity analysts assigned to Enron shares in two ways.

**Understating Debt:** A company's "enterprise value" is a measure of what the market believes a company's ongoing operations are worth. A text book definition calculates enterprise value as:

      Market equity (representing shareholders' ownership in the company)
+    Preferred stock (representing preferred shareholders' ownership in the company)
+    Net debt (representing lenders' "investment" in the company)
=    Enterprise value[18]

This definition assumes the market has knowledge of a company's indebtedness and preferred equity obligations, and takes that information into account when determining the "fair" value of a company's shares, which equate to its market equity. If, however, a company has hidden a portion of its debt either off-balance sheet or in other liabilities such as trading liabilities, or if analysts and investors fail to adjust their estimation of the company's value to reflect this higher indebtedness, the company's market equity value will be overstated.

The following graph illustrates this point. Enron had a market-determined enterprise value of $26.7 billion as of October 2001.[19] Enron's equity value can be determined by subtracting net debt and preferred securities from the enterprise value. Dividing that equity value by the number of Enron shares outstanding yields the market price per share. If investors learn that instead of $12 billion in net debt on its balance sheet, Enron has close to $17 billion in debt, they will likely react by selling Enron shares until the price falls to a level consistent with that level of indebtedness.[20]

| | Balance Sheet Debt | Adjustment | Balance Sheet Debt + Prepays |
|---|---|---|---|
| **Enterprise Value** | $23.4 billion | | $23.4 billion |
| **Subtract Debt and Pref. Obligations** | $13.1 billion | $4.8 billion | $17.9 billion |
| **= Equity Value** | $10.3 billion | | $5.5 billion |
| | | | |
| **Divide by Shares Outstanding** | 744 million | | 744 million |
| **= Actual / Implied Market Price per Share** | **$14** | | **$7** |
| **Decline in Share Price** | | | - 46% |

**Earnings Impact:** Enron's practice of using prepay transactions to understate debt and overstate cash flows from operations had an additional share price impact. As previously discussed, Enron needed prepay transactions to

---

[18]Enterprise value or "Market Value of Invested Capital ("MVIC"). Pratt, Shannon. The Market Approach to Valuation of Businesses. John Wiley, publisher, 2001.

[19]Enterprise value equals market equity value of $10.4 billion plus balance sheet debt, net of cash, of $12.0 billion plus preferred securities of $1.1 billion. Market equity value is based on Enron's share price of $14 as of October 2001 multiplied by 744 million shares outstanding.

[20]This Subcommittee staff analysis is for demonstrative purposes only and does not take into consideration a number of other complicating factors, including the billions of dollars in off-balance sheet debt that, once known to the market, resulted in the collapse of Enron's share price. The fact that Enron shares ultimately traded at pennies per share suggests that investors thought the company had exceeded its limit in loans and other financing structures.

generate cash flow and support its credit rating. By supporting its "investment grade" credit rating, Enron was able to expand its trading business as well as borrow money at a relatively low interest rate.

The result of robust trading activities (accented by mark to market accounting) and relatively lower interest expense was a boost to Enron's net income, which in turn is the key driver of a company's share price.[21] As long as Enron could continue to show positive earnings growth, it could expect to see appreciation in its stock price. By using prepay transactions to generate cash flow from operations, Enron was able to maintain its investment grade ratings, which allowed Enron to build a trading business that was the engine behind Enron's income growth. As earnings grew, so did Enron's share price. In addition, to the extent equity analysts viewed growth in Enron's operating cash flow, fueled by net prepay transactions of over $1.5 billion in 2000 alone, as indicative of Enron's future growth, the cash flow impact of prepay transactions can also be viewed as a key driver of Enron's share price.[22]

## III. Accounting and Structuring for Prepays as Cash from Operations

In order to treat the prepay transactions as trading activities instead of loans, Enron referenced accounting guidelines[23] for treating contracts as derivatives.[24] SFAS 133, which was issued by FASB in 1998 and became effective in June 2000, establishes the rules for both defining and accounting for derivatives contracts. Derivatives contracts are considered part of a trading company's operations. To meet these guidelines, Enron had to structure the prepays using three separate parties: Enron, the bank providing the money, and an independent third party. Without an independent third party, the prepay would be viewed as a loan.

An Andersen presentation obtained by the Subcommittee from Enron summarizes the key criteria needed to meet classification of a prepay as a trade rather than a loan.[25]

"**For prepays to be treated as trading contracts, the following attributes must exist**:

**None of the individual agreements . . . are linked commercially** or make references to any of the other documents; in effect, **each is a stand-alone**, normally occurring derivative instrument which continue to be in effect even if other pieces of the transaction are terminated for any reason. . . .

**Price risk** related to the PGA[26] **is transferred from the gas supplier to the purchaser**, without the gas supplier further affecting the purchaser's management of this risk or the purchaser's other PGA-related economics. **This includes any future actual or contingent swaps that may be contemplated.**

---

[21]Shares of companies in the energy sector typically trade in the market at a share price based on their Price/Earnings ratio. "Price" refers to the current market price for one share of the company; "Earnings" refers to net income or earnings per share, also known as "EPS". For example, a company whose shares trade at $20 per share and has earnings per share of $2.00 is said to trade at a P/E ratio of 10 times earnings ($20 / $2.00 = 10). If 10 times earnings is the industry standard multiple for energy companies, an increase in earnings per share to $3.00 per share should result in an increase in share price to $30 per share, thereby maintaining the P/E ratio at 10 times ($30 / $3.00 = 10).

[22]A higher debt level has the potential impact of reducing a company's cost of capital, which in a discounted cash flow analysis would result in a higher present value of the company's future cash flows. However, the increased debt level also increases the risk profile of the company, which would increase the cost of capital, thereby reducing the present value of future cash flows.

[23]Accounting literature referenced as per Arthur Andersen memorandum on Prepay Transactions, Bates ECp000094306: EITF 96-21; EITF 90-15; Topic D-14; December 1997 SEC Speech - Armando Pimentel; EITF 88-18. Also, FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities."

[24] A derivative is a financial instrument whose value is based on another instrument, such as a stock or an index, or in the case of Enron's prepays, the price of commodities including gas and crude oil.

[25]Arthur Andersen presentation to Enron Corp. "Prepaid Transactions Discussion." Bates  EC 000013365 - 69.

[26]Term undefined.  It may mean "Prepaid Gas Agreement."

**The purchaser of the gas must have an ordinary business reason for purchasing the gas, not in-substance be a special purpose entity (SPE) established just to effect a secured investment in a debt instrument from a gas supplier.** The SPE issue could arise by virtue of the purchaser's very nature and the substance (or lack thereof) of its other business operations. It could also arise based on the types of the contractual limits included in the series of structured transactions (e.g., the debt of the purchaser is recourse to the gas supplier or not recourse to any of the purchaser's other assets)."

An Arthur Andersen memorandum to the Audit Files from June 1999[27] provides a more detailed description of the criteria, summarized in the presentation, that Andersen considered important for determining the appropriate accounting treatment for Enron's prepay transactions.

The purpose of the Andersen criteria for prepays was to distinguish true trading activity from loans. The criteria warn against such indicia of phony trading activity as linked trades, prepay transactions where no party is at risk of monetary loss, and trades involving shell corporations with no ordinary business reason to buy or sell energy commodities. These criteria show that the accounting community was well aware that prepays could be manipulated to function as disguised loans and had devised criteria to disallow accounting as operational business activity those prepays which were, in reality, devices to obtain financing.

The 1999 Andersen memorandum states explicitly that the transactions between the three parties that comprise the prepay transaction must be de-linked in every way from the original transactions. The most obvious form of linkage would be any cross-default provisions in the contracts. Cross-default provisions would allow, for example, Enron to seek payment from the bank if the third party defaults on its obligation to Enron. Furthermore, these transactions should stand alone, without reference to each other. This would preclude, for example, an assignment of rights and obligations of the third party to the bank. Finally, any elements that would indicate that the third party and the bank are related might constitute linkage. If the bank were covering all of the third party's costs, or if the third party played no role in negotiating its contract with Enron and deferred all decision-making to the bank, it might raise serious questions as to the independence of the third party from the bank.[28]

The Andersen memorandum also stipulates that the fixed payments made by the parties to the prepay transaction must be based on fixed volumes of the commodity so as to isolate the price of the commodity as the only variable.[29] Andersen also concluded that the trades should be settled periodically. Periodic settlement is more indicative of normal trading activity because it subjects the parties to the price fluctuation of the market (as opposed to basing settlement solely on the price of the commodity at a fixed point in time). Andersen also concluded that the existence of a second "triangle" that mirrored the original prepay transaction (with the direction of the fixed and floating legs reversed) would preclude treatment of any of the transactions as valid trades because the mirroring eliminated price risk entirely.[30] Finally, if, for example, either the bank or the third party were so perfectly hedged that neither made any profit on the trade itself, it might raise questions as to why they entered into the transaction and to whether the parties were related.[31] Elimination of price risk, therefore, could lead to a determination that the contracts were linked and should therefore be collapsed as described above. Emphasis is placed on confirming price risk in each leg of the transaction because price risk is what distinguishes a trade from a loan.

The criteria are designed to: 1) avoid linkage between the contracts and/or the parties to the contracts; and 2) eliminate the price risk between the parties to the transaction, either of which event could result in classifying a prepay

---

[27] Bates ECp 000094306.

[28] Arthur Andersen, Staff Interview, July 13-14, 2002.

[29] Ibid. Arthur Andersen also required that pricing of the contracts reference the market price of the commodity in question.

[30] Arthur Andersen Staff Interview, July 14, 2002.

[31] Arthur Andersen Staff Interview, July 13, 2002. This would be especially relevant if the trades were entered into simultaneously.

transaction as debt rather than as a trade and classifying cash generated in prepay transactions as cash flow from financing activities rather than cash flow from operating activities.

The Enron prepays blatantly contradict the Andersen prepay criteria. They involve linked trades, an elimination of price risk, and shell off-shore corporations that were controlled by banks and that functioned as sham trading parties. Each prepay was orchestrated as a three-part round-robin trade whose true function was not to buy or sell an energy commodity, but to provide Enron with financing that Enron would repay with interest. The parties involved in the Enron prepays were aware of the entire structure and its accounting purpose.

Under the Enron prepay structure, a participating bank would send cash (the money destined for Enron) to the third party, in exchange for the future delivery of a fixed amount of a commodity. The third party, in turn, would enter into an identical arrangement with Enron, and effectively serve as a pass through for the bank funding to Enron. Enron would repay the funding in a fixed amount of commodities, which would pass through the third party en route to the bank. Up to this point, this appears to be a "real" trade because all three parties bear the risk that the price of the underlying commodity will change. This is called price risk and it is an essential element in a true trading transaction.

But, Enron's prepays also entailed a transaction known as a "swap" in order to mitigate price risk. Under a swap agreement, Enron exchanged (with the bank) the floating price of the commodity for the fixed price of the commodity. The net effect is to cancel out any price risk to all parties in the trade. The fact that were the third party was not independent and the terms of the prepay were predetermined based on Enron's decision as to how much operating cash flow it needed to report presented other problems with Enron's prepay structure.

Enron engaged in these prepays, which often involved natural gas or crude oil, at a pace of one or two per year from 1992 to September 2001 when the last prepay transaction was implemented.[32] Most of those transactions (both in number and in dollar value) were with JPMorgan Chase and Citigroup. Chase and Enron engaged in at least 12 transactions with a value of $3.7 billion. Citigroup and Enron engaged in at least 14 transactions with a value of $4.8 billion.[33]

h h h

---

[32]The September 2001 prepay closed on September 28, 2001, but remained outstanding along with seven other Chase prepays when Enron filed for bankruptcy on December 2, 2001.

[33]The specific details of each transaction varied slightly - some included additional financial institutions as counterparties; some used different commodities; and some involved the actual physical exchange of the commodity while others were merely paper transactions. All but one of the Chase transactions were physically settled; conversely all but one of the Citigroup transactions were paper transactions.

# A P P E N D I X   B

## KNOWLEDGE AND PARTICIPATION OF FINANCIAL INSTITUTIONS IN ENRON PREPAYS

The evidence reviewed by the Subcommittee staff indicates that the financial institutions that participated in Enron "prepays" understood that Enron was seeking to obtain financing from them, but wanted to obtain the financing through orchestrated, multi-party commodity (largely energy) trades rather than straight-out loans, so that the company could characterize the funds as cash flow from operations rather than cash flow from financing. Internal communications show that the financial institutions not only understood that Enron intended to engage in this deceptive accounting, they actively aided Enron in return for fees and favorable consideration in other business dealings. The evidence also indicates that these financial institutions complied with Enron's desire not to disclose its transactions to outside parties, and knowingly allowed investors, financial analysts and others to rely on Enron financial statements that the financial institutions knew or should have known were misleading.

The evidence indicates that Enron would not have been able to engage in the extent of the prepay accounting deceptions it did, involving more than $8 billion, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities.

*Financial Institutions Involved in Enron Prepays*

Enron used "prepay" transactions to obtain more than $8 billion in financing over approximately 6 years.[1] This $8 billion figure is a conservative estimate based upon the evidence gathered by the Subcommittee to date; it is possible that the total dollar amount involved in this financing, since Enron began using it in 1992, is much larger.

Most of Enron's "prepays," both in number and dollar value, involved either JPMorgan Chase Bank ("Chase") or Citigroup.[2] Altogether, Chase and Enron engaged in at least 12 transactions from 1992 until 2001, with a combined value of more than $3.7 billion. Citigroup and Enron engaged in at least 14 transactions from 1993 until 2001, with a combined value of more than $4.8 billion. Enron also completed "prepays" with a number of other financial institutions over the last ten years including Barclays, Credit Suisse First Boston, FleetBoston, Royal Bank of Canada, Royal Bank of Scotland, and Toronto Dominion. Although the investigation was unable to determine the total value of these transactions, the evidence indicates they had a combined value in excess of $1 billion.

*Financial Institution Knowledge of Accounting Deception*

Internal communications and documentation at the financial institutions, Enron and Enron's accounting firm, Arthur Andersen, indicate that it was common knowledge that Enron's "prepays" were designed to manipulate Enron's financial statement by overstating cash flow from operations and understating debt.

Among the internal communications documenting the knowledge of the financial institutions are the following.

---

[1]"ASF – Detail on Prepays," Enron presentation, August 2001. Bates EC 000058019.

[2]"Summary of Enron Prepays with JPMorgan Chase and Citigroup," Appendix E.

–   A Chase banker wrote in a 1998 email: "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev[enue] or (better yet) bury it in their trading liabilities."[3]

–   In a telephone conversation on September 20, 2001, taped in the normal course of business, three Chase employees discussed one of the Enron prepays in the following terms:

    - " . . . [W]hy do they want to hedge with gas where it is now?"
    - "They're not hedging, they're just, they're just, they do the back-to-back swap."
    - "This is a circular deal that goes right back to them."
    - "It's basically a structured finance-"
    - "It's a financing?"
    - "Yeah, its totally a financing, which has piece of it, they're always had on as a piece of their capital structure, so-"
    - "So its amortizing.  Yeah, it's amortizing debt.  I get it."
    - "That's exactly what it is."[4]

–   A September 2000 internal email from a Citigroup employee to colleagues made these suggestions on how to explain the Yosemite prepay to potential investors:  "Get into why co[mpany] does it (gets cash flow, shows up as other liab[ilities] not debt . . .) . . .  i.e., [g]ives some oomph to revenues . . . . [Enron] gets money that gives them c[ash]flow but does not show up on books as big D Debt."[5]

–   A 1997 Chase summary of a proposed $250 million Enron prepay, written to gain credit approval for this transaction, included the following statement:  "In the past three years, Enron has utilized the prepaid sale as a mechanism to address a number of needs, including . . . sourcing funds (classified as 'Liabilities from Price Risk Management' as opposed to long term debt)."[6]

–   A 1998 Citigroup loan approval memorandum in support of a prepay known as Roosevelt states: "The prepaid forward structure will allow Enron to raise funds without classifying the proceeds from this transaction as debt (it is accounted for as 'deferred revenue').  This is a common method of raising non-debt financing among energy companies."[7]

–   A June 2001 Citigroup document summarizing the accounting and tax treatment for Enron prepays states: "As we understand the accounting, the Pre-Paid creates price risk management liability, thereby receiving non-'D' debt treatment.  Operating cash flow increases . . . .  From a tax perspective, the Pre-Paid can be treated much like a traditional loan[.]  Swap payments are deductible on the tax books, similar to loan payments."[8]  A January 2000 memorandum from Enron's tax planning department makes it clear that the prepay structures are not driven by tax requirements, but by accounting considerations: "The use of a prepaid swap was not motivated by tax considerations but instead was necessary in order to report the

---

[3]Chase email, November 11, 1998.  Bates SENATE MAH-02129.

[4]Chase audio tape, September 20, 2001.

[5]Citigroup email, "My take on how to explain ECLN," September 28, 2000.  Bates CITI-SPSI 0084924.

[6]"Structuring Summary," prepared by Chase, 11/14/97.  Bates JPM-1-00061.

[7]"Global Loans Approval Memorandum" for Roosevelt prepay, prepared by Citigroup, December 21, 1998.

[8]"Summary of Pre-Paid Accounting and Tax," prepared by Citigroup and attached to internal email from Citigroup employee Timothy Swanson (6/25/01).  Bates CITI-SPSI 0050680.

transaction as part of [Enron's] price risk management activities rather than debt for financial accounting purposes."[9]

–   In a June 2002 court filing to require certain surety bond providers to make payment on bonds related to certain Enron prepays, Chase asserts that the sureties "knew that the deals [the prepays] were part of a structured financing transaction for Enron's general corporate benefit" and that "the surety bonds were part of financing transactions in which the funds advanced by JPMorgan Chase to Mahonia were ultimately used by Enron for general corporate purposes, not to secure future sources of the oil and gas to be delivered."[10]

–   Credit Suisse First Boston ("CSFB"), which participated in two Enron prepays also understood the accounting-driven nature of the transactions. Emails exchanged among CSFB employees describe a prepay transaction as an "oil-linked loan,"[11] and state that "the net effect for [Enron] is raising $150M at L[IBOR] + 75bps [basis points] for 9 months off-balance sheet. As the swap is booked in their oil swap book and not treated as debt."[12]

–   One CSFB lawyer raised concerns that the Enron "prepay" was "an accounting driven transaction,"[13] and recommended vetting it through the firm's "Reputational Risk Review" process. This review raised sufficient concerns to request Enron to make six representations about the transaction, including attesting to the fact that Enron senior management was aware of the transaction and that Enron was responsible for determining its accounting treatment.[14] Enron reportedly provided verbal assurance on these matters, but declined to provide anything in writing. CSFB approved the transaction and funded the prepay.

–   In 1998, Chase developed a "pitch book" to sell other companies on Enron-style prepays. The presentation describes the transactions as an "[a]lternative source of finance" and "[b]alance sheet 'friendly' " and explains that they have an "[a]ttractive accounting impact by converting funded debt to 'deferred revenue' or long-term trade payable."[15] A similar Citigroup presentation, promoting Yosemite-style prepays, boasts that the structure "[e]xpands capability to raise non-debt financing and ... improves cash flows from operations."[16]

---

[9]Enron Interoffice Memorandum from Tax Planning Department, January 10, 2000. Bates EC 000037274.

[10]Amended complaint, JPMorgan Chase Bank v. Liberty Mutual Insurance Co. (USDC SDNY) Case Number 01-Civ. 11523 (JSR), paragraphs 18-19.

[11]Credit Suisse First Boston email, December 18, 2000. Bates SR 00037828.

[12]Credit Suisse First Boston email, December 8, 2000. Bates SR 00038448.

[13]Credit Suisse First Boston email, "RE: URGENT / decision required - status on Eneron (sic) oil linked loan," December 14, 2000. Bates SR 00041087.

[14]Credit Suisse First Boston, Staff Interview, July 12, 2002.

[15]Chase presentation, July 16, 1998. Bates SENATE MAH - 02604.

[16]"Credit-Linked Notes," presentation by Citibank/Salomon Smith Barney (May 2001), at 37. Bates CITI-SPSI 0041206.

–   Enron itself was clear about the purpose of its "prepays."  A presentation prepared by Enron's accounting department for an internal educational seminar states:  "Why does Enron enter into Prepays?  Off balance sheet financing (i.e. generate cash without increasing debt load)."[17]

–   Andersen was equally clear.  "Enron is continuing to pursue various structures to get cash in the door without accounting for it as debt."[18]

*Financial Institution Actions to Assist Enron's Accounting Deception*

The participants in Enron's "prepays" were not only aware that the transactions were driven by Enron's desire to manipulate its financial statements, the financial institutions actively aided Enron in designing and implementing financial structures that created and maintained the fiction that the transactions were trades rather than loans.

–   To help Enron create an appearance of independent trades in each "prepay," both Chase and Citigroup included as one of the participants an offshore shell corporation that appeared to be an independent entity but, in reality, was established and  controlled by the respective bank.  The two offshore entities are Mahonia Ltd.[19] and  Delta Energy Corp., which were created and controlled by Chase and Citigroup, respectively.  Since these entities apparently had no employees, no office, and no independent business operations, each bank provided the legal advice, paperwork, and financial support necessary for its affiliated offshore shell to participate in the trades.  Without an independent third party, the trades that canceled each other out and allowed the prepay to function as a loan would not have been possible.

–   When Andersen raised questions about the independence of Mahonia and Delta and requested a letter from each representing that it was an independent operational business apart from the bank and Enron, personnel at the associated banks complied.  A taped telephone conversation on September 13, 2001, among Chase and Enron employees discussing the Andersen request shows that they were well aware that they were contributing to a fiction that Mahonia was independent from Chase:

-"You're talking about the rep letter from Mahonia . . . saying, you know, it has the right to do transactions like this. . . .Before what we've done is just really looked at the actual charter, and you've got the information, but now Andersen is pushing back and saying, hey, we need to have a specific rep letter that a representative of Mahonia signed that reps a certain point"
-"Which is, yeah, separate from Chase.  It doesn't have Chase showing up anywhere on the fax letterhead or anything along those lines, a separate fax number, et cetera. . . ."
-"That goes to the same point you were raising earlier, Jeff, that from your side, you also want to make sure that Mahonia seems independent."[20]

–   In one recent Enron prepay, a May 2001 internal Citibank memorandum suggested adding a minimal charge of one penny to the price spread to make it seem "a little more like a true trade."  The memorandum states: "[The spread offers a more real transaction, the penny is in fact diminutive and figures to be an incremental 1 [basis point] on the whole transaction . . . .  I highlighted the 1 penny spread to Kelly after I sent an initial script . . . .  I told her that the charge makes the prepaid structure a little more like a true

---

[17]"What are Prepays?", presentation prepared by Enron accounting department for internal educational seminar, undated.  Bates EC 001594740.

[18]Internal Andersen email, December 16, 1998.  Bates AASCGA 1132-1.

[19] Other Chase-controlled entities such as Mahonia natural Gas Limited and Stoneville Aegean were sometimes used in place of or in addition to Mahonia, Ltd.

[20]Chase audio tape, September 13, 2001.

B - 4

trade, whereas a written floor and a purchased cap cannot be executed at the same level – good for both parties from an auditing/regulatory perspective."[21]

–   To help Enron characterize prepay funds as coming from energy trades, several of the financial institutions were careful not to include requirements or descriptive language in the prepay documentation that would disclose the true nature of the transaction. For example, when drafting documents for its prepay with Enron, CSFB instructed its lawyers: "very important for them [Enron] is that the docs are as standard as possible and DO NOT include any representations on accounting driven transactions."[22]

–   A 1999 Citigroup memo discussing Enron's repayment of a portion of a prepay states: "The paperwork cannot reflect their [Enron's] agreement to repay the $190 mm as it would unfavorably alter the accounting . . . ."[23] Citigroup memos reveal that Enron had agreed to repay the $190 million in two payments by dates certain, prior to the delivery dates for crude oil indicated in the energy trading documentation, but putting that agreement in writing would have caused the transaction to be classified as debt. As a result, Citibank accepted an unwritten "agreement" from Enron that it would repay the $190 million by the agreed date.[24] All of these actions made it easier for Enron to execute its "prepays" and claim they were the proceeds of energy trades rather than loans.

–   When due to Enron's growing debt levels, Citigroup credit analysts became reluctant to extend Enron additional financing through new "prepays," Citigroup worked with Enron to design and establish the Yosemite structures which, instead of relying on bank financing, obtained funds under Rule 144(A) offerings from qualified investors. Citigroup underwrote four Yosemite offerings which produced sufficient funds for half a dozen Enron prepays worth a total of $2.4 billion. Citigroup even participated as an equity owner in the trusts that were a key element in these structures.

*Financial Institution Actions to Keep Prepays Secret*

In addition to helping Enron design and execute multiple "prepay" transactions, the financial institutions complied with Enron requests to restrict disclosure of the nature and extent of its prepay activities. By design and intent, the "prepays" structured by Enron and the financial institutions made it impossible for investors, analysts, and other financial institutions to uncover the true level of Enron's indebtedness.

–   Enron hid from investors and financial analysts the extent and nature of its "prepay" activities. In its financial statements, Enron included the money it received from "prepay" transactions on its balance sheet in a line item known as "Price Risk Management," burying the proceeds within a much larger figure, about $20 billion in 2000, representing the company's overall trading liabilities. This $20 billion did not separately identify funds derived from "prepay" transactions; in fact, Enron's financial statements never explicitly addressed Enron's "prepay" activity at all, despite its growing role in the company's finances. At one point Arthur Andersen auditors recommended to Enron Chief Accounting Officer Rick Causey that Enron provide more complete disclosure on its prepay transactions, but Mr. Causey declined to do so.[25] The financial institutions that participated in Enron's "prepays" also kept quiet about what they knew.

---

[21]Citigroup email, May 9, 2001. Bates CITI-SPSI 0053452.

[22]Credit Suisse First Boston email, December 15, 2000. Bates SR 00037769.

[23]Citigroup email, "Enron/Roosevelt Update," April 22, 1999. Bates CITI-SPSI 0068751.

[24]Citigroup email, "Enron/Consent to Amendment to Roosevelt Transaction," April 27, 1999. Bates CITI-SPSI 0046833.

[25] Arthur Andersen, Staff Interview, July 19, 2002.

Most of Enron's "prepays" were transacted with Chase and Citigroup; neither disclosed information publicly about the extent of Enron's prepay activity, even in documentation associated with the Yosemite Rule 144(A) offerings. Financial analysts that closely followed Enron, including analysts with major credit rating agencies, told the Subcommittee staff that they had been completely unaware of Enron's prepay activities prior to its bankruptcy.

– Citigroup provided a major boost to Enron's prepay secrecy when it worked on the design of the Yosemite structures. These structures offered investments in Enron-related matters and did not reveal to investors the specific investments into which their funds were being placed. The trusts and the lack of information on specific investments functioned as a "black box," in the words of Enron, to prevent investors and others from knowing that the Yosemite proceeds were being used to fund Enron prepays. An Enron presentation touting the advantages of using the Yosemite proceeds for prepays states that the Yosemite structure "provides for a unique 'black box' feature which provides considerable flexibility" and that the "[b]lack box allows Enron the ability to provide a permanent take-out feature for highly structure[d] transactions in the capital markets while limiting disclosure of prepay to Citibank." The presentation warns: "[T]he use of prepays as a monetization tool is a sensitive topic for both the rating agencies and banks/institutional investors. The ability to continue minimizing disclosure will likely be compromised if transactions continue to be syndicated."[26]

– On one occasion, when a Yosemite investor learned about Delta Energy Corporation and contacted Enron for additional information, Enron personnel reacted strongly to stop further disclosure. Enron immediately sent a series of emails to Citigroup which stated: "[A]pparently an investor spoke to someone at citi and received info on delta. This person . . . is now calling us asking about delta now. We need to shut this down."[27] "By the way – not blaming you guys just trying to figure out how to shut it down."[28] Citigroup declined to provide any additional information to the investor.

– Enron's prepay secrecy was so successful that, while each financial institution involved in an Enron prepay had inside knowledge of that particular transaction, it appears that no financial institution – even Chase or Citigroup – knew the total number and dollar value of all of the "prepays" engaged in by Enron. For example, an October 2001 exchange of emails at Chase had this to say after the bank learned, to its surprise, that Enron had $5 billion in prepays outstanding, an amount that was much greater than Chase had expected:

-"$5B in prepays!!!!!!!!!"
-"shutup and delete this email."[29]

– In September 1999, in response to internal concerns regarding the complexity, reliability and completeness of Enron's audited financial statements, a Salomon Smith Barney ("SSB") senior banker led a review of Enron's capitalization. The report[30] was presented to Citigroup's Investment Grade Debt Commitment Committee, which is charged with approving commitments of the bank's capital to investment grade debt financings. The report included information on Enron's capitalization taken from Enron's audited financial statements, analyses conducted by Moody's and an analysis based on SSB's knowledge of the company.

[26]Enron presentation on Yosemite. Bates ECa000196339, 41.

[27]Citigroup email, November 14, 2001. Bates ECp000097038.

[28]Citigroup email, November 14, 2001. Bates ECp000097037.

[29]Chase emails, October 24, 2001. Bates SENATE MAH 00645.

[30]Salomon Smith Barney presentation, "Capitalization". September 20, 1999. Bates CITI-SPSI 0031094 - 98.

The internal SSB analysis reported a level of indebtedness which included prepays and was higher than what was reported in Enron's financial statements and in Moody's analysis of Enron.[31]   In Enron's financial statements, the prepay number was not shown as debt but was buried in Price Risk Management Liabilities and not disclosed separately from Enron's other trading liabilities. There would be no way for an institution other than Enron, the bank involved, or Enron's auditor to know how much in prepay transactions was outstanding.[32]

Clearly, Citigroup had better insight into Enron's true financial condition than most other actors, acknowledging that "there is no question that Enron cashflow has become more dependent on Price Risk Management (prepay) activities."[33]   It is safe to conclude that analysts and investors also would have been interested in evaluating these outstanding Enron commitments; in the case of so-called prepays, that analysis was impossible for outsiders.

In advance of Enron-linked securities offerings in 2000 and 2001 (the Yosemite and ECLN offerings), Citigroup prepared additional internal Enron credit analyses, using the same methodology employed in the first analysis.  In all instances, the level of indebtedness was significantly higher than what was reported in Enron's financial statements.[34]  The aggregate amount of debt related to prepays increased from $750 million in the September 1999 SSB internal analysis to more than $2.2 billion in the April 2001 analysis. This $2.2 billion includes Yosemite I, Yosemite II and ECLN I proceeds, which were used to fund new prepay transactions.  Only Enron and Citigroup knew the use of Yosemite I and II and ECLN I proceeds, given the "blind" nature of these trusts.  Citigroup included this information in its internal analysis of Enron, increasing Enron's publicly disclosed debt levels by the amount of the Yosemite and ECLN offerings, as well as the $750 million attributed to prepays in SSB's initial internal analysis.  This fact raises questions regarding Citigroup's representation of Enron's financial condition in the offerings for Yosemite and ECLN securities.

*Incentives for Financial Institutions to Support Enron's Accounting Deceptions*

There are many possible explanations for why major financial institutions were willing to go along with and even expand upon Enron's "prepay" activities.  One obvious incentive was the fees paid by Enron which provided lucrative business deals to a number of financial institutions on Wall Street and elsewhere. (Citigroup earned approximately $167 million from 1997 through 2001.]

----

[31]Representatives of Citigroup pointed out that some structures included in their analysis were already counted, at least in part, in the Moody's analysis, therefore indebtedness linked to these structures may have been double-counted in the initial SSB internal analysis.  These items included $1.5 billion from Condor, $550 million from Marlin; $500 million from Margaux and $450 million from Firefly.  Bates CITI-SPSI 0031097.

[32]Not even Citigroup knew how much Enron had outstanding in prepay transactions.  Yet, the firm viewed prepays as an important component of Enron's capital commitments, as reflected by Citigroup's inclusion of prepays in the analysis.  In explaining why Citigroup decided to include the prepay number in the capitalization analysis, while it did not include any other trading liabilities, the SSB banker who oversaw the first analysis told Subcommittee staff that,  "We knew the number was there, and it has cash flow that has already been spoken for associated with it."  Staff Interview, July 16, 2002.

[33]Citigroup email, "Enron Credit Approval," April 18, 2001.  Bates CITI-SPSI 0085843.

[34]November 1999 analysis: SSB estimate of Enron debt was 38% higher than debt reported in Enron's financial statements.  Bates CITI-SPSI 0005184.  August 2000 analysis: SSB estimate of Enron debt was 40 - 53% higher than debt reported in Enron's financial statements.  Bates CITI-SPSI 0007241.  April 2001: SSB estimate of Enron debt was 57 - 92% higher than debt reported in Enron's financial statements.  Bates CITI-SPSI 0008756.

In addition, in some cases, Enron explicitly pressured some financial institutions to participate in particular "prepay" transactions, as a favor and inducement for Enron to channel additional business their way.  A series of Citigroup emails illustrates this issue.

   –   A September 2001 Citigroup email states: "Spoke with Ben Glisan, [Enron Treasurer], re our turn down of the $200mm prepaid bridge request. . . .  He was calm and did not threaten loss of any specific business. . . . [T]his turndown was major disappointment and perhaps a first from Citi but we still have significant capital committed and Enron recognizes that. . . .  Expect will continue to work on existing deals with us but intend to spread the business. . . .  Told him that we intended to work even harder on the relationship etc.  More to come; I have call with Fastow today."[35]

   –   An October Citigroup email a few days later states: "Spoke with Fastow . . . .  CP rollover was clear financial need in a difficult time while the prepaid was an accounting need in a difficult time and we differentiated between the two.  Talked about need for continuing dialog particularly our appetite for additional Enron paper during the quarter."[36]

   –   A Citigroup email exchange[37] a week later states:

       -"Last week, we were informed by enron that we had not been selected to arrange either project X (monetize contract values in their price risk book) or project popeye . . . .  Each are potentially precedent-setting and lucrative deals. . . .  Also: chase and csfb did provide prepays at the end of the last quarter - csfb replacing us when we rejected the 20mm request. . . ."
       -"With respect to Brazos I specifically visited with Glisan several weeks ago before the $200mm request was on the table saying that we had some issues with Brazos such that we would prefer not to participate but I wanted feedback from him as to how important it was to them and that we would have to look at it as a 'trust me, Enron relationship deal'.  He said he would prefer not to do 'trust me' deals and he would get back to me.  He has not.  Also at same meeting questioned him on what he had 'scheduled' for us for remainder of year. . . . .  We still have the existing $250mm prepaid to deal with for which they still 'owe' us one for having provided the $250mm originally."

CSFB emails show similar concerns, as well as actions by Enron to encourage the financial institution to participate in a "prepay."  A CSFB email exchange[38] in September states:

       - "Please remind me as to who at Enron originally asked for this deal and why we agreed to do it (and most importantly what did CSFB get from it besides being nice guys once again)."
       - "We agreed to do the deal [a prepay] as it was a special request/favor from Ben [Glisan].  Not sure if we got anything specific other than a relationship building chip."

In the case of Citigroup, another motivation in setting up the Yosemite and CLN structures was to lower its own exposure to Enron.  A Citigroup memorandum states, "these prepays [Roosevelt and Truman] will be repaid with the proceeds from the Yosemite, ...eliminating the obligor exception."  Instead, credit exposure for all the Yosemites and CLNs was transferred to the bondholders.[39]

---

[35]Citigroup email, September 26, 2001.  Bates CITI-SPSI 0085837.

[36]Citigroup email, October 1, 2001.  Bates CITI-SPSI 0085836.

[37]Citigroup emails, October 8, 2001.  Bates CITI-SPSI 0085833-34.

[38]CSFB emails, September 17, 2001.  Bates SR 00037828.

[39] Global Loans Approval Memorandum, Citigroup, October 19, 1999.  Bates CITI-SPSI 0002996.

After several years of participating in Enron "prepays," both Chase and Citigroup found another reason to go along.  Both began attempting to sell the product to other companies.  Chase informed the Subcommittee that it entered into Enron-style prepays with seven companies apart from Enron.[40]  Citigroup indicated that it shopped the idea to 14 companies apart from Enron, successfully selling it to at least three.[41]

This evidence suggests that Enron is not the only company obtaining loans disguised as energy trades and recording cash flows from operations instead of from financing.  Major financial institutions are knowingly assisting and even promoting such transactions, which would not be possible without their willingness to provide the funds, supporting paperwork, and a sham offshore trading partner.

h h h

---

[40]Chase correspondence with the Subcommittee, July 18, 2002.

[41]Citigroup correspondence with Subcommittee, July 17, 2002.

# A P P E N D I X   C

## JPMORGAN CHASE CASE HISTORY

Chase Manhattan Bank, N.A. ("Chase") arranged the first prepay for Enron in 1992 apparently so that Enron could claim oil exploration tax credits that would soon expire. To prevent the credits from expiring, Enron needed to find a way to accelerate income into that year. While early prepay transactions appear to be tax-driven, starting in the mid-1990s, prepay transactions were executed in order to meet funding objectives. By 2001, Chase (or its predecessor, Chase Manhattan Bank[1]) had arranged approximately $3.7 billion in prepays for Enron. Approximately $1.6 billion of the Chase-Enron prepays remains outstanding.

*How the Chase Prepays Worked*

Typically, Enron would initiate the prepay transaction near the end of a financial reporting period when Enron determined it needed to report more cash flow from operations on its financial statement. Enron would contact Chase and request that Chase arrange a prepay. A Chase employee familiar with the Enron prepays said he was not aware of any instances when Chase refused Enron's request (although occasionally, the size of the prepay would be reduced from Enron's original request).[2]

Chase set up a Special Purpose Entity or SPE called Mahonia Ltd. to serve as the "independent" third party in the Enron prepays. The basic steps of the Chase prepays are as follows:

---

[1]Enron entered into its first prepay transactions with Chase Manhattan Bank, known currently as JPMorgan Chase Bank as the successor by merger.

[2]Staff Interview, June 26, 2002.

- Chase and Mahonia execute a contract in which Mahonia receives funds from Chase, and in exchange, agrees to deliver to Chase a fixed amount of gas at specified dates and locations agreed to in advance.  This is called a prepaid forward contract. The price paid for the gas is the estimated future price of the gas on the expected delivery date.



**Chase-Mahonia Prepay Leg**

- Mahonia and Enron (or an Enron subsidiary, such as Enron North America or Enron Natural Gas Marketing Corp.) simultaneously execute a mirror contract in which Enron receives funds (the same amount of funds that Mahonia received from Chase) from Mahonia, and in exchange, agrees to deliver to Mahonia a fixed amount of gas at specified dates and locations agreed to in advance. Thus, Chase ends up holding title to a fixed amount of gas that was transferred from Enron to Mahonia and Mahonia to Enron.



**Mahonia-Enron Prepay Leg**

• At the same time that the two prepaid contracts are executed, Enron and Chase execute a commodity swap agreement in which Enron pays Chase a fixed price (a predetermined amount that is equivalent to principal plus an implied interest rate) and Chase pays Enron the floating price on the same quantity of gas that passed from Enron to Mahonia and Mahonia to Chase in steps one and two above.[3]  There is no transfer of title to the gas in this transaction.  This transaction is called a financially settled commodity swap.  Enron generally pays the fixed price in installments.



**Chase-Enron Commodity Swap**

• At the same time that Chase receives title to the gas from Mahonia and pays the equivalent of the floating price to Enron under the swap agreement, Chase sells the gas to the market (in some cases, back to another Enron entity) at the spot price.



**Complete Structure Including Chase Gas Sale**

---

[3] Prior to 1996, the prepay transactions included some price risk.  In 1995, for example, the structure did not include a prepaid forward contract (a contract to purchase a commodity now for future delivery) between Mahonia and Chase.  Instead, Mahonia and Chase entered into a financially settled swap.  Mahonia then entered a prepaid forward contract with Enron.  Mahonia took delivery of the oil or gas from Enron and sold it in the spot market.  Mahonia hedged its price risk with a futures contract.

In sum, Enron receives cash up-front from Mahonia, which has been funded by Chase. Enron pays the cash plus interest back to Chase according to a prearranged schedule.[4] The price risk is eliminated because deliveries are made simultaneously among the parties with Chase selling the gas to the market at the spot price at the same time on the same day that it receives title to the gas. To ease the burden on Chase, which must sell the gas for cash, in most transactions Enron agreed to buy the gas.

*Credit support*

The basic prepay structure has two key credit support mechanisms to guarantee the parties' obligations, thus removing the performance risk in favor of Chase. First, Enron provides an unconditional guarantee for the obligations of its subsidiary to Chase (through Mahonia). Second, the Enron guarantee is supported by either a Performance Letter of Credit ("PLC") with Enron as the account and Mahonia as the beneficiary; or by surety bonds issued by insurance companies. The PLC amortizes according to the amortization schedule of the Enron subsidiary's delivery of gas to Mahonia. That is, if Enron defaults on its guarantee, drawings on the PLC will match the amount outstanding on the prepay amortization schedule. Enron pays the PLC fees, which are determined according to Enron's senior debt rating.

Sometime in May or June 1998, Enron approached Chase about replacing the existing PLCs with surety bonds. The surety bonds would guarantee Enron's delivery performance obligations. If Enron defaulted on its guarantee, the insurance companies would be obligated to pay liquidated damages.[5] Enron wanted to replace the PLCs with surety bonds issued by insurance companies to free up additional bank capacity and because it could obtain credit support from sureties at a more competitive rate.[6] The surety exposure was limited by spreading it across ten insurance companies. Chase agreed to replace the PLCs with the sureties in September 1998.[7]

*Ownership and Control of Mahonia*

---

[4]In memoranda documenting discussions between Chase and Enron regarding prepays, fees typically are discussed in terms of the London Interbank Offered Rate (LIBOR) plus a basis point spread, terms generally used to refer to pricing on loans. Bates JPMC-H-011470; Bates JPM-6-04204; Bates Senate-MAH 02296.

[5]When Enron failed to meets its obligations, and the insurance companies failed to pay liquidated damages, Chase filed a complaint on December 11, 2001, to force the insurance companies to pay. The insurance companies claim that the prepay transactions were nothing more than a "complicated (and undisclosed) . . . loan" from Chase to Enron using Mahonia as a pass-through vehicle.

[6]Chase email, "re: request for credit approval to replace PLCs," September 22, 1998. Bates JPMC-H 011640.

[7] Staff Interview, June 25, 2002.

Although Mahonia is technically a legally separate entity from Chase, the facts surrounding its creation, operation and control raise questions as to whether it is truly independent. In 1986, Chase sought the assistance a Jersey law firm, Mourant du Feu & Jeune ("Mourant"), in establishing a charitable trust to own special purpose vehicles that would be "controlled by Chase but, for accounting and other requirements...[not be] wholly owned by Chase."[8] Chase wanted to use the trust to assist clients who wished "to raise finance not by way of borrowing but by way of a related transaction."[9] To accomplish this objective, Mourant created the Eastmoss Charitable Trust ("Eastmoss"), which would come to own a number of SPEs that served as counter-parties to prepay transactions with Chase and Chase's clients. Mourant served as trustee for Eastmoss.

Chase's ongoing involvement in Eastmoss and its related entities is undeniable. In thanking the Commercial Relations Department of the States of Jersey for assisting with incorporation of Eastmoss, Mourant adds that the Department's work "was very much appreciated . . . by Chase."[10] The purpose of the SPEs was to "issue notes and to finance transactions arranged by Chase Bank."[11] Documents indicate that over twenty-five Jersey registered companies owned by the Trustees of the Eastmoss Trust were created on Chase's behalf.[12] One of these companies was Mahonia Limited.

Mahonia Limited, created by Mourant in December 1992, is described as a "finance company" whose purpose is "to assist in transactions arranged by Chase Bank."[13] Mourant defined the purpose of these vehicles more narrowly in a letter regarding the incorporation of Mahonia II Limited: "The overall effect of these arrangements will be that Chase will be providing finance to the relevant US Oil or Gas company on the security of the inventory of Oil or Gas, but without [Mahonia II] taking any exposure to the Oil and Gas market."[14] In reality, Mahonia could not have functioned as an independent trading party because it had only £10,000 of capitalization,[15] no employees and Mourant attorneys who served as the Directors. In each prepay transaction Mahonia's financing came from Chase, and a security agreement signed by Mahonia in favor of Chase gave Chase a lien on all rights to receive gas, collateral and proceeds. In addition, for each

---

[8] April 24, 1986 application letter to Commercial Relations Officer for Island of Jersey from Mourant, page 2.

[9] Ibid., page 1.

[10] May 29, 1986 letter to Assistant Commercial Relations Officer for the Island of Jersey from Mourant.

[11] States of Jersey creation documents for Stoneville Aegean Limited.

[12] "Jersey Registered Companies Owned by the Trustees of Eastmoss Trust."

[13] States of Jersey creation documents for Mahonia Limited; Chase Staff interview confirmed that Mahonia only performed transactions involving Chase.

[14] Letter to the Jersey Financial Services Commission from Mourant, November 19, 1999. February/March, 2002 Mourant email discusses "anomalies" in which Mahonia was excluded from certain trades, indicating that Mahonia's sole purpose was to overcome legal and accounting hurdles rather than to serve as a pivotal trading partner.

[15] States of Jersey creation documents for Mahonia Limited.

prepay transaction, Mahonia agreed to let Chase operate as its agent. The agency agreement allowed Chase to review transaction documents on behalf of Mahonia, and even more broadly, to "perform such other functions as are reasonably" necessary.[16] Chase controlled Mahonia so completely that such a security agreement was probably superfluous.

If Mahonia and Chase are substantively the same entity, then Enron's prepay transactions have but two legs and must be accounted for as loans. Mahonia is a non-substantive entity established for the benefit of Chase:

•     Chase used Mahonia to assist clients who wished "to raise finance not by way of borrowing but by way of a related transaction."[17]

•     Mahonia could not have functioned as an independent trading party because it had only £10,000 of capitalization,[18] no employees and Mourant attorneys who served as the Directors.

•     In each prepay transaction Mahonia's financing came from Chase.

•     Chase and Enron bypassed Mahonia in pipeline agreements for certain trades.[19]

•     Mahonia attorney states that Mahonia "would be controlled by Chase but, for accounting and other requirements...[not be] wholly owned by Chase.[20]

•     Chase was granted power of attorney and named as agent by Mahonia.[21]

•     Chase's attorneys would review the documents on behalf of Mahonia and forward the documents to Mourant attorneys for them to sign.[22] In some cases, Enron's attorneys from

---

[16]Agency agreement between Chase and Mahonia, September 28, 2001. Bates JPM-6-03145.

[17]April 24, 1986, application letter to Commercial Relations Officer for Island of Jersey from Mourant.

[18]States of Jersey creation documents for Mahonia Limited.

[19]February 2002 Mourant email discusses "anomalies" in which Mahonia was excluded from certain trades, indicating that Mahonia's sole purpose was to overcome legal and accounting hurdles rather than to serve as a pivotal trading partner.

[20]April 24, 1986 application letter to Commercial Relations Officer for Island of Jersey from Mourant.

[21] See, for example, letter from Mahonia to Chase, September 28, 2001. Bates JPM-6-03145.

[22] Chase, Staff Interview, June 25, 2002; Chase, Staff Interview, July 16, 2002; Chase email to Mourant in which a Chase attorney states that he is "in the process of reviewing the enclosed documents and will provide comments on Mahonia's behalf to Enron," September 24, 2001. Bates JPM-6-03044; email from Chase to Mourant attorneys states that "the following documentation forwarded by Vinson & Elkins is acceptable and may be executed by Mahonia," June 28, 2000.

Vinson & Elkins would review the Enron-Mahonia documents and forward them (assumably for Mahonia's review) directly to Chase.

•    Chase did not charge Mahonia a fee for its services, and, in fact, reimbursed Mahonia for any administrative fees incurred as a result of transactions with Chase.[23]

•    When Enron employees needed to communicate with Mahonia, they directed all inquiries through Chase.[24]

•    Chase bankers made business decisions for Mahonia, such as whether or not to close bank accounts.[25]

•    When Arthur Andersen sought to confirm Mahonia's independence from Chase, employees of Chase and Enron crafted Mahonia's response.[26]

Further evidence indicates that contracts between Enron, Chase and Mahonia did not achieve the other criteria outlined by Arthur Andersen for treating prepays as trading activities: de-linkage and price risk.

---

[23] Chase, Staff Interview, July 16, 2002; Mourant invoice sent to Chase, October 29, 2001. Bates JPM-6-03128.

[24] Enron, Staff Interview, June 28th, 2002.

[25] Chase email to Mourant.  ". . . close a number of dormant demand deposit accounts . . . close all but two accounts (Mahonia Limited and Mahonia II Limited)," April 27, 2000.  Bates JPMC-H 011240.

[26] Email exchange among and between Chase and Enron, September 2001.  Bates SENATE MAH - 00765. Approximately two weeks before the September 2001 prepay transaction was scheduled to close, Arthur Andersen communicated to Enron that they would like Mahonia to make four representations: (1) Mahonia was not restricted from undertaking business with other entities and that it had undertaken business with entities other than Enron; (2) Mahonia had assets other than those acquired through transactions with Enron; (3) Mahonia had unencumbered assets, which were available for application toward obligations owed to its creditors; and (4) Chase and its consolidated subsidiaries do not own the ownership interests of the Company or consolidate the Company under generally accepted accounting principles. Arthur Andersen did not, however, ask Mahonia to confirm that it had participated in transactions other than with Chase.

The resulting letter from an Enron executive, dated September 26, 2001, informed Mahonia that Arthur Andersen would like to confirm information as part of "an audit of [Enron's] financial statements."  The Subcommittee learned in Staff Interview with Andersen, July 13, 2001, that Andersen allowed Enron to send the letter, which was addressed to Mourant and signed by the Enron executive, directly to Mahonia and that it was returned by Mahonia directly to Enron.  The normal course of action when an auditor is attempting to confirm information from a third party as part of an audit is for the auditor to maintain custody of the letter, including sealing the envelope, sending the confirmation letter, and receiving the third party's response.

The purpose for this audit approach is to ensure that terms of the confirmation letter are not changed by the third party.  In this case, point number four (4) from above was changed to "The Chase Manhattan Bank and its consolidated subsidiaries do not own the ownership interests of the Company" before the letter was signed and returned by Mahonia.

- The Security Agreement between Chase and Mahonia related to the December 1997 Chase/Enron prepay gives Chase a lien on Mahonia's rights and interests in its agreement with Enron. Enron consented to that Agreement.[27]

- Mahonia was perfectly hedged in its transactions with Enron and Chase in every prepay.

- Mahonia's profit from each of the prepays was fixed and in no way dependent on the market price of the underlying commodity.[28]

- Margin calls owed by Enron to Mahonia as a result of changes in the market price of the commodities underlying the prepay transactions were, in some instances, never made, demonstrating that Mahonia neither benefitted not lost in its transactions with Chase on the basis of market fluctuations.[29]

- Enron had an elaborate methodology for backing into the monetary values in the prepay transactions irrespective of commodities prices.[30]

- Pricing of prepays with Chase were based on LIBOR, a convention for pricing bank loans.[31]

*September 28, 2001, Prepay*

The last Enron prepay closed on September 28, 2001, and was arguably the most obvious about its true purpose. At that time, Enron needed to identify additional operating cash flow to report in its third quarter financial statements and was making inquiries of several financial institutions about the possibility of executing a prepay transaction.[32] When two Enron employees called Chase about doing a $350 million prepay designed to close before the end of the third quarter,

---

[27]Consent and Agreement for the December 1997 Chase/Enron Prepay, Bates JPMC-H 003030, and the corresponding Security Agreement between Mahonia and Chase, Bates JPMC-H 000045. Arthur Andersen stipulates that the contracts in the Prepay must stand alone and not reference each other in any way, especially in the event of default. Under this arrangement Chase received all rights to floating payments by Enron to Mahonia and accepted all responsibilities of Mahonia. The arrangement would cause Mahonia and Chase to collapse into a single entity in the event of a Mahonia default. The net result of that collapse would have Enron paying a fixed amount to Chase under the Enron-Chase swap agreement in exchange for the cash it was prepaid originally, a typical loan arrangement.

[28]Letter from Mourant to Chase regarding a fixed management fee and administration fee. Bates JPM-6-04141; September 5, 2000, email from Mourant describing Mahonia's fees as being "levied on a fixed basis" and not "factored into trading prices," JPMC-H 011239; Mourant memo to Chase dated December 11, 1996: "In return for participation in the transaction described in your letter Mahonia Limited would levy a fixed management and administration fee of £15,000."

[29]Chase email, July 17, 2000. Bates SENATE MAH - 02500.

[30]Enron email to Chase describes in detail Enron's methodology, June 19, 2000. Bates SENATE MAH - 00757.

[31] Bates SENATE MAH 02296 and Bates JPM-1-00061.

[32]Concurrent with its discussions with Chase, Enron was executing a $150 million prepay "refinancing" with Credit Suisse First Boston ("CSFB"). Moreover, Enron requested an additional $200 million in prepay financing from CSFB, bringing the total prepay funding sought by Enron prior to prior to the end or the third quarter 2001, to $700 million.

an Enron manager told Chase that Enron would "take any money (it could get) now even if it's on a one year basis."[33]

Eventually, Chase and Enron agreed on a prepay with a six month duration/maturity. Unlike previous Chase/Enron prepays, the parties agreed that the transaction would be financially settled; thus, rather than execute two prepaid forward contracts and a swap, the structure had three swaps. The transaction closed on September 28, 2001, with bullet payment scheduled for March 26, 2002. The structure included the following steps:

• Chase and Mahonia entered into a prepaid commodity swap whereby Chase transferred $350 million to Mahonia on September 28, 2001, and Mahonia agreed to pay a floating price calculated by multiplying the notional quantity of natural gas (127,923,977 MMBtus) by the market price for gas on the agreed upon payment day, March 26, 2002. The floating payment was to be derived from the price of gas on March 25, 2002, of the NYMEX Henry Hub Natural Gas Futures Contract for the April 2002 delivery month.

• Mahonia and Enron entered into a mirror contract whereby Mahonia paid $350 million to Enron on September 28, 2001, and Enron agreed to pay the same floating price on the same payment day, March 26, 2002. (Enron agreed to pay an arrangement fee of $1 million at closing to be deducted from the $350 million prepayment amount.[34])

• To hedge their exposure from the price risk created by the prepaid swaps in steps one and two, Enron and Chase entered into a financially settled commodity swap whereby on March 26, 2002, Enron was to pay a fixed price to Chase determined by multiplying $2.7826 by the notional quantity of natural gas, 127,923,977 MMBtu ($355,961,258). In return, Chase was to pay on March 26, 2002, a floating price determined as described in step one and step two.

The result of these financially settled swaps was that Chase provided $350 million to Enron in September 2001, and Enron promised to re-pay Chase $355.9 million in March of 2002. In effect, Chase loaned Enron $350 million, and Enron agreed to re-pay the principal within 6 months at an effective annual interest rate of 3.44%.[35]

h h h

---

[33]Chase email, September 12, 2001. Bates SENATE MAH - 0721. Initially, Enron requested that the prepay be backed by surety bonds as in similar prepays. Chase's credit department refused because the bank did not want to take on additional surety exposure and would no longer accept the bonds as credit support. Enron signed a guarantee, as it did for previous prepay transactions, in favor of Chase to guarantee the performance of its subsidiary, Enron North America. To mitigate risk, Enron brought Westdeutsche Landesbank Girozentrale ("WestLB") into the transaction, and WestLB underwrote a letter of credit for $165 million that was syndicated to other banks. Chase also arranged a syndication of banks that issued a second letter of credit for $150 million in Mahonia's favor. The letters of credit were posted to secure Chase's exposure under the prepaid commodity transaction. WestLB has refused to pay, and Chase has filed a lawsuit against WestLB in a United Kingdom court.

[34]Fee letter from Chase to Enron, September 28, 2001. Bates SENATE MAH- 03273.

[35]Effective interest rate does not factor in the $1 million up-front fee paid to Chase.

# A P P E N D I X   D

## CITIGROUP CASE HISTORY

Citigroup, along with Chase was, was a major provider of prepays and financing to Enron. Beginning in December 1993, Citigroup led 14 separate prepay transactions totaling $4.8 billion for Enron. The total outstanding Citigroup prepay debt at the time of Enron's bankruptcy was $2.5 billion.[1]

The structure employed for Citigroup's prepays closely follows the structure of Chase/Mahonia transactions with Enron.[2] Citigroup created an offshore entity called Delta Energy Corporation in the Cayman Islands, which along with Enron and Citibank, would form the familiar triangle used to structure the prepays and remove price risk from the transaction.

The most prominent structural difference between the Enron/Chase transactions and the Enron/Citigroup transactions was the manner in which the later Enron/Citigroup transactions were financed. The first Enron/Citigroup transactions involved financing similar to the Enron/Chase transactions, in which the bank served as the source of funds that went through the special purpose entity, Delta, and on to Enron. Later Enron/Citibank transactions, representing $2.4 billion of the total $4.8 billion in prepay transactions between the two parties, were financed through bond offerings. "Yosemite" was the name of a series of six synthetic Enron bond offerings used to raise the $2.4 billion.[3] All of these bonds, with maturities ranging from five to seven years, remained outstanding at the time of the Enron bankruptcy.

For each of the offerings, a trust that was off-balance sheet to Enron offered credit linked obligations (notes that were linked to Enron's credit) to "Qualified Institutional Buyers."[4] By raising the funds for the prepays in this fashion, the institutional investors, rather than Citigroup, took on the risk that Enron would not or could not repay the funds. No additional credit support, such as surety bonds or letters of credit, was employed.

*How the Citigroup Prepays Worked*

---

[1]See Appendix E for a list of all the Citigroup prepays.

[2]Citigroup's prepays involved the transfer of crude oil and natural gas. Prior to 1999, the transactions appear to have been physically settled -- the title to ownership of the commodity was transferred among the parties to the transactions. Thereafter, the transactions were all financially settled -- the funds representing the net value of each of the trades and swaps between the parties to the transaction was transferred among the parties.

[3]They were: Yosemite I, 11/18/99, $750 mm; Yosemite II, 2/23/00, £200 mm; Yosemite III (issued as Enron CLN I–Credit Linked Note), 8/17/00, $500 mm; Yosemite IV (issued as Enron CLN II), 5/17/01, comprising 3 offerings: $500 mm; £125 mm; and 200 mm Euros.

[4]Under SEC rules, "Qualified Institutional Buyers" are entities that have sufficient resources and investment sophistication that they are deemed capable of making investment decisions without the offering material being filed with the SEC for adequate disclosure review. These are commonly called Rule 144(A) offerings.

The same basic triangle employed in the Enron/Chase prepays applied to the Enron/Citigroup transactions. For illustration purposes, a simplified prepay transaction is described with the Yosemite I Trust providing the initial funding.

- The Yosemite I Trust loaned $800 million proceeds to Delta Energy, a Citigroup SPE.

- Delta immediately entered into a cash-settled prepaid forward contract with Enron. Delta paid Enron the $800 million up front. In return, Delta would receive the spot price value of a preset number of barrels of crude oil at maturity. The net difference between Delta's payment to Enron and the value of the crude oil owed to Delta by Enron would be settled through a cash payment.



**Delta-Enron Prepay Leg for Yosemite I**

• At the same time, Enron and Citigroup entered into a hedging transaction.[5] In a cash-settled swap, Enron would receive the spot value of the same fixed amount of crude as in the Enron-Delta transaction at maturity, while Citigroup would receive a fixed value of $800 million at maturity.



**Enron-Citigroup Commodity Swap (Hedge)**

• Meanwhile, Citigroup and Delta entered into a hedging transaction. In a cash-settled swap, Citigroup would receive the spot value of the same fixed amount of crude as in the Enron-Delta and Citigroup-Enron transaction at maturity, while Delta would receive the fixed value of $800 million at maturity.



**Citigroup-Delta Commodity Swap (Hedge)**

---

[5]A hedging transaction is a transaction established to limit or eliminate the risk a party bears in another transaction. In this case, Enron has price risk in its transaction with Delta - i.e., the $800 million it receives from Delta might be less than the cost of the spot price of the oil that it owes to Delta. Similarly, Citibank has price risk from the transaction that it enters into with Delta as part of the series of transactions involved in this prepay transaction - the spot value of the oil it receives from Delta may be less than the $800 million it pays up front to Delta.

In this arrangement, the spot value of the crude oil that each party owes and receives cancel each other out.  Thus, the net effect is that the only transfer of funds is the transfer of $800 million from Enron to Citigroup and back to Delta, from which it originated.[6]



**Complete Citigroup Prepay**

In effect, Enron receives $800 million at the beginning of the transaction and repays the principal to Delta (via Citibank) at maturity.  Every six months an interest payment, the spot value of a certain fixed volume of oil, is returned to Delta by Enron.  Swaps in place on the Enron/Citibank and Citibank/Delta legs ensure a fixed interest payment of $29 million being paid to Delta every six months, an effective rate of 7.25%.  The risk retained by Citibank and Delta is the same as if they loaned money to Enron. The effect of the transaction is like a loan, but it is not accounted as such in Enron's financial statements.

Citigroup and Enron also introduced a series of caps and floors on the payments made in each leg of the transaction.[7] These floors and caps ensured that no party paid or received more or

---

[6]Another way to look at the structure is to look at the net cash payments at maturity for each leg.  The Enron-Delta leg pays the spot value of the fixed number of barrels back to Delta upon maturity.  This value may be more or less than $800 million.  If it is more than $800 million, the swaps in the other trading legs effectively "refund" the spread to Enron via Citigroup.  If the Enron-Delta payment at maturity is less than $800 million, the swaps in the other trading legs effectively provide a "make-whole" payment paid by Enron to Delta via Citigroup such that Delta's payments from both legs total $800 million. Price risk is eliminated.  The net result is that $800 million of principal is routed directly and indirectly from Enron to Delta upon maturity.

[7]The purpose of the floor/cap arrangement was to eliminate excess pre-settlement risk (PSR) on the principal.  The problem addressed arises from the case where the spot value of the oil at maturity is greater than the fixed amount of $800 million.  Under this circumstance, the cash in excess of $800 million that needs to be in transit during settlement represents additional risk for the parties depending on how the legs settle.

The Yosemite structures place a cap on the cash payment at maturity from Enron back to Delta.  The cap is set to the fixed amount, namely $800 million in the case of Yosemite I.  There is no longer any need for additional cash to refund the excess payment to Enron via Citigroup should the spot value of the crude exceed $800 million.  To complete the structure, floors along the path from Enron to Delta via Citigroup block payments in the reverse direction for the high spot value case.

Therefore, if the spot value paid by Enron to Delta at maturity is less than the fixed value, just as before, the swap/floor still effectively provides a make-whole payment from Enron to Delta via Citigroup such that Delta's payments

less than the original $800 million paid by Delta.  The floor/cap arrangement was considered proprietary "prepay technology" by Citigroup, not to be revealed to other financial institutions.[8]

To ensure that each leg of the triangle appears as a true trading contract, there is also an up-front premium payment made in each leg to cover the value of the cap or floor derivatives in each leg.  Since the price of each derivative ($94 million for Yosemite I) is identical for each of the legs and flows in the same direction around the triangle, no net payment accrues to any party.  The net effect, however, is that the $800 million up-front prepay from Delta to Enron is reduced to $706 million, and an additional "premium payment" flows from Delta to Enron via Citigroup.  Enron still receives the same $800 million up-front.



**Yosemite I Principal Payments**

Upon close-out of the trading legs, Delta repays the $800 million principal to the trust, which then pays back the bondholders.

---

from both legs total $800 million.  If the spot value at maturity is greater than or equal to the fixed value, then a payment of the fixed value is made by Enron directly to Delta.  No payments are made on the other legs.  In either case, price risk is eliminated, but now the total amount of cash in transit prior to settlement is never more than the fixed value, namely $800 million in the case of Yosemite I.

[8]Citigroup email, "RE: Yosemite II (Europe)," November 16, 1999.  Bates CITI-SPSI 003361.

*Ownership and Control of Delta*

Similar to the Enron-Chase prepays, all but one of the Citibank-Enron prepays involved an SPE, Delta Energy Corporation, which was incorporated in the Cayman Islands in 1993 at the request of Citigroup.[9]  Its purpose was to be a third party to the prepay transactions.  None of the individuals interviewed from Enron and Citigroup, however, indicated to the Subcommittee that Delta was anything other than an SPE established for the sole purpose of entering into contracts to effect prepays.

Although Delta appears, technically, to be a legally separate entity from Citigroup, as with Mahonia, the facts surrounding its creation, operation and control prove otherwise.  Delta is a non-substantive entity established for the benefit of Citigroup.

•   Delta was established by Citigroup.[10]

•   There is no indication that Delta has a physical office or staff, or that it has the personnel or physical facilities to engage in oil and gas trading.

•   Delta only participated in prepay transactions that also included Citigroup.[11]

•   Delta was capitalized with only $1,000.  It could not have participated in trading activity of the size of the Yosemite deals without receiving financing from Citigroup or Yosemite Securities Trust.[12]

Citigroup controls Delta

•   For each transaction, Citigroup and Enron prepared a set of completed documents for Delta.[13]

---

[9]Delta was originally administered by Givens Hall Bank and Trust, Ltd. in the Cayman Islands and is now administered by Schroder Cayman Bank and Trust Company, Ltd.  Schroder was acquired by Salomon Smith Barney, a subsidiary of Citigroup, in January 2000. As of September 10, 2001, Delta's parent company was Grand Commodities Corporation, also of the Cayman Islands.  It is represented by Maples and Calder, Cayman Islands Attorneys at Law. Bates CITI-SPSI 0103726.

[10]Citigroup email, "RE: A couple more questions," August 31, 2000.  Bates CITI-SPSI 0046024.

[11]September 3, 1999 Citigroup email implies that Citigroup is Delta's only business partner.  Bates CITI-SPSI 0036322.

[12]Bates CITI-SPSI 0046605 and CITI-SPSI 0046542.

[13]Citigroup, Staff Interview, June 24, 2002.

- When third parties needed to communicate or negotiate with Delta, they directed all inquiries through Citigroup.[14,15]

- Delta's outside attorneys seek authorizations from Citigroup instead of from Delta directly.[16]

- Delta's expenses associated with prepay transactions were reimbursed by Citigroup.[17,18]

- Delta's Citigroup bank account is controlled by Citicorp.[19]

- Delta's Administrator is Schroder Cayman Bank and Trust Company, Ltd, a subsidiary of Citigroup since January, 2000.[20]

Further evidence indicates that contracts between Enron, Citigroup and Delta did not achieve the de-linkage requirements set forth by Arthur Andersen.[21]

- Yosemite had cross-termination provisions that were designed to collapse the entire prepay structure in the event of a party's default.[22]

---

[14]Memo from Maples and Calder to Citigroup asks Citigroup to look into fees not paid by Enron to Maples and Calder related to Delta, September 10, 2001.  Bates CITI-SPSI 0103726.

[15]Enron email to Citigroup to discuss representations that Delta needs to make to Arthur Andersen, June 22, 2001.  Bates CITI-SPSI 0050675.

[16]Memo from Maples and Calder. They would like to disclose information about Delta and ask Citigroup "if you would confirm whether it is acceptable to you for this information to be provided." November 2, 1999.  Bates CITI-SPSI 0046604.

[17]Fax from Bank of Bermuda (Cayman) Limited to Citigroup asking to be paid fees for work done related to Delta.  Bates CITI-SPSI 0103717.

[18]May 16, 1999 fax to Citicorp Securities Inc. acknowledging that Delta fees were paid. Bates CITI-SPSI 0046893.

[19]Citigroup memos, "We will not be obtaining any documentation because of the internal nature of the account," September 27, 1994.  Bates CITI-SPSI 0032825 and CITI-SPSI 0032830.

[20]Memo from Maples and Calder to Citigroup, September 10, 2001.  Bates CITI-SPSI 0103726.

[21]Bates CITI-SPSI 0103943.

[22]See, for example, December 22, 1999, Citibank/Delta Swap Confirmation, p. 8, Bates CITI-SPSI 0003606. In his interview with Subcommittee staff, a Citigroup Vice President who signed many of the swap agreements, confirmed that the goal of these clauses was to collapse all three legs of the transaction simultaneously.  Note: Swap Confirmation agreements for all three parties to the prepay (including the Enron-Delta leg) were drafted by the same attorneys for Citigroup, Milbank, Tweed, Hadley & McCloy.

- As a result of a provision associated with the Yosemite trust, Citigroup effectively had a lien on Delta's right, title, and interest in Delta's agreements with Enron.[23]

- Another provision of the Citigroup-Delta leg precludes Delta from making any changes in the Enron-Delta leg without the consent of Citigroup.[24]

- Citigroup emails after Enron bankruptcy show an operational concern for terminating the agreements on the same day.[25,26]

Finally, as with Mahonia in the Chase prepays, Delta did not have sufficient price risk in its transactions to justify accounting for them as trades.

- Citigroup paid Delta a fixed fee for serving as a party to the prepay transaction.[27]

- Delta never profited from or lost on price fluctuation in the commodities traded in the prepay transactions. Commodities prices were not a factor in profitability to Delta.[28]

- Values for legs of the Yosemite prepay were calculated based on borrowing rates instead of commodities prices.[29]

- Delta contracts designed to terminate simultaneously with other contracts to avoid price risk.[30]

*Yosemite*

---

[23]Enron/Delta Swap Confirmation, December 22, 1999, p. 8, Bates CITI-SPSI 0003580.

[24]Citibank/Delta Swap Confirmation, December 22, 1999, p. 8, Bates CITI-SPSI 0003606.

[25]Citigroup email addressing the need to terminate the floating legs of a prepay transaction between Delta and Enron simultaneously, November 13, 2001. Bates CITI-SPSI 0068679.

[26]Citigroup email, December 2, 2001. Bates CITI-SPSI 0091839.

[27]From transaction documents, this amount, typically $5,000, was taken from the initial proceeds of each financing. Delta Fee document, Bates CITI-SPSI 0103719.

[28]Ibid.

[29]An Enron/Citigroup presentation for Yosemite prepay shows the prepay calculated in terms of LIBOR. Bates CITI-SPSI 0103942.

[30]Citigroup email, September 3, 1999. Bates CITI-SPSI 0036322.

Citigroup (then Citicorp) had been working with Enron on various financial transactions since 1989. The relationship earned Citigroup a total of $167 million fees and interest income from 1997 to 2001.[31]  By the first quarter of 1999, Citigroup's total exposure to Enron increased to $1.668 billion, a level more than four times Citibank's internally-imposed limit for Enron.[32]  At this time, internal Citibank documents indicate that it was making efforts to rein in this exposure. One company email late in 1999 states, "we still have an exposure issue as it relates to obligor limits; there is a developing view that limits are limits and not to be exceeded. This is something we will all have to deal with."[33]

Sometime in early 1999, Enron selected Salomon Smith Barney to create a security known as a Credit Linked Obligation (CLO).[34]  This structure allowed for securitization of assets by issuing obligations that looked like corporate bonds and would free-up bank capacity by tapping the capital markets, selling bonds linked to Enron credit. Enron's objectives for the CLO included limited "Rating agency disclosure", "Substitution rights" and "flexibility."[35]

Yosemite was intended to be a synthetic Enron bond. Its first issuance would offer a fixed interest rate of 8.25% – roughly 200 basis points above U.S. Treasury bills of matching tenor. In the case of an Enron bankruptcy, it would emulate an Enron bond: Yosemite bondholders would receive claims to an equivalent holding of senior unsecured Enron debt.

From Citigroup's perspective this was good business to pursue. The newly merged Citigroup possessed or could develop key capabilities to carry out the structure arm that was to become Yosemite. But besides the substantial fees it would earn on the deal, it would be a way to significantly reduce Citigroup's own exposure to Enron by rolling over its Enron loans into the capital markets.

A Salomon Smith Barney official described Enron's goal of achieving flexibility typically associated with a bank facility through the CLO vehicle. The "black box" feature of the Yosemite vehicle, which hid from investors Enron's use of the proceeds turned out to be an ideal cloak for prepays. In fact, a "Yosemite Update" presentation points out that the structure "provides for a unique 'black box' feature which provides considerable flexibility for substitution...while limiting disclosure of the prepay to Citibank."[36]  The presentation goes on to state, "The use of prepays as

[31]Citigroup letter to the Subcommittee, May 2, 2002, in response to Subcommittee subpoena.

[32]This "Obligor Limit" was set to $375 million prior to mid-1999. Global Loans Approval Memorandum, "Truman" Extension Transaction. Bates CITI-SPSI 0103768.

[33]Citigroup email, "RE: Yosemite II (Europe)" November 10, 1999. Bates CITI-SPSI 0033633.

[34]Citigroup, Staff Interview, June 24, 2002.

[35]Enron Presentation, "Project Yosemite," January 1999. Bates CITI-SPSI 0035868.

[36]Bates ECa000196339.

a monetization tool is a sensitive topic for both the rating agencies and banks/institutional investors. The ability to continue minimizing disclosure will likely be compromised if transactions continue to be syndicated."

Both Enron and Citigroup clearly knew about and understood the accounting implications of Yosemite.  An internal Enron memo states, "The use of the prepaid swap was not motivated by tax considerations but instead was necessary to report the transaction as part of ENA's price risk management activities rather than debt for financial accounting purposes."[37]

A Citigroup email provides an overview of the entire core functionality of the Yosemite transaction in a single, shorthand paragraph.[38]   The text describes the transaction as "net net economically like a loan . . . E [Enron] gets money that gives them cflow [cash flow] but does not show up on the books as big D Debt."

*The Yosemite Investments*

Yosemite brought in a total of $825 million, $750 million from debt notes, and $75 million from equity certificates.[39]  Of these proceeds, *all* were invested in so-called "Enron Investments"– specifically defined in the Offering Memorandum as "payment obligations supported, in whole or

---

[37]Enron memo, "Yosemite I Withholding", January 10, 2000, Bates EC2 000011612, footnote 5.  The Subcommittee staff verified the conclusions in this document through a Staff Interview, June 18, 2002.

[38]Citibank email, "My take on how to explain ECLN."  Bates CITI-SPSI 0084924.

[39]For various tax, ERISA, accounting, and structural considerations, Citigroup and Enron settled on $75 million worth of equity "certificates" to be issued.  For tax purposes, Yosemite would be structured as a debt vehicle, the certificates would be first loss, and the certificates would bear 11% interest.  The certificates were to be split evenly between Enron and Citigroup such that neither company would be required to consolidate Yosemite on its books, nor report the structure in footnotes to financial statements.

Although there was no apparent business purpose for doing so, Citigroup set out to mask the identities of the certificate holders–including Citgroup's own identity.  All of the four Yosemite Offering Memoranda state that the identities of the certificate holders will not be revealed.  The *de facto* owners, Enron and Citigroup, each turned out to have issues with their certificates.

Citigroup set up a "front" certificate holder using BankBoston (now FleetBoston Financial) as a "conduit" or "balance sheet provider." Fleet had previously established a general-use, special-purpose, off-balance sheet entity called Long Lane Master Trust IV.  On paper, Long Lane "owned" the Yosemite certificate.  However, through a Total Return Swap transaction with Fleet, Citigroup would effectively retain the rights and risks (albeit remote) of ownership.  During an interview with Subcommittee staff, June 19, 2002, officials from Fleet stated that it was not their habit to ask questions of Citigroup about how the conduit would be employed and that they would hold this transaction, like any other transaction, confidential.  The Subcommittee staff believes that such conduit providers are commonplace and are thought to be permissible–at least in their simple building block form–under a literal interpretation of accounting rules.

Since Citigroup was providing $37.5 million of credit for its share of the trust certificates, it analyzed its own risk position in a Global Loans Approval Memorandum.  As part of Citigroup's agreement with Enron, Citigroup's equity certificates would realize preferential payback in case of an Enron bankruptcy by a factor of two over the Yosemite noteholders.

After Yosemite closed, Enron determined that for accounting reasons related to the disclosure of Yosemite on Enron's financial statements, Enron actually still had too much equity in Yosemite.  Therefore, Enron acted to find another buyer–before the year 1999 was out–for what amounted to 45% of the total Yosemite equity.  Enron finally found a buyer in an Enron-related party, Whitewing.  Enron did not sell its Yosemite certificate directly to Whitewing.  Rather, the certificates were sold to Whitewing via LJM–the partnership managed by Enron Chief Financial Officer Andy Fastow–such that the certificates passed through LJM2's possession for a single day.  Enron wanted to carry out a true value sale between the related parties, Enron and Whitewing.  The transfer may well have missed the end-of-year deadline for a disclosure-related sale–the sale was formally closed in late February, 2000.

in part, directly or indirectly, by Enron." Specifically, $800 million were invested in a prepay through Delta Energy.[40] (This was the exact amount of prepay obligations due in the fourth quarter of 1999 to two Citibank-structured prepays known as "Roosevelt" and "Truman.")

*Yosemite II, CLN I, CLN II*

Yosemite II closed in February 2000 for £200 million. Structurally, it was identical to Yosemite I, except that it was incorporated in Jersey, Channel Islands, rather than Delaware.[41] After Yosemite I and II, two more versions, Yosemite III and IV were issued. To the outside world, these were known as the Credit Linked Note (CLN) I (issued in August 2000) and CLN II, CLN Euro, and CLN Sterling (issued in three currencies in May 2001). These CLN structures offered a number of minor but significant improvements over the Yosemite I and II structures. Most of these had to do with simplifying the security from the bondholder's perspective, but Citigroup also took steps to reduce its own exposure.[42]

h h h

---

[40]The remaining $25 million was invested in what Enron called the "Magic Note." The Magic Note provided a "make whole" payment. The yield from Yosemite's investments inevitably fell short of the 8.25% advertised in the Offering Memorandum. Delta's note was set up to pay 7.25% interest. Therefore, a credit subsidy was needed to make up the spread between the actual and required returns. Bates EC2 000011608.

The $25 million "principal" was invested in Enron corporate bonds. The "interest" payments came back to Yosemite to exactly make up the difference in interest payments and certificate yield from the prepays that would be required to pay the noteholders and certificate holders the return they were advertised. The interest received for Yosemite I was nearly $10 million per year--an effective interest rate of 40% per annum.

[41]To provide further protection to Citigroup for Yosemite II, Citigroup's certificates would still receive preferential payback by a factor of two. Furthermore, an amount equal to the Citigroup certificate value of £11,125,000 Sterling was retained in the trust in the form of high-yield securities. This amount was intended to serve as collateral for Citigroup in the event of an Enron bankruptcy. Bates CITI-SPSI 0035139. As in Yosemite I, Enron transferred its share of all but 5% of the outstanding ownership of Yosemite II to Whitewing at year end 2000 for accounting disclosure reasons. However, instead of transferring the certificate to Whitewing via LJM2 as it had done for Yosemite I, Enron first transferred the certificate through FleetBoston's Long Lane Master Trust IV on its way to Whitewing. Bates AASCGA(TX)005886.

[42]The main difference with the CLN was that all the investments were AAA rather than a mix of high-yield and Enron investments. The broad specification of AAA investments was largely appearance, however, as the trust simply invested its proceeds into Citibank certificates. Citibank then entered into a prepay agreement with Enron with Delta Energy as the hedging counterparty.

Citibank took 100% of the certificate value, using Royal Bank of Canada as the conduit for CLN I and ING Baring for CLN II. Ultimately, Citibank (retroactively) chose to consolidate the CLNs on Citigroup's balance sheet, but at that point such consolidation was of no consequence to Citigroup since the bond proceeds would exactly cancel out the loan to Enron.

Collateral for the full amount of the certificate was retained in the trust for Citibank (i.e., not used in the prepays). In the event of an Enron bankruptcy and the Citibank swap, there would be essentially no risk for Citibank to recover its certificate investment. Internal Citibank emails appear to discuss the implications of such a position and point out that the Offering Memorandum "makes clear" that the certificate is not a first loss position for the noteholders. Bates CITI-SPSI 0081540.

**APPENDIX E**
Summary of Enron "Prepays" with J.P. Morgan Chase and Citigroup

**Prepay Transactions with Chase**

*US$ millions*

| Transaction Name | Issuance Date | Commodity | Chase Commitment | Amount | Final Maturity Date | Amount Outstanding at Bankruptcy* | |
|---|---|---|---|---|---|---|---|
| Chase I | Dec-92 | Crude | $75.0 | $75.0 | Dec-94 | $0.0 | |
| Chase II | Jun-93 | Crude | $230.0 | $230.0 | Dec-94 | $0.0 | |
| Chase III | Dec-94 | Crude | $207.9 | $207.9 | Dec-00 | $0.0 | |
| Chase IV | Sep-95 | Gas | $225.0 | $225.0 | Jun-04 | $0.0 | |
| Chase V | Dec-96 | Gas/Crude | $350.0 | $350.0 | Jun-05 | $0.0 | |
| Chase VI | Dec-97 | Gas | $300.0 | $300.0 | Nov-01 | $6.0 | |
| Chase VII | Jun-98 | Gas | $250.0 | $250.0 | Jun-02 | $48.5 | |
| Chase VIII | Dec-98 | Crude | $250.0 | $250.0 | Dec-02 | $85.4 | |
| Chase IX | Jun-99 | Gas | $500.0 | $500.0 | Jun-04 | $298.0 | |
| Chase X | Jun-00 | Gas | $650.0 | $650.0 | Jun-05 | $519.6 | |
| Chase XI | Dec-00 | Gas | $165.0 | $330.0 | Dec-05 | $255.2 | |
| Chase XII | Sep-01 | Gas | $350.0 | $350.0 | Mar-02 | $352.0 | |
| | | | $3,552.9 | $3,717.9 | | $1,564.7 | Totals |

**Prepay Transactions with Citigroup**

*US$ millions*

| Transaction Name | Issuance Date | Commodity | Citigroup Commitment | Amount | Final Maturity Date | Amount Outstanding at Bankruptcy** | |
|---|---|---|---|---|---|---|---|
| Citibank Delta Energy 1994 | Sep-94 | Crude | $125.0 | $125.0 | Apr-96 | $0.0 | |
| Roosevelt (Natural Gas) | Dec-98 | Gas | $310.0 | $310.0 | May-99 | $0.0 | Planned syndication not realized |
| Roosevelt (Crude Oil) | Dec-98 | Crude | $190.0 | $190.0 | May-99 | $0.0 | |
| Roosevelt Extension | May-99 | Crude | $125.0 | $125.0 | Dec-99 | $0.0 | |
| Truman | Jun-99 | Crude | $250.0 | $500.0 | Jun-99 | $0.0 | Enron name: "Jethro" |
| Truman Extension | Sep-00 | Crude | $337.5 | $675.0 | Nov-99 | $0.0 | Enron name: "Jethro Extension" |
| Yosemite I | Nov-99 | Crude | $37.5 | $800.0 | Nov-04 | $800.0 | |
| Nixon | Dec-99 | Crude | $104.0 | $331.4 | Apr-00 | $0.0 | Enron name: "Yosemite II Bridge" |
| Yosemite II | Feb-00 | Crude | $16.0 | $305.0 | Feb-07 | $305.0 | |
| CLN I (Yosemite III) | Aug-00 | Crude | $0.0 | $500.0 | Aug-05 | $475.0 | |
| *Yosemite IV* | | | | | | | |
| CLN II | May-01 | Crude | $0.0 | $500.0 | May-06 | $475.0 | |
| Euro CLN | May-01 | Crude | $0.0 | $155.0 | May-06 | $155.0 | |
| Sterling CLN | May-01 | Crude | $0.0 | $161.0 | May-06 | $161.0 | |
| Citibank Natural Gas | Jun-01 | Gas | $250.0 | $250.0 | Dec-01 | $250.0 | |
| | | | $1,745.0 | $4,927.4 | | $2,621.0 | Totals |
| | | | $5,297.9 | $8,645.3 | | $4,185.7 | GRAND TOTALS |

*From letter from J.P. Morgan Chase Counsel pursuant to Subcommittee request.  Amount for Chase XII submitted by Chase was $176,000,000.

**From Credit Linked Notes Offering Memoranda and Citigroup due diligence for Dynegy merger, Bates CITI-SPSI 0033029