**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ENRON CORP., et *al.*, | Case No. 01-16034 (AJG) |
| Debtors. | Jointly Administered |

----------------------------------------------------- x

## APPENDIX D

**(Role of Citigroup and its Affiliates)**

**to**

**THIRD INTERIM REPORT OF NEAL BATSON,**
**COURT-APPOINTED EXAMINER**

Reference is made to the preceding Third Interim Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1
        A.    Introduction  and  Overview ......................................................... 1
        B.    Citigroup's  Role in Enron's SPE Transactions.. ......................... 6
        C.    Background   Information.............................................................. 8

II.     HISTORY  AND  DEVELOPMENT  OF  CITIGROUP'S  INVOLVEMENT
        WITH ENRON ....................................................................................... 11
        A.    Relationship  Between  Citigroup and Enron ............................... 11
        B.    Citigroup's Knowledge of Em-on's Financial Condition . . . . . . . . . . . . . . . . . . . . . . . 32

III.    CITIGROUP'S  ROLE IN ENRON'S SPE TRANSACTIONS ............. 45
        A.    Prepay  Transactions.. ................................................................ 45
        B.    Minority  Interest  Transactions.. ................................................ 88
        C.    Forest  Products  Transactions  .................................................. 115

IV.     POTENTIAL  LIABILITY  OF  CITIGROUP ..................................... 135
        A.    Arguments  Supporting  the  Imposition  of  Aiding  and  Abetting
              Liability  and  Equitable  Subordination............................................. 135
        B.    Arguments  Against  the  Imposition  of  Aiding  and  Abetting
              Liability  and  Equitable  Subordination ...................................... 142
        C.    Conclusions  ............................................................................ 148

I.    **INTRODUCTION**

A.    **Introduction and Overview**

In Appendix C (Role of Enron's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading. These wrongful acts caused direct and foreseeable harm to Enron itself, and they resulted in harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

This Appendix considers the role of Citigroup, Inc. ("Citigroup") in the Debtors' SPE transactions.    Through several of its subsidiaries, Citigroup helped Em-on implement-and in some cases Citigroup also designed-a number of such SPE transactions. These include notably four Prepay Transactions referred to as Yosemite I through IV in the Second Interim Report,' five additional Prepay Transactions that the Examiner did not analyze earlier (these five Prepay Transactions, together with Yosemite I through IV, are referred to collectively as the "Citigroup Prepays"), two Minority Interest Transactions called Nighthawk and Nahanni,[2] and two Forest Products

---

[1] Second Interim Report, Appendix E (Prepay Transactions). Citigroup referred to Yosemite III and IV as Enron Credit Linked Notes I and II, respectively, or ECLN I and II, respectively.

[2] Second Interim Report, Appendix I (Minority Interest Transactions). Citigroup also helped Enron complete the Rawhide Minority Interest Transaction, which is discussed in more detail later in this Appendix. Although the Examiner concluded in the Second Interim Report that Enron did not account for Rawhide in compliance with GAAP, the Examiner has not found sufficient evidence to date from which a fact-finder could conclude that Citigroup committed wrongful actions in connection with Rawhide.

Transactions called Bacchus (a FAS 140 Transaction) and Sundance Industrial.[3] In Appendix C (Role of Em-on's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties by causing Enron to enter into these transactions.

In this Appendix, the Examiner discusses evidence indicating that: (i) Citigroup had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by the Debtors' officers; (ii) Citigroup gave substantial assistance to the Debtors' officers by participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of this conduct. The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude[4] that Citigroup aided and abetted certain Enron officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct by Citigroup in connection with the Enron SPE transactions described above for a court to conclude that Citigroup's claims should be equitably subordinated to the claims of other creditors.

Citigroup's conduct in the Citigroup Prepays, Nighthawk, Nahanni, Bacchus and Sundance enabled Em-on to complete approximately $5.9 billion of financings. As a result of these financings, Enron improperly recorded more than $5 billion of cash flows from operating activities, improperly recorded approximately $132 million of income,

---

[3] Second Interim Report, Appendix K (Forest Products Transactions). Em-on used the name "Sundance" for two limited partnerships, Sundance Industrial Partners L.P. ("Sundance Industrial" or "Sundance"), which is the entity involved in this forest products transaction, and Sundance Assets L.P., which was involved in the Rawhide transaction.

[4] *See* Report, *Standard Adopted by the Examiner.*

and understated the debt on its December 31, 2000 balance sheet by approximately $1.9 billion and on its June 30, 2001 balance sheet by approximately $2.7 billion.

The evidence would allow a fact-finder to conclude that:

- Citigroup assisted Enron in completing the Citigroup Prepays, with gross proceeds totaling over $4.6 billion,[5] even though Citigroup knew that Em-on's accounting for these transactions, with no other meaningful related disclosure, would result in misleading financial presentation;

- Citigroup assisted Em-on in structuring and completing the credit linked notes fundings for the Yosemite I and II Citigroup Prepays, even though Citigroup had a substantial belief that Enron should have consolidated the borrowing entities in those transactions for accounting purposes and, therefore, should have reflected the approximately $1.1 billion of note proceeds as debt on its balance sheet;

- Citigroup designed and helped Enron implement the Nighthawk Minority Interest Transaction, allowing Em-on to raise $500 million of year-end financing without reflecting that amount on its balance sheet as debt, even though Citigroup had a substantial belief that Enron should have consolidated the Nighthawk minority investor and, therefore, that the $500 million should have been reflected as debt on Enron's balance sheet;

- Citigroup proposed that Em-on sell U.S. Treasury Securities in the Nahanni Minority Interest Transaction, in order to record $500 million of cash flow from operating activities, with knowledge that such securities likely did not qualify as merchant investments making such

---

[5] The proceeds of certain of the Citigroup Prepays were used to repay outstanding Citigroup Prepays that were maturing. For example, the $675 million Jethro Prepay Transaction refinanced and extended the $500 million Truman Prepay Transaction. See Global Loans Approval Memorandum, regarding Truman, Sept. 19, 1999 (the "Truman Global Loans Approval Memo") [CITI-B 0035882-CITI-B 00358881. The $4.6 billion total represents the gross amount of the nine Citigroup Prepays. This total includes the proceeds of three prepay transactions that were partially funded by other financial institutions, including: (i) Truman, a $500 million total transaction, in which Toronto Dominion Bank funded $250 million and Citigroup funded $250 million; (ii) Jethro, a $675 million total transaction, in which Toronto Dominion Bank funded $337.5 million and Citigroup funded $337.5 million; and (iii) Nixon, a $324 million total transaction, in which Barclays Bank PLC funded $110 million, Royal Bank of Scotland funded $110 million and Citigroup funded $104 million. The Examiner has included the total amounts of these transactions in the $4.6 billion total because, as discussed below in this Appendix, Citigroup played roles in each transaction that facilitated Enron's ability to obtain the full amount of each transaction, and Enron considered each transaction to be a single transaction. See Enron Corp. Chief Financial Officer Report, Aug. 13, 2001 (the "August 2001 Fastow Report"), at 2-12 [AB0247 02299-AB0247 023101.

cash flow reporting inappropriate, and with knowledge that the sale of the securities would bridge Enron's year end and be repaid only three to four weeks later;

- Citigroup invested $28.5 million in the Sundance Industrial transaction, agreeing to structure the investment as partnership equity in order for Enron to keep its forest products assets and related debt (in excess of $375 million) off its balance sheet, even though Citigroup considered the investment to be a loan and had a substantial belief that Enron should consolidate the partnership;

- Also in Sundance Industrial, Citigroup used $20 million of its investment to "purchase" a .01% equity interest in an Em-on SPE and then immediately contributed that equity to the partnership, despite having no business purpose for owning the equity, solely to assist Enron in recording "true sale" treatment on the purported purchase and, thereby, $20 million of income from gain on sale;

- In Bacchus, Citigroup relied upon Enron's verbal support of its 3% equity investment, knowing that the existence of such support would preclude Enron from receiving the accounting treatment that it desired for that transaction; and

- Citigroup agreed to fund the Bacchus transaction with $200 million at year-end 2000, despite a substantial belief that Em-on's sole purpose for completing the transaction was to record a material amount of earnings from gain on the sale of an asset and that the transaction was structured so that no "true sale" occurred.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Moreover, there are certain defenses to aiding and abetting liability and equitable subordination available to Citigroup. Whether Citigroup will succeed on one or more of these defenses will depend upon the fact-finder's resolution of the facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of Citigroup's *knowledge* of the acts giving rise to the breaches of fiduciary duty. In particular, whether Citigroup knew that Em-on's reporting of the SPE transactions described above would result in materially misleading presentation of Em-on's financial condition because: (i) the transactions were disclosed in a manner that disguised their economic substance so as to mislead Rating Agencies, creditors and investors; and/or (ii) the accounting for these transactions was incorrect. As part of this determination, the fact-finder may consider, among other things: (i) Citigroup's knowledge that the economic substance of these transactions was inconsistent with the disclosure; (ii) its knowledge that Enron's accounting for these transactions was likely incorrect; (iii) the impact of the verbal support in the Bacchus transaction; and (iv) whether there was any reliance on accounting representations from Enron or from Andersen through Enron, and if so, whether this reliance was reasonable.

- The degree of *assistance* provided by Citigroup to Enron's officers. As part of this determination, the fact-finder may consider whether Citigroup designed the transaction, structured the transaction, assisted in the disclosure process, consummated the transaction or took any action that would invalidate the desired accounting.

- Whether it would have been *reasonably foreseeable* to Citigroup that these transactions would cause injury to Enron and/or its creditors. As part of this analysis, a fact-finder may consider whether the transaction had a material impact on Em-on's financial statements.

Citigroup's claims in the Bankruptcy Case, which total approximately $2.4 billion,[6] are susceptible of being equitably subordinated to the claims of other creditors. This would be in addition to any affirmative recovery that may be available to the

---

[6] The Examiner has reviewed the proofs of claim filed by Citigroup against the Debtors, Citigroup's responses to the Examiner's request for information about its relationship with Enron, and information provided by Enron itself. Based on that information, it appears that Citigroup's claims against the Debtors total approximately $2.4 billion. The Examiner has attempted to exclude claims that Citigroup filed but does not economically hold, such as claims on behalf of lenders in transactions in which Citigroup served as the syndicator, but in certain instances the Examiner's information may be incomplete.

Debtors against Citigroup for aiding and abetting the officers' breach of fiduciary duty, assuming that the Debtors have standing to pursue such a claim.

### B.    Citigroup's Role in Enron's SPE Transactions

Citigroup had pivotal roles in three types of Em-on's SPE transactions: the Prepay Transactions, the Minority Interest Transactions and two of the transactions related to Enron's forest products business.

In five of the nine Citigroup Prepays, Citigroup loaned its own funds to Enron. These loans totaled over $1.4 billion in the aggregate, although some of the funds were immediately paid to Citigroup to repay existing Prepay Transactions and other outstanding obligations that Em-on owed to Citigroup. In six of the Citigroup Prepays, Citigroup's SPE, Delta Energy Corporation ("Delta"), served as a swap counter-party or the conduit entity that Enron believed was necessary to accomplish its accounting objectives. In two other Citigroup Prepays, Enron used Toronto Dominion Bank ("TD Bank") as the conduit, and Citigroup reciprocated by serving as the conduit in mirror Prepay Transactions where TD Bank was the lender, in each case with the commodity risk being hedged back to Em-on.

In the four Citigroup Prepays referred to as Yosemite I through IV, Citigroup played an even larger role. Each of these transactions included an Em-on credit linked notes issuance, the proceeds of which funded an associated prepay. Citigroup designed the credit linked notes structure and served as an underwriter, raising approximately $2.4 billion from the institutional market.

The three Minority Interest Transactions all used a structure that Citigroup designed and considered to be its proprietary product. In addition, Citigroup loaned its

own funds to Em-on in each of these transactions, and it served as placement agent for obtaining the required equity investments. When Em-on asked Citigroup at year-end 1999 to help find a way for Enron to increase its cash flows from operating activities, Citigroup suggested that Enron use U.S. Treasury Securities in the Nahanni transaction, which existed for only three weeks to bridge the year-end.

Finally, Citigroup participated in Bacchus and Sundance Industrial, which related to Em-on's forest products business. Bacchus was a FAS 140 Transaction, in which Enron transferred its pulp and paper trading business to an SPE in December 2000 so that it could record $112 million of income from the gain on sale. Citigroup facilitated the transaction by loaning the purchaser SPE $194 million, which was guaranteed by an Enron Total Return Swap. Citigroup also purchased for $6 million the 3% equity necessary for Enron to take the position that the transaction qualified for "true sale" treatment, with the equity supported by Enron's verbal support.

In Sundance Industrial, Enron sought to move all of its forest products assets and their associated debt into a nonconsolidated partnership. Citigroup purchased "equity" in the partnership for a $28.5 million cash investment and a $160 million unfunded commitment. Citigroup's investment was intended to fulfill the requirement for nonconsolidation that an independent third party own at least 3% of the partnership's equity, Also, just prior to the June 1, 2001 closing date, Citigroup agreed to use $20 million of its investment to "purchase" a .01% interest in one of the assets being contributed to the partnership, so that Enron could record $20 million of income from gain on the purported sale.

C.    **Background Information**

Citigroup is reported to be the world's second-largest financial services firm,[7] with over $1 trillion in assets as of March 3 1, 2003.[8] In October 1998, Citicorp merged with a wholly owned subsidiary of Travelers Group, Inc., which had previously acquired the investment bank Salomon Brothers.' The merged company adopted the name Citigroup, Inc. [10] Through its subsidiaries, and with approximately 250,000 employees worldwide," Citigroup provides "a broad range of financial services to consumer and corporate customers with some 200 million customer accounts in over 100 countries and territories."[12]

Citigroup provides financial services and products to its corporate customers through its Global Corporate and Investment Bank (the "GCIB").[13] The GCIB encompasses a number of business units, including notably Global Relationship Banking,[14] Global Investment Banking," Global Capital Structuring,[16] Fixed Income and Derivatives Capital Markets,[17] Energy and Mining," and Risk Management. [19]

---

[7] Citigroup Inc., Company Capsule, Hoovers Online, *available at* http://www.hoovers.com/co/capsule/ 5/0,2163,58365,00.html (last visited June 25, 2003).

[8] Citigroup Form 10-Q filed with the SEC for the Quarterly Period ended Mar. 31, 2003, Citigroup, Inc. and Subsidiaries Consolidated Statement of Financial Position.

[9] Citigroup Form 10-K filed with the SEC for the Year ended Dec. 31, 1998 (the "Citigroup 10-K for 1998"), at *5; Citigroup Begins Trading Today as Big Merger Closes,* Wall St. J., Oct. 8, 1998, at C6.

[10] Citigroup 10-K for 1998, at 5.

[11] Citigroup Form 10-K filed with the SEC for the Year ended 2002 (the "Citigroup 10-K for 2002"), at 2.

[12] Citigroup 10-K for 2002, at 2.

[13] Citigroup 10-K for 2002, at 2; Citigroup corporate and investment banking, Our Business, *available at* http://www.citigroupgcib.com/our_businesses/our_businesses.html (last visited June 25, 2003).

[14] Citigroup corporate and investment banking, Global Relationship Banking, *available at* http://www.citigroupgcib.com/our_businesses/h_global_relationshi.html (last visited June 25, 2003).

[15] Citigroup corporate and investment banking, Global Investment Banking, *available at* http://www.citigroupgcib.com/our_businesses/g_global_investment.html (last visited June 25, 2003).

Citigroup appears to structure its operations around business units rather than legal entities. Units such as Global Capital Structuring and Derivatives design the products, sell them, and use various legal entities within Citigroup to participate in and book the transactions.[20]  Few of the Citigroup employees who gave testimony to the Examiner were certain of the legal entity that employed them, and some had signing authority for multiple legal entities.[21]

In addition, the proofs of claim filed by Citigroup in the Bankruptcy Case do not appear to distinguish among the various Citigroup legal entities. With the exception of a claim made as a vendor under certain equipment leases, Citigroup has made each proof of claim either in the name of Citibank, N.A. or Citicorp North America, Inc., or by

---

[16] Citigroup corporate and investment banking, Global Capital Structuring, *available at* http://www.citigroupgcib.com/our_businesses/g_structured_corpora.html (last visited June 25, 2003).

[17] Citigroup corporate and investment banking, Fixed Income and Derivatives Capital Markets, *available at* http://www.citigroupgcib.com/our_businesses/d_fixed_income_deriv.html (last visited June 25, 2003).

[18] Citigroup corporate and investment banking, Energy and Mining, *available at* http://www.citigroupgcib.com/our_businesses/h_industry_groups.html (last visited June 25, 2003).

[19] Citigroup corporate and investment banking, Risk Management, *available at* http://www.citigroupgcib.com/our_businesses/c_risk_manage.html (last visited June 25, 2003).

[20] Sworn Statement of Paul Deards, Citigroup, to Steven M. Collins, A&B, June 9, 2003 (the "Deards Sworn Statement"), at 11 ("Legal vehicles out of which we traded depended upon customer preference, I think.").

[21] See, e.g., Deards Sworn Statement, at 11 ("Q. During the period 1998 through 2001, do you know which legal entity within the Citigroup family you were employed by? A. I – all I can say is that it changed from time to time."); Sworn Statement of Steven Wagman, Citigroup, to Steven M. Collins, A&B, May 29, 2003 (the "Wagman Sworn Statement"), at 44-45 ("We have many legal entities and, not only that, we have recently changed our name and changed the legal entity, and so which legal entity I actually was or is or am employed by is not loo-percent certain by me."); Sworn Statement of William T. Fox, III, Citigroup, to Steven M. Collins, A&B, May 14, 2003 (the "Fox Sworn Statement"), at 7 ("Q. If you think of it in terms of a legal entity, Citibank, Global Securities, Inc., Salomon Smith Barney, do you know which of those legal entities you are employed by ?  A. No."); Sworn Statement of Elliot Conway, Citigroup, to Steven M. Collins, A&B, Apr. 30, 2003 and May 23, 2003 (the "Conway Sworn Statement"), at 6-7 (indicating signing authority for entity other than employer); Sworn Statement of James F. Reilly, Jr., Citigroup, to Steven M. Collins, A&B, Apr. 25, 2003 and May 6, 2003 (the "Reilly Sworn Statement"), at 8 ("Q. Are you employed by any Citigroup entity? A. I work for Citigroup Global Markets, I believe is what it's called."); Sworn Statement of Richard J. Caplan, Citigroup, to Steven M. Collins, A&B, Apr. 22, 2003 and May 9, 2003 (the "Caplan Sworn Statement"), at 9-10 (indicating signing authority for entity other than employer).

"Citigroup, Inc. on behalf of itself and its subsidiaries."[22] Consequently, in this Appendix, the Examiner uses the term "Citigroup" to refer to the institution as a whole and does not identify the specific affiliate that was involved in a particular aspect of a particular transaction. Similarly, the Examiner refers to "Enron" rather than identifying the specific Enron affiliate involved, because such detail was addressed in the Second Interim Report and is not relevant to the matters discussed in this Appendix,

---

[22] See Citibank, N.A. Proof of Claim, No. 11264; Citibank, N.A. Proof of Claim, No. 12099; Citibank, N.A. Proof of Claim, No. 12100; Citibank, N.A. Proof of Claim, No. 12101; Citibank, N.A. Proof of Claim, No. 12102; Citibank, N.A. Proof of Claim, No. 12103; Citibank, N.A. Proof of Claim, No. 12104; Citibank, N.A. Proof of Claim, No. 12105; Citibank, N.A. Proof of Claim, No. 12106; Citibank, N.A. Proof of Claim, No. 12107; Citibank, N.A. Proof of Claim, No. 12108; Citibank, N.A. Proof of Claim, No. 12109; Citibank, N.A. Proof of Claim, No. 12110; Citibank, N.A. Proof of Claim No. 12111; Citibank, N.A. Proof of Claim, No. 14179; Citibank, N.A. Proof of Claim, No. 11264; Citibank, N.A. Proof of Claim, No. 14196; Citibank, N.A. Proof of Claim, No. 14208; Citibank, N.A. Proof of Claim, No. 14209; Citigroup, Inc. (on behalf of itself and subsidiaries) Proof of Claim, No. 12843; Citigroup, Inc. (on behalf of itself and subsidiaries) Proof of Claim, No. 14503; Citigroup, Inc. (on behalf of itself and subsidiaries) Proof of Claim, No. 14504; Citigroup, Inc. (on behalf of itself and subsidiaries) Proof of Claim, No. 14505; Citicorp North America, Inc. Proof of Claim, No. 12098; Citicorp North America, Inc. Proof of Claim, No. 14198. Citicorp Vendor Finance, Inc. also filed several small Proofs of Claim regarding various equipment leases it had entered into with the Debtors.

## II.    HISTORY AND DEVELOPMENT OF CITIGROUP'S INVOLVEMENT WITH ENRON

### A.    Relationship Between Citigroup and Enron

Citigroup's relationship with Em-on began over 20 years ago.[23] By 1997, Enron considered Citigroup to be one of its most important banking relationships.[24] From 1997 through 2001, Enron utilized the services of more than thirty banks in total and obtained debt and privately placed equity investments from more than 200 institutional investors.[25] Citigroup, however, never failed to be among Enron's group of nine or ten Tier 1 banks.[26] One Em-on employee described Citigroup as "one of the solid performers" for his business unit, "provid[ing] us with good ideas and valuable insight."[27] Em-on wrote that Citigroup was the "[p]rimary banking relationship for Enron in 1999. They line up perfectly with us – we should reward this structure."[28]

Citigroup's involvement with Enron was extensive and frequent. During the period 1997 through the Petition Date, Citigroup completed over 60 transactions with

---

[23] Memorandum from GEM-Houston, to Onno Ruding, Fernando Ynigo, Tom Stott, John Byrne, Steven Victorin and Bill Fox, Citigroup, regarding Enron Rawhide/Corporate Revolving Credit Facilities, Apr. 14, 2000, at SEC00086274 ("Citibank has maintained a relationship with Enron for over 20 years. . . .") [SEC00086226-SEC00086297]; Standard Credit Memorandum:  Enron Corporation, June 23, 1998, (the "1998 Credit Review"), at 7 [CITI-B 00978682-CITI-B 009786891 ("Citicorp has maintained a relationship with Enron for over 20 years, and is a co-lead bank for the company together with Chase."); Global Loans Approval Memorandum, regarding JEDI II, May 11, 1998, at 10 [CITI-B 0044631 l-CITI-B 004463221.

[24] In 1996, Citigroup wrote:  "We are viewed by the company [Enron] as one of its most important banks if not the most important bank."    Citicorp Loan Structuring Approval Memo, regarding Contractual Securitization Holding Trust 3, July 23, 1996 (the "CASH 3 Approval Memo"), at 10 (Ex. 37 to Reilly Sworn Statement) [SEC00187444-SEC00187461]; Reilly Sworn Statement, at 35.

[25] See, e.g., Enron Mid-Year Debt Investor Relationship Review, July 2000 (the "July 2000 Relationship Review") [AB0252 01443-AB0252 015451.

[26] See Enron Relationship Review Mid-Year 1999, July 1999 [AB0252 01557-AB0252 01601]; Enron Relationship Review, Jan. 2000 [0252 01602-AB0252 016591; July 2000 Relationship Review; Enron Debt Investor Relationship Review, Jan. 2001 [AB0252 01349-AB0252 014421; Enron Debt Investor Relationship Review, Aug. 2001 [AB0252 01291-AB0252 013481.

[27] July 2000 Relationship Review, at AB 0252 01538.

[28] *Id.* at AB 0252 01454.

Enron, counting extensions of and modifications to existing financings and credit facilities.[29]  This was an average of more than one per month.   The  following  timeline illustrates when each of the Prepay Transactions, Minority Interest Transactions and other SPE transactions discussed in this Appendix was completed. It also indicates when Citigroup completed other transactions with Enron during this time  period.[30]



| | |
|---|---|
| January 1997 | 1 lending transaction;[31] 1 underwriting |
| February 1997 | |
| March 1997 | |
| April 1997 | |
| May 1997 | 1 lending transaction |
| June 1997 | |
| July 1997 | 1 lending transaction; 1 M&A transaction |
| August 1997 | |
| September 1997 | 1 lending transaction; 1 underwriting |
| October 1997 | |
| November 1997 | 2 underwritings |
| December 1997 | **NIGHTHAWK/$500** million minority interest financing (closed (12/29/97) |
| January 1998 | Citigroup affiliates' purchase of Marlin Water Trust **Certificates**[32] |
| February 1998 | |
| March 1998 | |
| April 1998 | |
| May 1998 | 2 lending transactions |
| June 1998 | |

---

[29] Response of Citigroup Inc., Citibank, N.A. and Salomon Smith Barney, Inc. to the Examiner's Request dated 2/4/03 for Rule 2004 Examination, Feb. 4, 2003 (the "Citigroup Responses"), at 9-43. This total considers each of Yosemite I through IV as including two transactions:   the credit linked notes underwriting and the prepay transaction.

[30] The classification of a transaction as lending, underwriting or M&A (mergers and acquisitions) was provided by Citigroup in its responses to the Examiner's requests for relationship information. Citigroup Responses, at 9-43.

[31] This transaction was an increase of the principal amount of a term loan, originally $325 million and increased to $500 million, the proceeds of which were used by Enron for the construction of the Dabhol (India) power plant. See Citigroup Responses, at 16-17. The Citigroup Reponses indicated only that the transaction was completed in 1997, but did not indicate which month. *Id.*

[32] The Citigroup Responses stated that certain entities affiliated with Travelers made an aggregate investment of $15 million in Marlin Water Trust Certificates sometime in 1998, but without specifying an exact closing date. Citigroup Responses, at 46.

| | |
|---|---|
| July 1998 | |
| August 1998 | |
| September 1998 | l underwriting |
| October 1998 | |
| November 1998   I | l M&A transaction |
| | |
| | RAWHIDE/$750 million minority interest financing (closed 12/18/98) |
| December 1998 | ROOSEVELT / $500 million prepay transaction (closed 12/30/98) |
| | l lending transaction; 1 underwriting |
| January 1999 | Citigroup affiliates' purchase of Osprey Notes[33] |
| February 1999 | 1 underwriting |
| March 1999 | |
| April 1999 | ROOSEVELT/amendments |
| May 1999 | 1 lending transaction |
| June 1999 | TRUMAN/$250 million prepay transaction (closed 6/29/99) |
| July 1999 | l lending transaction |
| August 1999 | l lending transaction; 3 underwritings |
| September 1999 | JETHRO/$337.5 million prepay transaction (closed 9/29/99)[34] |
| | l underwriting |
| October 1999 | |
| November 1999 | YOSEMITE I Prepay/$800 million prepay transaction funded via credit linked notes transaction (closed 11/18/99), and associated underwriting |

---

[33] The Citigroup Responses stated that five of Citigroup's insurance company affiliates purchased an aggregate of $129 million of notes from Osprey Trust, Osprey Trust I Inc. in 1999 and 2000. Citigroup Responses, at 46. However, Citigroup did not specify which month within each of those years the transactions closed.

[34] Citigroup refers to Jethro as an extension of Truman. Citigroup Responses, at 38. However, Jethro (the nickname that Enron used) was completed one day after Truman expired by its terms, and the parties documented Jethro as a new Prepay Transaction rather than an amendment of Truman. See August 2001 Fastow Report, at 2-12. Enron used the proceeds of Jethro, in part, to repay Truman. Truman Global Loans Approval Memo, at 2 1.



**December 1999**

YOSEMITE I Prepay/existing $800 million prepay transaction replaced with longer term prepay (closed 12/22/99)

NIXON/$104 million prepay transaction (closed 12/15/99)

**NAHANNI/$500** million minority interest financing (closed 12/29/99)

Citigroup affiliates' investment in LJM2[35]

1 lending transaction

**January 2000**

**NAHANNI/substantially** redeemed (l/14/00)

RAWHIDE/amendments

**February 2000**

YOSEMITE **II/$33** 1.8 million prepay transaction funded via credit linked notes (closed 2/23/00), and associated underwriting

NIXON/amendments

**March 2000**

RAWHIDE/amendments

1 lending transaction; 1 underwriting

**April 2000**

**May 2000**

2 lending transactions

**June 2000**

RAWHIDE/amendments

**July 2000**

**August 2000**

YOSEMITE III/$475 million prepay transaction funded via credit linked notes (closed 8/25/00), and associated underwriting

**September 2000**

**October 2000**

1 underwriting

**November 2000**

1 underwriting

**December 2000**

**BACCHUS/$200** million FAS 140 structure (closed 12/20/00)

2 lending transactions; 1 M&A transaction

**January 2001**

1 underwriting

**February 2001**

---

[35] The Citigroup Responses stated that certain of its affiliates made an aggregate $15 million investment in LJM2 sometime in 1999, but without specifying an exact closing date. Citigroup Responses, at 46. A letter agreement that Citigroup executed in connection with its subscription for the LJM2 interest is dated Dec. 20, 1999. Letter Agreement between Citigroup and LJM2 Capital Management, L.P., Dec. 20, 1999 [CITI-B 0017373-CITI-B 00173771.



| | |
|---|---|
| March 200 1 | 1 lending transaction; 1 M&A transaction[36] |
| April 2001 | |
| | YOSEMITE IV/$775.1 million prepay transactions (three transactions denominated in different currencies) funded via credit linked notes (closed 5/24/01), and associated underwriting |
| May 200 1 | |
| | 2 lending transactions; 1 underwriting |
| | SUNDANCE INDUSTRIAL/Enron moved forest products assets into off-balance sheet partnership and redeemed Bacchus (closed 6/01/01) |
| June 2001 | JUNE 2001 PREPAY/$250 million prepay transaction (closed 6/28/01) |
| | 1 lending transaction |
| July 2001 | |
| August 2001 | 1 underwriting |
| September 200 1 | |
| October 2001 | 1 M&A transaction (failed merger with Dynegy)[37] |
| | SUNDANCE INDUSTRIAL/redeemed with full payment of principal and interest (closed 1 1/29/01) |
| November 200 1 | |
| | 1 lending transaction |
| December 200 1 | PETITION DATE (12/02/01) |

A bold line indicates the end of a quarterly or annual reporting period.

*Types of Transactions*

As the timeline illustrates, during the five years leading up to Em-on's bankruptcy, Citigroup was an important source of funding for Enron, both as a direct lender and as an agent for locating other lenders and investors. During this period, Citigroup represented

---

[36] This transaction is Enron's purchase of the stock of Compagnie de Papier Stadacona Ltee., which owned a paper mill in Canada that Citigroup referred to as Daishowa Paper Products. Citigroup Responses, at 32. Citigroup indicated that the transaction was completed in "late 2000," Citigroup Responses, at 32, however, the transaction documents indicate that Enron executed the purchase agreement in January 2001. See Share Purchase Agreement among Enron Industrial Markets, LLC, Enron Holdings (Canada) Co., EIM Holdings (U.S.) Inc. and Daishowa North America Corporation, Jan. 30, 2001 [AB000429016-AB000429354].

[37] The Citigroup Responses did not include any other transactions in which Citigroup assisted Enron but that failed to close. Thus, this timeline also does not include any such transactions.

Em-on in 21 initial or follow-on lending transactions.[38] Citigroup arranged or assisted in arranging over $8 billion in debt on behalf of Enron.[39] These financings took a wide variety of structures, including term loans, revolving credit facilities, a letter of credit facility, a commercial paper liquidity backstop facility, and a monetization of contract rights.[40] Citigroup served at various times in practically every role available to a financial institution, including lender, arranger (sole, lead and co-lead), adviser, underwriter, documentation agent, administrative agent, paying agent and bookrunner.[41]

In addition, Citigroup performed a wide range of investment banking services for Em-on, including designing and helping Enron implement complex and cutting edge structured finance transactions, Some of the transactions used Citigroup's proprietary products, and Citigroup played many roles for Enron, including arranger, syndicator, underwriter, financial adviser and investor.[42] In one internal memorandum, Citigroup described Enron as "a high profile customer of SSB [Salomon Smith Barney] and one of the largest users of investment bank products and services."[43]

During the period 1997 through 2001, Citigroup was an underwriter for 21 debt, equity and partnership unit offerings made by Enron and its affiliates.[44] These offerings were often for Enron Corp., but they also related to many of Enron's subsidiaries,

---

[38] Citigroup Responses, at 9-20.

[39] Id.

[40] *Id.*

[41] *Id.*

[42] ***Id.*** at 33-35.

[43] Salomon Smith Barney Investment Banking Commitment Committee Memorandum, regarding Enron Credit Linked Note Trust Senior Notes offering [Yosemite IV], Apr. 16, 2001 ("Yosemite IV SSB Memo"), at 41 [CITI-B 0080904-CITI-B 00809451.

[44] Citigroup Responses, at 2 1-3 1.

including Enron Oil & Gas Company, Northern Border Pipeline Company, Portland General Electric Company, The New Power Company, and Osprey Trust, which was affiliated with the Whitewing structure.[45]     These underwritings, which included both public and private placements, resulted in the sale of securities with an aggregate face value of approximately $9.3 billion, and Citigroup served variously as lead, co-lead and sole underwriter, as a member of the underwriting syndicate, as placement agent, and as bookrunner.[46]

During that same period, Citigroup acted as a financial adviser to Enron in four completed merger and acquisition transactions, including notably the 1997 merger with Portland General Electric, and the 2000 acquisition of Azurix Corp.'s publicly held stock.[47]  Citigroup also represented Enron in connection with its failed attempt to merge with Dynegy, Inc. in the fall of 2001, for which Citigroup received a fee of $18.6 million.[48]

In addition, Citigroup assisted Enron in completing the nine Citigroup Prepays between 1998 and 2001 totaling over $3.8 billion,[49] and Citigroup participated in five structured finance transactions with Em-on-including Nighthawk, Rawhide, Nahanni, Bacchus and Sundance Industrial-which provided Enron almost $2 billion of financing.[50]

---

[45] *Id.*

[46] *Id.*

[47] Id. at 32-33.

[48] *Id.*

[49] *Id.* at 37-43.

[50] *Id.* at 33-37.

As a result of the many varied roles that Citigroup played for Enron, it had access to substantial information about the company. As a lender, underwriter and investor, Citigroup performed due diligence with respect to all aspects of Em-on's operations, and most particularly with respect to its financial condition.[51] Many of the internal approval documents at Citigroup relating to Enron transactions included lengthy reviews of Enron.[52] These reviews often included sections on market statistics, core businesses, historical financial information, capital structure (including on and off balance sheet debt), credit rating, recent developments, financial and stock market performance, strategy, strengths and risk factors.[53] Often, these memoranda also included detailed descriptions about specific structured finance transactions that Enron had outstanding at

---

[51] 1998 Credit Review, at 8 ("Due Diligence:  The primary credit files have been reviewed and are complete"); Salomon Smith Barney Interoffice Memo, to a number of Citigroup employees, regarding Investment Grade — New York Committee Meeting for Yosemite I, Oct. 25, 1999 (the "Yosemite I SSB Memo"), at 37 ("SSB will conduct an update financial and legal due diligence call with Enron during the week of October 24, 1999. Milbank Tweed will also conduct a thorough legal due diligence of Enron prior to closing of the transaction.") [CITI-B 0120905-CITI-B 01209441; Investment Banking Commitment Committee Memorandum, regarding Enron Credit Linked Note Trust Senior Notes Offering [Yosemite III], Aug. 11, 2000 (the "Yosemite III SSB Memo"), at 40 ("SSB will conduct an update financial and legal due diligence call with Enron prior to printing preliminary prospectus.  Milbank Tweed will also conduct a thorough legal due diligence of Enron prior to closing of the transaction.") [CITI-B 0265865-CITI-B 02659071; Yosemite IV SSB Memo, at 41 ("Salomon Smith Barney is in frequent dialogue with Enron's management team regarding the Company's, and each of its subsidiaries', operating and financial results and business outlook. Milbank Tweed will also conduct a thorough legal due diligence of Enron prior to closing of the transaction."); Investment Banking Commitment Committee Memorandum, regarding $1 Billion Enron Senior Notes Offering, Aug. 13, 2001 (the "August 2001 SSB Memo"), at 27 ("Salomon Smith Barney is in frequent dialogue with Enron's management team regarding the Company's, and each of its subsidiaries', operating and financial results and business outlook. Milbank Tweed will also conduct a thorough legal due diligence of Enron prior to closing of the transaction.") [CITI-B 00828332-CITI-B 008283591.

[52] See, e.g., Yosemite I SSB Memo; Yosemite III SSB Memo; Citibank Global Loans Approval Memorandum, regarding Yosemite Corporation, Jan. 21, 2000 ("Yosemite II Global Loans Approval Memo") [CITI-B 0156 189-CITI-B 0156 198]; Global Loans Approval Memorandum, regarding Nahanni, Dec. 7, 1999 (the "Nahanni Global Loans Approval Memo") [CITI-B 0046491-CITI-B 00465051.

[53] See, e.g., Yosemite I SSB Memo; Yosemite III SSB Memo; Yosemite II Global Loans Approval Memo; Nahanni Global Loans Approval Memo.

the time, including some in which Citigroup was not involved.[54] They also often included detailed information about the company's directors and officers.[55]

For this five-year period, Citigroup had an essentially continuous opportunity for due diligence and had the need to stay abreast of Em-on's operations and financial condition. Citigroup appears to have had some type of transaction in progress with Enron at all times during this period. Thus, Citigroup's relationship with Enron presented it with the opportunity to maintain substantial current, detailed and often nonpublic information about the company.

### *Revenues*

Citigroup received in the aggregate approximately $188 million in revenues[56] from Enron during 1997 through 2001 .[57] The annual revenues steadily increased, as reflected in the following chart:

---

[54] See, e.g., Yosemite I SSB Memo, at 29-31 (describing Marlin (arranged by DLJ and Alex Brown) and Firefly (arranged by JPMorgan Chase, DLJ and Alex Brown)).

[55] *See, e.g., id.* at 32-34.

[56] Fox testified that "when we typically talk about a client's revenue from Citibank, it's all revenue that Citigroup would have collected from all different types of transactions we may have been engaged in. , . . It somewhat varies a little bit by product area, but it is a measure we use when we determine how much revenue we have from a client." Fox Sworn Statement, at 154-55. Fox testified that "revenues" would include structuring fees and interest net of cost of funds, but that return on equity would not be included. *Id.* at 155.

[57] Citigroup's internal documents contain discrepancies in the annual revenue amounts for 1998, 1999 and 2000. For 1998, documents report both $16.2 million and $18.1 million. See Standard Credit Memorandum: Enron Corp., Apr. 13, 1999 (the "4/13/99 Standard Credit Memo"), at 10 (reporting $16.2 million) [CITI-B 00534442-CITI-B 005344521; Standard Relationship Credit Approval regarding Enron Corp., June 30, 2000 (the "6/30/00 Standard Relationship Credit Approval"), at 6 (reporting $18.1 million) [CITI-B 0046402-CITI-B 00464071. For 1999, documents report $32.1 million, $44.0 million and $44.3 million. See 6/30/00 Credit Approval, at 6 (reporting $32.1 million); Interoffice Memo from Alberto Verme, Jim Reilly, Dean Keller and Damien Mitchell, Citigroup, to Robert Morse, Citigroup, regarding Enron Prepaid Transaction, Sept. 24, 2001 (the "9/24/01 Revenue Memo"), at 2-3 (reporting $44.0 million) [CITI-B 00397722-CITI-B 003977241; Global Loans Short Form Approval Memorandum, regarding JEDI II Renewal and $250 MM 180 Day Gas Prepaid, June 21, 2001 (the "June 2001 Prepay Global Loans Approval Memo"), at 8 (reporting $44.3 million) [CITI-B 0032222-CITI-B 00322321. For 2000, documents report both $49.7 million and $50.2 million. See June 2001 Prepay Global Loans Approval Memo, at 8 (reporting $49.7 million); Standard Relationship Credit Approval regarding Enron Corp., Aug. 17, 2001 (the "8/17/01 Standard Relationship Credit Approval"), at CITI-B 00883041 (reporting $50.2

| Year | Revenues |
|------|----------|
| 1997 | $16.8 million[58] |
| 1998 | 16.2 million[59] |
| 1999 | 44.0 million[60] |
| 2000 | 49.7 million[61] |
| 2001 | 61.6 million[62] |

In September 2001, Citigroup acknowledged that "[o]ver the last three years, Enron has grown to be one of the highest revenue clients within Citigroup."[63] This income likely gave Citigroup incentive to maintain Enron as a significant client. There is evidence that Citigroup felt pressured to accommodate Enron's requests for transactions. Often, Citigroup participated in deals with the understanding that Enron would reward the bank with future business. Many internal documents and communications at Citigroup contain references to such relationship pressure, including, for example:

- "Enron generates substantial GCIB revenue ($50mm in 2000); any decision to limit/reduce credit availability will significantly reduce revenues going forward both at CIT and SSB and permanently impair the relationship."[64]

- "Based on the significant relationship pressure with which we are confronted, we recommend approval of a ninety day

---

million) [CITI-B 00883034-CITI-B 0000883042].   In deriving the $188 million revenue figure, the Examiner has used the lower of the two reported figures for each of 1998 and 2000, and the median reported figure for 1999.

[58] 4/13/99 Standard Credit Memo, at 10.

[59] *Id.*

[60] 9/24/01 Revenue Memo, at 2-3.

[61] June 2001 Prepay Global Loans Approval Memo, at 8.

[62] This amount is the sum of $31 million of revenue reported in the 8/17/01 Standard Relationship Credit Approval, plus $18.6 million that Citigroup received as a fee in Nov. 2001 for the failed merger with Dynegy Inc. and $12 million that Citigroup received as an arrangement fee for the Secured Line of Credit for two Enron pipeline subsidiaries in Nov. 2001. See 8/17/01 Standard Relationship Credit Approval, at CITI-B 00883041; Citigroup Responses, at 32-33, 20.

[63] 9/24/01 Revenue Memo, at 2.

[64] Email from William Fox, Citigroup, to Thomas Stott, Citigroup, regarding Enron Credit Approval, Apr. 18, 2001 [CITI-B 02361481.

extension of our existing $36 million commitment to this revolver."[65]

- "We still have the existing $250mm prepaid to deal with for which they still 'owe' us one for having provided the $250mm originally. Joint call on Glisan/Fastow appropriate."[66]

- Regarding Em-on's rejection of Citigroup as a participant in a project called Popeye:

  [W]e were told that it was a result of our rejection of a 15mm participation in the brazos production-payment financing. . . . I believe it is too late to save popeye, but could we reconsider brazos in an attempt to get back into the ABS [asset-backed securities] hunt?"[67]

- "As a part of Citi's broader relationship with Enron, we have been asked to support this transaction. Given the importance of this relationship to GEM [Global Energy and Mining], it is difficult if not impossible to deny this request."[68]

*Exposure Limits*

Throughout most of 1998 and 1999, Em-on's outstanding obligations to Citigroup and, therefore, Citigroup's credit exposure to Em-on, exceeded the target amount, or "Obligor Limit," that Citigroup had set for this client. Citigroup's general practice was to assign each client an "Obligor Risk Rating" based in part on the client's credit rating.[69]

---

[65] Citibank Global Loans Short Form Approval Memorandum, May 3, 1999, at CITI-B 003 17735 [CITI-B 003 17734-CITI-B 003 177371.

[66] Email from William Fox, Citigroup, to James Reilly and Michael Nepveux and copy to Alberto Verme, Citigroup, et *al.,* regarding Enron, Oct. 8, 2001 [CITI-B 02361401.

[67] Email from James F. Reilly, Citigroup, to William Fox and Michael Nepveux and copy to Alberto J. Verme, Citigroup, et *al.,* regarding Enron, Oct. 8, 2001 (capitalization omitted in original) [CITI-B *006462261.*

[68] Global Loans Approval Memorandum, regarding Project Bacchus, Dec. 6, 2000 (the "Bacchus Global Loans Approval Memo"), at 4 [CITI-B 0290015-CITI-B 0290041].

[69] Memorandum from Dave Bushnell and Ann Goodbody, Citigroup, to GCIB Credit Officers and Securities Officers, and GCIB Senior Business Managers, distributing an attached GCIB Credit Policies and Procedures, Dec. 21, 2000 (the "GCIB Credit Policy"), at CITI-B 00877013-CITI-B 00877014 [CITI-B 00876988-CITI-B 008771431. It appears that, prior to the date of the GCIB Credit Policy, Citigroup had a formal credit policy, but the Examiner has been unable to obtain a copy. The GCIB Credit Policy from December 2000 identifies "Notable Changes" to the prior policy, and there do not appear to have been

For example, when Enron had a long-term credit rating of BBB+ from S&P and Baa2 from Moody's, Enron was considered to have an Obligor Risk Rating of "4+" on Citigroup's ten-point scale.[70] This Obligor Risk Rating was then used to help set the Obligor Limit for that client for each of three categories of exposures: those with terms of up to two years, those with terms of two to five years, and those with terms of five to ten years.[71] Enron's Obligor Limit for exposures of two to five years was $375 million until August 1999,[72] when it increased to $450 million.[73]

Citigroup did not always adhere to these Obligor Limits and would occasionally permit clients to exceed the limits, with the excess being referred to as the client's "Obligor Exception."[74] According to Citigroup's guidelines for extending credit set out in its 2000 "Credit Policies and Procedures" (the "GCIB Credit Policies"), however, "[e]xceptions to the Obligor Limits will be rare, and will limited [sic] to specifically defined, pre-approved, circumstances. All exceptions to Obligor Limits must be approved by the Senior Risk Officer for Citigroup, or his designees."[75] The GCIB Credit Policies provided that "[r]equests for exception approvals must include an action plan and

---

material changes to the portions of the credit policy discussed in this Appendix. *Id.* at CITI-B 00876988. See *also* Sworn Statement of Thomas Stott, Citigroup, to Steven M. Collins, A&B, June 3, 2003 ("Stott Sworn Statement"), at 24-25; Reilly Sworn Statement, at 27.

[70] See, e.g., Citicorp/Citibank Credit Approval, Dec. 21, 1999, regarding Nahanni, at 1 [CITI-B 0105079-CITI-B 0105084]. See *also* Stott Sworn Statement, at 25.

[71] GCIB Credit Policy, at CITI-B 00877013; Stott Sworn Statement, at 26.

[72] Truman Global Loans Approval Memo, at 3.

[73] *Id.*

[74] *Id.* See *generally* Stott Sworn Statement, at 29-32; Reilly Sworn Statement, at 28-29. To determine an Obligor Exception, Citigroup subtracted the client's Obligor Limit from its total amount of outstanding indebtedness and unused commitment (what Citigroup referred to as "OSUC"). GCIB Credit Policy, at CITI-B 00877013; Stott Sworn Statement, at 27. The unused commitments included within OSUC were committed facilities that Citigroup could not unilaterally withdraw. Stott Sworn Statement, at 28.

[75] GCIB Credit Policy, at CITI-B 00877013.

time frame for bringing the credit exposure back within Obligor Limits,"[76] but the document otherwise does not explain factors that might influence Citigroup to allow an Obligor Exception.

Thomas Stott ("Stott"), a senior officer in Citigroup's Risk Management Group, testified that it was not unusual for clients to have Obligor Exceptions. He testified that Citigroup "had a number of clients who exceeded the obligor limit by more than $500 [million] from time to time."[77] He also testified that it was not a rare event for a client to have an Obligor Exception of more than $1 billion, but he could not immediately think of any examples, and he testified that he had experienced clients with exceptions of several billion dollars.[78]

Enron benefited from a substantial Obligor Exception during most of 1998 and 1999. As can be seen in the following chart, which reflects points in time at which Citigroup reported Enron's Obligor Exception in its internal documents, Em-on's Obligor Exception increased steadily until the end of 1999, when Citigroup took action to reduce the exposure:

---

[76] *Id.*

[77] Stott Sworn Statement, at 20. Stott testified that, in the industries for which he is responsible at Citigroup (energy, metals and mining, chemicals, pharmaceuticals and forest products, *id.* at 15), about 30 or more of the "250-ish clients" would have Obligor Exceptions at any given time. *Id.* at 30.

[78] Stott Sworn Statement, at 3 1, 97.

**Enron Obligor Exception'''**



The documents reflect there was concern over this exposure within Citigroup.[80]
In January 1999, when warning colleagues that the bank likely would not approve a new
cash management facility for Enron, Citigroup's primary relationship manager for Enron

---

[79] For 12/97 data, see Citibank Credit Approval regarding Nighthawk, Dec. 1.5, 1997, at 1 [CITI-B 00742230-CITI-B 007422331. For 12/98 data, see Citibank Credit Approval regarding Roosevelt, on or about Dec. 22, 1998, at 1 [CITI-B 0031965CITI-B 0031970]. For 4/99 data, see 4/13/99 Credit Memo at 11. For 7/99 data, see Citibank Credit Approval regarding Enron Corp. Annual Review, Jul. 7, 1999, at 1 [CITI-B 0052534-CITI-B 00525471. For 9/99 data, see Truman Global Loans Approval Memo, at 3. For 11/99 data, see Nahanni Global Loans Approval Memo, at 11. For 1/00 data, see Yosemite II Global Loans Approval Memo, at 2, 4.    For 6/01 data, see Draft Citibank Global Loans Short Form Approval Memorandum regarding JEDI II Renewal and $250 Million Prepay, June 21, 2001, at 2 [CITI-B 0032247-CITI-B 00322571. For 9/01 data, see Memorandum from Michael Nepveux, Citigroup, to Bill Fox, Citigroup, regarding Enron Corp. Sept. 30 Prepay, Sept. 19, 2001, at CITI-B 00617118 [CITI-B 00617117-CITI-B 006 17 118].

[80] As early as December 1997, Citigroup's primary relationship manager for Enron wrote in an email regarding Nighthawk: "Several rough patches: We are well over all exposure guidelines due to Nighthawk (which has, as we now account for it, structural features which do not easily allow for sell-down of the exposure) and are trying to manage it down to ensure that we can transact new business." Email from James F. Reilly, Citigroup, to Niels C. Kirk and Valerie Wilmot, Citigroup, regarding Enron, Mar. 27, 1998 [CITI-B 003155531.

wrote that "our exposure predicament is legend."[81]   Toward the end of that year, in

November 1999, William T. Fox, III ("Fox"), then the head of Citigroup's Global Energy

and Mining Group, noted that "we still have an exposure issue as it relates to obligor

limits [for Em-on]; there is a developing view that limits are limits and not to be exceed

[sic]. This is something we will all have to deal with."[82]

That same month, just prior to the closing of the first Yosemite credit linked notes

funding, Onno Ruding ("Ruding"), a Vice Chairman of Citigroup, noted that the bank's

"overall exposure . . . to Enron is huge . . . ."[83]   He refused to approve any additional

exposure until the Yosemite I proceeds had been received.[84] He informed relationship

managers for Em-on and Stott that "[u]ntil the moment that we have received the debt

repayment resulting from the Yosemite transaction, I am not willing to approve another

incremental exposure on Enron."[85]   Following the receipt of the Yosemite proceeds,

Citigroup was "under [its] Obligor Limit [with respect to Enron] for the first time in

years . . . ."[86]

Ruding's communication indicates that Citigroup was motivated to help Enron

complete new financings that would bring in cash to reduce Em-on's Obligor Exception.

For example, Citigroup designed the Yosemite credit linked notes structure to assist

---

[81] Email from James F. Reilly, Citigroup, to Nicola Stores, Citigroup, regarding Enron BACs Lines, Jan. 13, 1999, at CITI-B 00440585 [CITI-B 00440585-CITI-B 004405861.

[82] Email from William Fox, Citigroup, to Niels C. Kirk and James F. Reilly, Citigroup, regarding Yosemite II (Europe), Nov. 10, 1999, at 2 [CITI-B 0223408-CITI-B 02234091.

[83] Email from H-Onno Ruding, Citigroup, to James F. Reilly, Steve Baillie and Thomas Stott and copy to William Rhodes, Citigroup, et al., regarding Enron Credit, Nov. 10, 1999 (the "Ruding 1 1/10/99 Email") [CITI-B 00465331.

[84] Ruding 1 1/10/99 Email.

[85] Id.

[86] Email from James F. Reilly, Citigroup, to Niels C. Kirk, Citigroup, regarding Yosemite II (Europe), Nov. 9, 1999 [CITI-B 01431731.

Em-on in accessing institutional investors when bank credit began to tighten.[87] That structure also helped Citigroup by generating cash proceeds that Enron used to repay some of its then existing exposure to Citigroup. Another example is Sundance Industrial, in which Citigroup invested $28.5 million, but received a $200 million repayment of its exposure in Bacchus. Using proceeds from new financings to reduce Em-on's Obligor Exception is noted in several of Citigroup's transaction and credit approval memos for the SPE transactions.[88]

*Appropriateness Test*

Many of Citigroup's internal approval documents and communications about Em-on's SPE transactions mention "appropriateness" as one of the factors that the bank considered.[89] Fox testified that Citigroup had and continues to have a policy of requiring

---

[87] Transaction Memorandum, regarding Enron Project Yosemite, $500MM-$1,500MM Default Swap and Credit Linked Note, Apr. 6, 1999, at 1 [CITI-B 0119713-CITI-B 01197211.

[88] See, e.g., Global Loans Approval Memorandum, regarding Yosemite I, Oct. 19, 1999 (the "Yosemite I Global Loans Approval Memo"), at 2 (Yosemite I proceeds used to repay Roosevelt and Truman) [CITI-B 0046548-CITI-B 00465561; Yosemite II Global Loans Approval Memo, at 2 (Yosemite II proceeds used to repay Nixon; "Upon repayment of Nixon, Enron will have $617.3 million Total Facilities and $368.1 of outstanding and unused commitments, eliminating the Obligor Exception.") [CITI-B 01456261; Citibank Global Loans Approval Memorandum, regarding Project Nixon Prepaid, Dec. 7, 1999 (the "Nixon Global Loans Approval Memo"), at 20 (Nixon bridge financing expected to be repaid with Yosemite II proceeds) [CITI-B 0046517-CITI-B 00465211.

[89] See, e.g., Email from Saul Bernstein, Citigroup, to Frederick Battline and copy to Linda Bergen, Citigroup, et al., Nov. 3, 1999 (the "Bernstein 1 1/3/99 Email"), at CITI-B 0129861 ("Please note that all transactions are approved from an appropriateness and suitability aspect.") [CITI-B 0129860-CITI-B 01298621; Email from James F. Reilly, Citigroup, to William Fox and copy to Thomas Stott, Citigroup, et al., regarding Enron/CMAC-Yosemite 2, Dec. 6, 1999 ("Among the issues for discussion: transaction 'appropriateness', tenor, booking for the equity (Enron exposure or otherwise)") [CITI-B 01456261; Email from William Fox, Citigroup, to Steve Baillie and James Reilly and copy to Niels S. Kirk, Citigroup, Nov. 14, 1999, at 1 ("Two points: one can we technically strcuture [sic] a default swap from the trust that eliminates our exposure and two there is a question of appropriateness: presumably we will be representing to investors that we are putting up half the equity and then with or without disclsoure [sic] (?) we are doing a default swap with the trust; sound [sic] questionable.") [CITI-B 0223408-CITI-B 02234101; Email from Steve Baillie, Citigroup, to William Fox, Lydia Junek, Niels Kirk, John Lyons and James F. Reilly, Citigroup, regarding Enron Update, Nov. 24, 2000, at 1 (identifying concerns with the Bacchus transaction, "I see three key concerns here: . , . (2) appropriateness since there is now an earnings dimension to this deal, which was not there before") [CITI-B 0289702-CITI-B 02897031; Email from William Fox, Citigroup, to Niels Kirk, Steve Baillie, William Fox, Lydia Junek, Chris Lyons and James F. Reilly and copy to Elliot S. Conway, Citigroup, regarding Enron Update, Nov. 27, 2000 (discussing possible Enron

that all its structured transactions meet an appropriateness standard.'" Fox explained that this policy "addresses whether or not the transaction is appropriate for the client to do, meaning does the client understand the risks, does it under – does the client understand the impact a transaction could have on its financials."[91] He testified that Citigroup looks at such appropriateness along with other factors when deciding whether the bank should be involved in a transaction.[92]

At the time that Enron's Minority Interest Transactions were completed,[93] Citigroup's Global Capital Structuring group considered the appropriateness of a transaction by requiring that each approval request package include a written questionnaire called an "Appropriateness Test Questionnaire,"[94] setting out ten areas of review.[95] These questions went beyond the objective types of financial criteria that had

---

year-end 2000 deals: "If Baachauss [sic] and the Falcon bridge materialize, that's about a $1B incremental over year end; that's enough; maybe Nahanni since it will be small exposure but it will be major appropriateness issue as will the first two.") [CITI-B 02840491.

[90] Fox Sworn Statement, at 46.

[91] *Id.* at 47.

[92] *Id.* at 47-48 ("Q. Is appropriateness an issue that you address routinely in deciding whether to approve transactions? A. It's an issue that I think we look at with all transactions, along with a host of other things."). When asked to give an example of circumstances in which it would be inappropriate for Citigroup to enter into a transaction, Fox testified: "This is a personal view now. If there was fraud involved, I think it would be inappropriate to be involved in a transaction. I'm sure there are others that may come up, but they are all going to be transaction-specific, and those all tend to be judgmental issues that are made in the context of the transaction and the circumstances at the time." Fox Sworn Statement, at 48. Caplan also testified that appropriateness encompassed concerns about illegality, but added that "reputational issues" fall "under the rubric of appropriateness" as well. Caplan Sworn Statement, at 91-93.

[93] Nighthawk was completed in December 1997, Rawhide in December 1998, and Nahanni in December 1999. See Citigroup Responses, at 33-35.

[94] Conway Sworn Statement, at 36; Sworn Statement of Otto Jager, Citigroup, to Steven M. Collins, A&B, Apr. 29, 2003 (the "Jager Sworn Statement"), at 46. Conway testified that the Global Capital Structuring group no longer uses the questionnaire form, but that it still requires "a discussion with the same questions being addressed." Conway Sworn Statement, at 36.

[95] Project Nighthawk Transaction Approval Package, Dec., 1997 (the "Nighthawk Capital Structuring December Approval Package"), at CITI-B 00375913-CITI-B 00375914 (containing the Nighthawk Appropriateness Test Questionnaire) [CITI-B 00375890-CITI-B 003759141; Rawhide Capital Structuring US Approval Request Package, Nov. 2, 1998 (the "Rawhide Capital Structuring Approval Package"), at CITI-B 00403920-CITI-B 00403921 (including the Rawhide Appropriateness Test Questionnaire) [CITI-B

to be considered (such as the client's credit risk), and instead focused on the more subjective features of the transaction. For example, the questionnaire focused on issues such as whether the client had a legitimate business purpose for entering into the transaction, and whether the documentation for the transaction was constructed to allow a reader to understand if the deal was part of a larger overall transaction.[96]

The ten areas that the Global Capital Structuring group required be addressed and approved by the "Designated Responsible Senior" for each transaction were as follows:

1. Lack of transparency (Business Objective) – The true economic substance of the transaction cannot be determined from the structure without significant analysis.
2. Secrecy of identity of true party – The true identity of a party to the transaction cannot be determined because of the use of SPVs or charitable trusts in offshore tax havens or bank secrecy jurisdictions.
3. Circularity – The transaction is essentially circular with the customer being both the ultimate lender and borrower and/or ultimate buyer and seller.
4. Fragmentation – The transaction is constructed so that no one document describes the whole transaction, making it possible for a reader to review documents for a segment of the transaction and not understand that it is part of a larger transaction.
5. Unusual terms – The transaction is off-market or contains terms which are significantly different from what one would expect.
6. Absence of rules/guidance – The applicable regulatory/ legal/accounting/tax systems lack developed rules or guidance for complex products.
7. Event risk in regulatory/legal/accounting systems – The rules governing the transaction are not predictable and could be subject to sudden application of tighter standards, or heightened prosecution because of political or social developments.

---

00403912-CITI-B 00403921]; Appropriateness Test Questionnaire, undated (the "Rawhide Amendment Appropriateness Test Questionnaire") (relating to amendments to Rawhide) [CITI-B 00402470-CITI-B 00402471]; Nahanni Global Capital Structuring US Approval Request Package, Oct. 25, 1999 (the "Nahanni Global Capital Structuring Approval Package"), at CITI-B 0105066-CITI-B 0105067 (including the Nahanni Appropriateness Test Questionnaire) [CITI-B 0105065-CITI-B 0105076].

[96] Nighthawk Capital Structuring December Approval Package, at CITI-B 00375913-CITI-B 00375914 (the Nighthawk Appropriateness Test Questionnaire); Rawhide Capital Structuring Approval Package, at CITI-B 00403920-CITI-B 0040392 1 (the Rawhide Appropriateness Test Questionnaire); Rawhide Amendment Appropriateness Test Questionnaire; Nahanni Global Capital Structuring Approval Package, at CITI-B 0105066-CITI-B 0105067 (the Nahanni Appropriateness Test Questionnaire).

8. Multiple jurisdictions – Multiple jurisdictions are involved with internal approvals sought individually in each making the process harder to manage and the risk of oversight of the entire transaction greater.

9. Lack of confirmation of customer assurances – The absence of third party confirmations (e.g. regulators, auditors, appraisers) of customer assurances on sensitive issues.

10. Disproportionate impact – The transaction will have a significant impact on the customer's financial condition or results, and will not be required to be disclosed.[97]

It is not clear whether any unit within Citigroup other than Global Capital Structuring, which was responsible for the Minority Interest Transactions, used this formal appropriateness test questionnaire. However, Richard Caplan ("Caplan"), a Managing Director formerly in the Derivatives group, which was involved in the Citigroup Prepays, Bacchus and Sundance Industrial, testified that his group considered these matters when considering whether to grant transaction approvals.[98]

By its consideration of these matters, it appears that Citigroup felt responsibility to ensure that it did not engage in a transaction that obscured the true economic substance, that the transaction was disclosed clearly and adequately to investors and that the transaction had a legitimate business purpose. As discussed in Part III of this Appendix, there are numerous instances in which Citigroup's transactions with Em-on did not meet these standards.[99]

---

[97] Nighthawk Capital Structuring December Approval Package, at CITI-B 00375913-CITI-B 00375914 (the Nighthawk Appropriateness Test Questionnaire); Rawhide Capital Structuring Approval Package, at CITI-B 00403920-CITI-B 0040392 1 (the Rawhide Appropriateness Test Questionnaire); Rawhide Amendment Appropriateness Test Questionnaire; Nahanni Global Capital Structuring Approval Package, at CITI-B 0105066-CITI-B 0105067 (the Nahanni Appropriateness Test Questionnaire).

[98] Caplan Sworn Statement, at 396-97 ("[I]n derivatives CMAC [Capital Markets Approval Committee] would deal with the questions that are in this questionnaire.") (referring to Exhibit 182, the Nighthawk Appropriateness Test Questionnaire).

[99] Sanford Weill ("Weill"), Chairman of Citigroup, emphasized the commitment to consider such matters in a memorandum to all Citigroup employees on August 7, 2002. See Memorandum from Weill, to All Employees, regarding Progress Report, Aug. 7, *2002, available at* http://www.citigroup.com/

*Analysts ' Coverage*

For much of the period 1997 through 2001, Citigroup employed an equity analyst who covered Enron. Until late 1999, the analyst was Don Dufresne ("Dufresne").[100] On at least one occasion, in March 1999, Fastow expressed displeasure with Dufresne's rating of Em-on." Robert Holloman ("Holloman"), a Citigroup employee who spoke with Fastow about the matter, reported that Fastow said Dufresne "was not constructive in his views on Enron" and that Enron "also did not believe Don had fully supported the company in its recent equity offering and that this was reflected in the fact that [Citigroup] sold less stock than any other manager."[102] Fastow also told Holloman that Em-on's displeasure with Dufresne was the "one reason" Enron did not allow Citigroup to have more than a trivial role in the $750 million initial public offering of Azurix, Enron's

---

citigroup/press/2002/020807a.htm (last visited June 23, 2003). Under the subheading "New Initiatives in our Structured Finance Business," Mr. Weill wrote:

> At Citigroup, we are committed to greater transparency in the disclosure of structured finance transactions and we are answering the call from Washington and from investors by adopting strong initiatives ourselves.

> Quite simply, if a company does not agree to record a material financing as debt on its balance sheet, Citigroup will only execute the transaction if the company agrees to publicly disclose its impact to investors.

> Starting immediately, we will only do these transactions for clients that agree to make prompt disclosure of the details of the transaction including management's analysis of the net effect the transaction has on the financial condition of the company, the nature and amount of the obligations, and a description of events that may cause an obligation to arise, increase or become accelerated. In addition, we will only do these transactions for clients that agree to provide the complete set of transaction documents to their chief financial officer, chief legal officer and independent auditors. We believe our new policy will encourage companies to provide greater transparency than currently required by law and help restore investor confidence in our financial markets.

at 2.

[100] Memorandum from Michael Carpenter, Citigroup, to Dean Keller, Citigroup, regarding Enron, Dec. 15, 1999 (the "Carpenter 12/15/99 Memo"), at 4 [CITI-B 0131718-CITI-B 01317221.

[101] Email from Robert Holloman, Citigroup, to James Reilly, Citigroup, *et* al., Mar. 16, 1999 (the "Holloman 3/16/99 Email") [CITI-B 00645887-CITI-B 006458881.

[102] *Id,*

water subsidiary.[103]  Fastow sent Citigroup, through Holloman, a "strong message . . . that Enron would like to see some progress in our equity research view of Enron before the relationship with SSB can really progress."[104]  Fastow offered to have senior management at Em-on spend time with Dufresne to help him better understand the company's strategy and industry position.[105]

Dufresne remained with Citigroup until around the end of 1999, when Citigroup terminated his employment.[106]  He was replaced in March 2000 by Raymond Niles ("Niles"), an analyst who had been covering Enron for the investment banking firm Schroders plc, which Citigroup acquired in 2000.[107] Mark Koenig, Enron's head of investor relations, specifically requested that Citigroup hire Niles.[108]

Niles began his coverage of Enron for Citigroup with a rating of 1H for Em-on, with the number 1 reflecting the highest possible buy recommendation and the letter H representing the second highest rating for risk."" Niles did not change his rating until October 2001, when he reduced it to 1 S, which is still a buy recommendation but with the

---

[103] Id.

[104]  *Id.*

[105] Id.

[106] Carpenter 12/15/99 Memo, at 4.

[107] Sworn Statement of Raymond Niles, Citigroup, to Robb E. Hellwig, A&B, May 9, 2003 (the "Niles Sworn Statement"), at 11-13; Citigroup Form 10-K filed with the SEC for the Year ended Dec. 31, 2000, at *37.*

[108] Memorandum from Maureen Hendricks, Citigroup, to Michael Carpenter, Citigroup, regarding Enron Meeting March 9 at 2pm, Mar. 8, 2000 (the "Hendricks 3/8/00 Memo"), at 1 [CITI-B 00324434-CITI-B *003244371.*

[109] Niles Sworn Statement, at 15-16. In contrast, in the Fall of 1999, Dufresne's rating had been 2H. Investment Banking Commitment Committee Memorandum, regarding Project Condor, prepared between June 30, 1999 and Sept. 13, 1999, at CITI-B 0098008 [CITI-B 0097976-CITI-B 0098021]. At this same time, Dufresne at Citigroup estimated Enron's earnings per share for 1999 to be $1.20 and classified the company as "outperform," *id.* at CITI-B 0098010, and Niles at Schroders estimated the 1999 earnings per share at $1.25 and classified the company as a "Top Pick." *Id.*

highest risk rating ("speculative").[110] He then lowered it further to 3S, which was neutral as to the buy recommendation with the same speculative risk rating."

While Enron expressed its displeasure over Dufresne's ratings, it is not known if that influenced Citigroup's decision to terminate his employment. Likewise, while Enron recommended to Citigroup that it hire Niles, "a huge ENE fan,"[112] Niles may have been a likely candidate for the position anyway because Citigroup acquired his then-current employer. The Examiner has found no evidence to date that Citigroup breached any "ethical wall" [13] with respect to its Enron transactions and its analysts' coverage of the company.' [14]

### B. Citigroup's Knowledge of Enron's Financial Condition

As a result of its extensive involvement with Enron between 1997 and 2001, Citigroup had significant access to financial information about Em-on. As a Tier 1 bank to Em-on, with transactions in progress virtually at all times, Citigroup had access to confidential information and to senior management at the company. Citigroup acknowledged this stating, for example, in October 1999, that "Salomon Smith Barney is

---

[110] Niles Sworn Statement, at 16-17.

[111] *Id.* at 17.

[112] Hendricks 3/8/00 Memo, at 1.

[113] For Citigroup's internal policies, see Citigroup Interoffice Correspondence from Legal and Compliance, to All Employees, regarding Information-Protection Guidelines, May 8, 2000 [CITI-B 00326132–CITI-B 003261351. See *also,* e.g., SSB Interoffice Memorandum from Control Group to Global Investment Banking Managing Directors, Directors, Vice Presidents, Associates, and Analysts, regarding Notification Standards, May 8, 2000 [CITI-B 00326221-CITI-B 003262231; SSB Interoffice Correspondence from David Fenimore to Global Control Groups and Legal/Compliance Directors, regarding Chinese Wall Breach Contingency Plan, Feb. 15, 2000 [CITI-B 00326142-CITI-B 003261461.

[114] Citigroup announced on May 24, 2003 that it had terminated the employment of eight analysts, including Niles. Landon Thomas, Jr., *8 Analysts Are Dismissed by Citigroup: Coverage of Companies Is Temporarily Cut Back,* N.Y. Times, May 24, 2003, at B1.

in frequent dialogue with Enron's management team regarding the company's, and each of its subsidiaries', operating and financial results and business outlook."[115]

Citigroup was also knowledgeable about Enron's complex business operations, as well as the complicated accounting that Enron employed. For example, Citigroup understood generally how energy companies like Enron used complicated "value-at-risk" and other methodologies to manage the risk in their investments.'[16] Citigroup also understood the effect that Enron's MTM accounting had when applied to the company's merchant investments, resulting in gains and the potential for losses.[1][17] Citigroup knew that these gains and losses affected the amount of Em-on's reported net income, even though they did not generate cash. This knowledge is exhibited in a 1999 internal review of Enron, in which Citigroup seemed pleased to find that Em-on's merchant activities may have generated cash flows: "[a]fter factoring in the purchase of merchant assets, the

---

[115] Yosemite I SSB Memo, at 37. See *also* Global Loans Approval Memorandum, regarding $1.75 Billion/364-Day facility and $1.25 Billion/S-Year facility, Apr. 17, 2000, at SEC00086292 ("We maintain regular contact at Management levels throughout the organization including CEO, COO, CFO, and SVP Finance.   In addition, we have frequent contact with the business groups as a result of the broad range of deals under consideration.") [SEC00086287-SEC00086293].

[116] See, e.g., Email from Shirley S. Elliott, Citigroup, to William Fox and copy to Steve Baillie, Citigroup, et *al.,* Dec. 14, 2000, at 1 ("Enron, Dynegy, and El Paso utilize a one-day holding period and a 95% confidence level where Williams uses a 97.5% confidence interval. Enron evaluates, measures and manages the market risk in its investments on a daily basis utilizing value at risk and other methodologies. Value at risk represents an estimate of reasonably possible net losses in earnings that would be recognized on its investments assuming hypothetical movements in future market rates and no change in positions.") [CITI-B 0284053-CITI-B 02840551; Email from Lynn Feintech, Citigroup, to Amanda Angelini, Citigroup, *et al.,* regarding meeting with Forese, May 4, 2001 ("We need a stop loss to insure that even if VAR is not breeched [sic], unacceptable losses can be stopped.") [CITI-B 03024181; Email from Timothy Leroux, Citigroup, to Doug Warren, Citigroup, *et al.,* regarding Sundance Update from L. Feintech, May 4, 2001 ("Bill will investigate whether they will give us notification of losses in the trading book in excess of a certain amount (but still under VAR).") [CITI-B 006966961; Email from Timothy Leroux, Citigroup, to Lynn Feintech, Citigroup, et *al.,* regarding Sundance Issues ▬ Updated, May 10, 2001, at 1 ("Establish an INTERNAL stop loss for Fishtail . . . Require notification of VAR changes within 2 business days") [CITI-B 0297478-CITI-B 02974791; Citibank, Capital Markets Approval Committee, regarding Project Sundance Transaction, undated, at 3 [CITI-B 0302137-CITI-B 0302140].

[117] Enron Corp. Third Quarter Update, undated (but discussing revenues and EBITDA for twelve months ended Sept. 30, 1999, and citing market capitalization as of Oct. 21, 1999) (the "Third Quarter 1999 Update"), at SEC00086285 [SEC00086283-SEC00086286]; Nahanni Global Loans Approval Memo, at 13; Yosemite II Global Loans Approval Memo, at 7-8.

business was still a positive cash generator in 1999, giving some comfort that these activities produce 'real' cash flow."[118]

Citigroup also came to understand that Enron was motivated, in large part by Rating Agency pressures, to generate cash flow from operating activities in order to match reported earnings."' A 1996 approval memorandum for the "CASH 3" contract monetization stated that Enron was doing that transaction "for the purpose of accelerating cashflow to better match earnings taken under [Em-on's] mark-to-market accounting methodology."[120] By 1999, Citigroup wrote in loan approval memoranda: "In recent years, rating agencies have focused on 'managing to cash' the profits earned under MTM accounting:   that is ensuring earnings were a reflection of cash received."[121]

Many of the SPE transactions that Citigroup completed with Enron were intended to generate such operating cash flows. In November 1999, a Citigroup credit profile of Enron explained Citigroup's understanding of the transactions that it completed with Em-on:

> **Why do they do prepaids and the various other structured financings, what benefit do they think they get, and why therefore is it worth the premiums they pay?**
> Em-on uses structured financings for varying reasons, depending on the type of transaction employed:
> ➢ Minority Interest Equity – Enron clearly believes its [sic] receives significant rating agency equity treatment from these transactions comparable to other quasi-equity instruments such as DECS. These structures also provide Em-on with Minority Interest for GAAP reporting purposes, which is beneficial for certain constituencies.

---

[118] Third Quarter 1999 Update, at SEC00086285.

[119] See, e.g., Reilly Sworn Statement, at 156-57; Nahanni Global Loans Approval Memo, at 13; Yosemite II Global Loans Approval Memo, at 7-8.

[120] CASH 3 Approval Memo, at 3.

[121] Nahanni Global Loans Approval Memo, at 13. See *also* Yosemite II Global Loans Approval Memo, at 7.

➢ Deconsolidated Capital Structuring Transactions – (i.e Marlin, Condor, Firefly) which are settled in Enron stock. Again, Enron is confident that it receives significant equity credit from ratings agencies, and some GAAP reporting benefit.

➢ Prepaids/Contract Monetizations – As explained in the attached memo titled "Em-on Corporation Credit Profile" Em-on has used contract monetizations and prepaids to address two issues which have been raised by the rating agencies. One of the agencies' issues was that earnings which Enron recognized when mark-to-marking [sic] its trading book produce a commensurate cash inflow on a timely basis. Another issue was the tenor mismatch between trading asset and trading liabilities. Em-on used to deal with these issues through monetizations, that is effectively selling a given cash flow stream arising from a commodity contract. This produced upfront cash equal to the net present value of the profit in the transaction, and removed the asset and liability from the trading book. However due to certain accounting changes, contract monetizations became less attractive and are no longer used by Enron. Today, Enron enters into prepaids, which effectively monetize the earnings Em-on recognizes in mark-to-marking [sic] its trading book, and "upfronts" the cash. Prepaids also have the benefit of lengthening the tenor of the trading book liabilities, and hence help to balance the tenor mismatch between trading assets and liabilities. The premium paid for entering into a prepaid transaction is relatively modest.

Overall, Enron believes that structured finance transactions provide benefits incremental to the alternative of straight debt – risk shifting, rating agency, commodity denomination, etc. – at costs not significantly higher than that available at the straight bank or capital markets.[122]

*Citigroup 's Knowledge of Enron 's Total Debt*

Citigroup prepared detailed analyses of Enron's financial condition for purposes of considering new under-writings for Em-on and the extension of new credit to Enron, and as part of its periodic reviews of its existing exposure to Enron.[123] When Citigroup

---

[122] Email from Sumit Mathai, Citigroup, to William Fox and Thomas Stott and copy to Steve Baillie and James F. Reilly, Citigroup, Nov. 5, 1999, at CITI-B 00449879-CITI-B 00449880 (attaching "Additional Information") (bold in original) [CITI-B 00449878-CITI-B 004498801.

[123] See, e.g., Yosemite I SSB Memo; Salomon Smith Barney Interoffice Memo to a number of Citigroup employees, regarding Investment Grade – European Committee Meeting for Yosemite II, Nov. 19, 1999 (the "Yosemite II SSB Memo") [CITI-B 0146504-CITI-B 01465851; Yosemite III SSB Memo; Yosemite IV SSB Memo; August 2001 SSB Memo; Truman Global Loans Approval Memo; Yosemite II Global Loans Approval Memo; Nahanni Global Loans Approval Memo; 8/17/01 Standard Relationship Credit

prepared its analyses of Enron, it often included detailed descriptions of Em-on's debt and other obligations, recharacterizing as debt many types of obligations that Em-on did not report as debt, or taking into account obligations that Enron did not report at all in its consolidated financial statements.[124] These obligations included such items as prepays, structured financings, leases, receivables securitizations and guarantees of unconsolidated subsidiaries.[125]

In compiling its analyses of Enron, Citigroup used information from various publicly available sources, including Enron's public filings, Rating Agency reports, press releases and stock research.[126] Importantly, however, Citigroup possessed knowledge of Enron learned from the extensive and frequent contact it had with senior management of the company. Because it was involved in so many of Enron's structured fmancings,

---

Approval; 6/30/00 Standard Relationship Credit Approval; Third Quarter 1999 Update; 4/13/99 Standard Credit Memo; 1998 Credit Review.

[124] See, e.g., Yosemite I SSB Memo; Yosemite II SSB Memo; Yosemite III SSB Memo; Yosemite IV SSB Memo; August 2001 SSB Memo; Truman Global Loans Approval Memo; Nahanni Global Loans Approval Memo; 4/13/99 Standard Credit Memo.

[125] See, e.g., Yosemite I SSB Memo, at 21-22; Yosemite II SSB Memo, at 8-10; Yosemite III SSB Memo, at 17-18; Yosemite IV SSB Memo, at 20-21; August 2001 SSB Memo, at 11-12; Truman Global Loans Approval Memo, at 5-6; Nahanni Global Loans Approval Memo, at 14-15; 4/13/99 Standard Credit Memo, at 9.

[126] Sworn Statement of Maureen Hendricks, Citigroup, to Steven M. Collins, A&B, May 16, 2003 (the "Hendricks Sworn Statement"), at 19-20. Hendricks testified that, in gathering the information for such analyses: "we would have reviewed all of the public market data that was available. . . . We would have read all of the [Moody's and Standard & Poors'] reports. We would have read all of the financial information on Enron, all financial statements. We would have read any and all press releases. We would have reviewed any and all results of any meetings we had with the company. We would have read any available stock research that we could get our hands on." Id. When asked if she would "have canvassed or tapped into sources within, let's say, Citibank NA to find out what they knew about Enron," id. at 20, Hendricks replied "Yes. At this point we were working very closely, and I believe Jim Reilly [one of Citigroup's key relationship managers for Enron] was one of the participants at that meeting." Id. When asked "Did you attempt to get information about other structured financings that Citibank or its affiliates had outstanding with Enron at that time?", id. at 21, Hendricks replied "Yes. I believe that there would have been a discussion of previous structured financings that Citibank had done with Enron, and that would have been run by Jim, because I wouldn't have been party to those." Id. at 2 1.

Citigroup understood many types of financings that Enron used and how they impacted Em-on's publicly disclosed financial statements. [127]

As early as 1993, Citigroup was aware that Enron had significant amounts of off-balance sheet obligations that were not included in Enron's publicly disclosed debt.[128] In later years, many of Citigroup's internal approval memoranda included an estimate of this amount.[129]

The Salomon Smith Barney Investment Banking unit prepared detailed analyses of Enron's total obligations. These reviews began in the Fall of 1999, in connection with the internal approval process for the first Yosemite transaction. Jessica Palmer, co-head of Citigroup's Investment Grade Commitment Committee, requested a special review of Em-on's financial condition.[130] That review, undertaken by the Global Energy and Power group (which was headed by Maureen Hendricks ("Hendricks")),[131] included a full-scale analysis of Enron's capital structure.[132]   Hendricks' group prepared similar, but increasingly detailed, analyses for each of the three subsequent Yosemite transactions, as well as for an August 2001 Em-on notes offering.[133]

---

[127] Reilly testified that Citigroup was aware of Enron transactions other than those in which Citigroup itself participated. Reilly Sworn Statement, at 43 ("[W]e may have just known that the deal was in the market, or maybe we looked at a deal and didn't participate.").

[128] CASH 3 Approval Memo, at 15 ("at year-end 1993, as Enron's total debt (not including off-balance sheet items of approximately $2.6 billion) was $2.805 billion. . .").

[129] See, e.g., Yosemite I Global Loans Approval Memo, at 7; Nahanni Global Loans Approval Memo, at 14- 15; Truman Global Loans Approval Memo, at 5.

[130] See Email from Jessica Palmer, Citigroup, to Maureen Hendricks, Citigroup, et al., regarding Enron Corp Project Yosemite, Aug. 27, 1999, at 2 ("We will need to be briefed on the accounting that is being used by Enron in this transaction and how this transaction affects the company's accounts and disclosure. It will be important for us to know who has talked to the company's auditors. Would this affect the company's ratings?") [CITI-B 00782495-CITI-B 007824981. See also Hendricks Sworn Statement, at 39.

[131] Hendricks Sworn Statement, at 33.

[132] Yosemite I SSB Memo, at 2 l-22.

[133] See Yosemite II SSB Memo; Yosemite III SSB Memo; Yosemite IV SSB Memo; August 2001 SSB Memo.

In these reviews, Citigroup compared Enron's publicly reported debt amounts and debt to capitalization ratio ("Debt/Cap Ratio") to amounts and ratios determined from the other sources of Em-on information available to Citigroup. These comparisons included either three or, beginning in August 2000, four computations. The first was Enron's publicly reported GAAP debt and Debt/Cap Ratio.[134] The second computation was based on a presentation Enron had given to the Moody's Rating Agency in 1999 in response to Moody's concerns that Enron's financial statements did not accurately depict the full extent of Em-on's obligations. [135] Enron's presentation purported to take into account "the kitchen sink" in its debt calculations, reclassifying as debt both unconsolidated subsidiary debt and partner equity.'"

Citigroup called its third computation the "SSB Base Case Analysis," and it added "certain significant 'off-balance-sheet' financing to the total debt number, excluding contingent equity secured transactions."[137] The fourth and final calculation was the "SSB Alternative Analysis," and it "was the most conservative scenario, also including contingent equity secured transactions as debt."[138] The following chart shows the debt amounts determined by Citigroup under its SSB Base Case Analysis and SSB Alternative Analysis, which Citigroup compared to Enron's publicly reported debt amounts:

---

[134] See, e.g., Yosemite IV SSB Memo, at 20; August 2001 SSB Memo, at 11.

[135] Hendricks Sworn Statement, at 55; Yosemite II SSB Memo, at 8-10.

[136] Enron Presentation to Moody's, Oct. 12-13, 1999 [CITI-B 0005494-CITI-B 00054981.

[137] Yosemite IV SSB Memo, at 20; August 2001 SSB Memo, at 11.

[138] Yosemite IV SSB Memo, at 20; August 2001 SSB Memo, at 11.

Enron's Total Obligations[139]



As part of the analyses, Citigroup recomputed Enron's Debt/Cap Ratios using the different debt comparisons. For example, in August 2001, Citigroup estimated that Enron had $18.8 billion of total debt obligations under the SSB Base Case Analysis, and as much as $22.8 billion of total debt obligations under the SSB Alternative Analysis, with only $11.9 billion of that amount reported as debt on its balance sheet.[140] Citigroup recomputed Em-on's Debt/Cap Ratio to be 54.1% under the SSB Base Case Analysis and

---

[139] For 1 1/99 data, see Yosemite II SSB Memo, at 8. For 8/00 data, see Yosemite III SSB Memo, at 17. For 4/01 data, see Yosemite IV SSB Memo, at 19. For 8/01, data see August 2001 SSB Memo, at 11. The Yosemite I SSB Memo, dated 10/99, is not included in the chart to avoid a misleading presentation of data because the methodology used in that first SSB analysis does not appear to be the same as in the other SSB Memos. See Yosemite I SSB Memo, at 21-22 (estimating $25.2 billion in off balance sheet debt, compared to Enron's reported debt of $12 billion).

[140] August 2001 SSB Memo, at 11-12. In arriving at this determination, Citigroup characterized the following transactions as "Off Balance Sheet Financings": Yosemite I, Yosemite II, Yosemite III, Yosemite IV, Rawhide, Oil Prepays, Leases, Receivable Financing, Marlin, and Margaux. *Id.* Citigroup also included $1 billion in "miscellaneous" off-balance sheet financings that it could not specifically identify. ***Id.***

58.9% under the SSB Alternative Analysis, compared to Enron's reported Debt/Cap Ratio of 42.8%.[141]

*Citigroup 's Concerns About Enron 's Financial Condition*

Hendricks testified that Citigroup's analyses were "as conservative as possible" and that the results showed that Em-on was "well within the margin of an investment grade credit, and that it was as good, if not better, than its peer group within the industry."[142]  After preparing the SSB Memo analyses, Hendricks' group consistently concluded that "Enron compares favorably with its integrated pipeline peer group companies on most financial benchmarks,"[143] and recommended approval of the proposed transactions.[144]

Although Hendricks testified that she "derived great comfort" from comparing the adjusted ratios for Enron with those of other energy companies,[145] others within Citigroup expressed concerns about Em-on's financial condition. In an annual credit review of Enron conducted in June 2000, Fernando Ynigo ("Ynigo"), a member of Citigroup's Credit Policy Committee, added the following caveat to his approval: "Given the direction this company is headed we need to keep track of their liquidity. Any deterioration in their liquidity should be closely examined."[146] Ynigo followed up in August 2000 with a message to Fox and Stott, among others, saying: "It is my perception

---

[141] *Id.*

[142] Hendricks Sworn Statement, at 38.

[143] Yosemite III SSB Memo, at 18; Yosemite IV SSB Memo, at 21; August 2001 SSB Memo, at 12. See also Yosemite III SSB Memo, at 16 ("Even after adjusting for off balance sheet obligations, Enron remains one of the most well capitalized companies in either peer group.").

[144] Yosemite I SSB Memo, at 37; Yosemite III SSB Memo, at 40; Yosemite IV SSB Memo, at 41; August 2001 SSB Memo, at 27.

[145] Hendricks Sworn Statement, at 38.

[146] 6/30/00 Standard Relationship Credit Approval, at 6.

client is still highly leveraged and constantly evolving, so, I need to understand better to get the obvious higher level of comfort that you all seem to have."[147]

In December 2000, Fox himself raised several questions about Enron, including why Enron's third quarter 2000 financial report was not consistent with what he would expect of a BBB+ rated company.[148] He asked Shirley Elliott ("Elliott"), a credit analyst in Citigroup's Houston office, to compile some answers.[149] She responded that, although Enron may "tidy up" its balance sheet for year end, it appeared to her that there was a "substantial rather than cosmetic" change in Enron's EBITDA, revenue and debt between year-end 1999 and September 30, 2000.[150]

Fox testified that, by the spring of 2001, Citigroup recognized that Enron's business, as well as that of its major competitors, was becoming more dependent on trading activities.[151] He stated that he and others associated with the Enron team wanted to understand better the risks and issues inherent in such a business.[152] Consequently, Citigroup conducted an internal analysis of Enron[153] and hired an outside consultant to provide a one-day seminar to help it better understand "Risk Management Activities reported by large energy marketing and trading companies, using specific examples from

---

[147] Email from Fernando Ynigo, Citigroup, to James F. Reilly and Thomas Stott and copy to Tom Boland and William Fox, Citigroup, Aug. 16, 2000 (the "Ynigo 8/1 6/00 Email") [CITI-B 005320951.

[148] Email from Shirley S. Elliott, Citigroup, to William Fox and copy to Steve Baillie, Lydia Junek, Thomas Stott and Tero A. Tiilikainen, Citigroup, regarding Enron, Dec. 13, 2000 (the "Elliott 12/13/00 Email"), at 3 [CITI-B 0284053-CITI-B 02840551; Fox Sworn Statement, at 96.

[149] Elliott 12/13/00 Email.

[150] *Id.* at 3.

[151] Fox Sworn Statement, at 106-07.

[152] *Id.* at 68-70, 106-08.

[153] Email from Shirley Elliott, Citigroup, to Trebonias R. Jokhai and copy to John F. Mugno, Citigroup, et al., July 20, 2001 (the "Elliott 7/20/01 Email"), at CITI-B 00616905 [CITI-B 00616905-CITI-B00616924].

Enron and Dynegy."[154]  Elliott again worked on the internal Enron analysis, and she participated in the effort to review Em-on's financial condition in detail, apparently with a particular focus on Em-on's cash flows, including prepay transactions.[155]

Finally, by late summer and early fall 2001, as the public image of Em-on's financial condition was rapidly deteriorating, Citigroup redoubled its efforts to complete the picture of Em-on's true financial condition.  Citigroup received a credit review presentation from Enron dated August 7, 2001.[156]  An extensive and detailed list of questions circulated within Citigroup on October 17.[157] Also in October, Fox directed others within Citigroup to "gather our collective knowledge" on Em-on's finances, including "Off Balance Sheet Structures: like Marlin, Osprey, Wessex, Electro, FASB 140 structures, Whitewing etc ie [sic] those deals that we are aware of but not involved in," and Enron's liquidity requirements.[158]

In late October 2001, as Em-on was requesting a new $1 billion line of credit from Citigroup and JPMorgan Chase, Hendricks expressed to Glisan, Em-on's Treasurer, the frustration at Citigroup that Em-on and Citigroup were "not communicating as clearly as

---

[154] Letter from William T. Fox, III, Citigroup, to Barry M. Frohlinger ("Frohlinger"), July 20, 2001, at CITI-B 01284035 (engaging Frohlinger's firm to provide training and educational services, including a discussion of "how to interpret and quantify the impact of off balance liabilities, such as pre-paids") [CITI-B 01284035-CITI-B 012840361. See also Fox Sworn Statement, at 68-70, 106-08. Stott testified that he could recall the following attendees:  Thomas Stott, Dan Brill, Michael Nepveux, Lydia Junek and John Mugno. Stott Sworn Statement, at 130-3 1.

[155] Elliott 7/20/01 Email, at CITI-B 00616905 (noting that she was producing a cash flow analysis "using a t-account analysis 'backing into' cash received based upon Enron's disclosed risk Management Activity EBIT and balances.").

[156] See Enron Credit Review, PowerPoint Presentation, prepared by Enron, Aug. 7, 2001 [CITI-B 004623%CITI-B  00462771.

[157] Email from Anne Clarke Wolff, Citigroup, to Maureen Hendricks, Citigroup, et al., Oct. 17, 2001 (distributing a list of due diligence questions to be posed to Enron) [CITI-B 00827896-CITI-B 00827900].

[158] Email from William T. Fox, III, Citigroup, to Amy Pincu, Citigroup, et al., Oct. 23, 2001 [CITI-B 006163431.

[they] needed to."[159]  She informed Glisan that if Enron "really wanted to advance this process," Enron should tell Citigrowp "everything and anything [they] wanted to know."[160]  Citigroup funded $600 million of the requested loan in November 2001 for which it received a $12 million fee; JPMorgan Chase funded the remaining $400 million.[161]

Although Enron was a complex organization with complicated accounting and was not always forthcoming with Citigroup about all aspects of its finances, it appears that Citigroup had an in-depth understanding of Enron. James Reilly ("Reilly"), one of Citigroup's key relationship managers for Enron,[162] testified that, in November 2001 when Em-on disclosed to its banks its true liquidity position, Citigroup was not surprised by any of the disclosures except with respect to the magnitude of Enron's FAS 140 Transactions and Prepay Transactions.[163]  Despite Citigroup's special knowledge of Em-on's financial condition, and the importance of that information to Citigroup in making its credit decisions, the Examiner has found no evidence that Citigroup disclosed this information to investors to whom it sold Enron securities or to whom it syndicated under-writings or debt.  In fact, in November 2001, when Enron was representing

---

[159] Email from Maureen A. Hendricks, Citigroup, to James F. Reilly, Dean Keller, Richard A. Stuckey and John Melesius and copy to Anne Clark-Wolff, Citigroup, *et al.*, regarding Tonight's call with Glisan, Oct. 23, 2001 (the "Hendricks 10/23/01 Email") [CITI-B 009316841.

[160] Hendricks 10/23/01 Email.

[161] Citigroup Responses, at 20. Citigroup was a participant in Enron's presentation to several banks in New York on Nov. 19, 2001, in which Enron purported to disclose its financial condition. Reilly Sworn Statement, at 342.

[162] See Reilly Sworn Statement, at 16-17 ("Q. At some point did you become the principal relationship manager for Enron at Citibank? A. Yes. Q. When was that? A. I was – probably from when I joined in '91 I would have been the senior relationship manager on the account.").

[163] Reilly Sworn Statement, at 336-37 ("[T]here were substantially more FAS 125 or 140 transactions than we were aware of. We had been led to believe that we were aware of the bulk of the prepaids, and there were more meaningful prepaids than we knew about.").

Citigroup in the failed merger with Dynegy, Citigroup's review of Enron helped it realize that Enron had a $10 billion liquidity shortfall.[164]  Fox wrote in an email that "we need to down play the $10B number; if this get [sic] public circulation it could cause problems with Dynegy and counterparties pending the merger."[165]

---

[164] Fox Sworn Statement, at 157.

[165] Email from William T. Fox, III, Citigroup, to Alberto J. Verme, Citigroup, regarding Enron, Nov. 12, 2001 [CITI-B  006464651.

III.    **CITIGROUP'S ROLE IN ENRON'S SPE TRANSACTIONS**

A.    Prepay Transactions

The Prepay Transactions-completed mostly with the help of Citigroup and JPMorgan Chase-were a powerful tool that Em-on used to manage its reported financial condition and satisfy Rating Agency expectations.[166] Enron's Prepay Transactions with Citigroup and JPMorgan Chase constituted virtually all of the company's reported cash flow from operating activities in 1999 and 32% of its reported net operating cash flows in 2000.[167]

Between 1998 and 2001, Citigroup assisted Em-on in completing the nine Citigroup Prepays, totaling over $4.6 billion, as identified in the following chart:

---

[166] Second Interim Report, Appendix E (Prepay Transactions), includes a more detailed analysis of Enron's Prepay Transactions with Citigroup and JPMorgan Chase.

[167] See August 2001 Fastow Report, at 2-12; Enron Form 10-K filed with the SEC for the Year ended Dec. 3 1, 2000 (the "Enron 10-K for 2000"), Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows; Enron Form 10-K filed with the SEC for the Year ended Dec. 3 1, 1999 (the "Enron 10-K for 1999"), Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

**Citigroup Prepays**

| Name | Closing Date | Amount | Date Settled |
|------|-------------|--------|--------------|
| Roosevelt | Dec. 30, 1998 | $500 million | $375 million repaid in May 1999,[168] remainder repaid in Nov. 1999 with proceeds of Yosemite I[169] |
| Truman | June 29, 1999 | $500 million | Sept. 1999, repaid with proceeds of Jethro[170] |
| Jethro | Sept. 29, 1999 | $675 million | Nov. 1999, repaid with proceeds of Yosemite I[171] |
| Yosemite I | Nov. 18, 1999 (prepay extended Dec. 22, 1999)[172] | $800 million | Citigroup's exposure terminated per credit default swap upon Enron's bankruptcy[173] |
| Nixon | Dec. 14, 1999 | $324 million | April 2000, repaid with proceeds of Yosemite II |
| Yosemite II | Feb. 23, 2000 | $331.8 million[174] | Same as Yosemite I |
| Yosemite III | Aug. 25, 2000 | $475 million | Same as Yosemite I |
| Yosemite IV | May 24, 2001 | $775.1 million[175] | Same as Yosemite I |
| June 2001 | June 28, 2001 | $250 million | Novated to loan agreements assumed by Transwestern Pipeline Company and Northern Natural Gas, Nov. 2001 |

---

[168] Citibank Global Loans Short Form Approval Memorandum, regarding Project Roosevelt Prepaid, Apr. 29, 1999 (the "Roosevelt Amendment Global Loans Approval Memo"), at 2 [CITI-B 0032126-CITI-B 00321281.

[169] Nixon Global Loans Approval Memo, at 2 1.

[170] Truman Global Loans Approval Memo, at 2.

[171] Nixon Global Loans Approval Memo. Citigroup referred to Jethro as an extension of Truman. Citigroup Responses, at 38.

[172] See Cancellation Letter from ENA to Delta, Dec. 22, 1999 [AB000026334  AB000026338]; see **also,** Second Interim Report, Annex 2 to Appendix E (Prepay Transactions).

[173] For an explanation of the mechanics of Citigroup's ability to terminate its exposure upon Enron's bankruptcy, see Second Interim Report, Annex 2 to Appendix E (Prepay Transactions).

[174] In Yosemite II, the amount was denoted in British pounds as approximately £206.75 million. The amount converts to approximately $33 1,77 1,725 using an exchange rate of $1.6047 per British pound on February 23, 2000. Federal Reserve Board, Federal Reserve Statistical Release, Foreign Exchange Rates, United Kingdom Historical Rates, H-10 (the "UK Rate Release"), **available at** http:// federalreserve.gov/releases/h10/Hist/dat00_uk.htm (last visited May 27, 2003).

[175] In Yosemite IV, there were three sets of prepay swaps, one denoted in US. dollars as $475 million, one denoted in British pounds as approximately £109.5 million, and one denoted in Euros as approximately €170 million. The amount denoted in British pounds converts to approximately $154,427,850 using an exchange rate of $1.4103 per British pound on May 24, 2001. See U.K. Rate Release. The amount denoted in Euros converts to approximately $145,690,000 using an exchange rate of $0.8570 per Euro on May 24, 2001. Federal Reserve Board, Federal Reserve Statistical Release, Foreign Exchange Rates, EMU Member Countries Historical Rates, H-10, **available at** http://federalreserve.gov/releases/h10/Hist/dat00_eu.htm (last visited June 9, 2003).

Each of the Citigroup Prepays was structured with the commodity price risk moving through the other parties and back to Enron in a circle, so that it was eliminated. An internal Citigroup email described the difference between prepay transactions, distinguishing between transactions "where there was no underlying commodity risk, . . . and where the customer was managing a long or short position. the enron prepaid transaction which we just closed [referring to the June 2001 Citigroup Prepay] clearly falls in the former (ie no commodity risk being hedged) category."[176] Thus, Em-on's Prepay Transactions were simply debt packaged as commodity swaps. Citigroup itself considered the Citigroup Prepays to be debt for its own regulatory accounting purposes[177] and when analyzing Em-on's debt to capital ratios.[178]

Nevertheless, Enron accounted for the Citigroup Prepays as price risk management activity and characterized the proceeds of these financings as cash flows from operating activities rather than from financing activities.[179] This method of

---

[176] Email from Paul Deards, Citigroup, to Christopher Fehon, Cititgroup, et *al.*, (the "Deards 7/6/01 Email"), at 2 ("The business appropriately will be treating the prepaid amount as a loan for RBC purposes,
Email"), at CITI-B 00694155 (capitalization omitted in original) [CITI-B 00694153-CITI-B 006941551. See *also* Email from Paul Deards, Citigroup, to Steve Wagman and James Forese, Citigroup, regarding Enron, June 25, 2001, at CITI-B 00706419 ("there is no underlying commodity exposure at all") [CITI-B 00706419-CITI-B 00706421]; Email from Steve Wagman, Citigroup, to Paul Deards, Citigroup, regarding Enron, July 6, 2001 [CITI-B 00639009]. This email contained a series of emails among Wagman, Deards and Sean Mulhearn, referring to the June 200 1 Citigroup Prepay, as follows:

> Mulheam:    "I presume deal was closed last Friday. Would be interested in the final prices & volumes you agreed given the sharp drop in ng [natural gas] prices last week."
>
> Deards:    "since this is all a circle, why does it matter ?   What was your response, or are you looking to me to reply?"
>
> Wagman: "No just fyi."

[177] Email from Saul Bernstein, Citigroup, to William J. Mackey, Citigroup, regarding Prepaid Swap, July 8, 1999, at 2 ("The business appropriately will be treating the prepaid amount as a loan for RBC purposes, but for GAAP reporting it is classified as a Revaluation Receivable.") [CITI-B 00649873-CITI-B 006498761; Caplan Sworn Statement, at 238-48, 406-08.

[178] See, e.g., August 2001 SSB Memo, at 11-12 (including Prepay Transactions as "Off Balance Sheet Financings").

[179] See ENA Memorandum from Financial Operations Accounting, to Distribution, regarding Prepaid Hydrocarbon Companies, Oct. 21, 1996 [AB0252 0106%AB0252 010731. Enron reported the amount of

accounting significantly understated Enron's true debt obligations and favorably affected Enron's key financial ratios, considered by the Rating Agencies when establishing Em-on's credit rating.[180]

The Citigroup Prepays alone, without consideration for Prepay Transactions that Enron completed with JPMorgan Chase or other financial institutions, had a material effect on Enron's cash flows from operating activities, as reflected in the following table:

the "magic notes" in the Yosemite transactions as debt. These were a small fraction of Enron's total prepay obligations, representing less than 3% of the total prepay obligations at June 30, 2001. See Second Interim Report, Appendix E (Prepay Transactions).

[180] See Testimony of John C. Diaz, Managing Director, Power & Energy Group, Moody's Investors Service, and Pamela M. Stumpp, Managing Director, Chief Credit Officer, Corporate Finance Group, Moody's Investors Service, before the PSI, July   23, 2002, ¶ 4 ("If such transactions had been accounted for as a loan, Enron's operating cash flow would have been reduced and its debt would have been greater. The disclosure of these transactions as loans would have exerted downward pressure on Enron's credit rating.") [AB000359566-AB000359568]; Testimony of Ronald M. Barone, Managing Director, S&P's Ratings Services, before the PSI, July 23, 2002, at 13 [AB000359524–AB000359542]; Written Statement of Lynn Turner, Former Chief Accountant of the SEC, to the PSI, July 23, 2002, at ELIB00002247-00006-ELIB00002247-00007 ("When a company improperly reports cash flows generated by or used in financings as cash generated from typical business operations [then investors, analysts and credit rating agencies will be mislead [sic] as to the financial health of a company and its ability to meet future commitments on cash.") [ELI00002247-00001-ELIB00002247-00013]. See also *id.* at ELIB00002247-00010 ("I have read the testimony of the subcommittee's chief investigator and various documents the staff of the subcommittee have provided to me. These documents lead to the conclusion that the Enron prepay transactions described therein should have been accounted for as bank or credit financings, rather than as liabilities from price risk management activities in the financial statements of Enron.").

**Enron's** Operating Cash Flows

| For Year Ended (dollar amounts in millions) | Reported Cash Flows From Operating Activities | Net Cash Flows From Citigroup Prepays | Cash Flows From Operating Activities Without Citigroup Prepays | Percentage Decrease |
|---|---|---|---|---|
| 1999 | $1,228[181] | $935[182] | $293 | 76% |
| 2000 | $4,779[183] | $546[184] | $4,233 | 11% |

In addition, if Enron had reported its obligations arising out of the Citigroup Prepays as debt, rather than as liabilities from price risk management activities, Enron's reported debt levels would have looked markedly different, as shown in the following table:

---

[181] See Enron 10-K for 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

[182] This number was determined by subtracting the outstanding balance of the Citigroup Prepays as of December 3 1, 1998 from the outstanding balance of the Citigroup Prepays as of December 3 1, 1999. See August 2001 Fastow Report, at 2-12. The outstanding balance for 1998, however, does not include approximately $47 million for a transaction that the August 2001 Fastow Report referred to as "Crude: Citibank – MahII," which "Ended 12/99." August 2001 Fastow Report, at 2-12. The Examiner has been unable to determine the transaction to which this reference related and, thus, did not include it in the comparative analysis.

[183] See Enron 10-K for 2000, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

[184] This number was determined by subtracting the outstanding balance of the Citigroup Prepays as of December 31, 1999 from the outstanding balance of the Citigroup Prepays as of December 3 1, 2000. See August 2001 Fastow Report, at 2-12.

**Em-on's Debt**

| As of Dec. 31, (dollar amounts in millions) | Reported Debt (Does Not Include Prepay Transactions) | Amount Outstanding on Citigroup Prepays | Debt Including Amount Outstanding on Citigroup Prepays | Percentage Increase |
|---|---|---|---|---|
| 1999 | $8,152[185] | $1,125[186] | $9,277 | 14% |
| 2000 | $10,229[187] | $1,671[188] | $11,900 | 16% |

Enron provided no meaningful disclosure of the Prepay Transactions, notwithstanding their magnitude and significance, and notwithstanding advice from Andersen that Em-on should provide more complete disclosure." As discussed below, Citigroup understood Em-on's accounting for the Citigroup Prepays and the inadequacy of the disclosures in Enron's financial statements. Yet, Citigroup provided assistance to Em-on in connection with the Citigroup Prepays, including: (i) lending its own funds in five of the transactions; (ii) assisting Em-on in accessing other sources of funds by developing the credit linked notes structure used in the four Yosemite transactions; (iii) purchasing equity (synthetically through a "balance sheet provider") in the issuing entity in Yosemite I and II and completing those credit linked notes transactions despite a strong belief that Enron should have consolidated the issuing entity; (iv) providing its

---

[185] See Enron 10-K for 1999, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[186] This amount includes $797,744,000 for Yosemite I and $327,298,000 for Nixon. See August 2001 Fastow Report, at 2-12.

[187] See Enron 10-K for 2000, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[188] This amount includes $832,326,000 for Yosemite I, $332,814,000 for Yosemite II and $506,056,000 for Yosemite III. See August 2001 Fastow Report, at 2-12.

[189] See Second Interim Report, Appendix D (Enron's Disclosure of its SPEs). See *also* Appendix B, PSI Prepay Report, at 5 (discussing an Andersen staff interview conducted by the PSI on July 19, 2002: "At one point, Arthur Andersen auditors recommended to Enron Chief Accounting Officer Rick Causey that Enron provide more complete disclosure on its prepay transactions, but Causey declined to do so."). As discussed in Appendix C (Role of Enron's Officers), and as discussed later in this Appendix, Andersen recommended that Enron model its disclosure after that of Aquila Energy Corporation.

SPE, Delta, in six of the Citigroup Prepays to serve as a swap counter-party or the conduit entity that Enron believed was necessary; and (v) serving as the conduit entity itself in two Prepay Transactions where TD Bank was the lender, in return for TD Bank's serving as conduit in two mirror Citigroup Prepays, Truman and Jethro.

*Summary  Description*

All of the Citigroup Prepays, other than Roosevelt, were financially settled and followed generally the same structure, which had the effect of eliminating all commodity price risk. Although Roosevelt was physically settled, it also had a circular structure that eliminated the price risk. Although each of the Citigroup Prepays has different details, with different parties playing the roles of lenders and conduit entities, the following description of a typical Citigroup Prepay shows the basic circular nature of the common transaction  structure:



- *Step One:    Citigroup/Enron.*    Citigroup and Em-on entered into a swap agreement pursuant to which Citigroup paid Enron a fixed sum on the closing date, i.e., a "prepayment." This is the amount loaned by Citigroup to Enron using the prepay structure.  In exchange, Enron agreed to pay Citigroup the floating price of a specified quantity of a commodity on a specified settlement date.

- *Step Two: Citigroup/Conduit.* Citigroup and a conduit entity entered into a swap agreement, pursuant to which Citigroup agreed to pay the conduit entity the floating price of a specified quantity of a commodity, which matched the payment it would receive from Em-on pursuant to the swap described in step one. In exchange, the conduit entity would pay Citigroup a fixed amount equal to the payment of principal plus interest on the prepayment made by Citigroup pursuant to the swap described in step one. This payment made by the conduit entity matched the payments it would receive from Enron pursuant to the swap described in step three.

- *Step Three:  Conduit/Enron.* The conduit entity and Em-on entered into a swap agreement, pursuant to which the conduit entity agreed to pay Enron on the settlement date an amount equal to the floating payment it would receive from Citigroup. In exchange, Enron agreed to pay to the conduit entity on the settlement date an amount equal to the principal and interest on the

prepayment which, pursuant to the swap described in step two, the conduit entity would transfer to Citigroup.

The net effect of the three steps of each Citigroup Prepay was that, at the closing, Em-on received a prepayment that was effectively a loan. On the specified settlement dates, the circular floating payment obligations of the parties based on the price of the commodity would eliminate one another, ensuring that no party had any risk with respect to such commodity price. In addition, on the specified settlement dates, Enron would repay the principal it had borrowed plus interest, with such payment passing through the conduit entity to Citigroup. In net economic substance, Citigroup made a loan to Enron that Em-on repaid with interest.

Each of the nine Citigroup Prepays was a variation of the structure described above, but regardless of the details, each transaction was circular. All commodity price risk was eliminated by having it circle back to Enron. The following is a brief summary of each of the nine Citigroup Prepays.[190]

*Roosevelt.* The Roosevelt Prepay Transaction, which closed in December 1998, was the only one of the nine Citigroup Prepays that was physically settled.""  As a result, the primary documents were a combination of a prepaid forward sales agreement and two swap agreements, rather than strictly swaps.[192]

---

[190] These summaries do not review all aspects of each transaction. Instead, the transaction descriptions are purposefully simplified to provide a general overview, including those facts that the Examiner believes are relevant to the scope of this Appendix. For example, in Roosevelt there were additional swap agreements such as an interest rate swap between Delta Energy Corp. and Barclays plc, but that agreement was ancillary to, and had no effect on, the basic nature of the circular prepay structure. For a detailed review of Yosemite I through IV, see Second Interim Report, Annexes 2 through 5 to Appendix E (Prepay Transactions).

[191] Roosevelt Credit Approval Memorandum, Dec. 21, 1998, at l-2 [CITI-B 0032040-CITI-B 0032046].

[192] The Roosevelt Prepay Transaction consisted of a crude oil prepay and a natural gas prepay, both of which were separately documented. The primary documents for the crude oil prepay were: (i) Crude Oil Inventory Forward Sale Contract between Enron Natural Gas Marketing Corp. ("EN,") and Delta, Dec. 30, 1998 [CITI-B 0261387-CITI-B 02614441; (ii) Confirmation Letter of Crude Oil Inventory Forward



In this transaction, an SPE called Delta, which had been formed by Citigroup,[193]

entered into step one with Enron. Delta paid Enron $500 million (which Delta had

Sale between Delta and ENG (the "Oil Forward Confirmation"), Dec. 30, 1998 [CITI-B 0261982-CITI-B 02619831; (iii) ISDA Master Agreement between Delta and Barclays Bank PLC ("Barclays"), Dec. 30, 1998 (the "Barclays/Delta Master Agreement") [BRC 000059073-BRC 000059117]; (iv) Commodity Confirmation between Delta and Barclays, Dec. 31, 1998 (the "Barclays/Delta Oil Swap Confirmation") [BRC 000010613-BRC 000010617]; (v) ISDA Master Agreement between ENA and Barclays, Jan. 13, 1994 (the "ENA/Barclays Master Agreement") [BRC 000023664-BRC 000023704]; (vi) Commodity Confirmation between ENA and Barclays, Dec. 31, 1998 (the "Barclays/ENA Oil Swap Confirmation") [BRC 000010575-BRC 000010579]. The primary documents for the natural gas prepay were: (i) Natural Gas Inventory Forward Sale Contract between ENG and Delta, Dec. 30, 1998 [CITI-B 0261445-CITI-B 0261501]; (ii) Confirmation Letter of Natural Gas Inventory Forward Sale between ENG and Delta, Dec. 30, 1998 (the "Gas Forward Confirmation") [CITI-B 0261985-CITI-B 02619861; (iii) the Barclays/Delta Master Agreement; (iv) Commodity Confirmation between Barclays and Delta, Dec. 3 1, 1998 (the "Barclays/Delta Gas Swap Confirmation") [BRC 0000 10618-BRC 000010622]; (v) the ENA/Barclays Master Agreement; and (vi) Commodity Confirmation between Barclays and ENA, Dec. 31, 1998 (the "Barclays/ENA Gas Swap Confirmation") [BRC 000010589-BRC 000010593].

[193] See Affidavit of Barbara Yastine, Chief Financial Officer, Corporate and Investment Bank, Citibank, July 29, 2002 (the "Yastine Affidavit"), at 1 [AB0005 1303 1-AB0005 130341.

borrowed from another Citigroup entity)[194] as the prepayment under a forward commodity sales contract.[195] Enron agreed to deliver to Delta specified quantities of natural gas and crude oil at specified points in time.[196] Because Delta apparently had no interest in taking delivery of the gas and oil, it signed a marketing agreement with Enron pursuant to which Enron would act as Delta's agent and was required to resell the gas and oil on behalf of Delta.[197]

In order to eliminate its risk with respect to the price of the commodities and get repaid a fixed amount of principal plus interest on its advance, Delta entered into a swap agreement with Barclays Bank PLC ("Barclays").[198] Pursuant to that agreement, Delta agreed to pay Barclays the market price of the gas and oil, and Barclays agreed to pay Delta a fixed amount (that it would receive from Em-on)."[199]" To close the circle, Barclays entered into a swap agreement with Enron.[200] Pursuant to that swap agreement, Barclays would pay Em-on an amount equal to the market price of the gas and oil-i.e., the same amount it received from Delta-and Enron would pay Barclays the $500 million prepayment plus an amount that functioned as interest, which equaled the amount Barclays was required to pay to Delta.[201] The net effect was that all commodity price risk

---

[194] See $500,000,000 Credit Agreement among Delta, as Borrower, Corporate Asset Funding Company, Inc. and Corporate Receivables Corp., as Lenders, and Citicorp North America, Inc., as Administrative Agent and Collateral Agent, Dec. 30, 1998 [CITI-B 0261689-CITI-B 02617931.

[195] Oil Forward Confirmation; Gas Forward Confirmation.

[196] Oil Forward Confirmation; Gas Forward Confirmation.

[197] Marketing Agreement between ENA and Delta, Dec. 30, 1998 [CITI-B 0261844-CITI-B 02618681.

[198] Barclays/Delta Oil Swap Confirmation; Barclays/Delta Gas Swap Confirmation.

[199] Barclays/Delta Oil Swap Confirmation; Barclays/Delta Gas Swap Confirmation.

[200] Barclays/ENA Oil Swap Confirmation; Barclays/ENA Gas Swap Confirmation.

[201] Barclays/ENA Oil Swap Confirmation; Barclays/ENA Gas Swap Confirmation.

was eliminated, and Enron was required to repay to Delta the $500 million principal with interest, with Barclays acting as the conduit entity.[202]

In May 1999, the parties amended Roosevelt.[203] Initially, Citigroup had agreed not to syndicate its $500 million loan in the transaction until May 1999, at which time Enron was scheduled to begin making amortization payments.[204] However, Enron requested modifications to Roosevelt (i) to permit Enron to pay $375 million of the outstanding principal in May 1999 and the remaining $125 million by September 30 of that year, if (ii) Citigroup would agree not to syndicate the transaction until October and to allow Enron to defer making amortization payments until October.[205]

In the spring of 1999, Em-on's Obligor Exception at Citigroup was somewhere in the range of $600 million to $900 million.[206] Thus, Citigroup had an incentive to approve Em-on's proposal and receive the $375 million immediate paydown of its exposure, with the remaining $125 million paydown occurring five months later. Citigroup understood from Enron, however, that Em-on's commitment to repay the remaining $125 million by

---

[202] Given Citigroup's experience with Em-on's circular Prepay Transactions, and the fact that Delta hedged its commodity and interest rate risk with Barclays, it is reasonable to infer that Citigroup was aware that Barclays passed the commodity risk back to Enron.   There is some documentary evidence of this knowledge, specifically a chart reflecting the structure of Roosevelt as it involved Citigroup and Delta, with a handwritten indication that an Enron affiliate entered into a swap with Barclays. Exhibit 144, PSI Prepay Report, at AB000153283 (Global Loans Approval Memorandum, regarding Roosevelt, Dec. 21, 1998) [AB000153274-AB00153283].

[203] Roosevelt Amendment Global Loans Approval Memo, at 2.

[204] *Id.*

[205] *Id.*

[206] See Email from James F. Reilly, Citigroup, to H-Onno Ruding, John J. Kennedy and Tom Boland and copy to William Fox, Citigroup, *et al.,* regarding Enron/Consent to Amendment to Roosevelt, Apr. 27, 1999 (the "Reilly 4/27/99 Email"), at CITI-B 0046838 (stating that Obligor Exception was roughly $608 million) [CITI-B 0046838-CITI-B 00468391; Citigroup Credit Approval, relating to amendments to Roosevelt, Apr. 5, 1999, at 1 (stating that Obligor Exception was $48 1 million) [CITI-B 0032129-CITI-B 0032133].

September 30, 1999 could not be reduced to writing because the existence of such a commitment would result in undesirable accounting treatment from Enron's perspective.

In testimony provided to the Examiner, Reilly explained the accounting concern, which resulted because Roosevelt was structured to require physical settlement. He testified that Roosevelt's three-year commodity settlement schedule could not be converted into a one-day repayment because "there is simply no way for the physical commodity to be delivered in that scale on that day."[207]  He stated that such a conversion "would not have allowed the company to account for the transaction as a prepaid commodity transaction, because I believe it would have been subject to some reasonableness test, and . . . that test couldn't have been passed if you had to deliver that volume of commodity on that day."[208]  Reilly concluded that it was his "best guess" that the alternate accounting treatment would have been to report the obligation as debt.[209]

Reilly explained Enron's proposed amendment and constraint to Ruding in an April 27, 1999 email:

> Enron has agreed to repay the remaining $125MM by 9/30. In return, they have asked for the following amendments:
>
> ▪ amend the syndications agreement to read that syndication will commence on 10/1 if the deal is still outstanding (altho they have agreed to prepay by 9/30, the papers cannot stipulate that as it would require recategorizing the prepaid as simple debt); . . . [210]

---

[207] Reilly Sworn Statement, at 118.

[208] *Id.* at 119.

[209] *Id.* at 120. The Examiner does not have sufficient information at this time to reach a conclusion as to whether Enron's promise to repay the remaining balance of Roosevelt prior to the stated transaction expiration date actually invalidated Enron's accounting for the transaction.

[210] Reilly 4/27/99 Email.

In an earlier email, Reilly had explained the accounting issue to a number of other Citigroup officers:

> [T]hey have agreed to prepay that amount no later than 9/30;
>
> - The paperwork cannot reflect their agreement to repay the $190MM as it would unfavorably alter the accounting; to compensate for that, we will amend the syndications letter to read that syndication will commence on 10/1; . . .[211]

An internal Citigroup approval memorandum for the changes to Roosevelt stated: "The company has verbally agreed to repay the remaining $125 million by September 30, 1999."[212] This approval memorandum also stated: "Based on the positive aspects of this transaction including the repayment of $375 million and the promise to repay in 5 months time, we recommend approval of the amended Roosevelt transaction."[213] Citigroup

---

[211] Email from James F. Reilly, Citigroup, to Thomas Stott, Steve Baillie, Trevor Randolph, David B. Gorte, Chris Lyons, Joseph J. Mankiewicz, Jean M. Diaz and William Fox, Citigroup, regarding Enron/Roosevelt Update, Apr. 22, 1999 (Enron ultimately agreed to pay enough to reduce the balance of Roosevelt to $125 million, apparently to eliminate the need for Citigroup to obtain certain internal approvals, per a later paragraph in the email) [CITI-B 02 1907 1].

[212] Roosevelt Amendment Global Loans Approval Memo, at 2.  See    Yosemite I Global Loans Approval Memo, at 4 ("By its terms, Roosevelt has an additional 4+ years until final maturity. However, the company has informally agreed to repay Roosevelt at 12/6/99."); Truman Global Loans Approval Memo, at 3 ("By its terms, Roosevelt has an additional 4+ years until final maturity. However, we had an agreement with Enron to prepay it on 9130199 (Enron prepaid $375 million on 5/1/99).   As part of the Truman extension [i.e., Jethro], they have asked instead to repay Roosevelt at 12/5/99."); Email from James F. Reilly, Citigroup, to Thomas Stott, David S. Gorte, Steve Baillie, Joseph J. Mackiewicz, Jean M. Diaz and William Fox, Citigroup, regarding Enron/Project Roosevelt, Apr. 19, 1999 [CITI-B 02 190671 ("I think we should approve the changes given the short time frame and the firm promise to fully repay before YE99.  . . . Enron characterizes this as a 'favor'.")

[213] Roosevelt Amendment Global Loans Approval Memo, at 2. In this document, Citigroup acknowledged that it was relying on the oral commitment in reducing Enron's Obligor Exception, stating:

> Citibank's insurance group is extending its approvals of the five surety bond providers from June 30, 1999 to September 30, 1999. Unlike the initial deal where the surety bond approvals expired prior to deal maturity, Enron's agreement to repay the entire obligation by September 30, 1999 for the amended deal coincides with Citibank's new surety bond approvals. In effect, Citibank's exposure in this transaction is now limited to five A-rated insurance companies, issuing surety bonds with a face value of $25 million each. The removal of Enron exposure from this transaction should enable Enron's obligor exception to be reduced by $125 million, or the size of the amended Roosevelt transaction.

*Id.*

granted such approval and later, in connection with the Jethro Prepay Transaction, agreed to allow a further extension of the repayment obligation to early December 1999, so that Roosevelt could be repaid with the proceeds of Yosemite I.[214]

**Truman.** In mid to late June 1999, Enron requested that Citigroup underwrite another $500 million Prepay Transaction, which would close by month end.[215] Even Citigroup felt the proposed timing was "daunting,"[216] but it proceeded to facilitate the desired transaction. However, instead of funding the entire $500 million itself, Citigroup funded $250 million, and TD Bank funded the remaining $250 million. The two financial institutions entered into essentially mirror-image Prepay Transactions that closed on the same day, and each served as the other's conduit entity. Both were financially settled Prepays and this was apparently the first time that Citigroup had done a Prepay that did not require any physical delivery of a commodity.[217]

---

[214] Nixon Global Loans Approval Memo, at 21

[215] Email from James F. Reilly, Citigroup, to William Fox, Tom Boland and Thomas Stott and copy to Steve Baillie, Citigroup, et al., regarding Enron/$500MM Prepaid, June 20, 1999 [CITI-B 0262788-CITI-B 02627891; Reilly Sworn Statement, at 140.

[216] Reilly Sworn Statement, at 142.

[217] *Id.* at 153. Apparently Enron suggested using a financially settled structure, and Enron officers explained to Reilly that Enron believed the accounting treatment would be the same as for physically settled transactions. Reilly Sworn Statement, at 153-54 (recalling conversations with Bill Brown and Jeff McMahon).

Specifically, in the Citigroup-funded Prepay Transaction, Citigroup entered into a swap agreement with Em-on, pursuant to which Citigroup paid Enron $250 million on the closing date.[218] Enron agreed to pay Citigroup the price of approximately 14 million barrels of crude oil 90 days later.[219] Citigroup then shifted the price risk of the oil to TD Bank via a swap agreement, whereby Citigroup agreed to pay TD Bank the same oil price on the same settlement date, and TD Bank agreed to pay Citigroup the fixed sum of approximately $254 million, constituting the $250 million principal plus interest.[220] Finally, completing the circle, TD Bank entered into a swap with Em-on, agreeing to pay Enron the same price of the oil on the settlement date.[221] Em-on agreed to pay TD Bank the same fixed sum of approximately $254 million.[222]

---

[218] ISDA Master Agreement between ENA and Citigroup, Nov. 17, 1992 (the "Citigroup/ENA Master Agreement") [SS000037868-SS000037913]; Confirmation between ENA and Citigroup, June 29, 1999 (the "Citigroup/ENA Confirmation") [SS000036643-SS000036651].

[219] Citigroup/ENA Master Agreement; Citigroup/ENA Confirmation.

[220] Swap Transaction Confirmation between Citigroup and TD Bank, July 6, 1999 (the "Truman Confirmation between Citigroup and TD Bank") [CITI-B 00373899-CITI-B 00373901].

[221] ISDA Interest Rate and Currency Exchange Agreement between ENA and TD Bank, Mar. 4, 1992 (the "ENA/TD Bank ISDA Interest Rate and Currency Exchange Agreement) [TDB-EX 002245TDB-EX 0022691; Revised Swap Transaction Confirmation between TD Bank and ENA, Aug. 6, 1999 (the "TD

The TD Bank-funded Prepay worked in the same fashion, except that TD Bank made the initial $250 million payment to Enron, and Citigroup served as the conduit entity to shift the price risk back to Enron so that it would be eliminated.[223] Enron paid each of Citigroup and TD Bank a $1 million upfront fee for funding its $250 million share, as well as a $100,000 fee for serving as the conduit entity for the other lender.[224]

*Jethro.* On September 29, 1999, the day that the 90-day Prepay Transactions in Truman were to settle, Citigroup and TD Bank effectively refinanced and increased the Truman obligations by executing two new Prepay Transactions. Although Citigroup generally referred to this follow-on transaction as an extension of Truman,[225] Enron referred to it as Project Jethro.[226] The parties executed a new set of documents as opposed to amending the then-expiring Truman documents. According to Citigroup's internal approval memorandum for Jethro, the parties' intent had been to retire Truman

---

Bank/ENA Revised Swap Transaction Confirmation") [SS000036594-SS000036596]. It is reasonable to infer that Citigroup was aware of this swap, since Citigroup entered into a similar swap with Enron in the mirror Prepay Transaction where it served as the conduit.

[222] ENA/TD Bank ISDA Interest Rate and Currency Exchange Agreement; TD Bank/ENA Revised Swap Transaction Confirmation.

[223] ISDA Master Agreement between ENA and Toronto Dominion (Texas), Inc. ("TD Texas"), Dec. 18, 1998 [TDB-EX 000604-TBD-EX 000631]; Swap Transaction Confirmation between TD Texas and ENA, Aug. 6, 1999 [SS000036591-SS000036593]; Citigroup/ENA Master Agreement; Revised Confirmation between ENA and Citigroup, July 30, 1999 [SS000036617-SS000036629]. The Examiner was unable to locate a copy of the Swap Transaction Confirmation between TD Texas and Citigroup; however, an Enron chart shows that this leg of the transaction existed. See Enron Crude Prepay Charts, undated (the "Enron Truman Charts") (showing the structure of the Truman transaction) [SS000037612-SS000037618].

[224] Upfront Fee Letter from Citigroup, to Doug McDowell, Director, Enron, June 29, 1999 [SS000037494]; Swap Fee Letter from Citigroup, to Doug McDowell, Enron, June 29, 1999 [SS000037467]; Upfront Fee Letter from Ann P. Scully, Vice President, TD Securities (USA) Inc., to Doug McDowell, Director, Enron, June 28, 1999 [SS000037465-SS000037466]; Swap Fee Letter from Ann P. Scully, Vice President, TD Securities (USA) Inc., to Doug McDowell, Director, Enron, June 28, 1999 [SS000037495-SS000037496]; Swap Fee Letter from Citigroup, to Doug McDowell, Enron, June 29, 1999 [SS000037467].

[225] Truman Global Loans Approval Memo, at 2; Citigroup Responses, at 38.

[226] Memorandum from Bill Brown, Enron, to Doug McDowell, Enron, regarding Annual Review – 1999, Nov. 30, 1999 (the "Bill Brown 1999 Annual Review Memo"), at 1 [SS000036560 – SS000036561].

with the proceeds of Yosemite I prior to the end of third quarter 1999.[227] However, the credit linked notes underwriting planned for Yosemite I was delayed, creating the need for another short-term bridge financing.[228]

Jethro mirrored the Truman transaction, with Citigroup and TD Bank again playing their same roles as lenders and conduit entities. Each lender funded $337.5 million to Enron, and the Jethro Prepays were set to expire in 90 days on December 28, 1999.[229] Enron used the proceeds of Jethro, in part, to repay the maturing Truman obligations.

*Nixon.* The Nixon Prepay Transaction closed in December 1999 and was intended as a 180-day bridge financing that would be repaid with proceeds of the Yosemite II transaction scheduled for closing in first quarter 2000.[230] Nixon was actually a set of three interrelated Prepay Transactions that provided Em-on with a total of $324 million. It was financed by Citigroup, Barclays and Royal Bank of Scotland PLC ("RBS"), with TD Bank serving as the conduit entity for all three lenders.

---

[227] Truman Global Loans Approval Memo, at 2.

[228] *Id.*

[229] The principal documents for the TD Bank prepay were: (i) Swap Transaction Confirmation between ENA and TD Texas, Sept. 29, 1999 [SS000036413-SS000036415]; (ii) Confirmation between Citigroup and ENA, Oct. 19, 1999 [SS000036416-SS 000036420]; and (iii) a confirmation between TD Texas and Citigroup. Although the Examiner was unable to locate a copy of this confirmation between TD Texas and Citigroup, it is presumed to exist based on the fact that Jethro is an extension of Truman, and Enron charts of the Truman structure show this step of the transaction. See Enron Truman Charts. The principal documents for the Citigroup prepay were: (i) Confirmation between ENA and Citigroup, Oct. 6, 1999 [SS000036423-SS000036427]; (ii) Confirmation between TD Bank and Citigroup, Oct. 18, 1999 (unsigned copy) [CITI-B 0032392-CITI-B 00323951; and (iii) a confirmation between ENA and TD Bank. Although the Examiner was unable to locate a copy of this confirmation between ENA and TD Bank, it is presumed to exist since such confirmation exists between ENA and TD Bank for Truman, and Jethro is a refinancing of Truman. See Truman Confirmation between Citigroup and TD Bank.

[230] Nixon Global Loans Approval Memo, at 20.



Citigroup paid Enron $104 million on the closing date pursuant to a swap agreement.[231] Enron agreed to pay Citigroup an amount based on the price of crude oil on the settlement date.[232] Citigroup then entered into a swap with TD Bank, pursuant to which Citigroup agreed to pay the same price of crude oil to TD Bank in exchange for a fixed payment equal to the $104 million prepayment amount plus an amount that functioned as interest.[233]

---

[231] Citigroup/ENA Master Agreement; Swap Transaction Confirmation between Citigroup and ENA, Dec. 14, 1999 (the "12/14/99 Citigroup/ENA Swap Transaction Confirmation") [CITI-B 0134703-CITI-B 01347061. The initial settlement date of Mar. 15, 2001 was extended to Apr. 14, 2000. Swap Transaction Confirmation between Citigroup and ENA, Mar. 15, 2000 (the "3/15/00 Citigroup/ENA Swap Transaction Confirmation") [SS000037716-SS000037719].

[232] Citigroup/ENA Master Agreement; 12/14/99 Citigroup/ENA Swap Transaction Confirmation; 3/15/00 Citigroup/ENA Swap Transaction Confirmation.

[233] Confirmation between TD Bank and Citigroup, Dec. 22, 1999 (unsigned copy) [CITI-B 0032437-CITI-B 00324401. The initial settlement date of Mar. 15, 2000 was extended to Apr. 14, 2000. Revised

RBS also entered into a swap with Enron, paying Enron $110 million on the closing date.[234] Enron agreed to pay RBS an amount based on the price of crude oil on the settlement date.[235] RBS then entered into a swap with TD Bank, pursuant to which RBS agreed to pay the same price of crude oil to TD Bank, in exchange for a fixed payment equal to the $110 million prepayment amount plus an amount that functioned as interest.[236]

The third lender, Barclays, also entered into a swap with Enron, paying Enron $110 million on the closing date.[237] Enron agreed to pay Barclays an amount based on the price of crude oil on the settlement date.[238] Barclays then entered into a swap with TD Bank, pursuant to which Barclays agreed to pay the same price of crude oil to TD Bank, in exchange for a fixed payment equal to the $110 million prepayment amount plus an amount that functioned as interest.[239]

---

Confirmation between TD Bank and Citigroup, Mar. 15, 2000 (unsigned copy) [CITI-B 0032562–CITI-B 00325651.

[234] Swap Transaction Confirmation between RBS and ENA, Dec. 14, 1999 (the "12/14/99 RBS/ENA Swap Transaction Confirmation") [CITI-B 0032451-CITI-B 00324541. The initial settlement date of Mar. 15, 2000 was extended to Apr. 14, 2000. Swap Transaction Confirmation between RBS and ENA, Mar. 15, 2000 (the "3/15/00 RBS/ENA Swap Transaction Confirmation") [SS000037780-SS000037783].

[235] 12/14/99 RBS/ENA Swap Transaction Confirmation; 3/1 5/00 RBS/ENA Swap Transaction Confirmation.

[236] 12/14/99 RBS/ENA Swap Transaction Confirmation. Presumably, the initial settlement date of this step was extended like all of the other steps, although the Examiner has not located a copy of the extending confirmation.

[237] ENA/Barclays ISDA Master Agreement; Stand-Alone Swap Agreement between ENA and Barclays, Dec. 14, 1999 (the "12/14/99 ENA/Barclays Stand-Alone Swap Agreement") [CITI-B 0032445-CITI-B0032450]. The initial settlement date of Mar. 15, 2000 was extended to Apr. 14, 2000. Stand-Alone Swap Agreement between ENA and Barclays, Mar. 14, 2000 (the "3/14/00 ENA/Barclays Stand-Alone Swap Agreement) [SS000037751-SS000037757].

[238] ENA/Barclays ISDA Master Agreement; 12/14/99 ENA/Barclays Stand-Alone Swap Agreement; 3114100 ENA/Barclays Stand-Alone Swap Agreement.

[239] Swap Transaction Confirmation between TD Bank and Barclays, dated Dec. 14, 1997 [CITI-B 0032441-CITI-B 00324441. Presumably, the initial settlement date of this step was extended like all of the other steps, although the Examiner has not located a copy of the extending confirmation.

To complete the circle for all three sets of swaps, TD Bank entered into a swap with Enron.[240] TD Bank served as a conduit for passing the floating price back to Em-on, and for receiving the principal repayments plus interest from Enron and passing those on to the lenders.

*Yosemite I through IV.*   The Yosemite structure consisted of two related transactions, (i) a financially settled Prepay Transaction and (ii) the issuance of "credit linked" promissory notes and certificates in the institutional market, the proceeds of which funded the related Prepay Transactions. Citigroup takes credit for having designed the credit linked notes structure,[241] and it helped Enron complete four such structures from 1999 to 2001. Enron raised a total of approximately $2.4 billion from institutional investors through these transactions.   The four Yosemite transactions are described in more detail in Annexes 2 through 5 to Appendix E (Prepay Transactions) of the Second Interim Report.   The following is a chart showing salient features of the Yosemite structure:

---

[240] Swap Transaction Confirmation between ENA and TD Bank, Dec. 20, 1999 [CITI-B 0032459-CITI-B 00324621. The initial settlement date of Mar. 15, 2000 was extended to Apr. 14, 2000. Revised Swap Transaction Confirmation among TD Bank, ENA and Citigroup, Mar. 14, 2000 [SS000037788-SS000037792]. Citigroup served as the Calculation Agent under the Revised Confirmation and, thus, Citigroup was aware that TD Bank had entered into a swap with Enron shifting the commodity price risk back to the company and completing the circularity of all three Prepay Transactions involving Citigroup, Barclays and RBS .

[241] Testimony of Maureen Hendricks, Senior Advisory Director, Citigroup, before the PSI, July 23, 2002, at 173 ("Fitzgerald: Who came up with that idea [referring to Yosemite]? A. Mr. Caplan and colleagues of his in the credit derivatives group.") [AB000210232-AB000210500].



The Prepay Transaction within each Yosemite structure was essentially the same circular design as all of the other financially settled Citigroup Prepays. The series of swap agreements among Citigroup, Em-on and Delta had the net effect of eliminating all commodity price risk and resulting in Enron being obligated to repay a fixed amount of financing with interest. The credit linked notes portion of each structure had the effect of causing the institutional investors to provide the funding for each Prepay Transaction instead of Citigroup.

Although each Yosemite transaction had variations, the basic structure included forming a trust or similar entity (the "Trust") that sold promissory notes to institutional investors. In Yosemite I and II, Enron initially owned 50% of the applicable Trust's equity.[242]    Citigroup "synthetically" held the other 50%, by contracting with an independent "balance sheet provider," Long Lane Master Trust IV ("Long Lane"), to

---

[242] See Yosemite I Global Loans Approval Memo, at 2-3; Yosemite II Global Loans Approval Memo, at 3.

purchase the equity and then providing Long Lane with a Total Return Swap that transferred all economic risks and rewards back to Citigroup.[243] In each of Yosemite III and IV, an independent third party purchased all of the equity, but transferred the economic risks and rewards to Citigroup through a Total Return Swap.[244] Each Trust invested the proceeds of the notes and the equity certificates in ways that effectively funded the first step in the related Prepay Transaction.[245]

The Trust also entered into one or two swap agreements with Citigroup, which were designed so that the notes sold to the institutional investors would be linked to the credit of Enron.[246] Under these swaps, Citigroup would make periodic payments to the Trust in the amounts it needed to pay interest distributions on the notes and equity, respectively.[247] In return, the Trust paid to Citigroup any yield actually received by the Trust on its investments.[248] Upon an "Enron Bankruptcy," Citigroup could deliver to the Trust Enron obligations in exchange for the Trust's investments.[249]

---

[243] See Yosemite I Global Loans Approval Memo, at 2-3; Yosemite II Global Loans Approval Memo, at 3.

[244] See Yosemite III SSB Memo, at 5; Yosemite IV SSB Memo, at 10.

[245] In Yosemite I and II, the applicable Trust invested the proceeds in loans to Delta. In Yosemite III and IV, the applicable Trust invested the proceeds in Citigroup certificates of deposit. See Second Interim Report, Appendix E (Prepay Transactions).

[246] In Yosemite I and II, there were two swaps: one that related to regular payments and one that was applicable upon the occurrence of an Event of Default. See, e.g., Sections 1, 2, 3 and Annex 1, Confirmation (Delta Energy Corporation Promissory Note) between Yosemite Securities Company Ltd. and Citigroup, Feb. 23, 2000 [CITI-B 026501%CITI-B 02650311; Sections 1, 2, 3 and Annex 1, Confirmation (Enron Debt Security) between Yosemite Securities Company, Ltd. and Citigroup, Feb. 23, 2000 (the foregoing, collectively, the "YII Citibank/Yosemite Swaps") [CITI-B 00068 12-CITI-B 00068291. In Yosemite III and Yosemite IV, there was only one swap. See e.g., Swap Confirmation between Enron Credit Linked Notes Trust and Citigroup, dated Aug. 25, 2000 [CITI-B 0007964-CITI-B 000797 1].

[247] See, e.g., Section 2, YII Citibank/Yosemite Swaps.

[248] *Id.* Section 3.

[249] *Id.*

Thus, pursuant to each complete Yosemite transaction structure, Enron borrowed money via a Prepay Transaction, which was funded by institutional investors. Repayment to the note holders was supported only by the credit of Enron. As with other Citigroup Prepays, no party had any commodity price risk. Enron recorded the Citigroup Prepay financing as price risk management activity and cash flow from operating activities.[250]

*June* 2001. In mid-June 2001, Enron requested that Citigroup complete another Prepay Transaction before quarter end, looking for $250 million of "non-debt funding" that would mature in 2002.[251]



This June 2001 Citigroup Prepay, which apparently did not have a nickname, followed the familiar circular structure, with Citigroup paying a fixed amount of $250

---

[250] See Second Interim Report, Appendix E (Prepay Transactions).

[251] Email from Michael Nepveaux, Citigroup, to Amanda Angelini, James F. Reilly and Sean Mulheam, Citigroup, regarding Urgent Enron Deal, June 18, 2001 [CITI-B 006977941.

million to Delta pursuant to a swap on the closing date.[252] Delta agreed in return to pay
Citigroup a floating payment on the settlement date based on the price of natural gas.[253]
Delta then paid the $250 million to Enron on the closing date, in exchange for Enron's
agreement to pay Delta the floating payment on the settlement date based on the same gas
price.[254] Finally, Enron and Citigroup executed a swap, pursuant to which Enron agreed
to pay approximately $256 million to Citigroup on the settlement date, thus repaying to
Citigroup the principal plus interest.[255] Citigroup agreed to pay Enron a floating payment
based on the same price of gas, thus returning the commodity price risk to Enron and
thereby eliminating it.[256]

### Enron's Accounting and Other Disclosure

Enron used the Citigroup Prepays for several important financial statement
purposes:  (i) to obtain cash when it needed financing, but in a manner that would not
increase its reported debt; (ii) to increase its cash flows from operating activities, in order
to more closely match its non-cash MTM income; and (iii) to thereby maintain favorable
credit ratings from the Rating Agencies.[257]  Enron did not use the Citigroup Prepays to
actually sell commodities or transfer any commodity price risk, as evidenced by the
apparent ability of Enron to use Prepay Transactions interchangeably with other
financing  structures:  "IF [sic] Bacchus [a $200 million FAS 140 Transaction] is

---

[252] ISDA Master Agreement between ENA and Delta, Nov. 18, 1999 (the "ENA/Delta ISDA Master Agreement") [CITI-B 0034343-CITI-B 00343771; Swap Transaction Confirmation between ENA and Delta, June 28, 2001 (the "ENA/Delta Swap Transaction Confirmation") [SS000037989-SS000037994].

[253] ENA/Delta ISDA Master Agreement; ENA/Delta Swap Transaction Confirmation.

[254] ENA/Delta ISDA Master Agreement; ENA/Delta Swap Transaction Confirmation.

[255] Citigroup/ENA Master Agreement; Swap Transaction Confirmation between Citigroup and ENA, June 28, 2001 (the "Citigroup/ENA Swap Transaction Confirmation") [SS000037848-SS000037853].

[256] Citigroup/ENA Master Agreement; Citigroup/ENA Swap Transaction Confirmation.

[257] See Second Interim Report, Appendix E (Prepay Transactions).

withdrawn, Em-on is likely to ask for Citi to provide a $200MM prepaid instead."[258] Caplan described Em-on's Prepay Transactions as Enron monetizing income,[259] and Steve Wagman ("Wagman"), a Director in Citigroup's Derivatives group, wrote that the Prepay Transactions "give some oomph to revenues."[260] In October 2001, when Citigroup declined Em-on's request for a new Prepay Transaction but was willing to consider providing funds for a commercial paper facility, Fox explained the distinction by saying "CP rollover was clear financial need in a difficult time while the prepaid was an accounting need in a difficult time and we differentiated between the two."[261]

Citigroup understood how Em-on accounted for the Citigroup Prepays and the effect that the Citigroup Prepays had on Enron's reported financial condition, including income, assets, liabilities and cash flow:

- "The transaction provides favorable accounting treatment for the customer. Although the deal is effectively a loan, the form of the transaction would allow the customer to reflect it as 'liabilities from price risk management activity' on their on their [sic] balance sheet and also provide a favourable [sic] impact on reported cash flow from operations."[262]

- "The prepaid forward structure will allow Em-on to raise funds without classifying the proceeds from this transaction [Roosevelt] as debt (it is accounted for as 'deferred revenue')."[263]

---

[258] Email from James F. Reilly, Citigroup, to Steve Baillie, Chris Lyons, Lydia Junek, Rick Caplan, Amanda Angelini, Steven Becton and Steve Wagman, Citigroup, regarding ENE/Bacchus, Dec. 11, 2000 [CITI-B 02828571.

[259] Caplan Sworn Statement, at 70-7 1,402.

[260] Email from Steve Wagman, Citigroup, to Asfar Hashmi, Citigroup, regarding my take on how to explain ECLN, Sept. 28, 2000 (the "Wagman 9/28/00 Email") [CITI-B 02352291.

[261] Email from William T. Fox, III, Citigroup, to Alberto Verme, Maureen Hendricks, Dean Keller, James F. Reilly, Michael Nepveux and Anne Clarke Wolff and copy to Thomas Stott and Lydia Junek, Citigroup, regarding Enron, Oct. 1, 2001 [CITI-B 02361411.

[262] Minutes of Citibank CMAC, June 22, 1999 (the "CMAC Truman Minutes"), at 2 [CITI-B 0260171-CITI-B 02601721.

[263] Global Loans Approval Memorandum, regarding Project Roosevelt, Dec. 21, 1998 (the "Roosevelt Global Loans Approval Memo"), at CITI-B 0032096 [CITI-B 0032090-CITI-B 00320981.

- • "This form of financing is advantageous to Enron in that it allows the borrowing to be reported as 'price risk management' liability rather than debt.  In addition, because of the way Enron classifies trading assets/liabilities on the balance sheet, the amount of the borrowing actually is recorded as cash from operations."[264]

- • "As we understand the accounting, the Pre-Paid creates price risk management liability, thereby receiving non-'D' debt treatment. Operating cash flow increases, helping to offset the current 'disconnect' between book and cash earnings."[265]

- • "Citibank executed a six-month $250MM gas prepay with Enron on June 28[th], 2001, thereby creating a price risk management liability for that period of time. (The prepay was earnings neutral, because the mark-to-market of the various legs of the transaction nets to zero.) . . . [T]he fact is that the prepay creates cash from operating activities by monetizing value that was created during the period within the PRM portfolio."[266]

- • "Enron uses prepay transactions to raise quarter-end non-debt funding. Also, the mark-to-market accounting method used in the trading business results in earnings recognition prior to receipt of the associated cash flow. A prepay transaction essentially monetizes this value creation, and helps to balance earnings with cash flow."[267]

Citigroup also recognized the importance of the Citigroup Prepays to Enron, writing in one instance that "[t]he primary purpose of this transaction [Yosemite IV] is to permit Enron to refinance certain borrowings, with proceeds from the Offering, while allowing Em-on to maintain the advantageous accounting and rating agency treatment of these financings."[268]  Citigroup knew that Enron used the Citigroup Prepays to manage financial statement presentation, with one senior officer writing in November 1999 that

---

[264] Summary of Enron's Capital Market Exposure with Citibank, prepared by Elena Matrollo and Murray Barnes, Citigroup, Oct. 26, 2001 (the "Citigroup Exposure Memo") [SEC00091086-SEC00091087].

[265] Citigroup Summary of Pre-Paid Accounting and Tax, June 25, 2001 [AB000153416].

[266] Elliott 7/20/Email, CITI-B 00616908.

[267] Memorandum from Michael Nepveux, Citigroup, to Bill Fox, Citigroup, regarding Enron Corp. - Sept. 30 Prepay Transaction, Sept. 19, 2001, at 1 [CITI-B 00397725CITI-B    003977261.

[268] Yosemite IV SSB Memo, at 7.

Em-on needed a Prepay "by year-end as the deal generates count [sic] as operational funds flow which will evidently fill a gap left by certain European projects/contracts."[269] As shown in the timeline above, six of the nine Citigroup Prepays closed near the end of a quarterly or annual financial reporting period.

Reilly testified that he knew Rating Agency pressure was an important part of Enron's motivation in doing Prepay Transactions.[270] Bill Brown and McMahon of Enron had explained to him in 1999 the Rating Agencies' concern about the widening gap between Enron's cash flows from operating activities and its net income.[271] This gap was generated in large measure by the MTM accounting in Enron's trading book.[272] According to Reilly, Enron knew that it needed to increase or "accelerate" cash flows from operating activities in order to please the Rating Agencies.[273]

Citigroup recognized that the Citigroup Prepays had no commodity price risk and were in substance debt. There is documentary evidence of Citigroup's knowledge, including, for example:

- An internal approval memorandum for the Roosevelt Prepay Transaction said "this prepaid forward is effectively a commodity denominated corporate obligation . . . ."[274]

---

[269] Email from Niels Kirk, Citigroup, to William Fox and James F. Reilly, Citigroup, regarding Yosemite II (Europe), Nov. 5, 1999, at CITI-B 0131315 [CITI-B 0131314-CITI-B 01313151. See also Email from William Fox, Citigroup, to Thomas Stott, Citigroup, Apr. 18, 2001 (recapping a number of Enron transactions, "There is no question that Enron cashflow has become more dependent on Price Management Activities.") [CITI-B 02361431.

[270] Reilly Sworn Statement, at 162-65 ("[T]he driver behind the prepaids . . . was not just the gap that was being created between net income and funds flow but the recognition of the focus of the rating agencies on that issue").

[271] *Id.* at 156.

[272] *Id.*

[273] *Id.* at 156-57.

[274] Roosevelt Global Loans Approval Memo, at CITI-B 0032092.

- Minutes of a meeting of Citigroup's Capital Markets Approval Committee considering the Truman Prepay Transaction contained the following statement: "[a]dditionally, the internal approval for the transaction will acknowledge the fact that we were basically making a loan to [Enron]."[275]

- A credit approval memorandum relating to the Nixon Prepay Transaction described it as a "[f]inancially (cash) settled oil prepaid. At maturity Em-on will deliver cash equal to the nominal number of barrels x the then-index price. Index will be converted to a fixed price via a swap with the Toronto Dominion Bank to provide the funds needed to retire the loan."[276]

- A September 2000 Citigroup email summarizing Enron's accounting for Prepay Transactions contained the following succinct recognition of the economic reality of Prepay Transactions as loans: "oil goes in acircle [sic] so they all cancel . . . net net economically like a loan."[277]

- An internal email discussing the Roosevelt Prepay Transaction noted, "The commodity delivery schedule is hedged to ensure that the price realized on the ultimate sale of the commodities is sufficient to retire the loan."[278]

- A July 2001 analysis of Enron drafted by Citigroup officers stated: "Em-on's total volume of prepays . , . represents essentially another layer of corporate debt in addition to debt accounted as such."[279]

- "[G]iven that the flows on the prepaid oil swap, caps and floor all net down to the $475mm payment at maturity and a coupon of 7.474%, was there a reason not to simply structure it as a loan or a note?"[280]

Em-on's disclosure of its Prepay Transactions, to the extent any was provided, was

merely a general description of Enron's accounting for price risk management and its

---

[275] CMAC Truman Minutes, at 2.

[276] Citicorp Credit Approval, Dec. 10, 1999, at 2 [CITI-B 0132240-CITI-B 01322461.

[277] Wagman 9/28/00 Email.

[278] Email from James F. Reilly, Citigroup, to Thomas Stott, Citigroup, *et al.,* regarding Enron/Consent to Amendment to Roosevelt Transaction, Apr. 27, 1999 [PSI00339097].

[279] Elliott 7/20/01 Email, at CITI-B 00616908.

[280] Email from Andrew Lee, Citigroup, to Rick Caplan, Citigroup, Aug. 3 1, 2000, at 1 [CITI-B 00499574-CITI-B 004995751.

various price risk management activities. In footnotes 1 and 3 to Em-on's consolidated financial statements, Enron stated that its price risk management activities included "forwards, swaps and other financial instruments with third parties [that] are reflected at market value, net of future physical delivery related costs," but it never described any of the Prepay Transactions specifically or disclosed the amount or nature of its obligations thereunder.[281] These footnotes did not provide an investor with adequate information on the significant amount of cash flow that Enron received from any of its Prepay Transactions or on the amount Enron had to repay on these transactions.[282]

Enron also failed to disclose the impact of its Prepay Transactions in its MD&A disclosure. In the section of its MD&A captioned "Results of Operations" for the wholesale services segment, Em-on provided generic descriptions of its price risk management activities that paralleled the descriptions found in the notes to the

---

[281] Enron 10-K for 1998, Notes to the Consolidated Financial Statements, Notes 1 and 3. See    Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 15-17.

[282] In Note 1 to Enron's consolidated financial statements, captioned "Summary of Significant Accounting Policies," Enron stated:

> Financial instruments utilized in connection with trading activities are accounted for using the mark-to-market method. Under the mark-to-market method of accounting, forwards, swaps, options and other financial instruments with third parties are reflected at market value, net of future physical delivery related costs, and are shown as "Assets and Liabilities From Price Risk Management Activities" in the Consolidated Balance Sheet. . . .

> . . . . The cash flow impact of financial instruments is reflected as cash flows from operating activities in the Consolidated Statement of Cash Flows.

Enron 10-K for 1998, Notes to the Consolidated Financial Statements, Note 1. In Note 3, captioned "Price Risk Management and Financial Instruments," Enron disclosed that, through its wholesale services segment, it offered price risk management services through "a variety of financial and other instruments including forward contracts involving physical delivery of an energy commodity, swap agreements, which require payments to (or receipt of payments from) counterparties based on the differential between a fixed and variable price for the commodity, options and other contractual arrangements." Enron 10-K for 1998, Notes to the Consolidated Financial Statements, Note 3. See *also* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 17-19.

consolidated financial statements.[283]    Again, however, Enron provided no separate

disclosure on the Prepay Transactions themselves, failing to make clear to investors the

significant amount of reported cash flow from operating activities that was in fact

generated by these financings or Enron's related repayment obligations.[284]

---

[283] In the MD&A section of its 2000 Form 10-K, Enron described the following factors that contributed to cash flows from operating activities in 2000, 1999 and 1998:

> Net cash provided by operating activities increased $3,551 million in 2000, primarily reflecting decreases in working capital, positive operating results and a receipt of cash associated with the assumption of a contractual obligation.  Net cash provided by operating activities decreased $412 million in 1999, primarily reflecting increases in working capital and net assets from price risk management activities, partially offset by increased earnings and higher proceeds from sales of merchant assets and investments. The 1998 amount reflects positive operating cash flow from Enron's major business segments, proceeds from sales of interests in energy-related merchant assets and cash from timing and other changes related to Enron's commodity portfolio, partially offset by new investments in merchant assets and investments.

Enron 10-K for 2000, Item 7 (MD&A) ▪ Financial Condition ▪ Cash flows. See **also** Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 17-19.

[284] In contrast to Enron's lack of disclosure, a number of companies that engaged in prepay transactions, some of which accounted for the transactions in a manner similar to Enron, provided some type of footnote and/or MD&A disclosure. For example, Occidental Petroleum Company ("Occidental"), which entered into a $500 million prepay transaction with JPMorgan Chase and its conduit entity, Mahonia Ltd., made a detailed disclosure in its 1998 financial statements on the advice of its auditors, Andersen. See Memorandum from Brian A. Levan, Occidental Petroleum Corporation, to J.R. Havert and S. Kumar, Occidental Petroleum Corporation, regarding Proposed Pre Sale of Gas, Nov. 16, 1998 [AB000512577-AB000512583]; Letter from Ahura Genack, Vice President and Assistant General Counsel, JPMorgan Chase, to Robert L. Roach, Counsel and Chief Investigator, PSI, July 18, 2002 [AB000153202]; Legal Department Memorandum from Philip Levy, In-house counsel, JPMorgan Chase, to Marjorie Gross, In-house counsel, JPMorgan Chase, regarding 1998 Accomplishments, Nov. 2, 1998, at 2 [JPMC 153925-JPMC 1539261. Occidental's disclosure described the salient terms of the prepay, including the "imputed interest rate," and the dollar amounts of Occidental's future obligations for each of the four years under the prepay.    Occidental Petroleum Corporation Form 10-K filed with the SEC for the Year ended Dec. 31, 1998, at 52.

As discussed in Appendix C (Role of Enron's Officers), Andersen had recommended that Enron model its disclosure of the Prepay Transactions after a company called Acquila Energy Corporation ("Acquila"). Acquila discussed its prepay transactions in the MD&A of a registration statement filed with the SEC in 2000, as well as in the notes to the financial statements contained in that tiling. Aquila wrote in its MD&A: "As part of our Wholesale Services segment, we periodically enter into long-term prepaid commodity contracts with our clients. Under these agreements, our clients pay us upfront for a specified commodity in exchange for a discounted, fixed-price for that commodity. To date, we have executed approximately $1 billion of these contracts, and we have used the proceeds to repay loans from UtiliCorp." Aquila Energy Corporation Form S-l filed with the SEC on Dec. 13, 2000 (the "Aquila Form S-l"), at 42. Aquila also disclosed that it experienced "[a] $536 million increase in long-term price risk management liabilities due to additional commodity prepay transactions in 2000," **id.** at 42, and that its operating cash flow for the nine months ended September 30, 2000 was $270 million higher than in the comparable period of 1999 due in part to the impact of a gas prepay transaction. **Id.** at 43.

Citigroup knew that Enron did not provide meaningful disclosure about the Citigroup Prepays. When Citigroup attempted to determine the total amount of Em-on's Prepay Transactions with other lenders, it was unable to do so, despite its intimate knowledge of how Prepay Transactions were structured and accounted for by Em-on:

- As part of an internal effort to understand Em-on's financial statements, a Citigroup employee reported to Stott that the amount of Em-on's obligations from Prepay Transactions was not available. Stott responded, "Agree total prepaids is not available. Some one [sic] needs to ask the company as we've done in the past."[285]

- Em-on apparently refused to give information about its Prepay Transactions to Citigroup, as noted by Elliott who had been charged with deciphering Em-on's financial statements:

  > Em-on's total volume of prepays (which it will not disclose to us) represents essentially another layer of corporate debt in addition to debt accounted as such. Although providing us only minimal comfort, it appears that the Company is using prepays only to monetize the ongoing net value creation within its marketing and trading activities, and is not creating PRM [Price Risk Management] liabilities in excess of PRM assets.[286]

- In light of its inability to understand the full impact of Enron's Prepay Transactions using its internal resources, Citigroup hired an outside consultant in an effort to gain more understanding. Fox testified:

  > A. We felt that we had to go external for someone who had a better handle on this than we had.
  > Q. What was the transparency issue?
  > A. . . . [A]s we talked about earlier, you know, prepaids got booked as liabilities in price risk management.

---

See *also* Columbia Energy Group Form 10-K filed with the SEC for Year ended Dec. 31, 1999, at 3 1, 63; Crystal Oil Co. Form 10-K filed with the SEC for Year ended Dec. 3 1, 1997, at 27-28, 40-41; Equitable Resources, Inc. Form 10-K filed with the SEC for Year ended Dec. 31, 2000, at 50; Ocean Energy, Inc. Form IO-Q filed with the SEC for Quarter ended June 30, 1999, at 11; Santa Fe Snyder Corp. Form 10-K filed with the SEC for Year ended Dec. 31, 1999, at 24, 56.

[285] Email from Thomas D. Stott, Citigroup, to Michael Nepveux and Lydia Junek and copy to William Fox, Citigroup, regarding Enron, June 28, 2001, at CITI-B 00740641 [CITI-B 00740641-CITI-B 007406421.

[286] Elliott 07/20/01 Email, at CITI-B 00616908.

> We were trying to understand how we could follow those transactions from the public financial statements.[287]

- The outside consultant hired by Citigroup listed as one of Citigroup's objectives, "Interpret and quantify the impact of off balance sheet liabilities, such as pre-paids."[288]

From its involvement in the Citigroup Prepays, Citigroup knew that Enron was inflating its reported cash flows from operating activities by including the proceeds from transactions that were effectively debt, that the magnitude of these transactions had a material effect on Enron's financial statements, and that Enron failed to disclose information publicly that would have allowed investors to understand the true nature and impact of the Citigroup Prepays. Such knowledge is consistent with Citigroup's role in structuring these deals. In discussing the June 2001 Citigroup Prepay, Paul Deards ("Deards"), then head of Citigroup's Derivatives group, acknowledged that his group played an important role in structuring Prepay Transactions for Enron and other clients generally:

> [I]t is critical that any transactions of this type, no matter how "plain vanilla", are viewed in the context of the overall funding strategy of the company (ie including interest rate profile, currency profile, liquidity preference, ratings agency considerations etc etc.). we are intricately involved in this process for key clients, indeed we are charged with providing the analytical framework.[289]

Comparing his group's involvement with Prepay Transactions to that of Citigroup's commodities trading group, Deards said:

> if as you say, much of what you do does not involve management of commodity exposures at all, but is simply manipulating cash flows, there

---

[287] Fox Sworn Statement, at 107-08.

[288] Risk Management Activities Project Presentation by Dr. Neil S. Weiss, undated, at CITI-B 01284038 [CITI-B 01284037-CITI-B 012840761.

[289] Deards 7/6/01 Email (capitalization omitted in original).

may be a much greater overlap in our businesses than i had been led to believe.[290]

Later in 2001, following the resignation of Skilling, Deards stated (in an email he testified was a joke) that: "also want to get your [Caplan's] confirmation that (apart from the fact we put deals together for Enron which we knew confused the ratings agencies) there is no skellington in the closet."[291]

Citigroup also took actions to facilitate Enron's accounting treatment. For example, Citigroup provided the Delta conduit entity, and it helped Em-on develop cross-default provisions among the swap agreements designed to avoid the appearance that the swap agreements were linked.

Delta. Based upon Andersen's advice, Enron believed that its desired accounting treatment of its Prepay Transactions depended, in part, on the participation of three parties in the structure.[292] According to Andersen, Enron's purported sale and purchase of the commodity needed to be with two different third parities, in order that those steps of the transaction be "de-linked."[293] Thus, the circular structure of the Prepay Transactions was effected with three parties, with the price risk shifting away from Enron and then back again after it passed through a third party, and with the repayment of the financing moving through the conduit and back to the lender. All of the Citigroup Prepays involved either another financial institution serving in the place of the conduit—

---

[290] Id.

[291] Email from Paul Deards, Citigroup, to Rick Caplan, Citigroup, regarding Ene, Oct. 25, 2001 (capitalization omitted in original) (Ex. 387 to Deards Sworn Statement) [CITI-B 00910235]. Deards testified that "skellington" may have been a pun on Skilling's name. Deards Sworn Statement, at 38-39.

[292] Memorandum from Deb Cash and Kimberly Scardino, Andersen, to The Files, regarding Yosemite III - Transaction Summary, Aug. 2000 (the "Yosemite III Andersen Prepay Memo"), at 3 [AB000565301-AB000565305].

[293] Id. at 3.

namely Barclays or TD Bank-or Citigroup's SPE, Delta, serving as the conduit. The parties used Delta in six of the Citigroup Prepays, including Roosevelt, Yosemite I through IV and the June 2001 Prepay.

Andersen had advised Enron that there needed to be a "substantive business purpose" for structuring the sale and purchase as separate steps,[294] which meant that the conduit entity needed to have a business purpose for entering into the commodity transaction. Andersen apparently believed that the conduit could not satisfy this criteria if it were an SPE.[295] Andersen also apparently believed that the conduit entity needed to be independent of the financial institution, and Citigroup was aware of this accounting position. Handwritten notes on a diagram that Citigroup prepared about Yosemite I said "Enron's Accountants don't want us to be seen to be controlling Delta."[296] On a diagram of the June 2001 Citigroup Prepay, handwritten notes said "[T]hey sell it to their accountants by saying Citi gets paid by a combination of Em-on & and [sic] independent third party."[297]

However, Citigroup had formed Delta for the limited purpose of engaging in these types of prepay transactions,[298] Delta only engaged in transactions involving Citigroup

---

[294] *Id.*

[295] Memorandum from Deb Cash and Patty Grutzmacher, Andersen, to The Files, regarding Yosemite Prepay, Dec. 1999 (the "Yosemite I Andersen Prepay Memo"), at 2 [AB0786 02820-AB0786 028221.

[296] Yosemite funded prepaid, presentation by Citigroup, undated (the "Citigroup Yosemite Presentation"), at CITI-B 0035976 [CITI-B 0035973-CITI-B 00359761.

[297] Enron Prepaid Cash Flows Diagram, undated (handwritten notes attribute statement to Steve Wagman of Citigroup) [CITI-B 003 5762].

[298] Citigroup formed Delta at a time when Citigroup was prohibited under regulation from agreeing to take physical delivery of commodities. Yastine Affidavit, at 1. See *also* Email from Richard Caplan, Citigroup, to Andrew P. Lee, Citigroup, Aug. 3 1, 2000 (the "Caplan 8/31/00 Email") [CITI-B 00499574-CITI-B 004995751.

(all but one of which involved Enron),[299] and Delta never received more than a "small fee" for entering into the transactions.[300] The stock of Delta was owned by a charitable trust in the Cayman Islands,[301] but on various occasions Citigroup paid the administrative costs-including registration fees-relating to Delta, its attorneys' fees and its transaction fees.[302] Additionally, forms establishing a Citigroup bank account for Delta listed Delta's address as "c/o Citicorp North America, Inc.," described the account as an "internal account" to be "controlled" by Citigroup, and identified three Citigroup employees as authorized signatories.[303] Citigroup employees referred to Delta as a "shell corporation/SPV,"[304] an affidavit that Citigroup provided to the PSI in July 2002 described Delta as a "special purpose entity,"[305] and even an internal Citigroup lawyer referred to it as an SPV.[306]

---

[299] See Summary in Lieu of Production of Document, Citigroup Response to July 2 Subpoena of PSI [AB000153343-AB000153344].

[300] Email from Amanda Angelini, Citigroup, to Andrew P. Lee, Citigroup, *et al.,* regarding Enron CLN Transaction-SFAS 133 Accounting For Prepaid Swaps, Nov. 20, 2000, at 1 [CITI-B 0035712-CITI-B 00357151; see *also* Delta Energy Corporation, Written Resolutions of the Sole Director, June 26, 2001 (noting fee of $5,000 in connection with swap transactions with Citigroup and ENA) [CITI-B 0035873-CITI-B 00358741.

[301] Yastine Affidavit, at l-2 (stating that Delta was owned by Grand Commodities Corporation, which was owned by Givens Hall Bank and Trust, which had placed its entire interest in a charitable trust existing for the benefit of any qualifying charity, with the default being the National Council of Voluntary Organisations); Caplan Sworn Statement, at 103.

[302] Yastine Affidavit, at 1.

[303] Citibank Application for New Account for Delta, Sept. 27, 1994 [CITI-B 0036004-CITI-B 00360111.

[304] Citigroup Exposure Memo, at 1. See *also* Email from Adam Kulick, Citigroup, to Rick Caplan, Doug Warren and William A. Sullivan, Citigroup, regarding Yosemite, Aug. 30, 1999 (the "Kulick 8/30/99 Email"), at CITI-B 00373610 (referring to the Enron/Delta forward contracts as the "Enron-SPV deals") [CITI-B 00373610-CITI-B 00373611].

[305] Yastine Affidavit, at 3 ("Delta was established at Citibank's request in 1993 as a special purpose entity (SPE) with the express intention of making it independent of, and unaffiliated with, Citibank under relevant legal and regulatory standpoints.").

[306] Email from William A. Sullivan, Citigroup, to Doug Warren, Rick Caplan and Adam Kulick and copy to Tom Francois, Citigroup, regarding Yosemite, Aug. 25, 1999 ("I spoke to Julian Reddyhough at Maples & Calder about using a Cayman SPC [sic] to be the 'purchaser' on the prepaid component of Yosemite. . . if Delta not available, about USD 5M to set up a new SPV.") [CITI-B 003736151.

On two occasions Citigroup caused Delta to make representations at the request of Andersen that, although perhaps technically correct, were written in a manner that did not disclose the reality of Delta's formation and use. In November 1999 in connection with Yosemite I,[307] and again with respect to the June 2001 Prepay,[308] Andersen requested that Delta make representations that included, notably, (i) that Delta had undertaken business with a number of entities, (ii) that Delta had assets other than those acquired through transactions with Enron and (iii) that Delta had unencumbered assets available to the Yosemite lenders upon a default.[309]

According to Wagman's testimony, Delta provided the requested representations to Andersen.[310] However, according to Caplan's testimony and an email he wrote to Wagman, (i) he was not aware of Delta having done business during 1999, 2000 or 2001 with any entity other than Enron, Citigroup and the Yosemite Trusts,[311] and (ii) he knew that Delta had only limited assets, consisting only of about $1,000 for the prefunding of directors fees and its initial capital.[312]

Cross Defaults. Andersen had advised Enron that one of the features necessary for the swap agreements in the Prepay Transactions to be treated as trading contracts (and, therefore, price risk management activity) was that the three swaps needed to be

---

[307] Caplan Sworn Statement, at 257.

[308] *Id.* at 258.

[309] Email from Jung-Suk Suh, Enron, to William A. Sullivan and Rick Caplan and copy to Mark E. Lindsey, Citigroup, et *al.*, regarding Andersen Language, Nov. 3, 1999 [CITI-B 00337461; Email from Alan Quaintance Jr., Enron, to Steve Wagman, Citigroup, Timothy Swanson, Citigroup, et *al.*, and Lisa Bills, Enron, regarding Delta Letter, June 22, 2001, (the "Quaintance 6/22/01 Email"), at 1 (attaching a letter with representations that Andersen wanted Delta to confirm) [CITI-B 00640610-CITI-B 006406111.

[310] Wagman Sworn Statement, at 87, 89.

[311] Caplan Sworn Statement, at 411.

[312] *Id.* at 261; Email from Rick Caplan, Citigroup, to Steve Wagman, Citigroup, regarding Delta Letter, June 22, 2001 (included in Ex. 138 to Caplan Sworn Statement) [CITI-B 00640610-CITI-B 00640611].

"de-linked."[313]   Andersen memoranda on this issue do not elaborate, but they imply that "de-linking" means the swaps could not be cross-defaulted.[314]  Caplan testified that he understood this to mean the three swaps in a Prepay Transaction could not be expressly and directly connected to each other.[315]

During Citigroup's development of the first Yosemite structure, William Sullivan ("Sullivan"), a lawyer at Citigroup, suggested that the swap agreement between Citigroup and Delta should contain a provision causing it to terminate automatically if either the swap agreement between Delta and Enron, or between Citigroup and Em-on, were to terminate.[316]  He was especially concerned about a situation in which Enron had not filed for bankruptcy but simply failed to perform on its obligations to either Delta or Citigroup.[317]   Adam Kulick, one of the primary Citigroup contacts in the Derivatives group for Yosemite I, knew that such a cross-default would "cause Enron accounting problems."[318]

As an alternative, Citigroup agreed to include in the swap between Citigroup and Delta a provision that caused the swap to terminate automatically if Delta experienced a default under any other material (greater than $250 million) swap transaction to which it

---

[313] See Memorandum from Deb Cash and Patty Gruzmacher, Andersen, to the Files, regarding Prepay Transactions, June 1999 (the "1999 Andersen Prepay Memo"), at l-3 [AB000153136-AB000153139]; see also Memorandum from Deb Cash, Patty Gruzmacher and Kate Agnew, Andersen, to The Files regarding Updated Prepay Transaction, June 2001 (the "2001 Andersen Prepay Memo") [AB0252 05240-AB0252 052431; Yosemite I Andersen Prepay Memo, at 2.

[314] See 1999 Andersen Prepay Memo; 2001 Andersen Prepay Memo; Yosemite I Andersen Prepay Memo.

[315] Caplan Sworn Statement, at 112-13.

[316] Email from Betty Ann Lofaso on behalf of William A. Sullivan, Citigroup, to Adam Kulick, Doug Warren and Rick Caplan and copy to Tom Francois, Citigroup, Aug. 30, 1999, at 2 [CITI-B 00373610-CITI-B 00373611].

[317] Id. at 1.

[318] Kulick 8/30/99 Email, at 1.

was a party.[319] This provision solved Sullivan's concerns, because Enron's failure to perform under the swap between it and Delta would be such a default. In addition, because Delta likely would have no transactions with anyone other than Em-on, this provision would not result in the swap between Citigroup and Delta being terminated for any reason other than a default by Em-on.

### Accounting for the Yosemite Trusts

Citigroup had a substantial belief that Enron's GAAP accounting for the Trust in Yosemite I was wrong. Since the Yosemite II Trust had an identical equity structure, the GAAP accounting problem would also extend to that transaction.[320] Specifically, Citigroup believed that Enron should have consolidated the Trusts, which would have required that Enron reflect the proceeds of the note issuances on its balance sheet as debt.

Enron purchased 50% of the equity of the Trusts in Yosemite I and II.[321] Citigroup "synthetically" purchased the remaining 50%.[322] Citigroup engaged Long Lane to make the purchase directly, and then Citigroup assumed all equity exposure through a Total Return Swap with Long Lane.[323] Saul Bernstein ("Bernstein"), a senior

---

[319] See, e.g., Delta/Citibank Swap Confirmation between Delta and Citigroup, Nov. 18, 1999 [AB000025706-AB000025715].

[320] This issue was not present in Yosemite III and IV. In those transactions, 100% of the Trusts' equity was held by a balance sheet provider supported by a total return swap from Citigroup. As a result, Citigroup consolidated the Trusts for accounting purposes. This had no net adverse effect on Citigroup's balance sheet, however. The Trusts in Yosemite III and IV deposited the proceeds of the note issuances with Citigroup, causing the amount of those proceeds to be included as a liability on Citigroup's balance sheet regardless of the consolidation.

[321] Certificate Purchase Agreement among Yosemite Securities Trust I, Enron and Fleet, as Trust Administrator for Long Lane, Nov. 18, 1999 [AB000080188-AB000080207]; Certificate Purchase Agreement among Yosemite Securities Company Ltd., Enron and Fleet, as Trust Administrator for Long Lane, Feb. 23, 2000 [AB00008 162 1 -AB00008 1640].

[322] Email from Adam Kulick, Citigroup, to James Reilly, Citigroup, et al., regarding Approval Package, Oct. 18, 1999 (the "Kulick 10/18/99 Email"), at CITI-B 0215692 [CITI-B 0215687-CITI-B 02156961.

[323] Swap Transaction Confirmation between Fleet and Salomon Brothers International Limited ("SBIL"), Aug. 11, 2000 (for Yosemite I) [CC FL 001139-CC FL 0011461; ISDA Master Agreement between SBIL and Fleet, Jan. 28, 2000 [CC FL 001152-CC FL 0011821; Swap Transaction Confirmation between Fleet

accountant in Citigroup's internal Accounting Advisory office, concluded in an October 1999 memorandum that Citigroup should not consolidate the Trust in Yosemite I because its 50% of the equity was not at risk.[324]   Bernstein's accounting analysis concluded that, because Long Lane's equity was not at risk, Long Lane was not considered a "real" equity investor per applicable accounting guidelines.[325]   Bernstein also concluded that Citigroup should not be viewed as a real equity investor on the basis of its Total Return Swap, and that it would have been "unconventional in today's accounting literature and practice" for Citigroup to consolidate the Trust based on Citigroup having risks and rewards pursuant to a derivative instrument.[326]

Bernstein's memorandum did not address whether Enron should consolidate the Yosemite I Trust. However, several days after the date of Bernstein's memorandum, another senior accountant at Citigroup, Frederick Battline ("Battline"), wrote an email to Bernstein raising that question.[327]   Battline noted that, under applicable accounting guidelines, one of the conditions for avoiding consolidation was that the majority owner of the Trust must be an independent third party who made a substantive capital investment.[328]   Battline noted that neither Enron nor Citigroup was independent of the

---

and SBIL, Dec. 10, 2001 (for Yosemite II) [CC FL 002077-CC FL 0020841; ISDA Master Agreement between SBIL and Fleet, Oct. 26, 1992 [CC FL 001307-CC FL 0013241; Schedule to the ISDA Master Agreement between SBIL and Fleet, Oct. 26, 1992 [CC FL 001295-CC FL 001306].

[324] Memorandum from Saul Bernstein, Citigroup, to Rick Caplan and Adam Kulick, Citigroup, regarding Project Yosemite – Yosemite Co. Structured Credit Derivative Transaction, Oct. 29, 1999 (the "Bernstein 10/29/99 Memo"), at 4 [CITI-B 0003517-CITI-B 00035221.

[325] Bernstein 10/29/99 Memo, at 4.

[326] *Id.*

[327] Email from Frederick Battline, Citigroup, to Saul Bernstein, Citigroup, regarding Project Yosemite, Nov. 3, 1999 (the "Battline 1 1/03/99 Email"), at CITI-B 0129861 [CITI-B0129860-CITI-B 01298621.

[328] *Id.*

rest of the transaction, and Long Lane was protected by the Total Return Swap.[329]
Battline wrote:

> If it is our view that the client should be consolidating the trust, we need to
> be sure that the client accepts this view. We are not responsible for the
> client's accounting, but since we are advising on the transaction it could
> be rather embarrassing if Citigroup's accounting position relied on a view
> that is contrary to our client's interest. In this transaction the client may
> be indifferent to consolidating the trust, since the obligations are on its
> balance sheet in one form or another. But if this is the case, why not have
> the client provide (a) all of the equity in the trust or (b) the total return
> swap?[330]

Bernstein's memorandum did not address the prepay portion of the transaction,
and so it is unclear if he or Battline understood that the proceeds of the note issuances
would only be reflected on Em-on's balance sheet as price risk management activity.
They may have assumed that the Trust would loan the proceeds of the note issuances
directly to Enron, in which event Enron would have been required to record the amount
as debt. However, because Delta provided the funds to Enron as part of the Prepay
Transaction, Enron would not have included that amount on its balance sheet as debt,
unless it were required to consolidate the Trust. The Yosemite I and II proceeds were
over $1.1 billion in total.[331] Thus, Enron was likely not indifferent to consolidating the
Trust, and at least Caplan, one of the primary Citigroup contacts for Yosemite I,
understood this.[332]

Bernstein, however, agreed with Battline that Enron should consolidate the Trust.
Bernstein responded to Battline's message:

---

[329] *Id.*

[330] *Id.*

[331] Citigroup Responses, at 28-29.

[332] Caplan Sworn Statement, at 156.

It is our view that Enron should consolidate the Trust (implied by the accounting rational [sic] documented in my memorandum which supports non-consolidation by Citibank), but GCIB Accounting Advisory nor the Business does not advise a customer regarding its accounting. We tell them to consult their internal accounting folks or external auditors. This is the customer's accounting risk to accept or reject. It has not been my experience that "we assure ourselves that the client accepts our view" regarding what we believe their accounting should be. This would be a new operating standard and business requirement, the competitive impact of which must be carefully considered. Please note that all transactions are approved from an appropriateness and suitability aspect.

Please also note, regarding our own accounting, this transaction was reviewed by Bill Bozarth, John Langer and Linda Bergen. We all got comfortable with not consolidating the Yosemite Trust, although we all share your concern.[333]

Battline then expressed a concern that this difference in accounting conclusions could be harmful to either Citigroup or its client:

You and others have spent more time on this than I have, but if we have structured a transaction to help a client avoid consolidation, how can we turn around and take the position that they should be consolidating?

I'm not suggesting that we are responsible for their accounting, but I am afraid that if we ever had to defend this we would either (a) embarrass the client or (b) lose the accounting argument.[334]

According to Caplan, he and Kulick discussed Citigroup's concern with "some combination of Bill Brown and Doug McDowell."[335]  Caplan testified that the Enron officers acknowledged they understood Citigroup's conclusion, but told him they would make their own accounting interpretation.[336]

---

[333] Bernstein 11/3/99 Email, at CITI-B 0129861. Bozarth, Langer and Bergen were all involved in either accounting or finance functions at Citigroup. See Sworn Statement of Saul Bernstein, Citigroup, to Steven M. Collins, A&B, May, 21 2003 (the "Bernstein Sworn Statement), at 104, 111.

[334] Email from Frederick Battline, Citigroup, to Saul Bernstein, Citigroup, regarding Project Yosemite, Nov. 3, 1999, at CITI B 0129860 [CITI-B 0129860-CITI-B 01298611.

[335] Caplan Sworn Statement, at 154-55.

[336] *Id.* at 155.

Ultimately, Battline accepted Bernstein's position that "the client understands the accounting risk and that it is their argument to lose,"[337] and the transaction was allowed to close. Thus, Citigroup facilitated the transactions in Yosemite I and II, with a substantial belief that Em-on did not intend to account for them properly under GAAP. Citigroup knew that the approximately $1.1 billion of proceeds would not be reflected as debt on Em-on's balance sheet, and its facilitation of Yosemite I and II included, among other things, Citigroup's underwriting of the notes offered to the institutional investors.

Within Citigroup, concern about Citigroup's role in the Yosemite Trusts, and particularly its disclosure of that role, continued to be expressed when Em-on asked for a second Yosemite transaction prior to the time that the first Yosemite transaction had closed.[338] Fox raised the question in an email, saying:

> Also there is the issue on the equity. Two points: one can we technically strcuture [sic] a default swap from the trust that eliminates our exposure and two there is a question of appropriateness: presumably we will be representing to investors that we are putting up half the equity and then with or without disclsoure [sic] (?) we are doing a default swap with the trust; sound [sic] questionable.[339]

Citigroup did not, however, disclose its ownership of the equity in the offering memorandum for the notes, and, therefore, it did not disclose its Total Return Swap support of the equity purchased by Long Lane.[340] Enron was aware that Citigroup had

---

[337] Email from Saul Bernstein, Citigroup, to Rick Caplan and Adam Kulick, Citigroup, regarding Project Yosemite, Nov. 3, 1999, at CITI-B 0129860 [CITI-B 0129860-CITI-B 01298611.

[338] Email from William Fox, Citigroup, to Steve Baillie and James Reilly and copy to Niels C. Kirk, Citigroup, regarding Yosemite II (Europe), Nov. 14, 1999, at 1 [CITI-B 0223408-CITI-B 02234101.

[339] *Id.*

[340] Kulick responded to Fox's concerns in an email saying that "the equity is only in the structure to satisfy tax and accounting issues . . . ." Email from Adam Kulick, Citigroup, to James Reilly, Citigroup, regarding Yosemite II (Europe), Nov. 15, 1999 [CITI-B 00337491. Kulick said, effectively, that the offering materials for the notes made it clear that the investors would not benefit from the equity in any way and that the default swap would cause them not to benefit from any non-Enron investment in the trust, and that

synthetically purchased the equity.[341] However, Andersen accountants have testified that they were not aware of this swap arrangement, and they have concluded that such an arrangement would have required Enron to consolidate the Trusts.[342]

### B.    Minority Interest Transactions

In December of 1997, 1998 and 1999, Citigroup assisted Em-on in completing year-end Minority Interest Transactions.[343]    These financings were referred to as Nighthawk, Rawhide and Nahanni, respectively. Collectively, these transactions allowed Enron to obtain $1.75 billion of year-end financing,[344] which Enron did not reflect on its financial statements as debt. Enron reported $500 million of this financing as cash flows from operating activities.[345]

Citigroup developed the idea for the Minority Interest structure and considered it to be a proprietary product.[346]  In addition, Citigroup funded the loans in each of the three structures and served as placement agent for obtaining the required equity investments, as well as serving in numerous other roles in each transaction.[347] In consideration, Enron paid Citigroup a total of $24.45 million in upfront structure fees and $4.7 million in

---

he therefore believed there was no appropriateness issue related to the lack of disclosure in the offering materials. *Id.*

[341] Email from Ann Marie Tiller, Enron, to Doug McDowell, Enron, regarding Salomon Bros. International, Jan. 11, 2000 [AB097 1 021831; Email from Janine Juggins, Enron, to Treasa Kirby, Enron, and copy to Simon Crowe, Enron, *et al.*, Jan. 14, 2000, at AB0971 02 187 ("Can you confirm whether a total return swap is planned between the Long Lane Master Trust and SSMB London? (this was the structure I believe on YI)") [AB097 1 02186-AB097 1 02 187].

[342] See Report, Appendix C (Role of Enron's Officers).

[343] Citigroup Responses, at 33-35.

[344] *Id.*

[345] Enron 1 O-K for 1999, Note 4 - Merchant Activities.

[346] The idea was jointly developed by Citigroup's Capital Structuring and Equity Derivatives groups. Nighthawk Capital Structuring December Approval Package, at CITI-B 00375892.

[347] Citigroup Responses, at 33-35.

underwriting fees.[348] Citigroup also earned derivative gains ($5.3 million on Nighthawk alone) and other returns on its investments.[349]

As discussed in the Second Interim Report, the Examiner has concluded that Enron's accounting treatment for Nighthawk, Rawhide and Nahanni was not in compliance with GAAP.[350] For accounting purposes, Enron should have consolidated the entities that borrowed the funds because the independent equity was not at risk, and that debt should have been reflected as debt on Em-on's balance sheet. The $500 million obtained in Nahanni should have been reported as cash flow from financings, rather than cash flow from operating activities. As a result of its accounting treatment of the Minority Interest Transactions, Enron materially misstated its financial statements.

As discussed below, Citigroup was aware of Enron's accounting for these transactions and was aware that the accounting for at least Nighthawk and Nahanni was likely not in compliance with GAAP. In addition, it was Citigroup's idea for Enron to sell U.S. Treasury Securities ("T-Bills") in the Nahanni structure and record the transaction as a sale of merchant investments, with knowledge that such securities did not fit within Em-on's, or any other commonly accepted, definition of merchant investments. Moreover, Citigroup recommended the Nahanni transaction with knowledge that Em-on would implement it in December 1999 and unwind it in January 2000.

Citigroup's role as architect of the Minority Interest Transaction structure and its crucial roles in helping Em-on implement three such transactions helped Citigroup understand that Enron was using Nighthawk, Rawhide and Nahanni to manage its year-

---

[348] *Id.*

[349] *Id.*

[350] Second Interim Report, Appendix I (Minority Interest Transactions).

end balance sheet. Citigroup itself described the Nahanni transaction as "year-end window dressing."[351]   Citigroup also knew that such transactions were material to Em-on's financial condition. Nahanni alone accounted for 41% of Em-on's total reported cash flow from operating activities in 1 999.[352]

*Summary Description of the Transaction Structure*

The following chart shows the basic structure of a Minority Interest Transaction.[353]



In such a transaction, Enron created a majority-owned, consolidated subsidiary and arranged for a minority investor to invest cash or other assets in the subsidiary.

---

[351] Citigroup Exposure Spreadsheet, undated, at 28 [CITI-B 0137997-CITI-B 0138003].

[352] Enron 10-K for 1999, at F-6.

[353] For a detailed discussion of Enron's Minority Interest Transactions, see Second Interim Report, Appendix I (Minority Interest Transactions).

Typically, the majority-owned subsidiary would then loan the funds obtained from the minority investor to Enron. On consolidation, this loan from the majority-owned subsidiary to Enron was eliminated. The minority investor was typically an SPE funded by one or more banks requiring a minimum of 3% of independent equity, and it was established for the sole purpose of the minority interest financing. Payments by the majority-owned subsidiary to the minority investor were in amounts and at times required to allow the minority investor to make required payments to the banks and distributions to its equity holders (who held 3% of the equity of the minority investor).   In each of these transactions, Enron provided significant credit support for the obligations of the majority-owned subsidiary to the minority investor through various means. While the economic characteristics of minority interest fmancings closely resembled loans, Enron recorded no debt, but instead reflected these financing arrangements as "minority interests" on its consolidated balance sheet.

Citigroup had used a minority interest financing structure with other clients and referred to it generally as a venture financing structure, or "VFS" for short.[354] In the fourth quarter of 1996, Citigroup presented to Enron a new form of VFS it referred to as Project Java.[355]   The Java structure was unique from any other VFS Citigroup had devised previously, because it contemplated that Em-on would contribute preferred convertible securities to the majority-owed subsidiary instead of operating or other assets.[356]

---

[354] Capital Structuring US Approval Request Form, regarding Enron ▪ Project Rawhide, Nov. 2, 1998, at 1, 6 [CITI-B 00403912-CITI-B 00403921].

[355] Conway Sworn Statement, at 16, lines 17-24. See Nighthawk Capital Structuring December Approval Package; Nighthawk Capital Structuring, Aug. 13, 1997 (the "Nighthawk Capital Structuring August Approval Package"), at CITI-B 0052745 [CITI-B 0052741-CITI-B 0052751].

[356] Conway Sworn Statement, at 16-17.

In preparation for marketing the Java structure, Citigroup sought the advice of Andersen's Professional Standards Group with respect to the accounting treatment.[357] It also met with Moody's to ensure that the Rating Agencies would likely give the minority interest substantial equity credit, rather than considering it to be debt, particularly for sponsors with a credit rating above non-investment grade.[358] Thus, it is reasonable to conclude that Citigroup was knowledgeable about all aspects of its proprietary structure and was prepared to assist potential purchasers with all aspects of its benefits and requirements.

### Nighthawk

During 1997, Enron determined to pursue a $500 million, five-year minority interest transaction with Citigroup based on the Java model, which the parties referred to as Project Nighthawk.[359]  In this transaction, which closed on December 27, 1997, Em-on contributed shares of its convertible preferred stock to a majority-owned subsidiary named Whitewing Associates L.L.C. ("Whitewing"), and borrowed from Whitewing $500 million of cash.[360]  The transaction was designed (absent a dramatic decline in the value of Em-on's stock) for the loan to be repaid from the proceeds of future sales of Em-on stock.[361]  Citigroup's Global Capital Structuring group had primary responsibility

---

[357] *Id.* at 21.

[358] *Id.* at 21-24.

[359] Nighthawk Capital Structuring December Approval Package, at CITI-B 00375892.

[360] See Second Interim Report, Annex 1 to Appendix I (Minority Interest Transactions). Project Nighthawk served as the starting point for the Whitewing Share Trust transaction, For further information about the Whitewing Share Trust transaction, see Second Interim Report, Appendix G (Whitewing Transaction).

[361] See Second Interim Report, Annex 1, Appendix I (Minority Interest Transactions).

for the transaction, with a team led by Elliot Conway ("Conway"), a Managing Director and co-head of the group.[362]

In a July 1997 marketing presentation, Citigroup explained to Em-on that Nighthawk's benefits would include: (i) the transaction would receive significant equity credit from Rating Agencies; (ii) it would not dilute Enron's earnings per share because the Em-on common shares would not be deemed to have been issued unless and until the preferred stock was converted; (iii) Enron would maintain control over all preferred shares transferred to the majority-owned subsidiary; and (iv) the transaction would remain "confidential" with "minimal public disclosure."[363] Thus, Citigroup knew that Nighthawk would accomplish a number of benefits for Enron, including obtaining financing that would not increase its debt, would not cause it to relinquish control over its assets, and would help it maintain a favorable credit rating. Citigroup also knew that Em-on had a desire to obtain these benefits before year-end 1997.[364]

As part of the July presentation, Citigroup gave Enron the proposed pro forma balance sheets for each of the major entities involved, including Enron, the majority-owned subsidiary and the minority investor.[365] These pro formas showed that Enron's assets would remain unchanged, its minority interest investment would increase by $500 million, and its debt would decrease by $500 million, assuming that Em-on would use the

---

[362] Nighthawk Capital Structuring December Approval Package, at CITI-B 00375890; Nighthawk Capital Structuring August Approval Package, at 005274 1.

[363] Project Nighthawk - Equity Monetization Structure, July 8, 1997 (the "Nighthawk Monetization Presentation"), at 2 [AB000512047-AB0005 120731.

[364] Nighthawk Capital Structuring August Approval Package, at CITI-B 0052751; Nighthawk Capital Structuring December Approval Package, at CITI-B 00375907.

[365] Nighthawk Monetization Presentation, at 17.

Nighthawk proceeds to pay down other existing debt.[366] Using Enron's actual financial statement amounts as of year-end 1996, the pro formas showed that, if the $500 million proceeds from Nighthawk had been included on Enron's balance sheet as debt, Enron's on-balance sheet debt would have increased by 8.7%. Under the GAAP treatment used by Citigroup in the pro formas, Nighthawk increased Enron's investments in minority interests by 60%, from $755 million to $1.255 billion.[367] Thus, Citigroup understood how material Nighthawk would be to Enron's financial statements.[368]

Citigroup understood that the benefits to Em-on of Project Nighthawk, or any other Minority Interest Transaction, depended upon Enron's ability to treat the minority investor as a nonconsolidated entity.[369] If Enron were required to consolidate the minority investor, then the minority investor's debt, the proceeds of which funded its capital contribution to the majority-owned subsidiary, would have to be included on Em-on's financial statements. In such an event, Em-on's reported debt would increase by the amount of the financing, which was the opposite of the primary objective of Project Nighthawk.

Citigroup understood that the relevant accounting literature under GAAP required that there be 3% substantive, "independent" equity at risk in the minority investor, in order for Em-on to avoid consolidating the minority investor.[370] To satisfy the 3% equity requirement, the parties structured Nighthawk so that the total $500 million proceeds

---

[366] *Id.* at 10.

[367] *id.* at 17.

[368] Memorandum from Elliot Conway, Citigroup, to Phil Sisneros, Enron, regarding Nighthawk, Nov. 10, 1997 [CITI-B 02563141.

[369] See Nighthawk Monetization Presentation.

[370] Jager Sworn Statement, at 15- 18.

were comprised of \$485 million of debt and \$15 million of equity.[371]  Citigroup made the \$485 million loan, using CXC, Inc., a commercial paper conduit managed by Citigroup.[372]  The third party equity investor was Harch Capital Management, Inc. ("Harch"), a money management firm based in Boca Raton, Florida that had previously participated in transactions with Citigroup's Global Capital Structuring Group.[373]  Harch formed two new entities solely for the purposes of Nighthawk, Golden Eagle L.L.C. ("Golden Eagle") and its sole member, Kestrel Investor L.L.C. ("Kestrel").[374]  Kestrel's sole member was HCM High Yield Opportunity Fund LP, which Harch controlled as its adviser.[375]  Golden Eagle made the direct \$15 million equity contribution to the minority investor,[376] having obtained the funds through the following series of transactions: (i) Harch contributed \$7.9 million to Kestrel;[377] (ii) Kestrel borrowed \$7.1 million from

---

[371] Section 2.01, Credit and Security Agreement among Nighthawk Investors LLC, CXC Incorporated ("CXC") and Citicorp North America, Inc. ("CNAI"), Dec. 29, 1997 (the "Nighthawk Credit Agreement") [AB000370573-AB000370669]; Preliminary Statements, Insurance Agreement among Ambac Assurance Corp. ("Ambac"), CXC Incorporated and Citicorp North America, Inc., Dec. 29, 1997 (the "Nighthawk Insurance Agreement"), at 1 [AB000371654-AB00037 1694]; Section 5.1, Nighthawk Investors LLC Amended and Restated Company Agreement, between Golden Eagle L.L.C. ("Golden Eagle") and Prairie Hawk, Inc. ("Prairie Hawk"), Dec. 29, 1997 (the "Nighthawk LLC Agreement") [AB000370949-AB000370992]; Nighthawk Investors LLC Class A Member's Certificate Regarding Capital Contributions to Nighthawk Investors LLC, Dec. 29, 1997 [AB000371996-AB000371997].

[372] Nighthawk Credit Agreement; Nighthawk Insurance Agreement.

[373] Project Nighthawk Closing Memorandum, Dec. 29, 1997 (the "Nighthawk Closing Memo"), at 5 [CITI-B 00322418-CITI-B 003224251.

[374] Nighthawk Closing Memo; Enron Funds Flow Memorandum, Apr. 19, 2000, at 1 [AB000494060-AB000494063]; Section 2.2, Kestrel Investor L.L.C. ("Kestrel") Company Agreement, Dec. 29, 1997 (the "Kestrel Company Agreement") [AB000373 112-AB000373132]; Kestrel Investor L.L.C. Borrower's Certificate, Dec. 30, 1997 (the "Kestrel Borrower's Certificate") [AB000373282-AB000373283].

[375] Kestrel Company Agreement; Kestrel Borrower's Certificate. HCM High Yield Opportunity Fund, LP ("HCM") also served as an equity investor in Rawhide Investors, L.L.C. in the Project Rawhide Structure. See Second Interim Report, Appendix I (Minority Interest Transactions).

[376] Nighthawk LLC Agreement; Nighthawk Investors LLC Notice of Borrowing, Dec. 29, 1997 [AB00037092 1-AB000370922].

[377] Kestrel Investor L.L.C. Member Certificate, Dec. 29, 1997 [CITI-B 0012469-CITI-B 0012471].

CXC on a nonrecourse basis;[378] and (iii) Kestrel contributed the full $15 million to Golden Eagle.[379]

The parties put into place three types of protection that covered Golden Eagle's $15 million equity investment. First, Citigroup obtained a surety bond from a third party, Ambac Assurance Corporation, which covered the $7.1 million that Kestrel had borrowed from CXC.[380]  Second, Citigroup issued to Kestrel a "costless collar" (the "Kestrel Collar"), covering approximately $15 million of the Enron stock in the Nighthawk structure.[381]  This collar consisted of an "at-the-market" put option (which Citigroup hedged with an offsetting put option (the "Hedge Put") purchased from Swiss Bank) and a 102.5% "out-of-the-money" call option.[382]  Third, Citigroup issued a separate $15 million put option for the benefit of Kestrel and Ambac (the "Kestrel Put").[383]  The effect of the Kestrel Collar and the Kestrel Put was to protect Kestrel from any losses attributed to the minority investor as a result of a decline in the value of the Enron stock that had been contributed to the Nighthawk structure.[384]

---

[378] Section 2.01, Credit and Security Agreement among Kestrel Investor L.L.C., CXC Incorporated and Citicorp North America, Inc., Dec. 29, 1997 (the "Kestrel Credit Agreement") [AB000372940-AB000373038]; Kestrel Investor L.L.C. Notice of Borrowing, Dec. 29, 1997 [AB000373098-AB000373099].

[379] Golden Eagle L.L.C. Company Agreement, Dec. 12, 1997 (the "Golden Eagle LLC Agreement") [AB000372502-AB000372522].

[380] Surety Bond No. AB0154BE of Ambac, Dec. 30, 1997 [AB000373204-AB000373213]; Insurance Agreement among Ambac Assurance Corn., Citicorp North America and CXC Incorporated, Dec. 29, 1997 [AB000373215-AB000373251].

[381] Confirmation from Citibank to Kestrel Investor L.L.C., Dec. 29, 1997 (the "Kestrel Collar") (also naming Ambac as an intended third-party beneficiary) [CITI-B 0012430-CITI-B 00124491; Confirmation from Citibank, N.A., to Kestrel Investor L.L.C., Jan. 9, 1998 (the "Kestrel Confirmation") (setting the put strike price at $14.6 million and the call strike price at $15.0 million) [CITI-B 0012451-CITI-B 00124521; ISDA Master Agreement between Citibank, N.A. and Kestrel Investor L.L.C., Dec. 29, 1997 (the "Kestrel ISDA Master Agreement") [CITI-B 0012399-CITI-B 00124281.

[382] Kestrel Collar; Kestrel Confirmation; Kestrel ISDA Master Agreement.

[383] Kestrel Confirmation; Kestrel ISDA Master Agreement.

[384] See Second Interim Report, Annex 1 to Appendix I (Minority Interest Transactions).

Based on this protection for the $15 million equity and the fact that a portion was funded through nonrecourse debt, the Examiner concluded in the Second Interim Report that the Nighthawk equity was not at risk and did not support Enron's decision not to consolidate the minority investor. Around the time that the transaction closed in December 1997, Bernstein, a senior member of Citigroup's Accounting Advisory office, reached a similar conclusion.[385]

Sometime prior to December 15, 1997, Conway's team requested that Bernstein review Nighthawk from an accounting perspective.[386] Bernstein testified that his purpose in making such a review was to determine whether Citigroup should consolidate the minority investor.[387] He concluded that it should not, and his pre-closing accounting analysis, set out in a December 15, 1997 memorandum, included a review of the reasons why Enron should consolidate the minority investor.[388]

> Bernstein wrote:

> Although the equity is substantive, at a 3% capitalization level the $15MM of equity is not at risk. A collar put option purchased by Citibank from an A-rated dealer protects the $15MM of equity (sharing in losses of the JV). The equity is back-levered on a non-recourse basis with a $7.1MM CXC loan with counter-party risk assumed by AMBAC.[389]

Bernstein then noted that the appropriate analysis was to consider which party in the transaction had the "primary ownership risks or benefits," and he concluded that

---

[385] Memo to File, regarding Project Nighthawk, Enron Monetization and Accounting Treatment, Dec. 15, 1997 (the "Bernstein 12/15/97 Nighthawk Memo") [CITI-B 00395280-CITI-B 003952831. Bernstein testified that he prepared this memorandum. Bernstein Sworn Statement, at 33 (referring to Ex. 88 to Conway Sworn Statement).

[386] Bernstein 12/15/97 Nighthawk Memo; Bernstein Sworn Statement, at 25.

[387] Bernstein Sworn Statement, at 37.

[388] Bernstein 12/15/97 Nighthawk Memo, at CITI-B 00395282.

[389] *Id.* at CITI-B 00395281.

Enron was the party predominately at risk of loss in the value of the underlying assets in Whitewing.[390]  Bernstein concluded that Em-on had transferred its shares to Whitewing without having relinquished the ownership risks and benefits of those shares, because (i) Em-on provided $500 million of first loss protection to Whitewing and, in turn, the minority investor, and (ii) Em-on was required to make Citigroup whole as derivative counterparty for reductions below $500 million in the value of the Enron shares.[391] Therefore, according to Bernstein, "one can reasonably conclude that Enron has the equity risk related to ownership of the Investor (SPV) [the minority investor]."[392]

Bernstein also concluded that Enron retained control over the assets (i.e., the shares of Enron stock) in Whitewing, citing several supporting facts including, among others, (i) Enron retained an unconditional right to convert and liquidate the shares at any time, and (ii) Enron could collapse the structure at its election.[393] Bernstein noted that "surrendering of control over assets is the lynchpin concept in determining whether to consolidate or not per the recent FASB Exposure Draft on Consolidation Policy and Procedures."[394]  Concluding that it was "clear that the SPV activities are on behalf of Em-on," Bernstein wrote that "[i]t would therefore seem appropriate, pursuant to EITF 90-15, for Enron to consolidate the Investor (SPV) as well as the JV."[395]

---

[390] *Id.* at CITI-B 00395281-CITI-B 00395282.

[391] *Id.* at CITI-B 00395282.

[392] *Id.*

[393] *Id.*

[394] Id.

[395] Id

Bernstein testified that he did not discuss his concerns with Enron.[396] Conway testified that, although he discussed regulatory and GAAP accounting issues regarding Nighthawk with Bernstein, he did not recall discussing the GAAP consolidation issue with anyone, including Bernstein or Enron.[397] Bernstein testified that, in accordance with his normal practice, he shared his December 15, 1997 accounting analysis with Conway, and he believed that Conway would have given him edits for his memorandum, although he had no recollection of receiving any such edits.[398]

In the three or so weeks prior to the December 29 closing date, the parties made changes to the Nighthawk structure that were designed in part to "alleviate Enron's auditors' last minute concerns which could have jeopardized Enron's off-balance sheet accounting for the deal."[399] One of the changes made was to add Golden Eagle as the direct equity holder of the minority investor, but with the credit protections for the $15 million Harch investment being implemented pursuant to contracts with Kestrel.[400] Apparently, there was some belief by Enron that the Golden Eagle equity could be considered at risk if the Kestrel Collar and Hedge Put were not provided directly to Golden Eagle.[401] As set forth in the Second Interim Report, the Examiner concluded that

---

[396] Bernstein Sworn Statement, at 41.

[397] Conway Sworn Statement, at 71-73.

[398] Bernstein Sworn Statement, at 38-40.

[399] Nighthawk Closing Memo, at 7. These changes were made after the date of Citigroup's "Execution Approval" of Nighthawk. Id. That date is unclear; the "Transaction Execution Approval Cover Page" is dated December 1, 1997, it is attached to a transaction summary memorandum dated December 5, 1997, and the approvals on the cover page are dated within the range December 9, 1997 to December 26, 1997. Nighthawk Capital Structuring December Approval Package, at CITI-B 0037890-CITI-B 0037891. The summary memorandum attached to the Transaction Execution Approval Cover Page does not reflect the addition of Golden Eagle. Nighthawk Closing Memo, at 7.

[400] See Nighthawk Closing Memo, at 8; Bernstein Sworn Statement, at 50-5 1.

[401] Bernstein Sworn Statement, at 50-5 1

this back-levering of the $15 million equity caused it not to be at risk, regardless of whether those protections were put in place directly with Golden Eagle or with its direct and sole parent entity.[402]

Following the Nighthawk closing, on February 4, 1998 Bernstein produced another version of his accounting analysis memorandum.[403]  In that memorandum, despite noting the structural changes that had occurred at the last minute, he did not change his conclusion that it was inappropriate for Citigroup to consolidate the minority investor.[404] He also did not change his conclusion that the 3% equity was not at risk.[405] He stated that "[t]he entire $15MM is protected from loss by the purchased put option from Swiss Bank.  Only if Swiss Bank defaults would either Harch or Ambac not be reimbursed for loss of these equity funds."[406]

Bernstein's February 1998 memorandum did not reiterate his earlier conclusion that Enron should consolidate the minority investor, but he continued to apply the risks and rewards analysis that he believed must be followed when the 3% equity is not at risk. His later memorandum stated his belief that:

> [Elm-on may be considered as having control over the SPE's assets as Enron is using the underlying assets, convertible preferred shares, for the purpose of achieving its own economic and business interests. Enron's use of assets indicates that it is the primary beneficiary of Nighthawk assets as well as the primary (98.5%, almost complete first loss protection) risk taker regarding the decline in value of the preferred shares , . . . [407]

---

[402] See Second Interim Report, Annex 1 to Appendix I (Minority Interest Transactions).

[403] Memorandum from Saul Bernstein, Citigroup, to E. Conway, L. Albers and L. Viola, Citigroup, regarding Nighthawk, Feb. 4 1998 (the "Bernstein 2/4/98 Nighthawk Memo") [CITI-B 00564789-CITI-B 005647931.

[404] Id. at 3-4.

[405] Id. at 3.

[406] Id.

[407] Id. at 4.

Bernstein's February 1998 memorandum did not supersede his December 1997 memorandum and, in fact, referred the reader to the earlier memorandum for a "more expanded accounting analysis."[408] In addition, when discussing his conclusion in the February 1998 memorandum that the hedges caused the 3% equity not to be at risk, Bernstein did not make any mention of the distinction between placing the hedges at the Kestrel level and placing the equity investment at the Golden Eagle level; he continued to look through to the ultimate owner of those entities, referring to at least $7.9 million of the investment as having been made by "a third party investor (Harch)."[409]

Although there are indications in the evidence that Enron consulted with its auditors on the transaction,[410] there is also evidence that Citigroup had a substantial belief that Enron's accounting for the transaction was not in compliance with GAAP. As late as December 24, 1999, Conway stated in an email message that "[t]he Equity Collar effectively protects the Equity Participant from any risk on a change in value of Em-on Common Shares," showing that he understood only three days before the Nighthawk closing that the equity was not at risk.[411] Nevertheless, Citigroup completed the transaction with Enron, with the knowledge that the primary benefits that Enron desired from the transaction, including notably keeping its reported debt level low to be more

---

[408] *Id.*

[409] *Id.* at 3.

[410] See, e.g., Nighthawk Closing Memo, at 4 ("Enron relied on senior partners in the Standards and Practices area of Arthur Andersen to review and approve the accounting implications of the transaction structure.").

[411] Email from Elliot S. Conway, regarding Nighthawk: Collar transaction with Equity Participant, Dec. 24, 1997 [CITI-B 005731421.

attractive to the Rating Agencies, depended upon its intended (but incorrect) accounting treatment.

Citigroup received substantial fees for structuring Nighthawk and participating in the transaction in other roles, which included lender, placement agent for the equity, underwriter of the required liquidity backstop, and derivative counterparty on the swaps entered into for hedging the various risks in the transaction.[412] Citigroup originally asked Em-on for a structure fee of $11.25 million,[413] but the parties settled on $9.35 million.[414] This fee represented a recognition of the "value added" by Citigroup, according to Conway.[415] He testified that any such fee would be determined in light of Citigroup's development of the transaction structure, the degree of difficulty in accomplishing the particular transaction, fees in comparable transactions and, in large measure, the expected Rating Agency benefits to the customer.[416]

*Rawhide*

In 1998, Enron approached Citigroup with the desire to do another minority interest financing. Enron was "looking to raise up to $750 million before year-end by monetizing a portfolio . . . of equity and debt investments in certain projects related to

---

[412] Nighthawk Capital Structuring December Approval Package. In fact, Citigroup had so many different roles in the transaction that its Transaction Approval Memorandum warned of possible conflicts of interest if there were ever a distressed situation, particularly requiring liquidation of the venture. Nighthawk Capital Structuring December Approval Package, at CITI-B 00375907.

[413] Letter from Elliot S. Conway, Managing Director, Citicorp, to Barry J. Schnapper, Director, Finance, Em-on, Oct. 1, 1997 [CITI-B 0052809-CITI-B 00528111.

[414] Nighthawk Closing Memo, at 5. Citigroup also received inception gains of approximately $5.3 million related to the structured equity contacts. *Id.*

[415] Conway Sworn Statement, at 44.

[416] *Id.* at 44-46.

Enron's merchant business activities worldwide."[417]  The transaction structure settled upon was essentially Citigroup's proprietary VFS,[418] and it was similar to Nighthawk, except that Enron contributed investments in approximately 50 different global energy-related projects to the structure instead of Enron convertible preferred stock.[419] The minority investor was capitalized with $727.5 million of debt, loaned by Citigroup through CXC, Inc., and $22.5 million of equity contributed by Harch, the same entity that had invested in Nighthawk, and Trust Company of the West ("TCW").[420]

Citigroup assisted Enron's completion of Rawhide, as financial adviser, lender, placement agent for the equity, and underwriter for the liquidity backstop.[421]  Enron paid Citigroup another $9.35 million upfront structure fee for Project Rawhide and a $3.5 million underwriting fee, and agreed to pay $2.5 million in annual securitization fees.[422] Like Nighthawk, Rawhide was handled on behalf of Citigroup by the Global Capital Structuring group, with the deal team led by Conway and including Conway's direct report, Otto Jager ("Jager").[423]

. As stated in the Second Interim Report, the Examiner has concluded that Rawhide, as initially closed by Enron in December 1998, may not have been in compliance with GAAP.[424]  This was primarily due to Enron having paid fees that were

---

[417] Rawhide Capital Structuring Transaction Approval Memorandum, Dec. 9, 1998 (the "Rawhide Capital Structuring Approval Memo"), at 1 [CITI-B 00369838-CITI-B 003698451.

[418] Closing Memorandum Project Rawhide, Feb. 25, 1999 (the "Rawhide Closing Memo"), at 1 [CITI-B 00412975CITI-B  00412983].

[419] Rawhide Capital Structuring Approval Memo, at 3; Rawhide Closing Memo, at 3.

[420] Rawhide Capital Structuring Approval Memo, at 6.

[421] Id.

[422] Citigroup Responses, at 34-35.

[423] Rawhide Closing Memo, at 8; Jager Sworn Statement, at 13-14.

[424] See Second Interim Report, Appendix I (Minority Interest Transactions).

attributed to the total assets of the venture, which meant that the $22.5 million of equity was actually less than 3% of such assets.[425]   It does not appear that Citigroup identified this accounting issue.

Citigroup nevertheless recognized there was a "franchise risk" to Citigroup that Rawhide might not meet Enron's desired accounting objectives.[426]   In its "Capital Structuring Transaction Approval Memorandum" for the initial Rawhide transaction, Citigroup acknowledged that it understood Em-on would consolidate the majority-owned subsidiary, and that Enron would not consolidate the minority investor.[427]   Citigroup then stated "[t]here is a risk that the financing raised is not treated as minority interest but as a loan on Em-on's balance sheet."[428]   However, Citigroup appears not to have considered this issue further based on its belief that Andersen, as Enron's auditor, had approved the accounting treatment for the transaction, and its experience that other similar transactions had received minority interest treatment for GAAP purposes.[429]

Enron told Citigroup that it was "essential" to close Rawhide before year-end 1998.[430]   Given Citigroup's knowledge of how Minority Interest Transactions were reflected on Enron's balance sheet, it is reasonable to conclude that Citigroup understood the materiality of Rawhide to Enron.

Following the initial Rawhide closing in December 1998, Citigroup's involvement in the transaction continued in 2000, as Enron completed several

---

[425] See Second Interim Report, Appendix I (Minority Interest Transactions).

[426] Rawhide Capital Structuring Approval Memo, at 5.

[427] *Id.* at 4.

[428] I .

[429] *Id.*

[430] Rawhide Capital Structuring Approval Package, at CITI-B 00403919.

amendments to the structure that relied upon accommodations by Citigroup. By January 2000, Enron demand notes being held by the majority-owned subsidiary as a debt reserve totaled almost $900 million, triggering a provision in the transaction documents that required Enron to repay the entire Rawhide financing.[431] Enron did not want to make such a repayment at that time, preferring to defer the repayment obligation to give it time to consider refinancing alternatives.[432] Citigroup personnel met with Glisan, Enron's Treasurer, to discuss alternatives, and one of the Citigroup officers reported that:

> [i]n an ideal world, Enron would "reload" Rawhide as essentially a corporate deal (i.e., leave notes to Enron in place for the full amount) and extend for 2 years. However, they are developing the view that extending the deal as essentially a corporate credit would create accounting problems -- i.e. the minority interest treatment they currently receive could be re-characterized as debt.[433]

Citigroup agreed to defer Enron's Rawhide repayment obligation from January to March 2000, and then again from March to June 2000.[434] Then in June 2000, the parties amended the transaction to eliminate the mandatory repayment provision altogether.[435] Enron paid Citigroup a fee of $750,000 for facilitating this bridge extension.[436]

---

[431] Citibank Memorandum from Bob Dewing and Nasir Khan, to Pete Dillon, regarding Rawhide Amendment, Jan. 6, 2000 (the "Dewing 1/6/00 Memo"), at 1 [CITI-B 00401537-CITI-B 00401538].

[432] *Id.*

[433] Email from Steve Baillie, Citigroup, to Elliot S. Conway, Citigroup, et *al.*, Feb. 1, 2000, at 1 [CITI-B 00645923-CITI-B 006459241.

[434] Dewing 1/06/00 Memo, at 1; Memorandum from Elliot Conway, Otto Jager, Louis Esposito, Citigroup, to Andrew Gaczy and Bill Finn, Citigroup, regarding Project Rawhide Amendments 3/27/00 and 5/29/00, June 20, 2000 (the "Rawhide Amendment Memo"), at 1 [CITI-B 0254720-CITI-B 02547211.

[435] Global Loans Approval Memorandum regarding Rawhide, Apr. 17, 1999, at 3 [CITI-B 00377155-CITI-B 003771621.  Reilly testified that the date on this document was likely incorrect and would have been later than April 1999. Reilly Sworn Statement, at 278 (referring to Ex. 118 to Reilly Sworn Statement).

[436] Rawhide Amendment Memo, at 2.

Also in March 2000, LJM2 purchased all of Harch's $12.5 million equity investment in Rawhide, leaving TCW as the only other equity investor.[437] However, Citigroup knew at the time that Fastow was the general partner of LJM2, that he had made a personal investment in the partnership, and that senior Enron employees managed LJM2.[438] Reilly stated in an email in February 2000 that LJM2 was "an affiliated entity" of Enron.[439] Nevertheless, in an internal approval document,[440] a closing memorandum[441] and, importantly, a Citigroup memorandum apparently prepared for distribution to participants in the syndication of the liquidity backstop,[442] Citigroup characterized LJM2 as "unaffiliated" with Enron. In the memorandum prepared for the other banks involved in the syndication, Citigroup did not disclose that Fastow was the general partner of LJM2.[443]

The evidence regarding Citigroup's involvement in Rawhide raises some questions. There is evidence that Citigroup considered Enron's accounting treatment of Rawhide at its inception to have a certain amount of risk. In addition, Citigroup's characterization of LJM2 as unaffiliated with Enron is questionable, particularly since this position was contrary to the one assumed by Reilly, the bank's primary relationship

---

[437] *Id.* at 1.

[438] Rawhide Amendment Capital Structuring Approval Package, Mar. 7, 1999 (the "Rawhide Amendment Capital Structuring Approval Package"), at CITI-B 0369995 [CITI-B 00369989-CITI-B 003699961.

[439] Email from James Reilly, Citigroup, to Sumit Mathai, Citigroup, Feb. 16, 2000 [CITI-B 0278917].

[440] Rawhide Amendment Capital Structuring Approval Package, at CITI-B 00369995.

[441] Rawhide Amendment Memo, at 1.

[442] Memorandum from Citibank/Salomon Smith Barney, to Distribution, regarding Rawhide, Apr. 14, 2000 (the "4/14/00 Rawhide Memo") [CITI-B 00449907-CITI-B 004499091.

[443] Id.

manager for Em-on.  The evidence does not, however, appear sufficient at this time to support a conclusion that Citigroup acted wrongfully with respect to Rawhide.

### *Nahanni*

At year-end 1999, Enron utilized Citigroup's VFS one final time in the form of Project Nahanni, adding new twists to the Minority Interest Transaction structure. As in Nighthawk, the 3% independent equity in Nahanni was not at risk, in this case due to a letter of credit that provided support to the equity investor.[444] Thus, as in Nighthawk, Enron should have consolidated the minority investor.

Unlike either Nighthawk or Rawhide, however, in Nahanni, the minority investor contributed $500 million of T-Bills to the majority-owned subsidiary instead of cash, and the majority-owned subsidiary then sold the T-Bills. Em-on treated the $500 million as cash flow from operating activities because it classified the T-Bills as merchant investments, a classification that, as discussed further below, was contrary to Em-on's own definition of merchant activities.  The majority-owned subsidiary loaned the proceeds of the T-Bill sale to Em-on, with the loan being eliminated upon the accounting consolidation of the majority-owned subsidiary with Enron. Finally, Nahanni by its terms was only a 30-day financing, designed to span year-end so that Enron could report the favorable accounting effects in its year-end financial statements. The transaction closed on December 29, 1999 and the debt was repaid on January 14, 2000.[445]

---

[444] For a detailed description of Nahanni, see the Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[445] On January 13, 2000, Enron repaid the $500 million it had borrowed from the majority-owned subsidiary. Enron Presentation, regarding "Project Nahanni Financing Structure," Oct. 2001 (the "Nahanni Financing Presentation"), at 10 [AB025202798-AB025202809]. On January 14, 2000, the majority-owned subsidiary distributed $485 million to Nahanni. *Id.*

The Global Capital Structuring group, primarily Conway and Jager, again handled the transaction for the bank.[446] According to Jager, Enron approached Citigroup in 1999 requesting help in reducing "volatility" in its cash flows from operating activities.[447] As Enron bought and sold merchant investments in its trading book, reported cash flows from operating activities increased and decreased accordingly. Enron desired to "better manage the timing and volatility of its cash flow."[448]

In a draft of a Global Loans Approval Memorandum relating to Nahanni, Citigroup explained this issue:

> Enron manages its balance sheet over year end. As previously mentioned, the Wholesale Energy business involves price risk management and merchant activities, which create cash flow from operations and funds flow, respectively. Price risk management activities create cash flow from operations by monetizing assets, and merchant activities create cash flow through the sale of assets held in the merchant portfolio.[449]

This language was deleted from the final draft of the memorandum. However, the final draft contained the following explanation for at least part of Enron's motivation in completing Nahanni:

> In recent years, rating agencies have focused on "managing to cash" the profits earned under MTM accounting: that is ensuring earnings were a reflection of cash received. They have also focused on the tenor mismatch

---

[446] Conway Sworn Statement, at 98; Jager Sworn Statement, at 32-33.

[447] Jager Sworn Statement, at 33-34. According to Jager, Bill Brown and Charles DeLacey of Em-on were involved in the transaction, *Id.* at 33. Jager testified that "They had indicated to us that they had a certain volatility in their cash flow from operations either due to the postponement of a sale of an asset or an expected purchase that they would like to do something about." *Id.* at 33-34. He said "They wanted to reduce that volatility through a transaction that generated a positive amount of cash flow from operating activities." *Id.* at 34.

[448] Citigroup Execution Approval Memorandum from Otto Jager, et al., to GCS Commitment Committee, regarding Project Nahanni Execution Approval, Dec. 14, 1999 (the "Nahanni Execution Memo"), at 1 [CITI-B0289915-CITI-B0289924].

[449] Email from Sumit Mathai, Citigroup, to Genevieve Gervais and Otto Jager and copy to Steve Baillie and James F. Reilly, Citigroup, regarding Nahanni additional comments, Dec. 5, 1997 (the "Mathai 12/5/97 Email"), at CITI-B 0289185 (attaching the Nahanni Global Loans Approval Memorandum) [CITI-B 0289175-CITI-B 02861941].

> within the trading book between short term trading liabilities, and longer term trading assets. Em-on has addressed these concerns by entering into contract monetizations, prepaids, and transactions like "Yosemite", which has [sic] helped to create a more timely match between cash received and earnings recognized. The objective is to have the assets and liabilities in balance.[450]

An earlier version of the memorandum had included in that paragraph: "Specifically, Em-on manages the change in total assets less total liabilities year over year."[451]

It is clear, therefore, that Citigroup was aware of the pressure Enron felt from the Rating Agencies to ensure that its reported earnings were matched by its cash flows from operating activities. It is also clear that Citigroup understood the impact of Nahanni on Em-on's financial statements:

> The Nahanni transaction allows Em-on to reduce the volatility of operating cash flow (at the expense of greater volatility in its cash flows from financing activities), while avoiding an increase in leverage. In effect, Nahanni allows Enron to balance the cash impact of the merchant asset/investment accounts, providing a "bridge" to the sale of merchant assets.[452]

At an early stage of the transaction, when Citigroup apparently thought the financing amount would be only $350 million, Citigroup wrote:

> The transaction will increase Em-on's minority interest and this increase will be disclosed in Enron's financial statements. Enron's current (1998 Annual Report) minority interest represents 7.3% of its balance sheet. On a pro forma basis, assuming additional minority interest of $[350] million and no investment in additional assets, minority interest would increase to 8.5% of Enron's balance sheet.[453]

---

[450] Nahanni Capital Structuring Transaction Execution Approval Package, Dec. 14, 1999 (the "Nahanni Capital Structuring Approval Package"), at CITI-B 0105097 [CITI-B 010507%CITI-B 0105 100].

[451] Mathai 12/5/97 Email, at CITI-B 0289185.

[452] Nahanni Execution Memo, at 7.

[453] Nahanni Global Capital Structuring Approval, at CITI-B 0105067.

*T-Bills* as Merchant Investments. According to Jager, Em-on suggested several deal structures for Citigroup's consideration, although he could not recall the details of any such structures.[454]    Instead, as a resolution for Enron's "volatility" problem, Citigroup suggested the idea for using a Minority Interest Transaction structure and having it sell merchant investments to generate the particular type of cash flow sought by Enron.[455]    Citigroup specifically suggested using T-Bills for this purpose,[456] what Jager referred to as a "T-Bill monetization."[457]

Jager was not aware of any other instance in which Citigroup had used T-Bills as merchant investments.[458]    T-Bills are not typical investments for merchant banking activities. The Federal Reserve Bank describes merchant banking activities as "investing in the equity of non-financial companies and lending to private equity-financed companies."[459]    T-Bills also did not qualify as merchant investments under Enron's own guidelines. Those guidelines described fairly standard venture activity-investments in "companies or projects," or "infrastructure assets."[460]    Citigroup's own description of Em-on's merchant investments, contained in the final Global Loans Approval

---

[454] Jager Sworn Statement, at 37. Jager testified that he, Conway and Reilly of Citigroup met with Bill Brown and probably Charles DeLacey of Enron in late 1999 to discuss potential transaction structures. *Id.* at 35.

[455] Jager Sworn Statement, at 37-38.

[456] *Id.* at 44. Per Jager, this was his idea. Jager Sworn Statement, at 44. Mr. Conway did not attribute the idea to any particular individual, but acknowledged that it had come from within Citigroup. Conway Sworn Statement, at 99.

[457] Email from Otto Jager, Citigroup to Andrew Geczy, Elliot Conway and Darin Yumashiro, Citigroup, regarding Enron, Nov. 24, 2000 (the "Jager 1 1/24/00 Email"), at 1 [CITI-0289677-CITI-B 02896801.

[458] Jager Sworn Statement, at 44.

[459] "Guidance on Equity Investment and Merchant Banking Activities of Financial Holding Companies and Other Banking Organizations Supervised by the Federal Reserve," FRB Guidance, June 22, 2000, at 1, *available at* http://www.federalreserve.gov/boarddocs/SRLETTERS/2000/sr0009a1.pdf.

[460] Enron Corp. Fair Value Memorandum, at 6 [AB025203682-AB025203690].

Memorandum for Nahanni, stated: "Enron provides capital, primarily to energy-related businesses, seeking debt or equity financing, and owns certain energy assets. Those investments and assets that are deemed not strategic, are classified as "merchant."[461]

Jager testified that it took Em-on some time to become comfortable with classifying T-Bills as merchant investments, and that Enron requested T-Bills be used with a maturity of longer than 90 days in order to assist in supporting that position.[462] Despite this novel use of government securities, and Enron's hesitation with the proposal, Jager stated that neither he, nor to his knowledge anyone else at Citigroup working on the Nahanni transaction, ever discussed the issue with inside or outside accounting advisers.[463] Jager and Conway did, however, confirm with Benjamin Neuhausen of Andersen's Standards and Practices Group in Chicago that a T-Bill with a maturity of more than 90 days would not constitute cash or cash equivalents under GAAP.[464] According to Jager, it was critical to the Nahanni structure that the T-Bills not be considered cash or cash equivalents, because the sale of cash or cash equivalents from the Minority Interest Transaction structure would not generate cash flow of any type.[465] It would be merely an exchange of cash for cash.[466]

As discussed further in Appendix C (Role of Enron's Officers), Enron had to change its definition of "merchant activities" in its 1999 financial statements in order to

---

[461] Nahanni Capital Structuring Approval Package, at CITI-B 0105097.

[462] Jager Sworn Statement, at 53-54.

[463] Id., at 40-43. Bernstein confirmed that he did not review the Nahanni transaction. Bernstein Sworn Statement, at 60-61.

[464] Jager Sworn Statement, at 41-43.

[465] Id. at 42.

[466] Id.

encompass T-Bills. The revised definition described "merchant activities" as "providing capital to energy or communications related businesses seeking debt or equity financing," stating without explanation that they included government securities with maturities of more than 90 days.[467] The reference to government securities was not included in the 1998 definition.[468] Andersen apparently advised Enron that "the Treasury Bills can be considered Merchant Investments; however, Enron's Merchant Activities footnote should be changed to include government securities in the description of Merchant Investments."[469]

   *Three- Week Term.* Nahanni was done on a very short-term basis specifically designed to improve Enron's cash flows from operating activities on its year-end financial statements.[470] Citigroup knew that the debt in the Nahanni structure would be repaid no later than January 27, 2000, because the letter of credit, which was required to remain in place at all times while the debt existed, expired by its terms on that date.[471] Prior to the Nahanni closing, Conway wrote that "Enron will agree to repay by January 14th but to provide for some Y2K slippage, we request an additional two weeks through

---

[467] Enron 10-K for 1999, at Note 4 to the Consolidated Financial Statements.

[468] See Enron 10-K for 1998, Note 4 to Consolidated Financial Statements. In an internal January 26, 2000 presentation apparently prepared for an Enron accounting offsite meeting just days after the Nahanni debt was repaid, Enron described certain aspects of its fair value accounting methodologies. See Enron Accounting and Transactions Offsite, Fair Value Accounting, Jan. 26, 2000 [AB0786 02672-AB0786 026881. It included a list of the "Types of Merchant Investments Enron has Made." *Id.* at 8. These investments included (i) "Equity structures," listing common equity, preferred equity, convertible preferred equity and warrants; (ii) "Debt structures," listing senior and subordinated debt and revolvers; (iii) "Hybrid structures," listing convertible debt, income participation certificates and cash participation certificates; and (iv) "Volumetric Production Payments." *Id.* Government securities were not included.

[469] Andersen Transaction Memo Summary, at 2 [PSI00001019-PSI00001022].

[470] See, e.g., Nahanni Execution Memo, at 1 ("An important additional benefit of the transaction will be the improvement of Enron's 1999 'Cash Flow From Operations'. . . .").

[471] Irrevocable Letter of Credit No. 22703100654WLB, Dec. 29, 1999 ("West LB Letter of Credit"), at 1 [SEC00697937-SEC00697945].

Monday, January 3 1 st."[472]   As discussed further in Appendix C (Roles of Enron's Officers), Enron employees testified to the Examiner that all parties, including Citigroup, knew Nahanni was intended to exist only to span the year-end reporting cutoff.[473]

Thus, from the outset, the December 1999 use of Nahanni was intended only to allow Enron to improve artificially its year-end reporting. Conway informed a number of his Citigroup colleagues in an email message that "Enron has requested the ability to borrow the funds raised in the structure over year end."[474] As quoted above, Citigroup itself referred to Nahanni as "year-end window dressing."[475]

Not only was Nahanni intended as a bridge for year-end 1999, it was also established in a manner that would allow the basic structure to remain in place in the event that Em-on might want to use it for similar year-end manipulations in the future. The equity in Nahanni remained in place after the January 2000 debt repayment, thereby keeping the structure in place, and under certain circumstances, Enron could request to draw down the debt again in the future.[476]   This feature made Nahanni effectively a "'revolving' minority interest financing."[477] Reilly wrote that Nahanni was "essentially, an insurance policy for YE 'balancing'."[478]   Jager knew that it was "[c]ertainly a

---

[472] Email from Elliot S. Conway, Citigroup, to Rene R. Kamber, Citigroup, et *al.,* regarding West LB $500 million approval, Dec. 14, 1999 (the "Conway 12/14/99 Email") [CITI-B 02895991.

[473] Neuhausen of Andersen has told the Examiner that he was not aware of this "hardwiring" in the transaction documents, which caused the deal to be repaid within 30 days. See Report, Appendix C (Role of Enron's Officers).

[474] Conway 12/14/99 Email.

[475] Citigroup Exposure Spreadsheet, undated, at 28 [CITI-B 0137997-CITI-B 0138003].

[476] Nahanni Capital Structuring Approval Package, at CITI-B 0105085-CITI-B 0105086.

[477] Email from Otto Jager, Citigroup, to Rick Caplan, Citigroup, and copy to Elliot S. Conway, Citigroup, regarding Enron Transactions, Oct. 23, 2001, at 2 [CITI-B 00691770-CITI-B 00691771].

[478] Email from James F. Reilly, Citigroup, to Michael Nepveux and copy to Joseph J. Mackiewicz, regarding Enron Deals, July 24, 2001, at 1 [CITI-B 0289597-CITI-B 02895981.

possibility" that Enron would draw on Nahanni again "towards year end (draw Dec / repay Jan)."[479]  Conway even suggested that Enron Europe might use Nahanni to solve some of its funds flow problems at year-end 2000,[480] although Em-on did not do so.[481]   As Enron's financial condition grew increasingly precarious in the fall of 2001, Citigroup reviewed its potential exposure under Nahanni and suggested that Enron agree to terminate the structure.[482]

*Equity Nut at Risk.*  The minority investor's $15 million of equity in Nahanni was purchased by two investors.  MacKenzie River Investors, L.L.C. ("MacKenzie"), an affiliate of TCW Asset Management Company, purchased $7.5 15 million of the equity.[483] Ambac Private Holdings, L.L.C. ("Ambac Holdings") purchased the remaining $7.485 million.[484] Even though MacKenzie and Ambac were independent of Em-on, and the $15 million constituted a 3% investment, the equity was not at risk because it was supported by a bank letter of credit.

West LB issued a direct-pay letter of credit for the benefit of the majority-owned subsidiary that provided credit protection for the $500 million of Enron demand notes

---

[479] Email from Otto Jager, Cititgroup, to Joseph A. Farina, Citigroup, *et* al., regarding Enron Deals, July 24, 2001, at 1 [CITI-B 0289597-CITI-B 02895981.

[480] Conway Sworn Statement, at 163-64.

[481] *Id.* at 169.

[482] Email from Steffen Lunde, Citigroup, to Joseph Mackiewicz, Citigroup, regarding Enron classification, Oct. 25, 2001, at 1 [CITI-B 0289604-CITI-B 02896051; Email from Otto Jager, Citigroup, to James F. Reilly, William Fox and Lydia Junek and copy to Chris Lyons, Citigroup, regarding Nahanni, Nov. 21, 2001 [CITI-B 02898371.

[483] Preliminary Statements and Section 5.2(a), Nahanni Amended and Restated Company Agreement among MacKenzie River Investors, L.L.C., Ambac Private Holdings, L.L.C., BSCS V, Inc., and Enron Corp., Dec. 17, 1999 (the "Nahanni LLC Agreement") [AB021602649-AB021602747].

[484] Section 5.2(a), Nahanni LLC Agreement.

that the majority-owned subsidiary had purchased with the proceeds of the T-Bill sale.[485] In the event that Enron did not pay the demand notes, the third-party custodian of the majority-owned subsidiary's assets (Wilmington Trust) was required to draw on the letter of credit in order to repay both the loan to and the equity investments in the minority investor.[486] Thus, the West LB letter of credit had the effect of assuring repayment of the 3% equity, causing it not to be at risk.

As a result, Enron should have consolidated the minority investor and reported the Nahanni debt on its balance sheet. This is the same issue that Bernstein reviewed in his accounting analysis of Nighthawk, and which he had shared with Conway.    It is reasonable to conclude that Conway recognized this accounting issue in Nahanni. Citigroup was aware of the back-levering of the Nahanni equity since it helped structure and document the deal, and therefore the evidence supports an inference that Citigroup was aware that Enron's accounting was not in compliance with GAAP.

C.    **Forest  Products  Transactions**

Citigroup's roles in Projects Bacchus and Sundance are examples of transactions in which Citigroup acknowledged that it bent its own internal rules and participated in transactions about which it had substantial reservations, in order to accommodate Enron and maintain an important client relationship.[487]    Citigroup had a substantial belief that

---

[485] Section 4.1, Master Letter of Credit and Reimbursement Agreement between Enron Corp. and West LB, dated as of Dec. 27, 1999 [SEC00694025-SEC00694049].

[486] Section 6.2(6), Yukon Custody Agreement between Yukon River Assets L.L.C. and Wilmington Trust Company, Dec. 17, 1999 [AB02 160282 1-AB02 16028421; Section 4.3(t), Marengo, LP ("Marengo") Amended and Restated Limited Partnership Agreement among Marengo, Yellowknife Investors, Inc., Enron Corp. and Nahanni Investors L.L.C., Dec. 17, 1999 [AB021602490-AB021602648]; Section 3.2, Nahanni LLC Agreement.

[487] Email from Steve Wagman, Citigroup, to Amanda Angelini and copy to Rick Caplan, Citigroup, regarding Enron/Bacchus, Dec. 27, 2000 (the "Wagman 12/27/00 Email") [CITI-B 02792521; Salomon

Enron's objective in completing Bacchus was to record income from gain on a flawed "true sale" of an asset,[488] and it admittedly stretched the boundaries of what it would normally approve for such a transaction.[489] Citigroup also had serious questions about the Sundance transaction, particularly with respect to whether Enron's accounting treatment was proper.[490] Nevertheless, Citigroup proceeded with the transactions, which Citigroup knew had material impacts on Enron's financial statements.[491]

*Bacchus*

*Summary Description.* During 2000, with assistance from Chase Securities, Inc., Enron attempted to find a venture partner for its forest products business.[492] Em-on wanted to develop and grow its forest products business in an off-balance sheet venture, with a partner that would assume part of the risk and help fund part of the start-up costs.[493] When it became clear in late 2000 that this effort would not succeed before year

---

Smith Barney Interoffice Memorandum, regarding Em-on Corp. - Project Sundance, May 29, 2001 [CITI-B 029666 1 -CITI-B 02966631.

[488] Email from Steve Baillie, Citigroup, to William Fox, Citigroup, et *al.,* Nov. 24, 2000 (the "Baillie 11/24/00 Email") [CITI-B 0289702-CITI-B 02897031; Email from James Reilly, Citigroup, to Steven Becton, Citigroup, et *al.,* Dec. 6, 2000 (the "Reilly 12/6/00 Email") [CITI-B 02840561.

[489] Email from Steve Wagman, Citigroup, to Amanda Angelini and copy to Rick Caplan, Citigroup, regarding Enron/Bacchus, Dec. 27, 2000 (the "Wagman 12/27/00 Email") [CITI-B 02819461.

[490] Email from Lynn Feintech, Citigroup, to Rick Caplan, Citigroup, May 15, 2001 (the "Feintech 5/15/01 Email") [CITI-B 02996131; Memorandum from Dave Bushnell, Citigroup, to Mike Carpenter, Citigroup, regarding Enron-Project Sundance Transaction, May 30, 2001 (the "Project Sundance Memo") [CITI-B 030209 1 -CITI-B 03020921.

[491] Elliott 12/13/00 Email, at 3; Amended and Restated Limited Partnership Agreement of Sundance Industrial Partners, L.P., by and among Enron Industrial Markets GP Corp., Enron Corp., Enron North America Corp., and Salomon Brothers Holding Company Inc., June 22, 2001 (the "Sundance Partnership Agreement") (consenting to $375 million debt incurred in the subsequent Slapshot transaction) [AB000066270-AB000066367]; Caplan Sworn Statement, at 301 ("So the purpose of this partnership was to allow them to keep the assets of the paper and pulp trading business off of their balance sheet, but to receive the benefit of those assets through their partnership stake in the partnership.")

[492] Confidential Private Placement Memorandum prepared by Enron and Chase Securities, Inc., adviser, regarding Enron Net Works Partners, L.P., July 26, 2000 [PSI00457259-PSI00457318].

[493] See Second Interim Report, Appendix K (Forest Products Transactions).

end, Enron began "scrambling" to find a way to recognize for GAAP purposes $112 million of gain that it claimed existed in its pulp and paper trading business.[494] Enron accomplished this in two steps.

First, on December 18, 2000, Em-on contributed the pulp and paper trading business, which had a MTM book value of approximately $88 million, to an off-balance sheet SPE called Fishtail in exchange for 80% of Fishtail's equity interests.[495] Enron took the position that it did not need to consolidate Fishtail because LJM2 purchased for cash a 3% equity position, and JPMorgan Chase provided an unfunded line of credit that, if funded, would have brought LJM2's equity to 20%. Enron took the position that the trading business had a fair market value of $250 million and a basis of $88 million. Under GAAP, however, Enron could not recognize gain simply by contributing the asset to the SPE.

Thus, one day later on December 19, 2000, Enron closed Bacchus as the second step. In Bacchus, which Enron attempted to structure as a FAS 140 Transaction, Em-on securitized its 80% interest in Fishtail by selling the equity to another SPE called Sonoma. Sonoma was capitalized (indirectly through an SPE called Caymus Trust) with $194 million loaned by Citigroup, and $6 million of equity also funded by Citigroup. By deeming its 80% interest in Fishtail to have been sold to Sonoma for $200 million, Enron took the position that it could record $112 million of gain and take that amount into income for 2000. Em-on recorded the $200 million as cash flow from operating activities.

---

[494] Memorandum from Steven Rosen and Wilmer Cutler, to Enron Files, regarding Interview of Michael Patrick, Dec. 18, 2001, at 4 [AB000000641-AB000000647]. See *also* Andersen Interoffice Memorandum from Tom H. Bauer and Kate E. Agnew, Andersen, to The Files, regarding Fishtail LLC Formation/Securitization, Dec. 29, 2000, at 4 [PSI00020261-PSI00020264].

[495] For a detailed discussion of the Bacchus transaction, see the Second Interim Report, Appendix K (Forest Products Transactions).



In the Second Interim Report, the Examiner concluded that Enron accounted for the Bacchus transaction improperly. Fishtail should have been consolidated with Em-on because LJM2 was a FAS 57 Related Party, and because the unfunded commitment from JPMorgan Chase was not equity at risk. Fishtail's assets did not qualify for FAS 140 treatment and, therefore, as a consolidated subsidiary its equity also did not qualify for FAS 140 treatment. Also, the transfer of the Sonoma equity to Citigroup (indirectly through Caymus Trust) did not qualify as a true sale as a legal matter, in large part because Em-on did not transfer control to an unaffiliated entity.

In addition, Citigroup's $194 million loan and $6 million equity investment both had the credit support of Em-on. Pursuant to a Total Return Swap, Enron guaranteed repayment of the $194 million loan. Fastow orally committed Enron to repay the $6 million equity. This equity investment was an important part of the Bacchus structure since, in order to comply with the 3% Equity Test, the equity had to remain at risk for the entire transaction and its repayment could not be guaranteed.[496]

Finally, Citigroup did not purchase the Bacchus equity directly, apparently in an attempt to ensure that it would not be required to consolidate the SPE for accounting purposes.[497] Long Lane, the same balance sheet provider that had purchased equity on behalf of Citigroup in the Yosemite Trusts, purchased the Bacchus equity.[498] Citigroup then gave Long Lane a Total Return Swap, shifting all risks and rewards of the equity back to Citigroup.[499]

Although Bernstein did not review the GAAP accounting for the Bacchus transaction,'' this Total Return Swap support of the equity created the same issue that he identified in his review of the accounting for the Trust in the Yosemite I transaction. Applying Bernstein's analysis to these facts, the Bacchus equity was not "real" equity at risk.

---

[496] The Examiner discussed the 3% Equity Test in the Second Interim Report. The relevance of the 3% Equity Test to Enron's FAS 140 Transactions is that in transactions where the borrower-SPE is not a "qualified" special purpose entity ("QSPE"), the 3% Equity Test must be met or the borrower-SPE will be required to be consolidated with Enron, thereby bringing the debt incurred by that SPE onto Enron's balance sheet. See Second Interim Report, Appendix M (FAS 140 Transactions), *Was the Accounting Treatment Proper? ▪ Accounting Consolidation Analysis.* That section also includes a discussion of the difference between a QSPE and an SPE that is not a QSPE.

[497] Caplan Sworn Statement, at 264.

[498] Bacchus Global Loans Approval Memo, at 4. See *also* Second Interim Report, Appendix K (Forest Products Transactions).

[499] *Id.*

[500] Bernstein Sworn Statement, at 154-55.

*Citigroup's Involvement.* Citigroup was aware of Em-on's objective when it completed the Bacchus transaction with Enron. According to an email written by Steve Baillie ("Baillie"), a Citigroup relationship manager for Enron, on November 24, 2000: "Enron's motivation in the deal now appears to be writing up the asset in question from a basis of about $100MM to as high as $250MM, thereby creating earnings."[501] This led Baillie to conclude that one of his "key concerns" in Bacchus was the "appropriateness" of the transaction, "since there is now an earnings dimension to this deal, which was not there before . . . ."[502]

Similarly, Reilly wrote on November 28, 2000:

> Em-on states that the objective of the transaction is to reduce debt levels at YE. This is accomplished by using the proceeds to repay ST debt outstanding today. According to them, it is possible that there will be funds flow and/or earnings impacts. Altho [sic] not certain at this time, we should assume that there will be FFO/earnings implications.[503]

An internal Citigroup Executive Summary, describing year-end 2000 Em-on transactions that were being considered by Citigroup, stated the purpose of Bacchus as follows: "The purpose of the financing is to monetize Enron's pulp and paper trading business over year end in anticipation of the ultimate financing through a joint venture between Enron and equity investors which is expected to close in the first quarter of 2001 ."[504]

---

[501] Baillie 1 1/24/00 Email.

[502] *Id.*

[503] Email from James Reilly, Citigroup, to Maureen A. Hendricks, Citigroup, *et al.,* regarding Enron/Bacchus Summary, Nov. 28, 2000 (the "Bacchus Summary Email"), at 1 [CITI-B 02700331.

[504] Citigroup, Executive Summary undated (the "Bacchus Executive Summary"), at 1 [CITI-B 0046333-CITI-B 00463341.

Later, on December 6, 2000, Reilly continued to believe that there would be an earnings impact, but noted Enron's suggestion that any such impact would likely be immaterial:

> Bacchus is part of a program designed to ensure that Enron will meet its YE debt/cap targets, in effect "bridging" to the preoceeds [sic] expected to come from a massive divestiture program underway . . . . In addition, it is probable that the monetization will add to FFO as a portion of the assets will be from the merchant pool. It is possible, but not certain, that there will be an earnings impact -- Enron has suggested, however, that because of their ongoing involvement in the business, it is unlikely that there will be any material earnings benefit.[505]

Citigroup's internal analysis suggested, however, that the impact of Bacchus would be material based on certain of Enron's reported financial measures. On December 13, 2000, Elliott, the credit analyst at Citigroup's Global Energy and Mining group in Houston, responded to questions raised by Fox:

> In terms of total balance sheet size, it appears that Bacchus is immaterial; however, the $200 million represents 16.3% and 22.4% of operating cash flow and net income, respectively, for the 12 months ended December 3 1, 1999. Bacchus represents 22.2% and 11.6% of cash EBITDA for nine months ended 9/30/00 and twelve months ended 12/31/00, respectively.[506]

Elliott appears to have assumed that Enron's basis in the underlying asset was zero, and that the full $200 million would, therefore, be income from gain on sale. However, the actual amount of gain that Enron sought to record, which was $112 million, would still have been material, constituting over 12.5% of net income for the year ended December 31, 1999.[507]

---

[505] Reilly 12/6/00 Email.

[506] Elliott 12/13/00 Email, at 3.

[507] This amount is computed by dividing $112 million by the 1999 net income of approximately $893 million. See 1 O-K for 1999, Enron Corp. and Subsidiaries Consolidated Income Statement.

Despite the possible earnings impact to Enron and consequent appropriateness questions raised for Citigroup, the bank determined that, for the sake of its relationship with Em-on, it needed to complete the transaction. According to Reilly: "For Em-on, this transaction is 'mission critical' (their label not mine) for YE and a 'must' for us."[508] In its Global Loans Approval Memorandum for Bacchus (the "Bacchus Approval Memo"), Citigroup wrote: "As part of Citi's broader relationship with Em-on, we have been asked to support this transaction. Given the importance of this relationship to GEM [Global Energy and Mining], it is difficult if not impossible to deny this request."[509] The Bacchus Approval Memo noted that, during 1999, Citigroup's revenues from Enron were $44.7 million, and 2000 revenues were expected to exceed $50MM.[510] Specifically for the Bacchus transaction, Enron paid Citigroup an upfront fee of $500,000, as well as LIBOR plus 65 basis points on the $194 million loan, and a 15% return on the $6 million of equity.[511]

The $194 million loan was guaranteed by a Total Return Swap from Enron, but Citigroup was concerned about the exposure on the $6 million equity investment. Baillie described the concern as "loaning the 'bottom' 3% on a deal which day 1 has 1:1 asset cover, and day 2 has 1.2x asset cover. Clearly a large trust me element to our $7.5M of exposure . . . ."[512] Citigroup eventually mitigated this risk by getting "oral support" from

---

[508] Bacchus Summary Email, at 2.

[509] Bacchus Global Loans Approval Memo, at 4.

[510] *Id.*

[511] See Second Interim Report, Appendix K (Forest Products Transactions).

[512] Baillie 1 1/24/00 Email. This email was written when Citigroup was considering Em-on's initial request to fund $250 million, which would have made the 3% of required equity $7.5 million instead of $6 million. It is unclear why the amount of the financing was reduced to $200 million, but Baillie's email notes a concern within Citigroup about funding as much as $250 million over year end.

Fastow. According to the Bacchus Approval Memo: "Enron's CFO, Andrew S. Fastow, has given his verbal commitment to Bill Fox, GEM Industry Head, that Enron Corp. will support the 3% equity piece of this transaction."[513] The Bacchus Approval Memo, which without exhibits is only four pages long, mentioned the oral support from Fastow in five places, including once under the heading "Security/Collateral," and referred to it as a "verbal commitment."[514] An internal email from Lydia Junek to Fox stated: "The equity component has been approved on the basis of verbal support verified by Enron CFO, Andy Fastow."[515] A year-end 2000 credit approval form covering a number of new or modified Enron transactions listed the Bacchus oral support under the heading "Verbal Guarantees."[516] That same credit approval form also stated that the "Facility Description" of Bacchus was a "Term Loan," evidence that Citigroup may have considered the oral support sufficient to mitigate the risks associated with an equity investment.[517]

---

[513] Bacchus Global Loans Approval Memo, at 3.

[514] *Id.*

[515] Email from Lydia Junek, Citigroup, to William Fox and copy to Amanda Angelini, Citigroup, *et al.,* Dec. 21, 2000 [CITI-B 00327914-CITI-B 003279151.

[516] Citicorp/Citibank Credit Approval, relating to Enron Corp., Dec. 2000, at CITI-B 00398508 (the "Dec. 2000 Credit Approval Form") [CITI-B 00398501-CITI-B 003985231.

[517] Dec. 2000 Credit Approval Form, at CITI-B 00398508. This form also classified Citigroup's $194 million loan in Bacchus, which was guaranteed by a Total Return Swap from Enron, as a "Term Loan." *Id.* at CITI-B 00398507. Thomas Stott, a senior officer in Citigroup's Risk Management group, testified that the "Facility Description" would have indicated equity if that were the true character of the investment:

> Q: . . . If there was an equity portion of a securitization, would it be unusual for that facility description to indicate "term loan"?
>
> A: I would think it would indicate something other than term loan.
>
> Q: What do you think it would indicate?
>
> A: You said equity. If it was equity, it should say equity. If it is subordinated debt, it should say subordinated debt.

Apparently, this oral commitment by Fastow was important to Citigroup in obtaining the required internal approvals to participate in the transaction. However, Citigroup knew that Enron's desired accounting for Bacchus depended, at least in part, upon there being equity at risk in the structure, a concept inconsistent with a repayment commitment from Enron.[518] Evidence suggests that Andersen accountants were not aware of the existence of this oral support and, that if they had been, they would have declined to approve Enron's accounting treatment of the transaction.[519] Nevertheless, Citigroup proceeded with the transaction, enabling Enron to take the position that it could record $112 million of income. A Citigroup employee summarized Citigroup's involvement in Bacchus in a December 27, 2000 email: "Sounds like we made a lot of exceptions to our standard policies. I am sure we have gone out of our way to let them know that we are bending over backwards for them . . . let's remember to collect this iou when it really counts. . . ."[520]

*Sundance*

The Bacchus structure was intended to be a short-term bridge financing. Although it had a stated term of nine months, Citigroup expected that Enron would pay

Stott Sworn Statement, at 138. The Dec. 2000 Credit Approval Form stated that the equity investment was $7.5 million, but the amount was reduced to $6 million before closing, and a handwritten note in the document acknowledged this change. Dec. 2000 Credit Approval Form, at CITI-B 00398508.

[518] See Bacchus Global Loans Approval memo (diagram of transaction structure with explanation of transaction steps).

[519] See Report, Appendix C (Role of Enron's Officers). It is unclear whether Andersen knew that Citigroup had purchased its equity in the Bacchus transaction pursuant to the arrangement with Long Lane, although there is evidence that Enron was aware of this arrangement. See Email from Nicole Alvino, Enron, to Shirley A. Hudler, Enron, copy to Dan Boyle, Enron, regarding Monitoring Info, Jan. 19, 2000, at 1.

[520] Wagman 12/27/2000 Email.

the debt during the first quarter of 2001.[521]    It was actually paid on June 1, 2001 in connection with the Sundance transaction.[522]

*Summary Description.*    In Sundance, Enron moved all of its forest products assets-then consisting of the Fishtail pulp and paper trading business, two paper mills in New Jersey and Canada, and some timberland in Maine-into a newly formed partnership.[523]    Citigroup made a $28.5 million investment, and it agreed to fund up to an additional $160 million in the event that the partnership experienced losses in excess of $747.5 million (the total value of the assets contributed to the partnership).    Enron characterized Citigroup's investment as representing 20% of the equity of the partnership.[524]    This enabled Em-on to take the position that Citigroup had made the substantive equity investment needed for Em-on to treat Sundance as a nonconsolidated entity for GAAP purposes.    In connection with the formation of the partnership, Em-on contributed $200 million in cash that was used to purchase the indirect Fishtail interest that Citigroup had acquired in Bacchus, thereby terminating the Bacchus financing.

---

[521] Bacchus Summary Email; Bacchus Global Loans Approval Memo, at 4.

[522] Project Sundance Capital Markets Approval Committee New Product/Complex Transaction Description Guidelines, undated, at 1 [CITI-B 0302 137-CITI-B 0302 140].

[523] For a detailed discussion of the Sundance transaction, see the Second Interim Report, Appendix K (Forest Products Transactions).

[524] Twenty percent was important under a "4-to-l" test used by Andersen. See Second Interim Report, Appendix K (Forest Products Transaction).



*Citigroup Involvement.* Throughout the process of structuring and negotiating Sundance, several Citigroup officers expressed concern over Citigroup's involvement in Sundance.[525] In fact, it was difficult for Caplan and his Derivatives group, which had

---

[525] Email from William Fox, Citigroup, to Lynn Feintech and copy to Lydia Junek and Thomas Stott, Citigroup, regarding Sundance, May 16, 2001 (the "Fox 5/16/03 Email") ("Also not clear to me how this structure achieves Enron's off balance sheet objectives. Do we have a full understanding of this aspect of the transaction?") [CITI-B 02844771; Project Sundance Memo (listing six reasons for Risk Management's

primary responsibility for Sundance Industrial, to obtain all the necessary approvals.[526] The concerns arose largely from questions about the propriety of Enron's proposed accounting for the transaction. There also appeared to be concern about Citigroup's "extensive credit exposure to Enron,"[527] and the steps taken by Citigroup to minimize this exposure contributed to the questionable accounting.

Citigroup negotiated terms with Em-on that made Citigroup's equity investment resemble debt much more than equity. An internal Citigroup memorandum that was prepared for the purpose of seeking approval for the transaction stated that "notwithstanding the form of the investment, the investment is debt-like."[528] Protections for Citigroup included, among others:

- Citigroup received a preferred return of LIBOR plus 6.62% per year, paid quarterly prior to any other distributions to other partners;[529]

- An excess income sweep provision capped Citigroup's return at the amount of the preferred return, ensuring that Citigroup would not share in any upside of the business;[530]

---

reluctance to approve the transaction); Email from Eleanor Wagner, Citigroup, to David Bushnell, Citigroup, regarding Project Sundance, May 25, 2001 (the "Wagner 5/25/01 Email") [CITI-B 0300102-CITI-B 0300103]; Email from Lynn Feintech, Citigroup, to Rick Caplan and copy to Timothy Leroux, Citigroup, regarding cmac memo, May 15, 2001 (the "Feintech 5/15/01 Email") [CITI-B 02996131.

[526] Email from James F. Reilly, Citigroup, to Rick Caplan and Joseph J. Mackiewicz, Citigroup, regarding Enron, June 15, 2001 ("Had drinks with bill brown: we should spend some time with him to run thru [sic] why sundance went so acrobatic at the end - generally OK but he was surprised by the need to go all the way to the supreme court.") (capitalization omitted in original) [CITI-B 004406561.

[527] Project Sundance Memo, at 2 (adding that Sundance "is highly correlated, if not direct, Enron exposure. One side of the house had told this to Enron, and is trying to be strict, while the other is committing capital to the company.").

[528] Memorandum from Jim Forese, Rick Caplan and Doug Warren, Citigroup, to Barbara Yastine, Citigroup, regarding Enron Corp. - Project Sundance, May 29, 2001 (the "Citigroup Sundance Memo"), at 1 [CITI-B 0296661-CITI-B0296663].

[529] Section 3.01, Sundance Administrative Services Agreement between ENA and Salomon, June 1, 2001 (the "Sundance Administrative Service Agreement") [AB 000066368-AB 000066375].

[530] Id.

- The partnership was required to hold a $28.5 million working capital reserve at all times;[531]

- The partnership would dissolve at the end of three years, giving Citigroup a stated maturity date for its investment; and[532]

- Citigroup could unilaterally terminate the partnership early by convening a board of directors, on which it and Enron had equal representation, and then forcing a dissolution by creating a deadlock of the board.[533]

In addition, Citigroup purchased a third-party credit default swap as protection for the $28.5 million investment.[534] Thus, Citigroup's $28.5 million cash equity investment was not at risk. Likewise, its contingent commitment to fund up to an additional $160 million was designed never to be drawn upon, In order to draw upon this commitment, the partnership would have had to experience GAAP losses of $689 million and use the full $90 million of credit extended by Enron; and in such event, Citigroup would still have been able to dissolve the partnership to avoid the funding obligation.[535] Citigroup acknowledged its lack of risk in several documents:

- "The transaction contains numerous structural elements to safeguard against our need to contribute the contingent equity."[536]

- "The transaction is structured to safeguard against the possibility that we need to contribute our contingent equity and to ensure that there is sufficient liquidity at all times to repay our $25 million investment."[537]

---

[531] Section 4.03(a), Sundance Partnership Agreement.

[532] *Id.* Section 9.01(g).

[533] *Id.* Section 6.05.

[534] Email from Saul Bernstein, Citigroup, to Andrew P. Lee and Rick Caplan and copy to Amanda Angelini, Citigroup, *et al.,* regarding Sundance Transaction Summary, June 1, 2001 ("Bernstein Sundance Summary"), at CITI-B 00501220 [CITI-B 00501219-CITI-B 00501222].

[535] Bernstein Sundance Summary, at 2.

[536] Project Sundance Memo, at 1.

[537] Email from Susan Hayward, Citigroup, to K. Anandasagar, *et al.,* May 15, 2001, at PSI00046856 [PSI00046855-PSI00046872].

- "Still an equity investment of sorts (acctg and tax basis for partnership) but is structured in such a way that the 670 bps is guaranteed or we blow the deal. Also our 'invest' is so subordinated and controlled that it is 'unimaginable' how our principal is not returned."[538]

- "Em-on's contributed assets must lose all of their value before our investment is at risk."[539]

- "I understand, that due to remoteness, the contingent $160MM partnership capital call on SBHC is NOT viewed as requiring a RBC capital charge."[540]

- "No circumstance under which $160 can be called — our investment is debt."[541]

- "We don't really take ene [sic] risk as we are structurally senior to the value of all of the assets in the partnership."[542]

- $160 million commitment "cannot be drawn since SBHC [Salomon Brothers Holding Company] will dissolve Partnership if draw triggers are being approached."[543]

Bernstein, Citigroup's internal accountant who reviewed the transaction, concluded that it was not appropriate for Citigroup to consolidate the partnership.[544] He concluded that "Enron has all the predominate risks and rewards related to the asset values and earnings from the operations of the Partnership and the direct or indirectly

---

[538] Email from Timothy Leroux, Citigroup, to Andrew Lee, Citigroup, regarding Enron/Sundance, May 25, 2001 [CITI-B0301369].

[539] Email from Rick Caplan, Citigroup, to Geoffrey 0. Coley and James Forese and copy to Doug Warren, Citigroup, regarding ene transactions, Oct. 30, 2001 (the "Caplan 10/30/01 Email") [CITI-B 0300526].

[540] Bernstein Sundance Summary, at 1 (referring to Salomon Brothers Holding Company, which was the wholly owned Citigroup subsidiary that made the investment in Sundance Industrial).

[541] Saul Bernstein, Citigroup, Handwritten Notes of Phone Call regarding Sundance, undated [PSI00457254].

[542] Caplan 10/30/01 Email.

[543] Email from Susan McCall-Bowen, Citigroup, to Patricia Butler-Kenzig and copy to Andrew P. Lee, regarding RBC Treatment for Project Sundance, May 18, 2001 (the "McCall-Bowen 5/18/01 Email") [PSI00457084].

[544] Bernstein Sundance Summary, at CITI-B 00501220.

controlled entities of the Sundance partnership."[545]    He acknowledged that "[t]he customer objective/need for the transaction is to satisfy its accounting requirement to keep the contributed (to Sundance) assets off its balance sheet."[546] He then continued by saying that "[t]he business has pointed out that Enron initiated and brought the transaction to SBHC and is designed to satisfy Enron's accounting and business requirements. The business, as is customary and usual, advised Enron to consult with its own legal and accounting advisors."[547] Although his memorandum on the accounting treatment for Sundance did not express a view as to whether Enron should consolidate the partnership, he testified that from his perspective, such a result would be required.[548]

Others at Citigroup were also aware of Enron's objective to treat Sundance Industrial as an off-balance partnership:

- "The sum of our cash contribution and contingent commitment is 20% of the partnership assets, sufficient, per Enron's external auditors, for off-balance sheet treatment."[549]

- Em-on "owns certain pulp and paper assets , . ., which have been purchased by Enron in a manner that the assets are off-balance sheet for GAAP accounting purposes. Em-on wishes to maintain that off-balance sheet treatment."[550]

They were also aware that Enron's proposed accounting treatment was likely not in compliance with GAAP, with one senior officer referring to Sundance as "a funky deal (accounting-wise)" and saying he was "amazed that they can get it off balance sheet."[551]

---

[545]  *Id.* at CITI-B 00501221.

[546]  **Id.** at CITI-B 00501220.

[547]  *Id.* at CITI-B 00501221.

[548]  Bernstein Sworn Statement, at 190.

[549]  Wagner 5/25/01 Email, at 1.

[550]  Citigroup Sundance Memo, at 1.

[551]  Feintech 5/15/01 Email, at 1.

Just two days before the transaction closed, David Bushnell ("Bushnell"), Head of Global Risk Management, wrote a memorandum and copied Alan MacDonald, a Vice Chairman at the bank.[552]  In this memorandum, Bushnell explained his refusal to approve the transaction, which was based in part on the accounting concerns. Bushnell wrote: "The GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."[553]

At best, Citigroup's role in Sundance Industrial was to make an investment that was called equity but that was closer to debt, and provide a line of credit that would never be drawn upon and was thus included for optical effect, responding to a client request for a transaction that the client initiated and designed and for which it took responsibility. Under Citigroup's own appropriateness standards, however, playing such a role would appear to be questionable. A last minute change requested by Enron exacerbated the questionable nature of this transaction.

Very late in the negotiations, apparently only a few days before the June 1 closing, Enron requested that Citigroup use $20 million of its $28.5 million cash investment to purchase Em-on's .01% of Sonoma Class A equity that it had retained in the Bacchus transaction.[554]  Enron's plan was for Citigroup to then immediately contribute the Sonoma equity to Sundance, along with $8.5 million in cash. Enron somehow took the position that this .01% interest was worth $20 million, and by selling it to Citigroup

---

[552] Project Sundance Memo.

[553] *Id.* at 2.

[554] Bernstein did not discuss this aspect of the transaction in a draft of his accounting summary dated May 15, 2001, but it is addressed prominently in the final version dated June 1. Notes of a call between Bernstein and Caplan on May 24 reflect a discussion of this aspect. Handwritten Notes of Saul Bernstein, Citigroup, regarding conversation with Rick Caplan, Citigroup, May 24, 2001 (the "Bernstein Sundance Notes") (Ex. 163 to Bernstein Sworn Statement) [SEC00693747-SEC00693748]. See Bernstein Sworn Statement, at 18 l-82 (confirming that he made the handwritten notes.).

rather than contributing it to Sundance directly, Enron believed it could record $20 million of gain and, therefore, income.[555]

Citigroup was aware that Enron desired to record "true sale" treatment on the "purchase" and "sale" of this equity. Bernstein wrote this in notes made during a May 24, 2001 phone conversation with Caplan.[556] Despite knowing Enron's purpose for this aspect of the transaction, and despite there being no apparent business purpose for Citigroup to purchase the fractional piece of Sonoma equity, Citigroup nevertheless agreed to participate.

Bernstein testified that no one at Citigroup ever explained to him any business purpose for Citigroup owning the Sonoma equity.[557] He was not aware of any basis supporting the $20 million valuation, even though he wrote in his summary of the transaction: "The carrying value of the asset transferred, $20MM, is most indicative of the fair value of the transaction."[558]  Although the Class A interest in Sonoma was entitled to all gains from the trading business in excess of $200 million, he was aware that "this is remote (SONOMA gains in calendar years 2000 and forecasted for 2001 are $10MM and $15 to 20 MM, respectively)."[559]

Moreover, in order to get true sale treatment, Em-on requested that Citigroup agree to grant Em-on a put right on the Sonoma equity, so that Enron could ostensibly put the asset back to Citigroup causing Citigroup to have the risks of ownership.  Citigroup was

---

[555] See Second Interim Report, Appendix K (Forest Products Transactions).

[556] Bernstein Sundance Notes, at SEC00693747; Bernstein Sworn Statement, at 181 (confirming that his handwritten notes stated "Enron wants true sale since they are selling the Sundance Class B [sic] interest to us at a fair value of 20 million.")

[557] Bernstein Sworn Statement, at 176-77.

[558] Bernstein Sundance Summary, at CITI-B 00501219; Bernstein Sworn Statement, at 175-76.

[559] Bernstein Sundance Summary, at CITI-B 00501219.

unwilling to own the asset, and insisted that the put could be exercisable only within a very limited window, and with sufficient notice to allow Citigroup to cause the partnership to dissolve before the put could be exercised.[560]

In a description of the Sundance transaction, Citigroup noted Enron's put right and stated "[w]e can avoid this result by calling a board of directors and electing to dissolve the partnership . . . ."[561] Caplan also described this feature: "One risk that we should be aware of is that they have a put to us of the paper trading business. We can avoid the put by terminating the structure upon their exercise (its [sic] built into the mechanics of the termination)."[562] Bernstein was even more certain that Citigroup would, in fact, dissolve the partnership rather than accept ownership of the Sonoma equity.[563] He noted that Enron could only exercise the put by providing notice between November 18 and November 20, 2001 and, that once notice was given, Citigroup could not take preemptive action.[564] He wrote in his summary of the transaction, therefore, that "[t]he business intends and will cause the dissolution (by calling a BOD) of Sundance at 1 1/18 as the business can not risk the event of the "A" interest in SONOMA being "put" back to SBHC."[565]

Whether it was to avoid the risk under the Sonoma equity put agreement, or in response to Em-on's deteriorating financial condition, in November 2001 Citigroup

---

[560] Bernstein Sundance Summary.

[561] Description of the Sundance Transaction, Oct. 29, 2001, at CITI-B 0305125 [CITI-B 0305124-CITI-B 03051251.

[562] Caplan 10/30/01 Email.

[563] Bernstein Sundance Summary, at CITI-B 00501221.

[564] Id.

[565] Bernstein Sundance Summary, at CITI-B 0050 122 1.

requested that Enron liquidate the bank's investment in the partnership. On November, 29, 2001, just three days before the Petition Date, Enron repaid Citigroup's $28.5 million investment plus a full return at the preferred rate, and terminated Citigroup's $160 million contingent funding commitment.[566] Caplan testified that he approached Jodi Coulter ("Coulter") of Enron and requested an early termination of the transaction, which the transaction documents entitled him to do.[567] Coulter confirmed the November 29 liquidation in an email to Caplan that said: "We are going to buy you out and want to do it today. I need the final number for interest, your bank acct number and someone over there to sign the docs. Happy?"[568] This favorable liquidation for Citigroup from a timing standpoint illustrates that the Sundance Industrial transaction structure afforded Citigroup the intended protections with respect to Enron credit risk, and it may also be a reflection of the strong relationship between the two institutions.

---

[566] Limited Partnership Interest Purchase and Sale Agreement among Enron Industrial Markets GP Corp., Salomon Brothers Holding Company, Enron Corp. and Enron North America, dated as of Nov. 29, 2001 [AB000482956-AB000482960].

[567] Caplan Sworn Statement, at 386-87.

[568] Email from Jodi Coulter, Enron, to Rick Caplan, Citigroup, Nov. 29, 2001 [CITI-B 0301057].

## IV.    POTENTIAL LIABILITY OF CITIGROUP

### A.    Arguments Supporting the Imposition of Aiding and Abetting Liability and Equitable Subordination

*Aiding and Abetting Liability*

*Elements of Aiding and Abetting Liability.* As described in Appendix C (Role of Enron's Officers), certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and which resulted in the dissemination of financial information known to be materially misleading. Citigroup participated in a number of these SPE transactions, including the Prepay Transactions, the Nighthawk and Nahanni Minority Interest Transactions, Bacchus and Sundance Industrial.

As set forth more fully in Appendix B (Legal Standards), assuming the Debtors have standing, an affirmative claim against Citigroup for aiding and abetting these breaches of fiduciary duty will exist if: (i) Citigroup had actual knowledge of the wrongful conduct giving rise to the breaches of fiduciary duty; (ii) Citigroup gave substantial assistance to the primary wrongdoers; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of Citigroup's conduct. The evidence is sufficient for a fact-tinder to conclude that Citigroup aided and abetted certain Enron officers in breaching their fiduciary duties.

*Analysis of Evidence.* There is evidence both that Citigroup knew Enron's SPE transactions would result in Enron's financial statements being materially misleading, and that Citigroup provided substantial assistance to Enron in completing those transactions.

With respect to one transaction, Bacchus, Citigroup participated in Enron's misrepresentation by taking action based on verbal support from Enron, knowing that the existence of such support would preclude Enron from receiving the GAAP accounting treatment it desired and ultimately recorded.

In Bacchus, Citigroup made a $6 million equity investment in an Enron SPE after receiving Enron's verbal support to repay the investment. Citigroup understood the structure and purpose of the proposed FAS 140 Transaction. Thus, it understood that the equity needed to be at risk in order for Enron to treat Bacchus as a FAS 140 Transaction and get "true sale" treatment on an asset and thereby record income from gain on sale. However, Citigroup knew that a repayment commitment from Enron would mean the equity was not at risk.  Citigroup accepted verbal support from Enron rather than requiring the repayment obligation to be put into writing. Nevertheless, the commitment was so important to Citigroup that Fox visited with Fastow to receive the commitment in person, and Citigroup's four-page approval memorandum for Bacchus mentioned the verbal support five times.  At least one Citigroup document referred to this as an oral "guarantee."[569]  Pursuant to Bacchus, Enron improperly recorded $112 million of income in December 2000, and it reported $200 million of cash flow from operating activities that should have been reported as cash flow from financings.

There are also numerous instances in which Citigroup facilitated transactions that it knew (or it can be inferred from the evidence that Citigroup knew) Enron would not account for properly. Some of these transactions were even designed by Citigroup. For example, both Nighthawk and Nahanni used the Minority Interest Transaction structure

---

[569] Dec. 2000 Credit Approval Form, at CITI-B 00398508.

Citigroup had designed and considered to be a proprietary product. Yet, in both transactions, Citigroup knew that the 3% independent equity was not at risk, due to back-levering through a put option in Nighthawk and a bank letter of credit in Nahanni. Citigroup knew that failure of the equity to be at risk meant Enron should have consolidated the minority investor, which in turn meant that the $1 billion of debt in those transactions collectively should have been reflected as debt on Enron's balance sheet. Citigroup also knew that reclassifying this amount as debt would affect the Rating Agencies' view of the transactions and, potentially, Enron's credit rating.

In addition, in Nahanni, Citigroup suggested the use of T-Bills as merchant investments, knowing that this conflicted with Enron's own definition of merchant investments, and knowing that Em-on planned to repay the transaction within three to four weeks after the year-end reporting date had passed. Even Enron had some difficulty in getting comfortable that it could treat the T-Bills as "merchant investments" and had to change its definition of that term in its financial statement notes in order to do so. By following Citigroup's suggestion, however, Enron improperly inflated its cash flows from operating activities by $500 million in a transaction that was intended to exist only for a brief time period in order to cause Em-on's year-end financial statements to be artificially improved.

Other examples of transactions in which Citigroup knew or had a substantial belief that the accounting was wrong include the Yosemite credit linked notes structures, Bacchus and Sundance Industrial. Citigroup developed the Yosemite structure and considered it to be a proprietary product of the bank.  Thus, Citigroup understood that it was important that the Trust in each of the first two of those structures completed-

Yosemite I and II-not be consolidated with Enron. Otherwise, Em-on would have been required to report as debt on its balance sheet the Trust's sale of notes to institutional investors. Enron and Citigroup purchased the equity in the Yosemite I and II Trusts, but to avoid its own consolidation issues, Citigroup purchased the equity synthetically through a balance sheet provider, Long Lane. Citigroup then guaranteed the equity by giving Long Lane a Total Return Swap, which meant the equity was not at risk and was not "real" equity in the words of Citigroup's internal accountant.[570] As a result, Enron likely should have consolidated the Trusts. Despite Citigroup's recognition of this issue, it helped Em-on complete Yosemite I and II, through which Enron borrowed a total of over $1 .1 billion that was not reflected as debt on Em-on's balance sheet.

Similarly, in Bacchus, apparently to avoid its own consolidation issues, Citigroup purchased the 3% "independent equity" synthetically, through Long Lane. This equity was, therefore, not at risk, resulting in the same issues presented in Yosemite I and II. It is reasonable to infer that Citigroup understood this would not support Em-on's treatment of Bacchus as a FAS 140 transaction.

Sundance Industrial had two primary accounting problems, both known to Citigroup. First, because Citigroup's equity in the partnership was structured to be "debt-like"[571] and was not at risk, it was inappropriate for Em-on to treat the partnership as nonconsolidated. This meant that all of the debt associated with Em-on's forest products assets, including the $375 million borrowed in the Slapshot transaction, should have been

---

[570] Bernstein 1 0/29/99 Memo, at 4.

[571] Citigroup Sundance Memo, at 1.

reflected on Em-on's balance sheet.[572] Citigroup was aware of this debt, because it executed documents in July 2001 agreeing to the Slapshot funding in its capacity as a partner of Sundance.[573] The other accounting problem in the Sundance transaction was Em-on's improper recording of $20 million of income. This occurred due to a last minute agreement by Citigroup to "purchase" for $20 million, and then immediately contribute to the partnership, a .01% equity interest in an SPE that held the equity of Enron's pulp and paper trading business. Citigroup had no business purpose for purchasing the equity; it negotiated the ability to dissolve the partnership to avoid having to take ownership of the equity in the future under a put right that Enron required; and it knew Enron's purpose for this aspect of the transaction was solely to record income from gain on sale.

Finally, Citigroup knew Enron's accounting for the Citigroup Prepays, with no other meaningful related disclosure, would result in misleading financial presentation. Citigroup understood that the Citigroup Prepays did not effect any transfer of a commodity, and that these transactions did not accomplish any hedge of the commodity price risk, since all price risk was eliminated by virtue of the circularity of the transaction structure. Citigroup understood, therefore, that the Citigroup Prepays were effectively loans to Enron, but that Enron recorded the swap agreements as price risk management activity and reported the proceeds as cash flows from operating activities. Citigroup knew that Enron did not make any public disclosure that would allow a reader of its financial statements to understand either the nature or the magnitude of its Prepay

---

[572] For a detailed discussion of the Slapshot transaction, which closed on June 22, 2001, three weeks after the Sundance transaction closed, see the Second Interim Report, Appendix K (Forest Products Transactions).

[573] See Second Interim Report, Appendix K (Forest Products Transactions).

Transactions. Citigroup Prepays allowed Em-on to obtain a gross amount of $4.6 billion in financing, only a fraction of which was reported on Enron's balance sheet as debt.

Many of the transactions that Citigroup facilitated for Enron closed at a quarter end or a year end. Six of the nine Citgroup Prepays closed in June, September or December; the three Minority Interest Transactions closed in December 1997, 1998 and 1999; Bacchus closed in December 2000; and Sundance Industrial closed in June 2001. Many of the transactions were short-term bridge tinancings, including several of the Citigroup Prepays, Bacchus and Nahanni, and were intended to exist for only a short period of time that spanned a reporting date. The Nahanni financing, for example, was outstanding for only three weeks, from December 29, 1999 to January 14, 2000. Citigroup was aware that Enron completed transactions solely for accounting purposes, and it was aware of Enron's pattern of closing transactions immediately prior to the end of a reporting period.

These transactions also violated Citigroup's own internal standards of appropriateness, providing further evidence of Citigroup's knowledge that the transactions would lead to misleading financial presentation by Enron. An example is the application of Citigroup's appropriateness test to the Citigroup Prepays. Citigroup's test, which was formally used by Global Capital Structuring with similar standards applied by the Derivatives group and generally throughout the bank, required that the bank consider whether "[t]he transaction will have a significant impact on the customer's financial condition or results, and will not be required to be disclosed."[574] The Citigroup Prepays

---

[574] Nighthawk Capital Structuring December Approval Package, at CITI-B 00375913-CITI-B 00375914 (the Nighthawk Appropriateness Test Questionnaire); Rawhide Capital Structuring Approval Package, at CITI-B 00403920-CITI-B 00403921 (the Rawhide Appropriateness Test Questionnaire); Rawhide

totaling $4.6 billion had a material effect on Enron's cash flows from operating activities and its liquidity. Yet, Enron's disclosure was so minimal that even a financial institution like Citigroup could not determine the amount (or even the existence) of Enron's total Prepay Transactions.

Under the applicable law of aiding and abetting, courts often include, as part of the element of substantial assistance, that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. With respect to the Citigroup Prepays, Nighthawk, Nahanni, Bacchus and Sundance, there is evidence of this element. Each of these transactions was structured to enable Enron to produce materially misleading financial statements, which were disseminated to the public. Enron suffered damages by virtue of the preparation and dissemination of these materially misleading financial statements, including incurring the costs of governmental investigations, the administrative costs of Enron's bankruptcy proceeding, and losses caused by the "deepening insolvency" of Em-on that occurred while its true financial condition was disguised. A fact-finder could conclude that damages such as these were a reasonably foreseeable result of Citigroup's conduct in connection with these SPE transactions with Enron.

### *Equitable Subordination*

As set forth more fully in Appendix B (Legal Standards), Citigroup's claims against the Debtors may be equitably subordinated if Citigroup engaged in inequitable conduct and such conduct resulted in an injury to creditors or an unfair advantage to Citigroup. The evidence discussed above supports a finding that Citigroup engaged in

Amendment Appropriateness Test Questionnaire; Nahanni Global Capital Structuring Approval, at CITI-B 0 105066 - CITI-B 0105067 (the Nahanni Appropriateness Test Questionnaire).

inequitable conduct that allowed Enron to produce materially misleading financial statements. Em-on's other creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, the Examiner concludes that sufficient evidence exists for a court to equitably subordinate the claims of Citigroup to those of other creditors.

### B.    Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination

The Examiner has considered several arguments that Citigroup might assert as defenses to aiding and abetting liability and equitable subordination, including:

- with respect to all of the SPE transactions in which Citigroup assisted Enron, Citigroup may argue that the bank relied on Enron's obtaining its own independent accounting advice with respect to its financial statements and other disclosures;

- with respect to the Prepay Transactions, Citigroup may argue that Em-on's accounting was in compliance with GAAP; and

- with respect to Bacchus, Citigroup may argue that the verbal support provided by Enron was legally unenforceable and, therefore, did not adversely affect Enron's accounting for that transaction.

*Reliance on Independent Accounting Advice.*    Most of the transactions that Citigroup completed with Em-on were complex, some were unique (having been developed by Citigroup for Em-on), and all required sophisticated accounting analyses and interpretations. Citigroup may argue that reasonable accounting interpretations could have differed, particularly those rendered at the time of the transactions in contrast to those rendered presently in hindsight. Citigroup may argue that its decisions with respect to such transactions with Enron were consistent with financial services industry standards applied at the time, and that its reliance on Enron being financially sophisticated and

having representation by one of the most well-respected accounting firms in the world precludes it from having any scienter or intent to aid and abet Enron's financial misrepresentations.

A number of the former and current Citigroup employees who provided testimony to the Examiner stated that they relied on Enron's obtaining its accounting advice from Andersen.[575] They knew that Enron had large and savvy accounting and financial staffs, and that Enron was represented by Andersen, which was a "blue chip" accounting firm.[576] In some instances, the current and former Citigroup employees testified that Enron told them Andersen had approved a particular transaction or aspect thereof,[577] but none of those individuals had any recollection of having talked directly with Andersen in its capacity as Em-on's auditor, and they consistently testified that to do so would have been highly unusual for Citigroup.[578]

Citigroup's typical engagement or mandate letters with Enron required Enron to make representations clarifying that it would not rely on Citigroup's accounting advice:

> (ii) the Company [Enron] is not relying on the advice of Citigroup or its affiliates for legal, regulatory, financial, accounting, tax or investment matters, but instead the Company is seeking and will rely on the advice of its own professionals and advisors for such matters; . . . (iv) the Company will determine, without reliance upon Citigroup or its affiliates, the economic risks and merits as well as the legal, regulatory, tax and accounting characterizations and consequences of the Transaction including any hedge transactions, and it will be capable of assuming such risks; and (v) Citigroup and its affiliates have not, and will not, make any recommendations, guarantees, or representations regarding the expected or

---

[575] See, e.g., Hendricks Sworn Statement, at 30; Conway Sworn Statement, at 72; Bernstein Sworn Statement, at 98-99; Fox Sworn Statement, at 111; Reilly Sworn Statement, at 155.

[576] Bernstein Sworn Statement, at 36-37.

[577] See, e.g., Caplan Sworn Statement, at 106; Reilly Sworn Statement, at 155; Jager Sworn Statement, at 26-27.

[578] See, e.g., Jager Sworn Statement, at 26-27; Caplan Sworn Statement, at 100; Reilly Sworn Statement, at 130.

projected success, performance, result, consequence or benefit (whether legal, regulatory, tax, financial, accounting or otherwise) of the transactions contemplated hereby.[579]

Such contractual terms, however, appear designed to make it clear that Citigroup had no responsibility for determining Enron's accounting treatment of any transaction. Citigroup may nevertheless have had knowledge of, and substantially assisted Enron with, Enron's production of materially misleading financial statements.

Whether Citigroup's reliance on Enron's obtaining independent accounting advice was reasonable is a question of fact. There is evidence that Citigroup believed Andersen approved Enron's transactions, and there is also evidence from which a fact-finder could conclude that such reliance was not reasonable. For example, with respect to the oral support in Bacchus, there is evidence that Citigroup knew the existence of such support would result in accounting treatment different from Enron's proposed accounting. Thus, Citigroup accepted the oral support rather than reducing it to writing. There is also evidence that Andersen was not aware of the oral support and would have found it to invalidate Enron's accounting for and disclosure of the transaction.

In other transactions, including Nighthawk, Nahanni, Sundance, and the credit linked notes portions of Yosemite I and II, Citigroup had a substantial belief that Enron's proposed accounting was not in compliance with GAAP. Citigroup's own internal accountants had reached such a conclusion. Finally, with respect to the Citigroup Prepays, Citigroup knew the magnitude of these transactions and how they impacted

---

[579] Engagement Letter between Enron Corp. and Citibank, N.A., Dec. 10, 1999, at 8 (relating to Nahanni) [CITI-B 00929497-CITI-B 009295071. *See* **also**, e.g., Engagement Letter between Enron Corp. and Citicorp Securities, Aug. 28, 1997 (relating to Nighthawk), at 8 [CITI-B 0255863-CITI-B 02558741; Engagement Letter between Enron Corp. and Citicorp Securities, Nov. 19, 1998 (relating to Rawhide), at 8 [CITI-B 00406902-CITI-B 00406912].

Enron's financial statements. Even if Andersen concurred with Em-on's GAAP accounting for the Citigroup Prepays, and there is evidence that Andersen was not aware of all relevant facts with respect to at least Yosemite I and II, Citigroup was aware that Em-on's disclosure of these transactions resulted in its cash flows from operating activities being materially inflated and its debt being materially understated.

As a result of the nine Citigroup Prepays, Nighthawk, Nahanni, Bacchus and Sundance, Citigroup was extensively involved in Enron's SPE transaction financings over the five years leading up to Enron's bankruptcy. These transactions include a number of instances in which Citigroup actively assisted Enron in accomplishing its accounting objectives, either by developing the transaction structure, by modifying an existing structure, or by accepting an oral commitment from Enron in lieu of a written agreement. The transactions also include numerous instances in which Citigroup knew or had a substantial belief that Enron's accounting was not in compliance with GAAP. A fact-finder would need to conclude whether Citigroup's extensive involvement in and knowledge of Enron's accounting and disclosure casts additional doubt on the reasonableness of Citigroup's claimed reliance on Em-on's obtaining independent accounting advice.

*Reliance on GAAP.* The Examiner concluded in the Second Interim Report that Enron's accounting for its Prepay Transactions did not comply with GAAP.[580] The Examiner has nonetheless considered the potential defense that Et-non's accounting for the Prepay Transactions may have complied with GAAP. In support of this defense, Citigroup likely would be able to produce expert testimony and other evidence supporting

---

[580] See Second Interim Report, Appendix E (Prepay Transactions).

the view that Em-on's accounting for the Prepay Transactions complied with GAAP notwithstanding the Examiner's conclusions to the contrary.

Although a fact question may exist as to whether Enron's accounting for the Prepay Transactions satisfied the technical requirements of GAAP, the Examiner is unable to conclude that the existence of such a fact question – or even a determination that the technical requirements of GAAP were satisfied by that accounting – would excuse Citigroup from potential liability as a matter of law. With respect to potential aiding and abetting liability, the fundamental issue of whether Em-on's officers breached their fiduciary duties in connection with the Prepay Transactions is not whether the technical rules of GAAP were satisfied, but whether the disclosure related to those transactions resulted in the knowing dissemination of materially misleading financial information. As set forth in Appendix B (Legal Standards), applicable case law provides that literal compliance with GAAP is not dispositive on that question. Accordingly, the Examiner is unable to conclude that Citigroup must be excused as a matter of law from potential aiding and abetting liability, notwithstanding the existence of a potential fact question on the issue of whether Enron's accounting for the Prepay Transactions complied with GAAP. Similarly, the Examiner is unable to conclude that a fact question on the issue of GAAP compliance would demand a finding that Citigroup did not engage in inequitable conduct in connection with the Prepay Transactions.

*Enforceability of Verbal Support.*   In testimony given to the Examiner and the PSI regarding Bacchus, current and former Citigroup employees have asserted that the verbal support provided by Enron was not enforceable and, therefore, did not affect Em-on's accounting for the Bacchus transaction:

- Caplan testified to the Examiner: "Our understanding of the verbal support was it was well short of that [referring to a guarantee]. It was not a legally binding enforceable obligation."[581]

- Fox testified to the Examiner: "my conversation with Andy Fastow was a businessman's understanding as to what the intent and expectation was. It was not enforceable."[582]

- Fox testified before the PSI that the Bacchus commitment "did not have the faith and full faith and credit from Enron. It was simply that Enron, through Mr. Fastow, was going to make certain that the take-out transaction was going to be accomplished."[583] "[Mr. Fastow] did not provide me any guarantee."[584]

Regardless of whether the verbal support was an agreement that would have been legally enforceable against Em-on, the evidence reflects that this verbal support was important to Citigroup's decision to approve the Bacchus transaction. The evidence also reflects that Citigroup understood that having such support would result in adverse accounting consequences to Em-on, and that the parties, therefore, did not reduce the support to writing in order to avoid those consequences. Caplan testified with respect to Bacchus:

> Let's be clear. The understanding was, from their accounting perspective, if they provided one of those direct obligations, such as a guarantee that would have not allowed them to account for this as a true sale. . . . If you had them enter into a legally binding enforceable obligation, they would not have been able to achieve the true sale treatment they were looking for. So we understood from the first day of the transaction that we were not going to get any sort of legally binding enforceable writing from them to that effect. But the verbal assurance was a loose relationship based concept.[585]

---

[581] Caplan Sworn Statement, at 277-78.

[582] Fox Sworn Statement, at 125.

[583] U.S. Senate Governmental Affairs Committee: PSI Hearing on Lessons Learned from Enron, FDCH Political Transcripts Dec. 11, 2002, at 21 (testimony of William T. Fox, III, Managing Director, Citibank Global Power & Energy Group).

[584] *Id*. at 20.

[585] Caplan Sworn Statement, at 277-78.

Andersen has testified that it was not aware of the verbal support in any of Enron's FAS 140 Transactions and that it would not have approved Em-on's accounting for any of such transactions had it known about the arrangement. Em-on honored its verbal support in Bacchus, repaying the equity in full with interest on June 1, 2001, in connection with closing the Sundance Industrial transaction.

C.    **Conclusions**

Through several of its subsidiaries, Citigroup helped Enron implement-and in some cases Citigroup also designed-SPE transactions including nine Citigroup Prepays, two Minority Interest Transactions called Nighthawk and Nahanni, and two Forest Products Transactions called Bacchus (a FAS 140 Transaction) and Sundance Industrial. The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that Citigroup aided and abetted certain Enron officers in breaching their fiduciary duties. There is also sufficient evidence of inequitable conduct by Citigroup in connection with such SPE transactions for a court to conclude that Citigroup's claims should be equitably subordinated to the claims of other creditors.

As a result, Citigroup's claims in the Bankruptcy Case totaling approximately $2.4 billion are susceptible of being equitably subordinated to the claims of other creditors. This subordination would be in addition to any affirmative recovery that may be available to the Debtors against Citigroup for aiding and abetting the officers' breaches of fiduciary duty, assuming that the Debtors have standing to pursue such a claim.