**EXHIBIT 16**



**ROBERT M. MORGENTHAU**
DISTRICT ATTORNEY

ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

July 28, 2003

Hon. Alan Greenspan, Chairman
Board of Governors of the Federal Reserve System
20th & C Streets, N.W.
Washington, D.C. 20551

Mr. Jamie B. Stewart, Jr., First Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045

Hon. John D. Hawke, Jr., Comptroller of the Currency
Office of the Comptroller of the Currency
Independence Square
250 E Street, S.W.
Washington, D.C. 20219

Hon. Diana L. Taylor, Superintendent
New York State Banking Department
1 State Street
New York, New York 10004

Dear Messrs. Greenspan, Stewart and Hawke and Ms. Taylor:

  I write concerning the conduct of J.P. Morgan Chase & Co. and Citigroup, Inc. with respect to Enron Corporation, the Houston-based energy company now in bankruptcy.

  This office has recently completed an 18-month investigation into a series of transactions, styled as prepaid forward commodities transactions, in which these New York financial institutions, acting through their banking subsidiaries, JPMorgan Chase Bank [hereinafter "Chase"] and Citibank N.A. ["Citibank"], provided Enron with more than $8.3 billion in the nine years prior to Enron's filing for bankruptcy protection in December 2001. Our investigation sought to determine what role these prepaid commodities transactions ["prepaids"] may have

played in the irregularities in Enron's accounts and financial statements that have come to light since the company began its precipitous public slide into bankruptcy.

In the course of our investigation, which began shortly after Enron filed its bankruptcy petition, we have interviewed hundreds of witnesses from throughout the country and abroad and analyzed more than one million documents. In addition, testimony was taken from 46 witnesses and more than 2,700 exhibits were introduced before a New York County Grand Jury, which sat for six months. In order to preserve the secrecy of grand jury proceedings, the information in this letter is taken strictly from interviews conducted and materials examined outside the grand jury.

### The So-called Commodities Transactions

Prepaid commodities transactions, which involve the present sale of a commodity in exchange for future delivery, are routine and serve legitimate economic ends in commodities trading. As our investigation disclosed, however, the prepaids Chase and Citibank engaged in with Enron were never designed to constitute trading in the commodities markets. Despite the banks' efforts to make these transactions look like commodities trades, they were trades on paper only. In substance, they were loans. Structuring these transactions as commodities trades, however, enabled Enron unfairly to account for the funds it received as cash flow from operations, rather than as the proceeds of bank or credit financing.

This letter discusses the Chase prepaids in greater detail than Citibank's, because, for reasons noted below, we focused more closely on the particulars of the Chase transactions in the course of our investigation.

**The Chase Prepaids:** All of the prepaid transactions between Chase and Enron involved so-called "special purpose entities" ["SPEs"][1], offshore corporations, controlled by Chase, which served as ostensibly independent counterparties in the deals. The SPE used most often was Mahonia Limited ["Mahonia"], a shell company incorporated at Chase's behest in the Isle of Jersey, one of the British Channel Islands. In each of the prepaids, save the last, an Enron subsidiary agreed to deliver natural gas or crude oil to Mahonia or to another of the Chase SPEs in exchange for a single prepayment from the SPE,[2] which ranged from $75 million to as much as $650 million. In addition to the Enron–SPE contract, each prepaid structure included a series of complex contractual arrangements through which Chase provided the SPE with financing for the deal, arranged for the SPE to dispose of the commodity it received from Enron, and guaranteed itself a known cash flow. In total, from December 1992 to September 2001, Chase and Enron

---

[1] The SPEs utilized by Chase to take part in the prepaid forward transactions were Mahonia Limited, Stoneville Aegean Limited, and Mahonia Natural Gas Limited.

[2] The $350 million September 2001 Chase prepaid was financially-settled, and thus did not involve deliveries of physical natural gas.

2

entered into 12 prepaid transactions with Enron through which Enron received more than $3.5 billion.

Prior to 1996, due to regulatory restrictions, Chase was not permitted to take title to physical natural gas or crude oil. Thus, in the four Chase prepaids executed prior to 1996, Mahonia took title to the gas or oil, and Chase, acting as Mahonia's agent, sold whatever commodity Mahonia received from Enron to the market, hedging itself to ensure a predictable cash flow. In 1996, however, after its merger with Chemical Bank, Chase received permission from the New York State Banking Department to take title to natural gas and crude oil; this eliminated any conceivable legitimate business purpose for including Mahonia in the prepaid arrangements. Nonetheless, Chase, after considering the matter, retained Mahonia as a part of future prepaids – no doubt, as discussed below, in deference to Enron's accounting objectives.

In a $300 million prepaid which closed in December 1997, Chase altered the structure of the transactions. In the new formulation, Mahonia delivered all of the natural gas it received from Enron to Chase, which, in turn, sold it to the market. As in previous deals, Chase bore some risk that market participants could not be found to buy the natural gas received from Enron at the index price. To that extent, the bank's return on the transaction still depended on market forces, though the amount at risk was negligible when measured against the total expected return. The structure of the deal included financial swaps with Enron, which virtually ensured a fixed rate of return for Chase on its money.

Thereafter, in order to eliminate any vestige of market risk, Chase designed and executed six round-trip trades in which, on the same day and at the same location, title to natural gas or crude oil moved from Enron to the SPE, from the SPE to Chase, and from Chase back to Enron. On the face of it, each of the six round-trip prepaid transactions consisted of three separate commodities transactions memorialized in three apparently unrelated contracts. In reality, however, the three contracts were conceived to be executed simultaneously, creating a circular structure that eliminated all material market risks from the transaction. These changes removed any doubt whatsoever about the economic substance of the transactions when all the related contracts were viewed as a whole: the prepaids, as a Chase memo recognized, were really "disguised loans." Appearances aside, Chase, for a pre-set fee, was simply providing funds to Enron to be repaid at a pre-determined rate of interest.

Between June 1998 and September 2001, these six round-trip transactions resulted in Enron's receipt of about $2.1 billion from Chase,[3] which Enron should

---

[3] With respect to the prepaid transaction arranged by Chase in December 2000, Enron received $330 million. Although Chase arranged the transaction, it supplied only half of its upfront funding, the remainder being supplied by Fleet Bank. The structure of the transaction, like that of the post-1998 prepaids, was circular, though we are aware of no evidence that Fleet was aware of its circular nature. The $2.1 billion figure cited above includes only that portion of the prepaid funds actually supplied by Chase.

3

have, but did not, account for as bank or credit financings. In the first of these, the June 1998 $250 million prepaid, Chase arranged for 50% of the commodity to flow in a round-trip from Enron, to Mahonia, to Chase, and back to Enron; a series of side agreements with Enron eliminated any risk for Chase on the other 50%, which was sold to the market. In the next four prepaids, 100% of the commodity involved flowed in a perfect circle. Indeed, a "tombstone" prepared by Enron employees memorialized the $650 million June 2000 prepaid with the slogan, "Let the circle be unbroken." (A copy of the tombstone and a detailed analysis of the June 2000 prepaid are provided in an addendum to this letter.) In the final prepaid, Chase and Enron eliminated the physical product from the structure altogether by executing a circular, financially-settled prepaid structure.

The contracts executed between Enron and the SPEs in all the prepaid transactions, including the round-trip prepaids, were designed to make it appear as if Enron were dealing with a bona fide trading company that actually wanted to obtain natural gas in the normal course of its business. Mahonia, for example, affirmed in the contracts that it intended to buy natural gas

> for commercial purposes related to its business as a producer, processor, fabricator, or merchandiser of Natural Gas or natural gas liquids. The Purchaser has the capacity, and intends, to take delivery of the Natural Gas to be delivered hereunder. The Purchaser is acquiring the natural Gas in the ordinary course of business.

In addition, Mahonia affirmed that it was "entitled to purchase the Natural Gas [involved in the Enron-Mahonia contract] free of any taxes" because it was "engaged in the business of reselling the Natural Gas delivered" under the contract, and that it was "purchasing the Natural Gas for resale to third parties." These representations are the sort one would expect from a company actually engaged in the business of buying and selling natural gas.

But, in fact, Mahonia and the other offshore SPEs were not trading companies; they were shell entities, incorporated at Chase's behest by a law firm on the Isle of Jersey and controlled by Chase officers. The only outward sign of Mahonia's existence in Jersey is a sign plate hanging in the lobby of the offshore law firm that created it. It has never had employees, office space, a commodities trading desk (much less any gas stations or tankers) or any facilities whatsoever for engaging in the business of commodities trading. Mahonia's total capitalization, which Chase ultimately paid, was only ten British pounds, and Chase paid all of the shell company's legal fees, administrative fees, government filing fees, and photocopying expenses. Mahonia's sole "profit" in each deal was a nominal prearranged fee – never more than $12,500 – again, paid by Chase. (In some deals, the participating SPEs' received no compensation whatever for taking part in the prepaids.)

As Chase has acknowledged, Mahonia was not allowed to do business with parties other than Chase without the bank's explicit permission. Chase acted as its unpaid agent with respect to its operational activities. Mahonia's off-shore directors were not allowed access to Mahonia's bank accounts at Chase and, in fact, were not even sent bank statements. Notably, when Chase officials simply forgot, on more than one occasion, to establish accounts for Mahonia and other SPEs at various pipelines where Enron was supposed to deliver gas – meaning that the SPEs could not actually receive any gas from Enron – no one acting on the SPEs' behalf ever complained. In sum, contrary to appearances, Mahonia had no meaningful existence independent of Chase. The circumstances of the other SPEs Chase used in the prepaids were similar.

The false appearance that the SPEs were bona fide trading companies was, however, necessary if the prepaids were to serve Enron's purposes. Enron's true objective in the transactions was to obtain funds the company could account for as cash flows from operations rather than as cash flows from financing. This, from Enron's perspective, was desirable to help the company maintain an illusory appearance of financial soundness and commercial viability. But, without an ostensibly independent third party standing between Chase and Enron, Enron and its outside auditor, Arthur Andersen, would have had to treat the Chase prepaids, under accepted accounting practices, as debt and cash flows from financing on Enron's financial statements. Accordingly, as one Chase employee acknowledged in an e-mail written in 2001, Mahonia "was set up for Enron's accounting purposes to trade with Enron," and, as an Enron official observed in a recorded conversation in 2001, Chase "want[ed] to make sure that Mahonia seems independent."

At least some Chase officials appreciated the effect that the prepaids, as structured, would have on Enron's financial statements. In 1998, for example, one Chase executive stated, in an e-mail:

> Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities.

In 1999, another Chase executive noted, prior to execution of the June 1999 $500 million Chase prepaid, that he had

> Talked to Joe [an Enron officer] about his interest in a 4th quarter prepay. Joe is looking for $500 MM essential to fill the liquidity gap resulting from the delay in closing the big asset sales of Portland General and the Southern Cone assets. The challenge is that [an Enron executive] wants a structure that gets non-debt treatment on his balance sheet.

5

And, in late 2001, on the eve of Enron's bankruptcy, one Chase executive explained to another, during a tape-recorded conversation, that Enron had used the prepaids because they did not "appear as debt" on its balance sheet.

Senior officials at Chase realized that Enron was hiding "debt capital," including the prepaids, in the price risk management liabilities section of its balance sheet. Recounting a meeting with an Enron executive, one Chase officer reported back to his colleagues that "Enron sponsors about $15 BN [billion] in debt capital of which half is on balance sheet;" in a table summarizing Enron's debt capital, he listed the prepaids in the off-balance sheet section, but provided a note explaining that the prepaids are "[a]ctually on B/S in assets and liabilities from price risk mgmt." In the same e-mail, the Chase official warned that "repackaging" Enron "debt capital" could have a dangerous result, i.e., "some deals that are less know [sic] to the [ratings] agencies [sic] may come to light," which "could well cause some heartburn for Enron."

Chase also knew that, in order to assess accurately Enron's true financial condition, the prepaids would have to be extracted from where they were hidden in Enron's balance sheet and re-characterized as debt. And officials at Chase did just that in an analysis, undertaken in the days leading up to execution of the $350 million September 2001 prepaid transaction, in an effort to assess the bank's overall credit position with respect to Enron. Chase's analysis failed, however, to take into account other deals Enron had done to hide debt, including the Citibank prepaids, which Chase had no means to identify. At a presentation in November 2001, just prior to its collapse, Enron revealed that $4.8 billion of $25 billion in previously undisclosed debt on its books was from prepaid commodities transactions. Chase officers were shocked to discover the full extent of Enron's prepaid obligations. In an e-mail sent to Chase's relationship manager for Enron, a Chase executive exclaimed, "$5B in prepays!!!!!!!!!!!!!!!!!" A little more than an hour later, the relationship manager replied, "Shutup and delete this email."

<u>The Citibank Prepaids</u>: During the period from December 1998 to June 2001, Citibank executed 14 prepaid transactions (including four "rollovers") with Enron totaling about $4.8 billion. All but one of these involved Delta Energy Corporation ["Delta"], an SPE incorporated for Citibank in the Cayman Islands and controlled by Citibank. Structurally, the Citibank prepaids resembled those designed by Chase for Enron: in each case, three separate derivative transactions between three ostensibly independent parties actually constituted a unified, circular structure which, in substance, eliminated price risk and enabled Citibank to make the economic equivalent of loans to Enron that Enron could account for as trades.

The most striking difference between the Citibank and Chase prepaids was the funding mechanism employed by Citibank in several of the deals. In the Chase prepaids, Chase itself funded the transactions, and Citibank did the same in the first of its several prepaids. However, the later Citibank prepaids, representing about

6

$2.4 billion of the total of about $4.8 billion, were financed through the so-called "Yosemite" bond offerings, marketed by Citigroup's then securities subsidiary, Salomon Smith Barney Inc. For each bond offering, a trust – off-balance sheet to Enron – offered credit-linked obligations (notes that were linked to Enron's credit) to "Qualified Institutional Buyers."[4] In practice, many pension funds around the country invested in the Yosemite offerings. Raising money through these bond offerings meant that Citibank effectively transferred to institutional investors the risk that Enron would be unable to repay the funds extended in each prepaid.

Citibank executed four prepaids utilizing the Yosemite structure:

| Name of Transaction | Date of Closing | Approx. Gross Proceeds Obtained by Enron[5] | Date of Maturity |
|---|---|---|---|
| Yosemite I | 12/22/99 | $800 million | 10/2004 |
| Yosemite II | 2/23/00 | $331.8 million | 1/2007 |
| Yosemite III | 8/25/00 | $475 million | 7/2005 |
| Yosemite IV | 5/24/01 | $775.1 million | 4/2006 |

Citibank executives, like their counterparts at Chase, knew full well the import, for Enron, of a transaction structure that appeared as if it were a commodities trade involving an independent offshore third party. Describing Enron's desire for the prepaid structure, one Citibank executive stated, "[t]he use of a prepaid swap was not motivated by tax considerations but instead was necessary in order to report the transaction as part of [an Enron subsidiary's] price risk management activities rather than debt for financial accounting purposes." Another, describing the effect the prepaids had on Enron's balance sheet, bragged "E gets money that gives them cflow but does not show up on books as big D Debt." And a third executive noted, "net net E has money today and pays back a fized [sic] stream over time—net net economically like a loan."

## Conclusions

In the wake of Enron's collapse in December 2001, thousands of its employees lost their jobs, and shareholders saw Enron's stock price plunge from as high as $90 to pennies per share. According to Enron's reorganization plan recently filed with the bankruptcy court, the company's 20,000 creditors, who are owed a

---

[4] Under SEC rules, "Qualified Institutional Buyers" are entities that have sufficient resources and investment sophistication that they have been deemed capable of making investment decisions without the offering material being filed with the SEC for adequate disclosure review. These are commonly referred to as Rule 144(a) offerings.

[5] With respect to Yosemite II and portions of Yosemite IV, the transactions were conducted in foreign currencies. See In Re Enron, et al., Case No. 01-16034, Second Interim Report of Neal Batson, Court-Appointed Examiner, Appendix E, at 9 for details regarding the conversion rate applied here and amounts of foreign currency utilized in each deal and a detailed discussion of the mechanics of Citibank's prepaids.

total of $67 billion, will receive only 14 to 18 cents on the dollar. The bankruptcy and its costly fallout are attributable, in great measure, to the fraudulent accounting schemes that allowed Enron to operate on an unsound basis for years, while it continued to attract financing and investment dollars. Unquestionably, both Chase and Citibank – now, ironically, the two largest creditors in the Enron bankruptcy case – bear a share of the responsibility for this unfortunate state of affairs.

Chase and Citibank knowingly structured the prepaid transactions with Enron in a way that allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent. The prepaids, ostensibly derivative transactions involving prepayment for volumes of crude oil or natural gas, created the appearance that three seemingly independent entities were engaged in legitimate arms-length commodities trading. In fact, the circular structure of the deals eliminated all conceivable market risk, and the transactions, even though they were handled by the derivatives departments, were really disguised loans. Enron should have recorded the prepaids as bank or credit financings and the cash received as cash flows from financings. It did neither. Instead, it recorded the debt as liabilities from price risk management activities and the cash as cash flows from operating activities. As a consequence, Enron continued to function, even as billions of dollars worth of debt-like obligations from the prepaids accumulated on its books, hidden from the view of investors, creditors and regulators alike.

On account of their role in the Enron debacle, both J.P. Morgan Chase & Co. and Citigroup have entered settlement agreements today with this office and with banking and securities regulators, calling for payments in the amount of $308 million.[6] Citibank fully cooperated with our investigation from the outset and began early on, in public statements and through internal changes, to disassociate itself from the type of business done in the Enron prepaids. This was not the case with Chase, and, accordingly, our investigation focused more intensively on the Chase prepaids. I am pleased, however, that both institutions have now renounced the policies and procedures which led to their involvement in the Enron debacle and have adopted reforms to see that nothing similar happens again.

We cannot, however, rest easy after the agreements reached today. Much more needs to be done to address, on a wider scale, the self-serving practices and failures of oversight that led to Chase's and Citibank's facilitation of the Enron fraud. All financial institutions need to take a broad view of their responsibilities to assess the economic substance and consequences of the transactions they enter into. It is not sufficient, as we found in examining the Enron prepaids, for a bank merely to assure itself that each separate component of a set of interrelated transactions, viewed in isolation, falls within statutory and regulatory limits. Bankers – and the lawyers and accountants they employ – all need to take off the blinders and judge the appropriateness of interrelated transactions as a whole. For accounting purposes, to take one example, it is not sufficient to determine that each line of a

---

[6] Of this total, $18.75 million is to be paid by Citibank, pursuant to its settlement with the SEC, for transactions, similar to the Enron prepaids, that Citibank engaged in with Dynegy, Inc.

financial statement can be defended under GAAP. Instead, accountants must judge whether the financial statement, taken as a whole, fairly presents the financial activities and condition of the company issuing it.

Financial institutions must also consider what use their clients intend to make of the transactions and whether, given their clients' intentions, the true nature of the transactions will be transparent to investors or other interested parties. Both Chase and Citibank knew that Enron was engaged in financial chicanery, but closed their eyes to it. Had officials at these institutions taken a clear-eyed look at Enron's intentions and their own responsibilities from the outset, much of the ensuing harm that accrued to them and to innocent third parties might have been avoided. These two banks have now pledged to adopt a broader view of their responsibilities in future deals. Similar standards must be adopted and enforced across the board in the financial industry.

The use of special purpose entities calls for particular scrutiny. While they have legitimate uses in leasing transactions and structured finance, SPEs can also be the source of much mischief. Because they are created for a specific purpose and are otherwise unknown to the marketplace, SPEs can be used, as they were in the Enron prepaids, to obfuscate the true nature of economic transactions. When used for legitimate purposes, SPEs do not have to be shrouded in secrecy; in any case where SPEs are used, the real parties in interest should disclose who caused them to be created, who controls their activities and what their true role is in the specific transaction. The financial industry and regulators need to make certain that SPEs are used only when there is a genuine need and only when their function is transparent to all concerned parties, including investors, creditors and regulators.

In no case should a bank or other financial institution use, or be permitted to use, SPEs that are chartered or domiciled in offshore jurisdictions which have unreasonably strict corporate and bank secrecy laws – like the Cayman Islands, the Bahamas or the British Virgin Islands. In this case, Delta, Citibank's SPE, was a Caymans corporation; however, Citibank's cooperative posture made it unnecessary for us to extend our investigation to the Caymans. Nonetheless, our experience in past cases has shown that that process would have been, at best, time-consuming, costly and frustrating.

While some offshore jurisdictions – notably the Isle of Jersey where Mahonia was incorporated – have shown an increased willingness to share information, many more, like the Caymans, remain intractable. Though secrecy jurisdictions may pay lip service to treaties and international protocols, their laws and practices make it extraordinarily difficult, and often impossible, for investors, regulators or law enforcement to obtain needed information on a timely basis. The facts concerning the establishment, control and activities of an SPE ostensibly located in one of these jurisdictions may remain hidden indefinitely unless alternative sources of information are found. It is courting disaster for responsible authorities to continue to permit SPEs to be set up in offshore secrecy havens.

9

      In truth, this is just one more in a long list of compelling reasons to stop banks and other financial institutions in the United States, at long last, from conducting any business whatever in the notoriously uncooperative secrecy jurisdictions. The dimensions of the problem posed by offshore secrecy havens should not be underestimated. There are nearly $750 billion U.S. dollars on deposit in Grand Cayman alone – roughly twice the amount on deposit in all the banks in New York City – and 47 of the world's 50 largest banks are licensed to maintain offices there. While some of this money may be there for legitimate purposes, much of it has been put there to avoid taxes and responsible regulation in this country, as well as to avoid the transparency in financial activities that is essential to fair dealing in business and the proper functioning of the securities markets. And in the worst cases, U.S. dollars are deposited offshore to be laundered and utilized for purposes of organized criminal activities and international terrorism. It is about time we got serious about getting banks that do business in the United States out of places like the Caymans.

---

      If there is a positive note to be struck about this aspect of the Enron case, it is that two major banks have publicly committed themselves, if belatedly, to internal changes which will promote integrity and transparency in financial transactions. This is an important step in the right direction. Other financial institutions would be well advised to follow this lead; federal and state authorities should make it clear that institutions which, instead, continue to engage in questionable transactions risk the loss, not only of their reputations and assets, but of their franchises as well. I have suggested additional reforms and some actions the government can take. I trust that, in time, other lessons will be drawn from this episode that will help avoid similar financial tragedies in the future.

                                      Sincerely,

                                        Robert M. Morgenthau

## ADDENDUM

Enron employees designed the following tombstone, a graphic commemorating the $650 million June 2000 prepaid transaction between Chase and Enron.



This transaction had the same structure that Chase used for all the prepaids, beginning in 1998. It had three primary components, all of which were executed in contemplation of one another:

1. A prepaid forward contract between Chase and Mahonia;
2. A matching prepaid forward contract between an Enron subsidiary and Mahonia; and
3. A series of swaps and physical sales between Chase and Enron.

The economic effect of the deal was, as the tombstone accurately heralded, an unbroken circle: the commodity, natural gas, flowed in a complete circle, from Enron to Mahonia to Chase and back to Enron.

Pursuant to the terms of their contract, Chase paid Mahonia about $650 million on June 29, 2000 for Mahonia's promise to deliver to Chase 264,211,000 mmBtus of natural gas during the period from October 2000 to June 2005. At the same time, Mahonia and an Enron subsidiary, Enron North America ["ENA"],

11

entered into a mirror-image prepaid forward contract, pursuant to which Mahonia paid ENA about $650 million on June 28th in return for ENA's promise to deliver to Mahonia 264,211,000 mmBtus during the same period. In short, all the natural gas ENA sent to Mahonia was to be delivered to Chase, and every dollar Mahonia received from Chase – save the $5,000 prearranged fee Chase paid Mahonia to play a role in the transaction – went to Enron.

To complete the circle, a series of agreements between Enron and Chase, executed simultaneously with the prepaid forward contracts, sent all the natural gas from Chase back to Enron; the agreements also effectively eliminated all price risk from the deal. This was accomplished by Chase's agreeing to circle 100% of the natural gas it was to receive from Mahonia, an aggregate of 242,900,000 mmBtus of natural gas, back to Enron in exchange for Enron's payment to Chase of the floating market price. Then, through a set of fixed-for-floating swaps, Chase agreed to pay Enron the floating market price of the natural gas – in economic terms the exact same amount of money it had just received from Enron – in exchange for Enron's payment to Chase of a fixed price. Chase was thereby guaranteed a fixed return, regardless of any movement in the price of natural gas during the life of the transaction.

For arranging the transaction, Chase received an upfront fee of about $1.6 million. The various agreements, if carried out as anticipated, required Enron to pay Chase, in total, about $800 million over the life of the transaction – in effect, $650 million in return of principal and $150 million in interest and fees.