EXECUTION COPY

**AGREEMENT**

between

**ENRON CORP.**
(an Oregon corporation)

and

**CITIBANK, N.A.**

Dated as of February 23, 2000

NY3:#7234572v8

AB000081592

## TABLE OF CONTENTS

Page

ARTICLE I  DEFINITIONS ........................................................................................... 1
    Section 1.1  Definitions................................................................................... 1

ARTICLE II  CLOSING.................................................................................................. 4
    Section 2.1  Time and Place of Closing........................................................... 4
    Section 2.2  Closing ........................................................................................ 4

ARTICLE III  CONDITIONS PRECEDENT .................................................................. 4
    Section 3.1  Conditions to the Occurrence of the Closing............................... 4

ARTICLE IV  REPRESENTATIONS AND WARRANTIES ......................................... 5
    Section 4.1  Representations and Warranties of Enron.................................... 5

ARTICLE V  OBLIGATIONS; CONSENTS; PAYMENTS, ETC............................... 6
    Section 5.1  Obligations................................................................................... 6
    Section 5.2  Consent to Transaction Documents and Enron Closing Date Documents. 12
    Section 5.3  Payments and Computations........................................................ 12

ARTICLE VI  INDEMNIFICATION .............................................................................. 12
    Section 6.1  General Indemnification ............................................................. 12

ARTICLE VII  MISCELLANEOUS................................................................................ 15
    Section 7.1  Amendments, Etc. ....................................................................... 15
    Section 7.2  Notices ........................................................................................ 15
    Section 7.3  Severability of Provisions ........................................................... 16
    Section 7.4  Binding Effect and Transfers ...................................................... 16
    Section 7.5  General Limitation of Liability. ................................................... 16
    Section 7.6  Counterparts................................................................................. 17
    Section 7.7  Governing Law. ........................................................................... 17
    Section 7.8  Jurisdiction; Waiver of Jury Trial ............................................... 17
    Section 7.9  No Third-Party Beneficiaries ...................................................... 18
    Section 7.10 Survival; Termination ................................................................. 18
    Section 7.11 Effect of Headings ...................................................................... 18
    Section 7.12 Amendments, Waivers, Etc......................................................... 18
    Section 7.13 Entire Agreement ....................................................................... 19
    Section 7.14 Expenses ..................................................................................... 19
    Section 7.15 No Bankruptcy Petition............................................................... 19
    Section 7.16 Confidentiality Regarding Enron Investments............................. 19

SCHEDULE 1 Initial Company Investments

AB000081593

This AGREEMENT, dated as of February 23, 2000 (this "Agreement") is by and between (i) ENRON CORP., an Oregon corporation ("Enron"), and (ii) CITIBANK, N.A. ("Citibank").

WHEREAS, the willingness of Citibank to enter into the Citibank Swap (as defined below) is subject to the effectiveness of this Agreement and the effectiveness of the Citibank Swap is a condition precedent to the consummation of the transactions contemplated by the Transaction Documents (as defined below); and

WHEREAS, each of the parties hereto is willing to assume the duties and obligations ascribed to it hereunder on the terms and conditions expressly set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1    Definitions. Each capitalized term used herein and not otherwise defined herein shall have the definition assigned to that term in Appendix A to the Collateral Security Agreement dated as of February 23, 2000 (the "Collateral Security Agreement") among Yosemite Securities Company Ltd. (the "Company"), Citibank, the Indenture Trustee, the Account Bank, the Securities Intermediary and the Collateral Agent, and the principles of interpretation set forth in such Appendix A shall apply to the terms defined herein and in such Appendix A. In addition, as used herein:

"Citibank Periodic Payment Amount" has the meaning given to such term in Section 5.1(a)(ii).

"Closing Date Documents" has the meaning given to such term in the Closing Agreement.

"Confirmation Notice" has the meaning given to such term in Section 5.1(c).

"Consolidated" refers to the consolidation of the accounts of Enron and its Subsidiaries in accordance with U.S. GAAP.

"Consolidated Net Worth" means at any date the Consolidated stockholders' equity of Enron and its Consolidated Subsidiaries (excluding any Redeemable Preferred Stock of Enron).

"Debt" of any Person means, at any date, without duplication, (i) obligations for the repayment of money borrowed which are or should be shown on a balance sheet as debt in accordance with U.S. GAAP, (ii) obligations as lessee under leases which, in accordance with U.S. GAAP, are capital leases, and (iii) guaranties of payment or collection of any obligations described in clauses (i) and (ii) of other Persons, provided, that clauses (i) and (ii) include, in the case of obligations of Enron or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with U.S. GAAP; provided, further, that none of the following shall constitute Debt: (A) transfers of Permitted Receivables pursuant to a Permitted Receivables Purchase Facility (as such terms are defined in the Enron Revolver), and indemnification, recourse or

NY3:#7234572v8

AB000081594

repurchase obligations thereunder, (B) the liability of any Person as a general partner of a partnership for Debt of such partnership, if the partnership is not a Subsidiary of such Person, and (C) obligations (other than borrowings, capital leases or financial guaranties by Enron or any Subsidiary) related to the sale, purchase or delivery of hydrocarbons in respect of production payments conveyed in transfers constituting sales under U.S. GAAP.

"<u>Default Rate</u>" means, on any day, a rate per annum equal to the base rate announced by Citibank and in effect for such day plus 2%.

"<u>Default Swap</u>" means, for a particular Series, one or more credit default swaps to be entered into by Citibank (with Enron as the "Reference Entity" or one or more Enron Investments as the "Enron Reference Obligation") having a notional amount not in excess of the Notional Amount of, and a duration not in excess of the duration of, the Confirmation issued by Citibank with respect to certain Permitted Investments under the Citibank Swap that are specified by Citibank in the related Confirmation to be related to such Series and having such other terms, and in form and substance, satisfactory to Citibank in its sole discretion.

"<u>Default Swap Premium</u>" means, as of any day of determination, all amounts due and payable by or on behalf of the counterparty, as buyer under the related Default Swap, to Citibank, as seller under the related Default Swap, in respect of credit protection.

"<u>Designated Reduction Investment</u>" has the meaning given to such term in Section 5.1(c).

"<u>Enron Closing Date Documents</u>" shall mean the Closing Agreement, the Certificate Purchase Agreement, the Note Purchase Agreement, the Tax Indemnification Agreement, this Agreement and the Fee Letters referred to in this Agreement.

"<u>Enron Debt Security</u>" means the £15,500,000 Enron Debt Security (Series 2000-A) dated the Closing Date.

"<u>Enron Event of Default</u>" shall mean the occurrence at any time of any of the following events:

(a)    Enron shall fail to pay (i) any amount payable by Enron under Section 5 of this Agreement (other than any fee payable under any Fee Letter) for more than five days after such payment becomes due and payable under this Agreement, or (ii) any other amount payable by Enron under this Agreement or any Fee Letter for more than 15 days after such amount becomes due and payable under this Agreement or such Fee Letter, as the case may be; or

(b)    Any representation or warranty made by Enron (or any of its officers) (including representations and warranties deemed made pursuant to Section 4.1) under this Agreement or any Fee Letter shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)    Enron shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any Fee Letter on its part to be performed or observed if such failure shall remain unremedied for 30 days after written notice thereof shall have been given to Enron by Citibank; or

(d)    Enron shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the

AB000081595

benefit of creditors; or any proceeding shall be instituted by or against Enron seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), shall remain undismissed or unstayed for a period of 60 days; or Enron shall take any corporate action to authorize any of the actions set forth above in this clause (d).

"Enron Periodic Payment Amount" has the meaning given to such term in Section 5.1(a)(i).

"Enron Reduction Notice" has the meaning given to such term in Section 5.1(c).

"Enron Revolver" shall mean the Revolving Credit Agreement dated as of August 3, 1999 among Enron, the Banks named therein and Citibank, as Administrative Agent, or any successor or replacement facility therefor.

"Enron Settlement Amount" has the meaning given to such term in Section 5.1(c).

"Fee Letter" has the meaning given to such term in Section 5.3.

"Fixed Payment Date" means the Business Day immediately preceding each February 23, commencing February 23, 2001, subject with respect to each Transaction to the provisions of Paragraph 5 (Partial Terminations) thereof.

"Final Offering Memorandum" means the Offering Memorandum dated February 15, 2000, and the Supplement thereto dated February 15, 2000, relating to the issuance and sale of the Notes.

"Indemnified Person" has the meaning given to such term in Section 6.1(b).

"Initial Fee Letter" means the Fee Letter dated of even date herewith.

"Notional Reduction Amount" has the meaning given to such term in Section 5.1(c).

"Preliminary Offering Memorandum" means the Preliminary Offering Memorandum dated January 19, 2000, and the Preliminary Supplement thereto dated January 19, 2000, relating to the issuance and sale of the Notes.

"Reduction" has the meaning given to such term in Section 5.1(c).

"Reduction Date" has the meaning given to such term in Section 5.1(c).

"Series Citibank Fixed Rate" means, with respect to a Series and a Fixed Payment Date, the Citibank Fixed Rate for all Transactions related to such Series as of such Fixed Payment Date.

"Series Citibank Periodic Payment Amount" has the meaning given to such term in Section 5.1(a).

"Series Enron Periodic Payment Amount" has the meaning given to such term in Section 5.1(a).

AB000081596

"Subsidiary" of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; provided, however, that no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of Enron, unless such entity is a Consolidated Subsidiary of Enron, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with U.S. GAAP. Unless otherwise provided or the context otherwise requires, the term "Subsidiary" when used herein shall refer to a Subsidiary of Enron.

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions or withholdings (including, without limitation, income, franchise, gross receipts, sales, rental, use, turnover, value added, ad valorem, transfer, recording, property (tangible and intangible), excise and stamp taxes) of any nature whatsoever, together with any and all assessments, penalties, fines, additions and interest relating thereto.

"Termination Date" has the meaning given to such term in Section 5.1(b).

## ARTICLE II

## CLOSING

Section 2.1    Time and Place of Closing.  The closing of the transactions described in Section 2.2 hereof shall commence at 9:00 a.m., London time, on the Closing Date at the offices of Milbank, Tweed, Hadley & McCloy LLP, Dashwood House, 69 Old Broad Street, London, EC2M 1QS England, or at such other time and at such other location as shall be agreed by the parties hereto.

Section 2.2    Closing.  On the Closing Date, subject to the terms and conditions hereof and thereof (including without limitation approval by Enron of the terms and conditions of each Confirmation covering the Company Investments listed on Schedule 1 hereto) and on the basis of the representations and warranties set forth herein and therein, Citibank and the Company will enter into the Citibank Swap, Citibank will issue Confirmations covering the Company Investments to be purchased on the Closing Date and Enron will pay to Citibank the fees specified in the Initial Fee Letter and all other fees and expenses provided for in Article VII.

## ARTICLE III

## CONDITIONS PRECEDENT

Section 3.1    Conditions to the Occurrence of the Closing.  The obligation of each of Enron and Citibank to enter into the transactions described in Section 2.2 hereof on the Closing Date shall be subject to the satisfaction (or waiver by such Person) on or prior to the Closing Date of the conditions precedent to the Closing with respect to this Agreement and the Closing Agreement and the obligation of Citibank to enter into such transactions is further subject to the following additional conditions precedent:

(i)    Receipt of a certificate of Enron dated the Closing Date in form and substance reasonably satisfactory to Citibank, certifying as to: (A) the representations and warranties of Enron set

AB000081597

forth in this Agreement are true and correct on and as of the Closing Date (both immediately prior to the consummation of the transactions intended to occur on the Closing Date and also after giving effect thereto) in all material respects as if made on and as of such date (or, if stated to have been made solely as of an earlier date, were true and correct as of such date); and (B) immediately before and immediately after the issuance of the Notes on the Closing Date no Enron Event of Default has occurred and is continuing.

        (ii)    Receipt of an opinion of Vinson & Elkins LLP, counsel to Enron, as to this Agreement and the Initial Fee Letter and an opinion of corporate counsel of Enron as to this Agreement and the Initial Fee Letter, in each case in form and substance reasonably satisfactory to Citibank.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

        Section 4.1    Representations and Warranties of Enron.  Enron makes the following representations and warranties to Citibank as of the Closing Date.

        (a)    Corporate Existence and Power.  Enron is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation. Enron has all requisite powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.

        (b)    Corporate and Governmental Authorizations; No Contravention.  The execution, delivery and performance by Enron of this Agreement and the Fee Letters are within Enron's corporate powers, have been duly authorized by all necessary corporate action of Enron, require, in respect of Enron, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to Enron or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of Enron or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon Enron or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of Enron.

        (c)    Binding Effect.  This Agreement and the Initial Fee Letter are, and each other Fee Letter, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of Enron enforceable against Enron in accordance with their respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

        (d)    No Defaults.  No Enron Event of Default has occurred and is continuing.

        (e)    Special Enron Investment. The Enron Debt Security is a legal, valid and binding obligation of Enron enforceable against Enron in accordance with its terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity, and the Enron Debt Security is not subject in whole or in part to any defense or limitation based upon any allegation of usury.

NY3:#7234572v8

5

AB000081598

## ARTICLE V

## OBLIGATIONS; CONSENTS; PAYMENTS, ETC.

Section 5.1    Obligations. So long as the Citibank Swap shall remain in full force and effect:

(a)    Periodic Payments. For each Calculation Period as to which Citibank and the Company are required to make Fixed Payments on a Fixed Payment Date under the terms of the Citibank Swap:

(i)    On such Fixed Payment Date, Enron shall pay to Citibank an amount (the "Enron Periodic Payment Amount") equal to the sum of the Series Enron Periodic Payment Amounts for each Series of Notes. The "Series Enron Periodic Payment Amount" means, with respect to each Series, an amount equal to the sum (if positive) of:

(A)    the product of:

(x)    a rate per annum equal to the sum of (I) the Series Citibank Fixed Rate during such Calculation Period plus (II) the daily weighted average (based on the Notional Amounts of the Confirmations covering the Enron Investments to which the Fee Letters described in this clause (x) relate) percentage compensation payable by Enron on such Fixed Payment Date under each outstanding Fee Letter covering Enron Investments related to such Series;

multiplied by

(y)    the sum of the Weighted Average Notional Amounts during such Calculation Period under each Confirmation covering Enron Investments related to such Series, reduced (if applicable) to give effect to the daily weighted average of the Notional Reduction Amount related to Designated Reduction Investments for each Reduction related to such Series during such Calculation Period;

multiplied by

(z)    the Day Count Fraction for such Calculation Period;

plus

(B)    the product of:

(x)    the Series Citibank Fixed Rate;

multiplied by

(y)    the Weighted Average Notional  Amount under the Confirmation covering Permitted Investments related to such Series during such Calculation Period, reduced (if

AB000081599

applicable) to give effect to the daily weighted average of the Notional Reduction Amount related to Designated Reduction Investments for each Reduction related to such Series during such Calculation Period;

multiplied by

(z)     the Day Count Fraction for such Calculation Period;

minus

(C)     the sum of:

(x)     the aggregate of all Default Swap Premiums (expressed as an amount in Dollars) paid to Citibank in respect of Default Swaps related to Permitted Investments held by the Company in respect of such Series during such Calculation Period;

plus

(y)     the aggregate amount of all Scheduled Interest Receipts on each Enron Investment related to such Series during such Calculation Period.

If the foregoing sum in this Section 5.1(a)(i) is zero or negative, then Enron pays zero under this Section 5.1(a)(i).

(ii)     On such Fixed Payment Date, Citibank shall pay to Enron an amount (the "Citibank Periodic Payment Amount") equal to the sum of the Series Citibank Periodic Payment Amounts for each Series of Notes. The "Series Citibank Periodic Payment Amount" means, with respect to each Series, the absolute value of the amount (if negative) calculated pursuant to Section 5.1(a)(i) for such Series and such Calculation Period. If the foregoing sum in this Section 5.1(a)(ii) is zero or positive, then Citibank pays zero under this Section 5.1(a)(ii).

(iii)     In respect of the period commencing at the end of the Calculation Period that ends four Business Days prior to the Maturity Date of the Related Series and ending on such Maturity Date, Enron shall pay to Citibank and Citibank shall pay to Enron, respectively, on such Maturity Date an amount, calculated as if such four Business Day period were a Calculation Period and otherwise in accordance with clause (i) and clause (ii) above.

(iv)     So long as Citibank shall be the Directing Party, Citibank as Directing Party shall not direct any Actual Interest Receipts received by the Company prior to the next succeeding Fixed Payment Date to be invested in any Temporary Investment other than Enron Commercial Paper maturing on or prior to such date, unless either (A) an Enron Event of Default has occurred and is continuing or (B) Enron has timely instructed Citibank in such capacity to direct the Company to invest all or a portion of such Actual Interest Receipts in other Temporary Investments.

(b)     Enron Event of Default; Remedies. If at any time an Enron Event of Default has occurred and is continuing, Citibank may, by notice to Enron specifying the relevant Enron Event of Default, designate a day not earlier than the day such notice is effective as the date upon which the

AB000081600

obligations of Citibank under this Agreement (including, without limitation, the obligation to make the Citibank Periodic Payment Amount) shall terminate (the "<u>Termination Date</u>"); <u>provided</u> that the Termination Date shall occur automatically upon the occurrence of an Enron Event of Default specified in clause (d) of the definition of such term in Section 1.1 hereof. On the Termination Date, this Agreement (other than Sections 6.1 and 7.5) shall forthwith terminate and each party hereto shall forthwith pay to the other party all amounts then due and payable by such party under this Agreement to the other party, unconditionally and without protest, demand, presentment or any other notice whatsoever, each of which is expressly and irrevocably waived by each party hereto.

(c)    <u>Reduction of Enron Obligations</u>.  Enron shall be entitled at any time and from time to time to reduce the Enron Periodic Payment Amount and the Citibank Periodic Payment Amount (collectively, a "<u>Reduction</u>") by delivering a notice of termination (an "<u>Enron Reduction Notice</u>") to Citibank, which notice will specify (i) the proposed date of such Reduction (the "<u>Reduction Date</u>"), which shall in any event be not less than 40 days after the date of receipt of such Enron Reduction Notice by Citibank, (ii) the notional amount of the proposed reduction (the "<u>Notional Reduction Amount</u>"), (iii) the Company Investment or Company Investments, or portion thereof, to be disposed of in connection with such proposed reduction (each, a "<u>Designated Reduction Investment</u>") and (iv) the Confirmation related to each Designated Reduction Investment.  Enron shall not be entitled to designate the Enron Debt Security as a Designated Reduction Investment other than in connection with an Early Redemption or Optional Tax Redemption, in each case of all outstanding Notes.  Enron shall not be entitled to designate a Permitted Investment related to a Default Swap as a Designated Reduction Investment unless (x) the beneficiary of the related Default Swap has unconditionally agreed with Citibank to terminate the Default Swap on the date of such Reduction or (y) Citibank had granted its prior written consent.  In the case of Permitted Investments, promptly upon receipt of a Reduction Notice, Citibank will obtain and advise Enron of quotations from dealers for the purchase of such Permitted Investments on the Reduction Date.  Not later than the date 35 days before the Reduction Date, Enron will advise Citibank in writing whether or not Enron intends to proceed with such proposed reduction on such Reduction Date (a "<u>Confirmation Notice</u>") and, if Enron intends to proceed, Enron will pay to an escrow account designated by Citibank the amount of the Optional Early Termination Settlement Amount (or deliver to Citibank a letter of credit in such amount in form and substance, and from a banking institution, satisfactory in all respects to Citibank) on the date of such Confirmation Notice and such Confirmation Notice will contain Enron's irrevocable and unconditional confirmation that Enron will indemnify Citibank in full on demand on the Reduction Date for any shortfall associated with any termination payments owing by Citibank under any Default Swap on such Reduction Date as a result of a failure by Citibank to receive sufficient payments and proceeds on account of such Designated Reduction Investments to pay in full such termination payments on the dates when due and any other Claims in connection therewith (collectively, the "<u>Enron Settlement Amount</u>").  Citibank will pay back to Enron on the day after such Reduction Date the portion (if any) of such escrowed amount (or release and return to Enron the unutilized portion of such letter of credit) not applied toward an Early Redemption of the Notes of the Series relating to the Designated Reduction Investments.

(d)    <u>Substitutions</u>.  Except as set forth in the next succeeding sentence, Citibank hereby agrees that it shall not exercise its rights under the Citibank Swap to issue any Confirmations in respect of Enron Investments or substitute Enron Investments for other Company Investments without the prior written consent of Enron.  Notwithstanding the foregoing sentence, if an Enron Bankruptcy, an Enron Investment Default Event with respect to a particular Enron Investment held by the Company or an Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1 has occurred, then Citibank may exercise such rights under the Citibank Swap without the prior written consent of Enron.  In addition, if an Enron Failure to Pay has occurred and the Company holds Permitted Investments, Citibank may exercise its rights under the Citibank Swap with respect to such Permitted Investments without the prior written consent of Enron if Citibank is exercising such rights in connection

AB000081601

with (i) any Enron Investment received by Citibank under a Default Swap or (ii) the substitution of different Permitted Investments for such Permitted Investments.

Enron shall, subject to the proviso in this Section 5.1(d), be entitled to require Citibank to exercise (i) on the Closing Date, the right under the Citibank Swap to issue Confirmations in respect of Enron Investments to be acquired by the Company substantially simultaneously therewith as designated in writing by Enron (and Enron hereby so designates the Enron Investments listed on Schedule 1 hereto) and (ii) at any time after the Closing Date, the right under the Citibank Swap to substitute one or more Company Investments then held by the Company (in the case of Permitted Investments, as selected by Citibank) with Company Investments designated in writing by Enron (or, in the case of Permitted Investments, as selected by Citibank) having the same aggregate outstanding amount and to issue one or more Confirmations (or amend existing Confirmations), as appropriate, to cover such substitute Company Investments in accordance with Company Investment Substitution Criteria; provided that (I) Enron and Citibank shall have agreed in a Fee Letter on the terms of compensation to Citibank with respect thereto; (II) no Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1, Enron Bankruptcy or Enron Investment Default Event with respect to a particular Enron Investment held by the Company has occurred and is continuing and, if the transaction will involve the acquisition of an Enron Investment, no Enron Investment Default Event has occurred and is continuing with respect to such Enron Investment; (III) Citibank is satisfied in its good faith judgment that the transactions contemplated by the acquisition by the Company of such Company Investment or the substitution thereof for such Company Investments (and, in the case of Permitted Investments, the transactions contemplated by any related Default Swap), as the case may be, will not contravene any Applicable Law or result in any Claim against or Tax payable by Citibank for which Claim or Tax Enron has not provided indemnification reasonably satisfactory to Citibank; (IV) all consents necessary or appropriate from all Persons have been obtained for the acquisition of such Company Investments by Citibank or the Company (as determined by Citibank), the Granting of a Lien thereon pursuant to the Collateral Security Agreement with the priority contemplated thereby and the exercise of rights and remedies by the Collateral Agent under the Collateral Security Agreement (including, without limitation, the transfer thereof to such Person as the Collateral Agent may determine); (V) the Company shall have received sufficient information, including without limitation representations and warranties as contemplated by the last sentence of Section 3.2(a) of the Collateral Security Agreement, to enable the Company to issue a Company Order in the form contemplated by said Section with respect to such Company Investments; (VI) in the case of a substitution involving Company Investments then held by the Company constituting Permitted Investments, the beneficiary of any related Default Swap will have unconditionally agreed with Citibank to terminate such Default Swap on the date of substitution thereof; and (VII) in the case of a transaction involving an Enron Investment to be delivered to the Company, the identity of any agent or other representative of the lenders under such Enron Investment shall be reasonably satisfactory to Citibank.  Notwithstanding anything to the contrary contained in this Agreement, Enron shall not at any time be entitled to require Citibank to exercise the right under the Citibank Swap to substitute the Enron Debt Security for any other Company Investment.

(e)    Failure to Agree.  If: (i) Enron and Citibank cannot agree on the specification of a replacement Company Investment for any Company Investment as to which an Enron Investment Default Event with respect to a particular Enron Investment held by the Company has occurred (a "Defaulted Company Investment") by the earlier of the date 22 days after the date of default thereon and the date four Business Days before maturity of the related Series, then Citibank shall be entitled (but not required) to deliver to the Company Deliverable Obligations if available through commercially reasonable efforts (as determined by Citibank in its sole discretion) or, if no Deliverable Obligations are so available, Company Investments, in each case as selected by Citibank in its sole discretion; (ii) Citibank shall be obligated under the Citibank Swap to issue or amend a Confirmation to cover new Company Investments, but Enron and Citibank have not agreed on a Fee Letter relating to a replacement Company Investment or

AB000081602

the conditions to consummation of such transaction set forth in Section 5.1(d) have not been satisfied or waived by Citibank, then Citibank shall be entitled to cause the Company to acquire Deliverable Obligations if available through reasonable commercial efforts (as determined by Citibank in its sole discretion) or, if no Deliverable Obligations are so available, Company Investments, in each case as selected by Citibank in its sole discretion; and (iii) the definition of "Bankruptcy" in any Default Swap does not conform to the definition of Bankruptcy contained in Appendix A to the Collateral Security Agreement, then Citibank shall be entitled to deliver any Enron Investment received by Citibank under such Default Swap in substitution for Permitted Investments held by the Company. Citibank shall be entitled to take such actions and issue or amend a Confirmation with respect to such new Company Investments without the need to obtain the prior written consent of Enron. Notwithstanding anything to the contrary in this Section 5.1(e), Citibank shall not be entitled to refuse to agree to the specification by Enron as a replacement Company Investment for an existing Company Investment of a Company Investment constituting a bond, loan or other credit facility evidencing indebtedness for borrowed money on which Enron is the direct obligor or an unconditional guarantor (but excluding in any event a participation interest in any such indebtedness).

(f)    Procedures for New Confirmations and Substitutions.  In connection with the exercise by Enron of its rights under Section 5.1(d), the following procedures shall apply:

(i)    Enron shall provide written notice to Citibank of each proposed new Enron Investment, together with true and complete copies of all Underlying Instruments related thereto;

(ii)    Enron shall use reasonable efforts to provide Citibank additional information with respect to such proposed new Enron Investments, not later than five (5) days after any request by Citibank for such additional information;

(iii)    Citibank shall provide to Enron written notice of Citibank's proposal with respect to pricing for such proposed new Enron Investment not later than forty-five (45) days after Citibank has received all information requested by Citibank with respect thereto;

(iv)    promptly upon agreement thereon between the parties, Enron and Citibank shall execute a Fee Letter specifying, inter alia, the agreed pricing with respect to such proposed new Enron Investment;

(v)    not later than one Business Day prior to the proposed date of acquisition by the Company of such proposed new Enron Investment, subject to the satisfaction (or waiver by Citibank) of the conditions to consummation of the proposed transaction set forth in Section 5.1(d), Enron will pay in full (or cause the payment in full) all amounts necessary to remove the original Enron Investment from the Company and enable the Company to acquire the proposed new Enron Investment; and

(vi)    on the proposed date of acquisition by the Company of such proposed new Enron Investment, subject to satisfaction (or waiver by Citibank) of the conditions to consummation of the proposed transaction set forth in Section 5.1(d), Citibank shall terminate any existing Confirmation and issue a new Confirmation covering such proposed new Enron Investment, all in accordance with Section 5.1(d) and the Citibank Swap. Enron unconditionally and irrevocably agrees to indemnify Citibank in full on demand for any Claims in connection with a failure by Enron to deliver (or cause the delivery) to the Company on the terms and conditions of this Agreement of any proposed

AB000081603

new Enron Investments on the proposed date of acquisition thereof by the Company; <u>provided</u>, that in mitigation of such Claim Enron may deliver (or cause the delivery of) Deliverable Obligations to the Company in lieu of such proposed new Enron Investments.

(g)    <u>Default Swaps</u>. Citibank shall be entitled to designate the counterparty to any Default Swap, subject to Enron's prior approval. Citibank shall deliver to Enron copies of all Default Swaps issued by Citibank in connection with this Agreement.

(h)    <u>Enron Cure Rights; Acceptable Replacement Swap Counterparty; Replacement Collateral Agent; Replacement Directing Party</u>. Citibank agrees that (i) if an "Event of Default" or a "Termination Event" under and as defined in the Citibank Swap has occurred and is continuing (other than an "Event of Default" resulting in an "Automatic Early Termination" as provided in the Citibank Swap), then Citibank shall give written notice of such "Event of Default" or "Termination Event" to Enron, (ii) if a Swap Termination Date attributable to Citibank shall occur, Citibank shall take such actions and execute such documents (at the sole expense of Citibank) reasonably requested by Enron as Citibank may lawfully undertake or execute to enable Enron to cause the Company to accept an Acceptable Replacement Swap Counterparty for Citibank as swap counterparty under the Citibank Swap, (iii) so long as no Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1, Enron Bankruptcy or Enron Investment Default Event related to a particular Enron Investment held by the Company has occurred and is continuing, Citibank shall not agree to a replacement Collateral Agent under Article II of the Collateral Security Agreement or amend, waive or otherwise modify any term of any Transaction Document, Closing Date Document or Underlying Instrument without the prior written consent of Enron (such consent not to be unreasonably withheld or delayed) and (iv) so long as no Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1, Enron Bankruptcy or Enron Investment Default Event related to a particular Enron Investment held by the Company has occurred and is continuing, if Citibank desires to resign as Directing Party, Citibank shall consult with Enron regarding Citibank's desire to resign as Directing Party and the identity of any successor Directing Party until such time as the appointment of such successor as Directing Party becomes effective in accordance with the terms of the Collateral Security Agreement.

(i)    <u>Notices Received by Citibank</u>. Citibank will provide promptly to Enron a copy of any written notice Citibank receives under the Transaction Documents or Closing Date Documents that has not been sent directly to Enron; <u>provided</u> that any failure to give or delay in giving such a copy of any such notice shall not relieve Enron of any of its obligations hereunder or under any of the Transaction Documents or Enron Closing Date Documents.

Section 5.2    <u>Consent to Transaction Documents and Enron Closing Date Documents</u>. Enron acknowledges receipt of true and complete copies of the Transaction Documents and Enron Closing Date Documents as in effect on the Closing Date and acknowledges and consents to the exercise by Citibank of the rights and remedies afforded to Citibank thereunder, whether as swap counterparty under the Citibank Swap, Calculation Agent, Directing Party or otherwise.

Section 5.3    <u>Payments and Computations</u>. Enron shall make each payment owing by Enron under this Agreement or under any agreements between Enron and Citibank relating to compensation to Citibank and reimbursement of expenses (including, without limitation, reasonable fees and expenses of counsel) for the transactions contemplated hereby (each, a "<u>Fee Letter</u>") not later than 11:00 A.M. London time on the day when due in pounds sterling to Citibank at Citibank London, SWIFT: CITIGB2L, Favor: Citibank NY, Account No. 600008, and Citibank shall make each payment owing by Citibank under this Agreement to Enron not later than 11:00 A.M. London time on the day when due in

AB000081604

pounds sterling to Enron at Citibank, N.A., [_____, Account No. _____], in each case in same day funds, without set-off, counterclaim or any other deduction whatsoever. Whenever any payment hereunder or thereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or compensation, as the case may be. Without limitation of any other provision of this Agreement, (a) if Enron shall fail to pay any amount owing by Enron under this Article V, Article VI or any other provision of this Agreement or any Fee Letter on the date when due hereunder or thereunder (whether on a scheduled payment date, on the Termination Date, on an Early Termination Date or otherwise), Enron shall pay interest on such overdue amount on demand from time to time at the Default Rate for each day from and including the due date thereof until such overdue amount is paid in full at the Default Rate and (b) if Citibank shall fail to pay any amount owing by Citibank under this Article V or any other provision of this Agreement on the date when due hereunder, Citibank shall pay interest on such overdue amount on demand from time to time by Enron for each day from and including the due date thereof until such overdue amount is paid in full at the Default Rate.

## ARTICLE VI

## INDEMNIFICATION

Section 6.1    General Indemnification. (a)    Claims Defined. For the purposes of this Section 6.1, "Claims" shall mean (a) any and all costs, expenses, liabilities, obligations payable or owed to third parties, including any and all losses (except as otherwise provided below), damages, penalties, actions or suits or claims of whatsoever kind or nature (whether or not on the basis of negligence, strict or absolute liability or liability in tort) which may be imposed on, incurred by, suffered by or asserted against an Indemnified Person in connection therewith or related thereto (b) any and all amounts required to be withheld or deducted from payments due to Citibank under the Citibank Swap or due to the Company under a Company Investment and in either case for or on account of any present or future Taxes and, (c) except as otherwise expressly provided in this Section 6.1, all reasonable out-of-pocket costs, disbursements and expenses (including legal fees and expenses) paid or incurred by an Indemnified Person in connection therewith or related thereto, subject to Section 7.14 hereof.

(b)    Indemnified Person Defined. For the purposes of this Section 6.1, "Indemnified Person" means Citibank, whether in its capacity as swap counterparty under the Citibank Swap, Directing Party (subject to Section 6.1(j) hereof), or Calculation Agent, and its directors, officers, employees, successors, permitted assigns, consultants, attorneys and accountants.

(c)    Claims Indemnified. Whether or not (i) any of the Notes or Certificates are sold or the Closing occurs or (ii) such Indemnified Person shall be indemnified as to such Claim by any other Person, but subject to the exclusions stated in paragraph (d) below, Enron agrees to indemnify, protect, defend and hold harmless each Indemnified Person against Claims directly or indirectly resulting from or arising out of or alleged to result from or arise out of:

(i)    performance by Citibank of its obligations and duties or exercise by Citibank of its rights and privileges under this Agreement, the Closing Date Documents or any other Transaction Document, in each case in accordance with the terms and conditions hereof or thereof, as appropriate;

(ii)    any act or omission (whether negligent or otherwise) by Enron or any breach of or failure to perform or observe, or any other non-compliance with, any covenant, condition or agreement to be performed by, or other obligation of, Enron under this Agreement, any Fee Letter or any of the Transaction Documents or Enron Closing Date Documents, or the

AB000081605

falsity of any representation or warranty (without giving effect to any qualification with respect to the materiality thereof) of Enron in any of this Agreement, any Fee Letter or any Enron Closing Date Documents or in any document or certificate delivered by Enron in connection therewith;

(iii)   the offer, sale or delivery of any Notes or Certificates; or

(iv)   any violation of law, rule, regulation or order by Enron or any Affiliate of Enron or their respective directors, officers, employees, agents or servants.

(d)   <u>Claims Excluded</u>. The following are excluded from Enron's agreement to indemnify under this Section 6.1: with respect to any particular Indemnified Person, Claims to the extent resulting from (w) the bad faith, gross negligence or willful misconduct of any Indemnified Person, (x) any actual breach of, any failure to perform or observe, or any other non-compliance with, any covenant, condition or agreement to be performed by, or other obligation of, Citibank under this Agreement, any Closing Date Document, any Fee Letter or any other Transaction Document or the falsity of any representation or warranty of Citibank in this Agreement, any Closing Date Document, any Fee Letter or any other Transaction Document or in a document or certificate delivered in connection herewith or therewith, (y) any untrue statement in the Preliminary Offering Memorandum or the Offering Memorandum or any omission to state a fact therein, in each case with respect to any Citibank Filed Document (as defined in the Note Purchase Agreement) or any financial statements, the notes thereto and the other financial or statistical information regarding Citibank, N.A. or Citicorp contained or incorporated by reference in or omitted from the Preliminary Offering Memorandum or the Final Offering Memorandum or any information concerning Citibank, N.A. or Citicorp set forth under or incorporated by reference under the headings "Available Information - Citibank, N.A." or "Description of Citibank, N.A." or (z) any payment obligation or other obligation payable or performable by Citibank under Part 5(d) of the Schedule to the Citibank Swap.

(e)   <u>Limitations on Indemnification Obligations</u>. The indemnities provided in this Agreement shall be subject to the following limitations:

(i)   <u>Limitation by Law</u>. Such indemnity shall be enforced only to the maximum extent permitted by law.

(ii)   <u>No Duplication</u>. Indemnified amounts under this Agreement shall be without duplication of any amounts actually paid under any other indemnification provisions of this Agreement or any Transaction Document or Enron Closing Date Document.

(f)   <u>Insured Claims</u>. In the case of any Claim indemnified by Enron hereunder which is covered by a policy of insurance maintained by Enron, each Indemnified Person agrees to provide good faith cooperation, at the sole expense of Enron, to the insurers in the exercise of their rights to investigate, defend, settle or compromise such Claim as may be required for Enron to retain the benefits of such insurance with respect to such Claim.

(g)   <u>Claims Procedure</u>.

(i)   An Indemnified Person shall, after obtaining actual knowledge thereof, promptly notify Enron of any Claim as to which indemnification is sought; <u>provided, however</u>, that the failure to give such notice shall not release Enron from any of its obligations under this Section 6.1, except (but only if Enron shall not have actual knowledge of such Claim) to the extent that failure to give notice of any action, suit or proceeding against such Indemnified Person shall prejudice Enron's ability to defend such Claim or recover proceeds under any insurance

AB000081606

policies maintained by Enron. Enron shall, after obtaining knowledge thereof, promptly notify each Indemnified Person of any indemnified Claim affecting such Indemnified Person. Subject to the provisions of the following paragraph, Enron shall at its sole cost and expense be entitled to control, and shall assume full responsibility for, the defense of such Claim and shall provide the Indemnified Person(s) who are the subject of such Claim with all information with respect to such proceeding as such Indemnified Person(s) shall reasonably request.

(ii)     Notwithstanding any of the foregoing to the contrary, Enron shall not be entitled to control and assume responsibility for the defense of any Claim if (1) an Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1, an Enron Bankruptcy or an Enron Investment Default Event related to a particular Enron Investment held by the Company shall have occurred and be continuing, (2) in the good faith opinion of such Indemnified Person, there exists an actual or potential conflict of interest such that it is advisable for such Indemnified Person to retain control of all or any portion of such proceeding (except that Enron shall be entitled to control and assume responsibility for the defense of that portion of the proceeding as to which such conflict does not apply) or (3) such Claim involves the possibility of criminal sanctions against or criminal liability of such Indemnified Person. In the circumstances described in clauses (1) through (3), the Indemnified Person shall be entitled to control and assume responsibility for the defense of that aspect of such Claim covered by clauses (1) through (3) at the expense of Enron, provided such defense is conducted by one counsel (in addition to any local counsel) acceptable to Enron, such acceptance not to be unreasonably withheld or delayed. In addition, any Indemnified Person may participate in any proceeding controlled by Enron pursuant to this Section 6.1, at its own expense, in respect of any such proceeding as to which Enron shall have acknowledged in writing its obligation to indemnify the Indemnified Person pursuant to this Section 6.1, and at the expense of Enron in respect of any such proceeding as to which Enron shall not have so acknowledged its obligation to the Indemnified Person pursuant to this Section 6.1. for so long as Enron fails to assume responsibility for the defense of such Claim. Enron may in any event participate in all such proceedings at its own cost. Nothing contained in this Section 6.1(g) shall be deemed to require an Indemnified Person to contest any Claim or to assume responsibility for or control of any judicial proceeding with respect thereto.

(h)     Subrogation. If a Claim indemnified by Enron under this Section 6.1 is paid in full by Enron and/or an insurer under a policy of insurance maintained by Enron, Enron and/or such insurer, as the case may be, shall be subrogated to the extent of such payment to the rights and remedies of the Indemnified Person (other than under insurance policies maintained by such Indemnified Person, the Company, the Indenture Trustee, the Collateral Agent, the Trustee, the Noteholders or the Certificateholders) on whose behalf such Claim was paid with respect to the transaction or event giving rise to such Claim. So long as no event referred to in clause (1) of Section 6.1(g)(ii) hereof shall have occurred and be continuing, should an Indemnified Person receive any refund, in whole or in part, with respect to any Claim paid by Enron hereunder, it shall promptly pay over the amount refunded (but not in excess of the amount Enron or any of its insurers has paid) to Enron.

(i)     Reports and Returns. In case any return, report or statement shall be required to be made with respect to any obligation of Enron under or arising out of this Section 6.1 of which Enron is, or through reasonable due diligence should be, aware, Enron shall, to the extent required or permitted by law, make and file in its own name such return, statement or report, and in the case of any such return, statement or report required to be made in the name of an Indemnified Person, to the extent of Enron's actual knowledge thereof, advise such Indemnified Person in writing of such fact and provide such Indemnified Person with information sufficient to permit such return, statement or report to be properly and timely made with respect to any obligations of Enron under or arising out of this Section 6.1.

AB000081607

(j)    Restoration.  If Enron has paid to Citibank any amount under this Section 6.1 in respect of a Claim relating to Citibank in its capacity as Directing Party and thereafter a final, non-appealable judgment or award shall be issued against Citibank in a judicial or arbitral proceeding by a court of competent jurisdiction with respect to such Claim, Citibank shall forthwith reimburse Enron the amount so paid by Enron.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any Fee Letter, nor consent to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by each of Enron and Citibank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.2    Notices.  Except as otherwise expressly provided herein in any particular case, all notices, approvals, consents, requests and other communications hereunder or under any Fee Letter shall be in writing and shall, if addressed as provided in the following sentence, be deemed to have been given, (i) when delivered by hand, (ii) one Business Day after being sent by a private nationally or internationally recognized overnight courier service or (iii) when sent by telecopy, if immediately after transmission the sender's facsimile machine records in writing the correct answer back.  Actual receipt at the address of an addressee, regardless of whether in compliance with the foregoing is effective notice hereunder.  Until otherwise so notified by the respective parties, all notices, approvals, consents, requests and other communications shall be addressed to the following addresses:

If to Enron:

1400 Smith
Houston, Texas  77002
Attention:  Treasurer
Telecopier No.:  713-646-8517
Telephone No.:  800-973-6766

with a copy to:

1400 Smith
Houston, Texas  77002
Attention:  General Counsel, Enron Global Finance
Telecopier No.:  713-853-9252
Telephone No.:  800-973-6766

If to Citibank:

Citibank, N.A.
c/o Derivatives
390 Greenwich Street
New York, New York 10013
Telecopier No.:  212-723-8610
Telephone No.:  212-723-6449

AB000081608

Each of Enron and Citibank may, by notice given hereunder, designate any further or different addresses to which subsequent notices, approvals, consents, requests or other communications shall be sent or persons to whose attention the same shall be directed.

Section 7.3    Severability of Provisions. If any provision hereof or of any Fee Letter is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of this Agreement or such Fee Letter shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as part of the Agreement or such Fee Letter a legal and enforceable provision as similar in terms to the severed provision as may be possible that maintains for each party hereto the benefit of such party's bargain.

Section 7.4    Binding Effect and Transfers.    All agreements, representations, warranties and indemnities in this Agreement and the Fee Letters and in any agreement, document or certificate delivered pursuant hereto or thereto shall be binding upon the Person making the same and its successors and assigns and shall inure to the benefit of and be enforceable by the Person for whom made and its successors and assigns; provided, however, Enron may not assign or transfer any of its rights or obligations hereunder without the prior written consent of Citibank except pursuant to any merger where Enron is the survivor or the survivor assumes all the obligations of such entity.

Section 7.5    General Limitation of Liability.  Enron acknowledges and confirms that with respect to the transactions described in Section 2.2 of the Closing Agreement, including any transactions with Citibank or its Affiliates: (i) neither Citibank nor its Affiliates are, or will be, acting as a fiduciary (or in any similar capacity) with respect to Enron and the transactions contemplated thereby and that this Agreement does not create nor is it the intention of Enron to create hereby or otherwise, a relationship of principal or agent with Citibank or its Affiliates with respect to the transactions contemplated thereby; (ii) Enron is not relying on the advice of Citibank or its Affiliates for legal, regulatory, financial, accounting, tax or investment matters but instead Enron is seeking and will rely on the advice of its own professionals and advisors for such matters; (iii) Enron will make its own independent analysis and decision regarding the transactions described in Section 2.2 of the Closing Agreement and the pricing and valuation thereof based on the advice from its own professionals and advisors; (iv) Enron will determine, without reliance upon Citibank or its Affiliates, the economic risks and merits as well as the legal, regulatory, tax and accounting characterizations and consequences of the transactions described in Section 2.2 of the Closing Agreement including any hedge transactions, and it will be capable of assuming such risks; and (v) neither Citibank nor its Affiliates have, or will, make any recommendations, guarantees or representations regarding the expected or projected success, performance, result, consequences or benefit (whether legal, regulatory, tax, financial, accounting or otherwise) of the transactions described in Section 2.2 of the Closing Agreement. Nothing herein shall give rise to any liability or responsibility on the part of Citibank or its Affiliates for the success or anticipated benefits of the transactions contemplated thereby.  Subject to the following sentence, neither Enron nor Citibank shall be liable in connection with the transaction contemplated hereby for any punitive, exemplary, or treble damages, including without limitation for the inaccuracy of any representation or warranty made by such party; in addition, with respect to the representations made by Enron in Section 4.1 hereof, Claims shall not include any consequential damages. Notwithstanding the limitations of liability described in the preceding sentence, Claims (including, without limitation Claims indemnified pursuant to Section 5.3) will include the consequential, punitive, exemplary or treble damages to the extent not excluded pursuant to Section 6.1(d), but only to the extent imposed on or paid by an Indemnified Person.

Section 7.6    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed

AB000081609

shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

Section 7.7    Governing Law. THE RIGHTS AND OBLIGATIONS OF EACH OF THE PARTIES UNDER THIS AGREEMENT AND THE FEE LETTERS SHALL, PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Section 7.8    Jurisdiction; Waiver of Jury Trial. (a) ANY PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY FEE LETTER MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK IN THE COMMERCIAL DIVISION OF THE SUPREME COURT, CIVIL BRANCH, OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK OR THE EASTERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY FEE LETTER BROUGHT IN THE COURTS REFERRED TO IN SECTION 7.8(a) HEREOF AND HEREBY FURTHER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY FEE LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND EACH FEE LETTER BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

Section 7.9    No Third-Party Beneficiaries. This Agreement and the Fee Letters are for the sole benefit of Enron and Citibank and their respective successors and assigns and, to the extent referred to in this Agreement, all Indemnified Persons and their respective successors and assigns, and are not for the benefit of any other Person.

Section 7.10    Survival; Termination. All agreements, representations, warranties and indemnities contained in this Agreement or any Fee Letter and in any agreement, document or certificate delivered pursuant hereto or thereto, or in connection herewith or therewith, shall survive and continue in effect following the execution and delivery of this Agreement and the Closing Date. Unless otherwise terminated prior thereto in accordance with this Agreement, the obligations of Citibank and Enron under this Agreement shall terminate on the Final Termination Date; provided, that (a) each obligation to pay

AB000081610

any amount remaining due and owing under this Agreement on the Final Termination Date shall survive until such payment is made in full in accordance with this Agreement and (b) the provisions of Section 6.1 and Section 7.5 shall survive any such termination. Enron shall be entitled to terminate its obligation to pay the Enron Periodic Payment Amount, upon prior written notice to Citibank, if Citibank has failed to pay the Citibank Periodic Payment Amount in full on the date when due under this Agreement and such failure has not been cured or remedied by Citibank within five (5) days after such due date.

Section 7.11    Effect of Headings.  The Table of Contents and the headings of the Articles, Sections, subsections, clauses and paragraphs hereof, and of Appendices hereto, are for convenience of reference only, and shall not affect the construction or interpretation of this Agreement.

Section 7.12    Amendments, Waivers, Etc.  Neither this Agreement nor any Fee Letter may be amended, discharged or terminated nor may any provision hereof or thereof be waived unless such amendment, discharge, termination or waiver is in writing and signed by each of Enron and Citibank and, to the extent affecting the rights of an Indemnified Person hereunder, such Person.

Section 7.13    Entire Agreement.  This Agreement (including, without limitation, the appendices hereto) and the Enron Closing Date Documents to which Enron and Citibank are party supersede all prior agreements, written or oral, between or among Enron and Citibank relating to the transactions contemplated hereby and thereby, and each of Enron and Citibank represents and warrants to the other that this Agreement and the Transaction Documents and Enron Closing Date Documents to which Enron and Citibank are party constitute the entire agreement between Enron and Citibank relating to the transactions contemplated hereby and thereby.

Section 7.14    Expenses.  All statements, reports, certificates, opinions and other documents or information required to be furnished by Enron to Citibank under this Agreement or any Fee Letter shall be supplied without cost to Citibank. Enron shall pay, within 30 days after demand therefor, (a) any Administrative Expenses incurred by Citibank to the extent such amounts are not paid pursuant to the Transaction Documents and Enron Closing Date Documents and (b) all reasonable and documented out-of-pocket costs and expenses (including legal fees and expenses) of Citibank and the Depositor incurred in connection with (i) the negotiation, preparation, execution and delivery of this Agreement and the Transaction Documents and Enron Closing Date Documents or any waiver or amendment of, or supplement or modification to, this Agreement or any Transaction Document or Enron Closing Date Document and (ii) the review of any of the other agreements, instruments or documents referred to in this Agreement or any Transaction Document or Enron Closing Date Document or relating to the transactions contemplated hereby or thereby. In addition, Enron shall pay, within 30 days after demand therefor, all reasonable and documented out-of-pocket costs and expenses (including legal fees and expenses) of Citibank incurred in connection with the enforcement or protection of its rights under this Agreement or any Fee Letter, including in connection with any workout, restructuring or negotiations in respect thereof, and including the exercise of the remedies of Citibank under this Agreement or any Fee Letter following the occurrence of an Enron Event of Default or Enron Credit Event.

Section 7.15    No Bankruptcy Petition.  (a)  Enron.  Enron covenants and agrees that, prior to the date that is a year and a day after the payment in full of all outstanding Notes and Certificates, it will not institute against, or join any other Person in instituting against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

(b)    Citibank.  Citibank covenants and agrees that, prior to the date that is a year and a day after the payment in full of all outstanding Notes and Certificates, it will not institute against, or join any other Person in instituting against, the Company any bankruptcy, reorganization, arrangement,

AB000081611

insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

        Section 7.16    <u>Confidentiality Regarding Enron Investments</u>.  So long as no Enron Event of Default or Enron Credit Event has occurred and is continuing, Citibank agrees to keep confidential all non-public information provided to it by the Company pursuant to the Transaction Documents with respect to Enron Investments; <u>provided</u> that nothing in this Section 7.16 shall prevent Citibank from disclosing any such information (i) as provided in this Agreement, any Default Swap, any Transaction Document or Enron Closing Date Document, (ii) to any prospective Acceptable Replacement Swap Counterparty, (iii) to its Affiliates and its or their respective employees, directors, agents, attorneys, accountants and other professional advisors, (iv) to the extent requested or required by any Governmental Authority or by any order of any court or other tribunal or as may otherwise be required pursuant to Applicable Law, (v) to the extent necessary or appropriate in connection with the protection, preservation, enforcement or exercise of any right or remedy under any Company Investment, under this Agreement, any Default Swap, any Fee Letter, any Transaction Document or Enron Closing Date Document or (vi) which has been publicly disclosed other than in breach of this Agreement.

AB000081612

IN WITNESS WHEREOF, each of Enron and Citibank has caused this Agreement to be executed in its name and on its behalf as of the date first above written.

CITIBANK, N.A.                          ENRON CORP.

By _____               By _____
   Name:                                    Name:
   Title:                                   Title:

NY3:#7234572v8                    S-1

AB000081613

SCHEDULE 1
To
Agreement

INITIAL COMPANY INVESTMENTS

**Enron Investments**

Title of Agreement          Outstanding Principal Amount

Promissory Note (Series 2000-    £206,750,000
A), dated as of February 23, 2000
issued by Delta Energy
Corporation to the order of
Yosemite Securities Company
Ltd.

Enron Debt Security (Series    £15,500,000
2000-A), dated February 23,
2000 issued by Enron Corp. to
the order of Yosemite Securities
Company Ltd.

**Permitted Investments**

None

NY3:#7234572v8

AB000081614

IN WITNESS WHEREOF, each of Enron and Citibank has caused this Agreement to be executed in its name and on its behalf as of the date first above written.

CITIBANK, N.A.                          ENRON CORP.

By _____            By _____
Name:                                   Name:
Title:                                  Title:

AB000081615

IN WITNESS WHEREOF, each of Enron and Citibank has caused this Agreement to be executed in its name and on its behalf as of the date first above written.

CITIBANK, N.A.                                ENRON CORP.


By _____          By _____
    Name:                                                Name:
    Title:                                                 Title:

AB000081616