**EXECUTION COPY**

**AGREEMENT**
**(Sterling)**

between

ENRON CORP.
(an Oregon corporation)

and

CITIBANK, N.A.

Dated as of May 24, 2001

ECMM000294368

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................................. 1
    Section 1.1    Definitions. ............................................................................................ 1

ARTICLE II CLOSING ................................................................................................. 3
    Section 2.1    Time and Place of Closing. .................................................................... 3
    Section 2.2    Closing. .................................................................................................. 3

ARTICLE III CONDITIONS PRECEDENT ................................................................. 3
    Section 3.1    Conditions to the Occurrence of the Closing ........................................ 3

ARTICLE IV REPRESENTATIONS AND WARRANTIES ......................................... 4
    Section 4.1    Representations and Warranties of Enron. ............................................ 4

ARTICLE V OBLIGATIONS; CONSENTS; PAYMENTS, ETC. ................................ 5
    Section 5.1    Obligations. ............................................................................................ 5
    Section 5.2    Consent to Transaction Documents and Enron Closing Date Documents ......... 6
    Section 5.3    Payments and Computations. ................................................................. 6

ARTICLE VI INDEMNIFICATION .............................................................................. 7
    Section 6.1    General Indemnification. ........................................................................ 7

ARTICLE VII MISCELLANEOUS ............................................................................... 10
    Section 7.1    Amendments, Etc. .................................................................................. 10
    Section 7.2    Notices. .................................................................................................. 10
    Section 7.3    Severability of Provisions. ..................................................................... 11
    Section 7.4    Binding Effect and Transfers. ............................................................... 11
    Section 7.5    General Limitation of Liability. ............................................................. 11
    Section 7.6    Counterparts. .......................................................................................... 12
    Section 7.7    Governing Law. ..................................................................................... 12
    Section 7.8    Jurisdiction; Waiver of Jury Trial .......................................................... 12
    Section 7.9    No Third-Party Beneficiaries. ................................................................ 13
    Section 7.10    Survival; Termination. .......................................................................... 13
    Section 7.11    Effect of Headings. ............................................................................... 13
    Section 7.12    Amendments, Waivers, Etc. .................................................................. 13
    Section 7.13    Entire Agreement. .................................................................................. 13
    Section 7.14    Expenses. ................................................................................................ 13
    Section 7.15    No Bankruptcy Petition. ........................................................................ 14
    Section 7.16    Confidentiality. ...................................................................................... 14

SCHEDULE 1 Enron Obligations

NY3:#7265358v4

ECMM000294369

This AGREEMENT, dated as of May 24, 2001 (this "<u>Agreement</u>") is by and between (i) ENRON CORP., an Oregon corporation ("<u>Enron</u>"), and (ii) CITIBANK, N.A. ("<u>Citibank</u>").

WHEREAS, the willingness of Citibank to enter into the Credit Swap (as defined below) is subject to the effectiveness of this Agreement and the effectiveness of the Credit Swap is a condition precedent to the consummation of the transactions contemplated by the Transaction Documents (as defined below); and

WHEREAS, each of the parties hereto is willing to assume the duties and obligations ascribed to it hereunder on the terms and conditions expressly set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1    <u>Definitions</u>.

Each capitalized term used herein and not otherwise defined herein shall have the definition assigned to that term in Appendix A to the Collateral Security Agreement dated as of May 24, 2001 (the "<u>Collateral Security Agreement</u>") among Enron Sterling Credit Linked Notes Trust (the "<u>Trust</u>"), Citibank, the Indenture Trustee, the Account Bank and the Collateral Agent, and the principles of interpretation set forth in such Appendix A shall apply to the terms defined herein and in such Appendix A.  In addition, as used herein:

"<u>Closing Date Documents</u>" has the meaning given to such term in the Closing Agreement.

"<u>Confirmation Notice</u>" has the meaning given to such term in Section 5.1(c).

"<u>Default Rate</u>" means, on any day, a rate per annum equal to the base rate announced by Citibank and in effect for such day plus 2%.

"<u>Designated Reduction Investment</u>" has the meaning given to such term in Section 5.1(c).

"<u>Enron Closing Date Documents</u>" shall mean the Closing Agreement, the Certificate Purchase Agreement, the Note Purchase Agreement, this Agreement and the Fee Letter referred to in this Agreement.

"<u>Enron Debt Security</u>" means the £15,500,000 Enron Debt Security dated the Closing Date as further described on Schedule 1 to this Agreement.

"<u>Enron Event of Default</u>" shall mean the occurrence at any time of any of the following events:

ECMM000294370

(a)    Enron shall fail to pay (i) any amount payable by Enron under Section 5 of this Agreement (other than any fee payable under the Fee Letter) for more than five days after such payment becomes due and payable under this Agreement, or (ii) any other amount payable by Enron under this Agreement or the Fee Letter for more than 15 days after such amount becomes due and payable under this Agreement or the Fee Letter, as the case may be; or

(b)    Any representation or warranty made by Enron (or any of its officers) (including representations and warranties deemed made pursuant to Section 4.1) under this Agreement or the Fee Letter shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)    Enron shall fail to perform or observe any term, covenant or agreement contained in this Agreement or the Fee Letter on its part to be performed or observed if such failure shall remain unremedied for 30 days after written notice thereof shall have been given to Enron by Citibank; or

(d)    Enron shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Enron seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), shall remain undismissed or unstayed for a period of 60 days; or Enron shall take any corporate action to authorize any of the actions set forth above in this clause (d).

"Enron Obligations" means the investments listed on Schedule 1 to this Agreement.

"Enron Reduction Notice" has the meaning given to such term in Section 5.1(c).

"Fee Letter" means the Fee Letter dated of even date herewith as it may be amended from time to time in accordance with the terms thereof.

"Final Offering Memorandum" means the Offering Memorandum dated May 17, 2001 relating to the issuance and sale of the Notes.

"Fixed Payment Date" means the Business Day immediately preceding each May 24, commencing May 24, 2002.

"Indemnified Person" has the meaning given to such term in Section 6.1(b).

"Notional Reduction Amount" has the meaning given to such term in Section 5.1(c).

"Preliminary Offering Memorandum" means the Preliminary Offering Memorandum dated April 30, 2001 relating to the issuance and sale of the Notes.

"Reduction" has the meaning given to such term in Section 5.1(c).

"Reduction Date" has the meaning given to such term in Section 5.1(c).

ECMM000294371

"Termination Date" has the meaning given to such term in Section 5.1(b).

## ARTICLE II

## CLOSING

Section 2.1    Time and Place of Closing.

The closing of the transactions described in Section 2.2 hereof shall commence at 9:00 a.m., New York City time, on the Closing Date at the offices of Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, or at such other time and at such other location as shall be agreed by the parties hereto.

Section 2.2    Closing.

On the Closing Date, subject to the terms and conditions hereof and thereof and on the basis of the representations and warranties set forth herein and therein, Citibank and the Trust will enter into the Credit Swap and Enron will pay to Citibank the fees specified in the Fee Letter and all other fees and expenses provided for in Article VII.

## ARTICLE III

## CONDITIONS PRECEDENT

Section 3.1    Conditions to the Occurrence of the Closing.  The obligation of each of Enron and Citibank to enter into the transactions described in Section 2.2 hereof on the Closing Date shall be subject to the satisfaction (or waiver by such Person) on or prior to the Closing Date of the conditions precedent to the Closing with respect to this Agreement and the Closing Agreement and the obligation of Citibank to enter into such transactions is further subject to the following additional conditions precedent:

(i)    Receipt of a certificate of Enron dated the Closing Date in form and substance reasonably satisfactory to Citibank, certifying as to: (A) the representations and warranties of Enron set forth in this Agreement are true and correct on and as of the Closing Date (both immediately prior to the consummation of the transactions intended to occur on the Closing Date and also after giving effect thereto) in all material respects as if made on and as of such date (or, if stated to have been made solely as of an earlier date, were true and correct as such date); and (B) immediately before and immediately after the issuance of the Notes on the Closing Date no Enron Event of Default has occurred and is continuing.

(ii)    Receipt of an opinion of Vinson & Elkins LLP, counsel to Enron, as to this Agreement and the Fee Letter and an opinion of corporate counsel of Enron as to this Agreement and the Fee Letter, in each case in form and substance reasonably satisfactory to Citibank.

ECMM000294372

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of Enron.

Enron makes the following representations and warranties to Citibank as of the Closing Date.

(a)    Corporate Existence and Power. Enron is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation. Enron has all requisite powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.

(b)    Corporate and Governmental Authorizations; No Contravention. The execution, delivery and performance by Enron of this Agreement and the Fee Letter are within Enron's corporate powers, have been duly authorized by all necessary corporate action of Enron, require, in respect of Enron, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to Enron or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended,  or by-laws, as amended, of Enron or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon Enron or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of Enron.

(c)    Binding Effect. This Agreement and the Fee Letter are legal, valid and binding obligations of Enron enforceable against Enron in accordance with their respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(d)    No Defaults. No Enron Event of Default has occurred and is continuing.

(e)    Special Enron Obligation. The Enron Debt Security is a legal, valid and binding obligation of Enron enforceable against Enron in accordance with its terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity, and the Enron Debt Security is not subject in whole or in part to any defense or limitation based upon any allegation of usury.

ECMM000294373

## ARTICLE V

## OBLIGATIONS; CONSENTS; PAYMENTS, ETC.

Section 5.1    Obligations.

So long as the Credit Swap shall remain in full force and effect:

(a)    Periodic Payments by Enron. On each Fixed Payment Date, Enron shall pay to Citibank any amount payable by Citibank under Part 5(c) of the Schedule to the Credit Swap; provided, that Enron shall not be required to pay any such amounts to the extent that Citibank is able to deliver, but chooses not to deliver, the Enron Obligations to the Trust in connection with a settlement of the Credit Swap. For purposes of this Section 5.1(a), for the period from the relevant objection described in this sentence, such time, if ever, such objection is resolved adversely to the Person objecting, Citibank shall be deemed to be unable to deliver (whether or not actually delivered to the Trust) any Enron Obligation the delivery of which has been objected to by the Trust, the Indenture Trustee or any Noteholder, which objection is based in effect on an assertion that (i) the representation of Enron in Section 4.1(e) hereof is incorrect, (ii) the Enron Obligations do not meet the criteria of Enron Deliverable Obligations, (iii) any of the representations of Enron in the Forward Oil Swap described in Schedule 1 hereto are incorrect, or (iv) any of the representations of Enron in the Forward Oil Swap between Enron and Delta Energy Corporation pursuant to the terms of a Confirmation dated May 24, 2001 to the ISDA Master Agreement between such parties dated as of November 18, 1999 are incorrect.

(b)    Enron Event of Default; Remedies. If at any time an Enron Event of Default has occurred and is continuing, Citibank may, by notice to Enron specifying the relevant Enron Event of Default, designate a day not earlier than the day such notice is effective as the date upon which the obligations of Citibank under this Agreement shall terminate (the "Termination Date"); provided that the Termination Date shall occur automatically upon the occurrence of an Enron Event of Default specified in clause (d) of the definition of such term in Section 1.1 hereof. On the Termination Date, this Agreement (other than Sections 5.1(d), 6.1 and 7.5) shall forthwith terminate and each party hereto shall forthwith pay to the other party all amounts then due and payable by such party under this Agreement to the other party, unconditionally and without protest, demand, presentment or any other notice whatsoever, each of which is expressly and irrevocably waived by each party hereto.

(c)    Reduction of Enron Obligations.  Enron shall be entitled at any time and from time to time to reduce the Enron Obligations (collectively, a "Reduction") by delivering a notice of termination (an "Enron Reduction Notice") to Citibank, which notice will specify (i) the proposed date of such Reduction (the "Reduction Date"), which shall in any event be not less than 40 days after the date of receipt of such Enron Reduction Notice by Citibank, (ii) the notional amount of the proposed reduction (the "Notional Reduction Amount") and (iii) the Trust Investment or Trust Investments, or portion thereof, to be disposed of in connection with such proposed reduction (each, a "Designated Reduction Investment"). Promptly upon receipt of a Reduction Notice, Citibank will obtain and advise Enron of quotations from dealers for the purchase of the Designated Reduction Investments on the Reduction Date. Not later than the date 35 days before the Reduction Date, Enron will advise Citibank in writing whether or not Enron intends to proceed with such proposed reduction on such Reduction Date (a "Confirmation Notice") and, if Enron intends to proceed, Enron will pay to an escrow account designated by Citibank the amount of the Early Termination Settlement Amount (or deliver to Citibank a letter of credit in such amount in form and substance, and from a banking institution, satisfactory in all respects to Citibank) on the date of such Confirmation Notice. Citibank will pay back to Enron on the day after such Reduction Date the portion (if any) of such escrowed amount (or release and return to Enron the unutilized portion of such letter of credit) not applied toward an Early Redemption of the Notes and the Certificates. On the

ECMM000294374

Reduction Date, the outstanding amount of the Forward Oil Swap listed on Schedule 1 to this Agreement shall be automatically reduced by the Notional Reduction Amount. The outstanding amount of the Enron Debt Security shall only be reduced on a Reduction Date in connection with an Early Redemption of all of the Notes.

(d)    <u>Substitutions; Settlement of Credit Swap</u>.  Citibank shall be entitled, at any time, without the consent of Enron but in accordance with the terms of the Collateral Security Agreement, to direct the Collateral Agent to (i) substitute Trust Investments held by the Trust for new Trust Investments selected by Citibank and (ii) invest the principal proceeds of any matured Trust Investments in new Trust Investments selected by Citibank. Citibank is authorized to receive compensation from the seller or issuer of such new Trust Investments. If an Enron Failure to Pay has occurred, Citibank will not exercise its rights under the Credit Swap unless the Enron Failure to Pay is with respect to the Enron Obligations. If an Enron Bankruptcy has occurred, Citibank may exercise its rights under the Credit Swap without the prior written consent of Enron.

(e)    <u>Enron Cure Rights; Replacement Collateral Agent</u>.  Citibank agrees that (i) if an "Event of Default" or a "Termination Event" under and as defined in the Credit Swap has occurred and is continuing (other than an "Event of Default" resulting in an "Automatic Early Termination" as provided in the Credit Swap), then Citibank shall give written notice of such "Event of Default" or "Termination Event" to Enron and (ii) so long as no (x) Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1, (y) Enron Bankruptcy or (z) Enron Failure to Pay with respect to a particular Enron Obligation held by Citibank has occurred and is continuing, Citibank shall not agree to a replacement Collateral Agent under Article II of the Collateral Security Agreement or amend, waive or otherwise modify any term of any Transaction Document, Closing Date Document or Underlying Instrument without the prior written consent of Enron (such consent not to be unreasonably withheld or delayed).

(f)    <u>Notices Received by Citibank</u>.  Citibank will provide promptly to Enron a copy of any written notice Citibank receives under the Transaction Documents or Closing Date Documents that has not been sent directly to Enron; <u>provided</u> that any failure to give or delay in giving such a copy of any such notice shall not relieve Enron of any of its obligations hereunder or under any of the Transaction Documents or Enron Closing Date Documents.

Section 5.2    <u>Consent to Transaction Documents and Enron Closing Date Documents</u>. Enron acknowledges receipt of true and complete copies of the Transaction Documents and Enron Closing Date Documents as in effect on the Closing Date and acknowledges and consents to the exercise by Citibank of the rights and remedies afforded to Citibank thereunder, whether as swap counterparty under the Credit Swap, Calculation Agent, Directing Party or otherwise.

Section 5.3    <u>Payments and Computations</u>.  Enron shall make each payment owing by Enron under this Agreement or under any agreements between Enron and Citibank relating to compensation to Citibank and reimbursement of expenses (including, without limitation, reasonable fees and expenses of counsel) for the transactions contemplated hereby not later than 10:00 A.M. London time on the day when due in Sterling or Dollars, as applicable, to Citibank N.A., London at its office at P.O. Box 199, Cottons Centre Hayes Lane, London SE1 2QT, SWIFT: CITIGB2L, Account No. 600008, Reference: Credit Derivatives, and Citibank shall make each payment owing by Citibank under this Agreement to Enron not later than 10:00 A.M. London time on the day when due in Sterling or Dollars, as applicable, to Enron at Citibank, N.A., London at its office at P.O. Box 199, Cottons Centre Hayes Lane, London SE1 2QT, Account No. 8896933, in each case in same day funds, without set-off, counterclaim or any other deduction whatsoever. Whenever any payment hereunder or thereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next

ECMM000294375

succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or compensation, as the case may be. Without limitation of any other provision of this Agreement, (a) if Enron shall fail to pay any amount owing by Enron under this Article V, Article VI or any other provision of this Agreement or the Fee Letter on the date when due hereunder or thereunder (whether on a scheduled payment date, on the Termination Date, on an Early Termination Date or otherwise), Enron shall pay interest on such overdue amount (without duplication of any default interest payable under the Enron Obligations) on demand from time to time by Citibank for each day from and including the due date thereof until such overdue amount is paid in full at the Default Rate and (b) if Citibank shall fail to pay any amount owing by Citibank under this Article V or any other provision of this Agreement on the date when due hereunder, Citibank shall pay interest on such overdue amount on demand from time to time by Enron for each day from and including the due date thereof until such overdue amount is paid in full at the Default Rate.

## ARTICLE VI

## INDEMNIFICATION

Section 6.1    General Indemnification. (a)    Claims Defined. For the purposes of this Section 6.1, "Claims" shall mean any and all costs, expenses, liabilities, obligations, in each case, payable or owed to third parties, including any and all losses (except as otherwise provided below), damages, penalties, actions or suits or claims of whatsoever kind or nature (whether or not on the basis of negligence, strict or absolute liability or liability in tort) which may be imposed on, incurred by, suffered by or asserted against an Indemnified Person in connection therewith or related thereto and, except as otherwise expressly provided in this Section 6.1, all reasonable out-of-pocket costs, disbursements and expenses (including legal fees and expenses) paid or incurred by an Indemnified Person in connection therewith or related thereto, subject to Section 7.14 hereof.

(b)    Indemnified Person Defined. For the purposes of this Section 6.1, "Indemnified Person" means Citibank, whether in its capacity as swap counterparty under the Credit Swap, Directing Party (subject to Section 6.1(j) hereof), or Calculation Agent, and its directors, officers, employees, successors, permitted assigns, consultants, attorneys and accountants.

(c)    Claims Indemnified. Whether or not (i) any of the Notes or Certificates are sold or the Closing occurs or (ii) such Indemnified Person shall be indemnified as to such Claim by any other Person, but subject to the exclusions stated in paragraph (d) below, Enron agrees to indemnify, protect, defend and hold harmless each Indemnified Person against Claims directly or indirectly resulting from or arising out of or alleged to result from or arise out of:

(i)    performance by Citibank of its obligations and duties or exercise by Citibank of its rights and privileges under this Agreement, the Closing Date Documents or any other Transaction Document, in each case in accordance with the terms and conditions hereof or thereof, as appropriate;

(ii)    any act or omission (whether negligent or otherwise) by Enron or any breach of or failure to perform or observe, or any other non-compliance with, any covenant, condition or agreement to be performed by, or other obligation of, Enron under this Agreement, the Fee Letter or any of the Transaction Documents or Enron Closing Date Documents, or the falsity of any representation or warranty (without giving effect to any qualification with respect to the materiality thereof) of Enron in any of this Agreement, the Fee Letter or any Enron Closing Date Documents or in any document or certificate delivered by Enron in connection therewith;

ECMM000294376

(iii)     the offer, sale or delivery of any Notes or Certificates; or

(iv)     any violation of law, rule, regulation or order by Enron or any Affiliate of Enron or their respective directors, officers, employees, agents or servants.

(d)     Claims Excluded.  The following are excluded from Enron's agreement to indemnify under this Section 6.1: with respect to any particular Indemnified Person, Claims to the extent resulting from (w) the bad faith, gross negligence or willful misconduct of any Indemnified Person, (x) any actual breach of, any failure to perform or observe, or any other non-compliance with, any covenant, condition or agreement to be performed by, or other obligation of, Citibank under this Agreement, any Closing Date Document, the Fee Letter or any other Transaction Document or the falsity of any representation or warranty of Citibank in this Agreement, any Closing Date Document, the Fee Letter or any other Transaction Document or in a document or certificate delivered in connection herewith or therewith, (y) any untrue statement in the Preliminary Offering Memorandum or the Final Offering Memorandum or any omission to state a fact therein, in each case with respect to any Citibank Filed Document (as defined in the Note Purchase Agreement) or any financial statements, the notes thereto and the other financial or statistical information regarding Citibank or Citicorp contained or incorporated by reference in or omitted from the Preliminary Offering Memorandum or the Final Offering Memorandum or any information concerning Citibank or Citicorp set forth under or incorporated by reference under the headings "Available Information - Citibank" or "Description of Citibank" or (z) any payment obligation or other obligation payable or performable by Citibank under Part 5(d) of the Schedule to the Credit Swap.

(e)     Limitations on Indemnification Obligations.  The indemnities provided in this Agreement shall be subject to the following limitations:

(i)     Limitation by Law.  Such indemnity shall be enforced only to the maximum extent permitted by law.

(ii)     No Duplication.  Indemnified amounts under this Agreement shall be without duplication of any amounts actually paid under any other indemnification provisions of this Agreement or any Transaction Document or Enron Closing Date Document.

(f)     Insured Claims.  In the case of any Claim indemnified by Enron hereunder which is covered by a policy of insurance maintained by Enron, each Indemnified Person agrees to provide good faith cooperation, at the sole expense of Enron, to the insurers in the exercise of their rights to investigate, defend, settle or compromise such Claim as may be required for Enron to retain the benefits of such insurance with respect to such Claim.

(g)     Claims Procedure.

(i)     An Indemnified Person shall, after obtaining actual knowledge thereof, promptly notify Enron of any Claim as to which indemnification is sought; provided, however, that the failure to give such notice shall not release Enron from any of its obligations under this Section 6.1, except (but only if Enron shall not have actual knowledge of such Claim) to the extent that failure to give notice of any action, suit or proceeding against such Indemnified Person shall prejudice Enron's ability to defend such Claim or recover proceeds under any insurance policies maintained by Enron.  Enron shall, after obtaining knowledge thereof, promptly notify each Indemnified Person of any indemnified Claim affecting such Indemnified Person.  Subject to the provisions of the following paragraph, Enron shall at its sole cost and expense be entitled to control, and shall assume full responsibility for, the defense of such Claim and shall provide the

ECMM000294377

Indemnified Person(s) who are the subject of such Claim with all information with respect to such proceeding as such Indemnified Person(s) shall reasonably request.

(ii)     Notwithstanding any of the foregoing to the contrary, Enron shall not be entitled to control and assume responsibility for the defense of any Claim if (1) an Enron Event of Default described in any of clauses (a), (c) or (d) of the definition thereof in Section 1.1, an Enron Bankruptcy or an Enron Failure to Pay with respect to a particular Enron Obligation held by Citibank shall have occurred and be continuing, (2) in the good faith opinion of such Indemnified Person, there exists an actual or potential conflict of interest such that it is advisable for such Indemnified Person to retain control of all or any portion of such proceeding (except that Enron shall be entitled to control and assume responsibility for the defense of that portion of the proceeding as to which such conflict does not apply) or (3) such Claim involves the possibility of criminal sanctions against or criminal liability of such Indemnified Person. In the circumstances described in clauses (1) through (3), the Indemnified Person shall be entitled to control and assume responsibility for the defense of that aspect of such Claim covered by clauses (1) through (3) at the expense of Enron, provided such defense is conducted by one counsel (in addition to any local counsel) acceptable to Enron, such acceptance not to be unreasonably withheld or delayed. In addition, any Indemnified Person may participate in any proceeding controlled by Enron pursuant to this Section 6.1, at its own expense, in respect of any such proceeding as to which Enron shall have acknowledged in writing its obligation to indemnify the Indemnified Person pursuant to this Section 6.1, and at the expense of Enron in respect of any such proceeding as to which Enron shall not have so acknowledged its obligation to the Indemnified Person pursuant to this Section 6.1. for so long as Enron fails to assume responsibility for the defense of such Claim. Enron may in any event participate in all such proceedings at its own cost. Nothing contained in this Section 6.1(g) shall be deemed to require an Indemnified Person to contest any Claim or to assume responsibility for or control of any judicial proceeding with respect thereto.

(h)     Subrogation. If a Claim indemnified by Enron under this Section 6.1 is paid in full by Enron and/or an insurer under a policy of insurance maintained by Enron, Enron and/or such insurer, as the case may be, shall be subrogated to the extent of such payment to the rights and remedies of the Indemnified Person (other than under insurance policies maintained by such Indemnified Person, the Trust, the Indenture Trustee, the Collateral Agent, the Trustee, the Noteholders or the Certificateholders) on whose behalf such Claim was paid with respect to the transaction or event giving rise to such Claim. So long as no event referred to in clause (1) of Section 6.1(g)(ii) hereof shall have occurred and be continuing, should an Indemnified Person receive any refund, in whole or in part, with respect to any Claim paid by Enron hereunder, it shall promptly pay over the amount refunded (but not in excess of the amount Enron or any of its insurers has paid) to Enron.

(i)     Reports and Returns. In case any return, report or statement shall be required to be made with respect to any obligation of Enron under or arising out of this Section 6.1 of which Enron is, or through reasonable due diligence should be, aware, Enron shall, to the extent required or permitted by law, make and file in its own name such return, statement or report, and in the case of any such return, statement or report required to be made in the name of an Indemnified Person, to the extent of Enron's actual knowledge thereof, advise such Indemnified Person in writing of such fact and provide such Indemnified Person with information sufficient to permit such return, statement or report to be properly and timely made with respect to any obligations of Enron under or arising out of this Section 6.1.

(j)     Restoration. If Enron has paid to Citibank any amount under this Section 6.1 in respect of a Claim relating to Citibank in its capacity as Directing Party and thereafter a final, non-appealable judgment or award shall be issued against Citibank in its capacity as Directing Party in a

ECMM000294378

judicial or arbitral proceeding by a court of competent jurisdiction with respect to such Claim, Citibank shall forthwith reimburse Enron the amount so paid by Enron.

ARTICLE VII

MISCELLANEOUS

Section 7.1      Amendments, Etc.

No amendment or waiver of any provision of this Agreement or the Fee Letter, nor consent to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by each of Enron and Citibank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.2      Notices.

Except as otherwise expressly provided herein in any particular case, all notices, approvals, consents, requests and other communications hereunder or under the Fee Letter shall be in writing and shall, if addressed as provided in the following sentence, be deemed to have been given, (i) when delivered by hand, (ii) one Business Day after being sent by a private nationally or internationally recognized overnight courier service or (iii) when sent by telecopy, if immediately after transmission the sender's facsimile machine records in writing the correct answer back. Actual receipt at the address of an addressee, regardless of whether in compliance with the foregoing is effective notice hereunder. Until otherwise so notified by the respective parties, all notices, approvals, consents, requests and other communications shall be addressed to the following addresses:

> If to Enron:
>
> 1400 Smith Street
> Houston, Texas  77002
> Attention: Treasurer
> Telecopier No.: 713-646-8517
> Telephone No.: 800-973-6766
>
> with a copy to:
>
> 1400 Smith Street
> Houston, Texas  77002
> Attention:  General Counsel, Enron Global Finance
> Telecopier No.: 713-853-9252
> Telephone No.: 800-973-6766

NY3:#7265358v4

10

ECMM000294379

<u>If to Citibank</u>:

Citibank, N.A.
c/o Derivatives
390 Greenwich Street
New York, New York 10013
Telecopier No.: 212-723-8610
Telephone No.: 212-723-6453

Each of Enron and Citibank may, by notice given hereunder, designate any further or different addresses to which subsequent notices, approvals, consents, requests or other communications shall be sent or persons to whose attention the same shall be directed.

Section 7.3       <u>Severability of Provisions.</u>

If any provision hereof or of the Fee Letter is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of this Agreement or such Fee Letter shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as part of the Agreement or such Fee Letter a legal and enforceable provision as similar in terms to the severed provision as may be possible that maintains for each party hereto the benefit of such party's bargain.

Section 7.4       <u>Binding Effect and Transfers.</u>

All agreements, representations, warranties and indemnities in this Agreement and the Fee Letter and in any agreement, document or certificate delivered pursuant hereto or thereto shall be binding upon the Person making the same and its successors and assigns and shall inure to the benefit of and be enforceable by the Person for whom made and its successors and assigns; <u>provided, however,</u> Enron may not assign or transfer any of its rights or obligations hereunder without the prior written consent of Citibank except pursuant to any merger where Enron is the survivor or the survivor assumes all the obligations of such entity.

Section 7.5       <u>General Limitation of Liability.</u>  Enron acknowledges and confirms that with respect to the transactions described in Section 2.2 of the Closing Agreement, including any transactions with Citibank or its Affiliates: (i) neither Citibank nor its Affiliates are, or will be, acting as a fiduciary (or in any similar capacity) with respect to Enron and the transactions contemplated thereby and that this Agreement does not create nor is it the intention of Enron to create hereby or otherwise, a relationship of principal or agent with Citibank or its Affiliates with respect to the transactions contemplated thereby; (ii) Enron is not relying on the advice of Citibank or its Affiliates for legal, regulatory, financial, accounting, tax or investment matters but instead Enron is seeking and will rely on the advice of its own professionals and advisors for such matters; (iii) Enron will make its own independent analysis and decision regarding the transactions described in Section 2.2 of the Closing Agreement and the pricing and valuation thereof based on the advice from its own professionals and advisors; (iv) Enron will determine, without reliance upon Citibank or its Affiliates, the economic risks and merits as well as the legal, regulatory, tax and accounting characterizations and consequences of the transactions described in Section 2.2 of the Closing Agreement including any hedge transactions, and it will be capable of assuming such risks; and (v) neither Citibank nor its Affiliates have, or will, make any recommendations, guarantees or representations regarding the expected or projected success, performance, result, consequences or benefit (whether legal, regulatory, tax, financial, accounting or otherwise) of the transactions described in Section 2.2 of the Closing Agreement. Nothing herein shall give rise to any liability or responsibility on the part of Citibank or its Affiliates for the success or

ECMM000294380

anticipated benefits of the transactions contemplated thereby. Subject to the following sentence, neither Enron nor Citibank shall be liable in connection with the transaction contemplated hereby for any punitive, exemplary, or treble damages, including without limitation for the inaccuracy of any representation or warranty made by such party; in addition, with respect to the representations made by Enron in Section 4.1 hereof, Claims shall not include any consequential damages. Notwithstanding the limitations of liability described in the preceding sentence, Claims (including, without limitation, Claims indemnified pursuant to Section 5.3) will include the consequential, punitive, exemplary or treble damages to the extent not excluded pursuant to Section 6.1(d), but only to the extent imposed on or paid by an Indemnified Person.

Section 7.6     Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

Section 7.7     Governing Law.  THE RIGHTS AND OBLIGATIONS OF EACH OF THE PARTIES UNDER THIS AGREEMENT AND THE FEE LETTER SHALL, PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Section 7.8     Jurisdiction; Waiver of Jury Trial.

(a)     ANY PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE FEE LETTER MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK IN THE COMMERCIAL DIVISION OF THE SUPREME COURT, CIVIL BRANCH, OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN NEW YORK COUNTY AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE FEE LETTER BROUGHT IN THE COURTS REFERRED TO IN SECTION 7.8(a) HEREOF AND HEREBY FURTHER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR THE FEE LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO

ECMM000294381

ENTER INTO THIS AGREEMENT AND EACH FEE LETTER BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

Section 7.9    No Third-Party Beneficiaries.

This Agreement and the Fee Letter are for the sole benefit of Enron and Citibank and their respective successors and assigns and, to the extent referred to in this Agreement, all Indemnified Persons and their respective successors and assigns, and are not for the benefit of any other Person.

Section 7.10    Survival; Termination.

All agreements, representations, warranties and indemnities contained in this Agreement or the Fee Letter and in any agreement, document or certificate delivered pursuant hereto or thereto, or in connection herewith or therewith, shall survive and continue in effect following the execution and delivery of this Agreement and the Closing Date. Unless otherwise terminated prior thereto in accordance with this Agreement, the obligations of Citibank and Enron under this Agreement shall terminate on the Final Termination Date; provided, that (a) each obligation to pay any amount remaining due and owing under this Agreement on the Final Termination Date shall survive until such payment is made in full in accordance with this Agreement and (b) the provisions of Section 6.1 and Section 7.5 shall survive any such termination.

Section 7.11    Effect of Headings.

The Table of Contents and the headings of the Articles, Sections, subsections, clauses and paragraphs hereof, and of Appendices hereto, are for convenience of reference only, and shall not affect the construction or interpretation of this Agreement.

Section 7.12    Amendments, Waivers, Etc.

Neither this Agreement nor the Fee Letter may be amended, discharged or terminated nor may any provision hereof or thereof be waived unless such amendment, discharge, termination or waiver is in writing and signed by each of Enron and Citibank and, to the extent affecting the rights of an Indemnified Person hereunder, such Person.

Section 7.13    Entire Agreement.

This Agreement (including, without limitation, the appendices hereto) and the Enron Closing Date Documents to which Enron and Citibank are party supersede all prior agreements, written or oral, between or among Enron and Citibank relating to the transactions contemplated hereby and thereby, and each of Enron and Citibank represents and warrants to the other that this Agreement and the Transaction Documents and Enron Closing Date Documents to which Enron and Citibank are party constitute the entire agreement between Enron and Citibank relating to the transactions contemplated hereby and thereby.

Section 7.14    Expenses.

All statements, reports, certificates, opinions and other documents or information required to be furnished by Enron to Citibank under this Agreement or the Fee Letter shall be supplied without cost to Citibank. Enron shall pay, within 30 days after demand therefor, (a) any Administrative Expenses incurred by Citibank to the extent such amounts are not paid pursuant to the Transaction Documents and Enron Closing Date Documents and (b) all reasonable and documented out-of-pocket

ECMM000294382

costs and expenses (including reasonable legal fees and expenses) of Citibank incurred in connection with (i) the negotiation, preparation, execution and delivery of this Agreement and the Transaction Documents and Enron Closing Date Documents or any waiver or amendment of, or supplement or modification to, this Agreement or any Transaction Document or Enron Closing Date Document and (ii) the review of any of the other agreements, instruments or documents referred to in this Agreement or any Transaction Document or Enron Closing Date Document or relating to the transactions contemplated hereby or thereby. In addition, Enron shall pay, within 30 days after demand therefor, all reasonable and documented out-of-pocket costs and expenses (including legal fees and expenses) of Citibank incurred in connection with the enforcement or protection of its rights under this Agreement or the Fee Letter, including in connection with any workout, restructuring or negotiations in respect thereof, and including the exercise of the remedies of Citibank under this Agreement or the Fee Letter following the occurrence of an Enron Event of Default or Enron Credit Event.

Section 7.15    No Bankruptcy Petition.

(a)    Enron. Enron covenants and agrees that, prior to the date that is a year and a day after the payment in full of all outstanding Notes and Certificates, it will not institute against, or join any other Person in instituting against, the Trust any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

(b)    Citibank. Citibank covenants and agrees that, prior to the date that is a year and a day after the payment in full of all outstanding Notes and Certificates, it will not institute against, or join any other Person in instituting against, the Trust any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or similar proceeding under the laws of the United States or any state of the United States.

Section 7.16    Confidentiality. Enron agrees to keep confidential (and, with respect to any financial or other information prepared by or on behalf of Enron for distribution by the Trust, to use its reasonable efforts to cause the Trust to keep confidential) all non-public information provided to it or to the Trust with respect to the Trust Investments; provided that nothing in this Section 7.16 shall prevent Enron from disclosing any such information (i) as provided in any Transaction Document, (ii) to the extent requested or required by any Governmental Authority or by any order of any court or other tribunal or as may otherwise be required pursuant to Applicable Law, or (iii) which has been publicly disclosed other than in breach of this Agreement.

ECMM000294383

IN WITNESS WHEREOF, each of Enron and Citibank has caused this Agreement to be executed in its name and on its behalf as of the date first above written.

CITIBANK, N.A.                                    ENRON CORP.

By _____          By _____
    Name:                                              Name:  Dan O. Boyle
    Title:                                               Title:    Agent and Attorney in Fact

S-1                                    ECMM000294384

IN WITNESS WHEREOF, each of Enron and Citibank has caused this Agreement to be executed in its name and on its behalf as of the date first above written.

CITIBANK, N.A.                                    ENRON CORP.


By _____          By _____
  Name:                                               Name:
  Title:                                                Title:

ECMM000294385

SCHEDULE 1
To
Agreement

ENRON OBLIGATIONS

| Title of Agreement | Outstanding Amount |
| --- | --- |
| Forward Oil Swap between Enron and Citibank pursuant to the terms of a Confirmation dated May 24, 2001 to the ISDA Master Agreement between such parties dated as of November 18, 1999. | £109,500,000 |
| Enron Debt Security, dated May 24, 2001 issued by Enron Corp. to Citibank. | £15,500,000 |

NY3:#7265358v4

ECMM000294386