# ENRON AGREEMENT

DATED AS OF

## DECEMBER 29, 1997

SS_NYL3A/46697          This document is subject to a written Confidentiality Agreement

EC 001013021

AB000371212

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Preliminary Statements | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |

## Section 1

## Defined Terms; Rules of Construction

| 1.1. | Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| 1.2. | Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| 1.3. | Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| 1.4. | No Presumption Against Any Party . . . . . . . . . . . . . . . . . . . . | 2 |
| 1.5. | Use of Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| 1.6. | Headings and References . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |

## SECTION 2

## REPRESENTATIONS AND WARRANTIES

| 2.1. | Due Formation or Incorporation; Authorization of Agreement . . . . . . . . . . . | 2 |
| 2.2. | No Contravention of Restrictions; No Default . . . . . . . . . . . . . . . . | 3 |
| 2.3. | Governmental Authorizations . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| 2.4. | Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 2.5. | Subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 2.6. | Business Operations and Condition . . . . . . . . . . . . . . . . . . . . | 4 |
| 2.7. | Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 2.8. | Investment Company; Holding Company . . . . . . . . . . . . . . . . . . | 4 |
| 2.9. | Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 2.10. | Creditors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 2.11 | Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 2.12 | No Enron Event . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 2.13 | ERISA Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 2.14. | Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |

## SECTION 3

## INDEMNIFICATION

| 3.1. | Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| 3.2. | Survival of Indemnification Obligations . . . . . . . . . . . . . . . . . | 8 |
| 3.3. | Limitations on Indemnification Obligations . . . . . . . . . . . . . . . . | 8 |
| 3.4. | Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| 3.5. | Procedural Requirements . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |

This document is subject to a written Confidentiality Agreement

EC 001013022

AB000371213

(ii)

SECTION 4

[INTENTIONALLY OMITTED]

SECTION 5

ENRON COVENANTS

| 5.1. | Separate Existence | 12 |
| 5.2. | Affirmative Covenants | 15 |
| 5.3. | Negative Covenants | 17 |

SECTION 6

MISCELLANEOUS

| 6.1. | Amendments | 19 |
| 6.2. | Addresses for Notices | 19 |
| 6.3. | No Waiver; Cumulative Remedies | 20 |
| 6.4. | Waiver of Jury Trial | 20 |
| 6.5. | Assignment | 20 |
| 6.6. | Governing Law | 20 |
| 6.7. | Counterparts | 20 |
| 6.8. | Survival of Representations, Warranties and Indemnities; Entire Agreement | 20 |
| 6.9. | Severability | 20 |
| 6.10. | No Third-Party Beneficiaries | 21 |
| 6.11. | Obligations Absolute | 21 |
| 6.12. | Waiver | 22 |
| 6.13. | Intentionally Omitted | 22 |
| 6.14. | Confidentiality | 22 |
| 6.15. | Deemed Representation | 23 |

| EXHIBIT A | DEFINITIONS |
| ANNEX I | FINANCIAL MODEL |

SS_NYLJA/46697        This document is subject to a written Confidentiality Agreement

EC 001013023

AB000371214

## ENRON AGREEMENT

ENRON AGREEMENT dated as of December 29, 1997 (this *"Agreement"*) by Enron Corp., an Oregon corporation (*"Enron"*), in favor of Nighthawk Investors L.L.C., a Delaware limited liability company (the *"Investor"*), and the other Indemnified Persons (as defined below).

## PRELIMINARY STATEMENTS

A.     Enron is the member of Whitewing Associates L.L.C., a Delaware limited liability company (the *"Joint Venture"*) and desires to have the Investor become a member of the Joint Venture in accordance with the Amended and Restated Company Agreement of the Joint Venture dated as of December 29, 1997 (the *"Joint Venture Company Agreement"*).

B.     The Investor is willing to become a member of the Joint Venture only on the condition, among others, that Enron provide certain assurances set forth in this Agreement.

In consideration of the premises, and intending to be legally bound by this Agreement, Enron agrees as follows:

## SECTION 1

## DEFINED TERMS; RULES OF CONSTRUCTION

1.1.     Definitions. As used in this Agreement, capitalized terms defined in the preamble, Preliminary Statements and other Sections of this Agreement shall have the meanings set forth therein, terms defined in Exhibit A shall have the meanings set forth therein, and capitalized terms used herein or in Exhibit A but not otherwise defined herein or in Exhibit A shall have the meanings set forth in the Joint Venture Company Agreement.

1.2.     Computation of Time Periods. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the word "to" and "until" means "to but excluding."

1.3.     Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with financial covenants shall be based upon, GAAP applied consistently, *provided, however*, the financial statements

EC 001013024

AB000371215

2

and reports required pursuant to Section 5.2(b)(i) shall be prepared in accordance with generally accepted accounting principles consistently applied except to the extent stated therein.

     1.4.  No Presumption Against Any Party. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any particular party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

     1.5.  Use of Certain Terms. Unless the context of this Agreement requires otherwise, the plural includes the singular, the singular includes the plural, and *"including"* has the inclusive meaning of *"including without limitation."* The words *"hereof,"* *"herein,"* *"hereby,"* *"hereunder,"* and other similar terms of this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

     1.6.  Headings and References. Section and other headings are for reference only, and shall not affect the interpretation or meaning of any provision of this Agreement. Unless otherwise provided, references to Articles, Sections, Schedules, and Exhibits shall be deemed references to Articles, Sections, Schedules, and Exhibits of this Agreement. References to this Agreement and any other Operative Document include this Agreement and the other Operative Documents as the same may be modified, amended, restated or supplemented from time to time pursuant to the provisions hereof or thereof as permitted by the Operative Documents. A reference to any Law shall mean that Law as it may be amended, modified or supplemented from time to time, and any successor Law. A reference to a Person includes the successors and assigns of such Person, but such reference shall not increase, decrease or otherwise modify in any way the provisions in this Agreement governing the assignment of rights and obligations under or the binding effect of any provision of this Agreement, including Section 6.5.

SECTION 2

REPRESENTATIONS AND WARRANTIES.

     Enron hereby represents and warrants as follows:

SS_NYLJA/46697         This document is subject to a written Confidentiality Agreement

EC 001013025

AB000371216

3

2.1.  Due Formation or Incorporation; Authorization of Agreement. Enron, each Principal Subsidiary and each Enron Party are duly organized or validly formed, validly existing and (if applicable) in good standing in each case under the laws of its jurisdiction of incorporation or formation. Enron, each Enron Party and each Principal Subsidiary have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on their respective businesses as now conducted. Enron and each Enron Party have the power and authority to execute and deliver this Agreement and the other Operative Documents to which they are a party and to perform their respective obligations hereunder and thereunder. The execution, delivery and performance by Enron and each Enron Party of this Agreement and each other Operative Document to which any such Person is a party have been duly authorized by all necessary corporate, limited liability company or other entity, as the case may be, action. Each of this Agreement and each other Operative Document to which Enron or any Enron Party is a party constitutes the legal, valid and binding obligation of such Person and is enforceable against such Person in accordance with its respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

2.2.  No Contravention of Restrictions; No Default. The execution, delivery and performance by Enron and each Enron Party of each Operative Document to which they respectively are parties (a) do not contravene, or constitute a default under, (i) any provision of law or regulation (including Regulation X issued by the Board of Governors of the Federal Reserve System) applicable to Enron or such Enron Party or Regulations G or U issued by the Board of Governors of the Federal Reserve System or the Organizational Documents of Enron or such Enron Party, respectively, (ii) any judgment, injunction, order or decree, (iii) any material ("*material*" for the purposes of this representation meaning creating a liability of $50,000,000 or more) agreement to which Enron or any Enron Party is a party or bound by, (iv) in the case of any Enron Party, any agreement to which such Enron Party is a party, binding upon such Enron Party, or (v) any agreement to which Enron or such Enron Party is a party, to the extent non-compliance therewith would have a Material Adverse Effect as defined in clauses (b), (c), or (d) thereof, or (b) will not result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of Enron or any of its Subsidiaries or of such Enron Party.

2.3.  Governmental Authorizations. The execution, delivery and performance by Enron and each Enron Party of each Operative Document to which they respectively are parties do not require, in respect of Enron or such Enron Party, any action by or in respect of (including any license or permit), or filing with, any governmental body, agency or official, which has not been obtained or made and which is not in full force and effect, except for actions or filings with respect to the filing of the Shelf Registration Statement and under the "*HSR Act*" (as defined in the Purchase Option Agreement) and under the Securities Exchange

This document is subject to a written Confidentiality Agreement

EC 001013026

AB000371217

4

Act of 1934, as amended, in each case which are to be performed or filed at a date after the date of this Agreement.

2.4.    Litigation. Except as disclosed in Enron's Form 10-K for the year ended December 31, 1996, Enron's Form 8-Ks dated March 17, 1997, June 5, 1997, August 29, 1997 and September 17, 1997, or the Enron's Forms 10-Q for the quarters ended March 31, 1997, June 30, 1997 or September 30, 1997 (collectively, the "*Securities Filings*"), there is no action, suit or proceeding pending against Enron or any of its Subsidiaries or any Enron Party, or to the knowledge of Enron threatened against Enron or any of its Subsidiaries or any Enron Party, before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of Enron and its Subsidiaries taken as a whole or of the Joint Venture or the Investor Enron Member or which could reasonably be expected to impair Enron's or such Enron Party's ability to perform its obligations under, or which in any manner draws into question the validity of, this Agreement or any other Operative Document to which Enron or any Enron Party is a party.

2.5.    Subsidiaries. The Investor Enron Member is a wholly owned Subsidiary of Enron.

2.6.    Business Operations and Condition. Except as disclosed in the Securities Filings referred to in the first sentence of Section 2.4, since December 31, 1996 through the date hereof, there has been no material adverse change in the business, consolidated financial position or consolidated results of operations of Enron and its Subsidiaries, considered as a whole.

2.7.    Financial Statements. The audited consolidated balance sheet of the Enron and its Subsidiaries as of December 31, 1996, and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of Enron and its Subsidiaries as of September 30, 1997 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the nine months then ended included in Enron's Forms 10-Q and Form 10-K referenced in Section 2.4, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of Enron and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

2.8.    Investment Company; Holding Company. Neither Enron nor any of its Subsidiaries nor any Enron Party is an "investment company" within the meaning of the

EC 001013027

AB000371218

5

Investment Company Act of 1940, as amended. Each of Enron, its Principal Subsidiaries and each Enron Party is not subject to, or is exempt from, regulation as a "holding company," a "subsidiary company" of a "holding company," an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935, as amended.

2.9.   Taxes.  United States federal income tax returns of Enron and its Subsidiaries have been examined and closed through the fiscal year ended December 31, 1991. Enron and its Subsidiaries have filed or caused to be filed all United States federal income tax returns and all other material tax returns which to the knowledge of Enron are required to be filed by them and have paid or provided for the payment, before the same became delinquent, of all taxes due pursuant to such returns or pursuant to any assessment received by Enron or any Subsidiary, other than those taxes contested in good faith by appropriate proceedings. The charges, accruals and reserves on the books of Enron and its Subsidiaries in respect of taxes are, in the opinion of Enron, adequate to the extent required by GAAP.

2.10.   Creditors.  None of the transactions in connection with which this Agreement is being executed is being entered into by Enron or any Enron Party with the intent to delay, hinder or defraud any of their respective creditors.

2.11   Priority.  The obligations of Enron under the Enron Notes do rank and will rank in priority of payment with all other senior unsecured Debt of Enron; *provided, however*, that this Section 2.11 is not a representation or warranty that the Enron Notes constitute "*Senior Indebtedness*" (or any comparable term) under any indentures, instruments or agreements evidencing or pertaining to any Subordinated Debt.

2.12.   No Enron Event.  As of the date hereof, no Enron Event or event which, with the passage of time or giving of notice or both, would result in an Enron Event, has occurred and is continuing.

2.13   ERISA Matters.  No Termination Event has occurred or is reasonably expected to occur with respect to any Plan for which an Insufficiency in excess of $50,000,000 exists.  Neither Enron nor any ERISA Affiliate has received any notification (or has knowledge of any reason to expect) that any Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, for which a Withdrawal Liability in excess of $50,000,000 exists.

EC 001013028

AB000371219

6

2.14.  Disclosure.  The financial model for the Investor attached hereto as Annex I (the "*Financial Model*"), subject to the qualifications and assumptions set forth in the Financial Model, (x) contains formulas which are consistent with and fairly reflect (i) the allocations provided in the Joint Venture Company Agreement and (ii) the other relevant financial terms of the Joint Venture Company Agreement and the Investor Company Agreement and (y) generates computed amounts that fairly reflect the application of such formulae to the assumptions contained in the Financial Model.

## SECTION 3

### INDEMNIFICATION

3.1.  Indemnity.  Subject to the limitations set forth in Section 3.3, Enron agrees, to the fullest extent permitted by law, to indemnify, hold harmless and pay, on an After-Tax Basis, all Expenses (the Expenses, on an After-Tax Basis, being referred to collectively as the "*Indemnified Amounts*") of any Beneficiary, and the direct and indirect members, partners, shareholders and other equity holders of any Beneficiary, and the successors and permitted assignees of such Person (whether pursuant to an assignment for security or otherwise) and creditors of and surety providers with respect to, any of the foregoing, and their respective successors and assigns (whether pursuant to an assignment for security or otherwise) and each of the respective directors, officers, employees, administrators and agents of any of the foregoing (each of the foregoing indemnified Persons being an "*Indemnified Person*"), which may be incurred or realized by or asserted against such Indemnified Person relating to, growing out of or resulting from:

(a)     Enron Obligations.  Any failure by Enron or any Enron Party to perform or observe each of its covenants and obligations under this Agreement, the Joint Venture Company Agreement, the Preferred Stock Purchase and Registration Agreement, any Investor Document to which it is a party, or any other Operative Document to which it is a party (collectively, the "*Covered Documents*"), including Indemnified Amounts resulting from or arising out of or in connection with enforcement of the Covered Documents (or determining whether or how to enforce any Covered Documents, whether through negotiations, legal proceedings or otherwise), or responding to any subpoena or other legal process or informal investigative demand in connection herewith or therewith; or

(b)     Representations and Warranties.  Any inaccuracy in, or any breach of, any written certification, representation or warranty made or deemed made (i) by Enron in this Agreement or by Enron or any Enron Party or any Enron Controlled Entity (or any officer or other authorized representative thereof) to or for the benefit of any Indemnified Person or the Joint Venture in any Covered Document, or (ii) by Enron,

SS_NYLJA/46697          This document is subject to a written Confidentiality Agreement

EC 001013029

AB000371220

7

any Enron Party or any Enron Controlled Entity (or any officer or other authorized representative thereof) in any written report or certification required hereunder or under any Covered Document, in each case (A) if but only if such certification, representation or warranty is made as of a specific date, as of the date as of which the facts stated therein were certified, represented or warranted and (B) in all other cases, as of any date or during any period to which such certification, representation or warranty may be applicable; or

(c)    Investigations: Litigation: Proceedings. Any investigation, litigation or proceeding, whether or not such Indemnified Person is a party thereto, that (i) relates to, grows out of or results from any action or omission, or alleged action or omission, by or on behalf of or attributable to Enron or any Enron Party or any Enron Controlled Entity, whether relating to the Joint Venture or otherwise, and (ii) would not have resulted in Indemnified Amounts incurred or realized by or asserted against such Indemnified Person but for their being a party to, or a direct or indirect participant in, or having a relationship to a party to, or a direct or indirect participant in, the Operative Documents or any of the transactions contemplated thereby; or

(d)    Substantive Consolidation. (i) Any petition or proceeding (x) seeking or asserting, or (y) a court ordering, in any case or proceeding under the United States Bankruptcy Code involving Enron, any Enron Party or any other Subsidiary of Enron, as debtor, that the assets and liabilities of the Joint Venture be consolidated substantively with the assets and liabilities of Enron, any Enron Party (other than Joint Venture) or any other Subsidiary of Enron (other than the Joint Venture) and (ii) defending against any petition, proceeding or order referred to clause (i) of this paragraph (d); it being agreed that upon the occurrence of an event described in sub-clause (y) of such clause (i) which is or becomes a final judgment or order, the Indemnified Persons involved shall be entitled to recover from Enron, as liquidated damages for Indemnified Amounts under such clause (i) (but without prejudice to amounts recoverable under clause (ii) of this paragraph (d) or any other provision of the Operative Documents), and not as a penalty, an aggregate amount equal to the sum of the amount that would be paid to the Investor as the "*Member Interest Liquidation Value*" (as defined in the Purchase Option Agreement) (assuming that a "*Standard Exercise*" (as defined in the Purchase Option Agreement) occurred and the Full Purchase Option Closing Date occurred on the date prior to the date of the court order referred to in such clause (i) with respect to the Joint Venture) and all accrued and unpaid Guaranteed Payments through the date of payment in full of the Member Interest Liquidation Value in addition to all other Indemnified Amounts hereunder; or

(e)    Restricted Shares. Enron Shares being Restricted Shares at the time of their Disposition; it being agreed that upon the occurrence of the events described in

This document is subject to a written Confidentiality Agreement

EC 001013030

AB00371221

8

the preceding portion of this clause (e), the Indemnified Persons involved shall be entitled to recover from Enron, as liquidated damages and not as a penalty, an aggregate amount determined by the Appraiser in good faith, and supported by calculations thereof in reasonable detail based upon reasonable assumptions and such other facts as the Appraiser, in its good faith reasonable discretion, shall deem relevant for such determination, in addition to other Indemnified Amounts hereunder; or

     (f)    ERISA.  Any liability or other Indemnified Amounts that the Joint Venture may incur in connection with any Plan or Multiemployer Plan; or

     (g)    Expenses.  Any amendment, supplement, modification, consent or waiver of, to or under any Covered Document (to the extent not otherwise reimbursed pursuant to any Operative Document).

     3.2.    Survival of Indemnification Obligations.  All indemnities provided for in this Agreement shall survive the Transfer of any Member Interest in the Joint Venture and the liquidation of the Joint Venture.  After any such Transfer or liquidation, the provisions of this Section 3 shall inure to the benefit of each Indemnified Person with respect to Indemnified Amounts arising in respect of the period during which the Transferring Member was a Member (including with respect to actions taken or omitted to be taken, and events occurring and circumstances existing, during such period) of the Joint Venture.

     3.3.    Limitations on Indemnification Obligations.  The indemnities provided in Section 3.1 shall be subject to the following limitations:

     (a)    Limitation by Law.  Such sections shall be enforced only to the maximum extent permitted by Law.

     (b)    Misconduct, Etc.  No Person, and no controlling Affiliate of such Person in its own right (but without prejudice to the claims of Persons who are Indemnified Persons by reason of a relationship to such controlling Affiliate (such as an agent, employee, creditor or surety of such controlling Affiliate)) shall be indemnified from any liability solely caused by or resulting from (i) the actual fraud, willful misconduct, bad faith or gross negligence of such Person or (ii) any inaccuracy in, or breach of, any written certification, representation or warranty made by such Person in any Covered Document or in any written report or certification required hereunder or under any other Covered Document unless such inaccuracy or breach is attributable to any written information provided by Enron or its Affiliates, in each case under this clause (ii) (A) if, but only if, such certification, representation or warranty is made as of a specific date, as of the date as of which the facts stated therein were certified,

        This document is subject to a written Confidentiality Agreement

EC 001013031

AB000371222

9

represented or warranted and (B) in all other cases, as of any date or during any period to which such certification, representation or warranty may be applicable.

(c)    No Duplication.  Indemnified Amounts under this Section 3 shall be without duplication of any amounts payable under indemnification provisions of any other "Operative Document" as defined in either the Joint Venture Company Agreement or the Investor Credit Agreement or any amounts actually paid thereunder.

3.4.    Payments.  Any amounts subject to the indemnification provisions of this Section 3 shall be paid by Enron within ten Business Days following demand therefor, accompanied, as may be appropriate in the context, by supporting documentation in reasonable detail.  Payment shall be made to the bank account or at another location as such Indemnified Person shall designate in writing or as is expressly required under any Operative Document the obligations under which are the subject of any such payment, not later than 1:00 pm (New York time) on the date for such payment in immediately available funds.

3.5.    Procedural Requirements.

(a)    Notice of Claims.  Any Indemnified Person that proposes to assert a right to be indemnified under this Section 3 will, promptly after receipt of notice of commencement of any action, suit or proceeding against such Indemnified Person, or the incurrence or realization of Indemnified Amounts, in respect of which a claim is to be made against Enron under this Section 3, notify Enron of such incurrence or realization or of the commencement of such action, suit or proceeding, enclosing a copy of all papers served, but the omission so to notify Enron promptly of any such incurrence, realization, action, suit or proceeding shall not relieve (x) Enron from any liability that it may have to such Indemnified Person under this Section 3 or otherwise, except, as to Enron's liability under this Section 3, to the extent, but only to the extent, that Enron shall have been prejudiced by such omission, or (y) any other indemnitor from liability that it may have to any Indemnified Person under the Operative Documents.

(b) -    Defense of Proceedings.  In case any such action, suit or proceeding shall be brought against any Indemnified Person and it shall notify Enron of the commencement thereof, Enron shall be entitled to participate in, and to assume the defense of, such action, suit or proceeding with counsel reasonably satisfactory to such Indemnified Person, and after notice from Enron to such Indemnified Person of Enron's election so to assume the defense thereof and the failure by such Indemnified Person to object to such counsel within ten Business Days following its receipt of such notice, Enron shall not be liable to such Indemnified Person for legal or other expenses incurred after such notice of election to assume such defense except as provided below and except for the reasonable costs of investigating, monitoring or cooperating in such defense subsequently incurred by such Indemnified Person reasonably necessary in connection with the defense thereof.  Such

EC 001013032

AB000371223

10

Indemnified Person shall have the right to employ its counsel in any such action, suit or proceeding, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless:

(i)     the employment of counsel by such Indemnified Person at the expense of Enron has been authorized in writing by Enron;

(ii)     such Indemnified Person shall have concluded in its good faith (which conclusion shall be determinative unless a court determines that conclusion was not reached in good faith) that there is or may be a conflict of interest between Enron and such Indemnified Person in the conduct of the defense of such action or that there are or may be one or more different or additional defenses, claims, counterclaims, or causes of action available to such Indemnified Person (it being agreed that in any case referred to in this clause (ii) Enron shall not have the right to direct the defense of such action on behalf of the Indemnified Person);

(iii)     Enron shall not have employed counsel to assume the defense of such action within a reasonable time after notice of the commencement thereof; or

(iv)     any counsel employed by Enron shall fail to timely commence or maintain the defense of such action,

in each of which cases the fees and expenses of counsel for such Indemnified Person shall be at the expense of Enron; *provided* that without the prior written consent of such Indemnified Person, Enron shall not settle or compromise, or consent to the entry of any judgment in, any pending or threatened claim, action, investigation, suit or other legal proceeding in respect of which indemnification may be sought under this Section 3, unless such settlement, compromise or consent includes an unconditional release of such Indemnified Person from all liability for Expenses arising out of such claim, action, investigation, suit or other legal proceeding.  No Indemnified Person shall settle or compromise, or consent to the entry of any judgment in, any pending or threatened claim, action, investigation, suit or other legal proceeding in respect of which any payment would result hereunder or under the other Operative Documents without the prior written consent of Enron, such consent not to be unreasonably withheld or delayed.

THE FOREGOING INDEMNITY SHALL EXPRESSLY INCLUDE ANY INDEMNIFIED AMOUNTS ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF ANY INDEMNIFIED PERSON, BUT SHALL EXCLUDE ANY SUCH INDEMNIFIED AMOUNTS ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON. IT IS THE INTENT OF THE PARTIES HERETO THAT THE INDEMNIFIED PERSONS, SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 3, BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE.

EC 001013033

AB000371224

11

## SECTION 4

### [INTENTIONALLY OMITTED]

## SECTION 5

### ENRON COVENANTS

5.1.    Separate Existence.  Enron hereby covenants and agrees that, so long as
the Investor, or its successors and assigns (other than Enron or any Subsidiary of Enron),
holds an interest in the Joint Venture, Enron will, and will cause each of the Enron Controlled
Entities (including the Enron Parties) and, as applicable, the Joint Venture (for so long as
Enron, as the Class A Member, has the power and authority to manage the business and affairs
of the Joint Venture), in connection with any transaction, agreement or dealing with or relating
to the Investor or the Joint Venture to comply (except for such noncompliance which, in the
aggregate, is not material) with the following undertakings:

    (i)     Enron and the Enron Controlled Entities (other than the Joint Venture)
will maintain their books, financial records and accounts, including checking and other
bank accounts and custodian and other securities safekeeping accounts, separate and
distinct from those of the Joint Venture or the Investor, as the case may be.

    (ii)    Enron and the Enron Controlled Entities (other than the Joint Venture)
will maintain their books, financial records and accounts (including inter-entity
transaction accounts) in a manner so that it will not be difficult or costly to segregate,
ascertain or otherwise identify their assets and liabilities separate and distinct from the
assets and liabilities of the Joint Venture or the Investor, as the case may be.

    (iii)   Enron and the Enron Controlled Entities (other than the Joint Venture)
on the one hand, will not commingle any of their assets, funds, liabilities or business
functions with the assets, funds, liabilities or business functions of the Joint Venture or
the Investor, as the case may be, on the other hand.

    (iv)    Enron and the Enron Controlled Entities (other than the Joint Venture)
will each observe all requisite corporate procedures and formalities, including the
holding of periodic and special meetings of shareholders and boards of directors, the
recordation and maintenance of minutes of such meetings, and the recordation and
maintenance of resolutions adopted at such meetings.

EC 001013034

AB000371225

12

(v)    The Joint Venture will observe all requisite organizational procedures and formalities, including the holding of meetings of members as required by the Joint Venture Company Agreement, the recordation and maintenance of minutes of such meetings, and the recordation of and maintenance of resolutions adopted at such meetings.

(vi)    None of Enron or the Enron Controlled Entities (other than the Joint Venture will be consensually merged or consolidated with the Joint Venture or the Investor, as the case may be (other than, with respect to the Joint Venture, for financial reporting purposes).  None of Enron or the Enron Controlled Entities will be consensually merged or consolidated with the Investor for any purpose.

(vii)    Enron will include in its consolidated financial statements footnotes that clearly disclose, among other things, the separate existence and identity of the Joint Venture from Enron and its other Subsidiaries, and that the Joint Venture has separate assets and liabilities.  The Investor will not be consolidated with Enron for the purposes of Enron's consolidated financial statements.

(viii)    All transactions, agreements and dealings between Enron and the Enron Controlled Entities (other than the Joint Venture) on the one hand, and the Joint Venture or the Investor, as the case may be, on the other hand (including transactions, agreements and dealings pursuant to which the assets or property of one is used or to be used by the other), will reflect the separate identity and legal existence of each entity.

(ix)    Transactions between the Joint Venture on the one hand, and any third parties, on the other hand, will be conducted in the name of the Joint Venture as an entity separate and distinct from Enron or any Enron Controlled Entities (other than the Joint Venture).

(x)    Except as otherwise specified in the Operative Documents, the Joint Venture on the one hand, will pay its liabilities and losses from its respective assets, and Enron, the Enron Controlled Entities (other than the Joint Venture) on the other hand, will pay their liabilities and losses from their respective assets.

(xi)    Representatives and agents of the Joint Venture (whether or not they are "loaned" employees of Enron or the Enron Controlled Entities (other than the Joint Venture)) will, when purporting to act on behalf of the Joint Venture, hold themselves out to third parties as being representatives or agents, as the case may be, of the Joint Venture, and will utilize business cards, letterhead, purchase orders, invoices and the like of the Joint Venture.

EC 001013035

AB00371226

13

(xii)    The Joint Venture will compensate all consultants, independent contractors and agents from its own funds for services provided to it by such consultants, independent contractors and agents.

(xiii)    To the extent that the Joint Venture on the one hand, and Enron or the Enron Controlled Entities (other than the Joint Venture), on the other hand, jointly contract or do business with vendors or service providers or share overhead expenses, the costs and expenses incurred in so doing will be fairly and nonarbitrarily allocated between or among such entities, with the result that each such entity bears its fair share of all such costs and expenses. To the extent that the Joint Venture, on the one hand, and Enron or the Enron Controlled Entities (other than the Joint Venture) on the other hand, contracts or does business with vendors or service providers where the goods or services are wholly or partially for the benefit of the other, then the costs incurred in so doing will be fairly and nonarbitrarily allocated to the entity for whose benefit the goods or services are provided, with the result that each such entity bears its fair share of all such costs, except to the extent otherwise provided in the Operative Documents.

(xiv)    The Joint Venture will have annual financial statements prepared in accordance with GAAP, separate from Enron and the Enron Controlled Entities (other than the Joint Venture).

(xv)    None of Enron or the Enron Controlled Entities (other than the Joint Venture) will make any inter-entity loans, advances, guarantees, extensions of credit or contributions of capital to, from or for the benefit of the Joint Venture or the Investor, as the case may be without proper documentation and accounting satisfactory to its and their accountants and only in accordance with the provisions of the Joint Venture Company Agreement or the Investor Company Agreement, as the case may be, and the other Operative Documents.

(xvi)    The Joint Venture will cause to be prepared and filed all legally required tax returns for itself (including federal and state income tax returns) separately from the tax returns of Enron and the Enron Controlled Entities (other than the Joint Venture).

(xvii)    Enron and the Enron Controlled Entities (other than the Joint Venture) will not refer to the Joint Venture or the Investor, as the case may be, as a department or division of Enron or any of the Enron Controlled Entities (other than the Joint Venture) and will not otherwise refer to the Joint Venture or the Investor, as the case may be in a manner inconsistent with its status as a separate and distinct legal entity. In addition, the Joint Venture will hold itself out as separate and distinct from Enron and the Enron Controlled Entities (other than the Joint Venture).

EC 001013036

AB000371227

14

5.2.    <u>Affirmative Covenants</u>.  Enron hereby covenants and agrees that, until the Collection Date, it will:

(a)    <u>Compliance with Laws, Etc</u>.  (i)  Comply with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a Material Adverse Effect, (ii) cause each of its Consolidated Subsidiaries to comply with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a Material Adverse Effect under clause (a) of the definition thereof and (iii) cause each of its Subsidiaries to comply with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a Material Adverse Effect as defined in clauses (b), (c) or (d) of the definition thereof,  in each case such compliance to include compliance with environmental laws and the paying before the same become delinquent of all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith.

(b)    <u>Reporting Requirements</u>.  Furnish to the Investor sufficient copies for each Beneficiary the following:

(i)    (1) promptly after the sending or filing thereof, a copy of each of the Enron's reports on Form 8-K (or any comparable form), (2) promptly after the filing or sending thereof, and in any event within 75 days after the end of each of the first three fiscal quarters of each fiscal year of Enron, a copy of Enron's report on Form 10-Q (or any comparable form) for such quarter, which report will include Enron's quarterly unaudited consolidated financial statements as of the end of and for such quarter, and (3) promptly after the filing or sending thereof, and in any event within 135 days after the end of each fiscal year of Enron, a copy of Enron's annual report which it sends to its public security holders, and a copy of the Enron's report on Form 10-K (or any comparable form) for such year, which annual report will include the Enron's annual audited consolidated financial statements as of the end of and for such year;

(ii)    as soon as possible and in any event within five days after a Responsible Officer having obtained knowledge thereof, notice of (A) the occurrence of any Enron Event, Joint Venture Notice Event or Joint Venture Liquidating Event or any event which, with the giving of notice or lapse of time, or both, would constitute an Enron Event, Joint Venture Notice Event or Joint Venture Liquidating Event (other than the 2002 Termination Event), continuing on the date of such notice or (B) any litigation, arbitration proceeding or governmental investigation or proceeding pending (x) against Enron or any Enron Party which would have a Material Adverse Effect as

EC 001013037

AB000371228

15

defined in clauses (b), (c) or (d) of the definition thereof or (y) with respect to any Operative Document to which Enron or any Subsidiary of Enron or any Enron Party is a party, and in each case a statement of the chief financial officer of Enron setting forth details thereof and the action which Enron has taken and proposes to take with respect thereto; and

(iii)    From time to time, such other information relating to Enron and the Enron Parties and the transactions contemplated by any Operative Document to which Enron or any Enron Party is a party as any Beneficiary may reasonably request.

(c)    Visitation Rights. At any reasonable time and from time to time, after reasonable notice, permit CXC, the Agent, the Security and Collection Agent, the Investor, the Surety Provider and the Lender (as such terms are defined in the Investor Credit Agreement) or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, Enron, any of its Principal Subsidiaries and any Enron Parties, and to discuss the affairs, finances and accounts of Enron, any of its Principal Subsidiaries and any Enron Parties with any of their respective officers or directors. Enron shall assume or pay all reasonable costs and expenses associated with any such discussion or examination.

(d)    Maintenance of Existence, Etc. Preserve and maintain, and cause each of the Principal Subsidiaries to preserve and maintain, its legal existence, rights (charter, if applicable, and statutory) and franchises; *provided, however*, that this Section 5.2(d) shall not apply to any transactions or matters not prohibited by Section 5.3 (d) or (e) and shall not prevent the termination of existence, rights and franchises of any Principal Subsidiary pursuant to any merger or consolidation to which such Principal Subsidiary is a party or pursuant to lease, sale, transfer or other disposition of assets by a Principal Subsidiary, and *provided further* that Enron or any Principal Subsidiary shall not be required to preserve any right or franchise if Enron or such Principal Subsidiary shall determine that the preservation thereof is no longer desirable in the conduct of the business of Enron or such Principal Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to the Beneficiaries; *provided further, however*, that notwithstanding the previous provisos to the contrary, so long as Enron or any Enron Party is a member of the Joint Venture or the Investor, Enron shall maintain at all times and do all things necessary to preserve and keep in full force and effect its and such Enron Party's respective corporate, company or partnership existence, rights and authority; *provided, however*, that the foregoing shall not impair any right of Enron to undertake a transaction not prohibited by Section 5.3(e).

EC 001013038


AB000371229

16

    (e)    <u>Maintenance of Insurance</u>.  Maintain, and cause each of the Principal Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties as Enron or such Principal Subsidiary, *provided* that self-insurance by Enron or any such Principal Subsidiary shall not be deemed a violation of this covenant to the extent that companies engaged in similar businesses and owning similar properties as Enron or such Principal Subsidiary self-insure.  Enron may maintain its Principal Subsidiaries' insurance on behalf of them.

    (f)    <u>Subsidiaries</u>.  At all times each Enron Party other than the Joint Venture will be an Enron Company.

    (g)    <u>Investor Enron Member Obligations</u>.  Cause the Investor Enron Member to perform and pay its obligations under the Investor Company Agreement.

    5.3.    <u>Negative Covenants</u>.  Enron hereby covenants and agrees that, until the Collection Date, it will not at any time:

    (a)    <u>Negative Pledge</u>.  Fail to perform and observe any term covenant or agreement contained in Section 1007 of the Enron Indenture (as modified for purposes hereof as set forth in the proviso to the next sentence hereof).  For the purposes of this Section 5.3(a), Section 1007, and the definitions of all terms defined in the Enron Indenture and used in or otherwise applicable to such Section 1007, are hereby incorporated in this Agreement by reference as if such provisions and definitions were set forth in full herein; *provided, however*, that solely for the purposes of this Section 5.3(a) the word *"Securities"* as used in the Enron Indenture shall mean the Obligations of Enron under this Agreement, the word *"Company"* used therein shall mean Enron, the phrase *"this Section 1007"* used therein shall mean this Section 5.3(a), the word *"Trustee"* used therein shall mean the Investor, the phrase *"by supplemental indenture executed to the Trustee"* used therein shall mean by executing and delivering to the Investor a security agreement, mortgage or other appropriate agreement or instrument (together with instruments and documents in form and substance reasonably acceptable to the Agent consenting to and otherwise facilitating the assignment as collateral security of the Investor's rights in such security agreement, mortgage or other appropriate agreement or instrument to the Agent as security and collection agent under the Investor Credit Agreement), and the phrase *"So long as any of the Securities are outstanding"* used therein shall mean until the occurrence of the Collection Date.

    (b)    <u>Senior Debt to Capitalization</u>.  Have a ratio of (i) Total Senior Debt (other than Debt of the EOG Group) to (ii) Total Capitalization greater than 65%.

SS_NYL3A/46697        This document is subject to a written Confidentiality Agreement

EC 001013039

AB000371230

17

(c)     <u>Tangible Net Worth</u>. Have a Consolidated Tangible Net Worth of less than $1,500,000,000:

(d)     <u>Disposition of Assets</u>. Lease, sell, transfer or otherwise dispose of, voluntarily or involuntarily, all or substantially all of its assets.

(e)     <u>Mergers, Etc.</u> Merge or consolidate with or into, any Person, unless (i) Enron is the survivor or (ii) the surviving Person, if not Enron, is organized under the laws of the United States or a state thereof and expressly assumes in writing all Obligations of Enron under this Agreement, the Joint Venture Company Agreement, the Stock Purchase and Registration Agreement and the other Operative Documents to which Enron is a party and makes in favor of the Beneficiaries the representations and warranties of Enron set forth in Sections 2.1, 2.2, 2.3 and 2.8 as of the date of such merger or consolidation, *provided*, in each case, that immediately after giving effect to such proposed transaction, no Enron Event, Joint Venture Notice Event or Joint Venture Termination Event or event which, with the giving of notice or the lapse of time, or both, would constitute an Enron Event, Joint Venture Notice Event or Joint Venture Termination Event (other than the 2002 Termination Event) would exist or result (including any of such events as would result from a breach of any representation of such surviving Person made pursuant to this Section 5.3(e)).

(f)     <u>Compliance with ERISA</u>. (i) Terminate, or permit any ERISA Affiliate to terminate, any Plan so as to result in any liability in excess of $50,000,000 of Enron or any ERISA Affiliate to the PBGC, or (ii) permit circumstances which give rise to a Termination Event described in clause (ii), (iv) or (v) of the definition of Termination Event with respect to a Plan so as to result in any liability in excess of $50,000,000 of Enron or any ERISA Affiliate to the PBGC.

(g)     <u>Joint Venture or Investor Bankruptcy</u>. Consent to, vote for, or otherwise cause or permit (or permit any of its Affiliates, to consent to, or vote for, or otherwise cause or permit) the Joint Venture or the Investor voluntarily to take any action of the type referred to in clauses (i)(c) or (ii), or clause (iii) insofar as such clause (iii) refers to clauses (i)(c) or (ii), of the definition of *Voluntary Bankruptcy*".

(h)     <u>Amendment of Preferred Shares</u>.  Consent to, vote for, or otherwise cause or permit any amendment to any term of the Enron Preferred Shares or the Statement of Resolutions Establishing a Series of Preferred Stock of Enron Corp., in the form-attached to the Preferred Stock Purchase and Registration Agreement as Annex I and as filed with the Secretary of State of the State of Oregon on December 29, 1997; *provided* that this subsection (h) shall not prohibit any such amendment in connection with a merger or consolidation not prohibited by Section 5.3(e) if, after

This document is subject to a written Confidentiality Agreement

EC 001013040

AB00371231

18

giving effect thereto, the Joint Venture as a holder of the Enron Preferred Shares immediately preceding such merger or consolidation shall receive or continue to hold in the surviving or resulting corporation or other entity the same number of shares, with substantially the same rights and preferences (except as contemplated by subparagraph F(5) of such Statement of Resolutions and except for those rights and preferences that could be affected without the vote of the Joint Venture as a holder of the Enron Preferred Shares, such as the authorization and issuance of senior stock), as correspond to the Enron Preferred Shares so held by the Joint Venture.

## SECTION 6

## MISCELLANEOUS

6.1.    Amendments.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by Enron herefrom, shall in any event be effective unless the same shall be in writing and signed by the Investor and Enron.  No such waiver of a provision or consent to a departure in any one instance shall be construed as a further or continuing waiver of or consent to subsequent occurrences, or a waiver of any other provision or consent to any other departure.  Any such amendment, waiver or consent of the Investor shall be binding on all Indemnified Persons.  After the date hereof, any amendment to or waiver of the provisions of any of the Investor Documents or the Operative Documents shall require the prior express written consent of Enron.

6.2.    Addresses for Notices.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing or by facsimile and shall be deemed to have been delivered, given, and received for all purposes (a) if delivered personally to the Person or to an officer of the Person to whom the same is directed, or (b) when the same is actually received (if during the recipient's normal business hours if during a Business Day, or, if not, on the next succeeding Business Day), if sent by facsimile (followed by a hard copy of the facsimiled communication sent by certified mail, postage and charges prepaid), or by courier or delivery service or by mail, addressed as follows, or to such other address as such Person may from time to time specify by notice, if to Enron, at its address at 1400 Smith Street, Houston, TX 77002, Attention: Treasurer, Facsimile No.: 713-646-3422, with a copy to W. Lance Schuler, Esq., at the same address, if to the Investor, at its address specified in Section 2.2 of the Joint Venture Company Agreement, and if to any other Beneficiary, at its address specified by notice given in the manner provided herein to each other Person entitled to receive notice hereunder, or, in each case, to such other address (and with copies to such other Persons) as the Person entitled to receive notice hereunder shall specify by notice given in the manner provided herein to the other Persons entitled to receive notice hereunder.

SS_NYL3A/46697                         This document is subject to a written Confidentiality Agreement

EC 001013041


AB000371232

19

6.3.  No Waiver: Cumulative Remedies.  No failure on the part of any Indemnified Person to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

6.4.  Waiver of Jury Trial.  ENRON AND, BY ACCEPTING THE BENEFITS HEREOF, EACH INDEMNIFIED PERSON, EACH HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

6.5.  Assignment.  All covenants and other agreements and obligations in this Agreement shall (i) be binding upon Enron and its successors, but Enron may not assign its obligations hereunder without the consent of the Investor except pursuant to a merger or consolidation not prohibited by Section 5.3(e), and (ii) inure to the exclusive benefit of, and be enforceable by, the Investor and any Indemnified Person and, in each case, by its respective successors, transferees and assigns (including any assignee for security purposes or Person holding a security interest herein).  This Agreement may not be assigned by any Indemnified Person to any Person other than the Security and Collection Agent or its designee, without the prior written consent of Enron.

6.6.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

6.7.  Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

6.8.  Survival of Representations, Warranties and Indemnities; Entire Agreement.  All representations, warranties and indemnities and undertakings to pay costs and expenses contained herein or made in writing by or on behalf of Enron, as the case may be, in connection herewith or in connection with the Operative Documents shall survive the execution and delivery of this Agreement, and may be relied upon by any Indemnified Person or any assignee of such Indemnified Person permitted hereunder, regardless of any investigation made at any time by or on behalf of any Indemnified Person or any such assignee.

6.9.  Severability.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of

EC 001013042

AB000371233

20

this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause Enron or any Beneficiary or other Indemnified Person to lose the benefit of its economic bargain.

6.10.   No Third-Party Beneficiaries. This Agreement is intended for the exclusive benefit of the Indemnified Persons and no other Person shall have any rights hereunder, whether as a third-party beneficiary or otherwise.

6.11.   Obligations Absolute. To the fullest extent permitted under applicable Law, Enron covenants and agrees that its obligations hereunder will be performed strictly in accordance with the terms of this Agreement, regardless of any Law now or hereafter in effect in any jurisdiction affecting the ability of any Enron Party to perform its obligations under any Investor Agreement or Operative Document or the rights of any Indemnified Person with respect thereto.

To the fullest extent permitted under applicable Law, any action or actions may be brought hereunder by any Indemnified Person without the necessity of joining any prior or other Indemnified Person in such action or actions. To the fullest extent permitted under applicable Law, the liability of Enron under this Agreement shall be irrevocable, absolute and unconditional irrespective of, and Enron hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i)     Subject to Section 6.1, any change in the time, manner or place of performance, or in any other term, of all or any of the Obligations of Enron under any other Operative Document, or any other amendment, supplement or waiver of or any consent to departure from any of the Operative Documents, including any increase in or modification of the Obligations of Enron thereunder, or the dissolution of any of the Enron Parties;

(ii)    Any change, restructuring or termination of the corporate, limited liability company, or partnership structure, as the case may be, or in the existence or ownership of any of the Enron Parties;

(iii)   Subject to Section 3.3, any act or omission of any Indemnified Person or any prior or subsequent Indemnified Person hereunder (other than any written amendment or waiver of, or consent to departure from, this Agreement meeting the requirements of Section 6.1);

SS_NYL3A/46697                          This document is subject to a written Confidentiality Agreement

EC 001013043

AB000371234

21

(iv)    Any failure of any Indemnified Person to disclose to Enron any information relating to the financial condition, operations, properties or prospects of the Joint Venture or any Investor Enron Member now or in the future known to any Indemnified Person (Enron waiving any duty on the part of each Indemnified Person to disclose such information); or

(v)    Any other circumstance (including any statute of limitations or any existence of or reliance on any representation by any Indemnified Person) which might otherwise constitute a defense available to, or a discharge of, any of the Enron Parties or Enron or a guarantor or indemnitor generally other than payment and performance when due.

Enron's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by Enron or any Enron Party in satisfaction of any of the Investor Member Obligations is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Enron or any Enron Party, or any Subsidiary of such Person, or otherwise, all as though such payment had not been made.

6.12.    Waiver.  Subject to the provisions of Section 3, Enron hereby waives (to the extent it may do so under Law) promptness, diligence, and any notice from any Indemnified Person with respect to any of Enron's obligations under this Agreement and any requirement that any Indemnified Person exhaust any right or take any action against any of the Enron Parties or any other Person.

6.13.    Intentionally Omitted.

6.14.    Confidentiality.  By accepting the benefits hereunder, each Indemnified Person agrees that it will use reasonable efforts not to disclose without the prior consent of Enron (other than to its Affiliates in the ordinary course of business in connection with any Operative Document or Investor Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another Indemnified Person if the disclosing Indemnified Person or the disclosing Indemnified Person's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to Enron or its Subsidiaries which is furnished pursuant to this Agreement or any other Operative Document or Investor Document and which is designated by Enron to the Beneficiaries in writing as confidential, provided that any Indemnified Person may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Indemnified Person or to the Board of Governors of the Federal Reserve System or the Federal Deposit Insurance Corporation or similar organizations (whether in the

EC 001013044

AB000371235

22

United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Indemnified Person, and (e) to the prospective transferee in connection with any contemplated Permitted Transfer of any Member Interest by such Beneficiary, *provided* that such prospective transferee executes an agreement with Enron containing provisions substantially identical to those contained in this Section.

     6.15.  <u>Deemed Representation</u>.  Enron shall be deemed to make the representations and warranties required by the Syndication Letter to the Beneficiaries, and such deemed representations and warranties shall be deemed to be a part of this Agreement. Such deemed representations shall be deemed made on the date of the syndication of the "Commitments" (as defined in the Investor Credit Agreement), as such date is notified to Enron and the Beneficiaries by the Agent.

SS_NYLJA/46697                    This document is subject to a written Confidentiality Agreement

EC 001013045

ABC00371236

IN WITNESS WHEREOF, Enron has caused this Agreement to be duly executed and delivered by its officer or other duly authorized signatory thereunto duly authorized as of the date first above written.

ENRON CORP.

By:_____
    Name:  Barry J. Schnapper
    Title:  Deputy Treasurer

SS_NYLJA/46697                    This document is subject to a written Confidentiality Agreement

EC 001013046

AB000371237

EXHIBIT A

DEFINITIONS

"*Beneficiary*" shall mean the Agent, the Security and Collection Agent, each Liquidity Provider, the Surety Provider (each as defined in the Investor Credit Agreement), the Investor and the direct and indirect members of the Investor and the creditors and surety providers of such members and any permitted assignee of any such Person (whether pursuant to an assignment for security or otherwise).

"*Consolidated*" refers to the consolidation of the accounts of Enron and its Subsidiaries in accordance with GAAP.

"*Consolidated Net Worth*" means at any date the Consolidated stockholders' equity of Enron and its Consolidated Subsidiaries (excluding any Redeemable Preferred Stock of Enron).

"*Consolidated Tangible Net Worth*" means at any date Consolidated Net Worth less the amount, if any, in excess of $110,000,000 of Consolidated "intangible assets" (as defined below) included in determining Consolidated Net Worth. For the purposes of this definition, "intangible assets" means the amount of (i) all write-ups (other than write-ups resulting from foreign currency translations and write-ups of assets of a going concern business made within twelve months after the acquisition of such business) subsequent to December 31, 1994, in the book value of any asset owned by Enron or a Subsidiary and (ii) all unamortized goodwill, patents, trademarks, service marks, trade names, copyrights, organization or developmental expenses and other intangible items.

"*CXC*" shall mean CXC Incorporated, a Delaware corporation.

"*Debt*" of any Person means, at any date, without duplication, (i) obligations for the repayment of money borrowed which are or should be shown on a balance sheet as debt in accordance with GAAP, (ii) obligations as lessee under leases which, in accordance with GAAP, are capital leases, and (iii) guaranties of payments or collection of any obligations described in clauses (i) and (ii) of other Persons, *provided* that clauses (i) and (ii) include, in the case of obligations of Enron or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with GAAP; *provided further* that none of the following shall constitute Debt; (A) transfers of Permitted Receivables pursuant to a Permitted Receivables Purchase Facility (and indemnification, recourse or repurchase obligations thereunder), (B) the liability of any Person as a general partner of a partnership for Debt of such partnership, if the partnership is not a Subsidiary of such Person, and (C) obligations (other than borrowings, capital leases or financial guaranties by Enron or any Subsidiary) related to the sale, purchase or delivery of

EC 001013047

AB000371238

A-2

hydrocarbons in respect of production payments conveyed in transfers constituting sales under GAAP.

"*Enron Agreement*" shall mean the Enron Agreement dated as of December 29, 1997, by Enron in favor of the Indemnified Persons.

"*Enron Company*" shall mean a corporation, partnership or other business entity with respect to which Enron directly, or indirectly through one or more intermediaries, controls (i) in the case of any such corporation (x) more than 50% of the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors and (y) issued and outstanding capital stock entitled to receive more than 50% of dividends or declared in respect of all issued and outstanding shares of capital stock of such corporation or (ii) in the case of any such partnership or other business entity (x) more than 50% of the interests in such partnership or other business entity entitled (1) to manage or direct the management of such entity or (2) having voting power to elect a managing partner, board of other Person or entity responsible for the management of such entity and (y) more than 50% of the interests in the capital or profits of such partnership or other business entity.

"*Enron Controlled Entity*" shall mean a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Enron.

"*Enron Event*" shall mean the occurrence and continuance of any of the following events:

(a)    Enron shall fail to pay any amount payable by it under the Enron Agreement after the same becomes due and payable or the principal of any Enron Note after the same becomes due and payable or is demanded, or interest on any Enron Note 5 days after the same becomes due and payable; or

(b)    Any written representation or warranty made by Enron or any of the Enron Parties in any Operative Document (other than the Joint Venture Company Agreement), or in any certificate or report prepared by or furnished by or on behalf of Enron or such Enron Party pursuant to any Operative Document (other than the Joint Venture Company Agreement) shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)    (i) Enron shall fail to perform or observe any term, covenant or agreement contained in Section 5.3 hereof or shall fail to perform or observe any other term, covenant or agreement contained in the Enron Agreement on its part to be performed or observed if, in the case of such other term, covenant or agreement, such failure shall remain unremedied for 30 days after written notice thereof shall have been

EC 001013048

AB000371239

A-3

given to Enron by any Beneficiary; provided, however, that for the purpose of this clause (i), if Enron fails to give a notice and statement when required by Section 5.2(b)(ii), then it shall be deemed that the 30 days' written notice to Enron from any Beneficiary referred to in this clause (i) shall have been given to Enron on the date of the first occurrence of the event or condition which would have given rise to the required notice from Enron under Section 5.2(b)(ii); or (ii) Enron or any Enron Party shall fail to perform or observe any term, covenant or agreement contained in any Operative Document (other than the Joint Venture Company Agreement) on its part to be performed or observed if, in the case of such other term, covenant or agreement, such failure shall remain unremedied for 5 Business Days after written notice thereof shall have been given to Enron by any Beneficiary; or

(d)     Enron or any of its Principal Subsidiaries shall (1) fail to pay any principal of or premium or interest on any Debt (other than Debt described in clause (iii) of the definition of Debt) which is outstanding in the principal amount of at least $50,000,000 in the aggregate, of Enron or such Principal Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment or as a result of the giving of notice of a voluntary prepayment), prior to the stated maturity thereof, or (2) with respect to Debt described in clause (iii) of the definition of Debt, fail to pay any such Debt which is outstanding in the principal amount of at least $50,000,000 in the aggregate, of Enron or such Principal Subsidiary (as the case may be), when the same become due and payable and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or

(e)     Any Bankruptcy shall have occurred with respect to any Principal Subsidiary or Enron Party (other than the Joint Venture); or

(f)     Any judgment, decree or order for the payment of money in excess of $50,000,000 shall be rendered against Enron or any of its Principal Subsidiaries and remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment, decree or order or (ii) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g)     Any Termination Event as defined in clause (ii), (iv) or (v) of the definition thereof with respect to a Plan shall have occurred and, 30 days after notice thereof shall

EC 001013049


AB000371240

A-4

have been given to Enron by any Beneficiary, (i) such Termination Event shall still exist and (ii) the sum (determined as of the date of occurrence of such Termination Event) of the liabilities to the PBGC resulting from all such Termination Events is equal to or greater than $100,000,000; or

(h)    Enron or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount which, when aggregated with all other amounts required to be paid to Multiemployer Plans in connection with Withdrawal Liabilities (determined as of the date of such notification), exceeds $100,000,000 or requires payments exceeding $50,000,000 in any year; or

(i)    Enron or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if as a result of such reorganization or termination the aggregate annual contributions of Enron and its ERISA Affiliates to all Multiemployer Plans which are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the respective plan years which include the date hereof by an amount exceeding $50,000,000 in the aggregate; or

(j)    The Enron Agreement or any other Operative Document to which Enron or any Enron Party is a party shall for any reason cease to be the legal valid and binding obligations of Enron or such Enron Party, as the case may be, or the validity of any such agreement shall be contested in writing by Enron or any such Enron Party, or Enron or any such Enron Party shall in writing deny liability under the Enron Agreement or any such other Operative Document (whether by general suspension of payments or a moratorium on the payment of indebtedness or otherwise);

(k)    An early termination date shall be designated with respect to any transaction under the Specified Related Transaction; or

(l)    Enron shall fail to perform or observe any term, covenant or agreement contained in the Syndication Letter and such failure shall remain unremedied for 5 Business Days after written notice thereof shall have been given to Enron.

"***Enron Indenture***" means that certain indenture dated as of November 1, 1985 between Enron (formerly InterNorth, Inc.) and Harris Trust and Savings Bank, as Trustee, without giving effect to any amendment or modification thereof.

"***Enron Parties***" shall mean the Joint Venture (so long as Enron is the Class A Member), the Investor Enron Member and, if any, the Affiliates of Enron that are parties to the Operative Documents.

SS_NYLJA/46697          This document is subject to a written Confidentiality Agreement

EC 001013050

AB000371241

A-5

"*EOG Group*" means Enron Oil & Gas Company, a Delaware corporation, and its subsidiaries.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute of similar import, together with the regulations thereunder, as in effect from time to time.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) which is a member of a group of which Enron is a member and which is under common control within the meaning of the regulations under Section 414 of the Code.

"*Escrow Agent*" shall mean Citicorp North America, Inc. or any successor escrow agent appointed pursuant to the terms of the Escrow Agreement and acting as such pursuant to the Escrow Agreement.

"*Escrow Agreement*" shall mean the Escrow Agreement, dated as of December 29, 1997, among the Investor, Enron, the Joint Venture, the Escrow Agent and the Security and Collection Agent.

"*Expenses*" means (i) any and all judgments, damages or penalties with respect to, or amounts paid in settlement of, claims (including negligence, strict or absolute liability, liability in tort and liabilities arising out of violation of laws or regulatory requirements of any kind), actions or suits, and (ii) liabilities, obligations, losses, costs, expenses (including reasonable fees and disbursements of counsel and claims, damages, losses, liabilities and expenses relating to environmental matters) and disbursements, but excluding Taxes, as defined in the Joint Venture Company Agreement.

"*FERC*" means the Federal Energy Regulatory Commission, or any federal agency or authority of the United States from time to time succeeding to its function.

"*GAAP*" shall mean United States generally accepted accounting principles and policies consistent with those applied in the preparation of the audited consolidated financial statements referred to in Section 2.7.

"*Indemnified Amounts*" shall have the meaning set forth in Section 3.1 of the Enron Agreement.

"*Indemnified Persons*" shall have the meaning set forth in Section 3.1 of the Enron Agreement.

"*Insufficiency*" means, with respect to any Plan, the amount, if any, by which the present value of the accrued benefits under such Plan exceeds the fair market value of the assets of such Plan allocable to such benefits.

EC 001013051

AB000371242

A-6

"*Investor Company Agreement*" shall mean the Amended and Restated Company Agreement of Nighthawk Investors L.L.C., dated as of December 29, 1997, between the Investor Enron Member and Golden Eagle L.L.C.

"*Investor Documents*" shall mean the Escrow Agreement, the "*Escrowed Documents*" (as defined in the Escrow Agreement), the Joint Venture Assignment, the Purchase Option Agreement, the Purchase Option Escrow Agreement (as defined in the Purchase Option Agreement) and any certificates delivered under any of the foregoing, individually and collectively.

"*Investor Enron Member*" shall mean, collectively, Prairie Hawk, Inc., a Delaware corporation and those Enron Controlled Entities that from time to time are members of the Investor.

"*Investor Member Obligations*" shall mean the Obligations of the Investor Enron Member under the Investor Company Agreement.

"*Joint Venture Assignment*" has the meaning set forth in the Credit Agreement.

"*Liquidity Facility*" shall mean at any time the then existing 364-day liquidity facility supporting the lender's advances under the Investor Credit Agreement in an aggregate amount of up to $485,000,000 entered into with certain liquidity providers.

"*Material Adverse Effect*" shall mean (a) a material adverse effect on the business, operations, properties, or condition (financial or otherwise) of Enron and its Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of Enron, any Enron Party, or any of Enron's Subsidiaries to perform its obligations under this Agreement and the other Operative Documents to which it is a party, (c) the invalidity or unenforceability, in whole or, in the case of any obligation other than a payment obligation, in material part or, in the case of any payment obligation, in part, hereof or of any of such other Operative Documents or the assertion by any such Person of any such invalidity or unenforceability or (d) a material adverse effect on the rights or remedies of any Indemnified Person under any such Operative Document.

"*Multiemployer Plan*" means a "*multiemployer plan*" as defined in Section 4001(a)(3) of ERISA to which Enron or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"*Multiple Employer Plan*" means an employee benefit plan, other than a Multiemployer Plan, subject to Title IV of ERISA to which Enron or any ERISA Affiliate, and more than one employer other than Enron or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which

SS_NYLJ-A/46697          This document is subject to a written Confidentiality Agreement

EC 001013052

AB000371243

A-7

Enron or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"*Obligation*" shall mean, with respect to any Person, any obligation of such Person of any kind, including any liability of such Person on any claim (whether contingent or otherwise).

"*PBGC*" means the Pension Benefit Guaranty Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"*Permitted Receivables*" means (a) any receivables and rights (whether now existing or hereafter arising) resulting from any Regulated Subsidiary's authority to collect revenue from any customer receiving service that is subject to the jurisdiction of the FERC, whether such revenue is collected by means of a demand charge, reservation fee, commodity charge, usage fee or other rate for such service set forth in such Regulated Subsidiary's FERC gas tariff or by means of any surcharge upon or other fee levied in conjunction with any such rate, (b) all indebtedness of any obligor (whether now existing or hereafter arising) under a contract for sale or transportation of crude oil, natural gas or other goods or services by Enron or any of its Subsidiaries and all related rights of Enron or such Subsidiary, which shall include any obligation of such obligor (whether now existing or hereafter arising) to pay amounts based on the monthly entitlement of such obligor to such sales or transportation service (for entitlements not to exceed 90 days from date of invoice) and any obligation of such obligor (whether now existing or hereafter arising) to pay interest, finance charges or amounts with respect thereto, and (c) with respect to any of the foregoing receivables or indebtedness, all guarantees, insurance, letters of credit and other agreements or arrangements of whatever character from time to time supporting or securing payment of any such receivables or indebtedness.

"*Permitted Receivables Purchase Facility*" means any agreement of Enron or any of its Subsidiaries providing for transfers of Permitted Receivables purporting to be sales (and considered sales under GAAP) that do not provide, directly or indirectly, for recourse against the seller of such Permitted Receivables (or against any such seller's affiliates), by way of a guaranty or any other support arrangement, for the collectibility of such Permitted Receivables (based on the financial condition or circumstances of the obligor thereunder), other than such limited recourse as is reasonable given market standards for transactions of a similar type, taking into account such factors as historical bad debt loss experience and obligor concentration levels.

"*Plan*" means an employee benefit plan (other than a Multiemployer Plan) which is (or, in the event that any such plan has been terminated within five years after a transaction described in Section 4069 of ERISA, was) maintained for employees of Enron or any ERISA Affiliate and covered by Title IV of ERISA.

"*Preferred Stock*" means, as applied to any corporation, shares of such corporation which shall be entitled to preference or priority over any other shares of such

EC 001013053

AB000371244

A-8

corporation in respect of either (or both) the payment of dividends or the distribution of assets upon liquidation.

"*Preferred Stock Purchase and Registration Agreement*" shall mean the Preferred Stock Purchase and Registration Agreement dated as of December 29, 1997, between Enron and the Joint Venture.

"*Principal Subsidiary*" means as of any date of determination, any Subsidiary having consolidated assets (less any debt of such Subsidiary and any of such Subsidiary's consolidated subsidiaries with respect to which Enron has not guaranteed payment) equal to or greater than 5% of Enron's consolidated assets; *provided* that, as of any date of determination, each of the following named entities shall be deemed to be a Principal Subsidiary (but only if such entity is a "Subsidiary" as of such date of determination) without regard to the consolidated assets test described above in this definition: Enron Oil & Gas Company, Houston Pipe Line Company, Transwestern Pipeline Company, Northern Natural Gas Company, Enron Capital & Trade Resources Corp., and Enron Pipeline Company. For purposes of this definition, (a) consolidated assets of a Subsidiary shall be determined based on the most recently quarterly or annual consolidated financial statements of such Subsidiary available prior to such determination, and (b) consolidated assets of Enron shall be determined based on the most recent quarterly or annual consolidated financial statements of Enron available prior to such determination.

"*Redeemable*" means, as applied to any Preferred Stock, any Preferred Stock which (i) the issuer undertakes to redeem at a fixed or determinable date or dates (other than pursuant to the exercise of an option to redeem by the issuer, if the failure to exercise such option would not materially adversely affect the business, consolidated financial position or consolidated results of operations of the issuer and its subsidiaries taken as a whole), whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer, or (ii) is redeemable at the option of the holder.

"*Regulated Subsidiary*" means Transwestern Pipeline Company, Northern Natural Gas Company or any other Subsidiary regulated by FERC.

"*Responsible Officer*" shall mean an executive officer of Enron or any officer or employee of Enron or its Affiliates responsible for the administration of, or monitoring compliance with, this Agreement or any other Operative Document.

"*Security and Collection Agent*" shall mean Citibank North America, Inc., or any successor security and collateral agent, as security and collateral agent under the Investor Credit Agreement with respect to, among other things, the rights and interests under the Enron Agreement of certain Beneficiaries.

"*Securities Filings*" has the meaning set forth in Section 2.4.

This document is subject to a written Confidentiality Agreement

EC 001013054

AB000371245

A-9

"*Specified Related Transaction*" means the ISDA Master Agreement dated November 2, 1994 between Citibank and Enron.

"*Subordinated Debt*" means, (a) the 8.25% Senior Subordinated Debentures due 2012 and the 6 3/4% Senior Subordinated Debentures due July 1, 2005 of Enron issued pursuant to the Indenture dated as of February 1, 1987 between Enron and NationsBank of Texas, N.A., as trustee, (b) the obligations of Enron Corp. under the Loan Agreement dated as of November 15, 1993, between Enron Corp. and Enron Capital L.L.C., (c) the obligations of Enron Corp. under the Loan Agreement dated as of August 3, 1994, between Enron Corp. and Enron Capital Resources, L.P., and (d) any Debt of Enron which is subordinate to any other obligations of Enron so long as (i) the terms of such Debt are (x) substantially similar to and no less favorable to the holders of "*Senior Indebtedness*" (as defined in such Indenture) than the terms of such Senior Subordinated Debentures due 2012 of Enron or (y) consented to by the Investor (which consent will not be unreasonably withheld), and (ii) no payments of principal shall be payable (whether by scheduled maturity, required prepayment, or otherwise, unless as a result of the acceleration of such Debt in accordance with the terms thereof) under such Debt prior to December 15, 2001.

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; *provided, however*, that, other than for purposes of Section 3.1(d), Section 5.1, Section 5.2(a)(iii) or Section 6.11, no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of Enron, unless such entity is a Consolidated Subsidiary of Enron, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with GAAP. Unless otherwise provided or the context otherwise requires, the term "*Subsidiary*" when used herein shall refer to a Subsidiary of Enron.

"*Surety Provider*" shall have the meaning set forth in the Investor Credit Agreement.

"*Syndication Letter*" means the letter agreement dated as of December 29, 1997 between Enron and Citicorp North America, Inc., with respect to the Liquidity Facility.

"*Termination Event*" means (i) a "*reportable event*", as such term is described in Section 4043 of ERISA (other than a "*reportable event*" not subject to the provision for 30-day notice to the PBGC), or an event described in Section 4062(e) of ERISA, or (ii) the withdrawal of Enron or any ERISA Affiliate from a Multiple Employer Plan during a plan year in which it was a "substantial employer", as such term is defined in Section 4001(a)(2) of ERISA, or the incurrence of liability by Enron or any ERISA Affiliate under Section 4064 of ERISA upon the

 This document is subject to a written Confidentiality Agreement

EC 001013055

AB000371246

A-10

termination of a Multiple Employer Plan, or (iii) the distribution of a notice of intent to terminate a Plan pursuant to Section 4041(a)(2) of ERISA or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or (iv) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or (v) any other event or condition which might constitute grounds under Section 4042 of ERISA or the termination, of, or the appointment of a trustee to administer, any Plan.

*"Total Capitalization"* means, at any time, the sum (without duplication) of (a) Total Senior Debt, (b) the total outstanding principal amount (or the book carrying amount of such Debt if issued at a discount) of Subordinated Debt of Enron and its Consolidated Subsidiaries, (c) Consolidated Net Worth less any amount thereof attributable to *"minority interests"* (as defined below), and (d) Redeemable Preferred Stock of Enron and its Consolidated Subsidiaries other than the EOG Group. For the purpose of this definition, *"minority interests"* means any investment or interest of Enron in any corporation, partnership or other entity to the extent that the total amount thereof owned by Enron (directly or indirectly) constitutes 50% or less of all outstanding interests or investments in such corporation, partnership or entity.

*"Total Senior Debt"* means, at any time, all Consolidated Debt of Enron and its Consolidated Subsidiaries other than Subordinated Debt.

*"Transactions"* shall mean all the transactions and activities referred to in or contemplated by the Operative Documents to which Enron or any Enron Party is a party.

*"United States Bankruptcy Code"* shall mean Title 11 of the United States Code entitled *"Bankruptcy"* as in effect from time to time, or any successor thereto.

*"Withdrawal Liability"* shall have the meaning given such term under Part 1 of Subtitle E of Title IV of ERISA.

This document is subject to a written Confidentiality Agreement

EC 001013056

AB000371247

ANNEX I to ENRON AGREEMENT
Case #1

EC 001013057

AB000371248

PROJECT NIGHTHAWK  $200MM Mark-to-Market Gain Assumed at Early Termination on 10/2/2000

*Case 1.*
*Exhibit A*

**ASSUMPTIONS**

| | |
|---|---|
| Expected Joint Venture Liquidating Date | 7/1/2003 |
| Partial Purchase Date | |
| Actual Joint Venture Liquidating Date | 10/2/2000 |

| Gross Asset Value and Dividend Assumptions ($ Thousands) | | Value at 12/31/97 | Value at Liquidation |
|---|---|---|---|
| **Enron Preferred Shares:** | | | |
| Face Amount (for dividend calculation) | | 1,000,000 | |
| Price ($/Shr) | | $4,000.00 | |
| Number of Enron Preferred Shares (Shr Thousands) | | 250 | |
| Gross Asset Value | | 1,000,000 | |
| Conversion Ratio | | 100 | |
| **Enron Common Shares:** | | | |
| Price Per Share ($/Shr) | | $40.00 | $48.00 |
| Number of Shares (Shr Thousands) | | | 25,000 |
| Gross Asset Value | | | 1,200,000 |
| LIBOR (12/26/97) | | 5.91% | |
| CXC/Notified Rate (Assume LIBOR) | | 5.91% | |
| Dividends on Enron Preferred Shares (Actual/360) | L + | 0.85% | 6.76% |
| Rate on Enron Notes (Actual/360) | L + | 0.10% | 6.01% |
| Class A Member Priority Return | L + | 4.00% | 9.91% |
| Nighthawk Operating Expenses ($000) | | $38 | |
| Partial Purchase Base Amount | | 200,000 | |
| Share Price at Partial | | $20.00 | |

*Note: Assume same borrowing rate for CXC & Enron Loans to Golden Eagle.*

| Equity Current Return (actual/actual) | 10.968% |
|---|---|

EC 001013058

ABC0037124-9

Document Excerpted to
Reduce Bulk