**ENRON AGREEMENT**

Dated as of December 17, 1999

By

**ENRON CORP.**

in favor of

**THE INDEMNIFIED PERSONS REFERRED TO HEREIN**

NYDOCS03/494757

EC21020A0090597

# TABLE OF CONTENTS

**Page**

Preliminary Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## SECTION 1

### DEFINED TERMS; RULES OF CONSTRUCTION

1.1.   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2.   Use of Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.3.   Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.4.   No Presumption Against Any Party . . . . . . . . . . . . . . . . . . . . . . . . 2
1.5.   Headings and References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## SECTION 2

### REPRESENTATIONS AND WARRANTIES

2.1.   Due Formation or Incorporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.2.   Authorization; No Contravention of Restrictions . . . . . . . . . . . . . . . . . . 3
2.3.   Legal Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.4.   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.5.   Enron Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.6.   Business Operations and Condition . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.7.   Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.8.   Investment Company; Holding Company . . . . . . . . . . . . . . . . . . . . . . 4
2.9.   Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.10.  Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.11.  No Enron Event or Liquidating Event . . . . . . . . . . . . . . . . . . . . . . . . 5
2.12.  Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.13.  Environmental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.14.  Year 2000 Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## SECTION 3

### PERFORMANCE GUARANTEE AND INDEMNIFICATION

3.1.   Subsidiary Guaranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
3.2.   General Indemnities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

EC21020A0090598

Page

3.3.  Survival of Indemnification Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
3.4.  Limitations on Indemnification Obligations . . . . . . . . . . . . . . . . . . . . . . . . . 9
3.5.  Procedural Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
3.6.  BREACH OF COVENANTS AND MISREPRESENTATION . . . . . . . . . . . . . . . . . . . . . 12
3.7.  CONSEQUENTIAL DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13


SECTION 4

PAYMENTS

4.1.  Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
4.2.  Payments Free of Withholdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
4.3.  Other Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
4.4.  Tax Receipts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14


SECTION 5

ENRON COVENANTS

5.1.  Separate Existence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5.2.  Affirmative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
5.3.  Negative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


SECTION 6

MISCELLANEOUS

6.1.  Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
6.2.  Addresses for Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
6.3.  No Waiver; Cumulative Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.4.  Waiver of Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.5.  Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.6.  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.7.  Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.8.  Survival of Representations, Warranties and Indemnities; Entire Agreement . . . . . 23
6.9.  Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.10. No Third-Party Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

NYDOCS03/494752

(ii)

EC21020A0090599

|  |  | Page |
|---|---|---|
| 6.11. | Obligations Absolute | 23 |
| 6.12. | Waiver | 24 |
| 6.13. | Confidentiality | 25 |
| 6.14. | Jurisdiction, Etc. | 26 |
| 6.15. | Deemed Representation | 26 |

ANNEX I     FINANCIAL MODEL

EC21020A0090600

### ENRON AGREEMENT

ENRON AGREEMENT dated as of December 17, 1999 (this "*Agreement*") by Enron Corp., an Oregon corporation ("*Enron*"), in favor of Nahanni Investors L.L.C., a Delaware limited liability company ("*Nahanni*"), and the other Indemnified Persons (as defined below).

### PRELIMINARY STATEMENTS

A.    Enron is, through one or more wholly owned subsidiaries, the owner of 100% of the issued and outstanding capital stock of Yellowknife Investors, Inc. ("*Yellowknife*"). Yellowknife is the General Partner of Marengo, L.P., a Delaware limited partnership ("*Marengo*"), and controls Marengo. Marengo is the sole member of each of the Marengo Subsidiaries.

B.    Enron and Yellowknife desire Nahanni to become a Marengo Limited Partner in accordance with the Amended and Restated Partnership Agreement of Marengo dated as of December 17, 1999 (the "*Marengo Partnership Agreement*").

C.    Nahanni is willing to become a limited partner of Marengo only on the condition, among others, that Enron provides certain assurances set forth in this Agreement

In consideration of the premises, and intending to be legally bound by this Agreement, Enron agrees as follows:

### SECTION 1

### DEFINED TERMS; RULES OF CONSTRUCTION

1.1.    Definitions. As used in this Agreement, capitalized terms defined in the preamble, Preliminary Statements and other Sections of this Agreement shall have the meanings set forth therein and capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in Exhibit A to the Marengo Partnership Agreement.

1.2.    Use of Certain Terms. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the word "*to*" and "*until*" means "to but excluding". Unless the context of this Agreement requires otherwise, the plural includes the singular, the singular includes the plural, and "*including*" has the inclusive meaning of "including without limitation". The words "*hereof*",

EC21020A0090601

2

"*herein*", "*hereby*", "*hereunder*", and other similar terms of this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

      1.3.   Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with financial covenants shall be based upon, GAAP applied consistently, *provided, however*, the financial statements and reports required pursuant to Section 5.2(b)(i) shall be prepared in accordance with generally accepted accounting principles consistently applied except to the extent stated therein.

      1.4.   No Presumption Against Any Party. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any particular party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

      1.5.   Headings and References. Section and other headings are for reference only, and shall not affect the interpretation or meaning of any provision of this Agreement. Unless otherwise provided, references to Articles, Sections, Schedules, and Exhibits shall be deemed references to Articles, Sections, Schedules, and Exhibits of this Agreement. References to this Agreement and any other Operative Document include this Agreement and the other Operative Documents as the same may be modified, amended, restated or supplemented from time to time pursuant to the provisions hereof or thereof as permitted by the Operative Documents, in each case whether or not so stated. A reference to, including any definition of, any Law shall mean that Law as it may be amended, modified or supplemented from time to time, and any successor Law. A reference to a Person includes the successors and assigns of such Person, but such reference shall not increase, decrease or otherwise modify in any way the provisions in this Agreement or any other Operative Document governing the assignment of rights and obligations under or the binding effect of any provision of this Agreement or any other Operative Document, including Section 6.5.

SECTION 2

·

REPRESENTATIONS AND WARRANTIES

      Enron hereby represents and warrants as of the Closing Date (other than with respect to the first sentence of Section 2.12 to the extent it relates to the APA Purchasers Information Memorandum ), as of the date of any Notice of Capital Contribution, as of the date

NYDOCS03;494752

EC21020A0090602

3

of any Capital Contribution by Nahanni pursuant to Section 5.3 of the Marengo Partnership Agreement and as of the Syndication Date as follows:

2.1.    Due Formation or Incorporation. Enron and each Enron Party are duly organized or validly formed, validly existing and (if applicable) in good standing in each case under the laws of its jurisdiction of incorporation or formation. Enron and each Enron Party have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted.

2.2.    Authorization: No Contravention of Restrictions. The execution, delivery and performance by Enron and each Enron Party of each Operative Document to which it is or will be a party are within its corporate, limited partnership, limited company or other entity powers, have been duly authorized by all necessary corporate, limited partnership, limited company or other entity action of Enron or such Enron Party, require, in respect of Enron or such Enron Party, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation applicable to Enron or such Enron Party or the amended and restated articles of incorporation, as amended, by-laws, as amended, or, if applicable, other Organizational Documents, as amended, of Enron or such Enron Party or any judgment, injunction, order, decree binding upon Enron or such Enron Party, or, in the case of Enron and each Enron Party (other than Marengo and any Marengo Subsidiary), any material ("*material*" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon Enron or such Enron Party, or in the case of Marengo and any Marengo Subsidiary, any agreement binding on Marengo or any such Marengo Subsidiary, or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of any Enron Party or any of its Subsidiaries.

2.3.    Legal Validity. Each of this Agreement and the other Operative Documents to which Enron or any Enron Party is or will be a party, is the legal, valid and binding obligation of each such Person enforceable against such Person in accordance with its terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity, whether considered in a proceeding in equity or at law.

2.4.    Litigation. Except as disclosed in Enron's Form 10-K for the year ended December 31, 1998, Enron's Forms 8-K filed on January 26, 1999 and March 18, 1999, or Enron's Forms 10-Q for the quarters ended March 31, 1999, June 30, 1999, and September 30, 1999 (collectively, the "*Securities Filings*"), there is no action, suit or proceeding pending against Enron or any of its Subsidiaries, or to the knowledge of Enron threatened against Enron or any of its Subsidiaries, before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of Enron

EC21020A0090603

4

and its Subsidiaries taken as a whole or of Marengo and the Marengo Subsidiaries taken as a whole or which in any manner draws into question the validity of, this Agreement or any other Operative Document to which Enron or any Enron Party is a party.

2.5. <u>Enron Companies</u>. The Nahanni Enron Member is either Enron or a wholly owned Subsidiary of Enron. Yellowknife is an Enron Company.

2.6. <u>Business Operations and Condition</u>. Except as disclosed in the Securities Filings, since December 31, 1998, there has been no material adverse change in the business, consolidated financial position or consolidated results of operations of Enron and its Subsidiaries, considered as a whole.

2.7. <u>Financial Statements</u>. The audited consolidated balance sheet of Enron and its Subsidiaries as of December 31, 1998 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of Enron and its Subsidiaries as of September 30, 1999, and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the nine months then ended included in Enron's Forms 10-Q and Form 10-K referred to in Section 2.4 fairly present, in conformity with GAAP except as otherwise noted therein, the consolidated financial position of Enron and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

2.8. <u>Investment Company; Holding Company</u>. (a) None of Enron, any of its Subsidiaries or any Enron Party is an "*investment company*" within the meaning of the Investment Company Act.

(b) None of Enron, any of its Principal Subsidiaries or any Enron Party is subject to, or is exempt from, regulation as a "*holding company*", a "*subsidiary company*" of a "*holding company*", an "*affiliate*" of a "*holding company*" or an "*affiliate*" of a "*subsidiary company*" of a "*holding company*", in each case as such terms are defined in the Public Utility Holding Company Act of 1935.

2.9. <u>Taxes</u>. (a) United States Federal income tax returns of Enron and its Subsidiaries have been examined and closed through to the fiscal year ended December 31, 1991.

(b) Enron and each of its Subsidiaries have filed or caused to be filed all United States federal income tax returns and all other material domestic tax returns which to the knowledge of Enron are required to be filed by them and have paid or provided for the payment, before the same became delinquent, of all taxes due pursuant to such returns or pursuant to any

NYDOCS03/494752

EC21020A0090604

5

assessment received by Enron or any Subsidiary, other than those taxes contested in good faith by appropriate proceedings. Enron and its Subsidiaries accrue for taxes in accordance with GAAP. The charges, accruals and reserves on the books of Enron and its Subsidiaries in respect of taxes are, in the opinion of Enron, adequate to the extent required by GAAP.

2.10.  Priority.  The obligations of Enron under or in respect of the Enron Demand Loans (including any guarantee thereof of loans made to Affiliates of Enron) rank in priority of payment as and with all other senior unsecured Debt of Enron.

2.11.  No Enron Event or Liquidating Event.  No Enron Event or Liquidating Event or, to the actual knowledge of Enron, event which, with the passage of time or giving of notice or both, would result in an Enron Event or Liquidating Event has occurred and is continuing.

2.12.  Disclosure.  The APA Purchasers Information Memorandum does not contain any misstatement of material fact or omit to state a material fact necessary to be made in order to make the statements contained therein (taken as a whole), in light of the circumstances under which such information is provided, not misleading with respect to Enron and its Subsidiaries, Marengo, Yukon, Klondike, Yellowknife, the Contributed Investments and the Operative Documents, subject to the Disclosure Qualification. The financial model for Nahanni attached hereto as Annex I (the "*Financial Model*"), subject to the qualifications and assumptions set forth in the Financial Model, (x) contains formulas which are consistent with and fairly reflect (i) the allocations provided in the Marengo Partnership Agreement and (ii) the other relevant financial terms of the Marengo Partnership Agreement and the Nahanni Company Agreement and (y) the computed amounts fairly reflect the application of such formulae to the assumptions contained in the Financial Model.

2.13.  Environmental.  (i) Except as set forth in the most recent Securities Filings, each of Enron and the Enron Parties is in compliance with all applicable Environmental Laws with respect to any Property and the requirements of any permits issued under such Environmental Laws with respect to any such Property, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

(ii)  Except as set forth in the most recent Securities Filings, there are no pending or, to their knowledge, threatened Environmental Claims against Enron or any Enron Party or any Property that individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

(iii)  Except as set forth in the most recent Securities Filings, the executive officers of Enron have no actual knowledge of any facts, circumstances, conditions or occurrences that could reasonably be anticipated to form the basis of an Environmental Claim against Enron

NYDOCS03/494752

EC21020A0090605

6

or any Enron Party or on any Property that individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

2.14.  Year 2000 Problem.  Enron and its Principal Subsidiaries have (i) as of the date hereof, initiated a review and assessment of all material areas within its business and operations (including those affected by major suppliers, vendors and customers) that could be adversely affected by the risk that computer applications used by Enron and its Principal Subsidiaries (or any of their respective major suppliers, vendors and customers) may be unable to recognize and perform properly date-sensitive functions involving certain dates on or prior to and any date after December 31, 1999 (the *"Year 2000 Problem"*), (ii) as of the date hereof, developed a plan and timeline for addressing the Year 2000 Problem on a timely basis and (iii) to the date hereof, implemented that plan in accordance with that timetable.  All computer applications (including, to Enron's best knowledge based on such review and assessment to the date hereof, those of major domestic suppliers, vendors and customers) that are material to any of the business and operations of Enron and its Principal Subsidiaries are, as of the date hereof, reasonably expected on a timely basis to be able to perform properly date-sensitive functions for all dates before, on or after January 1, 2000, except to the extent that a failure to do so could not reasonably be expected to materially adversely affect the business, consolidated financial position or consolidated results of operations of Enron and its Subsidiaries taken as a whole.

## SECTION 3

### PERFORMANCE GUARANTEE AND INDEMNIFICATION

3.1.  Subsidiary Guaranties.  Subject to the limitation set forth in Section 3.6, Enron hereby absolutely, unconditionally and irrevocably guarantees, for the benefit of the Beneficiaries, the due and punctual payment, performance and observance by Yellowknife or any other Affiliate of Enron that may be a Marengo General Partner, and Yellowknife acting as Marengo General Partner and on behalf of Marengo as the member of each Marengo Subsidiary, of each of its covenants and Obligations under each Operative Document to which it is a party, including the obligations of Yellowknife or any such other Affiliate as the Marengo General Partner under Section 4 of the Marengo Partnership Agreement and the obligations of Yellowknife or any such other Affiliate to make additional Capital Contributions pursuant to Section 5.4 of the Marengo Partnership Agreement, but excluding any obligation of Yellowknife or any such other Affiliate to make any Preferred Payment under the Marengo Partnership Agreement (except to the extent that there are funds on deposit in the Marengo Operating Account at the time such payment is due) (the *"Marengo General Partner Obligations"*).

3.2.  General Indemnities.  Subject to the limitations set forth in Section 3.4 and Section 3.6, Enron agrees to the fullest extent permitted by law to indemnify, hold harmless and

EC21020A0090606

7

pay on an After-Tax Basis all Expenses (the Expenses on an After-Tax Basis being referred to collectively as the "*Indemnified Amounts*") of any Indemnified Person which may be incurred or realized by or asserted against such Indemnified Person relating to, growing out of or resulting from:

      (a)    Marengo General Partner Obligations. Any breach by the Marengo General Partner of a Marengo General Partner Obligation; or

      (b)    Enron Obligations. Any failure by Enron or any Enron Party (other than Yellowknife with respect to any Marengo General Partner Obligations and, without limiting Section 3.2(a) above, Marengo) to perform or observe any of its covenants and obligations under this Agreement and each other Operative Document to which it is a party or under which it is stated to have obligations; or

      (c)    Representations and Warranties. Any inaccuracy in, or any breach of, any written certification, representation or warranty made or deemed made:

      (i)    by Enron in this Agreement or by Enron or any Enron Party or other Affiliate of Enron (or any officer or other authorized representative thereof) to or for the benefit of any Indemnified Person, Marengo or any Marengo Subsidiary in any Operative Document to which such Person is a party; or

      (ii)    by Enron or any Enron Party or any other Affiliate of Enron (or any officer or other authorized representative thereof) in any written report or certification required hereunder or under any Operative Document to which such Person is a party,

in each case (A) if but only if such certification, representation or warranty is made as of a specific date, as of the date as of which the facts stated therein were certified, represented or warranted and (B) in all other cases, as of any date or during any period to which such certification, representation or warranty may be applicable; or

      (d)    Investigations; Litigation; Proceedings; Enforcement. (i) Enforcement of this Agreement or any other Operative Document or agreement related to any Operative Document to which Enron or an Enron Party is a party, and (ii) any investigation, litigation or proceeding, whether or not such Indemnified Person is a party thereto, that:

      (A)    relates to, grows out of or results from any action or omission, or alleged action or omission, by or on behalf of or attributable to Enron or any Enron Party (whether relating to Marengo, a Marengo Subsidiary, Yellowknife or

NYDOCS03/494752

EC21020A0090607

8

otherwise) under or in relation to the Operative Documents or the transactions contemplated thereby; and

(B)    would not have resulted in Indemnified Amounts incurred or realized by or asserted against such Indemnified Person but for their being a party to, or a direct or indirect participant in, or having a relationship described in the definition of "Indemnified Person" to a party to, or a direct or indirect participant in, the Operative Documents or any of the transactions contemplated thereby; or

(e)    Substantive Consolidation.  (i) Any petition or proceeding (x) seeking or asserting, or (y) a court ordering, in any case or proceeding under the United States Bankruptcy Code involving Enron, any Enron Party or any other Subsidiary of Enron, as debtor, that the assets and liabilities of any Marengo Party be consolidated substantively with the assets and liabilities of Enron, any Enron Party (other than a Marengo Party) or any other Subsidiary of Enron (other than a Marengo Party) and (ii) defending against any petition, proceeding or order referred to in clause (i) of this paragraph (e); it being agreed that upon the occurrence of an event described in sub-clause (y) of such clause (i) which is or becomes a final judgment or order, the Indemnified Persons involved shall be entitled to recover from Enron, as liquidated damages for Indemnified Amounts under such clause (i) (but without prejudice to amounts recoverable under clause (ii) of this paragraph (e) or any other provision of the Operative Documents), and not as a penalty, an aggregate amount equal to the sum of the amount that would be paid to Nahanni as the "*Purchase Amount*" (as defined in the Purchase Option Agreement) and all accrued and unpaid Guaranteed Payments through the date of payment in full of such amount in addition to all other Indemnified Amounts hereunder; or

(f)    ERISA.  Any liability or other Indemnified Amounts that Marengo or any Marengo Subsidiary may incur in connection with any Plan or Multiemployer Plan; or

(g)    Expenses.  Any amendment, supplement, modification, consent or waiver of, to or under any Operative Document or any related agreement to which any Affiliate of Enron or Enron is a party (to the extent not otherwise reimbursed pursuant to any Operative Document); or

(h)    Taxes.  For the full amount of any Taxes or Other Taxes referred to in Sections 4.2 and 4.3 hereof (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by Enron under this Section 3.2(i)) paid by Nahanni (or any direct or indirect member of Nahanni) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto; or

NYDOCS03/494752

EC21020A0090608

9

      (i)    Environmental Liabilities. The actual or alleged presence of Hazardous Materials on any property of the Underlying Business, a Marengo Party or any other Enron Party or any Environmental Action relating in any way to the Underlying Business, such Marengo Party or any other Enron Party; or

      (j)    Casualty, Etc. Any casualty, theft, personal injury, tort or third party liability arising under or in connection with or attributable to the Contributed Investment or any Underlying Business; or

      (k)    Deficiency Claims. Any claim for subscription or any other mandatory capital, contractual, or financial contribution obligation or assessment under or in connection with or attributable to the Contributed Investment or the Underlying Business that has not been fulfilled; or

      (l)    Contributed Investment. To the extent not otherwise provided for herein, arising out of or relating to any Contributed Investment or Underlying Business; or

      (m)    Contributed Investment Value. Without limiting Section 3.2(c), any shortfall between the Contributed Value of any Contributed Investment and the cash proceeds (net of all taxes, sales commissions, sale expenses and all other amounts payable in connection with such sale) of sale realized from the Disposition of such Contributed Investment following the occurrence of a Liquidating Event within 90 days of the Liquidation Start Date. For purposes of the foregoing, in the event that any Contributed Investment is not sold within such 90 day period, the proceeds thereof shall be deemed $0. Upon payment of such shortfall, to the extent of the remaining interest, if any, of Marengo or Klondike in such Contributed Investment, Enron shall be entitled to cause Marengo and Klondike to convey such interest to Enron or any designee, at Enron's or such designee's expense.

      3.3.    Survival of Indemnification Obligations. All indemnities provided for in this Agreement shall survive the Transfer (whether or not such Transfer was a Permitted Transfer) or retirement of any Partnership Interest in Marengo or the liquidation of Marengo and any Marengo Subsidiary. After any such Transfer, retirement or liquidation, the provisions of Section 3.2 shall inure to the benefit of each Indemnified Person with respect to Indemnified Amounts arising in respect of the period during which the Marengo Partner who has Transferred its Partnership Interest (or whose Partnership Interest was retired) was a partner of Marengo (including with respect to actions taken or omitted to be taken, and events occurring and circumstances existing, during such period).

      3.4.    Limitations on Indemnification Obligations. The indemnities provided in Section 3.2 shall be subject to the following limitations:

NYDOCS05/494752

EC21020A0090609

10

(a)    Limitation by Law. Such Sections shall be enforced only to the maximum extent permitted by Law.

(b)    Misconduct, Etc. No Person, and no controlling Affiliate of such Person in its own right (but without prejudice to the claims of Persons who are Indemnified Persons by reason of a relationship to such controlling Affiliate (such as an agent, employee, creditor or surety of such controlling Affiliate)) shall be indemnified from any liability solely caused by or resulting from (as determined by a final judgment of a court of competent jurisdiction) (i) the actual fraud, willful misconduct, bad faith or gross negligence of such Person or (ii) any inaccuracy in, or breach of, any written certification, representation or warranty made by such Person in any Operative Document or in any written report or certification required hereunder or under any other Operative Document unless such inaccuracy or breach is attributable to any written information provided by Enron or its Affiliates, in each case under this clause (b) (A) if, but only if, such certification, representation or warranty is made as of a specific date, as of the date as of which the facts stated therein were certified, represented or warranted and (B) in all other cases, as of any date or during any period to which such certification, representation or warranty may be applicable.

(c)    No Duplication. Indemnified Amounts under Section 3.2 shall be without duplication of any amounts payable under indemnification provisions of any other Operative Document or any amounts actually paid thereunder.

(d)    General. Notwithstanding the provisions of this Section 3 to the contrary, Enron shall *not* be required to pay, protect, indemnify, or hold harmless:

(i)    Any Indemnified Person for Indemnified Amounts arising solely from, or attributable to, disputes among the Lender, the Committed Lenders, the Collateral Agent, any Marengo Portfolio Manager (other than a Marengo Portfolio Manager which is an Affiliate of Enron), the Investor, CXC Incorporated, the APA Purchasers, the Surety or the Equity Investors and that are not caused or contributed to in any material respect (as determined by a final judgment of a court of competent jurisdiction) by any act or omission of Yellowknife, Enron, or their respective Affiliates (other than, at any time when Enron or an Affiliate thereof is not the Marengo General Partner, a Marengo Party, individually or in any capacity under the Operative Documents); or

(ii)    Any Indemnified Person for Indemnified Amounts arising solely from, or attributable to, the violation by such Indemnified Person of any Laws (including banking or securities laws), other than any such violation to the extent (x) caused by Enron or any of its Affiliates (other than, at any time when Enron or

NYDOCS03,494752

11

an Affiliate thereof is not the Marengo General Partner, as determined by a final judgment of a court of competent jurisdiction) or (y) resulting from the entering into of the Operative Documents and the transactions contemplated thereby.

3.5.    Procedural Requirements. (a) Notice of Claims. Any Indemnified Person that proposes to assert a right to be indemnified under Section 3.2 will, promptly after receipt of notice of commencement of any action, suit or proceeding against such Indemnified Person, or the incurrence or realization of Indemnified Amounts, in respect of which a claim is to be made against Enron under Section 3.2, notify Enron of such incurrence or realization or of the commencement of such action, suit or proceeding, enclosing a copy of all papers served, but the omission so to notify Enron promptly of any such incurrence, realization, action, suit or proceeding shall not relieve (x) Enron from any liability that it may have to such Indemnified Person under Section 3.2 or otherwise, except, as to Enron's liability under Section 3.2, to the extent, but only to the extent, that Enron shall have been prejudiced by such omission or (y) any other Person from liability that it may have to any Indemnified Person under the Operative Documents.

(b)    Defense of Proceedings. In case any such action, suit or proceeding shall be brought against any Indemnified Person and it shall notify Enron of the commencement thereof, Enron shall be entitled to participate in, and to assume the defense of, such action, suit or proceeding with counsel reasonably satisfactory to such Indemnified Person, and after notice from Enron to such Indemnified Person of Enron's election so to assume the defense thereof and the failure by such Indemnified Person to object to such counsel within ten Business Days following its receipt of such notice. Enron shall not be liable to such Indemnified Person for legal or other expenses incurred after such notice of election to assume such defense except as provided below and except for the reasonable costs of investigating, monitoring or cooperating in such defense subsequently incurred by such Indemnified Person reasonably necessary in connection with the defense thereof. Such Indemnified Person shall have the right to employ its counsel in any such action, suit or proceeding, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless:

(i)    the employment of counsel by such Indemnified Person at the expense of Enron has been authorized in writing by Enron;

(ii)    such Indemnified Person shall have concluded in its good faith (which conclusion shall be determinative unless a court determines that conclusion was not reached in good faith) that there is or may be a conflict of interest between Enron and such Indemnified Person in the conduct of the defense of such action or that there are or may be one or more different or additional defenses, claims, counterclaims, or causes of action available to such Indemnified Person (it being agreed that in any case referred to in this

EC21020A0090611

12

clause (ii) Enron shall not have the right to direct the defense of such action on behalf of the Indemnified Person);

     (iii)    Enron shall not have employed counsel to assume the defense of such action within a reasonable time after notice of the commencement thereof; or

     (iv)    any counsel employed by Enron shall fail to timely commence or maintain the defense of such action,

in each of which cases the fees and expenses of counsel for such Indemnified Person shall be at the expense of Enron; *provided* that, without the prior written consent of such Indemnified Person, Enron shall not settle or compromise, or consent to the entry of any judgment in, any pending or threatened claim, action, investigation, suit or other legal proceeding in respect of which indemnification may be sought under Section 3.2, unless such settlement, compromise or consent includes an unconditional release of such Indemnified Person from all liability for Expenses arising out of such claim, action, investigation, suit or other legal proceeding. No Indemnified Person shall settle or compromise, or consent to the entry of any judgment in, any pending or threatened claim, action, investigation, suit or other legal proceeding in respect of which any payment by Enron would result hereunder or under the other Operative Documents without the prior written consent of Enron, such consent not to be unreasonably withheld or delayed.

THE FOREGOING INDEMNITY SHALL EXPRESSLY INCLUDE ANY INDEMNIFIED AMOUNTS ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF ANY INDEMNIFIED PERSON, BUT SHALL EXCLUDE ANY SUCH INDEMNIFIED AMOUNTS ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON. IT IS THE INTENT OF THE PARTIES HERETO THAT THE INDEMNIFIED PERSONS, SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 3, BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE.

     3.6.    BREACH OF COVENANTS AND MISREPRESENTATION.  (a)  The liability of Enron under Sections 3.2(a), (b), (c), (d) and (l) shall be unlimited, *provided* that Enron may satisfy its obligations under such Sections by:

     (i)    purchasing the Nahanni Partnership Interest (as such term is defined in the Purchase Option Agreement) pursuant to and in compliance with the Purchase Option Agreement; and

     (ii)    assuming all of the Indemnified Parties' unperformed obligations under or arising out of the Operative Documents and the transactions contemplated by the Operative Documents.

NYDOCS03/494752

EC21020A0090612

13

(b)     Other Indemnities.    The maximum aggregate liability of Enron under Sections 3.2, (e), (f), (g), (h), (i), (j), or (k) shall be limited to an amount of $1,000,000,000.

3.7.    CONSEQUENTIAL DAMAGES.  IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT OR ANY INDEMNITOR BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT OR ANY INDEMNIFIED PERSON, IRRESPECTIVE OF WHETHER ALLEGED TO BE BY WAY OF INDEMNITY OR AS A RESULT OF BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL THEORY, AND WHETHER ARISING BEFORE OR AFTER THE COLLECTION DATE, FOR DAMAGES THAT CONSTITUTE PUNITIVE, EXEMPLARY, INCIDENTAL, SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER.

SECTION 4

PAYMENTS

4.1.    Payments.  All payments to be made by Enron under Section 3 shall be paid by Enron within ten Business Days following demand therefor, accompanied, as may be appropriate in the context, by supporting documentation in reasonable detail.  Payment shall be made to the bank account or at another location as such Indemnified Person shall designate in writing or as is expressly required under any Operative Document the obligations under which are the subject of any such payment, not later than 1:00 PM (New York time) on the date for such payment in immediately available funds.

4.2.    Payments Free of Withholdings.  (a)  Any and all payments by Enron hereunder shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, *excluding*, in the case of any Indemnified Person, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) such Indemnified Person is organized or any political subdivision thereof and, in the case of CXC or any APA Purchaser, taxes imposed on its income, and franchise taxes imposed on it, by any jurisdiction or any political subdivision thereof out of which CXC makes an "Advance" under the Nahanni Credit Agreement or such APA Purchaser makes any purchase in respect of such Advance pursuant to the "Asset Purchase Agreement" (as defined in the Nahanni Credit Agreement) and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof, to payments to be made to any Indemnified Persons (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "*Taxes*").  If Enron shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to an Indemnified Person, (i) the sum payable shall be increased as may be necessary so that after

NYDOCS03/494752

EC21020A0090613

14

making all required deductions (including deductions applicable to additional sums payable under this Section 4.2) such Indemnified Person receives on an After-Tax Basis an amount equal to the sum it would have received had no such deductions been made, (ii) Enron shall make such deductions and (iii) Enron shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Law.

(b)     Notwithstanding anything to the contrary contained in this Agreement, Enron shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts payable hereunder for the account of any Indemnified Person (without the payment by Enron of increased amounts to such Indemnified Person pursuant to clause (a) above) other than an Indemnified Person (i) that is a domestic corporation (as such term is defined in Section 7701 of the Internal Revenue Code) for federal income tax purposes or (ii) which has the "Prescribed Forms" (as defined in the Nahanni Credit Agreement) on file with Nahanni and the Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, *provided* that if Enron shall so deduct or withhold any such taxes, it shall provide a statement to such Indemnified Person setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation that such Indemnified Person may reasonably request for assisting such Indemnified Person to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which such Indemnified Person is subject to tax.

4.3.     Other Taxes.   In addition, Enron agrees to pay any present or future transfer, ad valorem, registration, title, license, stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made by Enron hereunder or from its execution or delivery or performance of, or otherwise arising out of its actions with respect to, this Agreement (hereinafter referred to as *"Other Taxes"*).

4.4.     Tax Receipts.   Within 30 days after the date of any payment of Taxes, Enron will furnish to the relevant Indemnified Person (a) the original or a certified copy of a receipt evidencing payment thereof, if the relevant taxing authority provides a receipt or (b) if the relevant taxing authority does not provide a receipt, other reasonable evidence of the payment thereof. Should any Indemnified Person (other than CXC or any Person managed by Citicorp North America, Inc. in a relationship similar to that of CXC and Citicorp North America, Inc.) ever receive any refund from any taxing authority to which such Indemnified Person would not be entitled but for the payment by Enron of Taxes as required by Section 4.1 (it being understood that the decision as to whether or not to claim, and if claimed, as to the amount of any such refund shall be made by such Indemnified Person in its sole discretion), such Indemnified Person, as the case may be, thereupon shall repay to Enron an amount with respect to such refund equal to any net reduction in taxes actually obtained by such Indemnified Person attributable to such refund. Enron shall have no right to examine or audit any tax returns, claims for refund, books, records

EC21020A0090614

15

or other tax related documentation or otherwise review the tax-related positions of any Indemnified Person.

## SECTION 5

### ENRON COVENANTS

5.1.    <u>Separate Existence</u>.  Enron hereby covenants and agrees that, so long as Nahanni, or its successors and assigns (other than Enron or any Subsidiary of Enron), holds an interest in Marengo, Enron will, and will cause each of the Enron Companies (including the Enron Parties) and, as applicable, each Marengo Party (for so long as Yellowknife, as the Marengo General Partner, has the power and authority to manage the business and affairs of Marengo) in connection with any transaction, agreement or dealing with or relating to Nahanni or a Marengo Party to comply (except for such noncompliance which, in the aggregate, is not material) with the following undertakings:

(i)    Enron and the Enron Companies (other than the Marengo Parties) will maintain their books, financial records and accounts, including checking and other bank accounts and custodian and other securities safekeeping accounts, separate and distinct from those of the Marengo Parties or Nahanni, as the case may be.

(ii)    Enron and the Enron Companies (other than the Marengo Parties) will maintain their books, financial records and accounts (including inter-entity transaction accounts) in a manner so that it will not be difficult or costly to segregate, ascertain or otherwise identify their assets and liabilities separate and distinct from the assets and liabilities of the Marengo Parties or Nahanni, as the case may be.

(iii)    Enron and the Enron Companies (other than the Marengo Parties), on the one hand, will not commingle any of their assets, funds, liabilities or business functions with the assets, funds, liabilities or business functions of the Marengo Parties or Nahanni, as the case may be, on the other hand.

(iv)    Enron and the Enron Companies (other than the Marengo Parties) will each observe all requisite corporate procedures and formalities, including the holding of periodic and special meetings of shareholders and boards of directors, the recordation and maintenance of minutes of such meetings, and the recordation and maintenance of resolutions adopted at such meetings.

(v)    Each of the Marengo Parties will observe all requisite organizational procedures and formalities, including the holding of meetings of partners as required by

NYDOCS03/494752

EC21020A0090615

16

its Organizational Documents, the recordation and maintenance of minutes of such meetings, and the recordation of and maintenance of resolutions adopted at such meetings.

(vi)    None of Enron or the Enron Companies (other than the Marengo Parties) will be consensually merged or consolidated with any Marengo Party or Nahanni, as the case may be (other than, with respect to the Marengo Parties, for financial reporting purposes).  None of Enron or the Enron Companies will be consensually merged or consolidated with Nahanni for any purpose.

(vii)    Enron will include, and will cause the Marengo General Partner to include, in its and the Marengo's consolidated financial statements footnotes that clearly disclose, among other things, the separate existence and identity of the Marengo Parties from Enron and its other Subsidiaries, and that the Marengo Parties have separate assets and liabilities. Nahanni will not be consolidated with Enron for the purposes of Enron's consolidated financial statements.

(viii)    All transactions, agreements and dealings between Enron and the Enron Companies (other than the Marengo Parties), on the one hand, and the Marengo Parties, on the other hand, and between the Marengo Parties, on the one hand, and Nahanni, on the other hand (including, in each case, transactions, agreements and dealings pursuant to which the assets or property of one is used or to be used by the other), will reflect the separate identity and legal existence of each entity.

(ix)    Transactions between any of the Marengo Parties, on the one hand, and any third parties, on the other hand, will be conducted in the name of the applicable Marengo Party as an entity separate and distinct from Enron or any Enron Company (other than Marengo Party).

(x)    Except as otherwise specified in the Operative Documents, each Marengo, Party on the one hand, will pay its liabilities and losses from its respective assets, and Enron and the Enron Companies (other than the applicable Marengo Party), on the other hand, will pay their liabilities and losses from their respective assets.

(xi)    Representatives and agents of any of the Marengo Parties (whether or not they are *"loaned"* employees of Enron or the Enron Companies (other than such Marengo Party)) will, when purporting to act on behalf of such Marengo Party, hold themselves out to third parties as being representatives or agents, as the case may be, of such Marengo Party, and will utilize business cards, letterhead, purchase orders, invoices and the like of such Marengo Party.

EC21020A0090616

17

(xii)    Each Marengo Party will compensate all consultants, independent contractors and agents from its own funds for services provided to it by such consultants, independent contractors and agents.

(xiii)    To the extent that any Marengo Party, on the one hand, and Enron or the Enron Companies (other than such Marengo Party), on the other hand, jointly contract or do business with vendors or service providers or share overhead expenses, the costs and expenses incurred in so doing will be fairly and nonarbitrarily allocated between or among such entities, with the result that each such entity bears its fair share of all such costs and expenses. To the extent that any Marengo Party, on the one hand, and Enron or the Enron Companies (other than such Marengo Party) on the other hand, contracts or does business with vendors or service providers where the goods or services are wholly or partially for the benefit of the other, then the costs incurred in so doing will be fairly and nonarbitrarily allocated to the entity for whose benefit the goods or services are provided, with the result that each such entity bears its fair share of all such costs, except to the extent otherwise provided in the Operative Documents.

(xiv)    Each Marengo Party will have annual financial statements prepared in accordance with GAAP, separate from Enron and the Enron Companies (other than the other Marengo Parties).

(xv)    None of Enron or the Enron Companies (other than the Marengo Parties) will make any inter-entity loans, advances, guarantees, extensions of credit or contributions of capital to, from or for the benefit of any Marengo Party or Nahanni, as the case may be without proper documentation and accounting in accordance with GAAP and only in accordance with the provisions of the Marengo Partnership Agreement or the Nahanni Company Agreement, as the case may be, and the other Operative Documents.

(xvi)    Marengo will cause to be prepared and filed all legally required tax returns for itself (including Federal and state income tax returns) separately from the tax returns of Enron and the Enron Companies (other than the Marengo Parties).

(xvii)    Enron and the Enron Companies (other than Marengo) will not refer to Marengo or Nahanni, as the case may be, as a department or division of Enron or any of the Enron Companies (other than Marengo) and will not otherwise refer to Marengo or Nahanni, as the case may be in a manner inconsistent with its status as a separate and distinct legal entity. In addition, each Marengo Party will hold itself out as separate and distinct from Enron and the Enron Companies (other than Marengo).

NYDOCS03/494752

EC21020A0090617

18

5.2.   Affirmative Covenants. Enron hereby covenants and agrees that, until the Collection Date, it will:

(a)   Compliance with Laws, Etc. (i) Comply with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a Material Adverse Effect and (ii) cause each of the Enron Parties to comply with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a Material Adverse Effect as defined in clauses (b), (c) or (d) of the definition thereof, in each case such compliance to include compliance with environmental laws and the paying before the same become delinquent of all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith.

(b)   Furnish to Nahanni sufficient copies for each Beneficiary of the following:

(i)   by making available on "EDGAR" or Enron's home page on the "World Wide Web" at www.enron.com, or otherwise transmitting to each Beneficiary (1) promptly after the sending or filing thereof, a copy of each of Enron's reports on Form 8-K (or any comparable form), (2) promptly after the filing or sending thereof, and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of Enron, a copy of Enron's report on Form 10-Q (or any comparable form) for such quarter, which report will include Enron's quarterly unaudited consolidated financial statements as of the end of and for such quarter, and (3) promptly after the filing or sending thereof, and in any event within 90 days after the end of each fiscal year of Enron, a copy of Enron's annual report which it sends to its public security holders, and a copy of the Enron's report on Form 10-K (or any comparable form) for such year, which annual report will include the Enron's annual audited consolidated financial statements as of the end of and for such year;

(ii)   simultaneously with the furnishing of each of the annual or quarterly reports referred to in clause (i) above, a certificate of the chief financial officer or the chief accounting officer of Enron in a form acceptable to Nahanni (x) setting forth in reasonable detail the calculations required to establish whether Enron was in compliance with the requirements of Section 5.3(b) on the date of the financial statements contained in such report and (y) stating whether there exists on the date of such certificate any Enron Event or event which, with the giving of notice or lapse of time, or both, would constitute an Enron Event, and, if so, setting forth the details thereof and the action which Enron has taken and proposes to take with respect thereto;

EC21020A0090618

19

(iii)     as soon as possible and in any event within five days after a Responsible Officer having obtained knowledge thereof, notice of (A) the occurrence of any Enron Event or any event which, with the giving of notice or lapse of time or both, would constitute an, Enron Event, continuing on the date of such notice or (B) any litigation, arbitration proceeding or governmental investigation or proceeding pending (x) against Enron or any Enron Party which would have a Material Adverse Effect as defined in clauses (ii), (iii) or (iv) of the definition thereof or (y) with respect to any Operative Document to which Enron or any Subsidiary of Enron or any Enron Party is a party, and in each case a statement of the chief financial officer of Enron setting forth details thereof and the action which Enron has taken and proposes to take with respect thereto;

(iv)     as soon as possible after request therefor, a copy of the Enron Revolving Credit Facility Agreement in effect at such time; and

(v)     from time to time, such other information relating to Enron and the Enron Parties and the transactions contemplated by any Operative Document to which Enron or any Enron Party is a party as any Beneficiary may reasonably request.

(c)     Visitation Rights. At any reasonable time and from time to time, after reasonable notice, permit the Agent, the Collateral Agent, Nahanni, the Equity Investors and the Surety Provider (as such terms are defined in the Nahanni Credit Agreement) or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, Enron and any of the Enron Parties, and to discuss the affairs, finances and accounts of Enron and any of the Enron Parties with any of their respective officers or directors.   Enron shall assume or pay all reasonable costs and expenses associated with any such discussion or examination (limited, prior to the occurrence of a Termination Event, or a Notice Event, to once per calendar year for each of (x) Nahanni and (y) the Agent, the Collateral Agent and the Surety Provider at the principal place of business of Enron).

(d)     Preservation of Corporate Existence, Etc. Preserve and maintain, and cause each of the Enron Parties to preserve and maintain, its legal existence, rights (charter, if applicable, and statutory) and franchises; provided, however, that this Section 5.2(d) shall not apply to any transactions or matters not prohibited by Section 5.3(d) or (e) and shall not prevent the termination of existence, rights and franchises of any Enron Party pursuant to any merger or consolidation to which such Enron Party is a party or pursuant to lease, sale, transfer or other disposition of assets by an Enron Party, and provided further that Enron or any Enron Party shall not be required to preserve any right or franchise if Enron or such Enron Party shall determine that the preservation thereof is no longer desirable in

NYDOCS03/494752

EC21020A0090619

the conduct of the business of Enron or such Enron Party, as the case may be, and that the loss thereof is not disadvantageous in any material respect to the Beneficiaries; *provided further, however*, that notwithstanding the previous provisos to the contrary, so long as Enron or any Enron Party is a partner of Marengo or a member of Nahanni, Enron shall maintain at all times and do all things necessary to preserve and keep in full force and effect its and such Enron Party's respective corporate, company or partnership existence, rights and authority and otherwise cause Marengo and the Marengo Subsidiaries and the Marengo General Partner to act in accordance with the Marengo Partnership Agreement; *provided, however*, that the foregoing shall not impair any right of Enron to undertake a transaction not prohibited by Section 5.3(e).

(e)     Maintenance of Insurance. (i) Maintain, and cause each Enron Party to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties as Enron or such Enron Party, *provided* that self-insurance by Enron or any such Enron Party shall not be deemed a violation of this covenant to the extent that companies engaged in similar businesses and owning similar properties as Enron or such Enron Party self-insure. Enron may maintain insurance on behalf of an Enron Party.

(f)     Enron Companies. At all times each Enron Party other than the Marengo Parties will be an Enron Company.

(g)     Enron Party Obligations; Enron Affiliates Obligations. Cause each Enron Party to perform its obligations under the Operative Documents to which it is a party.

(h)     Turnover. Pay, and cause each of its Affiliates to pay, all amounts required pursuant to the Operative Documents to be paid to the Cash Reserve to be so paid to the Cash Reserve, as the case may be.

5.3.    Negative Covenants. Enron hereby covenants and agrees that, until the Collection Date, it will not at any time:

(a)     Equal and Ratable Security. Fail to perform and observe any term, covenant or agreement contained in Section 1007 of the Enron Indenture (as modified for purposes hereof as set forth in the proviso to the next sentence hereof). For the purposes of this Section 5.3(a), Section 1007, and the definitions of all terms defined in the Enron Indenture and used in or otherwise applicable to such Section 1007, are hereby incorporated in this Agreement by reference as if such provisions and definitions were set forth in full herein; *provided, however*, that solely for the purposes of this Section 5.3(a) the word "*Securities*" as used in the Enron Indenture shall mean the Obligations of Enron

EC21020A0090620

21

under this Agreement, the word *"Company"* used therein shall mean Enron, the phrase *"this Section 1007"* used therein shall mean this Section 5.3(a), the word *"Trustee"* used therein shall mean Nahanni, and the phrase *"So long as any of the Securities are outstanding"* used therein shall mean until the occurrence of the Collection Date.

(b)    <u>Senior Debt to Capitalization</u>.  Have a ratio of (i) Total Senior Debt to (ii) Total Capitalization greater than 65%.

(c)    <u>Disposition of Assets</u>.  Lease, sell, transfer or otherwise dispose of, voluntarily or involuntarily, all or substantially all of its assets.

(d)    <u>Mergers, Etc</u>.  Merge or consolidate with or into, any Person, unless (i) Enron is the survivor or (ii) the surviving Person, if not Enron, is organized under the laws of the United States or a state thereof and assumes in writing all Obligations of Enron under this Agreement, the Purchase Option Agreement and the other Operative Documents to which Enron and the other Enron Parties are a party and makes in favor of the Beneficiaries the representations and warranties of Enron set forth in Sections 2.1, 2.2, 2.3 and 2.8 as of the date of such merger or consolidation, *provided*, in each case, that immediately after giving effect to such proposed transaction, no Enron Event, Notice Event or Termination Event or event which, with the giving of notice or the lapse of time or both, would constitute an Enron Event, Notice Event or Termination Event, would exist or result (including any of such events as would result from a breach of any representation of such surviving Person made pursuant to this Section 5.3(e)).

(e)    <u>Marengo, Marengo Subsidiaries or Nahanni Bankruptcy</u>.  Consent to, vote for, or otherwise cause or permit (or permit any of its Affiliates, to consent to, or vote for, or otherwise cause or permit) Marengo, any Marengo Subsidiary or Nahanni voluntarily to take any action of the type referred to in clauses (i)(c) or (ii), or clause (iii) insofar as such clause (iii) refers to clauses (i)(c) or (ii), of the definition of *"Voluntary Bankruptcy"*.

(f)    <u>Prepayment of Enron Demand Loans</u>.  Make, cause or permit, or permit any of its Affiliates to make, cause or permit, any prepayment of amounts outstanding in respect of Enron Demand Loans, except as expressly provided in Section 6.2 of the Yukon Custody Agreement.

EC21020A0090621

22

## SECTION 6

### MISCELLANEOUS

6.1.  Amendments.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by Enron herefrom, shall in any event be effective unless the same shall be in writing and signed by Nahanni and Enron.  No such waiver of a provision or consent to a departure in any one instance shall be construed as a further or continuing waiver of or consent to subsequent occurrences, or a waiver of any other provision or consent to any other departure.  Any such amendment, waiver or consent of Nahanni shall be binding on all Indemnified Persons.  After the date hereof, any amendment to or waiver of the provisions of any of the Operative Documents shall require the prior express written consent of Enron.

6.2.  Addresses for Notices.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing or by facsimile and shall be deemed to have been delivered, given, and received for all purposes (a) if delivered personally to the Person or to an officer of the Person to whom the same is directed, or (b) when the same is actually received (if during the recipient's normal business hours if on Business Day, or, if not, on the next succeeding Business Day), if sent by facsimile (followed by a hard copy of the facsimiled communication sent by certified mail, postage and charges prepaid), or by courier or delivery service or by mail, addressed as follows, or to such other address as such Person may from time to time specify by notice:  if to Enron, at its address at 1400 Smith Street, Houston, TX 77002, Attention:  Treasurer, Facsimile No.:  713-646-3422, with a copy to Corporate Secretary at the same address; if to Nahanni, at its address specified in Section 2.2 of the Marengo Partnership Agreement; and if to any other Beneficiary, at its address specified by notice given in the manner provided herein to each other Person entitled to receive notice hereunder, or, in each case, to such other address (and with copies to such other Persons) as the Person entitled to receive notice hereunder shall specify by notice given in the manner provided herein to the other Persons entitled to receive notice hereunder.

6.3.  No Waiver: Cumulative Remedies.  No failure on the part of any Indemnified Person to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

6.4.  Waiver of Jury Trial.  ENRON AND, BY ACCEPTING THE BENEFITS HEREOF, EACH INDEMNIFIED PERSON, EACH HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

EC21020A0090622

23

6.5.    Assignment.  All covenants and other agreements and obligations in this Agreement shall (i) be binding upon Enron and its successors, but Enron may not assign its obligations hereunder without the consent of Nahanni except pursuant to a merger or consolidation not prohibited by Section 5.3(e), and (ii) inure to the exclusive benefit of, and be enforceable by, Nahanni and any Indemnified Person and, in each case, by its respective successors, transferees and assigns (including any assignee for security purposes or Person holding a security interest herein).  This Agreement may not be assigned by any Indemnified Person to any Person other than the Collateral Agent or its designee, without the prior written consent of Enron.

6.6.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

6.7.    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

6.8.    Survival of Representations, Warranties and Indemnities; Entire Agreement.  All representations, warranties and indemnities and undertakings to pay costs and expenses contained herein or made in writing by or on behalf of Enron, as the case may be, in connection herewith or in connection with the Operative Documents shall survive (a) the execution and delivery of this Agreement, (b) the completion of the performance by Yellowknife of the Marengo General Partner Obligations, or (c) the Transfer (whether or not such Transfer was a permitted Transfer and, for purposes of this Section 6.8, including any retirement of an interest as a Transfer) by (A) Yellowknife of all or a portion of its partnership interest in Marengo or any termination of its status as a Marengo Partner pursuant to the Marengo Partnership Agreement or (B) Nahanni of all or a portion of its partnership interest in Marengo or any termination of its status as a Marengo Partner pursuant to the Marengo Partnership Agreement, and may be relied upon by any Indemnified Person or any assignee of such Indemnified Person permitted hereunder, regardless of any investigation made at any time by or on behalf of any Indemnified Person or any such assignee.

6.9.    Severability.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause Enron or any Beneficiary or other Indemnified Person to lose the benefit of its economic bargain.

EC21820A0090623

24

6.10.  No Third-Party Beneficiaries.  This Agreement is intended for the exclusive benefit of the Indemnified Persons and no other Person shall have any rights hereunder, whether as a third-party beneficiary or otherwise.

6.11.  Obligations Absolute.  (a)  To the fullest extent permitted under applicable Law, Enron covenants and agrees that its obligations hereunder will be performed strictly in accordance with the terms of this Agreement, regardless of any Law now or hereafter in effect in any jurisdiction affecting the ability of any Enron Party to perform its obligations under any Operative Document or the rights of any Indemnified Person with respect thereto.

(b)  To the fullest extent permitted under applicable Law, any action or actions may be brought hereunder by any Indemnified Person without the necessity of joining any prior or other Indemnified Person in such action or actions.  To the fullest extent permitted under applicable Law, the liability of Enron under this Agreement shall be irrevocable, absolute and unconditional irrespective of, and Enron hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i)  Subject to Section 6.1, any change in the time, manner or place of performance, or in any other term, of all or any of the Obligations of Enron or any Enron Party under any other Operative Document, or any other amendment, supplement or waiver of or any consent to departure from any of the Operative Documents, including any increase in or modification of the Obligations of Enron or any Enron Party thereunder, or the dissolution of any of the Enron Parties;

(ii)  Any change, restructuring or termination of the corporate, limited liability company, or partnership structure, as the case may be, or in the existence or ownership of any of the Enron Parties;

(iii)  Subject to Section 3.3, any act or omission of any Indemnified Person or any prior or subsequent Indemnified Person hereunder (other than any written amendment or waiver of, or consent to departure from, this Agreement meeting the requirements of Section 6.1);

(iv)  Any failure of any Indemnified Person to disclose to Enron any information relating to the financial condition, operations, properties or prospects of any Marengo Party or any Nahanni Enron Member now or in the future known to any Indemnified Person (Enron waiving any duty on the part of each Indemnified Person to disclose such information); or

(v)  Any other circumstance (including any statute of limitations or any existence of or reliance on any representation by any Indemnified Person) which might otherwise

EC21020A0090624

25

constitute a defense available to, or a discharge of, any of the Enron Parties or Enron or a guarantor or indemnitor generally other than payment and performance when due.

(c)    Enron's obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment by Enron or any Enron Party in satisfaction of any of the obligations of Enron or any Enron Party under the Operative Documents is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Enron or any Enron Party, or any Subsidiary of such Person, or otherwise, all as though such payment had not been made.

6.12.    Waiver.  Subject to the provisions of Section 3, Enron hereby waives (to the extent it may do so under Law) promptness, diligence, and any notice from any Indemnified Person with respect to any of Enron's obligations under this Agreement and any requirement that any Indemnified Person exhaust any right or take any action against any of the Enron Parties or any other Person.

6.13.    Confidentiality.  Each Indemnified Party shall hold in confidence and not disclose any Confidential Information in accordance with the following requirements:

(a)    No Indemnified Party shall disclose any Confidential Information without the prior written consent of Enron, other than disclosure of Confidential Information:

(i)    to such party's Affiliates, auditors, employees, representatives or counsel and the auditors, employees, representatives and counsel of such party's Affiliates;

(ii)    which has become generally available to the public,

(iii)    as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Indemnified Person or to the Board of Governors of the Federal Reserve System or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere), *provided* that if an Indemnified Party is required to disclose Confidential Information to any such regulatory body, it will use reasonable efforts to prevent such Confidential Information from becoming a part of the public record;

(iv)    subject to clause (c) below, as may be required or appropriate in response to any summons or subpoena or in connection with any litigation;

NYDOCS03/494752

EC21020A0090625

26

(v)    in order to comply with any law, order, regulation or ruling applicable to such Indemnified Person; and

(vi)    to the prospective transferee in connection with any contemplated Permitted Transfer of any Marengo Limited Partnership Interest, *provided* that such prospective transferee executes an agreement with Enron containing provisions substantially identical to those contained in this Section.

(b)    No Indemnified Party shall use any Confidential Information for any purpose other than the evaluation, negotiation, consummation and administration of the transactions contemplated by the Operative Documents.

(c)    If any Indemnified Party is required by Law or judicial order to disclose any Confidential Information, such Indemnified Party will promptly notify Enron of such requirement so that Enron may seek an appropriate protective order to provide a waiver of the provisions of this Section 6.13. If, in the absence of any such protective order or waiver, an Indemnified Party is compelled to disclose such Confidential Information, such Indemnified Party may disclose such Confidential Information as is required to comply with applicable Law. Any Indemnified Party may use or disclose any Confidential Information to the extent necessary for the exercise of its remedial rights under the Operative Documents or the enforcement of its remedial rights under the Operative Documents.

(d)    The foregoing provisions of this Section 6.13 shall in no way limit or impair any obligations of, or any restrictions on, any Indemnified Party under any existing agreement restricting disclosure or use of information relating to the transactions contemplated by the Operative Documents in favor of Enron and its Affiliates or Citibank, N.A. and its affiliates.

6.14.    Jurisdiction, Etc.  (a)  Enron hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the federal district court of the United States of America in the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Operative Document to which it is a party, or for recognition or enforcement of any judgment; and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court, or to the extent permitted by law, in such federal court. Enron agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to

EC21020A0090626

27

bring any action or proceeding relating to this Agreement or any other Operative Document to which Enron is a party in the courts of any jurisdiction.

(b)    Enron irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Operative Document to which it is a party in only that New York State court or federal court identified in Section 6.14(a). Enron hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in both courts.

6.15.    Deemed Representation. Enron shall be deemed to make the representations and warranties required by the Syndication Letter to the Beneficiaries, and such deemed representations and warranties shall be deemed to be a part of this Agreement. Such deemed representations shall be deemed made on the date of the syndication of the "Commitments" (as defined in the Nahanni Credit Agreement), as such date is notified to Enron and the Beneficiaries by the Agent.

EC21020A0090627

IN WITNESS WHEREOF, Enron has caused this Agreement to be duly executed and delivered by its officer or other duly authorized signatory thereunto duly authorized as of the date first above written.

ENRON CORP.

By: _William W. B_____ SMS
    Name: William W. Brown
    Title: Deputy Treasurer

EC21020A0090628

PROJECT NAHANNI FINANCIAL MODEL                                                    COVENANTS

| FINANCIAL SUMMARY | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|---|
| **Cash Flow of Marengo** | | | | | | | | |
| Interest on T-Bills (Debt Securities) | Weeks Outstanding: | 2 | 5.160% | 992 | 992 | 992 | 992 | 992 |
| Interest on Yukon Demand Loans | Weeks Outstanding: | 4 | 6.000% | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 |
| Interest on Cash/Cash Equivalents | | | 5.160% | 685 | 685 | 685 | 685 | 685 |
| Interest on Klondike Demand Loans | | | 6.000% | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 |
| Marengo Administrative and Management Fees | | | 25 | (25) | (25) | (25) | (25) | (25) |
| Total Cash Flow | | | | 27,960 | 27,960 | 27,960 | 27,960 | 27,960 |
| **Preferred Payment to Nahanni** | | | | | | | | |
| Interest & Fees on $485MM of Nahanni Debt | | | | | | | | |
| Interest & Fees for Used Period[1] | Weeks Used: | 6 | 6.644% | 3,718 | 3,718 | 3,718 | 3,718 | 3,718 |
| Fees for Unused Period | Weeks Unused: | 46 | 0.375% | 1,609 | 1,609 | 1,609 | 1,609 | 1,609 |
| Current Return on $15MM of Nahanni Equity | | | 10.124% | 1,519 | 1,519 | 1,519 | 1,519 | 1,519 |
| Nahanni Administrative and Managing Member Fees | | | 50 | 50 | 50 | 50 | 50 | 50 |
| Total Preferred Payment | | | | 6,896 | 6,896 | 6,896 | 6,896 | 6,896 |
| **Assets of Marengo** | | | | | | | | |
| T-Bills and/or Cash Outstanding at year-end | | | | - | - | - | - | - |
| Yukon Demand Loans Outstanding | | | | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| Klondike Demand Loans Outstanding | | | | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 |
| HPL Equity Interest | | | 7.000% | 107,000 | 114,490 | 122,504 | 131,080 | 140,255 |
| Total Assets at year-end | | | | 1,007,000 | 1,014,490 | 1,022,504 | 1,031,080 | 1,040,255 |
| Nahanni Unrecovered Capital at year-end | | | | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |



| FINANCIAL COVENANTS | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Permitted Asset Ratio** | | | | | | |
| (T-Bills + Cash + Yukon Demand Lns. + Klondike Demand Lns. + Contributed Value of HPL Equity Int.) / (Nahanni Unrecov. Capital) : | Minimum 1.50 | 2.01 | 2.03 | 2.05 | 2.06 | 2.08 |
| | | Yes | Yes | Yes | Yes | Yes |
| **Permitted Investment Ratio** | | | | | | |
| (T-Bills + Cash + Yukon Demand Loans) / (Nahanni Unrecovered Capital) . | Minimum 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| | | Yes | Yes | Yes | Yes | Yes |
| **Cash Flow Coverage Ratio** | | | | | | |
| (Cash Flow from Permitted Assets) / (Preferred Payment for Rolling Four Quarters) : | Minimum 1.25 | 4.06 | 4.06 | 4.06 | 4.06 | 4.06 |
| | | Yes | Yes | Yes | Yes | Yes |

[1] LIBOR assumed to be 6.124%. CP rate assumed to equal LIBOR.

EC21020A0090629

Document Excerpted to Reduce Bulk