1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-01025

- - - - - - - - - - - - - - - - - - - -x

ENRON CORPORATION,

                    Plaintiff,

         -against-


SPRINGFIELD ASSOCIATES, LLC, ET AL.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x



                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                October 15, 2007

                2:00 PM


B E F O R E:

HON. ARTHUR J. GONZALEZ

U.S. BANKRUPTCY JUDGE

2

1      HEARING re Status conference.

2

3      HEARING re Discovery conference.

4

5      HEARING re Status conference re: motion to assume lease.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Pnina Eilberg

3

1

2  A P P E A R A N C E S :

3  KLEE, TUCHIN, BOGDANOFF & STERN LLP

4       Attorneys for Enron

5       1999 Avenue of the Starts

6       Los Angeles, CA 90067

7

8  BY:   DAVID M. STERN, ESQ.

9

10

11 KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

12       Attorneys for Springfield

13       551 Fifth Avenue

14       New York, NY 10176

15

16 BY:   DAVID PARKER, ESQ.

17       MATTHEW J. GOLD, ESQ.

18

19

20 ARNOLD & PORTER LLP

21       Attorneys for Westpac Bank

22       399 Park Avenue

23       New York, NY 10022

24

25 BY:   CHARLES G. BERRY, ESQ.

4

1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2        Attorneys for Citi Bank

3        1285 Avenue of the Americas

4        New York, NY 10019

5

6   BY:   STEPHEN J. SHIMSHAK, ESQ.

7        BRAD S. KARP, ESQ.

8        CLAUDIA L. HAMMERMAN, ESQ.

9

10

11  CROWELL MORING

12       1001 Pennsylvania Avenue, NW

13       Washington, DC 20004

14

15  BY:   CLIFTON S. ELGARTEN, ESQ.

16

17

18

19

20

21

22

23

24

25

5

1                        P R O C E E D I N G S

2            THE COURT:  Please be seated.  All right.  Good

3     afternoon.

4            MR. PARKER:  Good afternoon.

5            THE COURT:  All right.  We are here on a status

6     conference regarding the District Court's mandate.  So in light

7     of the fact that the original motion was filed by the

8     defendants to dismiss and the remand is related to a finding

9     that the District Court directed this Court to make, I will

10    start then with counsel for the defendants.

11           MR. PARKER:  Your Honor, I'm David Parker, Kleinberg,

12    Kaplan, Wolff and Cohen.  With me is Matthew Gold.  We're here

13    for the defendant, Springfield.

14              At this point, Your Honor, the matter has, of course,

15    been remanded to you.  The issue that Judge Scheindlin remanded

16    was whether the transfer at issue here an assignment or a sale.

17    Ultimately, it will be Springfield's position that a sale is a

18    species of assignment.  And that while many rights were

19    assigned to Springfield as part of this transaction,

20    Springfield purchased them for real money in an open market and

21    the transaction therefore was a sale.  She said in her

22    opinion --

23           THE COURT:  So your position is going to be, all

24    assignments are sales?

25           MR. PARKER:  Not all assignments are sales but sales

6

1    are a species of assignment.  That some assignments are sales.

2    It may be that most assignments are sales.

3              THE COURT:  All right.

4              MR. PARKER:  Judge Scheindlin sent it down to Your

5    Honor to see whether he could make that determination, based on

6    the transaction documents themselves.  I'm frankly unsure

7    whether you can make that distinction on the transaction

8    documents themselves.  Judge Scheindlin, frankly, made a

9    distinction between assignments and sales.  It's one that

10   Springfield did not agree, on appeal, was a relevant

11   distinction, and Enron did not agree, on appeal, was a relevant

12   distinction.  She ruled against both of us in that regard and

13   sent it back down here.

14             We think it may be possible, with some very limited

15   discovery, of the nature of the transaction itself and the

16   nature of the market to be able to put the issue before you in

17   an encapsulated way.  However, last week Enron served upon us

18   very broad -- us and Citi Bank and Westpac, who is the other

19   defendant in the case, some very broad discovery demands that

20   went not only to that issue but much broader issues as well.

21   Those are discovery demands that we're still in the process of

22   trying to wrestle with and decide what our responses will be.

23   And we would hope to be able to work out with Enron a more

24   targeted approach that would frame the issue of whether this

25   transaction was an assignment or a sale, as Judge Scheindlin

7

1  appears to be making that distinction, so that Your Honor can

2  rule on it.

3          THE COURT:  All right.  Anyone else on behalf of the

4  defendants?

5          MR. BERRY:  Yes, Your Honor.  My name is

6  Charles Berry for Arnold and Porter and we represent the

7  defendant Westpac Bank which is an Australian bank.

8          We filed an answer back in April of 2005 but have not

9  been actively participating in the litigation since that time.

10 We did not join in the motion that Springfield and Citi brought

11 before Your Honor for the appeal before Judge Scheindlin, but

12 the issues have application to our interest as well.  I thought

13 it might be useful for me to explain just a little bit about

14 the nature of Westpac's claim and how it came to be a creditor

15 of Enron.

16         Westpac --

17         THE COURT:  But what is that relevant to?  Today we

18 have to move forward with this remand, what is the relevance of

19 your client's -- how your client became a creditor at this

20 point?

21         MR. BERRY:  Well, it bares on the issue that

22 Judge Scheindlin remanded to Your Honor.  We did not come by

23 our claim in the same way that Springfield did, which was a

24 purchaser in the secondary market.  We entered into a pre-

25 bankruptcy, a pre-filing, credit default swap.  And indeed,

1    Judge Scheindlin noted in footnote 91 on page 37 of her

2    decision that credit default swaps may pose some unique issues

3    and may, on their own, be entitled to the holder in due course

4    doctrine regardless of the question of assignment versus sale.

5    So I just wanted to bring that in particular --

6            THE COURT:  And the holder in due course document

7    would be premised upon what?

8            MR. BERRY:  It would be premised on Westpac providing

9    value for the credit default transaction prior to bankruptcy so

10   that however you characterize --

11           THE COURT:  Would it have to involve a negotiable

12   instrument?

13           MR. BERRY:  As a close question as to whether the

14   credit default swap is -- is considered that.  That's something

15   that was discussed before Judge Scheindlin on oral argument.  I

16   don't know if you would characterize it as such.

17           THE COURT:  We would also -- what -- I mean, it's my

18   understanding that with holder in due course if there's already

19   been a default you couldn't be a holder in due course, is that

20   a correct statement?

21           MR. BERRY:  Yes, but it may relate back to the pre-

22   bankruptcy transaction because the post-bankruptcy transaction

23   whereby we came into possession of the Enron debt was the

24   natural consequence of the credit default swap transaction.

25           THE COURT:  What you have, if I understood what you

1    said, you have a situation in which pre-bankruptcy there was an

2    agreement to take in the event of a default.

3              MR. BERRY:  That's correct.

4              THE COURT:  So you then believe that that's

5    distinguishable from the situation in which you take after a

6    default.

7              MR. BERRY:  Yes, I think it is one --

8              THE COURT:  All right.

9              MR. BERRY:  -- global transaction or may be viewed

10   that way.  I believe Judge Scheindlin believed that was a

11   possibility.  At least she thought sufficiently significant to

12   mention in her footnote.

13             I would also mention that we also received the

14   discovery request just last week and they do appear to us to be

15   certainly over broad.  We haven't had a chance to speak with

16   counsel about the over breadth but I think more importantly

17   premature.  Because if the mega complaint action against Citi

18   Bank does not succeed -- only if it does succeed would it be

19   necessary to examine further.

20             There is no allegation in the complaint of any

21   wrongdoing by Westpac.  And the only conceivable relevance of

22   discovery, as I see it, is the possible claim that Westpac was

23   engaged in some kind of bad faith or had knowledge of

24   wrongdoing either by Enron or Citi Bank.  There's no allegation

25   of that in the complaint.  And we respectfully submit that it

1    is premature to burden Westpac and -- and the plaintiff and the

2    creditors who are interested in recovery through the plaintiff

3    with the enormous expense of the discovery that's contemplated.

4    Thank you.

5              THE COURT:  All right.  Thank you.

6              MR. SHIMSHAK:  Good afternoon, Your Honor.  Steven

7    Shimshak, Paul, Weiss, Rifkind, Wharton and Garrison for

8    Citi Bank.  Also appearing with me today are my partners

9    Brad Karp and Claudia Hammerman.

10             Your Honor, we are third party defendants in the

11   underlying adversary proceeding in which Springfield has

12   asserted over against us its indemnification claim.

13             I'm not going to comment, at any length on Judge

14   Scheindlin's decision except to say that we believe it clearly

15   encompasses the distinction between sale and assignment,

16   clearly encompasses the transactions involving Springfield and

17   Westpac and that they qualify as sales.

18             I am going to comment a bit about process.  Judge

19   Scheindlin did remand this matter to you for further

20   deliberations but she didn't actually say when you should take

21   this up.  She didn't say take it up immediately.  And I think,

22   dealing with some of the comments made by Mr. Berry, its fair

23   for the Court to consider the environment today as against the

24   environment in April 2000 -- excuse me -- November 2005 when

25   the first of the decisions was rendered, the decision on

11

1    equitable subordination.

2           We are now five and a half months from the trial of

3    these matters going forward and every indication is that we are

4    going to trial in April.  In that trial the issue of whether or

5    not Citi Bank's comment -- conduct warrants equitable

6    subordination will be tried.  And that is an essential element

7    in every situation to the subordination of these claims.  So

8    that a practical argument exists that perhaps the deliberation

9    on this matter should abide the outcome of the trial.  And I

10   think that was the point, in part, that Mr. Berry was making.

11          That being said, if the Court is going to go forward

12   with the matter, as others have observed, Enron has begun

13   serving discovery on all of the defendants.  We have begun to

14   review that discovery.  We're going to be talking to our client

15   about it very shortly.  Some of it looks manageable; some of it

16   looks more problematic.  And we will certainly give

17   consideration on our side as to what discovery we think needs

18   to take place to put this motion in the proper framework for

19   the Court's decision.  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you.  All right.

21   Enron?

22      MR. STERN:  Thank you, Your Honor.  David Stern, Klee,

23   Tuchin, Bogdanoff and Stern appearing on behalf of Enron.

24      Your Honor, we have a slightly different view, although

25   there is some areas of concurrence with those -- with the

1  position just asserted by the defendants.  I believe Mr. Parker

2  alluded to the notion that there were elements of

3  Judge Scheindlin's decision that his client didn't agree with

4  and that we didn't agree with.  And while that's an appropriate

5  observation, it's also not a relevant one in my view.  Some

6  years ago a Court in -- in dealing with a mandate from the

7  U.S. Supreme Court said that there was a concurrence under

8  compulsion is what -- is what -- it was Judge Albiser (ph.) who

9  used that terminology.  And I find myself in something of that

10  position and perhaps Your Honor does as well.

11      The simple fact is that Judge Scheindlin has spoken and

12  now it is our duty to implement the remand and the directions.

13  As we view it, the issues are a bit more nuanced then simply

14  the question of sale versus assignment and certainly go beyond

15  the question of whether or not the documents say sale versus

16  assignment, again an area that it appears that the defendants

17  have some agreement with us.

18      As we view it there is, sort of if you will, a multi-

19  level set of inquiries and our discovery is directed to that.

20  In terms of the breadth of the discovery, I would only advice

21  Your Honor that when we sent out the discovery it went with an

22  e-mail that specifically said call us; let us know if you're

23  having any problems with it.  If you have any agreements,

24  disagreements, we're going to try to work this out without the

25  necessity of court intervention and I hope we can do so

13

1    promptly.  We think we did the right thing.  If our colleagues

2    believe we did incorrectly, I'm sure they'll point it out.  And

3    if they point it out to our satisfaction we'll withdraw certain

4    requests.

5         The question starts with, and we believe -- I'm not going

6    to try to answer all the questions we're going to have in this

7    case.  I'd really rather talk about the questions we're going

8    to have.  But it really is, kind of, a multi-level question.

9    Which is, there is the sale or assignment distinction.  And

10   that's important because the Court observed -- the District

11   Court observed that that general principle of assignment law is

12   that an assignee stands in the shoes of the assignor and

13   subject to all equities against the assignor.  So if, in fact,

14   sale is a subset of assignment, and I'm not going to argue that

15   point today.  We have to see whether or not we depart from the

16   general principle.  And the reason we would depart from the

17   general principle was because there was quite a campaign in

18   the -- well, I'll term it, in the market that this was

19   threatening some type of market mechanisms involving anonymous

20   buyers and sellers of claims who do not deal with one another

21   directly who do not have the opportunity to negotiate

22   warranties and indemnities.

23        And while that may or may not be true with respect to

24   certain types of trade claims that do get traded on that basis,

25   we don't believe that's correct with respect to bank claims and

14

1    almost can't be correct with respect to bank claims.  But more

2    importantly, we're not correct with respect to the bank claims

3    being negotiated in this instance.  And we think that we're

4    going to be looking at the question of what were the

5    circumstances, what was negotiated, what were the opportunities

6    to be negotiated.  And in this particular instance I think

7    we're going to find that a lot falls on the assignment side of

8    the line or if you will, it falls on the side of the line where

9    the successor has the claims subject to the infirmities of its

10   predecessor.  Rather than trying to deal with sale and

11   assignment we'll talk about whether the -- the infirmities

12   travel.  And that's why the discovery is targeted the way it

13   is.

14        There are subsets of issues, which is even if it is a

15   sale, the question then would arise according -- again

16   according to Judge Scheindlin's decision, whether or not the

17   buyer in that case had notice of the infirmities.  And again,

18   discovery is targeted to that question because that is an issue

19   that her honor raised and that we, therefore, have to deal

20   with.

21        And then there is, if you will, a third level of inquiry

22   which is whether or not the transferee engaged in misconduct

23   would result in equitable subordination.  Again, Judge

24   Scheindlin's opinion noted that there were, in effect, two

25   types of conduct that could do that.  One is the classic

1    equitable subordination, Mobile Steel and its progeny, but she

2    also alluded, in her opinion, in fact she said in her opinion

3    that where a transferee takes under circumstances, for example,

4    where it participates in claim washing, where there is a

5    complicity element, that under that set of circumstances that

6    would also be a basis for equitable subordination.  In effect,

7    adding a new ground to equitable subordination that did not

8    previously exist.

9        All of these, we think, are properly addressed, not

10   through a motion to dismiss probably not even through motions

11   for summary judgment but rather through a -- a hearing

12   involving contested matters.  Well now, whether that involves

13   witnesses or doesn't involve witnesses I don't know.  I mean, I

14   think -- I think we're not there yet.  But in terms of

15   methodologically speaking, and that's how we, sort of, framed

16   it.  We have document requests and some interrogatories who had

17   asked to identify people.  We hope to get responses shortly.

18   Then we can determine whether or not we need to depose and then

19   we can determine exactly what type of procedures would be most

20   appropriate before Your Honor to determine these questions.

21       In terms of whether or not Springfield is or is not in

22   the category of transferee to take subject to infirmities and

23   whether or not Westpac is, is again a question at this point

24   and not -- not really an answer.  I'm more than happy to

25   address the credit default swap issue, and I will do so if Your

1  Honor wanted me to, but I believe that the real question here,

2  at this status conference, is not what the answers are to the

3  questions.  I think it's probably premature for me to -- to

4  suggest what those answers are, although I will suggest that we

5  were reasonably confident of which way this ought to come out.

6  But the real question now is, how do we get the necessary

7  discovery, the papers in front of Your Honor so that Your Honor

8  could make the determinations that the District Court has

9  directed be made.

10      As to the timing of those determinations, our view is

11 that it's just a little bit difficult to say we're going to try

12 equitable subordination against Citi Bank and presumably

13 against the Yosemite trusts starting in April, which I do

14 believe we are.  But we're really not going to know who's in

15 there.  We know, for example, that we're going to be getting

16 motions that are -- we'll call them Springfield motions from

17 the -- from the Yosemite Trust so they're going to say they

18 shouldn't be in there.  The notion here is, and I'm surprised

19 to hear both Springfield and Westbanc say it although perhaps

20 their indemnities impel them to do so, that they would simply

21 stand back and let this trial take place in which they

22 presumably either would or wouldn't participate, I'm not sure

23 which.  They either participate at enormous expense or they

24 wouldn't participate and be subject to the ruling here before

25 they knew whether they were subject to the Citi Bank

1    infirmities or not.

2        So, although I heard -- I heard that argument I don't

3    quite understand it.  I think the best way to implement

4    Judge Scheindlin's direction is to find out the facts that the

5    District Court ordered us to find out, to make those

6    determinations and then have an extremely fulsome record so

7    that there is no question as to what went on and why and

8    proceed forward from there.  Thank you.

9        THE COURT:  All right.  Thank you.  All right.  This

10   is probably misdirected at both sides.  Going through the

11   discovery that's been sent out by Enron, understanding that

12   you'll have things to discuss about that discovery, when would

13   you be in a position to know or have an idea as to when that

14   discovery would conclude and if at the end of that it's going

15   to result in motion practice, when you would be able to make

16   that determination?

17       MR. STERN:  I think that question was directed to me,

18   David Stern on behalf of Enron.  I don't know exactly when

19   they're going to answer the discovery but it was propounded a

20   week ago.  So it's due in roughly three weeks or so, you know,

21   somewhere between twenty and thirty days.  Once I have that

22   discovery, and again I've been doing this long enough not to be

23   completely optimistic that I'm going to get full and complete

24   answers without objections in thirty days.  If that were to

25   happen this would -- this case would -- would become the first

18

1  in a thirty-plus year career.  But assuming I had -- I had

2  responses I would have the documents, I would have the identity

3  of witnesses, I would know how many people I had.  Once I have

4  that I could determine pretty quickly whether I was going to

5  take any depositions.  If I did, I have a feeling there

6  wouldn't be that many.  It would not be unreasonable, assuming

7  that we had cooperation from the other side, and that's a big

8  assumption, to say that, you know, sixty to seventy-five days

9  from now, and again I recognize there are holidays coming up,

10  say sixty to ninety days from now we would know that we, you

11  know, what we had and whether or not this was solved either by

12  motion, by contested matter and by evidentiary hearing or

13  whether that evidentiary hearing was going to involve live

14  witnesses or not.  So that's -- that's my best guess.

15          THE COURT:  All right.  Go ahead, any or all.

16          MR. SHIMSHAK:  Your Honor, for Citi I honestly can't

17  say.  I mean, we've got to meet with our client.  We've got to

18  understand what's entailed in responding to this discovery.  I

19  know it's not going to be less than thirty days; it might be

20  well be more than thirty days to respond to this discovery.

21  And as I indicated in my earlier remarks, we're doing our own

22  thinking about what's required to properly put this matter

23  before you, which may entail some discovery initiatives of our

24  own.

25          THE COURT:  All right.

1          MR. PARKER:  And Your Honor, I find myself somewhat

2    in the same position as Citi here.  We just got these discovery

3    demands last week.  My -- the person I had to speak to wasn't

4    even in town last week.  I have to get with them and figure out

5    what's going on but this document demands arguably call for

6    tens of thousands, perhaps hundreds of thousands of pages of

7    material, I'm not sure.  There have been millions of pages of

8    material already produced in the MDL litigation relating to

9    many of these same matters.  So it may be that some of this

10   material has already been produced.  There's been depositions

11   of my client, I think six depositions of my client in the MDL

12   litigation as well and it may be some of its covered there too,

13   we just haven't been able to figure it out.  So we won't be

14   able to come back to Your Honor, at least for some weeks, in

15   order to figure out even how long we think this will take.

16          I will say, though, that the issue of whether the

17   market is anonymous or not is not the distinction Judge

18   Scheindlin made.  And as counsel pointed out, we're bound by

19   what Judge Scheindlin said here.  Nor is it whether infirmities

20   travel, she ruled when infirmities travel based on the

21   distinction she purported to make.  And the distinction she

22   made between pure assignment and open market sales is one that,

23   I think, will also require some evidence and perhaps some

24   discovery about the nature of the market so that Your Honor

25   will have a full record in front of him.  And I don't have a

1    fix yet, at all, for what time table that might be on.  I think

2    seventy-five to ninety days is very, very optimistic.  Maybe --

3    maybe counsel's right but I just don't think so.  We won't be

4    in a position to evaluate that for some time yet.

5              THE COURT:  All right.

6              MR. BERRY:  Your Honor, very briefly, on behalf of

7    Westpac, I would note, as I've said before, that it's our

8    position that discovery from Westpac is unnecessary.  The

9    discovery that Mr. Parker referred to about the market has no

10   relevance whatsoever to our claim because we were not

11   purchasers in the market, we came by our Enron debt pursuant to

12   the consummation of the credit default swap.  So I expect that

13   we would have extensive objections to -- to the discovery.

14             I would also note that Westpac has itself brought, in

15   the District Court, actions against Citi Bank.  And there has

16   been discovery in that case.  It would not be appropriate for

17   Westpac, as Mr. Stern was suggesting, to join in as a plaintiff

18   in the mega complaint action.  We have our separate action

19   which has been coordinated for discovery before Judge Harlin.

20   And that's another reason why we think it would be a particular

21   burden and unnecessary for Westpac to have to duplicate that

22   discovery in this Bankruptcy Court.

23             THE COURT:  All right.

24             MR. BERRY:  Thank you.

25

1          MR. STERN:  Your Honor if I might, maybe Mr. Berry

2    misspoke or maybe he was really thinking about this but we

3    didn't envision Westpac as a plaintiff in the mega litigation.

4    We envisioned them as a defendant.  And we'd love to have

5    allies and he's welcome to join but seriously speaking that is

6    not what we anticipated.  We anticipated them being the

7    defendant.  And as far as tens of thousands of pages, count me

8    surprised if that's -- if that's the case unless there's a

9    document dump.  And if Westpac doesn't have much in the way of

10   documents that relate to this, then they don't have very much

11   in the way of documents that relate to this.  It doesn't result

12   in objections it results in a handful of documents rather than

13   box loads.

14          THE COURT:  All right.  What I will do -- first, as

15   far as the April trial date, I think as we move along with this

16   we'll see how to proceed.  I don't see any reason on my -- my

17   part to move that April trial date, it should go forward.

18   Whether this can be accomplished simultaneously or ahead of it,

19   I'm not really sure.  So I think we'll just have to wait and

20   see what happens.  But what I will do is schedule or continue

21   this status conference until December 13th at which time I

22   think the parties will be far more informed about any kind of

23   schedule thereafter as to how and when we'll be able to move

24   forward.

25          Now in the interim, obviously, if discovery disputes

22

1    come up that need the Court's intervention, I'm sure someone

2    will contact chambers.  But the only schedule date I will put

3    for this matter regarding the remand and the status -- related

4    status conference will be December 13th at 10:00.

5                MR. SHIMSHAK:  Thank you, Your Honor.

6                MR. STERN:  Thank you very much, Your Honor.

7                THE COURT:  Thank you.

8                MR. BERRY:  Thank you.

9                THE COURT:  All right.  I will return at 3 o'clock.

10        (Recess from 2:28 till 2:59 PM)

11                THE COURT:  Please be seated.  All right.  Enron,

12    since you requested this conference why don't you begin.

13                MR. ELGARTEN:  Yes, Your Honor.  This is Cliff

14    Elgarten for Enron.  This is a discreet issue.  It involves the

15    enforcement of Citi's non-disparagement clause.  It's here on

16    pre-motion conference and there are two letters, our letter of

17    October 1st and Citi's letter of October 4th responding.  The

18    issue is -- specifically arises because we sought some

19    assurances from Citi that it would not be seeking to enforce

20    its non-disparagement clause to prevent us from interviewing

21    certain former employees.

22                I think, as I read the letter, that there's less

23    dispute about the law then I had anticipated.  I do see a

24    little bit of hyperbole in that letter and I think I'm going to

25    turn to that after a few minutes because I've been told that

23

1    our letter was scurrilous.  It became clear to us that certain

2    employees would speak to us.  They said they would do it except

3    for a non-disparagement clause.  The non-disparagement clause

4    is in their severance agreements with Citi.

5            The cases, it turns out, in this jurisdiction are

6    quite clear that this is a 2007 case, of course, that it is

7    permissible for opposing counsel to speak to the former

8    employees, and that is a 2007 Court of Appeals case in New

9    York.  And the former employees can speak outside the presence

10   of their employer in the context of a litigation and it's

11   covered by a privilege.  Citi cites cases that are supportive

12   of that point.  They say its time honored that counsel has a

13   right to interview an adverse party's witnesses in private,

14   without the presence or consent of opposing counsel.  That's

15   the GI Holdings case, their case, Barron and Bud, their leading

16   case in their letter.  We didn't know they would rely on it.

17           And so, the difference here is that Citi has put an

18   anti-disparagement clause in their contract and it says, well

19   that should be the obstacle, or at least we feared that they

20   would say that that is the obstacle.  And that is the obstacle

21   that is preventing those employees from speaking.  In other

22   words, that's what was reported to us as the reason why they

23   wouldn't come forward.

24           So, as we read the letters, to my surprise, Citi has

25   apparently looked at the case law and now they agree that a

24

 1    non-disparagement clause cannot be used to prevent Enron from

 2    interviewing their former employees.  They make that concession

 3    in the letter.  Their point is -- their argument is in their

 4    letter that our request is somehow overbroad.

 5            They say they put other clauses in that are going to

 6    achieve that objective and so when we ask don't enforce the

 7    non-disparagement clause they say there are other clauses that

 8    we should be worried about.  They mention two, I don't know

 9    much about them.

10            One, they say, is a cooperation clause.  I can't

11    believe that they could make much out of a notion that the

12    former employees would cooperate with Citi.  That doesn't mean

13    they have to be present at the hearing or be present at an

14    interview.  And then they say there's a duty to report

15    violations of law.  They're not going to be able to make that

16    out as a reason why they should be there.

17            They cite two cases.  They cite the GI Holdings case

18    that did allow someone to be present -- the former employer to

19    be present.  If you recall, that case is called Barron and Bud

20    because the employer, in that case, was a law firm and people

21    wanted to interview the employees, the lay employees of the law

22    firm.  And the Court said privilege issues are right in those

23    circumstances.  And therefore the lay employees shouldn't be in

24    the position of being called upon to make judgments about

25    privilege.  So it is in that rare circumstance where you allow

25

1    the employer, the former employer, to be present at the

2    interview.  That is the only kind of circumstance.

3           The only other case I've seen like that is where

4    there had not been that chambers -- there was a mass

5    interviewing program that someone was about to undertake and

6    they said you -- to protect the interests of the employee in

7    dealing with these issues, I could take care of that right now.

8    I'll provide this assurance, which will take care of that

9    problem.

10          The employees that are at issue here are represented

11   by counsel and they are free to turn to their counsel, and as

12   far as I know counsel will be present at those interviews.

13   Their own counsel, not Citi interfering.  That's exactly why we

14   have the rule that the former employer cannot sit in on those

15   interviews.  Their own counsel will guide them through the

16   process of what they have to provide.  They'll walk them

17   through any privilege issues.  We don't see privilege issues

18   arising.  We're not concerned -- we're not asking for any

19   privileged information obviously.  But since those employees

20   will be represented by counsel that could be put in the

21   assurance letter so it could be read, so long as counsel is

22   present representing those employees Citi shall not attempt to

23   enforce the non-disparagement clause.  That will satisfy us on

24   that particular issue.  And so I think that takes care of the

25   issue.

1          Last, as to the scurrilous accusation, that's what

2    was made about our letter.  Our letter, I thought, handled

3    these issues pretty much straight up.  It described the

4    circumstance and it described the situation we were facing.

5    Mr. Karp recites a conversation I had with him fairly

6    accurately and then he says, after we had that conversation

7    where we asked him for some sort of relief I didn't call back.

8    And I'm sure if he thinks back on that conversation he did not

9    leave me much recourse at that point.  He said take your

10    chances, in essence.  I don't mean to be summary in what he

11    did; he did it in a perfectly cordial way.  But he didn't say

12    I'll call you back, I'll think about it, I'll look at it, your

13    request is overbroad.  It was a take your chances kind of

14    situation which required us to come to the Court as -- by way

15    of pre-motion before presenting it.

16          I think that's all I have to say, Your Honor.  I do

17    say that when he makes this charge that there was something

18    scurrilous in our letter he takes a portion of a sentence that

19    we wrote.  And that portion of the sentence was one in which

20    straight up it said that the refusal to grant assurances that

21    they would not enforce this clause would have the interorum

22    effect of intimidating witnesses into maintaining their silence

23    because they'd be afraid of punishment from Cit.

24          We did not accuse Citi of intimidating witnesses.  We

25    described the effect of their refusal to grant assurance.  I do

27

1    notice that there's a statement about this being in the press.

2    The press took the same half of a sentence out of that cover

3    letter, used the word intimidation, which is actually just a

4    subordinate part of that letter and Mr. Karp makes a big deal

5    of that in his letter.  I thought I ought to respond to it.

6    Thank you, Your Honor.

7              THE COURT:  You're welcome.

8              MR. KARP:  Good afternoon, Your Honor.  Brad Karp for

9    Citi Group.  I have a very different perspective on this

10   application.  And if Your Honor will give me a few moments, let

11   me try to explain why.  As best as we can discern, this

12   application appears to be nothing but an unfortunate publicity

13   stunt on the part of Enron.  Given it's timing, given it's

14   resort to hyperbolic and loaded phrases like intimidation of

15   witnesses, that as I will show you in a moment, lack any

16   foundation whatsoever and given the fact that Enron sent this

17   application to the press and apparently reached out to several

18   reports to pedal this phony story.  It appears that Enron is

19   using this application for an improper purpose.  Perhaps, Your

20   Honor, to divert attention from its public defeat last month

21   before Judge Scheindlin on the equitable subordination and

22   disqualification motion.  Whatever, Your Honor, Enron's true

23   motives may be here, the fact remains that this application is

24   deficient and its disingenuous, I submit, on many levels.

25             Let me start, Your Honor, if I may with the most

28

1    obvious deficiency in this application.  What Enron seeks here

2    is a classic and impermissible advisory opinion from this

3    Court.  You have Mr. Elgarten's two-page letter in which Enron

4    offers no proof whatsoever and no evidence of any kind to

5    support any relief here, let alone the sweeping protective

6    order that it is requesting that this Court enter.

7          I'd like to walk you through, step by step Your

8    Honor, what Enron has done here.  Enron's new lawyers and I

9    would note that we're dealing now with yet another set of

10   replacement counsel, Enron's lawyers have represented to the

11   Court, and I quote "several former Citi employees with relevant

12   information have been intimidate and they're unwilling to talk

13   to Enron because of non-disparagement clauses in Citi's

14   separation agreements."  That's Enron's allegation.  That's the

15   one that they've trumpeted to the press.

16         Let's consider, for just a moment, the evidence that

17   Enron has presented to the Court to back up its witness

18   intimidation allegation and to support its request for an order

19   that would give it permission to engage in ex-parte interviews

20   of Citi former employees.  Your Honor, there is not a stitch of

21   evidence, nothing.  Who are the several former Citi employees

22   who were intimidated?  We don't know.  Your Honor can't

23   possibly know because Enron hasn't told us and it hasn't told

24   you.  What were their positions at Citi?  Again, we don't know.

25   Your Honor can't possibly know because Enron has not told us

1    and it has not told this Court.  And where, Your Honor, are the

2    affidavits establishing as Enron's newest set of litigators

3    assure this Court that some former Citi employees were

4    intimidated by non-disparagement clauses and refuse to provide

5    Enron's lawyers with critical information to be used at trial.

6    There are no affidavits, as Your Honor is well aware, because

7    Enron has not provided a single one.

8            Your Honor, I'd like to believe that this is a real

9    litigation with billions of dollars at stake and that it is

10   subject to some minimal ground rules and procedures and

11   processes that we can count on.  How can this Court possibly

12   make any judgments or rulings on this issue, on this record,

13   without a stitch of proof?  On this record we don't know that

14   any former Citi employee said he or she was intimidated by any

15   non-disparagement clause.  For all we know, Your Honor, former

16   employees contacted by Enron's counsel in 2007, when asked

17   about their experiences at Citi a decade earlier, made whatever

18   excuse they could to avoid getting involved in this case.

19   That's just human nature and its common sense.

20           The point is, on this record, we don't know and Your

21   Honor cannot possibly know.  We don't have any secret trust me

22   type of proceeding in this world, we need evidence in order to

23   make a motion and seek relief.

24           And Your Honor, while we're on the topic of Enron's

25   empty application let me ask, where are Citi's separation

30

1    agreements that supposedly led to this witness intimidation.

2    Here too, Enron for whatever reason, and you'll have to ask

3    Mr. Elgarten, has not provided them to this Court.  They were

4    provided in discovery that Enron has but they were not provided

5    to Your Honor for whatever reason.  How does the Citi non-

6    disparagement clause read?  This Court doesn't know because

7    Enron hasn't provided it.

8            What about the other provisions in Citi's separation

9    agreements that Mr. Elgarten adverted to that give Citi

10   numerous rights and protections.  Again, this Court doesn't

11   know because it hasn't been provided with the relevant

12   agreements by Enron.

13           What about the specific provisions in the separation

14   agreements that prohibit former Citi employees from disclosing

15   confidential or privileged information, they're not before this

16   Court.

17           What about the cooperation provisions that require

18   former Citi employees to cooperate with Citi and its counsel

19   with respect to any past, present or future legal matters that

20   relate in any way to the employees tenure at Citi.  Enron,

21   again, hasn't shared any of this with Your Honor.  And how does

22   the cooperation clause interface with the non-disparagement

23   clause?  Here again, Enron has not submitted any documents, any

24   evidence whatsoever to this Court.  Again, how could Your Honor

25   make any judgment or ruling about the scope or the

31

1  enforceability of provisions in Citi's separation agreements if

2  it hasn't been provided with a copy of any such agreement.

3          Unlike what Enron is trying to do here, every single

4  Court to have considered the ex-parte interview issue in this

5  context actually deals with particular former employees and

6  particular separation agreements.  All one has to do is read

7  the cases.  The cases also deal with particular information

8  that is being sought by the counsel from the former employees.

9  And to continue in this vein, I would like to ask Your Honor,

10  what is the supposedly relevant and unique information that

11  these secret former Citi employees have that Enron seeks and

12  that is impairing Enron's ability to prepare for trial?  What

13  information do these unnamed witnesses have that is not

14  entirely duplicative of information that Enron has been

15  provided by the thirty-three Citi witnesses who have been

16  deposed by  Enron for a total of sixty-four days in this

17  proceeding alone?  Typically, Enron doesn't provide the Court

18  with a clue as to what information it is seeking from these

19  witnesses.

20          Let me tell the Court some of what we do know.  We do

21  know that many former Citi employees with separation

22  agreements, and it happens, non-disparagement clauses were

23  deposed by  Enron, we know that Your Honor.  And Your Honor, we

24  also know that the non-disparagement clause has never been

25  invoked by a single former Citi employee as a justification for

1    not providing testimony in this proceeding.  And we also know,

2    Your Honor, that Enron's several prior sets of counsel never

3    once suggested that Enron's ability to obtain information for

4    use at trial was impaired by the non-disparagement clause.

5            So where does this leave us?  Enron asked this Court

6    for a protective order without providing this Court with any

7    evidence whatsoever to support the request.  The application is

8    procedurally defective on its face and it plainly cannot

9    support the entry of any relief whatsoever.

10           Your Honor, the Spectrum Brands Court, and it's a

11   decision out of the Northern District of Georgia, reported at

12   207 -- 2007 Westlaw 148-3633 which was handed down just a

13   couple of months ago, dealt with a similar request to the one

14   being presented here by Enron and dismissed that request out of

15   hand.  I'd like to read to you Your Honor's holding which is

16   instructed here.  And I quote, "plaintiffs allege that six

17   confidential informants have refused to share potentially

18   relevant information for fear of breaching the scope of

19   confidentiality agreements."  Plaintiffs seek a ruling, as

20   Enron does here, reassuring these confidential informants that

21   Spectrum cannot punish them for participating in plaintiff's

22   investigation.  Plaintiffs have not brought the language of

23   these alleged agreements to the Court.  Nor do they claim to

24   have attempted to obtain them.  Plaintiffs have not provided

25   even a general description of the type of information their

 1    alleged confidential informants would share in the absence of

 2    concern about the confidentiality agreements.  Plaintiffs have

 3    not even specified what questions they seek to ask.  Plaintiffs

 4    do not cite any authority for the proposition that the Court

 5    can issue an advisory opinion concerning the scope of an

 6    agreement whose provisions are entirely unknown.

 7            Your Honor, the same is true here.  We submit that

 8    Enron should return to this Court with evidence that several

 9    former Citi employees have been intimidated, their word not

10    mine, from providing important information by reason of Citi's

11    non-disparagement clauses.  If and when Enron does that, then

12    Citi can respond to the evidence and to the facts.  And then

13    this Court will have a record on which it can make a ruling.

14    Absent that, this Court, we respectfully submit, has no basis

15    to issue any ruling whatsoever.  Because to delve into this

16    issue here, on this record, would be a classic advisory

17    opinion.

18            I'd like to address one more issue briefly, if I may

19    Your Honor.  And even though it's premature on this record to

20    consider it, the protective order proposed by Enron here is

21    grossly overbroad and is inconsistent with the case law

22    addressing such issues in this circuit.  First of all, there is

23    no case that permits ex-parte interviews in the face of a

24    cooperation agreement between a former employee and her

25    employer such as exists here.  Mr. Elgarten has not pointed to

1  any case that deals with a cooperation agreement.  But at a

2  minimum, if Enron wishes to troll for information from former

3  Citi employees, and if sixty-four days of Citi group

4  depositions were not sufficient, we would suggest that Enron

5  must advice Citi of its desire to interview former Citi

6  employees, provide Citi with the names of such employees,

7  indicate what topics it wishes to discuss with such former Citi

8  employees.  And contrary to Mr. Elgarten's assurance, permit

9  Citi's counsel to attend such interviews to protect against the

10 disclosure of privileged and confidential information.  The

11 case cited by Enron in its letter requires similar protection.

12 That's the Chambers versus Capital City's case issued by the

13 Southern District in 1995 where the Judge required the

14 plaintiff to provide notice and an opportunity for the

15 defendant to be present at the interview of defendant's former

16 employees.

17        Your Honor, on that note I'd like to conclude, unless

18 the Court has any questions at this point.

19        THE COURT:  No, I don't have any questions.

20        MR. ELGARTEN:  Can I respond, Your Honor?

21        THE COURT:  Go ahead.

22        MR. ELGARTEN:  Thank you.  The -- certain statements

23 are made about not putting an affidavit in our informal motion

24 to the -- our informal letter to the Court.  But I think I can

25 clear up some of this thing right away.  We did -- Mr. Karp did

1    ask me what the names of the employees are and I was asked, by

2    those employees, not to reveal that to Citi.  That's exactly

3    why we are before the Court, because they have a well-founded

4    fear that under the circumstances, given Mr. Karp's position,

5    they will be accused of something for having revealed their

6    name in open court if things don't go well.  As you read these

7    cases, they are concerned.  I was asked to not provide that

8    information.

9            Mr. Karp does not dispute that there is a non-

10   disparagement clause.  He does not dispute that it would be

11   unenforceable, that clause.  He says there may be other clauses

12   in his agreement and that's -- those are the ones he wants to

13   enforce.  The employees are concerned that if they reveal this

14   they will feel consequences from Citi.

15           Now, let's turn to that second issue that was raised.

16   That's why the issue is right here.  And the cases have been

17   clear that it is the opposing side has standing, as the party

18   seeking to conduct the interviews, to pursue the action under

19   these circumstances.

20           The last point goes to his desire to protect

21   privileged information.  He says there's agreements on that.

22   The employees are not concerned about that because they have

23   their own counsel to protect against that set of circumstances.

24   And therefore they will guard against that revealing of

25   privilege.  So I will make that representation.  That could be

1    a condition of Mr. Karp's letter -- the letter of assurance or

2    it could be a condition of this Court's order at an appropriate

3    time.  This is not a case of us going out randomly seeking

4    people.  These people came to our attention and that's why we

5    are bringing it to the attention of the Court.

6         If Mr. Karp had responded to my inquiry by saying

7    sure I'll provide you with the insurance, we don't try to

8    enforce the non-disparagement clause but I'm concerned

9    privilege maybe we wouldn't be here.  We didn't get that far.

10   The answer you've heard is, even though he agrees it's not

11   enforceable he doesn't want to let the interviews go forward

12   for precisely the reason they say.

13        And the last is, I keep hearing this thing about

14   intimidation, if you read the letter that we wrote I think we

15   describe, absolutely accurately, exactly the situation that's

16   faced by the employees and by us in proceeding.  There's no

17   scurrilous accusations or any accusations.  It is a plain

18   description and I don't appreciate the hyperbole.

19        THE COURT:  All right.  Citi Bank?

20        MR. KARP:  Your Honor, the only thing I would add is

21   we are prepared to deal with this issue when it is teed up

22   appropriately by means of a motion, by means of affidavits, by

23   means of evidence, by means of proof and we could respond fully

24   at an appropriate time.  I am certain that in many of the other

25   cases that exist in this area, the former employees may have as

1    issues, fears, concerns, what have you.  The fact remains that

2    in order to ask a judge to issue a sweeping protective order

3    there needs to be a record.  The only evidence we have is Mr.

4    Elgarten's letter and the probing that we had done, even the

5    superficial probing, suggests that there are holes.  Mr.

6    Elgarten, in his letter, did not alert this Court even though

7    Enron has access to the separation agreements to any of the

8    rights and protections that those separation agreements provide

9    Citi.  This Court is being given a half view of what is going

10   on here.  This Court, we submit respectfully, cannot possibly

11   rely on the record that has been present.  The record is

12   patently and manifestedly incomplete and one-sided.  And there

13   are issues here, leave aside that Enron ran to the press with

14   this and made a big point about witness intimidation by Citi.

15   And that Citi was contacted by numerous reporters on that -- on

16   that score, leave that aside for one moment about what's really

17   going on here.  We simply want to get an understanding of what

18   is at issue here.  As I mentioned, it is not as if this is pre-

19   discovery, it is not as if there had been a token number of

20   Citi witnesses who have been deposed in this case.  We're

21   talking about thirty-three different Citi witnesses who have

22   been deposed by Enron for sixty-four deposition dates.  Every

23   witness Enron asked us to make available for deposition they

24   had an opportunity to depose.  We have no idea in the world

25   what additional information that Enron can possibly and

38

1   reasonably seek from these so-called new witnesses, witnesses

2   34, 35, 36 and on up, that would be relevant and unique and not

3   duplicative.

4         On this record we submit this Court cannot issue any

5   order of any kind.  The courts that have dealt with these

6   issues and have issued orders did so on a complete record.  The

7   Court in the Northern District of Georgia, the Spectrum Brands

8   decision just a couple of months ago dealt with exactly this

9   issue and framed it correctly as an improper and inappropriate

10   request for an advisory opinion.  That's what Enron is seeking

11   here and the relief it is seeking is overbroad and inconsistent

12   with among other controlling Southern District Cases, the

13   Capital Cities case.

14         THE COURT:  All right.  Thank you.  Enron, do you

15   care to add anything?

16         MR. ELGARTEN:  Well, Your Honor, the -- there was one

17   point I'd want to go over the ground that's been covered.  Mr.

18   Karp is quite correct that I have not told you what these

19   witnesses purport to want to say because I don't know.  He may

20   be quite correct and maybe it's good for him that they don't

21   have much to add to what -- what is already in the record.

22   This is not about witnesses that are deposed.  But if they

23   believe they have something to say and he cannot enforce the

24   non-disparagement clause, there is absolutely no reason why

25   they should feel that they would be breaching their agreement

39

1   in this context.

2           I did look at the cases, as I'm sitting here.  I

3   don't see the names of the -- in the other cases the employees

4   and I would simply point out to the Court that protective

5   orders are often issued to allow a party in a case to go

6   forward.  In other words, having become aware that there is a

7   non-disparagement clause a Court could issue a protective

8   order.  Indeed it could have been in a pre-trial order in the

9   case if it was coming up that would simply say the non-

10  disparagement clause that Citi puts in its agreement shall not

11  be used against Enron and its employees.  Simple --

12          THE COURT:  I'm not clear.  You both seem to be

13  talking about two separate and distinct processes.  One is the

14  -- the pre-deposition interview and the other is the

15  deposition.  And what do you believe either or both of these

16  situations do you maintain that Citi Bank has said the non-

17  disparagement or asparaging agreements are unenforceable, in

18  both or just in --

19          MR. ELGARTEN:  In their letter, and I can quote their

20  letter.  As the case law makes clear -- let's see -- it's only

21  in the connection with the interviews.  I don't think Citi

22  would, if there was a deposition, and I don't think Citi has in

23  the context of the deposition suggested that non-disparagement

24  would prevent a deposition from going forward.  In fact, that's

25  usually called the governmental proceedings exception and that

1    becomes easy.  We've sought to present to the Court a slightly

2    more ambiguous set of cases.  And it turns out there was a

3    great deal of case law on it saying that the interview process

4    is also a part of the government proceeding.  And the quote I'm

5    going to use is from Citi.  It's on the second page, third down

6    and if they had told me this on the phone I would have -- I

7    would have been pretty happy about this.  "Citi Group does not

8    disagree with the general proposition that non-disparagement

9    clauses in severance agreements should not bar disclosure of

10   facts relating to alleged or potential violations of law.

11           And I think, when you read the cases, it turns out

12   that in that -- that that pre-interview setting, that rule

13   absolutely does apply.  You've now seen within -- with respect

14   to both letters, a good deal of case law that addresses that

15   point.  It is supplemented, of course, by the New York Court of

16   Appeals decision this year that talks about interviewing former

17   employees at Seabrit.  That's also a 2007 case.  So it has

18   become quite well established nowadays that non-disparagement,

19   non-disclosure clauses cannot prevent the truth seeking

20   process, including that process associated with interviews.  So

21   that's why I said their only dispute, and their only legitimate

22   interest, relates to this notion that these -- our request is

23   overbroad which goes to that protection of privilege kind of

24   issue.  I don't think their other clauses are going to come up

25   and the counsel for these attorneys are not concerned about

1  that issue right now.  They are concerned about the non-

2  disparagement clause and that is what we sought to have

3  addressed.  And it's perfectly usual to see that addressed in a

4  court order.

5        THE COURT:  But what about the cooperation

6  provisions?

7        MR. ELGARTEN:  If -- I don't believe -- if the -- if

8  Mr. Karp puts forward an interpretation of the cooperation

9  clause that says you cannot be interviewed outside the presence

10  of Citi attorneys, if that's what it said and that was the

11  agreement, I'd like to see it.  I doubt it's going to say that.

12  It's usually something that says you shall cooperate with Citi

13  in connection with any request Citi makes to you.  I don't know

14  if he hasn't put it forward.

15        As to the particular clauses, he says we've seen non-

16  disparagement agreements in other cases or other circumstances,

17  not this case and this circumstance.  So it is overbroad.  I

18  don't think that cooperation clause is going to have the

19  agreement he's looking for.  And if it did -- if these persons,

20  represented by counsel, were not in fear of it, I can't believe

21  it's going to be interpreted that way.  I just don't -- I just

22  don't see it.  I don't believe it's going to say that.  No

23  one's going to say that.  You can't -- the cooperation clauses

24  I've always seen say if Citi comes to you and asks you to help

25  in something that came up during your course of employment

1    you'll cooperate with Citi, perfectly ordinary.  It doesn't

2    mean if someone calls you on the phone to be interviewed

3    because you have specific information relating to a judicial

4    proceeding you can't go forward unless you tell Citi and have

5    Citi's counsel sitting in.  It doesn't say that, at least I

6    don't believe Mr. Karp is going to say it says that.

7              THE COURT:  And it's your representation that these

8    employees said that they wouldn't speak to you for fear that

9    this clause would be enforced and they chose, as well, or asked

10   not to have their names revealed to Citi Bank that they were

11   concerned about the enforcement?

12             MR. ELGARTEN:  Yes, Your Honor, that is my

13   representation.

14             THE COURT:  And it's also your representation that

15   that -- that that fear was on of -- that that would fit within

16   the non-disparagement provision?

17             MR. ELGARTEN:  It was there -- that was their own --

18   that was the clause they called to our attention.  They were

19   also concerned -- yes -- whether I agreed with them or not,

20   that was their fear.

21             THE COURT:  But you see -- it seems to me merging two

22   concepts.  The fact that someone says there's a non-

23   disparagement provision, I'm concerned about providing an

24   interview with you if Citi Bank may include that, what -- I'm

25   not clear about the nexus then to say well, I won't give my

1    name because somehow that's a violation of -- of the clause in

2    an of itself saying I, employee so and so, am concerned about

3    the enforcement of this clause.

4            MR. ELGARTEN:  I'm trying to do this without

5    revealing what I was asked to maintain into confidence which is

6    -- the concern was that the -- there is a concern that the non-

7    disparagement clause went so far as to talk about even the

8    extent of cooperation extended thus far, that the non-

9    disparagement clause and confidentiality clauses would be in

10   the breach by their mere coming forward.  I don't actually

11   think that that is at all surprising which is, if Citi got a

12   hold of their names, they're concerned Citi's going to do

13   something to them, simple as that, Your Honor.  And I think

14   that's wrong.  And I don't think that's the position Citi wants

15   to take should be.  So that's what they've told us and that's

16   why I'm standing here in this condition.  I could not tell

17   Mr. Karp the names on the phone.  I only believe, in fact, well

18   I can't -- I couldn't tell him any more then I could tell him.

19           THE COURT:  Uh-huh.  Citi Bank, would you like to

20   respond?

21           MR. KARP:  Yeah.  Your Honor, it's difficult to

22   respond to this.  I've never really seen a situation quite like

23   this.  We just had ten minutes of Mr. Elgarten making

24   representations to the Court about provisions he frankly admits

25   he's never seen.  So for this Court to rely on Mr. Elgarten's

44

1    assurances as to --

2            THE COURT:  I -- look, don't -- try not to tell me

3    what I can rely on and not.

4            MR. KARP:  Okay.

5            THE COURT:  This is an informal conference, all

6    right?  You're not here on the argument.  Just get to the

7    point.

8            MR. KARP:  My point is, that Mr. Elgarten is talking

9    about provisions, the terms of the non-disparagement clause,

10   the terms of the cooperation agreement that he has not seen and

11   that are not before the Court.  So I, obviously, have the

12   benefit of those provisions so I can tell you that Citi Group

13   views the cooperation agreement that is contained in these

14   separation agreements as not permitting one of its employees to

15   engage in ex-parte secret meetings with adversary counsel.

16   Citi Group would expect that its employees, who have received

17   consideration in exchange for entering into this agreement that

18   contained many provisions one of which is the cooperation

19   agreement, Citi Group would expect its employees to live up to

20   their cooperation obligations.

21           When the agreement indicates that you are to

22   cooperate with Citi and its counsel with regard to any past,

23   present or future legal matters which relate to or arise out of

24   the business you conducted on behalf of Citi and you

25   acknowledge that you have advised Citi's legal counsel

45

1    completely and candidly of all facts that you are aware of that

2    constitute or might constitute violations of the company's

3    ethical standards or legal obligations and that you agree that

4    you ill advise the company's legal counsel in the future of all

5    such facts that come to your attention, and that you agree to

6    make yourself available to Citi, Citi Group, I think

7    reasonably, does not view that as comprehending the ability to

8    sit down with adversary counsel and share with them whatever it

9    is that they want to discuss.  There are confidentiality

10   issues.  There are privilege issues.

11        I don't think Citi Group needs to rely on Enron to

12   enforce Citi's obligations and rights and protections under

13   this separation agreement.  Whatever Enron is seeking,

14   presumably it is factual in nature, Citi Group would be

15   prepared, on a record, to work with the Court to come up with

16   an accommodation that would, in fact, allow these fact sessions

17   to go forward.  Citi, like the Cap Cities case, all Citi wants

18   is the opportunity to be present, to make sure that its rights

19   are protected.  To make sure that these employees have access

20   to counsel.  I don't know which counsel Mr. Elgarten is

21   referring to.  Citi Group is willing to make available to its

22   former employees counsel.

23        If what Enron is interested here in is factual in

24   nature, beyond the thirty-three depositions and whatnot, Citi

25   Group is not objecting to that.  We do have agreement on that

1  score.  What Citi is objecting to, first of all, is the blind

2  and secret nature of this proceeding.  All we want is some

3  element of factual record being developed that we can approach.

4  And secondly, Citi wants to make sure that its former employees

5  are living up to the obligations in the separation agreements.

6  That they are cooperative, that they're dealing with facts,

7  that they're not divulging confidential information, that

8  they're not saying things to Enron that are inconsistent with

9  representations that they've made to Citi.  We want this to be

10  a fair and open proceeding, not a secret proceeding.

11         That's what the cases provide.  That's what Judge

12  Broderick held in Cap Cities.  And that's what Judge Sweet held

13  in the G-1 Holdings case against Baron and Bud.  Magistrate

14  judges will get involved to make sure these proceedings are

15  protected.  Counsel for the former employer will be invited to

16  make sure that formalities are abided by.  That's what we're

17  looking for.

18         We've made all of our witnesses available and no one

19  has -- no witness on the part of Citi has ever cited one of

20  these non-disparagement clauses to prevent the disclosure of

21  any information.  It's just that those were formal proceedings

22  where the witness was represented by counsel and the witness

23  gave full and complete and comprehensive answers to old

24  questions.  We're not trying to hide behind the non-

25  disparagement clause.  We made that point clear in the letter

1    that we wrote to Your Honor.  We just want to make sure that

2    how this is handled is appropriate and that Citi's interests

3    and rights and protections are safeguarded.

4            THE COURT:  All right.  Clarify for me the

5    confidentiality issue.  If an employee, in response to a

6    question, were to reveal a confidence, you would want the

7    ability to enforce your agreement against that employee in the

8    context of the informal discussions that would take -- would

9    take place.  But if the employee were asked the same question

10   during a deposition, how does it differ?

11           MR. KARP:  Well, at a deposition the employee is

12   represented by counsel, either Citi Group counsel or his or her

13   own counsel that has access to this agreement.  And that there

14   is an element of formality.  If there's a deposition taken

15   there is a record.  If the employee says something on that

16   record it can be presented to a Court.  What we're talking

17   about here, I imagine, are secret, ex-parte, informal

18   communications where there is no record, there is no recording,

19   there is no transcription.  And if a confidence is breached, if

20   a privilege is waived, if information is provided that is in

21   violation of this agreement, Citi Group would be entirely

22   without recourse.  That is not cooperation within the meaning

23   of this agreement.

24           And every single case we have read, none of the cases

25   we have read involve cooperation agreements.  So it's difficult

48

1   to have a back and forth with Your Honor and with Enron's

2   counsel here when this agreement is not before Your Honor.  And

3   the notion that the name of the witness can't be provided

4   because Citi Group is going to take some hostile act with

5   respect to that witness.  That -- that seems like a protectoral

6   excuse, either on the part of Enron or on the part of the

7   witness.  And Your Honor has the ability, certainly, to demand

8   a certain level of evidentiary proof before entering a

9   protective order of this type.

10          THE COURT:  All right.  Thank you.

11          MR. ELGARTEN:  Your Honor, I actually think we're

12  getting somewhere here.  So if it's an informal conference can

13  I -- can I follow up?

14          THE COURT:  Go ahead.

15          MR. ELGARTEN:  I think we're getting somewhere here

16  on two points.  One is we told that counsel should be present,

17  and I have assured the Court that that could be made a

18  condition.  They are represented by counsel and therefore I can

19  assure the Court that they -- they will have their own counsel

20  present --

21          THE COURT:  Well, I think you --

22          MR. ELGARTEN:  -- so at least that part is taken care

23  of.

24          THE COURT:  I think you -- I don't think it's quite

25  taken care of because I think they were referring to Citi Bank

49

1    counsel.

2            MR. KARP:  That's correct, Your Honor.

3            MR. ELGARTEN:  The second part of that is, the

4    references have shifted here, in the course of this discussion

5    and informal conference, from the anti-disparagement clause to

6    the cooperation clause.  Mr. Karp just read that clause aloud

7    to the Court.  And I didn't hear a single thing that in any

8    way, shape or form and I would appreciate if he would provide

9    it that would have covered a circumstance like this.  It is the

10   classic cooperation clause where you say, if Citi comes to you

11   will you help us if it related to your prior employment.

12            If Citi comes to these employees that will -- that

13   will work out and I think that could be taken care of.  So I

14   think that's all well and good.  And the last part went to the

15   deposition portion and if this was going to become a formal

16   proceeding I think it is quite clear that all these issues

17   would be played out in this context.  But the interview

18   process, which is the subject of the Court of Appeals Division

19   is separate.  It is preliminary to the deposition process.

20            Before this goes further, we would not be able to,

21   and I'll be there to make the representations, we would not be

22   able to put the witness on without giving them a chance to hear

23   the testimony and do a formal deposition.  But the interview

24   process exists as a prelude where, frankly, you find out

25   whether the person is worth pursuing and following up on and do

50

1    they have information.  I am not representing how strong, what

2    the information is, I can't do that.

3            THE COURT:  All right.  Well, how do you deal with

4    the breach of any confidence?

5            MR. ELGARTEN:  The attorneys, I don't believe that we

6    are going to be asking anything that would be called

7    confidential trade secret information of that sort of thing.

8    And the attorney in that case, their attorney --

9            THE COURT:  When you say their, you're talking about

10   the potential witnesses' attorney, not Citi Bank.

11           MR. ELGARTEN:  Yes.  And if you look at the case law,

12   and I'm sure the Court at least looked it over, they were

13   talking about lay witnesses where the witness, as in the GI

14   Holdings case, can't make a decision about whether they're

15   getting into a sensitive area.

16           THE COURT:  But that sensitive area was privileged,

17   right?

18           MR. ELGARTEN:  In that -- in the GI Holdings case it

19   was privileged.  Yes, Your Honor.

20           THE COURT:  And you're equating that to confidential

21   information.

22           MR. ELGARTEN:  Well, could -- if -- and you know, I

23   suppose they could try to drive a truck through the word

24   confidential information and say confidential is anything that

25   ever happened to you when you were at Citi.  That's not what I

1  think they're talking about.  They're talking about trade

2  secrets and that sort of thing.  Their attorney, at least,

3  would alert them and advise them on their obligations under the

4  agreement.  That's what attorneys do, they advise you about

5  your obligations under an agreement.  And here, that attorney

6  did not raise that particular form to me.  He was concerned

7  about the anti-disparagement clause.  That was what the issue

8  was so that's what I raised and that's what we're dealing with.

9            THE COURT:  All right.  Anything further from anyone?

10            MR. KARP:  No, Your Honor, not from Citi.

11            THE COURT:  All right.  Thank you.  What I'll do is,

12  I'll invite you back here on Thursday at 2 o'clock and I'll

13  issue a ruling with respect to the request set forth in the

14  letters regarding this informal conference.  And then we will

15  proceed form there.

16            MR. KARP:  Thank you, Your Honor.

17            MR. ELGARTEN:  Thank you.

18            THE COURT:  Thank you.

19       (Proceedings concluded at 2:44 PM)

20

21

22

23

24

25

52

1                              C E R T I F I C A T I O N

2

3        I, Pnina Eilberg, court approved transcriber, certify that the

4        foregoing is a correct transcript from the official electronic

5        sound recording of the proceedings in the above-entitled

6        matter.

7

8        _____ October 17, 2007

9        Signature of Transcriber              Date

10

11       Pnina Eilberg

12       typed or printed name

13

14

15

16

17

18

19

20

21

22

23

24

25