**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------- x
                                        :
In re:                                  :        Chapter 11
                                        :
ENRON CORP., et al.,                    :        Case No. 01-16034 (AJG)
                                        :
                 Debtors.               :        Jointly Administered
                                        :
_____       :
```

<br>

## APPENDIX E

### (Prepay Transactions)

### to

### SECOND INTERIM REPORT OF NEAL BATSON,
### COURT-APPOINTED EXAMINER

<br>

Reference is made to the preceding Second Interim Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix, and any Annex hereto, constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

## TABLE OF CONTENTS

I.      THE TYPICAL PREPAY TRANSACTION ........................................................    1
        A. Purpose of the Typical Prepay Transaction ....................................................    5
        B. Structure of the Typical Prepay Transaction ...................................................    9
        C. Economics and Allocation of Risk of the Typical Prepay Transaction ......... . 20

II.     LEGAL ISSUES RAISED BY THE TYPICAL PREPAY TRANSACTION . . . . 23

III.    ACCOUNTING ISSUES RAISED BY THE PREPAY TRANSACTIONS ..... . 24
        A. Accounting  Treatment  ...............................................................................    24
        B. Was the Accounting Treatment Proper? ......................................................    29

IV.     ROLE OF FINANCIAL INSTITUTIONS IN THE PREPAY
        TRANSACTIONS  ...........................................................................................    46
        A. Knowledge of Enron's Accounting Treatment .............................................    47
        B. Characterization of Prepay Transactions as Loans .......................................    48
        C. Facilitation of Enron's Accounting Treatment .............................................    52
        D. Summary  ....................................................................................................    53

V.      EXAMINER'S CONCLUSIONS REGARDING THE PREPAY
        TRANSACTIONS ............................................................................................... ................    54


Annex 1 ― Mahonia Transactions
Annex 2 ― Yosemite I Transaction
Annex 3 ― Yosemite II Transaction
Annex 4 ― Yosemite III Transaction
Annex 5 ― Yosemite IV Transaction

I.    **THE TYPICAL PREPAY TRANSACTION**

From 1992 through 2001, Enron engaged in structured commodity transactions, commonly referred to as "prepay transactions," pursuant to which it obtained at least $8.6 billion in financing.' Eleven of those transactions were entered into between 1997 and 2001 and were still outstanding on' the Petition Date (collectively, the "Prepay Transactions").[2] These eleven represent financings of $5 billion and are described in this Appendix and its Annexes.[3]

In these Prepay Transactions, Enron agreed to deliver (or pay the financial equivalent of) commodities such as oil and gas in the future in exchange for a single "prepayment" of the purchase price from a conduit entity. The conduit entity obtained the required funding from large financial institutions or institutional investors. However, through a complex series of contracts, Enron effectively agreed to repay the amount of the prepayment over time, together with additional amounts comparable to interest. In addition, the parties to the transaction transferred the price risk of the underlying commodity in a circle so that, on a net basis, no party incurred any additional material

---

[1] See Appendix E, *The Role of Financial Institutions in Enron's Collapse (Day One): Hearings before the Permanent Subcomm. On Investigations of the Senate Comm. Of Governmental Affairs,* 107'ᵗ Cong. (July 23, 2002) (the "PSI Prepay Report") (testimony of Robert Roach, Counsel & Chief Investigator, PSI) [AB000359469-AB000359509].

[2] Enron entered into other prepay transactions during this period of time, some of which may have still been outstanding on the Petition Date, that are not described in this Appendix and its Annexes.

[3] This Appendix and its attached Annexes focus on the eleven structured commodity transactions that Enron entered into between 1997 and 2001 (collectively, the "Prepay Transactions") that were outstanding on the Petition Date. Seven of the Prepay Transactions were facilitated by JPMorgan (collectively, the "Mahonia Transactions") and the remaining four were facilitated by Citibank (collectively, the "Yosemite Transactions"). Individual Mahonia Transactions are referred to by the names "Chase VI" through "Chase XII," referring to the chronological order in which they were completed and are addressed in detail in Annex 1 to this Appendix. The Yosemite Transactions are referred to as "Yosemite I," "Yosemite II," "Yosemite III" and "Yosemite IV" and are discussed in detail in Annexes 2 through 5, respectively, to this Appendix.

price risk with respect to the commodity as a result of the transaction. Thus, in substance, the prepayments to Enron simply created Enron debt.[4]

These transactions had an extraordinary effect on Enron's reported financial condition. Enron accounted for the Prepay Transactions as price risk management activity and characterized the proceeds of these financings as cash flow from operating activities rather than from financing activities.[5] As discussed below, the Prepay Transactions accounted for virtually all of Enron's net cash flow from operating activities in 1999 and 32% of its net operating cash flow in 2000.[6] Yet, of the $5 billion outstanding from the Prepay Transactions on June 30, 2001, Enron reflected only $148.2 million as debt on its balance sheet.[7] This method of accounting significantly understated Enron's true debt obligations and favorably affected Enron's key financial ratios, used by the Rating Agencies to establish Enron's credit rating.'

The increase in net cash flow from operating activities attributed to the Prepay Transactions helped Enron bring its operating cash flow closer to its net income. This

---

[4] The PSI Chief Investigator concluded that, "when all the bells and whistles are stripped away . . . what remains is a loan." PSI Prepay Report, at 1.

[5] See Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) Memorandum to Distribution from Financial Operations Accounting, regarding Prepaid Hydrocarbon Companies, Oct. 2 1, 1996 (the "Enron Memo Re: Prepay Companies")[AB025201068-AB025201073].

[6] The cash flow component used in Enron's key credit ratios was "funds flow from operations." Funds flow from operations equals net cash provided by operating activities *plus* increases in working capital, or less decreases in working capital. The Prepay Transactions accounted for 55% of Enron's funds flow from operations in 1999 and 5 1% of Enron's funds flow from operations in 2000.

[7] This is the aggregate amount of the "magic notes" issued by Enron in the Yosemite Transactions, as described in Annexes 2 through 5 of Appendix (Prepay Transactions) to this Report.

[8] See Testimony of John C. Diaz, Managing Director, Power & Energy Group, Moody's Investors Service, and Pamela M. Stumpp, Managing Director, Chief Credit Officer, Corporate Finance Group, Moody's Investors Service, before the PSI, July 23, 2002 (the "Diaz PSI Testimony"), ¶ 4 [AB000359566-AB000359568]; Testimony of Ronald M. Barone, Managing Director, S&P's Ratings Services, before the PSI, July 23, 2002 (the "Barone PSI Testimony"), at 13 [AB000359524-AB000359542].

assisted Enron in addressing the "quality of earnings" problem caused by early recognition of revenue as a result of its mark-to-market accounting.'

Despite the magnitude and importance of the Prepay Transactions, and after receiving contrary advice from Andersen, [10] Em-on provided no detailed disclosure of these transactions in its financial statements. Enron's financial statement footnotes did contain *a* general disclosure regarding price risk management activities, including commodity transactions. But the mere mention of a "variety of financial instruments including forward contracts involving physical delivery of an energy commodity"[11] did not provide an investor with sufficient information to evaluate the quality of the "operating" cash flow Enron received from these transactions or the terms of Enron's related obligations. [12]

Enron engaged in prepay transactions with a number of financial institutions.[13] Most such transactions, including all of the Prepay Transactions discussed in this

---

[9] See Report, Appendix B (Accounting Standards).

[10] "At one point, Arthur Andersen auditors recommended to Enron Chief Accounting Officer Rick Causey that Enron provide more complete disclosure on its prepay transactions, but Mr. Causey declined to do so." Appendix B, PSI Prepay Report, at 5 (citing an Andersen staff interview conducted by the PSI on July 19, *2002).*

[11] Enron Form 10-K filed with the SEC for the Year ended Dec 3 1, 1998, Notes to the Consolidated Financial Statements (the "10-K for 1998"), Note 3. See *also* Enron Form 10-K filed with the SEC for the Year ended Dec. 3 1, 1999, Notes to the Consolidated Financial Statements (the "10-K for 1999"), Note 3; Enron Form 10-K filed with the SEC for the Year ended Dec. 3 1, 2000, Notes to the Consolidated Financial Statements (the "10-K for 2000"), Note 3.

[12] The Examiner's analysis of Enron's disclosures regarding the Prepay Transactions, and his conclusion that such disclosures were inadequate, are set forth in Appendix D (Disclosure) to this Report.

[13] The Examiner is also reviewing prepay transactions ENA entered into with CSFB and Toronto Dominion (Texas), Inc. ("Toronto Dominion"). The CSFB prepay transaction originally closed in December 2000 and was extended in September 2001. See Confirmation (Swap) Deal No. QH4714.1 between ENA and CSFB, Dec. 15, 2000 [AB025200998-AB025201001]; Confirmation (Swap) Deal QH4715.1 between ENA and Morgan Stanley Capital Group, Inc. ("Morgan Stanley"), Dec. 18, 2000 [AB025200881-AB025200884]; see *also* Confirmation (Swap) between ENA and CSFB, Cayman Islands Branch, Sept. 27, 2001 (the "ENA/CSFB Swap") [AB025200890-AB025200901]; Confirmation (Swap) between ENA and Barclays, Sept. 27, 2001 (the "ENA/Barclays Swap") [AB025200885-AB025200889]. The transaction consisted of the familiar circular structure of three swaps which were financially settled and

Appendix, involved either Citibank or JPMorgan. Both of these financial institutions believed that Em-on accounted for its obligations under the Prepay Transactions as price risk management liabilities instead of debt and that Enron accounted for the proceeds as cash flow from operating activities rather than from financing activities.[14] Nevertheless, both financial institutions recognized that the transactions were effectively loans and worked with Enron to structure the transactions to help Enron achieve its desired accounting result.

This Appendix and its Annexes focus on seven Prepay Transactions facilitated by JPMorgan and four Prepay Transactions facilitated by Citibank, all of which were outstanding on the Petition Date. The JPMorgan transactions are referred to collectively as the "Mahonia Transactions" and are discussed in detail in Annex 1 to this Appendix. Individual Mahonia Transactions are referred to by the names "Chase VI" through "Chase XII," referring to the chronological order in which they were completed. The

resulted in ENA receiving $150 million up-front, effectively funded by CSFB, which ENA was required to repay with interest at maturity (which, after extension, was October 2002). See ENA/CSFB Swap (definition of "Fixed Amount"); ENA/ Barclays Swap (definition of "Fixed Amount"); see *also* Spreadsheet, Barclays (noting net payments of 4.0 cents per barrel to Barclays) [BRC000005095].

The Toronto Dominion prepay also closed in December 2000, but was actually two transactions, each of which involved ENA, Toronto Dominion and Morgan Stanley. See, e.g. Confirmation (Swap) between ENA and Morgan Stanley relating to Deal No. QH0092.1, dated Jan. 22, 2001 [AB025202413-AB025202417]; Confirmation (Swap) between ENA and Toronto Dominion relating to Deal No. QH009 1.1, dated Dec. 15, 2000 [AB025200906-AB025200909]; Confirmation (Swap) between ENA and Toronto Dominion relating to Deal No. QJ8902.1, dated Jan. 29, 2001 [AB025202418-AB025202421]; Confirmation (Swap) between ENA and Morgan Stanley relating to Deal No. QJ8903.1, dated Jan. 29, 2001 [AB025202422-AB025202425]. The Toronto Dominion prepay again consisted of a circular set of swaps, which resulted in ENA receiving, in the aggregate, $165 million up-front, effectively funded by Toronto Dominion, which ENA was required to repay with interest in December 2001. See *id.*

Unlike the Prepay Transactions with Citibank and JPMorgan, the "third step" of each of the CSFB and Toronto Dominion prepays was not with a conduit entity formed by CSFB or Toronto Dominion, but rather with a an independent third party - initially Morgan Stanley and then Barclays, in the CSFB prepay, and Morgan Stanley, in the Toronto Dominion prepay. The CSFB and Toronto Dominion prepay transactions raise questions similar to those raised by the Prepay Transactions. The Examiner will continue to examine the roles of CSFB, Toronto Dominion, Barclays and Morgan Stanley in these transactions as additional documentation is provided.

[14] See Report, Annexes 1 and 2 to Appendix E (Prepay Transactions).

Citibank transactions are referred to as Yosemite I, II, III and IV (collectively, the "Yosemite Transactions") and are discussed in detail in Annexes 2 through 5, respectively, to this Appendix. The remainder of this Appendix provides an analysis of the typical prepay transaction employed by Enron, drawing from the specific transactions described in the Annexes.

The Examiner has concluded that Enron's accounting treatment of the Prepay Transactions did not comply with GAAP. Rather than recording the transaction obligations as price risk management liabilities, Enron should have reflected them as debt in its financial statements. From just the eleven Prepay Transactions discussed in this Appendix and its Annexes, Enron should have included $5 billion of debt on its balance sheet as of June 30, 2001, rather than the $148.2 million that it actually reported. In addition, Enron should not have reported the increases in the balances of its prepay transactions as net cash from operating activities, but rather as cash provided by financing activities.

A.    **Purpose of the Typical Prepay Transaction**

For Enron, prepay transactions were simply a means of obtaining significant amounts of borrowed cash pursuant to a structure that allowed it to report favorable financial statement results through increased operating cash flow and reduced debt. Enron used prepay transactions as a tool to manage its reported financial condition and satisfy Rating Agency expectations. Significantly, these transactions tended to close toward the end of a financial quarter.[15]

---

[15] Eight of the eleven Prepay Transactions closed within 30 days of the end of a financial quarter.

A report Fastow made in August 2001 (the "August 2001 Fastow Report") shows how the balance of outstanding prepays ballooned from $1.258 billion at the end of 1998 to over $5 billion by June 2001: [16]



**Prepays Outstanding (in 000's)**

The following table illustrates the similarly dramatic impact that prepays had on Enron's cash flows from operating activities for 1999 and 2000 as reported in its 2000 Annual Report:"

|  | 2000 | 1999 |
| --- | --- | --- |
| Total Cash Flows | $4.779 billion | $1.228 billion |
| Cash Flows from Prepays'* | $1.527 billion | $1.23 1 billion |
| Cash Flows without Prepays | $3.252 billion | ($003 billion) |
| **Percentage Decrease** | **32%** | **100%** |

---

[16] Enron Corp Chief Financial Officer Report, Aug. 13, 2001 (the "August 2001 Fastow Report"), at 5 [AB000204725-AB000204736].

[17] 10-K for 2000.

[18] August 2001 Fastow Report, at 5.

The related impact on liabilities is also striking. If Enron had accounted for the liabilities associated with prepay transactions as debt rather than liabilities from price risk management activities, its reported debt levels and its debt to capitalization ratio (the percentage of total capitalization represented by debt) would have looked remarkably different:

|  | **2000** | **1999** |
|---|---|---|
| Debt excluding Prepays | $10.229 billion | $8.152 billion |
| Amount of Prepays | $4.016 billion | $2.489 billion |
| Debt including Prepays | $14.245 billion | $10.641 billion |
| **Percentage Increase** | **39%** | **31%** |
| Debt to Cap Ratio (w/o Prepays) | **40.9%** | **38.5%** |
| **Debt to Cap Ratio (w/ Prepays)** | **49.1%** | **45.0%** |

Reduced operating cash flow and increased debt levels in these amounts would almost certainly have resulted in credit ratings lower than those enjoyed by Enron during this period.["]

Thus, prepay transactions were powerful tools Enron employed to meet the requirements of Rating Agencies and maintain its investment grade credit rating. Bill Brown--the Enron officer charged with lead responsibility for Yosemite I and II and who, at the time of these transactions, managed Enron's corporate finance group--stated that he understood the amount of any given prepay transaction was determined by the targeted cash flow Enron wanted to show the Rating Agencies.[20] Ben Glisan, former treasurer of Enron, explained to representatives from JPMorgan that Enron needed to find ways to

---

[19] Diaz PSI Testimony, ¶ 4 ; Barone PSI Testimony, at 13 (testimony of Ronald M. Barone, Managing Director, Standard & Poor's Ratings Services).

[20] Telephone Interview with William Brown, Enron, by H. Sadler Poe, Partner, A&B, et al., Dec. 4, 2002 (the "Brown Interview").

raise money through prepays and other forms of financing because the Rating Agencies required Enron's cash flow to match more closely its mark-to-market earnings.*' According to handwritten notes on a copy of the August 2001 Fastow Report, Fastow apparently explained that prepay transactions were used to "bring cash forward to match earnings."[22]   A Managing Director at Salomon, a Citibank affiliate, described this matching as giving "oomph to revenues."[23]

---

[21] See Email from Charles G. Freeman, JPMorgan, to Robert Traband and James Ballentine, JPMorgan, Nov. 4, 2001, at 1 [JPMBKR0007935- JPMBKR0007942].

[22] See August 2001 Fastow Report, at 5 (quoting from handwritten notes appearing on the copy of the August 2001 Fastow Report – writer unknown).

[23] Email from Steve Wagman, Citibank, to Azfar Hashmi, Citibank, Sept. 28, 2000 [AB000153284].

B.     **Structure of the Typical Prepay Transaction**

The   following   chart   summarizes   the   dates   and   amounts   of   the   Prepay Transactions   described   in   the   attached   Annexes:

| Name of Transaction | Date of Closing | Approximate Gross Proceeds Received by Enron Affiliate* | Date of Maturity |
|---|---|---|---|
| Chase VI | Dec. 18, 1997 | $300   million | Dec. 2001 |
| Chase VII | June 26, 1998 | **$250** million | June 2002 |
| Chase VIII | Dec. 1, 1998 | $250   million | Dec. 2002 |
| Chase IX | June 28, 1999 | $500   million | June 2004 |
| Yosemite I | Dec. 22, 1999 | $800   million | Oct. 2004 |
| Yosemite II | Feb. 23, 2000 | $33 1.8 million[24] | Jan. 2007 |
| Chase X | June 28, 2000 | $650   million | June 2005 |
| Yosemite III | Aug. 25, 2000 | $475   million | July 2005 |
| Chase XI | Dec. 28, 2000 | $330.4   million | **Nov. 2005** |
| Yosemite IV ($) | May 24, 2001 | $475   million | Apr. 2006 |
| Yosemite IV (£) | May 24, 2001 | $154.4 million[25] | Apr. 2006 |
| Yosemite IV (€) | May 24, 2001 | $145.7 million[26] | Apr. 2006 |
| Chase XII | Sept. 28, 2001 | $350   million | Mar. 2002 |

*Note that these amounts do not necessarily reflect net increases in the prepay balances, as some later prepay transactions replaced earlier prepay transactions.

[24] In Yosemite II, this amount was actually denoted in British pounds as approximately £206.75 million. The amount converts to approximately $33 1,771,725 using an exchange rate of $1.6047 per British Pound on February 23, 2000. Federal Reserve Board, Federal Reserve Statistical Release, Foreign Exchange Rates,   United   Kingdom   Historical   Rates,   H.10   (Jan.   16,   2003) (available at <http://federalreserve.gov/releases/h10/Hist/dat00_uk.htm>).

[25] In Yosemite IV, this amount was actually denoted in British pounds as approximately £109.5 million. The amount converts to approximately $154,427,850 using an exchange rate of $1.4103 per British Pound on May 24, 2001. I.

[26] In Yosemite IV, this amount was actually denoted in Euros as approximately €170 million. The amount *converts* to approximately $145,690,000 using an exchange rate of $0.8570 per Euro on May 24, 2001. Federal Reserve Board, Federal Reserve Statistical Release, United Kingdom Historical Rates (Jan. 16,2003) (available at <http://federalreserve.gov/releases/h10/Hist/dat00_eu.htm>).

- 9 -

While each of the Prepay Transactions was different in its details, the following illustrates the circular nature of a typical prepay transaction:

## Basic Prepay Structure



Note: Entity in bold is wholly owned (directly or indirectly) by Enron.

The typical Enron prepay transaction involved an Enron affiliate (usually ENA), a financial institution such as Citibank or JPMorgan, and a conduit entity usually formed by or at the direction of the financial institution.

### Financial Institution/Conduit

As the first step in the circular transaction, the financial institution and the conduit entity entered into a forward contract for the delivery of a commodity. Under the forward contract, the financial institution made a prepayment equal to the amount Enron desired to borrow. In exchange, the conduit entity agreed to deliver to the financial institution a specified quantity of commodities at specified times in the future.

### Conduit/Enron Affiliate

As the second step, the conduit entity paid the same prepayment amount to the Enron affiliate, in exchange for the Enron affiliate's agreement to deliver to the conduit

- 10 -

entity the commodities under a forward contract with terms identical to the forward contract between the financial institution and the conduit.

### Enron Affiliate/Financial Institution

As the final step, the financial institution agreed to deliver to the Enron affiliate the commodity on the same terms as the forward contracts in the preceding steps. In exchange, the Enron affiliate agreed to pay to the financial institution fixed amounts for the commodity in the future, equal in the aggregate to the prepayment amount the Enron affiliate received from the conduit entity plus an additional amount that effectively would be interest. This third step, which is a type of hedging transaction, would typically be documented by a swap agreement.

The net effect of the three steps of the transaction is that, at the closing, the Enron affiliate received a prepayment from the financial institution by way of the conduit entity. On the future commodity delivery dates (i) the circular delivery obligations of the parties under the forward agreements and the swap would effectively eliminate one another and (ii) the Enron affiliate would pay directly to the financial institution the amount of the upfront payment, plus an additional agreed upon amount for the use of the funds.[27] In economic substance, the financial institution made a loan to the Enron affiliate that the Em-on affiliate repaid with interest. Because of the circular deliveries and payments with respect to the commodities, no party assumed any additional material risk or had any potential for gain with respect to fluctuations in the price of the commodity.

With the price risk of the commodity effectively eliminated as a result of the circular nature of the structure, the only risk remaining in a typical prepay transaction

---

[27] Sometimes this payment flowed to the financial institution through a third party, as was the case in the prepay transactions involving CSFB and Toronto Dominion (discussed below).

was the risk that a party would not perform or be able to pay its obligations. Thus, Em-on's prepay transactions typically included some type of credit enhancement or security to support the obligations of the Enron affiliate. Enron typically guaranteed those affiliate obligations. In addition, third parties often provided credit support for the obligations of Enron and/or the Enron affiliate. This credit support typically took the form of a letter of credit provided by one or more commercial banks or surety bonds issued by one or more insurance companies.

In the Prepay Transactions described in this Appendix, the terms of the basic transaction steps varied in form and complexity, but they achieved the same net results.

### Mahonia Transactions

Each of the Mahonia Transactions involved an Enron affiliate, JPMorgan and, in most cases, Mahonia Limited ("Mahonia"),[28] an offshore conduit entity formed at JPMorgan's direction. All of the Mahonia Transactions employed a similar circular structure, and all except Chase XII involved prepaid forward contracts that were "physically settled," meaning they required physical delivery of either oil or gas.[29] Chase XII used a financially settled swap instead.[30]

---

[28] In at least one of the transactions, an entity named Mahonia Natural Gas Limited, a Jersey corporation ("MNG"), was involved instead of Mahonia Limited ("Mahonia").

[29] See Natural Gas Inventory Forward Sale Contract between JPMorgan and Mahonia, dated as of Dec. 18, 1997 [JPMCBKR0025086-JPMCBKR0025104]; Natural Gas Inventory Forward Sale Contract between JPMorgan and Mahonia, dated as of June 26, 1998 [JPMCBKR0024979-JPMCBKR0024999]; Crude Oil Inventory Forward Sale Contract between JPMorgan and Mahonia, dated as of Dec. 1, 1998 (the "Chase/Mahonia Chase VIII Forward Contract") [JPMCBKR0025185-JPMCBKR0025204]; Natural Gas Forward Sale Contract between JPMorgan and Mahonia, dated as of June 28, 1999 [JPMCBKR0025338-JPMCBKR0025358]; Natural Gas Forward Sale Contract between JPMorgan and Mahonia, dated as of June 28, 2000 [JPMCBKR0025463-JPMCBKR0025484] (collectively, the "Chase/Mahonia Forward Contracts").

[30] See Swap Confirmation between JPMorgan and Mahonia, dated as of Sept. 28, 2001 (the "Chase/Mahonia Chase XII Swap") [PSI00394798-PSI00394801].



Note: Entities in bold represent Enron or a wholly owned subsidiary of Enron.

In each of the Mahonia Transactions, JPMorgan provided the funding[31] by entering into a prepaid forward contract with Mahonia under which it paid Mahonia between $250 million and $650 million.[32] In exchange, Mahonia agreed to deliver specified quantities of commodities at a specific time and place.[33] Mahonia then entered into a virtually identical contract with an Enron affiliate, under which Mahonia paid to

---

[31] In the case of Chase XI, JPMorgan and Fleet together provided the funding.

[32] Confirmation of Natural Gas Forward Sale between JPMorgan and Mahonia, Dec. 19, 1997 [JPMCBKR0025105-JPMCBKR0025106]; Confirmation of Natural Gas Forward Sale between JPMorgan and Mahonia, June 29, 1998 [JPMCBKR0025000-JPMCBKR0025001]; Confirmation of Crude Oil Forward Sale between JPMorgan and Mahonia, Dec. 2, 1998 (the "Chase/Mahonia Chase VIII Confirmation Letter") [JPMCBKR0025205-JPMCBKR0025206]; Confirmation of Natural Gas Forward Sale between JPMorgan and Mahonia, June 29, 1999 [JPMCBKR0025359-JPMCBKR0025360]; Confirmation of Natural Gas Forward Sale between JPMorgan and Mahonia, June 29, 2000 (collectively, the "Chase/Mahonia Confirmation Letters") [JPMCBKR0028909-JPMCBKR0028911]. In Chase XII, this step took the form of a financially settled swap. Chase/Mahonia Chase XII Swaps.

[33] Chase/Mahonia Chase XII Swaps.

the Em-on affiliate the money it had received from JPMorgan.[34] Because the Enron affiliate agreed to deliver the commodity to Mahonia on the same terms as Mahonia had agreed to deliver the commodity to JPMorgan, the Enron affiliate assumed the price risk.[35]

The Enron affiliate[36] and JPMorgan then completed the third step in the transaction by entering into a swap agreement that shifted the price risk of the commodity back to JPMorgan which had created it in the first step and also provided the mechanism

---

[34] Natural Gas Inventory Forward Sale Contract between Enron Natural Gas Marketing Corp. ("EN,") and Mahonia, dated Dec. 18, 1997 [AB000365250-AB000365290]; Natural Gas Inventory Forward Sale Contract between Enron Natural Gas Marketing Corp. and Mahonia, dated June 26, 1998 [AB000365509-AB000365554]; Crude Oil Inventory Forward Sale Contract between ENG and Mahonia, dated Dec. 1, 1998 (the "Enron/Mahonia Chase VIII Forward Contract") [AB000366017-AB000366069]; Natural Gas Forward Sale Contract between ENG and Mahonia, dated June 28, 1999 [AB000366642-AB000366696]; Natural Gas Forward Sale Contract between ENA and Mahonia, dated June 28, 2000 [AB000366755-AB000366781]; Natural Gas Forward Sale Contract between ENA and MNG, dated as of Dec. 28, 2000 [AB000121571-AB000121597] (collectively, the "Enron/Mahonia Forward Contracts"); see *also* Confirmation of Natural Gas Forward Sale between ENG and Mahonia, Dec. 19, 1997 [AB000365316-AB000365317]; Confirmation of Natural Gas Forward Sale between ENG and Mahonia, June 29, 1998 [AB000365578-AB000365580]; Confirmation of Crude Oil Forward Sale between ENG and Mahonia, Dec. 2, 1998 (the "Enron/Mahonia Chase VIII Confirmation Letter") [AB000366094-AB0003666095]; Confirmation of Natural Gas Forward Sale between ENG and Mahonia, June 29, 1999 [AB000366722-AB000366724]; Confirmation of Natural Gas Forward Sale between ENA and Mahonia, June 29, 2000 [AB000366813-AB000366815]; Confirmation of Natural Gas Forward Sale between ENA and MNG, Dec. 28, 2000 [AB000121618-AB000121620] (collectively, the "Enron/Mahonia Confirmation Letters"); Swap Transaction Confirmation – Reference No. Y57079.2 between ENA and Mahonia, Sept. 28, 2001 (the "Enron/Mahonia Chase XII Swap") [AB018301100-AB018301137].

[35] Enron/Mahonia Confirmation Letters. In Chase XII, the prepaid contracts were financially settled, so instead of acquiring and delivering the fuel, the Enron subsidiary, ENG, and Mahonia could satisfy their obligations by paying a sum that equaled the market price of the nominal amount of fuel that was required to be delivered. Chase/Mahonia Chase XII Swap. As discussed above and in Annex 1 to this Appendix, the first prepay transaction between an Enron affiliate and Mahonia occurred in 1992 and several such transactions took place prior to the Mahonia Transactions (which are discussed in detail in Annex 1 to this Appendix and with respect to which amounts were outstanding on the Petition Date). Unlike the Mahonia Transactions, for the most part, these prior transactions with Mahonia did not contain this third step of a swap between JPMorgan and an Enron affiliate. Rather, the commodity risk was usually hedged by Enron on the NYMEX. In-Person Interview with Joe Deffner, Enron, by Paul M. Cushing, Partner, A&B, et al., Nov. 21, 2002.

[36] The Enron affiliate involved in this third step was not always the same as the Enron affiliate involved in the second step.

for repaying the initial amount advanced by JPMorgan with interest.[37] The swap provided that JPMorgan would pay the Enron affiliate the prevailing market price for the commodity at the time the Enron affiliate was to make delivery to Mahonia.[38] Thus, regardless of what happened to the price of the commodity, the Em-on affiliate would have the funds it needed to purchase the commodity for delivery to Mahonia. Mahonia would then deliver the commodity to JPMorgan, which JPMorgan could then sell in the market or, in most cases, back to Enron.[39]  Since that sale would be at market prices, JPMorgan would recover the amount it had paid to the Enron affiliate under the swap. The price risk for the commodity had moved around the circle and no party had incurred, on a net basis, any additional material price risk as a result of these transactions.

---

[37] Swap Confirmation between JPMorgan and ENA, dated Dec. 30, 1997 [JPMBKR0019063-JPMCBKR0019066]; Letter from JPMorgan to ENA, dated Dec. 19, 1997 [JPMCBKR001905 1-JPMCBKR0019052]; Swap Confirmation between JPMorgan and ENA, dated Dec. 30, 1997 [JPMC154464-JPMC154467]; Swap Confirmation between JPMorgan and ENA, dated July 15, 1998 [PSI00067348-PSI00067351]; Swap Confirmation between JPMorgan and ENA, dated July 15, 1998 [PSI00067343-PSI00067347]; Swap Confirmation between JPMorgan and ENA, dated July 15, 1998 [PSI00067338-PSI00067342]; Swap Confirmation between ENA and JPMorgan, dated Jan. 26, 1999 (the "Chase/Enron Chase VIII Swap") [JPMC156987.01-JPMC156987.10]; Swap Confirmation between ENA and JPMorgan, dated July 8, 1999 [JPMCBKR0019123-JPMCBKR0019127]; Swap Confirmation between ENA and JPMorgan, dated June 29, 1999 [JPMC54422-JPMC54427]; Swap Confirmation between ENA and JPMorgan, dated June 29, 1999 [JPMC54436-JPMC54441]; Swap Confirmation between ENA and JPMorgan, dated June 30, 2000 [JPMCBKR00192 11 -JPMCBKROO 192 15]; Swap Confirmation between ENA and JPMorgan, dated Feb. 26, 2001 [JPMCBKR0019184-JPMCBKR0019189]; Swap Confirmation between ENA and JPMorgan, dated Jan. 18, 2001 [JPMC54579- JPMC54584]; Swap Confirmation between ENA and JPMorgan, dated Jan. 18, 2001 [JPMC54509- JPMC54513] (collectively, the "Chase/Enron Swaps"); see *also* Swap Transaction Confirmation – Reference No. Y57079.1 between ENA and JPMorgan, dated Sept. 28, 2001 (the "Chase/Enron Chase XII Swap") [PSI00394769-PSI00394772]. There were generally multiple Chase/Enron Swaps for each transaction, because the gas delivered at each delivery point was subject to a separate swap confirmation.

[38] See Chase/Enron Swaps; Chase/Enron Chase XII Swap, at 2 (providing the "Floating Amount Details").

[39] See, e.g., Confirmation between JPMorgan and ENA, dated July 3, 1998 [JPMCBKR0018957-JPMC0018958]; Confirmation between JPMorgan and ENA, dated July 3, 1998 [JPMCBKR0018969-JPMC0018970]; Confirmation between JPMorgan and ENA, dated July 3, 1998 [PSI00394412-PSI00394413] (collectively, the "Chase VII Sellback Letters").

The swap agreement between the Enron affiliate and JPMorgan also required the Enron affiliate to make cash payments to JPMorgan on specified dates.[40] The aggregate amount of these payments equaled the initial prepayment amount advanced by JPMorgan to the Enron affiliate through Mahonia, plus an additional amount that paid JPMorgan for the use of its capital, i.e., interest.[41]

*Yosemite Transactions*

The Yosemite Transactions, which were facilitated by Citibank, differed from the Mahonia Transactions in two principal ways.  First, the commodity contracts in the Yosemite Transactions required "financial settlement," meaning the parties could only satisfy their obligations by paying an amount equal to the market price of the commodity required to be delivered, in lieu of delivering the commodity itself.[42] Second, instead of funding the prepay transaction with its own funds, in Yosemite I and II Citibank arranged for a business trust and an offshore corporation, respectively, to issue notes and certificates in Rule 144A[43] or similar offerings and then loan the proceeds of these offerings to the conduit entity.[44] In Yosemite III and IV, Citibank funded the transaction

---

[40] See Chase/Enron Swaps; Chase/Enron Chase XII Swap, at 2 ( providing the "Fixed Amount Details").

[41] *Compare* Chase/Enron Swaps (providing "Fixed Amount Details") *with* Enron/Mahonia Confirmation Letters; *compare* Chase/Enron XII Swap *with* Enron/Mahonia Chase XII Swap.

[42] See, e.g., Enron/Delta Swap Confirmation between ENA and Delta Energy Corporation ("Delta"), Dec. 22, 1999 (the "YI ENA/Delta Swap") [AB000026348-AB000026360]; Enron/Citibank Swap Confirmation between ENA and Citibank, Dec. 22, 1999 (the "YI ENA/Citibank Swap ") [AB000026361-AB000026373]. These confirmations were issued pursuant to ISDA Master Agreements and Schedules between ENA and Delta and ENA and Citibank, respectively. ISDA Master Agreement between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Delta, dated as of Nov. 18, 1999 (the "ENA/Delta Master Agreement") [AB000025805-AB000025840]; ISDA Master Agreement between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Citibank, dated as of Nov. 17, 1992 (the "ENA/Citibank Master Agreement") [AB000025717-AB000025762].

[43] Private Resales of Securities to Institutions, 17 CFR § 230.144A.

[44] The Yosemite I and Yosemite II transactions as discussed in Annexes 2 and 3, respectively, to this Appendix. See Report, Annex 2 to Appendix E (Prepay Transactions); Report, Annex 3 to Appendix E (Prepay Transactions).

directly, but supported the funding with the offering proceeds that other entities had invested in Citibank certificates of deposit.[45]

In all of the Yosemite Transactions, the three parties in the circular structure were an Enron affiliate, Citibank and Delta.[46] There are some differences among the four Yosemite Transactions, which are described in Annexes 2 through 5 to this Appendix. However, to illustrate how the Yosemite Transactions generally differed from the Mahonia Transactions, the following describes the specific terms of Yosemite I:



Note: Entity in bold is wholly owned (directly or indirectly) by Enron.

In the first step of Yosemite I, the Enron affiliate received approximately $706 million from Delta under a Swap Agreement, in return for which it agreed to make semi-annual payments to Delta of the market price of 1,212,375 barrels of oil.[47] In addition, it

---

[45] The Yosemite III and Yosemite IV transactions, as discussed in Annexes 4 and 5, respectively, to this Appendix. See Report, Annex 2 to Appendix E (Prepay Transactions); Report, Annex 3 to Appendix E (Prepay Transactions).

[46] Affidavit of Barbara Yastine, Chief Financial Officer, Corporate and Investment Bank, Citibank, July 29, 2002 (the "Yastine Affidavit"), at 1 [AB0005 13031-AB0005 130341.

[47] Sections 1, 2 and 3, YI ENA/Delta Swap.

agreed to pay Delta, on the maturity date in October 2004, the lesser of $800 million or the market price of 44,469,150 barrels of oil.[48]

In the second step, Citibank paid the Enron affiliate an additional $94 million pursuant to a swap agreement. The Enron affiliate therefore obtained a total of $800 million in financing from Delta and Citibank.[49] In addition, Citibank agreed to make semi-annual payments to the Enron affiliate of the market price of 1,212,375 barrels of oil.[50] This amount was identical to the semi-annual payment that the Enron affiliate was required to make to Delta. In exchange, the Enron affiliate agreed to pay to Citibank $29 million semi-annually[51] and $800 million minus the market price of 44,469,150 barrels of oil (if less than $800 million) on the maturity date.[52] The sum of this final payment to Citibank and the maturity date payment that the Enron affiliate would pay to Delta would always total $800 million.

The third step consisted of swap agreements between Citibank and Delta that mirrored the swap agreements in the second step between Citibank and the Enron affiliate. Under these swap agreements, Delta paid Citibank the $94 million that Citibank had paid to the Enron affiliate.[53] Delta also agreed to pay Citibank semi-annual payments

---

[48] *Id*. Section 4.

[49] Section 2, YI ENA/Citibank Swap; Section 2, YI ENA/Delta Swap.

[50] Section 3, YI ENA/Citibank Swap.

[51] *Compare* YI ENA/Delta Swap, with Section 3, YI ENA/Citibank Swap. This semi-Annual payment is indicative of a per annum interest rate equal to 7.25%.

[52] Section 5, YI ENA/Citibank Swap.

[53] *Compare id*. Section 2, *with* Section 2, Delta/Citibank Swap Confirmation between Delta and Citibank, Dec. 22, 1999 (the "YI Delta/Citibank Swap") [AB000026374-AB000026385]. The confirmation relating to the YI Delta/Citibank Swap was issued pursuant to an ISDA Master Agreement and Schedule between Delta and Citibank, dated as of Sept. 27, 1994 (the "Delta/Citibank Master Agreement") [AB000025661-AB000025705].

equal to the market price of 1,212,375 barrels of oil,[54] completing the circle of commodity-based payments.  In exchange, Citibank agreed to pay Delta $29 million semi-annually[55] and an amount equal to the final payment Citibank would receive from the Enron affiliate, which would be $800 million minus the market price of 44,469,150 barrels of oil on the maturity date.[56]

Delta obtained the $800 million to fund the transaction through a borrowing from Yosemite Securities Trust I (the "Yosemite I Trust"), a business trust established for this transaction. The loan was evidenced by a promissory note bearing an interest rate of 7.25% (the "YI Delta Note").[57]  This business trust had sold $750 million of 8.25% notes[58] and $75 million of 11% trust certificates[59] in the institutional market through a Rule 144A or similar offering. Thus, the trust had $825 million of obligations, requiring interest payments in excess of amounts it would receive under the YI Delta Note. The trust compensated for this shortfall by loaning $25 million to Enron on what has been referred to as a "magic note," pursuant to which the amount of each interest payment due from Enron would "magically" equal the amount by which the aggregate interest owed

---

[54] Section 3, YI Delta/Citibank Swap.

[55] *Id.* Section 4.

[56] *Compare* Section 5, YI ENA/Citibank Swap *with* Section 5, YI Delta/Citibank Swap.

[57] Promissory Note by Delta in favor of Yosemite Securities Trust I ("Yosemite I Trust") in the Original Principal Amount of $800 million, Nov. 18, 1999 (the "YI Base Note") [AB000025892-AB000025921]. Interest originally accrued on the YI Base Note at the rate of 6.30% per annum and the YI Base Note was to mature on Jan. 31, 2000. See YI Base Note, at 1; Annex 1, YI Base Note (definition of "Scheduled Termination Date"). The YI Base Note was subsequently amended to, among other things, increase the interest rate thereon to 7.25%. Amendment No. 1 between Delta and Yosemite Trust I, dated as of Dec. 22, 1999 (the "YI Note Amendment"; the YI Base Note as Amended by the YI Note Amendment, the "YI Delta Note") [AB000026329-AB000026333].

[58] Article II, Indenture Supplement between Yosemite I Trust and USTNY, as Indenture Trustee, dated as of Nov. 18, 1999 (the "Yosemite I Indenture Supplement") [AB000080115-AB000080120].

[59] Yosemite 11% Trust Certificate No. 1, dated Nov. 18, 1999 [AB000080888-AB000080892]; Yosemite 11% Trust Certificate No. 2, dated Nov. 18, 1999 [AB000080893-AB000080897].

by the trust on its notes and certificates exceeded the interest received by the trust from Delta under the YI Delta Note.[60]

If all parties to the Yosemite I transaction had performed as agreed, the semi-annual payments equal to the market price of 1,212,375 barrels of oil would flow from Delta to Citibank, from Citibank to the Enron affiliate, and from the Enron affiliate back to Delta, thereby offsetting each other and eliminating all commodity price risk from the transaction. The Enron affiliate would pay Delta (through Citibank) $29 million semi-annually, which would equal the interest Delta owed the trust on the YI Delta Note. Enron would pay the trust the interest differential under the magic note.  On the maturity date, the Enron affiliate would pay Delta a total of $800 million, part of which might flow through Citibank. The price of the commodity was irrelevant, and the Enron affiliate achieved an $800 million loan that was reflected as cash flow from operations, but not as debt in the financial statements.  The other three Yosemite Transactions worked in a similar  fashion.

C.    **Economics and Allocation of Risk in the Typical Prepay Transaction**

In form, each Prepay Transaction consists of three commodities transactions, but the economic substance and risk allocation is that of a loan to the Enron affiliate in the transaction. Regardless of whether the contracts call for financial or physical settlement, the commodity transfers in all of the Prepay Transactions are circular and essentially eliminate all material price risk with respect to the commodity.  As a result, pursuant to the same set of commodity contracts in each Prepay Transaction, the Em-on affiliate

---

[60] Enron Debt Security [series 1999-A] by Enron in favor of Yosemite I Trust in the Original Principal Amount of $25 million, Nov. 18, 1999 (the "YI Magic Note") [AB000080348-AB000080351].

obtained, and agreed to repay with interest, what was in essence a loan made or facilitated by either JPMorgan or Citibank.

The only risk that remained in the Prepay Transactions was, in the case of physically settled transactions, the risk that one of the parties would fail to satisfy its settlement obligations under its commodity contracts or swap agreements. In both the Mahonia Transactions and the Yosemite Transactions, the risks to JPMorgan, Mahonia, Citibank and Yosemite related only to Enron's credit and performance.[61]

Mahonia had limited responsibility and business activities.  Most of its transactions were with Enron,[62] and Mahonia functioned only as a conduit in these transactions. Likewise, Delta was effectively controlled by Citibank[63] and served in the transactions only as a conduit.  All of its transactions were with Citibank, and all but one involved Enron.[64]  Accordingly, the risk that these conduit entities would fail to perform their obligations to JPMorgan or Citibank, as applicable, was remote.

JPMorgan and Citibank structured their respective Prepay Transactions to address the remaining Enron credit risk.  Six of the Mahonia Transactions were supported by surety bonds issued by insurers.[65]  The remaining Mahonia Transaction, Chase XII, was

---

[61] See Annexes 1 and 2 to Appendix E (Prepay Transactions).

[62] Mahonia Limited Commodity Transactions – June 1993 to September 2001, Administrative Fees and Profits Received [JPMCBKR0012397-JPMCBKR0012402].

[63] See Annex 2 to Appendix E (Prepay Transactions).

[64] See Summary in Lieu of Production of Document, Citigroup Response to July 2 Subpoena of PSI [AB000153343-AB000153344].

[65] See Advance Payment Supply Surety Bond among Liberty Mutual Insurance Company, Travelers Casualty and Surety Company, St. Paul Fire and Marine Insurance Company, Continental Casualty Company/National Fire Insurance Company of Hartford and Fireman's Fund Insurance Company, Sept. 29, 1998 [AB000365849-AB000365864]; Advance Payment Supply Surety Bond between Liberty Mutual Insurance Company and Travelers Casualty and Surety Company, June 29, 1998 [AB000365605-AB000365614]; Advance Payment Supply Surety Bond among SAFECO Insurance Company of America, The Travelers Indemnity Company, St. Paul Fire and Marine Insurance Company, Continental Casualty Company and National Fire Insurance Company of Hartford and Fireman's Fund Insurance Company,

supported by a letter of credit issued by WestLB.[66]  In either case, if the Enron affiliate did not perform, JPMorgan (acting on behalf of Mahonia) could terminate the transaction (the equivalent of accelerating the maturity of a loan) and draw on the letter of credit or surety bond.

In the Yosemite Transactions, there were no letters of credit or surety bonds issued by third parties.  Instead, Citibank used credit default swaps[67] to transfer the Enron credit risk to the trusts and other entities that financed the transactions, thereby avoiding increased exposure to Enron credit risk.[68]  Thus, the Em-on credit risk in those transactions ultimately resided with the investors who actually provided the funds.

---

Dec. 2, 1998 [AB000366107-AB000366140]; Advance Payment Surety Bond among Federal Insurance Company, Travelers Indemnity Company, St. Paul Fire and Marine Insurance Company, Continental Casualty Company/National Fire Insurance Company of Hartford and Fireman's Fund Insurance Company, June 28, 1999 [AB00043 1114-AB000431131]; Advance Payment Surety Bond among Federal Insurance Company, Travelers Indemnity Company, Lumbermens Mutual Casualty Company and Fireman's Fund Insurance Company, June 28, 2000 [AB000366840-AB000366855]; Advance Payment Surety Bond among Travelers Indemnity Company, St. Paul Fire and Marine Insurance Company, Lumbermens Mutual Casualty Company, Hartford Fire Insurance Company and Safeco Insurance Company of America, Dec. 28, 2000 (the "Chase XI Surety Bond," and, collectively, the "Surety Bonds") [AB00012 1648-AB000121666].

[66] Transferable Standby Letter of Credit No. 2170300IC140450 issued by Westdeutsche Landesbank Girozontrale, London Branch, in favor of Mahonia, Oct. 5, 2001 (the "West LB L/C") [AB018301148-AB018301151].

[67] In general terms, a credit default swap is an arrangement between two parties, one with a lower tolerance for the credit risk of a given obligor, where the party with the higher tolerance agrees to purchase obligations owed by the obligor to the other party upon the occurrence of specified credit events (like a payment default or bankruptcy) with respect to the obligor.

[68] See *generally* Report, Annex 2 to Appendix E (Prepay Transactions) (discussing Yosemite I).

## II.    LEGAL ISSUES RAISED BY THE TYPICAL PREPAY TRANSACTION

This Appendix (including the Annexes) will not discuss potential legal issues, which include principles of equitable subordination, third-party culpability (including culpability of any officer, director, professional or financial institution), avoidance claims,[69] or other potential affirmative claims of the Debtors' estates (including any claims relating to the post-petition termination of certain contracts). The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[70]

---

[69] Avoidance actions arising out of the Prepay Transactions, if any, will be addressed in subsequent reports.

[70] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## III.   ACCOUNTING ISSUES RAISED BY THE PREPAY TRANSACTIONS

### A.     Accounting Treatment

#### In General

Enron treated its obligations under the Prepay Transactions as price risk management liabilities rather than debt and treated the net increase in its outstanding prepay balances during the reporting period as cash provided from operating activities rather than cash from financing activities.

The cash flow treatment is not directly apparent from the face of Enron's Statement of Cash Flows. In reconciling "Net Income" to "Net Cash Provided by Operating Activities," Enron adds or subtracts an amount labeled "Net assets from price risk management activities." This amount, if positive, represents the decrease during the period in Enron's net price risk management assets, and if negative, represents the increase during the period of its net price risk management assets. Enron's net price risk management assets were the excess of its long-term and short-term price risk management assets over its long-term and short-term price risk management liabilities.

For 2000, as shown on Enron's Balance Sheets, its net price risk management assets increased from $308 million on December 3 1, 1999, to $1.088 billion at December 3 1, 2000, an increase of $780 million. On its Statement of Cash Flows, Enron subtracted $763 million as "Net assets from price risk management activities." (The reconciling $17 million was due to price risk management assets Enron purchased in an acquisition.[71])

Increases in net price risk management assets were analogous to increases in working capital-they were a use of cash and thus subtracted from net income to arrive at

---

[71]  Determined by the Examiner from a review of Andersen's workpapers.

cash flow from operating activities. Conversely, decreases in net price risk management assets were analogous to decreases in working capital and thus were added to net income to arrive at cash flow from operating activities. Accordingly, any increase in price risk management liabilities, such as a borrowing under a Prepay Transaction, served to increase cash flow from operating activities.

As discussed in the Report, "Funds Flow From Operations"[72] and "Total Obligations"[73] were important components of Enron's credit ratios. The prepay transactions were crucial tools in managing these components, but there was a practical limit to their use. If obligations under the prepay transactions caused price risk management obligations to exceed price risk management assets, the excess would be treated as debt in computing the "Total Obligations" credit ratio component. Thus, to make maximum use of this technique, Enron would borrow under prepay transactions amounts that would cause its price risk management liabilities to come close to, but not exceed, its price risk management assets.

### Specific Accounting En tries

When Enron[74] entered into a forward commodity contract, it recorded a price risk management liability in the amount of the cash received and then periodically marked that liability to market.[75] Any increase (or decrease) in that liability during a reporting

---

[72] Defined as net cash provided by operating activities minus decreases in working capital or plus increases in working capital. See 10-K for 2000, Consolidated Statement of Cash Flows.

[73] Defined as debt, guarantees of third parties, guarantees of lease residual values, and any net price risk management liability.

[74] In the Prepay Transactions affiliates of Enron, rather than Enron itself, were parties to the various commodity contracts and swap agreements. This portion of the Appendix refers to Enron as a matter of convenience. The specific affiliates involved in the Prepay Transactions are identified in the Annexes to this Appendix.

[75] See Enron Memo re: Prepay Companies.

period resulting from an increase (or decrease) of the price of the commodity would flow through to the income statement for that period as a loss (or gain). To make periodic deliveries required by the forward contract, Enron would acquire the commodity in the market (or obtain the commodity under an existing supply contract), reducing cash by the cost of the commodity acquired and increasing cost of sales by the same amount (or in the case of a supply contract, corresponding entries would be made). Upon delivery of the commodity, revenue would be increased by the amount of the commodity delivered and the price risk management liability would be reduced by the same amount.[76]

Amounts payable under commodity swap agreements entered into with the banks as a hedge at the time of the forward commodity contract eliminated, from Enron's perspective, the effect of fluctuations in the price of the commodity over the life of the forward contract. If the price of the commodity increased from that provided for in the forward contract, Enron would be paid the amount of this increase under the swap, thus providing additional cash (over and above that received under the forward contract) needed to acquire the commodity at then prevailing market prices. Of course, if the price of the commodity decreased, Enron would have to pay the amount of this decrease under the swap, but because of the decrease in price, Enron's obligation under the forward contract would be correspondingly reduced.

The mark-to-market adjustments for the swap agreement hedging the forward contract offset the mark-to-market adjustments to the price risk management liability associated with the forward contract. If the price of the commodity increased, the price

---

[76] Thus, not only was Enron recognizing cash flow from operations and avoiding the recognition of debt, it was recognizing revenue as well. The amount of revenue recognized was offset by cost of sales, so, although the volume increased, there was no increase in gross profit or net income.

risk management liability associated with the forward contract would increase. The increase in the price of the commodity would also increase the value of the swap agreement by a like amount. A decrease in the price of the commodity would have the opposite effect-the price risk management liability would be reduced as would the value of the swap agreement (which, if "out of the money," would be reflected as a liability). These mark-to-market adjustments for the swap agreement would flow through to the income statement as gains or losses and would neutralize any effect the mark-to-market entries for the forward contract had on Em-on's income. These adjustments would also neutralize any effect that changes in commodity prices would have on Enron's net price risk management assets.

The accounting entries for a prepay transaction involving only financially settled contracts (such as those in the Yosemite Transactions or in Chase XII) would be similar, the only significant difference being the elimination of the entries associated with the acquisition and sale of the commodity. Expenses associated with financially settled contracts would flow through as gain (or loss) on price risk management activities rather than purchases and sales. Price risk management liabilities and assets would be established as appropriate for each step of the transaction involving Enron. Under mark-to-market accounting principles, as the price of the underlying commodity fluctuated, these assets and liabilities would increase or decrease accordingly and by offsetting amounts. These increases and decreases would flow through to the income statement as offsetting gains and losses.

*Andersen's Advice*

Andersen advised Enron how it should structure prepay transactions so that the contracts involved in the transactions could be accounted for as trading contracts, and thus, as price risk management activities. Andersen summarized the basic criteria of a prepay transaction in memoranda in June 1999 and June 2001 as follows:

- The upfront payment had to equal the present value of the fixed volumes to be delivered in the future.

- The counter-party had to have price risk.

- Settlement under the contract had to be periodic (*i.e.* monthly or quarterly).

- Each of the individual agreements in the transaction had to be "de-linked" (although the Andersen memoranda do not elaborate or analyze what it means for the agreements to be "de-linked," the memoranda do imply that if the agreements contained cross-default provisions they would not be "de-linked").

- Each contract had to be on standard terms (i.e. a "normal swap").[77]

In advising Em-on on how to structure the Prepay Transaction, Andersen stated that it relied on EITF 96-2 1,[78] EITF 90-15,[79] EITF 98-10,[80] EITF 88-18,[81] EITF Topic D-14[82]

---

[77] See Memorandum to the Files from Deb Cash, Andersen, and Patty Gruzmacher, Andersen, regarding Prepay Transactions, June 1999 (the "Andersen Prepay Memo"), at l-3 [AB000153136-AB000153139]. See **also** Memorandum to the Files from Deb Cash, Andersen, Patty Gruzmacher, Andersen, and Kate Agnew, Andersen, regarding Updated Prepay Transaction, June 2001 (the "2001 Andersen Prepay Memo") [AB025205240-AB025205243].

[78] Implementation Issues in Accounting for Leasing Transactions Involving Special-Purpose Entities, 2 EITF Abstracts (FASB) 96-21, at 891-900 (Sept. 18-19, 1996) ("EITF 96-21").

[79] Impact of Nonsubstantive Lessors, Residual Value Guarantees, and Other Provisions in Leasing Transactions, 1 EITF Abstracts (FASB) 90-15 (July 11, 1991) ("EITF 90-15").

[80] Accounting for Contracts Involved in Energy Trading and Risk Management Activities, EITF Abstracts (FASB) 98-10.

[81] Sales of Future Revenues, 1 EITF Abstracts (FASB) 88-18 (Feb. 23, 1989) ("EITF 88-18").

[82] Transactions involving Special-Purpose Entities, (FASB) D-14, at 4979-80 (May 31, 1990) ("EITF Topic D-14"); Andersen Prepay Memo, at 4; 2001 Andersen Prepay Memo, at 4.

and the Pimentel 1997 Remarks.[83] The appropriateness of Enron's accounting treatment for the Prepay Transactions is evaluated in detail below.

**B.    Was the Accounting Treatment Proper?**

*EITF 88-18*

No specific comprehensive accounting guidance for prepay transactions exists. However, EITF Issue 88-18, *Sales of Future Revenues* ("EITF 88-18"), provides guidance on distinguishing deferred revenue from debt when an enterprise receives cash from an investor and agrees to pay the investor for a defined period a specified percentage or amount of revenue or some measure of income.[84] EITF 88-18 gives guidance because prepay transactions provide Enron the right to receive funds currently in exchange for an obligation to provide a commodity in the future.

EITF 88-18 lists the following six factors, the presence of any one of which creates a rebuttable presumption that debt exists:

1.    The transaction does not purport to be a sale (that is, the form of the transaction is debt).

2.    The enterprise has significant continuing involvement in the generation of the cash flows due the investor (for example, active involvement in the generation of the operating revenues of a product line, subsidiary, or business segment).

3.    The transaction is cancelable by either the enterprise or the investor through payment of a lump sum or other transfer of assets by the enterprise.

4.    The investor's rate of return is implicitly or explicitly limited by the terms of the transaction.

---

[83] See Report, Appendix B (Accounting Standards). The Examiner is aware of instances in which other public companies engaged in transactions that may bear similarities to the Prepay Transactions. The Examiner has not reviewed the details of these transactions or the propriety of the accounting for these transactions,

[84] EITF 88-18 was part of the accounting literature Andersen considered when advising Enron regarding the accounting treatment of prepay transactions. Andersen Prepay Memo, at 4.

5.    Variations in the enterprise's revenue or income underlying the transaction have only a trifling impact on the investor's rate of return.

6.    The investor has any recourse to the enterprise relating to the payments due the investor.[85]

*Proper Framework for Analysis*

When considering these factors, it is analytically useful to decide whether (i) the three steps of the Prepay Transactions should be considered independently, (ii) the three steps should be considered collectively, or (iii) the step between the conduit entity and Enron should be collapsed. The Examiner believes that regardless of which of these analytical constructs is selected, at least one of the EITF 88-18 factors is always present in the Prepay Transactions, thus giving rise to the presumption of debt. The Examiner also believes, however, that the better view is either to consider the three steps collectively or to collapse into Enron the step between Enron and Delta or Mahonia, and then consider the resulting effect of the remaining obligations between Enron and the banks (or in the case of Yosemite I, Yosemite I Trust, and in the case of Yosemite II, Yosemite II Company).

The "commercial interdependence" of the three steps supports the approach of analyzing the transactions collectively. Although the three steps were not legally linked --a default on one step would not necessarily result in a default on any other step--all three were entered into at the same time, all involved the same quantities or notional amounts, and none would have been entered into but for the other two.

---

[85] EITF 88-18.

In addition, SPE Accounting Consolidation Analysis supports the collapse of the step between Enron and Delta or Mahonia back into Enron.[86] Under applicable GAAP pertaining to the SPE Accounting Consolidation Analysis, there is a strong argument that Mahonia or Delta should be viewed as an SPE, and the step between it and Enron should be viewed as a "virtual SPE" and "consolidated" with Enron, thus resulting in only two steps against which to analyze the existence of the six EITF 88-18 factors.[87] Specifically, each of Delta and Mahonia were formed by Citibank and JPMorgan, respectively, to benefit that bank's customers in financing transactions structured as prepays, just as the single SPE described in Question 1 of EITF *96-21 (Multiple Properties within a Single SPE-Lessor)* was formed by a "sponsor" to lease real estate to separate lessees.

Under Question 1 of EITF 96-21, the cash flows and assets associated with two leases were effectively segregated because each property was financed with nonrecourse debt. Thus, the EITF concluded that each lease should be treated as a separate SPE and the SPE Accounting Consolidation Analysis should be applied to that separate SPE to determine whether each lessee should "consolidate" the SPE--i.e., to determine whether the leased property should be treated as owned by the lessee and the debt as owed by the lessee.[88]

---

[86] The Examiner has not concluded his investigation of whether the trusts (or the off-shore corporation in the case of the Yosemite II transaction) that issued notes and certificates in the Yosemite Transactions should be consolidated with Enron based on the SPE Accounting Consolidation Analysis.

[87] In the cases of Yosemite I and II, collapsing the step between Enron and Delta would mean that Enron should be viewed as owing the Delta Notes directly to the Yosemite I Trust or Yosemite II Company, as applicable, and thus it should be viewed as debt without resort to any analysis of the EITF 88-18 factors.

[88] Note that the issue in EITF 96-21, Question 1 is not whether the virtual SPE should be consolidated with its "sponsor" but rather with the respective lessees – i.e., the parties who benefited from the structure. See Question 1, EITF 96-21.

Likewise, in the cases of Mahonia and Delta, the cash flows and assets were also effectively segregated. Mahonia and Delta in substance had receivables from multiple parties and obligations to a single bank. Although the Examiner has not investigated Delta's transactions with Citibank's customers other than Enron, or Mahonia's transactions with JPMorgan's customers other than Enron, it seems highly unlikely that failure by one customer to pay Mahonia or Delta would have adversely affected the transaction of the banks' other customers.   Thus, assuming this to be the case, and following the reasoning of EITF 96-21, Question 1, each prepay transaction should be viewed as a separate SPE subject to the SPE Accounting Consolidation Analysis.'"

In applying the 3% Equity Test applicable under the SPE Accounting Consolidation Analysis, there must be equity at risk equal to 3% of the amount of the prepay.  The obligations of Mahonia or Delta to their respective banks under that step of the Prepay Transaction would not have qualified, because those obligations mirrored those of the Enron affiliate to Mahonia or Delta -- thus, there was no retained risk. The Examiner is not aware of any other equity that would have been sufficient to qualify under the 3% Equity Test. Accordingly, assuming no such equity existed, each prepaid forward contract should be viewed as a "virtual" SPE that fails the 3% Equity Test and is thus "consolidated" with Enron.

An Andersen PowerPoint presentation regarding prepay transactions, which was found in the files of Enron Transaction Accounting personnel, advised that the purchaser

---

[89] These virtual SPEs within Mahonia and Delta cannot be analyzed as QSPEs because they were not legal entities at all, much less legal entities that were permanently limited by their legal documents establishing them to holding title, issuing beneficial interests, collecting cash from assets held, and distributing the cash. See FAS 125, ¶ 26(a). It is also doubtful that, even if they were QSPEs, they could have avoided consolidation.

in a prepay transaction needed an ordinary business reason for acquiring the commodity and could not, in substance, be an SPE.[90]  Andersen noted that this "issue could arise by virtue of the purchaser's very nature and the substance (or lack thereof) of its other business operations.""  Andersen apparently believed that if Mahonia and Delta were "businesses,"[92] then they were not SPEs, and thus, they could neither be subject to the

---

[90]  Andersen Prepaid Transactions Discussion **PowerPoint** Presentation (the "Andersen Prepaid Transactions Discussion"), at 4 [AB000153128-AB000153135]. The presentation contained the following:

> For prepays to be treated as trading contracts, the following attributes must exist:
>
> - None of the individual agreements in this structured transaction are linked commercially or make reference to any of the other documents; in effect, each is a stand-alone, normally occurring derivative instrument which continue [sic] to be in effect even if other pieces of the transaction are terminated for any reason.
>
> . The PGA and each swap are settled at current market values, and the PFA includes replacement cost provisions with monthly settlement (which is typical of MTM trading instruments).
>
> - Price risk related to the PGA is transferred from the gas supplier to the purchaser, without the gas supplier further affecting the purchaser's management of this risk or the purchaser's other PGA-related economics. This includes any future actual or contingent swaps that may be contemplated.
>
> - The purchaser of the gas must have an ordinary business reason for purchasing the gas, not in-substance be a special purpose entity (SPE) established just to effect a secured investment in a debt instrument from a gas supplier. The SPE issue could arise by virtue of the purchaser's very nature and the substance (or lack thereof) of its other business operations. It could also arise based on the types of contractual limits included in the series of structured transactions (e.g., the debt of the purchaser is recourse to the gas supplier or not recourse to any of the purchaser's other assets). EITF 97-__ also addresses the establishment of a "virtual SPE" when the recourse provisions of specific contracts substantively create an SPE within an otherwise "normal" commercial entity.

*Id.*, at 3-4. Presumably, "EITF 97-__" was intended to be a reference to EITF 96-21, since its Question 1 describes a virtual SPE. The presentation also noted that "[t]ypically counterparties are municipalities who can raise cash through the issuance of tax free municipal bonds."  Andersen Prepaid Transactions Discussion, at 2.  This Andersen **PowerPoint** presentation does not appear to be Andersen's formal accounting advice with respect to any particular Prepay Transaction.

[91]  *Id.*

[92]  See Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business, 2 EITF Abstracts (FASB) 98-3 (Jan. 19-20, 2000). In connection with the closing of one Mahonia transaction, Andersen obtained a letter from Mahonia in which Mahonia represented that: (a) its corporate documents contained no limitations on the number of entities with which Mahonia could do

SPE Accounting Consolidation Analysis nor house several "virtual" SPEs that could be subject to the SPE Accounting Consolidation Analysis as in the case of EITF 96-21, Question 1.

Regardless of Andersen's apparent belief, and regardless of the number of clients and transactions serviced through the conduit entities, there is little doubt that both Mahonia and Delta were SPEs. Both Mahonia and Delta were established for the limited purpose of engaging in these types of Prepay Transactions.[93] Delta was formed at Citibank's request to serve as a counterparty in physically settled commodities transactions because, for a time, Citibank could not take physical delivery of commodities.[94] Delta only engaged in transactions involving Citibank, all but one of which involved Enron.[95] Regardless of the size of the Prepay Transactions, Delta never received more than a "small fee" for entering into the transactions.[96] Two Citibank employees bluntly referred to Delta as a "shell corporation/SPV."[97] Similarly, JPMorgan

---

business; (b) Mahonia had assets in addition to those acquired through transactions with Enron and its subsidiaries and affiliates; (c) Mahonia had unencumbered assets available to its creditors; and (d) neither JPMorgan nor any of its consolidated subsidiaries owned any ownership interest in Mahonia. See Letter from Ian James, Director, Mahonia, to Andersen, Sept. 28, 2001 [AB000512192]. Andersen sought a similar letter from Delta. See Email from Alan Quaintance, Jr., Enron, to Steve Wagman, Citibank, Timothy Swanson, Citibank, and Lisa Bills, Enron, June 22, 2001 (to which was attached a form of representation letter requested by Andersen) [CITI-B0201036-CITI-B0201037]. These representations appear to be directed toward determining whether Mahonia and Delta were SPEs.

[93] See Report, Annex 1 to Appendix E (Prepay Transactions) (discussing Mahonia); Report, Annex 2 to Appendix E (Prepay Transactions) (discussing Delta).

[94] Yastine Affidavit, at 1; Email from Richard Caplan, Citibank, to Andrew P. Lee, Citibank, Aug. 31, 2000 (the "Delta Background Email") [AB000153425].

[95] See Summary in Lieu of Production of Document, Citigroup Response to July 2 Subpoena of PSI [AB000153343-AB000153344].

[96] Email from Amanda Angelini, Citibank, to Andrew P. Lee, Citibank, Nov. 20, 2000 [AB000512760-AB000512763]; see also Delta Energy Corporation, Written Resolutions of the Sole Director, June 26, 2001 (noting fee of $5,000 in connection with swap transactions with Citibank and ENA) [AB0001533 11-AB000153312].

[97] Summary of Enron's Capital Market Exposure with Citibank, prepared by Elena Matrollo and Murray Barnes, Citibank, Oct. 29, 2001 (the "Citibank Exposure Memo"), at 1 [SEC0009 1086-SEC0009 1087].

formed Mahonia at a time at which JPMorgan could not take physical delivery of commodities.[98] The formation documents list Mahonia's only purpose as assisting in "transactions arranged by Chase Bank."[99] JPMorgan advised others that it had control over all cash flows of Mahonia relating to the physical sale of oil and gas.[100] One JPMorgan officer referred to Mahonia as "a special purpose company which works exclusively on Chase arranged transactions."[101] The Examiner believes that on the facts, Mahonia and Delta were each equivalent to the single SPE described in EITF 96-21, Question 1 that housed multiple "virtual" SPEs, each subject to consolidation with the party they were designed to benefit.

Thus, the Examiner believes that the proper framework within which to analyze the existence of any of the six EITF 88-18 factors is either to (i) consider all of the steps collectively based upon "commercial interdependence," or (ii) collapse the steps of the Prepay Transaction between Enron and Mahonia or Delta back into Enron and consider the remaining obligations between Enron and the applicable bank (or in the case of Yosemite I and II, between Enron and the trust or off-shore corporation).

### EITF 88-l 8 Factors 4 and 5

Whether one views the three steps collectively based on "commercial interdependence" or views the remaining obligations between Enron and the respective

---

[98] See Executive Approval Memorandum Enron Corp., Mitchell S. Taylor and Stephen A. Thorington, JPMorgan, Dec. 23, 1992 ("Chase Global Risk Management developed a structure that could take physical delivery through the use of a special purpose corporation") [JPMCBKROO 192431.

[99] States of Jersey Application for consent to issue shares in a proposed Jersey Company, Dec. 15, 1992 (the "Jersey Application"), at 2 [AB000153164-AB000153165].

[100] See Letter from Greg Crowley, JPMorgan, to Le Ann Cantron, Texas Gas Transmission Corporation, Oct. 18, 1995 (the "Crowley Letter"), at 2 [JPMCBKR0038370-JPMCBKR0038371].

[101] Email from Jeffrey W. Dellapina, JPMorgan, to Gary K. Wright, JPMorgan, et al., Apr. 23, 1999 [JPMCBKR0020656-JPMCBKR0020657].

bank after collapsing the steps of the Prepay Transaction between Enron and Mahonia or Delta, EITF 88-18's presumptive debt factors 4 and 5 are clearly present. Factor 4 provides:

> 4.    The investor's rate of return is implicitly or explicitly limited by the terms of the transaction.

The rate of return realized by Mahonia under the forward contracts in the Mahonia Transactions (or the rate of return realized by JPMorgan if the Enron/Mahonia prepay step was "consolidated" into Enron) was a function of (i) changes in price of the underlying commodity and (ii) the discount rate inherent in the forward contract. Because Mahonia entered into mirror arrangements with JPMorgan (or because JPMorgan eliminated its price risk through the swap with Enron if the SPE step is deemed collapsed), the portion of JPMorgan's return dependent on commodity price fluctuations was eliminated. Thus, JPMorgan's rate of return was implicitly limited by the terms of the transaction.

Though structurally different from the Mahonia Transactions, the Yosemite Transactions also resulted in limited rates of return to the party funding the prepay — Delta in the case of Yosemite I and II and Citibank in the case of Yosemite III and IV. Because the steps of the prepay transactions in the Yosemite Transactions either contained mirror arrangements or balancing payments in different parts of the transaction, the portion of the funding party's return dependent on commodity price fluctuations was eliminated. Thus, the funding party's rate of return was implicitly limited by the terms of the transaction.

In Yosemite III and IV, this limitation becomes more evident upon consolidation of the Enron/Delta prepay step into Em-on because only fixed payment obligations remain

all payments based on commodity prices are eliminated. The effect of consolidating the Enron/Delta step into Enron in Yosemite I and II is even clearer. In those two transactions, the obligations between Delta and Citibank were identical to those of Citibank and Enron under the respective steps of the Prepay Transaction, so consolidation of the Delta step into Enron results in complete elimination of the prepay circle. Thus, Enron is left obligated in respect of the promissory note Delta made to the trust in Yosemite I, or the off-shore corporation in the case of Yosemite II, an obligation that would be properly classified as debt under GAAP.

Enron was aware of the existence of the offsetting transaction between Mahonia and JPMorgan or Delta and Citibank. Indeed, the parties to these transactions spoke in terms of fixed interest rates, a strong indication that they intended the transactions to yield limited rates of return.[102]    Accordingly, factor 4 of EITF 88-18 supports the presumption of characterization as debt.

Factor 5 of EITF 88-18 provides:

> 5.    Variations in the enterprise's revenue or income underlying the transaction have only a trifling impact on the investor's rate of return.

Enron had no variation in its income as a result of any of the Prepay Transactions. Regardless of any change in the price of the commodity, Enron was hedged through its swap with the bank. Moreover, neither Mahonia or Delta nor their respective banks

---

[102] See Email from Todd Warwick, Enron, to Michael Garberding, Enron, Oct. 2, 2001 [AB0197 00209]; Enron Interoffice Memorandum to Bret Wells, Enron, from John Swafford, Enron, regarding Financial Prepayments – Book and Tax Reporting, Oct. 24, 2001, at 2 (listing the "interest rates" for the Yosemite Transactions) [AB0197 00087-AB0197 00089]. The swap confirmations for the swaps to which ENA was a party in the Yosemite Transactions provided for a "Discount Rate" (expressed as a number) equal to the implied interest rate of the "loan" created by the swap agreements, and also provided for a "Default Rate" (also expressed as a number) one percent greater than the "Discount Rate." See, e.g., Section 1, Enron/Citibank Swap Confirmation between ENA and Citibank, dated Aug. 25, 2000 [AB000022815–AB000022851].

would have any variation in their rate of return since their price risk was effectively eliminated as well. Thus, if all three steps are viewed collectively or if the SPE step is collapsed (both of which the Examiner believes are proper), any variation in the amount of revenue or income Enron made on a given Prepay Transaction had no effect on the rate of return yielded by that transaction. This suggests that the transaction is presumed to give rise to debt under factor 5 of EITF 88-18.

### EITF 88-18 Factor 6

Regardless of whether the steps should be viewed separately or collectively, or whether collapsing the SPE step is appropriate, it appears that EITF 88-18 factor 6 exists:

> 6.    The investor has any recourse to the enterprise relating to the payments due the investor.

None of the documents evidencing the Yosemite or Mahonia Transactions contained any provisions suggesting that recourse to the applicable Enron entity was limited in any way, thus warranting a presumption under EITF 88-18 factor 6 that the transactions gave rise to debt.

### EITF 88-18 Factor 1

In the case of the financially settled Prepay Transactions, regardless of whether the steps should be viewed separately, viewed collectively, or collapsed, it is arguable that factor 1 exists:

> 1.    The transaction does not purport to be a sale (that is the form of the transaction is debt).

Each of the Mahonia Transactions (with the exception of Chase XII) purported to involve the sale of oil or natural gas. Thus, factor 1 would not exist to support a characterization of debt for those transactions. The Yosemite Transactions and Chase XII, however, were financially settled transactions not calling for the physical

delivery of commodities. This lack of physical delivery suggests something other than a sale, giving rise to a rebuttable presumption under EITF 88-18 factor 1 that the proceeds received in these Prepay Transactions should have been accounted for as debt.

### Overall Application of EITF 88-l 8

Under EITF 88-18 the presence of any one of the above six factors creates a rebuttable presumption that Enron should treat the proceeds received in the Prepay Transactions as debt. Whether the transactions should be viewed separately, or whether they should be viewed collectively, or whether the prepay step between Enron and Delta or Mahonia should be collapsed into Enron under the SPE Accounting Consolidation Analysis, at least one of the factors exists in each and every case. Given that the economic substance of each transaction was a loan, the Examiner believes it would be difficult for Enron to rebut this presumption.[103]

### EITF 98-l 0

EITF Issue 98-10, *Accounting for Contracts Involved in Energy Trading and Risk Management* ("EITF 98-lo"), provides that "energy trading contracts should be marked to market (that is, measured at fair value determined as of the balance sheet date) with gains and losses included in earnings and separately disclosed in the financial statements or footnotes thereto."[104] Andersen cited EITF 98-10 as relevant authority in accounting

---

[103] The Andersen Prepay Memo contains the following statement regarding EITF 88-18: "EITF 88-18 provides guidance on whether certain factors of the [prepay] transaction indicate debt or deferred revenue. We reviewed the factors indicating debt vs. deferred revenue and believe the transaction would meet several factors that would indicate debt if the contracts contained cross-defaults." Andersen Prepay Memo, at 3. Why Andersen's analysis was limited to the case of cross-defaulted transactions is not clear, as EITF 88-18 does not appear to require that multiple transactions be cross-defaulted before their combined effect should be considered under EITF 88-18. Put another way, "commercial interdependence" can exist even in the absence of cross-defaults.

[104] EITF 98-10, ¶7.

for prepays,'" and it (or, prior to 1998, Enron's own mark-to-market accounting policy) was the basis for marking to market both the liability under the prepaid forward contract with Mahonia or Delta and the swap agreement with the bank in a manner that eliminated any net accounting impact from the fluctuation of commodity prices.

The potential application of EITF 98-10 raises three key issues with respect to Enron's accounting for its Prepay Transactions:

1.    Whether the prepaid forward contracts between Enron and the conduit entities were energy trading contracts that qualified for mark-to-market accounting under EITF 98- 10;

2.    If the answer to issue 1 is yes, whether the mark-to-market rules of EITF 98-10 required that the prepaid forward contracts be treated as trading liabilities rather than debt, thus preempting the debt analysis under EITF 88-18; and

3.    If the answers to issues 1 and 2 are both yes, whether the SPE Accounting Consolidation Analysis that requires collapsing the prepaid forward contract between Enron and the conduit entity back into Enron would affect the accounting result.

The only substantive provision of EITF 98-10 states: "The Task Force reached a consensus that energy trading contracts should be marked to market (that is, measured at fair value determined as of the balance sheet date) with gains and losses included in earnings and separately disclosed in the financial statements and footnotes thereto."[106]

---

[105] Andersen Prepay Memo, at 4; 2001 Andersen Prepay Memo, at 4.

[106] EITF 98-1 0, ¶7.

The remainder of EITF 98-10 is devoted to providing the parameters of this statement, and in particular to the definition of "energy trading contracts" and "energy trading activities."   In this regard, and particularly relevant to issue 1 above, paragraph 2 of the EITF provides that:

> For purposes of this Issue, energy *contracts* refers to contracts entered into for (or indexed to) the purchase or sale of electricity, natural gas, natural gas liquids, crude oil, refined products, coal, and other hydrocarbons (collectively, energy). *Energy contracts* also include energy-related contracts (for example, capacity contracts, requirements contracts, and transportation contracts). *Energy trading activities* or *energy trading contracts* refers to energy contracts entered into with the objective of generating profits on or from exposure to shifts or changes in market prices.[107]

Paragraph 8 of the EITF provides further elaboration:

> The Task Force reached a consensus that determining whether or when an entity is involved in energy trading activities is a matter of judgment that depends on relevant facts and circumstances. . . . The Task Force agreed that the framework in which such facts and circumstances are assessed should be based on an evaluation of the various activities of an entity rather than solely on the terms of the contract.  Inherent in that framework is an evaluation of the entity's intent in entering into an energy contract. The Task Force reached a consensus that the factors or indicators identified in Exhibit 98-10A should be considered in evaluating whether an operation's energy contracts are entered into for trading purposes. As used in Exhibit 98-10A, *operation* refers to any identifiable activity of an entity (for example, a subsidiary, a division, or a unit) that enters into the types of energy contracts that are within the scope of this Issue.[108]

Exhibit 98-10A provides a hierarchy of factors or indicators to be considered for each identifiable operation or activity of an entity that enters into energy contracts, to assist in determining whether the energy contract is entered into for trading purposes.

---

[107] EITF 98-10, ¶2 (emphasis in original) (footnotes omitted).

[108] EITF 98-10, ¶8 (emphasis in original).

Applying the definitions set forth in paragraph 2 of EITF 98- 10 and the factors in Exhibit 98-10A, Em-on engaged in an "energy trading activity" within its wholesale services business. In addition, the prepaid forward contracts between Enron and the conduit entities in the Prepay Transactions were "energy contracts" because they were entered into for the purchase or sale of energy.  However, these contracts were not "energy trading contracts" under EITF 98-10, since Enron did not enter into the contracts "with the objective of generating profits on or from exposure to shifts or changes in market prices" as required by paragraph 2.  In fact, the circular movement of the price risk among the parties in the Prepay Transactions effectively eliminated all price risk, leaving Enron with no exposure to changes in market prices.

The factors set forth in Exhibit 98-10A for determining whether operations constitute trading activities do not repeat the requirement of paragraph 2 that an energy trading contract be entered into with an objective of profiting from exposure to changes in market prices.  If EITF 98-10 and Exhibit 98-10A could be interpreted to mean that energy contracts are energy trading contracts if entered into by an entity engaged in energy trading activities notwithstanding the lack of a profit motive, then EITF 98-10 might apply to the Prepay Transactions. If EITF 98-10 applies, it is necessary to analyze issue 2 above: whether the characterization of the prepaid forward contract as an energy trading contract that is required to be marked to market under EITF 98-10 also means that the liability associated with such contract should be reflected on the balance sheet as a trading liability and not as debt, and thus the proceeds treated as cash flow from operations rather than as cash flow from financing.  In other words, does the

- 42 -

characterization of an energy contract as an energy trading contract under EITF 98-10 preempt analysis under EITF 88-1 8?

Neither EITF 98-10, EITF 88-18 nor any other GAAP authority appears to provide for this result. EITF 98-10 expressly addresses only the mark-to-market accounting treatment of energy trading contracts and not their balance sheet classification. Consequently, the Examiner believes the proper interpretation is that EITF 88-18 is not preempted, even if EITF 98-10 were to apply to the prepaid forward contracts.

If (i) the profit motive requirement of paragraph 2 of EITF 98-10 is ignored so that EITF 98-10 applies to the prepaid forward contract, and (ii) application of the EITF 98-10 mark-to-market rules implicitly justifies reporting the liability as a trading liability and not as debt irrespective of analysis under EITF 88-18, then any entity engaged in "energy trading activities" based on the Exhibit 98-10A criteria could structure all of its borrowings as prepays, and thus avoid reporting any debt on its balance sheet while reporting the proceeds of its borrowings as cash flow from operations."" The Examiner finds it implausible to conclude that the Task Force intended for those entities qualified as engaging in "energy trading activities" under Exhibit 98-10A to also qualify for debt-free financial reporting, with their borrowings producing operating cash flow.""

---

[109] The only constraint on Enron's use of Prepay Transactions seems to have been that any excess of price risk management liabilities over price risk management assets was required to be added to its debt in computing "Total Obligations" for purposes of its credit ratios. Under Enron's accounting, however, even the excess liability would continue to be reported as a price risk management liability and not a debt on the balance sheet and the proceeds would produce cash flow from operations.

[110] EITF 98-10 was effective for fiscal years beginning after December 15, 1998, but entities could elect to apply it to annual financial statements for fiscal years beginning prior to December 16, 1998, if they had not previously issued those annual financial statements. Enron, however, used mark-to-market accounting for its gas trading contracts beginning in 1992 as a result of the Schuetze Letter. See Appendix B (Accounting Standards). Nothing in the Schuetze Letter suggests that the mark-to-market treatment of gas

Even assuming such an interpretation of EITF 98-10 could be supported, a proper application of the SPE Accounting Consolidation Analysis would nevertheless result in the Prepay Transactions being accounted for as debt. Under the SPE Accounting Consolidation Analysis, the prepaid forward contract step between Enron and Mahonia or Delta would be viewed as a "virtual" SPE and thus collapsed or "consolidated" into Enron. Thus, in the case of Yosemite I and Yosemite II, Enron would be viewed as the obligor under the Delta Note to the Yosemite I Trust and Yosemite II Company, respectively, which could only be accounted for as debt. In the case of Yosemite III and IV, the consolidation would result in a two-party relationship between Enron and Citibank, where these two parties would owe each other identical floating payments in respect of the commodities, eliminating the relevance of these payments and leaving only fixed payments payable by Enron to Citibank that the Examiner believes should be viewed as debt.

Similarly, in the case of the Mahonia Transactions the consolidation would result in a two-party relationship in which Em-on would have a floating price commodity obligation to JPMorgan under the prepaid forward contract and JPMorgan would have an identical floating price commodity obligation to Enron under the swap agreement. Regardless of whether these two identical obligations between the same parties could be

---

trading contracts provides a basis or authority for exempting the prepaid forward contracts from analysis under EITF 88-18 to determine whether they should be accounted for as debt or otherwise authorizes or supports Enron's accounting for the Prepay Transactions. Thus, the Examiner's analysis of the EITF 98-10 issues with respect to the Prepay Transactions and the resulting conclusion that EITF 98-10 does not provide credible GAAP authority to support Enron's accounting for the Prepay Transactions would apply to periods prior to 1998 as well.

offset for financial statement purposes,'" the Examiner believes that the fixed obligation of Enron to the bank should be viewed as debt.

While the strict application of a rules-based approach to GAAP often results in accounting treatment dependent more on form than substance,[112] to justify such a result there must be a GAAP rule, or at least a logically plausible extension of or analogy to a GAAP rule. In the case of the Prepay Transactions, based on the analysis set forth above, the Examiner does not believe there are any GAAP rules, or plausible extensions of or analogies to GAAP rules, that would provide a credible basis to support Enron's accounting for these transactions in a manner inconsistent with their substance.

---

[111] See FIN 39.

[112] Report, Appendix B (Accounting Standards),

## IV. ROLE OF FINANCIAL INSTITUTIONS IN THE PREPAY TRANSACTIONS

Though Em-on engaged in prepay transactions with a number of financial institutions, Citibank and JPMorgan financed or arranged most of Em-on's prepay transactions (both in number and dollar amount) and all of the Prepay Transactions existing on the Petition Date. Both Citibank and JPMorgan knew that Enron accounted for its obligations under the Prepay Transactions as liabilities from price risk management activities rather than debt. They also believed that Enron accounted for the cash proceeds from the Prepay Transactions as cash flow from operating activities rather than financing activities. Nevertheless, both lenders recognized that the Prepay Transactions they engaged in with Enron were essentially loans. Citibank and JPMorgan structured their respective Prepay Transactions to help Enron achieve its desired accounting treatment. In addition, Citibank worked with Em-on to develop the Yosemite Transaction structure. This enabled Enron to engage in prepay transactions funded by investors in the capital markets, providing Enron with additional funding sources and avoiding increased Citibank credit exposure to Enron.

This portion of this Appendix discusses in general terms the roles Citibank and JPMorgan played in the Prepay Transactions. Annex 1 to this Appendix considers in more detail JPMorgan's role in the Mahonia Transactions, and Annex 2 considers in more detail Citibank's role in the Yosemite Transactions.

This Appendix (including its Annexes) will not discuss potential legal issues arising from these facts, which include principles of equitable subordination, third-party culpability, or other potential affirmative claims of the Debtors' estates. The Examiner is

in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.' [13]

### A.    <u>Knowledge of Enron's Accounting Treatment</u>

Both Citibank and JPMorgan were aware of Enron's method for accounting for prepay transactions. An internal report prepared by employees of Citibank summarizing Em-on's capital exposure with Citibank made the following observation regarding prepay transactions:

> This form of financing is advantageous to Enron in that it allows the borrowing to be reported as "price risk management" liability rather than debt. In addition, because of the way Em-on classifies trading assets/liabilities on the balance sheet, the amount of the borrowing actually is recorded as cash from operations.[114]

At a meeting of Citibank's Capital Markets Approval Committee convened to consider the approval of an approximately $500 million prepay oil transaction with Enron, Enron's accounting methods relating to prepay transactions were summarized as follows:

> The transaction provides favorable accounting treatment for the customer [Em-on]. Although the deal is effectively a loan, the form of the transaction would allow the customer to reflect it as "liabilities from price risk management activity" on their on their [sic] balance sheet and also provide a favorable impact on reported cash flow from operations."'

JPMorgan also knew of Enron's method of accounting for prepay transactions. In a 1992 memorandum describing an "innovative forward purchase agreement of crude oil from Enron Corp," a JPMorgan employee noted that "[t]he transaction provides a

---

[113] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

[114] Citibank Exposure Memo, at 1.

[115] Citibank CMAC Minutes, June 22, 1999, at 2 [AB000512667-AB000512668].

mechanism for Enron to . . . replace long term debt with a trade payable."""[116] A letter JPMorgan sent to Enron in anticipation of a meeting to review Enron's on and off-balance sheet debt structures and consolidated and non-consolidated cash flows was accompanied by a copy of Enron's 1998 and 1997 annual financial statements. The statements had been marked to show JPMorgan's "understanding of how ENE's financial statements might be impacted by various project structures."[117] The word "Prepays" was typed on the balance sheet with an arrow pointing to the entry for "Liabilities for price risk management activities." The word "Prepays" was also typed on the statement of cash flows with an arrow pointing to "Net assets from price risk management activities."[118] Regarding Enron's utilization of prepay transactions, one JPMorgan officer candidly observed that "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities."[119]

**B.    Characterization of Prepay Transactions as Loans**

Even though both Citibank and JPMorgan knew that Enron accounted for prepay transactions as price risk management activities, both lenders recognized that the transactions were effectively loans. The Citibank report referred to above, summarizing Citibank's capital exposure to Em-on, described an existing prepay transaction with Enron

---

[116] Memorandum to Steve Thorington, JPMorgan, from Mitchell Taylor, JPMorgan, regarding Enron, Dec. 22, 1992 [JPMBKR0002200].

[117] Letter from Richard Walker, JPMorgan, and Robert Traband, JPMorgan, to Bill Brown, Vice President, Enron, and Phil Sisneros, Director, Enron, May 11, 1999 (the "Walker/Traband Letter"), at 1 [AB0005 12617-AB0005 126231.

[118] *Id.* at 2.

[119] Email from George Serice, JPMorgan, to Karen Simon, JPMorgan, Nov. 25, 1998 (the "Serice/Simon 11/25 Email")[AB000153175].

in basic terms: "This is economically a loan, but it was set up via pre paid commodity forwards."[120] The report also stated that, "[Em-on] must pay the loan back with interest in December of this year."[121] A Citibank officer described the prepay transaction being funded by a Yosemite Transaction as follows: "Essentially, the transaction amounts to a prepaid loan in the form of a swap by the Trust to Enron with repayment based on commodities prices."[122]

At least as far back as 1993, JPMorgan also recognized that prepay transactions were effectively loans. An Executive Approval Memorandum regarding a prepaid oil sale with an Enron subsidiary that closed in June 1993 described the transaction as an "innovative funding vehicle developed by Chase GRM in late 1992 and first used with Enron."[123] The memorandum added,

> a funded swap is a means by which an energy company can raise capital
> by receiving a prepayment for oil sales. In essence, a lender such as Chase
> pays in advance for future deliveries of oil. By entering into swaps or
> other hedges, Chase is able to create a known cash flow which recovers
> the prepaid amount plus interest.[124]

Another JPMorgan officer put it more simply: "Ran into the notorious prepaid forwards again. . . . Basically, I take these to be loans, cash is paid up from [sic] for a future delivery of oil."[125] In correspondence with the State of New York Banking Department in which JPMorgan was seeking regulatory authority to accept physical delivery of

---

[120] Citibank Exposure Memo, at 1.

[121] *Id.*

[122] Email from Rick Caplan, Citibank, to Saul Bernstein, Citibank, Sept. 24, 1999 [CITI-BO 1468 15].

[123] JPMorgan Executive Approval Memorandum regarding Enron, Oct. 7, 1993 (the "JPMorgan Executive Approval Memorandum"), at 2 (JPMorgan approval memorandum regarding Enron) [JPMCBKROO 13466-JPMCBKROO 134671.

[124] *Id.*

[125] Email from John Gleason, JPMorgan, to Gary Smeal, JPMorgan, Oct. 29, 2001 (the "Gleason/Smeal Email") [JPMCBKR0018167].

commodities, an in-house attorney with JPMorgan stated that "Prepaid forward transactions are, in effect, unsecured loans."[126] He added that "The funding aspect of the pre-paid forward transaction, therefore, can be viewed as the functional equivalent of an extension of credit."[127]

Consistent with characterizing prepay transactions as loans, both Citibank and JPMorgan considered Enron's obligations under prepay transactions as credit exposure when determining whether they were in compliance with their regulatory and internal credit limits. For example, when Enron used the proceeds generated by Yosemite I to retire two existing prepay transactions funded by Citibank known as "Roosevelt" and "Truman,"[128] a Citibank employee remarked prior to the closing that after those retirements Enron would be within Citibank's internally imposed credit limit for Enron "for the first time in years."[129] A review by Citibank of its exposure to Enron undertaken just prior to the Petition Date included $4.997 billion of "Prepaids" in "Total Obligations" and observed that there were no assets that could be paired with those obligations to help offset the amount of the obligations.[130]

JPMorgan also considered obligations under prepay transactions to be credit exposure to Enron. To arrive at a number representative of Enron's total incremental

---

[126] Letter from Phillip Levy, Vice President & Assistant General Counsel, Chemical Bank, to Kathleen Scott, Assistant Counsel, State of New York Banking Department, June 4, 1996 (the "Levy Letter"), at 7 [JPMC111089-JPMC111101].

[127] *Id.*

[128] See Citibank Global Loans Approval Memorandum, Sept. 19, 1999, at 2 [AB000153314-AB000153319].

[129] Email from James F. Reilly, Citibank, to Neils Kirk, Citibank, Nov. 9, 1999 [AB000153419-AB000153420].

[130] Enron Valuation & Exposure, Nov. 27, 2001 (prepared by Citibank), at 5 [CITI-B0141367-CITI-B0141378].

debt expressed in an internal JPMorgan memorandum reviewing Enron's financial position, the author included $225 million of exposure under prepaid oil financings.[131] As part of an effort to manage JPMorgan's credit exposure to Enron, a JPMorgan officer circulated internally a summary of the bank's position. In his cover email, the officer noted "I have attached the credit stats, including the prepays as debt."[132]

Moreover, on their own books, both Citibank and JPMorgan appear to have accounted for the prepay transactions as loans rather than commodity trading activities. For example, in an email to others at Citibank involved with the Yosemite Transactions, the writer made the following statement regarding Citibank's accounting for the commodity swaps involved in the transactions:

> [T]he Enron Credit Linked Note transactions do not contain net commodities exposure. After discussing the characteristics of the Enron transactions with him again, Saul's position was that we should continue to use accrual accounting because the desk does not take any commodities risk in the trade structure, that the desk is not aiming for short term profits from trading prepaid energy swaps and that the commodities exposure is hedged within the structure with counterparties that have a relationship with each other.[133]

In 1996, JPMorgan undertook a review of how it should account for derivatives transactions evidencing loans. A memorandum distributed to a number of officers of JPMorgan advising the recipients how to classify prepay transactions and other derivatives transactions evidencing loans for accounting purposes, took the preliminary position that "[a] transaction that is a derivative in form but economically equivalent

---

[131] Memorandum to Stephen Thorington, JPMorgan, from Todd Dittman, JPMorgan, regarding Enron Corporation Annual Review (1992), July 26, 1993 (the "Dittman/Thorington Memo"), at 19 [JPMBKR0003 112- JPMBKR0003 132].

[132] See Email from Robert Traband, JPMorgan, to James Ballentine, JPMorgan, et al., Sept. 20, 2001 (the "Traband/Ballentine 9/20/01 Email") [JPMCBKROO 12024-JPMCBKR0012025].

[133] Email from Andrew Lee, Citibank, to Rick Caplan, Citibank, and Amanda Angelini, Citibank, Aug. 10, 2001 [PSI00324505].

primarily to a loan should be reported as a loan.. ..["][134] The memorandum provides a number of examples of transactions that should be treated as loans, the first of which is a prepaid commodity swap.[135]

## C.    Facilitation of Enron's Accounting Treatment

Aware of the extraordinary effect of the Prepay Transactions on Em-on's reported financial condition, Citibank and JPMorgan structured the Prepay Transactions to help Em-on achieve its desired accounting treatment.

### Citibank

Citibank and its affiliate, Salomon, developed the Yosemite structure specifically for Enron. The primary purpose of this structure was to transfer Enron credit risk held by Em-on's various banks under structured financing transactions to investors in the longer term capital markets. Though initially designed to free up bank lending capacity consumed by various banks' credit exposure to Enron in existing structured financings, Enron ultimately used Citibank's Yosemite structure to finance over $2.371 billion of new prepay transactions.[136]

### JPMorgan

From 1992 through 2001, JPMorgan participated in twelve prepay transactions yielding $3.553 billion of proceeds to Enron.[137] When the appetite of the bank market for Enron credit risk began to wane, JPMorgan developed a prepay transaction structure that

---

[134] See Memorandum to Jack Alexander, JPMorgan, *et al.,* from Diane M. Butterfield, Corporate Accounting Policies, JPMorgan, regarding Loans/Borrowings Documented as Derivatives, Sept. 26, 1996 (the "Butterfield Memo"), at 2 [AB000512481-AB000512484].

[135] *Id.* at 3. The author of the Butterfield Memo subsequently modified some of the advice provided in the memorandum. See Report, Annex 1 to Appendix E (Prepay Transactions).

[136] Appendix E, PSI Prepay Report. This amount does not include the amounts owing under the various "magic notes" executed by Enron and described in Annexes 2 through 5 of this Appendix.

[137] Appendix E, PSI Prepay Report.

utilized surety bonds issued by insurance companies as credit support rather than letters of credit issued by banks.[138]  As a result, Enron was able to engage in additional prepay transactions at cost-effective rates.

*Off-Shore Entities*

Citibank and JPMorgan also facilitated Enron's accounting for prepay transactions by involving their off-shore entities to act as the conduits in their respective prepay transactions.  Based upon Andersen's advice, Enron believed that its desired accounting treatment depended, in part, on the participation of third parties in the prepay transaction structure.[139]  By involving these off-shore entities to serve that purpose, Citibank and JPMorgan accommodated Enron's desired structuring of the prepay transactions.

**D.**     **Summary**

The financial institutions-specifically Citibank and JPMorgan-played significant roles in facilitating the Prepay Transactions. They helped Enron structure the transactions, provided or arranged the funding, and formed the necessary conduit entities. Both Citibank and JPMorgan knew that Enron accounted for its obligations under the Prepay Transactions as liabilities from price risk management activities rather than debt. They also knew that Enron reported the cash as cash flow from operating activity rather than financing activity.   Nevertheless, both lenders recognized that the Prepay Transactions were essentially loans.

---

[138] See Memorandum to Dave Delainey, Enron, from Joe Deffner, Enron, regarding Year End Accomplishments and Overall Past Enron Accomplishments, 2000, at 6 (the "Deffner Review Memo") [AB025202258-AB025202281]; Serice/Simon 1 1/15 Email.

[139] See Andersen Prepaid Transactions Discussion, at 3-4.

## V.    EXAMINER'S CONCLUSIONS REGARDING THE PREPAY TRANSACTIONS

Collectively, the Prepay Transactions may have been Enron's single largest source of cash during the four-year period prior to the Petition Date, providing Enron with $5 billion of cash flow. Yet Em-on's accounting for the transactions was inappropriate.

Enron's obligations in respect of the Prepay Transactions were effectively debt. However, Enron accounted for the Prepay Transactions as price risk management liabilities, which did not comply with GAAP. Applying EITF 88-18, which provides guidance on distinguishing deferred revenue from debt in situations similar to the Prepay Transactions, creates a strong presumption that Enron should have accounted for the transactions as debt. Contrary to Em-on's accounting position, the transactions did not satisfy the criteria suggested by Andersen for treating the transactions as trading contracts. This inappropriate accounting treatment resulted in an overstatement of Enron's price risk management liabilities, giving an appearance that Enron's core business was generating sufficient operating cash to sustain itself.

Enron made no specific disclosure of the Prepay Transactions in its financial statements or other public filings. Though Enron included a general mention of commodity transactions in a financial statement footnote, it made no public disclosure that would have provided an investor with sufficient information to appreciate the magnitude and quality of operating cash flow recorded by Enron from the Prepay Transactions, or of Enron's obligations to repay the prepaid amounts.

**ANNEX 1 (Mahonia Transactions)**

**to**

**APPENDIX E**

**(Prepay Transactions)**

**to**

**SECOND INTERIM REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

TABLE OF CONTENTS

| I. | INTRODUCTION AND OVERVIEW OF THE MAHONIA TRANSACTIONS .................................................................................... | 1 |
| II. | STRUCTURE OF THE MAHONIA TRANSACTIONS ....................................... | 3 |
| | A.   Circular Structure.. ........................................................................................ | .3 |
| | B.   Specific Transactions.. ................................................................................... | .6 |
| III. | ECONOMICS AND ALLOCATION OF RISK IN THE MAHONIA TRANSACTIONS .............................................................................................. | 17 |
| IV. | LEGAL ISSUES IN THE MAHONIA TRANSACTIONS .................................... | 21 |
| V. | ACCOUNTING ISSUES IN THE MAHONIA TRANSACTIONS.. ..................... | 22 |
| VI. | ROLE OF JPMORGAN IN THE MAHONIA TRANSACTIONS.. ....................... | 23 |
| | A.   Knowledge of Enron's Accounting Treatment of Prepays ............................ | .23 |
| | B.   Characterization of Prepay Transactions as Loans ......................................... | .26 |
| | C.   Facilitation of Enron's Accounting Treatment .............................................. | .34 |
| | D.   Summary.. ...................................................................................................... | .40 |
| VII. | EXAMINER'S CONCLUSIONS WITH RESPECT TO THE MAHONIA TRANSACTIONS .............................................................................. | 42 |

I.    **INTRODUCTION AND OVERVIEW OF THE MAHONIA
TRANSACTIONS**

The Prepay Transactions discussed in this Annex include a series of commodity

transactions involving ENA or Enron Natural Gas Marketing Corp. ("ENG", and together

with ENA, the "Enron affiliates"), JPMorgan, and Mahonia Limited, a Jersey corporation

created to assist in transactions arranged by JPMorgan ("Mahonia").' From December

1992 through September 2001, the Enron affiliates entered into a total of 12 such prepay

transactions, of which seven were outstanding on the Petition Date.[2] The Examiner has

limited his review to these seven transactions (collectively, the "Mahonia

Transactions").[3]   Individual Mahonia Transactions are referred to by the names "Chase

VI" through "Chase XII," referring to the chronological order in which they were

completed.

---

[1] Jersey Application.   At least one transaction involved MNG. For convenience, this Annex refers to
"Mahonia" generally unless a specific reference to MNG is appropriate. Also, Chase XI involved
Stoneville Aegean Ltd., a Jersey corporation ("Stoneville"), and Fleet, as discussed further below.

[2] Appendix E, PSI Prepay Report.

[3] A number of the Mahonia transactions were the subject of a lawsuit, *JPMorgan v. Liberty Mutual, No.*
Ol-CIV-11523 (S.D.N.Y. filed Dec. 11, 2001), which was pending in the U.S. District Court for the
Southern District of New York, but has been settled.  Shortly after the Petition Date, JPMorgan tiled suit
against various issuers of surety bonds supporting the obligations of Enron and ENA under forward
commodity contracts with Mahonia.   In the suit, JPMorgan sought a declaratory judgment that the issuers
had to comply with their obligations under the surety bonds. See  *id.* As an affirmative defense to
JPMorgan's claim, the issuers contended that the forward commodity contracts were in reality disguised
loans and that JPMorgan misrepresented, concealed and/or withheld material facts from the issuers,
fraudulently inducing them to issue the surety bonds. See, e.g., Amended Answer and Counterclaims of
Continental Casualty Company and National Fire Insurance Company of Hartford, at  *5, JPMorgan v.
Liberty Mutual,* No. Ol-CIV-11523 (S.D.N.Y. filed July 1, 2000). Under the reported terms of the
settlement, the issuers of the surety bonds will cover 60%, or approximately $655 million, of the more than
$1 billion of claims made by JPMorgan. See Christopher Oster and Randall Smith, *Enron Deals Cost J. P.
Morgan; Bank Takes $1.3 Billion Charge,* Wall St. J., Jan. 3, 2003, *et al.* Although matters that were the
subject of that lawsuit are discussed in this Annex and the foregoing Appendix, the Examiner is not
expressing an opinion on the merits of any of the claims or defenses that were asserted in such lawsuit and
nothing contained herein should be construed as such. The Examiner is reviewing deposition and trial
testimony and other evidence from that litigation as part of his ongoing investigation.

The following chart sets forth the amounts and dates of the Mahonia Transactions:

| Transaction | Closing  Date[4] | Maturity  Date[5] | Prepayment  to Enron  Affiliate" |
|---|---|---|---|
| Chase VI | December 1997 | December 2001 | $299,991,678.74 |
| Chase VII | June 1998 | June 2002 | $250,000,000.00 |
| Chase VIII | December 1998 | December 2002 | $249,994,351.87 |
| Chase IX | June 1999 | June 2004 | $499,999,986.24 |
| Chase X | June 2000 | June 2005 | $649,999,352.13 |
| Chase XI | December 2000 | November 2005 | $330,403,325.05 |
| Chase XII | September 2001 | March 2002 | $350,000,000.00 |
| Total | | | $2,630,388,694.03 |

As this chart shows, Enron received over $2.6 billion in financing through the Mahonia Transactions, which Enron accounted for as price risk management activity and characterized the proceeds as cash flows from operating activities. However, as discussed below and in Appendix E (Prepay Transactions) to the Report, the Examiner has concluded that Enron's accounting for the Mahonia Transactions did not comply with GAAP. Rather than recording the transaction obligations as price risk management liabilities, Enron should have recorded the obligations as debt. In addition, Enron should not have reported the increases in the balances of its prepay transactions as net cash from operating activities, but rather as cash from financing activities.

The information in this Annex provides a detailed description of the Mahonia Transactions and should be read together with the Examiner's discussion of the Prepay Transactions contained in the foregoing Appendix. Appendix E (Prepay Transactions) to the Report provides a more complete discussion of the Examiner's analysis and conclusions regarding the Prepay Transactions.

---

[4]  See Enron/Mahonia Confirmation Letters; Enron/Mahonia Chase XII Swap.

[5]  See Enron/Mahonia Confirmation Letters; see *also* Chase/Enron Chase XII Swap.

[6]  See Enron/Mahonia Confirmation Letters; Enron/Mahonia Chase XII Swap.

## II.    STRUCTURE OF THE MAHONIA TRANSACTIONS

This Section provides a general description of the structure of the Mahonia Transactions. It then describes certain of the specific details of individual transactions, particularly where those transactions materially differed from others.

### A.    Circular Structure

The following diagram shows the structure of the Mahonia Transactions:



Note: Entities in bold represent **Enron** or a wholly owned subsidiary of **Enron**.

*JPMorgan/Mahonia Step*

In the first step of the transaction, JPMorgan[7] provided the funding for the transaction by entering into a prepaid forward contract with Mahonia under which it paid Mahonia a large sum, ranging from $250 million to $650 million.* In exchange, Mahonia

---

[7]  In the case of Chase XI, JPMorgan and Fleet together provided the funding.

[8]  See Chase/Mahonia Confirmation Letters; Chase/Mahonia Forward Contracts; see **also** Chase/Mahonia Chase XII Swap.

agreed to deliver specified quantities of oil or gas[9] at a specific time and place.[10] Under this step of the transaction, Mahonia assumed the risk that the market price of the commodity would fluctuate (the "price risk"), because it had to acquire and deliver the fuel regardless of what happened to the market price. [11]

### Enron Affiliate/Mahonia Step

In the second step, Mahonia entered into a virtually identical contract with an Enron affiliate, under which Mahonia paid to the Enron affiliate an amount approximately equal to the money Mahonia had received from JPMorgan.[12] Because the Enron affiliate agreed to deliver an equal amount of the commodity to Mahonia, the Enron affiliate assumed the price risk.[13]

### Enron Affiliate/JPMorgan Step

The Enron affiliate and JPMorgan then completed the third step of the transaction by entering into a swap agreement under which JPMorgan assumed the price risk it had created in the prepaid forward contracts. The swap also provided the mechanism for repaying the initial amount advanced by JPMorgan with interest.[14] The swap provided that, at the same time the Enron affiliate was to deliver the oil or gas to Mahonia under

---

[9]   Except for Chase XII, all of the Mahonia Transactions involved physically settled forward commodity transactions, meaning they required physical delivery of the commodity. Chase XII was financially settled, meaning that the parties could satisfy their obligations by paying a sum equal to the market price of the commodity.

[10] See Section 2.01, Chase/Mahonia Forward Contracts; Chase/Mahonia Confirmation Letters.

[11] *Id.*

[12] **Compare** Enron/Mahonia Confirmation Letters **with** Chase/Mahonia Confirmation Letters. Any difference was presumably retained by Mahonia as its fees.

[13] In Chase XII, the prepaid contracts were financially settled, so instead of acquiring and delivering the fuel, the Enron subsidiary and Mahonia could satisfy their obligations by paying a sum that equaled the market price of the nominal amount of fuel that was required to be delivered.

[14] See Chase/Enron Swaps; Chase/Enron Chase XII Swap (providing "Fixed Amount Details").

- 4 -

the prepaid forward contract, JPMorgan would pay the Enron affiliate the prevailing market price for that commodity." Thus, regardless of what happened to the price of the commodity, the Enron affiliate would have the money it needed to purchase the commodity for delivery to Mahonia. Mahonia would then deliver the commodity to JPMorgan, which JPMorgan would then sell in the market or, in most cases, back to Enron.[16] Because that sale would be at market prices, JPMorgan would recover the amount it had paid to the Enron affiliate under the swap. In essence, the price risk for the commodity had moved around the circle and was effectively eliminated. The swap agreement between the Enron affiliate and JPMorgan also required the Enron affiliate to make fixed cash payments to JPMorgan on specified dates.[17] The aggregate amount of these payments equaled the initial amount advanced by JPMorgan to the Enron affiliate through Mahonia, plus an additional amount that provided JPMorgan with a fee for the use of its capital, i.e., interest.[18]

The net effect of the three steps of the transaction is that, at the closing, the Enron affiliate would receive a prepayment from JPMorgan by way of Mahonia. On the future commodity delivery dates (i) the commodity deliveries/payments simply went around the circle thereby enabling each party to satisfy its obligations to the others and (ii) the Enron affiliate would pay directly to JPMorgan the amount of the upfront payment, plus an additional agreed upon amount for the use of the funds. In economic substance,

---

[15] See Chase/Enron Swaps; Chase/Enron Chase XII Swap (providing "Floating Amount Details").

[16] See e.g., Chase VII Sellback Letters.

[17] See Chase/Enron Swaps (providing "Fixed Amount Details"); Chase/Enron Chase XII Swap (providing "Fixed Amount Details").

[18] *Compare* Chase/Enron Swaps (providing "Fixed Amount Details") with Enron/Mahonia Confirmation Letters; *compare* Chase/Enron Chase XII Swap *with* Enron/Mahonia Chase XII Swap.

JPMorgan had made a loan to the Enron affiliate that the Enron affiliate repaid with interest.

### Credit Support

With the price risk of the commodity effectively eliminated as a result of the circular nature of the structure,[19] the only material risk remaining in the Mahonia Transactions was the risk that a party would not perform or be able to pay its obligations. As discussed in more detail below, Mahonia was formed to enter into transactions with JPMorgan, which also effectively controlled it.[20] Thus, there was little risk that Mahonia would not perform its obligations to JP Morgan, assuming Enron performed its obligations to Mahonia, leaving only JPMorgan's exposure to Enron credit risk. In the Mahonia Transactions, Enron guaranteed the obligations of the Enron affiliates. In addition, third parties provided credit support for the obligations of Em-on and/or the Enron affiliate. This credit support took the form of a letter of credit provided by one or more commercial banks or surety bonds issued by one or more insurance companies.

### B.    **Specific Transactions**

*JPMorgan/Mahonia Step*

*Chase VI-Chase X.*  Under the first step of each of Chase VI through Chase X, JPMorgan and Mahonia entered into either a Natural Gas Inventory Forward Sale Contract, or in the case of Chase VIII, a Crude Oil Inventory Forward Sale Contract (each a "Chase/Mahonia Forward Contract").*'  Pursuant to each such contract, the

---

[19] Certain limited market-related risks did remain in the transaction. See "Economics and Allocation of Risks in the Mahonia Transactions" below.

[20] Jersey Application.

[21] Chase/Mahonia Forward Contracts.

parties agreed to enter into a Confirmation Letter (each a "Chase/Mahonia Confirmation Letter")[22] to evidence their agreement on, among other things, (i) the amount and point of delivery for quantities of natural gas or oil Mahonia was to deliver to JPMorgan over the term of the contract, and (ii) the amount and due date of the upfront payment to be made by JPMorgan to Mahonia.[23]    These terms were then confirmed pursuant to the Chase/Mahonia Confirmation Letter relating to such transaction.[24]

To secure its obligations under a given Chase/Mahonia Forward Contract and related transaction documents, Mahonia executed a Security Agreement (each a "Security Agreement")[25] in favor of JPMorgan pursuant to which Mahonia pledged all its rights under the related forward contract between Mahonia and the Enron affiliate and other relevant transaction documents. Pursuant to a Consent and Agreement (each a "Security Agreement Consent"),[26] the Enron affiliate consented to such pledge and agreed that JPMorgan could exercise all rights of Mahonia under the relevant forward contract between the Enron affiliate and Mahonia and other transaction documents.  In addition to the foregoing, JPMorgan agreed pursuant to a letter agreement (each a "Limited Recourse

---

[22] Chase/Mahonia Confirmation Letters.

[23] Section 2.01, Chase/Mahonia Forward Contracts.

[24] See Chase/Mahonia Confirmation Letters.

[25] Security Agreement between Mahonia and JPMorgan, dated as of Dec. 18, 1997 [JPMCBKR0025132-JPMCBKR0025149]; Security Agreement between Mahonia and JPMorgan, dated as of June 26, 1998 [JPMCBKR0025037-JPMCBKR0025054]; Security Agreement between Mahonia and JPMorgan, dated as of Dec. 1, 1998 [JPMCBKR0025283-JPMCBKR0025299]; Security Agreement between Mahonia and JPMorgan, dated as of June 28, 1999 [JPMCBKR0025408-JPMCBKR0025423]; Security Agreement between Mahonia and JPMorgan, dated as of June 28, 2000 [JPMCBKR0025539-JPMCBKR0025555].

[26] Consent and Agreement between Enron Natural Gas Marketing Corp. and JPMorgan, dated as of Dec. 18, 1997 [AB000365321-AB000365322]; Consent and Agreement between Enron Natural Gas Marketing Corp. and JPMorgan, dated as of June 26, 1998 [AB000365586-AB000365587]; Consent and Agreement between Enron Natural Gas Marketing Corp. and JPMorgan, dated as of Dec. 1, 1998 [AB000366103-AB000366104]; Consent and Agreement between Enron Natural Gas Marketing Corp. and JPMorgan, dated as of June 28, 1999 [AB000366727-AB000366728]; Consent and Agreement between Enron Natural Gas Marketing Corp. and JPMorgan, dated as of June 28, 2000 [AB000366819-AB000366822].

- 7 -

Letter")[27] that it would enforce its rights and remedies against Mahonia under the relevant Chase/Mahonia Forward Contract and Security Agreement only to the extent of the security granted by Mahonia under such relevant contracts.

Chase XI. The first step of Chase XI was structured differently from those in the other Mahonia Transactions. Rather than executing a forward contract, Mahonia Natural Gas Limited, a Jersey corporation ("MNG"), JPMorgan and Fleet entered into an Assignment Agreement (the "MNG/Chase-Fleet Assignment")[28] pursuant to which MNG assigned all of its rights under the Chase XI Enron/Mahonia Forward Contract (described below) to Fleet and JPMorgan. In consideration for this assignment, JPMorgan and Fleet paid to MNG $330,403,325.05, the same amount MNG paid to ENA under the Chase XI Enron/Mahonia Forward Contract.[29] The MNG/Chase-Fleet Assignment also provided that Fleet's portion of the purchase price could be paid by Long Lane Master Trust IV (which was the nominal purchaser of the 50% of the certificates issued by Yosemite I Trust and Yosemite II Company in the Yosemite I and Yosemite II Transactions, respectively).[30]

As with Chase VI through Chase X, to secure its obligations under a given Chase/Mahonia Forward Contract and related transaction documents, MNG executed a

---

[27] Letter from JPMorgan to the Directors of Mahonia, dated as of Dec. 18, 1997 [JPMCBKR0025150]; Letter from JPMorgan to the Directors of Mahonia, dated as of June 26, 1998 [JPMC72710]; Letter from JPMorgan to the Directors of Mahonia, dated as of Dec. 1, 1998 [JPMCBKR0025300]; Letter from JPMorgan to the Directors of Mahonia, dated as of June 28, 1999 [JPMCBKR0025424]; Letter from JPMorgan to the Directors of Mahonia, dated as of June 28, 2000[JPMCBKR0025556].

[28] Assignment Agreement among MNG, JPMorgan and Fleet, dated as of Dec. 28, 2000 (the "MNG/Chase-Fleet Assignment") [JPMCBKR0025596-JPMCBKR0025611].

[29] Section 3.2, MNG/Chase-Fleet Assignment.

[30] Id. Section 2.6.

Security Agreement[31] in favor of JPMorgan, pursuant to which MNG pledged all its right under the surety bond relating to the forward contract between ENG and MNG. Pursuant to a Consent and Agreement in favor of Fleet and JPMorgan, ENG consented to the MNG/Chase-Fleet Assignment and agreed that JPMorgan and Fleet could exercise all rights of MNG under the relevant forward contract between the Enron affiliate and MNG and other transaction documents.[32]   Finally, pursuant to a Natural Gas Offtake Agreement,[33] JPMorgan agreed to purchase all of the natural gas actually delivered to MNG/Chase-Fleet under the Chase XI Enron/Mahonia Forward Contract.[34]

*Chase XII.* The first step of the Chase XII transaction was also different from the those in the other Mahonia Transactions.  It consisted of a financially settled swap between JPMorgan and Mahonia (the "Chase/Mahonia Chase XII Swap").[35] Under the Chase/Mahonia Chase XII Swap, JPMorgan agreed to deliver to Mahonia $350 million at closing on September 28, 2001 .[36]   In return, Mahonia agreed to pay to JPMorgan on March 25, 2002 the settlement price on such date of the NYMEX Henry Hub Natural Gas Futures Contract for April 2002 delivery with respect to 127,923,977 mmbtu of gas.[37] In order to secure its obligations under the Chase/Mahonia Chase XII Swap, Mahonia executed a Security Agreement in favor of JPMorgan pursuant to which Mahonia granted

---

[31]  Security Agreement among MNG, JPMorgan, and Fleet, dated as of Dec. 28, 2000 [JPMCBKR0025743-JPMCBKR0025761].

[32] Consent and Agreement among Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.), JPMorgan, and Fleet, dated as of Dec. 28, 2000 [AB000121629-AB000121632].

[33] Natural Gas Offtake Agreement among JPMorgan, Fleet, and MNG, dated as of Dec. 28, 2000 (the "Offtake Agreement") [JPMCBKR0025612-JPMCBKR0025638].

[34] Section 2.01, Offtake Agreement.

[35] Chase/Mahonia Chase XII Swap.

[36] *Id.* at 2 (providing "Fixed Amount Details").

[37] IL!. at 2 (definitions of "Notional Quantity per Calculation Period" and "Floating Amount Details").

to JPMorgan all of its rights under the ENA/Mahonia Chase XII Swap and the guaranty by Em-on and letters of credit relating thereto.[38]

*Enron Affiliate/Mahonia Step*

*Chase* VI- *Chase XI.* Under the second step of each of Chase VI through Chase XI, an Enron affiliate and Mahonia entered into a Natural Gas Inventory Forward Sale Contract, or in the case of Chase VIII, a Crude Oil Inventory Forward Sale Contract (each an "Enron/Mahonia Forward Contract").[39] Pursuant to these agreements, the parties entered into a Confirmation Letter (each an "Enron/Mahonia Confirmation Letter")[40] to evidence their agreement on, among other things, (i) the amount and point of delivery for quantities of natural gas or oil the Enron affiliate was to deliver to Mahonia over the term of the contract, and (ii) the amount and due date of the upfront payment to be made by Mahonia to the Enron affiliate.[41] These terms were then confirmed pursuant to an Enron/Mahonia Confirmation Letter. In each case, the terms were identical to the terms of the corresponding Chase/Mahonia Forward Contract and Chase/Mahonia Confirmation Letter.

---

[38] Section 4, Security Agreement between Mahonia and JPMorgan, dated as of Sept. 27, 2001 [PSI00394991- PSI00395005].

[39] Enron/Mahonia Forward Contracts.

[40] Enron/Mahonia Confirmation Letters.

[41] Section 2.01, Enron/Mahonia Forward Contracts.

The Enron affiliate and Mahonia also entered into a margin agreement (each, a "Margin Agreement")[42] pursuant to which the Enron affiliate agreed to deliver to Mahonia security for the Enron affiliate's obligations under the Enron/Mahonia Forward Contract upon the occurrence of any of following three "Trigger Events": (i) when the ratio of Enron's senior debt to its total capitalization exceeded 65%; (ii) when Enron's tangible net worth was less than $1.5 billion; or (iii) when the aggregate "excess" value of required delivery quantities of gas which the Enron affiliate had yet to deliver[43] exceeded a specified threshold amount determined by reference to Enron's credit rating.[44] If a Trigger Event described in either clause (i) or (ii) above occurred, then the Enron affiliate was required to deliver additional security to Mahonia having a calculated value greater than or equal to the "Termination Payment" that would be payable by such Enron affiliate under the relevant Enron/Mahonia Forward Contract were it to be terminated at

---

[42] Margin Agreement between Mahonia and Enron Natural Gas Marketing Corp., dated as of Dec. 18, 1997 [AB000365291-AB000365301], as amended by the Amendment between Enron Natural Gas Marketing Corp. and Mahonia, dated Dec. 19, 2000 [AB000367503-AB000367505]; Margin Agreement between Mahonia and Enron Natural Gas Marketing Corp., dated of June 26, 1998 [AB000365555-AB000365566]; Margin Agreement between Mahonia and Enron Natural Gas Marketing Corp., dated as of Dec. 1, 1998 [AB0003653 14-AB0003653 15]; Margin Agreement between Mahonia and Enron Natural Gas Marketing Corp., dated as of June 28, 1999 [AB000366697-AB000366708]; Margin Agreement between Mahonia and Enron Natural Gas Marketing Corp., dated as of June 28, 2000 [AB000366782-AB000366795]; Margin Agreement between MNG and Enron Natural Gas Marketing Corp., dated as of Dec. 28, 2000 [AB000 121598-AB000 12 161 1] (collectively, the "Margin Agreements").

[43] This value was determined by subtracting the margin reference price set forth in a Margin Price Confirmation Letter cited to below from the spot price of gas or oil and multiplying that amount by the volume of gas or oil the Enron affiliate had yet to deliver. See Section 1, Margin Agreements (definition of "Total Market Exposure"); Margin Price Confirmation Letter between ENG and Mahonia, dated as of Dec. 19, 1997 [AB0003653 15]; Margin Price Confirmation Letter between ENG and Mahonia, dated as of June 29, 1998 [AB000365581-AB000365582]; Margin Price Confirmation Letter between ENG and Mahonia, dated as of Dec. 2, 1998 [AB000366096-AB000366097]; Margin Price Confirmation Letter between ENG and Mahonia, dated as of June 29, 1999 [AB000366720-AB000366721]; Margin Price Confirmation Letter between ENA and Mahonia, dated as of June 29, 2000 [AB000366809-AB000366812]; Margin Price Confirmation Letter between ENA and Mahonia, dated as of Dec. 28, 2000 [AB000121615- AB000121617].

[44] Sections 1 and 2, Margin Agreements.

such time.[45] If a Trigger Event described in clause (iii) above occurred, the Enron affiliate was required to deliver additional security to Mahonia having a calculated value greater than or equal to the amount by which (a) the required delivery quantities of gas or oil which the Enron affiliate had not yet delivered, *multiplied* by (b) the difference between the market price of gas or oil and the price agreed to in the applicable Enron/Mahonia Confirmation Letter, *exceeded* (c) the applicable specified threshold amount.[46] The Margin Agreements contained language expressly permitting Mahonia to pledge for its own account any additional security provided by the relevant Enron affiliate under the Margin Agreements.[47]

Chase *XII*. Rather than taking the form of a forward sale contract, the second step of the Chase XII transaction was a swap between ENA and Mahonia (the "Enron/Mahonia Chase XII Swap").[48]   Under the Enron/Mahonia Chase XII Swap, Mahonia agreed to deliver to ENA $350 million at closing on September 28, 2001.[49] In return, ENA agreed to pay to Mahonia on March 26, 2002, the settlement price on March 25, 2002 of the NYMEX Henry Hub Natural Gas Futures Contract for April 2002 delivery with respect to 127,923,977 mmbtu of gas.[50] In connection with the Enron/Mahonia Chase XII Swap, Enron guaranteed the obligations of ENA and entered

---

[45] *Id.*

[46] *Id.*

[47] *Id.* Section 9(b)(ii).

[48] Enron/Mahonia Chase XII Swap.

[49] *Id.* at 2 (providing "Fixed Amount Details").

[50] *Id.* at 2 (providing "Notional Quantity per Calculation Period" and "Floating Amount Details").

into a Credit Support Annex setting forth the terms and conditions under which collateral would be posted by Mahonia or ENA, as applicable."

*Enron Affiliate/JPMorgan Step*

*Chase* VI- *Chase XI.* At the same time that the parties entered into the other two steps of these transactions, the Enron affiliate and JPMorgan entered into commodity swaps (the "Chase/Enron Swaps")[52] forming the third step. Pursuant to the Chase/Enron Swaps, the Enron affiliate agreed to make payments to JPMorgan equal to the quantities of commodity the Enron affiliate was to deliver to Mahonia under the related Enron/Mahonia Forward Contract times a fixed price. In exchange, JPMorgan agreed to make payments to the Enron affiliate equal to those same quantities of commodity calculated at the prevailing market price. These payments were required to be made on the same dates that the deliveries were to be made under the Enron/Mahonia Forward Contract.[53]

Because this third step of the Mahonia Transactions involved a financially settled swap, JPMorgan ended up owning the actual gas or oil delivered by Mahonia under the related Chase/Mahonia Forward Contract (the same gas or oil Mahonia had received from

---

[51] Guaranty Agreement executed by Enron in favor of Mahonia, dated effective as of Sept. 28, 2001 [SEC00117082-SEC00117088]; ISDA Credit Support Annex to the Schedule of the Swap Transaction Confirmation between ENA and Mahonia Limited, dated as of Sept. 28, 2001 [SEC00117060-SEC00 11708 1].

[52] Chase/Enron Swaps.

[53] *Id.* In Chase XI, there was no Chase/Enron Swap. Rather ENA entered into a contract with Stoneville pursuant to which ENA agreed to purchase from Stoneville the entire amount of natural gas ENA had sold to MNG on the dates upon which the gas was to be delivered to MNG. See Exhibit A, Natural Gas Forward Sale Agreement between Stoneville and Enron Natural Gas Marketing Corp., dated as of Dec. 29, 2000 (the "ENA/Stoneville Purchase Contract") [JPMCBKR0019789-JPMCBKR0019812]. Stoneville had acquired the gas through a contract with JPMorgan in which it agreed to purchase the same amount of natural gas from JPMorgan on the dates upon which Stoneville agreed to sell such gas to ENA. See Exhibit A, Natural Gas Forward Sale Agreement between Stoneville and JPMorgan, dated as of Dec. 29, 2000 [JPMCBKR0019856-JPMCBKR0019881].   JPMorgan had acquired the gas pursuant to the Offtake Agreement described above.

- 13 -

the Em-on affiliate under the related Enron/Mahonia Forward Contract). However, no party had material price risk, because (i) Mahonia was merely a conduit, (ii) JPMorgan had agreed to pay Enron the market price of the commodity, and (iii) JPMorgan could sell the commodity in the market at the same time for the same price. Rather than sell the commodity into the market, however, in the case of Chase VII, ENA agreed to purchase 50% of the commodity it would deliver to JPMorgan, and under Chase VIII through Chase XI, ENA agreed to purchase the entire amount of the commodity it would deliver to JPMorgan.[54]

Chase XII. At the same time the parties entered into the Enron/Mahonia Chase XII Swap and the Chase/Mahonia Chase XII Swap, ENA and JPMorgan entered into a swap (the "Chase/Enron Chase XII Swap").[55] Under the Chase/Em-on Chase XII Swap, JPMorgan agreed to pay to ENA on March 26, 2002, the settlement price on March 25, 2002 of the NYMEX Henry Hub Natural Gas Futures Contract for April 2002 delivery with respect to 127,923,977 mmbtu of gas.[56] This was exactly the same payment due by ENA to Mahonia under the Enron/Mahonia Chase XII Swap and by Mahonia to JPMorgan under the Chase/Mahonia Chase XII Swap. In return, ENA agreed to pay to JPMorgan $355,961,248.40 on March 26, 2002.[57]

---

[54] In-Person Interview with Diane Genova, JPMorgan, *et al.,* by James C. Grant, Partner, A&B, *et al., Nov.* 18, 2002 (the "Genova Interview").

[55] Chase/Enron Chase XII Swap, at 1-2.

[56] *Id.* at 2 ("Floating Amount Details").

[57] *Id.* For the six months that the Chase/Enron Chase XII Swap and the Enron/Mahonia Chase XII Swap were in place, this worked out to be an effective interest rate of 3.4064% on $350 million.

*Credit Support*

*Enron Guaranty.* Enron executed a guaranty (each an "Enron/Mahonia Guaranty")[58] in favor of Mahonia pursuant to which Enron guaranteed the payment and performance of all obligations of the Enron affiliate under the Enron/Mahonia Forward Contract. The Enron/Mahonia Guarantees expressly permitted Mahonia to assign its rights under the Enron/Mahonia Guarantees as security for any financing or hedging provided to Mahonia."[59] Enron and JPMorgan[60] entered into a Consent and Agreement (each an "Enron/Mahonia Guaranty Consent")[61] in which Em-on (i) consented to the assignment by Mahonia to JPMorgan[62] of all of Mahonia's rights under the relevant Enron/Mahonia Guaranty, and (ii) agreed that JPMorgan[63] could exercise all rights and remedies of Mahonia under the relevant Enron/Mahonia Guaranty.

---

[58] Enron Guaranty executed by Enron in favor of Mahonia, dated effective as of Dec. 18, 1997 [AB000365302-AB000365313]; Enron Guaranty executed by Enron in favor of Mahonia, dated effective as of June 26, 1998 [AB000365567-AB000365577]; Enron Guaranty executed by Enron in favor of Mahonia, dated effective as of Dec. 1, 1998 [AB000366082-AB000366093]; Enron Guaranty executed by Enron in favor of Mahonia, dated effective as of June 28, 1999 [AB000366709-AB000366719]; Enron Guaranty executed by Enron in favor of Mahonia, dated effective as of June 28, 2000 [AB000366796-AB000366808]; Enron Guaranty executed by Enron in favor of MNG, dated effective as of Dec. 28, 2000 [AB000121633- AB000121643] (collectively, the "Enron/Mahonia Guarantys").

[59] Section 6.10, Enron/Mahonia Guarantys.

[60] In the case of Chase XI, Enron, JPMorgan and Fleet entered into the Consent and Agreement.

[61] Consent and Agreement between Enron Corp. and JPMorgan, dated as of Dec. 18, 1997 [AB000365323-AB000365324]; Consent and Agreement between Enron Corp. and JPMorgan, dated as of June 26, 1998 [AB000365588-AB000365589]; Consent and Agreement between Enron Corp. and JPMorgan, dated as of Dec. 1, 1998 [AB000366105-AB000366106]; Consent and Agreement between Enron Corp. and JPMorgan, dated as of June 28, 1999 [AB000366729-AB000366731]; Consent and Agreement between Enron Corp. and JPMorgan, dated as of June 28, 2000 [AB000366823-AB000366825]; Consent and Agreement between Enron Corp., Fleet and JPMorgan, dated as of Dec. 28, 2000 [AB000121644-AB000121647].

[62] In the case of Chase XI, Enron consented to the assignment by Mahonia to JPMorgan and to Fleet.

[63] In the case of Chase XI, Enron agreed that JPMorgan and Fleet could exercise all rights and remedies of Mahonia under the relevant guaranty.

*Letters of Credit and Surety Bonds.*    Initially, Enron's obligations under the Enron/Mahonia Guaranty were supported by letters of credit.[64] In September 1998, in order to free up credit capacity being utilized by the letters of credit and to lower transaction costs,[65] the parties replaced the existing performance letters with surety bonds issued by various insurance companies.[66] In addition, under each transaction entered into after December 1997 (other than Chase XII, which was supported by a transferable standby letter of credit), surety bonds (each a "Surety Bond") were used to support the Enron guaranty rather than letters of credit.[67] Mahonia was entitled to payment under the Surety Bond if neither the Enron affiliate nor Enron (as guarantor) paid Mahonia the Termination Payment when due and payable under the applicable Enron/Mahonia Forward Contract.[68]

---

[64] See, e.g., Irrevocable Performance Letter of Credit issued by JPMorgan, et *al.,* in favor of Mahonia, Dec. 24, 1997 [AB000365413–AB000365422].

[65] See Deffner Review Memo; Serice/Simon 1 1/25 Email.

[66] See Serice/Simon 1 1/25 Email.

[67] Surety Bonds.

[68] See, e.g., Section 1, Chase XI Surety Bond.

### III.    ECONOMICS AND ALLOCATION OF RISK IN THE MAHONIA TRANSACTIONS

Each of the Mahonia Transactions consisted of separate but commercially interdependent bilateral contracts that were designed to function together to produce what was, in economic substance, a term loan to Enron. Viewed separately, each bilateral contract was a commodity trade or a commodity hedge that exposed each of the contracting parties to the uncovered market risk of the commodity and at least one of the parties to the credit risk of the other.  When viewed as an integrated whole, the market risk was transferred from party to party in such a way that it was effectively eliminated. The credit risk of Mahonia, which served as a mere conduit, was minimal, with the result that the primary credit exposure was between JPMorgan, on the one hand, and Enron and its affiliates on the other.

Although the structures of the various Mahonia Transactions were not identical, they worked essentially as follows.  Through Mahonia, JPMorgan made upfront payments to the Enron affiliate either pursuant to forward sale contracts (in the case of Chase VI through Chase XI) or through financially settled forward swaps (in the case of Chase XII). The Enron affiliate agreed to repay the amounts initially advanced through periodic payments under the Em-on/Chase Swaps so that, at maturity, the Em-on affiliate had repaid the initial amount advanced plus "interest." The transactions were completed, in the case of the physically settled forwards, by the Enron affiliate's delivery of the commodity to Mahonia, which then transferred the commodity to JPMorgan. JPMorgan would then either sell the commodity into the market or back to Em-on. The financially settled transaction was simpler. The Em-on affiliate paid the market price of the

commodity to Mahonia which passed that payment on to JPMorgan, which, in effect, passed the payment back to Enron through the swap agreement.

Regardless of whether the transaction was settled physically or financially, the commodity transfers were circular and greatly minimized all price risk with respect to the commodity. For example, in Chase VIII, ENA entered into a forward contract requiring it to deliver a specified quantity of crude oil to Mahonia on specified dates.[69] Mahonia entered into a virtually identical forward contract requiring it to deliver the same quantity of oil to JPMorgan on the same dates.[70] Completing the circle, JPMorgan entered into a swap agreement requiring it to pay to ENA a floating amount equal to the prevailing market price of the oil that ENA was required to deliver to Mahonia.[71]  On each settlement date, JPMorgan recovered the amount it paid to ENA by selling the oil it received from Mahonia, in each case selling it to ENA.[72] Although the Mahonia Transactions reduced the commodity price risk, they did not eliminate it entirely. The basic commodity price risk was simply moved around the circle. So long as the circle was not broken-as would occur in a default-the risk did not reside with any party.  The physically settled transactions retained a number of additional risks. For example, there was always the possibility that delivery of the commodity could not be effected on time because of problems with a pipeline or other market disruptions.  The terms of settlement also posed risks that would not be present in a typical loan transaction. When Enron repurchased the commodity from JPMorgan, for example, the customs of the commodity

---

[69] Enron/Mahonia Chase VIII Forward Contract; Enron/Mahonia Chase VIII Confirmation Letter.

[70] Chase/Mahonia Chase VIII Forward Contract; Chase/Mahonia Chase VIII Confirmation Letter.

[71] Chase/Enron Chase VIII Swap, at l-2 (providing "Floating Amount Details").

[72] See, e.g., Chase VII Sellback Letters.

market allowed Enron to delay payment until the 25th day of the next month.    On the Petition Date, there were numerous unsettled trades that left JPMorgan exposed in a way that it would not have been in a typical loan. Moreover, the trading contracts and swaps included margin requirements that required the parties to post collateral with one another if there were significant swings in the price of the commodities. The collateral postings were largely offsetting.    That is, if Enron posted collateral to Mahonia (and through Mahonia to JPMorgan) under a forward contract, JPMorgan would generally have to post collateral to Enron under the swap. The collateral requirements were not symmetrical, however, and in certain circumstances, Enron could be required to post collateral to JPMorgan without receiving any offsetting collateral whatever. Although these risks remained, the parties appear to have deemed them immaterial because they do not appear to have affected the pricing of the transactions. The interest rates inherent in the Mahonia Transactions do not appear to vary significantly from the market price for comparably rated credit of the same term.[73]

JPMorgan's remaining risk in the transactions was exposure to Enron credit. The Em-on affiliates had obligations to make cash payments under the Enron/Chase Swaps, the Enron/Mahonia Forward Contracts and the Enron/Mahonia Chase XII Swap (which

---

[73] For example, the imputed interest rate for Chase VIII is 5.683% per annum. Its term was approximately four years. At the time of its issuance BBB credits of three years bore interest at 5.89% per annum, and BBB credit of four years bore interest at 5.95% per annum.    *Weekly Market Update,* Vol. 1, No. 2, Houlihan Lokey Howard & Zurkin (Dec. 11, 1998). Apparently, JPMorgan priced prepaid forward transactions consistent with how JPMorgan priced loans. See email from Peter Coad, JPMorgan, to Don Layton and Don Wilson, JPMorgan, dated Dec. 02, 1998 (forwarding an email providing background on prepaid forward transactions and noting that, "A transaction is priced as if it is a loan with 100% retention using the Bank's model.")[JPMCBRK0020570-JPMCBRK0020571]; Email from Donald Layton, JPMorgan, to David Pflug, JPMorgan, *et* al., May 12, 1999 (including the following question regarding commodities derivatives transactions -- "IS THE PRICING RIGHT VS. THE LOAN MARKET, OR DOES IT UNDERPRICE VS. THE LOAN MARKET EVEN IF IT PRODUCES A GOOD SVA?") [JPMCBRK0013921].

Mahonia could transfer to JPMorgan in satisfaction of Mahonia's obligations under the relevant Chase/Mahonia Forward Contracts).    However, JPMorgan structured the transactions to minimize this exposure. Enron provided the Enron/Mahonia Guaranty to guarantee the obligations of the Enron affiliates. In addition, six of the Mahonia Transactions were supported by the Surety Bonds, shifting a substantial part of the risk to the issuing insurers.[74] The remaining Mahonia Transaction, Chase XII, was supported by a performance letter of credit, shifting a substantial portion of the risk to the issuing bank, West LB.[75] In all cases, if the Enron affiliate did not perform, JPMorgan (acting on behalf of Mahonia) could terminate the transaction (the equivalent of accelerating the maturity of a loan) and draw on the applicable Chase/Enron Guaranty, Surety Bond or letter of credit.

---

[74] See Surety Bonds.

[75] West LB L/C.

## IV.    LEGAL ISSUES IN THE MAHONIA TRANSACTIONS

This Annex will not discuss potential legal issues, which include principles of equitable subordination, third-party culpability (including culpability of any officer, director, professional or financial institution), avoidance claims, or other potential affirmative claims of the Debtors' estates. The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[76]

---

[76]    The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## V.    ACCOUNTING ISSUES IN THE MAHONIA TRANSACTIONS

The accounting issues raised by the Mahonia Transactions are addressed in Appendix E (Prepay Transactions) to which this Annex is attached.

## VI.    ROLE OF JPMORGAN IN THE MAHONIA TRANSACTIONS

JPMorgan had an understanding of many facets of the Prepay Transactions. It understood both how Em-on accounted for these transactions and the importance of structuring these transactions to achieve Enron's desired accounting treatment. It actively engaged in structuring these transactions for Enron and others and marketed its expertise in so doing. When the commercial bank market appeared to be reluctant to assume more credit exposure for these types of transactions, JPMorgan agreed to Em-on's use of Surety Bonds issued by insurance companies as credit support, thereby allowing Enron to engage in additional prepay transactions.    Nevertheless, JPMorgan also clearly recognized that the Prepay Transactions were loans in economic substance. JPMorgan referred to them as loans in numerous internal documents and treated them as such for its own regulatory and accounting purposes. Moreover, JPMorgan reviewed its own policies and procedures with respect to prepay transactions and other similar financings completed as derivatives (calling them "disguised loans"), to ensure that its officers and employees engaged in banking practices in connection with these transactions that reflected their character as loans.

### A.    Knowledge of Em-on's Accounting Treatment of Prepays

JPMorgan was aware of Enron's accounting for prepay transactions by the early 1990's. In a 1992 memorandum describing an "innovative forward purchase agreement of crude oil from Enron Corp," a JPMorgan employee noted that "[t]he transaction provides a mechanism for Em-on to . . . replace long term debt with a trade payable."[77] One of the more candid assessments of Em-on's accounting was a JPMorgan employee's

---

[77] Memorandum to Steve Thorington, JPMorgan, from Mitchell Taylor, JPMorgan, regarding Enron, Dec. 22, 1992 [JPMBKR0002200].

- 23 -

observation that "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities."[78]

JPMorgan's knowledge of Em-on's accounting for the prepay transactions appears to be more than a general understanding. Officers of JPMorgan specifically understood the financial effects of these transactions on Enron's reported financial condition, including Enron's desire to balance its price risk management assets and liabilities. A 1999 letter to Enron in anticipation of a meeting to discuss Em-on's on and off-balance sheet debt structures and consolidated and non-consolidated cash flows was accompanied by a copy of Enron's 1998 financial statements.[79] These statements reflected JPMorgan's "understanding of how ENE's financial statements might be impacted by various project structures."[80] The word "Prepays" had been typed on the balance sheet with an arrow pointing to the entry for "Liabilities from price risk management activities." The word "Prepays" had also been typed on the statement of cash flows with an arrow pointing to "Net assets from price risk management activities."[81]

Moreover, JPMorgan internal approval documents relating to Em-on prepay transactions repeatedly contained statements to the effect that "Enron has utilized the prepaid sale as a mechanism to address a number of needs, including . . . sourcing funds

---

[78] Serice/Simon 1 1/25 Email.

[79] Walker/Traband Letter.

[80] *Id.* at 1.

[81] *Id.* at 6-7.

(classified as 'Liabilities from Price Risk Management' as opposed to long term debt)."[82]
One of these documents noted:

> In the past four years, Enron has utilized the prepaid sale as a mechanism to balance Enron's book of Assets from Price Risk Management Activities versus Liabilities from Price Risk Management Activities. To date, the company has executed 11 such transactions. Eight of the existing eleven, totaling $2.7 Bn, have been underwritten and syndicated by Chase.. . .[83]

Another such document, from October 2001, stated, "[i]n an effort to manage the balance of their assets and liabilities for price risk management, Enron has labeled this [prepay] transaction a high priority quarter-end item"[84] (suggesting that JPMorgan also knew that Enron used prepay transactions to manage its financial position at the end of reporting periods). A JPMorgan managing director explained the accounting as follows: "From a financial statement perspective, the prepay structure serves to 'monetize' the positive excess of assets for price risk management over liabilities for price risk management."[85] Another JPMorgan employee explained the accounting to the Co-Head of Credit of JPMorgan's Global Investment Bank by noting that "Enron utilizes the prepays to balance its book of Assets from Price Risk Management Activities versus

---

[82] See, e.g., JPMorgan Structuring Summary, Nov. 18, 1998, at 1 [PSI00065355-PSI00065376]; JPMorgan Structuring Summary, June 1, 1998, at 1 [PSI00065306-PSI00065318]; JPMorgan Structuring Summary dated Nov. 14, 1997, at 1 [PSI00065251-PSI00065258].

[83] JPMorgan Structuring Summary, Nov. 2000 (the "JPMorgan 12/2000 Structuring Summary"), at 1 [PSI00450736-PSI00450751].

[84] JPMorgan Structuring Summary, Oct. 4, 2001 (the "JPMorgan 10/2001 Structuring Summary"), at 2 [PSI00065748-PSI00065766]. See    JPMorgan 12/2000 Structuring Summary.

[85] Email from Richard S. Walker, JPMorgan, to Dinsa Mehta, JPMorgan, June 24, 1999 [AB000153178].

Liabilities from Price Risk Management Activities, making the prepays more closely aligned with its wholesale marketing activities than EOG's production."[86]

JPMorgan evidenced its knowledge of Em-on's accounting for prepay transactions in pitch books that it used to solicit additional business. JPMorgan employees circulated a copy of a "new prepay pitch,"[87] referring to a prepay transaction as "[b]alance sheet 'friendly'" and noting the "[a]ttractive accounting impact by converting funded debt to 'deferred revenue', or long-term trade payable.'" A pitch book JPMorgan prepared for a proposed prepay transaction with Equitable Resources Inc. contained the "balance sheet 'friendly'" statement noted above,[89] and went on to state that the proposed prepay transaction "can be executed with little market visibility" and that the "[d]elivery of natural gas will be regarded as a commercial, as opposed to a financial obligation.'"

### B.    Characterization of Prepay Transactions as Loans

*JPMorgan's Recognition that Prepay Transactions Were Loans*

Despite JPMorgan's knowledge that Enron accounted for its prepay transaction obligations as liabilities from price risk management activities rather than as debt, JPMorgan recognized that the Mahonia Transactions were effectively loans. In an email discussing the pricing of a proposed prepaid forward contract with Em-on, a JPMorgan

---

[86] Memorandum to Jim Biello, JPMorgan, and Gary Wright, JPMorgan, from Rob Traband, JPMorgan, regarding Impact of EOG Transaction on Enron Prepays, Aug. 3 1, 1999, at 1 [JPMCBKR0031657-JPMCBKR003 1658].

[87] Email from HSC, to William Manias, JPMorgan, copy to Jeffrey Dellapina, JPMorgan, July 17, 1998 (attaching PowerPoint presentation entitled "XYZ Corporation – Presentation of: Prepaid, Forward Sale of Inventory, 16 July 1998") [JPMCBKR0032317- JPMCBKR0032330].

[88] *Id.* at 4 and 6.

[89] Equitable Resources Presentation: Prepaid, Forward Sale of Natural Gas, Oct. 2000 (the "Equitable Prepay Pitch Book"), at 3 [JPMCBKR0013272-JPMCBKR00 1328 1].

[90] *Id.*

employee stated, "[s]ince this is a prepaid forward contract the economics work just like a loan and will attract hog share capital."[91]  As early as 1993, a JPMorgan Executive Approval Memorandum regarding a $230 million Enron prepay described the economic substance of the transaction using terms associated with a loan. After noting that the transaction represented an "innovative funding vehicle developed by Chase GRM in late 1992 and first used with Enron," the memorandum added, "[a] funded swap is a means by which an energy company can raise capital by receiving a prepayment for oil sales.   In essence, a lender such as Chase pays in advance for future deliveries of oil. By entering into swaps or other hedges, Chase is able to create a known cash flow which recovers the prepaid amount plus interest."[92]

The following statements illustrate JPMorgan's recognition that prepay transactions are the economic equivalent of loans generally, not just in the context of transactions with Enron:

- "Prepaid forwards are effectively loans and thus, represent 100% exposure."[93]

- "Ran into the notorious prepaid forwards again. . . . Basically, I take these to be loans, cash is paid up from [sic] for a future delivery of oil."[94]

---

[91] Email from Dennis Oakley, JPMorgan, to Robert Traband, JPMorgan, May 3 1, 2000 (the reference to attracting "hog share capital" presumably being an implication that JPMorgan would have to reserve more capital against the prepaid contract since it was effectively a loan and not a swap) [AB000153179].

[92] JPMorgan Executive Approval Memorandum, at 2.

[93] Email from George Brash, JPMorgan, to Peter Licalzi, JPMorgan, June 29, 1999, at 2 [JPMCBKR0016405-JPMCBKR0016406].

[94] Gleason&meal Email.

- "I suppose that the limit covering this prepaid will NOT be booked under a Replacement Value facility since it is really an unsecured loan of $1 75MM."[95]

- "In conjunction with the lending areas, *Global Commodities* transacts pre-paid energy swaps. These transactions involve lendings where principal and interest are paid by periodic deliveries of natural gas and crude oil."[96]

- "We price the loan (trading asset and trading derivative) to the customer at their credit grade, say credit grade 4 is LIBOR plus 125 bps."[97]

- "When an instrument has a significant cash component, a portion of the flows relate to the funding of the instrument. . . . For example, in prepaid commodity swap, Chase makes a significant up-front payment and receives flows over time. A portion of those flows is effectively interest on the cash advanced."["]

When seeking regulatory authority to take physical delivery of commodities, JPMorgan took the position that prepay transactions were effectively loans and thus were permissible banking activities. In anticipation of the merger of The Chase Manhattan Bank, N.A. into Chemical Bank, Chemical Bank applied to the State of New York Banking Department seeking its concurrence that the merged bank could engage in certain transactions that The Chase Manhattan Bank, N.A. engaged in, including prepay

---

[95] Email from Anne Marie Sullivan, JPMorgan, to Henry Cheever, JPMorgan, Dec. 8, 1998 (statement made in reference to a forward gas sale agreement with Unocal) [JPMCBKR0018347-JPMCBKR0018348].

[96] Memorandum to Fraser Partridge, Managing Director, JPMorgan, copy to: Donald H. Layton, Vice Chairman, JPMorgan, *et al.*, from Vivian Shelton, Vice President, JPMorgan, regarding Global Commodities Market Risk Review, Sept. 2 1, 1999, at 16 [JPMCBKR0027734-JPMCBKR0027766]; see *also* Memorandum to Carl Batlin, Managing Director, JPMorgan, *et al.*, copy to: Donald H. Layton, Vice Chairman, JPMorgan, *et al.*, from Vivian Shelton, Vice President, JPMorgan, regarding Global Commodity Market Risk Review, May 18, 1998, at 22 [JPMCBKR0015826-JPMCBKR0015848].

[97] Email from Robin A. Ayers, JPMorgan, to Janet Caruso, JPMorgan, *et al.*, Mar. 15, 2000, at 1 (statement made in the context of a general discussion on how JPMorgan prices prepaid forwards) [JPMCBKR0018366-JPMCBKR0018367].

[98] Email from Patrick O'Brien, JPMorgan, to Poh Keng Cheong, JPMorgan, Dec. 27, 1999, at 1 [JPMCBKROO 16439-JPMCBKR00 164441.

transactions.[99]  In correspondence with the Banking Department, Chemical Bank stated that "[p]repaid forward transactions are, in effect, unsecured loans."[100]  The bank also stated that "[t]he funding aspect of the pre-paid forward transaction, therefore, can be viewed as the functional equivalent of an extension of credit."[101]

Prior to that merger of The Chase Manhattan Bank, N.A. and Chemical Bank, the former Chase Manhattan Bank sought similar regulatory approval from the Office of the Comptroller of the Currency.[102]  In its request, Chase Manhattan Bank stated "Chase would analyze credit risk resulting from the advance of funds under a pre-paid forward as it would if making a loan on an unsecured basis."[103]  It argued "[t]he purpose of taking delivery would not be to take advantage of price fluctuations or to speculate, but to provide financing in a manner most responsive to the customer's needs.  Those needs include the perception by the customer that a pre-paid forward sale would be more advantageous from an accounting, tax or other standpoint than a loan."[104]  In concluding its argument, it stated "[i]n sum, we believe that the proposed pre-paid forward transactions are part of the business of banking because such transactions are the functional equivalent of extensions of credit and delivery of the Eligible Commodity is incidental to that extension of Credit.""

---

[99] Levy Letter.

[100] Id. at 7.

[101] Id.

[102] See Letter from Garland D. Sims, Vice President, Senior Associate Counsel, JPMorgan, to Senior Deputy Comptroller for Bank Supervision-Operation, Office of the Comptroller of the Currency, Nov. 3, 1994 (the "OCC Letter") [JPMCBKR0012737- JPMCBKR0012753].

[103] Id. at 9.

[104] Id. at 9-10.

[105] Id. at 10.

*JPMorgan's* Internal Accounting

Even though JPMorgan recognized that prepay transactions are equivalent to loans, a difference of opinion existed within JPMorgan as to whether it should account for prepay transactions as loans or as risk management assets and liabilities because the transactions were documented as derivatives. The classification was important, as it affected when and how JPMorgan could recognize income on the underlying transaction. A JPMorgan officer described the issue in a 1996 memorandum. [106] Apparently unaware of any internal policy or guidelines regarding proper classification, the officer observed that "a possible accounting policy would be that a transaction not causing meaningful market risk as of a reporting date should be classified as a loan, while one causing meaningful market risk should be reported as a risk management asset/liability."[107] After making such observation, the officer recommended that certain specified prepaid forward transactions with Enron be reclassified as loans. [108]

Another 1996 memorandum alerted JPMorgan officers to the classification issue, indicating that JPMorgan's Global Bank and Corporate Controllers were in the process of determining how derivatives transactions evidencing loans should be accounted for going forward, and presenting a preliminary position on the issue.[109] The memorandum stated, "[a] transaction that is a derivative in form but economically equivalent primarily to a loan should be reported as a loan.. .."[110] In providing guidance as to when a transaction

---

[106] Memorandum to Joseph L. Sclafani, JPMorgan, and Mark Staines, JPMorgan, from William Macomber, JPMorgan, regarding Prepaid Forwards, Aug. 6, 1996 [AB000512575-AB000512576].

[107] *Id.* at 1

[108]  *Id.*

[109] See Butterfield Memorandum.

[110] *Id.* at 2.

should be considered a loan, the memorandum observed that "[t]he principal factor determining whether a transaction is a loan (or a borrowing) is a 'time lag' between cash flows...."[111]  As an additional factor indicative of a loan, the memorandum listed "an absence of any market risk to the Bank.. .."[112] The memorandum also provided a number of examples of transactions that should be treated as loans.  The first example is a prepaid commodity swap:

> **Transaction One: Documented as a prepaid commodity swap with no market risk.** A clear example of a transaction that is the economic equivalent of a loan is a derivative transaction that required the Bank to make a $10 million cash payment today and requires the customer to deliver in 30 days a quantity of a commodity to be determined based on the commodity price at the delivery date. When the quantity is determined, the related market value of the commodity to be delivered will be equal to a $10 million loan plus interest for 30 days.[113]

*Tracking of 'Disguised Loans" by JPMorgan's Systems*

In the Spring of 1999, Donald Layton, Vice Chairman of JPMorgan, began to voice his concerns within JPMorgan regarding whether JPMorgan's systems for monitoring credit exposure adequately reflected JPMorgan's credit exposure under certain transactions, including derivatives transactions and prepay transactions, all of

---

[111] *Id.*

[112] *Id.*

[113] *Id.* at 3 (emphasis in original). In November 1997, Ms. Butterfield sent an email to others at JPMorgan apparently clarifying the preliminary advice given in the Butterfield Memo. She stated in the email that "transactions which are confirmed with the counterparty as derivatives should be reported in Trading Assets/Liabilities – Risk Management instruments and marked to market. Under no circumstances should such transaction be reported in Other Assets or Other Liabilities. This conclusion supercedes the interim guidance set forth in a September 20, 1996 memorandum previously distributed." Email from Diane Butterfield, JPMorgan, to Jack Alexander et al., JPMorgan, Nov. 13, 1997 [JPMC116528]. Presumably the reference to the "September 20, 1996 memorandum previously distributed" is intended to be a reference to the Butterfield Memo (which is dated Sept. 26, 1996).

which involved initial disbursements of cash by JPMorgan.[114] Mr. Layton, who had been advised of JPMorgan's prepay transactions with Enron,[115] referred to the up front payment components as "disguised loans" in the various emails he circulated internally at JPMorgan. For example, in an email bearing a subject line reading "PREPAID OIL SWAP," Mr. Layton said "THERE IS A CATEGORY OF 'DISGUISED LOAN' THAT SHOWS UP IN MANY UNITS OF GLOBAL MARKETS. THIS [PREPAID OIL SWAP] IS JUST ONE SUCH EXAMPLE."[116] A few days later, Mr. Layton sent another internal email expressing his growing concern: "WE ARE MAKING DISGUISED LOANS, USUALLY BURIED IN COMMODITIES OR EQUITIES DERIVATIVES (AND I'M SURE IN OTHER AREAS). WITH AFEW [sic] EXCEPTIONS, THEY ARE UNDERSTOOD TO BE DISGUISED LOANS AND APPROVED AS SUCH. BUT I AM QUEASY ABOUT THE PROCESS:. . .."[117] Apparently concerned that officers and employees of JPMorgan were not giving proper consideration to the issues these types of transactions presented for JPMorgan, such as whether the transactions underpriced the loan market and whether the transactions were documented to appropriate loan

---

[114] Trial Testimony of Donald Layton, Head of Retail Banking, J. P. Morgan Chase & Co., before Honorable Jed S. Rakoff, Dec. 30, 2002, at 3691--3694 (J.P. Morgan Chase Bank v. Liberty Mutual Insurance Co., Ol-CV-11523 (S.D.N.Y. 2003)).

[115] See Email from Peter Coad, JPMorgan, to Don Layton, JPMorgan, Dec. 2, 1998, at 1 (forwarding an internal email giving background on Enron prepay transactions done to date) [JPMCBKR0013918-JPMCBKR0013919].

[116] Email from Don Layton, JPMorgan, to Dennis Oakly, JPMorgan, *et* al., May 10, 1999 (capitalization in original) [JPMCBKROO 162641.

[117] Email from Don Layton, JPMorgan, to David Pflug, JPMorgan, *et al.,* May 12, 1999 (capitalization in original) [JPMCBKR0013921].

standards,"  Mr. Layton then set into motion a "TOP LEVEL REVIEW OF OUR DISGUISED LOANS.""""

*Consideration of Prepays When Determining Credit Exposure to* **Enron**

In its periodic reviews of its credit exposure to Em-on, JPMorgan sometimes included Enron's obligations under prepay transactions as debt. For example, a 1992 annual review of Enron included a review of JPMorgan's exposure to Enron off-balance sheet financings.[120] The obligations under those off-balance sheet financings, as well as $225 million of exposure under prepaid oil transactions, were added to the debt reflected on Enron's balance sheet to arrive at Enron's total incremental debt held by JPMorgan.[121] In connection with a 1999 Enron project, a summary of JPMorgan's overall credit exposure to Enron included $1 billion of "Prepays" and observed that this exposure was "[a]ctually on B/S [balance sheet] in 'assets and liabilities for price risk mgmt.' category."[122]  A similar summary as of September 2001, which outlined various steps intended to reduce exposure to Enron, included a summary of JPMorgan's overall exposure.[123] With respect to that summary, the writer noted, "I have attached the credit stats including the prepays as debt."[124]

---

[118] *See id.*

[119] Email from Don Layton, JPMorgan, to Don Wilson, JPMorgan, et al., May 21, 1999 (capitalization in original) [JPMCBKROO 13924-JPMCBKR0013925]; see Email from Don Layton, JPMorgan, to Don M. Wilson, JPMorgan, et *al.,* May 24, 1999 (refers to kicking off "the effort" and states the object of the project being "TO ENSURE STRATEGIC TRANSPARENCY") [JPMCBKR0020568-JPMCBKR0020569].

[120] Dittman/Thorington Memo.

[121] *Id.* at 19.

[122] Email from Richard Walker, JPMorgan, to Philip Orenstein, JPMorgan, et al., Jan. 15, 1999 (the "JPMorgan CLO Email")[AB000512509-AB0005 125 11].

[123] See Traband/Ballentine 9/20/01 Email.

[124] Id.

## C.    Facilitation of Enron's Accounting Treatment

JPMorgan helped Em-on accomplish its desired accounting treatment of prepay transactions in several ways. Most directly, JPMorgan funded and arranged a significant number and dollar amount of prepay transactions for Em-on. In addition, as banks' willingness to take on additional Em-on credit exposure decreased, making it more difficult and expensive for Enron to obtain credit enhancement for prepay transactions through letters of credit, JPMorgan agreed to Em-on's use of Surety Bonds issued by various insurance providers as an alternative source of credit support for prepay transactions.    By so doing, these financial insurers assumed Enron credit risk while JPMorgan and the other banks that provided the funding for these transactions had the highly rated credit risk of the financial insurers.  By shifting the Enron credit risk from banks to insurance companies in this fashion, Em-on was able to continue engaging in prepay transactions on economically attractive terms. Finally, JPMorgan's dominant relationship with Mahonia allowed for a level of efficiency in the transaction that might not have been present if Mahonia were independent, while at the same time providing a structural element Andersen and Enron believed necessary to obtain the desired accounting treatment of the transactions.

*Funding of Prepay Transactions and Alternative Credit Support*

One of the most direct ways JPMorgan facilitated Em-on's accounting for prepay transactions was its funding of the Mahonia Transactions and the other prepay transactions it financed and arranged for Enron.  From 1992 through 2001, JPMorgan participated in twelve prepay transactions with Enron, yielding $3.553 billion of

proceeds.[125]   Yet JPMorgan knew that the market and the Rating Agencies were not operating with complete knowledge of the various structured transactions in which Enron engaged.

When advising a fellow JPMorgan officer on a potential prepay transaction with another client, Richard Walker, a managing director who often worked on Enron transactions, provided "a few items relative to our experience with the commodity 'prepay' deals Chase has executed for Enron."[126]   He noted that the structure "enables Enron to take a more aggressive accounting posture on the deal.. . ."[127] With regard to an Enron syndication memorandum he provided to the other officer as a sample, Mr. Walker explained that "[t]he syndication memo is admittedly very skimpy. This is because we have never let the market know anything about the underlying structure and the emphasis is totally on the letter of credit backed by the Enron Corp."[128]

At another time, Mr. Walker observed with regard to the Rating Agencies' knowledge of Enron's structured transactions: "Some deals that are less know [sic] to the agencies [sic] may come to light if they are placed in newly formed rated vehicles. This could well cause some heartburn for Enron."[129]

As mentioned above, JPMorgan also played an important role in helping Enron gain access to the financial insurance companies to obtain more credit on favorable terms through additional prepay transactions.    Initially, Enron's obligations in prepay

---

[125] Appendix E, PSI Prepay Report.

[126] See Memorandum to Karen Simon, JPMorgan, from Rick Walker, JPMorgan, regarding ANADARKO PETROLEUM – Forward Sale of Oil, Feb. 5, 1996 [JPMCBKROO 199761.

[127] *Id.*

[128] *Id.*

[129] JPMorgan CLO Email, at 2.

transactions with JPMorgan had been supported by letters of credit issued by various banks. In 1998, Enron and JPMorgan modified the structure of the Mahonia Transactions by using the Surety Bonds instead of the letters of credit, which had become increasingly expensive to obtain as the various letter of credit banks began to approach their respective limits for Enron credit exposure.[130]

### Mahonia

JPMorgan also facilitated Em-on's prepay transactions by permitting Mahonia to act as the conduit entity in these transactions. As discussed below, Mahonia was a Jersey corporation that, although not owned by JPMorgan, was effectively controlled by it. Although it may not have been necessary for the conduit entity in Enron's prepay transactions to be independent from the financial institution in order to achieve Enron's desired accounting treatment, both Andersen and Enron believed that to be the case.[131] Thus, it was important to Enron that JPMorgan provided this service and took steps to create the appearance that Mahonia maintained the required levels of independence.

JPMorgan did not hold an ownership interest in Mahonia.[132] Mahonia was formed to enter into transactions with JPMorgan and take physical delivery of commodities at a time when applicable banking regulations precluded JPMorgan from

---

[130] See Deffner Review Memo; Serice/Simon 11/25 Email. Following the closing of the first such transaction, a JPMorgan employee wrote: "This morning we closed the $250,000,000, natural gas forward sale transaction. Thanks to your assistance, we have 'advanced the technology' on the prepaid commodity transactions by structuring credit enhancement in the form of surety bonds rather than bank LCs." Email from Jeffrey Dellapina, JPMorgan, to Mark Malloy, JPMorgan, *et* al., June 29, 1998 [JPMCBKR0014367].

[131] See Andersen Prepaid Transactions Discussion, at 3-4.

[132] The Ownership of Mahonia Limited (chart indicating the ownership of Mahonia) [AB000 153 154].

doing so.[133]  Mahonia's only purpose, as provided in the formation documents, was to

assist in "transactions arranged by Chase."[134]    Counsel for JPMorgan delivered

documents to Mahonia "for signature"[135] with notes that the documents were suitable for

execution by Mahonia,[136] and provided comments on transaction documents to Enron on

behalf of Mahonia.[137]  Furthermore, Mahonia appointed JPMorgan "as [its] agent for the

purpose of arranging all our physical natural gas receipts and deliveries until further

notice"[138] and JPMorgan represented to the Texas Gas Transmission Corporation that

"[JPMorgan] has full control over all cash flows in [Mahonia] relating to the physical

sales of oil and gas."[139]  In one instance, JPMorgan became concerned when it discovered

gas deliveries, which should have been made first to Mahonia and then to JPMorgan,

---

[133] See Executive Approval Memorandum Enron Corp., Mitchell S. Taylor, JPMorgan, and Stephen A. Thorington, JPMorgan, Dec. 23, 1992 (the "JPMorgan 12/1992 Approval Memo") ("Chase Global Risk Management developed a structure that could take physical delivery through the use of a special purpose corporation") [JPMCBKR0019243]; see also OCC Letter (pursuant to which the former Chase Manhattan Bank requests the ability to make physical delivery of commodities "to provide financing in a manner most responsive to the customers needs"); Jersey Application. In addition to prepay transactions with Enron, Mahonia entered into commodity prepaid forward transactions with other clients of JPMorgan. See letter from Ahuva Genack, Vice President and Assistant General Counsel, JPMorgan, to Robert L. Roach, Counsel & Chief Investigator, Permanent Subcommittee of Investigations, United States Senate, July 18, 2002 (the "Genack Letter to the PSI") (disclosing a total of seven commodity prepaid forward transactions with six other clients of JPMorgan) [AB000153202]; Exhibit 2 to Deposition of Anne Marie Sullivan, Vice President, JPMorgan, by Stewart D. Aaron, Dorsey & Whitney, LLP, June 27, 2002 (a spread sheet of JPMorgan's exposure to counterparties under prepaid forward commodity contracts disclosing a total of 11 commodity prepaid forward transactions with eight other clients of JPMorgan, some of which are not referenced in the Genack Letter to the P S I ) [JPMCBKR0008436-JPMCBKR0008474] [JPMCBKR0018339-JPMCBKR0018450] [JPMCBKR0018343-JPMCBKR0018344].

[134] Jersey Application, at 2; see also Email from Jeffrey W. Dellapina, JPMorgan, to Gary K. Wright, JPMorgan, et al., Apr. 23, 1999 (Mahonia is "a special purpose company which works exclusively on Chase arranged transactions") [JPMCBKR0020656-JPMCBKR0020657].

[135] See Email from Philip Levy, In-House Counsel, JPMorgan, to Julie Carter, Mourant & Co. Secretaries Limited, Sept. 24, 2001, at 2 [SEC00135603-SEC00135606].

[136] Email from Philip Levy, In-House Counsel, JPMorgan, to Garth Essex Carter, Mourant & Co., Secretaries Limited, June 28, 2000 [AB0005 12178].

[137] Email from Philip Levy, In-House Counsel, JPMorgan, to Julie Carter, Mourant & Co., Secretaries Limited, Sept. 24, 2001 [PSI00448884-PSI00448886].

[138] Letter from Mahonia to Whom it May Concern, Oct. 24, 1995 [JPMCBKR0038369].

[139] Crowley Letter.

were going directly to JPMorgan, a fact apparently unknown to Mahonia until it received notice from JPMorgan.[140]

In addition, Mahonia's fees did not increase with increases in the amount of the prepay transactions, as would be expected in an arms length arrangement.[141] In fact, over time, Mahonia's fees decreased as the size of the Mahonia transactions were constant or rising.[142]   For example, Mahonia's fees in Chase VIII were $12,500 where the prepayment was $250 million, and its fees in Chase X were $5,000 where the prepayment was approximately $650 million.[143]

Nevertheless, JPMorgan took steps to maintain Mahonia's independence as a legal matter. At least in the early Mahonia Transactions, JPMorgan sent letters to Mahonia's attorneys asking Mahonia to acknowledge that it participated in the prepay transactions at its own risk, without reliance upon any statements or representations from JPMorgan.[144]   In addition, in at least one instance JPMorgan asked Mahonia's attorneys to make comments on transaction documents[145] and, in Chase XI, Mahonia's attorneys participated in a conference call regarding the transaction.[146]

---

[140] See Email from Julie Carter, Mourant & Co. Secretaries Limited, to Ian James, Mourant & Co. Secretaries Limited, Feb. 28, 2002 [JPMCBKR0012613-JPMCBKR0012614].

[141] *Compare* Mahonia Limited Commodity Transactions    June 1993 to September 2001, Administrative Fees and Profits Received, at 1-2 [JPMCBKR0012397-JPMCBKR0012402] *with* Enron/Mahonia Confirmation Letters.

[142] *Id.*

[143] *Id.* Additionally, the fees in Chase VII were $12,500 while the amount of the prepay was $250 million, and the fees in Chase IX were $7,513.76 while the amount of the prepay was $500 million.

[144] See, e.g., Letter from Mark Webster, Director, JPMorgan, to Ian James, Mourant du Feu & Jeune, June 23, 1993 [JPMCBKR0019273-JPMCBKR0019275].

[145] Email from Philip Levy, In-House Counsel, JPMorgan, to Gareth Essex Carter, Mourant du Feu & Jeune, June 21, 1999 [PSI00444426].

[146] See Email from Jeffrey W. Dellapina, JPMorgan, to Ian James, Mourant du Feu & Jeune, June 21, 1999 [PSI0045 1640].

As mentioned above, in the initial Mahonia Transactions JPMorgan was precluded by applicable banking law from taking physical delivery of commodities and thus established Mahonia to do so.[147] Once JPMorgan was permitted to take physical delivery of commodities,[148] it apparently no longer had a need to use Mahonia and proceeded to accomplish prepay transactions without using Mahonia.[149] Nevertheless, all of Em-on's subsequent Mahonia Transactions involved Mahonia.[150] Certain JPMorgan correspondence indicates that the continued use of Mahonia may have been for convenience.[151] The parties also likely continued to use Mahonia because Andersen had approved Em-on's accounting treatment of the prepay transactions based on a structure that included Mahonia.[152] Further, JPMorgan appeared to capitalize on the business benefits of the structure in selling prepay transactions to other potential clients in 1999 and 2000.[153] In sales presentations, JPMorgan's prepay transactions involving Mahonia were touted as having "attractive accounting treatment," the ability to be completed

---

[147] JPMorgan 12/1992 Approval Memo; Email from Bruce Ellard, JPMorgan, to Theresa Bohlmann, JPMorgan, and Peter Coad, JPMorgan, Dec. 1, 1998 (the "Ellard/Bohlmann Email") [JPMCBKR0032234-JPMCBKR0032235].

[148] See Letter from Kathleen Scott, Assistant Counsel, State of New York Banking Department, to Phillip Levy, Vice President and Assistant General Counsel, Chemical Bank, July 3 1, 1996 (the "Chemical NY Approval Letter"), at 1 (noting former Chase Manhattan Bank's ability to take physical deliveries of commodities) [JPMC111102-JPMC111103]; OCC Letter.

[149] Call Report regarding call on Enron Corporation, Richard S. Walker, JPMorgan, Oct. 3, 1997 ("In speaking with Dinsa [Mehta] earlier this week, he indicated that we are now doing all prepays in [JPMorgan's] name and are no longer working with Mahonia") [JPMCBKR0015348-JPMCBKR0015349].

[150] See Enron/Mahonia Forward Contracts,

[151] Ellard/Bohlmann Email.

[152] Genova Interview.

[153] JPMorgan, Hunt Oil Company Reserve Financing Alternatives: Volumetric Production Payment/Forward Sale (Prepay) Discussion, Dec. 22, 1999 (the "Hunt Prepay Pitch Book") (PowerPoint Presentation) [AB000512585-AB000512599]; Equitable Prepay Pitch Book.

"quietly and discretely" and as being "rating agency friendly" [154] and "balance sheet 'friendly.'"[155]

Finally, when Andersen requested a letter from Mahonia containing certain representations as to Mahonia's "non-SPV" status,[156] which Andersen believed was necessary to accomplish Enron's desired accounting for the Mahonia Transactions, JPMorgan became involved to make certain the letter satisfied Andersen. In a taped telephone call between JPMorgan and Enron in which the representation letter was discussed, one of the participants noted that JPMorgan, as well as Enron, wanted to make certain that "Mahonia *seems* independent."[157]    Eventually, Mahonia delivered a representation letter that satisfied Andersen. [158]

### D.    **Summary**

JPMorgan played a significant role in facilitating the Mahonia Transactions. It helped Enron structure the transactions, provided the funding and assisted in forming and controlled Mahonia to serve as the conduit entity. JPMorgan knew that Em-on accounted for its obligations under the Mahonia Transactions as liabilities from price risk management activities rather than debt. It also knew that Enron reported the cash as cash flow from operating activities rather than financing activities. Nevertheless, JPMorgan recognized that the Mahonia Transactions were essentially loans.

---

[154] Hunt Prepay Pitch Book, at 22.

[155] Equitable Prepay Pitch Book, at 3.

[156] Letter from Wes Coldwell, Managing Director, Enron, to Mahonia Limited, Sept. 26, 2001 [AB0005 12 19 1]; Letter from Mahonia to Andersen, Sept. 28, 2001 (the "Mahonia Rep Letter") [AB000512192].

[157] Transcript of Taped Telephone Call between Jeffrey Dellapina, JPMorgan, and Robert Traband, JPMorgan, Sept. 13, 2001, at 2 (emphasis added) [AB000153426-AB000153428].

[158] Mahonia Rep Letter.

This Annex will not discuss potential legal issues arising from these facts, which include principles of equitable subordination, third-party culpability, or other potential affirmative claims of the Debtors' estates. The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[159]

---

[159] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## VII.   EXAMINER'S CONCLUSIONS WITH RESPECT TO THE MAHONIA TRANSACTIONS

The Mahonia Transactions were effectively debt. As discussed in Appendix E (Prepay Transactions), Enron's accounting for the Mahonia Transactions as price risk management activity did not comply with GAAP. Enron should have included the $2.6 billion it obtained through the Mahonia Transactions during 1997 through 2001 as debt on its financial statements. In addition, Enron should have reported the proceeds of these transactions as cash flows from financing activities rather than from operating activities.

As discussed in Appendix D (Disclosure), Enron made no specific disclosure of the Mahonia Transactions in its financial statements or other public filings. Thus, it made no public disclosure that would have provided an investor with sufficient information to appreciate the magnitude and quality of operating cash flow recorded by Enron from the Mahonia Transactions, or of the terms under which Enron was required to repay the proceeds of the transactions.

**ANNEX 2 (Yosemite I Transaction)**

**to**

**APPENDIX E**

**(Prepay Transactions)**

**to**

**SECOND INTERIM REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

TABLE OF CONTENTS

I.      INTRODUCTION AND OVERVIEW OF THE YOSEMITE I
        TRANSACTION ................................................................... 1

II.     STRUCTURE OF THE YOSEMITE I TRANSACTION ................................... .3
        A.    The Swap Transactions ................................................ 3
        B.    The Credit Linked Notes Transaction ................................. 9
        C.    Settlement Mechanics of the Various Swap Transactions
              Upon   Termination............................................... 16

III.    ECONOMICS AND ALLOCATION OF RISK IN THE YOSEMITE I
        TRANSACTION ................................................................... 23

IV.     LEGAL ISSUES IN THE YOSEMITE I TRANSACTION ................................. .24

V.      ACCOUNTING ISSUES IN THE YOSEMITE I TRANSACTION.. ................ 25

VI.     ROLE OF CITIBANK IN THE YOSEMITE I TRANSACTION.. ................. .26
        A.    Knowledge of Enron's Accounting Treatment........................ .26
        B.    Characterization of Prepay Transactions as Loans ................ .30
        C.    Facilitation of Enron's Accounting Treatment .................... .34

VII.    EXAMINER'S CONCLUSIONS WITH RESPECT TO THE
        YOSEMITE I TRANSACTION.. ...................................................... .42

## I.   INTRODUCTION AND OVERVIEW OF THE YOSEMITE I TRANSACTION

The Prepay Transaction discussed in this Annex ("Yosemite I") involved Enron, ENA, Citibank, Delta Energy Corporation ("Delta"), Yosemite I Trust and various outside investors. Yosemite I closed in late 1999 and provided Enron with $800 million in financing. It was the first in a series of four Prepay Transactions among ENA, Enron, Citibank and Delta. Collectively, these transactions resulted in Enron obtaining approximately $2.4 billion in financing during the period 1999 through 2001.[1]

This Annex describes Yosemite I in detail. The other three Prepay Transactions in the series, Yosemite II, III and IV, are described in Annexes 3, 4 and 5, respectively. The four Yosemite transactions are referred to collectively as the "Yosemite Transactions."

As discussed below and in Appendix E (Prepay Transactions), the Examiner has concluded that Enron's accounting for Yosemite I did not comply with GAAP. Rather than recording the transaction obligations as price risk management liabilities, Enron should have recorded the obligations as debt. Thus, as a result of Yosemite I, Enron understated its debt at December 3 1, 1999 by $800 million. In addition, Em-on should not have reported the increases in balances of its prepay transactions as net cash from operating activities, but rather as cash from financing activities.

The information in this Annex is intended to provide a detailed description of Yosemite I and should be read together with the Examiner's discussion of the Prepay

---

[1] Appendix E, PSI Prepay Report. The amounts do not include the amounts outstanding under the various "magic notes" executed by Enron and described in Annex 2, 3, 4, and 5 of Appendix E (Prepay Transactions) to the Report.

Transactions contained in Appendix E. Appendix E provides a more complete discussion of the Examiner's analysis and conclusions regarding the Prepay Transactions generally.

## II.  STRUCTURE OF THE YOSEMITE I TRANSACTION

The Yosemite I structure, developed by Citibank, consisted of two related transactions: (1) a series of financially settled crude oil swaps pursuant to which ENA received upfront payments totaling approximately $800 million, and (2) the issuance of promissory notes and certificates in the institutional market by Yosemite I Trust, the proceeds of which ultimately funded the swap transactions.

### A.    The Swap Transactions

Yosemite I initially closed on November 18, 1999. On December 22, 1999,[2] however, the parties replaced the crude oil swap transactions executed in November with swap transactions with similar terms, except that the replacement swap agreements terminated on the maturity date of the YI Notes (described below) and some of the payment amounts were changed.[3]

---

[2] The negotiations of the swap transactions and the credit linked notes transactions took place on parallel tracks, and when the credit linked notes transactions were ready to close, there had not yet been a careful analysis of whether the swap transactions would integrate perfectly with the credit linked notes transactions.    See In-Person Interview with Richard Caplan, Managing Director, Citibank, by John E. Stephenson, Jr., Partner, A&B, et al., Dec. 5, 2002 (the "Caplan Interview"). Therefore, Enron and Citibank decided to put in place an interim set of swap transactions, review them after closing to see if any changes needed to be made and then replace them with a set of permanent swap transactions containing any such changes. *Id.*

[3] Like the replacement swap transactions, the initial swap transactions consisted of three swaps    one between ENA and Delta, one between ENA and Citibank and one between Delta and Citibank. See Enron/Delta Swap Confirmation between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Delta, Nov. 18, 1999 (the "Original YI ENA/Delta Swap") [AB000025842-AB000025854]; Enron/Citibank Swap Confirmation between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Citibank, Nov. 18, 1999 (the "Original YI ENA/Citibank Swap") [AB000025764-AB000025775]; and Delta/Citibank Swap Confirmation between Delta and Citibank, Nov. 18, 1999 [AB000025706-AB000025715] (collectively, the "Yosemite I Original Swaps"). These initial swaps were scheduled to terminate on January 3 1, 2000 and resulted in up-front payments to ENA of $799,995,000 (the $5,000 difference between $800 million was presumably retained by Delta as a fee). Sections 1 and 2, Yosemite I Original Swaps. Pursuant to the cancellation of the Original YI ENA/Delta Swap, ENA paid $804,812,534.48 to Delta on December 22, 1999. Cancellation Letter from ENA to Delta, Dec. 22, 1999 [AB000026334-AB000026338]. Pursuant to the cancellation of the Original YI ENA/Citibank Swap, Citibank paid $52,534.48 to ENA on December 22, 1999. Cancellation Letter from Citibank to ENA, Dec. 22, 1999 [AB000026339-AB000026343]. Netting these payments with the amounts received under the YI ENA/Delta Swap and YI ENA/Citibank Swap (described fully below) resulted in ENA being "out-of-pocket" an amount equal to the "accrued interest" on the swaps to date.

- 3 -

The following diagram illustrates the amount and flow of the various payments under the swap transactions:



Note: Entity in bold is wholly owned (directly or indirectly) by Enron.

### YI ENA/Delta Swap

The first swap transaction consisted of a swap between ENA and Delta (the "YI ENA/Delta Swap").[4]  Under the YI ENA/Delta Swap, Delta paid $705,725,402 on the closing date to ENA.[5]  ENA agreed to make payments to Delta on April 14 and October 14 of each year[6] in an amount equal to the market value of 1,212,375 barrels of oil.[7]

The YI ENA/Delta Swap had a scheduled termination date of October 26, 2004.[8] On that date, ENA was to pay Delta an amount equal to the lesser of $800 million and the

---

[4] Enron/Delta Swap Confirmation between ENA and Delta Energy Corporation, Dec. 22, 1999 (the "YI ENA/Delta Swap") [AB00026348-AB00026360].

[5] Id. Section 2. This $705,725,402 plus the $94,274,598 paid to ENA under the ENA/Citibank Swap results in a total payment to ENA at the closing of $800 million.  See discussion below.

[6] Id. Section 1.

[7] Id. Section 3.

[8] Id. Section 1.

value of 44,469,150 barrels of oil, the price of which was determined in the same manner as that used for the determination of the periodic payments.' A separate Fiscal Agency Agreement gave Yosemite I Trust a lien on Delta's claims under this swap and allowed claims owing by ENA to Delta upon termination of the YI ENA/Delta Swap to be transferred to Yosemite I Trust or a "qualified institutional buyer.'" Finally, Em-on guaranteed all obligations of ENA under the YI ENA/Delta Swap."

### YI ENA/Citibank Swap

The second step in the structure consisted of a swap between ENA and Citibank (the "YI ENA/Citibank Swap"),[12] under which Citibank made an initial payment to ENA of $94,274,598 on the closing date.[13] The YI ENA/Citibank Swap called for periodic payments on the same dates as periodic payments were to be made under the YI ENA/Delta Swap.[14] ENA agreed that, on those dates, it would make a fixed payment to Citibank in the amount of $29 million," and Citibank agreed to pay ENA a variable amount equal to the value (determined in the same manner as the values for oil under the YI ENA/Delta Swap) of the same number of barrels of oil for which ENA was required to make payment to Delta on such dates.[16] As a result, such payment by Citibank would

---

[9] *Id.* Section 4.

[10] Sections 5.01 and 5.03, Fiscal Agency Agreement among Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.), Enron Corp., Delta and United States Trust Company of New York ("USTNY"), made as of Nov. 18, 1999 [AB000025863-AB000025882].

[11] Guaranty executed by Enron in favor of Delta, dated as of Dec. 22, 1999 (the "YI Enron/Delta Guaranty") [AB000026406-AB000026411].

[12] Original YI ENA/Citibank Swap.

[13] *Id.* Section 2.

[14] **Compare** Section 1, YI ENA/Citibank Swap, **with** Section 1, YI ENA/Delta Swap.

[15] Section 4, YI ENA/Citibank Swap.

[16] **Compare** Section 3, YI ENA/Citibank Swap, with Section 3, YI ENA/Delta Swap.

always equal the floating payment ENA had to pay Delta under the YI ENA/Delta Swap, and ENA was hedged against any commodity price risk under the YI ENA/Delta Swap.

The scheduled termination date of the YI ENA/Citibank Swap was the same as that for the YI ENA/Delta Swap.[17] On this date, ENA would pay Citibank the amount, if any, by which $800 million exceeded the value of the same number of barrels of oil, valued in the same manner as the number of barrels used in determining the final payment under the YI ENA/Delta Swap.[18] Like the YI ENA/Delta Swap, ENA agreed to make that same payment at any earlier agreed-upon termination date or on the occurrence of an "Early Termination Date" under the governing ISDA Master Agreement." As in the YI ENA/Delta Swap, a separate Fiscal Agency Agreement provided that Citibank could transfer to the Yosemite I Trust or a "qualified institutional buyer" any claims owing by ENA to Citibank upon termination of the YI ENA/Citibank Swap.[20] Finally, as with the YI ENA/Delta Swap, Enron guaranteed all obligations of ENA under the YI ENA/Citibank Swap.[21]

*YI Delta/Citibank Swap*

The final swap was between Citibank and Delta (the "YI Delta/Citibank Swap"; together with the YI ENA/Citibank Swap and the YI ENA/Delta Swap, collectively, the

---

[17] *Compare* Section 1, YI ENA/Citibank Swap, *with* Section 1, YI ENA/Delta Swap.

[18] *Compare* Section 5, YI ENA/Citibank Swap, *with* Section 4, YI ENA/Delta Swap. Thus, the payment could never be more than $800 million and under no circumstances would Citibank be required to make a payment to ENA on such date.

[19] See Section 7, YI ENA/Citibank Swap (definition of "Cancellation Date").

[20] Sections 5.01 and 5.03, Fiscal Agency Agreement among Citibank, Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.), Enron Corp. and USTNY, made as of Nov. 18, 1999 [AB000025784-AB000025803]. Section 5.03(f) provided that the transfer could only be made either to the Yosemite I Trust or a qualified institutional buyer. *Id.*

[21] Guaranty executed by Enron in favor of Citibank, dated as of Dec. 22, 1999 (the "YI Enron/Citibank Guaranty") [AB000026412-AB000026417].

"Yosemite I Swaps").[22] Under the YI Delta/Citibank Swap, Delta made an initial payment of $94,274,598 on the closing date to Citibank (the same amount which Citibank paid to ENA under the YI ENA/Citibank Swap on the closing date).[23] On the same periodic payment dates as the other Yosemite I Swaps, Delta would make a payment to Citibank with respect to the same number of barrels of oil, valued in the same manner used to determine the floating payments under the other Yosemite I Swaps (thereby completing the circle with respect to these payments).[24] These variable payments were offset by $29 million in fixed payments to be made by Citibank to Delta (the same amount Citibank would receive from ENA under the YI ENA/Citibank Swap on the same dates).[25]

The YI Delta/Citibank Swap was scheduled to terminate on the same date as the other Yosemite I Swaps.[26]  On that date, Citibank would pay to Delta an amount determined using the same criteria used to set the payment by ENA to Citibank under the YI ENA/Citibank Swap.[27]  Citibank was also required to make that same payment on any agreed-upon earlier termination date or on the occurrence of an "Early Termination Date" under the governing ISDA Master Agreement."

---

[22] YI Delta/Citibank Swap.    This confirmation was issued pursuant to the Delta/Citibank Master Agreement.

[23] *Compare* Section 2, YI Delta/Citibank Swap, *with* Section 2, YI ENA/Citibank Swap.

[24] *Compare* Sections 1 and 3, YI Delta/Citibank Swap, *with* Sections 1 and 3, YI ENA/Delta Swap, *and* Sections 1 and Section 3, YI ENA/Citibank Swap.

[25] *Compare* Section 4, YI Delta/Citibank Swap, *with* Section 4, YI ENA/Citibank Swap.

[26] *Compare* Section 1, YI Delta/Citibank Swap, *with* Section 1, YI ENA/Delta Swap *and* Section 1, YI ENA/Citibank Swap.

[27] *Compare* Section 5, YI Delta/Citibank Swap, *with* Section 4, YI ENA/Delta Swap *and* Section 5, YI ENA/Citibank Swap.

[28] *Compare* Section 7, YI Delta/Citibank Swap (definition of "Cancellation Date"), *with* Section 7, YI ENA/Citibank Swap (definition of "Cancellation Date").

- 7 -

*Net Result of the Yosemite I Swaps*

The net result of the Yosemite I Swaps was as follows:

- On the closing date, ENA received $800 million from Delta:[29]

    - $705,725,402 from Delta under the YI ENA/Delta Swap, and

    - $94,274,598 from Citibank under the YI ENA/Citibank Swap (Citibank having received that same amount from Delta under the YI Delta/Citibank Swap).

- Semiannually, ENA paid $29 million to Citibank under the YI ENA/Citibank Swap (which Citibank then paid to Delta under the YI Delta/Citibank Swap).

- The semiannual payments based on the market price of the specified number of barrels payable among the parties under all three of the Yosemite I Swaps offset one another.

- At maturity or termination, ENA was to pay Delta $800 million under the YI ENA/Delta Swap. To the extent the payment under the YI ENA/Delta Swap was less than $800 million because of lower oil prices, that shortfall would be equal to the amount ENA had to pay Citibank under the YI ENA/Citibank Swap and which Citibank in turn had to pay Delta under the YI Delta/Citibank Swap.

ENA used the proceeds received in Yosemite I to repay two then existing prepay transactions funded by Citibank, known as the "Roosevelt" and "Truman" transactions.[30] Those transactions originally closed in December 1998 and June of 1999, respectively, and were extended in May 1999 and September 1999, respectively.[31]

---

[29] Actually, ENA received $799,995,000 at the original closing on November 18. The $5,000 difference was retained by Delta, presumably as a fee. See Section 1, Original YI ENA/Delta Swap; Section 1, Original YI ENA/Citibank Swap.

[30] Citibank Global Loans Approval Memorandum, Dec. 7, 1999 (the "Dec. 1999 Citibank Approval Memo"), at 3 [AB000512676-AB000512680].

[31] Sept. 1999 Citibank Global Loans Approval Memo, at 2. Email from Jim Reilly, Citibank, to Onno Ruding, et *al.,* Citibank, Apr. 28, 1999 , at 1 [PSI00339100-PSI00339101].

### B.    The Credit Linked Notes Transaction

The following chart illustrates the structure of the credit linked notes portion of Yosemite I:



*Issuance of Notes and Certificates*

Pursuant to an Indenture between Yosemite I Trust[32] and United States Trust Company of New York ("USTNY"),[33] Yosemite I Trust issued $750 million in aggregate principal amount of notes (the "YI Notes"), which bore interest at 8.25% per annum and were to mature on November 15, 2004.[34]    Interest was payable on the YI Notes on

---

[32] The Yosemite Trust was established on October 26, 1999. See Yosemite Securities Trust I Amended and Restated Trust Agreement between Wilmington Trust Company and Structured Products Corp., dated as of Nov. 18, 1999 (the "Yosemite I Trust Agreement") [AB000079997-AB000080032].

[33] Indenture between Yosemite I Trust and USTNY, dated as of Nov. 18, 1999 (the "Yosemite I Base Indenture") [AB000080034-AB000080113]; Yosemite I Indenture Supplement.

[34] Article II, Yosemite I Indenture Supplement.

May 15 and November 15 of each year, commencing May 15, 2000.[35] The YI Notes were initially sold to BT/Deutsche, Donaldson, Lufkin and Jenrette Securities Corporation, Greenwich NatWest Limited, as agent of National Westminster Bank, Plc, and Salomon (collectively, the "YI Initial Purchasers").[36] The YI Initial Purchasers then offered and sold the YI Notes to qualified institutional buyers[37] pursuant to Rule 144A and/or in an offshore transaction governed by Regulation S[38] of the Securities Act.[39] Yosemite I Trust secured the YI Notes with a security interest in all of Yosemite I Trust's rights in all current or future assets of Yosemite I Trust, including its various investments.[40]   Standard & Poor's rated the YI Notes "BBB+"[41] and Moody's rated the YI Notes "Baa2."[42]

In addition to the YI Notes, Yosemite I Trust issued $75 million in Certificates (the "YI Certificates"), which bore interest at 11% per annum.[43] Like the YI Notes, Yosemite I Trust was to make distributions on the YI Certificates on May 15 and

---

[35] *Id.*

[36] Note Purchase Agreement among Yosemite I Trust, Enron and the Yosemite I Initial Purchasers, made on Nov. 4, 1999 (the "YI Note Purchase Agreement") [AB000079596-AB000079628].

[37] As used in the Securities Act of 1933, as amended, Although they are listed as an initial purchaser of the YI Notes, Schedule A to the YI Note Purchase Agreement states that Greenwich NatWest did not purchase any of the YI Notes.   Schedule A, YI Note Purchase Agreement.

[38] $745 million of the YI Notes were issued in the form of a Rule 144A Global Note and $5 million in YI Notes were issued in the form of a Regulation S Global Note. See Delivery Certificate from USTNY to Yosemite I Trust, Nov. 18, 1999 [AB000079989-AB000079990].

[39] See Supplement to Offering Memorandum relating to Yosemite Securities Trust I Linked Enron Obligations, Nov. 4, 1999 (the "OM") [AB000079770-AB000079863].

[40] Section 3.1, Collateral Security Agreement among Yosemite I Trust, Citibank and USTNY, dated as of Nov. 18, 1999 (the "YI Collateral Security Agreement") [AB000080122-AB000080186].

[41] Letter from Joseph Sheridan, Managing Director, S&P's, to Richard Caplan, Salomon, Nov. 18, 1999 [AB000080568-AB000080569].

[42] Letter from Isaac Efrat, Moody's, and Sloan Walker, Moody's, to Yosemite I Trust, Nov. 18, 1999 [AB000080570].

[43] Yosemite 11% Trust Certificate No. 1 [AB000080888-AB000080892]; Yosemite 11% Trust Certificate No. 2 [AB000080893-AB000080897].

November 15 of each year, commencing May 15, 2000.[44] Long Lane Master Trust IV ("Long Lane"), through Fleet, as trust administrator, initially purchased $37.5 million of YI Certificates while Enron purchased the remaining $37.5 million.[45] Long Lane then entered into a Total Return Swap with Salomon, an affiliate of Citibank, pursuant to which Salomon gained the economic benefit of the YI Certificates.[46] On December 29, 1999, Enron sold $33.75 million of YI Certificates to LJM2[47] at 100% of the face amount, plus $1,031,250[48] in accrued interest, leaving Enron holding $3.75 million of YI Certificates.[49]    On December 30, 1999, LJM2 then sold all $33.75 million of YI Certificates it had purchased the day before to SE Raptor, L.P., an entity affiliated with the Whitewing structure, for 100% of the face amount, plus the $1,03 1,250 amount for accrued interest.[50]

---

[44] See Appendix A, YI Collateral Security Agreement (definitions of "Distribution Date" and "Certificate Distribution Date").

[45] Certificate Purchase Agreement among Yosemite I Trust, Enron Corp. and Fleet, as Trust Administrator for Long Lane, dated as of Nov. 18, 1999 (the "YI Certificate Purchase Agreement") [AB000080188-AB000080207].

[46] See Caplan Interview.

[47] Certificate Purchase and Sale Agreement between Enron and LJM2, effective as of Dec. 29, 1999 (the "YI Enron/LJM2 Sale Agreement") [AB000073782-AB000073796].

[48] Enron also later agreed to pay a fee of $100,000 to LJM2 for "certain services rendered in connection [with the Certificate Purchase and Sale Agreement]."    Letter from William W. Brown, Deputy Treasurer, Enron, to Fastow, LJM2, Mar. 8, 2000 [AB000073809]. In addition, Enron reimbursed LJM2 for expenses in the amount of $7,061.48. *Id.* This letter was executed on behalf of LJM2 by Fastow. *Id.* Enron's sale of the YI Certificates reduced Enron's ownership interest in Yosemite I Trust to approximately 5%. If Enron had owned 50% of the equity in Yosemite I Trust over year-end, the Yosemite I transaction "would have had to [have been] disclosed in the unconsolidated affiliates footnote." Yosemite I Transaction (Enron's summary of Yosemite I) [AB024400653].

[49] See YI Enron/LJM2 Sale Agreement.

[50] See Certificate Purchase and Sale Agreement between LJM2 and SE Raptor, L.P., effective as of Dec. 30, 1999 [AB000073797-AB000073808].

- 11 -

*YI   Citibank/Yosemite  Swaps*

The YI Notes and YI Certificates were linked to Enron's credit through two swap transactions between Citibank and Yosemite I Trust (collectively, the "YI Citibank/Yosemite Swaps").[51] One swap transaction related to the periodic payments due on the YI Notes and YI Certificates.  Citibank agreed to pay to Yosemite I Trust, on the business day immediately preceding May 15 and November 15 of each year,[52] an amount equal to the semi-annual interest due on the $825 million of outstanding YI Notes and YI Certificates.[53]  In return, Citibank was entitled to any yield actually received by Yosemite I Trust with respect to any investments held by Yosemite I Trust.[54] The other swap transaction was a credit default swap that required settlement upon, among other things, an "Enron Bankruptcy."[55]  Upon the occurrence of such an event, Citibank had the option to settle the swap transaction by either (i) paying Yosemite I Trust what

---

[51] See Amended and Restated Confirmation (Delta Energy Corporation Promissory Note), between Citibank and Yosemite, Dec. 22, 1999 (relating to a notional amount of $800 million) [AB000026386-AB000026405]. It can be inferred from the other transaction documents that there was also an Amended and Restated Confirmation, dated Dec. 22, 1999, between Citibank and Yosemite relating to a notional amount of $25 million (collectively, the "YI Citibank/Yosemite Swaps"). These confirmations were issued pursuant to the ISDA Master Agreement and Schedule between Yosemite I Trust and Citibank. ISDA Master Agreement between Yosemite I Trust and Citibank, dated as of Nov. 18, 1999 [AB000080225-AB000080260]. These confirmations amended and restated those originally executed on November 18, 1999.

[52] Section 2, YI Citibank/Yosemite Swaps.

[53] *See id.*

[54] See *id.* Section 3. Citibank received the interest, earnings, periodic fees and other periodic amounts received with respect to the trust investments.   See Appendix A, YI Collateral Security Agreement (definition of "Actual Interest").

[55] An Enron Bankruptcy was defined as "(i) without petition, approval or consent of Enron, a period of 60 days shall have elapsed after the entry of an order for relief under the Bankruptcy Court, or a similar law, by a court of competent jurisdiction or the appointment of a trustee, custodian or receiver for Enron (but the 60 day period did not include any time when the order was stayed on appeal) or (ii) the filing, or consenting or acquiescing to, a petition seeking an order for relief under the Bankruptcy Code by Enron, the making of an assignment for the benefit of creditors by, the consenting to the appointment of a receiver or custodian by Enron or the filing by Enron of a petition seeking, consenting or acquiescing to the granting of relief under any other bankruptcy or insolvency law."   See Appendix A, YI Collateral Security Agreement (definition of "Enron Bankruptcy").

- 12 -

holders of publicly traded senior unsecured corporate obligations of Enron equal in principal amount to the YI Notes would receive as a result of the Enron bankruptcy, or (ii) delivering to Yosemite I Trust "Em-on Investments"[56] in an outstanding amount equal to the outstanding notional amounts of the YI Citibank/Yosemite Swaps ($825 million) less the amount of the YI Certificates ($75 million).[57] In return for settling this swap transaction, Yosemite I Trust had to deliver to Citibank investments held by Yosemite I Trust in an aggregate amount equal to $825 million.[58] Yosemite I Trust secured its obligations under the YI Citibank/Yosemite Swaps by its investments and all other assets of Yosemite I Trust.'"

### Connection between the Credit Linked Notes and the Swap Transactions

Under the Yosemite I Trust Agreement, Yosemite I Trust was not required to disclose to the holders of the YI Notes any information relating to its specific investments absent a default under the YI Indenture.[60] The Yosemite I Trust Agreement, however, did limit the types of investments Yosemite I Trust was permitted to make to:[61] (i) payment obligations supported by Enron,[62] and (ii) other specified high-quality

---

[56] Enron Investments were defined as any payment obligations (or participations therein assigned to Yosemite I Trust by the holder of such obligations) supported in whole or in part, directly or indirectly, by Enron. See id. (definition of "Enron Investment").

[57] See Section 3(c), YI Citibank/Yosemite Swaps.

[58] Id. Pursuant to this transfer provision, Citibank essentially received an amount equal to the claims of the holders of the YI Certificates. See discussion below.

[59] See Section 3.1, YI Collateral Security Agreement.

[60] Section 6.01(b), Yosemite I Base Indenture.

[61] See Section 1.04, Yosemite I Trust Agreement. The definition of Trust Investments contained in Appendix A to the YI Collateral Security Agreement includes "Enron Investments" and "Permitted Investments." Appendix A, YI Collateral Security Agreement.

[62] See Appendix A, YI Collateral Security Agreement (definition of "Enron Investment").

"permitted investments."[63] As a result of these investment limitations, the credit quality of Yosemite I Trust's investments effectively passed through to the credit quality of the YI Notes and YI Certificates, thereby creating the "credit link" to Enron's credit and making the YI Notes and YI Certificates attractive to investors interested in investing in Em-on.

The transaction documents required Yosemite I Trust to acquire permitted investments in an aggregate amount of $825 million on the closing date.[64] Yosemite I Trust did so by making two loans, one to Delta in the amount of $800 million and the other to Enron in the amount of $25 million.

**Delta Loan.** In exchange for the proceeds of the $800 million loan made by Yosemite I Trust to Delta on the closing date,[65] Delta executed an $800 million note (the "YI Delta Note") in favor of Yosemite I Trust.[66] Delta used these loan proceeds to satisfy its initial funding obligations owing under the YI Delta/Citibank Swap and the YI ENA/Delta Swap. The YI Delta Note was to mature on October 27, 2004.[67] Interest

---

[63] The definition of "Permitted Investments" included: (a) securities having either (i) a short term debt rating of "P-l" by Moody's and "A-l+" by S&P's of issuers whose long-term unsecured debt rating is "Aa3" or better by Moody's and "AA-" or better by S&P's and maturing in 45 days or less or (ii) a long term debt rating of "Aaa" by Moody's and "AAA" by S&P's or (b) direct obligations of the United States or agencies thereof. *Id.*

[64] Section 3.6, YI Collateral Security Agreement.

[65] Cross Receipt from Delta to Yosemite I Trust, Nov. 18, 1999 [AB000025949]. Notwithstanding this, the amount of proceeds of the YI Notes actually received by Yosemite I Trust was only $749,797,500 as a result of a purchasers discount of $202,500.  See Memorandum from Yosemite Securities Trust I regarding Flow of Funds Memorandum, dated as of Nov. 18, 1999 (the "YI Flow of Funds Memorandum") [AB000079968-AB000079977]. In addition to this discount, the YI Flow of Funds Memorandum shows that Enron paid Salomon $5,437,500 to cover "co-managers' fees and structuring fees associated with the LEOs issuance." YI Flow of Funds Memorandum, at 4.

[66] YI Base Note.  Interest originally accrued on the YI Base Note at the rate of 6.30% per annum and the YI Base Note was to mature on Jan. 31, 2000. See Section 2 and Annex 1, YI Base Note (definition of "Scheduled Termination Date").

[67] See Section 2(B), YI Note Amendment (definition of "Scheduled Maturity Date").

accrued on the YI Delta Note at the rate of 7.25% per annum and was payable on April 15 and October 15 of each year.[68]   This interest rate reflected the yield Delta received as a result of the $29 million semi-annual payment made by ENA under the Yosemite I Swaps.

As security for its obligations under the YI Delta Note, Delta granted Yosemite I Trust a security interest in the YI ENA/Delta Swap and the YI Enron/Delta Guaranty.[69] Further, the YI Delta Note provided that if an event of default occurred, Delta had the right to satisfy its obligations in full under the YI Delta Note by transferring to Yosemite I Trust "Enron Swap Obligations," a term defined to include any swap to which ENA was a party. [70]

**Enron Loan.**  To evidence the $25 million loan from Delta, Enron executed a note in the original principal amount of $25 million in favor of Yosemite I Trust (the "YI Magic Note").[71]  Accrued interest was payable on April 20 and October 20 of each year[72] and the YI Magic Note was scheduled to mature on November 8, 2004.[73]  Em-on referred to this note as "magic" because the amount of each interest payment was

---

[68] YI Note Amendment, at 1.  Actually, the proceeds of the YI Delta Note went directly to Citibank in the amount of the closing payment under the YI ENA/Citibank Swap to be made by Citibank to ENA, and to ENA, in the amount of the closing payment to be paid by Delta to  ENA under the  YI Original ENA/Delta Swap. See discussion above.

[69] See Section 19, YI Base Note; see *also* Section 2(B), YI Note Amendment. This security interest does not seem to have extended the rights of Delta to any termination claims under the YI ENA/Citibank Swap which might have been acquired by Delta in connection with the termination of the YI Delta/Citibank Swap. Section 2(B), YI Note Amendment.

[70] Section 2(c) and Annex 1, YI Base Note. This included any swap to which ENA was a counterparty. *Id.*

[71] YI Magic Note. Actually, the funds flow statements show that Enron received proceeds of $24,797,500. This difference of $202,500 is equal to the original purchasers discount (the note face amount − the proceeds actually received) described above.   See Memorandum from Yosemite Securities Trust I regarding Trust Investment Settlement Memorandum (the "YI Trust Investment Settlement Memorandum") [AB000079979-AB000079984].

[72] YI Magic Note, at 1.

[73] *Id.* at 1.

- 15 -

designed to equal the amount by which the total amount due from Citibank under the YI Citibank/Yosemite Swaps (interest paid on the YI Notes and YI Certificates)[74] exceeded the aggregate scheduled interest receipts on the investments held by Yosemite I Trust (namely the interest paid on the Delta Note).[75]

### C.  Settlement Mechanics of the Various Swap Transactions Upon Termination

*YI ENA/Citibank Swap Termination*

In addition to other events, an Enron bankruptcy would give Citibank the right to terminate the YI ENA/Citibank Swap.[76]  By notice to ENA upon the occurrence of such an event, Citibank could designate a specific date as an "Early Termination Date" of the YI ENA/Citibank Swap.[77]  Upon early termination of the YI ENA/Citibank Swap, the parties were no longer required to make periodic payments,[78] and ENA would be required to pay to Citibank the same amounts payable at the scheduled maturity of the swap (i.e., the amount, if any, by which $800 million exceeded the value of the specified number of

---

[74] See Section 2, YI Citibank/Yosemite Swap. This amount would be paid by ENA to Yosemite I Trust which would, in turn, pay it over to Citibank under the terms of the YI Citibank/Yosemite Swaps. *Id.* The result is that the payments under the YI Citibank/Yosemite Swaps netted out and no money would actually change hands.

[75] YI Magic Note, at 1.

[76] See Sections S(a)(i), (iii) and (vii), ENA/Citibank Master Agreement. The ENA/Citibank Master Agreement provided that an Event of Default occurred under the YI ENA/Citibank Swap if any of those events occurred with respect to any party to that agreement or to any credit support provider.   Enron was named the "Credit Support Provider" for ENA. See Schedule, ENA/Citibank Master Agreement at Part 4, Section 9. The bankruptcy of ENA or Enron would result in the automatic early termination of the YI ENA/Citibank Swap if such event was designated an "Automatic Early Termination" event under the schedule to ENA/Citibank Master Agreement. See Section 6(a), ENA/Citibank Master Agreement. However, the bankruptcy of Em-on or ENA was not an "Automatic Early Termination" event unless such bankruptcy was "governed by a system of law which does not permit termination to take place after the occurrence of the [bankruptcy]." See Schedule, ENA/Citibank Master Agreement at Part 1, (8).

[77] Section 6, ENA/Citibank Master Agreement.

[78] See id. Section 6(c).

- 16 -

barrels priced at a current market price).[79]

### YI  ENA/Delta Swap Termination

The termination provisions of the YI  ENA/Delta Swap were identical to those of the YI ENA/Citibank Swap.[80]  Thus, the bankruptcy of ENA or Enron gave Delta the right to terminate the YI ENA/Delta Swap early by notice to ENA.[81]    Like the YI ENA/Citibank Swap, upon early termination of the YI ENA/Delta Swap, the parties were no longer required to make periodic payments[82] and ENA would be required to pay to Delta (and Delta would be required to pay to ENA), the same amounts payable at the scheduled maturity of the swap.   In the case of ENA, this equaled the lesser of $800 million and the value of the specified number of barrels of oil priced at a current market price.[83]

### YI  Delta/Citibank Swap Termination

To avoid a situation where Delta and Citibank would have obligations owing to each other under the YI Delta/Citibank Swap at a time when both the YI ENA/Delta Swap and the YI ENA/Citibank Swap had terminated, Citibank wanted to include a cross-default to the YI ENA/Delta Swap. Enron objected to such a cross-default because it would jeopardize Enron's desired accounting treatment of the swaps.[84]    As a compromise, the YI Delta/Citibank Swap provided that if any "Material Commodity

---

[79] See Section 7, YI ENA/Citibank Swap (definition of "Cancellation Date").

[80] **Compare** Sections 5(a)(i), (iii), (vii) and 6(a), ENA/Delta Master Agreement *with* Section 5(a)(i), (ii), (vii) and 6(a), ENA/Citibank Master Agreement.   See Schedule, ENA/Delta Master Agreement at Part 4, Section 8, Part 1, (10).

[81] See Section 6(a), ENA/Delta Master Agreement.

[82] **Compare** Section 6(c), ENA/Delta Master Agreement, *with* Section 6(c), ENA/Citibank Master Agreement.

[83] See Section 6, YI ENA/Delta Swap (definition of "Cancellation Date").

[84] Caplan Interview; See **also** Andersen Prepaid Transactions Discussion.

Transaction" (defined as a commodity transaction to which Delta was a party having an initial notional amount or strike price in excess of $250 million)[85] terminated early, then the YI Delta/Citibank Swap terminated automatically and without further action by the parties.[86] Given the notional amount of the YI ENA/Delta Swap, it would qualify as a Material Commodity Transaction, thereby achieving the desired cross-default as a practical matter.[87]

The YI Delta/Citibank Swap provided that upon its early termination, Citibank could transfer to Delta "Enron Swap Obligations" (a term defined to include swap obligations of ENA)[88] in complete satisfaction of all of its obligations under the YI Delta/Citibank Swap.[89] As a result, Citibank could tender to Delta ENA's obligations owing to Citibank under the YI ENA/Citibank Swap, thereby extinguishing the YI Delta/Citibank Swap and collapsing the triangle created by the Yosemite I Swaps.

*YI Citibank/Yosemite Swaps and the Simultaneous Settlement Agreement*

Upon the occurrence of an Enron bankruptcy, Citibank had the option to either settle the YI Citibank/Yosemite Swaps in cash or effect a physical settlement. A cash settlement of the YI Citibank/Yosemite Swaps would require that Citibank pay to Yosemite I Trust an amount equal to the recovery percentage received by holders of the publicly traded senior unsecured corporate obligations of Enron as a result of the Enron

---

[85] See Section 9(h), YI Delta/Citibank Swap (definition of "Material Commodity Transaction"),

[86] See *id.* Section 9(h).

[87] In the context of the Yosemite I transaction, an Enron employee acknowledged that this provision was intended to be a cross-default. See Email to E. Moser, from Carol St. Clair, Enron, Nov. 14, 1999 (the "Enron/Milbank Email") [AB025202884-AB025202885].

[88] Section 8(b), YI Delta/Citibank Swap.

[89] *Id.* In connection with the termination of the Yosemite I Swap Transactions, this did occur. Delta then transferred these termination claims to Yosemite I Trust in satisfaction of the YI Delta Note, as discussed under the Section entitled *Collapse of the Transactions* below.

Bankruptcy multiplied by the outstanding amount of the YI Notes plus accrued interest to the date of settlement." In return, Yosemite I Trust agreed to pay to Citibank the recovery percentage of the "Em-on Investment"[91] resulting from the Enron Bankruptcy, multiplied by $825 million, plus interest to the date of settlement, accrued at the rate at which Citibank would have been required to pay interest to Yosemite I Trust pursuant to the terms of the YI Citibank/Yosemite Swaps had the Em-on Bankruptcy not occurred.[92] These provisions, together with the set-off and netting provisions, would have resulted in Yosemite I Trust receiving an amount equal to the amount that would have been distributed to holders of senior unsecured obligations of Enron in the amount of the YI Notes and Citibank receiving an amount equal to the amount that would have been recovered by the holders of the YI Certificates had they been Enron securities.

Alternatively, Citibank had the right under the YI Citibank/Yosemite Swaps to settle by physical delivery. In that case, Citibank was required to deliver "Enron Investments"[93] to Yosemite I Trust in an outstanding amount equal to the outstanding notional amounts of the YI Citibank/Yosemite Swaps ($825 million) less the amount of the YI Certificates ($75 million)[94] and, in return, Yosemite I Trust would be required to

---

[90] Section 3, YI Citibank/Yosemite Swaps.

[91] The YI ENA/Citibank Swap and YI ENA/Delta Swap would qualify. See Appendix A, YI Collateral Security Agreement (definition of "Enron Investment").

[92] In the event of an Enron Bankruptcy, the YI Citibank/Yosemite Swaps provided that upon the delivery of the notice of the bankruptcy by either party to the other, the YI Citibank/Yosemite Swaps would automatically cash settle. However, prior to the cash settlement, Citibank still had the right to elect a physical settlement of the YI Citibank/Yosemite Swaps. Section 3(a)(ii), YI Citibank/Yosemite Swaps.

[93] "Enron Investments" were defined as any payment obligations (or participations therein assigned to Yosemite I Trust by the holder of such obligations) supported in whole or in part, directly or indirectly by Enron. Appendix A, YI Collateral Security Agreement (definition of "Enron Investment").

[94] Section 3(c), YI Citibank/Yosemite Swaps.

deliver to Citibank investments held by Yosemite I Trust in an outstanding amount equal to $825 million.[95]

Upon physical settlement of the YI Yosemite/Citibank Swaps, Citibank would receive $825 million of Yosemite I Trust's investments, which would include the Delta Note. In exchange, Citibank would have to deliver to Yosemite I Trust "Enron Investments" (a term defined to include obligations owing by ENA under the YI ENA/Delta Swap and the YI ENA/Citibank Swap).[96] As noted above, Delta could satisfy its obligations under the Delta Note by tendering obligations owing by ENA under the YI ENA/Delta Swap and the YI ENA/Citibank Swap (which Citibank could tender to Delta in satisfaction of its obligations to Delta under the YI Delta/Citibank Swap). If Delta did so and Citibank had elected to physically settle the YI Yosemite/Citibank Swaps, then Citibank would receive the obligations owing by ENA under the YI ENA/Delta Swap and the YI ENA/Citibank Swap tendered by Delta in satisfaction of the Delta Note. Citibank could then tender these obligations constituting "Enron Investments" to Yosemite I Trust to physically settle the YI Yosemite/Citibank Swaps.

To simplify this settlement process, Yosemite I Trust and Citibank entered into the Simultaneous Settlement Agreement (the "Simultaneous Settlement Agreement").[97] The Simultaneous Settlement Agreement provided that in the event of an Enron Bankruptcy or an Enron Investment Default Event,[98] Delta would deliver to Yosemite I

---

[95] **Id.**  Pursuant to this transfer provision, Citibank essentially received an amount equal to the claims of the holders of the YI Certificates.

[96]  Appendix A, YI Collateral Security Agreement (definition of "Enron Investment").

[97]  Agreement among Yosemite I Trust, Citibank, and USTNY, dated as of Nov. 18, 1999 (the "YI Simultaneous Settlement Agreement") [AB000026325-AB000026328].

[98] Defined as a failure to pay by Enron with respect to the YI Magic Note. Appendix A, YI Collateral Security Agreement (definition of "Enron Investment Default Event").

Trust all of Delta's right to claims against ENA under the YI ENA/Delta Swap and YI ENA/Citibank Swap in an amount equal to the amount required to be delivered by Citibank to Yosemite I Trust in settlement of the YI Citibank/Yosemite Swaps. In such event, Citibank would be deemed to have delivered to Yosemite I Trust those same claims in satisfaction of the requirement that it effect a physical settlement of the YI Citibank/Yosemite Swaps.'" In addition, Delta agreed to deliver to Citibank any remaining termination claims it had under the YI ENA/Delta Swap and YI ENA/Citibank Swap and any other trust investments.'"

*Collapse of the Transactions*

Citibank gave notice January 31, 2002 that it intended to physically settle the YI Citibank/Yosemite Swaps as a result of Enron's Bankruptcy.'"  Subsequently, on February 8, 2002 and as contemplated by the Simultaneous Settlement Agreement, Citibank, Delta and Yosemite I Trust entered into an Assignment and Settlement Agreement [102] pursuant to which: (i) Delta assigned to Yosemite I Trust termination claims against ENA in the amount of $725,234,022.99 under the YI ENA/Delta Swap and $28,547,227.01 in termination claims owing by ENA under the YI ENA/Citibank Swap; and (ii) Delta assigned to Citibank termination claims against ENA in the amount of $58,009,074 under the YI ENA/Delta Swap and $2,283,398.40 under the

---

[99] YI Simultaneous Settlement Agreement, at 1. See *also* Annex I, YI Delta Note (definition of "Enron Swaps").

[100] YI Simultaneous Settlement Agreement, at 1.

[101] Notice of Intended Physical Settlement from Citibank to Yosemite I Trust and USTNY, dated Jan. 31, 2002, at 2 [AB024400210-AB024400212].

[102] Assignment and Settlement Agreement among Citibank, Yosemite I Trust, and Delta, Feb. 8, 2002 [AB024400203-AB024400208].

YI ENA/Citibank Swap.[103]    In addition, Yosemite I Trust assigned to Citibank the

YI Magic Note.[104]

The net results of these settlement transactions were as follows:

- All of the Yosemite I Swaps were terminated;

- The YI Delta/Citibank Swap was settled by Citibank tendering to Delta the YI ENA/Delta Swap;

- Delta was relieved of its obligation under the YI Delta Note by tendering the YI ENA/Delta Swap and the YI Delta/Citibank Swap and by doing so was effectively removed from the transactions;

- The YI Citibank/Yosemite Swaps were settled as contemplated by the Simultaneous Settlement Agreement;

- Citibank became the holder of (i) termination claims in the amount of $58,009,074 under the YI ENA/Delta Swap and $2,283,398.40 under the YI ENA/Citibank Swap and (ii) the YI Magic Note; and

- Yosemite I Trust became the holder of termination claims in the amount of $725,234,022.99 under the YI ENA/Delta Swap and $28,547,227.01 under the YI ENA/Citibank Swap.

---

[103] **Id.** Section 1.

[104] Letter from Yosemite I Trust to ENA and Enron, Feb. 8, 2002 [AB024400213-AB024400214].

### III. ECONOMICS AND ALLOCATION OF RISK IN THE YOSEMITE I TRANSACTION

In economic substance, Yosemite I was a loan from Delta to ENA of $800 million. Total upfront payments to ENA under the Yosemite I Swaps were approximately $800 million ($706 million directly from Delta and $94 million indirectly from Delta through Citibank). ENA made semiannual payments of $29 million to Delta (indirectly through Citibank) and at maturity, ENA was required to make a total of $800 million in net payments to Delta (with some of the payments possibly being made through Citibank depending on the market price of oil).[105] Economically, this portion of the transaction can be characterized as an interest-only loan from Delta to Enron, accruing interest at a per annum rate equal to 7.25% (the same interest rate payable by Delta to Yosemite I Trust under the YI Delta Note).

The circle of commodity transfers in Yosemite I resulted in the elimination of commodity price risk from the transaction. The only risk remaining was Delta's exposure to ENA's credit risk. Delta's right to satisfy its obligations under the YI Delta Note by transferring to Yosemite I Trust "Enron Swap Obligations" had the effect of transferring this exposure to Yosemite I Trust and, therefore, to the holders of the YI Notes and YI Certificates.

---

[105] Note that any shortfall in the final payment due to Citibank from ENA because of lower oil prices was made up by the final difference payment that ENA made to the Delta entity, which passed the funds on to Citibank. In other words, the price of oil had no effect on the aggregate net amount paid by ENA.

## IV.    LEGAL ISSUES IN THE YOSEMITE I TRANSACTION

This Annex will not discuss potential legal issues, which include principles of equitable subordination, third-party culpability (including culpability of any officer, director, professional or financial institution), avoidance claims, or other potential affirmative claims of the Debtors' estates. The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[106]

---

[106] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## V.     ACCOUNTING ISSUES IN THE YOSEMITE I TRANSACTION

The accounting issues raised by Yosemite I are addressed in detail in Appendix E (Prepay Transactions) to which this Annex is attached.

## VI.    ROLE OF CITIBANK IN THE YOSEMITE I TRANSACTION

Citibank had an understanding of many facets of the Prepay Transactions. It understood both how Enron accounted for these transactions and the importance of structuring these transactions to achieve Enron's desired accounting treatment. It was actively engaged in structuring these transactions for Em-on and others and marketed its expertise in the area. When the lenders that generally financed Em-on's various structured transactions began to reach their credit limits, Citibank developed the Yosemite Transaction structure, thereby assisting Enron to access the institutional investor market and freeing bank credit capacity that Enron could use for other financings. Nevertheless, Citibank also clearly recognized that the Prepay Transactions were loans in economic substance. Citibank referred to them as loans in numerous internal documents and treated them as such for its own accounting purposes.

### A.    Knowledge of Em-on's Accounting Treatment

Citibank knew how Enron accounted for prepay transactions and the effect such accounting had on Enron's reported financial condition. A 1998 Citibank internal credit approval memorandum stated that, "[t]he prepaid forward structure will allow Enron to raise funds without classifying the proceeds from this transaction [Yosemite I] as debt (it is accounted for as 'deferred revenue')."[107] Minutes from a meeting of Citibank's Capital Markets Approval Committee, at which the committee considered an approximately $500 million prepaid oil transaction with Enron, contained the following summary of the accounting:

---

[107] Citicorp Global Loans Approval Memorandum, Dec. 21, 1998, at 7 [AB000153274-AB000153283].

The transaction provides favorable accounting treatment for the customer. Although the deal is effectively a loan, the form of the transaction would allow the customer to reflect it as "liabilities from price risk management activity" on their on their [sic] balance sheet and also provide a favourable impact on reported cash flow from operations. [108]

An internally prepared summary of Citibank's exposure to Enron credit as of October 2001 observed the following about Enron's accounting for prepay transactions:

This form of financing is advantageous to Enron in that it allows the borrowing to be reported as "price risk management" liability rather than debt. In addition, because of the way Enron classifies trading assets/liabilities on the balance sheet, the amount of the borrowing actually is recorded as cash from operations.[109]

A Citibank presentation stated the effects of Enron's accounting treatment for prepay transactions in simple, straightforward terms:

As we understand the accounting, the Pre-Paid creates price risk management liability, thereby receiving non-"D" debt treatment. Operating cash flow increases, helping to offset the current 'disconnect' between book and cash earnings.[110]

When counseling a Citibank officer on how to explain the Yosemite structure, Steve Wagman, a managing director at Salomon who was involved with the Yosemite Transactions, provided the following somewhat cryptic yet insightful description of Enron's accounting for prepay transactions:

First I would go through the prepaid on a stand alone basis. Get into why co [Em-on] does it (gets cash flow, shows up as other liab not debt, cflow [cash flow] helps to avoid large revenues (due to MTM gains going through I/S [income statement]) with no cash flow.. . i.e. Gives some

---

[108] Minutes of Citibank CMAC, June 22, 1999 (the "CMAC Minutes"), at 2 [AB0005 12667-AB0005 126681.

[109] Citibank Exposure Memo.

[110] Citigroup Summary of Pre-Paid Accounting and Tax, June 25, 2001 [AB000153416].

oomph to revenues . . . . E gets money that gives them cflow but does not show up on books as big D Debt.'"

Indicative of Citibank's understanding of Enron's accounting for prepay transactions was its application of the reverse of the accounting treatment to benefit one of its other customers. In an internal email to another Citibank officer considering doing a prepay transaction with this customer, Mr. Wagman said the following:

> [T]he ene prepaid we just did, which all signed off on -- i would like to propose the same trade but in reverse to [the customer] -- i don't think anyone here will have the concerns they had before given its the same structure we just did with enron which had the effect of improving cash flow from ops and increasing price risk mgt liab -- now reversed -- the business argument here is that [the customer has] plenty of cash flow now and this shifts out of cash flow from ops and into price risk management asset on b/s -- it seems to me that if it is ok one way, it has to be ok the other way as well.. .[112]

Citibank understood that when a prepay transaction was being refinanced, the refinancing had to be effected through a similar transaction to preserve the desired accounting.    Jim Reilly, the Citibank officer responsible for the maintenance of Citibank's overall relationship with Enron, stated in an internal email that "[Enron does] not wish to repay Roosevelt without full corresponding refinancing and they were unable, with all else that has been going on, to arrange the crude oil refinancing piece in time (the prepaids go into their commodity 'book' so repaying requires a [sic] offsetting deal to keep the 'book' in balance).'" [13]  Mr. Reilly made the following similar statement in an

---

[111] Email from Steve Wagman, Citibank, to Azfar Hashmi, Citibank, Sept. 28, 2000 (the "Wagman 9/2000 Email") [AB000153284]; see also Email from James F. Reilly, Citibank, to Thomas Stott, Citibank,. et al., Apr. 19, 1999 [PSI00339090].

[112] Email from Steve Wagman, Citibank, to Paul B. Deards, Citibank, June 29, 2001 (the "Wagman Email") [CITI-B 02011241.

[113] Email from James F. Reilly, Citibank, to Thomas Stott, et al., Citibank, Apr. 19, 1999 [PSI00339090-PSI00339090].

internal email sent a few days later, "generally the refinancings must also be commodity-based to ensure that the Enron risk book remains balanced."[114]

Not only was Citibank aware of Enron's accounting treatment afforded prepay transactions, they were sensitive to its importance to Enron. An internal memorandum prepared by Salomon stated, "The primary purpose of this transaction [Yosemite IV][115] is to permit Enron to refinance certain borrowings, with proceeds from the Offering, while allowing Em-on to maintain the advantageous accounting and rating agency treatment of these financings."[116] Internal communications among Citibank officers show their awareness of Enron's reliance on this accounting treatment for Enron's continued success. One internal email states, "[t]here is no question that Enron cashflow has become more dependent on Price Management Activities."[117] Citibank knew that Enron executed prepay transactions to increase cash flows from operating activities for reporting purposes. In November 1999, a Citibank officer wrote that Enron needed a proposed prepay transaction "by year-end as the deal generates count [sic] as operational funds flow which will evidently till a gap left by certain European projects/contracts."["*

---

[114] Email from James F. Reilly, Citibank, to Thomas Stott, Citibank, *et al.*, Apr. 27, 1999 [PSI00339097].

[115] See Report, Annex 5 to Appendix E (Prepay Transactions).

[116] Salomon Credit Committee Memo, Apr. 16, 2001 (the "SSB 4/16/01 Credit Committee Memo"), at 6 [AB000153365-AB000153371].

[117] Email from William Fox, Citibank, to Thomas Stott, Citibank, Apr. 18, 2001 [AB000153417].

[118] Email from Neils Kirk, Citibank, to James F. Reilly, Citibank, Nov. 5, 1999 [AB000153419-AB000153420].

**B.**      **Characterization of Prepay Transactions as Loans**

*Citibank's Recognition that Prepay Transactions Were Loans*

Citibank considered the Yosemite Transactions to be the economic equivalents of

loans:

- A September 2000 Citibank email summarizing Enron's accounting for prepay transactions contained the following succinct recognition of the economic reality of prepay transactions as loans: "oil goes in a circle [sic] so they all cancel.. . .net net economically like a loan.""[119]"

- An internal Citigroup memorandum summarizing Enron's capital market exposure with Citigroup described a June 2001 prepay with Enron in clear and simple terms: "[t]his is economically a loan, but it was set up via pre paid commodity forwards."[120] That same memorandum stated, "[t]hey must pay the loan back with interest in December of this year."[121]

- Minutes from a meeting of Citibank's Capital Markets Approval Committee considering a $500 million prepaid oil transaction with Enron contained the following statement: "[a]dditionally, the internal approval for the transaction will acknowledge the fact that we were basically making a loan to [Em-on] ."[122]

- An internal email discussing the Roosevelt prepay transaction noted, "The commodity delivery schedule is hedged to ensure that the price realized on the ultimate sale of the commodities is sufficient to retire the loan."[123]

- Describing one of the Yosemite Transactions, a Citibank officer stated, "Essentially, the transaction amounts to a prepaid loan in the form of a swap by the Trust to Enron with repayment based on commodities prices."[124]

---

[119] Wagman 9/2000 Email.

[120] Citibank Exposure Memo, at 1.

[121] *Id.*

[122] CMAC Minutes, at 2.

[123] Email from James F. Reilly, Citibank, to Thomas Stott, Citibank, et *al.,* Apr. 27, 1999 [PSI00339097].

[124] Email from Rick Caplan, Citibank, to Saul Bernstein, Citibank, Sept. 24, 1999 [CITI-B0146815].

- Discussing Yosemite I, an internal transaction memorandum referred to the "Principal" of the prepay and the related "Interest cost."[125]

- Hand written notes on an email describing the Yosemite II transaction acknowledged, "Really, prepay is a <u>loan</u> anyway."[126]

- A Citibank chart detailing the flow of funds for the closing of the Yosemite IV transaction indicated that Enron would receive "Em-on Loan Amount Less Swap Premium."[127]

- An internal email discussing exposure under a prepay transaction described the structure of the transaction as "Citibank borrows $475 and simultaneously loan [sic] counterparty $475mm and they are to repay the principal in 5 years.. , ."[128]

*Citibank's Internal Accounting of Prepay Transactions as Loans*

An email exchange between Citibank employees indicates that Citibank accounted for the Yosemite Transactions as loans rather than derivatives. One portion of the exchange contained the following observations:

> The CLN does not make direct reference to the prepaid swap, but rather to deliverable obligations of Em-on.. . (DEO). This protection is against the whole prepaid swap *(loan)* or other DEOs, not against a sold default swap position imbedded in the prepaid swap. The bank has a *funded exposure,* not a sold credit derivative, or a synthetic long position. I would not encourage bifurcating a sold DS from the loan, If not for SFAS 133, I would not bifurcate the default swap from the CLN, because I believe it makes more sense to follow the current banking book accounting treatment today when they purchase protection – i.e., accrual accounting.

---

[125] Citibank Transaction Memorandum: Project Yosemite $[1.5] Billion Credit Default Swap Structure Referencing Enron Corp., Oct. 1, 1999 (the "Project Yosemite Transaction Memo"), at 7 [PSI00336290-PSI00336298].

[126] Email from Tom Francois, Citibank, to Adam Kulick, *et* al., Citibank, Nov. 22, 1999 (emphasis in original) [CITI-B0145690-CITI-B0145692].

[127] USD Enron Credit Linked Notes II Closing Flows (Citibank prepared detail of Yosemite IV Cash Flow, May 24, 2001), at 3 [CITI-B0215207-CITI-B02 152121.

[128] Email from Timothy Swanson, Citibank, to David Lamb, Citibank, May 21, 2001 [CITI-B0035773-CITI-B0035774]. The actual text of the email does not refer to Enron, however, handwritten notes on the copy of the email provided by Citibank make several references to "ENE."

> Because this prepaid swap is part of a structured transaction, my impression is that we are not holding this loan for short-term profit opportunity. Also, my impression is that there would not be much of a secondary loan trading market for this customized prepaid swap which is protected by the CLN. If this loan was purchased in the secondary market, maybe we could then view it as a trading asset. [129]

In an email to others at Citibank involved with the Yosemite Transactions, anticipating the effectiveness of FAS 133, the recipient of the above email advised:

> In summary, under SFAS 133 . . . we would no longer be able to mark to market the prepaid swap because it fails to qualify as a derivative. As a result, we would have to apply loan/accrual accounting for the prepaid. [130]

The following year, Citibank reconsidered the accounting of the Yosemite Transactions and concluded that accrual accounting should continue to be applied. The writer of the prior email subsequently wrote the following:

> [T]he Enron Credit Linked Note transactions do not contain net commodities exposure. After discussing the characteristics of the Enron transactions with him again, Saul's position was that we should continue to use accrual accounting because the desk does not take any commodities risk in the trade structure, that the desk is not aiming for short term profits from trading prepaid energy swaps and that the commodities exposure is hedged within the structure with counterparties that have a relationship with each other. [131]

*Consideration of Prepays When Determining Exposure to Enron*

In reviewing Enron's financial condition, Citibank included its exposure to Enron under prepay transactions when determining its overall exposure to Enron credit risk. For example, when Enron used the proceeds generated by Yosemite I to retire two existing

---

[129] Email from Saul Bernstein, Citibank, to Andrew P. Lee, Citibank, et al., Nov. 10, 2000 [CITI-B0035710-CITI-B0035711].

[130] Email from Andrew P. Lee, Citibank, to Rick Caplan, Citibank, and Amanda Angelini, Citibank, Nov. 16, 2000 [CITI-B0035709].

[131] Email from Andrew P. Lee, Citibank, to Rick Caplan, Citibank, and Amanda Angelini, Citibank, Aug. 10, 2001 (referring to Saul Bernstein, Citibank accounting) [PSI00324505].

prepay transactions funded by Citibank known as "Roosevelt" and "Truman,"[132] a Citibank employee remarked that Em-on was within Citibank's internally imposed credit limit for Enron "for the first time in years."[133]   The retirement of those prepay transactions was described as follows: "[o]n November 17 Enron repaid our Roosevelt prepaid, reducing our Em-on exposure by roughly $130MM. On November 18, they repaid our Truman prepaid, further reducing exposure by approximately $400MM."[134] In anticipation of Enron's application of proceeds received by Enron from the closing of the Yosemite II transaction,[135] a Citibank employee wrote:

> Today SSB successfully sold the sterling 200MM Yosemite 2 bonds. Funds are to be received by Enron on 2/23. Proceeds for Yosemite 2 are earmarked to repay a series of prepaid oil transactions currently held by three banks, including Citi. For us, Yosemite 2 will retire the $126MM in exposure under the 'Nixon' prepaid transaction.[136]

A review of Citibank's exposure to Enron undertaken just prior to the Petition Date included $4.997 billion of "Prepaids" in "Total Obligations" and observed that there were no assets that could be paired with those obligations to help offset the amount of the exposure.[137]

---

[132] See Dec. 1999 Citibank Approval Memo, at 2.

[133] Email from James F. Reilly, Citibank, to Neils Kirk, Citibank, Nov. 9, 1999 [AB000153419-AB000153420].

[134] Email from James F. Reilly, Citibank, to H-Onno Ruding, Citibank, et al., Nov. 19, 1999 [CITI-B0132215].

[135] See Report, Annex 3 to Appendix E (Prepay Transactions).

[136] Email from James F. Reilly, Citibank, to H-Onno Ruding, Citibank, et al., Feb. 15, 2000 [PSI00339103].

[137] Enron Valuation & Exposure, Nov. 27, 2001, at 4 (prepared by Citibank) [CITI-B0141367-CITI-B0141378].

## C.    Facilitation of Enron's Accounting Treatment

*Development of the Yosemite Transaction Structure*

In late 1998 or early 1999, Em-on began to experience "restriction in the capacity of the bank market to absorb Em-on credit risk"[138] imbedded in its various forms of off-balance sheet financings, tax-efficient financings and cost-effective equity financings.[139] Citibank assisted with the solution to this problem by developing the Yosemite Transaction structure as a way for Enron to transfer existing Enron credit risk from the bank market to the broader capital markets.[140] The Yosemite structure utilized a credit default swap to free lender capacity by transferring the Enron credit risk created under an existing structured financing to the Yosemite trust in exchange for the credit risk of the investments held by that trust (typically high quality investments).

In a series of "Frequently Asked Questions" prepared by Salomon, the basic purpose of the Yosemite structure was stated as: "Yosemite allows Em-on to take advantage of the flexibility provided by banks in structuring complex financings while placing pure long dated credit risk in the capital markets."[141] A presentation prepared by Citibank and outlining several credit derivatives transactions executed by Citibank and its affiliates provided the following more detailed description of the Yosemite structure and its desired effect of shifting credit risk from the bank market to the capital markets:

---

[138] Transaction Memorandum regarding Enron Project Yosemite, $500MM-$1,500MMM Default Swap and Credit Linked Note, Apr. 6, 1999 (the "Yosemite Transaction Memo"), at 1 (Citibank credit approval memorandum) [AB000512691-AB000512695].

[139] *Id.*

[140] Brown Interview.

[141] Yosemite Securities Trust I Linked Enron Obligations (LEOs) Frequently Asked Questions, Oct. 29, 1999, at 1 [AB024400231-AB024400233]

A unique credit derivatives/144A issuance/securitization structure that enables Enron to execute structured bank financings while Citibank places the credit risk of the financing into the capital markets. Yosemite enables Citibank to place each of the structural risk and credit risk of a structured bank financing into the market that is best suited to absorb it-structural risk in the bank market and credit risk in the capital markets. Consequently, Enron can employ the financial flexibility of bank financings without being constrained by the credit appetites of banks. [142]

When describing the shifting of credit risk effected by the Yosemite structure, an internal Citibank memorandum summarized the benefits as follows: "The purpose of the Yosemite transaction is to enable Enron to create additional credit capacity for itself in the bank market by shifting Enron credit risk from the bank market to the capital markets without affecting existing rating agency and accounting treatment of the Enron Structured Debt."[143]

In addition to shifting credit risk to the broader capital markets and preserving the existing accounting treatment, Enron's other desired objectives of the Yosemite structure included:

1.    Increase bank credit capacity;

2.    Maintenance of existing balance sheet treatment of transactions;
      * * *

6.    Minimize rating agency disclosure;
      * * *

---

[142] Sample of Recent Credit Derivatives Transactions Executed by Citigroup, Mar. 29, 2002 (Citibank PowerPoint presentation), at 10 [PSI00389287-PSI00389307]. The risk retained by the bank or syndicate of the banks involved in the underlying structured transaction, referred to as "basis risk," included risks such as casualty risk and political risk, and determined the pricing of a given credit default swap. Caplan Interview; See Project Yosemite: Implications of Basis Risk When Taken by Various Parties, May 24, 1999 ("Basis Risk Memo") (author unclear) [AB024400937].

[143] Transaction Memorandum regarding Project Yosemite, $0.5 Billion Credit Default Swap Structure Referencing Enron Corp., Oct. 1, 1999, at 1 (Citibank credit approval memorandum) [PSI00336290-PSI00336293].

9. Maintain bank group in existing deals. Ideally, banks who are not top tier participants in deals will be unaware of the "sale" of the existing positions of top tier banks. . . [144]

As discussed above, the governing documents for the Yosemite structure prevented investors in the Yosemite Transactions from knowing the specifics of the Em-on credit risk to which they were being exposed. Em-on referred to this feature as the "black box."[145] A presentation regarding the Yosemite structure prepared jointly by Citibank and Salomon contained several references to this so-called "black box":

- Benefits of CLNs include: . . . Eliminates the need for Capital Market disclosure, keeping structure mechanics private.

- SPV Investments purchased by the SPV are unknown to the investors and the rating agencies.

- Allows structured transaction access to the Capital Markets . . . [h]owever, structure remains private – no Capital Markets disclosure.

- Capital markets look to the credit swap and do not see the structures.[146]

This feature apparently increased the efficiency of the closing of a Yosemite-type transaction because it eliminated the need for investor due diligence on any associated structured financing. This feature, however, also meant that the Rating Agencies who rated the securities issued by the Yosemite trusts would not be afforded the opportunity to review the underlying structured financings.

Citibank and Enron designed the Yosemite structure to be suitable for transferring credit risks associated with a variety of existing structured financings, but settled on prepay transactions. This choice was in part because of the low basis risk presented by a

---

[144] *Id.*

[145] Yosemite Update (the "Yosemite Update Presentation"), at 1 (PowerPoint presentation) [AB000512325-AB000512337].

[146] Citibank/Salomon Credit-Linked Notes ('CLNs'), May 2001, at 25-37 (the "May 2001 CLN Presentation") (PowerPoint presentation) [AB000153325-AB000153340].

prepay transaction and the ease with which the structure of a prepay transaction could be modified to fit with the Yosemite structure.[147] The choice also appears to have been motivated by Enron's desire to generate significant levels of cash flow from operations, which would include the cash generated by prepay transactions given Enron's applicable method of accounting. An internal Enron presentation providing an update on the progress of the development of the Yosemite structure states, "[n]eed for prepay financings to generate FFO are anticipated to be ~$1Bn/yr."[148] The presentation then makes the following points:

> Yosemite provides distinct advantages in conjunction with a prepay:
>
> - A longer-dated prepay (10+ years) can be accommodated within Yosemite to eliminate refinancing risk without any incremental costs other than the normal bond tenor costs
>
> - A new prepay model has been developed to fit within the Yosemite structure which eliminates the need for any commodity swap exposure
>
> - Disclosure of the prepay transaction would be limited to Citibank[149]

Citibank understood that Enron's need to engage in prepay transactions generating these levels of cash flows from operating activities resulted from Enron's desire to satisfy the Rating Agencies' expectation that Enron monetize its assets." Notwithstanding customary confidentiality arrangements in place between Enron and Citibank, Em-on had such a high level of concern that the Rating Agencies might learn

---

[147] Caplan Interview; Basis Risk Memo.

[148] Yosemite Update Presentation, at 3.

[149] *Id.* at 12.

[150] Caplan Interview.

that the Yosemite structures were to fund prepay transactions, that Em-on specifically asked Citibank not to discuss these prepay transactions with the Rating Agencies.‟

*Delta*

Citibank also facilitated Enron's prepay transactions with the use of Delta. Although in fact it may not have been necessary for the conduit entity in Enron's prepay transaction structures to be independent from the financial institution in order to achieve Em-on's desired accounting treatment, both Andersen and Enron believed that to be the case. Thus, it was important to Em-on that Citibank provide this service.

Although Citibank did not own Delta,[152] it appears that Citibank effectively controlled it. Delta was a Cayman Islands corporation,[153] established at Citibank's request for the purpose of serving as a counterparty in physically settled prepaid forward commodities transactions. At that time, Citibank could not take physical delivery of commodities due to regulatory restrictions.[154]  On various occasions, Citibank paid the administrative costs--including registration fees--relating to Delta, its attorneys' fees (including Delta's legal fees incurred in connection with the unwinding of the Yosemite Transactions after the Petition Date), and Delta's transaction fees.[155] Additionally, forms establishing a Citibank bank account for Delta show Delta's address as "c/o Citicorp North America, Inc.," describe the account as an "internal account" to be "controlled" by

---

[151] *Id.*

[152] Yastine Affidavit, at 1.

[153] Memorandum of Association of Delta Energy Corporation, Dec. 3, 1993 [AB000025963-AB000025967].

[154] Yastine Affidavit, at 1; Delta Background Email.

[155] Yastine Affidavit, at 2.

Citibank, and list three Citibank employees as authorized signatories on the account.[156] Though one Citibank employee stated that Delta was "independently operated, set up with its own management,"[157] the Counsel and Chief Investigator of the PSI stated that Delta "apparently had no employees, no office, and no independent business operations" and that Citibank "provided the legal advice, paperwork, and financial support necessary for [Delta] to participate in the trades."[158] Two Citibank employees bluntly referred to Delta as a "shell corporation/SPV."[159] Citibank's influence over Delta is further illustrated by the fact that Delta only engaged in transactions involving Citibank,[160] all but one of which involved Enron.[161] Finally, although the Yosemite Transactions and other Citibank prepays with Enron varied in size, Delta never received more than a "small fee" for entering into the transactions."[*]

Enron, Citibank and Delta's lawyers were sensitive to the disclosure of Delta to outside parties. When attorneys with Milbank, Citibank's counsel, requested certain information concerning Delta, Delta's attorney responded that the information could not be disclosed without authorization from its client.[163] Delta's attorney then asked Citibank

---

[156] Citibank Application for New Account for Delta, Sept. 27, 1994 [AB000153306-AB000153308].

[157] Delta Background Email.

[158] Appendix B, PSI Prepay Report, at 4.

[159] Citibank Exposure Memo.

[160] Appendix D, PSI Prepay Report, at 6.

[161] See Summary in Lieu of Production of Document (Citigroup Response to July 2 Subpoena of the PSI) [AB000153343-AB000153344].

[162] Email from Amanda Angelini, Citibank, to Andrew P. Lee, Citibank, Nov. 20, 2000 [AB000512760-AB000512763]; see also Delta Energy Corporation, Written Resolutions of the Sole Director, June 26, 2001 (noting fee of $5,000 in connection with swap transactions with Citibank and ENA) [AB000153311-AB000153312].

[163] Letter from Joannah Hodden, Maples and Calder, to Bill Sullivan, Citibank, Nov. 2, 1999 [AB000153305].

whether it was acceptable to provide the information about Delta.[164] In addition, in one instance, Citibank, upon request, provided information regarding Delta to an investor at Sumitomo Trust and then the investor called Enron to inquire about Delta.[165] Enron responded by sending an email to Citibank noting the conversations and commanding, "we need to shut this down."[166] Not surprisingly, when Andersen requested certain representations from Delta as to Delta's "non-SPE" status, Enron contacted Citibank directly with a copy of the letter, noting such confirmation was necessary if Enron was to achieve its accounting objectives and that Enron would be happy to discuss the representations with Citibank or its advisors.[167] Eventually, Delta delivered a letter to Andersen containing representations that satisfied Andersen even though Citibank subsequently admitted that Delta was in fact an SPE.[168]

### *Summary*

Citibank played a significant role in facilitating Yosemite I. It helped Enron structure the transaction, providing the funding and assisting in forming and controlling Delta to serve as the conduit entity. Citibank knew that Enron accounted for its obligations under Yosemite I as liabilities from price risk management activities rather than debt. It also knew that Enron reported the cash as cash flow from operating activities rather than financing activities. Nevertheless, Citibank recognized that Yosemite I was essentially a loan.

---

[164] *Id.*

[165] Email from Doug McDowell, Enron, to Richard Caplan, Citibank, Nov. 14, 2001 [AB000153320].

[166] *Id.*

[167] Email from Alan Quaintance, Enron, to Steve Wagman, Citibank, Timothy Swanson, Citibank, and Lisa Bills, Enron, *et al.* June 22, 2001 [CITI-B0201036-CITI-B0201037].

[168] Yastine Affidavit, at 3.

This Annex will not discuss potential legal issues arising from these facts, which includes principles of equitable subordination, third-party culpability, or other potential affirmative claims of the Debtors' estates. The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[169]

---

[169] The Examiner has requested, and in some cases has not yet received documents from certain parties involved in the transactions time discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced and conducting other means of discovery.

## VII.    EXAMINER'S CONCLUSIONS WITH RESPECT TO THE YOSEMITE I TRANSACTION

Enron's obligations under the Yosemite I prepay transaction were effectively debt. As discussed in Appendix E, (Prepay Transactions), Em-on's accounting for Yosemite I as price risk management activity did not comply with GAAP. Enron should have included the $800 million it obtained through Yosemite I as debt on its 1999 financial statements. In addition, Enron should have reported this amount as cash flows from financing activities rather than from operating activities.

As discussed in Appendix D (Disclosure), Enron made no specific disclosure of Yosemite I in its financial statements or other public filings. Thus, it made no public disclosure that would have provided an investor with sufficient information to appreciate the magnitude and quality of operating cash flow recorded by Enron from Yosemite I, or of the terms under which Em-on was required to repay the effectively borrowed money.

**ANNEX 3 (Yosemite II Transaction)**

**to**

**APPENDIX E**

**(Prepay Transactions)**

**to**

**SECOND INTERIM REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

TABLE OF CONTENTS

I.     INTRODUCTION AND OVERVIEW OF THE YOSEMITE II
       TRANSACTION ...................................................................................................1

II.    STRUCTURE OF THE YOSEMITE II TRANSACTION ...................................     2
       A.    The Swap Transactions ..................................................................     2
       B.    The Credit Linked Notes Transaction.. .........................................     5
       C.    The Collapse of the Transaction ..................................................     .8

III.   ECONOMICS AND ALLOCATION OF RISK IN THE YOSEMITE II
       TRANSACTION ...................................................................................................9

IV.    LEGAL ISSUES OF THE YOSEMITE II TRANSACTION . . . . . . . . . . . ..a................. 10

V.     ACCOUNTING ISSUES OF THE YOSEMITE II TRANSACTION . . . . . . . . . . . . . . . . . . 11

VI.    ROLE OF CITIBANK IN THE YOSEMITE II TRANSACTION ..a.................... 12

VII.   EXAMINER'S CONCLUSIONS WITH RESPECT TO THE
       YOSEMITE II TRANSACTION ........................................................................ 13

# I.    INTRODUCTION AND OVERVIEW OF THE YOSEMITE II TRANSACTION

The second Yosemite Transaction ("Yosemite II") was structurally identical to Yosemite I, differing principally by its size, currency denomination and payment dates. The primary parties involved were the same as in Yosemite I -- Citibank, Delta, ENA and Enron. However, in this transaction the issuer of the notes and certificates was Yosemite Securities Company Ltd. ("Yosemite II Company"), and the underwriters varied from those involved in Yosemite I.'

Yosemite II closed on February 23, 2000 and provided Enron with approximately $331.8 million of cash. As discussed below and in Appendix E (Prepay Transactions), the Examiner has concluded that Enron's accounting for Yosemite II did not comply with GAAP. The transaction was essentially debt. Thus, as a result of Yosemite II, Enron understated its debt for 2000 by $331.8 million. In addition, Enron should have reported proceeds of the transaction as cash flows from financing activities rather than from operating activities.

The information in this Annex is intended to provide detail about the Yosemite II Transaction, as background and support for the discussion of the Prepay Transactions set forth in Appendix E.    That Appendix should be reviewed for a more complete understanding of the Examiner's analysis and conclusions.

---

[1] The specific use by Enron of the funds from Yosemite II is unclear. Email from Niels C. Kirk, Citibank, to William Fox, Citibank, and James Reilly, Citibank, Nov. 5, 1999 ("the deal generates count as operational funds flow which will evidently fill a gap left by certain European projects/contracts") [PSI00382247]; Email from James Reilly, Citibank, to Onno Ruding, Citibank, et al., Feb. 15, 2000 ("Proceeds from Yosemite 2 are earmarked to repay a series of prepaid oil transactions currently held by three banks, including Citi. For us, Yosemite 2 will retire the $126MM exposure under the "Nixon" prepaid transaction") [PSI00339103-PSI00339104]; Telephone Interview with William Brown, Enron, by H. Sadler Poe, Partner, A&B, et al., Dec. 4, 2002 (proceeds were used by Enron Europe to monetize a large receivable).

## II.    STRUCTURE OF THE YOSEMITE II TRANSACTION

Yosemite II closed on February 23, 2000[2] and involved an upfront payment of approximately £206.75 million[3] to ENA, funded through interrelated crude oil swap transactions involving Citibank and Delta. Delta was the primary source of the 'initial funding, financed with proceeds of a loan from Yosemite II Company.[4] In turn, Yosemite II Company received its funds by issuing securities linked to Enron's credit. ENA's payment obligations to Citibank and Delta under the swap transactions provided the funds Delta used to make payments on its obligations to Yosemite II Company. Through a swap transaction between Citibank and Yosemite II Company, Citibank agreed to pay Yosemite II Company amounts it owed on the securities, in exchange for payments received by Yosemite II Company on the Delta note and its other investments.

### A.    The Swap Transactions

The swap transactions consisted of three swaps, (i) between ENA and Delta (the "YII ENA/Delta Swap"), (ii) between ENA and Citibank (the "YII ENA/Citibank Swap")

---

[2] See, e.g., Section 1, Enron/Delta Swap Confirmation between ENA and Delta, Feb. 23, 2000 (the "YII ENA/Delta Swap") [AB000026688-AB000026700]; Section 1, Enron/Citibank Swap Confirmation between ENA and Citibank, Feb. 23, 2000 (the "YII ENA/Citibank Swap") [AB000026606-AB000026618]. The ENA/Delta Swap was issued pursuant to an ISDA Master Agreement and Schedule between ENA and Delta. ISDA Master Agreement between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Delta, dated as of Nov. 18, 1999 [AB000026651-AB000026686]. The ENA/Citibank Swap was issued pursuant to an ISDA Master Agreement and Schedule between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Citibank. ISDA Master Agreement between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Citibank, dated as of Nov. 17, 1992 [AB000026558–AB000026604].

[3] Section 4, YII ENA/Delta Swap; Section 5, YII ENA/Citibank Swap. The trust securities that were sold to finance the transaction were sold in an offshore offering, and the transaction payments were denominated in British pounds. The £206.75 million amount converts to approximately $331,771,725 using an exchange rate of $1.6047 per British pound on the closing date of February 23, 2000. Federal Reserve Board, *Federal Reserve Statistical Release, United Kingdom Historical Rates* (Jan. 16, 2003) (available at <http://federalreserve.gov/releases/h10/Hist/dat00_uk.htm>).

[4] See Promissory Note by Delta in favor of Yosemite II Company in the principal amount of £206.75 million, Feb. 23, 2000 (the "YII Delta Note") [AB000026733-AB000026762].

- 2 -

and (iii) between Delta and Citibank (the "YII Delta/Citibank Swap"). These were substantially similar to those in Yosemite I, except for the changes in amount and the nominal number of barrels of oil involved.[5] As with Yosemite I, Enron guaranteed all of ENA's obligations to Delta and Citibank under these swaps.' The following illustrates the amount and flow of the various payments under the swap transactions:



Note: Entity in bold is wholly owned (directly or indirectly) by Enron.

---

[5] See Sections 1, 2, 3 and 4, YII ENA/Delta Swap; Sections 1, 2, 3, 4 and 5, YII ENA/Citibank Swap; Sections 1, 2, 3, 4 and 5, Delta/Citibank Swap Confirmation between Delta and Citibank, dated Feb. 23, 2000 (the "YII Delta/Citibank Swap") [AB000026547-AB000026557]. The YII Delta/Citibank Swap was issued pursuant to an ISDA Master Agreement and Schedule between Delta and Citibank. ISDA Master Agreement between Delta and Citibank, dated as of Sept. 27, 1994 [AB000026501-AB000026545].

[6] Guaranty executed by Enron in favor of Delta, dated as of Feb. 23, 2000 [AB000026702-AB000026707]; Guaranty executed by Enron in favor of Citibank, dated as of Feb. 23, 2000 [AB000026620-AB000026625].

On the closing date, ENA received £206.75 million from Delta:[7]

- £182,535,932 from Delta under the YII ENA/Delta Swap;[8] and

- £24,212,068 from Citibank under the YII ENA/Citibank Swap (Citibank having received that same amount from Delta under the YII Delta/Citibank Swap)."

Annually, [10] ENA paid £15,506,250 to Citibank under the YII ENA/Citibank Swap[11] (which Citibank then paid to Delta under the YII Delta/Citibank Swap).[12] The annual payments that were based on the market price of the oil, payable among the parties under all three swap agreements, effectively canceled one another.[13] At maturity[14] or upon termination, ENA was required to pay Delta £206.75 million under the YII ENA/Delta Swap.[15] To the extent the payment under the YII ENA/Delta Swap was less than £206.75 million because of lower oil prices, that shortfall would equal the amount ENA had to pay Citibank under the YII ENA/Citibank Swap[16] and also the

---

[7] Actually, ENA received £206,748,000. Section 2, YII ENA/Delta Swap; Section 2, YII ENA/Citibank Swap. The £2,000 difference was presumably retained by Delta as a fee.

[8] Section 2, YII ENA/Delta Swap.

[9] Section 2, YII ENA/Citibank Swap.

[10] *Id.* Section 1. This annual payment was due on January 22. *Id.*

[11] *Id.* Section 4.

[12] Section 4, YII Delta/Citibank Swap.

[13] See Sections 1 and 3, YII ENA/Delta Swap; Sections 1 and 3, YII ENA/Citibank Swap; Sections 1 and 3, YII Delta/Citibank Swap.

[14] These swap transactions were scheduled to terminate on January 22, 2007. Section 1, YII ENA/Delta Swap; Section 1, YII ENA/Citibank Swap; Section 1, YII Delta/Citibank Swap.

[15] Section 4, YII ENA/Delta Swap.

[16] See *id.* Section 5.

- 4 -

amount that Citibank in turn had to pay Delta under the YII Delta/Citibank Swap.[17]

Enron guaranteed ENA's obligations to Delta and Citibank under these swaps."

### B.     The Credit Linked Notes Transaction

The second part of the transaction took the following form:



---

[17] Id.

[18] Section 2, Guaranty executed by Enron Corp. in favor of Citibank, dated as of Feb. 23, 2000 [AB000026620-AB000026625]; Section 2, Guaranty by Enron in favor of Delta, dated as of Feb. 23, 2000 [AB000026702-AB000026707].

Yosemite II Company issued £200 million''' in notes (the "YII Notes"), which bore interest at 8.75% per annum,[20] were to mature on February 23, 2007,[21] and were secured by all assets of Yosemite II Company.[22] These were issued to a group of institutional investors[23] that in turn sold them in an offshore transaction governed by Regulation S of the Securities Act.[24] S&P rated the YII Notes "BBB+"[25] and Moody's rated the YII Notes "Baa2" with a watch for a possible upgrade.[26]

Yosemite II Company also sold £22.25 million[27] of shares (which were equity interests in Yosemite II Company) (the "YII Certificates") that bore interest at 12% per annum.[28] Half of the YII Certificates were purchased by Long Lane, through Fleet, as

---

[19] See Article II, Indenture Supplement between Yosemite II Company and United States Trust Company of New York ("USTNY"), dated as of Feb. 23, 2000 (the "Yosemite II Supplement") [AB000081434-AB000081439]; Indenture between Yosemite and USTNY, dated as of Feb. 23, 2000 (the "Yosemite II Base Indenture") [AB000081373-AB000081433].

[20] Article II, Yosemite II Supplement.

[21] *Id.*

[22] Section 3.1, Collateral Security Agreement among Yosemite II Company, Citibank, DeutscheBank and USTNY, dated as of Feb. 23, 2000 (the "YII Collateral Security Agreement") [AB000081505-AB000081572].

[23] Note Purchase Agreement among Salomon, Barclays and Royal Bank of Scotland (collectively, the "YII Initial Purchasers"), Yosemite II Company and Enron Corp., dated as of Feb. 15, 2000 (the "YII Note Purchase Agreement") [AB000081052-AB000081081].

[24] Section 4(b)(i), Supplement Dated Feb. 22, 2000 to Offering Memorandum and Supplement Thereto, dated Feb. 15, 2000, Yosemite Securities Company Ltd. $200,000,000, 8.75 per cent, Series 2000-A Linked Enron Obligations (LEO)"'') due 2007 (the "YII OM"), at 2 [AB000081266-AB000081350].

[25] Letter from Alain Carron, Director, S&P, to Yosemite II Company, Feb. 22, 2000 [AB000082385-AB000082386].

[26] Letter from Isaac Efrat, Vice President, Moody's, and Sloan Walker, Vice President, Moody's, to Yosemite II Company, Feb. 23, 2000 [AB000082384].

[27] Schedule 1, Certificate Purchase Agreement among Yosemite II Company, Enron Corp. and Fleet, as Trust Administrator for Long Lane, dated as of Feb. 23, 2000 (the "YII Certificate Purchase Agreement") [AB00008 162 1 -AB000081640].

[28] See Appendix A, YII Collateral Security Agreement (definition of "Certificate Yield").

- 6 -

trust administrator,[29] while the other half were initially purchased by Enron.[30] Interest was payable on the YII Notes and the YII Certificates on February 23 of each year, commencing February 23, 2001.[31]

Yosemite II Company invested £206.75 million of the proceeds received from the issuance of the YII Notes and YII Certificates in a promissory note issued by Delta (the "YII Delta Note").[32] Delta used this cash to fund its initial obligations under the swap transactions.   Interest accrued on the YII Delta Note at the rate of 7.50% per annum and was payable on January 23 of each year.[33]   The YII Delta Note was to mature on January 23, 2007.[34]   The 7.50% interest rate results in a payment of £15,506,250 annually, the same amount payable by ENA to Delta under the swap transactions.

Yosemite II Company invested the remaining £15.5 million of proceeds in a promissory note (the "YII Magic Note") issued by Enron which was to mature on the same date as the YII Delta Note.[35] Interest payments under the YII Magic Note were due periodically in an amount equal to the shortfall between the yield on the YII Delta Note

---

[29] Schedule 1, YII Certificate Purchase Agreement. Long Lane then entered into a total return swap with SBIL or another affiliate of Citibank, whereby such affiliate synthetically purchased the certificates from Long Lane.   In-Person Interview with Richard Caplan, Managing Director, Citibank, by John E. Stephenson, Jr., Partner, A&B, *et al., Nov.* 27, 2002.

[30] See Schedule 1, YII Certificate Purchase Agreement. On December 20, 2000, Enron sold £10,013,000 of YII Certificates to Long Lane at 100% of the face amount plus accrued interest. See Certificate Purchase and Sale Agreement between Enron and Long Lane, effective as of Dec. 20, 2000 [AB000073822-AB000073833]. That same day, Long Lane in turn transferred the same £10,013,000 in YII Certificates to SE Raptor, L.P. See Certificate Purchase Agreement between Long Lane and SE Raptor, L.P., effective as of Dec. 20, 2000 [AB000073811-AB000073821].

[31] See Appendix A, YII Collateral Security Agreement (definition of "Distribution Date").

[32] See YII Delta Note.

[33] Section 2(a) and Annex 1, YII Delta Note.

[34] See introductory paragraph and Annex 1, YII Delta Note.

[35] Enron Debt Security executed by Enron in favor of Yosemite II Company in the Original Principal Amount of £15.5 million, dated Feb. 23, 2000 (the "YII Magic Note") [AB025200562-AB025200565].

and the interest payments required to be paid to the holders of the YII Notes and the YII Certificates.[36]  Citibank and Yosemite II Company entered into swap agreements (the "YII Citibank/Yosemite Swaps") pursuant to which, absent certain credit events, Citibank agreed to pay to Yosemite II Company the amount necessary to fund the periodic payments under the YII Notes and the YII Certificates.[37] In exchange, Yosemite II Company would pay to Citibank any yield that it received on any investments of Yosemite II Company (i.e., the YII Delta Note).[38]

###    C.    **The Collapse of the Transaction**

As a result of Enron's bankruptcy, on the Petition Date Citibank delivered notice to ENA of early termination of the YII ENA/Citibank Swap.'"[39] On December 3, 2001, Delta delivered notice to ENA of early termination of the YII ENA/Delta Swap.[40] As a result of the early termination of the YII ENA/Delta Swap, the YII Delta/Citibank Swap terminated automatically.[41]   The Examiner has been unable to obtain specific documentation yet relating to any of the Citibank/Yosemite Swaps.

---

[36] See YII Magic Note, at 1.

[37] See Sections 1, 2, 3 and Annex 1, Confirmation (Delta Energy Corporation Promissory Note) between Yosemite II Company and Citibank, Feb. 23, 2000 [AB000082175-AB000082193]; Sections 1, 2, 3 and Annex 1, Confirmation (Enron Debt Security) between Yosemite II Company and Citibank, Feb. 23, 2000 [AB000082194-AB000082212]. These confirmations were issued pursuant to an ISDA Master Agreement and Schedule between Yosemite II Company and Citibank.  ISDA Master Agreement between Yosemite II Company and Citibank, dated as of Feb. 23, 2000 [AB000081440-AB000081504].

[38] Id.

[39] Letter from Michael Nepvaux, Attorney-In-Fact, Citibank, to ENA, Dec. 2, 2001 [SEC00097774]

[40] Letter from Delta to Enron, Dec. 3, 2001, at 2 [SEC00097783-SEC00097784].

[41] Letter from Citibank to Delta, Dec. 3, 2001, at 2 [SEC00097779-SEC00097780].

### HI.   ECONOMICS AND ALLOCATION OF RISK IN THE YOSEMITE II TRANSACTION

The economics and allocation of risk in Yosemite II are essentially identical to those involved in Yosemite I, which is discussed in Annex 2 to Appendix E (Prepay Transactions).

## IV.    LEGAL ISSUES IN THE YOSEMITE II TRANSACTION

This Annex will not discuss potential legal issues, which include principles of equitable subordination, third-party culpability (including culpability of any officer, director, professional or financial institution), avoidance claims, or other potential affirmative claims of the Debtors' estates. The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[42]

---

[42] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## V.    ACCOUNTING ISSUES IN THE YOSEMITE II TRANSACTION

The accounting issues raised by Yosemite II are discussed in detail in Appendix E (Prepay Transactions).

## VI.    ROLE OF CITIBANK IN THE YOSEMITE II TRANSACTION

Citibank's role with respect to all of the Yosemite Transactions, including Yosemite II, is discussed in Annex 2 to Appendix E (Prepay Transactions).

## VII.   EXAMINER'S CONCLUSIONS WITH RESPECT TO THE YOSEMITE II TRANSACTION

Yosemite II was effectively debt. Although it was structured as a complex set of commodity sales contracts, Enron never transferred any price risk of the commodities to Delta or Citibank. The offsetting movements of the price risk around the circular structure of the transaction essentially eliminated the price risk. Thus, the upfront cash payments to Enron, designed to be prepayments for the commodity sales, were in effect loans from Delta to Enron.

As discussed in Appendix E (Prepay Transactions), Enron's accounting for Yosemite II as price risk management activity did not comply with GAAP. Enron should have included the $331.8 million it obtained through Yosemite II as debt on its 2000 financial statements. In addition, Enron should have reported proceeds of the transaction as cash flows from financing activities rather than from operating activities.

As discussed in Appendix D (Disclosure), Enron made no specific disclosure of Yosemite II in its financial statements or other public filings. Thus, it made no public disclosure that would have provided an investor with transparent information on the significant amount of cash flow generated by the transaction, or of the terms under which Enron was required to repay the effectively borrowed money.

**ANNEX 4 (Yosemite III Transaction)**

**to**

**APPENDIX E**

**(Prepay Transactions)**

**to**

**SECOND INTERIM REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

TABLE OF CONTENTS

I.     INTRODUCTION AND OVERVIEW OF THE YOSEMITE III
       TRANSACTION ...................................................................................................1

II.    STRUCTURE OF THE YOSEMITE III TRANSACTION.. .................................. .2
       A.    The Swap Transactions.. ..................................................................... .2
       B.    The Credit Linked Notes Transaction.. ............................................... .5
       C.    The Collapse of the Transactions ....................................................... 8

III.   ECONOMICS AND ALLOCATION OF RISK IN THE
       YOSEMITE III TRANSACTION .......................................................................... 9

IV.    LEGAL ISSUES IN THE YOSEMITE III TRANSACTION .............................. 10

V.     ACCOUNTING ISSUES IN THE YOSEMITE III TRANSACTION ................. 11

VI.    ROLE OF CITIBANK IN THE YOSEMITE III TRANSACTION ..................... 12

VII.   EXAMINER'S CONCLUSIONS WITH RESPECT TO THE
       YOSEMITE III TRANSACTION ...................................................................... 13

# I.  INTRODUCTION AND OVERVIEW OF THE YOSEMITE III TRANSACTION

The transaction described in this Annex ("Yosemite III") was the third in the series of Yosemite transactions. Enron closed Yosemite III in August 2000 and obtained $475 million of cash.[1]

As discussed below and in Appendix E (Prepay Transactions), the Examiner has concluded that Enron's accounting for Yosemite III did not comply with GAAP. The transaction was essentially debt. Thus, as a result of Yosemite III, Enron understated its debt for 2000 by $475 million. In addition, Enron should have reported proceeds of the transaction as cash flows from financing activities, rather than from operating activities.

The information in this Annex is intended to provide detail about Yosemite III, as background and support for the discussion of the Prepay Transactions set forth in Appendix E. That Appendix should be reviewed for a more complete understanding of the Examiner's analysis and conclusions.

---

[1] See Section 2, Enron/Citibank Swap Confirmation between ENA and Citibank, Aug. 25, 2000 (the "YIII ENA/Citibank Swap") [AB0000228 15–AB00002285 1]; Section 2, Enron/Delta Swap Confirmation between ENA and Delta, dated Aug. 25, 2000 (the "YIII ENA/Delta Swap") [AB000022947-AB000022985]. The YIII ENA/Citibank Swap was issued pursuant to an ISDA Master Agreement between Citibank and ENA. ISDA Master Agreement between Citibank and Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.), dated as of Nov. 17, 1992 [AB000022768–AB000022813]. The ENA/Delta Swap was issued pursuant to an ISDA Master Agreement between ENA and Delta. ISDA Master Agreement between Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) and Delta, dated as of Nov. 18, 1999 [AB000022911–AB000022945].

## II.     STRUCTURE OF THE YOSEMITE III TRANSACTION

Structurally, Yosemite III shared many of the characteristics of Yosemite I and II: (i) the primary parties were Citibank, Delta and ENA; (ii) it involved the issuance by a trust of notes and certificates to outside investors (in this case Enron Credit Linked Notes Trust ("ECLN I Trust")); and (iii) it included a credit default swap mechanism to transfer Enron credit risk held by Citibank to the ECLN I Trust. However, in response to concerns expressed by potential investors* and to simplify the Yosemite structure in order to obtain better pricing,[3] Citibank and Enron modified the structure from that of the two prior Yosemite transactions principally in the following three ways:

- Citibank had the nominal credit risk in the swap transactions (rather than Delta);

- Citibank invested in the "magic note" (rather than Delta); and

- ECLN I Trust invested the proceeds from its issuance of notes and certificates in a Citibank certificate of deposit (which, under the credit default swap mechanism, ECLN I Trust was to give to Citibank in exchange for qualifying Enron debt obligations upon default).

### A.     The Swap Transactions

Yosemite III involved the typical three swaps of a Prepay Transaction – one between ENA and Citibank (the "YIII ENA/Citibank Swap"),[4] one between ENA and Delta (the "YIII ENA/Delta Swap")' and one between Delta and Citibank (the "YIII

---

[2] In-Person Interview with Barry Schnapper, Enron, by Paul M. Cushing, Partner, A&B, Nov. 21, 2002 (the "Schnapper Interview").

[3] See Email from James Keller, Citibank, to Charles Wainhouse, Citibank, July 20, 2000 ("We, in conjunction with Enron, have been working to simplify the structure while still providing them cost effective funding. The theory behind the simplification is that a simpler structure will result in tighter spreads on the credit linked notes distributed to the market.") [PSI00334507].

[4] YIII ENA/Citibank Swap.

[5] YIII ENA/Delta Swap.

Delta/Citibank Swap")." The following illustrates the amount and flow of the various payments under these three swap transactions:



Note: Entity in bold is wholly owned (directly or indirectly) by Enron.

On the closing date, ENA received $475 million from Citibank:

- $439,677,103 from Citibank under the YIII ENA/Citibank Swap;[7] and

- $35,317,897 from Delta under the YIII ENA/Delta Swap[8] (Delta having received just over that amount from Citibank under the YIII Delta/Citibank Swap)."

---

[6] Delta/Citibank Swap Confirmation between Delta and Citibank, dated Aug. 25, 2000 (the "YIII Delta/Citibank Swap") [AB000022752-AB000022766]. The Delta/Citibank Swap was issued pursuant to an ISDA Master Agreement and Schedule between Delta and Citibank.   ISDA Master Agreement between Delta and Citibank, dated as of Sept. 27, 1994 [AB000022706-AB000022750].

[7] Section 2, YIII ENA/Citibank Swap.

[8] Section 2, YIII ENA/Delta Swap.

[9] Section 2, YIII Delta/Citibank Swap.

Semi-annually," ENA paid $17,750,750 to Delta under the YIII ENA/Delta Swap," which Delta then paid to Citibank under the YIII Delta/Citibank Swap.[12] The semiannual payments based on the market price of the commodity, payable among the parties under all three swap agreements, effectively canceled one another.[13] At maturity[14] or upon termination, ENA would pay Citibank $475 million under the YIII ENA/Citibank Swap." To the extent the payment under the YIII ENA/Citibank Swap was less than $475 million because of lower oil prices, that shortfall would equal the amount ENA had to pay Delta under the YIII ENA/Delta Swap,[16] which Delta in turn was required to pay Citibank under the YIII Delta/Citibank Swap.[17] As in the prior Yosemite transactions, Enron guaranteed ENA's obligations to Delta and Citibank under these swaps."

---

[10] See *id.* Section 1. These payments were due on January 14 and July 14. *Id.*

[11] Section 4, YIII ENA/Delta Swap.

[12] Section 4, YIII Delta/Citibank Swap.

[13] See Section 3, YIII ENA/Citibank Swap; Section 3, YIII ENA/Delta Swap; Section 3, YIII Delta/Citibank Swap.

[14] These swap transactions were scheduled to terminate on July 14, 2005. Section 1, YIII ENA/Citibank Swap; Section 1, YIII ENA/Delta Swap; Section 1, YIII Delta/Citibank Swap.

[15] Section 4, YIII ENA/Citibank Swap.

[16] See Section 5, YIII ENA/Delta Swap.

[17] Section 7, YIII Delta/Citibank Swap.

[18] Section 2, Guaranty executed by Enron Corp. in favor of Citibank, dated as of Aug. 25, 2000 [AB000022878-AB00022884]; Section 2, Guaranty executed by Enron Corp. in favor of Delta, dated as of Aug. 25, 2000 [AB000023004-AB00023010].

**B.**     **The Credit Linked Notes Transaction**

The credit linked notes part of the transaction took the following form:



Note: Entities in bold are Enron and its wholly owned subsidiaries.

ECLN I Trust issued $500 million" in aggregate principal amount of Notes (the "YIII Notes"), which bore interest at 8.00% per annum,[20] were to mature on August 15, 2005[21] and were secured by all assets of ECLN I Trust.[22] These were issued to a group of

---

[19] See Section 2.02, Indenture between ECLN I Trust and USTNY, dated as of Aug. 25, 2000 (the "YIII    , Indenture") [AB000074120-AB0000074206].

[20] See Section 2.02, Indenture.

[21] *Id.*

[22] Section 3.1, Collateral Security Agreement among ECLN I Trust, Citibank and USTNY, dated as of Aug. 25, 2000 (the "YIII Collateral Security Agreement") [AB000074249-AB000074307].

institutional investors[23] who sold them to "Non-U.S. persons" within the meaning of Regulation S of the Securities Act and "qualified institutional buyers" within the meaning of the Securities Act.[24] S&P rated the YIII Notes "BBB+"[25] and Moody's rated the YIII Notes "Baa1."[26]

The ECLN I Trust also issued $50 million[27] in Certificates (the "YIII Certificates") which bore interest at 9%.[28] Royal Bank of Canada purchased the entire $50 million of YIII Certificates*' but entered into a Total Return Swap with Salomon (or another Citibank affiliate), who thereby gained the economic benefit of the YIII Certificates.[30] Interest was payable on the YIII Notes and YIII Certificates on February 15 and August 15 of each year commencing February 15, 2001.[31]

---

[23] See Note Purchase Agreement among Salomon, DeutscheBank Securities Inc. (together, the "YIII Initial Purchasers"), ECLN I Trust and Enron Corp., dated as of Aug. 17, 2000 (the "YIII Note Purchase Agreement") [AB000073913-AB000073944]. Strangely, the YIII Note Purchase Agreement states that although DeutscheBank Securities Inc. was listed as an initial purchaser, they did not actually purchase any of the Notes. Schedule A, YIII Note Purchase Agreement.

[24] See Offering Memorandum relating to Enron Credit Linked Notes Trust, 8.00% Enron Credit Linked Notes due 2005, Aug. 17, 2000 (the "YIII OM") [AB000074013-AB000074078].

[25] See Letter from Joseph F. Sheridan, Managing Director, S&P, to Richard Caplan, Citibank, Aug. 25, 2000 [AB000074892–AB000074893].

[26] See Letter from William L. May, Moody's, to ECLN I Trust, Aug. 25, 2000 [AB0000874891].

[27] See Certificate Purchase Agreement among ECLN I Trust, Enron Corp. and Royal Bank of Canada Europe Limited, dated as of Aug. 25, 2000 (the "YIII Certificate Purchase Agreement") [AB000074308-AB000074325].

[28] See Appendix A, YIII Collateral Security Agreement (definition of "Certificate Yield").

[29] See Schedule II, YIII Certificate Purchase Agreement. In the two prior Yosemite transactions, Citibank was not willing to acquire more than 50% of the equity in the applicable trust because it did not want to include the trust in its consolidated financial statements. In-Person Interview with Richard Caplan, Managing Director, Citibank, by John E. Stephenson, Jr., Partner, A&B, et al., Nov. 27, 2002 (the "Caplan Interview"). Because the Yosemite III transaction would be included in Citibank's consolidated financial statements (for example, the certificate of deposit being reflected as a liability), Citibank was willing to acquire all of the equity in ECLN I Trust. Caplan Interview.

[30] Caplan Interview.

[31] See Appendix A, YIII Collateral Security Agreement (definition of "Distribution Date").

The ECLN I Trust funded the interest payments on the YIII Notes and the YIII Certificates pursuant to a swap transaction with Citibank (the "YIII Citibank/Yosemite Swap"),[32] under which Citibank agreed to pay to the ECLN I Trust the interest due on the YIII Notes and the YIII Certificates.[33] In exchange, the ECLN I Trust paid to Citibank any yield it actually received with respect to its investments.[34] The ECLN I Trust secured its obligations under the YIII Citibank/Yosemite Swap by granting Citibank a security interest in all of the ECLN I Trust's assets.[35] The YIII Citibank/Yosemite Swap, like the corresponding credit default swaps in the Yosemite I and II Transactions, provided that upon the occurrence of certain credit events with respect to Enron, Citibank would transfer to the ECLN I Trust certain obligations of Enron and that, in return, the ECLN I Trust would deliver to Citibank the trust's investments.[36]

Unlike the credit linked notes transactions in the Yosemite I and II Transactions, the ECLN I Trust invested the proceeds it received from the issuance of the YIII Notes and YIII Certificates in a $550 million certificate of deposit issued by Citibank (the "YIII Citibank CD") which paid a yield of 6.94875% per annum and matured on August 24,

---

[32] Swap Confirmation between ECLN I Trust and Citibank, dated Aug. 25, 2000 (the "YIII Citibank/Yosemite Swap") [AB000074240-AB000074247]. This confirmation was issued pursuant to that certain ISDA Master Agreement and Schedule between ECLN I Trust and Citibank. ISDA Master Agreement between ECLN I Trust and Citibank, dated as of Aug. 25, 2000 [AB000074207-AB000074239].

[33] Section 2, YIII Citibank/Yosemite Swap.

[34] *Id.* Citibank received the interest, earnings, periodic fees and other periodic amounts received with respect to the Trust Investments. See Appendix A, YIII Collateral Security Agreement (definition of "Actual Interest Receipts").

[35] Section 3.1, YIII Collateral Security Agreement.

[36] See Section 3, YIII Citibank/Yosemite Swap.

2001 .[37]  Citibank used approximately $475 million of this deposit to make its initial payments under the YIII ENA/Citibank Swap and the YIII Delta/Citibank Swap.[38] Citibank also used a portion of the deposit proceeds to fund a $25 million loan to Enron evidenced by a note (the "YIII Magic Note"),[39] which accrued interest at the rate of 24.83% per annum, and was payable on the same dates periodic payments were to be made by ENA under the YIII ENA/Delta Swap.[40] These interest payments would equal $6,207,500 per year.[41]  Citibank would thus receive $41,709,000 annually under the swap transactions and the YIII Magic Note, resulting in an effective interest rate of 8.34% on $500 million.

### C.    The Collapse of the Transactions

Promptly following the Petition Date, both Citibank and Delta exercised their rights to terminate their respective swap agreements with ENA.[42] As a result, Delta terminated its position by assigning its claims against ENA to Citibank, and Citibank assigned its claims against ENA to the trust.[43]

---

[37] See Citibank N.A. Certificate of Deposit (the "YIII Citibank CD") [AB000074780-AB000074783]. As the maturity date of the YIII Citibank CD was prior to the Petition Date, it is likely the YIII Citibank CD was replaced with another Citibank certificate of deposit prior to the Petition Date.

[38] Given the fungible nature of money, whether, as a technical matter, Citibank used the actual funds received upon the opening of the YIII Citibank CD has not been verified.

[39] Enron Debt Security executed by Enron Corp. in favor of Citibank, in the Original Principal Amount of $25 million, Aug. 25, 2000 (the "YIII Magic Note") [AB000074784-AB00074787].

[40] *Id.* at 1

[41] *See id.*

[42] Letter from Citibank to ENA, Dec. 2, 2001 [SEC00097774]; Letter from Delta to Enron, Dec. 3, 2001 [SEC00097783-SEC00097784]. As a result of the early termination of the YIII ENA/Delta Swap, the YIII Delta/Citibank Swap terminated automatically.  Letter from Citibank to Delta, Dec. 3, 2001 [SEC00097779-SEC00097780].

[43] Assignment and Settlement Agreement between ECLN Trust and Citibank, dated as of Feb. 2002 [ENPF011676-ENPF011679].

**III.    ECONOMICS AND ALLOCATION OF RISK IN THE YOSEMITE III TRANSACTION**

The economics and allocation of risk of Yosemite III are essentially the same as in Yosemite I discussed in Annex 2 to Appendix E (Prepay Transactions). However, in Yosemite III Citibank held the nominal credit risk of ENA under the swap transactions rather than Delta.

## IV.    LEGAL ISSUES IN THE YOSEMITE III TRANSACTION

This Annex will not discuss potential legal issues, which include principles of equitable subordination, third-party culpability (including culpability of any officer, director, professional or financial institution), avoidance claims, or other potential affirmative claims of the Debtors' estates. The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[44]

---

[44] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## V.    ACCOUNTING ISSUES IN THE YOSEMITE III TRANSACTION

The accounting issues raised by Yosemite III are discussed in detail in Appendix E (Prepay Transactions).

## VI.    ROLE OF CITIBANK IN THE YOSEMITE III TRANSACTION

Citibank's role with respect to all of the Yosemite Transactions, including Yosemite III, is discussed in Annex 2 to Appendix E (Prepay Transactions).

## VII. EXAMINER'S CONCLUSIONS WITH RESPECT TO THE YOSEMITE III TRANSACTION

Yosemite III was effectively debt. Although it was structured as a complex set of commodity sales contracts, Enron never transferred any price risk of the commodities to Delta or Citibank. The offsetting movements in the price risk around the circular structure of the transaction essentially eliminated the price risk. Thus, the upfront cash payments to Em-on, designed to be prepayments for the commodity sales, were in effect loans from Citibank to Enron.

As discussed in Appendix E (Prepay Transactions), Enron's accounting for Yosemite III as price risk management activity did not comply with GAAP. Enron should have included the $475 million it obtained through Yosemite III as debt on its 2000 financial statements. In addition, Enron should have reported proceeds of the transaction as cash flows from financing activities rather than from operating activities.

As discussed in Appendix D (Disclosure), Enron made no specific disclosure of Yosemite III in its financial statements or other public filings. Thus, it made no public disclosure that would have provided an investor with transparent information on the significant amount of cash flow generated by the transaction, or of the terms under which Enron was required to repay the effectively borrowed money.

**ANNEX 5 (Yosemite IV Transaction)**

**to**

**APPENDIX E**

**(Prepay Transactions)**

**to**

**SECOND INTERIM REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

TABLE OF CONTENTS

I.      INTRODUCTION AND OVERVIEW OF THE YOSEMITE IV
        TRANSACTION ...................................................................................1

II.     STRUCTURE OF THE YOSEMITE IV TRANSACTION ..................................    2
        A.   The Swap Transactions.. ...................................................................    .3
        B.   The Credit Linked Notes Transactions ............................................    6
        C.   The Collapse of the Transactions.. .................................................    .11

III.    ECONOMICS AND ALLOCATION OF RISK IN THE
        YOSEMITE IV TRANSACTION.........................................................................12

IV.     LEGAL ISSUES IN THE YOSEMITE IV TRANSACTION ............................... 13

VI.     ACCOUNTING ISSUES IN THE YOSEMITE IV TRANSACTION . . . . . . . . . . . . . . . . 14

V.      ROLE OF CITIBANK IN THE YOSEMITE IV TRANSACTION . .................... 15

VII.    EXAMINER'S CONCLUSIONS WITH RESPECT TO THE
        YOSEMITE IV TRANSACTION.........................................................................16

# I. INTRODUCTION AND OVERVIEW OF THE YOSEMITE IV TRANSACTION

The transaction described in this Annex ("Yosemite IV") was the fourth and final transaction in the series of Yosemite Transactions and involved the same parties — Citibank, Delta, ENA and Enron. The transaction was structurally very similar to Yosemite III, except that there were three tranches of credit linked notes denominated in Dollars, Sterling and Euro, respectively, issued by three different trusts. Yosemite IV closed in May 2001 and provided Enron with approximately $775 million of cash. This Annex describes Yosemite IV in detail.

As discussed below and in Appendix E (Prepay Transactions), the Examiner has concluded that Enron's accounting for Yosemite IV did not comply with GAAP. The transaction was essentially debt. Thus, as a result of Yosemite IV, Enron understated its debt for 2001 by $775 million. In addition, Enron should have reported proceeds of the transaction as cash flows from financing activities, rather than from operating activities.

The information in this Annex is intended to provide detail about Yosemite IV, as background and support for the discussion of the Prepay Transactions set forth in Appendix E (Prepay Transactions).  That Appendix should be reviewed for a more complete understanding of the Examiner's analysis and conclusions.

## II.     STRUCTURE OF THE YOSEMITE IV TRANSACTION

Generally, funds flowed through Yosemite IV in the same manner as in Yosemite III. In Yosemite IV, ENA received upfront payments totaling approximately $775 million, funded through interrelated crude oil swap transactions involving Citibank and Delta. However, in Yosemite IV there were three tranches of swaps among the parties as follows: (i) $475 million under the Dollar denominated tranche ("Yosemite IV Dollar"); (ii) £109.5 million under the Sterling denominated tranche ("Yosemite IV Sterling"); and (iii) €170 million under the Euro denominated tranche ("Yosemite IV Euro").

Citibank was the primary source of the initial funding of each tranche and, as in Yosemite III, Citibank's funding obligations were financed with proceeds of certificates of deposit opened by the applicable trusts. Those trusts issued securities structured to be linked to Enron's credit. Citibank and each trust entered into a swap transaction under which Citibank agreed to pay the trust the amounts payable on that trust's securities, in exchange for receipt of all payments received by that trust on its certificate of deposit and other investments.

ENA's payment obligations to Citibank and Delta under the swap transactions provided the funds Citibank used, in part, to cover payments required to be made under the swap transactions with the trusts. As in the prior Yosemite Transactions, the return on the investments of the trusts (i.e., the certificates of deposit) was lower than the coupon payable on the securities issued by that trust. This difference was covered by interest payments from Enron on loans funded by Citibank evidenced by so-called "magic notes."

- 2 -

A.    **The Swap Transactions**

Yosemite IV closed on May 24, 2001' and involved three commodity swaps for each separate tranche – one between ENA and Citibank (the "YIV ENA/Citibank Swaps"),[2] one between ENA and Delta (the "YIV ENA/Delta Swaps")[3] and one between Delta and Citibank (the "YIV Delta/Citibank Swaps").[4]    The following illustrates the flow of the various payments under the swap transactions:

---

[1] See, e.g., Section 1, Enron/Citibank U.S. Dollar Denominated Swap Confirmation between ENA and Citibank, dated May 24, 2001 (the "YIV ENA/Citibank Dollar Swap") [AB000023650-AB000023682]; Enron/Citibank Sterling-Denominated Swap Confirmation between ENA and Citibank, May 24, 2001 (the "YIV ENA/Citibank Sterling Swap") [AB000024986-AB000025018]; Enron/Citibank Euro-Denominated Swap Confirmation between ENA and Citibank, dated May 24, 2001 (collectively, the "YIV ENA/Citibank Swaps") [AB000024226-AB000024258]. Each of these confirmations was issued pursuant to an ISDA Master Agreement and Schedule between ENA and Citibank. ISDA Master Agreement between ENA and Citibank, dated as of Nov. 17, 1992 [AB000023603-AB000023648].

[2] YIV ENA/Citibank Swaps.

[3] Enron/Delta US. Dollar Denominated Swap Confirmation between ENA and Delta, dated May 24, 2001 (the "YIV ENA/Delta Dollar Swap") [AB000023753-AB000023768]; Enron/Delta Sterling-Denominated Swap Confirmation between ENA and Delta, dated May 24, 2001 (the "YIV ENA/Delta Sterling Swap") [AB000025088-AB00025120]; Enron/Delta Euro-Denominated Swap Confirmation between ENA and Delta, May 24, 2001 (the "YIV ENA/Delta Euro Swap"; the YIV ENA/Delta Euro Swap, together with the YIV ENA/Delta Dollar Swap and the YIV ENA/Delta Sterling Swap, collectively, the "YIV ENA/Delta Swaps")[AB000024327-AB000024358]. Each of these confirmations was issued pursuant to an ISDA Master Agreement and Schedule between ENA and Delta. ISDA Master Agreement between ENA and Delta, dated as of Nov. 18, 1999 [AB000023718-AB000023752].

[4] See Delta/Citibank US. Dollar-Denominated Swap Confirmation between Delta and Citibank, dated May 24, 2001 (the "YIV Delta/Citibank Dollar Swap") [AB000023588-AB000023602]; Enron/Delta Sterling-Denominated Swap Confirmation between and Delta and Citibank, dated May 24, 2001 (the "YIV Delta/Citibank Sterling Swap") [AB000024924-AB000024938]; Enron/Delta Euro-Denominated Swap Confirmation between and Delta and Citibank, dated May 24, 2001 (the "YIV Delta/Citibank Swaps") [AB000024165-AB000024179]. Each of these confirmations was issued pursuant to an ISDA Master Agreement and Schedule between Delta and Citibank.  ISDA Master Agreement between Delta and Citibank, dated as of Sept. 27, 1994 [AB000024120-AB000024164].



Note: Entity in bold is wholly owned (directly or indirectly) by Enron.

On the closing date, ENA received $474,780,904, £109,449,492 and €169,921,586 from Citibank:

- $393,058,118, £90,610,239 and €140,673,431 under the YIV ENA/Citibank Swaps;' and

- $8 1,722,786, £18,839,253 and €29,248,155 under the YIV ENA/Delta Swaps.' These were the same amounts Delta received from Citibank under the YIV Delta/Citibank Swaps.'

Semiannually under the Dollar denominated swap transactions,[8] and annually under the Sterling and Euro denominated swap transactions," ENA paid $14,725,000, £6,980,625 and €9,775,000 to Delta." Delta then paid those amounts to Citibank under

---

[5] Section 2, YIV ENA/Citibank Swaps.

[6] Section 2, YIV ENA/Delta Swaps.

[7] Section 2, YIV Delta/Citibank Swaps.

[8] These payments were due on April 14, and October 14. Section 1, YIV ENA/Delta Dollar Swap.

[9] These payments were due on April 23.   Section 1, YIV ENA/Delta Sterling Swap; Section 1, YIV ENA/Delta Euro Swap.

[10] Section 4, YIV ENA/Delta Swaps.

- 4 -

the YIV Delta/Citibank Swaps." The semi-annual or annual payments based on the market price of the commodity, payable among the parties under each of the three swap agreements relating to each tranche, effectively canceled one another.[12] At maturity[13] or upon termination, ENA would pay Citibank $475 million, £109.5 million and €170 million under the YIV ENA/Citibank Swaps.[14] To the extent the payment under the YIV ENA/Citibank Swaps was less than those amounts because of lower oil prices, that shortfall would equal the amount ENA was required to pay Delta under the YIV ENA/Delta Swaps," which Delta was required to pay to Citibank under the YIV Delta/Citibank Swap)." As in the other Yosemite transactions, Enron guaranteed ENA's obligations to Delta and Citibank under these swaps.[17]

---

[11] Section 4, YIV Delta/Citibank Swaps.

[12] See *id.* Section 3; Section 3, YIV ENA/Delta Swaps; Section 3, YIV Delta/Citibank Swaps.

[13] The Yosemite IV Dollar swap transactions were scheduled to terminate on Apr. 14, 2006 and the Yosemite IV Sterling and Euro swap transactions were scheduled to terminate on Apr. 23, 2006. Section 1, YIV ENA/Citibank Swaps; Section 1, YIV ENA/Delta Swaps; Section 1, YIV Delta/Citibank Swaps.

[14] See Sections 1 and 4, YIV ENA/Citibank Swaps.

[15] See Sections 1 and 5, YIV ENA/Delta Swaps.

[16] See Sections 1 and 7, YIV Delta/Citibank Swaps.

[17] Section 2, U.S. Dollar-Denominated Guaranty executed by Enron Corp. in favor of Citibank [AB000023687-AB000023693]; Section 2, Sterling-Denominated Guaranty executed by Enron Corp. in favor of Citibank dated as of May 24, 2001 [AB000025023–AB000025029]; Section 2, Euro-Denominated Guaranty executed by Enron Corp. in favor of Citibank, dated as of May 24, 2001 [AB000024263–AB000024269]. See *also* Section 2, U.S.-Dollar Denominated Guaranty executed by Enron Corp. in favor of Delta, dated as of May 24, 2001 [AB000023775-AB000023781], Section 2, Sterling-Denominated Guaranty executed by Enron in favor of Delta, dated as of May 24, 2001 [AB000025125–AB000025130]; Section 2, Euro-Denominated Guaranty executed by Enron in favor of Delta, dated as of May 24, 2001 [AB000024363–AB000024369].

**B.**     **The Credit Linked Notes Transaction**

The credit linked notes part of Yosemite IV took the following form (with one such structure for each tranche):



Note: Entities in bold are Enron or its wholly owned subsidiaries.

As in the other Yosemite Transactions, the particular trust associated with each of the three tranches issued notes to a group of underwriters who in turn sold the notes to investors. Pursuant to three Indentures (collectively, the "YIV Indentures"):[18]

---

[18] Indenture between ECLN II Trust and United States Trust Company of New York ("USTNY"), dated as of May 24, 2001 (the "YIV Dollar Indenture") [AB000075257-AB000075343]; Indenture between ECLN Sterling Trust and USTNY, dated as of May 24, 2001 (the "YIV Sterling Indenture") [AB000077534–AB000077620]; Indenture between ECLN Euro Trust and USTNY, dated as of May 24, 2001 (the "YIV Euro Indenture") [AB000374579-AB000374666].

- • Enron Credit Linked Notes Trust II (the "ECLN II Trust") issued $500 million in aggregate principal amount of Notes (the "YIV Dollar Notes"), which bore interest at 7.375% per annum and which were to mature on May 15, 2006;[19]

- • Em-on Sterling Credit Linked Notes Trust (the "ECLN Sterling Trust") issued £125 million in aggregate principal amount of Notes (the "YIV Sterling Notes"), which bore interest at 7.25% per annum and which were to mature on May 24, 2006;[20] and

- • Enron Euro Credit Linked Notes Trust (the "YIV ECLN Euro Trust"; together with the ECLN II Trust and the ECLN Sterling Trust, the "ECLN III Trusts") issued €200 million in aggregate principal amount of Notes (the "YIV Euro Notes"; together with the YIV Dollar Notes and the YIV Sterling Notes, the "YIV Notes"), which bore interest at 6.50% per annum and which were to mature on May 24, 2006.[21]

Interest was payable on the YIV Dollar Notes on May 15 and November 15 of each year commencing November 15, 2001 ,[22] and on the YIV Sterling Notes and YIV Euro Notes on May 24 of each year, commencing May 24, 2002.[23] The YIV Notes were originally sold to groups of underwriters or "initial purchasers" (the "YIV Initial Purchasers").[24] The YIV Notes were then offered and sold to "Non-US persons" within the meaning of Regulation S of the Securities Act and "qualified institutional buyers"

---

[19] Section 2.02, YIV Dollar Indenture.

[20] Section 2.02, YIV Sterling Indenture.

[21] Section 2.02, YIV Euro Indenture.

[22] Section 2.02, YIV Dollar Indenture.

[23] Section 2.02, YIV Sterling Indenture; Section 2.02, YIV Euro Indenture.

[24] The YIV Initial Purchasers of the YIV Dollar Notes were Salomon, UBS Warburg LLC, Credit Lyonnais Securities (USA) Inc., Royal Bank of Scotland, BNP Paribas Securities Corp. and Scotia Capital (USA) Inc. (collectively, the "YIV Dollar Initial Purchasers").   Schedule A, Note Purchase Agreement among ECLN II Trust, Enron Corp. and the YIV Dollar Initial Purchasers, dated as of May 17, 2001 [AB000074993-AB000075027]. The YIV Initial Purchasers of the YIV Sterling Notes were SBIL, UBS AG, acting through its business group UBS Warburg, Credit Lyonnais S.A., Royal Bank of Scotland, BNP Paribas and Scotia Capital Inc. (collectively, the "YIV Sterling Initial Purchasers"). Schedule A, Note Purchase Agreement among ECLN Sterling Trust, Enron Corp. and the YIV Sterling Initial Purchasers, dated as of May 24, 2001 [AB000077290-AB000077324]. The YIV Initial Purchasers of the YIV Euro Notes were identical to those of the YIV Sterling Notes (collectively, the "YIV Euro Initial Purchasers"). See Schedule A, Note Purchase Agreement among ECLN Euro, Enron Corp. and the Euro Initial Purchasers, May 17, 2001 [AB000374396-AB000374430].

within the meaning of the Securities Act.[25] The YIV Notes were secured by a grant of a security interest in all the issuer's rights in and under the assets of the applicable ECLN III Trust.[26] S&P rated the YIV Notes "BBB+"[27] and Moody's rated the YIV Notes "Baa1."[28]

In addition to the YIV Notes, ECLN II Trust issued $50 million in Certificates (the "YIV Dollar Certificates"),[29] ECLN Sterling Trust issued £14 million in Certificates (the "YIV Sterling Certificates")[30] and ECLN Euro Trust issued €22.5 million in Certificates (the "YIV Euro Certificates"; together with the YIV Dollar Certificates and the YIV Sterling Certificates, the "YIV Certificates").[31] Distributions were to be made on the same dates as interest payments under the relevant issuance of YIV Notes.[32] ING Baring (U.S.) Capital Markets LLC ("ING") initially purchased the entire amount of YIV

---

[25] See Cover Page, Offering Memorandum relating to 7.375% Enron Credit Linked Notes due 2006 (the "YIV Dollar OM") [AB000075096-AB000075163]; Cover Page, Offering Memorandum relating to 7.25% Enron Sterling Credit Linked Notes due 2006, May 17, 2001 (the "YIV Sterling OM") [AB000077389-AB000077452] and Cover page of Offering Memorandum dated May 17, 2001 relating to 6.50% Enron Euro Credit Linked Notes due 2006 (the "YIV Euro OM") [AB000374491-AB000374550].

[26] See Section 3.1, Collateral Security Agreement, among ECLN II Trust, Citibank and USTNY, dated as of May 24, 2001 (the "YIV Dollar Collateral Security Agreement") [AB000075388-AB000075447]; Section 3.1, Collateral Security Agreement, among ECLN Sterling Trust, Citibank, DeutscheBank ("DB") and USTNY, dated as of May 24, 2001 (the "YIV Sterling Collateral Security Agreement") [AB000077665-AB000077720]; Section 3.1, Collateral Security Agreement, among ECLN Euro Trust, Citibank, DB, and USTNY dated as of May 24, 2001 (the "YIV Euro Collateral Security Agreement") [AB000374711-AB000374766].

[27] See, e.g., Letter from Joseph F. Sheridan, Managing Director, S&P, to Amanda Angelini, Salomon, May 24, 2001 [AB000076544–AB000076545]; Letter from Joseph F. Sheridan, Managing Director, S&P, to Amanda Angelini, Salomon, May 24, 2001 [AB000375384 –AB000375385].

[28] See Letter from William L. May, Moody's, to ECLN II Trust May 24, 2001 [AB000076543]; Letter from William L. May, Moody's, to ECLN Sterling Trust May 24, 2001 [AB000078878]; Letter from William L. May, Moody's, to ECLN Euro Trust May 24, 2001 [AB000375383].

[29] See Appendix A, YIV Dollar Collateral Security Agreement (definition of "Certificate Yield").

[30] See Enron Sterling Credit Linked Notes Trust: 8.5% Trust Certificate, No. 1, in the Amount of £14,000,000 [AB000078625-AB000078628].

[31] See Appendix A, YIV Sterling Collateral Security Agreement (definition of "Certificate Yield").

[32] See *id.* (definition of "Distribution Date").

Certificates[33] and subsequently entered into a Total Return Swap with Salomon, or another Citibank affiliate, whereby such affiliate synthetically purchased the YIV Certificates from ING.[34]

As in the other Yosemite Transactions, each ECLN III Trust funded payments on the YIV Notes and the YIV Certificates issued by it by entering into a swap transaction with Citibank (the "YIV Citibank/Yosemite Swaps"),[35] pursuant to which Citibank agreed to pay to the ECLN III Trust an amount equal to the interest due on the outstanding YIV Notes and YIV Certificates on the dates such payments were due.[36] In exchange, the applicable ECLN III Trust paid to Citibank any yield actually received by such ECLN III Trust with respect to its investments.[37] The YIV Citibank/Yosemite

---

[33] See Certificate Purchase Agreement among ECLN II Trust, Enron Corp. and ING, dated as of May 24, 2001 (the "YIV Dollar Certificate Purchase Agreement") [AB000075448-AB000075465]; Certificate Purchase Agreement among ECLN Sterling Trust, Enron Corp. and ING, dated as of May 24, 2001 (the "YIV Sterling Certificate Purchase Agreement") [AB000077743-AB000077760]; Certificate Purchase Agreement among ECLN Euro Trust, Enron and ING, dated as of May 24, 2001 (the "YIV Sterling Certificate Purchase Agreement") [AB000374789-AB000374806].

[34] In-Person Interview with Richard Caplan, Managing Director, Citibank, by John E. Stephenson, Jr., Partner, A&B, et al., Nov. 27, 2002 (the "Caplan Interview").

[35] See Swap Confirmation between ECLN II Trust and Citibank, May 24, 2001 (the "YIV Dollar Citibank/Yosemite Swap") [AB000075378-AB000075386]; Swap Confirmation between ECLN Sterling Trust and Citibank, dated May 24, 2001 (the "YIV Sterling Citibank/Yosemite Swap") [AB000077655-AB000077663]; and Swap Confirmation between ECLN Euro Trust and Citibank, dated May 24, 2001 (the "YIV Euro Citibank/Yosemite Swap") [AB000374701-AB00374709]. The YIV Citibank/Yosemite Swaps were issued pursuant to ISDA Master Agreements and Schedules between Citibank and the various ECLN III Trusts. ISDA Master Agreement between ECLN II Trust and Citibank, dated as of May 24, 2000 [AB000075344-AB000075377]; ISDA Master Agreement between ECLN Sterling Trust and Citibank, dated as of May 24, 2001 [AB000077621-AB000077654]; ISDA Master Agreement between ECLN Euro Trust and Citibank, dated as of May 24, 2001[AB0000374667-AB0000374700].

[36] See Section 2, YIV Citibank/Yosemite Swaps.

[37] See id. Section 2. Citibank received the interest, earnings, periodic fees and other periodic amounts received with respect to the Trust Investments. See Appendix A, YIV Collateral Security Agreements (definition of "Actual Interest Receipts").

Swaps were secured by the investments of such ECLN III Trust and all other assets of the relevant ECLN III Trust (other than the relevant YIV Citibank/Yosemite Swap itself).[38]

Similar to Yosemite III, the relevant ECLN III Trust invested the proceeds it received from the issuance of YIV Notes and YIV Certificates in a certificate of deposit issued by Citibank (each a "YIV Citibank CD").[39] Citibank used a portion of the proceeds received from the issuance of the YIV Citibank CDs to make its initial payments under the YIV ENA/Citibank Swaps and the YIV Delta/Citibank Swaps.[40] Citibank used the balance of the proceeds to fund loans to Enron in the original principal amounts of $25 million,[41] £15.5 million[42] and €30 million[43] (the "YIV Magic Notes"), which related to the Yosemite IV Dollar, Yosemite IV Sterling and Yosemite IV Euro transactions, respectively. Pursuant to the terms of the YIV Magic Notes, interest accrued at the rate of 35.70%, 15.85 1 %[44] and 12.750% per year and was paid on the same dates ENA was required to make the fixed payments under the relevant swap

---

[38] Section 3.1, YIV Collateral Security Agreement.

[39] See Citibank Certificate of Deposit in the Amount of $550 million (the "YIV Dollar CD") [AB000375260–AB000375264]; Citibank Certificate of Deposit in the Amount of £139 million (the "YIV Sterling CD") [AB000078762-AB000078766]; Citibank Certificate of Deposit in the Amount of e222.5 million, (the "YIV Euro CD") [EVE37335-EVE37337]. The Dollar denominated YIV Citibank CD yielded 4.07500%, the Sterling denominated YIV Citibank CD yielded 5.21719% and the Euro denominated YIV Citibank CD yielded 4.55063%.

[40] Given the fungible nature of money, whether, as a technical matter, Citibank used the actual funds received upon the opening of the Citibank CD has not been verified.

[41] Enron Debt Security by Enron Corp. in favor of Citibank in the Original Principal Amount of $25,000,000, dated May 24, 2001 (the "YIV Dollar Magic Note") [AB000375268-AB000375271].

[42] Enron Debt Security by Enron Corp. in favor of Citibank in the Original Principal Amount of £15,500,000, dated May 24, 2001 (the "YIV Sterling Magic Note") [AB000078768-AB000078771].

[43] Enron Debt Security by Enron Corp. in favor of Citibank in the Original Principal Amount of €30,000,000, dated May 24, 2001 (the "YIV Euro Magic Note") [AB024400181-AB024400184].

[44] A stamp over the interest rate on the copy of the note provided to the Examiner makes this amount unclear.

- 10 -

transactions.[45]    These interest payments were $8,925,000,[46] £2,456,905,[47] and €3,825,000,[48] respectively. According to a post-closing summary of the Yosemite IV Transaction apparently prepared internally by Enron, the coupon of the YIV Magic Notes was "intended to cover the 30 bpts balance sheet fee paid to Citi plus the shortfall between the embedded coupon on the prepay transaction and the coupon on the Credit Linked Notes."[49]

C.    **The Collapse of the Transactions**

Promptly following the Petition Date, both Citibank and Delta exercised their rights to terminate their respective swap agreements with Enron.[50] As a result, Delta terminated its position by assigning its claims against ENA to Citibank," and Citibank assigned all its claims against ENA to the trusts.[52]

---

[45] See YIV Magic Notes, at 1.

[46] *Id.* Citibank would thus receive $38,375,000 annually under the Dollar denominated Yosemite IV swaps and the YIV Dollar Magic Note, resulting in an effective interest rate of 7.675% on $500 million.

[47] YIV Sterling Magic Note, at 1. Citibank would thus receive £9,437,530 annually under the Sterling denominated Yosemite IV swaps and the YIV Sterling Magic Note, resulting in an effective interest rate of 7.55% on £125 million.

[48] YIV Euro Magic Note, at 1. Citibank would thus receive €13,600,000 annually under the Euro denominated Yosemite IV swaps and YIV Euro Magic Note, resulting in an effective interest rate of 6.8% on €200 million.

[49] See Post Closing Summary Enron Credit Linked Notes II Crude Oil Prepay, May 17, 2001 [AB025201074-AB025201076].

[50] Letter from Citibank to ENA, Dec. 2, 2001 [SEC00097774]; Letter from Delta to Enron, Dec. 3, 2001 [SEC00097783-SEC00097784].

[51] Assignment and Settlement Agreement between Citibank and Delta, dated as of Feb. 7, 2002 [SEC00097837-SEC00097840]; Assignment and Settlement Agreement between Citibank and Delta, Feb. 7, 2002 [SEC00097837-SEC00097840]; Assignment and Settlement Agreement between Delta and Citibank, Feb. 7, 2002 [SEC00098074-SEC00098077].

[52] See, e.g., Letter from Citibank to ECLN Sterling Trust, Jan. 31, 2002 [SEC00097943-SEC00097945]; Letter from Citibank to ECLN Euro Trust, Jan. 31, 2002 [SEC00098061-SEC00098063]; Assignment and Settlement Agreement between ECLN II Trust and Citibank, dated as of Feb. 8, 2002 [SEC00097863-SEC00097868]; Assignment and Settlement Agreement between ECLN Sterling Trust and Citibank, dated as of Feb. 8, 2002 [SEC00097996-SEC00098007]; Assignment and Settlement Agreement between ECLN Sterling Trust and Citibank dated as of Feb. 8, 2002 [SEC00097996-SEC00098007].

### III.  ECONOMICS AND ALLOCATION OF RISK IN THE YOSEMITE IV TRANSACTION

The economics and allocation of the risk of Yosemite IV are essentially the same as in Yosemite III discussed in Annex 4 to Appendix E (Prepay Transactions).

## IV.     LEGAL ISSUES IN THE YOSEMITE IV TRANSACTION

This Annex will not discuss potential legal issues, which include principles of equitable subordination, third-party culpability (including culpability of any officer, director, professional or financial institution), avoidance claims, or other potential affirmative claims of the Debtors' estates.  The Examiner is in the process of gathering and analyzing the evidence necessary to report on these matters in subsequent reports.[53]

---

[53] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Appendix and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

V.      **ACCOUNTING ISSUES IN THE YOSEMITE IV TRANSACTION**

The accounting issues raised by Yosemite IV are discussed in detail in Appendix

E (Prepay Transactions).

## VI. ROLE OF CITIBANK IN THE YOSEMITE IV TRANSACTION

Citibank's role with respect to all of the Yosemite Transactions, including Yosemite IV, is discussed in Annex 2 to Appendix E (Prepay Transactions).

## VII.   EXAMINER'S  CONCLUSIONS  WITH  RESPECT  TO  THE YOSEMITE IV TRANSACTION

Em-on's obligations under Yosemite IV were effectively debt.    Although Yosemite IV was structured as a complex set of commodity swaps, Enron never transferred any price risk of the commodities to Delta or Citibank. The offsetting movements of the payments based on market prices around the circular structure of the transaction essentially eliminated the price risk.   Thus, the upfront cash payments to Enron were in effect loans from Delta to Enron.

As discussed in Appendix E (Prepay Transactions), Enron's accounting for Yosemite IV as price risk management activity did not comply with GAAP. Enron should have included the $775 million it obtained through Yosemite IV as debt on its 2001 financial statements. In addition, Enron should have reported this amount as cash flows from financing activities rather than from operating activities.

As discussed in Appendix D (Disclosure), Enron made no specific disclosure of Yosemite IV in its financial statements or other public filings. Thus, it made no public disclosure that would have provided an investor with transparent information on the significant amount of cash flow generated by the transaction, or of the terms under which Em-on was required to repay the effectively borrowed money.