U.S. $485,000,000

# CREDIT AND SECURITY AGREEMENT

Dated as of December 29, 1997

Among

## NIGHTHAWK INVESTORS, L.L.C.

as Borrower

and

## CXC INCORPORATED

as Initial Lender

and

## CITICORP NORTH AMERICA, INC.

as Agent and as
Security and Collection Agent

This document is subject to a
written Confidentiality Agreement

EC 001014121

AB000370573

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.  Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
SECTION 1.02.  Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . .  19
SECTION 1.03.  Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

## ARTICLE II

### AMOUNTS AND TERMS OF THE ADVANCE

SECTION 2.01.  The Advance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
SECTION 2.02.  Making the Advance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
SECTION 2.03.  Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
SECTION 2.04.  Certain Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
SECTION 2.05.  Repayment of the Advance  . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
SECTION 2.06.  Prepayments of the Advance  . . . . . . . . . . . . . . . . . . . . . . . . . .  22
SECTION 2.07.  Increased Costs; Capital Adequacy, Etc  . . . . . . . . . . . . . . . . . . .  24
SECTION 2.08.  Interest Rate Determination; Payments and Computations  . . . . . . . .  25
SECTION 2.09.  Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
SECTION 2.10.  Evidence of Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
SECTION 2.11.  Change of Lending Office.  . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
SECTION 2.12.  Replacement of Lender and Liquidity Providers Under Certain
               Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
SECTION 2.13.  Exercise of Full Purchase Option  . . . . . . . . . . . . . . . . . . . . . . .  30

## ARTICLE III

### CONDITIONS TO ADVANCE

SECTION 3.01.  Conditions Precedent to Make the Advance . . . . . . . . . . . . . . . . .  31
SECTION 3.02.  Determinations Under Section 3.01 . . . . . . . . . . . . . . . . . . . . . .  38

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014122

AB000370574

ii

|  |  | Page |
|---|---|---|
| SECTION 4.01. | Representations and Warranties of the Borrower | 39 |

## ARTICLE V

### COVENANTS OF THE BORROWER

| SECTION 5.01. | Affirmative Covenants | 43 |
| SECTION 5.02. | Negative Covenants | 45 |
| SECTION 5.03. | Reporting Requirements | 48 |

## ARTICLE VI

### EVENTS OF DEFAULT

| SECTION 6.01. | Events of Default | 51 |

## ARTICLE VII

### GRANT OF SECURITY INTEREST, PLEDGE AND ASSIGNMENT

| SECTION 7.01. | Pledge and Assignment | 53 |
| SECTION 7.02. | Security for Obligations | 55 |
| SECTION 7.03. | Delivery of Pledged Collateral | 55 |
| SECTION 7.04. | Borrower Remains Liable | 56 |
| SECTION 7.05. | Further Assurances | 56 |
| SECTION 7.06. | Security and Collection Agent Appointed Attorney-in-Fact | 57 |
| SECTION 7.07. | Security and Collection Agent May Perform | 58 |
| SECTION 7.08. | Reasonable Care | 58 |
| SECTION 7.09. | Rights, Remedies and Obligations | 58 |
| SECTION 7.10. | Remedies upon Default | 60 |
| SECTION 7.11. | Continuing Assignment and Security Interest; Transfer of Advance | 62 |
| SECTION 7.12. | Registration of Pledge | 62 |

## ARTICLE VIII

### ADMINISTRATION, SETTLEMENT AND COLLECTION

| SECTION 8.01. | Maintaining the Operating Account | 63 |
| SECTION 8.02. | Deposit of Funds into the Operating Accounts | 63 |
| SECTION 8.03. | Investing of Amounts in the Operating Account | 64 |

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014123

AB000370575

iii

|  |  | Page |
|---|---|---|
| SECTION 8.04. | Transfers from the Accounts | 65 |
| SECTION 8.05. | Agent's Agreements | 71 |

ARTICLE IX

THE AGENT, THE SECURITY AND COLLECTION AGENT
AND THE ESCROW AGENT

| SECTION 9.01. | Authorization and Action | 72 |
| SECTION 9.02. | Agent's, Security and Collection Agent's and Escrow Agent's Reliance, Etc. | 73 |
| SECTION 9.03. | CNAI and Affiliates | 74 |
| SECTION 9.04. | Lender Credit Decision | 74 |

ARTICLE X

ASSIGNMENT OF ADVANCE

| SECTION 10.01. | Assignment and Participations | 75 |

ARTICLE XI

INDEMNIFICATION

| SECTION 11.01 | Indemnities by the Borrower. | 79 |

ARTICLE XII

MISCELLANEOUS

| SECTION 12.01. | Amendments, Etc. | 81 |
| SECTION 12.02. | Notices, Etc. | 82 |
| SECTION 12.03. | No Waiver; Remedies | 82 |
| SECTION 12.04. | Costs and Expenses | 82 |
| SECTION 12.05. | Right of Set-off | 84 |
| SECTION 12.06. | Binding Effect | 84 |
| SECTION 12.07. | Governing Law | 85 |
| SECTION 12.08. | Execution in Counterparts | 85 |
| SECTION 12.09. | Borrower Class A Member and Administrator | 85 |
| SECTION 12.10. | Non-Recourse Liability | 85 |

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014124

AB000370576

                                                                                    **Page**

SECTION 12.11.  Consent to Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86
SECTION 12.12.  Confidentiality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  88
SECTION 12.13.  Headings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89
SECTION 12.14.  Acknowledgement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89
SECTION 12.15.  WAIVER OF JURY TRIAL  . . . . . . . . . . . . . . . . . . . . . . . . . .  89

**Exhibits**

Exhibit A      -     Form of Assignment and Acceptance
                     Schedule 1 to Assignment and Acceptance

Exhibit B      -     Form of Opinion of Jones, Day, Reavis & Pogue, special counsel to
                     Borrower and Equity Participant

Exhibit C      -     Form of Opinion of Potter Anderson & Corroon, special Delaware
                     counsel to Joint Venture and Borrower

Exhibit D-1    -     Form of Opinion of Vinson & Elkins LLP, special counsel to Enron

Exhibit D-2    -     Form of Opinion of Vinson & Elkins LLP, special counsel to Enron

Exhibit D-3    -     Form of Opinion of Oregon Utility Counsel

Exhibit E-1    -     Form of Opinion of internal counsel of Enron

Exhibit E-2    -     Form of Opinion of Perkins Coie, special counsel to Enron

Exhibit F      -     Form of Opinion of Shearman & Sterling, special counsel to Agent

Exhibit G      -     Form of Opinion of Karl T. Molin, Esq., counsel of the Surety Provider

Exhibit H      -     Form of Comfort Letter

Exhibit I      -     Form of Confidentiality Agreement

Exhibit J      -     Form of Written Instructions to Register Pledge

Exhibit K      -     Form of Initial Transaction Statement

EC 001014125

AB000370577

CREDIT AND SECURITY AGREEMENT

Dated as of December 29, 1997

NIGHTHAWK INVESTORS, L.L.C., a Delaware limited liability company (the "Borrower"), CXC INCORPORATED, a Delaware corporation ("CXC" or the "Initial Lender"), and CITICORP NORTH AMERICA, INC., a Delaware corporation ("CNAI"), as agent (the "Agent") and security and collection agent (the "Security and Collection Agent") for the Lender (as hereinafter defined), agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Joint Venture Company Agreement. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Financing Costs" means interest, fees, costs, indemnities, taxes payable under Section 2.09 hereof, expenses and similar items and amounts that are required to be paid by (or an obligation to pay which has been incurred by) the Borrower under the Loan Documents, other than (i) interest payable under this Agreement pursuant to Section 2.03 (other than Unapplied Amount Interest and any interest included in the computation of CP Breakage Amount), (ii) fees payable under this Agreement pursuant to Section 2.04 and (iii) the principal amount of the Advance, but including amounts payable under Section 2.09 in respect of any of the foregoing exclusions.

"Administration Agreement" means the Administration Agreement dated as of the date hereof, between the Administrator and the Borrower, pursuant to which the Borrower engaged the Administrator to administer the business and affairs of the Borrower, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Administrator" means Wilmington Trust Company as administrator of the Borrower pursuant to the Administration Agreement, and any permitted successor thereto.

SS_NYLJA/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014126


AB000370578

2

"Administrator's Account" means the "Administrator's Account" maintained pursuant to the Administration Agreement and held with the Administrator at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890.

"Advance" means the advance made by the Initial Lender to the Borrower pursuant to Article II.

"Affiliate" means (i) as to any Person, (a) any Person directly or indirectly controlling, controlled by or under common control with such Person, (b) any executive officer, director, manager, managing member or general partner of such Person or (c) any Person who is an executive officer, director, manager, managing member, general partner, or trustee of any Person described in clauses (a) or (b) of this sentence and (ii) as to CNAI or CXC, shall also include CXC or CNAI, respectively, and any other Person who has a relationship to CNAI comparable to that of CXC.

"Agent" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Agent's Account" means the account no. 40606138 of the Agent maintained at Citibank, 399 Park Avenue, New York, New York 10043, or such other account as shall be notified to the Borrower by the Agent from time to time.

"Agreement" means this Credit and Security Agreement, as amended, supplemented or otherwise modified from time to time.

"Applicable Funds" has the meaning set forth in Section 8.04(a) hereof.

"Applicable Margin" means, as of any date, a percentage per annum equal to .50 of 1%, as such percentage may be adjusted annually by the Agent in good faith based on the quoted percentage spread over the LIBO Rate received by the Agent from the Liquidity Providers at the time of the entering into (including entering into at the time of the initial syndication by the Initial Liquidity Provider of its Commitment) or renewal of their respective Commitments.

"Asset Purchase Agreement" means the Asset Purchase Agreement to be entered into among the Agent and the Liquidity Providers (as the same may be modified, supplemented or amended from time to time).

"Assigned Agreements" has the meaning set forth in Section 7.01(a) hereof.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014127

AB000370579

3

"Assignee" means any Person as the assignee of the Advance or an interest therein pursuant to Section 10.01.

"Assignee Advance" means the Advance during each Interest Period (or any portion thereof) on the first day of which the Lender will not be funding the maintenance of such Advance for such Interest Period (or portion thereof) through the issuance of commercial paper notes or other promissory notes.

"Assignee Rate" means, for any Interest Period (or portion thereof) in which an Advance is an Assignee Advance, an interest rate per annum equal to the LIBO Rate for such Interest Period (or portion thereof) plus the Applicable Margin then in effect; provided, however, that if either (i) the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for the Lender to obtain funds in the London interbank market during such Interest Period (or portion thereof); (ii) the LIBO Rate will not adequately reflect the cost to the Lender, or, if CXC shall have assigned interests in the Advance to the Liquidity Providers pursuant to their respective Commitments, to the Majority Liquidity Providers, of maintaining the Advance during such Interest Period (or portion thereof); or (iii) the LIBO Rate cannot be determined, as described in Section 2.08(g), then the "Assignee Rate" for such Interest Period (or portion thereof) shall be the interest rate per annum equal to the Base Rate in effect on the first day of such Interest Period (or portion thereof).

"Assignment and Acceptance" means an assignment and acceptance entered into by the Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit A hereto.

"Base Rate" means, for any period, a fluctuating interest rate per annum as shall be in effect from time to time which rate per annum shall at all times be equal to the highest of:

      (a)    the rate of interest announced publicly by Citibank in New York, New York, from time to time, as Citibank's base rate;

      (b)    the sum (adjusted to the nearest 1/4 of 1% or, if there is no nearest 1/4 of 1%, to the next higher 1/4 of 1%) of (i) 1/2 of 1% per annum, plus (ii) the rate obtained by dividing (A) the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major United States money market banks, such three-week moving average (adjusted to the basis of a year of 360 days) being determined weekly on each Monday (or, if such day is not a Business Day, on

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014128

AB000370580

4

the next succeeding Business Day) for the three-week period ending on the previous Friday by Citibank on the basis of such rates reported by certificate of deposit dealers to and published by the Federal Reserve Bank of New York or, if such publication shall be suspended or terminated, on the basis of quotations for such rates received by Citibank from three New York certificate of deposit dealers of recognized standing selected by Citibank by (B) a percentage equal to 100% minus the average of the daily percentages specified during such three-week period by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, but not limited to, any emergency, supplemental or other marginal reserve requirement) for Citibank with respect to liabilities consisting of or including (among other liabilities) three-month U.S. dollar non-personal time deposits in the United States, plus (iii) the average during such three-week period of the annual assessment rates estimated by Citibank for determining the then current annual assessment payable by Citibank to the Federal Deposit Insurance Corporation (or any successor) for insuring U.S. dollar deposits of Citibank in the United States; and

(c)     the sum of 1/2 of one percent per annum plus the Federal Funds Rate in effect from time to time.

"Borrower Class A Member" means a Class A member of the Borrower pursuant to the Investor Company Agreement.

"Borrower Class B Member" means a Class B member of the Borrower pursuant to the Investor Company Agreement.

"Borrower Liquidating Event" means an "Investor Liquidating Event" as defined in the Investor Company Agreement.

"Borrower Member Consent" means the letter of the Borrower to each of the Borrower Members dated as of the date hereof, as accepted and agreed to by such Borrower Members, acknowledging each Borrower Member's consent to the assignment to the Security and Collection Agent of the Joint Venture Interest, and of the Borrower's rights and interests under the Assigned Agreements and the other Pledged Collateral pursuant hereto.

"Borrower Members" means, collectively, the Members of the Borrower.

"Business Day" means (i) any day of the year except Saturday or Sunday that is a day on which banks are not required or authorized by law to close in New York City,

SS_NYL3A/27974
Nighthawk Credit & Security Agreement                    This document is subject to a
                                                         written Confidentiality Agreement

EC 001014129

AB000370581

5

New York, Wilmington, Delaware or Houston, Texas and (ii) if the applicable Business Day relates to any Assignee Advance bearing interest based on the LIBO Rate, any day that is a "Business Day" described in clause (i) and that is also a day for trading by and between banks in the London interbank Eurodollar market.

"Cash Equivalents" has the meaning set forth in the Investor Company Agreement.

"Citibank" means Citibank, N.A.

"Citicorp" means Citicorp, a Delaware corporation.

"Closing Date" means December 30, 1997.

"Commitment" means a commitment of a Liquidity Provider under the Asset Purchase Agreement or, in the case of the Initial Liquidity Provider, under any other liquidity agreement relating hereto.

"Confidential Information" means information that the Borrower, Enron or any Affiliate of either furnishes to the Agent, the Lender, the Surety Provider, the Security and Collection Agent or any Liquidity Provider and designates in writing as confidential information, but does not include any such information (a) that is or becomes generally available to the public other than as a result of a breach by the Agent, the Lender, the Surety Provider, the Security and Collection Agent or such Liquidity Provider of its obligations hereunder or (b) that is or becomes available to the Agent, the Lender, the Surety Provider, the Security and Collection Agent or such Liquidity Provider from a source other than the Borrower that is not, to the best of the Agent's, the Lender's, the Surety Provider's, the Security and Collection Agent's or such Liquidity Provider's knowledge, acting in violation of a confidentiality agreement with the Borrower.

"Consolidated" refers to the consolidation of accounts in accordance with GAAP.

"CP Breakage Amount" means, if the Advance is an Assignee Advance for only a portion of an Interest Period (and not for the entire Interest Period), the sum of (a) any amounts required to compensate the Lender or any Liquidity Provider (as the case may be) for any additional losses, costs or expenses that the Lender or such Liquidity Provider may reasonably incur as a result of any prepayment of all or a portion of the Advance or conversion of all or any portion of the Advance to an Assignee Advance prior to the end of an Interest Period, including, without limitation, any loss (excluding

This document is subject to a
written Confidentiality Agreement

EC 001014130


AB000370582

6

loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender or such Liquidity Provider to fund or maintain the Advance or portion thereof, as the case may be and (b) if any portion of the Advance is assigned to the Liquidity Providers for a portion of an Interest Period, the sum of (i) the amount of interest accrued to the Lender in respect of the Advance through the date of such assignment to the Liquidity Providers on the portion so assigned and (ii) interest accruing at the Assignee Rate on such amount of interest described in clause (b)(i) through the date of payment of such interest described in clause (b)(i).

"CXC Advance" means the Advance during each Interest Period (or any portion thereof) on the first day of which the Lender will be funding the maintenance of such Advance for such Interest Period (or portion thereof) through the issuance of commercial paper notes or other promissory notes.

"CXC Rate" means, for any Interest Period (or any portion thereof), the sum of .02 of 1% per annum in respect of the administration fee and the per annum rate equivalent to the weighted average of the per annum rates paid or payable by the Lender from time to time as interest on or otherwise (by means of interest rate hedges or otherwise) in respect of those promissory notes issued by the Lender that are allocated, in whole or in part, by the Agent (on behalf of the Lender) to fund the Advance or maintenance of the Advance during such Interest Period (or portion thereof), as determined by the Agent (on behalf of the Lender) and reported to the Borrower, which rates shall reflect and give effect to the commissions of placement agents and dealers in respect of such promissory notes, to the extent such commissions are allocated, in whole or in part, to such promissory notes by the Agent (on behalf of the Lender); provided, however, that if any component of such rate is a discount rate, in calculating the "CXC Rate" for such Interest Period (or portion thereof), the Agent shall for such component use the rate resulting from converting such discount rate to an interest bearing equivalent rate per annum.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (whether or not the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all Obligations, contingent or otherwise, of such Person under acceptance,

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014131

AB000370583

7

letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any partnership or member or other equity interests of such Person, (h) all Obligations of such Person in respect of Hedge Agreements, (i) all other financial Obligations of such Person under any contract or other agreement to which such Person is a party, (j) all Debt of other Persons referred to in clauses (a) through (i) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to  make payment of such Debt or to assure the holder of such Debt against loss, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss, and (k) all Debt referred to in clauses (a) through (j) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"Debt Collection Date" means the first day on or after the Collection Date on which the aggregate outstanding principal amount of the Advance shall have been paid in full together with all interest accrued thereon, and the Borrower shall have paid in full all of the Liquidation Amounts, Liquidity Fees, Premiums and other amounts payable by the Borrower under this Agreement accrued through the date of such payment of principal and interest.

"Default" means any event (other than the 2002 Termination Event) that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Deficiency" has the meaning set forth in Section 8.04(f)(i) hereof.

"Deficiency Notice" has the meaning set forth in Section 8.04(f)(ii) hereof.

"Distributions" means any distribution or dividend or return of capital or any other distribution, payment or delivery of property or cash, or the redemption, retirement, purchase or acquisition, directly or indirectly, of any membership or partnership interest now or hereafter outstanding (or any warrants for or options in respect of any such interest) or the setting aside of any funds for any of the foregoing purposes.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014132

AB000370584

8

"Eligible Assignee" means (a) a commercial bank organized under the laws of the United States, or any State thereof, and having total assets in excess of $1,000,000,000 (or the equivalent thereof); (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having total assets in excess of $1,000,000,000 (or the equivalent thereof); (c) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow, or a political subdivision of any such country, and having total assets in excess of $1,000,000,000 (or the equivalent thereof); (d) the central bank of any country that is a member of the OECD; (e) Ambac Assurance Corporation, the Surety Provider, Citibank or CNAI; (f) any Person or entity that, directly or indirectly, controls, is controlled by or is under common control with Citicorp with short term debt ratings of at least A-1 by S&P and P-1 by Moody's; (g) any person or entity to which or for whom Citicorp, or any other person or entity described in clause (e) or (f) above, provides services or administrative functions with short term debt ratings of at least A-1 by S&P and P-1 by Moody's and which has a relationship to Citicorp comparable to that of CXC; (h) any Liquidity Provider; or (i) any other Person approved by the Agent and the Borrower, such approval not to be unreasonably withheld; provided, however, that none of the Borrower, Enron or any Joint Venture Class A Member or any Affiliate of the Borrower or of Enron or of any Joint Venture Class A Member shall qualify as an Eligible Assignee; provided further that each such Eligible Assignee shall also be a "qualified purchaser" as defined in the Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"Enron Consent" means the letter of the Borrower to Enron dated as of the date hereof, as accepted and agreed to by Enron, acknowledging Enron's consent to the assignment to the Security and Collection Agent of the Borrower's rights and interest under the Enron Agreement (other than in respect of Excluded Payments) pursuant hereto, which letter shall include, without limitation, Enron's acknowledgment that the Security and Collection Agent can exercise the rights of the Borrower under the Enron Agreement if an Event of Default has occurred and is continuing.

"Enron Event" has the meaning given such term in the Enron Agreement.

"Equity Delegee" means Harch Capital Management, Inc.

"Equity Investors Agreement" means the Equity Investors Agreement, dated as of December 29, 1997, between Enron, Prairie Hawk, HCM High Yield Opportunity Fund L.P., and the Equity Participant, in the form delivered to the Agent on the

This document is subject to a
written Confidentiality Agreement

EC 001014133

AB000370585

Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time.

"Equity Participant" means Golden Eagle L.L.C., a Delaware limited liability company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that for purposes of Title IV of ERISA is a member of the Borrower's controlled group, or under common control with the Borrower, within the meaning of Section 414 of the Internal Revenue Code. For purposes of this Agreement, "ERISA Affiliate" shall not include Enron, the Administrator or any of their respective Affiliates.

"Escrow Agent" means CNAI, or any successor escrow agent, appointed pursuant to the terms hereof and of the Escrow Agreement and acting as such pursuant to the Escrow Agreement.

"Escrow Agreement" means the Escrow Agreement dated as of the date hereof among the Borrower, the Joint Venture, Prairie Hawk, the Equity Participant, the Escrow Agent, the Agent and the Security and Collection Agent, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time.

"Escrowed Documents" means the documents required to be delivered to and held in escrow by the Escrow Agent pursuant to the Escrow Agreement.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Events of Default" has the meaning specified in Section 6.01.

"Excluded Payments" means (i) any indemnification or other payments under the Operative Documents payable to Persons other than the Borrower in its own right, (ii) any payment by the Joint Venture to the Borrower in respect of the Termination Premium, (iii) Transaction Costs (including Transaction Costs constituting Member Expenses) and Adjusted Member Additional Financing Costs in respect of Member Additional Financing Costs under the Investor Company Agreement, (iv) with respect

EC 001014134

AB000370586

10

to any regularly scheduled Preferred Payment received by the Borrower pursuant to Section 7.1(a) of the Joint Venture Company Agreement, an amount equal to $7750 per Fiscal Quarter and (v) interest on any of the foregoing paid as a result of any late payment by the Joint Venture of amounts in respect of any of the foregoing.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Final Settlement Date" has the meaning set forth in the Purchase Option Agreement.

"Fiscal Quarter" means (i) the period commencing on December 30, 1997 and ending on December 31, 1997 and (ii) any subsequent period commencing on each of January 1, April 1, July 1 and October 1 and ending on the last date before the next such date.

"Fiscal Year" means (a) the period commencing on December 30, 1997 and ending on December 31, 1997 and (b) any subsequent period commencing on January 1 and ending on the last date before the next such date.

"Full Purchase Closing Date" has the meaning set forth in the Purchase Option Agreement.

"Full Purchase Default" has the meaning set forth in the Purchase Option Agreement.

"Full Purchase Exercise Notice" has the meaning set forth in the Purchase Option Agreement.

"GAAP" has the meaning specified in Section 1.03.

"Guaranteed Payment" has the meaning specified in the Joint Venture Company Agreement.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014135

AB000370587

11

"Hedge Agreements" means interest rate swaps, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements.

"Incipient Event" means any event that, with notice or lapse of time, or both, would constitute a Joint Venture Termination Event (other than the 2002 Termination Event) or a Joint Venture Notice Event.

"Indemnified Amounts" has the meaning set forth in Section 11.01 hereof.

"Indemnified Party" has the meaning set forth in Section 11.01 hereof.

"Initial Lender" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Initial Liquidity Provider" means Citibank as a Commitment provider.

"Insurance Agreement" means the Insurance Agreement dated as of December 29, 1997 among the Surety Provider, CXC, the Security and Collection Agent and the Agent pursuant to which the Surety Bond in the amount of the Insured Amount under and as defined in such Insurance Agreement shall be issued, in the form delivered to the Agent on the Closing Date, as such Agreement may be amended, supplemented or otherwise modified from time to time.

"Interest Period" means the period commencing on December 30, 1997 and ending on the first Business Day of April 1998, and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the next succeeding first Business Day of July, October, January or April, as the case may be, of each year; provided, however, that, in the case of any Interest Period that commences before the Maturity Date and would otherwise end on a date occurring after the Maturity Date, such Interest Period shall end on the Maturity Date and the duration of each Interest Period that commences on or after the Maturity Date shall be of such duration as shall be selected by the Agent.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any capital stock, warrants, rights, options, obligations or other securities of such Person, any capital contribution to such Person or any other investment in such Person, including, without limitation, any arrangement pursuant to

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014136

AB000370588

12

which the investor incurs Debt of the types referred to in clauses (j) and (k) of the definition of "Debt" in respect of such Person.

"Investor Company Agreement" means the Amended and Restated Company Agreement of Nighthawk Investors L.L.C. dated as of December 29, 1997 among the Equity Participant and Prairie Hawk, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Joint Venture" means Whitewing Associates L.L.C., a Delaware limited liability company.

"Joint Venture Class A Member" means the Class A Member (as defined in the Joint Venture Company Agreement) of the Joint Venture pursuant to the Joint Venture Company Agreement.

"Joint Venture Company Agreement" means the Amended and Restated Company Agreement of Whitewing Associates L.L.C. dated as of the date hereof, between Enron and the Borrower, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Joint Venture Consent" means the letter of the Borrower to the Joint Venture dated as of the date hereof, as accepted and agreed to by Enron and the Joint Venture, acknowledging the Joint Venture's consent to the assignment to the Security and Collection Agent of the Borrower's rights and interests (other than in respect of Excluded Payments) under the Joint Venture Company Agreement, the other Assigned Agreements to which Enron and the Joint Venture are parties and of the Joint Venture Interest pursuant hereto.

"Joint Venture Custodian Consent" means the letter of the Borrower to the Joint Venture dated as of the date hereof, as accepted and agreed to by the Custodian, acknowledging the Custodian's consent to the assignment to the Security and Collection Agent of the Borrower's rights and interests (other than in respect of the Excluded Payments) under the Joint Venture Company Agreement and of the Joint Venture Interest pursuant hereto.

"Joint Venture Documents" means, collectively, the "Operative Documents" as defined in the Joint Venture Company Agreement, each in the form delivered to the Agent on the Closing Date, as such agreements may be amended, supplemented or otherwise modified from time to time as permitted hereby.

This document is subject to a
written Confidentiality Agreement

EC 001014137

AB000370589

13

"Joint Venture Interest" means the total membership interest in the Joint Venture held from time to time by the Borrower as such Joint Venture Interest may be increased or decreased in accordance with the terms of the Joint Venture Company Agreement.

"Lender" means, on and after the making of the Advance, the Initial Lender; provided, however, that, on and after any assignment of the Advance pursuant to Section 10.01 to any Assignee, such Assignee shall be the "Lender".

"Lending Office" means the lending office or offices from time to time specified by the Lender as its "Lending Office" hereunder for any Assignee Advance.

"LIBO Rate" means, for any Interest Period (or any portion thereof), an interest rate per annum equal to the average (rounded upward to the nearest whole multiple of 1/16 of 1% per annum, if such average is not such a multiple) of the rate per annum at which dollar deposits in immediately available funds are offered by the Reference Bank to leading banks in the London interbank Eurodollar market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period (or any portion thereof) in an amount substantially equal to the amount of the Advance to be outstanding during such Interest Period (or any portion thereof) and for a period equal to such Interest Period (or portion thereof). The LIBO Rate for each Interest Period (or any portion thereof) shall be determined by the Agent on the basis of applicable rates furnished to and received by the Agent from the Reference Bank two Business Days before the first day of such Interest Period (or portion thereof), subject, however, to the provisions of Section 2.08.

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), priority, security interest, or other security device or arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code (as in effect from time to time in the relevant jurisdiction), or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Liquidation Amount" means, for any payment of the outstanding principal amount of the Advance that is applied during (and not on the last day of) any Interest Period, any amounts required to compensate the Lender or any Liquidity Provider (as the case may be) for any additional losses, costs or expenses that the Lender or such Liquidity Provider may reasonably incur as a result of such payment, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds

SS_NYLJA/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014138


AB000370590

14

acquired by the Lender or such Liquidity Provider to fund or maintain the Advance or portion thereof, as the case may be.

"Liquidity Fee" has the meaning set forth in Section 2.04(a).

"Liquidity Provider" means the Initial Liquidity Provider, or any other financial institution that is an Eligible Assignee described in clause (e), (f) or (g) of the definition of Eligible Assignee, or any other Eligible Assignee consented to by the Borrower (such consent not to be unreasonably withheld or delayed), in each case which has provided or hereafter provides a Commitment.

"Loan Documents" means this Agreement, the Surety Bond, the Asset Purchase Agreement, the Insurance Agreement, the Joint Venture Consent, the Borrower Member Consent, the Joint Venture Custodian Consent, the Escrow Agreement, the Escrowed Documents, the Enron Consent and the Process Agent Agreement, in the form delivered to the Agent on the Closing Date, as each such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Majority Liquidity Providers" means those Liquidity Providers having at least 51% of the Commitments.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the Borrower, (b) the rights and remedies of the Agent, the Security and Collection Agent, the Lender or the Surety Provider under any Loan Document or Assigned Agreement or (c) the ability of the Borrower to perform its Obligations under any Loan Document or other Operative Document to which it is or is to be a party.

"Maturity Date" means June 30, 2003.

"Maximum Advance Amount" means $485,000,000.

"Member" means, with respect to any limited liability company, any member admitted to such company in compliance with the company agreement for such company.

"Member Additional Financing Costs" has the meaning set forth in the Investor Company Agreement.

"Member Expenses" has the meaning set forth in the Investor Company Agreement.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014139

AB000370591

15

"Moody's" means Moody's Investors Service, Inc., or any successor that is a national statistical rating organization.

"Multiemployer Plan" of the Borrower means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any of its ERISA Affiliates is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" of the Borrower means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and at least one Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Notice of Borrowing" has the meaning set forth in Section 2.02(a).

"Obligation" means, with respect to any Person, any obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 6.01(e). Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, costs, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that CNAI, CXC, the Lender or the Surety Provider, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"OECD" means the Organization for Economic Cooperation and Development.

"Operating Account" means the "Operating Account" established and maintained pursuant to the Administration Agreement and held with the Administrator at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, in the name of the Borrower but under the sole dominion and control of, and exclusive right of withdrawal at the direction of, the Security and Collection Agent and subject to the terms of this Agreement and the Administration Agreement.

This document is subject to a
written Confidentiality Agreement

EC 001014140

AB000370592

16

"Operative Documents" means the Loan Documents, the Purchase Option Agreement, the Purchase Option Escrow Agreement, the Investor Company Agreement, the Administration Agreement, the Enron Agreement, the Equity Investors Agreement, the Tax Indemnity Agreement and the Joint Venture Documents.

"Other Taxes" has the meaning set forth in Section 2.09(c).

"Participation Register" has the meaning set forth in Section 10.01(g).

"Payment Date" means the sixth Business Day of each January, April, July and October in each year, commencing April 8, 1998.

"Permitted Investments" has the meaning set forth in Section 8.03 hereof.

"Permitted Liens" has the meaning set forth in Section 5.02(a).

"Person" means any legal person, including any individual, partnership, corporation (including a business trust), joint stock company, trust, joint venture, unincorporated association, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Pledged Collateral" has the meaning set forth in Section 7.01.

"Prairie Hawk" means Prairie Hawk, Inc., a Delaware corporation.

"Premium" has the meaning set forth in Section 2.04(b).

"Prescribed Forms" shall mean such duly executed form(s) or statement(s), and in such number of copies, that may, from time to time, be prescribed by law and that, pursuant to applicable provisions of (a) an income tax treaty between the United States and the country of residence of the Lender or any Liquidity Provider providing the form(s) or statement(s), (b) the Internal Revenue Code, or (c) any applicable rule or regulation under the Internal Revenue Code, permit the Borrower to make payments hereunder for the account of the Lender or such Liquidity Provider free of deduction or withholding of income or similar taxes (except for any deduction or withholding of income or similar taxes as a result of any change in or in the interpretation of any such treaty, the Internal Revenue Code or any such rule or regulation).

"Process Agent" has the meaning set forth in Section 12.11(c).

This document is subject to a
written Confidentiality Agreement

EC 001014141

AB000370593

17

"Process Agent Agreement" means the agreement dated as of the date hereof between the Borrower, Enron and The Corporation Trust Company pursuant to which the Borrower appointed The Corporation Trust Company as its Process Agent pursuant to Section 12.11(c) (or any agreement with any successor Process Agent as provided therein) in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Program Fee" has the meaning set forth in Section 2.04(c).

"Purchase Option Agreement" means the Purchase Option Agreement dated as of December 29, 1997 among Enron, the Borrower, the Agent, the Equity Participant and Prairie Hawk, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified as permitted hereby.

"Purchase Option Escrow Account" means the "Escrow Account" as defined in the Purchase Option Agreement.

"Purchase Option Escrow Agreement" means the "Escrow Agreement" as defined in the Purchase Option Agreement.

"Reference Bank" means Citibank, N.A. or any successor thereto.

"Register" has the meaning specified in Section 10.01(c).

"S&P" means Standard & Poors Rating Group, a division of McGraw-Hill Companies, Inc., or any successor that is a national statistical rating organization.

"Secured Obligations" has the meaning set forth in Section 7.02 hereof.

"Securities" has the meaning set forth in Section 7.01(e) hereof.

"Security and Collection Agent" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Single Employer Plan" of the Borrower means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and its ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

This document is subject to a
written Confidentiality Agreement

EC 001014142

AB000370594

18

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture, or limited liability company or (c) the beneficial interest in such trust or estate, is at the time directly or indirectly owned or controlled by such Person or by such Person and one or more of such Person's other Subsidiaries. For purposes of this Agreement, the Joint Venture shall not be a Subsidiary of the Borrower.

"Surety Bond" means the Surety Bond issued pursuant to the Insurance Agreement, in the form delivered to the Agent on the Closing Date, as amended, supplemented or otherwise modified from time to time, and each replacement surety bond issued by a Surety Provider in favor of the Agent on behalf of the Lender.

"Surety Provider" means initially, Ambac Assurance Corporation as issuer of the Surety Bond, and each successor and assignee of Ambac Assurance Corporation and issuer of a replacement Surety Bond pursuant to an Insurance Agreement satisfying the highest ratings requirement of CXC, and any other securitization vehicle that may be the Lender hereunder.

"Tax Indemnity Agreement" has the meaning set forth in the Investor Company Agreement, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified as permitted hereby.

"Taxes" has the meaning set forth in Section 2.09(a).

"Termination Date" means December 31, 1997.

"Transaction Costs" has the meaning set forth in the Investor Company Agreement.

"UCC" has the meaning set forth in Section 7.10(a) hereof.

"Unapplied Amount Interest" means (i) if any payment hereunder is received later than 1:00 P.M. (New York City time) on the day when due, the excess of (A) the interest accruing hereunder on the amount of such payment for the period from the date on which such payment is due to the next following Business Day over (B) earnings on the amount of such payment for such period.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014143

AB000370595

19

"Welfare Plan" means a welfare plan, as defined in Section 3(1) of ERISA.

SECTION 1.02.  Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to," "through" and "until" each mean "to but excluding".

SECTION 1.03.  Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with covenants shall be based upon, generally accepted accounting principles ("GAAP").

ARTICLE II

AMOUNTS AND TERMS OF THE ADVANCE

SECTION 2.01.  The Advance.  (a)  On the terms and conditions hereinafter set forth, the Initial Lender may, in its sole discretion, make a single advance to the Borrower (such advance being the "Advance") on any Business Day until the Termination Date in an aggregate amount not to exceed the Maximum Advance Amount.

(b)    The Advance shall be in integral multiples of $1,000,000 and shall initially be a CXC Advance.

(c)    Amounts borrowed hereunder and repaid or prepaid may not be reborrowed.

SECTION 2.02.  Making the Advance.  (a)  The Advance shall be made on notice (a "Notice of Borrowing"), given by the Borrower to the Agent not later than 10:00 A.M. (New York City time) on the proposed date of the making of the Advance, specifying the date and amount thereof.  Upon·the Initial Lender's agreement to make the Advance, and the satisfaction of the conditions precedent set forth herein, the Initial Lender shall, before 11:00 A.M. (New York City time) on the proposed date of the making of such Advance make such Advance available to the Borrower by deposit of the proceeds thereof to the Operating Account.

(b)    The Notice of Borrowing shall be irrevocable and binding on the Borrower.  The Borrower shall indemnify the Initial Lender against any loss, cost or expense incurred by the Initial Lender as a result of any failure to fulfill on or before the proposed date specified for the Advance the applicable conditions set forth in Article III, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense actually incurred by

SS_NYLJA/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014144

AB000370596

20

the Initial Lender, by reason of the liquidation or reemployment of deposits or other funds acquired by the Initial Lender to fund the Advance (net of any income received by the Initial Lender from reinvestment) when the Advance, as a result of such failure, is not made on such date.

SECTION 2.03.  Interest.  (a)  The Borrower shall pay interest on the unpaid principal amount of the Advance from the date of the making of the Advance, until such principal amount shall be paid in full, at the following rate per annum:

(i)    CXC Advance.  During each Interest Period (or portion thereof) for which the Advance is a CXC Advance, a rate per annum at all times during such Interest Period (or portion thereof) equal to the CXC Rate for such Interest Period (or portion thereof), payable on the Payment Date next succeeding the last day of such Interest Period.

(ii)    Assignee Advance.  During each Interest Period (or portion thereof) for which the Advance is an Assignee Advance, a rate per annum at all times during such Interest Period (or portion thereof) equal to the Assignee Rate for such Interest Period (or portion thereof), payable on the Payment Date next succeeding the last day of such Interest Period.

The Agent shall notify the Borrower and the Security and Collection Agent of such Assignee Rate or CXC Rate, as the case may be, on the third Business Day after the last day of such Interest Period in the case of the CXC Rate and on the first day of such Interest Period in the case of the Assignee Rate (or, if the Advance is an Assignee Advance for only a portion of such Interest Period, on the day such Advance becomes an Assignee Advance).

(b)  If the Advance is an Assignee Advance for only a portion of an Interest Period, the Borrower shall pay on demand by the Lender the CP Breakage Amount to the Agent for the benefit of the Lender on the Payment Date next following the day the Advance becomes an Assignee Advance; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount.

(c)  The Agent shall notify the Borrower and the Security and Collection Agent of any annual adjustment in the Applicable Margin as permitted pursuant to the definition of Applicable Margin contained herein.

(d)  The Borrower shall pay any Unapplied Amount Interest Amount promptly upon demand therefor, supported by documentation reasonably acceptable to the Borrower, by the

This document is subject to a
written Confidentiality Agreement

EC 001014145

AB000370597