21

Lender; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount.

(e)  If the Lender or any Liquidity Provider is required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, and if as a result thereof there is an increase in the cost to the Lender or such Liquidity Provider of agreeing to make or making, funding or maintaining the Assignee Advance, then the Borrower shall from time to time, upon demand by the Lender or such Liquidity Provider (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender or such Liquidity Provider, as the case may be, additional amounts, as additional interest hereunder, sufficient to compensate the Lender or such Liquidity Provider for such increased cost; provided that (i) if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount, and (ii) such additional amounts shall be without duplication in case of such additional amounts demanded by the Lender and a Liquidity Provider on the same Assignee Advance.  A certificate in reasonable detail as to the basis for and the amount of such increased cost, submitted to the Borrower and the Agent by the Lender or such Liquidity Provider, shall be conclusive and binding for all purposes, absent manifest error.

(f)  If any payment of principal of any Assignee Advance bearing interest calculated by reference to the LIBO Rate is made by the Borrower to or for the account of the Lender other than on the last day of the Interest Period for such Assignee Advance, the Borrower shall, upon demand by the Lender (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender any Liquidation Amount due and owing; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount.

SECTION 2.04.  Certain Fees.  (a)  The Borrower shall pay to the Agent for the account of the Liquidity Providers, in consideration for their Commitments, on the average daily aggregate outstanding principal amount of the Advance from time to time from December 30, 1997 until the Debt Collection Date, a fee at the rate of .15 of 1% per annum (as adjusted annually (including at the time of the initial syndication by the Initial Liquidity Provider of its Commitment) as determined in good faith by the Agent on the basis of the fees payable in respect of Commitments of the Liquidity Providers), such fee payable only at such times as the Advance is a CXC Advance (the "Liquidity Fee").  The Liquidity Fee is payable in arrears on

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014146

AB000370598

22

each Payment Date during the term of this Agreement and on the Debt Collection Date. The Agent shall notify the Borrower and the Security and Collection Agent of any annual adjustment in the Liquidity Fee.

(b)     The Borrower shall pay to the Agent for the account of the Surety Provider, in consideration of its issuance of the Surety Bond, on the average daily outstanding principal amount of the Advance from time to time from December 30, 1997 until the Debt Collection Date, a premium equal to .16 of 1% per annum (the "Premium"). The Premium is payable in arrears on each Payment Date during the term of this Agreement and on the Debt Collection Date.

(c)     The Borrower shall pay to the Agent for the account of CXC a program fee (the "Program Fee") of .20 of 1%, during such Interest Periods (or portions thereof) as the Advance is a CXC Advance, on the average daily aggregate outstanding principal amount of the Advance from December 30, 1997 until the Debt Collection Date. The Program Fee is payable in arrears on each Payment Date during the term of this Agreement and on the Debt Collection Date.

SECTION 2.05.  Repayment of the Advance.  The Borrower shall repay to the Lender on the Maturity Date the principal amount of the Advance then outstanding.

SECTION 2.06.  Prepayments of the Advance.  (a)  Optional.  The Borrower may, upon at least five Business Days' notice to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Borrower shall, prepay the outstanding principal amount of the Advance in whole or in part, together with (i) accrued interest, fees and Premium payable under Section 2.04 to the date of such prepayment on the principal amount prepaid and (ii) Additional Financing Costs, in each case of which the Borrower has received notice at least 3 Business Days prior to such prepayment; provided, however, that (x) each partial prepayment shall be in an aggregate principal amount of not less than $1,000,000 and (y) in the event of any such prepayment on a day other than the last day of an Interest Period, the Borrower shall pay to the Lender, on the last day of such Interest Period, any Liquidation Amount for such prepayment.

(b)     Mandatory.  (i)  The Borrower shall, upon receipt of any Base Amount and any related Partial Purchase Amount resulting from the exercise of a Partial Purchase Option under the Purchase Option Agreement, apply 100% of such Base Amount to prepay the principal amount of the Advance in accordance with Section 8.04(c) and apply such Partial Purchase Amount, less any Excluded Payments included therein, in accordance with Section 8.04(c).

This document is subject to a
written Confidentiality Agreement

EC 001014147

AB000370599

23

(ii)    The Borrower shall, upon receipt of any (x) distribution in respect of the capital account of the Borrower in the Joint Venture in a liquidation of the Joint Venture under Section 12 of the Joint Venture Company Agreement and any related Guaranteed Payments paid in connection therewith or (y) payment of the Member Interest Liquidation Value and any related Full Purchase Amount resulting from the exercise of the Full Purchase Option under the Purchase Option Agreement, apply 100% of the amount of such distribution or the Member Interest Liquidation Value to prepay the principal amount of the Advance in accordance with Section 8.04(d) and apply such Guaranteed Payments or Full Purchase Amount, as the case may be, less any Excluded Payments included therein, in accordance with Section 8.04(d). The amount of the Closing Payment in respect of an exercise of the Full Purchase Option shall be applied pursuant to Section 8.04(f)(v).

(iii)    In addition, any prepayments made under this subsection (b) other than on any Payment Date shall be accompanied by any Liquidation Amount for such prepayment; provided that, if a Deficiency exists at the time of such prepayment (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), such Liquidation Amount shall be due and payable by the Borrower only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such Liquidation Amount.

(c)    Information.  Upon receipt of notice of any optional or mandatory prepayment, the Agent shall notify the Borrower of accrued and unpaid interest on the principal amount to be prepaid, any Liquidation Amount or CP Breakage Amount in connection with such prepayment, any accrued and unpaid Premium, fees or Additional Financing Costs to be paid in connection therewith pursuant to Section 8.04(c) or (d), as the case may be, and such other information as may be reasonably necessary for the Borrower to advise Enron and the Joint Venture, as the case may be, as to the amounts to be paid to the Borrower in connection with any exercise of the Purchase Options or distribution from the Joint Venture.

(d)    Notice.  Each prepayment shall be accompanied by written notice to the Agent and the Security and Collection Agent of the provision of Section 2.06(a) or 2.06(b) under which such prepayment is to be made, and identifying the source of the proceeds of such prepayment.

(e)    Termination Fee.  In the event the Advance is prepaid in full prior to the sixth Payment Date after the Closing Date, the Borrower shall pay to the Surety Provider the "Termination Fee" as defined in the Insurance Agreement.

SECTION 2.07.  Increased Costs; Capital Adequacy, Etc. (a) If, due to either (i) the introduction of or any change (other than any change by way of imposition or increase of reserve requirements included in the definition of Base Rate or covered by Section 2.03(e)

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014148


AB000370600

hereof) in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to the Lender or any Liquidity Provider of agreeing to make or making, funding or maintaining any CXC Advance or Assignee Advance (excluding for purposes of this Section 2.07 increased costs described in clause (b) of this Section 2.07 and increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.09 shall govern) and (ii) taxes excluded from the definition of "Taxes" set forth in clauses (1) and (2) of the first sentence of Section 2.09(a) hereof) then the Borrower shall from time to time, upon demand by the Lender or such Liquidity Provider (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender or such Liquidity Provider additional amounts sufficient to compensate the Lender or such Liquidity Provider for such increased cost; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount. A certificate in reasonable detail as to the basis for and the amount of such increased cost, submitted to the Borrower and the Agent by the Lender or such Liquidity Provider, shall be prima facie evidence of the accurate determination of such additional amounts; provided that such certificate shall state that the Lender or such Liquidity Provider is claiming such additional amounts generally from its borrowers that have borrowings subject to such change and that are subject to similar provisions. Promptly after the Lender or any Liquidity Provider becomes aware of any such introduction, change or proposed compliance, the Lender or such Liquidity Provider shall notify the Borrower thereof. Neither any Lender (other than CXC or a Person described in clause (g) of the definition of "Eligible Assignee") nor any Liquidity Provider shall be permitted to recover increased costs incurred or accrued more than 90 days prior to such notice to the Borrower.

        (b)    If the Lender or any Liquidity Provider shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Lender or any Liquidity Provider (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of the Lender or such Liquidity Provider), has the effect of increasing the amount of capital required or expected to be maintained as a result of the Lender's offer to lend hereunder or such Liquidity Provider's Commitment to make purchases under the Asset Purchase Agreement by an amount material to the Lender or such Liquidity Provider, then the Lender or such Liquidity Provider shall have the right to give prompt written notice thereof to the Borrower

This document is subject to a
written Confidentiality Agreement

EC 001014149

AB000370601

25

with a copy to the Agent, which notice shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate the Lender or such Liquidity Provider for the increased cost to the Lender or such Liquidity Provider as a result of such increase in capital and shall certify that such costs are generally being charged by the Lender or such Liquidity Provider to other similarly situated borrowers under similar credit facilities, which notice shall be prima facie evidence of the accurate determination of such costs, although the failure to give any such notice shall not, unless such notice fails to set forth the information required above or except as otherwise expressly provided in Section 2.07(c), release or diminish any of the Borrower's obligations to pay additional amounts pursuant to Section 2.07(c).

(c)     Each of the Lender and each Liquidity Provider agree that, upon giving notice specified in Section 2.07(b), at the request of the Borrower, it will promptly enter into good faith negotiations with the Borrower with respect to the method of reimbursement for the additional costs specified in such notice. No later than 15 days after the date of the giving of any such notice, and assuming the Lender or such Liquidity Provider giving same has made itself available for the aforesaid good faith negotiations, the Borrower shall compensate the Lender or such Liquidity Provider for the specified additional costs on the basis, if any, negotiated between the Lender or such Liquidity Provider and the Borrower; provided that if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount. Notwithstanding the foregoing, the Borrower shall not be obligated to reimburse the Lender (other than CXC or a Person described in clause (g) of the definition of "Eligible Assignee") or such Liquidity Provider pursuant to this Section 2.07(c) or Section 2.12 for any additional costs under Section 2.07(b) incurred or accruing more than 90 days prior to the date on which such Lender or Liquidity Provider gave the written notice specified in Section 2.07(b).

SECTION 2.08. Interest Rate Determination: Payments and Computations. (a) The Borrower shall make each payment hereunder not later than 1:00 P.M. (New York City time) on the day when due in U.S. dollars to the Agent at the Agent's Account in same day funds. Any payment received after 1:00 P.M. (New York City time) on the day when due shall be applied on the next following Business Day.

(b)     The Borrower shall, to the extent permitted by law, pay to the Agent interest on all amounts not paid or deposited when due by it hereunder or, with respect to Additional Financing Costs, when due under the Joint Venture Company Agreement (other than amounts in respect of which Unapplied Amount Interest is payable) at the rate of 2% per annum above the CXC Rate (if the Advance is then a CXC Advance) or the Assignee Rate (if the Advance is then an Assignee Advance), in each case in effect from time to time, payable on

This document is subject to a
written Confidentiality Agreement

EC 001014150

AB000370602

26

demand; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount; provided further, however, that such interest rate shall not at any time exceed the maximum rate permitted by applicable law. Such interest shall be paid pro rata to the parties to whom such overdue payment is owing.

(c)    All computations of interest and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed. Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; provided, however, in the case of any payment of any . Advance bearing interest determined by reference to the LIBO Rate, if such extension would cause payment to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)    The Agent will endeavor to obtain from the Reference Bank timely information for the purpose of determining each LIBO Rate with respect to each Interest Period, as applicable.

(f)    The Agent shall give prompt notice to the Borrower, the Lender, and if applicable, the Liquidity Providers of the Assignee Rate determined by the Agent, and the applicable rate, if any, furnished by the Reference Bank for the purpose of determining Assignee Rate.

(g)    If the Reference Bank does not furnish timely information to the Agent for determining the LIBO Rate for the Assignee Advance, the Agent shall forthwith notify the Borrower, the Lender and, if applicable, the Liquidity Providers that the LIBO Rate cannot be determined for the Assignee Advance.

SECTION 2.09. Taxes. (a) Any and all payments by the Borrower hereunder shall be made, in accordance with Section 2.08, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, excluding, in the case of the Lender, any Liquidity Provider, the Agent and the Surety Provider, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) the Lender, such Liquidity Provider, the

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014151



27

Agent or the Surety Provider (as the case may be) is organized or any political subdivision thereof and, in the case of the Lender, any Liquidity Provider or the Surety Provider, taxes imposed on its income, and franchise taxes imposed on it, by any jurisdiction or any political subdivision thereof out of which the Lender makes an Advance in connection with this Agreement, such Liquidity Provider makes any purchase in respect of the Advance pursuant to the Asset Purchase Agreement, or the Surety Provider makes any payment in respect of either, and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof, to payments to be made to the Lender, any Liquidity Provider, the Agent, or the Surety Provider (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, any Liquidity Provider, the Agent or the Surety Provider, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.09) the Lender, such Liquidity Provider, the Agent or the Surety Provider(as the case may be) receives an amount equal to the sum it would have received had no such deductions been made; *provided* that, if a Deficiency exists at the time that any payment shall need to be increased as provided in this clause (i) (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall be obligated to pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such increased amount, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    Notwithstanding anything to the contrary contained in this Agreement, each of the Borrower and the Agent shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts payable hereunder for the account of the Lender, any Liquidity Provider, or the Surety Provider (without the payment by the Borrower of increased amounts to the Lender, such Liquidity Provider or the Surety Provider pursuant to clause (a) above) other than the Lender, a Liquidity Provider or the Surety Provider (i) which is a domestic corporation (as such term is defined in Section 7701 of the Internal Revenue Code) for federal income tax purposes or (ii) which has the Prescribed Forms on file with the Borrower and the Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, provided that if the Borrower shall so deduct or withhold any such taxes, it shall provide a statement to the Agent and the Lender, such Liquidity Provider, or the Surety Provider, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation that the Lender, such Liquidity Provider, the Surety Provider, or the Agent may reasonably request for assisting the Lender, such Liquidity Provider, the Surety Provider,

This document is subject to a
written Confidentiality Agreement

EC 001014152

AB000370604

28

or the Agent to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which the Lender, such Liquidity Provider or the Surety Provider is subject to tax.

(c)    In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise, property or transfer taxes, charges or similar levies that arise from any transfer made under, from possession arising under, from any action of the Security and Collection Agent contemplated in, or any payment made under, or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "Other Taxes").

(d)    The Borrower, to the fullest extent permitted by law, will indemnify the Lender, each Liquidity Provider, and the Agent and the Surety Provider for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.09) paid by the Lender, such Liquidity Provider, the Surety Provider, or the Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto except as a result of the gross negligence or willful misconduct of the Lender, such Liquidity Provider, the Surety Provider, or the Agent, whether or not such Taxes or Other Taxes were correctly or legally asserted.  This indemnification shall be made within 30 days from the date the Lender, the Liquidity Provider, the Surety Provider, or the Agent (as the case may be) makes written demand therefor; provided that if a Deficiency exists at the time of such demand or at the time such payment is due (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount.  The Lender (other than CXC or a Person described in clause (g) of the definition of "Eligible Assignee"), any Liquidity Provider, the Surety Provider, and/or the Agent shall not be indemnified for Taxes or Other Taxes incurred or accrued more than 90 days prior to the date that such Lender, such Liquidity Provider, such Surety Provider, or the Agent notifies the Borrower thereof.

(e)    Within 30 days after the date of any payment of Taxes by or at the direction of the Borrower, the Borrower will furnish to the Agent, at its address referred to in Section 12.02, the original or a certified copy of a receipt evidencing payment thereof.  Should the Lender, any Liquidity Provider, the Agent or the Surety Provider ever receive any credit or deduction (to the extent that the amount thereof can be reasonably determined) or refund from any taxing authority to which the Lender, such Liquidity Provider, the Agent, or the Surety Provider would not be entitled but for the payment by the Borrower of Taxes as required by Section 2.09 (it being understood that the decision as to whether or not to claim, and, if claimed, as to the amount of any such credit, deduction or refund shall be made by the Lender, such Liquidity Provider, the Agent, or the Surety Provider in its sole discretion), the

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014153

AB000370605

29

Lender, such Liquidity Provider, the Agent, or the Surety Provider, as the case may be, thereupon shall repay to the Borrower an amount with respect to such credit, deduction or refund equal to any net reduction in taxes actually obtained by the Lender, the Liquidity Provider, Agent, or the Surety Provider, as the case may be, and determined by the Lender, such Liquidity Provider, the Agent, or the Surety Provider, as the case may be, to be attributable to such refund, credit or deduction.

SECTION 2.10.  Evidence of Debt.  (a)  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from the Advance, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(b)     The Register maintained by the Agent pursuant to Section 10.01(c) shall include a control account, in which shall be recorded (i) the date and amount of the Advance made hereunder and the Lender to whom the Advance is owing, (ii) the terms of each Assignment and Acceptance delivered to and by it, (iii) the amount of any principal and interest due and payable or to become due and payable from the Borrower to the Lender hereunder, and (iv) the amount of any sum received by the Agent from the Borrower hereunder and distributed to the Lender hereunder.

(c)     The entries made in the Register shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.11.  Change of Lending Office.  The Lender (other than CXC or a Person described in clause (g) of the definition of "Eligible Assignee") and each Liquidity Provider agree that, upon the occurrence of any event giving rise to the operation of Section 2.07 or 2.09 with respect to such Lender or such Liquidity Provider, such Lender or such Liquidity Provider will use its best efforts (consistent with the internal policies of and legal and statutory restrictions applicable to such Lender or such Liquidity Provider) to select a jurisdiction for the Lending Office of such Lender or such Liquidity Provider or change the jurisdiction of such Lending Office so as to avoid the need for or reduce the amount of any amounts accruing under Section 2.07 or 2.09; provided that no such selection or change of the jurisdiction of such Lending Office shall be made if, in the reasonable judgment of such Lender or such Liquidity Provider, such selection or change would be disadvantageous to such Lender or such Liquidity Provider.

SECTION 2.12.  Replacement of Lender and Liquidity Providers Under Certain Circumstances.  The Borrower shall be permitted to replace the Lender, or any Liquidity Provider, which requests reimbursement for amounts owing pursuant to Section 2.07 or 2.09 with a replacement bank or other financial institution; provided that (i) such replacement does not conflict with any Law, (ii) no Default, Event of Default, Joint Venture Notice Event, Joint

This document is subject to a
written Confidentiality Agreement

EC 001014154

AB000370606

30

Venture Liquidating Event, Joint Venture Termination Event or Incipient Event shall have occurred and be continuing at the time of such replacement, (iii) the replacement bank or institution shall purchase, at par, all amounts owing to such replaced Lender or Liquidity Provider prior to the date of replacement and, in the case of such replaced Liquidity Provider, shall execute and deliver a Commitment in the amount of such replaced Liquidity Provider's Commitment, (iv) the Borrower shall be liable to such replaced Lender or Liquidity Provider for any amounts owing to such Lender or Liquidity Provider as a result of such replacement, including any Liquidation Amount, and accrued costs and fees, (v) the replacement bank or institution, if not already the Lender or a Liquidity Provider, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Agent, (vi) the replaced Lender or Liquidity Provider shall be obligated to make such replacement in accordance with the provisions of Article X (provided that the replacement Lender or Liquidity Provider shall be obligated to pay any registration and processing fee referred to therein), (vii) during the first thirty days following receipt by the Agent of a request by the Borrower to replace the Lender or any Liquidity Provider pursuant to this Section 2.12, the Borrower shall not be required to pay to such Lender or Liquidity Provider, as applicable, any additional amounts pursuant to Section 2.07 or 2.09, as the case may be, and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Agent, the Surety Provider, the Lender or any other Liquidity Provider shall have against such replaced Lender or Liquidity Provider; provided, however, the Borrower shall pay any such demanded amount only upon receipt from the Joint Venture of amounts in respect of Additional Financing Costs related to such demanded amount.  The provisions of this Section 2.12 shall not constitute a waiver of any rights or remedies of the Borrower pursuant to this Agreement or applicable law.

SECTION 2.13.  Exercise of Full Purchase Option.  Upon receipt of a Full Purchase Exercise Notice pursuant to the Purchase Option Agreement, the Agent shall notify the Lender, the Surety Provider, the Security and Collection Agent and the Liquidity Providers.  Upon the completion of the transactions contemplated to occur on the Full Purchase Closing Date under the Purchase Option Agreement, upon notice thereof to the Agent, the Agent shall notify the Lender, the Surety Provider, the Security and Collection Agent and the Liquidity Providers thereof.  Notwithstanding any provision of this Agreement to the contrary, if the Full Purchase Closing Date shall have occurred, the Lender, the Surety Provider, the Security and Collection Agent and the Liquidity Providers shall deliver notice to the Agent and the Borrower (and the Agent with respect to itself shall deliver notice to the Borrower) no later than 11:00 A.M. (New York time) on the earlier of the fifth Business Day following receipt of notice from the Agent of the occurrence of the Full Purchase Closing Date and the eighth Business Day following the Full Purchase Closing Date of all Additional Financing Costs then accrued and unpaid owing to such Person (or the Agent with respect to itself) as of the Full Purchase Closing Date, including as a result of any prepayment of the Advance pursuant to Section 2.06(b)(ii).  Failure on the part of the Lender, the Surety Provider, the Security and Collection Agent or any Liquidity Provider (or the Agent with

This document is subject to a
written Confidentiality Agreement

EC 001014155

AB000370607

31

respect to itself) so to timely notify the Agent and the Borrower (or, in the case of the Agent with respect to itself, the Borrower) shall constitute a waiver of such Persons's (or the Agent's with respect to itself) right to demand such Additional Financing Costs. All such amounts so notified to the Borrower shall be due and paid by the Borrower upon receipt of the "Final Settlement Amount" (as defined in the Purchase Option Agreement) in respect thereof pursuant to the Purchase Option Agreement, including interest thereon included in such "Final Settlement Amount", in connection with payments made on the Final Settlement Date with respect to the exercise of the Full Purchase Option pursuant to the Purchase Option Agreement.

SECTION 2.14. Additional Financing Costs. After the occurrence of the Collection Date or except as provided in Section 2.13, no claim may be made hereunder for any Additional Financing Costs (other than any Additional Financing Costs arising under Article XI (other than any Additional Financing Costs claimable pursuant to Section 2.13) and thereafter arising under Section 12.04(c)).

ARTICLE III

CONDITIONS TO ADVANCE

SECTION 3.01. Conditions Precedent to Make the Advance. The agreement of the Initial Lender to make the Advance is subject to the following conditions precedent being satisfied on or prior to the date of the Advance:

(a)    Since December 31, 1996 in the case of Enron, and since the date of their respective formations in the case of the Borrowers and the Joint Venture, nothing shall have occurred that the Agent, the Initial Lender, the Surety Provider, the Initial Liquidity Provider or the Security and Collection Agent shall determine (i) has resulted in a material adverse effect on the rights or remedies of the Lender, the Surety Provider, the Agent, the Initial Liquidity Provider or the Security and Collection Agent or on the ability of Enron, the Borrower or the Joint Venture to perform their obligations under the Operative Documents to which they are a party, (ii) has resulted in a material adverse effect on the performance, business, assets, operation, properties or condition (financial or otherwise) of Enron and its Subsidiaries, taken as a whole, or the Borrower or the Joint Venture, or (iii) indicates the inaccuracy in any material respect of any information (taken as a whole) previously provided to the Agent, the Initial Lender, the Surety Provider, the Security and Collection Agent or the Initial Liquidity Provider in connection with their respective analyses of the credit facility hereunder or indicates the omission therefrom of any material information.

This document is subject to a
written Confidentiality Agreement

EC 001014156

AB000370608

32

(b)    The Agent shall have received the following documents, each dated as of the date of the making of the Advance (other than the documents described in clauses (ii)(A) and (xiv)) and duly executed by the respective party or parties thereto, and otherwise in form and substance satisfactory to the Initial Lender, the Surety Provider, the Initial Liquidity Provider and the Agent, and (except for the documents listed in clauses (ii) (A), (ii)(B), (xiii), (xiv) and (xv)) in the number of copies necessary to provide the Initial Lender, the Surety Provider, the Initial Liquidity Provider and the Agent each with original counterparts of such documents plus three additional original counterparts:

(i)    This Agreement.

(ii)    (A) Duly executed copies of proper Financing Statements (Form UCC-1) and (B) written notification of registration of the pledge of the Joint Venture Interest under the Uniform Commercial Code of all jurisdictions that may be necessary or that the Security and Collection Agent may deem reasonably desirable in order to perfect and protect the Liens created hereby, covering the Pledged Collateral.

(iii)    Evidence that all other actions to the extent necessary or desirable, in the judgment of the Security and Collection Agent, to perfect and protect the Liens created hereby have been taken.

(iv)    An original counterpart of (A) the Investor Company Agreement and all amendments thereto, (B) the Joint Venture Company Agreement and all amendments thereto, and (C) the Company Agreement of Golden Eagle L.L.C. dated as of December 12, 1997.

(v)    An original counterpart of the Enron Agreement.

(vi)    An original counterpart of the Administration Agreement.

(vii)    An original counterpart of the Process Agent Agreement.

(viii)    An original counterpart of the Borrower Member Consent.

(ix)    An original counterpart of the Enron Consent.

(x)    An original counterpart of the Joint Venture Consent.

(xi)    An original counterpart of the Joint Venture Custodian Consent.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014157



33

(xii)     An original counterpart of each of the Escrow Agreement and the Escrowed Documents.

(xiii)     The Surety Bond, duly issued by the Surety Provider, and the Insurance Agreement, duly executed by the Surety Provider.

(xiv)     A certificate of the Secretary of State of the State of Delaware with respect to Prairie Hawk and of the Secretary of State of the State of Oregon with respect to Enron, (each dated on or a recent date prior to the Closing Date), attaching the charter of such Person and each amendment thereto on file in such office and certifying that (A) such charter is a true and complete copy thereof, (B) such amendments are the only amendments to such charter on file in such office, (C) such Person has paid all franchise taxes to the date of such certificate and (D) such Person is duly incorporated and in good standing under the laws of Delaware and Oregon, as the case may be.

(xv)     Certificates of the Secretary of State of the State of Delaware (dated on or a recent date prior to the Closing Date) with respect to each of the Borrower, the Joint Venture, and the Equity Participant, in each case attaching the certificate of formation of such Person and each amendment thereto on file in such office and certifying that (A) such certificate is a true and complete copy thereof, (B) such amendments are the only amendments to such certificate on file in such office, (C) such Person has paid all franchise taxes to the date of such Secretary of State certificate and (D) certifying that such Person is a limited liability company in good standing under the laws of Delaware.

(xvi)     Certificates of each of the Borrower, the Equity Participant, the Joint Venture, Prairie Hawk and Enron, signed on behalf of each such Person by a managing member, President, a Vice President, Treasurer, Assistant Treasurer, the Secretary, Deputy Corporate Secretary, any Assistant Secretary or Deputy Treasurer of each such Person (the statements made in which certificate shall be true and correct on and as of the Closing Date), certifying as to:

(A)     the absence of any amendments to the charter or certificate of formation of such Person since the date of the certificate referred to in Section 3.01(b)(xiv) or (xv), as the case may be,

(B)     with respect to Enron and Prairie Hawk only, a true and correct copy of the by-laws of such Person as in effect on the date of the making of the Advance,

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014158

AB000370610

34

(C)     the due incorporation or formation and good standing of such Person as a corporation, limited partnership or limited liability company, as the case may be, under the laws of the jurisdiction of its organization, and the absence of any proceeding for the dissolution or liquidation of such Person,

(D)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors, executive (or other) committee of the board of directors, general partner, managing member or manager, as applicable, of such Person authorizing the execution, delivery and performance of (1) in the case of the Equity Participant, in its individual capacity and on behalf of the Borrower, as the case may be, the Investor Company Agreement, the Joint Venture Company Agreement, the Administration Agreement, the Purchase Option Agreement, the Purchase Option Escrow Agreement, each Loan Document and any agreements pursuant to which the Equity Participant made a capital contribution to the Borrower or on behalf of the Borrower, (2) in the case of Enron, the Joint Venture Company Agreement, the Joint Venture Consent, the Joint Venture Custody Agreement, the Joint Venture Registration Agreement, the Purchase Option Agreement, any agreements pursuant to which Enron made a capital contribution to the Joint Venture and the other Operative Documents to which it is a party and (3) in the case of Prairie Hawk, the Investor Company Agreement, the Purchase Option Agreement and any agreements pursuant to which Prairie Hawk made a capital contribution to the Borrower,

(E)     in the case of each such Person, that such resolutions have not been revoked, annulled or modified in any manner and are in full force and effect,

(F)     in the case of each such Person, the incumbency and specimen signature of each officer or an authorized representative of a managing member, as applicable, of such Person executing the documents described in items (1) through (4) of clause (D) above, and a certification of another officer of each such Person as to the signature of the officers signing certificates referred to in this subclause (xvii), and

(G)     in the case of Enron, no Joint Venture Liquidating Event, Joint Venture Termination Event, Joint Venture Notice Event or Incipient Event has occurred and is continuing and Enron has made or is

This document is subject to a
written Confidentiality Agreement

EC 001014159

AB000370611

35

simultaneously making all capital contributions required to be made by Enron on the Closing Date pursuant to the Joint Venture Company Agreement.

(xvii)  A favorable opinion of Jones, Day, Reavis, & Pogue, special counsel to the Borrower and the Equity Participant, in substantially the form of Exhibit B hereto.

(xviii)  A favorable opinion of Potter Anderson & Corroon, special Delaware counsel to the Joint Venture and the Borrower, in substantially the form of Exhibit C hereto.

(xix)  Favorable opinions of Vinson & Elkins LLP, special counsel to Enron, in respect of the Joint Venture and Enron, in substantially the form of Exhibits D-1 and D-2 hereto.

(xx)  (A) A favorable opinion of the general counsel for Enron, in substantially the form of Exhibit E-1 hereto and (B) a favorable opinion of Perkins Coie, special Oregon counsel for Enron, in substantially the form of Exhibit E-2 hereto.

(xxi)  A favorable opinion of Shearman & Sterling, special counsel to the Agent, in substantially the form of Exhibit F hereto.

(xxii)  A favorable opinion of Karl T. Molin, Esq., internal counsel for the Surety Provider, in substantially the form of Exhibit G hereto.

(xxiii)  A certified copy of each other Operative Document and such other certificates, documents and opinions as the Agent or the Initial Lender may reasonably request.

(xxiv)  A certificate of the Joint Venture Class A Member certifying that, on the date of the making of the Advance and after giving effect to the use of proceeds and other transactions contemplated by the Operative Documents:  (A) the Borrower is a Class B Member of the Joint Venture, (B) the Borrower's Capital Account under and as defined in the Joint Venture Company Agreement (after giving effect to all allocations required to be made through the Closing Date and the making of additional capital contributions to the Joint Venture in respect of the Joint Venture Interest) in the Joint Venture shall in no event be less than $500,000,000, (C) Enron has made all capital contributions required under Section 5.2 of the Joint Venture Company Agreement and (D) the Joint

This document is subject to a
written Confidentiality Agreement

EC 001014160

AB000370612

36

Venture has purchased the Enron Preferred Shares and the Enron Preferred Shares are free and clear of all Liens and are fully paid and non-assessable.

(xxv)   A certificate of the Borrower Class A Member certifying that, on or prior to the date of the making of the Advance, the Borrower has received as cash capital contributions from the Borrower Member in an amount equal to $15,000,000.

(xxvi)  An original counterpart of the Custody Agreement (with an attached copy of, if certificated, the Enron Preferred Shares).

(xxvii) A copy of each notice by the Borrower required pursuant to Section 8.01(b) and Section 8.02(a), (b), (d) and (e) hereof.

(xxviii)  A copy of all documentation with respect to the Enron Notes described in Section 4.3(t) of the Joint Venture Company Agreement, including an opinion of counsel to Enron that each such Enron Note is legal, valid, binding and enforceable in accordance with its terms against Enron.

(xxix)  An original counterpart of each of the Purchase Option Agreement and the Purchase Option Escrow Agreement.

(c)     The Borrower shall be a Class B Member of the Joint Venture.

(d)     All agreements related to, and the limited liability company capital and legal structure of, the Borrower and the Joint Venture (including, but not limited to, the Operative Documents) and all organizational documents shall be reasonably satisfactory to the Agent, the Initial Lender, the Surety Provider and the Initial Liquidity Provider.

(e)     All necessary governmental and third-party approvals in connection with the acquisition of or making of capital contributions in respect of the Joint Venture Interest, the transactions contemplated hereby and by the other Operative Documents and otherwise referred to herein shall have been received, except for such governmental and third party approvals that, pursuant to the provisions hereof or the Operative Documents, are not required to be obtained on or prior to the date of the Advance.

(f)     No litigation by any entity (private or governmental) shall be pending or, to the Borrower's knowledge, threatened with respect to the acquisition of or making of capital contributions in respect of the Joint Venture Interest, this Agreement or any other Operative Document or any documentation executed in connection therewith that the Agent, the Initial Lender, the Surety Provider or the Initial Liquidity Provider shall

This document is subject to a
written Confidentiality Agreement

EC 001014161

AB000370613

37

determine could reasonably be expected to have a material adverse effect on the acquisition of or making of capital contributions in respect of the Joint Venture Interest or on the performance, business, operations, properties, or condition (financial or otherwise) of the Borrower, the Joint Venture or Enron and its Subsidiaries, taken as a whole.

(g)    All fees and reasonable out-of-pocket costs and expenses including, without limitation, reasonable legal fees and expenses (and other compensation contemplated hereby) payable to the Initial Lender, the Agent, the Surety Provider, the Initial Liquidity Provider or the Security and Collection Agent, required to be paid by the Borrower hereunder shall have been paid to the extent due.

(h)    The Agent, the Initial Lender, the Surety Provider and the Initial Liquidity Provider shall be reasonably satisfied with all legal issues including tax and regulatory matters.

(i)    The Agent shall have received such other approvals, opinions or documents as the Agent, the Initial Lender, the Surety Provider or the Initial Liquidity Provider may reasonably request.

(j)    On the date of the making of the Advance the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of the Advance shall constitute a representation and warranty by the Borrower that on the date of the Advance such statements are true):

(i)    the representations and warranties of the Borrower contained in each Loan Document to which it is a party are correct in all material respects on and as of the date of the Advance, before and after giving effect to the Advance and to the application of the proceeds therefrom, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date));

(ii)    no event has occurred and is continuing, or would result from the making of the Advance or from the application of the proceeds therefrom, that constitutes an Event of Default or a Default; and

(iii)    the Advance is being requested to make the contribution of the Borrower required under Section 5.2(b) of the Joint Venture Company Agreement.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014162

AB000370614

38

(k)     On the date of the making of the Advance the following events shall have or will contemporaneously have occurred (and each of the giving of the Notice of Borrowing and the acceptance by the Borrower of the proceeds of the Advance shall constitute a representation and warranty by the Borrower and its Members that on the date of the making of the Advance such events shall have or will simultaneously have occurred):

(i)     the Equity Participant shall have made or shall simultaneously make any capital contributions required to be made by the Equity Participant at such time pursuant to the Investor Company Agreement; and

(ii)     the Borrower shall simultaneously make its capital contribution pursuant to Section 5.2(b) of the Joint Venture Company Agreement from the proceeds of the Advance and contributions of the Members of the Borrower.

SECTION 3.02.  Determinations Under Section 3.01.  For purposes of determining compliance with the conditions specified in Section 3.01, the Initial Lender, the Surety Provider and the Initial Liquidity Provider shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Initial Lender, the Surety Provider and the Initial Liquidity Provider unless an officer of the Agent responsible for the transactions contemplated by this Agreement shall have received notice from the Initial Lender, the Surety Provider or the Initial Liquidity Provider prior to the date specified in the Notice of Borrowing for the making of the Advance, specifying its objection thereto.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.  Representations and Warranties of the Borrower.  The Borrower represents and warrants as follows:

(a)     The Borrower (i) has been duly formed and is validly existing and in good standing as a limited liability company under the Delaware Limited Liability Company Act with all requisite company power and authority under the Investor Company Agreement to execute, deliver and perform its obligations under this Agreement, each other Loan Document and each other Operative Document to which it is a party, to acquire the Joint Venture Interest and to conduct its business as described in the Investor Company Agreement, (ii) is duly qualified and is authorized to do business and is in good standing in each other jurisdiction in which the conduct of its

This document is subject to a
written Confidentiality Agreement

EC 001014163

AB000370615

39

business requires it to be so qualified or authorized except where the failure to be so qualified or authorized is not reasonably likely to have a Material Adverse Effect and (iii) has all requisite company power and authority to own its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)     The execution, delivery and performance by the Borrower of this Agreement, each other Loan Document and each other Operative Document to which it is or is to be a party, and the other transactions contemplated hereby, are within the Borrower's company powers, have been duly authorized by all necessary company action of the Borrower, and do not (i) contravene, or constitute a default under, the Borrower's organizational documents, (ii) violate any law (including, without limitation, the Securities Exchange Act of 1934, as amended), rule, regulation (including, without limitation, Regulations U or X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default under, the Investor Company Agreement or any Assigned Agreement or any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting the Borrower or any of its properties or (iv) except for the Liens created under any Operative Document to which the Borrower is a party, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower.  The Borrower is not in violation of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument.

(c)     No consent of any other Person and no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the due execution, delivery or performance by the Borrower of this Agreement, any other Loan Document or any other Operative Document to which it is or is to be a party, or for the consummation of the other transactions contemplated hereby, (ii) the pledge by the Borrower of the Pledged Collateral pursuant hereto, (iii) the grant by the Borrower of the Liens granted by it pursuant hereto, (iv) the perfection or maintenance of the Liens created hereby (including the first priority nature thereof) or (v) the exercise by the Agent, the Security and Collection Agent or the Lender of its rights under the Operative Documents or the remedies in respect of the Pledged Collateral pursuant hereto (other than any consents, approvals, notices or filings that may be required under the Securities Act of 1933, as amended, and Article 9 of the Uniform Commercial Code as in effect in the relevant jurisdiction in connection with the perfection of the security interests in or with the foreclosure on, and disposition of, the Pledged Collateral), except (1) in each case for the filings of the Form UCC-1 Financing Statements referenced in Section 3.01(b)(ii)(A) hereof and any continuation statements with respect to such filings, (2)

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014164

AB000370616

40

the registration of the pledge of any Pledged Collateral constituting uncertificated securities on the books of the issuer thereof and (3) such consents, authorizations, approvals, actions, notices, and filings as (x) have been obtained, made, taken or given, are in full force and effect and copies of which have been furnished to the Agent or (y) are not yet required to be obtained, made, taken or given under the terms of the Operative Documents to which the Borrower is a party.

(d)     This Agreement has been, and each other Loan Document and each other Operative Document to which it is a party when delivered hereunder will have been, duly executed and delivered by the Borrower.  This Agreement is, and each other Loan Document and each other Operative Document to which it is a party when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(e)     There is (x) no action, suit, litigation or proceeding pending or, to the best of the Borrower's knowledge, threatened, and (y), to the best of the Borrower's knowledge, no investigation pending or threatened, before any court, governmental agency or arbitrator that (i) purports to affect the Borrower or any of its assets or properties or (ii) purports to affect the legality, validity or enforceability of this Agreement, any other Loan Document or any other Operative Document or the consummation of the transactions contemplated hereby.

(f)     Neither the making of the Advance nor the use of the proceeds thereof in accordance with this Agreement will violate the provisions of Regulations G, T, U or X of the Board of Governors of the Federal Reserve System.

(g)     Since the date of its formation, the Borrower has not engaged in any activity other than that contemplated by the Loan Documents or the Investor Company Agreement or entered into any commitment or incurred any Debt other than pursuant to, or as permitted under, the Operative Documents to which it is a party.

(h)     Neither the Borrower nor any ERISA Affiliate has ever maintained, contributed to or incurred or assumed any legal obligation with respect to any Plan, Multiemployer Plan or Welfare Plan.

(i)     The Borrower has filed, has caused to be filed or has been included in all tax returns (Federal, state, local and foreign) required to be filed by the Borrower and has paid or caused to be paid all taxes due for the periods covered thereby, including

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014165

AB000370617

41

interest and penalties, other than any filings or payments the failure of which to file or pay would not result in a Material Adverse Effect.

(j)   . The Borrower is not an "investment company", or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended (the "1940 Act"). Neither the making of the Advance, nor the application of the proceeds or repayment thereof by the Borrower (including, without limitation, the acquisition of the Joint Venture Interest pursuant to the Joint Venture Company Agreement, nor the consummation of the other transactions contemplated hereby, will violate any provision of the 1940 Act or any rule, regulation or order of the Securities and Exchange Commission thereunder.

(k)    The Borrower has no Subsidiaries.

(l)    The Borrower was formed to effect the acquisition of the Joint Venture Interest and, except in connection therewith (and except as contemplated by the Operative Documents), has no significant assets or liabilities.

(m)    All of the existing Pledged Collateral is owned legally and beneficially by the Borrower free and clear of all Liens, except for those created or permitted by the Loan Documents. This Agreement and the pledge and/or assignment of the Pledged Collateral pursuant hereto, together with the financing statements to be filed with respect thereto, the Joint Venture Consent, the Enron Consent, the Borrower Member Consent, the Joint Venture Custodian Consent, the Security and Collection Agent's taking and maintaining possession of all instruments and certificates representing or evidencing the Pledged Collateral, the registration of the pledge of any Pledged Collateral constituting uncertificated securities on the books of the issuer thereof in the name of the Agent and the Security and Collection Agent and the other actions taken by the Borrower in accordance with Section 7.03, the filing of the financing statements referred to in Sections 3.01(b)(ii) and 4.01(c), create valid and enforceable perfected security interests in and Liens on such Pledged Collateral, securing the payment of all Obligations purported to be secured thereby. Such security interests, to the extent perfection is governed by the UCC, are first priority.

(n)    The Borrower is not a "holding company" or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014166

AB000370618

42

(o)    Since the date of its formation, there has been no event with respect to the Borrower that has resulted in a Material Adverse Effect.

(p)    The Borrower possesses all licenses, permits and certificates and has duly obtained, taken, given or made all other authorizations, approvals, consents, orders, actions, notices and filings, all of which are in full force and effect, that are necessary or appropriate for the ownership of its properties and for the conduct of its activities as contemplated by the Investor Company Agreement, except for any thereof that the Borrower is not yet required to obtain or make pursuant to the provisions of the Operative Documents.

(q)    None of the Assigned Agreements has been amended or otherwise modified, and each Assigned Agreement is in full force and effect. The Borrower is not, and to the best of its knowledge, no other party to any Assigned Agreement is, in default of its obligations under any Assigned Agreement.

(r)    The Borrower has irrevocably instructed each other party to each of the Assigned Agreements that all payments (other than Excluded Payments) due or to become due under or in connection with any such Assigned Agreement shall be made directly to the Operating Account.

(s)    The Borrower does not own any Securities that are not Pledged Collateral.

(t)    The Borrower has an office located at the address specified for the Borrower in Section 12.02. Blue Highway Management, Ltd., the general partner of a Delaware limited partnership which is the indirect Class A member of the Borrower, is located at Williams House, 20 Reid Street, Hamilton Bermuda HM 11, the registered office of HCM High Yield Opportunity Fund, L.P., such indirect Class A Member, has a registered office at 15 East North Street, Dover, Delaware 19901, and the Equity Delegee of such general partner is located at One Park Place, 621 NW 53rd Street, Suite 620, Boca Raton, FL 33487.


## ARTICLE V

## COVENANTS OF THE BORROWER

SECTION 5.01. <u>Affirmative Covenants</u>. Until the Debt Collection Date, the Borrower will, at all times, unless consented to in writing by the Agent, the Surety Provider and the Lender:

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014167

AB000370619

43

    (a)   <u>Compliance with Laws, Etc</u>. Comply with, and cause its properties to be maintained and used in accordance with, all laws, rules, regulations and orders applicable to it or its properties, except where the failure to do so would not have a Material Adverse Effect.

    (b)   <u>Payment of Taxes, Etc</u>. Pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property; <u>provided</u>, <u>however</u>, that the Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained (in the reasonable judgment of the Borrower), unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

    (c)   <u>Preservation of Existence, Etc</u>. Preserve and maintain its existence as a limited liability company, and its rights (charter and statutory) and authority.

    (d)   <u>Inspection Rights</u>. Upon reasonable notice, at any reasonable time during normal business hours and not more often than is reasonable under the circumstances, permit the Agent, the Security and Collection Agent, the Surety Provider or the Lender or any agents or representatives thereof to examine and make copies of and abstracts from the records and books of account of the Borrower, and to discuss the affairs, finances and accounts of the Borrower with any officer of the Borrower, discuss the affairs, finances and accounts of the Borrower with the Borrower Class A Member and the Administrator and permit the Borrower Class A Member and the Administrator to disclose to the Agent, the Security and Collection Agent, the Surety Provider or the Lender or any agents or representatives thereof any and all financial statements and other information of any kind that either of them may have with respect to the Borrower and, after prior notice to the Borrower (setting forth the time and place of such meeting) and provided that the Borrower may be present therefor, to discuss the affairs, finances and accounts of the Borrower with its independent certified public accountants and permit such accountants to disclose to the Agent, the Security and Collection Agent, the Surety Provider and the Lender any and all financial statements and other information of any kind that they may have with respect to the Borrower; <u>provided</u> that the Agent, the Security and Collection Agent, the Surety Provider and the Lender and any such agents or representatives shall keep confidential all nonpublic information obtained pursuant to the terms of its confidentiality agreement with the Borrower. The Borrower shall assume or pay all reasonable costs and expenses associated with any such examination, discussion or copying.

This document is subject to a written Confidentiality Agreement

EC 001014168

AB000370620

44

(e)  Keeping of Books.  Keep complete, proper and separate books of record and account, including a record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the business of the Borrower, all in accordance with GAAP, in each case to the extent necessary to enable the Borrower to comply with the periodic reporting requirements of this Agreement.

(f)  Performance of Documents.  Perform and observe in all material respects all of the terms and provisions of each Operative Document and each Assigned Agreement to be performed or observed by it, maintain, to the extent it has the capacity to do so, each such Operative Document to which the Borrower is a party and each Assigned Agreement, and take all action to maintain the Joint Venture Interest (subject, respectively, to the provisions of the Joint Venture Company Agreement and other Operative Documents), in full force and effect, promptly enforce in all material respects each such Operative Document and Assigned Agreement in accordance with its terms (subject to the terms of Article VII hereof and the Investor Company Agreement), take all such action to such end (not in violation of the Investor Company Agreement) as may be from time to time reasonably requested by the Agent or the Security and Collection Agent and, upon request of the Agent or the Security and Collection Agent, make to each other party to each such Operative Document such demands and requests for information and reports or for action as the Borrower is entitled to make under such Operative Document (including, without limitation, in respect of "Required Actions" (as such term is defined in the Joint Venture Company Agreement)) except as otherwise provided in Section 7.09 or 7.10, provided, however, that the Borrower shall not be obligated to take any such enforcement action that, in the Borrower's reasonable judgment, may result in the Borrower incurring any non de minimis out of pocket expenses if, at such time, the Security and Collection Agent may take such enforcement action pursuant to the terms of Article VII.

(g)  Maintenance of Licenses and Permits.  Maintain all licenses and permits necessary to own its properties and to conduct its activities in accordance with all laws, rules, regulations and orders applicable to the Borrower or its properties, except for such failures as would not result in a Material Adverse Effect.

(h)  Search Reports.  Promptly following the Closing Date, deliver to the Agent, in form and substance satisfactory to the Agent, certified copies of reflective searches, or equivalent reports, listing all effective financing statements filed in the jurisdictions referred to in Section 3.01(b)(ii)(A) that name the Borrower as debtor, together with copies of such other financing statements.

This document is subject to a
written Confidentiality Agreement

EC 001014169

AB000370621

45

(i)    Review or Audit.  Within 90 days after the end of each Fiscal Year, cause the Lender's independent public accountants, or permit other independent public accountants specified by or otherwise acceptable to the Agent, to review or audit, and to deliver to the Agent a written report of such review or audit, with respect to the Pledged Collateral and related assets and the Operating Account activity on a scope and in a form reasonably requested by the Agent for such review or audit.

(j)    Claims for Additional Financing Costs.  Upon receipt of notice of any Additional Financing Costs, notify the Joint Venture of such Additional Financing Costs pursuant to Section 4.15(a) of the Joint Venture Company Agreement.

SECTION 5.02.  Negative Covenants.  Until the Debt Collection Date, the Borrower will not, at any time, without the written consent of the Agent, the Surety Provider and the Lender:

(a)    Liens, Etc.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties or assets of any character (including, without limitation, the Pledged Collateral) whether now owned or hereafter acquired, or sign or file, under the Uniform Commercial Code of any jurisdiction, a financing statement that names the Borrower as debtor, or sign any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, excluding, however, from the operation of the foregoing restrictions the following (such exclusions collectively being "Permitted Liens"): (i) bankers' rights of set-off for uncollected items and routine fees and expenses arising in the ordinary course of business, (ii) the Purchase Option Agreement, (iii) Liens for taxes and other governmental charges and assessments (and other Liens imposed by law) not yet delinquent or being contested in good faith and by proper proceedings and as to which appropriate reserves (in the reasonable judgment of the Borrower) are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors, (iv) restrictions on transfers of Securities under applicable laws, (v) restrictions on the transfer of its Joint Venture Interest under the Joint Venture Company Agreement and any other Operative Documents, (vi) restrictions on the transfer or assignment of rights under the terms of the Assigned Agreements and (vii) Liens created by, pursuant to or contemplated by any other Operative Document to which the Borrower is a party.

(b)    Debt.  Create, incur, assume or suffer to exist, any Debt other than (i) Debt under any Operative Document to which the Borrower is a party including, without limitation, the Borrower's indemnification obligations under Section 12 of the Investor Company Agreement, provided that so long as any Default or Event of Default has occurred and is continuing, the Borrower shall not be permitted to make any

This document is subject to a
written Confidentiality Agreement

EC 001014170

AB000370622

46

payment (except out of Excluded Payments) to any of its Members under such Section until such time as such Default or Event of Default has been waived or is no longer continuing, and (ii) unsecured Debt incurred in the ordinary course of activities permitted under this Agreement, including payables under the Administration Agreement.

(c)    Mergers. Etc.  Enter into any transaction of consolidation or merger with or into any other Person or wind up, liquidate or dissolve its affairs, except as otherwise expressly permitted by Section 11.1 of the Investor Company Agreement in connection with the occurrence of any Borrower Liquidating Event.

(d)    Sales. Etc. of Assets.  Enter into any partnership, joint venture or sale-leaseback transaction, or purchase or otherwise acquire (in one or a series of related transactions) any portion of the property or assets of any Person or sell, lease, transfer, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, directly or indirectly  (or agree to any of the foregoing at any future time) all or any material portion of its property or assets or any of the Pledged Collateral, except (a) Permitted Investments in the ordinary course of business, (b) in the case of transfers of the Joint Venture Interest, as expressly specified or permitted by the Joint Venture Company Agreement, (c) the Purchase Option Agreement and sales of Pledged Collateral pursuant thereto and (d) as permitted under any other provision of this Agreement or any other Operative Document.

(e)    Investments in Other Persons.  Make or hold any Investment in any Person except (i) for its acquisition and holding of the Joint Venture Interest and (ii) for Permitted Investments made in accordance with Section 8.03.

(f)    Accounting Changes.  Make or permit any change in accounting policies or reporting practices, except in accordance with GAAP.

(g)    Amendment. Etc., of Operative Documents.  Cancel or terminate any Operative Document or consent to or accept any cancellation or termination thereof, amend, modify or change in any manner any term or condition of any Operative Document or give any consent, waiver or approval thereunder, waive any default under or any breach of any term or condition of any Operative Document, agree in any manner to any other amendment, modification or change of any term or condition of any Operative Document, or appoint a liquidator under the Joint Venture Company Agreement (in each case in the event such liquidator is not Citibank, or its designee), other than (i) any amendment, supplement, cancellation, termination, consent, approval, waiver or modification consented to or waived by the Lender, the Agent and the Surety Provider pursuant to Section 12.01 hereof or (ii) any such amendment,

This document is subject to a
written Confidentiality Agreement

EC 001014171

AB000370623

47

supplement, consent, approval, change, waiver or modification that is ministerial or immaterial or non-substantive in nature, not adverse to the Lender and has been consented to by the Agent and the Surety Provider.

(h)    Negative Pledge.  Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets other than (i) any such agreement in favor of the Security and Collection Agent, the Agent and the Lender or (ii) as provided in the Investor Company Agreement and the Operative Documents.

(i)    Administrator Engagement.  Cancel or otherwise suspend the arrangement by which the Administrator was engaged to administer the business and affairs of the Borrower or enter into any new arrangement with respect to the foregoing, except that the Borrower may remove the Administrator for any reason, provided that the replacement Administrator is (i) reasonably acceptable to the Agent and the Surety Provider and (ii) engaged by the Borrower pursuant to the Administration Agreement, or any other agreement containing undertakings of the Administrator not materially less than, and compensation levels not materially greater than, those set forth in the Administration Agreement.

(j)    Subsidiaries.  Establish, create, acquire or permit to exist any Subsidiary.

(k)    Nature of Activities.  Engage in any activity other than the management and protection of its investment in the Joint Venture Interest and such other activities as are incidentally related thereto or as otherwise required or expressly contemplated in the Operative Documents to which it is a party.

(l)    Distributions.  Declare or pay any Distributions (other than Distributions constituting or in respect of Excluded Payments) except that (i) the Borrower may make Distributions from the Administrator's Account and (ii) so long as there shall exist no Default or Event of Default, the Borrower may pay Distributions in accordance with and pursuant to the terms of the Investor Company Agreement, subject to the terms of Articles VII and VIII hereof.

(m)    Affiliate Transactions.  Enter into any transaction or series of related transactions, with any of its Affiliates or Enron or any of its Affiliates, other than the transactions contemplated by the Operative Documents to which it is a party and other than any transaction or series of transactions expressly required or permitted under the Operative Documents to which it is a party upon the terms required for such transaction or series of transactions under the relevant Operative Document.

This document is subject to a
written Confidentiality Agreement

EC 001014172

AB000370624

48

(n)  ERISA.  Adopt, maintain, contribute to or incur or assume any legal obligation with respect to any Plan, Multiemployer Plan or Welfare Plan, or permit any ERISA Affiliate to do any of the foregoing.

(o)  Hedge Agreements.  Enter into any Hedge Agreement.

Anything herein to the contrary notwithstanding, the parties hereto agree that the execution, delivery and performance of the Purchase Option Agreement will not contravene the provisions of this Section 5.02.

SECTION 5.03.  Reporting Requirements.  Until the Debt Collection Date, the Borrower will, unless consented to in writing by the Agent, the Surety Provider and the Lender, furnish to the Agent and the Surety Provider and, in the case of subsections (a), (d), (e), (f) and (g) below, the Security and Collection Agent:

(a)  Default Notice.  As soon as possible and in any event within five (5) days after a natural person who is an officer or authorized representative of the member of the Borrower Class A Member (or if such member is a limited liability company or partnership, a member or general partner, or an officer or authorized representative thereof) or the Equity Delegee obtains actual knowledge thereof, a notice setting forth details of any Default or Event of Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)  Annual Reports.  Within thirty (30) days after the receipt of financial statements from the Joint Venture for each Fiscal Year, a copy of the annual report for such Fiscal Year that includes the following information:

(i)  An audited (or, with respect to the Fiscal Year ending December 31, 1997, an unaudited) balance sheet of the Borrower as of the last day of such Fiscal Year and the preceding year, if applicable, income statements and statements of cash flow of the Borrower for the related periods and the notes associated with each, all prepared in accordance with GAAP;

(ii)  Other than with respect to the Fiscal Year ending December 31, 1997, a report of a nationally recognized accounting firm stating that such audited financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Borrower in accordance with GAAP, such report to be accompanied by a comfort letter as shown in Exhibit H; and

This document is subject to a
written Confidentiality Agreement

EC 001014173

AB000370625

49

    (iii)    Written certification of the Borrower executed by a Borrower Class A Member that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

    (c)    Quarterly Reports.  Within thirty (30) days after the receipt of financial statements from the Joint Venture for each Fiscal Quarter, copies of each of the following:  (i) balance sheets of the Borrower as of the end of such Fiscal Quarter and for the comparable quarter of the prior year, if applicable, (ii) income statements of the Borrower for such Fiscal Quarter, for the Fiscal Year, if any, ending such Fiscal Quarter and for the comparable periods of the prior Fiscal Year, if applicable, and (iii) statements of cash flow of the Borrower for such Fiscal Quarter and any other periods reported on pursuant to subclause (ii) above.  The financial statements referred to in this Section 5.03(c) will be unaudited and prepared in accordance with GAAP.

    (d)    Litigation.  Promptly upon a natural person who is an officer or authorized representative of the member of the Borrower Class A Member (or if such member is a limited liability company or partnership, a member or general partner, or an officer or authorized representative thereof) or the Equity Delegee obtaining knowledge thereof, notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting the Borrower or any Loan Document or Operative Document of the type described in Section 4.01(e) hereof.

    (e)    Joint Venture Notices.  Promptly upon and in any event within five (5) Business Days after receipt thereof, copies of all reports and financial statements of the Joint Venture furnished to the Borrower pursuant to Section 8.3 of the Joint Venture Company Agreement, copies of all statements, reports and other information furnished to the Borrower pursuant to Section 8.4 of the Joint Venture Company Agreement, and copies of all other statements, reports and notices furnished to the Borrower pursuant to the terms of the Joint Venture Company Agreement and the Joint Venture Custody Agreement, respectively.

    (f)    Event Notices.  Promptly and in any event within two Business Days after a natural person who is an officer of the managing member of a Borrower Class A Member or the Equity Delegee obtains actual knowledge thereof, notice of the occurrence of an Incipient Event, a Joint Venture Notice Event, a Joint Venture Termination Event or a Joint Venture Liquidating Event.

SS_NYL3A/27974
Nighthawk Credit & Security Agreement

This document is subject to a
written Confidentiality Agreement

EC 001014174

AB000370626

50

(g)    <u>Other Notices</u>.  Promptly upon receipt thereof, copies of any other notices, requests, reports, financial statements and other information and documents received by the Borrower (including without limitation all reports issued by the Joint Venture Custodian under the Joint Venture Custodian Agreement) under or pursuant to any other Operative Document (other than those issued or sent by the Agent, the Surety Provider,  the Security and Collection Agent or the Lender) and, from time to time upon request by the Agent, such information and reports required under such other Operative Documents as the Agent may reasonably request.

(h)    <u>Other Information</u>.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower in the possession or control of the Borrower, any Borrower Class A Member, Equity Delegee or the Administrator promptly after the Agent's reasonable request in writing therefor identifying this Section 5.03(h).

ARTICLE VI

EVENTS OF DEFAULT

SECTION 6.01.  <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)    the Borrower shall fail to pay (i) any principal on the Advance when the same becomes due and payable or (ii) any interest on the Advance or any other amount payable by it under this Agreement or under any other Loan Document when the same becomes due and payable if such failure to pay shall remain unremedied for five (5) Business Days after the Borrower's receipt of written notice from the Agent that such amount is overdue; or

(b)    any written representation or warranty made or deemed made by the Borrower under or in connection with any Loan Document or any other certificate or report made by or on behalf of the Borrower hereunder shall prove to have been incorrect when made or deemed made in any material respect; or

(c)    (i) the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.02 (in the case of Section 5.02(k) or (m), after notice from the Agent or the Lender that any such failure shall constitute an Event of Default) or in Section 5.03(a) or 5.03(f) or (ii) the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.03(b), 5.03(c), 5.03(d), 5.03(e), 5.03(g) or 5.03(h) if such failure shall remain unremedied for five (5) Business Days

This document is subject to a
written Confidentiality Agreement

EC 001014175

AB000370627