# SECURITY AGREEMENT

SECURITY AGREEMENT (this *"Agreement"*), dated as of December 30, 1998, from Delta Energy Corporation, a Borrower duly organized and validly existing under the laws of the Cayman Islands (the *"Borrower"*), is for the benefit of Citicorp North America, Inc., a Delaware corporation (herein called the *"Collateral Agent"*) for the equal and ratable benefit of the Secured Parties.

The Borrower and Enron Natural Gas Marketing Corp., a Delaware corporation (*"ENGMC"*), are parties to a Natural Gas Inventory Forward Sale Contract (the *"Gas Contract"*) and a Crude Oil Inventory Forward Sale Contract (the *"Oil Contract"*, and together with the Gas Contract, each as modified and supplemented and in effect from time to time, collectively, the *"Forward Sale Contracts"*), each dated as of the date hereof, providing, subject to the terms and conditions thereof, for the prepaid forward sale of the natural gas and crude oil by ENGMC to the Borrower.

The Borrower, Corporate Asset Funding Company, Inc. (*"CAFCO"*) and Corporate Receivables Corp. (*"CRC"*, and together with CAFCO, collectively, the *"Lenders"*), Citicorp North America, Inc. (*"CNAI"*), as Administrative Agent and the Collateral Agent are parties to a Credit Agreement, dated as of the date hereof (as modified and supplemented and in effect from time to time, the *"Credit Agreement"*), providing, subject to the terms and conditions thereof, for extensions of credit to be made by the Lenders to the Borrower in an aggregate principal amount not exceeding $500,000,000.

The Borrower and Barclays Bank PLC (the *"Commodity Swap Counterparty"*) are parties to a Commodity Price Swap Agreement, dated as of the date hereof, and the confirmations thereunder (together, as modified and supplemented and in effect from time to time, the *"Master Commodity Price Swap Agreement"*), providing, subject to the terms and conditions thereof, for the entry by the parties thereto into one or more commodity price swap transactions.

The Borrower and Enron Capital & Trade Resources Corp., a Delaware corporation (the *"Interest Rate Swap Counterparty"*, and together with the Collateral Agent, the Commodity Swap Counterparty and the Lenders, collectively, the *"Secured Parties"*) are parties to an Interest Swap Agreement, dated as of the date hereof, (together, as modified and supplemented and in effect from time to time, the *"Master Interest Rate Swap Agreement"*), providing, subject to the terms and conditions thereof, for the entry by the parties thereto into one or more interest rate swap transactions.

To induce the Lenders to enter into the Credit Agreement, to induce the Commodity Swap Counterparty to enter into the Master Commodity Price Swap Agreement and to induce the Interest Rate Swap Counterparty to enter into the Master Interest Rate Price Swap Agreement and to perform their respective obligations thereunder and for other good and valuable consideration, the receipt and

925093.9

EC 001588084

sufficiency of which are hereby acknowledged, the Borrower has agreed to pledge and grant a security interest in the Collateral (as hereinafter defined) as security for the Secured Obligations (as hereinafter defined). Accordingly, the parties hereto agree as follows:

Section 1.    Definitions. All capitalized terms used herein shall have the meanings set forth in the recitals to this Agreement and as set forth below:

"*Accounts*" shall have the meaning ascribed thereto in Section 3.01(e) hereof.

"*Advances*" shall mean the Advances by each of the Lenders to the Borrower pursuant to the Credit Agreement.

"*Administrative Agent*" shall mean Citicorp North America, Inc.

"*Administration Agreement*" shall mean the Administration Agreement, dated December 3, 1993, between the Borrower and The Givens Hall Bank & Trust Ltd., a Borrower duly organized and validly existing under the laws of the Cayman Islands.

"*Assignee*" means any bank or other entity to which a Lender has assigned all or a portion of such Lender's rights and obligations under the Credit Agreement in accordance with the provisions of the Credit Agreement.

"*Borrower*" shall have the meaning specified in the recitals.

"*CNAI*" shall have the meaning specified in the recitals.

"*Collateral*" shall have the meaning specified in Section 3.01.

"*Collateral Account*" shall mean the account established by the Collateral Agent in accordance with Section 5.01(a) hereof.

"*Collateral Agent*" shall have the meaning specified in the recitals.

"*Collateral Documents*" shall have the meaning specified in Section 3.01(a).

"*Commodities*" shall mean, collectively, Natural Gas and Crude Oil.

"*Commodity Agreements*" shall mean the Forward Sale Contracts, the Enron Guaranties, the Margin Agreements, the Marketing Agreement and the ENGMC Surety Bond.

"*Commodity Swap Counterparty*" shall mean Barclays Bank PLC .

"*Credit Agreement*" shall have the meaning specified in the recitals.

EC 001588085

"*Crude Oil*" shall have the meaning specified in the Oil Contract.

"*Crude Oil Margin Agreement*" shall mean the Margin Agreement (Crude Oil) between ENGMC and the Borrower dated as of the date hereof.

"*Designated Office*" shall mean the principal office of the Collateral Agent, which office is located as of the date hereof, at 450 Mamaroneck Avenue Harrison, New York 10528.

"*Early Commodity Swap Termination Date*" shall mean an Early Termination Date as specified under the Master Commodity Price Swap Agreement.

"*Early Interest Rate Swap Termination Date*" shall mean an Early Termination Date as specified under the Master Interest Rate Swap Agreement.

"*Early Swap Termination Date*" shall mean either or both, as the context so requires, of an Early Interest Rate Swap Termination Date or an Early Commodity Swap Termination Date.

"*ENGMC*" shall have the meaning specified in the recitals.

" *ENGMC Surety Bond*" shall mean the Surety Bond as defined in each of the Forward Sale Contracts.

"*Enron*" shall mean Enron Corp., a corporation organized and existing under the laws of Oregon.

"*Enron Entities*" shall mean ENGMC and Enron Capital & Trade Resources Corp.

"*Enron Forward Sale Guaranty*" shall mean the Forward Sale Guaranty between Enron and the Borrower dated as of the date hereof.

"*Enron Marketing Guaranty*" shall mean the Enron Marketing Guaranty between Enron and the Borrower dated as of the date hereof.

"*Enron Guaranties*" shall mean, collectively, the Enron Forward Sale Guaranty, the Enron Marketing Guaranty and the Enron Swap Guaranty.

"*Enron Swap Guaranty*" shall mean the Enron Swap Guaranty between Enron and the Borrower dated as of the date hereof.

"*Escrow Agreement*" shall mean an escrow agreement to be executed by, and which is in form and substance reasonably satisfactory to the Borrower and the Marketer, in which CNAI is designated as the escrow agent.

EC 001588086

"*Event of Default*" shall mean an Event of Default as specified under the Credit Agreement.

"*Final Retirement Date*" shall mean the date on which all principal of and interest on the Notes have been paid in full.

"*Fixed Price Payor*" shall have the meaning specified in the Master Commodity Price Swap Agreement or the Master Interest Rate Swap Agreement, as the case may be.

"*Forward Sale Contracts*" shall have the meaning specified in the recitals.

"*Forward Sale Contract Termination Event*" shall mean the occurrence of a Termination Date under either Forward Sale Contract.

"*Funding Requirement*" shall have the meaning specified in Section 5.04.

"*Gas Contract*" shall have the meaning specified in the recitals.

"*Interest Rate Swap Counterparty*" shall mean Enron Capital & Trade Resources Corp.

"*Investment Property*" shall have the meaning specified in the UCC.

"*Investment Earnings*"shall mean, with respect to any fund or account, earnings derived from the investment of funds held in such fund or account.

"*Lenders*" shall mean CAFCO and CRC and each Assignee that shall become a party to the Credit Agreement.

"*Lien*" shall mean any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"*Limited Recourse Obligations*" shall have the meaning specified in Section 8.01.

"*Loan Documents*" shall mean, collectively, the Credit Agreement, each of the Notes issued pursuant to the Credit Agreement, this Agreement, the Master Commodity Price Swap Agreement and the Master Interest Rate Swap Agreement.

"*Marketer*" shall mean Enron Capital & Trade Resources Corp.

EC 001588087

925093.9

"*Marketing Agreement*" shall mean the Marketing Agreement dated as of the date hereof by and between Enron Capital & Trade Resources Corp. and the Borrower.

"*Margin Agreements*" shall mean the Natural Gas Margin Agreement and the Crude Oil Margin Agreement.

"*Master Commodity Price Swap Agreement*" shall have the meaning specified in the recitals.

"*Master Interest Rate Swap Agreement*" shall have the meaning specified in the recitals.

"*Maximum Penal Sum*" shall have the meaning specified in the ENGMC Surety Bond.

"*Moody's*" shall mean Moody's Investors Service, Inc. and any successor thereto which is a nationally recognized statistical rating organization.

"*Natural Gas*" shall have the meaning specified in the Gas Contract.

"*Natural Gas Margin Agreement*" shall mean the Margin Agreement (Natural Gas) between ENGMC and the Borrower dated as of the date hereof.

"*Oil Contract*" shall have the meaning specified in the recitals.

"*Operative Accounts*" shall mean, collectively, the Collateral Account, the Swap Account, the Reserve Account and the Swap Liquidation Account.

"*Operative Documents*" shall mean, without duplication, each of the Loan Documents, the Security Documents and the Commodity Agreements and each other instrument, document or agreement delivered in connection therewith.

"*Payment Date*" shall mean the dates specified as payment dates in Schedule I to this Agreement.

"*Permitted Investments*" shall mean investments in interest bearing deposit accounts (which may be represented by short-term certificates of deposit, time deposit open account agreements or other short-term deposit instruments) in Citibank, N.A.

"*Person*" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

EC 001588088

"*Qualified Purchaser*" shall have the meaning specified in the Marketing Agreement.

"*Recourse Obligations*" shall have the meaning specified in Section 8.01.

"*Repayment Obligations*" shall mean any obligations of the Borrower to reimburse the Marketer pursuant to Section 2.17(c) of the Marketing Agreement.

"*Replacement Swap Counterparty*" shall mean any replacement counterparty to a replacement Swap; provided that each replacement counterparty (at the time it enters into a Swap) must have a credit rating by Moody's of A3 (or higher) or by S&P of A- (or higher), respectively, and must have at least $500,000,000 in capital and surplus.

"*Required Lenders*" shall mean, at any time, Lenders holding not less than 66 2/3% of the then aggregate unpaid principal amount of the Advances owing to Lenders.

"*Reserve Account*" shall mean the Reserve Account established pursuant to Section 5.01(c).

"*Scheduled Swap Payment*" shall mean, with respect to either of the Swaps, any net amount owed on any Payment Date to the Swap Counterparty under such Swap, excluding any Settlement Amounts or other accelerated amounts due as a result of an Early Swap Termination. After the occurrence of any Early Swap Termination but before a Forward Sale Contract Termination Event, Scheduled Swap Payments with respect such Swap shall continue to be calculated as if such Swap had not been terminated until such time as all Settlement Amounts, plus accrued interest thereon as provided in such Swap, have been paid in full.

"*Secured Obligations*" shall mean, collectively, (i) all amounts from time to time owing to the Lenders by the Borrower under the Loan Documents, including, without limitation, the principal of and interest on the Notes, (ii) all amounts from time to time owing to the Interest Rate Swap Counterparty by the Borrower other than any Termination Payment Amount (as defined in the Master Interest Rate Swap Agreement), (iii) all amounts from time to time owing to the Commodity Swap Counterparty by the Borrower other than any Termination Payment Amount (as defined in the Master Commodity Price Swap Agreement), and (v) all obligations of the Borrower to the Secured Parties hereunder.

"*Secured Parties*" shall have the meaning specified in the recitals.

"*Security*" shall have the meaning specified in Section 8.01.

"*Security Documents*" shall mean, collectively, this Security Agreement and all UCC financing statements required by this Agreement or the Credit Agreement to be filed with

EC 001588089

respect to the security interests in personal property and fixtures created pursuant to this Agreement.

"*Settlement Amount*" shall mean, with respect to any Swap, the Settlement Amount as specified in such Swap.

"*S&P*" shall mean Standard & Poor's Ratings Service, a division of the McGraw-Hill Companies, Inc., and any successor thereto which is a nationally recognized statistical rating organization.

"*Swap Account*" shall mean the account established by the Collateral Agent pursuant to Section 5.01(b).

"*Swap Counterparty*" or "*Swap Counterparties*" shall mean either or both, as the context so requires, of the Interest Rate Swap Counterparty or the Commodity Swap Counterparty.

"*Swaps*" shall mean, collectively, the Master Commodity Price Swap Agreement and the Master Interest Rate Swap Agreement.

"*Swap Surety Amounts*" shall mean, as of any date, with respect to the Commodity Swap Counterparty (in relation to all Secured Parties), the product of the aggregate amounts paid by the ENGMC Surety Companies pursuant to the ENGMC Surety Bond <u>multiplied by</u> quotient of $20,000,000 <u>divided by</u> $520,000,000.

"*Swap Termination Event*" shall mean the designation or occurrence of an Early Termination Date under either Swap.

"*UCC*" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

Section 2.    <u>Representations and Warranties</u>. The Borrower represents and warrants to the Secured Party as follows:

(a)    The Borrower is the sole beneficial owner of the Collateral and no Lien exists or will exist upon the Collateral at any time, except for the pledge and security interest in favor of the Secured Parties created or provided for herein, which pledge and security interest constitute a first priority perfected pledge and security interest in and to all of the Collateral.

(b)    The Borrower has all necessary corporate power, authority and legal right to execute, deliver and perform its obligations under this Agreement, the execution, delivery and performance by the Borrower of this Agreement has been duly authorized by all necessary corporate action on its part (including, without limitation, any required shareholder approvals); and this Agreement has been duly and validly executed and delivered by the

Borrower and constitutes, its legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights. The Borrower has its sole place of business in Grand Cayman, British West Indies.

Section 3.     Collateral.

3.01     Assignment for Security. To secure the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations and the performance and observance by the Borrower of all the agreements, covenants and provisions contained herein and in the other Operative Documents and for the uses and purposes and subject to the terms and provisions hereof, and in consideration of the premises and of the covenants herein contained, the Borrower hereby grants, assigns, transfers and pledges to the Collateral Agent for the benefit of the Secured Parties, and its successors and assigns, a security interest in and a lien on all estate, right, title and interest of the Borrower in, to and under the following described property, rights, interests and privileges, whether now or hereafter acquired and wherever located (all being collectively referred to herein as "*Collateral*"):

(a)     each of the Commodity Agreements (other than the Margin Agreements) and the Escrow Agreement (the "*Collateral Documents*"), but including, without limitation, (1) all rights of the Borrower to receive moneys due and to become due under or pursuant to such Collateral Documents, (2) all rights of the Borrower to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to such Collateral Documents, (3) claims of the Borrower for damages arising out of or for breach of or default under such Collateral Documents, (4) the right of the Borrower to terminate such Collateral Documents, to perform its obligations thereunder and to compel performance and otherwise exercise all remedies thereunder, (5) all of the Borrower's claims, rights, powers, privileges and remedies under any such Collateral Documents, (6) all of the Borrower's rights under any such Collateral Documents to make determinations, to exercise any election (including but not limited to election of remedies) or option, to give or receive any notice, consent, waiver or approval, to demand, receive, enforce, collect or receipt for any of the foregoing rights or any property which is the subject of any of such Collateral Documents, to file any claims and to take any action which, in the opinion of the Required Lenders, may be necessary or advisable in connection with any of the foregoing, and (7) all proceeds of any and all of the foregoing;

(b)     the Commodities delivered or to be delivered to the Borrower pursuant to the Forward Sale Contracts, and all moneys due and to become due to the Borrower under, and all rights of the Borrower under, or in respect of the Forward Sale Contracts;

(c)     all contracts between the Borrower and any other Person providing for the sale of the Commodities by the Borrower;

EC 001588091

(d)    all interests of the Borrower under letters of credit issued for the benefit of the Borrower in connection with the Collateral Documents;

(e)    all accounts and general intangibles (each as defined in the UCC) of the Borrower constituting any right to the payment of money (such accounts, general intangibles and moneys due and to become due, collectively "*Accounts*");

(f)    all amounts, if any, payable to the Borrower under the Swaps;

(g)    all rents, issues, profits, revenues and other income of the property described in the preceding six clauses and all estate, right, title and interest of every nature whatsoever of the Borrower in and to the same and every part thereof;

(h)    all insurance proceeds and all other payments of any kind with respect to any of the foregoing;

(i)    the Operative Accounts and all cash investments and Investment Property held in the Operative Accounts and all interest and Investment Earnings thereon;

(j)    all moneys and securities now or hereafter paid or deposited or required to be paid or deposited to or with the Secured Parties by or for the account of the Borrower and held or required to be held hereunder; and

(k)    all proceeds of the foregoing.

3.02    Operative Documents.

(a)    It is expressly agreed that, anything herein contained to the contrary notwithstanding, the Borrower shall remain liable under the Operative Documents to perform all of the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and the Collateral Agent and the Secured Parties shall not have any obligation or liability under any thereof by reason of or arising out of the assignment hereunder, nor shall the Collateral Agent nor the Secured Parties be required or obligated in any manner to perform or fulfill any obligations of the Borrower under or pursuant to any of the Operative Documents, except as herein expressly provided, to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)    The Borrower hereby ratifies and confirms its obligations under the Operative Documents and, subject to the rights of the Secured Parties hereunder, does hereby agree that it will not take or omit to take, any action, the taking or omission of which might result in an alteration or impairment of any of the Operative Documents or of any of the rights created by any thereof or the assignment hereunder.

Section 4.     Further Assurances; Remedies.  In furtherance of the assignment for security and the security interest pursuant to Section 3 hereof, the Borrower hereby agrees with the Secured Parties as follows:

(a)     Delivery and Other Perfection.  The Borrower shall:

(i)     give, execute, deliver, file and/or record any financing statement, notice, instrument, document, agreement or other papers that may be required, necessary or desirable to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable the Collateral Agent to exercise and enforce its rights hereunder with respect to such assignment for security and security interest, provided that notices to account debtors in respect of any Accounts shall be subject to the provisions of clause (iv) of this Section 4(a);

(ii)     keep full and accurate books and records relating to the Collateral, and stamp or otherwise mark such books and records in such manner as the Collateral Agent may reasonably require in order to reflect the security interest granted by this Agreement;

(iii)     permit representatives of the Collateral Agent, upon reasonable notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral, and permit representatives of the Collateral Agent to be present at the Borrower's place of business to receive copies of all communications and remittances relating to the Collateral, and forward copies of any notices or communications received by the Borrower with respect to the Collateral, all in such manner as the Collateral Agent may require and at the sole cost and expense of the Borrower; and

(iv)     promptly notify (and the Borrower hereby authorizes the Collateral Agent so to notify) each account debtor in respect of any Account and the other Persons obligated to make payments to the Borrower in respect of such obligations that such Collateral has been assigned to the Collateral Agent for the benefit of the Secured Parties hereunder, and that any payments due or to become due in respect of such Collateral are to be made directly to the Collateral Account.

(b)     Other Financing Statements and Liens.  Without the prior written consent of the Collateral Agent (acting on the written direction of the Required Lenders), the Borrower shall not file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to the Collateral in which the Collateral Agent is not named as the sole secured party for the benefit of the Secured Parties.

(c)     Preservation of Rights.  The Collateral Agent shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

(d)     No Amendments.  The Borrower will not, without the prior written consent of the Collateral Agent (acting on the written direction of the Required Lenders), (i) enter into any agreement amending, modifying or supplementing any of the Operative Documents, execute any

925093.9

-10-

EC 001588093

waiver or modification of, or consent under, the terms of any of the Operative Documents, or revoke or terminate any of the Operative Documents, (ii) settle or compromise any claim arising under any of the Operative Documents, or (iii) submit or consent to the submission of any dispute, difference or other matter arising under or in respect of any of the Operative Documents to arbitration thereunder; provided that in addition to the requirements above, no amendment, waiver, or consent shall, unless in writing and signed by the affected Enron Entities, adversely affect such Enron Entities.

     (e)     <u>Events of Default, Swap Termination Event, Etc.</u> During the period during which an Event of Default or a Swap Termination Event shall have occurred and be continuing:

     (i)     the Borrower shall, at the request of the Collateral Agent, assemble the Collateral owned by it at such place or places, reasonably convenient to both Collateral Agent and the Borrower, designated in the Collateral Agent's request;

     (ii)     the Collateral Agent may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

     (iii)     the Collateral Agent shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, with limitation, the right, to the maximum extent permit by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Collateral Agent were the sole and absolute owner thereof (and the Borrower agrees to take all such as may be appropriate to give effect to such right) and to exercise any and all other rights of the Borrower with respect to the Collateral without the consent and without any further action by, the Borrower;

     (iv)     the Collateral Agent in its discretion may, in its own name or in the name of the Borrower or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so;

     (v)     the Collateral Agent may, upon ten business days prior written notice to the Borrower of the time and place, with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of the Collateral Agent or any Secured Party or any of their respective agents, sell, lease, assign or otherwise dispose of all or any part of such Collateral, at such place or places as the Collateral Agent deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived), and the Collateral Agent may be the

EC 001588094

purchaser, lessee, assignee recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of the Borrower, any such demand, notice and right or equity being hereby expressly waived and released (it being understood and agreed that any purchase price received by the Collateral Agent in connection with any sale held hereunder shall be conclusive and binding upon the Borrower and the Secured Parties). The Collateral Agent without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at a time or place to which the sale may be so adjourned; and

(vi)    the Collateral Agent may exercise any and all rights of the Borrower under the Master Commodity Price Swap Agreement and the Master Interest Rate Swap Agreement.

The proceeds of each collection, sale or other disposition under this Section 4(e) shall be applied in accordance with Section 5.04 hereof.

(f)    Deficiency.  If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to Section 4(e) hereof are insufficient to cover the costs and expenses of such realization and the payment in full of the Secured Obligations, the Borrower shall remain liable for any deficiency subject to Section 8.08 of the Credit Agreement and to Section 8.01 of this Agreement.

(g)    Removals, Etc.  Without at least 30 days' prior written notice to the Collateral Agent, the Borrower shall not (i) maintain any of its books and records with respect to the Collateral at any office or maintain its principal place of business at any place other than at the address indicated in Section 8.02 of the Credit Agreement or at one of the locations identified in Annex 1 hereto or in transit from one of such locations to another or (ii) change its name, or the name under which it does business, from the name shown on the signature pages hereto.

(h)    Private Sale.  The Collateral Agent shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 4(d) hereof conducted in a commercially reasonable manner.  The Borrower hereby waives any claims against the Collateral Agent and the Secured Parties, arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree.

(i)    Application of Proceeds.  Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by the Collateral Agent under Section 3 hereof or this Section 4, shall be applied by the Collateral Agent in the manner set forth in Section 5.03.

EC 001588095

As used in this Section 4, "proceeds" of Collateral shall mean cash, securities and other property realized in respect of, and distributions in kind of, Collateral, including thereof received under any reorganization, liquidation or adjustment of debt of the Borrower or any issuer of or obligor on any of the Collateral.

(j)    Attorney-in-Fact.  The Collateral Agent is hereby appointed the attorney-in-fact of the Borrower for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument which the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing at all times the Secured Parties shall have the right and power to the exclusion of the Borrower to give all notices and to make all determinations and to exercise in the name of the Borrower or the Collateral Agent all rights of the Borrower in and under any of the Collateral, to receive, endorse and collect all checks made payable to the order of the Borrower representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same. The Collateral Agent and the Borrower each severally shall have the right to receive all notices with respect to the Collateral.

(k)    Perfection.  Prior to or concurrently with the execution and delivery of this Agreement, the Borrower shall file such financing statements, continuation statements and other documents in such offices as may be required to perfect and continue the perfection of the security interests granted in Section 3 of this Agreement.

(l)    Termination.  When all Secured Obligations shall have been paid in full, this Agreement shall terminate, and the Collateral Agent shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Borrower. The Collateral Agent shall, at the written direction of the Administrative Agent, also execute and deliver to the Borrower upon such termination such UCC termination statements and such other documentation as shall be reasonably requested and prepared by the Borrower to effect the termination and release of the Liens on the Collateral.

(m)    Expenses.  The Borrower agrees to pay to the Collateral Agent all out-of-pocket expenses (including reasonable expenses for legal services of every kind) of, or incident to, the enforcement of any of the provisions of this Section 4, or performance by the Collateral Agent of any obligations of the Borrower in respect of the Collateral which the Borrower has failed or refused to perform, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement in respect of any of the Collateral, and for the care of the Collateral and defending or asserting rights and claims of the Collateral Agent in respect thereof, by litigation or otherwise, including expenses of insurance, and all such expenses shall be Secured Obligations to the Collateral Agent secured under Section 3 hereof.

(n)    Further Assurances.  The Borrower agrees that, from time to time upon the written request of the Collateral Agent, the Borrower will execute and deliver such further documents and

EC 001588096

do such other acts and things as the Collateral Agent may reasonably request in order fully to effect the purposes of this Agreement.

(o)    <u>Marketing Agreement</u>. The Collateral Agent shall, at the request of the Required Lenders, direct the Borrower to remove any Qualified Purchaser from the list of such purchasers under the Marketing Agreement.

Section 5.    <u>Operative Accounts</u>.

5.01    <u>Establishment of Operative Accounts</u>. The Borrower hereby requests the Collateral Agent to establish at its Designated Office the following accounts in the name of the Collateral Agent to be held in the custody of the Collateral Agent for the benefit of the Borrower and the Secured Parties:

(a)    A non-interest bearing account entitled *"CNAI-Delta-Enron Collateral Account"* (Account No. 40788605);

(b)    A non-interest bearing account entitled *"CNAI-Delta-Enron Swap Account"* (Account No. 40788613); and

(c)    A non-interest bearing account entitled *"CNAI-Delta-Enron Reserve Account"* (Account No. 40788621).

5.02    <u>Collateral Agent Undertakings</u>. The Collateral Agent hereby agrees to act as securities intermediary (as defined in the UCC) with respect to the Operative Accounts. The Borrower hereby acknowledges that the Collateral Agent shall act as securities intermediary with respect to the Operative Accounts and pursuant to this Agreement. The Collateral Agent shall not have any duties or responsibilities except those expressly set forth in Section 5.02 of this Agreement.

(a)    The Borrower and the Collateral Agent each hereby agree and confirm that (i) the Collateral Agent will establish the Operative Accounts as set forth in Section 5.01, (ii) each Operative Account is and will be maintained as a "securities account" (within the meaning of Section 8-501 of the UCC), (iii) the Collateral Agent is the "entitlement holder" (within the meaning of Section 8-102(a)(7) of the UCC) in respect of the "financial asset" (within the meaning of Section 8-102(a)(9) of the UCC) credited to such Operative Accounts, (iv) all property delivered to the Collateral Agent pursuant to this Agreement or any other Operative Document will be held by the Collateral Agent and promptly credited to an Operative Account by an appropriate entry in its records in accordance with this Agreement, (v) all "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) in registered form or payable to or to the order of and credited to any such Operative Account shall be registered in the name of, payable to or to the order of, or indorsed to, the Collateral Agent or in blank, or credited to another securities account maintained in the name of the Collateral Agent, and in no case will any financial asset credited to any such Operative Account be registered in the name of, payable to or to the order of, or indorsed to, the Borrower or the Collateral Agent except to the extent the foregoing have been subsequently indorsed by the Borrower

EC 001588097

or the Collateral Agent, as the case may be, to the Collateral Agent or in blank and (vi) the Collateral Agent shall not change the name or account number of any such Operative Account without the prior written consent of the Secured Parties.

(b)    The Collateral Agent agrees that each item of property (including any security, instrument or obligation, share, participation, interest or other property whatsoever, other than cash) credited to any Operative Account shall be treated as a "financial asset" within the meaning of Section 8-102(a)(9) of the UCC.

(c)    The parties hereto hereby agree that the Collateral Agent shall have "control" (within the meaning of Section 8-106(d) of the UCC) of any "security entitlement" (within the meaning of Section 8-102(a)(17) of the UCC) with respect to the financial assets credited to the Operative Accounts and the Borrower hereby disclaims any entitlement to claim "control" of such "security entitlement".

(d)    In the event that the Collateral Agent has or subsequently obtains by agreement, operation of law or otherwise a lien or security interest in any Operative Account or any security entitlement credited thereto, the Collateral Agent agrees that such lien or security interest shall be subordinate to the lien and security interest of the Collateral Agent created under this Agreement. The financial assets standing to the credit of the Operative Accounts will not be subject to deduction, set-off, banker's lien, or any other right in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties (except that the face amount of any checks which have been credited to any Operative Account but are subsequently returned unpaid because of uncollected or insufficient funds).

(e)    The Collateral Agent and the Borrower have not entered into any agreement with respect to the Operative Accounts or any financial assets credited to any Operative Account other than this Agreement and the other Operative Documents. In the event of any conflict between this Section 5.02 or any other Operative Document or any other agreement now existing or hereafter entered into, the terms of this Section 5.02 shall prevail.

(f)    Except for the claims and interest of the Collateral Agent in each of the Operative Accounts, the Borrower does not know of any claim to, or interest in, any Operative Account or in any financial asset credited thereto. If any Person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against any Operative Account or in any financial asset credited thereto, the Collateral Agent will promptly notify the Collateral Agent thereof.

(g)    The rights and powers granted by the Borrower to the Collateral Agent have been granted in order to perfect the Collateral Agent's lien and security interests in the Operative Accounts, are powers coupled with an interest and will neither be affected by the bankruptcy of any Person nor the lapse of time.

EC 001588098

(h)   Each Operative Account (including all security entitlements relating thereto) shall be governed by the law of the State of New York. Regardless of any provision in any other agreement, for purposes of the UCC, the "securities intermediary's jurisdiction" of the Collateral Agent with respect to the Operative Accounts is the State of New York.

(i)   The Collateral Agent shall provide to the Secured Parties and Borrower, a monthly statement of all deposits to, disbursements from and interest and earnings credited to each Operative Account established and maintained hereunder by the Collateral Agent.

Section 5.03   Deposits Into Operative Accounts.

(a)   Collateral Account. Subject to Section 5.03 (b), after the date hereof and until the Final Retirement Date, the Borrower shall deposit or cause to be deposited into the Collateral Account all amounts paid to the Borrower under the Collateral Documents or on account of any other Collateral.

(b)   Swap Account. Upon an Early Commodity Swap Termination Event, the Borrower and the Collateral Agent shall deposit or cause to be deposited into the Swap Account the Swap Surety Amounts.

(c)   Reserve Account. After application of the funds in the Reserve Account pursuant to Section 5.07(c), the Collateral Agent shall, on each Payment Date on or prior to the earlier to occur of (i) a Swap Termination Event and (ii) the Final Retirement Date, transfer amounts on deposit in the Reserve Account to the Collateral Account.

Section 5.04   Application of Payments.

(a)   Collateral Account Distribution Priorities. On or before 12:00 noon (New York City time) on each Payment Date on or prior to the Final Retirement Date or on any other date prior to the Final Retirement Date on which the Collateral Agent shall have received written instructions from the Borrower pursuant to Section 2.16(e) or Section 2.17(c) of the Marketing Agreement, the Collateral Agent shall apply amounts in the Collateral Account as follows (and in the following order of priority), each of the applications set forth below, being herein referred to as a *"Funding Requirement"*:

(i)   *First,* to the payment of any Repayment Obligations of the Borrower under the Marketing Agreement owed on such Payment Date;

(ii)   *Second,* to the Marketer to pay the fees owed on such Payment Date to the Marketer;

(iii)   *Third,* (A) to the Administrative Agent for the payment of the principal of and interest on the Notes due and payable on such Payment Date and (B) to the Commodity Swap Counterparty to pay the Scheduled Swap Payment payable to the Commodity Swap

EC 001588099

Counterparty arising prior to an Early Commodity Swap Termination Date (in the case of both (A) and (B), pro rata to the Persons entitled to receive such payments);

(iv)  *Fourth,* to the Interest Rate Swap Counterparty to pay the Scheduled Swap Payment arising prior to an Early Interest Rate Swap Termination Date;

(v)  *Fifth,* to ENGMC to reimburse ENGMC for amounts as directed pursuant to Section 2.18 of the Marketing Agreement; and

(vi)  *Sixth,* to the Reserve Account.

(b)  <u>Swap Account Distribution</u>. Upon deposit of the Swap Surety Amount into the Swap Account, the Collateral Agent shall pay to the Commodity Swap Counterparty the Settlement Amount, if any, owed to the Commodity Swap Counterparty.

5.05  <u>Limitations on Distributions</u>.  The foregoing applications of funds in the Operative Accounts are subject to the requirements that:

(a)  No funds in the Collateral Account shall be applied on any Payment Date to any Funding Requirement unless all Funding Requirements with a higher priority and that first become due and owing on or prior to such Payment Date shall have been satisfied in full;

(b)  In the event that the balance on deposit in the Collateral Account is not sufficient to satisfy any Funding Requirement in full (to the extent then due and owing or scheduled to be paid) after giving effect to all deposits to be made into the Collateral Account pursuant to Section 5.03, such balance shall nevertheless be applied to such Funding Requirement in accordance with Section 5.04(a);

(c)  No payments shall be made pursuant to Section 5.04 (a)(iii)(B) if a Swap Termination Event shall have occurred under the Master Commodity Price Swap Agreement and the Settlement Amount due by the Commodity Swap Counterparty, if any, has been paid in full;

(d)  No payments shall be made pursuant to Section 5.04 (a)(iv) if a Swap Termination Event shall have occurred under the Master Interest Rate Swap Agreement and the Settlement Amount due by the Interest Rate Swap Counterparty, if any, has been paid in full;

(e)  The Collateral Agent shall have no obligation to pay any Funding Requirements until receipt of a written certification by the Administrative Agent of the amounts due with respect to such Funding Requirements; and

(f)  The Collateral Agent shall have no obligation to pay any Swap Settlement Amount due the Commodity Swap Counterparty until receipt of a written certification by the Commodity Swap Counterparty of the Settlement Amount due to it.

EC 001588100

Section 5.06    Balance Disbursement; Investment.

(a)    Disbursements on the Final Retirement Date. On the Final Retirement Date, upon satisfaction in full of all Funding Requirements, the Collateral Agent shall, at the written direction of the Administrative Agent, pay (i) the balance in the Collateral Account and the Swap Account to Borrower and (ii) the balance in the Reserve Account to the Marketer.

(b)    Investment of Operative Account Funds. All balances in the Operative Accounts shall be invested solely in Permitted Investments. All such Permitted Investments shall be issued, registered, established or entered into, as applicable, in the name of the Collateral Agent, and the Collateral Agent shall have exclusive possession of, and sole dominion and control over, such Permitted Investments. All Investment Earnings on such Permitted Investments shall be added to the balance in, and shall be retained in, each such respective account, pending disbursement of such balance in accordance with Section 4 and any investment losses shall be debited thereto.

(c)    Investment; Direction to Collateral Agent. The Collateral Agent shall invest all balances in the Operative Accounts in Permitted Investments.

Section 5.07    Interest Rate Swaps.

(a)    Swap Implementation. On the date hereof, the Borrower is entering into the Swaps. From time to time the Borrower shall, upon the direction of the Administrative Agent, enter into one or more replacement or additional Swaps; provided that such replacement or additional agreement shall (i) be with a Replacement Swap Counterparty, (ii) contain substantially the same terms as the Swaps entered into on the date hereof, and (iii) have been approved by the Required Lenders.

(b)    Swap Unwind. If a Swap Termination Event occurs, then the Administrative Agent shall (to the extent that the Administrative Agent is able to locate a Replacement Swap Counterparty) instruct the Borrower to purchase a replacement Master Interest Rate Swap Agreement or Master Commodity Swap Agreement, as applicable, with terms substantially similar to the terms of the Swap being replaced, if adequate funds are available therefor in the Reserve Account. Any replacement Swap entered into pursuant to this Section 5.07(b) shall be with a Replacement Swap Counterparty and shall be approved in writing by the Required Lenders.

(c)    Settlement Amounts. All Settlement Amounts received by the Borrower from a Swap Counterparty as a consequence of a Swap Early Event shall be deposited into the Reserve Account and applied by the Collateral Agent to the extent necessary, toward the cost of a replacement Swap arranged by the Administrative Agent pursuant to Section 5.07(b). Any funds remaining in the Reserve Account after the consummation of a replacement Swap pursuant to Section 5.07(b), shall be transferred to the Collateral Account. If the Administrative Agent is unable to locate a Replacement Swap Counterparty to enter into a replacement Swap pursuant to Section 5.07(b), then, such Settlement Amount shall remain on deposit in the Reserve Account to be distributed in accordance with Section 5.03(c).

EC 001588101

Section 6.    Collateral Agent.

6.01    Authorization and Action.  Each Lender and each Swap Counterparty hereby appoints Citicorp North America, Inc. as the Collateral Agent hereunder and authorizes Citicorp North America, Inc. to take such action as Collateral Agent on its behalf and to exercise such powers and discretion under this Agreement as are delegated to the Collateral Agent by the terms hereof, together with such powers as are reasonably incidental thereto.  The Collateral Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement on its part to be performed and no implied covenants or obligations shall be read in this Agreement or any other Operative Document against the Collateral Agent.  The Collateral Agent shall not be required to exercise any discretionary power granted to it under this Agreement, and as to any matters not expressly provided for by this Agreement, the Collateral Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders and only if furnished with indemnity satisfactory to the Collateral Agent, by the person making the request, and such instructions shall be binding upon all Secured Parties; *provided, however*, that the Collateral Agent shall not be required to take any action that exposes it to personal liability or that is contrary to this Agreement or applicable law.  The Collateral Agent agrees to give to each Secured Party prompt notice of each notice and copies of all other documents given to it by the Borrower and the Collateral Agent pursuant to the terms of the Credit Agreement and the Agreement, and agrees to give the Secured Parties prompt notice of each notice and copies of all other documents given to it by the Borrower and the Secured Parties pursuant to the terms of this Agreement.

6.02    Collateral Agent's Reliance, Etc.

(a)    Neither the Collateral Agent nor any of its respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing: (i) the Collateral Agent may consult with legal counsel (including counsel for the Borrower) or independent public accountants and other experts selected by them, and shall not be liable for any action taken or omitted to be taken in good faith by them in accordance with the advice of such counsel, accountants or experts; (ii) the Collateral Agent shall be permitted to act through agents, attorneys, nominees and custodians and shall not be responsible for the negligence or misconduct of any such Persons or for the supervision thereof selected by it in good faith; (iii) the Collateral Agent makes no warranty or representation to any Secured Party and shall not be responsible to any Secured Party for any statements, warranties or representations made in or in connection with this Agreement; (iv) the Collateral Agent shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Operative Document on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (v) the Collateral Agent shall not be responsible to any Secured Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Operative Document or any other instrument or document furnished pursuant hereto or thereto; (vi) the Collateral

EC 001588102

Agent makes no representation or warranty and shall have no responsibility concerning the value or validity of the Collateral or the validity or the perfection of the pledge thereof; and (vii) the Collateral Agent shall incur no liability under or in respect of any Operative Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

6.03    Collateral Agent Indemnification. Each Lender and each Swap Counterparty agrees to indemnify the Collateral Agent and its directors, officers, employees and agents (to the extent not promptly reimbursed by the Borrower), ratably from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Collateral Agent in any way relating to or arising out of this Agreement or any action taken or omitted by the Collateral Agent under this Agreement; provided, however, that no Secured Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Collateral Agent's gross negligence or willful misconduct. Without limitation of the foregoing, each Secured Party agrees to reimburse the Collateral Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including counsel fees) incurred by the Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings, or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, to the extent that the Collateral Agent is not promptly reimbursed for such costs and expenses by the Borrower. Any commercial paper conduit administered by the Administrative Agent that is a Lender shall only make a payment under this section to the extent that there are funds available to make such payment after taking into account payments with respect to such Lender's outstanding commercial paper plus other senior debt. The obligations set forth in this Section 6.03 shall survive the termination of the Credit Agreement and this Agreement or the earlier resignation or removal of the Collateral Agent.

6.04    Successor Agent. The Collateral Agent may resign as Collateral Agent at any time by giving written notice thereof to the Secured Parties and the Borrower. Upon any such resignation, the Secured Parties shall have the right to appoint a successor Collateral Agent, with the consent of the Borrower, so long as there is no Default, which consent shall not be unreasonably withheld if such successor Collateral Agent is a Secured Party. Such resignation shall become effective upon the acceptance of the appointment by the successor Collateral Agent. If no successor Collateral Agent shall have been so appointed by the Secured Parties, and shall have accepted the appointment as Collateral Agent, within 30 days after the retiring Collateral Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Secured Parties, appoint a successor as Collateral Agent. Any successor Collateral Agent hereunder shall be a commercial bank organized or licensed under the laws of the United States of America or of any state thereof and, if so licensed, organized under the laws of any country that is a member of the Organization for Economic Cooperation and Development, and have a combined capital and surplus of at least $100,000,000. Upon the acceptance of any appointment as Collateral Agent

925093.9

-20-

EC 001588103

hereunder by a successor Collateral Agent, notice of the appointment and acceptance of such successor Collateral Agent shall be given by the Required Secured Parties to the Borrower and such successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Collateral Agent's resignation hereunder as Collateral Agent, the provisions of this Section 6 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement.

6.05    Limited Obligation.  None of the provisions of this Agreement shall require the Collateral Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

6.06    Reliance.  The Collateral Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

6.07    Certificate of Lenders.  Whenever in the administration of the provisions of this Agreement the Collateral Agent shall deem it necessary or desirable that a matter be provided or established prior to taking or suffering any action to be taken hereunder, such matter (unless specifically prescribed) may, in the absence of gross negligence or bad faith on the party of the Collateral Agent, be deemed to be conclusively proved and established by a certificate signed by the Required Lenders and delivered to the Collateral Agent and such certificate, in the absence of gross negligence or bad faith on the part of the Collateral Agent, shall be full warrant to the Collateral Agent for any action taken, suffered or omitted by it under the provisions of this Agreement upon the faith thereof.

6.08    No Investigation.  The Collateral Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, entitlement order, approval or other paper or document.

6.09    Limited Investment Obligations.  The Collateral Agent shall have no obligation to invest and reinvest any cash held in the Operative Accounts in the absence of timely and specific written investment direction from the Borrower. In no event shall the Collateral Agent be liable for the selection of investments or for investment losses incurred thereon. The Collateral Agent shall have no liability in respect of losses incurred as a result of the liquidation of any investment prior to its stated maturity or the failure of the Borrower to provide timely written investment direction.

6.10    Merger, Conversion, Consolidation.  Any corporation into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any

corporation succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

6.11    Limitation of Liability. Neither the Collateral Agent nor any of its officers, directors, employees or agents shall be liable for any action taken or omitted under this Agreement or in connection therewith except to the extent caused by the Collateral Agent's gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, no longer subject to appeal or review. The parties each (for itself and any person or entity claiming through it hereby releases, waives, discharges, exculpates and covenants not to sue the Collateral Agent for any action taken or omitted under this Agreement except to the extent caused by the Collateral Agent's gross negligence or willful misconduct. Anything in this Agreement to the contrary notwithstanding, in no event shall the Collateral Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 7.    Miscellaneous.

7.01    No Waiver. No failure on the part of the Collateral Agent or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Collateral Agent or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.

7.02    Submission to Jurisdiction; Venue.

(a)    Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York located in the county of New York or of the United States for the Southern District of New York, and, by execution and delivery of this Agreement, the Borrower, each Secured Party and the Collateral Agent each hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of the Collateral Agent or any Secured Party to bring any legal action or proceeding with respect to this Agreement or any other Operative Document against the Borrower in the courts of any other jurisdiction.

(b)    The Borrower, the Collateral Agent and each of the Secured Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Operative Document brought in the courts referred to in clause (a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

925093.9

-22-

EC 001588105

7.03    WAIVER OF JURY TRIAL. EACH OF THE BORROWER, THE COLLATERAL AGENT AND THE SECURED PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

7.04    Notices. All notices, requests, consents and demands hereunder shall be in writing and telexed, telecopied or delivered to the intended recipient (i) in the case of the Commodity Swap Party, as provided in Part 4(1) of the Schedule to the Master Commodity Price Swap Agreement, (ii) in the case of the Interest Rate Swap Counterparty, as provided in Section 7.01 of the Master Interest Rate Swap Agreement and (iv) in the case of the Borrower, the Lenders and the Collateral Agent, at the following addresses:

BORROWER:

Delta Energy Corporation
c/o Givens Hall Bank & Trust Ltd.
P.O. Box 2097 GP
Grand Cayman
Cayman Islands
British West Indies
Attention: Peter Anderson
Telecopier No.:        (345) 949-8295
Telephone No.:        (345) 949-8141

LENDERS:

CAFCO and CFC

Citicorp North America, Inc.
450 Mamaroneck Avenue
Harrison, New York 10528
Attention: Deal Administrator-Project Roosevelt
Telecopier: (914) 899-7015
Telephone: (914) 899-7170

Citicorp North America, Inc.
399 Park Avenue, 6th Floor
New York, New York 10022
Attention: Global Securitization-Project Roosevelt
Telecopier: (212) 758-7245
Telephone: (212) 559-6166

925093.9                    -23-                    EC 001588106

COLLATERAL AGENT:

Citicorp North America, Inc.
1200 Smith Street, Suite 2000
Houston, Texas 77002
Attention: Carol Rooney
Telecopier: (713) 654.2849
Telephone: (713) 654.3590

Citicorp North America, Inc.
450 Mamaroneck Avenue
Harrison, New York 10528
Attention: Deal Administrator-Project Roosevelt
Telecopier: (914) 899-7015
Telephone: (914) 899-7170

Citicorp North America, Inc.
399 Park Avenue, 6th Floor
New York, New York 10022
Attention: Global Securitization-Project Roosevelt
Telecopier: (212) 758-7245
Telephone: (212) 559-6166

all such notices and communications shall, when sent by registered or certified mail, telecopied, telegraphed, telexed, cabled or sent by overnight courier, be effective when received in the case of mail, or when transmitted by telecopier (followed by delivery of the original of such notice or communication), delivered to the telegraph company, confirmed by telex answer back, delivered to the cable company or delivered to the courier company.

     7.05    Waivers, Etc. The terms of this Agreement may be waived, altered or amended only by an instrument in writing duly executed by the Borrower and the Collateral Agent (acting upon the written direction of the Required Lenders). Any such amendment or waiver shall be binding upon the Collateral Agent, each holder of any of the Secured Obligations and the Borrower.

     7.06    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Borrower and the Collateral Agent, and each holder of any of the Secured Obligations; provided, however, that the Borrower shall not assign or transfer its rights hereunder without the prior written consent of the Collateral Agent. The Collateral Agent may assign all or a portion of its rights hereunder to any assignee or Participant.

     7.07    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

925093.9                                    -24-                          EC 001588107

7.08    <u>Severability</u>. If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Collateral Agent in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

7.09    <u>Construction of Agreement</u>.    The word "or" will have the inclusive meaning represented by the phrase "and/or". Unless the context of this Agreement clearly requires otherwise, all references to (i) Sections or Articles refer to sections or articles of this Agreement, (ii) any Person as a party to a document or instrument shall include such Person's successors and assigns to such status to the extent permitted by the Operative Documents, and (iii) any document or instrument shall mean such document or instrument and all exhibits thereto, as the same may be amended, supplemented, or modified, or replaced from time to time as permitted by the Operative Documents.

7.10    The Collateral Agent hereby agrees that it shall not institute against, or join any other Person in instituting against, any commercial paper conduit administered by the Administrative Agent that is a Lender, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any federal or state bankruptcy or similar law, for one year and a day after payment in full of the latest maturing promissory notes issued by such Lender.

Section 8.    <u>Indemnification</u>.

8.01    The Borrower agrees to indemnify the Collateral Agent and its directors, officers, employees and agents for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind and nature whatsoever which may be imposed on, incurred by or asserted against the Collateral Agent in any way relating to or arising out of this Agreement or any other documents contemplated by or referred to herein or the transactions contemplated hereby or the enforcement of any of the terms hereof or thereof or of any such other documents, provided that the Borrower shall not be liable for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of the party to be indemnified. The obligations of the Borrower hereunder shall survive the termination of the Credit Agreement and this Agreement or the earlier resignation or removal of the Collateral Agent.

The Borrower, as security for its obligations under this Agreement, is willing to assign, grant a security interest and create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties in the Borrower's right, title and interest in, to and under the Security Documents and the Collateral Documents including without limitation all of the Collateral (all such property and rights, the "*Security*"). In furtherance of the foregoing, the Borrower is willing to execute and deliver the Security Documents to the Collateral Agent on the Closing Date. In recognition of the Borrower's willingness to do such acts and things, the Secured Parties are prepared to limit their recourse against the Borrower in respect of the indemnity obligations of the Borrower under this Section 8.01 (all such payment obligations, "*Limited Recourse Obligations*") to the Security. Accordingly, anything in this Agreement or the other Loan Documents to the contrary, all payments to be made to the

EC 001588108

Collateral Agent by the Borrower on its Limited Recourse Obligations shall be recoverable by the Collateral Agent only from and to the extent of the sums payable to or on behalf of the Borrower under the Operative Documents with respect to the Security or the property otherwise constituting a portion of the Security and the Collateral Agent agree that they will look solely to such sums or property for such payments; provided, however, that the Borrower shall be personally and fully liable for and shall indemnify the Collateral Agent and each Secured Party and reimburse each Secured Party and the Collateral Agent upon demand for any loss, damage, liability, claim or expense (including without limitation reasonable fees and disbursements of counsel but excluding any Limited Recourse Obligation, or aforesaid) incurred by any Secured Party of the Collateral Agent (i) as a result of the Borrower's gross negligence or fraudulent or willful misconduct with respect to any aspect of the transactions contemplated by this Agreement or any other Operative Document to which it is a party, (ii) as a result of any representation or warranty made or given by the Borrower in this Agreement being untrue or incorrect in any material respect on the date made or given, and (iii) as a result of the failure by the Borrower to perform any of its material obligations hereunder or under the other Operative Documents, other than the aforesaid Limited Recourse Obligations (unless the Borrower is entitled to be reimbursed or otherwise indemnified pursuant to the Forward Sales Contract for the costs and expenses of its performance of any such material obligation and its failure to perform such obligations is due to the fact that it has not been so reimbursed or indemnified), (all such obligations set forth in this proviso, "*Recourse Obligations*") and each Secured Party and the Collateral Agent shall be at liberty to pursue all its rights and remedies against the Borrower with respect thereto.

The foregoing paragraph of this Section 8.01 shall only limit the personal liability of the Borrower for the discharge of its Limited Recourse Obligations and shall not (i) limit or restrict in any way the accrual of interest on any such unpaid amount (although the limitations as to the personal liability of the Borrower shall apply to such interest as to such unpaid amount) or (ii) derogate from or otherwise limit the right of recovery, realization or application by the Collateral Agent or the Secured Parties under or pursuant to any of the Operative Documents with respect to any Recourse Obligations or anything assigned, mortgaged, charged, pledged or secured to the Collateral Agent under or pursuant to any of the Operative Documents. The Collateral Agent shall be entitled to reimburse itself in full from the proceeds of the enforcement of any security given to the Collateral Agent under or pursuant to and in accordance with the provisions of this Agreement and the other Operative Documents.

If and to the extent that for any reason any payment made by or on behalf of the Borrower and received by the Collateral Agent or any Secured Party in respect of the Limited Recourse Obligation is rescinded or must be otherwise restored by the Borrower to any Person pursuant to any order of any court, then the Collateral Agent or such Secured Party, as the case may be, shall forthwith make such payment to such Person as such court may direct and, subject always to the provisions of this Section 8.01, the obligations of the Borrower to the Collateral Agent and the Secured Parties hereunder shall be automatically reinstated to the extent of such payment.

8.02    Entire Agreement. This Agreement together with all Annex I hereto, constitutes the sole and entire agreement of the parties with respect to the subject matter hereof.

EC 001588109

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be duly executed and delivered as of the day and year first above written.

*[Signatures Follow on Separate Pages]*

EC 001588110

DELTA ENERGY CORPORATION

By:____ ~~J. Benson~~
Name:_ J. B. Benson
Title:__ Director

**THIS IS A SIGNATURE PAGE TO THE SECURITY AGREEMENT
AND IS EXECUTED BY THE PARTY NAMED ABOVE.**

EC 001588111

DEC 31 '98 08:31 FR BRACEWELL & PATTERSON 713 221 1168 TO 1637#016951#0081 P.05/07

**COLLATERAL AGENT:**

CITICORP NORTH AMERICA, INC.

By: _____

Name: _____
JEAN M. DIAZ, VP
Title: _____
399 Park 6/6
Securitization
(212) 559-5260

**THIS IS A SIGNATURE PAGE TO THE SECURITY AGREEMENT
AND IS EXECUTED BY THE PARTY NAMED ABOVE.**

EC 001588112

For purposes of Section 6 hereof:

CORPORATE ASSET FUNDING
COMPANY, INC.

By:  CITICORP NORTH-AMERICA, INC.
     as Attorney-in-Fact

By:
Name:  JEAN M. DIEZ VP
Title:  359 Park 6'6
        Securities
        (212) 559 5050

**THIS IS A SIGNATURE PAGE TO THE SECURITY AGREEMENT
AND IS EXECUTED BY THE PARTY NAMED ABOVE.**

EC 001588113

For purposes of Section 6 hereof:

CORPORATE RECEIVABLES CORP.

By:    CITICORP NORTH-AMERICA, INC.
as Attorney-in-Fact

By:_____

Name:_____

Title:_____

JEAN M. DIAZ, VP
399 Park 6-6
Securitization
(212) 559-5260

THIS IS A SIGNATURE PAGE TO THE SECURITY AGREEMENT
AND IS EXECUTED BY THE PARTY NAMED ABOVE.

EC 001588114

** TOTAL PAGE.07 **

For purposes of Section 6 hereof:

BARCLAYS BANK PLC

By: _____
Name: _____
Title: _____

**THIS IS A SIGNATURE PAGE TO THE SECURITY AGREEMENT
AND IS EXECUTED BY THE PARTY NAMED ABOVE.**

EC 001588115

ENRON CAPITAL & TRADE RESOURCES CORP.

By: _Andrew Reed_____
Name: _ANDREA REED_____
Title: _VICE PRESIDENT_____

**THIS IS A SIGNATURE PAGE TO THE SECURITY AGREEMENT
AND IS EXECUTED BY THE PARTY NAMED ABOVE.**

EC 001588116

Annex 1

## List of Locations

None.

EC 001588117

## Schedule I

| Payment Date | Principal |
|---|---|
| February 5, 1999 | $- |
| March 5, 1999 | $- |
| April 6, 1999 | $- |
| May 5, 1999 | $- |
| June 7, 1999 | $- |
| July 6, 1999 | $13,565,434.77 |
| August 5, 1999 | $13,223,896.10 |
| September 7, 1999 | $13,390,654.76 |
| October 5, 1999 | $13,820,011.19 |
| November 5, 1999 | $13,344,078.33 |
| December 6, 1999 | $13,735,862.07 |
| January 5, 2000 | $13,541,214.27 |
| February 7, 2000 | $13,741,345.27 |
| March 6, 2000 | $15,433,458.64 |
| April 5, 2000 | $14,688,485.05 |
| May 5, 2000 | $15,452,344.93 |
| June 5, 2000 | $15,123,355.50 |
| July 5, 2000 | $15,596,050.72 |
| August 7, 2000 | $15,173,767.93 |
| September 5, 2000 | $15,787,682.39 |
| October 5, 2000 | $15,814,870.98 |
| November 6, 2000 | $15,457,663.96 |
| December 5, 2000 | $16,001,492.65 |
| January 5, 2001 | $15,652,513.05 |
| February 5, 2001 | $16,075,944.09 |
| March 5, 2001 | $16,945,352.78 |
| April 5, 2001 | $15,879,493.52 |
| May 8, 2001 | $16,954,241.93 |
| June 5, 2001 | $16,813,161.05 |
| July 5, 2001 | $17,194,010.23 |
| August 6, 2001 | $16,886,192.98 |
| September 5, 2001 | $17,354,187.18 |
| October 5, 2001 | $17,435,751.86 |
| November 5, 2001 | $17,156,203.28 |
| December 5, 2001 | $17,598,334.05 |
| January 7, 2002 | $17,314,002.99 |
| February 5, 2002 | $17,765,205.25 |

EC 001588118