<b>EXECUTION COPY</b>

U.S. $485,000,000

**CREDIT AND SECURITY AGREEMENT**

Dated as of December 17, 1999

Among

**NAHANNI INVESTORS L.L.C.**

as <u>Borrower</u>

and

**CXC INCORPORATED**

as <u>Initial</u> <u>Lender</u>

and

**CITICORP NORTH AMERICA, INC.**

as <u>Agent</u> <u>and</u> <u>as</u>
<u>Collateral</u> <u>Agent</u>

and

**THE COMMITTED LENDERS**
Party Hereto

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090724

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
SECTION 1.02. Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
SECTION 1.03. Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 1.04. Use of Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 1.05. Headings and References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## ARTICLE II

### AMOUNTS AND TERMS OF THE ADVANCES

SECTION 2.01. The Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 2.02. Making the Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 2.03. Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
SECTION 2.04. Certain Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
SECTION 2.05. Repayment of the Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 2.06. Prepayments of the Advance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 2.07. Increased Costs; Capital Adequacy, Etc. . . . . . . . . . . . . . . . . . . . . . 32
SECTION 2.08. Interest Rate Determination; Payments and Computations . . . . . . . . . 34
SECTION 2.09. Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 2.10. Evidence of Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
SECTION 2.11. Change of Lending Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
SECTION 2.12. Replacement of Lender, Committed Lenders and Purchasers Under Certain Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
SECTION 2.13. Exercise of Purchase Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
SECTION 2.14. Termination or Reduction of the Committed Lender Commitment . . . . . . . 40
SECTION 2.15. Extension of Committed Lender Commitment Termination Date . . . . . . . . . 40
SECTION 2.16. Extension of Purchase Commitment Termination Date . . . . . . . . . . . . . . . 42

## ARTICLE III

### CONDITIONS TO ADVANCE

SECTION 3.01. Conditions Precedent to Making the Initial Advance . . . . . . . . . . . . . . . 42

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090725

ii

|  |  | Page |
|---|---|---|
| SECTION 3.02. | Conditions Precedent to Each Advance | 48 |
| SECTION 3.03. | Conditions Precedent to each Drawdown Termination Advance | 49 |
| SECTION 3.04. | Determinations Under Section 3.01 | 49 |
| SECTION 3.05. | Determinations Under Sections 3.02 and 3.03 | 50 |

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

| SECTION 4.01. | Representations and Warranties of the Borrower | 50 |
|---|---|---|

### ARTICLE V

### COVENANTS OF THE BORROWER

| SECTION 5.01. | Affirmative Covenants | 54 |
|---|---|---|
| SECTION 5.02. | Negative Covenants | 56 |
| SECTION 5.03. | Reporting Requirements | 60 |

### ARTICLE VI

### EVENTS OF DEFAULT

| SECTION 6.01. | Events of Default | 62 |
|---|---|---|

### ARTICLE VII

### GRANT OF SECURITY INTEREST, PLEDGE AND ASSIGNMENT

| SECTION 7.01. | Pledge and Assignment | 65 |
|---|---|---|
| SECTION 7.02. | Security for Obligations | 67 |
| SECTION 7.03. | Delivery of Pledged Collateral | 67 |
| SECTION 7.04. | Borrower Remains Liable | 68 |
| SECTION 7.05. | Further Assurances | 68 |
| SECTION 7.06. | Collateral Agent Appointed Attorney-in-Fact | 69 |
| SECTION 7.07. | Collateral Agent May Perform | 69 |
| SECTION 7.08. | Reasonable Care | 69 |
| SECTION 7.09. | Rights, Remedies and Obligations | 70 |

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090726

iii

Page

SECTION 7.10. Remedies upon Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
SECTION 7.11. Continuing Assignment and Security Interest; Transfer of Advance . . . . . . . 73

## ARTICLE VIII

### ADMINISTRATION, SETTLEMENT AND COLLECTION

SECTION 8.01. Maintaining the Operating Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
SECTION 8.02. Deposit of Funds into the Operating Accounts . . . . . . . . . . . . . . . . . . . . . 75
SECTION 8.03. Investing of Amounts in the Operating Account . . . . . . . . . . . . . . . . . . . . 75
SECTION 8.04. Transfers from the Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
SECTION 8.05. Investing of Amounts in the Collateral Account . . . . . . . . . . . . . . . . . . . . 84
SECTION 8.06. Renewal of Drawdown Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
SECTION 8.07. Agent's Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

## ARTICLE IX

### THE AGENT, THE COLLATERAL AGENT
### AND THE ESCROW AGENT

SECTION 9.01. Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
SECTION 9.02. Agent's, Collateral Agent's and Escrow Agent's Reliance, Etc. . . . . . . . . . . . 86
SECTION 9.03. CNAI and Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
SECTION 9.04. Independent Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

## ARTICLE X

### ASSIGNMENT OF ADVANCE

SECTION 10.01. Assignment and Participations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

## ARTICLE XI

### INDEMNIFICATION

SECTION 11.01. Indemnities by the Borrower . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090727

iv

## ARTICLE XII

### MISCELLANEOUS

SECTION 12.01. Amendments, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
SECTION 12.02. Notices, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
SECTION 12.03. No Waiver; Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
SECTION 12.04. Costs and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
SECTION 12.05. Right of Set-off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
SECTION 12.06. Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
SECTION 12.07. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
SECTION 12.08. Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
SECTION 12.09. Borrower Managing Member and Administrator . . . . . . . . . . . . . 100
SECTION 12.10. Non-Recourse Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
SECTION 12.11. Consent to Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
SECTION 12.12. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
SECTION 12.13. Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
SECTION 12.14. WAIVER OF JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
SECTION 12.15. CONSEQUENTIAL DAMAGES . . . . . . . . . . . . . . . . . . . . . . . 104

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement

EC21020A0090728

v

## Schedules

Schedule I　　-　　Committed Lender Addresses

## Exhibits

Exhibit A　　-　　Form of Assignment and Acceptance
Schedule 1 to Assignment and Acceptance

Exhibit B　　-　　Form of Opinion of Jones, Day, Reavis & Pogue, special counsel to Borrower
and Equity Participants

Exhibit C-1　　-　　Form of Opinion of Potter Anderson & Corroon LLP, special Delaware
counsel to Marengo and Borrower

Exhibit C-2　　-　　Form of Opinion of Potter Anderson & Corroon LLP, special Delaware
counsel to Wilmington Trust Company

Exhibit D-1　　-　　Form of Opinion of Vinson & Elkins LLP, special counsel to Enron

Exhibit D-2　　-　　Form of Opinion of Vinson & Elkins LLP, special counsel to Enron

Exhibit E　　-　　Form of Opinion of internal counsel of Enron

Exhibit F　　-　　Form of Opinion of Shearman & Sterling, special counsel to Agent

Exhibit G　　-　　Form of Opinion of Kevin Doyle, internal counsel of the Surety Provider

Exhibit H　　-　　Form of Confidentiality Agreement

Exhibit I-1　　-　　Form of Lender Note

Exhibit I-2　　-　　Form of Committed Lender Note

This document is subject to
a written Confidentiality Agreement.

EC21020A0090729

# CREDIT AND SECURITY AGREEMENT

## Dated as of December 17, 1999

NAHANNI INVESTORS L.L.C., a Delaware limited liability company (the "Borrower"), CXC INCORPORATED, a Delaware corporation ("CXC" or the "Initial Lender"), CITIBANK, N.A., a national banking association ("Citibank" or the "Initial Committed Lender") and the other Committed Lenders (as hereinafter defined) from time to time parties hereto, and CITICORP NORTH AMERICA, INC., a Delaware corporation ("CNAI"), as agent (the "Agent") and collateral agent (the "Collateral Agent") for the Lender (as hereinafter defined) and the Committed Lenders, agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Marengo Partnership Agreement. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Financing Costs" means interest, fees, costs, indemnities, additional amounts under Section 2.07, taxes payable under Section 2.09, Unapplied Amount Interest, interest payable under Section 2.08(b), Liquidation Amounts, expenses and similar items and amounts that are required to be paid by (or an obligation to pay which has been incurred by) the Borrower under the Loan Documents, other than (i) interest payable under this Agreement pursuant to Section 2.03 (other than Unapplied Amount Interest and any interest included in the computation of Liquidation Amount and interest payable under Section 2.08(b)), (ii) fees payable under this Agreement pursuant to Section 2.04 and (iii) the principal amount of the Advance, but including amounts payable under Section 2.09 in respect of any of the foregoing exclusions.

"Administration Agreement" means the Administration Agreement dated as of the date hereof, between the Administrator and the Borrower, pursuant to which the Borrower engaged the Administrator to administer the business and affairs of the Borrower, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with its terms as permitted hereby.

This document is subject to
a written Confidentiality Agreement

EC21020A0090730

2

"Administrative Fee Letter" means the letter dated the date hereof from Nahanni to the Administrator setting out details of the fee payable under Section 5 of the Administration Agreement.

"Administrator" means Wilmington Trust Company as administrator of the Borrower pursuant to the Administration Agreement, and any permitted successor thereto.

"Administrator's Account" means the "Administrator's Account" maintained pursuant to the Administration Agreement and held with the Administrator at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890.

"Advance" has the meaning set forth in Section 2.01, and shall include (without limitation) a Drawdown Termination Advance, if any.

"Affiliate" means (i) as to any Person, (a) any Person directly or indirectly controlling, controlled by or under common control with such Person, (b) any executive officer, director, manager, managing member or general partner of such Person or (c) any Person who is an executive officer, director, manager, managing member, general partner, or trustee of any Person described in clauses (a) or (b) of this sentence and (ii) as to CNAI or CXC, shall also include CXC or CNAI, respectively, and any other Person who has a relationship to CNAI comparable to that of CXC.

"Agent" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Agent's Account" means the account no. 40606138 of the Agent maintained at Citibank, 399 Park Avenue, New York, New York 10043, or such other account as shall be notified to the Borrower by the Agent from time to time.

"Agreement" means this Credit and Security Agreement, as amended, supplemented or otherwise modified from time to time.

"APA Agent" means the "Agent" as defined in the Asset Purchase Agreement.

"APA Purchasers" means each of the banks and the other financial institutions initially party to the Asset Purchase Agreement as purchasers thereunder.

"Applicable Funds" has the meaning set forth in Section 8.04(a).

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090731

3

"Applicable Margin" means a percentage per annum equal to 0.75% (subject, however, to the provisions of Section 2.03(a)(iv)), as such percentage may be adjusted periodically by the Agent in good faith based on the quoted percentage spread over the LIBO Rate received by the Agent from the Committed Lenders at the time of the entering into (including entering into at the time of the initial syndication by the Initial Committed Lender of its Committed Lender Commitment) or (pursuant to Section 2.15) renewal of their respective Committed Lender Commitments.

"Asset Purchase Agreement" means the Asset Purchase Agreement dated as of December 21, 1999 to be entered into between CNAI, as APA Agent, and Citibank and the other financial institutions party thereto as Purchasers thereunder, as the same may be amended, modified, or otherwise supplemented from time to time in accordance with its terms.

"Assigned Agreements" has the meaning set forth in Section 7.01(a).

"Assignment and Acceptance" means an assignment and acceptance entered into by the Lender or a Committed Lender (as the case may be) and an Eligible Assignee, and accepted by the Agent and consented to by the Borrower where required pursuant to the provisions of Section 10.01 (which consent shall not be unreasonably withheld), in substantially the form of Exhibit A hereto.

"Base Rate" means, for any period, a fluctuating interest rate per annum as shall be in effect from time to time which rate per annum shall at all times be equal to the highest of:

(a)    the rate of interest announced publicly by Citibank in New York, New York, from time to time, as Citibank's base rate;

(b)    the sum (adjusted to the nearest 1/4 of 1% or, if there is no nearest 1/4 of 1%, to the next higher 1/4 of 1%) of (i) ½ of 1% per annum, plus (ii) the rate obtained by dividing (A) the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major United States money market banks, such three-week moving average (adjusted to the basis of a year of 360 days) being determined weekly on each Monday (or, if such day is not a Business Day, on the next succeeding Business Day) for the three-week period ending on the previous Friday by Citibank on the basis of such rates reported by certificate of deposit dealers to and published by the Federal Reserve Bank of New York or, if such publication shall be suspended or terminated, on the basis of quotations for such rates received by Citibank from three New York certificate of deposit dealers of recognized standing selected by Citibank by (B) a

This document is subject to
a written Confidentiality Agreement.

EC21020A0090732

4

percentage equal to 100% minus the average of the daily percentages specified during such three-week period by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, but not limited to, any emergency, supplemental or other marginal reserve requirement) for Citibank with respect to liabilities consisting of or including (among other liabilities) three-month U.S. dollar non-personal time deposits in the United States, plus (iii) the average during such three-week period of the annual assessment rates estimated by Citibank for determining the then current annual assessment payable by Citibank to the Federal Deposit Insurance Corporation (or any successor) for insuring U.S. dollar deposits of Citibank in the United States; and

(c)  the sum of ½ of one percent per annum plus the Federal Funds Rate in effect from time to time.

"Borrower" has the meaning set forth in the recital to this Agreement.

"Borrower Class A Member" means a Class A member of the Borrower pursuant to the Nahanni Company Agreement.

"Borrower Class B Member" means a Class B member of the Borrower pursuant to the Nahanni Company Agreement.

"Borrower Class C Member" means a Class C member of the Borrower pursuant to the Nahanni Company Agreement.

"Borrower Liquidating Event" means a "Nahanni Liquidating Event" as defined in the Nahanni Company Agreement.

"Borrower Managing Member" means the Managing Member of the Borrower pursuant to the Nahanni Company Agreement.

"Borrower Member Consent" means the letter of the Borrower to each of the Borrower Members dated as of the date hereof, as accepted and agreed to by such Borrower Members, acknowledging each Borrower Member's consent to the assignment to the Collateral Agent of the Nahanni Marengo Interest and of the Borrower's rights and interests under the Assigned Agreements and the other Pledged Collateral pursuant hereto.

"Borrower Members" means, collectively, the Members of the Borrower.

"BSCS" means BSCS V, Inc., a Delaware corporation.

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement


EC21020A0090733

5

"Business Day" means (i) any day of the year except Saturday, Sunday and any day on which banks are not required or authorized by law to close in New York, New York, Wilmington, Delaware or Houston, Texas and (ii) if the applicable Business Day relates to any Purchaser Advance or Committed Lender Advance bearing interest based on the LIBO Rate, any day that is a "Business Day" described in clause (i) and that is also a day for trading by and between banks in the London interbank Eurodollar market.

"Cash Equivalents" has the meaning set forth in the Nahanni Company Agreement.

"Citibank" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Citigroup" means Citigroup, Inc., a Delaware corporation.

"Class C Member Fee Letter" means the letter dated the date hereof from Nahanni to BSCS setting out details in respect of the fee payable pursuant to the Nahanni Company Agreement.

"Closing Date" means December 21, 1999.

"CNAI" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Collateral Account" means the securities account which will be established and maintained on the date of the first Drawdown Termination Event either with the Administrator or with each Committed Lender (as directed by the Collateral Agent), in the name of the Borrower but under the sole dominion and control of, and exclusive right of withdrawal at the direction of, the Collateral Agent (in the case of the Collateral Account with the Administrator) or such Committed Lender (in the case of the Collateral Account with such Committed Lender) and subject to the terms of this Agreement.

"Collateral Account Amount" means at any time the amount equal to (i) the aggregate principal amount of the Drawdown Termination Advances less (ii) the amounts transferred from the Collateral Account to the Operating Account pursuant to Section 8.04(c)(ii) plus (iii) the amounts deposited to the Collateral Account pursuant to the proviso in Section 8.04(c)(4).

"Collateral Account Permitted Investments" has the meaning specified in Section 8.05.

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement

EC21020A0090734

6

"Collateral Agent" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Committed Lender" means each Person executing this Agreement as a "Committed Lender" and each Eligible Assignee that shall become a party to this Agreement pursuant to Section 10.01.

"Committed Lender Advance" means an Advance made by the Committed Lenders.

"Committed Lender Commitment" of any Committed Lender means (i) with respect to any Committed Lender at any time, the amount set forth opposite such Committed Lender's name on the signature pages hereto or such amount as reduced by any Assignment and Acceptance entered into between Citibank and other Committed Lenders; or (ii) with respect to a Committed Lender that has entered into an Assignment and Acceptance, the amount set forth therein as such Committed Lender's Committed Lender Commitment, in each case as such amount may be reduced by an Assignment and Acceptance entered into between such Committed Lender and an Eligible Assignee, and in each such case as such Committed Lender Commitments may be reduced pursuant to Section 2.14 hereof.

"Committed Lender Commitment Termination Date" means the earlier of (a) December 19, 2000, subject to the extension thereof pursuant to Section 2.15 or 8.06(b) and (b) the date of termination in whole of the Committed Lender Commitments pursuant to Section 2.14 or 6.01.

"Committed Lender Note" means each promissory note of the Borrower payable to any Committed Lender, in substantially the form of Exhibit I-2 hereto, evidencing the indebtedness of the Borrower to such Committed Lender resulting from the Advances made by such Committed Lender.

"Committed Lender Percentage" of any Committed Lender at any time means the percentage obtained by dividing the Committed Lender Commitment of such Lender at such time by the aggregate Committed Lender Commitments of all Committed Lenders at such time.

"Confidential Information" means information that the Borrower, Enron or any Affiliate of either furnishes to the Agent, the Lender, any Committed Lender, the Collateral Agent or any Purchaser, but does not include any such information (a) that is or becomes generally available to the public other than as a result of a breach by the Agent, the Lender, such Committed Lender, the Collateral Agent or such Purchaser of its obligations hereunder


EC21020A0090735

7

or (b) that is or becomes available to the Agent, the Lender, such Committed Lender, the Collateral Agent or such Purchaser from a source other than the Borrower that is not, to the best of the Agent's, the Lender's, such Committed Lender's, the Collateral Agent's or such Purchaser's knowledge, acting in violation of a confidentiality agreement with the Borrower.

"Custodian Fee Letter" means the letter dated the date hereof from Marengo to the Administrator setting out details of the fee payable under Section 9.1 of the Custody Agreement.

"CXC" has the meaning set forth in the recital of parties to this Agreement in the first paragraph of this Agreement.

"CXC Advance" means an Advance (or any portion thereof) made by the Lender during each Interest Period (or any portion thereof) on the first day of which Advance the Lender will be funding the maintenance of such Advance (or such portion) for such Interest Period (or portion thereof) through the issuance of commercial paper notes or other promissory notes.

"CXC Rate" means, for any Interest Period (or any portion thereof), the sum of .02 of 1% per annum in respect of the administration fee plus the per annum rate equivalent to the weighted average of the per annum rates paid or payable by the Lender from time to time as interest on or otherwise (by means of interest rate hedges or otherwise) in respect of those promissory notes issued by the Lender that are allocated, in whole or in part, by the Agent (on behalf of the Lender) to fund an Advance or maintenance of such Advance during such Interest Period (or portion thereof), as determined by the Agent (on behalf of the Lender) and reported to the Borrower, which rates shall reflect and give effect to the commissions of placement agents and dealers in respect of such promissory notes, to the extent such commissions are allocated, in whole or in part, to such promissory notes by the Agent (on behalf of the Lender); provided, however, that if any component of such rate is a discount rate, in calculating the "CXC Rate" for such Interest Period (or portion thereof), the Agent shall for such component use the rate resulting from converting such discount rate to an interest bearing equivalent rate per annum.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (whether or not the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all

This document is subject to
a written Confidentiality Agreement.



8

Obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all Obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any partnership or member or other equity interests of such Person, (h) all Obligations of such Person in respect of Hedge Agreements, (i) all other financial Obligations of such Person under any contract or other agreement to which such Person is a party, (j) all Debt of other Persons referred to in clauses (a) through (i) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss, and (k) all Debt referred to in clauses (a) through (j) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"Debt Collection Date" means the first day on or after the earliest to occur of (i) the end of the final Drawdown Period, (ii) the Purchase Closing Date, (iii) the Retirement Date and (iv) the Maturity Date, in each case on which the aggregate outstanding principal amount of the Advances shall have been paid in full by the Borrower together with all interest accrued thereon, and the Borrower shall have paid in full all of any Additional Financing Costs, Unapplied Amount Interest, the Liquidation Amount, Liquidity Fee, Program Fee, Premium and other amounts payable by the Borrower under this Agreement accrued through the date of such payment of such principal and interest.

"Default" means any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Deficiency" has the meaning set forth in Section 8.04(f)(i) hereof.

"Deficiency Notice" has the meaning set forth in Section 8.04(f)(ii) hereof.

"Distribution Amount" has the meaning set forth in Section 2.06(b).

This document is subject to
a written Confidentiality Agreement.

EC21020A0090737

9

"Distributions" means any distribution or dividend or return of capital or any other distribution, payment or delivery of property or cash, or the redemption, retirement, purchase or acquisition, directly or indirectly, of any membership or partnership interest now or hereafter outstanding (or any warrants for or options in respect of any such interest) or the setting aside of any funds for any of the foregoing purposes.

"Drawdown Period" means the period commencing on the Closing Date and ending on the earliest to occur of (a) the Committed Lender Commitment Termination Date, (b) the Purchase Commitment Termination Date and (c) December 10, 2004; provided, however, that upon the Drawdown Renewal Date, the Drawdown Period shall be reinstated to commence from the date of such Drawdown Renewal Date until the earlier to occur of the (a) Committed Lender Termination Date and (b) December 10, 2004.

"Drawdown Renewal Date" has the meaning set forth in Section 8.06(b).

"Drawdown Termination Advance" has the meaning set forth in Section 2.02(d).

"Drawdown Termination Event" has the meaning set forth in Section 2.15.

"Eligible Assignee" means (a) a Purchaser; (b) a wholly owned Affiliate of a Purchaser; (c) a commercial bank organized under the laws of the United States, or any State thereof, and having total assets in excess of $1,000,000,000 (or the equivalent thereof); (d) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having total assets in excess of $1,000,000,000 (or the equivalent thereof); (e) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow, or a political subdivision of any such country, and having total assets in excess of $1,000,000,000 (or the equivalent thereof); (f) the central bank of any country that is a member of the OECD; (g) the Surety Provider, Citibank, CXC or CNAI; (h) any Person or entity that, directly or indirectly, controls, is controlled by or is under common control with Citigroup with short term debt ratings of at least A-1 by S&P and P-1 by Moody's; (i) any person or entity to which or for whom Citigroup, or any other person or entity described in clause (g) or (h) above, provides services or administrative functions with short term debt ratings of at least A-1 by S&P and P-1 by Moody's and which has a relationship to Citigroup comparable to that of CXC and which issues commercial paper notes or other promissory notes to fund its making and maintaining of advances; or (j) any other Person approved by the Agent and the Borrower, such approval not to be unreasonably withheld; provided, however, that any Eligible Assignee shall be (i) organized under the laws of the United States or any State thereof or (ii) shall be wholly exempt from United States federal withholding tax on

This document is subject to
a written Confidentiality Agreement

EC21020A0090738

10

payments for its account hereunder either because (x) it is acting through a branch or agency located in the United States such that the payments it receives pursuant to this Agreement are effectively connected with the conduct of a trade or business within the United States or (y) it is entitled to the benefit of a zero rate United States federal withholding tax pursuant to a double tax treaty between the United States and its country of residence; provided further that none of the Borrower, Enron or any Member of the Borrower or any Affiliate of the Borrower or of Enron or of any Member of the Borrower shall qualify as an Eligible Assignee.

"Enron" means Enron Corp., an Oregon corporation, and any successor not prohibited by the terms of the Enron Agreement.

"Enron Consent" means the letter of the Borrower to Enron dated as of the date hereof, as accepted and agreed to by Enron, acknowledging Enron's consent to the assignment to the Collateral Agent of the Borrower's rights and interest under the Enron Agreement (other than in respect of Excluded Payments) pursuant hereto, which letter shall include, without limitation, Enron's acknowledgment that the Collateral Agent can exercise the rights of the Borrower under the Enron Agreement if an Event of Default has occurred and is continuing.

"Enron Event" has the meaning given such term in the Enron Agreement.

"Enron Guaranty" means the guaranty agreement, dated as of December 17, 1999 made by Enron in favor of the Guaranty Beneficiaries (as such term is defined therein).

"Equity Participants" means Ambac Private Holdings, LLC, a Delaware limited liability company, and MacKenzie River Investors, LLC, a Delaware limited liability company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that for purposes of Title IV of ERISA is a member of the Borrower's controlled group, or under common control with the Borrower, within the meaning of Section 414 of the Internal Revenue Code. For purposes of this Agreement. "ERISA Affiliate" shall not include Enron, the Administrator or any of their respective Affiliates.

This document is subject to
a written Confidentiality Agreement

EC21020A0090739

11

"Escrow Agent" means CNAI, or any successor escrow agent, appointed pursuant to the terms hereof and of the Escrow Agreement and acting as such pursuant to the Escrow Agreement.

"Escrow Agreement" means the Escrow Agreement dated as of the date hereof among the Borrower, Marengo, the Administrator, the Equity Participants, the Escrow Agent, the Agent and the Collateral Agent, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time.

"Escrowed Documents" means the documents required to be delivered to and held in escrow by the Escrow Agent pursuant to the Escrow Agreement.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Event of Default" has the meaning specified in Section 6.01.

"Excluded Payments" means (i) any indemnification or other payments under the Operative Documents payable to Persons other than the Borrower in its own right, (ii) Transaction Costs (including Transaction Costs constituting Member Expenses), under and as defined in the Nahanni Company Agreement, and (iii) interest on the foregoing paid as a result of any late payment by Marengo of amounts in respect of the foregoing.

"Facility Amount" means $485,0000,000.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Fiscal Quarter" means (i) the period commencing on December 17, 1999 and ending on March 31, 2000 and (ii) any subsequent period commencing on each of January 1, April 1, July 1 and October 1 and ending on the earlier to occur of (x) the last date before the next such date and (y) the date on which all Marengo Property is distributed pursuant to Section 12.2 of the Marengo Partnership Agreement and Marengo's certificate of formation has been canceled pursuant to the Act.

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement

EC21020A0090740

12

"Fiscal Year" means (i) the period commencing on December 17, 1999 and ending on December 31, 2000 and (ii) any subsequent period commencing on January 1 and ending on the earlier to occur of (x) the next December 31 and (y) the date on which all Marengo Property is distributed pursuant to Section 12.2 of the Marengo Partnership Agreement and Marengo's certificate of formation has been canceled pursuant to the Act.

"GAAP" has the meaning specified in Section 1.03.

"Guaranteed Payment" has the meaning specified in the Marengo Partnership Agreement.

"Hedge Agreements" means interest rate swaps, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements.

"Incipient Event" means any event that, with notice or lapse of time, or both, would constitute a Marengo Termination Event, a Marengo Notice Event or a Marengo Liquidating Event.

"Indemnified Amounts" has the meaning set forth in Section 11.01 hereof.

"Indemnified Party" has the meaning set forth in Section 11.01 hereof.

"Initial Advance" means the initial Advance hereunder.

"Initial Lender" has the meaning set forth in the recital of the parties to this Agreement contained in the first paragraph of this Agreement.

"Insurance Agreement" means the Insurance Agreement dated as of December 21, 1999 among the Surety Provider, CXC, Citibank and the Agent pursuant to which the Surety Bond in the amount of the Insured Amount under and as defined in such Insurance Agreement shall be issued, in the form delivered to the Agent on the Closing Date, as such Agreement may be amended, supplemented or otherwise modified from time to time.

"Insurance Premium Letter" means the letter dated as of December 17, 1999 from the Surety Provider to the Agent setting out details in respect of the Premium, as such letter may be amended, supplemented or otherwise modified from time to time.

"Interest Period" means the period commencing on the Closing Date and ending on April 1, 2000, and, thereafter, each subsequent period commencing on the last day of the

This document is subject to
a written Confidentiality Agreement.

EC21020A0090741

13

immediately preceding Interest Period and ending on the next succeeding first day of April, July, October or January, as the case may be, of each year; provided, however, that, in the case of any Interest Period that commences before the Maturity Date and would otherwise end on a date occurring after the Maturity Date, such Interest Period shall end on the Maturity Date and the duration of each Interest Period that commences on or after the Maturity Date shall be initially, the period commencing on the Maturity Date and ending on the first day of the immediately following calendar quarter and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the next succeeding first day of April, July, October or January, as the case may be, of each year or of such other duration as shall be selected by the Agent.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any capital stock, warrants, rights, options, obligations or other securities of such Person, any capital contribution to such Person or any other investment in such Person, including, without limitation, any arrangement pursuant to which the investor incurs Debt of the types referred to in clauses (j) and (k) of the definition of "Debt" in respect of such Person.

"Klondike" means Klondike River Assets, L.L.C., a Delaware limited liability company.

"Klondike Custodian" means Wilmington Trust Company, or any successor thereto, in its capacity as Klondike Custodian pursuant to the Klondike Custody Agreement.

"Klondike Custody Agreement" means the Custody Agreement dated as of December 17, 1999, between Klondike and the Klondike Custodian.

"Lender" means, on and after the making of any Advance by the Initial Lender, the Initial Lender; provided, however, that on and after any assignment by the Lender of all of its rights and obligations under this Agreement pursuant to Section 10.01 to any Eligible Assignee, such Eligible Assignee shall be the "Lender".

"Lender Note" means the promissory note of the Borrower payable to the Initial Lender, in substantially the form of Exhibit I-1 hereto, evidencing the indebtedness of the Borrower to such Initial Lender resulting from the Advances made by such Initial Lender.

This document is subject to
a written Confidentiality Agreement.

EC21020A0090742

14

"Lending Office" means (i) with respect to the Lender, the lending office or offices from time to time specified by the Lender as its "Lending Office" hereunder for any Purchaser Advance and (ii) with respect to a Committed Lender, the lending office or offices from time to time specified by the Committed Lender as its "Lending Office" hereunder.

"Letter of Credit" means a letter of credit issued in connection with any Qualified Enron Demand Loan.

"LIBO Rate" means, for any Interest Period (or any portion thereof), an interest rate per annum equal to the rate per annum reported, on the date two Business Days prior to the first day of such Interest Period (or portion thereof), on the Bloomberg Financial Markets Services Display Screen (or, if such screen shall cease to be publicly available, as reported by Reuters or any other publicly available source of similar market data selected by the Agent) as the London Interbank Offered Rate for U.S. dollar deposits having a term comparable to such Interest Period (or portion thereof).

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), priority, security interest, or other security device or arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code (as in effect from time to time in the relevant jurisdiction), or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Liquidation Amount" means:

(a)    if, during any period in which any Advance is a CXC Advance, any payment or prepayment of any principal of such Advance is made by the Borrower to or for the account of the Lender (whether during, or on the last day of, an Interest Period therefor) or if an Advance (or any portion thereof) converts from a CXC Advance to a Purchaser Advance at any time, the amount, if any, by which:

(i)    the additional interest (calculated without taking into account any Liquidation Amount or any shortened duration of such Interest Period) that would have accrued at the CXC Rate on the amount of such payment or prepayment of such Advance, or the amount of such Advance (or such portion thereof) so converted, as the case may be, during such Interest Period if such amount had remained a CXC Advance,

exceeds

This document is subject to
a written Confidentiality Agreement.

EC21020A0090743

15

      (ii)      the income, if any, received by the Lender during the remaining portion of such Interest Period from the Lender's investing the proceeds of such payment or prepayment in commercial paper with tenors approximating the tenors of the then outstanding commercial paper notes issued by the Lender to fund or maintain such Advance (or such portion thereof) during such Interest Period,

and (b) if, during any period in which an Advance is a Purchaser Advance or Committed Lender Advance bearing interest computed by reference to the LIBO Rate, any payment or prepayment of any principal of such Advance is made by the Borrower to or for the account of the Lender or the Committed Lenders (as the case may be) and applied during (but not on the last day of) any Interest Period therefor or if an Advance (or any portion thereof) converts from a Purchaser Advance to a CXC Advance during (but not on the last day of) any Interest Period therefor, any amounts required to compensate the Lender or any Purchaser (as the case may be) for any additional losses, costs or expenses that the Lender or such Purchaser may reasonably incur as a result of such payment, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender or such Purchaser to fund or maintain the Advance or portion thereof, as the case may be.

      "Liquidity Fee" has the meaning set forth in Section 2.04(a).

      "Loan Documents" means this Agreement, the Notes, the Surety Bond, the Asset Purchase Agreement, the Insurance Agreement, the Marengo Consent, the Borrower Member Consent, the Marengo Custodian Consent, the Escrow Agreement, the Escrowed Documents, the Enron Consent, the Process Agent Agreement, the Custodian Fee Letter and the Administrative Fee Letter, in the form delivered to the Agent on the Closing Date, as each such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

      "Majority Committed Lenders" means, at any time, those Committed Lenders having a majority of the aggregate Committed Lender Commitments at such time, or, if such Committed Lender Commitments have terminated and any Committed Lender Advances shall be outstanding, having a majority of the outstanding principal amount of the aggregate outstanding principal amount of the Committed Lender Advances at such time.

      "Majority Purchasers" means, at any time, those Purchasers having a majority of the aggregate Purchase Commitments at such time or, if such Purchase Commitments have terminated and any Purchaser Advances shall be outstanding, having a majority of the

This document is subject to
a written Confidentiality Agreement.

EC21020A0090744

16

outstanding principal amount of the aggregate outstanding principal amount of the Purchaser Advances at such time.

"Managing Member Fee Letter" means the letter dated the date hereof from Nahanni to Borrower Managing Member setting out details in respect of the fee payable pursuant to the Nahanni Company Agreement.

"Marengo" means Marengo, L.P., a Delaware limited partnership.

"Marengo Assignment" has the meaning assigned to such term in the Escrow Agreement.

"Marengo Consent" means the letter of the Borrower to Marengo dated as of the date hereof, as accepted and agreed to by Enron, Marengo, Yellowknife, Yukon, Klondike and the Administrator, acknowledging each of Marengo's, Yukon's and Klondike's consent to the assignment to the Collateral Agent of the Borrower's rights and interests (other than in respect of Excluded Payments) under the Marengo Partnership Agreement and the other Assigned Agreements to which Enron and Marengo are parties and of the Nahanni Marengo Interest, in each case pursuant hereto.

"Marengo Custodian Consent" means the letter of the Borrower to the Marengo Custodian, the Klondike Custodian and the Yukon Custodian, dated as of the date hereof, as accepted and agreed to by each of the Marengo Custodian, the Klondike Custodian and the Yukon Custodian, acknowledging each such Custodian's consent to the assignment to the Collateral Agent of the Borrower's rights and interests (other than in respect of the Excluded Payments) under the Marengo Partnership Agreement and of the Nahanni Marengo Interest, in each case pursuant hereto.

"Marengo Documents" means, collectively, the "Operative Documents" as defined in the Marengo Partnership Agreement, each in the form delivered to the Agent on the Closing Date, as such agreements may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Marengo General Partner" means the General Partner (as defined in the Marengo Partnership Agreement) of Marengo pursuant to the Marengo Partnership Agreement.

"Marengo Limited Partner" means the Limited Partner (as defined in the Marengo Partnership Agreement) of Marengo pursuant to the Marengo Partnership Agreement.

This document is subject to
a written Confidentiality Agreement

EC21020A0090745

17

"Marengo Liquidating Event" means a "Liquidating Event" as defined in the Marengo Partnership Agreement.

"Marengo Notice Event" means a "Notice Event" as defined in the Marengo Partnership Agreement.

"Marengo Partnership Agreement" means the Amended and Restated Limited Partnership Agreement of Marengo, L.P. dated as of the date hereof, between Yellowknife, Marengo, Enron and the Borrower, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Marengo Subsidiaries" means Klondike and Yukon.

"Marengo Termination Event" means a "Termination Event" as defined in the Marengo Partnership Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, financial condition, operations, performance or properties of the Borrower, (b) the rights and remedies of the Agent, the Collateral Agent, the Lender, the Committed Lenders or the Purchasers under any Loan Document or Assigned Agreement or (c) the ability of the Borrower to perform its Obligations under any Loan Document or other Operative Document to which it is or is to be a party.

"Maturity Date" means the earlier of (a) December 14, 2004 and (b) the date on which the Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable pursuant to Section 6.01.

"Member" means, with respect to any limited liability company, any member admitted to such company in compliance with the company agreement for such company.

"Member Expenses" has the meaning set forth in the Nahanni Company Agreement.

"Moody's" means Moody's Investors Service, Inc., or any successor that is a national statistical rating organization.

"Multiemployer Plan" of the Borrower means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any of its ERISA Affiliates is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

This document is subject to
a written Confidentiality Agreement.

EC21020A0090746

18

"Multiple Employer Plan" of the Borrower means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and at least one Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Nahanni Company Agreement" means the Amended and Restated Company Agreement of Nahanni Investors L.L.C. dated as of December 17, 1999 among the Equity Participants, BSCS and Enron, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Nahanni Marengo Interest" means the total partnership interest in Marengo held from time to time by the Borrower as such Nahanni Marengo Interest may be increased or decreased in accordance with the terms of the Marengo Partnership Agreement.

"Non-Extending Committed Lender" has the meaning set forth in Section 2.14(b).

"Note" means the Lender Note or any Committed Lender Note.

"Notice of Borrowing" has the meaning set forth in Section 2.02(a).

"Obligation" means, with respect to any Person, any obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 6.01(e). Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, costs, expenses, Additional Financing Costs, Liquidation Amounts, Liquidity Fee, Premium, Program Fee, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that CNAI, CXC or the Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"OECD" means the Organization for Economic Cooperation and Development.

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.



19

"Operating Account" means the "Operating Account" established and maintained pursuant to the Administration Agreement and held with the Administrator at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, in the name of the Borrower but under the sole dominion and control of, and exclusive right of withdrawal at the direction of, the Collateral Agent and subject to the terms of this Agreement.

"Operative Documents" means, collectively, the Loan Documents, the Marengo Documents and the Nahanni Company Agreement.

"Organizational Documents" means, with respect to any Person, any certificate of incorporation, charter, by-laws, memorandum of association, articles of association, partnership agreement, limited liability company agreement, certificate of limited partnership, certificate of formation, certificate of trust, trust agreement, indenture or other agreement or instrument under which such Person is formed or organized under applicable Laws.

"Other Taxes" has the meaning set forth in Section 2.09(c).



"Participation Register" has the meaning set forth in Section 10.01(g).

"Partner" means, with respect to any limited partnership, any partner admitted to such partnership in compliance with the limited partnership agreement of such limited partnership.

"Payment Date" means the fifth Business Day of each January, April, July and October in each year, commencing April 7, 2000 or, if notification of any amount required to determine the Preferred Payment (as defined in the Marengo Partnership Agreement) is not timely made, the third Business Day after such notification is made.

"Percentage Interest Margin" means, for any Interest Period (or portion thereof) during which the Purchasers shall purchase Percentage Interests under the Asset Purchase Agreement, an interest rate per annum calculated by the Agent for such Interest Period (or portion thereof) in which an Advance is a Purchaser Advance, that, when applied to the outstanding principal amount of such Advance for such Interest Period (or portion thereof), equals the amount of (i) interest, accrued or to accrue during the period from the date of such purchase to the maturity dates of the then outstanding promissory notes issued by the Lender to fund or maintain such Advance (or such portion thereof) at an interest rate per annum equal to the Purchaser Rate for such Interest Period (or portion thereof), on that portion of the purchase price paid by the Purchasers for such Percentage Interests which represents interest during such period plus (ii) the amount, if any, by which (A) that portion of the

This document is subject to
a written Confidentiality Agreement

EC21020A0090748

20

purchase price paid by the Purchasers for such Percentage Interests which represents interest during such period exceeds (B) the interest accrued and to accrue during such period on the outstanding principal amount of such Advance at the Purchaser Rate for such Interest Period (or portion thereof).

"Percentage Interests" has the meaning assigned to such term in the second paragraph of the Preliminary Statements to the Asset Purchase Agreement

"Permitted Investments" has the meaning set forth in Section 8.03 hereof.

"Permitted Liens" has the meaning set forth in Section 5.02(a).

"Person" means any legal person, including any individual, partnership, corporation (including a business trust), joint stock company, trust, joint venture, unincorporated association, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Pledged Collateral" has the meaning set forth in Section 7.01.

"Premium" has the meaning set forth in Section 2.04(b).

"Prepayment Amount" has the meaning set forth in Section 2.06(a).

"Prescribed Forms" shall mean such duly executed form(s) or statement(s), and in such number of copies, that may, from time to time, be prescribed by law and that, pursuant to applicable provisions of (a) an income tax treaty between the United States and the country of residence of the Lender, any Committed Lender or any Purchaser providing the form(s) or statement(s), (b) the Internal Revenue Code, or (c) any applicable rule or regulation under the Internal Revenue Code, permit the Borrower to make payments hereunder for the account of the Lender, such Committed Lender or such Purchaser free of deduction or withholding of income or similar taxes (except for any deduction or withholding of income or similar taxes as a result of any change in or in the interpretation of any such treaty, the Internal Revenue Code or any such rule or regulation).

"Principal Portion" of a Percentage Interest means the portion of such Percentage Interest that is attributable to the principal amount of the Advance in respect of which the Purchasers have purchased such Percentage Interest.

NYDOCS03/494722
Nakanu Credit Agreement

This document is subject to
a written Confidentiality Agreement

21

"Process Agent" has the meaning set forth in Section 12.11(c).

"Process Agent Agreement" means the agreement dated as of the date hereof between the Borrower, Enron and The Corporation Trust Company pursuant to which the Borrower appointed The Corporation Trust Company as its Process Agent pursuant to Section 12.11(c) (or any agreement with any successor Process Agent as provided therein) in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified from time to time as permitted hereby.

"Program Fee" has the meaning set forth in Section 2.04(c).

"Program Fee Letter" means the letter dated the date hereof from CXC to the Borrower and the Agent and the Collateral Agent setting out details in respect of the Program Fee, as such letter may be amended, supplemented or otherwise modified from time to time.

"Purchase Amount" has the meaning set forth in the Purchase Option Agreement.

"Purchase Closing Date" has the meaning set forth in the Purchase Option Agreement.

"Purchase Commitment" means a commitment of a Purchaser under the Asset Purchase Agreement or, in the case of the APA Purchasers, under any other liquidity agreement relating hereto.

"Purchase Commitment Termination Date" means the date on which any Purchase Commitment of any Purchaser shall have expired (and shall not have been extended for a term of 364 days from the date of such expiration) under the Asset Purchase Agreement unless any other Purchaser shall have assumed or otherwise become obligated for such Purchaser Commitment for a term of 364 days from the date of such expiration or the Facility Amount shall have been reduced pursuant to Section 2.14 in an amount equal to such Purchase Commitment in connection with the expiration thereof.

"Purchase Default" has the meaning set forth in the Purchase Option Agreement.

"Purchase Exercise Notice" has the meaning set forth in the Purchase Option Agreement.

"Purchase Option Agreement" means the Purchase Option Agreement dated as of December 17, 1999 among Enron, the Borrower, the Collateral Agent, BSCS and the Equity

This document is subject to
a written Confidentiality Agreement

EC21020A0090750

22

Participants, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified as permitted hereby.

"Purchaser" means each of the APA Purchasers and any other "Eligible Assignee" as defined in, and assigned a Commitment under Section 8 of, the Asset Purchase Agreement.

"Purchaser Advance" means an Advance (or any portion thereof) made by the Lender during each Interest Period (or any portion thereof) as to which Advance the Lender will not be funding the maintenance of such Advance (or such portion) for such Interest Period (or portion thereof) through the issuance of commercial paper notes or other promissory notes.

"Purchaser Rate" means, for any Interest Period (or portion thereof) in which an Advance is a Purchaser Advance or a Committed Lender Advance, as the case may be, an interest rate per annum equal to the sum of the LIBO Rate for such Interest Period (or portion thereof) plus the Applicable Margin then in effect plus the Percentage Interest Margin; provided, however, that, upon an Advance first becoming a Purchaser Advance, the "Purchaser Rate" for the first three days that such Advance is a Purchaser Advance shall be the interest rate per annum equal to the sum of the Base Rate in effect on the date such Advance became a Purchaser Advance plus the Percentage Interest Margin; provided further that if either (i) the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for a Purchaser or a Committed Lender, as the case may be, to obtain funds in the London interbank market during such Interest Period (or portion thereof), (ii) the LIBO Rate will not adequately reflect the cost to the Majority Committed Lenders, or, if CXC shall have assigned interests in its Advances to the Purchasers pursuant to their respective Purchase Commitments, to the Majority Purchasers, of maintaining such Advance during such Interest Period (or portion thereof), or (iii) the LIBO Rate cannot be determined, then the "Purchaser Rate" for such Interest Period (or portion thereof) shall be the interest rate per annum equal to the sum of the Base Rate in effect on the first day of such Interest Period (or portion thereof) plus, in the case of any Purchaser Advance, the Percentage Interest Margin.

"Register" has the meaning specified in Section 10.01(c).

"Remaining Committed Lenders" has the meaning specified in Section 2.15(b).

"Renewal Period" has the meaning specified 2.15(a) hereof.

This document is subject to
a written Confidentiality Agreement



23

"Retirement Date" has the meaning specified in Section 7.7(c) of the Marengo Partnership Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor that is a national statistical rating organization.

"Secured Obligations" has the meaning set forth in Section 7.02 hereof.

"Securities" has the meaning set forth in Section 7.01(e) hereof.

"Single Employer Plan" of the Borrower means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture, or limited liability company or (c) the beneficial interest in such trust or estate, is at the time directly or indirectly owned or controlled by such Person or by such Person and one or more of such Person's other Subsidiaries. For purposes of this Agreement, Marengo shall not be a Subsidiary of the Borrower.

"Surety Bond" means the Surety Bond dated as of December 21, 1999 issued by the Surety Provider pursuant to the Insurance Agreement, as the same may be amended, modified or otherwise supplemented from time to time in accordance with its terms, and each replacement surety bond issued by a Surety Provider in favor of the Agent on behalf of the Lender, the Committed Lenders and the Purchasers.

"Surety Provider" means initially, Ambac Assurance Corporation as issuer of the Surety Bond and each successor and assignee of Ambac Assurance Corporation, and the issuer of a replacement Surety Bond pursuant to an Insurance Agreement satisfying the highest ratings requirement of CXC or any other securitization vehicle that may be the Lender hereunder.

NYDOCS03/494722
Nahano: Credit Agreement

This document is subject to
a written Confidentiality Agreement.



24

"Tax Indemnity Agreement" means the Tax Indemnity Agreement dated as of the Closing Date, by and among Enron and the Equity Participants, in the form delivered to the Agent on the Closing Date, as such agreement may be amended, supplemented or otherwise modified as permitted hereby.

"Taxes" has the meaning set forth in Section 2.09(a).

"Transaction Costs" has the meaning set forth in the Nahanni Company Agreement.

"UCC" has the meaning set forth in Section 7.10(a) hereof.

"Unapplied Amount Interest" means, if any payment hereunder is received later than 1:00 P.M. (New York City time) on the day when due and is not applied on such day, the excess of (i) the interest accruing hereunder for the period from the date of the receipt of such payment to the date such payment is applied hereunder over (ii) earnings on the amount of such payment for such period.

"Unused Committed Lender Commitment" of any Committed Lender at any time means the excess, if any, of (a) the Committed Lender Commitment of such Committed Lender at such time over (b) the sum of (i) the aggregate principal amount of all Committed Lender Advances made by such Committed Lender and outstanding at such time and (ii) the aggregate principal amount of Percentage Interests held by such Committed Lender, as a Purchaser under the Asset Purchase Agreement.

"Welfare Plan" means a welfare plan, as defined in Section 3(1) of ERISA.

"Yellowknife" means Yellowknife Investors, Inc., a Delaware corporation.

"Yukon" means Yukon River Assets, L.L.C., a Delaware limited liability company.

"Yukon Custodian" means Wilmington Trust Company, or any successor thereto, in a capacity as Yukon Custodian pursuant to the Yukon Custody Agreement.

"Yukon Custody Agreement" means the Custody Agreement dated as of December 17, 1999 between, Yukon and the Yukon Custodian.

SECTION 1.02.  Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to," "through" and "until" each mean "to but excluding"

This document is subject to
a written Confidentiality Agreement.

EC21020A0090753

25

SECTION 1.03. <u>Accounting Terms</u>. All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with covenants shall be based upon, generally accepted accounting principles ("<u>GAAP</u>").

SECTION 1.04. <u>Use of Certain Terms</u>. Unless the context of this Agreement requires otherwise, the plural includes the singular, the singular includes the plural, and "including" has the inclusive meaning of "including without limitation." The words "hereof", "herein", "hereby", "hereunder", and other similar terms of this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

SECTION 1.05. <u>Headings and References</u>. Section and other headings are for reference only, and shall not affect the interpretation or meaning of any provision of or to this Agreement. Unless otherwise provided, references to Articles, Sections, Schedules, and Exhibits shall be deemed references to Articles, Sections, Schedules, and Exhibits of or to this Agreement. Whether or not specified herein or therein, references in this Agreement to this Agreement and to any other Operative Document or any other agreement include this Agreement and the other Operative Documents and agreements as the same may be modified, amended, restated or supplemented from time to time pursuant to the provisions hereof or thereof as permitted by the Operative Documents. Whether or not specified herein, a reference to any law, rule, order or regulation (as the case may be) shall mean that law, rule, order or regulation (as the case may be), as it may be amended, modified or supplemented from time to time, and any successor law, rule, order or regulation (as the case may be). A reference to a Person includes the successors and assigns of such Person, but such reference shall not increase, decrease or otherwise modify in any way the provisions in this Agreement and the other Operative Documents governing the assignment of rights and obligations under or the binding effect of any provision of this Agreement.

## ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES

SECTION 2.01. <u>The Advances</u>. (a) On the terms and conditions hereinafter set forth, the Lender may, in its sole discretion, and each Committed Lender severally shall, ratably in accordance with their respective Committed Lender Commitments and in accordance with Section 2.02, make advances to the Borrower from time to time (each such advance being an "<u>Advance</u>") during the Drawdown Period. Under no circumstances shall CXC make any Advance, or the Committed Lenders be obligated to make any Advance, if after giving effect to such Advance (i) the aggregate principal amount of outstanding Advances exceed the Facility Amount or (ii) the

This document is subject to
a written Confidentiality Agreement.

EC21020AD090754

26

aggregate principal amount of outstanding Committed Lender Advances plus the aggregate principal amount of all Percentage Interests would exceed the aggregate Committed Lender Commitments of all Committed Lenders at such time. Within the limits of (i) each Committed Lender's Unused Committed Lender Commitment in effect from time to time, with respect to Committed Lender Advances, and (ii) the Facility Amount, with respect to CXC Advances, the Borrower may borrow under this Section 2.01(a), prepay pursuant to Section 2.06(a) and reborrow under this Section 2.01(a).

(b)     If an Advance is not a Committed Lender Advance, such Advance shall initially be a CXC Advance.

SECTION 2.02. Making the Advances. (a) Each Advance shall be made on notice (a "Notice of Borrowing"), given by the Borrower to the Agent not later than 8:00 A.M. (New York City time) on the proposed date of the making of such Advance, specifying the date and amount (such amount shall not be less than $5,000,000) thereof.

(b)     If CXC has determined not to accept a proposed Advance, the Agent shall promptly send the Notice of Borrowing to all of the Committed Lenders concurrently by telecopier, telex or cable specifying the date of such Advance and each Committed Lender's Committed Lender Percentage multiplied by the aggregate amount of the proposed Advance.

(c)     Upon the Lender's agreement to make an Advance, or upon receipt by the Committed Lenders of the Notice of Borrowing as set forth in (b) above, and the satisfaction of the applicable conditions precedent set forth in Article III, the Lender or the Committed Lenders, as the case may be, shall, before 2:00 P.M. (New York City time) on the proposed date of the making of such Advance make such Advance available to the Borrower by deposit of the proceeds thereof to the Operating Account.

(d)     Anything in this Section 2.02 to the contrary notwithstanding, if at the close of business of the third Business Day preceding the then existing Committed Lender Commitment Termination Date  all the Committed Lenders have not consented to the extension of such Committed Lender Commitment Termination Date, on or after the second Business Day preceding the end of the then existing Drawdown Period, the Borrower may request a Committed Lender Advance (a "Drawdown Termination Advance") by delivering to the Agent on or after such second Business Day a Notice of Borrowing not later than 11:00 A.M. (New York City time) on the last day of such Drawdown Period, specifying the Drawdown Termination Advance and the amount thereof. The Agent shall promptly send such Notice of Borrowing to all of the Committed Lenders concurrently by telecopier, telex or cable specifying the Drawdown Termination Advance and each Committed Lender's Committed Lender Percentage multiplied by the aggregate amount of such Drawdown Termination Advance. Upon receipt by the Committed Lenders of such Notice of

This document is subject to
a written Confidentiality Agreement.


EC21020A0090755

27

Borrowing, and the satisfaction of the conditions precedent set forth in Section 3.03, the Committed Lenders shall, before 1:00 P.M. (New York City time) on the last day of such Drawdown Period, make the Drawdown Termination Advance available to the Borrower by deposit of the proceeds thereof to the Collateral Account; provided, however, that if, on or before such last day of such Drawdown Period, the Drawdown Termination Event referred to above shall have been cured due to either (i) any Committed Lenders that originally shall not have consented to the Borrower's request to extend the then effective Committed Lender Commitment Termination Date pursuant to Section 2.15 finally consenting to such request or (ii) any other Committed Lenders or other Eligible Assignees having assumed or otherwise becoming obligated for any Non-Extending Committed Lender's Committed Lender Commitment for a period of 364 days from the date of such Committed Lender Commitment Termination Date or (iii) the Facility Amount being reduced by the aggregate unused amount of the Committed Lender Commitments of any Non-Extending Committed Lenders, or (iv) any combination of the events referred to in clauses (i), (ii) and (iii) above, then such Notice of Borrowing shall be deemed to have been cancelled and the Committed Lenders shall not make any Drawdown Termination Advances.

(e)     Each Notice of Borrowing (subject to clause (d) above) shall be irrevocable and binding on the Borrower. The Borrower shall indemnify the Lender or the Committed Lenders, as the case may be, against any loss, cost or expense incurred by the Lender or the Committed Lenders, as the case may be, as a result of any failure to fulfill on or before the proposed date specified for the Advance the applicable conditions set forth in Article III, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense actually incurred by the Lender or the Committed Lenders, as the case may be, by reason of the liquidation or reemployment of deposits or other funds acquired by the Initial Lender or the Committed Lenders, as the case may be, to fund or maintain an Advance (net of any income received by the Initial Lender from reinvestment) when such Advance, as a result of such failure, is not made on such date.

(f)     Each Committed Lender's obligation shall be several, such that the failure of any Committed Lender to make available to the Borrower any funds in connection with any Advance shall not relieve any other Committed Lender of its obligation, if any, hereunder to make funds available on the date of such Advance, and no Committed Lender shall be responsible for the failure of any other Committed Lender to make funds available in connection with any Advance.

SECTION 2.03.  Interest.  (a)  The Borrower shall pay to the Lender or each Committed Lender, as the case may be, interest on the unpaid principal amount of each Advance from the date of the making of such Advance, until such principal amount shall be paid in full, at the following rate per annum:

(i)     CXC Advances.  During each Interest Period (or portion thereof) for which such Advance (or any portion thereof) is a CXC Advance, a rate per annum at all times

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.


EC21020A0090756

28

during such Interest Period (or portion thereof) equal to the CXC Rate for such Interest Period (or portion thereof), payable on the Payment Date next succeeding the last day of such Interest Period.

(ii)     Purchaser Advances.  During each Interest Period (or portion thereof) for which such Advance (or any portion thereof) is a Purchaser Advance, a rate per annum at all times during such Interest Period (or portion thereof) equal to the Purchaser Rate for such Interest Period (or portion thereof), payable on the Payment Date next succeeding the last day of such Interest Period.

(iii)     Committed Lender Advance.  During each Interest Period (or portion thereof) for which such Advance is a Committed Lender Advance, a rate per annum at all times during such Interest Period (or portion thereof) equal to the Purchaser Rate for such Interest Period (or portion thereof), payable on the Payment Date next succeeding the last day of such Interest Period provided, however that during each Interest Period (or portion thereof) for which such Advance is a Drawdown Termination Advance, that principal amount of such Advance which is equal to the Collateral Account Amount shall not earn interest at the Purchaser Rate, but rather the Collateral Agent (if the Collateral Account is with the Administrator) or each Committed Lender (if the Collateral Account is with such Committed Lender) shall, on the Payment Date next succeeding the last day of such Interest Period, pay to such Committed Lender on behalf of the Borrower, as interest accrued on such Committed Lender's portion of such principal amount of such Advance during such Interest Period (or portion thereof), an amount equal to such Committed Lender's portion of the aggregate amount earned during such Interest Period (or portion thereof) on the Collateral Account Permitted Investments.

(iv)     Applicable Margin.  If at any time that any Purchaser Advance or Committed Lender Advance is outstanding (x) Yukon holds any Qualifying Enron Demand Loans and (y) an Enron Event exists, the "Applicable Margin" shall be a percentage per annum equal to 1.00%.

The Agent shall notify the Borrower and the Collateral Agent of such Purchaser Rate or CXC Rate, as the case may be, within two Business Days following the last day of such Interest Period in the case of the CXC Rate and on the first Business Day of such Interest Period in the case of the Purchaser Rate (or, if the Advance is a Purchaser Advance or a Committed Lender Advance for only a portion of such Interest Period, on the first Business Day after the Advance becomes a Purchaser Advance or a Committed Lender Advance (as the case may be)).

(b)     If, during any period in which an Advance is a CXC Advance, any payment or prepayment of such principal of the Advance is made by the Borrower to or for the account of the

This document is subject to
a written Confidentiality Agreement.

EC21020A0090757


29

Lender (whether during, or on the last day of, an Interest Period therefor) or if such Advance (or any portion thereof) converts from a CXC Advance to a Purchaser Advance, the Borrower shall, upon demand by the Lender (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender the applicable Liquidation Amount; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of the Additional Financing Costs related to such demanded amount.

(c)     [Intentionally Omitted].

(d)     The Borrower shall pay any Unapplied Amount Interest promptly upon demand therefor, supported by documentation reasonably acceptable to the Borrower, by the Lender or the Committed Lenders, as the case may be; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount.

(e)     If the Lender, any Committed Lender or any Purchaser is required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, and if as a result thereof there is an increase in the cost to the Lender or such Purchaser of agreeing to make or making, funding or maintaining a Purchaser Advance or a Committed Lender Advance, as the case may be, then the Borrower shall from time to time, upon demand by the Lender, such Committed Lender or such Purchaser, as the case may be, (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender, such Committed Lender or such Purchaser, as the case may be, additional amounts, as additional interest hereunder, sufficient to compensate the Lender, such Committed Lender or such Purchaser for such increased cost; provided that (i) if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount, and (ii) such additional amounts shall be without duplication in case of such additional amounts demanded by the Lender and a Purchaser on the same Purchaser Advance or, in the case of such additional amounts demanded by such Committed Lender, on the same Committed Lender Advance. A certificate in reasonable detail as to the basis for and the amount of such increased cost, submitted to the Borrower and the Agent by the Lender, the Committed Lender or such Purchaser, as the case may be, shall be conclusive and binding for all purposes, absent manifest error.

(f)     If any payment of any principal of any Purchaser Advance or any Committed Lender Advance bearing interest calculated by reference to the LIBO Rate is made by the Borrower to or for the account of the Lender or any Committed Lender, as the case may be, and applied other

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090758

30

than on the last day of the Interest Period for such Purchaser Advance or such Committed Lender Advance, as the case may be, or if such Advance (or any portion thereof) converts from a Purchaser Advance to a CXC Advance during (but not on the last day of) any Interest Period therefor, the Borrower shall, upon demand by the Lender (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender, the applicable Liquidation Amount; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount.

(g)     If, for any reason, funds paid by or for the account of the Borrower under Section 2.06 shall be credited to the Agent's Account in respect of the prepayment of the Advance prior to the maturity dates of the then outstanding promissory notes issued by the Initial Lender to fund or maintain the Advance, the Initial Lender shall, until such maturity dates and for its own account and with respect to the interest, dividends and other yield (such interest, dividends and other yield being "Investment Yield") upon such funds to the extent payable pursuant to clause "third" below, for the account of the Borrower, continually invest such funds, and any proceeds of Investment Yield, in Cash Equivalents (such funds and such investments being "Invested Funds"); provided, however, that the maturity of any such investment shall not extend beyond such maturity dates. On such maturity dates, the Initial Lender shall, prior to 3:00 p.m. (New York City time) on such last day, apply cash proceeds of such investments (including Investment Yield) as follows: first, to the payment of accrued and unpaid interest on and principal of any promissory notes issued to fund or maintain the Advance until all such amounts due and owing in respect of such promissory notes have been paid in full (it being expressly understood and agreed that no Person, including any party hereto, other than the Initial Lender, shall have any interest whatsoever in any Invested Funds or Investment Yield until all such amounts in respect of such promissory notes have been paid in full); second, as a repayment of the Advance by the Borrower in an amount equal to the excess of the Advance over the amount applied pursuant to clause "first" above; and, third, to the Borrower.

SECTION 2.04.  Certain Fees.  (a)  The Borrower shall pay to the Agent for the account of the Committed Lenders a liquidity fee (the "Liquidity Fee"), from the Closing Date until the Maturity Date, on the average daily aggregate amount of the remainder of (i) the aggregate Committed Lender Commitments minus (ii) the sum of (A) the aggregate outstanding principal amount of all Committed Lender Advances other than the Drawdown Termination Advance to the extent of the Collateral Account Amount and (B) the aggregate outstanding principal amount of all Percentage Interests held by the Committed Lenders as Purchasers under the Asset Purchase Agreement, at the rate of 0.15 of 1% per annum (as such percentage may be adjusted periodically by the Agent in good faith based on the quoted percentage for the Liquidity Fee received by the Agent from the Committed Lenders at the time of the entering into (including entering into at the time of the initial syndication by the Initial Committed Lender of its Committed Lender

NYDOCS03/494722
Naharru Credit Agreement

This document is subject to
a written Confidentiality Agreement.


EC21020A0090759

31

Commitment) or (pursuant to Section 2.15) renewal of their respective Committed Lender Commitments). The Liquidity Fee is payable in arrears on each Payment Date during the term of this Agreement and on the Debt Collection Date.

(b)     The Borrower shall pay to the Agent for the account of the Surety Provider, in consideration of its issuance of the Surety Bond, from the Closing Date until the Debt Collection Date, a surety fee or premium (such surety fee or premium being the "Premium") as set forth in the Insurance Premium Letter. The Premium is payable in arrears on each Payment Date during the term of this Agreement and on the Debt Collection Date.

(c)     The Borrower shall pay to the Agent for the account of CXC a program fee (the "Program Fee") from the Closing Date until the Debt Collection Date as set forth in the Program Fee Letter. The Program Fee is payable in arrears on each Payment Date during the term of this Agreement and on the Debt Collection Date.

SECTION 2.05. Repayment of the Advances. The Borrower shall repay to (i) the Lender on the Maturity Date the principal amount of the CXC Advances and/or Purchaser Advances then outstanding and (ii) the Committed Lenders on the Maturity Date the principal amount of the Committed Lender Advances then outstanding.

SECTION 2.06. Prepayments of the Advance. (a) Optional. The Borrower may, upon at least five Business Days' notice to the Agent stating the proposed date and aggregate principal amount of the prepayment (the "Prepayment Amount"), and if such notice is given the Borrower shall, prepay the outstanding principal amount of the Advances in whole or in part, together with (i) accrued interest to the date of such prepayment on the principal amount prepaid and (ii) Additional Financing Costs, in each case of which the Borrower has received notice at least seven (7) Business Days prior to such prepayment; provided, however, that (x) each partial prepayment shall be in an aggregate principal amount of not less than $1,000,000 and (y) in the event of any such prepayment on a day other than the last day of an Interest Period, the Borrower shall pay to the Lender or each Committed Lender, as the case may be, on the last day of such Interest Period, any Liquidation Amount for such prepayment.

(b)     Mandatory. (i) The Borrower shall, upon receipt of any distribution pursuant to Section 7.2(a) of the Marengo Partnership Agreement (the "Distribution Amount"), in each case together with any related Guaranteed Payments paid in connection therewith, apply 100% of the amount of such Distribution Amount and such Guaranteed Payments in accordance with Section 8.04(c).

(ii)     The Borrower shall, upon receipt of any (A) distribution in respect of the capital account of the Borrower in Marengo in a liquidation of Marengo under Section 12 of the

This document is subject to
a written Confidentiality Agreement.

EC21020A0090760

32

Marengo Partnership Agreement and any related Guaranteed Payments paid in connection therewith, (B) payment of the Purchase Amount resulting from the exercise of the Purchase Option under the Purchase Option Agreement or (C) any distribution pursuant to Section 7.7 of the Marengo Partnership Agreement, apply 100% of the amount of such distribution or the Purchase Amount in accordance with Section 8.04(d).

(iii)    In addition, any prepayments made under this subsection (b) other than on any Payment Date shall be accompanied by any Liquidation Amount for such prepayment; provided that, if a Deficiency exists at the time of such prepayment (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), such Liquidation Amount shall be due and payable by the Borrower only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such Liquidation Amount.

(c)    Information.  Upon receipt of notice of any optional or mandatory prepayment, the Agent shall notify the Borrower of accrued and unpaid interest on the principal amount to be prepaid and the applicable Liquidation Amount in connection with such prepayment, any Additional Financing Costs to be paid in connection therewith pursuant to Section 8.04(c) or (d), as the case may be, and such other information as may be reasonably necessary for the Borrower to advise Enron and Marengo, as the case may be, as to the amounts to be paid to the Borrower in connection with any exercise of the Purchase Options or distribution from Marengo.

(d)    Notice.  Each prepayment shall be accompanied by written notice to the Agent and the Collateral Agent of the provision of Section 2.06(a) or 2.06(b) under which such prepayment is to be made, and identifying the source of the proceeds of such prepayment.

SECTION 2.07.  Increased Costs; Capital Adequacy, Etc.  (a)  If, due to either (i) the introduction of or any change (other than any change by way of imposition or increase of reserve requirements included in the definition of Base Rate or covered by Section 2.03(e) hereof) in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to the Lender, any Committed Lender or any Purchaser of agreeing to make or making, funding or maintaining any CXC Advance, Committed Lender Advance or Purchaser Advance (excluding for purposes of this Section 2.07 increased costs described in clause (b) of this Section 2.07 and increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.09 shall govern) and (ii) taxes excluded from the definition of "Taxes" set forth in clauses (1) and (2) of the first sentence of Section 2.09(a) hereof), then the Borrower shall from time to time, upon demand by the Lender, such Committed Lender or such Purchaser (with a copy of such demand to the Agent), pay to the Agent for the account of the Lender, such Committed Lender or such Purchaser additional amounts sufficient to

This document is subject to
a written Confidentiality Agreement.


EC21020A0090761

33

compensate the Lender, such Committed Lender or such Purchaser for such increased cost; provided that, if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount and the payment of such demanded amount shall be made in accordance with the provisions of Section 4.11 of the Marengo Partnership Agreement. A certificate in reasonable detail as to the basis for and the amount of such increased cost, submitted to the Borrower and the Agent by the Lender, such Committed Lender or such Purchaser, shall be prima facie evidence of the accurate determination of such additional amounts; provided that such certificate shall state that the Lender, such Committed Lender or such Purchaser is claiming such additional amounts generally from its borrowers under similar financings that have borrowings subject to such change and that are subject to similar provisions.  Promptly after the Lender, any Committed Lender or any Purchaser becomes aware of any such introduction, change or proposed compliance, the Lender, such Committed Lender or such Purchaser shall notify the Borrower thereof.  Neither any Lender (other than CXC or a Person described in clause (i) of the definition of "Eligible Assignee"), any Committed Lender nor any Purchaser shall be permitted to recover increased costs incurred or accrued more than 90 days prior to such notice to the Borrower.

(b)    If the Lender, any Committed Lender or any Purchaser shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Lender, any Committed Lender or any Purchaser (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of the Lender, such Committed Lender or such Purchaser), has the effect of increasing the amount of capital required or expected to be maintained as a result of the Lender's offer to lend hereunder, the Committed Lender Commitment of such Committed Lender hereunder or the Purchase Commitment of such Purchaser to make purchases under the Asset Purchase Agreement by an amount material to the Lender, such Committed Lender or such Purchaser, then the Lender, such Committed Lender or such Purchaser shall have the right to give prompt written notice thereof to the Borrower with a copy to the Agent, which notice shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate the Lender, such Committed Lender or such Purchaser for the increased cost to the Lender, such Committed Lender or such Purchaser as a result of such increase in capital and shall certify that such costs are generally being charged by the Lender, such Committed Lender or such Purchaser to other similarly situated borrowers under similar credit facilities, which notice shall be prima facie evidence of the accurate determination of such costs, although the failure to give any such notice shall not, unless such notice fails to set forth the

This document is subject to
a written Confidentiality Agreement.

EC21020A0090762

34

information required above or except as otherwise expressly provided in Section 2.07(c), release or diminish any of the Borrower's obligations to pay additional amounts pursuant to Section 2.07(c).

(c)    Each of the Lender, each Committed Lender and each Purchaser agree that, upon giving notice specified in Section 2.07(b), at the request of the Borrower, it will promptly enter into good faith negotiations with the Borrower with respect to the method of reimbursement for the additional costs specified in such notice. No later than 15 days after the date of the giving of any such notice, and assuming the Lender, such Committed Lender or such Purchaser giving same has made itself available for the aforesaid good faith negotiations, the Borrower shall compensate the Lender, such Committed Lender or such Purchaser for the specified additional costs on the basis, if any, negotiated between the Lender, such Committed Lender or such Purchaser and the Borrower or, if no agreement has been negotiated between the Lender, such Committed Lender or such Purchaser and the Borrower, for the amount of such additional cost that the Lender, such Committed Lender or such Purchaser, as the case may be, shall certify to the Borrower; provided that (i) if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount and (ii) the payment of such additional costs shall be made in accordance with the provisions of Section 4.12 of the Marengo Partnership Agreement. Notwithstanding the foregoing, the Borrower shall not be obligated to reimburse the Lender (other than CXC or a Person described in clause (i) of the definition of "Eligible Assignee"), such Committed Lender or such Purchaser pursuant to this Section 2.07(c) or Section 2.12 for any additional costs under Section 2.07(b) incurred or accruing more than 90 days prior to the date on which such Lender, Committed Lender or Purchaser gave the written notice specified in Section 2.07(b).

SECTION 2.08. Interest Rate Determination: Payments and Computations. (a) The Borrower shall make each payment hereunder not later than 1:00 P.M. (New York City time) on the day when due in U.S. dollars to the Agent at the Agent's Account in same day funds. Any payment received after 1:00 P.M. (New York City time) on the day when due shall be applied on the next following Business Day. Such payments shall be effected through transfers from the Operating Account in the manner prescribed in Section 8.04.

(b)    The Borrower shall, to the extent permitted by law, pay to the Agent interest on any overdue principal of and interest on any Advance at the rate of 2% per annum above the interest rate in effect with respect to such Advance pursuant to Section 2.03(a) from time to time. Interest accrued and unpaid on any Advance Shall be payable in the Operating Account. With respect to Additional Financing Costs and fees payable under this Agreement pursuant to Section 2.04, the Borrower shall pay to the Agent interest on such Additional Financing Costs and fees when due hereunder or under the Marengo Partnership Agreement (in all cases other than amounts in respect of which Unapplied Amount Interest is payable) at the rate of 2% per annum above the LIBO

This document is subject to
a written Confidentiality Agreement.



EC21020A0090763

35

Rate in effect from time to time, payable on demand; provided, however, that if a Deficiency exists at the time of such demand (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount in accordance with Section 4.11 of the Marengo Partnership Agreement; provided further, however, that such interest rate shall not at any time exceed the maximum rate permitted by applicable law. Such interest shall be paid pro rata to the parties to whom such overdue payment is owing. Notwithstanding the foregoing, no such additional interest shall be payable by the Borrower if any scheduled payment becomes overdue solely due to the Collateral Agent's failure to direct the Administrator to make, or the failure of the Administrator to make, a required transfer from the Operating Account pursuant to Section 8.04 when funds are available in the Operating Account.

(c)    All computations of interest based on the Base Rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and all other computations of interest and fees hereunder shall be made on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) elapsed. Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; provided, however, in the case of any payment of any Advance bearing interest determined by reference to the LIBO Rate, if such extension would cause payment to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)    The Agent shall give prompt notice to the Borrower, the Lender, the Committed Lenders and, if applicable, the Purchasers, of the CXC Rate or the Purchaser Rate upon any request therefor in order to make any determination of any payment under the Operative Documents, and otherwise upon each determination thereof by the Agent.

SECTION 2.09. Taxes. (a) Any and all payments by the Borrower hereunder shall be made, in accordance with Section 2.08, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, excluding, in the case of the Lender, any Committed Lender, any Purchaser and the Agent, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) the Lender, such Committed Lender, such Purchaser or the Agent (as the case may be) is organized or any political subdivision thereof and, in the case of the Lender, any Committed Lender, or any Purchaser, taxes imposed on its income, and franchise taxes imposed on it, by any jurisdiction or any political subdivision thereof out of which the Lender or any Committed Lender makes any

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.


EC21020A0090764

36

Advance in connection with this Agreement or such Purchaser makes any purchase in respect of any Advance pursuant to the Asset Purchase Agreement and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof, to payments to be made to the Lender, any Committed Lender, any Purchaser, or the Agent (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, any Committed Lender, any Purchaser, or the Agent, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.09) the Lender, such Committed Lender, such Purchaser or the Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    Notwithstanding anything to the contrary contained in this Agreement, each of the Borrower and the Agent shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts payable hereunder for the account of the Lender, any Committed Lender or any Purchaser (without the payment by the Borrower of increased amounts to the Lender, such Committed Lender or such Purchaser pursuant to clause (a) above) other than the Lender, any Committed Lender or any Purchaser (i) which is a domestic corporation (as such term is defined in Section 7701 of the Internal Revenue Code) for federal income tax purposes or (ii) which has the Prescribed Forms on file with the Borrower and the Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, provided that if the Borrower shall so deduct or withhold any such taxes, it shall provide a statement to the Agent, the Lender, such Committed Lender or such Purchaser, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation that the Lender, such Committed Lender, such Purchaser or the Agent may reasonably request for assisting the Lender, such Committed Lender, such Purchaser or the Agent to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which the Lender, such Committed Lender or such Purchaser is subject to tax.

(c)    In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise, property or transfer taxes, charges or similar levies that arise from any transfer made under, from possession arising under, from any action of the Collateral Agent contemplated in, or any payment made under, or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "Other Taxes").

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.



EC21020A0090765

37

(d)    The Borrower, to the fullest extent permitted by law, will indemnify the Lender, each Committed Lender, each Purchaser, and the Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.09) paid by the Lender, such Committed Lender, such Purchaser or the Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto except as a result of the gross negligence or willful misconduct of the Lender, such Committed Lender, such Purchaser or the Agent, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date the Lender, such Committed Lender, such Purchaser or the Agent (as the case may be) makes written demand therefor; provided that (i) if a Deficiency exists at the time of such demand or at the time such payment is due (after giving effect to any payment to the Operating Account pursuant to Section 8.04(f)(ii)), the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount and (ii) the payment of such indemnification shall be made in accordance with the provisions of Section 4.11 of the Marengo Partnership Agreement. The Lender (other than CXC or a Person described in clause (i) of the definition of "Eligible Assignee"), any Committed Lender any Purchaser and/or the Agent shall not be indemnified for Taxes or Other Taxes incurred or accrued more than 90 days prior to the date that such Lender, such Committed Lender, such Purchaser or the Agent notifies the Borrower thereof.

(e)    Within 30 days after the date of any payment of Taxes by or at the direction of the Borrower, the Borrower will furnish to the Agent, at its address referred to in Section 12.02, the original or a certified copy of a receipt evidencing payment thereof. Should the Lender, such Committed Lender, any Purchaser or the Agent ever receive any refund from any taxing authority to which the Lender, such Committed Lender, such Purchaser or the Agent would not be entitled but for the payment by the Borrower of Taxes as required by Section 2.09 (it being understood that the decision as to whether or not to claim, and, if claimed, as to the amount of any such refund shall be made by the Lender, such Committed Lender, such Purchaser or the Agent in its sole discretion), the Lender, such Committed Lender, such Purchaser, or the Agent, as the case may be, thereupon shall repay to the Borrower an amount with respect to such refund equal to any net reduction in taxes actually obtained by the Lender, such Committed Lender, such Purchaser or Agent, as the case may be, and determined by the Lender, such Committed Lender, such Purchaser or the Agent, as the case may be, to be attributable to such refund, credit or deduction.

SECTION 2.10.  Evidence of Debt.  (a) The Lender and each Committed Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender or the Committed Lenders, as the case may be, resulting from the Advances, including the amounts of principal and interest payable and paid to the Lender or the Committed Lender, as the case may be, from time to time hereunder.

This document is subject to
a written Confidentiality Agreement.

EC21020A0090766

38

(b)    The Borrower agrees that on or before the Closing Date it shall execute and deliver (i) to the Initial Lender a Lender Note, in substantially the form of Exhibit I-1 hereto, payable to the order of the Initial Lender in a principal amount equal to the Facility Amount and (ii) to each Initial Committed Lender a Committed Lender Note, in substantially the form of Exhibit I-2 hereto, payable to the order of such Committed Lender in a principal amount equal to such Committed Lender's Committed Lender Commitment.

(c)    The Register maintained by the Agent pursuant to Section 10.01(c) shall include a control account, in which shall be recorded (i) the date and amount of each Advance made hereunder and the Lender or the Committed Lenders, as the case may be, to whom each such Advance is owing, (ii) the terms of each Assignment and Acceptance delivered to and by it, (iii) the amount of any principal and interest due and payable or to become due and payable from the Borrower to the Lender or the Committed Lenders, as the case may be, hereunder, and (iv) the amount of any sum received by the Agent from the Borrower hereunder and distributed to the Lender or the Committed Lenders, as the case may be, hereunder.

(d)    The entries made in the Register shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.11. Change of Lending Office. The Lender (other than CXC or a Person described in clause (i) of the definition of "Eligible Assignee"), each Committed Lender and each Purchaser agree that, upon the occurrence of any event giving rise to the operation of Section 2.07 or 2.09 with respect to such Lender, such Committed Lender or such Purchaser, such Lender, such Committed Lender or such Purchaser will use its best efforts (consistent with the internal policies of and legal and statutory restrictions applicable to such Lender, such Committed Lender or such Purchaser) to select a jurisdiction for the Lending Office of such Lender, such Committed Lender or such Purchaser or change the jurisdiction of such Lending Office or assign its rights and obligations hereunder to a wholly owned Affiliate so as to avoid the need for or reduce the amount of any amounts accruing under Section 2.07 or 2.09; provided that no such selection, change of the jurisdiction of such Lending Office or assignment shall be made if, in the reasonable judgment of such Lender, such Committed Lender or such Purchaser, as applicable, such selection, change or assignment would be disadvantageous to such Lender, such Committed Lender or such Purchaser.

SECTION 2.12. Replacement of Lender, Committed Lenders and Purchasers Under Certain Circumstances. The Borrower shall be permitted to replace the Lender, any Committed Lender or any Purchaser, that requests reimbursement for amounts owing pursuant to Section 2.07 or 2.09 or that causes the Purchaser Rate to be determined by reference to the Base Rate on account of proviso (i) of the definition of "Purchaser Rate", with a replacement bank or other financial institution; provided that (i) such replacement does not conflict with any applicable law, (ii) no Default or Event of Default shall have occurred and be continuing at the time of such replacement,

This document is subject to
a written Confidentiality Agreement.

EC21020A0090767