(iii) the Borrower, with the consent of the Agent (which consent shall not be unreasonably withheld) shall identify a replacement bank or institution and such replacement bank or institution shall purchase, at par, all amounts owing to such replaced Lender, Committed Lender or Purchaser prior to the date of replacement and, in the case of such replaced Purchaser, shall execute and deliver a Purchase Commitment in the amount of such replaced Purchaser's Commitment and in the case of such Committed Lender, shall execute and deliver an Assignment and Acceptance with respect to the Advances and Committed Lender Commitment assigned to such replacement Committed Lender, (iv) the Borrower shall be liable to such replaced Lender, Committed Lender or Purchaser for any amounts owing to such Lender, Committed Lender or Purchaser as a result of such replacement, including any Liquidation Amount, and accrued costs and fees (provided that the Borrower shall pay such amounts only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such amounts), (v) the replacement bank or institution and the terms and conditions of such replacement shall be reasonably satisfactory to the Agent, (vi) the replaced Lender, Committed Lender or Purchaser shall be obligated to make such replacement in accordance with the provisions of Article X (provided that the replacement Lender, Committed Lender or Purchaser shall be obligated to pay any registration and processing fee referred to therein), (vii) during the first thirty days following receipt by the Agent of a request by the Borrower to replace the Lender, Committed Lender or any Purchaser pursuant to this Section 2.12, the Borrower shall not be required to pay to such Lender, Committed Lender or Purchaser, as applicable, any additional amounts pursuant to any of the provisions of this Agreement referenced above, and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Agent, the Lender, Committed Lender or any other Purchaser shall have against such replaced Lender, Committed Lender or Purchaser; provided that the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing Costs related to such demanded amount. The provisions of this Section 2.12 shall not constitute a waiver of any rights or remedies of the Borrower pursuant to this Agreement or applicable law.

SECTION 2.13. Exercise of Purchase Option. Upon receipt of a Purchase Exercise Notice pursuant to the Purchase Option Agreement, the Agent shall notify the Lender, the Committed Lenders, the Collateral Agent and the Purchasers. Upon the completion of the transactions contemplated to occur on the Purchase Closing Date under the Purchase Option Agreement, upon notice thereof to the Agent, the Agent shall notify the Lender, the Committed Lenders, the Collateral Agent and the Purchasers thereof. Notwithstanding any provision of this Agreement to the contrary, if the Purchase Closing Date shall have occurred, the Lender, the Committed Lenders, the Collateral Agent and the Purchasers shall deliver notice to the Agent and the Borrower (and the Agent with respect to itself shall deliver notice to the Borrower) no later than 11:00 A.M. (New York time) on the earlier of the fifth Business Day following receipt of notice from the Agent of the occurrence of the Purchase Closing Date and the eighth Business Day following the Purchase Closing Date, of all Additional Financing Costs then accrued and unpaid owing to such Person (or the Agent with respect to itself) as of the Purchase Closing Date, including



NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090768

40

as a result of any prepayment of the Advance pursuant to Section 2.06(b). Failure on the part of the Lender, any Committed Lender, the Collateral Agent or any Purchaser (or the Agent with respect to itself) so to timely notify the Agent and the Borrower (or, in the case of the Agent with respect to itself, the Borrower) shall constitute a waiver of such Person's (or the Agent's with respect to itself) right to demand such Additional Financing Costs. All such amounts so notified to the Borrower shall be due and paid by the Borrower upon receipt of Purchase Option Expenses (as defined in the Purchase Option Agreement) in respect thereof pursuant to the Purchase Option Agreement.

SECTION 2.14. Termination or Reduction of the Committed Lender Commitment. (a) The Borrower shall have the right, upon at least four Business Days' notice to the Agent, to terminate in whole or reduce ratably in part the unused portions of the respective Committed Lender Commitments of the Committed Lenders, provided that (i) each such reduction of the Committed Lender Commitments shall only be permitted to the extent of the then unused portion of the Facility Amount, (ii) the unused portion of the Facility Amount shall be reduced simultaneously by the same amount and (iii) each such partial reduction shall be in the aggregate amount of $1,000,000 or an integral multiple of $5,000,000 in excess thereof.

(b)     If any Committed Lender (a "Non-Extending Committed Lender") shall not consent to extend for 364 days its Committed Lender Commitment pursuant to the second sentence of Section 2.15 and if Committed Lenders having Committed Lender Commitments of $50,000,000 or more at such time shall have consented to extend their respective Committed Lender Commitments pursuant to Section 2.15 (unless any other Committed Lender or other Eligible Assignee shall have assumed or otherwise become obligated for such Non-Extending Committed Lender's Committed Lender Commitment for a term of 364 days from the date of the then effective Committed Lender Commitment Termination Date by the fifth Business Day prior to such Committed Lender Commitment Termination Date), the Borrower may, upon at least three Business Days' written notice to the Agent, reduce the Facility Amount by the unused amount of such Non-Extending Committed Lender's Committed Lender Commitment hereunder; provided, however, that (i) such reduction shall on the then effective Committed Lender Commitment Termination Date, give effect to the termination of such Non-Extending Committed Lender's Committed Lender Commitment and the unused portion of the aggregate Committed Lender Commitments shall be reduced accordingly, and (ii) such reduction shall not reduce or otherwise effect any other Committed Lender's Committed Lender Commitment. The obligations of each such Non-Extending Committed Lender hereunder shall, by the provisions hereof, be released and discharged.

SECTION 2.15. Extension of Committed Lender Commitment Termination Date. (a)     At least 45 days but not more than 60 days prior to the Committed Lender Commitment Termination Date, the Borrower, by written notice to the Agent, may request an extension of the Committed Lender Commitment Termination Date in effect at such time for a

This document is subject to
a written Confidentiality Agreement.

41

period of 364 days from the then effective Committed Lender Commitment Termination Date (such period, for such extension, a "Renewal Period"). The Agent shall promptly notify each Committed Lender of such request, and each Committed Lender shall in turn, in its sole discretion, at any time before the expiration of its Committed Lender Commitment Termination Date then in effect, notify the Borrower and the Agent in writing as to whether such Committed Lender consents to such extension. Within 5 Business Days of such written notice from the Borrower (but in any event no earlier than the 45 days prior to the then Committed Lender Commitment Termination Date), the Agent shall notify the Borrower of the indicative Applicable Margin and Liquidity Fee for the Renewal Period as determined in good faith by the Agent. Such indicative pricing shall not be binding on the Agent or any Committed Lender.

(b)    The Agent shall promptly notify the Borrower of each Committed Lender who consents to such extension. On the fifth Business Day prior to the Committed Lender Commitment Termination Date, the Agent shall notify the Borrower of the Applicable Margin and Liquidity Fee as determined by the Agent in good faith (the "Notified Margins") for the Renewal Period in accordance with the definition of Applicable Margin and Section 2.04(a). On the third Business Day prior to the Committed Lender Commitment Termination Date, the Agent shall notify the Borrower of the Committed Lenders who have consented to such extension as of such date. The Applicable Margin and the Liquidity Fee effective on the first day of such Renewal Period shall be adjusted to the Notified Margins.

(c)    If all the Committed Lenders consent in writing to such request, the Committed Lender Commitment Termination Date in effect at such time shall, effective on the then effective Committed Lender Termination Date (the "Extension Date"), be extended for such 364-day period; provided that on the Extension Date, no Marengo Liquidating Event, Marengo Termination Event, Default or Event of Default shall have occurred and be continuing, or shall occur as a consequence thereof.

(d)    If less than all of the Remaining Committed Lenders have consented in writing to any such request in accordance with this Section 2.15, the Committed Lender Commitment Termination Date shall not be so extended (such non-extension being a "Drawdown Termination Event", it being understood and agreed that if the Borrower shall not have made any such request to so extend the then effective Committed Lender Commitment Termination Date, no Drawdown Termination Event shall occur). "Remaining Committed Lenders" means the Committed Lenders other than any Non-Extending Committed Lenders if either (i) the Facility Amount is reduced by the aggregate unused amount of the Non-Extending Committed Lenders' Committed Lender Commitments pursuant to Section 2.14(b) or (ii) other Committed Lenders or other Eligible Assignees shall have assumed or otherwise become obligated for such Non-Extending Committed Lenders' Committed Lender Commitments for a term of 364 days from the date of the then effective Committed Lender Commitment Date.

NYDOCS03/494722
Nahanni Credit Agreement                                      This document is subject to
a written Confidentiality Agreement.

EC21020A0090770

42

SECTION 2.16.  Extension of Purchase Commitment Termination Date. Any Committed Lender consenting to the extension of its Committed Lender Commitment for any 364-day period pursuant to Section 2.15 shall be deemed to have consented to extend its Purchase Commitment as a Purchaser for the same period under the Asset Purchase Agreement.

## ARTICLE III

## CONDITIONS TO ADVANCE

SECTION 3.01.  Conditions Precedent to Making the Initial Advance.  The agreement of the Initial Lender or the Initial Committed Lender, as the case may be, to make the Initial Advance is subject to the following conditions precedent being satisfied on or prior to the Closing Date:

(a)     Since December 31, 1998 in the case of Enron, and since the date of their respective formations in the case of the Borrower, Marengo and the Marengo Subsidiaries, nothing shall have occurred that the Agent, the Initial Lender or the APA Purchasers shall determine (i) has resulted in a material adverse effect on the rights or remedies of the Lender, the Committed Lender, the Agent, the APA Purchasers or the Collateral Agent or on the ability of Enron, the Borrower or Marengo to perform their obligations under the Operative Documents to which they are a party, (ii) has resulted in a material adverse effect on the performance, business, assets, operation, properties or financial condition of Enron and its Subsidiaries, taken as a whole, or the Borrower or Marengo, or (iii) indicates the inaccuracy in any material respect of any information (taken as a whole) previously provided to the Agent, the Initial Lender, the Committed Lenders, the Collateral Agent or the APA Purchasers in connection with their respective analyses of the credit facility hereunder or indicates the omission therefrom of any material information.

(b)     The Agent shall have received the following documents, each dated as of the date of the making of the Advance (other than the documents described in clauses (ii), (xviii), (xix) and (xx)) and duly executed by the respective party or parties thereto, and  otherwise in form and substance satisfactory to the Initial Lender, the Initial Committed Lenders, the APA Purchasers and the Agent, and (except for the documents listed in clauses (i), (ii), (xvii), (xviii), (xix) and (xx)) in the number of copies necessary to provide the Initial Lender, the Initial Committed Lenders, the Surety Provider, the APA Purchasers and the Agent each with original counterparts of such documents plus (except for any Notes) three additional original counterparts:

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A2090771

Document Excerpted to
Reduce Bulk

72

(g)    Without the prior written consent of the Collateral Agent, the Majority Committed Lenders, the Majority Purchasers and the Lender, the Borrower shall not (i) terminate any Assigned Agreement or consent to or accept any cancellation or termination thereof, (ii) waive any default under or breach of any Assigned Agreement, (iii) subject the Borrower to any additional obligations under the Marengo Partnership Agreement, (iv) consent to reduce the obligations of any Partner of Marengo under the Marengo Partnership Agreement, (v) release Enron from, or consent to the assignment by Enron of obligations under, the Enron Agreement or the Purchase Option Agreement, or reduce any of Enron's obligations thereunder or (vi) otherwise impair in any material respect the value, interest or rights of the Borrower in the Pledged Collateral.

(h)    Subject to the other provisions of this Agreement and the Asset Purchase Agreement, so long as no Event of Default shall have occurred and be continuing and subject to the other provisions of this Agreement, the Borrower may exercise any and all voting rights or rights to take discretionary actions under the Operative Documents, including without limitation with respect to any Marengo Required Actions. The Borrower shall give the APA Agent and the Collateral Agent at least five days' written notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right.

(i)    Subject to the other provisions of this Agreement and the Asset Purchase Agreement, upon the occurrence and during the continuance of an Event of Default, all rights of the Borrower to exercise or refrain from exercising the voting rights that it would otherwise be entitled to exercise pursuant to Section 7.09(h) shall cease and all such rights shall thereupon become vested in the Collateral Agent solely (and not vested in the Borrower), which shall thereupon have the sole right to exercise or refrain from exercising such voting rights.

SECTION 7.10.  Remedies upon Default.  If any Event of Default shall have occurred and be continuing:

(a)    The Collateral Agent may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the Uniform Commercial Code (the "UCC") in effect in the State of New York at that time (whether or not the UCC applies to the Pledged Collateral at issue) to the fullest extent permitted under applicable law, and the Collateral Agent may also, without notice except as specified below, sell the Pledged Collateral or any part thereof in one or more parcels at public or private sale, or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable.  The Borrower agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Collateral Agent shall not be obligated to make any

73

sale of Pledged Collateral or any part thereof regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Notwithstanding the foregoing, if a Marengo Liquidating Event has occurred or if Enron has delivered the Purchase Exercise Notice (as defined in the Purchase Option Agreement), the Collateral Agent may not sell the Pledged Collateral until the earlier of (i) the occurrence of the Purchase Closing Date with respect to the exercise of the Purchase Option and the transactions contemplated to occur thereon pursuant to the Purchase Option Agreement and (ii) the expiration of the Liquidation Period.

(b)    Any cash held by the Collateral Agent as Pledged Collateral and all cash proceeds received by the Collateral Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Pledged Collateral shall be paid promptly after receipt thereof (and after payment of any amounts payable to the Collateral Agent pursuant to Sections 11.01 and 12.04 hereof) in whole or in part by the Collateral Agent pursuant to Section 8.04(d).

(c)    Subject to the other provisions of this Agreement and of the Asset Purchase Agreement, all rights of the Borrower to deliver any notices under or exercise any voting rights or other discretionary or consensual rights under any Assigned Agreement or to deliver instructions with respect to the investment of amounts held in the Operating Account that it would otherwise be entitled to exercise shall cease, and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights and to direct such investments until such time as the Collateral Agent has sold or transferred the Nahanni Marengo Interest pursuant to the terms hereof or the Secured Obligations have been paid in full; provided that upon the occurrence of a Marengo Notice Event and prior to any exercise by the Collateral Agent of its right to foreclose on the Pledged Collateral pursuant to this Section 7.10, the Borrower shall continue to be entitled to give a Marengo Termination Notice as provided in Section 12.1 of the Marengo Partnership Agreement, in the manner and with the effect provided therein and to enforce the Operative Documents. Notwithstanding the foregoing provisions, unless and until an Event of Default shall have occurred and be continuing, the Borrower may perform its obligations under the Assigned Agreements and may take any other actions in respect of such Assigned Agreements in any lawful manner not inconsistent with the provisions of this Agreement or any Assigned Agreement.

SECTION 7.11. Continuing Assignment and Security Interest; Transfer of Advance. This Agreement shall create a continuing security interest in the Pledged Collateral and shall (i) remain in full force and effect until the payment in full of the Secured Obligations on the Debt

This document is subject to
a written Confidentiality Agreement.

EC21020A0090802

74

Collection Date, (ii) be binding upon the Borrower and its successors and assigns, and (iii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent, the Agent, the Lender, the Committed Lenders and the Purchasers and their respective successors, transferees and assigns. Without limiting the generality of the foregoing clause (iii), (A) the Lender may assign any of its interest in any Advance held by it to any other Person to the extent permitted by Article X, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the  Lender herein or otherwise and (B) a Committed Lender may assign any of its interest in any Advance held by it to any other Person to the extent permitted by Article X, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Committed Lender herein or otherwise. Upon the payment in full of the Secured Obligations on the Debt Collection Date, the Borrower shall be entitled to the return, upon its request and at its expense, of such of the Pledged Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof and the Collateral Agent will execute and deliver such instruments, including UCC termination statements, as the Borrower may reasonably request to confirm the release and discharge of the Lien hereunder.

### ARTICLE VIII

### ADMINISTRATION, SETTLEMENT AND COLLECTION

SECTION 8.01.  Maintaining the Operating Account.  Until the payment in full of the Secured Obligations on the Debt Collection Date:

(a)    The Borrower will maintain the Operating Account only with the Administrator, subject to the dominion and control of the Collateral Agent.

(b)    It shall be a term and condition of the Operating Account, and on or prior to the date hereof the Borrower shall give to the Administrator written notice and shall obtain the Administrator's written agreement (such notice and agreement to be in form and substance satisfactory to the Collateral Agent), that notwithstanding any term or condition to the contrary in any other agreement relating to the Operating Account, (i) the Operating Account shall be subject to the dominion and control of the Collateral Agent and (ii) except as otherwise provided in Section 7.01 or 8.04 hereof concerning transfers and payments or in Section 7.10 hereof concerning payments after an Event of Default has occurred and is continuing, no amount (including interest on Permitted Investments held in the Operating Account) shall be paid or released from the Operating Account to or for the account of, or withdrawn by or for the account of, the Borrower or any other Person. The Operating Account shall be subject to applicable laws, and applicable regulations of any competent banking or governmental authority, as may now or hereafter be in effect.

NYDOCS03/494732
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.


EC21020A0090803

75

SECTION 8.02. Deposit of Funds into the Operating Accounts. (a) On or prior to the date hereof, the Borrower shall give to Marengo and its Members written notice (such notice to be in form and substance satisfactory to the Collateral Agent) irrevocably instructing Marengo and the Marengo Custodian, respectively, that all payments due to the Borrower (other than Excluded Payments) under or in respect of the Marengo Partnership Agreement or the Purchase Option Agreement, as the case may be, and all other payments due to the Borrower under or in respect of the Nahanni Marengo Interest shall be deposited directly into the Operating Account; provided that if, after the delivery of a Purchase Exercise Notice (as such term is defined in the Purchase Option Agreement) by Enron pursuant to the Purchase Option Agreement, a Purchase Default shall occur, then any liquidating distributions received by Nahanni from Marengo that, pursuant to Section 8(d) of the Purchase Option Agreement, are to be paid to Yellowknife, shall be paid to Yellowknife.

(b)     Proceeds of each Advance (other than the Drawdown Termination Advances) shall be deposited directly into the Operating Account.

(c)     On or prior to the date hereof, the Borrower shall give to Enron written notice (such notice to be in form and substance satisfactory to the Collateral Agent) irrevocably instructing Enron that all amounts payable by Enron (other than Excluded Payments) under the Enron Agreement and the Purchase Option Agreement shall be deposited directly into the Operating Account, such deposits to be in satisfaction of Enron's payment obligations thereunder.

(d)     The Borrower shall cause the Administrator to promptly notify the Borrower, the Collateral Agent and the Agent (if other than the Collateral Agent) of any such deposit made pursuant to this Section 8.02 and to provide to the Borrower, the Collateral Agent and the Agent (if other than the Collateral Agent) monthly reports of holdings and transactions in the Operating Account.

SECTION 8.03. Investing of Amounts in the Operating Account. If requested by the Borrower, the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction), subject to the provisions set forth in Section 8.04 hereof concerning transfers and payments and in Section 7.10 hereof concerning default, from time to time (a) to invest amounts on deposit in the Operating Account in such Cash Equivalents in the name of the Collateral Agent or as to which all actions required by Section 7.05 shall have been taken as the Borrower may select pursuant to written instructions received from time to time from a representative of the Borrower designated in writing from time to time to the Collateral Agent or, in the absence of such direction, in accordance with its customary practice, and (b) to the extent practicable, to invest interest and other earnings paid on the Cash Equivalents referred to in clause (a) above, and reinvest other proceeds of any such Cash Equivalents, in each case in such Cash Equivalents in the name of the Collateral Agent or as to which all actions required by Section 7.05 shall have been taken as the Borrower may select pursuant to written instructions received from time

This document is subject to
a written Confidentiality Agreement.



76

to time from a representative of the Borrower designated in writing to the Collateral Agent (the Cash Equivalents referred to in clauses (a) and (b) above being the "Permitted Investments"); provided, however, that the Collateral Agent may liquidate, or direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) to liquidate, any Permitted Investment prior to its maturity if the proceeds of such liquidation or conversion are necessary for any payment required to be made by the Collateral Agent in accordance with the provisions of Section 8.04 or 7.10 hereof. Interest and proceeds that are not invested or reinvested as provided above shall be deposited and held in the Operating Account. The Collateral Agent shall, to the extent reasonably practicable, dispose of investments in the Operating Account in a manner to minimize any loss on such investments, but in no event shall the Collateral Agent be liable for any losses incurred as the result of any sale or disposition of Permitted Investments, and the Borrower hereby releases the Collateral Agent from any liability arising out of, or in connection with, any investment or liquidation or conversion made by it hereunder, except where such liability arises from the Collateral Agent's gross negligence or willful misconduct. The Borrower hereby notifies the Administrator that the Collateral Agent has full dominion and control of the Operating Account and instructs the Administrator to act, or refrain from acting, with respect to the Operating Account at the direction of the Collateral Agent. The Borrower agrees not to take any action inconsistent with the preceding sentence.

SECTION 8.04. Transfers from the Accounts. (a) Transfers in Respect of Periodic Payments from the Operating Account. To the extent funds are available in the Operating Account and subject to Section 8.04(f)(iv) hereof, the Collateral Agent shall on each Payment Date (or, to the extent such funds are not available on such date, as soon as practicable on any Business Day thereafter to the extent funds are then available) direct the Administrator (and the Borrower agrees not to take any action inconsistent with such direction) to transfer and pay to the parties or accounts specified below the amounts indicated below from funds (other than Excluded Payments) then held in the Operating Account (such funds, collectively, the "Applicable Funds"), such transfers and payments to be made free and clear of any Lien hereunder:

(1)    First, to the Collateral Agent, an amount equal to the sum of the aggregate amount of fees and those Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such Payment Date (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and that are then due and payable to the Collateral Agent for its own account;

(2)    Second, to the Agent, for its account, an amount equal to the sum of the aggregate amount of fees and any Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such Payment Date (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and that are then due and payable to the Agent;

NYDOCS03/494722
Nabarro Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090805

77

(3)    Third, (i) to the Agent for the account of the Lender, an amount equal to the aggregate amount of accrued and unpaid interest and fees, including the Program Fee, then due and payable to the Lender hereunder, (ii) to the Agent for the account of the Surety Provider, an amount equal to the accrued and unpaid Premium then due and payable to the Surety Provider hereunder and (iii) to the Agent for the account of the Committed Lenders, an amount equal to the aggregate amount of accrued and unpaid interest then due and payable to the Committed Lenders hereunder, ratably as to clauses (i), (ii) and (iii) according to their respective amounts;

(4)    Fourth, to the Agent for the account of the Committed Lenders, an amount equal to the accrued and unpaid Liquidity Fee then due and payable to the Committed Lenders hereunder;

(5)    Fifth, to the Agent for the ratable account, in accordance with their respective interests, of the Lender, the Committed Lenders, the Purchasers and the Surety Provider, respectively, in each case to whom those Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such Payment Date (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and are then due and payable, an amount equal to such Additional Financing Costs, if any, then due and payable to the Lender, the Committed Lenders, the Purchasers and the Surety Provider, respectively; and

(6)    Sixth, to the Administrator, the balance of such funds for deposit into the Administrator's Account.

(b)    Transfers from the Operating Account in Respect of Non-Periodic Payments Other Than in Respect of Principal.  Subject to Section 8.04(f)(iv) hereof, to the extent funds are available in the Operating Account and after giving effect to any transfers required to be made pursuant to Section 8.04(a) above, the Collateral Agent shall from time to time direct the Administrator (and the Borrower agrees not to take any action inconsistent with such direction) to transfer and pay to the parties or accounts specified below the amounts indicated for such parties or accounts from funds held in the Operating Account as requested by the parties specified below, such transfers and payments to be made free and clear of any Lien hereunder:

(1)    First, from time to time, to the Collateral Agent, an amount equal to the sum of fees and those Additional Financing Costs of which the Borrower shall have had notice no less than 5 Business Days prior to such Payment Date (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and that are then due and payable to the Collateral Agent for its own account; and

This document is subject to
a written Confidentiality Agreement.

EC21020A0090806

78

(2)    Second, from time to time, to the Agent on behalf of itself, the Lender, the Committed Lenders, the Purchasers and the Surety Provider, respectively, for their ratable account in accordance with their respective interests therein, an amount equal to those Additional Financing Costs of which the Borrower shall have had notice no less than 5 Business Days prior to such Payment Date (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and that are then due and payable to the Agent, the Lender, the Committed Lenders, the Purchasers and the Surety Provider, respectively, as advised by the Agent.

In the event that the Collateral Agent receives a request from more than one party to direct the transfer of amounts from the Operating Account pursuant to this Section 8.04(b) the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) to transfer amounts set forth in this Section 8.04(b) in the order and priority of clauses (1) and (2) above.

(c)    Transfers from the Operating Account in Respect of Prepayments of Principal Under Section 2.06(a) and Section 2.06(b)(i). Subject to clause (d) below and Section 8.04(f)(iv) hereof, upon receipt by the Collateral Agent of any prepayment of the principal amount of the Advance pursuant to Section 2.06(a) or Section 2.06(b)(i), the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with such direction) to transfer and pay from the Operating Account, promptly upon receipt thereof, to the parties specified below the amounts indicated below for such parties, solely from, and to the extent of, such funds received, such transfers and payments to be made free and clear of any Lien hereunder:

(1)    First, to the Collateral Agent, an amount equal to the sum of the aggregate amount of those Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such transfer and payment (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and which are then due and payable to the Collateral Agent for its own account;

(2)    Second, to the Agent, an amount equal to the sum of the aggregate amount of those Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such transfer and payment (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and which are then due and payable to the Agent, the Lender, the Purchasers and the Surety Provider, respectively, for their ratable account in accordance with their respective interests therein;

This document is subject to
a written Confidentiality Agreement.



79

(3)    Third, (i) to the Agent for the account of the Lender, an amount equal to the aggregate amount of accrued and unpaid interest in respect of that portion of the principal amount of the Advance to be prepaid pursuant to clause fourth below, as advised by the Agent and (ii) to the Agent for the account of the Committed Lenders, an amount equal to the aggregate amount of accrued and unpaid interest then due and payable to the Committed Lenders hereunder, ratably as to clauses (i) and (ii) according to their respective amounts;

(4)    Fourth, to the Agent for the account of the Lender and the Committed Lenders, ratably, in respect of the outstanding principal amount of the Advances, the Prepayment Amount pursuant to Section 2.06(a) or the Distribution Amount pursuant to Section 2.06(b)(i); *provided*, that if the Drawdown Termination Advance has been made and no Renewal Period is then in effect, so long as no Event of Default or Marengo Liquidation Event shall have occurred and, in the case of an Event of Default, be continuing, such Distribution Amount shall be deposited to the Collateral Account instead and not applied to prepayment of the Advances; and

(5)    Fifth, to the Administrator, the balance, if any, of such funds for deposit into the Administrator's Account; *provided*, that after the date of the Drawdown Termination Advance and at such times as the balance on deposit in the Collateral Account is less than the aggregate amount of the Drawdown Termination Advance, the amount released to the Administrator shall not be more than the accrued and unpaid "Equity Amount" as defined in the Marengo Partnership Agreement.

provided, however, that, after the Borrower makes a Drawdown Termination Advance and in connection with the reduction or termination by the Borrower of the Facility Amount, the Borrower may request in writing the Collateral Agent to, and if so instructed the Collateral Agent will, direct the Administrator, or each Committed Lender, who shall be maintaining the Collateral Amount to pay to each Committed Lender an amount from the Collateral Account reflecting such reduction or termination in prepayment, pursuant to Section 2.06(a), of the Drawdown Termination Advance owing to such Committed Lender, together with accrued interest to the date of prepayment on the principal amount prepaid.

(d)    Transfers from the Operating Accounts in Respect of Prepayments of Principal Under Section 2.06(b)(ii) or Application of Proceeds of Pledged Collateral Pursuant to Section 7.10(b). Subject to Section 8.04(f)(iv) hereof, upon receipt by the Collateral Agent of any mandatory prepayment of the principal amount of an Advance pursuant to Section 2.06(b)(ii) and any related Guaranteed Payment or Purchase Amount, as the case may be, or any proceeds of Pledged Collateral upon and after the exercise of remedies pursuant to Section 7.10(b), the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with such direction) to transfer and pay, promptly upon receipt thereof, to the parties specified below

This document is subject to
a written Confidentiality Agreement

EC21020A0090808

80

the amounts indicated below for such parties, solely from, and to the extent of, such funds received and such transfers, such payments to be made free and clear of any Lien hereunder:

(1)    First, to the Collateral Agent, an amount equal to the sum of the aggregate amount of fees and those Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such transfer and payment (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and which are then due and payable to the Collateral Agent;

(2)    Second, to the Agent, an amount equal to the sum of the aggregate amount of fees and those Additional Financing Costs of which the Borrower shall have had notice no less than 7 Business Days prior to such transfer and payment (or, if the Purchase Closing Date shall have occurred, which have been notified to the Borrower in accordance with Section 2.13) and which are then due and payable to the Agent, the Lender, the Purchasers and the Surety Provider, respectively, for their ratable account in accordance with their respective interests therein;

(3)    Third, (i) to the Agent for the account of the Lender, an amount equal to the aggregate amount of fees, including the Program Fee, and accrued and unpaid interest in respect of that portion of the principal amount of the Advance to be prepaid pursuant to clause fifth below, as advised by the Agent, (ii) to the Agent for the account of the Surety Provider, an amount equal to the accrued and unpaid Premium then due and payable to the Surety Provider hereunder and (iii) to the Agent for the account of the Committed Lenders, an amount equal to the aggregate amount of accrued and unpaid interest then due and payable to the Committed Lenders hereunder, ratably as to clauses (i), (ii) and (iii) according to their respective amounts;

(4)    Fourth, to the Agent for the account, in accordance with their respective interests, of the Committed Lenders, an amount equal to the accrued and unpaid Liquidity Fee then due and payable to the Purchasers hereunder;

(5)    Fifth, to the Agent for the account of the Lender and the Committed Lenders, ratably, an amount equal to (x) in the case of a prepayment pursuant to Section 2.06(b)(ii), the amount of the Purchase Amount described therein and (y) otherwise the lesser of (1) the balance of such funds and (2) the aggregate outstanding principal amount of the Advances; and

(6)    Sixth, to the Administrator, the balance, if any, of such funds for deposit into the Administrator's Account;

NYDOCSG3/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090809

81

provided, however, that upon the exercise of remedies pursuant to Section 7.10(b), (i) the Collateral Agent shall, if the Collateral Account is with the Administrator, direct the Administrator (and the Borrower agrees not to take any action inconsistent with such direction) to transfer and pay those amounts then credited to the Collateral Account, ratably, to the Committed Lenders as payment of their respective portions of the principal, and interest on the then outstanding Drawdown Termination Advance and (ii) each Committed Lender shall, if the Collateral Account is with such Committed Lender, apply those amounts then credited to the Collateral Account to such Committed Lender's portion of the principal of and interest on the then outstanding Drawdown Termination Advances.

(e)    Transfers from the Operating Account or Collateral Account in Respect of an Advance, Capital Contributions or Prepayment. (i) Subject to Section 8.04(f)(iv) hereof, upon receipt by the Collateral Agent of any proceeds identified to it by the Agent as being the proceeds of an Advance (other than the Drawdown Termination Advance), the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) to transfer and pay, promptly upon receipt thereof, amounts then held in the Operating Account to the Marengo Custodian's "Marengo Operating Account" established and maintained pursuant to the Marengo Custody Agreement and held with Wilmington Trust Company at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, solely from, and to the extent of, such funds received, such payments to be made free and clear of any Liens hereunder.

(ii)    Subject to Section 8.04(f)(iv) hereof, after the date of a Drawdown Termination Advance and upon notice from the Marengo General Partner that the Borrower is required to make an additional Capital Contribution pursuant to Section 5.3 of the Marengo Partnership Agreement, and upon satisfaction of the following conditions precedent:

(A)    On the date of the making of such Capital Contribution the Borrower shall simultaneously make its capital contribution in the form requested pursuant to Section 5.3 of the Marengo Partnership Agreement from amounts on deposit in the Collateral Account; and

(B)    All conditions precedent to the making of such Capital Contribution by the Borrower under Section 5.3 of the Marengo Partnership Agreement (except for the availability of funding under this Agreement) shall have been satisfied, and the Agent shall have received a copy of all notices and other documents delivered in connection therewith; and

(C)    On the date of the making of such Capital Contribution, no event has occurred and is continuing that constitutes an Event of Default or a Default,

82

the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) or each Committed Lender, as the case may be, which is maintaining the Collateral Account, to (and such Committed Lender shall) transfer and pay amounts then held in the Collateral Account and proceeds thereof to the Marengo Custodian's "Marengo Operating Account" established and maintained pursuant to the Marengo Custody Agreement and held with Wilmington Trust Company at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, to the extent of the additional required Capital Contribution, such payments to be made free and clear of any Liens hereunder.

(iii)    Subject to Section 8.04(f)(iv) hereof, at the time the Collateral Agent directs the Administrator to make a transfer and payment pursuant to Section 8.04(e)(i), the Collateral Agent shall direct the Administrator (and the Borrower shall cause the Administrator to promptly comply with any such direction) to transfer and pay amounts then held in the Operating Account to the Marengo Custodian's account referred to in Section 8.04(e)(i) or (ii) in the amount as notified by the Borrower Managing Member and solely from, and to the extent of, the aggregate amount of capital contributions made by the Members of the Borrower and deposited to the Operating Account, such payments to be made free and clear of any Lien hereunder.

(iv)    After the date of a Drawdown Termination Advance, if the Borrower elects to make an optional prepayment of the Advances pursuant to Section 2.06(a), the Collateral Agent shall direct the Administrator (and the Borrower shall cause the Administrator to promptly comply with any such direction) to transfer and pay amounts then held in the Collateral Account to the Operating Account in the amount required to be applied pursuant to Section 2.06(a).

(v)    After the date of a Drawdown Termination Advance, on each Payment Date the Collateral Agent shall direct the Administrator (and the Borrower shall cause the Administrator to promptly comply with any such direction) to transfer and pay from the Collateral Account to the Operating Account the aggregate amount earned during the Interest Period (or portion thereof) ending immediately prior to such Payment Date on the Collateral Account Permitted Investments.

(f)    General Provisions Applicable to All Transfers.  (i)  From time to time, upon the Collateral Agent's receipt of a notice from the Agent in respect of Additional Financing Costs (other than Additional Financing Costs described in the succeeding sentence) then due and payable or its own determination of any Additional Financing Costs (other than Additional Financing Costs described in the succeeding sentence) then due and payable to the Collateral Agent, the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) to transfer and pay to the Agent or the Collateral Agent, as the case may be, from Applicable Funds, an amount equal to such Additional Financing Costs or to the extent of Applicable Funds. If at any time (x) the amount of Applicable Funds is insufficient to make such requested payment or (y) the Collateral Agent receives notice from the Agent that, or the Collateral

This document is subject to
a written Confidentiality Agreement


EC21020A0090811

83

Agent determines that, Additional Financing Costs in respect of interest payable pursuant to Section 2.08(b) (other than interest that would otherwise be payable under Section 2.03 in respect of the Advance) are then due and payable, there shall exist a "Deficiency" equal to the amount of such shortfall in such requested payment or such default interest.

(ii)     In the event of a Deficiency the Collateral Agent shall, within one Business Day of its determination of such Deficiency or receipt of any notice specified in Section 8.04(f)(i) above, give notice (a "Deficiency Notice") to the Administrator, the Borrower, the Members of the Borrower and the Agent specifying the amount and nature of such Deficiency and setting out the amount specified or requested, and the Borrower shall, to the extent of amounts on deposit in the Administrator's Account other than those relating to any Excluded Payment, pay to the Operating Account such amount so specified or requested.

(iii)    Upon the Collateral Agent's receipt of a notice from the Agent in respect of Additional Financing Costs then due and payable, or its own determination of an amount then due and payable to it, the Collateral Agent shall, within one Business Day of receipt of such notice from the Agent or such determination, as the case may be, provide copies of such notices or notice of such determination, as the case may be, to the Administrator, the Borrower, the Members of the Borrower and the Agent. In the case of the Collateral Agent's determination of an amount then due and payable to it, the notice of such determination shall set forth in reasonable detail the basis therefor and such notice shall be conclusive absent manifest error.

(iv)    Notwithstanding anything to the contrary set forth in this Section 8.04, (A) except as otherwise provided in subclause (B) below, at any time any officer of the Collateral Agent has or obtains actual knowledge (whether as a result of notice or otherwise) of the occurrence and continuance of an Event of Default and until such time as the Collateral Agent shall have received notice from the Agent that such Default or Event of Default is no longer continuing, no transfers or payments of funds from the Operating Account shall be required to be directed by the Collateral Agent to be made by the Administrator to the Administrator's Account and (B) at any time any officer of the Collateral Agent has or obtains actual knowledge (whether as a result of notice or otherwise) of (x) the occurrence and continuance of an Event of Default under Section 6.01(a) or (y) the acceleration of the maturity of the Advances pursuant to Article VI and until such time as the Collateral Agent receives notice from the Agent that such Event of Default no longer continues or that such acceleration has been rescinded, the Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) to apply funds held in the Operating Accounts pursuant to Section 7.10(b) hereof, as directed by the Agent; provided, however, that upon the occurrence and during the continuance of any Event of Default other than of any type set forth in Section 6.01(a), the Collateral Agent shall continue to direct the transfer of funds from the Operating Account in accordance with the other provisions of this Section 8.04 (including transfers to the Administrator's Account), if and so long as at the time of, and after giving

This document is subject to
a written Confidentiality Agreement

EC21020AD090812

84

effect to, such transfer no Event of Default shall have occurred and be continuing, or would occur, under Section 6.01(a). The Agent shall promptly notify the Collateral Agent if any Event of Default ceases to exist or is waived.

SECTION 8.05. <u>Investing of Amounts in the Collateral Account</u>. The Collateral Agent shall direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) or each Committed Lender, as the case may be, which is maintaining the Collateral Account, subject to the provisions set forth in Section 7.10 hereof concerning default, from time to time (a) to invest amounts on deposit in the Collateral Account in such Cash Equivalents in the name of the Collateral Agent , as the Borrower may select pursuant to written instructions received from time to time from a representative of the Borrower designated in writing from time to time to the Collateral Agent or, in the absence of such direction, in accordance with its customary practice, and (b) to the extent practicable, to invest interest and other earnings paid on the Cash Equivalents, in each case in such Cash Equivalents, as the Borrower may select pursuant to written instructions received from time to time from a representative of the Borrower designated in writing to the Collateral Agent (the Cash Equivalents referred to in clause (a) and (b) above being the "<u>Collateral Account Permitted Investments</u>"); <u>provided, however,</u> that the Collateral Agent may liquidate or direct the Administrator (and the Borrower agrees not to take any action inconsistent with any such direction) to liquidate, any Collateral Account Permitted Investment prior to its maturity if the proceeds of such liquidation are necessary for any payment required to be made by the Collateral Agent in accordance with the provisions of Section 8.04(f)(iv) or 7.10 hereof. Interest and proceeds that are not invested or reinvested as provided above shall be deposited and held in the Collateral Account. The Collateral Agent shall, to the extent reasonably practicable, dispose of investments in the Collateral Account in a manner to minimize any loss on such investments, but in no event shall the Collateral Agent be liable for any losses incurred as the result of any sale or disposition of Permitted Investments, and the Borrower hereby releases the Collateral Agent from any liability arising out of, or in connection with, any investment or liquidation made by it hereunder, except where such liability arises from the Collateral Agent's gross negligence or willful misconduct.

SECTION 8.06. <u>Renewal of Drawdown Period</u>. (a) <u>Prepayment of Collateral Account Amounts</u>. Subject to the requirements of Section 8.06(b), the Borrower will, after receiving the written notice of the Drawdown Renewal Date pursuant to Section 8.06(b) and upon five Business Days' notice to the Agent and the Collateral Agent stating the proposed date and the Prepayment Amount, prepay the Collateral Account Amounts of all Drawdown Termination Advances, together with accrued interest (as contemplated in the <u>proviso</u> clause in Section 2.03(a)(iii) to the date of such prepayment on the principal amount prepaid). Upon receipt of such notice, the Collateral Agent shall instruct the Administrator, or each Committed Lender, who is maintaining the Collateral Account, to pay to each of the Committed Lenders from the Collateral Account the amounts set forth above, in repayment of the Collateral Account Amount of the Drawdown Termination Advance made by such Committed Lender.

This document is subject to
a written Confidentiality Agreement.

EC21020A0090813

85

(b) New Committed Lender Commitments. After the making of a Drawdown Termination Advance, the Borrower or the Majority Committed Lenders may, at any time thereafter, notify the Agent in writing of its or their request to reinstate the respective Committed Lender Commitments of the Committed Lenders. The Agent shall promptly notify each Committed Lender of such request by the Borrower (and, if the Majority Committed Lenders have made such a request, the Borrower and each Committed Lender), and each Committed Lender shall in turn, in its sole discretion, notify the Agent of its intention as to whether such Committed Lender wishes to reinstate its Committed Lender Commitment. If all the Committed Lenders consent in writing to extend their respective Committed Lender Commitments, the Agent shall notify the Borrower in writing of the date of such reinstatement of the Committed Lender Commitments, and on such date (the "Drawdown Renewal Date"), all the Committed Lender Commitments shall be extended, and the Committed Lender Termination Date shall be extended to the Maturity Date. The Applicable Margin or Liquidity Fee shall not change as a result of the reinstatement of any Committed Lender Commitment pursuant to this Section 8.06(b).

SECTION 8.07. Agent's Agreements. During such periods as the Agent and the Collateral Agent are not the same Person, the Agent agrees as follows:

(i)    At least one Business Day prior to each Payment Date, the Agent agrees to provide the Collateral Agent  notice of the amount of each payment to be made by the Collateral Agent on such Payment Date in respect of amounts then payable by the Borrower in respect of interest and fees under this Agreement, it being understood by the Agent and the Lender that the Collateral Agent shall have no obligation to make any such payments unless and until it has received notice from the Agent.

(ii)    The Agent agrees to give the Collateral Agent prompt notice in writing of the date and amount of each payment to be made by the Collateral Agent in respect of amounts payable by the Borrower in respect of principal and interest and all other amounts due under this Agreement, it being understood by the Agent and the Lender that the Collateral Agent shall have no obligation to make any such payments unless and until it has received notice from the Agent.

(iii)    The Agent agrees promptly to notify the Collateral Agent of (A) the occurrence of a Default or Event of Default of which the Agent has actual knowledge, (B) each Assignment and Acceptance delivered to and accepted by it and (C) the payment in full of the Secured Obligations on the Debt Collection Date. The Collateral Agent shall not be deemed to have knowledge of any Default or Event of Default unless informed in writing by the Agent, the Lender, the Majority Committed Lenders or the Borrower.

This document is subject to
a written Confidentiality Agreement.

EC21020A0090814

86

## ARTICLE IX

### THE AGENT, THE COLLATERAL AGENT
### AND THE ESCROW AGENT

SECTION 9.01. Authorization and Action. The Lender, the Committed Lenders and the Purchasers hereby appoint and authorize CNAI as the Agent hereunder, as the Collateral Agent hereunder and as the Escrow Agent under the Escrow Agreement, to take such action as Agent, Collateral Agent and Escrow Agent, respectively, on its behalf and to exercise such powers and discretion under this Agreement, the Escrow Agreement, the other Loan Documents and the Purchase Option Agreement as are delegated to the Agent, the Collateral Agent and the Escrow Agent, respectively, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents and the Purchase Option Agreement including, without limitation, enforcement or collection of the Debt resulting from the Advances and enforcement of this Agreement, the Escrow Agreement and the Purchase Option Agreement, the Agent, the Collateral Agent and the Escrow Agent, respectively, shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Lender, the Majority Committed Lenders and the Majority Purchasers and such instructions shall be binding upon the Lender, the Committed Lenders and the Purchasers; provided, however, that the Agent, the Collateral Agent and the Escrow Agent, as applicable, shall not be required to take any action that exposes it to personal liability or that is contrary to this Agreement, the Escrow Agreement, the Purchase Option Agreement or applicable law. The Agent agrees to give to the Lender, the Committed Lenders and the Purchasers prompt notice of each notice and copies of all other documents given to it by the Borrower, a Borrower Managing Member, the Administrator, the Collateral Agent and the Escrow Agent pursuant to the terms of this Agreement or the Escrow Agreement, and agrees to give the Collateral Agent, if not the same Person as the Agent, and the Escrow Agent prompt notice of each notice and copies of all other documents given to it by the Borrower, the Lender, the Committed Lenders and the Purchasers pursuant to the terms of this Agreement. The Collateral Agent, if not the same Person as the Agent, and the Escrow Agent agree to give to the Agent prompt notice of each notice and copies of all other documents given to it by the Borrower, the Lender, the Committed Lenders or the Purchasers pursuant to the terms hereof or the Escrow Agreement, respectively.

SECTION 9.02. Agent's, Collateral Agent's and Escrow Agent's Reliance, Etc. Neither the Agent, nor the Collateral Agent, nor the Escrow Agent nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents or the Purchase Option Agreement, except for its or their own gross negligence, fraud or willful misconduct, and the Lender, each Purchaser and each Committed Lender agrees that it will not assert or seek to assert any claim it

This document is subject to
a written Confidentiality Agreement


EC21020A0090815

87

might have against any of them in violation of this provision. Without limitation of the generality of the foregoing: (i) the Agent may treat (A) the Lender that made a CXC Advance as the holder of the Debt resulting therefrom until the Agent receives and accepts an Assignment and Acceptance entered into by the Lender, as assignor, and an Eligible Assignee, as assignee, as provided in Article X hereof and (B) each Committed Lender that made a Committed Lender Advance as the holder of the Debt resulting therefrom until the Agent receives and accepts an Assignment and Acceptance entered into by such Committed Lender, as assignor, and an Eligible Assignee, as assignee, as provided in Article X hereof; (ii) the Agent, the Collateral Agent and the Escrow Agent may consult with legal counsel (including counsel for the Borrower or any Member of the Borrower), independent public accountants and other experts selected by them and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) neither the Agent, nor the Collateral Agent nor the Escrow Agent makes any warranty or representation to the Lender or the Committed Lenders or shall be responsible to the Lender or the Committed Lenders for any statements, warranties or representations made in or in connection with the Loan Documents or the Purchase Option Agreement; (iv) neither the Agent, nor the Collateral Agent nor the Escrow Agent shall have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or the Purchase Option Agreement on the part of the Borrower (or in the case of the Purchase Option Agreement, Enron) or to inspect the property (including the books and records) of the Borrower (or in the case of the Purchase Option Agreement, Enron); (v) neither the Agent, nor the Collateral Agent nor the Escrow Agent shall be responsible to the Lender or the Committed Lenders for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or the Purchase Option Agreement or any other instrument or document furnished pursuant hereto or thereto; (vi) neither the Agent, nor the Collateral Agent nor the Escrow Agent shall be liable under or in respect of any Loan Document or the Purchase Option Agreement by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties; (vii) neither the Agent, nor the Collateral Agent nor the Escrow Agent shall be liable to the Lender or the Committed Lenders for any losses incurred as the result of any sale or disposition of Permitted Investments in accordance with Article VIII; (viii) neither the Agent, nor the Collateral Agent nor the Escrow Agent makes any representation or warranty and neither the Agent, the Collateral Agent nor the Escrow Agent shall have responsibility concerning the value or validity of the Pledged Collateral or the validity or the perfection of the pledge thereof; and (ix) the Agent may assume that no Default or Event of Default has occurred and is continuing unless it has, in its capacity as Agent for the Lender and the Committed Lenders, actual knowledge or actual notice to the contrary.

SECTION 9.03. CNAI and Affiliates. (a) With respect to any Purchaser Advance held by it, CNAI shall have the same rights and powers under the Loan Documents as the Lender, the Committed Lenders or any Purchaser and may exercise the same as though it were not the Agent,

This document is subject to
a written Confidentiality Agreement

EC21020A0090816

88

the Collateral Agent or the Escrow Agent, as the case may be; and with respect to any Advance held by CNAI, the term "Lender", "Committed Lender" or "Purchaser" shall, unless otherwise expressly indicated, include CNAI in its individual capacity. CNAI and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, Enron, any of their respective Affiliates and any Person who may do business with or own an interest in any of them, all as if it were not the Collateral Agent, the Collateral Agent or the Escrow Agent and without any duty to account therefor to the Lender or the Committed Lenders.

(b)    With respect to any Advance held by it, Citibank shall have the same rights and powers under the Loan Documents as the Lender or any Purchaser and may exercise the same as though it were not the Collateral Agent, and with respect to any Advance held by Citibank, the term "Lender", "Committed Lender" or "Purchaser" shall, unless otherwise expressly indicated, include Citibank in its individual capacity. Citibank and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, Enron, any of their respective Affiliates and any Person who may do business with or own an interest in any of them, all as if it were not the Collateral Agent and without any duty to account therefor to the Lender.

SECTION 9.04. Independent Credit Decision. Each of the Lenders, each Committed Lender and each Purchaser acknowledges that it has, independently and without reliance upon the Agent or the Collateral Agent and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each of the Lenders, each Committed Lender and each Purchaser also acknowledges that it will, independently and without reliance upon the Agent or the Collateral Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

## ARTICLE X

## ASSIGNMENT OF ADVANCE

SECTION 10.01.  Assignment and Participations.  (a)  The Lender and each Committed Lender may, upon at least five (5) Business Days' notice to the Borrower and the Agent, assign to one or more banks or other entities all (but not a portion) of its rights and obligations under this Agreement (including, without limitation, all (but not a portion) of the Advance owing to it); provided, however. that (i) each such assignment shall be of all such rights and obligations of the assigning Lender or Committed Lender, as the case may be, (ii) each such assignment shall be either to an Eligible Assignee described in clause (e), (f) or (g) of the definition of Eligible Assignee or to

NYDOCS01/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement


EC21020A0090817

89

any other Eligible Assignee consented to by the Borrower, which consent may not be unreasonably withheld, or, in the case of the Lender, to the Purchasers pursuant to Section 8 of the Asset Purchase Agreement, (iii) no assignment shall be allowable hereunder unless the assignee is a "Qualified Purchaser" under the Investment Company Act of 1940, as amended, and the regulations promulgated thereunder, (iv) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with a recordation fee of $1,000 (except in the case of any such assignment pursuant to Section 3(c) of the Asset Purchase Agreement or pursuant to the Insurance Agreement), (v) the Eligible Assignee shall have executed and delivered a confidentiality agreement in the form of Exhibit I hereto, (vi) prior to the completion of any such assignment, the assigning Lender shall give written notice to the Agent with a copy to the Borrower of the proposed assignment, which notice shall state the name and address of the proposed assignee and the portion of the Advance to be assigned and (vii) in the case of any Committed Lender, such Committed Lender shall have assigned to such assignee a proportionate share of its interests as a Purchaser under the Asset Purchase Agreement pursuant to the terms thereof. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement and under the other Loan Documents (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto); provided, however, that no assignee shall have any right to payments under Section 2.07, 2.09 or 12.04 or Article XI in an amount greater than the Initial Lender and any Purchaser consented to by the Borrower would have been entitled to receive if such assignment had not been made.

(b)     By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender or Committed Lender, as the case may be, makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received

This document is subject to
a written Confidentiality Agreement.

EC21020A0090B18

90

a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or Committed Lender, as the case may be, or any former Lender or Committed Lender, as the case may be, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent, the Collateral Agent and the Escrow Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the Escrow Agreement, respectively, as are delegated to the Agent, the Collateral Agent and the Escrow Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement and the Escrow Agreement, respectively, are required to be performed by it as the Lender or Committed Lender, as the case may be.

(c)     The Agent shall maintain at its address referred to in Section 12.02 hereof a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the name and address of the Lender or Committed Lender, as the case may be, from time to time and principal amount of the Advance owing to the Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as the Lender or Committed Lender (as the case may be) hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower, the Lender or the Committed Lenders at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender or Committed Lender, as the case may be, and an assignee, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit A hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and to the assigning Lender or Committed Lender, as the case may be.

(e)     The Lender or Committed Lender, as the case may be, may, subject to subsections (f), (g) and (h) of this Section 10.01, sell to any Purchaser or any Eligible Assignee described in clause (e), (f) or (g) of the definition of "Eligible Assignee" or to any other Eligible Assignee consented to by the Borrower, which consent may not be unreasonably withheld, participations in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Advance owing to it); provided, however, that (i) the Lender's or Committed Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender or Committed Lender, as the case may be, shall remain solely responsible to the other parties

NYDOCS01/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement

91

hereto for the performance of such obligations, (iii) the Borrower and the Agent shall continue to deal solely and directly with the Lender or Committed Lender, as the case may be, in connection with the Lender's or Committed Lender's rights and obligations under this Agreement, (iv) no participant (other than any Purchaser) under any participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any party thereto therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Advance or any fees or other amounts payable for the benefit of such participant hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Advance or any such fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Pledged Collateral, (v) no participation shall be allowed to be sold hereunder (other than to any Purchaser) unless the participant represents and warrants that, at the time it becomes a participant, that it is a "Qualified Purchaser" under the Investment Company Act of 1940, as amended, and the regulations promulgated thereunder and (vi) such participant shall have executed and delivered a confidentiality agreement in the form of Exhibit I hereto. No participant shall be entitled to receive any greater benefit pursuant to Sections 2.07, 2.09 or 12.04 or Article XI than the Lender or Committed Lender granting such participation would have been entitled to receive with respect to the rights transferred in such participation.

(f)    Prior to the completion of a participation by the Lender, the Lender proposing to sell a participation shall give written notice to the Agent with a copy to the Borrower of the proposed participation, which notice shall state the name and address of the proposed participant and the portion of the Advance to be sold in such participation.

(g)    The Lender or Committed Lender, as the case may be, shall, upon completion of a participation that shall be subject to receipt of the confirmation referred to in subclause (f)(i)(A) above, provide written notice to the Agent and the Borrower stating the name and address of the participant and the portion of the Advance sold to such participant or repurchased from such participant, as the case may be, and the Agent shall maintain at its address referred to in Section 12.02 a copy of each such notice received by it and a register for the recordation of such participations (the "Participation Register"), which register shall be conclusive and binding for all purposes, absent manifest error. The Participation Register shall be available for inspection by the Borrower or the Lender or any Committed Lender at any reasonable time and from time to time upon reasonable prior notice.

(h)    ANY ATTEMPTED ASSIGNMENT OR GRANT OF A PARTICIPATION OR SUBPARTICIPATION IN VIOLATION OF THIS SECTION 10.01 SHALL BE VOID. TO THE EXTENT THE LENDER OR ANY COMMITTED LENDER ASSIGNS OR PARTICIPATES ANY PORTION OF ITS ADVANCE OR COMMITMENT IN VIOLATION OF THIS SECTION 10.01, THE LENDER OR SUCH COMMITTED LENDER AND THE PROPOSED PURCHASER

This document is subject to
a written Confidentiality Agreement


EC21020A0090820

92

OR PARTICIPANT, AS THE CASE MAY BE, SHALL UPON NOTICE BY THE AGENT TAKE ALL STEPS NECESSARY OR ADVISABLE TO AVOID THE BORROWER BEING OR BECOMING AN "INVESTMENT COMPANY" WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT OF 1940, INCLUDING BUT NOT LIMITED TO, ALL STEPS NECESSARY TO TRANSFER SUCH ASSIGNED OR PARTICIPATED INTEREST THEREUNDER TO THE LENDER OR SUCH COMMITTED LENDER SELECTED BY THE BORROWER AND THE AGENT. NO PURCHASER (TO THE EXTENT PROVIDED IN SECTION 10.01(A)) AND NO PARTICIPANT SHALL BE ENTITLED TO RECEIVE ANY GREATER BENEFIT PURSUANT TO SECTIONS 2.07, 2.09 AND 12.04 AND ARTICLE XI HEREOF THAN THE LENDER, COMMITTED LENDER OR PURCHASER CONSENTED TO BY THE BORROWER WOULD HAVE BEEN ENTITLED TO RECEIVE WITH RESPECT TO THE RIGHTS TRANSFERRED.

(i)     The Lender or any Committed Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.01, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower furnished to the Lender or any Committed Lender by or on behalf of the Borrower; provided, however, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall sign a confidentiality agreement in the form of Exhibit H hereto.

(j)     Notwithstanding any other provision set forth in this Agreement, (i) the Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Advance owing to it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System, and (ii) upon any payment by the Surety Provider under the Surety Bond to any Insured Party (as defined in the Surety Bond), the Lender and each other Insured Party may assign to the Surety Provider all or any portion of its rights under and with respect to this Agreement and the Advance outstanding at such time, the Pledged Collateral and the other amounts payable hereunder to the extent required under, and in accordance with, the Insurance Agreement.

ARTICLE XI

INDEMNIFICATION

SECTION 11.01. Indemnities by the Borrower. (a) The Borrower agrees, to the fullest extent permitted by law, to indemnify and hold harmless the Agent, the Collateral Agent, the Surety Provider, the Lender, each Committed Lender, the APA Agent, each Purchaser and any Affiliate of any thereof (each, an "Indemnified Party") from and against any and all claims, damages, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel

This document is subject to
a written Confidentiality Agreement


EC21020A0090821

93

and claims, damages, liabilities and expenses relating to environmental matters), and, in the case of clause (viii) below, losses, other than Taxes or Other Taxes (and taxes excluded from the definition of the term "Taxes" pursuant to clauses (1) and (2) of the first sentence of Section 2.09(a)) or Additional Financing Costs under Section 2.07, or if the Purchase Closing Date has occurred, any Additional Financing Costs claimable pursuant to Section 2.13 (all of the foregoing to the extent not expressly excluded being collectively referred to as the "Indemnified Amounts") for which any of them may become liable or which may be incurred by or asserted against any such Indemnified Party, in each case arising out of, related to or in connection with this Agreement or any other Loan Document, any Operative Document or any Assigned Agreement, or the use of proceeds of the Advance, including, without limitation, any and all Indemnified Amounts relating to or resulting from:

     (i)    reliance on any written representation or warranty or statement made or deemed made by the Borrower (or any of its members) in this Agreement or any other Loan Document which shall have been incorrect in any material respect when made;

     (ii)    the failure by the Borrower to comply with any applicable law, rule or regulation with respect to any Operative Document or Assigned Agreement, or the nonconformity of any Operative Document or Assigned Agreement with any such applicable law, rule or regulation, unless due to any act or omission on the part of the Agent, the Lender, the Committed Lenders, the Purchasers, the Surety Provider or the Collateral Agent;

     (iii)    the failure to vest in the Collateral Agent a valid and perfected first priority security interest in the Pledged Collateral (subject to Permitted Liens) unless due to any act or omission on the part of and solely in the control of the Agent, the Lender, the Committed Lenders, the Purchasers, the Surety Provider or the Collateral Agent;

     (iv)    the failure to have filed, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other applicable laws with respect to any Pledged Collateral, unless due to any act or omission on the part and solely in the control of the Agent, the Lender, the Committed Lenders, the Purchasers, the Surety Provider or the Collateral Agent;

     (v)    any dispute, claim, offset or defense of Marengo, Enron or any other party to an Operative Document or Assigned Agreement to the payment of any amount owing to the Borrower under the provisions thereof (including, without limitation, a defense based on such payment or the related Operative Document or Assigned Agreement not being a legal valid and binding obligation of such Person enforceable against it in accordance with its terms), unless the same is due to any act or omission on the part of the Agent, the Lender, the Committed Lenders, the Purchasers, or the Collateral Agent;


NYDOCS03/494722
Nassau Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090822

94

(vi)    any failure of the Borrower to perform its duties or obligations in accordance with the provisions hereof or to perform its duties and obligations under the Assigned Agreements;

(vii)    any investigation, litigation or proceeding related to this Agreement or any other Loan Document or the use of proceeds of an Advance or in respect of any Operative Document or Assigned Agreement, unless due to any act or omission on the part and solely in the control of the Agent, the Lender, the Committed Lenders, the Purchasers, the Surety Provider, or the Collateral Agent; or

(viii)    (A) the investment of amounts on deposit in the Collateral Account in Cash Equivalents or other investment property, (B) the reinvestment of interest and other earnings paid on the Cash Equivalents or other investment property and (C) the liquidation of any Collateral Account Permitted Investment or other investment property on deposit in the Collateral Account prior to its maturity for any reason (including, without limitation, if the proceeds of such liquidation are necessary for any payment required to be made by the Collateral Agent in accordance with the provisions of Sections 7.10, 8.04(e)(ii) 8.04(f)(iv) or 8.06 hereof).

Notwithstanding anything to the contrary contained herein, no Person shall be indemnified hereunder for any liability caused by or resulting from the actual fraud, willful misconduct, bad faith or gross negligence of such Person (or any of its Affiliates, directors, members, partners, employees, officers, agents, Subsidiaries or any other Person controlled by such Person). Indemnified Amounts paid under this Article XI shall be without duplication of any other amounts under any of the other Loan Documents.

THE FOREGOING INDEMNITY SHALL EXPRESSLY INCLUDE ANY INDEMNIFIED AMOUNT ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF ANY INDEMNIFIED PARTY, BUT SHALL EXCLUDE ANY INDEMNIFIED AMOUNT ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY. IT IS THE INTENT OF THE PARTIES HERETO THAT THE INDEMNIFIED PARTIES, TO THE EXTENT PROVIDED IN THIS SECTION 11.01(a), BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE.

(b)    Any Indemnified Party that proposes to assert a right to be indemnified under this Section 11.01 will, promptly after receipt of notice of commencement of any action, suit or proceeding against such Indemnified Party, or the incurrence or realization of Indemnified Amounts, in respect of which a claim is to be made against the Borrower under this Section 11.01, notify the Borrower of such incurrence or realization or of the commencement of such action, suit or proceeding, enclosing a copy of all papers served, but the omission so to notify the Borrower promptly of any such incurrence, realization, action, suit or proceeding shall not relieve (x) the

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement

EC21020A0090823

95

Borrower from any liability that it may have to such Indemnified Party under this Section 11.01 or otherwise, except, as to the Borrower's liability under this Section 11.01, to the extent, but only to the extent, that the Borrower shall have been prejudiced by such omission, or (y) any other Person from liability that it may have to any Indemnified Party under this Section 11.01 or otherwise.

(c)    In connection with any investigation, litigation or proceeding for which the Borrower has agreed to indemnify the Indemnified Parties pursuant to Section 11.01(a), the reasonable fees and expenses of one firm of counsel (plus any local or special counsel as may be necessary) acting on behalf of the Indemnified Parties (as a group) shall constitute the obligations for fees and expenses of counsel to be reimbursed by the Borrower to the Indemnified Parties; provided, however, that in the event the Agent, the Collateral Agent, the Surety Provider, the Majority Purchasers, the Majority Committed Lenders or the Lender reasonably determines that there is a conflict of interest between the Agent, the Collateral Agent, the Surety Provider, the Purchasers (as a group), the Committed Lenders (as a group) or the Lender in the conduct of the defense of such investigation, litigation or proceeding or that there are specific defenses available to the Agent, the Collateral Agent, the Surety Provider, the Purchasers (as a group), the Committed Lenders (as a group) or the Lender that are different from or additional to those available to the Agent, the Collateral Agent, the Surety Provider, the Purchasers (as a group), the Committed Lenders (as a group) or the Lender, then the party making such reasonable determination shall have the right to appoint one firm of separate counsel (plus any local or special counsel as may be necessary with respect to such conflict), the reasonable fees and expenses of which shall also constitute the obligations for fees and expenses of counsel to be reimbursed by the Borrower to the Indemnified Parties.

(d)    Notwithstanding the provisions of this Section 11.01 to the contrary, the Borrower shall *not* be required to pay, protect, indemnify, or hold harmless:

(i)    Any Indemnified Person for Indemnified Amounts arising solely from, or attributable to, disputes among the Lender, the Purchasers, the Committed Lenders, the Collateral Agent, any Marengo Portfolio Manager (other than a Marengo Portfolio Manager which is an Affiliate of Enron), CXC Incorporated, the Purchasers, the Surety Provider or the Equity Participants and that are not caused or contributed to in any material respect (as determined by a final judgment of a court of competent jurisdiction) by any act or omission of the Borrower, Marengo, Yellowknife, Enron, or any of their respective Affiliates (other than, at any time when Enron or an Affiliate thereof is not the Marengo General Partner, Marengo and the Marengo Subsidiaries); or

(ii)    Any Indemnified Person for Indemnified Amounts arising solely from, or attributable to, the violation by such Indemnified Person of any Laws (including banking or securities laws), other than any such violation to the extent (as determined by a final

This document is subject to
a written Confidentiality Agreement


EC21020A0090824

96

judgment of a court of competent jurisdiction) (x) caused by Yellowknife, Enron or any of their respective Affiliates (other than, at any time when Enron or an Affiliate thereof is not the Marengo General Partner, Marengo and the Marengo Subsidiaries) or (y) resulting from the entering into of the Operative Documents and the transactions contemplated thereby.

## ARTICLE XII

## MISCELLANEOUS

SECTION 12.01.  Amendments, Etc.  Subject to the other provisions of this Agreement and of the Asset Purchase Agreement, no amendment, waiver, modification or supplement of any provision of this Agreement or any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless (i) the same shall be in writing and signed by the Borrower, the Agent, the APA Agent, the Majority Committed Lenders and the Lender, or, if the Agent, the APA Agent, the Lender or the Majority Committed Lenders shall not be the party thereto, by the party thereto and consented to by the Agent, the APA Agent, the Lender and the Majority Committed Lenders, and (ii) prior written notice of the same shall have been delivered to S&P and Moody's (and, in the case of any material amendment, waiver, modification, supplement, consent or departure, S&P and Moody's shall have consented in writing thereto or, at S&P or Moody's respective option, have provided oral consent thereto satisfactory to the Agent), and then such amendment, waiver, modification, supplement or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 12.02.  Notices, Etc.  All notices and other communications provided for hereunder shall be in writing (including telecopy communication) and mailed, telecopied or delivered, if to the Borrower, at its address at c/o Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware, 19890, Attention:  Corporate Trust Department, facsimile no. (302) 427-4749; with copies to (x) Nahanni Investors L.L.C., c/o Enron Corp., 1400 Smith Street, Houston, Texas, 77002, Attention:  Treasurer, (y) Enron Corp., 1400 Smith Street, Houston, Texas, 77002, Attention:  Treasurer with a copy to General Counsel, Enron Global Finance at the same address and (z) TCW Asset Management Company, c/o Trust Company of the West, 200 Park Avenue, 22ⁿᵈ Floor, New York, New York 10166, Attention:  Jonathan Insull; if to the Initial Lender, CXC Incorporated c/o Citicorp North America, Inc., 450 Mamaroneck Avenue, Harrison, New York 10528, Attention:  Global Securitization, with copies to the Initial Lender at 399 Park Avenue, New York, New York 10043, Attention:  Global Securitization; if to the Initial Committed Lender, at its address specified on Schedule 1 hereto or otherwise notified to the Agent in writing; if to the APA Agent, 399 Park Avenue, New York, New York 10043, Attention: Global Securitization with copies to the APA Agent at 399 Park Avenue, New York, New York 10043, Attention: Global Securitization; and as to any other Lender at the address specified

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090825

97

in the Assignment and Acceptance pursuant to which it became a Lender; if to the Agent, at 450 Mamaroneck Avenue, Harrison, New York 10528, Attention: Global Securitization, with copies to the Agent at 399 Park Avenue, New York, New York 10043, Attention: Global Securitization; if to the Collateral Agent, at 399 Park Avenue, New York, New York 10043, Attention: Global Securitization; or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties. Any such notices and communications shall be deemed to be delivered, given, and received for all purposes as of the date so delivered, if delivered personally, or otherwise as of the date on which the same was received (if a Business Day or, if not, on the next succeeding Business Day). Anything in Section 5.03 to the contrary notwithstanding, the obligation of the Borrower to deliver notices to the Agent and the Collateral Agent pursuant to Section 5.03(e), 5.03(f) and 5.03(g) shall be deemed satisfied to the extent that Marengo has delivered such notices to the Agent and the Collateral Agent. In addition, the Agent agrees to furnish to S&P and Moody's copies of all written notices that it receives from time to time hereunder other than the Notice of Borrowing.

SECTION 12.03. No Waiver; Remedies. No failure on the part of the Borrower, the Lender, the Committed Lenders, the Purchasers, the Agent, the Collateral Agent or the APA Agent to exercise, and no delay in exercising, any right hereunder or under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 12.04. Costs and Expenses. (a) The Borrower agrees to pay pursuant to Section 8.04 (i) all reasonable costs and expenses of the Agent, the Collateral Agent, the Surety Provider, the Lender, the Committed Lenders, the APA Agent, the APA Purchasers and (after the occurrence of any Marengo Notice Event, Marengo Termination Event, Marengo Liquidating Event, Default or Event of Default) the other Purchasers, in connection with the administration, modification and amendment of the Loan Documents (including, without limitation, (A) all due diligence, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing, rating agency and recording fees and expenses, (B) the preservation of, or the sale (other than any registration under the securities laws with respect thereto) of, collection from, or other realization upon, any of the Pledged Collateral, (C) the enforcement of any of the rights of the Collateral Agent, the Agent, the Committed Lenders, the Purchasers, the Surety Provider, the APA Agent or the Lender hereunder and (D) the reasonable fees and expenses of counsel for each of the Agent, the Collateral Agent, the Surety Provider, the Lender, the Committed Lenders, the APA Agent, the APA Purchasers and (after the occurrence of any Marengo Notice Event, Marengo Termination Event, Marengo Liquidating Event or Event of Default) the other Purchasers with respect to advising each such Person as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with the Borrower or with other creditors of the Borrower arising out of any Default or Event of Default or with Marengo or Enron

This document is subject to
a written Confidentiality Agreement.

EC21020A0090826

98

arising out of any Marengo Notice Event, Marengo Termination Event or Marengo Liquidating Event or any events or circumstances that may give rise to a Default or Event of Default or a Marengo Notice Event, Marengo Termination Event or Marengo Liquidating Event and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto with respect to the Borrower, Marengo or Enron) and (ii) all reasonable out-of-pocket costs and expenses of the Agent, the Collateral Agent, the Surety Provider, the APA Agent, the Lender, the Committed Lenders and the Purchasers in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally or otherwise (including, without limitation, the reasonable fees and expenses of counsel for the Agent, the Lender, the APA Agent, the Purchasers, the Committed Lenders, and the Surety Provider with respect thereto), subject, in each case to the limitations set forth in Section 11.01(c).

(b)     If the Borrower fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, but excluding scheduled principal and interest payments and commitment fees, such amount may be paid on behalf of the Borrower by the Agent, the Lender or the Committed Lenders, in their sole discretion.

(c)     The indemnities set forth in Article XI and this Section 12.04 shall be in addition to any other obligations or liabilities of the Borrower hereunder or at common law or otherwise; provided, however, that the indemnities set forth in Article XI and this Section 12.04 shall not apply with respect to (x) Additional Financing Costs subject to Section 2.07 or claimable pursuant to Section 2.13 (for which the exclusive remedy shall be pursuant to Section 2.07 or Section 2.13, as the case may be) or (y) Taxes and liabilities with respect thereto, for which the exclusive remedy of the Lender, the Purchasers, the Committed Lenders, the Surety Provider, the APA Agent, the Agent and the Collateral Agent against the Borrower shall be pursuant to Section 2.09 hereof. Without prejudice to the survival of any other obligation of the Borrower under this Agreement, but subject to the foregoing, the indemnities and obligations contained in Article XI and this Section 12.04 shall survive the payment in full of the principal of and interest on the Advance or any other termination of this Agreement.

(d)     If a Deficiency exists at the time of any demand for payment under Article XI or this Section 12.04, the Borrower shall pay such demanded amount only upon receipt from Marengo of amounts in respect of Additional Financing costs related to such demanded amount.

SECTION 12.05.  Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 hereof to authorize the Agent to declare the Advance due and payable

This document is subject to
a written Confidentiality Agreement

EC21020A0090827

99

pursuant to the provisions of Section 6.01 hereof, the Lender and the Committed Lenders are hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set-off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender and the Committed Lenders to or for the credit or the account of the Borrower (other than any deposits held in the Administrator's Account or deposits in any account to the extent constituting Excluded Payments, which deposits the parties to this Agreement acknowledge are specifically excluded from the Lender's and the Committed Lenders' set-off rights provided for in this Section 12.05) against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement and although such obligations may be unmatured. The Lender and the Committed Lenders agree promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender and the Committed Lenders under this Section 12.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Lender and the Committed Lenders may have.

SECTION 12.06. Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower, the Agent and the Collateral Agent and when the Agent shall have been notified by the Initial Lender that the Initial Lender has executed it and when the Agent shall have been notified by each of the Initial Committed Lenders that such Initial Committed Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, the Agent, the Collateral Agent, the Lender and the Committed Lenders and their respective successors and assigns, provided, however, that the obligations of the Lender and the Committed Lenders under Article II hereof shall not become effective until satisfaction by the Borrower or waiver by the Lender and the Committed Lenders of each of the conditions set forth in Section 3.01 hereof, and provided further that the Borrower shall not have the right to assign its rights or obligations hereunder or any interest herein without the prior written consent of the Lender and the Committed Lenders, except to its Borrower Managing Member and the Administrator as provided in Section 12.09. The Surety Provider, the Escrow Agent, the Purchasers and the APA Agent shall be deemed third-party beneficiaries of the provisions in this Agreement relating to the Surety Provider, the Escrow Agent, the Purchasers and the APA Agent, as fully as if each were a party to this Agreement.

SECTION 12.07. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 12.08. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090828

100

Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 12.09. Borrower Managing Member and Administrator. Pursuant to the Nahanni Company Agreement, certain duties and responsibilities of the Borrower pursuant to this Agreement and the other Loan Documents have been delegated to the Borrower Managing Member. Pursuant to the Administration Agreement, the Borrower has delegated to the Administrator certain duties and responsibilities of the Borrower pursuant to this Agreement and the other Loan Documents. The Borrower acknowledges and agrees that the Lender, the Committed Lenders, the Purchasers, the Agent, the Surety Provider and the Collateral Agent shall be entitled to rely on the written directions, instructions, consents, approvals, and other actions taken by the Borrower Managing Member and the Administrator on behalf or for the account of the Borrower pursuant to the terms of this Agreement and the other Loan Documents.

SECTION 12.10. Non-Recourse Liability. (a) No recourse under any obligation, covenant or agreement of the Borrower contained in this Agreement or the other Loan Documents shall be had against the Borrower (except to the extent of the Pledged Collateral), any Member of the Borrower, any permitted transferee of any Member or the Administrator, or any beneficiary, stockholder, trustee, employee, member, partner, officer or director of, or any lender to, any Member of the Borrower, any permitted transferee of any such Member or the Administrator, or of any of their respective Affiliates or to any of their assets, by the enforcement of any assessment or by any legal or equitable proceedings seeking to assert such recourse against the Borrower, its Members or any permitted transferee of any Member or any of the other foregoing Persons, by virtue of any statute or otherwise; it being expressly agreed and understood that no personal liability whatever shall attach to or be incurred by the Borrower (except to the extent of the Pledged Collateral), any Member of the Borrower, any permitted transferee of any such Member or the Administrator, or any beneficiary, stockholder, trustee, employee, member, partner, officer or director of, or any lender to, any Member of the Borrower, any permitted transferee of any such Member or the Administrator, or any of their respective Affiliates, or any of them, under or by reason of any of the obligations, covenants or agreements of the Borrower contained in this Agreement or the other Loan Documents, or implied therefrom; and it being further expressly agreed and understood that any and all personal liability of the Borrower (except to the extent of the Pledged Collateral), any Member of the Borrower, any permitted transferee of any such Member or the Administrator, as such, and of every such beneficiary, stockholder, trustee, employee, member, partner, officer, or director of, or any lender to, any Member of the Borrower, any permitted transferee of any such Member or the Administrator, or any of their respective Affiliates, for breaches by the Borrower of any of such obligations, covenants or agreements, either at common law or at equity or under any statute or constitution, is hereby expressly waived by the Agent, the Collateral Agent, the Purchasers, the APA Agent, the Committed Lenders and the Lender as a condition of and consideration for the execution of this Agreement; provided, however, that nothing

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement



101

contained in this Section 12.10 shall impair the validity of the Obligations evidenced by this Agreement, prevent the taking of any action permitted by law against the Borrower to the extent of the Pledged Collateral or the proceeds of such Pledged Collateral, or in any way affect or impair the right of the Agent, any Committed Lender or any Lender to take any action permitted by law to realize upon any of the Pledged Collateral.

(b)    Each of the Agent, the Purchasers, the APA Agent, the Committed Lender and the Lender hereby irrevocably agrees that, in furtherance of the provisions of the preceding subsection (a) of this Section 12.10, (i) it shall not institute against, or join any other Person in instituting against, any Member of the Borrower or any permitted transferee of any Member, as such, or any beneficiary, stockholder, trustee, employee, member, partner, officer or director of, or any lender to, any Member of the Borrower or any permitted transferee of any such Member, as such, or any of their respective Affiliates (except for the Borrower itself but solely to the extent of, and to the extent necessary to realize on, the Pledged Collateral), any bankruptcy, reorganization, insolvency or liquidation proceeding, or other proceeding under any national, federal or state bankruptcy or similar law, in connection with any claim relating to the transactions contemplated hereby, (ii) in the event of any reorganization under the Bankruptcy Reform Act of 1978, as amended, of any Member of the Borrower, or the Borrower, it will make the election under Section 1111(b)(2) of such Act and (iii) if for any reason, whether or not related to the Bankruptcy Reform Act of 1978, as amended, it shall recover from the Borrower or any Member of the Borrower or any permitted transferee of any such Member or any other Person referred to in paragraph (a) above, any assets or amounts other than the assets constituting the Pledged Collateral, it promptly shall return such asset or amount recovered to such Person.  Nothing contained in this Section 12.10 shall prevent the Lender or the Committed Lender from enforcing as a full recourse obligation (and retaining the proceeds thereof) any obligation under this Agreement or any other Loan Document that is expressed as being an obligation of any entity other than the Borrower.

SECTION 12.11.  Consent to Jurisdiction.  (a)  The Borrower, on behalf of itself and its successors and assigns and in respect of its property, hereby irrevocably agrees, to the fullest extent it may do so under law, in the event it files any action, one effect of which could be to halt, enjoin, impair or hinder the enforcement of the parties' obligations hereunder or under the other Loan Documents, or proceedings to enforce collection on those obligations, including, but not limited to, any proceeding under the United States Bankruptcy Code, to file such action, and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined, in the United States District Court for the Southern District of New York sitting in New York City or in such District's Bankruptcy Court, as applicable, assuming venue in that District would be proper, or in or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County, and any appellate court from any thereof.  The Borrower, on behalf of itself and its successors and assigns, hereby irrevocably waives, to the fullest extent it may do so under law, the defense of an inconvenient forum to such action or proceeding.  To the fullest extent

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.



102

permitted by applicable Law, the Borrower, on behalf of itself and its successors and assigns, hereby irrevocably agrees to elect in favor of filing in or transferring to the United States District Court for the Southern District of New York, assuming that venue in such district would otherwise be proper, to the extent it has any control over the choice of a district for the filing or transfer of a case under the United States Bankruptcy Code for any of its Affiliates as debtor. In the event an Affiliate of the Borrower or Enron or any of its Affiliates is the subject of a separate case under the United States Bankruptcy Code, in a court other than the Bankruptcy Court for the Southern District of New York, the Borrower, on behalf of itself and its successors and assigns, hereby irrevocably agrees to the fullest extent permitted by applicable Law to seek a transfer to the latter district, assuming venue in such district would otherwise be proper. In the event that a bankruptcy court enters a motion to consolidate multiple cases filed by the Borrower or any of its Affiliates or Enron or any of its Affiliates, the Borrower also agrees to the fullest extent permitted by applicable Law to seek a transfer of the consolidated case to the latter district, assuming venue in such district would otherwise be proper. The execution of this Agreement is expressly conditioned on the willingness and intention of the Borrower to enforce the provisions of this Section 12.11. In addition, the Borrower warrants that it is subject to no preexisting obligations that would interfere with its adherence to the foregoing provisions of this Section 12.11 and additionally warrants that it will not enter into other agreements that in any way compromise its ability to adhere to these provisions without the express written consent of the Lender and the Majority Committed Lenders.

     (b)    Any legal action or proceeding with respect to this Agreement or any other Loan Document may be brought in the courts of the State of New York located in the County of New York or of the United States for the Southern District of New York, and, by execution and delivery of this Agreement, the Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of the Agent, the Collateral Agent, the Lender or the Committed Lenders to bring any legal action or proceeding with respect to this Agreement or any other Loan Document against the Borrower in the courts of any other jurisdiction. To the fullest extent permitted by applicable Law, the Borrower hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Loan Document brought in the courts referred to in subsection (a) of this Section 12.11 and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

     (c)    The Borrower hereby irrevocably appoints C T Corporation System with offices on the date hereof at 111 Eighth Avenue, 13th Floor, New York, NY 10011 (or any successor appointed by the Borrower Managing Member, provided that such successor shall be located in New York City and engaged in the business of acting as a process agent and shall be a company of national recognition, and provided further that notice of such successor agent shall be promptly given

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement


EC21020A0090831

103

to the Collateral Agent and the Agent by such Borrower Managing Member, the "Process Agent") as its designee, appointee and agent to receive, accept and acknowledge on its behalf and its property service of copies of the summons and complaint and any other process that may be served in any action or proceeding under subsection (a) or (b) of this Section 12.11. Such service may be made by delivering a copy of such process to the Borrower in care of the Process Agent at the Process Agent's address, and the Borrower hereby authorizes and directs the Process Agent to accept such service on its behalf. As an alternative method of service, the Borrower also irrevocably consents to the service of any and all process in any such action or proceeding by the delivering of copies of such process to the Borrower at its address specified in Section 12.02 hereof. To the fullest extent permitted by applicable Law, the Borrower agrees that a non-appealable final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

SECTION 12.12.  Confidentiality.  Except to the extent permitted by another confidentiality agreement entered into in connection herewith, each of the Agent, the Collateral Agent, the APA Agent, the Purchasers, the Committed Lenders and the Lender agrees that it shall not to disclose without the prior consent of the Borrower (other than to its Affiliates in the ordinary course of business in connection with any Loan Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another party to any Loan Document to the extent that such party is the Agent, the Collateral Agent, the APA Agent, the Committed Lenders, the Purchasers or the Lender if the disclosing party or the disclosing party's holding or parent company in its sole discretion determines that any such other party should have access to such information) any Confidential Information, provided that each of the Agent, the Collateral Agent, the APA Agent, the Purchasers, the Committed Lenders and the Lender may disclose any such information (a) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such party or to the Board of Governors of the Federal Reserve System or the Federal Deposit Insurance Corporation or similar regulatory organizations (whether in the United States or elsewhere), (b) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, and (c) in order to comply with any law, order, regulation or ruling applicable to any such party.

SECTION 12.13.  Headings.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect any of the terms hereof.

SECTION 12.14. WAIVER OF JURY TRIAL.  THE BORROWER, THE AGENT, THE COLLATERAL AGENT, THE COMMITTED LENDERS AND THE LENDER EACH HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS,

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement

EC21020A0090832

104

THE ADVANCE OR THE ACTIONS OF THE AGENT, THE COLLATERAL AGENT OR THE LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 12.15. CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT NOR ANY INDEMNITOR BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT NOR ANY INDEMNIFIED PERSON, IRRESPECTIVE OF WHETHER ALLEGED TO BE BY WAY OF INDEMNITY OR AS A RESULT OF BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL THEORY, AND WHETHER ARISING BEFORE OR AFTER THE COLLECTION DATE, FOR DAMAGES THAT CONSTITUTE PUNITIVE, EXEMPLARY, INCIDENTAL, SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

This document is subject to
a written Confidentiality Agreement.



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

NAHANNI INVESTORS L.L.C.

By:     MacKenzie River Investors, LLC,
        its Managing Member

By:     CRESCENT/MACH 1 Partners, L.P.
        as its Sole Member

By:     TCW Asset Management Company
        as its Investment Manager

By:     _____
        Name: Jonathan R. Insull
        Title: Vice President

This document is subject to
a written Confidentiality Agreement

EC21020A0090834

CITICORP NORTH AMERICA, INC.,
as Agent and as Collateral Agent

By: _____

Name:

Title:
            **BRAN A. RASKOVIC**
            **VICE PRESIDENT**

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090P35

Initial Lender

CXC INCORPORATED

By:  Citicorp North America, Inc.,
     its Attorney-in-Fact


By:_____ _____
    Name:
    Title:        BRAN. A RASKOVIC
                  VICE PRESIDENT

This document is subject to
a written Confidentiality Agreement.

EC21020A0090836

**Commitment**

$485,000,000

**Initial Committed Lender**

CITIBANK, N.A.

By: _____

Name:
Title:    BRIAN A RASKOVIC
          VICE PRESIDENT

NYDOCS03/494722
Nahanni Credit Agreement

This document is subject to
a written Confidentiality Agreement.

EC21020A0090837

# Document Excerpted to Reduce Bulk