# MARENGO, L.P.

---

## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

### DATED AS OF

### DECEMBER 17, 1999

---

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090351

TABLE OF CONTENTS

Page

## SECTION 1

### DEFINED TERMS; RULES OF CONSTRUCTION

1.1. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2. Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.3. Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.4. No Presumption Against Any Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.5. Use of Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.6. Headings and References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## SECTION 2

### ORGANIZATIONAL MATTERS

2.1. Continuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.2. Marengo Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.3. Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.4. Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.5. Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.6. Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.7. Principal Place of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.8. Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.9. Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.10. Agent for Service of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.11. Filings; Cancellation Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.12. Compensation and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.13. Independent Activities; Transactions with Affiliates . . . . . . . . . . . . . . . . . 5
2.14. Title to Marengo Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.15. Payments of Individual Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.16. Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.17. Liability to Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.18. Admission of New Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.19. No Withholding Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.20. Covenant of Each of the Marengo Partners . . . . . . . . . . . . . . . . . . . . . . . . 11
2.21. Equity Investment Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
2.22. Revision of Contributed Value of Contributed Investment. . . . . . . . . . . . . 15
2.23. Proceeds from Yukon Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

EC21020A0090352

ii

Page

## SECTION 3

## MARENGO PARTNERS

| | | |
|---|---|---|
| 3.1. | Rights of Marengo Partners | 15 |
| 3.2. | Marengo Partnership Interests | 15 |
| 3.3. | Additional Covenants of General Partner | 16 |
| 3.4. | Marengo Limited Partner | 16 |
| 3.5. | Meetings of the Marengo Partners | 17 |
| 3.6. | Partition | 18 |
| 3.7. | Covenant Not to Dissolve | 18 |
| 3.8. | Termination of Status as Marengo Partner | 18 |

## SECTION 4

## MANAGEMENT

| | | |
|---|---|---|
| 4.1. | Management of Marengo and the Marengo Subsidiaries | 19 |
| 4.2. | Reliance by Third Parties | 22 |
| 4.3. | Restrictions on Authority | 22 |
| 4.4. | Separate Identity and Operations | 26 |
| 4.5. | Compliance with Agreement | 26 |
| 4.6. | No Employees | 26 |
| 4.7. | Affiliate Transactions | 26 |
| 4.8. | Required Actions | 27 |
| 4.9. | Compliance with Laws | 27 |
| 4.10. | Marengo Custodian, Klondike Custodian and Yukon Custodian | 27 |
| 4.11. | Additional Financing Costs, Transaction Costs and Liquidation Amounts | 28 |
| 4.12. | Disposition and Distribution of Contributed Investments, Debt Securities or Enron Demand Loans | 28 |
| 4.13. | Payment Instructions. | 30 |
| 4.14. | Contributed Investments. | 30 |
| 4.15. | The Marengo Portfolio Manager | 30 |
| 4.16. | Substitution of Contributed Investment | 32 |
| 4.17. | Disposition of Contributed Investments to Enron and its Affiliates | 32 |
| 4.18. | Disposition of Amounts in Marengo Operating Account | 33 |
| 4.19. | Contribution of Marengo Property Held By Marengo | 33 |
| 4.20. | Marengo Property held by Marengo | 33 |

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090353

iii

Page

## SECTION 5

### PARTNERSHIP CAPITAL

| | | |
|---|---|---|
| 5.1. | Capital Accounts | 34 |
| 5.2. | Closing Date Contribution by the Marengo Partners | 35 |
| 5.3. | Additional Capital Contributions | 35 |
| 5.4. | Mandatory Capital Contributions | 37 |
| 5.5. | No Withdrawal of Capital | 38 |
| 5.6. | No Return on Capital | 38 |
| 5.7 | Contribution of Capital Contributions Received by Marengo | 38 |

## SECTION 6

### ALLOCATIONS

| | | |
|---|---|---|
| 6.1. | Allocations Generally | 38 |
| 6.2. | Losses | 38 |
| 6.3. | Profits | 39 |
| 6.4. | Special Allocations | 39 |
| 6.5 | Timing of Allocations | 40 |
| 6.6. | Contributed Property | 40 |
| 6.7. | Other Allocation Rules | 40 |

## SECTION 7

### GUARANTEED PAYMENTS, DISTRIBUTIONS AND RETIREMENTS

| | | |
|---|---|---|
| 7.1. | Guaranteed Payments | 40 |
| 7.2. | Distributions | 41 |
| 7.3. | Admission and Withdrawal of Marengo Limited Partner | 42 |
| 7.4. | Making of Payments, Etc. | 43 |
| 7.5. | Payment Reports | 43 |
| 7.6. | Determination of the Preferred Payment | 43 |
| 7.7. | Retirement of Marengo Limited Partnership Interest | 44 |

## SECTION 8

### ACCOUNTING; BOOKS AND RECORDS; REPORTS

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090354

iv

                                                                                           Page

8.1.    Accounting; Books and Records .................................... 45
8.2.    Tax Matters .................................................... 46


                            SECTION 9

              REPORTS AND INFORMATION; ENRON DEMAND LOANS

9.1.    Periodic Reporting .............................................. 47
9.2.    Notices ........................................................ 48
9.3.    Payment Identification .......................................... 48
9.4.    Accounts ....................................................... 48
9.5.    Enron Demand Loans ............................................ 50


                           SECTION 10

                TRANSFERS OF PARTNERSHIP INTERESTS

10.1.   Restriction on Transfers ......................................... 50
10.2.   Permitted Transfer — Limited Partner ............................ 50
10.3.   Conditions to Permitted Transfers ................................ 51
10.4.   Pledge of Marengo Limited Partnership Interest; Foreclosure Transfers ...... 52
10.5.   Prohibited Transfers ............................................ 53
10.6.   Rights of Unadmitted Assignees .................................. 53
10.7.   Admission as Substituted Partners ................................ 53
10.8.   Distributions with Respect to Transferred Marengo Partnership Interests ..... 54


                           SECTION 11

                       POWER OF ATTORNEY

11.1.   Attorney-in-Fact ............................................... 55
11.2.   Nature of Special Power ......................................... 56


                           SECTION 12

                  DISSOLUTION AND WINDING UP

12.1.   Liquidation .................................................... 56
12.2.   Winding Up .................................................... 56
12.3.   No Restoration of Deficit Capital Accounts ........................ 58

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090355

| 12.4. | No Constructive Liquidation | 58 |
| 12.5. | Rights of Marengo Partners | 58 |
| 12.6. | Occurrence of Liquidating Event | 58 |
| 12.7. | Allocations and Distributions During Period of Liquidation | 59 |
| 12.8. | Character of Liquidating Distributions | 59 |
| 12.9. | Liquidation Procedures | 59 |
| 12.10. | Form of Liquidating Distributions to Partners | 59 |

## SECTION 13

## INDEMNIFICATION AND CERTAIN LIMITATIONS ON DAMAGES

| 13.1. | Indemnification of the Marengo Partners | 59 |
| 13.2. | Indemnification for Business Qualification Requirements | 60 |
| 13.3. | Marengo Portfolio Manager and Sales Agent Indemnification | 61 |
| 13.4. | Survival of Indemnification Obligations | 61 |
| 13.5. | Limitations on Indemnification Obligations | 61 |
| 13.6. | Payments; No Reduction of Capital Account | 62 |
| 13.7. | Procedural Requirements | 63 |
| 13.8. | Consequential Damages | 64 |

## SECTION 14

## MISCELLANEOUS

| 14.1. | Notices | 64 |
| 14.2. | Binding Effect | 65 |
| 14.3. | Severability | 65 |
| 14.4 | Set-Off | 65 |
| 14.5. | Construction | 65 |
| 14.6. | Governing Law | 66 |
| 14.7. | Counterpart Execution | 66 |
| 14.8. | Specific Performance | 66 |
| 14.9. | Amendments | 66 |
| 14.10. | Waiver of Jury Trial | 66 |
| 14.11. | Consent to Jurisdiction and Service of Process | 66 |

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT


EC21020A0090356

vi

Schedule I       Acceptable Letter of Credit Providers
Schedule II      Required Principal Amount
Schedule 2.16   Description of Contributed Investment
Schedule 2.14   Covenants Relating to the Underlying Businesses
Schedule 5.2    Debt Securities


Exhibit A        Definitions
Exhibit B        Form of Transferee Certificate
Exhibit C        Form of Transferor Certificate
Exhibit D        Form of Confidentiality Agreement
Exhibit E        Compliance Certificate
Exhibit F        Form of Operating Report
Exhibit G        Notice of Capital Contribution
Exhibit H-1      Form of Enron Demand Note (Enron)
Exhibit H-2      Form of Enron Demand Note (Enron Affiliate)
Exhibit H-3      Form of Qualified Enron Demand Note
Exhibit I        Form of Letter of Credit

EC21020A0090357

# MARENGO, L.P.
## AMENDED AND RESTATED LIMITED
## PARTNERSHIP AGREEMENT

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF MARENGO, L.P. (*"Marengo"*) dated as of December 17, 1999, by and among Marengo, Yellowknife Investors, Inc., a Delaware corporation (*"Yellowknife"*), ENRON CORP., an Oregon corporation (*"Enron"*), and NAHANNI INVESTORS L.L.C., a Delaware limited liability company (*"Nahanni"*).

## PRELIMINARY STATEMENTS

A.     Marengo was formed as a Delaware limited partnership on December 17, 1999 under the name "Marengo Assets, L.P.", with Yellowknife as the Initial Marengo General Partner and Enron as the Initial Marengo Limited Partner pursuant to the Original Marengo Partnership Agreement.

B.     The parties to this Agreement desire that (i) the Original Marengo Partnership Agreement be amended and restated in its entirety as set forth in this Amended and Restated Limited Partnership Agreement (this *"Agreement"*) and (ii) Marengo continue on the terms set forth in this Agreement.

In consideration of the premises and intending to be legally bound by this Agreement, the parties hereby amend and restate the Original Marengo Partnership Agreement and agree as follows:

## SECTION 1

## DEFINED TERMS: RULES OF CONSTRUCTION

1.1.     Definitions.  As used in this Agreement, capitalized terms defined in the preamble, Preliminary Statements and other Sections of this Agreement shall have the meanings set forth therein, and terms defined in Exhibit A shall have the meanings set forth therein.

1.2.     Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word *"from"* means "from and including" and the words *"to"*, *"through"* and *"until"* mean "to but excluding".

1.3.     Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP applied consistently, except with respect to Capital Accounts

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090358

2

and items entering into the computation of Capital Accounts, and except to the extent otherwise specified in the terms hereof.

1.4.    <u>No Presumption Against Any Party</u>.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any particular party, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

1.5.    <u>Use of Certain Terms</u>.  Unless the context of this Agreement requires otherwise, the plural includes the singular, the singular includes the plural, and "*including*" has the inclusive meaning of "including without limitation".  The words "*hereof*", "*herein*", "*hereby*", "*hereunder*", and other similar terms of this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

1.6.    <u>Headings and References</u>.  Section and other headings are for reference only, and shall not affect the interpretation or meaning of any provision of or to this Agreement.  Unless otherwise provided, references to Articles, Sections, Schedules, and Exhibits shall be deemed references to Articles, Sections, Schedules, and Exhibits of or to this Agreement.  References in this Agreement and in Exhibit A to this Agreement and to any other Operative Document or any other agreement include this Agreement and the other Operative Documents and agreements as the same may be modified, amended, restated or supplemented from time to time pursuant to the provisions hereof or thereof as permitted by the Operative Documents, in each case whether or not so stated.  A reference to, including any definition of, any Law shall mean that Law as it may be amended, modified or supplemented from time to time, and any successor Law.  A reference to a Person includes the successors and assigns of such Person, but such reference shall not increase, decrease or otherwise modify in any way the provisions in this Agreement or any other Operative Document governing the assignment of rights and obligations under or the binding effect of any provision of this Agreement or any other Operative Document.

SECTION 2

<u>ORGANIZATIONAL MATTERS</u>

2.1.    <u>Continuation</u>.  Marengo shall continue as a limited partnership under the Act upon the terms and conditions in this Agreement.

2.2.    <u>Marengo Partners</u>.  Simultaneously with the execution of, and pursuant to, this Agreement, (a) Yellowknife in its capacity as the Initial Marengo General Partner shall remain the

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090359

3

sole general partner of Marengo and in such capacity shall continue and be referred to as the "*Marengo General Partner*", (b) Nahanni is admitted as a Marengo Limited Partner, and (c) immediately thereafter, ENA, in its capacity as the Initial Marengo Limited Partner, withdraws from Marengo. The names and addresses of the Marengo Partners as of the date hereof are as follows:

| | |
|---|---|
| Marengo General Partner | Yellowknife Investors, Inc.<br>c/o Enron Corp.<br>1400 Smith Street<br>Houston, TX 77002<br>Attention: Senior Vice President and Secretary<br>Facsimile No.: 713-646-4990 |
| Marengo Limited Partner | Nahanni Investors L.L.C.<br>c/o Wilmington Trust Company<br>1100 North Market Street<br>Rodney Square North<br>Wilmington, DE 19890<br>Attention: Corporate Trust Department, Ann Roberts<br>Facsimile No.: 302-651-8882 |

and with a copy to:

Citibank, N.A.
399 Park Avenue, 6th Floor
New York, NY 10043
Attention: Elliot Conway, Managing Director, Capital Structuring
Facsimile No.: 212-751-9731

and with a copy to:

Citibank, N.A.
1200 Smith Street
Suite 2000
Houston, TX 77002
Attention: James Reilly, Relationship Manager, Enron Corp.
Facsimile No.: 713-654-2849

2.3.    Agreement. This Agreement completely amends, restates and supersedes the Original Marengo Partnership Agreement.

2.4.    Name. On the date hereof, the name of Marengo shall be changed to "*Marengo, L.P.*" and all business of Marengo shall be conducted in such name.

THIS AGREEMENT IS SUBJECT TO<br>A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090360

4

2.5.   Powers.  Marengo shall possess and may exercise all of the powers and privileges granted by the Act or by any other Law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the permitted business purposes or activities of Marengo.

2.6.   Purpose.  The purposes of Marengo are to (a) hold, manage, protect and conserve, and cause Klondike to hold, manage, protect and conserve, the Contributed Investments, (b) make, and cause to be made, Dispositions of Marengo Property in accordance with the terms of this Agreement, (c) invest in, make, acquire, hold, manage, protect and conserve Permitted Assets and cause the Marengo Subsidiaries to invest in, make, acquire, hold, manage, protect and conserve Permitted Assets, (d) enter into, and cause each Marengo Subsidiary to enter into, the Operative Documents to which it is a party and exercise, and cause each Marengo Subsidiary to exercise, its rights and perform its obligations thereunder, (e) establish and hold, and cause the Marengo Subsidiaries to establish and hold, the accounts contemplated by the Operative Documents, (f) engage, and cause the Marengo Subsidiaries to engage, in such additional business activities as are permitted under this Agreement or otherwise as the Marengo Partners may unanimously agree in writing, and (g) engage, and cause the Marengo Subsidiaries to engage,  in activities related or incidental to the foregoing and necessary or appropriate therefor as permitted by this Agreement.

2.7.   Principal Place of Business.  The principal place of business of Marengo shall be c/o Enron Corp., 1400 Smith Street, Houston, Texas 77002, Attention:  Vice President and Secretary. The Marengo General Partner may not change the principal place of business of Marengo to any other place without the prior written consent of the Marengo Limited Partner, such consent not to be unreasonably withheld; provided that in any event (i) such location shall be within the United States and within a state that permits the qualification as a foreign limited partnership of a limited partnership organized under the Laws of the State of Delaware, and (ii) Marengo is duly qualified to do business under the applicable Laws of such state. The registered office of Marengo in the State of Delaware is located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

2.8.   Term.  The term of Marengo commenced on the date its certificate of limited partnership was filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of Marengo and its business is completed following a Liquidating Event, as provided in Section 12.

2.9.   Fiscal Year.  The fiscal year of Marengo for financial statement and Federal income tax purposes shall be the same and shall end on December 31 of each year, except as may be required by the Code.

2.10.   Agent for Service of Process.  The registered agent for service of process on Marengo in the State of Delaware shall be The Corporation Trust Company, Corporation Trust

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090361

5

Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 or any successor as appointed by the Marengo General Partner in accordance with the Act.

2.11.   Filings; Cancellation Certificates.   (a) The Marengo General Partner has caused the certificate of limited partnership for Marengo to be filed in the office of the Secretary of State of the State of Delaware in accordance with the provisions of the Act. On the date hereof the Marengo General Partner shall cause the certificate of limited partnership of Marengo to be amended to change the name to "Marengo, L.P." in accordance with the provisions of the Act. The Marengo General Partner shall take any action and all other actions reasonably necessary to perfect and maintain the status of Marengo as a limited partnership under the Laws of the State of Delaware. The Marengo General Partner shall cause amendments to the certificate of limited partnership to be filed whenever required by the Act. Such amendments may be executed by the Marengo General Partner and by each Person designated in the amendment as a new Marengo General Partner.

(b)     Upon the dissolution and completion of the winding up of Marengo, the Marengo General Partner (or, if any Marengo Portfolio Manager has been appointed, such Marengo Portfolio Manager) shall promptly execute and cause to be filed certificates of cancellation in accordance with the Act and the Laws of any other states or other jurisdictions in which the Marengo General Partner or such Marengo Portfolio Manager, as the case may be, deems such filing necessary or advisable.

2.12.   Compensation and Expenses.   Except as otherwise expressly provided in this Agreement, no Marengo Partner or Affiliate of any Marengo Partner shall receive any salary, fee, or draw for services rendered to or on behalf of Marengo or otherwise in its capacity as a Marengo Partner, nor shall any Marengo Partner or Affiliate of any Marengo Partner be reimbursed by Marengo for any expenses incurred by such Marengo Partner or Affiliate on behalf of Marengo or otherwise in its capacity as a Marengo Partner, except as otherwise contemplated by this Agreement and the other Operative Documents.

2.13.   Independent Activities; Transactions with Affiliates.   (a) The Marengo General Partner and any of the officers and directors of Yellowknife shall be required to devote only such time to the affairs of Marengo as the Marengo General Partner determines in its reasonable discretion may be necessary to manage and operate Marengo, and each such Person shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its discretion.

(b)     Other Activities.   Each Marengo Partner acknowledges that the Affiliates of the other Marengo Partners are free to engage or invest in an unlimited number of activities or businesses, any one or more of which may be related to the activities or businesses of Marengo, without having or incurring any obligation to offer any interest in such activities or businesses to Marengo or any Marengo Partner, and neither this Agreement nor any activity undertaken pursuant to this Agreement shall prevent any such Affiliate of any such Marengo Partner from engaging in such activities, or require any Marengo Partner to permit Marengo or any such Affiliate of any such

EC21020A0090362

6

Marengo Partner to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Marengo Partner, each Marengo Partner hereby waives, relinquishes, and renounces any such right or claim of participation.

2.14.  <u>Title to Marengo Property</u>. All Marengo Property shall be owned by Marengo or by a Marengo Subsidiary, in each case, as an entity, and no Marengo Partner shall have any ownership interest in such property in its individual name or right. Each Marengo Partner's interest in Marengo shall be personal property for all purposes. Marengo shall hold all of the Marengo Property owned by Marengo in the name of Marengo or the name of the Marengo Custodian (on behalf of Marengo) and not in the name of any Marengo Partner.

2.15.  <u>Payments of Individual Obligations</u>. The credit and assets of the Marengo Parties shall be used solely for the benefit of such Marengo Parties, and no asset of the Marengo Parties shall be transferred or encumbered for or in payment of any individual obligation of any Marengo Partner.

2.16.  <u>Representations and Warranties</u>. As of the Closing Date, the date of each Notice of Capital Contribution, each Capital Contribution Date and as of the Syndication Date, each Marengo Partner hereby makes the representations and warranties applicable to such Marengo Partner as set forth in this Section as follows, and all of such representations and warranties shall survive the execution of this Agreement:

(a)  <u>Representations and Warranties of Yellowknife</u>. (i) <u>Due Formation/Incorporation</u>. The Underlying Business and each of the Marengo Subsidiaries:

(A)  are duly formed or incorporated, as the case may be, validly existing and (to the extent the concept is meaningful under Applicable Law) in good standing under the laws of the jurisdiction of their respective formation or incorporation, as the case may be; and

(B)  have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted.

(ii)  <u>Marengo Limited Partner</u>. No consent of any other Person and no Governmental Approval is required for the exercise by the Marengo Limited Partner of its rights and remedies under this Agreement.

(iii)  <u>Investment Company Act; Public Utility Holding Company Act</u>. The Underlying Business is not an "*investment company*" within the meaning of the Investment Company Act. The Underlying Business is not subject to, or is exempt from, regulation as a "*holding company*" or a "*subsidiary company*" of a "*holding company*", an "*affiliate*" of a

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090363

7

"*holding company*", or an "*affiliate*" of a "*subsidiary company*" or a "*holding company*", in each case within the meaning of the Public Utility Holding Company Act of 1935.

(iv)   No Event. No Incipient Event, Liquidating Event, Termination Event or Notice Event has occurred and is continuing.

(v)   Permitted Assets. After giving effect to the transactions contemplated by the Operative Documents on the Closing Date and as of each other date that these representations and warranties are made:

(A)   Marengo and the Marengo Subsidiaries have good and valid title to, and are the beneficial and record owners of, the Permitted Assets, free and clear of all Liens other than Permitted Liens.

(B)   Marengo has no Investment in any Person and otherwise holds no assets, other than (i) Marengo's member interests in the Marengo Subsidiaries and (ii) amounts from time to time standing to the credit of the Marengo Accounts, and the Marengo Subsidiaries have no Investments in any Person and otherwise hold no assets, other than, in each case, Permitted Assets.

(C)   Schedule 2.16 (as supplemented by any notice delivered pursuant to Section 4.16(d)) accurately describes the Equity Interests comprising each Contributed Investment and each Underlying Business relating to each Contributed Investment. Each such Equity Interest has been duly authorized and validly issued by the issuer thereof. Each such Equity Interest is fully paid and nonassessable, except as otherwise described on Schedule 2.16.

(D)   Marengo, each Marengo Subsidiary and each Underlying Business has filed and paid, or caused to be filed and paid, on a timely basis all tax returns and Taxes (whether gains Taxes, transfer Taxes, recording fees or Taxes and all other Taxes) due and owing and such other tax returns and Taxes that arise in connection with the transactions contemplated by the Operative Documents on the Closing Date, but excluding any Taxes the non-timely filing or payment of which, in the context of the Operative Documents, the transactions contemplated thereby and the rights and remedies of the respective parties thereto, could not reasonably be expected to have a Material Adverse Effect.

(E)   Marengo, each Marengo Subsidiary and each Underlying Business is in compliance with all Laws (other than Environmental Laws) and all licensing requirements (other than Environmental Permits) of all Governmental Authorities the violation of which could reasonably be expected to have a Material Adverse Effect, and neither Marengo, nor the Marengo Subsidiaries, nor any Underlying Business is

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090364

8

the subject of any outstanding or, to the best of Yellowknife's knowledge, threatened citation, order, or investigation by any Governmental Authority that could reasonably be expected to have a Material Adverse Effect, and no such citation, order or investigation, to the best knowledge of Yellowknife, is contemplated by any Governmental Authority.

(F)    The operations and properties of Marengo, the Marengo Subsidiaries, Yellowknife and each Underlying Business comply in all material respects with all Environmental Laws, all Environmental Permits that are necessary to the conduct of the business of such Person have been obtained and are in effect for the operations and the properties of Marengo, the Marengo Subsidiaries, Yellowknife and each Underlying Business and no circumstances exist that could be reasonably likely to (A) form the basis of an Environmental Action against Marengo, the Marengo Subsidiaries, Yellowknife or such Underlying Business or any of their respective properties that could have a Material Adverse Effect or (B) cause any such property to be subject to any material restriction on ownership, occupancy, use or transferability under any Environmental Law.

(G)    Klondike is the legal and beneficial owner of each Contributed Investment.

(H)    Based upon Enron's internal valuation methodology and assumptions and qualifications the Marengo General Partner believes to be reasonable and appropriate in all material respects, the fair value of all Contributed Investments is at least equal to the Contributed Value of such Contributed Investments.

(I)    Each Contributed Investment is an Eligible Investment.

(vi)    ERISA. Marengo and the Marengo Subsidiaries have never maintained, contributed to or incurred or assumed any legal obligation with respect to any Plan or Multiemployer Plan.

(vii)    Tort Claims. Neither Yellowknife nor any natural person that is a Responsible Officer of Yellowknife has actual knowledge of any facts, circumstances, conditions or occurrences that could reasonably be anticipated to form the basis of any tort claim against Marengo or the Marengo Subsidiaries or with respect to any Marengo Property that individually or in the aggregate could have a Material Adverse Effect.

(viii)    Payments. Yellowknife, on behalf of Marengo, and Marengo, on behalf of the Marengo Subsidiaries, have instructed (A) each issuer of a Contributed Investment, Enron and each Affiliate of Enron to which an Enron Demand Loan has or will be made by Klondike that all payments due or to become due under or in connection with the Contributed

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090365

9

Investments and such Enron Demand Loan shall be made directly to the Klondike Operating Account, and (B) Enron that all payments due or to become due under or in connection with each Qualified Enron Demand Loan shall be made directly to the Yukon Operating Account.

(b)    <u>Representations and Warranties of Nahanni</u>.    (i)    <u>Due Formation; Authorization of Agreement</u>. Nahanni is duly formed, validly existing and in good standing as a limited liability company in each case under the Laws of the State of Delaware. Nahanni has all limited liability company powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted. Nahanni has the limited liability company power and authority required to execute and deliver this Agreement and the other Operative Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Nahanni of this Agreement and each other Operative Document to which it is a party have been duly authorized by all necessary limited liability company action. Each of this Agreement and the other Operative Documents to which Nahanni is a party constitutes the legal, valid and binding obligation of Nahanni and is enforceable against Nahanni in accordance with its terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity, whether considered in a proceeding in equity or at law.

(ii)    <u>No Conflict with Restrictions; No Default</u>. The execution, delivery and performance by Nahanni of each Operative Document to which it is a party do not (A) contravene, or constitute a default under, (1) any provision of law or regulation applicable to Nahanni, (2) the Organizational Documents of Nahanni, or (3) any judgment, injunction, order, decree or agreement binding upon Nahanni or (B) result in the creation or imposition of any Lien on any asset of Nahanni, except for Permitted Liens.

(iii)    <u>Governmental Authorizations</u>. The execution, delivery and performance by Nahanni of each Operative Document to which it is a party do not require, in respect of Nahanni, any action by or in respect of (including any license or permit), or filing with, any governmental body, agency or official, or any other Person, that has not been obtained or made and that is not in full force and effect, except for (A) actions or filings expressly required by Section 4(b) of the Purchase Option Agreement and filings required in the ordinary course of Nahanni's business, in each case that are to be performed or filed at a date after the date of the relevant Operative Document and (B) the filing of financing statements under the UCC in relevant jurisdictions permitted by the provisions of the Operative Documents to be performed or filed at a later date.

(iv)    <u>Litigation</u>. There are no actions, suits, proceedings or known investigations pending or, to the knowledge of Nahanni, threatened against or affecting Nahanni or any of its properties, assets, rights or businesses, in any court or before or by any governmental

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090366

10

department, board, agency or instrumentality, domestic or foreign, or any arbitrator. Nahanni has not received any currently effective notice of any default, and Nahanni is not in default, under any applicable order, writ, injunction, decree, permit, determination or award of any court, any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator.

(v)    Investment Company Act; Public Utility Holding Company Act. Nahanni is not an "*investment company*" within the meaning of the Investment Company Act. Nahanni is not subject to, or is exempt from, regulation as a "*holding company*" or a "*subsidiary company*" of a "*holding company*" within the meaning of the Public Utility Holding Company Act of 1935.

(c)    Investigation; Intent. (i) Each Marengo Partner is acquiring its Marengo Partnership Interest based upon its own investigation, and the exercise by such Marengo Partner of its rights and the performance by such Marengo Partner of its obligations under this Agreement will be based upon its own investigation, analysis and expertise, (ii) each Marengo Partner's acquisition of its Marengo Partnership Interest is being made for its own account for investment, and not with a view to the sale or distribution thereof, (iii) each Marengo Partner intends hereby to form a limited partnership for the purpose of making an economic profit from the transactions proposed to be entered into by Marengo, (iv) each Marengo Partner is an "accredited investor" as defined in the rules adopted pursuant to the Securities Act and a "qualified purchaser" as defined in the Investment Company Act and the rules adopted pursuant thereto and (v) each Marengo Partner has obtained from Marengo all such information as it has requested to evaluate its investment in Marengo.

2.17.    Liability to Third Parties. The debts, obligations and liabilities of Marengo, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of Marengo; and no Marengo Limited Partner shall be obligated personally for any such debt, obligation or liability of Marengo solely by reason of being a Marengo Limited Partner.

2.18.    Admission of New Partners. Subject to the restrictions and requirements set forth in Sections 4.3(p) and Section 10 of this Agreement, the Marengo General Partner may admit one or more new Marengo Partners. In no event shall Marengo have more than fifty Marengo Partners. For purposes of this provision, the number of Marengo Partners shall be determined in accordance with Treas. Reg. Section 1.7704-1.

2.19.    No Withholding Tax. Nahanni represents that neither it nor any Person who owns a direct or indirect interest in it and who may be treated for Federal tax purposes as a Marengo Limited Partner (or is attributed income from Marengo on a pass-through basis) is a nonresident alien individual, foreign partnership, foreign corporation or other foreign person with respect to whom (taking into account statutory or treaty exemptions) distributions, allocations or payments from Marengo are subject to withholding tax at a rate in excess of zero percent under Sections 1441,

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090367

11

1442, 1446 or any other provision of the Code imposing U.S. Federal tax withholding requirements upon distributions, allocations or payments by a partnership to a foreign person. Nahanni shall be deemed to make this representation each time Marengo either makes a payment to Nahanni, Marengo receives or accrues a payment any portion of which is allocated to Nahanni under Section 6 or Nahanni receives or accrues a payment from Marengo.

     2.20.   <u>Covenant of Each of the Marengo Partners</u>. Each Marengo Partner hereby covenants to each other Marengo Partner that such Marengo Partner will, in connection with any transaction, agreement or dealing with or relating to Marengo or any Marengo Subsidiary (collectively, the "*Marengo Parties*"), and the Marengo General Partner hereby covenants to each other Marengo Partner that the Marengo General Partner will cause the Marengo Parties to, comply (except for such noncompliance which, in the aggregate, is not material and it being understood that each Marengo Limited Partner covenants only as to itself) with the following undertakings:

     (i)    Such Marengo Partner and the Marengo Parties will maintain its books, financial records and accounts, including checking and other bank accounts and custodian and other securities safekeeping accounts, separate and distinct from those of the other Marengo Parties and each Marengo Partner, as the case may be.

     (ii)    Such Marengo Partner and each of the Marengo Parties will maintain its books, financial records and accounts (including inter-entity transaction accounts) in a manner so that it will not be difficult or costly to segregate, ascertain or otherwise identify its assets and liabilities separate and distinct from the assets and liabilities of the other Marengo Parties and each Marengo Partner, as the case may be.

     (iii)    Neither such Marengo Partner nor any Marengo Party will commingle any of its assets, funds, liabilities or business functions with the assets, funds, liabilities or business functions of the other Marengo Parties or any of the Marengo Partners, as the case may be.

     (iv)    Such Marengo Partner and each of the Marengo Parties will observe all requisite corporate or internal procedures and formalities, including the holding of periodic and special meetings of shareholders and boards of directors (or other governing body), the recordation and maintenance of minutes of such meetings, and the recordation and maintenance of resolutions adopted at such meetings.

     (v)    Such Marengo Partner will not be consensually merged or consolidated with any of the Marengo Parties, other than for financial reporting purposes. None of the Marengo Parties will be consensually merged or consolidated with Nahanni for any purpose.

     (vi)    Enron and each Marengo Partner that prepares consolidated financial statements will include in its consolidated financial statements footnotes that clearly disclose, among other things, the separate existence and identity of the Marengo Parties from Enron

Marengo Partnership Agreement
NYDOCS03/494571
THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090368

12

and its other Subsidiaries and such Marengo Partner, and that the Marengo Parties taken as a whole have separate assets and liabilities.

(vii)    All transactions, agreements and dealings between such Marengo Partner and the Marengo Parties and the Marengo Parties and any Marengo Partner, as the case may be (including transactions, agreements and dealings pursuant to which the assets or property of one is used or to be used by the other), will reflect the separate identity and legal existence of each entity.

(viii)    Transactions between the Marengo Parties on the one hand, and any third parties, on the other hand, will be conducted in the name of the applicable Marengo Party as an entity separate and distinct from such Marengo Partner.

(ix)    Except as otherwise specified in the Operative Documents, each of the Marengo Parties on the one hand, will pay its liabilities and losses from its assets, and such Marengo Partner on the other hand, will pay its liabilities and losses from its respective assets.

(x)    Representatives and agents of the Marengo Parties (whether or not they are "loaned" employees of any Marengo Partner) will, when purporting to act on behalf of any Marengo Party, hold themselves out to third parties as being representatives or agents, as the case may be, of such Marengo Party, and will utilize business cards, letterhead, purchase orders, invoices and the like of such Marengo Party.

(xi)    Each Marengo Party will compensate all consultants, independent contractors and agents from its own funds for services provided to it by such consultants, independent contractors and agents.

(xii)    To the extent that any Marengo Party on the one hand, and such Marengo Partner on the other hand, jointly contract or do business with vendors or service providers or share overhead expenses, the costs and expenses incurred in so doing will be fairly and nonarbitrarily allocated between or among such entities, with the result that each such entity bears its fair share of all such costs and expenses.  To the extent that any Marengo Party on the one hand, and such Marengo Partner on the other hand, contract or do business with vendors or service providers where the goods or services are wholly or partially for the benefit of the other, then the costs incurred in so doing will be fairly and nonarbitrarily allocated to the entity for whose benefit the goods or services are provided, with the result that each such entity bears its fair share of all such costs, except to the extent otherwise provided in the Operative Documents.

(xiii)    The Marengo Parties will have annual and quarterly financial statements prepared in accordance with GAAP, separate from any Marengo Partner.

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090369

13

(xiv)   Such Marengo Partner and the Marengo Parties will not make any inter-entity loans, advances, guarantees, extensions of credit or contributions of capital to, from or for the benefit of such Marengo Party or any Marengo Partner, as the case may be, without proper documentation and accounting in accordance with GAAP and only in accordance with the provisions of the Marengo Partnership Agreement or the Nahanni Company Agreement, as the case may be, and the other Operative Documents.

(xv)   The Marengo Parties will cause to be prepared and filed all legally required tax returns for itself (including federal and state income tax returns) separately from the tax returns of any Marengo Partner.

(xvi)   Such Marengo Partner will not refer to any Marengo Party and the Marengo Parties will not refer to any Marengo Partner, as the case may be, as a department or division of such Marengo Partner or any Marengo Party, as the case may be, and will not otherwise refer to the Marengo Parties and Marengo will not refer to any Marengo Partner, as the case may be, in a manner inconsistent with its status as a separate and distinct legal entity. In addition, Marengo will hold itself out as separate and distinct from each Marengo Partner.

2.21.   Equity Investment Requirements. (a) In General. Marengo and the Marengo Subsidiaries shall at all times maintain a portfolio of Permitted Assets in accordance with the requirements of this Section 2.21 ("*Equity Investment Requirements*" or "*EIR*").

(i)   Permitted Asset Requirement. All assets held by Marengo and the Marengo Subsidiaries must be Permitted Assets;

(ii)   Aggregate Asset Coverage Requirement. At the end of each Fiscal Quarter, after giving effect to any substitution of Permitted Assets and after giving effect to any other Disposition of Permitted Assets (including pursuant to Section 4.12), any Distribution pursuant to Section 7.2 (and the making of all payments required in connection therewith), and the making of any payments required to be made pursuant to Section 7.1(a), the EIR Asset Value of all Permitted Assets held by Marengo and the Marengo Subsidiaries shall be equal to at least 1.5 times the Marengo Limited Partner's Unrecovered Capital;

(iii)   Cash Equivalents and Debt Securities. (x) At the end of each Fiscal Quarter and (y) after giving effect to any Disposition of any Permitted Asset (including pursuant to Section 4.12), any Distribution pursuant to Section 7.2 (and the making of all payments required in connection therewith), and the making of any payments required to be made pursuant to Section 7.1(a), the EIR Asset Value of all Cash Equivalents (other than Debt Securities) held by Yukon, and Debt Securities then held by Yukon and Qualified Enron Demand Loans then held by Yukon shall be at least equal to the Marengo Limited Partner's Unrecovered Capital;

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090370

14

(iv)   Cash Flow Requirement.  At the end of each Fiscal Quarter, Permitted Assets Cash Flow for the four most recent Fiscal Quarters (or such lesser number of Fiscal Quarters elapsed since the Closing Date) must be equal to at least 1.25 times the sum of the Preferred Payments for the four most recent Fiscal Quarters (or such lesser number of Fiscal Quarters elapsed since the Closing Date); and

(v)   Enron Demand Loans.  (A) Klondike shall at all times hold Enron Demand Loans in an aggregate principal amount equal to or greater than the Required Principal Amount, and (B) the Yukon Custody Agreement shall provide that all Qualified Enron Demand Loans made or held by Yukon shall require the Yukon Custodian to cause all amounts payable under the Acceptable Letter of Credit issued in connection therewith to be paid by the applicable Acceptable Letter of Credit Provider on or before January 18, 2000.

(b)   Determination of EIR Asset Value.  For the purposes of Section 2.21(a)(ii), a value (the "*EIR Asset Value*") shall be determined pursuant to this Section 2.21(b) for each Permitted Asset held by Marengo and the Marengo Subsidiaries as follows:

(i)   Enron Demand Loans.  The Enron Demand Loans will be valued at par plus accrued but unpaid interest, except that, (A) if any payment default, after the expiration of any applicable grace periods (without giving effect to any extension or waiver thereof) shall have occurred and be continuing with respect to any Enron Demand Loan, or (B) any Bankruptcy of Enron shall have occurred, the EIR Asset Value of such Enron Demand Loan will be equal to zero.

(ii)   Cash Equivalents.  Cash Equivalents (other than Debt Securities) will be valued at their face value plus accrued but unpaid interest and less unamortized discount, if any, except that, if any payment default, after the expiration of any applicable grace periods (without giving effect to any extension or waiver thereof) shall have occurred and be continuing with respect to any Cash Equivalents, the EIR Asset Value of such Cash Equivalents will be equal to zero.

(iii)   Debt Securities.  Debt Securities will be valued using the bid price for such Debt Securities as quoted on Bloomberg page PX1 (or any successor page) on the date of determination, provided, however, that if there is no bid price quoted for such Debt Securities, such Debt Securities will be valued by the Marengo General Partner by reference to other relevant factors, including dealer price quotations, price activity for comparable instruments and valuation pricing models.

(iv)   Contributed Investments.  The Contributed Investments will be valued at the Contributed Value in effect immediately prior to the date of determination.

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090371

15

2.22.   Revision of Contributed Value of Contributed Investment. Yellowknife may (and shall upon the substitution of a Contributed Investment pursuant to Section 4.16 or any Disposition of a Contributed Investment pursuant to Section 4.12 ) revise the Contributed Value of the Contributed Investments by delivering notice to the Marengo Limited Partner of such revised Contributed Value, provided, however, that Yellowknife may not revise the Contributed Value of the Contributed Investments (x) more than once in any Fiscal Quarter, (y) if the ratios referred to in Section 2.21(a)(ii) and (iii) (before and immediately after giving effect to such revised value) would not be met, or (z) if a Notice Event, Incipient Event, Enron Event, Termination Event or Liquidating Event shall have occurred and shall be continuing.

2.23.   Proceeds from Yukon Accounts. Marengo will Distribute, and the Marengo General Partner will cause Marengo to Distribute, any funds received by Marengo from the Yukon Accounts, solely in accordance with Section 7.2 or 7.7 or, if applicable, Section 12.

## SECTION 3

## MARENGO PARTNERS

3.1.   Rights of Marengo Partners. The Marengo Partners shall have the rights and obligations provided in this Agreement and, to the extent consistent with this Agreement, the Act.

3.2.   Marengo Partnership Interests. There shall be two classes of Marengo Partnership Interests, each of which shall have the rights set forth below:

(a)   Marengo General Partnership Interest. The Marengo General Partner shall have the following rights under this Agreement (in addition to the other rights granted hereunder):

(i)   the right to receive Distributions and to share in the Profits and Losses of Marengo, all to the extent provided in this Agreement;

(ii)   the right to receive liquidating Distributions to the extent provided in Section 12; and

(iii)   the right to vote upon, approve or consent to actions of Marengo and each of the Marengo Subsidiaries and to participate in the management of Marengo and each of the Marengo Subsidiaries, all to the extent provided in this Agreement.

(b)   Marengo Limited Partnership Interest. The Marengo Limited Partner shall have the following rights under this Agreement (in addition to the other rights granted hereunder):

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090372

16

(i)    the right to receive Distributions and to share in the Profits and Losses of Marengo, all to the extent provided in this Agreement;

(ii)    the right to receive liquidating Distributions to the extent provided in Section 12;

(iii)    the right to vote upon, approve or consent to actions of Marengo, the Marengo Subsidiaries and the Marengo General Partner, all to the limited extent, but only to the limited extent, provided in this Agreement; provided, however, that none of the rights given to the Marengo Limited Partner pursuant to this Agreement shall be deemed to be participation in the control of the business of Marengo within the meaning of Section 17-303 of the Act, and this Agreement shall be interpreted consistently with this Section 3.2(b)(iii); and

(iv)    the right to appoint or remove the Marengo Portfolio Manager as provided in Section 12.9.

3.3.    **Additional Covenants of General Partner**. The Marengo General Partner hereby covenants and agrees not to transfer all or any portion of its Marengo General Partnership Interest. Further, the Marengo General Partner hereby covenants and agrees to continue to carry out the duties of the Marengo General Partner under this Agreement until Marengo is dissolved and liquidated pursuant to Section 12 hereof.

3.4.    **Marengo Limited Partner**. (a) **Rights or Powers**. The Marengo Limited Partner shall not have any right or power to take part in the management or control of Marengo or its business and affairs or to act for or bind Marengo in any way. Notwithstanding the foregoing, the Marengo Limited Partner shall have all of the rights and powers specifically set forth in this Agreement and, to the extent consistent with this Agreement, the Act. The existence and exercise of these rights and powers will not result in the Marengo Limited Partner being deemed to be participating in the control of the business of Marengo within the meaning of Section 17-303 of the Act or otherwise affect the limited liability of the Marengo Limited Partner.

(b)    **Voting Rights**. The Marengo Limited Partner shall have the right to vote only on those matters specifically reserved for its vote which are set forth in this Agreement.

(c)    **Marengo Limited Partner Liability**. The Marengo Limited Partner shall not be liable for the debts, liabilities, contracts or any other obligations of Marengo. Except as otherwise provided by mandatory provisions of applicable state law and except with respect to the obligation of the Marengo Limited Partner to return to Marengo a distribution made to the Marengo Limited Partner in violation of the Act at a time when the Marengo Limited Partner knew the distribution would violate the Act, the Marengo Limited Partner shall be liable only to make its Capital Contributions (to the extent required by, and in accordance with the provisions of, this Agreement)

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090373

17

and shall not be required to lend any funds to Marengo or, after its Capital Contributions have been made, to make any additional Capital Contributions to Marengo.

3.5.    Meetings of the Marengo Partners. (a) Notice. Meetings of the Marengo Partners shall be called upon the written request of any Marengo Partner. The call shall state the nature of the business to be transacted. Notice of any such meeting shall be given to all Marengo Partners not less than five Business Days nor more than 30 days prior to the date of such meeting. Marengo Partners may vote in person, by proxy or by telephone at such meeting.

(b)    Record Date. For the purpose of determining the Marengo Partners entitled to vote on, or to vote at, any meeting of the Marengo Partners or any adjournment thereof, the Marengo Partner requesting such meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than 30 days nor less than seven Business Days before any such meeting.

(c)    Proxy. Any Marengo Partner may authorize any Person or Persons to act for it by proxy on all matters in which such Marengo Partner is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by such Marengo Partner or its attorney-in-fact. No proxy shall be valid after the expiration of 11 months from the date thereof unless otherwise provided in the proxy. Every proxy given by a Marengo Partner shall be revocable at the pleasure of the Marengo Partner executing it unless otherwise expressly stated in such proxy.

(d)    Consents. The approval or consent of any Marengo Partner required under this Agreement may, except as expressly provided to the contrary in this Agreement, be given or withheld in the sole and absolute discretion of such Marengo Partner.

(e)    Conduct of Meeting. Each meeting of the Marengo Partners shall be conducted by the Marengo General Partner or such other Person as the Marengo General Partner may appoint pursuant to such rules for the conduct of the meeting as the Marengo General Partner or such other Person deems appropriate.

(f)    Consent in Lieu of Meeting. In the event the consent of any Marengo Partner is required for any action to be taken by Marengo, such consent may be given at a meeting, which may be conducted by conference telephone call, or provided in writing, executed by the Marengo Partner necessary to authorize such action at a meeting.

(g)    No Meeting Required for Certain Actions. Any action, consent or approval that by the terms of this Agreement may be taken by any class of Marengo Partner acting as a class or alone may be taken without the necessity of calling or holding a meeting of Marengo Partners.

Marengo Partnership Agreement
NYDOCS03/49457!                THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT



18

3.6. Partition. To the fullest extent permitted under Applicable Law, each Marengo Partner waives any and all rights that it may have to maintain an action for partition of Marengo's property.

3.7. Covenant Not to Dissolve. Except as otherwise permitted by this Agreement, to the fullest extent permitted under Applicable Law, each Marengo Partner hereby covenants and agrees not to (a) take any action to file a certificate of dissolution or its equivalent with respect to itself, (b) exercise any power under the Act to dissolve Marengo or (c) petition for judicial dissolution of Marengo.

3.8. Termination of Status as Marengo Partner. (a) Certain Events. A Person shall cease to be a Marengo Partner only upon the first to occur of:

(i) The Transfer of all of its Marengo Partnership Interest (other than by way of the imposition of a Permitted Lien); provided that the transferee of such Marengo Partnership Interest is admitted as a substituted Marengo Partner in accordance with this Agreement.

(ii) With respect to the Marengo General Partner, the happening of any of the events specified in Section 17-402 of the Act (which shall not relieve such Person from any liability under this Agreement, including liabilities for an unpermitted resignation).

(iii) The involuntary Transfer by operation of Law (other than by way of imposition of a Permitted Lien) of its Marengo Partnership Interest (which shall not relieve such Person from any liability under this Agreement, including liabilities for an unpermitted resignation).

(iv) The vote of the Marengo Partners required to approve a request by such Marengo Partner to withdraw pursuant to Section 3.8(b).

The happening of the foregoing events shall not cause a dissolution of Marengo except as provided in Section 12. Except to the extent specifically set forth herein, upon the termination of a Person's status as a Marengo Partner, such Person shall not be entitled to any Distributions from Marengo, including a Distribution based on the fair value of such Person's Marengo Partnership Interest.

(b) Withdrawal. No Marengo Partner may withdraw from Marengo, except (i) with the prior written consent of the Marengo Partners, (ii) as a consequence of a Permitted Transfer pursuant to which the Transferee is admitted as a Marengo Partner or (iii) pursuant to Sections 7.3 or 7.7 hereof.

(c) Continuing Obligations. Any debts, obligations, or liabilities in damages to Marengo of any Person who ceases to be a Marengo Partner shall be collectible by any legal means and Marengo is authorized, in addition to any other remedies at Law or in equity, to apply any

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090375

19

amounts otherwise distributable or payable by Marengo to such Person to satisfy such debts, obligations or liabilities.

(d)    Transferee. Except as otherwise provided in this Agreement, in the event a Person ceases to be a Marengo Partner without having Transferred all of its Marengo Partnership Interest in accordance with this Agreement (including upon removal or resignation), such transferee shall be treated as an unadmitted transferee of a Marengo Partnership Interest as a result of a Transfer (other than a Permitted Transfer) of a Marengo Partnership Interest pursuant to Section 10.6.

(e)    Removal. The Marengo General Partner may be removed by the Marengo Limited Partner only if the Marengo General Partner has (i) attempted to make a Transfer of its Marengo Partnership Interest that is not a Permitted Transfer, (ii) committed a material breach of this Agreement which has not been cured within thirty days after notice of such breach is given to the Marengo General Partner by the Marengo Limited Partner or (iii) the Marengo General Partner has been grossly negligent or has engaged in willful misconduct in managing or otherwise conducting the business and affairs of Marengo.

(f)    Continuing Obligations. If the Marengo General Partner ceases to be a Marengo Partner for any reason under this Agreement, it shall remain liable as a Marengo General Partner for all debts and obligations of Marengo existing at the time such Person ceases to be the Marengo General Partner, regardless of whether, at such time, such debts or liabilities were known or unknown, actual or contingent; provided, however, that this Section 3.8(f) shall not be construed as waiving any requirement that a judgment creditor of the Marengo General Partner first comply with the provisions of Section 17-403(d) of the Act before attempting to levy the assets of the Marengo General Partner. A Person shall not be liable as the Marengo General Partner for the debts and obligations of Marengo arising after such Person ceases to be the Marengo General Partner.

(g)    Status as Marengo Limited Partner. If at the time a Person ceases to be a Marengo General Partner, such Person is also a Marengo Limited Partner with respect to a Marengo Limited Partnership Interest, such cessation shall not affect such Person's rights and obligations with respect to such Marengo Limited Partnership Interest.

SECTION 4

MANAGEMENT

4.1.    Management of Marengo and the Marengo Subsidiaries. (a) Marengo General Partner. The management of Marengo shall be vested in the Marengo General Partner as general partner and except as otherwise provided in this Agreement such Marengo General Partner shall have full power and authority to manage the business and affairs of Marengo to the extent provided in the Act, and no other Marengo Partner shall have any such management power and

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090376

20

authority. The Marengo General Partner shall have all of the rights and powers which may be possessed by general partners under the Act. Except as otherwise provided in this Agreement and the other Operative Documents (including, without limitation, the Organizational Documents of each of the Marengo Subsidiaries), the management of each of the Marengo Subsidiaries shall be vested in the Marengo General Partner on behalf of Marengo as the sole member of each of the Marengo Subsidiaries and the Marengo General Partner shall have full power and authority to manage the affairs of each of the Marengo Subsidiaries on behalf of Marengo and no other Marengo Partner shall have any such management power and authority.

(b)     Authority of Marengo General Partner.  The Marengo General Partner shall have the authority on behalf and in the name of Marengo to perform all acts necessary and desirable to the objects and purposes of Marengo, subject only to the restrictions expressly set forth in this Agreement (including Section 4.3 and Section 4.8) and subject to the rights of the Marengo Portfolio Manager to liquidate Marengo and take all actions incidental thereto during the Liquidation Period and to the additional grants of power and authority expressly set forth herein. Subject to such restrictions, the authority of the Marengo General Partner shall include the authority to:

(i)     engage in transactions and dealings on behalf of Marengo and each of the Marengo Subsidiaries, including transactions and dealings with Marengo, the Marengo Subsidiaries, any Marengo Partner or any Affiliate of any Marengo Partner;

(ii)     call meetings of Marengo Partners or any class thereof;

(iii)     vote, or cause any Marengo Subsidiary to vote, any securities held by Marengo or such Marengo Subsidiary, as the case may be;

(iv)     make, or cause any Marengo Subsidiary to make, Investments in Permitted Assets;

(v)     determine and make Distributions, in cash or otherwise, on Marengo Partnership Interests in accordance with the provisions of this Agreement and the Act and cause each Marengo Subsidiary to do all things necessary or desirable to be done by such Marengo Subsidiary to enable Marengo to make such Distributions;

(vi)     appoint (and dismiss from appointment) officers, attorneys and agents on behalf of Marengo and the Marengo Subsidiaries, and engage (and dismiss from engagement) any and all Persons providing legal, accounting or financial services to Marengo and the Marengo Subsidiaries (including accountants and counsel to Enron and any of its Affiliates), or such other Persons as the Marengo General Partner deems necessary or desirable for the management and operation of Marengo and the Marengo Subsidiaries;

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090377

21

(vii)   incur and pay all expenses and obligations incidental to the operation and management of Marengo and the Marengo Subsidiaries;

(viii)   open accounts with each of the Custodians and delegate to each Custodian the duties of such Custodian set forth in the applicable Custody Agreement;

(ix)   subject to Section 12, effect a dissolution and winding up of Marengo and the Marengo Subsidiaries after the occurrence of a Liquidating Event;

(x)   bring and defend (or settle) on behalf of Marengo and the Marengo Subsidiaries actions and proceedings at law or equity before any court or governmental, administrative or other regulatory agency, body or commission or any arbitrator or otherwise;

(xi)   prepare or cause to be prepared reports, statements and other relevant information for distribution to the Marengo Partners as may be required by this Agreement or the Act and any additional information determined to be appropriate by the Marengo General Partner from time to time;

(xii)   execute and deliver on behalf of Marengo and each Marengo Subsidiary, and perform Marengo's and such Marengo Subsidiary's obligations under, any Operative Documents to which Marengo or such Marengo Subsidiary is a party, including any certificates and other documents and instruments related thereto;

(xiii)   prepare and file all necessary returns and statements and pay all taxes, assessments and other impositions applicable to the Marengo Property and the property of the Marengo Subsidiaries pursuant to Section 8.2;

(xiv)   dispose of, or cause the disposition of, Debt Securities in accordance with Section 4.12 of this Agreement and the other Operative Documents;

(xv)   cause Marengo to contribute any Marengo Property held by Marengo from time to time to any Marengo Subsidiary permitted to hold such Marengo Property and cause any Marengo Subsidiary to distribute, in accordance with the provisions of the Operative Documents, from time to time any Marengo Property held by such Marengo Subsidiary to Marengo; and

(xvi)   execute all other documents or instruments, perform all duties and powers and do all things for and on behalf of Marengo and the Marengo Subsidiaries in all matters necessary or desirable for or incidental to the foregoing.

22

4.2.    Reliance by Third Parties. Persons dealing with Marengo and the Marengo Subsidiaries are entitled to rely conclusively upon the power and authority of the Marengo General Partner set forth in this Agreement.

4.3.    Restrictions on Authority. The Marengo General Partner and the Marengo Subsidiaries shall not be authorized to take any of the actions set forth in this Section 4.3 without the prior written approval of the Marengo Limited Partner. The Marengo General Partner covenants and agrees that it shall not, and shall not cause or permit any Marengo Subsidiary to, without such approval:

(a)    Contravention. Do any act in contravention of this Agreement or any Marengo Subsidiary Company Agreement or, when acting on behalf of Marengo or any of the Marengo Subsidiaries, engage in activities other than those contemplated by Section 2.6 or any Marengo Subsidiary Company Agreement;

(b)    Impossibility. Do any act that would make it impossible to carry on the ordinary business of Marengo or any of the Marengo Subsidiaries, except as otherwise expressly provided in Section 12 of this Agreement;

(c)    Litigation, Etc. Confess a judgment against Marengo or any Marengo Subsidiary or settle on behalf of Marengo or any of the Marengo Subsidiaries actions and proceedings at law or in equity before any Governmental Authority or any arbitrator or otherwise (i) to which Enron, Yellowknife or any of their respective Affiliates is a party in opposition to Marengo or any Marengo Subsidiary or (ii) as a result of which it is reasonably likely that the rights, assets or interests of Marengo, any Marengo Subsidiary or the Marengo Partners as such would be adversely affected (other than, in the case of clause (ii), any such adverse effect on such rights, assets or interests with respect to the Contributed Investment that is the subject of any such actions and proceedings);

(d)    Possession of Marengo Property. Possess Marengo Property or assign rights in Marengo Property, for other than a Marengo purpose;

(e)    Liability. Perform any act that would cause, or knowingly fail to perform any act the failure to perform which would cause, the Marengo Limited Partner to be obligated personally for any debt, obligation or liability of Marengo or any of the Marengo Subsidiaries in any jurisdiction solely by reason of the Marengo Limited Partner being the Marengo Limited Partner;

(f)    Bankruptcy, Insolvency. Cause or permit Marengo or any Marengo Subsidiary voluntarily to take any action of the type referred to in the definition of *"Voluntary Bankruptcy"*;

23

(g)    Indebtedness. Cause or permit Marengo or any Marengo Subsidiary to incur, assume or obligate itself for any Indebtedness, except that Marengo and the Marengo Subsidiaries may enter into and incur obligations under the Operative Documents and accounts payable associated with Marengo Expenses and Marengo Subsidiary Expenses incurred in the ordinary course of business;

(h)    Custody Agreements. Direct any Custodian to (i) release any property from its custody under any Custody Agreement other than pursuant to the terms of such Custody Agreement or this Agreement, (ii) appoint a substitute Marengo Custodian, Klondike Custodian or Yukon Custodian or (iii) close any account established pursuant to any Custody Agreement except, in each case, to the extent such account is replaced with a new account under the applicable Custody Agreement;

(i)    Liens. Cause or permit Marengo or any Marengo Subsidiary to incur or suffer to exist any Liens on any of its assets, except for Permitted Liens;

(j)    Investments, Etc. (i) Cause or permit Marengo or Klondike to acquire by purchase or contribution or otherwise hold or maintain or become obligated to hold or maintain:

(A)    any assets other than Permitted Assets; and

(B)    any Cash Equivalent or Debt Security that is in default; provided that Marengo and Klondike may maintain any defaulted Cash Equivalent or Debt Security for a reasonable period after the occurrence of such default to Dispose of such Cash Equivalent or Debt Security in an orderly fashion or to diligently pursue collection or enforcement thereof;

(ii)    cause or permit Yukon to acquire by purchase or contribution or otherwise hold or maintain or become obligated to hold or maintain;

(A)    any assets other than Debt Securities, Cash Equivalents and, on and after December 27, 1999 and prior to January 24, 2000, Qualified Enron Demand Loans; and

(B)    any Cash Equivalent or Debt Security that is in default; provided that Yukon may maintain any defaulted Cash Equivalent or Debt Security for a reasonable period after the occurrence of such default to dispose of such Cash Equivalent or Debt Security in an orderly fashion or to diligently pursue collection or enforcement thereof;

(k)    Merger. Cause or permit Marengo or any Marengo Subsidiary to merge or consolidate with or into any other Person;

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090380

24

(l)  <u>Tax and Accounting Matters</u>.  Except as may be required by Law, cause or permit changes in any material tax position or policy of Marengo or any Marengo Subsidiary, make or change any tax election that would adversely affect the Marengo Limited Partner relating to the calculation or reporting of any material item of income, gain, loss, deduction or credit or cause or permit changes in or adoption of any accounting position, practice or policy (including a change in its fiscal year) of Marengo or any Marengo Subsidiary not in accordance with GAAP;

(m)  <u>Distributions</u>.  Cause or permit Distributions to the Marengo Partners of cash or other Marengo Property or cause or permit distributions to Marengo of cash or other Marengo Property, in each case except as expressly provided in this Agreement;

(n)  <u>Dissolution</u>.  Cause or permit Marengo or any Marengo Subsidiary voluntarily to take any action that would cause a dissolution of Marengo or such Marengo Subsidiary except (i) to the extent that the Marengo General Partner may in its capacity as the Marengo General Partner and in accordance with this Agreement vote to dissolve, wind up and liquidate Marengo and the Marengo Subsidiaries, and (ii) with respect to the Marengo Subsidiaries, as set forth in the Organizational Documents of such Marengo Subsidiary;

(o)  <u>Reimbursement</u>.  Cause or permit Marengo or any Marengo Subsidiary to reimburse any Marengo Partner for any liability, loss, cost or Expense other than as expressly provided for in or contemplated by this Agreement or any other Operative Document;

(p)  <u>Admission of Marengo Partners</u>.  Cause or permit the admission of any Marengo Partner to Marengo other than pursuant to Section 10 and Section 12;

(q)  <u>Operative Documents</u>.  Cause or consent to (x) any termination, cancellation, assignment, delegation or other transfer of, or (y) any amendment, modification, supplement or waiver of, Marengo's or any other Person's rights or obligations under this Agreement or any other Operative Document to which Marengo or any Marengo Subsidiary is a party or a beneficiary or otherwise a Person that must consent to any such amendment, modification, supplement or waiver (other than, in the case of clause (x) above, pursuant to the Custody Agreements);

(r)  <u>Affiliate Transactions</u>.  Cause or permit Marengo or any Marengo Subsidiary to enter into any contracts (including any indemnification agreements) or transactions with any Marengo Partner or any Affiliate of any Marengo Partner other than as expressly provided for or contemplated by this Agreement (including Sections 4.1(b) (xv) and 4.7 hereof) and by any other Operative Document;

(s)  <u>Disposition of the Marengo Property</u>.  Cause or permit Marengo or any Marengo Subsidiary to Dispose of all or any portion of the Marengo Property, except for

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090381

25

(i) Dispositions of Debt Securities by a Marengo Subsidiary in accordance with Section 4.12, (ii) Dispositions of the Marengo Property by Marengo or any Marengo Subsidiary in connection with the liquidation, dissolution and winding up of Marengo or any Marengo Subsidiary pursuant to Section 12 (with respect to Marengo) or Article 9 of any of the Marengo Subsidiary Company Agreements or the retirement of the Marengo Limited Partnership Interest pursuant to Section 7.7, (iii) Dispositions made by Marengo pursuant to Section 7 or, subject to Section 4.12, by a Marengo Subsidiary for the purpose of enabling Marengo to make such a Distribution, (iv) capital contributions by Marengo to the Marengo Subsidiaries, and (v) Dispositions by Marengo or any Marengo Subsidiary of amounts on deposit in any of the Accounts for value in connection with any Marengo Subsidiary's investment and reinvestment in, in the case of Klondike, Permitted Investments and, in the case of Yukon, Cash Equivalents, Qualified Enron Demand Loans or Debt Securities;

(t)     <u>Actions Under the Enron Demand Loans and Qualified Enron Demand Loans</u>. Subject to Section 4.8, cause or permit Marengo or any Marengo Subsidiary to (i) agree, elect or consent to or approve the taking by the Marengo General Partner of any action requiring the prior approval, election or consent of Marengo or any Marengo Subsidiary under any Enron Demand Loan or, in the case of Qualified Enron Demand Loans, any Acceptable Letter of Credit issued in connection therewith or decline or fail to enforce the obligations of Enron or its Affiliates under (and, in the case of Qualified Enron Demand Loans, of the issuer of the Acceptable Letter of Credit under), or in respect of, any Enron Demand Loan or, in the case of Qualified Enron Demand Loans, any Acceptable Letter of Credit issued in connection therewith, or (ii) cause or consent to (x) any termination or cancellation of, (y) any assignment, delegation or other transfer of Marengo's or any Marengo Subsidiary's rights or obligations under, or (z) any amendment, modification, supplement or waiver of Marengo's or any Marengo Subsidiary's rights or obligations under any Enron Demand Loan, and the Enron Guaranty or, in the case of Qualified Enron Demand Loans, any Acceptable Letter of Credit issued in connection therewith; <u>provided</u>, that except as provided in Section 6.2(c) of the Yukon Custody Agreement, in no event shall any demand of any amount under any Enron Demand Loan be made prior to the Liquidation Start Date;

(u)     <u>ERISA</u>. Cause or permit Marengo or any Marengo Subsidiary to maintain, contribute to or incur or assume any legal obligation with respect to any Plan or Multiemployer Plan;

(v)     <u>Marengo Subsidiaries</u>. Cause or permit Marengo to own less than 100% of the member interests in each of the Marengo Subsidiaries; and

(w)     <u>Payment of Qualified Enron Demand Loans</u>. Except as provided in Section 6.2(c) of the Yukon Custody Agreement, cause or permit the payment of any Qualified Enron Demand Loan other than pursuant to a drawing under the Acceptable Letter of Credit

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090382

26

supporting such Qualified Enron Demand Loan or permit the prepayment of any Enron Demand Loan.

4.4.    <u>Separate Identity and Operations</u>. The Marengo General Partner shall cause Marengo and each Marengo Subsidiary to conduct its business and operations separate and apart from that of any Marengo Partner or any Affiliates of any Marengo Partner, including (i) segregating Marengo Property and not allowing funds or other assets of Marengo or any Marengo Subsidiary to be commingled with the funds or other assets of, held by, or registered in the name of, any Marengo Partner or any Affiliate of any Marengo Partner (other than Marengo), (ii) maintaining books and financial records of Marengo and each Marengo Subsidiary separate from the books and financial records of any Marengo Partner or any Affiliate of any Marengo Partner (other than Marengo), and observing all Marengo and Marengo Subsidiary procedures and formalities, including maintaining minutes or records of meetings of Marengo and each Marengo Subsidiary and acting on behalf of Marengo and each Marengo Subsidiary only pursuant to due authorization of the Marengo Partners (including any authorization as is given in this Agreement), (iii) causing Marengo and each Marengo Subsidiary to pay its liabilities from assets of Marengo or the applicable Marengo Subsidiary, as the case may be, and (iv) causing Marengo and each Marengo Subsidiary to conduct its dealings with third parties in its own name and as a separate and independent entity.

4.5.    <u>Compliance with Agreement</u>. The Marengo General Partner shall cause Marengo and each Marengo Subsidiary to comply with all of the obligations of Marengo and such Marengo Subsidiary set forth in this Agreement and the other Operative Documents to which it is a party or under which it is stated to have obligations.

4.6.    <u>No Employees</u>. The Marengo General Partner shall not permit Marengo or any Marengo Subsidiary to have any employees.

4.7.    <u>Affiliate Transactions</u>. Except as otherwise provided in this Agreement, the Marengo General Partner, when acting on behalf of Marengo and any Marengo Subsidiary, is hereby authorized to deal with any Marengo Partner, acting on its own behalf, or any Affiliate of any Marengo Partner; <u>provided</u> that any such transaction, other than any transaction otherwise expressly permitted or contemplated by the Operative Documents, shall be made on terms and conditions that, taken as a whole, are comparable to those offered by Enron and its Affiliates (or which Enron and its Affiliates would offer) to an independent third party and (excluding any Disposition of any of the Marengo Property to such Marengo Partner or such Affiliate of such Marengo Partner) shall be in the ordinary course of Marengo's or, as the case may be, such Marengo Subsidiary's business. The Marengo Partners agree that the Operative Documents (and the transactions contemplated thereby) shall satisfy this third party standard and the Marengo Partners hereby authorize the Marengo General Partner to cause Marengo and the Marengo Subsidiaries to enter into the Operative Documents to which Marengo and such Marengo Subsidiary are a party (and to consummate the transactions contemplated thereby).

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090383



27

4.8.    Required Actions.  The Marengo General Partner shall take or cause to be taken by Marengo and each applicable Marengo Subsidiary each of the Marengo Required Actions (as such Marengo Required Actions may be requested, and as any determinations or calculations to be made in connection therewith may be made, by the Marengo Limited Partner in accordance with the Operative Documents), promptly (and, in any event on the next succeeding Business Day) upon receipt of a written request therefor from the Marengo Limited Partner, which notice shall provide in reasonable detail the Marengo Required Action to be taken.  The parties hereto agree that the Yukon Custodian is hereby authorized and directed to take the actions described in Section 6.2(b) of the Yukon Custody Agreement without further requests or directions from any Partner.  In the event that the Marengo General Partner shall fail to take or cause to be taken any Marengo Required Action requested by the Marengo Limited Partner prior to the close of business on the next succeeding Business Day after receipt of such request, the Marengo Limited Partner may, on behalf of Marengo, direct any Custodian to take such Marengo Required Action, and in connection therewith such Custodian shall have all requisite power and authority to bind Marengo and the applicable Marengo Subsidiary for the purpose of, and to the extent necessary to exercise, such Marengo Required Actions.

4.9.    Compliance with Laws.  The Marengo General Partner shall cause Marengo and each Marengo Subsidiary to comply with all Applicable Laws except for such non-compliance as is attributable solely to any action taken or omitted to be taken by the Marengo Limited Partner.

4.10.    Marengo Custodian, Klondike Custodian and Yukon Custodian.    (a) Simultaneously with the execution of this Agreement, the Marengo General Partner shall, on behalf of Marengo, enter into the Marengo Custody Agreement and all other documents as may be reasonably required to be executed by Marengo in connection therewith and take such other actions as may be reasonably necessary to consummate the transactions contemplated thereby and to appoint the Marengo Custodian.  The Marengo General Partner shall instruct the Marengo Custodian to make all payments to be made on behalf of Marengo, including all payments in respect of Preferred Payments, Additional Financing Costs, Transaction Costs and Disposition Costs to be made in accordance with the Marengo Custody Agreement.

(b)    Simultaneously with the execution of this Agreement, the Marengo General Partner shall, on behalf of Yukon, enter into the Yukon Custody Agreement and all other documents as may be reasonably required to be executed by Yukon in connection therewith and take such other actions as may be reasonably necessary to consummate the transactions contemplated thereby and to appoint the Yukon Custodian.  The Marengo General Partner shall, and shall cause Yukon to, instruct the Yukon Custodian to make all payments to be made on behalf of Yukon, including all payments in respect of Marengo Subsidiary Expenses payable by Yukon, to be made accordance with the Yukon Custody Agreement.

(c)    Simultaneously with the execution of this Agreement, the Marengo General Partner shall, on behalf of Klondike, enter into the Klondike Custody Agreement and all other

Marengo Partnership Agreement
NYDOCS03/494571

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090384

28

documents as may be reasonably required to be executed by Klondike in connection therewith and take such other actions as may be reasonably necessary to consummate the transactions contemplated thereby and to appoint the Klondike Custodian. The Marengo General Partner shall, and shall cause Klondike to, instruct the Klondike Custodian to make all payments to be made on behalf of Klondike, including all payments in respect of Marengo Subsidiary Expenses payable by Klondike, to be made accordance with the Klondike Custody Agreement.

(d)     The Marengo Partners acknowledge that the Marengo General Partner, on behalf of each of Marengo, Klondike and Yukon, has delegated certain responsibilities to Wilmington Trust Company pursuant to this Agreement, each of the Custody Agreements and the other Operative Documents, and agree that (x) such delegation is reasonable and appropriate under the circumstances and (y) the Marengo General Partner shall have no responsibility or liability for errors and omissions of Wilmington Trust Company, as Marengo Custodian, Klondike Custodian or Yukon Custodian, in performing such responsibilities.

4.11.     Additional Financing Costs, Transaction Costs and Liquidation Amounts. (a) The Marengo Limited Partner may deliver to Marengo written notice with supporting documents therefor certifying in reasonable detail the nature of, and if applicable, the method of computation of, any Additional Financing Costs, Transaction Costs and/or Liquidation Amounts and requiring Marengo to pay additional amounts sufficient to pay the Marengo Limited Partner in full such Additional Financing Costs, Transaction Costs and/or Liquidation Amounts. The Marengo Limited Partner shall specify whether such Additional Financing Costs, Transaction Costs and/or Liquidation Amounts will be recurring, and, if known, the duration of such recurrence. The Marengo Limited Partner shall notify Marengo if any such recurring cost ceases to be recurring promptly after becoming aware thereof.

(b)     Marengo shall pay to the Marengo Limited Partner all Additional Financing Costs, Transaction Costs and Liquidation Amounts arising from a claim by the Marengo Limited Partner for Additional Financing Costs, Transaction Costs and/or Liquidation Amounts (as the case may be) made pursuant to Section 4.11(a) on the Payment Date, Retirement Date or Distribution Date immediately succeeding the notice referred to in Section 4.11(a); provided that, if so requested by the Marengo Limited Partner in the notice referred to in Section 4.11(a), Marengo shall pay to the Marengo Limited Partner all such Additional Financing Costs, Transaction Costs and Liquidation Amounts within seven Business Days of receipt of such notice.

4.12.     Disposition and Distribution of Contributed Investments, Debt Securities or Enron Demand Loans. The Marengo General Partner shall be permitted to Dispose of on behalf of Marengo, or, in the case of the Marengo Subsidiaries, cause the Disposition of on behalf of the Marengo Subsidiaries, pursuant to this Section 4.12 the Contributed Investments or the Debt Securities in whole or in part at any time prior to the Liquidation Start Date, subject to the following provisions:

THIS AGREEMENT IS SUBJECT TO
A WRITTEN CONFIDENTIALITY AGREEMENT

EC21020A0090385